# EXHIBIT A
# Redacted Version of Document Sought to be Sealed

Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

CHASOM BROWN, WILLIAM BYATT,      )
JEREMY DAVIS, CHRISTOPHER CASTILLO )
and MONIQUE TRUJILLO, individually )
and on behalf of all others        )
similarly situated,                )
                                   )      **ORIGINAL**
        Plaintiffs,                )
                                   )
   VS.                             )      NO. C 20-03664 LHK (SVK)
                                   )
GOOGLE LLC and ALPHABET INC.,      )
                                   )
        Defendant.                 )      *** SEALED BY ORDER ***
_____  )             OF THE COURT
PATRICK CALHOUN, ELAINE CRESPO,    )
HADIYAH JACKSON, CLAUDIA KINDLER,  )
LEROY RANDOLPH, DR. CORINICE       )
WILSON, DR. RODNEY JOHNSON,        )
MICHAEL HENRY, and JOSE MARIA DE   )
GUZMAN, on behalf of themselves    )
and all others similarly situated, )
                                   )
        Plaintiffs,                )
                                   )
   VS.                             )      NO. C 20-05146 LHK (SVK)
                                   )
GOOGLE LLC,                        )      San Jose, California
                                   )      Thursday
        Defendant.                 )      September 30, 2021
_____  )

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**

**OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**TIME:  9:36 A.M.  -  11:39 A.M.  =  2 HOURS, 3 MINUTES**

(APPEARANCES ON FOLLOWING PAGE)

TRANSCRIBED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                 CSR No. 7445, Official U.S. Reporter

ORIGINAL

```
 1   APPEARANCES VIA ZOOM:

 2   For the Brown Plaintiffs:
                         SUSMAN GODFREY LLP
 3                       1901 Avenue of the Stars, Suite 950
                         Los Angeles, California 90067
 4               BY:     AMANDA K. BONN, ATTORNEY AT LAW

 5                       SUSMAN GODFREY LLP
                         1301 Avenue of the Americas, 32nd Floor
 6                       New York, New York 10019
                 BY:     ALEXANDER P. FRAWLEY, ATTORNEY AT LAW
 7

 8                       BOIES SCHILLER FLEXNER LLP
                         44 Montgomery Street, 41st Floor
 9                       San Francisco, California 94104
                 BY:     BEKO O.R. REBLITZ-RICHARDSON
10                       ATTORNEY AT LAW
                         MARK MAO, ATTORNEY AT LAW
11
                         MORGAN & MORGAN
12                       One Tampa City Center
                         201 North Franklin Street, Seventh Floor
13                       Tampa, Florida 33602
                 BY:     RYAN McGEE, ATTORNEY AT LAW
14

15   For the Calhoun Plaintiffs:
                         BLEICHMAR, FONTI & AULD LLP
16                       555 12th Street, Suite 1600
                         Oakland, California 94607
17               BY:     LESLEY E. WEAVER, ATTORNEY AT LAW
                         ANGELICA M. ORNELAS, ATTORNEY AT LAW
18
                         DICELLO LEVITT & GUTZLER LLC
19                       One Grand Central Place
                         60 East 42nd Street, Suite 2400
20                       New York, New York 10165
                 BY:     DAVID A. STRAITE, ATTORNEY AT LAW
21
                         DICELLO LEVITT & GUTZLER LLC
22                       Ten North Dearborn Street, Sixth Floor
                         Chicago, Illinois 60602
23               BY:     ADAM PROM, ATTORNEY AT LAW

24           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For the Calhoun Plaintiffs:
                        SIMMONS HANLY CONROY LLC
 3                      112 Madison Avenue, Seventh Floor
                        New York, New York 10016
 4                 BY:  JASON "JAY" BARNES, ATTORNEY AT LAW

 5

 6   For Defendants:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 7                      50 California Street, 22nd Floor
                        San Francisco, California 94111
 8                 BY:  JONATHAN S. TSE, ATTORNEY AT LAW

 9                      QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        555 Twin Dolphin Drive, Fifth Floor
10                      Redwood Shores, California 94065
                   BY:  SARA E. JENKINS, ATTORNEY AT LAW
11

12                      QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        865 South Figueroa Street, Tenth Floor
13                      Los Angeles, California 90017
                   BY:  VIOLA TREBICKA, ATTORNEY AT LAW
14                      STEPHEN A. BROOME, ATTORNEY AT LAW

15                      QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        191 N. Upper Wacker Drive, Suite 2700
16                      Chicago, Illinois 60606
                   BY:  ANDREW H. SCHAPIRO, ATTORNEY AT LAW
17                      TEUTA FANI, ATTORNEY AT LAW

18                      QUINN, EMANUEL, URQUART & SULLIVAN LLP
                        51 Madison Avenue, 22nd Floor
19                      New York, New York 10010
                   BY:  JOMAIRE A. CRAWFORD, ATTORNEY AT LAW
20                      JOSEF T. ANSORGE, ATTORNEY AT LAW

21

     Also Present:      Douglas A. Brush, Special Master
22                      Tim Schmidt

23

24

25
```

```
 1   Thursday - September 30, 2021                    9:36 a.m.

 2                      P R O C E E D I N G S

 3                         ---o0o---

 4        (Proceedings under seal by order of the court.)

 5        THE CLERK:  Please come to order.  The Honorable

 6   Susan van Keulen presiding.

 7        THE COURT:  Good morning.  Good morning, everyone.

 8   Thank you for navigating the Zoom landscape this morning.  Once

 9   again, Ms. Fanthorpe had to go unlock a back door for me to

10   actually appear.  I think Thursday mornings are very heavy

11   traffic in the Court for Zoom.  So we'll just -- we'll just

12   blame the -- put it on -- on traffic load.

13        Okay.  Thank you all for being here.  And all of you were

14   on time.  Thank you.

15        And, Ms. Fanthorpe, if you'll call the cases, we'll get

16   under way.

17        THE CLERK:  Yes.  Calling Case 20-cv-3664, Brown, et al.

18   versus Google LLC, et al., and Case 20-cv-5146, Calhoun, et al.

19   versus Google LLC.

20        These hearings are being recorded this morning via Zoom,

21   and this is a sealed hearing.

22        Counsel, please identify yourselves for the record,

23   beginning with plaintiff.

24        THE COURT:  And I'll tell you what.  To streamline the

25   process a little bit, we'll take the Brown plaintiffs and then
```

UNDER SEAL BY ORDER OF THE COURT

1    the Calhoun plaintiff appearances and then the Google

2    appearances at one time for both cases, and then I'll take the

3    appearance of the Special Master.

4         So let's start with Brown plaintiffs, please.

5         **MS. BONN:**  Good morning, Your Honor.  Amanda Bonn with

6    Susman Godfrey on behalf of the Brown plaintiffs.  And also on

7    the line from Susman Godfrey is my colleague Alex Frawley.

8         **MR. FRAWLEY:**  Good morning, Your Honor.

9         **MS. BONN:**  And I'll allow our co-counsel to introduce

10   themselves.

11        **THE COURT:**  Good morning.

12        And, actually, since the screen is quite full at the

13   moment, as it should be for appearances, if you all would raise

14   your hand about camera level when you start to speak.  I do

15   prefer the gallery view to the speaker view because I like to

16   keep an eye on everybody.  So that'll help me find you quickly.

17        **MR. MAO:**  Good morning, Your Honor.  This is Mark Mao of

18   Boies Schiller Flexner.  And also on the screen is my colleague

19   Beko Richardson.  We are here on behalf of the Brown

20   plaintiffs.  Good morning, Your Honor.

21        **THE COURT:**  Thank you.  Good morning.

22        Good morning, Mr. Richardson.

23        **MR. McGEE:**  And good morning, Judge.  Ryan McGee with the

24   law firm of Morgan & Morgan, also on behalf of the plaintiffs.

25        **THE COURT:**  Mr. McGee, good morning.

1    All right.  Anyone else for Brown plaintiffs this morning?

2                        (No response.)

3    **THE COURT:**  All right.  Excellent.

4    Let's turn to Calhoun, please.

5    **MR. STRAITE:**  Good morning, Your Honor.  This is

6    David Straite from DiCello Levitt in New York for the Calhoun

7    plaintiffs.  Also joining me from DiCello Levitt from our

8    Chicago office is Adam Prom.

9    **THE COURT:**  Mr. Prom.

10   **MR. STRAITE:**  And then we also have colleagues.

11   Jay, why don't you go next.

12   **MR. BARNES:**  Sure.

13   Thank you, Your Honor.  Jay Barnes from Simmons Hanly

14   Conroy on behalf of the plaintiffs.

15   **THE COURT:**  Good morning, Mr. Barnes.

16   **MS. WEAVER:**  And good morning, Your Honor.  Lesley Weaver

17   from Bleichmar Fonti.  And with me I have Angelica Ornelas,

18   also from my firm, on behalf of Calhoun.

19   **THE COURT:**  Ms. Ornelas, good morning.

20   Ms. Weaver, thank you.

21   Anyone else for the Calhoun plaintiffs this morning?

22   **MR. STRAITE:**  No, Your Honor.  That should be it.

23   **THE COURT:**  Excellent.

24   All right.  And for Google in both cases, appearances

25   today, please.

UNDER SEAL BY ORDER OF THE COURT

1   **MR. SCHAPIRO:**  Good morning, Your Honor.  I'm Andrew

2   Schapiro.  And I'm joined by a number of colleagues so that we

3   can cover whatever you want to cover with each of these cases.

4   I'll ask them each to wave.

5       Stephen Broome.

6       **THE COURT:**  Mr. Broome, good morning.

7       **MR. SCHAPIRO:**  Sara Jenkins, who I don't believe you've

8   met yet, but who's been doing all the most important work in

9   this case, really.

10      **THE COURT:**  Outstanding.

11      Ms. Jenkins, welcome.

12      **MR. SCHAPIRO:**  Teuta Fani.

13      **THE COURT:**  Ms. Fani, good morning.

14      **MR. SCHAPIRO:**  Jomaire Crawford.

15      **THE COURT:**  Ms. Crawford.

16      **MR. SCHAPIRO:**  And then some familiar faces to you.

17  Jonathan Tse.

18      **THE COURT:**  Mr. Tse, good morning.

19      **MR. SCHAPIRO:**  Josef Ansorge.

20      **THE COURT:**  Mr. Ansorge.

21      **MR. SCHAPIRO:**  And Viola Trebicka.

22      **THE COURT:**  Ms. Trebicka, good morning.

23      All right.  Thank you all very much.

24      And I did ask the Special Master to join us today.

25      Mr. Brush, if you'll introduce yourself for the record,

UNDER SEAL BY ORDER OF THE COURT

1   please.

2       **SPECIAL MASTER BRUSH:**  Hi.  This is Douglas Brush.  And

3   joining with me today is Tim Schmidt, representing the Special

4   Counsel Team.

5       **THE COURT:**  Excellent.

6       **SPECIAL MASTER BRUSH:**  The Special Master Team.  Sorry.

7       **THE COURT:**  Special Master.  That's all right.  We got it.

8       And I know you are well known to everyone on this call, as

9   I do get regular updates from the Special Master and I do take

10  advantage of his technical expertise as needed.

11      So thank you for being here, Special Master Brush and

12  Mr. Schmidt.

13      All right, then.  I want to start with the proposed orders

14  regarding discovery limitations.

15      I have a proposed order from Google in both Brown and

16  Calhoun.  It is not clear to me how much, if any, meet and

17  confer has taken place on these orders in their entirety.  I

18  know there are a few issues that have been discussed by the

19  parties.  And I note that the orders are -- are different.

20  They are tailored to the respective classes.

21      My thought would be to -- I'd like to hear briefly from

22  the parties on the status of the -- of a discussion, if there

23  has been any, on discovery limitations.  And then we'll set a

24  short timeline to complete meet and confer and for you to get a

25  proposed order to me.

1    And I'll just, again, remind folks.  I know that Google

2    proposed limitations a couple of months ago, which I

3    acknowledged there would be an appropriate time in the future,

4    but it was not yet at that time.

5        We're now, for all intents and purposes, at the start of

6    October; and there are three months and three weeks, roughly,

7    left on the -- in discovery.  So I think now is a good time

8    indeed.

9        So with that said, let's start in Brown.

10       And, Mr. Schapiro, I don't know who has the mic from

11   Google on this issue.  I just want a brief update as to what

12   discussions, if any, have there been with Brown around these

13   issues; and then I'll hear from someone on the Brown side; and

14   then we'll do the same thing on Calhoun.

15       If you're not addressing the discovery -- proposed

16   discovery orders today, I will ask you to turn off your video,

17   just because that will help me.  You're welcome to come back or

18   pop in if your subject comes up.  But, again, that just helps

19   me to be sure I'm organized and looking at and speaking with

20   the right folks.

21       So with that said, Mr. Schapiro, who has the mic --

22       **MR. SCHAPIRO:**  Yes.

23       **THE COURT:**  -- on this for Google?

24       **MR. SCHAPIRO:**  So, Your Honor, Ms. Jenkins will primarily

25   address this.

1  I just wanted to provide two or three sentences of

2  context.

3  **THE COURT:**  Okay.

4  **MR. SCHAPIRO:**  So you'll recall at the last hearing I

5  pleaded with you towards the end for an extra week.  You were

6  going to have us -- you were going to set a deadline of

7  September 30th, today, and I said even an extra week would

8  help.

9  And I'm pleased to say we're going to meet that deadline,

10  but I wanted to just give you two sentences on what that

11  entailed to frame our discussions as we go forward so that we

12  don't lose sight of proportionality here.

13  **THE COURT:**  Okay.  Okay.  Well, we're going to get to the

14  status of the production and the work in front of

15  Special Master Brush, which is largely, I think, what drives

16  the October 6 deadline.  And this is really just a:  What's the

17  status on these proposals?

18  **MR. SCHAPIRO:**  Then I will hand off to Ms. Jenkins and

19  I'll save my speech.

20  **THE COURT:**  The two sentences.

21  **MR. SCHAPIRO:**  Yeah.  It's a two-sentence speech.

22  **THE COURT:**  You can save the two sentences.

23  Ms. Jenkins, welcome.

24  **MS. JENKINS:**  Thanks.

25  **THE COURT:**  Bring me up to date for Google, please.

UNDER SEAL BY ORDER OF THE COURT

1    **MS. JENKINS:**  Thank you.  Good morning, Your Honor.

2         Yes.  We did meet and confer last week with the Brown

3    plaintiffs about the -- the elements of the proposed order.  We

4    believe that there is some room here for agreement on some of

5    these issues, and the plaintiffs acknowledge that there --

6    there may be areas with which they would agree, and potentially

7    some additional meet and confer might be helpful to that point.

8         There are -- there are a few points in our proposed order

9    that plaintiffs have said that they do not agree with.  And

10   would you like me to go through the elements?

11   **THE COURT:**  No.  I'll let them just say what they think

12   the big issues are.

13        What areas do you think -- or are you aware of any issues

14   of agreement at this time or that you are hopeful or expect the

15   parties to reach agreement?

16   **MS. JENKINS:**  I believe the parties can reach agre- --

17   meet agreement on the issue of any additional requests for

18   production of documents; that the parties seem to be in

19   agreement that they could meet and confer to discuss whether

20   there should be any additional requests for production of

21   documents should the plaintiffs decide that they need some and

22   then come to the Court if there is a disagreement about whether

23   they are needed.

24        And that -- the same status with respect to search terms.

25   I believe we are in agreement that the parties can discuss if

1  the plaintiffs believe that they need any additional search

2  terms, which they've expressed to us that they do not currently

3  foresee that but, if it should become necessary based on review

4  of the current documents, that we could meet and confer with

5  them and, if there are any issues, if there's an impasse, that

6  we could ask for your guidance on that.

7      **THE COURT:** Okay. That's very helpful.

8      Ms. Jenkins, one final question. Is there any additional

9  meet and confer already scheduled at this time on this issue?

10     **MS. JENKINS:** There is not. But, I mean, we're prepared

11 to do it, and I can be available today or tomorrow, whenever

12 plaintiffs are available.

13     **THE COURT:** All right. Thank you, Ms. Jenkins.

14     All right. And for the Brown plaintiffs, Mr. Richardson,

15 is that you?

16     **MR. RICHARDSON:** Yes, Your Honor. Good morning.

17     **THE COURT:** Good morning.

18     **MR. RICHARDSON:** How Ms. Jenkins described it is correct.

19 I think there's -- there's room to negotiate here.

20     This was sent to us just before the filing. We quickly

21 scheduled a meet and confer. We told them then that we think

22 we can -- we can talk about some of these issues, especially

23 service of additional discovery and search terms.

24     You'll also notice there are a few points here that

25 overlap with our other disputes.

1    **THE COURT:**  Mm-hmm.

2    **MR. RICHARDSON:**  So, for example, the first one, we have a

3    dispute on counting interrogatories, which is obviously

4    relevant to what the cap should be on the number of

5    interrogatories.

6    We have a dispute regarding privilege issues.  That's the

7    last bullet point.

8    **THE COURT:**  Mm-hmm.

9    **MR. RICHARDSON:**  And the deadline for producing additional

10   privilege logs and how to handle those issues.  And Ms. Bonn

11   will -- will address those separately.

12   But I just wanted to flag, there's a few points in here

13   where we very clearly have a dispute, but then there's a couple

14   points where I think we can certainly make progress.  We're

15   also happy to meet and confer later today or tomorrow.

16   **THE COURT:**  Okay.  So you identified the privilege log

17   issue -- and I know that's wrapped up in today's agenda -- and

18   the "how do you count interrogatory" issue.

19   And was there something else that you had clearly as a

20   dispute?

21   **MR. RICHARDSON:**  Yes.  Let me add two more.  One is the

22   production of earlier-in-time e-mails.

23   **THE COURT:**  Okay.

24   **MR. RICHARDSON:**  We had an --

25   **THE COURT:**  You're not closing any doors.  Let me just be

1   clear.  By not identifying a dispute doesn't mean that I'm

2   assuming --

3        **MR. RICHARDSON:**  Yes.

4        **THE COURT:**  -- there's agreement.

5        I just want to know where the -- where you at this moment

6   perceive the real sticking points.

7        **MR. RICHARDSON:**  So I think it would be the first bullet,

8   the limit on interrogatories; the second bullet, the limit on

9   RFAs.

10        **THE COURT:**  Mm-hmm.

11        **MR. RICHARDSON:**  The fourth bullet, the last-in-time

12   e-mails; and then the last two bullets in terms of privilege

13   issues.

14        But in terms of additional discovery and search terms, I'm

15   sure we can work that out.

16        **THE COURT:**  Okay.  Good.  I'm glad to hear that.

17   All right.  That's very helpful.  Thank you, both.

18        Let me hear, similarly, in the Calhoun case, and then

19   we'll come back to next steps.

20        So who has -- well, let me start with you, Ms. Jenkins.

21   And just again in the same form, where have you been on meet

22   and confer and -- if anywhere, and areas where you're hopeful

23   for agreement?

24        **MS. JENKINS:**  So, Your Honor, my understanding is we've

25   not met and conferred specifically on the protective order, but

1 we have met and conferred on some of the issues that are

2 rep- -- not the protective order.  Sorry.  The --

3   THE COURT:  I know.

4   MS. JENKINS:  -- proposed order.

5   THE COURT:  I know what you mean.

6   MS. JENKINS:  But we have -- we have met and conferred

7 regarding some of these issues, specifically requesting that

8 the plaintiffs agree to some limitations on discovery.  And we

9 understand that there is -- has been no willingness of the

10 plaintiffs to agree to that.

11   We've asked them to agree to -- to the production of only

12 the last-in-time e-mails; and they've said -- they've also said

13 they would not agree to that.

14   They've indicated that despite the fact that since your

15 last -- since July, they've had a huge influx of discovery

16 requests on us and the majority of those coming after the

17 August 12th hearing wherein you set the October 6th deadline --

18   THE COURT:  Right.

19   MS. JENKINS:  -- that they still intend to propound more

20 discovery requests, including --

21   THE COURT:  I -- I --

22   MS. JENKINS:  -- document requests.

23   THE COURT:  I do understand the problem.  I do.

24   MS. JENKINS:  Okay.

25   THE COURT:  I mean, I got that from the briefing.  I just

1    really wanted to --

2         **MS. JENKINS:**  Sorry.

3         **THE COURT:**  -- understand.

4         That's all right.  That's all right.

5         **MS. JENKINS:**  Thank you, Your Honor.

6         **THE COURT:**  But I think you answered my question, which

7    is, the parties haven't really discussed, and we'll just take

8    it as all in dispute from your side at the moment.

9         But perhaps Mr. Straite has better news for the Court with

10   regards to Calhoun.

11        Parties' position on discovery limitation proposed order?

12        **MR. STRAITE:**  Thank you, Your Honor.  Yes, David Straite

13   for Calhoun plaintiffs.

14        I would describe this as better news.  I would -- I would

15   agree with Ms. Jenkins that we have not had a specific

16   conversation about the proposed order that they attached to the

17   chart.  However, there has been a lot of discussion, a lot of

18   meet and confer about how you would approach Google's request

19   for sequencing and limitations of discovery that they would

20   like between now and the end of fact discovery in January.

21        We have a different posture in Calhoun, only because we

22   have a class certification deadline in 15 days.

23        **THE COURT:**  Mm-hmm.

24        **MR. STRAITE:**  If that reality -- as soon as Google

25   approached us about the limitations that they're proposing in

**UNDER SEAL BY ORDER OF THE COURT**

1   their order, our response was to ask if we could sequence

2   discovery and prioritize discovery that would be useful for

3   class certification.  It was our understanding that Google

4   agreed that that was the smart approach.  So that's how we've

5   been proceeding in response to Google's request.

6         So, for example, we've had multiple meet and confers,

7   including just yesterday, with Joey -- with Mr. Ansorge

8   regarding some discovery issues.  We've also propounded

9   additional RFAs and other RFPs and interrogatories that are

10   focused on certain class certification issues.

11         There are two additional issues that we believe need to be

12   prioritized in light of the upcoming class certification

13   deadline.  They're fairly critical, and they really do inform

14   how we could proceed with Google's request for their proposed

15   limitation order.

16         Number one is -- obviously, it's under control right now.

17   This is Dispute Number 1.3, plaintiffs' --

18         **THE COURT:**  Okay.  Wait, wait, wait.  You're getting --

19   you're moving away from the proposed discovery order.

20         I understand you've got issues tied on the class

21   certification issue.

22         **MR. STRAITE:**  Right.

23         **THE COURT:**  My question -- go ahead.

24         **MR. STRAITE:**  So the two class certification issues that

25   are most critical to resolve in order to understand Google's

1    request, one is Dispute 1.3.  Because it implicates plaintiff

2    data that we believe would be useful to inform the class

3    certification process, that's the number-one priority, is

4    getting the plaintiff data dispute with Special Master Brush

5    resolved in advance of class certification.

6        And then, number two, we've identified a new dispute,

7    Number 1.15.  1.15 is the most critical dispute.  Those would

8    hold up further discussions about Google's proposal in their

9    limitation order.

10        THE COURT:  Okay.  Well, I expect both of those to be --

11   well, 1.13 is what you're working on with Special Master Brush.

12   So that is before him.

13        And 1.13 -- maybe I have those numbers backwards.  But,

14   yeah, I recognize the issue that Calhoun identified.  Okay.

15        MR. STRAITE:  1.15 is the (inaudible) --

16        THE COURT:  1.15.  Is that it?  Yeah.  Okay.

17        MR. STRAITE:  Okay.

18        THE COURT:  All right, then.  Thank you all for that.

19        What you will do is, obviously, we have a few issues to

20   address today, which I expect I will -- you know, I will hear

21   and then issue a ruling, if not today, tomorrow.  And that may

22   then inform how the parties proceed on this.

23        So I want the parties then to meet and confer and -- on

24   discovery limits and submit a proposed order.  If you -- the

25   areas where you can't agree, I actually prefer it as a -- as a

 1  single joint submission with the positions interleaved.  Please
 2  number the bullets.  Let's not -- because it's easier to refer
 3  to them that way, you know, 1 through 15, or whatever they are.
 4  And then it can be Google's position followed by the
 5  plaintiffs' position in a different color font so I can easily
 6  see what the differences are.
 7       I'll have you submit that to the Court by next Friday, the
 8  8th.  I'm not available next week.  So I won't get to it any
 9  sooner.  But I will endeavor to turn to it when I am back
10  the week of the 11th.  So I want to be sure I have that in
11  hand.  All right?
12       **MR. STRAITE:**  For that submission, would it be useful to
13  have it ordered to be done by close of business so that we can
14  respect the lives of our associates?
15       **THE COURT:**  Actually, on the 8th, I'd like to get it by
16  noon.  That's --
17       **MR. STRAITE:**  Thank you, Your Honor.
18       **THE COURT:**  -- often what I do, because then I know I have
19  a chance to get it.
20       And as is sometimes helpful in this case, I actually print
21  the papers because it's just easier to manage them in hard
22  copy.
23       The discovery charts are a definite exception to that
24  comment, of course.
25       All right.  So discovery orders to the Court.  A joint

1   submission.

2       I would certainly welcome the parties' agreement, but let

3   me remind the parties of an obligation to this Court to engage

4   in robust -- and not just good faith, but robust meet and

5   confer.  And if you are not able or comfortable at this time to

6   do that in person, that's fine; but then it's going to be by

7   video or by phone.  This -- you can certainly follow up by

8   e-mail, but this is not an e-mail discussion.  This is a

9   sleeves rolled up, here's what we need, and there will need to

10  be compromise on all sides.

11      There will be limits on discovery.  And I appreciate that

12  discovery has been staged with a focus on class certification.

13  However, given the depth and scope and efforts of the parties

14  before the Special Master and the work of the Special Master on

15  database/logs production issues, given the work by this Court

16  and the parties on the ESI issues, I find -- it strikes me that

17  hundreds of RFPs is just -- is not -- not a thoughtful process.

18  So everybody needs to keep that in mind.

19      Similarly, I know that we are at this stage because it

20  took a long time for Google to get up and producing and making

21  meaningful productions, certainly in terms of numbers of

22  documents produced.

23      So both sides need to take a very hard, close look at what

24  they need, at the calendar, and demonstrate some -- some

25  compromise.  Obviously, we are guided by Rule 26.  This is

UNDER SEAL BY ORDER OF THE COURT

1   discovery.  It is going to happen.  It will be -- it will be

2   proportional to the needs of the case.  It will be also --

3   discovery is naturally an iterative process.  It is not

4   necessarily always linear.  But we will be moving forward and

5   narrowing.  So everyone keep that in mind as you meet and

6   confer through this effort.

7       Okay.  That addresses the discovery orders.

8       Let's turn briefly, then -- not "briefly," but let's turn

9   in Brown to the issue -- let's see.  Let's go to the privilege

10  issue that has been raised in Brown.  I think that is P-19 from

11  the plaintiffs' side and D-7 from Google's side, if I'm

12  remembering that correctly.  They appear more or less to be the

13  flip sides of each other.

14      And I take the plaintiffs' request as objecting to a

15  clawback effort by Google of a document which plaintiffs would

16  like to submit *in camera* for my review.  And the -- and

17  Google's complaint is not just limited to that document, but is

18  how the plaintiffs had responded to privileged documents

19  overall.  I think I'm understanding that correctly, and I'm

20  going to give the parties next steps.

21      But my question, my very specific question is:  Have I --

22  have I overlooked something?  Is there something else at issue

23  here that I haven't identified?

24      And it's -- I'll start at P-19.  So, Ms. Bonn, your camera

25  is on.  I assume you have the mic.

1       **MS. BONN:**  Thank you, Your Honor.

2       I think you're certainly correct as to the clawback

3   document.  I do think that from the plaintiffs' perspective,

4   what we're asking for is also broader, and here's the way in

5   which it's broader.

6       What we are seeing is that Google is withholding and

7   redacting categories of documents that appear simply not to be

8   privileged.  They are technical documents that involve only

9   engineers and no lawyers, and they are documents in which a

10  lawyer may simply be one of dozens of cc's on an e-mail chain

11  that clearly appears to be a business discussion.

12      And we've tried to raise those issues with Google via

13  letters, one in early August and another in early September.

14  These letters were about documents that had been withheld or

15  redacted prior to June.  And we're simply not getting

16  responses.  We're not getting a meaningful engagement from

17  Google in re-reviewing these documents that appear not to be

18  privileged.

19      And now we're expecting a large production by October 6th,

20  and if we're dealing with a similar time frame, we're simply

21  not going to be able to resolve privilege disputes by the end

22  of the discovery period.

23      So I think what we're really asking for is some guidance

24  from the Court on a process that we can use to efficiently,

25  number one, from plaintiffs' perspective, identify to Google

UNDER SEAL BY ORDER OF THE COURT

1    the log entries and the redactions that appear to be -- that

2    appear to us not to be privileged, and to have a meaningful

3    process to have those issues addressed.

4         I've seen in other cases, you know, before this Court,

5    sometimes that's handled via a Special Master, you know,

6    engaging with the process.  Other times I have seen magistrate

7    judges give high-level guidance on their view of what is and is

8    not appropriate to redact or withhold on privilege grounds in

9    some of these categories, and directing the withholding party

10   to re-review with that in mind.

11        So I think, in part, what we're asking for from Your Honor

12   is some guidance on how we can meaningfully work our way

13   through what plaintiffs believe are improper privilege

14   assertions such that we can make sure we're taking depositions

15   once with the documents that are non-privileged and that we

16   should have.

17        THE COURT:  Okay.  Thank you, Ms. Bonn.

18        Ms. Trebicka, it looks like you have the -- you have the

19   mic for Google on this.

20        MS. TREBICKA:  Yes, Your Honor.  So these issues are

21   indeed -- so plaintiffs' issue and Google's issue are indeed

22   related, and they go to the heart of an issue that has

23   tremendous importance to us, and it's causing real prejudice on

24   two levels.

25        THE COURT:  Okay.  So let me just interject there because

UNDER SEAL BY ORDER OF THE COURT

1  I did --

2     **MS. TREBICKA:**  Sure.

3     **THE COURT:**  -- read Google's summary and its concerns on

4  how privileged documents are being handled, and I'll speak to

5  that.

6     Answer a couple of questions for me first.

7     **MS. TREBICKA:**  Sure.

8     **THE COURT:**  And then I will hear from you.

9     With regards to the clawback document, the specific

10  document for which *in camera* review has been requested, I know

11  that obviously Google opposes that.  And I think that's tied

12  into your view on how plaintiffs have handled privileged

13  documents.  Is that correct?

14     **MS. TREBICKA:**  Correct, Your Honor.  We oppose it.

15     **THE COURT:**  Okay.

16     **MS. TREBICKA:**  That's to plaintiffs' issue.

17     **THE COURT:**  That's right.  That's right.

18     **MS. TREBICKA:**  Okay.  Yes.

19     **THE COURT:**  And then, with regards to the timing, if I

20  understood, again, the summary, Google received a second

21  meet-and-confer letter on privilege log issues September 11.

22  So has Google responded to that -- has there been meet and

23  confer, as in discussion with the plaintiffs, since receipt of

24  that letter?

25     **MS. TREBICKA:**  There have been meet-and-confer

**UNDER SEAL BY ORDER OF THE COURT**

1   discussions.  We have not formally responded yet.  We are in

2   the process of reviewing the letter, which -- and I know

3   Your Honor doesn't have the benefit of the letter.

4         **THE COURT:**  That's all right.

5         **MS. TREBICKA:**  But it challenges dozens of privilege log

6   entries, if not more than a hundred.  So we are in the process

7   of reviewing it.

8         And the concern, of course, is that the basis for these

9   improper challenges, in our view, is the review of plaintiffs'

10  counsel of our redacted information.  So it's sort of a

11  chicken-and-egg problem.  The reason that this letter came

12  forth is because now plaintiff -- because plaintiffs has been

13  basing these challenges on their improper review of our

14  redacted information, information we claim is privileged.

15        **THE COURT:**  Okay.  And I -- I -- I did see Google's

16  argument in that regard.  Here's how I'm going to proceed.

17        One, I will remind both parties of the obligations under

18  the Federal Rules of Civil Procedure, specifically 26(b)(5)(B);

19  and I expect all team members on both sides to be very familiar

20  with that provision, which is -- guides the parties'

21  obligations under the federal rules on how to respond to

22  receipt of privileged material inadvertently produced in a

23  production.

24        And in this case, as I said previously, I set a hard

25  deadline.  Google has a lot of documents to be produced.  I

1    would be surprised if there were not inadvertent productions or

2    even -- perhaps an appropriate word is "inconsistent"

3    productions, where a document or an e-mail is redacted but it

4    has also been produced in unredacted form.

5         And so the rules of civil procedure do address this, which

6    is, when a party becomes aware of, either that they produced it

7    or, in this case, that they have received a document that is

8    not consistently -- let's take the situation as it's been --

9    perhaps arose in this case -- not consistently redacted, there

10   is an obligation to treat that as privileged and to lock it

11   down, not distribute it further, inform the other side

12   immediately.

13        And "Then what?" of course, is the question.  And

14   especially in a case of inconsistent productions, it's not

15   realistic to think that the redactions have not been read or

16   considered.  You know, maybe the unredacted version was -- was

17   encountered first.

18        It's also -- when something is redacted, does a party

19   search for it to see if it's redacted everywhere?  That is not

20   inappropriate by itself, simply because if it's -- if it's not

21   redacted in other internal e-mails, then that could very well

22   be a situation of inconsistent or inadvertent production.  But

23   if that same material is -- appears in a publication or a

24   public document or something that was broadcast certainly

25   outside the company, then that would, of course, call into

UNDER SEAL BY ORDER OF THE COURT

1   question privilege.

2        And that's why I expect the parties to address this in a

3   good faith and professional manner.  And that is, it is not

4   inappropriate for a party to say:  Okay, we have two versions

5   of this.  One is redacted and one is not.  And it does not

6   appear from the unredacted version to be a privileged

7   discussion.

8        Starting that is not inappropriate.  Starting that --

9   you know, raising that in meet and confer is not inappropriate.

10  However, that must be -- before that, must -- the party

11  receiving it must treat the document as privileged; that is,

12  not distribute it further, lock it down, flag it, all versions

13  of it that they have found, and set those aside until they have

14  met and conferred with counsel on it; and, if necessary, put it

15  in a pile of, you know, "Is disputed."

16       So I expect the parties to -- to know how to proceed on

17  this and to proceed accordingly.  And I do not want to hear any

18  more instances of a document not being properly locked down or

19  being distributed.

20       Similarly, it's -- it is not a breach of ethical

21  violations to raise a -- in the context of meet and confer, to

22  raise the status of a document, particularly where, you know,

23  it's been perhaps not consistently treated.  As long as the

24  receiving party has essentially locked it down, they can

25  certainly raise it with opposing counsel.  All right?

UNDER SEAL BY ORDER OF THE COURT

1    So I think that should be clear, and I think both sides

2   need to clean up how they proceed in this regard.  All right?

3   So, again, that's FRCP 26(b)(5)(B).  And everyone on the teams

4   who are reviewing documents or receiving documents needs to be

5   familiar with it, and that will be -- will be enforced.  Clear?

6   Good.

7        Okay.  The parties need to address privilege log issues.

8   They need to do that in a timely fashion.  I did see some back

9   and forth on dates.  Again, Google will need time.  The

10  production will be completed on October 6.  Notwithstanding

11  that I did not get back to Mr. Schapiro's two-sentence speech,

12  but that production will happen, and there will need to be some

13  time to then do that privilege log.  There obviously have been

14  preceding privilege logs.  I'm going to step back and give some

15  careful thought to that timing, but it's not going to be out in

16  the back half of November.  So privilege logs will get

17  produced, and the parties will address and respond to those

18  properly.

19       It is not going to be a solution -- not going to be a

20  solution -- to submit hundreds of documents, either to

21  the Court or the Special Master, for *in camera* review.

22       If you come down to a dispute over, you know, a broad

23  category, then we'll do it by sample.  We'll do it by sampling.

24  But the work that Special Master Brush and his team have in

25  front of them, the work that this -- you know, that the Court

**UNDER SEAL BY ORDER OF THE COURT**

1    engages on on this case, that simply is not going to be

2    feasible.  So I just want you to know where -- you know, where

3    we're headed.  And I will set some deadlines.

4         I do expect the parties to meet and confer and for Google

5    to respond to the latest letter, and that'll need to happen

6    here in the near term.  You're coming up on 30 days that

7    you've -- that you've had that letter.  Obviously, there's been

8    a lot of other stuff going on.

9         With regards to the clawback document, I will -- you can

10   submit the document *in camera*, and I'll take two pages from

11   each side as to privilege or not privilege.  I'll take a joint

12   submission, two pages each, as to -- on the privilege status of

13   that document.  And you can submit it, get that to me by the

14   8th, noon on the 8th of October.  All right?

15        I haven't set definitive deadlines.  But I think that

16   addresses the issues, and I'll fill in the dates.  I need to

17   step back and look carefully at my calendar.

18        Ms. Bonn?

19        **MS. BONN:**  Thank you, Your Honor.

20        The only clarification I was going to say is I think that

21   the sampling approach Your Honor mentioned makes a lot of

22   sense.  And however much I hope that will be avoided, I think

23   that there's a realistic possibility that it won't

24   (inaudible) --

25        **THE COURT:**  I don't want to hear that, Ms. Bonn.

UNDER SEAL BY ORDER OF THE COURT

1      **MS. BONN:**  -- (inaudible) in dispute.

2      **THE COURT:**  I do not want to hear that.  All right?  That

3  is a last resort.  A --

4      **MS. BONN:**  Understood.

5      **THE COURT:**  -- last resort.

6      All right?  Because as every litigator on this call knows,

7  document production does take an element of good faith and

8  trust.  And we have very good lawyers and highly ethical

9  lawyers on both sides on this case, and I expect that privilege

10 will not be asserted not in good faith.

11      I understand that there are some, a few very narrow gray

12 areas, very narrow.  But matters of attorney-client privilege,

13 matters of attorney work product are privileged.  That being

14 said, the fact that a lawyer is cc'd in a long string does not

15 make a business discussion privileged.  I know everyone knows

16 the guidelines, and I expect those to be followed.

17      So that is not a place to head.  I just want to be very

18 clear.  I want compromise on both sides.  And I'm going to hear

19 argument before I start even considering any *in camera* review.

20 And frankly, the parties really don't have time for it.

21      Ms. Trebicka, follow (inaudible) --

22      **MS. TREBICKA:**  We hear you, Your Honor, and we agree.

23      **THE COURT:**  All right.  But I'll do it if -- and I'm

24 not -- I will be very, very concerned if I take a look at

25 documents and -- and they're not privileged.  All right?

1      All right.  Okay.  I think that addresses the privilege

2  issue.  I owe you some dates.

3      Okay.  So that's P-19, D-7.  That's the discovery orders.

4      And we have -- I'm going to come back to P-12 with the

5  wealth of RFPs in dispute in the Brown case.

6      Let's go to D-9, the requests for admission.

7      Let me just find my notes on that one.

8      And this is RFAs 30, 32, and 34.  And you did send me the

9  actual RFAs.  Thank you.  And this is the dispute about why

10  these are RFAs in this case.  And, there they are.

11      Who has the mic?  Is that you, Ms. -- Mr. McGee?  Who has

12  the mic for -- I apologize -- for -- for Google?

13      **MS. FANI:**  I do, Your Honor.

14      **THE COURT:**  Ms. Fani.  Thank you.  Very briefly, Ms. Fani.

15  I did read the submissions.  I read the RFAs.

16      Why are these helpful in this case?

17      **MS. FANI:**  So I have several reasons, Your Honor, but I'll

18  be brief.

19      So the Brown plaintiffs have alleged in their complaint

20  that the collection of data at issue in this case in modes

21  other than Incognito is common knowledge.  And these requests

22  for admission are designed to test that allegation, among other

23  things.

24      **THE COURT:**  Say that -- say that again, Ms. Fani.

25      **MS. FANI:**  So they have alleged that the collection of

UNDER SEAL BY ORDER OF THE COURT

1   data, the data at issue in this case, is common knowledge for

2   users who are using Chrome outside of Incognito mode; so in

3   basic mode or in sync mode.

4         **THE COURT:**  Okay.  Okay.  Go ahead.  I just wanted to be

5   sure.

6         **MS. FANI:**  So -- yeah, that's one of the main reasons.

7         And then, of course, this is -- this is relevant to the

8   case because it's impor- -- we would like to know -- so --

9   apologies.

10        **THE COURT:**  I took you off script.  Sorry.

11        **MS. FANI:**  No.  So this would help us understand,

12  Your Honor.  If plaintiffs understood that Google was receiving

13  this data in all Chrome modes, then it would help us get closer

14  to showing that our disclosures regarding Incognito mode did

15  not suggest otherwise.  And so it would give us just a more

16  fulsome picture of plaintiffs' understanding of our disclosures

17  in the Chrome Privacy Notice.

18        **THE COURT:**  Okay.  All right.  That was kind of what I

19  took away from the summary, and that's -- that's helpful.

20  Thank you, Ms. Fani.

21        And, Mr. McGee, why not?

22        **MR. McGEE:**  Judge, first of all, I heard Ms. Fani mention

23  sync; and as we put in our submission, the term "sync" does not

24  appear in our complaint.

25        You can look -- and I'm -- I think it was helpful that

**UNDER SEAL BY ORDER OF THE COURT**

1    Google -- that you called for it and that Google submitted the

2    RFAs fully.  Frankly, when we received these, we thought that

3    they were served to the wrong party.  I had to review them

4    probably two or three times to make sure that they were

5    actually served in Brown and meant to be served in Brown.

6        But it's a clear attempt to conduct absent class member

7    discovery, Judge.  Whether our plaintiffs have any

8    understanding of sync is not alleged in our complaint.  It's

9    not been the focus of any discovery.  And importantly, these

10   RFAs -- and I would have to check the date, but I believe they

11   were served before you ordered cross use in this case.

12       So, you know, this is an attempt by Google to get

13   responses by the plaintiffs in Brown to use them in the

14   discovery in Calhoun, to inquire (inaudible) --

15       **THE COURT:**  How can they use it in Calhoun, Mr. McGee?

16       **MR. McGEE:**  In their letter, they actually intimate that

17   they will because there's cross use and there's cross

18   production of the discovery responses.

19       We did not specifically include that, and I'm not sure

20   whether Google will be disputing that.  But whether our

21   plaintiffs knew about sync or whether they have any

22   understanding of any functions outside of Incognito is not

23   really at issue in this case.

24       If the plaintiffs -- you know, in the complaint, there may

25   be a general statement that Google's collection in

1    non-Incognito modes may be a little more understood by the

2    public.  But, you know, Google has severely attempted to limit

3    the discovery in this case to Incognito.

4        We have other disputes that I won't get into with logged

5    in and logged out that are before Your Honor.  Yet now they

6    want to expand the scope of the discovery in this case to

7    include modes that have no issue with our litigation.

8        **THE COURT:**  How would -- Ms. Fani, how would Google use

9    these in this case?  Give me an example of how you see an

10   admission or a denial utilized in this case.

11       And you're on mute.

12       **MS. FANI:**  Yes, Your Honor.

13       So, to the contrary, these -- these RFAs are meant to

14   narrow the issues in the case.  We would like to know what the

15   baseline understanding plaintiffs have of each Chrome mode,

16   which are all in one Chrome Privacy -- the Chrome Privacy

17   Policy, which was at issue here.

18       So, for example, if plaintiffs understood Google --

19   Google's disclosures explained that Google receives data while

20   users are in basic mode, the question in the lawsuit becomes:

21   Why did they have a thought that Incognito was any different?

22       So that's why we believe that these requests for admission

23   are specifically relevant to the Brown matter, independent of

24   whether they are relevant in Calhoun or not.

25       **THE COURT:**  All right.  Thank you.  I'll consider that

UNDER SEAL BY ORDER OF THE COURT

1   further.  The input of counsel is helpful.  Thank you.

2       **MS. WEAVER:**  Your Honor, may Calhoun be heard on this

3   issue?

4       **THE COURT:**  No.  Calhoun has their own issue.  Thank you,

5   Ms. Weaver.

6       **MS. WEAVER:**  Okay.  Okay.

7       **THE COURT:**  This is a dispute directed to the Brown

8   defendants -- excuse me -- plaintiffs.

9       Okay.  With regards to the specific -- Brown's

10  Dispute P-12, which I acknowledge matches the format I asked it

11  for, P-12 and then its parade of RFPs in dispute, I have just a

12  couple of questions.

13      I have given these some careful consideration, and as I

14  say, there's just a few where I would appreciate hearing from

15  counsel on my specific questions, and then I'll issue a ruling

16  on these shortly.

17      So for plaintiffs, who's got the -- who have we got?  Oh,

18  Mr. Richardson, there you are.

19      **MR. RICHARDSON:**  Yes, Your Honor.

20      **THE COURT:**  Thank you.

21      And, Ms. Jenkins.  Okay.  Welcome back.

22      Let's turn to RFP 50 -- RFP 50, which is the documents

23  sufficient to identify all websites and publishers that use

24  Google Analytics.

25      And, you know, again, looking at the class definition

1    of -- the class definition for the Class 1, the Android device

2    users who access a website in private browsing mode, who access

3    a website containing Google Analytics or Ad Manager and who are

4    in private browsing mode and are not logged into their account,

5    it's a -- it's a large ask.  I'm trying to figure out how that

6    really helps the plaintiffs or what -- what it leads to in that

7    regard.

8        Mr. Richardson, I'll start with you, briefly.  I have read

9    the submissions.

10       **MR. RICHARDSON:**  Thank you, Your Honor.

11       And I hope -- I know this didn't come across in the

12   submission, but Ms. Jenkins and I have had many conversations

13   regarding these RFPs and tried very hard to narrow the

14   disputes.

15       This is one where we were unable to resolve our dispute,

16   and I think --

17       **THE COURT:**  And I take it this -- I mean, I see 50, 57,

18   and -- what is it? -- 65 are all sort of the same.

19       **MR. RICHARDSON:**  Correct.

20       **THE COURT:**  Okay.  Good.

21       **MR. RICHARDSON:**  Okay?

22       **THE COURT:**  All right.

23       **MR. RICHARDSON:**  And I think that all three of those go to

24   the enormity of Google's collection during the class period and

25   the -- the inability of class members to avoid Google's

UNDER SEAL BY ORDER OF THE COURT

 1   collection of their information while they are browsing

 2   privately.

 3       So there's no dispute that when a class member goes to a

 4   website that has Google Analytics, that Google is collecting

 5   information from their private browsing.  And so by seeking the

 6   specific identification of those websites that use Google

 7   Analytics, we're seeking to understand the scope of the

 8   collection during the class period, which is relevant to

 9   liability; we're seeking to understand that for purposes of

10   damages; and we're also seeking to understand that for purposes

11   of Google's consent defense.

12       Google has asserted that publishers somehow consent to

13   this practice.  Judge Koh, you know, rejected their argument on

14   the motion to dismiss, but that's still at play here.

15       So we are trying to understand the full scope of

16   collection during the class period by identifying the specific

17   websites and publishers that used Google Analytics.

18       **THE COURT:**  Okay.  So you're going to get a list of

19   millions of, you know, domain names and other publisher

20   identifiers.  How is that helpful to the -- to the plaintiffs?

21       **MR. RICHARDSON:**  Well, I think that the specific -- the

22   specifics, in terms of the number, is relevant, again, in terms

23   of liability.  It may also prove useful in terms of identifying

24   class members who can say:  Oh, yes, I went to those websites;

25   so Google would have collected my data.

UNDER SEAL BY ORDER OF THE COURT

1    And it may -- it may inform what we're trying to do with

2  Special Master Brush in terms of, if Google didn't preserve the

3  data specifically that it collected, it may be possible to say:

4  Okay, well, this is a website where, if a class member visited

5  the website, Google would have collected their private browsing

6  information because it had Google Analytics.

7    **THE COURT:**  All right.  All right.

8    Ms. Jenkins?

9    **MS. JENKINS:**  Yes, Your Honor.

10    **THE COURT:**  Why not -- why not push a button and turn over

11  a list?

12    And I do take Google's point that some -- take some

13  websites -- website owners, for want of a better word, they may

14  have signed up for Google Analytics, you know, for some period

15  of time, not some other period of time.  But, I mean, Google

16  has the information.  It's -- it's millions of names.  Why not

17  push the button, generate the list, and turn it over for just

18  the reasons that Mr. Richardson has identified?

19    **MS. JENKINS:**  Yes, Your Honor.

20    It is -- it would -- it is a number of tens of millions of

21  websites that would be included by this.  And there are a

22  couple of points.

23    One is that it is -- it is not just as easy as pushing a

24  button and coming up with a customer list, particularly in the

25  way that the plaintiffs have asked for the information, which

**UNDER SEAL BY ORDER OF THE COURT**

1    is, they would like to have the periods in which websites used

2    the Google Analytics or Google Ad Manager during the class

3    period, as well as periods in which they did not, which for

4    tens of millions of websites, compiling something like that, it

5    would take so many hours to try to figure that out that I think

6    we would still be here months from now trying to do that.

7         In addition, for Google Analytics, the plaintiffs

8    themselves can go to a website, use developer tools and

9    determine whether that website uses Google Analytics.  They do

10   not need us to come up with this list.

11        And as we said in our briefing, we have already provided

12   this top 25 list for Google Analytics and for Google Ad Manager

13   showing the top 25 websites on a specific date that -- by terms

14   of traffic that use those services.

15        So there doesn't seem -- it is not a request that is

16   proportional to the needs of the case for Google to try to come

17   up with this -- this customer list.

18        On top of that, although we know there's a protective

19   order, the full customer lists of Google is something that is

20   private.  It would be considered a trade secret to have these

21   full customer lists.  And so there is that concern as well --

22        **THE COURT:**  But is --

23        **MS. JENKINS:**  -- especially considering the small amount

24   of relevance.

25        Sorry, Your Honor.

UNDER SEAL BY ORDER OF THE COURT

1       **THE COURT:**  That's all right.  No, no.  Ms. Jenkins, to

2   your point that the plaintiffs can find this out by using

3   tools, going to a website, using tools, seeing if that website

4   uses Google Analytics, that's at that moment, right --

5   right? -- that they're currently a user of Google Analytics?

6       **MS. JENKINS:**  I believe that's true, Your Honor, yes.

7       **THE COURT:**  Okay.  All right.  Does -- without providing

8   the list, does Google then forego a defense that websites that

9   plaintiffs were using, class members were using did not

10  provide -- or did not use Google Analytics?

11      I mean, they've asked for it.

12      You say:  Oh, that's too hard too determine, too hard, too

13  burdensome, not proportional.

14      Then it seems to me that, then, Google is forestalled from

15  using that as a defense when the experts start doing the math

16  about, you know, number of websites, number of users impacted,

17  scope, for damages, et cetera.

18      **MS. JENKINS:**  No.  Your Honor --

19      **MR. BROOME:**  Your Honor, maybe --

20      Sorry, Sara.  Go ahead.  Sorry.

21      **MS. JENKINS:**  It's clear, and Google would recognize, that

22  many websites use these services, especially Google Analytics.

23      If any specific website comes up as being specifically

24  relevant that the plaintiffs want to argue, you know, was using

25  Google Analytics, they can look at the website themselves and

1   see if it was using it.  And so I don't think that we would

2   necessarily be conceding any defenses on that basis.

3       THE COURT:  Well, but they can -- they only know if it's

4   using it at that moment.  They don't know if it was using it,

5   you know, two years ago when they were going to that website

6   every day.

7       MS. JENKINS:  Yes.  But to the extent that Google is able

8   to provide any -- if we were ordered to provide a list of all

9   of the websites, our ability to do that and provide the

10  different time periods for which a --

11      THE COURT:  I understand.

12      MS. JENKINS:  -- website --

13      It's -- it's unlikely that we would be able to provide

14  that type of information anyway.

15      THE COURT:  I understand.

16      MS. JENKINS:  At least not within the time constraints of

17  this case.

18      THE COURT:  Thank you.  Thank you, Ms. Jenkins.

19      And, Counsel, did you want to be heard?  For some reason,

20  you --

21      MR. BROOME:  Just briefly, Your Honor.

22      THE COURT:  Wait, wait.  Identify yourself for the record.

23      MR. BROOME:  I'm sorry, Your Honor.  Stephen Broome for

24  Google.

25      THE COURT:  Okay.

UNDER SEAL BY ORDER OF THE COURT

1    **MR. BROOME:**  Just briefly on the issue of waiving the

2    defense.

3        I think we need to preserve our ability to make the

4    argument that in order for Google to have collected data from a

5    user who is in private browsing mode, they first would need to

6    visit a website that actually uses Google Analytics, and that

7    may be relevant in the context of class certification and,

8    you know, establishing damages models, et cetera.

9        But I don't -- I don't think the plaintiffs' argument is

10   going to be that -- or I don't think our argument is going to

11   be that none of these plaintiffs ever visited a Google

12   website -- or, sorry -- a website that uses Google Analytics.

13   That's -- that's not something I believe we'd be advancing.

14       **THE COURT:**  All right.  Special Master Brush, you had

15   turned on your video for a moment, and I'm interested in any

16   questions that you have for either side to shed light on this

17   dispute.  But I'm also putting you on the spot, and if you

18   don't have any, that's fine.

19       **SPECIAL MASTER BRUSH:**  Not at this time, Your Honor.

20       **THE COURT:**  Okay.  Thank you.

21       **MR. RICHARDSON:**  Your Honor, if I may briefly respond to

22   Mr. Broome's comments.

23       I think that raises exactly what we're concerned about

24   here, is that Google wants to withhold this very basic

25   information that would be relevant to identifying the occasions

1   where Google is collecting private browsing information; but at

2   the same time, he mentioned damages and that they want to

3   reserve their right to oppose class certification and raise

4   challenges to the analysis of our experts based on the analysis

5   as it ties to specific websites.

6        And so the problem that you identified, Your Honor, is

7   exactly the problem we're facing here, not only in terms of

8   Google's defenses, but Google's plan to both withhold

9   information and then attack our analysis at class certification

10  and at trial, both with respect to liability and damages and

11  their affirmative defenses.

12       **THE COURT:**  All right.  Thank you.

13       Okay.  That's fine.  Understood.  The parties' positions

14  were pretty well summarized.  I know it's always a struggle to

15  deal with a summary, but I do appreciate it, and I do see and

16  appreciate the meet-and-confer efforts.

17       I have a -- just a quick question -- I should know better

18  than saying that -- with regards to RFP 57, which is

19  Google Analytics User-ID, which is:  What do plaintiffs think

20  specifically this is?

21       And then I'll hear from -- from Ms. Jenkins.

22       **MR. RICHARDSON:**  To the extent you want further details,

23  I'll have to defer to my colleague Mr. Mao.  But I will just

24  say that this would be another piece of information simply

25  linked to identifying those websites that use Google Analytics.

UNDER SEAL BY ORDER OF THE COURT

1   I assume that Google also has the record that just identifies

2   whether they use Google Analytics User-ID, which is --

3       **THE COURT:**  And is that a different service?  Is that what

4   plaintiff -- is that plaintiffs' position, that this is

5   something different?

6       **MR. RICHARDSON:**  No.  That is a part of Google Analytics.

7   And that's a way in which users are identified.  So it's just

8   an identifier linked to Google Analytics.  So I would imagine

9   if there's a list of a hundred, some subset of those would use

10  Google Analytics User-ID.  It wouldn't be a separate list.

11      **THE COURT:**  And why would that additional information --

12  what -- what would that add for plaintiffs?

13      **MR. RICHARDSON:**  That is an identifier that's used to

14  identify people.  So that's, you know, part of our -- our

15  complaint describes how that's used.

16      **THE COURT:**  Okay.  And I think the -- what information

17  Google is collecting on the users is an issue very much before

18  Special Master Brush.

19      But, Ms. Jenkins, did you want to speak specifically to

20  RFP 57?  Did you have any --

21      **MS. JENKINS:**  Well, with respect to RFP 57, as a

22  compromise that we did not propose in the discovery chart, if

23  there were -- for instance, for our list of 25 top websites

24  that we've already provided, we -- we would be able to annotate

25  that to show which of those use Goog- -- use User-ID or have

UNDER SEAL BY ORDER OF THE COURT

1   User-ID.  And that, I think, would give them the information

2   that they need with respect to the websites using User-ID.

3        **THE COURT:**  All right.  That's helpful.

4        Mr. Richardson, have plaintiffs considered the value of a

5   response from Google, going back to where we -- I had them

6   identify the top 25 websites as a point-000-something percent

7   of the tens of millions of websites --

8        **MR. RICHARDSON:**  Yes.

9        **THE COURT:**  -- to an increase in that number, a helpful

10  increase in that number.

11       **MR. RICHARDSON:**  We have, Your Honor.  I mean, we've had

12  multiple meet and confers regarding these RFPs.  And the truth

13  is that the issues flagged by Mr. Broome, that's exactly what

14  we're focused on.

15       We feel like we can't agree to that sort of compromise

16  because it puts us in a precarious position going forward in

17  terms of having relevant information for purposes of, you know,

18  proceeding with this case and not having Google oppose class

19  certification or our claims at trial based on not providing

20  this information.

21       **THE COURT:**  Okay.  All right.  Question with regards to

22  RFP 64, which is for documents sufficient to show the ways --

23  all ways in which Google uses the data gathered through Google

24  cookies.  Has that -- I take Google's position that this has

25  been -- this is a topic that has been covered in the custodial

1    searches, of which we have all spent a great deal of time.

2        And there's also a reference by Google to a possible

3    stipulation regarding Google's use of data that's been

4    collected.  So what -- what's the status of the -- of that

5    stipulation?  Ms. Jenkins, has something actually gone across

6    the table to the other side?

7        **MS. JENKINS:**  Your Honor, we did provide plaintiffs with a

8    stipulation which did not -- to be perfectly frank, probably

9    did not get to the issues.  One of the reasons the plaintiffs

10   rejected that stipulation is they did not think it properly

11   considered this RFP and other -- other -- other requests

12   relating to the use of data.

13       **THE COURT:**  Mm-hmm.

14       **MS. JENKINS:**  And so we have met and conferred with

15   plaintiffs to attempt to come to some other -- some

16   understanding of how -- what sort of stipulation would be

17   acceptable to them that we could enter into, because we do

18   think that this is very fact specific; and plaintiffs haven't

19   given us a clear indication of what would need to be in the

20   stipulation in order for it to go forward.

21       So while we are still looking into that issue, right now

22   it's unclear whether there is a way forward with a stipulation

23   on that issue.

24       **THE COURT:**  Mm-hmm.  Mm-hmm.  Hard for the plaintiffs to

25   know what to stipulate to when they don't know what they don't

1    know.  That is, they don't know how Google has used the

2    information.  Okay.  Well, that was really my question in that

3    regard.

4         And, Mr. Richardson, I -- I'm not saying that this is

5    determinative, but this topic has been covered, is addressed

6    through custodial searches.  Correct?

7         **MR. RICHARDSON:**  That's correct, Your Honor.

8         And I would just add that RFP 64, it's narrow.  It's

9    documents sufficient to show.  And, you know, I do not think

10   this should be a big burden on Google to identify and produce

11   non-custodial documents responsive to this request.  As

12   Ms. Jenkins noted, the stipulation that was provided to us

13   prior to the last hearing didn't address this RFP in any way.

14        **THE COURT:**  I understand.  I understand.

15        **MR. RICHARDSON:**  Okay.

16        **THE COURT:**  Okay.

17        **MS. JENKINS:**  Your Honor, if I may, as -- the plaintiffs

18   have not identified any gaps in the custodial productions that

19   we've already made.  I -- and so we are left -- it's not as

20   though we -- we know the existence of a non-custodial document

21   that just contains all of this information and we are

22   withholding it.  That's not what's happening here.  It is

23   trying to find the needle in the haystack of some -- of

24   documents sufficient to show what they're asking for here.

25        And we believe, with the broad nature of the search terms

UNDER SEAL BY ORDER OF THE COURT

1   and with the custodians that were selected particularly to have

2   documents about these issues, that that should be sufficient.

3        And to be clear, with our custodial production of

4   documents, we are not just producing e-mail.  We are collecting

5   those custodians' other documents, the documents that they --

6   they -- their Google documents, where they keep it on their

7   personal drives, and other chats that result in --

8        **THE COURT:**  I understand.  I understand the challenges,

9   Ms. Jenkins.  I got it.

10       **MS. JENKINS:**  Thank you, Your Honor.

11       **THE COURT:**  I got it.  Thank you.

12       And last, but not least, RFP 166, the -- is a request for

13  dashboard information.  And in Google's response, it looks --

14  Google's response is essentially:  We're thinking about it.

15  We're looking at it.  We're thinking about it.

16       So where -- Mr. Richardson, you can't wait to give me the

17  update; so I'll let you go first.  I really want to know where

18  Google is on this, and then we're done for today on this.

19       **MR. RICHARDSON:**  Well, Your Honor, I have some good news.

20  We did exchange e-mails this morning, and I think there is some

21  forward movement on producing this information.

22       So I don't actually understand Google to be opposing

23  production of this information.  And I would simply say that

24  Google should be ordered to produce so that we don't end up in

25  front of you again, arguing this same point in the future.

1    Google seems willing to produce this information.

2        **THE COURT:**  Okay.  Let's hear -- let's hear it from

3    Google, then.

4        Ms. Jenkins?

5        **MS. JENKINS:**  So, Your Honor, we are not -- we are not

6    opposed to producing this information.  And I believe just

7    either earlier today, or it might have been yesterday, we have

8    told them that we will be providing them with screenshots of

9    this information.  So -- so to that extent, we are not

10   opposing.  I think we --

11       **THE COURT:**  Okay.

12       **MS. JENKINS:**  The nature of the RFP, if it's read very

13   broadly, all internal dashboard information, I don't know that

14   we are in total agreement.  We are still discussing with the

15   plaintiffs what they want.  And I think after we provide them

16   with this next list of metrics, it will depend on -- if they

17   say that they still need more information, we may have a

18   dispute.  I -- I don't know.  Hopefully --

19       **THE COURT:**  Okay.

20       **MS. JENKINS:**  -- we will not.

21       **THE COURT:**  Okay.  I hope not too.

22       All right.  That's all very helpful.  Thank you for the

23   attention and preparation.  That is all I have on Brown for

24   today.

25       I'm going to take everything under submission.  As I say,

UNDER SEAL BY ORDER OF THE COURT

1    I need to sit down with my calendar and my clerks and work out

2    a few dates on the critical issues.  All right?  So, thank you.

3         **MR. RICHARDSON:**  Thank you.  Thank you, Your Honor.

4         **THE COURT:**  All right.  Let's take a five-minute recess,

5    and then we will resume with Calhoun.  Thank you.

6    Five minutes.

7                    (Recess taken at 10:48 a.m.)

8                    (Proceedings resume at 10:56 a.m.)

9         **THE CLERK:**  Please come to order.  Court is back in

10   session.

11        **THE COURT:**  All right.  Welcome back.

12        Okay.  Calhoun matters.  Let's start with status before

13   the Special Master and with Mr. Schapiro's two-sentence update,

14   if that's still relevant.

15        Back to you, Mr. Schapiro.

16        On mute.

17        **MR. SCHAPIRO:**  Sorry about that.  You didn't miss much.

18        I think it's still relevant.  And my colleague,

19   Mr. Ansorge, will probably be speaking about some of the

20   specifics of the issue before the Special Master.

21        But as I noted before, I'm pleased to report that we're

22   going to hit that substantial completion deadline of October 6.

23   I don't think we would have made today.  So we thank you for

24   that and we're grateful.  But I wanted to give a little context

25   of what that's entailed because I think it might frame, I hope,

UNDER SEAL BY ORDER OF THE COURT

 1 | thoughts about what -- what comes next.

 2 |     **THE COURT:**  Sure.

 3 |     **MR. SCHAPIRO:**  In order to meet this, Google hired 300

 4 | lawyers, 300 contract lawyers, to do the reviewing after your

 5 | last -- after the last order.  I've been in some big cases.  I

 6 | don't think I've ever had one where we've had to hire, on short

 7 | notice, 300 people to complete a progress -- a project like

 8 | this.  It was a herculean effort that involved a huge amount of

 9 | time and resources.

10 |     I'm gratified that Your Honor recognized, or seemed to

11 | recognize in one of your comments earlier about privilege, that

12 | sometimes when you do that, you know, there are going to be

13 | some inevitable mistakes; you have to claw things back; or

14 | there might be some later -- you know, some small follow-up

15 | productions where we learn, you know, in quality control that

16 | there was a call here or there on responsiveness or privilege

17 | that was wrong.

18 |     But we've produced now, totally -- I think this is across

19 | both cases.  I can break it down, if necessary, but it's

20 | roughly even -- around 4 million pages, I'm told; you know,

21 | over a million documents, 4 million pages, something like that.

22 |     And as we go forward, I just hope that we don't lose sight

23 | of the proportionality concerns -- I don't think we will.  You

24 | adverted to that earlier today -- and lose sight of what these

25 | two cases are about.  They're about, as we view it, at their

 1   core, disputes about what Google represented and how those were

 2   understood.

 3        We're not really disputing much about our receipt of data

 4   here.  You can make edge arguments about, well, this might be

 5   relevant in one or two ways to damages or ascertainability, but

 6   it's not the core.  And we, and I think the folks in Brown, at

 7   least, want to move quickly to get class cert done, get experts

 8   done, get summary judgment done.

 9        I just ask that the relative -- the burden and the effort

10   be borne in mind at today's hearing.  That's -- that's all I've

11   got, Your Honor.

12        **THE COURT:**  That's fine.  Thank you, Mr. Schapiro.  I do

13   appreciate that.  And I am well aware of the efforts and the

14   time on both sides.  As I say, Special Master Brush and his

15   team have kept me up to date weekly.  You know, I didn't just

16   send you all out there to run up -- run headlong into the wall

17   that is October 6th.

18        And I -- I see progress.  I see the challenges that have

19   been identified and met.  And we're going to -- we're going to

20   keep going.  We're going to keep doing exactly what we're doing

21   and try to -- well, we will; we don't have any choice -- we

22   will keep this moving forward.

23        And I do recognize the effort and the time and the

24   long hours on both sides.  Okay.  And, as I'm sure you

25   appreciate, by the Court as well.

**UNDER SEAL BY ORDER OF THE COURT**

1      Okay.  So turning to Calhoun, I want to address two issues

2  first because I think they're covered by other issues going on.

3      So let me just start with 2.1, which is raised on the --

4  in the chart.  And this is -- was one of plaintiffs'

5  priorities, even though it's a Google dispute.

6      And let me just get my pages in order here.

7      This is -- relates to Google's motion for a protective

8  order against suspending ordinary log retention policies.  And

9  I view this as linked to the preservation plan dispute between

10  the parties, which I know you submitted to me some time ago.

11  And I want to be sure, first of all, that I'm understanding

12  that correctly.

13      So from plaintiffs, who's got the mic for plaintiffs on

14  this issue?

15      **MR. STRAITE:**  Yes, Your Honor.  David Straite for

16  plaintiffs.

17      There will be a moment when we get into the specifics of a

18  couple of these disputes it will be smarter to turn it over to

19  my learned colleague Jay Barnes; but just for the overview

20  where we are, Section 2.1 -- sorry -- Dispute 2.1 was

21  originally a Google dispute.

22      We know the order that Your Honor issued.  Not only did

23  you -- did Your Honor issue the protective order, but it was

24  without prejudice to revisiting it --

25      **THE COURT:**  Right.

UNDER SEAL BY ORDER OF THE COURT

1     **MR. STRAITE:**  -- as we get more --

2     **THE COURT:**  I know it well --

3     **MR. STRAITE:**  -- information.

4     **THE COURT:**  -- Mr. Straite.

5     **MR. STRAITE:**  Right.

6     **THE COURT:**  I know it well.

7     **MR. STRAITE:**  So during -- during the depositions and

8     other efforts to get discovery into the logs that weren't

9     specifically covered by the order, we were told those questions

10    are out of scope.  We've been denied access to any discovery.

11    **THE COURT:**  I -- I understand the dispute.  I just want to

12    be sure that this is -- from plaintiffs' perspective, the

13    preservation plan issues and this protective order issue are

14    all -- they're different angles on the same problem.

15    **MR. STRAITE:**  They are.  And there's three angles.  So

16    it'd be this 2.1, along with the preservation issue, which is

17    1.1, and then now Dispute 1.15.  All three of those are linked

18    inextricably.

19    **THE COURT:**  Okay.  I'm sorry.  You said 2.1 and --

20    **MR. STRAITE:**  1.1.

21    **THE COURT:**  -- 1.1?  Uh-huh.

22    **MR. STRAITE:**  And 1.15, with the most important of those

23    being 1.15.  That one --

24    **THE COURT:**  Yeah.

25    **MR. STRAITE:**  -- is going --

UNDER SEAL BY ORDER OF THE COURT

1      **THE COURT:**  I'm not --

2      **MR. STRAITE:**  (Inaudible).

3      **THE COURT:**  Yeah.  Okay.  All right.

4      On that -- and did -- I just want to be sure the answer to

5  my question is "yes" from the Google side as well.

6      Mr. Ansorge?

7      **MR. ANSORGE:**  Yes, Your Honor.  We believe that the

8  protective -- I mean, the preservation plan that we had

9  submitted is also related to the scope of the protective order

10  that's in place.

11     **THE COURT:**  Okay.  All right, then.

12     **MR. ANSORGE:**  (Inaudible).

13     **THE COURT:**  So the dispute regarding the preservation

14  plan, which is, as Mr. Straite identified, I think, articulated

15  in 1.1, I am referring that to Special Master Brush formally.

16  And he and I have -- have discussed that generally, in that the

17  preservation plan, the protective order, the issue around

18  preservation of logs is something that will be addressed in due

19  course, and that will be addressed by Special Master Brush.

20     And we're going to finish this -- this segment on the

21  production issues -- and I know they're not entirely distinct

22  from the preservation issue but -- the production issues that

23  are currently before Special Master Brush with the four steps

24  and the plan that everyone's working hard through.  And

25  production will be under way here shortly in light of our

1   October 6th deadline.  We're going to get through that, and

2   this issue will follow.  Okay?

3       MR. STRAITE:  Thank you.

4       THE COURT:  Mr. Barnes, did you need to be heard just

5   specifically on the referral of 1.1 and --

6       MR. BARNES:  Well, it's about -- it's about what you

7   started with, which was, I think, 1.3.  You were asking about

8   Special Master Brush.  And I -- I had --

9       THE COURT:  No, I wasn't talking about 1.3.

10      MR. BARNES:  Okay.  I thought that's where -- I'm sorry.

11  Then I misunderstood when -- when we started.

12      THE COURT:  Okay.

13      MR. BARNES:  Sorry.

14      THE COURT:  No, it's not on my list.

15      Oh, I did -- no.  I started with 2.1.  And if I misspoke,

16  I apologize.

17      Okay.  So preservation plan and protective order, 2.1,

18  1.1, those are formally referred to the Special Master.

19      2.13.  2.13, which is a general, as I read it -- and I

20  don't mean this in a pejorative way -- but is a general dispute

21  around plaintiffs' -- number of plaintiffs' discovery requests.

22      I see that as something that will be addressed through the

23  discovery order meet and confer that the parties are going to

24  engage in and get back to me.  So that -- I see 2.13 will be

25  covered through the discovery order discussion -- limitation --

1    discovery limitation order.

2        And, Mr. Straite, from plaintiffs, do you agree?

3        **MR. STRAITE:**  Thank you, Your Honor.  It makes perfect

4    sense.  And we'll make it happen by the -- the noon deadline on

5    October 8th.

6        **THE COURT:**  Thank you.

7        And, Ms. Jenkins, for Google?

8        **MS. JENKINS:**  Yes.  Agreed, Your Honor.

9        **THE COURT:**  Okay.  Excellent.  Thank you.

10       All right.  Then let me ask about Dispute 2.16, 2.16,

11   which was identified by Google as a priority, which was

12   plaintiffs' response to Google Interrogatory 15, which related

13   to Google's request for all e-mail addresses of the plaintiffs

14   that they used -- excuse me -- all e-mail addresses for

15   plaintiffs' Google accounts to which plaintiffs had access or

16   used during the class period.

17       It sounded like meet and confer was under way.  Dare I

18   hope that this is being handled in a constructive way?  Maybe

19   even some good news.  It's a Google dispute; so let me hear

20   from Google first.

21       Ms. Fani, welcome back.

22       **MS. FANI:**  Thank you, Your Honor.

23       So, you know, the parties have been meeting and conferring

24   on this dispute in advance of this hearing and before the joint

25   submission was submitted.  But there is an underlying issue

UNDER SEAL BY ORDER OF THE COURT

1   that I believe we are at impasse on, and that is that,

2   you know, this -- this interrogatory requests all e-mail

3   addresses for the Google accounts that plaintiffs had or had

4   access to during the class period, including shared accounts.

5       And plaintiffs' perspective is that they can just pick

6   select few e-mail addresses or Google accounts that they deem

7   relevant to provide to us, but we do believe that they are all

8   relevant and we -- we'd like the fulsome picture and a list of

9   all of these e-mail addresses.

10      So I do believe that that difference still exists.  And we

11  are happy to continue meeting and conferring, of course.  I

12  just don't know that we can get past that.

13      **THE COURT:**  Why does Google believe it needs all of the

14  e-mail accounts?

15      **MS. FANI:**  So, Your Honor, plaintiffs have alleged that

16  Google had a contract with them which has various Google

17  disclosures throughout, and those disclosures change over time.

18  And so we'd like the full list of plaintiffs' Google accounts

19  to help us assist -- or to help us establish what disclosures

20  were seen, when they were seen, by which plaintiffs, and how

21  many -- how many disclosures were seen.  So that's directly

22  relevant to our consent defense, Your Honor.

23      **THE COURT:**  Okay.  Thank you, Ms. Fani.

24      Mr. Straite, why not --

25      **MR. STRAITE:**  Your Honor --

1     **THE COURT:** -- turn over -- wait.

2     Let me just be sure you understand exactly what's on my

3 mind, which is, why not for the plaintiffs -- I mean, we've got

4 a handful of folks -- turn over all the e-mail addresses?

5     **MR. STRAITE:** Thank you, Your Honor. And with your

6 permission, I'd like to turn this over to Ms. Weaver, who is

7 better prepared to address this.

8     **THE COURT:** Oh, thank you. All right.

9     Ms. Weaver, to you, good morning or --

10     **MS. WEAVER:** Good morning.

11     **THE COURT:** Yes.

12     **MS. WEAVER:** Good morning, Your Honor.

13     We're a little mystified here. We have turned over all

14 Gmail accounts for everybody, save one address which they

15 actually have and know. But it is for one plaintiff's work,

16 her business address, and she's a medical provider. And the

17 address actually is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We

18 mistakenly identified it in the complaint. We had meet and

19 confers about it. We told them we were withdrawing that and

20 identifying her personal. It's not within her control. Her

21 business is not a party to this lawsuit, and it's a medical

22 provider. So what she is sending from that work address --

23     **THE COURT:** Okay. So -- okay. I get it. I get it --

24     **MS. WEAVER:** Okay.

25     **THE COURT:** -- as to that one.

 1        Are you saying that for all the other plaintiffs, all of

 2  their e-mail accounts -- excuse me -- all of the e-mail

 3  addresses for each of their Google accounts has been provided?

 4        **MS. WEAVER:**  Yes.

 5        **THE COURT:**  Okay.  And were -- was defendant aware of that

 6  prior to --

 7        **MS. WEAVER:**  Yes --

 8        **THE COURT:**  -- today?

 9        **MS. WEAVER:**  -- we believe so.

10        **MS. FANI:**  No, Your Honor.  That's what the interrogatory

11  asks.  We ask, you know, please list all of them or say,

12  you know, if you have listed all of them, that we have provided

13  all of them.

14        So our -- from our perspective, plaintiffs had selected a

15  few e-mail addresses that they've provided to us.  We're

16  hearing for the first time that all of them but one has been

17  disclosed.

18        **THE COURT:**  Okay.  All right.

19        **MS. FANI:**  And just a quick --

20        **THE COURT:**  Let's --

21        **MS. FANI:**  -- point of clarification, just -- just so it's

22  not lost.

23        This isn't just Gmail addresses.  We would -- what we're

24  asking is for any e-mail address linked to a Google account,

25  whether plaintiffs' or shared.

1    **THE COURT:**  I understand.

2    Ms. Weaver, that was my question.  All e-mail addresses?

3    **MS. WEAVER:**  Okay.  Well, that is a little confusing to

4  us.  I don't know what they mean by "linked to a Google

5  account" actually means.

6    We have provided e-mail addresses for all of the

7  plaintiffs.  We don't know how Google might be linking other

8  people's e-mail addresses.  So maybe --

9    **THE COURT:**  Okay.

10    **MS. WEAVER:**  -- now -- yes.

11    **THE COURT:**  It sounds like --

12    **MS. WEAVER:**  It sounds like we need to confer.

13    **THE COURT:**  It sounds like some further meet and confer

14  would be beneficial.

15    So, obviously, if all e-mail addresses -- well, I'll --

16  I'll let the parties have that discussion.  But if

17  everything -- you can agree everything's been turned over but

18  the one business account, then I'm going to count this one as

19  resolved.

20    If there's a dispute about which accounts have to be

21  turned over, I expect the parties to figure that out,

22  compromise, and close this issue.  It really doesn't seem like

23  you need court intervention.

24    **MR. SCHAPIRO:**  Just to save us from having to come back,

25  can I just clarify one thing?  Because Ms. Weaver said she

UNDER SEAL BY ORDER OF THE COURT

1    wasn't sure what we meant.

2         So, for example, Patrick Calhoun, whose deposition we

3    took, has a Google account, but he set it up with his Yahoo!

4    e-mail.  You can do that.  You can set up an -- an account as

5    a -- to use Google products.  So, I believe Ms. Kindler did as

6    well.

7         That's what we're asking about broadly when we say:  Okay,

8    what e-mails have you used to set up Google accounts?

9         **THE COURT:**  Okay.

10        **MR. SCHAPIRO:**  We can discuss it further in meet and

11   confers, but I just wanted -- maybe that answers the question

12   quite readily.  So --

13        **THE COURT:**  Okay.  Well, then we won't use court time for

14   the meet-and-confer process.  I'll give you a deadline.  Let's

15   get this worked out.

16        **MR. BARNES:**  Your Honor, if -- if -- if I may?

17        **THE COURT:**  I -- not -- I don't think we need any more on

18   this one, Mr. Barnes.  I am going to send everyone off to meet

19   and confer and see if they can close it.

20        Let's get to the -- let's get to 1.15, which plaintiffs

21   have identified as most critical to the case.  And, first, my

22   first question is:  What's the nature of the dispute?

23   Transmissions -- I mean, it's framed as transmissions to

24   Google.com and Google APIs.  Sounds like it's a log/database

25   dispute.  It's not clear to me that this is the subject of an

1   RFP.  Or did it come up in a depo?  Or is it part of the log

2   and database that we may still explore somewhat here today?

3   But what's the nature -- what's the origin of this dispute.

4        And, Mr. Barnes?

5        **MR. BARNES:**  In answer to your question, all of the above.

6   So Google --

7        **THE COURT:**  Okay.

8        **MR. BARNES:**  -- here is attempting to exclude a majority

9   of our case.

10       When I think back to the first hearing we had in front of

11  you, we thought you were impressed by the detail with which we

12  pled the specific transmissions from Chrome to Google.  In

13  fact, at one point you said:  Well, what else do you need other

14  than these transmissions?

15       In that complaint, there are more examples of

16  transmissions to Google.com than there are to any other Google

17  property combined.  Those transmissions to Google.com, that's

18  Google Search.

19       And I can give you specific examples from the complaint,

20  Your Honor.

21       **THE COURT:**  No.  I'm -- I'm well aware.  I --

22       **MR. BARNES:**  Right.  It's a --

23       **THE COURT:**  -- look at the complaint --

24       **MR. BARNES:**  -- state government welfare office.

25       **THE COURT:**  -- every time I pick this case up.

UNDER SEAL BY ORDER OF THE COURT

1    **MR. BARNES:**  A state government welfare office.  When a
2    plaintiff was there, the source code caused a transmission to
3    be sent to Google.com.  A bank; a state unemployment
4    application; a healthcare provider, where they were seeking
5    an -- an appointment, got sent to Google.com.
6         Google's deponents have admitted that this goes to
7    Search logs.
8         And they say:  Oh, well, no, Search logs are not relevant.
9         In fact, the first time we figured this out for certain
10   was in the first 30(b)(6) deposition you ordered.  And their
11   deponent said, in regards to, I believe it was -- it's now
12   FAC 165 that that would be associated with Search and a whole
13   other slew of logs.  When Ms. Weaver attempted to ask another
14   question, she was cut off and a break was taken.
15        Every time since, we've got some answers from their
16   deponents.  And we didn't find out until the last 30(b)(6) that
17   you ordered, they tried to limit it to Display Ads and
18   Analytics.
19        And what Google's doing here, Your Honor, is they're
20   playing games with words.  Our complaint distinguishes between
21   Google Ads, which is Google -- which includes Google Search,
22   versus Google DoubleClick, which is Display Ads, and
23   Google Analytics, which is Google Analytics.
24        They're saying:  Even though you pled it 19 separate times
25   in the complaint that there are transmissions to Google.com,

UNDER SEAL BY ORDER OF THE COURT

1   that's not relevant to the case.

2       And if I take Your Honor back to April 29th, which is the

3   second hearing we had, we had a discussion -- my co-counsel has

4   told me I'm not allowed to say ███████████ but I'm going to say

5   it anyway.  Right?  We had a discussion about the ███████████

6   cookie.  The ███████████ cookie goes to Google.com.  It's

7   associated with Search.  There were questions asked about it.

8       Google counsel answered questions about it in that

9   hearing, even making a joke that it was a delicious German

10  cracker, without ever saying it was outside the scope of this

11  case, because they knew at that time that it was in our

12  complaint.

13      It's that cookie, Your Honor, we believe is included in

14  the complaint more times than any other cookie in the

15  complaint.  And now we find out a year later that they're

16  trying to exclude this from the case, and there's no good faith

17  reason to do so.

18      Now, what you might hear from Google is:  Well,

19  Your Honor --

20          THE COURT:  Wait, wait, wait.  Wait, wait.  Wait, wait.

21  Let me just --

22          MR. BARNES:  Okay.  I'm sorry.  I got --

23          THE COURT:  I got it.

24          MR. BARNES:  -- worked up.

25          THE COURT:  I got it.

1      Let me hear from Ms. Trebicka.  I'll be back.

2      **MR. BARNES:**  Thank you.

3      **THE COURT:**  Ms. Trebicka?

4      **MS. TREBICKA:**  Thank you, Your Honor.

5      So we're hearing a lot about this unilateral limitation by

6  Google, but that's just not correct.

7      It's been with plaintiffs' acknowledgment and

8  participation and actual words that discovery has been limited

9  in this case to these two products, which is Display Ads,

10  Google Analytics, and, of course, a third product which is

11  Chrome.

12      And I'll -- since we're dredging up some hearing

13  admissions, at the March 5th hearing, the hearing for our

14  protective order, Mr. Barnes acknowledged himself that the

15  allegations in the complaint did not emanate from a Google

16  property.  And Google.com, Google Search is a Google property.

17  And that's in the March 5 hearing at page 40, lines 3 through

18  6.

19      So it's been clear from the very beginning of this case

20  that it -- that it is limited to these two services on

21  third-party websites when plaintiffs, using Chrome in an

22  unsynced mode, are going to visit these third-party websites.

23      And not to belabor the point, but it's been clear in the

24  custodian selection, both by Google as well as by plaintiffs.

25  It's been clear in the search term selections by Google and

1    plaintiffs.  It's been clear in the briefing as well.

2         So, again, going back to the protective order briefing,

3    Google specifically stated -- Docket 108-4 at page 2 -- that

4    plaintiffs allege that Google improperly collected data when

5    plaintiffs used Google's Chrome browser to visit websites that

6    use Google Analytics and Ad Manager services.

7         And plaintiffs took no issue with that in their

8    opposition.  On the contrary, their only response to that --

9    this is Docket 117-4 at page 2 -- is that Google ignored sync

10   traffic logs.  They agreed that Analytics and Display logs were

11   the proper -- was really the proper scope of the case.

12        And one more -- one more point, Your Honor, which is, this

13   limitation to exclude Google Search, Google.com, or even

14   embedded Google Search in third-party websites makes a lot of

15   sense because of the allegations in their complaint, which are

16   allegations about wiretap and privacy.  There cannot be a

17   privacy claim for a user who goes to Google.com and then claims

18   that they understood Google would not be receiving their data

19   if they were browsing in Chrome with- -- without being synced.

20   And frankly, if that was -- if those were the allegations in

21   their complaint, our motion to dismiss would look very

22   differently from what it did and would have likely been

23   granted.

24        I'll stop there, if there's anything in specific you'd

25   like me to discuss in terms of the issues here.

UNDER SEAL BY ORDER OF THE COURT

1   **THE COURT:**  All right.  Mr. Barnes, I am -- again, I -- we
2   go back -- I do go back to the complaint, and I look at our --
3   this Court's previous orders.

4       I am -- I'm still trying to work my way through the
5   Google.com -- I mean, you type in a search.  You start getting,
6   you know, response -- or you start to type; you start getting
7   suggested searches.  And I'm not -- it's just not clear.

8       What's the -- what's the value of -- of, you know, the log
9   of my keystrokes when I'm at Google.com?

10      **MR. BARNES:**  So, Your Honor, thank you for the question.
11      Ms. Trebicka did not address the actual issue because
12  we're talking about, in the complaint, allegations of
13  transmissions when our plaintiff was at a ▮▮▮▮▮▮▮▮  ▮▮▮▮
14  ▮▮▮▮▮▮  ▮▮▮▮▮ not on Google.com, and not because of the
15  toolbar transmission in the complaint.

16      And, Your Honor, I don't know if I can share things on --
17      **THE COURT:**  Well, so why is this a Google.com issue?
18  Isn't that captured because the state welfare website is using
19  some other -- you know, is using Google Analytics or Google
20  Ad Manager?

21      **MR. BARNES:**  No.  It's not captured in Display Ads or
22  Google Analytics.

23      And this is the fundamental dishonesty Google is
24  propagating on this Court.  Their deponent testified that those
25  transmissions alleged in the complaint go to Google Search.

1   Not when you're on Google.com.  When you're at █ █

2   █ █ █ █ █ █ █, they go

3   to Google Search.

4        Google is confusing the issue for you.

5   **THE COURT:**  Because -- because you got there through the

6   Chrome browser?  I mean, I'm looking at the class definition.

7   **MR. BARNES:**  Because -- yes.  Because you're on Chrome and

8   you're unsynced, if you go -- for example, paragraph 165 was

9   █ █ which is a █ █

10  █ website.

11   **THE COURT:**  Right.

12   **MR. BARNES:**  This sends data to Google.com, the search

13  engine.  Google's deponents said it went to Search.  Even

14  though you're on █ █ it went to

15  Google Search.

16   **THE COURT:**  Okay.

17   **MR. BARNES:**  So when Ms. Trebicka just said, "Oh, this

18  case is all about communications that weren't directly on

19  Google.com," we want to take -- we want to -- there's actually

20  an issue with that as well.

21       But at the first instance, there are 18 different

22  paragraphs in the complaint alleging unauthorized disclosures

23  of plaintiff data to Google.com, which is Google Search, when

24  they were not on the Google.com web page.

25       And what Google has done is -- I'm sorry, Your Honor.

1   They are perpetrating a fraud on this Court.

2        **THE COURT:**  Well, let's --

3        **MR. BARNES:**  Display Ads --

4        **THE COURT:**  Just tell me --

5        **MR. BARNES:**  Display Ads --

6        **THE COURT:**  -- what you need and why you think you need

7   it.

8        **MR. BARNES:**  Display Ads are different than Google Ads.

9   If you -- and we've distinguished --

10       **THE COURT:**  All right.

11       **MR. BARNES:**  -- in the complaint.

12       If you go to 154, we talked about --

13       **THE COURT:**  I do appreciate that difference.  I do.

14       **MR. BARNES:**  -- Google Ads, Display Ads, and Analytics.

15       If you go to Google Ads, the home page today, it doesn't

16  say anything about Display Ads, Your Honor.  It says search and

17  maps.

18       And so we don't understand what else we -- how many

19  different times we have to allege it in the complaint.  There

20  are literally more allegations about transmissions to

21  Google.com in the complaint than there are Display Ads and

22  Analytics transmissions combined.  So how can those not be

23  relevant?  Their -- and their deponents have admitted.  And

24  they came before this Court and said the NID -- talked about

25  the NID cookie without saying it's not relevant to our case.

UNDER SEAL BY ORDER OF THE COURT

```
1        And while we're at it, I take great issue with
2   Ms. Trebicka's recounting of how we got here.  My
3   understanding, Your Honor, is you didn't like the parties going
4   back into this "he said, she said" about how we got here.
5   We -- if you want to hear the history of it, we're happy to
6   give it to you, but I see from that face you don't want to.
7        She mentioned the dispute --
8        THE COURT:  Okay.  I got it.
9        MR. BARNES:  -- about preservation -- just one more point,
10  Your Honor.
11       She mentioned the dispute about preservation.  The dispute
12  about preservation was about logs Google said was too onerous
13  and too short-lived that they shouldn't have to preserve them.
14       Our understanding is that Search logs are kept for a very
15  long period of time.  And so that's why it's not -- it's not
16  part of their preservation plan.
17       And finally, go back to, their original response to our
18  motion -- to our RFPs said nothing about this being limited to
19  Display Ads and Analytics.  They had a thing in their that
20  said, "We'll give you information about people in Google Ads,"
21  which we understand to mean transmissions to Google.com.
22       At some point I'd also like to address the sideshow about
23  things directly on Google.com and why and how Google made that
24  relevant and --
25       THE COURT:  Not -- not --
```

UNDER SEAL BY ORDER OF THE COURT

1    **MR. BARNES:**  Okay.

2    **THE COURT:**  Not at this point, Mr. Barnes.  Thank you.

3    All right.  Ms. Trebicka?

4    **MS. TREBICKA:**  Yes, Your Honor.

5    **THE COURT:**  Let me just focus that.  Okay?  Let's just,

6    everybody take a breath here.  I don't --

7    **MS. TREBICKA:**  I agree.  I'm actually --

8    **THE COURT:**  I've got -- let me just -- okay?  I -- we have

9    good lawyers and enthusiastic advocates on both sides.

10   **MS. TREBICKA:**  Okay.

11   **THE COURT:**  Would it be helpful --

12   **MS. TREBICKA:**  I hope that was not directed to me

13   specifically, because I will not address --

14   **THE COURT:**  Ms. Trebicka, Ms. Trebicka.

15   **MS. TREBICKA:**  -- fraud on the Court --

16   **THE COURT:**  What the Court wants from -- there's no fraud

17   by Ms. Trebicka on the Court.  Okay?  I'll make that very

18   clear.

19   What I want you to address is, I do see the allegations in

20   the complaint and we see these -- we see the allegations tied

21   to visits to websites, data being transmitted, the argument by

22   counsel this is all going to Google Search, and, you know, that

23   this is -- that it meets the -- you know, this is what is --

24   how the class is defined and is in the -- in the pot, if you

25   will, of the transmissions that are -- that are at issue.

**UNDER SEAL BY ORDER OF THE COURT**

1       And please don't back me up to Google's description of the

2   case as being about disclosures.  I take that.  It's about

3   disclosures and transmissions.

4       So why aren't these relevant?  Or acknowledging they're

5   relevant, why should they not be produced?

6       **MS. TREBICKA:**  Well, I think there's two separate issues

7   here.  There's the issue of the -- of the scope of the case,

8   and then there's the separate related issue of logs and what

9   kinds of transmissions maybe that could have some relevance but

10  for many, many reasons should not necessarily be searched or

11  produced.  Right?

12      So as far as the scope of the case, I think I've addressed

13  it; and I think that --

14      **THE COURT:**  Yes, you have.

15      **MS. TREBICKA:**  Right.

16      **THE COURT:**  Yes.

17      **MS. TREBICKA:**  So, and, you know, I will rest on that.

18      As far as the transmissions at issue, to be frank, this is

19  the first time that we have actually understood what it is that

20  plaintiffs are -- claim we have excluded from the case, because

21  there's countless correspondence and there were countless meet

22  and confers on this issue where the allegation was that -- or

23  the charge was that we were excluding improperly from the case

24  products like Google Search, Google.com, actually -- a user

25  actually going to Google.com.  Right?  So that is something

UNDER SEAL BY ORDER OF THE COURT

1   that we take an issue with.

2       But now we understand that that's not necessarily what

3   plaintiffs are talking about.  And we welcome this kind of

4   clarification.

5       As far as the transmissions at issue, the issue is that

6   the way that plaintiffs are -- want to expand the scope of the

7   case now, it would sweep in dozens of Google products that

8   aren't even -- that would be way too burdensome and

9   disproportional to the case to now find a back door to admit

10  into the case.  There's more than 80 Google products that are

11  listed in the terms of service.

12      Now that plaintiffs are trying to expand the scope of the

13  case just weeks before class certification, I think we really

14  need to ask ourselves very thoughtfully as to whether this is

15  proportional to the needs of this case where, in discovery, we

16  have now found out that -- you know, I will go back to the

17  disclosures just for a little point, which is, the allegations

18  on this -- in this case are based on Google allegedly

19  misrepresenting something in the Chrome Privacy Notice, and now

20  we are finding out in discovery that none of the plaintiffs we

21  deposed have actually read the Chrome Privacy Notice.  We're

22  finding out that none of them (inaudible) --

23      **THE COURT:**  I'm going to let you keep the -- let you

24  preserve -- put on ice the disclosure arguments.

25      **MS. TREBICKA:**  Okay.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**   (Inaudible).

2    **MS. TREBICKA:**   No, that's fine, Your Honor.  But we think

3    there's two issues here.

4        First up, that up until now, it was a mass of non-clarity

5    as to what the scope of the case was introduced in about July

6    of this year; whereas for more than -- or about a year, the

7    parties had proceeded to -- with the understanding that the

8    scope of the case was about Google Analytics and Google

9    Ad Manager within the context of Chrome browsing.  In July, all

10   of these different allegations arose; and frankly, they took us

11   by surprise because they made no sense in the context of the

12   allegations of the case.

13       And now, for the first time, we're hearing that it is

14   about these specific transmissions to Google Search.  Right?

15   Whereas, again, in other correspondence, it's been about all

16   different types of Google products that may receive -- that

17   plaintiffs claim may receive these -- this data when plaintiffs

18   are browsing on Chrome unsynced.

19       So if we can take this narrowing, at least, of what the

20   dispute is -- right? -- I think we've done some progress here.

21   I think perhaps we can try to find some agreement.

22       And, again, it's not -- I don't think it's about the scope

23   of the case.  I think it's more of an issue of the

24   transmissions and perhaps what data there may be in certain

25   types of logs.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Understood.  Okay.  Thank you, Ms. Trebicka.

2  Okay.

3    **MR. BARNES:**  Your Honor?

4    **THE COURT:**  Got it.  I'm going to give that some careful

5  consideration.  And, again, the parties' summary, I think, did

6  highlight these issues and has been further enhanced by the

7  arguments of counsel here today.  So I will give that

8  consideration, and it'll be reflected in my order.

9    All right.  Any -- I think that is everything, then, that

10 was on the Calhoun list.

11    Let me call all counsel back.  You can turn on your

12 videos.  We'll talk briefly about next steps.

13    Let me first, again, call on Special Master Brush.  I

14 obviously want to acknowledge, for the record, the

15 Special Master's hard work; hard and consistent.  "Diligent"

16 I think would be a good word for Mr. Brush and his team.

17    And, Mr. Brush, do you have any comments or questions that

18 you would like to raise at this time or that you would like to

19 direct to the parties on anything that I haven't covered?

20    Oop.  Lost your audio.

21    **SPECIAL MASTER BRUSH:**  There we go.  I was double-muted.

22 Sorry.  Thank you, Your Honor.

23    No.  I'd just like to remind the parties, we exchanged

24 some e-mails over the past 24 hours; that my expectation is for

25 you all to continue to kind of work with each other to the best

UNDER SEAL BY ORDER OF THE COURT

1    possible way to resolving some of these open issues.

2         And, again, there's a lot of nuance and details,

3    obviously, with the technology; but stepping back and looking

4    at it from the macro issues of identifying data sources,

5    searching data sources, producing relevant data as part of the

6    discovery process in the next couple -- really, the next week

7    is going to be paramount.  So really want to encourage folks to

8    be working together and that parties should be meeting and

9    conferring on this.  Certainly do not need my permission.  I

10   will resolve issues as they come up and are needed.

11        But I can't stress enough my desire for you folks to work

12   with each other to resolve these things and come to me with

13   fully -- well, at least a little bit more fully thought out,

14   you know, problems as opposed to just:  Jeez, we can't get

15   anywhere.  I'd like to continue to emphasize that your

16   continued cooperation is appreciated.

17        **THE COURT:**  All right.  Thank you, Special Master Brush.

18        And obviously, the Special Master's position echoes that

19   of this Court, which is, the parties have an obligation,

20   sleeves rolled up, hard work.  You've been doing it on some

21   issues more than others, and -- but it needs to continue.

22        And I know it's exhausting.  And I know often you feel

23   like, you know, there's no -- there's nowhere to go from here.

24   And a good way to test that is, you've got to come back with

25   constructive proposals; not just "Here's a mess.  Here's a

1   problem.  Figure this out," but a constructive proposal and --
2   and the support for that proposal.  So that goes both for
3   issues that come back before me and -- and the issues before
4   the Special Master.  So please keep that in mind because, of
5   course, any constructive proposal that comes to either of us
6   has gone to the other side first, and that is something that
7   you all can look at and evaluate.
8        You all have decisions every day to make about picking
9   your battles because there are limited resources, limited time,
10  and, you know, you all have to -- do have to make some choices.
11  So please continue your earnest and good faith efforts in that
12  regard.
13       As far as next steps with this Court, we talked about a
14  couple of deadlines of submissions that you'll get to me by
15  October 8th, and I will endeavor to get you rulings on those
16  the following week.
17       In terms of when do we meet again, I don't know yet, and I
18  have to step back with my clerks and the calendar.
19       I will not be able to get to you -- we will not have three
20  more sessions.  I know we've got three months to the end of
21  the year.  There will not be another three.  I'm not sure we're
22  going to get to another two, and we may -- we may need to make
23  some adjustments to the format.
24       The reality is, of course, post-COVID or waning COVID, one
25  always hopes, floodgates have opened.  The courts are full and

**UNDER SEAL BY ORDER OF THE COURT**

1    fully at it.  We have a lot of trials set.  We have a lot of

2    motions and a lot of work on the criminal side as well.

3         So I know -- I know you've got tight deadlines, and we're

4    going to get this case -- you know, we're going -- we will keep

5    the discovery managed and moving forward.  So, stay tuned.

6         I also appreciate it takes a lot of coordination on your

7    sides, which is why I usually try to give you dates far enough

8    in advance.

9         So I'll give you dates, and if parties need to meet and

10   confer and request a modest adjustment on dates, I'll entertain

11   that; but, you know, it has to be a mutual request.  And it may

12   be rejected, not because I don't consider counsel's schedule,

13   but it just may be reflecting limitation of court -- court

14   availability.  Okay?

15        All right.  Any final questions or comments for the Court?

16        I think we covered the -- certainly, the priority issues.

17   Didn't conclude them, but -- but I think we touched on all of

18   them.

19        From the Brown plaintiffs, anything further for today?

20   Ms. Bonn?

21        **MS. BONN:**  No, Your Honor.  Thank you.

22        **THE COURT:**  All right.  And for the Calhoun plaintiffs,

23   anything further for today?

24        **MR. STRAITE:**  No, Your Honor.  Thank you very much.

25        **THE COURT:**  Thank you.

UNDER SEAL BY ORDER OF THE COURT

1    All right.  And from Google, anything further for today's

2  proceedings?

3    **MR. SCHAPIRO:**  No.  Thank you and the Special Master and

4  Mr. Schmidt for your time.

5    **THE COURT:**  All right.  Thank you all very much.

6  Appreciate it.  That concludes today's session.

7    Obviously, we did not have a court reporter, Thursday

8  mornings being what they are.  But Ms. Fanthorpe has diligently

9  kept us recording on Zoom, and that is our official recording

10  and can be official (audio breaks up) should the parties so

11  desire.  All right?

12    Okay.  Thank you all very much.  That concludes this

13  matter for today, and we are adjourned.  Have a good day.

14    (Proceedings adjourned at 11:39 a.m.)

15    ---o0o---

16

17

18

19

20

21

22

23

24

25

1

2        **CERTIFICATE OF TRANSCRIBER**

3

4        I, ANA DUB, CSR NO. 7445, RDR, RMR, CRR, CCRR, CRG, CCG,

5   certify that the foregoing is a true and correct transcript, to

6   the best of my ability, of the above pages of the official

7   electronic sound recording provided to me by the U.S. District

8   Court, Northern District of California, of the proceedings

9   taken on the date and time previously stated in the above

10  matter.

11       I further certify that I am neither counsel for, related

12  to, nor employed by any of the parties to the action in which

13  this hearing was taken; and, further, that I am not financially

14  nor otherwise interested in the outcome of the action.

15

16

17  DATE:  Wednesday, October 27, 2021

18

19

20  _____

21       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG

22

23

24

25