# Redacted Version of Document Sought to be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

*Attorneys for Plaintiffs*

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>      Defendant. | Case No.:  5:20-cv-03664-YGR-SVK<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT (R. CIV. P. 15(a))**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Courtroom 1 - 4th Floor<br>Date: March 15, 2022<br>Time: 2:00 p.m.<br><br>**Unredacted Version of Document Sought to be Sealed** |

**NOTICE OF MOTION AND**

**MOTION SEEKING LEAVE TO AMEND COMPLAINT**

PLEASE TAKE NOTICE that on March 15, 2022, at 2:00 p.m., or as soon thereafter as the matter may be heard, the undersigned will appear before the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California at the Oakland Courthouse, Courtroom 1, 1301 Clay Street, Oakland, CA 94612. Plaintiffs will and hereby do move the Court for an order pursuant to Rule 15(a) of the Federal Rules of Civil Procedure granting Plaintiffs leave to file their proposed Third Amended Complaint. This Motion is based upon this Notice and Motion, the following Memorandum of Points and Authorities, the Declaration of Mark C. Mao, other materials in the record, argument of counsel, and such other matters as the Court may consider.

**ISSUE PRESENTED**

Whether Plaintiffs should be granted leave to file their proposed Third Amended Complaint?

**RELIEF REQUESTED**

Plaintiffs respectfully request an Order providing that Plaintiffs may file their proposed Third Amended Complaint, attached as Exhibit A to the concurrently filed Declaration of Mark C. Mao.

Dated: February 3, 2022                    SUSMAN GODFREY L.L.P.

                                           By: */s/ Amanda Bonn*
                                           Amanda Bonn (CA Bar No. 270891)

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 5

BACKGROUND ................................................................................................................... 7

    I.      Google promised Plaintiffs that it would not collect their private browsing data, but Google still collected the data .................................... 7

    II.    The Court denies both of Google's motions to dismiss ........................... 8

    III.   Discovery has proven that Google intentionally chose profits over privacy, ignoring known misconceptions of Incognito ........................ 10

    IV.   Proposed Amendment ......................................................................... 14

ARGUMENT ....................................................................................................................... 19

    I.      Legal Standard .................................................................................. 19

    II.    All four *Foman* factors favor granting leave to amend ....................... 20

          A.    Prejudice ................................................................................ 20

          B.    Undue Delay ........................................................................... 23

          C.    Bad Faith ................................................................................ 24

          D.    Futility ................................................................................... 25

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguilar v. Boulder Brands, Inc.*,
    2014 WL 4352169, (S.D. Cal. Sept. 2, 2014) ...........................................................21, 25, 26

*Bowen v. Target Corp.*,
    2019 WL 9240985 (C.D. Cal. Nov. 12, 2019) ....................................................................25

*Clayborne v. Chevron Corp.*,
    2020 WL 11563087 (N.D. Cal. Dec. 2, 2020) ....................................................................21

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ...............................................................................7, 20, 21

*Foman v. Davis*,
    371 U.S. 178 (1962) .....................................................................................................7, 21

*Hughes v. S.A.W. Ent., Ltd.*,
    2018 WL 6046461 (N.D. Cal. Nov. 19, 2018) ...................................................................20

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ...............................................................................7, 20, 24

*McCabe v. Six Continents Hotels, Inc.*,
    2013 WL 12306494 (N.D. Cal. Oct. 10, 2013) .............................................................23, 24

*Meaux v. Nw. Airlines, Inc.*,
    2006 WL 8459606 (N.D. Cal. July 17, 2006) .................................................................7, 20

*Nangle v. Penske Logistics*, *LLC*,
    2016 WL 9503736 (S.D. Cal. July 20, 2016) .....................................................................21

*Unicolors, Inc. v. Kohl's, Inc.*,
    2016 WL 9211658 (C.D. Cal. Aug. 23, 2016) .............................................................22, 26

**Other Authorities**

Fed. R. Civ. P. 15 ...................................................................................................7, 20, 24

4

## **INTRODUCTION**

Plaintiffs seek leave to amend their Complaint to adjust their class definitions to the evidence Google has produced. The core of this case remains the same: Google's unlawful collection and use of private browsing data by way of Google code embedded within non-Google websites. Judge Koh has twice validated Plaintiffs' theory, denying two separate motions to dismiss. Based on numerous uniform Google disclosures, "Plaintiffs could have reasonably assumed that Google would not receive their data while they were in private browsing mode." Dkt. 113 (Order denying MTD FAC) at 36; *see also* Dkt. 363 (Order Denying MTD SAC).

Discovery substantiates the claims. Google employees internally described Google's private browsing mode (Incognito) as "***effectively a lie***" and "***radioactive***" (Ex.[1] 1, GOOG-BRWN-00630517), "***broken***" (Ex. 2, GOOG-BRWN-00441285 at -86), "***misleading***" (Ex. 3, GOOG-BRWN-00475063 at -65), a "***confusing mess***" (Ex. 4, GOOG-CABR-03827263 at -63), and "not truly private" (Ex. 5, GOOG-BRWN-00406065 at -67), with concerns about "***collecting data without consent in Incognito mode***" (Ex. 6, GOOG-BRWN-00686207 at -43) and "people ***operating under a false sense of privacy***" (Ex. 7, GOOG-BRWN-00457255) (emphases added). Google collected private browsing information despite its awareness of "common misconceptions about private mode" (Ex. 8, GOOG-BRWN-00042388 at -403)—thus "over-promising and under-delivering" (Ex. 9, GOOG-BRWN-00140297 at -302).

Discovery has also revealed the true (and vast) scope of Google's pervasive tracking of such private browsing, and the ███████ of dollars in illicit profits that Google has made from its collection and use of private browsing information. In 2020, shortly before this lawsuit was filed, Google employees quantified the value to Google of just one form of ███████████████ ████████████████████████████████████████████████████████████ in annual Google revenues. Ex. 10, GOOG-CABR-04324934 at -35 (discussing Google's

---

[1] "Ex." refers to the exhibits attached to the Declaration of Mark Mao, concurrently filed herewith.

1 ██████████████████    Other aspects of Google's private browsing tracking are, according to

2 Google's own internal analysis, ████████████

3      Plaintiffs now seek leave to amend their class definitions as follows:

4      Class 1 – All ~~Android device owners~~ Chrome browser users with a Google account who
accessed a non-Google website containing Google ~~Analytics or Ad Manager~~ tracking or
5 advertising code using such a ~~device~~ browser, and who were (a) in "~~private browsing~~
Incognito mode" on that ~~device's~~ browser and (b) were not logged into their Google
6 account on that ~~device's~~ browser, but whose communications, including identifying
information and online browsing history, Google nevertheless intercepted, received, or
7 collected from June 1, 2016 through the present (the "Class Period").

8      Class 2 – All ~~individuals~~ non-Chrome browser users with a Google account who accessed
a non-Google website containing Google ~~Analytics or Ad Manager~~ tracking or advertising
9 code using any ~~non Android device~~ such browser, and who were (a) in "private browsing
mode" on that ~~device's~~ browser, and (b) were not logged into their Google account on that
10 ~~device's~~ browser, but whose communications, including identifying information and
online browsing history, Google nevertheless intercepted, received, or collected from June
11 1, 2016 through the present (the "Class Period").

12

13      While the SAC mentions Google Analytics and Ad Manager in the proposed class

14 definitions, the allegations in the Complaint have never been limited to those two Google services.

15 Rather, the Complaint alleges that Google uses various mechanisms to collect users' private

16 browsing information. As summarized by Judge Koh:

17      Plaintiffs allege that Google collects data from them while they are in private browsing
mode "***through means that include*** Google Analytics, Google 'fingerprinting' techniques,
18 concurrent Google applications and processes on a consumer's device, and Google's Ad
Manager." According to Plaintiffs, "[m]ore than 70% of all online publishers (websites)
19 use one or more of these Google services."

20 Dkt. 113 at 2 (quoting FAC, Dkt. 68 ¶ 8) (emphasis added). Discovery has now proven that Google

21 uses numerous tracking and advertising mechanisms to collect and monetize private browsing data

22 from users' visits to non-Google websites. With this amendment, Plaintiffs seek to conform their

23 class definitions to this discovery, to cover the true scope of Google's illicit tracking, collection,

24 and use of private browsing information.

25      Leave to amend the class definition is warranted because Google cannot meet its burden to

26 establish any of the *Foman* factors: "undue delay, bad faith or dilatory motive, futility of

27 amendment, and prejudice to the opposing party." *Meaux v. Nw. Airlines, Inc.*, 2006 WL 8459606,

28

6

1    at *1 (N.D. Cal. July 17, 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The Second

2    Amended Complaint was filed last April—when discovery was in its infancy. Dkt. 136-1. Google

3    only this month answered that complaint (following the Court's December denial of its motion to

4    dismiss), which makes this Plaintiffs' first opportunity to conform the class definitions to the

5    evidence. Google cannot establish that Plaintiffs seek this amendment in bad faith, nor that

6    amendment will be futile, particularly because their theory of the case remains the one this Court

7    has (twice) affirmed. And since this amendment simply conforms the class definition to discovery

8    Google itself provided, there is no prejudice (the most significant factor). *See Eminence Cap., LLC*

9    *v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Moreover, Plaintiffs do not seek to extend

10   the case deadlines nor serve new discovery on the basis of this amendment. The amendment is

11   simply guided by "the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather

12   than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1128 (9th Cir. 2000).

13   Google's liability and damages should correspond with the evidence that discovery has yielded.

14                                              **BACKGROUND**

15   **I.     Google promised Plaintiffs that it would not collect their private browsing data, but
            Google still collected the data**

16
17        Plaintiffs are Google account holders who chose to use private browsing modes, including

     Google's Chrome Incognito mode, based on Google's promises about private browsing. SAC ¶ 3.
18
     Google assured users that they were "in control of what information [they] share with Google" and
19
     that they could adjust their privacy settings "across [Google's] services" to "control what [Google]
20
     collect[s] and how [their] information is used." SAC ¶¶ 2, 42. To exercise this "control," Google
21
     invited users to "browse the web privately," including through Google's Incognito mode. SAC ¶
22
     42. When users selected Incognito mode in Google's Chrome browser, they were automatically
23
     taken to a Google pop-up "Splash Screen" disclosure which further assured that "Chrome won't
24
     save the following information: [y]our browsing history…[c]ookies and site data." SAC ¶ 52.
25
          In breach of these promises, Google continued collecting users' private browsing
26
     communications with non-Google websites by way of Google tracking and advertising code
27
28                                                    7

1    embedded within those websites. SAC ¶¶ 5, 8, 102, 120, 122. The information sent to Google

2    shows the precise content the user is asking a website to display, as well as a referrer header

3    containing the URL information of what the user has been viewing and requesting from other

4    websites. SAC ¶¶ 5, 63. Google admits that it intercepts and collects this data even when Plaintiffs

5    are in a private browsing mode. Dkt. 164 (Google's MTD SAC) at 1-2.

6         Google collects and uses private browsing data because it is very valuable. A number of

7    platforms allow consumers to monetize their browsing data, and Google would have to pay for

8    this data but for Google's improper collection of it. SAC ¶¶ 135, 138. Google's conduct is

9    particularly egregious because users' private browsing activity reveals sexual interests, political

10   views, and other deeply sensitive, private information. SAC ¶ 162. Google uses that sensitive data

11   to provide targeted advertisements to users and to charge advertisers and websites more for

12   Google's services—thus generating ███████ of dollars in illicit profits. SAC ¶¶ 1, 115-16.

13   **II.     The Court denies both of Google's motions to dismiss**

14        Google tried and failed to dismiss Plaintiffs' First Amended Complaint, which included

15   claims under the (1) Federal Wiretap Act, 18 U.S.C. §§ 2510, et seq.; (2) the California Invasion

16   of Privacy Act (CIPA), Cal. Penal Code §§ 631 & 632; (3) the Comprehensive Computer Data

17   Access and Fraud Act ("CDAFA"), Cal. Penal Code §§ 502 et seq.; (4) Invasion of Privacy under

18   the California Constitution; and (5) Intrusion Upon Seclusion under California law. *See* Dkt. 68.

19   Google principally "contend[ed] that users expressly consented to Google's alleged data collection

20   while they were in private browsing mode," arguing that portions of "Google's Privacy Policy

21   disclosed that Google would receive the data from its third-party services [that Google provides to

22   websites]." Dkt 113 (Order Denying MTD FAC) at 15.

23        This Court disagreed, holding that the general provision on which Google relied "never

24   mentions private browsing mode," much less "disclose[s] Google's alleged data collection while

25   Plaintiffs were in private browsing mode." *Id.* at 15-16. To the contrary, in the Google Privacy

26   Policy and elsewhere, "Google's representations regarding private browsing present private

27   browsing as a way that users manage their privacy and omit Google as an entity that can view

28                                                    8

users' activity while in private browsing mode." *Id.* at 16. For example, the Privacy Policy promised that private browsing (including Incognito) prevents Google from collecting the data Google typically collects by way of the services that Google provides to websites:

> "You can use our services in a variety of ways to manage your privacy. For example, . . . You can . . . choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used." Google's Privacy Policy makes clear that "Our services include . . . Products that are integrated into third-party apps and sites, like ads . . . ."

*Id.* at 19 (quoting Google's Privacy Policy) (alterations in original). "[I]n reality, private browsing does not permit [users] to manage their privacy or control what Google collects because Google collects this information even when they use private browsing mode." *Id.*

In addition to the Privacy Policy, this Court also relied on the Incognito Splash Screen (which is automatically displayed to users at the beginning of every Incognito session), Google's "Search & browse privately" webpage, and Google's Chrome Privacy Notice, holding that "a reasonable internet user could read ***each of*** these statements as representing that 'private browsing mode' prevents Google from collecting users' data." Dkt. 363 (Order Denying MTD SAC) at 21 (summarizing Order Denying MTD FAC) (emphasis added). For example, "Although the Splash Screen states that websites may be able to see a user's activity, the Splash Screen does not state that Google sees a user's activity. Based on the omission of Google from the list of entities that can see a user's activity, a user might have reasonably concluded that Google would not see his or her activity." Dkt. 113 (MTD FAC Order) at 17. Similarly, by promising that "Now you can browse privately, *and* other people who use this device won't see your activity," the Splash Screen represents that "Incognito mode provided privacy from Google and privacy from other people who use the same device." *Id.* at 18 (emphasis in original). Based on these and other uniform Google disclosures, "Plaintiffs could have reasonably assumed that Google would not receive their data while they were in private browsing mode." *Id.* at 36.

Plaintiffs then filed a Second Amended Complaint (Dkt. 136-1), adding breach of contract and UCL claims. Those two claims rely on the same conduct and Google promises that this Court

9

1  considered when it denied Google's first motion to dismiss. Google consented to Plaintiffs'

2  amendment, Dkt. 136, and ultimately filed another motion to dismiss, seeking to dismiss only the

3  two new claims. Dkt. 164. For the contract claim, Google effectively sought reconsideration of

4  this Court's prior ruling, arguing that—at worst—it had failed to disclose that Google "is among

5  the entities that may receive private browsing data," and that an "alleged failure to disclose a

6  practice cannot give rise to contract liability." Dkt. 164 (MTD) at 9.

7  　　　This Court *again* disagreed with Google, holding that "[a] reasonable user could read the

8  contract as promising that 'private browsing mode' would prevent Google from collecting users'

9  data." Dkt. 363 at 19. "A reasonable user could conclude that Google's repeated affirmative

10  assertions that 'private browsing mode' provides internet users with 'privacy' and 'control' were

11  meant to emphasize to users that Google would provide users with the maximum amount of data

12  privacy." *Id.* at 21-22. This Court also explained that "the contract must be interpreted objectively"

13  and that "the objective meaning of a contract is determined by reading the contract 'from the

14  perspective of a reasonable [Google] user.' By offering an interpretation about what Plaintiffs

15  'reasonably expected,' Plaintiffs provide that perspective." *Id.* at 23.

16  　　　This Court also sustained the UCL claim, holding that Plaintiffs "plausibly alleged that

17  Google's data collection practice caused Plaintiffs to lose 'money or property.'" *Id.* at 24.

18  "[B]ecause Google previously has paid individuals for browsing histories, it is plausible that, had

19  Plaintiffs been aware of Google's data collection, they would have demanded payment for their

20  data." *Id.* at 26. And "because there are several browsers and platforms willing to pay individuals

21  for data, it is plausible that Plaintiffs will decide to sell their data at some point." *Id.*

22  **III.   Discovery has proven that Google intentionally chose profits over privacy, ignoring
　　　known misconceptions of Incognito**

23
　　　Though discovery, Plaintiffs have obtained internal Google documents acknowledging

24  "known misconceptions" concerning Incognito and other private browsing modes. Google was

25  aware of but never fixed what its own employees referred to internally as "The Incognito Problem."

26
　　　　● In 2015, Google employees had "Incognito-fest" meetings and discussed "ditching the

27  　　　　Incognito name entirely" (Ex. 11, GOOG-BRWN-00393432), recognizing that "[u]sers

28  　　　　　　　　　　　　　　　　　　　　　10

are surprised that Google gets information about their browsing while in incognito mode" (Ex. 12, GOOG-CABR-03750737 at -55) and that "[u]sers often misunderstand what Incognito does" (Ex. 13, GOOG-CABR-04981563 at -67).  Google employees admitted that Incognito was "effectively a lie" and also "radioactive" and explained how Google's privacy team had "dropped the ball." Ex. 14, GOOG-BRWN-00806426.

- In 2018, Google employees discussed what they called "The Incognito Problem" and how Google was "over-promising and under-delivering" with "complex disclosures" that "confuse people" (Ex. 9, GOOG-BRWN-00140297 at -299, -302). Senior Google employees agreed "there is an incognito problem" (Ex. 15, GOOG-BRWN-00804212) and described Incognito as a "confusing mess" (Ex. 4, GOOG-CABR-03827263 at -63). Google employees recognized that "the blame for people's misconceptions about Incognito mode is due to that name and branding." Ex. 16, GOOG-CABR-03923580 at -81.

- In 2019, Google employees explained that Incognito was "not private in ways that many users want, that is, as to Google," with Google actually "recording the data you input" and logging "your activity in Incognito"—thus providing "fewer data controls" and no ability to "delete" that data. Ex. 17, GOOG-BRWN-00153850.C at -55.C, -56.C. Google employees prepared a document for Google CEO Sundar Pichai regarding "known misconceptions about protections Incognito mode provides" where they warned Mr. Pichai "Do not use the words private, confidential, anonymous, off-the-record when describing benefits of Incognito mode." Ex. 18, GOOG-BRWN-00048967.C at -68.C.

- In 2021, after this lawsuit was filed, Google's top executives understood that Incognito was "not truly private, thus requiring really fuzzy, hedging language that is almost more damaging." Ex. 5, GOOG-BRWN-00406065 at -67. ████████████████ Google knew that "[u]sers have misconceptions about Incognito and often overestimate the protections." Ex. 19, GOOG-CABR-04668451. The stated goal of that project was to "clear up known user misconceptions" about Incognito. (Ex. 20, GOOG-CABR-04739841 at -41), but Google never made those changes.

Instead of fixing the Incognito Problem, Google CEO Sundar Pichai chose not to.  Mr. Pichai led the team that launched Incognito in 2008, which knew then that "[p]eople didn't understand Incognito." Ex. 21, GOOG-BRWN-00409986 at -87. Similarly, a 2015 "Perceptions of Google Chrome Incognito" report (again recognizing that people were "confused" and "unsure about [Incognito's] true functionality") discussed "work contributed toward the Privacy/Policy presentation to Sundar [Pichai]." Ex. 22, GOOG-BRWN-00477510 at -11, -14. Informed of "known misconceptions" regarding Incognito (Ex. 18, GOOG-BRWN-00048967.C at -68.C), Mr. Pichai decided in 2019 that he did not want to "put incognito under the spotlight" (Ex. 23, GOOG-

11

BRWN-00388293 at -93). And although Mr. Pichai initially expressed "enthusiasm" for an

████████████████████ (Ex. 24, GOOG-CABR-05126022 at -23) █████

(Ex. 25, GOOG-CABR-05269357.R at -79.R), that concept was never launched, and Google

continued collecting users' private browsing information. An internal Google slideshow

presentation titled "The Future of Incognito" sums up Google's shortcomings nicely:

Ex. 26, GOOG-CABR-05756666 at -84.

Google's misconduct has impacted millions of Americans. Google tracks Incognito usage

through its ████████████████████████████████████████████████

██████ Ex. 27, GOOG-BRWN-00394965) ████████████████████████

████████████████████" Ex. 28, GOOG-CABR-04967959 at -59. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ 9. Ex. 29, GOOG-BRWN-00750077. ██████████████████████

12

1   ███████████████████████████████████████████████████████

2   ████████████████████ Ex. 30, GOOG-BRWN-00601022. Google documents also prove that

3   most Chrome users are Incognito users. *E.g.,* Ex. 31, GOOG-BRWN-00529122 at -22 ("Incognito

4   mode is used by ████ of Chrome users, and ████ use it at least once per week"). Discovery has

5   substantiated Plaintiffs' allegations that Google's illicit tracking impacts millions of Americans.

6       Discovery has also shown that Google has made ████ of dollars from its unlawful

7   collection and use of private browsing information. ████████████████████████

8   ███████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ████████████████████ (Ex. 10, GOOG-CABR-04324934 at -35). Extrapolating back to

13  the start of the Class Period, this "ChromeGuard" analysis alone suggests that Google was unjustly

14  enriched by more than ████████ This ████████ figure is limited to the value of information that

15  Google collected from Incognito users' visits to non-Google websites (i.e., the data at issue in this

16  case). A third-party cookie is a cookie sent by a server that "is not the same as the server that a

17  person browsing the web is in the middle of visiting at the time that the communication happens"—

18  Ex. 32, Kleber Tr. 34:17-35:1—e.g., a Google cookie used to track a user visiting a non-Google

19  website. Conversely, Google cookies are "first-party" cookies when placed on a user's browser

20  during a visit to a Google website because "the domain that is sending or receiving the cookie is

21  the same as the one that the person browsing is in the middle of visiting." *Id.* 35:4-8.

22      Google could have blocked third-party cookies within Incognito far earlier than 2020, but

23  Google chose not to because Google knew that it would lose money. Former Google engineer

24  Justin Schuh testified that "as a technical matter, the hard part is not making the change," and he

25  confirmed that Google could have made this particular change as early as June 2016 (the start of

26  the Class Period) and probably earlier. Ex. 33, Schuh Tr. 146:21-147:6; *see also* Ex. 34, GOOG-

27  BRWN-00397243 at -44 (August 2016 email from Justin Schuh stating that "I realize that this is

28
                                            13

1   [a] subject [] fraught with peril, but maybe it's time to take another crack at a phasing third-party

2   cookie blocking into Chrome by default"). Consistent with Mr. Schuh's testimony that Google

3   could have made this change years earlier, Google's competitors implemented third-party cookie

4   blocking long before Google. For example, Apple implemented Intelligent Tracking Prevention

5   ("ITP") for Safari in June 2017, which "blocked most third-party tracking cookies." Ex. 35,

6   GOOG-CABR-04588763 at -78.

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ███████████████████████████████████████████. Ex. 10, GOOG-

12  CABR-0432934 at -37, -39, -40. Relatedly, Google Analytics, which is used by over ███ of the

13  "top 1M websites," Ex. 36, GOOG-BRWN-00490767 at -72, uses "first-party cookies" even on

14  non-Google websites. *See* Ex. 32 Kleber Tr. 175:20-177:2.[2]

15      Other Google documents assessed the financial impact to Google of proposed changes to

16  Incognito that were never adopted. One proposal would have permitted private browsing to start

17  with an "incognito.google.com" website, with an estimated revenue impact of ████████ per year

18  based on an assumed ███ usage. Ex. 37, GOOG-CABR-04787255 at -91. The proposal also noted

19  that "If mode usage is mainstream -> ███████ as a lower bound." *Id.* As such, discovery has

20  substantiated Plaintiffs' allegations that Google reaps billions in illicit profits from its collection

21  and use of private browsing information. SAC ¶¶ 1, 113-38.

22  **IV.    Proposed Amendment**

23      Plaintiffs now seek leave to amend only their proposed class definitions:

24

25  ─────────────────────

26  [2] Google engineer Michael Kleber admits that it is "somewhat confusing" that Google Analytics
    cookies are classified as "first-party" cookies when used on non-Google websites. Ex. 32, Kleber

27  Tr. 176:1-3. The upshot is that Google's belated decision to finally implement third-party cookie
    blocking was mitigated by Google reclassifying Analytics cookies to be "first-party" cookies.

28                                       14

Class 1 – All ~~Android device owners~~ Chrome browser users with a Google account who accessed a non-Google website containing Google ~~Analytics or Ad Manager~~ tracking or advertising code using such a ~~device~~ browser, and who were (a) in "~~private browsing~~ Incognito mode" on that ~~device's~~ browser and (b) were not logged into their Google account on that ~~device's~~ browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the "Class Period").

Class 2 – All ~~individuals~~ non-Chrome browser users with a Google account who accessed a non-Google website containing Google ~~Analytics or Ad Manager~~ tracking or advertising code using any ~~non-Android device~~ such browser, and who were (a) in "private browsing mode" on that ~~device's~~ browser, and (b) were not logged into their Google account on that ~~device's~~ browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the "Class Period").

There are two changes reflected above. First, rather than divide the classes between Android owners and non-Android owners, the classes are now divided between Chrome Incognito users and users of other private browsing modes. This change does not alter the scope of the case at all—it merely adjusts how class members are categorized between the two classes (by browser as opposed to device).

The second change conforms the class definitions to what Plaintiffs have learned in discovery about various Google tracking and advertising mechanisms that collect and monetize users' private browsing information. While the current class definitions mention two such Google services (Analytics and Ad Manager), the Complaint has always alleged that Google uses numerous additional mechanisms to collect private browsing information:

- Google intercepts and collects this data by causing the user's web browsing software to run ***Google software scripts*** (bits of code) that replicate and send the data to Google servers in California. SAC ¶ 5 (emphasis added).

- Google accomplishes its surreptitious interception and data collection through means ***that include*** Google Analytics, Google "fingerprinting" techniques, concurrent Google applications and processes on a consumer's device, and Google's Ad Manager. SAC ¶ 8 (emphasis added).

- Google also authorizes Websites to place ***digital pixels*** ('Google Approved Pixels') embedded within the Websites' code. SAC ¶ 102 (emphasis added).

- Google secretly plants ***numerous tracking mechanisms*** on users' computers and web browsers, which allow Google to track users' browsing histories and correlate them

15

with user, device, and browser IDs, rendering ineffective users' efforts to prevent access to their data. SAC ¶ 122 (emphasis added).

Discovery supports these allegations. Google's collection and use of private browsing data extends beyond the tracking and advertising code used for Google Analytics and Ad Manager.

For example, Plaintiffs have learned through discovery that Google collects and monetizes private browsing information by way of conversion tracking code, which forms a significant portion of Google's ███████ financial analysis. *See* Ex. 10, GOOG-CABR-04324934 at -35. An advertising conversion "occurs whenever a user takes any action that is identified as important or relevant to a given advertiser/marketer," including signing up for something or making a purchase. Ex. 38, GOOG-CABR-03738741 at -41. "Historically, conversion tracking has been done via third-party cookies. The user clicks an ad, they are . . . redirected to a Google-owned domain where a cookie is set, then finally redirected to the customer's landing page. When a user later converts [i.e., buys something on the website], the ***conversion tracking beacon*** picks up the conversion cookie from the Google-owned domain (which in that context is third-party) and the conversion can then be joined back to the original click." Ex. 39, GOOG-CABR-00903677 at -77 (emphasis added). These conversions happen on *non*-Google websites regardless of whether the advertisement the user viewed or clicked leading up to the conversion event was first shown on a Google website or non-Google website.

For the ███████ analysis, conversion revenue was attributed to each of Search ads, YouTube ads, and Display ads. *See* Ex. 10, GOOG-CABR-04324934 at -35:

16

This breakdown proves that Google uses private browsing information collected from users' visits to non-Google websites (via third-party Google cookies and trackers) to monetize advertisements shown not only on non-Google websites but also by linking the information to users' visits to Google websites (e.g., Google.com). While users might start with a Google search, the tracking and conversions depend on what users do on *non*-Google websites—which has always been the focus of this case. Google can "join[] back" any conversion event to the "original click." Ex. 39, GOOG-CABR-00903677 at -77 (e.g., clicking a Search ad and later making a purchase on a non-Google website). The same is true for conversions based on display ads (ads shown to users on non-Google websites). In the display ad scenario, Google joins the user's click on an advertisement during her visit to non-Google site A (e.g., NY Times) with her decision to make a purchase on non-Google site B (e.g., Ticketmaster.com). Google collects and joins all of this data notwithstanding its promises that private browsing mode (including Incognito mode) prevents Google from collecting the data it typically collects by way of the services it provides to websites.

17

Google uses other mechanisms to track and monetize conversions. For example, one internal Google document explains how while it is relatively easy to track a "conversion [that] happens in the same incognito session," ███████████████████████  ████████ ██████████████████████████████████████████████," e.g., a user views an advertisement within an Incognito session and then later (perhaps on an entirely different device) makes the purchase. Ex. 40, GOOG-CABR-00547295 at -95. Another document describes conversion tracking as "complex" and lists "different ways to track website conversions."

Ex. 41, GOOG-CABR-04076770 at -75.

As another example of a Google tracking technology, Google collects information about private browsing users' visits to non-Google websites by way of AdSense, which is a service for publisher websites, similar to Google Ad Manager. Ad Manager and AdSense are each Google services that generate targeted advertisements to be displayed on non-Google websites. SAC ¶ 118. Plaintiffs initially specified only Google Ad Manager in their class definition because Ad Manager is the ad exchange that serves display ads for AdSense. *See* Ex. 42, GOOG-CABR-00543864 at -923. Now, Google appears to take the position that AdSense is somehow not part of the case. Mao Decl. ¶ 10. But Plaintiffs recently served an interrogatory asking Google to explain any differences between AdSense and Ad Manager with respect to how the embedded Google

18

code cause users' browsers to send copies of users' communications to Google. Google's response confirms that the two services are functionally equivalent for purposes of this case:



Ex. 43, Google's Resp. to Interrogatory No. 30.

Discovery has shown that Google's tracking of private browsing information is not limited to Google Analytics and Ad Manager. This amendment conforms the Complaint to that discovery.

## ARGUMENT

### I.     Legal Standard

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The Supreme Court has stated that 'this mandate is to be heeded.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Similarly, the Ninth Circuit has "repeatedly stressed that the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities." *Id.* at 1127 (alteration in original). "This leave policy is applied with extreme liberality." *Hughes v. S.A.W. Ent., Ltd.*, 2018 WL 6046461, at *1 (N.D. Cal. Nov. 19, 2018).

"The Supreme Court has identified four factors relevant to whether a motion for leave to amend should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party." *Meaux v. Nw. Airlines, Inc.*, 2006 WL 8459606, at *1 (N.D. Cal. July 17, 2006) (citing *Foman*, 371 U.S. at 182). "As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 185 (9th Cir. 1987)). "Absent prejudice, or a strong showing of any of the remaining

19

*Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* (emphasis in original). As "[t]he non-moving party[, Google] bears the burden of demonstrating why leave to amend should not be granted." *Clayborne v. Chevron Corp.*, 2020 WL 11563087, at *1 (N.D. Cal. Dec. 2, 2020).

## II.    All four *Foman* factors favor granting leave to amend

Here, Google cannot meet its burden as to any of the *Foman* factors, particularly because Plaintiffs are not seeking to serve new discovery and because the crux of the case remains Google's collection and use of private browsing information collected by way of Google tracking and advertising code embedded within non-Google websites.

### A.    Prejudice

Leave to amend should be granted because the prejudice factor "carries the greatest weight," and Google cannot demonstrate any prejudice for several reasons. *Eminence Cap*, 316 F.3d at 1052. *First*, Plaintiffs' Complaint has always alleged that Google unlawfully collected third-party browsing data via a *variety* of tracking technologies that merely "include" Google Analytics and Ad Manager, among others. SAC ¶¶ 5, 8, 102, 120, 122. Plaintiffs have also long alleged that Google enhances and monetizes Google Search by way of information collected from private browsing users' visits to non-Google websites:

> Google market power in Search is entirely dependent on its ability to track what consumers are doing. The ***trackers that Google has across the internet*** not only tell Google where consumers go subsequent to searching on Google Search, the trackers allow Google to track what websites are popular and how often they are visited.

SAC ¶ 121 (emphasis added). This allegation is substantiated by Google's production of documents confirming its various methods of conversion tracking and its ███████ analysis. Google has produced documents about a variety of its tracking mechanisms outside of Google Analytics and Ad Manager—reflecting that Google itself understood these other tracking mechanisms to be within the scope of Plaintiffs' claims.

*Second*, there is no prejudice when "[d]iscovery should not be substantially impacted." *Aguilar v. Boulder Brands*, Inc., 2014 WL 4352169, at *5 (S.D. Cal. Sept. 2, 2014). Plaintiffs have

20

1   no plans to propound additional discovery tied to this amendment. Mao Decl. ¶ 7. Plaintiffs have

2   already served their RFPs, and Plaintiffs have already served their forty allotted interrogatories

3   and their seventy-five allotted Requests for Admissions. *Id.*; *see also* Dkt. 298 (Order limiting

4   ongoing discovery). Plaintiffs have already sought dates for all 20 of their permitted depositions,

5   including by allotting three slots for 30(b)(6) depositions. Mao Decl. ¶ 7. And Plaintiffs will not

6   seek an extension of the discovery deadlines on the basis of this amendment.[3]

7        Brand new discovery is unnecessary because, as before, "the focus remains on Defendant's

8   [collection and use of private browsing data from non-Google websites] and their . . .

9   representations" regarding private browsing. *Aguilar*, 2014 WL 4352169, at *5. Plaintiffs'

10  "amendment relates to the same set of facts that were at issue in the original complaint, [and] will

11  therefore not require voluminous discovery and will have little impact on the length of the judicial

12  proceedings since no trial date had been set and motion practice is still ongoing." *Nangle v. Penske*

13  *Logistics*, LLC, 2016 WL 9503736, at *4 (S.D. Cal. July 20, 2016) (granting leave to amend); *see*

14  *also Unicolors, Inc. v. Kohl's, Inc.*, 2016 WL 9211658, at *2 (C.D. Cal. Aug. 23, 2016) (granting

15  leave to amend because the proposed amendment "will not result in significant additional

16  discovery, nor would it affect the scheduled trial date"). The crux of this case has always been

17  Google's collection, storage, and use of private browsing information collected during users' visits

18  to non-Google websites by way of embedded Google code. *See* SAC ¶ 62.

19       Google may argue that the amendment is prejudicial because Plaintiffs are seeking Rule

20  30(b)(6) testimony about its conversion tracking technologies and Ad Sense (in addition to

21  Analytics and Ad Manager). To be sure, for the Rule 30(b)(6) deposition notices Plaintiffs served

22  back in December, Plaintiffs are seeking testimony relating to AdSense, Search ads revenues, and

23  conversion tracking, among other topics. Mao Decl. ¶ 8. That's not new. Plaintiffs have been

24  seeking that same testimony since December 3, when they served their three Rule 30(b)(6) notices.

25

26  _____

[3] To the extent a modification of the discovery deadlines becomes necessary, it will be for Google to complete its obligations with respect to already served discovery, including Rule 30(b)(6) depositions (for notices served on December 3) and the data productions being overseen by Special Master Brush—for which Google is already far behind its deadlines. Mao Decl. ¶ 7.

27

28

21

1  *Id.* Plaintiffs reasonably seek this testimony based on documents Google previously produced,

2  including documents regarding the ███████ financial analysis. Google has been resisting

3  Plaintiffs' Rule 30(b)(6) topics on the grounds that its Search ads revenues and AdSense are

4  irrelevant, as Plaintiffs' claims center around data collected from users' visits to non-Google

5  websites and the class definition did not specifically mention AdSense. Mao Decl. ¶ 10.

6      These arguments attack a straw man and are simply erroneous. Plaintiffs do not seek this

7  testimony to argue that Google violates the wiretap statutes when it collects a user's Google.com

8  search query. Rather, Plaintiffs seek this testimony to explore how Google *uses* information

9  collected from people's visits to *non*-Google websites to monetize Google Search ads, as reflected

10  in the ChromeGuard analysis. That conduct amounts to improper use of data collected from users'

11  visits to non-Google websites. Moreover, as discussed above, discovery has confirmed that

12  AdSense operates in a functionally equivalent way with respect to collecting users' non-Google

13  browsing activity. Google is not prejudiced by adjusting the class definition to reflect a fact it has

14  long been aware of and that has already been the subject of extensive document discovery.

15      *Third*, that this amendment might increase liability—by referencing Google's tracking and

16  advertising code in the class definition as opposed to merely Analytics and Ad Manager—provides

17  no basis to deny leave. *See McCabe v. Six Continents Hotels, Inc.*, 2013 WL 12306494, at *1 (N.D.

18  Cal. Oct. 10, 2013). In *McCabe*, the plaintiffs initially alleged that the "defendant unlawfully

19  recorded, without consent or notice, calls to toll-free telephone numbers through which callers

20  made reservations for Holiday Inn Hotels." *Id.* During discovery, "plaintiffs came to learn that

21  toll-free reservation numbers associated with Six Continents Hotels' other hotel brands likely were

22  routed to the same call centers as the numbers identified in the complaint." *Id.* Plaintiffs therefore

23  sought leave to amend to "add allegations regarding the additional hotel brands." *Id.* at *2. The

24  court granted leave, reasoning: "While the proposed amended complaint would cover a larger

25  number of telephone numbers and hotel brands, it would be based on the same alleged unlawful

26  practice—the unauthorized recording of telephone conversations." *Id.*

27

28                                    22

Here, as in *McCabe,* to the extent the amendment "would cover a larger number of [collections of private browsing information]," leave is warranted because the Complaint is still "based on the same alleged unlawful practice—the unauthorized" collection (and subsequent use) of private browsing communications collected during users' visits to non-Google websites. *Id.* This "proposed amendment does not raise a new legal or factual theory that would alter the nature of the action." *Id.* Plaintiffs have no plans to serve new discovery, nor to extend the case deadlines on the basis of this amendment. Plaintiffs will also be amending their initial disclosures and prior discovery responses to make them consistent with what they have learned in discovery. And if Google has any questions about the amendment, it is free to serve discovery.  Plaintiffs now merely seek to amend their class definitions as they begin to prepare their motion for class certification. To deny leave in these circumstances would lead to a final judgment on "technicalities" rather than the merits—thereby flouting the "underlying purpose of Rule 15." *Lopez*, 203 F.3d at 1127.

### B.      Undue Delay

Nor can Google establish that Plaintiffs have delayed in seeking this amendment, much less unduly delayed. This is Plaintiffs' first opportunity to seek this amendment. Plaintiffs previously amended their complaint on April 14, 2021—right after the Court denied Google's motion to dismiss the First Amended Complaint. Dkt. 113; *See* Dkt. 136-1. At that point, discovery was just in its infancy. In fact, this Court had recently criticized Google for moving too slowly and delaying its production of non-public Google documents. *See* Dkt. 116 ("The Court is disappointed that Google has produced just 983 documents [since January 6, 2021], and all but one of those documents is publicly available."). Plaintiffs did not yet have the full collection of non-public Google documents that form the basis of this amendment. Mao Decl. ¶ 6.

When Google did finally begin producing documents in earnest (with a substantial completion date of October 6, 2021, Dkt. 242-1), Google produced documents confirming a variety of tracking and advertising code embedded in non-Google websites, which Google used to collect users' private-browsing data. *Id.* These documents confirmed that Google itself understood such tracking technologies to be within the scope of relevant discovery in this case. In the meantime,

23

1  the parties were awaiting the Court's decision on Google's motion to dismiss the Second Amended

2  Complaint's two new claims (breach of contract and UCL) (Dkt. 164). The Court denied that

3  motion on December 22, 2021, Dkt. 363. Google then sought and received a ten-day extension on

4  its deadline to file its Answer, which Google ultimately filed on January 14, 2022. Dkt. 387.

5        Around the same time—in December 2021—Google for the first time articulated its

6  position that it would not produce a Rule 30(b)(6) witness concerning some of its tracking and

7  conversion technologies (such as AdSense) because it did not believe such technologies were

8  within the scope of Plaintiffs' class definition. Mao Decl. ¶ 9. Google took this position, despite

9  the fact that (1) Plaintiffs' Complaint has long alleged that Google used a variety of other tracking

10  technologies; (2) the Court's orders on Google's motions to dismiss have also discussed examples

11  of such other technologies; and (3) Google itself had been producing documents in discovery about

12  such other technologies. Plaintiffs now promptly move to conform their proposed class definition

13  to what they have learned in discovery since filing the previous complaint, at the first practical

14  opportunity to do so in light of Google's substantial production of documents in the Fall of last

15  year; the Court's recent resolution of Google's motion to dismiss the SAC (and Google's Answer);

16  and Google's recent arguments concerning Plaintiffs' class definition.

17        Finally, even if Plaintiffs have delayed in seeking this amendment (and they have not),

18  "delay, by itself, is insufficient to justify denial of leave to amend," *Aguilar*, 2014 WL 4352169,

19  at *1, particularly when the amendment is triggered by information learned through discovery.

20  "The volume and complexity of discovery in a case is an acceptable reason for delayed

21  amendment." *Bowen v. Target Corp.*, 2019 WL 9240985, at *3 (C.D. Cal. Nov. 12, 2019).

22      **C.**    **Bad Faith**

23        Plaintiffs do not seek to amend in bad faith. "Bad faith has been construed by the Ninth

24  Circuit as an amendment sought with wrongful motive or a plaintiff merely . . . seeking to prolong

25  the litigation by adding new but baseless legal theories." *Id.* at *5. To the contrary, Plaintiffs'

26  amendment "can be fairly characterized as a clarification of the allegations. There is nothing

27  deceptive about the scope of Plaintiff's revisions or how she describes the revisions." *Aguilar*,

28                                        24

1   2014 WL 4352169, at *4. Plaintiffs are simply clarifying that the class definition should not be

2   limited to information tracked by Analytics and Ad Manager, as (1) the SAC alleged extensively

3   that Google used a variety of tracking technologies and (2) discovery has confirmed as much.

4       **D.**    **Futility**

5       Finally, Google cannot establish that amendment would be futile. This Court has twice

6   affirmed Plaintiffs' theory of the case, namely, that Google promised that private browsing would

7   prevent Google from collecting the data it typically collects by way of the services it provides to

8   non-Google websites. In its initial motion to dismiss, Google argued that Plaintiffs consented to

9   Google's collection of their private browsing information by agreeing to the Google Privacy

10  Policy, which stated: "We collect information about the services that you use and when you use

11  them, like when you . . . visit a website that uses our advertising services, or view and interact with

12  our ads and content." Dkt. 82 at 5 (quoting Google Privacy Policy) (alteration in original) (internal

13  quotation marks omitted). Google's argument tellingly did not rely on a disclosure unique to

14  Google Analytics or Google Ad Manager. Google instead argued that it had generally disclosed

15  that embedded Google tracking and advertising code collects information about users' visits to

16  non-Google websites. This Court disagreed:

17
18  > Google argues that . . . Google's Privacy Policy disclosed that Google would receive the
    > data ***from its third-party services***. However, Google's Privacy Policy does not disclose
    > Google's alleged data collection while Plaintiffs were in private browsing mode. . . . In
19  > addition . . . , Google's representations regarding private browsing present private browsing
    > as a way that users can manage their privacy and omit Google as an entity that can view
20  > users' activity while in private browsing mode.

21  Dkt. 113 (MTD FAC Order) at 15-16 (emphasis added). This holding applies with respect to any

22  Google tracking or advertising code used to provide services to non-Google websites, including

23  AdSense and conversion tracking codes. Moreover, amendment "would not be futile because the

24  amendment relates to important concerns useful to the just disposition of this case." *Unicolors,*

25  *Inc.*, 2016 WL 9211658, at *2. Google's damages should correspond with the evidence.

26                           **CONCLUSION**

27      Plaintiffs respectfully request leave to file their proposed Third Amended Complaint.

28  25

1

Dated: February 3, 2022                          SUSMAN GODFREY L.L.P.

2

3                                                By */s/ Amanda Bonn*

4                                                Amanda Bonn (CA Bar No. 270891)
                                                 abonn@susmangodfrey.com
5                                                SUSMAN GODFREY L.L.P.
                                                 1900 Avenue of the Stars, Suite 1400
6                                                Los Angeles, CA 90067
                                                 Telephone: (310) 789-3100
7

8                                                Mark C. Mao (CA Bar No. 236165)
                                                 mmao@bsfllp.com
9                                                Beko Rebitz-Richardson (CA Bar No. 238027)
                                                 brichardson@bsfllp.com
10                                               Erika Nyborg-Burch (*pro hac vice*)
                                                 enyborg-burch@bsfllp.com
11                                               BOIES SCHILLER FLEXNER LLP
                                                 44 Montgomery Street, 41st Floor
12                                               San Francisco, CA 94104
                                                 Telephone: (415) 293 6858
13                                               Facsimile (415) 999 9695
14
                                                 James W. Lee (*pro hac vice*)
15                                               jlee@bsfllp.com
                                                 Rossana Baeza (*pro hac vice*)
16                                               rbaeza@bsfllp.com
                                                 BOIES SCHILLER FLEXNER LLP
17                                               100 SE 2nd Street, Suite 2800
                                                 Miami, FL 33130
18                                               Telephone: (305) 539-8400
                                                 Facsimile: (305) 539-1304
19
                                                 William Christopher Carmody (*pro hac vice*)
20                                               bcarmody@susmangodfrey.com
                                                 Shawn J. Rabin (*pro hac vice*)
21                                               srabin@susmangodfrey.com
                                                 Steven Shepard (*pro hac vice*)
22                                               sshepard@susmangodfrey.com
                                                 Alexander P. Frawley (*pro hac vice*)
23                                               afrawley@susmangodfrey.com
                                                 SUSMAN GODFREY L.L.P.
24                                               1301 Avenue of the Americas, 32nd Floor
                                                 New York, NY  10019
25                                               Telephone: (212) 336-8330
26
                                                 John A. Yanchunis (*pro hac vice*)
27
                                                              26
28

1    jyanchunis@forthepeople.com
     Ryan J. McGee (*pro hac vice*)
2    rmcgee@forthepeople.com
     MORGAN & MORGAN, P.A.
3    201 N Franklin Street, 7th Floor
     Tampa, FL 33602
4    Telephone: (813) 223-5505
     Facsimile: (813) 222-4736
5
6    Michael F. Ram, CA Bar No. 104805
     MORGAN & MORGAN
7    711 Van Ness Ave, Suite 500
     San Francisco, CA 94102
8    Tel: (415) 358-6913
     mram@forthepeople.com
9
10   *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27