# EXHIBIT 1

# Redacted Version of Document Sought to be Sealed

Message

---

| | |
|---|---|
| **From:** | Parisa Tabriz [parisa@google.com] |
| **Sent:** | 2/11/2015 6:57:06 PM |
| **To:** | Chris Palmer [palmer@google.com] |
| **CC:** | Adrienne Porter Felt [felt@google.com] |
| **Subject:** | Re: Incognito-fest 2015 |

On Wed, Feb 11, 2015 at 10:52 AM, Chris Palmer <palmer@google.com> wrote:
On Wed, Feb 11, 2015 at 4:41 AM, Adrienne Porter Felt <felt@google.com> wrote:

> Second question. Is Incognito something our team wants to take on? (Palmer,
> in Q2 or Q3?) It would take attention and focus away from HTTPS but OTOH it
> is also something I know we all care about. Or should we focus on trying to
> poke the privacy team into action?

1. Sure, I can give a brief briefing. What is the best format?
Document, slides, in-person chat, a CL that has +0 lines and -15000?
:)

2a. I'm not sure we should take it on. It's radioactive: In its
current form, it is effectively a lie; in its fixed form (rebranded,
clarified) it will be a huge negative press cycle like Master Password
was (most people drunkenly screeching; Kevin Poulsen being the lone
sane voice); in its genericized form (█████████████████████████
█████████████████████████████████████) people will
think we killed it unceremoniously and then it will be 100%
screeching.

I'd prefer our team does not take this on and Chrome Privacy steps up.

2b. If we don't take it on, it will fester and perhaps metastasize,
and we will feel like we were derelict in our duty.

I think we should help Chrome Privacy step up.

2c. Does Privacy team realize they have dropped the ball? I.e. if we
try to take it on, will they push back thinking it's still theirs? Or,
can we get them on board with our plan and then get them to act on it,
solving (2a)?

Which Privacy Team are we talking about? I consider Chrome Privacy distinct from "Privacy Team" (where
Garth comes from)...

CONFIDENTIAL

# EXHIBIT 3

## Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From:** | palmer@google.com [palmer@google.com] |
| **Sent:** | 7/11/2018 4:44:17 PM |
| **To:** | palmer@google.com; jyasskin@google.com; estark@google.com; kenrb@google.com; ellyjones@google.com; agl@google.com; sleevi@google.com |
| **Subject:** | AAAA952KuYI-IULXO2v58wc |

- **palmer@google.com** 2018-07-11T16:44:17.423Z

There's some interest in ████████████████████████ again

- **palmer@google.com** 2018-07-11T16:44:36.620Z

Mozilla and IPT 2 have everyone what we can do (which is good)

- **Updated on**2018-07-11T16:52:30.089Z

Mozilla and IPT 2 have everyone wondering what we can do (which is good)

- **palmer@google.com** 2018-07-11T16:44:45.067Z

but I remain not on-board with ██ per se

- **palmer@google.com** 2018-07-11T16:44:54.465Z

what do other people think?

- **jyasskin@google.com** 2018-07-11T16:45:08.462Z

Also https://brave.com/tor-tabs-beta/.

o        https://brave.com/tor-tabs-beta/

- **Updated on**2018-07-11T16:52:18.703Z

Also https://brave.com/tor-tabs-beta/.

o        https://brave.com/tor-tabs-beta/

- **estark@google.com** 2018-07-11T16:45:10.704Z

"Mozilla and IPT 2 have everyone what we can do" <-- missing a word?

- **kenrb@google.com** 2018-07-11T16:49:13.034Z

the question is whether we should consider trying to add web anonymization to Incognito?

- **estark@google.com** 2018-07-11T16:49:30.440Z

████████████████████████████████████

- **estark@google.com** 2018-07-11T16:49:38.983Z

and is basically orthogonal?

- **palmer@google.com** 2018-07-11T16:51:51.768Z

Oh, sorry: *wondering* what we can do

- **palmer@google.com** 2018-07-11T16:52:12.512Z

@Emily Stark Yes. But, people are just brainstorming.

- **estark@google.com** 2018-07-11T16:53:06.993Z

@Mike West has lots of Thoughts on the ITP stuff, have you seen any of his docs/brainstorms already?

- **palmer@google.com** 2018-07-11T16:53:14.634Z

1 idea was to ████████████████████████ (!!!). I was like, no.

- **kenrb@google.com** 2018-07-11T16:53:23.823Z

████████████████████████████

- **palmer@google.com** 2018-07-11T16:53:32.557Z

Yeah I joined the ████████ list, if that's what you mean @Emily Stark

- **palmer@google.com** 2018-07-11T16:54:15.470Z

a fear is that too-good tracking prevention will just escalate the arms race and we'll end up in a Fingerprinting Nightmare World

- **ellyjones@google.com** 2018-07-11T16:54:16.981Z

We looked at this for Chrome OS many years ago also

- **palmer@google.com** 2018-07-11T16:54:20.311Z

yeah

- **estark@google.com** 2018-07-11T16:54:25.686Z

in a former life I worked on a project to bundle a node in every webpage ☺

- **ellyjones@google.com** 2018-07-11T16:54:31.290Z

and the ███ people hard passed on the idea of shipping a ███ node on each chromebook - it would have demolished their infra

- **ellyjones@google.com** 2018-07-11T16:54:49.786Z

(this was in like 2011 so maybe things have changed)

- **ellyjones@google.com** 2018-07-11T16:55:03.495Z

I know Sleevi has strong feelings about ████████████████████████

- **estark@google.com** 2018-07-11T16:55:45.126Z

@Chris Palmer I also fear the Prompt On Every Subresource For Every Webpage Nightmare World

- **kenrb@google.com** 2018-07-11T16:56:09.079Z

@Chris Palmer but maybe we can reduce fingerprinting vectors to the point where few people are individually distinguishable

- **ellyjones@google.com** 2018-07-11T16:56:19.715Z

"This website would like to load an image. [Allow] [Deny]"

- **agl@google.com** 2018-07-11T16:58:17.233Z

Clearly the answer is for the whole world to use AMP, then we can expose the AMP cache via a Private Information Retrieval protocol and disable Javascript when rendering.

- **palmer@google.com** 2018-07-11T16:59:15.671Z

that is... wow

- **palmer@google.com** 2018-07-11T16:59:25.640Z

If I weren't already sitting down, I'd need to sit down

- **jyasskin@google.com** 2018-07-11T17:00:45.654Z

I assume everyone's seen https://www.blaseur.com/papers/www18privatebrowsing.pdf? (Thanks @Martin Shelton)

o        https://www.blaseur.com/papers/www18privatebrowsing.pdf

- **palmer@google.com** 2018-07-11T17:01:04.761Z

yep, I am waving it in front of people

- **palmer@google.com** 2018-07-11T17:01:36.786Z

I am going to get back on my old shit of yelling that we need to stop calling it Incognito and stop using a Spy Guy icon

- **palmer@google.com** 2018-07-11T17:01:40.468Z

Temporary Mode

- **palmer@google.com** 2018-07-11T17:02:27.381Z

although that paper does note that people were least confused by Chrome's disclosure (their word for the disclaimer/explainer language)

- **palmer@google.com** 2018-07-11T17:02:54.443Z

Incognito: Voted Least Confusing Private Mode, 2018

- **ellyjones@google.com** 2018-07-11T17:04:37.562Z

good news palmer

- **ellyjones@google.com** 2018-07-11T17:04:47.313Z

we're working on a Dark Mode for Mac Chrome that will probably look quite a bit like incognito

- **kenrb@google.com** 2018-07-11T17:05:32.947Z

call it 'Dark Web Mode'

- **ellyjones@google.com** 2018-07-11T17:05:50.778Z

I love it

- **palmer@google.com** 2018-07-11T17:06:44.351Z

sob

- **kenrb@google.com** 2018-07-11T17:07:04.006Z

@Chris Palmer I know the 'incognito' war was waged and lost years ago, but do you remember why? It has always been a misleading name

- **palmer@google.com** 2018-07-11T17:07:22.790Z

Just as long as we don't get a Dark Intellectual Web Mode
(https://www.nytimes.com/2018/05/08/opinion/intellectual-dark-web.html)

o          https://www.nytimes.com/2018/05/08/opinion/intellectual-dark-web.html

- **ellyjones@google.com** 2018-07-11T17:07:40.746Z

regardless of the name, the icon should always have been http://simpsons.wikia.com/wiki/Guy_Incognito

o          http://simpsons.wikia.com/wiki/Guy_Incognito

- **ellyjones@google.com** 2018-07-11T17:07:49.327Z

which also accurately conveys the level of privacy it provides I think

- **palmer@google.com** 2018-07-11T17:08:13.654Z

@Ken Buchanan They didn't believe me that people would get confused; and they were still loving the Aw, Snap!/i18n-resistant whimsy thing

- **palmer@google.com** 2018-07-11T17:08:17.227Z

Maybe now is the time

- **kenrb@google.com** 2018-07-11T17:08:37.081Z

CONFIDENTIAL

GOOG-BRWN-00475065

I see

- **palmer@google.com** 2018-07-11T17:08:38.747Z

now that we have results from, among others, a person we offered an Enamel job to (Sascha Fahl, co-author)

- **kenrb@google.com** 2018-07-11T17:09:13.964Z

"We have this wall of text explaining to people that incognito doesn't mean unrecognizable, when we use it"

- **sleevi@google.com** 2018-07-11T20:03:52.557Z

Yes, Eric Roman has similarly Strong Feelings about ███████████. In theory, I'm not opposed to █████
████████████████████████████████████████████████████ is that it's
largely un(der?)staffed. Between ████████████████, things just get... really weird and unpredictable. I
mean, same as Android, just more weird. ████████████████████
████████████████████████████████████████.

GOOG-BRWN-00475066

# EXHIBIT 4

# Redacted Version of Document Sought to be Sealed

Message

**From:** Rachel Popkin (Google Docs) [comments-noreply@docs.google.com]
**Sent:** 12/10/2018 9:33:08 PM
**To:** mardini@google.com
**Subject:** Synthesized Themes for Browser 6 Pager

Rachel Popkin added comments to Synthesized Themes for Browser 6 Pager
New

2 comments

New
Comments


### Adrienne Porter Felt

We have to stop thinking about privacy as a bit flip within Chrome and instead think of it as a core part of our product. We have to re-think flows from the beginning, making it transparent to users when and how their data is being shared and then give them the control to either edit or remove that data. We have to be able to do this for our first party relationship with Google, through third-party relationships with websites, and within the complexity of shared-device scenarios.

something we need to decide: how far do we want to go with this?

do we want to stop opting people in to ███ by default? do we want to build federated analysis with ███


### Parisa Tabriz

I think we need to understand what problems we're solving first. For example, even if we could design and publish a provably privacy-preserving system to do ad remarketing, I'm not sure if that makes it any less creepy to users or will mean Apple criticizes us any less.

I'd love to be challenged on this, but I don't think we get criticisim because ███ is opt-out, or even got any criticism when we made the opt-in-to-opt-out change. My guess is because (1) most users don't care about/understand this level of detail (2) users that do care think the tradeoff and change was reasonable.

From my view, sync/identity/privacy+security-settings are just way too complicated, and users can't make any reasoned tradeoffs for themselves without more help. Also, incognito is a confusing mess that also doesn't have high user awareness, and all of this makes situations where people use Chrome in shared settings dangerous (w.r.t. privacy). If we could materially address some of these problems, I'd be pretty happy.


### AbdelKarim Mardini

I don't think ███ and the likes are the issue. If we're talking about user perception/feelings, there is a clear PR/narrative issue that needs concerted x-functional effort to fix regarding privacy, in-product as well as off-product. It's also not a Chrome issue per se but a Google issue overall and Chrome is collateral damage.

### Rachel Popkin
I just caught up with bgalbs on potassium's 2 year plan, and I'm newly worried about history sync. Let's discuss!

ReplyOpen

CONFIDENTIAL

**AbdelKarim Mardini**

who remix and create content

The mental model I had been using here is the creation of public "Play Lists" about topics (well, Reading Lists", I guess) that are analogous to users who create public Deezer/Spotify Plalists, or public maps with interesting stuff on it, ...etc. Is this what you mean by remixing?

**Rachel Popkin**

I think remix involves changing or layering on something new - but maybe curation is part of that! I love the idea of play lists for the web on certain topics.

ReplyOpen

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you are a participant in the updated discussion threads.Change what Google Docs sends you.You can not reply to this email.

GOOG-CABR-03827264

# EXHIBIT 5

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From:** | Lorraine Twohill [lorraine@google.com] |
| **Sent:** | 1/29/2021 3:30:31 AM |
| **To:** | Sundar Pichai [sundar@google.com]; Rahul Roy-Chowdhury [rahulrc@google.com]; Jen Fitzpatrick [jen@google.com]; Luiz André Barroso [luiz@google.com] |
| **Subject:** | Today is Data Privacy day...so please read! |

Hi folks,

As today is International Data Privacy Day (check out our homepage), and Privacy has been on my mind, as well as all of yours for some time,  I wanted to share some thoughts. It has been almost 11 years since I first spoke at Exec Circle (and Ben listened!) about User Trust and needing a Google Account with controls. And 7 years since I did the User Trust tgif. I have been doing  a lot of thinking (and asking!) over the years. And we have made a lot of progress but our challenges are even greater. We need more velocity! So, since I know you all agree, and I know Sundar that you have been thinking about this too, I wanted to share my random thoughts here, as hopefully somewhat useful and actionable. And yes there will be reasons why a lot of this is hard, but we are at our best when solving really hard problems! And then just maybe we could get to this vision that we put together just over a year ago,

With the greatest of respect, and apologies in advance for my ramblings...

L.

What I think we need:

1.
2.    Much more visible comms on and off product
3.
4.
5.    Privacy as a feature/products making meaningful change
6.
7.
8.    Definitive progress in ads, including showing that we are ok losing out too
9.
10.
11.    Owning our absolute strength in security
12.
13.
14.    Other random ideas that could help

## 1. Much more visible comms on and off product

In 2020, we sent over ▮▮▮▮ users to our privacy check ups and ▮▮▮▮ to our security check up from our homepage and promo efforts. But it feels completely separate from those *moments of truth* when a user is in-product and needs our help. What if we:

- 
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ There's a number of moments in product where we already use the shield and messaging to signal

privacy and security protections (e.g., "only you can see this" for Google Account related queries in Search and in My Activity). But we need to accelerate implementation across PAs so it shows up in the products people use every day.

•

•

• **Increase user facing reassurances in-product**: No more unexplained features or cross-product data usage that freaks a user out. We know that a feature can trigger user concern over how their data is being used and why (particularly x-app). Increase investment and prioritize ▮▮▮▮▮▮▮▮ to provide users with helpful transparency, education, and access to their controls in these moments.

•

•

• **Explain ourselves much, much better. And do that everywhere.** This is not new work but is a compelling way of talking about the data we have, 3 types of data, stuff you save, stuff you do (your activities) and stuff we use for ads (much smaller). If we did this well, everywhere, including in your Google Account, it would help a lot.

•

•

• **Move our promo real estate to the TOP of the screen in mobile.** Instead of push-up promos, move them to the top of the screen so they are unmissable. Instagram P&S promos are at the top of the screen, Twitter's promos are overlays. At the bottom of the screen, ours don't have the same gravity and visibility, making our P&S messages feel unimportant/optional. By adding some friction we will increase engagement and demonstrate to users and KOFs that privacy and security are a top priority.

•

• **Establish GSEC(Google Safety Engineering Center) in the US.** Building on the successful launch of GSEC Munich (and GSEC Dublin) let's identify key offices where we have strong privacy efforts (e.g. Cambridge for Chrome) and establish GSEC in the US as a key part of our KOF outreach efforts.

## 2. Privacy as a feature/products making meaningful change

We need more products built upon our privacy north star that PDPO has been championing. Our collaboration with Pay is a good example of how a product can build privacy and security right into the product ('A safer way to pay'). But there is more that is needed to ensure that across the company we live up to the new privacy principles and develop consistent, scalable privacy features that bring those principles to life. Could we start with:

**Giving users more transparency and control over their data**





**Creating more visible, ownable privacy products and brands:**

### 3. Make faster and more demonstrable progress on ads

Users point to our ads as THE reason why they can't trust Google and why they think we sell their personal information to 3rd parties. While we have made great progress with things like our recent Privacy Sandbox announcement there is more we need to do here faster. We could start with:

- 
- **Focus on where we think the long term is in Ads.**

- 
- 
- **Improve Ads Settings/make this a much bigger deal:**
. This <u>page</u> is decent, we need to tell people about it in product and link to it, and we need to promote it and also make it better.
- 
-

- **Making Mute this Ad a more valuable property.** Every ad has 'mute this ad' but the current experience is limited and does not allow us to tell our story to our users. ███████████████

-
-

- **Accelerating potential changes in ad retargeting.** ███████████████████████████████████████████████████████████████████████████████████████████████████

-
-
○

○       **Further accelerate Privacy Sandbox efforts:** As part of the Privacy Sandbox effort to replace 3P cookies in Chrome, ███████████████████████████████████████████████████████████████

○

○

○       **Push for Privacy Norms faster:** In parallel to Privacy Sandbox, Ads is working to get internal alignment on a ████████████████████████████████████████████████████████████████████████████████

○

○

○       **Increase velocity around Experiments**: Beyond the Privacy Sandbox and Privacy Norms efforts, there are also user experiments being conducted in Ads, such as one that ███████████████

-
-

- **Explore tagging ads that preserve privacy**. Introduce a ████████████████████████████████████████

anonymized). Make this work across all surfaces, building from Chrome. Brand these ads!
-
-

- **Mythbust Data Selling:** ████ of users believe we sell their data.  We need to do more to communicate to them **in-produc**t that their data is never sold and never shared without their permission.

## 4. Owning our absolute strength in security

We do a lot to keep people safe across Chrome, Android, Gmail and your Google account but people have no idea. We keep lots of KOFs safe and governments, but do we tell them? Users see privacy and security as two sides of the same coin so our leadership here is a huge opportunity. Could we:

-

- **Develop a bolder Security claim.** What is the equivalent of "Never sell our users' personal information to anyone" for Security. Our current underline version ("Build the strongest security technologies into our products") does

not seem bold enough. ██████████████████████████████

- 
- 
- **Humanize our Security efforts:.** ████████████████████████████████

████████████████████████████████████████.

- 
- 

- **Add helpful security tips to every security email.** The emails we send to verify when users have signed into a new device are the most frequent email we send - super high volume and frequency of impressions - so much so that there are memes online about Google Security detecting anything suspicious
- 
- 

- **More visibly surface security benefits in user comms.** Remind users of all the occasions where we have their back. One of the reasons MSFT is scoring well on security is that you have to consciously update versions, install virus protections, etc. In our case we do a lot of that invisibly (in Chrome/Chrome OS/Android/Play Protect/Gmail). For example we could: ████████████████████████

████████████████████████████████████████████████
████████████████████████████

- 
- 

- **Treat users like VIPs when security issues arise**: Beyond communicating how we're activating our 'automatic' protections, such as spam protections in Gmail, ████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

- 
- 

- **Incentivize users to use our security features.** Put our money where our mouth is. Show that we care about our users' safety so much we will ████████████████████████████

████████████████

## 5. Other random ideas that could help

These are various other areas we could invest in that would help. We should think about:

- 
- ████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████.
- 
- 
- ████████████████████████████████████████████████
████████████████████████████████████████████████
-

- **Developing an** ███████████████████████████████████████

If you got this far, thank you for reading!

Your privacy obsessed pal...

L.

GOOG-BRWN-00406070

# EXHIBIT 6

# Redacted Version of Document Sought to be Sealed



**KOF Research Review:**
Reputation Council Update

June 2021

Brand Studio
il. insightslab

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-BRWN-00686207

## Goals for today:

1. Educate: Systems in place to understand KOF sentiment/action

2. Go Deep: KOF IQ

3. Discuss: Gaps / asks

## Why KOFs?

1. Significantly more pressure from KOFs globally

2. More marketing investment than ever before

3. Increased research demand; new systems in place

google_l
ogo

il. insightslab

# What can we learn from KOF IQ?

## *EMEA*

google_l
ogo

il. insightslab

- KOF Social Listening has been running in EMEA for the past few years (since 2018 for KOF, and 2017 for consumer) but this year we transitioned to a globally aligned structure



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



A Google KOF mention is when one of our KOFs is mentioned alongside Google.
This includes mentions that are ones to be further analyzed and fall within our
topic structure and those that fall outside such as a mention saying "Google
posted record sales", or passing mentions of Google in a side headline.
A KOF All Topic Google mentions are mentions that fall within Corporate
Responsibility, Economic Contribution, Technology, Products, Initiatives &
Events.
KOF Main Topic Google mentions are those that fall within Corporate
Responsibility, Economic Contribution or Technology.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



- This is taken from our recently released qrtly report
- One key learning from is that Google is being grouped together with GAFAM as 'big tech' and this is impeding our overall perception
- Several years ago, we saw in Europe that Google and Facebook were consistently mentioned in tandem. Google took decisive steps to differentiate (in terms of Policy approach) ahead of the Cambridge Analytica scandal, and this lessened the damage
- This is something that we need to address again in Europe, as it exacerbates 'market power' perceptions and we actually see Google sentiment is more positive when discussed in isolation of other 'big tech'
- Data and tax are the other key issues in Europe

GOOG-BRWN-00686243



GOOG-BRWN-00686244

# EXHIBIT 8

# Redacted Version of Document Sought to be Sealed



GOOG-BRWN-00042388



GOOG-BRWN-00042389

Chrome User Segments (US)

CONFIDENTIAL



**Follower** — These **less tech savvy users crave security and privacy**, but **aren't sure how** to achieve it. They struggle to differentiate between browsers, and are waiting to be **told what to do to get where they want to go.**

**Traditionalist** — These long tenured internet users view browsers through an early 2000s lens, and crave speed & reliability most of all. They see browsers as a **limited tool for navigating the internet**, and don't bother themselves with privacy.

**Power User** — These are the true power users, who self-selected their current browser very carefully and understand the differences. They **sign in, use across devices, and want help to protect their privacy** which will strengthen their trust with Chrome.

**App Fan** — This more mobile focused group cares less about browsers because they find what they need through apps. They're **willing to trade privacy for customization**, but don't possess the DIY spirit to do it through a browser they find complicated.

**Customizer** — These free spirits want **convenience, customization, and personalization** as they discover and explore the internet. They're not particularly worried about privacy, and instead want to tailor their experience to what they want.

CONFIDENTIAL



The UX Research Archive has ███ "incognito entries"*

I did not study all :-) but skimmed quite some of them and compiled main meta-level insights.

Let's go.

CONFIDENTIAL

GOOG-BRWN-00042392

Use Cases

CONFIDENTIAL

GOOG-BRWN-00042393



CONFIDENTIAL

GOOG-BRWN-00042394





Chrome Signin Awareness Survey | December 2019

Visited website types when using Incognito / Private Browsing mode  (multiple responses possible, n = 2000)

CONFIDENTIAL



Types of information that participants wouldn't want the following people *[Spouse, Children(s), Parent(s), Sibling(s), Roommate(s), Boss, Co-workers and Google]* to have access (N = 256).

CONFIDENTIAL

GOOG-BRWN-00042397

Identity-related vs. Context-dependent Use

CONFIDENTIAL
GOOG-BRWN-00042398

OneGoogle | June 2019

Users see Incognito as a "Mode".

*When asking the participants if incognito is a mode, a state, a type of an account or something different, all participants describe that "incognito is a mode".*

GOOG-BRWN-00042399

Assistant | July 2019

## Evidence differs with regards to personalization.

**A Google Assistant version that still "knows them" seems very appealing**

● Many users said that a version of "private mode" that they would use is one that doesn't record any interactions, but may still use information about them.

● Users had a variety of opinions for what information it should remember about them from before the "private session."

● Unclear how many would actually use this - but the existence itself is comforting.

CONFIDENTIAL



Incognito Users*: What if Feature [X] is Implemented in a more Privacy Observant Manner? (N = 99)
* Uses Incognito at least once per month

CONFIDENTIAL

Misconceptions & Expectations

CONFIDENTIAL

sumUX Research | March 2020
Chrome Lit. Review | 2018

What do users think private modes are? What does it do or not do?
Do users understand what works or doesn't work when they are in the mode?

- **Participants overestimate private mode protections.** There are several common misconceptions about private mode, including that it prevents all external parties from accessing user data and search history, safeguards against hacking, and protects against tracking and ad targeting... gives anonymity, obscures location, hides browsing activity from Google...

- **Participants do not understand how private mode works.** Although participants understand search history and cookies are not saved in private mode, they do not understand its technical mechanisms or that private mode has limited protection against external parties.

- **Participants expect limited functionality in private mode.** There is some evidence that participants don't expect websites/applications to fully function in private mode.

GOOG-BRWN-00042403



Chrome Sign in Awareness Survey | December 2019

[redacted] of user expect **no session-based tracking.**

[redacted] users expect **multi-session but no bookmarks** being shared across modes and **device location being obscured.**

[redacted] users expect **more security** and privacy from ISPs. Others expect tracking across modes.

[redacted] users expect **anonymity** even **after signing** into a website.

[redacted] users expect **browsing history** being stored.

*Wrong and unsure responses per belief question (Incognito mode only; n = 1025)*

GOOG-BRWN-00042404

Tactical Research

CONFIDENTIAL

GOOG-BRWN-00042405

sumUX Research | March 2020

Do users expect private modes to stay on for all future sessions until they turn it off? How would participants react to having their private session expire after a certain period of time? Indirect evidence...

- **expect to manually terminate private sessions.** Participants generally understand that they must exit their private browser to end their session.

- **like automatic timeouts of private sessions.** Some participants are concerned their information will be made vulnerable if they forget to end their session. Automatic timeouts may make them feel more secure, and participants already expect automatic session terminations when logged into sensitive accounts (i.e. banking, healthcare sites).

- **appreciate system reminders.** Some participants find it difficult to tell when they are in public vs. private mode. Given the concern about forgetting to end a private session, better indicators about the status of a private session may help participants feel more secure.

GOOG-BRWN-00042406

Geo UXR | March 2019

# But, auto-expire is differently perceived.

**Background:**

+   This study aims to understand **users' motivations for and expectations of using Incognito mode in GMM.**

**Auto-expire:**

+   Auto expire did not resonate with users; almost all expected the session to remain on permanently.

**Data storage:**

+   Most ppts expected their location history to be private at the GMM account and device levels. There was no consensus on whether or not Google saved this information. Several expressed disappointment, but no surprise at the prospect of Google saving this data.



GOOG-BRWN-00042407



Incognito Users*: Should Feature [X] be enabled in Regular vs. Incognito (N = 138)
* Uses Incognito at least once per month

GOOG-BRWN-00042408

sumUX Research | March 2020

What are any risks or potential moments when trust might be lost with participants while in private mode? How can these risks be mitigated or minimized?

- **Not being made aware of private mode limitations.** Given that participants overestimate private mode protections, participants are surprised and feel misled when made aware of private mode vulnerabilities.

- **Being shown ambiguous or misleading disclosures.** Although participants often click through or ignore disclosures, disclosures should be difficult to ignore in order to clear up misconceptions and mitigate potential trust violations.

- **Having personal information leaked.** Settings that clearly show when they are in private mode, easy control of the mode, and control over information sharing may mitigate this concern.

- **Receiving targeted ads or suggestions.** Unless it is clearly disclosed that their activity may be trackable, receiving targeted ads or suggestions based on private mode activity may erode trust.



No statistically significant differences between any group (p=▉▉▉▉).

GOOG-BRWN-00042410

Branding, Awareness

CONFIDENTIAL

GOOG-BRWN-00042411





GOOG-BRWN-00042413

NBU

CONFIDENTIAL

GOOG-BRWN-00042414



GOOG-BRWN-00042415

## NBU users are not familiar with Incognito Mode.

- Some words in the disclaimer text (particularly "school", "employer", and "internet service provider") confuse participants.

- A Mini Learning video aided comprehension, and most said they understood the main purpose of Incognito after watching. However, only a few could demonstrate its use.

- Most understood the No History concept from the Mini Learning Video



The confusing section of the video

CONFIDENTIAL

UXR Recap

CONFIDENTIAL

GOOG-BRWN-00042417



You've gone Incognito. Have you?

# EXHIBIT 9

# Redacted Version of Document Sought to be Sealed

# The Incognito Problem

Chris Palmer (palmer@)

CONFIDENTIAL

GOOG-BRWN-00140297

# Key Fact: Incognito Confuses People

CONFIDENTIAL

GOOG-BRWN-00140298

## "Incognito" Confuses People

We know from intuition, anecdotes, and now empirically (Yuxi Wu, et al.; see also Habib, et al.) that the "incognito"/Spy Guy branding, and the complex disclosures (like all complex disclosures), confuse people as to what exact guarantees it offers and does not offer.

Ironically, across all browsers, Chrome's disclosures were the least confusing by a modest amount. But it's still bad.

GOOG-BRWN-00140299

| Id | Date | Text |
|----|------|------|
| 1 | 07/22/2018 07:53:36 | It'd be good to try to replicate or further validate the study, but I'd be surprised if we got a significantly different result. |

CONFIDENTIAL

GOOG-BRWN-00140300

Yuxi Wu, Panya Gupta, Miranda Wei, Yasemin Acar[†], Sascha Fahl[†], Blase Ur

**Table 5: Scenarios where participants held misconceptions, shown with the correct answers and percentage of participants who gave incorrect answers. For comparative scenarios, (in)equality symbols denote the correct answer, and we give the sum of all participants answering otherwise.**

| Scenario | Answer | | % Incorrect | |
|---|---|---|---|---|
| | Std. | Priv. | Std. | Priv. |
| *Overestimating private mode's privacy protections* | | | | |
| Search queries associated (logged in) | Yes | Yes | 1.5 | 56.3 |
| Bookmarks saved across sessions | Yes | Yes | 25.4 | 46.5 |
| Geolocation can be estimated | Yes | Yes | 5.2 | 40.2 |
| Employer can track browsing | Yes | Yes | 1.1 | 37.0 |
| Better protected from viruses/malware | Std. = Priv. | | 27.1 | |
| IP address can be collected | Yes | Yes | 0.7 | 25.2 |
| Government can track browsing | Yes | Yes | 4.1 | 22.6 |
| ISP can track browsing | Yes | Yes | 3.0 | 22.0 |
| *Underestimating private mode's privacy protections* | | | | |
| Downloaded file in browser's list | Yes | No* | 1.3 | 51.7 |
| Proportion of targeted ads | Std. > Priv. | | 30.9 | |
| Search queries associated (not logged in) | Yes | No | 20.2 | 30.0 |

*Except in Brave's private mode, which does retain download history

**Table 6: Distinguishing scenarios where private mode's impact depends on the browser or context.**

| Scenario | % Yes | |
|---|---|---|
| | Std. | Priv. |
| Items in shopping cart saved across sessions | 97.8 | 78.8 |
| Browser extensions active across sessions | 98.3 | 69.1 |
| Forensic expert can reconstruct browsing history | 98.7 | 52.8 |
| Site-specific preferences (e.g., for pop-ups) saved | 98.3 | 31.3 |

**Table 7: Distribution of responses for comparative scenarios where the impact depends on the browser or context.**

| Scenario | % Responses | | |
|---|---|---|---|
| | Std. > Priv. | Std. = Priv. | Std. < Priv. |
| Amount of ads | 32.2 | 64.9 | 2.9 |
| Page loading speed | 24.8 | 53.6 | 21.6 |

$(\chi^2(12) = 38.1, p = .001)$. In the control condition, 32.4% of participants mistakenly believed downloaded files would still be listed in the browser. A higher proportion of participants in Brave (62.2%,

CONFIDENTIAL                                                          GOOG-BRWN-00140301

## This Is Bad

**We are over-promising and under-delivering.**

This is bad for people and reflects badly on our product when/if people do come to understand.

CONFIDENTIAL

GOOG-BRWN-00140302

Key Question:
What Do People
Use Incognito
For?

CONFIDENTIAL

## Why Do People Use Private Modes?

From Wu, et al.:

1. Hide browsing history, especially visits to adult websites;
2. prevent targeted ads and search suggestions;
3. achieve "safer" browsing;
4. Prevent browsers from saving login-related information;
5. avoid cookies;
6. accommodate intentional or unintentional use by others.

CONFIDENTIAL

GOOG-BRWN-00140304

| Id | Date | Text |
|---|---|---|
| 1 | 07/23/2018 13:28:04 | what's the motivation here? how does this differ from 2? |
| 2 | 07/23/2018 13:28:04 | This is a list of reasons that people reported to the researchers for why they use private browsing modes. Part of the point of the research is that people don't fully understand the mechanisms. |

GOOG-BRWN-00140305

## Incognito Is Overloaded

Those 6 reasons are related but different. Perhaps we really need multiple modes (we've already got Guest mode)?

Or more and easier affordances for privacy and control in Settings/elsewhere?

CONFIDENTIAL

# Key Fact: There's A Privacy Feature Race

CONFIDENTIAL

GOOG-BRWN-00140307



GOOG-BRWN-00140308

**tom's HARDWARE**   PRODUCT REVIEWS   BUYING GUIDES   HOW TO   DEALS   NE'

## A Firefox Competitive Advantage

The Tor Project developers said that Project Fusion has the accord of Mozilla's CEO and CTO, which probably means it has a high chance of coming to fruition. However, many issues have to be considered first, such as developing private telemetry, fixing the problem with fingerprinting resistance breaking websites, and so on.

Additionally, Mozilla wants to first standardize the Tor client specification, write conformance tests for it, and open the documentation. All of that means that more people could look at how Tor is implemented in Firefox and see if there are any issues with that implementation.

The main reason why Mozilla would even want to integrate Tor into Firefox is because it could provide its users real private browsing, something that most competitors will not be able to offer. Mozilla has taken an increasingly strong pro-privacy stance in the past few years, and Project Fusion could further boost its pro-privacy image.

It could also put Firefox in a much more direct contrast with Chrome, a browser developed by Google, which is heavily invested in user tracking in order to serve more targeted ads.

GOOG-BRWN-00140309

## ITP, ITP2, ITP3

Safari and Mozilla are moving in this area, and we'll need to have some kind of response as well.

GOOG-BRWN-00140310



GOOG-BRWN-00140311



GOOG-BRWN-00140312



CONFIDENTIAL

GOOG-BRWN-00140313

Options

CONFIDENTIAL
GOOG-BRWN-00140314



CONFIDENTIAL

GOOG-BRWN-00140315



CONFIDENTIAL



| Id | Date | Text |
|----|------|------|
| 1 | 07/23/2018 14:04:19 | |
| 1 | 07/23/2018 14:05:29 | |
| 2 | 07/23/2018 14:05:29 | |

GOOG-BRWN-00140317



CONFIDENTIAL

GOOG-BRWN-00140318



CONFIDENTIAL

GOOG-BRWN-00140319



GOOG-BRWN-00140320





## Most VPN Services are Terrible

Short version: I strongly *do not* recommend using any of these providers. You are, of course, free to use whatever you like. My TL;DR advice: Roll your own and use Algo or Streisand. For messaging & voice, use Signal. For increased anonymity, use Tor for desktop (though recognize that doing so may actually put you at greater risk), and Onion Browser for mobile.

This mini-rant came on the heels of an interesting twitter discussion:
https://twitter.com/kennwhite/status/591074055018582016

Again I strongly do *not* recommend using any of these providers.

Provider / known "Secret" Key

```
Astril / way2stars
EarthVPN / earthvpn
GFwVPN / gfwvpn
GoldenFrog / thisisourkey
IBVPN / ibVPNsharedPSK!
IPVanish / ipvanish
NordVPN  / nordvpn
PrivateInternetAccess (PIA) / mysafety
PureVPN / 12345678
SlickVPN / gogoVPN
TorGuard / torguard
TigerVPN / tigerVPN
```

source: https://gist.github.com/kennwhite/1f3bc4d889b02b35d8aa

CONFIDENTIAL

GOOG-BRWN-00140322



GOOG-BRWN-00140323

**Key Question: How Much Breakage Will People Tolerate?**

CONFIDENTIAL

GOOG-BRWN-00140324



CONFIDENTIAL

# Conclusion: Options, But No Single Clear Path

GOOG-BRWN-00140326



GOOG-BRWN-00140327





GOOG-BRWN-00140329

# EXHIBIT 10
# Redacted in its Entirety

# EXHIBIT 12

# Redacted Version of Document Sought to be Sealed



CONFIDENTIAL

GOOG-CABR-03750737



CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-03750739

Google

Currently supported use cases

- user wants to hide browsing activity to someone with access to the device (e.g. spouse)
- user doesn't want information about their browsing be tracked longtime on the internet (readvertising, records in search history)
- user doesn't want information about their browsing to be shared with Google

Google Confidential and Proprietary

| Id | Date | Text |
|---|---|---|
| 1 | 02/25/2015 19:27:01 | +battre@google.com Dominic, could you please review and add missing use cases, if any? |

Google Confidential and Proprietary



## Current promises

### You've gone incognito

Pages you view in incognito tabs won't stick around in your browser's
history, cookie store, or search history after you've closed all of your
incognito tabs. Any files you download or bookmarks you create will
be kept. Learn more about incognito browsing

**Going incognito doesn't hide your browsing from your employer,
your internet service provider, or the websites you visit.**



- The name "Incognito mode" might create the false expectation that you're invisible on the web
- Help Center article

Google Confidential and Proprietary

GOOG-CABR-03750742



GOOG-CABR-03750743



GOOG-CABR-03750744



GOOG-CABR-03750745



CONFIDENTIAL

GOOG-CABR-03750746

Google

## **What else** is incognito mode?

Don't talk to Google in the background
- Online spell-checking disabled
- URL auto completion disabled
- No geolocation in omnibar searches

Start with a fresh profile
- Empty local storage
- Passwords are only filled on user request

Google Confidential and Proprietary

CONFIDENTIAL



CONFIDENTIAL

Google

## Challenges & limitations

- Misinterpretation of definition (see Eric Schmidt quotes)
- Tension about definition across teams
  (e.g. discussion on linkability due to HSTS)
- Limitations on iOS
- Finger printing

Google Confidential and Proprietary



CONFIDENTIAL

Google

## Objective

- Keep it useful
- Keep it at least on a par with other browsers
- No degradation
- Decrease misunderstanding
- Allow users to trust Chrome when they don't want it to connect to Google

Google Confidential and Proprietary



GOOG-CABR-03750752



| Id | Date | Text |
|---|---|---|
| 1 | 02/26/2015 00:58:36 | Deltas might help illustrate what the options are. |
| 2 | 02/26/2015 14:42:29 | +battre@google.com +garths@google.com<br>Dominic, should we describe our proposal with clearly outlining the delta to today's mode here? |
| 1 | 02/26/2015 14:42:29 | Sabine, I have added your proposal to the next slide.<br><br>Garth, what you describe is something I explicitly do not want for two reasons:<br>1) It puts us into significantly worse position when compared to other browsers int he press.<br>2) I believe that we don't do our users a service. We have a solution that works for 99% of cases of the proposed definition. Ignoring 3rd party tracking leads incognito mode ad absurdum in my opinion. |

Google Confidential and Proprietary

GOOG-CABR-03750753



CONFIDENTIAL

Google

## Unwanted events to be prohibited

- **People** walk up to computer and can see what user has done in incognito mode before.
- **Data leakage:** User is greeted in incognito mode with ads / account name / ... that transcended from a previous incognito session or regular mode.
  - We will add a disclaimer that explains the limitations (tracking by governments, employers, ...; tracking via fingerprinting).
- Users are surprised that **Google** gets information about their browsing while in incognito mode.

Google Confidential and Proprietary

GOOG-CABR-03750755

| Id | Date | Text |
|---|---|---|
| 2 | 02/26/2015 14:43:20 | Is this bad? There is some personalization currently in Incognito already. Having an account name is similar and would make sense if the branding matched it. (i.e. the mode was about forgetting activity during the session and not about being a spy) |
| 2 | 02/26/2015 14:43:20 | Which part are you referring to with your question whether this is bad? |

Google Confidential and Proprietary

GOOG-CABR-03750756



GOOG-CABR-03750757

Google

## Fingerprinting

- Most users do not feel threatened by fingerprinting as long as it has no perceptible impact on their browsing.
- Major websites use it only for "good" purposes.
- Our position:
  - We condemn the use and make it harder (e.g. introducing noise into canvas fingerprinting)
  - We don't limit incognito mode functionality because somebody could use fingerprinting (if we accepted fingerprinting in the threat model, we would end up with a useless or non-existing incognito mode).

Google Confidential and Proprietary

GOOG-CABR-03750758

# EXHIBIT 13

# Redacted Version of Document Sought to be Sealed



# Incognito-fest Intro

2.26.2015

http://go/google-incognito

CONFIDENTIAL



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Goals for Today

1. Understand the history and current state of Incognito across Google.
2. Agree on goals of Incognito (supported use cases).
3. Understand product options. Define limited set of these.
4. Reach recommendation on the best option for the next version of Incognito across Google platforms.

# Not Goals?

1. Find an actual brand?

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Agenda

- Intro (this!)
- Chrome
- Android
- Internet of Things
- UER summary
- (break)
- Deep dive

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Known: Incognito is successful

- Somewhere between ▮▮▮▮▮▮ weekly actives in Chrome.
- Meets real user needs.

# Implications

- Incognito is worth pursuing.

Confidential & Proprietary  Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Known: The Brand is Wrong

- Users often misunderstand what Incognito does.
- "Incognito" implies spy-related functionality that we don't want to provide.

## Implications



- "Incognito" should be considered a placeholder name.
- We should decide on the best feature to build, then find branding that makes sense.

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-CABR-04981567

# Known: We are in a cross-platform world

- Users move freely between platforms (Chrome, Android, iOS)
- Users have privacy needs on all these platforms.

# Implications

- Incognito on multiple platforms makes sense.
- We need a consistent experience to aid in platform mobility.

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-CABR-04981568

# Known: Guest, Incognito both make sense

- Guest provides a blank slate that enables sharing a device with a friend.
- Incognito is personalized but discrete. It gives you *your* Google experience.

# Implications

- Being clear about the roles of Guest and Incognito is important.
- It likely makes sense to offer both.

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-CABR-04981569

# Known: Usability is a challenge

- We need to properly describe Incognito in-context, and make use transparent and understandable.
- Discoverability is also important.

# Implications

- We need to design a consistent UX for Incognito that applies across platforms.

Google Incognito

Confidential & Proprietary  Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# break for other presentations

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Use case: Sensitive Activity

- Seeking birth control information.
- Buying a present secretly.
- Porn.

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-CABR-04981572

# Not use case: Dangerous Domains

- Reporting war crimes from a war zone.
- Political dissident fighting established government.

Google Incognito

Confidential & Proprietary   Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-CABR-04981573

# Not use case: High stakes comms

- Lawyer communicating in anti-trust lawsuit.
- Corporate researcher transmitting critical intellectual property.

Google Incognito

Confidential & Proprietary  Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 14

# Redacted Version of Document Sought to be Sealed

Message
---

**From:**      Chris Palmer [palmer@google.com]
**Sent:**      2/11/2015 6:52:47 PM
**To:**        Adrienne Porter Felt [felt@google.com]
**CC:**        Parisa Tabriz [parisa@google.com]
**Subject:**   Re: Incognito-fest 2015


On Wed, Feb 11, 2015 at 4:41 AM, Adrienne Porter Felt <felt@google.com> wrote:

> Second question. Is Incognito something our team wants to take on? (Palmer,
> in Q2 or Q3?) It would take attention and focus away from HTTPS but OTOH it
> is also something I know we all care about. Or should we focus on trying to
> poke the privacy team into action?

1. Sure, I can give a brief briefing. What is the best format?
Document, slides, in-person chat, a CL that has +0 lines and -15000?
:)

2a. I'm not sure we should take it on. It's radioactive: In its
current form, it is effectively a lie; in its fixed form (rebranded,
clarified) it will be a huge negative press cycle like Master Password
was (most people drunkenly screeching; Kevin Poulsen being the lone
sane voice); in its genericized form ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) people will
think we killed it unceremoniously and then it will be 100%
screeching.

2b. If we don't take it on, it will fester and perhaps metastasize,
and we will feel like we were derelict in our duty.

2c. Does Privacy team realize they have dropped the ball? I.e. if we
try to take it on, will they push back thinking it's still theirs? Or,
can we get them on board with our plan and then get them to act on it,
solving (2a)?

                                              GOOG-BRWN-00806426

# EXHIBIT 16

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From**: | Chris Palmer [palmer@google.com] |
| **Sent**: | 11/6/2018 6:38:47 PM |
| **To**: | Michael Paddon [mwp@google.com] |
| **CC**: | Michael Kleber [kleber@google.com]; Mike West [mkwst@google.com]; potassium@google.com; chrome-privacy-core@google.com |
| **Subject**: | Re: EFF: "Google Chrome's Users Take a Back Seat to Its Bottom Line" |

We certainly do have our blind spots (hoooo boy). You're right that the culture is changing, and what was acceptable is less acceptable now; but I'm not sure EFF is necessarily the bellwether we should look to — I find e.g. Zeynep Tufekci's NYT articles a much more compelling and mainstream-understandable critique.

But whatever; what's more important is that we do something meaningful soon. I've bargled various ideas; we could also tighten the 3P cookie rules or block 3P cookies by default in Incognito. Maybe that's not a good idea for various reasons, but we could certainly ship it and things like it soon if we wanted to.

███████████████████████

On Tue, Nov 6, 2018 at 4:13 AM Michael Paddon <mwp@google.com> wrote:
I don't think we can conclude '████████████████████████ " in general. It does in experiments where advertisers can defect to to status quo. But we cannot conclude what the behaviour would be in the absence of 3p cookies from the entire ecosystem. Put another way, A/B testing is effective for gradient descent but not for finding global minima.

Just as it is easy for us to see EFF's blindspots, we should be aware that we also have enormous blindspots of our own. And so do our advertising partners.

What I see is that the world is changing. The EFF is a bellwether. What was acceptable behaviour in data gathering is becoming unacceptable. I think we need to get out ahead and own the change rather than defending old business models. If the market wants a truly incognito mode, let's give them the best one possible.

On Tue, Nov 6, 2018 at 6:36 AM, Michael Kleber <kleber@google.com> wrote:
Thanks, Chris, that does help.

Much as I love the "We should continue to reach out and offer to help inform them" point of view in general,

████████████████. Even internally we hedge and point out that it's different for every site, which is true, but frankly I think this is so locked-down because we don't want to cause industry-wide panic.

Unfortunately, so long as we're unwilling to talk about this detail externally, I don't see a path to substantially changing the narrative.

--Michael

On Mon, Nov 5, 2018 at 2:16 PM Chris Palmer <palmer@google.com> wrote:
I have worked at EFF twice, first as Staff Technologist & Technology Manager, and again as Technology Director. So maybe I can provide some context. I left EFF and came to Google on the informed belief that I can successfully do more EFF-like work here than at EFF. After 7 years here, I am certain I was right. But, do take this with a grain of salt — I have A Viewpoint and it might not be 100% objective. :)

CONFIDENTIAL

To answer Michael's question: It's ignorance, not malice. (Sure, they're feisty, but that is good!) Generally, EFF does not think hard about how people who create information goods make money. They have an old-timey Wired Magazine/1990s internet boom/techno-solutionist/"we're already post-scarcity!" ideology that requires them to believe that low marginal cost per copy means that information goods are 'free' to make. You'll see this in their positions on any information good, whether it's software, music, journalism, literature, et c. (They rely heavily on Cory Doctorow's hard-to-replicate experience of getting lucky, which notably involved running a popular ad-supported blog. Doot-de-doo...)

As for "credulous and naive", yes; part of their problem is epistemic closure. (Again, *not malice* — they are good people trying to do the right thing.) They tend to alienate people who could inform them, leaving only people who already agree. For example, they didn't ask me if they had the facts right before posting this post, despite knowing me and that I am on Chrome Security; similarly, AFAIK they have never had anyone who has ever been in the intelligence community on staff.

Their closure also reduces their potential reach, although they do have vocal support in parts of the security engineering community (and, weirdly, vocal opposition in other parts of the security community). We should continue to reach out and offer to help inform them. I don't necessarily expect huge returns from that; Google gave EFF an early view of Gmail and EFF still blasted them for its "creepiness", but I think it was good for everyone to at least have the conversation. It's better than random broadsides like this post.

Ultimately, the blame for people's misconceptions about Incognito Mode is due to that name and branding, as I have argued repeatedly. I believe the Incognito part of this blog post would basically not exist if we had called it (e.g.) Temporary Mode.

Could Incognito/Temporary work better, such as the site- or origin-specific local storage deletion? Sure, maybe that would work. As much as I want to ratchet down the brand and apparent 'guarantee', I am also in favor of ratcheting up the guarantee *where technically possible*. (I'll continue to push back on infeasible or impossible guarantees.)

On Mon, Nov 5, 2018 at 6:26 AM Michael Kleber <kleber@google.com> wrote:
I am really surprised by their never touching on how publishers get money. They (wrongly) claim that "The marginal benefit of each additional bit of information about your activities online is relatively small to an advertiser, especially given how much you directly give Google through your searches". But there is no corresponding thinking about the marginal benefit of the cookie is *huge for publishers*, because without it we have no way to bring *any* of that information to bear on display ad monetization.

Any opinion on whether that omission is ignorance or malice?

Their take on "incognito mode" is very interesting. The idea that it "does nothing to protect you from being tracked by Google" is a rational complaint if you sign into Google in incognito mode (which seems like an oxymoron to me), or if you use the same incognito session for a long time.

Have we considered an

"A sustainable Web needs to be built on consent, not subterfuge" surprises me, in that I would have expected them to be as skeptical of consent as we are. Maybe political considerations mean you can't say that publicly (yet)?

CONFIDENTIAL

--Michael

On Mon, Nov 5, 2018 at 3:27 AM Mike West <mkwst@google.com> wrote:
Ouch. https://www.eff.org/deeplinks/2018/11/google-chromes-users-take-back-seat-its-bottom-line

A few things to call out:

"The closest thing it offers to 'private' browsing out-of-the-box is 'incognito mode', which only hides what you do from others who use your machine. That might hide embarrassing searches from your family, but does nothing to protect you from being tracked by Google." which is an interesting form of the "Incognito should do more" argument.

"Facebook recently announced its intention to move away from using third-party cookies to power Pixel, its third-party analytics product." is a fairly naive and credulous take on Facebook's moves in this space.

"Google could take the lead on solving this problem. Trackers are not necessary to make the Web work, and they shouldn't be necessary for Google to make lots (and lots) of money. As we noted above, Google has mountains of direct information about what you want to buy through its various services, from search to Maps to Google Play. Ads don't need to be targeted using every little bit of information about us that Google has access to via our use of its browser. A sustainable Web needs to be built on consent, not subterfuge." Apparently first-party tracking is fine.

"Google has come under fire in the past for using its power in one arena, like browsing or search, to drive revenue to other parts of its business." I heard a similar kind of argument from one of our friends at Samsung at dinner during TPAC a week or two ago.


-mike

--
You received this message because you are subscribed to the Google Groups "potassium" group.
To unsubscribe from this group and stop receiving emails from it, send an email to potassium+unsubscribe@google.com.
To post to this group, send email to potassium@google.com.
To view this discussion on the web visit
https://groups.google.com/a/google.com/d/msgid/potassium/CAKXHy%3Dc1Ovb%3DLbdoQeAa7r%2B9y2Kaya7G7xfmtZ3SzKKq8rOa%2BA%40mail.gmail.com.



--
Forewarned is worth an octopus in the bush.

--
You received this message because you are subscribed to the Google Groups "potassium" group.
To unsubscribe from this group and stop receiving emails from it, send an email to potassium+unsubscribe@google.com.
To post to this group, send email to potassium@google.com.
To view this discussion on the web visit
https://groups.google.com/a/google.com/d/msgid/potassium/CAA6DcCePf9riuRtP%3DgO0u4RUcG6A3%2Bi%3D4YCt2tPonpAPtW0VNg%40mail.gmail.com.

CONFIDENTIAL

GOOG-CABR-03923582

--
Forewarned is worth an octopus in the bush.

--
You received this message because you are subscribed to the Google Groups "potassium" group.
To unsubscribe from this group and stop receiving emails from it, send an email to
potassium+unsubscribe@google.com.
To post to this group, send email to potassium@google.com.
To view this discussion on the web visit
https://groups.google.com/a/google.com/d/msgid/potassium/CAA6DcCdpq3SfjVdc7yLTZBJ7EnecZWk2XM
2DnYm0rtOK718p2A%40mail.gmail.com.

CONFIDENTIAL
GOOG-CABR-03923583

# EXHIBIT 20
# Redacted in its
# Entirety

# EXHIBIT 22
# Redacted in its Entirety

# EXHIBIT 23

# Redacted Version of Document Sought to be Sealed

Message

---

**From:** Mardini [mardini@google.com]
**Sent:** 4/30/2019 7:14:16 PM
**To:** Jochen Eisinger [eisinger@google.com]; Shimi Rahim [srahim@google.com]
**CC:** Margret Schmidt [margrets@google.com]; Parisa Tabriz [parisa@google.com]; Alex Ainslie [ainslie@google.com]
**Subject:** Re: Branding for Incognito (IO Update)

[narrowing down list of recipients - pls don't forward]

An update on our meeting with Sammit today.  We discussed the following:
1/ Debugging the process
2/ Got context around the incognito iconography/rebranding for I/O then cancellation
3/ Got clarity on who owns that Incognito comms doc and whether our comments are being addressed

**1/** Made it clear what the ideal process should be from Chrome's point of view. No disagreements there and it was clear for them but there was a mad rush to get things for I/O from various execs that made folks panic.

**2/** This was driven by Lorraine who told the PDPO steering committee that Incognito might need rebranding so a workstream ensued involving the brand studio about 2-3 weeks ago.
Yesterday, at the PDPO SC meeting, Tom Oliveri was present and told them that Sundar didn't want to put incognito under the spotlight so this iconography/rebranding should not be an I/O topic.
The plan of record with regards to incognito in I/O is just to mention in one or two sentences related to bringing Incognito to Google Maps (not clear whether there will be mocks or not for that).
The SC was asked to commit to exploring in 2019 to develop a consistent vision for how an "Incognito 2.0" would look like with impact analysis on revenue, usage, and comms.
Relatedly, Ben Gomes showed a demo of AGSA launching Chrome in in Incognito mode. i.e. if a user is in AGSA and they want to conduct an incognito search, they'd intent into an Incognito NTP in Clank

**3/** That comms doc is owned by the brand studio and Sundar's speech writing team. I emphasized the need to double check with Chrome PM/Eng the accuracy of the information mentioned there. Sammit acknowledged but mentioned that the comms around I/O are very closely guarded and it's challenging to get a full picture for what will be said exactly....

Thanks,

  --Mardini

On Tue, Apr 30, 2019 at 8:40 AM Mardini <mardini@google.com> wrote:

> Le mar. 30 avr. 2019 à 08:33, Mardini <mardini@google.com> a écrit :
> Thank you, Alex.
> We (Rory/Ramin/Sabine/myself) have a meeting with Sammit today so will discuss the process and work cadence issue as well.
>
> As discussed in our chat yesterday, Jochen and I will try to get some time with the PDPO folks visiting Munich for GSEC in a couple of weeks to sync in person.
>
> I also didn't receive the note below about revisiting the incognito brand after I/O. Maybe it was sent only to those who replied "yes" to the meeting.

GOOG-BRWN-00388293

I see it now. Gmail didn't classify it as important :/.

Le mar. 30 avr. 2019 à 07:29, Yuan Chen <yuanchen@google.com> a écrit :
Thank you for keeping us in the loop - I also didn't get the update from PDPO. I agree we need to get into a better work cadence with PDPO folks.

On Tue, Apr 30, 2019 at 2:12 AM Shimi Rahim <srahim@google.com> wrote:
Thanks for filling us in, Alex & Parisa (I didn't see an email from PDPO), and for helping us navigate I/O challenges!

On Mon, Apr 29, 2019 at 5:03 PM Parisa Tabriz <parisa@google.com> wrote:
On Mon, Apr 29, 2019 at 4:42 PM Alex Ainslie <ainslie@google.com> wrote:
(narrowing to just Chrome folks)

I'm glad to see the update from PDPO below about waiting to tackle any branding updates until After IO.

Ah, me too!

Their timing was too aggressive and their proposal wasn't compelling :/

Here's the Chrome summary from my discussions with many of you (in sequence) this morning:
• Chrome is comfortable with a high level message at IO about expanding Incognito to other flagship Google products on Android (AGSA, Maps, YouTube).
• We've nurtured the Incognito brand for the past 10 years and our team would need to conduct a significant investigation (including UX Research) to feel confident about a change.
• For that reason, Chrome does not support announcing new PDPO-proposed branding at IO
• Additionally, speculative announcements related to Privacy are extra risky because the bar for Google is high and we need to make sure not to promise something we can't deliver.

Chrome + PDPO (Mis)alignment

| Should Google ... | PDPO + Brand Studio | Chrome |
|---|---|---|
| ... do more product work focused on Privacy? | Yes | Yes |
| ... talk more about that Privacy work in public? | Yes | Yes |
| ... extend Chrome's Incognito mode to other products? | Yes | Maybe? |
| ... change the current Incognito brand? | Yes | Maybe? Err |
| ... announce Incognito branding changes at IO before they've been thoroughly studied? | Yes | No |

Going forward, I agree with Jochen that we'll need to get into a better working cadence with PDPO folks.

Yep. I'd recommend syncing with miraglia@ in a small setting to share how this effort was perceived from the Chrome side so we can reset.

Alex

On Mon, Apr 29, 2019 at 4:00 PM Sammit Adhya <sadhya@google.com> wrote:

Hi Everyone,

Just wanted to let you know that leads decided to revisit the Incognito branding after I/O. Apologies for scheduling the urgent meeting, but we look forward to working with everyone after I/O.

Thanks much,
Sammit

---

## [Confirmed] - Exploration of Iconography and Branding for Incognito

### *Scheduled per Sammit's request*

We wanted to share some new Incognito branding and iconography ideas that the Brand Studio team has been exploring to get your thoughts and feedback.

Leads: anilsa, parisa, miraglia
PM: (rorymcclelland), (sabineb), mardini
Eng: eisinger, (rhalavati)
UXR: martinshelton, (lorindole)
UXD: ainslie
Marketing: martinal, jcroom
Brand: mediha, julianneyi, frederick
PDPO: sadhya, gregfair, rast

| | |
|---|---|
| When | Tue Apr 30, 2019 3:30pm – 4pm Pacific Time - Los Angeles |
| Where | MTV-900-2-ChromeOZone (8) [GVC, No External Guests], MTV-900-2-Rage Against The Machine (4) [GVC, No External Guests], SFO-1MST-14-Daniel Handler (4) [GVC], SFO-2HS-4-Eight O'Clock Coffee (5) [GVC], SYD-ODI-3-410 - Gone (2) [GVC, No External Guests, Phone] (map) |
| Joining info | ▮▮▮▮▮▮▮▮▮▮ |
| | Or dial: + ▮▮▮▮▮▮▮▮▮ More phone numbers |
| Who | • Eric Miraglia - organizer |
| | • Jieun Lee - creator |
| | • Martin Shelton |
| | • Sammit Adhya |
| | • rast@google.com |
| | • Martina Laresova |
| | • Ken Frederick |
| | • Jochen Eisinger |
| | • James Croom |
| | • Anil Sabharwal |
| | • Mediha Abdulhay |
| | • Greg Fair |
| | • Alex Ainslie |
| | • Shimi Rahim |
| | • AbdelKarim Mardini |
| | • Martha Welsh |
| | • Julianne Yi |
| | • Parisa Tabriz |

GOOG-BRWN-00388295

- **Ramin Halavati** - optional
- **Lorin Dole** - optional
- **Sabine Borsay** - optional
- **Rory McClelland** - optional

--
**Yuan Chen**
Interaction Designer

Google Germany GmbH
<u>Erika-Mann-Str. 33</u>
<u>80636 München</u>

Geschäftsführer: Paul Manicle, Halimah DeLaine Prado
Registergericht und -nummer: Hamburg, HRB 86891
Sitz der Gesellschaft: Hamburg

Diese E-Mail ist vertraulich. Wenn Sie nicht der richtige Adressat sind, leiten Sie diese bitte nicht weiter, informieren Sie den Absender und löschen Sie die E-Mail und alle Anhänge. Vielen Dank.

This e-mail is confidential. If you are not the right addressee please do not forward it, please inform the sender, and please erase this e-mail including any attachments. Thanks.

GOOG-BRWN-00388296

# EXHIBIT 24

# Redacted Version of Document
# Sought to be Sealed

Message

| | |
|---|---|
| **From:** | Jochen Eisinger [eisinger@google.com] |
| **Sent:** | 3/22/2019 7:42:29 AM |
| **To:** | Mike West [mkwst@google.com]; AbdelKarim Mardini [mardini@google.com] |
| **CC:** | Alex Nicolaou [anicolao@google.com]; Michael Kleber [kleber@google.com]; Rick Byers [rbyers@google.com]; Rory McClelland [rorymcclelland@google.com]; Vivek Sekhar [vsekhar@google.com] |
| **Subject:** | Re: Follow up from Sundar meeting |

+AbdelKarim Mardini

On Fri, Mar 22, 2019 at 6:13 AM Mike West <mkwst@google.com> wrote:
 +Jochen, Rory

 On Fri 22. Mar 2019 at 05:59, Alex Nicolaou <anicolao@google.com> wrote:
 Ads Team summary.

 ---------- Forwarded message ---------
 From: **Ben Galbraith** <bgalbs@google.com>
 Date: Thu, Mar 21, 2019 at 4:33 PM
 Subject: Fwd: Follow up from Sundar meeting
 To: Jack Chen <jlchen@google.com>, Darin Fisher <darin@google.com>, Parisa Tabriz
 <parisa@google.com>, Margret Schmidt <margrets@google.com>, Alex Nicolaou <anicolao@google.com>,
 Vivek Sekhar <vsekhar@google.com>, Ivy Choi <ivyc@google.com>, Ben Goodger <beng@google.com>
 Cc: Anil Sabharwal <anilsa@google.com>


 Privileged and confidential

 FYI, here's the Ads team version of the note I sent out earlier.

 ---------- Forwarded message ---------
 From: **Struan Robertson** <struan@google.com>
 Date: Thu, Mar 21, 2019 at 12:54 PM
 Subject: Re: Follow up from Sundar meeting
 To: Chetna Bindra <cbindra@google.com>, Jack Chen <jlchen@google.com>
 Cc: Jerry Dischler <jdischler@google.com>, Suresh Kumar <sureshkm@google.com>, Shiv Venkataraman
 <shivav@google.com>, Sagnik Nandy <sagnik@google.com>, Anurag Agarwal <anuragag@google.com>,
 Darin Fisher <darin@google.com>, Anil Sabharwal <anilsa@google.com>, Ben Galbraith
 <bgalbs@google.com>, Brad Bender <bradbender@google.com>


 +Jack Chen

 On Thu, Mar 21, 2019 at 12:37 PM Chetna Bindra <cbindra@google.com> wrote:
 Privileged and confidential

 All,

 Thanks for all the collaboration leading up to the Sundar meeting. Overall we had a positive meeting with Sundar, landing on
 approval for our recommendation in the deck. He acknowledged the complexity of this space and expressed his gratitude on the
 progress we've made given the complex topic. He specifically said that we do not need to come back for a review, but he would
 review comms in the lead up to I/O.

**Key takeaways**
- Totally agreed with the strategic value of balancing both ecosystem health and privacy
- Overall comfortable with not removing 3P cookies, but wanted to focus on how Chrome is helping users with 3P cookie concerns (i.e., "3P cookies" have become a strong industry narrative that we can't ignore or wait years to address). He was supportive of our plans to address these issues largely with opt-in controls that we should make sure are incorporated as part of our messaging at I/O.
- Overall approval of plan on data disclosures, Ads Privacy center, Chrome guard controls - 3P / Incognito controls
- Focus on messaging by I/O. Ensure it covers the entire proposal - data disclosures, Ads privacy center, Chrome controls, data retention within Chrome and Ads. A lot of enthusiasm for " ████████████ " and encouragement to dovetail with the broader Google Incognito narrative if we're ready.
  - (A tactical AI was given to the Chrome team to dovetail with a broader data retention initiative.)
- Comfortable with reactive messaging on saying that Apples 3P cookies removal hasn't done enough, and 3P tracking continues
  - Sundar drove the point in the meeting (with several other examples) that if Chrome removes 3P cookies, it would create a very disruptive situation for publishers, and is keen to support overall ecosystem health. He acknowledged that Apple and Google are optimizing for different things.
- He firmly expressed a desire for both Chrome and Ads to get out in public with a narrative ASAP. He felt that silence in the market was no longer an option, and alignment that I/O was the right initial moment , followed by GML
- Eventual enforcement seemed to be a punted question

**Key AIs / Next Steps**
Evaluate an advisory board rather than a coalition, and learn from the AI advisory board
Plug in with the I/O and GML team for messaging

Best,
Chetna (on behalf of the team)

--

Struan Robertson |          Director, Legal |          struan@google.com |          650-713-7613

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
-mike

GOOG-CABR-05126023

# EXHIBIT 25
# Redacted in its Entirety

# EXHIBIT 26

# Redacted Version of Document Sought to be Sealed



Future of Imagery

## Agenda

| | |
|---|---|
| — Quick introduction (name/role) | 5 min |
| — Workshop goals | 5 min |
| | 15 min |
| — Recap of the project brief (Sammit) | 15 min |
| | 25 min |
| — Top use cases discussion | 20 min |
| | 20 min |
| — Brand wheel discussion | 5 min |
| — Onlyness exercise discussion | |
| — What does success look like? | |
| — Next steps | |

20-25 min buffer

GOOG-CABR-05756667



20-25 min buffer



CONFIDENTIAL

GOOG-CABR-05756669

Design a clearly branded, well-defined Incognito experience where the ability to activate and deactivate this mode is **trivially simple**, **intuitive** and **consistent** across our products.

Design a comprehensive **messaging strategy** that helps users understand how incognito works and how to appropriately use it to match its functionality.

Communication of incognito means

CONFIDENTIAL



CONFIDENTIAL



GOOG-CABR-05756672

GOOG-CABR-05756673



CONFIDENTIAL

GOOG-CABR-05756674



CONFIDENTIAL

GOOG-CABR-05756675

The future of Incognito & Halo Monday

# Use case scenarios in Google Search app on iOS (iGSA)

Limiting the types of ads you see (and saving you from embarrassment if ad is reflective of sensitive content).

I'm using a shared device and don't want to co-mingle my data with other users' data (for recommendations, etc.).

I'm at work and I don't want to mix work and personal activity online.

I don't want another site I visit to recognize me as me; e.g., I want to visita LinkedIn profile without revealing my identity.

I want a clean slate next time I do this search or visit this site.

Cursory privacy for female users in NBU countries.

There, or now time search queries that you don't want affecting your personalized ads.

Searching for a birthday present for a close family member that you don't want them to find out about.

It's personal; private. I like better searching for this in private.

Look up medical symptoms/diseases that you don't want to become part of your history (e.g., covid ads).

When replacing an incognito session on iOS, the app requires re-authentication (at hostID or faceID).

Search for things/items that I do not want to see. (A: I tied to my google account and used no personalization (ads & content).

(B) Recorded in search history and surfaced at inopportune moments (e.g., when visiting people in mind). Fallen further, incognito search history used to determine interest when I look my screen - secular should not appear when I unlock my phone, even if this was the last thing I was looking at.

(C) Shared with my NBU work, or you browser apartates.

© Halo Monday

CONFIDENTIAL

GOOG-CABR-05756676



GOOG-CABR-05756677

The future of Incognito & Hello Monday

## Use case scenarios in the YouTube app on Android

Let my little nieces and nephews watch their kiddie videos that I don't want to see again

Learning how to do something new and ambitious like exploring a new business, entrepreneurship, where you don't want to let anyone else know about it yet

Searches & content you wish to keep private from family on a shared device in a NBU country.

Incognito especially helps reduce the potential that ephemeral or one-time interests don't take over your video recommendations.

When I watch or search for videos in incognito, I do not want them to be surfaced at inopportune moments (e.g., when handing phone to friend). * Therefore, incognito videos should be hidden/deleted when I lock my screen or press the power button - videos should not appear when I unlock my phone, even if this was the last thing I was looking at.



*Great idea! Let's make sure this is followed up upon as a product feature.

© Hello Monday

CONFIDENTIAL

GOOG-CABR-05756678



GOOG-CABR-05756679



GOOG-CABR-05756680



GOOG-CABR-05756681



GOOG-CABR-05756682



The future of Incognito & Safe Browsing

## Takeaway - interesting themes in use cases

**Control - Not so much of Incognito experience, but more of the 'normal mode' experience.**
Avoiding pollution of 'normal' mode experience by having one-time searches influence ads and
content suggestions.
Avoid mingling work activity with private activity.

**Device Sharing - Keeping searches away from others' eyes**
Children + Households: Going Incognito when devices are shared with kids or out of courtesy to
others in the house.
Or to avoid spoiling surprises and having embarrassing results pop up.

**Site-specific - Being 'anonymous' on a certain site for very specific reasons**
LinkedIn profile searches, Google docs, checking public sites when you're the owner.

**NBU - Incognito is proving relevant here - cultural considerations**
Device sharing is common - ███ % of Indian women borrow a device for primary access ███
share their device at least once a month. "

© Safe Browsing

GOOG-CABR-05756683



CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-05756685

# EXHIBIT 28
# Redacted in its Entirety

# EXHIBIT 28
# Redacted in its
# Entirety

# EXHIBIT 30

# Redacted Version of Document Sought to be Sealed

Message
_____

**From:**      Rory McClelland [rorymcclelland@google.com]
**Sent:**      2/6/2020 3:56:43 PM
**To:**        Christian Dullweber [dullweber@google.com]
**CC:**        Ramin Halavati [rhalavati@google.com]; Angel Maredia [angelsm@google.com]
**Subject:**   Re: Chrome Incognito Metrics


Thanks, both!


On Thu, 6 Feb 2020 at 02:27, Christian Dullweber <dullweber@google.com> wrote:
  ███% of users used the Clear Browsing Data dialog in the last 28 days. ███% deleted cookies at least once.
  ████████████████████████████████████████████████████


On Wed, 5 Feb 2020 at 22:57, Ramin Halavati <rhalavati@google.com> wrote:
  +Christian Dullweber

  Hi Angela,

  Based on this query, in the last 28 days, in US, and on Android and iOS, we had ████████ unique users of
  incognito mode and ████████ of regular mode. Assuming that all users of incognito mode have also used
  regular mode, the ratio will be ████%.

  On the clear browsing data question, Christian should know better.
  Please let me know if I could help more.

  Best,
  Ramin


On Wed, Feb 5, 2020 at 9:49 AM Rory McClelland <rorymcclelland@google.com> wrote:
  Hi Angela,

  +Ramin Halavati our Incognito lead to help me out with the two questions. Thanks, Ramin.

  Rory


  On Wed, 5 Feb 2020 at 07:18, Angel Maredia <angelsm@google.com> wrote:
   Also sorry for the follow up email! I was wondering, do you know what % of Chrome users clear their
   cookies or history on mobile and how often?

   On Tue, Feb 4, 2020 at 10:08 PM Angel Maredia <angelsm@google.com> wrote:
    Hey Rory,

    My name is Angel and I'm the PM on Fi leading our privacy and security team. I was looking into
    Incognito mode for Chrome, and I was wondering, what % of users use Incognito mode on mobile out of
    total users, focusing on the US?

    Thanks,

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**                                                    GOOG-BRWN-00601022

Angel

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-BRWN-00601023

# EXHIBIT 31

# Redacted Version of Document Sought to be Sealed



**Steve Hamilton <sthamilton@google.com>**

# What we know about Incognito users (re. The most underused Privacy Surface)
7 messages

**Steve Hamilton** <sthamilton@google.com>                         Wed, Jan 27, 2021 at 1:41 PM
To: leathern@google.com, Othar Hansson <othar@google.com>, Mark Risher <risher@google.com>, Rahul Roy-Chowdhury
<rahulrc@google.com>, Sarah Hammond <shammond@google.com>, Lauren Palmer <laurenpalmer@google.com>,
Gretchen Gelke <ggelke@google.com>, Arne de Booij <adebooij@google.com>, Tal Herman <talherman@google.com>,
Guemmy Kim <guemmy@google.com>, Kalle Buschmann <kallebu@google.com>

Hi Everyone,

I'm Steve, a UXR in the PDPO working on Sin Rastro (Google-wide Incognito mode).
Attached is a deck that summarizes what we know about Incognito users, what they use it for, and some of
the risks that we've identified over the course of the project.

It's worth noting that the Chrome team have done some excellent work in this space (as you might expect),
and are putting together some very interesting plans in go/incognito2021 (slides 24 to 31 are probably the
most relevant)

Please feel free to reach-out with any questions or concerns, I'm more than happy to help.
Best,
Steve

TL;DR of the deck:
Executive Summary
- Frequency of Use:
  - Incognito mode is used by ▇ % of Chrome users, and ▇% use it at least once per week
- User Characteristics:
  - Weekly users are more likely to be ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    - 47% of weekly users state, "I do everything I can to protect my privacy," implying that they
      are more privacy sensitive than non-users, and may be more open to other privacy
      controls
- Top use cases for Incognito mode:
  - ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇
  - ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
- Risks to press cycles on Incognito mode:
  - Users overestimate the protections that Incognito provides and are unaware of the
    personalization and data collection that occurs when it is on
  - When considered together, Incognito mode appears to negatively impact user sentiment
    towards regular browsing
  - Educational moments intended to reassure and inform users of quality-of-life features (autofill &
    autocomplete) have led to negative reactions

**Rob Leathern** <leathern@google.com>                       Wed, Jan 27, 2021 at 3:47 PM

CONFIDENTIAL                                                   GOOG-BRWN-00529122

To: Steve Hamilton <sthamilton@google.com>, Annie Klemp <annieklemp@google.com>, Sam Heft-Luthy <heftluthy@google.com>, Ane Fabo Aranzabal <anefabo@google.com>
Cc: Othar Hansson <othar@google.com>, Mark Risher <risher@google.com>, Rahul Roy-Chowdhury <rahulrc@google.com>, Sarah Hammond <shammond@google.com>, Lauren Palmer <laurenpalmer@google.com>, Gretchen Gelke <ggelke@google.com>, Arne de Booij <adebooij@google.com>, Tal Herman <talherman@google.com>, Guemmy Kim <guemmy@google.com>, Kalle Buschmann <kallebu@google.com>

Thanks Steve, appreciate the update. Will let you know any questions as we dig into the data/insights.

@Annie Klemp / @Ane Fabo Aranzabal / @Sam Heft-Luthy for context.
Rob

[Quoted text hidden]

**Sarah Hammond** <shammond@google.com>                                      Wed, Jan 27, 2021 at 5:43 PM
To: Steve Hamilton <sthamilton@google.com>

Thanks so much, Steve!
[Quoted text hidden]
--

Sarah Hammond | UX Director, User and PDPO | shammond@google.com |
*Sign up for my office hours:* go/shammond-oh

**Steve Hamilton** <sthamilton@google.com>                                    Thu, Jan 28, 2021 at 8:25 AM
To: Sarah Hammond <shammond@google.com>

No worries, Sarah! I appreciate being asked to contribute :)
[Quoted text hidden]

**Othar Hansson** <othar@google.com>                                         Thu, Feb 4, 2021 at 5:16 PM
To: Rob Leathern <leathern@google.com>, Micha Segeritz <mseg@google.com>
Cc: Steve Hamilton <sthamilton@google.com>, Annie Klemp <annieklemp@google.com>, Sam Heft-Luthy <heftluthy@google.com>, Ane Fabo Aranzabal <anefabo@google.com>, Mark Risher <risher@google.com>, Rahul Roy-Chowdhury <rahulrc@google.com>, Sarah Hammond <shammond@google.com>, Lauren Palmer <laurenpalmer@google.com>, Gretchen Gelke <ggelke@google.com>, Arne de Booij <adebooij@google.com>, Tal Herman <talherman@google.com>, Guemmy Kim <guemmy@google.com>, Kalle Buschmann <kallebu@google.com>

+Micha Segeritz also
[Quoted text hidden]

**Micha Segeritz** <mseg@google.com>                                         Thu, Feb 4, 2021 at 6:34 PM
Cc: Steve Hamilton <sthamilton@google.com>

Hi Steve (just.you),

Where does this come from: Incognito mode is used by ██% of Chrome users, and ██% use it at least once per week (i don't have access.to the deck).

It's a lot higher than what I would have assumed based on inspecting the chrome client data.

Thanks,

Micha

[Quoted text hidden]

**Steve Hamilton** <sthamilton@google.com>                                    Fri, Feb 5, 2021 at 11:48 AM

CONFIDENTIAL                                                  GOOG-BRWN-00529123

To: Micha Segeritz <mseg@google.com>

Hi Micha,

You should have access to the summary deck now. The stats are self-reported from our Incognito survey. I agree, it does seem high given what Chrome report. I think it's a combination of self-report biases (mis-remembering/overestimating frequency of use) and the fact that Chrome use ▮▮▮▮▮▮ cookie age as the indicator of Incognito usage (this was their method last time I heard - they may have a new metric now). This may underestimate those who stay in Incognito forever and/or have very long Incognito sessions as they would be classified as signed-out users.

It does also seem to align with some of the work that Florian has done on Chrome - good discussion amongst them in this doc.

LMK if you want to chat more,

Steve

[Quoted text hidden]

CONFIDENTIAL      GOOG-BRWN-00529124

# EXHIBIT 32

# Redacted Version of Document Sought to be Sealed

CONFIDENTIAL

```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4      - - - - - - - - - - - - - - - - - - - - x

5      CHASOM BROWN, ET AL.

6           Plaintiffs

7      vs.                    CA No. 20-cv-03664-LHK

8      GOOGLE, LLC

9           Defendant

10     - - - - - - - - - - - - - - - - - - - - x

11

12              C O N F I D E N T I A L

13

14       ALL PARTICIPANTS APPEARING VIA ZOOM

15

16       VIDEO DEPOSITION of MICHAEL KLEBER

17       Friday, January 14, 2022 - 9:03 a.m.

18

19

20

21

22

23     Job no. 5027840

24     Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

25     Pages 1 - 213
```

Page 1

```
 1   APPEARANCES:

 2

 3   Susman Godfrey LLP

 4       Alexander P. Frawley, Esq.

 5       1301 Avenue of the Americas, 32nd Floor

 6       New York, New York 10019

 7       212.729.2044

 8       afrawley@susmangodfrey.com

 9   - and -

10   Boies Schiller Flexner LLP

11       Beko Reblitz-Richardson, Esq.

12       Erika Nyborg-Burch, Esq.

13       44 Montgomery Street, 41st Floor

14       San Francisco, California 94104

15       415.293.6800

16       brichardson@bsfllp.com

17       enyborg-burch@bsfllp.com

18       Counsel for plaintiffs

19

20

21

22

23

24

25
```

CONFIDENTIAL

```
 1    Quinn Emanuel Urquhart & Sullivan LLP
 2        Andrew H. Schapiro, Esq.
 3        Teuta Fani, Esq.
 4        191 N. Wacker Drive, Suite 2700
 5        Chicago, Illinois 60606
 6        312.705.7400
 7        andrewschapiro@quinnemanuel.com
 8        teutafani@quinnemanuel.com
 9        Counsel for defendant
10
11    Simmons Hanly Conroy
12        An Truong, Esq.
13        112 Madison Avenue, 7th Floor
14        New York, New York 10016-7416
15        212.257.8482
16        atruong@simmonsfirm.com
17        Counsel for plaintiffs in the Calhoun v. Google
18        matter
19
20    Also present:  Toni Baker
21
22    Videographer:  Bob Giannini
23
24
25
```

Page 3

```
 1                    I N D E X

 2

 3     WITNESS:

 4

 5     MICHAEL KLEBER

 6          Examination by Mr. Frawley          7

 7

 8                   E X H I B I T S

 9

10     Exhibit 1    Email, Kleber to Nicolaou,     21

11                  11/6/2018

12     Exhibit 2    Email, McClelland to Kleber,   32

13                  11/7/2018

14     Exhibit 3    ██████████ leads notes         42

15     Exhibit 4    Group chat, 8/22/2019          53

16     Exhibit 5    Google Keyword post by         55

17                  Schuh, 8/22/2019

18     Exhibit 6    Chat, Kaustubha and Kleber,    61

19                  3/20/2020

20     Exhibit 7    Group chat, 8/10/2018          65

21     Exhibit 8    Group chat, 9/11/2018          75

22     Exhibit 9    "Potential Sundar Questions"   95

23     Exhibit 10   Notes                         115

24     Exhibit 11   Group chat, 9/12/2019         120

25     Exhibit 12   Email, Schuh to Rahim,        126
```

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | | 9/13/2019 | |
| 2 | Exhibit 13 | "Assessing Chrome/Ads | 131 |
| 3 | | Relationship" (Draft) | |
| 4 | Exhibit 14 | "Assessing Chrome/Ads | 135 |
| 5 | | Relationship" | |
| 6 | Exhibit 15 | "K-API defaults in Chrome | 140 |
| 7 | | Incognito" | |
| 8 | Exhibit 16 | Privacy Sandbox initiative | 155 |
| 9 | | overview presentation | |
| 10 | Exhibit 17 | Group chat, 1/14/2021 | 171 |
| 11 | Exhibit 18 | Group chat, 9/5/2018 | 173 |
| 12 | Exhibit 19 | Group chat, 9/6/2018 | 183 |
| 13 | Exhibit 20 | Email, Sekhar to Kleber, | 189 |
| 14 | | 2/27/2019 | |
| 15 | Exhibit 21 | Email, Kleber to Jun, | 190 |
| 16 | | 2/27/2019 | |

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  Good morning.

 4    We are on the record.  This is the videographer

 5    speaking, Bob Giannini, with court reporter,

 6    Jill Ruggieri, with Veritext Legal Solutions.

 7              Today's date is January 14,          09:03:01

 8    2022, and the time is 9:03 a.m.                09:03:03

 9              We are here to take the remote       09:03:09

10    video deposition of Michael Kleber in the      09:03:10

11    matter of Chasom Brown v. Google LLC.          09:03:13

12              Will counsel please introduce        09:03:18

13    themselves for the record.                     09:03:20

14              MR. FRAWLEY:  Good morning.          09:03:21

15    Alexander Frawley from Susman Godfrey for the  09:03:21

16    plaintiffs.  With me are my colleagues, Beko   09:03:26

17    Reblitz-Richardson and Erika Nyborg-Burch, from 09:03:28

18    Boies Schiller Flexner.                        09:03:33

19              MR. SCHAPIRO:  Good morning.         09:03:34

20    I'm Andrew Schapiro for Google.  I am joined by 09:03:35

21    my colleague, Teuta Fani, and also an attorney 09:03:40

22    from Google, Toni Baker.                       09:03:45

23              MS. TRUONG:  And good morning,       09:03:46

24    everyone.  An Truong, Simmons Hanly Conroy, on 09:03:47

25    behalf of plaintiffs in the Calhoun v. Google  09:03:51
```

Page 6

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | matter, which is related to this case and | 09:03:54 |
| 2 | appearing pursuant to the court's cross-use | 09:03:55 |
| 3 | order.  Thank you. | 09:03:58 |
| 4 | THE VIDEOGRAPHER:  Okay.  Thank | 09:04:00 |
| 5 | you. | 09:04:00 |
| 6 | Will the court reporter please | 09:04:01 |
| 7 | swear in the witness. | 09:04:03 |
| 8 | | 09:04:04 |
| 9 | MICHAEL KLEBER, a witness having | 09:04:04 |
| 10 | been duly sworn, on oath deposes and says as | 09:04:04 |
| 11 | follows: | 09:04:04 |
| 12 | | 09:04:04 |
| 13 | EXAMINATION | 09:04:04 |
| 14 | BY MR. FRAWLEY: | 09:04:18 |
| 15 | Q    Good morning, Mr. Kleber. | 09:04:21 |
| 16 | A    Good morning. | 09:04:23 |
| 17 | Q    Can you please state your full name? | 09:04:24 |
| 18 | A    Sure.  My name is Michael Kleber. | 09:04:27 |
| 19 | Q    And have you testified before? | 09:04:32 |
| 20 | A    I have. | 09:04:34 |
| 21 | Q    When have you testified before? | 09:04:37 |
| 22 | A    A previous lawsuit against Google. | 09:04:45 |
| 23 | Q    And was it for a deposition? | 09:04:48 |
| 24 | A    Yes. | 09:04:51 |
| 25 | Q    And did you also testify for trial? | 09:04:53 |

Page 7

| | | |
|---|---|---|
| 1 | Q     And if you know, what did he mean by | 09:45:06 |
| 2 | "blocking third-party cookies by default in | 09:45:08 |
| 3 | incognito mode"? | 09:45:11 |
| 4 | A     That seems to refer to the way | 09:45:17 |
| 5 | incognito mode in Chrome actually works today. | 09:45:20 |
| 6 | Q     Today, does all of Chrome block | 09:45:26 |
| 7 | third-party cookies by default, or is it just | 09:45:30 |
| 8 | incognito mode? | 09:45:34 |
| 9 | A     Just incognito mode. | 09:45:35 |
| 10 | Q     What's a third-party cookie? | 09:45:37 |
| 11 | A     That's a good question. | 09:45:44 |
| 12 | Cookies are a form of data | 09:45:52 |
| 13 | storage that exists in web browsers where the | 09:45:58 |
| 14 | browser retains some data that came from the | 09:46:05 |
| 15 | server and then sends it back to that server | 09:46:07 |
| 16 | later. | 09:46:10 |
| 17 | Third-party cookies are | 09:46:12 |
| 18 | cookies -- the phrase "third-party cookies" is | 09:46:15 |
| 19 | a little ambiguous and not always used to mean | 09:46:24 |
| 20 | exactly the same thing.  But probably the best | 09:46:26 |
| 21 | definition of it is cookies where the server | 09:46:31 |
| 22 | that sent or received back the data that I | 09:46:34 |
| 23 | referred to is not the same as the server that | 09:46:39 |
| 24 | a person browsing the web is in the middle of | 09:46:47 |
| 25 | visiting at the time that the communication | 09:46:50 |

Page 34

```
 1    happens.                                      09:46:52
 2        Q    And then how is that different from a  09:46:56
 3    first-party cookie?                           09:46:58
 4        A    First-party cookie is where the      09:47:00
 5    server -- the domain that is sending or       09:47:03
 6    receiving the cookie is the same as the one   09:47:07
 7    that the person browsing is in the middle of  09:47:11
 8    visiting.                                     09:47:18
 9        Q    And did you ever follow up with      09:47:22
10    Mr. McClelland about his consideration of the 09:47:23
11    idea that he mentioned?                       09:47:26
12        A    I don't recall.  Sorry.             09:47:29
13        Q    Do you know why Google chose not to  09:47:37
14    implement that idea for incognito mode?       09:47:39
15             MR. SCHAPIRO:  Objection.            09:47:41
16    Foundation.                                   09:47:41
17        A    As I think I said before, this was   09:47:49
18    not a proposal or a well-fleshed-out idea,    09:47:52
19    even.  It was just a question of have we ever 09:47:59
20    thought about doing something like that.      09:48:01
21             So any question about whether to     09:48:07
22    actually pursue it or not would need to start 09:48:09
23    with an actual "it" that we might or might not 09:48:12
24    pursue, and I don't have any such particular  09:48:15
25    proposal to consider or even look at here.    09:48:18
```

Page 35

```
 1    page.                                          15:00:36

 2         A    Just a minute.  Let me read through  15:00:39

 3    to get context.                                15:00:43

 4                   (The deponent read the          15:00:51

 5    document.)                                     15:00:51

 6                   Yup, okay.                       15:00:52

 7         Q    Do you see near the middle where you 15:00:54

 8    wrote:  "Seems that the Ads blog post later   15:00:56

 9    this month is going to say that we get back   15:00:58

10    greater than ██ percent of advertiser CPD using 15:01:01

11    FLoC instead of third-party cookies for       15:01:05

12    in-market audience targeting"?                 15:01:08

13         A    Yes, I do.                           15:01:11

14         Q    And CPD refers to conversions per   15:01:13

15    dollar?                                        15:01:16

16         A    That's correct.                      15:01:19

17         Q    And then right underneath, do you see 15:01:20

18    where you wrote:  "That will make people sit up 15:01:22

19    and pay attention"?                            15:01:24

20         A    Yes, I do.                           15:01:27

21         Q    Why did you think that that would   15:01:29

22    make people sit up and pay attention?         15:01:32

23         A    I think the context here is the     15:01:37

24    comment from Justin Schuh immediately above the 15:01:41

25    one that you read, in which Justin says, "I   15:01:46
```

Page 172

| | | |
|---|---|---|
| 1 | feel like the industry is kinda sleeping on | 15:01:49 |
| 2 | FLoC."  The FLoC API idea had been announced | 15:01:53 |
| 3 | sometime previously, but it had not gotten | 15:02:05 |
| 4 | substantial attention from the ad tech industry | 15:02:10 |
| 5 | at the point that this chat happened. | 15:02:15 |
| 6 | Q    All right.  I'm going to introduce | 15:02:28 |
| 7 | another exhibit. | 15:02:29 |
| 8 | (Exhibit 18 marked for | 15:02:30 |
| 9 | identification.) | 15:02:30 |
| 10 | BY MR. FRAWLEY: | 15:02:30 |
| 11 | Q    I have to move the exhibit box thing, | 15:03:04 |
| 12 | which is fun but annoying. | 15:03:06 |
| 13 | I've introduced what's marked as | 15:03:09 |
| 14 | Exhibit 18.  It's Bates No. GOOG-CABR-00801283. | 15:03:11 |
| 15 | A    Okay.  I have it. | 15:03:20 |
| 16 | Q    Look at the second page. | 15:03:39 |
| 17 | A    Just a minute.  Let me read through | 15:03:43 |
| 18 | to get context. | 15:03:45 |
| 19 | (The deponent read the | 15:03:57 |
| 20 | document.) | 15:03:57 |
| 21 | Okay.  Sure. | 15:04:05 |
| 22 | Q    Okay. | 15:04:09 |
| 23 | Do you see where Mike West | 15:04:09 |
| 24 | wrote:  "I see.  I suppose that maps to things | 15:04:11 |
| 25 | like GA as well, which might be happy to accept | 15:04:14 |

Page 173

| | | |
|---|---|---|
| 1 | a hashed variant of the first-party identifier | 15:04:17 |
| 2 | in order to do analytics"? | 15:04:20 |
| 3 | A    Yes, I see that. | 15:04:25 |
| 4 | Q    GA refers to Google Analytics, | 15:04:26 |
| 5 | correct? | 15:04:28 |
| 6 | A    Yes, that's correct. | 15:04:31 |
| 7 | Q    And then do you see where you | 15:04:33 |
| 8 | responded:  "Right, great example, this is | 15:04:34 |
| 9 | exactly the way Google Analytics uses the | 15:04:37 |
| 10 | first-party cookie space today"? | 15:04:39 |
| 11 | Can you explain how Google | 15:04:47 |
| 12 | Analytics uses the first-party cookie space at | 15:04:47 |
| 13 | that point in time, November -- sorry, | 15:04:53 |
| 14 | September 2018? | 15:04:55 |
| 15 | MR. SCHAPIRO:  Objection. | 15:04:56 |
| 16 | Foundation. | 15:04:56 |
| 17 | A    Yes.  So Google Analytics is a -- an | 15:05:08 |
| 18 | analytics service that lets website owners | 15:05:10 |
| 19 | understand some kind of aggregated information | 15:05:24 |
| 20 | about how people use their website.  Obtaining | 15:05:29 |
| 21 | that information requires -- is built on Google | 15:05:42 |
| 22 | Analytics understanding not just one individual | 15:05:50 |
| 23 | page load at a time, but understanding like a | 15:05:57 |
| 24 | whole session -- a whole sequence of page view | 15:06:01 |
| 25 | kind of activity that might happen on one site | 15:06:07 |

Page 174

| | | |
|---|---|---|
| 1 | at a time. | 15:06:13 |
| 2 | And stitching together those | 15:06:16 |
| 3 | individual page views into an overall session | 15:06:23 |
| 4 | on one particular website requires having some | 15:06:26 |
| 5 | sort of pseudonymous identifier that is | 15:06:33 |
| 6 | associated with all of those individual page | 15:06:37 |
| 7 | loads. | 15:06:42 |
| 8 | So that -- the way in which | 15:06:44 |
| 9 | Google Analytics uses the first-party cookie | 15:06:49 |
| 10 | space as described in this chat is exactly to | 15:06:54 |
| 11 | store the pseudonymous identifier that is | 15:06:58 |
| 12 | associated with one browser's behavior on one | 15:07:04 |
| 13 | particular website. | 15:07:08 |
| 14 | Q    And you mentioned just a moment ago | 15:07:15 |
| 15 | something about stitching together those | 15:07:17 |
| 16 | individual page views. | 15:07:20 |
| 17 | Does Google Analytics use | 15:07:21 |
| 18 | cookies to do that stitching? | 15:07:23 |
| 19 | A    Yes. | 15:07:31 |
| 20 | Q    And would those be first-party | 15:07:32 |
| 21 | cookies or third-party cookies? | 15:07:33 |
| 22 | A    First-party cookies. | 15:07:37 |
| 23 | Q    So if a user visits a website that | 15:07:40 |
| 24 | uses Google Analytics, like The New York Times, | 15:07:43 |
| 25 | for example, the New York -- sorry, the | 15:07:47 |

Page 175

```
 1    analytics cookie will be first-party cookie?      15:07:50
 2        A    This is somewhat confusing, actually.    15:07:58
 3    As -- yeah.                                        15:08:07
 4               Yeah.  First-party cookies on           15:08:20
 5    The New York Times's website are cookies that      15:08:31
 6    are available when you're on New York Times or     15:08:39
 7    when your browser is communicating with New        15:08:45
 8    York Times.                                        15:08:48
 9               If your browser is communicating        15:08:52
10    with New York Times, then the cookies are sent     15:08:54
11    to the server as part of the request, or at        15:09:03
12    least they might be in some cases.                 15:09:05
13               If you're looking at a webpage          15:09:09
14    on The New York Times website, then The New        15:09:14
15    York Times cookies can also be accessed by --      15:09:20
16    or some New York Times cookies can also be         15:09:24
17    accessed by the JavaScript code that is part of    15:09:28
18    The New York Times's website.                      15:09:34
19               All of those things that I just         15:09:41
20    described are first-party cookies.  And that       15:09:44
21    type of first-party cookie that is accessed        15:09:53
22    through JavaScript that is built into The New      15:09:59
23    York Times's website is the way in which Google    15:10:03
24    Analytics uses first-party cookies to -- to get    15:10:08
25    a pseudonymous identifier associated with          15:10:18
```

Page 176

| | | |
|---|---|---|
| 1 | multiple different page views on New York | 15:10:22 |
| 2 | Times. | 15:10:25 |
| 3 | Q    So do you recall earlier where you | 15:10:30 |
| 4 | said that today, Chrome, by default, blocks | 15:10:31 |
| 5 | third-party cookies within incognito? | 15:10:35 |
| 6 | A    Yes. | 15:10:39 |
| 7 | Q    So blocking third-party cookies by | 15:10:41 |
| 8 | default within incognito has no effect on the | 15:10:43 |
| 9 | Google Analytics processes you just described, | 15:10:45 |
| 10 | correct? | 15:10:48 |
| 11 | A    I believe that's correct, yes. | 15:10:52 |
| 12 | Q    Does blocking third-party cookies by | 15:10:57 |
| 13 | default have any effect on Google Analytics? | 15:10:59 |
| 14 | A    I'm not sure. | 15:11:07 |
| 15 | Q    And within an incognito session, | 15:11:14 |
| 16 | let's say on New York Times, the cookie is | 15:11:17 |
| 17 | being sent back and forth, does Chrome save | 15:11:22 |
| 18 | those cookies? | 15:11:25 |
| 19 | MR. SCHAPIRO:  Objection to the | 15:11:26 |
| 20 | form of the question.  Vague.  Ambiguous. | 15:11:26 |
| 21 | A    I'm sorry, could you repeat the | 15:11:30 |
| 22 | question? | 15:11:32 |
| 23 | Q    Yes. | 15:11:32 |
| 24 | So I just want to go back to -- | 15:11:33 |
| 25 | we were talking about The New York Times, | 15:11:37 |

Page 177

# EXHIBIT 34

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From**: | Justin Schuh [jschuh@google.com] |
| **Sent**: | 8/30/2016 7:22:59 PM |
| **To**: | Mike West [mkwst@google.com] |
| **CC**: | Jochen Eisinger [eisinger@google.com]; Ojan Vafai [ojan@google.com]; Dominic Battre [battre@google.com]; Joel Weinberger [jww@google.com]; Artur Janc [aaj@google.com]; chrome-security-owp [chrome-security-owp@google.com]; Stephen Röttger [sroettger@google.com] |
| **Subject**: | Re: HEIST is a good reason to revisit third-party cookie handling? |

This is similar to where mixed-content blocking was several years ago. Microsoft had a very dodgy implementation, but at least they were doing something. And their work gave us cover when we started attacking the problem, and iterated on increasingly better blocking.

Eventually, other browsers started tagging along, and some sucker even got duped into making a spec out of it. 😜

On Tue, Aug 30, 2016 at 12:04 PM, Mike West <mkwst@google.com> wrote:
On Tue, Aug 30, 2016 at 8:40 PM, Jochen Eisinger <eisinger@google.com> wrote:
Safari moving the needle? o_O

Perception-wise, totally. And their default is stricter than ours.

What they call third-party cookie blocking is not really blocking. I'd be fine with making our default to do what Safari does (only block writing if there are no pre-existing cookies), but keep our "block 3rd party cookies" setting as is (actually block stuff).

SGTM as a first step, but, you know, let's break all the things.

On Tue, Aug 30, 2016 at 6:23 PM Mike West <mkwst@google.com> wrote:
+ojan, who I thought was added earlier in the thread, but apparently wasn't.

On Tue, Aug 30, 2016 at 5:59 PM, Justin Schuh <jschuh@google.com> wrote:
I totally appreciate the compatibility concerns, but Safari has been moving the needle here for several years now. So, I think we should start pushing too.

I don't know what to do about fingerprinting. Personally, I'm dubious it's a problem that we could reasonably solve even if were to start all over with the Web. And I feel it's intractable with the Web as it is today. However, I also view that as a very different problem from a security perspective.

My big security concern is the ambient permission leakage that comes from allowing third-party cookies. So, I think there's a big value in solving that problem on its own, independent of user tracking (via cookies or fingerprinting) as a privacy issue.

I agree. I suspect Dominic/privacy agrees too.

-mike

On Tue, Aug 30, 2016 at 3:17 AM, Mike West <mkwst@google.com> wrote:
We didn't do things like https://docs.google.com/document/d/1tFLIeYmE8MR-m79MLSmJ_mHDHNQLn7yYo9aDBslKIVs/edit

or https://docs.google.com/document/d/1hK4nB3lZGCtII_r_tIPg4xPMmDr6Ahh9lL5veAccsrg/edit in the past for the two reasons that Jochen notes: fingerprinting, and identity providers.

Identity providers are solvable in some way via better UI for users or intelligent decisions the browser makes about when to allow cookies and when to block them ("Hey, you've been to this site at the top-level 100 times in the last week. Maybe you like it?").

Fingerprinting is harder. There's nothing we can technically do to prevent it, and we haven't been successful at creating a technical/regulatory framework in which to successfully ostracize it.

That said, based on some comments they've made in WebAppSec, Safari seems to be doing things to tighten their behavior in this area. I think it's something we should think about again. +battre from Privacy.

-mike

-mike

On Mon, Aug 22, 2016 at 1:54 PM, Jochen Eisinger <eisinger@google.com> wrote:
The other big use case are ID providers, i.e., you'll need to whitelist google.com to use teams.googleplex.com

In order to be able to ███████████████████████████████████████████████████████
███████████████████████████████████.

We also need a better story for fingerprinting, as this will just push (non-IBA) ad networks into using fingerprinting instead of cookies.

On Tue, Aug 9, 2016 at 3:24 AM Joel Weinberger <jww@google.com> wrote:
My ignorance is astounding, but I assume third-party cookies are almost exclusively used by ad folks these days, yes? If so, should we bring Ojan and the Magnolia folks in on this?

On Fri, Aug 5, 2016 at 11:27 AM Artur Janc <aaj@google.com> wrote:
+sroettger

On Fri, Aug 5, 2016 at 11:18 AM, Justin Schuh <jschuh@google.com> wrote:
Here's the Blackhat presentation:
https://www.blackhat.com/docs/us-16/materials/us-16-VanGoethem-HEIST-HTTP-Encrypted-Information-Can-Be-Stolen-Through-TCP-Windows-wp.pdf

The tl;dr is that third-party cookie blocking would prevent HEIST from being able to steal sensitive content. I realize that this is subject is fraught with peril, but maybe it's time to take another crack at a ██████████████████████████████████?

--
You received this message because you are subscribed to the Google Groups "chrome-security-owp" group.
To unsubscribe from this group and stop receiving emails from it, send an email to chrome-security-owp+unsubscribe@google.com.
To post to this group, send email to chrome-security-owp@google.com.
To view this discussion on the web visit https://groups.google.com/a/google.com/d/msgid/chrome-

security-
owp/CAObUUC_j2SkZnYxLt5dw4vdRLxuPTZuMdM0s8ucdFkWrj7cRSw%40mail.gmail.com.

--
You received this message because you are subscribed to the Google Groups "chrome-security-owp"
group.
To unsubscribe from this group and stop receiving emails from it, send an email to chrome-security-
owp+unsubscribe@google.com.
To post to this group, send email to chrome-security-owp@google.com.
To view this discussion on the web visit https://groups.google.com/a/google.com/d/msgid/chrome-
security-owp/CAPYVjqq%2BZRCAgxxwjNRSycZei-9Mg9x-iWphjznmnNEV3WT-
tw%40mail.gmail.com.
--
You received this message because you are subscribed to the Google Groups "chrome-security-owp"
group.
To unsubscribe from this group and stop receiving emails from it, send an email to chrome-security-
owp+unsubscribe@google.com.
To post to this group, send email to chrome-security-owp@google.com.
To view this discussion on the web visit https://groups.google.com/a/google.com/d/msgid/chrome-
security-owp/CAHQV2K%3De7M6ZrZ3vy4R-
FJts950M_gJVTB4c70_e1fm%2B4PC%3DrA%40mail.gmail.com.

--
You received this message because you are subscribed to the Google Groups "chrome-security-owp"
group.
To unsubscribe from this group and stop receiving emails from it, send an email to chrome-security-
owp+unsubscribe@google.com.
To post to this group, send email to chrome-security-owp@google.com.
To view this discussion on the web visit https://groups.google.com/a/google.com/d/msgid/chrome-
security-owp/CAKXHy%3DeVyjK5S3ix-unmMFd-2SZyfiL0oh17KHeOV2yzQ4-
xfw%40mail.gmail.com.

CONFIDENTIAL

# EXHIBIT 36

# Redacted Version of Document Sought to be Sealed



# Google Analytics: Starting Conversation

**Last updated: November - 2020**

Confidential + Proprietary

 GOOG-BRWN-00490767

# Agenda

1. Mission, Objectives, Key Metrics
2. Product Segmentation, Customers, Personas, User Clusters
3. Understanding the Product
4. The Industry Landscape
5. Pricing & Commercialization
6. Gold History
7. Architecture (Eng deep-dive to follow!)

Google

Confidential + Proprietary

GOOG-BRWN-00490768





 GOOG-BRWN-00490770

Proprietary + Confidential

# Value to Google



***Protect and grow Google media spend***
Influence strategic budgets and grow Google's digital share via better insights and integrations for customers.



- We have a paid business because it is necessary to capture & influence Google's largest & most sophisticated customers (some customers will not adopt our product without a price tag, sales, services, SLAs, and enterprise capabilities)

- Our value also includes being: a key catalyst in driving better overall user experiences for the internet.

Google

## Our impact



Google

GOOG-BRWN-00490772



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 37
# Redacted in its
# Entirety

# EXHIBIT 38
# Redacted in its Entirety

# EXHIBIT 39
# Redacted in its Entirety

# EXHIBIT 40
# Redacted in its Entirety

# EXHIBIT 41
# Redacted in its
# Entirety

# EXHIBIT 42
# Redacted in its Entirety

# EXHIBIT 43

# Unredacted Version of Document Sought to be Sealed

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO, individually and on behalf of all similarly situated, | Case No. 5:20-cv-03664-LHK |
| Plaintiffs, | |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFFS'**
**8TH SET OF INTERROGATORIES (NOS. 30-33)**

Pursuant to Federal Rule of Civil Procedure 33, Defendant Google LLC ("Google") hereby responds and objects to Plaintiffs' Interrogatories, Set 8 (Nos. 30-33). These objections and responses are made solely for the purpose of and in relation to this action. In addition, the objections and responses set forth in this document are based on Google's knowledge, investigations, and analysis to date. As discovery proceeds, Google may become aware of additional facts or evidence and its analysis of the case may change. Google reserves all rights to supplement and amend its objections and responses accordingly.

**GENERAL OBJECTIONS**

1.      Google objects to Plaintiffs' definition of "GOOGLE," "YOU," and "YOUR" as encompassing "any of its directors, officers, consultants, agents, representatives, predecessors in interest, subsidiaries, assignees, licensees, employees, attorneys and any other persons acting on GOOGLE LLC'S behalf, including contractors," as well as "purporting to act on" Google's behalf. Google further objects to these definitions to the extent that it seeks to require Google to produce or otherwise analyze any document or other information that is not within the possession, custody, or

CONFIDENTIAL

control of Google. Google further objects to these definitions to the extent that it purports to impute knowledge of unspecified or unknown parties or persons to Google. Google further objects to these definitions as overly broad, vague, and ambiguous to the extent they purport to include entities other than Google, which is the only named defendant in the present action. Google further objects to these definitions and instruction to the extent that they include Google's attorneys and, therefore, cause interrogatories using "Google" to improperly seek information protected by the attorney-client privilege, the work product doctrine, the common interest privilege and/or any other applicable privileges or immunities.

2.      Google objects to Plaintiffs' definitions of "ALL," "INCLUDE," "INCLUDING," "CONCERNING," and "RELATING TO" to the extent that they propose to alter the plain meaning or scope of any specific interrogatory and to the extent that such alteration renders the interrogatory vague, ambiguous, and overbroad.

3.      Google objects to Plaintiffs' definition of INSTANCES as vague, ambiguous and overly broad.

4.      Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they seek information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

5.      Google objects to the interrogatories to the extent that they seek information shielded from disclosure by the attorney-client privilege, the work-product doctrine, the settlement privilege and/or any other applicable privilege or protection from discovery.

6.      Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they conflict with or encompass information and/or records falling outside the scope of discovery under the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

CONFIDENTIAL

7.      Google's responses to these interrogatories are hereby made without waiving or intending to waive, but rather, to the contrary, by preserving and intending to preserve:

      a.      All questions as to the competence, relevance, proportionality, materiality, and admissibility as evidence for any purpose of the information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

      b.      The right to object on any ground to the use of any such information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

      c.      The right to object at any time in connection with any further response to these or any other interrogatories; and

      d.      The right at any time to supplement its responses.

8.      Google anticipates that future discovery, independent investigation, or analysis will supply additional facts and add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses set forth herein. Google reserves the right to modify, supplement, withdraw, or otherwise alter its responses to these interrogatories in accordance with the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

Subject to the foregoing objections, Google objects and responds to Plaintiffs' interrogatories as follows:

CONFIDENTIAL

**INTERROGATORY NO. 30:**

Please explain all differences regarding how browsing data is sent from users' devices to Google when (1) a user visits a website that uses Google Ad Manager but not Google AdSense compared with (2) a user visits a website that uses Google AdSense but not Google Ad Manager.

**RESPONSE TO INTERROGATORY NO. 30:**

Google incorporates its General Objections as if set forth fully herein. Google further objects to this interrogatory as overbroad and unduly burdensome on the grounds that Google AdSense is not tied to Plaintiff's class definition. *See* Dkt. 136-1 (Second Amended Complaint ("SAC")) ¶ 192. Google further objects to this interrogatory as vague and ambiguous as to the meaning of the terms "browsing data" and "sent from users' devices to Google." Google will assume for purposes of its response that "browsing data…sent from users' devices to Google" means data generated when users visit third-party websites that use Google Ad Manager or Google AdSense while not logged into their Google Account.  Google further objects to this interrogatory to the extent it seeks information related to non-Chrome browsers, which may have unique browser features that impact data collection by Google Ad Manager and Google AdSense. Google further objects to this interrogatory as overbroad and unduly burdensome because it seeks a description of "all" differences between data received by websites using Ad Manager or AdSense.

Subject to and without waiving the foregoing objections, Google responds as follows:

Google Ad Manager will not receive data related to a user's visit to a specific website unless Ad Manager scripts have been installed in the website's HTML code.  Similarly, Google AdSense will not receive data related to a user's visit to a specific website unless AdSense scripts have been installed in the website's HTML code.  The Ad Manager scripts are different from the AdSense scripts, but each may be viewed by any Chrome user by visiting the webpage using Google Ad Manager (or AdSense) and clicking on "View," "Developer," "Developer Tools," "Sources."  The

CONFIDENTIAL

data sent to Google Ad Manager and Google AdSense depends on the functionality defined in the respective scripts. The data sent to Google Ad Manager will differ from the data sent to Google AdSense in a number of respects, due to differences between the two products and the respective APIs they provide to publishers, which are described in publicly-available documentation. *See, e.g.,* https://developers.google.com/publisher-tag/guides/get-started; https://support.google.com/adsense/answer/9274634.

The data sent to Google Ad Manager or Google AdSense also depends on a number of other factors. When a user (in any browser) visits a website that uses Google Ad Manager or AdSense, Google Ad Manager or AdSense may receive: (1) cookies that specific Google domains previously set on the user's browser; (2) the HTTP request sent by the user's browser, including the hostname, browser type, and language, and depending on the browser used, Java support, Flash support, and screen resolution; (3) the URL of the website making the ad request to Google Ad Manager or AdSense, and/or the referrer URL; (4) the IP address assigned to the device on which the browser is running; (5) the request for an ad to be served on a non-Google website and the ad slot to be filled; (6) event data such as impressions or clicks; and (7) if the user is in Chrome and a mode other than Incognito, the browser's X-Client-Data Header.  The X-Client-Data Header may also be empty even when the browser is not in Incognito mode, including: (i) a new browser instance (ii) the browser has not been used for 30 days or more; (iii) the Chrome server sends too many variation IDs to the Chrome browser thereby causing the Chrome browser to delete the header to keep it from becoming too large; and (iv) a firewall prevents Chrome from receiving the variation IDs that are used to populate the X-Client-Data Header.

Whether Google in fact receives these categories of data depends on numerous factors, including (1) features and settings enabled by the user in Chrome or in the user's Google Account settings and (2) use of third-party software by the user.  For example, Chrome's cookie settings,

CONFIDENTIAL

which are accessible via a drop-down menu or by navigating to chrome://settings/cookies, include an option to "block all cookies." When the user enables this feature, Chrome prevents websites, Google Ad Manager and AdSense from setting or receiving any cookies. If all cookies are blocked in this manner, the Chrome browser will not send any cookies to Google Ad Manager or AdSense. Chrome's settings also include an option to "block third-party cookies." When the user enables this feature, Chrome does not set or transmit to Google Ad Manager or AdSense any third-party cookies, including advertising cookies.  Similarly, enabling "clear cookies and site data when you close all windows" in Chrome settings means that cookies do not persist across browsing sessions and Google Ad Manager and AdSense will not receive any cookies set in a prior session.

As another example, Chrome's JavaScript settings, which are accessible via a drop-down menu or by navigating to chrome://settings/content/javascript, include the following option: "Don't allow sites to use Javascript." When a user selects "Don't allow sites to use JavaScript," Chrome prevents websites from using JavaScript, including Google Ad Manager and AdSense tags based on JavaScript. As a result, if JavaScript is disabled in this manner, the Google Ad Manager or AdSense JavaScript tag will not be able to send information to Google Ad Manager or AdSense when a Chrome user visits a website that uses Google Ad Manager or AdSense.

There are also multiple ad-blocking extensions available on the Chrome Web Store that, when installed, can be configured to block Chrome from sending ad requests. Popular examples of those extensions are AdBlock and Adblock Plus.  When installed by a user, these ad-blocking extensions may, depending on their configuration, prevent Chrome from sending ad requests to Google Ad Manager or AdSense. There are also multiple standalone (not browser extension/plug-in) ad blocker programs that are designed to provide the same ad-blocking functionality. Popular examples of those programs are AdGuard and AdLock. When installed by a user, these ad-blocking programs may, depending on their configuration, prevent Chrome from sending any ad requests to

CONFIDENTIAL

Google Ad Manager or AdSense, thus preventing Google Ad Manager or AdSense from receiving any of the information described above.

If Chrome is used in Incognito mode, Chrome will not send the X-Client-Data Header to doubleclick.com or any other domain used by Google Ad Manager or AdSense. Furthermore, when a user activates Incognito mode, Chrome will create a new cookie jar that only stores first-party cookies and third-party cookies if not blocked (the default setting is for third-party cookies to be blocked in Incognito mode) for the duration of that Incognito session, and those cookies are deleted when the Incognito session ends. Because Chrome creates a new cookie jar for the Incognito session, Google Ad Manager and AdSense will not receive any cookie values set in a prior session.  Similar to Incognito mode, when a user activates Guest mode, Chrome will create a new cookie jar that only stores cookies for the duration of that Guest mode session, and those cookies are deleted when the Guest mode session ends. Because Chrome creates a new cookie jar for the Guest mode session, Google Ad Manager and AdSense will not receive any cookies set in a prior session.

There are also a number of third-party privacy programs and features that users can employ that affect whether Google Ad Manager or AdSense receives the data at issue, including proxy servers and VPNs, firewalls, ad blockers, and opt-out features. For example, if a Chrome user or their network administrator employs a proxy server or VPN (Virtual Private Network) that masks the sending device's IP address, then Google Ad Manager or AdSense would not receive the user's real IP address. Instead, Google Ad Manager or AdSense would receive only the IP address assigned by the VPN or proxy server.  And if a Chrome user or their network administrator employs a firewall that is configured to allow traffic only to specific domains (not including domains associated with Google Ad Manager or AdSense), or to prevent traffic to specific domains (including domains associated with Google Ad Manager or AdSense), then any transmissions that the Chrome browser attempts to send to Google Ad Manager or AdSense will be blocked by the firewall. Firewalls can

DEFENDANT'S RESPONSES AND OBJECTIONS TO 8TH SET OF ROGS (NOS. 30-33)

CONFIDENTIAL

also prevent Chrome from receiving the variation IDs that are used to populate the X-Client-Data Header.

When a user (in any browser) visits a website that uses Google AdSense, Google AdSense may receive many of the same types of data described above for Google Ad Manager (subject to the same factors described above).  However, Google AdSense will not receive certain items of data that are only relevant to Google Ad Manager.  For example, as described in publicly available documentation, Google Ad Manager allows publishers to set a publisher-provided identifier (PPID).  *See* https://support.google.com/admanager/answer/2880055.  Google AdSense does not provide this feature, so when a user visits a website that uses Google AdSense, the browser would not send a PPID value to Google AdSense.

**INTERROGATORY NO. 31:**

Please explain the basis for Google's determination that "false positives" for Chrome Incognito browsing detection in log-based analyses "range from ███████ (GOOG-BRWN-00204687), including by identifying documents and individuals tied to this determination.

**RESPONSE TO INTERROGATORY NO. 31:**

Google incorporates its General Objections as if set forth fully herein.  Google further objects to this interrogatory to the extent it mischaracterizes a draft document prepared by individual Google employees as "Google's determinations" regarding "'false positives' for Chrome Incognito browsing detection."  Google further objects to this interrogatory as vague and ambiguous as to the meaning of the terms "Chrome Incognito browsing detection," "log-based analyses," and "tied to this determination."

Subject to and without waiving the foregoing objections, Google responds as follows:

The estimated "false positives to identify Chrome traffic" ranging from "████" referenced at GOOG-BRWN-00204684 at -87 was based on differences observed between certain statistics collected from multiple independent sources, including data available to Chrome engineers and data