1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5    CHASOM BROWN, MARIA NGUYEN, AND   )  C-20-03664 LHK
     WILLIAM BYATT, INDIVIDUALLY AND   )
6    ON BEHALF OF ALL SIMILARLY        )  SAN JOSE, CALIFORNIA
     SITUATED,                         )
7                                      )  APRIL 21, 2022
                     PLAINTIFF,        )
8                                      )  PAGES 1-220
              VS.                      )
9                                      )
     GOOGLE LLC AND ALPHABET INC.,     )
10                                     )
                     DEFENDANTS.       )
11   _____  )

12

13              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SUSAN VAN KEULEN
14            UNITED STATES MAGISTRATE JUDGE

15

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFFS:   BOIES SCHILLER FLEXNER LLP
                           BY:  DAVID BOIES
18                         333 MAIN STREET
                           ARMONK, NEW YORK  10504
19
                           BY:  MARK C. MAO
20                         44 MONTGOMERY STREET, 41ST FLOOR
                           SAN FRANCISCO, CALIFORNIA  94104
21

22           APPEARANCES CONTINUED ON NEXT PAGE

23   OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3


4      FOR THE PLAINTIFFS:     BOIES SCHILLER FLEXNER LLP
                               BY:  ALISON L. ANDERSON
5                              725 S. FIGUEROA STREET, 31ST FLOOR
                               LOS ANGELES, CALIFORNIA  90017
6

7                              MORGAN & MORGAN
                               BY:   JOHN A. YANCHUNIS
8                                    RYAN J. MCGEE
                               201 N. FRANKLIN STREET, 7TH FLOOR
9                              TAMPA, FLORIDA  33602

10

11     FOR THE DEFENDANTS:     QUINN EMANUEL URQUHART & SULLIVAN
                               BY:  ANDREW H. SCHAPIRO
12                             191 N. WACKER DRIVE, SUITE 2700
                               CHICAGO, ILLINOIS  60606
13

14                             BY:  VIOLA TREBICKA
                               865 S. FIGUEROA STREET, 10TH FLOOR
15                             LOS ANGELES, CALIFORNIA  90017

16                             BY:  JOSEF ANSORGE
                               1300 I. STREET, N.W., SUITE 900
17                             WASHINGTON, D.C.  20005

18     ALSO PRESENT:           DOUGLAS BRUSH
                               TIMOTHY SCHMIDT
19                             TONI BAKER
                               NORA PUCKETT
20

21

22

23

24

25

1

2                          INDEX OF WITNESSES

3      PLAINTIFFS'

4      CHRISTOPHER THOMPSON
            DIRECT EXAM BY MR. MAO                    P. 34
5           VOIR DIRE EXAM BY MR. SCHAPIRO            P. 36
            DIRECT EXAM BY MR. MAO (RES.)             P. 37
6           CROSS-EXAM BY MR. SCHAPIRO               P. 58
            REDIRECT EXAM BY MR. MAO                 P. 86
7           RECROSS-EXAM BY MR. SCHAPIRO             P. 91

8

9      DEFENDANT'S

10     CHRIS LIAO
            DIRECT EXAM BY MS. TREBICKA              P. 155
11          CROSS-EXAM BY MR. YANCHUNIS              P. 162

12     WING-PAN LEUNG
            DIRECT EXAM BY MR. ANSORGE               P. 171
13          CROSS-EXAM BY MR. MCGEE                  P. 179

14     ANDRE GOLUEKE
            DIRECT EXAM BY MR. SCHAPIRO              P. 185
15          CROSS-EXAM BY MR. BOIES                  P. 192

16     CAITLIN SADOWSKI
            DIRECT EXAM BY MS. TREBICKA              P. 200
17          CROSS-EXAM BY MR. MCGEE                  P. 206

18

19

20

21

22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                      MARKED        ADMITTED

4       PLAINTIFFS'

5       A                                             34
        110, PREVIOUSLY MARKED AS A                   38
6       15, 19, 20, 75, 87, 88                        94
        63, 109                                       115
7       46, 48, 85, 103                               216

8

9       DEFENDANT'S

10      A                                             94

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      SAN JOSE, CALIFORNIA                    APRIL 21, 2022

2                      P R O C E E D I N G S

3          (PROCEEDINGS CONVENED AT 10:26 A.M.)

4              THE COURT:  GOOD MORNING, EVERYONE.  WELCOME TO THE

5      10:00 O'CLOCK HEARING, MORE OR LESS.  SO PLEASE BE SEATED.

6          THANK YOU FOR YOUR PATIENCE WHILE WE GOT THE TECHNOLOGY UP

7      AND RUNNING.

8          MS. FANTHORPE, IF YOU'LL CALL THE MATTER, WE'LL GET

9      UNDERWAY.

10             THE CLERK:  CALLING CASE 20-CV-3664, BROWN, ET AL,

11     VERSUS GOOGLE, LLC, ET AL.

12         COUNSEL, PLEASE IDENTIFY YOURSELVES FOR THE RECORD,

13     BEGINNING WITH PLAINTIFF.

14             MR. MAO:  GOOD MORNING, YOUR HONOR.

15         THIS IS MR. MAO.

16         I WANTED TO INTRODUCE MR. BOIES.

17             MR. BOIES:  GOOD MORNING, YOUR HONOR.

18             MR. MAO:  WE ALSO HAVE SOMEONE NEW TO OUR FIRM.  THIS

19     IS ALISON ANDERSON FROM THE DEPARTMENT OF JUSTICE.

20             MS. ANDERSON:  GOOD MORNING, YOUR HONOR.

21             MR. MAO:  MR. YANCHUNIS, WHO YOU OBVIOUSLY HAD APPEAR

22     BEFORE YOU BEFORE.

23         AND MR. MCGEE FROM MORGAN & MORGAN AS WELL, AND THE FIVE

24     OF US WILL BE CONDUCTING THE HEARING.

25             THE COURT:  EXCELLENT.  THANK YOU.  GOOD MORNING.
```

1    AND THANK YOU ALL FOR GETTING HERE IN PERSON.  I APPRECIATE IT.

2         AND FOR THE DEFENDANTS TODAY?

3              MR. SCHAPIRO:  HELLO, YOUR HONOR.

4         I'M ANDREW SCHAPIRO FROM QUINN, EMANUEL FOR GOOGLE.

5         I'M JOINED BY MY COLLEAGUE, VIOLA TREBICKA.

6              MS. TREBICKA:  GOOD MORNING, YOUR HONOR.

7              MR. SCHAPIRO:  AND JOSEF ANSORGE.

8              MR. ANSORGE:  GOOD MORNING, YOUR HONOR.

9              MR. SCHAPIRO:  WE'RE THE THREE WHO WILL BE PRESENTING

10   OR ADDRESSING THE COURT OR THE WITNESS TODAY.

11        WE ALSO HAVE OUR TRUSTED ASSOCIATE, SETH FORTENBERY, WHO

12   WILL BE RUNNING THE SHOW HERE TODAY.

13             THE COURT:  EXCELLENT.

14             MR. SCHAPIRO:  AND PRESENT WITH US IN THE AUDIENCE WE

15   HAVE TWO ATTORNEYS FROM GOOGLE.  WE HAVE TONI BAKER, WHO IS

16   ASSOCIATE DISCOVERY COUNSEL.

17             THE COURT:  GOOD MORNING.

18             MR. SCHAPIRO:  AND WE HAVE NORA PUCKETT, WHO IS

19   DIRECTOR OF LITIGATION.

20             THE COURT:  GOOD MORNING.  THANK YOU FOR BEING HERE.

21        ALL RIGHT.  WE ALSO HAVE THE SPECIAL MASTER,

22   DOUGLAS BRUSH, AND MR. SCHMIDT, WHO'S A MEMBER OF HIS TEAM.

23   THEY'VE BEEN VERY INVOLVED IN THE PROCEEDINGS IN THIS MATTER

24   AND ARE JOINING US IN PERSON TODAY.

25             THANK YOU FOR MAKING THAT EFFORT.

```
1              IT IS GOOD TO SEE EVERYONE.  IT'S GOOD TO HAVE EVERYBODY
2       IN PERSON IN COURT, SO THANK YOU ALL FOR THAT EFFORT.
3              WE ARE WEARING MASKS TODAY.  WE WILL PROCEED WITH CAUTION.
4              AND WHEN WE HAVE A WITNESS ON THE STAND -- OH, THEY
5       ADJUSTED MY MONITOR.  THAT'S NOT GOING TO WORK, IS IT?
6              BUT WHEN WE HAVE A WITNESS ON THE STAND, I MAY ASK THE
7       WITNESS AND THE SPEAKER TO TAKE OFF THEIR MASKS SO THAT THE
8       COURT REPORTER CAN HEAR AND BE SURE THAT OUR RECORD IS
9       COMPLETE.
10             ALL RIGHT.  WE ARE ON TODAY FOR A PROCEEDING THAT FOLLOWS
11      PLAINTIFFS' MOTION FOR DISCOVERY SANCTIONS, AND I HAVE HAD SOME
12      CONVERSATIONS WITH COUNSEL AS TO HOW WE WILL PROCEED.
13             AND WHAT WE WILL DO IS I WILL FIRST HEAR A SHORT, BRIEF
14      OPENING POSITION STATEMENT FROM EACH SIDE; AND THEN WE WILL
15      PROCEED FIRST IN HEARING MODE ON THE MOTION WITH A --
16      PLAINTIFFS WILL MOVE THROUGH AND MAKE THEIR POINTS AND THEN,
17      WHEN APPROPRIATE, CALL A WITNESS.  I UNDERSTAND THERE'S ONE
18      WITNESS ON THE PLAINTIFFS' SIDE.
19             AND I HAVE RECEIVED LOTS AND LOTS OF EXHIBITS FROM ALL THE
20      PARTIES, SO TO THE EXTENT THAT THERE ARE ADDITIONAL DOCUMENTS
21      THAT ARE NOT ALREADY IN THE RECORD BEFORE THE COURT THAT A
22      PARTY WANTS TO MOVE INTO EVIDENCE IN THESE PROCEEDINGS, WE'LL
23      HANDLE THAT.
24             ALL RIGHT.  SO WITHOUT FURTHER DELAY OR ADO, MR. BOIES,
25      LET'S START WITH PLAINTIFF.
```

1        MR. BOIES:  THANK YOU, YOUR HONOR.

2        MAY IT PLEASE THE COURT.

3        WHAT I'LL TRY TO DO IS BRIEFLY SUMMARIZE SEVEN KEY POINTS

4   THAT I THINK MAY BE HELPFUL TO THE COURT IN FRAMING THE

5   PRESENTATION THAT WE'RE GOING TO GIVE TODAY.

6        FIRST -- AND I DON'T THINK THIS SHOULD BE IN DISPUTE --

7   DATA AND DOCUMENTS CONCERNING INCOGNITO USE AND USERS ARE

8   RELEVANT.  THEY'RE RELEVANT TO DAMAGES, FOR EXAMPLE, THE EXTENT

9   OF THE USE; THEY'RE RELEVANT TO LIABILITY, THE TYPE AND NATURE

10  OF USE; AND ACCORDING TO GOOGLE, THEY'RE RELEVANT TO CLASS

11  CERTIFICATION.

12       THE COURT IS WELL AWARE, I THINK, OF PLAINTIFFS' REPEATED,

13  AND I MIGHT SAY URGENT, EFFORTS TO OBTAIN DOCUMENTS AND DATA

14  CONCERNING INCOGNITO USE AND USERS.

15       SECOND, I DON'T KNOW IF WE -- IF THESE ARE BEING DISPLAYED

16  OR NOT, THEY'RE NOT COMING UP ON THE MONITOR HERE.

17            THE CLERK:  YOU WOULD NEED TO TELL ME.  WHAT DID YOU

18  WANT DISPLAYED?  PLAINTIFFS'?

19            MR. BOIES:  MAY I HAVE JUST A MOMENT, YOUR HONOR?

20            THE COURT:  YES.

21            THE CLERK:  IS IT PLAINTIFFS' SIDE?

22            MR. MAO:  YES, PLAINTIFFS' SIDE.

23            THE CLERK:  I JUST HAVE TO DO A LITTLE TOGGLE, SO I

24  JUST NEED TO KNOW.

25            MR. BOIES:  THANK YOU.

1          SECOND, IN ORDER TO TRACK AND ANALYZE INCOGNITO BROWSING,

2     GOOGLE DEVELOPED INCOGNITO DETECTION SIGNALS.  THESE SIGNALS

3     WERE ONE BIT FIELDS THAT WERE TURNED ON AND OFF BASED ON

4     WHETHER THE INCOGNITO MODE WAS BEING USED.

5          THESE SIGNALS INCLUDE IS_CHROME_INCOGNITO,

6     MAYBE_CHROME_INCOGNITO, AND IS_CHROME_NON_INCOGNITO.

7          GOOGLE STILL -- AND I WANT TO EMPHASIZE THIS, YOUR

8     HONOR -- STILL HAS NOT DISCLOSED WHETHER THERE ARE OTHER FIELDS

9     THAT ARE USED TO LOG INCOGNITO USE.

10          THIRD, INCOGNITO DETECTION BITS DIRECTLY CONCERN

11     INCOGNITO'S USE AND USERS.

12          FIRST, WITH RESPECT TO THAT, GOOGLE ITSELF DESCRIBES THE

13     IS_CHROME_INCOGNITO SIGNAL AS REPRESENTING IF AN ENTRY COMES

14     FROM A CHROME WEB BROWSER IN INCOGNITO MODE.

15          GOOGLE ITSELF DESCRIBES THE MAYBE_CHROME_INCOGNITO SIGNAL

16     AS ACCURATELY TRACKING INCOGNITO USAGE.

17          AND LATER TODAY, WE'LL REFER TO SOME DOCUMENTS, INTERNAL

18     GOOGLE DOCUMENTS THAT TRACK AND ANALYZE AND DECIDE THAT THE

19     INCOGNITO TRACKING IS ACCURATE.

20          NOW, THESE SIGNALS AND GOOGLE'S USE OF THEM ARE RELEVANT

21     TO THE USE AND USERS OF INCOGNITO.

22          HOW ACCURATE THEY ARE AND EXACTLY HOW THEY ARE USED AT

23     GOOGLE MAY BE SUBJECT TO DISPUTE.  WE MAY BE DEBATING THAT

24     TODAY.

25          BUT REGARDLESS OF HOW ACCURATE OR INACCURATE GOOGLE CLAIMS

1    THEY ARE, WE RESPECTFULLY SUBMIT THAT PLAINTIFFS WERE ENTITLED

2    TO KNOW ABOUT THEM, ANALYZE THEM FOR THEMSELVES, HAVE THEIR OWN

3    EXPERTS ANALYZE THEM, AND HAVE THE COURT DECIDE WHETHER THEY

4    WERE RELIABLE OR IRRELEVANT OR NOT.

5         NOW, FOURTH, GOOGLE DID NOT GIVE US DOCUMENTS RELATED TO

6    THESE INCOGNITO IDENTIFICATION BITS.

7         EXHIBIT 15 IS A LETTER DATED APRIL 1ST, 2022.  IT'S

8    EXHIBIT 15.

9         AND --

10            THE COURT:  AND, MR. BOIES, JUST TO BE CLEAR, THAT

11   EXHIBIT 15, IS THAT TO THE MAO DECLARATION?

12            MR. BOIES:  I'M SORRY, YOUR HONOR.  THE EXHIBIT

13   NUMBERS I WILL BE USING WILL BE THE EXHIBIT NUMBERS FOR THIS

14   PRESENTATION.

15            THE COURT:  OKAY.

16            MR. BOIES:  SO THIS WILL BE HEARING EXHIBIT 15.

17            THE COURT:  OKAY.  THANK YOU.

18            MR. BOIES:  AND WE RECEIVED THIS LETTER APRIL 1ST

19   AFTER THE CLOSE OF DISCOVERY, AND FOR THE FIRST TIME, GOOGLE

20   SAYS IT'S PROVIDING THE PROTO COMMENT FOR THE

21   IS_CHROME_INCOGNITO FIELD.

22         IT SAYS IT REPRESENTS IF AN ENTRY COMES FROM A CHROME WEB

23   BROWSER IN THE INCOGNITO MODE.

24         NOW, THIS IS THE FIRST TIME THAT THIS WAS PRESENTED TO US.

25         WE DID NOT GET A SINGLE DOCUMENT, NOT A SINGLE DOCUMENT IN

1    DISCOVERY THAT EVEN MENTIONED THE IS_CHROME_INCOGNITO FIELD.

2         NOW, THIS OBVIOUSLY HAD TO COME FROM SOMEWHERE.  WE STILL

3    HAVEN'T ACTUALLY GOTTEN THOSE DOCUMENTS.

4         NOW, FIFTH, GOOGLE DID NOT DISCLOSE THE IDENTITIES OF

5    EMPLOYEES KNOWLEDGEABLE CONCERNING ITS INCOGNITO SIGNALS.

6         THE COURT WILL REMEMBER THAT WE SERVED REQUESTS FOR

7    PRODUCTION.  ON FEBRUARY 4TH, 2021, GOOGLE RESPONDED TO OUR

8    RFP'S 11 AND 12 BY GIVING US A LIST OF 226 PEOPLE WHO HAD

9    RELEVANT KNOWLEDGE.

10        THAT LIST DID NOT INCLUDE ANY OF THE PEOPLE RESPONSIBLE

11   FOR GOOGLE'S INCOGNITO DETECTION BITS.  THEY ADMITTED

12   MESSRS. LIAO, LEUNG, FIARD, AND MS. LIU, ALL OF WHOM YOU'RE

13   GOING TO HEAR ABOUT TODAY.

14        NOW, THEN WE SERVED INTERROGATORIES, AND ON

15   MARCH 29, 2021, THEY RESPONDED TO OUR INTERROGATORY NUMBER 4,

16   WHICH ASKED FOR THEM TO IDENTIFY THE PEOPLE WHO KNEW ABOUT

17   PRIVATE BOT BROWSING AND KNEW ABOUT INCOGNITO.

18        GOOGLE RESPONDED BY REFERENCING ITS EARLIER LIST OF 226

19   EMPLOYEES AND ADDING EIGHT MORE, BUT, AGAIN, NOT LISTING ANY OF

20   THE PEOPLE RESPONSIBLE FOR GOOGLE'S INCOGNITO DETECTION BITS,

21   INCLUDING THE SAME FIVE PEOPLE.

22        NOW, SIXTH, THE COURT ORDERED GOOGLE TO PROVIDE A

23   DECLARATION -- THE COURT ORDERED THAT ON NOVEMBER 12TH, 2021 --

24   THAT PROVIDED A COMPLETE LIST OF THE DATA SOURCES THAT WERE

25   RELEVANT, THAT CONTAINED INFORMATION RELEVANT TO PLAINTIFFS'

1    CLAIMS IN THE COURT'S WORDS.

2         GOOGLE'S DECLARATION FAILED TO DISCLOSE TWO LOGS THAT

3    LOGGED GOOGLE'S IS_CHROME_INCOGNITO SIGNAL.  THEY HAD THEM IN

4    THEIR POSSESSION.  THEY DIDN'T DISCLOSE THEM.

5         THEY DIDN'T DISCLOSE THREE LOGS THAT LOGGED GOOGLE'S

6    IS_CHROME_NON_INCOGNITO SIGNAL.  AGAIN, THEY HAD THOSE LOGS.

7    THEY DIDN'T DISCLOSE THEM.

8         THEY ALSO FAILED TO DISCLOSE 17 LOGS THAT LOGGED GOOGLE'S

9    MAYBE_CHROME_INCOGNITO SIGNAL.

10        SEVENTH.  ON DECEMBER 3, 2021, MR. CHRIS LIAO TESTIFIED,

11   AND WE BELIEVE TESTIFIED INACCURATELY, DESCRIBING THE

12   MAYBE_CHROME_INCOGNITO SIGNAL AS A "HYPOTHETICAL SIGNAL" THAT

13   HAD BEEN ABANDONED.

14        WE RESPECTFULLY SUGGEST TO THE COURT THAT THE

15   MAYBE_CHROME_INCOGNITO SIGNAL WAS NOT HYPOTHETICAL.  IT WAS

16   OPERATIONAL AND WAS BEING LOGGED IN AT LEAST 19 LOGS.

17        SECOND, THE MAYBE_CHROME_INCOGNITO SIGNAL WAS ALSO NOT

18   ABANDONED.  IT WAS BEING USED AT THE VERY TIME MR. LIAO

19   TESTIFIED.  INDEED, WE WILL SEE LATER THIS MORNING RECENTLY

20   DISCLOSED DOCUMENTS THAT SHOW THAT MR. LIAO'S DIRECT REPORTS

21   WERE TRACKING, ANALYZING, AND EVALUATING THIS PARTICULAR

22   INCOGNITO DETECTION BIT AND CONCLUDING THAT THE BIT ACCURATELY

23   REFLECTED THE AMOUNT OF USAGE OF INCOGNITO.

24        AGAIN, WHETHER OR NOT GOOGLE CLAIMS THE SIGNAL'S RELIABLE

25   IS IRRELEVANT TO THIS MOTION.  RELIABLE OR NOT, THIS IS

1    SOMETHING THAT THE PLAINTIFFS DEMANDED, THE COURT ORDERED US TO

2    RECEIVE, AND WE DIDN'T GET IT.

3         THANK YOU, YOUR HONOR.

4              THE COURT:  THANK YOU, MR. BOIES.

5         MS. TREBICKA.

6              MS. TREBICKA:  GOOD MORNING, YOUR HONOR.

7         I WILL TAKE MY MASK OFF AS INSTRUCTED BY THE COURT

8    REPORTER.  THANK YOU.

9              MS. FANTHORPE, MAY WE PLEASE PUT OUR SLIDES UP?

10             THE CLERK:  YES.

11             MS. TREBICKA:  GOOD MORNING, YOUR HONOR.  MAY IT

12    PLEASE THE COURT.  THANK YOU FOR THIS OPPORTUNITY.

13        WHAT I'D LIKE TO PROVIDE THE COURT IN THIS OPENING IS A

14   MENTAL MAP OF WHAT'S IMPORTANT FOR PURPOSES OF THIS SANCTIONS

15   MOTION.

16        YOU HEARD FOR -- OR YOU HEARD SEVEN POINT FROM MR. BOIES.

17        I'D LIKE TO POINT YOUR ATTENTION TO FOUR PRINCIPLE

18   QUESTIONS THAT ARE VERY IMPORTANT AND THAT WE WILL GO THROUGH

19   DURING THIS HEARING.

20        THE FIRST IS, WAS THERE CONCEALMENT?

21        THE SECOND IS, WAS THERE PREJUDICE?

22        THE THIRD IS, IS THE X-CLIENT DATA HEADER ACTUALLY A

23   RELIABLE DETECTION TOOL FOR CHROME INCOGNITO BROWSING?

24        AND LASTLY, SHOULD THERE BE SANCTIONS?

25        AND WE BELIEVE THE ANSWER TO ALL OF THOSE FOUR QUESTIONS

1        IS NO.

2              BY FAR THE MOST IMPORTANT QUESTION IS THE CONCEALMENT

3        QUESTION, WAS THERE CONCEALMENT?

4              WE WILL SHOW THAT GOOGLE AFFIRMATIVELY DISCLOSED THESE

5        BITS DURING DISCOVERY, AND WE DISCLOSED THEM LAST YEAR.

6              THE -- OVER THE COURSE OF THE BRIEFING, THE FOCUS OF THE

7        PLAINTIFFS' ALLEGATIONS HAS CHANGED A LITTLE BIT, BUT IT DOES

8        STILL FOCUS ON THE MAYBE_CHROME_INCOGNITO BIT AND THE FACT

9        THAT, AS THEY ALLEGE, WE HID IT.

10             WE INCLUDED A TABLE IN OUR OPENING BRIEF THAT HIGHLIGHTED

11       WHY THAT IS UNTRUE, WORD FOR WORD.  WE'VE ACTUALLY COLOR CODED

12       IT HERE FOR YOU TODAY SO THAT YOU CAN MATCH WHAT THEY CLAIM WE

13       HID WITH WHEN WE DISCLOSED IT, WHICH WAS IN SEPTEMBER OF 2021.

14             BUT THOSE DOCUMENTS WERE NOT ISOLATED INSTANCES.  WE WILL

15       GO THROUGH, IN OUR ARGUMENT AND OUR CASE-IN-CHIEF, THE ACTUAL

16       DOCUMENTS THAT WERE NOT NEEDLES IN THE HAYSTACK.  THEY WERE

17       ACTUALLY DOCUMENTS THAT WERE PRODUCED OVER AND OVER AND THAT

18       PLAINTIFFS FOUND AND REVIEWED.

19             AND HOW DO WE KNOW THAT?  WELL, THEY CITED THEM IN

20       BRIEFING.  THEY CITED THEM TO YOUR HONOR AT THE NOVEMBER 4TH

21       HEARING THAT WE HAD HERE RELATED TO THE SPECIAL MASTER

22       OBJECTIONS.

23             NOW, CURIOUSLY, DESPITE HAVING ALL OF THIS INFORMATION,

24       AND DESPITE ADMITTEDLY REVIEWING IT, PLAINTIFFS WAITED UNTIL

25       THE LAST WEEKS OF DISCOVERY TO ASK WITNESSES IN DEPOSITIONS

1    QUESTIONS ABOUT THEM, TO ASK DISCOVERY QUESTIONS ABOUT THEM AND

2    FOLLOW UP IN DISCOVERY, AND TO INCORPORATE IT IN THE SPECIAL

3    MASTER PROCESS.  THAT WAS A DETAILED, EXHAUSTIVE PROCESS, THE

4    PURPOSE OF WHICH WAS TO GET AT THESE TECHNICAL QUESTIONS AND

5    THE TECHNICAL EXPLANATIONS BEHIND THEM.

6         NOW, GOOGLE -- YOU HEARD, IN OPENING, THAT GOOGLE DID NOT

7    DISCLOSE THE RIGHT WITNESSES.

8         GOOGLE DID DISCLOSE THE RIGHT WITNESSES, YOUR HONOR.  AND

9    I'D LIKE TO REMIND US WHAT THE RIGHT WITNESSES MEANS.  IT MEANS

10   THE RELEVANT WITNESSES, AND THE RELEVANCE HERE IS TIED TO, OR

11   TETHERED TO THE CLASS DEFINITION THAT WAS THE OPERATIVE CLASS

12   DEFINITION UP UNTIL LAST MONTH, AND THAT CLASS DEFINITION WAS,

13   AGAIN, TETHERED TO THE GOOGLE ANALYTICS AND GOOGLE AD MANAGER

14   SERVICES WITHIN GOOGLE.

15        SO WHAT GOOGLE DID IN RESPONDING TO INTERROGATORY

16   RESPONSES OR IDENTIFYING PEOPLE TO PUT ON, TO PUT IN THE

17   EMPLOYEE LIST THAT WE PRODUCED TO PLAINTIFFS, WAS TO GO BACK TO

18   THOSE SERVICES AND IDENTIFY THE FOLKS WITH RELEVANT, UNIQUE,

19   NON-DUPLICATIVE KNOWLEDGE WITHIN CHROME, GOOGLE AD MANAGER, AND

20   GOOGLE ANALYTICS, AND THAT IS HOW WE ARRIVED AT THOSE LISTS.

21   THAT IS THE PROCESS WE FOLLOWED.

22        LEUNG AND LIU -- MR. BERT LEUNG AND MS. MANDY LIU AND

23   MR. QUENTIN FIARD WERE NOT OF GOOGLE AD MANAGER, GOOGLE

24   ANALYTICS, OR GOOGLE CHROME.

25        I MENTIONED THAT THE CLASS DEFINITION WAS THE ONE THAT

1    I'VE DISPLAYED ON THE SCREEN UNTIL LAST MONTH.  THAT'S BECAUSE

2    LAST MONTH PLAINTIFFS FILED A MOTION TO AMEND THEIR COMPLAINT

3    AND JUDGE GONZALEZ ROGERS GRANTED IT.

4         NOW, THE MOTION -- NOW, THE CLASS CERTIFICATION IS

5    SOMEWHAT BROADER.  IT INCLUDES USERS WHO WENT TO THIRD PARTY

6    WEBSITES THAT HAD ANY GOOGLE ADVERTISING OR TRACKING CODE.

7         HOWEVER, THAT MOTION WAS GRANTED WITH THE EXPRESS

8    LIMITATION THAT DISCOVERY WOULD NOT CHANGE, THE SCOPE OF

9    DISCOVERY WOULD NOT CHANGE, AND PLAINTIFFS AGREED TO IT, WITH

10   THE UNDERSTANDING THAT THE DISCOVERY, UP TO THAT POINT, UP TO

11   LAST MONTH -- THIS IS BEFORE THEY FILED THE MOTION FOR

12   SANCTIONS -- WAS PROPER AND APPROPRIATE AND SUFFICIENT.

13        AND HERE WE ARE TODAY.

14        PLAINTIFFS MAKE A LOT OF MR. LEUNG AND MS. LIU AND

15   MR. FIARD.

16        I'D LIKE TO NOTE, TO JUST REST ON MR. LIAO FOR LITTLE BIT.

17   HE WAS ADDED AS A CUSTODIAN IN JUNE 2021.  THE REASON HE WAS

18   ADDED AS A CUSTODIAN WAS NOT BECAUSE OF THE

19   MAYBE_CHROME_INCOGNITO BIT, WHICH WAS A MINOR PART OF HIS WORK

20   AS YOU WILL HEAR TODAY.

21        IT WAS RATHER BECAUSE HE WAS THE TEAM LEAD OF THE ADS

22   IDENTITY AND INFRASTRUCTURE TEAM, WHICH PROVIDES, SECURES, AND

23   MANAGES THE USE OF IDENTITY IN ADS SURVEY.

24        SO IT'S THE PLACE -- AND HE WAS THE MASTERMIND OF THIS.

25        IT'S THE PLACE WHERE GOOGLE INTERNALLY DECIDES, OKAY, IS

1    THE AD SERVING GOING TO BE ON A BISCOTTI BASIS OR A GAIA BASIS?

2    AND THAT IS THE WHOLE INFRASTRUCTURE IS THAT THAT THE

3    AUTHENTICATED AND UNAUTHENTICATED DATA CAN BE KEPT APART, CAN

4    BE KEPT SEPARATE.  AND THAT IS A PRIVACY REASON THAT IS FOUNDED

5    ON PRIVACY PRINCIPLES.

6         WE OFFERED CHRIS LIAO FOR A DEPOSITION ON AUGUST 31ST,

7    2021.  PLAINTIFFS DID NOT TAKE THAT DATE.  MR. LIAO WAS NOT

8    DEPOSED UNTIL DECEMBER 3RD, 2021.

9         AS I SAID, WE DID NOT ADD BERT LEUNG OR MANDY LIU OR

10   QUENTIN FIARD TO THE CUSTODIAN LIST, AT LEAST FOR BERT LEUNG

11   AND MANDY LIU, UNTIL WE REALIZED THE IMPORTANCE AND YOUR HONOR

12   ASKED US TO ADD THEM, IN WHICH CASE WE DID ADD THEM AND PRODUCE

13   THE DOCUMENTS.  WE DID SO ON AN ACCELERATED BASIS, WHICH LED TO

14   CERTAIN PRIVILEGED DOCUMENTS ALSO BEING INADVERTENTLY

15   DISCLOSED.  THIS WAS ALL IN AN EFFORT TO CURE WHATEVER

16   PREJUDICE PLAINTIFFS MAY CLAIM THERE IS.

17        HOWEVER, EVEN BEFORE THEY WERE ADDED TO THE CUSTODIAN

18   LIST, THERE WERE MORE -- OR CLOSE TO 10,000 DOCUMENTS WITH

19   THOSE PEOPLE'S NAMES ON IT.  SOME OF THEM WERE DOCUMENTS THAT

20   PLAINTIFFS REVIEWED AND CITED TO YOUR HONOR.

21        NEXT, GOOGLE DID NOT MISLEAD OR CONCEAL, YOUR HONOR, AND

22   THAT IS THE THREE ISSUES THAT YOU WILL HEAR A LOT MORE ABOUT,

23   INCLUDING FROM WITNESSES.

24        TAKING THEM FROM THE BOTTOM, MR. LIAO DID NOT MISLEAD

25   PLAINTIFFS.  WE WILL SHOW YOU THE QUESTIONS THAT WERE ASKED OF

1    HIM.  WE WILL SHOW YOU HIS ANSWERS.  HAD HE ANSWERED ANY

2    DIFFERENTLY, HE WOULD HAVE PERJURED HIMSELF.

3         AGAIN FROM THE BOTTOM, MR. GOLUEKE DID NOT CONCEAL

4    ANYTHING.  HE IS GOING TO TESTIFY TO THE THOROUGH PROCESS THAT

5    HE WENT THROUGH TO UNDER -- TO ARRIVE AT THE RELEVANT LOG THAT

6    IS WE PROPOSED TO BE SEARCHED IN THE SPECIAL MASTER PROCESS.

7    AGAIN, IT WAS TIED TO THE CLASS DEFINITION.  THE STARTING POINT

8    WAS LOGS FROM THE SERVICES THAT MATTERED THAT WERE RELEVANT,

9    GOOGLE AD MANAGER AND GOOGLE ANALYTICS.

10        AND FINALLY, WE DID NOT ALTER EVIDENCE.  IT'S PURE

11   FABRICATION TO SAY SO.  SPECIAL MASTER BRUSH, WHO IS SITTING

12   HERE TODAY WITH US, WE DESCRIBED TO HIM THE TECHNICAL BURDENS

13   OF PROVIDING THE ENTIRE SCHEMA FROM LOGS, FROM SPECIFIC LOGS,

14   NOT ALL LOGS, ONLY THE SAWMILL LOGS, AND WE ASKED THAT WE USE

15   THIS READY-MADE TOOL TO IDENTIFY THE HUNDRED LARGEST FIELDS

16   FROM THOSE LOGS.

17        IN UNDERSTANDING THE TECHNICAL BURDENS THAT CAME WITH

18   PROVIDING THE ENTIRETY OF THE SCHEMA AND THE UNRELIABILITY IN

19   PROVIDING THE ENTIRE SCHEMA FOR SAWMILL LOGS, MR. BRUSH ALLOWED

20   US TO DO THAT.

21        AND BY THE WAY, YOUR HONOR, THIS IS A LITTLE TECHNICAL,

22   AND WE'LL GO THROUGH THIS IN ARGUMENT A LITTLE MORE, BUT THE

23   PREJUDICE IS VERY LITTLE, BECAUSE AFTER PRODUCING THE SCHEMA,

24   WE THEN ALSO PRODUCED THE LOGS WITH DATA WRITTEN IN THE LOGS

25   WHICH ALSO PRODUCED THE FIELDS AGAIN.  THEREFORE, ANY CLAIM OF

1    PREJUDICE IS REALLY PURE FABRICATION.

2         NOW WE ARE AT THE PREJUDICE POINT, WHICH I'VE PREVIEWED A

3    LITTLE BIT.

4         THIS IS ANOTHER EXTREMELY IMPORTANT POINT, AND I WILL GO

5    THROUGH IT QUICKLY BECAUSE I PUT A TIMER FOR MYSELF AND I KNOW

6    THAT I AM SPEAKING QUITE A BIT AND I DO WANT US TO GET TO THE

7    CASE-IN-CHIEF.

8         BUT I'D LIKE TO -- AS I SAID, I'D LIKE TO LAY THIS MENTAL

9    MAP FOR YOUR HONOR TO KNOW WHAT'S COMING, WHAT'S COMING AHEAD.

10        THERE WAS NO PREJUDICE, YOUR HONOR.  PLAINTIFFS OBTAINED

11   THE RELEVANT DOCUMENTS.  THEY OBTAINED THE RELEVANT TESTIMONY,

12   INCLUDING ON THE THREE BITS:  MANDY LIU TESTIMONY, BERT LEUNG

13   TESTIMONY AND CAITLIN SADOWSKI TESTIMONY.  SHE IS THE CHROME

14   ENGINEER WHO KNOWS THE MOST, ONE OF THE FOREMOST EXPERTS OF THE

15   DATA THAT CHROME SENDS TO GOOGLE.

16        THEY HAVE NOT BEEN PREJUDICED DURING THE SPECIAL MASTER

17   PROCESS.  THE SPECIAL MASTER HAS BEEN VERY DILIGENT IN DIGGING

18   FURTHER, MAKING SURE THAT IF THERE IS ANY WHIFF OF ADDITIONAL

19   INFORMATION THAT MAY BE RELEVANT, THAT SHOULD BE DISCLOSED, TO

20   ASK US TO DISCLOSE IT, AND WE HAVE COMPLIED.

21        PLAINTIFFS HAVE NOT BEEN PREJUDICED IN EXPERT DISCOVERY

22   THAT.  THAT ONE IS A LITTLE CURIOUS BECAUSE ONLY A MONTH --

23   ONLY LAST MONTH WE AGREED TO, AT AN ARM'S LENGTH NEGOTIATION,

24   TO EXTEND THE EXPERT SCHEDULE, IT WAS RECENTLY ALSO GRANTED BY

25   JUDGE GONZALEZ ROGERS.  HAD THERE BEEN ANY CONCERN THAT EXPERT

1    DISCOVERY WOULD BE PREJUDICED BY THESE REVELATIONS, THAT SHOULD

2    HAVE BEEN TAKEN INTO ACCOUNT.  IT WAS NOT.

3         AND LASTLY, YOUR HONOR, PLAINTIFFS HAVE NOT BEEN

4    PREJUDICED IN REBUTTING GOOGLE'S CONTENTIONS.

5         TO THE EXTENT THEY STILL DON'T HAVE THE EVIDENCE TO REBUT

6    OUR CONTENTIONS, THERE'S NO AMOUNT OF EVIDENCE THAT WILL EVER

7    CURE THAT.

8         FINALLY, YOUR HONOR -- OR NOT FINALLY.

9         THIRD -- I'M SORRY -- THE RELIABILITY OF THE X-CLIENT DATA

10   HEADER IS NOT -- WE AGREE WITH MR. BOIES, THAT'S REALLY NOT

11   WHAT'S AT ISSUE.

12        HOWEVER, IT DOES UNDERLIE BOTH THE PREJUDICE AND THE

13   CONCEALMENT DETERMINATIONS THAT YOUR HONOR NEEDS TO MAKE.  AND

14   THAT IS FOR THIS REASON:  THE X-CLIENT DATA HEADER HAS BEEN A

15   PART OF THIS LITIGATION SINCE DAY ONE.  INITIALLY IT WAS IN THE

16   COMPLAINT AS A UNIQUE IDENTIFIER THAT GOOGLE USED TO IDENTIFY

17   PEOPLE.

18        NEXT, THE COMPLAINT WAS AMENDED.  NOW IT IS THE IDENTIFIER

19   THAT PLAINTIFFS WILL USE TO IDENTIFY THEIR CLASS, TO ASCERTAIN

20   THEIR CLASS.

21        ON THAT BASIS, THE DISCOVERY HAS BEEN ROBUST.  THERE WAS A

22   30(B)(6) WITNESS -- THERE WAS A 30(B)(6) WITNESS ON THIS ISSUE.

23   HE TESTIFIED TO ALL THE REASONS WHY THE X-CLIENT DATA HEADER IS

24   NOT RELIABLE.  THERE WAS NO FOLLOW-UP.  THIS WAS IN JUNE OF

25   2021.

1          FURTHER, THERE WERE HUNDREDS OF DOCUMENTS PRODUCED ABOUT

2     THE PROJECT, WHICH IS THE PROJECT THAT STARTED IN 2019, AND AS

3     FAR AS THAT, MR. LIAO WAS ONE OF THE PEOPLE MOST RELEVANT.  WE

4     OFFERED HIM FOR A DEPOSITION ON AUGUST 31, 2021.

5          THE DEPOSITION WAS NOT TAKEN UNTIL DECEMBER 2021, AND

6     PLAINTIFFS DID NOT ASK A SINGLE QUESTION ABOUT THE

7     MAYBE_CHROME_INCOGNITO BIT TO MR. LIAO.

8          THIS -- FOR THAT REASON, THE X-CLIENT DATA HEADER HAS

9     ALWAYS BEEN A PART OF THIS LITIGATION, AND FOR THAT REASON,

10    THERE HAS BEEN BRIEFING, THERE HAS BEEN ARGUMENT, THERE HAS

11    BEEN SUPPLEMENTAL BRIEFING, INCLUDING IN FRONT OF THE SPECIAL

12    MASTER, AND AS A RESULT OF THAT EXTENSIVE BRIEFING AND

13    DISCOVERY, THERE WAS A FINDING WITH RESPECT TO THE X-CLIENT

14    DATA HEADER.

15         PLAINTIFFS ASKED FOR ALL EVENT LEVEL DATA WHERE THE

16    X-CLIENT DATA HEADER WAS ABSENT FOR THE PURPOSE OF IDENTIFYING

17    THEIR CLASS AND DAMAGES.

18         IT WAS DENIED.

19         AND THAT IS WHY IT'S RELEVANT TO THIS, TO THIS SANCTIONS

20    HEARING, BECAUSE THE -- THE RELIABILITY DETERMINATION OF THE

21    X-CLIENT DATA HEADER CARRIES FROM THE PROJECT INTO THE

22    CONTINUATION OF THE PROJECT, WHICH GAVE RISE TO THE BIT.

23         THE X-CLIENT DATA HEADER, WE'VE BEEN HERE BEFORE, YOUR

24    HONOR.

25         FINALLY, THIS ALL LEADS ME TO CONCLUDE THAT THE EVIDENCE

 1    WILL SHOW THERE SHOULD BE NO SANCTIONS.  THE LAW DOES NOT

 2    SUPPORT THE SANCTIONS THAT PLAINTIFFS SEEK.

 3         THE PRECLUSION SANCTIONS ARE NOT ONLY EXTREME AND

 4    UNWARRANTED ON THE FACTS, BUT THEY DON'T EVEN FOLLOW WHAT

 5    PLAINTIFFS CLAIM THE EVIDENCE WILL SHOW, BECAUSE PLAINTIFFS

 6    CLAIM GOOGLE HID THE MAYBE_CHROME_INCOGNITO BIT.

 7         AS PRECLUSION SANCTIONS, THEY SEEK THAT THE COURT FIND

 8    THAT THE CHROME INCOGNITO BIT WAS A RELIABLE DETERMINATION FOR

 9    INCOGNITO, AND THAT GOOGLE CAN LINK INCOGNITO DATA TO

10    PLAINTIFFS.

11         THERE IS NO RELIABLE EVIDENCE FOR THAT, NO BASIS FOR THAT

12    DETERMINATION.

13         AND THEN EVEN MORE, A LEGAL DETERMINATION THAT THE CLASS

14    IS ASCERTAINABLE.

15         THAT DOES NOT FOLLOW FROM EVEN -- EVEN IF YOU GIVE THE

16    BENEFIT OF THE DOUBT TO THE FACTS THAT PLAINTIFFS SAY THEY WILL

17    ADDUCE.

18         AN ADVERSE JURY INSTRUCTION IS SIMILARLY INAPPROPRIATE

19    HERE, AND THAT'S BECAUSE IT'S BOTH INCORRECT -- THE JURY

20    INSTRUCTION THAT THEY SEEK IS THAT GOOGLE HID EVIDENCE, THE

21    CONCEALED EVIDENCE RELATED TO DETECTION OF THE INCOGNITO MODE.

22    THAT IS INCORRECT.

23         BUT IN ADDITION TO THAT, IT WOULD BE EXTREMELY PREJUDICIAL

24    AND UNHEARD OF TO TELL THE JURY THAT GOOGLE HID A FACT WHICH

25    THEY DON'T NEED TO MAKE THEIR DETERMINATION BECAUSE THE

1    DETERMINATION THAT THE CLASS IS ASCERTAINABLE WILL BE MADE BY

2    THE JUDGE AT CLASS CERT OR -- THE REVERSE OF THAT

3    DETERMINATION, WE BELIEVE.

4         FINALLY, YOUR HONOR, REIMBURSEMENT OF THE SPECIAL MASTER

5    FEES, IT'S JUST NOT ACCORDING TO THE LAW.  THE FEES -- THE

6    FEES, AT BEST, SHOULD BE THE FEES THAT WENT INTO PREPARING THE

7    MOTION, AND WE THINK THAT EVEN IS NOT APPROPRIATE.

8         THANK YOU, YOUR HONOR, FOR YOUR TIME.

9         THE COURT:  THANK YOU, MS. TREBICKA.

10        ALL RIGHT.  FROM PLAINTIFF, PLEASE.

11        MR. BOIES:  THANK YOU, YOUR HONOR.

12    LET ME BEGIN BY SUMMARIZING WHAT WE BELIEVE GOOGLE'S

13    MISCONDUCT WAS THAT IS AT ISSUE HERE.

14        AND IF WE CAN PUT UP THE CHART NUMBER 5.

15        THE CLERK:  DID IT COME UP FOR YOU?

16        THE COURT:  NO.  NOW IT IS.

17        MR. BOIES:  FIRST, GOOGLE DID NOT DISCLOSE RELEVANT

18     KEY EMPLOYEES.

19        SECOND, GOOGLE DID NOT PRODUCE RELEVANT KEY DOCUMENTS.

20        THIRD, GOOGLE MISREPRESENTED PRESERVATION BURDENS.

21        FOURTH, GOOGLE SUBMITTED AN INACCURATE DECLARATION FROM

22    MR. GOLUEKE.

23        FIFTH, GOOGLE EMPLOYEE CHRIS LIAO PROVIDED INACCURATE

24    TESTIMONY.

25        SIXTH, GOOGLE OMITTED INCOGNITO-DETECTION FIELDS FROM THE

1    SCHEMA THAT IT PRODUCED.

2         AND, SEVENTH, GOOGLE DESTROYED AND FAILED TO PRODUCE

3    PLAINTIFFS' DATA THAT IT HAD BEEN ORDERED TO PRODUCE.

4         NOW, COUNSEL SUGGESTED IN HER OPENING THAT THERE HAD NOT

5    BEEN ANY PREJUDICE.

6         THERE'S BEEN AT LEAST FOUR KINDS OF PREJUDICE, YOUR HONOR.

7         FIRST, WE HAVE MISSING DOCUMENTS THAT ARE STILL MISSING.

8    AND I SAID EARLIER IN THE OPENING, WE STILL HAVE NOT GOTTEN A

9    SINGLE DOCUMENT THAT MENTIONS THE IS_CHROME_INCOGNITO FIELD.

10        SECOND, THERE'S MISSING TESTIMONY.  BECAUSE WE DID NOT

11   KNOW WHO THE PEOPLE WERE AND BECAUSE WE DID NOT HAVE THE

12   DOCUMENTS AT THE TIME, WE WERE NOT ABLE TO TAKE THOSE PEOPLE'S

13   DEPOSITIONS; OR IF WE DID TAKE THOSE DEPOSITIONS, WE WERE NOT

14   ON NOTICE AS TO WHAT WE WOULD ASK QUESTIONS ABOUT.

15        COUNSEL IN HER OPENING SAYS THAT WHEN I THINK IT WAS

16   MR. LIAO WAS DEPOSED, HE WAS NOT ASKED A SINGLE QUESTION ABOUT

17   ONE OF THE INCOGNITO DETECTION BITS.

18        WELL, WE STILL HAD NEVER HAD IDENTIFIED TO US THE

19   IS_CHROME_INCOGNITO BIT.  WE COULDN'T HAVE ASKED HIM ANY

20   QUESTIONS ABOUT THAT BECAUSE THEY HAD NOT GIVEN US A SINGLE

21   DOCUMENT OR A SINGLE IDENTIFICATION THAT THAT FIELD EVEN

22   EXISTED.

23        THEY HAD GIVEN US, I BELIEVE IT WAS ONE DOCUMENT.  IN HER

24   OPENING, SHE SUGGESTED IT WAS TWO DOCUMENTS.  AND MAYBE WE

25   MISSED ONE, BUT SHE DIDN'T IDENTIFY WHAT THE DOCUMENTS WERE, SO

1    I WASN'T ABLE TO CHECK IT AT THE TIME.

2         BUT IT'S EITHER ONE OR TWO DOCUMENTS, WE THINK IT'S ONE,

3    THAT MENTIONED THE IS_CHROME_NON_INCOGNITO BIT, JUST ONE OR TWO

4    DOCUMENTS, AND ENTIRELY OUT OF CONTEXT, ENTIRELY NOT SHOWING

5    WHAT IT WAS BEING USED FOR, ENTIRELY UNTETHERED FROM ANY USE

6    AND RECORDING AND LOGS.

7         THERE WAS NO BASIS, BASED ON THOSE TWO DOCUMENTS.

8         THEY CANNOT, I RESPECTFULLY SUGGEST TO THE COURT, HOLD

9    BACK ALL THE DOCUMENTS OR MOST OF THE DOCUMENTS AND DRIBBLE OUT

10   ONE OR TWO AND THEN SAY, YEAH, BUT YOU WERE ON NOTICE.

11        THAT'S NOT WHAT DISCOVERY IS ABOUT.  THAT'S NOT THEIR

12   OBLIGATION UNDER FEDERAL RULES.  IT'S NOT THEIR OBLIGATION

13   UNDER THE COURT'S ORDER.

14        NOW, WITH RESPECT TO THE THIRD BIT, THE

15   MAYBE_CHROME_INCOGNITO BIT, THAT THEY GAVE US SOMEWHERE BETWEEN

16   15 AND 20 DOCUMENTS BEFORE WE RAISED THE ISSUE THAT RELATES TO

17   THIS MOTION.

18        WE ALREADY KNOW THAT THAT'S LESS THAN 10 PERCENT OF THE

19   DOCUMENTS THAT THEY HAD BECAUSE THEY PRODUCED NINE TIMES AS

20   MANY DOCUMENTS SINCE WE RAISED THIS ISSUE AS THEY DID DURING

21   DISCOVERY.

22        SO THEY MAY HAVE GIVEN US THE TIP OF THE ICEBERG, BUT THEY

23   DID NOT GIVE US THE BULK OF THOSE DOCUMENTS, AND THEY WERE --

24   THEY WERE OBLIGATED DO THAT.

25        A PARTY DOES NOT HAVE THE RIGHT TO HAVE A SET OF RELEVANT

1    DOCUMENTS AND SAY, WE'RE ONLY GOING TO GIVE YOU SOME AND WE'RE

2    GOING TO HOLD BACK THE ONES THAT ENABLE YOU TO UNDERSTAND

3    WHAT'S REALLY GOING ON.

4        SO THOSE, THOSE DOCUMENTS WERE WITHHELD, AND WE COULDN'T

5    ASK QUESTIONS ABOUT THEM BECAUSE WE DIDN'T HAVE THEM.

6        IN ADDITION, DATA WAS DESTROYED.  WE ARGUED PRESERVATION

7    TO THE COURT, AND GOOGLE CAME IN AND SAID, THERE'S SO MUCH

8    BURDEN HERE AND WE CANNOT FIND A WAY TO AVOID THAT.  AND THE

9    COURT SAID, WELL, THE BURDEN IS JUST TOO GREAT.  I'M NOT GOING

10   TO FORCE THEM TO DO THAT.

11       BUT IF THEY HAD DISCLOSED THESE DETECTION BITS, WE COULD

12   HAVE SAID, OKAY, AT LEAST PRESERVE THE DATA THAT YOU HAVE FROM

13   THESE DETECTION SIGNALS.  AT LEAST PRESERVE THE DATA THAT YOU

14   HAVE FROM IS_CHROME_INCOGNITO, IS_CHROME_NON_INCOGNITO,

15   MAYBE_CHROME_INCOGNITO, PRESERVE THOSE FIELDS.

16       THAT WOULDN'T HAVE BEEN BURDENSOME.

17       BUT BECAUSE WE DIDN'T KNOW ABOUT IT, WE COULDN'T MAKE THAT

18   ARGUMENT TO THE COURT.  AND BECAUSE WE COULDN'T MAKE THAT

19   ARGUMENT TO THE COURT, THAT RELEVANT DATA GOT SWEPT UP WITH

20   EVERYTHING ELSE THAT GOOGLE WAS PERMITTED TO DESTROY.

21       AND FOURTH, THERE'S BEEN AN ENORMOUS AMOUNT OF TIME AND

22   MONEY WASTED.  IT'S NOT JUST THE -- IT'S NOT JUST THE TIME AND

23   MONEY THAT IT'S TAKEN TO BRING THIS MOTION.  WE HAD TO INFER,

24   GUESS, TRACK, IN EFFECT BECOME DETECTIVES TO TRY TO FIND OUT

25   ABOUT DOCUMENTS AND DATA THAT THEY WERE OBLIGATED TO TELL US

1    ABOUT.

2         THE IS_CHROME_INCOGNITO MODE, THEY NEVER TOLD US ABOUT

3    THAT, EVEN WHEN THEY WERE TELLING US ABOUT OTHER BITS.  WE

4    ASKED -- WE FINALLY ASKED A QUESTION ABOUT THAT BECAUSE ONE OF

5    OUR EXPERTS SAID, WELL, IF THERE'S A IS_CHROME_NON_INCOGNITO,

6    MAYBE THERE'S A FIELD THAT'S IS_CHROME_INCOGNITO.

7         THAT ISN'T THE KIND OF BURDEN THAT THE FEDERAL RULES PLACE

8    UPON A PARTY.  IT'S NOT HIDE THE BALL.  IT'S NOT SEE HOW CLEVER

9    WE CAN MAKE THEM BE TO FIND OUT WHAT THE FACTS ARE.

10        IT IS WHEN THEY HAVE RELEVANT DOCUMENTS AND DATA, THEY'VE

11   GOT AN OBLIGATION TO PRODUCE THEM TO US AND THEY DIDN'T DO

12   THAT.

13        NOW, LET ME TURN TO THESE INCOGNITO DETECTION BITS AND

14   SPEND A LITTLE TIME JUST ON THE BACKGROUND FOR THAT.

15        AND WE'RE GOING TO BE TALKING ABOUT LOGS THAT LOG THESE

16   SIGNALS, AND I THINK IT'S USEFUL TO FOCUS ON THE STEPS THAT

17   HAVE TO BE TAKEN TO CREATE LOGS.

18        FIRST, GOOGLE COLLECTS DATA; SECOND, GOOGLE CREATES

19   FIELDS; THIRD, GOOGLE PROCESSES THE DATA TO POPULATE SELECTED

20   FIELDS TO CREATE LOGS.

21        NOW, ONE OF THE THINGS THAT'S IMPORTANT IS THAT ONCE A

22   FIELD HAS BEEN CREATED LIKE THIS, IT CAN BE USED IN A LARGE

23   NUMBER OF LOGS; THAT IS, IT'S NOT BURDENSOME, IT'S NOT

24   TECHNOLOGICALLY DIFFICULT OR TIME CONSUMING TO USE A FIELD THAT

25   HAS BEEN CREATED IN MULTIPLE NUMBER OF LOGS.

1    IF WE HAD KNOWN ABOUT THESE FIELDS AND IF WE HAD PRESERVED

2    THE DATA NECESSARY TO POPULATE THOSE FIELDS, WE COULD HAVE

3    PRESENTED TO THE COURT EXACTLY THE KIND OF INFORMATION THAT THE

4    COURT KNOWS THE PLAINTIFFS HAVE BEEN ASKING FOR OVER AND OVER

5    AGAIN.

6    THIS IS NOT SOME OBSCURE ISSUE ABOUT PRIVATE BROWSING.

7    THERE CANNOT, I RESPECTFULLY SAY TO THE COURT, HAVE BEEN ANY

8    DOUBT IN GOOGLE'S MIND WHAT WE WERE LOOKING FOR.  WE WERE NOT

9    ONLY LOOKING FOR DATA ABOUT INCOGNITO THAT WAS OVER IN THIS

10   BUCKET OR OVER IN THIS BUCKET.

11   THAT'S NOT WHAT OUR INTERROGATORIES SAID.  THAT'S NOT WHAT

12   THE COURT ORDER SAID.

13   WHAT THEY WERE OBLIGATED TO DO WAS GIVE US ALL OF THE DATA

14   THAT THEY HAD, ALL OF THE DOCUMENTS THAT THEY HAD THAT RELATED

15   TO TRACKING INCOGNITO USE AND USERS.

16   THEY DIDN'T DO THAT.

17   AND IF I COULD JUST PUT UP A TYPICAL USER TRACKING LOG.

18   AND LOGS WILL HAVE DIFFERENT FIELDS.  THIS PARTICULAR LOG

19   MIGHT HAVE AN I.P. ADDRESS, USER AGENT DATA, URL'S, I'VE PUT IN

20   HERE THE IS_CHROME_INCOGNITO FIELD, AND THE BISCOTTI

21   IDENTIFIER, ZWIEBACK IDENTIFIER, PPID, ANALYTICS UID, OTHER

22   FIELDS.

23   ONE OF THE THINGS THAT'S IMPORTANT IN UNDERSTANDING THE

24   LOGS IS THAT THE DATA THAT IS IN THESE FIELDS CAN BE USED IN

25   CONJUNCTION WITH OTHER DATA THAT IS IN THESE FIELDS.

1          GOOGLE CLAIMS, AND WE'RE GOING TO DISPUTE THIS, BUT GOOGLE

2     CLAIMS THAT THE IS_CHROME_INCOGNITO AND THE

3     MAYBE_CHROME_INCOGNITO FIELDS ARE NOT THEMSELVES COMPLETELY

4     ACCURATE OR DO NOT COMPLETELY IDENTIFY USERS.

5          WE THINK -- WE DISPUTE THAT.

6          BUT IN ADDITION TO THAT, EVEN IF THAT WERE TRUE -- AND

7     YOU'RE GOING TO HEAR THIS FROM ONE OF THE EXPERTS -- YOU CAN

8     USE OTHER PIECES OF DATA THAT ARE IN THERE IN CONJUNCTION WITH

9     THAT, FOR EXAMPLE, TO IDENTIFY USERS.

10         BUT WHEN YOU'RE DEPRIVED OF ONE OF THOSE DATA SETS, YOU

11    ARE UNABLE -- YOU'RE UNABLE TO DO THAT.

12         LET ME DIRECT THE COURT'S ATTENTION TO FOUR DOCUMENTS --

13    AND THESE ARE THE EXHIBITS FOR THE HEARING NUMBERING -- 19, 20,

14    87, AND 88.

15         AND WE WON'T REVEAL THE -- AT LEAST SOME OF THESE

16    DOCUMENTS ARE SEALED.

17         LET ME PUT UP A DEMONSTRATIVE FOR THE COURT THAT WILL GIVE

18    THE COURT A PORTION OF EACH OF THOSE DOCUMENTS THAT THE COURT

19    CAN LOOK AT IN THE CONTEXT OF THE DOCUMENTS WHICH THE COURT

20    WILL HAVE AVAILABLE TO IT.

21         ON JUNE 9, 2020, MR. LEUNG NOTED THE "PRIVACY RISK OF

22    LOGGING INFERRED CHROME INCOGNITO DETENTION," AND SOUGHT

23    "FEEDBACK FROM PRIVACY GURUS."

24         THIS WAS PART OF THE INCOGNITO DETECTION WORK THAT WAS

25    GOING ON AT THAT TIME.

1          THIS DOCUMENT WAS NOT PRODUCED TO US -- IT'S A

2     JUNE 9, 2020 DOCUMENT.  IT WAS NOT PRODUCED TO US UNTIL

3     FEBRUARY 18TH OF 2022.

4          EXHIBIT 19 IS MARCH 5, 2021, AND THERE MR. LIU -- OR

5     MS. LIU WAS TALKING ABOUT, "A LONG TERM SOLUTION IS IN NEED TO

6     PROVIDE A STANDARD WAY TO DETECT AND MONITOR INCOGNITO."

7          THIS IS A MARCH 5, 2021 DOCUMENT.  WE DID NOT GET IT UNTIL

8     FEBRUARY 18, 2022, AFTER MOST OF THE DEPOSITIONS WERE OVER

9     WITH.

10          NOW, WITH RESPECT TO THE ISSUE OF ADEQUACY, AS I SAID --

11     AND I THINK WE MAY HAVE AGREEMENT FROM COUNSEL ON THIS -- THEIR

12     CLAIM THAT THIS BIT IS NOT, OR THIS FIELD OR THIS SIGNAL IS NOT

13     AN ACCURATE OR COMPLETELY ACCURATE OR DEFINITIVELY ACCURATE WAY

14     TO DETERMINE INCOGNITO USE AND USERS IS NOT REALLY RELEVANT TO

15     THIS MOTION.

16          WE'RE ENTITLED TO HAVE THAT INFORMATION.  ON ITS FACE,

17     IT'S RELEVANT.  ON ITS FACE, IT'S CALLED FOR.  AND WE'RE

18     ENTITLED TO HAVE THAT INFORMATION SO THAT WE AND OUR OWN

19     EXPERTS CAN MAKE THAT DETERMINATION AND PRESENT THAT

20     INFORMATION TO THE FINAL DETERMINATION OF THE JUDGE AND JURY.

21          HOWEVER, I THINK IN TERMS OF THE SIGNIFICANCE, IT IS WORTH

22     NOTING THAT GOOGLE ITSELF THOUGHT THAT THESE DETECTION BITS

23     WERE RELIABLE.  AND, FOR EXAMPLE, IF I BEGIN WITH EXHIBIT 87,

24     WHICH GOES BACK TO MAY 15TH, 2020, WHAT YOU SEE IS GOOGLE

25     CONCLUDING THAT AN INCOGNITO USAGE OF 3.08 PERCENT IS "GROUND

1      TRUTH" FOR ANALYSIS OF INCOGNITO.

2           THAT IS -- THAT IS WHAT THEY CONCLUDED FROM THE UMA DATA

3      WAS THE AMOUNT OF INCOGNITO USAGE.

4           AND WHAT THEY THEN DID WITH THESE INCOGNITO DETECTION

5      FIELDS IS THEY TRIED TO COMPARE THE RESULTS FROM THOSE FIELDS

6      WITH THIS 3 PERCENT NUMBER TO TRY TO SEE WHETHER THE INCOGNITO

7      DETECTION BITS WERE REALLY ACCURATELY TRACKING AND CAPTURING

8      INCOGNITO USAGE.

9           AND IF WE GO BACK TO THE PRIOR EXHIBIT, WHICH -- OR MAYBE

10     I CAN PUT UP THE FIRST PAGE OF EXHIBIT 88.

11          IF YOU SEE FEBRUARY 3, 2022 -- AND THESE WERE NOTES THAT

12     MS. LIU TESTIFIED WERE HER NOTES AND THAT REFLECTED MEETINGS

13     THAT SHE'D HAD WITH MR. LEUNG -- AND YOU SEE THE SECOND BULLET

14     DOWN, "GOOD NEWS:  CHROME INCOGNITO RATE IS APPROXIMATELY 3

15     PERCENT."

16          SO WHAT THEY WERE DOING IS THEY WERE CONSTANTLY TRACKING

17     THIS AND DETERMINING THAT THE DATA THAT THEY WERE GETTING FROM

18     THESE INCOGNITO BITS ACCURATELY REFLECTED INCOGNITO USAGE.

19          THIS TESTIMONY IS ALSO, I THINK, RELEVANT TO THE QUESTION

20     THAT WE'LL DEAL WITH IN A LITTLE WHILE AS TO WHETHER THESE

21     BITS, AS WAS TESTIFIED BY MR. LIAO, HAD BEEN -- HAD NOT BEEN

22     ABANDONED.

23          AT THIS POINT -- AND BEFORE GOING ON TO THE SEVEN ELEMENTS

24     THAT I IDENTIFIED AT THE BEGINNING WHERE WE BELIEVE GOOGLE HAS

25     NOT FULFILLED ITS DISCOVERY OBLIGATIONS, I'M GOING TO PAUSE AND

```
1     WE'RE GOING TO PUT ON OUR EXPERT WITNESS THAT MR. MAO WILL

2     HANDLE.

3               THE COURT:  ALL RIGHT.

4               MR. BOIES:  THANK YOU, YOUR HONOR.

5               THE COURT:  THANK YOU, MR. BOIES.

6               MR. MAO:  SORRY, YOUR HONOR.  I'VE GOT VOLUMES HERE.

7      IF YOU'LL GIVE ME A SECOND.

8               THE COURT:  I KNOW JUST HOW IT FEELS, MR. MAO.

9          (PAUSE IN PROCEEDINGS.)

10              MR. MAO:  YOUR HONOR, I WOULD LIKE TO CALL

11     MR. CHRISTOPHER THOMPSON TO THE STAND IF THAT IS OKAY WITH YOU.

12              THE COURT:  ALL RIGHT.

13         MR. THOMPSON, COME ON UP AND REMAIN STANDING AND THE COURT

14     REPORTER -- THE COURTROOM DEPUTY WILL SWEAR YOU IN.

15              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16         **(PLAINTIFFS' WITNESS, CHRISTOPHER THOMPSON, WAS SWORN.)**

17              THE WITNESS:  I DO.

18              THE CLERK:  THANK YOU.  HAVE A SEAT.

19              MR. MAO:  I APOLOGIZE, YOUR HONOR.  IF YOU CAN GIVE

20     ME A SECOND?  WE'RE MISSING ONE BINDER.

21              THE COURT:  MR. THOMPSON, IF YOU'RE COMFORTABLE WITH

22     REMOVING YOUR MASK, THAT WOULD BE HELPFUL TO THE COURT

23     REPORTER.

24              THE WITNESS:  CERTAINLY.

25              THE COURT:  THANK YOU.
```

```
1                THE WITNESS:  SHOULD I ADJUST THIS A LITTLE BIT?

2        WOULD THAT HELP AS WELL?

3                THE COURT:  YES, PLEASE.

4                MR. MAO:  BACK ON THE RECORD.

5            YOUR HONOR, I THINK IT WOULD BE OF ASSISTANCE TO

6        MR. THOMPSON IF HE HAD HIS EXHIBITS WITH HIM.

7                THE COURT:  OKAY.

8                MR. MAO:  WE'VE MADE COPIES FOR OPPOSING COUNSEL, AND

9        YOUR HONOR HAS COPIES OF THE EXHIBITS.

10               THE COURT:  I DO.

11               MR. MAO:  I JUST WANT TO PROFFER TO MY OPPOSING

12       COUNSEL SO HE SEES THAT WHAT I'M OFFERING MR. THOMPSON IS THE

13       SAME THING AS WHAT HE HAS.

14               MR. SCHAPIRO:  YES.

15               MR. MAO:  THANK YOU.

16           YOUR HONOR, MAY I APPROACH?

17               THE COURT:  YES, PLEASE.

18               MR. MAO:  (HANDING.)

19               THE WITNESS:  THANK YOU.

20               MR. SCHAPIRO:  SORRY, MARK.  I THOUGHT YOU WERE

21       HANDING ME A BINDER.

22               MR. MAO:  YOU HAVE THEM.

23               MR. SCHAPIRO:  OH, WE DO.  THANK YOU.  ALL GOOD.

24               MR. MAO:  WE'RE GOOD?

25               THE CLERK:  HE WAS SWORN IN.
```

```
 1              THE REPORTER:  DID WE HAVE HIM STATE HIS NAME?

 2              THE COURT:  PLEASE STATE YOUR FULL NAME FOR THE

 3     RECORD.

 4              THE WITNESS:  MY NAME IS CHRISTOPHER MICHAEL

 5     THOMPSON.

 6              THE COURT:  AND, MR. MAO, YOU MAY REMOVE YOUR MASK IF

 7     YOU WOULD LIKE.

 8              MR. MAO:  OH, YES.

 9              THE COURT:  IT'S NOT REQUIRED.  MADAM COURT REPORTER

10     WILL LET YOU KNOW.

11              MR. MAO:  OKAY.  I DID NOT ACTUALLY REALIZE HOW

12     STRAINING IT IS TO ARGUE WITH A MASK.

13          THANK YOU, YOUR HONOR.

14                       DIRECT EXAMINATION

15     BY MR. MAO:

16     Q.  MR. THOMPSON --

17          IF YOU DON'T MIND, I WOULD LIKE TO INTRODUCE INTO THE

18     EXHIBIT THOMPSON EXHIBIT A.

19          THIS IS PART OF HIS DECLARATION IN SUPPORT OF THE REPLY

20     FOR THE ORDER TO SHOW CAUSE.

21              MR. SCHAPIRO:  NO OBJECTION.

22              THE COURT:  ALL RIGHT.  EXHIBIT A WILL BE ADMITTED.

23          (PLAINTIFFS' EXHIBIT A WAS ADMITTED IN EVIDENCE.)

24     BY MR. MAO:

25     Q.  MR. THOMPSON, GOOD MORNING.
```

1          IF I CAN TROUBLE YOU, CAN YOU PLEASE TAKE A LOOK AT

2     EXHIBIT A AND TELL ME IF THAT IS A TRUE AND ACCURATE COPY OF

3     YOUR CV?

4     A.   SURE THING.

5          (PAUSE IN PROCEEDINGS.)

6          THE WITNESS:  YES, THIS LOOKS ACCURATE.

7     BY MR. MAO:

8     Q.   COULD YOU TELL ME A LITTLE BIT ABOUT YOUR EDUCATIONAL

9     BACKGROUND?

10    A.   SURE THING.

11         I GRADUATED FROM VANDERBILT UNIVERSITY IN 2010 WITH AN

12    UNDERGRADUATE DEGREE IN COMPUTER ENGINEERING.

13    Q.   HOW MANY PUBLICATIONS HAVE YOU PUBLISHED IN THE GENERAL

14    AREA OF COMPUTER SCIENCES?

15    A.   I WOULD NEED TO COUNT THESE, BUT APPROXIMATELY 10 TO 15.

16    Q.   YOU HAVE A NUMBER OF PATENTS IN THE AREA AS WELL; IS THAT

17    CORRECT?

18    A.   YES, THAT'S CORRECT.

19    Q.   CAN YOU TELL ME A LITTLE BIT ABOUT ANY RELEVANT WORK

20    EXPERIENCE YOU MAY HAVE IN THE AREA OF COMPUTER SCIENCE?

21    A.   SURE THING.

22         SO I'VE WORKED IN THE AREA OF COMPUTER SCIENCE FOR 10 TO

23    11 YEARS NOW.  I'VE WORKED WITH EVERYTHING FROM MOBILE

24    APPLICATIONS TO NETWORK CONNECTIONS, DISTRIBUTED SYSTEMS, AND

25    VARIOUS DATABASE AND STORAGE APPLICATIONS.

1           MR. MAO:  OKAY.  YOUR HONOR, I WOULD LIKE TO PROFFER

2    THE WITNESS AS A WITNESS GENERALLY JUST FOR THESE -- EXPERT

3    WITNESS JUST GENERALLY FOR THESE PROCEEDINGS FOR THE PURPOSES

4    OF EXPLAINING VARIOUS THINGS IN THE BACKGROUND UNDER RULE 26.

5           THE COURT:  OKAY.

6           MR. SCHAPIRO:  MAY I HAVE A BRIEF VOIR DIRE?

7                        **VOIR DIRE EXAMINATION**

8    BY MR. SCHAPIRO:

9    Q.   MR. THOMPSON, YOU SAID YOU HAVE AN UNDERGRADUATE DEGREE IN

10   COMPUTER ENGINEERING.  THAT'S FROM VANDERBILT?

11   A.   THAT'S CORRECT.

12   Q.   DO YOU HAVE A MASTER'S DEGREE OR A PH.D. IN ANY FIELDS

13   RELATED TO COMPUTERS?

14   A.   I DO NOT.

15   Q.   AND WHO'S YOUR CURRENT EMPLOYER?

16   A.   MY CURRENT EMPLOYER IS I'M SELF-EMPLOYED.

17          MR. SCHAPIRO:  WE WON'T OBJECT FOR THE PURPOSE OF

18   THIS HEARING.

19          THE COURT:  THANK YOU.

20          MR. MAO:  THANK YOU, YOUR HONOR.

21          THE COURT:  YOU MAY PROCEED.

22          MR. MAO:  OKAY.  CAN WE PUT UP THE SLIDES FOR

23   MR. THOMPSON.

24   ///

25   ///

1              **DIRECT EXAMINATION (RESUMED)**

2    BY MR. MAO:

3    Q.   YES.  MR. THOMPSON, I UNDERSTAND THAT YOU --

4              THE COURT:  MR. MAO, EXCUSE ME.  JUST FOR

5    HOUSEKEEPING --

6              MR. MAO:  YES.

7              THE COURT:  -- YOU REFERRED TO THOMPSON EXHIBIT A.

8         DID WE WORK OUT A NUMBERING OR LETTERING PROTOCOL?

9    BECAUSE I THOUGHT PLAINTIFFS HAD NUMBERS.

10             MR. MAO:  OH, WE DO.

11        DID WE PROFFER THE CORRELATION TO THAT?

12        SO THERE SHOULD BE AN INDEX KIND OF -- SORRY, BECAUSE OF

13   THE VARIOUS SUBMISSIONS AT DIFFERENT TIMES --

14             THE COURT:  ALL RIGHT.

15             MR. MAO:  -- THERE SHOULD HAVE BEEN A TABLE.  BUT WE

16   HAVE EXTRA PRINTED COPIES.  CAN WE GIVE A COPY TO --

17             THE COURT:  I HAVE A TABLE OF THOMPSON EXHIBITS.

18             MR. MAO:  YEAH, AND --

19             THE COURT:  IS THERE SOMETHING THAT CORRELATES THAT

20   TO HEARING EXHIBITS?

21        (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

22             MR. MAO:  SORRY, YOUR HONOR.  I GUESS IT'S PART OF

23   THE THOMPSON EXHIBITS FOLDER, AND THE TABLE IN HERE IS THE

24   ATTEMPT FOR US TO CORRELATE ACROSS ALL THE EXHIBITS

25   (INDICATING).

```
 1              IT'S THE FRONT PAGE OF THE FOLDER.

 2              THE COURT:  YEAH, AND I HAVE THAT.

 3         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

 4              MR. MAO:  YOUR HONOR, IF YOU DON'T MIND, IT MIGHT BE

 5    EASIEST FOR THESE PROCEEDINGS IF WE JUST START WITH 110 BECAUSE

 6    109 IS OUR LAST EXHIBIT.

 7              THE COURT:  OKAY.

 8              MR. MAO:  SO --

 9              THE COURT:  THE CV WILL BE --

10              MR. MAO:  THE CV, YES, WILL BE 110.

11              THE COURT:  -- PLAINTIFFS' EXHIBIT 110, THOMPSON CV.

12         (PLAINTIFFS' EXHIBIT 110, PREVIOUSLY EXHIBIT A, WAS

13    ADMITTED IN EVIDENCE.)

14    BY MR. MAO:

15    Q.   MR. THOMPSON, I UNDERSTAND YOU HAD PREPARED SOME

16    EXPOSITORY SLIDES TODAY; IS THAT CORRECT?

17    A.   THAT'S CORRECT.

18    Q.   IS THAT WHAT YOU HAVE IN FRONT OF YOU --

19    A.   THAT'S CORRECT.

20    Q.   -- ON THE DISPLAY?

21              MAY WE GO TO THE FIRST PAGE?  THANK YOU VERY MUCH.

22              CAN YOU EXPLAIN TO THE COURT AND THE AUDIENCE HERE WHAT

23    YOU HAVE HERE ON THIS FIRST PAGE?

24    A.   SURE.  IF I MAY GIVE A BRIEF OVERVIEW OF WHERE I'M GOING

25    TO GO?
```

 1        Q.   SURE, YES.

 2        A.   SO I'M INTENDING TO EXPLAIN PRIMARILY THREE POINTS.

 3             ONE IS JUST A BRIEF INTRODUCTION, KIND OF A HIGH LEVEL OF

 4        EXPLAINING HOW DATA IS TRANSMITTED FROM A USER'S BROWSER TO

 5        GOOGLE, AND THEN HOW IT'S LOGGED.

 6             FROM THERE I'M GOING TO TALK A LITTLE BIT ABOUT CONNECTING

 7        OR JOINING THESE LOGS USING THE VARIOUS IDENTIFIERS THAT

 8        MR. BOIES HAS DISCUSSED.

 9             AND THEN FINALLY, I'M GOING TO TALK A LITTLE BIT ABOUT THE

10        INCOGNITO BITS AND HOW THEY RELATE TO IDENTIFYING FLAGGING

11        CERTAIN RECORDS THAT CAN THEN BE USED FOR PURPOSES LATER.

12             THE COURT:  ALL RIGHT.

13             THE WITNESS:  SO TO ANSWER YOUR ORIGINAL QUESTION,

14        MR. MAO, THIS IS AN INITIAL INCOGNITO SPLASH SCREEN.  SO THIS

15        IS WHAT'S DISPLAYED WHEN YOU OPEN A NEW INCOGNITO TAB, AND YOU

16        CAN SEE THE CHROME OMNIBAR I'VE HIGHLIGHTED HERE IS THE INPUT

17        THAT THE USER TYPES IN IN ORDER TO TELL CHROME TO DO SOMETHING.

18             AND IN THIS CASE I'VE TYPED "NY TIMES," SO I'M TRYING TO

19        GET TO *THE NEW YORK TIMES*.

20             AND WHAT HAPPENS, AS WE'LL SEE ON THE NEXT SLIDE, IS IF

21        YOU DON'T ENTER A GENERALLY RECOGNIZED URL, CHROME WILL TRIGGER

22        A SEARCH INSTEAD OF TAKING YOU, SAY, TO THENEWYORKTIMES.COM,

23        WHICH IS WHAT WE SEE HERE.

24             SO A SEARCH HAS BEEN DONE FOR *NEW YORK TIMES*.  SO WE'VE

25        STARTED IN INCOGNITO, WE'VE TYPED IN "NY TIMES," AND NOW WE'RE

1    ON A SEARCH RESULTS PAGE.

2         AND THEN ON THE NEXT SLIDE I'VE HIGHLIGHTED HERE AN AD

3    THAT IS DISPLAYED WITHIN THE SEARCH RESULTS, AND THIS IS FOR A

4    SUBSCRIPTION THAT *NEW YORK TIMES* IS OFFERING.

5         AND WHEN YOU CLICK ON THAT AD, YOU'RE TAKEN TO THE

6    *NEW YORK TIMES* WEBSITE AS YOU CAN SEE IN THE CALL OUT TO THE

7    LEFT, BUT GOOGLE HAS ALSO EMBEDDED WITHIN THE URL THAT YOU'VE

8    USED TO NAVIGATE TO *THE NEW YORK TIMES* THIS GCL ID, WHICH IS A

9    CLICK ID, AN INDICATOR, A UNIQUE IDENTIFIER INDICATING --

10   GIVING THEM THE ABILITY TO TRACK YOUR ACTIVITY NOW THAT YOU'VE

11   LEFT THE SEARCH PAGE.

12        AND WHAT HAPPENS IS THAT THERE ARE A NUMBER OF SCRIPTS

13   THAT ARE EMBEDDED BEHIND THE SCENES ON THE WEBSITE THAT WILL

14   USE THAT IDENTIFIER THAT'S WITHIN THE URL AND TRANSMIT DATA IN

15   THE BACKGROUND TO GOOGLE SERVERS.

16   Q.   IN TERMS OF GOOGLE LOGS, ARE THERE -- IS THERE INFORMATION

17    IN THIS INITIAL STEP THAT YOU MAY NOT BE ABLE TO OBTAIN IN

18    OTHER LOGS, FOR EXAMPLE?

19   A.   SURE.  SO THE FIRST INTERACTION WITH THE SEARCH ENGINE IS

20    GOING TO EXIST WITHIN ONE SET OF LOGS, WHEREAS THE INTERACTIONS

21    ON *THE NEW YORK TIMES* WEBSITE WILL EXIST IN A SEPARATE SET OF

22    LOGS, AND WE'LL TALK MORE ABOUT THE DIFFERENT TYPES OF LOGS IN

23    A MINUTE AS WELL.

24   Q.   SURE.  WE'LL MOVE ON TO THE NEXT PAGE.  CAN YOU EXPLAIN

25    THAT A LITTLE BIT, MR. THOMPSON?

1    A.   SURE.  SO THIS IS EFFECTIVELY A DIFFERENT VIEW OF WHAT I

2    JUST SHOWED, AND THIS IS A USER'S BROWSER CONNECTING TO AND

3    TRANSMITTING INFORMATION TO GOOGLE, AND THAT REACHES WHAT'S

4    REFERRED TO AS A FRONTEND SERVER, IT'S THE FIRST SERVER THAT

5    THE BROWSER IS TALKING TO.

6         AND WE SOMETIMES CALL TRANSMISSIONS REQUESTS REGARDLESS OF

7    WHETHER THE USER WAS ACTIVELY DOING SOMETHING OR IF -- IF

8    THEY'RE DOING SOMETHING BEHIND THE SCENES.

9         SO THEN WHAT WILL HAPPEN IS THAT THAT FRONTEND SERVER WILL

10   THEN COMMUNICATE WITH A NUMBER OF WHAT WE REFER TO AS

11   DOWNSTREAM SERVERS, KIND OF LIKE FLOWING DOWN A RIVER.

12        AND I'VE ILLUSTRATED TWO HERE, BUT THERE COULD BE MORE,

13   AND EACH OF THOSE SERVERS ARE GOING TO WRITE TO THEIR OWN LOGS,

14   GENERATING FOR ONE TRANSMISSION A NUMBER OF DIFFERENT LOG

15   ENTRIES.

16   Q.   NEXT SLIDE, PLEASE.

17        YOU HAVE THIS TITLED "JOINING DATA:  THREE TYPES OF LOGS."

18   CAN YOU EXPLAIN TO ME A LITTLE BIT ABOUT HOW THERE'S THREE

19   TYPES OF LOGS HERE AND THE JOINING YOU'RE REFERRING TO HERE.

20   A.   SURE.  SO NOW WE'VE MOVED PAST MY FIRST POINT AND WE'RE

21   INTO MY SECOND POINT, WHICH IS HOW DO WE CONNECT AND HOW DO WE

22   LOOK AT THOSE LOGS AND ANALYZE THOSE LOGS TO POTENTIALLY

23   CONNECT THE DATA WITHIN THEM?

24        SO THERE ARE -- FOR THE PURPOSES OF OUR DISCUSSION TODAY,

25   THERE ARE THREE TYPES OF LOGS.

1          AND THINKING ABOUT INCOGNITO DATA, TYPICALLY THAT'S GOING

2     TO BE IN THAT RED BOX, WHICH IS THE B LOGS, B AS IN BOY.  AND

3     THAT'S WHAT GOOGLE REFERS AS, QUOTE-UNQUOTE, UNAUTHENTICATED

4     DATA, AND I'VE LISTED ONLY A VERY SMALL SUBSET OF THE FIELDS

5     THAT MAY OCCUR WITHIN THESE LOGS.

6          BUT, FOR INSTANCE, YOU HAVE I.P. ADDRESS, YOU HAVE USER

7     AGENT STRING, YOU HAVE TIMESTAMP, AND YOU HAVE WHAT ARE

8     REFERRED TO AT GOOGLE AS PSEUDONYMOUS IDENTIFIERS, WHICH ARE

9     BASICALLY RANDOM NUMBERS, BUT THEY'RE CARRIED WITHIN THE

10    COOKIES THAT ARE TRANSMITTED TO GOOGLE ALONG WITH THE BROWSER'S

11    TRANSMISSIONS FOR OTHER THINGS.

12         ON THE OTHER SIDE OF THAT, YOU HAVE WHAT ARE CALLED

13    P LOGS, P AS IN PAUL, LOGS, AND THESE CONTAIN WHAT GOOGLE

14    REFERS TO AS AUTHENTICATED DATA.  A SIMILAR SET OF FIELDS HERE.

15    YOU'LL SEE THE OVERLAP.

16         BUT THESE ALSO CONTAIN THE GAIA ID, WHICH IS ANOTHER

17    NUMBER THAT YOU CAN KIND OF THINK OF IT AS THE IDENTIFIER THAT

18    CORRESPONDS TO A GOOGLE ACCOUNT, A GMAIL ADDRESS OR SOMETHING

19    LIKE THAT.

20         FINALLY, WE HAVE ANALYTICS LOGS WHICH, AGAIN, ARE SIMILAR,

21    AND THESE CONTAIN AGAIN THE I.P. ADDRESS, THE USER AGENT, THE

22    TIMESTAMP, THE PSEUDONYMOUS ID'S, AND THEY ALSO CONTAIN THIRD

23    PARTY IDENTIFIERS.

24         SO THESE ARE GOING TO CONTAIN, FOR INSTANCE, IF YOU WERE

25    TO SIGN INTO *THE NEW YORK TIMES* OR YOU WERE TO SIGN INTO

1     *THE WASHINGTON POST*, THE SCRIPTS ON THOSE SITES WOULD TRANSMIT

2     THAT ID TO GOOGLE AND BE RECORDED ALONGSIDE THESE IDENTIFIERS.

3     Q.   NEXT SLIDE, PLEASE.

4          SO BEFORE YOU START ON THIS, I WANT TO UNDERSTAND,

5     MR. THOMPSON.  DO YOU UNDERSTAND THAT THE COURT HAD REFERRED

6     THE PLAINTIFFS IN THIS CASE TO THE SPECIAL MASTER IN ORDER TO

7     BE ABLE TO TRY TO SEE IF YOU CAN QUERY A STRUCTURE, OR DESIGN

8     QUERIES TO BE ABLE TO GET THEIR DATA FROM PLAINTIFFS' LOGS AND

9     DATABASE?

10         DO YOU UNDERSTAND THAT?

11    A.   I DO.

12    Q.   OKAY.  CAN YOU EXPLAIN TO ME WHAT YOU ARE TRYING TO SHOW

13    HERE ON THIS SLIDE?

14    A.   SURE.  SO THESE ARE LOG OUTPUTS THAT WERE PRODUCED AS PART

15    OF THE SPECIAL MASTER PROCESS, AND THIS IS JUST ONE EXAMPLE OF

16    MANY, BUT ONE OF THE IMPORTANT THINGS WHEN YOU'RE LOOKING TO

17    QUERY DATA FROM A PARTICULAR DATA SOURCE -- AND THIS IS

18    GENERALLY TRUE OUTSIDE OF THE CONTEXT OF THIS CASE -- IS THAT

19    IT'S IMPORTANT TO UNDERSTAND THE FORMAT THE DATA IS STORED IN.

20         SO, FOR INSTANCE, IF YOU ARE LOOKING TO PERFORM AN EXACT

21    MATCH OR YOU ARE LOOKING TO SEARCH FOR SOMETHING, YOU NEED TO

22    KNOW HOW IT IS ENCODED IN ORDER TO CORRECTLY MATCH AGAINST THE

23    INPUT STREAM.

24         SO THESE THINGS CAN BE ENCODED IN DIFFERENT WAYS FOR A

25    NUMBER OF DIFFERENT REASONS.  WHAT WE HAVE HERE IS AN EXAMPLE

1    WHERE WE HAVE TWO DIFFERENT LOGS, BOTH CONTAIN AN I.P. ADDRESS,

2    WE CAN SEE HERE HIGHLIGHTED THE REMOTE HOST FIELD, AND WE CAN

3    SEE THE CLIENT IPS FIELD, AND THEY'RE ACTUALLY, DESPITE LOOKING

4    DIFFERENT, THEY'RE ACTUALLY THE SAME VALUE WITH TWO DIFFERENT

5    REPRESENTATIONS.

6         SO ON THE LEFT WE HAVE WHAT MOST PEOPLE WOULD RECOGNIZE AS

7    AN I.P. ADDRESS, SO IT'S GOT THE DOTS IN IT; AND ON THE RIGHT,

8    THAT SAME VALUE HAS BEEN ENCODED INTO INTEGERS.

9    Q.   SO I APOLOGIZE, MR. THOMPSON.  I HAVE A POLITICAL SCIENCE

10   DEGREE.  SO IF I WERE TO KIND OF REDUCE THIS A LITTLE BIT,

11   WOULD IT BE ACCURATE TO SAY, FOR EXAMPLE, IF I WERE SEARCHING

12   AGAINST A BIBLE FOR CERTAIN TEXT AND I WANT TO FIND SOMETHING,

13   LET'S SAY, IN LUKE 5, I PROBABLY WOULD NEED TO KNOW WHETHER OR

14   NOT THE BIBLE IS WRITTEN IN CHINESE OR ENGLISH; ISN'T THAT

15   CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   WHAT HAPPENS IF I ACTUALLY SEARCH AGAINST, LET'S SAY, A

18   BIBLE THAT'S WRITTEN IN CHINESE BY ENGLISH?  WHAT WOULD HAPPEN

19   IN THE TYPICAL SCENARIO INVOLVING A DATABASE QUERY?

20   A.   IT WOULD PROBABLY RETURN NOTHING.

21   Q.   ALL RIGHT.

22   A.   IT WOULD BE DIFFERENT -- SO CHINESE IS A GREAT EXAMPLE.

23   IT'S A TOTALLY DIFFERENT CHARACTER SET THAN ENGLISH, WHICH IS

24   DIFFERENT THAN POTENTIALLY SEARCHING LATIN VERSUS ENGLISH.

25        IT WOULD RETURN NOTHING.

1    Q.   RIGHT.  SO CAN YOU GIVE ME JUST A LITTLE BIT ABOUT WHAT

2    EXACTLY, WHEN WE'RE STRUCTURING A COMPUTER QUERY, LIKE A SCRIPT

3    TO SEARCH AGAINST A DATABASE, WHAT EXACTLY ARE WE TELLING THE

4    COMPUTER TO DO IN THIS SPECIFIC EXAMPLE THAT YOU HAVE?

5    A.   RIGHT.  SO WE'RE, WE'RE BASICALLY TELLING THE COMPUTER TO

6    GO FIND THE INSTANCES WHERE, IN A PARTICULAR FIELD -- SO

7    COLUMN, ROW, HOWEVER THE DATA IS STRUCTURED -- IN A PARTICULAR

8    FIELD, FIND THE VALUE THAT WE'VE SUPPLIED.

9         NOW, IF WE WERE TO INPUT 146.71.8.79 INTO A QUERY THAT WAS

10   TARGETED AT THE LOG ON THE RIGHT, WE WOULD RETURN NOTHING.

11        SO NOT ONLY DO WE NEED TO KNOW THAT THE I.P. ADDRESS VALUE

12   IS CONTAINED WITHIN THE CLIENT IPS FIELD, WHICH WE POTENTIALLY

13   COULD GAIN FROM THE SCHEMA OF THE DATA, OR THE LIST OF FIELDS,

14   WE ALSO NEED TO KNOW WHAT TRANSFORMATIONS WE HAVE TO APPLY TO

15   THAT DATA, WHICH IS WHY IT'S IMPORTANT TO BE ABLE TO SEE WHAT'S

16   ACTUALLY INSIDE THE LOG ITSELF.

17   Q.   SO I CAPTURED A NUANCE, I HEARD A NUANCE THERE AND I

18   WANTED TO MAKE SURE I UNDERSTAND.  IS THERE A DIFFERENCE

19   BETWEEN THE SCHEMA OF A LOG VERSUS HOW THE VALUE IN THE SCHEMA

20   MAY BE EXPRESSED?  IF THERE IS, CAN YOU PLEASE EXPLAIN THAT FOR

21   THE COURT AND THE AUDIENCE?

22   A.   SURE THING.

23        SO SCHEMA IS THE STRUCTURE.  SCHEMA IS THE FIELDS, THE

24   LIST OF AVAILABLE FIELDS, IN A GIVEN ENTRY.  THE SCHEMA,

25   DEPENDING ON THE SYSTEM, MAY MEAN THAT ALL THOSE FIELDS HAVE TO

1     BE THERE.

2          OTHER SYSTEMS, LIKE WE'LL TALK ABOUT IN A MINUTE, MEAN

3     THAT NOT ALL OF THOSE FIELDS HAVE TO BE THERE, BUT THEY'RE

4     AVAILABLE.  THERE ARE SLOTS FOR THEM WITHIN THE STRUCTURED

5     DATA.

6          AND GENERALLY SPEAKING, THE SCHEMA WILL DEFINE A DATA

7     TYPE, WHICH IS A BROAD TERM THAT BREAKS DOWN THE THINGS LIKE

8     NUMBER VERSUS TEXT, THAT SORT OF THING.

9          IN SOME MORE COMPLEX SYSTEMS, YOU CAN HAVE SUBSCHEMAS THAT

10    ARE PART OF A LARGER SCHEMA AS WELL.

11    Q.   SO CAN I WRITE A PROPER QUERY WITHOUT KNOWING BOTH THE

12    SCHEMA AND HOW THE VALUES ARE STORED?

13    A.   NO.  YOU'D BE TAKING SHOTS IN THE DARK.

14    Q.   CAN YOU EXPLAIN A LITTLE BIT WHY THAT IS?

15    A.   SURE.  SO AS I MENTIONED BEFORE, IF YOU DON'T KNOW HOW YOU

16    NEED TO TRANSFORM THE DATA, YOU'RE NOT GOING TO BE ABLE TO GET

17    THE QUERY THAT GIVES YOU THE RESULTS BACK THAT YOU WANT.

18         AND, IN FACT, IF YOU DON'T KNOW THE PROPER WAY TO

19    TRANSFORM THE DATA, YOU MAY GET BACK RESULTS THAT YOU DIDN'T

20    WANT, DEPENDING ON THE SYSTEM.

21         IT ENDS UP BEING LIKE LITERALLY TAKING SHOTS IN THE DARK

22    AND GUESS AND CHECK.  YOU WOULD RUN THE QUERY, SEE WHAT YOU GET

23    BACK, LOOK TO SEE IF IT MAKES SENSE, AND THEN HAVE TO TAKE

24    ANOTHER STAB AT IT.

25    Q.   I APOLOGIZE, MR. BOLES.  CAN I TROUBLE YOU TO JUST PUT UP

1          ON TO THE SCREEN EXHIBIT NUMBER 75.

2               YOUR HONOR, EXHIBIT NUMBER 75 IS A CORRESPONDENCE BETWEEN

3          COUNSEL.

4               AND ALL I NEED IS REALLY THE TOP HALF RIGHT THERE.

5               MR. THOMPSON, IF YOU MAY GIVE ME A SEC HERE -- ACTUALLY,

6          I'LL ALLOW THE WITNESS TO READ IT.

7               (PAUSE IN PROCEEDINGS.)

8          BY MR. MAO:

9          Q.   MR. THOMPSON, YOU UNDERSTAND THAT EXPERT REPORTS, OPENING

10         EXPERT REPORTS IN THIS CASE HAVE ALREADY BEEN EXCHANGED; IS

11         THAT CORRECT?

12         A.   THAT IS MY UNDERSTANDING, YES.

13         Q.   OKAY.  DO YOU KNOW WHEN THAT WAS EXCHANGED?

14         A.   I THINK IT WAS LESS THAN A WEEK AGO, BUT I'M NOT TOTALLY

15         SURE.

16         Q.   THAT'S CORRECT.

17              OKAY.  YOU SEE THE SEARCH THERE, SEARCH II, STEP 2?

18         A.   YES.

19         Q.   DO YOU KNOW WHAT WE WERE SEARCHING FOR THERE IN SEARCH II,

20         STEP 2?

21         A.   YES.  SO IN SEARCH II, STEP 2, WE WERE LOOKING FOR THE

22         LOGS THAT CONTAINED THE MAYBE_CHROME_INCOGNITO BIT AND THE LOGS

23         THAT CONTAINED THE IS_CHROME_INCOGNITO AND THE

24         IS_CHROME_NON_INCOGNITO BITS.

25         Q.   RIGHT.  AND YOU UNDERSTAND THERE'S A LOT OF DATA THAT IS

1    NOT GOING TO BE COMING BACK UNTIL MAY 20TH, 2022, RIGHT, WHICH

2    IS ALSO THE REBUTTAL REPORTS, WHEN THAT IS DUE; IS THAT

3    CORRECT?

4    A.   SO I'M NOT SURE OF THE EXACT DATE, BUT I KNOW IT'S NOT

5    BEEN PRODUCED.  I'VE BEEN TOLD AT SOME POINT WE'LL GET IT.

6    Q.   SO IS IT TRUE THAT TYPICALLY IN THESE TYPE OF QUERIES, YOU

7    ALSO WANT TO ROUND BY WHICH, ONCE YOU GET THE DATA, YOU

8    ACTUALLY WANT TO BE ABLE TO TEST HOW THE DATA WAS OBTAINED?

9    A.   YEAH.  SO GETTING BACK TO MY DISCUSSION ABOUT TAKING SHOTS

10   IN THE DARK, PART OF THE ISSUE IS THAT YOU DO WANT TO VALIDATE,

11   YOU DO WANT TO DO WHAT'S SOMETIMES CALLED DEBUGGING, IN

12   COMPUTER SCIENCE PARLANCE, TO MAKE SURE THAT YOU ARE GETTING

13   THE DATA BACK THAT YOU EXPECT TO BE GETTING BACK, AND TO MAKE

14   SURE THAT YOU EXCLUDE THE THINGS YOU INTENDED TO EXCLUDE AND

15   INCLUDED THE THINGS THAT YOU INTENDED TO INCLUDE.

16       IT'S AN ITERATIVE PROCESS, WHICH IS ACTUALLY WHAT I

17   UNDERSTAND THE SPECIAL MASTER PROCESS TO HAVE BEEN, WHICH IS TO

18   CONTINUE TO REFINE.

19       AN ANALOGY THAT I FREQUENTLY USE WITH MY WIFE, WHO'S NOT

20   IN THIS FIELD, IS IT'S LIKE TAKING -- STARTING WITH A LARGER

21   CHISEL AND YOU SLOWLY MOVE TO A SMALLER CHISEL AS YOU LEARN

22   MORE ABOUT THE PROBLEM THAT YOU'RE SOLVING, THE PARAMETERS, AND

23   THE ASSUMPTIONS AND CONSTRAINTS.

24   Q.   SO WOULD IT BE ACCURATE -- IT'S THE MOMENTUM, YOU KNOW.

25       IS IT ACCURATE TO SAY THAT PLAINTIFFS WOULD NOT BE ABLE TO

1    TEST THE DATA ONCE THEY RECEIVE THE DATA FOR THE INCOGNITO BITS

2    FOR THE FIRST TIME SOMETIME ON OR AROUND MAY 20TH?

3    A.   THAT'S CORRECT, YES.

4    Q.   BACK TO THE SLIDES.  CAN WE GO TO THE NEXT SLIDE?

5         I BELIEVE ACTUALLY WE'RE MOVING ON TO YOUR THIRD TOPIC.

6         WHERE DID YOU GET THIS, THE CONTENTS FOR THIS SLIDE FROM?

7    A.   SURE.  SO THIS IS -- AND I APOLOGIZE IN ADVANCE TO THE

8    COURT IF I MESS UP THE LEGAL TERMINOLOGY FOR THIS -- BUT MY

9    UNDERSTANDING IS THIS IS THE OPPOSITION BRIEF TO THE ORDER TO

10   SHOW CAUSE.

11        AND THE DISCUSSION AROUND THIS IS, AS I MENTIONED BEFORE,

12   SOMETIMES THERE ARE OPTIONAL FIELDS WITHIN SCHEMAS THAT EXIST.

13   SO -- AND THE -- THIS HIGHLIGHTED STATEMENT HERE IS SAYING THAT

14   THE IS_CHROME_NON_INCOGNITO BIT IS INCLUDED IN THE GOOGLE WEB

15   SERVICES PROTOCOL BUFFER, OR GWS PROTO, A DATA FORMAT USED TO

16   SERIALIZE DATA.  NOT EVERY LOG THAT USES THIS PROTO WILL

17   INCLUDE EVERY SINGLE FIELD, AND THAT'S CONSISTENT WITH THE WAY

18   THAT PROTOCOL BUFFERS WORK.  THEY ALLOW FOR OPTIONAL INCLUSION

19   OF DATA.

20        BUT THE SECONDARY POINT IS THAT FOR ALL OF THE LOG

21   PROCESSES THAT UTILIZE THIS SCHEMA, THE GWS PROTO, IT IS

22   AVAILABLE, SO THEY COULD WRITE TO IT.

23        AND I THINK IT PROBABLY MAKES SENSE, ON THIS NEXT SLIDE,

24   TO DISCUSS A LITTLE BIT ABOUT PROTOCOL BUFFERS.

25        PROTOCOL BUFFERS IS AN OPEN SOURCE FRAMEWORK PUBLISHED BY

1    GOOGLE THAT IS FOR, THE TECHNICAL TERM IS SERIALIZING DATA, BUT

2    IT BASICALLY IS FOR STORING AND TRANSMITTING DATA.

3         AND AS WE HAVE HERE, HIGHLIGHTED HERE, PROTOCOL BUFFERS

4    ARE THE MOST COMMONLY USED DATA FORMAT AT GOOGLE, AND THAT WAS

5    REFERENCED ON THE PREVIOUS SLIDE AS WELL WITH THIS GWS LOG

6    ENTRY.

7    Q.   CAN YOU MAYBE EXPLAIN FOR ME IN A MORE EVERY DAY KIND OF

8    ANALOGY WHAT EXACTLY A PROTOCOL BUFFER DOES AND HOW IT ACTUALLY

9    RELATES TO LOGS, WHICH WAS YOUR SECOND TOPIC?

10   A.   SURE.

11        SO A PROTOCOL BUFFER IS FOR STORING THINGS.  A PROTOCOL

12   BUFFER, OR PROTO ENTRY, IS FOR STORING THINGS.

13        SO ONE EXAMPLE THAT YOU COULD THINK OF -- AND THIS IS

14   ADMITTEDLY NOT A PERFECT EXAMPLE, BUT IT'S AN EXAMPLE -- IS IF

15   YOU HAVE A STREAM OF WATER AND YOU'RE LOOKING TO FILTER OUT

16   THINGS THAT ARE IN IT, SO MAYBE THERE ARE PRECIOUS MINERALS,

17   MAYBE THERE'S DEBRIS, MAYBE THERE ARE LARGE CHUNKS OF THINGS,

18   AND AS YOU APPLY YOUR FILTER, YOU TAKE THE THINGS THAT YOU

19   CAPTURE OUT OF THE FILTER AND YOU PUT THEM IN A SPECIAL BOX

20   THAT'S DESIGNED TO HOLD ALL OF THE THINGS THAT YOU CAPTURE OUT

21   OF THE WATER, AND THERE ARE DIFFERENT SLOTS IN THAT BOX FOR THE

22   THINGS THAT YOU CAPTURE, AND MAYBE YOUR FILTER IS ONLY LOOKING

23   FOR PRECIOUS METAL AND MAYBE YOU'RE NOT FILLING UP THE DEBRIS

24   SLOT, BUT THE DEBRIS SLOT IS THERE.  YOU CAN TURN THE FILTER

25   SUCH THAT IT DOES POPULATE THE DEBRIS SLOT.

1          THAT'S KIND OF THE WAY TO THINK OF THIS.  EACH ENTRY IS

2     EFFECTIVELY A COLLECTION OF THINGS THAT HAVE BEEN PULLED OUT OF

3     THE STREAM WITH SOME COMBINATION OF THEM POPULATED WITHIN THE

4     BOX.

5     Q.   SO JUST REAL FAST, YOU TALK ABOUT PROTOCOL BUFFERS HERE.

6          WHEN WEB DEVELOPERS OR, YOU KNOW, PEOPLE DESIGNING

7     PROTOCOL BUFFERS ARE PUTTING IT TOGETHER, ARE THERE GENERALLY

8     DESIGN DOCUMENTS THAT WOULD BE RELATED TO WHATEVER YOU'VE PUT

9     TOGETHER FOR THE PROTOCOL BUFFER?

10    A.   I WOULD EXPECT THERE TO BE.

11    Q.   CAN WE PUT UP EXHIBIT 15 ON THE SCREEN.

12         MR. THOMPSON, HAVE YOU EVER SEEN THIS LETTER FROM

13    MR. ANSORGE DATED APRIL 1ST, 2022, WHICH IS EXHIBIT 15?

14    A.   I BELIEVE I HAVE, YES.

15    Q.   DO YOU SEE THAT THERE?  CAN YOU READ THAT INTO THE RECORD,

16    THE COMMENT ON THE TOP?

17    A.   SURE.

18    Q.   SORRY.  ON THE BOTTOM?

19    A.   ON THE VERY BOTTOM IN YELLOW, "REPRESENTS IF AN ENTRY

20    COMES FROM A CHROME WEB BROWSER IN THE INCOGNITO MODE."

21    Q.   WHEN THIS LETTER SAYS THAT "BELOW IS THE PROTO COMMENT IN

22    THE FIELD," WHAT EXACTLY DOES THAT ACTUALLY MEAN?  CAN YOU GIVE

23    ME A TANGIBLE WAY THAT I CAN VISUALIZE WHAT THAT ACTUALLY

24    MEANS?

25    A.   SURE.  SO A WAY TO THINK ABOUT COMMENTS IS JUST LIKE

```
1     COMMENTS IN A WORD DOCUMENT OR AN EXCEL SHEET OR SOMETHING LIKE

2     THAT.

3          THE SAME IS TRUE FOR SOFTWARE DEVELOPERS, SOFTWARE

4     ENGINEERS.  IT'S A WAY TO COMMUNICATE BETWEEN PEOPLE WHO ARE

5     WORKING TOGETHER, WITHOUT NECESSARILY PUTTING IT DIRECTLY INTO

6     THE CONTENT OF WHAT YOU'RE LOOKING AT.

7          AND SO THIS IS A COMMENT THAT IS, I BELIEVE IS --

8     SUPPOSEDLY EXISTS IN THE SCHEMA FILE THAT DEFINES THE THING

9     THAT CONTAINS THE IS_CHROME_INCOGNITO FIELD.

10    Q.   HAVE YOU -- WOULD YOU EXPECT THAT THIS WOULD BE PRODUCED

11    IN SOME TYPE OF DOCUMENT, IF THERE'S A DOCUMENT SUITE FOR

12    PROTOCOL COMMENT, PROTOCOL BUFFER COMMENTS?

13    A.   YEAH, IT -- I WOULD.  I THINK IT'S A, IT'S A COMMENT,

14    RIGHT.  IT'S A -- IT'S NON-EXECUTABLE.  I WOULD EXPECT THERE TO

15    BE DOCUMENTATION ASSOCIATED WITH IT.

16    Q.   AND YOU HAVE NOT YET SEEN THE UNDERLYING DOCUMENT THAT'S

17    ACTUALLY ASSOCIATED WITH WHATEVER IS REFERENCED IN THIS LETTER;

18    IS THAT CORRECT?

19    A.   THAT'S CORRECT.

20    Q.   OKAY.  I'D LIKE TO MOVE ON TO, BACK TO THE PRESENTATION TO

21    THE SLIDES, AND GO TO THE NEXT SLIDE, PLEASE.

22         I'M JUST CURIOUS, YOU SEE YOU ALSO INCLUDED THIS "FIELD

23    DISCLOSURE."  WHAT EXACTLY WERE YOU TRYING TO EXPLAIN HERE?

24    A.   RIGHT.  SO THIS IS -- I APOLOGIZE IT'S A LITTLE BIT SMALL,

25    IT'S TAKEN OUT OF AN EXCEL VIEW, BUT WHAT WE CAN SEE HERE,
```

1       HIGHLIGHTED QUICKLY, AND THEN WE CAN ZOOM OUT, IS THE PRESENCE

2       OF THE IS_CHROME_NON_INCOGNITO MODE FIELD.

3            AND THIS -- MY UNDERSTANDING IS THIS PRODUCTION WAS PART

4       OF THE SPECIAL MASTER PROCESS AND IT IS A LISTING OF THE FIELDS

5       THAT WERE CONTAINED WITHIN A SPECIFIC LOG, REGARDLESS OF

6       WHETHER THEY WERE USED IN THE LOG, BUT THEY WERE PRESENT IN THE

7       LOG.

8            AND THIS IS CONSISTENT WITH THE, THE LETTER THAT WE

9       HIGHLIGHTED EARLIER, THE OPPOSITION BRIEF THAT WE HIGHLIGHTED

10      EARLIER SAYING THAT THE IS_CHROME_NON_INCOGNITO FIELD IS

11      PRESENT IN THE NUMBER OF DIFFERENT LOG SCHEMAS.

12      Q.   WHEN THIS SCHEMA WAS FIRST PROVIDED TO YOU IN NOVEMBER --

13      SORRY -- DECEMBER OF 2021, WAS THAT SPECIFIC FIELD, THE

14      IS_CHROME_NON_INCOGNITO MODE FIELD, IN THE SCHEMA?

15      A.   FOR THIS LOG, NO, IT WAS NOT.

16      Q.   OKAY.  WHAT DOES THE FACT THAT IT APPEARS NOW TELL YOU

17      ABOUT THE NATURE OF WHERE THIS EXISTS IN TERMS OF WHAT YOU HAD

18      JUST TESTIFIED TO ABOUT PROTOCOL BUFFERS?

19      A.   SO I THINK THE FACT THAT IT SHOWS UP IN THIS LOG, COMBINED

20      WITH THE REFERENCE TO THE GWS LOG ENTRY PROTO, TELLS ME THAT

21      IT'S POTENTIALLY IN A LOT OF PLACES, OR COULD BE USED IN A LOT

22      OF PLACES WITH MINIMAL EFFORT.

23           I'M NOT SAYING THAT IT'S NECESSARILY WRITTEN THERE, BUT IT

24      COULD BE BECAUSE THAT'S -- IT'S WITHIN THE SCHEMA THAT'S

25      AVAILABLE TO THE PROCESSES THAT ARE USING IT.

1    Q.   I BELIEVE YOU WERE ACTUALLY A PERCIPIENT WITNESS TO THE

2    FIRST TIME IN WHICH I ACTUALLY SAW THIS FIELD IN A SCHEMA.  CAN

3    YOU EXPLAIN A LITTLE BIT ABOUT HOW THAT ACTUALLY HAPPENED?

4    A.   THAT'S CORRECT, YES.  SO IT WAS DURING THE LIVE SEARCHES

5    FACILITATED BY SPECIAL MASTER BRUSH AND MR. SCHMIDT.

6    Q.   SORRY.  AND THE DATE FOR THAT WAS MARCH 4TH, WELL AFTER

7    DISCOVERY HAD CLOSED; IS THAT CORRECT?

8         MR. SCHAPIRO:  OBJECTION TO LEADING AND THE

9    COMMENTARY.

10        THE WITNESS:  UM --

11        THE COURT:  GO AHEAD.

12        THE WITNESS:  I DON'T REMEMBER THE EXACT DATE.  I

13   REMEMBER IT WAS THE WEEK OF LIVE SEARCHES, WHICH WOULD HAVE

14   BEEN EARLY MARCH.

15   BY MR. MAO:

16   Q.   OKAY.  PLEASE.

17   A.   THERE WAS A WEEK IN WHICH WE DID, I THINK, FIVE DAYS OF

18   KIND OF LIVE ZOOM CALLS WITH GOOGLE ENGINEERS AND VARIOUS LEGAL

19   TEAMS.

20        BUT IT WAS ACTUALLY A SEARCH THAT WAS RUN BY THE EXPERT

21   FOR THE CALHOUN PLAINTIFFS USING A TOOL CALLED A DREMEL, WHICH

22   IS AN INTERNAL TOOL, SPELLED LIKE THE TOOL YOU BUY AT HOME

23   DEPOT, THAT IS FOR QUERYING DATA IN A RELATIVELY EFFICIENT

24   MANNER IS MY UNDERSTANDING.

25        AND DURING THE QUERY, I BELIEVE IT WAS A SYNC LOG, A

1        CHROME SYNC LOG, IT SHOWED UP.

2             AND WE KIND OF COLLECTIVELY HAD A "WHAT IS THAT?" MOMENT.

3        "WHY IS THIS HERE?" MOMENT.

4        Q.   MR. THOMPSON, YOU UNDERSTAND THAT DR. SADOWSKI -- WELL,

5        THERE'S -- YOU UNDERSTAND DR. SADOWSKI HAD TESTIFIED THAT THERE

6        WERE FIVE DIFFERENT IS_INCOGNITO AND NON_INCOGNITO LOGS; IS

7        THAT CORRECT?

8        A.   I BELIEVE THAT'S CORRECT.

9        Q.   WHEN YOU LOOKED AT THOSE LOGS, DID ANY OF THEM APPEAR TO

10       YOU TO BE A, QUOTE-UNQUOTE, SYNC LOG?

11       A.   NO.

12       Q.   AND WHAT YOU SAW THAT DAY ON MARCH 4TH, THAT WAS RUN --

13       THAT WAS A QUERY THAT WAS RUN AGAINST A SYNC LOG; IS THAT

14       CORRECT?

15       A.   THAT'S CORRECT.

16       Q.   SO DO YOU BELIEVE THAT, GIVEN THAT THERE WERE ONLY FIVE

17       LOGS THAT WERE IDENTIFIED BY DR. SADOWSKI, THAT THERE MAY BE

18       ACTUALLY MORE LOGS THAT CONTAIN THESE INCOGNITO BITS?

19       A.   YEAH, I THINK WE DON'T KNOW.  I THINK THAT WE'VE SEEN,

20       WE'VE SEEN THINGS THAT DON'T LINE UP.

21       Q.   CAN WE GO ON TO THE NEXT SLIDE, PLEASE.

22       A.   SO WITH ALL OF THAT SAID, AND I'VE ALLUDED TO THIS

23       EARLIER, BUT JUST TO KIND OF ROUND OUT THIS PORTION OF

24       DISCUSSION, WRITING TO THESE FIELDS, ONCE THEY ALREADY EXIST,

25       ESPECIALLY A FIELD AS SIMPLE AS TRUE/FALSE, IS REALLY AS SIMPLE

1       AS FLIPPING A LIGHT SWITCH.  IT'S A VERY SIMPLE CODE CHANGE.

2       THE SCHEMA ALREADY EXISTED.  THE CODE ALREADY EXISTED.  IT'S A

3       MATTER OF EFFECTIVELY ENABLING THE FUNCTIONALITY.

4       Q.   IF WE CAN MOVE ON TO I THINK WHAT MAY BE THE LAST SLIDE.

5            CAN YOU TELL US, THE COURT, THE SPECIAL MASTER ALSO, THE

6       AUDIENCE HERE, WHAT EXACTLY THAT MIGHT HAVE MEANT IN TERMS OF

7       PRESERVING DATA?

8       A.   SURE.  THIS IS MY POINT THREE, AND THE ABILITY TO FLAG

9       TRAFFIC, DETECT TRAFFIC THAT IS INCOGNITO, MAY BE INCOGNITO, IS

10      RELEVANT BECAUSE IT ALLOWS US TO REDUCE THE AMOUNT OF DATA THAT

11      NEEDS TO BE PRESERVED FOR THE PURPOSES OF THIS CASE.

12           SO, YOU KNOW, WHEN YOU LOOK AT THE BEGINNING, YOU SAY, OH,

13      THERE'S ALL THE DATA BECAUSE WE DON'T KNOW.

14           BUT WE ACTUALLY CAN TAKE SEVERAL STEPS TO REDUCE IT.  IN

15      MY EARLIER SLIDES I TALKED ABOUT HOW ONE TRANSMISSION TO GOOGLE

16      WOULD RESULT IN POTENTIALLY MULTIPLE LOG ENTRIES BEING WRITTEN,

17      AND FOR THE PURPOSES OF THIS CASE, THOSE LOG ENTRIES MAY HAVE

18      NUMEROUS USES AT GOOGLE, BUT FOR THE PURPOSES OF THIS CASE, WE

19      REALLY DON'T NEED ALL OF THOSE.  WE NEED TO DEDUPLICATE THE

20      DATA IN SOME WAY.  SO THAT REDUCES THE DATA IN THE FIRST CUT.

21           WE ALSO DON'T NEED ALL OF THE FIELDS.  THERE ARE NUMEROUS

22      FIELDS THAT ARE PRESENT.  THERE'S ONLY A CERTAIN SUBSET OF

23      FIELDS THAT WE'RE LOOKING AT.  SO THAT REDUCES IT FURTHER.

24           AND THEN IF YOU LAYER IN THE ABILITY TO DETECT INCOGNITO

25      TRAFFIC AND FLAG INCOGNITO TRAFFIC, YOU'RE ABLE TO IDENTIFY THE

1    TRAFFIC THAT REALLY NEEDS TO BE PRESERVED, AND ANY RELATED

2    TRAFFIC, SO RELATED ENTRIES LIKE ENCRYPTION KEYS OR POTENTIALLY

3    GAIA ENTRIES, THAT SORT OF THING RELATED TO CORE THINGS LATER

4    ON.

5         BUT IT'S A MUCH SMALLER SUBSET OF THE DATA.  GOOGLE'S OWN

6    NUMBERS SAY THAT IT'S ABOUT 3 PERCENT OF CHROME TRAFFIC, AND

7    CHROME IS OBVIOUSLY NOT THE ENTIRE WORLD OF BROWSER TRAFFIC.

8         SO IT ALLOWS YOU TO BASICALLY REDUCE WHAT YOU WOULD NEED

9    TO PRESERVE FOR THE PURPOSES OF THIS CASE.

10   Q.   OKAY.  ALMOST THERE.

11        MR. THOMPSON, WERE YOU HERE IN THE ROOM WHEN YOU HEARD

12   MS. TREBICKA'S ARGUMENTS?

13   A.   YES.

14   Q.   YOU HEARD HER REFER TO SOMETHING CALLED THE X-CLIENT DATA

15   HEADER; ISN'T THAT CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   OKAY.  HERE WE'RE TALKING ABOUT THE INCOGNITO BITS; RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   ARE THERE DIFFERENCES BETWEEN THOSE TWO DIFFERENT GROUPS

20   OF THINGS?

21   A.   SURE.  SO THE X-CLIENT DATA HEADER -- THE INCOGNITO

22   BITS -- IN COMPUTER SCIENCE, A BIT IS A 1 OR A 0, AND IN THE

23   INCOGNITO BITS, THESE ARE A TRUE OR A FALSE STATEMENT.

24        THOSE ARE SMALLER THAN THE X-CLIENT DATA HEADER.  THE

25   X-CLIENT DATA HEADER IS A STRING OF VARIABLE LENGTH, BUT IN

1    BROWSER TRAFFIC, IT'S TENS OF CHARACTERS, IF NOT MORE.  IT

2    VARIES A LITTLE BIT.

3         BUT IN ANY CASE, IT'S BIGGER THAN THE SINGLE BIT THAT WE

4    USE TO REPRESENT INCOGNITO, NON_INCOGNITO.

5    Q.   WITH REGARD TO THE IS_CHROME_INCOGNITO BIT AND THE

6    IS_CHROME_NON_INCOGNITO BIT, HAVE YOU ACTUALLY SEEN THE CODE OR

7    THE ALGORITHM AS TO HOW THAT IS ACTUALLY DERIVED AS A TRUE OR A

8    FALSE?

9    A.   NO, I HAVE NOT.

10   Q.   OKAY.  SO INSOFAR AS MS. TREBICKA'S REFERRING TO THE

11   X-CLIENT DATA HEADER, YOU ACTUALLY DO NOT HAVE ANY

12   DOCUMENTATION ON HOW THOSE THINGS ACTUALLY RELATE TO ONE

13   ANOTHER, DO YOU?

14   A.   NO.  THEY'RE -- NO.

15        MR. MAO:  I HAVE NO FURTHER QUESTIONS FOR NOW.

16        THE COURT:  THANK YOU.

17   MR. SCHAPIRO?

18                       **CROSS-EXAMINATION**

19   BY MR. SCHAPIRO:

20   Q.   GOOD AFTERNOON, MR. THOMPSON.

21   A.   GOOD AFTERNOON.

22   Q.   I NOTICE MR. MAO DIDN'T ASK YOU ANY QUESTIONS ABOUT

23   SEGMENTS OF A DECLARATION THAT YOU PUT IN IN SUPPORT OF THIS

24   HEARING IN WHICH YOU SAID THAT YOU HAD A WAY TO TRY AND WORK

25   BACKWARDS FROM MATERIAL THAT COULD BE PROVIDED TO YOU FROM

1      GOOGLE TO IDENTIFY CLASS MEMBERS.

2          DO YOU RECALL SUBMITTING THAT, THAT DECLARATION?

3      A.   I DO RECALL THAT.

4      Q.   SO I WANTED TO ASK YOU A LITTLE BIT ABOUT THAT.

5      A.   SURE.

6      Q.   THAT DECLARATION IN WHICH YOU DESIGNED WHAT YOU PURPORTED

7      TO, WHAT YOU PURPORTED TO BE A WAY OF DETERMINING MEMBERS OF

8      THE CLASS FROM INFORMATION THAT YOU COULD GATHER THROUGH

9      DISCOVERY, IT WAS BASED ON, AMONG OTHER THINGS, AN I.P. ADDRESS

10     AND A USER AGENT; CORRECT?

11     A.   THOSE VALUES WERE INCLUDED IN THE PROCESS THAT I OUTLINED,

12     YES.

13     Q.   AND, MR. THOMPSON, YOU'RE NOT STATING -- IT'S NOT YOUR

14     POSITION THAT AN I.P. ADDRESS IS UNIQUE TO ANY INDIVIDUAL

15     HUMAN, ARE YOU?

16     A.   NO, I'M NOT TAKING THAT POSITION.

17     Q.   AND YOU WOULD AGREE WITH ME THAT AN I.P. ADDRESS IS NOT

18     UNIQUE TO A PARTICULAR DEVICE, IS IT?

19     A.   IT DEPENDS ON THE CIRCUMSTANCES, BUT GENERALLY NO.

20     Q.   AND A USER AGENT -- NOW, THAT'S BASICALLY WHAT THE -- IS

21     IT FAIR TO, IN LAYMAN'S TERMS, SAY THAT'S WHAT THE COMPUTER IS

22     RUNNING AT THE TIME?  FAIR SHORTHAND?

23     A.   CLOSE, YEAH.

24     Q.   ALL RIGHT.  SO USER AGENTS OBVIOUSLY ARE NOT UNIQUE AS

25     WELL, RIGHT?  I COULD BE RUNNING CHROME, THE LATEST VERSION OF

1    CHROME ON MY LAPTOP, SOMEONE ELSE COULD BE RUNNING THE SAME

2    VERSION OF CHROME ON HER LAPTOP; CORRECT?

3    A.   SO I THINK THIS IS -- NOT QUITE.  THIS IS WHERE I THINK

4    MY -- I SAID IT'S CLOSE FOR YOUR INITIAL CHARACTERIZATION OF

5    IT.

6         IT DEPENDS MORE THAN JUST THE VERSION OF CHROME.  SO THERE

7    ARE SEVERAL SIGNALS THAT ARE LAYERED INTO THE USER AGENT, MORE

8    THAN JUST THE VERSION OF CHROME.

9    Q.   SURE.  BUT THE BASIC PRINCIPLE, USER AGENT IS NOT

10   NECESSARILY UNIQUE TO ANY ONE DEVICE; CORRECT?

11   A.   THAT'S GENERALLY CORRECT, YES.

12   Q.   IN FACT, YOU'VE WRITTEN SOME -- YOU WROTE A PAPER AT SOME

13   POINT ABOUT CELL PHONES, AND YOU AGREE THAT A SINGLE CELL PHONE

14   COULD HAVE MULTIPLE USER AGENTS; RIGHT?

15   A.   CAN YOU EXPLAIN A LITTLE BIT?  IN WHAT CONTEXT DO YOU MEAN

16   "MULTIPLE AGENTS"?

17   Q.   SURE.  WELL, LET'S SAY A BROWSER IS UPDATED ON MY CELL

18   PHONE.  THE USER AGENT AFTER THE UPDATE IS GOING TO APPEAR

19   DIFFERENT THAN BEFORE; RIGHT?

20   A.   YES.

21   Q.   SAME THING WITH A LAPTOP; RIGHT?  WHEN A BROWSER IS

22   UPDATED OR IF A LAPTOP IS RUNNING TWO DIFFERENT BROWSERS, I

23   MIGHT HAVE SAFARI, I MIGHT HAVE CHROME, IT COULD HAVE TWO

24   DIFFERENT USER AGENTS; RIGHT?

25   A.   UM-HUM.

1     Q.   AND IN DOING YOUR EXPERIMENT IN WHICH YOU SAID YOU WOULD,

2     IF YOU HAD THIS INFORMATION, YOU WOULD BE ABLE TO WORK

3     BACKWARDS AND IDENTIFY CLASS MEMBERS, YOU SHOWED SOME, SOME

4     EXAMPLES IN YOUR DECLARATION, OR YOUR REPORT; IS THAT RIGHT?

5     A.   THAT'S CORRECT.

6     Q.   AND IN THOSE, YOU USED CERTAIN I.P. ADDRESSES; CORRECT?

7     A.   THAT'S CORRECT.

8     Q.   AND THE I.P. ADDRESSES THAT YOU USED IN DOING THAT

9     EXPERIENCE -- EXCUSE ME -- THAT EXPERIMENT, THOSE WERE

10    SOMETHING THAT WERE CALLED IPV4 I.P. ADDRESSES; CORRECT?

11    A.   I BELIEVE.  I WOULD NEED TO LOOK AT THE EXHIBITS AGAIN

12    SPECIFICALLY.

13    Q.   WELL, THERE ARE TWO DIFFERENT KINDS OF I.P. ADDRESSES;

14    RIGHT?

15    A.   YES.

16    Q.   IPV4 AND IPV6; IS THAT RIGHT?

17    A.   THAT'S CORRECT.

18    Q.   AND YOU'LL AGREE WITH ME THAT AN IPV4 ADDRESS HAS LESS

19    INFORMATION BUILT INTO IT AND IS, THEREFORE, LESS UNIQUE THAN

20    AN IPV6 ADDRESS; CORRECT?

21    A.   YES, THEY ARE SHORTER, YES, THAT'S TRUE.

22    Q.   AND IN DOING THIS, THIS EXPERIMENT THAT YOU DID, YOU

23    PULLED THE IPV4 ADDRESSES THAT YOU USED FROM A DEVICE USING AN

24    I.P. ADDRESS LOOKUP SERVICE; CORRECT?

25    A.   THAT'S CORRECT.

1    Q.   YOU'LL AGREE WITH ME ALSO THAT THERE ARE STATIC I.P.

2    ADDRESSES AND DYNAMIC I.P. ADDRESSES; RIGHT?  SOME THAT CHANGE

3    MORE OFTEN, SOME THAT CHANGE LESS; CORRECT?

4    A.   THAT'S TRUE, YES.

5    Q.   AND WITH REGARD TO UPDATES TO BROWSERS THAT MIGHT CHANGE A

6    USER AGENT, ARE YOU AWARE THAT CHROME UPDATES TO A NEW VERSION

7    EVERY SIX WEEKS?

8    A.   I'M NOT AWARE OF GOOGLE'S PUBLICATION SCHEDULE FOR CHROME.

9    Q.   IT'S FAIR TO SAY THAT YOU'RE AWARE THAT CHROME UPDATES

10   WITH SOME REGULARITY?

11   A.   I BELIEVE THAT GOOGLE PUSHES UPDATES TO CHROME WITH SOME

12   REGULARITY, THAT'S MY UNDERSTANDING, ALTHOUGH I DON'T KNOW WHAT

13   THE SCHEDULE IS.

14   Q.   ALL RIGHT.  SO THE GIST OF ALL THIS -- TELL ME IF YOU

15   DISAGREE WITH ANY OF THIS -- IS THAT AN I.P. ADDRESS COMBINED

16   WITH A USER AGENT CAN'T TELL YOU WHO AN INDIVIDUAL HUMAN BEING

17   USING THE COMPUTER IS; CORRECT?

18   A.   I'M NOT SURE THAT'S TOTALLY ACCURATE.

19   Q.   TELL ME HOW YOU COULD TAKE AN I.P. ADDRESS AND A USER

20   AGENT AND IDENTIFY A HUMAN BEING WHO IS USING THAT DEVICE.

21   A.   SO I SUPPOSE THERE'S, THERE'S THE -- THERE'S THE

22   DIFFERENCE BETWEEN IDENTIFYING THE DEVICE AND IDENTIFYING THE

23   HUMAN, AND I BELIEVE WHAT I OUTLINED IS THE STEPS THAT, IN THE

24   PROOF OF CONCEPT, WERE IDENTIFYING THE DEVICE AND IDENTIFYING

25   THE TRAFFIC SPECIFICALLY.

1        SO THE ISSUE OF WHO WAS USING IT, I SUPPOSE, IS UP FOR A

2   DIFFERENT SORT OF DEBATE, BUT I DON'T THINK THAT I OFFERED ANY

3   OPINION ON THAT.

4        BUT IDENTIFYING THE TRAFFIC IS ABOUT NARROWING DOWN --

5   TAKING THE DATA THAT'S PRESENT AND COMBINING IT IN A WAY THAT

6   YOU CAN SUCCESSFULLY IDENTIFY THE TRAFFIC IN MULTIPLE LOGS, FOR

7   EXAMPLE.

8        SO ONE OF THE EXAMPLES THAT, THAT WE LOOK AT IS -- SO,

9   YES, CHROME DOES UPDATE.  THERE ARE UPDATES APPLIED TO CHROME.

10       THE USER TYPICALLY HAS TO TAKE SOME INTERVENTION TO DO

11   THAT.  SO I'M SURE YOU'VE USED CHROME AND YOU'LL SEE EVERY ONCE

12   IN A WHILE THERE WILL BE A THING UP IN THE CORNER WHERE IT'S

13   GREEN AND THEN IT GETS YELLOW AND THEN IT GETS RED IF YOU'VE

14   PUT OFF UPDATES FOR TOO LONG, AND IF YOU RESTART CHROME, IT'LL

15   UPDATE.  BUT UNTIL YOU DO THAT, IT WON'T UPDATE EVEN IF IT'S

16   DOWNLOADED THE UPDATE.  CHROME WON'T UPDATE, WON'T KICK YOU OUT

17   EVEN IF IT'S DOWNLOADING THE UPDATE.

18       SO ONE OF THE OTHER ELEMENTS THAT IS IMPORTANT TO INCLUDE

19   IS THE NOTION OF TIME, RIGHT?  SO IF I'M LOOKING AT RECORDS

20   FROM SIX MONTHS AGO AND YOU'RE TELLING ME YOUR USER AGENT AND

21   I.P. ADDRESS IS SIX MONTHS OR SOMETHING AND YOU'RE SAYING IT'S

22   THE SAME AS SIX MONTHS AGO, WELL, NO, THAT'S NOT WHAT I'M

23   SAYING.

24       MY POINT IS THAT WITHIN THE CONFINES OF THE EXPERIMENT AND

25   THE DATA THAT WE HAVE ACCESS TO, THIS ILLUSTRATES THE CONCEPT.

1    Q.   SO, MR. THOMPSON, THAT WAS A LONG ANSWER.  I WANT TO

2    REPEAT MY QUESTION, WHICH I THINK WAS JUST A STRAIGHTFORWARD

3    ONE.  YOU'RE NOT SAYING, IN THAT REPORT OR ON THE WITNESS STAND

4    TODAY, THAT YOU CAN TAKE AN I.P. ADDRESS AND A USER AGENT AND

5    DETERMINE WHAT HUMAN BEING WAS, WAS USING THE INTERNET JUST

6    FROM THOSE TWO ITEMS; CORRECT?

7    A.   SO YOU'RE SAYING THE I.P. AND USER AGENT -- YOU'RE ASKING

8    ME WHETHER I THINK THAT THE I.P. AND USER AGENT IS TIED TO A

9    FLESH AND BLOOD PERSON?

10   Q.   I'M ASKING IF YOU COULD -- YEAH, THAT SEEMS FAIR, YEAH.

11   A.   YEAH, I DON'T THINK I'VE OFFERED THAT OPINION.

12   Q.   AND, IN FACT, YOU'RE AWARE OF -- STRIKE THAT.

13        IF YOU HAVE A FAMILY --

14   A.   UM-HUM.

15   Q.   -- SHARING A COMPUTER, THE I.P. ADDRESS AND THE USER

16   AGENT, THEY'RE GOING TO BE IDENTICAL; RIGHT?  SOMEONE GOES ON

17   THE COMPUTER IN THE KITCHEN AND SEARCHES FOR A RECIPE, YOU

18   CAN'T TELL FROM THE USER AGENT OR THE I.P. ADDRESS WHETHER THAT

19   WAS MOM, DAD, OR JUNIOR; RIGHT?

20   A.   I CERTAINLY CAN.

21   Q.   YOU CAN?

22   A.   I CAN.

23   Q.   TELL ME HOW.

24   A.   WELL, SO I -- I DON'T KNOW YOUR FAMILY.

25        MY DAUGHTER HAS A KINDLE FIRE TABLET.  MY WIFE HAS A SMALL

1    13 INCH MACBOOK.  I HAVE A 15 INCH MACBOOK.

2         MY WIFE IS NOT GOOD ABOUT INSTALLING UPDATES.  I'M GOOD

3    ABOUT INSTALLING UPDATES.  MY DAUGHTER DOESN'T INSTALL UPDATES

4    BECAUSE SHE'S FOUR.

5         THOSE ARE ALL GOING TO HAVE DIFFERENT USER AGENTS.  THEY

6    MAY HAVE THE SAME I.P., IT DEPENDS ON CIRCUMSTANCES.

7    Q.   I APOLOGIZE IF MY QUESTION WAS UNCLEAR.

8         I'M TALKING ABOUT ONE COMPUTER, BECAUSE THERE ARE

9    FAMILIES, MINE INCLUDED IF I CAN VOUCH, THAT HAVE A COMPUTER IN

10   A ROOM THAT MIGHT BE THE FAMILY COMPUTER, AND WILL YOU DISAGREE

11   WITH ME THAT IF SOMEONE GOES AND SEARCHES FOR A RECIPE ON THE

12   COMPUTER IN THE KITCHEN, YOU CAN'T TELL WHETHER IT'S MOM, DAD,

13   OR JUNIOR?

14   A.   I APOLOGIZE.  I DID MISUNDERSTAND YOUR QUESTION.

15        THIS GETS BACK TO THE FLESH AND BLOOD, AND NO, I DON'T --

16   THAT'S NOT THE OPINION THAT I'VE OFFERED.

17   Q.   AND, MR. THOMPSON, IN FACT, INCOGNITO MODE IS DESIGNED FOR

18   SITUATIONS IN WHICH PEOPLE ARE SHARING DEVICES, ISN'T IT?

19        MR. MAO:  OBJECTION.  OUTSIDE THE SCOPE OF THE EXPERT

20   IS TESTIFYING ABOUT, DESIGNATED TO TESTIFY FOR, AND LACKS

21   FOUNDATION.

22        MR. SCHAPIRO:  WELL, LET ME WITHDRAW THAT QUESTION

23   AND LAY A FOUNDATION.

24        CAN WE PUT UP THE FIRST SLIDE THAT YOU SHOWED

25   MR.  THOMPSON IN WHICH HE HAD THE SPLASH SCREEN FROM INCOGNITO.

1    Q.   SO THIS IS -- MR. MAO ASKED YOU ABOUT THIS SPLASH SCREEN.

2         DO YOU RECALL THAT?

3    A.   I DO.

4    Q.   AND I'LL ASK YOU TO READ THE SENTENCE UNDERNEATH THE WORDS

5    "YOU'VE GONE INCOGNITO."

6         CAN YOU READ THOSE OUT LOUD, PLEASE?

7    A.   SURE.  "NOW YOU CAN BROWSE PRIVATELY, AND OTHER PEOPLE WHO

8    USE THIS DEVICE WON'T SEE YOUR ACTIVITY."

9    Q.   IS IT FAIR TO SAY THAT ONE OF THE PARADIGMATIC USE CASES

10   FOR INCOGNITO IS PEOPLE WHO ARE SHARING A DEVICE, FOR EXAMPLE,

11   A SPOUSE WHO MIGHT NOT WANT -- OR A BOYFRIEND WHO MIGHT NOT

12   WANT HIS GIRLFRIEND TO SEE THAT HE WAS SEARCHING FOR AN

13   ENGAGEMENT RING?

14        MR. MAO:  OBJECTION.  CALLS FOR SPECULATION.

15        THE COURT:  I'LL ALLOW IT.

16   GO AHEAD.

17        THE WITNESS:  I CAN'T COMMENT ON THAT.  I WASN'T

18   INVOLVED IN THE DESIGN DECISIONS OF WHAT WENT INTO CHROME OR

19   HOW PEOPLE NECESSARILY CHOOSE TO OPEN INCOGNITO.

20   BY MR. SCHAPIRO:

21   Q.   WELL, MR. THOMPSON, YOU'VE USED CHROME; CORRECT?

22   A.   UM-HUM, I HAVE.

23   Q.   AND YOU'VE BEEN IN -- YOU TOLD US YOU GRADUATED FROM

24   COLLEGE MORE THAN TEN YEARS AGO AND YOU'VE WORKED IN COMPUTERS

25   IN ONE WAY OR ANOTHER SINCE THEN; RIGHT?

1    A.    THAT'S CORRECT.

2    Q.    AND YOU'RE TELLING ME YOU HAVE NO POSITION ON WHETHER

3    CHROME -- THAT A PARADIGMATIC USE CASE FOR CHROME IS TO MAKE

4    SURE THAT OTHER PEOPLE WHO USE THE SAME DEVICE DON'T SEE YOUR

5    ACTIVITY?

6    A.    THAT'S WHAT I SAID.

7         WHAT I THINK THAT -- SO LET ME GIVE YOU AN EXAMPLE.  MY

8    PRIMARY USE OF PRIVATE BROWSING MODE HAS TO DO WITH THERE ARE

9    VARIOUS ENTITIES THAT I DO CONSULTING SERVICES FOR, AND

10   SOMETIMES I HAVE ACCOUNTS AT DIFFERENT PLACES.

11        CERTAIN SERVICES DON'T COOPERATE WELL WITH SIGNING OUT AND

12   SIGNING BACK IN, OR IT'S ANNOYING, SO I'LL USE A PRIVATE

13   BROWSING MODE TO SIGN INTO SOMETHING NEW.

14   Q.    I'M SORRY.  DID YOU SAY YOU DO THAT SOMETIMES ON DIFFERENT

15   DEVICES?

16   A.    NO, ON THE SAME DEVICE.

17   Q.    ALL RIGHT.  AND DO YOU DO THAT IN DIFFERENT LOCATIONS

18   SOMETIMES?

19   A.    I SUPPOSE I COULD.

20   Q.    AND IF YOU'RE IN A DIFFERENT LOCATION, YOUR PUBLIC I.P.

21   ADDRESS WOULD ALMOST CERTAINLY BE DIFFERENT; IS THAT CORRECT?

22   A.    PROBABLY.

23   Q.    AND IN THESE EXPERIMENTS THAT YOU DID AND THAT YOU -- FOR

24   WHICH YOU SUBMITTED A DECLARATION TO THIS COURT, YOU USED

25   CERTAIN, CERTAIN ID'S AS A PIECE OF YOUR EXPERIMENT; CORRECT?

THOMPSON CROSS BY MR. SCHAPIRO

1   A.   I THINK THAT'S ACCURATE, YES.

2   Q.   AND YOU KNEW WHO HAD GENERATED THOSE ID'S BECAUSE THESE

3   WERE ID'S THAT WERE GENERATED EITHER BY SOME OF PLAINTIFFS'

4   EXPERTS OR BY THE NAMED PLAINTIFFS THEMSELVES; IS THAT RIGHT?

5   A.   I WOULD SAY I UNDERSTAND THE PARAMETERS UNDER WHICH THE

6   DATA WAS CAPTURED.

7   Q.   AND YOU -- DID YOU UNDERSTAND THAT -- DID YOU HAVE

8   KNOWLEDGE OF WHETHER THE DATA -- WHEN THE DATA WAS CAPTURED, TO

9   USE YOUR PHRASE, THE USER WAS IN INCOGNITO MODE?

10  A.   YES.

11  Q.   SO BASICALLY WHAT YOUR EXPERIMENT SHOWED IS THAT SOMEONE

12  WHO YOU ALREADY KNEW WAS IN INCOGNITO MODE DIDN'T HAVE AN

13  X-CLIENT DATA HEADER IN GOOGLE'S LOGS; RIGHT?

14  A.   UM, I'M NOT SURE I TOTALLY AGREE WITH THE SIMPLIFICATION.

15  CAN YOU MAYBE TRY THAT AGAIN?

16  Q.   3WELL, YOUR EXPERIMENT DIDN'T WORK BACKWARDS FINDING SOME

17  RANDOM ENTRY WITHOUT AN X-CLIENT DATA HEADER TO THEN ESTABLISH

18  THAT A PERSON WAS IN INCOGNITO; CORRECT?

19  A.   THAT'S CORRECT.

20  Q.   I THINK YOU SAID IN, IN THE -- IN YOUR DECLARATION THAT

21  YOU'RE FAMILIAR WITH THE, THE DOCUMENTS THAT HAVE BEEN

22  PRESENTED IN -- SHARED IN THIS CASE; IS THAT CORRECT?

23  A.   CERTAIN, CERTAIN DOCUMENTS, YES.

24  Q.   AND YOU'VE WORKED CLOSELY WITH THE PLAINTIFFS IN HELPING

25  TO ANALYZE SOME OF THE MATERIAL THAT'S BEEN PROVIDED?

1    A.   GENERALLY, YES.

2    Q.   AND I THINK YOU CITED IN YOUR, IN YOUR REPORT TO SOME

3    PORTIONS OF THE -- TO A DEPOSITION FROM A MAN NAMED

4    RORY MCCLELLAND IN SUPPORT OF YOUR THEORY THAT YOU MIGHT BE

5    ABLE TO SOMEHOW WORK BACKWARDS AND JOIN DATA TO HUMANS.

6         DO YOU RECALL THAT?

7    A.   YES, I DO RECALL THAT.

8    Q.   DID YOU READ THE MCCLELLAND DECLARATION WITH CARE?

9    A.   YES.

10   Q.   EXCUSE ME, THE MCCLELLAND DEPOSITION.

11   A.   YES.

12   Q.   SO YOU READ THE PORTION ON PAGE 319 OF HIS DEPOSITION IN

13   WHICH HE STATED, "WITH EACH NEW INCOGNITO" -- EXCUSE ME.

14        HE STATED "USERS TYPICALLY HAVE ONE OR TWO NEW PRIMARY

15   PROFILES, PERHAPS A PERSONAL ONE AND A WORK ONE AND THEN,

16   DEPENDING UPON HOW FREQUENTLY AND IF THEY USE INCOGNITO, THEY

17   MAY HAVE MULTIPLE ORPHANED INCOGNITO SESSION.

18        "WITH EACH NEW INCOGNITO SESSION, THERE IS A NEW PROFILE."

19        DO YOU RECALL READING THAT IN THE MCCLELLAND DEPOSITION?

20   A.   I DON'T HAVE IT COMMITTED TO MEMORY.  I'D BE HAPPY TO READ

21   IT AGAIN IF YOU WANTED TO PUT IT IN FRONT OF ME.

22   Q.   IN YOUR EXPERIMENT, DID YOU REACH ANY CONCLUSION THAT IS

23   CONTRARY TO THE STATEMENT FROM MR. MCCLELLAND THAT WITH EACH

24   NEW INCOGNITO SESSION, THERE'S A NEW PROFILE?

25             MR. MAO:  OBJECTION.  THE WITNESS ASKED TO BE ABLE TO

1      READ THE RECORD IF YOU'RE GOING TO ASK HIM A QUESTION ABOUT

2      THAT RECORD.

3              THE COURT:  THAT WAS A YES OR NO QUESTION AS I

4      UNDERSTAND IT.

5      BY MR. SCHAPIRO:

6      Q.   YOU MAY ANSWER.

7      A.   I'M SORRY.  CAN YOU STATE IT AGAIN?

8      Q.   YES.  IN THE EXPERIMENT THAT YOU DID --

9      A.   UM-HUM.

10     Q.   -- THAT YOU SUBMITTED TO THIS COURT, DID YOU REACH ANY

11     CONCLUSION THAT WOULD CAUSE YOU TO DISAGREE WITH THE STATEMENT

12     FROM MR. MCCLELLAND THAT WITH EACH NEW INCOGNITO SESSION, THERE

13     WAS A NEW PROFILE?

14     A.   I'M NOT GOING TO COMMENT ON THE -- ON HIS STATEMENT,

15     WHETHER I AGREE OR DISAGREE WITHOUT KIND OF SEEING IT AND

16     HAVING MORE CONTEXT AROUND IT.

17          WE DIDN'T DO A WHOLE LOT OF ANALYSIS OF THE NOTION OF A

18     PROFILE, THOUGH.  THAT WASN'T REALLY PART OF THE EXPERIMENT AND

19     I DON'T THINK I OFFERED ANY OPINIONS ON THE NOTION OF PROFILES.

20     Q.   WELL, LET ME ASK YOU ABOUT SOMETHING THAT MR. MCCLELLAND

21     SAID ON PAGE 25 OF HIS DEPOSITION.  HE SAID, "WHEN YOU GO" --

22             THE COURT:  EXCUSE ME, MR. SCHAPIRO.  YOU'RE

23     REFERRING TO THE MCCLELLAND DEPO AS AN EXHIBIT TO

24     MR. THOMPSON'S DECLARATION.  BUT THE PAGES YOU'RE REFERRING TO

25     ARE NOT THE PAGES THAT ARE INCLUDED AS AN EXHIBIT, AT LEAST NOT

1      IN MY VERSION.

2           MR. SCHAPIRO:  WE WOULD BE HAPPY TO SUBMIT THESE

3      AFTERWARDS.  I'M USING THESE TO IMPEACH HIM, AND IF HE SAYS HE

4      DIDN'T REMEMBER ANYTHING ABOUT IT, THAT'S OKAY.  I'M USING IT

5      AS A JUMPING OFF POINT.  BUT HE DID TESTIFY THAT HE HAD READ

6      ALL THE RELEVANT PAPERS AND HE RELIED ON THIS DEPOSITION.

7           THE COURT:  HE DID TESTIFY THAT HE READ THE

8      DEPOSITION.  I'M JUST -- I DON'T HAVE THE PAGES.

9           MR. SCHAPIRO:  THAT'S OUR OVERSIGHT, YOUR HONOR.  AS

10     LONG AS IT'S NOT IMPROPER PROCEDURALLY, I'LL STILL ASK HIM THE

11     QUESTIONS AND THEN WE CAN TRY AND SUBMIT THE FULL DEPOSITION.

12         WE ONLY RECEIVED THEIR EXHIBITS, AS THEY DID OURS, LATE

13     LAST NIGHT, AND I APOLOGIZE FOR NOT NOTING THAT THE ENTIRE

14     DEPOSITION WAS AN EXHIBIT.

15          MR. MAO:  YOUR HONOR, I APOLOGIZE, BUT THE PROCEDURAL

16     PROBLEM IS THAT THE WITNESS DID ASK FOR A COPY SO THAT HE CAN

17     SEE WHAT MR. SCHAPIRO IS ASKING HIM ABOUT.

18         HE'S ASKING HIM ABOUT THE CONTEXT ABOUT THE PORTION OF THE

19     DEPOSITION THAT IS BEING -- IT JUST SEEMS PROCEDURALLY UNFAIR,

20     WHICH WAS MR. SCHAPIRO'S SUGGESTION THAT THIS BE PROCEDURALLY

21     FAIR.

22          THE COURT:  I'LL LET YOU RESTATE YOUR QUESTION,

23     MR. SCHAPIRO.

24          MR. SCHAPIRO:  SURE.

25     Q.  DO YOU DISAGREE WITH THE FOLLOWING PROPOSITION -- AND I

THOMPSON CROSS BY MR. SCHAPIRO

```
1    DON'T EVEN NEED TO TIE IT TO A DEPOSITION -- DO YOU DISAGREE

2    WITH THIS:  THAT WHEN A PERSON GOES INTO INCOGNITO, THAT PERSON

3    PRESENTS TO THE WEB SERVER, BE THAT GOOGLE OR OTHERWISE, AS A

4    NEW USER, A CLEAN SLATE USER, AND THUS IS NOT ASSOCIATED WITH

5    THE REGULAR DAY-TO-DAY BROWSING SO THAT THE ACTIVITY UNDERTAKEN

6    WITHIN THAT INCOGNITO SESSION IS ISOLATED AND SEGMENTED FROM

7    THE PERSON'S PRIMARY CHROME PROFILE?

8        DO YOU DISAGREE WITH THAT?

9    A.  SO I THINK THAT -- THE CHROME PROFILE BIT I WANT TO STAY

10   AWAY FROM BECAUSE, AGAIN, I JUST NEED MORE CONTEXT FOR WHAT

11   YOU'RE TALKING ABOUT WITH CHROME PROFILES.

12       CAN YOU SAY THE BEGINNING PART AGAIN?  I APOLOGIZE.

13   Q.  SURE.  MAYBE I CAN REPHRASE IT.  WHEN YOU GO INTO

14   INCOGNITO MODE, DO YOU PRESENT TO THE WEB SERVER, WHETHER IT'S

15   GOOGLE OR OTHERWISE, AS A NEW USER WITH A CLEAN SLATE?

16   A.  ARE YOU REFERRING TO -- WHEN YOU SAY WHEN YOU GO INTO

17   INCOGNITO MODE, CAN YOU EXPLAIN WHAT STEPS ARE WE TALKING

18   ABOUT, LIKE WHAT ACTIONS ARE TAKEN?

19   Q.  YOU HAVE A CHROME BROWSER OPEN AND YOU SELECT OPEN A NEW

20   INCOGNITO WINDOW AND YOU GO SEARCH FOR SOMETHING.

21   A.  SO IN THIS HYPOTHETICAL, DO WE HAVE OTHER INCOGNITO TABS

22   OR WINDOWS OPEN?

23   Q.  NO.

24   A.  OKAY.  SO YOU HAVE A SINGLE OR A REGULAR INCOGNITO MODE

25   WINDOW OR TAB?
```

1   Q.   YEAH.

2   A.   AND YOU HAVE OPENED A NEW INCOGNITO MODE THAT -- WITH NO

3   OTHER INCOGNITO WINDOWS OR TABS OPEN?  IS THAT ACCURATE?

4   Q.   THAT'S ACCURATE.

5   A.   SO THAT'S THE SITUATION YOU'RE TALKING ABOUT?

6   Q.   YEAH.

7   A.   OKAY.  CAN YOU SAY THE NEXT BIT NOW THAT WE'VE ESTABLISHED

8   THAT.

9   Q.   SURE.  YOU GO INTO INCOGNITO MODE, AS WE'VE JUST AGREED

10  YOU WOULD.

11       DO YOU DISAGREE THAT YOU PRESENT TO THE WEB SERVER, OR YOU

12  APPEAR TO THE WEB SERVER, BE IT GOOGLE OR OTHERWISE, AS A NEW

13  USER, A CLEAN SLATE USER?

14  A.   I THINK THAT YOU PRESENT WITH NO COOKIES AT THAT TIME.

15       SO I THINK THAT THE MECHANISMS THAT USE -- IF YOU SHOW UP

16  TO A WEBSITE, THEY'LL GIVE YOU A NEW COOKIE.

17  Q.   I WANT TO ASK YOU ANOTHER QUESTION ABOUT MR. MCCLELLAND'S

18  DEPOSITION.  APOLOGIES IF THIS ISN'T IN THE PART THAT GOES

19  TO -- THAT IS WITH THE COURT.

20       I DON'T KNOW.  IS PAGE 74?

21            MS. TREBICKA:  WE'RE CHECKING.

22            MR. SCHAPIRO:  OKAY.  WHETHER THAT'S PART OF THE

23  EXHIBIT.

24  Q.   WHEN YOU STUDIED MR. MCCLELLAND'S DEPOSITION TO HELP YOU

25  PREPARE YOUR DECLARATION, DID YOU FIND ANYTHING TO DISAGREE

1      WITH FROM THE FOLLOWING TESTIMONY:

2          "PROFILES ARE NEVER JOINED, SO IT JUST LOOKS LIKE ANOTHER

3      USER IN THE WEB SERVER'S EYES AND EVERY TIME THE USER COMES

4      BACK IN A NEW INCOGNITO SESSION, A NEW PROFILE IS CREATED AND,

5      AGAIN, NEVER JOINED, SO THAT SEPARATION OCCURS BOTH FROM THE

6      PRIMARY SESSION, BUT ALSO ACROSS DIFFERENT DISTINCT INCOGNITO

7      SESSIONS"?

8          MR. MAO:  OBJECTION TO HEARSAY.

9          THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AT

10     THIS POINT AS TO READING FROM THE DEPOSITION TESTIMONY THAT THE

11     WITNESS HAS ASKED FOR.

12         BEFORE YOU MOVED YOUR QUESTIONS OFF OF, AWAY FROM THE

13     DEPOSITION.

14         BUT TO QUIZ HIM ON THE DEPOSITION TESTIMONY, I'LL SUSTAIN

15     THAT OBJECTION.

16         MR. SCHAPIRO:  THAT'S FINE, YOUR HONOR.  I'LL ASK IT

17     IN A GENERIC WAY.

18         DO YOU AGREE WITH THE PROPOSITION THAT -- DO YOU DISAGREE

19     WITH THE PROPOSITION THAT GOOGLE NEVER JOINS A PROFILE WITH

20     INCOGNITO ACTIVITY TO AN IDENTIFIABLE PROFILE?

21     A.   I -- I DO FOR -- YEAH, I DO.

22     Q.   SO YOU AGREE OR DISAGREE?

23     A.   I DISAGREE.  DID -- SORRY.  SAY IT AGAIN, BECAUSE I WANT

24     TO MAKE SURE I UNDERSTAND WHICH -- WHICH IS AGREEING AND WHICH

25     IS DISAGREEING.

1    Q.   GOOGLE NEVER JOINS PROFILES?  I'LL GIVE YOU THE SHORTHAND.

2    A.   I DISAGREE WITH THAT.

3    Q.   AND WHAT EVIDENCE HAVE YOU SEEN THAT ESTABLISHES THAT

4    GOOGLE JOINS PROFILES?

5    A.   SO I THINK THAT THERE'S A COUPLE THINGS THAT I DISAGREE

6    WITH IN THAT STATEMENT.

7         ONE, YOU SAID "NEVER," WHICH IS AN ABSOLUTE WHICH I THINK

8    IS NOT SOMETHING THAT I'M COMFORTABLE WITH.

9         SECOND IS THAT WE'VE ESTABLISHED THAT, THAT THERE ARE

10   LINKAGES THAT EXIST WITHIN, AGAIN, THE ANALYTICS UID'S, THE

11   PPID'S, THOSE ARE VERY STRAIGHTFORWARD LINKAGES THAT EXIST

12   WHERE ONE COULD COME FROM INCOGNITO, ONE COULD COME FROM

13   REGULAR, AND THEY EXIST.

14        I THINK THAT ASKING ME ABOUT -- YOU ASKED ME TO GIVE YOU

15   AN ABSOLUTE, AND WE'VE BEEN ASKING FOR MORE DATA.  I'M NOT IN A

16   POSITION TO ESTABLISH AN ABSOLUTE WITHOUT MORE DATA.

17   Q.   I UNDERSTAND.  SO YOU DON'T WANT TO TAKE AN ABSOLUTE

18   POSITION.

19        LET ME ASK YOU ABOUT SOMETHING A LITTLE MORE NARROW.

20        MR. MAO SHOWED YOU A SLIDE, I CAN'T REMEMBER, IT WAS MAYBE

21   THREE OR FOUR SLIDES IN, THAT HAD THREE COLUMNS AND A RED BOX

22   AROUND THE COLUMN IN THE MIDDLE.

23        DO YOU REMEMBER THAT ONE?

24   A.   THAT'S CORRECT.

25   Q.   AND GOING ACROSS IN A ROW, THOSE THREE COLUMNS, YOU HAD

1    THE TERM PSEUDONYMOUS ID, OR IDENTIFIED -- PSEUDONYMOUS

2    SOMETHING -- THERE WE GO.  PSEUDONYMOUS ID, PSEUDONYMOUS ID,

3    PSEUDONYMOUS ID; CORRECT?

4    A.   YES.

5    Q.   IT'S NOT YOUR POSITION, IS IT, THAT THE PSEUDONYMOUS ID IN

6    COLUMN 1 IS GOING TO HAVE THE SAME VALUE AS THE PSEUDONYMOUS ID

7    IN THE SECOND COLUMN, AND THE SAME WITH THE THIRD?  OR IS IT?

8    A.   IN WHAT CONTEXT?  SO WHAT SCENARIO?

9         I MEAN, I THINK -- AND I APOLOGIZE, THIS IS NOT TRYING TO

10   ARGUE, BUT THIS IS ALL -- AND I'M SURE, AS YOUR TEAM KNOWS,

11   THIS IS ALL VERY COMPLICATED, SO THE PARAMETERS OF THE QUESTION

12   MATTER.  RIGHT?

13   Q.   WELL, YOUR SLIDE HERE -- I GUESS I'M GOING TO ASK YOU HOW

14   YOU USED IT.

15        YOUR SLIDE HERE IS CALLED "JOINING DATA"?

16   A.   UM-HUM.

17   Q.   AND MAYBE I MISUNDERSTOOD THE SLIDE, BUT IT LOOKED TO ME

18   AS IF YOU WERE SAYING YOU CAN TRACK PSEUDONYMOUS ID'S ACROSS

19   FROM A P LOG -- THAT IS, AUTHENTICATED DATE -- TO A B LOG, TO

20   ANALYTICS LOGS.

21        AND I JUST WANTED TO UNDERSTAND, ARE YOU, IN WHATEVER IT

22   IS YOU WERE TRYING TO GET ACROSS IN THIS SLIDE, ARE YOU

23   SUGGESTING THAT THE PSEUDONYMOUS ID REMAINS THE SAME ACROSS

24   THESE -- THE ROW?

25   A.   I STILL DON'T UNDERSTAND THE, THE -- I MEAN, THE

1    PARAMETERS MATTER.  SO IF YOU PICKED RANDOM ENTRIES, WOULD THEY

2    BE THE SAME ACROSS?  NOT NECESSARILY.  IT'S LIKE PICKING RANDOM

3    EXCEL ROWS.

4        CAN YOU EXPLAIN THE PARAMETERS?  I NEED TO UNDERSTAND THE

5    PARAMETERS OF THE SITUATION WHERE YOU'RE ASKING ME THAT

6    QUESTION.

7    Q.   WELL, WHAT DOES "PSEUDONYMOUS" MEAN IN YOUR EXPERIENCE AS

8    AN EXPERT?

9    A.   SO MY UNDERSTANDING OF PSEUDONYMOUS IS NOT QUITE

10   ANONYMOUS.  SO IT'S AN IDENTIFIER THAT, IN THIS CONTEXT, IS NOT

11   DIRECTLY ASSOCIATED WITH A GAIA ACCOUNT.

12   Q.   CAN YOU DESCRIBE FOR ME A SITUATION IN WHICH YOU BELIEVE

13   THAT THE PSEUDONYMOUS IDENTIFIER IN THESE THREE COLUMNS WOULD

14   BE IDENTICAL?

15   A.   SO YOU'RE ASKING FOR A HYPOTHETICAL, A COMPLEX --

16   Q.   YOU'RE AN EXPERT.

17   A.   SURE.  BUT I WANT TO COUCH THIS WITH IT'S A HYPOTHETICAL,

18   AND WE HAVE LIMITED TIME, SO I'M GOING TO TRY TO GIVE AN

19   EXAMPLE.

20       BUT, AGAIN, WE'VE ASKED FOR MORE DATA, ASKED FOR MORE

21   INSIGHT, SO THIS IS A SIMPLE EXAMPLE.

22       SO ONE WOULD BE YOU ARE BROWSING IN INCOGNITO AND YOU SHOW

23   UP -- SORRY.

24       SO YOUR QUESTION WAS THE PSEUDONYMOUS ID'S APPEAR IN BOTH?

25   Q.   YES, SIR.

1    A.   SO MY UNDERSTANDING OF THE INCOGNITO TRAFFIC IS THAT THE,

2    OR THE WAY THAT THE LOGGING INFRASTRUCTURE WORKS IS THAT WHEN

3    YOU HAVE LOGGED OUT -- SO YOU'VE NOT LOGGED IN OR OPENED A NEW

4    CHROME SESSION, CHROME INCOGNITO SESSION -- YOUR DATA, AS I

5    TESTIFIED EARLIER, IS GOING INTO THE B LOGS, BISCOTTI LOGS.

6         HOWEVER, IF YOU SIGN IN DURING THAT SESSION, YOU CAN END

7    UP IN THE P LOGS WHERE YOU HAVE, NOW YOU HAVE -- YOU'VE SIGNED

8    IN.

9         AND THOSE, THOSE -- AND THE PSEUDONYMOUS ID'S, THE ID'S

10   THAT ARE FROM THE B LOGS, CAN THEN BE ENCRYPTED WITH THE

11   P LOGS.

12   Q.   AND YOU'RE AWARE THAT THE CLASS IN THIS CASE INCLUDES ONLY

13   USERS WHO WERE NOT SIGNED IN; CORRECT?

14   A.   SO I'M NOT GOING TO TESTIFY ON THE IN'S AND OUT'S OF THE

15   SPECIFICS OF THE CLASS.  I'M GOING TO TESTIFY ABOUT THE TESTING

16   THAT I DID AND THE IDENTIFICATION OF THE DATA.

17        AND YOU ASKED ME FOR AN EXAMPLE, AND THAT IS A SIMPLE

18   EXAMPLE TO ILLUSTRATE KIND OF WHAT I'M TALKING ABOUT ON THAT

19   SPECIFIC ROW.

20        THERE ARE OTHER WAYS TO LINK THESE COLUMNS, BUT ON THAT

21   SPECIFIC ROW, THAT'S A SIMPLE EXAMPLE.

22   Q.   MR. THOMPSON, MR. MAO ASKED YOU SOME QUESTIONS ABOUT LOGS.

23        DO YOU REMEMBER THAT?

24   A.   I REMEMBER WE TALKED ABOUT LOGS, YES.

25   Q.   AND YOU SAID, YOU KNOW, IF YOU'VE GOT A BIT LIKE THE ONE

1      WE'RE TALKING ABOUT, IT'S AS SIMPLE AS FLIPPING A SWITCH TO ADD

2      IT TO A LOG'S INFRASTRUCTURE.

3          DO YOU REMEMBER THAT?

4      A.   I THINK THERE'S A SLIDE WITH THAT, YES.

5      Q.   YEAH, IT HAD A LIGHT SWITCH ON IT.

6          SO IN, IN YOUR TIME AS A SELF-EMPLOYED COLLEGE GRADUATE,

7      HOW MANY LOGS HAVE YOU WORKED WITH THAT HAD A SHARED PROTO?

8      A.   CAN YOU EXPLAIN THAT?  HOW MANY LOGS?  HOW WOULD I

9      QUANTIFY A LOG?

10     Q.   WELL, YOU GUYS ARE -- STRIKE YOU GUYS.  I APOLOGIZE.

11         YOU'VE BEEN ASKING HERE FOR THE PRODUCTION OF CERTAIN

12     LOGS, SO WHATEVER TERM YOU'RE USING TO DESCRIBE THE LOGS THAT

13     YOU'RE SEEKING FROM GOOGLE.

14     A.   ALL RIGHT.  SO ARE YOU ASKING ABOUT HOW OFTEN HAVE I

15     WORKED WITH SHARED SCHEMAS GENERALLY?

16     Q.   YES, SIR.

17     A.   I'VE LOST COUNT.

18     Q.   AND HAVE YOU EVER -- CAN YOU LIST FOR ME THE TIMES IN

19     WHICH YOU'VE WORKED ON A SYSTEM IN WHICH HUNDREDS OF DIFFERENT

20     LOGS MANAGED BY DOZENS OF DIFFERENT TEAMS ASSOCIATED WITH

21     DOZENS OF DIFFERENT PRODUCTS BASED IN MULTIPLE DIFFERENT

22     LOCATIONS SHARED PROTOS?

23     A.   SO THAT'S A VERY SPECIFIC SCENARIO.

24         WHAT I'LL SAY IS THAT I CAN DESCRIBE SCENARIOS -- AND THIS

25     IS IN VARIOUS CONSULTANCIES THAT I WORK WITH NOW WHERE THERE

1    ARE DISTRIBUTED TEAMS SHARING INFORMATION, SHARING SCHEMAS,

2    WORKING WITH VARIOUS DIFFERENT SOURCE CODE TECHNOLOGIES THAT

3    MAKE DATA AVAILABLE TO EACH OTHER.

4    Q.   I'M SORRY.  I LOST THE SECOND HALF OF THAT.

5    A.   THERE ARE -- MAYBE I'LL JUST TRY TO REANSWER BECAUSE I'M

6    NOT SURE WHERE YOU LOST ME.

7    Q.   THANKS.

8    A.   SO I CAN TELL YOU IN MY VARIOUS ROLES AND THE PROJECTS

9    THAT I'VE WORKED ON, IT IS NOT UNCOMMON TO HAVE DISTRIBUTED

10   TEAMS IN VARIOUS TIME ZONES, VARIOUS AREAS, THAT ARE BOTH

11   SHARING RESOURCES, SHARING SOURCE CODE, SHARING SCHEMAS,

12   WRITING TO SIMILAR LOGS, WHETHER THEY ARE TEXT LOGS OR DATABASE

13   DRIVEN LOGS OR POTENTIALLY PROTO LOGS, COMMUNICATING BETWEEN

14   SYSTEMS USING THE SHARED SCHEMAS AND SCHEMAS THAT NEED TO BE

15   AGREED UPON.

16        AND, IN FACT, THE NOTION OF INHERITANCE, WHICH IS, BROADLY

17   SPEAKING, THE SHARED SCHEMA IN SOFTWARE ENGINEERING PARLANCE,

18   THAT IS VERY COMMON.

19   Q.   I BELIEVE YOU TOLD US EARLIER THAT YOU'VE BEEN MADE PRIVY

20   TO DOCUMENTS THAT HAVE -- THAT HAVE BEEN PRODUCED IN THIS

21   LITIGATION; IS THAT CORRECT?

22   A.   YES.

23   Q.   AND SO WERE YOU AWARE THAT IN JUNE OF 2021 GOOGLE PRODUCED

24   A DOCUMENT IDENTIFYING THE IS_CHROME_NON -- STRIKE THAT.

25        WHEN DID YOU BECOME AWARE THAT IN JUNE OF 2021 GOOGLE

1    PRODUCED A DOCUMENT THAT IDENTIFIED THE IS_CHROME_NON_INCOGNITO

2    BIT?

3    A.   SO YOU'RE ASKING ME WHEN I BECAME AWARE THAT GOOGLE

4    PRODUCED THE DOCUMENT?

5    Q.   YES, SIR.

6    A.   CAN I SEE THE DOCUMENT YOU'RE TALKING ABOUT?

7         MR. MAO:  MR. SCHAPIRO --

8         MR. SCHAPIRO:  THIS WILL TAKE A MOMENT.

9         (PAUSE IN PROCEEDINGS.)

10   BY MR. SCHAPIRO:

11   Q.   WHILE WE'RE PULLING UP THAT DOCUMENT, I'LL ASK YOU ABOUT A

12   FEW OTHERS, AND IF YOU CAN JUST TELL ME IF YOU'RE AWARE OF THEM

13   OR NOT, AND IF WE NEED TO SHOW THEM TO YOU, WE WILL.

14        WHEN, IF EVER, DID YOU BECOME AWARE THAT IN JUNE OF 2021

15   GOOGLE PRODUCED A DOCUMENT IDENTIFYING WHAT WE'RE CALLING HERE

16   THE PROJECT THAT LED TO THE MAYBE_CHROME_INCOGNITO BIT AND

17   IDENTIFYING MANDY LIU AS A PERSON WORKING ON IT?

18   A.   I WOULD NEED TO SEE THE DOCUMENT.

19   Q.   DO YOU HAVE ANY RECOLLECTION OF SEEING SUCH A DOCUMENT?

20   A.   I'VE SEEN -- I'VE SEEN MANDY LIU'S NAME AND I'VE SEEN

21   REFERENCES TO WHAT WE'RE CALLING THE PROJECT, BUT I CAN'T TELL

22   YOU -- I DON'T RECALL WHEN CERTAIN DOCUMENTS WERE --

23   Q.   AND, MR. THOMPSON, I THINK THE POSITION THAT YOU'RE TAKING

24   HERE AND THAT YOUR COUNSEL IS TAKING IS THAT THE

25   IS_CHROME_NON_INCOGNITO MODE IS IMPORTANT FOR YOUR WORK; IS

1    THAT RIGHT?

2    A.   I THINK IT'S -- YEAH, I THINK WE'VE IDENTIFIED THAT IT IS

3    RELEVANT AND USEFUL.

4    Q.   AND DO YOU REMEMBER WHEN YOU FIRST LEARNED ABOUT IT?

5    A.   I DON'T RECALL.

6    Q.   SO I'M GOING TO SHOW YOU, THIS IS GOING TO BE OUR

7    EXHIBIT A --

8         IT'S TAB 2 IN YOUR BINDER, YOUR HONOR.

9         IT'S TAB 2 IN THE BINDERS WE SHARED WITH YOU GUYS.

10        IT'S TAB 2.  I'VE GOT IT MARKED LIKE THIS, YOUR HONOR,

11   BECAUSE I'M PULLING IT HERE.

12        SO I DON'T THINK THIS IS --

13        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

14          MR. SCHAPIRO:  ALL RIGHT.  I SEE IT.

15   Q.   SO I'M GOING TO SHOW YOU WHAT --

16        MAY I APPROACH THE WITNESS, YOUR HONOR?

17          THE COURT:  YES, YOU MAY.

18   BY MR. SCHAPIRO:

19   Q.   -- WHAT WE'RE CALLING OUR EXHIBIT A (HANDING).

20   A.   THANK YOU.

21   Q.   I'M GOING TO ASK YOU IF YOU REMEMBER ROUGHLY, IT CAN BE

22   THIS YEAR, LAST YEAR, WHEN YOU FIRST SAW THAT DOCUMENT, WHICH I

23   WILL REPRESENT WAS PRODUCED TO PLAINTIFFS ON JUNE 18TH, 2021.

24   A.   DO YOU MIND IF I TAKE A SECOND?

25   Q.   PLEASE DO.

1              THE COURT:  MR. SCHAPIRO, DO YOU WANT TO IDENTIFY

2     THAT BY BATES NUMBER?  CAN YOU DO THAT?

3              MR. SCHAPIRO:  YEAH.  CAN WE -- YOU CAN SHOUT IT.

4     THIS IS YOUR MOMENT IN THE SPOTLIGHT.

5         (LAUGHTER.)

6              MR. FORTENBERY:  YOUR HONOR, IT'S GOOGLE BROWN

7     00176433.

8              THE COURT:  THANK YOU.

9              MR. FORTENBERY:  THANK YOU.

10    BY MR. SCHAPIRO:

11    Q.   HAVE YOU HAD A CHANCE TO LOOK AT IT?

12    A.   I HAVE, YES.  THANK YOU.

13    Q.   AND AT THE BACK, THAT DOCUMENT IDENTIFIES THE

14    IS_CHROME_NON_INCOGNITO MODE.

15        DO YOU SEE THAT?

16    A.   YES, I SEE.

17    Q.   AND DO YOU RECALL WHEN YOU WERE FIRST MADE AWARE OF THAT

18    DOCUMENT AS ONE OF PLAINTIFFS' EXPERTS?

19    A.   SO I DO NOT.  I RECALL SEEING IT THIS WEEK, BUT I DON'T

20    RECALL THE FIRST TIME I SAW IT.

21    Q.   SO WERE YOU INVOLVED, AS AN EXPERT, IN ANY OF THE BRIEFING

22    THAT PLAINTIFFS PREPARED ABOUT THE X-CLIENT DATA HEADER?

23    A.   WHICH BRIEFING IS THIS?

24    Q.   BRIEFING IN JULY OF 2021.

25    A.   I DON'T RECALL.

1    Q.   AND SO IF YOU DON'T RECALL, I ASSUME YOU ALSO DON'T RECALL

2    WHETHER THIS DOCUMENT OR THE DOCUMENTS IDENTIFYING MANDY LIU

3    WERE ACTUALLY CITED IN YOUR BRIEFS IN JULY OF 2021, BECAUSE YOU

4    DON'T KNOW IF YOU WORKED ON THAT BRIEF?

5    A.   YEAH, I DON'T RECALL.

6    Q.   WOULD X-CLIENT DATA HEADER BE A TOPIC AS TO WHICH YOU'D BE

7    INVOLVED IN THE BRIEFING AS ONE OF THE PLAINTIFFS' EXPERTS?

8    A.   POTENTIALLY.  I --

9    Q.   GO AHEAD.

10   A.   NO, I -- PART OF MY ROLE IS ANSWERING QUESTIONS, AND

11   X-CLIENT DATA HEADER HAS BEEN A TOPIC THAT'S DISCUSSED.

12        BUT I CAN'T -- I DON'T RECALL THE SPECIFICS OF THAT

13   BRIEFING.

14   Q.   SO JUST TO SAVE TIME, I'M GOING TO ASSUME THAT, AT LEAST

15   AS YOU SIT HERE TODAY, BUT TELL ME IF I'M WRONG -- OR I'LL JUST

16   ASK YOU, DO YOU REMEMBER SEEING ANY DOCUMENTS IN SEPTEMBER --

17   IN SEPTEMBER, OCTOBER, NOVEMBER OF LAST YEAR, JUST LAST FALL,

18   SUCH AS THE DESIGN DOCUMENTS UNDERLYING THE

19   MAYBE_CHROME_INCOGNITO BIT?

20   A.   I DON'T RECALL.

21             MR. SCHAPIRO:  I THINK THAT'S ALL I HAVE, YOUR HONOR.

22             THE COURT:  THANK YOU.  MR. MAO?

23             MR. SCHAPIRO:  OH, IS THAT ALL I HAVE?

24   HANG ON.

25             (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

1    BY MR. SCHAPIRO:

2    Q.   JUST A HANDFUL OF QUESTIONS PROVIDED BY THE TEAM.

3         YOU MENTIONED THAT YOU LOOKED AT RELEVANT DOCUMENTS IN

4    PREPARING YOUR REPORT.

5         HAVE YOU TAKEN A LOOK AT ALL AT DR. SADOWSKI'S TESTIMONY

6    IN THIS CASE?

7    A.   I HAVE REVIEWED IT, YES.

8    Q.   AND SHE TESTIFIED THAT THE IS_CHROME_NON_INCOGNITO BIT IS

9    BASED ON THE ABSENCE OF THE X-CLIENT DATA HEADER; CORRECT?

10   A.   AGAIN, I WOULD LIKE A SPECIFIC -- I'D LIKE TO REVIEW IT IF

11   YOU'RE TALKING ABOUT SOMETHING SPECIFIC.

12        BUT I DO REMEMBER THAT TOPIC.

13   Q.   YOU REMEMBER THAT TOPIC CAME UP AT LEAST.  AND DO YOU

14   DISAGREE THAT THE IS_CHROME_NON_INCOGNITO IS BASED ON THE

15   ABSENCE OF X-CLIENT DATA HEADER?

16   A.   I ACTUALLY HAVE NOT SEEN SOURCE CODE OR ALGORITHM FOR THE

17   BIT, SO I CAN'T REALLY COMMENT ON THAT.

18   Q.   SO YOU DON'T KNOW ONE WAY OR THE OTHER?

19   A.   I DON'T KNOW FOR SURE.

20   Q.   WHEN YOU SAY YOU DON'T KNOW FOR SURE, DO YOU MEAN YOU HAVE

21   AN INKLING?

22   A.   AS SOMEONE WHO'S AN ENGINEER AND WE'RE TALKING ABOUT AN

23   ALGORITHM, I WOULD LIKE TO UNDERSTAND, IF YOU'RE GOING TO ASK

24   ME, UNDER OATH, WHAT'S INVOLVED, RIGHT, SO I'D LIKE TO SEE THE

25   SPECIFICS OF HOW IT'S CALCULATED TO COMMENT YES OR NO TO ANSWER

1      YOUR QUESTION.

2                MR. SCHAPIRO:  THANKS.  NOTHING FURTHER.

3                THE COURT:  THANK YOU, MR. SCHAPIRO.

4           BRIEF REDIRECT, MR. MAO?

5                MR. MAO:  YES, BRIEF.  THANK YOU, YOUR HONOR.

6           I'M SO SORRY.  IS IT OKAY IF I HAVE THIS OFF?

7                THE COURT:  YES.

8                MR. MAO:  THANK YOU.

9                       **REDIRECT EXAMINATION**

10     BY MR. MAO:

11     Q.   MR. THOMPSON, WITH REGARD TO I.P. ADDRESSES, IPV6

12     ADDRESSES DO INDIVIDUALLY IDENTIFY DEVICES; IS THAT CORRECT?

13     A.   SO THE ISSUING SCHEMA, OR ISSUING SYSTEM FOR IPV6

14     ADDRESSES IS DIFFERENT THAN FOR IPV4.  I BELIEVE MR. SCHAPIRO

15     SAID THEY'RE LONGER, WHICH IS TRUE, AND IPV6'S, YES, USUALLY DO

16     UNIQUELY IDENTIFY A DEVICE.  THEY CAN BE USED TO UNIQUELY

17     IDENTIFY A DEVICE.

18     Q.   AND EVEN IN THE SAME HOUSEHOLD, PEOPLE WITH DIFFERENT

19     DEVICES WOULD HAVE DIFFERENT IPV6 ADDRESSES; ISN'T THAT

20     CORRECT?

21     A.   THAT'S CORRECT, BECAUSE OF THE WAY THAT THEY'RE ISSUED,

22     YES.

23     Q.   OKAY.  AND WITHIN YOUR HOUSEHOLD, DO YOU THINK THAT EACH

24     OF THE MEMBERS OF YOUR HOUSEHOLD KNOW WHICH DEVICES ACTUALLY

25     BELONG TO THEM?

1    A.   YES.

2    Q.   IF WE COULD PUT BACK UP THE "JOINING ABILITY" SLIDE, I

3    THINK THAT'S WHAT IT'S CALLED.  OH, YES, THE "JOINING DATA"

4    SLIDE.

5         WE'RE LOOKING AT PSEUDONYMOUS ID'S, LET'S SAY INSTEAD OF

6    LOOKING TOWARD THE LEFT OF THIS PAGE, WE LOOK AT THE RIGHT OF

7    THIS PAGE, B LOGS AND ANALYTICS LOGS.

8         WOULD PPID'S AND UID'S BE A TYPE OF POTENTIALLY

9    PSEUDONYMOUS ID?

10   A.   NO.  THEY WOULD FALL IN THE LAST COLUMN.

11   Q.   OKAY.  DO THIRD PARTY --

12   A.   THE LAST ROW -- EXCUSE ME -- THE LAST ROW.

13   Q.   DO THIRD PARTY AUTHENTICATED ID'S APPEAR IN B LOGS?

14   A.   WE HAVE SEEN LOGS THAT ARE KEYED BY THE SAME KEY THAT WAS

15   KEYED IN B LOG THAT CONTAIN THIRD PARTY ID'S YES.

16   Q.   RIGHT.  AND WOULD P LOGS OBTAIN THIRD PARTY AUTHENTICATED

17   ID'S?

18   A.   THE SAME ANSWER, YES.

19   Q.   SO PRESUMABLY IF YOU LOG IN, IN YOUR HYPOTHETICAL, TO A

20   THIRD PARTY WEBSITE, YOU CAN JOIN THE PROFILES AND THE DATA

21   ACROSS THOSE DIFFERENT SESSIONS; ISN'T THAT CORRECT?

22   A.   YOU WOULD HAVE RECORDS THAT EXISTED IN BOTH WORLDS THAT

23   HAD THE SAME IDENTIFIERS.

24   Q.   WHEN YOU SAY "KEY," RIGHT, WHEN YOU WERE LOOKING TO TRY TO

25   ASSESS THIS DATA, AS WE HAVE PREVIOUSLY HEARD YOU SAY, IT

1    MATTERS IN TERMS OF THE FORMAT IN WHICH EACH OF THESE -- IN

2    WHICH EACH OF THESE ID'S ARE ACTUALLY STORED; ISN'T THAT

3    CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   IN ORDER FOR US TO FIND THOSE ID'S, YOU WOULD NEED TO KNOW

6    HOW THEY'RE STORED; ISN'T THAT CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   MR. SCHAPIRO HAD REFERRED YOU TO WHAT WAS AN EXHIBIT

9    NUMBER 2.

10        CAN WE PUT THAT BACK UP?

11            THE COURT:  SO I THINK, JUST TO BE CLEAR, IT'S

12   EXHIBIT A AT TAB 2.

13        IS THAT RIGHT?

14            MR. SCHAPIRO:  YES, IT'S OUR EXHIBIT A.

15            THE COURT:  IT'S THEIR EXHIBIT A.

16            MR. MAO:  OH, SORRY.

17            THE COURT:  BUT IT IS TAB 2 IN THE EXHIBIT BINDER.

18            MR. MAO:  MAY I JUST MAKE THAT PART OF THE RECORD AS

19   EXHIBIT NUMBER 191?  IS THAT OKAY?  BECAUSE WE HAVE A --

20            THE COURT:  YOU MEAN YOU'RE USING PLAINTIFF -- YOU'RE

21   USING NUMBERS AND THE DEFENDANTS ARE USING LETTERS.

22            MR. MAO:  YEAH, OKAY.

23            THE COURT:  SO IT IS DEFENDANT'S EXHIBIT A.

24            MR. SCHAPIRO:  I THINK WE ALREADY LABELED IT.

25            MR. MAO:  OKAY.  SO FOR US, IT WOULD BE EXHIBIT

1    NUMBER 90, IF WE COULD PULL THAT FROM PLAINTIFFS' SIDE.

2         I'M SORRY, YOUR HONOR.  I'M TRYING TO MAKE SURE WE'RE

3    TALKING ABOUT THE SAME DOCUMENT.

4    Q.   WOULD YOU MIND LOOKING AT EXHIBIT NUMBER 90 JUST THERE ON

5    THE SCREEN?  I JUST WANT TO MAKE SURE.

6         THAT DOES APPEAR TO BE THE SAME DOCUMENT.  IS THAT SHOWING

7    UP ON YOUR SIDE OF THE SCREEN?

8    A.   YES, I'VE GOT IT, AND THE SECTION LOOKS THE SAME.

9    Q.   CAN YOU DO ME A FAVOR?  YOU SEE ABOUT TWO ROWS DOWN,

10   THERE'S A STATEMENT FROM MR. PEARSON UP TOP UP IN THE MIDDLE

11   THERE?

12   A.   YES.

13   Q.   WHAT DOES THAT SAY?  CAN YOU READ THAT INTO THE RECORD,

14   PLEASE?

15   A.   THIS SAYS, "MARK PEARSON, FYI:  FOR CHROME USERS, IT'S

16   TECHNICALLY POSSIBLE ON THE SEARCH SIDE TO DISTINGUISH BETWEEN

17   INCOGNITO AND NON-INCOGNITO SESSIONS ENTIRELY INDEPENDENTLY

18   FROM THE COOKIE STATE.  IT HAS TO DO WITH WHAT OTHER HEADERS

19   CHROME SENDS TO GOOGLE.  AS SUCH, SOME SERVER-SIDE METRICS

20   (E.G. METRICS IN RASTA) CAN BE CALCULATED SLICED BY INCOGNITO

21   STATUS FOR CHROME."

22        SHOULD I KEEP GOING?

23   Q.   NO.

24        CAN WE ALSO GO TO THE BOTTOM OF THIS DOCUMENT.  CAN YOU

25   HIGHLIGHT NUMBER 2 FOR MR. PEARSON?

```
 1          CAN YOU READ THAT INTO THE RECORD, PLEASE?
 2     A.   SURE THING.  "REGARDING PEOPLE WHO DO THIS, I SUGGEST
 3     SEARCHING FOR 'X-CLIENT-DATA' IN INTERNAL CODE SEARCH AND
 4     LOOKING FOR PAGES THAT INCLUDE THE MENTION OF INCOGNITO.  THE
 5     LAST TIME I SEARCHED FOR X-CLIENT-DATA, I FOUND A FEW MENTIONS
 6     THAT SEEMED TO BE USING THIS FOR SNIFFING OUT INCOGNITO USERS."
 7     Q.   OKAY.  SO MY QUESTION TO YOU IS, WHEN YOU'RE LOOKING AT
 8     THIS SECOND PARAGRAPH HERE, RIGHT, WOULD YOU HAVE KNOWN WHETHER
 9     OR NOT THE DATA IN WHICH MR. PEARSON IS REFERRING TO, WHERE
10     THEY ACTUALLY SIT IN TERMS OF A SCHEMA OR A LOG?
11     A.   NO.
12     Q.   LOOKING AT THIS, MR. THOMPSON, WOULD YOU KNOW THE FORMAT
13     BY WHICH THE DATA HE'S REFERRING TO IS ACTUALLY STORED?
14     A.   NO.
15     Q.   LOOKING AT THIS, MR. THOMPSON, WOULD YOU KNOW HOW TO
16     STRUCTURE A QUERY TO SEARCH AGAINST THE GOOGLE DATA IN ORDER TO
17     FIND WHAT MR. PEARSON IS REFERRING TO?
18     A.   NO.
19     Q.   OKAY.  LET'S GO BACK UP TO THE TOP OF THAT PAGE AGAIN.
20          IF WE ASSUME THAT MR. MARK PEARSON IS A GOOGLE EMPLOYEE,
21     AM I RIGHT IN SAYING THAT WHEN I READ THIS PARAGRAPH, IT
22     SUGGESTS TO ME THAT MR. PEARSON IS ACKNOWLEDGING THAT INCOGNITO
23     AND NON-INCOGNITO SESSIONS COULD BE JOINED?
24               MR. SCHAPIRO:  OBJECTION TO THE FORM OF THE QUESTION.
25               THE WITNESS:  I'M SORRY.  THIS IS --
```

1          THE COURT:  HOLD ON JUST A SECOND, MR. THOMPSON.

2          MR. MAO:  THAT SAME PARAGRAPH RIGHT THERE.

3          THE COURT:  WHY DON'T YOU REPHRASE THAT?  NOW YOU'RE

4    ASKING HIM WHETHER --

5          MR. MAO:  SURE.  LET ME BRING IT BACK A LITTLE BIT.

6    Q.   LOOKING AT THAT PARAGRAPH, MR. PEARSON IS SAYING THAT

7    GOOGLE CLEARLY TRACKS INCOGNITO USERS IN TERMS OF THEIR

8    INCOGNITO USAGE; ISN'T THAT CORRECT?

9    A.   SPECIFICALLY WITHIN THE NOTE -- LET'S SEE.  SO, YEAH, HE

10   SAYS THAT -- I DO SEE WHAT -- I DO SEE WHERE HE SAYS THAT

11   PEOPLE MIGHT BE DOING IT IN THE LOGS, LOGS ANALYSIS CODE.

12         MR. MAO:  THANK YOU, YOUR HONOR.

13      THANK YOU, MR. THOMPSON.

14         MR. SCHAPIRO:  ONE QUESTION, YOUR HONOR.

15         THE COURT:  ONE QUESTION, MR. SCHAPIRO.

16                         **RECROSS-EXAMINATION**

17   BY MR. SCHAPIRO:

18   Q.   MR. THOMPSON, AFTER YOU FIRST SAW THAT -- TWO QUESTIONS.

19   SORRY.

20      MR. MAO SUGGESTED THAT THERE WAS SOME FOLLOW-UP

21   INFORMATION YOU MIGHT NEED TO FULLY UNDERSTAND THAT DOCUMENT.

22      DO YOU RECALL HIM SAYING COULD YOU DETERMINE THE SCHEMA,

23   OR WHATEVER IT MIGHT BE?

24   A.   I DO RECALL THAT, YES.

25   Q.   SO AFTER YOU FIRST SAW THAT DOCUMENT, WHICH WAS PRODUCED

1    TO THE PLAINTIFFS LAST SUMMER, WHAT DID YOU DO?  DID YOU ASK

2    FOR THOSE THINGS?

3    A.   SO, AGAIN, I DON'T RECALL WHEN I FIRST SAW THIS.  I KNOW

4    THAT WHEN I REVIEWED IT AGAIN THIS WEEK, WHICH I DON'T REMEMBER

5    WHEN I FIRST SAW IT, THERE IS -- IT IS UNCLEAR WHERE THIS DATA

6    IS BEING STORED, WOULD LIVE, OR HOW IT WOULD BE FORMATTED.

7             MR. SCHAPIRO:  THAT'S ALL.  THANK YOU.

8             THE COURT:  THANK YOU.

9             THE WITNESS:  THANK YOU.

10            THE COURT:  YOU MAY STEP DOWN, MR. THOMPSON.

11            MR. SCHAPIRO:  YOUR HONOR, ANY CHANCE FOR A FIVE

12   MINUTE --

13            THE COURT:  YEAH.  WE HAD TALKED ABOUT TAKING A 20

14   MINUTE BREAK AND RESUMING.

15        MR. BOIES, WHAT -- HOW MUCH DO PLAINTIFFS HAVE LEFT?

16            MR. BOIES:  I WOULD ESTIMATE, YOUR HONOR, PROBABLY

17   45, 55 MINUTES.

18            THE COURT:  AND IS THAT ARGUMENT?  IS THAT --

19            MR. BOIES:  THAT'S NOT WITNESS TESTIMONY.  IT IS

20   PRESENTATION, ARGUMENT AND EXHIBITS AND MATERIALS.

21            THE COURT:  ALL RIGHT.

22            MR. BOIES:  AND PROFFERS.

23            THE COURT:  ALL RIGHT.  LET'S TAKE OUR 20 MINUTE

24   BREAK, AND I'M GOING TO REMIND THE PARTIES OF THE TIME

25   ESTIMATES THAT WE DISCUSSED LAST WEEK.  AND WE'VE NOW BEEN

1    GOING TWO FULL HOURS, AND OBVIOUSLY SOME OF THAT WAS IN

2    CROSS-EXAMINATION, BUT WE NEED TO MOVE THIS ALONG PERHAPS MORE

3    QUICKLY.

4         AND THAT'LL BE AS FOR BOTH SIDE.  ALL RIGHT?

5              MR. BOIES:  THANK YOU, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  WE'LL TAKE 20 MINUTES.  THANK

7    YOU.

8         (RECESS FROM 12:36 P.M. UNTIL 1:01 P.M.)

9              THE CLERK:  REMAIN SEATED AND COME TO ORDER.  COURT

10   IS BACK IN SESSION.

11             THE COURT:  NOT WITHOUT DEFENSE COUNSEL, IT'S NOT.

12             THE CLERK:  OH, THEY WERE HERE A MINUTE AGO.

13             MR. MAO:  YOUR HONOR, IS IT OKAY IF I GET SOME WATER?

14             THE COURT:  OF COURSE.

15             MR. MAO:  THANK YOU.

16        (PAUSE IN PROCEEDINGS.)

17             THE COURT:  ALL RIGHT.

18        MR. BOIES.

19             MR. BOIES:  THANK YOU, YOUR HONOR.

20             MR. SCHAPIRO:  YOUR --

21             THE COURT:  EXCUSE ME?  NO?

22        MR. BOIES, YOU'RE ON.

23             MR. BOIES:  THANK YOU, YOUR HONOR.

24        LET ME, JUST AS A HOUSEKEEPING MATTER, OFFER THE EXHIBITS

25   THAT WE'VE MENTIONED, BUT I THINK MAY NOT HAVE BEEN OFFERED.

```
1            EXHIBITS 15, 19, 20, 75, 87, AND 88, AND DEFENDANT'S

2     EXHIBIT A.

3            THE COURT:  I'M SORRY.  READ THOSE AGAIN, PLEASE.

4     15, 19?

5            MR. BOIES:  PLAINTIFFS' EXHIBITS 15, 19, 20, 87, 88,

6     75, AND DEFENDANT'S EXHIBIT A.

7            THE COURT:  ALL RIGHT.  THOSE ARE OFFERED.

8         ANY OBJECTION?

9            MR. SCHAPIRO:  NO OBJECTION, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  THOSE WILL BE ADMITTED.

11          (PLAINTIFFS' EXHIBITS 15, 19, 20, 75, 87, 88, AND

12    DEFENDANT'S A WERE ADMITTED IN EVIDENCE.)

13           THE COURT:  THANK YOU, MR. BOIES.  PLEASE PROCEED.

14           MR. BOIES:  THANK YOU, YOUR HONOR.

15           THE COURT:  MINDFUL OF THE TIME.

16           MR. BOIES:  MINDFUL OF THE TIME.  I'LL TRY TO GO

17    FASTER.

18           THE COURT:  THAT DOESN'T MEAN TALK FASTER.

19           MR. BOIES:  I KNOW.  I WILL TRY TO RESIST THAT.

20           THE COURT:  THANK YOU.

21           MR. BOIES:  LET ME BEGIN WITH GOING THROUGH THE LIST

22    OF THE POINTS THAT WE MADE THAT WE THINK REPRESENT DISCOVERY

23    LAPSES ON GOOGLE'S PART.

24           THE COURT:  UM-HUM.

25           MR. BOIES:  AND FIRST, AND IF YOU WOULD PUT UP
```

1   CHART 6, OR CHART A, CHART A, AND THIS HAS TO DO WITH THEIR

2   FAILING TO IDENTIFY RELEVANT PEOPLE.

3       AND THE FIRST SET THAT THEY GAVE US WAS FEBRUARY 4TH,

4   2021, IN RESPONSE TO OUR RFP 11 AND 12.

5       AND WHAT COUNSEL IN THE OPENING SAID WAS THEY DIDN'T KNOW

6   AT THAT TIME THAT LIAO, LEUNG, LIU, AND FIARD AND THE WHOLE

7   PRIVATE BROWSING AREA WAS RELEVANT.

8       WE THINK THERE ARE A NUMBER OF THINGS INCONSISTENT IN

9   THAT, YOUR HONOR.

10      BUT IN ANY EVENT, PLAINTIFFS' INTERROGATORY NUMBER 4 THAT

11  WE SERVED ON FEBRUARY 26TH, 2021, IN 4C ASKED THEM TO IDENTIFY

12  ALL OF THE PEOPLE THAT WERE KNOWLEDGEABLE ABOUT, AND I'LL READ

13  THIS, QUOTE, "GOOGLE'S COLLECTION OF AND USE OF DATA IN

14  CONNECTION WITH USERS' ACTIVITY WHILE IN A PRIVATE BROWSING

15  MODE, INCLUDING WITH RESPECT TO GOOGLE COOKIES, GOOGLE

16  ANALYTICS, GOOGLE AD MANAGER, G STATIC, APPROVED PIXELS, AND

17  ANY GOOGLE PRODUCTS OR SERVICES THAT COLLECT AND USE SUCH

18  DATA."

19      THERE COULD NOT HAVE BEEN ANY DOUBT, AS OF FEBRUARY 26TH,

20  2021, THAT THESE FIELDS, IS_CHROME_INCOGNITO,

21  IS_CHROME_NOT_INCOGNITO, MAYBE_CHROME_INCOGNITO, THERE COULD

22  NOT HAVE BEEN ANY DOUBT AS OF FEBRUARY 26TH, 2021, THAT THAT

23  WAS RELEVANT.

24      AND ON MARCH 29, 2021, THEY GAVE US A RESPONSE TO

25  INTERROGATORY 4 AND THEY GAVE US EIGHT MORE NAMES.  THEY

1    REFERENCED THE ORIGINAL LIST OF 226 AND THEY GAVE US EIGHT MORE

2    NAMES, BUT DID NOT INCLUDE ANY OF THESE FOUR PEOPLE.

3         NOW, MOREOVER, WE KNOW, FOR EXAMPLE, FROM A PRIVILEGE LOG

4    THAT ON FEBRUARY 1ST, 2021, ALMOST TWO MONTHS BEFORE THE

5    INTERROGATORY RESPONSE, MR. LEUNG WAS ALREADY IN COMMUNICATIONS

6    WITH COUNSEL IN THIS CASE.

7         WE ALSO KNOW, FROM THE METADATA OF AN EXHIBIT THAT WAS --

8    A DOCUMENT THAT WAS GIVEN US ON SEPTEMBER 1ST OF LAST YEAR,

9    THAT'S EXHIBIT 109, WE KNOW FROM EXHIBIT 109'S METADATA THAT

10   THIS WAS PREPARED IN JANUARY OF 2021, PREPARED IN JANUARY OF

11   2021.

12        THIS IS A DOCUMENT THAT IDENTIFIES LIAO, LEUNG, AND LIU AS

13   PEOPLE WITH KNOWLEDGE, BUT THIS WAS ONLY GIVEN TO US ON

14   SEPTEMBER 1ST, 2021.  AND INCIDENTALLY, IT WAS GIVEN TO US AS

15   ONE OF 894,000 DOCUMENTS GIVEN TO US THAT DAY, BURIED IN THAT

16   PRODUCTION.

17        BUT THAT WAS, IN ANY EVENT, AFTER THE DEADLINE FOR THE

18   IDENTIFICATION OF CUSTODIANS, AND IT WAS SOMETHING THAT WAS, AT

19   THAT STAGE WHEN WE FINALLY GOT IT, OF LIMITED UTILITY.

20        NOW, LET ME GO ON TO EXHIBIT 15, WHICH THE COURT HAS SEEN

21   BEFORE.

22        THIS GOES TO THE POINT THAT THEY ALSO DIDN'T PRODUCE

23   DOCUMENTS, AND I HAVE NOT HEARD IN THEIR OPENING, AND WE'VE NOT

24   SEEN IN THEIR PAPERS -- NOT THEIR BRIEFS, NOT THEIR PROPOSED

25   FINDINGS -- ANY DISAGREEMENT WITH THE FACT THAT THEY DID NOT

1    PRODUCE A SINGLE DOCUMENT MENTIONING OR REFERRING TO OR

2    RELATING TO THE IS_CHROME_INCOGNITO FIELD.

3         THEY STILL HAVEN'T.  THEY'VE GIVEN US NO EXPLANATION FOR

4    WHY THAT DIDN'T HAPPEN.

5         AND, YOU KNOW, I SUBMIT THAT WHATEVER ELSE THEY PRODUCED,

6    THAT BY ITSELF IS SOMETHING THAT IS A SERIOUS FAILURE IN

7    PROVIDING THE DISCOVERY THAT WE'RE ENTITLED TO GET.

8         NEXT, LET ME GO TO THE DECLARATION AND PUT UP CHART 25.

9         THE COURT WILL RECALL THAT ON NOVEMBER 12TH, 2021, THE

10   COURT, IN RESPONSE TO ARGUMENTS THAT WE HAD MADE, ORDERED THAT

11   GOOGLE, THE COURT SAID, "GOOGLE SHALL PROVIDE A DECLARATION,

12   UNDER PENALTY OF PERJURY FROM GOOGLE, NOT COUNSEL, THAT, 1.  TO

13   THE BEST OF ITS KNOWLEDGE, GOOGLE HAS PROVIDED A COMPLETE LIST

14   OF DATA SOURCES THAT CONTAIN INFORMATION RELEVANT TO

15   PLAINTIFFS' CLAIMS."

16        AND ON THE 18TH OF THAT MONTH, GOOGLE PROVIDED THAT

17   DECLARATION.

18        NOW, THAT DECLARATION -- IF WE GO TO CHART 17, THAT

19   DECLARATION DID NOT LIST THREE CHARTS, THREE GOOGLE -- THREE

20   GOOGLE LOGS THAT INCLUDED THE IS_CHROME_NON_INCOGNITO FIELD,

21   DID NOT INCLUDE TWO LOGS THAT INCLUDED THE IS_CHROME_INCOGNITO

22   FIELD, AND DID NOT INCLUDE 17 LOGS THAT INCLUDED THE

23   MAYBE_CHROME_INCOGNITO FIELD.

24        AND THERE CANNOT BE ANY DOUBT IN ANYBODY'S MIND, AS OF

25   NOVEMBER 18TH, 2021, THAT THIS WAS RELEVANT.

1          THE COURT WILL RECALL THAT ON JULY 9TH OF 2021, PLAINTIFFS

2     HAD SUBMITTED A BRIEF -- IN FACT, IN THEIR PAPERS TO THIS COURT

3     ON THIS MOTION, THE DEFENDANT REFERS TO THIS BRIEF -- WE

4     PROVIDED A BRIEF THAT LAID OUT EXACTLY WHY ALL OF THESE BITS OR

5     FIELDS WOULD BE RELEVANT.

6          WE DIDN'T KNOW WHAT THEY WERE AT THAT POINT.  WE HAD A --

7     WE HAD ONE REFERENCE.  AT THAT POINT WE HAD ONE REFERENCE TO

8     MADE -- TO IS_CHROME_NON_INCOGNITO FIELD, ONE DOCUMENT, AND A

9     FEW DOCUMENTS THAT MENTIONED THE MAYBE.

10         AND WHAT WE WERE ASKING FOR IS THAT INFORMATION, AND WE

11    MADE CLEAR WHY WE THOUGHT THAT WAS RELEVANT.

12         AND THAT'S IN EXHIBIT 63 WHICH I WOULD OFFER.

13              MR. SCHAPIRO:  NO OBJECTION.

14              THE COURT:  ALL RIGHT.  LET ME FIND EXHIBIT 63.

15              MR. BOIES:  SO --

16              THE COURT:  HANG ON ONE MINUTE.

17         (PAUSE IN PROCEEDINGS.)

18              THE COURT:  EXHIBIT 3 IS THE SUBMISSION; RIGHT?

19              MR. BOIES:  EXHIBIT 63, YES.

20              THE COURT:  OKAY.

21              MR. BOIES:  AND I RESPECTFULLY SUBMIT THAT NO ONE,

22     AFTER READING THIS, COULD DOUBT THAT WE CONSIDERED THESE

23     FIELDS, TO THE EXTENT THEY EXISTED, TO BE RELEVANT.

24         THE -- YOU KNOW, FOR EXAMPLE, ONE OF THE THINGS WE SAY IN

25     FOUR, "GOOGLE MAINTAINS SYSTEM AND PROCESS TO IDENTIFY

1    INCOGNITO BROWSING."

2         THERE COULD NOT HAVE BEEN ANY DOUBT THAT AT THAT POINT --

3    WE THINK FAR, FAR EARLIER THAN THAT, WE THINK THAT WAS CLEAR

4    FROM OUR INTERROGATORY NUMBER 4 FROM BACK IN FEBRUARY OF

5    2021 -- BUT THERE CERTAINLY COULD NOT HAVE BEEN ANY DOUBT THAT

6    THESE LOGS WERE RELEVANT.

7         GOOGLE, IN ITS PAPERS, IN ITS PROPOSED FINDINGS, DOES NOT

8    DISPUTE THAT THESE LOGS WEREN'T PRODUCED AND GIVES NO

9    EXPLANATION FOR WHY THESE LOGS WEREN'T PRODUCED.

10        NOW, TO GO BACK TO CHART NUMBER 25, THIS COURT'S

11   NOVEMBER 12, 2021 ORDER ALSO ORDERED GOOGLE TO PROVIDE THE

12   SPECIAL MASTER FULL SCHEMAS AND A LIST OF ALL FIELDS, AND THE

13   COURT CAPITALIZED "ALL" FIELDS, WITH THEIR DESCRIPTIONS.

14        AND THAT, OF COURSE, WAS NOT DONE.  THE ONLY TWO LOGS THAT

15   WERE IDENTIFIED IN GOOGLE'S DECLARATION THAT INCLUDED ANY OF

16   THE INCOGNITO FIELDS, THE ONLY TWO, THEY DID NOT IDENTIFY THOSE

17   FIELDS TO US.

18        AND YOU'VE HEARD THE EXPLANATION THAT THEY WENT TO THE

19   SPECIAL MASTER AND TOLD THE SPECIAL MASTER THAT THEY ONLY HAD

20   TO DO THE TOP 100 BECAUSE THERE WAS TOO MUCH BURDEN TO DO MORE.

21        WE'RE NOT AWARE, OBVIOUSLY, OF WHAT THEY SAID IN THEIR EX

22   PARTE COMMUNICATIONS WITH THE SPECIAL MASTER.

23        BUT WE DOUBT HIGHLY THAT THEY TOLD THE SPECIAL MASTER

24   ANYTHING ABOUT THESE INCOGNITO FIELDS.  WE DOUBT VERY HIGHLY

25   THAT THEY TOLD THE SPECIAL MASTER THERE ARE THESE ONE BIT

1    FIELDS THAT ARE CLEARLY RELEVANT UNDER WHAT THE PLAINTIFFS HAVE

2    BEEN TRYING TO GET, WHAT THE PLAINTIFFS ASKED FOR IN

3    INTERROGATORY NUMBER 4, WHAT THE PLAINTIFFS ASKED FOR IN

4    EXHIBIT 63, WE DOUBT VERY HIGHLY THAT THEY TOLD THE SPECIAL

5    MASTER THESE ONE BIT FIELDS EXISTED HERE, THESE RELEVANT ONE

6    BIT FIELDS EXISTED HERE, BUT WE SHOULDN'T HAVE TO PRODUCE THEM.

7         LET ME GO TO THE LIAO DEPOSITION AND PUT UP CHART 18.

8         AND I -- I WOULD REFER TO SOME OF THESE PORTIONS, BUT I

9    WOULD ASK THE COURT TO READ PAGES 133 TO 140 OF MR. LIAO'S

10   DEPOSITION.

11        AND I RESPECTFULLY SUBMIT THAT YOU CANNOT READ THOSE PAGES

12   AND UNDERSTAND THAT GOOGLE HAD, AT THE VERY TIME THAT THIS

13   DEPOSITION WAS GOING ON, A PROGRAM OF LOGGING THE

14   MAYBE_CHROME_INCOGNITO SIGNAL, TRACKING IT, IMPLEMENTING IT,

15   AND ULTIMATELY CONCLUDING THAT IT WAS ACCURATE IN RECORDING THE

16   USAGE OF INCOGNITO.

17        HE TALKS ABOUT IT BEING A HYPOTHETICAL SIGNAL.  HE TALKS

18   ABOUT THERE BEING NO SUCH FURTHER ACTION WAS TAKEN TO BUILD

19   SUCH A HYPOTHETICAL SIGNAL.

20        AND YET, AT THE SAME TIME THAT THAT WAS GOING ON, THEY HAD

21   THESE LOGS THAT LOGGED THAT SIGNAL AND THEY WERE TRACKING THAT

22   INFORMATION TO TRY TO DETERMINE WHETHER IT WAS CONSISTENT WITH

23   WHAT THEY KNEW TO BE THE OVERALL USAGE OF INCOGNITO.

24        THE COURT WILL RECALL FROM THE OPENING, I SHOWED THE CHART

25   IN WHICH THEY SAID THAT 3.08 PERCENT USAGE WAS THE TRUE GROUND

1    ZERO, AND THEY THEN COMPARED WHAT THEY WERE GETTING FROM THESE

2    INCOGNITO DETECTION BITS TO THAT STANDARD.

3         AND IF WE GO TO THE FIRST PAGE OF EXHIBIT 88, AT THE VERY

4    BOTTOM YOU SEE A MEETING -- AND THIS IS BETWEEN MS. LIU AND

5    MR. LEUNG -- AND THEY HAVE A MEETING ON JANUARY 27TH, 2022.

6    AND THEY SAY, "INCOGNITO RATE IS STILL TOO HIGH."

7         SO WHAT THEY'RE DOING IS NOT ONLY ARE THEY LOGGING AND

8    ANALYZING THE RATE, BUT THEY ARE COMPARING IT TO THE 3.08

9    PERCENT RATE THAT THEY KNOW IS THEIR TARGET.

10        AND THEN ABOUT A MONTH LATER -- ACTUALLY, IT WAS ONLY

11   ABOUT A WEEK LATER -- IT'S THE NEXT MONTH, BUT ONLY ABOUT A

12   WEEK LATER -- ON FEBRUARY 3RD, 2022, THEY SAY "GOOD NEWS:

13   CHROME INCOGNITO RATE IS NOW ABOUT 3 PERCENT."

14        THAT IS, THEY HAVE NOW VALIDATED THAT THE CHROME INCOGNITO

15   DETECTION FIELDS ARE ACCURATELY COMPILING CHROME USAGE IN THE

16   INCOGNITO MODE.

17        NOW, AGAIN, I WANT TO EMPHASIZE THAT WHETHER THIS IS TRUE

18   OR NOT, WHETHER IT'S ACCURATE OR NOT, EXACTLY WHAT THEY WERE

19   DOING IS NOT CRITICAL FOR THIS MOTION, EVEN IF IT PROVED --

20   EVEN IF THEY WERE SOMEHOW ABLE TO COME IN AND PROVE THAT ALL

21   THESE PEOPLE WERE WRONG AND IT WAS NOT RELIABLE, WE WERE STILL

22   ENTITLED TO NOW ABOUT IT.  THEY WERE OBLIGATED UNDER THIS

23   COURT'S ORDER AND DISCOVERY OBLIGATIONS TO SHOW IT TO US.

24        NOW, I WANT TO TOUCH JUST BRIEFLY ON THE PRESERVATION

25   ISSUE BECAUSE THIS GOES IN PART TO THE KIND OF PREJUDICE THAT

```
 1    WE SUFFER.

 2          THE COURT WILL RECALL THAT THE -- I'M GOING TO JUST SEE IF

 3    I CAN FIND ONE CHART.

 4          (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

 5          MR. BOIES:  I CAN'T, BUT IN THE INTEREST OF TIME,

 6    I'LL JUST SUMMARIZE IT.  I KNOW THE COURT IS FAMILIAR WITH THIS

 7     IN ANY EVENT.

 8          THEY KEPT COMING IN AND SAYING HOW BURDENSOME IT WOULD BE

 9    TO PRESERVE THE DATA.

10          WHAT WE DIDN'T KNOW, BECAUSE THEY DIDN'T IDENTIFY THE

11    EMPLOYEES WHO KNEW, THEY DIDN'T GIVE US THE DOCUMENTS, THEY

12    DIDN'T PRODUCE THE DATA, WE DIDN'T KNOW THAT THESE BITS

13    EXISTED.

14          BUT IF WE HAD KNOWN THESE BITS EXISTED, WE COULD HAVE GONE

15    TO THE COURT, WE COULD HAVE SAID, JUST PRESERVE THESE, THESE

16    SMALL BITS, JUST THIS SMALL AMOUNT OF DATA, PRESERVE THAT.

17          AND, YOU KNOW, I DON'T WANT TO SPEAK FOR THE COURT, BUT I

18    THINK THE COURT MIGHT HAVE THOUGHT THAT THAT WAS NOT AN

19    UNREASONABLE BURDEN TO PLACE ON THEM.

20          BUT WE LOST THAT OPPORTUNITY BECAUSE WE DIDN'T KNOW AND

21    THE COURT DIDN'T KNOW WHAT IT WAS.

22          AND I HAVE FOUND CHART 16, AND I JUST WANT TO REMIND THE

23    COURT WHAT THEY SAID, FOR EXAMPLE, ON FEBRUARY 5, 2021.  "LOG

24    DATA IS NOT REASONABLY LIMITED BY GEOGRAPHIC REGION, BY

25    BROWSER, OR BY BROWSER MODE."
```

1        WHAT THEY DIDN'T TELL THE COURT WAS THAT THERE WERE LOGS

2    THAT HAD LIMITATIONS BY BROWSER MODE.  THEY HAD THE INCOGNITO

3    SIGNALS.  THEY HAD THOSE FIELDS.

4        AND WHAT THEY TOLD THE COURT HERE WAS SIMPLY INCONSISTENT

5    WITH THE EXISTENCE OF THOSE, OF THOSE LOGS.

6        I APPRECIATE THE COURT'S INDULGENCE.

7        MS. ANDERSON WILL BRIEFLY ADDRESS THE ISSUE OF REMEDY.

8            THE COURT:  THANK YOU VERY MUCH.

9            MR. BOIES:  THANK YOU.

10           MS. ANDERSON:  GOOD AFTERNOON, YOUR HONOR.

11           THE COURT:  GOOD AFTERNOON.

12           MS. ANDERSON:  I'M GOING TO TRY TO GO THROUGH THIS

13   REALLY QUICKLY.  I KNOW WE'RE TRYING TO SAVE SOME TIME.

14       AND SO TO APPEASE ANY WORRY, WE ARE GOING TO PROVIDE THESE

15   SLIDES TO THE COURT AFTERWARDS SO THAT THEY'LL STILL BE

16   AVAILABLE, SO I'M GOING TO GO THROUGH THEM PRETTY QUICKLY.

17           THE COURT:  DO I HAVE A HARD COPY OF THESE YET?

18           MS. ANDERSON:  YES, WE'LL GIVE YOU A HARD COPY OF

19   THESE SLIDES.

20           THE COURT:  HAVE YOU ALREADY GIVEN IT TO ME?

21           MS. ANDERSON:  I DON'T THINK THAT WE HAVE.

22           THE COURT:  OKAY.  THAT'S FINE.  THAT'S FINE.

23           MS. ANDERSON:  BUT WE WILL.

24           THE COURT:  I WILL SAY THIS AGAIN BEFORE WE END, BUT

25   I'D LIKE ELECTRONIC COPIES OF WHATEVER THE DEMONSTRATIVES ARE

1         THAT ARE USED TODAY.

2              MS. ANDERSON:  OKAY.

3              THE COURT:  I KNOW WE GOT DOWNLOADS AND I'VE GOT LOTS

4         OF BINDERS.  BUT FROM WHAT YOU USE TODAY, I'D LIKE TO GET AN

5         ELECTRONIC COPY.

6              MS. ANDERSON:  AND WE CAN EASILY DO THAT, SO WE'LL DO

7         THAT FOR YOU, YOUR HONOR.

8         BEFORE I START, THOUGH, TO TALK THROUGH OUR REQUESTED

9         RELIEF, I THINK IT IS IMPORTANT TO SAY -- AND GOOGLE DID POINT

10        OUT -- THAT SOME OF THIS HAS BEEN SORT OF A MOVING TARGET OR

11        SHIFTING THROUGHOUT THE PAPERS, AND SOME OF THAT HAS BEEN, YOU

12        KNOW, BECAUSE AS THESE PAPERS WERE FILED, WE WERE LEARNING MORE

13        AND MORE.

14        SO, YOU KNOW, WE REALLY TOOK TO HEART AND TRIED TO TAILOR

15        THESE REMEDIES AND THE REQUESTED RELIEF TO THE PREJUDICE THAT

16        WE BELIEVE WE HAVE SUFFERED FROM THIS, AND SO THAT'S WHY, YOU

17        KNOW, I THINK YOU'VE SEEN THEM CHANGE A BIT.

18        BUT HERE IS, YOU KNOW, HOW WE'VE PRESENTED THEM IN OUR

19        CONCLUSIONS OF LAW, AS WELL AS HOW WE'LL BE PRESENTING THEM

20        TODAY.

21        SO THERE ARE SORT OF FOUR CATEGORIES.  THE FIRST IS

22        PRECLUSION ORDERS; SECOND IS JURY INSTRUCTIONS; THIRD IS

23        PRESUMPTION; AND FOURTH IS FOR MONETARY RELIEF.

24        SO WE CAN GO TO THE FIRST.  AND HERE WE'VE STATED THAT

25        WE'RE LOOKING FOR TWO PRECLUSION ORDERS:  ONE IS THAT GOOGLE IS

1    PRECLUDED FROM MAKING ANY ARGUMENTS ABOUT ANY INCOGNITO

2    DETECTION BIT FOR THE DURATION OF THE CASE; AND THE SECOND IS

3    GOOGLE MAY NOT RELY ON TESTIMONY BY MR. FIARD OR ANY OTHER

4    EMPLOYEE NOT IDENTIFIED IN RESPONSE TO PLAINTIFFS'

5    INTERROGATORY NUMBER 4.

6         THE SECOND -- AND THE REASON WE THINK THAT'S IMPORTANT IS

7    THERE'S BEEN A LOT OF ARGUMENT THAT THIS WASN'T RELIABLE, YOU

8    KNOW, THIS DATA.

9         BUT HOW DO WE KNOW?  WE DIDN'T GET IT.  WE COULDN'T TEST

10   IT.  WE WEREN'T GIVEN THE OPPORTUNITY TO LET OUR EXPERTS

11   EXAMINE THIS DATA.  AND SO THAT IS WHY WE THINK THIS PRECLUSION

12   ORDER IS IMPORTANT.

13        GO TO THE NEXT SLIDE.

14        AND THEN WE'RE REQUESTING SOME JURY INSTRUCTIONS:  GOOGLE

15   CONCEALED AND ALTERED EVIDENCE REGARDING ITS ABILITY TO

16   IDENTIFY INCOGNITO TRAFFIC; GOOGLE FAILED TO DISCLOSE TO

17   PLAINTIFFS THE NAMES OF KEY GOOGLE EMPLOYEES RESPONSIBLE FOR

18   DEVELOPING AND IMPLEMENTING GOOGLE'S INCOGNITO-DETECTION BITS;

19   AND THAT GOOGLE DURING THE COURSE OF THIS LITIGATION DELETED

20   DATA THAT WOULD HAVE BEEN UNFAVORABLE TO GOOGLE'S POSITIONS IN

21   THIS LITIGATION."

22        NOW, IF WE CAN JUST -- WE CAN SKIP THROUGH THESE, I

23   THINK -- AND I'M HAPPY TO ANSWER ANY QUESTIONS, AND SORT OF THE

24   BASIS IN WHICH RULES --

25             MR. SCHAPIRO:  YOUR HONOR, CAN I JUST RISE WITH AN

```
1       OBJECTION?  MAYBE I'M NOT SEEING SOMETHING CORRECTLY.

2            AM I -- THESE DO NOT APPEAR TO COMPORT WITH THE SANCTIONS

3       THAT WERE REQUESTED IN THE BRIEFING AND THAT WE BRIEFED AND

4       THAT WE'RE PREPARED TO ADDRESS TODAY AND AS TO WHICH WE HAVE

5       RESEARCHED THE LAW.  MS. VIOLA IS LOOKING.

6            AM I MISUNDERSTANDING THAT?

7                MS. ANDERSON:  SO WE DID ADD A LITTLE BIT IN OUR

8       CONCLUSIONS OF LAW, SO THERE WERE ADDITIONAL REQUESTS MADE

9       WITHIN THAT.

10           AND THAT, AS I WAS TRYING TO EXPLAIN, YOUR HONOR -- AND

11      YOUR HONOR'S --

12               THE COURT:  WELL, FIRST, LET'S GO BACK TO THE SLIDE

13      ON CONCLUSIONS, BECAUSE I HAD A SIMILAR QUESTION.

14           YOU MAY BE SEATED, MR. SCHAPIRO.  THANK YOU.

15           AND THIS IS AS GOOD A TIME AS ANY.

16           SO THE SECOND REQUEST, NOT TO RELY ON TESTIMONY OF ANY

17      EMPLOYEE NOT IDENTIFIED IN RESPONSE TO INTERROGATORY 4, I DON'T

18      RECALL SEEING THAT IN THE BRIEFING.  BUT IT -- IS IT?  OR IS

19      THIS THE FIRST TIME YOU'RE REQUESTING THAT?

20               MS. ANDERSON:  I BELIEVE IT WAS IN OUR CONCLUSIONS OF

21      LAW.  YEAH, SO IT WAS IN OUR CONCLUSIONS OF LAW.  SO IT WAS NOT

22      IN THE FILING -- IN THE BRIEFING PAPERS.

23               THE COURT:  OKAY.

24               MS. ANDERSON:  SO THAT'S WHAT WE'RE TRYING TO

25      EXPLAIN, THAT WE -- WE REALLY DID TRY TO -- IN FACT, THIS IS A
```

1      BIT NARROWER THAN I THINK WE ATTEMPTED TO DO IN OUR FIRST

2      PAPERS.

3          AND --

4              THE COURT:  OKAY.

5              MS. ANDERSON:  -- IN SPEAKING TO A SPECIFIC

6      INTERROGATORY AS WELL TO TRY TO MAKE THAT REASONABLY TAILORED

7      TO THE REMEDY, OR TO THE PREJUDICE THAT WE BELIEVE WE SUFFERED.

8              THE COURT:  I'LL KEEP THAT IN MIND, THAT THAT'S WHERE

9      IT WAS PRESENTED.

10         OKAY.  AND THEN GO TO THE NEXT SLIDE.  I THINK I

11     UNDERSTAND THIS POINT.  I BELIEVE THIS WAS IN THE BRIEF.

12             AND THE NEXT SLIDE, PLEASE.

13             MS. ANDERSON:  AND I THINK WE HAD ASKED FOR THE

14     BROADER ONE, AND SO WE'RE OFFERING SOME MORE NARROWLY TAILORED

15     OPTIONS HERE.

16             THE COURT:  ALL RIGHT.

17             MS. ANDERSON:  SO IF WE CAN GO TO THE NEXT SLIDE.

18         AND THEN IT -- THE COURT IS WELL AWARE, UNDER THE FACEBOOK

19     PAPERS, SORT OF THE SUPPORT FOR EACH OF THESE, SO I WAS GOING

20     TO THEN JUST MOVE TO THE REQUESTED RELIEF UNLESS YOU HAD ANY

21     QUESTIONS.

22             THE COURT:  MR. SCHAPIRO, DID YOU WANT TO BE HEARD?

23             MR. SCHAPIRO:  YES, YOUR HONOR.

24         SO WE HAVE NOT HAD A CHANCE TO BRIEF OR RESEARCH THE LAW

25      OR THE ARGUMENTS ON THESE SANCTIONS.

```
 1          NOW, I AM OPTIMISTIC THAT WHEN WE'RE FINISHED TODAY,

 2    YOU'RE GOING TO CONCLUDE THAT NO SANCTIONS OF ANY TYPE ARE IN

 3    ORDER.

 4          THE COURT:  ALL RIGHT.

 5          MR. SCHAPIRO:  SO I DON'T WANT TO DELAY THINGS BY

 6    ASKING IN ANY WAY FOR ANY MORE BRIEFING, BUT I DO WANT TO LODGE

 7    AN OBJECTION, BECAUSE WE'RE HERE READY TO EXPLAIN WHY -- AND

 8    MAYBE THIS IS WHY THEY CHANGED IT A COUPLE DAYS AGO

 9    APPARENTLY -- WHY THE SANCTIONS THAT THEY REQUESTED IN THE

10    BRIEFING THAT WE ALL SPENT A LOT OF TIME AND ENERGY ON ARE

11    UNWARRANTED AND WOULD BE ERROR.  SO I WANT TO LODGE MY

12    OBJECTION.

13          BUT I DON'T THINK YOU'RE GOING TO IMPOSE ANY SANCTIONS,

14    SO --

15          THE COURT:  I UNDERSTAND, AND I -- IF I FEEL LIKE I

16    NEED MORE BRIEFING ON THE ISSUES OF REMEDY, I'VE RARELY BEEN

17    SHY ABOUT ASKING FOR MORE BRIEFING.

18          MR. SCHAPIRO:  WE UNDERSTAND.

19    THANK YOU, YOUR HONOR.

20          THE COURT:  WE'LL TURN TO THAT IF AND WHEN NEEDED.

21    I DO WANT TO KEEP US MOVING --

22          MS. ANDERSON:  YES.

23          THE COURT:  -- SO LET'S GO AHEAD AND PROCEED WITH THE

24    PRESENTATION.  I UNDERSTAND THAT THESE HAVE BEEN FURTHER

25    REFINED SINCE THE FINAL BRIEFING.
```

1      MS. ANDERSON:  AND THE LAW AND THE BASIS REMAIN THE

2   SAME.  IT'S JUST TRYING TO NARROWLY TAILOR THESE.

3      THE THIRD IS A PRESUMPTION, THAT THE COURT PRESUMES FOR

4   ALL PURPOSES IN THIS CASE THAT THE DATA GOOGLE DELETED WAS

5   UNFAVORABLE TO GOOGLE.

6      AND THE FOURTH IS THE MONETARY REQUESTS RELATED TO THE

7   COSTS OF THE SPECIAL MASTER PROCESS, AS WELL AS PREPARING FOR

8   AND DOING THESE MOTIONS.

9      BUT AT THE END OF THE DAY, THE POINT BEING, AND WE CAN --

10  YOU KNOW, WE CAN TALK ABOUT DIFFERENT WAYS TO TAILOR THESE

11  SANCTIONS, BUT THE POINT IS THAT MONETARY SANCTIONS HERE JUST

12  ISN'T ENOUGH.  IT JUST ISN'T GOING TO DETER GOOGLE AND IT'S NOT

13  GOING TO REMEDY THE PLAINTIFFS' HARM.

14     IT'S -- AND THE POINT IS, IT WAS LIKE A SNOWBALL, YOU

15  KNOW, GOING DOWNHILL.  IT STARTED IN THE PRESERVATION ARGUMENTS

16  WHEN IT WAS FOCUSSED ON THE X-CLIENT DATA HEADER AND THERE WAS

17  NO DISCUSSION THAT THERE WERE OTHER WAYS TO TRY TO TRACK

18  INCOGNITO TRAFFIC, THAT THERE WERE OTHER WAYS TO PRESERVE THIS

19  DATA IN A MORE NARROW SET, AND THAT THERE WERE WAYS -- AND IT

20  WASN'T -- YOU KNOW, THE INCOGNITO BITS DON'T JUST USE THE

21  X-CLIENT DATA HEADER, SO IT'S NOT THE SAME THING.

22     AND THERE WAS A LOT OF ARGUMENT ABOUT THAT AND PAPERS BACK

23  AND FORTH AND IT WAS NOT EVEN RAISED THAT THERE WAS THIS OTHER

24  POSSIBILITY.

25     AND THE SNOWBALL STARTED FROM THERE AND IT JUST CONTINUED

1    TO GO DOWNHILL AS WE DIDN'T HAVE THE DATA, IT DIDN'T GET

2    PRESERVED, THE DATA GOT DELETED.

3        WE THEN GO INTO FACT DISCOVERY WITHOUT UNDERSTANDING THESE

4    BITS, WITHOUT HAVING THIS DATA, WE DON'T GET THE DOCUMENTS

5    ABOUT THESE BITS THAT ARE RELEVANT.

6        AND THEN, YOU KNOW, WE HEAD INTO EXPERTS AND WE DON'T HAVE

7    THIS DATA.  WE STILL DON'T HAVE THIS DATA.

8        THE LAST AND FINAL EXPERT REPORT IS DUE TOMORROW EVEN, AND

9    SO IT REALLY JUST SORT OF COMPOUNDED UPON ITSELF AS IT WENT

10   THROUGH.

11       AND IT'S INHERENTLY UNFAIR TO LET GOOGLE DELETE RELEVANT

12   EVIDENCE AND THEN ARGUE ABOUT THE ABSENCE OF THAT EVIDENCE, OR

13   ARGUE TO THE PLAINTIFFS AND TO THE COURT THAT IT WASN'T

14   RELIABLE WHEN WE JUST HAVE TO TAKE THEIR WORD FOR IT.

15       WE DON'T HAVE THE DATA TO BE ABLE TO TEST THAT OR TO SHOW

16   THAT IT WAS OR WAS NOT RELIABLE.

17       AND SO AT THE END OF THE DAY, IT'S REALLY FOCUSSING ON

18   THIS IDEA THAT THEY JUST CAN'T BENEFIT FROM DELETING THIS DATA,

19   AND IT CAN'T JUST BE MONETARY SANCTIONS.

20       AND IF WHATEVER EXACTLY THESE ISSUE PRECLUSIONS OR

21   PRESUMPTIONS ARE, YOU KNOW, WE COULD EVEN ADDRESS THOSE WHEN

22   GOOGLE FILES THEIR PAPERS, WHEN THEY DO THEIR, YOU KNOW, THEIR

23   FILINGS FOR CLASS CERTIFICATION WHEN WE'RE HEADED, YOU KNOW,

24   WHEN WE'RE HEADED INTO TRIAL TO SEE WHAT ARGUMENTS THEY

25   ACTUALLY ARE MAKING AND THEN TO SEE WHICH ONES ARE UNFAIR.

1      IT'S JUST THE POINT IS THERE HAS TO BE SOMETHING THAT THEY

2    CANNOT ARGUE ABOUT THE DATA THEY DELETED, AND THEY JUST CANNOT

3    ARGUE WHAT IT WOULD SHOW, WHAT IT WOULDN'T SHOW, OR ARGUE THAT

4    WE HAVE AN ABSENCE OF PROOF THAT WOULD HAVE BEEN IN THAT DATA.

5      AND THE COURT CAN, AS THOSE PAPERS COME IN, YOU KNOW,

6    UNDER THE LAW, AS IT SAYS, TO TAILOR THE SANCTIONS SO THAT

7    THEY'RE REASONABLY RELATED TO WHAT HAPPENED HERE.  YOU CAN DO

8    THAT, YOU KNOW, AS WE GO THROUGH THE PROCESS IF WE DON'T WANT

9    TO DO THOSE NOW.

10      BUT THAT'S THE REAL POINT AND THAT'S THE REAL HEART OF

11    THIS MATTER.

12      AND THE PLAINTIFFS SUFFERED SERIOUS CONSEQUENCES.  THE

13    DATA IS LOST.  WE CAN'T LOOK AT THIS DATA TO TEST ANYTHING, TO

14    FIGURE OUT -- YOU KNOW, WE'RE JUST LEFT HERE HAVING TO ACCEPT

15    GOOGLE'S WORD ABOUT WHETHER IT WAS RELIABLE, IF IT WAS

16    RELIABLE, WHAT IT DOES, HOW IT INTERACTS WITH OTHER LOGS AND

17    PROFILES, AND ALL OF THAT IS ALL HYPOTHETICAL BECAUSE WE DON'T

18    HAVE THE DATA TO ACTUALLY BE WORKING WITH.

19      SO UNLESS YOUR HONOR HAS ANY QUESTIONS, I THINK --

20          THE COURT:  I DO HAVE A QUESTION --

21          MS. ANDERSON:  OKAY.

22          THE COURT:  -- WHICH IS -- AND IT WAS -- AGAIN, IT

23    WASN'T QUITE CLEAR TO ME FROM THE PAPERS, ARE THE PLAINTIFFS

24    ASKING FOR SOMETHING THAT IS ASKING FOR FURTHER PRODUCTION?

25      I UNDERSTAND THE REMEDIES THAT YOU'RE ASKING FOR, BUT IS

1    THERE SOMETHING THAT SPECIFICALLY -- IT WASN'T CLEAR TO ME IF

2    YOU WERE STILL ASKING THAT SOMETHING ELSE BE TURNED OVER.

3            MR. BOIES:  YES, YOUR HONOR.  IF I COULD JUST ADDRESS

4    THAT BRIEFLY?

5            THE COURT:  IF YOU WOULD, PLEASE.

6            MR. BOIES:  WE ARE.  WE STILL DON'T THINK WE HAVE

7    GOTTEN ALL OF THE DOCUMENTS AND ALL OF THE LOGS THAT USE THESE

8    SIGNALS.

9            IT IS NOT CONCEIVABLE TO US THAT THERE'S NOT A SINGLE

10   DOCUMENT IN THEIR FILES THAT MENTIONS IS_CHROME_INCOGNITO.

11           BASED ON OUR EXPERTS' ANALYSIS, WE ARE VERY, VERY DUBIOUS

12   THAT THEY HAVE PRODUCED ALL OF THE LOGS THAT HAVE THESE FIELDS

13   IN THEM.

14           THEY HAVE NOT EVEN SAID TO THE COURT, OR TO US,

15   DEFINITIVELY, THESE ARE THE ONLY FIELDS OR SIGNALS THAT WE

16   DEVELOPED OR TRIED TO DEVELOP TO DETECT INCOGNITO BROWSING.

17           SO WE ARE -- WE'RE ASKING FOR WHAT IS THERE THAT THEY

18   HAVEN'T GIVEN US.

19           AS I SAID, THEY HAVE -- THEY GAVE US A HANDFUL OF

20   DOCUMENTS ABOUT THE MAYBE FIELD.  THEN WHEN WE BROUGHT THIS

21   MOTION, THEY GAVE US NINE TIMES AS MANY DOCUMENTS.

22           NOW, WHETHER THAT'S ALL THE DOCUMENTS THEY HAVE THAT

23   MENTION THAT FIELD OR NOT, WE DON'T KNOW.

24           BUT WE ARE ASKING TO SORT OF COMPLETE THE DISCOVERY AND

25   COMPLETE THEIR REPRESENTATIONS TO THE COURT THAT THEY HAVE

1   FULLY COMPLIED.

2           THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU,

3   MR. BOIES.

4           MR. MAO:  YOUR HONOR, IF I MAY JUST MENTION SOMETHING

5   REAL QUICKLY PROCEDURALLY?

6           THE COURT:  YES.

7           MR. MAO:  AND I'LL BE QUICK.  I'LL BE A MINUTE.

8       ONE OF THE BIG ISSUES, YOUR HONOR, IS THAT, AS YOU CAN

9   APPRECIATE, THE TECHNICAL EXPERT REPORTS WERE DUE LAST WEEK.

10      THE ITERATIVE PROCESS WHICH YOU HAD ORDERED IN NOVEMBER, I

11  BELIEVE, WAS ITERATIVE SEARCHES COULD BE TESTED, QUALITY COULD

12  BE ASSURED.  THE OBJECTIVE WAS NOT TO FIRST SEE EACH OTHER'S

13  EXPERT REPORTS, AND THEN DEAL WITH HOW DATA MAY BE PRODUCED,

14  AND THEN ARGUE ABOUT THAT IN REBUTTAL, ESPECIALLY WITHOUT

15  PLAINTIFFS HAVING HAD AN OPPORTUNITY TO EXAMINE THEM.

16      THE OTHER THING IS I DO NOT BELIEVE THERE'S GOING TO BE

17  ANY DISPUTE THAT THIS DATA IS STILL BEING USED TO OBTAIN

18  ADVERTISING REVENUE AND OTHER REVENUE, BUT AS A RESULT OF THAT,

19  THERE IS SOME URGENCY ON BEHALF OF THE CLASS MEMBERS IN ORDER

20  FOR US TO OBTAIN RELIEF.

21      WE, TOO, LIKE THE SPECIAL MASTER AND YOUR HONOR, WOULD

22  LIKE TO CONCLUDE THE PROCESS.

23      ONE OF THE PROBLEMS IS THAT THE PROCESS, IF I MAY

24  EUPHEMISTICALLY SAY, HAS BEEN SOMEWHAT KINKED, AND THAT IS ONE

25  OF THE PREJUDICES THAT WE JUST CANNOT COME BACK FROM.

```
1            THE COURT:  I'M SORRY.  WAS THERE AN ASK THERE, OR IS

2     THAT JUST A FURTHER ARGUMENT?  I UNDERSTAND THE ARGUMENT.

3            MR. MAO:  OKAY.

4            THE COURT:  WERE YOU ASKING FOR SOMETHING IN TERMS OF

5     FURTHER THINGS?

6            MR. MAO:  NO, NOT BEYOND WHAT MR. BOIES AND

7     MS. ANDERSON HAS SAID.

8            THE COURT:  OKAY.  GOT IT.  THANK YOU.

9            MS. ANDERSON:  I THINK WHAT MR. MAO WAS JUST TRYING

10    TO SAY IS WE CAN'T UNRING THE BELL.

11           THE COURT:  I GOT IT.

12           MS. ANDERSON:  WE'RE SO FAR DOWN THAT WE CAN'T GO

13    BACK AND REDEPOSE WITNESSES AND DO THOSE THINGS.

14           THE COURT:  I GOT IT.

15           MS. ANDERSON:  DO YOU HAVE ANY OTHER QUESTIONS?

16           THE COURT:  I DON'T.

17           MS. ANDERSON:  OKAY.  THANK YOU.

18           MR. BOIES:  ONE HOUSEKEEPING, YOUR HONOR.  I THINK I

19    FORGOT TO OFFER EXHIBIT 109 THAT I MENTIONED.  I WOULD OFFER

20    EXHIBIT 109.  THAT'S THE DOCUMENT THAT WE'VE SEEN, SEPTEMBER 1,

21    THAT LISTS THE RELEVANT GOOGLE EMPLOYEES.

22           THE COURT:  I HAVE IT OFFERED AND ADMITTED.  WAS

23    THERE ANY OBJECTION?

24           MR. SCHAPIRO:  NO.

25           THE COURT:  OKAY.  109, TO BE CLEAR, IS ADMITTED.
```

1          THE CLERK:  YOUR HONOR, CAN I VERIFY, 63 WAS ALSO

2     ADMITTED.

3          THE COURT:  YES, IT WAS.

4          THE CLERK:  THANK YOU.

5      (PLAINTIFFS' EXHIBITS 63 AND 109 WERE ADMITTED IN

6     EVIDENCE.)

7          MS. ANDERSON:  AND ALSO A HOUSEKEEPING MATTER, AND I

8     THINK I UNDERSTOOD FROM THE PHONE CALL, BUT ANYTHING THAT WAS

9     ALREADY IN THE RECORD AS EXHIBITS, WE CAN CONSIDER AS IN THE

10    RECORD?

11         THE COURT:  THAT'S RIGHT.

12         MS. ANDERSON:  OKAY, GREAT.  THANK YOU.

13         THE COURT:  WE'RE NOT GOING TO READMIT FROM PREVIOUS

14    PROCEEDINGS EVERYTHING ELSE THAT WE'VE ALREADY COVERED.

15      ALL RIGHT.  LET'S MOVE TO THE DEFENDANTS, PLEASE.

16         MR. MCGEE:  GOOD MORNING, YOUR HONOR.  RYAN MCGEE.

17      I WAS GOING TO ASK, JUDGE, I BELIEVE WE SUBMITTED THE

18    EXHIBIT LIST TO YOUR HONOR WITH THE 109.  WE'VE SINCE BEEN

19    UPDATING THAT.  IS THERE AN ISSUE WITH US JUST MOVING ALL OF

20    THAT INTO EVIDENCE?  I KNOW THAT WE'RE TRYING TO ACHIEVE SOME

21    TIME EFFICIENCIES HERE.

22         THE COURT:  ALL OF WHAT?

23         MR. MCGEE:  THE 109 EXHIBITS THAT WERE SUBMITTED

24    WITHIN THE TABLE LAST NIGHT, AND I BELIEVE THERE WERE TWO OR

25    THREE THAT WERE ADDRESSED TODAY.

```
1              THE COURT:  I ASSUME MOST OF THESE DOCUMENTS ARE

2     ALREADY IN THE COURT RECORD.

3              MR. MCGEE:  MANY OF THEM HAVE DOCKET ENTRIES.

4              THE COURT:  THEN WE'RE NOT GOING TO MOVE THEM IN

5     AGAIN IN THIS PROCEEDING.

6              MR. MCGEE:  SO I GUESS ANY THAT DO NOT HAVE DOCKET

7     ENTRIES --

8              THE COURT:  ALL I'M EXPECTING TO MOVE IN THIS THROUGH

9     THIS PROCEEDING ARE DOCUMENTS THAT ARE USED IN THE PROCEEDING

10    THAT ARE NOT OTHERWISE IN THE RECORD.

11             MR. MAO:  SO THAT RAISES A, A PROCEDURAL CONUNDRUM,

12    YOUR HONOR.  WE JUST WANT TO MAKE SURE THAT WE WILL HAVE THE

13    OPPORTUNITY TO EXAMINE THE WITNESSES THAT WERE IDENTIFIED BY

14    DEFENDANT, AND ONE OF THE REASONS WHY MR. MCGEE WAS ASKING THAT

15    QUESTION WAS BECAUSE WE WILL NEED THAT EVIDENCE FOR DEFENDANTS'

16    WITNESSES WHICH WE'RE EXPECTING TO EXAMINE.

17             THE COURT:  OKAY.

18             MR. MAO:  SO HOPEFULLY THAT CLARIFIES IT A LITTLE

19    BIT, WHICH IS WHY WE WANTED ALL OF THAT IN THERE BECAUSE WE MAY

20    USE IT IN EXAMINATION.  SO SORRY FOR THAT.

21             THE COURT:  WELL, LET'S SEE HOW THAT GOES.

22             MR. MAO:  SURE.  THANK YOU.

23             THE COURT:  ALL RIGHT.

24         FROM GOOGLE?

25             MR. SCHAPIRO:  I'VE NOTICED THAT THERE WAS SOMETIMES
```

1    A BUZZING.  I DON'T KNOW IF PEOPLE ARE HEARING IT, AND I DON'T

2    KNOW IF THERE'S A -- SOMETHING WITH THE AUDIO SYSTEM.  I DON'T

3    KNOW IF THERE'S SOMETHING THAT WE'RE DOING OR SOME SIMPLE TRICK

4    THAT --

5         THE CLERK:  IT'S THE AUDIO SYSTEM.  APOLOGIES.  IT

6    JUST BUZZES.

7         MR. SCHAPIRO:  THAT'S TOTALLY FINE.  TOTALLY FINE.

8    YOUR HONOR, I THINK IN MANY WAYS WHAT WE HAVE SEEN THUS

9    FAR TODAY IS THE INCREDIBLE SHRINKING CASE.

10   WHEN THE PLAINTIFFS' OPENING BRIEF WAS FILED, IT WAS FULL

11   OF ALLEGATIONS OF INTENTIONAL DELETION OF MATERIAL.  IT WAS

12   FULL OF ALLEGATIONS THAT WE HAD ALTERED EVIDENCE.  THE FOCUS

13   WAS ON THE MAYBE_CHROME_INCOGNITO BIT.  THE REQUEST FOR

14   SANCTIONS WAS BROAD, SWEEPING, AT LEAST QUITE DIFFERENT THAN IT

15   IS TODAY.  THE CLAIMS OF PREJUDICE WERE FAR BROADER.

16   THEN WE RESPONDED AND WE SHOWED THE PLAINTIFFS THAT MUCH

17   OF WHAT THEY WERE COMPLAINING ABOUT HAD ALREADY BEEN PRODUCED

18   TO THEM.  WE SHOWED THEM WHERE THEY HAD ACTUALLY CITED SOME OF

19   THESE DOCUMENTS OR PIECES OF EVIDENCE IN THEIR OWN PAPERS.

20   WE SHOWED THEM WHY SOME OF THE SANCTIONS THEY WERE ASKING

21   FOR WOULD ACTUALLY UNDERMINE THE ABILITY OF ANY COURT TO RUN A

22   REASONABLE CLASS ACTION HERE.

23   NOW WE'RE BEFORE THE COURT AND IT SEEMS LIKE THE CASE IS

24   NOW ABOUT THE -- ABOUT ONE THING, THE IS_CHROME_INCOGNITO BIT,

25   MORE OR LESS.

1         I'M GOING TO GO THROUGH AND ADDRESS QUICKLY -- I THINK I

2    CAN DO IT BEFORE YOUR HONOR'S CRIMINAL MATTER -- ALL OF THE

3    POINTS THAT HAVE BEEN MADE HERE, BUT I WANTED TO NOTE THAT AT

4    THE OUTSET.

5         OUR VIEW HERE, YOUR HONOR, IS THAT AT WORST WHAT HAS

6    HAPPENED IN THIS CASE IS WHAT HAPPENS IN DISCOVERY IN ALL KINDS

7    OF COMPLEX CASES WITH LOTS AND LOTS OF DOCUMENTS AND LOTS OF

8    EVIDENCE, AND FRANKLY, OCCASIONALLY SHIFTING THEORIES WHERE ONE

9    DAY IT'S THE ZWIEBACK, ONE DAY IT'S SEARCH, ANOTHER DAY IT'S

10   THESE INCOGNITO BITS THAT ONE SIDE OR OTHER IS MOST INTERESTED

11   IN.

12        IT HAPPENS IN ORDINARY LITIGATION THAT SOMETIMES DOCUMENTS

13   DON'T -- AREN'T PRODUCED RIGHT AWAY, SOMETIMES DOCUMENTS COME

14   IN, A PARTY HAS TO GO BACK, ASK FOLLOW-UP QUESTIONS.  IT HAS

15   HAPPENED IN THIS CASE ON BOTH SIDES.

16        BUT OF COURSE, IT'S MORE OF A ONE-WAY RATCHET IN A CLASS

17   ACTION WHERE YOU HAVE A COMPANY AND INDIVIDUALS, SO ALMOST ALL

18   OF THE DISCOVERY IS GOING THIS WAY.

19        WE HAVE BEEN VERY ABLY ASSISTED BY A SPECIAL MASTER WHO I

20   THINK AT EVERY TURN HAS SAID, ON THE RECORD, THAT THE PARTIES

21   ARE WORKING TOGETHER IN GOOD FAITH AND THAT SOMETIMES THERE ARE

22   THESE GLITCHES IN DISCOVERY.

23        LET ME MAKE ONE THING VERY CLEAR, BECAUSE I NOTICED IN THE

24   REPLY BRIEF FILED BY THE PLAINTIFFS, THEY SAID, TELLINGLY,

25   GOOGLE HAS NEVER STATED THAT ITS COUNSEL WAS UNAWARE OF THE

1    EXISTENCE OF THESE BITS.

2        I'M TELLING YOU, YOUR HONOR, AS AN OFFICER OF THE COURT,

3    WE WERE UNAWARE OF THE EXISTENCE OF THESE BITS WITH THESE

4    FIELDS AT THE RELEVANT TIMES THAT THE PLAINTIFFS HAVE BEEN

5    POINTING TO, CERTAINLY THE IS_CHROME_INCOGNITO MODE.

6        WE LEARNED ABOUT THIS AS THINGS WERE BEING PRODUCED,

7    SOMETIMES AFTER THINGS WERE BEING PRODUCED, BECAUSE HERE'S

8    ANOTHER THING THAT HAPPENS IN ORDINARY LITIGATION.

9        SOMETIMES A PARTY GETS A BUNCH OF DOCUMENTS AND IT TAKES

10   THEM AWHILE TO SIFT THROUGH AND FIND THE ONES THAT THEY'RE

11   INTERESTED IN AND WANT TO FOLLOW UP ON.

12       AND I CAN ASSURE YOU, YOUR HONOR, BECAUSE YOU HEARD IT

13   HERE EARLY IN THE CASE, IN A WAY, WE'RE KIND OF DARNED IF WE DO

14   AND DARNED IF WE DON'T.  IF WE DON'T PRODUCE A LOT OF

15   DOCUMENTS, THE PLAINTIFFS ARE GOING TO COME AND SAY, YOUR

16   HONOR, WE'VE ONLY GOTTEN A HANDFUL OF DOCUMENTS FROM GOOGLE,

17   WHAT'S GOING ON HERE?  AND IF WE PRODUCE A WHOLE BUNCH OF

18   DOCUMENTS, THE PARTIES -- THE PLAINTIFFS ARE GOING TO COME,

19   LIKE THEY DID JUST A FEW MINUTES AGO, AND SAY, WELL, WE GOT

20   840,000 DOCUMENTS, WHAT ARE WE SUPPOSED TO DO?

21       WHAT WE'RE SUPPOSED TO DO IS DO OUR BEST IN GOOD FAITH.

22   AND HONESTLY, THE PLAINTIFFS SHOULD HAVE ASKED, AS THEY DID

23   WITH THE SPECIAL MASTER, RAISING SOME OF THESE ISSUES, SAID YOU

24   KNOW WHAT, WE NEED SOME FOLLOW-UP HERE.  WHAT CAN WE DO TO

25   WORKING TOGETHER ABOUT IT?

1        INSTEAD THERE'S THE RUSH TO SANCTIONS.

2        LET ME TELL YOU WHY THE BASIC CASE THAT THEY'VE MADE IS

3    NOT ACCURATE, AND MS. TREBICKA WILL TELL YOU WHY THE REMEDIES

4    THAT THEY ARE SEEKING ARE NOT WARRANTED.

5        THERE ARE FOUR RELEVANT QUESTIONS TODAY.  MS. TREBICKA

6    HIGHLIGHTED THEM, OR PREVIEWED THEM IN HER OPENING.  WAS THERE

7    CONCEALMENT?  WAS THERE PREJUDICE?

8        DO WE HAVE OUR SLIDES?

9            MS. TREBICKA:  YES.  MS. FANTHORPE NEEDS TO CHANGE

10    THE OUTPUT.

11            THE CLERK:  THANK YOU.

12            MR. SCHAPIRO:  OKAY.

13        AND, YOUR HONOR, YOU HAVE THIS POWERPOINT PRESENTATION IN

14    YOUR BINDER.  I THINK IT'S, UNFORTUNATELY, STAPLED OR CLIPPED

15    RATHER THAN WITH HOLES.

16            THE COURT:  YEAH, THANK YOU.  I'VE GOT IT.

17            MR. SCHAPIRO:  SO THERE ARE FOUR RELEVANT QUESTIONS

18    THAT THE ANSWER -- THAT THE EVIDENCE WE THINK HAS ALREADY

19    ANSWERED, OR AFTER YOU HEAR FROM SOME WITNESSES WILL ANSWER

20    TODAY.

21        HAS THERE BEEN CONCEALMENT?

22        HAS THERE BEEN PREJUDICE?

23        ARE ANY OF THESE BITS AS IMPORTANT TO THE CASE AS THE

24    PLAINTIFFS SAY?

25        AND, FINALLY, SHOULD THERE BE SANCTIONS?

1          SO LET'S TAKE THEM ONE BY ONE.

2          CONCEALMENT.

3          SO THESE GOOGLE BITS WERE DISCLOSED LAST YEAR.  GOOGLE

4     DISCLOSED THE OOLONG BITS -- LET ME TAKE THEM ONE AT A TIME.

5     THIS IS SORT OF A TABLE OF CONTENTS.

6          I'M GOING TO WALK THROUGH EACH OF THESE, BUT JUST VERY

7     BRIEFLY, WE DISCLOSED THE OOLONG BITS -- EXCUSE ME -- THE BITS

8     FROM WHAT WE ARE CALLING THE SEARCH, THE PREVIOUSLY IDENTIFIED

9     SEARCH LOGS IN JUNE 2021; THE MAYBE_CHROME_INCOGNITO BIT IN

10    SEPTEMBER 2021; WE PRODUCED INFORMATION ABOUT MR. LEUNG AND

11    MS. LIU AND THE WITNESSES WHO THE PLAINTIFFS HAVE CLAIMED DID

12    NOT TESTIFY TRUTHFULLY TESTIFIED ENTIRELY ACCURATELY.

13         FIRST, THE OOLONG BITS, JUNE 18TH, 2021.  THIS DOCUMENT

14    WAS PRODUCED.  I THINK WE'VE ALREADY JUST TALKED ABOUT IT A FEW

15    MINUTES AGO.  YOU'VE SEEN THIS DOCUMENT.  IT IS, I BELIEVE, OUR

16    EXHIBIT A AND THE PLAINTIFFS' EXHIBIT 109 ALREADY, ALREADY IN.

17              THE COURT:  IN EVIDENCE, YES.

18              MR. SCHAPIRO:  THE LONG AND SHORT OF THIS IS LAST

19     SUMMER, GOOGLE PRODUCED A DOCUMENT IDENTIFYING THE

20     IS_CHROME_NON_INCOGNITO BIT THAT WAS SENT, ONLY SENT IN SOME

21     PARTICULAR LOGS, THE LOGS ARE RELATING TO THE PREVIOUSLY

22     IDENTIFIED SEARCH LOGS.

23         PLAINTIFFS LATER CITED THIS DOCUMENT -- THEY CAN'T COME IN

24    AND SAY, WELL, BUT IT WAS JUST A DROP IN THE OCEAN, WE DIDN'T

25    SEE IT, BECAUSE THEY CITED IT IN THEIR RULE 30(B)(6) DEPOSITION

```
1        NOTICE REGARDING THE BIT.

2           ALSO ON JUNE 18TH, 2021, WE PRODUCED A DOCUMENT

3    IDENTIFYING THE PROJECT, WHAT WE'RE REFERRING TO HERE AS THE

4    PROJECT, THAT LED TO THE MAYBE_CHROME_INCOGNITO BIT.

5           NOW, THIS DOCUMENT DOESN'T ONLY IDENTIFY THE PROJECT LAST

6    SUMMER.  IT IDENTIFIES MANDY LIU AS A PERSON WORKING ON THE

7    PRODUCT, AND IT INCLUDES COMMENTS FROM MS. LIU REGARDING THE

8    DETECTION OF INCOGNITO BY USE OF THE X-CLIENT DATA HEADER.

9           SO THIS IS ONE OF THE THINGS THAT, DESPITE HAVING HAD

10   THIS, THE PLAINTIFFS HAVE COME IN AND SAID THAT THE

11   FEBRUARY 18TH, 2022 PRODUCTION CONTAINS STUNNING REVELATIONS

12   REVEALING THAT SINCE JUNE OF 2020, THAT MR. LEUNG AND MS. LIU

13   HAD WORKED ON A PROJECT TO DO EXACTLY WHAT THIS DOCUMENT SAYS

14   THAT IT DOES.

15          SO THIS WAS NOT CONCEALED IN ANY WAY.

16          ON JULY 9TH OF 2021, AS I FORESHADOWED, THE PLAINTIFFS

17   DISCUSSED THESE VERY DOCUMENTS IN THEIR BRIEFING.  SO I WANT TO

18   BE 100 PERCENT CLEAR.  THESE WEREN'T STRAY DOCUMENTS THAT

19   SLIPPED THROUGH UNNOTICED OR THAT SOMEHOW WERE LOST IN A

20   DOCUMENT DUMP.  THEY CITED THEM TO YOUR HONOR IN SUPPLEMENTAL

21   BRIEFING THAT YOU HAD REQUESTED REGARDING THE X-CLIENT DATA

22   HEADER, STATING THAT THEIR REQUEST FOR THIS DISCOVERY WAS

23   ALSO -- I'M QUOTING HERE FROM DOCKET NUMBER 217-4 -- STATING

24   THAT THEIR REQUEST FOR THIS DISCOVERY WAS "ALSO CONSISTENT WITH

25   THE NUMEROUS STATEMENTS BY GOOGLE EMPLOYEES EXPLAINING HOW
```

1    GOOGLE ITSELF USES THE X-CLIENT DATA HEADER TO IDENTIFY

2    INCOGNITO BROWSING."

3         THEY EVEN CITED MANDY LIU'S COMMENT REGARDING THE X-CLIENT

4    DATA HEADER AS SOMETHING THAT A GOOGLE EMPLOYEE WROTE.

5         SEPTEMBER 1ST OF LAST YEAR, WE PRODUCED DETAILED DESIGN,

6    ACTUALLY MORE THAN ONE, BUT WE PRODUCED DETAILED DESIGN

7    DOCUMENTS FOR THE MAYBE_CHROME_INCOGNITO BIT.

8         SO THESE DOCUMENTS SHOULD HAVE LEFT PLAINTIFFS AND THEIR

9    25 EXPERTS WHO HAVE SIGNED THE PROTECTIVE ORDER TO GET

10   PERMISSION TO VIEW OUR ATTORNEYS' EYES ONLY MATERIAL WITH ZERO

11   DOUBT ABOUT THE EXISTENCE AND IMPLEMENTATION OF THE PROJECT,

12   ABOUT ITS TECHNICAL AND FACTUAL UNDERPINNINGS, ABOUT THE ROLE

13   OF THE MAYBE_CHROME_INCOGNITO BIT, AND ITS RELIANCE ON

14   INFERENCES REGARDING THE ABSENCE OF THE X-CLIENT DATA HEADER.

15        AND WHO ARE THE LISTED AUTHORS FOR THESE DOCUMENTS?

16   BERT LEUNG, MANDY LIU.

17        WE CONTINUED TO PRODUCE DOCUMENTS ABOUT THE PROJECT

18   THROUGHOUT THE AUTUMN OF 2021, INCLUDING DOCUMENTS SHOWING THE

19   BIT AT VARIOUS STAGES OF THE PROJECT WERE APPROVED.

20        LET ME GRAB MY GLASSES HERE.

21        YOU SEE HERE THIS DOCUMENT HAS THE LGTM APPROVAL NOTE ON

22   IT.

23        AND A FEW MINUTES AGO, I DESCRIBED THIS AS THE INCREDIBLE

24   SHRINKING CASE, AND I WAS TALKING ABOUT A LOT OF THE CLAIMS

25   THAT YOU SAW IN THE OPENING BRIEFS.

 1          ONE OF THE ONES THAT I THOUGHT DIDN'T REALLY HOLD WATER,

 2     EVEN ON ITS OWN TERMS, WAS THIS CLAIM THAT, WELL, WE KNEW ABOUT

 3     IT, BUT SINCE ONLY FOUR OUT OF FIVE APPROVERS HAD APPROVED IT,

 4     WE DIDN'T THINK IT WAS WORTH FOLLOWING UP WITH A QUESTION.

 5          I THINK THAT IS FACIALLY INCREDIBLE IN SCORCHED, OR WHAT

 6     HAS BEEN SCORCHED EARTH LITIGATION SUCH AS THIS.

 7          BUT EVEN THAT, ON ITS OWN TERMS, IS NOT ACCURATE, AND I

 8     THINK IT CALLS INTO QUESTION THE ACCURACY OF SOME OF THE OTHER

 9     THINGS THAT ARE SAID IN THIS BRIEF, BECAUSE IF YOU LOOK AT THE

10     ACTUAL DOCUMENT THAT THEY'RE CITING, EVERYONE WHO WAS

11     AUTHORIZED AS AN APPROVER APPROVED IT.

12          TAKE A LOOK AT THIS DOCUMENT HERE.  ROLE:  APPROVER.

13     APPROVED.  ROLE:  APPROVER.  APPROVED.  ROLE:  APPROVER.

14     APPROVED.  ROLE:  APPROVER.  APPROVED.  AND THEN THE FINAL

15     PERSON IS A REVIEWER WHO REVIEWED.

16          SO FOUR OUT OF FOUR PEOPLE APPROVED THE DOCUMENTS FOR THE

17     MAYBE_CHROME_INCOGNITO BIT.

18          THIS SUGGESTION THAT THE -- IF ONLY, IF ONLY WE HAD

19     PRODUCED A DOCUMENT THAT HAD FIVE OUT OF FIVE, THEN THEY WOULD

20     HAVE CAUGHT ON AND ASKED THE FOLLOW-UP QUESTIONS THAT THEY

21     SHOULD HAVE ASKED, IT DOESN'T HOLD WATER, YOUR HONOR.

22          NOW, WE ALSO, IN THE FALL, PROVIDED EVIDENCE ABOUT THE

23     PREVIOUSLY IDENTIFIED SEARCH BITS, THE 2017 BITS.

24          IN OCTOBER OF LAST YEAR, 2021, WE PRODUCED A DESIGN

25     DOCUMENT SHOWING THE PROPOSAL TO LOG A BIT APPROXIMATING

1    INCOGNITO TRAFFIC IN THE PREVIOUSLY IDENTIFIED SEARCH LOGS.

2    YOU CAN SEE IT HERE.

3         SO NOW THAT TAKES US TO NOVEMBER OF LAST YEAR WHEN WE HAD

4    A HEARING AND SOME ARGUMENT ABOUT WHAT WAS THEN CALLED THE P16

5    DISPUTE ABOUT THE X-CLIENT DATA HEADER.

6         THE PLAINTIFFS THEMSELVES PREPARED, ACTUALLY PREPARED A

7    SLIDE CITING MANDY LIU'S STATEMENT ABOUT HOW THE CHROME

8    INCOGNITO MODE IS DETECTED FROM X CLIENT DATA HEADER.

9         THIS TIME IT WAS IN A SLIDE THAT WAS SENT TO THE COURT FOR

10   THE HEARING THAT LED TO THE NOVEMBER 12TH ORDER.

11        SO THERE'S BEEN NO WITHHOLDING -- IF WE WERE

12   WITHHOLDING -- YOU KNOW, SOMETIMES YOU'LL HEAR IN CRIMINAL

13   CASES, BOY, THIS GUY MUST HAVE BEEN THE WORST CONSPIRATOR IN

14   THE WORLD BECAUSE HE WAS SO OBVIOUS.

15        IF WE WERE TRYING TO CONCEAL DOCUMENTS HERE, THIS IS THE

16   MOST INEPT EFFORT TO CONCEAL THAT I THINK ANY JUDGE WILL EVER

17   HAVE SEEN.

18        SO THIS IDEA THAT WE FAILED TO DISCLOSE BERT LEUNG AND

19   MANDY LIU, AS YOU KNOW, JUST TO SUM UP, WE CITED STATEMENTS BY

20   MS. LIU TO THE COURT -- EXCUSE ME -- THE PLAINTIFFS CITED

21   STATEMENTS BY MS. LIU TO THE COURT MULTIPLE TIMES LAST YEAR.

22   THEY HAD DOCUMENTS IN HAND SHOWING THAT MR. LEUNG HAD AUTHORED

23   DESIGN DOCUMENTS RELATING TO THE PROJECT BACK IN SEPTEMBER.

24        THOSE DOCUMENTS, PLUS OUR STEADY PRODUCTION OF ADDITIONAL

25   DOCUMENTS THROUGH NOVEMBER, GAVE THEM AMPLE INFORMATION TO

1    EXPLORE THESE BITS IF THEY HAD WANTED.

2         BUT THERE'S -- SO THERE'S BEEN NO CONCEALMENT ON THE PART

3    OF GOOGLE.

4         PLAINTIFFS HAVE ALSO RAISED COMPLAINTS ABOUT THE, THE

5    SUBMISSION OF MR. GOLUEKE IN RESPONSE TO THIS COURT'S

6    NOVEMBER 12TH ORDER.

7         AND YOU WILL HEAR FROM MR. GOLUEKE ON THE STAND, AND YOU

8    CAN ASSESS HIS CREDIBILITY YOURSELF.  HE IS A TRUTHFUL, HARD

9    WORKING PERSON WHO'S OUT THERE DOING THE BEST HE CAN.

10        THE COURT HAD ORDERED GOOGLE TO PROVIDE A DECLARATION

11   THAT, TO THE BEST OF ITS KNOWLEDGE, WE HAD PROVIDED A -- GOOGLE

12   HAD PROVIDED A COMPLETE LIST OF DATA SOURCES THAT CONTAINED

13   INFORMATION RELEVANT TO THE PLAINTIFFS' CLAIMS -- AND I'M

14   EMPHASIZING THAT LAST CLAUSE FOR A REASON -- AND THAT ALL OF

15   THE DATA RESPONSIVE TO THE NAMED PLAINTIFFS HAVE BEEN PRODUCED

16   FROM ALL SEARCHED DATA SOURCES IN THE RESPECTIVE PRIOR

17   SEARCHES.  I'M EMPHASIZING THAT FOR A REASON AS WELL.

18        AND WHAT DID YOUR HONOR DO?  YOUR HONOR, I THINK WISELY,

19   BROUGHT IN THE SPECIAL MASTER AND MR. SCHMIDT TO, IN YOUR OWN

20   WORDS, THE WORDS OF THE ORDER FROM NOVEMBER 12TH, TO BE AN

21   INTERMEDIARY THROUGHOUT EACH STEP OF GOOGLE'S PRODUCTION OF

22   DATA, TO, QUOTE, "EVALUATE THE RESULTS FOR CONTENT AND

23   COMPLIANCE WITH THIS ORDER."

24        AND YOU AUTHORIZED THE SPECIAL MASTER -- THIS, AGAIN, IS

25   IN THE WORDS OF YOUR ORDER -- TO TAKE ALL APPROPRIATE MEASURES

1    TO PERFORM HIS DUTIES FAIRLY AND EFFICIENTLY AND TO ENFORCE

2    THIS ORDER AS HE DEEMS APPROPRIATE, INCLUDING MODIFYING THIS

3    ORDER AND ISSUING FURTHER ORDERS.

4         IT IS AGAINST THAT BACKDROP THAT MR. GOLUEKE PROVIDED HIS

5    DECLARATION.

6         HOW DID HE DO IT?  HE OBTAINED INFORMATION FROM MULTIPLE

7    GOOGLE ENGINEERS.

8         HE'S PUT IN A DECLARATION, BY THE WAY, IN CONNECTION WITH

9    THIS SANCTIONS HEARING AS WELL THAT I THINK YOU HAVE,

10   CONSULTING WITH MULTIPLE GOOGLE ENGINEERS AND GOOGLE PERSONNEL

11   WORKING ON AND IDENTIFYING -- WORKING ON IDENTIFYING AND

12   SEARCHING COMPLEX DATA SOURCES FOR THIS LITIGATION.

13        AND HIS DECLARATION ATTACHED A LIST OF THOSE DATA SOURCES

14   SPANNING NEARLY FOUR PAGES, THAT'S DOCKET 337-3; AND HE

15   RECEIVED A LIST OF PLAINTIFFS' DATA THAT HAD BEEN PRODUCED OR

16   WOULD BE PRODUCED SPANNING 20 PAGES.

17        NOW, ALTHOUGH THE PLAINTIFFS HAD DOCUMENTS IN HAND AT THAT

18   TIME IDENTIFYING THE IS_CHROME_NON_INCOGNITO BIT AND

19   IDENTIFYING THAT IT WAS STORED IN THE PREVIOUSLY IDENTIFIED

20   SEARCH LOG, THEY DIDN'T CHALLENGE HIS DECLARATION OR THE

21   EXHIBITS ATTACHED ON THE GROUND THAT THEY DIDN'T CONTAIN THOSE

22   LOGS, OR ON ANY OTHER GROUNDS AT THE TIME.

23        AND OBVIOUSLY MR. GOLUEKE DID NOT PURPORT TO SPEAK ABOUT

24   FUTURE SEARCHES THAT MIGHT HAPPEN.

25        I SAW A REFERENCE IN THE PLAINTIFFS' REPLY BRIEF SAYING,

1    OH, THERE'S SOME THINGS THAT WE -- THAT HAVEN'T YET HAPPENED

2    AND THEY'RE NOT MENTIONED IN HIS DECLARATION.

3         THE DECLARATION ASKED HIM TO TALK ABOUT PRIOR SEARCHES

4    THAT OCCURRED.  THE DECLARATION WAS 100 PERCENT ACCURATE.

5         THE SPECIAL MASTER, CONSISTENT WITH YOUR HONOR'S ORDER

6    ALLOWING HIM TO MANAGE THE PROCESS, LIMITED PRODUCTION

7    INITIALLY TO THE 100 LARGEST FIELDS FOR WHAT ARE CALLED THE

8    SAWMILL LOGS IN THIS CASE, AND YOU CAN FIND SOME OF THAT,

9    THERE'S -- WE HAVE A TRANSCRIPT.  THERE'S A TRANSCRIPT OF THE

10   SPECIAL MASTER HEARING FROM MARCH 5TH, 2022, PAGE 67, AND WE

11   CITE IT IN OUR BRIEF.

12        NOW, THE PLAINTIFFS WOULD HAVE IT, I THINK, TRYING TO

13   FRAME EVERYTHING IN SINISTER TONES, THAT SOMEHOW THE REASON WE

14   REQUESTED TO LIMIT THE PRODUCTION TO THE 100 LARGEST FIELDS WAS

15   BECAUSE WE WERE INTENDING TO INCLUDE OR EXCLUDE CERTAIN,

16   CERTAIN FIELDS FROM PRODUCTION.

17        THAT'S NOT WHY IT HAPPENED AT ALL.  THE LIMITATION WAS

18   DRIVEN BY THE CAPABILITIES OF SOMETHING CALLED THE LOG'S FRONT

19   DOOR, THE LOG'S FRONT DOOR, WHICH IS A TOOL THAT GOOGLE

20   MAINTAINS IN THE ORDINARY COURSE OF BUSINESS THAT CAN

21   AUTOMATICALLY GENERATE A LIST OF THE LARGEST 100 FIELDS FROM A

22   SAWMILL LOG.

23        SO IT WAS -- AFTER BACK AND FORTH WITH THE SPECIAL MASTER,

24   WE SAID, LOOK, IS THIS A WAY -- WE CAN'T GO AND SEARCH

25   THOUSANDS OF LOGS HERE.  CAN WE -- WE HAVE THIS TOOL, THOUGH,

1       THAT ALLOWS US VERY QUICKLY TO PRODUCE THE 100 FIELDS.

2           WE DIDN'T SELECT WHAT THOSE 100 FIELDS WERE.  WE DIDN'T --

3       THERE WERE NO MACHINATIONS.  IT WAS, THIS IS THE ONE WHERE WE

4       CAN PUSH A BUTTON -- IT'S NOT AS SIMPLE AS PUSHING A BUTTON --

5       BUT THIS IS A SIMPLE TOOL THAT WILL PRODUCE THESE.  CAN WE DO

6       THAT?

7           YES, WE CAN.

8           WE HAD ATTEMPTED AT ONE POINT TO OBTAIN ALL THE FIELDS,

9       WHICH AS THE SPECIAL MASTER RECORD WILL CONFIRM, TURNED OUT TO

10      BE A HUGE ENGINEERING TASK.  WE DID MANAGE TO DO IT FOR SOME

11      LOGS.

12          BUT THE 100 FIELDS, WHICH IS RELEVANT, OF COURSE, TO THE

13      GOLUEKE DECLARATION, HAS THE BENIGN ORIGIN THAT I HAVE JUST

14      DESCRIBED.

15          I'D LIKE TO MOVE TO THE LIAO DEPOSITION NOW.

16          I JOIN MR. BOIES IN INVITING YOU TO READ THE RELEVANT

17      PAGES OF THE DEPOSITION, BECAUSE I THINK THERE'S ONLY ONE

18      CONCLUSION THAT ONE CAN DRAW FROM IT, AT LEAST AFTER THE

19      CONTEXT THAT I'M ABOUT TO PROVIDE, AND THAT'S --

20              THE COURT:  LET ME -- MR. SCHAPIRO, THEN LET ME JUST

21       ADD TO THE REQUEST, LET ME HAVE THE DEFENDANTS' EMAIL ME

22       MR. LIAO'S DEPOSITION.

23              MR. SCHAPIRO:  SAY THAT AGAIN.

24              THE COURT:  EMAIL THE LIAO DEPOSITION TO ME --

25              MR. SCHAPIRO:  WE WILL DO THAT.

```
1              THE COURT:  -- IN ITS ENTIRETY AFTER THESE

2        PROCEEDINGS.

3              MR. SCHAPIRO:  WE WILL DO THAT.

4          THE RELEVANT -- THE PAGES THAT I THINK ARE IN DISPUTE

5    HERE, AND I THINK THEY'RE THE SAME PAGES THAT MR. BOIES CITED,

6    ARE IN THE 130'S, AND THAT DEPOSITION TOOK PLACE ON

7    DECEMBER 3RD OF LAST YEAR.

8          SO IF YOU REMEMBER SOME OF THE POINTS THAT I MADE A LITTLE

9    BIT EARLIER TODAY, BY DECEMBER 3RD, 2021, THE PLAINTIFFS HAD

10   NUMEROUS DOCUMENTS, INCLUDING DESIGN DOCUMENTS, EMAIL

11   CORRESPONDENCE REGARDING THE MAYBE_CHROME_INCOGNITO BIT,

12   INCLUDING CORRESPONDENCE IN WHICH MR. LIAO HIMSELF SUGGESTS

13   THAT THE NAME OF THE BIT SHOULD BE CHANGED TO

14   MAYBE_CHROME_INCOGNITO TO BE MORE ACCURATE.  THAT'S A DOCUMENT

15   THAT WAS PRODUCED TO THEM IN NOVEMBER.

16         PLAINTIFFS DID NOT ASK MR. LIAO A SINGLE QUESTION ABOUT

17   THE BIT.

18         AND LET ME TELL YOU, I THINK HIGHLY OF THE ABILITIES OF

19   OPPOSING COUNSEL, AND ANY GOOD LAWYER, BEFORE YOU DEPOSE A

20   WITNESS, YOU HAVE SOMEBODY RUN A SEARCH OF THAT PERSON'S

21   DOCUMENTS, WHAT ARE THE DOCUMENTS, ESPECIALLY THE DOCUMENTS

22   WE'VE RECENTLY RECEIVED ABOUT THIS PERSON, BECAUSE THOSE MIGHT

23   BE SOME THAT WE HAVEN'T FULLY ABSORBED.

24         SO THEY HAD THAT DOCUMENT.  THEY CHOSE NOT TO ASK HIM

25   ABOUT IT.
```

1        BUT NOW THEY'RE PLACE OUTSIZED FOCUS ON CERTAIN ANSWERS

2     GIVEN MY MR. LIAO.  BUT, YOUR HONOR, THIS IS A TRUISM, BUT

3     ANSWERS OCCUR IN RESPONSE TO QUESTIONS, AND ONCE YOU FOCUS ON

4     THE QUESTIONS, MR. LIAO'S ANSWERS NOT ONLY MAKE SENSE, BUT

5     THERE'S NO -- THERE'S NO WAY ANYONE COULD BE MISLED BY HIM, AND

6     IT WOULD HAVE BEEN MISLEADING FOR HIM TO ANSWER OTHERWISE.

7        WHAT WERE THE QUESTIONS THAT MR. LIAO WAS ASKED BY

8     MR. MAO?

9        AND WE HAVE THESE TRANSCRIPT EXCERPTS HERE WHERE WE'VE

10     HIGHLIGHTED SOME KEY PHRASES, BUT THIS IS IMPORTANT ENOUGH THAT

11     I THINK I WANT TO WALK THROUGH THEM ALL PRETTY QUICKLY.

12        MR. MAO ASKS MR. LIAO, "I BELIEVE YOU SAID THAT'S PARSING

13     WHETHER OR NOT THE INCOMING SIGNAL FROM THE EXTERNAL WORLD

14     CONTAINS A PRIVACY PREFERENCE OR SETTING OF SOME TYPE."

15        AND THEN HE SAYS, "AS FAR AS YOU'RE AWARE, AMONGST THESE

16     PRIVACY SIGNALS, IS THERE ONE FOR INCOGNITO MODE BROWSING ON

17     CHROME?"

18        NEXT QUESTION -- NOT NECESSARILY THE NEXT QUESTION, BUT

19     THE NEXT ON OUR SLIDE, "WHAT ABOUT A PARAMETER SPECIFICALLY TO

20     SIGNAL TO UIS" -- AND UIS MEANS UNIFIED --

21        MS. TREBICKA:  IDENTITY SERVICE.

22        MR. SCHAPIRO:  -- IDENTITY SERVICE, WHICH IS

23     SOMETHING THROUGH WHICH THE MAYBE_CHROME_INCOGNITO BIT DOESN'T

24     TRAVEL.

25        "WHAT ABOUT PARAMETER SPECIFICALLY TO SIGNAL TO UIS TO

1    PARSE OUT THAT, OH, THIS IS INCOGNITO MODE TRAFFIC?"

2    ANOTHER QUESTION.  "WERE YOU EVER INVOLVED IN ANY

3    DISCUSSION ON WHETHER OR NOT UIS SHOULD BE DESIGNED TO RECEIVE

4    AND PARSE SUCH A SIGNAL?"

5    "WAS THERE A DISCUSSION ON WHETHER OR NOT THAT SHOULD BE A

6    SIGNAL TO UIS?  WHETHER OR NOT THAT DESIGN SHOULD INCLUDE, YOU

7    KNOW, A SIGNAL TO UIS, SAYING THAT THE USER OR DEVICE WAS

8    BROWSING IN INCOGNITO MODE?"

9    "MY QUESTION TO YOU IS WHETHER OR NOT YOU'RE AWARE OF A

10   DISCUSSION OR PROPOSAL OF A NON-URL SIGNAL THAT WOULD BE SENT

11   TO UIS?"

12   YOUR HONOR, THE ABSENCE OF THE X-CLIENT DATA HEADER AND

13   THESE BITS THAT ARE BUILT UPON THE ABSENCE OF THE X-CLIENT DATA

14   HEADER ARE IN NO UNIVERSE A SIGNAL SENT FROM A BROWSER BACK TO

15   GOOGLE, LET ALONE A SIGNAL SPECIFICALLY SENT TO UIS.

16   IT IS THE ABSENCE OF SOMETHING FROM WHICH SOMEONE MIGHT

17   INFER SOMETHING, AND YOU WILL SEE FROM MR. LIAO YOURSELF, HE IS

18   A WITNESS WHO LISTENS CAREFULLY TO THE QUESTIONS AND ANSWERS

19   THEM HONESTLY, AND HE WAS ASKED -- THE QUESTION ON WHICH THE

20   PLAINTIFFS HAD PLACED EMPHASIS WAS A QUESTION ABOUT, IS THERE

21   SUCH A SIGNAL IN THE CONTEXT OF ALL THESE QUESTIONS ABOUT THAT

22   TYPE OF SIGNAL?

23   NO, THERE ISN'T, WE'RE NOT DEVELOPING ONE.

24   SO THERE'S NO CONCEALMENT THERE.

25   AS I MENTIONED AT THE BEGINNING, THE FOCUS OF PLAINTIFFS'

```
1       CASE HAS SHIFTED A LITTLE BIT NOW TO WHAT WE'RE CALLING THE

2       PREVIOUSLY IDENTIFIED SEARCH LOGS.

3           WELL, THEY KNEW ENOUGH ABOUT THAT TO SERVE A RULE 30(B)(6)

4       NOTICE ON THE TOPIC ON DECEMBER 3RD OF LAST YEAR.  THEY SENT A

5       30(B)(6) NOTICE ON THE IS_CHROME_NON_INCOGNITO MODE BIT IN

6       THOSE LOGS?  IT CITED THE DOCUMENTS THAT -- ONE OF THE

7       DOCUMENTS I PREVIOUSLY SHOWED YOU FROM JUNE OF 2021.

8           AND DR. CAITLIN SADOWSKI, WHO YOU WILL HEAR FROM AS WELL

9       TODAY, TESTIFIED AS GOOGLE'S WITNESS ON THAT TOPIC ON

10      MARCH 10TH OF THIS YEAR.

11          THAT SUMS UP -- EXCUSE ME.

12          ALL OF THIS DEMONSTRATES THAT NOTHING WAS CONCEALED BY

13      GOOGLE.  PLAINTIFFS HAD THE INFORMATION THAT THEY NOW SAY IS

14      SUDDENLY THE CENTER OF THEIR CASE, AND CERTAINLY NOTHING THAT

15      THE PLAINTIFFS HAVE IDENTIFIED OR THAT I HAVE WALKED THROUGH

16      INDICATES ANY TYPE OF BAD FAITH OR INTENTIONAL MISCONDUCT BY

17      GOOGLE OR BY ITS ATTORNEYS.

18          BUT THERE ALSO HAS BEEN NO PREJUDICE.  THE PLAINTIFFS HAVE

19      NOW ALL THAT THEY CLAIM TO NEED.

20          I CAN GET THROUGH THESE NEXT COUPLE OF SLIDES PRETTY

21      QUICKLY BECAUSE I THINK YOU'VE SEEN SOME OF THIS.

22          THEY HAVE OBTAINED THE RELEVANT DOCUMENTS.

23          THEY HAVE OBTAINED THE RELEVANT TESTIMONY.

24          THEY HAVE NOT BEEN PREJUDICED IN THE SPECIAL MASTER

25      PROCESS.
```

1        THEY HAVE NOT BEEN PREJUDICED IN EXPERT DISCOVERY, NOR IN

2    THEIR ABILITY TO REBUT OUR CONTENTIONS.

3        LET'S TAKE A LOOK, QUICK LOOK AT THE FIRST ONE, RELEVANT

4    DOCUMENTS.

5        MANDY LIU AND BERT LEUNG HAVE BEEN MADE DOCUMENT

6    CUSTODIANS.  WE'VE PRODUCED DOCUMENTS FROM THEIR CUSTODIAL

7    FILES AT AN ACCELERATED PACE.  I THINK MS. TREBICKA MENTIONED

8    THIS.  IT WAS SO ACCELERATED THAT WE HAD TO CLAW THEM BACK

9    BECAUSE WE WERE RUSHING THEM OUT THE DOOR.

10       PLAINTIFFS ALSO OBTAINED RELEVANT TESTIMONY.  THEY DEPOSED

11   BERT LEUNG, THEY DEPOSED MANDY LIU, THEY DEPOSED

12   CAITLIN SADOWSKI ON THE TOPICS OF THE BITS THAT WE'RE HERE

13   DISCUSSING TODAY.

14       THEY HAVE NOT BEEN PREJUDICED IN THE SPECIAL MASTER

15   PROCESS.  THEY PROVIDED THEIR FINAL SET OF SEARCHS TO THE

16   SPECIAL MASTER ON APRIL 14TH, SO THIS IS LONG AFTER THE

17   SUPPOSED BLOCKBUSTER REVELATIONS.  THOSE SEARCH REQUESTS

18   INCLUDE ALL OF THE LOGS THAT CONTAIN THE

19   MAYBE_CHROME_INCOGNITO, THE IS_CHROME_NON_INCOGNITO, AND THE

20   IS_CHROME_INCOGNITO BITS.

21       I'LL REPEAT THAT.  THE SEARCH REQUEST THAT THEY GAVE TO

22   THE SPECIAL MASTER ON APRIL 14TH INCLUDE ALL LOGS THAT CONTAIN

23   THESE THREE BITS.

24       WE ARE SEARCHING THOSE LOGS UNDER THE SPECIAL MASTER'S

25   GUIDANCE.

1        AND ALL OF THE LOGS THAT CONTAINED THE BITS AT ISSUE HAVE

2   BEEN INCLUDED IN THE SPECIAL MASTER'S PRESERVATION PROPOSAL.

3        WHEN OPPOSING COUNSEL WAS SUMMING UP A FEW MINUTES AGO,

4   YOU ASKED, WELL, IS THERE AN ASK?  IS THERE SOMETHING ELSE THAT

5   YOU NEED?

6        AND IN OUR VIEW, IT'S TELLING THAT THE PLAINTIFFS REALLY

7   COULDN'T COME UP WITH ANYTHING ELSE THAT THEY SAY THEY NEED.

8        THEY HAVE CLAIMED THAT THEY'VE BEEN PREJUDICED IN EXPERT

9   DISCOVERY, BUT THEIR EXPERTS HAVE PARTICIPATED IN THE SPECIAL

10  MASTER HEARINGS, INCLUDING LIVE DEMONSTRATIONS WHERE, A MONTH

11  OR TWO AGO -- WHICH I THINK YOU HEARD FROM MR. THOMPSON ON THE

12  STAND -- THAT HE WAS ABLE TO DO SOME SEARCHES, OR LOOK OVER THE

13  SHOULDERS OF GOOGLE ENGINEERS AS THEY RAN SEARCHES RELATED TO

14  THE MAYBE_CHROME_INCOGNITO BIT, WHILE BEING QUESTIONED IN WHAT

15  I WOULD SAY WAS A SOMEWHAT IRREGULAR MANNER BY PLAINTIFFS'

16  EXPERTS, KIND OF AN INFORMAL DEPOSITION, SO THEY WERE ABLE TO

17  ASK WHATEVER QUESTIONS THEY WANTED.

18       AND AFTER THE SANCTIONS MOTION WAS FILED, WE NEGOTIATED AN

19  EXTENSION TO THE EXPERT SCHEDULE WITH THE PLAINTIFFS.  THEY DID

20  NOT ASK US FOR MORE TIME.

21       FINALLY, YOUR HONOR, AT LEAST ON MY TOPICS HERE, FINALLY,

22  THE PLAINTIFFS HAVE NOT BEEN PREJUDICED IN THEIR ABILITY TO

23  REBUT WHATEVER CONTENTIONS THEY SAY THEY NEED TO REBUT.

24       THROUGH THE SPECIAL MASTER PROCESS, THE PLAINTIFFS HAVE

25  RECEIVED LITERALLY GIGABYTES OF DATA ASSOCIATED WITH THEIR OWN

1    AUTHENTICATED IDENTIFIERS.  THEY'VE RECEIVED THE RESULTS OF

2    HUNDREDS -- EXCUSE ME -- OF SEARCHES FOR HUNDREDS OF

3    UNAUTHENTICATED IDENTIFIERS, AND AFTER THIS FINAL SET OF

4    SEARCHES IS COMPLETE, THEIR EXPERTS WILL HAVE EVEN MORE DATA.

5         SO WE WOULD SAY THAT AFTER DOZENS OF DEPOSITIONS, MILLIONS

6    OF PAGES OF PRODUCED DOCUMENTS, GETTING GIGABYTES OF USER DATA,

7    THEY HAVE A VAST AMOUNT OF INFORMATION.

8         IF THEY WANT TO ARGUE ABOUT IT, IF WE WANT TO HAVE

9    ARGUMENTS DOWN THE ROAD ABOUT WHETHER A CLASS IS OR ISN'T

10   ASCERTAINABLE, THAT'S GOING TO HAPPEN IN FRONT OF JUDGE ROGERS,

11   I ASSUME.

12        BUT WHATEVER ARGUMENTS THEY MAY WANT TO MAKE AND WHATEVER

13   ARGUMENTS WE MAY WANT TO MAKE, THEY CAN MAKE.  THEY MAY SAY,

14   OH, GOOGLE, YOU THOUGHT THIS WAS RELIABLE BECAUSE YOU USED IT

15   IN SOME PROJECT OR SOME BITS.  HAVE AT IT, THEY CAN MAKE IT.

16        WE WANT TO RESPOND, WELL, WAIT A MINUTE, THERE'S SOME

17   REASONS WHY IT'S, IT'S UNRELIABLE AND IT CAN'T DO WHAT YOU WANT

18   IT TO DO.  THERE HAVE BEEN FULL DEPOSITIONS ABOUT THAT,

19   MULTIPLE DEPOSITIONS ABOUT THAT.

20        THEY ARE AT NO DISADVANTAGE.

21        THE FACT THAT THIS INFORMATION STILL MIGHT NOT BE ENOUGH

22   IN THEIR MIND TO REBUT OUR CONTENTIONS IS BECAUSE OUR

23   CONTENTIONS ARE CORRECT.  THERE IS NO RELIABLE MEANS TO

24   IDENTIFY INCOGNITO TRAFFIC.  THE DATA AT ISSUE IS NOT

25   MAINTAINED IN ANYTHING RESEMBLING A CRADLE-TO-GRAVE

1    COMPREHENSIVE PROFILE.

2         ONE MOMENT.

3         (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

4         MR. SCHAPIRO:  JUST ONE WORD ON THE SPECIAL MASTER

5    AND THEN MS. TREBICKA WILL BRIEFLY ADDRESS A POINT ABOUT THE

6    X-CLIENT DATA HEADER AND SANCTIONS.

7         DISCOVERY -- THE SPECIAL MASTER PROCESS HERE HAS BEEN

8    ROBUST.  I DON'T NEED TO WALK YOU THROUGH THE NUMBERS ON THIS

9    SLIDE.

10        BUT SUFFICE IT TO SAY ALL OF US HERE -- AND THE FOLKS FROM

11   CALHOUN WHO ARE HERE AS WELL -- HAVE SPENT A GOOD DEAL OF TIME

12   WITH MR. BRUSH AND WITH MR. SCHMIDT, INCLUDING ON THE WEEKENDS

13   OR EVENINGS, AND I BELIEVE, AND I BELIEVE THE RECORD WILL

14   REFLECT, BOTH SIDES HAVE WORKED IN GOOD FAITH, BOTH SIDES HAVE

15   BEEN FRUSTRATED AT TIMES BECAUSE WE FEEL THE OTHER SIDE IS

16   BEING UNREASONABLE, AND WE HAVE WALKED THAT MIDDLE ROAD THAT

17   HAPPENS IN DISCOVERY IN AN ORDINARY CASE.

18        BUT THERE CAN BE NO DOUBT THAT THE PLAINTIFFS HAVE NOW HAD

19   AMPLE OPPORTUNITY TO ASK FOR AND RECEIVE WHATEVER THEY WANT.

20        AND IF WE WERE REALLY PLAYING GAMES AND HIDING THE BALL,

21   ESPECIALLY SINCE THIS ISSUE ABOUT THE, THESE BITS HAS BEEN ON

22   THE PLAINTIFFS' RADAR AT LEAST SINCE FEBRUARY, ALTHOUGH WE

23   ASSERT THAT THERE'S MORE, THAT THE SPECIAL MASTER WOULD HAVE

24   SAID SOMETHING ABOUT IT OR IMPOSED HIS OWN RULINGS.

25        IN ADDITION TO BEING ROBUST, THE PROCESS HAS BEEN

1    SUCCESSFUL.  THE SLIDE HERE SPEAKS FOR ITSELF.

2         BUT WE CAN SEND YOU -- WE CAN SUBMIT, IF YOU WISH, SOME OF

3    THE TRANSCRIPTS -- WE STARTED AT SOME POINT HALFWAY THROUGH

4    RECORDING BY ZOOM SOME OF THESE HEARINGS AND THEN HAVING

5    TRANSCRIPTS MADE.

6         BUT THE SPECIAL MASTER HAS SAID -- THIS IS FROM THE

7    TRANSCRIPT OF FEBRUARY 16TH, 2022:  "I MEAN WE HAVE TO ASSUME

8    THERE'S A GOOD FAITH EFFORT THAT GOOGLE HAS MADE SOME ATTEMPT

9    ON THE SEEMINGLY SIGNIFICANT MATTER TO USE THE TOOLS IDENTIFIED

10   TO SEARCH THE DATA IN A RESPONSIVE AND PRODUCTIVE WAY."

11        FROM THE FEBRUARY 25TH, 2022 TRANSCRIPT:  "AGAIN, LET'S

12   NOT ALWAYS FRAME EVERYTHING AS IF THERE WAS SOME MALICE OR

13   TRYING TO HIDE THINGS.  I MEAN, THIS IS A COMPLICATED ISSUE."

14   THAT WAS FEBRUARY 25TH.

15        OUR HEARING ON MARCH 5TH:  "WHAT'S BEFORE ME, YES, YOU

16   HAVE -- BOTH SIDE HAVE WORKED TOGETHER."

17        THIS IS AFTER THE STUNNING REVELATIONS ABOUT THE BITS.

18        AND FROM A HEARING JUST MARCH 23RD:  "LOOK, WE WOULDN'T BE

19   IN THIS PROCESS IF IT WAS EASY.  I MEAN, THERE ARE COMPLEXITIES

20   TO THIS THAT WE'RE WORKING THROUGH AND I BELIEVE BOTH PARTIES

21   ARE DOING IN GOOD FAITH."

22        AND THAT'S WHERE I WANT TO CLOSE MY PORTION, YOUR HONOR,

23   BECAUSE THAT'S ALL THAT'S HAPPENED HERE.  YOU HAVE PARTY --

24        THE COURT:  LET ME ASK A COUPLE QUESTIONS,

25    MR. SCHAPIRO.

```
 1                MR. SCHAPIRO:  SURE.

 2                THE COURT:  IS GOOGLE -- IS IT CORRECT THAT GOOGLE

 3    HAS NOT ANSWERED THE QUESTION AS TO WHETHER OR NOT THERE ARE

 4    OTHER FIELDS THAT IDENTIFY INCOGNITO TRAFFIC?

 5                MR. SCHAPIRO:  I'M GOING TO NEED TO CONFER WITH

 6    MR. ANSORGE.  IT IS NOT A SIMPLE THING TO DO.

 7                MS. TREBICKA:  IT'S COMPLICATED.  I CAN EXPLAIN,

 8    BUT --

 9                MR. SCHAPIRO:  WE HAVE NOT, BECAUSE IT'S A DIFFICULT

10    THING TO DO, AS YOU WILL HEAR FROM SOME OF THE WITNESSES WHO

11    WILL BE TESTIFYING TODAY.

12                THE COURT:  ALL RIGHT.  SO THERE, AT LEAST IN THEORY,

13    COULD BE ADDITIONAL FIELDS --

14                MR. SCHAPIRO:  YES.

15                THE COURT:  -- THAT ARE, YOU KNOW, MAYBE INCOGNITO,

16    OF THAT ILK, THAT HAVE NOT YET BEEN IDENTIFIED.

17                MS. TREBICKA:  IN THEORY, YOUR HONOR.

18          TO THE BEST OF OUR KNOWLEDGE, WITH THE DUE DILIGENCE THAT

19    WE'VE DONE, I DON'T BELIEVE SO.

20          BUT I'D LIKE ALSO TO POINT OUT THAT INCOGNITO IS NOT A

21    TERM THAT'S USED ONLY WITH RESPECT TO CHROME BROWSING.  IT HAS

22    DIFFERENT USES WITHIN GOOGLE AS WELL.  SO IT'S NOT A SIMPLE,

23    LET'S SEARCH FOR INCOGNITO AND IT'LL HIT ON ONLY RELEVANT

24    RESULTS.

25                MR. SCHAPIRO:  FOR EXAMPLE, YOUTUBE INCOGNITO, ALL
```

1      KINDS OF OTHER SERVICES.  AND SO -- BUT WE WANT TO BE CAREFUL,

2      TO THE BEST OF OUR KNOWLEDGE IS I THINK THE ANSWER.

3          BUT FINDING OURSELVES HERE AND BEING, YOU KNOW, KNOWING

4      WHAT -- IT'S VERY IMPORTANT TO BE ACCURATE.

5              THE COURT:  AND OBVIOUSLY IT'S DISPUTED AS TO WHETHER

6      OR NOT ALL LOGS WITH THE FIELDS WE'VE BEEN TALKING ABOUT HAVE

7      BEEN PRODUCED, AND I KNOW PLAINTIFFS HAVE A VIEW THAT THEY HAVE

8      NOT.

9          WHEN YOU SAY ALL LOGS AS YOU'RE REFERENCING A COUPLE OF

10     SLIDES AGO, BEFORE THE SPECIAL MASTER, AND ALL OF THE LOGS WERE

11     IDENTIFIED, ARE WE TALKING ABOUT THE 19 LOGS?

12             MR. SCHAPIRO:  SO I THINK WE'RE TALKING ABOUT LOGS

13     THAT ARE SEARCHED RATHER THAN LOGS THAT HAVE BEEN PRODUCED.

14     BUT, YES, THE 19 ARE INCLUDED.

15             MR. ANSORGE:  AND THE OOLONG LOG AS WELL.

16             MR. SCHAPIRO:  AND THE LOGS FROM THE ADDITIONAL --

17     FROM THE ARTIST FORMERLY KNOWN AS --

18             THE COURT:  SO IT'S THE 5, THE 19 AND THE 5?

19             MR. SCHAPIRO:  YES.

20             THE COURT:  ALL RIGHT.  THOSE ARE MY QUESTIONS.

21             MR. SCHAPIRO:  THANK YOU, JUDGE.

22         MS. TREBICKA WILL NOW JUST ADDRESS TWO SHORTER ISSUES.

23             THE COURT:  ALL RIGHT.

24         MS. FANTHORPE, I ASSUME NO WORD YET FROM THE JUDGE?

25             THE CLERK:  I'M WATCHING.

1          THE COURT:  OKAY.

2          MS. TREBICKA:  THANK YOU, YOUR HONOR.

3      I'D LIKE TO PICK UP WITH THE THIRD ISSUE, WHICH IS THE

4   X-CLIENT DATA HEADER ISSUE AND WHETHER IT'S A RELIABLE

5   DETERMINATION OF INCOGNITO MODE.

6      I THINK BOTH SIDES AGREE THAT IT'S NOT AN ISSUE THAT WILL

7   CHANGE THE DETERMINATION HERE.

8      BUT AS I MENTIONED IN THE OPENING, IT IS AN ISSUE THAT

9   UNDERLIES BOTH THE CONCEALMENT ARGUMENT THAT PLAINTIFFS MAKE,

10  AS WELL AS THE PREJUDICE ARGUMENT THAT PLAINTIFFS MAKE.

11     AND IF WE CAN MOVE ON TO THE NEXT SLIDE, THE FACT THAT THE

12  X-CLIENT DATA HEADER CAN BE ABSENT FOR MULTIPLE REASONS AND,

13  THEREFORE, IS NOT RELIABLE TO INDICATE INCOGNITO MODE IS NOT

14  SOMETHING NEW.  IT WAS DISCUSSED EXTENSIVELY IN THE JUNE 16TH

15  DEPOSITION OF GLENN BERNSTON, AND AT THE VERY LEAST THESE

16  EXCERPTS THAT WE HAVE CITED IN THE SLIDES ARE IN THE RECORD,

17  BUT WE ARE HAPPY TO INCLUDE THE FULL TESTIMONY OF DR. BERNSTON

18  INTO THE RECORD AS WELL.

19     THIS WAS THE SAME ISSUE THAT PLAINTIFFS FOCUSSED ON AND

20  PROVIDED FULL BRIEFING, INCLUDING SUPPLEMENTAL BRIEFING.

21     NOW, WITH RESPECT TO THE 2017 BITS, THE BITS FROM THE

22  IDENTIFIED GOOGLE SEARCH LOGS, IT'S THE SAME HEURISTIC

23  METHOD -- AND YOU'LL HEAR THE WITNESSES TALK ABOUT WHAT THAT IS

24  REALLY, IT'S A COMPUTER SCIENCE TERM -- BUT IT'S THE SAME

25  HEURISTIC METHOD THAT UNDERLIES IT.

1        YOU HEARD DR. THOMPSON ON THE STAND TRY TO SHED SOME DOUBT

2    ON IT.

3        BUT DR. SADOWSKI, OUR 30(B)(6) WITNESS AND A CHROME

4    ENGINEER, AN EXPERT ON THIS, HAS ACTUALLY TESTIFIED AS TO THIS

5    HEURISTIC.  SHE HAS LOOKED AT THE UNDERLYING CODE, AGAIN, IN

6    PREPARATION FOR THE HEARING, SO SHE CAN PROVIDE PROPER

7    TESTIMONY TO YOUR HONOR, AND THE SAME HEURISTIC METHOD, WHICH

8    IS THE ABSENCE OF THE X-CLIENT DATA HEADER, UNDERLIES BOTH

9    BITS.

10        AND LET ME JUST UNPACK THAT A LITTLE BIT.  THE SAME METHOD

11    UNDERLIES THE FIRST BIT, THE IS_CHROME_NON_INCOGNITO BIT.  SO

12    IF THE X-CLIENT DATA HEADER IS PRESENT, THAT MEANS THAT IT'S A

13    CHROME COMMUNICATION BECAUSE IT'S ONLY SENT IN CHROME, AND IT'S

14    NOT INCOGNITO.

15        THE SECOND BIT, THE IS_CHROME_INCOGNITO, IS ACTUALLY

16    DERIVED FROM THE FIRST BIT, AND DR. SADOWSKI CAN TESTIFY TO

17    THAT, AND SHE HAS IN DEPOSITION, WHICH WE'VE ALSO INCLUDED IN

18    THE RECORD.

19        IT'S THE FIRST BIT, TOGETHER WITH AN ADDITIONAL INPUT, OR

20    SIGNAL, WHICH IS THE USER AGENT.

21        SO IF THE FIRST BIT IS SET TO FALSE, AND THE USER AGENT

22    INDICATES CHROME, THEN THE SECOND BIT WILL BE TRUE.  CHROME IS

23    IN INCOGNITO.

24        THOSE NAMES, I UNDERSTAND THEY LOOK RELIABLE OR

25    DEFINITIVE, BUT THE SAME UNDERLYING HEURISTIC UNDERLIES THOSE

```
1    BITS AS WELL.  BOTH WERE CREATED BY A TEAM THAT PROVIDED

2    GEOLOCATION INFORMATION TO VARIOUS PARTS OF GOOGLE.

3         THESE LOGS IN WHICH THE BITS WERE FOUND RELATED ONLY TO

4    GOOGLE SEARCH.  AND, AGAIN, THAT IS IN THE RECORD.

5         IF WE CAN MOVE TO THE NEXT SLIDE -- OH, ACTUALLY, I

6    APOLOGIZE, YES, TO -- YES, YOU FOUND THE RIGHT SLIDE.  THANK

7    YOU, SETH.

8         SO THE SADOWSKI DEPOSITION TESTIMONY ACTUALLY CONFIRMS

9    THAT THAT IS THE CASE.

10        THERE'S BEEN THIS ISSUE OF THERE'S NOTHING IN THE RECORD,

11   OR THERE'S VERY LITTLE IN THE RECORD ABOUT THE 2017 BITS, AND

12   I'D LIKE TO ADDRESS IT AGAIN.

13        AND REALLY THE, THE SAME PROBLEM, OR THE SAME ISSUE, THE

14   SAME EXPLANATION FOR WHY THERE'S VERY LITTLE IN THE DISCOVERY

15   RECORD ON THESE BITS, AS I EXPLAINED IN THE BEGINNING, WHICH IS

16   THAT IT IS TIED TO THE CLASS DEFINITION.

17        THE CLASS DEFINITION, THAT WAS THE OPERATIVE CLASS

18   DEFINITION FOR MOST OF THE DISCOVERY PERIOD REALLY RELATED TO

19   GOOGLE AD MANAGER AND GOOGLE ANALYTICS, AND WE'VE PUT UP THE

20   CLASS DEFINITION ON THE SLIDE.

21        THAT IS THE REASON THAT THE BITS FROM THE -- THE 2017 BITS

22   FROM THE IDENTIFIED LOGS WERE, AND I BELIEVE CONTINUE TO BE,

23   ENTIRELY OUTSIDE OF THE SCOPE OF THIS CASE.

24        THERE IS NO REASON THAT WE WOULD HAVE LOOKED TO FIND THESE

25   BITS ANYWHERE, OR THAT WE HAD ANY REASON TO BELIEVE THAT THEY
```

1    WOULD HAVE BEEN HELPFUL TO PLAINTIFFS GIVEN THE FACT THAT THEY

2    WERE OUTSIDE OF, OUTSIDE OF THE SCOPE OF DISCOVERY.

3         WE CAN MOVE ON TO SANCTIONS NOW, YOUR HONOR, AND I HAVE TO

4    APOLOGIZE BECAUSE MY PREPARATION TO ADDRESS SANCTIONS WAS

5    REALLY ON THE BASIS OF THE SANCTIONS OR REMEDIES THAT WE

6    UNDERSTOOD PLAINTIFFS WERE SEEKING.

7         IT'S CHANGED A LITTLE BIT, BUT I DO AGREE WITH

8    MS. ANDERSON THAT THE LAW UNDERLYING THE SANCTIONS SOUGHT IS

9    REALLY THE SAME.

10        AND THERE'S ONLY TWO CASES THAT PLAINTIFFS HAVE CITED

11   WHERE THE COURT ORDERED ISSUE PRECLUSION FOR DISCOVERY

12   VIOLATIONS, AND IN BOTH CASES, DEFENDANT PROVIDED NO DISCOVERY

13   ON THE RELEVANT TOPIC, ZERO DISCOVERY, DESPITE THERE BEING

14   REPEATED ORDERS BY THE COURT, AND DESPITE BEING FOREWARNED BY

15   THE COURT.

16        IN FACT, PRECLUSION SANCTIONS -- IN FACT, PRECLUSION

17   SANCTIONS ARE SO SEVERE AS TO BE RARELY IMPOSED, AND THEY'RE

18   ONLY RESERVED FOR DISCOVERY ABUSES THAT ARE EXTREME AND

19   PREJUDICIAL.

20        WE DON'T HAVE THAT HERE.  THERE HAS BEEN NO PREJUDICE, AND

21   THERE ARE LESSER REMEDIES.

22        THE ADDITIONAL ISSUE WITH PRECLUSION SANCTIONS IN THIS

23   CASE IS THE FACT THAT THEY ARE MEANT TO PUBLISH -- TO PUNISH

24   GOOGLE.  BUT, IN FACT, THEY WILL PUNISH THE CLASS AND THE COURT

25   BECAUSE THEY WILL LEAD TO A CLASS THAT IS UNMANAGEABLE, AND

1    THEY WILL ALSO MEAN THAT THAT -- THOSE SAME CLASS MEMBERS,

2    THEIR SHARE OF WHATEVER REMEDY THERE MAY BE FOR THE CLASS WILL

3    BE DILUTED BECAUSE THE BIT IS UNRELIABLE AND, THEREFORE, IT

4    WILL INCLUDE MANY OTHER MEMBERS IN THE CLASS THAN ACTUALLY

5    DESERVE TO BE IN THE CLASS.

6         AT THE END OF THE DAY, THE -- ONE OF THE PRIMARY ISSUES

7    THAT COURTS LOOK AT FOR PURPOSES OF ANY TYPE OF SANCTIONS IS

8    WHETHER THERE HAS BEEN BAD FAITH.

9         HERE THERE HAS BEEN NO BAD FAITH.  THERE HAS BEEN

10   ABSOLUTELY NO BAD FAITH, IN PART BECAUSE WE DIDN'T EVEN KNOW

11   THAT THE BIT EXISTED, WE WEREN'T TRYING TO HIDE IT.  AND ALSO

12   BECAUSE THERE IS -- BECAUSE THE EVIDENCE THAT IS IN THE RECORD

13   THAT WE HAVE PRODUCED A YEAR AGO IN 2021 IS INCONSISTENT WITH

14   AN INTENT TO HIDE.

15        WE HAVE A SLIDE HERE, YOUR HONOR, WITH THE CASE LAW AND

16   THE -- WHAT COURTS HAVE DONE BEFORE WITH REQUESTS FOR

17   PRECLUSION SANCTIONS.

18        AND WHAT WE'VE SEEN IS NOT ONLY THAT THE TWO CASES THAT

19   PLAINTIFFS FIND -- FOUND AND HAVE CITED, AND WE BASICALLY

20   HAVEN'T FOUND ANY MORE, THAT HAVE ORDERED PRECLUSION SANCTIONS

21   WHERE THE FACTS WERE VERY, VERY DIFFERENT FROM WHAT THEY ARE

22   HERE.

23        BUT WE'VE ALSO FOUND THAT EVEN WHERE COURTS HAVE DENIED

24   PRECLUSION SANCTIONS, THE CONDUCT HAS BEEN MUCH, MUCH WORSE

25   THAN WHAT EVEN THE ALLEGATIONS ARE HERE ABOUT GOOGLE'S CONDUCT.

1          PLAINTIFFS' REPLY REALLY DOESN'T GRAPPLE WITH THE CASE

2     LAW.  IT TRIES TO SWEEP OUR CASES UNDER THE RUG BY CLAIMING

3     THAT THEY WERE CASES CONCERNING TERMINATING SANCTIONS AND ARE,

4     THEREFORE, SIMPLY OFF POINT.

5          BUT THAT'S NOT ACCURATE BECAUSE THE AUTHORITY THAT WE CITE

6     IS AUTHORITY THAT DEALT WITH THE ISSUE PRECLUSION -- WITH THE

7     EVIDENCE PRECLUSION SANCTIONS AT THE SAME -- IN THE SAME

8     OPINION, IT ALSO DEALT WITH TERMINATING SANCTIONS.

9          ALL OF THE PLACES THAT WE CITE, ALL OF THE PIN CITES OF

10     OUR CASES ARE TO THE EVIDENCE PRECLUSION SANCTIONS.  WE DON'T

11     CITE LAW THAT DEALS WITH TERMINATING SANCTIONS.

12          A FEW OTHER THINGS ARE VERY IMPORTANT TO, TO NOTICE IN THE

13     AUTHORITY, OR WHAT'S ABSENT IN THE AUTHORITY THAT PLAINTIFFS

14     CITE.

15          THEY HAVE CITED NO CASES IN WHICH A COURT HAS GRANTED

16     PRECLUSIVE SANCTIONS IN THE FORM OF FINDING A CLASS

17     ASCERTAINABLE.

18          THE ONLY CASES THAT THEY COULD FIND ARE WHERE THE OTHER

19     SIDE OR THE SANCTIONED PARTY PROVIDED NO DISCOVERY ON THE

20     RELEVANT ISSUE AT ALL, DESPITE FOREWARNING BY THE COURT.

21          WHAT WE'VE ALSO FOUND IN THE CASE LAW, YOUR HONOR, IS THAT

22     THE EVIDENCE PRECLUSION SUMMARY ADJUDICATIONS NEARLY ALWAYS

23     PERMIT THE SANCTIONED PARTY TO RELY ON EVIDENCE THAT WAS TIMELY

24     PRODUCED, AND THAT IS ALSO INCONSISTENT WITH THE RELIEF THAT

25     PLAINTIFFS SEEK.

1           JURY INSTRUCTIONS, YOUR HONOR, ARE LIKEWISE PREJUDICIAL

2    AND IRRELEVANT.  AND, AGAIN, HERE THE JURY INSTRUCTIONS THAT

3    PLAINTIFFS SEEK ARE CHANGING.

4           BUT AT THE HEART OF IT, NOT ONLY IS IT ONE OF THE MOST

5    SEVERE SANCTIONS THAT SHOULD NOT BE IMPOSED CASUALLY, BUT ALSO

6    THERE'S TWO ADDITIONAL ISSUES WITH IT.

7           FIRST IS THAT IT WOULD BE INACCURATE.  GOOGLE DID NOT HIDE

8    EVIDENCE.  IT IS INACCURATE TO SUGGEST TO THE JURY THAT WE DID.

9           BUT SECOND, IT IS AN INSTRUCTION THAT GOES TO EVIDENCE

10   THAT THE JURY WOULD EVEN HAVE NO OCCASION TO RELY ON, OR TO

11   VIEW OR TO CONSIDER FOR THE DETERMINATIONS THAT IT WOULD BE

12   MAKING.

13          IT'S IN EVIDENCE, THAT'S ONLY -- IT'S EVIDENCE THAT'S

14   ONLY -- THAT SHOULD ONLY BE RELEVANT TO A JUDGE'S DETERMINATION

15   AS TO CLASS CERT.

16          AND FINALLY, YOUR HONOR, PLAINTIFFS' REIMBURSEMENT REQUEST

17   IS ALSO IMPROPER BECAUSE IT IS SEEKING FOR THE REIMBURSEMENT OF

18   FEES OVER THE ENTIRETY OF THE SPECIAL MASTER PROCESS, WHICH --

19   AND THE, EVEN THE ALLEGATIONS ABOUT GOOGLE'S PURPORTED

20   MISCONDUCT GO ONLY TO A SMALL PART OF THE SPECIAL MASTER

21   PROCESS.

22          I WOULD LIKE TO POINT OUT TWO ADDITIONAL THINGS, YOUR

23   HONOR, AND THIS IS NOT IN THE SLIDES, BUT PLAINTIFFS PUT UP

24   THREE EMAILS THAT WERE -- THAT HAD BEEN ON OUR PRIVILEGED LOG

25   AND THEY WERE EMAILS BETWEEN ONE OF OUR ATTORNEYS AND

1    MR. LEUNG, MR. BERT LEUNG.

2        THE IMPLICATION FROM PLAINTIFFS' ARGUMENT WAS THAT GOOGLE

3    HAD KNOWN AT THE TIME OF THOSE EMAILS THAT THE

4    MAYBE_CHROME_INCOGNITO BIT, AT THE VERY LEAST, EXISTED.

5        THAT IS ABSOLUTELY FALSE.  MR. BERT LEUNG'S WORK INVOLVES

6    SO MUCH MORE THAN THE MAYBE_CHROME_INCOGNITO BIT.  IN FACT, IT

7    INVOLVES, AS I ALLUDED TO EARLIER IN MY OPENING, SOME OF THE

8    CRUCIAL INFRASTRUCTURE OF GOOGLE TO KEEP AUTHENTICATED AND

9    UNAUTHENTICATED DATA SEPARATE, AND YOU WILL HEAR FROM MR. LEUNG

10   HIMSELF TODAY.

11       WE ARE -- WE OFFER, YOUR HONOR, TO PROVIDE THOSE DOCUMENTS

12   TO YOU FOR REVIEW IN CAMERA, BECAUSE THEY'RE PRIVILEGED

13   DOCUMENTS, TO UNDERSCORE THE FACT THAT THEY ARE NOT WHAT

14   PLAINTIFFS WOULD LIKE THEM TO BE.

15           THE COURT:  ALL RIGHT.

16       YOU HAD ANOTHER POINT?

17           MS. TREBICKA:  I DID, YOUR HONOR.

18       IF WE COULD -- IF WE COULD GO BACK TO THE REMEDY THAT --

19    YOUR HONOR MADE A VERY POINTED QUESTION TO PLAINTIFFS' COUNSEL,

20    WHICH IS, WELL, WHAT IS IT YOU WANT?  HOW CAN WE REMEDY THE

21    SITUATION?

22       AND THERE WAS A LOT OF RESPONSES, BUT REALLY IT BOILED

23   DOWN TO, I THINK, WHAT WAS THE REAL ASK WAS ALL OF THE

24   DOCUMENTS AND DATA THAT RELATE TO THESE BITS.

25       WE ALL KNOW THAT'S NOT HOW DISCOVERY GOES.  YOU CAN'T ASK

1    FOR ALL DOCUMENTS AND DATA THAT RELATE TO A PARTICULAR WHATEVER

2    ISSUE, CONCEPT.

3         WHAT YOU DO IS WHAT WE'VE DONE IN THIS CASE, IDENTIFY

4    CUSTODIANS, IDENTIFY SEARCH TERMS, YOU RUN THOSE, AND WE HAVE A

5    LOT OF CUSTODIANS AND SEARCH TERMS IN THIS CASE, AND THAT IS

6    THE PROPER WAY TO ARRIVE AT RELEVANT DOCUMENTS.

7         SO TO THE EXTENT THAT THE ONLY ASK THAT PLAINTIFFS MAKE

8    RELATES TO THE DOCUMENTS AND DATA THAT'S RELATED TO THESE BITS,

9    WHATEVER THOSE BITS ARE, I BELIEVE THAT THE APPROPRIATE WAY TO

10   RESOLVE IT IS TO ORDER A SEARCH ON THE BASIS OF CERTAIN

11   CUSTODIANS AND CERTAIN SEARCH TERMS SO THAT PLAINTIFFS HAVE THE

12   DOCUMENTS THAT THEY BELIEVE THEY MAY NEED.

13        THAT'S IT, YOUR HONOR.

14        THE COURT:  THANK YOU, MS. TREBICKA.

15   HOW WE DOING, MS. FANTHORPE?

16        THE CLERK:  I'M NOT SURE.

17        THE COURT:  OKAY.  WELL, THEY'RE GOING TO CALL US.

18        MS. TREBICKA:  YOUR HONOR, YES, I WANTED TO EXPLAIN,

19   I SHOULD HAVE SAID THERE'S THREE THINGS.

20   WE HAVE FOUR WITNESSES THAT WE WOULD LIKE TO CALL.

21        THE COURT:  YES.  SO WE'RE COMING TO THAT.

22        MS. TREBICKA:  OKAY.

23        THE COURT:  OKAY.  SO AS I --

24        THE CLERK:  THEY'RE ON THE SECOND MATTER, BUT I DON'T

25   KNOW HOW MUCH LONGER.

1          THE COURT:  OKAY.  THAT'S FINE.  THAT'S FINE.

2          WE ARE GOING TO KEEP GOING, BUT WHEN WE GET THE HIGH SIGN

3     FROM THE JAIL, I HAVE TO LEAVE RIGHT THEN TO DEAL WITH A

4     CRIMINAL MATTER, WHICH I WILL ESTIMATE IT'LL TAKE ABOUT 30

5     MINUTES, SO WE WILL TAKE A 30 MINUTE RECESS.

6          THAT DOESN'T LEAVE US A LOT OF TIME.

7          I THINK THAT THE PRESENTATIONS SO FAR ON BOTH SIDES HAVE

8     BEEN VERY HELPFUL.  AS I SAY, I DID GET THROUGH THE SUBMISSIONS

9     OF THE PARTIES, AND IN PARTICULAR THE PROPOSED FINDINGS, AND

10    LOOKED AT THE EXHIBITS THAT SUPPORT THOSE.  I FOUND THAT VERY

11    HELPFUL, AND TODAY'S PRESENTATIONS SO FAR HAVE LARGELY TRACKED

12    THAT, AND THAT HAS BEEN HELPFUL.

13         AND OF COURSE WE HAD A FULL BACK AND FORTH WITH

14    MR. THOMPSON AS WELL.

15         SO I TOLD BOTH SIDES THEY WOULD HAVE AN OPPORTUNITY TO

16    CALL THEIR WITNESSES, AND OF COURSE THERE'S AN OPPORTUNITY TO

17    CROSS-EXAMINE, BUT I AM CONCERNED ABOUT TIME.

18         WE DO HAVE TO FINISH THESE PROCEEDINGS TODAY, AND WE HAVE

19    TO FINISH BY 4:30, AND AT LEAST 30 MINUTES OF THAT TIME I HAVE

20    TO BE ON ANOTHER MATTER.

21         SO I CAN -- NOW WE CAN SET TIME LIMITS.  WE CAN LIMIT, YOU

22    KNOW, CROSS CAN'T EXCEED DIRECT IN TIME.

23         I DON'T KNOW IF YOU STILL FEEL THE NEED TO CALL ALL FOUR

24    WITNESSES.

25         BUT IF YOU WANT TO, I WILL GIVE YOU THAT OPTION.

1          MR. SCHAPIRO:  I THINK WE MIGHT WANT A MINUTE TO

2     DISCUSS THAT, YOUR HONOR.

3          THE COURT:  ABSOLUTELY.

4          MR. SCHAPIRO:  WE'RE CERTAINLY ALSO OPEN TO TIME

5     LIMITS, MAYBE -- I DON'T KNOW, I HAVEN'T ADDED UP THE NUMBERS,

6     BUT IF WE HAD TEN MINUTES AND TEN MINUTES FOR EACH WITNESS SUCH

7     THAT THAT ENDS UP BEING 80 MINUTES, I GUESS, AND I DON'T KNOW

8     IF -- I KNOW YOU HAD ANTICIPATING CLOSINGS, BUT MAYBE THEY

9     COULD BE SHORT BECAUSE THESE HYBRIDS THAT WE'VE JUST DONE HAVE

10    BEEN --

11         THE COURT:  HAVE BEEN QUITE THOROUGH.

12         MR. SCHAPIRO:  SO I THINK A LOT OF IT MIGHT BE

13    REPETITIVE.  WE'LL SEE.  COULD WE HAVE ONE MINUTE?

14         THE COURT:  SURE.

15         MR. SCHAPIRO:  WE CERTAINLY WANT TO PUT ON SOME

16    WITNESSES, AND WE ALSO WOULD NEED TO GET THEM DOWNSTAIRS.

17         THE COURT:  THAT'S FINE.

18         MR. SCHAPIRO:  SO CAN WE TAKE A FIVE MINUTE BREAK,

19    AND WHEN WE COME BACK WE WILL, I'M SURE, HAVE A FIRST WITNESS,

20    AND WE'LL BE ABLE TO TELL YOU WHETHER THERE'S ANYONE WE CAN

21    CUT.

22         THE COURT:  OKAY.  I THINK THAT WOULD BE HELPFUL TO

23    CONFER.  IF YOU'RE GOING TO CUT ANYONE, I WANT YOU TO LET

24    PLAINTIFFS KNOW, BECAUSE THEY WERE COUNTING ON SOME OF THOSE

25    PEOPLE BEING HERE.

1          BUT I -- THAT GOES FOR PLAINTIFFS, TOO.  I DON'T THINK I

2     NEED TO HEAR FROM ALL FOUR WITNESSES ON EITHER DIRECT OR CROSS.

3     AGAIN, THE PRESENTATIONS HAVE BEEN QUITE THOROUGH.  THE RECORD

4     IS VERY WELL DEVELOPED.

5          I UNDERSTAND EVERYONE WANTS A CHANCE TO MAKE THEIR POINTS,

6     AND WE WILL PROCEED, BUT --

7               MR. SCHAPIRO:  COULD WE MAKE IT TEN MINUTES THEN,

8     BECAUSE THAT MIGHT ALLOW US TO ACTUALLY GET COMFORTABLE CUTTING

9     SOMEONE.  OR WE'LL DO FIVE, YOUR HONOR.

10              THE COURT:  OKAY.  LET'S START WITH FIVE AND GET AS

11    MUCH -- MAKE IT AS PRODUCTIVE AS YOU CAN.

12         ALL RIGHT.  WE'LL TAKE A SHORT BREAK.  MS. FANTHORPE WILL

13    LET YOU KNOW IF MY CRIMINAL MATTER CALLS ME DURING THIS RECESS.

14         (RECESS FROM 2:33 P.M. UNTIL 3:22 P.M.)

15              THE COURT:  ALL RIGHT.  WHERE ARE WE WITH REGARD TO

16    WITNESSES, MR. SCHAPIRO?

17              MR. SCHAPIRO:  YOUR HONOR, THERE WAS ONE WITNESS THAT

18    WE WERE WILLING TO CUT, MR. GOLUEKE.  WE PROPOSED THAT TO THE

19    PLAINTIFFS.  THE PLAINTIFFS HAVE SAID THEY WANT TO HAVE HIM AS

20    A WITNESS.

21              THE COURT:  OKAY.

22              MR. SCHAPIRO:  SO I THINK WE -- WE'LL GO WITH OUR

23    FOUR WITNESSES BECAUSE THERE'S NO ONE ELSE WE WOULD BE

24    COMFORTABLE CUTTING.

25              THE COURT:  ALL RIGHT.

```
1              MR. SCHAPIRO:  WE ARE MORE THAN HAPPY TO HAVE TIME
2     LIMITS, AND I WOULD PROPOSE, GIVEN WHAT YOUR HONOR SAID ABOUT
3     WHEN YOU WANT TO FINISH, TEN MINUTES FOR DIRECT AND TEN MINUTES
4     FOR CROSS.  THAT ADDS UP TO JUST UNDER AN HOUR AND A HALF.
5              THE COURT:  I THINK WE CAN DO THAT.
6              MR. SCHAPIRO:  SO 80 MINUTES WITH WHATEVER
7     TRANSACTION -- WHAT CROSS THERE MIGHT IN THERE.  BUT I LEAVE IT
8     TO YOU.
9              THE COURT:  ALL RIGHT.  THEN THAT'S WHAT WE'LL DO.
10        CALL YOUR FIRST WITNESS.
11             MR. SCHAPIRO:  ALL RIGHT.  I WILL -- SETH, CAN YOU
12    GET THEM.
13        (PAUSE IN PROCEEDINGS.)
14             MS. TREBICKA:  YOUR HONOR, WE HAVE GIVEN WORD TO THE
15    WITNESS, IT'S JUST THAT THE RECEPTION MAY NOT HAVE BEEN THAT
16    GREAT, SO NOW WE SENT SOMEONE PHYSICALLY.
17             THE COURT:  OKAY.
18             MS. TREBICKA:  THE WITNESS IS IN THE ATTORNEY LOUNGE.
19             THE COURT:  OKAY.  WHO IS GOING TO BE THE WITNESS?
20             MS. TREBICKA:  CHRIS LIAO.
21             MR. SCHAPIRO:  WOULD IT BE OKAY WHILE WE'RE HERE IF I
22    RAISE A PURELY SCHEDULING ISSUE RELATING TO BOTH CASES, BROWN
23    AND CALHOUN?
24             THE COURT:  OKAY.
25             MR. SCHAPIRO:  I DON'T THINK WE NEED TO BE ON THE
```

1    RECORD, IF THAT'S OKAY WITH YOUR HONOR.

2              THE COURT:  WE CAN GO OFF THE RECORD.  THANK YOU.

3          (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND COUNSEL.)

4              THE COURT:  BACK ON THE RECORD, AND PLEASE CALL YOUR

5    FIRST WITNESS.

6              MS. TREBICKA:  THANK YOU, YOUR HONOR.

7          GOOGLE CALLS CHRIS LIAO.

8              THE COURT:  MR. LIAO, PLEASE COME FORWARD AND

9    APPROACH THE WITNESS BOX.  MY COURTROOM DEPUTY WILL SWEAR YOU

10   IN.

11             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

12         **(DEFENDANT'S WITNESS, CHRIS LIAO, WAS SWORN.)**

13             THE WITNESS:  YES.

14             THE CLERK:  THANK YOU.  HAVE A SEAT.

15             THE COURT:  PLEASE STATE YOUR FULL NAME.

16             THE WITNESS:  MY NAME IS CHRIS LIAO.

17             THE COURT:  OKAY.  MR. LIAO, YOU MAY REMOVE YOUR

18   MASK.

19         PLEASE SPEAK TOWARDS THE MICROPHONE SO EVERYONE CAN HEAR

20   YOU.

21         AND YOU MAY PROCEED.

22             MS. TREBICKA:  THANK YOU, YOUR HONOR.

23                          **DIRECT EXAMINATION**

24   BY MS. TREBICKA:

25   Q.   THANK YOU, MR. LIAO.  GOOD AFTERNOON.

1      A.    GOOD AFTERNOON.

2      Q.    THANK YOU FOR WAITING PATIENTLY DOWNSTAIRS FOR US.

3            WHAT IS YOUR ROLE CURRENTLY AT GOOGLE?

4      A.    I'M A SOFTWARE ENGINEER AT GOOGLE.

5      Q.    AND WHAT TEAM DO YOU WORK WITH?

6      A.    I MANAGE THE ADS IDENTITY INFRASTRUCTURE TEAM.

7      Q.    HOW LONG HAVE YOU WORKED AT GOOGLE?

8      A.    FOR ABOUT TEN YEARS.

9      Q.    HOW LONG HAVE YOU MANAGED THE ADS IDENTITY AND

10     INFRASTRUCTURE TEAM?

11     A.    FOR ABOUT THREE YEARS.

12     Q.    JUST TELL US GENERALLY, TELL THE COURT GENERALLY, WHAT THE

13     ADS IDENTITY AND INFRASTRUCTURE TEAM DOES.

14     A.    SO IDENTITY INFRASTRUCTURE AND ADS IS A COLLECTION OF SOME

15     ONLINE SERVERS AND OFFLINE PIPELINES.  COLLECTIVELY, THE

16     INFRASTRUCTURE IS RESPONSIBLE FOR THINGS LIKE INGESTING

17     COOKIES, PARSING COOKIES, RETRIEVING USER CONSENT SETTINGS, AS

18     WELL AS DETERMINING WHETHER OR NOT, FOR EXAMPLE, AN AD QUERY IS

19     SERVED IN GAIA MODE VERSUS BISCOTTI MODE.

20     Q.    WHAT IS UIS?

21     A.    UIS STANDS FOR UNIFIED IDENTITY SERVICE.

22     Q.    DOES THAT FIT WITHIN THE GOOGLE ADS IDENTITY

23     INFRASTRUCTURE?

24     A.    UIS IS PART OF THE IDENTITY INFRASTRUCTURE.

25     Q.    SO YOU MANAGE UIS AS WELL?

1    A.   YES.

2    Q.   OTHER THAN MANAGING THE GOOGLE ADS IDENTITY AND

3    INFRASTRUCTURE, DO YOU HAVE ANY OTHER RESPONSIBILITIES WITHIN

4    GOOGLE?

5    A.   YES.  MY PRIMARY RESPONSIBILITY FOR THE PAST THREE YEARS

6    INCLUDED MANY DIFFERENT PROJECTS ACROSS DIFFERENT GOOGLE TEAMS

7    AND FUNCTIONS.  SOME OF THE EXAMPLES WERE TRANSITIONING SAME

8    SIDE COOKIES ACROSS ALL OF THE GOOGLE, MAJOR GOOGLE COOKIES,

9    ACROSS ADS TEAMS, AND ALSO TEAMS OUTSIDE OF THAT.

10        MY RESPONSIBILITY ALSO INCLUDED SOME OF THE CRITICAL

11   RESPONSES TO APPLE'S IOS 14 CHANGES IN ADS; AND OTHER

12   RESPONSIBILITIES INCLUDED DEVELOPING LIBRARIES FOR PRIVACY AND

13   IDENTITY INFRASTRUCTURE FOR OUR NEW CLIENTS ACROSS ADS.

14   Q.   ARE YOU PART OF GOOGLE AD MANAGER?

15   A.   NO.

16   Q.   WHEN I SAY "YOU," I MEAN YOUR TEAM, THE GOOGLE ADS

17   IDENTITY AND INFRASTRUCTURE TEAM.

18   A.   THAT'S CORRECT, NEITHER MYSELF OR MY TEAM ARE PART OF THE

19   GOOGLE AD MANAGER ORG.

20   Q.   WHAT ABOUT GOOGLE ANALYTICS?  ARE YOU OR YOUR TEAM PART OF

21   ANALYTICS?

22   A.   NO.

23   Q.   ARE YOU PART OF THE CHROME ORGANIZATION WITHIN GOOGLE?

24   A.   NO.

25   Q.   HOW MANY EMPLOYEES WITHIN GOOGLE REPORT TO YOU?

LIAO DIRECT BY MS. TREBICKA

1        A.    APPROXIMATELY 22 TO 24.

2        Q.    DOES BERT LEUNG REPORT TO YOU?

3        A.    YES.

4        Q.    DOES MANDY LIU REPORT TO YOU?

5        A.    MANDY REPORTS TO BERT, WHO THEN REPORTS TO ME.

6        Q.    DO YOU RECALL A PROJECT INVOLVING THE

7        MAYBE_CHROME_INCOGNITO BIT?

8        A.    YES.

9        Q.    AND THAT IS WHY WE'RE HERE TODAY; CORRECT?

10       A.    THAT IS MY UNDERSTANDING.

11       Q.    WHEN DID YOU FIRST START WORKING ON THAT PROJECT?

12       A.    I FIRST STARTED WORKING ON THAT PROJECT I BELIEVE AROUND

13       THE SECOND HALF OR TOWARDS THE END OF 2019.

14       Q.    AND WHAT IS IT THAT YOU DID IN 2019 FOR THIS PROJECT?

15       A.    THE EXERCISE AT THE TIME, AS I RECALL NOW, WAS PRIMARILY

16       TO ESTIMATE THE APPROXIMATE IMPACT TO GOOGLE'S ADVERTISING

17       REVENUE AS A RESULT OF CERTAIN CHANGES IN CHROME.

18       Q.    WHAT WERE THOSE CHANGES?  DESCRIBE THEM IN A FEW WORDS.

19       AND PLEASE, MR. LIAO, BE MINDFUL OF THE FACT THAT WE HAVE

20       AGREED TO USE CERTAIN CODE NAMES SO WE CAN KEEP THESE

21       PROCEEDINGS PUBLIC.

22       A.    RIGHT.  SO THE CHROME CHANGES WERE MAINLY ABOUT BLOCKING

23       THIRD PARTY COOKIES INSIDE INCOGNITO MODE.

24       Q.    WHO ELSE WORKED ON THAT PROJECT WITH YOU?

25       A.    ON MY TEAM, MY RECOLLECTION IS BERT AND I WORKED ON THE

1       PROJECT TOGETHER.

2           THERE WERE A LARGE NUMBER OF PEOPLE INSIDE AND OUTSIDE OF

3       ADS THAT WERE INVOLVED IN THE PROJECT AS WELL.

4       Q.   AT A GENERAL LEVEL, WHAT DID YOU ATTEMPT TO DO WITH THIS

5       PROJECT?

6       A.   WE WERE ATTEMPTING TO APPROXIMATELY INFER THE POTENTIAL

7       IMPACT TO GOOGLE'S ADVERTISING REVENUE AS A RESULT OF THE

8       CHANGES THAT I MENTIONED EARLIER.

9       Q.   DID YOU HAVE TO ESTIMATE THE INCOGNITO TRAFFIC TO BE ABLE

10      TO DO THAT FOR YOUR PROJECT?

11      A.   YES.

12      Q.   AND HOW DID YOU DO THAT?  HOW DID YOU ESTIMATE INCOGNITO

13      TRAFFIC IN ADS?

14      A.   WE HAD A NUMBER OF DISCUSSIONS BETWEEN ADS ENGINEERS AND

15      CHROME ENGINEERS, AND THROUGH THE NUMBER OF CONVERSATIONS, WE

16      ENDED UP USING THE ABSENCE OF X-CLIENT DATA HEADER AS AN

17      APPROXIMATE INDICATION OF INCOGNITO MODE.

18      Q.   WHAT IS THE X-CLIENT DATA HEADER?

19      A.   MY UNDERSTANDING IS IT IS A -- IT IS AN HTTP HEADER SENT

20      BY THE CHROME BROWSER TO GOOGLE DOMAINS UNDER SOME

21      CIRCUMSTANCE, BUT NOT UNDER ALL CIRCUMSTANCES.

22      Q.   AND WHY WOULD THE ABSENCE OF THE X-CLIENT DATA HEADER HELP

23      YOU IN YOUR PROJECT?

24      A.   BECAUSE OUR UNDERSTANDING, COMING FROM THOSE CONVERSATIONS

25      WITH CHROME, BASICALLY WAS THE HEADER IN QUESTION HERE WILL NOT

1      BE SENT UNDER INCOGNITO MODE.

2          BUT ALSO, IT WILL NOT BE SENT UNDER A LARGE NUMBER OF

3      OTHER CIRCUMSTANCES.

4      Q.   WELL, LET ME ASK YOU, HOW RELIABLE AN INDICATOR IS THE

5      ABSENCE OF THE X-CLIENT DATA HEADER AS A DETECTION TOOL FOR

6      CHROME INCOGNITO?

7      A.   MY UNDERSTANDING -- AGAIN, DERIVED FROM ALL THE

8      CONVERSATIONS WITH THE CHROME ENGINEERS -- IS THAT IT IS NOT

9      VERY RELIABLE AS AN INDICATION.

10     Q.   WHY IS IT --

11          MR. YANCHUNIS:  YOUR HONOR, EXCUSE ME.  I WOULD MOVE

12     TO STRIKE THAT.  THAT'S CLEARLY HEARSAY.  HE JUST RELATED THAT

13     HE GAINED THAT FROM THE CONVERSATIONS WITH OTHERS.

14          THOSE OTHERS ARE NOT HERE IN THE COURTROOM, IN WHICH CASE

15     I CANNOT CROSS-EXAMINE THEM.

16          MS. TREBICKA:  MAY I RESPOND?

17          THE COURT:  YES.

18          MS. TREBICKA:  YOUR HONOR, IT'S ABOUT THE STATE OF

19     MIND.  IT'S ABOUT THE EFFECT ON THE LISTENER.

20          THE COURT:  I'M GOING TO ALLOW IT.  YOU'LL BE ABLE TO

21     CROSS HIM.

22          GO AHEAD.

23          MS. TREBICKA:  AND, THEREFORE, THE TESTIMONY IS

24     ALREADY IN?

25          THE COURT:  UM-HUM.

1    BY MS. TREBICKA:

2    Q.   MR. LIAO, MY QUESTION, AND I THINK THE QUESTION THAT

3    OTHERS ARE ASKING AS WELL, IS WHY WOULD YOU USE THAT THEN?  WHY

4    WOULD YOU USE THE ABSENCE OF THE X-CLIENT DATA HEADER TO

5    DETERMINE THE APPROXIMATE AMOUNT OF INCOGNITO TRAFFIC?

6    A.   BECAUSE THE PURPOSE OF THE EXERCISE, AGAIN, IS TO, IS TO

7    APPROXIMATE THE POTENTIAL REVENUE IMPACT.

8         WE DIDN'T REQUIRE AN EXACT NUMBER, AND IT WAS DETERMINED

9    THAT THE ABSENCE OF THE X-CLIENT DATA HEADER WAS A PROCESS

10   SIGNAL THAT CAN GIVE US THAT APPROXIMATE APPROXIMATION TO THE

11   REVENUE, POTENTIAL REVENUE IMPACT.

12   Q.   AS PART OF YOUR ANALYSIS IN THIS PROJECT, DID YOUR TEAM

13   EVER ATTEMPT TO IDENTIFY PARTICULAR INCOGNITO USERS?

14   A.   NO.

15   Q.   RECALL THAT WE STARTED THIS EXAMINATION WHEN I ASKED YOU

16   ABOUT THE MAYBE_CHROME_INCOGNITO BIT.

17        WHO CREATED THE CHROME, THE MAYBE_CHROME_INCOGNITO BIT?

18   A.   I BELIEVE BERT AND MANDY CREATED THE BIT.

19   Q.   AND IS THAT BERT LEUNG AND MANDY LIU?

20   A.   YES.

21   Q.   WHY DID THEY CREATE THE BIT?

22   A.   MY UNDERSTANDING IS THE BIT WAS CREATED, OR THE FIELD IN

23   THE LOG WAS CREATED TO POWER A DASHBOARD WHOSE PURPOSE IS TO

24   MONITOR OR KEEP AN EYE ON THE SLICE OF TRAFFIC WHERE WE THINK

25   THIRD PARTY COOKIES MAY BE BLOCKED IN AD QUERIES.

1    Q.   IS -- WAS THIS A CONTINUATION OF THE PROJECT THAT WE

2    TALKED ABOUT THAT YOU SAID STARTED IN 2019?

3    A.   YES.

4    Q.   AND WHAT WAS THE PURPOSE OF THIS CONTINUATION OF THE

5    PROJECT?

6    A.   THE CONTINUATION, THE PURPOSE OF CONTINUING THAT IS STILL

7    TO APPROXIMATELY MONITOR THE SLICE OF TRAFFIC AND THE POTENTIAL

8    REVENUE IMPACT OF THIRD PARTY COOKIE BLOCKING, AND ALSO HOW THE

9    SLICE OF TRAFFIC CHANGES OVER TIME.

10   Q.   NOW, DO YOU UNDERSTAND, AT A HIGH LEVEL, HOW THE

11   MAYBE_CHROME_INCOGNITO BIT WORKS?

12   A.   I HAVE A HIGH LEVEL UNDERSTANDING OF IT.

13   Q.   COULD YOU EXPLAIN?

14   A.   MY UNDERSTANDING OF HOW THIS BIT IS COMPUTED IS THAT IT

15   TAKES IN, AS INPUT, TWO PIECES OF INFORMATION:  ONE IS THE

16   ABSENCE OF THE X-CLIENT DATA HEADER; THE OTHER IS THE USER

17   AGENT HEADER.

18   Q.   NOW, HOW DOES THIS LOGIC THAT YOU JUST EXPLAINED FOR THE

19   MAYBE_CHROME_INCOGNITO BIT DIFFER FROM THE LOGIC THAT YOU USED

20   IN THE INITIAL PART OF THE PROJECT IN 2019?

21   A.    MY UNDERSTANDING IS THEY'RE THE SAME.

22   Q.   IS THE MAYBE_CHROME --

23            THE COURT:  THAT'S TIME.  LAST QUESTION.

24            MS. TREBICKA:  YES, UNDERSTOOD, YOUR HONOR.

25         MAY I HAVE A SECOND?

```
 1                    THE COURT:  OKAY.

 2              (PAUSE IN PROCEEDINGS.)

 3         BY MS. TREBICKA:

 4         Q.  IS THE MAYBE_CHROME_INCOGNITO BIT A DEDICATED SIGNAL FOR

 5         INCOGNITO MODE?

 6         A.  NO.

 7                    MS. TREBICKA:  NO FURTHER QUESTIONS.

 8                    THE COURT:  THANK YOU.

 9              CROSS-EXAMINATION.

10                    MR. YANCHUNIS:  EXHIBIT 103, PLEASE.

11                         CROSS-EXAMINATION

12         BY MR. YANCHUNIS:

13         Q.  MR. LIAO, I'D LIKE TO SHOW YOU A DOCUMENT THAT HAS BEEN

14         MARKED AS EXHIBIT 103.

15              DO YOU HAVE THAT IN FRONT OF YOU ON THE SCREEN?

16         A.  YES.

17         Q.  OKAY.  THIS IS AN EMAIL STRING THAT STARTS WITH THE FIRST

18         EMAIL ON THE LAST PAGE AND THEN BUILDS BACK TO THE FIRST PAGE

19         CHRONOLOGICALLY; CORRECT?

20         A.  MAY I?

21              CAN YOU SCROLL UP SO THAT I CAN MAKE SURE IT'S

22         CHRONOLOGICAL?

23         Q.  I'LL HAVE THAT DONE FOR YOU.

24         A.  YES, IT APPEARS THAT WAY.

25         Q.  OKAY.  ON THE PAGE ENDING WITH THE NUMBER 293, REFERENCING
```

1      THE BATES NUMBER IN THE LOWER RIGHT-HAND CORNER --

2      A.   YES.

3      Q.   OKAY.  YOU STARTED THIS EMAIL STRING ON JULY 10TH, 2020;

4      CORRECT?

5      A.   YES.

6      Q.   AND YOU WROTE, AND LET ME QUOTE IT, "SO FAR, ALL METRICS

7      LOOK STABLE, AND AS EXPECTED:

8          "CHROME METRICS SHOW NO SIGNIFICANT CHANGES IN INCOGNITO

9      USAGE."

10         DID I READ THAT CORRECTLY?

11     A.   YES.

12     Q.   AND THAT UNDERLINED TEXT IS A HYPERLINK THAT WOULD LEAD TO

13     AN INTERNAL GOOGLE PAGE, SUCH AS A WIKI, A WIKI-TYPE PAGE;

14     CORRECT?

15     A.   I DO NOT RECALL, NOR CAN I TELL ON WHAT THE LINK GOES TO

16     FROM JUST THE SCREENSHOT HERE.

17     Q.   ALL RIGHT.  DO YOU RECALL WHETHER THAT LINK TRACKED

18     INCOGNITO USAGE IN CHROME?

19     A.   I WOULD HAVE TO CLICK ON IT TO MAKE SURE, BUT IT DOES LOOK

20     LIKE THE LINK TO ME.

21     Q.   OKAY.  I'M HAVING TECHNICAL DIFFICULTIES HERE.

22         EXCUSE ME, YOUR HONOR.  I'M HAVING A LITTLE BIT OF A

23     PROBLEM HERE.

24         (PAUSE IN PROCEEDINGS.)

25     BY MR. YANCHUNIS:

LIAO CROSS BY MR. YANCHUNIS

1      Q.   LOOK AT THE SECOND BULLET POINT ON THE SAME PAGE.

2           AND IN THAT, YOU WROTE, AND I'LL QUOTE, "ADS (PROXY)

3      METRICS SHOW STABLE INCOGNITO DETECTION LEVELS AS WELL:

4      SEARCH, DISPLAY."

5           DID I READ THAT CORRECTLY?

6      A.   YES.

7      Q.   DO YOU RECALL WRITING THAT?

8      A.   YES.

9      Q.   AND INCOGNITO DETECTION, THAT'S REFERRING TO CHROME

10     INCOGNITO; RIGHT?

11     A.   I BELIEVE SO.

12     Q.   OKAY.  AND YOU'RE REFERRING TO BOTH SEARCH AND DISPLAY;

13     RIGHT?

14     A.   I BELIEVE THE REFERENCE HERE IS TO SEARCH ADS AND DISPLAY,

15     YES.

16     Q.   AND DISPLAY, IS THAT ADS?

17     A.   YES.

18     Q.   AND LIKE WITH THE BULLET POINT, THE UNDERLYING TEXT ARE A

19     HYPERLINK THAT WOULD LEAD TO AN INTERNAL GOOGLE PAGE, SUCH AS A

20     WIKI, OR SOME OTHER TYPE OF PAGE; CORRECT?

21     A.   AS I STATED BEFORE, I THINK I WOULD HAVE TO CLICK ON IT TO

22     MAKE SURE WHAT IT LINKS OUT TO, BUT THEY DO APPEAR TO ME AS

23     LINKS.

24     Q.   OKAY.  AND THE LINKS FOR THOSE PAGES TRACKED INCOGNITO

25     USAGE IN CHROME; CORRECT?

1    A.   I CANNOT CONFIRM THAT RIGHT HERE WITHOUT CLICKING ON THEM.

2    Q.   YOU DON'T HAVE A RECOLLECTION OF THAT?

3    A.   I RECALL THIS COMMUNICATION, BUT I DON'T RECALL WHAT

4    EXACTLY THEY LINK OUT TO AS I SIT HERE RIGHT NOW.

5    Q.   FURTHER ON INTO THE EMAIL, YOUR COLLEAGUES GO ON TO

6    DISCUSS THE IS_CHROME_INCOGNITO BIT AND WHETHER IT IS BEING

7    LOGGED AS SEARCH AND DISPLAY CLICKS.

8         DO YOU SEE THAT ON THE SAME PAGE?

9    A.   WHICH PARAGRAPH ARE YOU REFERRING TO, PLEASE?

10   Q.   RYAN, WILL YOU GET THAT ON THE DOCUMENT, PLEASE?

11   A.   YES, I SEE IT.

12   Q.   WHAT DOES THAT REFER TO, SIR?

13   A.   I BELIEVE THIS WAS A QUESTION FROM AMIN CHARANIYA TO BERT

14   ON WHETHER OR NOT THERE IS A PROXY THAT CAN BE LOGGED OR USED

15   INSTEAD OF THE INCOGNITO BIT.

16   Q.   AND INCOGNITO, WHAT DOES THAT REFER TO?

17   A.   I'M NOT COMPLETELY SURE WHAT AMIN MAY HAVE MEANT BY THAT.

18   BUT MY, MY GUESS, AS I'M SITTING HERE, WOULD BE THAT HE WAS

19   REFERRING TO THE MAYBE_CHROME_INCOGNITO UNDERSCORE BIT.

20   Q.   OKAY.  NOT -- HE WASN'T REFERRING TO IS_CHROME_INCOGNITO?

21   A.   AS I STATED BEFORE, I DON'T KNOW WHAT AMIN MEANT IN THAT

22   MESSAGE, BUT MY GUESS WOULD BE THAT HE WAS REFERRING TO THE

23   MAYBE_CHROME_INCOGNITO BIT OR FIELD IN THE LOG.

24   Q.   COULD IT BE THAT THIS IS A FOURTH INCOGNITO DETECTION BIT?

25   A.   SORRY, CAN YOU REPEAT THAT?

1    Q.   COULD HE HAVE BEEN REFERRING TO A FOURTH INCOGNITO

2    DETECTION BIT?

3    A.   CAN YOU CLARIFY --

4    Q.   YES, SIR.

5    A.   -- WHAT IS THAT FOURTH ONE?

6    Q.   YES, SIR.  WE HAVE AN IS_CHROME_INCOGNITO BIT; CORRECT?

7    A.   SORRY.  WHICH PART ARE YOU REFERRING TO?

8    Q.   I'M JUST ASKING YOU, IN CONNECTION WITH, AT GOOGLE, THERE

9    IS AN IS_CHROME_INCOGNITO BIT?

10   A.   THAT IS NOT THE NAME OF THE BIT THAT MY TEAM CREATED.

11   Q.   OKAY.  BUT ARE YOU AWARE OF A BIT CALLED

12   IS_CHROME_INCOGNITO?

13   A.   I AM NOT PERSONALLY AWARE.  BUT THERE MAY BE SUCH A BIT

14   SOMEWHERE.

15   Q.   OKAY.  YOU KNOW THAT THERE IS A BIT CALLED

16   IS_CHROME_NON_INCOGNITO; CORRECT?

17   A.   I AM NOT PERSONALLY AWARE OF THAT BIT.  BUT IT MAY EXIST

18   SOMEWHERE.

19   Q.   MR. LIAO, ON APRIL 4TH, 2022, YOU EXECUTED A DECLARATION

20   FOR GOOGLE'S OPPOSITION TO THIS MOTION.

21        DO YOU RECALL DOING THAT?

22   A.   YES.

23   Q.   OKAY.

24        YOUR HONOR, THAT'S FOUND AT DOCKET ENTRY 528-3.

25        DO YOU NEED TO SEE YOUR DECLARATION?

1      A.   IT WOULD BE GREAT IF I CAN, PLEASE.

2            THE COURT:  IS IT A TAB?

3      BY MR. YANCHUNIS:

4      Q.   THERE IT IS IN FRONT OF YOU, MR. LIAO.

5            THE COURT:  IS IT A TAB IN MY BINDER OF EXHIBITS?

6            MR. MCGEE:  TAB 27, YOUR HONOR.

7            THE COURT:  THANK YOU.

8      BY MR. YANCHUNIS:

9      Q.   DO YOU HAVE IT ON THE SCREEN?

10     A.   YES, I DO.

11     Q.   LET'S GO TO PARAGRAPH 5 OF YOUR DECLARATION.

12           IN PARAGRAPH 5, YOU ALLEGE THERE ARE TWO PRIMARY HURDLES

13     WITH USING THE ABSENCE OF THE X-CLIENT DATA HEADER TO IDENTIFY

14     INCOGNITO TRAFFIC; CORRECT?

15     A.   YES.

16     Q.   OKAY.  LET'S GO TO PARAGRAPH 6.

17           IN PARAGRAPH 6, YOU PROVIDE THE FIRST HURDLE, WHICH IS

18     THAT SOME CHROME TRAFFIC THAT IS NOT INCOGNITO MAY STILL

19     PRODUCE AN EMPTY X-CLIENT DATA HEADER FIELD; CORRECT?

20     A.   YES.

21     Q.   SO IN PLAIN ENGLISH, THIS WOULD RESULT IN ALL INCOGNITO

22     TRAFFIC AND HYPOTHETICALLY SOME SLICE OF NON-INCOGNITO TRAFFIC;

23     CORRECT?

24     A.   IN NOT SENDING THE X-CLIENT DATA HEADER, I'M ASSUMING

25     THAT'S WHAT YOU MEANT.

1    Q.   YES.

2    A.   YES.

3    Q.   AND IN PARAGRAPH 7, YOU PROVIDE THE SECOND HURDLE, WHICH

4    IS A TWO-PART EXAMPLE.  FIRST, THAT SOME NON-CHROME TRAFFIC MAY

5    SPOOF ITSELF TO LOOK LIKE CHROME TRAFFIC.

6         DID I GET THAT RIGHT?

7    A.   YES.

8    Q.   AND SECOND FOR THAT TRAFFIC, BECAUSE IT'S NOT CHROME

9    TRAFFIC TO BEGIN WITH, IT WON'T HAVE X-CLIENT DATA HEADER

10   ASSOCIATED WITH IT.

11        DID I GET THAT RIGHT?

12   A.   YES.

13   Q.   SO IN PLAIN ENGLISH, THAT WOULD RESULT IN ALL INCOGNITO

14   TRAFFIC AND HYPOTHETICALLY SOME SLICE OF NON-CHROME TRAFFIC;

15   CORRECT?

16   A.   AGAIN, IN NOT SENDING THE X-CLIENT DATA HEADER, THAT IS

17   CORRECT.

18   Q.   OKAY.  SO BOTH EXAMPLES IN PARAGRAPH 6 AND 7 WOULD STILL

19   IDENTIFY ALL INCOGNITO TRAFFIC, PLUS SOME EDGE CASES; RIGHT?

20             MR. SCHAPIRO:  OBJECTION.

21             THE WITNESS:  I --

22             MR. SCHAPIRO:  WITHDRAW MY OBJECTION.  SORRY.

23             THE COURT:  YOU CAN ANSWER.

24             THE WITNESS:  SO THE INACCURACIES ASSOCIATED WITH

25   USING THE ABSENCE OF X-CLIENT DATA HEADER IN DETECTING

```
1     INCOGNITO MODE IS THAT BASED ON OUR UNDERSTANDING, WHICH WE

2     DERIVED PRIMARILY THROUGH A SERIES OF CONVERSATIONS WITH THE

3     CHROME ENGINEERS, IS THAT THERE ARE EDGE CASES, THERE ARE CASES

4     IN CHROME, AND ALSO NON-CHROME BROWSERS WHERE WE WOULDN'T BE

5     ABLE TO SERVE THIS HEADER THAT IS OUTSIDE OF INCOGNITO MODE.

6     BY MR. YANCHUNIS:

7     Q.   BUT OTHERWISE, IT WOULD IDENTIFY ALL INCOGNITO TRAFFIC,

8     PLUS SOME EDGE CASES; RIGHT?

9     A.   THAT IS CORRECT, ALTHOUGH I DO NOT KNOW HOW SUBSTANTIAL IN

10    TERMS OF THE AMOUNT OF TRAFFIC THE EDGE CASES REPRESENT.

11    Q.   DURING YOUR DIRECT EXAMINATION, YOU SAID YOU WERE FAMILIAR

12    WITH UIS, OR AS YOU IDENTIFIED IT, UNIFIED IDENTITY SERVICE;

13    CORRECT?

14    A.   YES.

15         THE COURT:  I HAVE YOU AT JUST ABOUT TIME,

16    MR. YANCHUNIS.

17         MR. YANCHUNIS:  DO I HAVE ONE QUESTION, YOUR HONOR?

18         THE COURT:  ABSOLUTELY.

19    BY MR. YANCHUNIS:

20    Q.   DOES GOOGLE ANALYTICS USE UIS?

21    A.   I'M NOT VERY FAMILIAR WITH GOOGLE ANALYTICS, BUT IN SOME

22    OF THEIR SERVING PATH, I BELIEVE UIS MAY BE INVOLVED.

23         MR. YANCHUNIS:  YOUR HONOR, THANK YOU.

24    I APPRECIATE YOUR TIME.  THANK YOU, MR. LIAO.

25         THE COURT:  THANK YOU.
```

```
1            YOU MAY STEP DOWN, MR. LIAO.  THANK YOU.

2            NEXT WITNESS?

3                 THE CLERK:  WHO ARE WE CALLING NEXT?

4                 MR. ANSORGE:  YES, GOOGLE WILL BE CALLING

5       MR. BERT LEUNG.  HE'S JUST OUTSIDE.

6            (PAUSE IN PROCEEDINGS.)

7                 THE COURT:  MR. LEUNG, PLEASE COME FORWARD.  COME

8       RIGHT UP HERE TO THE WITNESS STAND.  THANK YOU.

9            AND RAISE YOUR HAND.  YOU HAVE PLENTY OF TIME.  THANK YOU.

10           IF YOU'LL RAISE YOUR RIGHT HAND, PLEASE.

11           (DEFENDANT'S WITNESS, WING-PAN LEUNG, WAS SWORN.)

12                THE WITNESS:  YES, I DO.

13                THE CLERK:  HAVE A SEAT, PLEASE.

14                THE COURT:  PLEASE STATE YOUR FULL NAME.

15                THE WITNESS:  WING-PAN LEUNG.

16                THE COURT:  OKAY.  MR. LEUNG, YOU MAY REMOVE YOUR

17      MASK --

18                THE WITNESS:  OKAY.

19                THE COURT:  -- IF YOU WOULD LIKE.

20           AND SPEAK INTO THE MICROPHONE.  THAT WILL HELP THE COURT

21      REPORTER.

22                THE WITNESS:  OKAY.

23                THE COURT:  OKAY.  THANK YOU.

24           YOU MAY PROCEED.

25                MR. ANSORGE:  THANK YOU, YOUR HONOR.
```

1                      **DIRECT EXAMINATION**

2    BY MR. ANSORGE:

3    Q.   GOOD AFTERNOON, MR. LEUNG.

4    A.   GOOD AFTERNOON.

5    Q.   HOW LONG HAVE YOU WORKED AT GOOGLE?

6    A.   ABOUT EIGHT YEARS.

7    Q.   WHAT IS YOUR CURRENT ROLE AT GOOGLE?

8    A.   SOFTWARE ENGINEER.

9    Q.   MR. LEUNG, WHY COULD YOU NOT APPEAR FOR A DEPOSITION ON

10   FEBRUARY 24TH?

11   A.   I WAS IN AN EMERGENCY -- ENGINEERING EMERGENCY RELATED TO

12   GOOGLE SEARCH.

13   Q.   DID ANY LAWYER TELL YOU NOT TO APPEAR FOR A DEPOSITION ON

14   FEBRUARY 24TH?

15   A.   NO.

16   Q.   WHAT IS AN X-CLIENT DATA HEADER?

17   A.   MY UNDERSTANDING OF X-CLIENT DATA HEADER IS AN INPUT

18   SIGNAL THAT IS GENERATED AND SENT BY CHROME BROWSERS TO WEB

19   SERVERS.

20   Q.   AND WHAT IS THE PURPOSE OF THE X-CLIENT DATA HEADER?

21   A.   MY UNDERSTANDING IS IT'S FOR CHROME TO ENABLE THE SERVERS

22   TO EXPERIMENTAL FEATURES.

23   Q.   MR. LEUNG, DO YOU RECALL WORK ON ANY PROJECTS THAT USED

24   THE ABSENCE OF THE X-CLIENT DATA HEADER AS AN INPUT?

25   A.   YES.

1    Q.   AND OVER THE EIGHT YEARS THAT YOU'VE WORKED AT GOOGLE,

2    APPROXIMATELY HOW MUCH TIME IN TOTAL DID YOU SPEND ON THOSE

3    PROJECTS?

4    A.   IN AGGREGATE, IT'S PROBABLY ABOUT A WEEK OF MY TIME.

5    Q.   CAN YOU PLEASE DESCRIBE THE PROJECT.

6    A.   THE FIRST PROJECT IS TO UNDERSTAND THE IMPACT OF A

7    PREVIOUS CHROME LAUNCH IN TERMS OF THE THIRD PARTY COOKIE

8    BLOCKING FOR INCOGNITO MODE.

9         THEN THERE'S EXTENSION OF THE PROJECT.

10   Q.   DID YOU HAVE A RELIABLE WAY TO MEASURE AGGREGATE INCOGNITO

11   TRAFFIC FOR THOSE PROJECTS?

12   A.   NO.

13   Q.   WHY NOT?

14   A.   THE PROJECT RELIES ON THE HEURISTIC METHOD, WHICH IS BASED

15   ON ONE OF THE SIGNALS -- ONE OF THE INPUT IS BASED ON THE

16   ABSENCE OF THE X-CLIENT DATA HEADER.

17        BUT THERE ARE A NUMBER OF REASONS THAT THOSE CAN BE ABSENT

18   NOT RELATED TO CHROME INCOGNITO MODE, SO THAT'S NOT A RELIABLE

19   SIGNAL.

20   Q.   SO HOW DID YOUR TEAM ATTEMPT TO APPROXIMATE THE INCOGNITO

21   TRAFFIC?

22   A.   IT'S BASED ON A HEURISTIC METHOD, WHICH IS BASED ON THE

23   NUMBER OF INPUTS, THE ABSENCE OF X-CLIENT DATA TO IDENTIFY

24   CHROME THROUGH, THROUGH USER AGENT, BUT ALSO THAT'S NOT A VERY

25   RELIABLE WAY SPECIFICALLY.

1          THEN ALSO TRYING TO PROVE A NUMBER OF WAY -- POSSIBILITIES

2     THAT THE X-CLIENT DATA WILL NEVER BE, BE -- WOULD NEVER EXIST

3     EVEN REGARDLESS IF IT'S IN INCOGNITO MODE OR NOT.

4     Q.   AND IS THE ABSENCE OF THE X-CLIENT DATA HEADER A RELIABLE

5     SIGNAL TO DETECT INCOGNITO TRAFFIC?

6     A.   NO.

7     Q.   WHY NOT?

8     A.   THERE ARE OTHER POSSIBILITIES AND NO SCENARIOS THAT THE

9     X-CLIENT DATA HEADER WOULD BE SIMPLY ABSENT REGARDLESS WHETHER

10    IT'S CHROME INCOGNITO OR NOT.

11    Q.   WILL YOU PLEASE GIVE US AN EXAMPLE OF A CASE WHERE THE

12    X-CLIENT DATA HEADER IS NOT PRESENT EVEN IF THE USER IS NOT IN

13    INCOGNITO MODE?

14    A.   ONE OF THE EXAMPLES WOULD BE OUR IOS CHROME BROWSERS.

15          THE COURT:  I'M SORRY, WHAT WAS THAT?

16          THE WITNESS:  IOS CHROME BROWSERS.

17          THE COURT:  IOS?

18          THE WITNESS:  CHROME BROWSERS ON IPHONE.

19    BY MR. ANSORGE:

20    Q.   COULD YOU PLEASE EXPLAIN THAT A LITTLE BIT MORE FOR US?

21    A.   TO THE BEST OF MY KNOWLEDGE, X-CLIENT DATA IS SIMPLY NOT

22    GENERATED OR SENT IN IOS CHROME BROWSER, REGARDLESS OF THE USER

23    IS IN INCOGNITO MODE OR NOT.

24    Q.   SO IF A USER IS ON CHROME BROWSER ON AN IPHONE, CAN THE

25    ABSENCE OF THE X-CLIENT DATA HEADER BE USED TO INFER THAT A

1    USER IS IN INCOGNITO MODE?

2    A.   NO.

3    Q.   AND HOW DID YOU ACCOUNT FOR CHROME IOS TRAFFIC IN THE

4    PROJECT?

5    A.   IN THE HEURISTIC, WE SEEM TO EXCLUDE THOSE TRAFFIC.

6    Q.   MR. LEUNG, DID YOUR TEAM EVER ATTEMPT TO MEASURE THE ERROR

7    RATE FOR CASES WHERE THE X-CLIENT DATA HEADER WAS MISSING, BUT

8    THE TRAFFIC WAS NOT IN INCOGNITO?

9    A.   NO.

10   Q.   WHY NOT?

11   A.   THERE'S NO RELIABLE WAY TO MEASURE THE ERROR RATE BECAUSE

12   THERE'S NO GROUND TRUTH TO MEASURE THAT.

13   Q.   MR. LEUNG, IF THE AGGREGATE RATIO OF THE

14   MAYBE_CHROME_INCOGNITO HEURISTIC OUTPUT IS AT 3 PERCENT, DOES

15   THAT MEAN THAT THE HEURISTIC HAS PROPERLY DETECTED INCOGNITO

16   TRAFFIC IN EACH INSTANCE?

17   A.   THERE'S NO PROOF OF THAT.

18   Q.   WHY NOT?

19   A.   THE HEURISTIC IS BASED ON THE, THE -- WHEN USING THE

20   HEURISTIC AND LOOKING INTO THE REQUEST SIGNALS TO COMPUTE THE

21   OUTPUT.

22        BUT ON THE OTHER HAND, THE 3 PERCENT NUMBER IS ALSO A, A

23   NUMBER THAT CHROME USES AND PROVIDED TO ME IN THE PROJECT, BUT

24   THAT'S BASED ON A DIFFERENT DATA SET.

25        SO THEY ARE -- THEY ARE COMING FROM TWO DIFFERENT DATA

1    SETS.

2         AND THERE'S ALSO NO GUARANTEE THAT THE SAME 3 -- EVEN WITH

3    BOTH SIDES COME UP WITH 3 PERCENT, THERE'S NO GUARANTEE THAT

4    THEY'RE ACTUALLY POINTING TO THE SAME 3 PERCENT OF THE TRAFFIC.

5         SO WITHOUT THOSE PROOF, THERE'S NO WAY FOR ME TO SAY THAT

6    THE HEURISTIC CAN BE RELIABLE ENOUGH.

7    Q.   WHAT ARE SOME OF THE DIFFERENCES BETWEEN THOSE TWO DATA

8    SETS?

9    A.   MY UNDERSTANDING ON THE CHROME SIDE, THEY ARE MEASURING

10   PAGE LOAD.

11        ON ADS, WE ARE MEASURING PER REQUEST.

12   Q.   MR. LEUNG, IF THE ABSENCE OF THE X-CLIENT DATA HEADER IS

13   NOT A RELIABLE MEANS TO DETECT INCOGNITO TRAFFIC, THEN WHY DID

14   YOUR TEAM USE IT?

15   A.   EVEN IF IT'S NOT RELIABLE ENOUGH, BUT THEY ARE -- BUT THE

16   HEURISTIC IS GOOD ENOUGH FOR THE PURPOSE OF THE PROJECT.

17   Q.   AND WHAT IS A HEURISTIC?

18   A.   A HEURISTIC IS, IN MY UNDERSTANDING, IS A SIMPLER AND

19   FASTER WAY TO COMPUTE INPUT WHICH WOULD BE GOOD ENOUGH FOR THE

20   PURPOSE, EVEN THOUGH IT'S NOT COMPREHENSIVE AND NOT SUPER

21   RELIABLE.

22   Q.   MR. LEUNG, WHAT IS THE MAYBE_CHROME_INCOGNITO BIT?

23   A.   IT'S AN OUTPUT OF THE HEURISTIC.

24   Q.   AND WHAT IS CONTAINED WITHIN THE MAYBE_CHROME_INCOGNITO

25   BIT?

1    A.   THAT BIT IS A BOOLEAN VALUE, WHICH IS EITHER A TRUE OR

2    FALSE.

3    Q.   WHY IS IT CALLED A MAYBE_CHROME_INCOGNITO BIT?

4    A.   THAT PREFIX IS TO EMPHASIZE THIS BIT IS NOT A RELIABLE WAY

5    TO IDENTIFY CHROME INCOGNITO TRAFFIC.

6    Q.   AND, MR. LEUNG, WHILE WE'VE REFERRED TO IT TODAY AS THE

7    MAYBE_CHROME_INCOGNITO BIT, IS THAT THE FULL NAME OF THE BIT?

8    A.   NO.

9    Q.   WHAT IS THE FULL NAME OF THE BIT?

10   A.   MAYBE_CHROME_INCOGNITO_DO_NOT_USE_WITHOUT_CONSULTING_

11   ADS_IDENTITY_TEAM.

12   Q.   AND WHY DID YOUR TEAM INCLUDE A SUFFIX IN THE BIT'S NAME

13   STATING DO_NOT_USE_WITHOUT_CONSULTING_THE_ADS_IDENTITY_TEAM?

14   A.   THAT BIT IS NOT BUILT FOR GENERAL USAGE, SO IN ORDER TO

15   PREVENT MISUSE OF THAT BIT, WE ADD THE SUFFIX TO THAT SO THAT

16   ANY PEOPLE, ANY PEOPLE WHO WANT TO USE THE BIT FOR ANY OTHER

17   USAGES SHOULD FIRST CONSULT OUR TEAM.

18   Q.   AND HAS ANYBODY EVER CONSULTED THE ADS IDENTITY TEAM ABOUT

19   USING THAT BIT?

20   A.   NO.

21   Q.   MR. LEUNG, IS THE MAYBE_CHROME_INCOGNITO BIT OR BOOLEAN

22   FIELD A SIGNAL SENT FROM CHROME TO GOOGLE?

23   A.   CAN YOU REPEAT THE QUESTION?

24   Q.   IS THE MAYBE_CHROME_INCOGNITO BIT A SIGNAL THAT'S SENT

25   FROM CHROME TO GOOGLE?

1      A.   NO.

2      Q.   AND WHAT TYPE OF INFORMATION IS CONTAINED IN THE

3      MAYBE_CHROME_INCOGNITO BIT?

4      A.   IT'S THE BOOLEAN VALUE, SO IT'S EITHER TRUE OR FALSE.

5      Q.   SO DOES THE MAYBE_CHROME_INCOGNITO BIT CONTAIN ANY

6      INFORMATION IDENTIFYING USERS INDIVIDUALLY?

7      A.   NO.

8      Q.   DID YOUR TEAM EVER ATTEMPT TO USE THE BIT TO IDENTIFY

9      INDIVIDUAL USERS BROWSING IN INCOGNITO MODE?

10     A.   NO.

11     Q.   WHY NOT?

12     A.   WELL, FIRST OF ALL, IT'S TECHNICALLY NOT POSSIBLE BECAUSE

13     IT'S EITHER A TRUE OR FALSE VALUE.

14          SECOND, WE DO NOT HAVE ANY USAGE FOR THAT, NEED TO DO

15     THAT.

16     Q.   MR. LEUNG, AS PART OF THESE PROJECTS YOU'RE DESCRIBING

17     TODAY, DID YOUR TEAM EVER ATTEMPT TO IDENTIFY ANY PARTICULAR

18     USERS AT ALL WHO WERE BROWSING IN INCOGNITO MODE?

19     A.   NO.

20     Q.   DID YOUR TEAM EVER ATTEMPT -- I'M SPEEDING UP BECAUSE OF

21     THE TIME RESTRAINTS.

22          DID YOUR TEAM EVER ATTEMPT TO LINK TRAFFIC THAT DID NOT

23     HAVE AN X-CLIENT DATA HEADER WITH A PARTICULAR I.P. ADDRESS?

24     A.   NO.

25     Q.   DID YOUR TEAM EVER ATTEMPT TO LINK TRAFFIC THAT DID NOT

LEUNG DIRECT BY MR. ANSORGE

1    HAVE AN X-CLIENT DATA HEADER WITH A PARTICULAR GAIA ID?

2    A.   NO.

3    Q.   DID YOUR TEAM EVER ATTEMPT TO LINK TRAFFIC THAT DID NOT

4    HAVE AN X-CLIENT DATA HEADER WITH ANYTHING AT ALL THAT WOULD

5    IDENTIFY A PARTICULAR PERSON?

6    A.   NO.

7    Q.   MR. LEUNG, FOR THE DATA FLOW AT ISSUE IN THIS CASE WHERE

8    USERS AREN'T SIGNED INTO THEIR GOOGLE ACCOUNTS, THEY'RE USING A

9    BROWSER IN PRIVATE BROWSING MODE TO VISIT A WEBSITE AND THAT

10   WEBSITE USES GOOGLE SERVICES, CAN THE MAYBE_CHROME_INCOGNITO

11   BIT IDENTIFY INDIVIDUAL USERS?

12   A.   NO.  AS YOU SAID, IT'S NOT SIGNED IN, SO -- AND THE BIT

13   ITSELF IS JUST A TRUE OR FALSE VALUE, SO IT'S NOT POSSIBLE.

14   Q.   ARE YOU AWARE OF GOOGLE MAINTAINING ANY PROFILES THAT

15   COMBINE --

16           THE COURT:  LAST QUESTION, MR. ANSORGE.

17           MR. ANSORGE:  YES, YOUR HONOR.  THIS IS THE LAST

18   QUESTION AS WELL.

19   Q.   ARE YOU AWARE OF GOOGLE MAINTAINING ANY PROFILES THAT

20   CONTAINED LOGGED OUT PRIVATE BROWSING ACTIVITY FROM SEPARATE

21   BROWSING SESSIONS?

22   A.   NO.

23           MR. ANSORGE:  THANK YOU.

24           THE COURT:  CROSS-EXAM.

25           MR. MCGEE:  THANK YOU.

1                        **CROSS-EXAMINATION**

2     BY MR. MCGEE:

3     Q.   MR. LEUNG, ON YOUR DIRECT EXAMINATION, YOU SAID THAT THE

4     BIT WAS RELIABLE ENOUGH; CORRECT?

5     A.   NO, I DIDN'T SAY THAT.

6     Q.   YOU DIDN'T SAY THAT THE BIT WAS GOOD ENOUGH FOR THE

7     PROJECT?

8     A.   THE BIT IS GOOD ENOUGH FOR THE PROJECT.

9     Q.   BUT YOUR TESTIMONY IS YOU DID NOT SAY THAT IT WAS RELIABLE

10    ENOUGH FOR THAT PROJECT?

11    A.   IT'S -- WELL, IT'S GOOD ENOUGH FOR THE PROJECT.

12         BUT THE BIT ITSELF IS NOT A RELIABLE WAY TO IDENTIFY

13    CHROME INCOGNITO.

14    Q.   RIGHT.  SO IF I CAN PULL UP EXHIBIT 87.  AND THE -- YEAH,

15    THE TOP PART.  THANK YOU.

16         RIGHT HERE, ON MAY 15TH, 2020, WHICH WAS TWO WEEKS BEFORE

17    WE FILED THIS LAWSUIT, YOU'RE SPEAKING WITH OTHERS ON YOUR TEAM

18    AND YOUR ENGINEER THAT YOU SUPERVISE, BERT LEUNG, SAID THAT THE

19    GROUND TRUTH FOR THE ANALYSIS THAT YOUR TEAM WAS GOING TO BE

20    CONDUCTING WAS THE 3.08 PERCENT; CORRECT?

21         I'M SORRY, YOU WROTE THAT.  EXCUSE ME.

22    A.   WELL, THIS IS WHAT I SAID.

23    Q.   RIGHT.  SO YOU WROTE THAT THE 3.08 PERCENT WAS A GROUND

24    TRUTH FOR THE PROJECT THAT YOU, MANDY LIU, AND OTHERS ON YOUR

25    TEAM WERE GOING TO BE CONDUCTING, CORRECT, WITH THE

LEUNG CROSS BY MR. MCGEE

1    MAYBE_CHROME_INCOGNITO BIT?

2    A.   ACCORDING TO THIS EMAIL, THIS IS THE GROUND TRUTH FOR THE

3    ANALYSIS.

4    Q.   RIGHT.  AND THAT'S AN EMAIL THAT YOU AUTHORED ON MAY 15TH

5    OF 2020; CORRECT?

6    A.   YES.

7    Q.   OKAY.  AND THEN IF I CAN BRING UP EXHIBIT 88, AND THE

8    NOTES FROM JANUARY 27TH OF 2022.

9         YOU AND MANDY LIU MET, AND THESE ARE MINUTES FROM YOUR

10   MEETINGS; CORRECT?

11   A.   YES.

12   Q.   AND MANDY LIU, OR YOU, WROTE THAT THE INCOGNITO RATE WAS

13   STILL TOO HIGH; CORRECT?

14   A.   THIS IS WHAT MANDY WROTE, YES.

15   Q.   OKAY.  AND THIS WAS BASED ON WHICH INCOGNITO DETECTION

16   BIT?

17   A.   THIS SHOULD BE BASED ON THE EXTENSION OF THE PROJECT, SO

18   MAYBE_CHROME_INCOGNITO BIT.

19   Q.   OKAY, SO THE MAYBE_CHROME_INCOGNITO BIT.

20        AND THEN SIX DAYS LATER, OR MAYBE SEVEN DAYS LATER, ON

21   FEBRUARY 3RD, WHO WROTE, "GOOD NEWS:  CHROME INCOGNITO RATE IS

22   3 PERCENT."

23        WAS THAT YOU OR MS. LIU?

24   A.   IT SHOULD BE MS. LIU.

25   Q.   OKAY.  SO MS. LIU, USING THE MAYBE_CHROME_INCOGNITO BIT,

1    FOUND THAT THE 3 PERCENT EQUALLED TO THE GROUND TRUTH FROM

2    EXHIBIT 87; CORRECT?

3    A.   THE NUMBER ITSELF LOOKS THE SAME.

4    Q.   RIGHT.  AND EARLIER YOU TESTIFIED ON YOUR DIRECT

5    EXAMINATION THAT THE BIT IS A BOOLEAN BIT; CORRECT?

6    A.   YES.

7    Q.   SO IT'S A TRUE/FALSE?

8    A.   IT'S EITHER TRUE OR FALSE.

9    Q.   OKAY.  AND WITH JUST THAT BIT, YOU TESTIFIED THAT YOU

10   WOULD NOT BE ABLE TO IDENTIFY USERS; CORRECT?

11   A.   YES.

12   Q.   BUT THOSE BITS ARE CONTAINED IN OTHER LOGS; CORRECT?

13   A.   CAN YOU SAY THAT AGAIN?

14   Q.   THOSE BITS ARE CONTAINED IN LOGS; CORRECT?

15   A.   YES.

16   Q.   AND THOSE LOGS HAVE ADDITIONAL INFORMATION; CORRECT?

17   A.   YES.

18   Q.   SUCH AS IDENTIFIERS?

19   A.   THERE CAN BE IDENTIFIERS.  BUT IF YOU'RE TALKING ABOUT

20   GAIA ID, AS LONG AS THE USER IS NOT SIGNED IN, I DON'T THINK

21   THERE'S GAIA ID THERE.

22   Q.   NO.  BUT THERE ARE IDENTIFIERS IN THOSE LOGS THAT ALSO

23   CONTAIN A TRUE OR FALSE STATEMENT FOR THAT BIT; CORRECT?

24   A.   I DON'T QUITE UNDERSTAND THE QUESTION.  CAN YOU SAY AGAIN?

25   Q.   SO THERE'S A LOG, AND IT CONTAINS MULTIPLE DATA SOURCES;

1    CORRECT?  OR MULTIPLE DATA POINTS?  CAN WE SAY THAT, DATA

2    FIELDS?

3    A.   LOGS THAT CONTAIN MULTIPLE DATA FIELDS.

4    Q.   RIGHT.  ONE OF THEM WOULD BE LABELED THE

5    MAYBE_CHROME_INCOGNITO FIELD; CORRECT?

6    A.   IF THE LOG CONTAINS THAT, YES.

7    Q.   AND THAT WOULD BE A TRUE OR FALSE VALUE; CORRECT?

8    A.   YES.

9    Q.   AND THEN IN OTHER PARTS OF THAT LOG, THERE WOULD BE, FOR

10   EXAMPLE, A BISCOTTI ID; CORRECT?

11   A.   THERE COULD BE BISCOTTI ID, YES.

12   Q.   THERE COULD BE A UID; CORRECT?

13   A.   I DON'T KNOW WHAT THE UID MEAN.

14   Q.   WHAT ABOUT A CRMID, HAVE YOU EVER HEARD OF THAT?

15   A.   I'VE HEARD OF THAT, BUT I DON'T KNOW WHETHER IT'S LOG OR

16   NOT.

17   Q.   OKAY.  BUT THE POINT IS THAT THE INCOGNITO DETECTION BIT,

18   MAYBE_CHROME_INCOGNITO, CAN EXIST IN LOGS THAT HAVE

19   IDENTIFIERS; CORRECT?

20   A.   CAN YOU CLARIFY WHAT YOU MEAN BY "IDENTIFIERS"?

21   Q.   BISCOTTI IDENTIFIER?

22   A.   IT COULD BE.

23   Q.   GAIA IDENTIFIER?

24   A.   ONLY IF THE USER SIGNED IN.

25   Q.   OKAY.  BUT IF THE USER IS SIGNED IN, A GAIA IDENTIFIER

1    WOULD BE IN THE SAME LOG AS THE INCOGNITO DETECTION BIT THAT

2    YOU AND MANDY LIU USED TO GET TO THE GROUND TRUTH OF 3.08

3    PERCENT; CORRECT?

4    A.   SO IF THE USER IS SIGNED IN, THEN, YEAH, THE GAIA WOULD BE

5    THERE.

6         BUT THEN, SURE, THE MAYBE_CHROME_INCOGNITO BIT WOULD BE

7    LOGGED.  THAT COULD BE AGGREGATE, SO THAT COULD BE THE

8    AGGREGATE THAT GOES TO 3 PERCENT, WHICH LOOKS SIMILAR TO THE

9    PREVIOUS ONE NUMBER THAT THE CHROME ENGINEER PROVIDED TO ME.

10        BUT THERE'S NO GUARANTEE THAT IT'S ACTUALLY THE SAME 3

11   PERCENT OF THE REQUEST.

12   Q.   AND WHAT ABOUT PPID'S?  HAVE YOU EVER HEARD OF THOSE?

13   A.   I'VE HEARD OF THAT.

14   Q.   I'M SORRY?

15   A.   I'VE HEARD OF IT.

16   Q.   AND THOSE ARE THE PUBLISHER PROVIDED IDENTIFIERS; CORRECT?

17   A.   TO MY KNOWLEDGE, IT STANDS FOR PUBLISHER PROVIDED

18   IDENTIFIER.

19   Q.   AND THOSE CAN ALSO EXIST IN LOGS WITH THE

20   MAYBE_CHROME_INCOGNITO BIT?

21   A.   I AM NOT AWARE OF WHERE IT IS LOGGED, SO I DON'T KNOW.

22   Q.   OKAY.  YOU DON'T KNOW; RIGHT?

23   A.   I DON'T KNOW.

24   Q.   OKAY.  AND, MR. LIAO, EARLIER YOU TESTIFIED THAT THE IOS

25   CHROME BROWSERS DON'T SEND THE X-CLIENT DATA HEADER.  YOU SAID

1    THAT WAS TO THE BEST OF YOUR KNOWLEDGE; CORRECT?

2    A.   YES.

3    Q.   WHO DID YOU SPEAK WITH TO OBTAIN THAT KNOWLEDGE?

4    A.   IT SHOULD BE A CHROME ENGINEER.

5    Q.   WHO?

6    A.   PROBABLY FLORIAN.

7    Q.   WHEN DID YOU SPEAK WITH FLORIAN UUNK TO OBTAIN THAT

8    INFORMATION?

9    A.   PROBABLY SOMETIME IN 2019 OR 2020.

10   Q.   DID YOU REVIEW ANY DOCUMENTS TO CONFIRM WHAT MS. UUNK

11   SAID?

12   A.   SAY THAT AGAIN.

13   Q.   DID YOU REVIEW ANY DOCUMENTS TO CONFIRM YOUR DISCUSSION

14   WITH FLORIAN UUNK?

15   A.   NO.

16        MR. MCGEE:  OKAY.

17      YOUR HONOR, MAY I HAVE ONE MOMENT?

18        THE COURT:  YES.

19      (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

20        MR. MCGEE:  THANK YOU, JUDGE.  I HAVE NO FURTHER

21   QUESTIONS.

22        THE COURT:  THANK YOU.

23      ALL RIGHT.  MR. LEUNG, YOU'RE FINISHED.  YOU MAY STEP

24   DOWN.

25        THE WITNESS:  THANK YOU.

1                 THE COURT:  THANK YOU.

2            CALL YOUR NEXT WITNESS.

3                 MR. SCHAPIRO:  YOUR HONOR, GOOGLE CALLS

4       ANDRE GOLUEKE.

5                 THE COURT:  MR. GOLUEKE, COME UP HERE TO THE WITNESS

6       BOX, PLEASE.

7            REMAIN STANDING.  RAISE YOUR RIGHT HAND.

8            **(DEFENDANT'S WITNESS, ANDRE GOLUEKE, WAS SWORN.)**

9                 THE WITNESS:  I DO.

10                THE CLERK:  HAVE A SEAT.

11                THE COURT:  PLEASE STATE YOUR FULL NAME.

12                THE WITNESS:  ANDRE GOLUEKE.

13                THE COURT:  THANK YOU.

14                       **DIRECT EXAMINATION**

15      BY MR. SCHAPIRO:

16      Q.   MR. GOLUEKE, HOW LONG HAVE YOU WORKED FOR GOOGLE?

17      A.   IT'LL BE 11 YEARS IN JULY.

18      Q.   AND WHAT IS YOUR CURRENT ROLE AT GOOGLE?

19      A.   I'M A STRATEGY AND OPERATIONS LEAD.

20      Q.   AND WHAT DO YOU DO IN THAT CAPACITY?

21      A.   I MANAGE THE TECHNICAL OPERATIONS TEAM.  WE FOCUS ON THE

22      PROCESSING AND COLLECTION, PRODUCTION OF DOCUMENTS FOR

23      REGULATORY INVESTIGATIONS, INTERNAL INVESTIGATIONS, LITIGATION,

24      THAT KIND OF THING.

25                AND I ALSO MANAGE A TEAM THAT DOES STRATEGY AND

1     OPERATIONAL SUPPORT FOR THE BROAD ORGANIZATION, WHICH INCLUDES

2     DISCOVERY AND LAW ENFORCEMENT INVESTIGATION SUPPORT AS WELL.

3     Q.   AND OVER THE 10-PLUS YEARS THAT YOU'VE WORKED AT GOOGLE,

4     APPROXIMATELY HOW MANY CASES HAVE YOU WORKED ON?

5     A.   I DON'T KNOW THE EXACT NUMBER.  IT'S EITHER DOZENS OR AS

6     MANY AS HUNDREDS.

7     Q.   WHEN DID YOU FIRST BECOME INVOLVED IN DISCOVERY IN WHAT

8     I'LL CALL THE CHROME PRIVACY MATTERS, THE CALHOUN AND BROWN

9     CASES?

10    A.   AROUND THE TIME OF MY INITIAL DECLARATION FOR THE CALHOUN

11    MATTER, WHICH WAS FEBRUARY OF 2021.

12    Q.   AND SO -- WELL, STRIKE THAT.

13         WHAT HAS BEEN YOUR INVOLVEMENT SINCE THAT FEBRUARY 2021

14    DECLARATION?

15    A.   I RECEIVED PERIODIC UPDATES ABOUT BOTH THE CALHOUN AND

16    BROWN MATTERS.

17         AND THEN I ALSO SUBMITTED A DECLARATION IN NOVEMBER 2021

18    FOR THE BROWN MATTER, AND I DID ANOTHER ONE A FEW WEEKS AGO AS

19    WELL.

20    Q.   NOW, REFERRING BACK TO THE FEBRUARY 2021 DECLARATION THAT

21    YOU SUBMITTED IN THE CALHOUN CASE, WHAT WAS THE PURPOSE OF THAT

22    DECLARATION, IF YOU RECALL?

23    A.   I BELIEVE IT WAS BURDEN ASSOCIATED WITH CATEGORICAL

24    PRESERVATION OF MY ACTIVITY, ANALYTICS, AND CERTAIN DISPLAY ADS

25    LOGS.

1    Q.   AND WHEN YOU WERE PREPARING THAT DECLARATION, HOW DID YOU

2    GO ABOUT DETERMINING THE BURDEN OF PRESERVING THESE LOGS FOR MY

3    ACTIVITY, ANALYTICS, AND DISPLAY ADS?

4    A.   IT WAS A -- IT WAS A MATTER OF -- WE LOOKED AT PLAINTIFFS'

5    CLAIMS AND THEIR CLASS DEFINITION TO DETERMINE WHAT WAS

6    POTENTIALLY IN SCOPE, WHICH AS YOU MENTIONED WAS ANALYTICS, MY

7    ACTIVITY, AND -- ANALYTICS AND DISPLAY ADS LOGS.

8         THEN WE IDENTIFIED ENGINEERS ON THOSE VARIOUS TEAMS OR

9    PRODUCT MANAGERS.

10        AND THEN I SCHEDULED MEETINGS TO TALK TO THOSE ENGINEERS

11   OR PRODUCT MANAGERS FROM THOSE VARIOUS TEAMS AND WE DISCUSSED

12   WHAT WAS POTENTIALLY IN SCOPE FOR THIS MATTER AND THE POTENTIAL

13   SIZE OF THOSE LOGS.

14   Q.   NOW, HOW ABOUT -- THAT WAS IN THE CALHOUN CASE; CORRECT?

15   A.   CORRECT.

16   Q.   HOW ABOUT IN THE BROWN CASE, THIS CASE?  I THINK YOU

17   MENTIONED YOU SUBMITTED A DECLARATION IN NOVEMBER OF LAST YEAR;

18   CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   SO WHAT WAS THAT DECLARATION ABOUT?  WHAT WAS THE ORIGIN

21   OF THAT?

22   A.   THAT WAS IN RESPONSE TO THE SPECIAL MASTER'S ORDER, AND

23   WHAT WE DID THERE IS I REFRESHED MY MEMORY FROM MY DISCUSSIONS

24   WITH THOSE ENGINEERS AND PRODUCT MANAGERS FROM CALHOUN AND

25   CONTINUED TO WORK WITH THOSE INDIVIDUALS TO COME UP WITH THIS

1      LIST OF LOGS THAT WAS POTENTIALLY RELEVANT.

2      Q.   AND WHEN YOU JUST DESCRIBED THE SPECIAL MASTER'S ORDER, IS

3      IT POSSIBLE YOU'RE THINKING OF THE NOVEMBER 12TH ORDER FROM THE

4      MAGISTRATE JUDGE, JUDGE VAN KEULEN?

5      A.   YES.  I'M SORRY.

6      Q.   MR. GOLUEKE, AND SO IN -- WELL, LET ME ASK YOU FIRST, WHY

7      WOULD YOU BE A LOGICAL PERSON TO PREPARE SUCH A DECLARATION?

8      A.   I THINK A NUMBER OF REASONS.  ONE IS THERE IS NO SINGLE

9      INDIVIDUAL THAT IS FAMILIAR WITH ALL LOGS ACROSS ALL OF GOOGLE.

10          SO IN THIS CASE I MET WITH SEVERAL INDIVIDUALS FROM THE

11     AFOREMENTIONED TEAMS TO EDUCATE MYSELF ABOUT THOSE LOGS AND

12     PROVIDE A CENTRALIZED SOURCE TO DECLARE.

13          I ALSO HAVE ALMOST 11 YEARS OF EXPERIENCE IN

14     IDENTIFICATION OF DATA SOURCES ACROSS MY TIME AT GOOGLE.

15          AND I ALSO HAVE SOME EXPERIENCE DRAFTING SOME OF THE

16     DOCUMENTATION BY WHICH LEGAL WILL PLACE CERTAIN LOGS ON HOLD.

17     Q.   AND IN DETERMINING WHICH ENGINEERS TO SPEAK TO, DID YOU

18     HAVE OCCASION TO LOOK AT THE COMPLAINT, OR ANY PARTS OF THE

19     COMPLAINT, THE OPERATIVE COMPLAINT AT THE TIME IN THIS CASE?

20          MS. FANTHORPE, WE MIGHT WANT TO DISPLAY ONE DOCUMENT.

21     A.   I DID, YES.

22     Q.   AND WHAT DID YOU LOOK AT AND WHY?

23     A.   IT'S BEING SHOWN HERE.  THE COMPLAINT LISTS, AS PART OF

24     THE CLASS DEFINITION, USERS THAT WERE IN PRIVATE BROWSING THAT

25     WENT TO THIRD PARTY WEBSITES THAT WERE UTILIZING AD MANAGER OR

1    GOOGLE ANALYTICS.

2    Q.   AND SO AFTER YOU HAD FAMILIARIZED YOURSELF WITH THE CLASS

3    DEFINITION AT THE TIME, HOW DID THAT AFFECT YOUR DECISION ABOUT

4    WHO TO GO SPEAK TO?

5    A.   WELL, I KNEW THAT IT WAS ABOUT ANALYTICS AND AD MANAGER,

6    SO I WENT AND SPOKE TO INDIVIDUALS FROM THE FOOTPRINTS OR MY

7    ANALYTICS TEAM, ALSO ANALYTIC, AND AD MANAGER TEAMS OR DISPLAY

8    ADS SEPARATELY.

9    Q.   AND WHAT PEOPLE DID YOU SPEAK WITH?

10   A.   I MET WITH DAN STONE FROM THE ANALYTICS TEAM.  HE'S A

11   PROGRAM MANAGER, OR PRODUCT MANAGER.

12        I ALSO MET WITH DAVE MONSEES, WHO WAS A PRODUCT MANAGER OF

13   FOOTPRINTS AND ANALYTICS, BUT FOCUSES ON PRIVACY AND USER DATA.

14        AND THEN I ALSO SPOKE TO BEN KORNACKI, WHO IS AN ENGINEER

15   ON THE DISPLAY ADS TEAM.

16   Q.   AND IN THE DECLARATION THAT YOU'VE SUBMITTED IN CONNECTION

17   WITH THIS PROCEEDING, THE SANCTIONS PROCEEDING, YOU TALKED

18   ABOUT SEARCHING FOR LOGS AND OTHER SOURCES THAT CONTAINED EVENT

19   LEVEL USER DATA RELEVANT TO THE PRODUCTS AND CLAIMS AT ISSUE.

20        WHAT IS EVENT LEVEL USER DATA?

21   A.   DATA GENERATED BY USER ACTIONS.  SO, FOR EXAMPLE, CLICKING

22   ON AN AD.

23   Q.   SO AFTER YOUR CONVERSATIONS WITH GOOGLE ENGINEERS AND

24   PRODUCT MANAGERS, WERE THERE ANY CATEGORIES OF LOG SOURCES THAT

25   YOU, THAT YOU RULED OUT FOR YOUR RESPONSE TO THE COURT ORDER?

1    A.   YEAH.  ONE, ONE EXAMPLE IS P LOGS, OR PERSONAL LOGS.  SO

2    BECAUSE THE CLASS DEFINITION WAS ABOUT PRIVATE BROWSING, I KNEW

3    THAT P LOGS WEREN'T GOING TO BE AN ISSUE BECAUSE THOSE RELATE

4    TO SIGNED IN OR SENT USERS.

5    Q.   WHEN YOU WERE LOOKING FOR RELEVANT DATA SOURCES, DID YOU

6    SEARCH BY FIELD?  DID YOU SEARCH FOR ANY PARTICULAR -- FOR DATA

7    SOURCES CONTAINING ANY PARTICULAR FIELD?

8    A.   NO.  TO MY KNOWLEDGE, THERE IS NO TOOL AT GOOGLE THAT

9    ALLOWS YOU TO SEARCH LIMITING TO JUST FIELD NAMES, NOT TO

10   MENTION THERE ARE TENS OF THOUSANDS OF POTENTIAL DATA SOURCES,

11   AND WITHIN THOSE, MANY HAVE HUNDREDS, THOUSANDS, OR TENS OF

12   THOUSANDS OF INDIVIDUAL FIELDS.

13        SO IT'S BEEN MY EXPERIENCE THAT THE MOST EXPEDITIOUS AND

14   BEST WAY TO DO THIS IS TO SPEAK TO ENGINEERS AND PRODUCT

15   MANAGERS FROM THOSE VARIOUS PRODUCTS AS THEY ARE MOST

16   KNOWLEDGEABLE -- EXCUSE ME -- MOST KNOWLEDGEABLE ABOUT THEIR

17   PRODUCTS.

18   Q.   ARE YOU AWARE THAT THE PLAINTIFFS ARE CLAIMING YOUR

19   NOVEMBER 18TH DECLARATION WAS DEFICIENT BECAUSE IT DID NOT

20   INCLUDE THE MAYBE_CHROME_INCOGNITO OR THE

21   IS_CHROME_NON_INCOGNITO OR THE IS_CHROME_INCOGNITO BITS?

22   A.   I AM.

23   Q.   AND JUST BECAUSE WE'RE SHORT ON TIME, I'LL ASK YOU TO

24   ADDRESS THEM TOGETHER.  WHY DIDN'T YOUR NOVEMBER 18TH

25   DECLARATION LIST FIELDS -- EXCUSE ME -- LOGS, DATA SOURCES,

1      INCLUDING THOSE BITS, THOSE FIELDS?

2      A.   I WAS NOT AWARE OF THOSE FIELDS AT THE TIME OF THAT

3      DECLARATION.

4           SECOND, AGAIN, WE -- THERE'S NO WAY, AS FAR AS I KNOW, NO

5      TOOL THAT WILL ALLOW YOU TO SEARCH BY FIELD NAME ACROSS ALL OF

6      THE RELEVANT -- ACROSS ALL OF THE DATA SOURCES ACROSS ALL OF

7      GOOGLE.

8           AND THEN, THIRD, I UNDERSTAND THAT SOME OF THE -- THAT THE

9      IS_CHROME_INCOGNITO AND IS_CHROME_NON_INCOGNITO RELATE TO THE

10     PREVIOUSLY IDENTIFIED SEARCH LOGS, WHICH WERE NOT IN SCOPE

11     BASED ON THE CLASS DEFINITION.

12          THE COURT:  LAST QUESTION.

13          MR. SCHAPIRO:  MY LAST QUESTION.

14     Q.   MR. GOLUEKE, DID ANYONE AT GOOGLE, ANY LAWYER, OR ANYONE

15     ELSE, ASK OR DIRECT YOU TO OMIT ANY DATA SOURCES FROM YOUR

16     DECLARATION?

17     A.   NO.

18          MR. SCHAPIRO:  THANK YOU.

19          THE COURT:  CROSS-EXAM.

20          MR. BOIES:  THANK YOU, YOUR HONOR.

21                       **CROSS-EXAMINATION**

22     BY MR. BOIES:

23     Q.   GOOD AFTERNOON, MR. GOLUEKE.  MY NAME IS DAVE BOIES, AND I

24     REPRESENT THE PLAINTIFFS.

25          DID YOU UNDERSTAND AT THE TIME THAT YOU DID YOUR NOVEMBER

1    DECLARATION THAT TRACKING OR ESTIMATING CHROME INCOGNITO USAGE

2    WAS RELEVANT TO THIS CASE?

3    A.   CAN YOU ASK THAT AGAIN?

4    Q.   SURE.  AT THE TIME THAT YOU DID YOUR DECLARATION IN THIS

5    CASE IN NOVEMBER OF 2021, DID YOU UNDERSTAND THAT THE TRACKING

6    OR ESTIMATING OF CHROME INCOGNITO USAGE WAS RELEVANT?

7    A.   AGAIN, I -- I BASED MY DISCUSSIONS WITH THOSE ENGINEERS

8    BASED ON THE CLASS DEFINITION, WHICH WAS PRIVATE BROWSING ON

9    THIRD PARTY WEBSITES UTILIZING AD MANAGER OR ANALYTICS.

10        SO I FOCUSSED ON ANALYTIC, AD MANAGER, AND THE FOOTPRINTS

11   LOGS.

12   Q.   NOT MY QUESTION, SIR.

13        MY QUESTION IS WHETHER YOU UNDERSTOOD AT THE TIME OF YOUR

14   DECLARATION THAT THE TRACKING OR ESTIMATING OF CHROME INCOGNITO

15   USAGE WAS RELEVANT TO THIS CASE.

16   A.   BASED ON THE PRIVATE BROWSING SECTION OF THAT CLASS

17   DEFINITION, I WOULD SAY YES.

18   Q.   YOU WOULD SAY YES?

19        AND DID YOU UNDERSTAND AT THE TIME OF YOUR DECLARATION

20   THAT GOOGLE ATTEMPTED TO TRACK OR ESTIMATE CHROME INCOGNITO

21   USAGE?

22   A.   NO.

23   Q.   YOU DIDN'T UNDERSTAND THAT?

24   A.   I DIDN'T KNOW THAT.

25   Q.   DID YOU ASK ANYBODY?

1    A.   I DON'T RECALL.

2    Q.   WELL, YOU KNEW THAT IT WAS RELEVANT; CORRECT?  YOU SAID

3    THAT.

4    A.   UM-HUM.

5    Q.   RIGHT?

6    A.   YES.

7    Q.   AND IN PREPARING YOUR DECLARATION, DID YOU TRY TO FIND OUT

8    FROM ANYBODY WHETHER GOOGLE WAS ACTUALLY DOING THAT?

9    A.   NO, I DON'T -- I DON'T THINK SO.

10   Q.   OKAY.  NOW, COUNSEL ASKED YOU WHETHER ANY LAWYER

11   REPRESENTING GOOGLE ASKED YOU TO OMIT SOMETHING.

12        DO YOU RECALL THAT?

13   A.   YES.

14   Q.   DID ANY LAWYER FROM GOOGLE ADVISE YOU AS TO WHAT WAS

15   RELEVANT IN THIS CASE?

16   A.   I SPOKE WITH COUNSEL.  I DON'T RECALL EXACTLY WHAT

17   COMMUNICATIONS WE HAD ABOUT THIS MATTER.

18        I KNOW THAT I BASED MOST OF MY DISCUSSION WITH ENGINEERS

19   ON THE CLASS DEFINITION.

20   Q.   BUT YOU'RE NOT A LAWYER; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   AND WHAT I'M ASKING YOU IS, DID YOU GET ANY ADVICE FROM

23   ANY OF THE LAWYERS ON THIS CASE AS TO WHAT WAS RELEVANT TO THIS

24   CASE?

25   A.   I THINK WE HAD SOME DISCUSSIONS ABOUT THAT.

1       Q.   AND WHAT DID THEY TELL YOU WAS RELEVANT?

2               MR. SCHAPIRO:  OBJECTION.  PRIVILEGE.

3               MR. BOIES:  YOUR HONOR, I THINK THAT IF HE'S BASING

4       THAT ON HIS DECLARATION, I'M ENTITLED TO KNOW WHAT HIS, WHAT

5       HIS BASIS IS.

6               THE COURT:  ASKING HIM SPECIFICALLY WHAT COUNSEL SAID

7       TO HIM IS PRIVILEGED.  I'LL SUSTAIN THE OBJECTION.

8       BY MR. BOIES:

9       Q.   WERE YOU AWARE, AT THE TIME THAT YOU DID YOUR DECLARATION,

10      THAT THERE WERE ANY LOGS THAT CONTAINED INCOGNITO DETECTION

11      FIELDS?

12      A.   NO.

13      Q.   DID YOU ASK ANYONE WHETHER THERE WERE ANY LOGS THAT

14      CONTAINED INCOGNITO DETECTION FIELDS?

15      A.   I DON'T RECALL.

16      Q.   IN PREPARATION FOR YOUR DECLARATION, DID YOU EVER TALK TO

17      MR. CHRIS LIAO?

18      A.   NO.

19      Q.   CAITLIN SADOWSKI?

20      A.   AT THE TIME OF THAT DECLARATION, NO.

21      Q.   BERT LEUNG?

22      A.   NO.

23      Q.   MANDY LIU?

24      A.   NO.

25      Q.   IVAN PETROV?

1    A.   NO.

2    Q.   HUA LUO?

3    A.   NO.

4    Q.   QUENTIN FIARD?

5    A.   NO.

6    Q.   PRIOR TO SUBMITTING YOUR DECLARATION, DID YOU EVER ASK

7    ANYBODY WHETHER THERE WAS ANYBODY IN GOOGLE WHO WAS WORKING ON

8    THE TRACKING OR ESTIMATING OF CHROME INCOGNITO USAGE?

9    A.   NOT THAT I RECALL.

10   Q.   DID YOU EVER REVIEW THE JULY 9, 2021 SUBMISSION BY

11   PLAINTIFFS IN THIS CASE AS TO INFORMATION THAT THEY WERE

12   SEEKING?

13   A.   I DON'T -- I DON'T RECALL.

14   Q.   ON -- DID YOU EVER REVIEW ANY OF THE BRIEFS OR SUBMISSIONS

15   FROM PLAINTIFFS AS TO WHAT INFORMATION THEY WERE SEEKING IN

16   THIS CASE?

17   A.   AGAIN, I LOOKED AT THE, THE ORIGINAL COMPLAINT AND THE

18   CLASS DEFINITION THEREIN.

19   Q.   OTHER THAN LOOKING AT THE ORIGINAL COMPLAINT AND THE CLASS

20   DEFINITION, DID YOU LOOK AT ANY DOCUMENTS THAT SET FORTH WHAT

21   THE PLAINTIFFS WERE ASKING FOR IN THIS LITIGATION?

22   A.   I BELIEVE I ALSO LOOKED AT THE ORDER, THE MAGISTRATE'S

23   ORDER.

24   Q.   THIS IS THE ORDER THAT TOLD YOU TO IDENTIFY ALL THE DATA

25   SOURCES THAT WERE RELEVANT TO OUR CLAIMS; RIGHT?

1    A.   CORRECT.

2    Q.   BUT THAT ORDER DIDN'T DEFINE WHAT WAS RELEVANT TO OUR

3    CLAIMS; CORRECT?

4    A.   I DON'T RECALL SPECIFICALLY.

5    Q.   OTHER THAN THE ORIGINAL COMPLAINT'S CLASS DEFINITIONS, DID

6    YOU LOOK AT ANY OTHER DOCUMENT PREPARED BY THE PLAINTIFFS THAT

7    SET FORTH WHAT THE PLAINTIFFS BELIEVE WERE RELEVANT IN THIS

8    CASE?

9    A.   I DON'T RECALL.

10   Q.   NOW, I THINK YOU SAID ON DIRECT EXAMINATION THAT YOU WERE

11   NOW FAMILIAR WITH CERTAIN LOGS THAT CONTAINED THE INCOGNITO

12   DETECTION FIELDS.  IS THAT CORRECT?

13   A.   AT A HIGH LEVEL, YES.

14   Q.   YOU ARE -- YOU ARE FAMILIAR THAT THERE ARE SUCH LOGS?

15   A.   CORRECT.

16   Q.   AND HOW DID YOU BECOME FAMILIAR WITH THOSE, WITH THE

17   EXISTENCE OF THOSE LOGS?

18        MR. SCHAPIRO:  I'LL JUST CAUTION THE WITNESS NOT TO

19   REVEAL CONVERSATIONS -- THE CONTENT OF CONVERSATIONS WITH

20   COUNSEL.

21   BY MR. BOIES:

22   Q.   DID YOU BECOME AWARE OF THE EXISTENCE OF THOSE LOGS FROM

23   ANY SOURCE OTHER THAN COUNSEL?

24   A.   DO YOU MIND REPHRASING THAT?

25   Q.   DID YOU BECOME AWARE OF THE EXISTENCE OF THESE LOGS THAT

1    CONTAINED THE INCOGNITO DETECTION FIELDS FROM ANY SOURCE OTHER

2    THAN COUNSEL?

3    A.   YEAH, I HAVE SUBSEQUENTLY SPOKEN WITH BEN KORNACKI AND

4    CURT HARDING FROM THE DISPLAY ADS TEAM ABOUT SOME OF THOSE

5    LOGS, YES.

6    Q.   AND THEY -- AND DID THEY TELL YOU THAT THERE WERE THESE

7    LOGS THAT CONTAINED THE INCOGNITO DETECTION BIT FIELDS?

8    A.   YES.

9    Q.   AND WHEN DID YOU HAVE THOSE CONVERSATIONS?

10   A.   I DON'T RECALL THE EXACT DATES.

11   Q.   BUT IT WOULD HAVE BEEN AFTER YOUR DECLARATION IS YOUR

12   TESTIMONY?

13   A.   AFTER THE NOVEMBER 18TH DECLARATION, YES.

14   Q.   AND IT IS YOUR TESTIMONY THAT PRIOR TO THE NOVEMBER 2021

15   DECLARATION, YOU DIDN'T ASK ANYBODY WHETHER SUCH LOGS EXISTED,

16   OR EVEN WHETHER THERE WERE ANY INCOGNITO DETECTION FIELDS?

17            MR. SCHAPIRO:  OBJECTION.  COMPOUND.

18            THE COURT:  GO AHEAD.  YOU CAN ANSWER.

19            THE WITNESS:  I WAS FOCUSSED ON IDENTIFICATION OF

20   DATA SOURCES, NOT INDIVIDUAL FIELDS.

21        I WAS RELYING ON THE EXPERTISE OF ENGINEERS AND PRODUCT

22   MANAGERS ON THOSE VARIOUS TEAMS TO HELP ME IDENTIFY RELEVANT

23   LOGS, NOT INDIVIDUAL FIELDS.

24   BY MR. BOIES:

25   Q.   AND WHEN YOU TALK ABOUT RELEVANT LOGS, YOU'RE TALKING

1    ABOUT THE LOGS THAT YOU CONSIDERED RELEVANT UNDER THE CLASS

2    DEFINITION; CORRECT, SIR?

3    A.   YEAH, WHICH WAS PRIVATE BROWSING, THIRD PARTY WEBSITES.

4    Q.   AND YOU DIDN'T ASK ANYBODY AS TO WHETHER THERE WERE PEOPLE

5    IN GOOGLE WHO WERE WORKING ON INCOGNITO DETECTION; CORRECT?

6    A.   I THINK THAT'S RIGHT.

7    Q.   DID YOU ASK ANYBODY IN GOOGLE WHETHER ANYONE WAS WORKING

8    ON TRACKING OR ESTIMATING PRIVATE BROWSING?

9    A.   CAN YOU ASK THAT AGAIN?  SORRY.

10   Q.   DID YOU ASK ANYONE WITHIN GOOGLE AS TO WHETHER THERE WAS

11   ANYONE IN GOOGLE WHO WAS WORKING ON TRACKING OR ESTIMATING

12   PRIVATE BROWSING?

13   A.   NOT THAT I RECALL.

14   Q.   DID YOU UNDERSTAND THAT ONE OF THE THINGS THAT THE

15   PLAINTIFFS WERE INTERESTED IN HERE WAS WHETHER THERE WERE

16   PEOPLE IN GOOGLE WHO WERE TRYING TO ESTIMATE OR TRACK PRIVATE

17   BROWSING?

18   A.   CAN YOU -- CAN YOU REPHRASE THAT AGAIN?

19   Q.   DID YOU UNDERSTAND THAT THERE WERE EFFORTS BY THE

20   PLAINTIFFS TO FIND OUT INFORMATION AS TO WHETHER THERE WERE

21   PEOPLE IN GOOGLE WHO WERE TRYING TO ESTIMATE OR TRACK PRIVATE

22   BROWSING?

23   A.   I DIDN'T KNOW THAT IN PARTICULAR.

24        THE COURT:  LAST QUESTION, MR. BOIES.

25        MR. BOIES:  THANK YOU, YOUR HONOR.

1          THE COURT:  YOU MAY HAVE ONE MORE QUESTION.

2          MR. BOIES:  I'LL PASS.  THANK YOU.

3          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

4       THANK YOU, MR. GOLUEKE.

5          THE WITNESS:  THANK YOU.

6          THE COURT:  YOU MAY STEP DOWN.

7          MS. TREBICKA:  YOUR HONOR, GOOGLE WILL CALL

8    DR. CAITLIN SADOWSKI.

9          THE COURT:  THANK YOU.

10      MS. SADOWSKI, DR. SADOWSKI, COME RIGHT ON UP HERE AND BE

11   SEATED.

12      ACTUALLY, RAISE YOUR RIGHT HAND AND REMAIN STANDING.  COME

13   ON UP.

14      TOO MANY DIRECTIONS.  I'M SORRY.  THERE YOU GO.

15         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16      **(DEFENDANT'S WITNESS, CAITLIN SADOWSKI, WAS SWORN.)**

17         THE WITNESS:  I DO.

18         THE CLERK:  THANK YOU.  HAVE A SEAT, PLEASE.

19         THE COURT:  PLEASE STATE YOUR FULL NAME.

20         THE WITNESS:  MY NAME IS DR. CAITLIN SADOWSKI.  DO

21   YOU WANT ME TO SPELL IT?

22         THE COURT:  I THINK WE'VE GOT IT.  THANK YOU.

23                     **DIRECT EXAMINATION**

24   BY MS. TREBICKA:

25   Q.   DR. SADOWSKI, WHAT IS YOUR ROLE AT GOOGLE?

SADOWSKI DIRECT BY MS. TREBICKA

1      A.   I LEAD THE CHROME DATA TEAM.

2      Q.   AND WHAT DOES THE CHROME DATA TEAM DO?

3      A.   SO WE'RE A CROSS-FUNCTIONAL TEAM CONSISTING OF ENGINEERS

4      AND ANALYSTS.  WE OWN ALL THE INFRASTRUCTURE FOR COLLECTING IN

5      THE WILD METRICS ABOUT CHROME BROWSER USAGE, AND THEN WE ALSO

6      HELP PEOPLE ANSWER QUESTIONS ABOUT CHROME BROWSER USAGE.

7      Q.   AND DO YOU LEAD THAT TEAM?

8      A.   YES, I LEAD THAT TEAM.

9      Q.   HOW MANY PEOPLE REPORT TO YOU?

10     A.   ABOUT 30.

11     Q.   NOW, DOES -- DO YOU KNOW WHAT THE X-CLIENT DATA HEADER IS?

12     A.   YES.

13     Q.   AND HOW HAVE YOU BECOME AWARE OF THE X-CLIENT DATA HEADER?

14     A.   THE X-CLIENT DATA HEADER IS SENT BY -- AS PART OF

15     INFRASTRUCTURE OWNED BY MY TEAM IN ORDER TO CONVEY

16     EXPERIMENTATION STATE.

17     Q.   DO YOU KNOW WHETHER CHROME SENDS THE X-CLIENT DATA HEADER

18     IN INCOGNITO MODE?

19     A.   CHROME DOES NOT TYPICALLY SEND THE X-CLIENT DATA HEADER IN

20     INCOGNITO MODE.

21     Q.   WHY IS THAT?

22     A.   BECAUSE USER PRIVACY IS IMPORTANT AND WE DON'T WANT TO

23     HAVE ANY WAY TO BE TRACKING USERS BETWEEN INCOGNITO AND

24     NON-INCOGNITO MODE.

25          SO EVEN THOUGH THERE'S NOT A LOT OF INFORMATION IN THE

1     X-CLIENT DATA HEADER, WE DON'T SEND IT FOR PRIVACY REASONS.

2     Q.   NOW, DOES CHROME, OR YOUR TEAM WITHIN CHROME, USE THE

3     ABSENCE OF THE X-CLIENT DATA HEADER TO DETECT INCOGNITO MODE?

4     A.   WE DO NOT.

5     Q.   DOES ANYBODY WITHIN CHROME USE THE ABSENCE OF THE X-CLIENT

6     DATA HEADER TO DETECT INCOGNITO MODE?

7     A.   WE DO NOT.

8     Q.   WHY NOT?

9     A.   BECAUSE IT'S NOT A RELIABLE INDICATOR OF WHETHER SOMEONE

10    IS OR IS NOT IN INCOGNITO MODE.

11    Q.   AS A CHROME ENGINEER AND THE LEADER OF THE CHROME METRICS

12    TEAM, CAN YOU TELL US ALL THE REASONS WHY THE ABSENCE OF THE

13    X-CLIENT DATA HEADER IS NOT A RELIABLE DETECTION TOOL FOR

14    INCOGNITO BROWSING?

15    A.   EVEN I CAN'T TELL YOU ALL THE REASONS, BUT I CAN TELL YOU

16    SOME OF THE REASONS.

17    Q.   THAT'S GOOD.  LET'S -- JUST SO THE RECORD IS CLEAR, WHY

18    DON'T WE TAKE IT ONE BY ONE.  TELL ME THE FIRST REASON THAT YOU

19    CAN THINK OF.

20    A.   SO, FOR EXAMPLE, ON IOS, THE X-CLIENT DATA HEADER IS

21    TYPICALLY NOT SENT, EXCEPT IN SOME KINDS OF SEARCHES.

22    Q.   AND WHAT IS --

23    A.   AND NAVIGATIONS.

24    Q.   UNDERSTOOD.  WHAT IS ANOTHER REASON THAT THE X-CLIENT DATA

25    HEADER IS NOT SENT IN INCOGNITO MODE?

1      I'M SORRY.  WHAT IS ANOTHER REASON THAT THE X-CLIENT DATA

2   HEADER IS NOT SENT AND THE USER IS NOT IN INCOGNITO MODE?

3   A.   ANOTHER EXAMPLE IS DURING A FIRST RUN OF CHROME, IT'S

4   TYPICALLY NOT SENT, OR NOT SENT FOR I THINK MOST PLATFORMS.

5      SO FIRST RUN IS, LIKE, WHEN YOU HAVE JUST STARTED A NEW

6   INSTALL OF CHROME.

7   Q.   OKAY.  CAN YOU THINK OF ANOTHER REASON?

8   A.   ANOTHER EXAMPLE IS, FOR EXAMPLE, BUGS OR PROBLEMS.  IT'S

9   NOT SENT ANY TIME THAT IT'S EMPTY.

10      SO IF THERE'S A PROBLEM WITH GETTING THE EXPERIMENTATION

11   STATE OR UNDERSTANDING THE EXPERIMENTATION STATE, IT'S NOT

12   SENT.

13      AND IT'S NOT SENT IF IT'S EMPTY AND IS PUBLICLY AVAILABLE

14   CHROMIUM SOURCE CODE.

15      SO, LIKE, FOR EXAMPLE, WE DISCOVERED RECENTLY THAT THERE

16   WERE SOME USERS THAT HAD VERY OLD EXPERIMENTATION

17   CONFIGURATIONS AND WERE IN A WEIRD STATE.

18   Q.   ANY OTHER REASONS WHY THE X-CLIENT DATA HEADER MAY NOT BE

19   SENT WHEN A USER IS NOT IN INCOGNITO MODE?

20   A.   YEAH.  SO IT'S ONLY SENT TO GOOGLE PROPERTIES, BUT IT'S

21   NOT SENT IF THERE'S REDIRECTS.

22   Q.   AND WHAT DO YOU MEAN BY "REDIRECTS"?

23   A.   LIKE IF YOU HAD A, ANOTHER PAGE THAT THEN, LIKE, TOOK YOU

24   TO A GOOGLE PAGE WITH, LIKE, TWO DIFFERENT REQUESTS, IT ONLY IS

25   LOOKING AT THE MAIN PAGES AS A GOOGLE PROPERTY.

1    Q.   AND WITHOUT EXPLAINING THE OTHER REASONS, ARE THERE OTHER

2    REASONS THAT YOU KNOW OF THAT THE X-CLIENT DATA HEADER IS NOT

3    SENT, BUT THE USER IS NOT IN INCOGNITO MODE?

4    A.   THOSE ARE THE BIGGEST.  BUT THE, THE WHEN IS THE

5    EXPERIMENTATION STATE EMPTY, THAT COULD HAPPEN FOR A VARIETY OF

6    REASONS.

7    Q.   OKAY.  SO DO YOU KNOW HOW MANY TIMES THIS PHENOMENA

8    HAPPENS, WHICH IS THE X-CLIENT DATA HEADER IS NOT SENT AND,

9    YET, THE USER IS NOT IN CHROME INCOGNITO?

10   A.   THAT WOULD BE -- I DON'T KNOW -- I DON'T KNOW THE NUMBER

11   OFF THE TOP OF MY HEAD, BUT IT IS NOT SMALL.

12        I MENTIONED IOS.  MANY TIMES IN IOS, AND ALSO FIRST RUN,

13   THERE ARE MANY USERS THAT ARE USING CHROME FOR THE FIRST TIME

14   OR HAVE KIND OF REINSTALLED CHROME.  I BELIEVE THERE'S

15   UTILITIES ON MOBILE THAT ACTUALLY JUST LET YOU REINSTALL

16   CHROME, AND SOME PEOPLE USE THEM ON A DAILY BASIS.

17   Q.   WOULD YOU SAY THAT'S IN MILLIONS OF INSTANCES?  I --

18             MR. MCGEE:  OBJECTION.  SPECULATION, YOUR HONOR.

19             THE COURT:  I'LL ALLOW IT.

20             THE WITNESS:  I WOULD CONSERVATIVELY SAY MILLIONS.

21   SO I WOULD EXPECT MORE THAN THAT.

22   BY MS. TREBICKA:

23   Q.   IS THE PURPOSE OF THE X-CLIENT DATA HEADER TO MEASURE

24   INCOGNITO TRAFFIC?

25   A.   NO, THAT IS NOT THE PURPOSE OF THE X-CLIENT DATA HEADER.

1    Q.   HOW DOES YOUR TEAM, THE UMA TEAM, MEASURE INCOGNITO

2    STATISTICS?

3    A.   SO MY TEAM WOULD REFER PEOPLE TO USE UMA IF THEY WANTED TO

4    UNDERSTAND STATISTICS ABOUT INCOGNITO USAGE.  UMA IS VERY

5    PRIVACY PRESERVING, WHICH IS WHY IT'S THE DATA SET WE USE AND

6    WE STILL TRACK METRICS EVEN IN INCOGNITO MODE.

7    Q.   WHAT DOES UMA STAND FOR?

8    A.   USER METRICS ANALYSIS.

9    Q.   AND THAT IS THE TEAM THAT YOU LEAD; CORRECT?

10   A.   YES.

11   Q.   CAN UMA DATA BE USED TO IDENTIFY INDIVIDUAL USERS?

12   A.   NO.  SO UMA DATA IS KEYED BY A CLIENT ID, WHICH ROUGHLY

13   CORRESPONDS TO A CHROME INSTALL.  SO YOU COULD HAVE ONE USER,

14   LIKE, FOR EXAMPLE, MYSELF, I HAVE TWO DIFFERENT VERSIONS OF

15   CHROME RUNNING ON MY LAPTOP, A CANARY VERSION, LIKE AN EARLY

16   VERSION THAT MIGHT BE BUGGY, AND THEN THE MAIN, NORMAL CHROME

17   VERSION.

18        I ALSO HAVE A VERSION OF CHROME RUNNING ON MY PHONE, AND

19   ALL OF THOSE WILL HAVE DIFFERENT ID'S ASSOCIATED WITH THE SAME

20   PERSON, ME.

21        YOU COULD ALSO HAVE MULTIPLE PEOPLE USING THE SAME CHROME

22   INSTALL AND HAVE THE SAME CLIENT ID ASSOCIATED WITH MULTIPLE

23   PEOPLE.

24   Q.   DOES GOOGLE JOIN THE UMA DATA WITH GOOGLE ACCOUNT

25   INFORMATION?

SADOWSKI DIRECT BY MS. TREBICKA

1    A.   NO.

2    Q.   WHY NOT?

3    A.   THERE ISN'T A WAY TO DIRECTLY JOIN UMA DATA WITH GOOGLE

4    ACCOUNT INFORMATION.  WE DO NOT HAVE A MAPPING FROM UMA CLIENT

5    ID'S TO GOOGLE USER NAMES.

6    Q.   YOU RECALL THAT YOU WERE DEPOSED IN THE BROWN VERSUS

7    GOOGLE ACTION?

8    A.   I DO RECALL.

9    Q.   AND DO YOU RECALL THAT YOU PROVIDED TESTIMONY AS A

10   CORPORATE WITNESS?

11   A.   YES.

12   Q.   AND YOU PREPARED FOR THAT TESTIMONY?

13   A.   YES.

14   Q.   DO YOU RECALL THE TOPICS GENERALLY THAT YOU WERE ASKED

15   ABOUT?

16   A.   I WAS ASKED ABOUT MANY TOPICS IN THE COURSE OF THE

17   DEPOSITION, BUT THAT INCLUDED SOME QUESTIONS ABOUT UMA, AND

18   ALSO ABOUT SEARCH LOGS IDENTIFIED FOR THIS PARTICULAR CASE.

19   Q.   AND IN PARTICULAR, DID THE QUESTIONS REVOLVE AROUND

20   CERTAIN BITS, FIELDS, FOUND IN THESE IDENTIFIED SEARCH LOGS?

21   A.   YES.  I WAS QUESTIONED ABOUT SPECIFIC FIELDS FOUND IN

22   THESE IDENTIFIED SEARCH LOGS.

23   Q.   IN YOUR UNDERSTANDING AS A CHROME ENGINEER, CAN THESE BITS

24   FOUND IN THESE IDENTIFIED SEARCH LOGS BE MAPPED TO UMA DATA?

25   A.   NO, THEY CANNOT.

1          MS. TREBICKA:  THANK YOU, YOUR HONOR.

2      I HAVE NO FURTHER QUESTIONS.

3          THE COURT:  THANK YOU.

4      CROSS EXAM?

5                    **CROSS-EXAMINATION**

6  BY MR. MCGEE:

7  Q.   DR. SADOWSKI, EARLIER YOU TESTIFIED THAT IOS TYPICALLY

8  DOES NOT SEND THE X-CLIENT DATA HEADER; CORRECT?  IOS TRAFFIC?

9  A.   I DON'T RECALL MY EXACT WORDS.  I BELIEVE IT IS SENT WHEN

10  YOU DO AN OMNI BOX MEDIATED SEARCH OR NAVIGATION.

11  Q.   BUT YOU CAN EXCLUDE IOS CHROME TRAFFIC WITH UTILIZING THE

12  USER AGENT STRING; CORRECT?

13  A.   I DON'T KNOW WHAT YOU MEAN BY "YOU CAN EXCLUDE."  FROM

14  WHERE?

15  Q.   GOOGLE HAS SET ALL OF THE DATA THAT IS BEING SENT WITHOUT

16  AN X-CLIENT DATA HEADER, THAT CAN BE SEGMENTED BY THE USE OF A

17  USER AGENT STRING; CORRECT?

18  A.   A USER AGENT STRING, I DON'T KNOW, FOR EXAMPLE, HOW OFTEN

19  THAT'S CORRECT.  YOU CAN USE IT TO PARTITION DATA.

20      BUT I DO KNOW IT'S ALSO EASILY SPOOFED AND THERE'S THINGS

21  YOU CAN DOWNLOAD.

22  Q.   HOW OFTEN IS IT EASILY SPOOFED?  HOW OFTEN DO PEOPLE SPOOF

23  A USER AGENT STRING?

24  A.   I HAVE NO IDEA.

25  Q.   OKAY.  DOES GOOGLE TRACK HOW OFTEN PEOPLE SPOOF USER AGENT

1    STRINGS?

2    A.   I HAVE NO IDEA.

3    Q.   OKAY.  SO THAT WOULD JUST BE PURE SPECULATION AS TO HOW

4    OFTEN PEOPLE ARE SPOOFING USER AGENT STRINGS; CORRECT?

5    A.   IT'S EASY TO SPOOF IS WHAT I SAID.  I DID NOT MAKE ANY

6    CLAIMS ABOUT HOW OFTEN PEOPLE SPOOF IT.

7    Q.   OKAY.  AND YOU SAID THERE WERE ALSO FIRST RUNS WHERE AN

8    X-CLIENT DATA HEADER IS NOT SENT, CORRECT, WITH TRAFFIC?

9    A.   YES, THAT'S ONE OTHER EXAMPLE.

10   Q.   RIGHT.

11   A.   BUT I WOULD LIKE TO MENTION THERE ARE MANY.  I ONLY KNOW

12   SOME.  I FIND OUT ABOUT MORE AS THEY COME UP.

13   Q.   YEAH.

14   A.   SOME ARE, AS I MENTIONED, THIS BUG WITH OLDER --

15   Q.   AND I ONLY WANT TO SPEAK ABOUT THE ONES THAT YOU KNOW.

16        BUT IT'S AFTER A FIRST RUN; CORRECT?

17   A.   IT --

18   Q.   IN OTHER WORDS, IF SOMEONE BROWSES AROUND THE INTERNET,

19   CHROME QUICKLY STARTS SENDING AN X-CLIENT DATA HEADER; CORRECT?

20   A.   I DON'T KNOW THE EXACT TIME IN BETWEEN.

21   Q.   CAN YOU ESTIMATE IT?

22   A.   NOT OFF THE TOP OF MY HEAD.

23   Q.   IS IT TWO SEARCHES?

24   A.   I DON'T WANT TO SPECULATE WITHOUT LOOKING AT THE SOURCE

25   CODE.

1     Q.   OKAY.  BUT YOU'D HAVE TO LOOK AT SOURCE CODE TO FIGURE

2     THAT OUT?  IS THAT WHAT YOU'RE TELLING ME?

3     A.   OR TALK TO SOMEONE OR DO SOME RESEARCH ABOUT LOOKING AT

4     DOCUMENTATION.

5          BUT THE EXACT TIME, NO.  SO IT'S DURING -- DURING KIND OF

6     WHEN CHROME STARTS UP FOR THE FIRST TIME OR WHEN THAT, THAT

7     INSTALL OF CHROME STARTS UP FOR THE FIRST TIME.

8     Q.   DID YOU DO ANY OF THAT RESEARCH IN PREPARATION FOR YOUR

9     TESTIMONY HERE TODAY?

10    A.   I DID NOT --

11    Q.   OKAY.

12    A.   -- DO RESEARCH ABOUT THE EXACT LENGTH OF TIME THAT IS

13    ELAPSED BETWEEN STARTING UP CHROME AND SENDING AN X-CLIENT DATA

14    HEADER.

15    Q.   OKAY.  AND EARLIER IN YOUR TESTIMONY, YOU ALSO TESTIFIED

16    THAT IT'S YOUR OPINION THAT YOU CANNOT JOIN UMA AND GOOGLE USER

17    NAMES; CORRECT?

18    A.   THAT IS CORRECT.

19    Q.   AND WHY IS THAT?

20    A.   BECAUSE UMA IS KEYED BY A RANDOM STRING CORRESPONDING TO A

21    CHROME INSTALL.  THERE IS NO USER NAME INFORMATION IN THE UMA

22    DATA SET.

23    Q.   SO THERE'S NO DIRECT LINK; CORRECT?

24    A.   THAT IS CORRECT.  THERE'S NO KEY THAT YOU CAN JOIN UMA

25    WITH ANOTHER DATA SET THAT IS A USER, USER ID BASED DATA SET.

1    Q.   BUT IN THIS LITIGATION, GOOGLE PRODUCED OUR PLAINTIFFS'

2    UMA DATA; CORRECT?

3    A.   I DO NOT KNOW EVERYTHING THAT GOOGLE PRODUCED IN THIS

4    LITIGATION.

5         IF YOU HAVE A PARTICULAR MACHINE, YOU CAN FIND THE UMA ID

6    FOR THAT MACHINE BECAUSE IT'S NOT A SECRET THING.  YOU CAN LOOK

7    UP YOUR, YOUR OWN UMA DATA.  SO IF YOU ARE A PERSON AND YOU

8    WANT TO KNOW, LIKE, YOUR OWN UMA CLIENT ID FOR A PARTICULAR

9    INSTALL OF CHROME, YOU CAN LOOK THAT UP.

10        BUT YOU CAN'T DO THAT AT ANY KIND OF SCALE.

11   Q.   RIGHT.  BUT GOOGLE WOULDN'T PRODUCE NON-PLAINTIFF DATA,

12   CORRECT, IN THIS LITIGATION?

13   A.   I DO NOT KNOW THE FULL SET OF THINGS THAT GOOGLE HAS

14   PRODUCED IN THIS LITIGATION.  I AM SURE THAT THERE ARE ALL

15   KINDS OF DOCUMENTS AND DATA SETS AND INFORMATION PRODUCED.

16   Q.   SO I'D LIKE TO DRAW YOUR ATTENTION TO EXHIBIT 14 OF THE

17   DEPOSITION THAT I TOOK OF YOU BACK ON MARCH 10TH.

18   A.   IS THIS --

19   Q.   IT'S GOING TO COME UP ON THE SCREEN.

20   A.   OKAY.

21        MR. MCGEE:  AND, YOUR HONOR, THIS IS EXHIBIT 7 TO

22   MS. TREBICKA'S DECLARATION, WHICH IS FOUND AT DOCKET ENTRY

23   528-7.

24   Q.   NOW, DR. SADOWSKI, WE TALKED -- DO YOU RECALL SPEAKING

25   WITH ME ABOUT THIS DOCUMENT?

1          THE COURT:  MR. MCGEE, COULD YOU JUST IDENTIFY THE

2     BATES NUMBER?

3          MR. MCGEE:  YES, YOUR HONOR, MY APOLOGIES, IT'S

4     GOOG-BRWN-00536949, AND IT'S THE SAME PAGE.

5     Q.   DR. SADOWSKI, YOU RECALL SPEAKING WITH ME ABOUT THIS

6     DOCUMENT AT YOUR DEPOSITION; CORRECT?

7     A.   I BELIEVE SO.  I DEFINITELY RECALL REVIEWING THIS

8     DOCUMENT.

9     Q.   AND QUENTIN FIARD IS AT THE TOP.

10         DO YOU REMEMBER SPEAKING ABOUT QUENTIN FIARD?

11    A.   I DO.

12    Q.   AND YOU SAID THAT THIS DOCUMENT RELATES TO

13    IS_CHROME_NON_INCOGNITO BIT; CORRECT?

14    A.   THIS DOCUMENT RELATES TO THE IS_CHROME_NON_INCOGNITO MODE

15    BINARY FIELD.

16    Q.   RIGHT.  BUT NOWHERE MENTIONED IN THIS DOCUMENT IS THAT

17    ACTUAL REFERENCE; RIGHT?

18    A.   THIS DOCUMENT PRECEDED IMPLEMENTATION.  THIS IS A PROPOSAL

19    DOCUMENT FOR SOMETHING THEY WANTED TO DO.

20         THIS DOCUMENT IS LINKED FROM THE PARTICULAR FIELD

21    DEFINITION FOR THAT FIELD.

22    Q.   RIGHT.  IT WAS THE PROTO FIELD; RIGHT?

23    A.   ANYTHING IS A BINARY PROTO FIELD.

24    Q.   RIGHT.  AND YOU SEARCHED ACROSS THE MULTI-BILLION LINE

25    GOOGLE CODE, THE REPOSITORY -- I THINK THAT'S WHAT YOU

1    TESTIFIED TO AT YOUR DEPOSITION -- TO FIND THAT PROTO COMMENT;

2    CORRECT?

3    A.   I -- IF -- I LOOKED FOR A COUPLE OTHER SEARCH STRINGS THAT

4    WE TALKED ABOUT AT MY DEPOSITION.

5         FOR THIS PARTICULAR PROTO FIELD, IF YOU LOOK FOR

6    IS_CHROME_NON_INCOGNITO MODE, THERE IS ONE PARTICULAR PROTO

7    FIELD.

8    Q.   YOU SAID THIS DOCUMENT PREDATES IMPLEMENTATION; CORRECT?

9    A.   YES.  THIS IS A PROPOSAL DOCUMENT THAT WAS USED TO GET

10   GOOGLE TO DO THE IMPLEMENTATION.

11   Q.   BUT, AGAIN, NOWHERE IN THIS DOCUMENT DOES IT ACTUALLY

12   MENTION THE UNDERSCORE BIT, CORRECT?  THE IS UNDERSCORE CHROME

13   UNDERSCORE NON UNDERSCORE INCOGNITO?  YOU HAD TO DO THAT ON

14   YOUR BACK END WITH THE SOURCE CODE TO ACTUALLY IDENTIFY THIS

15   DOCUMENT AS RELATING TO THAT BIT; CORRECT?

16   A.   THE REASONS I KNOW THIS DOCUMENT IS RELATED TO THAT BIT,

17   ONE IS FROM TALKING TO QUENTIN FIARD HIMSELF, WHO IS THE PERSON

18   THAT WROTE THIS DOCUMENT; TWO IS FROM THE FACT THAT THE

19   DEFINITION OF THE PROTO FIELD ACTUALLY DIRECTLY LINKS OUT TO

20   THIS DOCUMENT.

21   Q.   RIGHT.  AND EVERYTHING YOU KNOW ABOUT THESE BITS IS BASED

22   ON YOUR DISCUSSIONS WITH QUENTIN FIARD; CORRECT?

23   A.   THAT IS NOT CORRECT.  I SUBSEQUENTLY READ THE SOURCE CODE

24   THAT IS USED TO ACTUALLY WRITE THESE BITS.

25   Q.   OKAY.  ANYTHING ELSE?

1    A.   I ALSO TALKED WITH TWO MEMBERS OF THE CURRENT TEAM THAT

2    QUENTIN WAS PREVIOUSLY ON.

3    Q.   OKAY.  AND IF I CAN BRING UP EXHIBIT 90.

4         AND, JUDGE, THAT'S GOING TO BE DOCKET ENTRY 528-7, AGAIN,

5    TO MS. TREBICKA'S DECLARATION.  THAT'S EXHIBIT 15, AND IT BEARS

6    BATES GOOG-BRWN-176433.

7         AND THERE'S A PORTION OF THIS DOCUMENT HERE WHERE

8    MR. MARK PEARSON SAYS "FYI:  FOR CHROME USERS, IT'S TECHNICALLY

9    POSSIBLE ON THE SEARCH SIDE TO DISTINGUISH BETWEEN INCOGNITO

10   AND NON-INCOGNITO SESSIONS ENTIRELY INDEPENDENTLY FROM THE

11   COOKIE STATE."

12        DO YOU SEE THAT?

13   A.   YES.

14   Q.   AND A LITTLE FARTHER DOWN IN THE DOCUMENT, "REGARDING

15   PEOPLE WHO DO THIS, I SUGGEST SEARCHING FOR 'X-CLIENT-DATA' IN

16   THE INTERNAL CODE SEARCH TOOL AND LOOKING FOR PAGES THAT

17   INCLUDE THE MENTION OF INCOGNITO."

18        DO YOU SEE THAT?

19             MR. SCHAPIRO:  OBJECTION.  MISSTATES THE DOCUMENT.

20             MR. MCGEE:  SORRY.  WHICH --

21             MR. SCHAPIRO:  YOU DIDN'T READ IT CORRECTLY.

22   BY MR. MCGEE:

23   Q.   OKAY.  WELL, DR. SADOWSKI, YOU CAN READ THE DOCUMENT.  I

24   DON'T MEAN TO MISSTATE IT.

25        BUT THE PART THAT SAID 2 PERIOD, REGARDING, CAN YOU READ

1    THAT FIRST SENTENCE FOR ME THAT'S HIGHLIGHTED?

2    A.   "REGARDING PEOPLE WHO DO THIS, I SUGGEST SEARCHING FOR

3    'X-CLIENT-DATA' IN INTERNAL CODE SEARCH AND LOOKING FOR PAGES

4    THAT INCLUDED MENTION OF INCOGNITO."

5    Q.   IS THAT THE SAME CODE SEARCH TOOL THAT YOU USED TO PREPARE

6    FOR YOUR 30(B)(6) DEPOSITION IN THIS CASE?

7    A.   CODE SEARCH IS A, BASICALLY LIKE GOOGLE SEARCH, BUT FOR

8    CODE.  YOU CAN SEARCH FOR ALL KINDS OF THINGS AND GET A VARIETY

9    OF RESULTS.  SO IT IS --

10   Q.   AND THAT'S HOW YOU SEARCHED FOR THE INCOGNITO DETECTION

11   BITS THAT WERE OUTLINED ON THE 30(B)(6) DEPOSITION NOTICES;

12   CORRECT?

13   A.   YEAH.  IF THERE'S A PARTICULAR STRING THAT I AM TRYING TO

14   FIND IN CODE, I WOULD USE CODE SEARCH TO SEARCH FOR IT.

15        OR IF THERE'S A PARTICULAR FILE I'M TRYING TO ACCESS, I

16   WOULD USE CODE SEARCH TO SEARCH FOR IT.

17        IT'S A VERY COMMONLY USED TOOL BY GOOGLE ENGINEERS IN THE

18   DAILY COURSE OF OUR JOBS.

19   Q.   SO TO PREPARE FOR THAT DEPOSITION, DID YOU SEARCH FOR THE

20   X-CLIENT DATA IN THE CODE SEARCH TOOL AND LOOK FOR ANYTHING

21   THAT MENTIONED INCOGNITO?

22   A.   I DON'T THINK I'VE GONE THROUGH EVERY MENTION OF X-CLIENT

23   DATA HEADER, OR X-CLIENT DATA IN CODE SEARCH.

24   Q.   ANYONE ON YOUR TEAM DONE THAT?

25        THE COURT:  LAST QUESTION.

1          THE WITNESS:  MARK PEARSON IS ON MY TEAM.

2          I DON'T KNOW IF ANYONE ON MY TEAM HAS EVER SEARCHED FOR

3      X-CLIENT DATA HEADER AND INCOGNITO BEYOND THIS DOCUMENT.

4          AS A SIDE NOTE, I TALKED TO MARK ABOUT THIS PARTICULAR

5      DOCUMENT, AND HE ALSO CLARIFIED THAT HE -- THAT HIS STATEMENTS

6      THAT YOU CAN DISTINGUISH BETWEEN INCOGNITO AND NOT INCOGNITO

7      SESSIONS USING X-CLIENT DATA HEADER IS INCORRECT.

8          MR. MCGEE:  YOUR HONOR, I'D MOVE TO STRIKE THAT LAST

9      PORTION AS HEARSAY AND NONRESPONSIVE.

10          THE COURT:  STRICKEN.

11          MR. MCGEE:  THANK YOU.

12          THE COURT:  OKAY.

13          MR. MCGEE:  AND JUST FOR THE RECORD, JUDGE, I BELIEVE

14      YOU SAID YOU SUSTAINED THAT OBJECTION.

15          THE COURT:  I SUSTAINED THAT OBJECTION.

16          THANK YOU.  THAT'S ALL, DR. SADOWSKI.  YOU MAY STEP DOWN.

17          MR. BOIES:  YOUR HONOR, JUST AS A HOUSEKEEPING

18      MATTER, I THINK WE FAILED TO OFFER INTO EVIDENCE EXHIBITS 85

19      AND 103, BUT WE WOULD OFFER THEM AT THIS TIME.

20          THE COURT:  I'M SORRY, MR. BOIES.  YOU'RE GOING TO

21      HAVE TO COME UP TO THE MICROPHONE.

22          MR. BOIES:  I APOLOGIZE, YOUR HONOR.

23          I THINK JUST AS A HOUSEKEEPING MATTER, I DON'T THINK WE

24      OFFERED EXHIBITS 85 AND 103, BOTH OF WHICH WE USED, BUT WE

25      DIDN'T OFFER.

1        THE COURT:  I WAS JUST GOING TO ASK BOTH SIDES IF

2    THEY HAVE EXHIBITS NOW THAT THEY USED IN THEIR EXAMINATIONS

3    THAT THEY WANT TO MOVE IN.

4        WE DID IT FOR SOME, BUT NOT ALL, SO I WANT TO BE SURE THAT

5    WE CAPTURE THEM.

6        IS THAT ALL THAT THE PLAINTIFFS HAVE TO ADD?

7        MR. BOIES:  THAT'S ALL I HAVE IN MIND.  MAYBE SOMEONE

8    ELSE ON THE TEAM --

9        THE COURT:  OKAY.  WHY DON'T YOU TAKE JUST A MINUTE

10   AND CONFER?

11       MS. TREBICKA:  WE DO AS WELL, YOUR HONOR.  MAY WE DO

12   IT NOW?

13       THE COURT:  IF YOU'RE PREPARED TO, YES.

14       MS. TREBICKA:  YES.

15       THE COURT:  YOU MAY GO AHEAD.  WHY DON'T YOU COME UP?

16       MS. TREBICKA:  DO YOU NEED ME TO --

17       THE COURT:  YEAH, COME ON UP TO THE PODIUM.

18       (PAUSE IN PROCEEDINGS.)

19       MR. BOIES:  YOUR HONOR, I'M REMINDED ABOUT EXHIBITS

20   46 AND 48.  SO IT WOULD BE 46, 48, 85, AND 103.

21       THE COURT:  46?

22       MR. BOIES:  46, PLAINTIFFS' EXHIBIT 46, PLAINTIFFS'

23   EXHIBIT 48, PLAINTIFFS' EXHIBIT 85, AND PLAINTIFFS'

24   EXHIBIT 103.

25       THE COURT:  OKAY.

1     ANY OBJECTION?  I'M GOING TO ADMIT THOSE.

2            MR. SCHAPIRO:  NO OBJECTION, YOUR HONOR.

3            THE COURT:  ALL RIGHT.  THOSE WILL BE ADMITTED,

4     PLAINTIFFS' 46, 48, 85, AND 103.

5            (PLAINTIFFS' EXHIBITS 46, 48, 85 AND 103 WERE ADMITTED IN

6     EVIDENCE.)

7            THE COURT:  AND FROM THE DEFENDANTS?

8            MS. TREBICKA:  YOUR HONOR, WE'D LIKE TO MOVE INTO

9     EVIDENCE AS EXHIBIT B OF DEFENDANT'S TAB NUMBER 3 IN OUR

10    BINDER, WHICH IS BATES NUMBER GOOG-BRWN-00175184.

11           AS EXHIBIT C OF DEFENDANT'S, THE GLENN BERNSTON DEPOSITION

12    TRANSCRIPT OF JUNE 16TH, 2021.  THAT IS TAB 15 IN OUR BINDER.

13           THE COURT:  IS THAT AN EXCERPT OF THE TRANSCRIPT?

14           MS. TREBICKA:  I BELIEVE IT'S THE ENTIRETY OF THE

15    TRANSCRIPT.

16           MR. MCGEE:  YOUR HONOR, I DON'T KNOW IF YOU WANT A

17    RESPONSE BY US, BUT WE WOULD HAVE AN OBJECTION TO THAT.  THAT

18    WAS 30(B)(6) TESTIMONY.  I BELIEVE IT WOULD BE HEARSAY.

19           WE WOULD BE ABLE TO OFFER IT, BUT I DON'T BELIEVE THAT A

20    CORPORATION CAN OFFER ITS OWN 30(B)(6) TESTIMONY IN SUPPORT OF

21    EVIDENCE.

22           THE COURT:  I ALSO DON'T BELIEVE IT WAS REFERRED TO

23    IN THE EXAMINATION.

24           MS. TREBICKA:  IT WAS, YOUR HONOR.

25           NOT IN EXAMINATION OF WITNESSES.  IT WAS REFERRED TO IN

1    COUNSEL ARGUMENT, WHICH WE UNDERSTOOD WAS -- IT WAS POSSIBLE

2    FOR US TO OFFER -- REFER TO EVIDENCE SO THAT WE COULD FORGO,

3    YOU KNOW, BRINGING WITNESSES IN IN SUPPORT OF THAT EVIDENCE.

4         THE COURT:  IT'S NOT ALREADY IN THE RECORD, AND IT

5    HASN'T BEEN OFFERED THROUGH A WITNESS THIS AFTERNOON.

6         IF THERE ARE -- IF THERE'S AN EXCERPT OR SOMETHING

7    SPECIFIC, YOU MAY FOLLOW UP WITH A --

8         MS. TREBICKA:  WE CAN DO THAT, YOUR HONOR.  THANK

9    YOU.

10         THE COURT:  BUT I'M NOT GOING TO ADMIT THE WHOLE

11    THING.

12         MS. TREBICKA:  THANK YOU, YOUR HONOR.

13       AND WE'D ALSO LIKE TO OFFER AS EXHIBITS THE FEBRUARY 25TH

14    SPECIAL MASTER PROCEEDING TRANSCRIPT, AND THE MARCH 25TH --

15         THE COURT:  I'M NOT GOING TO TAKE FULL TRANSCRIPTS.

16         MS. TREBICKA:  WE CAN DO EXCERPTS.  CAN WE DO THAT,

17    YOUR HONOR?

18         THE COURT:  YOU WILL MEET AND CONFER ABOUT THOSE.

19         MS. TREBICKA:  SOUNDS GOOD.

20       THANK YOU, YOUR HONOR.

21         THE COURT:  OKAY.  SO YOU'RE GOING TO MEET AND CONFER

22    ON THE BERNSTON DEPO, ON THE MAGISTRATE -- EXCUSE ME -- ON THE

23    SPECIAL MASTER TRANSCRIPT OF WHAT DATE?

24         MS. TREBICKA:  YES, FEBRUARY 25TH AND MARCH 25TH.

25         THE COURT:  YOU'LL IDENTIFY PORTIONS, THE PARTIES

1    WILL MEET AND CONFER, AND IF THERE'S A -- YOU CAN EITHER SUBMIT

2    A STIPULATION OR IF THERE'S A DISPUTE, YOU CAN STATE THAT

3    BRIEFLY AND I'LL RULE.

4          MR. MAO:  YOUR HONOR, I BELIEVE I REFERRED TO

5    EXHIBIT, PLAINTIFFS' NUMBER 75.  I WOULD LIKE TO ADMIT THAT

6    INTO EVIDENCE, YOUR HONOR.

7          THE COURT:  YOU USED THAT WITH A WITNESS THIS

8    AFTERNOON?

9          MR. MAO:  YES.

10          THE CLERK:  I'M SORRY, PLAINTIFFS' 75?

11          THE COURT:  PLAINTIFFS' 75.

12          THE CLERK:  THAT WAS ADMITTED EARLIER.

13          THE COURT:  THAT'S WHAT I THOUGHT.

14          MR. MAO:  OKAY.  THANK YOU.

15          THE COURT:  ALL RIGHT.  IS THAT ALL OF THE EXHIBITS?

16          MR. SCHAPIRO:  I BELIEVE SO, YOUR HONOR.

17          THE COURT:  ALL RIGHT.

18          MR. BOIES:  I BELIEVE SO, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  I DO NOT -- WE'VE HAD A LOT

20    OF DISCUSSION AND ARGUMENT TODAY, AS WELL AS WITNESS TESTIMONY.

21          FIRST, I DO WANT TO THANK COUNSEL ON BOTH SIDES.  THOSE

22    WERE VERY EFFICIENT DIRECT AND CROSS-EXAMINATIONS.  YOU MAY

23    HAVE JUST LAID THE FOUNDATION FOR THE TEN MINUTE RULE.

24          (LAUGHTER.)

25          THE COURT:  I DON'T FEEL THE NEED FOR CLOSING

```
1     ARGUMENTS.  I THINK THAT EVERYONE HAS TOUCHED ON THE POINTS.  I
2     FEEL I HAVE A VERY GOOD UNDERSTANDING OF THE ISSUES IN DISPUTE
3     AND THE EVIDENCE, IMPORTANTLY, THE EVIDENCE ON BOTH SIDES OF
4     THESE DISPUTES.
5          SO UNLESS SOMEONE WANTS TO BE HEARD TO THE CONTRARY, WE
6     WILL FORGO ANY FURTHER CLOSING.
7          FROM PLAINTIFFS, MR. BOIES?
8          MR. BOIES:  YOUR HONOR, I THINK WE ARE BOTH PREPARED
9     TO GO WITH THE COURT'S JUDGMENT.
10          THE COURT:  ALL RIGHT.
11     AND FROM GOOGLE?
12          MR. SCHAPIRO:  THAT'S CORRECT, YOUR HONOR.
13          THE COURT:  ALL RIGHT.  EXCELLENT.
14     THEN THE MATTER WILL BE SUBMITTED, AND I WILL GIVE IT
15     CAREFUL CONSIDERATION.
16     IF I NEED ANYTHING FURTHER, I WILL ASK THE PARTIES TO
17     SUBMIT THAT.
18     BUT, AGAIN, I WILL USE ANYTHING THAT HAS BEEN FILED ON ECF
19     AS PART OF THE RECORD, AS WELL AS UNIQUE EXHIBITS THAT HAVE
20     BEEN ADMITTED HERE TODAY.
21     YOU HAVE A LITTLE BIT OF HOUSEKEEPING ON THE TWO EXHIBITS
22     WE JUST DISCUSSED, SO TAKE CARE OF THAT IN THE NEXT SEVEN DAYS.
23     OKAY.  ANYTHING FURTHER FOR TODAY'S PROCEEDINGS FROM
24     PLAINTIFFS, MR. BOIES?
25          MR. BOIES:  NO, YOUR HONOR.
```

```
 1                    THE COURT:  ALL RIGHT.

 2              MR. SCHAPIRO?

 3                    MR. SCHAPIRO:  NOTHING, YOUR HONOR.

 4                    THE COURT:  OKAY.  THANK YOU.

 5              ALL RIGHT THEN.  THAT CONCLUDES THIS PROCEEDING.

 6                    MR. BOIES:  THANK YOU, YOUR HONOR.

 7                    MR. MAO:  THANK YOU, YOUR HONOR.

 8                    MR. SCHAPIRO:  THANK YOU, YOUR HONOR.

 9                    THE COURT:  AND YOU MAY PACK UP AND RUN WHILE I SORT

10         MY BINDERS.

11                    MS. TREBICKA:  THANK YOU, YOUR HONOR.

12              (THE PROCEEDINGS WERE CONCLUDED AT 4:58 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
17  CERTIFICATE NUMBER 9595

18       DATED:  APRIL 29, 2022

19

20

21

22

23

24

25