Plaintiffs' Request for an Order
for Google to Show Cause for
Why it Should Not Be Sanctioned
for Discovery Misconduct

Redacted Version of Document
Sought to be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br> GOOGLE LLC,<br><br>        Defendant. | Case No.:  4:20-cv-03664-YGR-SVK<br><br>**PLAINTIFFS' REQUEST FOR AN ORDER FOR GOOGLE TO SHOW CAUSE FOR WHY IT SHOULD NOT BE SANCTIONED FOR DISCOVERY MISCONDUCT**<br><br>Referral: The Honorable Susan van Keulen |

**REQUEST FOR AN ORDER TO SHOW CAUSE**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

The undersigned respectfully asks the Honorable Susan van Keulen of the United States District Court for the Northern District of California to issue an order for Google, LLC ("Google") to show cause for why it should not be sanctioned for discovery misconduct. This Request is based on the attached Memorandum of Points and Authorities, the Declaration of Mark C. Mao and exhibits attached thereto, the pleadings and other papers on file in this action, any oral argument, and any other evidence that the Court may consider.

**ISSUE PRESENTED**

Whether the Court should order Google to show cause for why it should not be sanctioned for discovery misconduct for (1) concealing its logging of a "maybe_chrome_incognito" to detect, monitor, and analyze Chrome Incognito traffic from putative class members, from Plaintiffs, the Special Master, and the Court; and (2) violating the Court's November 12, 2021 Order.

**RELIEF REQUESTED**

Pursuant to this Request, and Plaintiffs' October 14, 2021 Rule 37(b) Motion, Plaintiffs respectfully ask the Court to set an evidentiary hearing and order Google to show cause for why it should not be sanctioned for discovery misconduct, including by:

1. Taking as established for purposes of the action that (A) Google can detect event-level Incognito traffic within its logs, (B) this Incognito data is linkable to users, so that (C) the class is ascertainable.

2. Instructing the jury that "Google concealed and altered evidence regarding its ability to identify Incognito traffic."

3. Requiring Google to reimburse Plaintiffs for all fees that have been paid and will be paid to Special Master Brush.

Plaintiffs also ask that the Court order Google employees Chris Liao and Bert Leung to appear at the evidentiary hearing, as well as the Google declarant who swore to the Court that Google complied with the November 12 Order (Dkt. 338).

1

1

2    Dated: February 26, 2022                    BOIES SCHILLER FLEXNER LLP

3
                                                 By: /s/ Mark C. Mao
4                                                Mark C. Mao (CA Bar No. 236165)
                                                 mmao@bsfllp.com
5                                                44 Montgomery Street, 41st Floor
                                                 San Francisco, CA 94104
6                                                Telephone: (415) 293 6858
                                                 Facsimile (415) 999 9695
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                                 2
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION..............................................................................................................1

BACKGROUND ............................................................................................................4

I.  Plaintiffs Uncover the Scope of Google's Misconduct.........................................4

A.  Two Weeks Before the Close of Fact Discovery, Plaintiffs Learn that Google Implemented an Incognito Detection Tool Within Google Logs. .............................................................................................4

B.  Google Admits That It Removed this Incognito Detection Field from a Log Produced to Special Master Brush, and that Google Withheld Other Logs With the Incognito Detection Field........................5

II.  18 Months of Obstruction.....................................................................................7

A.  In Late 2020, Google Claims that It Has No Documents to Help Identify Class Members; Meanwhile Bert Leung Has Already Begun Working to Detect Incognito Traffic Within Google Logs .............................................................................................................7

B.  In 2021, Google Hides Mr. Leung and His Significant Progress from Plaintiffs and the Court........................................................8

C.  Google Undermines the Special Master Process.....................................12

D.  With the Court's Help, Plaintiffs Finally Discover the Truth.................14

ARGUMENT..................................................................................................................17

I.  Legal Standard .....................................................................................................17

II.  Google Violated the November 12 Order, and Abused the Discovery Process Throughout this Case.....................................................................17

III.  Google Should Be Sanctioned ...........................................................................19

A.  Evidentiary Sanctions and Jury Instructions...........................................19

B.  Reimbursement of Fees Paid to Special Master Brush............................22

CONCLUSION...............................................................................................................23

i

1

# TABLE OF AUTHORITIES

**Page(s)**

2

3

**Cases**

4

*Apple Inc. v. Samsung Elecs. Co.*,
    2012 WL 1595784 (N.D. Cal. May 4, 2012) ...................................................................21

5

*Craftwood Lumber Co. v. Interline Brands, Inc.*,
    2013 WL 4598490 (N.D. Ill. Aug. 29, 2013) .................................................................21

6

7

*Dahl v. City of Huntington Beach*,
    84 F.3d 363 (9th Cir. 1996) ...........................................................................................17

8

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001)..........................................................................................17

9

10

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*,
    2016 WL 5870218 (N.D. Cal. Oct. 7, 2016)...........................................................22, 23

11

*Gibson v. Chrysler Corp.*,
    261 F.3d 927 (9th Cir. 2001)..........................................................................................20

12

13

*Guifu Li v. A Perfect Day Franchise, Inc.*,
    2011 WL 3895118 (N.D. Cal. Aug. 29, 2011)..........................................................20, 21

14

*Guifu Li v. A Perfect Day Franchise, Inc*,
    281 F.R.D. 373 (N.D. Cal. 2012) ..............................................................................17, 19

15

16

*Hanni v. Am. Airlines, Inc.*,
    2009 WL 1505286 (N.D. Cal. May 27, 2009) ................................................................21

17

18

*HRC-Hainan Holding Co., LLC v. Yihan Hu*,
    2020 WL 1643786 (N.D. Cal. Apr. 2, 2020) ..................................................................23

19

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .......................................................................................................19

20

21

*Kannan v. Apple Inc.*,
    2020 WL 9048723 (N.D. Cal. Sept. 21, 2020) ..............................................................22

22

*Karnazes v. Cty. of San Mateo*,
    2010 WL 2672003 (N.D. Cal. July 2, 2010)...................................................................22

23

24

*Lanier v. San Joaquin Valley Offs. Ass'n*,
    2016 WL 4764669 (E.D. Cal. Sept. 12, 2016)................................................................20

25

26

27

ii

28

*Oracle USA, Inc. v. SAP AG*,
  264 F.R.D. 541 (N.D. Cal. 2009) ........................................................21

*Sali v. Corona Reg'l Med. Ctr.*,
  884 F.3d 1218 (9th Cir. 2018)..............................................................17

*Sanchez v. Rodriguez*,
  298 F.R.D. 460 (C.D. Cal. 2014) .........................................................17

*Sas v. Sawabeh Info. Servs.*,
  2015 WL 12711646 (C.D. Cal. Feb. 6, 2015)......................................20

*Unigard Sec. Ins. Co. v. Lakewood Eng. Mfg. Corp.*,
  982 F.2d 363 (9th Cir. 1992)................................................................17

*United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*,
  617 F.2d 1365 (9th Cir. 1980)..............................................................20

*Von Brimer v. Whirlpool Corp.*,
  536 F.2d 838 (9th Cir. 1976)................................................................20

*Zurich Am. Ins. Co. of Ill. v. World Priv. Sec., Inc.*,
  2020 WL 8610839 (C.D. Cal. Nov. 23, 2020) .....................................19

**Rules**

Fed. R. Civ. P. 37(a)..............................................................................17

Fed. R. Civ. P. 37(b)...................................................................3, 12, 17

Fed. R. Civ. P. 37(b)(2)....................................................................17, 23

Fed. R. Civ. P. 37(b)(2)(A)..............................................................17, 22

Fed. R. Civ. P. 37(b)(2)(A)(i)................................................................19

Fed. R. Civ. P. 37(b)(2)(A)(ii)...............................................................20

Fed. R. Civ. P. 37(b)(2)(C)....................................................................22

iii

1

### **INTRODUCTION**

2      On September 2, 2020, Google told the Court that "it is unclear how Plaintiffs could

3  ascertain the members of the proposed class" (including people who used Chrome Incognito).

4  Dkt. 59 at 8. Ever since, Google has concealed from Plaintiffs, the Court, and the Special Master

5  that Google implemented a tool to do just that for its own business purposes. Google produced 283

6  of Bert Leung's documents on Friday, February 18, 2022—two weeks before the close of

7  discovery and months into the Special Master process. Those documents' revelations are stunning:

8      • Since June 2020, Mr. Leung and Mandy Liu have worked on a project to ████████

9        ████████████████████████████████████████████████████████ Ex. 1 GOOG-

10        BRWN-00845639 at -40;

11      • As part of that effort, Mr. Leung suggested ████████████████████████████

         ████████ in June 2020 (*id.*), and he and Ms. Liu decided to call this field a

12        "*maybe_chrome_incognito*" bit in October 2020 (after this case was filed). Ex. 2,
         GOOG-BRWN-00845596;

13      • Google *actually began logging* the proposed *"maybe_chrome_incognito"* ████

14        ████████████████████████████████████████████████████████████████████████

15        ████████████████████████████████████████
         Ex. 3, GOOG-BRWN-00845423.

16      As part of the Special Master process to provide "Plaintiffs the tools to identify class

17  members using Google's data," the Court ordered Google to submit a sworn declaration that "to

18  the best of its knowledge, Google has provided a complete list of data sources that contain

19  information relevant to Plaintiffs' claims." Dkt. 331, Ex. 1 ¶ 1. On November 18, 2021, Google

20  falsely certified that it had done so—when, in fact, it failed to disclose ████████ logs that apparently

21  contain the "maybe_chrome_incognito" field. *Compare* Dkt. 338-1 (list of data sources disclosed

22  by Google), *with* Ex. 3, GOOG-BRWN-00845423. And for a log Google did disclose, Google

23  altered evidence by *deleting the "maybe_chrome_incognito" field from the schema* before

24  producing it to the Special Master and Plaintiffs. As a result, Plaintiffs and the Special Master had

25  *no idea the "maybe_chrome_incognito" field existed*.

26

27                                          1

28

This was the culmination of Google's concealment, not its inception. To throw Plaintiffs off the scent from the very start, Google failed to disclose Bert Leung and Mandy Liu in a list of 200+ persons with knowledge and potential document custodians Google provided Plaintiffs on February 4, 2021. Ex. 4, GOOG-BRWN-00023909. Google again failed to disclose Mr. Leung or Ms. Liu in its March 29, 2021, response to Plaintiffs' Interrogatory asking Google to identify employees with knowledge about "Google's collection and use of data in connection with users' activity while in a private browsing mode." Exs. 5, 6. These omissions were inexcusable, given that (a) Mr. Leung and Ms. Liu had already been working on their project to detect Incognito since mid-2020 and (b) Google's counsel have been directly communicating with Mr. Leung about this case since at least February 1, 2021 (before Google produced its list of potential custodians). *See* Ex. 7.

Without Mr. Leung's or Ms. Liu's documents, Plaintiffs were missing critically important information concerning Google's logging of the "maybe_chrome_incognito" field. In December 2021, Plaintiffs deposed Mr. Leung's supervisor Chris Liao—and asked him about Google's efforts to study whether Incognito could be detected. Mr. Liao falsely testified that any Google project to detect Chrome Incognito had been abandoned and Google did not "go on to build any dedicated signals afterwards either." Ex. 8, Liao Tr. 134:7-10. Google did not correct those false statements, either informally or through Mr. Liao's January 6, 2022, errata to his deposition transcript.

But Google not only deceived Plaintiffs—it deceived the Court and the Court's appointed Special Master. During the entire period that Google was concealing Mr. Leung's development and implementation of the "maybe_chrome_incognito" bit, Google made multiple misleading statements to the Court and the Special Master concerning its ability to detect Incognito, its data production, and the supposed "burdens" it claims to have faced throughout the discovery process.

And Google almost got away with it. But for this Court's recent ruling on Plaintiffs' motion to compel documents from Mr. Leung, Google might have crossed the discovery finish line before

2

1   their misconduct caught up to them. That document production made just two weeks before the

2   close of discovery revealed, for the first time, that Mr. Leung did not just analyze Incognito

3   detection (as a handful of previously produced documents had implied). In fact, Mr. Leung figured

4   it out, developing and implementing a "maybe_chrome_incognito" detection tool within specific

5   Google logs. These belatedly produced documents led to an avalanche of further discoveries in the

6   past week, confirming the lengths to which Google went to conceal the

7   "maybe_chrome_incognito" field from Plaintiffs, the Special Master, and the Court.

8       Google's actions simply cannot be reconciled with its obligations to conduct discovery in

9   good faith, tell the truth under oath, and comply with Court orders. Google's conduct cannot be

10  chalked up to a mere discovery dispute. Without appropriate sanctions—ones with teeth—Google

11  has not been, and will not be, deterred. Google's attitude appears to be that it has nothing to lose

12  and everything to gain: Absent real sanctions, it can hide the ball and either (a) get away with it or

13  (b) when caught, simply produce what it should have provided earlier. And monetary sanctions,

14  while certainly warranted, do not suffice. Google generates hundreds of billions of dollars in

15  revenue per year and monetary sanctions are simply immaterial to Google's bottom line.

16  Moreover, discovery is coming to a close and Plaintiffs have been prejudiced, having taken

17  numerous depositions and engaged in a many-months-long Special Master process, all while

18  Google withheld the truth and plainly relevant data in violation of a Court order.

19      Plaintiffs respectfully ask the Court to reinstate Plaintiffs' October 14, 2021, Rule 37(b)

20  Motion and order Google to show cause why it should not be sanctioned in connection with that

21  motion and this one. Appropriate sanctions may include but are not limited to:

22      1.  Taking as established for purposes of the action that (A) Google can detect
23          event-level Incognito traffic within its logs, (B) this Incognito data is linkable
            to users, so that (C) the class is ascertainable.

24      2.  Instructing the jury that "Google concealed and altered evidence regarding its
25          ability to identify Incognito traffic."

26      3.  Requiring Google to reimburse Plaintiffs for all fees that have been paid and
            will be paid to Special Master Brush.

27                                          3

28
---

1       Plaintiffs also submit that an evidentiary hearing is warranted to hear testimony from

2   (1) Mr. Leung (whose deposition Google unilaterally rescheduled to the last day of fact discovery,

3   after Plaintiffs began raising questions concerning the content of his recently-produced

4   documents); (2) Mr. Liao (who gave false testimony concerning Google's Incognito detection);

5   and (3) Google's Court-ordered declarant (who it appears falsely certified that Google had

6   complied with the Court's order to provide a "complete list of data sources that contain information

7   relevant to Plaintiffs' claims").

8   **BACKGROUND**

9   **I.      Plaintiffs Uncover the Scope of Google's Misconduct**

10      **A.      Two Weeks Before the Close of Fact Discovery, Plaintiffs Learn that Google Implemented an Incognito Detection Tool Within Google Logs.**

11      On September 2, *2020*, Google told the Court that "it is unclear how Plaintiffs could

12  ascertain the members of the proposed class" (i.e., people who used a private browsing mode,

13  including Chrome Incognito). Dkt. 59 at 8. Since then, Plaintiffs have diligently sought discovery

14  to refute Google's assertion.

15      Eighteen months later, in a February 18, *2022* production, following Plaintiffs' motion to

16  compel documents from Bert Leung (see Dkt. 401), Plaintiffs for the first time learned that internal

17  Google logs and data sources now contain a field dedicated to identifying and tracking Incognito

18  traffic. The name of the field is *"maybe-chrome-incognito"*:

19

20      •   **Bert Leung,** 2021-09-13 14:58:47
        are we already logging maybe-chrome-incognito in search ▮▮▮▮ lready?

21      •   **Mandy Liu,** 2021-09-13 14:58:54

22      yes

23  Ex. 9, GOOG-BRWN-00845312 at -18.  Prior to this production, Mr. Leung's supervisor, Chris

24  Liao, testified that projects to identify and track Incognito traffic had been discontinued for alleged

25  lack of accuracy. Ex. 8, Liao Tr. 134:7-10. ("We did not, to my best knowledge, go on to build

26  any dedicated signals afterwards either.").

27  4

28

1    Documents from Google's February 18 production show that in 2021 Mr. Leung and Ms.

2  Liu finalized and implemented an Incognito-detection tool for both Google "Search" logs (as noted

3  in the above document) as well as "Display" logs, i.e., logs that store data about users' visits to

4  non-Google websites. Ex. 10, GOOG-BRWN-00845569 at -69. Because Google had represented

5  in the Liao deposition that such projects had been abandoned, Plaintiffs had no idea that Google

6  implemented this Incognito-detection tool until Google produced documents for the first time just

7  two weeks before the upcoming March 4 close of fact discovery.

8    Google developed this "maybe_chrome_incognito" tool by relying on something called the

9  "X-Client Data Header." The absence of the "X-Client Data Header" is the "proxy" for detecting

10 Incognito traffic within these logs. Ex. 11, GOOG-BRWN-00845277. Notably, Google has

11 consistently represented to Plaintiffs, the Special Master, and the Court that the absence of the X-

12 Client Data Header cannot be used to detect Incognito use. *E.g.*, Dkt. 140 at 5, Dkt. 218 at 6.

13    While Google was repeatedly representing to this Court that private browsing users cannot

14 be identified, Mr. Leung and Ms. Liu were in fact developing (and eventually implemented) a tool

15 designed to do precisely that–detect Incognito traffic within Google logs. Apparently, Google

16 needed such tools so that it can measure and attempt to ███████████████ as a result of a new

17 feature for its Incognito mode that blocks third-party cookies, in addition to a stronger pro-privacy

18 environment that disfavors third-party cookies.  Ex. 12, GOOG-CABR-05144884 at -933.  In

19 essence, when a business purpose arises, Google can readily develop tools to detect Incognito

20 traffic, but when it comes to this litigation, Google tells the Court it cannot be done.

21   **B.    Google Admits That It Removed This Incognito Detection Field from a Log
          Produced to Special Master Brush, and that Google Withheld Other Logs
22          With the Incognito Detection Field**

23    As discovery progressed, Google graduated from concealing evidence to altering evidence.

24 After finally learning that Google had implemented Mr. Leung's and Ms. Liu's

25 "maybe_chrome_incognito" detection tool within specific logs, Plaintiffs promptly asked Google

26

27                                           5

28

1   to clarify whether all such logs had already been identified and produced within the Special Master

2   process, in accordance with this Court's November 12 Order, Dkt. 331.

3          During a February 23, 2022, meet-and-confer supervised by Special Master Brush, counsel

4   for Google admitted that Google had only produced schema for ███████ log while

5   withholding other logs entirely. Mao Decl. ¶ 26. And later that night, counsel admitted that *the*

6   *"maybe_chrome_incognito" field had been entirely removed from this schema prior to its*

7   *production*. Ex. 20. Let us be clear: prior to producing this log to Plaintiffs, Google removed from

8   it all traces of a field dedicated to detecting Incognito traffic, a field which could identify class

9   members.  Google poisoned the Special Master process from the start.

10         Google claims that it did not include this critical Incognito detection within the schema

11  produced because this field may not fall within "the largest 100 fields" of a given log–an absurd

12  position. The Court's November 12 Order required that Google identify *all* relevant logs and

13  produce *all* schema and fields, and Google and its counsel understood the purpose of this entire

14  process. There was and is no excuse for removing a field named "incognito." To the extent Google

15  decided it was necessary to cull the information for some reason (even though this would be

16  contrary to the November 12 Order), surely Google realized that "*maybe_chrome_incognito*"

17  should not have been among the withheld fields.

18         Furthermore, Plaintiffs still have barely any insight into what *other* logs contain the

19  Incognito detection field that *still* have not been disclosed. On Friday, February 18, 2022, Google

20  produced for the first time a May 18, 2021 document approving logging the

21  "maybe_chrome_incognito" bit in certain logs (and stating there were ██████ logs not listed).

22  Ex. 3, GOOG-BRWN-00845423 at -24. Many of the listed logs do not appear to have been

23  included in Google's Court-ordered declaration that it had identified all relevant sources. Dkt. 338-

24  1. During the February 23 meet-and-confer, Google refused to clarify how many other logs contain

25  this field. Mao Decl. ¶ 26. Plaintiffs repeatedly asked but, rather than answer, Google told Plaintiffs

26  to ask Mr. Leung during his upcoming deposition. *Id.* But while Mr. Leung's deposition had been

27

28

scheduled for February 25 pursuant to written agreement by the parties, as soon as Plaintiffs began asking questions arising from Mr. Leung's documents, Google unilaterally and without explanation re-set the deposition for March 4, the last day of discovery. Mao Decl. ¶ 25. Google claimed it was necessary to reschedule Mr. Leung's February 25, 2021 deposition because he had a sudden "conflict" arise—but then refused to say what the supposed conflict was in response to multiple demands from Plaintiffs. *Id.*

Google's misconduct has undermined the Special Master process. Had the schema for the log with the Incognito field been produced without any alteration, Plaintiffs would have discovered the Incognito detection field months ago. Plaintiffs did not even choose this log for Iterative Search 1 because Plaintiffs had no idea that Google had actually implemented an Incognito detection field. Moreover, Plaintiffs and the Special Master would have had sufficient time to navigate the identification and production of all such logs (assuming *arguendo* that Google not only provided the field, but the other logs that also contain this field as well). Instead, discovery is about to close and Plaintiffs do not have a single log entry of their data that includes the Incognito detection field.

## II.  18 Months of Obstruction

### A.  In Late 2020, Google Claims that It Has No Documents to Help Identify Class Members; Meanwhile Bert Leung Has Already Begun Working to Detect Incognito Traffic Within Google Logs

The above lays out where Google's concealment ended. But it is also important to understand just how far back it began. Google's deception began on September 30, 2020, after Plaintiffs served RFP 10, seeking, "Documents sufficient to identify all alleged class members, including all electronic or physical address information associated with alleged class members." Ex. 13 at 13. Google refused to produce any documents, claiming that "Google does not maintain documents or data in the ordinary course of business that would allow it to 'identify all alleged class members'" and that the "identity of 'alleged class members' . . . is not ascertainable." *Id.*

Yet three months earlier, in June 2020, Mr. Leung had already begun working on the project that would culminate in the development and implementation of the

7

1  "maybe_chrome_incognito" field. On June 9, 2020 (a week after this case was filed), Mr. Leung

2  submitted a proposal about his idea to ████████████████████████████

3  ████████████████████████████████████ Ex. 1, GOOG-BRWN-00845639

4  at -40. This project was important because Google had recently begun ████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████ *See* Ex. 14, GOOG-CABR-

7  04324934 at -35 (discussing project ████████████████████████████

8  ████████████████████████████); *see also* Dkt. 395 at 13-14, 16-17

9  (summarizing this financial analysis). Within his June 9 proposal, Mr. Leung flagged the "potential

10 privacy risk of logging inferred Chrome Incognito detection," and Mr. Leung sought "feedback

11 from privacy gurus" about his concern. Ex. 1.  In October, after this lawsuit was filed, Mr. Leung

12 and Ms. Liu named their tool: "maybe_chrome_incognito." Ex. 2. GOOG-BRWN-00845596.

13          Google did not provide any information about these efforts to Plaintiffs at that time.

14     **B.    In 2021, Google Hides Mr. Leung and His Significant Progress from Plaintiffs
               and the Court**

15          Plaintiffs persisted in seeking discovery for purposes of class identification. To identify

16 document custodians, Plaintiffs asked for a list of employees with information about the case.

17 Google provided that list on February 4, 2021, and it included over 200 employees. Ex. 4, GOOG-

18 BRWN-00023909. ***The list did not include Mr. Leung or Ms. Liu***, who had already set out on a

19 project to develop a "maybe_chrome_incognito" field. Ex. 2, GOOG-BRWN-00845596.

20          Google surely knew that Mr. Leung and Ms. Liu had relevant information. So did Google's

21 outside counsel. During the same time period (and perhaps long before), Google's counsel was

22 communicating with Mr. Leung about the case. Ex. 7. And while they remained in touch, Google

23 neglected to identify either Mr. Leung or Ms. Liu in a March 29, 2021 response to an Interrogatory

24 asking Google to identify employees with knowledge about "Google's collection and use of data

25 in connection with users' activity while in a private browsing mode." Exs. 5, 6.

26

27                                              8

28

1    Plaintiffs also sought to address deficiencies with Google's preservation efforts. On March

2    23, the parties filed a joint letter brief regarding Google's refusal to suspend its routine deletion

3    periods for any logs. Dkt. 119. Google told the Court that Plaintiffs' demand would require Google

4    to preserve any log in which private browsing data might have been stored, and on that basis

5    characterized "Plaintiffs' preservation demand [a]s extraordinarily burdensome [and] not

6    feasible." Dkt. 119 at 3.   Ultimately, "[b]ased upon the facts currently before the Court" and

7    "without prejudice to Plaintiffs' ability to raise a challenge based upon new evidence not currently

8    before the Court," this Court granted Google a Protective Order. *Calhoun v. Google*, 5:20-cv-

9    05146 (N.D. Cal.) at Dkt. 174 (adopted by reference in Dkt. 147-1 at 1). Plaintiffs briefed this

10   preservation dispute, and this Court issued a ruling, without knowing about the progress that Mr.

11   Leung and Ms. Liu were making in their efforts to detect, log, and preserve Incognito traffic.

12   For example, on April 14, two weeks before this Court's ruling, Mr. Leung and Ms. Liu

13   sought advice from colleagues regarding their efforts. Ms. Liu wrote:

14

15

16

     Ex. 15, GOOG-BRWN-00845477 at -77.

17

18                                                                        Ex. 16, GOOG-BRWN-00845481,

     at -81. Ms. Liu replied:

19

20   Ex. 15.

21   By contrast, Google in this case never proposed to

22                                           *Id.*

23                                        Nor did Google disclose to Plaintiffs that Mr. Leung and Ms.

24   Liu were developing a "maybe_chrome_incognito" detection tool for particular logs.  Had Google

25   done so, the parties could have easily reached a compromise in which Google would preserve a

26   far more limited set of data, namely, only the necessary parts of the particular logs in which the

27   "maybe_chrome_incognito" field would live.

                                        9

28

1       Google's obstruction likewise infected the parties' dispute over RFP 10, which sought

2  "Documents sufficient to identify all alleged class members." In their April 23, 2021 motion to

3  compel, Plaintiffs, as a compromise, proposed focusing on data from logs containing the "X-

4  Client-Data Header" field, and, specifically, data where this "X-Client Data Header" is missing:

5          At the 30(b)(6) deposition in this case, Google's representative confirmed that when a
           user is engaged in Incognito mode, the "X-Client Data header" is not sent to Google.

6          Google also admits that it maintains raw referrer header logs containing X-Client Data
           Header fields. ***Class members may be ascertained by looking for entries without the X-***

7          ***Client Data header.***

8  Dkt. 140 at 4 (emphasis added).  Plaintiffs thus proposed doing what Bert Leung was

9  simultaneously doing, as Mr. Leung's "maybe_chrome_incognito" bit is logged when the X-

10 Data Header is absent (and certain other criteria are also satisfied). *See* Ex. 11.

11      In opposition, Google told the Court that Plaintiffs' proposal was "unworkable" since "the

12 absence of the header cannot be used to ascertain purported class members as it would improperly

13 include all users browsing on a non-Chrome browser." Dkt. 140 at 5.  And during the ensuing

14 April 29 discovery hearing, counsel for Google doubled down on those assertions, going so far as

15 to accuse Plaintiffs' counsel of "speculation":

16       •  [W]e felt like there's quite a lot of speculation on behalf of [Plaintiffs' counsel] and
            we wanted to explain to you that this is actually not something that we just have or

17          can quickly query, nor do we think their proposed path is one that will lead to that
            outcome.  Apr. 29 Tr. at 20:1-6.

18

19       •  [W]e do not have the information to identify the plaintiffs' private browsing
            sessions.  I know [Plaintiffs' counsel] doesn't like that, but that is the reality.  Apr.

20          29 Tr. at 24:1-13.

21 As with the preservation dispute, Google did not inform Plaintiffs (or the Court) about Mr. Leung's

22 and Ms. Liu's efforts.

23      The Court rejected Google's arguments, holding that Plaintiffs were entitled to

24 test Google's say-so about the data through discovery:

25         Well, but what the Plaintiffs are asking for is pieces of information from
           different places because they want to see if they can piece together, by

26         combination of that information, class members.  And that's why – I mean,

27                             10

28

*it seems to me that they have a right to try to do that with whatever information you have*.

Apr. 29 Tr. at 19:2-7 (emphasis added). The Court then ordered Google to produce all "authenticated" and "unauthenticated" data relating to the named Plaintiffs. Dkt 147-1 at 2.

Meanwhile, Mr. Leung and Ms. Liu continued making significant progress. In a May 10, 2021 conversation (produced for the first time on February 18, 2022), Mr. Leung told Ms. Liu that the "maybe_chrome_incognito" detection tool is "sensitive"—"not from a privacy perspective, but from a legal (competition) perspective." Ex. 17, GOOG-BRWN-00845437.[1] By that point, Google was apparently no longer concerned that tracking Incognito within its logs raised any "privacy" concerns. Google was instead worried about the "legal" implications, i.e., for lawsuits like this one. Yet Google still did not disclose Mr. Leung or Ms. Liu or their work to Plaintiffs.

In July 2021, Plaintiffs moved to compel responses to RFP 120, which sought "[d]ocuments sufficient to identify, during the Class Period, Chrome web browser communications that did not contain any X-Client-Data-Header." Dkt. 218 at 3. Plaintiffs sought this information to "identify class members and determine what data Google collected (and continues to collect) from their private browsing activities, using the empty X-Client-Data header field as the starting point." *Id.* In opposition, Google complained that producing the information sought would be "burdensome and not proportional because Google would have to produce records (including confidential business information related to fields collected) that have nothing to do with the claims at issue here." *Id.* at 9.

Once again, Google did not inform the Court or Plaintiffs that Google was already (or at least on the cusp of) implementing the "maybe_chrome_incognito" detection field within specific Google logs and that the absence of the X-Client-Data Header was one of the criteria for logging that field.

---

[1] Part of the document is not visible because of how Google produced it. Plaintiffs used the metadata to complete this quote.

11

1    Had Google been forthcoming, the parties could have reached a compromise where

2   Google would only produce data from the specific logs that contain the

3   "maybe_chrome_incognito" detection tool. Google instead once again misrepresented its burden,

4   pretending that it would need to produce every piece of data that lacked an X-Client Data Header.

5   Because of Google's misrepresentations, Plaintiffs' motion was denied (after being referred to the

6   Special Master). *See* Dkt. 331.

7         **C.    Google Undermines the Special Master Process**

8         Google's misconduct culminated in its violation of the Court's orders governing the

9   Special Master process. In October 2021, Plaintiffs filed a Rule 37(b) motion because Google was

10   withholding data on the basis of its say-so about the data's relevance. *See* Dkt. 292 at 6-12

11   (summarizing the data that Google was refusing to produce). In their motion, Plaintiffs asked the

12   Court to order Google to comply with the April 30 Order or, alternatively, prohibit Google from

13   making arguments about any data it refused to produce. *Id.* at 15-19. Special Master Brush

14   informed the Court of his plan to issue a Report and Recommendation regarding certain disputes,

15   and the Court stayed further briefing on Plaintiffs' Rule 37(b) motion "pending resolution of the

16   issues set forth in the forthcoming Report and Recommendation." Dkt. 297.

17         Special Master Brush's Report validated Plaintiffs' concerns. He found as "fact" that the

18   named Plaintiffs' data has "not yet been fully produced." Dkt. 299 ¶ 53. And this Court, on *de*

19   *novo* review, upheld his factual finding:

> [T]he Court finds that the Special Master's factual conclusions regarding the deficiencies
> in Google's production of information about searches conducted to date as well as
> production of Plaintiffs and putative class data . . . are well founded and adopts those
> findings. As previously noted by this Court, Google knows what data it has collected
> regarding Plaintiffs and putative class members and where the data may be found, therefore
> Google must produce the information and data as directed herein.

Dkt. 331 at 3.

25         To remedy the problem, Google was ordered to conduct an additional four rounds of

26   iterative searches for the named Plaintiffs' data—in effect, Google got another chance to play by

27   the rules. Plaintiffs would select from among data sources that Google had already identified and

12

then propose search strings, and Google would produce the data that hit on those strings. Dt. 331, Ex. 1. The Court also found that any burden concerns were Google's own fault:

> To the extent [this process] requires the significant commitment of time, effort, and resources across groups of engineers at Google on very short timelines, that burden . . . arises, at least in part, as a result of Google's reticence thus far to provide critical data source information in these actions.

*Id.* at 4-5.

To address Plaintiffs' concern about Google's failure to identify necessary logs, Google was also required to "provide a declaration, under penalty of perjury from Google, not counsel, that . . . [t]o the best of its knowledge, Google has provided a complete list of data sources that contain information relevant to Plaintiffs' claims." *Id.* Ex. 1 ¶ 1. A Google Discovery Manager provided that declaration on November 18, swearing that "To the best of my knowledge and informed understanding, Google has provided a complete list of sources that contain information about Plaintiffs relevant to Plaintiffs' claims." Dkt. 338. ¶ 3.

This statement, in light of Mr. Leung's recently produced documents, appears to be false. Documents Google produced on February 18, 2022 appear to demonstrate that "maybe_chrome_incognito" was approved for use in multiple logs that had not been disclosed in Google's Court-ordered declaration. Ex. 3, GOOG-BRWN-00845423. Moreover, even for the logs that Google *did* disclose, Google did not reveal to Plaintiffs or the Special Master that they contained a "maybe_chrome_incognito" field. Worse yet, for the only log schema Plaintiffs received that actually contains this field, *Google removed any trace of the field prior to its production*. And Google still hasn't told Plaintiffs which other logs contain this field that have not yet been identified and produced. Mao Decl. ¶ 26. Google likewise removed the schema the ▆ fields that Mr. Leung and Ms. Liu were using in conjunction with the "maybe_chrome_incognito" field. *Id.*; *see also* Ex. 3, GOOG-BRWN-00845423.

Google's obstruction has made a mockery of the whole Special Master process. In the Court's words, this process was intended to, among other things, "***provide the* Brown . . . *Plaintiffs the tools to identify class members using Google's data*.**" Dkt. 331 at 4 (emphasis added). Yet

13

1  Google is still withholding from Plaintiffs the precise logs and fields that Google itself has been

2  using to identify Incognito traffic during the discovery period. Google has wasted the Court's time,

3  the Special Master's time, and Plaintiffs' time.

4      **D.    With the Court's Help, Plaintiffs Finally Discover the Truth**

5      On Thanksgiving Eve 2021 (long after Google's early October document production

6  deadline), Google produced a document that finally set Plaintiffs on the path to uncovering

7  Google's misconduct. The document was a July 2020 email from Bert Leung discussing a ████

8  ████████████████████████████████████████████████████████████████

9  ████████████ Ex. 18, GOOG-CABR-05280756. Plaintiffs now understand this July 2020

10  ██████ as the beginning of Mr. Leung's efforts to build the "maybe_chrome_incognito" field.

11      Plaintiffs were alarmed to realize that one of logs that Mr. Leung was studying, the

12  ████████████, had not yet been disclosed. Plaintiffs promptly brought this missing log to

13  the Special Master, and after reviewing the documents, he directed Google to produce the log

14  schema for the log and to run searches of the log. Mao Decl. ¶ 28. Special Master Brush thus

15  overruled Google's objection that the log was irrelevant insofar as it was a "Search" log. From that

16  point forward, Google was indisputably on notice that it could not withhold logs on the basis of

17  the log being a "Search" log, particularly any log that Mr. Leung studied for his analysis, let alone

18  a log in which Mr. Leung actually implemented the Incognito detection field.

19      Google has since then refused to tell Plaintiffs which other logs Mr. Leung evaluated in the

20  early stages of his "log analysis of Chrome Incognito." After Special Master Brush overruled

21  Google's objection on the ████████████ Plaintiffs asked Google whether any other logs

22  that Mr. Leung studied had been withheld. Mao Decl. ¶ 29. Counsel for Google never responded

23  to Plaintiffs' multiple requests. *Id.*

24      Plaintiffs then propounded an interrogatory asking Google to "identify *every* log and data

25  source that Google reviewed, analyzed, or searched as part of Google's efforts to conduct a 'log

26  analysis of Chrome Incognito' in and around mid-2020. *See, e.g.*, GOOG-CABR-05280756," Ex.

27

28

14

19 (emphasis added). Google did not answer that question, either. Google instead evaded it by merely quoting back *one* of the logs that was already mentioned in the email that Plaintiffs cited. *See id.* ("Google used ███████████████ in the analysis of Ad Manager browsing traffic described in GOOG-CABR-05280756."). That evasion is improper. Google has subsequently clarified in meet-and-confers that Mr. Leung's analysis was not limited to the logs mentioned in this one document, and yet Plaintiffs still do not have a complete list of every data source that Mr. Leung studied, much less a complete list of the logs in which "maybe_chrome_incognito" field has officially been implemented. Mao Decl. ¶ 30.

The Thanksgiving Eve production also clarified for Plaintiffs that Mr. Leung was an important witness for this case, so Plaintiffs asked Google to produce custodial documents from his files. Google objected, principally contending that Plaintiffs could not show "good cause" to add another custodian above the limit the Court had previously set. Dkt. 399 (joint letter brief). Plaintiffs countered by arguing that Google had never disclosed Mr. Leung as a potential custodian with relevant information and likewise delayed in producing documents about his role in the Incognito detection analysis. *Id.*

Meanwhile, on December 2, Chris Liao, Mr. Leung's immediate supervisor, testified that Google had abandoned any efforts to identify Incognito traffic within its logs. Plaintiffs asked Mr. Liao whether "amongst these privacy signals, is there one for incognito mode browsing on Chrome?" Ex. 8, Liao Tr. 131:14-16. Mr. Liao answered, "No." *Id.* He went on to elaborate for minutes, never once mentioning the creation and implementation of the "maybe_chrome_incognito" field, which had been introduced in certain logs by no later than September. Ex. 9, GOOG-BRWN-00845312 at -18.

- [T]here was discussion around proxy signals that we can sue to approximate incognito traffic. However, we were not able to identify any definitive or reliable signal to identify incognito mode in the end. Ex. 8, Liao Tr. 133:23-134:3.
- [I]t was determined that there was no reliable way to technically detect incognito in a definitive and reliable and accurate manner. And as a result, *no further action was taken to build such a hypothetical signal*. *Id.* 134:15-20 (emphasis added).

15

1

- As I stated before, we do not have a reliable **signal to infer incognito** mode at this time we receive an ad query. *Id.* 140:6-10 (emphasis added).

2

3    These statements were misleading, at best. Google had already implemented a specific field

4    within Google logs to detect Incognito. Whether Mr. Liao would now contend that signal is 100%

5    accurate is of no moment. Google deemed the signal accurate enough to roll it out for its own use,

and Plaintiffs are entitled to this discovery.

6

7    Google might have gotten away with concealing critical evidence but for this Court's ruling

8    on the Bert Leung document dispute. The Court agreed with Plaintiffs, ordering Google to provide

hit counts for the search terms that Plaintiffs requested and to then meet-and-confer to resolve the

9
dispute. Dkt. 401. It turns out that Plaintiffs' proposal hit on just 982 documents, and Google

10
shortly thereafter made a production from Mr. Leung's custodial files. Mao Decl. ¶ 5. That

11
February 18, 2022 production revealed to Plaintiffs, for the first time, that Google had actually

12
implemented a field within particular logs called "maybe-chrome-incognito." Ex. 9, GOOG-

13
BRWN-00845312 at -18 (Leung: "are we already logging maybe-chrome-incognito in search

14
███ already?" Liu: "yes"). And days later, Plaintiffs learned, again for the first time, that

15
(a) Google had removed this field from a log schema produced to Plaintiffs and (b) continued to

16
withhold in their entirety *other* logs with the field.[2] In light of all of these revelations, Plaintiffs

17
are seeking additional discovery from Google relating to this field. *See* Dkt. 424 at P22.

18    But regardless of whether Plaintiffs obtain additional discovery, Google's persistent efforts

19    over 18 months to obstruct discovery and conceal its implementation of an Incognito detection

20    tool should not be countenanced. Google must be held accountable for its misconduct.

21

22

23   [2] Google might point out in opposition that it produced a tiny number of documents alluding to the
     possibility of developing a "maybe_chrome_incognito" field prior to the February 18, 2022
24   production. *See generally* Mao Decl. (summarizing the earlier productions). None of those
     documents showed that Google actually implemented the field in Google logs; they at most
25   reflected the idea of creating such a field. And Plaintiffs had no reason to believe this field had
     been actually implemented, particularly when Google (1) removed the field from a log schema it
26   produced, and (2) a Google witness testified that Google did not in fact implement any Incognito
     detection signal.
27
                                                   16

28

1

## ARGUMENT

2

**I.     Legal Standard**

3         Under Rule 37(b)(2)(A), when a party fails to comply with a discovery order, a court may

4  impose "whatever sanctions are just . . . up to dismissal of part or all of the party's claims."

5  *Sanchez v. Rodriguez*, 298 F.R.D. 460, 463 (C.D. Cal. 2014).  Such remedies may include but are

6  not limited to establishing facts in favor of the moving party, prohibiting the party in violation

7  from supporting designated claims or introducing designated matters in evidence, imposing

8  monetary sanctions in the form of reasonable expenses caused by the failure to obey, treating this

9  failure as contempt and staying the proceedings until the order is obeyed.  *See* Fed. R. Civ. P.

10 37(b)(2). In the context of Rule 37(b) sanctions, the court reads the term "order" in Rule 37(a)

11 "broadly."  *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018).  A "district court

12 has great latitude in imposing sanctions for discovery abuse." *Dahl v. City of Huntington Beach*,

13 84 F.3d 363, 367 (9th Cir. 1996).

14         In addition, "discovery misconduct may be punished under the court's 'inherent powers' to

15 manage its affairs." *Guifu Li v. A Perfect Day Franchise, Inc*, 281 F.R.D. 373, 396 (N.D. Cal.

16 2012) (quoting *Unigard Sec. Ins. Co. v. Lakewood Eng. Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.

17 1992)); *see also Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001) (district courts have inherent

18 power to levy sanctions for "bad faith or conduct tantamount to bad faith," including recklessness

19 combined with "frivolousness, harassment, or an improper purpose.").

20 **II.    Google Violated the November 12 Order, and Abused the Discovery Process**
   **Throughout this Case**

21         Google     violated     the     November     12     Order     by     (1)     withholding     the

22 "maybe_chrome_incognito" field from Plaintiffs, and (2) representing to the Court that it had

23 identified all relevant sources to Plaintiffs. The November 12 Order required Google to "provide

24 a declaration, under penalty of perjury from Google, not counsel, that . . . [t]o the best of its

25 knowledge, Google has provided a complete list of data sources that contain information relevant

26

27                                              17

28

1  to Plaintiffs' claims." *Id.* Ex. 1 ¶ 1. A Google Discovery Manager provided that declaration on
2  November 18. Dkt. 338. ¶ 3.

3          In fact, Google altered one of the log schemas it produced to Plaintiffs by removing the
4  "maybe_chrome_incognito" field from the log, and Google continues to withhold a still-
5  unspecified number of other logs that contain this same Incognito detection field, including logs
6  that contain so-called "unauthenticated" data. There is no excuse for these plain-as-day violations
7  of this Court's order, particularly when Google knows that the purpose of this process is to
8  "***provide the* Brown *. . . Plaintiffs the tools to identify class members using Google's data*.**" Dkt.
9  331 at 4 (emphasis added).

10         Plaintiffs expect Google to argue that some of the withheld logs did not have to be produced
11  because those logs contain "Search" data or "authenticated" data. But the whole point of the
12  Special Master process is to "provide the *Brown* . . . Plaintiffs the tools to identify class members
13  using Google's data." Dkt. 331 at 4. Search data is obviously such a tool. As explained in Plaintiffs'
14  portion of the 30(b)(6) letter brief, people run Google searches to visit non-Google websites. Dkt.
15  411 at 2.  Therefore, the Court ordered Google to produce a witness to testify about "Google's
16  ability to identify users or devices based on their Google searches within a private browsing mode."
17  Dkt. 418-1 at 26. In any event, Google has also refused to confirm whether it withheld any logs
18  with this field that are specific to so-called "unauthenticated" data. Mao Decl. ¶¶ 26. If Google has
19  produced all "unauthenticated" data logs that contain the Incognito detection tool, then surely
20  Google would confirm as much. At bottom, in a case where Google has been disputing Plaintiffs'
21  ability to identify class members, there is simply no excuse for Google withhold from Plaintiffs
22  logs that contain the "maybe_chrome_incognito" field.

23          As a result of Google's violations, with just one week left before the close of fact
24  discovery, Plaintiffs still lack a single piece of data associated with the
25  "maybe_chrome_incognito" field. The Court and Special Master could not have envisioned this
26  outcome.

27
                                                18
28

1   But the misconduct here goes beyond violating one or two Court Orders. Google has made

2   a mockery of the entire course of discovery. To recap:

3   • Google omitted Mr. Leung and Ms. Liu from a list of over 200 employees with
       relevant information and likewise omitted them from an interrogatory response.

4   • Google briefed and prevailed in many discovery disputes, including over ESI
5      preservation, by misrepresenting the burden associated with Plaintiffs' requests.
       Google could have simply followed Mr. Leung's lead and produced and preserved
6      a tiny fraction of its data—only the data used for the "maybe_chrome_incognito"
       field.
7
    • A Google witness testified that any projects to identify and track Incognito traffic
8      had been discontinued for alleged lack of accuracy.  Ex. 8, Liao Tr. 134:7-10.

9   **III.    Google Should Be Sanctioned**

10      To remedy the severe prejudice caused by Google's misconduct, Plaintiffs respectfully

11  seek: (A) evidentiary sanctions and jury instructions related to Google's concealment of the

12  "maybe_chrome_incognito" field; and (B) reimbursement by Google for all fees paid by Plaintiffs'

13  counsel to Special Master Brush.

14      **A.    Evidentiary Sanctions and Jury Instructions**

15      If a party does "not obey[] a [d]iscovery [o]rder," Rule 37(b)(2)(A)(i) permits the court to

16  "direct[] that the matters embraced in the order or other designated facts be taken as established

17  for purposes of the action." *See also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de

18  Guinee*, 456 U.S. 694, 695 (1982) (affirming sanction as "clearly appropriate" where petitioners

19  engaged in continued delay in "obvious disregard of [court] orders")..  Because Google failed to

20  comply with the November 12 Order, the Court should "take[] as established for purposes of the

21  action" that (1) Google can detect event-level Incognito traffic within its logs,  (2) this Incognito

22  data is linkable to users, so that (3) the class is ascertainable. Fed. R. Civ. P. 37(b)(2)(A)(i).

23      "Court intervention to protect Plaintiffs' ability to prove the[ir] allegations is necessary"

24  when, as here, "[t]he withheld evidence is uniquely within the possession of the Defendants" and

25  "there was no way for Plaintiffs to test their theory" as a result of the "documents withheld." *Guifu*,

26  281 F.R.D. at 39; *see also Zurich Am. Ins. Co. of Ill. v. World Priv. Sec., Inc.*, 2020 WL 8610839,

27

28

19

1   at *5 (C.D. Cal. Nov. 23, 2020) ("As a result of [defendant's] shortcomings, the Court finds that

2   evidentiary sanctions against it are warranted. Plaintiffs assert that there are certain factual matters

3   at issue in [Plaintiff's] discovery that must be established for the purposes of this action.

4   Accordingly, the Court finds that the following matters are established for the purposes of this

5   action . . . ."). Such an adverse factual finding "merely serves as a mechanism for establishing facts

6   that are being improperly hidden by the party resisting discovery." *Gibson v. Chrysler Corp.*, 261

7   F.3d 927, 948 (9th Cir. 2001) (noting presumption that party resisting discovery "is doing so

8   because the information sought is unfavorable to its interest.").

9        Google should likewise be precluded from presenting any arguments in this case

10   concerning whether Google can identify Incognito traffic within logs and whether that data is

11   linkable to users. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii); *Von Brimer v. Whirlpool Corp.*, 536 F.2d

12   838, 844 (9th Cir. 1976). "Preclusionary orders ensure that a party will not be able to profit from

13   its own failure to comply." *Sas v. Sawabeh Info. Servs.*, 2015 WL 12711646, at *9 (C.D. Cal. Feb.

14   6, 2015) (quoting *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369

15   (9th Cir. 1980)). "[I]t is entirely reasonable to sanction [Google's] defiance of the [November 12]

16   Order by precluding [it] from presenting evidence on [issues for which Google] ha[s] not provided

17   timely and complete discovery." *Id.* "Discovery is first and foremost a way for one party to

18   determine the evidence supporting another party's allegations, so it can properly investigate that

19   evidence prior to trial." *Lanier v. San Joaquin Valley Offs. Ass'n*, 2016 WL 4764669, at *8 (E.D.

20   Cal. Sept. 12, 2016).  Google "has thwarted [Plaintiffs'] efforts to understand the basis of"

21   Google's class identification arguments, so it is "appropriate, based on these failures, to preclude

22   [Google] from introducing further facts or evidence in response to these issues." *Id.* Otherwise,

23   Google will benefit from any evidentiary gaps that it has caused by refusing to comply with this

24   Court's November 12 Order.

25        Evidentiary sanctions are particularly important for Plaintiffs' anticipated motion for class

26   certification. In *Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 3895118, at *3 (N.D. Cal.

27

28

20

1   Aug. 29, 2011), the court granted a preclusion remedy after the defendant refused to produce a
2   corporate representative, in violation of a court order. The court agreed with Plaintiffs' concern
3   that "the information withheld from Plaintiffs could very well bear on whether or not Plaintiffs are
4   able to establish commonality of issues across the putative class." *Id.* "To remedy the prejudice
5   suffered by Plaintiffs in their class certification motion" the Court prohibited the defendant from
6   "utilizing declaration evidence . . . regarding its corporate structure or ownership in its opposition
7   to class certification/collective action." *Id.* at *4; *see also Hanni v. Am. Airlines, Inc.*, 2009 WL
8   1505286, at *5 (N.D. Cal. May 27, 2009) (ordering that plaintiffs who failed to comply with
9   discovery obligations "may not rely on any discovery provided after the close of class certification
10  discovery in support of their motion for class certification or in opposition to Defendant's motion
11  to deny class certification"); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2013 WL 4598490,
12  at *13 (N.D. Ill. Aug. 29, 2013) (granting preclusion order where defendant "engaged in a pattern
13  of stonewalling" production of databases it claimed contained evidence supporting its statutory
14  defenses against liability).

15        Google's eighteen-month-long obstruction and misconduct warrants sanctions regardless
16  of whether Google finally abides by the November 12 Order. Google has already jeopardized
17  Plaintiffs' experts' ability to "conduct the required analysis within the time limits set [by the
18  Court]." *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 557 (N.D. Cal. 2009) (precluding party
19  from presenting evidence concerning alleged lost profit damages for failing to timely produce the
20  relevant data); *see also Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1595784, at *3 (N.D. Cal. May
21  4, 2012) (preclusion warranted for belated production of relevant source code because "Apple's
22  experts were left with no meaningful opportunity to comprehend this code, even as they face
23  criticism from Samsung in deposition (and assuredly at trial) that their code analysis was
24  deficient"); *Hanni*, 2009 WL 1505286, at *5 (prohibiting party from relying on evidence produced
25  after the close of class certification-related discovery when moving for class certification).

26

27                                          21

28

1    Rule 37(b)(2)(A) also "authorizes a court to issue an adverse-inference jury instruction as

2    a remedy when 'bad faith or gross negligence has resulted in either the spoliation of evidence or

3    failure to turn over relevant evidence.'" *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, 2016

4    WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016) (quoting *Karnazes v. Cty. of San Mateo*, 2010 WL

5    2672003, at *2–3 (N.D. Cal. July 2, 2010) (awarding an adverse-inference jury instruction when

6    plaintiff failed to facilitate the deposition of her treating physician))). "[T]he court does not need

7    to find bad faith before it issues an adverse-inference instruction as a sanction." *First Fin. Sec.,*

8    *Inc.*, 2016 WL 5870218, at *6 (granting adverse inference jury instruction sanctions where "gross

9    negligence [] resulted in a failure to turn over [] native-format data", the receipt of which would

10   have provided "a valuable opportunity to verify the accuracy of the highly relevant facts").

11   Google's decision to withhold relevant evidence of its employees' successful efforts to identify

12   Incognito traffic—at the same time that it represented to Plaintiffs in depositions and in the Special

13   Master process that such evidence did not exist—surpasses gross negligence. As a remedy,

14   Plaintiffs seek an instruction to the jury that "Google concealed and altered evidence regarding its

15   ability to identify Incognito traffic." Such an adverse inference instruction would limit the benefit

16   that Google can extract from its misconduct. *See Kannan v. Apple Inc.*, 2020 WL 9048723, at *9

17   (N.D. Cal. Sept. 21, 2020) (ordering adverse jury instruction where party adopted a unilateral and

18   limiting interpretation of discovery obligations, and either deleted or withheld responsive

19   documents in sole possession he was ordered to produce).

20       **B.    Reimbursement of Fees Paid to Special Master Brush**

21       The Federal Rules require one last sanction: Because Google violated a discovery order

22   (three, actually), "the court *must* order [Google], the attorney[s] advising [it], or both to pay the

23   reasonable expenses, including attorney's fees, caused by [its] failure" to comply. Fed. R. Civ. P.

24   37(b)(2)(C) (emphasis added). The Court repeatedly set forth a detailed process pursuant to which

25   Google would produce data relevant to Plaintiffs' efforts to identify class members and quantify

26   interceptions. In its April 30 and September 16 Orders (Dkts. 147-1, 273), the Court ordered

27

28

22

1  Google to produce the named Plaintiffs' data in a three-step process overseen by Special Master

2  Brush. Google was ordered to finish production by October 6, 2021, Dkt. 273 at 2, but because of

3  Google's misconduct, the Court concluded on November 12 that Plaintiffs' data had "not yet been

4  fully produced," Dkt. 299 ¶ 53 (Special Master's Report and Recommendation); Dkt. 331 at 3

5  (affirming finding). In its November 12 Order, the Court gave Google a second chance and

6  restarted the data production process. Dkt. 331 Ex. 1. But here we are again. Only this time, as we

7  have exhaustively explained, Google is *tampering with* evidence, not just concealing it. And that

8  evidence goes to the core purpose of the proceedings before the Special Master: detection of

9  private browsing.

10      Because Google has frustrated the purpose of the proceedings before the Special Master,

11  Plaintiffs' counsel and the class should not be made to pay for it. Google can avoid these monetary

12  sanctions only if it shows that its violations of the Court's Orders were "substantially justified."

13  Fed. R. Civ. P. 37(b)(2). But there is no way to justify such severe misconduct. *See HRC-Hainan*

14  *Holding Co., LLC v. Yihan Hu*, 2020 WL 1643786, at *3 (N.D. Cal. Apr. 2, 2020) (violation "was

15  not substantially justified" where the circumstances "strongly indicate[d]" bad faith); *First Fin.*

16  *Sec., Inc.*, 2016 WL 5870218, at *7 (same, even though the failure to produce native version of

17  document as ordered by the court was "consistent with technological ignorance and . . . not

18  necessarily the result of subjective bad faith"). Plaintiffs therefore ask the Court to order Google

19  to reimburse Plaintiffs for all fees they have paid and will pay to Special Master Brush.

20                          **<u>CONCLUSION</u>**

21      Plaintiffs request that the Court issue an Order to Show Cause for why it should not enter

22  any or all of the aforementioned sanctions and remedies for Google's discovery misconduct:

23

24  Dated: February 26, 2022              MORGAN AND MORGAN

25

26

27                     By  */s/ John A. Yanchunis*
                          23
28

1

2   Mark C. Mao (CA Bar No. 236165)
    mmao@bsfllp.com
3   Beko Rebitz-Richardson (CA Bar No. 238027)
    brichardson@bsfllp.com
4   Erika Nyborg-Burch (CA Bar No. 342125)
    enyborg-burch@bsfllp.com
5   BOIES SCHILLER FLEXNER LLP
    44 Montgomery Street, 41st Floor
6   San Francisco, CA 94104
    Telephone: (415) 293 6858
7   Facsimile (415) 999 9695

8
    James W. Lee (*pro hac vice*)
9   jlee@bsfllp.com
    Rossana Baeza (*pro hac vice*)
10  rbaeza@bsfllp.com
    BOIES SCHILLER FLEXNER LLP
11  100 SE 2nd Street, Suite 2800
    Miami, FL 33130
12  Telephone: (305) 539-8400
    Facsimile: (305) 539-1304

13
    Amanda Bonn (CA Bar No. 270891)
14  abonn@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
15  1900 Avenue of the Stars, Suite 1400
    Los Angeles, CA 90067
16  Telephone: (310) 789-3100

17
    William Christopher Carmody (*pro hac vice*)
18  bcarmody@susmangodfrey.com
    Shawn J. Rabin (*pro hac vice*)
19  srabin@susmangodfrey.com
    Steven Shepard (*pro hac vice*)
20  sshepard@susmangodfrey.com
    Alexander P. Frawley (*pro hac vice*)
21  afrawley@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
22  1301 Avenue of the Americas, 32nd Floor
    New York, NY  10019
23  Telephone: (212) 336-8330

24

25
    John A. Yanchunis (*pro hac vice*)
26  jyanchunis@forthepeople.com
    Ryan J. McGee (*pro hac vice*)

27                                24

28

1  rmcgee@forthepeople.com
   MORGAN & MORGAN, P.A.
2  201 N Franklin Street, 7th Floor
   Tampa, FL 33602
3  Telephone: (813) 223-5505
   Facsimile: (813) 222-4736
4
5  Michael F. Ram, CA Bar No. 104805
   MORGAN & MORGAN
6  711 Van Ness Ave, Suite 500
   San Francisco, CA 94102
7  Tel: (415) 358-6913
   mram@forthepeople.com
8
9  *Attorneys for Plaintiffs*
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27                         25
28

Declaration of Mao
ISO Plaintiff's Request
for an Order to Show
Cause

Redacted Version of
Document Sought to
be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No.:  4:20-cv-03664-YGR-SVK <br><br> **DECLARATION OF MARK C. MAO IN SUPPORT OF PLAINTIFFS' REQUEST FOR AN ORDER TO SHOW CAUSE** <br><br> Referral: The Honorable Susan van Keulen |

## DECLARATION OF MARK C. MAO

I, Mark C. Mao, declare as follows.

1.      I am a partner with the law firm of Boies Schiller Flexner LLP, counsel for Plaintiffs in this matter. I am an attorney at law duly licensed to practice before all courts of the State of California. I have personal knowledge of the matters set forth herein and am competent to testify.

2.      I submit this Declaration in support of Plaintiffs' Request for the Court to issue an Order to Show Cause for Why Google Should Not Be Sanctioned for Discovery Misconduct.

3.      On January 31, 2022, Google produced for the first time a document titled "Detect 3P Cookies Blocking Browsers" that was "last updated: 05/05/2021." Ex. 21, GOOG-CABR-05757329.

4.      This document, for the first time, indicated to Plaintiffs that Google submitted to its ▮▮▮▮▮▮▮▮ or ▮▮▮ team a plan to change Google's logging practices to log a "maybe_chrome_incognito" field in approximately ▮ logs called ▮▮▮ logs. Google did so to support a Dashboard tool to monitor and analyze traffic from browsers that block third-party cookies, including Chrome Incognito, and assess their revenue impact on Google. Plaintiffs promptly followed up with Google and demanded further information on the Dashboard referenced in that document. Ex. 21, GOOG-CABR-05757329 at -31-32.

5.      On February 18, 2022, Google produced approximately 283 documents from Bert Leung's custodial files. This production followed a ruling from the Court directing Google to tell Plaintiffs the "hit counts" for Mr. Leung's documents. Contrary to Google's assertions of burden with respect to producing Mr. Leung's documents, Google informed Plaintiffs that their search term proposal resulted in just 982 hits and agreed to produce responsive documents.

6.      The documents Google produced from Mr. Leung's files on February 18, 2022, appeared to confirm for the first time several key pieces of information that Google never previously disclosed to Plaintiffs, the Special Master, or the Court.

7.      *First*, the ▮▮▮▮▮▮▮ or ▮▮▮ team had actually approved the plan to log the "maybe_chrome_incognito" bit in approximately ▮ ▮▮▮ logs. Ex. 3, GOOG-BRWN-

00845423.

8.      *Second*, following that approval, Google implemented the change and began logging the "maybe_chrome_incognito" field, likely around May or June 2021 after the ■ team approved the change. Ex. 3, GOOG-BRWN-00845423; Ex. 9, GOOG-BRWN-00845312 at -18.

9.      *Third*, Google engineers Bert Leung and Mandy Liu spent the next several months continuing to refine and improve their Dashboard tool to detect and monitor third-party cookie blocking based on those logging changes. Ex. 22, GOOG-BRWN-00845281; Ex. 23, GOOG-BRWN-00845275; Ex. 24, GOOG-BRWN-00845274.

10.      Google had previously never disclosed to Plaintiffs, the Special Master, or the Court (a) that it had actually implemented a change to its logging practices in 2021 to log a "maybe_chrome_incognito" field in (apparently) ■ logs or (b) the specific logs in which that field resides. To the contrary, as explained below and in Plaintiffs' accompanying memorandum, Google went to great lengths to conceal this information throughout the discovery process (and particularly in the last several months during the Court-ordered Special Master process).

11.      In September 2021, Google for the first time produced three *earlier* versions of the document titled "Detect 3P Cookies Blocking Browsers" that discussed the possibility of logging a "maybe_chrome_incognito" field. None of those documents (a) indicated that the "maybe_chrome_incognito" field was actually implemented or (b) listed the specific ■ logs in which the field would ultimately be included.

12.      To the contrary, the most up-to-date version of the document that Google had produced (prior to January 31, 2022) discussed an *earlier* plan—which Google subsequently modified—to log the "maybe_incognito_bit" in a set of ■ logs called ■ **logs.** These were ***completely different logs*** from the ■ logs in which Google appears to have ultimately implemented the "maybe_chrome_incognito" field. For example, Google produced one such document from Chris Liao's files titled "Detect 3P Cookies Blocking Browsers," which (a) was "last updated: 05/04/2021" and (b) discussed the abandoned ■ logging plan (as opposed to the

1        ██ logging plan that was apparently added to the document on 05/05/2021). A true and correct

2   copy of the most up-to-date version of the document Google produced in 2021 is attached as

3   Exhibit 25 (GOOG-CABR-03668216).

4        13.    On November 12, 2021, the Court issued an order requiring that "Google shall

5   provide a declaration, under penalty of perjury from Google, not counsel, that 1. To the best of its

6   knowledge, ***Google has provided a complete list of data sources that contain information***

7   ***relevant to Plaintiffs' claims*** . . . ." Dkt. 331 at 8 (emphasis added).

8        14.    On November 18, 2021, Google submitted a declaration from Andre Golueke, "a

9   Discovery Manager within the Legal Department at Google LLC." Dkt. 338. The declaration

10  certified that "Google has provided a complete list of sources that contain information about

11  Plaintiffs relevant to Plaintiffs' claims. The data sources are listed in Exhibit A."

12       15.    Exhibit A to Google's declaration, in turn, ***only listed*** ██ ***of the approximately*** ██

13  ***logs*** that may contain the "maybe_chrome_incognito" field according to the most up-to-

14  date version of the "Detect 3P Cookies Blocking Browsers" document that Google had produced

15  in on January 31, 2022. *Compare* Ex. Dkt. 338-1 (Google's Ex. A) *with* Ex. 3, GOOG-BRWN-

16  00845423. And Exhibit A also only listed ██ ***of the approximately*** ██ ***logs*** in which Google

17  had ***contemplated*** logging the "maybe_chrome_incognito" bit according to the earlier design

18  documents Google produced in September 2021. The chart below, created by Plaintiffs' counsel,

19  illustrates the extent of the declaration's omissions:

20  

| 05/04/2021 "Detect 3P Blocking Browsers" ██ Logs (Produced on 09/24/2021) | In Declaration [Produced on 11/18/2021]? | 05/05/2021 "Detect 3P Blocking Browsers" ██ Logs (Produced on 01/31/2021) | In Declaration [Produced on 11/18/2021]? | Same as ██ Logs? |
|---|---|---|---|---|
| | YES | | YES | NO |
| | YES | | YES | NO |
| | YES | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | NO | | NO | NO |
| | | | NO | NO |
| | | | NO | NO |

1    16.    The Court also ordered that "within four days of the date of this Order Google is to

2    provide to the Special Master full schemas, a list of ALL fields with their descriptions, a list of

3    tools used to search the respective data sources, and instruction sets and manuals for all tools

4    identified as being used by 'Googlers' to search each of the following data sources…" The Court

5    then listed (a) ▮▮ specific logs, (b) "any data sources searched in addition to the ▮ listed above,"

6    and (c) "[a]ny other of the data sources Plaintiffs specific from the list of potentially relevant data

7    sources provided by Google . . . ." Dkt. 331 Ex. 1.

8    17.    On December 2, 2021, Google provided schema for ▮▮ logs, including the only ▮▮

9    ▮▮ logs identified in Google's sworn declaration (*i.e.*, the only ▮▮ logs Google disclosed that

10   actually, and unbeknownst to Plaintiffs, contained the =="maybe_chrome_incognito"== field).

11   18.    However, rather than produce "full schemas and a "list of ALL fields with their

12   descriptions," as the Court ordered, Google only produced field names for the "100 largest fields"

13   in the ▮▮ ▮▮ logs. None of those field names reflected the truth: that a

14   =="maybe_chrome_incognito"== field was included in those ▮▮ logs.

15   19.    Tellingly, for certain other logs that apparently do not include a

16   =="maybe_chrome_incognito"== field, Google was happy to produce more than the 100 largest fields.

17   For instance, on September 24, 2021, Google identified ▮▮ fields in its ▮▮▮▮ log.

18   20.    As a result of Google's conduct, neither Plaintiffs nor the Special Master had ***any***

19   ***idea that these*** ▮▮ ▮▮ ***logs contained the*** ==***"maybe_chrome_incognito"*** ***field.***== Nor did

20   Plaintiffs or the Special Master have any idea that there may have been approximately ▮ ***other,***

21   ***undisclosed*** ▮▮ ***logs*** which also contained such a field.

22   21.    The very next day on December 3, 2021, Plaintiffs deposed Google employee Chris

23   Liao, who is Bert Leung's supervisor. Mr. Liao testified: "***There is no explicit signal to identify***

24   ***incognito mode traffic.***" Ex. 8, Liao Tr. 132:2-3. Mr. Liao further testified that "***it was determined***

25   ***that there was no reliable way to technically detect incognito in a definitive and reliable and***

26   ***accurate manner. And as a result no further action was taken to build such a hypothetical***

27   ***signal.***" I followed up by asking: "And that was within the confines of the existing architecture?

28

1  Because you said that you didn't then build any new dedicated signals, right, for incognito mode."

2  Mr. Liao answered: "***I'm not certain if we can build that or not***." *Id.* 134:15-135:3.

3       22.     Based on the information Google had disclosed by December 2021, Plaintiffs had

4  no idea—and simply no reason to believe—that Google had (a) actually implemented its plan to

5  log a "maybe_chrome_incognito" field or (b) that such a field was apparently included in ██

6  ████ logs (only ███ of which were even identified in Google's Court-ordered and sworn list of

7  data sources). To the contrary, the documents, sworn declaration, and testimony proffered by

8  Google suggested that the idea to log a "maybe_chrome_incognito" field in ████ logs (or

9  elsewhere) had simply never been implemented. As a result, Plaintiffs did not select for their

10 Iterative Search 1 either of the ███  ███ logs that Google disclosed in its sworn list of data

11 sources.

12      23.     Google finally produced Mr. Leung's custodial documents on Friday, February 18,

13 2022, which set off a cascade of revelations that are the basis for this request for an order to show

14 cause.   For   the   first   time,   Google   produced   evidence   confirming   that   the

15 "maybe_chrome_incognito" field was actually logged in approximately ██  ████ logs.

16      24.     On Sunday, February 20, 2022, Plaintiffs promptly alerted the Special Master and

17 Google that those documents appear to reveal that "Google has omitted from its prior lists a critical

18 data source—a '████ log'" and the fact that Google had actually begun "adding a specific

19 Incognito detection field to both its Search and Display logs."

20      25.     The next day on Monday, February 21, 2022, Google unilaterally cancelled Mr.

21 Leung's scheduled February 25, 2022 deposition, which had been set by written agreement.

22 Google claimed that "a conflict has arisen for Mr. Leung on February 25." Google insisted that the

23 deposition be rescheduled to March 4, 2022—the last day of fact discovery. Plaintiffs objected and

24 repeatedly asked, via a Zoom call and multiple times in writing, what this supposed conflict was.

25 Google refused to answer.

26      26.     Plaintiffs thereafter met and conferred with Google on Wednesday, February 23,

27 2022, under the Special Master's supervision. During the meet and confer, Google indicated that

28

1    only one of the logs that Google identified in its November 2022 declaration contained the
2    "maybe_chrome_incognito" field. Google refused to answer Plaintiffs' questions about what other
3    logs contain that field, telling Plaintiffs to ask Mr. Leung during his deposition. Plaintiffs still do
4    not have a list of the logs which logs contain this field (though based on documents Google
5    produced on January 31, 2022, and February 18, 2022, it appears that there may be ███ such ████
6    logs). Google will not even confirm whether it withheld any logs with the Incognito detection field
7    that are specific to so-called "unauthenticated" data

8         27.    Google also took the position during the meet and confer that it did not need to
9    produce any logs that are "Search" logs notwithstanding whether the logs contain the
10   "maybe_chrome_incognito" field. But the Special Master in December already deemed Search
11   logs to be within the scope of the process, particularly for class identification process.

12        28.    Last November, following a document production, Plaintiffs were alarmed to
13   realize that one of logs that Mr. Leung was studying, the █████████████, had not yet been
14   disclosed. Plaintiffs promptly brought this missing log to the Special Master, and after reviewing
15   the documents, he directed Google to produce the log schema for the log and to run searches of
16   the log. Special Master Brush thus overruled Google's objection that the log was irrelevant insofar
17   as it was a "Search" log. From that point forward, Google was indisputably on notice that it could
18   not withhold logs on the basis of the log being a "Search" log, particularly any log that Mr. Leung
19   studied for his analysis, let alone a log in which Mr. Leung actually implemented the Incognito
20   detection field.

21        29.    Google has since then refused to tell Plaintiffs which other logs Mr. Leung
22   evaluated in the early stages of his "log analysis of Chrome Incognito." After Special Master Brush
23   overruled Google's objection on the █████████ log, Plaintiffs asked Google whether any
24   other logs that Mr. Leung studied had been withheld. Counsel for Google never responded to
25   Plaintiffs' multiple requests. *Id.*

26        30.    Plaintiffs then propounded an interrogatory asking Google to "identify *every* log
27   and data source that Google reviewed, analyzed, or searched as part of Google's efforts to conduct

28

a 'log analysis of Chrome Incognito' in and around mid-2020. *See, e.g.*, GOOG-CABR-05280756." Google did not answer that question, either. Google instead evaded it by merely quoting back ***one*** of the logs that was already mentioned in the email that Plaintiffs cited. ("Google used ███████████ in the analysis of Ad Manager browsing traffic described in GOOG-CABR-05280756."). Google's evasion was improper. Google has subsequently clarified in meet-and-confers that Mr. Leung's analysis was not limited to the logs mentioned in this one document, and yet Plaintiffs still do not have a complete list of every data source that Mr. Leung studied, much less a complete list of the logs in which ==<mark>"maybe_chrome_incognito"</mark>== field has officially been implemented.

31.    Over the course of the past week, Plaintiffs have asked Google to remedy the prejudice it has caused in multiple, reasonable ways: (a) by producing Mandy Liu's custodial documents that hit on limited search terms tied to her work with Mr. Leung concerning the ==<mark>"maybe_chrome_incognito"</mark>== field and permitting a 2-hour deposition of her; (b) by extending the fact discovery cut-off so that Plaintiffs can complete their discovery of Plaintiffs' data and the ==<mark>"maybe_chrome_incognito"</mark>== field; and (c) by identifying every other log that contains the ==<mark>"maybe_chrome_incognito"</mark>== bit and promptly producing all schema, all field names, and all field descriptions from such logs (and subsequently searching them and producing full results). Google has simply refused.

32. Attached hereto as **Exhibit 1** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845639. The document was produced on February 18, 2022.

33. Attached hereto as **Exhibit 2** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845596. The document was produced on February 18, 2022.

34. Attached hereto as **Exhibit 3** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845423. The document was produced on February 18, 2022.

35. Attached hereto as **Exhibit 4** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00023909. The document was produced on February 1, 2021.

36. Attached hereto as **Exhibit 5** is a true and correct copy of Plaintiffs' Interrogatories Set 2.

37. Attached hereto as **Exhibit 6** is a true and correct copy of Google's Responses and Objections Plaintiffs' Interrogatories Set 2.

38. Attached hereto as **Exhibit 7** is a true and correct copy of a February 21, 2022 email exchange between counsel for Plaintiffs and counsel for Google.

39. Attached hereto as **Exhibit 8** are excerpts from the December 2, 2021 deposition of Google employee Chris Liao.

40. Attached hereto as **Exhibit 9** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845312. The document was produced on February 18, 2022.

41. Attached hereto as **Exhibit 10** is a true and correct copy of a document Google Produced in discovery labeled GOOG-BRWN-00845569. The document was produced on February 18, 2022.

42.  Attached hereto as **Exhibit 11** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845277. The document was produced on February 18, 2022.

43. Attached hereto as **Exhibit 12** are excerpts from a document Google produced in discovery labeled GOOG-CABR-05144884. The document was produced on November 16, 2021.

44. Attached hereto as **Exhibit 13** is a true and correct copy of Google's Responses and Objections to Plaintiffs' First Set of Requests for Production (Nos. 1-19).

45. Attached hereto as **Exhibit 14** is a true and correct copy of a document Google produced in discovery labeled GOOG-CABR-04324934. The document was produced on October 5, 2021.

46. Attached hereto as **Exhibit 15** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845477. The document was produced on February 18, 2022.

47. Attached hereto as **Exhibit 16** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845481. The document was produced on February 18, 2022.

48. Attached hereto as **Exhibit 17** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845437. The document was produced on February 18, 2022. Part of the document is not visible because of how Google produced it. Plaintiffs consulted the metadata for the full text.

49. Attached hereto as **Exhibit 18** is a true and correct copy of a document Google produced in discovery labeled GOOG-CABR-05280756. The document was produced on November 24, 2021.

50. Attached hereto as **Exhibit 19** are excerpts of Google's Responses and Objections to Plaintiffs' Ninth Set of Interrogatories.

51. Attached hereto as **Exhibit 20** is a true and correct copy of a February 23, 2022 email exchange between counsel for Plaintiffs and counsel for Google.

52. Attached hereto as **Exhibit 21** is a true and correct copy of a document Google produced in discovery labeled GOOG-CABR-05757329. The document was produced on January 31, 2022.

53. Attached hereto as **Exhibit 22** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845281. The document was produced on February 18, 2022.

54. Attached hereto as **Exhibit 23** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00845275. The document was produced on February 18, 2022.

55. Attached hereto as **Exhibit 24** is a true and correct copy of a document Google

1    produced in discovery labeled GOOG-BRWN-00845274. The document was produced on

2    February 18, 2022.

3         56. Attached hereto as **Exhibit 25** is a true and correct copy of a document Google

4    produced in discovery labeled GOOG-CABR-03668216. The document was produced on

5    September 24, 2021.

6

7         I declare under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.  Executed this 25th day of February, 2022, at Freemont, California.

9                                                    */s/ Mark Mao*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# FILED UNDER SEAL

Message

| | |
|---|---|
| **From**: | Google Forms [forms-receipts-noreply@google.com] |
| **Sent**: | 6/9/2020 12:15:35 AM |
| **To**: | bertleung@google.com |
| **Subject**: | PWG-Display Sellside Silo Office Hours Booking |



## Thanks for filling out PWG-Display Sellside Silo Office Hours Booking

Here's what we got from you:

# PWG-Display Sellside Silo Office Hours Booking

Complete this form to book a slot for PWG-Display Office Hours. If you've booked a slot and need to cancel, please ping/email katrinaswanson@.

Your email address (**bertleung@google.com**) was recorded when you submitted this form.

Top of Form

## What is your primary goal for attending Office Hours? *
Select the first option that applies.

I was asked by a PWG representative (Display or otherwise) to attend PWG-Display Office Hours

I need the privacy bit for my launch approved

I have a few simple privacy questions or concerns

I have multiple or complex privacy questions / concerns

**Project Details**

Help us help you help us all. Details about your project help us get the right folks in the room so that we can most efficiently answer your questions!

CONFIDENTIAL

GOOG-BRWN-00845639

What is the name of your project/launch? *

Detect 3P Cookies Blocking Browsers

Who is the presenter? *

Please enter the presenter's username. This could be you or another person.

bertleung

Who else should be invited to the Office Hours slot? *

Comma separated list of usernames. If you're not the presenter but need to attend, add yourself!

bertleung

What is this launch/product about? Give the elevator pitch, providing a quick summary to someone who has no idea what you do. *

Detect 3P cookie blocking browsers (Safari ITP, Firefox ETP, Chrome Incognito, etc) in ad serving, and log this information for monitoring and analysis.

In your opinion, what are the privacy or other vulnerabilities? Do you propose any mitigation? *

Potential privacy risk of logging inferred Chrome Incognito detection, would like to get feedback from privacy gurus.

If you have an Ariane launch, please link it below: *

Not yet.

Please link to any relevant docs, including design docs, presentation decks, etc. *

go/3p-blocking-browsers

If this is not a first launch, what is the delta from the last time it was reviewed by the Privacy team? *

GOOG-BRWN-00845640

This is the first design.

Have you visited PWG-Display office hours before for this topic? Include the date if you remember it. *

This is the first time.

Have you consulted directly with anyone in any PWG or the Ads Privacy team outside of Office Hours? If so, who? *

This includes anyone from the Ads Internal Controls team, Ads Transparency and Control team, Serving Ads Privacy Team, Ads Identity, or Ads Partner Policy team.

No.

Have you been in contact with your PCounsel regarding this launch? If so, please include their LDAP. *

Not sure who your PCounsel is? Check https://goto.google.com/whichlawyer

Not yet.

**Booking Details**

Tell us when you want to attend Office Hours!

When would you like to attend Office Hours? *

If none of the available options work for you, please reach out to pwg-display@.

Thu Jun 18 2020 10:30:00 GMT-0700 (Pacific Daylight Time)

Thu Jun 18 2020 10:45:00 GMT-0700 (Pacific Daylight Time)

Thu Jun 25 2020 10:30:00 GMT-0700 (Pacific Daylight Time)

GOOG-BRWN-00845641

Thu Jun 25 2020 10:45:00 GMT-0700 (Pacific Daylight Time)


Thu Jul 09 2020 10:30:00 GMT-0700 (Pacific Daylight Time)

Thu Jul 09 2020 10:45:00 GMT-0700 (Pacific Daylight Time)

Bottom of Form

Create your own Google Form

EXHIBIT 2

FILED UNDER SEAL

---

**Message**

---

**From**:      Mandy Liu (Google Docs) [comments-noreply@docs.google.com]
**Sent**:      10/6/2020 12:34:54 AM
**To**:      bertleung@google.com
**Subject**:      Detect 3P Cookie ... - nit: we will need a more scary name t...

---

## Mandy Liu resolved a comment in the following document

Detect 3P Cookie Blocking Browser Technical Design

maybe_chrome_incognito

     Bert Leung

     nit: we will need a more scary name to deter un-approved usages.

     Mandy Liu
     New

     *Marked as resolved*

     Open

---

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you are a participant in this thread. Change what Google Docs sends you. You can reply to this email to reply to the discussion.

GOOG-BRWN-00845596

# EXHIBIT 3

# Redacted in its
# Entirely

EXHIBIT 4

Redacted in its
Entirely

# EXHIBIT 8

## Redacted Version of Document Sought to be Sealed

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN JOSE DIVISION
 4                        ---o0o---
 5   PATRICK CALHOUN, et al.,       )
     on behalf of themselves and    )
 6   all others similarly           )
     situated,                      )
 7                                  )
              Plaintiffs,           )Case No.
 8                                  )5:20-cv-5146-LHK-SVK
     vs.                            )
 9                                  )
     GOOGLE LLC,                    )
10                                  )
              Defendant.            )
11   _____   )
     CHASOM BROWN, et al.,          )
12   on behalf of themselves and    )
     all others similarly           )
13   situated,                      )
                                    )
14            Plaintiffs,           )Case No.
                                    )5:20-cv-03664-LHK
15   vs.                            )
                                    )
16   GOOGLE LLC,                    )
                                    )
17            Defendant.            )
     _____   )
18
                          ---o0o---
19             Videotaped Zoom Deposition of
20                 HUEI-HUNG (CHRIS) LIAO
21            CONFIDENTIAL, ATTORNEYS' EYES ONLY
22               Friday, December 3, 2021
23                        ---o0o---
24
     Katy E. Schmidt
25   RPR, RMR, CRR, CSR 13096
     Veritext Job No.: 4962198
```

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 2**

```
 1       IN THE UNITED STATES DISTRICT COURT
 2    FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3            SAN JOSE DIVISION
 4            ---o0o---
 5  PATRICK CALHOUN, et al ,     )
    on behalf of themselves and  )
 6  all others similarly         )
    situated,                    )
 7                               )
        Plaintiffs,  )Case No
 8                )5:20-cv-5146-LHK-SVK
    vs                           )
 9                               )
    GOOGLE LLC,         )
10                               )
        Defendant     )
11  _____)
    CHASOM BROWN, et al ,        )
12  on behalf of themselves and  )
    all others similarly         )
13  situated,                    )
                                 )
14      Plaintiffs,  )Case No
                  )5:20-cv-03664-LHK
15  vs                           )
                                 )
16  GOOGLE LLC,         )
                                 )
17      Defendant     )
    _____)
18
        BE IT REMEMBERED that, pursuant to Notice, and
19  on Friday, the 3rd day of December, 2021, commencing at
    the hour of 9:05 a m , thereof, in Sunnyvale,
20  California, before me, KATY E  SCHMIDT, a Certified
    Shorthand Reporter in and for the County of Yolo, State
21  of California, there virtually personally appeared
22      HUEI-HUNG (CHRIS) LIAO
23  called as a witness herein, who, being by me first duly
    sworn, was thereupon examined and interrogated as
24  hereinafter set forth
25
```

**Page 3**

```
 1  APPEARANCES:
 2  For The Plaintiffs:
 3       (Appeared via Zoom)
 4  BLEICHMAR FONTI & AULD LLP
    BY: LESLEY WEAVER, Esq
 5  555 12th Street, Suite 1600
    Oakland, California 994607
 6  415 445 4003
    lweaver@bfalaw.com
 7
         (Appeared via Zoom)
 8
    SIMMONS HANLY CONROY
 9  BY: JASON "JAY" BARNES, Esq
    BY: AN TRUONG, Esq
10  One Court Street
    Alton, Illinois 62002
11  618 693 3104
    jaybarnes@simmonsfirm com
12
         (Appeared via Zoom)
13
    BOIES SCHILLER FLEXNER LLP
14  BY: MARK MAO, Esq
    BY: BEKO RICHARDSON, Esq
15  BY: ERIKA NYBORG-BURCH, Esq
    44 Montgomery Street, 41st Floor
16  San Francisco, California 94104
    415 293 6800
17  mmao@bsfllp com
18  For The Defendants:
19       (Appeared via Zoom)
20  Quinn Emanuel Urquhart & Sullivan LLP
    BY: JOSEF ANSORGE, Esq
21  BY: TRACY GAO, Esq
    51 Madison Avenue, 22nd Floor
22  New York, New York 10010
    212 849 7000
23
    josefansorge@quinnemanuel com
24  ///
25  ///
```

**Page 4**

```
 1  APPEARANCES CONTINUED:
 2  Also present:
 3       David West, Videographer
 4       Ryan McGee, In-house counsel
 5       Toni Baker, In-house counsel
 6
            ---o0o---
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          INDEX OF EXAMINATION
 2            ---o0o---
 3                    Page
 4  Examination by Mr. Mao          09
 5  Examination by Mr. Ansorge         197
 6            ---o0o---
 7
 8      QUESTIONS INSTRUCTED NOT TO ANSWER
 9
10       Page    Line
11
12       (NOTHING OFFERED.)
13            ---o0o---
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 122**

1 BY MR. MAO:                                          12:53
2    Q.  Good afternoon, Mr. Liao.                     12:53
3        If I can trouble you to pull Exhibit No. 4.   12:53
4 Thank you.                                           12:53
5    A.  Exhibit No. 4.                                12:53
6    Q.  Yeah.  It's the "Ads Identity &               12:53
7 Infrastructure" document again.                      12:53
8    A.  I have it.                                     12:53
9    Q.  If you don't mind going to page 11, which is  12:53
10 on the bottom 24.  It should be -- let's see -- that 12:53
11 page.  I know it's a very long document.             12:53
12    A.  I have it.                                    12:53
13    Q.  Okay.  Great.                                 12:54
14        By the way, were you the author or one of the 12:54
15 authors of this presentation?                        12:54
16    A.  Yes.                                          12:54
17    Q.  On the top right there, what exactly is an    12:54
18 identity handler?                                    12:54
19    A.  I believe I created this slide, but I borrowed 12:54
20 some graphics created earlier by other people.  And the 12:54
21 diagrams containing the identity handler was one of the 12:54
22 graphics I borrowed.                                 12:54
23        In this case, I think identity handlers refers 12:54
24 to what eventually became [REDACTED]               12:54
25    Q.  Got it.                                       12:54

**Page 123**

1        And so this is an older -- this is the old    12:54
2 original serving model and not the current [REDACTED] serving 12:54
3 model.                                                12:54
4        Is that right?  Or do I have that wrong?      12:54
5    A.  As I stated, I did not create the graphics on  12:55
6 this particular slide.  So I think some of the graphics 12:55
7 does look outdated, including referring -- having     12:55
8 referred to [REDACTED] with a different name.        12:55
9    Q.  Okay.  But I think what you're trying to --   12:55
10 what you were trying to show in the middle column of  12:55
11 these three columns is that the identity handler --   12:55
12    A.  Oh, that's my Nest thermal detector auto      12:55
13 testing.  I apologize for the disruption.            12:55
14    Q.  Oh, no worries.  I've had that happen before  12:55
15 with my Nest.                                         12:55
16        That middle column, were you trying to show   12:55
17 with that middle column that the identity handler is  12:55
18 handling data that goes into the stack from both I guess 12:56
19 P-logs and B-logs?                                    12:56
20        MR. ANSORGE:  Objection.  Vague.              12:56
21        THE WITNESS:  I believe the middle diagram is 12:56
22 trying to explain the forms of identity that come into 12:56
23 [REDACTED] does not produce P-logs or B-logs.       12:56
24 BY MR. MAO:                                           12:56
25    Q.  But it accesses a variant of the data from the 12:56

**Page 124**

1 P-logs and B-logs or variance from P-logs and B-logs?  12:56
2    A.  No.                                            12:56
3    Q.  So what is the identity handler there doing    12:56
4 with regard to P-logs and B-logs?                     12:57
5    A.  In the middle diagram, the identity handler is 12:57
6 not directly interacting with P-logs and B-logs.      12:57
7    Q.  What instead is it doing?                      12:57
8    A.  I believe the diagram is trying to convey, for 12:57
9 example, encrypted Biscotti cookie coming from the    12:57
10 external world.  And then the identity handler, which  12:57
11 eventually became [REDACTED] handles it by decrypting and then 12:57
12 later re-encrypting into other -- using other forms of 12:57
13 encryption, and then making the correct identity signals 12:57
14 and privacy instructions available to the rest of this 12:57
15 stack, which, I believe, is represented by the larger 12:58
16 box at the middle of the graphic.                     12:58
17    Q.  So what my -- is something wrong with my       12:58
18 phraseology in saying that [REDACTED] in this situation would 12:58
19 be handling data from both P-logs and B-logs?         12:58
20        How would I state that properly?              12:58
21        MR. ANSORGE:  Objection.  Vague.  Form.       12:58
22        THE WITNESS:  I'm not exactly sure.  But I    12:58
23 can -- I can -- my understanding is that [REDACTED] in this 12:58
24 case is processing identity signals as they come from 12:58
25 the external world, and that [REDACTED] is not directly 12:58

**Page 125**

1 producing P-logs or B-logs.                           12:58
2 BY MR. MAO:                                            12:58
3    Q.  Got it.                                         12:58
4        So are these signals coming in from the        12:58
5 external world the same signals that would have -- or I 12:58
6 guess variants of the signals that went into the P-logs 12:59
7 and B-logs?                                            12:59
8    A.  I can't speak to the full extent of the        12:59
9 information that goes into P-logs and B-logs.  But     12:59
10 identity signals and privacy instructions under some  12:59
11 circumstances can be present in P-logs and B-logs.     12:59
12    Q.  Got it.                                         12:59
13        So I think you were asked about this           12:59
14 yesterday, if you don't mind going down to page --    12:59
15 sorry.  My .pdf number is not coming up for some      12:59
16 reason -- page 13.                                     12:59
17    A.  Page 13.                                        12:59
18    Q.  Which is 26 on the bottom.                      12:59
19    A.  26.  I have it.                                 12:59
20    Q.  It's -- yeah.  It's this chart, this one that  12:59
21 you were asked about yesterday.                        01:00
22    A.  I have it.                                      01:00
23    Q.  Yep.  Great.                                    01:00
24        So with regard to this chart, I guess are     01:00
25 Gaia cookies and Biscotti cookies here in the middle and 01:00

**Page 126**

1 also PPID on the right there, are these all external    01:00
2 signals -- I'm sorry -- signal -- identity signals    01:00
3 coming in from the external world?    01:00
4    A. Yes.    01:00
5    Q. And that is getting parsed on the top right    01:00
6 where it says the "Parsing Layer." And where does ▇    01:00
7 sit in this chart?    01:00
8    A. In this chart, ▇ is represented by the    01:00
9 larger bounding box containing the individual smaller    01:00
10 boxes.    01:00
11    Q. Got it. Okay.    01:00
12       So ▇ is the bigger gray box covering all the    01:01
13 yellow boxes.    01:01
14       And I guess are you trying to convey that it's    01:01
15 ingesting the different identity signals coming in from    01:01
16 the external world to move downward in the process in    01:01
17 terms of what comes out?    01:01
18       MR. ANSORGE: Objection. Vague and form.    01:01
19 BY MR. MAO:    01:01
20    Q. I'm just trying to understand literally what    01:01
21 you're trying to convey with this graph.    01:01
22    A. The graph is trying to describe the    01:01
23 internal -- some of the internal components of ▇ by    01:01
24 their logical functional grouping.    01:01
25    Q. Ah. Got it.    01:01

**Page 127**

1       And then if you move down one more page, and    01:01
2 you were asked about this as well yesterday, which is    01:01
3 page 13, and on the bottom it should be 27.    01:01
4    A. 27.    01:02
5    Q. Yeah.    01:02
6    A. I have it.    01:02
7    Q. Yep. This one?    01:02
8    A. Yes.    01:02
9    Q. Is this entire yellow box part of ▇ or    01:02
10 where does ▇ sit on this chart? And let me give you a    01:02
11 little bit of idea of why I'm asking this.    01:02
12       I'm trying to understand -- you see everything    01:02
13 that's on the right side because it looks to me like    01:02
14 this is going from left to right.    01:02
15       I'm trying to understand if everything that    01:02
16 comes out on the right-hand side there from, you know,    01:02
17 "Biscotti cookie" on the top, all the way down to the    01:02
18 bottom to the "GFP Cookie," are these all outputs and    01:02
19 responsibilities that, you know, ▇ is responsible for    01:02
20 or is this some other part of the layer? Or some other    01:02
21 process? Sorry. I'm trying to understand.    01:02
22       MR. ANSORGE: Objection. Form and compound.    01:02
23       THE WITNESS: I -- as I stated yesterday, I    01:03
24 did not personally create this particular slide,    01:03
25 although I included it in the presentation deck.    01:03

**Page 128**

1       I believe the parsing layer, the enrichment    01:03
2 layer, and the selection layer, I believe they    01:03
3 correspond to the previous diagram with the layers of    01:03
4 the same names.    01:03
5       This one is the diagram I drew. I don't know    01:03
6 if the entire yellowish box on this slide 14 refers to    01:03
7 ▇ or not, but I think the three layers represented on    01:03
8 this slide do represent the same layers that I had    01:03
9 designated for ▇ on the previous slide.    01:03
10 BY MR. MAO:    01:04
11    Q. Got it. Got it.    01:04
12       So you would probably say at least for what's    01:04
13 sandwiched between the green end red layer and    01:04
14 everything in between, that's essentially what would    01:04
15 correspond to the gray portion in the prior graph in the    01:04
16 prior page?    01:04
17    A. I think so.    01:04
18    Q. Got it. Okay. That's super helpful. Thank    01:04
19 you so much.    01:04
20       (Plaintiffs' Exhibit 25 was    01:04
21       marked for identification.)    01:04
22 BY MR. MAO:    01:04
23    Q. If you don't mind, I had introduced into    01:04
24 Exhibit -- let me just make sure I have the right number    01:04
25 here. Sorry. It should be Exhibit No. 25. Would you    01:04

**Page 129**

1 mind pulling that?    01:04
2    A. Exhibit 25.    01:04
3    Q. I think it's "ID Enrichment."    01:04
4    A. I have it.    01:04
5    Q. Yeah. Take some time to familiarize yourself    01:04
6 with it.    01:04
7       And my first question to you is basically    01:04
8 going to be have you seen this before?    01:04
9    A. I don't recall seeing it. I may have been    01:05
10 present in the room the presentation was given, but I    01:05
11 have no recollection at this moment.    01:05
12    Q. Got it.    01:05
13       Would you mind going to page 4, which is 59 on    01:05
14 the bottom right?    01:05
15    A. Can I take a brief moment to read through --    01:05
16    Q. Of course. Please. Please do. Thank you so    01:05
17 much.    01:05
18    A. Okay.    01:06
19    Q. I'm still at page -- sorry. Not complaining    01:06
20 about the deposition software -- page 3 on the bottom    01:06
21 right.    01:06
22    A. Page 3.    01:06
23    Q. Yeah. Bottom right. It would be 59.    01:06
24    A. 59.    01:06
25    Q. Yes.    01:06

33 (Pages 126 - 129)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 A. Okay. I have it.   01:06
2 Q. This looks to me to basically be a variant of   01:06
3 your prior graph, I think.   01:07
4 You could take a look --   01:07
5 A. It appears so.   01:07
6 Q. Yeah.   01:07
7 So my question to you, and I think -- I think   01:07
8 Mr. Barnes asked this, either from this graph or the   01:07
9 graph like you saw before on the other exhibit that was   01:07
10 right below this.   01:07
11 I think my question to you is -- I think --   01:07
12 oh, yes. There, I see it. It's been grayed out.   01:07
13 You see on the top right, right under "Parse   01:07
14 PPID," there's a "Parse privacy req params"?   01:07
15 Again, I might be referring to the wrong one   01:07
16 of two graphs. But I believe that you said that that's   01:07
17 parsing whether or not the incoming signal from the   01:07
18 external world contains a privacy preference or setting   01:07
19 of some type.   01:07
20 Is that -- do I have that right?   01:08
21 MR. ANSORGE: Objection. Mischaracterizes   01:08
22 prior testimony.   01:08
23 THE WITNESS: For the box of "parse privacy   01:08
24 req," which stands for "request," parameters, the   01:08
25 purpose of this piece of logic is to parse the URL   01:08

Page 130

1 parameters that are related to privacy treatment as we   01:08
2 receive from the URL network request itself.   01:08
3 As I stated yesterday, I believe some of the   01:08
4 examples of such a URL can be, for example, GDPR, which   01:08
5 indicates to our systems that applicable GDPR behaviors   01:08
6 have to be enabled for this particular ad query.   01:08
7 I believe another example I gave was TFCD,   01:08
8 which stands for "treat for child directed." I believe   01:09
9 the presence of the parameter enables our systems to   01:09
10 treat the ad query with the necessary child directed   01:09
11 treatments.   01:09
12 BY MR. MAO:
13 Q. Got it. Got it.   01:09
14 As far as you're aware, amongst these privacy   01:09
15 signals, is there one for incognito mode browsing on   01:09
16 Chrome?   01:09
17 A. No.   01:09
18 Q. Is there a reason that you're aware as to why   01:09
19 that would not be a privacy req parameter for [redacted]?   01:09
20 MR. ANSORGE: Objection. Form.   01:09
21 THE WITNESS: I am not aware of a URL   01:09
22 parameter that would indicate incognito mode.   01:09
23 BY MR. MAO:   01:09
24 Q. What about a parameter specifically to signal   01:09
25 to [redacted] to parse out that, oh, this is incognito mode   01:09

Page 131

1 traffic?   01:10
2 A. There is no explicit signal to identify   01:10
3 incognito mode traffic.   01:10
4 Q. Were you ever involved in any discussions on   01:10
5 whether or not [redacted] should be designed to receive and   01:10
6 parse such a signal?   01:10
7 A. I was involved in projects having to work with   01:10
8 incognito mode.   01:10
9 Q. Was there a discussion on whether or not that   01:10
10 should be a signal to [redacted]? Whether or not that design   01:10
11 should include, you know, a signal to [redacted] saying that   01:10
12 the user or device was browsing in incognito mode?   01:10
13 A. I do not recall if there was a specific   01:10
14 discussion around using the URL parameter as a signal   01:10
15 to [redacted] to indicate incognito mode.   01:10
16 But as I stated, I was involved in projects   01:11
17 related to incognito mode.   01:11
18 Q. How about amongst those projects that you were   01:11
19 involved, were there any discussions on whether or not   01:11
20 there were any other types of signals other than a URL   01:11
21 parameter signal for incognito traffic that would be   01:11
22 given to [redacted] at the --   01:11
23 MR. ANSORGE: Objection.   01:11
24 MR. MAO: Sorry. It was at the parsing layer,   01:11
25 Ms. Court Reporter.   01:11

Page 132

1 Yeah. Go ahead, Joey, please.   01:11
2 MR. ANSORGE: Yeah. Objection. Vague.   01:11
3 THE WITNESS: Can you clarify which part of   01:11
4 you're referring to in this question?   01:11
5 BY MR. MAO:   01:11
6 Q. Sure. Sure.   01:11
7 I'm looking at the parsing layer. And my   01:11
8 understanding of that is that that's the first layer   01:11
9 that kind of hits [redacted] that says, hey, here are all the   01:11
10 signals coming from the external world in which, you   01:11
11 know, like might be relevant, you know, for terms of   01:11
12 UIS digesting and then spitting out whatever it spits   01:11
13 out on the other end.   01:11
14 My question is -- you limited your prior   01:11
15 answers to a URL signal for [redacted] and you not being aware   01:12
16 of that being a discussion.   01:12
17 My question to you is whether or not you're   01:12
18 aware of a discussion or proposal on a non-URL signal   01:12
19 that would be sent to [redacted]?   01:12
20 A. I do not recall the specifics of such a   01:12
21 discussion. I do not recall if such a discussion --   01:12
22 specific discussion happened.   01:12
23 But as I stated, I was involved in projects   01:12
24 that have -- have to do with incognito mode. And there   01:12
25 was discussion around proxy signals that we can use to   01:12

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 approximate incognito traffic. However, we were not    01:12
2 able to identify any definitive or reliable signal to    01:12
3 identify incognito mode in the end.    01:12
4      Q.   That's based on existing signals or is that    01:12
5 based on signals that you can build?    01:13
6          MR. ANSORGE:  Objection.  Vague.    01:13
7          THE WITNESS:  The conversations were based on    01:13
8 signals that existed at the time.  We did not, to my    01:13
9 best knowledge, go on to build any dedicated signals    01:13
10 afterwards either.    01:13
11 BY MR. MAO:    01:13
12      Q.   What was the reason you didn't build any    01:13
13 dedicated signals afterwards to ███?    01:13
14          MR. ANSORGE:  Objection.  Foundation.    01:13
15          THE WITNESS:  There was -- after those    01:13
16 conversations, it was determined that there was no    01:13
17 reliable way to technically detect incognito in a    01:13
18 definitive and reliable and accurate manner.  And as a    01:13
19 result, no further action was taken to build such a    01:13
20 hypothetical signal.    01:14
21 BY MR. MAO:    01:14
22      Q.   And that was within the confines of the    01:14
23 existing architecture?  Because you said that you didn't    01:14
24 then build any new dedicated signals, right, for    01:14
25 incognito mode.    01:14

Page 134

1          And my question is can you build that?    01:14
2          MR. ANSORGE:  Objection.  Vague.  Foundation.    01:14
3          THE WITNESS:  I'm not certain if we can build    01:14
4 that or not.    01:14
5 BY MR. MAO:    01:14
6      Q.   Why are you not certain?    01:14
7      A.   Because of the technical constraints that I    01:14
8 mentioned because of the lack of a reliable way of    01:14
9 detecting incognito, I'm not sure if such a signal can    01:14
10 be built.    01:14
11      Q.   So tell me a little bit about what was the    01:14
12 problem that you ran into when you were trying to detect    01:14
13 in incognito mode?    01:14
14          MR. ANSORGE:  Objection.  Vague.    01:14
15          THE WITNESS:  I can't comment on the detailed    01:15
16 implementation of Chrome so I can only comment from an    01:15
17 ads perspective.    01:15
18          We were not able to reliably detect incognito    01:15
19 mode because there is no apparent differences or signals    01:15
20 that are unique to the incognito mode as opposed to    01:15
21 non-incognito mode.    01:15
22          For example, incognito mode blocks third-party    01:15
23 cookies today but third-party cookies can also be absent    01:15
24 for a large number of other reasons that are not a    01:15
25 result of incognito mode.    01:15

Page 135

1 BY MR. MAO:    01:15
2      Q.   Did you explore whether or not you would use    01:15
3 the X-Client-Data header as a signal?    01:15
4      A.   Yes.    01:15
5      Q.   And what was the conclusion on that?    01:16
6      A.   We did explore the use of X-Data -- User    01:16
7 Data -- Data User header -- I apologize.  I don't have    01:16
8 the exact code name.    01:16
9          In the end it was determined that the accuracy    01:16
10 of using that header as the indication for incognito    01:16
11 mode is rather low.  And, again, I am not a Chrome    01:16
12 engineer, so I do not know the specifics around the    01:16
13 header.    01:16
14          My understanding is that the absence of the    01:16
15 header can be due to a variety of reasons, one of which    01:16
16 can be incognito mode, but it can also -- the header can    01:16
17 also be absent for a large number of other reasons.    01:16
18      Q.   Right.    01:16
19          But you would agree that at least in Chrome,    01:16
20 all incognito traffic would not include the    01:16
21 X-Client-Data header generally.    01:16
22          Isn't that correct?    01:17
23          MR. ANSORGE:  Objection.  Vague.  Form and    01:17
24 foundation.    01:17
25          THE WITNESS:  Again, I'm not a Chrome    01:17

Page 136

1 engineer, so I do not know the exact conditions under    01:17
2 which the header may or may not be sent.    01:17
3          My understanding is in general, incognito mode    01:17
4 will not carry that header, but also a large number of    01:17
5 scenarios will also lead to the absence of the header.    01:17
6 BY MR. MAO:    01:17
7      Q.   Right.    01:17
8          But are you aware of situations where the    01:17
9 X-Client-Data header would be included in incognito    01:17
10 mode?    01:17
11          MR. ANSORGE:  Objection --    01:17
12          THE WITNESS:  No.    01:17
13          MR. ANSORGE:  -- vague.  Form and foundation.    01:17
14 BY MR. MAO:    01:17
15      Q.   So you say "No."    01:17
16          Is the reason for -- so it sounds like what    01:17
17 you're saying is that inaccuracy is one of    01:17
18 over-inclusiveness; right?  In other words, you're    01:17
19 saying the lack of the X-Client-Data header, even though    01:17
20 you're not aware of incognito mode ever carrying the    01:17
21 X-Client-Data header, the lack of the X-Client-Data    01:17
22 header to you, as a non-Chrome engineer, at least is not    01:17
23 indicative of the incognito mode.    01:18
24          Did I say that correctly?    01:18
25          MR. ANSORGE:  Objection.  Form and narrative.    01:18

Page 137

35 (Pages 134 - 137)

| | |
|---|---|
| 1 THE WITNESS: As far as I'm aware -- and I do 01:18 | 1 Do I understand your questions correctly? 01:20 |
| 2 not know the specific implementation of the Chrome 01:18 | 2 Q. Yes. We can answer it in that order. That's 01:20 |
| 3 header in question here. 01:18 | 3 perfectly fine. 01:20 |
| 4 But my general understanding is incognito mode 01:18 | 4 Let's start with the logs and then let's start 01:21 |
| 5 does not carry this header. I do not know if the 01:18 | 5 with ▓ ability in that role. 01:21 |
| 6 opposite is true or not. 01:18 | 6 A. As I stated before, we do not have a reliable 01:21 |
| 7 BY MR. MAO: 01:18 | 7 signal to infer incognito mode at this time we receive 01:21 |
| 8 Q. Got it. 01:18 | 8 an ad query. And as a result, we are also unable to 01:21 |
| 9 So are there not other ways that can be custom 01:18 | 9 infer incognito mode using the same set of signals from 01:21 |
| 10 built to signal to ▓ that, hey, this is incognito 01:18 | 10 the logs. 01:21 |
| 11 traffic? 01:18 | 11 Q. So you would have no way of looking at the 01:21 |
| 12 MR. ANSORGE: Objection. Form. 01:18 | 12 logs and knowing what is incognito mode traffic to be 01:21 |
| 13 THE WITNESS: As I stated earlier, there isn't 01:18 | 13 removed, if I needed to remove incognito traffic or not. 01:21 |
| 14 a reliable signal that we are aware of that can be used 01:18 | 14 Isn't that correct? 01:21 |
| 15 to infer incognito mode. And as a result, I cannot 01:19 | 15 A. To the best of my knowledge, there exists no 01:21 |
| 16 think of a way of building a mechanism to reliably 01:19 | 16 way to definitively know the incognito state of a given 01:21 |
| 17 detect incognito mode. 01:19 | 17 ad query. 01:21 |
| 18 BY MR. MAO: 01:19 | 18 Q. If the Court were in this case to order Google 01:21 |
| 19 Q. At least from the ▓ side; right? Or is your 01:19 | 19 to delete all log entries containing incognito traffic, 01:21 |
| 20 opinion also opining on whether or not Chrome can be 01:19 | 20 at least sitting from the perspective of the head of 01:22 |
| 21 built to convey that this is incognito mode? 01:19 | 21 product of ▓ is there a way in which you can see 01:22 |
| 22 A. I cannot speak for Chrome. 01:19 | 22 within your purview of how we go about doing that? 01:22 |
| 23 Q. Even though you're not a Chrome engineer, you 01:19 | 23 MR. ANSORGE: Objection. Form. Vague. And 01:22 |
| 24 would agree with me that surely Chrome can be built to 01:19 | 24 incomplete hypothetical. 01:22 |
| 25 signal that something is in incognito mode, wouldn't you 01:19 | 25 THE WITNESS: Because of the lack of reliable 01:22 |
| Page 138 | Page 140 |

| | |
|---|---|
| 1 agree? 01:19 | 1 signals to infer incognito mode, we will not be able to 01:22 |
| 2 MR. ANSORGE: Objection. Form. Foundation. 01:19 | 2 definitively identify incognito traffic or log entries 01:22 |
| 3 THE WITNESS: I do not have the necessary 01:19 | 3 from this system. 01:22 |
| 4 knowledge to assess that statement. 01:19 | 4 BY MR. MAO: 01:22 |
| 5 BY MR. MAO: 01:19 | 5 Q. Got it. 01:22 |
| 6 Q. Okay. So then let me ask you the opposite. 01:19 | 6 Let me move down two pages on this exhibit to 01:22 |
| 7 As a result of that, how would ▓ when it's 01:19 | 7 Exhibit -- page 61 there -- it's page 6, 01:22 |
| 8 looking at the traffic that has already been generated, 01:19 | 8 dash 61 on the bottom. 01:23 |
| 9 know whether or not something was in incognito mode? 01:19 | 9 A. Dash 61. I have it. 01:23 |
| 10 MR. ANSORGE: Objection. Vague. Form. 01:19 | 10 Q. Great. 01:23 |
| 11 BY MR. MAO: 01:19 | 11 My question to you is -- and I'm going to give 01:23 |
| 12 Q. Let me give you a better example, something a 01:20 | 12 you some time to look at this. 01:23 |
| 13 little more clear. 01:20 | 13 My question to you is what is that thing all 01:23 |
| 14 If I were to say I wanted to delete all 01:20 | 14 the way on the right there, "Aggregated Unified 01:23 |
| 15 entries of logins in the ad query log, for example, that 01:20 | 15 Identifier Producer"? 01:23 |
| 16 we had just looked at, that were generated as a result 01:20 | 16 A. I'll take a brief moment to read through the 01:23 |
| 17 of being somebody in X -- somebody in incognito mode, 01:20 | 17 boxes on this slide. 01:23 |
| 18 am I able to use ▓ to identify those entries and 01:20 | 18 Q. Please. 01:23 |
| 19 delete it from the logs? 01:20 | 19 A. Okay. 01:23 |
| 20 A. I think there are two parts to your question, 01:20 | 20 Q. What exactly is that "Aggregated Unified 01:23 |
| 21 and the first part is whether or not it is technically 01:20 | 21 Identifier Producer" right there? 01:23 |
| 22 feasible to detect incognito from the logs. 01:20 | 22 A. The aggregated unified identifier producer is 01:23 |
| 23 And the second part of your question was 01:20 | 23 a producer which is an implementation of a logical unit 01:24 |
| 24 whether or not ▓ can be the place to -- for that to 01:20 | 24 in ▓ 01:24 |
| 25 happen? 01:20 | 25 Its main purpose is to take the output from 01:24 |
| Page 139 | Page 141 |

36 (Pages 138 - 141)

# EXHIBIT 9

# Redacted in its Entirety

# EXHIBIT 10

# Redacted in its Entirety

# EXHIBIT 11

# Redacted in its
# Entirety

# EXHIBIT 12

# Redacted in its Entirety

# EXHIBIT 14

# Redacted in its
Entirety

# EXHIBIT 15

# Redacted in its Entirety

# EXHIBIT 16

# Redacted in its Entirety

# EXHIBIT 17

# Sealed in its Entirety

# EXHIBIT 18

# Redacted in its Entirety

# EXHIBIT 19

# Redacted Version of Document Sought to be Sealed

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| CHASOM BROWN, MONIQUE TRUJILLO, WILLIAM BYATT, JEREMY DAVIS, and CHRISTOPHER CASTILLO, individually and on behalf of all similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>              Defendant. | Case No. 5:20-cv-03664-YTG-SVK |

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES SET 9 (NOS. 34-40)

Pursuant to Federal Rule of Civil Procedure 33, Defendant Google LLC ("Google") hereby responds and objects to Plaintiffs' Interrogatories, Set 9 (Nos. 34-40). These objections and responses are made solely for the purpose of and in relation to this action. In addition, the objections and responses set forth in this document are based on Google's knowledge, investigations, and analysis to date. As discovery proceeds, Google may become aware of additional facts or evidence and its analysis of the case may change. Google reserves all rights to supplement and amend its objections and responses accordingly.

## **GENERAL OBJECTIONS**

1.      Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they seek information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

2.      Google objects to the definition of "browser" as vague and ambiguous to the extent it draws a distinction between "web-based browsers" and "app browsers." All browsers are, by

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

definition, web-based and require software to be run on a device, whether that device is a desktop computer or a mobile device. Google will understand the term "browser" as referring to application software that contains a graphical user interface for displaying and navigating between web pages.

3.      Google objects to the definition of "browsing data" as overly broad and unduly burdensome because it combines information pertaining to specific website visits (*e.g.*, "HTTP request," "hostname") with basic information about the browser (*e.g.*, "browser type," "language"). Google further objects to the definition of "browsing data" as vague and ambiguous due to the inclusion of "'fingerprint' data (as described in paragraphs 100-104)." Paragraphs 100-104 of the Complaint describes "images, pixels, or fonts"—that is neither "fingerprint data" nor data Google uses to fingerprint users. Google further objects to the definition of "browsing data" as vague and ambiguous due to the inclusion of "geolocation data." Google will treat "geolocation data" as referring to precise latitude and longitude information that is collected from a mobile device.

4.      Google objects to the interrogatories to the extent that they seek information shielded from disclosure by the attorney-client privilege, the work-product doctrine, the settlement privilege and/or any other applicable privilege or protection from discovery.

5.      Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they conflict with or encompass information and/or records falling outside the scope of discovery under the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

6.      Google's responses to these interrogatories are hereby made without waiving or intending to waive, but rather, to the contrary, by preserving and intending to preserve:

　　　　　a.      All questions as to the competence, relevance, proportionality, materiality, and admissibility as evidence for any purpose of the information or

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

b.   The right to object on any ground to the use of any such information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

c.   The right to object at any time in connection with any further response to these or any other interrogatories; and

d.   The right at any time to supplement its responses.

7.   Google anticipates that future discovery, independent investigation, or analysis will supply additional facts and add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses set forth herein. Google reserves the right to modify, supplement, withdraw, or otherwise alter its responses to these interrogatories in accordance with the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 34:**

Please identify every log and data source that Google reviewed, analyzed, or searched as part of Google's efforts to conduct a "log analysis of Chrome Incognito" in and around mid-2020. See, e.g., GOOG-CABR-05280756.

**RESPONSE TO INTERROGATORY NO. 34:**

Google incorporates its General Objections as if set forth fully herein. Google further objects to this interrogatory as it mischaracterizes the cited document and an analysis performed by a small number of Google employees. Google further objects to the undefined phrase "every log and data source that Google reviewed, analyzed, or searched" as overly broad, unduly burdensome, vague, and ambiguous.  For the purposes of this response, Google understands this phrase to refer to the

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

log sources that Google used to perform the analysis described in GOOG-CABR-05280756.  Google further objects to this interrogatory as unduly burdensome to the extent it purports to seek information regarding Google Search Search Ads because Plaintiffs have expressly limited their purported class to users "who accessed a non-Google website containing Google Analytics or Ad Manager."  Dkt. 136-1 ¶ 192; *see also* June 2, 2021 Hearing Tr. 35:13-16 (discovery "is not carte blanche to all of Google's systems . . . and it will continue to tie back to the proper definitions of the class").  Google further objects to this interrogatory to the extent it is tailored to seek information protected by the attorney-client privilege, the work product doctrine, or the common interest doctrine, or that is otherwise privileged or protected from discovery.

Subject to and without waiving the foregoing objections, Google responds as follows:

Google used ███████████████ in the analysis of Ad Manager browsing traffic described in GOOG-CABR-05280756.

**INTERROGATORY NO. 35:**

Aside from Google's mid-2020 "log analysis of Chrome Incognito" (e.g., GOOG-CABR-05280756), please describe in detail any other log-based analysis of Chrome Incognito that Google conducted, including the data sources involved and the results of any such analysis.

**RESPONSE TO INTERROGATORY NO. 35:**

Google incorporates its General Objections as if set forth fully herein. Google further objects to this interrogatory as it mischaracterizes the cited document and an analysis performed by a small number of Google employees for a specific purpose. Google further objects to this interrogatory as vague and ambiguous as to the phrase "any other log-based analysis of Chrome Incognito that Google conducted," which is neither self-evident nor defined. As written, this undefined phrase is unintelligible, overly broad, and unduly burdensome because it does not explain, *inter alia*, what constitutes "log-based analysis" or how any such analysis would need to relate to Incognito mode on the Chrome browser in order to be responsive to this request. For the purposes of this response,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Google understands this phrase to refer to other analyses employing the methodology for estimating or inferring certain Incognito aggregate usage metrics described in GOOG-CABR-05280756, as applied to Ad Manager. Google further objects to this interrogatory to the extent it is tailored to seek information protected by the attorney-client privilege, the work product doctrine, or the common interest doctrine, or that is otherwise privileged or protected from discovery.

Subject to and without waiving the foregoing objections, Google responds as follows:

Google has not identified information responsive to this interrogatory after conducting a reasonable search.

**INTERROGATORY NO. 36:**

For the Class Period, please identify Incognito usage statistics for the USA, broken down by (1) the number of unique chrome instances within the United States, (2) the number of unique chrome instances within California that used Chrome Incognito, and (3) the number of unique chrome instances within the United States that used Chrome Incognito.

**RESPONSE TO INTERROGATORY NO. 36:**

Google incorporates its General Objections as if set forth fully herein. Google objects to this request as vague and ambiguous as to the phrases "the number of unique chrome instances" and "Incognito usage statistics," which are neither self-evident nor defined. Google further objects that this interrogatory is overly broad and unduly burdensome because at least Subpart (1) of this interrogatory seeks information for users who are not included in Plaintiffs' class definition. Google further objects to this interrogatory as compound because it includes at least three sub-parts.

Subject to and without waiving the foregoing objections, Google responds as follows:

**(1)** Google maintains information in the ordinary course of business that can be used to show the number of unique Chrome instances that appear to be in the United States during a 28-day period ending on the first of the month from June 1, 2016 to January 1, 2022. Based on Google's investigation to date, that information is set forth below.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1   **SERVICE LIST**

2   *Brown v. Google LLC*

3   *Case No. 5:20-cv-03664-LHK-SVK*

4   *Attorneys for Plaintiffs Chasom Brown et al.* BOIES SCHILLER FLEXNER LLP

5               Mark C. Mao, CA Bar No. 236165
            Sean P. Rodriguez, CA Bar No. 262437
6           Beko Richardson, CA Bar No. 238027
            Antonio Lavalle Ingram, II, CA Bar No. 300528
7           Alexander Justin Konik, CA Bar No. 299291
8           **BOIES SCHILLER FLEXNER LLP**
            44 Montgomery St., 41st Floor
9           San Francisco, CA 94104
            Tel.: (415) 293-6800
10          Fax: (415) 293-6899
11          mmao@bsfllp.com
            srodriguez@bsfllp.com
12          brichardson@bsfllp.com
            aingram@bsfllp.com
13          akonik@bsfllp.com

14
            James Lee (admitted pro hac vice)
15          Rossana Baeza (admitted pro hac vice)
            **BOIES SCHILLER FLEXNER LLP**
16          100 SE 2nd St., 28th Floor
            Miami, FL 33131
17          Tel.: (305) 539-8400
            Fax: (303) 539-1307
18          jlee@bsfllp.com
19          rbaeza@bsfllp.com

20          Amanda K. Bonn, CA Bar No. 270891
            **SUSMAN GODFREY L.L.P**
21          1900 Avenue of the Stars, Suite 1400
22          Los Angeles, CA. 90067
            Tel: (310) 789-3100
23          Fax: (310) 789-3150
            abonn@susmangodfrey.com
24
            William S. Carmody (admitted pro hac vice)
25          Shawn Rabin (admitted pro hac vice)
            Steven M. Shepard (admitted pro hac vice)
26          **SUSMAN GODFREY L.L.P.**
27          1301 Avenue of the Americas, 32nd Floor
            New York, NY 10019-6023
28          Tel.: (212) 336-8330

-15-                                         Case No. 5:20-cv-03664-LHK

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1
Fax: (212) 336-8340
bcarmody@susmangodfrey.com

2
srabin@susmangodfrey.com
sshepard@susmangodfrey.com

3

4
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)

5
Ra Olusegun Amen (admitted pro hac vice)
Jean Sutton Martin (admitted pro hac vice)

6
**MORGAN & MORGAN**

7
201 N. Franklin Street, 7th Floor
Tampa, FL 33602

8
Tel.: (813) 223-5505
jyanchunis@forthepeople.com

9
rmcgee@forthepeople.com
ramen@forthepeople.com

10
jean@jsmlawoffice.com

11
*Attorneys for Plaintiffs*

12

13

14
*Calhoun v. Google LLC*

15
*Case No. 5:20-cv-5146-LHK-SVK*

16

17
*Attorneys for Plaintiffs Patrick Calhoun et al.*

BLEICHMAR FONTI & AULD LLP

18

19
**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)

20
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)

21
555 12th Street, Suite 1600
Oakland, CA 994607

22
Tel.: (415) 445-4003
Fax: (415) 445-4020

23
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*

24
*jsamra@bfalaw.com*

25
**DICELLO LEVITT GUTZLER**
David A. Straite (admitted *pro hac vice*)

26
One Grand Central Place

27
60 East 42nd Street, Suite 2400
New York, NY 10165

28
Tel.: (646) 933-1000

-16-

DEFENDANT'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' INTERROGATORIES SET 9 (NOS. 34-40)

dstraite@dicellolevitt.com

Amy E. Keller (admitted *pro hac vice*)
Ten North Dearborn Street, 6th Fl.
Chicago, Illinois 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit (admitted *pro hac vice*)
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (*pro hac vice* to be sought)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
mbreit@simmonsfirm.com
jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com
ejohnson@simmonsfirm.com

*Attorneys for Plaintiffs*

# EXHIBIT 20

# Redacted Version of Document Sought to be Sealed

| | |
|---|---|
| **From:** | owner-googleteam@lists.susmangodfrey.com on behalf of Mark C. Mao |
| **To:** | Josef Ansorge; Ryan McGee x3030; Timothy Schmidt; Douglas Brush |
| **Cc:** | QE Brown; GOOGLETEAM@lists.susmangodfrey.com |
| **Subject:** | Re: Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential |
| **Date:** | Wednesday, February 23, 2022 8:17:34 PM |

<mark>EXTERNAL Email</mark>

Mr. Ansorge.  Thank you for confirming that you did not provide that field in the schema.  Please produce updated schemas containing that field.

Get Outlook for iOS

---

**From:** Josef Ansorge <josefansorge@quinnemanuel.com>
**Sent:** Wednesday, February 23, 2022 5:06:21 PM
**To:** Mark C. Mao <mmao@BSFLLP.com>; Ryan McGee x3030 <rmcgee@forthepeople.com>; Timothy Schmidt <timothy.schmidt@accelconsulting.llc>; Douglas Brush <douglas.brush@accelconsulting.llc>
**Cc:** QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com <GOOGLETEAM@lists.susmangodfrey.com>
**Subject:** Re: Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential

Mr. Mao:

Our understanding is that the log source ███████████ has a field named maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team.  As we have explained before, ██████████ lists the largest 100 fields in a given ██████ log. If the field maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team is not one of the largest 100 fields, then it won't be listed in ██████████.

Please let us know what time tomorrow afternoon you would like to meet and confer.

Best,

**Josef Ansorge**
*Of Counsel,*
Quinn Emanuel Urquhart & Sullivan, LLP

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8267 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
josefansorge@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client

communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Mark C. Mao <mmao@BSFLLP.com>
**Sent:** Wednesday, February 23, 2022 7:18:43 PM
**To:** Ryan McGee x3030 <rmcgee@forthepeople.com>; Timothy Schmidt <timothy.schmidt@accelconsulting.llc>; Douglas Brush <douglas.brush@accelconsulting.llc>
**Cc:** QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com <GOOGLETEAM@lists.susmangodfrey.com>
**Subject:** RE: Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential

**[EXTERNAL EMAIL from mmao@bsfllp.com]**

Mr. Ansorge: In addition to the question below, I am also open tomorrow and Friday to meet and confer with you as requested by the Special Master.

Special Master Brush and Mr. Schmidt – After Mr. Ansorge gives me a time to meet and confer, I will send out proposals for another meeting with you, prior to the next regular scheduled meeting.  Thank you.

**From:** Mark C. Mao
**Sent:** Wednesday, February 23, 2022 2:01 PM
**To:** Ryan McGee x3030 <rmcgee@forthepeople.com>; Timothy Schmidt <timothy.schmidt@accelconsulting.llc>; Douglas Brush <douglas.brush@accelconsulting.llc>
**Cc:** QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com
**Subject:** RE: Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential

Mr. Ansorge:

I looked at the ███████████ log you identified, and there is no field for the detect-Incognito bit. We looked at every field.

Which field from this schema would that bit be located?  Please let us know that quickly.

Thank you in advance.

**From:** Ryan McGee x3030 <rmcgee@forthepeople.com>
**Sent:** Tuesday, February 22, 2022 5:11 PM
**To:** Timothy Schmidt <timothy.schmidt@accelconsulting.llc>; Douglas Brush <douglas.brush@accelconsulting.llc>

**Cc:** QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com; Mark C. Mao <mmao@BSFLLP.com>
**Subject:** RE: Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential

**CAUTION:** External email. Please do not respond to or click on links/attachments unless you recognize the sender.

Dear Special Master Brush, Mr. Schmidt, and Counsel:

The *Brown* Plaintiffs propose the following agenda for our session:

1. Field Descriptions and Schema
   - Plaintiffs want to know when they will receive the field descriptions that the Special Master ordered on December 15, 2021 (see attached email)
   - Plaintiffs also want to know when they can expect schemas for all logs that Bert Leung used for his Incognito analysis
2. Any Withheld Information
   - Has Google limited or withheld any production of fields from the data sources, including Search and detect-Incognito bits.  If so, when, which, and why?
3. Incognito Detection Bit
   - Please identify all data sources that contain or contained the Incognito Detection bit.
4. Identifiers & Data Sources
   - Are there any identifiers that Plaintiffs have submitted that do not exist in the data sources requested to be searched with those identifiers?
5. Plaintiffs' Data
   - Googled stated it would search ███████████████████ and produce the results to the Special Master for review; when can Plaintiffs expect that production?
6. Searching Historical Data (more than 8 days)
   - What has Google done to search for historical data?
7. Finishing Iterative Search 1

Thank you,
Ryan

**Ryan McGee**
Attorney
My Bio

**P:** (813) 223-0931
**F:** (813) 222-4702
**A:** 201 N Franklin St, 7th Floor, Tampa, FL 33602

*A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.*

**From:** Timothy Schmidt <timothy.schmidt@accelconsulting.llc>
**Sent:** Tuesday, February 22, 2022 3:51 PM
**To:** QE Calhoun <qecalhoun@quinnemanuel.com>; QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com; Lesley Weaver <lweaver@bfalaw.com>; David Straite <dstraite@dicellolevitt.com>; jaybarnes@simmonsfirm.com; Mark C. Mao <mmao@bsfllp.com>; Sharon Cruz <scruz@dicellolevitt.com>; Ryan McGee x3030 <rmcgee@forthepeople.com>; Adam Prom <aprom@dicellolevitt.com>; Angelica Ornelas <aornelas@bfalaw.com>
**Cc:** Douglas Brush <douglas.brush@accelconsulting.llc>
**Subject:** *EXT* Brown ((20-3664) Calhoun (20-5146) v. Google - Informal Meet and Confer Conferences this Wednesday - Confidential

**CAUTION:** **Use caution when clicking on links or opening attachments in this external email.**

All,

In light of our upcoming informal conferences tomorrow, Special Master Brush and I have discussed and continue to review your submissions.

If you have further (brief) submissions for Special Master Brush, he will be taking those only until 5:00 pm EST today to have adequate time to prepare for the sessions thoughtfully.

Please also work together (Plaintiffs and Google) in preparing agendas for the conferences. As before, Mr. Brush has asked that these agendas be joint submissions with bullet points and only the necessary technical language to support issues. These are due no later than 8:00 pm EST, today.

Thank you,
Tim Schmidt

*Timothy Schmidt*
Consultant
**M** 202.577.5302
**E** timothy.schmidt@accelconsulting.llc

**Accel Consulting LLC**
BOULDER, CO 80301

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to other contractual or confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this message in error, please notify the sender by reply email and delete this message.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

---

This e-mail contains communication that may constitute attorney/client privileged information and/or attorney work product. If you received this message in error, please notify the sender and delete it immediately.

To unsubscribe from the GOOGLETEAM list, click here

# EXHIBIT 21

# Redacted in its Entirety

# EXHIBIT 22

# Redacted in its Entirety

# EXHIBIT 23

# Redacted in its
# Entirety

# EXHIBIT 24

# Redacted in its Entirety

# EXHIBIT 25

# Redacted in its Entirety