# Plaintiff's REPLY ISO Request for Order to Show Cause re Discovery Sanctions

# Redacted Version of Document Sought to be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
*srabin@susmangodfrey.com*
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505ß
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No.:  4:20-cv-03664-YGR-SVK

**PLAINTIFFS' REPLY IN SUPPORT OF REQUEST FOR AN ORDER FOR GOOGLE TO SHOW CAUSE WHY IT SHOULD NOT BE SANCTIONED FOR DISCOVERY MISCONDUCT**

The Honorable Susan van Keulen
Courtroom 6 - 4th Floor
Date: April 21, 2022
Time: 10:00 a.m.
**Filed Under Seal**

1
2

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.    Google Has No Justification for Its Discovery Misconduct and Concealment. ...............................................................................................2

        A.    Google Omitted Quentin Fiard, Bert Leung, and Mandy Liu from its February and March 2021 Lists of Relevant Employees .........................................................................................2

        B.    Google Never Disclosed the Incognito Detection Bits in the Parties' April 2021 Preservation Dispute or the July 2021 X-Client Data Header Dispute ..................................................2

        C.    Google Did Not Disclose the Logs that Contain these Incognito-bits in Its Court-Ordered November 2021 Declaration ...............................3

        D.    Google Does Not Explain Why It Could Not Produce More Complete Schema ...............................................................................5

        E.    Google's Document Defense Holds No Water. ..........................................6

        F.    Plaintiffs Learned the Truth through Mr. Leung's and Ms. Liu's Documents .............................................................................................8

    II.    Sanctions Are Warranted Because Google Severely Prejudiced Plaintiffs. ......................................................................................................9

        A.    Google's Conduct Severely Prejudiced Plaintiffs in Multiple Ways. ..............................................................................................9

        B.    This Court Has Authority to Sanction Google. ........................................11

        C.    The Punishment Must Fit the Crime. .......................................................12

CONCLUSION ................................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple v. Samsung Elecs.*
  2012 WL 1595784 (N.D. Cal. May 4, 2012)...................................................................11, 14

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .....................................................................................12

*Buffin v. City & Cty. of San Francisco*,
  2018 WL 1070892 (N.D. Cal. Feb. 26, 2018) (Gonzalez Rogers, J.) ..............................12, 16

*Conway v. Dunbar*,
  121 F.R.D. 211 (S.D.N.Y. 1988)...................................................................................14

*Craftwood Lumber Co. v. Interline Brands, Inc.*,
  2013 WL 4598490 (N.D. Ill. Aug. 29, 2013) ................................................................13

*Facebook, Inc. v. Onlineinc Inc.*,
  No. 3:19-cv-07071-SI (N.D. Cal.) Dkt. 222 .................................................................13

*Kannan v. Apple Inc.*,
  2020 WL 9048723 (N.D. Cal. Sept. 21, 2020)............................................................14, 15

*Natural Immunogenics Corp. v. Newport Trial Group.*,
  2016 WL 11520757 (C.D. Cal. June 16, 2016) ............................................................14

*Navellier v. Sletten*,
  262 F.3d 923 (9th Cir. 2001) ......................................................................................13

*North American Watch Corp. v. Princess Ermine Jewels*,
  786 F.2d 1447 (9th Cir. 1986) ....................................................................................14

*Nursing Home Pension Fund v. Oracle Corp.*,
  254 F.R.D. 559 (N.D. Cal. 2008) ...............................................................................15

*Sali v. Corona Reg'l Med. Ctr.*,
  884 F.3d 1218 (9th Cir. 2018).....................................................................................15

*Sas v. Sawabeh Info. Servs.*,
  2015 WL 12711646 (C.D. Cal. Feb. 6, 2015) ............................................................14, 15

*Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*,
  2017 WL 2840279 (S.D.N.Y. June 27, 2017) .............................................................14

ii

**Rules**

Fed. R. Civ. P. 26(a) ........................................................................................................... 11

Fed. R. Civ. P. 26(e)(1)(A) .................................................................................................. 11

Fed. R. Civ. P. 30(b)(6) ........................................................................................................ 9

Fed. R. Civ. P. 37 ................................................................................................................ 14

Fed. R. Civ. P. 37(b) ........................................................................................................... 11

Fed. R. Civ. P. 37(b)(2)(C) .................................................................................................. 15

Fed. R. Civ. P. 37(c) ........................................................................................................... 11

Fed. R. Civ. P. 37(c)(1) ....................................................................................................... 12

Fed. R. Civ. P. 37(e) ........................................................................................................... 12

Fed. R. Civ. P. 37(e)(1)-(2) ................................................................................................. 12

iii

## **INTRODUCTION**

Throughout this case, Google has been adamant that it cannot identify "Incognito" browsing data.  These assertions were false: Ever since 2017, Google has used incognito detection bits      (is_chrome_incognito,      is_chrome_non_incognito,      and,      since      2021, maybe_chrome_incognito) in at least ▊ logs. Just last week, Google finally produced the below "proto comments" for the "is_chrome_incognito" bit, which has existed since 2017:

> Below is the proto comment for the **is_chrome_incognito** field:
>
> ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Mao Reply Decl. Ex. 1. Timely disclosure of these bits would have allowed the parties to negotiate preservation of a much smaller data set than what Google represented it would otherwise need to preserve at this time last year. But Google concealed their existence, convinced the Court preservation was burdensome, and spoliated class member data along the way. Specifically, Google did not:

1. Inform the Court of the three Incognito detection bits in the context of the parties' preservation dispute;

2. Identify the employees responsible for these Incognito detection bits in interrogatory responses and custodian lists; or

3. Identify and produce complete schema for all of the data sources and logs where these Incognito bits have been implemented.

To this day, Google *still* has not confirmed to Plaintiffs that it has identified *all* "incognito" fields.

Against this backdrop, notably absent from Google's papers is any suggestion that its repeated failures were due to mere inadvertence. And while Google submits a declaration from its outside counsel, nowhere does that declaration suggest that counsel were *unaware* of these incognito detection bits. Instead, the remarkable gravamen of Google's Opposition is that despite its multiple efforts to conceal and obscure—including an *admittedly* incomplete and inaccurate Court-ordered declaration on relevant data sources—Plaintiffs should have gleaned enough from a tiny handful of documents that Google trickled out last fall to have caught on to Google's defiance of multiple Court Orders sooner.

1

1   Why did Google go to such great lengths to conceal these facts? Google's brief makes that

2   reason clear: Google's principal opposition to class certification will be to argue that class

3   members cannot be identified and that the private browsing data cannot be linked to individual

4   users. Opp. 2, 7. Google thus intentionally withheld discovery and deleted evidence that could

5   have been used to disprove its arguments. The most appropriate remedy is to issue evidentiary

6   sanctions that will prevent Google from achieving the very objective of its discovery misconduct.

7                                         **ARGUMENT**

8   **I.     Google Has No Justification for Its Discovery Misconduct and Concealment.**

9          A.     *Google Omitted Quentin Fiard, Bert Leung, and Mandy Liu from its February and March 2021 Lists of Relevant Employees*

10          Google offers no explanation for why it omitted Bert Leung and Mandy Liu in its February

11   2021 list of potential custodians and in its March 2021 interrogatory response. Google does not

12   even mention Mr. Fiard anywhere in its Opposition. These witnesses had long worked on the

13   "incognito" detection bits (Fiard since 2017, Leung since 2019, and Liu since 2020), and Google's

14   outside counsel was communicating *directly* with Mr. Leung *about this case*. Mot. 8-9; Supp. 2.

15   Google points to the fact that six months later, it cross-produced a *Calhoun* custodian list that

16   named Mr. Leung and Ms. Liu. Opp. 11. But given the importance of Mr. Leung and Ms. Liu to

17   developing the "incognito" bits, why would Google have disclosed them in *Calhoun* but not in

18   *Brown*? In any event, Google's belated cross-production post-dated the Court's cut-off for

19   custodian disputes.[1] And the belatedly produced *Calhoun* list *also* omits Mr. Fiard, the person

20   responsible for the two live "incognito" bits that date back to 2017.

21          B.     *Google Never Disclosed the Incognito Detection Bits in the Parties' April 2021 Preservation Dispute or the July 2021 X-Client-Data Header Dispute*

22          Google secured a protective order on preservation without informing Plaintiffs or the Court

23   that it had, since 2017, been logging event-level traffic as "incognito" by way of two bits across

24

---

25   [1] The Court set an August 24 deadline for final custodian disputes. Dkts. 242-1, 258. Further grasping at straws, Google points out that it had produced some emails from Mr. Leung. Opp. 12.

26   But just four of the cited documents (Trebicka Exs. 1, 3, 4, 5) were produced prior to Plaintiffs' August 24 deadline to select custodians, and these documents, buried in a sea of millions of pages,

27   did not explain that Google implemented Incognito detection bits or that the bits are live.

28                                              2

1   ███ logs: is_chrome_incognito and is_chrome_non_incognito. *See* Supp. at 1. Had Google timely

2   identified these bits, Plaintiffs could have narrowed their preservation request to focus on specific

3   data tied to the bits—a small fraction of the data Google logs.[2] Google recently admitted that it

4   can "construct a log source for preservation that only consists of the specific fields and data to be

5   preserved." Mao Reply Decl. Ex. 2. Google should have proposed such targeted preservation last

6   April. Had the Court known of these bits and Google's ability to extract and combine relevant

7   data, the Court may have ruled differently on Google's motion for a protective order. Instead,

8   Google presented a false "all or nothing" choice to preserve *all* potentially relevant logs in their

9   *entirety* or omit the log from the preservation plan. *See* Dkt. 119. Google left the Court with that

10  misleading impression for a reason. To this day, Google has never presented a shred of evidence

11  that preserving targeted data related to these incognito bits would be unduly burdensome.

12      Similarly, when the parties subsequently briefed their dispute over production of data

13  lacking any X-Client-Data Header (Dkt. 218), Google had by then also implemented the

14  maybe_chrome_incognito bit, based on the lack of the X-Client-Data Header, into at least ███

15  different ███ logs. Mao Reply Decl. Ex. 6. Once again, Google shows no contrition for failing

16  to disclose this information. Instead, Google brags about winning a rigged game, arguing that it

17  convinced the Special Master and the Court to deny Plaintiffs' motion. Mot. 11-12; Opp. 8. This

18  argument only highlights Google's concealment and Plaintiffs' prejudice.

19      C.   *Google Did Not Disclose the Logs that Contain these Incognito-bits in Its Court-Ordered November 2021 Declaration*

20      By November 2021, the jig should have been up. The Court required a "declaration, under

21  penalty of perjury from Google, not counsel, that: 1. To the best of its knowledge, Google has

22  provided a complete list of data sources that contain information relevant to Plaintiffs' claims…."

23  Dkt. 331 at 8. Yet Google selected as its declarant Andre Golueke, a "Senior Legal Operations

24  Manager" (in other words, a member of Google's legal support staff if not a lawyer himself).

25

26  [2] Google's employees state that Incognito traffic represents 3-4% of the total Chrome-generated
    traffic. *See infra* Section I.F. Thus, Google's preservation obligation would have been a fraction
27  of what Google represented.

28

1    Plaintiffs' motion explained that Mr. Golueke's court-ordered declaration "appears to be

2  false" because Mr. Leung's documents "demonstrate that maybe_chrome_incognito was approved

3  for use in multiple logs that had not been disclosed." Mot. 13 (citing Dkt. 338). Subsequent

4  discovery has confirmed as much: maybe_chrome_incognito was implemented into all ▮ logs in

5  June and July, 2021, and yet Mr. Golueke's Declaration listed just ▮ of those logs. *Compare*

6  Mao Decl. Reply Ex. 6, *with* Dkt. 338-1. And Mr. Golueke's Declaration did not list any of the

7  ▮ logs that contain the is_chrome_incognito or is_chrome_non_incognito bits.

8    Compounding the problems, Mr. Golueke's subsequent declaration (Dkt. 528-5) admits

9  that he "was not aware" that (i) "the maybe_chrome_incognito[] bit existed" or (ii) that ▮▮▮

10  "logs contained fields labeled 'is_chrome_incognito' or 'is_chrome_non_incognito mode.'" Dkt.

11  528-5 ¶¶ 10-11. Plaintiffs are troubled that Google's investigation failed to address these bits,

12  particularly since Google's outside counsel does not deny knowing about them well before Mr.

13  Golueke signed his initial declaration. *See generally* Ansorge Decl. (Dkt. 528-1) Google itself

14  certainly knew. Google's deliberate choice to select a "Legal Operations Manager" as its declarant

15  and then keep him in the dark about the "incognito" bits cannot be countenanced. Surely that is

16  not what the Court had in mind when it ordered Google to swear under oath that it "provided a

17  complete list of data sources." Dkt. 331; *id.* at 3 ("Google knows what data is has collected

18  regarding Plaintiffs and putative class members and where the data may be found").

19    Google does not even attempt to excuse its failure to identify the ▮ logs with the

20  maybe_chrome_incognito bit. As for the other bits, Google wrongly claims that they were, prior

21  to the class definition amendment, "irrelevant to the case" insofar as they live in "Search" logs.

22  Opp. 14.[3] This argument, which Google has clung to like a life-preserver throughout the litigation,

23  is meritless. One purpose of the Special Master process was to provide Plaintiffs "the tools to

24

---

25  [3] Even this explanation by Google was not forthcoming, as these bits showed up in the schema of

26  two non-Search logs (which the Special Master had Google reproduce after these issues arose).
Reply Mao Decl. ¶ 7. Therefore, Plaintiffs believe they have a reasonable basis to question how

27  many other logs already contain these bits, including in their schema.

28                                                    4

1    identify class members using Google's data." Dkt. 331 at 4. People who use Google Search within

2    Incognito can and do go on to visit non-Google websites. And the Special Master expressly

3    rejected Google's argument that Search is "out of scope" when he required Google to include the

4    ███████████ log, which Mr. Leung used for his 2020 analysis. Mot. 14. The Special Master's

5    reasoning applies even more so to logs where Google has since 2017 been marking event-level

6    traffic as "Incognito."

7         D.    *Google Does Not Explain Why It Could Not Produce More Complete Schema*

8         For the two logs with maybe_chrome_incognito that Mr. Golueke's declaration actually

9    identified, Google subsequently prevented Plaintiffs from learning about the bit by producing

10   altered log schema that omitted the field from ███ logs. Reply Mao Decl. ¶¶ 3-4; Mot. at 5-6.

11   Google's purported "largest-100 fields" excuse is implausible, including because (i) Google

12   produced schema for other logs that contained more than 100 fields and (ii) Google readily

13   provided more comprehensive schema for the maybe_chrome_incognito logs once Plaintiffs

14   moved for sanctions. Supplement at 4; Reply Mao Decl. ¶¶ 5-6. Google's Opposition has no

15   response to these points. Nor does Google dispute Plaintiffs' argument that the "largest-100 fields"

16   limitation automatically excluded the Incognito detection bits, which are boolean fields that show

17   up only as "true" or "false" and thus will never be among the largest fields. Supplement at 4-5.

18        Google suggests that "full compliance" with the November 12 order (i.e., producing full

19   schema with every field) would have posed "engineering burdens." Opp. 15. Setting aside that the

20   November 12 Order already rejected such concerns,[4] they are irrelevant here. All Google had to

21   do was supplement the 100-largest fields with the "incognito" bit. Google then goes so far as to

22   blame the Special Master for its own misconduct, quoting the Special Master's statement that

23   "maybe it was my fault for saying . . . produce these top hundred hoping that was going to be

24   enough." Opp. 16. As this statement implicitly acknowledges, the Special Master would not have

25   _____

26   [4] "To the extent [this process] requires the significant commitment of time, effort, and resources
     across groups of engineers at Google on very short timelines, that burden . . . arises, at least in part,

27   as a result of Google's reticence thus far to provide critical data source information in these
     actions." Dkt. 331 at 4-5.

28                                              5

1   permitted Google to limit its production to the largest-100 fields if Google informed him that doing

2   so would eliminate key boolean fields. Google did not disclose any of that information to the

3   Special Master when it requested permission to limit the schema. *See* Trebicka Decl. Ex 35.

4         E.      *Google's Document Defense Holds No Water.*

5         Google largely attempts to excuse much of the above misconduct by pointing to a small

6   handful of opaque and outdated documents that it produced. But those documents did not clearly

7   disclose that Google had implemented the "incognito" detection bits. And the doubt that was left

8   by this mere handful of documents was reinforced by Mr. Liao's misleading deposition testimony,

9   which he now attempts to defend by slicing the bologna so thin it is all but transparent.

10        With respect to the "is_chrome_incognito" bit, Google does not point to *any* documents

11  whatsoever that it has produced in this case. Not one. Opp. 12. With respect to the

12  "is_chrome_non_incognito" bit, Google points to a *single* document. And Google selectively

13  quotes from the document to make it sound more certain than it actually is—the underlined

14  portions of the following quote were omitted in Google's brief: "i think this has only been used by

15  the ▮▮▮▮ team, AFAICT [as far as I can tell]." Trebicka Decl. Ex. 15. Moreover, that Google

16  identifies only *one* document about just one of these bits--out of ▮▮▮▮ total documents—is

17  alarming given that "Incognito" was a search term. Dkt. 148. Especially given the proto comments

18  belatedly produced only recently, Mao Reply Decl. Ex. 1, Plaintiffs are deeply concerned that

19  Google intentionally held back other documents (including by not disclosing Mr. Fiard), and

20  Google should be prepared to address this issue at the hearing.

21        With respect to the "maybe_chrome_incognito" bit, Google misleadingly suggests that it

22  produced documents in the Fall of 2021 making clear that (i) a "technical design" for the bit dated

23  "May 4, 2021" was "APPROVED" and (ii) Google was "logging" the field "into ▮▮▮▮" by June

24  2021. Opp. 5. This is, quite simply, wrong for three reasons. *First*, the May 4, 2021 design

25  document from Mr. Liao's files was *not* fully "APPROVED" and implemented. Instead, the face

26  of the document indicates it was only approved by 4 out of 5 required "approvers." Trebicka Ex.

27  Decl. Ex. 13. That is because, as explained in detail in the opening Mao Declaration, the May 4,

28

6

1    2021 version of the design document reflected an older plan to log in ███ logs which was

2    abandoned the next day on May 5, 2021 to log in ███ logs. Opening Mao Decl. ¶ 12

3    (summarizing Trebicka Ex. 13). As the Opening Mao Declaration pointed out, Google *never*

4    produced the May 5, 2021, version of the document until January 31, 2022. *Id.* ¶ 3. Plaintiffs have

5    sent Google's counsel multiple messages demanding an explanation why the May 5, 2021, version

6    of the document was not produced from Mr. Liao's custodial files last fall. Mao Reply Decl. ¶ 10.

7    Google has never responded, *id.*, and Google's Opposition simply *ignores* these facts altogether.

8         *Second*, the single family of documents that Google produced last fall which mentioned

9    logging "into ███" likewise suggested that the plan had not yet been implemented. On

10   September 24, 2021, Google produced ███ documents from Mr. Liao's custodial files that

11   referenced "logging 6 fields into ███." Six fields were then listed, including "6. Maybe Chrome

12   Incognito bit (bool)." Trebicka Decl. Exs. 12, 17-18. The documents all indicated, however, that

13   this "data source factory *will be implemented* and registered in a subsequent CL," suggesting it

14   had not yet been implemented. *Id.* That language, combined with the way "Maybe Chrome

15   Incognito bit" was written (not in the other way it is typically expressed as a field name

16   "maybe_chrome_incognito") made it appear that perhaps a decision had not been finalized on

17   whether to log an incognito bit. Google subsequently produced additional variants of the same

18   document on November 24, 2021—Thanksgiving eve. *See* Trebicka Decl. Exs. 23-25.

19        *Third*, after Google produced this handful of documents from Mr. Liao's custodial files,

20   Plaintiffs then deposed Mr. Liao. Mr. Liao repeatedly gave misleading if not outright false

21   testimony under oath—testimony appearing to confirm that this plan had never been implemented.

22   Mot. 15-16. When asked if Google "explore[d] whether or not you would use the X-Client Data

23   header as a signal" for detecting Incognito traffic and "what was the conclusion on that?" Mr. Liao

24   responded: "Yes . . . . We did explore the use of [X-Client-Data Header]. In the end it was

25   determined that the accuracy of using that header as the indication for incognito mode is rather

26   low." Opening Mao Decl. Ex. 8, Liao Tr. 136:2-11. Google's Opposition tellingly ignores this

27   portion of Mr. Liao's testimony.

28

7

Moreover, in response to a question about whether entries in logs related to "incognito mode" could be "identif[ied]" and then "delete[d]," Mr. Liao answered in the negative: "As I stated before, we do not have a reliable signal to infer incognito mode at this time we receive an ad query. And *as a result, we are also unable to infer incognito mode using the same set of signals from the logs*." Opening Mao Decl. Ex. 8, Liao Tr. 140:6-10. Mr. Liao now attempts to justify his misleading answer by stating that (i) he unilaterally interpreted the word "signal" to require that it must be "reliable" and for a "dedicated purpose" and (ii) he would therefore use the term "heuristic" rather than "signal." Liao Decl. ¶¶ 5, 7, 13. But the only examples he gives concerning the purported inaccuracy of the maybe_chrome_incognito signal is that it may be *over*-inclusive— not that it does not accurately identify incognito traffic that could be flagged and either preserved or deleted (but rather that it may be over-inclusive and *also* include some other traffic, such as traffic that is "spoofed" to resemble Chrome). Mr. Liao's testimony was false at worst and deeply misleading at best. Google *was* in fact using the X-Client-Data Header to log traffic as "incognito" within at least ▇ logs, including in (i) the ▇▇▇ logs that Chris Liao was directly involved in for the maybe_chrome_incognito bit and (ii) at least ▇ logs for the "is_chrome_incognito" bit where the proto comments say "represents if an entry comes from a Chrome web browser in the incognito mode" (saying nothing about any inaccuracy). *See* Reply Ex. 11.

### F.   Plaintiffs Learned the Truth through Mr. Leung's and Ms. Liu's Documents

Google would have escaped without any repercussions but for this Court's February 2022 order compelling production of documents from Mr. Leung. Dkts. 399, 401. And Mr. Leung's documents led Plaintiffs to Ms. Liu. Opening Mao Decl. Exs. 22-24 (instant messages between them). Over Google's objection, this Court then ordered production of Ms. Liu's documents, Dkt. 437, which were even more revealing. They show that Google *perfected* the accuracy of maybe_chrome_incognito such that it now matches the "expected 3.08%" that Google considers to be the "ground truth" for Incognito traffic. *See* Mao Reply Decl. Ex. 5, GOOG-CABR-03849022 at -022 (email from Mr. Leung characterizing Chrome's UMA data (3.08%) as the "ground truth" for their Incognito detection analysis).  Ms. Liu's documents revealed:

8

> ● Good news: Chrome incognito rate is ~3%!

Mao Reply Decl. Ex. 4, GOOG-BRWN-00846508 at -08. Ms. Liu explained that Google "exclude[d] mobile app traffic from Chrome traffic" to reach this "good news" result. Supplemental Mao Decl. Ex. 4, Liu Tr. 40:10-20. That is something Google (or Plaintiffs' experts) could have done at any time, even if just for purposes of this case. Because Google did not timely preserve and produce data where maybe_chrome_incognito or is_chrome_incognito is equal to "true", Plaintiffs and their experts were precluded from attempting to use the data the isolate Incognito traffic. Declaration of Christopher Thompson, filed herewith ("Thompson Decl.") ¶ 23.

## II.  Sanctions Are Warranted Because Google Severely Prejudiced Plaintiffs.

### A.  *Google's Conduct Severely Prejudiced Plaintiffs in Multiple Ways.*

*First*, Google has all but foreclosed discovery into the "is_chrome_incognito" and "is_chrome_non_incognito" bits, which were implemented in 2017. Google's Opposition points to *zero documents* produced about the "is_chrome_incognito" bit and *one* document about the other. Plaintiffs were unable to ask a single fact witness any questions about them. Plaintiffs did not even learn the name of the person most knowledgeable about these bits until *after* the close of fact discovery from a Rule 30(b)(6) witness. Supplement at 2. Plaintiffs have no data whatsoever tied to these bits. Plaintiffs are, quite simply, in the dark about Google's efforts to log and identify "incognito" traffic using these bits since 2017—three years before the case was filed.

*Second*, the existence of these bits dating back so long makes clear that Google could have and should have preserved class member data. Incognito traffic makes up less than 4% of Chrome traffic, which itself is a subset of all the browser traffic that Google logs. Google misleadingly presented the Court with the false impression that (i) there was no method to specifically identify incognito traffic and (ii) therefore, the *only* way to preserve relevant data would be to preserve "all logs" in their entirety. Based on this misleading premise, Google secured a protective order which it used to justify its continued deletion of relevant "incognito" data throughout the class period.

*Third*, even with respect to the "maybe_chrome_incognito" bit, Plaintiffs did not receive documents from the employees responsible until the final weeks of fact discovery. And Plaintiffs

9

1   *still* do not have documents about how that bit may have related to the earlier bits. Plaintiffs agreed

2   to a narrow search of Mr. Leung and Ms. Liu's documents beginning in 2019 and 2020. Plaintiffs

3   also still lack data associated with any of the three Incognito detection bits.[5] And Google still will

4   not confirm whether there are any other incognito detection bits that they are still withholding.

5   Reply Mao Decl. ¶ 9.[6] But for Google's violation of numerous Court orders, Plaintiffs would have

6   learned about these bits far earlier, and would have had opportunities to seek evidence about them.

7   Plaintiffs would have asked other witnesses about these bits, requested more documents about

8   them, discovered other employees responsible for them, and conducted iterative searches using

9   data from them. Google's misconduct deprived Plaintiffs of these opportunities.

10          Google argues it was justified because the incognito bits (i) are "unreliable" and merely

11   measure "aggregate" data and (ii) cannot be used to identify potential class members. Opp. 9.

12   These arguments are not only meritless, but highlight the prejudice flowing from Google's

13   concealment and destruction. Google was flagging traffic on an event-by-event basis so that it

14   could then gather "aggregate" statistics about such events. The data was reliable enough for Google

15   to use it for its own business purposes. And those events could, in fact, be joined and linked to

16   specific users by (among other methods) comparing the IP address and user agent string associated

17   with such data to the same pairings in "signed-in" or GAIA logs. Thompson Decl. ¶¶ 10-12, 24-

18   28. To the extent Google disputes the reliability of its incognito detection bits, or whether incognito

19   data could have been linked to specific users' GAIA accounts, Google should have provided

20

21   ─────────────────────

21   [5] Google points out that Plaintiffs received some data reflecting other fields within these logs. Opp.
22   21. But Plaintiffs still lack any data from these logs for Search 1 or 2. Nor will the prejudice be
     cured should Google ultimately produce such data. Plaintiffs will not receive any of this data prior
23   to their April 15 deadline for opening expert reports. And, contrary to the November 12 Order,
     which provided four rounds of iterative searches (Dkt. 331, Ex. 1), Plaintiffs will never be able to
24   conduct follow-up searches using the data returned from these 24 logs.

25   [6] Google's point about the two bits being included "GWS proto" (Opp. 13 n.7) further illustrates
26   the prejudice Plaintiffs have suffered. These bits' inclusion in that proto means that their logic
     could have been applied to the data stored within any logs that draw from the proto. Thompson
27   Decl. ¶¶ 18-20; Mao Reply Ex. 3 Tr. 39:16-41:10 (Google counsel explaining GWS proto).

28                                                     10

fulsome discovery so the parties and their experts could properly litigate those issues. Google stacked the deck by hiding the existence of these bits, hiding documents that confirm these bits are accurate, and now, after being caught, claims Plaintiffs should simply accept Google's say-so.

> B.    *This Court Has Authority to Sanction Google.*

**Google Violated Multiple Court Orders:** The Court should sanction Google under Rule 37(b), and the Court's inherent authority, because Google violated multiple Court orders and repeatedly misled the Court. In April 2021, this Court ordered Google to produce Plaintiffs' data, explaining that Plaintiffs "have a right" to use the data to refute Google's assertions. Apr. 29 Tr. at 19:2-7 ("[W]hat the Plaintiffs are asking for is pieces of information from different places because they want to see if they can piece together, by combination of that information, class members. And that's why—I mean, *it seems to me that they have a right to try to do that with whatever information you have*." (emphasis added)). Google did not comply with those April 29 instructions, nor the corresponding April 30 order. (Dkt. 147-2)—**Strike 1.** Google got another chance when the Special Master imposed a three-step data production process in September 2021. Dkt. 273. Google still did not comply, culminating in factual findings by the Special Master and this Court that Plaintiffs' data has "not yet been fully produced." Dkt. 299 ¶ 53; Dkt. 331 at 3— **Strike 2.** Google was granted another do-over with the November 12 order. Still, Google continued hiding *at least* ▮▮▮ Incognito detection bits that have been implemented in *at least* ▮ Google logs—**Strike 3.** Google does not deserve another at bat. "Because the record is clear that [Google] violated the [various] Order[s], equally clear that [Google's] conduct was well within its own control, sanctions of some type are warranted." *Apple*, 2012 WL 1595784, at *3.

**Google Failed to Supplement its Interrogatory Responses:** The Court should also sanction Google under Rule 37(c) based on Google's failure to supplement its interrogatory response to identify Mr. Fiard, Mr. Leung, and Ms. Liu.[7] Google does not even try to show that its

---

[7] Fed. R. Civ. P. 37(c) (permitting sanctions if a party fails to provide information or identify a witness as required by Rule 26(a) or (e)); Fed. R. Civ. P. 26(e)(1)(A) (stating a party "who has responded to an interrogatory…must supplement or correct its disclosure or response…in a timely

11

1   failure to timely disclose these witnesses was "substantially justified" or "harmless," meaning

2   sanctions are mandatory. Fed. R. Civ. P. 37(c)(1).

3       **Google Spoliated Relevant "Incognito" Data:** Google should have preserved class

4   members' data that was or could have been associated with the "is_chrome_incognito" or

5   "maybe_chrome_incognito" bits. Yet Google "failed to take reasonable steps to preserve it" and

6   such data "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

7   Google's only apparent justification for deleting such data during the course of this litigation is

8   that it secured a protective order from the Court concerning the deletion of certain logs *in their*

9   *entirety*. But the Court never ruled that Google had no obligation to preserve event-level data that

10  was or could have been specifically flagged with an incognito bit. Instead, the record before the

11  Court was based on Google's misleading statements suggesting that it could not identify incognito

12  traffic and it would be burdensome to preserve "all logs." The evidence on the whole, and Google's

13  opposition brief, confirm that Google's conduct was not inadvertent: it "acted with the intent to

14  deprive [Plaintiffs] of the information's use in the litigation." Fed. R. Civ. P. 37(e)(1)-(2).

15      *C.*    *The Punishment Must Fit the Crime.*

16      **Evidentiary Sanctions:** This Court should take as established that: (1) Google can detect

17  event-level Incognito traffic within its logs; (2) this Incognito data is linkable to users; and (3) the

18  class is ascertainable. To be clear, there is no ascertainability requirement in the Ninth Circuit.

19  *Buffin v. City & Cty. of San Francisco*, 2018 WL 1070892, at *5 (N.D. Cal. Feb. 26, 2018)

20  (Gonzalez Rogers, J.) ("The Ninth Circuit has not adopted an ascertainability requirement." (citing

21  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017))). Nevertheless, Google's

22  Opposition makes clear that its misguided ascertainability argument is likely what motivated its

23  concealment of evidence and destruction of data.[8] Google should not be permitted to profit from

24

25      manner if the party learns that in some material respect the disclosure or response is incomplete or

26  incorrect, and if the additional or corrective information has not otherwise been made known").

27  [8] Opp. 2 ("Plaintiffs' fundamental problem is that . . . data collected from members of the first
    class . . . during Incognito sessions are islands or orphaned data; they are not linked to a user's

28

1  its concealment and data destruction by continuing to press such arguments—all while Plaintiffs

2  have been deprived of important evidence they were entitled to use to rebut Google's position.

3      Google's cases concerning terminating sanctions are simply off-point. Opp. at 20-21 (citing

4  cases). Plaintiffs do not seek terminating sanctions, although Google's conduct arguably warrants

5  such relief: Google has "lied to Plaintiffs and the Special Master, destroyed evidence before and

6  after this case began, and impeded resolution of this case by failing to make complete and timely

7  productions to Plaintiffs and the Special Master." *Facebook, Inc. v. Onlineinc Inc.*, No. 3:19-cv-

8  07071-SI (N.D. Cal.) Dkt. 222 (Van, Keulen, M.J.) (holding any "lesser sanction would be

9  inappropriate under the circumstances"). Yet where, as here, the sanction does not amount to a

10  default judgment, the only question is whether the sanction bears "a reasonable relationship to the

11  subject of discovery that was frustrated by sanctionable conduct." *Navellier v. Sletten*, 262 F.3d

12  923, 947 (9th Cir. 2001). Nor does it matter whether the requested sanction will, in Google's view,

13  make it more difficult for Google to oppose class certification. *Craftwood Lumber Co. v. Interline*

14  *Brands, Inc.,* 2013 WL 4598490, at *13 (N.D. Ill. Aug. 29, 2013) ("Craftwood does not dispute

15  that a preclusion order would leave Interline without a basis for opposing class certification, but

16  notes that this result is of Interline's own making. We agree. The sanction is harsh but warranted").

17      Google next suggests that "lesser remedies are available," implying that this Court should

18  at most preclude Google from relying on particular evidence. Opp. 23. If this Court chooses to

19  employ a preclusion sanction instead of taking facts as established, then this Court should preclude

20  Google from making any *arguments* about any of the incognito detection bits or the identifiability

21  and linkability of data that would have been captured by such bits. Plaintiffs should be permitted

22  to rely on the (limited) discovery they have into these bits, without Google being allowed to make

23  counterarguments. Preclusion otherwise would carry no teeth—as the defendant, Google would be

24  happy to argue that Plaintiffs failed to prove what the deleted and concealed evidence would show.

25      Google wrongly claims that this Court may only preclude it from "relying on arguments

26  _____

27  identity."); *id.* 7 (describing class member identification as a "dispositive class identification problem" and an "insurmountable obstacle").

28

1   and evidence that it had not already disclosed by the time of the decision or the close of discovery."

2   Opp. 23. But Google *still* has not produced discovery concerning the "is_chrome_incognito" and

3   "is_chrome_non_incognito" bits, and *still* has not produced any data for all three bits in the Special

4   Master process. In any event, "it is well-established that '[b]elated compliance with discovery

5   orders does not preclude the imposition of sanctions.'" *Sas v. Sawabeh Info. Servs.*, 2015 WL

6   12711646, at *7 (C.D. Cal. Feb. 6, 2015) (quoting *North American Watch Corp. v. Princess*

7   *Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986)). "As the Ninth Circuit has explained, the

8   '[l]ast-minute tender of documents does not cure the prejudice to opponents.'" *Sas*, 2015 WL

9   12711646, at *7 (quoting *Princess Erime Jewels*, 786 F.2d at 1451). Even if Google had eventually

10  complied with its obligations (it ***still*** has not), "it would be unjust to allow [Google's] egregious

11  conduct to escape sanction." *Id.* at *11. Sanctions are appropriate where, as here, a party's decision

12  to withhold material until the close of discovery (and after) deprives another of "a meaningful

13  opportunity" to "comprehend" complex discovery. *Apple v. Samsung Elecs.* 2012 WL 1595784,

14  at *3 (N.D. Cal. May 4, 2012). Here, the (extremely limited) discovery came far too late.

15      Google's conduct was "designed to achieve a tactical advantage"; such "obstruction should

16  not be permitted to achieve its objectives." *Conway v. Dunbar*, 121 F.R.D. 211, 214 (S.D.N.Y.

17  1988). "Where the discovery misconduct has deprived the opposing party of key evidence needed

18  to litigate a contested issue, an order prohibiting the disobedient party from contesting that issue—

19  or simply directing that the matter be taken as established—is also appropriate." *Shanghai Weiyi*

20  *Int'l Trade Co. v. Focus 2000 Corp.*, 2017 WL 2840279, at *11 (S.D.N.Y. June 27, 2017).

21  Google's suggestion that preclusion is inappropriate where the subject "remains a contested issue

22  of fact" is wrong: Were that the standard, there would be no preclusion standard.[9] Opp. 24.

23  _____

24  [9] For support, Google cites *Natural Immunogenics Corp. v. Newport Trial Group.*, 2016 WL
    11520757, at *6 (C.D. Cal. June 16, 2016), which is inapposite because the plaintiff did not even

25  seek sanctions under Rule 37. And the court in *Kannan v. Apple Inc.*, 2020 WL 9048723, at *9
    (N.D. Cal. Sept. 21, 2020) declined to employ preclusion because there was only a "possibility"

26  that the party's deficient evidence collection efforts resulted in withholding evidence. Here, by
    contrast, Plaintiffs have established that Google hid and withheld particular evidence regarding its

27  tracking of Incognito traffic.

28                                          14

1    **Jury Instruction:** This Court should also instruct the jury that "Google concealed and

2    altered evidence regarding its ability to identify Incognito traffic." Mot. 22. Google argues that

3    this Court cannot order such a sanction because Google did not permanently delete or withhold *all*

4    relevant evidence. But Google's selective production does not absolve Google for the evidence it

5    deleted or withheld. *Kannan*, 2020 WL 9048723, at *10 (ordering jury instruction where party

6    searched some but not *all* locations he was required to search); *Nursing Home Pension Fund v.*

7    *Oracle Corp.*, 254 F.R.D. 559, 564 (N.D. Cal. 2008) (finding "adverse inferences in plaintiffs'

8    favor are warranted with regard to *some categories of evidence* that defendants concede was not

9    produced or preserved."). Google also incorrectly suggests that only this Court will decide whether

10   class members can be identified. Opp. 25. But that Google was knowingly logging and earmarking

11   incognito data, and then concealed such evidence throughout the course of discovery, bears on the

12   offensiveness of Google's conduct and is thus relevant to Plaintiffs' claims for invasion of privacy

13   and intrusion upon seclusion, as well as Plaintiffs' entitlement to punitive damages.

14   **Reimbursement of Special Master Fees:** Finally, Google is mistaken that Plaintiffs may

15   not seek reimbursement of Special Master fees. Rule 37(b)(2)(C) requires the offending party to

16   "pay the ***reasonable expenses***, ***including*** attorney's fees, caused by the failure." (emphasis added);

17   *see also Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1225 (9th Cir. 2018) (affirming sanctions

18   for costs associated with court-ordered deposition). Timely identification by Google of the

19   incognito detection bits would have significantly streamlined the Special Master process, including

20   by making it clear exactly which logs should be searched. Google's misconduct made the whole

21   process far more time consuming and expensive than it needed to be.

22   ## CONCLUSION

23   Plaintiffs request that the Court issue the sanctions described above and any other sanction

24   the Court deems appropriate. One purpose of sanctions is to "to serve as a general deterrent in both

25   the case at hand and other cases." *Sas*, 2015 WL 12711646, at *10. Absent meaningful sanctions,

26   Google and other parties would be incentivized to do exactly what Google has done here; namely,

27   lie and withhold evidence until (if) caught. That behavior cannot be encouraged.

28                                              15

Dated:  April 11, 2022                          BOIES SCHILLER FLEXNER LLP


                                                By */s/ Mark Mao*


                                                Mark C. Mao (CA Bar No. 236165)
                                                *mmao@bsfllp.com*
                                                Beko Rebitz-Richardson (CA Bar No. 238027)
                                                brichardson@bsfllp.com
                                                Erika Nyborg-Burch (CA Bar No. 342125)
                                                enyborg-burch@bsfllp.com
                                                BOIES SCHILLER FLEXNER LLP
                                                *44 Montgomery Street, 41st Floor*
                                                *San Francisco, CA 94104*
                                                Telephone: (415) 293 6858
                                                Facsimile (415) 999 9695

                                                James W. Lee (*pro hac vice*)
                                                *jlee@bsfllp.com*
                                                Rossana Baeza (*pro hac vice*)
                                                *rbaeza@bsfllp.com*
                                                BOIES SCHILLER FLEXNER LLP
                                                100 SE 2nd Street, Suite 2800
                                                Miami, FL 33130
                                                Telephone: (305) 539-8400
                                                Facsimile: (305) 539-1304

                                                Amanda Bonn (CA Bar No. 270891)
                                                *abonn@susmangodfrey.com*
                                                SUSMAN GODFREY L.L.P.
                                                1900 Avenue of the Stars, Suite 1400
                                                Los Angeles, CA 90067
                                                Telephone: (310) 789-3100

                                                William Christopher Carmody (*pro hac vice*)
                                                *bcarmody@susmangodfrey.com*
                                                Shawn J. Rabin (*pro hac vice*)
                                                *srabin@susmangodfrey.com*
                                                Steven Shepard (*pro hac vice*)
                                                *sshepard@susmangodfrey.com*
                                                Alexander P. Frawley (*pro hac vice*)
                                                afrawley@susmangodfrey.com
                                                SUSMAN GODFREY L.L.P.
                                                1301 Avenue of the Americas, 32nd Floor
                                                New York, NY  10019
                                                Telephone: (212) 336-8330

16

John A. Yanchunis (*pro hac vice*)
*jyanchunis@forthepeople.com*
Ryan J. McGee (*pro hac vice*)
*rmcgee@forthepeople.com*
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

Michael F. Ram, CA Bar No. 104805
MORGAN & MORGAN
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

*Attorneys for Plaintiffs*

17

# Mao Reply Declaration

# Redacted Version of Document Sought to be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

*Attorneys for Plaintiffs*

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>          Defendant. | Case No.:  4:20-cv-03664-YGR-SVK<br><br>**THIRD DECLARATION OF MARK C. MAO IN SUPPORT OF PLAINTIFFS' REQUEST FOR AN ORDER TO SHOW CAUSE (MAO REPLY DECLARATION)**<br><br>The Honorable Susan van Keulen<br>Courtroom 6 - 4th Floor<br>Date: April 21, 2022<br>Time: 10:00 a.m. |

1

## <u>DECLARATION OF MARK C. MAO</u>

2
I, Mark C. Mao, declare as follows.

3
1.      I am a partner with the law firm of Boies Schiller Flexner LLP, counsel for Plaintiffs

4
in this matter. I am an attorney at law duly licensed to practice before all courts of the State of

5
California. I have personal knowledge of the matters set forth herein and am competent to testify.

6
2.      I submit this Declaration with Plaintiffs' Reply Brief in Support of their Request

7
for the Court to issue an Order to Show Cause for Why Google Should Not Be Sanctioned for

8
Discovery Misconduct.

9
3.      From Google's initial list of identified logs and data sources, produced on

10
November 18, 2021, Google identified only ▮▮ logs with the "maybe_chrome_incognito" bit, and

11
none with the "is_chrome_incognito" or "is_chrome_non_incognito" bits.  Dkt. 338-1.  The ▮▮

12
logs that Google identified that contain the "maybe_chrome_incognito" bit are the ▮▮▮▮

13
▮▮▮▮▮  and ▮▮▮▮▮▮▮▮▮  logs.

14
4.      As part of the Special Master process, Google produced a version of the schema for

15
these ▮▮  logs on December 1, 2021. But these versions did not contain the

16
maybe_chrome_incognito bit. Google now claims that this bit was omitted since it was not among

17
the largest 100 fields in each log. (At the time Plaintiffs filed the Opening brief, Plaintiffs did not

18
know that Google also altered the schema for the ▮▮▮▮▮▮▮▮  log.)

19
5.      But weeks prior, Google produced schema with more than 100 fields for a number

20
of logs and sources, including ▮▮ fields for the ▮▮▮▮▮, ▮▮ for the ▮▮▮▮▮,

21
and ▮▮ fields for ▮▮▮.

22
6.      Once the dispute that became the basis for Plaintiffs' Motion for an Order to Show

23
Cause arose, Google produced different versions of schema for some of the logs that contain the

24
maybe_chrome_incognito bit, this time which contained the bit.

25
7.      Google also hid the "is_chrome_non_incognito" field from the schema

26
productions.  Two examples of this are the ▮▮▮▮▮▮  and the ▮▮▮▮▮▮,

27
produced by Google on March 11, 2022. Once Google re-ran the schema for these ▮▮ logs, the

28

1   schema showed the "is_chrome_non_incognito" fields.  Although Mr. Josef Ansorge for Google

2   initially called ████████████████ a "search log," he later admitted in our meet and confers that

3   neither log was a search log.

4         8.     Google has not produced complete schema for any logs that contain the

5   "is_chrome_incognito" bit.

6         9.     Google still refuses to confirm whether they are withholding any *other* Incognito

7   detection bits or *other* logs or sources containing any such bits.

8        10.    Similarly, Google has refused to respond to Plaintiffs' inquiries seeking to know

9   why Google did not timely produce documents concerning the maybe_chrome_incognito bit. In

10   the Opposition Brief, Google suggests that it produced documents in the Fall of 2021 making clear

11   that (i) a "technical design" for the bit dated "May 4, 2021" was "APPROVED" and (ii) Google

12   was "logging" the field "into ████" by June 2021. Opp. 5 (citing Trebicka Decl. Ex. 13). But the

13   May 4, 2021 version of the design document reflected an older plan to log in ████ logs which was

14   abandoned the next day on May 5, 2021 to log in ████ logs. Opening Mao Decl. ¶ 12 As my

15   Opening Declaration pointed out, Google did not produce the May 5, 2021, version of the

16   document until January 31, 2022. *Id.* ¶ 3. Plaintiffs have sent Google's counsel multiple messages

17   demanding an explanation for why the May 5, 2021, version of the document was not produced

18   from Mr. Liao's custodial files last fall. Google has never responded.

19        11.    Attached hereto as **Exhibit 1** is a true and correct copy of an April 1, 2022 letter

20   from Mr. Josef Ansorge, counsel for Google, to Special Master Brush and myself.  Plaintiffs do

21   not have any actual documents with these "proto comments," and the comments were only

22   produced to Plaintiffs as part of this letter. Google has not explained to Plaintiffs why the

23   comments would not have been produced as part of Google's prior document productions.

24        12.    Attached hereto as **Exhibit 2** is a true and correct copy of a March 15, 2022 email

25   from Mr. Josef Ansorge, counsel for Google, to Special Master Brush and myself.

26        13.    Attached hereto as **Exhibit 3** is a true and correct copy of the transcript from the

27   March 23, 2022 conference between the parties and Special Master Brush.

28

14.     Attached hereto as **Exhibit 4** is a true and correct copy of a document Google produced in discovery labeled GOOG-BRWN-00846508. The document was produced on March 2, 2022.

15.     Attached hereto as **Exhibit 5** is a true and correct copy of a document Google produced in discovery labeled GOOG-CABR-03849022. The document was produced on September 28, 2021.

16.     Attached hereto as **Exhibit 6** is a true and correct copy of the stipulation that Google proposed to Plaintiffs in response to the Court's order requiring Google to provide additional information about the maybe_chrome_incognito. bit Dkt. 505-1. Google sent this draft to Plaintiffs on March 25. Plaintiffs responded that day with a follow-up question. Google has not responded, which is why the stipulation has not yet been finalized and filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 11th day of April, 2022, at San Francisco, California.

*/s/ Mark Mao*

# EXHIBIT 1

# Redacted Version of Document Sought to be Sealed

**quinn emanuel** trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S EMAIL ADDRESS
josefansorge@quinnemanuel.com

April 1, 2022

**HIGHLY CONFIDENTIAL - SPECIAL MASTER AND ATTORNEY'S EYES ONLY**

**VIA E-MAIL**

Special Master Douglas Brush
(douglas.brush@accelconsulting.llc)
Accel Consulting, LLC

Timothy Schmidt
(timothy.schmidt@accelconsulting.llc)
Accel Consulting, LLC

Mark Mao
(mmao@BSFLLP.com)
Boies Schiller Flexner LLP

Re:    *Brown v. Google LLC*, Case No. 5:20-cv-03664-LHK-SVK (N.D. Cal.)

Dear Special Master Brush, Mr. Schmidt, Counsel:

Google is providing along with this letter additional information for the **is_chrome_incognito** and **is_chrome_non_incognito_mode** fields.

Below is the proto comment for the **is_chrome_incognito** field:

The proto comment for the **is_chrome_non_incognito_mode** field has been provided in Google's March 5, 2022 letter, which we reproduce below:

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Respectfully,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Josef Ansorge

# EXHIBIT 2

# Redacted Version of Document Sought to be Sealed

| | |
|---|---|
| **From:** | owner-googleteam@lists.susmangodfrey.com on behalf of Josef Ansorge |
| **To:** | Mark C. Mao; Douglas Brush; Timothy Schmidt |
| **Cc:** | QE Brown; GOOGLETEAM@lists.susmangodfrey.com |
| **Subject:** | RE: Brown (20-3664) v. Google - Plaintiffs" Proposed Preservation Plan |
| **Date:** | Tuesday, March 15, 2022 12:56:41 PM |

<mark>EXTERNAL Email</mark>

Dear Mr. Mao,

Thank you for the productive meet and confer yesterday. Below please find our written proposal / suggested framework for preservation.

### 15-MAR-2022 Draft Google Framework for Preservation

Google proposes to preserve a daily sample of 1,000 Display Ads events associated with 1,000 different randomly selected UIDs scoped to activity in the United States based on the Country field:

1. Event_id (information used to identify events in log entries);

2. IP address;

3. User-agent;

4. HTTP header (including x-client-data header field);

5. URL; and

6. Date and time (to the extent that is not legible from Event_id).

Instead of categorically preserving a number of different log sources, Google proposes to construct a log source for preservation that only consists of the specific fields and data to be preserved. In addition, Google proposes preserving:

- the ▬▬▬ dashboard data (based on **is_chrome_non_incognito** and **is_chrome_incognito** boolean fields); and

- the Display Ads dashboard data (based on **maybe_chrome_incognito** boolean field).

We are optimistic that the parties can find agreement and look forward to discussing class-wide preservation with you in more detail during today's meet and confer.

Best,

**Josef Ansorge**
*Of Counsel,*
Quinn Emanuel Urquhart & Sullivan, LLP

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8267 Direct
202.538.8000 Main Office Number
202.538.8100 FAX

josefansorge@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Mark C. Mao <mmao@BSFLLP.com>
**Sent:** Wednesday, March 9, 2022 5:06 PM
**To:** Douglas Brush <douglas.brush@accelconsulting.llc>; Timothy Schmidt <timothy.schmidt@accelconsulting.llc>
**Cc:** QE Brown <qebrown@quinnemanuel.com>; GOOGLETEAM@lists.susmangodfrey.com
**Subject:** Brown (20-3664) v. Google - Plaintiffs' Proposed Preservation Plan

<mark>**[EXTERNAL EMAIL from mmao@bsfllp.com]**</mark>

Dear Special Master Brush,

As you have requested, Plaintiffs propose the following to try to move the ball forward on a preservation plan, consistent with the Magistrate Judge's recent orders.

<u>Google to Preserve:</u>

Plaintiffs propose that Google extend its default retention period for three discrete categories of logs, as well as any encryption and/or joinability keys associated with any identifiers in such logs, as follows:

1. <u>UMA Raw Logs:</u> Google should preserve raw UMA logs through the duration of this case. ████████████████████████████████████████████████ ████████████████████████████████████ *See* GOOG-CABR-04801490.

2. ██████ <u>Logs with the "Maybe_Incognito" Bit:</u> Google should preserve all of these logs for at least 1 year longer than the default retention period. Please note that Google considered retaining ██████ logs—which include substantially greater data and are costlier to preserve than ██████ logs—for up to one year for its own, internal business purposes. *See* GOOG-BRWN-00845467.

3. <u>Select Additional Logs:</u> Google should preserve the following logs, which appear to contain either (a) the X-Client data header or (b) PPID-mapped biscotti and/or Analytics User IDs, for at least 1 year longer than the default retention period: ██████████████████████

[REDACTED]

For sources Nos. 2-3, the proposed retention periods may be sufficient, or would provide sufficient time for the parties to agree on a more targeted preservation plan if necessary. Plaintiffs remain willing to consider any proposals by Google to narrow what is preserved to less than the full content of these logs, but Plaintiffs presently do not have sufficient information to propose such a subset without further input from Google and believe the full logs should be preserved at least long enough for the parties to confer about a more targeted preservation plan. For example, Plaintiffs may be willing to meet and confer to agree on the preservation of a smaller subset of the data, specifically – 1) identifiers, 2) IP address, 3) user-agent, 4) HTTP header, 5) URL, 6) date and time, and 7) any "incognito"-titled field (e.g., "maybe_chrome_incognito") or field containing Incognito-detection (e.g., [REDACTED] fields).

<u>Google to Disclose:</u>

Plaintiffs also propose that Google disclose the names of all logs in the following categories, as well as their default retention periods. Once such a disclosure is made, Plaintiffs can consider what preservation, if any, may be necessary.

1. All source logs from which the "maybe_incognito" bit in the [REDACTED] logs described above may be inferred.

2. All logs containing any parameter or field with "Incognito" in the name, and the full name/description of the field with "Incognito" in the name for each such log. (For instance, [REDACTED] logs that contain an "is_chrome_non_incognito" bit would be included here.)

3. All logs containing PPID-mapped biscotti and/or Analytics User IDs. Google has indicated that it does not have an "existing tool" that "provides a listing of populated fields that indicate whether a given log contains PPID or Analytics User ID."

For these three categories of logs and sources that Plaintiffs are requesting that Google disclose, Plaintiffs may again be willing to meet and confer to agree on the preservation of a smaller subset of the data, specifically – 1) identifiers, 2) IP address, 3) user-agent, 4) HTTP header, 5) URL, 6) date and time, and 7) any "incognito"-titled field (e.g., "maybe_chrome_incognito") or field containing Incognito-detection (e.g., [REDACTED] fields).  Plaintiffs respectfully submit that Google should use whatever means it has available to attempt in good faith to identify such logs; for example, by (1) asking persons likely to have such knowledge, (2) running test searches for such identifiers across a broader set of logs to identify those containing such identifiers, (3) using any tools that would identify such logs (even if such a tool would not "provide a listing of populated fields" as Google's carefully-worded statement above suggests), or (4) any other methods available to Google.

Plaintiffs and their experts remain available to discuss these issues to try to arrive at a sensible

preservation framework.

Respectfully,

**Mark C. Mao**
(He/him/his)
Partner

BOIES SCHILLER FLEXNER LLP

44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(t) 415 293 6858
(c) 415 999 9695
mmao@bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

This e-mail contains communication that may constitute attorney/client privileged information and/or attorney work product. If you received this message in error, please notify the sender and delete it immediately.

To unsubscribe from the GOOGLETEAM list, click here

# EXHIBIT 3

# Redacted Version of Document Sought to be Sealed

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                   CASE NO.: 4:20-03664-YGR-AVK

5

6  CHASOM BROWN, MARIA NGUYEN and

7  WILLIAM BYATT, individually and on

8  Behalf of all other similarly situated,

9              Plaintiffs,

10  v.

11  GOOGLE, LLC and ALPHABET, INC.,

12              Defendants.

13  _____/

14

15

16                       HEARING

17

18

19    HEARING BEFORE:     Special Master Douglas Brush

20       DATE TAKEN:      Wednesday, March 23rd, 2022

21           TIME:        Unknown

22          TAKEN:        Remotely via Zoom

23

24

25  TRANSCRIBED BY:  KIMBERLY H. NOLAN

## CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
### Hearing on 03/23/2022

Page 2

```
 1            A P P E A R A N C E S

 2

 3  For the Plaintiffs:

 4  MARK C. MAO, ESQUIRE

 5  Boies, Schiller & Flexner, LLP

 6  44 Montgomery Street, 41st Floor

 7  San Francisco, California 94104

 8  415.293.6800

 9

10  For Defendant Google, LLC:

11  ANDREW H. SCHAPIRO, ESQUIRE

12  Quinn, Emanuel, Urquhart & Sullivan, LLP

13  191 North Wacker Drive, Suite 2700

14  Chicago, Illinois 60606

15  312.705.7403

16

17  For Defendant Google, LLC:

18  JOSEF ANSORGE, ESQUIRE

19  Quinn, Emanuel, Urquhart & Sullivan, LLP

20  1300 L Street Northwest, Suite 900

21  Washington, D.C. 20005

22  202.538.8000

23

24  Also Present:

25  Tracy Gao, Law Clerk at Quinn, Emanuel, Urquhart & Sullivan
```

Page 3

```
 1            P R O C E E D I N G S

 2        MARCH 23RD, 2022; VIA ZOOM

 3      SPECIAL MASTER BRUSH:   Okay.  Do we have

 4  everybody on -- somebody's just coming in now.  I'll hold my

 5  thoughts.

 6      MR. SCHAPIRO:  That should be it for us.  That's

 7  Viola Trebicka joining.

 8      SPECIAL MASTER BRUSH:  Okay.  Well, great.  Thanks,

 9  everybody, for coming together on this as we wrap up some of

10  the -- well, really the two open discovery issues that are

11  before me on Brown v. Google.

12      I just wanted to kinda set the stage of where we're

13  going with this today, because, really, what we have to do

14  is finish things, and, you know, there's really the two

15  buckets, let's say, of things that are to be finished, and

16  one being the preservation plan and the searches, and that's

17  it.

18      And, so, with that said, I'm a little bit

19  disappointed in the parties' inability to come up with

20  something more cohesive as a preservation plan.

21      Mr. Schmidt and I will kind of take what was given

22  to us and try to come up with something -- a semblance of

23  something that could be court-worthy, and we'll have to --

24  just have to put the issue to rest.

25      This is really, you know, not gonna be today a
```

Page 4

```
 1  forum for arguments on that.  You know, those are long past

 2  due, and I really, quite frankly, expected something to be a

 3  little bit more fully baked than what was presented, so,

 4  like I said, a little disappointed with everybody on how

 5  that was presented.

 6      But we'll muddle through and try to get something

 7  turned around so it can go to the Court, because that's

 8  something that, quite frankly, shouldn't take as much work

 9  that it's gonna need from Mr. Schmidt and myself.

10      But it needs to get done, so we'll take what was

11  provided to us and kind of put together something that -- to

12  send back to you guys that can be filed with the Court.

13      Moving on to the searches, the searches were

14  provided, and I just wanted to go through that and see how

15  we can finalize these.

16      Basically, what we want to be able to do is put

17  together a final round of searches across whatever

18  respective data sources that need to be searched, produce

19  results, and that's it.

20      So, really what we wanna be able to do is make sure

21  the Brown plaintiffs can provide the right identifiers for

22  the right time periods across the correct -- the necessary

23  data sources and then basically put a search on the Google

24  end and produce those results.

25      So, with that, why don't -- I guess we can work
```

Page 5

```
 1  from the letters that were exchanged yesterday.  Well, let

 2  me first ask this.

 3      From the plaintiffs' side, does that -- do you have

 4  what you need at this point to formulate the searches to

 5  myself that we can then QC check and send to Google?

 6      MR. MAO:     Yeah.  We -- I think, Special Master

 7  Brush, we already provided that to you on Monday, and the

 8  identifiers that we selected were the same identifiers which

 9  we had from 2, which Google should have.

10      The one outstanding issue which is in front of you

11  both for that and also for the preservation plan is really

12  the Is_Non_Chrome_ Incognito bit and where that sits in the

13  fields.  I'm sure you can appreciate that.

14      That's actually a field in the GWIS entry proto,

15  and that's gonna be relevant for the searches and also for

16  your preservation plan, because, as you can probably

17  appreciate, that's sitting at the front end of the proto

18  logs, meaning that it's a field that could be in -- you

19  know, assembled for any customized logs, whether going

20  forward or going back historically.

21      I guess we can ultimately not resolve that issue

22  here and save that issue for the hearing in front of the

23  trial court and the magistrate judge in April, but I do

24  think that it's gonna be an important thing to be briefed

25  for both the preservation plan and just for something to be
```

**Page 6**

1  fleshed out in the searches, because you can probably
2  appreciate the surprise on our side when that showed up in
3  the ███████ and also the ███████ logs for the first
4  time earlier this month (blip) showing up.  So (blip) --
5  SPECIAL MASTER BRUSH:  Showing up as part of the
6  discovery process?
7  MR. MAO:  I'm sorry?
8  SPECIAL MASTER BRUSH:  Showing up as part of the
9  discovery process?
10  MR. MAO:  Showing up as part of your process,
11  Special Master.
12  SPECIAL MASTER BRUSH:  Which is part of the
13  discovery process, but what I'm saying is --
14  MR. MAO:  Right, right, right.  Sorry.  I was
15  unsure if you were differentiating the two.
16  SPECIAL MASTER BRUSH:  No, no, no.  But the
17  umbrella term.
18  MR. MAO:  (Inaudible) lawyer that way.
19  SPECIAL MASTER BRUSH:  What I'm saying is like I
20  think -- therefore, the discovery process before me has
21  served a purpose, then, if you're finding out things.
22  That's what discovery does.
23  So, I wouldn't be terribly surprised that you found
24  out things during discovery, because that's its purpose.
25  So, but that being said, you know, if this is a

**Page 7**

1  field that comes as part of a responsive query, so be it,
2  you know.
3  I guess what I'm asking is how -- you know, again,
4  if we're going off the specific identifiers to search the
5  logs with other characteristics, you know, it's something
6  that is either produced as part of results or not.
7  MR. MAO:  Yeah.  So, let me maybe just
8  simplify that a little bit.  Right?  If you recall, back in
9  November they produced -- Google produced a number of
10  schema.
11  There's some questions regarding how those schema
12  were produced and then was -- you know, there was some -- I
13  guess some -- I'm trying to avoid argument.
14  There was some perception by Google as to what they
15  believe they produced and perception of the plaintiffs as to
16  what they produced by December, which is, you know, a set of
17  schema.
18  That set of schema does not include that field,
19  although the production of that schema now in February and
20  March show that field, and, of course, that ultimately is
21  because that is a GWIS entry proto buffer field which sits
22  at the very front.  It's customizable.  It is, you know,
23  movable and mergeable with other logs.
24  And I guess the issue for me right now, setting
25  aside the searches, is that that's clearly part of the

**Page 8**

1  preservation proposal and issues to be addressed, and you
2  can see that that's actually a glaring -- glaring issue
3  which Google does not wanna address as part of this.
4  And let me point out, you should look at the
5  proposal -- we've been going back and forth last night -- in
6  front of you.  That's clearly not there, and here's the
7  reason why.  If you go back and --
8  SPECIAL MASTER BRUSH:  Are you saying that's the
9  preservation or the --
10  MR. ANSORGE:  The preservation --
11  SPECIAL MASTER BRUSH:  No.  We're not talking --
12  we're only talking about searches.  Preservation's done.
13  That was not -- we're taking that -- we're not talking about
14  that right now.  We're talking strictly on searches.
15  MR. MAO:  Okay.
16  SPECIAL MASTER BRUSH:  There is no discussion about
17  preservation today.
18  MR. MAO:  Yeah.  I guess the question, then,
19  is, you know, whether or not that's, you know, (blip)
20  search.
21  SPECIAL MASTER BRUSH:  Just going through the
22  process -- I mean, this is it, you know, what are gonna be
23  the search parameters that you wanna supply us that we will
24  search this final round of searches is what I'm getting at.
25  Like that's where we're at.  We need to compile that and

**Page 9**

1  press search and be done with this.
2  MR. MAO:  Okay.  Understood, Special Master.
3  SPECIAL MASTER BRUSH:  Okay.  I'm looking at the
4  letter now.  Is that something you wanna clearly refine a
5  little bit?
6  MR. MAO:  Yeah.  We can do that.  I think part
7  of the problem, as you can appreciate, Special Master, is
8  that there were searches that were supposed to come back
9  from iterative search 2 -- right? --
10  SPECIAL MASTER BRUSH:  Uh-huh.
11  MR. MAO:  -- but you wanted to know where we
12  were at with this, which is why we gave you that.
13  SPECIAL MASTER BRUSH:  But that's -- I think we're
14  framing up around the same thing, is what do you need.  Are
15  we waiting for any further production? Is there something --
16  MR. MAO:  Yeah.  So …
17  SPECIAL MASTER BRUSH:  And if that's the case, I
18  wanna take it to Google and find out -- you know what I'm
19  saying?  I just wanna get the order of operations down.
20  MR. MAO:  Yeah.  It -- I would like to get the
21  remaining searches done for search 2.  For example,
22  remember, we don't even have the histograms and the user
23  actions from the UMA searches for search 2 yet.  And also,
24  for the test parameters that you had ordered, we also
25  haven't gotten a number of the results back yet.

Page 10

```
 1              I'm hoping that with the selection -- you know,
 2    while we reserve our objections, that the selection of the
 3    publishers last night -- and I think that you were copied on
 4    -- we can move past those at least just get the -- you
 5    know, the schema, the fields and also the values if they are
 6    expressed so that we can move on with them.
 7              SPECIAL MASTER BRUSH:  Like I said, on the Google
 8    side, are you tracking what Mr. Mao's saying as far as what
 9    open productions are out there?  Is there anything that you
10    wanna add color to or specifically a timeline to?
11              MR. ANSORGE:  We're tracking -- what we wanted to
12    do is provide an update on UMA, which Mr. Mao was just
13    referencing.
14              SPECIAL MASTER BRUSH:  Uh-huh.
15              MR. ANSORGE:  There I can tell you we have two
16    engineers who are on the verge of nervous breakdowns, who
17    worked through all weekend, who have been trying to
18    reconstitute the historic data for the searches for these
19    specific pulls, and so far those searches have always timed
20    out.
21              We can provide you more technical detail and color
22    after another call with them today, if that's helpful to
23    you, Special Master Brush.
24              What I understand from their description is that
25    these aren't queries that are usually run.  They're such a
```

Page 11

```
 1    large source that they're having problems with the
 2    information being past.
 3              I understand there's some confusion with regard to
 4    what Mr. Mao was stating earlier with the searches, the
 5    Incognito fields in the preservation proposal.  We're happy
 6    to address any of those at your convenience.
 7              But what we're due for the searches is we're
 8    closing out the searches that are in the pipeline.  We have
 9    very helpful -- and we appreciate Mr. Mao's forthright
10    approach here -- we received their -- the selection for the
11    publishers that are supposed to receive notice.
12              Our hope was that we would be able to just provide
13    notice once.  Unfortunately, we still don't have the notice
14    from -- or the selection from Calhoun.  Hopefully, if we can
15    get that today we can, you know, have one process whereby we
16    notice all the different publishers.
17              We're not sure what other searches Mr. Mao proposed
18    or sent yesterday.  I believe he's followed the process
19    properly as in sending it to the special master first.  So,
20    I'm not sure how they slot into what we currently have going
21    on, but we are awaiting them with rapt attention.
22              SPECIAL MASTER BRUSH:  Gotcha.  Yeah.  No.  And
23    that's kinda why I firewalled it a little bit, just so we
24    can make sure one process doesn't interfere with the other.
25    So, it sounds like it's a work in progress with a TBD date
```

Page 12

```
 1    based on some other options that have to be done today
 2    because there was -- it was either timing or failing out
 3    over the --
 4              MR. ANSORGE:  Yes.
 5              SPECIAL MASTER BRUSH:  Okay.
 6              MR. ANSORGE:  Yes.  On the UMA search.  I mean,
 7    you can provide more data.  We've got a -- we're gonna have
 8    a call with them later where I can give you the different
 9    technical details, but my understanding is that -- we've
10    been receiving pings all through the weekend -- they've been
11    trying to troubleshoot in a variety of different ways to
12    pull that specific -- the historic dates that were required
13    and to reconstruct the searches that were done before.
14              I'm hoping that it's not going to be required
15    because we have so much overlap anyway now between the most
16    recent ▮▮▮▮▮ production and the previous UMA searches that
17    the main concern Plaintiffs had about overlaps should be
18    addressed with what we've already done and the data that
19    we're about to produce.
20              With regard to the publisher notice, we'll await
21    your input.  We would really appreciate it if we could also
22    have them from Calhoun and then do it in one fell swoop, but
23    if it's --
24              SPECIAL MASTER BRUSH:  No, no.  I'm fine with that.
25              MR. ANSORGE:  -- it's that frozen in time, okay,
```

Page 13

```
 1    great.
 2              SPECIAL MASTER BRUSH:  Yeah, yeah.  Because -- no,
 3    that makes sense.
 4              MR. ANSORGE:  Our TBD -- our goal there is seven
 5    to eight days for the publisher notice, and that's when we
 6    should be done -- well done with everything that's in the
 7    pipeline, everything that's been produced.
 8              The UMA data should be in well before then, as well
 9    as anything else that's outstanding.
10              SPECIAL MASTER BRUSH:  Okay.  Mr. Mao?
11              MR. MAO:         Yeah.  Just for the historical
12    searches, recall, Special Master Brush, we had been asking
13    for those since November in the process, and we're not
14    asking for a lot of dates here.  I would like for that
15    process to be (blip).
16              I don't see -- in terms of them not being produced
17    for search 2, that was not any shortfall or any failing on
18    Plaintiffs' side.  You know, in search 1 it produced the
19    histograms, they produced the user actions, and those are
20    simply omitted in search 2 using a different (blip).
21              MS. ANSORGE:  Yes.  And we're rerunning the
22    searches that can be run quickly and out through the window.
23    There's also duplicative dates.
24              What I was providing an update on is trying to
25    reconstruct the historic searches, and I think that is
```

**CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.**
**Hearing on 03/23/2022**

Page 14

1  timing out and that's not working.
2  And, Mr. Mao, I apologize. It's not that this is
3  something that we are doing to spite you. Believe me, I
4  would love for this to be over and just hand it to you.
5  There's actual technical limitations.
6  The engineer tells me it's timing out and they have
7  been working on it all weekend in light of all their other
8  tasks that they're supposed to be doing. That's the truth.
9  That's what I'm conveying to you.
10  I think it's not a problem, and it shouldn't be
11  one, because there's already overlap so many times over, and
12  I'm hoping we can lay it to rest.
13  I would also -- I'd just -- if there are any
14  additional searches that the special master team approves,
15  we would respectfully request that they don't require more
16  publisher notice, that that's not something we would have to
17  do again.
18  SPECIAL MASTER BRUSH: Okay. So -- go ahead, Mr.
19  Mao.
20  MR. MAO:   No. Just from the publisher notice
21  thing, we have an interim solution, you know, with both
22  sides reserving their rights on that (blip).
23  In terms of what Mr. Ansorge is saying, that there
24  be no more publisher notice, I'm just not sure that that's
25  an argument we need to get into now, because I'm not even

Page 15

1  sure what publishers (inaudible) would require notice. You
2  know, we're talking about a hypothetical now (blip) and I'm
3  not sure what that means.
4  I'm not sure if that (blip) means that we're gonna
5  (blip) on the production or -- I mean, you see which
6  publisher (blip).
7  MR. ANSORGE:   I lost part of the sound there.
8  MR. MAO:   Yeah. I mean --
9  SPECIAL MASTER BRUSH: Yeah, Mr. Mao. Can you
10  please -- please, just restate the question.
11  MR. MAO:   Yeah. My question is what is -- Mr.
12  Ansorge, I'm not sure what you mean by "no more additional
13  publisher notice." We (inaudible) --
14  MR. ANSORGE:   (Interposing) Yeah. I'm happy to
15  address that, Mr. Mao.
16  SPECIAL MASTER BRUSH: Yeah. I think that's a
17  clarification -- I'll let Mr. Ansorge clarify that, because
18  I think I'm tracking what he's saying and there might just
19  be a disconnect there.
20  MR. ANSORGE:   So, the list that we provided you,
21  Mr. Mao, you'll see that there is I think 400-plus different
22  publishers. Some of them, because we've broken it out by
23  how many events they correlate to, is one publisher for one
24  event. We believe that it's unduly burdensome and not
25  proportional to the needs of the case, where this is all p-

Page 16

1  log data, to have individual bilateral communications with
2  each publisher for a single individual event.
3  However, we gave Plaintiffs the option to choose
4  different ones if they want to, if there's a specific one
5  that they're interested in.
6  So, our fervent hope is that the publisher notice
7  can be done in one fell swoop, these are the ones that are
8  going to be noticed for Brown, these are the ones that are
9  going to be noticed for Calhoun, if we can have one process
10  by which we do that and then we are closed out and there's
11  no more publisher notice that's required.
12  So, what we're saying is for the next round of
13  searches we would hope that we're not again selecting
14  sources that require publisher notice so that we don't have
15  to go through that process again so that we can in one fell
16  swoop deal with it. That is our request.
17  So, the next round of searches, if we already know
18  what they are and the special master team approves them and
19  they do require publisher notice, then I would prefer for us
20  to sort that out today before we notice the 30-something
21  publishers that you have selected and then have to notice
22  other ones in a few days afterwards.
23  MR. MAO:   Yeah. I mean, you see the --
24  Special Master, I hope you see the catch-22 here for the
25  Brown plaintiffs in the sense that -- well, let me -- Mr.

Page 17

1  Ansorge, before you -- just let me finish my argument.
2  Google is the one with the storage of the data, and I'm
3  not trying to create additional notice requirements for you.
4  We're simply saying these are gonna be our searches and
5  we're entitled to the data we're entitled to.
6  There's also a protective order in place in terms
7  of your concerns about the publisher notice. We already
8  went along with your interim solution and selected, you
9  know, with reservation of rights, so that this can move
10  forward.
11  I'm not gonna carte blanche agree to something
12  which I don't know what you're actually asking me to agree
13  to before we've actually gone into it.
14  I mean, Mr. Ansorge, what you propose is
15  (inaudible) --
16  SPECIAL MASTER BRUSH:   (Interposing) Well, let me
17  pause -- let me pause you right there, because I just wanna
18  make sure we're clearly understanding this, we're not --
19  okay.
20  So, I believe what, Mr. Mao, you're saying is
21  because you don't have the search results that are being
22  held back at the current time because of publisher
23  notification, you don't have all the information that you
24  need to craft the final searches that may also require
25  publisher notification. Is that what you're saying?

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022

Page 18

1    MR. MAO:     No.  I don't -- no.  I think what
2  Mr. Ansorge is referring to is that once we submit the final
3  searches he's gonna hold back whatever -- whatever is deemed
4  to have required publisher notice unless we address that
5  today, Mr. Brush, and what I'm saying is how do I do that
6  when I don't know what's gonna be coming back.
7        SPECIAL MASTER BRUSH:  Yeah.  No.  I -- it's --
8  it's --
9        MR. MAO:     We're not talking -- see, we're not
10  talking about the historical corpus right now, we're talking
11  about the -- sorry -- we're not talking about the historical
12  corpus -- sorry -- we're not talking about the results that
13  they are preserving, we're talking about these final
14  searches that you want done.  Right?
15      Like Mr. Ansorge's asking me to say "Yes, if
16  there's any part of that that requires additional publisher
17  notice -- " okay? -- they're not gonna produce that and that
18  Mr. Mao and Mr. Frawley will have forever waived their
19  rights here today on that, and I'm not (inaudible) --
20      SPECIAL MASTER BRUSH:  (Interposing) Well, listen.
21  I mean, I've already ruled on the fact that if there is
22  responsive data that's part of the publisher data corpus and
23  they need to be notified, they will, it's just a matter of
24  timing.  I think I've been pretty clear that that's a --
25  that's something that will happen.

Page 19

1        What we're trying to find out is the most efficient
2  way for the defendants to do it so they can focus energy and
3  time and also getting you the results, because there are
4  limits in resources.  And that's the way I'm looking at it.
5      Mr. Ansorge, is that where -- are you understanding
6  that as well, that if there is responsive data that needs
7  third-party publisher notification that no matter what it's
8  gonna be done, it's just a matter of timing?
9        MR. ANSORGE:  So, I think we might have a slight
10  disconnect on what is responsive data and what is not.  Our
11  understanding from the search for the preserved data was
12  that we were going to identify what publishers it would not
13  be unduly burdensome to notice, because providing notice to
14  hundreds of publishers we believe is unduly burdensome and
15  not proportional to the needs of the case, especially where
16  this is all p-log data, which is not in the class, not part
17  of the actual case, so we're engaged in these individual
18  bilateral communications with all these different publishers
19  for data that might be relevant in a different case.  It's
20  actually not relevant in this case.
21      Our hope was that we would select -- and I
22  understand Plaintiffs are not waiving any of their rights,
23  but they select specific publishers that make up the bulk of
24  the corpus of the events, and we had frontloaded that
25  exercise for them by saying "There's these -- if you pick

Page 20

1  these 20, you get more than 50 percent, there's something
2  like 60,000 different events.  You pick these ten, you'll
3  get more than 80 percent in different formats for a
4  different set of searches."
5      If we do that, we have one moment where there's
6  notice, and we would prefer for that moment to be later in
7  the day if there's more that should be noticed, or if the
8  ruling is that actually all of them need to be noticed and
9  we do have to provide notice to 400 or 500, then we should
10  do that in one fell swoop.
11      If the additional searches that are currently being
12  discussed entail further publisher notice, our request was
13  simply that we would roll those into the publisher notice
14  that's currently going forward.
15      It wasn't intended to raise the temperature or to
16  move into argument in any way, Mr. Mao.
17      SPECIAL MASTER BRUSH:  No, no.  No.  Okay.  I take
18  it there's an important distinction there.  We're talking
19  about the -- you know, and I apologize if I (inaudible) --
20  we're talking about two different buckets of data.
21      You know, we have the data that was initially
22  preserved.  You know, we call that the preserved, not
23  produced historical data, which mixes a lot of the
24  terminology we're using, but it's the data that was
25  initially preserved but not produced.

Page 21

1        Is that the data set we're talking about?
2        MR. ANSORGE:  It's one of the data sets we're
3  talking about.
4        SPECIAL MASTER BRUSH:  One, right.  And then --
5        MR. ANSORGE:  It's one.  So -- yeah.
6        SPECIAL MASTER BRUSH:  And, so, for that, one of
7  the things I suggested was running searches along that and
8  seeing what was responsive to -- what was responsive to the
9  searches that might have third-party publisher notification.
10  Was that something that either could be done or does that
11  make sense in general terms?
12      MR. ANSORGE:  Yeah.  As something that could be
13  done that does make sense.  I believe we had a more detailed
14  discussion about it in the Calhoun case where we were saying
15  if we want to follow the practice that has been implemented
16  in the special master process, then we're running a specific
17  ID over a specific source for a specific period, and the
18  returns that are then, you know, responsive, we then
19  determine what is required for the publisher notice.
20      Here, they were going to receive even more where
21  instead of having to make that cut, we have already produced
22  AdMob and AdSense publisher data, which it's something like
23  400 different publishers rolled up in the first one, even
24  though neither of those products are part of the categories
25  of the actual services at issue in the class definition.

**CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.**
**Hearing on 03/23/2022**

Page 22

1    We now are discussing the tail end of logs that
2 require AdManager publisher consent, and for those we've
3 already previously produced logs that require the consent,
4 in January, so there should be clarity in terms of the field
5 structure.
6    We had reached this compromise proposal where we
7 ran IDs, stripped out the values so that Plaintiffs would
8 have the different field structure or kind of schema
9 approximation for certain tests to count IDs.
10    We're now simply talking about how to close out the
11 process more efficiently.  And we're fine with providing
12 this large bulk of preserved data.  Our main concern about
13 the burden relates to the burden in proportion of having
14 individual conversations with hundreds of different
15 publishers.
16    SPECIAL MASTER BRUSH:  No.  I get that.
17    MR. ANSORGE:  The less sophisticated ones have --
18 might not have in-house counsel, might not be familiar with
19 the data flow at all.  We'll have to in different ways
20 explain it.
21    It ends up being a very heavy lift for data that by
22 Plaintiffs' definition is not at issue in this case.
23    MR. MAO:    So, we -- well, we disagree with
24 that, but I'm trying to avoid argument here today, Mr.
25 Brush.

Page 23

1    SPECIAL MASTER BRUSH:  Oh, sure.  I'm just trying
2 to (inaudible) that we have two buckets -- that we have kind
3 of two -- they'll give us two buckets or tranches of data.
4    We have the historical -- or the preserved data
5 that has been preserved but not searched.  I would prefer
6 that we find some strategy for this to produce responsive
7 data to search criteria that we have.
8    Now, you've already gotten a good amount of that
9 that doesn't need the third-party consent, so there's been a
10 substantial production of that.
11    For the stuff that's left over, I think we do need
12 to find a way that needs to make it more in scope and in
13 line with the case so it's not a nowhere production, and
14 that's where I'm trying to apply some methodology that we've
15 used in the past in doing a terminology search.
16    Because essentially there is data there that we
17 don't even know is responsive, and it doesn't make sense for
18 Google to have to sit -- go out there and go to do all these
19 publishers who basically don't have data that falls within
20 the responsive scope.  Now, there's that.
21    Now we have all the other data that's in production
22 systems, and production systems being, you know, what's in
23 the Google day-to-day environment, and that goes for stuff
24 that's mirror-term searches, just stuff that's historical
25 logs that are sitting on Google servers.  That stuff, you

Page 24

1 know, we've been searching in iterations and doing different
2 searches.
3    As we finalize those searches and we're looking --
4 you know, I think we've talked about -- I'm just gonna use
5 the terminology (inaudible) -- but like these flume searches
6 across a lot of these compressed sequel databases.
7    I would anticipate -- and, Mr. Ansorge, you can
8 tell me -- that there would be a similar problem as we get
9 into this, that there could be publisher data in those final
10 searches that then would require notification.
11    MR. ANSORGE:  So, there's a few logs where that
12 would be the case.  I think it -- to respond to your first
13 question on how to close this out, I think this is what we
14 would propose for the bucket where this is data that was
15 part of the second set of iterative searches.
16    Plaintiffs have I believe selected more than ten --
17 something like 14 -- different publishers.  That provides
18 them the vast bulk of -- 80, 90 percent of all the different
19 event records of those specific searches, and it ends up
20 being a targeted set of notice requirements, and we would
21 propose that we follow that path where Plaintiffs have
22 selected specific searches.
23    We understand they're not waiving their rights, but
24 just in the interest of proceeding and managing to close it
25 out for the preserved data, historically preserved data.

Page 25

1    I wouldn't want to be too aggressive, but my
2 opening position, Special Master, would be that, well, none
3 of this is relevant because it's all p-log data, and that's
4 not the data that we've been -- has been subject to targeted
5 searches.
6    However, putting all that aside and having no
7 argument, we've already produced AdMob, AdSense data.  We
8 would be prepared to, in the interest of closing this
9 process out as quickly as possible, not forgoing the
10 targeted searches, because I think that that would be more
11 time-consuming at this stage, and instead focusing on these
12 20 publishers and providing them notice.
13    This will give Plaintiffs, in addition to all the
14 data they already have, another surfeit of information.
15    And I think most important for the historic data
16 discussion is this is data that would start from June 2020
17 in different forms encapsulated daily, and that is provided.
18    So, it covers a lot of the concerns and questions
19 about historic data, and I hope that will obviate the need
20 for at least a large part of further searches.
21    MR. MAO:    That was a lot.  Special Master
22 Brush, I (inaudible).
23    SPECIAL MASTER BRUSH:  (Interposing) No.  I'm
24 unpacking.  I'm just -- yeah.
25    MR. MAO:    I think the main thing here is we,

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022

Page 26

1  too, want to be finished with the process.  We just want our
2  data so that there's no gas in the hole from them.
3      SPECIAL MASTER BRUSH:  No.  And it's -- look, we
4  wouldn't be in this process if it was easy.  I mean, there's
5  complexities to this that we're working through and I
6  believe both parties are doing in good faith.
7      I mean, to me it keeps falling back that if there's
8  responsive data based on the search criteria -- or the
9  search process in the November 12th order, and the way that
10 we're doing it, it needs to be searched -- well, the
11 identified data sources, you know, need to be searched with
12 the criteria process in the November 12th order, and if it's
13 responsive, it needs to be produced.
14     I mean, that's just the logic I'm trying to follow
15 here in trying to apply this to this problem.  Then we have
16 the issue with the third-party notifications.
17     And, really, that all falls more -- I mean -- well,
18 I mean, it really kinda falls across both.  I mean, this is
19 why we have this process.
20     But I understand we're also -- I do appreciate, you
21 know, Google's position of trying to be efficient in the
22 notification process, and I do understand there's resource
23 constraints on that.  I'm just trying to figure out where
24 the gap -- you know, where the potential gap is here.
25     If we go forward with what Google's proposing,

Page 27

1  without waiving any rights, to get some data into
2  Plaintiffs' hands, might be the best way to go forward just
3  so we get something going.
4      But I appreciate the concerns from Plaintiffs and
5  would -- you know, if there is a concern that we can
6  distinctly say something's not right or missing or, you
7  know, we need you further, by all means, we would have
8  to readdress that.
9      But we need to kinda get this going forward in some
10 manner, and --
11     MR. ANSORGE:  So, a potential solution, if I may,
12 following up on that opening, Mr. Brush, then would be we
13 provide notice to all the publishers that are entailed in
14 the second round of searches.
15     SPECIAL MASTER BRUSH:  Yeah.
16     MR. ANSORGE:  By my count, that would be 81.  Some
17 of those, there's just individual single events.
18     SPECIAL MASTER BRUSH:  Sure.
19     MR. ANSORGE:  However, I would then respectfully
20 request that we don't provide any notice and do not provide
21 any data from that preserved corpus of p-log data, which
22 entails many different -- hundreds of different publishers,
23 and we focus -- we follow, you know, this line stringently,
24 that if there's something -- a search that was conducted
25 under the November 12th process, we'll provide the notice

Page 28

1  and that's -- you know, some of the -- I'm looking at the
2  second-round searches.
3      Some individual ones -- Glassdoor, Inc. -- is just
4  a single event, so we would have to speak to, you know,
5  counsel at Glassdoor about one plaintiff visiting one
6  website associated with Glassdoor one time, but we'd be
7  willing to do that to close out the process, and that would
8  then be noticed for 81 different publishers for the second
9  round of searches.
10     MR. MAO:    So, Mr. Brush, for the historical
11 corpus, what the clients really want -- sorry -- what the
12 plaintiffs really want are their IDs.  That's one thing.
13 And these other things --
14     SPECIAL MASTER BRUSH:  Mr. Mao, let -- sorry.
15 Let's clarify.  When you say "historical," which data source
16 -- I mean, which -- are you talking about the --
17     MR. MAO:    The preserved corpus, the preserved
18 corpus.
19     SPECIAL MASTER BRUSH:  Okay.  The preserved, not-
20 searched, partially-produced data set.
21     MR. MAO:    Yeah.  I mean, I think -- I think a
22 very small amount of that was produced.  What you're looking
23 for --
24     SPECIAL MASTER BRUSH:  Well, and that's the
25 question -- yeah, yeah.  You led me right into where I was

Page 29

1  going with it.
2      Do we know if -- and maybe we did this in Calhoun.
3  Is there a way to get a percentage, to say, well, look --
4  you know, whether in gigabytes or records or some way to
5  determine, you know, what was not produced because of the
6  need for third-party consent, to say, well, heck, it's only
7  5 percent, so, yeah, let's forgo that, because the bulk of
8  the data is gonna be within the stuff that has been
9  produced.
10     We don't know, unless Google can provide an answer
11 to that now.
12     MR. ANSORGE:  So, we had run some of those numbers
13 for Calhoun.  I would have to go and confirm them for Brown
14 -- and I'll speak to an engineer -- but they are I believe
15 in the range of -- it's something like 10 percent.  And,
16 again, it's data that --
17     SPECIAL MASTER BRUSH:  They being 10 percent that
18 was produced or held back?
19     MR. ANSORGE:  No.  Ten percent that was held back.
20 So, and these are for log sources where, you know, they
21 implicate third-party publisher data, and it's all p-log
22 data, so actually, by definition, not at issue in this case.
23     But that's -- I can get the specific numbers for
24 you.  I'll ask the engineer.
25     SPECIAL MASTER BRUSH:  Why don't we do that?

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022

Page 30

1      MR. ANSORGE:   But it's not a situation where
2  there's more of the not-produced data than produced data.  I
3  mean, the ratio is the other way around.
4      SPECIAL MASTER BRUSH:  Yeah.  No.  If that's the
5  case, that's a substantial amount, and we -- I would be in
6  the position of deprioritizing -- you know, wrestling with
7  that continually in favor of putting the efforts and laser
8  focus on finishing the searches, for the searches that have
9  been completed that need notification, getting those done,
10  and then finalizing the searches.
11      But if that's the case, then we are gonna
12  deprioritize that small subset of data, because there has
13  been a lot that was produced that, quite frankly, was never
14  really honed down or searched.
15      And, so, there would be enough data in there for
16  Plaintiffs to make a determination for final searches.
17      MR. MAO:      So --
18      SPECIAL MASTER BRUSH: Now --
19      MR. MAO:      Sorry, Mr. Brush.  You're still
20  talking about the historical preserved corpus, right?
21      SPECIAL MASTER BRUSH: Yeah.  I'm like -- I'm still
22  hesitant to say the word "historical," because there is --
23  when we've said that about some of the -- you know,
24  historical data being everything that's in the production of
25  the live systems and stuff that's in active databases but

Page 31

1  might be in a mere -- or a more offline status.
2      So, we do have some of that historical -- like
3  there's that data that still needs to be potentially
4  searched.  I'm just talking about the stuff that was
5  preserved early on in the matter.
6      MR. MAO:      Right.  And that's what I'm talking
7  about as well.
8      SPECIAL MASTER BRUSH:  Okay.
9      MR. MAO:      Again, I'm --
10      MR. ANSORGE:   We can probably run those numbers
11  just based on the spreadsheet we produced to you -- I'm
12  sorry for interrupting, Mr. Mao.  I'm just adding them up
13  real quickly.
14      MR. MAO:      Yeah.  Mr. Brush, we're looking
15  really primarily there for two things, which is, one, what
16  is stored, not the actual values -- we just wanna know what
17  is actually being stored and kept and what was preserved --
18  and, two, our clients' IDs (blip) that list.
19      So, so long as you're not precluding us from
20  obtaining our IDs, you know, from there searching for
21  our clients' IDs, and we're able to get an inventory of what
22  is actually stored and preserved, there might be some ways
23  to go forward on this.
24      SPECIAL MASTER BRUSH:  (Interposing) Well, I think
25  we have to start with --

Page 32

1      MR. MAO:      (Inaudible)
2      SPECIAL MASTER BRUSH:  Yeah.  We need some metrics
3  around what's there.  I mean, you have -- you know, let's
4  just say it is, you know, 90 percent of the data.  What's
5  missing, Mr. Mao?
6      MR. MAO:      We don't have 90 percent of the
7  data.
8      SPECIAL MASTER BRUSH:  But we just -- if that's the
9  determination, Mr. Mao, that only 10 percent was held back
10  because of the publisher issue, and you have the rest of
11  that, what's missing specifically?
12      MR. MAO:      Do we really know that for a fact?
13  I get -- that was a question that I've been asking.
14      (Speaking simultaneously)
15      SPECIAL MASTER BRUSH:  Well, we're going to find
16  out by --
17      MR. MAO:      That was a question I'm asking
18  (inaudible).
19      SPECIAL MASTER BRUSH:  Yeah.  Well, that's what I
20  just said.
21      MR. ANSORGE:  (Interposing) Yeah.  But there's a
22  lot of different ways for us to count it.  I mean, I'm
23  getting a count on the actual file size.  We could also look
24  at the events that required -- that are associated with
25  publishers that we've already produced, and that I'm just

Page 33

1  deriving from the spreadsheet that we sent everybody
2  yesterday.  There's 29,000 --
3      SPECIAL MASTER BRUSH:  Let's answer it -- yeah.
4  Let's (inaudible).  I don't wanna misrepresent it on the
5  record.  That's just -- you're setting yourself up for
6  failure; don't do that.  Let's take this one offline.
7      Let's get the counts and make a determination on
8  this data set.  But if that's the case and we have a better
9  understanding -- and maybe, you know, explain it again, even
10  if it's explained in writing, what the data represents that
11  was held back versus what was produced so we have clarity in
12  both numbers, counts and context, I think that will help all
13  of us make a better determination.
14      So, if we can get that -- can we say by close of
15  business today?
16      MR. ANSORGE:  Yes.  Will do.
17      SPECIAL MASTER BRUSH:  Great.  All right.  So,
18  moving past that data, what do we need -- okay.  So, then
19  there's -- okay.  So, there was the iterative round 2 search
20  data that still needs publishers' consent?
21      MR. MAO:      Sorry, Mr. Brush.  Was that to me?
22  You were asking if --
23      SPECIAL MASTER BRUSH:  Oh.  That was actually to
24  Mr. Asorge.
25      MR. MAO:      Oh, okay.

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022

1   SPECIAL MASTER BRUSH:  So, there was -- there was -
2   - was there stuff that was -- taking that date set out,
3   there's still the issue of publisher consent on some of the
4   searches that have been done?
5       MR. ANSORGE:  Yes.  So, the second-round searches,
6   those also --- there are some that require publisher notice.
7   There's 81 if we provide notice to each one.  If we provide
8   notice to the top ten, that's more than 80 percent of the
9   different events.
10      SPECIAL MASTER BRUSH:  Okay.  Now, for those,
11  because they were responsive, just provide notice to all 81
12  and let's get that data turned over.
13      MR. ANSORGE:  Will do.
14      SPECIAL MASTER BRUSH:  Okay.  And for that -- Mr.
15  Mao, for that data, are you saying you need that data
16  produced before you can provide your final search criteria?
17      MR. MAO:       It's hard for me to say, Mr. Brush,
18  without knowing just generally what's in there -- right? --
19  so that's why the inventory would help.  If I could even
20  get, you know, a general sense of what's in there, that'd be
21  helpful.
22      SPECIAL MASTER BRUSH:  Well, I think there's two
23  different -- let's say we're taking away the bucket with the
24  preserved data, just talking about their two searches.
25      MR. MAO:       The -- sorry.  Which searches?

1       SPECIAL MASTER BRUSH:  The iterative two searches
2   that still needed publisher consent before they were turned
3   over.
4       MR. MAO:   Oh, yeah.  Those we definitely need, Mr.
5   Brush.  I think you can appreciate there was test data in
6   there, too, and we just wanna see what (inaudible).
7       SPECIAL MASTER BRUSH:  (Interposing) Yeah.  No, no,
8   no.  I'm looking in your favor on that one.  It's a little
9   softball (inaudible).
10      MR. MAO:        Yeah.  I know, I know.  Which is why
11  I kept asking -- like we're talking about the --
12      SPECIAL MASTER BRUSH:  I know.
13      MR. MAO:        -- I don't wanna -- not historical
14  but the preserved data.  Right?  Because I just wanna make
15  sure that we finish out, you know, the testing and iterative
16  searches rounds, like -- you know, like what went in.  We
17  should be able to (blip).
18      SPECIAL MASTER BRUSH:  Yeah.
19      MR. MAO:        Yeah.  That's right.
20      SPECIAL MASTER BRUSH:  Right.  And, so, we need
21  that.  So, I guess it becomes for the 81 that need
22  notification, how long -- I mean, I'm assuming there's a
23  blank -- is there a blanket provision in the contract -- if
24  you don't know that, don't guess -- but as for how long?
25      You know, we talked about anywhere from 21 to 30 days.

1   I mean, is there any way to expedite that process by having
2   people pick up the phone with counsel and those parties and
3   say, "Hey, look, here's the situation.  Can we get a 'yes'
4   or 'no' and put it in writing?"
5       MS. ANSORGE:  Yeah.  It's much easier, of course,
6   if we have the 10 or 20 that was the -- that was our
7   thinking, Special Master, that we could, you know, work the
8   phone lines, and if the 10 or 20 -- they're usually large,
9   sophisticated publishers -- New York Post, Fox News.
10      We've spoken to them before.  They understand this.
11  They have familiarity with litigation.  It's quicker, and
12  it's something where we don't require as much notice.
13  That's why we had hoped to focus in on a handful.
14      We can, of course, still, you know, contact Turner,
15  HBO, the key players that there's relationships with, but
16  it's -- my concern is that there's just going to be a whole
17  bunch where, you know, they're not as -- like Glassdoor --
18  I'm  just looking at this as an example -- latent digital --
19      SPECIAL MASTER BRUSH:  I get that.  So, it's yes,
20  that you'll -- we'll do what we can to expedite that?
21      MR. ANSORGE:  Yeah.  Well, we'll do what we can to
22  expedite -- we can do it with the 10 or the top 20.
23      I'm not sure how we can do it for 80 different
24  ones, but, of course, we'll do our best and put forward our
25  best efforts to make sure that it doesn't take 21 or 30 days

1   or anything like that.  We'll aim to close it out in eight
2   days after we provide the notice.
3       And, of course, that's pushing it from the
4   publisher perspective in terms of what is reasonable notice,
5   but …
6       SPECIAL MASTER BRUSH:  Okay.  That sounds good.
7   All right.  So, why don't we close this out by -- so, I
8   think Google, you owe us a couple status report updates as
9   well as -- you know, by the end of the day as well -- you
10  know, what was timing out, get those updates, and then some
11  context around the preserved data that's still not been
12  produced, that potential 10 percent, let's get some slice-
13  and-dice numbers -- records, percentage, gigabyte counts --
14  and what it represents as far as the number of fields, just
15  so -- you know, and look, if there's been -- if you can even
16  say "Well, look, there's been similar field production from
17  publishers that didn't need the consent," you know, what
18  does that look like, just so we're not guessing.
19      The more context the better is what I'm getting at.
20      MR. ANSORGE:  Yes.  You'd like us to identify what
21  publishers did not require consent?
22      SPECIAL MASTER BRUSH:  No, no, no.  I'm just saying
23  if there's an example -- like what I'm thinking is, I'm
24  imagining in the data that's been produced there was
25  publisher information.

**Page 38**

1    MR. ANSORGE:  Yes, yes.

2    SPECIAL MASTER BRUSH:  So, I'm saying haul that out

3  and say, "Look, that's the general structure," then they'd

4  say, "Okay, then we know what's missing in the stuff that

5  would be potentially not produced."  Do you understand what

6  I'm saying?  Just so we know (blip).

7    MR. ANSORGE:  I understand, yeah.

8    SPECIAL MASTER BRUSH:  Okay.  So, we'll look for

9  those -- for that feedback today, and then we're gonna kinda

10  move from there.

11    MR. ANSORGE:  And with regard to the next searches

12  that Plaintiffs would provide, it would be very helpful if

13  Plaintiffs already know at least what sources they are

14  considering, because then, you know, that's something we

15  could factor in in terms of well, this is one that would

16  require publisher notice and we would try to frontload it so

17  that all the notice happens at once, just as a request.

18    If there are to be additional searches, if we

19  already know the sources, it would really be fantastic if

20  you could identify those for us.

21    MR. MAO:  I think we have a good sense of the

22  sources.  The one kind of like "X" factor is really what I

23  mentioned at the beginning of the call, which is the logs

24  that would contain the Is-Chrome-Non-Incognito or -- the Is-

25  Chrome-Non-Incognito fields within the schema.

**Page 39**

1    You know, if your response is "Well, that could've

2  been in any of the logs that were identified," that's one

3  thing --

4    MR. ANSORGE:  Yeah.

5    MR. MAO:  -- but if it's not, you know, I do

6  think that that's gonna accelerate debate -- I'm sorry --

7  accelerate a conclusion to the debate on what sources to

8  search, because otherwise you're just gonna get a -- you

9  know, a broad request to include all of those sources in the

10  searches, which I don't think is gonna be helpful to Mr.

11  Ansorge.

12    MR. ANSORGE:  So, I think we might be speaking

13  past each other, but I'm glad you've raised that here to

14  just give me an opportunity to I think explain where there's

15  a disconnect.

16    Dr. Sadowski at her deposition testified about that

17  particular field, and there's a 30(b)(6) deposition that

18  Plaintiffs took, that your colleague, Mr. McGee, and there

19  she explained that this is a field that's used by the ▇▇

20  logs, as in it's specific to the ▇▇▇ logs, and if a field

21  is specific to a log it can be written to a proto, but when

22  a different product area has a different log that uses the

23  same proto, that doesn't mean that they have access to that

24  field.

25    And this is the fundamental problem that we've had

**Page 40**

1  when proceeding with the proto as a unit of analysis, or

2  maybe even the field as a unit of analysis, is it's still

3  tied to a very specific log source in this case.

4    So, there are specific ▇▇▇ logs that we've

5  disclosed to you that have the field that's written, that

6  actually have that value.  If that's a search you're

7  requesting, we can figure out whether those entail publisher

8  data.

9    But I want to clarify that because something is in

10  a proto, that does not mean it's in every log that uses that

11  proto.  The proto is a list of all potential things that

12  could be filled in.

13    A lot of those are access-restricted, can only be

14  filled in by specific logs, and it's for that reason that in

15  our preservation proposal what we have tried to do is move

16  from the log level of analysis into the field level, where

17  if we agree these are the key fields that you're interested

18  in, we will work to figure out what is the longest period of

19  log where that exists.

20    That's separate from us changing the preserved --

21  preservation for entire log infrastructures, and I think

22  it's the most efficient way for us to proceed.

23    MR. MAO:  But that field is already in two of

24  the logs in which -- in two of the five Bert Young logs --

25  right? -- and that's on the ad side, that's not on the

**Page 41**

1  ▇▇▇ side.  In my understanding from Dr. Sadowski's

2  deposition, that field had been constructed and had existed

3  ever since 2017.

4    MR. ANSORGE:  And, so, because a field is seen in

5  a proto and the log uses that proto, that does not mean that

6  that particular field has a value.

7    The default will be false for values, and you're

8  going to find that -- you know, it -- UMA uses a GWIS proto

9  for parts of its infrastructure.  That doesn't mean that it

10  has that field written into it.

11    So, it's a -- if we need to search for information

12  related to that specific field, the special master thinks

13  that's, you know, proportional and appropriate for us to

14  proceed, I think we would -- could only do it in the

15  specific ▇▇▇ logs, except if you're just looking for some

16  kind of description of the field infrastructure overall.

17    But the overall point I'm trying to make is that

18  the level of analysis -- and this is what I tried to argue

19  at our in-person hearing, too, and I'm sorry if I wasn't

20  effective in communicating it -- but I think the most

21  efficient and effective level of analysis for us is the

22  actual field and not the log infrastructure as we're

23  discussing the preservation plan, because we very quickly

24  find ourselves in a scenario where -- right? -- each log

25  will have standard preservation periods, each field will

**Page 42**

1    have different ones.

2              But what we really need to be focused on are these

3    are the fields Plaintiffs care about, that they know about,

4    that they're focused on, that are in their complaint, and

5    for those we can figure out preservation proposals, and

6    that's what we tried to do in the proposal that we sent you.

7              MR. MAO:        And I'm not trying to lock you down

8    on the logic or the structure -- right? -- I'm literally

9    saying that for the logs you have identified as part of the

10   special master process, one, what logs actually include that

11   field, whether at a proto level or at the actual log level,

12   and then, two, which of those logs actually has that

13   specific field filled. I realize that there may be --

14             SPECIAL MASTER BRUSH:  (Interposing) Well, there's

15   one nuance -- you're so close.  I think there's one nuance.

16   The problem is which logs have the capability for that

17   proto, because, again, I think what Mr. Ansorge is saying is

18   like just because it can doesn't mean it does exist, and

19   that's where there's this kind of ephemeral thing.  And, so,

20   that map -- and so -- and, honestly, I mean -- and maybe --

21   I don't know what that is, so I'm gonna kick it back to Mr.

22   Ansorge on what that is.  No.

23             Is that even a doable thing to say, okay, with the

24   logs that have been identified as part of this process,

25   which ones could have -- could potentially have that field

**Page 43**

1    due to the proto construction, which ones do, and then a

2    count.

3              I don't -- I mean, is that -- it seems like "Is the

4    field there, yes or no" would be the easiest one to answer.

5    How full that is is a little bit more complicated.

6              And then potential field representation I'm

7    guessing is gonna be harder.  Is that a fair assumption?

8              MR. ANSORGE:   So, in general, there is no specific

9    tooling to say, well, this particular field will always be

10   written into a specific log.  There are exceptions, and this

11   is one of those wonderful exceptions.

12             The data that we've already provided to Plaintiffs

13   that they requested, the excerpts of the source code that

14   have been provided, the proto descriptions that have been

15   provided, make clear, along with the corporate testimony

16   that's already been offered, that this is a field that's

17   only filled in by specific ▇▇▇ logs.

18             We've listed out the ▇▇▇ logs, we prepared a

19   deponent to testify on those ▇▇▇ logs, and I won't be

20   able to, I think, add much more than what they have already

21   provided, which is there's a field that was built, it's

22   based on the same Heuristic method that we had discussed

23   many times in this case, which is the absence of the "X"

24   Klein data header, and it uses that to attempt to infer when

25   users are not in Incognito mode because they're trying to

**Page 44**

1    improve the product for users who are not in Incognito mode,

2    and they therefore use this inferential Heuristic -- it's

3    only used in the ▇▇▇ logs, and Dr. Sadowski testified

4    it's not used any more, they've built a dashboard

5    infrastructure, but it's not something that's regularly

6    looked at or used.

7              So, it exists.  We're happy to provide information.

8    We've already provided information.  We've offered a

9    30(b)(6) witness on that topic.  We've identified the

10   specific logs in which that field is written.

11             If those are sources that Plaintiffs select for

12   searching and the special master deems it appropriate, we

13   are happy to run the searches over those.

14             I think that would be the most efficient way to

15   proceed.  We'll have to figure out if it requires publisher

16   notice.  My hope is that it won't.

17             MR. MAO:        Just to be clear --

18             SPECIAL MASTER BRUSH:  Wait.  I just heard -- wait

19   --

20             MR. MAO:        Mr. Brush, if I may -- if I may

21   clarify something.  Mr. Ansorge refers to them having

22   identified some of the ▇▇▇ logs.

23             Our question, again, goes back to what she pointed

24   out -- right? -- that there's two parts, which is, one,

25   there has been no representation that that's actually

**Page 45**

1    exhaustive of where that field actually exits, and my main

2    question on that is which of the logs they've identified as

3    part of the special master process -- because those five

4    ▇▇▇ logs were not identified as part of the special

5    master process -- but which five -- which of the special

6    master process identified logs actually contained that

7    field, like actually uses it, and then, secondly, which one

8    of those logs potentially, you know, could use it either

9    because it is in the schema or because of some other way in

10   which it could be used.

11             Those are different questions.  And, you know, just

12   because they've identified five logs, all of which are

13   outside of the -- you know, were identified outside of the

14   special master process -- okay? -- does not mean that for

15   the special master process we don't need to finish up by

16   asking those two questions, and which you had pointed out.

17             MR. ANSORGE:   And, Mr. Mao, I don't know what more

18   representation we can provide to you than a 30(b)(6)

19   witness.  You noticed the topic in December.

20             We prepared the witness.  They spoke to engineers.

21   They looked -- conducted code searches.  You asked for

22   specific data.  We provided that data.

23             Plaintiffs deposed Google as a corporate designee

24   on this topic.  Dr. Sadowski testified on this topic.  I

25   can't add or subtract from that testimony.  That stands as

**Page 46**

1  it exists.
2        My concern here is how does any of this lead us to
3  actually having the next round of searches?  We're -- we
4  appear to be finding ourselves --
5        MR. MAO:      Right.  So, let me -- let me answer
6  that.
7        MR. ANSORGE:      -- in a hall of mirrors.
8        MR. MAO:      Two seconds.  I just need two
9  sentences.  One, you could simply update the logs and this
10  schema produced to answer that question, and then, two, out
11  of that you can identify which of those logs and schemas
12  this field could've either been used or is already being
13  used.  There, two sentences.  There's your tangible.  I'm
14  not trying to argue with you.
15        MR. ANSORGE:      And, so, all that has happened under
16  oath.  Dr. Sadowski testified on behalf of Google on a topic
17  where you were seeking this information -- you sought it in
18  December -- and that has been provided.
19        I'm sorry.  I feel like I'm absolutely being
20  deposed here, Mr. Mao --
21  (Speaking simultaneously)
22        SPECIAL MASTER BRUSH:  To do it successfully I
23  would (inaudible) that definition --
24        MR. ANSORGE:      -- and I don't believe --
25        MR. MAO:      I'm not deposing you.

**Page 47**

1        MR. ANSORGE:      Okay.  Well, in that case I
2  (inaudible) --
3        MR. MAO:      (Interposing) I'm not saying that
4  she said under oath that she needs to go back to talk to
5  engineers to figure that out.
6        MR. ANSORGE:      Well, then I think -- I would like
7  you to send us that specific quote and passage where she
8  said that she's not -- is not providing an answer.
9        Not only did she identify the specific log sources,
10  we put them on a piece of paper for you so that there'd be
11  no typo, so there'd be absolute clarity on which exist.
12        She explained when they were written and she
13  explained, most importantly, the logic by which they were
14  written, and that logic is one that we have discussed ad
15  infinitum, both before the special master and in other
16  processes, at least since July.
17        There's been 30(b)(b) corporate testimony about the
18  false positives, false negatives associated with the absence
19  of the "X" Klein data header.
20        MR. MAO:      Well, look, we're not arguing the
21  merits of the case right now, we're simply trying to isolate
22  the data, the relevant data.  Right?
23        My point is this popped up in the schema for two of
24  the ███ logs, and I'm simply asking you whether or not
25  you need to update the rest of the logs to either reflect

**Page 48**

1  that's similarly in there -- okay? -- or that it could be in
2  there, or something else.  Like you've given no explanation
3  or logic to that.
4        And by the way, Dr. Sadowski's deposition,
5  actually, the incongruence is that she didn't point to
6  either of those two logs which ended up showing that field.
7        So how do I reconcile you saying that this field --
8  that the logs -- the five logs she identified is exhaustive
9  when she didn't even list the two additional logs that was
10  produced as part of the special master process which did use
11  that field?
12        MR. ANSORGE:      Yeah.
13        MR. MAO:      How do I reconcile that?
14        MR. ANSORGE:      I think you reconcile that by
15  understanding what we've been trying to explain about protos
16  since October.
17        MS. GAO:      Mr. Mao, let me try to explain this.
18  So, two of the ███ logs, as you see, have this field, but
19  they will always be written as false because that's the
20  default written -- default writing of these logs, because
21  they don't really have the capability to write in the logs.
22        So, even if you select the sources and we run the
23  searches, all of the results you will see will be false.
24        MR. MAO:      So, I think you're wrong there, Ms.
25  Gao, because I think you used the word "capability," and

**Page 49**

1  that's not true.  I mean, it clearly has the capability to
2  do that.  And the two questions are, one --
3        SPECIAL MASTER BRUSH:  Well, let me pause you right
4  there, Mr. Mao, because I think there's a slight -- it's not
5  a universal capability to try to report it on, it's not --
6  even the option's not (blip) in every data source.  You
7  know, there's a nuance there.
8        MR. MAO:      Right.█  And, Mr. Brush --
9        SPECIAL MASTER BRUSH:  So, what -- I guess let's
10  close this out, because we're at time.  So --
11  (Speaking simultaneously)
12        MR. MAO:      I'm just trying to figure that out,
13  Mr. Brush.
14        SPECIAL MASTER BRUSH:  No, no, no.  I understand
15  that.
16        MR. MAO:      Exactly what (inaudible).
17        SPECIAL MASTER BRUSH:  Yeah.  It sounds like there
18  was a lot of information that was provided around this
19  topic, and if there's gaps, by all means.
20        I mean, I'm not saying we don't, but you're not
21  being -- we're not being very productive here getting to the
22  bottom of that.
23        But, you know, are you asking -- and can we do this
24  as kind of an approach -- out of the additional -- out of
25  all the identified logs in the process, is it -- what would

**CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.**
**Hearing on 03/23/2022**

Page 50

1  it take, Mr. Ansorge, for a person to identify the ones that
2  have the -- yeah.
3        So, I'm trying to get at if there's any way to see
4  if that field does exist in a normal course of business, or
5  what's the percentage -- is there anything to say, you know,
6  these logs were where this field is most likely to appear
7  out of the ones that have been identified?  Is that -- or
8  has that already been done and can it just be provided?
9        MR. ANSORGE:  It's been done.  It would usually be
10  something that's very difficult to do because it would
11  require running of test IDs across all the logs and then
12  comparing them.
13        SPECIAL MASTER BRUSH:  Sure.
14        MR. ANSORGE:  In this case, we were fortunate that
15  it's been done and we had corporate testimony on it under
16  oath and the specific sources were identified, specific log
17  sources.
18        I just harken back to your email from yesterday,
19  sir, which said we're not gonna be opening up any more
20  doors, falling down any other routes of discovery, and my
21  concern is that each of these being used as a condition or
22  precedent for further searches. It won't actually get us
23  closer to finishing up the process.
24        SPECIAL MASTER BRUSH:  Okay.  This is where I was
25  going with all this, is -- yeah.  Let -- if you can get it

Page 51

1  in writing -- because I feel like I'm -- you know, this is
2  not -- you know, we've been watching this argument go back
3  and forth for a while about this specific field, and I
4  understand there's -- the complexity is probably -- the
5  details were being lost.
6        But if you can articulate it well and in a concise
7  manner what you said about how it's been provided, have me
8  take a look at it and then I can make a further
9  determination.
10        Again, I'm not looking to opening up anything else,
11  I just think we need to get it a little bit more concise and
12  in writing as opposed to, you know, orally on Zoom
13  (inaudible) because I have seen some.
14        But if you can point to it specifically and
15  articulate it, I think we can close out this issue offline.
16        MR. MAO:  Mr. Brush, this is a critical issue
17  that you're gonna see come up, so I would ask that we -- the
18  Brown plaintiffs also be copied on the same correspondence.
19  That way we have (inaudible).
20        SPECIAL MASTER BRUSH:  (Interposing) Absolutely.
21  Oh, yes.  No, no, no.  It's not ex parte, it's -- it's --
22  because I wanna absorb it.
23        You know, you're certainly open to rebut in writing
24  on it and kind of get your sense of just -- but I think what
25  we want -- I'm gonna base this thing -- we're over time.

Page 52

1  I've heard what I need to hear orally on it.  Let's get it
2  in writing and kinda close this down for the day.
3        MR. MAO:  Yeah.  And it's not -- it's not
4  without reason, Mr. Brush.  Because I'm guessing, just given
5  the volume of traffic that went on last night, you probably
6  have not had a chance to look at the status of the
7  preservation plan discussion, but I think once you've had
8  the time to look at that you're gonna see that this is gonna
9  be germane and relevant to that issue, too.
10        And one of the issues that's gonna pop up on that
11  is this might be one of the elephants in the room as to why
12  we can't have a fulsome discussion about when log retention
13  and preservation periods should start.
14        But, you know, that might be the better subject of
15  a debate for later on.
16        SPECIAL MASTER BRUSH:  Oh, that's right.  We will
17  debate on the preservation.  You guys totally missed the
18  landing on that one, so I'll -- you know, we're gonna have
19  to take that as a separate thing and close that down,
20  because that should've been done two weeks ago.
21        MR. SCHAPIRO:  And, Mr. Brush, we hear you on that,
22  and -- I'll refrain -- so, if you have any questions about
23  the preservation plan as we've described it or submitted it,
24  we -- you know, over the course of the next whatever it is,
25  12 or 24 hours, when you're looking at and assessing them,

Page 53

1  we would, of course, be happy to answer any of them in
2  whatever forum or format you deem appropriate.
3        SPECIAL MASTER BRUSH:  Sounds good.  Thank you very
4  much.
5        MR. SCHAPIRO:  Thank you.
6        SPECIAL MASTER BRUSH:  All right.  Thanks,
7  everybody.
8  [END OF HEARING]
9  [END OF TRANSCRIPT]

**CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.**
**Hearing on 03/23/2022**

Page 54

```
1                    CERTIFICATION PAGE

2

3       I, Kimberly H. Nolan, Transcriptionist,

4  do hereby certify that this transcript

5  is a true and accurate record of the

6  electronically recorded proceedings,

7  transcribed by me this 1st day of

8  April, 2022.

9       Kimberly H. Nolan

10  _____

11

12  KIMBERLY H. NOLAN

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022                    Index: 1..ahead

**1**

1  13:18

10  29:15,17
  32:9 36:6,
  8,22 37:12

12  52:25

12th  26:9,
  12 27:25

14  24:17

**2**

2  5:9 9:9,
  21,23
  13:17,20
  33:19

20  20:1
  25:12
  36:6,8,22

2017  41:3

2020  25:16

2022  3:2

21  35:25
  36:25

23RD  3:2

24  52:25

29,000  33:2

**3**

30  35:25
  36:25

**30(b)(6)**
  39:17 44:9
  45:18

**30(b)(b)**
  47:17

**30-something**
  16:20

**4**

400  20:9
  21:23

400-plus
  15:21

**5**

5  29:7

50  20:1

500  20:9

**6**

60,000  20:2

**8**

80  20:3
  24:18 34:8
  36:23

81  27:16
  28:8 34:7,
  11 35:21

**9**

90  24:18
  32:4,6

**A**

absence
  43:23
  47:18

absolute
  47:11

absolutely
  46:19
  51:20

absorb  51:22

accelerate
  39:6,7

access  39:23

access-
restricted
  40:13

actions  9:23
  13:19

active  30:25

actual  14:5
  19:17
  21:25
  31:16
  32:23
  41:22
  42:11

ad  40:25
  47:14

add  10:10
  43:20
  45:25

adding  31:12

addition
  25:13

additional
  14:14
  15:12 17:3
  18:16
  20:11
  38:18 48:9
  49:24

address  8:3
  11:6 15:15
  18:4

addressed
  8:1 12:18

Adinteraction
  6:3

Admanager
  22:2

Admob  21:22
  25:7

Adqueries
  6:3

Adsense
  21:22 25:7

aggressive
  25:1

agree  17:11,
  12 40:17

ahead  14:18

aim   37:1

amount   23:8
  28:22 30:5

analysis
  40:1,2,16
  41:18,21

and-dice
  37:13

Ansorge   8:10
  10:11,15
  12:4,6,25
  13:4,21
  14:23
  15:7,12,
  14,17,20
  17:1,14
  18:2 19:5,
  9 21:2,5,
  12 22:17
  24:7,11
  27:11,16,
  19 29:12,
  19 30:1
  31:10
  32:21
  33:16
  34:5,13
  36:5,21
  37:20
  38:1,7,11
  39:4,11,12
  41:4
  42:17,22
  43:8 44:21
  45:17
  46:7,15,24
  47:1,6

48:12,14
  50:1,9,14

Ansorge's
  18:15

anticipate
  24:7

apologize
  14:2 20:19

apply   23:14
  26:15

approach
  11:10
  49:24

approves
  14:14
  16:18

approximation
  22:9

April   5:23

area   39:22

argue   41:18
  46:14

arguing
  47:20

argument
  7:13 14:25
  17:1 20:16
  22:24 25:7
  51:2

arguments
  4:1

articulate
  51:6,15

Asorge   33:24

assembled
  5:19

assessing
  52:25

assuming
  35:22

assumption
  43:7

attempt
  43:24

attention
  11:21

avoid   7:13
  22:24

await   12:20

awaiting
  11:21

_____

        B
_____

back   4:12
  5:20 7:8
  8:5,7 9:8,
  25 17:22
  18:3,6
  26:7
  29:18,19
  32:9 33:11
  42:21
  44:23 47:4
  50:18 51:2

baked   4:3

base   51:25

based   12:1
  26:8 31:11
  43:22

basically
  4:16,23
  23:19

beginning
  38:23

behalf   46:16

Bert   40:24

bilateral
  16:1 19:18

bit   3:18
  4:3 5:12
  7:8 9:5
  11:23 43:5
  51:11

blanche
  17:11

blank   35:23

blanket
  35:23

blip   6:4
  8:19
  13:15,20
  14:22
  15:2,4,5,6
  31:18
  35:17 38:6
  49:6

bottom   49:22

breakdowns
  10:16

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022

briefed 5:24

broad 39:9

broken 15:22

Brown 3:11
  4:21 16:8,
  25 29:13
  51:18

Brush 3:3,8
  5:7 6:5,8,
  12,16,19
  8:8,11,16,
  21 9:3,10,
  13,17
  10:7,14,23
  11:22
  12:5,24
  13:2,10,12
  14:18
  15:9,16
  17:16
  18:5,7,20
  20:17
  21:4,6
  22:16,25
  23:1
  25:22,23
  26:3
  27:12,15,
  18 28:10,
  14,19,24
  29:17,25
  30:4,18,
  19,21
  31:8,14,24
  32:2,8,15,
  19 33:3,
  17,21,23

34:1,10,
14,17,22
35:1,5,7,
12,18,20
36:19
37:6,22
38:2,8
42:14
44:18,20
46:22
49:3,8,9,
13,14,17
50:13,24
51:16,20
52:4,16,21
53:3,6

bucket 24:14
  34:23

buckets 3:15
  20:20
  23:2,3

buffer 7:21

built 43:21
  44:4

bulk 19:23
  22:12
  24:18 29:7

bunch 36:17

burden 22:13

burdensome
  15:24
  19:13,14

business
  33:15 50:4

——————————
            C
——————————

Calhoun
  11:14
  12:22 16:9
  21:14
  29:2,13

call 10:22
  12:8 20:22
  38:23

capability
  42:16
  48:21,25
  49:1,5

care 42:3

carte 17:11

case 9:17
  15:25
  19:15,17,
  19,20
  21:14
  22:22
  23:13
  24:12
  29:22
  30:5,11
  33:8 40:3
  43:23
  47:1,21
  50:14

catch-22
  16:24

categories
  21:24

chance 52:6

changing
  40:20

characteristic
s 7:5

check 5:5

choose 16:3

Chrome-non-
incognito
  38:25

clarification
  15:17

clarify
  15:17
  28:15 40:9
  44:21

clarity 22:4
  33:11
  47:11

class 19:16
  21:25

clear 18:24
  43:15
  44:17

clients
  28:11

clients'
  31:18,21

close 22:10
  24:13,24
  28:7 33:14
  37:1,7
  42:15
  49:10

51:15
52:2,19

closed  16:10

closer  50:23

closing  11:8
25:8

code  43:13
45:21

cohesive
3:20

colleague
39:18

color  10:10,
21

communicating
41:20

communications
16:1 19:18

comparing
50:12

compile  8:25

complaint
42:4

completed
30:9

complexities
26:5

complexity
51:4

complicated
43:5

compressed

24:6

compromise
22:6

concern
12:17
22:12 27:5
36:16 46:2
50:21

concerns
17:7 25:18
27:4

concise
51:6,11

conclusion
39:7

condition
50:21

conducted
27:24
45:21

confirm
29:13

confusion
11:3

consent
22:2,3
23:9 29:6
33:20 34:3
35:2
37:17,21

constraints
26:23

constructed
41:2

construction
43:1

contact
36:14

contained
45:6

context
33:12
37:11,19

continually
30:7

contract
35:23

convenience
11:6

conversations
22:14

conveying
14:9

copied  10:3
51:18

corporate
43:15
45:23
47:17
50:15

corpus
18:10,12,
22 19:24
27:21
28:11,17,
18 30:20

correct  4:22

correlate
15:23

correspondence
51:18

could've
39:1 46:12

counsel
22:18 28:5
36:2

count  22:9
27:16
32:22,23
43:2

counts  33:7,
12 37:13

couple  37:8

court  4:7,12
5:23

court-worthy
3:23

covers  25:18

craft  17:24

create  17:3

criteria
23:7 26:8,
12 34:16

critical
51:16

current
17:22

customizable
7:22

customized
 5:19

cut   21:21

---

### D

daily   25:17

dashboard
 44:4

data   4:18,
 23 10:18
 12:7,18
 13:8 16:1
 17:2,5
 18:22
 19:6,10,
 11,16,19
 20:20,21,
 23,24
 21:1,2,22
 22:12,19,
 21 23:3,4,
 7,16,19,21
 24:9,14,25
 25:3,4,7,
 14,15,16,
 19 26:2,8,
 11 27:1,21
 28:15,20
 29:8,16,
 21,22
 30:2,12,
 15,24 31:3
 32:4,7
 33:8,10,
 18,20
 34:12,15,

24 35:5,14
 37:11,24
 40:8
 43:12,24
 45:22
 47:19,22
 49:6

databases
 24:6 30:25

date   11:25
 34:2

dates   12:12
 13:14,23

day   20:7
 37:9 52:2

day-to-day
 23:23

days   13:5
 16:22
 35:25
 36:25 37:2

deal   16:16

debate   39:6,
 7 52:15,17

December
 7:16 45:19
 46:18

deem   53:2

deemed   18:3

deems   44:12

default   41:7
 48:20

defendants

19:2

definition
 21:25
 22:22
 29:22
 46:23

deponent
 43:19

deposed
 45:23
 46:20

deposing
 46:25

deposition
 39:16,17
 41:2 48:4

deprioritize
 30:12

deprioritizing
 30:6

deriving
 33:1

description
 10:24
 41:16

descriptions
 43:14

designee
 45:23

detail   10:21

detailed
 21:13

details   12:9

51:5

determination
 30:16 32:9
 33:7,13
 51:9

determine
 21:19 29:5

differentiatin
g   6:15

difficult
 50:10

digital
 36:18

disagree
 22:23

disappointed
 3:19 4:4

disclosed
 40:5

disconnect
 15:19
 19:10
 39:15

discovery
 3:10 6:6,
 9,13,20,
 22,24
 50:20

discussed
 20:12
 43:22
 47:14

discussing
 22:1 41:23

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.

Hearing on 03/23/2022          Index: discussion..familiar

**discussion**
8:16 21:14
25:16
52:7,12

**distinction**
20:18

**distinctly**
27:6

**doable** 42:23

**doors** 50:20

**due** 4:2
11:7 43:1

**duplicative**
13:23

---

**E**

**earlier** 6:4
11:4

**early** 31:5

**easier** 36:5

**easiest** 43:4

**easy** 26:4

**effective**
41:20,21

**efficient**
19:1 26:21
40:22
41:21
44:14

**efficiently**
22:11

**efforts** 30:7

36:25

**elephants**
52:11

**email** 50:18

**encapsulated**
25:17

**end** 4:24
5:17 22:1
37:9 53:8,
9

**ended** 48:6

**ends** 22:21
24:19

**energy** 19:2

**engaged**
19:17

**engineer**
14:6
29:14,24

**engineers**
10:16
45:20 47:5

**entail** 20:12
40:7

**entailed**
27:13

**entails**
27:22

**entire** 40:21

**entitled**
17:5

**entry** 5:14

7:21

**environment**
23:23

**ephemeral**
42:19

**essentially**
23:16

**event** 15:24
16:2 24:19
28:4

**events** 15:23
19:24 20:2
27:17
32:24 34:9

**exceptions**
43:10,11

**excerpts**
43:13

**exchanged**
5:1

**exercise**
19:25

**exhaustive**
45:1 48:8

**exist** 42:18
47:11 50:4

**existed** 41:2

**exists** 40:19
44:7 46:1

**exits** 45:1

**expected** 4:2

**expedite**

36:1,20,22

**explain**
22:20 33:9
39:14
48:15,17

**explained**
33:10
39:19
47:12,13

**explanation**
48:2

**expressed**
10:6

---

**F**

**fact** 18:21
32:12

**factor**
38:15,22

**failing** 12:2
13:17

**failure** 33:6

**fair** 43:7

**faith** 26:6

**falling** 26:7
50:20

**falls** 23:19
26:17,18

**false** 41:7
47:18
48:19,23

**familiar**

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022                    Index: familiarity..fulsome

22:18

familiarity
36:11

fantastic
38:19

favor 30:7
35:8

February
7:19

feedback
38:9

feel 46:19
51:1

fell 12:22
16:7,15
20:10

fervent 16:6

field 5:14,
18 7:1,18,
20,21
22:4,8
37:16
39:17,19,
20,24
40:2,5,16,
23 41:2,4,
6,10,12,
16,22,25
42:11,13,
25 43:4,6,
9,16,21
44:10
45:1,7
46:12
48:6,7,11,

18 50:4,6
51:3

fields 5:13
10:5 11:5
37:14
38:25
40:17 42:3

figure 26:23
40:7,18
42:5 44:15
47:5 49:12

file 32:23

filed 4:12

filled
40:12,14
42:13
43:17

final 4:17
8:24 17:24
18:2,13
24:9 30:16
34:16

finalize
4:15 24:3

finalizing
30:10

find 9:18
19:1 23:6,
12 32:15
41:8,24

finding 6:21
46:4

fine 12:24
22:11

finish 3:14
17:1 35:15
45:15

finished
3:15 26:1

finishing
30:8 50:23

firewalled
11:23

fleshed 6:1

flow 22:19

flume 24:5

focus 19:2
27:23 30:8
36:13

focused
42:2,4

focusing
25:11

follow 21:15
24:21
26:14
27:23

forever
18:18

forgo 29:7

forgoing
25:9

format 53:2

formats 20:3

forms 25:17

formulate

5:4

forthright
11:9

fortunate
50:14

forum 4:1
53:2

forward 5:20
17:10
20:14
26:25
27:2,9
31:23
36:24

found 6:23

Fox 36:9

framing 9:14

frankly 4:2,
8 30:13

Frawley
18:18

front 5:10,
17,22 7:22
8:6

frontload
38:16

frontloaded
19:24

frozen 12:25

full 43:5

fully 4:3

fulsome

52:12

**fundamental**
39:25

---
G
---

**Gao**   48:17,
25

**gap**   26:24

**gaps**   49:19

**gas**   26:2

**gave**   9:12
16:3

**general**
21:11
34:20  38:3
43:8

**generally**
34:18

**germane**   52:9

**gigabyte**
37:13

**gigabytes**
29:4

**give**   12:8
23:3  25:13
39:14

**glad**  39:13

**glaring**   8:2

**Glassdoor**
28:3,5,6
36:17

**goal**  13:4

**good**  23:8
26:6  37:6
38:21  53:3

**Google**  3:11
4:23  5:5,9
7:9,14  8:3
9:18  10:7
17:2
23:18,23,
25  29:10
37:8  45:23
46:16

**Google's**
26:21,25

**Gotcha**   11:22

**great**   3:8
13:1  33:17

**guess**   4:25
5:21  7:3,
13,24  8:18
35:21,24
49:9

**guessing**
37:18  43:7
52:4

**guys**   4:12
52:17

**GWIS**   5:14
7:21  41:8

---
H
---

**hall**   46:7

**hand**   14:4

**handful**
36:13

**hands**   27:2

**happen**   18:25

**happened**
46:15

**happy**   11:5
15:14
44:7,13
53:1

**hard**   34:17

**harder**   43:7

**harken**   50:18

**haul**   38:2

**HBO**   36:15

**header**   43:24
47:19

**hear**   52:1,
21

**heard**   44:18
52:1

**hearing**   5:22
41:19  53:8

**heavy**   22:21

**heck**   29:6

**held**   17:22
29:18,19
32:9  33:11

**helpful**
10:22  11:9
34:21

38:12
39:10

**hesitant**
30:22

**Heuristic**
43:22  44:2

**Hey**   36:3

**histograms**
9:22  13:19

**historic**
10:18
12:12
13:25
25:15,19

**historical**
13:11
18:10,11
20:23
23:4,24
28:10,15
30:20,22,
24  31:2
35:13

**historically**
5:20  24:25

**hold**   3:4
18:3

**hole**   26:2

**honed**   30:14

**honestly**
42:20

**hope**   11:12
16:6,13,24
19:21

25:19
44:16

hoped   36:13

hoping   10:1
12:14
14:12

hours   52:25

hundreds
19:14
22:14
27:22

hypothetical
15:2

_____

**I**
_____

ID   21:17

identified
26:11 39:2
42:9,24
44:9,22
45:2,4,6,
12,13 48:8
49:25
50:7,16

identifiers
4:21 5:8
7:4

identify
19:12
37:20
38:20
46:11 47:9
50:1

IDS   22:7,9

28:12
31:18,20,
21 50:11

imagining
37:24

implemented
21:15

implicate
29:21

important
5:24 20:18
25:15

importantly
47:13

improve   44:1

in-house
22:18

in-person
41:19

inability
3:19

inaudible
6:18 15:1,
13 17:15
18:19
20:19 23:2
24:5 25:22
32:1,18
33:4 35:6,
9 46:23
47:2 49:16
51:13,19

include   7:18
39:9 42:10

Incognito
5:12 11:5
43:25 44:1

incongruence
48:5

individual
16:1,2
19:17
22:14
27:17 28:3

infer   43:24

inferential
44:2

infinitum
47:15

information
11:2 17:23
25:14
37:25
41:11
44:7,8
46:17
49:18

infrastructure
41:9,16,22
44:5

infrastructure
s   40:21

initially
20:21,25

input   12:21

intended
20:15

interest

24:24 25:8

interested
16:5 40:17

interfere
11:24

interim
14:21 17:8

Interposing
15:14
17:16
18:20
25:23
31:24
32:21 35:7
42:14 47:3
51:20

interrupting
31:12

inventory
31:21
34:19

Is-   38:24

Is-chrome-non-
incognito
38:24

Is_non_chrome
5:12

isolate
47:21

issue   3:24
5:10,21,22
7:24 8:2
21:25
22:22

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022          Index: issues..magistrate

26:16
29:22
32:10 34:3
51:15,16
52:9

**issues**  3:10
8:1 52:10

**iterations**
24:1

**iterative**
9:9 24:15
33:19
35:1,15

---

**J**

**January**  22:4

**joining**  3:7

**judge**  5:23

**July**  47:16

**June**  25:16

---

**K**

**key**  36:15
40:17

**kick**  42:21

**kind**  3:21
4:11 22:8
23:2 38:22
41:16
42:19
49:24
51:24

**kinda**  3:12
11:23
26:18 27:9
38:9 52:2

**Klein**  43:24
47:19

**knowing**
34:18

---

**L**

**landing**
52:18

**large**  11:1
22:12
25:20 36:8

**laser**  30:7

**latent**  36:18

**lawyer**  6:18

**lay**  14:12

**lead**  46:2

**led**  28:25

**left**  23:11

**letter**  9:4

**letters**  5:1

**level**  40:16
41:18,21
42:11

**lift**  22:21

**light**  14:7

**limitations**
14:5

**limits**  19:4

**lines**  36:8

**list**  15:20
31:18
40:11 48:9

**listed**  43:18

**listen**  18:20

**literally**
42:8

**litigation**
36:11

**live**  30:25

**lock**  42:7

**log**  16:1
29:20
39:21,22
40:3,10,
16,19,21
41:5,22,24
42:11
43:10 47:9
50:16
52:12

**logic**  26:14
42:8
47:13,14
48:3

**logs**  5:18,
19 6:3
7:5,23
22:1,3
23:25
24:11
38:23

**39:2,20
40:4,14,24
41:15
42:9,10,
12,16,24
43:17,18,
19 44:3,
10,22
45:2,4,6,
8,12 46:9,
11 47:24,
25 48:6,8,
9,18,20,21
49:25
50:6,11**

**long**  4:1
31:19
35:22,24

**longest**
40:18

**looked**  44:6
45:21

**lost**  15:7
51:5

**lot**  13:14
20:23 24:6
25:18,21
30:13
32:22
40:13
49:18

**love**  14:4

---

**M**

**magistrate**

5:23

**main** 12:17
22:12
25:25 45:1

**make** 4:20
11:24
17:18
19:23
21:11,13,
21 23:12,
17 30:16
33:7,13
35:14
36:25
41:17
43:15 51:8

**makes** 13:3

**managing**
24:24

**manner** 27:10
51:7

**Mao** 5:6
6:7,10,14,
18 7:7
8:15,18
9:2,6,11,
16,20
10:12
11:4,17
13:10,11
14:2,19,20
15:8,9,11,
15,21
16:23
17:20
18:1,9,18

20:16
22:23
25:21,25
28:10,14,
17,21
30:17,19
31:6,9,12,
14 32:1,5,
6,9,12,17
33:21,25
34:15,17,
25 35:4,
10,13,19
38:21 39:5
40:23 42:7
44:17,20
45:17
46:5,8,20,
25 47:3,20
48:13,17,
24 49:4,8,
12,16
51:16 52:3

**Mao's** 10:8
11:9

**map** 42:20

**March** 3:2
7:20

**master** 3:3,8
5:6 6:5,8,
11,12,16,
19 8:8,11,
16,21 9:2,
3,7,10,13,
17 10:7,
14,23
11:19,22

12:5,24
13:2,10,12
14:14,18
15:9,16
16:18,24
17:16
18:7,20
20:17
21:4,6,16
22:16 23:1
25:2,21,23
26:3
27:15,18
28:14,19,
24 29:17,
25 30:4,
18,21
31:8,24
32:2,8,15,
19 33:3,
17,23
34:1,10,
14,22
35:1,7,12,
18,20
36:7,19
37:6,22
38:2,8
41:12
42:10,14
44:12,18
45:3,5,6,
14,15
46:22
47:15
48:10
49:3,9,14,
17 50:13,

24 51:20
52:16
53:3,6

**matter** 18:23
19:7,8
31:5

**Mcgee** 39:18

**meaning** 5:18

**means** 15:3,4
27:7 49:19

**mentioned**
38:23

**mere** 31:1

**mergeable**
7:23

**merits** 47:21

**method** 43:22

**methodology**
23:14

**metrics** 32:2

**mirror-term**
23:24

**mirrors** 46:7

**misrepresent**
33:4

**missed** 52:17

**missing** 27:6
32:5,11
38:4

**mixes** 20:23

**mode** 43:25
44:1

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.

moment 20:5, 6

Monday 5:7

month 6:4

movable 7:23

move 10:4,6 17:9 20:16 38:10 40:15

moving 4:13 33:18

muddle 4:6

_____

**N**

needed 35:2

negatives 47:18

nervous 10:16

News 36:9

night 8:5 10:3 52:5

normal 50:4

not- 28:19

not-produced 30:2

notice 11:11,13, 16 12:20 13:5 14:16,20, 24 15:1,13

16:6,11, 14,19,20, 21 17:3,7 18:4,17 19:13 20:6,9,12, 13 21:19 24:20 25:12 27:13,20, 25 34:6,7, 8,11 36:12 37:2,4 38:16,17 44:16

noticed 16:8,9 20:7,8 28:8 45:19

notification 17:23,25 19:7 21:9 24:10 26:22 30:9 35:22

notifications 26:16

notified 18:23

November 7:9 13:13 26:9,12 27:25

nuance 42:15 49:7

number 7:9 9:25 37:14

numbers 29:12,23 31:10 33:12 37:13

_____

**O**

oath 46:16 47:4 50:16

objections 10:2

obtaining 31:20

obviate 25:19

October 48:16

offered 43:16 44:8

offline 31:1 33:6 51:15

omitted 13:20

███████ 39:19,20 40:4 41:1, 15 43:17, 18,19 44:3,22 45:4 47:24 48:18

open 3:10 10:9 51:23

opening 25:2 27:12 50:19 51:10

operations 9:19

opportunity 39:14

opposed 51:12

option 16:3

option's 49:6

options 12:1

orally 51:12 52:1

order 9:19 17:6 26:9, 12

ordered 9:24

outstanding 5:10 13:9

overlap 12:15 14:11

overlaps 12:17

owe 37:8

---
**P**
---

p-  15:25

p-log  19:16
  25:3 27:21
  29:21

paper  47:10

parameters
  8:23 9:24

part  6:5,8,
  10,12 7:1,
  6,25 8:3
  9:6 15:7
  18:16,22
  19:16
  21:24
  24:15
  25:20
  42:9,24
  45:3,4
  48:10

parte  51:21

partially-
produced
  28:20

parties  26:6
  36:2

parties'
  3:19

parts  41:9
  44:24

passage  47:7

past  4:1
  10:4 11:2

23:15
33:18
39:13

path  24:21

pause  17:17
  49:3

people  36:2

percent
  20:1,3
  24:18
  29:7,15,
  17,19
  32:4,6,9
  34:8 37:12

percentage
  29:3 37:13
  50:5

perception
  7:14,15

period  21:17
  40:18

periods  4:22
  41:25
  52:13

person  50:1

perspective
  37:4

phone  36:2,8

pick  19:25
  20:2 36:2

piece  47:10

pings  12:10

pipeline
  11:8 13:7

place  17:6

plaintiff
  28:5

plaintiffs
  4:21 7:15
  12:17
  16:3,25
  19:22 22:7
  24:16,21
  25:13 27:4
  28:12
  30:16
  38:12,13
  39:18 42:3
  43:12
  44:11
  45:23
  51:18

plaintiffs'
  5:3 13:18
  22:22 27:2

plan  3:16,
  20 5:11,
  16,25
  41:23
  52:7,23

players
  36:15

point  5:4
  8:4 41:17
  47:23 48:5
  51:14

pointed

44:23
45:16

pop  52:10

popped  47:23

position
  25:2 26:21
  30:6

positives
  47:18

Post  36:9

potential
  26:24
  27:11
  37:12
  40:11 43:6

potentially
  31:3 38:5
  42:25 45:8

practice
  21:15

precedent
  50:22

precluding
  31:19

prefer  16:19
  20:6 23:5

prepared
  25:8 43:18
  45:20

presented
  4:3,5

preservation
  3:16,20

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022          Index: Preservation's..provide

5:11,16,25
8:1,9,10,
17 11:5
40:15,21
41:23,25
42:5 52:7,
13,17,23

**Preservation's**
8:12

**preserved**
19:11
20:22,25
22:12
23:4,5
24:25
27:21
28:17,19
30:20
31:5,17,22
34:24
35:14
37:11
40:20

**preserving**
18:13

**press**  9:1

**pretty**  18:24

**previous**
12:16

**previously**
22:3

**primarily**
31:15

**problem**  9:7
14:10  24:8

26:15
39:25
42:16

**problems**
11:1

**proceed**
40:22
41:14
44:15

**proceeding**
24:24  40:1

**process**  6:6,
9,10,13,20
8:22
11:15,18,
24 13:13,
15 16:9,15
21:16
22:11 25:9
26:1,4,9,
12,19,22
27:25 28:7
36:1
42:10,24
45:3,5,6,
14,15
48:10
49:25
50:23

**processes**
47:16

**produce**
4:18,24
12:19
18:17 23:6

**produced**
7:6,9,12,
15,16
13:7,16,
18,19
20:23,25
21:21 22:3
25:7 26:13
28:22
29:5,9,18
30:2,13
31:11
32:25
33:11
34:16
37:12,24
38:5 46:10
48:10

**product**
39:22 44:1

**production**
7:19 9:15
12:16 15:5
23:10,13,
21,22
30:24
37:16

**productions**
10:9

**productive**
49:21

**products**
21:24

**progress**
11:25

**properly**
11:19

**proportion**
22:13

**proportional**
15:25
19:15
41:13

**proposal**
8:1,5 11:5
22:6 40:15
42:6

**proposals**
42:5

**propose**
17:14
24:14,21

**proposed**
11:17

**proposing**
26:25

**protective**
17:6

**proto**  5:14,
17 7:21
39:21,23
40:1,10,11
41:5,8
42:11,17
43:1,14

**protos**  48:15

**provide**  4:21
10:12,21
11:12 12:7

20:9
27:13,20,
25 29:10
34:7,11,16
37:2 38:12
44:7 45:18

provided
4:11,14
5:7 15:20
25:17
43:12,14,
15,21 44:8
45:22
46:18
49:18 50:8
51:7

providing
13:24
19:13
22:11
25:12 47:8

provision
35:23

publisher
12:20 13:5
14:16,20,
24 15:6,
13,23
16:2,6,11,
14,19
17:7,22,25
18:4,16,22
19:7
20:12,13
21:9,19,22
22:2 24:9
29:21

32:10
34:3,6
35:2 37:4,
25 38:16
40:7 44:15

publishers
10:3
11:11,16
15:1,22
16:21
19:12,14,
18,23
21:23
22:15
23:19
24:17
25:12
27:13,22
28:8 32:25
36:9
37:17,21

publishers'
33:20

pull   12:12

pulls   10:19

purpose
6:21,24

pushing   37:3

put   3:24
4:11,16,23
36:4,24
47:10

putting   25:6
30:7

---

## Q

QC   5:5

queries
10:25

query   7:1

question
8:18
15:10,11
24:13
28:25
32:13,17
44:23 45:2
46:10

questions
7:11 25:18
45:11,16
49:2 52:22

quicker
36:11

quickly
13:22 25:9
31:13
41:23

quote   47:7

---

## R

raise   20:15

raised   39:13

ran   22:7

range   29:15

rapt   11:21

ratio   30:3

reached   22:6

readdress
27:8

real   31:13

realize
42:13

reason   8:7
40:14 52:4

reasonable
37:4

rebut   51:23

recall   7:8
13:12

receive
11:11
21:20

received
11:10

receiving
12:10

recent   12:16

reconcile
48:7,13,14

reconstitute
10:18

reconstruct
12:13
13:25

record   33:5

records
24:19 29:4

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.

Hearing on 03/23/2022                    Index: referencing..run

37:13

referencing
10:13

referring
18:2

refers   44:21

refine   9:4

reflect
47:25

refrain
52:22

regard   11:3
12:20
38:11

regularly
44:5

related
41:12

relates
22:13

relationships
36:15

relevant
5:15
19:19,20
25:3  47:22
52:9

remaining
9:21

remember
9:22

report   37:8
49:5

representation
43:6  44:25
45:18

represents
33:10
37:14

request
14:15
16:16
20:12
27:20
38:17  39:9

requested
43:13

requesting
40:7

require
14:15  15:1
16:14,19
17:24
22:2,3
24:10  34:6
36:12
37:21
38:16
50:11

required
12:12,14
16:11  18:4
21:19
32:24

requirements
17:3  24:20

requires
18:16

44:15

rerunning
13:21

reservation
17:9

reserve   10:2

reserving
14:22

resolve   5:21

resource
26:22

resources
19:4

respectfully
14:15
27:19

respective
4:18

respond
24:12

response
39:1

responsive
7:1  18:22
19:6,10
21:8,18
23:6,17,20
26:8,13
34:11

rest   3:24
14:12
32:10
47:25

restate
15:10

results
4:19,24
7:6  9:25
17:21
18:12  19:3
48:23

retention
52:12

returns
21:18

rights   14:22
17:9  18:19
19:22
24:23  27:1

roll   20:13

rolled   21:23

room   52:11

round   4:17
8:24
16:12,17
27:14  28:9
33:19  46:3

rounds   35:16

routes   50:20

ruled   18:21

ruling   20:8

run   10:25
13:22
29:12
31:10
44:13

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.
Hearing on 03/23/2022                                   Index: running..shortfall

48:22

running
  21:7,16
  50:11

_____
          S
_____

Sadowski
  39:16  44:3
  45:24
  46:16

Sadowski's
  41:1  48:4

save  5:22
███████████
  12:16

scenario
  41:24

SCHAPIRO  3:6
  52:21 53:5

schema  7:10,
  11,17,18,
  19 10:5
  22:8 38:25
  45:9 46:10
  47:23

schemas
  46:11

Schmidt  3:21
  4:9

scope  23:12,
  20

search  4:23
  7:4 8:20,

23,24 9:1,
9,21,23
12:6
13:17,18,
20 17:21
19:11
23:7,15
26:8,9
27:24
33:19
34:16 39:8
40:6 41:11

searched
  4:18 23:5
  26:10,11
  28:20
  30:14 31:4

searches
  3:16 4:13,
  17 5:4,15
  6:1 7:25
  8:12,14,24
  9:8,21,23
  10:18,19
  11:4,7,8,
  17 12:13,
  16 13:12,
  22,25
  14:14
  16:13,17
  17:4,24
  18:3,14
  20:4,11
  21:7,9
  23:24
  24:2,3,5,
  10,15,19,

22 25:5,
10,20
27:14
28:2,9
30:8,10,16
34:4,5,24,
25 35:1,16
38:11,18
39:10
44:13
45:21 46:3
48:23
50:22

searching
  24:1 31:20
  44:12

second-round
  28:2 34:5

seconds  46:8

seeking
  46:17

select
  19:21,23
  44:11
  48:22

selected  5:8
  16:21 17:8
  24:16,22

selecting
  16:13

selection
  10:1,2
  11:10,14

semblance
  3:22

send  4:12
  5:5 47:7

sending
  11:19

sense  13:3
  16:25
  21:11,13
  23:17
  34:20
  38:21
  51:24

sentences
  46:9,13

separate
  40:20
  52:19

sequel  24:6

served  6:21

servers
  23:25

services
  21:25

set  3:12
  7:16,18
  20:4 21:1
  24:15,20
  28:20 33:8
  34:2

sets  21:2

setting  7:24
  33:5

shortfall
  13:17

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.

should've
  52:20

show  7:20

showed  6:2

showing  6:4,
  5,8,10
  48:6

side  5:3
  6:2 10:8
  13:18
  40:25 41:1

sides  14:22

similar  24:8
  37:16

similarly
  48:1

simplify  7:8

simply  13:20
  17:4 20:13
  22:10 46:9
  47:21,24

simultaneously
  32:14
  46:21
  49:11

single  16:2
  27:17 28:4

sir  50:19

sit  23:18

sits  5:12
  7:21

sitting  5:17
  23:25

situation
  30:1 36:3

size  32:23

slice-  37:12

slight  19:9
  49:4

slot  11:20

small  28:22
  30:12

softball
  35:9

solution
  14:21 17:8
  27:11

somebody's
  3:4

something's
  27:6

sophisticated
  22:17 36:9

sort  16:20

sought  46:17

sound  15:7

sounds  11:25
  37:6 49:17
  53:3

source  11:1
  21:17
  28:15 40:3
  43:13 49:6

sources
  4:18,23

16:14
26:11
29:20
38:13,19,
  22 39:7,9
44:11 47:9
48:22
50:16,17

speak  28:4
  29:14

speaking
  32:14
  39:12
  46:21
  49:11

special  3:3,
  8 5:6 6:5,
  8,11,12,
  16,19 8:8,
  11,16,21
  9:2,3,7,
  10,13,17
  10:7,14,23
  11:19,22
  12:5,24
  13:2,10,12
  14:14,18
  15:9,16
  16:18,24
  17:16
  18:7,20
  20:17
  21:4,6,16
  22:16 23:1
  25:2,21,23
  26:3
  27:15,18

28:14,19,
  24 29:17,
  25 30:4,
  18,21
31:8,24
32:2,8,15,
  19 33:3,
  17,23
34:1,10,
  14,22
35:1,7,12,
  18,20
36:7,19
37:6,22
38:2,8
41:12
42:10,14
44:12,18
45:3,4,5,
  14,15
46:22
47:15
48:10
49:3,9,14,
  17 50:13,
  24 51:20
52:16
53:3,6

specific  7:4
  10:19
  12:12 16:4
  19:23
  21:16,17
  24:19,22
  29:23
  39:20,21
  40:3,4,14
  41:12,15

42:13
43:8,10,17
44:10
45:22
47:7,9
50:16 51:3

**specifically**
10:10
32:11
51:14

**spite** 14:3

**spoke** 45:20

**spoken** 36:10

**spreadsheet**
31:11 33:1

**stage** 3:12
25:11

**standard**
41:25

**stands** 45:25

**start** 25:16
31:25
52:13

**stating** 11:4

**status** 31:1
37:8 52:6

**storage** 17:2

**stored**
31:16,17,
22

**strategy**
23:6

**strictly**
8:14

**stringently**
27:23

**stripped**
22:7

**structure**
22:5,8
38:3 42:8

**stuff** 23:11,
23,24,25
29:8 30:25
31:4 34:2
38:4

**subject** 25:4
52:14

**submit** 18:2

**submitted**
52:23

**subset** 30:12

**substantial**
23:10 30:5

**subtract**
45:25

**successfully**
46:22

**suggested**
21:7

**supply** 8:23

**supposed** 9:8
11:11 14:8

**surfeit**
25:14

**surprise** 6:2

**surprised**
6:23

**swoop** 12:22
16:7,16
20:10

**systems**
23:22
30:25

———————

**T**

**tail** 22:1

**taking** 8:13
34:2,23

**talk** 47:4

**talked** 24:4
35:25

**talking**
8:11,12,
13,14 15:2
18:9,10,
11,12,13
20:18,20
21:1,3
22:10
28:16
30:20
31:4,6
34:24
35:11

**tangible**
46:13

**targeted**
24:20

25:4,10

**tasks** 14:8

**TBD** 11:25
13:4

**team** 14:14
16:18

**technical**
10:21 12:9
14:5

**tells** 14:6

**temperature**
20:15

**ten** 20:2
24:16
29:19 34:8

**term** 6:17

**terminology**
20:24
23:15 24:5

**terms** 13:16
14:23 17:6
21:11 22:4
37:4 38:15

**terribly**
6:23

**test** 9:24
35:5 50:11

**testified**
39:16 44:3
45:24
46:16

**testify**
43:19

CHASOM BROWN, ET AL. vs GOOGLE, LLC, ET AL.

testimony
  43:15
  45:25
  47:17
  50:15

testing
  35:15

tests  22:9

that'd  34:20

there'd
  47:10,11

thing  5:24
  9:14 14:21
  25:25
  28:12 39:3
  42:19,23
  51:25
  52:19

things  3:14,
  15 6:21,24
  21:7 28:13
  31:15
  40:11

thinking
  36:7 37:23

thinks  41:12

third-party
  19:7 21:9
  23:9 26:16
  29:6,21

thoughts  3:5

tied  40:3

time  4:22
  6:4 12:25

17:22 19:3
28:6 49:10
51:25 52:8

time-consuming
  25:11

timed  10:19

timeline
  10:10

times  14:11
  43:23

timing  12:2
  14:1,6
  18:24 19:8
  37:10

today  3:13,
  25 8:17
  10:22
  11:15 12:1
  16:20
  18:5,19
  22:24
  33:15 38:9

tooling  43:9

top  34:8
  36:22

topic  44:9
  45:19,24
  46:16
  49:19

totally
  52:17

tracking
  10:8,11
  15:18

traffic  52:5

tranches
  23:3

TRANSCRIPT
  53:9

Trebicka  3:7

trial  5:23

troubleshoot
  12:11

true  49:1

truth  14:8

turned  4:7
  34:12 35:2

Turner  36:14

typo  47:11

─────────────

        U

─────────────

Uh-huh  9:10
  10:14

ultimately
  5:21 7:20

UMA  9:23
  10:12
  12:6,16
  13:8 41:8

umbrella
  6:17

understand
  10:24 11:3
  19:22
  24:23
  26:20,22

36:10
38:5,7
49:14 51:4

understanding
  12:9 17:18
  19:5,11
  33:9 41:1
  48:15

Understood
  9:2

unduly  15:24
  19:13,14

unit  40:1,2

universal
  49:5

unpacking
  25:24

unsure  6:15

update  10:12
  13:24 46:9
  47:25

updates
  37:8,10

user  9:22
  13:19

users  43:25
  44:1

─────────────

        V

─────────────

values  10:5
  22:7 31:16
  41:7

variety

12:11

vast  24:18

verge  10:16

versus  33:11

Viola  3:7

visiting
 28:5

volume  52:5

—————————
W

wait  44:18

waiting  9:15

waived  18:18

waiving
 19:22
 24:23 27:1

wanna  4:20
 8:3,23
 9:4,18,19
 10:10
 17:17
 31:16 33:4
 35:6,13,14
 51:22

wanted  3:12
 4:14 9:11
 10:11

watching
 51:2

ways  12:11
 22:19
 31:22

32:22

website  28:6

weekend
 10:17
 12:10 14:7

weeks  52:20

window  13:22

wonderful
 43:11

word  30:22
 48:25

work  4:8,25
 11:25 36:7
 40:18

worked  10:17

working
 14:1,7
 26:5

wrap  3:9

wrestling
 30:6

write  48:21

writing
 33:10 36:4
 48:20
 51:1,12,23
 52:2

written
 39:21 40:5
 41:10
 43:10
 44:10
 47:12,14

48:19,20

wrong  48:24

—————————
Y

yesterday
 5:1 11:18
 33:2 50:18

Yhere's  17:6

York  36:9

Young  40:24

—————————
Z

Zoom  3:2
 51:12

# EXHIBIT 4

# Redacted in its Entirety

# EXHIBIT 5

# Redacted in its Entirety

# EXHIBIT 6

# Redacted Version of Document Sought to be Sealed

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293 6858
Fax: (415) 999 9695

**SUSMAN GODFREY L.L.P.**
William Christopher Carmody (pro hac vice)
bcarmody@susmangodfrey.com
Shawn J. Rabin (pro hac vice)
srabin@susmangodfrey.com
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

**MORGAN & MORGAN**
John A. Yanchunis (pro hac vice)
jyanchunis@forthepeople.com
Ryan J. McGee (pro hac vice)
rmcgee@forthepeople.com
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

*Counsel for Plaintiffs; additional counsel listed in signature blocks below*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
Fax: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

*Counsel for Defendant; additional counsel listed in signature blocks below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 4:20-cv-03664-YGR-SVK <br><br> **STIPULATION REGARDING GOOGLE'S "MAYBE_CHROME_INCOGNITO" FIELD** <br><br> Judge:    Honorable Yvonne Gonzalez Rogers |

Pursuant to Civil Local Rule 7-12, this joint stipulation is entered into between Plaintiffs and Defendant Google LLC ("Google"), collectively referred to as the "Parties."

WHEREAS, on March 4, 2022, Plaintiffs served a Rule 30(b)(6) deposition notice seeking testimony about the following topic:

> Google's development, implementation, and use of any bit or field containing the word "incognito" or whose name has ever contained the word "incognito," or whose function was intended to detect Incognito, including the following: is_chrome_incognito, maybe_chrome_incognito, not_chrome_incognito, and chrome_non_incognito. This Topic includes the reasons why Google developed, implemented, and used any such bit or field. This Topic also includes the log or traffic sources as well as the design (including any changes in design) used to determine the bit or field, as well as any logs or data sources where such a bit or field is used and how it is used.

WHEREAS, Google has offered to designate portions of Mr. Bert Leung's March 4, 2022 deposition testimony as Rule 30(b)(6) testimony in lieu of producing a witness to provide Rule 30(b)(6) testimony about the maybe_chrome_incognito field;

WHEREAS, pursuant to the Court's First Order on March 11, 2022 Joint Discovery Dispute Chart (Dkt. 487), Plaintiffs submitted a proposed factual stipulation concerning the maybe_chrome_incognito field to the court room deputy on March 15, 2022.

WHEREAS, on March 18, 2022, the Court ruled that "Topics 1-6 [in Plaintiffs' proposed factual stipulation] are appropriate and can proceed either by stipulation or further deposition. Google to notify Plaintiffs as to which option it selected by 3/18/2022 … Topics 7-12 are stricken as beyond the scope of this line of inquiry." Dkt. 505-1 at 1.

WHEREAS, on March 18, 2022, Google notified Plaintiffs it agreed to proceed by stipulation.

NOW THEREFORE, the Parties stipulate to the following facts, which shall be taken as established for all purposes throughout this case.

1. In May 2020, Google employees Chris Liao, Bert Leung, and Mandy Liu began developing a simple heuristic-based method to approximately infer Chrome Incognito traffic using existing signals in ad requests, and a boolean field to record the outcome of this heuristic-based method.

2. On or about March 11, 2021, Google employees drafted a logging proto to implement a boolean field called "maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team" that recorded the outcome of the aforementioned heuristic-based method.

3. The following table identifies all Google logs where the "maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team" boolean field has been implemented, including Zwieback, GAIA, and Biscotti logs, as well as the date when the "maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team" boolean field was logged in each data source.

| ███ Log containing maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team field | Date source began logging data |
|---|---|
| ████████████ | ██████ |
| ███████████████████ | ██████ |
| ██████████████ | ██████ |
| █████████████████ | ██████ |
| ███████████████████ | ████████ |
| ███████████████ | ██████ |
| ███████████████ | ██████ |
| █████████████████████ | ██████ |
| ███████████████ | ██████ |
| ██████████████ | ██████ |
| ████████████████ | ██████ |
| ████████████████████ | ██████ |
| ███████████████ | ██████ |

| | |
|---|---|
| ██████████████ | ████████ |
| ███████████████ | ████████ |
| ████████████ | ████████ |
| ████████████ | ████████ |
| ███████████████ | ██████ |
| █████████████ | ███████ |

4. Bert            Leung                implemented            the "maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team" boolean field into the data sources and logs listed above in Paragraph 4.

5. The Cookie Monitoring Dashboard for Search and Display Ad Serving that uses the "maybe_chrome_incognito_do_not_use_without_consulting_ads_identity_team" boolean field was officially launched on March 2, 2022.

DATED: April 11, 2022

QUINN EMANUEL URQUHART & SULLIVAN, LLP

_/s/_

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com

BOIES SCHILLER FLEXNER LLP

_/s/_

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293 6858
Fax: (415) 999 9695

James W. Lee (*pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (*pro hac vice*)
rbaeza@bsfllp.com
100 SE 2nd Street, Suite 2800

555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire A. Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

Miami, FL 33130
Tel: (305) 539-8400
Fax: (305) 539-1304

William Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Tel: (813) 223-5505
Fax: (813) 222-4736

Michael F. Ram (CA Bar No. 104805)
mram@forthepeople.com
MORGAN & MORGAN, P.A.
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913

*Attorneys for Plaintiffs*

1

**[PROPOSED] ORDE**

2   **PURSUANT TO STIPULATION, IT IS SO ORDERED.**

3

4

5   DATED: _____, 2022          _____

6                                          Honorable Susan van Keulen
                                           United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION OF CONCURRENCE

I am the ECF user whose ID and password are being used to file this STIPULATION Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in the filing of this document.

_____ /s/

# Thompson Declaration

# Redacted Version of Document Sought to be Sealed

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

*Attorneys for Plaintiffs*

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.:  4:20-cv-03664-YGR-SVK<br><br>**DECLARATION OF CHRISTOPHER THOMPSON IN SUPPORT OF PLAINTIFFS' REQUEST FOR AN ORDER TO SHOW CAUSE**<br><br>The Honorable Susan van Keulen<br>Courtroom 6 - 4th Floor<br>Date: April 21, 2022<br>Time: 10:00 a.m. |

# **DECLARATION OF CHRISTOPHER THOMPSON**

I, Christopher Thompson, declare:

      1.      Counsel for the *Brown* Plaintiffs retained me to provide technical analysis and testimony in connection with the upcoming evidentiary hearing on Plaintiffs' Request for an Order to Show Cause, including in response to the technical assertions made by Google in its opposition filing and by various Google declarants who filed statements in support of Google's opposition filing.

      2.      All of the statements in this declaration are true based on my analysis and personal knowledge, and I am available and if the Court permits it willing to testify on these matters during the upcoming evidentiary hearing.

      3.      A copy of my CV is attached as Exhibit A.  As reflected in my CV, I majored in Computer Engineering and have many years of experience in computing technology. I am being compensated at a rate of $275 per hour for my work in connection with this matter, and none of my compensation is contingent on the outcome of this litigation.

      4.      In the course of my previous work writing software and building software systems, I have used Protocol Buffers, defined "proto" schema files, and built systems that write to the data structures defined by proto files.

      5.      I have reviewed each and every submission Google and the Special Master made available as part of the Special Master process, including the Plaintiffs' data and test data produced by Google, and the transcripts of the hearings before the Special Master.  In addition, all documents Google produced and deposition transcripts for witnesses in this case have been made available to me pursuant to the Protective Order issued in this case.

      6.      I was also present at a live test demo with Google engineers and Special Master Douglas Brush on March 4, 2022.  At that session, we had tested a small set of Biscotti IDs against ███ of the "maybe_chrome_incognito" logs.

**Google's Ability To Detect Event-Level Incognito Traffic Within Its Logs**

7.       I reviewed Google's Opposition to Plaintiffs' Request For an Order For Google to Show Cause For Why It Should Not Be Sanctioned for Discovery Misconduct ("Google's Opposition" to "Plaintiffs' Request"), and I understand that Google is arguing that event-level Incognito usage cannot be identified.

8.       Based on my analysis of the data produced by Google in this litigation, including in connection with the Special Master process, that assertion is incorrect. The data produced by Google confirms that Google can (and in fact does) detect event-level Incognito traffic within its logs.

9.       I provide two simple experiments we used to demonstrate this event-level detection. This assessment is based on data produced by Google, and I worked with Plaintiffs' consultant Dr. Lillian Dai to prepare these examples.

10.       In one example, we used IP addresses and user agent strings to identify event-level Incognito traffic. Because this was data produced in connection with the Special Master, the data we were able to test was limited to the named Plaintiffs and certain test accounts created in connection with that process (referred to below as our "consulting team" accounts). First, we located the user's IP address and user agent string, either from the device, GAIA account information, or from GAIA logs. From the First Iterative Search with the Special Master, a GAIA log search against ███████████████████████████████████, containing a ████████ field in row 2 equal to "2454128719," which is converted[1] to IP address 146.71.8.79.[2] The same row contains user agent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.55 Safari/537.36,gzip(gfe)".

---

[1] IP addresses may be converted using https://www.browserling.com/tools/dec-to-ip.
[2]       This file lacks a Bates stamp, and is instead produced as ███████ .csv", produced by Google to the Special Master on February 23, 2022, as part of a production named "20220223 Brown v. Google - ███████████". Plaintiffs will be prepared to present this search result produced by Google at the evidentiary hearing.

11.     Next, we located the user's Biscotti ID using this IP address and user agent string pair.  In the same example, GOOG-BRWN-00826529[3] (████████████████), GOOG-BRWN-00826530 (████████████), GOOG-BRWN-00826531 (████████████████), GOOG-BRWN-00826532 (████████████), GOOG-BRWN-00826534 (██████████████████), GOOG-BRWN-00826535 (████████████████████), GOOG-BRWN-00826536 (████ ████████████), GOOG-BRWN-00826537 (██████████████████) and GOOG-BRWN-00840745 ████████████) contained our consulting team's Incognito signed-out experimental data associated with Biscotti ID "2501521082151731303".  GOOG-BRWN-00826130 (████████████████) contained our consulting team's Incognito signed-out experimental data associated with Zwieback ID "0xa30eae52e9dcb304". All of these Incognito signed-out Display and Search ad logs contain the same IP address and user agent as that in the GAIA log: RemoteHost: "146.71.8.79" or client_ips: "2454128719" and UserAgent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.55 Safari/537.36,gzip(gfe)". The user agent corresponds to a Mac device and Chrome browser.

12.     We also checked the Google ad logs containing the Biscotti IDs to verify Incognito usage. Here, we checked the above-referenced ████████████, ████████████████ and ██████████████, as well as logs containing "maybe_chrome_incognito" associated with Biscotti ID 2501521082151731303, to verify Incognito usage. The first ████ logs contain the X-Client-Data Header field, and the results had no X-Client-Data Header value for the correct IP address and user agent string. And the last set of logs contain the "maybe_chrome_incognito" bit, which Plaintiffs tested in a live demo on March 4, 2022, with Google engineers in which I was present.  Of the ████ logs tested, the result had "maybe_chrome_incognito" set as "true" for the Biscotti ID 2501521082151731303.

---

[3] For all Bates stamped logs referenced for this first example, these were all natively produced spreadsheets provided by Google. Plaintiffs can provide them to the Court or Google readily upon request. Regardless, Plaintiffs will be prepared to present them at the evidentiary hearing.

13.    As a second example, we used Google Analytics User IDs to identify event-level Incognito traffic.  First, we located the user's Google Analytics User ID ("UID"). This time from the Second Iterative Search, production "2022-03-25 Brown v. Google – Analytics ███ data – AEO", file ███ ███ ████████████████████ ██████████████████████[4] row 2246 corresponded to Plaintiff Mr. Jeremy Davis' UID "D6E68756C7085109E0530100007F4E1E" from washingtonpost.com. Column M of the same row contained a request URL containing his CID from washingtonpost.com: ████████████████.

14.    Next, we located the user's Biscotti ID using the CID.  In the same example, CID ██████████████████ was found in the file ████████████████████ ████████████████████, at row 5 and column M.  The same row, in column A showed Mr. Davis' Biscotti cookie "AHWqTUkuQpT6kkO-Dw_-ua3QraXieMCgN4y9rGORTwXNcUaWhg5Y47ntF2PavJTgdkg". The embedded Biscotti ID in this cookie is shown in "2022-03-02 Brown v. Google - Decode IDE.pdf", at page 4, item 33, as ███████████████.

15.    We then checked Google's ad logs containing the Biscotti IDs to verify Incognito usage.   The  logs  referenced  above  (████████████,  ████████████  and ████████████)  were  checked  to  verify  Incognito  usage  against  Biscotti  ID ████████████.  The results had no X-Client-Data Header value.

16.    As  the  two  above  examples  show,  from  only  the  First  and  Second  Iterative Searches, the "maybe_chrome_incognito" bit developed and implemented by Google, like the X-Client-Data Header field, sit in logs that contain identifiers such as a Biscotti ID, or can be located using other identifiers such as an IP address and user agent string pair.  As I discuss below in the next section, the "is_chrome_incognito" and "is_chrome_non_incognito" bits operate similarly,

---

[4] For all xlsx spreadsheets referenced for this second example, these were also all natively produced spreadsheets provided by Google. These sources, as named by Google, were identified correctly. Plaintiffs can provide them to the Court or Google readily upon request. Regardless, Plaintiffs will be prepared to present them at the evidentiary hearing.

1   and are contained within the GWSLogEntryProto (sometimes referred to by Google in filings as

2   "GWS Proto") bit schema, to which GWS logs would have ready and easy access.

3       17.     Because Google has not provided data for all three of these Incognito-detection bits

4   (let alone any other Incognito-detection bits that might exist), or all of the associated logs and

5   sources with their full schema, it is still unclear the extent to which different Google logs and

6   sources can be used for similar identification purposes.  Still, the above two examples illustrate at

7   least some ways by which event-level Incognito detection and identification can be done

8   (depending on the data retained by Google).

9   **Google's Ability To Preserve Event-Level Incognito Traffic**

10      18.     Google's "is_chrome_incognito" and "is_chrome_non_incognito" bits  are

11  especially  useful  for  identification  and  preservation  purposes  because  they  are

12  GWSLogEntryProto bits.  Because they exist in GWSLogEntryProto, this means that the two

13  Google bits can be used in connection with a number of different logs. Given that these fields were

14  built in 2017 and 2018, they could have been made "live" at the beginning of the case or "added"

15  to any GWS log.  Put differently, any process within Google that writes to a log using the

16  GWSLogEntryProto data structure can simply write to that specific field. Writing to an existing

17  field within a Protocol Buffer data structure is a one-line code addition. For example, Google could

18  have easily added these Incognito-detection bits into any of the GWS logs referenced in the two

19  examples discussed above.

20      19.     Google's  own  public  documentation  on  the  Protocol  Buffers  library  and

21  specification  explains  how  easy  it  is  to  write  to  an  existing  field.[5]  The  example  from  the

22  documentation involves writing an ID to "person" message, and in C++ it is as simple as person-

23  >set_id(id); where "id" is the desired value.

24      20.     Contrary to what Google's Opposition suggests, these Incognito-detection bits do

25  not  appear  to  be  just  for  "Search  logs."  During  the  Special  Master  process,  the

26  "is_chrome_non_incognito" bit appeared in the schema for the ███████████  and

27

28  [5] https://developers.google.com/protocol-buffers/docs/cpptutorial#writing-a-message

1   ████████████, as part of the March 11, 2022 production, in a file named "2022-03-10

2   Brown v. Google – Fields for ██ Logs – AEO.xlsx."[6] This means that the logs either were already

3   collecting data for these fields, or can simply be authorized to collect data for these fields. These

4   are not Search-only Incognito-detection bits.  Importantly, while these three Incognito-detection

5   bits also use the X-Client-Data Header or some logic relying on the same, the bits are much smaller

6   to store than the X-Client-Data Header field. The bits are "Boolean" in that they simply store a

7   "yes (1)" or "no (0)" value, and would have added minimal weight to any existing log if turned on

8   or added.

9   **Google's Incognito Traffic Detection Is At The Event-Level**

10         21.     I understand that Google is arguing that the three Incognito-detection bits were built

11  only for aggregated traffic analysis and not for event-level analysis.  While that may be how

12  Google allegedly intended to use the bits, the starting point is an event-level categorization.  And

13  the same bits can certainly be used to identify event-level data, as the above two examples from

14  the First and Second Iterative Searches already show.

15         22.     Perhaps more importantly, aggregated analysis still depends on event-level

16  detection.  This is an aggregation of event-level logs.  That is exactly why these bits are in event-

17  level logs.  The logs using these bits that Google identified contain event-level data.  While Google

18  may use those logs to create aggregated analysis, that does not change the fact that aggregation

19  starts with event-level Incognito-usage data.  To the extent logs had been or are preserved, the logs

20  can be used to identify Incognito-usage at an event level.

21  **Accuracy of Google's Detection of Event-Level Incognito Traffic**

22         23.     I also understand that Google is asserting that these Incognito-detection methods

23  are not necessarily "accurate."  Based on my own analysis, looking at the data produced in

24  connection with the Special Master process, that seems incorrect.  The records I have seen indicate

25  that Google is accurately detecting incognito-traffic and using these bits to identify the traffic as

26  

27  _____

[6] For xlsx spreadsheets referenced for this section, these were also all natively produced spreadsheets provided by Google. These sources, as named by Google, were identified correctly. Plaintiffs can provide them to the Court or Google readily upon request. Regardless, Plaintiffs will be prepared to present them at the evidentiary hearing.

28

1    such.  To the extent there are specific instances where non-incognito traffic has been labeled as

2    incognito traffic with these bits, that is something that could be the subject of further expert

3    analysis, had Google preserved or produced such data.

4    **Linkability/Joinability and Identification of Class Members**

5         24.    I also understand that Google is asserting that Incognito data is not linkable to

6    specific users, and that Google's data cannot be used to identify class members.

7         25.    Based on my analysis of the data produced in connection with the Special Master

8    process, these assertions are also incorrect.  As demonstrated above, the data produced by Google

9    can be linked to specific users, who can be identified as class members.

10        26.    These are issues where additional data, had it been preserved by Google, would

11   have provided additional proof on these points, allowing for the identification of additional users

12   of Chrome Incognito mode during the alleged class period.

13        27.    The linkability of these records is also something that Google's own employees

14   recognized during the class period.  ███████████████████████████████████

15   ████████████████████████████████████████  *See* McClelland Ex. 15,

16   GOOG-CABR-05256755 at -759; McClelland Tr. at 212:13-212:24. It is also possible for Google

17   to join separate zwieback cookies between different incognito sessions  ██████████

18   ████████████████████████  McClelland Tr. at 209:11-209:24; McClelland

19   Ex. 17, GOOG-CABR-00799341.  A true and correct copy of the relevant excerpts and exhibits

20   from the deposition is attached hereto as Exhibit B.

21        28.    I have also reviewed Google documents stating that Google logs an encrypted

22   signed out identifier in its personal logs, and retains the encryption key for ██ days.  GOOG-

23   CABR-04773853, -54, -67, -88.  Google employees understood that retaining the encryption key

24   provides a mechanism for Google to link signed-in activity associated with a Google account to

25   signed-out activity logged with the signed-out identifier.  GOOG-CABR-03652549, -552-53.  True

26   and correct copies of the relevant excerpts from these two documents are attached hereto as

27

28

1    Exhibits C and D respectively.[7]

2         I declare under penalty of perjury under the laws of the United States of America that the

3    foregoing is true and correct.  Executed this 11th day of April, 2022, at Nolensville, Tennessee.

4                                                  */s/ Christopher Thompson*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    [7] These lengthy documents produced by Google are cited correctly, and only excerpts are attached hereto.  Plaintiffs
      can provide these documents to the Court or Google readily upon request. Regardless, Plaintiffs will be prepared to
28    present them at the evidentiary hearing.

# EXHIBIT B-1

# Redacted in its Entirety

# EXHIBIT B-2

# Redacted Version of Document Sought to be Sealed

Message

---

| From: | rorymcclelland@google.com [rorymcclelland@google.com] |
|---|---|
| Sent: | 7/16/2020 3:39:56 PM |
| To: | rorymcclelland@google.com; mgalonsky@google.com; msramek@google.com |
| Subject: | AAAAD--SkdU-tG4WigFTVLM |

- **rorymcclelland@google.com** 2020-07-16T15:39:56.067Z

Privacy question of the day: Does anyone know where the 'we promise not to join Incognito and Regular data/logs' comes from? And for bonus points, where the commitment is recorded?

- **mgalonsky@google.com** 2020-07-16T15:48:56.578Z

What makes a data log an Incognito data log?

- **msramek@google.com** 2020-07-16T15:49:21.669Z

What are you referring to? Chrome Incognito should be indistinguishable to Google servers (modulo experiment IDs), I don't think we're separating logs.

- **msramek@google.com** 2020-07-16T15:49:34.308Z

Unless you mean "Incognito" of other Google products (i.e. Sin Rastro).

- **mgalonsky@google.com** 2020-07-16T15:50:26.756Z

There should be seperate Zwieback cookies between Incognito sessions, but they could be joinable on a technical level

- **msramek@google.com** 2020-07-16T15:51:29.380Z

Which is the same as separate Zwieback cookies across ▇▇▇ cookie deletion. So it's more about "we won't use your IP to fingerprint you" rather than Incognito separation.

- **msramek@google.com** 2020-07-16T15:52:14.703Z

Rory, did you maybe confuse this with the commitment to not join signed-in (GAIA) and signed-out (Zwieback) logs? That is definitely something that's written publicly somewhere.

- **rorymcclelland@google.com** 2020-07-16T16:07:28.763Z

Yes a bit of both of the above: the more generic question then: Where is the commitment recorded that we won't attempt to join separate Zweiback cookies or signed-in/out sessions?

- **rorymcclelland@google.com** 2020-07-16T16:07:32.061Z

Thanks!

- **msramek@google.com** 2020-07-16T16:11:02.234Z

I believe that was one of the things that were talked about during ▇▇▇▇ times.

- **msramek@google.com** 2020-07-16T16:12:05.691Z

I'm not sure where to look for it though, other than searching for keywords in Moma. We do hear it often from other privacy teams that deal with those cookies more.

- **rorymcclelland@google.com** 2020-07-16T16:14:50.142Z

Okay, thanks both. I'll do a bit of searching. FYI @Ramin Halavati

**EXHIBIT**
Rory McClelland
**17**

GOOG-CABR-00799341

# EXHIBIT C

# Redacted in its Entirety

# EXHIBIT D

# Redacted in its Entirety