# Mao Declaration

# Exhibit 51

Redacted Version of Document
Sought to Be Sealed

GOOG-BRWN-00182492

Message

| | |
|---|---|
| **From:** | Mardini [mardini@google.com] |
| **Sent:** | 11/6/2019 3:58:18 PM |
| **To:** | Ramin Halavati [rhalavati@google.com] |
| **CC:** | Florian Uunk [feuunk@google.com]; Sabine Borsay [sabineb@google.com]; Yuan Chen [yuanchen@google.com]; Christian Dullweber [dullweber@google.com] |
| **Subject:** | Re: Edge and InPrivate Mode + Balanced Protection |

Ramin: I agree with you.

FWIW, here is the coverage from tech crunch: https://techcrunch.com/2019/11/04/microsofts-chromium-based-edge-browser-gets-new-privacy-features-will-be-generally-available-january-15/
Note that the MSFT spokesperson narrative is very similar to ▮▮▮▮▮

On Wed, Nov 6, 2019 at 8:53 AM Ramin Halavati <rhalavati@google.com> wrote:
Can we still work on the plan to send the signal to Google to delete logs from Incognito browsing (at the end)? Even if the effect of it might not be very large from a technical point of view, from a psychological point of view it's much more reassuring to be able to say "You won't be logged" compared to "Your log cannot be used". If we do that, our possible reply to their assertion of "if you really want private browsing, use edge" would be better backed up.

On Tue, Nov 5, 2019 at 6:27 PM Mardini <mardini@google.com> wrote:

On Tue, Nov 5, 2019 at 5:22 PM Florian Uunk <feuunk@google.com> wrote:
Thanks Mardini, that's really interesting, I'm curious to hear how the reaction will be!

From the video (around 5m30s), it looks like they are actually telling Bing up front (because there is a Private indicator in the search box on bing.com).
I see. The way it was worded in the email ("when you close the window") made me believe it us upon closing the window but if the video shows they're telling it upfront then I stand corrected.

FWIW, this is what I sent Anil/Parisa/Margret:

- **Blocking signing-in while in Incognito:** We believe this breaks a lot of existing use cases we currently have. We're planning on adding a "sign-in awareness" step in incognito so that we show UI that would alert the user they are signing in into a site while in Incognito. Target: late Q1.
- **Sending signal to web properties to indicate user is in incognito to delete server-side logs:** We think sending a signal at the beginning of the session is not a tenable position and is against our privacy principles. We are talking with Sin Rastro about sending a signal at the end of the incognito session
- **Cookie tracking prevention by default:** We would love to be able to do that in regular mode but that is not currently possible. Worth noting that Edge are not blocking all 3P cookies but using the Disconnect Me list with specific trackers. Our control blocks *all* 3P cookies.

On Tue, Nov 5, 2019 at 4:58 PM Mardini <mardini@google.com> wrote:
My highlights below.

We have sign-in awareness and ChromeGuard coming up. But also it seems Edge will send to Bing at the end of an incognito session to clean up.

CONFIDENTIAL

GOOG-BRWN-00182492

On Mon, Nov 4, 2019 at 3:15 PM Lorena Crowley <lorenacrowley@google.com> wrote:
Hi team,

Day 1 of Microsoft Ignite wrapped today, where they kicked off the day with their Vision Keynote highlighting new releases and their vision for the enterprise across cloud, developer tools, security, and productivity. On a browser front they announced *that today the release of the final beta version of the new Microsoft Edge built on Chromium code, and that the new Edge will be generally available on January 15th in more than 90 languages.* Recording here.

We'd like to share a recap of the key highlights that Microsoft announced in regards to the new Edge:
• **Branded themselves as the 'browser and search engine for the enterprise'.** Microsoft is branding Edge and their search engine, Bing, as uniting the internet with your enterprise's intranet so that you can access more important data and find what you're looking for within your enterprise in one single browsing and search experience. This will help save employees time by being able to more quickly find the corporate information they need from within their browser and search engine. AI capabilities make it easy for employees to search in natural language to find a team's title, name, office location, or to understand what a company acronym means. Microsoft Search in Bing can now also be accessed on your mobile device, bringing these productivity enhancements to knowledge workers on the go. Their new logo is meant to capture the 'waves of innovation' that the Edge team plans to bring to the enterprise. They hinted at the end of the keynote that more enhancements are to come for developers and consumers in Spring 2020.



• **Default private browsing and cookie tracking prevention.** In combination with Bing, the new InPrivate browsing mode will keep your online searches and identities private. Unlike Incognito mode in Chrome, InPrivate mode also prevents you from accidentally being logged in. Any information about your browsing session on your local machine when you close the window is deleted and your search history on Bing and any personally identifiable information will also not be saved or associated back to you. Cookie tracking prevention will also be on by default in their Balanced browsing mode, in which they claim their Balanced mode is more protective than any other browser. A key theme throughout all of the keynote, beyond just Edge, was that Microsoft was company you could trust built on best of class privacy, responsible AI, and security.
• **Integration with 100+ enterprise ecosystem partners.** They launched their Microsoft Graph connectors preview program today that will expand Microsoft Search's reach for Microsoft 365 customers to access over 100+ connectors such as Salesforce.com, ServiceNow, Box, and more that will become available in H1 2020.



- **Internet Explorer sites will still work, and if it doesn't, Microsoft will fix it free of charge.** If your sites work in Internet Explorer 11, Chrome, or the current version of Microsoft Edge, the App Assure program will ensure that they work in the new Edge. If the site is not working, Microsoft will help the organization fix it at no additional cost.

**News Coverage of Microsoft Edge**
- *Microsoft:* Introducing the new Microsoft Edge and Bing
- *Microsoft:* Getting your sites ready for the new Microsoft Edge
- *The Verge:* Microsoft's Edge Chromium browser will launch on January 15th with a new logo
- *Ghacks.net:* Microsoft plans to release the new Microsoft Edge on January 15th, 2020
- **Engadget**: Microsoft Chromium Edge browser arrives January 15th
- *Appleinsider:* Edge with Chromium for macOS lands Jan 15th with preview available
- *The Register:* Pencil 15 Jan 2020 in your diary: That's when Microsoft hope you'll be t the cutting Edge...Chromium style
- *Business Insider:* It looks like Microsoft is finally ditching Internet Explorer branding for good with a revamped logo that looks like a wave
- *Bleeping Computer:* First Microsoft Edge Stable Release Candidate Now Available
- *TechCrunch*: Microsoft's Chromium-based Edge browser gets new privacy features, will be generally available January 15
- *ZDNet:* Microsoft's Chromium-based Edge browser to be generally available January 15th, 2020
- *Cnet:* With Edge browser update, Microsoft says work searches will no longer suck
- *Axios:* Microsoft's Bing and browser pivot to the business

**Enablement Resources**
We shared a variety of resources last week to support Edge-related discussions with customers, so check them out here.

**Other Relevant Highlights**
Some noteworthy items from sessions across today include:

- Microsoft Endpoint Manager was demoed in the productivity technical keynote. It offers a single view across Microsoft's different management tools today, and gives Microsoft System Center customers a free licence to Intune.
- Microsoft claims there modern managed devices (for Microsoft Managed Desktop customers and those using native Microsoft 365) can offer the following benefits:
  o   85% faster boot time
  o   Immediate resume
  o   Doubled battery life
  o   85% fewer crashes
- Security and manageability are coming together. In addition to tracking threats and showing risk and vulnerability scores, Microsoft tools will leverage AI to recommend which tasks IT should take to improve their security and compliance posture, all in the same console.

GOOG-BRWN-00182494

Raw notes from a variety of sessions on day one can be found here. We'll continue to track announcements, communications, and coverage the remainder of the week at Ignite. If you have any questions, please feel free to reach out in the meantime.

--

**Lorena Crowley**
lorenacrowley@google.com
Product Marketing
Manager, Chrome Browser
for Enterprise

GOOG-BRWN-00182495

PRODBEG: GOOG-BRWN-00182492
PRODBEGATT:
PRODEND: GOOG-BRWN-00182495
PRODENDATT:
PRODVOL: PROD023
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: AbdelKarim Mardini
TO: ramin halavati <rhalavati@google.com>
FROM: mardini <mardini@google.com>
CC: sabine borsay <sabineb@google.com>;florian uunk <feuunk@google.com>;christia-
      n dullweber <dullweber@google.com>;yuan chen <yuanchen@google.com-
      >
BCC:
CONFIDENTIALITY: Confidential
CROSS_ALLCUSTODIANS: AbdelKarim Mardini
CROSS_ATTACHMENTNAME:
CROSS_BEGATTACH:
CROSS_BEGBATES: GOOG-CABR-00227155
CROSS_CC: sabine borsay <sabineb@google.com>;florian uunk <feuunk@google.com>;ch-
      ristian dullweber <dullweber@google.com>;yuan chen <yuanchen@goog-
      le.com>
CROSS_CONFIDENTIALITY: CONFIDENTIAL
CROSS_CUSTODIAN: AbdelKarim Mardini
CROSS_DATECREATED:
CROSS_DATEMOD: 11/06/2019
CROSS_DATERECEIVED: 11/06/2019
CROSS_DATESENT: 11/06/2019
CROSS_DE-DUPED CUSTODIANS: AbdelKarim Mardini
CROSS_ENDATTACH:
CROSS_ENDBATES: GOOG-CABR-00227158
CROSS_FILEEXTENSION: eml
CROSS_FILENAME:
CROSS_FROM: mardini <mardini@google.com>
CROSS_MD5 HASH: 4444B36F8914F7531B86C82575C05735
CROSS_MESSAGE ID: <CAGQY0OcDs1UOcSU-
rSqhM0eXPJZTZDdnpnfgciQ238SuyLa8FQ@mail.gmai-
      l.com>
CROSS_OWNER: mardini
CROSS_PRODVAL: CROSS-PROD002
CROSS_REDACTED: N
CROSS_SUBJECT: Re: Edge and InPrivate Mode + Balanced Protection
CROSS_TITLE: Re: Edge and InPrivate Mode + Balanced Protection
CROSS_TO: ramin halavati <rhalavati@google.com>
CUSTODIAN/SOURCE: AbdelKarim Mardini
DATECREATED:
DATELASTMOD: 11/06/2019
DATERCVD:
DATESENT:
DeDupedCustodians:
DOCEXT:
FILENAME:
ILS_ProdDate: 06/18/2021
CROSS_ILS_ProdDate: 09/01/2021
MD5 HASH: 4444B36F8914F7531B86C82575C05735

MessageID:
NATIVEFILE:
Owner: mardini
PAGES:
REDACTED: N
SUBJECT: Re: Edge and InPrivate Mode + Balanced Protection

# Mao Declaration

# Exhibit 53

Redacted Version of Document
Sought to Be Sealed

McClelland Deposition Transcript

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - - - - - - - - - - - - - - - - - - - x
CHASOM BROWN; MARIA NGUYEN; WILLIAM
BYATT; JEREMY DAVIS; and CHRISTOPHER
CASTILLO, individually and on behalf
of all other similarly situated,

        Plaintiffs,

               No. 5:20-cv-03664-LHK

   -against-

GOOGLE LLC,

        Defendant.

- - - - - - - - - - - - - - - - - - - - x


        Zoom video conference deposition of
RORY McCLELLAND, taken pursuant to
notice, was held remotely, commencing
February 18, 2022, 5:30 a.m. Eastern
Standard Time, before Leslie Fagin, a
Stenographic Court Reporter and Notary
Public in the State of New York.
             - - -


        MAGNA LEGAL SERVICES
  320 West 37th Street, 12th Floor
    New York, New York 10018
      (866) 624-6221



Page 2

```
 1
 2   A P P E A R A N C E S:
     (All Parties Present Via Zoom.)
 3
 4
     BOIES SCHILLER & FLEXNER LLP
 5   Attorneys for Plaintiffs
                 44 Montgomery Street, 41st Floor
 6               San Francisco, California 94104
     BY:         MARK MAO, ESQUIRE
 7               ROSANNA BAEZA, ESQUIRE
 8
     QUINN EMANUEL URQUHART & SULLIVAN
 9   Attorneys for Defendant
                 51 Madison Avenue, 22nd Floor
10               New York, New York 10010
     BY:         JOMAIRE A. CRAWFORD, ESQUIRE
11               CARL SPILLY, ESQUIRE
12
     BAILEY GLASSER
13   Attorneys for Witness
                 209 Capitol Street
14               Charleston, West Virginia 25301
     BY:         BENJAMIN L. BAILEY, ESQUIRE
15               ELLIOTT McGRAW, ESQUIRE
16
     ALSO PRESENT:
17
     LESLEY WEAVER, ESQUIRE
18   BLEICHMAR FONTI
         For the Calhoun Plaintiffs
19
     VANESSA WHEELER, Exhibit Tech
20       Magna Legal Services
21
22
23
24
25
```



Page 4

```
 1              R. McClelland
 2   case.
 3              Can you state your full name for
 4   the record?
 5        A.   My full name is Rory James
 6   McClelland.
 7        Q.   Before we begin, where are you
 8   located presently?
 9        A.   I'm in London, United Kingdom.
10        Q.   Where exactly in London?
11        A.   In the Boies Schiller office.  The
12   address is No. 5 New Street Square.
13        Q.   Is there anybody in the room with
14   you today?
15        A.   No, there is not.
16        Q.   Mr. McClelland, have you ever
17   testified under oath before?
18        A.   No, I haven't.
19        Q.   Do you understand that you are
20   under the same oath today as if you were in a
21   courtroom?
22        A.   I do.
23        Q.   I'm going to assume that you
24   understand the questions that I ask you,
25   unless you tell me that you don't understand
```



Page 5

```
 1                    R. McClelland
 2    them, is that fair?
 3         A.   I understand, yes.
 4         Q.   Is there anything that would
 5    prevent you from testifying truthfully today?
 6         A.   No, there is nothing.
 7         Q.   If at any time you need to take a
 8    break during the deposition, will you let me
 9    know?
10         A.   I will.
11         Q.   Do you have an undergraduate
12    degree?
13         A.   I do, yes.
14         Q.   What did you study?
15         A.   Electronic and computer
16    engineering.
17         Q.   Where did you earn your
18    undergraduate degree?
19         A.   At the University of Birmingham.
20         Q.   When did you graduate from the
21    University of Birmingham?
22         A.   September 2001.
23         Q.   Do you have a graduate degree?
24         A.   I do.  I have a master's in
25    computer science from the same university.
```



Page 53

```
 1                    R. McClelland
 2   router, your ISP, potentially an authority,
 3   like a school or an employer.  There then
 4   typically are government entities involved,
 5   as well, and various backbone-type internet
 6   providers that provide and facilitate the
 7   working of the internet as a whole and that
 8   covers that middle section.
 9        Q.   Can you walk me through the third
10   icon that says Google?
11        A.   Certainly.  So Google, amongst
12   other website and web applications, are web
13   servers available for users to access using
14   their browsers.
15             Google is one of many Incognito
16   mode doesn't differentiate between Google and
17   third parties.
18             One of the promises that Incognito
19   mode makes the user is that the web server is
20   unaware of your Incognito intent, so,
21   therefore, by extension, Google and third
22   parties cannot be aware of the fact that you
23   are in Incognito mode and cannot change their
24   behavior accordingly.
25        Q.   What do you mean by, you are not
```


MAGNA
LEGAL SERVICES

 1                    R. McClelland

 2    protected from Google?

 3        A.    The use of Incognito mode does not

 4    afford you any additional protections from

 5    Google or third parties when using the

 6    internet.

 7        Q.    What kind of protections are you

 8    referring to?

 9        A.    For example, there is no change to

10    tracking behavior, there is no change to

11    server logging or server log retention policy

12    because the server is not aware you are in

13    Incognito mode.  It just treats you as if you

14    were a new user.  There is no special

15    treatments on the web server for Incognito

16    users.

17        Q.    What do you mean by tracking?

18        A.    On the internet, there are various

19    tracking technologies employed to measure the

20    performance of advertising.  Google has its

21    own ad tech division, product area team, so

22    because they cannot be aware of the Incognito

23    intent, they cannot behave differently for an

24    Incognito user versus a regular mode user.

25        Q.    By that, by they cannot behave



Page 55

1               R. McClelland

2      differently, do you mean that Google does not

3      stop tracking users who are in Incognito

4      mode?

5             MS. CRAWFORD:  Objection.

6         A.   That is right.  The tracking

7      continues, albeit in an isolated session, so

8      the user has Incognito mode affords the user

9      segmentation of their tracking, their

10     browsing activity and tracking, so that any

11     browsing activity or searches undertaken in

12     Incognito mode are not associated with their

13     primary browsing activity, but the tracking

14     does continue, yes, it is session-based

15     tracking, the tracking continues for the

16     duration of the Incognito session.

17             At the end of the Incognito

18     session, locally everything is deleted from

19     the user's computer, but the web server,

20     because it didn't know it has an Incognito

21     user, has no way of knowing that that user

22     cannot ever come back again, but that user

23     will never be seen again from the web

24     server's point of view.

25         Q.   Earlier, you testified there is no



Page 56

1                    R. McClelland

2      change to server logging or server log

3      retention policy.

4               Do you recall that?

5      A.    I do, yes.

6      Q.    What did you mean by server

7      logging?

8      A.    Most servers, Google or otherwise,

9      when you visit their website, records certain

10     data around that visit.  Typically, the IP

11     address, the time and date, the pages you

12     visit, amongst many other things.

13              That happens in regular mode

14     browsing, as well as in Incognito mode

15     because the web server is not aware of the

16     user being in Incognito mode, it cannot treat

17     that user in any different way, so,

18     therefore, logging happens as usual.

19     Q.    What did you mean by server log

20     retention?

21     A.    Server log retention refers to how

22     long logs are kept on the server before they

23     are deleted.

24     Q.    Is it correct to say that this icon

25     was meant to convey that users who are in



Page 57

```
 1                    R. McClelland
 2    Incognito mode are not protected from
 3    Google's server logging?
 4              MS. CRAWFORD:  Objection.
 5        A.   Yes, basically, that is right.  The
 6    intent was broader than just Google, but it's
 7    important to communicate to the user that
 8    it's all web services.
 9        Q.   Do you recall the study we looked
10    at earlier that said disclosures to be
11    difficult to ignore in order to clear up
12    misconceptions?
13              MS. CRAWFORD:  Objection, misstates
14         the document.
15        A.   I do, yes.
16        Q.   Is this proposal for the use of
17    iconography to show the limits of Incognito
18    protection, an effort to create a disclosure
19    that is difficult to ignore, to clear up
20    misconceptions about Incognito mode?
21              MS. CRAWFORD:  Objection, insofar
22         as you're misquoting the document or
23         mischaracterizing the witness'
24         testimony.
25        Q.   You can answer.
```



Page 58

    1                    R. McClelland

    2       A.   It is intended to present it in a

    3   format that is more accessible to a broader

    4   audience, but not to change the fundamental

    5   message.

    6       Q.   What you do you mean by more

    7   accessible?

    8       A.   It is intent to simplify the

    9   language use and to use imagery in lieu of

   10   text, so that it could be understood by a

   11   broader range of users.

   12       Q.   This proposal sought to address the

   13   misconception that Incognito mode hides

   14   browsing history from Google?

   15            MS. CRAWFORD:  Objection.

   16       A.   That is right.  It is intended to

   17   help a broader range of users understand that

   18   limitation.

   19       Q.   Did Google ever implement this

   20   proposal for the use of iconography to show

   21   Chrome Incognito users that they are not

   22   protected from Google when in Chrome

   23   Incognito mode in certain instances?

   24            MS. CRAWFORD:  Objection, misstates

   25       the witness' testimony, calls for



1                 R. McClelland

2       speculation.

3       A.    The change was never implemented

4    during my tenure at Google and I don't

5    believe any changes have happened since

6    either.

7       Q.    Can you identify anyone at Google

8    who supported this Incognito change to inform

9    users they are not protected from Google?

10              MS. CRAWFORD:  Objection.

11      A.    Yes, I could.  There are many

12   people who would have supported this.

13      Q.    Please name them.

14      A.    The first name that comes to mind

15   is the engineering lead for the Incognito

16   team, Ramin Halavati from memory, I struggle

17   slightly.

18      Q.    Anyone else?

19      A.    Martin Sramek.  Again, a lead

20   engineer on a different team privacy team,

21   Chrome browser privacy team.

22              Any member of the privacy

23   engineering teams would have supported this

24   site.  I don't remember there being any

25   dissent on this particular topic.



Page 63

```
 1                    R. McClelland
 2        A.   I see it.
 3        Q.   Google counsel has represented that
 4   this document is the hyperlink in a document
 5   called Chrome Sin Rastro one-pager.  We will
 6   review that exhibit later.  I just want to
 7   make that representation to you.
 8             Please take a moment to look at the
 9   document.
10             MS. CRAWFORD:  Does the witness
11        have the ability to manipulate this
12        document on his own?
13             I ask because, obviously, this is a
14        multipage document, unlike the prior
15        exhibits we were reviewing, and so it
16        may be helpful for him to, as he's
17        reviewing it, control and scroll at his
18        discretion.
19             MS. BAEZA:  Thanks, Jomaire.
20        Q.   Mr. McClelland, you can -- if you
21   go to the exhibit share link, you are able to
22   see the document and control it yourself.
23        A.   The exhibit share link is in the
24   Chat, is it?
25        Q.   I don't think it's in the Chat.  I
```



Page 124

```
 1                    R. McClelland
 2      A.    The do not track header signal.
 3      Q.    It says, Given all the scrutiny at
 4  the moment, it would be a really good privacy
 5  story.  Ruling out ████████  changes whilst
 6  continuing to ignore an explicit user
 7  statement as the DNT header is really giving
 8  mixed messages to both users and the press.
 9  If we really are serious about respecting
10  users' choices, then respecting this flag
11  seems a bare minimum.
12           Do you see that?
13      A.    I do, yes.
14      Q.    Was the conversation that you
15  wanted to reopen, a conversation about Google
16  respecting the DNT header?
17      A.    That is right.
18      Q.    Can you explain in more detail that
19  conversation?
20           MS. CRAWFORD:  Objection, vague and
21      overbroad.
22      A.    It's a long conversation that
23  predates my time at Google.  The do not track
24  setting header was naive.  All browsers added
25  it and it relied up the web server Google or
```



```
 1                   R. McClelland
 2  otherwise to observe and honor that user's
 3  request.
 4          Very rapidly, I can't give more
 5  precise than that, but, pretty quickly, it
 6  transpired that most ad tech companies were
 7  not observing that, were not honoring that
 8  user request and were just ignoring it.
 9          Then -- and I'm not entirely sure
10  of the timelines.  As I said, it was prior to
11  my time at Google and prior to me becoming a
12  specialist in this, but at some point in
13  time, Microsoft made the decision that they
14  would send do not track through for every
15  single user, at which point the value of that
16  header was negated in that it was no longer
17  an assertive expression from the user.  It
18  was one that Microsoft had determined for
19  them.  It also meant that there was a large
20  proportion of the web sending this signal,
21  which would have had revenue impacts for all
22  ad tech companies.
23          My understanding of how that story
24  played out, and, again, this is prior to my
25  time, was that Google observed that signal
```



Page 126

```
 1                    R. McClelland
 2    for a while through ads, observed that signal
 3    for a while, but it got to a point where they
 4    were -- they perceived they were at a
 5    competitive disadvantage compared to the
 6    competition and at that point in time, a
 7    decision was made to no longer observe it.
 8    The conversation here was, should we revisit
 9    that decision.
10              To be clear though, all of this is
11    prior to my time and it is information that I
12    have gained through having conversations with
13    other people, rather than being first party.
14       Q.   Do you have an idea, more or less,
15    of when Google began having conversations
16    about whether to respect the DNT header?
17              MS. CRAWFORD:  Objection, calls for
18        speculation.
19       A.   I don't know, but my understanding
20    was that initially, it was respected, so from
21    the beginning, it was respected and then, at
22    a point in time, they decided not to.
23       Q.   What do you mean by, decided not to
24    respect it?
25       A.   They would no longer honor that
```



Page 127

```
 1                    R. McClelland
 2    intent of the user, they would ignore the
 3    signal.
 4         Q.   What does it mean for Google to
 5    ignore the signal?
 6         A.   I don't know the specifics of what
 7    that would mean, but it would mean that a
 8    user who was signaling do not track true,
 9    would be treated the same as a user who was
10    signaling do not track false.
11         Q.   Can you explain to me the
12    difference between a do not track signal
13    that's true and a do not track false?
14         A.   I can.  True means that the user
15    has ticked the check box saying, do not
16    track, and false would be where the user has
17    not ticked the check box, do not track.
18         Q.   So if a user checks the do not
19    track true, Google made a decision not to
20    honor that signal?
21         A.   That is my understanding.
22              MS. CRAWFORD:  Objection, misstates
23         the witness' testimony, calls for
24         speculation, vague and overbroad as to
25         time.
```



Page 128

```
 1                    R. McClelland
 2        Q.   Why do you think that reopening the
 3   conversation about the do not track header
 4   was a non-starter?
 5             MS. CRAWFORD:  Objection, misstates
 6        the witness' testimony and
 7        mischaracterizes the document.
 8        A.   It wasn't my opinion that it was a
 9   non-starter.  I was being informed other
10   people thought it to be a non-starter,
11   speculation, but I think it was because
12   Microsoft was sending it for all users,
13   regardless of their desire, thus devaluing it
14   as a user statement.  It was more indicative
15   of a browser choice than a user preference.
16        Q.   Do you know who had the opinion
17   that it was a non-starter?
18        A.   No, I don't, sorry.
19        Q.   When you say that Microsoft was
20   sending it for all users, regardless of their
21   desire, does that mean that Microsoft was
22   honoring -- strike that.
23             When you said that Microsoft was
24   sending it for all users, regardless of their
25   desire, does that mean that Microsoft was
```



Page 129

```
 1                    R. McClelland
 2    sending a do not track true signal for
 3    everybody by default?
 4         A.   That is right.
 5         Q.   So Microsoft, by default, was not
 6    tracking users?
 7         A.   I don't know.  That is a different
 8    question.  Whether Microsoft was observing it
 9    or not, I don't know.
10              The intent there is that
11    Microsoft's Internet Explorer, in those days,
12    was sending it by default, whether Microsoft
13    observed it on the server side, I don't know.
14         Q.   Google was not sending the signals
15    by default, is that fair?
16         A.   Correct, it was off by default in
17    Google Chrome.
18         Q.   Even if a user opted to send the
19    signal as do not track true, Google was not
20    honoring that signal, correct?
21              MS. CRAWFORD:  Objection, misstates
22         the witness' testimony, vague and
23         overbroad.
24         A.   My understanding, from what I
25    learned from other people, was that
```



Page 130

```
 1                  R. McClelland
 2   initially, Google was respecting that, but at
 3   a point in time, that decision was reverted
 4   and from then on, they no longer were.
 5        Q.   During your time at Google, was
 6   Google respecting do not track signals that
 7   were true?
 8        A.   I don't know when the change was
 9   made.  I don't know if that was during my
10   tenure or prior to it, but at some point
11   during my tenure, they were not respecting
12   it.
13        Q.   Do you know why Google closed the
14   conversation it was having about the do not
15   track pattern?
16        A.   I don't know why.  Again, I think
17   that was prior to my time.
18        Q.   You mentioned that there may have
19   been anti-competitive issues.
20             What were you referring to?
21             MS. CRAWFORD:  Objection, and going
22        to caution the witness not to reveal any
23        information reflecting conversations
24        from or information obtained from
25        speaking with counsel or other Google
```



Page 131

```
 1                 R. McClelland

 2        in-house counsel.

 3        A.    Can you direct me to the phrase you

 4   are referring to, please?

 5        Q.    Earlier, you mentioned something

 6   about competition issues with the do not

 7   track pattern.

 8              Do you recall that?

 9        A.    I do.  I know what you are

10   referring to, yes.

11        Q.    What did you mean by that?

12        A.    The Google -- my understanding was

13   that the Google Ads team were happy to

14   observe that signal whilst the majority of

15   their competition were doing the same, but it

16   had got to a point where they were being put

17   in, in their own eyes, at a competitive

18   disadvantage by being the only ones who did

19   observe it and that was their motivation for

20   reverting.  Again, what I heard through other

21   people, not first party conversations.

22        Q.    How would there be a competitive

23   disadvantage to observing the signal?

24        A.    Revenue is made through tracking

25   users and, therefore, driving the ability to
```



Page 132

```
 1                R. McClelland
 2   serve the targeted advertising without the
 3   ability to target advertising to users.  The
 4   revenue per user is lower.
 5            A user who requests not to be
 6   tracked cannot be served targeted advertising
 7   and, therefore, is a less valuable user to
 8   the ad tech company.
 9       Q.   So honoring a do not track true
10   signal would have hurt Google's revenues?
11            MS. CRAWFORD:  Objection, insofar
12       as that calls for speculation.
13       A.   That is my understanding, yes.
14       Q.   Where it says, Rolling out
15   ▮▮▮▮▮▮▮ changes while continuing to ignore
16   an explicit user statement as a DNT header is
17   really giving mixed messages to both users
18   and the press.
19            Do you see that?
20       A.   I do, yes.
21       Q.   What did you mean by ignore
22   explicit user statement as a DNT?
23       A.   Do not track within Chrome is a
24   option the user has to manually enable, so to
25   that extent, it is an explicit desire from
```



Page 133

1              R. McClelland

2    the user, the desire not to be tracked.

3        Q.   So Google was ignoring an explicit

4    user statement?

5            MS. CRAWFORD:  Objection.  Sorry,

6        go ahead, Rosie.

7        Q.   So Google was ignoring user

8    requests that were explicit to honor a do not

9    track true signal?

10           MS. CRAWFORD:  Objection, misstates

11       the document.

12       A.   Whether that signal was coming from

13   a Chrome browser, Google was not observing

14   it.  Where it were coming from an internet

15   Explorer, it could be argued it was not an

16   explicit user statement.

17       Q.   How is rolling out ███████

18   changes while ignoring the DNT header

19   creating a mixed message to users?

20       A.   ████████████████████████

21   ████████████████████████████████

22   ██████████████████████████████████

23   ████████████████████████████████

24   ███████████████████████████████

25   █████████████████████████████████



Page 208

1               R. McClelland

2      A.   I'm not familiar enough with the

3  intricacies of GDPR to really have a strong

4  view on that.

5               MS. BAEZA:  We can take this

6      exhibit down.

7      Q.   Next I'm going to mark exhibit 17

8  this is a document containing messages

9  produced by Google, production No.

10 GOOG-CABR-00799341.

11               Please take a moment to review the

12 document.

13               (Exhibit 17, document bearing Bates

14      stamp No. GOOG-CABR-00799341, marked for

15      identification.)

16      A.   I have reviewed it.  Thank you.

17      Q.   Do you see the message at the

18 bottom from M. Sramek?

19      A.   I do, yes.

20      Q.   I'm looking at the message from M.

21 Sramek with a time stamp of 165026.  It

22 starts with, There should be.

23      A.   I see it.  I can read it without

24 the zoom in.

25      Q.   Who is MGalonsky?



Page 209

```
 1                    R. McClelland
 2        A.   It's Melissa.  She is a software
 3   engineer on the Chrome privacy team.
 4        Q.   Her last name is Galonsky?
 5        A.   Yes, that's right.
 6        Q.   Do you see it says, There should be
 7   separate Zwieback cookies between Incognito
 8   sessions, but they could be joinable on a
 9   technical level?
10        A.   I see it, yes.
11        Q.   If you know, how can separate
12   Zwieback cookies between Incognito sessions
13   be joinable?
14             MS. CRAWFORD:  Objection, insofar
15        as the question calls for speculation.
16        A.   It could be joinable by looking at
17   information in the cookie, for example, the
18   IP address.  If there is enough information,
19   similar conversations to fingerprinting this
20   morning.  If there is sufficient information,
21   then they become joinable, if you wanted to
22   do so.
23        Q.   Could it be joinable by Google?
24        A.   Google or anyone else.
25             MS. BAEZA:  We can take this
```



Page 210

```
 1                    R. McClelland

 2        exhibit down and I will go back to

 3        Exhibit 15 because I have time.

 4        Q.   Exhibit 15 is an email produced by

 5   Google with production Nos.

 6   GOOG-CABR-05256755 through page ending in

 7   760.

 8              Please let me know when you have

 9   that in front of you.

10              (Exhibit 15, documents bearing

11        Bates stamp No. GOOG-CABR-05256755

12        through GOOG-CABR-05256760, marked for

13        identification.)

14        A.   Can you repeat the page number

15   again, please?

16        Q.   I am focusing on the page ending in

17   758.  If you would like to go a little higher

18   and to read the email starting with -- the

19   email from Mark Pearson to get more context,

20   please go ahead and do so.

21        A.   Thank you.

22              MS. CRAWFORD:  Is that the page

23        ending in 759?

24        Q.   However you want to proceed, Mr.

25   McClelland.
```



Page 211

 1                  R. McClelland

 2        A.   I'm reading from the M. Pearson

 3   email on 755 now.

 4             Okay.  I have the general gist.

 5        Q.   Please go to the page ending in

 6   758.  You will see it's an email from you,

 7   starts at the bottom of page.  It says,

 8   Thanks, Mark.

 9        A.   Yeah, I see it.

10        Q.   If you go to the next page, it

11   says, I'd also point out, we already consider

12   it possible for Google to join regular and

13   Incognito sessions, so the promise not to do

14   this is effectively already being applied.

15   The GWS ID's approach would just make this

16   easier and more reliable.

17        A.   Uh-huh.

18        Q.   Where it says the GWS ID's approach

19   would just make this easier and more

20   reliable, what were you referring to?

21        A.   There was a desire to be able to

22   run experiments in Incognito mode and in

23   order for us to better understand what users

24   were using and to evaluate new features in

25   order to improve the product prior to this



Page 212

```
 1                    R. McClelland
 2   exchange, we were not able to do that within
 3   Incognito mode for risk of making more
 4   joinable with regular sessions, so we were
 5   proposing different ways through which we
 6   could run a limited number of experiments in
 7   Incognito mode and what the right level of
 8   balance was between our need as a product
 9   team to understand usage of our feature with
10   respecting the privacy needs of users who
11   are, by definition, in an elevated state of
12   privacy in Incognito mode.
13        Q.   Where it says, we already consider
14   it possible for Google to join regular and
15   Incognito sessions, who were you referring to
16   when you said, we?
17        A.   The Google Chrome privacy team.
18        Q.   Do you still agree with the
19   statement, it's possible for Google to join
20   regular and Incognito sessions?
21             MS. CRAWFORD:  Objection.
22        A.   As far as I know, assuming nothing
23   has changed, then, yes, it should still be
24   possible.
25             MS. BAEZA:  Thank you.  I have no
```



Page 213

1              R. McClelland

2       more questions at this time.

3            Do you want to go off the record,

4       Jomaire.

5            THE EXHIBIT TECH:  The time is

6       9:46.  We are off the record.

7            (Off the record.)

8            THE EXHIBIT TECH:  Recording has

9       resumed.  The time is 10:07 a.m. and we

10       are back on the record.

11  EXAMINATION BY

12  MS. CRAWFORD:

13       Q.   Good afternoon, Mr. McClelland.

14  I'm counsel for Google.  I'm going to be

15  asking you a couple of questions following up

16  on the examination that was led by Ms. Baeza

17  for plaintiffs' counsel in the Brown action.

18            Do you recall when Ms. Baeza asked

19  you about your educational background and

20  employment history?

21       A.   I do, yes.

22       Q.   Did you hold any jobs -- have you

23  held any jobs that were not covered during

24  your discussion?

25       A.   Yes, plenty.



1                          CERTIFICATE

2

3

4          I HEREBY CERTIFY that the foregoing proceedings

5    were duly sworn by me and that the proceedings are a

6    true record.

7

8    _____

9    Leslie Fagin,
     Registered Professional Reporter
10   Dated:

11

12

13          (The foregoing certification of this transcript

14   does not apply to any reproduction of the same by any

15   means, unless under the direct control and/or

16   supervision of the certifying reporter.)

17

18

19

20

21

22

23

24

25

# Mao Declaration

# Exhibit 54

Redacted Version of Document
Sought to Be Sealed

GOOG-BRWN-00409986

Message

| | |
|---|---|
| **From:** | Brian Rakowski [brakowski@google.com] |
| **Sent:** | 7/17/2008 4:58:31 AM |
| **To:** | chrome-team [chrome-team@google.com] |
| **BCC:** | consumer-pteam@google.com; Jonathan Rosenberg [jonathan@google.com] |
| **Subject:** | Chrome team meeting notes (7/15/08) |

[bcc: consumer-pteam, jonathan]

**Summary**: We're entering the final bombing run for external beta. Visual changes will halt after this week so we can start the screenshot and localization process. Until we get to a final release candidate, we're not going to do much thinking about OKRs and future planning, but we did talk about our ▮▮▮ integration plans.

Frontend status notes: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Backend status notes: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Welcome new team members**
- Mike Pinkerton: working on Mac

**Memory week wrap up**
- Brett Wilson
- Anantha Iyengar
- Mike Belshe
- Erik Kay
- Pam Greene

**Priorities**
- Fix crashers, regressions, and other P1s
- P2s
- not OKRs

**Plan for the next few weeks**
- July 18: String and visual freeze
- July 22: GPS
- July 26: Branch for beta

**▮▮▮+Chrome**
**Q**: What are the specific plans for integration?
**A**: Details are still to be determined, but the high-level goal is to have one team working on the web platform. Chrome frame is the mechanism for reflecting html5 into other browsers. Existing ▮▮▮ APIs will work in all browsers.

**Q**: How will we get more work into webkit? Will we have to fork?
**A**: We want to avoid forking. We hope to work with Apple to modularize WebKit to allow us to plug in more capbilities more easily. This will be easier once Chrome has launched and we can talk openly.

**Q**: Will this make it harder to get broad penetration of ▮▮▮ (Flash-like reach)?
**A**: Distribution is the key. We have a credible plan to get to ▮▮▮ of Internet-connected computers. Developer adoption will be critical to getting the last ▮▮▮

**Q**: How will we package the binary for distribution?
**A**: Undecided. At a minimum, we want to share source code.

**Q**: This sounds like Silverlight with an HTML-y API.

GOOG-BRWN-00409986

**A**: Yes, except that it's standards-based and open source. Our hope is that it gives developers a way to route around browser vendors that are slow to implement new standards/capabilities.

**Q**: What will we do WRT WebKit's HTML5 changes on ToT?
**A**: We probably want to update to ToT but it will depend on discussions for Apple. Also, we can't have the WebKit trunk be unstable.

**Q**: Where did this idea come from?
**A**: HTML5 started doing stuff that ▮▮▮▮ was doing. We are uncomfortable with the duplicated effort and with giving developers two ways to do the same thing. We didn't act at first because ▮▮▮▮ needed to focus on supporting teams using offline and Chrome needed to focus on launching.

**Tech talk: Chrome usability** (Rick Boardman)
- Longitudinal study: starting interview, survey, closing interview two weeks later
- We saw lots of fixes since early May: Bookmarks, importing, downloads discoverability, welcome page, manage search engines, home page
- Users reported that they weren't sure that Chrome was compelling enough to switch: need to help showcase the benefits (and add more killer features!)
- Omnibox takes some acclimation, new tab page seemed broken before it was populated
- New Tab page was seen as interesting/novel, but users wanted more control over it
(customizability, distractions, privacy, perception of inappropriate stuff appearing)
- Users were disoriented when they didn't have a home button by default
- People didn't understand Incognito. Does it keep sites from logging stuff on their servers?
- More research coming after launch!  If you have things you'd like to test, just ask

CONFIDENTIAL

PRODBEG: GOOG-BRWN-00409986
PRODBEGATT:
PRODEND: GOOG-BRWN-00409987
PRODENDATT:
PRODVOL: PROD028
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: Brian Rakowski
TO: chrome-team <chrome-team@google.com>
FROM: "brian rakowski" <brakowski@google.com>
CC:
BCC: "jonathan rosenberg" <jonathan@google.com>;consumer-pteam@google.com
CONFIDENTIALITY: Confidential
CROSS_ALLCUSTODIANS:
CROSS_ATTACHMENTNAME:
CROSS_BEGATTACH:
CROSS_BEGBATES:
CROSS_CC:
CROSS_CONFIDENTIALITY:
CROSS_CUSTODIAN:
CROSS_DATECREATED:
CROSS_DATEMOD:
CROSS_DATERECEIVED:
CROSS_DATESENT:
CROSS_DE-DUPED CUSTODIANS:
CROSS_ENDATTACH:
CROSS_ENDBATES:
CROSS_FILEEXTENSION:
CROSS_FILENAME:
CROSS_FROM:
CROSS_MD5 HASH:
CROSS_MESSAGE ID:
CROSS_OWNER:
CROSS_PRODVAL:
CROSS_REDACTED:
CROSS_SUBJECT:
CROSS_TITLE:
CROSS_TO:
CUSTODIAN/SOURCE: Brian Rakowski
DATECREATED:
DATELASTMOD: 07/17/2008
DATERCVD:
DATESENT:
DeDupedCustodians:
DOCEXT:
FILENAME:
ILS_ProdDate: 07/02/2021
CROSS_ILS_ProdDate:
MD5 HASH: 6E3848E98D08ABB5756F5D406BCD2250
MessageID:
NATIVEFILE:
Owner: brakowski
PAGES:
REDACTED: N
SUBJECT: Chrome team meeting notes (7/15/08)

# Mao Declaration

# Exhibit 55

Sealed Entirely

GOOG-BRWN-00477510

# Mao Declaration

# Exhibit 56

Redacted Version of Document
Sought to Be Sealed

GOOG-CABR-05126022

Message

| | |
|---|---|
| **From:** | Jochen Eisinger [eisinger@google.com] |
| **Sent:** | 3/22/2019 7:42:29 AM |
| **To:** | Mike West [mkwst@google.com]; AbdelKarim Mardini [mardini@google.com] |
| **CC:** | Alex Nicolaou [anicolao@google.com]; Michael Kleber [kleber@google.com]; Rick Byers [rbyers@google.com]; Rory McClelland [rorymcclelland@google.com]; Vivek Sekhar [vsekhar@google.com] |
| **Subject:** | Re: Follow up from Sundar meeting |

+AbdelKarim Mardini

On Fri, Mar 22, 2019 at 6:13 AM Mike West <mkwst@google.com> wrote:
 +Jochen, Rory

 On Fri 22. Mar 2019 at 05:59, Alex Nicolaou <anicolao@google.com> wrote:
 Ads Team summary.

 ---------- Forwarded message ---------
 From: **Ben Galbraith** <bgalbs@google.com>
 Date: Thu, Mar 21, 2019 at 4:33 PM
 Subject: Fwd: Follow up from Sundar meeting
 To: Jack Chen <jlchen@google.com>, Darin Fisher <darin@google.com>, Parisa Tabriz <parisa@google.com>, Margret Schmidt <margrets@google.com>, Alex Nicolaou <anicolao@google.com>, Vivek Sekhar <vsekhar@google.com>, Ivy Choi <ivyc@google.com>, Ben Goodger <beng@google.com>
 Cc: Anil Sabharwal <anilsa@google.com>


 Privileged and confidential

 FYI, here's the Ads team version of the note I sent out earlier.

 ---------- Forwarded message ---------
 From: **Struan Robertson** <struan@google.com>
 Date: Thu, Mar 21, 2019 at 12:54 PM
 Subject: Re: Follow up from Sundar meeting
 To: Chetna Bindra <cbindra@google.com>, Jack Chen <jlchen@google.com>
 Cc: Jerry Dischler <jdischler@google.com>, Suresh Kumar <sureshkm@google.com>, Shiv Venkataraman <shivav@google.com>, Sagnik Nandy <sagnik@google.com>, Anurag Agarwal <anuragag@google.com>, Darin Fisher <darin@google.com>, Anil Sabharwal <anilsa@google.com>, Ben Galbraith <bgalbs@google.com>, Brad Bender <bradbender@google.com>


 +Jack Chen

 On Thu, Mar 21, 2019 at 12:37 PM Chetna Bindra <cbindra@google.com> wrote:
  Privileged and confidential

  All,

  Thanks for all the collaboration leading up to the Sundar meeting. Overall we had a positive meeting with Sundar, landing on approval for our recommendation in the deck. He acknowledged the complexity of this space and expressed his gratitude on the progress we've made given the complex topic. He specifically said that we do not need to come back for a review, but he would review comms in the lead up to I/O.

    GOOG-CABR-05126022

**Key takeaways**

- Totally agreed with the strategic value of balancing both ecosystem health and privacy
- Overall comfortable with not removing 3P cookies, but wanted to focus on how Chrome is helping users with 3P cookie concerns (i.e., "3P cookies" have become a strong industry narrative that we can't ignore or wait years to address). He was supportive of our plans to address these issues largely with opt-in controls that we should make sure are incorporated as part of our messaging at I/O.
- Overall approval of plan on data disclosures, Ads Privacy center, ▓▓▓▓▓▓ controls - 3P / Incognito controls
- Focus on messaging by I/O. Ensure it covers the entire proposal - data disclosures, Ads privacy center, Chrome controls, data retention within Chrome and Ads. A lot of enthusiasm for ▓▓▓▓▓▓▓ and encouragement to dovetail with the broader Google Incognito narrative if we're ready.
- o (A tactical AI was given to the Chrome team to dovetail with a broader data retention initiative.)
- Comfortable with reactive messaging on saying that Apples 3P cookies removal hasn't done enough, and 3P tracking continues
- o Sundar drove the point in the meeting (with several other examples) that if Chrome removes 3P cookies, it would create a very disruptive situation for publishers, and is keen to support overall ecosystem health. He acknowledged that Apple and Google are optimizing for different things.
- He firmly expressed a desire for both Chrome and Ads to get out in public with a narrative ASAP. He felt that silence in the market was no longer an option, and alignment that I/O was the right initial moment , followed by GML
- Eventual enforcement seemed to be a punted question

**Key AIs / Next Steps**
Evaluate an advisory board rather than a coalition, and learn from the AI advisory board
Plug in with the I/O and GML team for messaging

Best,
Chetna (on behalf of the team)

--

Struan Robertson |        Director, Legal |        struan@google.com |        650-713-7613

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
-mike

CONFIDENTIAL

PRODBEG: GOOG-CABR-05126022
PRODBEGATT:
PRODEND: GOOG-CABR-05126023
PRODENDATT:
PRODVOL: CROSS-PROD040
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: AbdelKarim Mardini;Jochen Eisinger;Michael Kleber
TO: abdelkarim mardini <mardini@google.com>;mike west <mkwst@google.com>
FROM: jochen eisinger <eisinger@google.com>
CC: rick byers <rbyers@google.com>;rory mcclelland <rorymcclelland@google.com>;v-
        ivek sekhar <vsekhar@google.com>;michael kleber <kleber@google.co-
        m>;alex nicolaou <anicolao@google.com>
BCC:
CONFIDENTIALITY: CONFIDENTIAL
CROSS_ALLCUSTODIANS:
CROSS_ATTACHMENTNAME:
CROSS_BEGATTACH:
CROSS_BEGBATES:
CROSS_CC:
CROSS_CONFIDENTIALITY:
CROSS_CUSTODIAN:
CROSS_DATECREATED:
CROSS_DATEMOD:
CROSS_DATERECEIVED:
CROSS_DATESENT:
CROSS_DE-DUPED CUSTODIANS:
CROSS_ENDATTACH:
CROSS_ENDBATES:
CROSS_FILEEXTENSION:
CROSS_FILENAME:
CROSS_FROM:
CROSS_MD5 HASH:
CROSS_MESSAGE ID:
CROSS_OWNER:
CROSS_PRODVAL:
CROSS_REDACTED:
CROSS_SUBJECT:
CROSS_TITLE:
CROSS_TO:
CUSTODIAN/SOURCE: Jochen Eisinger
DATECREATED:
DATELASTMOD: 03/22/2019
DATERCVD:
DATESENT: 03/22/2019
DeDupedCustodians: AbdelKarim Mardini;Jochen Eisinger;Michael Kleber
DOCEXT: eml
FILENAME:
ILS_ProdDate: 11/16/2021
CROSS_ILS_ProdDate:
MD5 HASH: F6FC608ED7B72A89127B91EDB7389275
MessageID: <CALjhuif8vTn2fOodWC687BO9Cp0PwRNCTFCLiEU1CYHttKkwXQ@mail.gmail.com>
NATIVEFILE:
Owner: eisinger
PAGES: 2

REDACTED: N
SUBJECT: Re: Follow up from Sundar meeting

# Mao Declaration

# Exhibit 57

Sealed Entirely

GOOG-CABR-05269357.RR

# Mao Declaration

# Exhibit 58

Redacted Version of Document
Sought to Be Sealed

GOOG-BRWN-00418249

**From:** Sabine Borsay <sabineb@google.com>
**To:** Adrienne Porter Felt <felt@google.com>
**Subject:** Re: ▓▓▓▓▓ Google "Incognito" Precision
**Cc:** Ben Wells <benwells@google.com>, Joel Weinberger <jww@google.com>, Alex Ainslie <ainslie@google.com>, "▓ (core members)" ▓▓▓▓▓ @google.com>, Maximilian Walker <maxwalker@google.com>

The ▓▓▓▓ (Allo) team is aware of the fact that end-to-end encryption is the opposite privacy feature of what Chrome's Incognito mode provides. At least their feature will *also* clear traces locally on the device which basically is the "baseline" that Incognito mode provides, and then each product has its own specific implementation. We did share our concerns with them in-depth, and also all user research we've done over the last 2 years. It was a Sundar level decision.

The reasoning is basically to elevate the Incognito brand to a more Google-wide brand that offers privacy features within a given product, following the product's specific circumstances and limitations. They say that if we'd design this from scratch today, we'd also probably create a high-level Google privacy brand (Incognito) and then each specific implementation (in Allo, in Chrome, in whatever other products) is just different in their implementations based on the technical circumstances of the given product. I must say I understand the reasoning behind the decision.

On 18 May 2016 at 17:47, Adrienne Porter Felt <felt@google.com> wrote:

> Although they both mean "private," they are completely different definitions of "private."
> One means encryption such that your messages are hidden from both MITM and Google; the other means clearing your history, and both MITM and Google can see content on various services.
>
> We could change Chrome's definition of "Incognito" to also include "e2e encryption" and go crazy wolf on http-bad. :)
>
> On Wed, May 18, 2016 at 5:43 PM, Ben Wells <benwells@google.com> wrote:
>
>> I'm going to play devil's advocate. Isn't it better to have a small number of brand's / concepts that users need to grapple with?
>> Technically there are significant differences between allo-incognito and chrome-incognito, but from the users point of view they are very similar - they are both ways to make your activity private, for some definition of private.
>>
>> If Allo has a web client things could get really ugly though...
>>
>> On Thu, May 19, 2016 at 10:15 AM Joel Weinberger <jww@google.com> wrote:
>>
>>> As Adrienne says, I can only see this as leading to confusion. If anything, I think this would be a great opportunity for Chrome to abandon the Incognito "brand."
>>>
>>> On Wed, May 18, 2016 at 4:56 PM Adrienne Porter Felt <felt@google.com> wrote:
>>>
>>>> I think it's extremely disappointing that "Incognito" was used for another prominent Google feature that, unlike Chrome's Incognito mode, offers e2e encryption. I expect it will lead to confusion.
>>>>
>>>> On Wed, May 18, 2016 at 4:51 PM, Alex Ainslie <ainslie@google.com> wrote:
>>>>
>>>>> Errr. Should the Allo Incognito mode announcements today change anything about how we describe Chrome's Incognito mode ... (or do they give us an opportunity change some of those properties?).

CONFIDENTIAL

GOOG-BRWN-00418249



*"We're excited to partner with Google on the private communication features of their new smart messaging app, Allo. We've been collaborating together on the integration of Signal Protocol into Allo, which will bring all of Signal Protocol's strong encryption properties to Allo's incognito mode."*
https://whispersystems.org/blog/allo/

A

--
You received this message because you are subscribed to the Google Groups ▮▮▮▮ (core members)" group.
To unsubscribe from this group and stop receiving emails from it, send an email to ▮▮▮▮+unsubscribe@google.com.
To post to this group, send email to ▮▮▮▮@google.com.

--
You received this message because you are subscribed to the Google Groups ▮▮▮▮ (core members)" group.
To unsubscribe from this group and stop receiving emails from it, send an email to ▮▮▮▮+unsubscribe@google.com.
To post to this group, send email to ▮▮▮▮s@google.com.

--
You received this message because you are subscribed to the Google Groups ▮▮▮▮ (core members)" group.
To unsubscribe from this group and stop receiving emails from it, send an email to ▮▮▮▮+unsubscribe@google.com.
To post to this group, send email to ▮▮▮▮@google.com.


--
Sabine Borsay | Product Manager | **sabineb@google.com** | +491726757387

CONFIDENTIAL

GOOG-BRWN-00418250

PRODBEG: GOOG-BRWN-00418249
PRODBEGATT: GOOG-BRWN-00418249
PRODEND: GOOG-BRWN-00418250
PRODENDATT: GOOG-BRWN-00418251
PRODVOL: PROD029
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: Sabine Borsay
TO: adrienne porter felt <felt@google.com>
FROM: sabine borsay <sabineb@google.com>
CC: alex ainslie <ainslie@google.com>;ben wells <benwells@google.com>;" ████ (c-
         ore members)" ████████@google.com>;joel weinberger <jww@google-
         .com>;maximilian walker <maxwalker@google.com>
BCC:
CONFIDENTIALITY: Confidential
CROSS_ALLCUSTODIANS: Sabine Borsay
CROSS_ATTACHMENT NAME:  image.png
CROSS_BEGATTACH: GOOG-CABR-00353828
CROSS_BEGBATES: GOOG-CABR-00353828
CROSS_CC: alex ainslie <ainslie@google.com>;ben wells <benwells@google.com>;"████
         ████████ (core members)" <████████@google.com>;joel weinberger <jww@-
         google.com>;maximilian walker <maxwalker@google.com>
CROSS_CONFIDENTIALITY: CONFIDENTIAL
CROSS_CUSTODIAN: Sabine Borsay
CROSS_DATECREATED:
CROSS_DATEMOD: 05/19/2016
CROSS_DATERECEIVED: 05/19/2016
CROSS_DATESENT: 05/19/2016
CROSS_DE-DUPED CUSTODIANS: Sabine Borsay
CROSS_ENDATTACH: GOOG-CABR-00353830
CROSS_ENDBATES: GOOG-CABR-00353829
CROSS_FILEEXTENSION: eml
CROSS_FILENAME:
CROSS_FROM: sabine borsay <sabineb@google.com>
CROSS_MD5 HASH: 012F18A5A9AA2DD78EA2B44155E50155
CROSS_MESSAGE ID:
<CAPZn3fEpD3Xqm0YZKDyaourNKPuOWgkpFA_XWNUzFkHui1bniw@mail.gmai-
         l.com>
CROSS_OWNER: sabineb
CROSS_PRODVAL: CROSS-PROD002
CROSS_REDACTED: N
CROSS_SUBJECT: Re: ████████ Google "Incognito" Precision
CROSS_TITLE: Re: ████████ Google "Incognito" Precision
CROSS_TO: adrienne porter felt <felt@google.com>
CUSTODIAN/SOURCE: Sabine Borsay
DATECREATED:
DATELASTMOD: 05/19/2016
DATERCVD:
DATESENT:
DeDupedCustodians:
DOCEXT:
FILENAME:
ILS_ProdDate: 07/16/2021
CROSS_ILS_ProdDate: 09/01/2021
MD5 HASH: 012F18A5A9AA2DD78EA2B44155E50155

MessageID:
NATIVEFILE:
Owner: sabineb
PAGES:
REDACTED: N
SUBJECT: Re: █████████ Google "Incognito" Precision

# Mao Declaration

# Exhibit 59

Redacted Version of Document
Sought to Be Sealed

GOOG-BRWN-00167337

Message

| | |
|---|---|
| **From**: | Sabine Borsay [sabineb@google.com] |
| **Sent**: | 6/22/2016 7:43:30 AM |
| **To**: | Stephan Somogyi [somogyi@google.com] |
| **CC**: | Chris Palmer [palmer@google.com]; Lucas Garron [lgarron@google.com]; Emily Schechter [emilyschechter@google.com]; Aaron Stein [steina@google.com]; Alex Ainslie [ainslie@google.com]; Wieland Holfelder [holfelder@google.com]; Mark Larson [mal@google.com]; Parisa Tabriz [parisa@google.com]; Ben Wells [benwells@google.com]; ✶ Varun Khaneja [vakh@google.com]; Adrienne Porter Felt [felt@google.com]; Joel Weinberger [jww@google.com];  (core members)  @google.com]; Maximilian Walker [maxwalker@google.com]; Chrome Privacy Muc [chrome-privacy-muc@google.com]; Dominic Battre [battre@google.com] |
| **Subject**: | Re:  ] Google "Incognito" Precision |

Since Gmail collapses repeated text, parts of the quote were collapsed. So, here you go again:

*The Allo team is aware of the fact that end-to-end encryption is the opposite privacy feature of what Chrome's Incognito mode provides. At least their feature will also clear traces locally on the device which basically is the "baseline" that Incognito mode provides, and then each product has its own specific implementation. We did share our concerns with them in-depth, and also all user research we've done over the last 2 years. It was a Sundar level decision.*

*The reasoning is basically to elevate the Incognito brand to a more Google-wide brand that offers privacy features within a given product, following the product's specific circumstances and limitations. They say that if we'd design this from scratch today, we'd also probably create a high-level Google privacy brand (Incognito) and then each specific implementation (in Allo, in Chrome, in whatever other products) is just different in their implementations based on the technical circumstances of the given product. I must say I understand the reasoning behind the decision.*

Best,
Sabine

On 22 June 2016 at 09:40, Sabine Borsay <sabineb@google.com> wrote:
Yep, we (folks like Dominic, Chelsea, Tyler, and they also talked with Rahul) had a few of meetings with them in which we shared our concerns in-depth, the background of our concerns, our user research, etc. One meeting was after their first Sundar meeting in which he brought up the idea to call Allo's privacy feature Incognito mode, and another one after their second Sundar meeting in which they decided to go with it.

Since this email thread is so long, I'm pasting in here my comment from above:

*The Allo team is aware of the fact that end-to-end encryption is the opposite privacy feature of what Chrome's Incognito mode provides. At least their feature will also clear traces locally on the device which basically is the "baseline" that Incognito mode provides, and then each product has its own specific implementation. We did share our concerns with them in-depth, and also all user research we've done over the last 2 years. It was a Sundar level decision.*

*The reasoning is basically to elevate the Incognito brand to a more Google-wide brand that offers privacy features within a given product, following the product's specific circumstances and limitations. They say that if we'd design this from scratch today, we'd also probably create a high-level Google privacy brand (Incognito) and then each specific implementation (in Allo, in Chrome, in whatever other products) is just different in their implementations based on the technical circumstances of the given product. I must say I understand the reasoning behind the decision.*

On 22 June 2016 at 01:24, Stephan Somogyi <somogyi@google.com> wrote:
At the risk of creating even more dissonance, has anyone from our end asked the Allo folks if they're willing to NOT use "incognito" for their e2e mode?

On Tue, Jun 21, 2016 at 1:47 PM, Chris Palmer <palmer@google.com> wrote:
I've already made my case (for 5 years now), and so won't bore you with a meeting. :) But please note that nothing will be more scannable than the name and the icon, both of which are a poor fit for what the feature actually provides.

On Tue, Jun 21, 2016 at 1:40 PM, Sabine Borsay <sabineb@google.com> wrote:
I've stated this already on a related thread -- Eric Schmidt's exact statement was written in our Security & Privacy one-pager comms doc. So he most likely didn't go through a thought process concluding that misinterpretation about how Chrome Incognito works, but just learned the points from comms doc. Over the last couple of years, we've run numerous user studies on user perception and expectation and while some users do have some misconceptions, it seems less widespread than you assume. But stay tuned, we're working on a redesign of the Incognito NTP with two main goals: 1.) better scannability of the content around what it does offer and what it doesn't, 2.) illustrating the use case it does support. The reason why I mentioned that our messaging is pretty clear was to highlight that the only proactive comms I could imagine would be to explicitly call out the differences between Allo's and Chrome's Incognito mode. Again, if Chrome Security team wants to post something on the Chrome Security FAQs, we can draft something together with PR. Let me know.

I don't think we should abandon the Incognito mode brand because of the Allo launch. Happy to discuss more in a meeting.

On 21 June 2016 at 22:34, Lucas Garron <lgarron@google.com> wrote:

On Tue, Jun 21, 2016 at 1:21 PM Chris Palmer <palmer@google.com> wrote:
Although our Incognito messaging is clear, people (everyone from internet randos to bug reporters to Eric Schmidt)

Although it feels like I'm just piling on to Chris's comments, I think this cannot be understated.

Even Eric Schmidt couldn't even keep the core meaning of Incognito straight **when it only meant one thing**.

generally haven't understood it. So it's not clear enough. I suspect the confusion arises due to the tension inherent between https://www.chromium.org/Home/chromium-security/security-faq#TOC-Why-aren-t-physically-local-attacks-in-Chrome-s-threat-model- and what Incognito offers.

And although we and they have clear messages, Allo effectively ruined the clarity of our message by using our name for a thing that is very different from our thing.

We should proactively communicate about this. But we should also abandon the Incognito name, and change Incognito to "Temporary Mode" or whatever else you like. Allo's definition of the term is much stronger and makes much more sense.

I don't know how proactive we should be, but we should definitely have good answers ready about the distinction, and the decision to use the same name.

(And/or use this as a chance to rebrand Incognito in Chrome, which has always been an over-reaching name. But that won't be as easy, and sounds like it is counter to our lofty branding desires.)

GOOG-BRWN-00167338

On Tue, Jun 21, 2016 at 12:49 PM, Sabine Borsay <sabineb@google.com> wrote:
Happy to work with PR on comms for this. Though I was not planning to do proactive comms about the distinction to Allo's Incognito mode, since we're already pretty clear in our external comms (Help Center, Incognito NTP, etc.) about what Chrome Incognito does offer and what it does not offer. And our agreement with the Allo team was that they're clear about the functionality of their feature as well. Do I understand it correctly that the Chrome Security team however want to publish proactive comms around this? If so, I'm happy to collaborate on the draft. Let me know!

On 10 June 2016 at 01:45, Emily Schechter <emilyschechter@google.com> wrote:
+ steina and somogyi from the Security PR perspective

Do you know who the right folks are to work with here?

On Thu, Jun 9, 2016 at 3:57 PM, Lucas Garron <lgarron@google.com> wrote:
*volatile and isolated from regular profiles

Higher-level folks, are we allowed to put something like this on the security FAQ? Do we need sign-off from anyone, and how would we get it?

On Thu, Jun 9, 2016 at 3:52 PM Chris Palmer <palmer@google.com> wrote:
On Thu, Jun 9, 2016 at 3:40 PM, Lucas Garron <lgarron@google.com> wrote:

Should we add something to the Chrome Security FAQ?

I'm afraid the only correct thing we can say is "Incognito in Chrome has no technical relation to Incognito in Allo. They both give you better privacy than their respective regular modes, relative to the pragmatic threat models we have selected."

How about:

"Although Allo and Chrome both have features that go by the same name and use the same logo, they are designed to support very different threat models and use-cases. Allo's Incognito mode employs <a href="TODO">end to end encryption</a>, which is an additional layer of encryption for messages above and beyond the TLS Allo uses for transport. Chrome's Incognito mode is designed only to ensure that local browser state is volatile, and makes no further guarantees of confidentiality (such as confidentiality from 3rd parties or of network traffic)."

--
You received this message because you are subscribed to the Google Groups "█████ (core members)" group.
To unsubscribe from this group and stop receiving emails from it, send an email to █████+unsubscribe@google.com.
To post to this group, send email to █████ @google.com.



--

sabineb@google.com

--

sabineb@google.com

--

sabineb@google.com

--

sabineb@google.com

GOOG-BRWN-00167340

PRODBEG: GOOG-BRWN-00167337
PRODBEGATT:
PRODEND: GOOG-BRWN-00167340
PRODENDATT:
PRODVOL: PROD023
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: Sabine Borsay
TO: stephan somogyi <somogyi@google.com>
FROM: sabine borsay <sabineb@google.com>
CC: emily schechter <emilyschechter@google.com>;aaron stein <steina@google.com>;-
          joel weinberger <jww@google.com>;maximilian walker <maxwalker@goo-
          gle.com>;lucas garron <lgarron@google.com>;mark larson <mal@googl-
          e.com>;parisa tabriz <parisa@google.com>;alex ainslie <ainslie@go-
          ogle.com>;ben wells <benwells@google.com>;chris palmer <palmer@go-
          ogle.com> ▇▇▇▇ (core members)" ▇▇▇▇ @google.com>; ☆ varun-
          khaneja <vakh@google.com>;wieland holfelder <holfelder@google.co-
          m>;dominic battre <battre@google.com>;chrome privacy muc <chrome--
          privacy-muc@google.com>;adrienne porter felt <felt@google.com>
BCC:
CONFIDENTIALITY: Confidential
CROSS_ALLCUSTODIANS: Sabine Borsay
CROSS_ATTACHMENTNAME:
CROSS_BEGATTACH:
CROSS_BEGBATES: GOOG-CABR-00149435
CROSS_CC: emily schechter <emilyschechter@google.com>;aaron stein <steina@google-
          .com>;joel weinberger <jww@google.com>;maximilian walker <maxwalk-
          er@google.com>;lucas garron <lgarron@google.com>;mark larson <mal-
          @google.com>;parisa tabriz <parisa@google.com>;alex ainslie <ains-
          lie@google.com>;ben wells <benwells@google.com>;chris palmer <pal-
          mer@google.com>;"enamel (core members)" ▇▇▇▇ @google.com>; ☆ -
          varun khaneja <vakh@google.com>;wieland holfelder <holfelder@goo-
          gle.com>;dominic battre <battre@google.com>;chrome privacy muc <c-
          hrome-privacy-muc@google.com>;adrienne porter felt <felt@google.c-
          om>
CROSS_CONFIDENTIALITY: CONFIDENTIAL
CROSS_CUSTODIAN: Sabine Borsay
CROSS_DATECREATED:
CROSS_DATEMOD: 06/22/2016
CROSS_DATERECEIVED: 06/22/2016
CROSS_DATESENT: 06/22/2016
CROSS_DE-DUPED CUSTODIANS: Sabine Borsay
CROSS_ENDATTACH:
CROSS_ENDBATES: GOOG-CABR-00149438
CROSS_FILEEXTENSION: eml
CROSS_FILENAME:
CROSS_FROM: sabine borsay <sabineb@google.com>
CROSS_MD5 HASH: 9C892CE126C224D4EA7C39CCDFADB075
CROSS_MESSAGE ID: <CAPZn3fGib0q16hMCqyidcwTGJ1yu9tKT=1s-2__BRi4DWn0OJg@mail.gmai-
          l.com>
CROSS_OWNER: sabineb
CROSS_PRODVAL: CROSS-PROD002
CROSS_REDACTED: N
CROSS_SUBJECT: Re: ▇▇▇▇ Google "Incognito" Precision
CROSS_TITLE: Re: ▇▇▇▇ Google "Incognito" Precision

CROSS_TO: stephan somogyi <somogyi@google.com>
CUSTODIAN/SOURCE: Sabine Borsay
DATECREATED:
DATELASTMOD: 06/22/2016
DATERCVD:
DATESENT:
DeDupedCustodians:
DOCEXT:
FILENAME:
ILS_ProdDate: 06/18/2021
CROSS_ILS_ProdDate: 09/01/2021
MD5 HASH: 9C892CE126C224D4EA7C39CCDFADB075
MessageID:
NATIVEFILE:
Owner: sabineb
PAGES:
REDACTED: N
SUBJECT: Re: ███████ Google "Incognito" Precision

# Mao Declaration

# Exhibit 60

Redacted Version of Document
Sought to Be Sealed

GOOG-CABR-05603788

Message

| From: | Michael Kleber [kleber@google.com] |
|---|---|
| Sent: | 3/22/2019 2:06:17 PM |
| To: | Jochen Eisinger [eisinger@google.com]; Brad Lassey [lassey@google.com] |
| CC: | Mike West [mkwst@google.com]; AbdelKarim Mardini [mardini@google.com]; Alex Nicolaou [anicolao@google.com]; Anil Sabharwal [anilsa@google.com]; Ben Galbraith [bgalbs@google.com]; Ben Goodger [beng@google.com]; Darin Fisher [darin@google.com]; Ivy Choi [ivyc@google.com]; Jack Chen [jlchen@google.com]; Margret Schmidt [margrets@google.com]; Parisa Tabriz [parisa@google.com]; Rick Byers [rbyers@google.com]; Rory McClelland [rorymcclelland@google.com]; Vivek Sekhar [vsekhar@google.com] |
| Subject: | Re: Update on Sundar ▮▮▮▮ review |

+Brad Lassey

On Fri, Mar 22, 2019 at 3:43 AM Jochen Eisinger <eisinger@google.com> wrote:
  +AbdelKarim Mardini

 On Fri, Mar 22, 2019 at 6:12 AM Mike West <mkwst@google.com> wrote:
  +Jochen, Rory

  On Fri 22. Mar 2019 at 05:58, Alex Nicolaou <anicolao@google.com> wrote:
   [+kleber, rbyers, mkwst]

   On Thu, Mar 21, 2019 at 4:29 PM Ben Galbraith <bgalbs@google.com> wrote:
    Hi gang,

    Good meeting w/ Sundar today. Quick takeaways, more formal debrief to follow in an already-scheduled meeting:

    - Overall, Sundar showed a great deal of savviness about the nuance of the space, and was very appreciative of our efforts. He acknowledged that our position is a hard one, and shared his desire for us to get out in public with our own narrative ASAP.

    - He agreed that we should be investing in the aggressive, browser-brokered, privacy-preserving API work, but he felt that it would take a long time to bear fruit, and agreed that we should field a shorter-term roadmap in parallel

    - He liked the elements of the plan we presented:
    a. Ads metadata with associated user controls
    b. The 1P / 3P cookie space split with user opt-in controls to clear 3P state
    c. Providing privacy-conscious users with transparency and control over tracking state
    d. Adding opt-in anti-tracking / privacy controls with the theme of ▮▮▮▮▮▮▮▮▮▮ Sundar was particularly excited about this and felt it could be a very powerful component of the narrative

    - There was some discussion about whether we should block 3P cookies because it was becoming a de facto expectation of a modern browser. Sundar led the discussion on the topic, and ultimately trusted us to game it out properly, but encouraged us to not underestimate how much the specific mechanism of 3P cookies had become part of the public narrative and to look for ways to defuse that concern, balancing simplicity and nuance appropriately.

    Look forward to going into deeper detail when we meet.

CONFIDENTIAL                                                                      GOOG-CABR-05603788

On a personal note, today marked an important milestone in 8+ months of intense work from so many people across Chrome and Ads. *Thank you* to everyone on this thread, and please convey that to so many on your teams who have helped.

This is obviously just one more step in a long journey. There are lots of details to flesh out on all of these tracks.

To the Browser leads and teams, thank you for being flexible as the scope of this update expanded to represent some of your ideas and plans, and I look forward to working closely w/ you as you develop them further.

Best...

Ben

--
-mike


--
Forewarned is worth an octopus in the bush.

CONFIDENTIAL

GOOG-CABR-05603789

PRODBEG: GOOG-CABR-05603788
PRODBEGATT:
PRODEND: GOOG-CABR-05603789
PRODENDATT:
PRODVOL: CROSS-PROD069
2nd_CROSS_BEGBATES:
2nd_CROSS_ENDBATES:
AllCustodians: Jochen Eisinger;Michael Kleber
TO: jochen eisinger <eisinger@google.com>;brad lassey <lassey@google.com>
FROM: michael kleber <kleber@google.com>
CC: margret schmidt <margrets@google.com>;darin fisher <darin@google.com>;rick b-
        yers <rbyers@google.com>;alex nicolaou <anicolao@google.com>;mike-
        west <mkwst@google.com>;parisa tabriz <parisa@google.com>;jack c-
        hen <jlchen@google.com>;ivy choi <ivyc@google.com>;anil sabharwal-
        <anilsa@google.com>;ben goodger <beng@google.com>;abdelkarim mar-
        dini <mardini@google.com>;rory mcclelland <rorymcclelland@google.-
        com>;vivek sekhar <vsekhar@google.com>;ben galbraith <bgalbs@goog-
        le.com>
BCC:
CONFIDENTIALITY: CONFIDENTIAL
CROSS_ALLCUSTODIANS:
CROSS_ATTACHMENTNAME:
CROSS_BEGATTACH:
CROSS_BEGBATES:
CROSS_CC:
CROSS_CONFIDENTIALITY:
CROSS_CUSTODIAN:
CROSS_DATECREATED:
CROSS_DATEMOD:
CROSS_DATERECEIVED:
CROSS_DATESENT:
CROSS_DE-DUPED CUSTODIANS:
CROSS_ENDATTACH:
CROSS_ENDBATES:
CROSS_FILEEXTENSION:
CROSS_FILENAME:
CROSS_FROM:
CROSS_MD5 HASH:
CROSS_MESSAGE ID:
CROSS_OWNER:
CROSS_PRODVAL:
CROSS_REDACTED:
CROSS_SUBJECT:
CROSS_TITLE:
CROSS_TO:
CUSTODIAN/SOURCE: Jochen Eisinger
DATECREATED:
DATELASTMOD: 03/22/2019
DATERCVD:
DATESENT: 03/22/2019
DeDupedCustodians: Jochen Eisinger;Michael Kleber
DOCEXT: eml
FILENAME:
ILS_ProdDate: 01/07/2022
CROSS_ILS_ProdDate:

MD5 HASH: 625B4712A48F3BAAD6924B98F712E0C6
MessageID: <CAA6DcCdMJ1Kody41SAwK8fZ2RejPeFbWTwN6qmGc_K+48ju0kA@mail.gmail.com>
NATIVEFILE:
Owner: kleber
PAGES: 2
REDACTED: N
SUBJECT: Re: Update on Sundar ███████ review