# Redacted Version of
# Mark Keegan 5.22.2022
# Rebuttal Report and all Appendices
# (Plaintiffs)

# [Document sought to be sealed]



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Chasom Brown, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) Civil Action No.: 5:20-cv-03664-YGR |
|  | ) |
| Google LLC, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

### Expert Report of Mark Keegan:

### Rebuttal of Expert Report of Professor On Amir

**Keegan & Donato Consulting, LLC**
**May 20, 2022**



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Table of Contents

I.  Executive Summary of Opinions ...................................................................................... 1

II.  Summary of Assignment ............................................................................................... 3

III.  Firm Overview ............................................................................................................ 4

IV.  Analysis of the Amir Studies ......................................................................................... 6

Global deficiencies and limitations of the Amir Studies ........................................................ 7

Poor data quality ............................................................................................................ 8

Tainted respondents – lawsuit awareness ......................................................................... 12

Tainted respondents – recent survey takers ..................................................................... 13

Incorrect survey universe .............................................................................................. 14

Irrelevant and incomplete browser use ............................................................................ 16

Summary – Global limitations ........................................................................................ 18

Consumer Perceptions and Expectations Study ................................................................. 19

Inappropriate reading test ............................................................................................. 19

Failure to replicate the market ....................................................................................... 23

Irrelevant variables – unclear entities .............................................................................. 25

Irrelevant variables – oversimplification of data types ........................................................ 26

Summary – Consumer Perceptions and Expectations Study ................................................. 28

Interpretation Study ..................................................................................................... 28

Failure to replicate the market ....................................................................................... 28

Leading questions......................................................................................................... 31

Irrelevant variables – oversimplification of data types ........................................................ 33

Inappropriate reading test ............................................................................................. 33

Summary – Interpretation Study ..................................................................................... 34

Likelihood of Use Study ................................................................................................ 35

Flawed disclosure modifications ..................................................................................... 35

Failure to account for confounding variables .................................................................... 39

Self-serving "Learn More" exposure ................................................................................ 40

Summary – Likelihood of Use Study ................................................................................ 41

Conclusions – Amir Report ............................................................................................ 42



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

V.    The Keegan Study ................................................................................................ 42

   Summary of assignment .................................................................................... 42

   Methodology ...................................................................................................... 44

        Study integrity ............................................................................................. 44

        Study objectives .......................................................................................... 44

        Study population ......................................................................................... 45

        Study design ............................................................................................... 45

        Data collection ............................................................................................ 46

        Sampling ..................................................................................................... 47

        Bias management ........................................................................................ 47

        Questionnaire .............................................................................................. 49

   Sample characteristics ...................................................................................... 56

   Findings ............................................................................................................. 57

VI.   Analysis of Google Internal Documents ............................................................ 59

VII.  Conclusions ....................................................................................................... 62

**Exhibits**

Exhibit 1—Mark Keegan C.V.

Exhibit 2—Documents Considered

Exhibit 3—Amir Studies—Open-Ended Coding

Exhibit 4—Keegan Study—Questionnaire

Exhibit 5—Keegan Study—Tabulated Data

Exhibit 6—Keegan Study—Untabulated Data

Exhibit 7—Keegan Study—Disposition of Contacts

Exhibit 8—Summary of Google Internal Documents



KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

# I.   Executive Summary of Opinions

1.  Pursuant to the Court's Standing Order,[1] this section includes an executive summary of each opinion that I will offer regarding the April 15, 2022 Expert Report of Professor On Amir (the "Amir Report") and related topics.

2.  Opinion 1: As described in Section IV, all three of the studies presented in the Amir Report (the "Amir Studies") suffer from material methodological and analytical deficiencies and limitations which render the findings presented in the Amir Report an unreliable and invalid basis for drawing opinions and conclusions regarding Class Members' perceptions, expectations, and behaviors with regard to Google's private browsing mode ("PBM") data collection practices. Those deficiencies and limitations include:

    a.  Poor data quality;

    b.  Tainted respondents;

    c.  An incorrect survey universe;

    d.  Incorrect and incomplete browser usage questions.

3.  Opinion 2: As described in Section IV, Professor Amir's Consumer Perceptions and Expectations Study provides no valid or reliable evidence regarding the perceptions and expectations of any reasonable Class Member or any proportion of either of the two Classes and therefore provides no support for Professor Amir's stated opinions with respect to any Class Members.

---

[1] https://cand.uscourts.gov/wp-content/uploads/judges/gonzalez-rogers-ygr/Judge-Gonzalez-Rogers_-Standing-Order-In-Civil-Cases.pdf

4.  Opinion 3: As described in Section IV, Professor Amir's Interpretation Study provides no valid or reliable evidence regarding how any reasonable Class Member or any proportion of either of the two Classes would interpret Google's PBM disclosures in a real-world scenario and therefore provides no support for Professor Amir's stated opinions with respect to any Class Members.

5.  Opinion 4: As described in Section IV, Professor Amir's Likelihood of Use Study provides no valid or reliable evidence regarding the extent to which, if at all, any reasonable Class Member or any proportion of either of the two Classes would continue using Chrome Incognito for private browsing if adequately informed about Google's PBM data collection and storage practices and therefore provides no support for Professor Amir's stated opinions with respect to any Class Members.

6.  Opinion 5: As described in Section V, as a rebuttal to the Amir Studies, I designed and conducted a consumer study of 1,052 respondents (the "Keegan Study") that addressed deficiencies and limitations of the Amir Studies and also provides a reliable set of findings regarding the reasonable beliefs of Class Members during the Class Period, with common proof that can be broken down into the two separate Classes and provides quantitative results reflecting what a reasonable consumer would have understood.

7.  Opinion 6: As described in Section V, based on the Keegan Study results, it is clear both that a reasonable member of each of the two Classes and also virtually all Class Members would not have understood or believed that they had consented to Google's collection and storage of their private browsing data.

8.  Opinion 7: As described in Section V, the Keegan Study results show that **93.1 percent** of respondents were misinformed about Google's PBM data collection and storage practices:

| Base: All respondents (n=1,052) | % Respondents |
|---|---|
| **Misinformed about Google PBM data collection and storage practices** | |
| Google does not collect and save my Internet browsing activity in private browsing mode | 54.8 |
| I have not given consent to Google to collect and save my Internet browsing activity when I browse the Internet in PBM | 20.2 |
| I have given consent to Google to collect and save my Internet browsing activity in PBM only when visiting a Google website | 11.8 |
| I have given consent to Google to collect and save my Internet browsing activity in PBM only when signed in to my Google account | 3.6 |
| Indicated a belief that Google would not collect and save at least one type of data displayed in the matrix table | 2.8 |
| **Total misinformed about Google PBM data collection and storage practices** | **93.1** |
| **Informed or don't know** | **6.9** |
| **Total** | **100.0** |

9.  Opinion 8: As described in Section VI, I also considered documents produced by Google that relate to the relevant issues addressed in the Amir Studies and the Keegan Study. Those Google documents are fundamentally inconsistent with and undermine Professor Amir's findings and opinions, and they are in turn consistent with and provide support for my findings and opinions.

## II.   Summary of Assignment

10. For the purposes of this rebuttal report, I was asked to review and opine on an expert report submitted by Google's expert, Professor On Amir (the "Amir Report"). The Amir Report presents the findings of three consumer research studies (the "Amir Studies"), which are discussed in detail below.

11. In light of the material deficiencies and limitations of the Amir Studies, as discussed in this report, I also was asked to design and execute a methodologically-sound consumer research study to reliably gauge consumer beliefs with regard to Google's collection and storage of PBM data (the "Keegan Study").

12.   I was also asked to review and consider the documents produced by Google in this litigation, to assess the extent to which those were consistent with the findings and opinions of Professor Amir and my own findings and opinions.

13.   My analysis of the Amir Studies, a full detailing of the objectives, methodology, findings, and conclusions of the Keegan Study, and my assessment of the Google-produced documents are presented in this report.

## III.    Firm Overview

14.   I am a principal at Keegan & Donato Consulting, a consulting firm serving litigators and their clients. Our areas of expertise include marketing analysis, intellectual property, consumer survey research, damages analysis, forensic economic analysis, and related disciplines.

15.   Keegan & Donato Consulting designs and executes methodologically sound consumer survey research studies and conducts objective evaluation of existing survey research as well as collaborates on a wide range of marketing and complex commercial litigation issues. We are also regularly engaged by clients for non-litigation consulting assignments related to marketing research and strategy.

16.   Over the course of my career, I have personally conducted over 1,000 consumer surveys reaching more than 250,000 consumers. Many of these surveys have been admitted into evidence in federal courts, state courts, at arbitration, to the Trademark Trial and Appeal Board, the National Advertising Division of the Council of Better Business Bureaus, and the United States International Trade Commission.

17.   In the past four years, I have been deposed or testified at trial in conjunction with my involvement in litigation matters 31 times. I have also served as a rebuttal witness.

18.   I am a graduate of the University of Georgia's *Principles of Market Research Program*. This comprehensive course of study, developed in concert with the Market Research Institute International (MRII), is a post-graduate program for marketing industry professionals covering all aspects of the market research process. Coursework is based on the MRII's Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process. Certification is conferred only upon participants who demonstrate mastery of concepts presented in 284

detailed module studies across 13 core areas of market research, as determined via rigorous proctored examinations. The University of Georgia's *Principles of Market Research Program* is endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association.

19.    My educational background additionally includes a J.D. from Brooklyn Law School and a B.A. in History from Pace University. I have completed coursework in the MBA program at the Lubin School of Business at Pace University and in Harvard University's Corporate Finance Certificate program. I have also served as a Registered Representative, National Association of Securities Dealers (Series 7, expired).

20.    I have spent the entirety of my career in marketing-related roles. I have served as a marketing consultant to private clients and have advised on a wide range of issues including product development and rollout, advertising, consumer feedback and intelligence, the product life-cycle, and other issues concerning marketing and marketing research. Over the past two decades, I have founded and successfully operated two marketing consulting and marketing research firms, Keegan & Company LLC and Keegan & Donato Consulting, LLC. Prior to that, I served in various marketing management and research roles in both large and small companies including Information Markets Corp., Affiliation Networks, Inc., Uptick Technologies, Cosmos Internet Solutions, Fact Set Research Systems, and BMW of North America, Inc.

21.    As a marketing expert, I have formulated winning brand positioning strategies for some of the best-known consumer brands and services. While at Keegan & Company, I worked with General Electric to position its consumer credit services as an industry leading advantage available to all. In my time with Information Markets, I worked with consumer brands such as Nike, Pepsi, and Subaru to deliver online engagement services to a younger audience. I also collaborated with AOL, Excite, and NBC to develop and launch an online forum to exchange ideas and expertise among category thought leaders.

22.    I am a member of the American Marketing Association (AMA), the preeminent professional association for marketing practitioners and scholars. From the AMA I have earned the designation of Professional Certified Marketer (PCM). The AMA confers the PCM certification upon individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles. PCM certification requires rigorous testing, ongoing

professional development, and a commitment to upholding the highest standards in the marketing field. The AMA only accepts into the PCM certification program applicants with demonstrated professional experience in the field of marketing.

23.  Keegan & Donato Consulting is a member of ESOMAR, the leading global association for market, social, and opinion research, the American Association for Public Opinion Research (AAPOR), a professional organization of more than 2,000 public opinion and survey research professionals in the United States and from around the world, the International Trademark Association (INTA), and the Association for Consumer Research (ACR). I have published in an ESOMAR compendium on the benefits of methodologically sound marketing research. I have taught CLE-accredited courses on survey research for litigation at the Florida Bar's Annual IP Symposium and have addressed the Pennsylvania Bar Association's Intellectual Property Law group with a presentation on the building blocks of survey research for litigation, consumer research best practices, and current trends in the industry.

24.  Additional information about my credentials is provided at Exhibit 1 to this report. Exhibit 1 also lists the matters in which I have provided testimony over the last four years.

25.  Prior to this engagement, I had personally used some of the private browsing modes discussed in this report (including Chrome Incognito mode), but I did not know that Google receives and saves information from my private browsing mode activities, including in particular when I am visiting non-Google websites without being signed in to any Google account. This was something I first learned when I become engaged as an expert for this litigation.

## IV.    Analysis of the Amir Studies

26.  The Amir Studies purport to "evaluate consumer understanding, perceptions, and expectations specific to the facts of this case, and to evaluate whether and to what extent consumers' understanding, perceptions, and expectations affect their likelihood of using a specific internet browser or browser feature."[2] The Amir Report describes these studies as follows:

_____

[2] Amir Report, ¶ 2.

- The **Consumer Perceptions and Expectations Study**, which Professor Amir states was intended "to assess whether and to what extent users expect different types of entities to receive or to not receive data (such as IP address, URLs of the sites users visit, and cookies) when they visit websites while in private browsing mode";[3]

- The **Interpretation Study**, which Professor Amir states was intended "to assess whether and to what extent users expect Google to receive or to not receive URLs of the sites users visit, IP addresses, and cookies placed on users' browsers during their Incognito session after reviewing the Incognito Splash Screen and 'Learn More' page" as well as other Google disclosures;[4] and

- The **Likelihood of Use Study**, which Professor Amir states was intended "to assess whether and to what extent modification of certain language on the Incognito Splash Screen and the 'Learn More' page that address Plaintiffs' criticisms of those documents…impacts users' likelihood of using Chrome in Incognito mode for private browsing."[5]

27.   All three of the Amir Studies suffer from material methodological and analytical limitations which call into question the reliability and validity of the findings and opinions that are presented in the Amir Report. Whereas some of these limitations are global and apply to all of the Amir Studies, other limitations are specific to the individual study methodologies. I will discuss the deficiencies and limitations of the Amir Studies in the Sections that follow.

**Global deficiencies and limitations of the Amir Studies**

28.   The three studies presented in the Amir Report collectively suffer from a number of methodological and analytical deficiencies and limitations which undermine their usefulness as valid and reliable evidence on the issues that are relevant to this matter. Those deficiencies and limitations in turn significantly impact the reliability of the opinions and conclusions drawn from the resulting study data.

---

[3] Amir Report, ¶ 3.

[4] Amir Report, ¶ 8.

[5] Amir Report, ¶ 13.

### *Poor data quality*

29.   All of the Amir Studies suffer from data quality issues. This is evidenced by the low-quality verbatim responses to the open-ended format question[6] used in the Amir Studies. Toward the end of each questionnaire, all three Amir Studies asked respondents the following question: "Prior to this survey, were you or were you not aware of any lawsuits related to private browsing mode?"[7] Respondents who indicated that they were aware of at a lawsuit related to private browsing mode were asked a follow-up question wherein they were asked to "describe the lawsuit" in their own words in a text box.[8]

30.   When employing open-ended questions in a survey, the researcher typically will engage in a data cleansing process whereby low-quality and nonsense responses are identified and flagged for removal from the final data set. This is an important step in the data analysis process because respondents who do not engage with the survey questionnaire in the intended manner—i.e., those who appear to not take the survey seriously, those who provide low-effort responses, gibberish, etc.—are of questionable reliability. The process of removing low-quality and other problematic responses from the data set reinforces the integrity of the data and ensures that external biases, including respondent disengagement, keyboard mashing, copy/paste responses, guesses, bot activity, flippant responses, and other respondents who provide undesirable and untruthful data are not included in the survey results.

31.   A review of the open-ended responses to the Amir Studies shows that problematic responses were not identified and removed from the studies even though the study data maps[9] included the coding structure to remove low-quality responses.[10] Indeed, low-quality responses are

---

[6] An open-ended question is a question that requires respondents to answer in their own words. In an online survey, open-ended questions typically provide respondents with a text box wherein they can type their verbatim response.

[7] Amir Report Appendices, pp. F.1-14, F.2-19, F.3-10.

[8] A "Don't know / Unsure" option was provided. See Amir Report Appendices, pp. F.1-14, F.2-19, F.3-10.

[9] A data map is a listing of the data fields and corresponding numeric values that are represented in a database.

[10] The data maps for all three Amir Studies contain coding categories for "Verbatim Check Failed" and "Quality Check Failed." See Consumer Perceptions and Expectations Study data file, 2203704.xlsx, Interpretation Study data file, 2203487.xlsx, Likelihood of Use Study data file, 2203523.xlsx.

pervasive across all three of the Amir Studies. Table 1 below provides examples of a few of the many low-quality responses from the Consumer Perceptions and Expectations Study:

*Table 1. Exemplar low-quality verbatim responses, Consumer Perceptions and Expectations Study*

| Response ID | "Describe the lawsuit…" (verbatim response) |
|---|---|
| kxdrm40p9nerpzuf | dfddfgdfgdggdfg |
| w4fxv8uv2xg9afjv | Everything very good and very nice 👌 |
| 5an1aemb8u0yn0sx | good, nice, cool, better, fun, easy |
| b6bfb0am1r5r4z1u | I WAS VISITING A PORN SITE |
| kw9x1m5bq39eftxu | Is very good |
| qbk92qzu7x8fvrkv | Yes I'm going to get my hair done today and I just got home from work and I just got home from work and I just got home from work and I |
| h3mghcp7s62wsn54 | very good value |
| jf6enycp89wupkw9 | OVERALL ITS A VERY HELPFULL |
| xy351ak03myuzrnm | My lawsuit regarging is the best idea in this option |
| kqme1qr4tqqr3w97 | IT IS VERY LOVELY |

32.   Similarly, the Interpretation Study contains many low-quality responses. Table 2 below provides a sampling of the many low-quality responses from the Interpretation Study:

*Table 2. Exemplar low-quality verbatim responses, Interpretation Study*

| Response ID | "Describe the lawsuit…" (verbatim response) |
|---|---|
| 8316y92sewfqn8yw | afsdafsfsdf.dasf ads gfdsf sagdfgwdsaf ew.df af to long. |
| y9xs861jzd1b6dq4 | ALL IS AMAZING |
| 5k3rqgdnkbf0fb40 | Best concept and very interested |
| d0ys8m6jbn3yr5am | dfsdfsdfsdf sdfsdfsdf sfsdfdsf sdfs sdfsdf |
| vtcbm89wzsq7g7av | Excellent and wonderful great unique different from other products very reliable and trustworthy |
| ef60amndkk7a5w0n | excellent mode, I like very much |
| 3bfrtjc2qbchkef5 | F GD FGDFGDF GDFGDFD |
| xh3asbjd3c2hez50 | Hedjk and night in the next day and ktexjk in the world at all of the index finger and I think I can get the first place |
| bjputkttrsvbr08g | Hey buddy I just got home from raider I love you mama bye mama |
| f53us0vk1nc14t98 | very fantastic excellent |

33.   The Likelihood of Use Study was also materially impacted; Table 3 below provides exemplar low-quality verbatim responses from the Likelihood of Use Study:

*Table 3. Exemplar low-quality verbatim responses, Likelihood of Use Study*

| Response ID | "Describe the lawsuit…" (verbatim response) |
| --- | --- |
| 53eavqse4mjtgnsp | all is very perfect and very nice |
| evbgm6t5c446awdy | nm u hug sara kmne ki kaj |
| 0rzaq2bzhb4mc6ct | Nnnnnnnn |
| g574ejn318qac9va | EXCELLENT THE BEST |
| z3vb7fd9aqacac82 | Fggddffcvvcxxxxcccccccfffgggggggggggh hhhhhhhhhhhh |
| yftp4gwnywdh6dvd | I LOVE THIS |
| 72bdh6jetu6q35wz | I love you too hot to handle Netflix cast and crew of the series |
| 5e5yuwc8na2q8dft | I hope so fatboy I'm so excited |
| bpe62kt8qebmc0e8 | is design and model is excellent for the customer is interesting |
| nfm5991h8kq5nchs | please I was in my heart is broken heart and soul and friends and family |

34. The examples shown above are representative of a systemic deficiency in the Amir Studies' data. Across all three Amir Studies, 217 of 555 open-ended responses provided by respondents on this question—39.1 percent—should have been categorized as low-quality[11] and removed from the data sets. Because not all respondents provided open-ended responses, it is reasonable to extrapolate this analysis to the overall samples used in the Amir Studies to conclude that approximately 40 percent of all respondents who participated in the Amir Studies may have been low-quality respondents.

35. The inclusion of data from respondents who clearly were not taking the study seriously compromises the integrity of all three Amir Studies. Because the Amir Studies are based on a

---

[11] 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

foundation of a significant number of low-quality respondents, Professor Amir's opinions and conclusions are not reliable or supported and should be considered with caution.

### *Tainted respondents – lawsuit awareness*

36.   In addition to low-quality responses, all three Amir Studies included respondents who had an awareness of the current litigation. Table 4 below provides a sampling of the verbatim responses provided by such respondents.

*Table 4. Exemplar respondents aware of current litigation*

| Response ID | Study | "Describe the lawsuit…" (verbatim response) |
| --- | --- | --- |
| 9wpguy78djwbj1ux | Cons. Percep/ Expectations | Brown vs. Google LLC |
| 6c5qyq9mp8n0b7xf | Cons. Percep/ Expectations | Claims against Google using information obtained in private browsing |
| kgefj5zbh314pbmc | Cons. Percep/ Expectations | Google selling private information |
| p5ku4bq6pezhx0em | Cons. Percep/ Expectations | Google spying  through google analytics |
| 9aa7w9h815mz325z | Cons. Percep/ Expectations | I don't know much about it but it was a lawsuit that revealed that Google collects data from incognito and ever since I dint trust them as much. |
| e7tzjmvh1k01mfqc | Cons. Percep/ Expectations | I remember hearing someone sued Google over thinking incognito mode was 100% private or something like that. |
| 9um6tz1kbxatfpsb | Cons. Percep/ Expectations | I was aware of the google chrome private browser mode lawsuit. Supposedly that google chrome's private browsing mode wasn't so private. |
| 2ce91bzgm2ww18ne | Interpretation | 2020 google faced a demand of 5m $ for information tracked in incognito mode |
| t7g7zmh7hhkhd8v5 | Interpretation | Chrome will not store the browsing history, Cookies and sites data |
| uvzb08syppad8bry | Interpretation | Google being face with lawsuit over tracking their users in private mode |
| 12mbemw8sx1unnrb | Interpretation | Google had a lawsuit against them for tracking in incognito mode |
| 49ghc7w1jjwd6a8k | Interpretation | Google still gathering information from incognito |

| wpjzpe0uhxj30fdv | Interpretation | Google still might see what you're doing even if you using private wen |
| vyk3enr1u269udsu | Likelihood of Use | Google accidentally giving out info pertaining to it's users of incognito mode |
| ah0nwp98x8q639xg | Likelihood of Use | Google is ordered to face a $5 billion lawsuit alleging Chrome's Incognito browsing mode collects users' web history. |
| 3a7nqcf88ds4byr9 | Likelihood of Use | Google still track user's browsing data in private mode. |
| 74c9szdc9cqfv5hc | Likelihood of Use | Google supposedly shared private information that it said it would protect. |
| r24aes5712g1vnn1 | Likelihood of Use | I am aware of a lawsuit against google alleging that they still collect user data even in incognito mode |
| 85ukh7gmte8mdbxx | Likelihood of Use | I read that there is a lawsuit against Google incognito browsing because some information is still tracked and the statement on Google's incognito page is insufficient |
| pk82crzc7bahnazy | Likelihood of Use | I'm not sure if the details about who was suing Google, but the lawsuit was about the incognito mode not blocking all of the sensitive data that by design it promises too. |
| uhce24wzm1te8n3z | Likelihood of Use | That Google was being sued for tracking peoples data while they were supposedly in incognito mode. |

37.   In all, 25.3 percent of all respondents across all three Amir Studies indicated an awareness of a lawsuit related to private browsing mode, and as shown in the Table 4 above, many provided open-end responses that appear to specifically identify this litigation. None of these respondents were removed from the study data based on this criterion.[12] Again, as with the low-quality responses cited above, this is surprising considering the study data maps included the coding structure to remove such low-quality responses.[13]

### *Tainted respondents – recent survey takers*

38.   It is also notable that a material proportion of respondents across all three Amir Studies indicated that they had recently taken another survey related to private browsing. In each of

---

[12] 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

[13] 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

the three Amir Studies, respondents were asked, "In the <u>past three months</u>, have you or have you not taken any other survey related to <u>private browsing mode</u>?"[14] Across the three studies, a total of 13.7 percent of participants indicated that they had taken a survey related to private browsing mode in the past three months.[15] Despite the fact that information regarding recent survey activity was solicited, none of these respondents were removed from the Amir Studies.

### *Incorrect survey universe*

39. Properly defining the population from which a survey samples—the study's "universe," i.e., those whose perceptions are relevant to the issue(s) being studied—is of vital importance to the reliability and validity of the study. When conducting a survey, "selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."[16]

40. The proper universe for a consumer survey or surveys presented in a class action matter should include representative members of the proposed class or classes. In this case, the classes are defined in the Third Amended Complaint[17] as follows:

   · Class 1 – All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such a browser and who were (a) in "Incognito mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the "Class Period").

   · Class 2 – All non-Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using any such browser and who were (a) in "private browsing mode" on that browser, and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the "Class Period").

---

[14] Amir Report Appendices, pp. F.1-15, F.2-20, F.3-11.

[15] Consumer Perceptions and Expectations Study, 18.1 percent; Interpretation Study, 10.1 percent; Likelihood of Use Study, 15.0 percent. See Consumer Perceptions and Expectations Study data file, 2203704.xlsx, Interpretation Study data file, 2203487.xlsx, Likelihood of Use Study data file, 2203523.xlsx.

[16] McCarthy, J.T. (2020). *McCarthy on Trademarks and Unfair Competition*, 5th Ed., §32:159.

[17] Third Amended Complaint, ¶ 192.

41.   As noted above, the Class Period in this matter spans the period back to June 1, 2016.
      Anyone with a Google account who used one of the private browsing modes at issue during
      the Class Period is a potential member of the class and should have been eligible for
      participation in the Amir Studies.

42.   The Amir Studies did not target all potential Class Members, but instead screened
      respondents only on private browsing mode use in the past <u>six months</u>. Potential respondents
      were asked:[18]



43.   The Amir Studies' screening questions employed a time window which excluded more than
      90 percent of the Class Period, and only captured usage after the lawsuit was filed. The Amir
      Studies did not seek, and the resulting data does not reflect, the beliefs and expectations of
      respondents who used PBM more than six months prior to the execution of the Amir Studies,
      despite the fact that such respondents are relevant to the current litigation. In short, the
      beliefs, expectations, and behaviors of potential Class Members who used PBM between the
      start of the Class Period and the start of data collection for the Amir Studies—a period
      spanning approximately 4.5 years—is not known and cannot be determined from the Amir
      Studies' data.

---

[18] Amir Report Appendices, pp. G.1-9, G.2-9, G.3-9.

44. Because Professor Amir employed an inappropriate survey universe consisting only of a small fraction of potential Class Members, the Amir Studies' participants are not representative of the broader population of potential Class Members. As such, the findings presented in the Amir Report cannot be considered a valid and reliable source of information with respect to the relevant issues in this matter and Professor Amir's opinions and conclusions based on this data are unsupported and unreliable. This inappropriate universe is something that I addressed and corrected in the Keegan Study.

### *Irrelevant and incomplete browser use*

45. The screening criteria for all three Amir Studies required respondents to indicate which Internet browsers they currently use. Respondents were presented with a list of eight browsers[19] along with an "Other" option. Respondents were permitted to, and often did, select multiple browsers.

46. After identifying the browser(s) they had used, respondents were asked about their PBM usage. Respondents were asked, "In the past six months, which of the following features, if any, have you used on your internet browser(s)? (Select all that apply),"[20] where an option for "Private browsing mode" was provided, among other features.

47. Importantly, participants were not asked about the browser(s) upon which they use PBM; rather, the Amir Studies ascertain only that respondents use certain browsers and use PBM on at least one of those browsers. Indeed, for most respondents, it remains unknown which browser(s) they used for PBM browsing.

48. It is my understanding that the scope of this case is limited to private browsing in Chrome, Safari, and/or Edge/Internet Explorer.[21] Therefore, a respondent that does not use private browsing in one of those three Internet browsers is not part of the defined Classes in this case and should not be included in the Amir Studies' universe. Nevertheless, a review of the data

---

[19] Additionally, a fabricated browser ("Odeon") was included for screening purposes. See, for example, Amir Report Appendices, p. F.1-4.

[20] Amir Report Appendices, pp. F.1-5, F.2-5 F.3-5.

[21] It is my understanding from counsel that the scope of this case is limited to private browsing in Chrome, Safari, and/or Edge/Internet Explorer.

across the three Amir Studies shows that 6.2 percent of participants did not, in fact, use Chrome, Safari, or Edge/Internet Explorer at all, but rather used some other browser.[22]

49.   An additional 41.1 percent of participants selected Chrome, Safari, and/or Edge/Internet Explorer and at least one of the other five browsers listed.[23] By indicating that they used a combination of relevant browsers and irrelevant browsers (for the purpose of this litigation), and because of the flawed question design asking simply if they used private browsing on some (unknown) browser, it cannot be determined whether this 41.4 percent of the sample are actually Class Members. Over 41 percent of the Amir Studies' respondents therefore may fall outside the defined Classes in this matter.

50.   An example illustrates the problem with Professor Amir's approach. In the Consumer Perceptions and Expectations Study, the respondent with ID record 222 indicated that he/she had used Chrome, Firefox, *and* Opera.[24] Whereas the study does establish that this respondent engaged in private browsing generally, it is unclear—and indeed, unknowable—from the study data whether he/she engaged in private browsing in Chrome. It is entirely possible that this respondent exclusively performed private browsing in Firefox and/or Opera—i.e., irrelevant browsers. To the extent this is true, this respondent is not a Class Member but was included in Professor Amir's Consumer Perceptions and Expectations Study. This problem affects all three of the Amir Studies.

51.   In sum, reviewing the Amir Studies' data shows that 6.2 percent of the sample did not use any of the Internet browsers at issue in this lawsuit and should therefore have been excluded from the universe. An additional 41.4 percent of the sample are potentially non-Class Members, although one cannot know for certain given the limitations of the study design. Accordingly, 47.6 percent of respondents—nearly half the study universe—are either certainly not Class Members or potentially not Class Members. This is a material limitation of the Amir Studies which undermines the findings and opinions in the Amir Report. This is something that I addressed and corrected in the Keegan Study.

---

[22] 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

[23] The other browsers were Brave, Mozilla Firefox, Opera, DuckDuckGo, and Other. 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

[24] 2203704.xlsx, uuid: wxuqedgjkhz958sz.

***Summary – Global limitations***

52.  The inclusion of low-quality respondents and tainted respondents compromises the overall integrity of the Amir Studies. Across all three Amir Studies, approximately 40 percent of respondents appear to be of unacceptably low quality with respect to their engagement with the study. Although such respondents introduce biases into the study data, and the Amir Studies included the mechanics to identify and remove such respondents in the data coding schema, this data cleansing exercise was never performed.

53.  Additionally, 30 percent of respondents indicated that they were aware of a lawsuit involving private browsing mode or were recent survey participants on the subject.[25] Although these questions were included in each study and, again, the mechanics to remove those respondents was built into the data coding schema, these respondents were not removed, thereby rendering nearly one-third of respondents included in the Amir Report of dubious quality by the studies' own measurement.

54.  The Amir Studies also used an incorrect survey universe which screened respondents only on private browsing mode use in the past six months. The Amir Studies' screening questions employed a time window which excluded more than 90 percent of the Class Period. As such the resulting data does excludes Class Members who used PBM more than six months prior to the execution of the Amir Studies, resulting in a flawed survey universe.

55.  Finally, the Amir Studies included respondents who only used irrelevant Internet browsers and/or PBMs and are not part of the defined Classes. Indeed, 47.6 percent of respondents— nearly half the study universe—are either certainly not Class Members or potentially not Class Members based on their browser usage. Inclusion of these problematic respondents further erodes the reliability and applicability of the studies' data.

56.  For these reasons, I do not consider the opinions and conclusions presented in the Amir Report (which are based on the Amir Studies' flawed and unreliable data) to be reliable evidence on the relevant issues in this matter.

---

[25] 2203704.xlsx, 2203487.xlsx, 2203523.xlsx.

**Consumer Perceptions and Expectations Study**

57.   The Consumer Perceptions and Expectations Study was purportedly intended "to assess whether and to what extent users expect different types of entities to receive or to not receive data (such as IP address, URLs of the sites users visit, and cookies) when they visit websites while in private browsing mode."[26] In addition to the deficiencies and limitations identified above, the following sections discuss additional deficiencies and limitations of this study.[27]

### *Inappropriate reading test*

58.   The Consumer Perceptions and Expectations Study fails to collect objective information regarding respondents' perceptions and expectations because it forces respondents to study various disclosures and formulate their answers based on those forced exposures. In all cases, the study design made the survey stimuli available for respondents to reference when answering the key questions of interest.

59.   As noted by litigation research commentator Dr. Jacob Jacoby, "after exposing respondents to a…stimulus, the researcher has two basic options: either remove the stimulus from view before asking the critical substantive questions, those designed to shed light on the legal issues being tested, or leave it in full view of the respondent while asking these questions."[28] A design wherein the stimulus remains in the respondent's view has sometimes been referred to as a "reading test," because respondents have an opportunity to study, or "read," the stimulus when answering key questions of interest.

60.   In this case, the Consumer Perceptions and Expectations Study made available images of various disclosures while respondents answered the key measurement questions.

61.   One of the reasons that researchers commonly remove stimuli from the view of the respondent when administering key study measures is that leaving the stimuli in sight creates

---

[26] Amir Report, ¶ 3.

[27] It is my understanding based on information from Plaintiffs' Counsel that Plaintiffs are not asserting any claims based on Firefox private browsing. To the extent that the Amir Studies present data related to Firefox browsing, those calculations are irrelevant to my analysis. Additionally, I understand that Plaintiffs are asserting claims based on Edge/Internet Explorer private browsing. The Amir Studies did not include analyses of Edge/Internet Explorer private browsing and as such, Professor Amir does not offer any opinions on Edge/Internet Explorer.

[28] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 566.

an elevated risk of response bias. Rather than serving as an objective measure of what the respondent believes about the relevant issue, this methodological design risks being overly suggestive. By making the stimuli available, the design tends to suggest to the respondent that information they glean from studying the stimulus is a suitable answer regardless of their personal opinions or beliefs. This risk has been referred to as a "reading test," wherein the respondent simply reads back what is in front of them and their actual understanding and beliefs as to the issue being studied are not measured.[29]

62.   To mitigate the potential for response bias when using visual stimuli, researchers commonly remove such stimuli from view prior to administering the key measures of the study. Doing so forces the respondent to consider their individual interpretation of the stimuli to which he or she was previously exposed, thereby more closely approximating marketplace conditions. When a consumer evaluates a product or service in the marketplace—e.g., uses a private browsing mode in an Internet browser—they do not have a researcher asking them about their beliefs about the product or service as they are looking at it. Thus, it does not make sense to create this scenario in the survey environment.

63.   By exposing the consumer to the stimulus, then removing it, *and then* asking about their beliefs and opinions as to the key research issues, the researcher is able to access the consumer's actual real-world marketplace beliefs and understanding, not the more artificial and contrived response created when the interviewer allows the respondent to study the stimulus while answering the question.

64.   Removing the stimulus from view prior to asking the consumer about their beliefs is especially important when it is the defendant's expert that is conducting the study. When a defendant's messaging or behavior has been accused of being inaccurate or misleading, it becomes essential that the research professional investigate that claim in the most objective way possible to avoid the appearance of introducing bias, or in any way "padding" the results in favor of his or her client. The burden on the research professional to minimize every opportunity for bias is critical to maintaining the integrity of the study data, as surveys are too easily and subtly manipulated to affect a desired outcome.

---

[29] Swann, J.B. (2005). "A 'Reading' Test Or A 'Memory' Test: Which Survey Methodology Is Correct?" *The Trademark Reporter*, Vol. 95, p. 876-877.

65.   Expanding on this issue, Jacoby observes:

> In situations where defendant's goods or advertising is allegedly likely to cause confusion, deception, or to mislead, it seems obvious that *defendant's* survey should not ask questions of respondents while the stimulus remains in front of the respondent. If there was a propensity for the respondent to be confused or deceived, guided by the questions being asked, they could review the stimulus for information that pertains to the question, and, in this way, disabuse themselves of any confusion or deception they might otherwise have experienced.[30] [Emphasis in original.]

66.   In this case, the Consumer Perceptions and Expectations Study forced respondents to review Google's disclosures and made the study stimuli available to respondents throughout the administration of the key study measures. The potential benefit here is to the Defendant, Google, as the study design purports to measure expectations as to the types of information consumers expect entities to receive when they are in PBM. To the extent that respondents study and glean information from the stimuli in front of them (i.e., engage in the reading test), this creates the illusion that respondents are more informed about Google's PBM data collection and storage practices than they may actually be. Such respondents are potentially influenced by the survey instrument itself and may not be representative of the broader population of potential Class Members that would not be subject to such influences.

67.   The deficiency of the reading test scenario is compounded by the format of the questions asked, which are constructed to be of a factual nature and do not ask about the users' beliefs. For example, in the first key measure, respondents are presented with the following:

---

[30] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 573.



68.   This question presents respondents with a factual proposition: "While in Incognito mode, do
      the companies that own the websites you visited during the session receive or not receive the
      data from your Incognito session (such as IP address, URLs of the sites you visit, and
      cookies)?"[31] Rather than using opinion-based language ("*do you believe* that…" or which
      "best reflects *your understanding*…" or "best reflects *your beliefs* …"), the Consumer
      Perceptions and Expectations Study question format utilizes an inappropriate quiz-like format
      ("*do* the companies…") to suggest that the answer is present in the disclosures that the
      respondent considered and has available for review. This limitation is compounded by the

      _____

      [31] Amir Report Appendices, p. F.1-11.

fact that respondents are instructed to "base your answer on the screens you reviewed" and that those screens are available for further study on the same page as the question. This is not an objective measurement of respondents' perceptions and expectations regarding Google's PBM data collection and storage practices.

69.   The "open book" reading test format does not measure consumer perceptions and expectations regarding Google's PBM data collection and storage practices, but rather invites respondents to search for and find the "correct" answers to the questions within the curated materials provided. Because it makes use of an unreliable and biased reading test methodology, the findings of the Consumer Perceptions and Expectations Study (in contrast to the Keegan Study, described below) should be viewed as nothing more than a test of the respondent's ability to read from a webpage. Those findings provide no reliable or useful information regarding the perceptions and expectations of any Class Members and no support for Professor Amir's stated opinions regarding Class Members.

### Failure to replicate the market

70.   The negative implications of the reading test format of the Consumer Perceptions and Expectations Study are exacerbated by the fact that the study design also fails to accurately replicate a realistic marketplace scenario. It is important when designing a study intended to measure consumer perceptions about a product or service to recreate—to the extent possible within the artificial survey environment—a user experience within the questionnaire which faithfully and accurately replicates the experience the respondent would have in the real world.[32] Indeed, "while the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the [product or service] at issue."[33] This is the standard to which the researcher must strive if the research is to be considered a valid measure of consumer perceptions about the relevant issue, and the standard I applied for the Keegan Study.

---

[32] Morales, A. C., Amir, O., & Lee, L. (2017). "Keeping It Real in Experimental Research—Understanding When, Where, and How to Enhance Realism and Measure Consumer Behavior." *Journal of Consumer Research*, Vol. 44, p. 465-476.

[33] Edwards, G. K., (2012). "The Daubert Revolution and Lanham Act Surveys." in *Trademark and Deceptive Advertising Surveys*, Diamond & Swann (eds.), p. 346.

71.   In this case, the Consumer Perceptions and Expectations Study does not accurately recreate
the experience that consumers have when using Chrome and Safari in PBM (and also omits
Edge/Internet Explorer and includes irrelevant findings regarding Firefox—see "Irrelevant
and incomplete browser use" section above). Specifically, the Consumer Perceptions and
Expectations Study forces respondents into an unrealistic scenario whereby they are forced to
review disclosures in ways that are inconsistent with actual user behaviors.

72.   Using the Chrome browser as an example, the first stimulus exposure in this study was to the
Incognito splash screen. Respondents were forced to view the Incognito splash screen for 30
seconds before being allowed to continue to the next screen.[34] Next, respondents were forced
to view a Chrome help screen that the questionnaire asserts would display when the "Learn
More" link is clicked on the Incognito splash screen.[35] Respondents were forced to view this
screen for an additional 30 seconds.[36]

73.   This sequence of forced exposures is not realistic of the way that most consumers interact
with Chrome in Incognito mode. With repeated use and exposure to the Incognito splash
screen, it is unlikely that any user would spend 30 seconds studying the limited information
presented on that page. Most users quickly proceed to executing the search or navigating to
the URL for which they opened a Chrome Incognito window. Indeed, in the Keegan Study,
respondents' median viewing times for the browser splash screens were 8.9 seconds for
Chrome, 9.1 seconds for Safari, and 10.1 seconds for Edge/Internet Explorer.

74.   Additionally, the study's forced 30 second exposure to the "Learn more" page for all
respondents is unrealistic: another of the Amir Studies—the Likelihood of Use Study—
proves that exceedingly few users (just 2.4 percent of respondents) even click on the Learn
More link (discussed below). In light of this information, forcing respondents in the

---

[34] Amir Report Appendices, p. F.1-7.

[35] Amir Report Appendices, p. F.1. This was not the actual "Learn More" page that Google uses, but a
deeper-linked page that requires an extra click to access. The actual screen currently displayed when
"Learn More" is clicked (https://support.google.com/chrome/answer/9845881?visit_id=637878018652834
2754248452860&p=incognito&rd=1) was not used in the study. Rather, another page (https://support.
google.com/chrome/answer/7440301?hl=en&ref_topic=9845306), presumably considered more favorable
to Google's position in this case, was asserted as the page that respondents would see upon clicking the
"Learn More" link on the Incognito splash screen. This page is not currently accessible directly from the
Incognito splash screen.

[36] Amir Report Appendices, p. F.1.

Consumer Perceptions and Expectations Study to study Google's Learn More disclosures is not reflective of the realities of an actual use case. Hence, any measurements that come from this unrealistic scenario do not measure actual user beliefs.

### *Irrelevant variables – unclear entities*

75. The Consumer Perceptions and Expectations Study purports to measure what PBM users "expect while in private browsing mode."[37] In an attempt to collect this information, the survey asks respondents if three different types of entities receive different types of information while they are privately browsing. The entities inquired about, without further explanation to respondents, are presented as follows:

     a.  "Companies that own the websites that you visited during the session"

     b.  "Your internet service provider"

     c.  "Companies that provide analytics and advertising services to websites you visited during the session"

76. The entities presented to respondents in the Consumer Perceptions and Expectations Study do not comport with the allegations in this case. The Consumer Perceptions and Expectations Study claims to have used "more understandable concept[s]"[38] when interpreting the Complaint allegations and presenting those to respondents. However, this attempt fails as the study does not accurately convey the Complaint allegations to respondents, and in some cases omits allegations completely. The Consumer Perceptions and Expectations Study therefore measures something wholly irrelevant.

77. The Consumer Perceptions and Expectations Study has the effect of obfuscating what consumers' actual perceptions and expectations are with regard to the collection and use of the types of information and data that is at issue in this matter. Most notably, the reader is never asked whether Google collects information, or whether the user understands that Google is the company that provides analytics and advertising services to websites and thereby collects users' PBM data. Given this critical omission, the reader does not know—

---

[37] Amir Report Appendices, p. G.1-11.

[38] Amir Report, p. 10.

and survey respondents themselves are given no guidance—on what "Companies that provide analytics and advertising services to websites you visited during the session" means. Is this referencing all such companies, of which there are many? Certain of these companies? All companies except Google? Only Google? It is impossible to know. As a consequence, respondents are left to interpret this ambiguous language in their own varied ways.

78.   Additionally, the allegations in the Complaint with respect to the collection of users' information is confined to the activities and practices of Google; however, the Consumer Perceptions and Expectations Study makes no such restriction regarding consumer perceptions and expectations when using PBM. Indeed, Google is not mentioned as an entity at all.

79.   Because the Consumer Perceptions and Expectations Study asks respondents to consider what may be received by the three ambiguous types of entities described above, and not Google specifically, the measurement derived from this faulty methodology cannot be reliably applied to the allegations against Google alone in this case.

### *Irrelevant variables – oversimplification of data types*

80.   In addition to the misalignment of the three categories of entities in the Consumer Perceptions and Expectations Study to the allegations, the three types of information inquired about are also misidentified. The three types of information asked about are presented to respondents as:

a.   "IP addresses," defined as "Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. An IP address can often be used to identify the location from which a device is connecting to the Internet."[39]

b.   "URLs of the sites you visit," defined as "The web addresses of the webpages you visited using the browser."[40]

c.   "Cookies," defined as "A small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the

---

[39] Amir Report, p.10.

[40] Amir Report, p.10.

cookie allows that site to recognize your browser. Cookies may store user preferences and other information."[41]

81.   Although the Complaint makes clear that Google surreptitiously collects and saves many categories of information from users while in PBM,[42] the Consumer Perceptions and Expectations Study erroneously oversimplifies its description of this activity to respondents, consolidating all such data collection under the inaccurate umbrellas of "IP addresses," "URLs of the sites you visit," and "Cookies."[43] This is a gross oversimplification considering that the Third Amended Complaint alleges many categories of user information that is passed along to Google without the users' knowledge.[44]

82.   Additionally, while acknowledging certain allegations, the Amir Study fails to include them at all. For example, "fingerprint data" is one of the types of information alleged to be collected by Google while users are private browsing,[45] and is listed as such in the Amir Report,[46] yet the Amir Study omits it entirely from its list of types of information communicated.[47] This is also the case for "User-ID" data.[48]

83.   The Consumer Perceptions and Expectations Study fails to properly encompass the entirety of the allegations in this case and communicate those to respondents in the study. The study therefore does not faithfully measure pertinent information that can be applied to the allegations against Google in this matter.

---

[41] Amir Report, p. 11.

[42] Third Amended Complaint, pp. 17-18.

[43] Some of the Complaint allegations regarding the types of information collected and saved are relabeled or consolidated in the Consumer Perceptions and Expectations Study. For example, "GET requests" become "URLs," with the explanation that "I am informed that 'URLs of the sites visited' is a more understandable concept for survey respondents. Thus, I presented the term, 'URLs of the sites you visit' (Amir Report, FN19). The rebranding of this allegation to respondents fails to accurately convey the type of information being collected by Google. Such mischaracterization ultimately leads to a failure to accurately measure consumer perceptions and expectations regarding the allegations.

[44] Third Amended Complaint, pp. 17-18.

[45] Third Amended Complaint, p. 18.

[46] Amir Report, p. 10.

[47] Amir Report, p. 23.

[48] Amir Report, p. 10.

### *Summary – Consumer Perceptions and Expectations Study*

84.   The Consumer Perceptions and Expectations Study is hampered by a number of material
      deficiencies and limitations, including:

      ·   Use of a biased reading test survey format which makes the survey stimuli available
          to respondents during the administration of key study measures;

      ·   Failure to replicate the marketplace because of the use of lengthy forced exposures to
          Google and other private browsing disclosures; and

      ·   Use of irrelevant variables which do not accurately convey the Complaint allegations
          to respondents, and in some cases omit allegations completely.

85.   For these reasons, the Consumer Perceptions and Expectations Study provides no valid or
      reliable evidence regarding the perceptions, expectations, beliefs, or behaviors of any
      reasonable Class Member with respect to Google's PBM data collection and storage
      practices. As such, the Interpretation Study provides no support for Professor Amir's stated
      opinions with respect to any Class Members.

### Interpretation Study

86.   The Interpretation Study was purportedly intended "to assess whether and to what extent
      users expect Google to receive or to not receive URLs of the sites users visit, IP addresses,
      and cookies placed on users' browsers during their Incognito session after reviewing the
      Incognito Splash Screen and 'Learn More' page" as well as various other disclosures.[49] In
      addition to the deficiencies and limitations identified above, the following sections discuss
      additional deficiencies and limitations of this study.

### *Failure to replicate the market*

87.   Like the Consumer Perceptions and Expectations Study, the Interpretation Study fails to
      replicate the ways in which potential Class Members interact with and use PBM. Because the
      Interpretation Study fails to replicate the marketplace, it does not yield valid and reliable data
      upon which opinions and conclusions can be drawn about any Class Members.

---

[49] Amir Report, ¶ 8.

88.  The main portion of the Interpretation Study began by assigning respondents to one of four groups, each of which was exposed to different study stimuli. The stimuli assignments for the four groups were defined as follows:[50]

|  | Number of Completes | Stimuli Description |
|---|---|---|
| GROUP A (Splash Screen Only) | 250 | • Incognito Splash Screen<br>• "Learn More" page |
| GROUP B (Splash Screen with Policies (Highlighted)) | 250 | • Google Privacy Policy, March 31, 2020 (with and without highlights)<br>• Chrome Privacy Notice, May 20, 2020 (with and without highlights)<br>• Incognito Splash Screen<br>• "Learn More" page |
| GROUP C (Splash Screen with New Account Creation Agreement) | 250 | • New Account Creation Agreement<br>• Incognito Splash Screen<br>• "Learn More" page |
| GROUP D (Splash Screen with Consent Bump Agreement and FAQ Page) | 250 | • Consent Bump Agreement and FAQ page<br>• Incognito Splash Screen<br>• "Learn More" page |

89.  As shown in the table above, respondents in the Interpretation Study were forced to review up to four Google disclosures discussing various aspects of its data collection practices with respect to PBM. From the outset, this is an unrealistic exercise: the Amir Likelihood of Use Study proves that exceedingly few users—just 2.4 percent of respondents—click on the Learn More link (discussed below), yet a lengthy exposure to this information was required for all users in this study.

90.  The artificial nature of this exercise cannot be overstated. The Interpretation Study's stimuli exposures do not in any way replicate the experience that a typical user would have when

---

[50] Amir Report Appendices, p. F.2-6.

using Chrome Incognito. For example, respondents assigned to Group B were first exposed to Google's Privacy Policy, which they were forced to review for at least 30 seconds.[51] On the next page, respondents were forced to again view the Google Privacy Policy—this time with certain portions highlighted—for an additional 15 seconds.[52] Next, respondents were forced to view the Chrome Privacy Notice for at least 30 seconds.[53] On the next page, respondents were forced to again view the Chrome Privacy Notice—this time with highlights—for an additional 15 seconds.[54] Respondents were next forced to view the Chrome Incognito splash screen for at least 30 seconds.[55] Finally, respondents were forced to view a page characterized as the Incognito "Learn More" page for at least 30 seconds.[56]

91.   The Interpretation Study's stimuli exposure scheme is simply not reflective of the way that typical users engage with Chrome Incognito in a natural environment. In total, respondents in this group were forced to review six Google disclosures over a timespan of no less than two and a half minutes before answering any key study measures (while once again providing those respondents with copies of all of those disclosures while answering questions, employing a forced "reading test" format). This stands in contrast to the Keegan Study, wherein with no minimum forced exposure time, respondents' median viewing times for the browser splash screens were 8.9 seconds for Chrome, 9.1 seconds for Safari, and 10.1 seconds for Edge/Internet Explorer.

92.   It is highly unlikely that any respondent seeking to use Chrome Incognito would spend multiple minutes reviewing multiple Google disclosures before engaging in private browsing. Among those that do review one or more Google disclosures, is unlikely that such users would review all of those disclosures in direct succession.

---

[51] Amir Report Appendices, p. F.2-8.

[52] Amir Report Appendices, p. F.2-9.

[53] Amir Report Appendices, p. F.2-10.

[54] Amir Report Appendices, p. F.2-11.

[55] Amir Report Appendices, p. F.2-15.

[56] Amir Report Appendices, p. F.2-16.

*Leading questions*

93.   The Interpretation Study is also problematic insofar as the survey instructions and questions unnaturally lead respondents to information and answers that are beneficial to Google. A leading question is a question that, through the methodological construction of the question itself, suggests to the respondent particular information and/or a particular answer. It has been noted that "in framing survey questions, one must resist the temptation to lead responses to a desired end or to 'help' the witness to reach the 'correct' answer."[57] Leading questions "may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction."[58]

94.   The inclusion of highlighted passages in the study stimuli is a particularly perplexing example of this. Not only is highlighting content a complete fabrication that would not occur in the natural marketplace—i.e., users would never be exposed to highlighted passages when using Chrome Incognito outside of the Interpretation Study—but the use of highlights effectively cues respondents to focus on the exact content that Google wants them to review, and which may in turn cause respondents to disregard other portions of the documents that are not helpful to Google. This is a material deficiency of the Interpretation Study: to the extent that the highlighted content impacts the ways in which respondents review and process the information presented in Google's disclosures, this design choice biases respondents' understanding of Google's PBM data collection and storage practices.

95.   The Interpretation Study also made use of unclear and leading language in the survey instructions and questions, which contributes to respondents' potentially unnatural review of the Google disclosures. For example, the Interpretation Study potentially biases respondents at the outset of the key study measures by directly linking Google and Chrome. Respondents are instructed, "You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u>."[59] [Emphasis in original.] The Interpretation Study's effort through this instruction to establish a link between Google and Chrome potentially conditions respondents to focus on the information that *Chrome* stores locally on

---

[57] McCarthy, T.J. (2020). *McCarthy on Trademarks and Unfair Competition, 5th Ed*, §32:173.

[58] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 388.

[59] Amir Report Appendices, p. F.2-7.

one's computer, as opposed to the relevant issue in this case, which I understand to be *Google's* remote collection and storage of PBM data.

96.   Additionally, before viewing the study stimuli, respondents were told that they "will be able to view these images again as you answer the questions."[60] Respondents were instructed to read through the stimuli "carefully" and were repeatedly told that the stimuli would be available to view when answering questions. For all three of the key study measures, respondents were told to answer "based on the screens you reviewed."[61]

97.   Because the leading nature of the Interpretation Study's questionnaire potentially impacted the Interpretation Study's data in unknown ways, the reliability of the study's data is undermined.

98.   The study instructions also contribute to respondents' unnatural review of the Google disclosures. Throughout the Interpretation Study, respondents are provided with the following instructions which place undue emphasis on Google's disclosures:

·   "You will now see the Google Privacy Policy. Please carefully read this policy…Please scroll through the window below to see the whole image."[62]

·   "You will be able to view these images again as you answer the questions"[63]

·   "Please carefully read this policy"[64]

·   "Please scroll through the window below to see the whole image"[65]

·   "The thumbnails contain the images that you have viewed earlier. You can click on the thumbnails to see the enlarged versions of these images."[66]

---

[60] Amir Report Appendices, p. F-2.7.

[61] Amir Report Appendices, pp. F.2-17 - F.2-19.

[62] Amir Report Appendices, p. F.2-8.

[63] Amir Report Appendices, p. F.2-7.

[64] Amir Report Appendices, p. F.2-8.

[65] Amir Report Appendices, p. F.2-9.

[66] Amir Report Appendices, p. F.2-17.

99.  The Interpretation Study primes respondents to study Google's disclosures in ways that are not reflective of reality. The leading nature of the questionnaire language undermines the reliability of the Interpretation Study's data and the opinions and conclusions drawn therefrom.

### Irrelevant variables – oversimplification of data types

100. Like the Consumer Perceptions and Expectations Study, the Interpretation Study also oversimplifies the types of data that are collected by Google when a user searches the Internet in PBM. Here again, the Interpretation Study consolidates all of Google's data collection activities under the inaccurate umbrellas of "IP addresses," "URLs of the sites you visit," and "Cookies."[67] For this reason, with respect to its oversimplification of the types of data collected by Google when a user searches the Internet in PBM, the Interpretation Study is subject to the same critiques as the Consumer Perceptions and Expectations Study as outlined above.

### Inappropriate reading test

101. The Interpretation Study bears the hallmarks of a classic reading test. As such it is inherently biased and cannot be considered reliable evidence in this matter.

102. As discussed above, each of the four study groups was subjected to an extended forced exposure to their assigned stimuli. After this forced exposure, three key measures were administered:

· Based on the screens that you reviewed, please select one of the following regarding URLs of the sites you visit during an Incognito mode internet browsing session (e.g., watching a video or shopping for a product);[68]

· Based on the screens that you reviewed, please select one of the following regarding IP address during an Incognito mode internet browsing session (e.g., watching a video or shopping for a product);[69] and

[67] Amir Report Appendices, pp. F.2-17, F.2-18.

[68] Amir Report Appendices, p. F.2-17.

[69] Amir Report Appendices, p. F.2-18.

- Based on the screens that you reviewed, please select one of the following regarding cookies placed on your browser during an Incognito mode internet browsing session (e.g., watching a video or shopping for a product).[70]

103. Each of the three measures employed a five-point scale ranging from "Google does not receive this information" to "Google does receive this information." An additional answer option—I don't feel I have enough information to answer this question—was provided for each of the three measures.

104. For each of the questions of interest, the Interpretation Study allowed respondents access to the stimuli that they had viewed when answering the question. For all of the questions of interest, respondents were instructed that there are thumbnails on the page that "contain the images that you have viewed earlier"[71] and that they "can click on the thumbnails to see the enlarged versions of these images."[72]

105. Respondents are also told to answer the questions "based on the screens that you reviewed."[73] This instruction places undue emphasis on the study stimuli and potentially conditions respondents to answer the questions in ways that they would not in the absence of such an instruction.

106. For these reasons, the Interpretation Study is subject to the same critiques as the Consumer Perceptions and Expectations Study as outlined above with respect to its use of a reading test format.

### Summary – Interpretation Study

107. The Interpretation Study is hampered by a number of material deficiencies and limitations, including:

- Failure to replicate the marketplace because of the use of lengthy forced exposures to Google's disclosures;

---

[70] Amir Report Appendices, p. F.2-18.

[71] Amir Report Appendices, p. F.2-17.

[72] Amir Report Appendices, p. F.2-17.

[73] Amir Report Appendices, pp. F.2-17, F.2-18.

- Use of survey instructions and questions unnaturally lead respondents to information and answers that are beneficial to Google;

- Oversimplification of the types of data that are collected by Google when a user searches the Internet in PBM; and

- Use of a biased reading test survey format which make the survey stimuli available to respondents during the administration of key study measures.

108. For these reasons, the Interpretation Study provides no valid or reliable evidence regarding the perceptions, expectations, beliefs, or behaviors of any reasonable Class Member with respect to Google's PBM data collection and storage practices. As such, the Interpretation Study provides no support for Professor Amir's stated opinions with respect to any Class Members.

**Likelihood of Use Study**

109. The Likelihood of Use Study was purportedly intended "to assess whether and to what extent modification of certain language on the Incognito Splash Screen and the 'Learn More' page that address Plaintiffs' criticisms of those documents…impacts users' likelihood of using Chrome in Incognito mode for private browsing."[74] In addition to the deficiencies and limitations identified above, the following sections discuss additional deficiencies and limitations of this study.

    *Flawed disclosure modifications*

110. The Likelihood of Use Study purported to measure the impact of alternate language presented to users when private browsing. Using a test vs. control design, one group of respondents saw a Chrome Incognito splash screen in its unaltered state, whereas a second group of respondents saw a Chrome Incognito splash screen with alternative language. The unaltered "Learn More" page and a modified alternative language version were also made available to these respective groups:[75]

---

[74] Amir Report, ¶ 13.

[75] Amir Report, ¶ 77.

| Actual Language Group | Alternative Language Group |
|---|---|
| • Actual Chrome Incognito Splash Screen<br>• *(If respondent clicked the "Learn more" hyperlink)* Actual "Learn More" page | • Alternative Chrome Incognito Splash Screen<br>• *(If respondent clicked the "Learn more" hyperlink)* Alternative "Learn More" page |

111. By comparing the self-reported anticipated usage behaviors of these two groups, the study claims to have measured the impact of the alternative language on respondents' "likelihood that they would use Chrome in Incognito mode to do online research."[76]

112. The Amir Report asserts that "these language modifications address Plaintiffs' allegations as to how the actual language in the Incognito Splash Screen allegedly is misleading."[77] However, the fundamental premise of this test—that the alternative language stimulus represents a proper disclosure to respondents—is flawed, dooming this exercise from the outset.

113. As shown below, just two minor modifications were made to the Incognito splash screen to arrive at the alternative language version: (1) alteration of the top disclosure statement; and (2) the addition of a bullet point:[78]

---

[76] Amir Report, p. 39.

[77] Amir Report, p. 38.

[78] Amir Report, p. 38.

Keegan & Donato Consulting, LLC                                          Page 37





114. Considering first the top disclosure statement, the unaltered Incognito splash screen used in the study reads:

> Now you can browse privately, **and** other people who use this device won't see your activity. [Emphasis added.]

115. The modified Incognito splash screen reads:

> Now you can browse privately, **which means** other people who use this device won't see your activity.[79] [Emphasis added.]

116. The second and final modification to the test Incognito screen was the addition of a seventh informational bullet point. The modified Incognito screen added a seventh bullet in the middle of the right-hand list titled "Your activity might still be visible to," that reads:

> • Companies that provide services to websites you visit (such as Google Analytics, Adobe Analytics, Google Ad Manager, Facebook Ads).[80]

117. This "further clarifying" language does no such thing. The Incognito page language "You've gone incognito" and "Now you can browse privately" and use of "disguise" iconography[81] communicates (as demonstrated by the Keegan Study, and as confirmed by Google's own internal documents[82]) a clear message of privacy to users that is alleged to be misaligned with the actual lack of privacy afforded. The meager additional language provided in the alternative language group stimulus does not appear to be sufficient to overcome the overall communication of tracking-free browsing that consumers are alleged to expect and, according to the Keegan Study and Google's own documents, do expect.

118. Additionally, the added bullet point appears under the innocuous heading of "Your activity might still be visible to." The extent to which, if at all, consumers are cognizant that "visible" actually means collected, stored and used by Google for purposes beyond simply providing

---

[79] Amir Report, p. 37.

[80] Amir p. 37.

[81] Third Amended Complaint, p. 14.

[82] See "Analysis of Google Internal Documents" section below; See also Exhibit 8.

services for websites that users visit in PMB cannot be determined from the Likelihood of Use Study.

119.   The Amir Report assumes, without any support, that the language added to the alternative language page solves all the Google disclosure issues to which the Plaintiffs object.[83] However, consumers' impressions of what this language communicates is never measured. What was measured was the "likelihood that [respondents] would use Chrome in Incognito mode to do online research on a sensitive topic on a scale of 1 (Unlikely) to 5 (Likely)."[84] The likelihood of use measurement tells the reader nothing about what the alternative language communicates or does not communicate.

120.   The Likelihood of Use Study could have measured what the alternative language communicated to respondents separate and apart from the unaltered language by asking, for example, about respondents' beliefs regarding Google's collection of their browsing activity. This was not done.

### *Failure to account for confounding variables*

121.   Additionally, using the indirect measurement of respondents' "likelihood of using" Chrome Incognito ignores a range of confounding variables which obfuscate the impact, if any, of the alternative language. Perhaps, for example, users in the alternative language group are alarmed to learn that their PBM browsing activity is visible to Google Analytics but would still use Incognito at the same rate because it is convenient. Other users might have negative feelings about Google collecting and saving their private browsing data but are required to continue using Chrome on a work or school computer or to access certain websites.[85]

---

[83] It is also notable that the language changes made by Professor Amir are inconsistent with proposed changes that Google's own employees considered in 2021 to address known user misconceptions regarding Chrome Incognito mode, as referenced in Exhibit 8. For example, in 2021 it was recommended internally that Google remove the language "Now you can browse privately" entirely from the Incognito Splash Screen, noting that "the word 'private'" poses "the risk of overestimating the protection Incognito offers" (GOOG-CABR-04746153 at -172).

[84] Amir Report, p. 39.

[85] Expert Report of Bruce Schneier, 4/15/2022, ¶¶ 169-171.

122. Indeed, countless potential scenarios could account for the consumer decision to continue using Chrome Incognito that are not based in privacy concerns.[86] What is not known from the Likelihood of Use Study design is *why* users are unlikely or likely to use Chrome Incognito and whether this has anything to do with the modest alternative language presented in the study. Nor does the Likelihood of Use Study provide any information about consumers' feelings, either positive or negative, about Google's PBM data collection and storage practices.

### Self-serving "Learn More" exposure

123. The Likelihood of Use Study also employs a methodological element which improperly weighs the survey findings in favor of Google. In the first two Amir Studies (Consumer Perceptions and Expectations Study and Interpretation Study), respondents were forced to view the "Learn More" page regardless of whether they would have chosen to do so on their own.[87] In the Likelihood of Use Study, however, respondents have the choice whether to click on the Learn More link and view additional information about Google's PBM data collection and storage practices. These methodological choices advantage a favorable outcome for Google across all three Amir Studies:

· In the first two studies, wherein the studies are designed to collect information about respondents' *knowledge* about Google's PBM data collection practices (improperly measured by a reading test), the methodologies require that respondents view the information on the Learn More page *because a more informed respondent yields a better result for Google on these measures.*

· In the Likelihood of Use Study, wherein the study is designed to collect information about whether respondents *will continue using* Chrome Incognito after being exposed to the actual or alternative language Incognito splash screens, the methodology makes exposure to the Learn More screen optional *because a less informed respondent yields a better result for Google on this measure.*

124. By employing a test vs. control design, the Likelihood of Use Study seeks to determine whether there is a difference in respondents' likelihood of using Chrome Incognito depending on the stimulus viewed (actual language vs. Likelihood of Use Study alternative language).

---

[86] As Professor Amir states in his report, "consumer preferences vary when it comes to internet browsers and browser features, and consumers' concerns about privacy vary depending on context." Amir Report, p. 21.

[87] Professor Amir's Likelihood of Use Study shows that very few respondents—2.4 percent—actually click the "Learn More" page when given the choice.

Because there are so few differences between the two splash screens, it is perhaps not surprising that there would be little difference between respondents' likelihood of continuing to use Chrome Incognito between the two groups.

125. Making the Learn More screens optional serves as a mechanism to limit the number of respondents that receive additional disclosure as to Google's data collection practices before indicating their likelihood of continuing to use Chrome Incognito. The data from the Likelihood of Use Study confirms this trend: of the 1,005 respondents who participated in the study, just 24—2.4 percent—clicked on the Learn More link, showing that this information was virtually unseen by respondents in the test or the control.[88] So while the study purports to expose test and control groups to varying levels of disclosures, the study design in effect creates conditions for the two groups that are largely identical, ensuring the reported results.

### *Summary – Likelihood of Use Study*

126. The Likelihood of Use Study is hampered by a number of material deficiencies and limitations, including:

- Failure to create a consumer disclosure that sufficiently or effectively communicates the level of Google data collection alleged in the Complaint, let alone address any of the storage and usage issues;

- Ignoring confounding variables and hence failing to generate reliable information regarding what, if anything, the alternative language communicates to respondents; and

- Presenting respondents with a self-serving optional exposure to the "Learn More" page—in contrast to forced exposure in the other two Amir Studies—which serves to limit the actual alternative disclosures seen by respondents and therefore weighs the results in favor of the Google by reducing any potential impact on the results.

127. For these reasons, the Likelihood of Use Study provides no valid or reliable evidence regarding the perceptions, expectations, beliefs, or behaviors of any reasonable Class Member with respect to Google's PBM data collection and storage practices. As such, the

---

[88] Likelihood of Use Study data file, 2203523.xlsx.

Likelihood of Use Study provides no support for Professor Amir's stated opinions with respect to any Class Members.

**Conclusions – Amir Report**

128. The three studies presented in the Amir Report are hampered by numerous methodological and analytical flaws, as described above.

129. The three studies presented in the Amir Report do not comprise reliable and valid evidence with respect to consumer beliefs or expectations regarding Google's data collection practices while in private browsing mode.

130. As such, any opinions and conclusions presented in the Amir Report that are based on the findings of the Amir Studies are unsupported.

# V.     The Keegan Study

**Summary of assignment**

131. In light of the material methodological and analytical limitations of the Amir Studies, I was asked to design and execute a methodologically sound rebuttal survey—responsive to the Amir Studies—to reliably measure consumer perceptions and expectations with regard to Google's PBM data collection and storage practices, specifically, the extent to which Google collects and saves the user's personal information when using PBM.

132. To this end, I designed and executed a nationally representative U.S. study of 1,052 users of PBM in the Internet browsers relevant to the allegations in this matter (Chrome, Safari, and/or Edge/Internet Explorer) during the Class Period. Qualifying respondents were asked a series of questions to determine the extent to which they understand (or misunderstand, according to the allegations) Google's practices with regard to collecting and saving user data during PBM sessions.

133. My study addressed and corrected many errors in the Amir Studies, including:

   a.  Correcting Professor Amir's browser selection error (where the Amir Studies concern Chrome, Safari, and Firefox, and Plaintiffs seek to represent users of Chrome, Safari, and Edge/Internet Explorer);

    b.   Correcting Professor Amir's time period selection error (where Amir selected six months and I used five years);

    c.   Correcting Professor Amir's problematic use of forced viewing time periods for study stimuli;

    d.   Correcting Professor Amir's problematic use of available study stimuli on the same pages as key study measures;

    e.   Correcting Professor Amir's presentation of materials that would not otherwise have been presented to users when starting private browsing;

    f.   Correcting Professor Amir's failure to ask any questions regarding Google saving information collected when users are in PBM;

    g.   Correcting Professor Amir's failure to ask any questions about whether people believed they had consented to Google's PBM data collection and storage practices;

    h.   Correcting Professor Amir's failure to ask any questions about whether people believed they had consented to Google's PBM data collection and storage practices when visiting non-Google websites; and

    i.   Correcting Professor Amir's failure to ask any questions about whether people believed they had consented to Google's PBM data collection and storage practices when visiting non-Google websites while not logged in to a Google account.

134. As discussed in detail below, unlike the Amir Studies, my study conforms to best practices of survey research, and accordingly, reflects far different results than the Amir Studies. All findings are presented with a reasonable degree of scientific certainty.

135. The methodology and results of my study are presented in detail in the sections that follow.

**Methodology**

### Study integrity

136. This study of 1,052 U.S. respondents was designed and executed in accordance with accepted standards of survey research. This survey follows the guiding principles for survey research for the purpose of litigation as outlined by Shari Diamond,[89] including but not limited to:

- Appropriate universe selection and sampling frame;

- Rigorous and valid survey design that is probative of the relevant issues in the matter;

- Inclusion of representative, qualified respondents;

- Use of procedures to minimize potential biases in data collection;

- Use of objective, non-leading questions;

- Use of procedures to reduce guessing among respondents; and

- Full analysis and reporting of survey data.

137. Additional treatises commonly referenced by researchers conducting survey research for litigation were also instrumental in the design of the current research.[90]

### Study objectives

138. The primary objective of this study was to design and execute valid and reliable survey evidence, responsive to the Amir Studies, on the issue of the perceptions and expectations of potential Class Members regarding Google's PBM data collection and storage practices, specifically, the extent to which Google collects and saves the user's personal information when using PBM.

---

[89] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 359-423.

[90] See, for example, McCarthy, J.T. (2020). *McCarthy on Trademarks and Unfair Competition, 5th Ed.;* Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys.*

139. The purpose of this study was to correct for the deficiencies and limitations of the Amir Studies and to thereby generate more valid and reliable evidence addressing the issues relevant to this matter.

### Study population

140. Surveys are conducted by collecting data from a sample, or subset, of the population of interest, i.e., the larger group to which the study results may be projected. This survey is intended to provide information relevant to the proportion of U.S. respondents who may be Class Members—i.e., the population of U.S. consumers who engage in Internet browsing and have used one or more of the relevant private browsing modes during the past five years and may meet the requirements to be included in the prospective Classes. This stands in contrast to the Amir Studies, which sampled only from those users who had engaged in private browsing within the last six months (after the lawsuit was filed).

141. Consistent with typical marketing research practice, only respondents aged 18 and older were permitted to participate in the study.[91] Respondents who met the study population definition were identified through the use of screening questions that qualified respondents on these criteria (see Questionnaire at Exhibit 3).

### Study design

142. Unlike the Amir Studies, which primed respondents through forced exposures to disclosures and measured their ability to read back information from those disclosures, this study was designed to gauge respondents' actual, non-conditioned understanding of Google's PBM data collection and storage practices.

143. After qualifying respondents through a screening module and exposing them to the PBM splash screen for their browser assignment (discussed below), the main portion of the study asked respondents questions pertaining to the following issues:

· Whether users believe that Google collects and saves Internet browsing activity when the user browses the Internet in PBM;

---

[91] Special procedures and precautions must be followed when interviewing minors (see ESOMAR Guideline on Interviewing Children and Young People, www.esomar.org). For this reason, it is typical to interview minors only when there is a specific reason to do so. There was no such reason here.

- Whether users believe they have given consent for Google to collect and save information about their Internet browsing activity when in PBM;

- Whether users believe they have given consent for Google to collect and save information about their Internet browsing activity when visiting a non-Google website when in PBM;

- Whether users believe they have given consent for Google to collect and save information about their Internet browsing activity when they are signed out of their Google account when in PBM; and

- Whether users believe that Google collects and saves various specific types of browsing data (discussed below) when in PBM.

144. The Class Period begins June 1, 2016. The past five-year period was used in my survey to simplify the presentation to respondents rather than asking them to recall whether the specifics of a casual event—Internet browsing—occurred five years ago or five years and ten months ago.

145. Consistent with standard marketing research practice, several demographic questions were also administered.

### Data collection

146. This survey was completed through online interviewing via the Internet. Online interviewing is the dominant data collection method used in marketing research today.[92] Data collection for this study took place in May 2022.

147. The respondent sample for this project was provided by the Dynata[93] consumer panel. Dynata is a leading provider of online sample for research projects in the U.S. and across the globe. Dynata maintains an actively managed online panel of millions of consumers. Membership in the panel is by invitation only, and Dynata employs and enforces a range of policies and procedures to ensure "panel health"—i.e., that the panel is nationally representative and that

---

[92] *Global Market Research 2021: An ESOMAR Industry Report*, p. 58-61.

[93] www.dynata.com.

respondents provide honest and accurate answers to questions. Additional panel health checks include participation limits, screening questions, digital fingerprinting, IP verification, anti-automation filtering, random and illogical responding, capturing and removing flatliners and speeders, among others. Dynata utilizes a "double opt-in" procedure in its recruitment process, which helps to verify the respondent's identity and ensure the panel is populated by quality participants.[94]

148. I have personally used Dynata as a sample provider for many consumer research studies, am familiar with its panel health procedures, and am satisfied that it provides high quality, representative respondents. The Dynata consumer panel constituted the sampling frame of the study.

149. The survey was programmed using Qualtrics, an industry-leading online survey software platform. All survey programming was performed by Keegan & Donato Consulting. The survey software facilitates the programming and execution of advanced survey designs, custom coding, complex skip logic, and advanced rotation and randomization of questions, answer options, and stimuli. All such options were employed wherever appropriate.

### Sampling

150. Surveys typically, and in this case, are designed such that the results are reliable at the 95 percent confidence level. A total of 1,052 respondents qualified for and completed the questionnaire (see full disposition of contacts at Exhibit 7). Samples of this size are associated with a maximum margin of error of ±3.0 percentage points at 95 percent confidence.[95]

### Bias management

151. All efforts were made to present the survey questions in an objective, unbiased, and non-leading format. Respondents were presented with a "don't know," "no opinion," or equivalent

---

[94] *Dynata Panel Book*. Available at www.dynata.com/panel-book-form.

[95] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." See Diamond, S. (2011). "Reference Guide On Survey Research," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 381.

answer option wherever appropriate throughout the survey to minimize guessing or forcing respondents to select an answer where they may not have a strong opinion.

152. It is common in consumer survey research for the researcher to employ various types of randomization of questions and answer options across respondents. Randomization is an important tool that researchers use to minimize the potential for order bias (i.e., order effects) to impact the study's results. Order bias refers to a respondent's tendency to select the first answer in a given list of answer options regardless of the question content[96] or answer the first question in a series of questions differently than later questions.[97] In this study, randomization was used wherever possible to minimize the potential for order bias.

153. To ensure the integrity of the data, I sought to identify "speeders" for potential removal from the sample. Respondents who complete a survey too quickly may introduce respondent-related error into the survey data. Respondents were to be flagged if they completed the survey in less than one-third of the median completion time across all respondents in the sample. One respondent was removed from the sample based on this criterion (provided at Exhibit 5).

154. Consistent with standard survey methodologies and practices, the screening portion of the questionnaire also employed security questions, including a CAPTCHA question to prevent bots and other automated respondents from participating in the study. Respondents who did not pass the security measures were not permitted to complete the survey.

155. The study was conducted under "double blind" conditions—neither the panel provider nor the survey participants knew the purpose of the study or the sponsoring party. Double blind

---

[96] Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240.

[97] See Diamond, S. (2011). "Reference Guide On Survey Research," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 396: "To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level."

research is designed to prevent external or circumstantial bias from impacting the survey process and results.

### *Questionnaire*

156. The survey questionnaire consisted of two parts: a screening portion, which confirmed that respondents met the qualification criteria for participation in the study; and the main questionnaire, which administered the key measures of interest. The language and mechanics of the screener and main questionnaire are provided in summary below; screenshots of the questionnaire as it was viewed by respondents are provided at Exhibit 3.

157. The screener opened with a standard survey research statement that conveyed relevant information about duration, privacy issues, etc., and instructed respondents not to guess if they did not know the answer to a question but, instead, to use the "Don't know" option that was provided when appropriate. Only respondents who indicated that they understood the instructions were allowed to continue with the survey.

158. The next question asked respondents to provide their age. Only respondents aged 18 and older were permitted to continue with the survey:

> Which of the following age brackets contains your age on your last birthday?
> m Under 18
> m 18 - 30
> m 31 - 40
> m 41 - 50
> m 51 - 60
> m 61 - 70
> m 71 or older

159. On the next screen, respondents were asked to indicate the state in which they reside. This question was for demographic information purposes only and was not used to filter out any respondents:

> In which U.S. state do you currently reside?



160. Respondents were next asked to indicate their gender. This question was for demographic information purposes only and was not used to filter out any respondents:

> **What is your gender?**
> m Male
> m Female
> m Prefer to self-identify: _____
> m Prefer not to answer

161. The next screening question was a CAPTCHA-type security measure; it was included to confirm that respondents were devoting appropriate attention to their responses and to prevent bots and other automated respondents from participating in the study. Only respondents who answered the question correctly were permitted to continue with the survey.

162. Respondents were next asked about the types of Internet browsers they have used during the last five years:

> Which of the following Internet web browsers, if any, have you used in the <u>last five years</u>? Please select all that apply.
> ○ Safari
> ○ Chrome
> ○ Edge / Internet Explorer
> ○ Other
> ○ Don't know

163. Because Plaintiffs seek to represent users of private browsing mode in Chrome, Safari, and Edge/Internet Explorer, only respondents who indicated that they had used one or more of those browsers during the Class Period were permitted to continue with the survey. All other respondents were terminated.

164. Respondents were next asked about their use of private browsing mode in each of the relevant browsers (i.e., Chrome, Safari, and Edge/Internet Explorer). This question employed dynamic piping: respondents were only asked about their private browsing behaviors for the browsers they indicated they had used in the previous question. Respondents were asked:

> Some Internet web browsers offer a private browsing mode. Which of the
> following types of private browsing, if any, have you used in the last five years?
> Please select all that apply.
>
> ○ Private browsing mode in Chrome ("Incognito")
>
> ○ Private browsing mode in Edge / Internet Explorer ("InPrivate")
>
> ○ Private browsing mode in Safari ("Private Browsing Mode")
>
> ○ None of these

165.  Again, because Plaintiffs seek to represent users of private browsing mode in Chrome, Safari,
      and Edge/Internet Explorer, only respondents who indicated that they had used private
      browsing mode in one or more of those browsers during the Class Period were permitted to
      continue with the survey. All other respondents were terminated.

166.  Respondents who indicated that they had used private browsing mode in Chrome, Safari,
      and/or Edge/Internet Explorer during the last five years were confirmed to be potential Class
      Members and deemed qualified to participate in the study. These respondents advanced to the
      main portion of the questionnaire.

167.  The main portion of the questionnaire began with the following instruction intended to reduce
      guessing among respondents:

> For the remainder of this survey, if you do not know or do not have an opinion
> about any of the questions, please select the "don't know / no opinion" answer
> option. Please do not guess at any of your answers and please do not use the
> Internet or any other sources to inform your answers.

168.  Respondents were next exposed to one PBM splash screen for Chrome, Safari, <u>or</u>
      Edge/Internet explorer. For this study, I used the same (unmodified) Chrome Incognito splash
      screen that was used in the Amir Studies. It is my understanding that this version of the
      Chrome splash screen was in use for the majority of the Class Period. I also used the same
      Safari splash screen that was used in the Amir Studies. Because the Amir Studies did not
      address any issue related to Edge/Internet Explorer, there was no Edge splash screen stimulus
      in Professor Amir's production. I therefore used a current[98] and unmodified Edge splash
      screen image.

---

[98] Accessed 4/28/2022.

169. Assignment to the study stimulus was determined as follows: any respondent who indicated using Chrome (singularly or in combination with Safari and/or Edge/Internet Explorer) saw the Chrome splash screen; any respondent who indicated using only Safari saw the Safari splash screen; any respondent who indicated using only Edge/Internet Explorer saw the Edge splash screen; and any respondent who indicated using both Safari and Edge/Internet Explorer (but not Chrome) were randomly assigned to see either the Safari or the Edge/Internet Explorer splash screen. Respondents were provided with an instruction to view the stimulus as they would when opening a new PBM window[99] (Chrome stimulus presentation used here for demonstration purposes; All study stimuli available at Exhibit 3):

Shown below is the screen that displays when a new Chrome Incognito window is opened. Please review it as you normally would when opening a new Chrome Incognito window. You can view the image for as long as you would like. You may click on the image for an enlarged view.



---

[99] It is my understanding that this version of the Chrome splash screen was in use for the majority of the Class Period.

170. To accurately replicate the ways in which users interact with the PBM splash screen when starting a new private browsing session, respondents were not required to view the splash screen for any specific amount of time. Respondents were instructed to click the "Next" button at the bottom of the page when they were ready to continue.

171. The next sequence of questions constitutes the key measures of interest of the study. These questions were designed to measure the proportion of the sample that believes they have consented to Google's PBM data collection and storage practices (without addressing the issue of Google's use of this data). Respondents were first asked:

> Please think of the time(s) that you have used private browsing mode to browse the Internet in the <u>last five years</u>.
>
> Which of the following best reflects your understanding:
>
> m Google **collects and saves** my Internet browsing activity when I browse the Internet in private browsing mode
>
> m Google **does not collect and save** my Internet browsing activity when I browse the Internet in private browsing mode
>
> m Don't know / No opinion

172. Respondents who indicated a belief that Google "does not collect and save" Internet browsing activity when users browse the Internet in private browsing mode were considered misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint and skipped to the data integrity question (discussed below). Respondents who indicated a belief that Google "collects and saves" Internet browsing activity when users browse the Internet in private browsing mode or selected the "don't know" option advanced to the next question.

173. The next question was designed to measure the extent to which remaining respondents believed they had provided Google with consent to collect information about their Internet browsing activity when in PBM. Respondents were asked:

> Please think of the time(s) that you have used private browsing mode to browse the Internet in the last five years.
>
> Which of the following best reflects your beliefs about the level of consent that you provide Google to collect information about your Internet browsing activity when in private browsing mode?
>
> m I believe that when I am in private browsing mode, **I have given consent** for Google to collect and save information about my Internet browsing activity
>
> m I believe that when I am in private browsing mode, **I have not given consent** for Google to collect and save information about my Internet browsing activity
>
> m Don't know / No opinion

174. Respondents who indicated a belief that they "have not given consent" for Google to collect and save information about their Internet browsing activity when in PBM were considered misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint and skipped to the data integrity question. Respondents who indicated a belief that they "have given consent" for Google to collect and save information about their Internet browsing activity when in PBM or selected the "don't know" option advanced to the next question.

175. The next question was designed to collect information about the circumstances under which remaining respondents believed they had provided Google with consent to collect and save information about their Internet browsing activity when in PBM. Respondents were asked:

> Which of the following best reflects your opinion?
>
> I believe that when I am in private browsing mode, I have given consent for Google to collect and save information about my Internet browsing activity (please select all that apply):
>
> o When I am visiting a **Google website**
>
> o When I am visiting a **non-Google website**
>
> o Don't know

176. Respondents who indicated a belief that they had given consent for Google to collect and save information about their Internet browsing activity when in PBM *only* when visiting a Google website were considered misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint and skipped to the data integrity question. Respondents who indicated a belief that they had given consent for Google to collect and save information about their Internet browsing activity when in PBM when

visiting a non-Google website or selected the "don't know" option advanced to the next question.

177. Remaining respondents were next asked a question to determine whether they had a Google account during the Class Period. Respondents were asked:

> If you know, which of the following types of accounts have you had at any time during the <u>last five years</u>? Please select all that apply.
>
> ○ Google account (e.g., Gmail, Google Docs, Google Drive, Google Photos)
>
> ○ Microsoft account (e.g., OneDrive, Microsoft Teams, OneNote)
>
> ○ Apple account (e.g., iCloud, Apple Pay, Apple Music)
>
> ○ None of these

178. Respondents who indicated that they had a Google account during the Class Period were asked a question to determine their beliefs regarding whether they had given Google consent to collect and save information about their Internet browsing activity when in PBM and signed out of their Google account. Respondents were asked:

> Which of the following best reflects your opinion?
>
> I believe that when I am in private browsing mode, I have given consent for Google to collect and save information about my Internet browsing activity (please select all that apply):
>
> ○ When I am **signed in** to my Google account
>
> ○ When I am **signed out** of my Google account
>
> ○ Don't know

179. Respondents who indicated a belief that they had given consent for Google to collect and save information about their Internet browsing activity when in PBM *only* when signed in to their Google account were considered misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint and skipped to the data integrity question. Respondents who indicated a belief that they had given consent for Google to collect and save information about their Internet browsing activity when in PBM when signed out of their Google account or selected the "don't know" option advanced to the next question.

180. The final question in the sequence of key measures was designed to collect beliefs of remaining respondents with respect to the types of information they believe Google collects about their Internet browsing behavior when in PBM. Respondents were asked:

Please think of the time(s) that you have used private browsing mode to browse the Internet in the <u>last five years</u>.

Would you or would you not expect Google to collect and save each of the following types of information about your Internet browsing behavior during your private browsing mode session?

|  | **Yes**, Google would collect and save | **No**, Google would not collect and save | Don't know |
|---|:---:|:---:|:---:|
| URL information | ○ | ○ | ○ |
| HTTP information | ○ | ○ | ○ |
| Cookies | ○ | ○ | ○ |
| Your browsing activity | ○ | ○ | ○ |
| Your IP address | ○ | ○ | ○ |
| Your user agent | ○ | ○ | ○ |
| Your geolocation | ○ | ○ | ○ |
| Your unique user ID | ○ | ○ | ○ |

181. All respondents were next required to answer a data integrity question (i.e., attention filter) designed to ensure that they were taking the questionnaire seriously and devoting sufficient attention to reading and understanding the questionnaire. Respondents were asked:

> Please select "Green" from the list below.
> ɱ Red
> ɱ Green
> ɱ Blue
> ɱ Yellow

182. Only respondents who selected "Green" were permitted to continue with the survey. All other respondents were terminated.

183. The main questionnaire concluded with additional standard demographic questions regarding education and household income. The full questionnaire is provided at Exhibit 3.

**Sample characteristics**

184. The sample for this study is nationally representative, providing a robust, projectable overview of the perceptions and expectations of prospective Class Members. Demographic characteristics for the study participants are shown in Table 5 below.

*Table 5. Sample characteristics - demographics*

|  | % Respondents (n=1,052) |
|---|---|
| **Age** |  |
| 18 - 30 | 18.4 |
| 31 - 40 | 22.6 |
| 41 - 50 | 20.0 |
| 51 - 60 | 13.2 |
| 61 - 70 | 15.1 |
| 71 or older | 10.6 |
| **Education** |  |
| Less than high school | 2.2 |
| High school graduate | 21.9 |
| Some college | 22.6 |
| 2-year degree | 12.3 |
| 4-year degree | 26.2 |
| Master's / Professional degree | 12.6 |
| Doctorate | 2.2 |
| **Household income** |  |
| Under $35,000 | 23.7 |
| $35,000 - $49,999 | 17.3 |
| $50,000 - $74,999 | 18.3 |
| $75,000 - $99,999 | 15.7 |
| $100,000 - $124,999 | 9.3 |
| $125,000 - $149,999 | 6.3 |
| $150,000 or more | 7.6 |
| I prefer not to answer | 1.8 |
| **Region** |  |
| Northeast | 20.1 |
| South | 40.1 |
| Midwest | 20.1 |
| West | 19.8 |
| **Gender** |  |
| Male | 50.0 |
| Female | 49.9 |
| Prefer to self-identify | 0.1 |
| Prefer not to answer | 0.0 |

**Findings**

185. The findings of this study provide empirical evidence that nearly all potential Class Members—93.1 percent—are misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint.[100] In contrast, fewer than one-in-ten

---

[100] Google asserts that "Numerous third-party articles have explained that Google receives the at-issue data while users are in Incognito mode." (see Defendant's Supplemental Objections and Responses to Plaintiffs' Interrogatories Set 9 (Nos. 40), p. 11). A review of these articles shows that they were all published prior to

respondents—6.9 percent—provided responses indicating that they believed they understood and consented to Google's PBM data collection and storage practices (or do not know), without addressing how Google uses PBM data. Table 6 below provides a summary of the key study findings.

*Table 6. Consumer understanding of Google PBM data collection and storage practices*

| Base: All respondents (n=1,052) | % Respondents |
|---|---|
| **Misinformed about Google PBM data collection and storage practices** | |
| Google does not collect and save my Internet browsing activity in private browsing mode | 54.8 |
| I have not given consent to Google to collect and save my Internet browsing activity when I browse the Internet in PBM | 20.2 |
| I have given consent to Google to collect and save my Internet browsing activity in PBM only when visiting a Google website | 11.8 |
| I have given consent to Google to collect and save my Internet browsing activity in PBM only when signed in to my Google account | 3.6 |
| Indicated a belief that Google would not collect and save at least one type of data displayed in the matrix table | 2.8 |
| **Total misinformed about Google PBM data collection and storage practices** | **93.1** |
| ***Informed or don't know*** | **6.9** |
| ***Total*** | **100.0** |

186.  As shown in Table 6, over half of PBM users—54.8 percent—indicated a belief that Google does not collect and save their Internet browsing activity at all when browsing in PBM, before even asking about visiting non-Google websites while not signed in to any Google account.

187.  Additionally, of the entire sample, one-in-five respondents—20.2 percent—indicated a belief that they have not given consent to Google to collect and save their Internet browsing activity when they browse the Internet in PBM. An additional 11.8 percent of respondents believed that they had given consent to Google to collect their Internet browsing activity when using PBM only when visiting a Google website, and 3.6 percent believed that they had given

---

the start of the Keegan Study, therefore all information contained in those articles are accounted for in my results.

consent to Google to collect their Internet browsing activity when using PBM only when
signed in to their Google account.

188. An additional 2.8 percent of respondents were misinformed about the types of personal
information that Google collects when users browse in PBM.

189. In total, 93.1 percent of the sample were misinformed about Google's PBM data collection
and storage practices based on the allegations in the Complaint.

190. Overall, just 6.9 percent of study respondents provided answers indicating they believed they
had consented to Google's PBM data collection and storage practices or consistently
demonstrated an awareness of what Google's PBM data collection and storage practices are
(as alleged in the Complaint) or didn't know across all measures.

191. This study provides empirical evidence that Class Members are not aware of or do not believe
they have consented to Google's PBM data collection and storage practices.

192. Because the study accurately replicated the marketplace conditions under which typical PBM
users encounter the Chrome, Safari, and Edge/Internet Explorer splash pages and employed
objective, non-leading questions, the study data provides a reliable basis for projection to the
larger universe of Class Members.

## VI.    Analysis of Google Internal Documents

193. Another indicator that the Amir Studies do not yield any valid or reliable evidence on the
issues that are relevant to this case is the fact that the findings of the Amir Studies and
opinions in the Amir Report do not align with—and, in fact, stand in contrast to—a body of
research and other evidence produced by Google in this matter, which provides further
evidence in support of the existence of common misconceptions about Google's PBM data
collection and storage practices.

194. For example, a Google study of ▮▮▮▮ Incognito and other PBM users showed that consumers
largely overestimate the privacy protections offered by Chrome Incognito with what Google
characterized as "common misconceptions":

Participants overestimate private mode protections. There are several common misconceptions about private mode, including that it prevents all external parties from accessing user data and search history…protects against tracking and ad targeting, gives anonymity, obscures location, hides browsing activity from Google.[101]

195. This Google study also contains the following word map of concepts often cited by participants when asked their opinions about what the terms "Incognito" and "Private Browsing" communicate:[102]

 

196. As shown above, the concepts most often cited by respondents (large, bold lettering) center on issues related to anonymity and a lack of data collection, tracking, etc. This shows that users have an expectation of privacy and of not being tracked when engaging in private browsing, which is consistent with my findings.

197. Google's research also shows that "most users are not aware of session-based tracking"[103] and that a "majority of users expect no session-based tracking."[104] Users also expressed that they didn't want Google to collect data in Incognito, especially data tied to their identity.[105]

---

[101] GOOG-BRWN-00042403.

[102] GOOG-BRWN-00042412.

[103] GOOG-BRWN-00042404.

[104] GOOG-BRWN-00042404.

[105] GOOG-BRWN-00042408.

Google's research notes that "Given that participants overestimate private browsing mode protections, participants are surprised and feel misled when made aware of private mode vulnerabilities."[106]

198. These Google documents recognize a lack of awareness among PBM users extends both to use of Incognito even when logged in to a Google account. One Google study showed that █ █ of Incognito users believed that Google would not remember their browsing history even if they use Incognito when logged in to Gmail or another Google account.[107] Based on this, the study concluded that most Chrome users do not understand what is and is not saved when logging into an account in Incognito, even when they are experienced at using it."[108]

199. Google's documents also demonstrate an awareness from internal research that Google's disclosures are often disregarded or outright ignored by users. Noting that "participants often click through or ignore disclosures,"[109] Google's research shows that "most users don't properly read disclosure text yet in-context reminders about misconceptions can be confusing and misleading."[110]

200. Additionally, the Chrome Incognito splash screen, with its disguised Incognito icon, is a powerful signal that communicates a sense of privacy and anonymity to users. Google's research confirms that this is misleading:

> …Many users are confused about the privacy properties of Incognito, tying our icon and the name 'Incognito' to feelings of 'stealth' or being 'in hiding.' But Incognito (and private browsing mode broadly) only prevents users from saving information on their device. Private browsing does not make users invisible to external services, such as the accounts they log into.[111]

201. A wealth of internal Google communications and additional studies, summarized in Exhibit 8 to this report, support the Google research findings presented here. For example, one Google

---

[106] GOOG-BRWN-00042409.

[107] GOOG-BRWN-00042350.

[108] GOOG-BRWN-00042350.

[109] GOOG-BRWN-00042409.

[110] GOOG-BRWN-00042418.

[111] GOOG-BRWN-00042340.

employee noted that "The spy imagery is absolutely NOT what we want to keep portraying. It's unfortunate that we already have it. Incognito does NOT support the kinds of guarantees that people imagine for a 'spy mode.'"[112] Another communication stated, "Users have misconceptions about Incognito and often overestimate the protections available."[113]

202. The range of relevant information outlined herein was available to Professor Amir as well, and yet the Amir Studies did not directly test concepts related to Class Members' beliefs and expectations regarding Google's PBM data collection and storage practices. Rather, the Amir Studies adopted a tangential approach focused on (a) ill-defined "entities" and oversimplified types of information that might be "received" when users engage in private browsing, and (b) irrelevant likelihood of use measures. The Amir Studies' heavy focus on forced exposure to Google and other private browsing disclosures obscures the relevant research issue in this matter—i.e., the perceptions and expectations of potential Class Members regarding Google's PBM data collection and storage practices, and specifically, the extent to which Google collects and saves the user's personal information when using PBM.

203. As described herein, the Keegan Study addressed this issue directly and showed that, consistent with Google's internal research, nearly all Class Members are misinformed about Google's PBM data collection and storage practices based on the allegations in the Complaint.

## VII.  Conclusions

204. As described in detail throughout this report, none of the three Amir Studies provide valid or reliable evidence regarding the perceptions, expectations, beliefs, or behaviors of any reasonable Class Member with respect to Google's PBM data collection and storage practices. As such, the Amir Studies provide no valid or reliable support for Professor Amir's stated opinions with respect to any Class Members.

205. The Keegan Study, which was designed to correct many of the deficiencies and limitations of the Amir Studies, provides empirical evidence that a reasonable member of either of the two Classes would be and the vast majority of all Class Members are misinformed about the

---

[112] GOOG-BRWN-00812091.

[113] GOOG-CABR-04668451.

Google PBM data collection and storage practices alleged in the Complaint and at issue in this lawsuit.

I reserve the right to supplement and revise this report and the opinions expressed herein based on the availability of new information.


_____

Mark Keegan

May 20, 2022 _____

Date

**Exhibit 1—Mark Keegan C.V.**



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

**Mark T. Keegan, Esq.**

**Partner, Keegan & Donato Consulting, LLC**

**Education**

§  Principles of Market Research Program, University of Georgia (graduated 2021)

- Post-graduate program for industry professionals covering all aspects of the market research process

- Coursework based on the Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process developed by Market Research Institute International (MRII)

- Certification conferred upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research

- Endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association

§  Professional Certified Marketer (PCM), American Marketing Association (2015 – present)

- AMA certification for individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles

- Designation conferred only upon successful completion of rigorous testing spanning full range of marketing principles and concepts

- Ongoing professional development and education credits required on annual basis

- PCM recipients must have demonstrated professional experience in the field of marketing

§  Juris Doctor, Brooklyn Law School (graduated 1995)

§  Bachelor of Arts, History, Pace University (graduated 1990)

§  MBA Coursework, Pace University, Lubin School of Business (1990 – 1991)

§  Corporate Finance Program, Harvard University (coursework)

**Professional Memberships**

§   Admitted to the Bar in the states of New York and Connecticut

§   Member, ESOMAR (World Association of Opinion and Marketing Research Professionals)

§   Member, International Trademark Association (INTA)

§   Member, American Marketing Association (AMA)

§   Member, American Association for Public Opinion Research (AAPOR)

§   Member, Association for Consumer Research (ACR)

§   Registered Representative, National Association of Securities Dealers (Series 7, expired)

**Current Employment**

§   Keegan & Donato Consulting, LLC, Litigation Consultant, Founding Partner (7/2011 – present)

**Consumer Research Experience**

§   Designed and executed over 1,000 consumer research studies reaching more than 250,000 respondents for corporate and litigation clients over the course of two-decade career

§   Focus on trademark and marketing research with principal areas of study including consumer confusion, trade dress, dilution, secondary meaning, genericness, false advertising, consumer perception, consumer understanding, and other consumer research issues

§   Represented a mix of both plaintiffs and defendants in litigation matters spanning a broad range of products, services, and industries

§   Submitted survey research expert reports in relevant venues including federal courts, state courts, at arbitration, to the National Advertising Division of the Council of Better Business Bureaus, and to the Trademark Trial and Appeal Board

§   Founder and owner of two successful marketing and consumer research consulting firms

§   Regularly testify to consumer behavior research, findings, and related issues at trials, depositions, hearings, and other proceedings

KEEGAN_EXHIBITS_3

§   Qualified to testify as an expert in the field of consumer survey research at federal court trials:

- *BuzzBallz, LLC v. Jem Beverage Co.*, U.S. District Court (Central District of California), the Honorable William D. Keller presiding

- *Christopher Lewert v. Boiron, Inc.*, U.S. District Court (Central District of California), the Honorable André Birotte, Jr. presiding

- *Coty Inc., et al. v. Excell Brands LLC*, U.S. District Court (Southern District of New York), the Honorable Jesse M. Furman presiding

- *Bodum U.S.A., Inc. v. A Top New Casting, Inc.*, U.S. District Court, Northern District of Illinois, the Honorable Matthew F. Kennelly presiding

§   Qualified as a survey expert by numerous federal court judges (pre-trial)

§   Develop and execute consumer research studies using industry-accepted methodologies, cutting-edge technologies, and industry-leading consumer panel partners

**Marketing and Other Relevant Experience**

§   Served as a marketing consultant to private clients and have advised on a wide range of issues including product development and rollout, advertising, consumer feedback and intelligence, the product life-cycle, and other issues concerning marketing and marketing research

§   Formulated winning brand positioning strategies as a branding expert for some of the best-known consumer brands and services including General Electric (GE), Nike, Pepsi, Subaru, AOL, Excite, NBC, and others

§   Analyzed and evaluated comprehensive marketing campaigns for a broad range of corporate clients to determine their impact on consumers

§   Evaluated all components of integrated marketing communications including advertising, public relations, packaging, sales promotions, and point of sale materials, among others

§   Developed testimony on marketing messages and their intended influence on consumer understanding and behavior

KEEGAN_EXHIBITS_4

**Previous Employment**

§   Keegan & Company LLC, Founding Partner (9/2001 – 12/2015)

Designed and executed consumer research studies, conducted complex litigation consulting, and developed marketing and economic analyses for clients across a range of industries

§   Information Markets Corp, Program Manager (2000 – 2001)

Managed enterprise-wide marketing and product development. Developed use cases and conducted consumer market research. Coordinated with multiple partners including AOL, Excite, and NBC.

§   Affiliation Networks, Inc., Project Manager (1999 – 2000)

Produced online advertising solutions for Fortune 500 clients. Coordinated creative team of account managers, designers, programmers and copywriters.

§   UpTick Technologies, Marketing Consultant (1999)

Managed the creation of innovative marketing products for large brokerage software provider

§   Cosmos Internet Solutions, Marketing Consultant (1998 – 1999)

Developed marketing strategy for business ISP and hosting provider as well as Web site marketing and development for clients

§   FactSet Research Systems, Product Development (1996 – 1998)

Formulated product and communications strategies for leading integrated financial and economic database provider

§   Warren Keegan Associates, Inc., Marketing Consultant (1992 – 1996)

Marketing consultant to clients across a range of industries. Edited and contributed content to marketing textbooks and other academic marketing publications.

§   BMW of North America, Inc., Graduate Appointment (1991)

Reviewed, analyzed, and cataloged broad-based market research on consumer preferences and attitudes in the automobile industry

KEEGAN_EXHIBITS_5

**Submitted Surveys Excluded by Courts**[*]

§   *Kudos, Inc. v. Kudoboard, LLC, et al.* (2021). This Squirt-style survey was designed
    to test for a likelihood of confusion between two competing brands of employee
    recognition software among users and likely purchasers of this type of software. The
    Court disagreed with the survey universe, opining that a narrower population
    definition should have been employed. A rebuttal report that I submitted in this matter
    was accepted by the Court.

§   *The Episcopal Church, et al. v. The Right Reverend Mark J. Lawrence, et al.* (2019).
    In this Teflon-style survey, I interviewed Episcopalians regarding the potential
    genericness of the mark THE EPISCOPAL CHURCH. The Court disagreed with the
    survey universe, opining that the population definition should have included non-
    Episcopalians.

§   *Warner Brothers Entertainment, Inc., et al. v. The Global Asylum, Inc.* (2012). A
    deficiency in the pleadings (the client's failure to submit my resume among other
    credentials) led to the court excluding this survey at a preliminary injunction hearing.
    I did not testify in this matter.

**Lectures, Presentations & Publications**

§   *Squirt vs. Eveready: Battle of the Titans*, 9th Annual Intellectual Property Law
    Symposium, hosted by The Florida Bar Continuing Legal Education Committee and
    Business Law Section, April 12-13, 2018. CLE-accredited presentation.

§   *Panel Power: Online Panel Sampling for Litigation Surveys*, 8th Annual Intellectual
    Property Law Symposium, hosted by The Florida Bar Continuing Legal Education
    Committee and Business Law Section, March 30-31, 2017. CLE-accredited
    presentation.

§   *Evaluating a Brand's Equity in a Nascent Market*, ESOMAR World Research, The
    EUREKA's Project - Success Stories of Market Research, 2016.

§   *Consumer Survey Research for Litigation: With Great Data Comes Great Power.*
    Presentation before the Pennsylvania Bar Association, Intellectual Property Law
    Group, 12/8/2014.

---

[*] Lifetime. Court opinions available upon request.

KEEGAN_EXHIBITS_6

**Continuing Education**

§   *Online Sample Fraud: Causes, Costs & Cures*, Insights Association Webinar, 2/11/2022.

§   *Quantifying Unjust Enrichment*, Fox Forensic Accounting, 10/6/2021.

§   *Questionnaire Design Best Practices*, ESOMAR/University of Georgia Webinar, 5/19/2021.

§   *Making Online Samples More Representative*, ESOMAR Webinar, 3/17/2021.

§   *Intelligence 360: Solicited + Unsolicited Customer Opinion*, ESOMAR Webinar, 2/17/2021.

§   *The Future of Online Polling After 2020*, ESOMAR Webinar, 12/16/2020.

§   *The Opportunity for UX Research*, ESOMAR/University of Georgia Webinar, 12/8/2020.

§   *BigSurv20: Big Data Meets Survey Science*, Online Conference, November/December 2020.

§   *International Trademark Association (INTA), 141st Annual Meeting (2019)*, Attendee, May 2019.

**Contact Information**

Keegan & Donato Consulting, LLC
31 Purchase Street, Ste. 3-4
Rye, NY 10580
(914) 967-9421
mark@keegandonato.com



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Mark Keegan Testimony List (Past Four Years)

### Depositions

| Case Caption | Court | Client |
|---|---|---|
| BillFloat Inc., d/b/a SmartBiz Loans v. Collins Cash Inc., d/b/a Smart Business Funding, et at. | United States District Court, Northern District of California | Defendants |
| Kenco Bucket Trucks LLC v. Versabucket LLC, et al. | District Court, Harris County, Texas, 113th Judicial District | Defendants |
| EBIN New York, Inc. v. SIC Enterprise, Inc., et al. | United States District Court, Eastern District of New York | Plaintiff |
| Kudos, Inc. v. Kudoboard, LLC, et al. | United States District Court, Northern District of California | Plaintiff |
| Master Inspector Certification Board, Inc. v. Examination Board of Professional Home Inspectors, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Solid 21 Inc. v. Richemont North America, Inc. et al. | United States District Court, Southern District of New York | Defendants |
| Watching Time, LLC v. International Watchman, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Diamond Resorts U.S. Collection Development, LLC, et al. v. Newton Group Transfers, LLC, et al. | United States District Court, Southern District of Florida, West Palm Beach Division | Defendants |
| Fair Isaac Corporation v. Fido Alliance, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Defendant (Applicant) |
| Solid 21, Inc. v. Breitling U.S.A. Inc., et al. | United States District Court, District of Connecticut | Defendants |
| Juul Labs, Inc. v. Eonsmoke, LLC d/b/a 4X PODS, et al. | United States District Court, District of New Jersey | Defendants |
| Restoration Hardware, Inc., et al., v. Bungalow Home, LLC | United States District Court, Southern District of Ohio, Western Division | Plaintiffs |

KEEGAN_EXHIBITS_8



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court | Client |
|---|---|---|
| United States of America ex. rel., Yoash Gohil v. Sanofi U.S. Services Inc., et al. | U.S. District Court, Eastern District of Pennsylvania | Defendants |
| Alo, LLC v. Acadia Malibu, Inc., d/b/a Alo House Recovery Centers, et al. | U.S. District Court, Central District of California | Plaintiff |
| Farjad Fani, et al. v. Shartsis Friese LLP, et al. | JAMS Arbitration, JAMS Reference No. 1100104777 | Claimants |
| Solid 21, Inc. v. Ulysse Nardin USA Inc., et al. | U.S. District Court, Southern District of Florida | Defendants |
| The Shoppes at River Station, LLC v. College Park Retail Investors, LLC | Superior Court of Fulton County, State of Georgia | Plaintiff |
| Spartan Chemical Company, Inc. v. Ecolab, Inc. | U.S. District Court, Northern District of Ohio, Western Division | Plaintiff |
| Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc. | U.S. District Court, Central District of California, Southern Division | Defendant |
| The Episcopal Church, et al. v. The Right Reverend Mark J. Lawrence, et al. | U.S. District Court, District of South Carolina, Charleston Division | Plaintiffs |
| Spangler Candy Company v. Tootsie Roll Industries, LLC | U.S. District Court, Northern District of Ohio, Western Division - Toledo | Plaintiff |
| FCOA LLC v. Foremost Title & Escrow Services, LLC | U.S. District Court, Southern District of Florida | Defendant |
| Dentsply International Inc. v. Dental Brands for Less LLC d/b/a Dental Wholesale Direct | U.S. District Court, Southern District of New York | Plaintiff |
| eMove, Inc. and u-Haul International, Inc. v. Hire A Helper, LLC, et al. | U.S. District Court, Southern District of California | Defendants |
| J-B Weld Company, LLC v. The Gorilla Glue Company | U.S. District Court, Northern District of Georgia | Defendant |
| Gulfstream Aerospace Corp. v. Gulfstream Unsinkable Boats, LLC | U.S.P.T.O. Trademark Trial and Appeal Board | Defendant |
| Lokai Holdings, LLC v. Twin Tiger USA LLC | U.S. District Court, Southern District of New York | Plaintiff |
| Michael Kors, LLC v. Chunma, USA, Inc., et al. | U.S. District Court, Central District of California | Defendant |

KEEGAN_EXHIBITS_9



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court | Client |
|---|---|---|
| Mars, Inc. et al. v. The J.M. Smucker Company, et al. | U.S. District Court, Eastern District of Virginia | Plaintiffs |
| Bodum U.S.A., Inc. v. A Top New Casting, Inc. | U.S. District Court, Northern District of Illinois, Eastern Division | Defendant |

KEEGAN_EXHIBITS_10



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

Trials

| Case Caption | Court | Client |
|---|---|---|
| Bodum U.S.A., Inc. v. A Top New Casting, Inc. | U.S. District Court, Northern District of Illinois, Eastern Division | Defendant |
| Coty Inc., et al. v. Excell Brands, LLC | U.S. District Court, Southern District of New York | Defendant |
| Christopher Lewert, et al., v. Boiron, Inc., et al. | U.S. District Court, Central District of California | Plaintiffs |
| BuzzBallz, LLC v. BuzzBox Beverages, Inc., et al. | U.S. District Court, Central District of California | Plaintiff |

KEEGAN_EXHIBITS_11



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## About Us



Mark Keegan brings a wide breadth of experience to Keegan & Donato Consulting, having spent over a decade formulating case strategies in complex litigation. As a founding partner of Keegan & Donato Consulting, Mr. Keegan has actively consulted on a variety of litigation issues ranging from marketing and international business to consumer research for Lanham Act claims.

Prior to his work with Keegan & Donato Consulting, Mr. Keegan assisted a diverse range of companies as a marketing strategist and operations manager. From working with top brands to create innovative online advertising solutions to positioning and communicating a company's competitive advantage, Mr. Keegan's practical execution of successful marketing strategies has benefited several organizations.

Mr. Keegan received his law degree from Brooklyn Law School (1995) and is licensed to practice in New York and Connecticut. His undergraduate work was completed at Pace University where he received a Bachelor of Arts in history.



Tony Donato has served as a consultant in complex litigation matters since 2004. He has a broad range of experience in research, strategy, survey design & execution, data analysis and case management. Mr. Donato has consulted on a wide variety of marketing, intellectual property, and consumer behavior cases covering trademark, copyright, patent, best efforts, advertising, business damages, consumer surveys, business ethics, and other issues.

Mr. Donato has a strong analytical background which he developed in his prior employment as a member of the research team at Harvard Medical School's Division on Addictions. He is the co-author of several peer-reviewed journal articles.

Mr. Donato received a Master of Public Policy from Georgetown University (2002) and a Bachelor of Arts in politics from Ursinus College (2000).

KEEGAN_EXHIBITS_12

**Exhibit 2—Documents Considered**

KEEGAN_EXHIBITS_13



**KEEGAN & DONATO**
CONSULTING, LLC

| Documents Considered - Chasom Brown, et al. v. Google LLC |
|---|
| Third Amended Complaint |
| Expert Report of Professor On Amir with Appendices and Production Materials |
| Access granted to all ILS "expert level" documents |
| All documents cited in Keegan Report footnotes |
| All documents cited in Keegan Report Exhibit 8 |
| Brown v. Google - Schneier Expert Report.pdf |
| Calhoun 340 Mtn to Certify Class.pdf |
| Calhoun 429 Cert Opp.pdf |
| Calhoun 484 Reply re Motion to Certify Class.pdf |
| Chrome Privacy Policy (May 20, 2020) (GOOG-BRWN-00000930).pdf |
| DE 113 Mar 2021 Order by Judge Lucy H. Koh denying [82] Motion to Dismiss and denying [112].pdf |
| DE 113 Order by Judge Lucy H. Koh denying [82] Motion to Dismiss and denying [112].pdf |
| DE 136-1 Second Amended Complaint.pdf |
| DE 363 Dec 2021Order by Judge Lucy H. Koh Denying [164] Motion to Dismiss.pdf |
| DE 363 Order by Judge Lucy H. Koh Denying [164] Motion to Dismiss.pdf |
| DE 427 Administrative Motion to File Under Seal Opposition to Motion for Leave to Amend Complaint.pdf |
| DE 427-1 Declaration of Jonathan Tse.pdf |
| DE 427-2 Proposed Order.pdf |
| DE 427-4 Exhibit 4 - redacted.pdf |
| DE 427-6 Exhibit 5 - redacted.pdf |
| DE 427-8 Exhibit 9 - redacted.pdf |
| DE 428 RESPONSE (re [395] MOTION for Leave to File to Amend Complaint.pdf |
| DE 428-1 Proposed Order.pdf |
| DE 428-10 Exhibit 8.pdf |
| DE 428-11 Exhibit 9.pdf |
| DE 428-12 Exhibit 10.pdf |
| DE 428-13 Exhibit 11.pdf |
| DE 428-14 Exhibit 12.pdf |
| DE 428-15 Exhibit 13.pdf |
| DE 428-16 Exhibit 14.pdf |
| DE 428-2 Declaration of Stephen Broome.pdf |
| DE 428-3 Exhibit 1.pdf |
| DE 428-4 Exhibit 2.pdf |
| DE 428-5 Exhibit 3.pdf |
| DE 428-6 Exhibit 4.pdf |
| DE 428-7 Exhibit 5.pdf |
| DE 428-8 Exhibit 6.pdf |
| DE 428-9 Exhibit 7.pdf |
| DE 460 Administrative Motion to File Under Seal Reply in Support of Plaintiffs' Motion for Leave to Amend Complaint.pdf |
| DE 460-1 Redacted Version of Reply in Support of Plaintiffs' Motion for Leave to Am.pdf |
| DE 460-3 Redacted Version of Exhibit 2.pdf |
| DE 461 REPLY (re [395] MOTION for Leave to File to Amend Complaint (R. CIV. P. 15(a)) ).pdf |
| Erdem report - Calhoun 427-6 - Exh. 4 to Trebicka Decl.pdf |
| Erdem Report (Calhoun).pdf |
| Ex. A 2021-04-09 Brown v. Google SAC-.pdf |
| GOOG-BRWN-00028191.pdf |
| GOOG-BRWN-00042388.pdf |



**KEEGAN & DONATO**
CONSULTING, LLC

| Documents Considered - Chasom Brown, et al. v. Google LLC |
| --- |
| GOOG-BRWN-00042388.pdf |
| GOOG-BRWN-00406065.pdf |
| GOOG-BRWN-00441285.pdf |
| GOOG-BRWN-00475063.pdf |
| GOOG-BRWN-00477510.pdf |
| GOOG-BRWN-00555223.pdf |
| GOOG-BRWN-00806426.pdf |
| GOOG-CABR-00084985 - Native.pdf |
| GOOG-CABR-04400001.pdf |
| GOOG-CABR-04400002.pdf |
| GOOG-CABR-04400004.pdf |
| GOOG-CABR-04400005.pdf |
| GOOG-CABR-04400006.pdf |
| GOOG-CABR-04400021.pdf |
| GOOG-CABR-04400027.pdf |
| GOOG-CABR-04400029.pdf |
| GOOG-CABR-04400030.pdf |
| GOOG-CABR-04400032.pdf |
| GOOG-CABR-04400033.pdf |
| GOOG-CABR-04400034.pdf |
| GOOG-CABR-04665130.pdf |
| GOOG-CABR-04665136.pdf |
| GOOG-CABR-04665141.pdf |
| GOOG-CABR-04665148.pdf |
| GOOG-CABR-04665156.pdf |
| GOOG-CABR-04665164.pdf |
| GOOG-CABR-04665171.pdf |
| GOOG-CABR-04665175.pdf |
| GOOG-CABR-04665178.pdf |
| GOOG-CABR-04665183.pdf |
| GOOG-CABR-04738550.pdf |
| GOOG-CABR-04971904.pdf |
| GOOG-CABR-05477364.pdf |
| GOOG-CABR-05836882_CONFIDENTIAL.xlsx |
| GOOG-CABR-05876970.pdf |
| GOOG-CABR-05876977.pdf |
| GOOG-CABR-05876987.pdf |
| GOOG-CABR-05877005.pdf |
| GOOG-CABR-05877011.pdf |
| GOOG-CABR-05877015.pdf |
| GOOG-CABR-05877023.pdf |
| GOOG-CABR-05877032.pdf |
| GOOG-CABR-05877040.pdf |
| GOOG-CABR-05877049.pdf |
| GOOG-CABR-05877056.pdf |
| GOOG-CABR-05877221.pdf |
| GOOG-CABR-05877233.pdf |



**KEEGAN & DONATO**
CONSULTING, LLC

| Documents Considered - Chasom Brown, et al. v. Google LLC |
|---|
| GOOG-CABR-05877325.pdf |
| GOOG-CABR-05877511.pdf |
| GOOG-CABR-05877813.pdf |
| Google internal survey 2018-08-022_Incognito Metaphors_GOOG-BRWN-00042339.pdf |
| Google Privacy Policy (July 1, 2020) (GOOG-BRWN-00000239).pdf |
| Google Privacy Policy (March 31, 2020) (GOOG-BRWN-00000209).pdf |
| Google Privacy Policy (May 25, 2018) (GOOG-BRWN-00000096).pdf |
| Google Privacy Policy (Pre-to-Post Litigation Redline) (GOOG-BRWN-00000589).pdf |
| Google Supplemental R&Os to Pltfs ROGs Set 9 [No. 40] (2).pdf |
| Google Terms of Service (March 31, 2020) (GOOG-BRWN-00023941).pdf |
| Google Terms of Service (October 25, 2017 to March 31, 2020 redline) (GOOG-BRWN-00023967).pdf |
| In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589 (9th Cir. 2020).pdf |
| Incognito NTP Message since 2016.pdf |
| Reply ISO Mot. for Leave to Amend_ Without Highlights _Filed Under Seal.pdf |
| Search and Browse Privately (GOOG-BRWN-00024215).pdf |

**Exhibit 3—Amir Studies—Open-Ended Coding**

KEEGAN_EXHIBITS_17

| record | uuid | QF3r1 | Code |
|--------|------|-------|------|
| 1594 | g2q51937duq5690h | A claim that personal information had been leaked without our consent. | 2 |
| 126 | ufa9kuz1duzpxxjs | A litigation or action brought in a court. | |
| 945 | 64znjswx6cetwyg2 | all times good | 1 |
| 1620 | 9wpguy78djwbj1ux | Brown vs. Google LLC | 2 |
| 2384 | 6c5qyq9mp8n0b7xf | Claims against Google using information obtained in private browsing | 2 |
| 2409 | vkd2ensx9cbda5s8 | Companies using data when they're not supposed to | 2 |
| 1289 | dm2r2ckst28q12qw | Copyright infringement, | |
| 782 | kxdrm40p9nerpzuf | dfddfgdfgdggdfg | 1 |
| 548 | amw5jsc0r7qwythv | Dog Bite Lawsuits | |
| 1256 | h7236pdk9190us2b | Don't know | |
| 1281 | w4fxv8uv2xg9afjv | Everything very good and very nice 👍 | 1 |
| 1373 | xwzam4dscsf5ab1x | excelent | 1 |
| 1408 | wqa0jdu2qjr4j98e | firefox | |
| 1359 | wjb0dsryc6zq51bp | Firefox all of it great | 1 |
| 1423 | eq862mezzu19aa2b | Fraud should be restricted | |
| 911 | 256jam4aep5ccgpa | Good | 1 |
| 1454 | emcr18hnrtx6tc0p | GOOD | 1 |
| 719 | mwjkkvvry6x9t3vz | good mode | 1 |
| 1421 | 5an1aemb8u0yn0sx | good, nice, cool, better, fun, easy | 1 |
| 1617 | w4bvbb67s9fa76e6 | Google chrome | |
| 2428 | kgefj5zbh314pbmc | Google selling private information | 2 |
| 1632 | p5ku4bq6pezhx0em | Google spying  through google analytics | 2 |
| 124 | r8es6z2w1py819dk | Google tracks users even when they are not browsing | 2 |
| 271 | f2uaztxfebhnsrdn | Great | 1 |
| 1508 | q25wft1nyrkdmggt | great | 1 |
| 45 | vyd9b77sn3sbzzja | Great | 1 |
| 272 | cuwg5zjwg1srbrt0 | I am aware of the brand. | |
| 1120 | qxmvc2qq8wxvhffg | I am aware, I know there is one right now and then more to follow. | |
| 1449 | eawrmp89e71t58aw | I am suing the entire reptillian race. | 1 |
| 88 | 5hj6s4xva12y2ytu | I don't know | |
| 1730 | 9aa7w9h815mz325z | I don't know much about it but it was a lawsuit that revealed that Google collects data from incognito and ever since I dint trust them as much. | 2 |
| 1322 | 5uazdt873nsfpczh | I feel like one would be that the things you searched up, since it was done in private browsing mode, can not be used against you in court since it wasn't supposed to be seen by others in the first place. | 2 |
| 1395 | na5x4w9thgjfbjxs | I know there are some but not specifics of one case | |
| 1249 | 8zn52x6wxm9phnrn | I like | 1 |
| 1664 | e7tzjmvh1k01mfqc | I remember hearing someone sued Google over thinking incognito mode was 100% private or something like that. | 2 |
| 1644 | t8cndyw6ptvztnbv | i think good | 1 |
| 1582 | kbmtvj7wehvcb3t4 | i think it is a good thing | 1 |

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 756 | 0je0dd0k5ds3q87x | I was always take care about this details   It is so important for me | 1 |
| 1413 | 9um6tz1kbxatfpsb | I was aware of the google chrome private browser mode lawsuit. Supposedly that google chrome's private browsing mode wasn't so private. | 2 |
| 311 | b6bfb0am1r5r4z1u | I WAS VISITING A PORN SITE | 1 |
| 865 | wth2s2pkd5qbktwr | I watched a documentary about Google being a risky platform for private use. I'm not informed enough about the details of the case. | |
| 28 | fee36efwxy88sn99 | Idek tbh man | 1 |
| 853 | 20wbm2eyn977mgaq | if they share other peoples information | 2 |
| 807 | hf049hc3pux7vn0k | In 2020 google was sued for a 5 billion dolar lawsuit on the matter in question | 2 |
| 183 | b1pttxxk9kh1p8cv | inappropriate websites visited by minors | |
| 725 | ma1d8rvgy73vcjz2 | INGONTIC | |
| 884 | kw9x1m5bq39eftxu | Is very good | 1 |
| 1703 | m63uhyesrvcxmg21 | Issues with the seller | 1 |
| 1438 | wjpx8hwu3pzzg3c6 | IT IS GOOD | 1 |
| 304 | 1hkpbjnnsujvm78x | It is good and u are you doing today now he did not have data and on the bed and I will be | 1 |
| 1583 | 9s68nndyhj13a18v | it is very good and funny for my familya and my sister | 1 |
| 875 | nxfcfqvxjykhybnb | it is very good i like it a lot | 1 |
| 988 | kqme1qr4tqqr3w97 | IT IS VERY LOVELY | 1 |
| 1568 | hsg0532etsntj755 | IT SEEM DIFFERENT | 1 |
| 864 | 2e66btd2tars4jdp | It was a lawsuit against Google for tracking you through private browsing | 2 |
| 83 | 82q72tsjn1mtawm7 | It was not well attended to for it was lacking enough evidence | |
| 1638 | zr368jwf66jwd341 | It was very favorable | |
| 536 | ubxfz4600veewa1s | It's safe | |
| 1000 | 1ghk7a5rndnzz24z | Its much more good way to this so I like it much more. | 1 |
| 1771 | xfp3t2tz1db016gw | It's not just the first | |
| 990 | v4q1jkpnx4pxferj | It's very good | 1 |
| 1575 | 1903f4fgxpdhcjgg | LAWSUIT REGARDING TO PRIVATE BROWSING | 2 |
| 732 | dgsbrt0yjxb8nm24 | lawsuitprovide is very good and easy to work | 1 |
| 752 | bbzhzjeq7q9v8d64 | many kind of | |
| 1642 | 3vbywcue15qdgegp | mt internet service provider does not receive my data while i am using from private mode. | 2 |
| 136 | xy351ak03myuzrnm | My lawsuit regarging is the best idea in this option | 1 |
| 957 | b68y4zbs2t0zftxq | none | |
| 740 | 6nyjamnmcy9kw1qj | not sure | |
| 430 | nh49cwzkja16um81 | Not to disclose or share any content | 2 |
| 1736 | cxd167ncwdbzgu91 | Nothing | |
| 2227 | 75synv5kj5w2g17q | Opera | |
| 237 | jf6enycp89wupkw9 | OVERALL ITS A VERY HELPFULL | 1 |
| 805 | 6a6byhcyq25qbg85 | People filed a lawsuit because people said that google was still keeping data on private browsing. | 2 |

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 319 | 6utqmyq43ggjzmmq | People V Microsoft | |
| 67 | bx4rfmwj0pwerers | Privacy infringement | 2 |
| 1888 | spd530xheuej8sn5 | privacy terms have been secured | |
| 963 | 0339m2uz22ebm7m8 | Robins | |
| 879 | pw54r38mn670cjrh | safari | |
| 129 | vggbsbw1ygc8xvbu | Security | |
| 983 | 2eps3twgb6bfu0tq | Selling our data | 2 |
| 156 | y66btaw7a7qndh31 | someone i knew was getting sued and didnt know how to go on about certain business when someone was ordering with that | |
| 1429 | d2vmuw2c5zp1uew7 | Someone sued Apple because the website came up | |
| 1415 | rm4eq0ze9hxxf768 | SOMETIMES IT DOES NOT LOAD THE IP THAT IS | |
| 844 | k89pgaxfamf88udu | Still, in 2020, Mozilla Corporation's revenue was $466 million from its search partnerships (largely driven by its search deal with Google), subscriptions and advertising revenue | 1 |
| 1049 | xfuat8z106ezd92y | The internet was still able to see what i was browsing | 2 |
| 539 | 99cwbfkc8ma4bpnu | The law suit make everything more private and easy to use in order to keep private and all needed information being placed in needed places | |
| 1253 | f5fqg6g2utnqpnsb | The lawsuit that says things that are copy righted and other things such as privacy acts | |
| 1052 | hyut095q0wk419ax | The people who owns the internet will know the private browse history | 2 |
| 778 | ynpzuc5efv9u96p7 | They do not collect any data while i am in private browsing mode. | 2 |
| 974 | mtnv4g0bjv5vymgg | They re dealing with my private data like when I am in private mood any company will not be get my data as like I was anonymous to them. | 2 |
| 1589 | 7s2886afbba1jxvy | to give privacy | 2 |
| 1805 | fwchfrwbf0bw99ts | Unsure | |
| 2466 | whtyc6rt3spr9bg0 | Unsure of details | |
| 928 | 190hnhvf4m9betdm | UTE law | |
| 1392 | vf1k8fev60jsw74m | very  good | 1 |
| 600 | 4qx785tyx1drqv5b | very good | 1 |
| 1015 | rr4aejjq68q0fzyg | VERY GOOD | 1 |
| 1555 | h3mghcp7s62wsn54 | very good value | 1 |
| 434 | ct4y5qekhq8rev4c | Very unique and innovative products | 1 |
| 1621 | 7r661c781jwj0m4m | VERY USEFULL EVERY TIME | 1 |
| 1643 | 5jy9ut5d6dt3n3d8 | Visit adult site | 1 |
| 1814 | r8v9tfefnbwsg4vk | We have to be careful against hackers | |
| 1503 | qbk92qzu7x8fvrkv | Yes I'm going to get my hair done today and I just got home from work and I just got home from work and I just got home from work and I | 1 |
| 1034 | jjpkf8rdy3vaskzy7 | you can't use it with government's sites | |

| record | uuid | QF3r1 | Code |
|--------|------|-------|------|
| 639 | 2ce91bzgm2ww18ne | 2020 google faced a demand of 5m $ for information tracked in incognito mode | 2 |
| 4555 | tu87cvkz47qpmzt7 | A lawsuit was filed against Google claiming they can still monitor locations even if you're using incognito mode. | 2 |
| 4377 | y4k3y64c1p9fm6vz | A lawsuit where all of this info was false and Google can see everything. | 2 |
| 4064 | 8316y92sewfqn8yw | afsdafsfsdf.dasf ads gfdsf sagdfgwdsaf ew.df af to long. | 1 |
| 599 | y9xs861jzd1b6dq4 | ALL IS AMAZING | 1 |
| 1533 | ty5tjebv6qx1xyt2 | Amazing | 1 |
| 4478 | 74fgkzhu526ub2kx | Any lawsuits | |
| 17 | mu9va875hqm0fste | Arrested | |
| 1348 | 5k3rqgdnkbf0fb40 | Best concept and very interested | 1 |
| 907 | 7dgwy6v30et4ek0s | Better | 1 |
| 34 | 7jhpc5akr98azqj0 | Better understanding | 1 |
| 4563 | uc8vsj95tm91h6q9 | Chrome | |
| 4752 | 3th2696c39cqznut | Chrome | |
| 3123 | t7g7zmh7hhkhd8v5 | Chrome will not store the browsing history, Cookies and sites data | 2 |
| 2532 | rqd6hj68q5ya03at | confidentiality and privacy of browsing | 2 |
| 1129 | ee0427yt5xgpy6f7 | Copyright | |
| 1768 | e7fzc7vqmpc1j7gx | Copyright us a non no | |
| 1496 | 0bv1gbvy5efy42kw | Crimes can be tracked | |
| 3981 | d0ys8m6jbn3yr5am | dfsdfsdfsdf sdfsdfsdf sfsdfdsf sdfs sdfsdf sdfsdf | 1 |
| 2860 | wm6xuawvgvjbu93b | Don't know right know | |
| 4599 | shpm1p3j0gare6z8 | DON'T KNOW | |
| 5145 | 64aatbhk1vr0s2t2 | Don't know | |
| 1803 | rrspen7uqzux5qhw | don't now | |
| 1798 | 552zp5mbmqsd8c14 | Everything | |
| 3918 | bf1x84qqn19ss0fh | excelent | 1 |
| 5574 | xjrp8fgav859ybnu | EXCELENT | 1 |
| 1495 | hg8wwbb2z5nuaq6x | excellent | 1 |
| 2370 | k1tarm4gswzfrg5g | excellent | 1 |
| 3563 | mfa12z62yyu2ewdh | EXCELLENT | 1 |
| 3336 | z6s4yg8m0qnmr98u | Excellent and very good this browser. | 1 |
| 913 | vtcbm89wzsq7g7av | Excellent and wonderful great unique different from other products very reliable and trustworthy | 1 |
| 3153 | ef60amndkk7a5w0n | excellent mode, I like very much | 1 |
| 3192 | 3bfrtjc2qbchkef5 | F GD FGDFGDF GDFGDFD | |
| 1759 | 4h40wdf77v94m87m | Fake Ip address must not be in use | |
| 4445 | bjebqd00pg7wvmrk | fdfsdfsdf sdfsdfsdf sdfsdfsdf | 1 |
| 3991 | d8dq3yfq49g43pj0 | fine very good | 1 |
| 5293 | avuq2e5e42e7cs92 | Fraud | |
| 2397 | erjevs20p8mr9nqj | GOOD | |
| 2530 | 0snppnzeef7422xg | good | 1 |
| 3086 | 6ff8znqcmsw5fcdq | Good | 1 |
| 4771 | rqtbkxdqjum7b1j1 | good | 1 |

Interpretation Study

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_21

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 192 | 7znv8fujc1gfucwj | GOOD EXPERIENCE | 1 |
| 3191 | xh65n5w4mu5ajky4 | good lawsuit | 1 |
| 1352 | vshnj44jh0cx29v8 | GOOD VERY GOOD | 1 |
| 3089 | w2rymn5s3hy5c9yy | GOOGLE | |
| 4270 | m5w3mc2gym8bxgrh | Google | |
| 4336 | q1mg2y4kf8akpwhh | Google | |
| 4370 | z466a93859gms3s5 | Google | |
| 4523 | 8zus9zukf5dzx4kc | Google | |
| 4074 | uvzb08syppad8bry | Google being face with lawsuit over tracking their users in private mode | 2 |
| 3654 | nc96f0f4vm8agy3f | google chrome is very unsafe on the info | 2 |
| 2694 | 8t1295k3ra90nq4q | Google does not receive the websites you go to on private mode. | 2 |
| 5618 | 12mbemw8sx1unnrb | Google had a lawsuit against them for tracking in incognito mode | 2 |
| 3661 | feb0gck1nr9au938 | Google has Many lawsuits | |
| 1333 | g367m8ckkh3uxtcr | Google is a great provider | |
| 3482 | 7xxh3rts044bg8ja | GOOGLE LAWSUIT | 2 |
| 1005 | fc7kbz1zwyqur4n1 | Google security is most secured. | |
| 4060 | 49ghc7w1jjwd6a8k | Google still gathering information from incognito | 2 |
| 4564 | wpjzpe0uhxj30fdv | Google still might see what you're doing even if you using private wen | 2 |
| 1212 | nt99xmf9pjs6pqbh | google truck user | 2 |
| 3116 | 5krzdqubhtjb091t | Green | |
| 1559 | wbpd0z78zxcdtwx5 | Guest mode | |
| 4319 | pkkeh6n15975n5dy | Heard it wasnt that private | 2 |
| 1827 | xh3asbjd3c2hez50 | Hedjk and night in the next day and ktexjk in the world at all of the index finger and I think I can get the first place | 1 |
| 308 | bjputkttrsvbr08g | Hey buddy I just got home from raider I love love you mama bye mama mama mama | 1 |
| 2769 | mh9ws2bjdgyr5srx | hmm isnt the lawsuit like the policy of the each site | |
| 1347 | 56tfmf3cd9a3z4de | i already know about the private mode | |
| 1463 | 47y8frjbxh1hn105 | I browsing a address for shopping | |
| 1044 | u8x21jmcdm6eqp3v | I can get you anywhere lol lol | 1 |
| 553 | rxxxk72kxwtt60db | I definitely for sure have no idea right now. | |
| 4613 | k5bs43s9fb0fdu5k | i do not know | |
| 4486 | 8a0zqst8secu63ae | I do not know any specifics but I have heard about data breaches and potential lawsuits | 2 |
| 5656 | b1940vr04p1xpr67 | I don't remember specifics but peoples browsing history was being saved and info was being used | 2 |
| 1927 | mj5427vrr6hbhrdk | I heard about one stating that incognito mode was not entirely private, and Google still got the information of the user browsing in incognito mode. | 2 |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_22

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 1506 | 24nxzz8hbs18653u | I heard an individual was trying to sue because he was watching lorn in incognito mode thinking it was secure not knowing his wife was able to pull up the site and this led to a divorce | 2 |
| 1218 | e2n4h30z7eg4y86j | I heard or read about people suing sue to incognito mode not truly privatizing searches from ISP. | 2 |
| 687 | apy6zkk2d2abnchn | I HIT THE WRONG ONE I MEANT TO CHECK NO | |
| 1206 | wf8xuuvxbd2qgbma | I just remember seeing some thing on the Internet I didn't pay attention to much of it at the privacy laws are being questioned on Google | 2 |
| 68 | 1s8nyrq43zub9tx5 | I know that Google can see what you search up and that you should be careful and stay safe on the internet | 2 |
| 5153 | t4r77k180hrymg8a | I know there was a case they can look up by your IP adress | 2 |
| 1800 | vzxhhtctvqtxs6gt | i LIKE all mode | |
| 3566 | 37b4ggve2w6uwfrs | I like chrome | |
| 325 | 719we3nkwg3xevd3 | I like so much, I love it | 1 |
| 429 | je1vgsd8hg5ktg06 | I like so much, I love it | 1 |
| 3621 | p4kznqdajqev1v6k | I like to browse privately | |
| 1114 | u0knf6v4ratetwfk | I like very much this service | 1 |
| 946 | uc87scw8wsaxu9yt | I liked this browser mode, I think it helps to avoid saving temporary files that harm operating systems over time. | |
| 4253 | 7aqt6rk3g6mtwtyy | I LOVE USE THIS WHEN I USE SITE | 1 |
| 1378 | h8fjdvyubscgtvxe | I MY PRIVACITY DOES NOT PRIVATY- | |
| 1529 | arpemew3tzsbgbn2 | I prefer to keep this to myself | |
| 4698 | azr9azzsedv7gss1 | I SKY | |
| 1507 | 9wtb43jvwmchpvc3 | I think its a great idea i like it alot | 1 |
| 1257 | dkusuxxpm5vrvfd0 | I THINK ITS A VERY help full every time when i use a private mode | |
| 2821 | 9p4kn0kqkjka1apz | I think there's a lot of things to do | |
| 372 | 1duty2z3zk3hfc5n | I use this chrome in very moment for the privacy | |
| 227 | 7kfnp26ndvzbv64b | I VERY INTERESTING | 1 |
| 1377 | zg8mbw0pdm2k8cyw | I was are about lawsuit | |
| 4160 | 7sge00n647gv8m5u | I was aware but now I am not anymore too sad pepaga | 1 |
| 1267 | 63sc3wcwj07bp79j | I was aware of a user sewing Google because Google chrome missed up there phone | |
| 2799 | j11r5u9y7edjwgr0 | I was aware that it does collect some information. | 2 |
| 4235 | 3hpteuepb1a9pwaf | I was aware that recently Google was accused of still allowing advertisers to collect data even if users made actions to prevent them from collecting. | 2 |
| 1091 | vxcxjaetfuy42axu | I was getting sued for rear ending a car | |
| 4259 | bbdcuqp9dk84v989 | I watch it on TV | |
| 1330 | 6dn3r89k022ywvw0 | I'm just leaving my moms now to go home so I'll see what wtime ryeoryeie EI'm is not mad at me either but | 1 |
| 3545 | k2uzmd9wga3hfrcj | Identity theft | |
| 2449 | 9gm7ay7kp35psfkd | If there's any copywriter | |
| 1595 | 6pjtrgudjuwf5z64 | I'm concern about it. | |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_23

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4433 | 5y2st6t0fcx1rez1 | I'm not sure of the specifics, but I remember Google got sued for using people private browsing data for ads. | 2 |
| 4440 | j445tgnt34v54na5 | I'm probably aware of this service. | |
| 2006 | fr9u9zuvbtb1wspm | Innovate plus | |
| 3851 | ctzey3p3dcn4q06y | interesting and very good | 1 |
| 4075 | vkfx629qsxk8320z | is good | 1 |
| 3924 | yrp0vc1dn4gvqw1x | Is very good | 1 |
| 294 | bnnz29q85y4bu33f | IS VERY GOOD AND FINE | 1 |
| 3131 | wqucdjvrq5w2du0f | is very good google | 1 |
| 1789 | 4uuhb2ca09t7xzmw | is very important the information website | 1 |
| 3618 | djc66q9p3xt0g4w9 | is very nice | 1 |
| 4032 | k2gtbbvsjbf6z54b | Is worrying, the privacy and use of the data collected | 2 |
| 4702 | 6vg88jd37gbsrsbz | ISKY | |
| 2551 | y8chkfkswz852yw3 | Issues back in 2019 with security issues | |
| 2348 | g3tv88b4vqcgtyet | it had lawsuits over google stuff and legality stuff | |
| 1477 | q2yse4zj152jf18m | It is a very good company | |
| 998 | cjhsg6ztxnferb0s | IT IS GOOD | 1 |
| 4519 | q1y808fke0sx9nms | It is part of my digital awareness to properly use legalities associated with the account. | |
| 1259 | v3j4rhb76k5dvwc4 | it is very good | 1 |
| 2618 | 49xj591vusfprpz5 | It not actually being private | 2 |
| 2440 | s5xu182y7ezzx23m | it seems that it was not incognito | 2 |
| 686 | xb5cvyjs3r03wugk | It was dealing with third parties which was basically written there and they were one more thing they are making our browsing more sure and easy. | |
| 1821 | pmz3saukt9fehpx3 | It was good | 1 |
| 4124 | 1uu5q44n55sb1zem | It was pretty obvious | |
| 1429 | bkz8zrx9d8aanjq9 | It was very clear | |
| 514 | eb3xw8a2q739jap0 | It's a thing in the browser not sure what to say | |
| 1004 | a62uea79j74y97qa | Its a gogle layout and which is good | |
| 578 | feyacrup42qf4kur | Its better for cyber security. | |
| 49 | 3deu4qqzdsyf40cs | its good | 1 |
| 1227 | 724zh19k0kqgcpcp | It's good for all | 1 |
| 1028 | wjvjp0t65hjux5xy | It's very dangerous | |
| 185 | a548bea03u0u8n82 | like it and good it | 1 |
| 1396 | 7pygz6nh58mb9pwu | like to agree magnific | 1 |
| 4658 | pmxedgpqbzrmwn6j | likely | 1 |
| 1203 | a3kr06cbhpgnm4he | mention ed something about ip something tat i was clearly aware of | |
| 3468 | pg4zqjjwz44umjzn | Mode incognite in google chrome | |
| 4667 | yj3ca7xnuszs006j | nice | 1 |
| 4736 | w9dqrkw9hyek4v36 | nice | 1 |
| 4755 | pu5j9ychgpwa1rvm | nice | 1 |
| 4773 | rsw8zxv9sz2smkep | nice | 1 |
| 1815 | drnjrkb9z6spzq82 | No browsing history | |
| 4244 | 5dzpqsp2hm0qj1c9 | No crime against humanity type searches | |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_24

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4383 | wunr46x0kapw6wse | No hAcking  Privacy rights  Underwriting | |
| 2592 | ugw215t2gnt78w0q | No history in the pravate browsing mode | 2 |
| 1536 | senp07q8csb4zksw | none | |
| 1766 | e802e63xk1dfbmy4 | None | |
| 1853 | 4h0e7k9apudxq04w | NONE | |
| 554 | vx5x1gdac64gc58k | not sure | |
| 58 | u47qkkn07yb8y2vk | Nothing really much the law suit was thrown out | |
| 4163 | z0vs7pb6sdhm55x4 | People complaining google was tracking people policality what they were doing | 2 |
| 3379 | kqtn0y75hquct4na | People fighting against reading of personal information that was not provided by person | |
| 1083 | ghgqz1s0u7fv7dpf | Personal information | 2 |
| 1046 | ywz0rxjqxx8ejpue | Privacy concerns over browsing | 2 |
| 3181 | qzss2hhu31hr2dxx | privacy terms | 2 |
| 4531 | afet035tgffpeyh1 | Privacy thift lawsuit | 2 |
| 628 | 6tht4m2bhq260x3x | private browsing isn't actually private | 2 |
| 5527 | jkksy7xbua807r4x | Private mode is to be unseen. That's interfering in someone's privacy. | 2 |
| 1790 | 7td5jfbqrp5g9y94 | Probably google does receive this info | 2 |
| 1497 | x2qj10mfgfuf0dhf | Probably like Youtube ads on Google | |
| 296 | 5gfrwbnrbejf6dgr | respect for privacy | 2 |
| 3669 | ycf2x7rfew9uknnk | SDA DHT CIUYIUY IUY IU U YLI YL | 1 |
| 3495 | m9arue981s6b67tp | security breach | |
| 4789 | swees3mzfga81bhk | So good | 1 |
| 1123 | 4w7qg9ffy587u09w | SO SPECIFIC ABOUT IT | |
| 1843 | 2sw0y3442v1x96ac | succi Les aig guy | 1 |
| 1785 | hmt56wjscz390qf0 | THAT IS VERY AQMAZING AND REALLY LIKE TAHT. THAT IS VERY USEFUL AND HELPFUL FOR ME | 1 |
| 1293 | hmdapxkhezt7xx79 | That is very secure and innovative | |
| 508 | u231b5fss5q25kfy | That you can still trace the IP address when you browse in Google chrome | 2 |
| 1153 | x46dk4y22gy8sdfg | The Google lawsuit | 2 |
| 1854 | m9yt3cm1qtzec32q | The I have to get my stimulus it works for me | 1 |
| 1394 | qpmepb5qzubaz8zv | The internet is slowly | |
| 22 | u0uhgrd019k7ufc0 | The lawsiuts are so ffod and very protective in cookies information and giving good experiencs | |
| 355 | 1bfgjk2b9xxpfaep | The lawsuit contends that chrome's private browsing Incognito mode should also stop Google's server side tracking and that Google's failure to cease such tracking | 2 |
| 993 | bucrctuz8g61duhd | The lawsuit of being spotted even through private | 2 |
| 1010 | tr59pqyc1h3qhhd4 | The lawsuit, filed in June 2020, alleges that Google tracks users even when they're browsing in incognito mode | 2 |
| 1403 | ff71f6g6avecnauk | The lawsuit, filed in June 2020, alleges that Google tracks users even when they're browsing in incognito mode. | 2 |
| 4351 | v0x6cf0r83avtmap | They have good options for the people and need a best page for the college | |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_25

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4510 | gcrtn2hahpgt3ay3 | This is a unique browser | |
| 3156 | 8s9bhppgejwbxyq2 | This is so good and very likeable | 1 |
| 1455 | 8rhftfjjmxz4ayud | to give and be given in return. | |
| 4577 | up81ur92u95jcz0w | Trust him | 1 |
| 3990 | gqq5v9k0qyc76tuu | ugjbjhbhjjbjbbbb | 1 |
| 1814 | g2y5sene1vb1w563 | Um. I totally thought that question asked lawsuits agaisnt copying this information  ...    I read that all wrong | |
| 2683 | gh1c10fvh67yjkg5 | un legal browsing | |
| 1388 | uz4gvna46setnu77 | Understood - a lot of people may have used the incognito mode in the Google Chrome browser, but did the browser actually hide user data?    A lawsuit was filed by lawyers against Alpha Bit, the owner of the Google Chrome browser, because of the Incognito Mode, which allows the user to browse in secret, in order to preserve the confidentiality of users, which the lawsuit says is incorrect.    The lawsuit accuses Google of breaching people's privacy, tracking internet usage even when browsers are set to incognito mode. | 2 |
| 3098 | c40kfq74vmw95f7h | Unsure | |
| 4624 | s9h2n09ntppbxdj2 | unsure | |
| 4669 | 36auvnaec0kkupx7 | unsure | |
| 487 | 0z905p9xt4h3a2jr | Unsure of details | |
| 3919 | e9v8xntezj5qreyk | Unsure of specific details other than some information supposedly not collect or available actually is to Google. | 2 |
| 3811 | f53us0vk1nc14t98 | very fantastic excellent | 1 |
| 450 | csmkt3x0p0dqvbnj | Very good | 1 |
| 989 | edahwtg7aw98d5xm | very good | 1 |
| 1213 | 3j65n6vz55jc8ka8 | very good | 1 |
| 1914 | ctd7a4m3fvhc11m9 | very good | 1 |
| 3931 | vfauneq1dqpk8utg | very good | 1 |
| 3977 | d7qd1tqmn1ubvc40 | very good | 1 |
| 4000 | 9cku0za8xnc69egn | very good | 1 |
| 4223 | z1za7u1hs5j79ea1 | very good | 1 |
| 4690 | mw9jjt57tc5gn3zw | very good | 1 |
| 512 | cyf4z003zawdxztr | Very good is google | 1 |
| 2471 | wemtc45usmetaev2 | Very good is the private google | 1 |
| 384 | vp3dm82fxwhpjbsk | Very good like more | 1 |
| 559 | y1dd4fej3gg1cw9s | Very good like tree days | 1 |
| 1309 | dqy2erbdzn71qadq | very good, i like | 1 |
| 1424 | xd07h6a198bq56pr | very interesting | 1 |
| 2407 | z6xn4vrfnsdn1c98 | very positive | 1 |
| 1112 | zn6gjsfh0sxt1uyk | Welcome to Gboard clipboard, any text you copy will be saved here. | 1 |
| 3561 | r388g7x3mwca03vn | YES best | 1 |
| 4344 | 8f5q3nrysnrwsgd7 | yes very good | 1 |
| 208 | 68zjuspvztg8w53j | You share info your done | |
| 2921 | ymeddj7ducv5uepe | Your cookies and history isn't recorded | 2 |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_26

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4573 | 5mr9w0fsw8cqd8v4 | Your internet provider may still see your content | 2 |
| 3129 | p2acuxjtarxmzy98 | YRD BEST | 1 |

Interpretation Study

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_27

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 2657 | a77rheuz6d0w2zwa | A California judge has filed a lawsuit against Google, alleging that the search giant secretly collects data from users even in Incognito mode.    Three users filed a complaint last June claiming that Google has a widespread data tracking system and continues to track even if users take steps to protect their private information, such as using Incognito mode in Chrome or Safari and other browsers.    According to the technical website  The Verge , the lawsuit seeks to impose at least $ 5 billion on the company. | 2 |
| 3210 | 27wnu1532135hy0b | A LITTLE SLOW | |
| 2375 | 82puww8mzchk9qjd | About high quality of the chrome | |
| 3622 | 9sxbyxadzvtp7tfm | ABOUT THE CHROME | |
| 3478 | 53eavqse4mjtgnsp | all is very perfect and very nice | 1 |
| 2019 | jvw1tyw72k492682 | all of it good | 1 |
| 4092 | rmwyu9c5b51e6f28 | Apple vs bannana | 1 |
| 2024 | nqsgr6h57ypyj222 | Back page.com vs Washington State | |
| 3270 | hg6rjdjnqdg4cafz | Be able to broser the net privet | 2 |
| 2083 | r161ywhzb9mjeh3z | Because they are very innovative and trust that they provide us good services all the time very much Highly. | 1 |
| 3233 | ktpg22stqbbpdbn9 | Best | 1 |
| 4101 | 0ne1bpge6j6ghnfn | Best browsing and very interested | 1 |
| 1899 | 337s4cyq4nqgcmar | Best of the best with zero issues | |
| 3996 | 0pabrwyqrru8xkpd | Better understanding | |
| 298 | m2nmsfjtk5745xqt | BROSWE A LITTLE MORE PRIVATELY | |
| 442 | 4cnng09h27ac7dha | By facebook | |
| 3610 | yb31v33qbd4u2ckb | Can't remember | |
| 818 | xnep6ws5bsfsrd4y | Chrome | |
| 4140 | u4vmkta6pzt9wtxe | CHROME | |
| 466 | 4x3t9wwvbjejn57d | Chrome launce a private mood | |
| 699 | fp17kgq90mf6yqa1 | Consumers filed a class-action lawsuit against Google for collecting data while using Incognito mode in the Chrome browser | 2 |
| 2374 | dtdqx09kx2dz3ne0 | Cool | 1 |
| 1893 | 6y5wvvv60wtz90k5 | Crime law | |
| 1898 | tvfzjma1ygkuhtqr | darj mode | |
| 4246 | hsa7xuvkkvmffg3h | Data filtering. | |
| 153 | tw65ufmsa1ma4y2w | desktop | |
| 758 | x1v4xa888r2qb1k6 | Dj and get it done before you go home and I will come by tomorrow to get the room and I will come over and see if I can go to knabe nd take care h and get it evening vena I have to go | 1 |
| 3829 | zvbpws6txpdhqgbc | Do not steal user information | 2 |
| 2358 | mr91sb9ku4pmpdcc | Don't know | |
| 1046 | wr363fqese7c14jm | Don't know | |
| 2869 | 4bnfbbcc9qxr71vx | Esse aut saepe autem | 1 |
| 2199 | gw45cd2vbx8phzy0 | Every thing you browse on google is protected | |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_28

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4193 | c2fv3anr8n7u49e5 | EXCELENT | 1 |
| 2380 | 9wt0egm9cqwnrb5w | excellent | 1 |
| 4294 | z68w95afv2kg134t | excellent networks | 1 |
| 235 | g574ejn318qac9va | EXCELLENT THE BEST | 1 |
| 1463 | z3vb7fd9aqacac82 | Fggddffcvvcxxxxcccccccfffgggggggggggghhhhhhhhhhhhh | 1 |
| 3983 | wuwakgax6sjx7ay9 | Former employees | |
| 2341 | k2bv3ffjx2sa103p | Giving out personal information | 2 |
| 1233 | uwrc40zx5hbetx4f | Good | 1 |
| 2423 | f2xw049x8wy3jf5e | GOOD | 1 |
| 2909 | vdfu8xz18fjbrcfz | good enough | 1 |
| 2770 | 5a65mj6t7c0wgr4c | good experience | 1 |
| 2824 | u6f2wb7h46538cjy | Good ideas | 1 |
| 2276 | 8jkqy4vpk8dfescq | Good job | 1 |
| 3393 | vyk3enr1u269udsu | Google accidentally giving out info pertaining to it's users of incognito mode | 2 |
| 4291 | ah0nwp98x8q639xg | Google is ordered to face a $5 billion lawsuit alleging Chrome's Incognito browsing mode collects users' web | 2 |
| 66 | 3a7nqcf88ds4byr9 | Google still track user's browsing data in private mode. | 2 |
| 3474 | 74c9szdc9cqfv5hc | Google supposedly shared private information that it said it would protect. | 2 |
| 4085 | rschg0zh9na90m4k | Heard of Google analytics leaking people's | 2 |
| 1431 | 6fmfhaj2bmdt333u | How to get the kids to the kids to | 1 |
| 2345 | qj9be5cvv1ghkd0p | I already knew something about how incognito mode works | |
| 3367 | r24aes5712g1vnn1 | I am aware of a lawsuit against google alleging that they still collect user data even in incognito mode | 2 |
| 802 | x3ybjgw51thcj9u8 | I am aware the tools from google chrome | |
| 1755 | zth9e5u67vsb6760 | I am not going for the family time and they have a | 1 |
| 3615 | 5y6mqkkz1zd17tgp | i am very aware of lawsuit | |
| 1443 | dakjy77gknkumf0h | I can still be view my previous site | |
| 1420 | et0xnk215g5pgtp0 | I can't go into details at the moment on this situation | |
| 2456 | k89018mxwhf6csx7 | I don't know the answer to that | |
| 1208 | ephcjpeqtbd0tmuu | I heard about it in the news stating that Google might be in trouble | |
| 1855 | 5e5yuwc8na2q8dft | I hope so fatboy I'm so excited | 1 |
| 3346 | k913079f3w9mwcku | I knew that it was about the private browsing | 2 |
| 3240 | srddquvr98fq1kbc | I like | |
| 3250 | cwmrz87ay0zcmrpg | I like a lot this service | 1 |
| 3311 | 6pxqbmnxh8hjctru | I LIKE IT BECAUSE IT IS COMMITTED TO SAFETY | |
| 2585 | gj43s4kt2gusrtx4 | i LIKE IT BECAUSE THIRD PARTIES CANNOT SEE MY INFORMATION | |
| 2089 | 81fvm2q7dwj0g15w | i like it very much | 1 |
| 2114 | hv0a53jfh4e1az55 | I LIKE MORE FOR AND MY DATA PERSONAL | |
| 2805 | e4w7daatvjuq0mab | i like that mode. | 1 |
| 455 | m51gfby57beb5vem | i like this | 1 |
| 2138 | cc31fjj7fyk5p4ab | I like to browse in private window | |
| 430 | yftp4gwnywdh6dvd | I LOVE THIS | 1 |

1 = Low quality response
2 = Knowledge of current lawsuit

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 3467 | 4hh1n9p5smzhgt76 | i love this | 1 |
| 1811 | 72bdh6jetu6q35wz | I love you too hot to handle Netflix cast and crew of the series | 1 |
| 2190 | 85ukh7gmte8mdbxx | I read that there is a lawsuit against Google incognito browsing because some information is still tracked and the statement on Google's incognito page is insufficient | 2 |
| 1560 | jj6sfyvva38wyszp | I really don't know any of the details I'm afraid I just heard it through the grapevine | |
| 4033 | k5tnwbxseg1h18by | I remember hearing that so many people have been hacked and needs to have privacy and this what you showed helped | |
| 2454 | ze3t5fsqsapzefmq | I SEE THIS BUT I CAN'T EXPLAIN IT | |
| 3312 | t6xxp8afqf74e5vu | i think good | 1 |
| 3370 | 2p64zwzw2yaxm1m5 | I think this is one of best browser currently, I love to use. Incognite mode is a useful tool. | |
| 3918 | 5fqusqz8p9rww4t1 | I used brave browser and it is great | |
| 3204 | zjxtx1ycjccxbzqw | I was aware of chrome taking information that they did not tell people they were taking | 2 |
| 1202 | ns3ct2kyqkcr7pun | I'm an unsure | |
| 2280 | suj1hj08thb123gu | Idek tbh man | 1 |
| 3283 | qx68pxtt5g0xqjzd | If you go to download certain things your not supposed to you could get a fine | |
| 1637 | bgzwpe0ct84mhn8g | If you go to private mode then it delete your search history when your done and it leave no cookies | 2 |
| 1533 | qqk2cseu1jbgp1nn | If you plagerize there info they will sue you | |
| 1240 | p22r981u7ebdcrb9 | If you sign in to any website in Incognito mode, that site will know that you're the one browsing and can keep track of your activities from that moment on | 2 |
| 2154 | dy86s8w427rcsgc3 | I'm aware about at least three lawsuits | |
| 3773 | pk82crzc7bahnazy | I'm not sure if the details about who was suing Google, but the lawsuit was about the incognito mode not blocking all of the sensitive data that by design it promises too. | 2 |
| 3906 | g9w598jca5krsy0b | In my experience is very good | 1 |
| 2832 | fge4uxv03fgccv4u | Inappropriate data collection | 2 |
| 2350 | et35jgvaggz9ev35 | Incognito | |
| 3556 | 34svuy7fyvwxffky | Incognito doesn't make you invisible online and websites get to know when you visit them | 2 |
| 2854 | fkk9duejvcytrdrv | Incognito mode protection | |
| 595 | e205t2c7vfcs3gcn | information hacked | |
| 2596 | pburzg4sk1xvq459 | interesting and very good | 1 |
| 3093 | bpe62kt8qebmc0e8 | is design and model is excellent for the customer is interesting | 1 |
| 2135 | 2j8a1x8cykybac2z | is good becuase is excellent | 1 |
| 1190 | n1r72xwj656qu2a9 | is good becuas is excellent | 1 |
| 3209 | 7gu11j6zngvc0xef | is very good google | 1 |
| 2176 | zjykt22kxk91jjeh | is very good to me | 1 |
| 4180 | 38utj49vwgpuk2en | is very good to me | 1 |
| 970 | 6z0zg0rkxukfwfbg | Is very incredible | 1 |
| 3921 | 4m6duumeyvmsvryq | Issues of privacy & security. | |

1 = Low quality response
2 = Knowledge of current lawsuit

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 79 | 85p7yxffnj2cavmu | issues with security protocols | |
| 3272 | cjwsy1e8js6sxbsu | it is a great oportunity | 1 |
| 1822 | rck76b12z01matg0 | It is a very good | 1 |
| 2619 | byx998jwbr5f3yqz | IT IS VERY GOOD | 1 |
| 1231 | 3pvye0kjv6d99d09 | it is very good i like it a lot | 1 |
| 217 | j1bvqryh82ekddcx | it was a very well | 1 |
| 3483 | hmyp9ddufn26x8g6 | it was amazing | 1 |
| 1692 | bn78xdz8a8g2bhmd | IT WAS GOOD TO ME | 1 |
| 3890 | bpps0930gtesthgb | it was great one for me really i like it so much. | 1 |
| 1911 | jfr6kuq5s8a1e73x | It was on the news one morning | |
| 4132 | r4yv36frsmge99yg | it won't save your recent search for the cofedential | |
| 3826 | 353v09bqqshtnzpb | It's great to know more about laws I am aware of it | |
| 2215 | 04fzsyvrmvfjejf8 | Its a very good mode for me, I like so much this mode because keep work of better mode possible | 1 |
| 1842 | 54mdehxdt0hp15xy | ITS A VERY IMPORTING FOR EVEY TIME I LIKE A SO MUCH | 1 |
| 2610 | 71ty6acuwg8z9fg7 | It's against the law to hide your details it cause jail time | |
| 2095 | 7ccvb7un9ypy034m | Its good and safe | |
| 1342 | eg99kz83rsg9vqdv | It's very good and nice always | 1 |
| 1628 | 58m0xcneuaajhbu3 | I've been aware of a lawsuit that had to do with private browsing mode with a person that was under the age of 18 years old | |
| 3850 | gqn78tb1yctyw541 | I've forgotten how it went down though | |
| 3085 | 2zqfbmar06360h8r | Judge rules Google has to face lawsuit that claims it tracks users even in Incognito mode | 2 |
| 4100 | ercv5cswn7abr9pw | lawsuit can be a up grabber | |
| 2646 | kdp0gj1y0hbrjdzd | lawsuit deals with the description of being private verses the saving of some information.  claim is the site is mesleading | 2 |
| 1821 | 5ydtr8tjeh2cbnc2 | LAWSUIT PRIVATE BROWSING | 2 |
| 4201 | cq5g73ku402s1ent | Like that very much | 1 |
| 2371 | 9z1k9jvdqvkvcyw6 | Looking up illegal things | |
| 2385 | ndrtgv0u61wj6ej0 | LOVETHAT VERY TO ME | 1 |
| 1036 | jj32epux0jsanmea | many use it so that they o not discover the things they are looking for on the internet and it can be dangerous | |
| 3164 | nzyzz4yxuuh2mpm1 | Mecical | |
| 2351 | 7r6nd3wrw74zt3td | misled | |
| 163 | 0n64br467p77etwd | much better | 1 |
| 2289 | yjmwbb63akfzatq9 | my experience is excellent | 1 |
| 3964 | jsdc6urrgf4af83t | New Orleans | |
| 3181 | fx84we37n2nn3z0u | Nice | 1 |
| 241 | 6rdb4f7x2ue32jku | nike browsing mode | |
| 2786 | evbgm6t5c446awdy | nm u hug sara kmne ki kaj | 1 |
| 3160 | 0rzaq2bzhb4mc6ct | Nnnnnnnn | 1 |
| 3402 | ut4dqbds298mx5rg | No offense | |
| 995 | vz4dwej22d2vqs10 | NONE | |
| 2822 | u0fvftwvxwjwfjsf | NONE | |
| 3245 | c1gy41vmd54075u0 | none | |

| record | uuid | QF3r1 | Code |
|--------|------|-------|------|
| 4108 | 0ax0mt4asazmgygh | NONE | |
| 2429 | jnms06vmwt6g6yc1 | Not sharing | |
| 301 | shmagwkgmk75hpc4 | Not sure | |
| 4230 | vud2rdes4hz1c48m | Not sure really | |
| 3618 | utmdq7cr29cq6wj0 | nothing any more | |
| 3601 | 5k9vautaet1dz1vj | Nothing comes to mind | |
| 24 | 967rj9840yy3b37h | Okay | |
| 2365 | 9559smrgjtj2pww9 | One of the lawsuit that I can't use during private browsing mode is that you are not allowed to do fradualent activites | |
| 3600 | rq51pnzzdw2u7fn6 | outstanding incognito | |
| 3291 | 3te9cjqyrrmpsezm | PERFECT | 1 |
| 1410 | nfm5991h8kq5nchs | please I was in my heart is broken heart and soul and friends and family | 1 |
| 3772 | emp899qp4c531jqq | Privacy is our priority | |
| 4093 | 8pr70u7ubppwaxgx | Privacy lawsuit | 2 |
| 4197 | x0m2u4v784rx9raf | Privacy of browsing | 2 |
| 3248 | vkdpjmrkk61mj69c | privacy protection | 2 |
| 1738 | 2s19w3xrbpgfhhe5 | Private history | 2 |
| 2682 | jzd7nbfwe5pm1qr1 | protect my identyfy | 2 |
| 2424 | yymc7kgepmdupx53 | Quality | 1 |
| 4258 | g9c0j074n2vnnw32 | Recommended services and quality | 1 |
| 2417 | dcqqrhun77rbtz7p | Revealing of private info | 2 |
| 991 | cxvd6g1uzuv18528 | Some information still visible in private mode | 2 |
| 1757 | pv9ch7m3zhvv1rj0 | Some of the patent issue | |
| 3015 | 4zx35sa2nhzmke1h | Someone tried suing google for still tracking them in incognito mode but it saids your information can still be kept as soon as you open incognito mode on Google chrome | 2 |
| 2687 | df8rjpjvjddms05c | Sweet | 1 |
| 1399 | p5jkpgjg8j4rejcc | Thanks for the update and for the update and for | 1 |
| 2918 | 5b1mxvkrfwdr2kd0 | That google was being sued because they are still collecting information from incognito mode browsers | 2 |
| 2573 | uhce24wzm1te8n3z | That Google was being sued for tracking peoples data while they were supposedly in incognito mode. | 2 |
| 2845 | p4kdhp0j6ykgt19q | That some other sites could still see your information on the dark mode browser | 2 |
| 3456 | dkhfs2y0wew0kn7a | The block and hiding of personal details | 2 |
| 3802 | 4kdp4fh7cdxm6fw4 | The browser able to track personal info that lead to criminal charges | 2 |
| 3619 | bcjn9md0hu6anjd1 | The company not allow to use user's cookies as before, if they have our agreement to do so | 2 |
| 1771 | fmwy4969bhjmknz4 | The internet deals with alot of people but I think it was between dell. | |
| 3851 | k48yc2c5f9wjfwg3 | The lawsuit file in June 2020, alleges that google tracks user even when they're browsing in incognito mode. | 2 |
| 1485 | 5s78urjeztaaahnf | the lawsuit involving private browsing mode | 2 |

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4019 | pbf46ntt1g58vh40 | The lawsuit regarding private browsing mode is very relevant for me because I need something different about you is very relevant | 2 |
| 1916 | hq81nk6wyzyv2p9p | The lawsuit states that if anyone makes use of private browsing mode you should either be questioned or made to stand before a judge. | |
| 1405 | 1f9zhug4y6y682rx | The lawsuit was about the Google still saving data that was specific to the user for the purpose of ad sharing and creating algorithms that make the user experience more specific to the user rather than continuing to have unsaved random content appear that's wasn't specific to any users specific likes and dislikes! | 2 |
| 2653 | 2g1vv2wzsqkps6rp | The lawsuit which allowed viewers to suspend illegal activity | |
| 2260 | xkg0psba0ycq9kvn | The lawsuits I was aware of a civil legal action by one person or entity (the  plaintiff ) against another person or entity (the defendant ), to be decided in a court | |
| 1404 | gbfvrc94pvtrwp1g | The one that is being sued for collecting data | 2 |
| 2966 | gjh0uhgemx0sa25p | There is nothing more or less than I need right now for none of this stuff | 1 |
| 4128 | cd1rxru91w5m4r7u | They can't legally track you. | 2 |
| 93 | khnh00vqhrz5qmc4 | they is very good amazing perfect | 1 |
| 4103 | b6vc4879zvvp0wkh | This is a good tool to use daily, Chrome incognite help me to browser relax and secure. | |
| 3614 | whe5x2094jxvnu4e | this is amazing | 1 |
| 3064 | 5cvud9z9rj2zm7y7 | tracking and collecting data even when people use the private 'Incognito' mode on its Chrome browser. | 2 |
| 1412 | xd24thagfkupfsxt | Tracking their internet use through browsers set in private mode | 2 |
| 1415 | 3v5avwwdbpmeqnzh | Unsure | |
| 1586 | 77yngyhey9daehjk | Unsure | |
| 2893 | hnrgj2pjgmyue5r7 | UNSURE | |
| 4158 | 3y0a12v4b6fydxvp | Unsure of specifics.  Think it is chrome ingognito | |
| 3230 | 5tqt6uyc1a752aw1 | Using the browser freely and safely | |
| 3024 | 2ucr5uj2pzvy3u0u | UTE powersuit | |
| 1486 | cygv1xc8ymyqvj8u | V. Chug chihuahua. Xryuiin Chuck fgiik chbnkjfc.  Stub chuh vhhh.  Ddfgbc fun vhhhv. Bhubaneswar. Bj | 1 |
| 109 | w9v310jsatb3wvmq | Very good | 1 |
| 210 | d54824kycjs2452e | VEry good | 1 |
| 372 | vetmb9yj7a7xpr23 | Very good | 1 |
| 1024 | twr4espm6tqwdrtq | very good | 1 |
| 1197 | yx802s8t3rz7vyme | Very good | 1 |
| 1697 | 1q3zhe21aj1qbq0m | VERY GOOD | 1 |
| 2290 | xwumequygzcea7z2 | very good | 1 |
| 2382 | xdq8rt1eww39k1ub | VERY GOOD | 1 |
| 4040 | 3mpwkv64ms2x5d5x | VERY GOOD | 1 |
| 4186 | v07skz565716v4wy | very good | 1 |

Likelihood of Use Study

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_33

| record | uuid | QF3r1 | Code |
|---|---|---|---|
| 4087 | 9sp0wcxvy5719n2e | very good and goole browising is very satisfaid | 1 |
| 3183 | wzbf9h3cchby64yp | very good much | 1 |
| 942 | eay4xkq3mz2sm5k3 | very good value | 1 |
| 2061 | 660qeabng46rcsr4 | Very impressive | 1 |
| 3578 | 88hda5t7xe266xa5 | Very innovative | 1 |
| 1789 | tcwthks9y3y1tjvc | Very nice | 1 |
| 2870 | n8hdns7dqcvcuw95 | very positve | 1 |
| 2233 | xzcpw59wub8k5gq5 | Very useful for safety reasons | |
| 2309 | fagcma2vsqfptacg | Very well regarding to well think | 1 |
| 1954 | kva6f0r7782hmuk0 | Visit adult sites nd third website | 1 |
| 3705 | jh946jk16xbjbrab | Well | 1 |
| 3114 | 6mxuz5w4m68yn4bd | what search won't be visible to google only go the website. | 2 |
| 3444 | cr0ekg25nzunb2s1 | when i am using in private mode, my ISP can't trace my internet usage. | |
| 3392 | chckw34yy36fqb0v | Yeah I was definitely | 1 |
| 4188 | zw4tqaf77mhfftry | Yes I am aware of Google Chrome lawsuit but I don't trust Google | |
| 2725 | 17ga3pptwjk18c5z | Yes I thought I read something recently with a company and it's employee doing illegal things under secret browsing mode. | |
| 3030 | uj63xcde3mpq5fdg | yes i usually use private mode browse i find it more security for my data and i like it more | |
| 1394 | k3h8dx8tju8y1vbu | Yes I'm going to get my lawsuit to my browsing and i loke this regarding private and i like this used everyday | |
| 440 | g9nnhan5zzbk3pme | yes it | 1 |
| 3193 | rb5ek7su0bnqgw9r | Yes lawsuits on Google chrome | |
| 2368 | x82akf94gx8x6e8u | Yes, I am very impressed with all these and all that. | 1 |
| 3889 | urbt820w4t94r1pb | You can go to jail for break the law online | |

1 = Low quality response
2 = Knowledge of current lawsuit

KEEGAN_EXHIBITS_34

**Exhibit 4—Keegan Study—Questionnaire**

Thank you for agreeing to participate in this anonymous survey. The survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

The survey will take just a few minutes of your time. Before we begin, please read the following instructions:

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please feel free to select that answer when provided. We do not want you to guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding your survey answers.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.

Do you understand and agree to follow the instructions provided above?

| No |
|---|

| Yes |
|---|

| Don't know |
|---|

Next >>

KEEGAN_EXHIBITS_36

Which of the following age brackets contains your age on your last birthday?

Under 18

18 - 30

31 - 40

41 - 50

51 - 60

61 - 70

71 or older

Next >>

KEEGAN_EXHIBITS_37

In which U.S. state do you currently reside?

Next >>

KEEGAN_EXHIBITS_38

What is your gender?

Male

Female

Prefer to self-identify:

Prefer not to answer

Next >>

KEEGAN_EXHIBITS_39

Please complete the CAPTCHA below.

I'm not a robot

reCAPTCHA
Privacy - Terms

Next >>

KEEGAN_EXHIBITS_40

Which of the following Internet web browsers, if any, have you used in the last five years? Please select all that apply.

Chrome

Safari

Edge / Internet Explorer

Other

Don't know

Next >>

KEEGAN_EXHIBITS_41

Some Internet web browsers offer a **private browsing mode**. Which of the following types of private browsing, if any, have you used in the <u>last five years</u>? Please select all that apply.

Private browsing mode in Edge / Internet Explorer ("InPrivate")

Private browsing mode in Chrome ("Incognito")

Private browsing mode in Safari ("Private Browsing Mode")

None of these

Next >>

KEEGAN_EXHIBITS_42

For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.

Click the "Next" button below to continue.

Next >>

KEEGAN_EXHIBITS_43

Shown below is the screen that displays when a new Chrome Incognito window is opened. Please review it as you normally would when opening a new Chrome Incognito window. You can view the image for as long as you would like. You may click on the image for an enlarged view.



Click the "Next" button below to continue.

Next >>

Shown below is the screen that displays when a new Safari private browsing window is opened. Please review it as you normally would when opening a new Safari private browsing window. You can view the image for as long as you would like. You may click on the image for an enlarged view.



Click the "Next" button below to continue.

Next >>

Shown below is the screen that displays when a new Edge / Internet Explorer InPrivate window is opened. Please review it as you normally would when opening a new InPrivate window. You can view the image for as long as you would like. You may click on the image for an enlarged view.



Click the "Next" button below to continue.

KEEGAN_EXHIBITS_46

Next >>

KEEGAN_EXHIBITS_47

Please think of the time(s) that you have used private browsing mode to browse the Internet in the <u>last five years</u>.

Which of the following best reflects your understanding:

Google **collects and saves** my Internet browsing activity when I browse the Internet in private browsing mode

Google **does not collect and save** my Internet browsing activity when I browse the Internet in private browsing mode

Don't know / No opinion

Next >>

KEEGAN_EXHIBITS_48

Please think of the time(s) that you have used private browsing mode to browse the Internet in the <u>last five years</u>.

Which of the following best reflects your beliefs about the level of consent that you provide Google to collect information about your Internet browsing activity when in private browsing mode?

I believe that when I am in private browsing mode, **I have not given consent** for Google to collect and save information about my Internet browsing activity

I believe that when I am in private browsing mode, **I have given consent** for Google to collect and save information about my Internet browsing activity

Don't know / No opinion

Next >>

KEEGAN_EXHIBITS_49

Which of the following best reflects your opinion?

*I believe that when I am in private browsing mode, I have given consent for Google to collect and save information about my Internet browsing activity (please select all that apply):*

When I am visiting a **non-Google website**

When I am visiting a **Google website**

Don't know

Next >>

KEEGAN_EXHIBITS_50

If you know, which of the following types of accounts have you had at any time during the last five years? Please select all that apply.

Google account (e.g., Gmail, Google Docs, Google Drive, Google Photos)

Microsoft account (e.g., OneDrive, Microsoft Teams, OneNote)

Apple account (e.g., iCloud, Apple Pay, Apple Music)

None of these

Next >>

KEEGAN_EXHIBITS_51

Which of the following best reflects your opinion?

*I believe that when I am in private browsing mode, I have given consent for Google to collect and save information about my Internet browsing activity (please select all that apply):*

When I am **signed in** to my Google account

When I am **signed out** of my Google account

Don't know

Next >>

KEEGAN_EXHIBITS_52

Please think of the time(s) that you have used private browsing mode to browse the Internet in the last five years.

Would you or would you not expect Google to collect and save each of the following types of information about your Internet browsing behavior during your private browsing mode session?

| | **Yes**, Google would collect and save | **No**, Google would not collect and save | Don't know |
|---|---|---|---|
| Your IP address | ○ | ○ | ○ |
| HTTP information | ○ | ○ | ○ |
| Cookies | ○ | ○ | ○ |
| Your unique user ID | ○ | ○ | ○ |
| Your user agent | ○ | ○ | ○ |
| URL information | ○ | ○ | ○ |
| Your geolocation | ○ | ○ | ○ |
| Your browsing activity | ○ | ○ | ○ |

Next >>

KEEGAN_EXHIBITS_53

Please select "Green" from the list below.

Red

Green

Yellow

Blue

Next >>

KEEGAN_EXHIBITS_54

Now, a few more questions for classification purposes only. Which of the following best describes your educational background?

Less than high school

High school graduate

Some college

2-year degree

4-year degree

Master's / Professional degree

Doctorate

Next >>

KEEGAN_EXHIBITS_55

Which of the following includes your household's approximate annual income in 2021?

Under $35,000

$35,000 - $49,999

$50,000 - $74,999

$75,000 - $99,999

$100,000 - $124,999

$125,000 - $149,999

$150,000 or more

I prefer not to answer

Next >>

KEEGAN_EXHIBITS_56

We thank you for your time spent taking this survey.
Your response has been recorded.

KEEGAN_EXHIBITS_57

**Exhibit 5—Keegan Study—Tabulated Data**

KEEGAN_EXHIBITS_58

# Tabulated Data

Q1 - Beginning instruction



| Answer | % | Count |
|---|---|---|
| Yes | 100.0% | 1052 |
| No | 0.0% | 0 |
| Don't know | 0.0% | 0 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_59

## Q2 - Age



| Answer | % | Count |
|---|---|---|
| Under 18 | 0.0% | 0 |
| 18 - 30 | 18.4% | 194 |
| 31 - 40 | 22.6% | 238 |
| 41 - 50 | 20.0% | 210 |
| 51 - 60 | 13.2% | 139 |
| 61 - 70 | 15.1% | 159 |
| 71 or older | 10.6% | 112 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_60

## Q3 - State



| Answer | % | Count |
| --- | --- | --- |
| Alabama | 0.8% | 8 |
| Alaska | 0.1% | 1 |
| Arizona | 2.1% | 22 |
| Arkansas | 1.2% | 13 |
| California | 10.0% | 105 |

KEEGAN_EXHIBITS_61

| | | |
|---|---|---|
| Colorado | 1.8% | 19 |
| Connecticut | 1.6% | 17 |
| Delaware | 0.1% | 1 |
| District of Columbia | 0.1% | 1 |
| Florida | 9.3% | 98 |
| Georgia | 2.9% | 31 |
| Hawaii | 0.2% | 2 |
| Idaho | 0.0% | 0 |
| Illinois | 4.1% | 43 |
| Indiana | 1.4% | 15 |
| Iowa | 1.0% | 10 |
| Kansas | 0.8% | 8 |
| Kentucky | 1.9% | 20 |
| Louisiana | 1.0% | 10 |
| Maine | 0.5% | 5 |
| Maryland | 1.6% | 17 |
| Massachusetts | 1.6% | 17 |
| Michigan | 2.5% | 26 |
| Minnesota | 1.0% | 11 |
| Mississippi | 0.5% | 5 |
| Missouri | 2.7% | 28 |
| Montana | 0.1% | 1 |
| Nebraska | 1.0% | 10 |
| Nevada | 1.6% | 17 |
| New Hampshire | 0.5% | 5 |
| New Jersey | 3.2% | 34 |
| New Mexico | 0.3% | 3 |
| New York | 7.0% | 74 |
| North Carolina | 3.5% | 37 |
| North Dakota | 0.2% | 2 |

KEEGAN_EXHIBITS_62

| | | |
|---|---|---|
| Ohio | 3.6% | 38 |
| Oklahoma | 1.0% | 10 |
| Oregon | 1.2% | 13 |
| Pennsylvania | 5.0% | 53 |
| Rhode Island | 0.4% | 4 |
| South Carolina | 1.2% | 13 |
| South Dakota | 0.1% | 1 |
| Tennessee | 1.7% | 18 |
| Texas | 9.3% | 98 |
| Utah | 0.8% | 8 |
| Vermont | 0.1% | 1 |
| Virginia | 2.9% | 30 |
| Washington | 1.5% | 16 |
| West Virginia | 1.2% | 13 |
| Wisconsin | 1.8% | 19 |
| Wyoming | 0.1% | 1 |
| Other | 0.0% | 0 |
| None of these | 0.0% | 0 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_63

## Q4 - Gender



| Answer | % | Count |
|---|---|---|
| Male | 50.0% | 526 |
| Female | 49.9% | 525 |
| Prefer to self-identify: | 0.1% | 1 |
| Prefer not to answer | 0.0% | 0 |
| Total | 100% | 1052 |

## Q4_3_TEXT - Prefer to self-identify:

Prefer to self-identify: - Text

Non binary

KEEGAN_EXHIBITS_64

## Q6 - Browsers



| Answer | % | Count |
|---|---|---|
| Chrome | 87.6% | 922 |
| Safari | 48.1% | 506 |
| Edge / Internet Explorer | 51.8% | 545 |
| Other | 11.1% | 117 |
| Don't know | 0.0% | 0 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_65

## Q7 - Private browsing



| Answer | % | Count |
|---|---|---|
| Private browsing mode in Chrome ("Incognito") | 76.3% | 803 |
| Private browsing mode in Edge / Internet Explorer ("InPrivate") | 26.6% | 280 |
| Private browsing mode in Safari ("Private Browsing Mode") | 32.9% | 346 |
| None of these | 0.0% | 0 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_66

## Q15 - Collects and saves



| Answer | % | Count |
|---|---|---|
| Google collects and saves my Internet browsing activity when I browse the Internet in private browsing mode | 35.3% | 371 |
| Google does not collect and save my Internet browsing activity when I browse the Internet in private browsing mode | 54.8% | 576 |
| Don't know / No opinion | 10.0% | 105 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_67

## Q16 - Consent



| Answer | % | Count |
|---|---|---|
| I believe that when I am in private browsing mode, I have given consent for Google to collect and save information about my Internet browsing activity | 37.6% | 179 |
| I believe that when I am in private browsing mode, I have not given consent for Google to collect and save information about my Internet browsing activity | 44.5% | 212 |
| Don't know / No opinion | 17.9% | 85 |
| Total | 100% | 476 |

KEEGAN_EXHIBITS_68

Q17 - Consent - Google/non-Google



| Answer | % | Count |
|---|---|---|
| When I am visiting a Google website | 54.5% | 144 |
| When I am visiting a non-Google website | 24.6% | 65 |
| Don't know | 28.4% | 75 |
| Total | 100% | 264 |

KEEGAN_EXHIBITS_69

## Q18 - Accounts



| Answer | % | Count |
|---|---|---|
| Google account (e.g., Gmail, Google Docs, Google Drive, Google Photos) | 69.3% | 97 |
| Microsoft account (e.g., OneDrive, Microsoft Teams, OneNote) | 42.1% | 59 |
| Apple account (e.g., iCloud, Apple Pay, Apple Music) | 38.6% | 54 |
| None of these | 12.1% | 17 |
| Total | 100% | 140 |

KEEGAN_EXHIBITS_70

Q19 - Consent - Signed In or Out



| Answer | % | Count |
|---|---|---|
| When I am signed in to my Google account | 50.5% | 49 |
| When I am signed out of my Google account | 19.6% | 19 |
| Don't know | 41.2% | 40 |
| Total | 100% | 97 |

KEEGAN_EXHIBITS_71

Q20 - Matrix



| Question | Yes, Google would collect and save | | No, Google would not collect and save | | Don't know | | Total |
|---|---|---|---|---|---|---|---|
| URL information | 51.0% | 52 | 5.9% | 6 | 43.1% | 44 | 102 |
| HTTP information | 47.1% | 48 | 7.8% | 8 | 45.1% | 46 | 102 |
| Cookies | 45.1% | 46 | 13.7% | 14 | 41.2% | 42 | 102 |
| Your browsing activity | 46.1% | 47 | 9.8% | 10 | 44.1% | 45 | 102 |
| Your IP address | 46.1% | 47 | 11.8% | 12 | 42.2% | 43 | 102 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Your user agent | | 37.3% | 38 | | 9.8% | 10 | | 52.9% | 54 | 102 |
| Your geolocation | | 42.2% | 43 | | 11.8% | 12 | | 46.1% | 47 | 102 |
| Your unique user ID | | 39.2% | 40 | | 12.7% | 13 | | 48.0% | 49 | 102 |

KEEGAN_EXHIBITS_73

Q21 - Green



| Answer | % | Count |
|---|---|---|
| Red | 0.0% | 0 |
| Green | 100.0% | 1052 |
| Blue | 0.0% | 0 |
| Yellow | 0.0% | 0 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_74

## Q22 - Education



| Answer | % | Count |
|---|---:|---:|
| Less than high school | 2.2% | 23 |
| High school graduate | 21.9% | 230 |
| Some college | 22.6% | 238 |
| 2-year degree | 12.3% | 129 |
| 4-year degree | 26.2% | 276 |
| Master's / Professional degree | 12.6% | 133 |
| Doctorate | 2.2% | 23 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_75

## Q23 - Income



| Answer | % | Count |
|---|---|---|
| Under $35,000 | 23.7% | 249 |
| $35,000 - $49,999 | 17.3% | 182 |
| $50,000 - $74,999 | 18.3% | 193 |
| $75,000 - $99,999 | 15.7% | 165 |
| $100,000 - $124,999 | 9.3% | 98 |
| $125,000 - $149,999 | 6.3% | 66 |
| $150,000 or more | 7.6% | 80 |
| I prefer not to answer | 1.8% | 19 |
| Total | 100% | 1052 |

KEEGAN_EXHIBITS_76

## Exhibit 6—Keegan Study—Untabulated Data

**Produced electronically.**

**Exhibit 7—Keegan Study—Disposition of Contacts**

KEEGAN_EXHIBITS_78



**KEEGAN & DONATO**
CONSULTING, LLC

**Disposition of Contacts - Chasom Brown, et al. v. Google LLC**

|  | n | % |
|---|---|---|
| Responded to invitation | 1,987 | 100.0% |
| | | |
| Rejected - failed instruction acknowledgement question | 111 | 5.6% |
| Rejected - failed age question (under 18) | 11 | 0.6% |
| Rejected - failed - state (selected "other" or "don't know") | 2 | 0.1% |
| Rejected - failed - not a Chrome, Safari, or Edge/IE user | 82 | 4.1% |
| Rejected - failed - not a Chrome, Safari, or Edge/IE private browsing user | 708 | 35.6% |
| Rejected - failed security question ("Green") | 3 | 0.2% |
| Rejected - speeder | 1 | 0.1% |
| Rejected - over quota | 17 | 0.9% |
| Total qualified respondents | 1,052 | 52.9% |

**Exhibit 8—Summary of Google Internal Documents**

| Production Number | Description |
|---|---|
| GOOG-BRWN-00228597 | On June 12, 2008, a Google employee sent email referencing interviews of Google employees ("non-eng Googlers") regarding Incognito, noting a participant had "[p]rivacy concerns" and asked "if go incognito is REALLY going incognito[.]" |
| GOOG-BRWN-00477487 | On July 10, 2008, a Google employee circulated "feedback from the UX [user experience] studies" (at -487), where "most users did not fully understand what 'Go Incognito' was from the name alone" (at -488), noting that "a common misconception is that 'go incognito' will stop the server storing information" (at -488) and a "server logging misunderstanding" (at -489). |
| GOOG-BRWN-00409986 | On July 17, 2008, a Google employee circulated "Chrome team meeting notes" (at -986) reporting that "People didn't understand Incognito. Does it keep sites from logging stuff on their servers? (at -987)." |
| GOOG-BRWN-00477510 | (at -513-514). |
| GOOG-BRWN-00812091 | In March 2014, a Google employee wrote that "The spy imagery is absolutely NOT what we want to keep portraying. It's unfortunate that we already have it. Incognito does NOT support the kinds of guarantees that people imagine for a 'spy mode.'" |
| GOOG-CABR-05287675 | On September 23, 2014, a Google employee sent an email stating that "people don't and indeed cannot understand Incognito's guarantee(s) and non-guarantee(s)," that "[n]ormal people have no chance," and that "Incognito's confusability is actively harmful to the Chrome and Google brands." |
| GOOG-BRWN-00457255 | On September 25, 2014, a Google employee sent an email stating that Chrome Incognito users were "operating under a false sense |

| Production Number | Description |
|---|---|
| | of privacy" and that there is a need for Google to make changes so "we don't deceive users." |
| GOOG-BRWN-00806482 | In January 2015, Google employees discussed issues with people "perceiv[ing] that Incognito provides a guarantee of unlinkability" and noting that "[p]erception is the entire problem, and we foolishly fan the flames." |
| GOOG-CABR-05370279 | In January 8, 2015, a Google employee stated that "the fault lies partly with the name and the iconography" where "we give things names and icons that promise things that the software is not delivering." |
| GOOG-BRWN-00630517 | In February 2015, a Google employee described Incognito as "radioactive" and "effectively a lie." |
| GOOG-CABR-00111856 | An August 2015 document named "Exploration of primary value proposition of Incognito to users - GCS" notes that "[p]revious survey showed that there are various misconceptions among users on what an Incognito browser provides in terms of protecting their privacy," and that "[b]ased on this research, we hypothesized that Chrome's Incognito may benefit from a re-design of its tab page such that its true functionality and model of operation is more accurately conveyed" (at -856). |
| GOOG-BRWN-00390418 | In an April 2016 email, Google employee Sabine Borsay lamented "how much we're actually struggling with the Incognito branding and misconceptions it causes," including after "[a]ll the years of research." |
| GOOG-CABR-00353831 | In May 2016, a Google employee expressed that "it's extremely disappointing that 'Incognito' was used for another prominent Google feature that, unlike Chrome's Incognito, offers e2e encryption. I expect it will lead to confusion" (-831). |
| GOOG-CABR-04971904 | Discussing Incognito in May 2016, a Google engineer lamented: "This isn't just marketing, it isn't just a word, this isn't OK. This is a problem of professional ethics and basic honesty, and if we want to call ourselves security engineers and privacy engineers, we need to fix it." (at -04). |
| GOOG-BRWN-00410884 | On June 21, 2016, a Google employee sent an email concerning "Google 'Incognito' Precision" stating that "nothing will be more scannable than the name and the icon, both of which are a poor fit for what the feature actually provides" (at -884). |
| GOOG-BRWN-00475063 | In July 2018, a Google employee wrote that he "kn[e]w the 'incognito war was waged and lost years ago, but do you know why? It has always been a misleading name" (at -065). Another |

| Production Number | Description |
|---|---|
| | Google employee wrote "we need to stop calling it Incognito and stop using a Spy Guy icon" (at -065). |
| GOOG-CABR-04718352 | A document called "Five ways people misunderstand Incognito and private browsing" authored by Google employee Martin Shelton reports that "Private browsing has a problem. In both internal and external research, we've seen that the privacy properties of Incognito aren't well understood, to say the least. And the same is true for all modern browsers with a private browsing mode" (at -352). Mr. Shelton lists "common misconceptions," including that "[m]ost users believe their private browsing activity won't be remembered by Google, even after they sign into their account" (*id.*). He notes that "[t]hese misconceptions could give users a false impression of privacy in a moment when they expect it most, leading them to inadvertently share sensitive personal data," and proposes Google "be bolder about saying *who sees what* as we browse the web," beginning with making "creative changes to naming conventions, iconography, explanation strings, and/or the function of Incognito itself" (*id.*). |
| GOOG-BRWN-00140297 | A July 2018 Google presentation called "The Incognito Problem" reported that "[w]e know from intuition, anecdotes, and now empirically (Yuxi Wu, et al.; see also Habib, et al.) that the 'incognito'/Spy Guy branding, and the complex disclosures (like all complex disclosures), confuse people as to what exact guarantees it offers and does not offer" (at -299). That Google presentation states "[w]e are over-promising and under-delivering" (at -302) and recommends to "[u]se less loaded terms and iconography" and "[s]implify the disclosure/disclaimer" (at -315). |
| GOOG-BRWN-00797584 | On July 21, 2018, Google employee Mr. Palmer shared "The Incognito Problem" presentation with other Google employees, including the Google "Chrome Privacy Core" listserv and the Google ████████ listserv. |
| GOOG-BRWN-00634444 | In July 2018, regarding "The Incognito Problem," Google employee Dr. Adrienne Porter Felt stated she was a "fan" of "dial[ing] up Incognito to get closer to users' expectations." |
| GOOG-CABR-00084985 | In July 2018, Google admitted in an internal presentation that users experienced "several common misconceptions" about "how Incognito works" and admitted that "[t]he same is true for private browsing more generally." (at -043) |
| GOOG-BRWN-00804212 | On August 22, 2018, Google employee Mr. Palmer asked Dr. Porter Felt for her "views, if any, on The Incognito Problem? (Or do you agree there is a problem?)" and Dr. Porter Felt responded she "agree[s] there is an incognito problem." |

| Production Number | Description |
|---|---|
| GOOG-BRWN-00042339 | An August 2018 Google presentation called "How Do Users Interpret Alternative Incognito Metaphors" describes a survey of active Chrome users to assess a possible change to the Chrome Incognito icon, asking participants "whether they believe their search history would be remembered when they logged into Google" (at -341). Summarized findings include: "Most Chrome users do not understand what is and is not saved when logging into an account in Incognito, even if they are experienced using it" (at -347). |
| GOOG-CABR-03764749 | In August 2018, Martin Shelton, a User Experience Researcher at Google, explained that the words "Incognito" and "private" are problematic insofar as they reinforce the "misperception that your browsing is private *everywhere* instead of just on your device" (at -50) |
| GOOG-BRWN-00047390 | A September 24, 2018 Google document called "Incognito Mode, Current and Possible Promises" includes a section on "[r]educing user confusion" notes that ████████████████████ ██████████████████████████████████████ ██████████████████████████████ (at -397). |
| GOOG-CABR-04261880 | On September 24, 2018, a Google employee stated that Incognito "misconceptions flow directly from the framing of the feature as 'Incognito' (or, for other browsers, 'Private')." |
| GOOG-CABR-03923580 | On November 5, 2018, a Google employee stated that "the blame for people's misconceptions about Incognito mode is due to that name and branding," as that employee "had argued repeatedly" (at -581). |
| GOOG-CABR-00094550 | A Google document created in 2019 noted that "[r]esearch indicates that most users do not currently understand the current messaging" of Incognito mode and proposed changes to the Incognito Splash Screen to use "simple iconography" to "explain simply to a user who they are protected from," including to explain if "[y]ou are protected from Google." |
| GOOG-BRWN-00848723 | A January 2019 Google presentation includes "UXR Questions" (at -724). In response to the question "Do users really understand what they're consenting to when they consent to share browsing history or other behaviour data," the presentation states: "No. The research shows that participants don't read the text without guidance and don't understand the text when they do" and also that "a large fractions of users feel they have no choice in the bargain, or that the choice is difficult to find and the playfield is slanted against them" (at -726). |

| Production Number | Description |
|---|---|
| GOOG-CABR-04991831 | On February 27, 2019, Google employee sent an email discussing "██████ plans" and an "upcoming exec review" with Google CEO Sundar Pichai, where topics included "[e]hancements to Incognito, in line with the thinking from Chris Palmer and others." |
| GOOG-CABR-00142741 | A March 2019 Google presentation called "User Needs & Misconceptions" includes a set of slides labeled "Common Misconceptions" (at -745) referencing the March 2018 "Five misconceptions of Incognito Mode" (at -746) discussed above. The presentation acknowledges that the "idea that incognito can provide anonymity creates a false sense of security in returning incognito users" and notes that "user perceptions around these [Incognito] protections tend to be focused at the level of the webpage," not just the level of the device (at -747). The presentation also describes how Google uses the Incognito brand in other products despite"[i]nconsistencies mak[ing] it difficult for users to develop a consistent mental model" (at -751). |
| GOOG-BRWN-00047341 | In a December 2019 internal Google presentation, Google discussed the need to ███████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████" (at -44). |
| GOOG-CABR-00141578 | A January 2020 Google document "[r]ecommend[ing] [a] position for Chrome" reported that "[r]esearch strongly suggests that a significant proportion of users already expect Incognito to protect them from tracking on the network-stack and from the web-server" (at -579). |
| GOOG-CABR-05148261 | In a January 2020 internal Google presentation, Google admitted that "When Incognito is on," Google should not "save IP addresses or other unique IDs." (at -73). |
| GOOG-BRWN-00042388 | A March 2020 Google presentation called "Incognito Mode UXR Review" includes a section called "Misconceptions & Expectations" (at -402) (with references to "sumUX Research March 2020" and "Chrome Lit. Review 2018" studies) reports that participants in those studies "do not understand how private mode works" and "overestimate private mode protections" (-403). It lists "several common misconceptions about private mode, including that it prevents all external parties from accessing user data and search history, safeguards against hacking, and protects against tracking and ad targeting… gives anonymity, obscures location, hides browsing activity from Google" (at -403). It also notes that |

| Production Number | Description |
|---|---|
| | ███████████████████████████████ ████ (-404). |
| GOOG-CABR-04431207 | A March 2020 presentation called "Incognito mode [] Awareness and Landscape" describes an effort to "gather up-to-date information about awareness and usage of Incognito mode" in various areas, including "[u]nderstandings and misconceptions," covering "[h]ow well" users "understand the mechanics of Incognito mode" and "[w]hat protections" users "believe Incognito mode provides (-210). Google acknowledged that "[t]here has been a lot of external work that has looked at people's understandings and misunderstandings of Incognito mode," and Google sought to "run some of our own research into users' perceptions" (at -210). The presentation includes a "Methodology" slide describing an "online quantitative survey of regular Google Chrome users (weekly+ usage)" focusing on the U.S. market with ████ participants (at -211). In the "Executive Summary," Google reported that "[u]sers overestimate the protections that Incognito mode provides" (at -213). The Google presentation states that "Incognito mode is widely used" and that "there are significant misconceptions about features, security benefits, and data collection" (at -213). Questions in the survey included: "When I am using incognito mode, Google will <u>never</u> collect data about what I am doing" (-215). Google's presentation represents that the correct answer was "F" (false) and that only "████ of the "Weekly Incognito User" group answered that question correctly (at -215). Of the ██████████ of the respondents who answered that question incorrectly, according to the presentation, ████ answered true and ████ were unsure (at -224). |
| GOOG-BRWN-00406065 | In January 2021, Google CMO Lorraine Twohill characterized Incognito as "not truly private." (at -67). |
| GOOG-CABR-04738550 | A January 2021 Google presentation called "Incognito Users and Use Cases" references the same survey discussed above (in GOOG-CABR-04431207). In the "Executive Summary," the presentation provides that "[u]sers overestimate the protections that Incognito provides and are unaware of the personalization and data collection that occurs when it is on" (GOOG-CABR-04738550 at -552). The presentation reports that "████ of Chrome users use Incognito mode, at least occasionally" (at -560). |
| GOOG-CABR-04739841 | ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |

| Production Number | Description |
|---|---|
| | ██████████████████████████████████ ” (at -842). |
| GOOG-CABR-04668451 | A July 14, 2021 email with the subject "Incognito NTP Revamp" notes "User problem: Users have misconceptions about Incognito and often overestimate the protections available." |
| GOOG-CABR-04746153 | ██████████████████████████████████ (at -172). |