# GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT MICHAEL J. LASINSKI

# Redacted Version of Document Sought to be Sealed

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jomaire Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Counsel for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| CHASOM BROWN, et.al, individually and on behalf of all similarly situated,, <br><br> Plaintiffs, <br><br> vs. <br><br> GOOGLE LLC,, <br><br> Defendant. | Case No. 4:20-cv-03664-YGR-SVK <br><br> **GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT MICHAEL J. LASINSKI** <br><br> The Honorable Yvonne Gonzalez Rogers <br> Date:　　　 September 20, 2022 <br> Time:　　　 2:00 p.m. <br> Location:　 Courtroom 1 – 4th Floor |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PRELIMINARY STATEMENT ........................................................................2

II.    STATEMENT OF RELEVANT FACTS ......................................................3

      A.    Mr. Lasinski's Methods For Calculating Class-Wide Restitution Damages..............4

           1.    Ipsos Screenwise. .....................................................................................4

           2.    Other Methods Of Determining Restitution Damages. ...............................6

      B.    Mr. Lasinski's Methods For Calculating Class-Wide Unjust Enrichment................7

      C.    Mr. Lasinski's Method For Calculating Statutory Damages.....................................9

      D.    Mr. Lasinski's Damages Allocation Methodology ................................................10

III.   LEGAL STANDARD ......................................................................................12

IV.   ARGUMENT ..................................................................................................12

      A.    Mr. Lasinski's Entire Opinion Should Be Excluded Because He Fails to Account for Uninjured Users Who Consented to the At-issue Data Collection ..............................................................................................12

      B.    Mr. Lasinski's Restitution Opinion Should Be Excluded ......................................14

           1.    Mr. Lasinski's Primary Input For Calculating Class-Wide Restitution Damages Is Speculative And Unreliable. ..................................14

           2.    Mr. Lasinski's Restitution Opinion Fails To Account For Variability In User Benefit From Personalization And Valuation Of Privacy..............17

      C.    Mr. Lasinski's Unjust Enrichment/Disgorgement Model Should Be Excluded In Whole Or In Part As Unreliable And Contrary To The Law..............18

           1.    Failure To Deduct Costs From Unjust Enrichment/Disgorgement Calculations Is Contrary To The Law And Has No Basis In The Facts. ...........................................................................................................18

           2.    All Of Mr. Lasinski's Unjust Enrichment Scenarios Are Flawed And Should Be Excluded As Unreliable. ................................................19

      D.    Mr. Lasinski's Proposed Methods For Apportioning Damages Are Unreliable And Unhelpful ....................................................................................21

           1.    Mr. Lasinski's Proposed Methods For Apportioning Damages Ignore Individual Differences. ...............................................................21

           2.    Mr. Lasinski's Does Not Propose A Feasible Or Efficient Method For Distributing Damages. .....................................................................23

E.    Mr. Lasinski's Opinion On Calculating Statutory Damages Is Unreliable ..............24

V.    CONCLUSION ....................................................................................................................25

GOOGLE LLC'S MOTION TO EXCLUDE DAMAGES EXPERT MICHAEL J. LASINSKI

1

**TABLE OF AUTHORITIES**

2                                                                                          **Page**

3                                                 **Cases**

4    *Apple, Inc. v. Samsung Elecs. Co.*,
        No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012)................................. 19

5    *Bakst v. Cmty. Mem'l Health Sys., Inc.*,
6        2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) .......................................................... 16

7    *Bowerman v. Field Asset Servs., Inc.*,
        39 F.4th 652 (9th Cir. 2022)........................................................... 12, 13, 14, 23, 24

8    *Brazil v. Dole Packaged Foods, LLC*,
9        660 F. App'x 531 (9th Cir. 2016) ......................................................................... 17

10   *Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*,
        2019 WL 1170489 (N.D. Cal. Mar. 13, 2019) ...................................................... 21

11   *Calhoun v. Google LLC*,
12       526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ......................................................... 14

13   *Campbell v. Facebook, Inc.*,
        2016 WL 2897936 (N.D. Cal. May 18, 2016) ...................................................... 25

14   *Chowning v. Kohl's Dep't Stores, Inc.*,
15       733 F. App'x 404 (9th Cir. 2018)........................................................ 17, 21, 23

16   *Cisco Systems, Inc. v. Advanced Digital Solutions International, Inc.*,
        No. 4:18-CV-07602-YGR, 2021 WL 3129590 (N.D. Cal. July 23, 2021) .............................. 19

17   *Comcast Corp. v. Behrend*,
18       569 U.S. 27 (2013) ......................................................... 12, 13, 19, 20, 23, 24

19   *Conroy v. Ridge Tool Co.*
        No. 4:20-CV-05882-YGR, 2022 WL 911138 (N.D. Cal. Feb. 3, 2022)……………………….........25

20   *Consumer Fin. Prot. Bureau v. Gordon*,
21       819 F.3d 1179 (9th Cir. 2016)............................................................. 19, 21

22   *Cooper v. Brown*,
        510 F.3d 870 (9th Cir. 2007)........................................................................ 12

23   *Daubert v. Merrell Dow Pharm., Inc.*,
24       509 U.S. 579 (1993) ......................................... 1, 2, 12, 14, 15, 16, 18, 25

25   *Doyle v. Chrysler Grp., LLC*,
        663 F. App'x 576 (9th Cir. 2016)................................................................. 23

26   *Freitas v. Cricket Wireless*,
27       2022 WL 3018061 (N.D. Cal. July 29, 2022) ...................................................... 16, 19

28   *Gardiner v. Walmart Inc.*,
        2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ...................................................... 14

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................................................ 15

*Guidroz-Brault v. Missouri Pacific Railroad Co.*,
   254 F.3d 825 (9th Cir. 2001) ............................................................................. 19

*In re Apple iPhone Antitrust Litig.*,
   No. 11-CV-6714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ................. 12, 13, 21, 23

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*,
   2019 WL 7177984 (C.D. Cal. Dec. 2, 2019) ..................................................... 14

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
   21 F.4th 1102 (9th Cir. 2021)............................................................................ 24

*In re Hulu Priv. Litig.*,
   2014 WL 2758598 (N.D. Cal. June 17, 2014) ................................................... 24

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013)............................................................................. 12

*Looksmart Grp., Inc. v. Microsoft Corp.*,
   2019 WL 4009263 (N.D. Cal. Aug. 5, 2019) ................................................. 16, 19

*Noel v. Hall*,
   568 F.3d 743 (9th Cir. 2009)............................................................................. 24

*NovelPoster v. Javitch Canfield Group*,
   140 F.Supp.3d 938 (N.D. Cal. 2014) ................................................................ 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022)......................................................................... 13, 14

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014)............................................................................. 14

*Opperman v. Path, Inc.*,
   2016 WL 3844326 (N.D. Cal. July 15, 2016) ................................. 12, 18, 21, 22, 23

*Parino v. BidRack, Inc.*,
   838 F. Supp. 2d 900 (N.D. Cal. 2011) .............................................................. 14

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018).............................................................. 15

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ...................................................................................... 13

*Two Jinn, Inc. v. Gov't Payment Serv., Inc.*,
   233 Cal. App. 4th 1321 (2015) ......................................................................... 14

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund
   v. Teikoku Pharma USA,*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017)...................... 18 ,19

*Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   859 F. App'x 168 (9th Cir. 2021) ................................................................. 14

### **Statutory Authorities**

18 U.S.C. § 2520(c)(2)(b) ............................................................................ 14

Cal. Civ. Code § 3358 .................................................................................. 14

Cal. Civ. Code § 3515 .................................................................................. 19

Cal. Penal Code § 502 (West) ...................................................................... 14

Cal. Penal Code § 637.2 (West) ................................................................... 13

### **Rules and Regulations**

Fed. R. Civ. P. 23(b)(3) ....................................................................... 11, 13, 19

Fed. R. Evid. 702 .......................................................................... 1, 2, 12, 19,25

1    PLEASE TAKE NOTICE, on September 20, at 2:00 p.m., before the Honorable Yvonne

2   Gonzalez Rogers of the United States District Court, Northern District of California, Google LLC

3   ("Google") will move the Court to exclude the opinions of Plaintiffs' Damages Expert Michael J.

4   Lasinski ("Mr. Lasinski") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

5   *Pharms., Inc.*, 509 U.S. 579 (1993). This Motion is based on this Notice of Motion, accompanying

6   Memorandum of Points and Authorities, Declaration of Viola Trebicka, dated August 5, 2022

7   ("Trebicka Decl."), and all other evidence in the record.

8                                    **ISSUE TO BE DECIDED**

9    Whether Mr. Lasinski's opinions should be excluded in whole or in part under Federal Rules

10  of Evidence 702 and the standards articulated in *Daubert*.

11                                  **RELIEF REQUESTED**

12   Google requests that the Court exclude the following opinions set forth in Mr. Lasinski's

13  April 22, 2022 Expert Report, Dkt. 608-9 ("Lasinski Rep.") because they are unreliable and

14  unhelpful to the Court under *Daubert* and Rule 702:

15   (1) Each of Mr. Lasinski's damages opinions (Lasinski Rep. ¶¶ 52-198) should be excluded

16  for failure to account for users who consented and are therefore not injured; (2) Mr. Lasinski's entire

17  restitution opinion (*id*. ¶¶ 137-184) should be excluded because it relies on a non-comparable

18  measure for the value of the data alleged to be improperly collected (the "At-issue Data"), does not

19  account for or provide a way to exclude users who suffered no injury because the benefit they

20  received from personalized advertising outweighs the value of the At-issue Data, and/or fails to

21  account for the variation in how much users value the At-Issue Data and privacy; (3) Mr. Lasinski's

22  entire unjust enrichment opinion (*id*. ¶¶ 52-136) should be excluded as contrary to the law because

23  he calculates unjust revenue rather than unjust profit; (4) Mr. Lasinski's unjust enrichment Scenario

24  One and the portion of Scenario Two related to personalization (*id*. ¶¶ 60-79, 92-108, 115-124, 131-

25  136) should be excluded because they fail to subtract revenue attributable to third-party cookies to

26  which users explicitly consented on the Incognito New Tab Page ("NTP"); (5) Mr. Lasinski's unjust

27  enrichment Scenarios One, Three, and the portion of Scenario Two related to personalization (*id*. ¶¶

28  60-79, 86-124, 131-136) should be excluded for failure to remove revenue attributable to third-party

cookies to which users consented through pop-ups on individual third-party sites; (6) Mr. Lasinski's statutory damages opinion (*id.* ¶¶ 185-195) should be excluded for inflating damages beyond those attributable to the alleged improper data collection practices; (7) Mr. Lasinski's methodologies to apportion damages (*id.* ¶¶ 196-198) should be excluded because they do not fairly compensate class members in proportion to their alleged harm and/or are excessively difficult to administer.

DATED: August 5, 2022

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____*/s/Andrew H. Schapiro*_____
　　　Andrew H. Schapiro

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.　PRELIMINARY STATEMENT

In seeking certification of their class, Plaintiffs rely solely on the opinion of their expert, Michael J. Lasinski, to argue that their purported restitution, unjust enrichment/disgorgement, and statutory damages are susceptible to class-wide calculation and allocation. For the reasons below, Mr. Lasinski's opinions are too speculative and unreliable, fail to meet the requirements under *Daubert* and Federal Rule of Evidence 702, and thus cannot serve as the class-wide proof of damages Plaintiffs need at this stage.

*First*, Mr. Lasinski incorrectly assumes that every putative class member was injured by Google's alleged misconduct. The record demonstrates that many class members using private browsing mode ("PBM") were *not* harmed because they were aware of and consented to Google's collection of the At-issue Data. But Mr. Lasinski's methodology sweeps these non-injured putative class members and their purported attendant damages into his restitution, unjust enrichment, and statutory damages calculations, drastically overstating Plaintiffs' alleged damages. Mr. Lasinski's failure to propose a methodology that identifies and removes non-injured class members who lack any legal basis to recover in this action warrants exclusion of his opinion.

*Second*, Mr. Lasinski's restitution opinion improperly relies on the non-comparable compensation Google offers participants of its Ipsos Screenwise panel ("Ipsos"), $3 per month, as the baseline measure for the value of the At-issue Data. But during his deposition, Mr. Lasinski

conceded that the Ipsos award compensates participants for (1) consenting to a much wider collection of data than what is at issue here; and (2) a slew of elevated requirements and activities—such as minimum browsing requirements and rules against tools or settings to limit data transmission—that are also not at issue here. His restitution damages model is also contrary to law because it ignores evidence that the benefit some putative class members may have derived from personalized advertisements and other content outweighed the alleged value of their data or their alleged harm, such that they are not injured. Finally, the class-wide model fails to account for inevitable variations in how much users value the At-issue Data and privacy.

*Third*, Mr. Lasinski's opinion fails to follow the well-established formula for calculating unjust enrichment because he opines that Plaintiffs are entitled to unjust *revenue* rather than unjust *profits*. Mr. Lasinski's unjust enrichment model further fails to subtract revenue that Google earned that is not attributable to its alleged wrongful conduct, including revenue attributable to third-party cookies to which, record evidence shows, some PBM users consented.

*Fourth,* each of the bases Mr. Lasinski offers for calculating statutory damages are inflated, unreliable, and disproportional to the harm of individual class members, and do not account for Google's varied treatment of class members.

*Finally*, Mr. Lasinski's two proposed methods for apportioning the damages he calculates lead to a nonsensical allocation of damages to each class member, severely overcompensating some, while undercompensating others.

For all of these reasons,[1] the Court should exclude Mr. Lasinski's opinions in their entirety.

## II.    STATEMENT OF RELEVANT FACTS

In support of Plaintiffs' motion for class certification (Dkt. 608-3), Mr. Lasinski opines on three types of damages: (1) restitution,[2] (2) unjust enrichment, and (3) statutory damages. Lasinski Rep. at ¶ 11.

---

[1]    Additional relevant facts and Plaintiffs' allegations are set forth in Google's Opposition to Plaintiffs' Motion for Class Certification ("Class Cert. Opp"),  incorporated here by reference.
[2]    Mr. Lasinski confirmed that what his report refers to as "actual damages" is actually restitution. Trebicka Decl. Ex. 1, Transcript of Deposition of Michael J. Lasinski, dated July 20, 2022 ("Lasinski Dep.") 78:16-20.

**A.      Mr. Lasinski's Methods For Calculating Class-Wide Restitution Damages**

**1.      Ipsos Screenwise.**

Mr. Lasinski's class-wide restitution damages are ███████. Applying his assumption that $3 per month per device is the baseline value of the At-Issue data would mean the value of data from all traffic would be more than ███████. Trebicka Decl. Ex. 2, Expert Report of Bruce Strombom, dated May 27, 2022 ("Strombom Rep.") ¶ 4.a. This is more than Alphabet's operating profits from *all* products and services sold in the U.S.—and most of those products and services are not even at issue here. *Id.*

*Ipsos' $3 Payment As The Basis for Restitution.* The crux of Mr. Lasinski's method is the assumption that the proper restitution measure is the $3 per month fee Google pays Ipsos participants ("Panelists") to permit Google to have ***full*** access to their browsers to conduct consumer research. Lasinski Rep. ¶ 138.[3] Mr. Lasinski opines that the $3 figure is the "payment[] necessary to incentivize an individual to knowingly relinquish the choice to keep certain browsing private and allow an organization to track all online activity." *Id.* ¶ 137.[4] However, he concedes that the At-issue Data is "qualitatively different, as well as quantitatively different" from the information Google receives from Panelists. Lasinski Dep. 114:13-15. This is consistent with the deposition testimony of Google's corporate representative, Troy Walker, Engineering Director of the Screenwise program, in *Calhoun v. Google*, No. 5:20-cv-5146-YGR-SVK that the Ipsos "browser extension allows [Google] to collect much more information than what normally comes out of a browser" and that Panelists are compensated for "many different activities," including "continuous activity." Rule 30(b)(6) Dep. of Troy Walker at 8:17-21, 9:21-10:4.[5] Mr. Lasinski made further crucial admissions that undermine the reliability and reasonableness of his $3 per month opinion:

[3]  *See also* About the Ipsos Screenwise Panel, available at https://screenwisepanel.com/. To receive $3 per month, Panelists download an extension onto their browsers that permits Google to collect everything they browse on their computers.

[4]   To calculate total class-wide restitution damages, Mr. Lasinski proposes to multiply the $3 per month per device by the number of unique browser instances in PBM in each month in the Class Period, assuming that browser instances are equivalent to devices. Lasinski Rep. ¶¶ 183-184.

[5]   Google cites to this Rule 30(b)(6) deposition pursuant Dkt. 263, which allows counsel from both *Calhoun* and *Brown* to be present at depositions, and Dkt. 565, which ordered parties in both the *Brown* and *Calhoun* actions to "cross-produce the deposition transcripts" of Google employees.

- Google's payment to Panelists accounted for "collect[ing] more information than just the [information collected in] private browsing mode," Lasinski Dep. 102:14-22, including:

- "everything that you see on your screen, everything that you tap, everything that you type. You know, what you swipe or otherwise input." *Id.* 114: 16-25.

- demographic information about themselves, including name, age, email address, home address, and income, which Mr. Lasinski testified he "does not recall" as "being at issue data." *Id.* 86:13-24, 114:19-115:5.  (It is not. *See* 395-2 ¶ 63.)

- "Google expects panelists to spend time doing some activities that are required by the panel" and Mr. Lasinski agrees that part of the $3 per month is "compensat[ion] for that time," *id.* 119:17-23, not required of putative class members, such as, "respond to notifications" they receive on their devices, *id.* 118:24-119:4, "check their Google profile," *id.* 115:25-116:2, and "maintain a minimum level of online activity to receive the $3 payment per month," *id.* 115:8-12.

- Panelists agreed not to use "do not track features" or "ad blockers" on their devices. *Id*. 120:12-17. Mr. Lasinski admitted that Panelists receive the monthly $3 payment in part because their Ipsos participation is "taking away [the] choice" that they otherwise would have had to use these services. *Id.* 121:4-9.

Mr. Lasinski also conceded that collection of "more data" in the Ipsos panel is "more valuable than less data" collected when users are privately browsing. *Id*. 114:2-12; 122:4-8. Separate and apart from the comprehensive data collection and multitude of requirements for which the $3 Ipsos payment compensates Panelists, they can also receive ***additional*** compensation for ***additional*** tasks, which do not figure into the $3 compensation.[6]

*Mr. Lasinski Assumes All Putative Class Members are "Unwilling" and "Unknowing" Sellers of Data.* Despite the above admissions, Mr. Lasinski attempts to justify using the Ipsos payment as his benchmark by claiming it is a "conservative" payment for the class members. *Id.* 215:12-17. However, the ***only*** support for his supposition is that putative class members, unlike Panelists, are "unknowingly" or "unwillingly" giving up the At-issue Data. Lasinski Rep. ¶¶ 138, 165, 183; Lasinski Dep. 82:9-84:5, 101:13-25, 112:15-24. Mr. Lasinski admits that he has neither

---

[6]   Panelists can also receive $20 for completing a recruitment survey to determine if they qualify for the panel; $100 reward to install a WIFI router provided by Screenwise; and up to $16 for each household member who participates in the panel ($3 for each of a phone, tablet, or browser with a Screenwise meter installed, a $2 bonus for using three of these devices, and $5 for using the Screenwise router). Lasinski Dep. 212:4-213:25.

"do[ne] a study" nor "seen a study" supporting his opinion. Lasinski Dep. 107:6-109:1. Mr. Lasinski also did not offset his damages opinion to account for PBM users who were aware of or consented to Google's data collection. *Id*. 55:2-56:1. And even if all putative class members were "unwilling" and "unknowing," Mr. Lasinski's assumption that the proper value of the At-Issue Data is $3 per month per device is entirely arbitrary: there is no analysis, no valuation, no support, no economic rationale, and no quantifiable measure justifying this methodology. In other words, he provides no foundation for his claim that class members are entitled to a price premium because they are "unwilling" and "unknowing," or that the $3 Ipsos payment is representative of that premium.

*Mr. Lasinski's methodology does not provide any way to quantify restitution damages for any individual piece of data*. Mr. Lasinski admitted that not all types of At-issue Data are valued equally. *Id*. 121:10-16; 121:23-124:23. However, he also conceded that he has not valued individual pieces of data (such as cookies, IP Address, GET Requests), and has no methodology for doing so. *Id.* Nor has he done any research on tools or user controls that block the transmission of some At-Issue Data, which causes variability in the amount and type of data collected from different class members, or even accounted for them in his opinion. *Id*. 56:16-57:6. Nonetheless, he conclusorily asserts, "[i]f any of this information is collected during that period of time, I think that the full restitution damages . . . would be applicable." *Id.* 37:24-38:6.

*Mr. Lasinski's Model Fails to Offset Any Benefits Users May Have Received.* Mr. Lasinski admits that he did not offset or even consider any "benefit from personalized ads in the private browsing mode" in his damages opinion. *Id*. 76:18-24. He opines that PBM users do not want to see personalized ads, while admitting that this belief is based solely on isolated conversations with four or five unnamed individuals not disclosed in his report. *Id*. 73:8-19, 75:24-76:15. He did not perform any studies or research, and is not aware of any research, to support his opinion. *Id*. 75:13-23.

### 2.   Other Methods Of Determining Restitution Damages.

*AT&T "GigaPower Campaign & Internet Preferences Program".* AT&T offered its customers the option to pay $29 per month to opt out of the use of personal data to serve targeted advertisements. *Id. at* 85:4-8. Mr. Lasinski offers this as an example of users' willingness to pay to prevent data collection, *id*. 126:23-127:4, but admits he does not know how many AT&T customers

opted out. *Id.* 126:1-5. Mr. Lasinski concedes that the data AT&T collected may have also included data from the subscriber's television and mobile phone and may have been used for mail-in and TV advertisements in addition to digital, far more than the At-Issue Data. *Id.* 127:5-13, 129:8-25.

*Nielsen Computer and Mobile Panel, SavvyConnect, and UpVoice.* Mr. Lasinski offers what Nielsen Computer and Mobile Panel, SavvyConnect, and UpVoice pay participants, from $50 to $180 per year, for the purported willingness of research organizations to pay for data collection. Lasinski Rep. ¶¶ 160-164. Mr. Lasinski concedes that these programs collect a different, broader set of data than what is at issue here and, similar to Ipsos, compensates participants for: (1) agreeing to forego certain user controls to prevent collection of data, (2) completing profiles and supplemental surveys, (3) downloading or installing desktop apps, and (4) agreeing to a minimum amount of online activity. Lasinski Dep. 130:1-137:18. Mr. Lasinski also concedes he does not know the full extent of the data these companies collect. Lasinski Dep. 132:11-13; *see, e.g.*, 133:5-6.

**B.      Mr. Lasinski's Methods For Calculating Class-Wide Unjust Enrichment**

Mr. Lasinski testified that he believes unjust enrichment damages are available for Plaintiffs' breach of contract claims. Lasinski Dep. 17:2-6.  Accordingly, based on this assumption, he purports to calculate unjust enrichment damages from Google's U.S. revenues from Display Ads, Search Ads, and YouTube Ads in three scenarios. Lasinski Rep. ¶¶ 133-136.

*Scenario 1* attempts to calculate the alleged unjust revenue from (a) all of Google's U.S. Display Ads shown to users in PBM, (b) U.S. Search revenue attributable to conversion from all private browsing traffic, and (c) U.S. YouTube Ads revenue attributable to personalization from third-party cookies and conversion from all private browsing traffic. *Id.* ¶¶ 133–135. Mr. Lasinski calculates this at ████████. *Id.* ¶ 136.

*Scenario 2* attempts to calculate Google's Display, Search, and YouTube revenue that is attributable to personalization from third-party cookies and conversion from all private browsing traffic and was allegedly unjustly earned, which amounts to ████████.[7] *See id.* ¶¶ 133-136.

---

[7]  This is the sum of ████████ in U.S. Display Ad Revenues, ████████ in U.S. YouTube Ads Revenues, and ████████ in U.S. Search Ads Revenues in Mr. Lasinski's Figure 56.

*Scenario 3* attempts to calculate Google's Display, Search, and YouTube revenue that is attributable to personalization and conversion from third-party cookies and was allegedly unjustly earned from class members, which amounts to ███████████.[8] *See id.* ¶¶ 133-136.

For the first two scenarios, each of which lead to damages six times higher than Scenario 3, Mr. Lasinski calculated Google's revenue from "all" private browsing traffic, even when the revenue was obtained with consent.[9] *See* Lasinski Rep. ¶¶ 133-134; Lasinski Dep. 187:24-188:15, 167:18-168:7. In particular, since May 2020, ███████████████████████████████████████████████████████████████████████████████. Lasinski Rep. ¶ 30. Mr. Lasinski admits that he did not consider this tool giving users control over third-party tracking for either his Scenario 1 or the Search Ads component (███████) in Scenario 2; he has not even "attempted to exclude [from his total damages] any traffic on the basis that some users may have toggled to 'off' the blocking of third-party cookies in the new tab page for Incognito." Lasinski Dep. 183:24-184:6, 180:5-181:20, 186:20-187:9, 187:24-189:16.

Even before ███████████, once the GDPR went into effect, websites started to display to all their visitors, without geographic limitation, pop-up consent banners with the option to "agree" to enable certain cookies, and they often disclose Google as one of the third parties that receives this information by name. *See* Trebicka Decl. Ex. 3; Lasinski Dep. 189:21-190:14. Google's produced documents demonstrate that, as of 2020, "consent for cookies [wa]s very broad." Trebicka Decl. Ex. 4 at 2; *see also id.* Ex. 5 at 16 (GDPR reports indicate cookie consent is at ███████. Yet, as with ███████████, Mr. Lasinski has "not made an adjustment for" this consented data transmission. Lasinski Dep. 186:20-187:9, 180:5-181:20, 183:24-184:6 ; 187:24-189:16.

---

[8]  This is the sum of ███████████ in U.S. Display Ad Revenues, ███████████ in U.S. YouTube Ads Revenues, and ███████████ in U.S. Search Ads Revenues in Mr. Lasinski's Figure 56.
[9]  Scenario 1 includes "U.S. revenues and attendant profits generated from the collection and use of the private browsing data at issue" whether or not the data originated from conversion tracking or traffic with third-party cookies enabled. Scenario 2 includes "U.S. revenues and attendant profits . . . from its collection and use of the At-issue Data that is attributable to personalization from traffic with third-party cookies and conversion tracking from all traffic[.]" This means it still includes revenues from conversion tracking from sources other than third-party cookies. Scenario 3 is limited to traffic related to third-party cookies. Lasinski Rep. ¶ 133.

1      _Mr. Lasinski's Unjust Enrichment Method Does Not Account for Google's Costs._ Mr.

2  Lasinski concedes he only calculated "unjust revenue" (and not "unjust profit"), _Id_. 162:2-6; 167:21-

3  24, and opines that Google's costs should _**not**_ be deducted from his total unjust enrichment figure.

4  _Id_. 162:11-12. For example, he acknowledges that Google pays a share of its revenue from showing

5  display ads to the publisher website, yet steadfastly claims he has "not seen any evidence that would

6  indicate that [such payments to publishers] should be removed." _Id._ 166:9-13, 166:25:167-4. This

7  omission is significant; although costs vary by transaction and publisher, Google Ad Manager keeps

8  only ▮▮▮▮▮ of any revenue generated by its most basic transaction type (Open Auction). Levitte

9  Decl. ¶13. As any other business, Google incurs myriad other costs in generating its revenue.

10  Strombom Rep. ¶¶ 76-85. Mr. Lasinski claims he is justified in ignoring all of these costs because

11  (1) the ▮▮▮▮▮ study[10] purportedly did not deduct Google's costs in determining the impact

12  of disabling third-party cookies by default (because, as Mr. Lasinski explained in the report, "the

13  purpose of the Ads Impact document was to allow Google personnel to factor the revenue impact

14  of ▮▮▮▮▮," not _**profit**_ impact, _see_ Lasinski Rep. ¶ 34); and (2) he relied on discussions with

15  Plaintiffs' technical expert Jonathan Hochman on the topic of "muling" which he asserts is relevant

16  to the issue of costs, Lasinski Dep. 163:18-23. Mr. Hochman, who testified that he is not an

17  "economic damages" expert, does not recall making an opinion regarding the costs Google incurs

18  to generate revenue, and "does not recall discussing muling with anyone." Trebicka Decl. Ex. 7,

19  July 21, 2022 Deposition of Jonathan Hochman 571:8-11, 573:10-20, 575:11-14.

20      **C.      Mr. Lasinski's Method For Calculating Statutory Damages**

21      Mr. Lasinski provides four possible bases to determine the total amount of "violations" of

22  the ECPA and CIPA to calculate damages for the class, but takes no position on which of these

23  bases is superior. Lasinski Dep. 200:10-21. He opines that an undetermined statutory damages rate

24  of between "$100 and $10,000 per violation" may be applied based on one of the following: (1) the

25  number of individual pageloads in Incognito or PBM during the Class Period, (2) the unique number

26  of private browsing instances across the Classes during the Class Period, (3) the number of unique

27

28  [10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮. _See_ Lasinski Rep. ¶ 30.

monthly private browsing instances ("UMPBI") during the Class Period, or (4) the number of members in each Class during the Class Period. Lasinski Rep. ¶ 186. Respectively, Mr. Lasinski estimates ███████ private browsing pageloads, ███████ unique private browsing instances, ███████ unique private browsing instances during "peak UMPBI,"[11] and ███████ class members. Lasinski Rep. Figs. 72-75. Mr. Lasinski does not perform any calculations of statutory damages in his report, but applying his framework to his proposed range of $100 to $10,000 leads to statutory damages totals that range from ████████████████████. Mr. Lasinski acknowledged that these bases would *not* be adjusted to exclude PBM users who consented to such data collection. Lasinski Dep. at 55:2-20. Further, he concedes that defining whether these bases were proportional to the alleged harm was "beyond the scope of [his] report." *Id.* at 208:2-9; see also 62:25-63:8.

## D.     Mr. Lasinski's Damages Allocation Methodology

Mr. Lasinski's 83-page report devotes less than half a page to the apportionment of damages to class members. He proposes two methods.[12]

*UMPBI Method.* This method would divide the total dollar value of any monetary relief by the total number of UMPBI (the number of devices with *any* pageloads in PBM during the class period). Lasinski Rep. ¶ 197. The resulting amount would then be distributed to class members in the claims administration process based on the number of UMPBI deemed attributable to each Class member. *Id.* However, Mr. Lasinski testified that he is "not sure if there is a direct relationship" between the number of UMPBI attributable to each class member and the amount of At-issue Data Google collected from each class member. Lasinski Dep. 144:7-18. In addition, he makes a series of assumptions that give no consideration to the amount of alleged harm to each class member. First, he would attribute one UMPBI to a class member regardless of whether they had used private browsing mode only once for five minutes in a month or every single day for the entire month. *Id.* 144:3-6. Second, he does not know that any given "UMPBI has an approximate page load . . . that is approximately the same as another UMPBI" *Id.* 209:19-23. Third, a user who browses less

---

[11]     This appears to refer to the highest monthly number of unique private browsing instances in 2021 for each of the three browsers (Chrome, Safari, and IE/Edge). *See* Lasinski Rep. ¶192.

[12]     He has no methodology for apportioning statutory damages and testified that he "cannot think of a reason why it would be different" from the two methodologies above. Lasinski Dep. 202:6-12.

frequently in PBM or for a shorter duration of time on more than one device would be allocated more damages than a user who browses much more frequently and for a longer duration but on only one device. Lasinski Dep. 91:10-17. That is because a single UMPBI represents one or more pageloads in PBM on a single device during a one-month period. Lasinski Rep. ¶ 139.

Mr. Lasinski did not attempt to calculate the number of UMPBI per class member, Lasinski Dep. 221:15-222:19, but claimed that a class member could attest during claims administration to the number of months during the Class Period she used one or more devices to browse privately and specify the PBM they used (Chrome, Safari, Edge, and/or Internet Explorer). *See id*. 139:17-142:13; *see also* Trial Plan at 20. Such a methodology would necessarily turn on both user accuracy and honesty. As to the former, Mr. Lasinski admits that he would not be able to attest to even an approximation of how many times he used Chrome or Safari's private browsing mode in the past five years "[b]ecause I don't keep statistics on how often I go into private browsing mode." Lasinski Dep. 12:18-13:4, 15:16-24. As to the latter, he did not account for the risk that users would have incentive to exaggerate their use of PBM if it was linked to the damages they would be awarded.

*Class Member Method.* This apportionment method would have the claims administrator calculate the damages for each class member by dividing the class-wide unjust enrichment or restitution damages by the total number of class members, such that each class member "would take home the same amount" of damages regardless of how frequently they browsed in PBM or the amount of data Google collected. *Id.* 154:17-19; 152:17-20.

*Admissions Regarding Both Methods.* Mr. Lasinski admits neither of his damages allocation methodologies account for the various controls users employ to limit transmission of some (or all) of the At-issue Data to Google, including blocking third-party cookies in their browser settings, disabling Javascript, using a VPN to mask IP address, or disabling personalized ads in their account settings. Lasinski Dep. 160:17-161:13. He also concedes that his damages allocation methods do not take into account, much less attempt to exclude, users who "may have opted in [to third-party cookies] through the [Incognito] NTP page with ▮▮▮▮▮▮" or who "have opted in through the cookie pop-ups" on various websites. Mr. Lasinski also has not attempted to calculate the amount of revenue Google earned per class member. Lasinski Dep. 154:17-23.

III.   **LEGAL STANDARD**

To satisfy the "demanding" predominance criterion of Rule 23(b)(3), plaintiffs must introduce evidence, including expert testimony, to show by a preponderance of the evidence that damages can be awarded on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also In re Apple iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *16 (N.D. Cal. Mar. 29, 2022) (Plaintiffs "must also establish that there is a method, common across the class, for arriving at individual damages to survive the predominance inquiry.") (quotation marks omitted). Expert testimony is admissible only if (i) the expert's specialized knowledge will help the trier of fact; (ii) the testimony is based on sufficient facts or data; (iii) the testimony is the product of reliable principles and methods; and (iv) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (proponent of expert has the burden of proving admissibility).

The court must also conduct a "rigorous analysis" to determine whether plaintiffs' damages model is consistent with their theory of liability. *Comcast,* 569 U.S. at 35 (internal quotation marks omitted). To satisfy *Comcast*, Plaintiffs must demonstrate that they have "presented a method of calculating damages that is not excessively difficult." *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 653 (9th Cir. 2022); *see also Opperman v. Path, Inc.*, 2016 WL 3844326, at *15 (N.D. Cal. July 15, 2016) (quoting *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)) (court must "ensure" that class-wide damages can 'feasibly and efficiently be calculated once the common liability questions are adjudicated.'"). Mr. Lasinski's opinions fall far short of this standard.

IV.   **ARGUMENT**

    A.   **Mr. Lasinski's Entire Opinion Should Be Excluded Because He Fails to Account for Uninjured Users Who Consented to the At-issue Data Collection**

Mr. Lasinski's analysis and calculation of restitution, unjust enrichment and statutory damages rests on a fatal flaw: he erroneously ***assumes*** that "every user who falls within the class definitions was actually harmed by the alleged misconduct." *See* Lasinski Dep. 45:10-13. As a result, he provides no method for excluding uninjured class members from his damages model for

1  each of his restitution, unjust enrichment, and statutory damages calculations. This assumption is

2  both contrary to the record and the requirements of *Comcast*, which finds unreliable and

3  impermissible "a methodology that identifies damages that are not the result of the wrong." 569

4  U.S. at 37; *see also Bowerman*, 39 F.4th at 653 (reversing finding of class certification where class

5  members could not show by common evidence that individual class members would be entitled to

6  damages traceable to the alleged misconduct); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee*

7  *Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (*en banc*) (holding that Rule 23(b)(3) requires that

8  "common question predominate[] over any individual questions, including individualized questions

9  about injury or entitlement to damages); *In re Apple iPhone Antitrust Litig*., 2022 WL 1284104, at

10 *16 ("Consumer Plaintiffs cannot meet their predominance burden because they rely on an unsound

11 methodology, which cannot reliably demonstrate which members, and how many, were injured, as

12 common proof of class wide impact."). Although the question "whether every class member must

13 demonstrate standing *before* a court certifies a class," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

14 2208 n.4 (2021) is an open issue, *see id*., the Ninth Circuit has recognized that the district court "is

15 in the best position to determine whether individualized questions, including those regarding class

16 members' injury, 'will overwhelm common ones and render class certification inappropriate….'"

17 *Olean*, 31 F.4th at 669 (citation omitted).

18     Here, the damages inquiry will clearly overwhelm any common determinations. As set forth

19 in Google's Class Cert. Opp., various class members consented to the collection of the At-Issue

20 Data in ways that are not applicable to the class as a whole, raising the prospect that a significant

21 number, if not the majority, of putative class members lack injury and thus Article III standing.  *See*

22 Class Cert. Opp. at § III A. Yet, Mr. Lasinski completely ignores these crucial factors, including

23 consent, which would negate Plaintiffs' claims against Google. Opp. § III A. Instead, he says that

24 he "[doesn't] have any adjustment [for]" these potentially consented users. Lasinski Dep. 55:25-

25 56:1. On this basis alone, the entirety of Mr. Lasinski's opinion on restitution, unjust enrichment,

26

27

28

and statutory damages should be excluded.[13] Indeed, not only does Mr. Lasinski fail to address uninjured class members, but he ignores the fact that any determination as to which members consented to the data collection must be made on an individualized basis. The inability of his model to substantiate that damages can be proven based on common proof is an independent basis for exclusion. *See, e.g.*, *Bowerman*, 39 F.4th at 653; *Olean*, 31 F.4th at 669.

### B.   Mr. Lasinski's Restitution Opinion Should Be Excluded

#### 1.   <u>Mr. Lasinski's Primary Input For Calculating Class-Wide Restitution Damages Is Speculative And Unreliable.</u>

*Daubert*'s cornerstone principle is that expert testimony based on mere "subjective belief or unsupported speculation" is inadmissible. *Daubert*, 509 U.S. at 590.[14] Mr. Lasinski's $3 per month restitution figure is a case in point.

---

[13]   To the extent that the Court considers these opinions, restitution and unjust enrichment damages are not available for certain of Plaintiffs' claims, including CIPA, Invasion of Privacy, Breach of Contract, Intrusion Upon Seclusion, and UCL. *See* Cal. Penal Code § 637.2 (West) (limiting CIPA damages to three times the amount of actual damages); Blanco v. County of Kings, 142 F.Supp.3d 986, 1001 (E.D. Cal. 2015) ("No monetary damages are available for invasion of privacy under the California Constitution."); *Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 859 F. App'x 168, 168 (9th Cir. 2021) ("[N]o person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof….") (quoting Cal. Civ. Code § 3358); *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011) (Restitution "does not lie when an enforceable, binding agreement exists" and is only awarded "in lieu of breach of contract damages."). Google is aware of no decision awarding unjust enrichment for intrusion upon seclusion, nor one awarding restitution for such a claim on similar facts to those here. Moreover, even though the CDAFA and ECPA statutes allow for "equitable" remedies, Google has found no case in the Ninth Circuit that has awarded restitution or unjust enrichment for such claims. *See* Cal. Penal Code § 502 (West) (allowing civil action for equitable relief); 18 U.S.C. § 2520(c)(2)(b) (allowing for such preliminary and other equitable or declaratory relief as may be appropriate). Finally, "[t]he only monetary remedy available in a private action under the unfair competition law ["UCL"] is restitution." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021). However, restitution is not available here, where Plaintiffs have not demonstrated that they "lost money or property" as a result of Google's alleged violation of the UCL. *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 233 Cal. App. 4th 1321, 1331 (2015); *see also Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *8 (N.D. Cal. Mar. 5, 2021) ("[C]ourts have widely held that 'personal information' does not constitute money or property under the UCL"). Accordingly, if the Court denies any of these claims, Mr. Lasinski's damages theories as to those claims would become irrelevant.

[14]   *See also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (holding that district court properly exercised its "gatekeeping role" in barring expert testimony that was "inherently unreliable and unsupported by the facts."); *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 2019 WL 7177984, at *1 (C.D. Cal. Dec. 2, 2019) ("An expert's

---

Mr. Lasinski's $3 figure is based on the compensation Google gives Ipsos Panelists. *See supra* Section II. A. 1. This makes little sense since, as Mr. Lasinski expressly concedes, the data Ipsos collects is both "qualitatively" and "quantitatively different" from the At-issue Data. Lasinski Dep. 114:13-15. Mr. Lasinski admits Ipsos collects "more data . . . than would be collected in private browsing mode," including by "record[ing] everything that you see on your screen, everything that you tap, everything that you type[,] [y]ou know, what you swipe or otherwise input," collecting "your name, your email address, your home, your work address, telephone number," which are not collected from those in PBM. *Id.* 114:16-115:7. Panelists also affirmatively permit Google to track all of their movements across multiple devices. *Id.* 94:16-19. They are paid to permit such broad access into their daily lives across multiple devices–access that is not the case here and, as Mr. Lasinski concedes, has more value than the At-issue Data. *Id.* 95:1-8.

In attempting to bridge the gaping distance between the Ipsos compensation and possible restitution to putative class members, Mr. Lasinski speculates, with no support, that $3 per device per month is a "conservative" measure because, unlike the Ipsos Panelists, putative class members are "unknowingly" and therefore "unwillingly" giving up their information, and would thus need more incentive to relinquish such data. Lasinski Dep. 101:13-102:22. This is illogical and unsupportable for two reasons.

*First*, Mr. Lasinski provides ***no*** analysis, study, literature, economic logic, or other reliable methods to conclude that "unknowing" or "unwilling" sellers deserve either more or the same compensation as voluntary participants in Ipsos for data that is "qualitatively and quantitatively" different from the At-issue Data. Having provided no foundation or support for his claims that class members are entitled to a price premium because they are "unwilling" and "unknowing" and that the $3 Ipsos payment is representative of that price premium, Mr. Lasinski's opinion is mere *ipse dixit*. "Nothing in either *Daubert* or the Federal Rules of Evidence requires the admission of opinion evidence connected to existing data 'only by the ipse dixit of the expert.'" *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1019 (C.D. Cal. 2018) (quoting *Gen. Elec. Co. v. Joiner*,

---

opinions derived from an unsound or invalid methodology are without any evidentiary value because opinion evidence is only as good as the facts upon which it is based.") (internal quotations omitted).

522 U.S. 136, 146 (1997)). This Court has previously excluded Mr. Lasinski's expert opinions on analogous grounds: "it is no answer that some of Lasinski's other intermediate assumptions, such as the discount rate itself, were 'conservative' in Microsoft's favor. The Federal Circuit has rejected this method of compensating for a flawed premise." *Looksmart Grp., Inc. v. Microsoft Corp.*, 2019 WL 4009263, at *5 (N.D. Cal. Aug. 5, 2019) (internal citation omitted).

Just recently, Judge Alsup in *Freitas v. Cricket Wireless*, 2022 WL 3018061, at *3 (N.D. Cal. July 29, 2022) decertified a class because the damages model of Plaintiffs' expert "does not isolate those damages attributable only to overcharges due to misrepresentations about 4G coverage." *Id.* at *5. The court noted that "[a]lthough plaintiff's expert … selected 3G-capable phones 'most closely comparable' to the 4G-capable phones 'in terms of brand value and technical specifications,' there were significant differences between the phones that were left unaccounted for…" *Id.* at 4. The same is true here, rendering Mr. Lasinski's opinion unreliable.

*Second*, Mr. Lasinski admitted he has neither performed nor seen any analysis or study to support his conjecture that private browsing mode users *are* unwilling to sell their data. Lasinski Dep. 107:6-108:7. At the very least, a determination of "willingness" to sell would require individualized determinations, precluding class-wide treatment. His baseless assumption that PBM users are "unwilling" sellers is also belied by the record which shows that certain users actively enabled third-party cookies while privately browsing, either by clicking to accept third-party cookies on the websites they visit or by selecting the toggle to allow third-party cookies on the Incognito New Tab Page. *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (holding that expert's damages calculation failed to meet *Daubert*'s standards where it was "based on factual assumptions that are entirely unsupported in the record"). These users were willing to part with their data for free; they cannot be declared "unwilling" sellers that require more compensation, and he offers no empirical data to prove otherwise or calculate incentive amounts. Mr. Lasinski's restitution opinion should be excluded as arbitrary and unreliable.[15]

---

[15]   Mr. Lasinski proposes other measures of the value of the At-issue Data. *See supra* Section III.A.3. However, he admits those measures are less probative than the measure derived from the Ipsos and those reference points are similarly flawed. *Id.*; Lasinski Rep. ¶ 138.

**2.**    **Mr. Lasinski's Restitution Opinion Fails To Account For Variability In User Benefit From Personalization And Valuation Of Privacy.**

Mr. Lasinski's restitution opinion is also unreliable because he ignores the strong evidence of variability in the following two crucial restitution factors here: (1) the benefit that users may have received from personalized advertising and other personalized content; and (2) the value users place on the PBM data and their privacy.

*First*, the record confirms that some class members may have derived a benefit from personalized advertising and other personalized content that would offset—or even outweigh entirely[16]—the purported value of the At-issue Data. *See id.* Section II.A.1.[17] *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F. App'x 404, 406 (9th Cir. 2018) ("Restitution requires that the value of what the plaintiff received was less than what the plaintiff paid. Without evidence of the value received, that calculation is impossible.") (internal quotation marks and citations omitted); *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016) (holding that the measure of "restitution is equal to the difference between what the plaintiff paid and the value she received in return."). Yet Mr. Lasinski fails to take this benefit into account in his $3 per month per device damages measure; in fact, he testified: "I can't think of a reason why" the benefit class members

---

[16]   Class members for whom personalized content and advertising outweighs the value, if any, of the data, would be uninjured and should be excluded, yet Mr. Lasinski does not (and cannot) account for this in his model.

[17]   *See* Salesforce Research, "Trends in Customer Trust," Research Brief, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf, p. 7 (finding that "majority of customers are willing to share personal information if it is used to power personalized offers and engagements"); Adlucent, "71% of Consumers Prefer Personalized Ads," available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/ (finding that 44 percent of respondents were willing to give up information in order to get more personalized advertising); Infosys, "Rethinking Retail. Insights from consumers and retailers into an omni-channel shopping experience," 2013, pp. 2, 4, available at https://www.infosys.com/newsroom/press-releases/Documents/genome-research-report.pdf) (noting that the majority of consumers who have experienced online personalization "are highly in favor of personalized coupons," personalized offers, and promotions or product recommendations based on previous experiences); McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/ (finding that "[s]ixty-three percent of Millennial consumers and 58% of GenX consumers are willing to share data with companies in exchange for personalized offers and discounts").

1   receive from personalized ads should be offset from restitution damages. Lasinski Dep. 76:18-24.

2   There is no evidence that this variability can be accounted for class-wide.

3       *Second*, Mr. Lasinski fails to account for the variability in the value users put on the At-issue

4   Data or their privacy, despite admitting that some users would not part with this Data even if given

5   "$20 or $30 or $40 per month," ***while others would***. Lasinski Dep. 107:21-24. Further, several

6   studies which Mr. Lasinski failed to consider, demonstrate wide variation in users' value of privacy.

7   *See supra* n.17. Indeed, Plaintiffs' own expert, Bruce Schneier, agrees that there are differences in

8   user attitudes and definitions of privacy. *See* Trebicka Decl. Ex. 6, July 18, 2022 Deposition of

9   Bruce Schneier at 101:14-102:13.

10      Particularly instructive is the *Opperman* decision, which rejected an approach to valuing

11  privacy due to this very issue, explaining that "[t]he chief problem" with this method is that

12  "consumers do not have identical preferences, [and] each class member will place a very different

13  value on the protection of —or misappropriation of — their" data. *Id*. It is impossible to overcome

14  the variability in a class setting because "while some of those differences may be attributable to

15  observable characteristics such as age, gender, income, and education, some of them will be

16  attributable to variation across individuals concerning their attitude toward and willingness to

17  protect their privacy." *Id*. The Court rejected the expert opinion acknowledging that "[i]t may be

18  that the average damages that [the expert]'s model would predict will be very close to the damages

19  actually suffered by every class member, but there is no way of knowing this. It is equally or more

20  likely that" the model would over- or under-compensate. *Opperman*, 2016 WL 3844326 at *14–15.

21  Mr. Lasinski's restitution model is similarly faulty here, and should be excluded.

22      **C.   Mr. Lasinski's Unjust Enrichment/Disgorgement Model Should Be Excluded
             In Whole Or In Part As Unreliable And Contrary To The Law**

23

24          **1.   Failure To Deduct Costs From Unjust Enrichment/Disgorgement
                   Calculations Is Contrary To The Law And Has No Basis In The Facts.**

25      Mr. Lasinski testified that he does not "believe that [he] should have deducted any costs in

26  this case." Lasinski Dep. 162:11-12. That opinion should be excluded as unreasonable and contrary

27  to the law. "Exclusion of opinions that are…contrary to the law is appropriate through the *Daubert*

28  process" because such opinions are not helpful to the trier of fact. *United Food & Com. Workers*

*Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6-7 (N.D. Cal. June 30, 2012) (excluding expert opinions that are "contrary to law").

"Disgorgement is a remedy in which a court orders a wrongdoer to turn over all ***profits*** obtained by violating the law." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016) (emphasis added); *Cisco Systems, Inc. v. Advanced Digital Solutions International, Inc*., No. 4:18-CV-07602-YGR, 2021 WL 3129590, at *3 (N.D. Cal. July 23, 2021) (Gonzalez Rogers, J.) (holding that disgorgement is "limited to whatever enrichment ADSI individually received in the form of profits from the sale of counterfeit Cisco products"). In direct contradiction to this well-established rule, and the facts establishing Google incurred many costs in procuring the revenue, *see supra* Section II.B*,* Mr. Lasinski opines that costs ***should not be subtracted***. Lasinski Dep. 162:11-12. That opinion should be excluded as unreliable and unhelpful to the trier of fact. *Apple, Inc*, 2012 WL 2571332, at *6-7; Fed. R. Evid. 702; *Guidroz-Brault v. Missouri Pacific Railroad Co*., 254 F.3d 825, 830-31 (9th Cir. 2001) (opinion excluded as unreliable where conclusions relied on assumptions that had no basis in the facts). Mr. Lasinski's testimony was excluded for a similar reason in *Looksmart Grp., Inc.*, where his assumption that defendant's cost savings must be split between plaintiff and defendant was held "insupportable" as "a matter of both rudimentary economics and common sense." 2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019). It should be excluded here too.

## 2. All Of Mr. Lasinski's Unjust Enrichment Scenarios Are Flawed And Should Be Excluded As Unreliable.

At the class certification stage, Plaintiffs "must" ensure that their expert's "model purporting to serve as evidence of damages in a class action . . . measure only those damages attributable to that theory of liability." *Freitas*, 2022 WL 3018061, at *3 (quoting *Comcast*, 569 U.S. at 34-35). Otherwise, they "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of FRCP 23(b)(3)." *Id.* All of Mr. Lasinski's scenarios fail this standard.

*Scenarios 1 and 2* of Mr. Lasinski's unjust enrichment model's use of "all" private browsing traffic as the baseline for measuring damages is flawed because it includes revenues from Display

Ads, Search, and YouTube that are **not** attributable to Google's alleged wrongful conduct. In particular, it includes revenue attributable to third-party cookies to which a user has consented by selecting the toggle on the Incognito NTP. Lasinski Dep. 183:24-184:6. *See supra* Section II.B; 395-2 ¶ 1 ("This lawsuit concerns Google's surreptitious interception and collection of personal and sensitive user data while users are in a 'private browsing mode.' Google does this without disclosure or consent of users, to profile Plaintiffs and other class members."); *see also* Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it.").

Mr. Lasinski's "all traffic" scenarios as they relate to Display Ads revenue in particular suffer from additional fatal flaws in that they fail to subtract Google's Display Ads revenue that (1) does not depend on user data as it is determined by ▮▮▮▮▮ in the contracts between publisher websites and Google (i.e. revenue from non-programmatic advertising) (Levitte Decl. ¶ 17), and (2) is attributed to user data collected by advertisers or third-party advertising companies, not by Google (Levitte Decl. ¶¶ 16, 21). In both cases, the revenue does not pertain to the At-Issue Data and should therefore be excluded from the damages calculations under *Comcast.* 569 U.S. at 34.

_Scenarios 1 through 3_ of Mr. Lasinski's unjust enrichment model similarly fail to subtract the revenue attributable to users who consent to third-party cookie tracking via pop-ups on individual websites while in PBM (see Trebicka Decl. Ex. 3). Lasinski Dep. 186:25-187:9. Mr. Lasinski seeks to justify this failure by testifying that if this revenue is taken into account in the ▮▮▮▮▮▮ impact study that forms the basis of his unjust enrichment calculation, it is also taken into account in his model. Id. 188:22-189:9; 189:23-190:1. That is faulty reasoning relying on the ambiguous word "take into account." The point is that the ▮▮▮▮▮▮ impact study did not subtract such revenue because its purpose was not to remove consented users. Therefore, Mr. Lasinski's model includes revenue attributed to users who consented to third-party cookies on individual websites. See Strombom Rep. ¶ 61.

These flaws in Mr. Lasinski's sweeping damages model render it unreliable to accurately calculate class-wide damages and would have the effect of exaggerating damages and providing a windfall for Plaintiffs. Moreover, the three Scenarios Mr. Lasinski proposes provide a range of damages of over ▮▮▮▮▮ further demonstrating the speculative nature of his methodology. *In*

*re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at \*16 (denying class certification and criticizing damages model that provided "three-billion-dollar range" of damages as "speculative").

    **D.**    **Mr. Lasinski's Proposed Methods For Apportioning Damages Are Unreliable And Unhelpful**

        **1.**    <u>**Mr. Lasinski's Proposed Methods For Apportioning Damages Ignore Individual Differences.**</u>

At the class certification stage, plaintiffs may rely on aggregate damage estimates, but must also establish that "there is a method, common across the class, for arriving at individual damages" to survive the predominance inquiry. *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at \*16 (citing William R. Rubenstein, Newberg on Class Actions, Antitrust Class Actions, § 20:62 (Damages at class certification)). Where, as here, the individual alleged harm varies among class members, the expert must propose a method for apportioning damages that addresses those variations and awards damages in proportion to the harm suffered. *Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489, at \*5 (N.D. Cal. Mar. 13, 2019) (rejecting damages model in part because plaintiffs failed to proffer a model or a legitimate theory for how damages would be ... disseminated among class members and "it [wa]s inevitable that individual questions of damages will 'overwhelm questions common to the class'"); *Opperman*, 2016 WL 3844326 at \*14–15 (rejecting damages model that was "equally or more likely" to "overcompensate some class members, while undercompensating others") (internal quotation marks omitted). Mr. Lasinski admitted he does not even attempt to do so under either his UMPBI or class member apportionment methods. *See supra* Section II.D.

For unjust enrichment or disgorgement, a plaintiff is entitled to the "profits obtained [by defendant] by violating the law." *See Consumer Fin. Prot. Bureau*, 819 F.3d 1179, 1195 (9th Cir. 2016). Under the theory of restitution, a plaintiff is entitled to "[t]he difference between what the plaintiff paid and the value of what the plaintiff received." *Chowning*, 733 F. App'x at 405. Mr. Lasinski's apportionment methodologies overlook four categories of differences among class members that will greatly affect the amount of both unjust enrichment and restitution per individual class member.

*First,* Mr. Lasinski's allocation methodologies do not take into account how often or how long users browse in private browsing mode, which would lead to absurd results when damages are distributed. Under his UMPBI apportionment method, a user who browsed privately for only an hour in a month but across two devices would be entitled to ***double*** the amount of damages compared to a user who browsed privately for 10 hours each day of that same month on a single device. Under his class member method of apportioning damages equally per class member would allot the same amount of damages to a user who used a private browsing mode only once in the entire class period as a user who used it thousands of times during the class period. *See* Lasinski Dep. 91:10-17, 144:3-6. Yet the length of time users spend browsing and the corresponding amount of data Google receives affects Google's profit for purposes of unjust enrichment and how much restitution a class member is properly due.

*Second*, neither of the allocation methods Mr. Lasinski proposes accounts for the various user controls each class member may employ to limit Google's receipt of their private browsing data. This is similarly important for determining how much harm each class member allegedly suffered under each of Plaintiffs' theories of relief because it impacts the amount and type of data Google may have collected from each class member. For example, if a user had blocked third-party cookies and employed a VPN, Google would only receive three of the five categories of data alleged to be improperly collected. *See supra* at 11. Yet, Mr. Lasinski's methodologies would award this user this same amount of damages as a user who had employed no controls. *Id.*

*Third*, Mr. Lasinski does not account for users who explicitly consented to the receipt of their information by opting-in or enabling third-party cookies on the Incognito NTP pages or through the pop-ups on various websites. His methodologies would award the same amount of damages to these users as to those who, on the opposite end of the spectrum, did not block third-party cookies, despite that the absence of cookies would impact Google's profit and the amount necessary to restitute Plaintiffs.

*Fourth,* neither method accounts for the inevitable variability in how much individual users value their data (*see supra* Section IV. B. 2) or how much they benefit from personalized advertising. Such an analysis requires individualized inquiry and is crucial to apportioning restitution damages.

*See Chowning*, 733 F. App'x at 405; *Opperman*, 2016 WL 3844326 at *14–15 (recognizing "variation across individuals concerning their attitude toward and willingness to protect their privacy" and finding that "[n]o damages number arising from [] model will apply to all class members") (internal quotation marks omitted). Because Mr. Lasinski does not identify a process through which to address these individual differences, he fails to establish that "there is a method, common across the class, for arriving at individual damages." *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16 (internal citations omitted).

### 2.   Mr. Lasinski's Does Not Propose A Feasible Or Efficient Method For Distributing Damages.

At the class certification stage, Plaintiffs must show damages can "'feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016); *see also Opperman*, 2016 WL 3844326, at 15 (rejecting damages model because "[p]laintiffs have not shown that the damages model is administratively feasible"). Where the calculation of damages per class member is "excessively difficult," plaintiffs fail to satisfy *Comcast's* "simple command that the case be 'susceptible to awarding damages on a class-wide basis.'" *Bowerman*, 2022 WL 2433971, at *9 (citing *Comcast*, 569 U.S. at 32 n.4). Mr. Lasinski's incomplete proposals for apportioning damages fall far short of this standard.

*UMPBI Method*. Mr. Lasinski has neither attempted to calculate the UMPBI per class member, nor demonstrated that it ***can*** be calculated. He merely assumes that each class member can attest to the number of months since 2016 that they used one or more devices in PBM, and through which browser. Lasinski Dep. 140:21-141:4. Yet, illustrating the flaw in his assumption, Mr. Lasinski himself could not even attest to how long he has been using Chrome and Safari or how often he has used Chrome's Incognito or Safari's private browsing mode in the past five years (Lasinski Dep. 11:14-16, 12:18-23, 15:5-24). Moreover, he fails to account for the incentives class members would have to overstate their usage in order to boost their damages awards.

*Class member method*. Mr. Lasinski does not calculate the number of class members. Nor would identifying the number of class members be feasible, as Google's systems and policies are designed to ensure signed-out PBM users are *not* identified. *See* Class Cert Opp. Section III.H.

1   Plaintiffs similarly cannot rely on class members to identify themselves for this method because

2   "self-identification would be pure speculation, and any meaningful forensic verification of claims

3   would be prohibitively costly and time-consuming," "it [i]s not feasible to verify class members'

4   claims." *In re Google Inc. St. View Elec. Commc'ns Litig*., 21 F.4th 1102, 1115 (9th Cir. 2021).

5         Courts in this circuit have consistently rejected similar methods that rely on "using the

6   individual testimony of self-interested class members to calculate the overtime hours they worked

7   and the business expenses they incurred isn't easy." *Bowerman*, 2022 WL 2433971, at *9; *see also*

8   *In re Hulu Priv. Litig.*, 2014 WL 2758598, at *16-23 (N.D. Cal. June 17, 2014) (rejecting use of

9   self-reporting because "prone to subjective memory problems" and damages amount would "create

10  incentives for claimants."). That is because "such an approach has predictably caused the 'excessive

11  difficulty' that *Comcast* and our later decisions interpreting *Comcast* have sought to avoid."

12  *Bowerman*, 2022 WL 2433971, at *9. This model would not eliminate individual inquiries; it would

13  actually mire the Court in another round of intricate determinations regarding each class member's

14  circumstances. *See id.* (rejecting damages model that was "excessively difficult" to administer).

15        **E.      Mr. Lasinski's Opinion On Calculating Statutory Damages Is Unreliable**

16        Mr. Lasinski's opinion on calculating statutory damages for ECPA and CIPA should be

17  excluded in its entirety because each of the bases he uses would inflate damages and compensate

18  for more than the alleged harm.

19        *First,* Mr. Lasinski fails to account for instances in which Google would not have received

20  (and therefore "intercepted") the At-issue Data: when a user starts a private browsing session but

21  closes it before ever navigating to a third-party website, Lasinski Dep. 146:15-25, or when a user,

22  while in Incognito mode, navigates to Google.com to run a search and does not continue on to a

23  third-party website, *id.*, 40:9-25. *Cf. Noel v. Hall*, 568 F.3d 743, 750 (9th Cir. 2009) (concluding

24  that when no one intercepts a communication, there is no violation of the interception provision of

25  the Federal Wiretap Act); *NovelPoster v. Javitch Canfield Group*, 140 F.Supp.3d 938, 954 (N.D.

26  Cal. 2014) ("The analysis for a violation of the CIPA is the same as that under the federal Wiretap

27  Act."). Because Mr. Lasinski's model provides no way to exclude these users, it would punish

28

1   Google for alleged harms it never perpetrated while over-compensating users who had no data

2   collected and were thus not injured.

3      *Second,* Mr. Lasinski does not provide a way to calculate statutory damages for the proposed

4   California-resident only class for their CIPA claim, which is required under the statute, as no basis

5   isolates Californian users. *See* Pls. Mtn. for Class Cert. 13 (stating "Plaintiffs seek to certify

6   California-resident only classes for their CIPA claim).

7      *Finally,* Mr. Lasinski does not opine on a method for apportioning statutory damages. He

8   admitted that he "cannot think of a reason" that the UMPBI and per-class-member apportionment

9   methods that he proposed for allocating unjust enrichment and restitution would not apply equally

10  to apportioning statutory damages. Lasinski Dep. 202:6-12. But as described in Section IV. D, those

11  methods are insufficient and unreliable to apportion damages in proportion to each putative class

12  member's alleged harm. Further, he admitted that defining whether these bases were proportional

13  to alleged harm was "beyond the scope of [his] report." Lasinski Dep. at 208:2-9. This violates the

14  principle that "[s]tatutory damages are not to be awarded mechanically." *Campbell v. Facebook,*

15  *Inc.*, 2016 WL 2897936, *14 (N.D. Cal. May 18, 2016).

16     Mr. Lasinski's approach is particularly problematic here, where the record demonstrates that

17  Google treated class members differently in terms of the type and amount of data it collected (if

18  any) and the circumstances in which it collected that data. *See* Section II.C. Indeed, the severity of

19  the alleged violation under each statute, the extent of any intrusion into each putative class members'

20  privacy, and whether or not there was actual injury would depend on such individualized facts.

21  *Campbell*, 2016 WL 2897936 at *14-15. Each of the "four potential bases" Mr. Lasinski proffers

22  ignores such facts, undermining the reliability of his opinion. *See Conroy v. Ridge Tool Co.*, No.

23  4:20-CV-05882-YGR, 2022 WL 911138, at *6 (N.D. Cal. Feb. 3, 2022) ("*Daubert I* and Rule 702

24  also require that expert testimony be relevant to the task at hand and that it fit the facts of the case.")

25  (quotations omitted).

26  **V.    CONCLUSION**

27     The Court should grant Google's Motion and exclude Mr. Lasinski's opinions.

28

1    DATED:  August 5, 2022                QUINN EMANUEL URQUHART & SULLIVAN, LLP

2

3                                          By_____/s/ Andrew H. Schapiro_____
                                               Andrew H. Schapiro (admitted *pro hac vice*)
4                                              andrewschapiro@quinnemanuel.com
                                               191 N. Wacker Drive, Suite 2700
5                                              Chicago, IL 60606
                                               Telephone: (312) 705-7400
6                                              Facsimile: (312) 705-7401

7
                                               Stephen A. Broome (CA Bar No. 314605)
8                                              stephenbroome@quinnemanuel.com
                                               Viola Trebicka (CA Bar No. 269526)
9                                              violatrebicka@quinnemanuel.com
                                               Crystal Nix-Hines (Bar No. 326971)
10                                             crystalnixhines@quinnemanuel.com
                                               Marie Hayrapetian (CA Bar No. 315797)
11                                             mariehayrapetian@quinnemanuel.com
                                               865 S. Figueroa Street, 10th Floor
12                                             Los Angeles, CA 90017
                                               Telephone: (213) 443-3000
13                                             Facsimile: (213) 443-3100

14
                                               Diane M. Doolittle (CA Bar No. 142046)
15                                             dianedoolittle@quinnemanuel.com
                                               555 Twin Dolphin Drive, 5th Floor
16                                             Redwood Shores, CA 94065
                                               Telephone: (650) 801-5000
17                                             Facsimile: (650) 801-5100

18
                                               Josef Ansorge (admitted *pro hac vice*)
19                                             josefansorge@quinnemanuel.com
                                               1300 I. Street, N.W., Suite 900
20                                             Washington, D.C. 20005
                                               Telephone: 202-538-8000
21                                             Facsimile: 202-538-8100

22
                                               Jomaire A. Crawford (admitted *pro hac vice*)
23                                             jomairecrawford@quinnemanuel.com
                                               51 Madison Avenue, 22nd Floor
24                                             New York, NY 10010
                                               Telephone: (212) 849-7000
25                                             Facsimile: (212) 849-7100

26
                                               Jonathan Tse (CA Bar No. 305468)
27                                             jonathantse@quinnemanuel.com
                                               50 California Street, 22nd Floor
28

San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*