# Exhibit 1

# Redacted Version of Document Sought to be Sealed

CONFIDENTIAL

1                    UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

3

4

5     CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
6     CASTILLO, and MONIQUE
      TRUJILLO, individually and on
7     behalf of all other similarly
      situated,
8
                      Plaintiffs,
9                                          No.
              vs.                          4:20-cv-03664-YGR-SVK
10
      GOOGLE LLC,
11
                      Defendant.
12    _____/

13
                      -- CONFIDENTIAL --
14

15          VIDEOTAPED DEPOSITION OF MICHAEL LASINSKI

16                  Remote Zoom Proceedings

17                   Ann Arbor, Michigan

18                 Wednesday, July 20, 2022

19

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 225                         Job No. 5308350

                                             Page 1

1       UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
3
4
5   CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
6   CASTILLO, and MONIQUE
    TRUJILLO, individually and on
7   behalf of all other similarly
    situated,
8
            Plaintiffs,
9       vs              No
                4:20-cv-03664-YGR-SVK
10
    GOOGLE LLC,
11
        Defendant
12   _____/
13
14      -- CONFIDENTIAL --
15      Videotaped deposition of MICHAEL LASINSKI,
16   taken on behalf of Defendant, Remote Zoom Proceedings
17   from Cambridge, Massachusetts, beginning at 10:59 a m
18   Eastern Daylight Time and ending at 8:28 p m  Eastern
19   Daylight Time, on Wednesday, July 20, 2022, before
20   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21   No  3462
22
23
24
25
                                        Page 2

1   APPEARANCES (Continued):
2
3   FOR THE DEFENDANT:
4       QUINN EMANUEL URQUHART & SULLIVAN, LLP
5       BY: VIOLA TREBICKA, ESQ.
6        865 South Figueroa Street, 10th Floor
7       Los Angeles, California 90017
8       (213) 443-3000
9       violatrebicka@quinnemanuel.com
10       -and-
11      BY: TEUTA FANI, ESQ.
12      191 N. Wacker Drive, Suite 2700
13      Chicago, Illinois 60606
14      (312) 705-7400
15      teutafani@quinnemanuel.com
16
17  Also Present:
18      Amna Qamer, Boies Schiller Flexner LLP, summer
19          associate
20      Angela Peterson, Quinn Emanuel Urquhart & Sullivan,
21          LLP, summer associate
22      Denisha Bacchus, Google LLC
23      Christina Bartlett, Analysis Group
24      Robert Fenton, Videographer
25
                                        Page 4

1   APPEARANCES:
2
3   FOR THE PLAINTIFFS:
4       BOIES SCHILLER FLEXNER LLP
5       BY: JAMES LEE, ESQ.
6       100 SE Second Street, Suite 2800
7       Miami, Florida 33131
8       (305) 539-8400
9       jlee@bsfllp.com
10
11      MORGAN & MORGAN
12      BY: JOHN A. YANCHUNIS, ESQ.
13      201 North Franklin Street, 7th Floor
14      Tampa, Florida 33602
15      (813) 223-5505
16      jyanchuis@forthepeople.com
17
18      DICELLO LEVITT GUTZLER
19      BY: SHARON CRUZ, ESQ.
20      Ten North Dearborn Street, Sixth Floor
21      Chicago, Illinois 60602
22      (312) 214-7900
23      szruz@dicellolevitt.com
24
25
                                        Page 3

1               I N D E X
2
3
4   WEDNESDAY, JULY 20, 2022
5
6   WITNESS                 EXAMINATION
7   MICHAEL LASINSKI
8
9       BY MS. TREBICKA          10, 219
10      BY MR. LEE               211
11
12  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13          (NONE)
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 5

2 (Pages 2 - 5)

CONFIDENTIAL

|  |  | DEPOSITION EXHIBITS |  |
| --- | --- | --- | --- |
| 1 |  | DEPOSITION EXHIBITS |  |
| 2 |  | MICHAEL LASINSKI |  |
| 3 | NUMBER | DESCRIPTION | IDENTIFIED |
| 4 | Exhibit 1 | Expert Report of Michael J. | 8 |
| 5 |  | Lasinski |  |
| 6 | Exhibit 2 | Exhibit A, Third Amended | 31 |
| 7 |  | Complaint |  |
| 8 | Exhibit 3 | GOOG-CABR-04431207 - 271 | 49 |
| 9 | Exhibit 4 | Google Panel Terms & | 116 |
| 10 |  | Conditions, 6.1.21 |  |
| 11 | Exhibit 5 | Google Panel Privacy Policy, | 116 |
| 12 |  | 6.1.21 |  |
| 13 | Exhibit 6 | Nielsen Printout, Computer & | 130 |
| 14 |  | Mobile Panel |  |
| 15 | Exhibit 7 | Nielsen Printout, Computer & | 130 |
| 16 |  | Mobile Panel, Frequently |  |
| 17 |  | Asked Questions |  |
| 18 | Exhibit 8 | Nielsen Printout, U.S. Panel | 131 |
| 19 |  | Privacy Notice Summary |  |
| 20 | Exhibit 9 | SurveySavvy printout, How it | 131 |
| 21 |  | Works |  |
| 22 | Exhibit 10 | SavvyConnect printout, FAQs | 131 |
| 23 | Exhibit 11 | SavvyConnect, Terms and | 131 |
| 24 |  | Conditions |  |
| 25 | Exhibit 12 | UpVoice printout, FAQs | 131 |

Page 6

| 1 | Exhibit 13 | GOOG-CABR-04324934 - 44 | 171 |
| --- | --- | --- | --- |
| 2 | Exhibit 14 | Expert Report of Bruce A. | 176 |
| 3 |  | Strombom |  |
| 4 | Exhibit 15 | Screenshot, Latham & Watkins | 176 |

Page 7

1    Ann Arbor, Michigan; Wednesday, July 20, 2022
2        10:59 A M
3
4        PROCEEDINGS
5    (Exhibit 1, Expert Report of Michael J    10:58:23
6    Lasinski, marked for identification
7    electronically by counsel )
8        THE VIDEOGRAPHER:  Good morning  We are on the
9    record  The time is 10:59 a m  Eastern Time  Today is
10   July 20th, 2022                10:58:57
11       Please note that this deposition is being
12   conducted virtually  The quality of recording depends on
13   the quality of camera and internet connection of
14   participants  What is seen from the witness and heard on
15   screen is what will be recorded  Audio and video      10:59:11
16   recording will continue to take place unless all parties
17   agree to go off the record
18       This is Media Unit 1 of the video-recorded
19   deposition of Michael Lasinski, taken by counsel for
20   Defendant, in the matter of Chasom Brown versus Google   10:59:26
21   LLC, filed in the United States District Court, Northern
22   Division of California, San Jose (sic), Case Number
23   4:20-cv-03664-YGR-SVK
24       This deposition is being conducted remotely
25   using virtual technology                10:59:53

Page 8

1        My name is Robert Fenton, representing Veritext
2    Legal Solutions, and I am the videographer  The court
3    reporter is Leslie Rosas from the firm Veritext Legal
4    Solutions   I am not related to any party in this action,
5    nor am I financially interested in the outcome       11:00:09
6        If there are any objections to proceeding,
7    please state them at the time of your appearance
8    Counsel and all present, including remotely, will now
9    state their appearances and affiliations for the record,
10   beginning with the noticing attorney          11:00:24
11       MS  TREBICKA:  Viola Trebicka, Quinn Emanuel,
12   for Google
13       MR  LEE:  Good morning  James Lee from Boies,
14   Schiller & Flexner for the plaintiffs, and John Yanchunis
15   from Morgan & Morgan also here for the plaintiffs      11:00:35
16       MS  TREBICKA:  Teuta, can you also announce
17   yourself for the record?
18       MS  FANI:  Yes  Teuta Fani with Quinn Emanuel
19   for Google, and we also have Angela Peterson also from
20   Quinn Emanuel  She's a summer associate  As well as     11:00:54
21   Denisha Bacchus, inhouse counsel at Google, and Christina
22   Bartlett with Analysis Group
23       THE REPORTER:  Thank you
24   I also see a Sharon Cruz
25       MS  CRUZ:  Good morning  My name is Sharon     11 01:17

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL

1 Cruz. I am here observing on behalf of the California
2 plaintiffs. I'm with DiCello Levitt Gutzler.
3          THE VIDEOGRAPHER: Thank you.
4          Will the court reporter please swear in the
5 witness and then counsel may proceed.          11:01:31
6          THE REPORTER: And I see Amna Qamer.
7          MS. QAMER: Hi. Good morning. I'm a summer
8 associate with Boies Schiller, and I'll be observing
9 today.
10          THE REPORTER: Thank you.
11          Mr. Lasinski, if you would raise your right
12 hand, please, I'll swear you in.
13          Thank you.
14          You do solemnly state that the evidence you
15 shall give in this matter shall be the truth, the whole
16 truth and nothing but the truth, so help you God?
17          THE WITNESS: I do.
18          THE REPORTER: Thank you, sir.
19          You may proceed, Counsel.
20          MS. TREBICKA: Thank you.          11:01:59
21
22                EXAMINATION
23 BY MS. TREBICKA:
24     Q. Good morning, Mr. Lasinski.
25     A. Good morning.          11:02:03

Page 10

1     Q. Good to see you here today.
2          Is anyone in the room with you today?
3     A. No, there is not.
4     Q. Are you at home?
5     A. No, I'm in my office.          11:02:15
6     Q. Understood.
7          Mr. Lasinski, what browsers do you usually use?
8     A. I usually use --
9          MR. LEE: Object to the form, vague -- sorry
10 about that.          11:02:26
11          Objection to form, vague as to time.
12          Go ahead.
13          THE WITNESS: I usually use Safari and Chrome.
14     Q. BY MS. TREBICKA: How long have you been using
15 these two browsers each?          11:02:41
16     A. For many years. I'm not sure exactly how long.
17     Q. Which one did you start using first, Safari or
18 Chrome?
19     A. I would imagine Chrome.
20     Q. Did you start using it before 2016?          11:03:00
21     A. I think so.
22     Q. But you're not certain?
23     A. No, I would have used it before 2016.
24     Q. What about Safari, did you use it before 2016?
25     A. I don't know. I don't recall if I did or did          11:03:24

Page 11

1 not.
2     Q. Have you ever used the private browsing mode of
3 Chrome?
4     A. Yes, I have.
5     Q. Under what circumstances have you used the          11:03:36
6 private browsing mode of Chrome?
7          MR. LEE: Objection to form, vague.
8          THE WITNESS: I've used -- I have used it
9 recently to -- as part of this case, and then I've used
10 it before that as well.          11:04:02
11     Q. BY MS. TREBICKA: So setting aside your use of
12 Safari -- of the Chrome browser private browsing mode as
13 part of this case, for personal uses did you use the
14 Chrome private browsing mode, also known as Incognito, in
15 the last six months?          11:04:24
16     A. Not -- no. If I set aside this case, I have
17 not.
18     Q. What about in the past five years? Have you
19 used the Chrome private browsing mode in the past five
20 years for personal purposes?          11:04:39
21     A. I would think so, yes.
22     Q. How many times?
23     A. I don't know the answer to that.
24     Q. How come? Why don't you know?
25     A. Because I don't --          11:04:57

Page 12

1          MR LEE: Objection to form, argumentative
2          Go ahead and answer, if you can
3          THE WITNESS: Because I don't keep statistics on
4 how often I go into private browsing mode
5     Q BY MS TREBICKA: Generally speaking, in the          11:05:10
6 past five years when you've used Chrome private browsing
7 mode, what kinds of browsing have you used it for?
8          MR LEE: Beyond the scope of his opinions
9          THE WITNESS: One thing I use it for is when I'm
10 browsing for golf equipment          11:05:41
11     Q BY MS TREBICKA: Anything else?
12     A I cannot -- I mean, as I'm sitting here, I
13 cannot recall anything else
14     Q Why do you use it when you browse for golf
15 equipment?          11:06:00
16          MR LEE: Same objection
17          THE WITNESS: For two reasons: One is because I
18 don't want anyone to know that I'm browsing for golf
19 equipment And, two, I know exactly what I'm looking
20 for, and so I don't want anything to come up that would          11:06:14
21 be different from what I'm looking for
22     Q BY MS TREBICKA: When you say I don't want
23 anyone to know that you're browsing for golf equipment,
24 what do you mean by that?
25     A Well, I don't -- I want to go straight to the          11:06:41

Page 13

4 (Pages 10 - 13)

1 websites that I want to go to  I don't want any
2 advertisements for any different websites  And so I -- I
3 don't want -- I -- I just want to go right where I want
4 to go  I don't want to be bothered with anything else
5    Q  And in private browsing mode, is that -- on the    11:07:05
6 Chrome browser, is your expectation accomplished?
7        MR  LEE:  Calls for speculation
8        THE WITNESS:  I don't -- I don't recall the
9 answer to that
10    Q  BY MS  TREBICKA:  So you don't recall whether in    11:07:20
11 private browsing mode you have been receiving
12 advertisements for golf equipment?
13        MR  LEE:  Asked and answered
14        THE WITNESS:  I don't
15    Q  BY MS  TREBICKA:  You said that you don't want    11:07:31
16 anyone to know that you're browsing for golf equipment
17 Who do you mean by "anyone"?
18    A  I mean everyone  I -- I don't want any person
19 and/or computer saving my -- my information  I just want
20 to go straight to where I want to go, and I want it to be    11:07:52
21 just my own search
22    Q  Has your use of private browsing mode changed
23 over time?  Over the last five years, let's say
24    A  Well, certainly it has over the last six months
25 while I've been working on this case    11:08:18

Page 14

1    Q  How has it changed over the last six months?
2    A  I only use it for this case now
3    Q  Have you ever used Safari private browsing mode?
4    A  I believe that I have, yes
5    Q  When have you used Safari private browsing mode?    11:08:48
6    A  Similar to my answer for Chrome
7    Q  And that is -- well, let's tease that out a
8 little bit
9        Have you used Safari private browsing mode in
10 the last six months?    11:09 06
11    A  I believe that I have, yes
12    Q  Setting aside for purposes of this case, have
13 you used Safari private browsing mode in the last six
14 months?
15    A  I don't recall that I have, no    11:09:22
16    Q  Setting aside for purposes of this case, have
17 you used Safari in the last five years -- private
18 browsing mode in Safari?
19    A  I believe that I have, yes
20    Q  How many times have you done so?    11:09:35
21    A  Again, I don't keep statistics, so I don't know
22 the answer to that
23    Q  Do you have even an approximate answer?
24    A  I -- I would not  No, I cannot
25    Q  Any answer would be pure speculation?    11:09:51

Page 15

1    A  I --
2        MR  LEE:  Outside the scope
3        THE WITNESS:  I just haven't -- I just haven't
4 thought about it, so I just don't keep track
5    Q  BY MS  TREBICKA:  And what kinds of purposes do    11:10:07
6 you use the private browsing mode of Safari?
7    A  I mean, again, I -- similar to Chrome, to browse
8 for golf equipment
9    Q  Anything else that you can think of that you've
10 used the private browsing mode of Safari in the last five    11:10:30
11 years?
12        MR  LEE:  Beyond the scope
13        THE WITNESS:  I do believe that also when I've
14 been at home looking at some of my financial websites,
15 where my brokerage accounts are, I -- I look at that    11:10:52
16 through private browsing mode
17    Q  BY MS  TREBICKA:  Why do you use private
18 browsing mode to look at your -- at the financial
19 websites that have your brokerage accounts?
20        MR  LEE:  Same objection    11:11:09
21        THE WITNESS:  I mean, again, because I don't
22 want anyone knowing that I went to the website or
23 tracking any of my information or keeping any of my
24 information
25    Q  BY MS  TREBICKA:  Mr Lasinski, what is your    11:11:33

Page 16

1 assignment in this case?
2    A  My assignment in this case is to calculate the
3 damages as it relates to -- to types of harm  One is
4 unjust enrichment, which I understand is available
5 through breach of contract and -- through disgorgement    11:12:09
6 through breach of contract  One is actual harm through
7 restitution that's available through restitution damages
8 One is to calculate -- a third is to calculate bases to
9 which statutory damages could be applied  And one is --
10 and one is to determine methods of apportionment should    11:12:46
11 unjust enrichment or actual harm be awarded in this case
12        Further, I've outlined my assignment in my
13 report  So to the extent that I missed anything just
14 now, it would be outlined in my report
15    Q  You mentioned that one of your -- you mentioned    11:13:22
16 that your assignment in this case is to calculate the
17 damages as it relates to, one, unjust enrichment which
18 you understand is available through breach of contract
19        Is your understanding that unjust enrichment is
20 available for any other claim in this case?    11:13:52
21        MR  LEE:  Objection to form, calls for a legal
22 conclusion
23        THE WITNESS:  It may be available through
24 other -- other areas of the case  However, I do know
25 that it's available through breach of contract    11:14:45

Page 17

5 (Pages 14 - 17)

Page 18

1  Q  BY MS TREBICKA: How do you know that it's
2  available through breach of contract?
3     A  Because I've worked on numerous breach of
4  contract cases in the past, as well as discussions with
5  counsel on this case            11:15:01
6     Q  So setting aside discussions with counsel in
7  this case, is one of your opinions in this case that
8  unjust enrichment damages are available for a breach of
9  contract claim?
10    A  I think you're asking me for a legal conclusion    11:15:18
11  there  But my understanding from the work that I've done
12  in other cases, as well as here, that unjust enrichment
13  or disgorgement is available through breach of contract
14    Q  I'm only asking you for your opinion  Is one of
15  your opinions in this case that unjust enrichment damages    11:15:37
16  are available for a breach of contract claim?
17    MR LEE:  Asked and answered
18    He just told you
19    THE WITNESS:  Again, I'm not -- I'm not a
20  lawyer, so -- and I'm not trying to tie it to specific    11:15:48
21  areas of the case -- that unjust enrichment could be
22  available through breach of contract
23    through breach of contract
24    But I'm not actually offering an opinion on
25  that, I'm just offering an opinion on what the unjust    11:16:05

Page 19

1  enrichment would be if it's awarded.
2     Q.  BY MS. TREBICKA:  So you are not offering an
3  opinion that unjust enrichment is available for a breach
4  of contract claim?
5     A.  I am not offering legal opinions.  My -- my    11:16:19
6  understanding is that that would be a legal opinion.
7     What I am doing is quantifying the amount of
8  damages in this case -- that may be available in this
9  case.
10    Q.  You also mentioned actual harm.  Is your    11:16:34
11  quantification of actual harm your restitution opinion?
12  Are those one and the same?
13    A.  In this case, I have not -- yes, I've calculated
14  actual harm as restitution damages.
15    Q.  So there is no other quantification of actual    11:16:50
16  harm that you have offered or plan to offer, other than
17  your restitution  opinion?
18    A.  I have not -- yes, I have not quantified any
19  other actual harm.
20    Q.  Let's turn to -- actually, let me ask you,    11:17:10
21  Mr. Lasinski, is there any paper in front of you right
22  now?
23    A.  Yes, there is.
24    Q.  And what is it?
25    A.  I have a copy of my report that I printed from    11:17:19

Page 20

1  the PDF that was sent.  And then I have a copy of
2  Mr. Strombom's report that I received.
3     Q.  Are those annotated copies with your notes?
4     A.  There are no notes, no.  It's the actual just
5  straight PDF that was sent.            11:17:40
6     Q.  Any other paper on your desk?
7     A.  Well, there is a box of tissues.  And just for
8  completeness, there is a thing of Post-it Notes.
9     Q.  Those qualify as paper, so thank you.
10    A.  I'm just trying to be complete.  So, yes, that    11:17:59
11  is paper.
12    Q.  You're being very precise.
13    Let's turn to your report, which I will mark as
14  Exhibit 1 to this deposition -- or, actually, it's been
15  premarked so I don't need to mark it.            11:18:14
16    But it is on the Veritext Exhibit Share website.
17  Feel free to use that copy or the copy in front of you.
18    A.  I would like to just open it up on the website
19  to make sure that I have the ability to do so.
20    Okay.            11:19:00
21    Q.  All right.  So turn your attention to
22  paragraph 11 in your report, which is on page 4.
23    And if you could silently read along as I read
24  it into the record.
25    Paragraph 11 states:  "My assignment in this    11:19:16

Page 21

1  matter includes assessing the feasibility of identifying
2  and quantifying various measures of monetary relief tied
3  to Plaintiffs' claims, including that which I have
4  described below as Google's unjust enrichment,
5  Plaintiffs' actual damages, and statutory damages."    11:19:33
6     You say in the very first few words that your
7  assignment includes the following, what you've put in
8  your report.  Is there anything that your assignment also
9  includes that hasn't been explicitly stated in your
10  report?            11:19:55
11    MR. LEE:  I'm sorry, what -- you cut out for me,
12  Viola.  What was your question?
13    Q.  BY MS. TREBICKA:  Is there anything in your
14  assignment that you've done for this case that has not
15  been explicitly stated in paragraph 11 of your report?    11:20:14
16    MR. LEE:  Objection to form, vague.
17    You know what, Viola, while Mr. Lasinski's
18  reviewing his report, I will disclose to you that he has
19  reviewed the deposition transcript of Sabine Borsay, the
20  deposition of which was taken after he had issued the    11:21:26
21  report.
22    THE WITNESS:  So just for completeness,
23  paragraph 11 is my assignment.  But I want to ensure that
24  it is not considered exclusive of my Section 10 of my
25  report, which is apportioning monetary relief to the    11:22:16

1 class  I also have provided an opinion on that as well

2    Q  BY MS TREBICKA:  Understood

3       And apportioning the monetary relief to the

4 class, does that include the unjust enrichment damages?

5    A  It -- so it certainly would be one way of          11:22:44

6 allocating the unjust -- it identifies two ways of

7 allocating the unjust enrichment damages, yes

8    Q  What other -- as far as your apportionment

9 opinion, which you said you wanted to make sure was not

10 excluded, what damages that you quantify do you apportion   11:22:58

11 to the class?

12      When I say "what damages," I mean what types of

13 damages

14    A  Well, for -- for that section of the report,

15 Section 10, I am talking about either unjust enrichment   11:23:34

16 damages or restitutionary damages or actual harm

17    Q  If you could direct your attention to footnote 6

18 on that same page, page 4

19    A  Yes

20    Q  If you -- and if you could read silently while   11:24:02

21 I'm reading pieces of the footnote into the record

22      You say that, "I understand from discussions

23 with Mr Hochman that Mozilla took various steps to block

24 Google tracking beacons within the Firefox browser "

25      Do you see that?                              11:24:23

                                                     Page 22

1 various steps to block Google tracking beacons within the

2 Firefox browser

3       If you read the next sentence that we haven't

4 read into the record, he indicated that Google may have

5 been intermittently successful in attempts to circumvent   11:26:51

6 Mozilla's efforts in this regard  But because -- because

7 it wasn't 100 percent successful, I made the

8 determination not to include Firefox

9    Q  Did you make the determination to exclude any

10 other browsers from your unjust enrichment damages or   11:27:37

11 statutory damages assessment?

12      MR LEE:  Objection  Compound

13      THE WITNESS:  Certainly other browsers are

14 excluded  I've only included Safari and Edge

15    Q  BY MS TREBICKA:  In your view, is the Firefox   11:28:08

16 browser a more private browser?

17    A  I don't have a view on that  That's outside the

18 scope of my report

19    Q  So the only reason that you excluded the

20 Firefox browser is because in your conversations with   11:28:22

21 Mr Hochman, Mozilla took various steps to block Google

22 tracking beacons from the Firefox browser?

23      MR LEE:  Objection to form, mischaracterizes

24 his prior testimony, mischaracterizes the footnote

25      THE WITNESS:  I don't agree with that         11:28:39

                                                     Page 24

1    A  Yes

2    Q  And the sentence preceding that, you say that,

3 "The private browsing mode offered on the Firefox browser

4 is excluded from other private browsing modes as the term

5 is used in this report."                          11:24:34

6      Do you see that?

7    A  Yes

8    Q  And is your exclusion of the Firefox private

9 browsing mode a result of your conversation with

10 Mr. Hochman about Mozilla's various steps to block   11:24:44

11 tracking beacons?

12    A  Yes, it is.

13    Q  What did Mr. Hochman tell you about Mozilla's

14 steps to block Google's tracking beacons?

15      MR. LEE:  Objection.  The document speaks for   11:25:10

16 itself.

17      THE WITNESS:  Should I go ahead and answer that,

18 then, or --

19    Q  BY MS. TREBICKA:  Yes.

20    A  In performing my analysis, I was determining   11:25:48

21 which browsers, in addition to Chrome, should be

22 considered for unjust enrichment.  And I discussed that

23 with Mr. Hochman.

24      He had indicated -- he indicated that in some

25 instances, Mozilla took exactly what it says here,   11:26:26

                                                     Page 23

1    Q. BY MS. TREBICKA:  What do you not agree with?

2 What part of my question do you not agree?

3    A.  In -- in coming to the conclusion of which

4 browsers to include, I had a discussion with Mr Hochman

5 about Firefox.  Based on his representations to me, I   11:29:06

6 determined to exclude it -- determined it was appropriate

7 to exclude it.

8    Q.  Turn your attention to -- well, before we do

9 that, you're familiar with Plaintiffs' Operative

10 Complaint in this lawsuit; correct?                11:29:35

11    A.  I have read their Complaint.

12    Q.  And it's the Third Amended Complaint, I believe,

13 the Operative Complaint?

14    A.  That is my understanding.

15    Q.  And you know that the Complaint outlines to   11:29:49

16 putative classes that it seeks to certify?

17    A.  That is my understanding.

18    Q.  Class 1 is roughly related to -- or includes

19 Incognito users; correct?

20    A.  I think that there are other restrictions or   11:30:13

21 other qualifications to the class.  But my understanding

22 is one of the qualifications is -- is to be an Incognito

23 user.

24    Q.  And class 2, one of the qualifications or

25 limitations to class 2 is that it includes users of   11:30:30

                                                     Page 25

                                          7 (Pages 22 - 25)

1 non-Chrome browsers in private browsing mode; correct?

2    A   That is my understanding

3    Q   And you're aware that the definition of class 2

4 in the Operative Complaint is not limited to just Safari

5 and Edge users; correct?                    11:30:57

6         MR LEE:  Objection to form

7         THE WITNESS:  My understanding is that it

8 relates to non-Chrome browser users, not just Safari or

9 Firefox -- I'm sorry, Safari or Edge

10    Q   BY MS  TREBICKA:  So you are not quantifying     11:31:26

11 damages for all members of proposed class 2, in your

12 opinion; correct?

13        MR LEE:  Objection to the extent it calls for a

14 legal conclusion

15        THE WITNESS:  So to the extent -- I have     11:31:53

16 quantified Safari and Edge users  I have not quantified

17 other browsers

18    Q   BY MS  TREBICKA:  One of the limitations or

19 requirements to belong in the class is to have used

20 private browsing mode from June 2016 to the present;     11:32:14

21 correct?

22        MR LEE:  Which class?

23    Q   BY MS  TREBICKA:  Both classes

24    A   I do believe that that is accurate

25    Q   As long as a user has used private browsing     11:32:28

Page 26

1 mode once during the class period, which is June 2016 to

2 the present, that user would satisfy that requirement;

3 correct?

4    A.  I mean, I'm not making any kind of legal

5 conclusion here.  This sounds like you're asking me to     11:32:54

6 define something that's in -- in the Complaint.  I don't

7 have any dispute with that, as I sit here.

8    Q.  That's fair.

9        The better question would be:  As long as a user

10 has used private browsing mode once during the class     11:33:11

11 period, that user would satisfy that requirement, the

12 requirement of being a private browsing user, for

13 purposes of your quantification of damages?

14        MR. LEE:  Objection to form to the extent it

15 calls for a legal conclusion.     11:33:35

16        THE WITNESS:  I think that that -- I think that

17 that's a fair representation.

18    Q.  BY MS. TREBICKA:  Turn your attention to

19 footnote 5 now, please.

20        And about halfway through, the definition of     11:33:52

21 class 2 starts.  Well, it includes both definition of

22 class 1 and class 2.

23        So let's actually start with class 1.  On the

24 fourth line down -- and feel free to read it silently.

25 I'm not going to read it into the record.     11:34:18

Page 27

1        But about the fourth line down, it states that

2 one of the requirements for belonging to the class is

3 that -- "Whose communications, including identifying

4 information and online browsing history, Google

5 nevertheless intercepted, received or collected from     11:34:35

6 June 21, 2016, through the present "

7        And I'm not representing that I'm reading the

8 whole class definition  I'm just reading parts of what

9 I'd like to ask you a question about

10        Do you see that?     11:34:52

11    A   I see where you read

12        MR LEE:  And if you're going to ask about the

13 definition, I would ask Mr  Lasinski to read the whole

14 class definition before he answers questions

15    Q   BY MS  TREBICKA:  Do you understand what     11:35 01

16 identifying information refers to in this class

17 definition?

18        MR LEE:  Could you repeat the question, Viola?

19    Q   BY MS  TREBICKA:  Do you understand what

20 identifying information refers to in this class     11:35:22

21 definition?

22    A   I think as a technical term, I don't -- I don't

23 have -- I would not have a technical definition  I

24 don't --

25    Q   So you have no --     11:36:35

Page 28

1    A   I don't know how to define that

2    Q   You have no understanding of that term, for

3 purposes of your opinion?

4        MR LEE:  Objection to form, mischaracterizes

5        THE WITNESS:  I do have a general understanding     11:36:52

6 of how information is identified and transmitted through

7 my discussions with Mr  Hochman  However, I'm not a

8 technical expert, so I don't -- cannot technically define

9 this

10    Q   BY MS  TREBICKA:  You weren't asked to assume     11:37:18

11 what identifying information means in this case?

12    A   In this case, I was asked to assume that there

13 are certain types of information that are identified and

14 then intercepted, received and collected  And I've taken

15 that as an assumption in -- in making my calculations     11:38:08

16    Q   Okay  It also says here, "An online browsing

17 history "

18        Do you see that?

19    A   Yes, I do

20    Q   Yeah     11:38:31

21        Do you understand that to be synonymous with

22 identifying information?

23    A   My understanding is that identifying information

24 and that online browsing history is the type of

25 information that could be identified -- or would be     11:38:56

Page 29

8 (Pages 26 - 29)

1 identified.
2    Q.  So online browsing history, in your
3 understanding, is identifying information?
4    A.  No.  It's the type of -- it's the type of
5 information that is intercepted, received or collected.    11:39:21
6    Q.  So online browsing history is not necessarily
7 identifying information?
8    A.  Oh, online browsing history may be identifying
9 information.  I have not -- I'm not a technical expert,
10 so I'm not the one to determine whether or not it's    11:39:43
11 identifying information or not.
12    Q.  And in the context of your opinion, do you
13 understand that online browsing history at issue in this
14 class definition relates to the browsing history while a
15 user is in private browsing mode alone?    11:40:02
16    A.  Yes, I do.  My calculations are very aware of
17 that.  I make a number of adjustments to ensure that that
18 is the case.
19    Q.  Earlier, just a few minutes ago, you testified
20 that you were asked to assume that there are certain    11:40:25
21 types of information that are identified and then
22 intercepted, received and collected.  Do you recall that?
23    A.  Yes.
24    Q.  Are those the types of information that are
25 outlined in the Complaint?  And let me -- why don't I    11:40:41

Page 30

1 just mark the Complaint as the next exhibit, Exhibit 2.
2       (Exhibit 2, Exhibit A, Third Amended Complaint,
3       marked for identification electronically by
4       counsel.)
5    MR. LEE:  Asked and answered.    11:40:53
6    Q.  BY MS. TREBICKA:  So the exhibit --
7    A.  Hold on.  Nothing's coming up yet.  I guess I
8 have to do some sort of refresh?
9    Q.  Perhaps.  And the exhibit will be coming up for
10 you shortly.    11:41:15
11       But this is a standalone question:  Is it your
12 understanding that the types of information that are
13 outlined in the Complaint are the pieces of information
14 that you were asked to assume were identified and then
15 intercepted, received and collected?    11:41:27
16    MR. LEE:  Wait.  Hold on.  Is this a new
17 question?  Are you withdrawing your first question?
18    MS. TREBICKA:  James, I'd actually ask that you
19 stop the speaking objections, because it's interfering
20 with the deposition which is slow as it is.    11:41:38
21       If Mr. Lasinski doesn't understand my questions,
22 he will tell me.  He's an expert witness.  He has a lot
23 of experience.  Please stop with the speaking objections.
24    MR. LEE:  Okay.  Well, for the record, I'll
25 object.  I'll just note that there are two questions    11:41:53

Page 31

1 pending and now an exhibit pending.
2       So if you're --
3    MS. TREBICKA:  That's enough.  I think that's
4 enough.
5    MR. LEE:  Excuse me    11:42:01
6       Mr. Lasinski, if you want to read the Complaint
7 to answer this question, go ahead.  It's marked as
8 Exhibit 2.
9    Q.  BY MS. TREBICKA:  So, Mr. Lasinski, my question
10 is:  Is it your understanding that the types of    11:42:13
11 information that you were asked to assume were identified
12 and then intercepted, received and collected, are the
13 same as those that Plaintiffs have outlined in their
14 Complaint?
15    MR. LEE:  Same objection    11:42:29
16    THE WITNESS:  Could you just repeat the question
17 one more time?
18    Q.  BY MS. TREBICKA:  Sure
19       This is not -- I've marked the exhibit, the
20 Complaint  But this is not -- I marked it for purposes    11:43:56
21 of time  This question does not ask you to review the
22 Complaint
23       This is -- without reviewing the Complaint right
24 now, do you have an understanding that the types of
25 information that you were asked to assume were identified    11:44:12

Page 32

1 and then intercepted, received and collected, are the
2 same as those that Plaintiffs have include in their
3 Complaint?
4    MR. LEE:  Calls for speculation
5    THE WITNESS:  I think you're asking me for a    11:44:38
6 legal interpretation
7       What I did here was review the Complaint,
8 discuss with Mr Hochman, discuss with the attorneys the
9 types of -- the types of information, and then determine
10 the amount, how that would impact ultimately Google's    11:45:00
11 traffic and their ability to monetize that traffic based
12 on a -- my understanding of the Complaint, my discussions
13 with Mr Hochman, as well as counsel
14    Q.  BY MS. TREBICKA:  Let me ask you to turn to
15 paragraph 63 in Exhibit 2, which is the Third Amended    11:45:30
16 Complaint
17       And let me know when you're there
18    A  Okay
19    Q  It says here at line 13, "The Data Secretly
20 Collected "    11:45:53
21       Do you see that?
22    A  I see where it says, "Data Secretly Collected "
23    Q  And then paragraph 63 continues to outline
24 certain pieces of information that the message allegedly
25 intercepted from a user  "Contains "    11:46:06

Page 33

9 (Pages 30 - 33)

1    Do you see that?
2    A  Yes, I do
3    Q  It starts with "a  The 'get request' sent from
4  the user's computer to the website "
5    A  It does say that  I don't know that that's a       11:46:24
6  question  Is that a question?
7    Q  Do you understand that this is one of the pieces
8  of information you were asked to quantify damages for,
9  the receipt of which you were asked to quantify damages
10  for?                                                    11:46:43
11    MR  LEE:  Objection to form, asked and answered
12    Answer again, if you can
13    THE WITNESS:  So, again, this is a technical
14  question  To the extent this is analyzed by
15  Mr Hochman and counsel and this results in information  11:47:23
16  that would then be translated into unjust enrichment
17  under my calculations, yes, then this would be one of the
18  pieces of information that was quantified
19    But the technical translation from going from a
20  'get request' to my damages analysis is just that  It's  11:47:54
21  a combination of working with Mr  Hochman as well as
22  counsel to make sure that the footprint of what I am
23  calculating is appropriate
24    Q  BY MS  TREBICKA:  And moving on to the next --
25  to b on the next page, says, "The IP address of the      11:48:14

Page 34

1  user's connection to the internet."
2    My question is the same:  Do you understand that
3  this is one of the pieces of information that you were
4  asked to quantify damages for?
5    A.  I will answer it the same way as I answered the   11:48:37
6  last question, which is, again, to the extent that this
7  flows into both the technical and legal components of
8  information that was collected, and then is -- and
9  then is used, then, by Google to generate profits, for
10  example, yes, then this would be included in my         11:49:16
11  calculation.
12    Q.  Same questions with respect to items c through
13  f, which, for the record, are information identifying the
14  browser software that the user is using, including any
15  fingerprint data as described further below, infra, at   11:49:34
16  paragraphs 100 through 105.
17    "d.  Any 'user-ID' issued by the website to the
18  user, if available (as described further below, infra, at
19  paragraph 69)."
20    "e.  Geolocation of the user, if available (as      11:49:50
21  described further below, infra, at paragraphs 105 through
22  112)."
23    And "f.  Information contained in 'Google
24  cookies,' which were saved by the user's web browser on
25  the user's device at any prior time (as described further  11:50:06

Page 35

1  below, infra, at photographs 70 through 72)."
2    My -- my question is the same, which is:  Are
3  these pieces of information there you were asked to
4  quantify damages for -- the receipt of which you were
5  asked to quantify damages for?                           11:50:27
6    MR  LEE:  Compound.
7    THE WITNESS:  I mean, again --
8    THE REPORTER:  Excuse me.  Was there an
9  objection, Mr  Lee?
10    MR  LEE:  Yeah.                                       11:50:42
11  Compound.
12    THE WITNESS:  I would have to answer this the
13  same way.  I relied on technical discussions with
14  Mr  Hochman as well as with counsel to ensure that the
15  footprint of my analysis was consistent with the         11:50:52
16  footprint of the alleged wrongful conduct here.
17    Q.  BY MS  TREBICKA:  Do you quantify damages for
18  any of these pieces of information individually?
19    MR  LEE:  Objection to form, vague.
20    THE WITNESS:  In my analysis, I calculate          11:52:37
21  damages as it relates in certain instances to overall
22  traffic in Incognito mode.  I calculate damages as it
23  relates to damages that would stem from traffic that is
24  covered by site-wide tagging or first-party cookies and
25  third-party cookies.                                     11:53:13

Page 36

1    And then I also calculate damages for traffic
2  that is only covered by third-party cookies in my
3  analysis  That's the analysis that I performed based on
4  my discussions with counsel, as well as -- for unjust
5  enrichment counsel, as well as Mr  Hochman               11:53:30
6    And one of the ways -- one of the damages
7  calculations is only related to information that is
8  collected or covered -- traffic that is covered by
9  third-party cookies
10    Q  BY MS  TREBICKA:  This relates only to your      11:53:52
11  unjust enrichment opinion, though; correct?
12    MR  LEE:  Objection  Vague as to "this "
13    THE WITNESS:  I'm sorry  Could you repeat the
14  question?
15    Q  BY MS  TREBICKA:  Your explanation relates only   11:54:05
16  as to the unjust enrichment opinion; correct?
17    A  For those three types of calculations, that --
18  that is correct
19    Q  So with respect to your restitution opinion, do
20  you quantify damages with respect to any of these pieces   11:54:32
21  of information individually?
22    A  If you're asking do I break them out separately,
23  I do not break them out separately
24    Q  Does your methodology offer any way to quantify
25  damages -- restitution damages for any of these pieces of   11:55:05

Page 37

10 (Pages 34 - 37)

1 data individually?

2   A  I think -- I think that that would be an

3 inappropriate way to apply restitution damages  If any

4 of this information is collected during that period of

5 time, I think that the full restitution damages, the way   11:55:46

6 I calculate it, would be applicable

7       So I think it would be inappropriate to try to

8 do that separately

9   Q  And you have, in fact, not attempted to do that

10 separately?                        11:56:00

11   A  I think it would be inappropriate to do so, so I

12 did not do it

13       MR LEE:  Hey, Viola, we've been going for a

14 little bit  Almost an hour  I have to use the restroom

15 real quick  Do you mind if we break for five minutes?   11:56:14

16       MS TREBICKA:  Sure  We can do that

17       MR LEE:  Go off the record

18       THE VIDEOGRAPHER:  Going off the record at

19 11:56 a m

20       (Recess )                    12:03:47

21       THE VIDEOGRAPHER:  We are back on the record at

22 12:04 p m

23   Q  BY MS TREBICKA:  Mr Lasinski, before the

24 break, we were discussing pieces of information that you

25 have attempted to quantify in your damages opinion  So   12 04:05

Page 38

---

1 in the same vein of questions, I have a hypothetical for

2 you

3       Let's assume a user who is in private browsing

4 mode, let's call it Incognito, Chrome browser -- private

5 browsing mode, and not signed into her Google account,   12:04:23

6 visits Google com and does a search

7       Would you agree that Google receives certain

8 data from that user when she does the search?

9   A  My --

10       MR LEE:  Objection             12:04:44

11 I'm sorry

12       Objection  Beyond the scope

13       Go ahead

14       THE WITNESS:  That's not inconsistent with my

15 understanding               12:04:57

16   Q  BY MS TREBICKA:  And that user may also be

17 shown an ad?

18   A  That could be possible

19   Q  Now, is that data that Google receives when a

20 user in this scenario does a search part of the data that   12:05:12

21 you are trying to quantify damages for?

22   A  No  It would not -- I would not have quantified

23 damages in that case  At least as it pertains to my

24 unjust enrichment, it would not

25   Q  What about as it pertains to your restitutionary   12:05:42

Page 39

---

1 damages?

2   A  It is potentially included, although it's a --

3 that seems like a very Edge case that is not -- not going

4 to be the way the vast majority of people use the

5 internet would be -- would be included  That would just   12:06:36

6 be a very Edge case

7   Q  What is your basis for stating that it would be

8 an Edge case?

9   A  My discussions with Mr Hochman  That's not the

10 way people search the internet, just go to Google com do   12:06:48

11 one search and then leave and don't even click on

12 anything, just exit and leave  As well as just personal

13 knowledge of how people search the internet

14   Q  So similar scenario:  A user is in private

15 browsing mode, not signed into her Google account, visits   12:07:19

16 Google com, does a search, is displayed an ad and then

17 clicks on the ad to go to a third-party website

18       Would the data that Google receives in that

19 scenario be included in your restitution opinion?

20   A  So, I mean, this line of questioning is kind of   12:08:12

21 odd, because what my restitution opinion actually is is

22 calculating the number of unique monthly browser

23 instances

24       And so you're asking, is that included?  Well,

25 potentially it could be included  But it's -- it's --   12:08:34

Page 40

---

1 you know, if somebody were on the internet and they

2 browse for 7 times or 12 times or whatever, over that

3 month in Incognito --

4       I'm assuming -- I hope that we're together  I'm

5 assuming that you meant in Incognito mode here, because I   12:08:54

6 was -- and I think that you did say that  And so if I

7 forget that, I assume that you did mean Incognito mode

8 Is that correct?

9   Q  I meant private browsing mode, either Incognito,

10 Safari or Edge                     12:09:13

11   A  Okay  Okay  Maybe -- could we just do one

12 thing, though?  I want to be -- because I didn't listen

13 for that in the question

14       You know, if you don't mean Incognito mode or

15 private browsing mode, can you just be sure to, like,   12:09:23

16 say, "I don't mean private browsing mode"?  Because a lot

17 of times in this case I've just been thinking Incognito

18 mode -- you know, Incognito mode, but --

19       So I just want to make sure that we are on the

20 same page here                    12:09:38

21   Q  That's fair  I think what you're saying is that

22 most of our conversation will revolve around the three

23 private browsing modes for which you quantify damages,

24 Incognito, the Safari browsing mode and the -- private

25 browsing mode and the Edge private browsing mode   12:09:54

Page 41

11 (Pages 38 - 41)

1    A   Right   I just want to make sure that I don't --
2    I could answer a question incorrectly because I could
3    assume that it's Incognito mode or private browsing mode,
4    and it's not
5    Q   I think you can safely -- I don't want to say          12:10:10
6    assume, because obviously you need to listen to my
7    question very carefully   But most of our conversation
8    will involve private browsing modes   I will make it
9    clear in my question whether it's private browsing mode
10   or regular browsing   And I will make it extra clear if      12:10:24
11   I'm talking about all browsing, including regular
12   browsing
13   A   Okay   Okay
14   Q   But my question was actually a specific
15   limitation in the question, where I said that this -- the    12:10:35
16   hypothetical scenario involved a private browsing mode
17   user
18   A   Okay   Could you repeat the question, though,
19   because I -- I was starting to answer, and then I
20   couldn't remember if you asked that question or not -- or    12:10:51
21   made that qualifier or not
22   Q   That's fine
23       So user is in private browsing mode, not signed
24   into her Google account   During the class period does a
25   search on Google com, is shown an ad and clicks on that      12:11:03

Page 42

1    ad
2        So my question is:  Would that activity be
3    something that you are quantifying in your restitution
4    damages opinion?
5        MR LEE:  Incomplete hypothetical              12:11:20
6        Go ahead and answer
7        THE WITNESS:  Well, I mean, again, I just want
8    to make clear what I'm doing in my restitution damages
9    And that is looking at the number of unique monthly
10   browser instances                                 12:11:44
11       So if that results in an instance, as collected
12   by a browser -- a browser, if that results in an
13   instance, yes, that could be included -- that would be
14   included   But all the rest of their browsing that they
15   did that month also would be included in Incognito mode     12:12:14
16   Because I'm only -- I'm only calculating one instance per
17   month
18       So even if there were 24 instances and even if
19   they click on 37 websites in unique browsing mode, that
20   only counts as one instance                       12:12:37
21   Q   BY MS  TREBICKA:  And the same hypothetical --
22   do you need me to repeat it?
23   A   I guess so, because I thought I just answered
24   the question
25   Q   No, now the question is:  Would it be included   12:12:53

Page 43

1    in your unjust enrichment damages model?  But it's the
2    same hypothetical
3        MR LEE:  Asked and answered
4        THE WITNESS:  So if I'm -- if I'm understanding
5    the hypothetical correctly, they go -- just so -- just to   12:13:45
6    restate it, they go to private browsing mode, they go to
7    a website, and then that website -- and then that
8    website, they're displayed an ad, and then they go to
9    another website where that ad was displayed
10   Q   BY MS  TREBICKA:  Correct               12:14:06
11   A   I think that it could be   But the reality is I
12   take a lot of cuts   And so -- in my -- in my analysis
13   So, I mean, if it's something that they click on and
14   they -- like a mobile ad, that would not be included,
15   because I've cut that out of my analysis   Any app        12:14:44
16   traffic I've cut out of my analysis
17       So it really would depend on how that -- how
18   that actually all transpired
19   Q   That's fair, Mr  Lasinski   And we'll be talking
20   in a lot more detail about the unjust enrichment damages   12:15:00
21   model
22       Now, what is the injury for which you're
23   quantifying damages?
24       MR LEE:  Vague, beyond the scope
25       THE WITNESS:  I think you're asking for a legal  12:15:27

Page 44

1    conclusion there
2    Q   BY MS  TREBICKA:  You don't have any other
3    answer, other than one that you believe is a legal
4    conclusion?
5    A   I do believe that it's a legal conclusion   So   12:15:36
6    from an injury standpoint, my understanding is that
7    Google was unjustly enriched in this case, as well as
8    the -- the private browsing users were wrongfully -- had
9    their data wrongfully taken
10   Q   Is one of your assumptions that every user who   12:16:08
11   falls within the class definitions was actually harmed by
12   the alleged misconduct?
13   A   Yes, every user was harmed
14   Q   Now, you understand that there's some
15   variability in what users believe or are aware of about    12:16:48
16   what they let Google collect?
17       MR LEE:  Objection  Compound
18       THE WITNESS:  I don't -- I don't believe that
19   anyone is fully aware of what Google collects
20   Q   BY MS  TREBICKA:  Do you understand that there's   12:17:10
21   at least variability in what people are aware of, as far
22   as what Google collects?
23   A   When you're talking about the class, I don't
24   think that they -- they -- I don't think that users would
25   understand what Google collects  I don't think class     12:17:33

Page 45

12 (Pages 42 - 45)

1 users would understand what they collect or -- or are
2 aware of what they collect
3      Q  So your opinion is that no user is aware of what
4 Google collects when a user is in private browsing mode?
5      A  I don't think that that could be aware of what       12:17:56
6 Google collects  I don't think Google -- I mean, I read
7 the testimony of Ms  Borsay  She doesn't even know what
8 Google collects, and she's a key person in their private
9 browsing mode group
10      So users -- it would -- in my opinion, would be       12:18:16
11 beyond reasonable to assume that they're aware of what
12 Google is collecting
13      Q  So your assumption is that every single user in
14 the class has the same level of awareness of what Google
15 collects when they are browsing in private browsing mode?       12:18:34
16      MR  LEE:  Objection  Mischaracterizes his prior
17 testimony
18      THE WITNESS:  I don't think I have an assumption
19 that they -- I don't have to have an assumption what
20 level of awareness they -- they have  I just know that       12:18:48
21 they're not aware  And they can't -- they can't be
22 aware
23      I'm not aware of any place, or I've -- and I've
24 searched the data to see if there's anywhere that Google,
25 like, publicly states: Here's all the information that       12:19:06

Page 46

1 we collect on you when you're in private browsing mode
2 I'm not aware of anything like that
3      So I've talked to Mr Hochman  He's not aware
4 before this case what Google collects  And probably is
5 still not aware of everything that they collect       12:19:31
6      Ms  Borsay isn't aware of what is collected  So
7 I -- I don't believe that any user can be aware of what
8 Google is collecting
9      Q  BY MS  TREBICKA:  Do you believe that some users
10 may be aware of some of the data that Google collects but       12:19:47
11 not other pieces, while they're in private browsing mode?
12      A  I -- maybe some -- some people might suspect
13 that there's collection, but I don't think that they
14 could be aware, because I don't think it's published
15 anywhere  So I don't know how they could be aware of       12:20:10
16 what they collect
17      Q  What do you mean by "might suspect that there is
18 collection"?
19      A  Well, people -- I mean, certainly there's press
20 from this case right now  That's out there  So people       12:20:26
21 know that something is going on here  People may just be
22 paying attention to that, and so they might suspect
23 something is going on  But they cannot be aware of what
24 is going on, in my opinion
25      Q  So in your opinion, would users know, for       12:21:16

Page 47

1 example, that Google knows their location when they are
2 in an Incognito mode session?
3      A  I -- I don't have an opinion on what specific
4 users know or don't know
5      Again, I'm not -- I haven't done a study of what       12:22:07
6 users would say that they know  I mean, I think, again,
7 it would be hard to know something, because people aren't
8 aware of everything that Google is collecting  They
9 can't be aware of it because it's not published
10      Q  Are you drawing a difference between the word       12:22:32
11 "aware" and "know"?
12      A  I'm -- in that case, I don't think I was trying
13 to draw a difference between them
14      Q  So do you believe that Google -- that users are
15 aware that within an Incognito mode session, Google       12:22:55
16 learns things about the users to personalize their
17 experience when using Google products?
18      MR  LEE:  Calls for speculation, beyond the
19 scope
20      THE WITNESS:  Could you repeat that question?       12:23:59
21      Q  BY MS  TREBICKA:  Do you believe that Google
22 users are aware that within Incognito mode session,
23 Google is aware -- I apologize  Let me start again
24      Do you believe that Google users are aware that
25 within their Incognito mode session, Google knows       12:24:19

Page 48

1 their -- things about them in order to personalize their
2 experience when using Google products?
3      A  I mean, I think if I'm understanding the
4 question correctly, you're asking me about what a user
5 would think when they go into Incognito.       12:24:51
6      And, I mean, I'm just looking at my report, and
7 it says, "Chrome won't save the following information:
8 Your browser history, cookies and site data/information
9 entered into forums."
10      And so if you were to read -- if you were a user       12:25:06
11 and you were to read that definition, it would seem like
12 you would not be aware that they're actually using
13 information to personalize your web browsing history.
14      Q. Okay.
15      A. And I -- I'll also say that, you know, I read a       12:25:22
16 lot of the emails that were in this case, and it seems
17 like the Google people also understand that people don't
18 have an understanding of what is being collected.  And
19 their -- their expectations or awareness is different
20 than what Google Incognito mode actually does.       12:25:48
21      MS. TREBICKA:  Let me mark as Exhibit 3 --
22      (Exhibit 3, GOOG-CABR-04431207 - 271, marked for
23      identification electronically by counsel.)
24      MS. TREBICKA:  -- a Google document, which is
25 Tab 3 for tag purposes, with the Bates label       12:25:57

Page 49

13 (Pages 46 - 49)

1 GOOG-CABR-0443120.
2    Q. Which I will represent to you is a document that
3 you cite in your report in footnote 75.
4       MR. LEE:  Give us a spell for a second, Viola.
5 It hasn't come in yet.                    12:26:27
6       THE WITNESS:  Okay.
7    Q. BY MS. TREBICKA:  If you could turn to page 8 of
8 that document.  This is the page that I will represent to
9 you you cited in your report -- in footnote 77 -- 75 of
10 your report.                              12:26:58
11   A. Yes.
12   Q. Have you seen this document before?
13   A. I have.
14   Q. Okay.  You recognize this document?
15   A. I -- I do.                          12:27:04
16   Q. As one that you relied on?
17   A. As one that I considered in my report, yes.
18   Q. If you switch to -- or move to page 9, which is
19 the next page from the one that you cite in your
20 report --                                 12:27:19
21   A. Yes.
22   Q. -- the title says, "Chrome Incognito mode:
23 Understanding and misconceptions."
24      Do you see that?
25   A. Yes.                                 12:27:27

Page 50

1    Q  So if you review in the left table, it has --
2 the first column has the title "Percent Correct Answer "
3    A  Yes
4    Q  Then the next column says, "Correct Answer "
5 And the following column says, "Weekly Incognito User "   12:27:51
6       Do you see that?
7    A  You're asking me to look at this table
8    Q  I'm asking to situate you so that --
9    A  Okay
10   Q  -- you know what we're talking about      12:28:02
11   A  Okay  I'm -- I'm not -- I'm in the table but
12 I'm not sure what you're asking me yet
13   Q  I'm asking whether you see the -- there's two
14 tables  Do you see that side-to-side?
15   A  Yeah                                 12:28:19
16   Q  And I apologize  The font is very small
17   A  Very small
18   Q  So you will have to blow it up  And if you blow
19 it up, please focus on the left-hand
20   A  Uh-huh                              12:28:31
21      Okay
22   Q  So the left-hand table starts with -- the very
23 first statement in the table that I'd like you to focus
24 on, says, "Within my Incognito mode session, Google
25 websites will not use what they know about me from   12:28:47

Page 51

1 activities before entering Incognito mode to personalize
2 my experience."
3       Do you see where I am?
4    A. Uh-huh.
5    Q. "Yes"?                              12:28:55
6    A. I do.
7    Q. And the next statement says, "Within my
8 Incognito mode session, Google knows my location so
9 search results in Maps, Chrome and other Google products
10 can be specific to my current location."      12:29:09
11      Do you see that?
12   A. Yes.
13   Q. And do you see where it says that the correct
14 answer is "true"?
15   A. I -- I see where it says the correct answer is   12:29:19
16 "true," yes.
17   Q. And then the next column under "Weekly Incognito
18 User," it says, "48 percent."
19   A. Yes.
20   Q. And the -- this is 48 percent of the weekly      12:29:34
21 Incognito users found the correct answer, so understood
22 that this is what Google would do within an Incognito
23 mode session; correct?
24      MR. LEE:  Objection to form, mischaracterizes
25 the document, lack of foundation.          12:29:49

Page 52

1       THE WITNESS:  I see what you're saying  If
2 you're asking if it does say, "48 percent," it does say,
3 "48 percent "
4    Q  BY MS TREBICKA:  So the document, at least,
5 says that 48 percent of weekly Incognito users understood   12:30:20
6 that within an Incognito mode session, Google knows their
7 location; correct?
8       MR LEE:  Could you repeat that question?
9       MS TREBICKA:  Mr Lee, you're aware of
10 something that's called Remote Counsel that Veritext   12:30:41
11 makes available?  And it would lower the instances of
12 interruptions if you had that open and would be able to
13 see my question  The reporter is doing a very nice job
14 of taking it down
15      MR LEE:  Leslie, can you read back the      12:31:00
16 question, please?
17      (The record was read by the reporter
18      as follows:
19      "QUESTION:  So the document, at least, says that
20      48 percent of weekly Incognito users understood
21      that within an Incognito mode session, Google
22      knows their location; correct?")
23      MR. LEE:  Objection  Mischaracterizes the
24      document
25      THE WITNESS:  I don't think that it says that   12:31:29

Page 53

14 (Pages 50 - 53)

**Page 54**

1  Q. BY MS. TREBICKA: What do you believe it says?

2  A. Well, my understanding of this document is this

3  document is a survey, and people are just, by definition,

4  in my opinion, guessing at what they might or might not

5  think Google knows.                          12:31:55

6  Q. And what is your --

7  A. Because --

8  MR. LEE: Hold on.

9  Were you done, Mr. Lasinski?

10  THE WITNESS: No, no, no.              12:32:03

11  Because, again, like I talked before, no one

12  knows. So this is wrong. I mean, your question is, in

13  my opinion, is wrong in that no one knows that that's

14  actually being collected.

15  These people might have guessed that it's being  12:32:17

16  collected, but I don't think anyone knows that.

17  Q. BY MS. TREBICKA: And the next cell in that same

18  table, says, "Within my Incognito mode session, Google

19  learns things about me in order to personalize my

20  experience when using Google products."         12:32:37

21  The correct answer is "T," so "true." And it

22  says here that weekly Incognito -- ███████ of weekly

23  Incognito users found the correct answer.

24  Do you see that?

25  A. Yes. I have the same answer to what I just     12:32:56

**Page 55**

1  gave -- it does show that ███████ answered true

2  Q. Now, if it is proven that some users were aware

3  that the at issue data would be collected and still

4  proceeded to use private browsing mode, how would that

5  affect your unjust enrichment damages opinion?     12:33:21

6  A. I don't believe that it would  I don't believe

7  that it would

8  Q. And what is your basis for your answer?

9  A. So my basis -- that basis for that answer is I

10  don't believe that they could be aware, like I said     12:33:51

11  before  But on -- and at the same time, even if they

12  suspected, like I talked about before, this doesn't mean,

13  in my opinion, in any way that they consented to that

14  So I don't see where I would make an adjustment to my

15  calculation                          12:34:24

16  Q  Is it the same answer for your restitution

17  opinion?

18  A  Yes, it is

19  Q  What about for your statutory damages opinion?

20  A  Yes, that is the same answer         12:34:36

21  Q  Now, if it is proven that some users consented

22  to the data collection, how would that affect your unjust

23  enrichment damages opinion?

24  MR. LEE: Incomplete hypothetical

25  THE WITNESS: I'm not aware of anyone that did    12:35:24

**Page 56**

1  consent, so I -- I don't have any adjustment to it.

2  Q. BY MS. TREBICKA: Are you aware of users -- or

3  let me start again.

4  Are you aware of tools that users can use to opt

5  out of targeted advertisements?              12:36:00

6  MR. LEE: Beyond the scope, vague.

7  THE WITNESS: I -- I have an awareness that

8  there are such tools.

9  Q. BY MS. TREBICKA: Have you ever used them?

10  A. No.                          12:36:32

11  Q. Have you researched their -- the extent of their

12  variability?

13  MR. LEE: Objection to form.

14  Q. BY MS. TREBICKA: Let me strike that. That was

15  not a good --                          12:36:52

16  Have you researched the various tools that exist

17  to block ads -- targeted ads?

18  A. No, I have not.

19  Q. And my question -- my prior question was related

20  to opting out of ads. Similar question: Are you aware   12:37:12

21  of user controls to block personalized ads?

22  A. My understanding is that there are such

23  controls.

24  Q. Have you researched them?

25  A. I have not.                          12:37:25

**Page 57**

1  Q  What about user controls to turn off ads

2  personalization? Are you aware that it exists?

3  A  My understanding is that there are such tools

4  Q  Have you researched them for purposes of this

5  assignment?                          12:37:40

6  A  No  That would not affect my calculations

7  Q  Let's assume that a user who is part of the

8  class browsed in a private browsing mode but was not

9  shown any Google ads

10  Would you agree that Google was not unjustly     12:38:12

11  enriched from that class member for that particular

12  session where no ads were shown?

13  A  No

14  Q  So your opinion is that Google is unjustly

15  enriched from a user in private browsing mode who was not  12:38:30

16  shown any Google ads during that session?

17  A  Yes

18  Q  Can you explain?

19  A  Sure  So it's important for Google to know

20  information about users and whether or not they were   12:38:50

21  shown ads or not shown ads

22  And so to the extent that information was

23  collected on that user in private -- in private browsing

24  mode and they were not shown ads, that information is

25  something that Google then is able to use in its machine   12:39:09

15 (Pages 54 - 57)

1 learning algorithms.

2     Again, that's an area that I did not even

3 calculate unjust enrichment for, using data outside of

4 Incognito mode, for example, that it collects in

5 Incognito mode.              12:39:30

6     Also, it's able to use information and represent

7 to its advertisers, people that advertise with it, that

8 it has collected information on lots and lots of users

9 and whether or not -- and what was shown and what wasn't

10 shown to those users.         12:39:51

11     And it's also able to use information on -- it

12 also collects information that is useful in determining

13 conversion information as well.

14     So that data is still valuable to Google.

15     Q. Any other basis for your opinion that Google is   12:40:10

16 unjustly enriched from a user who was not shown any

17 Google ads?

18     A. I'm not sure. There may be additional. Those

19 are three reasons that I can think of, as I sit here.

20     Q. So that class member would still be allocated   12:40:36

21 unjust enrichment damages; correct?

22     A. I think that they should be.

23     Q. Have you done any analysis --

24     A. Hold on just really quickly. And, again, we're

25 talking about a class member user who searched in   12:40:54

                                       Page 58

1 Incognito mode.

2     Q. Correct. I -- I used that class member as a

3 shortcut for the line of questioning that we've been

4 engaged in so that it's clear for the record and I don't

5 unnecessarily speak.         12:41:09

6     A. Yeah, yeah. I just -- again, that was a

7 little -- just being a little cautious.

8     Q. So have you done any analysis to quantify the

9 enrichment that would accrue to Google as a result of

10 those three reasons that you outlined that Google would   12:41:33

11 still be unjustly enriched, even if it did not show an ad

12 to a putative class member?

13     A. I -- could you restate that question? Because

14 I'm not sure that I'm understanding it.

15     Q. Sure.         12:42:19

16     I asked you whether Google would be enriched

17 from a class member who is not -- a putative class member

18 who is not shown any advertisements by Google. And you

19 said yes.

20     And I asked you why, and you stated three bases.   12:42:34

21 And then you again confirmed that you had three bases, as

22 you were sitting here today, for why Google would still

23 be enriched from that class member.

24     Do you recall that testimony?

25     A. Yes, I do.         12:42:46

                                       Page 59

1     Q. So my question to you is: Have you done any

2 analysis to quantify the unjust enrichment revenue that

3 would accrue to Google as a result of -- of those three

4 bases that you outlined?

5     A. So from a conservative perspective, I did not   12:43:10

6 calculate the value that Google gains by collecting

7 information on users that are not shown ads, as they

8 relate to using them in their machine, learning

9 algorithms as it relates to non-Incognito mode or private

10 browsing mode. I've left that off the table.   12:44:14

11     When Google collects information and then is

12 able to communicate to its advertisers or its customers

13 about the scope -- the overall scope of its reach and/or

14 its ability to help provide -- help provide the right ads

15 so there's more likelihood of conversion, that scope --   12:44:58

16 that -- that scope of information that they have would --

17 would impact -- would impact to some extent the amount

18 of -- would impact to some extent the amount of

19 advertising and the value of that advertising.

20     So I haven't tried to isolation that in any   12:45:18

21 way. But to some extent, it would be in my unjust

22 enrichment -- unjust enriched calculations because it

23 comes in through the amount of advertising that they're

24 able to -- or that they provide to their customers.

25     Q. Let's assume that a user -- a putative class   12:45:50

                                       Page 60

1 member -- that's shortcut for someone in private browsing

2 mode during the relevant class period. So let's assume

3 that a putative class member who browsed in private

4 browsing mode but Google did not collect any of the at

5 issue data for that class member.         12:46:13

6     Do you believe that Google was unjustly enriched

7 from that class member, if Google did not collect any of

8 the at issue data?

9     MR. LEE: Objection to the extent it calls for a

10 legal conclusion.         12:46:36

11     THE WITNESS: I guess I'm just trying to imagine

12 a situation where they didn't collect any of the at issue

13 data.

14     I mean, I guess my understanding is the vast,

15 vast, vast majority of users, Google would have collected   12:47:51

16 at issue data during a private browsing mode session. So

17 I'm not -- I don't know of a situation where they

18 wouldn't have collected that data, so --

19     MR. LEE: Let me -- I'm sorry.

20     THE WITNESS: So it's difficult to answer   12:48:17

21 that -- it's difficult to answer that question.

22     MR. LEE: And I jumped in late, but let me

23 object as an incomplete hypothetical.

24     Q. BY MS. TREBICKA: I'm asking you to assume that

25 there are -- that there is a situation in which a class   12:48:28

                                       Page 61

                              16 (Pages 58 - 61)

CONFIDENTIAL

1 member who browsed in private browsing mode did not have
2 any of his or her data collected.
3     In that circumstance, in your opinion, was
4 Google unjustly enriched?
5    A. I guess, as I sit here, I can't think about -- I   12:49:04
6 can't envision a situation where they are unjustly
7 enriched if they didn't collect any data at all. But I
8 can't think of a situation -- a situation in which that
9 would happen. So I'm struggling to answer the
10 hypothetical, given everything that I've answered so far   12:49:33
11 on how they can be unjustly enriched given user's data.
12    Q. So same hypothetical. And I'm asking you to
13 assume that there is a situation which a class member who
14 browsed in private browsing mode did not have any his or
15 her -- or her data collected. Would that person be   12:49:52
16 entitled to restitution, in your opinion?
17    A. Again, I can't -- I don't have a situation in
18 mind that that would happen. I -- given everything that
19 we've just discussed, there is -- there is a possibility
20 if there is some way that you got into private browsing   12:50:45
21 mode and they didn't know you were in private browsing
22 mode and they didn't collect any information, somehow
23 they just didn't know about you as a user, maybe that
24 class member would not get restitution.
25    Q. Same hypothetical. Is that user entitled to   12:51:05

Page 62

1 And so in that situation, I am not aware of any
2 type of material, number of users, who browse privately
3 that would fit what you're saying So I have not made
4 any kind of adjustment for that
5    Q. How do you account for it in your restitution   12:53:17
6 model, if at all?
7    A. Again, in my restitution model, based on the way
8 users use private browsing mode and the information that
9 is collected and my apportionment methodology, I think
10 that the case that you're trying to outline is -- is such   12:53:50
11 an Edge case, that it would have any kind of -- it
12 wouldn't have any kind of material impact So I
13 haven't -- haven't made an adjustment
14    MR LEE: I think now is a good time to break
15 for lunch It's 1 o'clock over here for the East   12:54:06
16 Coasters
17    MS TREBICKA: Let me just finish this line of
18 questioning We have a few minutes
19    MR LEE: Sure
20    Q BY MS TREBICKA: And how do you account for it,   12:54:31
21 if at all, in your statutory damages model? And if the
22 answer is the same, you may just say so
23    MR LEE: I'll object to the extent it calls for
24 a legal conclusion Also, an incomplete hypothetical
25    THE WITNESS: So for statutory damages, one of   12:56:40

Page 64

1 statutory damages, in your view, if no data -- if no at
2 issue data was collected?
3    A. I mean, I think you're asking -- again, I mean,
4 with all this, I can't think of a situation in which
5 that -- in which that happens.   12:51:20
6    I -- there may be a possibility that they
7 wouldn't get statutory damages, but I'm not aware of a
8 situation in which that would occur.
9    Q. Do you account for this scenario in any of your
10 damages opinions? And by "this scenario" I mean a   12:51:40
11 putative class member whose data was not collected --
12 whose at issue data was not collected by Google.
13    A. Yes.
14    Q. How do you account for it in your -- we'll take
15 it one by one.   12:52:05
16    How do you account for it in your unjust
17 enrichment damages model?
18    A. Well, in my unjust enrichment damages model, I
19 don't think that there is a situation where that would
20 occur.   12:52:22
21    I have calculated unjust enrichment on the basis
22 of what they actually -- what they actually earned or
23 actually unjustly earned, and then I apportion that based
24 on the number of class members and unique monthly private
25 browsing instances.   12:52:50

Page 63

1 the bases that I've been asked to calculate for that
2 portion of damages is the estimated number of private
3 browsing page loads
4    And in that situation, my understanding is that
5 there are certain pages that -- certain pages that don't   12:57:22
6 have Google tracking beacons on them
7    And given that, I have deducted those pages that
8 don't have tracking beacons on them from my calculation
9 of total page loads
10    Q BY MS TREBICKA: That is one of your methods --   12:57:54
11    (Interruption in proceedings )
12    THE WITNESS: Total page -- total private
13 browsing page loads
14    MR LEE: Leslie, that's L-O-A-D-S
15    Q BY MS TREBICKA: You mentioned earlier that you   12:58:16
16 do not block personalized ads; correct?
17    A I do not
18    Q Do you look at the personalized ads that are
19 shown to you?
20    MR LEE: Objection to form, beyond the scope   12:58:31
21    THE WITNESS: I -- you know what? I can't even
22 recall looking at any ads
23    Q BY MS TREBICKA: Do you ever click on them?
24    MR LEE: Same objection
25    THE WITNESS: To be honest, I can't recall the   12:58:52

Page 65

17 (Pages 62 - 65)

1 last time I clicked on an ad.

2    MR. LEE:  You know what?  We're going to take

3 lunch now.  This is a new line of questioning.  It's

4 actually something you started with in the morning, which

5 obviously is irrelevant, but --                    12:59:05

6    MS. TREBICKA:  It's actually not, James.  I

7 don't agree.

8    MR. LEE:  Excuse me.  Excuse me.  I'm not done.

9    So we're going to take our lunch break, as I

10 already notified you we would.  I gave you time to finish    12:59:11

11 your line of questioning.  We're going to take lunch.

12    MS. TREBICKA:  I don't agree to get off the

13 record.

14    MR. LEE:  Mr. Lasinski, do you want to take a

15 break now?                                          12:59:21

16    THE WITNESS:  Yes, I would.

17    MR. LEE:  Okay.  So are you saying you're not

18 going to go off the record, Viola, when the witness has

19 asked to take a break?  I've asked for the courtesy for a

20 lunch break.                                        12:59:30

21    We gave you a courtesy to start at 11 o'clock

22 our time, even though the witness is on the East Coast.

23 I would like the same courtesy extended that -- when we

24 pre-agreed to when lunch would be served so that my

25 witness can stay fresh and have his -- have his meal.  We  12:59:43

Page 66

---

1 went through some advance work to get that coordinated,

2 and for you to say that you refuse to go off the record

3 and allow him to take his break at the appointed agreed

4 time, I think is weird.

5    MS. TREBICKA:  Mr. Lee --                        13:00:01

6    MR. LEE:  So I'm going to direct him not to

7 answer anymore questions until after lunch.  How about

8 that?

9    MS. TREBICKA:  Mr. Lee, what I'm saying is that

10 you cannot just unilaterally decide that we are taking     13:00:11

11 lunch right now.  You did not even allow me to ask you to

12 finish my line of questioning, which will only take a few

13 minutes.  So I believe that you are --

14    MR. LEE:  You certainly did.

15    MS. TREBICKA:  You are interrupting now.  Please  13:00:24

16 stop.  I believe that you are now being discourteous.

17    At any rate, as a courtesy and because this is

18 getting ridiculous, I will agree to get off the record.

19 I ask that we meet and confer privately, please.  Where

20 can I call you?                                      13:00:38

21    MR. LEE:  You don't have my cell?

22    MS. TREBICKA:  No.

23    MR. LEE:  I'll put it in the chat.  I'll put it

24 in the chat.

25    MS. TREBICKA:  Thank you.                        13:00:45

Page 67

---

1    We can get off the record.

2    MR. LEE:  I agree.

3    THE VIDEOGRAPHER:  Going off the record at

4 1:01 p.m.

5    (Recess.)                                        13:00:51

6    THE VIDEOGRAPHER:  We are back on the record at

7 1:47 p.m.

8    Q.  BY MS. TREBICKA:  Mr. Lasinski, did you have a

9 good lunch?

10    A.  It was all right.                           13:47:07

11    Q.  All right?  Just all right?

12    A.  Just all right.

13    Q.  So --

14    A.  If you're gonna say that I'm done, then it would

15 be a great lunch.                                   13:47:19

16    Q.  In a few hours.  In a few hours.  You can have a

17 great dinner.

18    Earlier, before we broke, we were talking about

19 personalized ads.  Do you recall that conversation?

20    A.  I -- I don't really recall personalized ads.  I  13:47:33

21 recall you asking me questions about -- you asking me

22 questions about my bases in my calculations.  But I don't

23 recall personal ads, so --

24    Q.  Earlier in your testimony before lunch, you

25 testified that you do not block ads as a matter of course  13:47:57

Page 68

---

1 in your personal browsing; correct?

2    A  I do not

3    Q  And you also testified that you, as a matter of

4 course, do not recall even looking at ads that are shown

5 to you; is that correct?                            13:48:13

6    MR. LEE:  Beyond the scope

7    THE WITNESS:  I don't remember saying I don't

8 recall looking at them.  I -- I may look at them.  I

9 don't -- I though I said I don't recall clicking on them

10    Q  BY MS TREBICKA:  Do you ever find personalized  13:48:30

11 ads useful, in your experience as a user?

12    MR. LEE:  Beyond the scope

13    THE WITNESS:  I don't have an opinion on that

14 I don't recall finding them useful

15    Q  BY MS TREBICKA:  In your opinion, could some    13:48:48

16 putative class members benefit from seeing personalized

17 ads?

18    MR. LEE:  Calls for speculation

19    Go ahead

20    Oh, I'm sorry.  Is this in Incognito mode or not  13:49:03

21 Incognito mode?

22    MS. TREBICKA:  Putative class members in --

23 browsing in Incognito mode

24    MR. LEE:  I'm sorry

25    THE WITNESS:  I -- I do not see why they would   13:49:11

Page 69

CONFIDENTIAL

1 have benefit from a personal ad in Incognito mode   No, I
2 don't see that -- they've made the choice to browse in
3 Incognito mode, so they would not benefit
4     Q   BY MS  TREBICKA:  So your basis for saying that
5 they would not benefit because they made the choice to        13:49:31
6 browse in Incognito mode?
7     A   Correct  They've made the choice to browse in a
8 mode that does not have personalized -- well, in my
9 understanding, would not have personalized ads  And they
10 made that choice                                              13:49:47
11     Q   So -- so in your understanding, Incognito mode
12 would not personalize ads on the basis of that Incognito
13 session?
14     A   Well, so my understanding of personalized ads is
15 that they require third-party cookies  And third-party      13:50 08
16 cookies come from information that is collected from
17 users during that session
18         And so users have chosen to search in Incognito
19 mode because they want to keep their browsing private
20 And, therefore, would not be better off -- or not benefit    13:50:34
21 from seeing personalized ads
22     Q   Is this the entirety of your basis for believing
23 that putative class members who browse in private
24 browsing modes would not benefit from seeing personalized
25 ads?                                                          13:50:58

Page 70

1     A   I mean, I -- I look at it like this:  Private
2 browsing mode users have made the choice not to have
3 their private browsing information taken  And since they
4 have made that choice, they would not benefit from
5 personalized ads  They've made the choice to not have        13:51:34
6 their information taken
7         My understanding is the way that you personalize
8 an ad, the way that Google personalizes ads, is based on
9 personalization  So they would not -- their choice has
10 been taken away  So that's not a benefit to them            13:51:51
11     Q   So what is your basis for your opinion that
12 users in private browsing mode have made the choice --
13 let me start over
14         What is your basis for believing that private
15 browsing mode users would not benefit from personalized    13:52:17
16 ads?
17     MR  LEE:  Asked and answered
18     THE WITNESS:  I guess I'm not understanding
19 your question, because I felt like I answered it with the
20 best -- with my last answer                                  13:52:32
21     Q   BY MS  TREBICKA:  So your basis for believing
22 that -- or for your opinion that users in private
23 browsing mode have made the choice -- let me start over
24         So your basis for the opinion that private
25 browsing mode users would not benefit from personalized    13:52:53

Page 71

1 ads is because you believe that private browsing mode
2 users have made the choice not to have their private
3 browsing mode information collected?
4     A   Not to have their private browsing information
5 collected and used  And my understanding is the way that     13:53:12
6 Google serves private browsing -- I'm sorry, personalized
7 ads is through using private browsing mode information
8         My understanding is the way that a personalized
9 ad is -- well, based on my discussion with Mr  Hochman
10 and also my review of the record, personalization occurs     13:53:34
11 through third-party cookies through which you must --
12 they must have collected and used information
13         And, therefore, taking away a person's choice,
14 in my opinion, is just that, you've taken away that
15 person's choice  And, therefore, they -- any speculative    13:53:58
16 benefit that they could have gotten is not -- does not
17 accrue to the user
18     Q   And when you say "taken away a person's choice,"
19 what do you mean by that?
20     A   My understanding is that in private browsing        13:54:19
21 mode, users choose to have their -- users choose to have
22 their information private  And so by collecting that
23 information and using that information, it's by
24 definition not private  And used by Google to serve ads
25         To some extent, this is a little bit beyond the     13:54:51

Page 72

1 point because my calculations are based on the way Google
2 determines the value of third-party cookies and the
3 revenues that they would lose if they couldn't track
4 third-party cookies
5         And my understanding is that third-party cookies     13:55:09
6 are an input or necessary to -- for there to be a
7 personalized ad
8     Q   So in your opinion, is one of the reasons that
9 users privately browse so that they do not see
10 personalized ads?                                            13:55:30
11     MR  LEE:  Beyond the scope
12     THE WITNESS:  Well, I do know from talking to
13 people -- I mean, you're asking is one of the reasons why
14 they do that  I do know from talking to people that when
15 they do go into private browsing mode, that they don't      13:56:08
16 want to see personalized ads
17         Certainly there are definitely people that don't
18 want to see private -- or personalized ads when they're
19 in Incognito mode
20     Q   BY MS  TREBICKA:  Have you done any research or     13:56:20
21 analysis to determine that people who browse in private
22 browsing mode do not want to see personalized ads?
23     MR  LEE:  Beyond the scope
24     THE WITNESS:  What I've done -- my investigation
25 relates to whether or not they -- Google should have        13:56:54

Page 73

19 (Pages 70 - 73)

1 collected that information and used that information and,

2 therefore, had the ability to serve personalized ads

3      My understanding is when you go into private

4 browsing mode, that you -- they would not have the

5 ability -- or should not have had the ability to collect   13:57:18

6 that information

7      And people have made that choice to go into

8 private browsing mode  And so in that situation, taking

9 away that choice would outweigh any perceived or

10 speculative benefit of receiving a personalized ad   13:57:36

11      MS TREBICKA: Move to strike as non-responsive

12   Q  Please listen to my question

13      Have you done any research or analysis to

14 determine that people who browse in private browsing mode

15 do not want to see personalized ads?   13:57:53

16      MR LEE: Beyond the scope

17      THE WITNESS: So, I mean, again, with my last

18 answer, I know that people have actually gone into

19 private browsing mode and made the choice not to have

20 their information taken   13:58:15

21      That said, I have not done a study of users in

22 the class on the topic that you asked about

23   Q  BY MS TREBICKA: What about any research or

24 analysis? Have you undertaken any research or analysis

25 to determine that people who browse in private browsing   13:58:34

Page 74

1 How many people have you spoken to on this question?

2   A. Four or five.

3   Q. Are they putative class members?

4   A. Based on my understanding of the class, they

5 potentially could be.   14:00:21

6   Q. But you don't know for certain that they are?

7   A. No, I didn't.  I do not.

8      MR. LEE: Calls for a legal conclusion.

9   Q. BY MS. TREBICKA:  Did you ask them whether

10 they'd privately browsed?   14:00:35

11      MR. LEE: Beyond the scope.

12      THE WITNESS: Yes, I did.

13   Q. BY MS. TREBICKA:  And what was the answer for

14 each of the four or five?

15   A. They have.   14:00:47

16   Q. So with respect to your restitution opinion,

17 have you -- or, actually, let me strike that.

18      Let's assume that some putative class members

19 receive some benefit from personalized ads in the private

20 browsing mode.  Do you believe that it should be offset   14:01:27

21 from your restitution damages opinion?

22      MR. LEE: Incomplete hypothetical.

23      THE WITNESS: No.  As I said, I can't think of a

24 reason why it would.

25   Q. BY MS. TREBICKA: If a Court finds that this   14:02:07

Page 76

1 mode do not want to see personalized advertising?

2      MR LEE: Asked and answered

3      THE WITNESS: I mean, beyond what I just said,

4 that the people have made the choice not to go -- to

5 go -- I'm sorry, to go into private browsing mode and not   13:58:49

6 have their information collected

7      Plus, I have talked to people, and I know that

8 there are users that do not want to see personalized ads

9 I have not done a study, if you will

10   Q  BY MS TREBICKA: I did not ask about a study,   13:59:08

11 though  I asked about research or analysis  So move to

12 strike, and asking it again

13      Have you done any research or analysis to

14 determine that people who browse in private browsing mode

15 do not want to see personalized ads?   13:59:21

16      MR LEE: Same objection

17      THE WITNESS: So, again, consistent with my last

18 answer, they -- I understand that those people who have

19 gone into private browsing mode don't want their

20 information collected   13:59:34

21      I have not done research to determine whether or

22 not users want to see -- want to see personalized ads

23 inside private browsing mode

24   Q  BY MS TREBICKA: You mentioned that you have

25 talked to people on this question of personalized ads   13:59:48

Page 75

1 benefit should be offset against your restitution damages

2 opinion, do you -- have you proposed any methodology for

3 doing so?

4   A. I have not in my report, no.  I think that that

5 would be inappropriate.  I've been very conservative in   14:02:30

6 my calculation of restitution damages.  So I can't

7 imagine that any benefit would be -- would offset any --

8 in any way the conservative nature of what I did.

9   Q. Have you attempted to quantify any such benefit

10 to putative class members from personalized ads?   14:02:45

11      MR. LEE: Objection.  Vague.

12      THE WITNESS: I have not.  Again, I do not

13 believe that there is a benefit.

14   Q. BY MS. TREBICKA: Mr. Lasinski, if you recall

15 just a few -- a minute or so ago, I asked you how many   14:03:06

16 people you've spoken with related to their view of

17 personalized ads in private browsing mode.

18      Do you remember that?

19   A. Yes.

20   Q. And I believe that I heard you say four or five.   14:03:23

21 Did I hear you correctly?

22   A. Yeah.  That's an estimate, yes.

23   Q. Understood.

24      MS. TREBICKA: Let the record reflect that the

25 correct answer is four or five.  It was mistakenly   14:03:35

Page 77

20 (Pages 74 - 77)

**Page 78**

1 transcribed as over five in the transcript.
2     MR. LEE:  We can stipulate to that.
3     Q.  BY MS. TREBICKA:  Mr. Lasinski, could we take a
4 look at your opinion -- the written opinion, your report,
5 paragraph 137?  I can help you with the page number.      14:04:04
6 This is page 60.
7     A.  Okay.
8     Q.  I would like you to -- I would like to direct
9 your attention to the second sentence in paragraph 137.
10 Well, first off, this is -- the section is "Actual      14:04:40
11 Damages"; correct?
12     A.  You're -- if I -- if I'm in the right place.  I
13 believe we're in Section 8 of my report, which is
14 entitled "Actual Damages."
15     Q.  Correct.  That's where I would like you to be.      14:04:52
16     And earlier, in the morning session, you
17 testified that your actual damages -- you have quantified
18 actual damages with your -- with a restitution
19 methodology; correct?
20     A.  Correct.      14:05:08
21     Q.  So paragraph 137 is that first paragraph under
22 "Actual Damages" --
23     A.  Yes.
24     Q.  -- in the "Restitution" section?
25     A.  Yes.      14:05:16

**Page 79**

1     Q.  Correct?
2     A.  Yes.
3     Q.  So I'm directing your attention to the second
4 sentence in paragraph 137 that starts with, "In my
5 opinion."      14:05:26
6     A.  Yep.
7     Q.  And I will read it into the record, as you can
8 read silently along.
9     "In my opinion, and as described below, such
10 actual damages can be determined as a function of the      14:05:36
11 payments necessary to incentivize an individual to
12 knowingly relinquish the choice to keep certain
13 private" -- "certain browsing private and allow an
14 organization to track all online activity."
15     Do you see that?      14:05:55
16     A.  I do, yes.
17     Q.  I have a question with respect to the word
18 choice "as a function of."
19     So you say here, "Actual damages can be
20 determined as a function of the payments necessary."      14:06:05
21     That -- that is different from saying actual
22 damages are equal to the payments necessary to
23 incentivize an individual to knowingly relinquish,
24 et cetera; correct?
25     A.  I -- in this case, I've calculated as equal to.      14:06:33

**Page 80**

1     Q.  Understood
2     So even though this says as a function of, you
3 have calculated it as the actual number equal to?
4     A.  I guess I'm not understanding the difference, as
5 you're trying to have it based on your question      14:06:53
6     I -- to make the record clear, I have not
7 calculated this section, "Actual Damages," if that's what
8 you're asking
9     Q.  Can you say that again?  Because I didn't
10 understand      14:07:19
11     A.  I think that -- I think that -- it sounded to me
12 like you were asking had I calculated damages that are
13 equal to what I calculate in actual damages that I
14 calculate in Section 8  Or I got the impression from
15 your question, maybe wrongly, that there was a second      14:07:39
16 calculation that you were asking if I had made  And
17 there is not
18     Q  That's very helpful  Thank you
19     I was also wondering the word choice "as a
20 function of," meaning once you understood the -- and I'm      14:07:51
21 reading from your opinion here, "The payments necessary
22 to incentivize an individual to knowingly relinquish,"
23 et cetera  That is the actual damages that you quantify
24 You don't do -- you don't do another step to that
25 payment -- to that amount of payment necessary to      14:08:12

**Page 81**

1 incentivize an individual to then arrive at actual
2 damages?
3     A.  I think -- I think here we're talking about the
4 rate, if I'm understanding you correctly.  Certainly the
5 rate that I'm talking about to incentivize class members      14:08:28
6 is -- maybe we'll get to this -- $3.
7     Obviously I do do additional calculations to
8 determine the number of monthly browsing instances -- or
9 unique monthly browsing instances.  But I don't do an
10 additional calculation after I determine that the $3 is      14:08:51
11 their correct rate.
12     Q.  Okay.  Thank you.  That clarifies it.  Thank
13 you.
14     In your opinion, do you quantify the opportunity
15 cost of users in giving up privacy from Google?      14:09:06
16     MR. LEE:  Objection to form, vague.
17     THE WITNESS:  I -- I guess I have not thought
18 about it in that -- in that way.  But certainly by the --
19 by the fact that they've given up their opportunity to
20 be -- to not -- to not browse privately, this is a      14:10:04
21 payment that I think would be conservative to incentivize
22 them to actually give up that -- that right.
23     Q.  BY MS. TREBICKA:  If we could move on to the --
24 to the next paragraph.  This is where you introduce the
25 $3 per month number; is that correct?      14:10:51

CONFIDENTIAL

1    A I think that this is the first time that I talk
2 about the $3 per month in my report  Wait  No
3 Obviously I think I talk about it in the executive
4 summary
5    Q Right                              14:11:09
6       Just for Section 8, this is where you
7 reintroduce, perhaps, the $3 per month number
8    A Okay
9    Q And I'll direct your attention to the second
10 sentence  I'll read it for the record while you read   14:11:21
11 silently along
12     "More specifically, it is my opinion that the
13 baseline payment to Screenwise Panel participants of $3
14 per month for their use of a Screenwise browser extension
15 or a Screenwise meter app on a single device represents a   14:11:36
16 conservative indicator of the monthly payment necessary
17 for an individual to knowingly relinquish the choice to
18 keep certain browsing private and allow Google to track
19 all their online activity, regardless of browsing mode "
20     Do you see that?                     14:11:58
21    A Yes, I do
22    Q And in your opinion, it is appropriate to
23 provide -- or restitute each class member a $3 damages
24 per month, per device, no matter how much or how little
25 they use private browsing mode during that one month;   14:12:23

Page 82

1 correct?
2    A. I have to modify that a little bit.  I mean,
3 they have to -- they have to use it.  There has to be a
4 private monthly browsing instance.
5       So, yes, I mean, they have to use it during that   14:12:41
6 month.  But that is correct.
7    Q. So provided they use it in a month, it does not
8 matter how much or how little they use it to obtain the
9 $3 per month, per device, under your methodology?
10    A. Yes, that is correct.  That's -- gets back to   14:12:58
11 what we were talking about earlier today.
12    Q. Okay.  You also say that this value is
13 conservative.
14       Do you see that?
15    A. Yes.                               14:13:14
16    Q. Why do you say that?  What do you mean by that?
17    A. I say that for a number of reasons.  First,
18 there are other data points that I talk about in my
19 Section 8 here that would suggest a higher rate per
20 month.                                   14:14:06
21       Furthermore, for the Screenwise Panel, in that
22 case there were numerous payments made to the
23 participants in addition to the $3 per month.
24       And then, additionally, in those cases in the
25 Screenwise Panel, the users knowingly gave up their   14:14:41

Page 83

1 browsing information in that case  And in my opinion, if
2 you are unknowingly giving it up or unwillingly giving
3 something up, that is more valuable to you than if you
4 knowingly give it up, and, therefore, it's conservative
5 Or willingly give it up, that's conservative   14:15:36
6     There may be other reasons why it's conservative
7 that I've highlighted in my report, but those are three
8 that I can think of, as I sit here
9    Q So you said that there are other data points in
10 Section 8 that would suggest a higher rate per month   14:16:08
11 Could you tell me, in a summary fashion, what those are?
12    A Sure  In a summary fashion, you know, one of
13 the things that the Screenwise survey does is it provides
14 monthly rewards of $5 for a router, $3 per device  But
15 then it also has a $2 bonus if you connect -- or if you   14:17:04
16 use three of the four devices above  So it provides a
17 bonus to users
18    Q Are you reading from your -- or reviewing your
19 report?
20     MR LEE: I don't think he was done with his   14:17:23
21 answer yet, so let him finish
22     MS TREBICKA: Yeah, I'm asking --
23     MR LEE: Hold on  Let him finish the answer to
24 the pending question, and then you can ask a follow up
25    Q BY MS TREBICKA: Mr Lasinski, if you can tell   14:17:35

Page 84

1 me where you are so I can follow along
2    A Sure  Page 64, Figure 59
3    Q Okay
4    A Also, in addition, the other data points that I
5 highlight is on page 68  Here, this indicates a $29 per   14:17:59
6 month for customers that do not opt in to an AT&T program
7 called GigaPower
8    Q Uh-huh
9    A And I'm just summarizing, because it's -- all
10 you asked me to do was summarize                14:18:33
11    Q Yes, thank you
12    A And then another data point is SavvyConnect,
13 which is paragraph 162, which is users can earn $5 per
14 device for up to three devices
15    Q Anything else?                       14:19:03
16    A Well, I mean, certainly the Nielsen computer and
17 mobile panel  And you could end up with more dollars per
18 year there, because you could earn up to $50 a year in
19 the Nielsen -- in the Nielsen study  Also, depending on
20 the number of devices you have, you could earn more   14:19:54
21 there
22     Oh, I'm sorry  I'm sorry  Yeah, so you could
23 earn more there  And you could earn more as a user in
24 UpVoice as well  That's also described in my Section 8
25 as well                                  14:20:20

Page 85

22 (Pages 82 - 85)

1    Q.  Direct your attention to Figure 58 on page 63.
2    A.  Okay.
3    Q.  This is a screenshot from the Ipsos Screenwise
4  Panel, "Summary of Rewards and Payments per
5  Screenwisepanel.com"; right?              14:20:51
6    A.  Yes.
7    Q.  And the very first square -- or rectangle, says,
8  "$20.  Earn a $20 reward if you qualify for the study."
9       Do you see that?
10   A.  Yes, I do.                          14:21:04
11   Q.  Now, this is not applicable to the at issue data
12  which you're trying to value; correct?
13   A.  If I remember correctly -- the study correctly,
14  and I don't -- or this correctly, I believe that they're
15  asking for demographic information about the users.   14:22:04
16      I'm not sure that that demographic information
17  would be the at-issue data that we're talking about here.
18   Q.  Well, sitting here today, do you have an opinion
19  as to whether demographic information would be at issue
20  data or no?                              14:22:28
21   A.  No.  I -- no.  What I'm saying is I don't recall
22  the complete set of information that is required that
23  goes in here -- to go in here.  It definitely requires
24  demographic information.
25      And so this is for signing up for the study and   14:22:44

Page 86

1  providing certain demographic information about the
2  panelists.
3       In my analysis, I am not attributing any of this
4  $20 towards the -- towards that information.
5    Q.  Because demographic information is not at issue   14:22:59
6  data; correct?
7       MR. LEE:  Objection to form, calls for
8  speculation, beyond the scope.
9       THE WITNESS:  The information that I remember
10  them collecting, I don't recall that as being at issue   14:23:16
11  data.
12   Q.  BY MS. TREBICKA:  The next rectangle says,
13  "$100.  Earn a $100 reward if you join and install a
14  special high-speed Wi-Fi router that we'll provide."
15      Do you see that?                     14:23:32
16   A.  Yes, I do.
17   Q.  This is not applicable to the at issue data
18  either; correct?
19   A.  I do not know technically how the at issue data
20  gets transmitted to Google.  My understanding is that   14:24:06
21  browser data often goes through a router.  And so to the
22  extent that this -- this router is collecting that data
23  and transmitting that data, that could be applicable to
24  the at issue data.
25   Q.  In your opinion, are putative class members       14:24:43

Page 87

1  required to install a special high-speed Wi-Fi router?
2    A.  No, that's not my opinion
3    Q.  Have you apportioned any of the $100 to -- to
4  putative class members as part of the $3 that you
5  apportion per month per device?           14:25:08
6    A.  No, I have not  But that's obviously a benefit
7  that those class -- I'm sorry, not class members -- that
8  those study members study -- get  Is it obviously $100
9  if they install the device, plus they get a free device
10  which is high-speed                      14:25:28
11   Q.  And the next rectangle says, "$16 "
12      Do you see that?
13   A.  Yes, I do
14   Q.  Okay  Do you understand how one could earn up
15  to $16 a month for each household member?   14:25:54
16   A.  Yes, I do
17   Q.  Could you explain?
18   A.  Sure  That's where we were on Figure 59   A
19  router -- if you install the router and have all the
20  Wi-Fi devices connected to the Screenwise router, you   14:26:25
21  could earn up to $5 per month, so --
22      And then if you have a browser, you could earn
23  $3 per month if the browser is using the -- I'm sorry --
24  Screenwise meter browser extension
25      The mobile phone, if you install the Screenwise   14:26:51

Page 88

1  meter app, that's $3.  And if you have a tablet and --
2  you could earn $3 for using the tablet with the
3  Screenwise meter app device.
4       If you add all of those up together, that's $16
5  per month.                               14:27:14
6    Q.  And also the $2 bonus; correct?
7    A.  Oh, I'm sorry.  I must have skipped that piece
8  of it.  Thank you.  Yes.
9       If you -- three of the four devices above, then
10  you could earn a bonus of $2 per month.    14:27:29
11   Q.  So the $5 -- the initial bullet point, is the $5
12  for having all Wi-Fi devices connected to the Screenwise
13  meter related to the at issue data?
14   A.  Yes.
15   Q.  And how so?                         14:28:08
16   A.  Well, again, if you're -- if you're browsing
17  in -- I mean, my understanding, I am an electrical
18  engineer, and I've dealt with some of these devices
19  before.  I'm not a technical expert in this case.
20      But my understanding is that when you browse at   14:28:25
21  home, your computer connects to the internet through a
22  router, and then that router would transmit the
23  information to the users, such as Google.  That
24  information then -- you know, then Google transmits
25  information back through -- through a router.   14:28:47

Page 89

23 (Pages 86 - 89)

1      And so having a router is -- is actually
2  something that -- the data -- the data that we're talking
3  about here would go through -- in my opinion, would
4  likely go through this router.
5      Q.  Now you're adding a technical opinion to your      14:29:10
6  damages opinion in this case as to how the data would be
7  routed to Google?
8      MR. LEE:  Objection to form, mischaracterizes
9  his testimony by a lot.
10      THE WITNESS:  I'm not -- I'm not trying to do      14:29:22
11  that.  You asked:  Would this be related to the -- you
12  asked:  Would this be related to the data?
13      My understanding is that routers are one way of
14  transmitting data.  And so, yes, it -- it -- I don't know
15  of another way that one would connect to the internet if      14:29:47
16  they didn't have a device like this.
17      My understanding is if you're going to collect
18  information, you have to collect -- you have to connect
19  to the internet in some way.
20      So just from a lay person's perspective, would      14:30:01
21  this be related?  Sure.  I mean, the data has to get
22  transmitted some way.
23      Q.  BY MS. TREBICKA:  Is your opinion here today
24  that all putative class members' data is transmitted to
25  Google through a Wi-Fi router?      14:30:18

Page 90

1      A.  No, it is not  That's not my opinion  But my
2  understanding is that some could be
3      Q.  Have you analyzed how many would be transmitted
4  through a Wi-Fi router versus another method?
5      A.  No, I have not      14:30:40
6      Q.  And you're not offering an opinion on that
7  today; correct?
8      A.  No  I was just trying -- you -- you asked me a
9  question  I -- I tried to answer it as best I could
10      Q.  In your opinion, if a user -- a putative class      14:30:53
11  member user browsing in private mode has one device that
12  they use to browse -- let's call that user user A  And
13  another user, user B, has two devices on which they
14  browse privately any given month, the first user, user A,
15  would receive $3 in restitution -- restitutionary      14:31:36
16  damages, and the second user would receive $6; correct?
17      A.  Generally, that is correct, yes
18      Q.  And that is so even if the amount of time spent
19  privately browsing is potentially -- let's assume that
20  the amount of time spent privately browsing is the same a      14:32:02
21  given month for user A and user B; correct?
22      A.  I didn't follow that
23      Q.  Yeah, sure
24      MR  LEE:  Incomplete hypothetical
25      Go ahead      14:32:17

Page 91

1      Q.  BY MS. TREBICKA:  User A has one device and
2  privately browses in a give month.  Let's assume as a
3  hypothetical ten hours for that month.  User B -- user B
4  has two devices, and user B browses on -- for that same
5  month one hour on the first device and one hour on the      14:32:37
6  second device.  So user B browses for a total of two
7  hours.  Again, private browsing for that month.
8      User B would get $6 for his two hours of private
9  browsing a month, and user A would get $3 for her ten
10  hours of private browsing that month; correct?      14:33:00
11      MR. LEE:  Incomplete hypothetical.
12      Answer if you can.
13      THE WITNESS:  Did you say -- I thought you just
14  said $10.  I don't think that that's right.  I thought it
15  was --      14:33:17
16      Q.  BY MS. TREBICKA:  No.  Let me say it again in
17  more simple terms.  I did not say $10.
18      For user A, one device, ten hours a month, would
19  get --
20      A.  Oh, I'm sorry.  I'm sorry.  Ten hours is what --      14:33:27
21  I thought you said $10.  Okay.
22      Q.  Okay.  So user A, one device, ten hours a month,
23  $3 in restitutionary damages.  User B, two devices, one
24  hour each, private browsing, would get $6 for that same
25  month; correct?      14:33:47

Page 92

1      A.  Yes, that's correct
2      Q.  Now, why does -- why is that reasonable,
3  allotting more damages to a user who is, in fact,
4  browsing less?
5      A.  Well, for -- for a number of reasons  One is we      14:34 06
6  know that that's the way the market works in this case
7  Google is willing to pay users $3 per month, per device
8  So it's a market -- it's a market-based method here
9      We don't see in the -- in the table that you
10  asked me to read -- or talk about where it's $3 for a      14:34:52
11  browser only if you use it 10 hours per month or only if
12  you use it 30 hours per month  We don't see a difference
13  in the actual -- in the actual marketplace
14      And that's not just true in -- in this
15  particular study, but that's true in some of the other      14:35:21
16  ones that I identify as well
17      Now, for example, like in the AT&T example, it
18  doesn't say, "I will give you $29 a month if you're a
19  heavy user and only $10 a month if you're a light user or
20  $50 a month if you're a really, really heavy user "      14:35:42
21  That's not -- that's not how this market is interacting
22  with people that are asked to be tracked
23      The second reason is, based on my discussions
24  with Mr Hochman -- Hochman, that it's valuable to Google
25  to know that someone was browsing ten hours a month  And      14:36:01

Page 93

24 (Pages 90 - 93)

1  valuable to know that a user was browsing one hour a
2  month on one device and one hour a month on another
3  device.
4       Google isn't treating those two users
5  differently.  They're not saying to a user, "Hey, you're      14:36:20
6  a ten-hour-a-month user.  You get all these special
7  benefits or perks for different things.  And, you know,
8  one-hour-a-month-user, you only get to see -- you don't
9  get anything.  You know, you're just a small user."
10      So the way Google actually -- actually treats      14:36:45
11  the people that actually use its services, treats them
12  the same.
13  Q.  Those were the two reasons; correct?
14  A.  Those are two that I can think of as I'm sitting
15  here, yes.      14:37:05
16  Q.  Okay.  Now, for the Ipsos study, it pays $3 per
17  device, but Ipsos is able to link the data across
18  devices; correct?
19  A.  That is my understanding, yes.
20  Q.  And that's what you were testifying where the      14:37:23
21  value is in -- despite the fact that it was just an hour
22  for device.  Being able to have the bird's-eye view has
23  some value; correct?
24      MR. LEE:  Objection.  Mischaracterizes.
25      THE WITNESS:  That's not what I testified to.      14:37:38
Page 94

1  Q  BY MS TREBICKA: So do you believe that there
2  is no value to having the bird's-eye view of a single
3  user using two devices?
4  A  No, I didn't say that
5  Q  Do you believe there is value to having that      14:37:51
6  view of a single user using two devices?
7  A  Sure  There -- there could be that -- there
8  would be value there  I don't think that that value in
9  any way would outweigh from a user's perspective
10      From a user's perspective, you taking someone's      14:38:21
11  private browsing data unwillingly, I think that that
12  still would be less valuable -- less valuable from a
13  user's perspective
14  Q  In -- for a putative class member who is
15  browsing in Incognito mode, so signed out of a Google      14:38:45
16  account in Incognito mode on device 1, and then that same
17  member is signed out of a Google account, so a putative
18  class member browsing in Incognito mode in device 2, is
19  it your understanding that Google links those two
20  browsing sessions and has this bird's-eye view that we've      14:39:13
21  been talking about for this putative class member?
22      MR LEE:  Beyond the scope
23      THE WITNESS:  That is beyond the scope of my --
24  of my opinion  That said, I have not assumed that in my
25  calculation      14:39:33
Page 95

1       MR. LEE:  I'll also object to the extent it is
2  subject to the Court's sanction order for Google's
3  discovery misconduct.
4  Q.  BY MS. TREBICKA:  So your understand- -- you
5  have not assumed in your calculations that those two      14:39:49
6  separate browsing sessions are connected; correct?
7       MR. LEE:  Same objection.
8       THE WITNESS:  Could you -- could you repeat the
9  whole question now?  Because now I'm not sure what I'm
10  answering.      14:40:02
11  Q.  BY MS. TREBICKA:  So I gave you a scenario of a
12  putative class member browsing in two devices in private
13  browsing mode.
14      And my question to you is:  In your
15  calculations, have you assumed that Google is able to      14:40:16
16  link the browsing activity on each of those devices for
17  that putative class member?
18  A.  No.  That -- that assumption is not necessary
19  for my -- I think we're only talking about restitution
20  damages now or actual harm.      14:40:32
21  Q.  Correct.  Restitution damages.
22      Is the answer different for unjust enrichment?
23  A.  No.  No, it's not.  I just -- you just asked me
24  a general question, and I thought -- I thought we were in
25  the middle of restitution here, and I just wanted to make      14:40:49
Page 96

1  sure that we're -- I'm not even sure how this would apply
2  to unjust enrichment.  I would have to think separately
3  about that.  But I -- that's not something that I
4  calculated in unjust enrichment.
5  Q.  So taking you back to -- give me one second.      14:41:08
6      Taking you back to paragraph 138, the paragraph
7  we were discussing, which is the second paragraph in your
8  Actual Damages section.
9  A.  I'm sorry.  Can you just give me a second?
10  Q.  Yeah.      14:41:47
11  A.  Okay.
12  Q.  The last sentence -- or second-to-last line,
13  where you say -- you were talking about, "A conservative
14  indicator of the monthly payment necessary for an
15  individual to knowingly relinquish the choice to keep      14:41:58
16  certain browsing private."
17      Do you see that?
18  A.  Yes.
19  Q.  "And allow Google to track all their online
20  activity regardless of browsing mode."      14:42:08
21      Do you see that?
22  A.  Yes.
23  Q.  Why do you say "certain browsing private" here?
24  A.  What I'm -- what I'm saying here is -- I'm being
25  consistent with the class.  So certain browsing private,      14:43:06
Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

1 I understand that if you browse privately in certain
2 ways, that that may not be consistent with the class.
3 Like, if you're logged in to your Google account.
4      Q. I understand.
5          So with this certain browsing private, do you        14:43:26
6 mean to limit it to the private browsing at issue in this
7 case?
8      A. Yes, I do.
9      Q. And your assignment to quantify restitution --
10 class-wide restitution damages is for the at issue data     14:43:41
11 collected during private browsing at issue in this case;
12 correct?
13         MR. LEE:  Asked and answered.
14         THE WITNESS:  I -- I believe that -- I think
15 you're asking for a legal conclusion, but I believe that    14:43:58
16 that is correct.
17     Q. BY MS. TREBICKA:  No, I asked for your
18 assignment.  What you understand your assignment to be.
19     A. I believe that that is correct.
20     Q. So not all of the user's online activity, rather     14:44:08
21 limited to the private browsing that is at issue in this
22 case; correct?
23     A. Well, now I don't understand what you just said.
24     Q. Okay.  So you -- I'll rephrase.
25         You understand your assignment in this case to       14:44:26

Page 98

1 quantify restitution for private browsing at issue in
2 this case, not for a user's -- not for a user's online
3 browsing generally, even in regular mode?
4      A. I feel like the answer is -- that the answer to
5 that is correct.  I'm not -- because you said regular       14:44:49
6 mode, no, I'm not trying to calculate anything for
7 regular mode.
8         THE WITNESS:  I just would note that we're
9 coming up on an hour.
10         MR. LEE:  Yeah.                                       14:45:07
11         THE WITNESS:  I don't know if this is a
12 reasonable breaking time or...
13         MR. LEE:  Mr. Lasinski, we can take a break
14 whenever you want, so -- and I don't think counsel will
15 object unless you're in the middle of a question.          14:45:18
16         MS. TREBICKA:  Yeah, I mean, look, we're going
17 to be reasonable.  Obviously we're all going to be
18 reasonable.
19     Q. If you'd like to take a break now, I'm happy to
20 take a break now.                                           14:45:30
21     A. Okay.  Thank you.  I just have to use the
22 restroom and getting a little uncomfortable.
23         THE VIDEOGRAPHER:  Going off the record at
24 2:46 p.m.
25         (Recess.)                                            14:45:41

Page 99

1         THE VIDEOGRAPHER:  We are back on the record at
2 2:55 p m
3      Q. BY MS TREBICKA:  All right  Mr  Lasinski,
4 before we went on the break we were talking about
5 paragraph 138 of your report                               14:55:25
6      A. Okay
7      Q. Do you recall that?
8      A. I do
9      Q. And you testified that the restitution damages
10 that you're calculating are limited -- or should be        14:55:39
11 limited to private browsing mode; is that correct?
12     A. Yes, it is
13     Q. Now, direct your attention to the last sentence
14 in paragraph 138
15     A. Yes                                                  14:55:56
16     Q. Where you say -- okay  Where you say -- and I'm
17 reading aloud, but please read silently along -- that,
18 "The $3 per month represents," picking up at line 3 -- or
19 the third line from the bottom -- "represents a
20 conservative indicator of the monthly payment necessary    14:56:12
21 for an individual to knowingly relinquish the choice to
22 keep certain browsing private and allow Google to track
23 all their online activity regardless of browsing mode "
24         Do you see that?
25     A. Yes, I do                                            14:56:30

Page 100

1      Q. So here you say, "And allow Google to track all
2 of their online activity regardless of browsing mode "
3         What does that mean?  If you're now testifying
4 that your restitution damages calculation is limited to
5 private browsing, why are you also stating that it allows   14:56:49
6 Google to track -- or this $3 a month is also an attempt
7 to restitute damages for allowing Google to track all
8 their online activity, regardless of browsing mode?
9         MR LEE:  Objection  Mischaracterizes
10 paragraph 138                                               14:57:11
11         THE WITNESS:  Yeah, that's not -- that's not the
12 way I read the sentence
13         The way I read this sentence is that the
14 baseline payment of $3 per month for the use of a
15 Screenwise browser extension or a Screenwise meter app     14:57:28
16 allows Google to track all the online activity,
17 regardless of browsing mode
18         However, it is conservative to say that that $3,
19 when someone knowingly or willingly is allowing someone
20 to track -- or, in this case Google, to track that         14:57:57
21 information, that one would apply -- and, in this case,
22 me apply, a $3 per month for certain browsing
23 information
24         So that's the way I intended this sentence to be
25 written and what I am doing in my calculation              14:58:18

Page 101

26 (Pages 98 - 101)

1    Q  BY MS  TREBICKA: So I just want to understand
2    What you're saying, what you're now explaining, is
3    that -- you're saying that the $3 a month is what Google
4    pays users to allow Google to track all their online
5    activity, regardless of browsing mode, and you're          14:58:45
6    applying that $3 number to the private browsing mode, and
7    you say that it is a conservative measure because private
8    browsing mode is more valuable to the user because they
9    are not knowingly relinquishing their privacy?
10       MR LEE: Compound                                        14:59:12
11       THE WITNESS: I'm sorry  I didn't hear
12       MR LEE: I just said, "Compound "  It's for the
13   record
14       THE WITNESS: I got it  I understand  Okay
15       I think what I'm -- no, I don't think  What I'm        14:59:25
16   saying here is that, yes, $3 per month for taking
17   someone's choice away, their private browsing choice, is
18   conservative, in this case  And I -- and I am aware of,
19   and I understand, that Google -- well, Ipsos collects
20   more information than just the private browsing mode       15:00 00
21       And given -- and still given that, my opinion is
22   that $3 is conservative
23       Q  BY MS  TREBICKA: And I asked you earlier about
24   why you think that is conservative or what your bases are
25   for thinking that it is conservative  And you provided     15:00:28

Page 102

1    me with three items.
2        One is that there's other data points that
3    suggest a higher rate.  Number two was that Screenwise
4    has numerous other payments.  And number three is that
5    it's different for a user to knowingly give up a browsing  15:00:43
6    history versus unknowingly being made to give it up.
7    Is that the -- am I correct in thinking of the
8    correct answer -- testimony that you provided in response
9    to my question of why is it conservative?
10       A. I think -- I think you asked me to summarize --    15:01:05
11   summarize my opinions, which I did.  I think it was --
12   actually, there's probably actually more detail that I
13   gave in that answer or provided after that.
14       However -- yes, I mean, again, here, I think
15   that -- and I think it's true, that a willing buyer or a  15:01:30
16   willing seller in a case would take less -- accept less
17   than a non-willing buyer.
18       I should say not willing seller, because we're
19   talking about the class members.
20       Q. However, in paragraph 137 in your opinion, you     15:02:11
21   say -- and this is the second sentence that we read
22   earlier.  You're talking about, "Payments necessary to
23   incentivize an individual to knowingly relinquish the
24   choice to keep certain browsing private."
25       Do you see that?                                       15:02:40

Page 103

1        A. Right.
2        Q. So you're actually initially talking about
3    valuing private browsing information that is knowingly
4    relinquished.  This unknowing relinquishing is -- is new;
5    correct?                                                   15:02:59
6        A. No, that's not correct.
7        Q. So then why do you say in paragraph 137 that
8    what you're trying to do is determine the payments
9    necessary to incentivize an individual to knowingly
10   relinquish the choice?                                     15:03:13
11       A. Because -- because you're trying to -- you're
12   trying to incentivize a non-willing seller, somebody that
13   has decided that they're going into private browsing
14   mode, to knowingly relinquish those rights.
15       So in my opinion, that is different than              15:03:29
16   somebody who is willing to knowingly relinquish those
17   rights.  And so to the extent that I mixed up "knowingly"
18   and "willingly" earlier, that's my mistake.
19       But in this -- but in this case, I understand --
20   my assumption is that they knowingly are giving up         15:03:52
21   something that they don't -- that they have chosen not to
22   give up.
23       Q. Okay.  Is it fair to say that you analyzed the
24   Ipsos Screenwise Panel program for purposes of your
25   opinion?                                                   15:04:16

Page 104

1        A. I did, yes.
2        Q. What is your understanding of the purpose of the
3    Ipsos Screenwise Panel?
4        MR. LEE:  For the record, Mr. Lasinski is
5    reviewing his expert report.                               15:05:39
6        THE WITNESS:  I talk about this in Section 61 --
7    I'm sorry, page 61, paragraph 144, of my report.
8        Google has indicated that it uses the Ipsos
9    study to better understand how consumers use technology
10   and digital media.                                         15:06:17
11       Q. BY MS. TREBICKA:  Okay.  What is your
12   understanding of what the $3 per device monthly payment
13   is meant to compensate the Screenwise participants for?
14       A. Let me just finish my last --
15       Q. Oh, I thought you were finished.                    15:06:40
16       A. Yeah, no.  So that's what they -- that's what
17   they use it for.  My understanding, you know, in part of
18   it -- part of it is they want to better understand this
19   because -- and I talk about this in paragraph 151.
20   They're able to -- or they're -- they have a concern       15:07:03
21   about privacy changes leading to a reduction in
22   measurable conversions.  And so then they talk about some
23   of the benefits of performing a study like this.
24       So could you reask your next question, just so
25   I'm --                                                     15:07:21

Page 105

27 (Pages 102 - 105)

1  Q.  Yeah.
2      What is your understanding of the $3 per device
3  monthly payment -- or let me ask it again.  Sorry.
4  Strike that.
5      What is your understanding of what the $3 per   15:07:35
6  device monthly payment is meant to compensate the
7  panelists for?
8  A.  Well, we talked about this earlier.  We talked
9  about there is a $20 payment that's made to -- you know,
10  to get -- collect information so they can qualify for the   15:08:17
11  study.  And then there's $100 payment if you input -- if
12  you set up the router and connect to the router.
13      But then in addition to that, there's monthly
14  payments, $3 per month, to users.  And then that -- you
15  know, so that monthly payment is to incent users to   15:08:34
16  continue to participate in the study.
17  Q.  Uh-huh.
18  A.  And it's $3 per device per user.
19  Q.  Okay.  I want to put a pin in this, the
20  paragraphs that you cited.  I want to circle back to   15:09:00
21  something that you testified to just a couple minutes
22  ago, which is that -- your explanation of how private
23  browsing users are unwilling sellers of their information
24  but knowing -- but you are measuring what it will take
25  to -- for them to give up the data knowingly.   15:09:23

Page 106

1      And the baseline -- or the method by which you
2  get there is by looking at the willing sellers of
3  information through -- in one way, the Ipsos Screenwise
4  Panel; is that right, generally speaking?
5  A  Generally speaking, yes   15:09:45
6  Q  So I wanted to ask you about the unwilling
7  sellers and whether you have done any testing on whether
8  users would value their data less if they know of the
9  data collection
10  MR LEE:  Objection to form, vague   15:10:09
11  THE WITNESS:  So -- so I'm trying to answer this
12  question, and I'm not actually sure if I -- if I agree
13  with you if I'm answering the question or if I disagree
14  with you on answering the question the way you phrased
15  it   15:10:34
16  I didn't do -- I didn't do a study, if that's
17  what you -- you're asking  But my belief is that what
18  I'm trying to do here when I -- when I say knowingly and
19  someone that unwillingly parted with their information,
20  is --   15:10:47
21  You know, some people would -- some people would
22  just not part with their private browsing information at
23  all  I don't care if you gave them a lot of money  You
24  know, 20 or 30 or $40 per month  They may not do that
25  So I'm not considering the situation where someone would   15:11:13

Page 107

1  not part with their -- with their private browsing
2  information
3      I'm trying to be fair here and say, okay,
4  what -- would somebody part with their private browsing
5  information -- knowingly part with their private browsing   15:11:29
6  information?  And I think $3 is a fair rate given what
7  we've talked about
8  Q  BY MS TREBICKA:  So I want to ask the question
9  a little bit differently
10     Have you seen any studies or testing on whether   15:11:50
11  users value their data more if they are unwilling sellers
12  of the data?
13  A  I -- I haven't seen a study on that from a data
14  perspective  But from an economic perspective, if you're
15  an unwilling seller versus a willing seller, you   15:12:27
16  wouldn't -- it's worth -- it's worth more to you  So
17  your choice is worth more to you
18      I mean, think of it this way:  I'm an unwilling
19  seller of my house  Somebody walks up to me and says
20  they want to buy my house  I'm, like, "Well, I'm not   15:12:49
21  moving "  You know, that's a different -- that's a
22  different set of facts than if I put my house on the
23  market and am going to sell it
24      And from an economic perspective, a willing
25  buyer -- or, I'm sorry, a willing seller will sell for   15:13:04

Page 108

1  less than an unwilling seller.
2  Q.  Have you seen any -- or have you identified any
3  support in the literature for your answer?
4  A.  In the literature for whether or not a willing
5  buyer or a willing seller would --   15:13:48
6  Q.  Actually, let me ask the question again.
7      Have you seen -- the question is:  Have you seen
8  any literature or studies on whether users would value
9  their data less if they know of a data collection?
10  A.  Wait, what?  I'm not -- I'm not getting it.   15:14:17
11  Q.  Okay.  So is it your view that a user would
12  value their data less if they are -- if they know of the
13  data collection?
14  MR. LEE:  Objection to form, mischaracterizes.
15  THE WITNESS:  No, I'm not.   15:14:35
16  Q.  BY MS. TREBICKA:  Okay.  Let's keep going for
17  now.
18      We were talking about the Screenwise -- the
19  Ipsos Screenwise program.  You -- in paragraph 143 of
20  your report.   15:15:06
21  A.  Okay.
22  Q.  You say -- you're actually -- let me see.  In
23  the second sentence of -- of that paragraph 143, you say
24  that, "Through these studies, which are marketed as the
25  Ipsos Screenwise Panel."   15:15:41

Page 109

CONFIDENTIAL

| | |
|---|---|
| 1   A  Where are you at now? | 1      MR LEE:  Hold on  Hold on |
| 2   Q  143, second sentence | 2      THE WITNESS:  You would sell for more  You |
| 3   A  Okay  I'm just -- okay  I see it | 3  would sell for more  You would not agree to sell for |
| 4   Q  "Through these studies, which are marketed as | 4  less |
| 5  the Ipsos Screenwise Panel, members of selected US       15:15:52 | 5   Q  BY MS TREBICKA:  And your understanding of an      15:18:45 |
| 6  households are paid to voluntarily link their devices, | 6  unwilling seller is a seller who is unknowingly providing |
| 7  operate a special router, and recruit other members of | 7  something; correct? |
| 8  the household to participate in a comprehensive online | 8   A  No  In -- to be clear, in this case, my |
| 9  data collection process " | 9  understanding of -- of the putative class members are |
| 10      Do you see that?       15:16:09 | 10  people that went to private browsing mode  Even though      15:19:07 |
| 11   A  Yes, I do | 11  they had the option to go into regular browsing mode, |
| 12   Q  So these are members of selected US households | 12  they went to private browsing mode |
| 13  Have you researched Google's selection criteria for | 13      And so that puts them in a different situation |
| 14  Ipsos? | 14  than someone that's browsing in regular browsing mode |
| 15   A  No, I have not       15:16:30 | 15   Q  So going into private browsing mode puts them in      15:19:25 |
| 16   Q  Do you know whether all putative class members | 16  the unwilling seller category, in your opinion? |
| 17  would have been selected to the panel had they attempted | 17   A  They are not willingly -- they are not willingly |
| 18  to register for it? | 18  transmitting -- or having their data collected, and |
| 19   A  No, I don't know the answer to that, if they | 19  they're unknowingly having their data collected |
| 20  would or would not have       15:16:45 | 20   Q  So going into private browsing mode puts them in      15:19:58 |
| 21      MR LEE:  I'll also object subject to the | 21  your unwilling seller category; correct? |
| 22  Court's sanction order | 22   A  In my -- in my opinion, their choice has been |
| 23   Q  BY MS TREBICKA:  You testified that some class | 23  taken away, and so they're no longer in that -- they are |
| 24  members -- or sorry  You testified that you don't know | 24  not in that category |
| 25  whether some class members would have been selected or      15:16:59 | 25   Q  If a Screenwise Panelist browses in private      15:20:13 |
| Page 110 | Page 112 |

| | |
|---|---|
| 1  not  Isn't that an important inquiry, for you to | 1  browsing mode, would you consider that person a -- |
| 2  determine whether class members would have even been able | 2  someone who you should apportion damages to? |
| 3  to register for the Ipsos Screenwise Panel? | 3      MR. LEE:  Viola, I'm assuming in your question |
| 4      MR LEE:  Objection subject to the Court's | 4  you're building in while the study is ongoing. |
| 5  sanction order       15:17:20 | 5      If not, I object as vague as to time frame.      15:20:43 |
| 6      THE WITNESS:  No, it is not | 6      MS. TREBICKA:  Okay. |
| 7   Q  BY MS TREBICKA:  Why not? | 7      THE WITNESS:  I guess I'm not understanding your |
| 8   A  Because I do know that these participants | 8  question.  If someone -- if there was a unique private |
| 9  were -- they signed up for the study  They knew that | 9  browsing instance, I have -- during a month, I have |
| 10  their private -- well, all their browsing, including       15:17:33 | 10  calculated -- and I think we're just still in restitution      15:21:02 |
| 11  their private browsing mode, to the extent that they were | 11  damages here -- I have calculated that that person should |
| 12  using one of these devices or connected to the router, | 12  be compensated. |
| 13  would have been collected  They -- so they're a | 13   Q. BY MS TREBICKA:  Even if that person was also |
| 14  willing -- they're a willing seller of that information | 14  an Ipsos Screenwise Panel participant? |
| 15      My opinion is that if you are -- if you don't       15:17:52 | 15   A. I see -- I see what you're saying in this case.      15:21:32 |
| 16  know or are not willing, that you would require more than | 16  My understanding -- my understanding -- my understanding |
| 17  what a willing seller would sell for | 17  of Ipsos is if there's, like, a thousand people in that |
| 18   Q  Okay  So I'm just reading from your testimony | 18  study.  So there may be -- that may be a group that could |
| 19  You say, "My opinion is that if you are or if you don't | 19  be selected out of whether or not there would be damages. |
| 20  know, you are not willing, that you would require more       15:18:22 | 20   Q. Okay.  Is your opinion that the data at issue in      15:22:10 |
| 21  than a willing seller would sell for"; is that correct? | 21  this case is identical to the data that Google collects |
| 22   A  Right  If you're an unwilling seller, then | 22  through the Ipsos Screenwise Panel? |
| 23  you -- then you would not | 23   A. No. |
| 24   Q  And -- | 24   Q. What is different between those two bodies of |
| 25   A  You would sell for more       15:18:38 | 25  data?  Actually, scratch that.  Let me ask you a slightly      15:22:28 |
| Page 111 | Page 113 |

29 (Pages 110 - 113)

1 different setup question
2     Have you analyzed what the difference is between
3 the data at issue in this case and the data that's
4 collected for Ipsos?
5     A  Yes, I have looked at the two          15:23:01
6     Q  Have you compared the two?
7     A  Yes
8     Q  And in your opinion, are they generally
9 comparable?
10    A  In -- in my opinion, in the Ipsos Screenwise    15:23:23
11 study, they -- there's more data collected than would be
12 collected in private -- in private browsing mode
13    Q  Is the data collected qualitatively different,
14 as well as quantitatively different?
15    A  Yes                              15:23:59
16    Q  Talk to me about -- or tell me why you believe
17 that the data collected in Ipsos is qualitatively
18 different from the data at issue in this lawsuit?
19    A  Well, I mean, I am not the technical expert, and
20 I would not be able to identify every single way in which    15:24:34
21 they're different  But I give an example of the types of
22 data that's included in the Ipsos study  And what I say
23 here is that placed on your mobile phone, it will record
24 everything that you see on your screen, everything that
25 you tap, everything that you type  You know, what you    15:24:59

Page 114

1 swipe or otherwise input  It also includes information
2 on TV user interfaces, information from apps, as I'm sure
3 that you know, take app information out of my
4 calculations here  It takes your name, your email
5 address, your home, your work address, telephone number    15:25:30
6     So there's -- that's quantitatively more and
7 qualitatively more as well
8     Q  You're also aware that Screenwise participants
9 were subject to requirements to maintain a minimum level
10 of online activity to receive the $3 payment per month?    15:25:51
11    MR LEE: That is not -- that's consistent with
12 my understanding, yes
13    Q  BY MS  TREBICKA: And you're also aware that
14 Screenwise participants are required to perform certain
15 activities; correct?                    15:26:14
16    A  I believe that that is accurate, yes
17    Q  And do you recall what activities they're
18 required to perform?
19    A  I don't -- I don't recall what activities, as I
20 sit here                              15:26:46
21    Q  Okay  Well, do you have any reason to doubt
22 that they were required to respond to notification on
23 their devices?
24    A  I do not know
25    Q  Do you have any reason to doubt that they needed    15:26:57

Page 115

1 to check their Google profile?
2     A  No, I do not
3     Q  Do you have any reason to doubt that they were
4 required to fill out surveys?
5     A  Well, no  I know that they were required to      15:27:20
6 fill out surveys  We already talked about that
7     MS  TREBICKA: So let me just mark for the
8 record Exhibit 12, which is the Google Panel Terms &
9 Conditions
10    I'm sorry, Tab 12 and Exhibit 4            15:27:33
11    (Exhibit 4, Google Panel Terms & Conditions,
12    6 1 21, marked for identification electronically
13    by counsel )
14    MS  TREBICKA: This is where Ms  Fani comes in
15 and rescues the day                    15:27:44
16    MR  LEE: Just give us a sec for it to load
17    MS  TREBICKA: Okay  It's up, I'm being told
18    THE WITNESS: I have it now
19    MS  TREBICKA: Okay  Ms  Fani, can you, please,
20 also introduce Tab 13 -- or load it, and we'll get to it?    15:28 00
21    (Exhibit 5, Google Panel Privacy Policy, 6 1 21,
22    marked for identification electronically by
23    counsel )
24    MS  TREBICKA: Is it Exhibit -- we marked
25 this -- the Google Panel Terms & Conditions as Exhibit 4    15:28:08

Page 116

1     MR  LEE: Is there a Bates Number on this?
2     MS  TREBICKA: I don't believe so
3     MR  LEE: I'm not seeing one  Was it produced?
4     MS  TREBICKA: It is public, and I'm not sure if
5 we've produced it                      15:28:32
6     But, Ms  Fani, you can -- if there's anything
7 else to add, please unmute and tell us
8     MS  FANI: Yes, I can represent that this was --
9 is just a printout of a current website, the current
10 website that is -- the link of which is listed in the    15:28:51
11 bottom left-hand corner of the first page
12    MR  LEE: Okay  And it wasn't produced; right?
13    MS  FANI: I -- I have not confirmed whether or
14 not it was produced  But it was printed from a public
15 website                              15:29:08
16    MR  LEE: Okay  Just if it was produced, please
17 let us know
18    MS  FANI: Okay
19    Q  BY MS  TREBICKA: Mr  Lasinski, have you seen
20 this document before?                    15:29:19
21    A  I'm going to look at it really quickly
22    Q  Sure
23    A  I don't know if I've seen this particular
24 document  I do believe I've seen a document similar to
25 this, if not the same as this  Because some of the terms    15:30:45

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

1 and some of the information in this document is familiar
2 to me.
3    Q.  Let me show you what we've marked as Exhibit 5,
4 which is also a publicly available document, with the
5 title "Google Panel Privacy Policy."        15:31:08
6       MR. LEE:  Five?
7       MS. TREBICKA:  Correct.
8       MR. LEE:  Okay.  This also does not have a Bates
9 Number; correct?
10      MS. TREBICKA:  Correct.  It's a publicly        15:31:26
11 available document.
12      MR. LEE:  Okay.
13      THE WITNESS:  Okay.
14    Q.  BY MS. TREBICKA:  Have you seen this document
15 before?        15:32:29
16    A.  I don't know if I've seen this particular
17 document.  I have gone to this website, and I have gone
18 to the Google Panel Privacy Policy in forming my
19 opinions.  I just don't know -- it says, "Last modified:
20 June 1, 2021."  I -- I don't recall -- I don't recall the        15:33:35
21 document that was up, if it's this exact same one.  It
22 likely is, but I'm not 100 percent sure.
23    Q.  Understood.
24       And earlier you agreed that Screenwise
25 participants are required to respond to notifications on        15:33:58

Page 118

1 their devices, check their Google profile, fill out
2 surveys; correct?
3    A  My -- you asked me if I had a reason to doubt that
4 that, and I do not have a reason to doubt that
5    Q  You don't recall that from the Google Panel        15:34:17
6 Terms & Conditions?
7    A  I thought that -- I thought that you were asking
8 me about the question that you asked before
9       My -- my -- that is consistent with my
10 understanding        15:34:39
11    Q  Okay  And you agree that doing those actions
12 requires time; correct?
13    A  If you were to do those actions, it would
14 require time
15    Q  And you agree that a person's time is valuable?        15:34:57
16    A  Yes, I do
17    Q  And if Google expects panelists to spend time
18 doing some activities that are required by the Panel, is
19 it reasonable to expect that the panelists are being
20 compensated for that time?        15:35:10
21    A  My understanding is that would be one of the
22 incentives to continue as a panel member  So, yes, it
23 would be
24    Q  So part of the monetary incentives to continue
25 as a panel member are also compensating the panelists for        15:35:38

Page 119

1 his or her time; correct?
2    A.  From the panelists' perspective, yes.
3    Q.  Now, turning your attention back to the
4 Privacy -- hold on.  Let me make sure I have the right
5 one here.        15:36:08
6       The Google Panel Terms & Conditions.  So
7 the -- so Exhibit 4.
8    A.  Okay.
9    Q.  Okay.  And if you could turn your attention to
10 Section 11.1.        15:36:26
11    A.  Yes.
12    Q.  You understand that Screenwise participants
13 agree not to use "do not track" features; correct?
14    A.  Yes, I do.  That's what it says here.
15    Q.  Correct.  And they also agree not to use ad        15:37:02
16 blockers?
17    A.  Yes, that's true.
18    Q.  And they also agree not to turn off location
19 reporting services or location history services?
20    A.  They do -- they do agree to that, correct.        15:37:25
21    Q.  And putative class members are not subject to
22 such restrictions; correct?
23    A.  I do not believe that they are, that is correct.
24    Q.  Now, would you agree that there is value to
25 users in the option to turn on a "do not track" feature        15:37:43

Page 120

1 or an ad blocker?
2    A.  I would agree that there is value to giving a --
3 users choice, yes.
4    Q.  And taking away that choice, as Screenwise is
5 doing for panelists, you would expect Screenwise to        15:38:09
6 compensate users accordingly; correct?
7    A.  Well, certainly this is one of the things that
8 Screenwise users are agreeing to do for the compensation
9 that they -- that they receive.
10    Q.  Other things being equal, would you agree that        15:38:45
11 data that tells you more about a particular user is more
12 valuable than data that tells you less about a particular
13 user?
14       MR. LEE:  Objection to form, vague.
15       THE WITNESS:  I would say other things being        15:39:19
16 equal, that is accurate, yes.
17    Q.  BY MS. TREBICKA:  Now, are there differences in
18 the value of different types of data?  For example, do
19 you believe that an IP address has the same value as
20 users' browsing history?        15:39:41
21    A.  I have not done an analysis of that, so I don't
22 know the answer to that question.
23    Q.  And all else equal, do you believe that more
24 reliable data is more valuable than less reliable data?
25       MR. LEE:  Objection to form, vague.        15:40:10

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

1      THE WITNESS:  I mean, if you're asking me all
2  else being equal, yes, that would be -- more reliable
3  data would be more valuable.
4      Q.  BY MS. TREBICKA:  And all else equal, again,
5  more data is more valuable than less data; correct?   15:40:33
6      MR. LEE:  Asked and answered.
7      THE WITNESS:  I -- I believe that is
8  accurate, yes.
9      Q.  BY MS. TREBICKA:  And why would you say that?
10     A.  If you're holding all else equal and you have   15:40:44
11  more information, you, by definition, have more than just
12  a subset of the information.  So it would be more
13  valuable.  Or it could -- I should say it could be more
14  valuable.  It wouldn't necessarily be more valuable, but
15  it could be more valuable.                            15:41:20
16     Q.  Now, would more data collected about a user
17  provide more information to Google about the user?
18     A.  So in my opinion, when you're talking about the
19  user and the value of the information, it's -- it's
20  valuable to know whether or not that person -- for      15:42:05
21  Google, it's valuable to know whether or not that person
22  spends time on a website or valuable to know whether or
23  not they do certain things.
24     But it's also valuable to know, and very
25  important to know, that they don't.  And so, actually,   15:42:31
Page 122

1  having less information is very valuable to them as well,
2  the types of people that don't spend time on websites,
3  that don't spend time on their devices and that don't
4  spend time searching stuff.  So that's also very valuable
5  to them.                                              15:42:58
6     And I'm not sure that it would be more valuable
7  one way or the other.
8     Q.  Because you haven't looked at whether one is
9  more valuable than the other; correct?  Or you haven't
10  analyzed; correct?                                    15:43:12
11     A.  That's not accurate.  I've talked to Mr. Hochman
12  about the value of data and the importance of data to
13  Google.
14     And I -- as we've -- as we've talked, here
15  I'm -- been very clear, I think, throughout my answers   15:43:31
16  that it's important to know information about users.
17  It's equally important to know if they spend less time,
18  thereby giving -- allowing Google to have less
19  information or more information.
20     So it's important for Google to know both      15:43:58
21  things.
22     Q.  And your -- your answer with respect to why
23  Google -- why it's valuable for Google to know whether a
24  user spends less time is because Google would know that a
25  particular user is not spending as much time on a      15:44:15
Page 123

1  particular website; correct?
2     A.  It gives them -- it gives them information that
3  they're able to use in their -- in their modeling and
4  when they're talking to their advertisers.
5     So having information about a broad universe of   15:44:41
6  people is very -- is important to Google.  And having
7  information that they do or do not do certain things is
8  important to Google.
9     Q.  Right.
10     So we were talking about the short periods of   15:44:54
11  time spent on a website.  And your view was that that is
12  valuable to Google.  You didn't quantify how much, but it
13  is valuable to Google because it allows Google to know
14  that a particular user is spending less time on a
15  website; correct?                                    15:45:13
16     A.  So what I'm saying in there -- in this case is
17  Google wants to collect information on all users, is my
18  understanding.  They want to collect information on all
19  users.  And knowing that information about those users is
20  important to them.                                    15:45:36
21     Whether or not -- whether or not they spent a
22  certain amount of time or spend less time is important to
23  them and can be equally as important to them.
24     MR. LEE:  Viola, can we take a restroom break?
25  I didn't go last time.                                15:45:55
Page 124

1     MS TREBICKA:  Give me one minute
2     MR LEE:  Okay
3     MS TREBICKA:  Yeah, that's fine  Let's just
4  take a break now
5     MR LEE:  Thank you                    15:46:09
6     THE VIDEOGRAPHER:  Going off the record at
7  3:46 p m
8     (Recess )
9     THE VIDEOGRAPHER:  We are back on the record at
10  3:58 p m                                            15:57:58
11     Q  BY MS TREBICKA:  Mr Lasinski, I would like to
12  ask you about the other indicators of value that you have
13  in your report and you, in a summary fashion, identified
14  earlier as well
15     Starting with page 68, AT&T's GigaPower campaign   15:58:21
16  and internet preferences program
17     A  Okay
18     Q  So whenever you're there -- so this is your
19  report, page 68
20     A  I'm there                        15:58:42
21     Q  Okay  This is one of the examples of consumer
22  willingness to pay to prevent data collection or block
23  advertisements that you identified in your report;
24  correct?
25     A  That is correct, yes              15:58:53
Page 125

32 (Pages 122 - 125)

CONFIDENTIAL

| | |
|---|---|
| 1    Q  Now, have you researched what portion of AT&T's | 1      MS. TREBICKA:  159. |
| 2   customers chose to pay the extra $29 per month to opt out | 2      MR. LEE:  Thanks. |
| 3   of the internet preferences program? | 3      THE WITNESS:  What I -- what I mean by |
| 4    A  No  That information was not available to me, | 4   "additional" in this -- in this particular sentence is |
| 5   so I did not              15:59:13 | 5   the types of information that I'm talking about in the     16:03:56 |
| 6    Q  Did you look for it, and it was not available? | 6   paragraphs below. |
| 7    A  It's not available, correct | 7    Q. BY MS. TREBICKA:  Additional to what? |
| 8    Q  Where did you look? | 8    A. I don't have an additional to what.  It's -- |
| 9    A  I searched on the internet and had my team | 9   it's the types of information that I'm talking about in |
| 10   search             15:59:31 | 10   paragraphs below.          16:04:19 |
| 11    Q  Have you researched why the program was | 11    Q. Just doubling back to the AT&T GigaPower |
| 12   discontinued? | 12   campaign questions, did you do any research to determine |
| 13    A  I do have an understanding of why it was | 13   whether the information that AT&T would stop collecting |
| 14   discontinued, yes | 14   in exchange for the $29 payment is comparable to the at |
| 15    Q  Why was it discontinued?      16:00:08 | 15   issue data in this case?        16:04:42 |
| 16    A  My understanding is that AT&T was attempting to | 16    A. Yes.  What I -- what I noted in this case is |
| 17   simplify its offering and confirm that data collection | 17   that AT&T was using this information to serve |
| 18   and targeted ads would be shut off as a result of the | 18   personalized ads tailored to your interests, including |
| 19   change | 19   search terms and web pages that you visit. |
| 20    Q  And have you researched how much AT&T charged    16:00:23 | 20     And so that information is comparable to the     16:06:01 |
| 21   customers after it discontinued the program? | 21   types of information that we're talking about here. |
| 22    A  No, I did not | 22   I feel like somebody's talking on the -- on one |
| 23    Q  Have you researched why the program was only | 23   of the -- |
| 24   available in three cities -- or Austin, Texas, Kansas | 24    Q. And do you know -- is that the extent of your |
| 25   City, Missouri, and parts of Kansas?     16:00:44 | 25   research, to determine the comparability of the two types   16:06:30 |
| Page 126 | Page 128 |

| | |
|---|---|
| 1    A  I did search for that information, but it's not | 1   of data? |
| 2   available publicly | 2    A. Ultimately, yes, there is not additional |
| 3    Q  You searched online again? | 3   information available.  But I was able to glean from the |
| 4    A  Yes, I did | 4   information that was available that we're talking here |
| 5    Q  Have you researched whether AT&T used the web    16:01:20 | 5   about personalized ads, targeted ads.      16:06:48 |
| 6   browsing information to provide TV advertisements? | 6     That is based upon, for example, search terms |
| 7    A  If I remember correctly, they did, yes | 7   and web pages that you go to. |
| 8    Q  What about mail-in advertisements? | 8    Q. Do you know whether this information that it |
| 9    A  I believe that that's also accurate | 9   collects and used, AT&T, could also be TV info? |
| 10    Q  Have you researched whether AT&T sold the data    16:02:04 | 10    A. That I believe is correct.  I believe that it    16:07:48 |
| 11   that it collected through this program? | 11   could be. |
| 12    A  That information is not -- I did  That | 12    Q. What about mobile info? |
| 13   information is not available publicly | 13    A. Do you mean information that comes from your |
| 14    Q  Turn your attention to paragraph 159, please | 14   mobile device? |
| 15    A  Yes           16:02:34 | 15    Q. Correct.             16:08:35 |
| 16    Q  And in that paragraph -- I'll read it for the | 16    A. -- or do you mean cellular information? |
| 17   record, if you could read along silently | 17    Q. Information that comes from your mobile device. |
| 18     "I have also identified and considered the | 18    A. I -- my understanding is that it could, because |
| 19   following indicators of research organizations' | 19   we're talking about their fiber network, and if you |
| 20   willingness to pay users to allow for additional data    16:02:47 | 20   connected it to your -- to the fiber network in your    16:08:49 |
| 21   collection " | 21   home, it could be. |
| 22     What does the term "additional" mean in this | 22    Q. And this information that AT&T collects and used |
| 23   sentence? | 23   could also be anything that might happen through the |
| 24    MR  LEE:  Viola, can you just tell me what | 24   internet but does not involve a browser; correct? |
| 25   paragraph we're on, please?       16:03:33 | 25    A. That is possible, yes.       16:09:06 |
| Page 127 | Page 129 |

33 (Pages 126 - 129)

| | |
|---|---|
| 1 Q If you could turn your attention to paragraph | 1 explaining this program? |
| 2 160 on page 69 | 2 A. It is, yes. |
| 3 A Yes | 3 Q. And you've seen this before? |
| 4 Q The Nielsen Computer and Mobile Panel | 4 A. I have, yes. |
| 5 A Yes                              16:09:43 | 5 Q. And this tells you that Nielsen requires the    16:11:39 |
| 6 Q Okay And here you state -- I'm reading for the | 6 user to install a separate desktop application; correct? |
| 7 record if you could silently follow along -- "Nielsen, | 7 A. Yes, it does. |
| 8 the world's leading provider of media and marketing | 8 Q. And it also tells you that Nielsen asks users to |
| 9 information, tracks and collects information related to | 9 complete an online user profile? |
| 10 device usage to develop an understanding of consumer   16 09:58 | 10 A. Yes, it does.                     16:11:55 |
| 11 behavior, including what consumers view and listen to, as | 11 Q. Okay. And do you know the information that goes |
| 12 well as how they browse the internet " | 12 into that profile? |
| 13    Do you see that? | 13 A. Not all of it, no, I do not. |
| 14 A Yes, I do | 14 Q. Nielsen also states on the first page that it |
| 15 Q Now, is the information that consumers listen to   16:10:12 | 15 collects general computer and/or mobile device activity.    16:12:17 |
| 16 at issue in this case? | 16    Do you see that? |
| 17 A I do not believe that it is, no | 17 A. I don't see where you're -- |
| 18 Q Let me show you exhibit -- what we've marked as | 18 Q. Okay. I don't see it either. I think let's go |
| 19 Exhibit 6, I believe, which is the Nielsen printout | 19 to the next exhibit, which should be Exhibit 7, and it's |
| 20 related to the computer mobile panel   16:10:53 | 20 a frequently asked questions document.           16:12:44 |
| 21    (Exhibit 6, Nielsen Printout, Computer & Mobile | 21 A. Yes. |
| 22    Panel, marked for identification electronically | 22 Q. Okay. And if you could turn your attention on |
| 23    by counsel ) | 23 that first page to "What does the Nielsen Computer & |
| 24    (Exhibit 7, Nielsen Printout, Computer & Mobile | 24 Mobile App/software collect?" |
| 25    Panel, Frequently Asked Questions, marked for | 25    Do you see that?                 16:13:04 |
| Page 130 | Page 132 |

| | |
|---|---|
| 1 identification electronically by counsel ) | 1 A. Yes, I do. |
| 2    (Exhibit 8, Nielsen Printout, U S Panel Privacy | 2 Q. Do you see that the third checkmark states: |
| 3    Notice Summary, marked for identification | 3 "General computer and/or mobile device activity"? |
| 4    electronically by counsel ) | 4 A. Yes, I do. Yes. |
| 5    (Exhibit 9, SurveySavvy printout, How it Works, | 5 Q. Have you researched what that data is?    16:13:17 |
| 6    marked for identification electronically by | 6 A. I have not. I could not determine that from my |
| 7    counsel ) | 7 internet searches. That said, I will note that Nielsen |
| 8    (Exhibit 10, SavvyConnect printout, FAQs, marked | 8 is asking people to willingly sign up to this, where the |
| 9    for identification electronically by counsel ) | 9 data that we're talking about here and the users that |
| 10    (Exhibit 11, SavvyConnect, Terms and Conditions, | 10 we're talking about here were not willing participants or    16:14:09 |
| 11    marked for identification electronically by | 11 did not knowingly give up their data like they did here. |
| 12    counsel ) | 12 Q. And the Nielsen panelists are required to |
| 13    (Exhibit 12, UpVoice printout, FAQs, marked for | 13 complete surveys; correct? |
| 14    identification electronically by counsel ) | 14 A. I believe that that is accurate, but I don't see |
| 15 Q BY MS TREBICKA: Please let me know when you   16:11:04 | 15 that here.                          16:15:34 |
| 16 have it | 16 Q. Well, let me show you exhibit -- what's been |
| 17 A I'm here, yes | 17 marked as Exhibit 8, which is the "Nielsen U.S. Panel |
| 18 Q Okay So you see this is a printout that has | 18 Privacy Notice Summary," and if you could turn to page 4, |
| 19 the tagline at the top "Get rewarded for using your | 19 towards the top half of the page -- towards the bottom of |
| 20 devices"? Have you seen this document before?   16:11:15 | 20 the top half, if that makes sense, under "demographic    16:16:08 |
| 21 A Yes, I have | 21 data" it says, "Once your household has joined the Panel, |
| 22 Q And this is -- at the top left corner, it has | 22 we may, from time to time, ask you to participate in |
| 23 the Nielsen name on it; correct? | 23 surveys, studies, or questionnaires and provide us with |
| 24 A Yes, it does | 24 additional information (mainly behavior data and |
| 25 Q And is this a computer and mobile panel page   16:11:26 | 25 preference data) in order to help us better understand    16:16:24 |
| Page 131 | Page 133 |

1 consumer behaviors and trends."

2     Do you see that?

3    A. I do, yes.

4    Q. So any reason to doubt that that's one of the

5 requirements to participate in the Nielsen Panel?   16:16:35

6    A. I'm sorry. My screen just went black. Hold on.

7    Could you ask me that question again?

8    Q. Do we need to get off the record?

9    A. No. It's back -- it's back up now.

10    Q. Okay. Any reason to doubt that that's one of   16:16:51

11 the requirements to participate in the Nielsen Panel?

12    A. I mean, no. That's not -- that is one of the

13 requirements. I mean, if you want to have a chance to

14 win up to, you know, $500 a month, you're -- which these

15 users are given that chance to earn up to $500 a month   16:17:17

16 and $50 for participating in the Panel, they are incented

17 to do that. I mean, as I say here, they give away

18 $10,000 of prizes every month, so you've got a chance of

19 winning $500, so you're incented to do your.

20    Q. And where do you get the $500 per month?   16:17:46

21    A. If you -- I'm sorry. I had to go to Exhibit 7.

22 If you go to Exhibit 7 instead of 8, the one that we were

23 on, it talks about what happened -- what happens after I

24 sign up.

25    Q. What page are you on?   16:18:50

Page 134

1    A. I'm on page -- unfortunately, it doesn't have

2 page numbers.

3    Q. Page 2?

4    A. Page 2.

5    It says you could win $50 a year in rewards, but   16:19:00

6 also you're eligible to win, you know, a portion of what

7 they give away each month, which is $10,000.

8    Q. So you've talked about sweepstakes; correct?

9    A. Yeah. So you have -- yeah, if you're a

10 participant, you have a chance to win a portion of the   16:19:21

11 $10,000, and some people win $500.

12    Q. Do you know how many participants there are?

13    A. I do not know how many participants there are.

14 That information isn't publicly available.

15    Q. Okay. Let's move on to SavvyConnect. That's   16:19:49

16 another one of the research organizations that you

17 included in your report; correct?

18    A. Correct.

19    Q. Paragraph 162.

20    A. Paragraph 162, yes.   16:20:05

21    Q. You're aware that SavvyConnect requires the user

22 to install a separate desktop application; right?

23    A. Yes, I am. Yes.

24    Q. And you're aware that SavvyConnect requires

25 users to complete an online user profile and a portrait;   16:20:18

Page 135

1 correct?

2    A. Yes, I understand that to be the case.

3    Q. Do you know what goes into that profile?

4    A. I know in part what goes into the profile, yes.

5    Q. What goes in the profile?   16:20:59

6    A. Well, in part, some of the information that goes

7 into it is the user's name, their email address and basic

8 demographic information.

9    Q. Okay. And you're aware that SavvyConnect has

10 minimum activity requirements; correct?   16:21:20

11    A. Yes, I am.

12    Q. And that it also connects user data through

13 supplementary surveys?

14    A. That's my understanding, yes.

15    Q. Okay. Let's move on to UpVoice, which is --   16:21:33

16    A. Just to be clear, I mean, again, my

17 understanding of SavvyConnect is that you willingly enter

18 this and knowingly provide them with your information as

19 a user or a panelist.

20    Q. And this is different from putative class   16:21:57

21 members, because in your view, they do not willingly

22 enter -- or they do not willingly give up their data or

23 knowingly give up their data; correct?

24    A. Correct.

25    Q. Okay. So just to be clear, putative class   16:22:12

Page 136

1 members do neither -- give up their data neither

2 willingly nor knowingly?

3    A. They are not aware of -- yes, correct. They are

4 not aware of the data that they are giving up. That is

5 correct.   16:22:31

6    Q. UpVoice. Paragraph 163, you're aware that

7 UpVoice requires a user to install a separate desktop

8 application?

9    A. Yes, I am. Yes.

10    Q. And that it has eligibility requirements for   16:22:49

11 panelists?

12    A. Yes, that is correct.

13    Q. And you're also aware that it requires that

14 users disable ad blockers?

15    A. Yes, that's true.   16:23:01

16    Q. And that also it collects additional information

17 through supplementary surveys; correct?

18    A. That is my understanding.

19    Q. How did you go about identifying these companies

20 that you listed in this section of your report?   16:23:16

21    A. Are you talking about Section 8, or are you

22 talking about just UpVoice here?

23    Q. I'm talking about UpVoice, SavvyConnect, Nielsen

24 and the AT&T's GigaPower Campaign.

25    A. I did research to identify these additional data   16:23:37

Page 137

35 (Pages 134 - 137)

CONFIDENTIAL

```
 1  points that we've just gone through.
 2      Q.  Did you identify any other data points that you
 3  decided not to include in your report?
 4      A.  I may have, but I can't recall as I sit here.  I
 5  can't recall any other data points.              16:24:15
 6      Q.  Now, moving on to allocation of the restitution
 7  damages that you calculate, you propose two possible
 8  methods to allocate restitution damages in paragraph 197
 9  of your report; correct?
10      A.  That is correct.                          16:25:10
11      Q.  One refers to -- or one method uses the number
12  of UMPBI attributable to each class member; correct?
13      A.  Yes, it does.
14      Q.  And UMPBI stands for?
15      A.  Unique monthly private browsing instances.  16:25:26
16      Q.  And the other method is according to the number
17  of class members or putative class members now; correct?
18      A.  I know that we're switching topics, and I know
19  that this is short, but I have to quickly use the
20  restroom.  I'm sorry about this.  I just -- it can   16:25:45
21  literally be less than five minutes.
22      Q.  It's all right.
23      A.  Okay.
24          THE VIDEOGRAPHER:  Going off the record at
25  4:26 p.m.                                         16:25:56
```
Page 138

```
 1      (Recess )
 2          THE VIDEOGRAPHER:  We are back on the record at
 3  4:30 p m
 4      Q  BY MS TREBICKA:  Okay  Mr Lasinski, you
 5  proposed two possible methods to allocate restitution  16:29:50
 6  damages; correct?
 7      A  I do, yes
 8      Q  And we briefly touched on them before the break;
 9  correct?
10      A  I believe that we talked about UMPBI   16:30:01
11      Q  The other method is according to the number of
12  class members?
13      A  Yes, it is
14      Q  And is one of them preferable to the other, in
15  your opinion?                                    16:30:29
16      A  I have not provided a preference
17      Q  Have you calculated the number of UMPBI deemed
18  attributable to each class member?
19      A  You mean for the entire class have I calculated
20  the number of UMPBI of each individual class member?  16:30:56
21      Q  Right, attributable to each class member
22          MR LEE:  Let me object subject to the Court's
23  sanction order for Google's discovery misconduct.
24          Are you representing that that data has been
25  produced, Counsel?                               16:31:14
```
Page 139

```
 1          MS TREBICKA:  I have a question for the
 2  witness  I think I need the witness to answer
 3          MR LEE:  Okay  So you're not going to answer
 4  my question?
 5          MS TREBICKA:  We can take it up after, not on  16:31:26
 6  the record
 7          MR LEE:  All right  Let me object based on the
 8  sanction order then
 9          THE WITNESS:  So my understanding is that not --
10  that data is not available to -- for the entire class  16:31:40
11      Q  BY MS TREBICKA:  Do you have an understanding
12  of how it can be --
13      A  Can I finish or --
14      Q  Oh, I didn't know you were not finished  With
15  the long pauses, it's making it hard for me know to when  16:31:52
16  you're finished
17          Go ahead
18      A  I appreciate that comment  Thank you
19          So my understanding is that data is not
20  available, and so I have not attempted to do it   16:32:08
21      Q  Do you know whether -- well, how do you propose
22  that it be done, given that this is one of your
23  methodologies?
24      A  So to the extent that Google produces the data,
25  one could calculate the number of unique private browsing  16:32:49
```
Page 140

```
 1  instances for the class members.  Another way one could
 2  do it if that data is not available or only partially
 3  available would be through attestation.  Class members
 4  could attest what they did over the -- over the period.
 5          But to be clear, I'm not -- I'm not the   16:33:22
 6  administrator in this case.  Those are two ways that seem
 7  reasonable to me to do this calculation, but again, I'm
 8  not the administrator, so I'm not sure exactly how they
 9  would do it.
10      Q.  So how it would be done is not part of your   16:33:39
11  opinion; correct?
12          MR. LEE:  Objection to form, mischaracterizes
13  paragraph 197.
14          THE WITNESS:  I just provide two ways that it
15  could be done or a combination of those ways, but my   16:33:50
16  understanding is that at some point there will be an
17  administrator and they will determine how to -- how to do
18  this if UMPBI is selected as the correct method.
19      Q.  BY MS. TREBICKA:  And you, sitting here today,
20  do not have an opinion on how to do this if UMPBI is   16:34:16
21  selected as the correct method?
22          MR. LEE:  Objection subject to the Court's
23  sanction order for Google's discovery misconduct.
24          THE WITNESS:  I mean, again, I have to -- as I
25  sit here, I haven't -- I mean, I have ways that it could  16:34:31
```
Page 141

36 (Pages 138 - 141)

1 be done  I mean, it could be done -- if Google produces
2 the information, it could be done that way  If Google
3 doesn't produce the information or it produces only a
4 portion of the information, it could be done through
5 attestation  Those are two ways that it could be done --   16:34:50
6    Q  BY MS  TREBICKA: And this is --
7    A  -- to get this -- to get the information
8 necessary to do it this way
9    Q  This is your opinion, that it can be done
10 through attestation?                              16:35:02
11    A  That seems like a reasonable way to do it, to
12 the extent that the information isn't available from
13 Google
14    Q  Do either of your two methodologies propose
15 allocation of restitution damages in proportion to the   16:35:23
16 amount of at issue data that Google collected from each
17 class member?
18    A  Yes
19    Q  Which one?
20    A  So UMP-- UMPBI would consider the amount of   16:35:56
21 information collected by Google  It obviously --
22 obviously considers use, and so, therefore, the amount of
23 information that was collected
24    Q  So in your opinion, there's a direct
25 relationship between use and the amount of relationship   16:36:26
                                              Page 142

1 get one UMPBI.  If you logged on twice in two consecutive
2 months, you'd get two, so it's got -- it considers use.
3    Q.  But in any given month, you are provided one
4 UMPBI whether you logged on just once for five minutes or
5 every single day for the entire month; correct?   16:38:54
6    A.  Correct.
7    Q.  So in your opinion, do you believe there is a
8 direct relationship between the number of UMPBI
9 attributable to each class member and the amount of at
10 issue data Google collected from each class member?   16:39:32
11    A.  I'm not sure if there is a direct relationship
12 between UMPBI and the amount on an individual basis.
13 However, how that user is treated and -- and the
14 information that Google is able to obtain on a user,
15 whether or not they spent a long time or a short time,   16:40:16
16 which is what I think you're asking here, is important to
17 Google, and, therefore, using this measurement of use is
18 an appropriate measure for allocation.
19        We also see -- we also see this measure of
20 allocation -- you know, this measure used in the   16:40:37
21 marketplace, like what we've been talking about earlier,
22 people pay, including Google through its Ipsos study, a
23 flat monthly rate per device.
24    Q.  But you also testified earlier that Google is --
25 that in your understanding at least, Google is not able   16:41:27
                                              Page 144

1 -- of data that was collected?
2    A  Yes, there is
3    Q  What is your opinion based on?
4    A  My discussions with Mr  Hochman
5    Q  What is --                              16:36:42
6    A  So my -- go ahead, please
7    Q  No  If you haven't finished your answer, please
8 go ahead
9    A  So we've talked about this earlier today  My
10 discussions with Mr  Hochman are that when you   16:36:59
11 calculate -- when Google collects information from users
12 about their browsing history, that's valuable to Google
13 Knowing that they're on for a long time or a short time
14 or that type of information is very valuable -- very
15 valuable to Google, and so they value that information   16:37:33
16        And a monthly browser instance, or in this case
17 a unique monthly browser instance, is an appropriate way
18 to consider that value to Google and an appropriate way
19 to apportion it, because it considers use by the class
20 member                                         16:38 07
21    Q  UMPBI does not measure use, however; correct?
22    A  No, that's incorrect
23    Q  In your view, UMPBI measures use?
24    A  It does  I mean, you have to log on each month
25 to get a UMPBI, so if you only logged on once, you'd only   16:38:24
                                              Page 143

1 to link to separate private browsing sessions for a
2 logged out user to each other, correct, if the user logs
3 out after every single browsing section?
4        MR LEE:  Mischaracterizes  Objection
5        THE WITNESS:  I did not -- I did not testify to   16:41:52
6 that  You asked -- I believe that you asked me a
7 question could they link that, and I said that it's not
8 necessary for my damages calculation -- for my
9 restitution calculation to assume -- to have assumed
10 that                                          16:42:09
11    Q  BY MS  TREBICKA: So for purposes of your
12 restitution calculation, you did not assume that Google
13 is able to link two separate private browsing sessions;
14 correct?
15    A  No, that's not correct              16:42:31
16    Q  What is not correct about it?
17    A  Well, so my understanding is that they would be
18 able to link two private browsing sessions, so long as
19 they came from the client -- from the same device
20        So I think what you were trying to get at is do   16:42:53
21 I -- have I double-counted, you know, unique monthly
22 browsing instances, and my understanding is that I have
23 not, that they can -- if there are two or three or four
24 or five browsing instances in a month, that they can say
25 that those browsing instances came from the same device   16:43:13
                                              Page 145

37 (Pages 142 - 145)

1 And that's my understanding of how they produced the
2 data.
3    Q. Okay. Well, you mentioned UMA data in your
4 report; correct?
5    A. I do, yes.                          16:43:39
6    Q. In your understanding, does every Chrome
7 instance browsing in Incognito report UMA data?
8    A. If I understand your question correctly, I think
9 that UMA data is based on sample data, and so to use UMA
10 data and to calculate the number of browsing instances,   16:44:34
11 you have to -- you have to adjust the UMA data, which I
12 did in my calculations.
13       MS. TREBICKA: Okay. And for the record, it's
14 U-M-A, alternatively pronounced U-M-A or UMA.
15    Q. If a user opens Incognito mode and looks at the   16:44:59
16 new tab page, the splash screen -- the Incognito splash
17 screen, but then this -- closes the Incognito session
18 before visiting another page, does that count as the
19 UMPBI in your calculations if reported?
20       MR. LEE: Beyond the scope.              16:45:26
21       THE WITNESS: I'm not aware of any data to
22 suggest that people do that, but if it came in through --
23 if it came in through the UMA data as a unique monthly
24 browsing instance, then I would have included it in my
25 analysis.                                16:46:14

Page 146

1    Q. BY MS. TREBICKA: If a user reinstalls Chrome on
2 their device, would that reinstallation count as a single
3 UMPBI in your calculation?
4    A. If a user reinstalls Chrome?
5    Q. Correct.                           16:46:43
6    A. I don't think -- I don't think it would.
7    Q. If a user reinstalls Chrome and then goes on to
8 do a private browsing session, would that be counted as a
9 new UMPBI in your calculation?
10    A. I -- if I remember correctly, Mr. Strombom had   16:47:37
11 indicated that it would. I talked to Mr. Hochman about
12 that. My understanding is that it's not that clear. It
13 depends on what device it's reinstalled on whether or not
14 it would actually show up as a new private browsing
15 instance or a new -- a new ID. So I don't believe that   16:48:04
16 it would in all cases. I believe that it could in some
17 cases. In any event, I'm not aware of there being a
18 significant number of instances -- of private browsing
19 instances.
20    Q. Turn your attention to paragraph 169 of your   16:48:27
21 report, and I will ask you about that first sentence in
22 your -- in that paragraph 169, which talks about "the
23 ███ factor" --
24    A. Yes.
25    Q. -- "indicated above to Google's prior production   16:49:00

Page 147

1 of data regarding 'unique Chrome instances' in the U.S.
2 for each month since June 2016."
3       Do you see that?
4    A. I do, yes.
5    Q. Okay. So this ███ assumes that usage   16:49:11
6 of Incognito relative to regular mode remained constant
7 between June 2016 and June -- and 2021; correct?
8    A. I'm going to the schedule where that's
9 calculated on.
10    Q. Are you going to Schedule 18.1?          16:50:27
11    A. Yes, I am.
12       Okay. I'm sorry. I'm ready for your question.
13    Q. Okay. So the question is: You're assuming that
14 between June 2016 and 2021 it's a -- that the usage of
15 Incognito is constant relative to regular mode; correct?   16:51:08
16    A. Yes, I am.
17    Q. And did you do any research or analysis to
18 confirm whether this is a reasonable assumption?
19    A. Yes.
20    Q. And describe your research or analysis.       16:51:36
21    A. Okay. So my research is reviewing the documents
22 in the record to inform my opinion on whether or not this
23 is an appropriate assumption, and based on my research,
24 it is.
25       I was able to see in some of the documents -- I   16:52:02

Page 148

1 can't recall the specific document, but there is a
2 document that exists in the record where there are graphs
3 of Incognito usage, and I believe that that document goes
4 back to 2014, and if you looked at Incognito usage, it
5 was -- that graph showed usage in and around ███   16:52:28
6 ███. I think it might have gone a little bit
7 below ███, but then a little bit above ███,
8 if I'm remembering that document correctly.
9       I also saw documents in the record that went
10 back into the 2018 time frame, if I'm remembering   16:52:55
11 correctly, that indicated that traffic was similar to
12 traffic in 2021, while not usage, it is -- usage from
13 a browsing perspective, it does show similarity in the
14 amount of overall traffic, and that document went back to
15 2018. I believe that there were also documents in 2019   16:53:38
16 which showed a similar level of traffic.
17       And then, you know, my understanding of
18 Incognito is that it was introduced at the same time
19 Chrome was in 2008. I mean, we're talking about here
20 2016 to 2021, and so, you know, in -- in the world of   16:54:10
21 technology, in the world of Google, you know, an
22 eight-year technology is a relatively mature technology,
23 so that, again, would suggest to me that it's a
24 reasonable assumption to assume a consistent level of
25 traffic. I'm sorry. I'm sorry. I don't mean traffic.   16:54:39

Page 149

38 (Pages 146 - 149)

1 I mean Incognito use

2   Q   And these documents that you are now describing,

3 are they cited in your report?

4   A   They would be, yes

5   Q   Where are they cited? Do you know off the top      16:54:53

6 of your head? I don't -- this is not an invitation to

7 spend the remaining time looking through your report, but

8 where would they be cited, generally speaking?

9   A   Well, generally speaking, they would be cited in

10 my docs considered                    16:55:14

11   Q   Would they be cited in the footnotes of your

12 report as well?

13     MR LEE:  Do you want him to look at the

14 footnotes, or do you want him to guess?

15     MS TREBICKA:  No  Again, not -- we have very      16:55:35

16 little time  I don't know if we'll need more than the

17 seven hours

18     MR LEE:  That's the only reason I interrupted

19   Q   BY MS TREBICKA:  I would like a -- because we

20 have not seen those documents that you are now      16:55:44

21 describing, Mr Lasinski, and we'd like to see them if

22 they indeed exist, so I'm asking whether you are able

23 to -- without, again, looking through the entirety of

24 your report or taking minutes to do that right now, are

25 you able to point me to a footnote or set of footnotes      16:56:04

Page 150

1 that would have these documents?

2   A   Well, let me -- so let me just clarify two

3 things before I answer that question

4     You, in fact, must have seen them, because they

5 are produced documents, so I can't agree that you didn't      16:56:25

6 see them or they weren't available to be seen

7     I can take a couple minutes, depends on how many

8 you give me, and go back to the section where I talk

9 about traffic and see if I can identify them, but that

10 would depend on how much time you want me to spend on      16:56:42

11 this

12   Q   Which section?  Just tell me the section  I

13 don't think I want you to spend any additional time on

14 it  I'd just like to know the section, please  Is it

15 the section where paragraph 169 is?          16:56:56

16   A   I'm not -- I'm not finding it, where they -- if

17 they -- I'm not finding where they would be footnoted

18   Q   Okay  Well, we are short on time, Mr Lasinski,

19 so I'd rather move on, but if you find them before the

20 deposition is over, please identify them for us, because      16:58:06

21 right now we just have your description of the record,

22 but not an actual citation

23     I am planning to move on to unjust enrichment

24 Happy to take a break, otherwise we keep going

25 Mr Lasinski, it's up to you                16:58:25

Page 151

1     A   I'd like to take a ten-minute break.

2     Q   Sure.

3       THE VIDEOGRAPHER:  Going off the record at

4 4:59 p.m.

5     (Recess.)                    17:08:33

6       THE VIDEOGRAPHER:  We are back on the record at

7 5:10 p.m.

8     Q   BY MS. TREBICKA:  All right.  Mr. Lasinski, I

9 would like to ask you about your allocation methodology

10 for unjust enrichment, which I understand is also      17:10:10

11 explained in paragraph 197 of your report that we went

12 over before the break.

13     A.  Okay.

14     Q.  Okay.

15     A.  One second.  I've just got to get back there.      17:10:22

16     Q.  Yes.  Absolutely.

17       You propose the same two methods, the UMPBI and

18 the class member method, for allocating unjust enrichment

19 damages; correct?

20     A.  Yes, I do.                  17:10:42

21     Q.  Now, how do you propose that the unjust

22 enrichment be allocated using UMPBI?

23     A.  I guess I'm not understanding the question.

24 Could you repeat it?

25     Q.  How -- mechanically, how would you proposal      17:11:01

Page 152

1 allocating unjust enrichment to individual class members

2 using UMPBI?

3       MR LEE:  Asked and answered

4       THE WITNESS:  Are you asking me how we would

5 calculate it, UMPBI?                  17:11:18

6     Q   BY MS TREBICKA:  No  So maybe the

7 misunderstanding is arising because when we previously

8 spoke about allocation, I was -- I understood our

9 conversation to be limited to restitutionary damages, to

10 the allocation using UMPBI over restitutionary damages      17:11:38

11     However, if the answers with respect to unjust

12 enrichment are the same, in other words you would take

13 the top level unjust enrichment number and divide it by

14 UMPBI, then perhaps that's a way to shortcut this

15 discussion?                    17:12:01

16     A   When you say "top level," I mean, my

17 understanding is it would be the awarded level  I

18 provide lots of different scenarios for unjust enrichment

19 here, so, yes, I would take the unjust enrichment and use

20 UMPBI to distribute it              17:12:20

21     Q   Okay  How would you use UMPBI to distribute the

22 awarded unjust enrichment number?

23       MR LEE:  Asked and answered

24       Go ahead

25       THE WITNESS:  I would take the award and divide      17:12:42

Page 153

1  the total dollar value by the total number of UMPBI in
2  the class period, as I explain in paragraph 197
3    Q  BY MS  TREBICKA:  And then you would calculate
4  the UMPBI attributable to each class member?
5    A  Yes                        17:13:04
6    Q  And each UMPBI would have a certain value that
7  would be equal -- each UMPBI would have an equal value
8  per month; correct?
9    A  Under the UMPBI scenario, correct
10    Q  And similarly, just a rundown of how you would    17:13:20
11  propose to allocate the unjust enrichment damages using
12  the number of class members
13    A  It would be a similar method  It would -- I
14  would take the damage -- I would take the resulting
15  dollar value of the unjust enrichment and divide it by    17:13:52
16  the number of class members
17    Q  So each class member would take home the same
18  amount in unjust enrichment damages; correct?
19    A  Yes, they would
20    Q  Now, do you think that Google earns the same    17:14:13
21  amount of revenue from each putative class member?
22    A  I have not attempted to calculate the amount of
23  revenue that they've earned for each class member  My
24  expectation, though, and my -- based on my discussions
25  with Mr  Hochman is that each class member and the    17:14:50

Page 154

1  information that they collect on each class member is
2  valuable
3      We see in the marketplace where participants in
4  studies are compensated equally on a per month instance,
5  if you will, and it's as appropriate, in my opinion, to    17:15:11
6  also consider each class -- to consider each class member
7  and divide the total by each class member
8    Q  Why in your opinion should the allocation of
9  unjust enrichment damages not be proportional to the
10  amount of revenue that Google collected from that class    17:15:41
11  member?
12      MR LEE:  Objection to form, mischaracterizes
13  facts
14      THE WITNESS:  I think we need to be clear that
15  my understanding is that Google doesn't collect revenue    17:15:58
16  from class members, that they're not -- none of these
17  class members are charged for their use here, but, in
18  fact, they do collect valuable information that is put
19  into their system and used in their system
20      And one of the value propositions that Google    17:16:22
21  has is is reach and the fact that it collects
22  information on all of the class members and can determine
23  and represent to its customers that it has such a large
24  reach and has information on all of these users, if you
25  will, or devices, if you will, is important to its    17:16:52

Page 155

1  model -- to its model.
2      And so it is important that class members are --
3  in my opinion are either, A, treated equally or, B,
4  treated fairly based on the number of UMPBI or browser --
5  or private browser instances per month.    17:17:24
6    Q. BY MS. TREBICKA:  And what is your opinion that
7  Google's -- the value that Google receives as part of
8  the -- or from the information is in part related to or
9  based on this proposition of reach of a large number of
10  class members?    17:17:48
11    A.  Well, that's based on my discussions with
12  Mr. Hochman.
13    Q.  What did Mr. Hochman tell you?
14    A.  That it's important to Google's business that
15  they have a large reach, and the greater the number of    17:18:00
16  class members, the -- I'm sorry, not class members.  The
17  greater the number of users, the greater the value of --
18  the greater their value proposition is to their
19  advertisers.
20      And so he also said that in many cases it's as    17:18:17
21  important to know whether or not, for example, somebody
22  converted or didn't convert on a specific ad, so having
23  information as to the negative as well as the positive
24  can be equally important to Google, especially when    17:18:45
25  you're talking about, in that case, conversions.

Page 156

1      And so a reasonable way to apportion the unjust
2  enrichment is to consider class members on an equal basis
3  or based on use, which is what we were talking about
4  under the UMPBI method.
5    Q.  Is it based on anything other than your    17:19:08
6  discussions with Mr. Hochman?
7    A.  Well, again, I mean, another -- another --
8  another data point that we talked about earlier is we see
9  in studies when they're trying to incent, meaning Google
10  and others, trying to incent somebody to participate,    17:19:36
11  they are paid a monthly rate, and that monthly rate does
12  not change by the amount of usage for those -- for those
13  individuals.
14      Also, one thing that I think I noted earlier in
15  my testimony is that, you know, Google treats their users    17:19:59
16  similarly.  It's not like Google is saying to a user that
17  spends ten hours per month on a device, "Look, you get
18  access to special Google systems or you get access to
19  special Google treatment, but you who use it only $2 --
20  or only two hours a month, we're not going to give you --    17:20:29
21  you know, we're going to give you the low end service."
22  They just don't treat their customers that way -- or I
23  should say their users.
24    Q.  So you've just mentioned -- before the Google
25  treats their users similarly point, you mentioned that --    17:20:48

Page 157

40 (Pages 154 - 157)

1 in the studies that they're trying to -- when they're
2 trying to incentivize, they pay a monthly rate for each
3 user; correct?
4     A.  They do, for each -- well, actually, for each
5 device.                                    17:21:06
6     Q.  For each device.
7         Now, you also admitted that certain of these
8 studies have minimum use requirements; correct?
9     A.  Yes, they do.  Sure.  Sure.
10     Q.  And there's no minimum use requirement for a        17:21:21
11 private browsing user to be part of the class; correct?
12     A.  That is my understanding, yes, that is correct.
13 But assuming that you meet that minimum use, it's not
14 like, say -- let's say the minimum use is five hours or
15 something and you go to ten hours.  It's not like        17:21:38
16 somebody who is at 20 hours then gets $7 or something
17 like that.  It just doesn't work that way.
18     Q.  Now, does the blocking of third-party cookies
19 affect Google's ability to earn revenue from the at issue
20 data?                                      17:22:13
21         MR. LEE:  Objection to form, vague.
22         Incognito mode, Viola, or no?
23         MS. TREBICKA:  At issue data.  I believe it's
24 all private browsing.
25         MR. LEE:  Just trying to be clear.              17:22:27

Page 158

1         THE WITNESS:  So -- so yes  If you -- if I'm
2 understanding your question correctly and you were to
3 think about my calculations, my calculations will, you
4 know, cut off, for example, in private browsing mode when
5 third-party cookies are blocked, for example, for        17:23:01
6 personalization, because my understanding is that
7 personalization is based on third-party -- is based on
8 third-party cookies, so that's how my calculations work,
9 which I think answers your question
10     Q  BY MS  TREBICKA:  My question was:  Does the        17:23:25
11 blocking of third-party cookies affect Google's ability
12 to earn revenue from the at issue data, and I believe the
13 answer is yes, it does; correct?
14     A  I believe that it -- I think if I'm
15 understanding your question correctly, yes, it does, and        17:23:41
16 I have modeled that in my analysis
17     Q  In each one of your scenarios?
18         MR  LEE:  Again, for the record, Mr  Lasinski is
19 reviewing the expert report
20         THE WITNESS:  So to be clear, yes, in each one        17:25:34
21 of my scenarios  But to be -- but to be clear, at least
22 in scenario one, so the first scenario under display ads,
23 my understanding is that there are other methods by which
24 Google wrongfully collects data and is then able to
25 to the same point as whether or not it blocked        17:26:05

Page 159

1 third-party cookies or not.
2     Q.  BY MS. TREBICKA:  Does your proposed allocation
3 method account for class members who blocked third-party
4 cookies in their browsers?
5     A.  Yes, it does.                         17:26:36
6     Q.  How so?
7     A.  So my starting calculations are actually -- my
8 calculations are actually based on how Google analyzes
9 blocking third-party cookies and the impact that it would
10 have on blocking third-party cookies, and then -- so to        17:27:02
11 the extent that -- to the extent that those unjust
12 enrichments -- those unjust enrichments would not include
13 third-party -- unjust enrichment would not include
14 third-party cookies where they were already blocked.
15     Q.  Understood as far as your unjust enrichment        17:27:41
16 calculation.
17         My question was whether the proposed allocation
18 method to individual class members takes into account the
19 class members' blocking of third-party cookies in their
20 browser?                                   17:27:55
21     A.  I do not believe that I -- no, I have not made a
22 deduction for individuals that have blocked third-party
23 cookies.
24     Q.  What about individuals who have disabled their
25 JavaScript?                                17:28:36

Page 160

1     A  No, I have not
2     Q  What about for individuals who use VPNs and
3 therefore mask their IP address?
4     A  I have not
5     Q  What about for individuals who disabled        17:28:55
6 personalized ads in their Google ad settings?
7     A  No  I have not made any adjustment for that,
8 no
9     Q  Your unjust enrichment methodology calculates,
10 as you were intimating, several scenarios of unjust        17:29:15
11 enrichment that a fact finder could pick from; is that
12 correct?
13     A  That is correct, yes
14     Q  And the ███████ amount in your calculation
15 represents the maximum amount of possible unjust revenue        17:29:39
16 that Google may have earned from the alleged wrongdoing;
17 correct?
18     A  No, that is not correct  That is the -- that is
19 the maximum amount that I have calculated of unjust
20 enrichment  I would expect that Google earned more than        17:30:18
21 that from the data that it collected
22     Q  Okay  But the ██████ amount is your
23 highest calculation of unjust enrichment earned from the
24 alleged wrongdoing; correct?
25     A  That is my -- that is the highest number that I        17:30:42

Page 161

41 (Pages 158 - 161)

1 calculated under unjust enrichment, correct

2   Q   And you did not deduct costs that Google may

3 have incurred to generate this revenue, potentially

4 unjustly enriched revenue; correct?

5   A   I did not deduct costs, that is correct   I   17:31:00

6 don't -- go ahead, please

7   Q   No   Sorry, I didn't mean to --

8        MR LEE:  If you were finished, then she should

9 go ahead   If you were still answering, then you should

10 go ahead   That's how this goes   17:31:14

11       THE WITNESS:  I don't believe that I should have

12 deducted any costs in this case

13   Q   BY MS  TREBICKA:  Why not?

14   A   Well, there are a number of reasons   One is

15 when Google performed its analysis for the ads impact --   17:31:35

16 the ads impact document that I talk about in my report,

17 and through which I model my damages under unjust

18 enrichment, they did not deduct any costs, and they're

19 talking about the impact in that case   They're talking

20 about the impact of, in their case, Google Chrome   17:32:02

21 blocking third-party cookies by default, so that's one

22 reason

23       The second reason is that a Google witness was

24 asked about costs as it relates to this area, and when

25 asked if they could identify -- or if she could identify   17:32:38

Page 162

1 any costs that would change based on calculations that

2 are similar to this, she could not identify any costs

3 that would change.

4       Third, my understanding of Google's business is

5 it's very infrastructure heavy, and based on the   17:33:01

6 infrastructure that it has in place and the amount of

7 revenue that we're talking about compared to Google's

8 global business here, we're talking about in every

9 scenario for every year below ███████.  In some cases

10 we're talking about ███████.   17:33:32

11       So to say that they would be able to save

12 costs -- incremental costs by such a low change in their

13 traffic seems inconsistent with what their business model

14 is.

15       And then I had a discussion with -- with   17:33:49

16 Mr. Hochman on this, and he indicated that that is his

17 understanding as well as to their business model.

18       Additionally, my understanding is that there are

19 certain types of data analysis that are done on users'

20 devices.  Actually, Mr. Hochman explained to me it's   17:34:24

21 called muling, and that that -- that those costs are

22 significant, and Google would no longer be able to save

23 those costs if it wasn't collecting this information.

24       And then finally, I mean, this is an area that

25 Mr. Strombom has looked at as well, and I find his   17:34:47

Page 163

1 analysis to be completely unconvincing.  He's looked at

2 and done some sort of an analysis that looks at Google's

3 overall revenue and tries to calculate some overall cost

4 percentage, or percentages I should say, and has not

5 looked at in any way, you know, the specifics that we're   17:35:07

6 talking about here as it relates to, you know, analysis

7 of a small subset of Google's data and a relatively small

8 portion of their revenue.

9   Q.  You mentioned taking -- trying to take it from

10 the top of the narrative answer that you just provided,   17:35:41

11 you mentioned a Google witness being asked about

12 identifying costs that would change based on the

13 calculations.

14       Who is that Google witness?  Is it Katie Nguyen?

15   A.  I have to look him up.  I have it in my report.   17:36:08

16 I'll find it.

17   Q.  Okay.  Please do not look at it now.  We don't

18 have the time right now.

19       But if it is -- you represent that it is in your

20 report?   17:36:24

21   A.  I do believe that it is my report, yes.

22   Q.  You also mentioned Mr. Strombom's analysis, and

23 you mentioned that it is not convincing because it -- he

24 hasn't looked in any way at the specifics of what we're

25 talking about.  What do you mean by that?   17:36:38

Page 164

1   A   Mr Strombom is -- if I understand his method

2 correctly, and I believe that I do, he's looked at

3 Google's overall business and overall cost structure and

4 not specifically at, you know, what would happen in a

5 situation where Google in Incognito mode collected   17:37:00

6 ultimately what is, you know, a very little bit of

7 additional information relative to Google's global

8 collection of information, and how that would impact

9 their business -- and how that would impact their

10 business, and identified specific costs that they would   17:37:30

11 have saved

12   Q   And when you say "identified specific costs that

13 they would have saved," what do you mean by that?

14   A   What are the specific incremental costs that

15 would have been saved   17:37:52

16   Q   You -- hold on   Give me a sec

17       Okay   You also mentioned Mr Hochman and that

18 he explained something to you that you also used as a

19 basis for your opinion

20       Can you tell me what Mr Hochman told you that   17:38:21

21 supports your opinion here that costs should not be

22 removed?

23       MR  LEE:  Asked and answered

24       THE WITNESS:  Sure   I mean, I think I answered

25 that question   My understanding from my discussions with   17:38:40

Page 165

42 (Pages 162 - 165)

1 him, when you're talking about the level of traffic that
2 we're talking about here and the amount of data that
3 we're talking about here, relative to Google's overall
4 traffic collection that it does in its normal course of
5 business, that it would be very difficult for them to cut   17:39:13
6 down their -- to cut down their infrastructure to reduce
7 their infrastructure in such a way that would provide any
8 meaningful cost savings
9    Q  BY MS  TREBICKA:  When a Google -- when Google
10 shows display ads to a user and receives revenue from the   17:39:39
11 advertiser, Google has to pay a revenue share to the
12 publisher; correct?
13    A  They do in some cases, that is correct
14    Q  And do you believe that it's reasonable to at
15 the very least remove that share that would be paid to   17:39:59
16 the publishers?
17    A  I mean, in this case, the advertisers -- the
18 advertisers -- as I think you know from the calculation,
19 it's not like you go from a personalized ad to no ad
20 There still are advertisers  My calculations indicate   17:40:38
21 that you still would be able to, under personalization,
22 show a non-personalized ad  That's the way that Google
23 looked at it, so there would still be an advertiser that
24 you would have to share revenue with in this case
25    Q  Do you believe that it's reasonable to remove   17:41:07

Page 166

1 from your unjust enrichment calculation the share that
2 would have to be paid to the publisher?
3    A  I mean, I have not seen any evidence that would
4 indicate that it should be removed here  I mean,
5 Mr Strombom had a calculation -- had the opportunity to   17:41:25
6 calculate such a cost if that were -- if that were
7 correctly -- correctly removed, and he did not
8    Q  Let me show you Figure 24 on page 32
9    A  Are you talking about my report now?
10    Q  Yes, your report   17:42:04
11    A  Page 32, I'm sorry?
12    Q  32, Figure 24
13    A  Yes
14    Q  This shows "U S  Display Ads Revenues
15 Attributable to Alleged Wrongful Conduct by Liability   17:42:18
16 Scenario"; correct?
17    A  Yes
18    Q  Under the "All," do you see that very first
19 column?
20    A  Yes   17:42:30
21    Q  Yeah  This includes unjust revenue from all US
22 display ads shown to users of private browsing mode,
23 according to your calculations; right?
24    A  That is in part correct, yes
25    Q  What do you mean "in part correct"?   17:43:30

Page 167

1    A  Well, in this case I still have taken out
2 revenue from AdMob  I've taken out revenue from app
3 traffic, but under this scenario, after -- after I make
4 those adjustments and I make -- and I make the adjustment
5 for Chrome traffic share -- well, Chrome share and   17:43:55
6 Incognito share of traffic, then the remainder is
7 considered unjust
8    Q  So this would include revenue from ads shown
9 that were not personalized using the at issue data;
10 correct?   17:44:22
11    A  No, that's not correct
12    Q  It would exclude revenue from ads shown that
13 were not personalized using the at issue data?
14    A  Yeah, so my understanding of this scenario, this
15 is based on my discussion with Mr Hochman, is there is a   17:44:44
16 scenario under which no display ads would be able to be
17 shown, given -- given the reductions that we just talked
18 about, and so those -- this is that scenario, that it
19 would -- that they -- given the issue with the data --
20 the at issue data, no display revenue -- or no display   17:45:14
21 revenue would be able to be shown or realized
22    Q  Are you talking about a scenario in which Google
23 simply does not receive any data from a user?
24    A  No, I'm not
25    Q  What are you talking about then?   17:45:43

Page 168

1    A  This is -- my -- this scenario is talking about
2 a situation in which Google has received information from
3 a user -- unjust information from a user, however,
4 that -- because they have received unjust information
5 from a user, they are unable to show -- unable to show   17:46:09
6 display ads.
7    Q  And when you say this is my scenario, that's
8 talking about, as you explained, which scenario are you
9 talking about, the "All"?
10    A  Yes.  I'm talking about Figure 25.   17:46:28
11    Q  Figure 25.  Let me go to Figure 25.
12    A  I thought that that's the figure that you wanted
13 me --
14    Q  No.  I was asking you about Figure 24, but let
15 me follow you and go to Figure 25, so which -- I'm in   17:46:43
16 Figure 25.  Which one are you talking about?
17    A  So, I mean, just to be clear, the way the math
18 works here is Figure 24, the "All" here, is made up of
19 Figure 25 and Figure 26.
20    Q  Yes.   17:47:27
21    A  Do you see that?  And then -- and then you
22 basically -- you take Figure 25 and you take Figure 26
23 and you make -- I -- I keep saying you.  I shouldn't say
24 you.  I guess I'm the one making these adjustments.
25       I make adjustments then for class definition,   17:48:03

Page 169

43 (Pages 166 - 169)

1 and then that results in Figure 27, and Figure 27 is
2 adding up Figures 25 and Figures 26 with the class
3 adjustments being made.
4    Q. And when you say class adjustment, what do you
5 mean by that?                                    17:48:35
6    A. Okay. If you look at Figure 25, Figure 25 comes
7 down to a total of ███████. Okay. Now, if you --
8 and then if you look at figure -- I'm sorry -- paragraph
9 71, so paragraph 71 I then multiply the ███████ --
10 for that particular calculation, because that's Chrome, I   17:49:47
11 multiply that by ███████, and then I multiply that
12 by ███████ to get to ███████.
13    Q. I understand what you are explaining.
14       Are you aware of contextual advertising? Do you
15 know that term?                                  17:50:13
16    A. I have heard that term before.
17    Q. What does it mean?
18    A. My understanding is that it's an advertisement
19 in the context -- in the context of what a user is doing.
20    Q. Do you exclude contextual advertising from your   17:50:33
21 unjust revenue calculations?
22    A. Are you talking about this scenario here?
23    Q. Let's start with this scenario.
24    A. I'm not aware that it would be -- I do not
25 believe it would be deducted here.                 17:51:23

Page 170

1    Q. Are you aware of any scenario that you calculate
2 where contextual advertising would be deducted?
3    A. Yes.
4    Q. Okay.
5    A. I mean, I'm assuming that you're -- when you say   17:51:50
6 "any scenario," you mean any scenario related to my
7 unjust enrichment?
8    Q. Correct.
9    A. Okay.
10    Q. Yeah, I have the answer. Thank you.           17:51:58
11       You mentioned earlier a Google study which
12 served in part as your basis for your unjust enrichment.
13 I believe that is the ███████ impact study; is that
14 correct?
15    A. That is correct, yes.                        17:52:30
16    Q. Let me mark as the next exhibit the ███████
17 ads impact study.
18       (Exhibit 13, GOOG-CABR-04324934 - 44, marked for
19       identification electronically by counsel.)
20    THE WITNESS: Is that Exhibit 9?                 17:52:43
21    MS. TREBICKA: I will rely on Teuta for the
22 number, but I believe it is. I don't know, actually.
23 I'm not sure.
24    MS. FANI: No. That will be Exhibit 13, which
25 I'm going to publish shortly.                     17:52:57

Page 171

1    Q. BY MS. TREBICKA: Okay.
2    A. It's not up yet.
3    Q. That's okay. My question is not with regard to
4 the text of the ███████ study, but did you review the
5 ███████ study for purposes of your report?        17:53:26
6    A. Assuming that we're talking about the same
7 document, yes, I did.
8    Q. And you understand that it was conducted in
9 2020?
10    A. Yes. I believe that it was, yes.             17:53:45
11    Q. And a lot of your inputs to your unjust
12 enrichment model come from this study; correct?
13    A. Yes, they do.
14    Q. So, for example, turning your attention to
15 paragraph 73.                                     17:54:09
16    MR. LEE: Are we on Exhibit 1 or 13 now?
17    MS. TREBICKA: No, we're back on the report,
18 sorry --
19    MR. LEE: Okay.
20    MS. TREBICKA: -- while we're waiting for the     17:54:25
21 exhibit.
22       I'll have some questions about it, but I just
23 wanted to mark it for the record.
24    MR. LEE: Okay. And just FYI, 13 has been
25 loaded for me, so it's ready when you're ready.     17:54:36

Page 172

1    Q. BY MS. TREBICKA: But turning to your report,
2 paragraph 73
3    A. Okay
4    Q. You mention here the ads impact document, if you
5 look at the second full sentence on page 37 of that   17:54:50
6 paragraph -- of paragraph 73
7    A. I just want to draw myself into this paragraph
8 real quick
9    Q. Yeah
10    A. Okay                                          17:55:23
11    Q. Okay. So you mention here the -- ███████ of
12 traffic that has third-party cookies prior to the launch
13 of ███████ Do you see that, that percentage?
14    A. Yes
15    Q. And this percentage comes from the ███████    17:55:38
16 study; correct?
17    A. Correct
18    Q. And you used the same number for all years
19 during the class period?
20    A. No, that's not correct                       17:56:07
21    Q. Let's turn to your Schedule 2 9
22    A. Okay
23    Q. Do you see --
24    A. Oh, no, I don't I'm not to Schedule 2 9 yet
25    Q. Okay                                          17:56:34

Page 173

44 (Pages 170 - 173)

CONFIDENTIAL

| | |
|---|---|
| 1   A. Yes, I see this. | 1   Q  BY MS TREBICKA:  Mr Lasinski, we've marked as |
| 2   Q. Okay.  Do you see "Implied Revenue Impact from | 2   the next exhibit Bruce Strombom's rebuttal report to your |
| 3   Traffic With Third-Party Cookies"? | 3   opening report |
| 4   A. Yes, I do. | 4        (Exhibit 14, Expert Report of Bruce A  Strombom, |
| 5   Q. And do you see the ▇▇▇ for years 2016     17:56:48 | 5        marked for identification electronically by |
| 6   through 2021? | 6        counsel ) |
| 7   A. Yes, I do. | 7        (Exhibit 15, Screenshot, Latham & Watkins, |
| 8   Q. Does this refresh your recollection that you do | 8        marked for identification electronically by |
| 9   use the same number for all years? | 9        counsel ) |
| 10   A. No, it does not.  I do not use the same number   17:57:00 | 10   Q  BY MS  TREBICKA:  Let me know if you see it  It   18:16:11 |
| 11   for all years. | 11   is Exhibit -- |
| 12   Q. Can you explain? | 12        MS TREBICKA:  Teuta? |
| 13   A. Sure. | 13        MS FANI:  It's Exhibit 14 |
| 14        Maybe the best way to explain this is to look at | 14        THE WITNESS:  Okay |
| 15   Schedules 2.4 and 2.5, starting with 2.5.      17:57:56 | 15   Q  BY MS  TREBICKA:  So let me know when you have   18:16:33 |
| 16   Q. Okay. | 16   it open |
| 17   A. If you look at Schedule 2.5, you'll see in -- in | 17   A  I do have it open |
| 18   that year you'll see -- in 2021 you'll see a ▇▇▇ there, | 18   Q  Okay  Thank you |
| 19   share of revenue not impacted by ▇▇▇ | 19        If you could direct your attention to |
| 20   implementation.                              17:58:25 | 20   paragraph -- give me one second -- paragraphs 95 and 96   18:16:45 |
| 21   Q. ▇▇▇ not impacted? | 21        Did you review Dr Strombom's rebuttal report? |
| 22   A. ▇▇▇ for 2016, 2017, 2018, 2019.  2020 | 22   A  I did, yes |
| 23   you see the number ▇▇▇? | 23   Q  And do you recall reviewing paragraphs 95 and 96 |
| 24   Q. Yes. | 24   in particular? |
| 25   A. And then in 2021 you see the number ▇▇▇.   17:58:43 | 25   A  Yes                                          18:17:36 |
| Page 174 | Page 176 |

| | |
|---|---|
| 1   Q. Yes. | 1   Q. And I'll represent to you that Dr. Strombom's |
| 2   A. Okay.  So then you have to take that up to | 2   report at those two paragraphs provides evidence that the |
| 3   Schedule 2.4, and Schedule 2.4 you'll see that ▇▇▇ -- | 3   share of revenue driven by conversion-based auto bidding |
| 4   well, I guess you don't see the ▇▇▇ that we were | 4   has grown over the 2016 to 2019 period. |
| 5   talking about there, but the ▇▇▇ gets       17:59:05 | 5        Do you have any reason to disagree with       18:17:54 |
| 6   calculated from the ▇▇▇, right, but in 2021, | 6   Dr. Strombom's evidence and conclusions? |
| 7   there's nothing -- there's nothing to multiply it by, | 7   A. I -- so I did not review his analysis to make |
| 8   because that was impacted -- because that is impacted by | 8   sure that the ▇▇▇ or the ▇▇▇ year-over-year |
| 9   ▇▇▇. | 9   calculations were accurate, so I don't have any reason to |
| 10        And in 2020, that number is -- you've got to   17:59:27 | 10   believe that he made calculations that were incorrect   18:18:59 |
| 11   look at Schedule 2.5.  There's -- it's multiplied by | 11   from a mathematical perspective.  However, I disagree |
| 12   ▇▇▇, so I think it -- I think it's | 12   with his conclusions as it -- as it relates to my |
| 13   inappropriate to say that I didn't consider that that | 13   analysis. |
| 14   could change over time. | 14   Q. What part of his conclusion related to |
| 15   Q. Okay.                                     17:59:53 | 15   conversion-based auto bidding do you disagree with?    18:19:21 |
| 16        MS. TREBICKA:  I need a five-minute break so I | 16   A. So -- so in my analysis, we see that -- from the |
| 17   can look through my notes since we're running short on | 17   ads impact document and supporting schedules that auto |
| 18   time. | 18   bidding seems to have grown from ▇▇▇ -- |
| 19        MR. LEE:  Okay. | 19   to ▇▇▇, and that relates to search. |
| 20        (Recess.)                    18:00:03 | 20        And the narrative around that is that that's   18:19:52 |
| 21        THE VIDEOGRAPHER:  Going off the record at | 21   unprecedented growth -- unprecedented growth in auto |
| 22   6 o'clock p.m. | 22   bidding.  That's about, I don't know, ▇▇▇ |
| 23        (Recess.) | 23   year-over-year growth, ▇▇▇.  It's a little |
| 24        THE VIDEOGRAPHER:  We are back on the record at | 24   bit more than that. |
| 25   6:16 p.m.                          18:15:55 | 25        So if that growth from that period of time is   18:20:16 |
| Page 175 | Page 177 |

45 (Pages 174 - 177)

1 unprecedented, then it would be -- these -- these
2 calculations that he's making don't -- don't seem to --
3 don't seem to hold water, because if a [REDACTED] growth
4 is unprecedented, he's making calculations for a subset
5 of certain sales.                           18:20:48
6         And -- but we already know from the ads impact
7 document or surrounding documents that a [REDACTED]
8 growth from -- I believe it is -- I can look it up.  It's
9 in my report, in my schedules.  From [REDACTED] to
10 [REDACTED] it is unprecedented.  Then these percentages  18:21:10
11 would be too high.  And I do take into account that
12 growth in auto bidding in my calculations.
13      Q.  You take into account the [REDACTED];
14 correct?
15      A.  I do, yes.                         18:21:31
16      Q.  Okay.  Any other reason to disagree with
17 Dr. Strombom's opinions?
18      A.  Well, I mean, the other reason to disagree with
19 Dr. Strombom's opinion is, I mean, he's using -- he's
20 using internal -- internal documents to come up with  18:21:58
21 these growth rates that he's saying are appropriate, but
22 he could have just gotten the information from his own
23 client on what actual auto bidding -- if he thinks that
24 it was -- it's different what I modeled, he could
25 have just gotten the information from his client.  18:22:20

Page 178

1      Q.  Could you turn your attention to your report, so
2 Exhibit 1, and in particular page 12, Figure 3, the
3 "Google Incognito New Tab Page"?
4         MR. LEE:  Page 12.
5         THE WITNESS:  I'm sorry.  Okay.  I'm here.  18:23:08
6      Q.  BY MS. TREBICKA:  Figure 3?
7      A.  Yes.
8      Q.  Yes.
9         So this is the Google new tab page for
10 Incognito; correct?                         18:23:16
11      A.  It is, correct.
12      Q.  And after [REDACTED], the project, the bottom
13 text was added, the block third-party cookies.
14         Do you see that?
15      A.  Yes, I do.                         18:23:32
16      Q.  And it says, "When on, sites can't use cookies
17 that track you across the web.  Features on some sites
18 may break."
19         Do you see that?
20      A.  Could you repeat -- I think you're just reading  18:23:43
21 the last line there.  I'm sorry.  Somebody honked a horn
22 outside my window.
23      Q.  No worries.  That's exactly what I read.
24      A.  Okay.
25      Q.  And you see the toggle?             18:23:55

Page 179

1      A.  I do, yes.
2      Q.  And the figure in your report has turned blue,
3 which means that it's on?
4      A.  Yes, I do.
5      Q.  And do you understand that a user could turn the  18:24:04
6 toggle off, and in that case, third cookies would not be
7 blocked by default when a user is privately browsing;
8 correct?
9      A.  When it's off.  I believe that you're right when
10 it's off.                                   18:24:32
11      Q.  Let me also show you what we've marked as
12 Exhibit 15 to your deposition.  Let me know when you're
13 in it.
14      A.  I'm in it.
15      Q.  Okay.  Do you see how this website printout,  18:24:51
16 which is of a law firm, Latham & Watkins here, but just
17 as an illustration, has a banner related to providing
18 some choices on cookies to users.  You see the first part
19 of the banner -- the banner in the color red, "The
20 cookies we use."                            18:25:19
21         Do you see that?
22      A.  Yes, I do.
23      Q.  And "Essential cookies," do you see that --
24      A.  I do, yes.
25      Q.  -- next to it?                     18:25:32

Page 180

1         And then "Analytics cookies," do you see that?
2      A.  Yes, I do.
3      Q.  And this one in particular mentions specifically
4 Google Analytics; correct?
5      A.  Yes, it does.                       18:25:40
6      Q.  Have you seen these types of cookie pop-ups on
7 the web as you browse?
8      A.  I have, yes.
9      Q.  And there is sometimes a toggle like you see
10 here to turn -- to either block cookies or allow cookies  18:26:13
11 as you are browsing; correct?
12      A.  That is -- that is my understanding, yes.
13      Q.  And these are equally available or shown to
14 users when users are in private browsing mode; correct?
15      A.  I haven't done a study of that.  I don't know  18:26:36
16 the answer to that.
17      Q.  Do you have any reason to doubt that these
18 are -- these also pop up when users are in private
19 browsing mode?
20      A.  No, I do not.                      18:26:47
21         MR. LEE:  Objection.  Calls for speculation.
22 Sorry for the late objection.
23      Q.  BY MS. TREBICKA:  Now, let me now turn your
24 attention to, again, your report, page 59, Figure 56 of
25 your report, where you have an example calculation of  18:27:06

Page 181

46 (Pages 178 - 181)

1  Google's unjust enrichment.
2      Do you see that?
3      A. Yes, I do.
4      Q. So direct -- so this is sort of a visual
5  representation of the various liability scenarios, and     18:27:28
6  here you have teased out one liability scenario in
7  the text underneath the table which says, "Example Unjust
8  Enrichment Calculation," and this is the total unjust
9  enrichment example of ████████ that we were
10 discussing earlier; correct?     18:27:50
11     A. Yes, it is.
12     Q. Now, direct your attention to the first
13 banner -- let me take another step back and say this --
14 the table, separate from the example, has three
15 banners --     18:28:06
16     A. I no longer know where you are now.
17     Q. Oh, okay.  I'm using a word "banner" in a way
18 that is --
19     A. No.  Are you -- you're not in my report any
20 more.     18:28:19
21     Q. I am in your report.  On page -- Figure 56.
22 We're talking about your unjust enrichment calculation.
23     A. Oh, I see.  Okay.
24     Q. Yeah, so what I'm calling a banner is really
25 just a selection of your table.     18:28:29

Page 182

1      A. Okay.
2      Q. Okay.  So probably the wrong word, but you see
3  how the first section of your table has "Google U.S.
4  Display Ads Revenues Attributable to the Alleged Wrongful
5  Conduct"?     18:28:40
6      A. Yes, I do.
7      Q. And then the next one has the same except for
8  Google U.S. YouTube ads revenues?
9      A. Yes.
10     Q. And the last applies to Google U.S. search ads     18:28:49
11 revenues?
12     A. Yes.
13     Q. And then for each you have a -- several options
14 of implicated US revenue base; correct?
15     A. Correct.     18:29:03
16     Q. Okay.  So my question to you is:  With respect
17 to that first table, or I was calling banner, the US
18 display ads revenues --
19     A. Yes.
20     Q. -- under the implicated US revenue base, the one     18:29:16
21 that says, "All."
22     Do you see that?
23     A. Yes.
24     Q. Okay.  So that's for -- in calculating that
25 unjust revenue, have you excluded or attempted to     18:29:35

Page 183

1  exclude, so just that one, just that piece of it, right,
2  just the one that says "All," have you attempted to
3  exclude any traffic on the basis that some users may have
4  toggled to "off" the blocking of third-party cookies in
5  the new tab page for Incognito?     18:30:09
6      A. No, I have not.  I -- just to be clear, in my
7  analysis, I understand that Google did not consider the
8  number of opt-ins in its ads impact document, which is I
9  think what you're talking about here, opt-in.  That data
10 was not produced, the number of opt-ins in this lawsuit,     18:30:41
11 and Mr. Strombom did not make any type of a calculation
12 or estimate of the number of opt-ins in this case.  So I
13 have not made that -- I've not made that calculation.
14     Q. Okay.  Have you asked for that number and it was
15 not provided to you?     18:31:07
16     MR. LEE:  Objection to form, vague.
17     THE WITNESS:  My understanding is that the
18 discovery request would -- to the extent that such
19 information was available, would have covered that
20 information.     18:31:32
21     Q. BY MS. TREBICKA:  If that information were
22 available, would you attempt to exclude it from this
23 number?
24     A. I don't know the answer to that, because I have
25 not seen that information.     18:31:52

Page 184

1      Q. Would it depend on the actual number or
2  percentage of users who have opted in?
3      MR. LEE:  Objection based on the sanction order.
4      THE WITNESS:  I don't know that it would.  It
5  would obviously be the type of thing where I'd have to     18:32:20
6  review the information and review what's available around
7  that information to determine if or how I would use it.
8      Q. BY MS. TREBICKA:  Well, in all fairness, if the
9  information were available, do you believe that it should
10 be at least accounted for in this number?     18:32:35
11     MR. LEE:  Objection subject to the Court's
12 sanction order.
13     THE WITNESS:  Well, in all fairness, if it were
14 available, then I'd be able to look at it and understand
15 the data and consider whether or not it should be     18:32:49
16 accounted for, but it is something that I would consider.
17 I don't know if it should be accounted for.  It's the
18 type of thing that I would consider, though.
19     Q. BY MS. TREBICKA:  You have not thought about
20 whether it should be accounted for or not?     18:33:02
21     MR. LEE:  Objection to form, mischaracterizes
22 prior testimony.
23     THE WITNESS:  No.  I said I would consider -- I
24 would consider accounting for it.  It's the type of
25 information that I think I would consider accounting for,     18:33:13

Page 185

1 but I don't have that information, so I don't want to
2 speculate on what I would do with it or how I would use
3 it since I don't have it, since it was not produced, and
4 since Mr. Strombom -- and since Mr. Strombom did not make
5 any kind of accounting for it either, so I don't know      18:33:38
6 what is going to actually be produced.
7      Q. BY MS. TREBICKA:  And my question is not whether
8 or how you would specifically use it.  My question is
9 should it be accounted for in this number according to
10 the logic of your methodology?                            18:33:54
11      MR. LEE:  Asked and answered.  I also object
12 subject to the Court's sanction order.
13      THE WITNESS:  Again, I mean, I can't answer that
14 unless I have the information.  It's the type of
15 information that I would consider accounting for.  The    18:34:14
16 ads impact document talks about it, opt-in, but I don't
17 know what form or how it would -- how it would come in,
18 and so I don't know whether or not it should be accounted
19 for until I see the information.
20      Q. BY MS. TREBICKA:  Do you recall that I also       18:34:36
21 showed you Exhibit 15, which was the cookie pop-up from
22 an illustrative website?  This one happened to be of
23 Latham & Watkins.
24      A. Yes.
25      Q. In your opinion -- or let me ask you:  Have you   18:34:51

                                                    Page 186

1 accounted for potential opt-ins through these individual
2 cookie banners on individual websites in the same
3 scenario that we were talking about, which is implicated
4 revenue US base all for US display ads revenues?
5      A. As I -- I'm trying to think through my            18:36:03
6 calculations and determine where this would be accounted
7 for.  As I sit here, I cannot -- I believe that this also
8 would be included in the opt-in category, so I have not
9 made -- I have not made an adjustment for this
10     Q. Have you asked for information, or have you        18:36:36
11 looked for information related to quantifying the impact
12 that these cookie pop-ups would have on this piece or
13 scenario of your display ads revenue unjust enrichment?
14     A. So I -- have I looked for the information, yes
15 I've looked for the -- I looked for opt-in information    18:37:22
16 My understanding is that opt-in information is not
17 available, based on my review of the record, my review of
18 Mr Strombom -- or Dr -- I guess it's Dr Strombom --
19 Dr Strombom's analysis, and so I'm not aware of any
20 information that is available on this point              18:37:43
21     Q  The same figure, Figure 56 in your report on
22 page 59 --
23     MR LEE: Hold on
24     Q BY MS TREBICKA: -- the table underneath
25 "Google U S  Display Ads Revenues," "Google U S YouTube  18:38:10

                                                    Page 187

1 Ads Revenues Attributable to the Alleged Wrongful
2 Conduct "
3      Do you see that?
4      A  Yes, I do
5      Q  So Figure 56, page 59, under "Implicated U S     18:38:25
6 Revenue Base," the middle base, so to speak, is
7 conversion tracking from all traffic
8      Do you see that?
9      A  Yes, I do
10     Q  Okay  And I will ask you similar questions to     18:38:41
11 the ones I asked you about the display ads revenue  The
12 first question is:  Have you taken into account the
13 ████████ opt-ins through the new tab page in
14 calculating this number?
15     A  I have not accounted for that in this number      18:39:30
16     Q  Have you --
17     A  Again, similar to my other answer, I did search
18 for this information  My understanding is it's not
19 available  It was not produced by Google and certainly
20 it wasn't something that Mr Strombom made an adjustment   18:39:46
21 to my calculations for
22     Q  For the same number, have you taken into account
23 the various website cookie pop-ups opt-ins in your
24 calculations?
25     A  So in this calculation, I am following           18:40:17

                                                    Page 188

1 specifically what -- I am following what Google employees
2 did in their ads impact document  So this is different
3 than what the Google Chrome -- I'm sorry
4 ████████ -- the ████████ implementation is  This
5 existed before Chrome -- these types of things existed    18:41:25
6 before ████████ did, is my understanding, and so to
7 the extent that they're -- the variables that they
8 considered were consistent with these types of pop-ups
9 then, yes, I would have considered that.
10     Q. You separately did not consider the impact that   18:42:03
11 these various pop-ups may have in these specific
12 calculations that I'm asking you about; correct?
13     A. I did not separately break them out of what
14 Google's calculations would have been, no.  I did not --
15 using Google's methodology, I did not separately break    18:42:29
16 them out.
17     Q. I'm not talking about breaking them out.  I'm
18 talking about you actually taking them into account in
19 whatever calculations you did.
20     MR. LEE:  Objection to form, vague.              18:42:48
21     THE WITNESS:  Well, again, I mean, just to be
22 clear, these types of pop-ups existed before ████████
23 and Google was -- Google made the analysis based on its
24 implementation of ████████.  In Google's analysis, it
25 identifies specifically opt-in as something that it did   18:43:17

                                                    Page 189

48 (Pages 186 - 189)

1 not consider
2    We talked about whether or not that data was
3 available, and it is not  However, this type of a pop-up
4 and this type of analytics was available at the time that
5 ████ was implemented, and so they -- and they are,    18:43:37
6 in their ads impact document, considering what blocking
7 third-party cookies by default will do to their revenues
8    And so to the extent that the variables that
9 they've calculated, and there are a number of variables
10 that go into the calculation, include that this is --    18:44:06
11 that these are possibilities, then, yes, it would be
12 included in my calculations  I cannot identify a
13 separate area where this is calculated separately in
14 those calculations, though
15    Q  BY MS TREBICKA: Going back to the -- to    18:44:25
16 Exhibit 15, which is on your screen, if a user toggles
17 "on" the, let's say for example, analytics cookie, do you
18 have an understanding that the user is agreeing to
19 providing to that website certain of his or her
20 information?    18:45:00
21    MR LEE:  In Incognito mode or non-Incognito
22 mode?
23    MS TREBICKA:  In any mode
24    MR LEE:  Beyond the scope
25    THE WITNESS:  I have not made an assumption one    18:45:26

Page 190

1 way or the other about that.
2    Q  BY MS. TREBICKA:  You were talking earlier about
3 a willing user -- or willing seller versus an unwilling
4 seller.  Do you remember that?
5    A.  Yes.    18:45:40
6    Q.  And also about a knowing seller versus an
7 unknowing seller.  Do you recall that?
8    A.  Yes, I do.
9    Q.  So if a user specifically toggles on the choice
10 here in this pop-up and others like it to share    18:45:54
11 information with, in this case, Google Analytics, would
12 that user be a willing seller, in your opinion?
13    MR. LEE:  In Incognito mode or non-Incognito
14 mode?
15    MS. TREBICKA:  In Incognito mode.    18:46:12
16    THE WITNESS:  I haven't analyzed that for this
17 particular situation.
18    Q  BY MS. TREBICKA:  Would that user be a knowing
19 seller?  Have you analyzed that?
20    A.  No, I have not.  This -- this doesn't -- I don't    18:46:46
21 believe that this impacts my unjust enrichment
22 calculation in a material way.
23    Q.  And what is your opinion based on, that it
24 doesn't impact your unjust enrichment in a material way?
25    A.  Because in Google's analysis of ████, it    18:47:12

Page 191

1 chose not to model opt-ins.  Furthermore, if it were
2 material and I shared my model, you know, very clearly in
3 this report with you and with experts on the other side,
4 Strombom -- Mr. Strombom -- or Dr. Strombom has every
5 opportunity in the world to say, "This is an area where    18:47:50
6 we have information, and I can make an adjustment to
7 Mr. Lasinski's calculation," I would have considered what
8 Mr. -- or Dr. Strombom did in that situation.  He did not
9 make any kind of adjustment.
10    So they didn't model it.  He didn't make any    18:48:13
11 adjustment.  The information is not in the record.  All
12 three of those things together indicate to me that
13 it's -- I would not need to make a material adjustment to
14 my calculation.
15    Q.  And you realize that the ████ analysis    18:48:37
16 mentioning the opt-ins is talking about the NTP page,
17 which is Figure 3 of your report; correct?
18    A.  Yes, I do.
19    Q.  Okay.  And the pop-up, an illustration of which
20 I showed you in Exhibit 15, is a separate type of opt-in    18:49:01
21 to providing information; correct?
22    A.  That is -- that is correct.
23    Q.  And the fact that Google in the ████
24 analysis did not remove the opt-ins, could it be that
25 Google didn't consider it because it was going for an    18:49:41

Page 192

1 upper bound of potential revenue lost as a result of
2 ████?
3    A  Moving -- we know that they weren't going for an
4 upper bound  There's information in the record that
5 shows that they weren't going for an upper bound    18:49:58
6    Q  Say that again  Were or were not?
7    A  We know -- we know that they were not  There's
8 information in the record that indicates that they know
9 that there's additional areas that they could analyze,
10 and they did not    18:50:16
11    Q  So your opinion is that the ████ analysis
12 was not going for an upper bound?
13    A  So if you look at the ████ analysis, one
14 of the things that they identify is that they did not
15 consider traffic from iOS, and one of the things that    18:50:36
16 they say is that it could be higher, because they didn't
17 consider such traffic from iOS -- the iOS operating
18 system in one of the documents  So in that case, if they
19 were going for an upper bound and trying to produce
20 numbers that were an upper bound, then they would have    18:51:01
21 analyzed that
22    Q  Okay  Any other reason for you believing that
23 the ████ analysis is not going for an upper bound?
24    A  Well, in addition to that, in addition to iOS,
25 they didn't -- they didn't -- certainly they didn't    18:51:46

Page 193

49 (Pages 190 - 193)

**Page 194**

1 analyze private browsing modes from Safari and/or Edge if
2 they're going for an upper bound of a calculation, but
3 the one that I mentioned earlier is the main reason that
4 I can think of, as I'm sitting here
5 Q  Okay  Because the ███████ analysis was with   18:52:14
6 respect to the Chrome browser, not Safari or Edge;
7 correct?
8 A  Correct
9 Q  Okay  Turning your attention back to -- well,
10 actually, on this point of upper bound, have you seen   18:52:26
11 comments in the ███████ study that state that Google
12 is using upper bounds for some metrics?
13 A  Yes, I have
14 Q  And regardless, your opinion is still that
15 Google was not going for an upper bound?   18:52:50
16 A  Well, they would not --
17 MR  LEE: Objection to form, mischaracterizes
18 Go ahead
19 THE WITNESS: At least in the one instance that
20 I've described, that would indicate that they're not   18:53:00
21 going for an upper bound
22 Q  BY MS  TREBICKA: So turning your attention back
23 to Figure 56, so we can complete the discussion of Figure
24 56, please turn your attention to the last -- to the
25 bottom table, which is -- which relates to U S  search   18:53:16

**Page 195**

1 ads revenues.
2 A. Yes.
3 Q. And here the revenue base has two options, all
4 traffic and traffic with -- conversion tracking from all
5 traffic or traffic with third-party cookies; correct?   18:53:32
6 A. Correct.
7 Q. Focusing your attention on conversion tracking
8 from all traffic, which is the ███████ number.
9 Do you see that?
10 A. Yes, I do.   18:53:43
11 Q. So for this number, have you taken into account
12 that some users may have opted in through ███████?
13 A. Again, I think it's similar to my earlier
14 answers.  I do not believe that that data is available,
15 so I did not include it in my calculations.   18:54:51
16 Q. Again, for this number, have you taken into
17 account that some users may have opted in through the
18 pop-ups similar to those -- to that depicted in
19 Exhibit 15?
20 A. I would answer that similarly to what I answered   18:55:08
21 before, in that these pop-ups existed prior to the
22 implementation of ███████, and Google's analysis for
23 search is only related to conversion -- conversion
24 tracking, and so to the extent that the variables that
25 they have calculated include these types of pop-ups,   18:55:43

**Page 196**

1 then, yes, I would have included them
2 Q  But you have not separately or independently
3 taken this into account, this -- that users may have
4 opted in through pop-ups similar to those that are
5 depicted in Exhibit 15?   18:56:06
6 A  I have not broken that calculation out
7 separately, if that's what you're asking
8 Q  Well, not just broken out  Again, my question
9 is: Have you done anything to identify and take it into
10 account, the fact that some users may have opted in   18:56:22
11 through the pop-ups similar to Exhibit 15?
12 A  Well, look --
13 MR  LEE:  Asked and answered
14 Go ahead
15 THE WITNESS:  Similar to my other answers, these   18:56:35
16 were the type of pop-ups that were available or that were
17 available prior to ███████  They -- they did their
18 analysis -- they did their analysis based on an
19 implementation of ███████  The variables that they
20 use in their analysis, therefore, and the lost revenue   18:56:56
21 that they were looking at because of ███████ and the
22 opt-ins is -- again, was focused on ███████ and the
23 opt-in for ███████
24 So to the extent that their variables understood
25 this, which Google understands what is going on in its   18:57:21

**Page 197**

1 business, yes, this would be accounted for in those
2 calculations.
3 Q. BY MS. TREBICKA: Have you analyzed or
4 researched whether the rate at which these pop-ups
5 existed in 2020 is the same as the rate that they existed   18:57:49
6 in prior years or years after?
7 A. No, I have not.
8 Q. For purposes of your allocation method, do you
9 take into account that certain users may have opted in
10 through the NTP page with ███████?   18:58:21
11 A. Again, that data was not -- is not available in
12 the record, so I do not -- I do not take that into
13 account.
14 Q. For purposes of your allocation method, do you
15 take into account that certain users may have opted in   18:58:41
16 through the cookie pop-ups, an example of which is --
17 I've shown you in Exhibit 15?
18 A. Again, that information is not available in the
19 record, so I have not made any adjustments to my
20 calculations for that.   18:59:02
21 MS. TREBICKA: Let me -- why don't we take a
22 little break, because I realize we have about 47 or
23 50 minutes on the record, and I'd just like to review my
24 notes again.
25 MR. LEE: Okay.   18:59:19

50 (Pages 194 - 197)

1    THE VIDEOGRAPHER:  Going off the record at
2  6:59 p.m.
3    (Recess.)
4    THE VIDEOGRAPHER:  We are back on the record at
5  7:12 p.m.                          19:12:21
6  Q.  BY MS. TREBICKA:  Mr. Lasinski, you testified
7  earlier that you have read Mr. Strombom's rebuttal
8  report; correct?
9  A.  Correct.
10  Q.  Have any of your opinions changed as a result of    19:12:32
11  reading Mr. Strombom's rebuttal?
12  A.  No, they have not.
13  Q.  You have an opinion on statutory damages in this
14  case; correct?
15  A.  Correct.                        19:12:49
16  Q.  That's Section 9 of your report, on page 78.  If
17  you could turn to that page.
18  A.  I'm there.
19  Q.  And turning your attention to paragraph 186,
20  which is on page 79, the next page.              19:13:19
21  A.  Okay.
22  Q.  You say that -- the second sentence, midway
23  through, I'm reading into the record:  "I understand from
24  Counsel could range" -- well, let me start from the top
25  so that it's clear.                    19:13:37

Page 198

1  "I have not investigated or made any
2  determination regarding the relevant damages rate, which
3  I understand from Counsel could range from $100 to 10,000
4  per violation of the relevant statutes "
5    Do you see that?                  19:13:53
6  A  Yes
7  Q  Do you have any opinion on what a violation is?
8    MR LEE:  Calls for a legal conclusion
9    THE WITNESS:  My understanding from a non-legal
10  perspective is that a violation would occur when Google    19:14:54
11  collected information or attempted to collect
12  information, but I don't have a legal definition or I'm
13  not a legal expert, but that is my understanding, is
14  violations could occur in those instances
15  Q  BY MS TREBICKA:  And the reasons that I asked    19:15:21
16  about whether you have an opinion on per violation is
17  because I was wondering whether you have an opinion on
18  whether a violation is each individual piece of data
19  that's collected, that's a separate violation, or whether
20  a violation is the instance of data being transmitted to    19:15:37
21  Google?
22  A  Could you repeat that?
23  Q  Sure
24    Do you have an opinion on what constitutes a
25  violation, whether it is a -- each piece of data being    19:15:52

Page 199

1  transmitted to Google is a violation or whether it is a
2  private browsing instance that is a single violation.
3  A.  So what I've done here is calculate the number
4  of page loads where there would be information
5  transmitted to Google for my top calculation.          19:16:54
6    In the other calculations -- in the other
7  calculations, I've calculated, like I said, unique
8  monthly browsing instances, we've talked about before,
9  and the number of each member of the class.
10  Q.  You say -- in that last sentence of paragraph      19:17:33
11  186 you say, "More specifically, I understand that as it
12  relates to this matter, there are four potential bases to
13  which a statutory damages rate could be applied."
14    You've been told to assume that there are these
15  four potential bases, or alternatively, it's your opinion    19:17:58
16  that there are four potential bases?
17    MR. LEE:  Objection to form, mischaracterizes.
18    THE WITNESS:  My understanding, based on
19  discussions with counsel, is that these are the four --
20  these are four potential bases that could be applied in    19:18:27
21  this case.
22  Q.  BY MS. TREBICKA:  Okay.  Now, let's assume, just
23  for the purposes of discussion and as a hypothetical
24  illustration, that the rate per violation is $100.
25  A.  Okay.                          19:18:49

Page 200

1  Q.  How would that be applied to the first bullet
2  point, which is, "The number of individual pageloads in
3  Incognito mode or Other Private Browsing Modes during the
4  Class Period"?
5  A.  If you're asking me to assume $100 per page      19:19:11
6  load, then you would multiply $100 per page load.
7  Q.  I'm not asking you to assume $100 per page load.
8  I'm asking you to assume $100 per violation.
9    So then the question is:  Is a violation the
10  equivalent of this -- for this bullet point the number of    19:19:34
11  individual page loads in Incognito mode, in your
12  understanding?
13  A.  My understanding is that that is one potential
14  base to which a rate could be applied.  I have not
15  assumed a rate in my calculations, so I -- yes.  That is    19:19:57
16  a base to which statutory damages could be applied.
17  Q.  Okay.  So, again, I'm supplying the rate as a
18  pure hypothetical, let's say $100 per violation.  The way
19  that you would calculate statutory damages in your model
20  is to apply the rate per violation with the number of    19:20:27
21  individual page loads in Incognito mode or other private
22  browsing modes during the class period; correct?
23  A.  Yes, if that's -- if that's the base that's
24  selected by the trier of fact, sure.  That's how you
25  would apply it.                      19:20:49

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL

1  Q  Right  And I'll be asking you about each of the
2  bases separately, so without prejudice to what the trier
3  of fact may select
4      How would you then allocate this number to
5  individual users?  What do you propose in your opinion?      19:21:13
6  A  So I have not determined a methodology -- in my
7  opinion, I don't have a methodology for apportioning
8  statutory damages  As you can see on -- in paragraph
9  197, I have determined that for unjust enrichment and
10  restitution  As I'm sitting here, I cannot think of a      19:23:23
11  reason why it would be different for statutory damages in
12  this case, but
13  Q  For unjust enrichment and restitution, you did
14  not have a methodology for allocating individual page
15  loads based calculations, though; correct?      19:23:45
16  A  That is correct  I did not calculate that for
17  individual page loads
18  Q  So sitting here today, do you have a methodology
19  for allocating a statutory damages number on the basis of
20  individual page loads?      19:23:59
21  A  No, I do not, as I'm sitting here today, based
22  on individual page loads  Again, I'm not the
23  administrator in this case, but to the extent that
24  restitution -- I'm sorry -- statutory damages are awarded
25  based on page loads, I think that still one would be --      19:24:23

Page 202

1  Q  And how would you allocate this third basis to
2  individual class members?
3  A  So, again, I think that you could allocate it
4  either way, unique monthly private browsing instances or
5  based on the number of class members.      19:27:11
6  Q  Well, note that the two middle bullets, one is
7  the number of unique monthly private browsing instances,
8  and the second is unique private browsing instances, not
9  monthly.
10  A  Correct.      19:27:25
11  Q  There is a difference there; correct?
12  A  Correct.
13  Q  And how would the allocation -- and backing up,
14  for the second bullet, the UMPBI, there is an allocation
15  that you propose for restitution and unjust enrichment on      19:27:42
16  the basis of UMPBI; correct?
17  A  Correct.
18  Q  For unique private browsing instances across the
19  class during the class period, there is no allocation
20  opinion for any damages expressed in your report      19:27:56
21  currently; correct?
22  A  I don't understand the question.
23      MR. LEE:  Objection to form, mischaracterizes.
24  Q  BY MS. TREBICKA:  Do you have --      19:28:08
25      MR. LEE:  Hold on.  Mischaracterizes the report.

Page 204

1  it would be appropriate to use the bases that I've
2  calculated under my apportionment methodologies in
3  paragraphs 197 and Section 10 of my report
4  Q  So, again, assuming that the rate per violation
5  is a hypothetical $100, how would that apply to your      19:24:57
6  second potential basis, "The number of unique monthly
7  private browsing instances across the Classes during the
8  Class Period"?
9      MR LEE:  Would you repeat that?
10  Q  BY MS  TREBICKA:  Assuming the rate of      19:25:24
11  violation -- per violation is a hypothetical $100, how
12  would that apply to your second potential basis, "The
13  number of unique monthly purchase -- unique private
14  browsing instances across the Classes during the Class
15  Period"?      19:25:45
16      MR LEE:  Thank you
17      THE WITNESS:  Well, it would be -- one would
18  multiply the unique monthly private browsing instances by
19  the rate that's selected or determined
20  Q  BY MS  TREBICKA:  Okay  Same question      19:26:15
21  Hypothetical $100 per violation  How would that apply to
22  your third bullet, the basis that reads:  "The number of
23  unique private browsing instances across the Classes
24  during the Class Period"?
25  A  I mean, I would apply it the same way      19:26:38

Page 203

1  Q  BY MS. TREBICKA:  Do you propose an allocation
2  method on the basis of unique private browsing instances?
3  A  No, I do not.  And just -- just to be clear,
4  though, this does say unique private browsing instances,
5  but what this really is is peak unique monthly private      19:28:45
6  browsing instances, so this is sort of a similar
7  definition to the number of class -- to the number of
8  class members or individual class members by device.
9  Q  Okay.  So it's similar.  So this -- what is your
10  understanding of the -- of a peak unique monthly private      19:29:15
11  browsing instances?
12  A  So what I did in this calculation is I
13  determined the peak number of unique monthly private
14  browsing instances in 2021.  That is the bases for the
15  top line in Figure 74, and then I adjusted it for the      19:29:44
16  class.  So I take the peak month data and put that into
17  the calculation.
18  Q  And this provides you the estimated unique
19  private browsing instances for the entirety of -- well,
20  for the class period through 2021?      19:30:20
21  A  Well, it really -- it really is the peak.  It
22  really is the -- it's the highest number.  I'm not trying
23  to calculate this on a monthly basis.
24  Q  Right.  So estimated unique private browsing
25  instances through 2021, this is what you are talking      19:30:44

Page 205

52 (Pages 202 - 205)

1 about with the third point, which is the number of unique
2 private browsing instances across the classes; right?
3   A. Yes. I mean, I think -- I think a better way to
4 have titled this -- because I think there's some
5 confusion here, a better way to have titled this would   19:31:04
6 have been estimated peak unique private browsing
7 instances.
8   Q. Yeah. And it would -- and you're referencing
9 here your Figure 74?
10   A. Correct.       19:31:21
11   Q. Okay. The next basis is, "The number of members
12 in each Class during the Period."
13     Do you see that?
14   A. Yes.
15   Q. So assuming a hypothetical rate of $100 per   19:31:29
16 violation, how would you apply that rate to this last
17 basis?
18   A. I would multiply that rate by the estimated
19 number of class members per browser.
20   Q. So in your opinion, the rate per violation would   19:31:51
21 be the amount that each putative class member would get?
22   A. Correct.
23   Q. Okay. Now, do any of these four bases that you
24 have calculate the statutory damages in proportion to the
25 alleged harm that each class member suffered?   19:32:21

Page 206

1   A I guess I'm taken aback -- I'm not quite
2 understanding your question here, because at the end of
3 the day, I don't apply a rate in any of my calculations
4   Q So then the answer is "no," you do not take into
5 account the alleged harm that each class member may have   19:33:29
6 suffered? It's a flat rate?
7   MR LEE: Objection to form, beyond the scope
8   THE WITNESS: That -- I -- as I -- I've been
9 very clear in my report here I have not analyzed the
10 rate in any way for statutory damages   19:33:54
11   Q BY MS TREBICKA: Right So setting aside the
12 rate, you yourself, in your analysis or proposal of these
13 four bases, do not propose to calculate statutory damages
14 in proportion to the alleged harm that each class member
15 has suffered?   19:34:23
16   MR LEE: Objection to form, beyond the scope,
17 mischaracterizes the statute in question
18   THE WITNESS: I mean, I have not attempted to
19 analyze it in that way, because I have not ultimately
20 determined a rate You're asking if it could be in   19:35:12
21 proportion to the alleged harm I mean, certainly I've
22 limited all of my bases to unique private browsing
23 instances or page loads or those numbers that have
24 browsed in private browsing mode, and so if one were to
25 consider those bases, that, in my opinion, would be   19:35:46

Page 207

1 proportional to the alleged harm
2   Q BY MS TREBICKA: So in your opinion, the
3 calculating damages on the basis of the UMPBI would be
4 calculating damages in proportion -- for each class
5 member in proportion to the alleged harm?   19:36:23
6   MR LEE: Objection to form, beyond the scope,
7 mischaracterizes the statutes
8   THE WITNESS: Yeah, this is beyond the scope of
9 my report The only thing I'm saying here is, for
10 example, if you look at my restitutionary -- my   19:36:38
11 restitution damages, I use UMPBI as one of the methods
12   You're asking me if the -- if this could be
13 proportional Well, if I use UMPBI in one situation and
14 UMPBI in another situation and I know that page loads are
15 consistent among UMPBI on an average basis, that would   19:37:00
16 mean that they would be proportional, because I'm using a
17 similar base in both situations Something is similar in
18 both calculations
19   Q BY MS TREBICKA: Well, do you know that page
20 loads are consistent among UMPBI?   19:37:21
21   A In some cases they are, yes
22   Q What is your opinion based on that in some case
23 they are?
24   A Based on my analysis that I did in this case
25   Q And in how many cases or what proportion of   19:37:37

Page 208

1 cases are they consistent among UMPBI?
2   A I don't have that information I didn't do
3 it -- an analysis in that way
4   Q What analysis did you do?
5   MR LEE: Objection Vague   19:37:56
6   THE WITNESS: I did an analysis on page 24 3
7   Q BY MS TREBICKA: On page?
8   A I'm sorry I'm sorry On Schedule 24 3
9   And what you can see here is the -- based on the
10 information of total private browsing page loads and   19:40 01
11 UMPBI that -- over that period, it's relatively
12 consistent
13   Q So what you've done here in 24 3 is divide the
14 total number of private browsing page loads by UMPBI;
15 correct?   19:40:31
16   A Correct
17   Q To arrive at an average per month; correct?
18   A Correct
19   Q Okay But you do not know, on the basis of this
20 analysis, that one UMPBI has an approximate page load   19:40:43
21 that is -- or has a page load that is approximately the
22 same as another UMPBI?
23   A That is correct
24   Q We spoke about this a little earlier, but do you
25 have a method to determine the number of UMBPIs deemed   19:41:21

Page 209

53 (Pages 206 - 209)

1 attributable to each class member?

2     A   My -- my analysis does not include calculating

3 UMPBI by class member   I do not believe that that data

4 is available to do -- to do that kind of an analysis

5 I'm looking at UMPBI -- my UMPBI is actually on a device      19:42:06

6 level -- effectively a device level

7     Q   Do you have a methodology to look at UMPBI or to

8 attribute UMPBI to a device?

9     A   Well, a UMPBI would effectively be at a device

10 level                                19:42:36

11     Q   Okay   I -- okay   Do you have -- have you

12 attempted to determine how many UMPBI are attributable to

13 the named plaintiffs?

14     A   No, I have not

15     Q   I have a few questions on your background       19:43:26

16     A   Well, let's -- we should stop for a minute here

17 Mr Lee seems to have --

18     Q   Oh

19         THE VIDEOGRAPHER:  He has dropped out just now

20         MS  TREBICKA:  Oh, yeah   Let's stop       19:43:42

21         THE VIDEOGRAPHER:  Going off the record at

22 7:44 p m

23     (Recess )

24         MS  TREBICKA:  If counsel is going to redirect,

25 then I will reserve the rest of my time       19:50:46

Page 210

1         MR. LEE:  Okay.  You pass the witness?

2         MS. TREBICKA:  If we will redirect, yes.

3         MR. LEE:  Okay.  Why don't we take five then and

4 let me consult with my team and see if I have a redirect.

5 I think I have a little bit, so let's take ten, and we'll     19:50:59

6 be back in ten.

7     (Recess.)

8         THE VIDEOGRAPHER:  We are back on the record at

9 8:03 p.m.

10                                   20:02:34

11         EXAMINATION

12 BY MR. LEE:

13     Q.  Good evening, Mr. Lasinski.  I'm James Lee, and

14 I represent the plaintiffs this case.  Okay?

15     A.  Okay.                          20:02:44

16     Q.  All right.  Now, Mr. Lasinski, you were asked

17 about how the Ipsos survey requires things of respondents

18 other than just allowing their data to be collected in

19 order for them to participate in that study.  Do you

20 remember questions about that?       20:02:58

21     A.  Yes.

22     Q.  All right.  For instance, counsel for Google

23 pointed out that to participate in the Ipsos survey,

24 respondents had to fill out a survey and respond to

25 notifications, provide demographic information, all of       20:03:11

Page 211

1 which requires a time investment.  Do you remember her

2 asking you questions about that?

3     A.  Yes, I do.

4     Q.  Okay.  Why don't you pull up your report at

5 Exhibit 1 and go to Figure 58.  Unfortunately, I don't       20:03:23

6 have a page number, but as soon as I get there, I'll let

7 you know.

8     A.  Yes.

9     Q.  Okay.

10         MR. LEE:  And for the record, Figure 58 is on       20:03:41

11 page 63 of the report.

12     Q.  Do you see here in Figure 58 how much a

13 respondent was paid for their time to participate in the

14 survey?

15     A.  Yes, I do.                       20:03:54

16     Q.  And what was that amount?

17     A.  It was $20.

18     Q.  Okay.  And did you include that $20 payment in

19 your restitution calculations?

20     A.  No, I did not.                    20:04:04

21         MS. TREBICKA:  Objection.

22         Mr. Lasinski, your counsel is now asking you

23 questions, so it's my turn to object.  If you could just

24 leave me a beat in between questions so that I don't

25 speak over you.                       20:04:16

Page 212

1         THE WITNESS:  Okay.

2         MS. TREBICKA:  Objection.  Assumes facts and

3 document speaks for itself.

4     Q.  BY MR. LEE:  So did you hear the question, or do

5 you want me to repeat it, Mr. Lasinski?       20:04:24

6     A.  I did hear the question.

7     Q.  Okay.  I didn't hear the answer, though.

8     A.  Oh.

9     Q.  You did answer.  I just didn't hear it.

10     A.  Well, you better repeat it now, because now I'm       20:04:34

11 not quite sure what I'm answering.

12     Q.  Right.  So let me ask it again, and then wait

13 for counsel to object and then you can answer.

14     A.  I will.

15     Q.  Did you include that $20 payment anywhere in       20:04:44

16 your restitution calculation?

17         MS. TREBICKA:  Objection.  Assumes facts and

18 leading, and the document speaks for itself,

19 mischaracterizes the document.

20         THE WITNESS:  I did not include this $20, no.       20:04:55

21     Q.  BY MR. LEE:  Okay.  Let's look at Figure 59 on

22 the next page.

23         Do you see in Figure 59 that in addition to

24 paying respondents $3 for their browsing data, that

25 respondents could also be paid for other things that they       20:05:16

Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1 might do as part of this survey?

2     MS TREBICKA: Objection Vague

3     THE WITNESS: Yes, I do

4     Q BY MR LEE: Okay And putting aside the $3 for

5 the browsing data, did you include these other payments   20:05:27

6 in any of your restitution calculations?

7     A So I did not include the $3 for -- I'm sorry --

8 the $5 for the router, nor did I include the $2 for the

9 bonus, but from a mobile phone perspective, I could have

10 included the $3 there as well or for a tablet   20:05:54

11     Q Right Did you ultimately end up using the $3

12 for mobile phones or tablets?

13     A No It's the same -- it's the same amount, so I

14 used the $3 for browsers

15     Q Right Okay Now, is the -- is the $3 that you   20:06:08

16 applied for your restitution -- restitution calculation,

17 what is that for?

18     MS TREBICKA: Objection Calls for a

19 narrative

20     THE WITNESS: That is to incent a user to   20:06:26

21 knowingly give up their private browsing information

22     Q BY MR LEE: Okay And do you see on Figure 59

23 under "Browser" the $3?

24     A Yes

25     Q What's the $3 for in Figure 59 that was part of   20:06:42

Page 214

Page 215

1 the Ipsos Screenwise survey?

2     A The $3 is for using browsers with a Screenwise

3 meter browser extension

4     Q Okay And why was it -- why in your opinion is

5 it appropriate to use that metric for your -- as an input   20:07:00

6 for your restitution calculation?

7     A Because the $3 that I'm using in restitution is

8 for people to unknowingly give their -- or people that

9 have unknowingly given up their information, and in this

10 case, it is for people that have knowingly given up their   20:07:31

11 information through a browser

12     Q Okay And do you believe, sitting here today,

13 that you considered all of the factors described by

14 counsel for Google, and having considered that, do you

15 find that -- your use of the $3 reasonable in this case?   20:07:54

16     A I still -- I still believe that my $3 is

17 conservative in this case

18     Q Okay Now, you were asked whether you made

19 certain adjustments for things like, you know, people who

20 block third-party cookies, used a VPN, had cookie pop-up   20:08:14

21 opt-ins, new tab page opt-ins or disabled JavaScripts,

22 things like that Do you recall those lines of

23 questions?

24     MS TREBICKA: Objection Vague, compound

25     THE WITNESS: I do recall those lines of   20:08:33

Page 215

Page 216

1 questions

2     Q BY MR LEE: Okay Are you aware of any data

3 produced by Google about the class members that would

4 tell you whether this group of people are statistically

5 significant to your calculations?   20:08:50

6     A I am not aware of any such data

7     Q Did Mr Strombom identify any such data in his

8 report?

9     A He did not

10     Q If Google were to make that information   20:09:03

11 available, would it be difficult for you to consider and,

12 if appropriate, apply any of these adjustments?

13     MS TREBICKA: Objection Leading

14     THE WITNESS: I do not believe that it would

15     Q BY MR LEE: Would you be willing to consider   20:09:20

16 that information?

17     A I would be willing to consider it, yes

18     Q Let's go to Exhibit 15

19     Do you remember counsel for Google showing you

20 this -- I guess she called it a pop-up from the website   20:09:41

21 of Latham & Watkins LLP?

22     A Yes, I do

23     Q And do you recall she directed your attention to

24 that pop-up that's indicated in red?

25     A Yes, I do   20:09:59

Page 216

Page 217

1     Q. Okay. Take a look at the representations made

2 in that red pop-up, and let me know if the pop-up says

3 anything about Incognito mode or any other private

4 browsing mode.

5     MS. TREBICKA: Objection. Leading.   20:10:10

6     THE WITNESS: I don't see where it does --

7     Q. BY MR. LEE: Let's --

8     A. -- identify anything about private browsing

9 mode.

10     Q. Sure. Thank you.   20:10:47

11     Does the pop-up say anything about Google

12 collecting data in Incognito mode or any other private

13 browsing mode?

14     MR. LEE: Objection. Leading. The document

15 speaks for itself.   20:10:58

16     THE WITNESS: No, it does not.

17     Q. BY MR. LEE: Okay. New topic. Do you

18 understand that Google has not provided data on class

19 members in this case other than for the named plaintiffs

20 in the case?   20:11:20

21     MS. TREBICKA: Objection. Leading.

22     THE WITNESS: That is my understanding, yes.

23     Q. BY MR. LEE: Okay. Now, if Google were to

24 provide the necessary data or class members provide

25 attestations or there's a combination of the two, would   20:11:37

Page 217

1 it be difficult to allocate statutory damages based on --
2 pardon me -- hold that thought   I want to make sure I
3 get it right -- based on the number of individual page
4 loads in Incognito mode or other private browsing modes
5 during the class period?                    20:12:07
6         MS TREBICKA: Objection   Compound, vague and
7 leading
8         THE WITNESS: I do not believe that it would
9    Q   BY MR LEE: Would it be difficult to do so in
10 the same ways I've just described, based on the number of   20:12:18
11 unique monthly private browsing instances across the
12 class during the class period?
13         MS TREBICKA: Objection   Compound, vague and
14 leading
15         THE WITNESS: If you -- if you had that     20:12:32
16 information, it would not be difficult
17    Q   BY MR LEE: How about for unique private
18 browsing instances across the classes during the class
19 period?
20         MS TREBICKA: Same objections     20:12:45
21         THE WITNESS: If you had that information, it
22 would not be difficult
23    Q   BY MR LEE: Okay   And how about the number of
24 members in each class during the class period?
25         MS TREBICKA: Same objection     20:12:53
                                                              Page 218

1         THE WITNESS: Similarly, it would not be
2 difficult.
3         MR. LEE: Okay.  I have no further questions for
4 now.  I pass the witness.
5         MS. TREBICKA: All right.  I need a couple of   20:13:01
6 minutes.
7         THE VIDEOGRAPHER: Would you like to go off the
8 record, Counsel?
9         MS. TREBICKA: Yes.
10        MR. LEE: Sure.                     20:13:09
11        THE VIDEOGRAPHER: Going off the record at
12 8:13 p.m.
13        (Recess.)
14        THE VIDEOGRAPHER: We are back on the record at
15 8:23 p.m.                          20:22:46
16        FURTHER EXAMINATION
17 BY MS. TREBICKA:
18    Q.   Mr. Lasinski, you recall in redirect your
19 counsel asked you questions about Figure 59 of your
20 report on page 64.  Could you please turn to that page?   20:22:54
21    A.   I am.
22    Q.   It says here that -- and counsel went through
23 the bullet points of how a user for Ipsos can earn
24 monthly rewards; correct?
25    A.   It does -- this does, yes.       20:23:13
                                                              Page 219

1    Q.   Okay.  Now, under your methodology for
2 restitution, if a user has a computer on which she has a
3 browser that she used to privately browse, you would
4 allot to that user $3 for using that browser on that
5 computer; correct?                     20:23:37
6    A.   That is correct, yes.
7    Q.   Let's say in a given month.
8    A.   Yes.
9    Q.   Now, if that same user in that same month had a
10 mobile phone with a browser, which she also used to     20:23:50
11 privately browse, you would allot that user $3 for
12 browsing privately on that mobile phone -- an additional
13 $3, I should say; is that correct?
14    A.   That is correct, yes.
15    Q.   And if a user -- if the same user had a tablet     20:24:02
16 with a browser which she also used to browse privately in
17 that same month, you would allot her another $3 for using
18 that browser off the tablet; correct?
19    A.   Correct.
20    Q.   You recall your counsel asking you questions     20:24:19
21 about your statutory damages calculation allocation?
22    A.   I do.
23    Q.   And that is page -- Section 10 of your report,
24 and -- I'm sorry, Section 9 of your report, page 78.
25 Would you mind turning to that page?     20:24:49
                                                              Page 220

1    A   Page 78, you said?
2    Q   78, yes   Section 9, page 78 through 79
3    A   Okay
4    Q   Okay   And your -- in your prior testimony, when
5 I was asking you questions, you talked about the ways in     20:25:04
6 which you would apply these bases to individual users and
7 also the fact that for certain of these bases you do
8 not -- you did not have an allocation opinion   Do you
9 recall that testimony?
10        MR LEE: Objection to form, mischaracterizes     20:25:25
11        THE WITNESS: Well, I thought that I had said
12 that you could use the bases that I had calculated
13 earlier -- the apportionment methodologies that I had
14 testified to earlier
15    Q   BY MS TREBICKA: You testified, however, that     20:25:44
16 it is -- that currently you do not have a methodology to
17 apportion the UMPBI or the peak PBI to specific class
18 members; correct?
19    A   That is correct   My understanding, and I think
20 I said this earlier, is that that data is not available     20:26:11
21    Q   And counsel asked you whether -- if that -- if
22 certain data became available, whether it would be
23 difficult for you to perform that calculation   Do you
24 recall that?
25    A   Yes, I do                     20:26:25
                                                              Page 221

Veritext Legal Solutions
866 299-5127

1    Q   And your answer was it is not very difficult to
2  perform that calculation   Do you recall that?
3    A   Yes, I do
4    Q   What is your answer that it is not, and I quote,
5  "very difficult to perform that calculation" based on?      20:26:40
6    A   Well, if you had unique monthly browsing
7  instances -- private browsing instances by class member
8  and that data were -- as an example, were produced, then
9  you would know that -- I mean, you would know that
10 information with certainty, because you could determine      20:26:58
11 unique monthly private browsing instances by class
12 member
13   Q   So you're -- when you were answering counsel's
14 question, you were relying on a type of data which
15 identifies the private browsing instances by class          20:27:18
16 member; correct?
17   A   I thought that that was the question   If that
18 were available by class member, yes, then you could do
19 that calculation
20       MS  TREBICKA:  Okay  No further questions         20:27:47
21   MR  LEE:  All right   We didn't have to fight
22       MS  TREBICKA:  Yeah, that's true
23       THE  REPORTER:  Off the record, Counsel?
24       MS  TREBICKA:  Yes
25       THE  VIDEOGRAPHER:  We are off the record at        20:27:58

Page 222

1  8:28 p m , and this concludes today's testimony given by
2  Michael Lasinski   The total number of media used was one
3  and will be retained by Veritext Legal Solutions.
4        (Time Noted:  8:28 p m )
5            --oOo--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1       I declare under the penalty of perjury under the
2  laws of the State of California that the foregoing is
3  true and correct.
4       Executed on _____, 2022, at
5  _____, _____.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1 STATE OF CALIFORNIA     ) ss:
2 COUNTY OF MARIN         )
3
4       I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6       That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9       That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16       I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20       IN WITNESS WHEREOF, I have subscribed my name
21 this 25th day of July, 2022.
22
23
24
25       LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 225

57 (Pages 222 - 225)

CONFIDENTIAL

1  JAMES LEE, ESQ.

2  jlee@bsfllp.com

3           July 25, 2022

4  RE: BROWN VS. GOOGLE LLC

5  JULY 20, 2022, MICHAEL LISINSKI, JOB NO. 5308350

6  The above-referenced transcript has been

7  completed by Veritext Legal Solutions and

8  review of the transcript is being handled as follows:

9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10  to schedule a time to review the original transcript at

11  a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13  Transcript - The witness should review the transcript and

14  make any necessary corrections on the errata pages included

15  below, notating the page and line number of the corrections.

16  The witness should then sign and date the errata and penalty

17  of perjury pages and return the completed pages to all

18  appearing counsel within the period of time determined at

19  the deposition or provided by the Code of Civil Procedure.

20  __ Waiving the CA Code of Civil Procedure per Stipulation of

21  Counsel - Original transcript to be released for signature

22  as determined at the deposition.

23  __ Signature Waived – Reading & Signature was waived at the

24  time of the deposition.

25

                                    Page 226

1  RE: BROWN VS. GOOGLE LLC

2  MICHAEL LISINSKI, JOB NO. 5308350

3           E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  WITNESS                    Date

25

                                    Page 228

1  _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2  Transcript - The witness should review the transcript and

3  make any necessary corrections on the errata pages included

4  below, notating the page and line number of the corrections.

5  The witness should then sign and date the errata and penalty

6  of perjury pages and return the completed pages to all

7  appearing counsel within the period of time determined at

8  the deposition or provided by the Federal Rules.

9  __ Federal R&S Not Requested - Reading & Signature was not

10  requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 227

58 (Pages 226 - 228)

**[& - 2022]**



**&**

**&**   3:11 4:4,20
6:9,13,15 7:4
9:14,15 116:8,11
116:25 119:6
120:6 130:21,24
132:23 176:7
180:16 186:23
216:21 226:23
227:9

**0**

**0**   174:25
**03664**   1:9 2:9
8:23
**04324934**   7:1
171:18
**0443120**   50:1
**04431207**   6:8
49:22

**1**

**10,000**   134:18
135:7,11 199:3

**105**   35:16,21
**10:59**   2:17 8:2,9
**10th**   4:6
**11**   6:23 20:22,25
21:15,23 66:21
131:10
**11.1.**   120:10

**112**   35:22
**116**   6:9,11
**11:56**   38:19

**12:04**   38:22

**130**   6:13,15
**131**   6:18,20,22
6:23,25
**137**   78:5,9,21
79:4 103:20
104:7
**138**   97:6 100:5
100:14 101:10
**14**   7:2 176:4,13
**143**   109:19,23
110:2

**144**   105:7
**15**   7:4 176:7
180:12 186:21
190:16 192:20
195:19 196:5,11
197:17 216:18
**151**   105:19
**159**   127:14 128:1
**16**   88:11,15 89:4
**160**   130:2
**162**   85:13 135:19
135:20
**163**   137:6
**169**   147:20,22
151:15
**171**   7:1
**176**   7:2,4
**18.1**   148:10
**186**   198:19
200:11
**191**   4:12
**197**   138:8 141:13
152:11 154:2
202:9 203:3
**1:01**   68:4
**1:47**   68:7

**2**

**2**   6:6 25:24,25
26:3,11 27:21,22
31:1,2 32:8
33:15 84:15
89:6,10 95:18
135:3,4 157:19
214:8
**2.4**   174:15 175:3
175:3

**2.5**   174:15,17
**2.5.**   174:15
175:11

**2.9**   173:24
**2.9.**   173:21

**2008**   149:19
**201**   3:13
**2014**   149:4
**2016**   11:20,23,24
26:20 27:1 28:6
148:2,7,14
149:20 174:5,22
177:4
**2017**   174:22
**2018**   149:10,15
174:22
**2019**   149:15
174:22 177:4
**2020**   172:9
174:22 175:10
197:5
**2021**   118:20
148:7,14 149:12
149:20 174:6,18
174:25 175:6
205:14,20,25
**2022**   1:18 2:19
5:4 8:1,10 224:4
225:21 226:3,5

Page 1

**[2025.520 - 74]**

**2025.520**   226:9
226:12
**20th**   8:10
**21**   28:6
**211**   5:10
**213**   4:8
**214-7900**   3:22
**219**   5:9
**223-5505**   3:15
**225**   1:25
**24**   43:18 167:8
167:12 169:14
169:18
**24.3**   209:13
**24.3.**   209:6,8
**25**   169:10,11,11
169:15,16,19,22
170:2,6,6 226:3
**25th**   225:21
**26**   169:19,22
170:2
**27**   170:1,1
**2700**   4:12
**271**   6:8 49:22
**2800**   3:6
**29**   85:5 93:18
126:2 128:14
**2:46**   99:24
**2:55**   100:2

### 3

**3**   6:8 49:21,22,25
81:6,10,25 82:2
82:7,13,23 83:9
83:23 84:14
88:4,23 89:1,2
91:15 92:9,23
93:7,10 94:16

100:18,18 101:6
101:14,18,22
102:3,6,16,22
105:12 106:2,5
106:14,18 108:6
115:10 179:2,6
192:17 213:24
214:4,7,10,11,14
214:15,23,25
215:2,7,15,16
220:4,11,13,17
**30**   93:12 107:24
227:1
**305**   3:8
**31**   6:6
**312**   3:22 4:14
**32**   167:8,11,12
**33131**   3:7
**33602**   3:14
**3462**   1:24 2:21
225:4,25
**3:46**   125:7
**3:58**   125:10

### 4

**4**   6:9 20:22
22:18 116:10,11
116:25 120:7
133:18
**40**   107:24

**44**   7:1 171:18
**443-3000**   4:8
**47**   197:22
**49**   6:8
**4:20**   1:9 2:9 8:23
**4:26**   138:25
**4:30**   139:3
**4:59**   152:4

### 5

**50**   85:18 93:20
134:16 135:5
197:23
**500**   134:14,15,19
134:20 135:11
**5308350**   1:25
226:5 228:2
**539-8400**   3:8
**5411**   225:24
**58**   86:1 212:5,10
212:12
**59**   85:2 88:18
181:24 187:22
188:5 213:21,23

214:22,25
219:19
**5:10**   152:7

### 6

**6**   6:13 22:17
91:16 92:8,24
130:19,21
175:22
**6.1.21**   6:10,12
116:12,21
**60**   78:6
**60602**   3:21
**60606**   4:13
**61**   105:6,7
**63**   33:15,23 86:1
212:11
**64**   85:2 219:20
**68**   85:5 125:15
125:19
**69**   35:19 130:2
**6:16**   175:25
**6:59**   198:2

### 7

**7**   6:15 41:2
130:24 132:19
134:21,22
158:16
**705-7400**   4:14
**71**   170:9,9
**73**   172:15 173:2
173:6
**74**   205:15 206:9

**[75 - adjustment]**

| | a | | |
|---|---|---|---|
| **75**  50:3,9 | **a.m.**  2:17 8:2,9 | **accounted** | 97:8 151:22 |
| **77**  50:9 | 38:19 | 185:10,16,17,20 | 178:23 185:1 |
| **78**  198:16 220:24 | **aback**  207:1 | 186:9,18 187:1,6 | **ad**  39:17 40:16 |
| 221:1,2,2 | **ability**  20:19 | 188:15 197:1 | 40:17 42:25 |
| **79**  198:20 221:2 | 33:11 60:14 | **accounting** | 43:1 44:8,9,14 |
| ■■■■■■ | 74:2,5,5 158:19 | 185:24,25 186:5 | 59:11 66:1 70:1 |
| **7:12**  198:5 | 159:11 225:15 | 186:15 | 71:8 72:9 73:7 |
| **7:44**  210:22 | **able**  53:12 57:25 | **accounts**  16:15 | 74:10 120:15 |
| **7th**  3:13 | 58:6,11 60:12,24 | 16:19 | 121:1 137:14 |
| **8** | 94:17,22 96:15 | **accrue**  59:9 60:3 | 156:22 161:6 |
| **8**  6:4,18 50:7 | 105:20 111:2 | 72:17 | 166:19,19,22 |
| 78:13 80:14 | 114:20 124:3 | **accurate**  26:24 | **add**  89:4 117:7 |
| 82:6 83:19 | 129:3 144:14,25 | 115:16 121:16 | **added**  179:13 |
| 84:10 85:24 | 145:13,18 | 122:8 123:11 | **adding**  90:5 |
| 131:2 133:17 | 148:25 150:22 | 127:9 133:14 | 170:2 |
| 134:22 137:21 | 150:25 159:24 | 177:9 225:13 | **addition**  23:21 |
| ■■■■■■ | 163:11,22 | **action**  9:4 | 83:23 85:4 |
| **813**  3:15 | 166:21 168:16 | 225:17,18 | 106:13 193:24 |
| ■■■■■■ | 168:21 185:14 | **actions**  119:11 | 193:24 213:23 |
| **865**  4:6 | **absolutely** | 119:13 | **additional**  58:18 |
| **8:03**  211:9 | 152:16 | **activities**  52:1 | 81:7,10 127:20 |
| **8:13**  219:12 | **accept**  103:16 | 115:15,17,19 | 127:22 128:4,7,8 |
| **8:23**  219:15 | **access**  157:18,18 | 119:18 | 129:2 133:24 |
| **8:28**  2:18 223:1 | **accomplished** | **activity**  43:2 | 137:16,25 |
| 223:4 | 14:6 | 79:14 82:19 | 151:13 165:7 |
| **9** | **account**  39:5 | 96:16 97:20 | 193:9 220:12 |
| **9**  6:20 50:18 | 40:15 42:24 | 98:20 100:23 | **additionally** |
| 131:5 171:20 | 63:9,14,16 64:5 | 101:2,8,16 102:5 | 83:24 163:18 |
| 198:16 220:24 | 64:20 95:16,17 | 115:10 132:15 | **address**  34:25 |
| 221:2 | 98:3 160:3,18 | 133:3 136:10 | 115:5,5 121:19 |
| **90017**  4:7 | 178:11,13 | **actual**  17:6,11 | 136:7 161:3 |
| ■■■■■■ | 188:12,22 | 19:10,11,14,15 | **adjust**  146:11 |
| **95**  170:12 176:20 | 189:18 195:11 | 19:19 20:4 21:5 | **adjusted**  205:15 |
| 176:23 | 195:17 196:3,10 | 22:16 78:10,14 | **adjustment** |
| **96**  176:20,23 | 197:9,13,15 | 78:17,18,22 | 55:14 56:1 64:4 |
| | 207:5 | 79:10,19,21 80:3 | 64:13 161:7 |
| | | 80:7,13,23 81:1 | 168:4 170:4 |
| | | 93:13,13 96:20 | 187:9 188:20 |

Veritext Legal Solutions
866 299-5127

**[adjustment - analysis]**

192:6,9,11,13
**adjustments**
  30:17 168:4
  169:24,25 170:3
  197:19 215:19
  216:12
**administered**
  225:8
**administrator**
  141:6,8,17
  202:23
**admitted** 158:7
**admob** 168:2
**ads** 56:17,17,20
  56:21 57:1,9,12
  57:16,21,21,24
  58:17 60:7,14
  65:16,18,22
  68:19,20,23,25
  69:4,11,17 70:9
  70:12,14,21,25
  71:5,8,16 72:1,7
  72:24 73:10,16
  73:18,22 74:2,15
  75:8,15,22,25
  76:19 77:10,17
  126:18 128:18
  129:5,5 159:22
  161:6 162:15,16
  166:10 167:14
  167:22 168:8,12
  168:16 169:6
  171:17 173:4
  177:17 178:6
  183:4,8,10,18
  184:8 186:16
  187:4,13,25
  188:1,11 189:2

190:6 195:1
**advance** 67:1
**advertise** 58:7
**advertisement**
  170:18
**advertisements**
  14:2,12 56:5
  59:18 125:23
  127:6,8
**advertiser**
  166:11,23
**advertisers** 58:7
  60:12 124:4
  156:19 166:17
  166:18,20
**advertising**
  60:19,19,23 75:1
  170:14,20 171:2
**affect** 55:5,22
  57:6 158:19
  159:11
**affiliations** 9:9
**ago** 30:19 77:15
  106:22
**agree** 8:17 24:25
  25:1,2 39:7
  57:10 66:7,12
  67:18 68:2
  107:12 112:3
  119:11,15
  120:13,15,18,20
  120:24 121:2,10
  151:5
**agreed** 66:24
  67:3 118:24
**agreeing** 121:8
  190:18

**ahead** 11:12
  13:2 23:17 32:7
  39:13 43:6
  69:19 91:25
  140:17 143:6,8
  153:24 162:6,9
  162:10 194:18
  196:14
**algorithms** 58:1
  60:9
**alleged** 36:16
  45:12 161:16,24
  167:15 183:4
  188:1 206:25
  207:5,14,21
  208:1,5
**allegedly** 33:24
**allocate** 138:8
  139:5 154:11
  202:4 204:1,3
  218:1
**allocated** 58:20
  152:22
**allocating** 22:6,7
  152:18 153:1
  202:14,19
**allocation** 138:6
  142:15 144:18
  144:20 152:9
  153:8,10 155:8
  160:2,17 197:8
  197:14 204:13
  204:14,19 205:1
  220:21 221:8
**allot** 220:4,11,17
**allotting** 93:3
**allow** 67:3,11
  79:13 82:18

97:19 100:22
  101:1 102:4
  127:20 181:10
**allowing** 101:7
  101:19 123:18
  211:18
**allows** 101:5,16
  124:13
**aloud** 100:17
**alternatively**
  146:14 200:15
**amended** 6:6
  25:12 31:2
  33:15
**amna** 4:18 10:6
**amount** 19:7
  33:10 60:17,18
  60:23 80:25
  91:18,20 124:22
  142:16,20,22,25
  144:9,12 149:14
  154:18,21,22
  155:10 157:12
  161:14,15,19,22
  163:6 166:2
  206:21 212:16
  214:13
**analysis** 4:23
  9:22 23:20
  34:20 36:15,20
  37:3,3 44:12,15
  44:16 58:23
  59:8 60:2 73:21
  74:13,24,24
  75:11,13 87:3
  121:21 146:25
  148:17,20
  159:16 162:15

**[analysis - asked]**

163:19 164:1,2,6
164:22 177:7,13
177:16 184:7
187:19 189:23
189:24 191:25
192:15,24
193:11,13,23
194:5 195:22
196:18,18,20
207:12 208:24
209:3,4,6,20
210:2,4
**analytics**   181:1,4
190:4,17 191:11
**analyze**   193:9
194:1 207:19
**analyzed**   34:14
91:3 104:23
114:2 123:10
191:16,19
193:21 197:3
207:9
**analyzes**   160:8
**angela**   4:20 9:19
**angeles**   4:7
**ann**   1:17 8:1
**annotated**   20:3
**announce**   9:16
**answer**   5:12
12:23 13:2 14:9
15:6,22,23,25
23:17 32:7
34:12 35:5
36:12 42:2,19
43:6 45:3 51:2,4
52:14,15,21
54:21,23,25 55:8
55:9,16,20 61:20

61:21 62:9
64:22 67:7
71:20 74:18
75:18 76:13
77:25 84:21,23
91:9 92:12
96:22 99:4,4
103:8,13 107:11
109:3 110:19
121:22 123:22
140:2,3 143:7
151:3 159:13
164:10 171:10
181:16 184:24
186:13 188:17
195:20 207:4
213:7,9,13 222:1
222:4
**answered**   14:13
18:17 31:5
34:11 35:5
43:23 44:3 55:1
62:10 71:17,19
75:2 98:13
122:6 153:3,23
165:23,24
186:11 195:20
196:13
**answering**   96:10
107:13,14 162:9
213:11 222:13
**answers**   28:14
123:15 153:11
159:9 195:14
196:15
**anymore**   67:7
**apologize**   48:23
51:16

**app**   44:15 82:15
89:1,3 101:15
115:3 132:24
168:2
**appearance**   9:7
**appearances**   3:1
4:1 9:9
**appearing**
226:18 227:7
**applicable**   38:6
86:11 87:17,23
**application**
132:6 135:22
137:8
**applied**   17:9
200:13,20 201:1
201:14,16
214:16
**applies**   183:10
**apply**   38:3 97:1
101:21,22
201:20,25 203:5
203:12,21,25
206:16 207:3
216:12 221:6
**applying**   102:6
**appointed**   67:3
**apportion**   22:10
63:23 88:5
113:2 143:19
157:1 221:17
**apportioned**
88:3
**apportioning**
21:25 22:3
202:7
**apportionment**
17:10 22:8 64:9

203:2 221:13
**appreciate**
140:18
**appropriate**
25:6 34:23
82:22 143:17,18
144:18 148:23
155:5 178:21
203:1 215:5
216:12
**approximate**
15:23 209:20
**approximately**
209:21
**apps**   115:2
**arbor**   1:17 8:1
**area**   58:2 162:24
163:24 190:13
192:5
**areas**   17:24
18:21 193:9
**argumentative**
13:1
**arising**   153:7
**arrive**   81:1
209:17
**aside**   12:11,16
15:12,16 18:6
207:11 214:4
**asked**   6:17 14:13
18:17 29:10,12
30:20 31:5,14
32:11,25 34:8,9
34:11 35:4 36:3
36:5 42:20 44:3
59:16,20 65:1
66:19,19 71:17
74:22 75:2,11

**[asked - aware]**

77:15 85:10
90:11,12 91:8
93:10,22 96:23
98:13,17 102:23
103:10 119:3,8
122:6 130:25
132:20 145:6,6
153:3,23 162:24
162:25 164:11
165:23 184:14
186:11 187:10
188:11 196:13
199:15 211:16
215:18 219:19
221:21

**asking** 18:10,14
27:5 33:5 37:22
40:24 44:25
49:4 51:7,8,12
51:13 53:2
61:24 62:12
63:3 68:21,21
73:13 75:12
80:8,12,16 84:22
86:15 98:15
107:17 119:7
122:1 133:8
144:16 150:22
153:4 169:14
189:12 196:7
201:5,7,8 202:1
207:20 208:12
212:2,22 220:20
221:5

**asks** 132:8

**assessing** 21:1

**assessment**
24:11

**assignment** 17:1
17:2,12,16 20:25
21:7,8,14,23
57:5 98:9,18,18
98:25

**associate** 4:19,21
9:20 10:8

**assume** 29:10,12
30:20 31:14
32:11,25 39:3
41:7 42:3,6
46:11 57:7
60:25 61:2,24
62:13 76:18
91:19 92:2
145:9,12 149:24
200:14,22 201:5
201:7,8

**assumed** 95:24
96:5,15 145:9
201:15

**assumes** 148:5
213:2,17

**assuming** 41:4,5
113:3 148:13
158:13 171:5
172:6 203:4,10
206:15

**assumption**
29:15 46:13,18
46:19 96:18
104:20 148:18
148:23 149:24
190:25

**assumptions**
45:10

**at&t** 85:6 93:17
126:16,20 127:5

127:10 128:11
128:13,17 129:9
129:22

**at&t's** 125:15
126:1 137:24

**attempt** 101:6
184:22

**attempted** 38:9
38:25 77:9
110:17 140:20
154:22 183:25
184:2 199:11
207:18 210:12

**attempting**
126:16

**attempts** 24:5

**attention** 20:21
22:17 25:8
27:18 47:22
78:9 79:3 82:9
86:1 100:13
120:3,9 127:14
130:1 132:22
147:20 172:14
176:19 179:1
181:24 182:12
194:9,22,24
195:7 198:19
216:23

**attest** 141:4

**attestation** 141:3
142:5,10

**attestations**
217:25

**attorney** 9:10

**attorneys** 33:8

**attributable**
138:12 139:18

139:21 144:9
154:4 167:15
183:4 188:1
210:1,12

**attribute** 210:8

**attributing** 87:3

**audio** 8:15

**austin** 126:24

**auto** 177:3,15,17
177:21 178:12
178:23

**available** 17:4,7
17:18,20,23,25
18:2,8,13,16,22
19:3,8 35:18,20
53:11 118:4,11
126:4,6,7,24
127:2,13 129:3,4
135:14 140:10
140:20 141:2,3
142:12 151:6
181:13 184:19
184:22 185:6,9
185:14 187:17
187:20 188:19
190:3,4 195:14
196:16,17
197:11,18 210:4
216:11 221:20
221:22 222:18

**average** 208:15
209:17

**award** 153:25

**awarded** 17:11
19:1 153:17,22
202:24

**aware** 26:3
30:16 45:15,19

Veritext Legal Solutions
866 299-5127

**[aware - benefit]**

45:21 46:2,3,5
46:11,21,22,23
47:2,3,5,6,7,10
47:14,15,23 48:8
48:9,11,15,22,23
48:24 49:12
53:9 55:2,10,25
56:2,4,20 57:2
63:7 64:1
102:18 115:8,13
135:21,24 136:9
137:3,4,6,13
146:21 147:17
170:14,24 171:1
187:19 216:2,6
**awareness**   46:14
46:20 49:19
56:7

**b**

**b**   34:25 91:13,21
92:3,3,4,6,8,23
156:3 227:1
**bacchus**   4:22
9:21
**back**   38:21
53:15 68:6
83:10 89:25
97:5,6 100:1
106:20 120:3
125:9 128:11
134:9,9 139:2
149:4,10,14
151:8 152:6,15
172:17 175:24
182:13 190:15
194:9,22 198:4
211:6,8 219:14

**background**
210:15
**backing**   204:13
**banner**   180:17
180:19,19
182:13,17,24
183:17
**banners**   182:15
187:2
**bartlett**   4:23
9:22
**base**   183:14,20
187:4 188:6,6
195:3 201:14,16
201:23 208:17
**based**   25:5 33:11
37:3 63:23 64:7
71:8 72:9 73:1
76:4 80:5 93:8
93:23 129:6
140:7 143:3
146:9 148:23
154:24 156:4,9
156:11 157:3,5
159:7,7 160:8
163:1,5 164:12
168:15 177:3,15
185:3 187:17
189:23 191:23
196:18 200:18
202:15,21,25
204:5 208:22,24
209:9 218:1,3,10
222:5
**baseline**   82:13
101:14 107:1
**bases**   17:8 59:20
59:21 60:4 65:1

68:22 102:24
200:12,15,16,20
202:2 203:1
205:14 206:23
207:13,22,25
221:6,7,12
**basic**   136:7
**basically**   169:22
**basis**   40:7 55:8,9
55:9 58:15
63:21 70:4,12,22
71:11,14,21,24
144:12 157:2
165:19 171:12
184:3 202:19
203:6,12,22
204:1,16 205:2
205:23 206:11
206:17 208:3,15
209:19
**bates**   49:25
117:1 118:8
**beacons**   22:24
23:11,14 24:1,22
65:6,8
**beat**   212:24
**beginning**   2:17
9:10
**behalf**   1:7 2:7,16
10:1
**behavior**   130:11
133:24
**behaviors**   134:1
**belief**   107:17
**believe**   15:4,11
15:19 16:13
25:12 26:24
45:3,5,15,18

47:7,9 48:14,21
48:24 54:1 55:6
55:6,10 61:6
67:13,16 72:1
76:20 77:13,20
78:13 86:14
95:1,5 98:14,15
98:19 114:16
115:16 117:2,24
120:23 121:19
121:23 122:7
127:9 129:10,10
130:17,19
133:14 139:10
144:7 145:6
147:15,16 149:3
149:15 158:23
159:12,14
160:21 162:11
164:21 165:2
166:14,25
170:25 171:13
171:22 172:10
177:10 178:8
180:9 185:9
187:7 191:21
195:14 210:3
215:12,16
216:14 218:8
**believing**   70:22
71:14,21 193:22
**belong**   26:19
**belonging**   28:2
**benefit**   69:16
70:1,3,5,20,24
71:4,10,15,25
72:16 74:10
76:19 77:1,7,9

Page 7

## [benefit - browsing]

77:13 88:6
**benefits** 94:7
105:23
**best** 71:20 91:9
174:14 225:14
**better** 27:9
70:20 105:9,18
133:25 206:3,5
213:10
**beyond** 13:8
16:12 39:12
44:24 46:11
48:18 56:6
65:20 69:6,12
72:25 73:11,23
74:16 75:3
76:11 87:8
95:22,23 146:20
190:24 207:7,16
208:6,8
**bidding** 177:3,15
177:18,22
178:12,23
███████████
████████
**bird's** 94:22 95:2
95:20
**bit** 15:8 38:14
72:25 83:2
108:9 149:6,7
165:6 177:24
211:5
**black** 134:6
**block** 22:23
23:10,14 24:1,21
56:17,21 65:16
68:25 125:22
179:13 181:10

215:20
**blocked** 159:5
159:25 160:3,14
160:22 180:7
**blocker** 121:1
**blockers** 120:16
137:14
**blocking** 158:18
159:11 160:9,10
160:19 162:21
184:4 190:6
**blow** 51:18,18
**blue** 180:2
**bodies** 113:24
**boies** 3:4 4:18
9:13 10:8
**bonus** 84:15,17
89:6,10 214:9
**borsay** 21:19
46:7 47:6
**bothered** 14:4
**bottom** 100:19
117:11 133:19
179:12 194:25
**bound** 193:1,4,5
193:12,19,20,23
194:2,10,15,21
**bounds** 194:12
**box** 20:7
**breach** 17:5,6,18
17:25 18:2,3,8
18:13,16,21,23
19:3
**break** 37:22,23
38:15,24 64:14
66:9,15,19,20
67:3 99:13,19,20
100:4 124:24

125:4 139:8
151:24 152:1,12
175:16 179:18
189:13,15
197:22
**breaking** 99:12
189:17
**briefly** 139:8
**broad** 124:5
**broke** 68:18
**broken** 196:6,8
**brokerage** 16:15
16:19
**brown** 1:5 2:5
8:20 226:4
228:1
**browse** 13:14
16:7 41:2 64:2
70:2,6,7,23 73:9
73:21 74:14,25
75:14 81:20
89:20 91:12,14
98:1 130:12
181:7 220:3,11
220:16
**browsed** 57:8
61:3 62:1,14
76:10 207:24
**browser** 12:12
14:6 22:24 23:3
24:2,16,16,20,22
26:8 35:14,24
39:4 40:22
43:10,12,12 49:8
82:14 87:21
88:22,23,24
93:11 101:15
129:24 143:16

143:17 156:4,5
160:20 194:6
206:19 214:23
215:3,11 220:3,4
220:10,16,18
**browsers** 11:7
11:15 23:21
24:10,13 25:4
26:1,17 160:4
214:14 215:2
**browses** 92:2,4,6
112:25
**browsing** 12:2,6
12:12,14,19 13:4
13:6,7,10,18,23
14:5,11,16,22
15:3,5,9,13,18
16:6,10,16,18
23:3,4,9 26:1,20
26:25 27:10,12
28:4 29:16,24
30:2,6,8,13,14
30:15 39:3,5
40:15 41:9,15,16
41:23,24,25,25
42:3,8,9,10,11
42:12,16,23
43:14,19 44:6
45:8 46:4,9,15
46:15 47:1,11
49:13 55:4 57:8
57:15,23 60:10
61:1,4,16 62:1
62:14,20,21
63:25 64:8 65:3
65:13 69:1,23
70:19,24 71:2,3
71:12,15,23,25

**[browsing - calling]**

72:1,3,4,6,7,20
73:15,22 74:4,8
74:14,19,25 75:5
75:14,19,23
76:20 77:17
79:13 81:8,9
82:18,19,25 83:4
84:1 89:16
91:11,19,20 92:7
92:9,10,24 93:4
93:25 94:1
95:11,15,18,20
96:6,12,13,16
97:16,20,23,25
98:5,6,11,21
99:1,3 100:11,22
100:23 101:2,5,8
101:17,22 102:5
102:6,8,17,20
103:5,24 104:3
104:13 106:23
107:22 108:1,4,5
111:10,11
112:10,11,12,14
112:14,15,20
113:1,9 114:12
121:20 127:6
138:15 140:25
143:12 145:1,3
145:13,18,22,24
145:25 146:7,10
146:24 147:8,14
147:18 149:13
158:11,24 159:4
167:22 180:7
181:11,14,19
194:1 200:2,8
201:3,22 203:7

203:14,18,23
204:4,7,8,18
205:2,4,6,11,14
205:19,24 206:2
206:6 207:22,24
209:10,14
213:24 214:5,21
217:4,8,13 218:4
218:11,18
220:12 222:6,7
222:11,15
**bruce**   7:2 176:2
176:4
**bsfllp.com**   3:9
226:2
**building**   113:4
**bullet**   89:11
201:1,10 203:22
204:14 219:23
**bullets**   204:6
**business**   156:14
163:4,8,13,17
165:3,9,10 166:5
197:1
**buy**   108:20
**buyer**   103:15,17
108:25 109:5
**byatt**   1:5 2:5

**c**

**c**   35:12
**ca**   226:9,12,20
**cabr**   6:8 7:1
49:22 50:1
171:18
**calculate**   17:2,8
17:8,16 36:20,22
37:1 38:6 58:3

60:6 65:1 80:13
80:14 99:6
138:7 140:25
143:11 146:10
153:5 154:3,22
164:3 167:6
171:1 200:3
201:19 202:16
205:23 206:24
207:13
**calculated**   19:13
63:21 79:25
80:3,7,12 97:4
113:10,11
139:17,19 148:9
161:19 162:1
175:6 190:9,13
195:25 200:7
203:2 221:12
**calculates**   161:9
**calculating**
34:23 40:22
43:16 100:10
183:24 188:14
208:3,4 210:2
**calculation**
35:11 55:15
65:8 77:6 80:16
81:10 95:25
101:4,25 141:7
145:8,9,12 147:3
147:9 160:16
161:14,23
166:18 167:1,5
170:10 181:25
182:8,22 184:11
184:13 188:25
190:10 191:22

192:7,14 194:2
196:6 200:5
205:12,17
213:16 214:16
215:6 220:21
221:23 222:2,5
222:19
**calculations**
29:15 30:16
34:17 37:7,17
57:6 60:22
68:22 73:1 81:7
96:5,15 115:4
146:12,19 159:3
159:3,8 160:7,8
163:1 164:13
166:20 167:23
170:21 177:9,10
178:2,4,12 187:6
188:21,24
189:12,14,19
190:12,14
195:15 197:2,20
200:6,7 201:15
202:15 207:3
208:18 212:19
214:6 216:5
**california**   1:2
2:2 4:7 8:22
10:1 224:2
225:1
**call**   39:4 67:20
91:12
**called**   53:10 85:7
163:21 216:20
**calling**   182:24
183:17

[calls - ███████████ ]

calls  14:7 17:21
  26:13 27:15
  33:4 48:18 61:9
  64:23 69:18
  76:8 87:7
  181:21 199:8
  214:18
cambridge  2:17
camera  8:13
campaign
  125:15 128:12
  137:24
care  107:23
carefully  42:7
case  8:22 12:9
  12:13,16 14:25
  15:2,12,16 17:1
  17:2,11,16,20,24
  18:5,7,7,15,21
  19:8,9,13 21:14
  29:11,12 30:18
  39:23 40:3,6,8
  41:17 45:7 47:4
  47:20 48:12
  49:16 64:10,11
  79:25 83:22
  84:1 89:19 90:6
  93:6 98:7,11,22
  98:25 99:2
  101:20,21
  102:18 103:16
  104:19 112:8
  113:15,21 114:3
  124:16 128:15
  128:16 130:16
  136:2 141:6
  143:16 156:25
  162:12,19,20

166:17,24 168:1
  180:6 184:12
  191:11 193:18
  198:14 200:21
  202:12,23
  208:22,24
  211:14 215:10
  215:15,17
  217:19,20
cases  18:4,12
  83:24 147:16,17
  156:20 163:9
  166:13 208:21
  208:25 209:1
castillo  1:6 2:6
category  112:16
  112:21,24 187:8
cautious  59:7
ccp  226:9,12
cell  54:17 67:21
cellular  129:16
certain  11:22
  29:13 30:20
  33:24 36:21
  39:7 65:5,5 76:6
  79:12,13 82:18
  87:1 97:16,23,25
  98:1,5 100:22
  101:22 103:24
  115:14 122:23
  124:7,22 154:6
  158:7 163:19
  178:5 190:19
  197:9,15 215:19
  221:7,22
certainly  14:24
  22:5 24:13
  47:19 67:14

73:17 81:4,18
  85:16 121:7
  188:19 193:25
  207:21
certainty  222:10
certified  2:20
certify  25:16
  225:5,16
cetera  79:24
  80:23
chance  134:13
  134:15,18
  135:10
change  126:19
  157:12 163:1,3
  163:12 164:12
  175:14 228:4,7
  228:10,13,16,19
changed  14:22
  15:1 198:10
changes  105:21
charged  126:20
  155:17
chasom  1:5 2:5
  8:20
chat  67:23,24
check  116:1
  119:1
checkmark
  133:2
chicago  3:21
  4:13
choice  70:2,5,7
  70:10 71:2,4,5,9
  71:12,23 72:2,13
  72:15,18 74:7,9
  74:19 75:4
  79:12,18 80:19

82:17 97:15
  100:21 102:17
  102:17 103:24
  104:10 108:17
  112:22 121:3,4
  191:9
choices  180:18
choose  72:21,21
chose  126:2
  192:1
chosen  70:18
  104:21
christina  4:23
  9:21
christopher  1:5
  2:5
chrome  11:13,18
  11:19 12:3,6,12
  12:14,19 13:6
  14:6 15:6 16:7
  23:21 26:1,8
  39:4 49:7 50:22
  52:9 146:6
  147:1,4,7 148:1
  149:19 162:20
  168:5,5 170:10
  189:3,5 194:6
  ██████████
  ██████████
  ██████████
  ██████████
  ██████████
  ██████████
  ██████████
  ██████████
  ██████████

**[████████ - column]**

████████
████

**circle**  106:20
**circumstance**
62:3
**circumstances**
12:5
**circumvent**  24:5
**citation**  151:22
**cite**  50:3,19
**cited**  50:9
106:20 150:3,5,8
150:9,11
**cities**  126:24
**city**  126:25
**civil**  226:19,20
**claim**  17:20 18:9
18:16 19:4
**claims**  21:3
**clarifies**  81:12
**clarify**  151:2
**class**  22:1,4,11
25:18,21,24,25
26:3,11,19,22
27:1,10,21,22,22
27:23 28:2,8,14
28:16,20 30:14
42:24 45:11,23
45:25 46:14
57:8,11 58:20,25
59:2,12,17,17,23
60:25 61:2,3,5,7
61:25 62:13,24
63:11,24 69:16
69:22 70:23
74:22 76:3,4,18
77:10 81:5
82:23 87:25

88:4,7,7 90:24
91:10 95:14,18
95:21 96:12,17
97:25 98:2,10
103:19 110:16
110:23,25 111:2
112:9 120:21
136:20,25
138:12,17,17
139:12,18,19,20
139:21 140:10
141:1,3 142:17
143:19 144:9,10
152:18 153:1
154:2,4,12,16,17
154:21,23,25
155:1,6,6,7,10
155:16,17,22
156:2,10,16,16
157:2 158:11
160:3,18,19
169:25 170:2,4
173:19 200:9
201:4,22 203:8
203:14,24 204:2
204:5,19,19
205:7,8,8,16,20
206:12,19,21,25
207:5,14 208:4
210:1,3 216:3
217:18,24 218:5
218:12,12,18,24
218:24 221:17
222:7,11,15,18
**classes**  25:16
26:23 203:7,14
203:23 206:2
218:18

**clear**  42:9,10
43:8 59:4 80:6
112:8 123:15
136:16,25 141:5
147:12 155:14
158:25 159:20
159:21 169:17
184:6 189:22
198:25 205:3
207:9
**clearly**  192:2
**click**  40:11 43:19
44:13 65:23
**clicked**  66:1
**clicking**  69:9
**clicks**  40:17
42:25
**client**  145:19
178:23,25
**closes**  146:17
**coast**  66:22
**coasters**  64:16
**code**  226:9,12,19
226:20
**collect**  45:16
46:1,2 47:1,5,16
61:4,7,12 62:7
62:22 74:5
90:17,18 106:10
124:17,18
132:24 155:1,15
155:18 199:11
**collected**  28:5
29:14 30:5,22
31:15 32:12
33:1,20,22 35:8
37:8 38:4 43:11
47:6 49:18

54:14,16 55:3
57:23 58:8
61:15,18 62:2,15
63:2,11,12 64:9
70:16 72:3,5,12
74:1 75:6,20
98:11 111:13
112:18,19 114:4
114:11,12,13,17
122:16 127:11
142:16,21,23
143:1 144:10
155:10 161:21
165:5 199:11,19
211:18
**collecting**  46:12
47:8 48:8 60:6
72:22 87:10,22
128:13 163:23
217:12
**collection**  47:13
47:18 55:22
107:9 109:9,13
110:9 125:22
126:17 127:21
165:8 166:4
**collects**  45:19,22
45:25 46:4,6,8
46:15 47:4,10
58:4,12 60:11
102:19 113:21
129:9,22 130:9
132:15 137:16
143:11 155:21
159:24
**color**  180:19
**column**  51:2,4,5
52:17 167:19

**[combination - constant]**

| | | | |
|---|---|---|---|
| **combination** 34:21 141:15 217:25 | **complaint** 6:7 25:10,11,12,13 25:15 26:4 27:6 | 45:1,4,5 61:10 64:24 76:8 98:15 177:14 | **conservative** 60:5 77:5,8 81:21 82:16 |

combination
  34:21 141:15
  217:25
come 12:24
  13:20 50:5
  70:16 172:12
  178:20 186:17
comes 60:23
  116:14 129:13
  129:17 170:6
  173:15
coming 25:3
  31:7,9 99:9
comment 140:18
comments
  194:11
communicate
  60:12
communications
  28:3
companies
  137:19
comparability
  128:25
comparable
  114:9 128:14,20
compared 114:6
  163:7
compensate
  105:13 106:6
  121:6
compensated
  113:12 119:20
  155:4
compensating
  119:25
compensation
  121:8

complaint 6:7
  25:10,11,12,13
  25:15 26:4 27:6
  30:25 31:1,2,13
  32:6,14,20,22,23
  33:3,7,12,16
complete 20:10
  86:22 132:9
  133:13 135:25
  194:23
completed 226:7
  226:17 227:6
completely
  164:1
completeness
  20:8 21:22
completion
  227:10
components
  35:7
compound 24:12
  36:6,11 45:17
  102:10,12
  215:24 218:6,13
comprehensive
  110:8
computer 6:13
  6:15 14:19 34:4
  85:16 89:21
  130:4,20,21,24
  131:25 132:15
  132:23 133:3
  220:2,5
concern 105:20
concludes 223:1
conclusion 17:22
  18:10 25:3
  26:14 27:5,15

45:1,4,5 61:10
  64:24 76:8
  98:15 177:14
  199:8
conclusions
  177:6,12
conditions 6:10
  6:24 116:9,11,25
  119:6 120:6
  131:10
conduct 36:16
  167:15 183:5
  188:2
conducted 8:12
  8:24 172:8
confer 67:19
confidential 1:13
  2:14
confirm 126:17
  148:18
confirmed 59:21
  117:13
confusion 206:5
connect 84:15
  90:15,18 106:12
connected 88:20
  89:12 96:6
  111:12 129:20
connection 8:13
  35:1
connects 89:21
  136:12
consecutive
  144:1
consent 56:1
consented 55:13
  55:21

conservative
  60:5 77:5,8
  81:21 82:16
  83:13 84:4,5,6
  97:13 100:20
  101:18 102:7,18
  102:22,24,25
  103:9 215:17
consider 113:1
  142:20 143:18
  155:6,6 157:2
  175:13 184:7
  185:15,16,18,23
  185:24,25
  186:15 189:10
  190:1 192:25
  193:15,17
  207:25 216:11
  216:15,17
considered
  21:24 23:22
  50:17 127:18
  150:10 168:7
  189:8,9 192:7
  215:13,14
considering
  107:25 190:6
considers 142:22
  143:19 144:2
consistent 36:15
  75:17 97:25
  98:2 115:11
  119:9 149:24
  189:8 208:15,20
  209:1,12
constant 148:6
  148:15

[constitutes - costs]

| | | | |
|---|---|---|---|
| **constitutes** | **convert** 156:22 | 78:11,15,19,20 | 167:24,25 |
| 199:24 | **converted** | 79:1,24 81:11,25 | 168:10,11 171:8 |
| **consult** 211:4 | 156:22 | 83:1,6,10 86:12 | 171:14,15 |
| **consumer** | **convincing** | 87:6,18 89:6 | 172:12 173:16 |
| 125:21 130:10 | 164:23 | 91:7,16,17,21 | 173:17,20 |
| 134:1 | **cookie** 181:6 | 92:10,25 93:1 | 178:14 179:10 |
| **consumers** 105:9 | 186:21 187:2,12 | 94:13,18,23 96:6 | 179:11 180:8 |
| 130:11,15 | 188:23 190:17 | 96:21 98:12,16 | 181:4,11,14 |
| **contact** 226:9 | 197:16 215:20 | 98:19,22 99:5 | 182:10 183:14 |
| **contain** 225:13 | **cookies** 35:24 | 100:11 103:7,8 | 183:15 189:12 |
| **contained** 35:23 | 36:24,25 37:2,9 | 104:5,6 111:21 | 192:17,21,22 |
| **contains** 33:25 | 49:8 70:15,16 | 112:7,21 115:15 | 194:7,8 195:5,6 |
| **context** 30:12 | 72:11 73:2,4,5 | 118:7,9,10 119:2 | 198:8,9,14,15 |
| 170:19,19 | 158:18 159:5,8 | 119:12 120:1,13 | 201:22 202:15 |
| **contextual** | 159:11 160:1,4,9 | 120:15,20,22,23 | 202:16 204:10 |
| 170:14,20 171:2 | 160:10,14,19,23 | 121:6 122:5 | 204:11,12,16,17 |
| **continue** 8:16 | 162:21 173:12 | 123:9,10 124:1 | 204:21 206:10 |
| 106:16 119:22 | 174:3 179:13,16 | 124:15 125:24 | 206:22 209:15 |
| 119:24 | 180:6,18,20,23 | 125:25 126:7 | 209:16,17,18,23 |
| **continued** 4:1 | 181:1,10,10 | 129:10,15,24 | 219:24 220:5,6 |
| **continues** 33:23 | 184:4 190:7 | 131:23 132:6 | 220:13,14,18,19 |
| **contract** 17:5,6 | 195:5 215:20 | 133:13 135:8,17 | 221:18,19 |
| 17:18,25 18:2,4 | **coordinated** | 135:18 136:1,10 | 222:16 224:3 |
| 18:9,13,16,22,23 | 67:1 | 136:23,24 137:3 | **corrections** |
| 19:4 | **copies** 20:3 | 137:5,12,17 | 226:14,15 227:3 |
| **controls** 56:21 | **copy** 19:25 20:1 | 138:9,10,12,17 | 227:4 |
| 56:23 57:1 | 20:17,17 | 139:6,9 141:11 | **correctly** 44:5 |
| **conversation** | **corner** 117:11 | 141:18,21 | 49:4 77:21 81:4 |
| 23:9 41:22 42:7 | 131:22 | 143:21 144:5,6 | 86:13,13,14 |
| 68:19 153:9 | **correct** 25:10,19 | 145:2,14,15,16 | 127:7 146:8 |
| **conversations** | 26:1,5,12,21 | 146:4 147:5 | 147:10 149:8,11 |
| 24:20 | 27:3 37:11,16,18 | 148:7,15 152:19 | 159:2,15 165:2 |
| **conversion** | 41:8 44:10 51:2 | 154:8,9,18 158:3 | 167:7,7 |
| 58:13 60:15 | 51:4 52:13,15,21 | 158:8,11,12 | **cost** 81:15 164:3 |
| 177:3,15 188:7 | 52:23 53:7,22 | 159:13 161:12 | 165:3 166:8 |
| 195:4,7,23,23 | 54:21,23 58:21 | 161:13,17,18,24 | 167:6 |
| **conversions** | 59:2 65:16 69:1 | 162:1,4,5 166:12 | **costs** 162:2,5,12 |
| 105:22 156:25 | 69:5 70:7 77:25 | 166:13 167:16 | 162:18,24 163:1 |

**[costs - data]**

163:2,12,12,21
163:23 164:12
165:10,12,14,21
**counsel** 8:7,19
9:8,21 10:5,19
18:5,6 31:4
33:13 34:15,22
36:14 37:4,5
49:23 53:10
99:14 116:13,23
130:23 131:1,4,7
131:9,12,14
139:25 171:19
176:6,9 198:24
199:3 200:19
210:24 211:22
212:22 213:13
215:14 216:19
219:8,19,22
220:20 221:21
222:23 225:10
225:16 226:18
226:21 227:7
**counsel's** 222:13
**count** 146:18
147:2
**counted** 145:21
147:8
**counts** 43:20
**county** 225:2
**couple** 106:21
151:7 219:5
**course** 68:25
69:4 166:4
**court** 1:1 2:1
8:21 9:2 10:4
76:25

**court's** 96:2
110:22 111:4
139:22 141:22
185:11 186:12
**courtesy** 66:19
66:21,23 67:17
**covered** 36:24
37:2,8,8 184:19
**criteria** 110:13
**cruz** 3:19 9:24
9:25 10:1
**csr** 1:24 225:4
225:25
**current** 52:10
117:9,9
**currently** 204:21
221:16
**customers** 60:12
60:24 85:6
126:2,21 155:23
157:22
**cut** 21:11 44:15
44:16 159:4
166:5,6
**cuts** 44:12
**cv** 1:9 2:9 8:23

**d**

**d** 5:1 35:17
65:14
**damage** 154:14
**damages** 17:3,7
17:9,17 18:8,15
19:8,14 21:5,5
22:4,7,10,12,13
22:16,16 24:10
24:11 26:11
27:13 34:8,9,20

35:4 36:4,5,17
36:21,22,23 37:1
37:6,20,25,25
38:3,5,25 39:21
39:23 40:1
41:23 43:4,8
44:1,20,23 55:5
55:19,23 58:21
63:1,7,10,17,18
64:21,25 65:2
76:21 77:1,6
78:11,14,17,18
78:22 79:10,19
79:22 80:7,12,13
80:23 81:2
82:23 90:6
91:16 92:23
93:3 96:20,21
97:8 98:10
100:9 101:4,7
113:2,11,19
138:7,8 139:6
142:15 145:8
152:19 153:9,10
154:11,18 155:9
162:17 198:13
199:2 200:13
201:16,19 202:8
202:11,19,24
204:20 206:24
207:10,13 208:3
208:4,11 218:1
220:21
**data** 33:19,22
35:15 38:1 39:8
39:19,20 40:18
45:9 46:24
47:10 49:8 55:3

55:22 58:3,14
61:5,8,13,16,18
62:2,7,11,15
63:1,2,11,12
83:18 84:9 85:4
85:12 86:11,17
86:20 87:6,11,17
87:19,21,22,23
87:24 89:13
90:2,2,6,12,14
90:21,24 94:17
95:11 98:10
103:2 106:25
107:8,9 108:11
108:12,13 109:9
109:9,12,13
110:9 112:18,19
113:20,21,25
114:3,3,11,13,17
114:18,22
121:11,12,18,24
121:24 122:3,5,5
122:16 123:12
123:12 125:22
126:17 127:10
127:20 128:15
129:1 133:5,9,11
133:21,24,25
136:12,22,23
137:1,4,25 138:2
138:5 139:24
140:10,19,24
141:2 142:16
143:1 144:10
146:2,3,7,9,9,10
146:11,21,23
148:1 157:8
158:20,23

**[data - different]**

159:12,24
161:21 163:19
164:7 166:2
168:9,13,19,20
168:23 184:9
185:15 190:2
195:14 197:11
199:18,20,25
205:16 210:3
211:18 213:24
214:5 216:2,6,7
217:12,18,24
221:20,22 222:8
222:14
**date**  226:16
227:5 228:24
**davis**  1:5 2:5
**day**  116:15
144:5 207:3
225:21
**daylight**  2:18,19
**dealt**  89:18
**dearborn**  3:20
**decide**  67:10
**decided**  104:13
138:3
**declare**  224:1
**deduct**  162:2,5
162:18
**deducted**  65:7
162:12 170:25
171:2
**deduction**
160:22
**deemed**  139:17
209:25
**default**  162:21
180:7 190:7

**defendant**  1:11
2:11,16 4:3 8:20
**define**  27:6 29:1
29:8
**definitely**  73:17
86:23
**definition**  26:3
27:20,21 28:8,13
28:14,17,21,23
30:14 49:11
54:3 72:24
122:11 169:25
199:12 205:7
**definitions**  45:11
**demographic**
86:15,16,19,24
87:1,5 133:20
136:8 211:25
**denisha**  4:22
9:21
**depend**  44:17
151:10 185:1
**depending**  85:19
**depends**  8:12
147:13 151:7
**depicted**  195:18
196:5
**deposition**  1:15
2:15 6:1 8:11,19
8:24 20:14
21:19,20 31:20
151:20 180:12
225:6 226:19,22
226:24 227:8,10
**describe**  148:20
**described**  21:4
35:15,18,21,25
79:9 85:24

194:20 215:13
218:10
**describing**  150:2
150:21
**description**  6:3
151:21
**desk**  20:6
**desktop**  132:6
135:22 137:7
**despite**  94:21
**detail**  44:20
103:12
**determination**
24:8,9 199:2
**determine**  17:10
30:10 33:9
73:21 74:14,25
75:14,21 81:8,10
104:8 111:2
128:12,25 133:6
141:17 155:22
185:7 187:6
209:25 210:12
222:10
**determined**  25:6
25:6 79:10,20
202:6,9 203:19
205:13 207:20
226:18,22 227:7
**determines**  73:2
**determining**
23:20 58:12
**develop**  130:10
**device**  35:25
82:15,24 83:9
84:14 85:14
88:5,9,9 89:3
90:16 91:11

92:1,5,6,18,22
93:7 94:2,3,17
94:22 95:16,18
105:12 106:2,6
106:18 129:14
129:17 130:10
132:15 133:3
144:23 145:19
145:25 147:2,13
157:17 158:5,6
205:8 210:5,6,8
210:9
**devices**  84:16
85:14,20 88:20
89:9,12,18 91:13
92:4,23 94:18
95:3,6 96:12,16
110:6 111:12
115:23 119:1
123:3 131:20
155:25 163:20
**dicello**  3:18 10:2
**dicellolevitt.co...**
3:23
**difference**  48:10
48:13 80:4
93:12 114:2
204:11
**differences**
121:17
**different**  13:21
14:2 49:19
79:21 94:7
96:22 103:5
104:15 108:21
108:22 112:13
113:24 114:1,13
114:14,18,21

Page 15

**[different - edge]**

121:18 136:20
153:18 178:24
189:2 202:11
**differently**   94:5
108:9
**difficult**   61:20
61:21 166:5
216:11 218:1,9
218:16,22 219:2
221:23 222:1,5
**digital**   105:10
**dinner**   68:17
**direct**   22:17 67:6
78:8 82:9 86:1
100:13 142:24
144:8,11 176:19
182:4,12
**directed**   216:23
**directing**   79:3
**direction**   225:12
**disable**   137:14
**disabled**   160:24
161:5 215:21
**disagree**   107:13
177:5,11,15
178:16,18
**disclose**   21:18
**discontinued**
126:12,14,15,21
**discourteous**
67:16
**discovery**   96:3
139:23 141:23
184:18
**discuss**   33:8,8
**discussed**   23:22
62:19

**discussing**   38:24
97:7 182:10
**discussion**   25:4
72:9 153:15
163:15 168:15
194:23 200:23
**discussions**   18:4
18:6 22:22 29:7
33:12 36:13
37:4 40:9 93:23
143:4,10 154:24
156:11 157:6
165:25 200:19
**disgorgement**
17:5 18:13
**display**   159:22
166:10 167:14
167:22 168:16
168:20,20 169:6
183:4,18 187:4
187:13,25
188:11
**displayed**   40:16
44:8,9
**dispute**   27:7
**distribute**
153:20,21
**district**   1:1,2 2:1
2:2 8:21
**divide**   153:13,25
154:15 155:7
209:13
**division**   1:2 2:2
8:22
**docs**   150:10
**document**   23:15
49:24 50:2,8,12
50:14 52:25

53:4,19,24 54:2
54:3 117:20,24
117:24 118:1,4
118:11,14,17,21
131:20 132:20
149:1,2,3,8,14
162:16 172:7
173:4 177:17
178:7 184:8
186:16 189:2
190:6 213:3,18
213:19 217:14
**documents**
148:21,25 149:9
149:15 150:2,20
151:1,5 178:7,20
193:18
**doing**   19:7 43:8
53:13 77:3
101:25 119:11
119:18 121:5
170:19
**dollar**   154:1,15
**dollars**   85:17
**double**   145:21
**doubling**   128:11
**doubt**   115:21,25
116:3 119:3,4
134:4,10 181:17
**dr**   176:21 177:1
177:6 178:17,19
187:18,18,19
192:4,8
**draw**   48:13
173:7
**drawing**   48:10
**drive**   4:12

**driven**   177:3
**dropped**   210:19

**e**

**e**   5:1 35:20 226:9
226:12 227:1
228:3,3,3
**earlier**   30:19
65:15 68:18,24
78:16 83:11
102:23 103:22
104:18 106:8
118:24 125:14
143:9 144:21,24
157:8,14 171:11
182:10 191:2
194:3 195:13
198:7 209:24
221:13,14,20
**earn**   85:13,18,20
85:23,23 86:8
87:13 88:14,21
88:22 89:2,10
134:15 158:19
159:12 219:23
**earned**   63:22,23
154:23 161:16
161:20,23
**earns**   154:20
**east**   64:15 66:22
**eastern**   2:18,18
8:9
**economic**   108:14
108:24
**edge**   24:14 26:5
26:9,16 40:3,6,8
41:10,25 64:11
194:1,6

Veritext Legal Solutions
866 299-5127

[effectively - exhibit]

**effectively** 210:6
210:9
**efforts** 24:6
**eight** 149:22
**either** 22:15 41:9
87:18 132:18
142:14 156:3
181:10 186:5
204:4
**electrical** 89:17
**electronically**
8:7 31:3 49:23
116:12,22
130:22 131:1,4,6
131:9,11,14
171:19 176:5,8
**eligibility** 137:10
**eligible** 135:6
**email** 115:4
136:7
**emails** 49:16
**emanuel** 4:4,20
9:11,18,20
**employees** 189:1
**engaged** 59:4
**engineer** 89:18
**enriched** 45:7
57:11,15 58:16
59:11,16,23
60:22 61:6 62:4
62:7,11 162:4
**enrichment** 17:4
17:11,17,19 18:8
18:12,15,22 19:1
19:3 21:4 22:4,7
22:15 23:22
24:10 34:16
37:5,11,16 39:24

44:1,20 55:5,23
58:3,21 59:9
60:2,22 63:17,18
63:21 96:22
97:2,4 151:23
152:10,18,22
153:1,12,13,18
153:19,22
154:11,15,18
155:9 157:2
160:13,15 161:9
161:11,20,23
162:1,18 167:1
171:7,12 172:12
182:1,8,9,22
187:13 191:21
191:24 202:9,13
204:15
**enrichments**
160:12,12
**ensure** 21:23
30:17 36:14
**enter** 136:17,22
**entered** 49:9
**entering** 52:1
**entire** 139:19
140:10 144:5
**entirety** 70:22
150:23 205:19
**entitled** 62:16,25
78:14
**envision** 62:6
**equal** 79:22,25
80:3,13 121:10
121:16,23 122:2
122:4,10 154:7,7
157:2

**equally** 123:17
124:23 155:4
156:3,24 181:13
**equipment** 13:10
13:15,19,23
14:12,16 16:8
**equivalent**
201:10
**errata** 226:14,16
227:3,5
**especially**
156:24
**esq** 3:5,12,19 4:5
4:11 226:1
**essential** 180:23
**estimate** 77:22
184:12
**estimated** 65:2
205:18,24 206:6
206:18
**et** 79:24 80:23
**evening** 211:13
**event** 147:17
**evidence** 10:14
167:3 177:2,6
**exact** 118:21
**exactly** 11:16
13:19 23:25
141:8 179:23
**examination** 5:6
10:22 211:11
219:16 225:10
**example** 35:10
48:1 58:4 93:17
93:17 114:21
121:18 129:6
156:21 159:4,5
172:14 181:25

182:7,9,14
190:17 197:16
208:10 222:8
**examples** 125:21
**exchange** 128:14
**exclude** 24:9
25:6,7 168:12
170:20 184:1,3
184:22
**excluded** 22:10
23:4 24:14,19
183:25
**exclusion** 23:8
**exclusive** 21:24
**excuse** 32:5 36:8
66:8,8
**executed** 224:4
**executive** 82:3
**exhibit** 6:4,6,6,8
6:9,11,13,15,18
6:20,22,23,25
7:1,2,4 8:5
20:14,16 31:1,1
31:2,2,6,9 32:1,8
32:19 33:15
49:21,22 116:8
116:10,11,21,24
116:25 118:3
120:7 130:18,19
130:21,24 131:2
131:5,8,10,13
132:19,19
133:16,17
134:21,22
171:16,18,20,24
172:16,21 176:2
176:4,7,11,13
179:2 180:12

[exhibit - finish]

186:21 190:16
192:20 195:19
196:5,11 197:17
212:5 216:18
**exhibits** 6:1
**exist** 56:16
150:22
**existed** 189:5,5
189:22 195:21
197:5,5
**exists** 57:2 149:2
**exit** 40:12
**expect** 119:19
121:5 161:20
**expectation** 14:6
154:24
**expectations**
49:19
**expects** 119:17
**experience** 31:23
48:17 49:2 52:2
54:20 69:11
**expert** 6:4 7:2
8:5 29:8 30:9
31:22 89:19
105:5 114:19
159:19 176:4
199:13
**experts** 192:3
**explain** 57:18
88:17 154:2
174:12,14
**explained**
152:11 163:20
165:18 169:8
**explaining** 102:2
132:1 170:13

**explanation**
37:15 106:22
**explicitly** 21:9
21:15
**expressed**
204:20
**extended** 66:23
**extension** 82:14
88:24 101:15
215:3
**extent** 17:13
26:13,15 27:14
34:14 35:6
56:11 57:22
60:17,18,21 61:9
64:23 72:25
87:22 96:1
104:17 111:11
128:24 140:24
142:12 160:11
160:11 184:18
189:7 190:8
195:24 196:24
202:23
**extra** 42:10
126:2
**eye** 94:22 95:2
95:20

**f**

**f** 35:13,23
**fact** 38:9 81:19
93:3 94:21
151:4 155:18,21
161:11 192:23
196:10 201:24
202:3 221:7

**factor** 147:23
**factors** 215:13
**facts** 108:22
155:13 213:2,17
**fair** 27:8,17
41:21 44:19
104:23 108:3,6
**fairly** 156:4
**fairness** 185:8
185:13
**falls** 45:11
**familiar** 25:9
118:1
**fani** 4:11 9:18,18
116:14,19 117:6
117:8,13,18
171:24 176:13
**faqs** 6:22,25
131:8,13
**far** 22:8 45:21
62:10 160:15
**fashion** 84:11,12
125:13
**feasibility** 21:1
**feature** 120:25
**features** 120:13
179:17
**federal** 227:1,8,9
**feel** 20:17 27:24
99:4 128:22
**felt** 71:19
**fenton** 4:24 9:1
**fi** 87:14 88:1,20
89:12 90:25
91:4
**fiber** 129:19,20
**fight** 222:21

**figueroa** 4:6
**figure** 85:2 86:1
88:18 167:8,12
169:10,11,11,12
169:14,15,16,18
169:19,19,22,22
170:1,1,6,6,8
179:2,6 180:2
181:24 182:21
187:21,21 188:5
192:17 194:23
194:23 205:15
206:9 212:5,10
212:12 213:21
213:23 214:22
214:25 219:19
**figures** 170:2,2
**filed** 8:21
**fill** 116:4,6 119:1
211:24
**finally** 163:24
**financial** 16:14
16:18
**financially** 9:5
**find** 69:10
151:19 163:25
164:16 215:15
**finder** 161:11
**finding** 69:14
151:16,17
**finds** 76:25
**fine** 42:22 125:3
**fingerprint**
35:15
**finish** 64:17
66:10 67:12
84:21,23 105:14
140:13

Veritext Legal Solutions
866 299-5127

[finished - given]

**finished** 105:15
140:14,16 143:7
162:8
**firefox** 22:24
23:3,8 24:2,8,15
24:20,22 25:5
26:9
**firm** 9:3 180:16
**first** 11:17 21:6
31:17 36:24
51:2,23 78:10,21
82:1 83:17 86:7
91:14 92:5
117:11 132:14
132:23 147:21
159:22 167:18
180:18 182:12
183:3,17 188:12
201:1
**fit** 64:3
**five** 12:18,19
13:6 14:23
15:17 16:10
38:15 76:2,14
77:20,25 78:1
118:6 138:21
144:4 145:24
158:14 175:16
211:3
**flat** 144:23 207:6
**flexner** 3:4 4:18
9:14
**floor** 3:13,20 4:6
**florida** 3:7,14
**flows** 35:7
**focus** 51:19,23
**focused** 196:22

**focusing** 195:7
**follow** 84:24
85:1 91:22
130:7 169:15
**following** 21:7
49:7 51:5
127:19 188:25
189:1
**follows** 53:18
226:8
**font** 51:16
**footnote** 22:17
22:21 24:24
27:19 50:3,9
150:25
**footnoted** 151:17
**footnotes** 150:11
150:14,25
**footprint** 34:22
36:15,16
**foregoing** 224:2
225:6,13
**forget** 41:7
**form** 11:9,11
12:7 13:1 17:21
21:16 24:23
26:6 27:14 29:4
34:11 36:19
52:24 56:13
65:20 81:16
87:7 90:8
107:10 109:14
121:14,25
141:12 155:12
158:21 184:16
185:21 186:17
189:20 194:17
200:17 204:23

207:7,16 208:6
221:10
**forming** 118:18
**forth** 225:7
**forthepeople.c...**
3:16
**forums** 49:9
**found** 52:21
54:23
**foundation**
52:25
**four** 76:2,14
77:20,25 84:16
89:9 145:23
200:12,15,16,19
200:20 206:23
207:13
**fourth** 27:24
28:1
**frame** 113:5
149:10
**franklin** 3:13
**frcp** 227:1
**free** 20:17 27:24
88:9
**frequently** 6:16
130:25 132:20
**fresh** 66:25
**front** 19:21
20:17
**full** 38:5 173:5
225:13
**fully** 45:19
**function** 79:10
79:18,20 80:2,20
**further** 17:12
35:15,18,21,25
219:3,16 222:20

225:16
**furthermore**
83:21 192:1
**fyi** 172:24

**g**

**gains** 60:6
**general** 29:5
96:24 132:15
133:3
**generally** 13:5
91:17 99:3
107:4,5 114:8
150:8,9
**generate** 35:9
162:3
**geolocation**
35:20
**getting** 67:18
99:22 109:10
**gigapower** 85:7
125:15 128:11
137:24
**give** 10:15 50:4
81:22 84:4,5
92:2 93:18 97:5
97:9 103:5,6
104:22 106:25
114:21 116:16
125:1 133:11
134:17 135:7
136:22,23 137:1
151:8 157:20,21
165:16 176:20
214:21 215:8
**given** 62:10,11
62:18 65:7
81:19 91:14,21

Page 19

**[given - google's]**

| | | | |
|---|---|---|---|
| 102:21,21 108:6 | 136:6 147:7 | 24:1,4,21 28:4 | 142:1,2,13,16,21 |
| 134:15 140:22 | 149:3 162:10 | 35:9,23 39:5,7 | 143:11,12,15,18 |
| 144:3 168:17,17 | **going** 27:25 | 39:19 40:15,18 | 144:10,14,17,22 |
| 168:19 215:9,10 | 28:12 34:19 | 42:24 45:7,16,19 | 144:24,25 |
| 220:7 223:1 | 38:13,18 40:3 | 45:22,25 46:4,6 | 145:12 149:21 |
| **gives** 124:2,2 | 47:21,23,24 66:2 | 46:6,8,12,14,24 | 154:20 155:10 |
| **giving** 81:15 | 66:9,11,18 67:6 | 47:4,8,10 48:1,8 | 155:15,20 156:7 |
| 84:2,2 104:20 | 68:3 90:17 | 48:14,15,17,21 | 156:24 157:9,15 |
| 121:2 123:18 | 99:16,17,23 | 48:23,24,25 49:2 | 157:16,18,19,24 |
| 137:4 | 104:13 108:23 | 49:17,20,24 | 159:24 160:8 |
| **glean** 129:3 | 109:16 112:15 | 51:24 52:8,9,22 | 161:6,16,20 |
| **global** 163:8 | 112:20 117:21 | 53:6,21 54:5,18 | 162:2,15,20,23 |
| 165:7 | 125:6 138:24 | 54:20 57:9,10,14 | 163:22 164:11 |
| **go** 8:17 11:12 | 140:3 148:8,10 | 57:16,19,25 | 164:14 165:5 |
| 13:2,4,25 14:1,3 | 151:24 152:3 | 58:14,15,17 59:9 | 166:9,9,11,22 |
| 14:4,20,20 23:17 | 157:20,21 | 59:10,16,18,22 | 168:22 169:2 |
| 32:7 38:17 | 171:25 175:21 | 60:3,6,11 61:4,6 | 171:11 179:3,9 |
| 39:13 40:10,17 | 186:6 190:15 | 61:7,15 62:4 | 181:4 183:3,8,10 |
| 43:6 44:5,6,6,8 | 192:25 193:3,5 | 63:12 65:6 71:8 | 184:7 187:25,25 |
| 49:5 66:18 67:2 | 193:12,19,23 | 72:6,24 73:1,25 | 188:19 189:1,3 |
| 69:19 73:15 | 194:2,15,21 | 81:15 82:18 | 189:23,23 |
| 74:3,7 75:4,5,5 | 196:25 198:1 | 87:20 89:23,24 | 191:11 192:23 |
| 86:23 90:3,4 | 210:21,24 | 90:7,25 93:7,24 | 192:25 194:11 |
| 91:25 112:11 | 219:11 | 94:4,10 95:15,17 | 194:15 196:25 |
| 124:25 129:7 | **golf** 13:10,14,18 | 95:19 96:15 | 199:10,21 200:1 |
| 132:18 134:21 | 13:23 14:12,16 | 97:19 98:3 | 200:5 211:22 |
| 134:22 137:19 | 16:8 | 100:22 101:1,6,7 | 215:14 216:3,10 |
| 140:17 143:6,8 | **gonna** 68:14 | 101:16,20 102:3 | 216:19 217:11 |
| 151:8 153:24 | **good** 8:8 9:13,25 | 102:4,19 105:8 | 217:18,23 226:4 |
| 158:15 162:6,9 | 10:7,24,25 11:1 | 113:21 116:1,8 | 228:1 |
| 162:10 166:19 | 56:15 64:14 | 116:11,21,25 | **google's** 21:4 |
| 169:11,15 | 68:9 211:13 | 118:5,18 119:1,5 | 23:14 33:10 |
| 190:10 194:18 | **goog** 6:8 7:1 | 119:17 120:6 | 96:2 110:13 |
| 196:14 212:5 | 49:22 50:1 | 122:17,21 | 139:23 141:23 |
| 216:18 219:7 | 171:18 | 123:13,18,20,23 | 147:25 156:7,14 |
| **god** 10:16 | **google** 1:10 2:10 | 123:23,24 124:6 | 158:19 159:11 |
| **goes** 86:23 87:21 | 4:22 6:9,11 8:20 | 124:8,12,13,13 | 163:4,7 164:2,7 |
| 132:11 136:3,4,5 | 9:12,19,21 22:24 | 124:17 140:24 | 165:3,7 166:3 |

[google's - identification]

182:1 189:14,15
189:24 191:25
195:22
**google.com**  39:6
40:10,16 42:25
**gotten**  72:16
178:22,25
**graph**  149:5
**graphs**  149:2
**great**  68:15,17
**greater**  156:15
156:17,17,18
**group**  4:23 9:22
46:9 113:18
216:4
**grown**  177:4,18
**growth**  177:21
177:21,23,25
178:3,8,12,21
**guess**  31:7 43:23
61:11,14 62:5
71:18 80:4
81:17 113:7
150:14 152:23
169:24 175:4
187:18 207:1
216:20
**guessed**  54:15
**guessing**  54:4
**gutzler**  3:18 10:2

**h**

**h**  228:3
**half**  133:19,20
**halfway**  27:20
**hand**  10:12
51:19,22 117:11

**handled**  226:8
**happen**  62:9,18
129:23 165:4
**happened**
134:23 186:22
**happens**  63:5
134:23
**happy**  99:19
151:24
**hard**  48:7
140:15
**harm**  17:3,6,11
19:10,11,14,16
19:19 22:16
96:20 206:25
207:5,14,21
208:1,5
**harmed**  45:11
45:13
**head**  150:6
**hear**  77:21
102:11 213:4,6,7
213:9
**heard**  8:14 77:20
170:16
**heavy**  93:19,20
163:5
**help**  10:16 60:14
60:14 78:5
133:25
**helpful**  80:18
**hey**  38:13 94:5
**hi**  10:7
**high**  87:14 88:1
88:10 178:11
**higher**  83:19
84:10 103:3
193:16

**highest**  161:23
161:25 205:22
**highlight**  85:5
**highlighted**  84:7
**history**  28:4
29:17,24 30:2,6
30:8,13,14 49:8
49:13 103:6
120:19 121:20
143:12
**hochman**  22:23
23:10,13,23
24:21 25:4 29:7
33:8,13 34:15,21
36:14 37:5 40:9
47:3 72:9 93:24
93:24 123:11
143:4,10 147:11
154:25 156:12
156:13 157:6
163:16,20
165:17,20
168:15
**hold**  31:7,16
54:8 58:24
84:23 112:1,1
120:4 134:6
165:16 178:3
187:23 204:25
218:2
**holding**  122:10
**home**  11:4 16:14
89:21 115:5
129:21 154:17
**honest**  65:25
**honked**  179:21
**hope**  41:4

**horn**  179:21
**hour**  38:14 92:5
92:5,24 94:1,2,6
94:8,21 99:9
**hours**  68:16,16
92:3,7,8,10,18
92:20,22 93:11
93:12,25 150:17
157:17,20
158:14,15,16
**house**  108:19,20
108:22
**household**  88:15
110:8 133:21
**households**
110:6,12
**huh**  51:20 52:4
85:8 106:17
**hypothetical**
39:1 42:16 43:5
43:21 44:2,5
55:24 61:23
62:10,12,25
64:24 76:22
91:24 92:3,11
200:23 201:18
203:5,11,21
206:15

**i**

**identical**  113:21
**identification**
8:6 31:3 49:23
116:12,22
130:22 131:1,3,6
131:9,11,14
171:19 176:5,8

Veritext Legal Solutions
866 299-5127

[identified - indicator]

**identified** 6:3
29:6,13,25 30:1
30:21 31:14
32:11,25 109:2
125:13,23
127:18 165:10
165:12
**identifies** 22:6
189:25 222:15
**identify** 93:16
114:20 137:25
138:2 151:9,20
162:25,25 163:2
190:12 193:14
196:9 216:7
217:8
**identifying** 21:1
28:3,16,20 29:11
29:22,23 30:3,7
30:8,11 35:13
137:19 164:12
**illinois** 3:21 4:13
**illustration**
180:17 192:19
200:24
**illustrative**
186:22
**imagine** 11:19
61:11 77:7
**impact** 33:10
60:17,17,18
64:12 160:9
162:15,16,19,20
165:8,9 171:13
171:17 173:4
174:2 177:17
178:6 184:8
186:16 187:11

189:2,10 190:6
191:24
**impacted** 174:19
174:21 175:8,8
**impacts** 191:21
**implementation**
174:20 189:4,24
195:22 196:19
**implemented**
190:5
**implicated**
183:14,20 187:3
188:5
**implied** 174:2
**importance**
123:12
**important** 57:19
111:1 122:25
123:16,17,20
124:6,8,20,22,23
144:16 155:25
156:2,14,21,24
**impression**
80:14
**inappropriate**
38:3,7,11 77:5
175:13
**incent** 106:15
157:9,10 214:20
**incented** 134:16
134:19
**incentives**
119:22,24
**incentivize** 79:11
79:23 80:22
81:1,5,21 103:23
104:9,12 158:2

**include** 22:4
24:8 25:4 33:2
138:3 160:12,13
168:8 190:10
195:15,25 210:2
212:18 213:15
213:20 214:5,7,8
**included** 24:14
35:10 40:2,5,19
40:24,25 43:13
43:14,15,25
44:14 114:22
135:17 146:24
187:8 190:12
196:1 214:10
226:14 227:3
**includes** 21:1,7,9
25:18,25 27:21
115:1 167:21
**including** 9:8
21:3 28:3 35:14
42:11 111:10
128:18 130:11
144:22
**incognito** 12:14
25:19,22 36:22
39:4 41:3,5,7,9
41:14,17,18,24
42:3 43:15 48:2
48:15,22,25 49:5
49:20 50:22
51:5,24 52:1,8
52:17,21,22 53:5
53:6,20,21 54:18
54:22,23 58:4,5
59:1 60:9 69:20
69:21,23 70:1,3
70:6,11,12,18

73:19 95:15,16
95:18 146:7,15
146:16,17 148:6
148:15 149:3,4
149:18 150:1
158:22 165:5
168:6 179:3,10
184:5 190:21,21
191:13,13,15
201:3,11,21
217:3,12 218:4
**incomplete** 43:5
55:24 61:23
64:24 76:22
91:24 92:11
**inconsistent**
39:14 163:13
**incorrect** 143:22
177:10
**incorrectly** 42:2
**incremental**
163:12 165:14
**incurred** 162:3
**independently**
196:2
**indicate** 166:20
167:4 192:12
194:20
**indicated** 23:24
23:24 24:4
105:8 147:11,25
149:11 163:16
216:24
**indicates** 85:5
193:8
**indicator** 82:16
97:14 100:20

[indicators - intermittently]

**indicators**
125:12 127:19
**individual** 79:11
79:23 80:22
81:1 82:17
97:15 100:21
103:23 104:9
139:20 144:12
153:1 160:18
187:1,2 199:18
201:2,11,21
202:5,14,17,20
202:22 204:2
205:8 218:3
221:6
**individually** 1:6
2:6 36:18 37:21
38:1
**individuals**
157:13 160:22
160:24 161:2,5
**info** 129:9,12
**inform** 148:22
**information**
14:19 16:23,24
28:4,16,20 29:6
29:11,13,22,23
29:25 30:3,5,7,9
30:11,21,24
31:12,13 32:11
32:25 33:9,24
34:8,15,18 35:3
35:8,13,23 36:3
36:18 37:7,21
38:4,24 46:25
49:7,8,13 57:20
57:22,24 58:6,8
58:11,12,13 60:7

60:11,16 62:22
64:8 70:16 71:3
71:6 72:3,4,7,12
72:22,23,23 74:1
74:1,6,20 75:6
75:20 84:1
86:15,16,19,22
86:24 87:1,4,5,9
89:23,24,25
90:18 101:21,23
102:20 104:3
106:10,23 107:3
107:19,22 108:2
108:5,6 111:14
115:1,2,3 118:1
122:11,12,17,19
123:1,16,19,19
124:2,5,7,17,18
124:19 126:4
127:1,6,12,13
128:5,9,13,17,20
128:21 129:3,4,8
129:13,16,17,22
130:9,9,15
132:11 133:24
135:14 136:6,8
136:18 137:16
142:2,3,4,7,12
142:21,23
143:11,14,15
144:14 155:1,18
155:22,24 156:8
156:23 163:23
165:7,8 169:2,3
169:4 178:22,25
184:19,20,21,25
185:6,7,9,25
186:1,14,15,19

187:10,11,14,15
187:16,20
188:18 190:20
191:11 192:6,11
192:21 193:4,8
197:18 199:11
199:12 200:4
209:2,10 211:25
214:21 215:9,11
216:10,16
218:16,21
222:10
**infra** 35:15,18
35:21 36:1
**infrastructure**
163:5,6 166:6,7
**inhouse** 9:21
**initial** 89:11
**initially** 104:2
**injury** 44:22
45:6
**input** 73:6
106:11 115:1
215:5
**inputs** 172:11
**inquiry** 111:1
**ins** 184:8,10,12
187:1 188:13,23
192:1,16,24
196:22 215:21
215:21
**inside** 75:23
**install** 87:13
88:1,9,19,25
132:6 135:22
137:7
**instance** 43:11
43:13,16,20 83:4

113:9 143:16,17
146:7,24 147:15
155:4 194:19
199:20 200:2
211:22
**instances** 23:25
36:21 40:23
43:10,18 53:11
63:25 81:8,9
138:15 141:1
145:22,24,25
146:10 147:18
147:19 148:1
156:5 199:14
200:8 203:7,14
203:18,23 204:4
204:7,8,18 205:2
205:4,6,11,14,19
205:25 206:2,7
207:23 218:11
218:18 222:7,7
222:11,15
**instructed** 5:12
**intended** 101:24
**interacting**
93:21
**intercepted** 28:5
29:14 30:5,22
31:15 32:12
33:1,25
**interested** 9:5
225:18
**interests** 128:18
**interfaces** 115:2
**interfering**
31:19
**intermittently**
24:5

**[internal - know]**

**internal** 178:20
178:20
**internet** 8:13
35:1 40:5,10,13
41:1 89:21
90:15,19 125:16
126:3,9 129:24
130:12 133:7
**interpretation**
33:6
**interrupted**
150:18
**interrupting**
67:15
**interruption**
65:11
**interruptions**
53:12
**intimating**
161:10
**introduce** 81:24
116:20
**introduced**
149:18
**investigated**
199:1
**investigation**
73:24
**investment**
212:1
**invitation** 150:6
**involve** 42:8
129:24
**involved** 42:16
**ios** 193:15,17,17
193:24
**ip** 34:25 121:19
161:3

**ipsos** 86:3 94:16
94:17 102:19
104:24 105:3,8
107:3 109:19,25
110:5,14 111:3
113:14,17,22
114:4,10,17,22
144:22 211:17
211:23 215:1
219:23
**irrelevant** 66:5
**isolation** 60:20
**issue** 30:13 55:3
61:5,8,12,16
63:2,12 86:11,17
86:19 87:5,10,17
87:19,24 89:13
98:6,10,11,21
99:1 113:20
114:3,18 128:15
130:16 142:16
144:10 158:19
158:23 159:12
168:9,13,19,20
**issued** 21:20
35:17
**items** 35:12
103:1

**j**

**j** 6:4 8:5
**james** 3:5 9:13
31:18 66:6
211:13 226:1
**javascript**
160:25
**javascripts**
215:21

**jeremy** 1:5 2:5
**jlee** 3:9 226:2
**job** 1:25 53:13
226:5 228:2
**john** 3:12 9:14
**join** 87:13
**joined** 133:21
**jose** 8:22
**july** 1:18 2:19
5:4 8:1,10
225:21 226:3,5
**jumped** 61:22
**june** 26:20 27:1
28:6 118:20
148:2,7,7,14
**jyanchuis** 3:16

**k**

**kansas** 126:24
126:25
**katie** 164:14
**keep** 13:3 15:21
16:4 70:19
79:12 82:18
97:15 100:22
103:24 109:16
151:24 169:23
**keeping** 16:23
**key** 46:8
**kind** 27:4 40:20
64:4,11,12 186:5
192:9 210:4
**kinds** 13:7 16:5
**knew** 111:9
**know** 11:25
12:23,24 13:18
13:19,23 14:16
15:21 17:24

18:1 21:17
25:15 29:1
33:17 34:5 41:1
41:14,18 46:7,20
47:15,21,25 48:4
48:4,6,7,11
49:15 51:10,25
57:19 61:17
62:21,23 65:21
66:2 73:12,14
74:18 75:7 76:6
84:12 87:19
89:24 90:14
93:6,25 94:1,7,9
99:11 105:17
106:9,15 107:8
107:21,24
108:21 109:9,12
110:16,19,24
111:8,16,20
114:25 115:3,24
116:5 117:17,23
118:16,19
121:22 122:20
122:21,22,24,25
123:16,17,20,23
123:24 124:13
128:24 129:8
131:15 132:11
134:14 135:6,12
135:13 136:3,4
138:18,18
140:14,15,21
144:20 145:21
149:17,20,21
150:5,16 151:14
156:21 157:15
157:21 159:4

Veritext Legal Solutions
866 299-5127

**[know - lee]**

164:5,6 165:4,6
166:18 170:15
171:22 176:10
176:15 177:22
178:6 180:12
181:15 182:16
184:24 185:4,17
186:5,17,18
192:2 193:3,7,7
193:8 208:14,19
209:19 212:7
215:19 217:2
222:9,9
**knowing** 16:22
106:24 124:19
143:13 191:6,18
**knowingly** 79:12
79:23 80:22
82:17 83:25
84:4 97:15
100:21 101:19
102:9 103:5,23
104:3,9,14,16,17
104:20 106:25
107:18 108:5
133:11 136:18
136:23 137:2
214:21 215:10
**knowledge** 40:13
**known** 12:14
**knows** 48:1,25
52:8 53:6,22
54:5,12,13,16

**l**

**l** 65:14
**label** 49:25

**lack** 52:25
**large** 155:23
156:9,15
**lasinski** 1:15
2:15 5:7 6:2,5
8:6,19 10:11,24
11:7 16:25
19:21 28:13
31:21 32:6,9
38:23 44:19
54:9 66:14 68:8
77:14 78:3
84:25 99:13
100:3 105:4
117:19 125:11
139:4 150:21
151:18,25 152:8
159:18 176:1
198:6 211:13,16
212:22 213:5
219:18 223:2
**lasinski's** 21:17
192:7
**late** 61:22
181:22
**latham** 7:4 176:7
180:16 186:23
216:21
**launch** 173:12
**law** 180:16
**laws** 224:2
**lawsuit** 25:10
114:18 184:10
**lawyer** 18:20
**lay** 90:20
**leading** 105:21
130:8 213:18
216:13 217:5,14

217:21 218:7,14
**learning** 58:1
60:8
**learns** 48:16
54:19
**leave** 40:11,12
212:24
**lee** 3:5 5:10 9:13
9:13 11:9 12:7
13:1,8,16 14:7
14:13 16:2,12,20
17:21 18:17
21:11,16 23:15
24:12,23 26:6,13
26:22 27:14
28:12,18 29:4
31:5,16,24 32:5
32:15 33:4
34:11 36:6,9,10
36:19 37:12
38:13,17 39:10
43:5 44:3,24
45:17 46:16
48:18 50:4
52:24 53:8,9,15
53:23 54:8
55:24 56:6,13
61:9,19,22 64:14
64:19,23 65:14
65:20,24 66:2,8
66:14,17 67:5,6
67:9,14,21,23
68:2 69:6,12,18
69:24 71:17
73:11,23 74:16
75:2,16 76:8,11
76:22 77:11
78:2 81:16

84:20,23 87:7
90:8 91:24
92:11 94:24
95:22 96:1,7
98:13 99:10,13
101:9 102:10,12
105:4 107:10
109:14 110:21
111:4 112:1
113:3 115:11
116:16 117:1,3
117:12,16 118:6
118:8,12 121:14
121:25 122:6
124:24 125:2,5
127:24 128:2
139:22 140:3,7
141:12,22 145:4
146:20 150:13
150:18 153:3,23
155:12 158:21
158:25 159:18
162:8 165:23
172:16,19,24
175:19 179:4
181:21 184:16
185:3,11,21
186:11 187:23
189:20 190:21
190:24 191:13
194:17 196:13
197:25 199:8
200:17 203:9,16
204:23,25 207:7
207:16 208:6
209:5 210:17
211:1,3,12,13
212:10 213:4,21

Veritext Legal Solutions
866 299-5127

**[lee - maintain]**

214:4,22 216:2
216:15 217:7,14
217:17,23 218:9
218:17,23 219:3
219:10 221:10
222:21 226:1
**left** 51:1,19,22
60:10 117:11
131:22
**legal** 9:2,3 17:21
18:10 19:5,6
26:14 27:4,15
33:6 35:7 44:25
45:3,5 61:10
64:24 76:8
98:15 199:8,9,12
199:13 223:3
226:7
**leslie** 1:24 2:20
9:3 53:15 65:14
225:4,25
**level** 46:14,20
115:9 149:16,24
153:13,16,17
166:1 210:6,6,10
**levitt** 3:18 10:2
**liability** 167:15
182:5,6
**light** 93:19
**likelihood** 60:15
**limit** 98:6
**limitation** 42:15
**limitations** 25:25
26:18
**limited** 26:4
98:21 100:10,11
101:4 153:9
207:22

**line** 27:24 28:1
33:19 40:20
59:3 64:17 66:3
66:11 67:12
97:12 100:18,19
179:21 205:15
226:15 227:4
228:4,7,10,13,16
228:19
**lines** 215:22,25
**link** 94:17 96:16
110:6 117:10
145:1,7,13,18
**links** 95:19
**lisinski** 226:5
228:2
**listed** 117:10
137:20
**listen** 41:12 42:6
74:12 130:11,15
**literally** 138:21
**literature** 109:3
109:4,8
**little** 15:8 38:14
59:7,7 72:25
82:24 83:2,8
99:22 108:9
149:6,7 150:16
165:6 177:23
197:22 209:24
211:5
**llc** 1:10 2:10
4:22 8:21 226:4
228:1
**llp** 3:4 4:4,18,21
216:21
**load** 116:16,20
201:6,6,7 209:20

209:21
**loaded** 172:25
**loads** 65:3,9,13
200:4 201:11,21
202:15,17,20,22
202:25 207:23
208:14,20
209:10,14 218:4
**location** 48:1
52:8,10 53:7,22
120:18,19
**locked** 226:12
227:1
**log** 143:24
**logged** 98:3
143:25 144:1,4
145:2
**logic** 186:10
**logs** 145:2
**long** 11:14,16
26:25 27:9
140:15 143:13
144:15 145:18
**longer** 112:23
163:22 182:16
**look** 16:15,18
51:7 65:18 69:8
71:1 78:4 99:16
117:21 126:6,8
150:13 157:17
164:15,17 170:6
170:8 173:5
174:14,17
175:11,17 178:8
185:14 193:13
196:12 208:10
210:7 213:21
217:1

**looked** 114:5
123:8 149:4
163:25 164:1,5
164:24 165:2
166:23 187:11
187:14,15,15
**looking** 13:19,21
16:14 43:9 49:6
65:22 69:4,8
107:2 150:7,23
196:21 210:5
**looks** 146:15
164:2
**los** 4:7
**lose** 73:3
**lost** 193:1 196:20
**lot** 31:22 41:16
44:12,20 49:16
90:9 107:23
172:11
**lots** 58:8,8
153:18
**low** 157:21
163:12
**lower** 53:11
**lunch** 64:15 66:3
66:9,11,20,24
67:7,11 68:9,15
68:24

| m |
| --- |

**m** 146:14,14
**machine** 57:25
60:8
**mail** 127:8
**main** 194:3
**maintain** 115:9

Veritext Legal Solutions
866 299-5127

**[majority - mentioned]**

**majority** 40:4
61:15
**making** 27:4
29:15 140:15
169:24 178:2,4
**maps** 52:9
**marin** 225:2
**mark** 20:13,15
31:1 49:21
116:7 171:16
172:23
**marked** 8:6 31:3
32:7,19,20 49:22
116:12,22,24
118:3 130:18,22
130:25 131:3,6,8
131:11,13
133:17 171:18
176:1,5,8 180:11
**market** 93:6,8,8
93:21 108:23
**marketed**
109:24 110:4
**marketing** 130:8
**marketplace**
93:13 144:21
155:3
**mask** 161:3
**massachusetts**
2:17
**material** 64:2,12
191:22,24 192:2
192:13
**math** 169:17
**mathematical**
177:11
**matter** 8:20
10:15 21:1

68:25 69:3
82:24 83:8
200:12
**mature** 149:22
**maximum**
161:15,19
**meal** 66:25
**mean** 13:12,24
14:17,18 16:7,21
22:12 27:4 36:7
40:20 41:7,14,16
43:7 44:13 46:6
47:17,19 48:6
49:3,6 54:12
55:12 61:14
63:3,3,10 71:1
72:19 73:13
74:17 75:3 83:2
83:5,16 85:16
89:17 90:21
98:6 99:16
101:3 103:14
108:18 114:19
122:1 127:22
128:3 129:13,16
134:12,13,17
136:16 139:19
141:24,25 142:1
143:24 149:19
149:25 150:1
153:16 157:7
162:7 163:24
164:25 165:13
165:24 166:17
167:3,4,25
169:17 170:5,17
171:5,6 178:18
178:19 186:13

189:21 203:25
206:3 207:18,21
208:16 222:9
**meaning** 80:20
157:9
**meaningful**
166:8
**means** 29:11
180:3
**meant** 41:5,9
105:13 106:6
**measurable**
105:22
**measure** 102:7
143:21 144:18
144:19,20
**measurement**
144:17
**measures** 21:2
143:23
**measuring**
106:24
**mechanically**
152:25
**media** 8:18
105:10 130:8
223:2
**meet** 67:19
158:13
**member** 57:11
58:20,25 59:2,12
59:17,17,23 61:1
61:3,5,7 62:1,13
62:24 63:11
82:23 88:15
91:11 95:14,17
95:18,21 96:12
96:17 119:22,25

138:12 139:18
139:20,21
142:17 143:20
144:9,10 152:18
154:4,17,21,23
154:25 155:1,6,7
155:11 200:9
206:21,25 207:5
207:14 208:5
210:1,3 222:7,12
222:16,18
**members** 26:11
63:24 69:16,22
70:23 76:3,18
77:10 81:5
87:25 88:4,7,8
90:24 103:19
110:5,7,12,16,24
110:25 111:2
112:9 120:21
136:21 137:1
138:17,17
139:12 141:1,3
153:1 154:12,16
155:16,17,22
156:2,10,16,16
157:2 160:3,18
160:19 204:2,5
205:8,8 206:11
206:19 216:3
217:19,24
218:24 221:18
**mention** 173:4
173:11
**mentioned** 17:15
17:15 19:10
65:15 75:24
146:3 157:24,25

Veritext Legal Solutions
866 299-5127

**[mentioned - model]**

164:9,11,22,23
165:17 171:11
194:3
**mentioning**
192:16
**mentions**   181:3
**message**   33:24
**meter**   82:15
88:24 89:1,3,13
101:15 215:3
**method**   91:4
93:8 107:1
138:11,16
139:11 141:18
141:21 152:18
154:13 157:4
160:3,18 165:1
197:8,14 205:2
209:25
**methodologies**
140:23 142:14
203:2 221:13
**methodology**
37:24 64:9 77:2
78:19 83:9
152:9 161:9
186:10 189:15
202:6,7,14,18
210:7 220:1
221:16
**methods**   17:10
65:10 138:8
139:5 152:17
159:23 208:11
**metric**   215:5
**metrics**   194:12
**miami**   3:7

**michael**   1:15
2:15 5:7 6:2,4
8:5,19 223:2
226:5 228:2
**michigan**   1:17
8:1
**middle**   96:25
99:15 188:6
204:6
**midway**   198:22
██████████
**mind**   38:15
62:18 220:25
**minimum**   115:9
136:10 158:8,10
158:13,14
**minute**   77:15
125:1 152:1
175:16 210:16
**minutes**   30:19
38:15 64:18
67:13 106:21
138:21 144:4
150:24 151:7
197:23 219:6
**mischaracterizes**
24:23,24 29:4
46:16 52:24
53:23 90:8
94:24 101:9
109:14 141:12
145:4 155:12
185:21 194:17
200:17 204:23
204:25 207:17
208:7 213:19
221:10

**misconceptions**
50:23
**misconduct**
45:12 96:3
139:23 141:23
**missed**   17:13
**missouri**   126:25
**mistake**   104:18
**mistakenly**
77:25
**misunderstand...**
153:7
**mixed**   104:17
**mobile**   6:14,16
44:14 85:17
88:25 114:23
129:12,14,17
130:4,20,21,24
131:25 132:15
132:24 133:3
214:9,12 220:10
220:12
**mode**   12:2,6,12
12:14,19 13:4,7
14:5,11,22 15:3
15:5,9,13,18
16:6,10,16,18
23:3,9 26:1,20
27:1,10 30:15
36:22 39:4,5
40:15 41:5,7,9
41:14,15,16,18
41:18,24,25,25
42:3,3,9,16,23
43:15,19 44:6
46:4,9,15 47:1
47:11 48:2,15,22
48:25 49:20

50:22 51:24
52:1,8,23 53:6
53:21 54:18
55:4 57:8,15,24
58:4,5 59:1 60:9
60:10 61:2,4,16
62:1,14,21,22
64:8 69:20,21,23
70:1,3,6,8,11,19
71:2,12,15,23,25
72:1,3,7,21
73:15,19,22 74:4
74:8,14,19 75:1
75:5,14,19,23
76:20 77:17
82:19,25 91:11
95:15,16,18
96:13 97:20
99:3,6,7 100:11
100:23 101:2,8
101:17 102:5,6,8
102:20 104:14
111:11 112:10
112:11,12,14,15
112:20 113:1
114:12 146:15
148:6,15 158:22
159:4 165:5
167:22 181:14
181:19 190:21
190:22,23
191:13,14,15
201:3,11,21
207:24 217:3,4,9
217:12,13 218:4
**model**   44:1,21
63:17,18 64:6,7
64:21 156:1,1

[model - note]

162:17 163:13
163:17 172:12
192:1,2,10
201:19
**modeled**  159:16
178:24
**modeling**  124:3
**modes**  23:4
41:23 42:8
70:24 194:1
201:3,22 218:4
**modified**  118:19
**modify**  83:2
**monetary**  21:2
21:25 22:3
119:24
**monetize**  33:11
**money**  107:23
**monique**  1:6 2:6
**month**  41:3
43:15,17 81:25
82:2,7,14,24,25
83:6,7,9,20,23
84:10 85:6 88:5
88:15,21,23 89:5
89:10 91:14,21
92:2,3,5,7,9,10
92:18,22,25 93:7
93:11,12,18,19
93:20,25 94:2,2
94:6,8 100:18
101:6,14,22
102:3,16 106:14
107:24 113:9
115:10 126:2
134:14,15,18,20
135:7 143:24
144:3,5 145:24

148:2 154:8
155:4 156:5
157:17,20
205:16 209:17
220:7,9,17
**monthly**  40:22
43:9 63:24 81:8
81:9 82:16 83:4
84:14 97:14
100:20 105:12
106:3,6,13,15
138:15 143:16
143:17 144:23
145:21 146:23
157:11,11 158:2
200:8 203:6,13
203:18 204:4,7,9
205:5,10,13,23
218:11 219:24
222:6,11
**months**  12:15
14:24 15:1,10,14
144:2
**morgan**  3:11,11
9:15,15
**morning**  8:8
9:13,25 10:7,24
10:25 66:4
78:16
**move**  50:18
74:11 75:11
81:23 135:15
136:15 151:19
151:23
**moving**  34:24
108:21 138:6
193:3

**mozilla**  22:23
23:25 24:21
**mozilla's**  23:10
23:13 24:6
**muling**  163:21
**multiplied**
175:11
**multiply**  170:9
170:11,11 175:7
201:6 203:18
206:18

| **n** |
| --- |

**n**  4:12 5:1
**name**  9:1,25
115:4 131:23
136:7 225:20
**named**  210:13
217:19
**narrative**  164:10
177:20 214:19
**nature**  77:8
**necessarily**  30:6
122:14
**necessary**  73:6
79:11,20,22
80:21,25 82:16
96:18 97:14
100:20 103:22
104:9 142:8
145:8 217:24
226:14 227:3
**need**  20:15 42:6
43:22 134:8
140:2 150:16
155:14 175:16
192:13 219:5

**needed**  115:25
**negative**  156:23
**neither**  137:1,1
225:16
**network**  129:19
129:20
**nevertheless**
28:5
**new**  31:16 66:3
104:4 146:16
147:9,14,15,15
179:3,9 184:5
188:13 215:21
217:17
**nguyen**  164:14
**nice**  53:13
**nielsen**  6:13,15
6:18 85:16,19,19
130:4,7,19,21,24
131:2,23 132:5,8
132:14,23 133:7
133:12,17 134:5
134:11 137:23
**non**  26:1,8 60:9
74:11 103:17
104:12 166:22
190:21 191:13
199:9
**normal**  166:4
**north**  3:13,20
**northern**  1:2 2:2
8:21
**notating**  226:15
227:4
**note**  8:11 31:25
99:8 133:7
204:6

**[noted - okay]**

noted  128:16
157:14 223:4
notes  20:3,4,8
175:17 197:24
nothing's  31:7
notice  6:19
131:3 133:18
noticing  9:10
notification
115:22
notifications
118:25 211:25
notified  66:10
ntp  192:16
197:10
number  6:3 8:22
30:17 40:22
43:9 63:24 64:2
65:2 78:5 80:3
81:8,25 82:7
83:17 85:20
93:5 102:6
103:3,4 115:5
117:1 118:9
138:11,16
139:11,17,20
140:25 144:8
146:10 147:18
153:13,22 154:1
154:12,16 156:4
156:9,15,17
161:25 162:14
171:22 173:18
174:9,10,23,25
175:10 184:8,10
184:12,14,23
185:1,10 186:9
188:14,15,22

190:9 195:8,11
195:16 200:3,9
201:2,10,20
202:4,19 203:6
203:13,22 204:5
204:7 205:7,7,13
205:22 206:1,11
206:19 209:14
209:25 212:6
218:3,10,23
223:2 226:15
227:4
numbers  135:2
193:20 207:23
numerous  18:3
83:22 103:4

**o**

o  65:14
o'clock  64:15
66:21 175:22
oakland  1:2 2:2
oath  225:8
object  11:9
31:25 61:23
64:23 96:1
99:15 110:21
113:5 139:22
140:7 186:11
212:23 213:13
objection  11:11
12:7 13:1,16
16:20 17:21
21:16 23:15
24:12,23 26:6,13
27:14 29:4
32:15 34:11
36:9,19 37:12

39:10,12 45:17
46:16 52:24
53:23 56:13
61:9 65:20,24
75:16 77:11
81:16 87:7 90:8
94:24 96:7
101:9 107:10
109:14 111:4
121:14,25
141:12,22 145:4
155:12 158:21
181:21,22
184:16 185:3,11
185:21 189:20
194:17 200:17
204:23 207:7,16
208:6 209:5
212:21 213:2,17
214:2,18 215:24
216:13 217:5,14
217:21 218:6,13
218:25 221:10
objections  9:6
31:19,23 218:20
225:9
observing  10:1,8
obtain  83:8
144:14
obviously  42:6
66:5 81:7 82:3
88:6,8 99:17
142:21,22 185:5
occur  63:8,20
199:10,14
occurs  72:10
odd  40:21

offer  19:16
37:24
offered  19:16
23:3
offering  18:24
18:25 19:2,5
91:6 126:17
office  11:5
226:11
offset  76:20 77:1
77:7
oh  30:8 69:20
85:22 89:7
92:20 105:15
140:14 173:24
182:17,23
210:18,20 213:8
okay  20:20
29:16 31:24
33:18 41:11,11
42:13,13,18
49:14 50:6,14
51:9,11,21 66:17
78:7 81:12 82:8
83:12 85:3 86:2
88:14 92:21,22
94:16 97:11
98:24 99:21
100:6,16 102:14
104:23 105:11
106:19 108:3
109:11,16,21
110:3,3 111:18
113:6,20 115:21
116:17,19
117:12,16,18
118:8,12,13
119:11 120:8,9

**[okay - outlined]**

| | | | |
|---|---|---|---|
| 125:2,17,21 | 220:1 221:3,4 | 57:14 58:15 | 192:5 |
| 130:6 131:18 | 222:20 | 62:3,16 69:13,15 | **opt** 56:4 85:6 |
| 132:11,18,22 | **once** 27:1,10 | 71:11,22,24 | 126:2 184:8,9,10 |
| 134:10 135:15 | 80:20 133:21 | 72:14 73:8 | 184:12 186:16 |
| 136:9,15,25 | 143:25 144:4 | 76:16,21 77:2 | 187:1,8,15,16 |
| 138:23 139:4 | **ones** 93:16 | 78:4,4 79:5,9 | 188:13,23 |
| 140:3 146:3,13 | 188:11 | 80:21 81:14 | 189:25 192:1,16 |
| 148:5,12,13,21 | **ongoing** 113:4 | 82:12,22 84:1 | 192:20,24 |
| 151:18 152:13 | **online** 28:4 | 86:18 87:25 | 196:22,23 |
| 152:14 153:21 | 29:16,24 30:2,6 | 88:2 90:3,5,6,23 | 215:21,21 |
| 161:22 164:17 | 30:8,13 79:14 | 91:1,6,10 95:24 | **opted** 185:2 |
| 165:17 170:6,7 | 82:19 97:19 | 102:21 103:20 | 195:12,17 196:4 |
| 171:4,9 172:1,3 | 98:20 99:2 | 104:15,25 | 196:10 197:9,15 |
| 172:19,24 173:3 | 100:23 101:2,8 | 111:15,19 | **opting** 56:20 |
| 173:10,11,22,25 | 101:16 102:4 | 112:16,22 | **option** 112:11 |
| 174:2,16 175:2 | 110:8 115:10 | 113:20 114:8,10 | 120:25 |
| 175:15,19 | 127:3 132:9 | 122:18 139:15 | **options** 183:13 |
| 176:14,18 | 135:25 | 141:11,20 142:9 | 195:3 |
| 178:16 179:5,24 | **ooo** 223:5 | 142:24 143:3 | **order** 49:1 54:19 |
| 180:15 182:17 | **open** 20:18 | 144:7 148:22 | 96:2 110:22 |
| 182:23 183:1,2 | 53:12 176:16,17 | 155:5,8 156:3,6 | 111:5 133:25 |
| 183:16,24 | **opening** 176:3 | 165:19,21 | 139:23 140:8 |
| 184:14 188:10 | **opens** 146:15 | 178:19 186:25 | 141:23 185:3,12 |
| 192:19 193:22 | **operate** 110:7 | 191:12,23 | 186:12 211:19 |
| 194:5,9 197:25 | **operating** | 193:11 194:14 | **organization** |
| 198:21 200:22 | 193:17 | 198:13 199:7,16 | 79:14 |
| 200:25 201:17 | **operative** 25:9 | 199:17,24 | **organizations** |
| 203:20 205:9 | 25:13 26:4 | 200:15 202:5,7 | 127:19 135:16 |
| 206:11,23 | **opinion** 18:14,24 | 204:20 206:20 | **original** 226:10 |
| 209:19 210:11 | 18:25 19:3,6,11 | 207:25 208:2,22 | 226:21 |
| 210:11 211:1,3 | 19:17 22:1,9 | 215:4 221:8 | **outcome** 9:5 |
| 211:14,15 212:4 | 26:12 29:3 | **opinions** 13:8 | 225:19 |
| 212:9,18 213:1,7 | 30:12 37:11,16 | 18:7,15 19:5 | **outline** 33:23 |
| 213:21 214:4,15 | 37:19 38:25 | 63:10 103:11 | 64:10 |
| 214:22 215:4,12 | 40:19,21 43:4 | 118:19 178:17 | **outlined** 17:12 |
| 215:18 216:2 | 46:3,10 47:24,25 | 198:10 | 17:14 30:25 |
| 217:1,7,17,23 | 48:3 54:4,13 | **opportunity** | 31:13 32:13 |
| 218:23 219:3 | 55:5,13,17,19,23 | 81:14,19 167:5 | 59:10 60:4 |

Veritext Legal Solutions
866 299-5127

[outlines - particular]

**outlines** 25:15
**outside** 16:2
  24:17 58:3
  179:22
**outweigh** 74:9
  95:9
**overall** 36:21
  60:13 149:14
  164:3,3 165:3,3
  166:3

**p**

**p.m.** 2:18 38:22
  68:4,7 99:24
  100:2 125:7,10
  138:25 139:3
  152:4,7 175:22
  175:25 198:2,5
  210:22 211:9
  219:12,15 223:1
  223:4
**page** 20:22 22:18
  22:18 34:25
  41:20 50:7,8,18
  50:19 65:3,9,12
  65:13 78:5,6
  85:2,5 86:1
  105:7 117:11
  125:15,19 130:2
  131:25 132:14
  132:23 133:18
  133:19 134:25
  135:1,2,3,4
  146:16,18 167:8
  167:11 173:5
  179:2,3,4,9
  181:24 182:21
  184:5 187:22

  188:5,13 192:16
  197:10 198:16
  198:17,20,20
  200:4 201:5,6,7
  201:11,21
  202:14,17,20,22
  202:25 207:23
  208:14,19 209:6
  209:7,10,14,20
  209:21 212:6,11
  213:22 215:21
  218:3 219:20,20
  220:23,24,25
  221:1,2 226:15
  227:4 228:4,7,10
  228:13,16,19
**pageloads** 201:2
**pages** 1:25 65:5
  65:5,7 128:19
  129:7 225:13
  226:14,17,17
  227:3,6,6
**paid** 110:6
  157:11 166:15
  167:2 212:13
  213:25
**panel** 6:9,11,14
  6:16,18 82:13
  83:21,25 85:17
  86:4 104:24
  105:3 107:4
  109:25 110:5,17
  111:3 113:14,22
  116:8,11,21,25
  118:5,18 119:5
  119:18,22,25
  120:6 130:4,20
  130:22,25 131:2

  131:25 133:17
  133:21 134:5,11
  134:16
**panelist** 112:25
  136:19
**panelists** 87:2
  106:7 119:17,19
  119:25 120:2
  121:5 133:12
  137:11
**paper** 19:21 20:6
  20:9,11
**paragraph** 20:22
  20:25 21:15,23
  33:15,23 35:19
  78:5,9,21,21
  79:4 81:24
  85:13 97:6,6,7
  100:5,14 101:10
  103:20 104:7
  105:7,19 109:19
  109:23 127:14
  127:16,25 130:1
  135:19,20 137:6
  138:8 141:13
  147:20,22
  151:15 152:11
  154:2 170:8,9
  172:15 173:2,6,6
  173:7 176:20
  198:19 200:10
  202:8
**paragraphs**
  35:16,21 106:20
  128:6,10 176:20
  176:23 177:2
  203:3

**pardon** 218:2
**part** 12:9,13
  25:2 39:20 57:7
  88:4 105:17,18
  107:22 108:1,4,5
  119:24 136:4,6
  141:10 156:7,8
  158:11 167:24
  167:25 171:12
  177:14 180:18
  214:1,25
**parted** 107:19
**partially** 141:2
**participant**
  113:14 135:10
**participants**
  8:14 82:13
  83:23 105:13
  111:8 115:8,14
  118:25 120:12
  133:10 135:12
  135:13 155:3
**participate**
  106:16 110:8
  133:22 134:5,11
  157:10 211:19
  211:23 212:13
**participating**
  134:16
**particular** 57:11
  93:15 117:23
  118:16 121:11
  121:12 123:25
  124:1,14 128:4
  170:10 176:24
  179:2 181:3
  191:17

Veritext Legal Solutions
866 299-5127

[parties - phone]

**parties** 8:16
**parts** 28:8
126:25
**party** 9:4 36:24
36:25 37:2,9
40:17 70:15,15
72:11 73:2,4,5
158:18 159:5,7,8
159:11 160:1,3,9
160:10,13,14,19
160:22 162:21
173:12 174:3
179:13 184:4
190:7 195:5
215:20 225:17
225:17
**pass** 211:1 219:4
**pauses** 140:15
**pay** 93:7 125:22
126:2 127:20
144:22 158:2
166:11
**paying** 47:22
213:24
**payment** 80:25
80:25 81:21
82:13,16 97:14
100:20 101:14
105:12 106:3,6,9
106:11,15
115:10 128:14
212:18 213:15
**payments** 79:11
79:20,22 80:21
83:22 86:4
103:4,22 104:8
106:14 214:5

**pays** 94:16 102:4
**pbi** 221:17
**pdf** 20:1,5
226:12 227:1
**peak** 205:5,10,13
205:16,21 206:6
221:17
**penalty** 224:1
226:16 227:5
**pending** 32:1,1
84:24
**people** 40:4,10
40:13 45:21
47:12,19,20,21
48:7 49:17,17
54:3,15 58:7
73:13,14,17,21
74:7,14,18,25
75:4,7,14,18,25
76:1 77:16
93:22 94:11
107:21,21
112:10 113:17
123:2 124:6
133:8 135:11
144:22 146:22
215:8,8,10,19
216:4
**perceived** 74:9
**percent** 24:7
51:2 52:18,20
53:2,3,5,20
54:22 55:1
118:22 148:5
149:6,7,7 163:9
163:10 170:11
170:12 173:11
174:5,21,22,25

175:4,5,6,12
177:8,8,18,18,19
177:22,23 178:3
178:7,9,10,13
**percentage**
164:4 173:13,15
185:2
**percentages**
164:4 178:10
**perform** 115:14
115:18 221:23
222:2,5
**performed** 37:3
162:15
**performing**
23:20 105:23
**period** 27:1,11
38:4 42:24 61:2
141:4 154:2
173:19 177:4,25
201:4,22 203:8
203:15,24
204:19 205:20
206:12 209:11
218:5,12,19,24
226:18 227:7
**periods** 124:10
**perjury** 224:1
226:17 227:6
**perks** 94:7
**person** 14:18
46:8 62:15
113:1,11,13
122:20,21
**person's** 72:13
72:15,18 90:20
119:15

**personal** 12:13
12:20 40:12
68:23 69:1 70:1
**personalization**
57:2 71:9 72:10
159:6,7 166:21
**personalize**
48:16 49:1,13
52:1 54:19
70:12 71:7
**personalized**
56:21 65:16,18
68:19,20 69:10
69:16 70:8,9,14
70:21,24 71:5,15
71:25 72:6,8
73:7,10,16,18,22
74:2,10,15 75:1
75:8,15,22,25
76:19 77:10,17
128:18 129:5
161:6 166:19,22
168:9,13
**personalizes**
71:8
**perspective** 60:5
90:20 95:9,10,13
108:14,14,24
120:2 149:13
177:11 199:10
214:9
**pertains** 39:23
39:25
**peterson** 4:20
9:19
**phone** 88:25
114:23 214:9
220:10,12

**[phones - private]**

**phones**  214:12
**photographs**
  36:1
**phrased**  107:14
**pick**  161:11
**picking**  100:18
**piece**  89:7 184:1
  187:12 199:18
  199:25
**pieces**  22:21
  31:13 33:24
  34:7,18 35:3
  36:3,18 37:20,25
  38:24 47:11
**pin**  106:19
**place**  8:16 46:23
  78:12 163:6
  225:7
**placed**  114:23
**plaintiffs**  1:8 2:8
  3:3 9:14,15 10:2
  21:3,5 25:9
  32:13 33:2
  210:13 211:14
  217:19
**plan**  19:16
**planning**  151:23
**please**  8:11 9:7
  10:4,12 27:19
  31:23 51:19
  53:16 67:15,19
  74:12 100:17
  116:19 117:7,16
  127:14,25
  131:15 143:6,7
  151:14,20 162:6
  164:17 194:24
  219:20

**plus**  75:7 88:9
**point**  73:1 85:12
  89:11 141:16
  150:25 157:8,25
  159:25 187:20
  194:10 201:2,10
  206:1
**pointed**  211:23
**points**  83:18
  84:9 85:4 103:2
  138:1,2,5 219:23
**policy**  6:11
  116:21 118:5,18
**pop**  181:6,18
  186:21 187:12
  188:23 189:8,11
  189:22 190:3
  191:10 192:19
  195:18,21,25
  196:4,11,16
  197:4,16 215:20
  216:20,24 217:2
  217:2,11
**portion**  65:2
  126:1 135:6,10
  142:4 164:8
**portrait**  135:25
**positive**  156:23
**possibilities**
  190:11
**possibility**  62:19
  63:6
**possible**  39:18
  129:25 138:7
  139:5 161:15
**post**  20:8
**potential**  187:1
  193:1 200:12,15

200:16,20
  201:13 203:6,12
**potentially**  40:2
  40:25 76:5
  91:19 162:3
**pre**  66:24
**preceding**  23:2
**precise**  20:12
**preferable**
  139:14
**preference**
  133:25 139:16
**preferences**
  125:16 126:3
**prejudice**  202:2
**premarked**
  20:15
**present**  4:17 9:8
  26:20 27:2 28:6
**press**  47:19
**prevent**  125:22
**previously**  153:7
**printed**  19:25
  117:14
**printout**  6:13,15
  6:18,20,22,25
  117:9 130:19,21
  130:24 131:2,5,8
  131:13,18
  180:15
**prior**  24:24
  35:25 46:16
  56:19 147:25
  173:12 185:22
  195:21 196:17
  197:6 221:4
**privacy**  6:11,19
  81:15 102:9

105:21 116:21
  118:5,18 120:4
  131:2 133:18
**private**  12:2,6,12
  12:14,19 13:4,6
  14:5,11,22 15:3
  15:5,9,13,17
  16:6,10,16,17
  23:3,4,8 24:16
  26:1,20,25 27:10
  27:12 30:15
  39:3,4 40:14
  41:9,15,16,23,24
  41:25 42:3,8,9
  42:16,23 44:6
  45:8 46:4,8,15
  47:1,11 55:4
  57:8,15,23,23
  60:9 61:1,3,16
  62:1,14,20,21
  63:24 64:8 65:2
  65:12 70:19,23
  71:1,3,12,14,22
  71:24 72:1,2,4,6
  72:7,20,22,24
  73:15,18,21 74:3
  74:8,14,19,25
  75:5,14,19,23
  76:19 77:17
  79:13,13 82:18
  82:25 83:4
  91:11 92:7,8,10
  92:24 95:11
  96:12 97:16,23
  97:25 98:5,6,11
  98:21 99:1
  100:11,22 101:5
  102:6,7,17,20

**[private - putative]**

103:24 104:3,13
106:22 107:22
108:1,4,5 111:10
111:11 112:10
112:12,15,20,25
113:8 114:12,12
138:15 140:25
145:1,13,18
147:8,14,18
156:5 158:11,24
159:4 167:22
181:14,18 194:1
200:2 201:3,21
203:7,13,18,23
204:4,7,8,18
205:2,4,5,10,13
205:19,24 206:2
206:6 207:22,24
209:10,14
214:21 217:3,8
217:12 218:4,11
218:17 222:7,11
222:15
**privately**   64:2
67:19 73:9
76:10 81:20
91:14,19,20 92:2
98:1 180:7
220:3,11,12,16
**prizes**   134:18
**probably**   47:4
103:12 183:2
**procedure**
226:19,20
**proceed**   10:5,19
**proceeded**   55:4
**proceeding**   9:6

**proceedings**
1:16 2:16 8:4
65:11 225:14
**process**   110:9
**produce**   142:3
193:19
**produced**   117:3
117:5,12,14,16
139:25 146:1
151:5 184:10
186:3,6 188:19
216:3 222:8
**produces**   140:24
142:1,3
**production**
147:25
**products**   48:17
49:2 52:9 54:20
**profile**   116:1
119:1 132:9,12
135:25 136:3,4,5
**profits**   35:9
**program**   85:6
104:24 109:19
125:16 126:3,11
126:21,23
127:11 132:1
**project**   179:12
**pronounced**
146:14
**proportion**
142:15 206:24
207:14,21 208:4
208:5,25
**proportional**
155:9 208:1,13
208:16

**proposal**   152:25
207:12
**propose**   138:7
140:21 142:14
152:17,21
154:11 202:5
204:15 205:1
207:13
**proposed**   26:11
77:2 139:5
160:2,17
**proposition**
156:9,18
**propositions**
155:20
**proven**   55:2,21
**provide**   60:14,14
60:24 82:23
87:14 122:17
127:6 133:23
136:18 141:14
153:18 166:7
211:25 217:24
217:24
**provided**   22:1
83:7 102:25
103:8,13 139:16
144:3 164:10
184:15 217:18
226:19 227:8
**provider**   130:8
**provides**   84:13
84:16 177:2
205:18
**providing**   87:1
112:6 180:17
190:19 192:21

**public**   117:4,14
**publicly**   46:25
118:4,10 127:2
127:13 135:14
**publish**   171:25
**published**   47:14
48:9
**publisher**   166:12
167:2
**publishers**
166:16
**pull**   212:4
**purchase**   203:13
**pure**   15:25
201:18
**purpose**   105:2
**purposes**   12:20
15:12,16 16:5
27:13 29:3
32:20 49:25
57:4 104:24
145:11 172:5
197:8,14 200:23
**put**   21:7 67:23
67:23 106:19
108:22 155:18
205:16
**putative**   25:16
59:12,17 60:25
61:3 63:11
69:16,22 70:23
76:3,18 77:10
87:25 88:4
90:24 91:10
95:14,17,21
96:12,17 110:16
112:9 120:21
136:20,25

**[putative - really]**

138:17 154:21
206:21
**puts**  112:13,15
112:20
**putting**  214:4

**q**

**qamer**  4:18 10:6
10:7
**qualifications**
25:21,22,24
**qualifier**  42:21
**qualify**  20:9 86:8
106:10
**qualitatively**
114:13,17 115:7
**quality**  8:12,13
**quantification**
19:11,15 27:13
**quantified**  19:18
26:16,16 34:18
39:22 78:17
**quantify**  22:10
34:8,9 35:4 36:4
36:5,17 37:20,24
38:25 39:21
41:23 59:8 60:2
77:9 80:23
81:14 98:9 99:1
124:12
**quantifying**  19:7
21:2 26:10 43:3
44:23 187:11
**quantitatively**
114:14 115:6
**question**  21:12
25:2 27:9 28:9
28:18 31:11,17

31:17 32:7,9,16
32:21 34:6,6,14
35:2,6 36:2
37:14 41:13
42:2,7,9,14,15
42:18,20 43:2,24
43:25 48:20
49:4 53:8,13,16
53:19 54:12
56:19,19,20
59:13 60:1
61:21 71:19
74:12 75:25
76:1 79:17 80:5
80:15 84:24
91:9 96:9,14,24
99:15 103:9
105:24 107:12
107:13,14 108:8
109:6,7 113:3,8
114:1 119:8
121:22 134:7
140:1,4 145:7
146:8 148:12,13
151:3 152:23
159:2,9,10,15
160:17 165:25
172:3 183:16
186:7,8 188:12
196:8 201:9
203:20 204:22
207:2,17 213:4,6
222:14,17
**questioning**
40:20 59:3
64:18 66:3,11
67:12

**questionnaires**
133:23
**questions**  5:12
6:17 28:14
31:21,25 35:12
39:1 67:7 68:21
68:22 128:12
130:25 132:20
172:22 188:10
210:15 211:20
212:2,23,24
215:23 216:1
219:3,19 220:20
221:5 222:20
**quick**  38:15
173:8
**quickly**  58:24
117:21 138:19
**quinn**  4:4,20
9:11,18,20
**quinnemanuel....**
4:9,15
**quite**  207:1
213:11
**quote**  222:4

**r**

**r**  228:3,3
**r&s**  227:1,9
**raise**  10:11
**range**  198:24
199:3
**rate**  67:17 81:4,5
81:11 83:19
84:10 103:3
108:6 144:23
157:11,11 158:2
197:4,5 199:2

200:13,24
201:14,15,17,20
203:4,10,19
206:15,16,18,20
207:3,6,10,12,20
**rates**  178:21
**reach**  60:13
155:21,24 156:9
156:15
**read**  20:23,23
22:20 24:3,4
25:11 27:24,25
28:11,13 32:6
46:6 49:10,11,15
53:15,17 79:7,8
82:10,10 93:10
100:17 101:12
101:13 103:21
127:16,17
179:23 198:7
**reading**  22:21
28:7,8 80:21
84:18 100:17
111:18 130:6
179:20 198:11
198:23 226:23
227:9
**reads**  203:22
**ready**  148:12
172:25,25
**real**  38:15 173:8
**reality**  44:11
**realize**  192:15
197:22
**realized**  168:21
**really**  44:17
58:24 68:20
93:20,20 117:21

Veritext Legal Solutions
866 299-5127

**[really - related]**

182:24 205:5,21
205:21,22
**reask** 105:24
**reason** 24:19
76:24 93:23
115:21,25 116:3
119:3,4 134:4,10
150:18 162:22
162:23 177:5,9
178:16,18
181:17 193:22
194:3 202:11
228:6,9,12,15,18
228:21
**reasonable**
46:11 93:2
99:12,17,18
119:19 141:7
142:11 148:18
149:24 157:1
166:14,25
215:15
**reasons** 13:17
58:19 59:10
73:8,13 83:17
84:6 93:5 94:13
162:14 199:15
**rebuttal** 176:2
176:21 198:7,11
**recall** 11:25
13:13 14:8,10
15:15 30:22
59:24 65:22,25
68:19,20,21,23
69:4,8,9,14
77:14 86:21
87:10 100:7
115:17,19

118:20,20 119:5
138:4,5 149:1
176:23 186:20
191:7 215:22,25
216:23 219:18
220:20 221:9,24
222:2
**receipt** 34:9 36:4
**receive** 76:19
91:15,16 115:10
121:9 168:23
**received** 20:2
28:5 29:14 30:5
30:22 31:15
32:12 33:1
169:2,4
**receives** 39:7,19
40:18 156:7
166:10
**receiving** 14:11
74:10
**recess** 38:20
68:5 99:25
125:8 139:1
152:5 175:20,23
198:3 210:23
211:7 219:13
**recognize** 50:14
**recollection**
174:8
**record** 8:9,17
9:9,17 20:24
22:21 24:4
27:25 31:24
35:13 38:17,18
38:21 53:17
59:4 66:13,18
67:2,18 68:1,3,6

72:10 77:24
79:7 80:6 82:10
99:23 100:1
102:13 105:4
114:23 116:8
125:6,9 127:17
130:7 134:8
138:24 139:2
140:6 146:13
148:22 149:2,9
151:21 152:3,6
159:18 172:23
175:21,24
187:17 192:11
193:4,8 197:12
197:19,23 198:1
198:4,23 210:21
211:8 212:10
219:8,11,14
222:23,25
225:14
**recorded** 8:15
8:18 225:11
**recording** 8:12
8:16
**recruit** 110:7
**rectangle** 86:7
87:12 88:11
**red** 180:19
216:24 217:2
**redirect** 210:24
211:2,4 219:18
**reduce** 166:6
**reduction**
105:21
**reductions**
168:17

**referenced** 226:6
**referencing**
206:8
**refers** 28:16,20
138:11
**reflect** 77:24
**refresh** 31:8
174:8
**refuse** 67:2
**regard** 24:6
172:3
**regarding** 148:1
199:2
**regardless** 82:19
97:20 100:23
101:2,8,17 102:5
194:14
**register** 110:18
111:3
**regular** 42:10,11
99:3,5,7 112:11
112:14 148:6,15
**reinstallation**
147:2
**reinstalled**
147:13
**reinstalls** 147:1
147:4,7
**reintroduce** 82:7
**relate** 60:8
**related** 9:4 25:18
37:7 56:19
77:16 89:13
90:11,12,21
130:9,20 156:8
171:6 177:14
180:17 187:11
195:23 225:17

Page 37

**[relates - researched]**

**relates** 17:3,17
26:8 30:14
36:21,23 37:10
37:15 60:9
73:25 162:24
164:6 177:12,19
194:25 200:12
**relationship**
142:25,25 144:8
144:11
**relative** 148:6,15
165:7 166:3
**relatively** 149:22
164:7 209:11
**released** 226:21
**relevant** 61:2
199:2,4
**reliable** 121:24
121:24 122:2
**relied** 36:13
50:16
**relief** 21:2,25
22:3
**relinquish** 79:12
79:23 80:22
82:17 97:15
100:21 103:23
104:10,14,16
**relinquished**
104:4
**relinquishing**
102:9 104:4
**rely** 171:21
**relying** 222:14
**remainder** 168:6
**remained** 148:6
**remaining** 150:7

**remember** 42:20
69:7 77:18
86:13 87:9
127:7 147:10
191:4 211:20
212:1 216:19
**remembering**
149:8,10
**remote** 1:16 2:16
53:10
**remotely** 8:24
9:8
**remove** 166:15
166:25 192:24
**removed** 165:22
167:4,7
**repeat** 28:18
32:16 37:13
42:18 43:22
48:20 53:8 96:8
152:24 179:20
199:22 203:9
213:5,10
**rephrase** 98:24
**report** 6:4 7:2
8:5 17:13,14
19:25 20:2,13,22
21:8,10,15,18,21
21:25 22:14
23:5 24:18 49:6
50:3,9,10,17,20
77:4 78:4,13
82:2 84:7,19
100:5 105:5,7
109:20 125:13
125:19,23
135:17 137:20
138:3,9 146:4,7

147:21 150:3,7
150:12,24
152:11 159:19
162:16 164:15
164:20,21 167:9
167:10 172:5,17
173:1 176:2,3,4
176:21 177:2
178:9 179:1
180:2 181:24,25
182:19,21
187:21 192:3,17
198:8,16 203:3
204:20,25 207:9
208:9 212:4,11
216:8 219:20
220:23,24
**reported** 1:23
146:19
**reporter** 2:20
9:3,23 10:4,6,10
10:18 36:8
53:13,17 222:23
**reporting** 120:19
**represent** 50:2,8
58:6 117:8
155:23 164:19
177:1 211:14
**representation**
27:17 182:5
**representations**
25:5 217:1
**representing** 9:1
28:7 139:24
**represents** 82:15
100:18,19
161:15

**request** 34:3,20
184:18
**requested** 227:1
227:9,10
**require** 70:15
111:16,20
119:14
**required** 86:22
88:1 115:14,18
115:22 116:4,5
118:25 119:18
133:12
**requirement**
27:2,11,12
158:10
**requirements**
26:19 28:2
115:9 134:5,11
134:13 136:10
137:10 158:8
**requires** 86:23
119:12 132:5
135:21,24 137:7
137:13 211:17
212:1
**rescues** 116:15
**research** 73:20
74:13,23,24
75:11,13,21
127:19 128:12
128:25 135:16
137:25 148:17
148:20,21,23
**researched**
56:11,16,24 57:4
110:13 126:1,11
126:20,23 127:5
127:10 133:5

Veritext Legal Solutions
866 299-5127

[researched - safari]

| | | | |
|---|---|---|---|
| 197:4 | 214:6,16,16 | 187:25 188:1 | 167:23 175:6 |
| **reserve** 210:25 | 215:6,7 220:2 | 190:7 195:1 | 180:9 184:1 |
| **respect** 35:12 | **restitutionary** | **review** 32:21 | 202:1 205:24 |
| 37:19,20 76:16 | 22:16 39:25 | 33:7 51:1 72:10 | 206:2 207:11 |
| 79:17 123:22 | 91:15 92:23 | 172:4 176:21 | 211:16,22 |
| 153:11 183:16 | 153:9,10 208:10 | 177:7 185:6,6 | 213:12 214:11 |
| 194:6 | **restrictions** | 187:17,17 | 214:15 218:3 |
| **respond** 115:22 | 25:20 120:22 | 197:23 226:8,10 | 219:5 222:21 |
| 118:25 211:24 | **restroom** 38:14 | 226:13 227:2 | **rights** 104:14,17 |
| **respondent** | 99:22 124:24 | **reviewed** 21:19 | **robert** 4:24 9:1 |
| 212:13 | 138:20 | **reviewing** 21:18 | **rockwood** 1:24 |
| **respondents** | **result** 23:9 59:9 | 32:23 84:18 | 2:20 225:4,25 |
| 211:17,24 | 60:3 126:18 | 105:5 148:21 | **room** 11:2 |
| 213:24,25 | 193:1 198:10 | 159:19 176:23 | **rosas** 1:24 2:20 |
| **response** 103:8 | **resulting** 154:14 | **revolve** 41:22 | 9:3 225:4,25 |
| **responsive** 74:11 | **results** 34:15 | **reward** 86:8 | **roughly** 25:18 |
| **rest** 43:14 | 43:11,12 52:9 | 87:13 | **routed** 90:7 |
| 210:25 | 170:1 | **rewarded** | **router** 84:14 |
| **restate** 44:6 | **retained** 223:3 | 131:19 | 87:14,21,22 88:1 |
| 59:13 | **return** 226:17 | **rewards** 84:14 | 88:19,19,20 |
| **restitute** 82:23 | 227:6 | 86:4 135:5 | 89:22,22,25 90:1 |
| 101:7 | **revenue** 60:2 | 219:24 | 90:4,25 91:4 |
| **restitution** 17:7 | 154:21,23 | **ridiculous** 67:18 | 106:12,12 110:7 |
| 17:7 19:11,14,17 | 155:10,15 | **right** 10:11 14:3 | 111:12 214:8 |
| 37:19,25 38:3,5 | 158:19 159:12 | 19:21 20:21 | **routers** 90:13 |
| 40:19,21 43:3,8 | 161:15 162:3,4 | 32:23 42:1 | **rpr** 1:24 2:20 |
| 55:16 62:16,24 | 163:7 164:3,8 | 47:20 60:14 | 225:4,25 |
| 64:5,7 76:16,21 | 166:10,11,24 | 67:11 68:10,11 | **rules** 227:8 |
| 77:1,6 78:18,24 | 167:21 168:2,2,8 | 68:11,12 78:12 | **rundown** 154:10 |
| 91:15 96:19,21 | 168:12,20,21 | 81:22 82:5 86:5 | **running** 175:17 |
| 96:25 98:9,10 | 170:21 174:2,19 | 92:14 100:3 | **s** |
| 99:1 100:9 | 177:3 183:14,20 | 104:1 107:4 | |
| 101:4 113:10 | 183:25 187:4,13 | 111:22 117:12 | **s** 65:14 228:3 |
| 138:6,8 139:5 | 188:6,11 193:1 | 120:4 124:9 | **sabine** 21:19 |
| 142:15 145:9,12 | 195:3 196:20 | 135:22 138:22 | **safari** 11:13,17 |
| 202:10,13,24 | **revenues** 73:3 | 139:21 140:7 | 11:24 12:12 |
| 204:15 208:11 | 167:14 183:4,8 | 150:24 151:21 | 15:3,5,9,13,17 |
| 212:19 213:16 | 183:11,18 187:4 | 152:8 164:18 | 15:18 16:6,10 |

Veritext Legal Solutions
866 299-5127

**[safari - see]**

24:14 26:4,8,9
26:16 41:10,24
194:1,6
**safely** 42:5
**sales** 178:5
**sample** 146:9
**san** 8:22
**sanction** 96:2
110:22 111:5
139:23 140:8
141:23 185:3,12
186:12
**satisfy** 27:2,11
**save** 49:7 163:11
163:22
**saved** 35:24
165:11,13,15
**saving** 14:19
**savings** 166:8
**savvyconnect**
6:22,23 85:12
131:8,10 135:15
135:21,24 136:9
136:17 137:23
**saw** 149:9
**saying** 41:21
53:1 64:3 66:17
67:9 69:7 70:4
79:21 86:21
94:5 97:24
102:2,3,16
113:15 124:16
157:16 169:23
178:21 208:9
**says** 23:25 29:16
33:19,22 34:25
49:7 50:22 51:4
51:5,24 52:7,13

52:15,18 53:5,19
53:25 54:1,18,22
80:2 86:7 87:12
88:11 108:19
118:19 120:14
133:21 135:5
179:16 182:7
183:21 184:2
217:2 219:22
**scenario** 39:20
40:14,19 42:16
63:9,10 96:11
154:9 159:22,22
163:9 167:16
168:3,14,16,18
168:22 169:1,7,8
170:22,23 171:1
171:6,6 182:6
187:3,13
**scenarios** 153:18
159:17,21
161:10 182:5
**schedule** 148:8
148:10 173:21
173:24 174:17
175:3,3,11 209:8
226:10
**schedules** 174:15
177:17 178:9
**schiller** 3:4 4:18
9:14 10:8
**scope** 13:8 16:2
16:12 24:18
39:12 44:24
48:19 56:6
60:13,13,15,16
65:20 69:6,12
73:11,23 74:16

76:11 87:8
95:22,23 146:20
190:24 207:7,16
208:6,8
**scratch** 113:25
**screen** 8:15
114:24 134:6
146:16,17
190:16
**screenshot** 7:4
86:3 176:7
**screenwise**
82:13,14,15
83:21,25 84:13
86:3 88:20,24,25
89:3,12 101:15
101:15 103:3
104:24 105:3,13
107:3 109:18,19
109:25 110:5
111:3 112:25
113:14,22
114:10 115:8,14
118:24 120:12
121:4,5,8 215:1
215:2
**screenwisepan...**
86:5
**se** 3:6
**search** 14:21
39:6,8,20 40:10
40:11,13,16
42:25 52:9
70:18 126:10
127:1 128:19
129:6 177:19
183:10 188:17
194:25 195:23

**searched** 46:24
58:25 126:9
127:3
**searches** 133:7
**searching** 123:4
**sec** 116:16
165:16
**second** 3:6 50:4
78:9 79:3 80:15
82:9 91:16 92:6
93:23 97:5,7,9
97:12 103:21
109:23 110:2
152:15 162:23
173:5 176:20
198:22 203:6,12
204:8,14
**secretly** 33:19,22
**section** 21:24
22:14,15 78:10
78:13,24 80:7,14
82:6 83:19
84:10 85:24
97:8 105:6
120:10 137:20
137:21 145:3
151:8,12,12,14
151:15 183:3
198:16 203:3
220:23,24 221:2
**see** 9:24 10:6
11:1 22:25 23:6
28:10,11 29:18
33:21,22 34:1
46:24 50:24
51:6,13,14 52:3
52:11,13,15 53:1
53:13 54:24

Page 40

**[see - shown]**

55:14 69:25
70:2 73:9,16,18
73:22 74:15
75:1,8,15,22,22
79:15 82:20
83:14 86:9
87:15 88:12
93:9,12 94:8
97:17,21 100:24
103:25 109:22
110:3,10 113:15
113:15 114:24
130:13 131:18
132:16,17,18,25
133:2,14 134:2
144:19,19 148:3
148:25 150:21
151:6,9 155:3
157:8 167:18
169:21 173:13
173:23 174:1,2,5
174:17,18,18,23
174:25 175:3,4
176:10 177:16
179:14,19,25
180:15,18,21,23
181:1,9 182:2,23
183:2,22 186:19
188:3,8 195:9
199:5 202:8
206:13 209:9
211:4 212:12
213:23 214:22
217:6
**seeing** 69:16
70:21,24 117:3
**seeks** 25:16

**seen** 8:14 50:12
108:10,13 109:2
109:7,7 117:19
117:23,24
118:14,16
131:20 132:3
150:20 151:4,6
167:3 181:6
184:25 194:10
**select** 202:3
**selected** 110:5
110:12,17,25
113:19 141:18
141:21 201:24
203:19
**selection** 110:13
182:25
**sell** 108:23,25
111:17,21,25
112:2,3,3
**seller** 103:16,18
104:12 108:15
108:15,19,25
109:1,5 111:14
111:17,21,22
112:6,6,16,21
191:3,4,6,7,12
191:19
**sellers** 106:23
107:2,7 108:11
**sense** 133:20
**sent** 20:1,5 34:3
**sentence** 23:2
24:3 78:9 79:4
82:10 97:12
100:13 101:12
101:13,24
103:21 109:23

110:2 127:23
128:4 147:21
173:5 198:22
200:10
**separate** 96:6
132:6 135:22
137:7 145:1,13
182:14 190:13
192:20 199:19
**separately** 37:22
37:23 38:8,10
97:2 189:10,13
189:15 190:13
196:2,7 202:2
**serve** 72:24 74:2
128:17
**served** 66:24
171:12
**serves** 72:6
**service** 157:21
**services** 94:11
120:19,19
**session** 48:2,15
48:22,25 51:24
52:8,23 53:6,21
54:18 57:12,16
61:16 70:13,17
78:16 146:17
147:8
**sessions** 95:20
96:6 145:1,13,18
**set** 12:16 86:22
106:12 108:22
150:25 225:7
**setting** 12:11
15:12,16 18:6
207:11

**settings** 161:6
**setup** 114:1
**seven** 150:17
**share** 20:16
166:11,15,24
167:1 168:5,5,6
174:19 177:3
191:10
**shared** 192:2
**sharon** 3:19 9:24
9:25
**short** 124:10
138:19 143:13
144:15 151:18
175:17
**shortcut** 59:3
61:1 153:14
**shorthand** 2:20
**shortly** 31:10
171:25
**show** 55:1 59:11
118:3 130:18
133:16 147:14
149:13 166:22
167:8 169:5,5
180:11
**showed** 149:5,16
186:21 192:20
**showing** 216:19
**shown** 39:17
42:25 57:9,12,16
57:21,21,24 58:9
58:10,16 59:18
60:7 65:19 69:4
167:22 168:8,12
168:17,21
181:13 197:17

**[shows - speculative]**

**shows**  166:10
 167:14 193:5
**shut**  126:18
**sic**  8:22
**side**  51:14,14
 192:3
**sign**  133:8
 134:24 226:16
 227:5
**signature**  225:24
 226:21,23,23
 227:9
**signed**  39:5
 40:15 42:23
 95:15,17 111:9
**significant**
 147:18 163:22
 216:5
**signing**  86:25
**silently**  20:23
 22:20 27:24
 79:8 82:11
 100:17 127:17
 130:7
**similar**  15:6 16:7
 40:14 56:20
 117:24 149:11
 149:16 154:13
 163:2 188:10,17
 195:13,18 196:4
 196:11,15 205:6
 205:9 208:17,17
**similarity**
 149:13
**similarly**  1:7 2:7
 154:10 157:16
 157:25 195:20
 219:1

**simple**  92:17
**simplify**  126:17
**simply**  168:23
**single**  46:13
 82:15 95:2,6
 114:20 144:5
 145:3 147:2
 200:2
**sir**  10:18
**sit**  27:7 58:19
 62:5 84:8
 115:20 138:4
 141:25 187:7
**site**  36:24 49:8
**sites**  179:16,17
**sitting**  13:12
 59:22 86:18
 94:14 141:19
 194:4 202:10,18
 202:21 215:12
**situate**  51:8
**situated**  1:7 2:7
**situation**  61:12
 61:17,25 62:6,8
 62:8,13,17 63:4
 63:8,19 64:1
 65:4 74:8
 107:25 112:13
 165:5 169:2
 191:17 192:8
 208:13,14
**situations**
 208:17
**six**  12:15 14:24
 15:1,10,13
**sixth**  3:20
**skill**  225:15

**skipped**  89:7
**slightly**  113:25
**slow**  31:20
**small**  51:16,17
 94:9 164:7,7
**software**  35:14
 132:24
**sold**  127:10
**solemnly**  10:14
**solutions**  9:2,4
 223:3 226:7
**somebody**  41:1
 104:12,16 108:4
 108:19 156:21
 157:10 158:16
 179:21
**somebody's**
 128:22
**someone's**  95:10
 102:17
**soon**  212:6
**sorry**  11:9 21:11
 26:9 37:13
 39:11 61:19
 69:20,24 72:6
 75:5 85:22,22
 88:7,23 89:7
 92:20,20 97:9
 102:11 105:7
 106:3 108:25
 110:24 116:10
 134:6,21 138:20
 148:12 149:25
 149:25 156:16
 162:7 167:11
 170:8 172:18
 179:5,21 181:22
 189:3 202:24

**209:8,8 214:7
 220:24
**sort**  31:8 164:2
 182:4 205:6
**sounded**  80:11
**sounds**  27:5
**south**  4:6
**speak**  59:5 188:6
 212:25
**speaking**  13:5
 31:19,23 107:4,5
 150:8,9
**speaks**  23:15
 213:3,18 217:15
**special**  87:14
 88:1 94:6 110:7
 157:18,19
**specific**  18:20
 42:14 48:3
 52:10 149:1
 156:22 165:10
 165:12,14
 189:11 221:17
**specifically**
 82:12 165:4
 181:3 186:8
 189:1,25 191:9
 200:11
**specifics**  164:5
 164:24
**speculate**  186:2
**speculation**  14:7
 15:25 33:4
 48:18 69:18
 87:8 181:21
**speculative**
 72:15 74:10

Veritext Legal Solutions
866 299-5127

**[speed - supervision]**

**speed**  87:14 88:1
  88:10
**spell**  50:4
**spend**  119:17
  123:2,3,4,17
  124:22 150:7
  151:10,13
**spending**  123:25
  124:14
**spends**  122:22
  123:24 157:17
**spent**  91:18,20
  124:11,21
  144:15
**splash**  146:16,16
**spoke**  153:8
  209:24
**spoken**  76:1
  77:16
**square**  86:7
**ss**  225:1
**standalone**
  31:11
**standpoint**  45:6
**stands**  138:14
**start**  11:17,20
  27:23 48:23
  56:3 66:21
  71:13,23 170:23
  198:24
**started**  66:4
**starting**  42:19
  125:15 160:7
  174:15
**starts**  27:21 34:3
  51:22 79:4
**state**  9:7,9 10:14
  130:6 194:11

224:2 225:1
  226:9,12
**stated**  21:9,15
  59:20
**statement**  51:23
  52:7
**states**  1:1 2:1
  8:21 20:25 28:1
  46:25 132:14
  133:2
**stating**  40:7
  101:5
**statistically**
  216:4
**statistics**  13:3
  15:21
**statute**  207:17
**statutes**  199:4
  208:7
**statutory**  17:9
  21:5 24:11
  55:19 63:1,7
  64:21,25 198:13
  200:13 201:16
  201:19 202:8,11
  202:19,24
  206:24 207:10
  207:13 218:1
  220:21
**stay**  66:25
**stem**  36:23
**stenographically**
  225:11
**step**  80:24
  182:13
**steps**  22:23
  23:10,14 24:1,21

**stipulate**  78:2
**stipulation**
  226:20
**stop**  31:19,23
  67:16 128:13
  210:16,20
**straight**  13:25
  14:20 20:5
**street**  3:6,13,20
  4:6
**strike**  56:14
  74:11 75:12
  76:17 106:4
**strombom**  7:3
  147:10 163:25
  165:1 167:5
  176:4 184:11
  186:4,4 187:18
  187:18 188:20
  192:4,4,4,8
  216:7
**strombom's**  20:2
  164:22 176:2,21
  177:1,6 178:17
  178:19 187:19
  198:7,11
**structure**  165:3
**struggling**  62:9
**studies**  108:10
  109:8,24 110:4
  133:23 155:4
  157:9 158:1,8
**study**  48:5 74:21
  75:9,10 85:19
  86:8,13,25 88:8
  88:8 93:15
  94:16 105:9,23
  106:11,16

107:16 108:13
  111:9 113:4,18
  114:11,22
  144:22 171:11
  171:13,17 172:4
  172:5,12 173:16
  181:15 194:11
  211:19
**stuff**  123:4
**subject**  96:2
  110:21 111:4
  115:9 120:21
  139:22 141:22
  185:11 186:12
**subscribed**
  225:20
**subset**  122:12
  164:7 178:4
**successful**  24:5,7
**suffered**  206:25
  207:6,15
**suggest**  83:19
  84:10 103:3
  146:22 149:23
**suite**  3:6 4:12
**sullivan**  4:4,20
**summarize**
  85:10 103:10,11
**summarizing**
  85:9
**summary**  6:19
  82:4 84:11,12
  86:4 125:13
  131:3 133:18
**summer**  4:18,21
  9:20 10:7
**supervision**
  225:12

Veritext Legal Solutions
866 299-5127

**[supplementary - targeted]**

supplementary
136:13 137:17
supplying
201:17
support 109:3
supporting
177:17
supports 165:21
sure 11:16 20:19
22:9 32:18
34:22 38:16
41:15,19 42:1
51:12 57:19
58:18 59:14,15
64:19 84:12
85:2 86:16
88:18 90:21
91:23 95:7 96:9
97:1,1 107:12
115:2 117:4,22
118:22 120:4
123:6 141:8
144:11 152:2
158:9,9 165:24
171:23 174:13
177:8 199:23
201:24 213:11
217:10 218:2
219:10
surrounding
178:7
survey 54:3
84:13 211:17,23
211:24 212:14
214:1 215:1
surveys 116:4,6
119:2 133:13,23
136:13 137:17

surveysavvy
6:20 131:5
suspect 47:12,17
47:22
suspected 55:12
svk 1:9 2:9 8:23
swear 10:4,12
sweepstakes
135:8
swipe 115:1
switch 50:18
switching
138:18
synonymous
29:21
system 155:19
155:19 193:18
systems 157:18
szruz 3:23

**t**

t 54:21 228:3,3
tab 49:25 116:10
116:20 146:16
179:3,9 184:5
188:13 215:21
table 51:1,7,11
51:19,22,23
54:18 60:10
93:9 182:7,14,25
183:3,17 187:24
194:25
tables 51:14
tablet 89:1,2
214:10 220:15
220:18
tablets 214:12

tag 49:25
tagging 36:24
tagline 131:19
tailored 128:18
take 8:16 44:12
63:14 66:2,9,11
66:14,19 67:3,12
78:3 99:13,19,20
103:16 106:24
115:3 124:24
125:4 140:5
151:7,24 152:1
153:12,19,25
154:14,14,17
164:9 169:22,22
175:2 178:11,13
182:13 196:9
197:9,12,15,21
205:16 207:4
211:3,5 217:1
taken 2:16 8:19
21:20 29:14
45:9 71:3,6,10
72:14,18 74:20
112:23 168:1,2
188:12,22
195:11,16 196:3
207:1 225:7
takes 115:4
160:18
talk 82:1,3 83:18
93:10 105:6,19
105:22 114:16
151:8 162:16
talked 47:3
54:11 55:12
75:7,25 106:8,8
108:7 116:6

123:11,14 135:8
139:10 143:9
147:11 157:8
168:17 190:2
200:8 221:5
talking 22:15
42:11 44:19
45:23 51:10
58:25 68:18
73:12,14 81:3,5
83:11 86:17
90:2 95:21
96:19 97:13
100:4 103:19,22
104:2 109:18
122:18 124:4,10
128:5,9,21,22
129:4,19 133:9
133:10 137:21
137:22,23
144:21 149:19
156:25 157:3
162:19,19 163:7
163:8,10 164:6
164:25 166:1,2,3
167:9 168:22,25
169:1,8,9,10,16
170:22 172:6
175:5 182:22
184:9 187:3
189:17,18 191:2
192:16 205:25
talks 134:23
147:22 186:16
tampa 3:14
tap 114:25
targeted 56:5,17
126:18 129:5

Veritext Legal Solutions
866 299-5127

**[team - thought]**

| | | | |
|---|---|---|---|
| **team** 126:9 | 78:17 94:25 | **things** 48:16 | 146:8 147:6,6 |
| 211:4 | 100:9 106:21 | 49:1 54:19 | 149:6 151:13 |
| **tease** 15:7 | 110:23,24 | 84:13 94:7 | 154:20 155:14 |
| **teased** 182:6 | 144:24 198:6 | 121:7,10,15 | 157:14 159:3,9 |
| **technical** 28:22 | 221:14,15 | 122:23 123:21 | 159:14 165:24 |
| 28:23 29:8 30:9 | **testify** 145:5 | 124:7 151:3 | 166:18 175:12 |
| 34:13,19 35:7 | **testifying** 94:20 | 189:5 192:12 | 175:12 179:20 |
| 36:13 89:19 | 101:3 | 193:14,15 | 184:9 185:25 |
| 90:5 114:19 | **testimony** 24:24 | 211:17 213:25 | 187:5 194:4 |
| **technically** 29:8 | 46:7,17 59:24 | 215:19,22 | 195:13 202:10 |
| 87:19 | 68:24 90:9 | **think** 11:21 | 202:25 204:3 |
| **technology** 8:25 | 103:8 111:18 | 12:21 16:9 | 206:3,3,4 211:5 |
| 105:9 149:21,22 | 157:15 185:22 | 18:10 25:20 | 221:19 |
| 149:22 | 221:4,9 223:1 | 27:16,16 28:22 | **thinking** 41:17 |
| **telephone** 115:5 | 225:6,9,14 | 32:3 33:5 38:2,2 | 102:25 103:7 |
| **tell** 23:13 31:22 | **testing** 107:7 | 38:5,7,11 41:6 | **thinks** 178:23 |
| 84:11,25 114:16 | 108:10 | 41:21 42:5 | **third** 6:6 17:8 |
| 117:7 127:24 | **teuta** 4:11 9:16 | 44:11,25 45:24 | 25:12 31:2 |
| 151:12 156:13 | 9:18 171:21 | 45:24,25 46:5,6 | 33:15 36:25 |
| 165:20 216:4 | 176:12 | 46:18 47:13,14 | 37:2,9 40:17 |
| **tells** 121:11,12 | **teutafani** 4:15 | 48:6,12 49:3,5 | 70:15,15 72:11 |
| 132:5,8 | **texas** 126:24 | 53:25 54:5,16 | 73:2,4,5 100:19 |
| **ten** 3:20 92:3,9 | **text** 172:4 | 58:19,22 62:5,8 | 133:2 158:18 |
| 92:18,20,22 | 179:13 182:7 | 63:3,4,19 64:9 | 159:5,7,8,11 |
| 93:25 94:6 | **thank** 9:23 10:3 | 64:14 67:4 | 160:1,3,9,10,13 |
| 152:1 157:17 | 10:10,13,18,20 | 76:23 77:4 | 160:14,19,22 |
| 158:15 211:5,6 | 20:9 67:25 | 80:11,11 81:3,3 | 162:21 163:4 |
| **term** 23:4 28:22 | 80:18 81:12,12 | 81:21 82:1,3 | 173:12 174:3 |
| 29:2 127:22 | 85:11 89:8 | 84:8,20 92:14 | 179:13 180:6 |
| 170:15,16 | 99:21 125:5 | 94:14 95:8,11 | 184:4 190:7 |
| **terms** 6:9,23 | 140:18 171:10 | 96:19 97:2 | 195:5 203:22 |
| 92:17 116:8,11 | 176:18 203:16 | 98:14 99:14 | 204:1 206:1 |
| 116:25 117:25 | 217:10 | 102:15,15,24 | 215:20 |
| 119:6 120:6 | **thanks** 128:2 | 103:10,10,11,14 | **thought** 16:4 |
| 128:19 129:6 | **thereof** 225:19 | 103:15 108:6,18 | 43:23 81:17 |
| 131:10 | **thing** 13:9 20:8 | 113:10 123:15 | 92:13,14,21 |
| **testified** 30:19 | 41:12 157:14 | 132:18 140:2 | 96:24,24 105:15 |
| 68:25 69:3 | 185:5,18 208:9 | 144:16 145:20 | 119:7,7 169:12 |

Veritext Legal Solutions
866 299-5127

[thought - trebicka]

185:19 218:2
221:11 222:17
**thousand** 113:17
**three** 37:17
41:22 58:19
59:10,20,21 60:3
84:7,16 85:14
89:9 103:1,4
126:24 145:23
182:14 192:12
**tie** 18:20
**tied** 21:2
**time** 2:18,19 8:9
8:9 9:7 11:11
14:23 32:17,21
35:25 38:5
55:11 64:14
66:1,10,22 67:4
82:1 91:18,20
99:12 113:5
119:12,14,15,17
119:20 120:1
122:22 123:2,3,4
123:17,24,25
124:11,14,22,22
124:25 133:22
133:22 143:13
143:13 144:15
144:15 149:10
149:18 150:7,16
151:10,13,18
164:18 175:14
175:18 177:25
190:4 210:25
212:1,13 223:4
225:7,8,10
226:10,18,24
227:7

**times** 12:22
15:20 41:2,2,17
170:9
**tissues** 20:7
**title** 50:22 51:2
118:5
**titled** 206:4,5
**today** 8:9 10:9
11:1,2 59:22
83:11 86:18
90:23 91:7
141:19 143:9
202:18,21
215:12
**today's** 223:1
**toggle** 179:25
180:6 181:9
**toggled** 184:4
**toggles** 190:16
191:9
**told** 18:18
116:17 165:20
200:14
**tools** 56:4,8,16
57:3
**top** 131:19,22
133:19,20 150:5
153:13,16
164:10 198:24
200:5 205:15
**topic** 74:22
217:17
**topics** 138:18
**total** 65:9,12,12
92:6 154:1,1
155:7 170:7
182:8 209:10,14
223:2

**touched** 139:8
**track** 16:4 73:3
79:14 82:18
97:19 100:22
101:1,6,7,16,20
101:20 102:4
120:13,25
179:17
**tracked** 93:22
**tracking** 16:23
22:24 23:11,14
24:1,22 65:6,8
188:7 195:4,7,24
**tracks** 130:9
**traffic** 33:11,11
36:22,23 37:1,8
44:16 149:11,12
149:14,16,25,25
151:9 163:13
166:1,4 168:3,5
168:6 173:12
174:3 184:3
188:7 193:15,17
195:4,4,5,5,8
**transcribed** 78:1
225:12
**transcript** 21:19
78:1 226:6,8,10
226:13,13,21
227:2,2
**translated** 34:16
**translation**
34:19
**transmit** 89:22
**transmits** 89:24
**transmitted** 29:6
87:20 90:22,24
91:3 199:20

200:1,5
**transmitting**
87:23 90:14
112:18
**transpired** 44:18
**treat** 157:22
**treated** 144:13
156:3,4
**treating** 94:4
**treatment**
157:19
**treats** 94:10,11
157:15,25
**trebicka** 4:5 5:9
9:11,11,16 10:20
10:23 11:14
12:11 13:5,11,22
14:10,15 16:5,17
16:25 18:1 19:2
21:13 22:2
23:19 24:15
25:1 26:10,18,23
27:18 28:15,19
29:10 31:6,18
32:3,9,18 33:14
34:24 36:17
37:10,15 38:16
38:23 39:16
43:21 44:10
45:2,20 47:9
48:21 49:21,24
50:7 53:4,9 54:1
54:17 56:2,9,14
61:24 64:17,20
65:10,15,23 66:6
66:12 67:5,9,15
67:22,25 68:8
69:10,15,22 70:4

Veritext Legal Solutions
866 299-5127

**[trebicka - umpbi]**

71:21 73:20
74:11,23 75:10
75:24 76:9,13,25
77:14,24 78:3
81:23 84:22,25
87:12 90:23
92:1,16 95:1
96:4,11 98:17
99:16 100:3
102:1,23 105:11
108:8 109:16
110:23 111:7
112:5 113:6,13
115:13 116:7,14
116:17,19,24
117:2,4,19 118:7
118:10,14
121:17 122:4,9
125:1,3,11 128:1
128:7 131:15
139:4 140:1,5,11
141:19 142:6
145:11 146:13
147:1 150:15,19
152:8 153:6
154:3 156:6
158:23 159:10
160:2 162:13
166:9 171:21
172:1,17,20
173:1 175:16
176:1,10,12,15
179:6 181:23
184:21 185:8,19
186:7,20 187:24
190:15,23 191:2
191:15,18
194:22 197:3,21

198:6 199:15
200:22 203:10
203:20 204:24
205:1 207:11
208:2,19 209:7
210:20,24 211:2
212:21 213:2,17
214:2,18 215:24
216:13 217:5,21
218:6,13,20,25
219:5,9,17
221:15 222:20
222:22,24
**trends**   134:1
**tried**   60:20 91:9
**trier**   201:24
202:2
**tries**   164:3
**true**   52:14,16
54:21 55:1
93:14,15 103:15
120:17 137:15
222:22 224:3
225:13
**trujillo**   1:6 2:6
**truth**   10:15,16
10:16
**try**   38:7
**trying**   18:20
20:10 39:21
48:12 61:11
64:10 80:5
86:12 90:10
91:8 99:6 104:8
104:11,12
107:11,18 108:3
145:20 157:9,10
158:1,2,25 164:9

187:5 193:19
205:22
**turn**   19:20 20:13
20:21 25:8
27:18 33:14
50:7 57:1 120:9
120:18,25
127:14 130:1
132:22 133:18
147:20 173:21
179:1 180:5
181:10,23
194:24 198:17
212:23 219:20
**turned**   180:2
**turning**   120:3
172:14 173:1
194:9,22 198:19
220:25
**tv**   115:2 127:6
129:9
**twice**   144:1
**two**   11:15 13:17
13:19 22:6
31:25 51:13
91:13 92:4,6,8
92:23 94:4,13,14
95:3,6,19 96:5
96:12 103:3
113:24 114:5,6
128:25 138:7
139:5 141:6,14
142:5,14 144:1,2
145:13,18,23
151:2 152:17
157:20 177:2
195:3 204:6
217:25

**type**   29:24 30:4
30:4 64:2
114:25 143:14
184:11 185:5,18
185:24 186:14
190:3,4 192:20
196:16 222:14
**types**   17:3 22:12
29:13 30:21,24
31:12 32:10,24
33:9,9 37:17
114:21 121:18
123:2 128:5,9,21
128:25 163:19
181:6 189:5,8,22
195:25

| u |
|---|

**u**   146:14,14
**u.s**   187:25 188:5
**u.s.**   6:18 131:2
133:17 148:1
167:14 183:3,8
183:10 187:25
194:25
**uh**   51:20 52:4
85:8 106:17
**ultimately**   33:10
129:2 165:6
207:19 214:11
**uma**   146:3,7,9,9
146:11,14,23
**umbpis**   209:25
**ump**   142:20
**umpbi**   138:12,14
139:10,17,20
141:18,20
142:20 143:21

Page 47

**[umpbi - unknowingly]**

| | | | |
|---|---|---|---|
| 143:23,25 144:1 | 199:3 200:11 | 184:17 187:16 | **universe**   124:5 |
| 144:4,8,12 | 204:22 217:18 | 188:18 189:6 | **unjust**   17:4,11 |
| 146:19 147:3,9 | **understanding** | 190:18 199:9,13 | 17:17,19 18:8,12 |
| 152:17,22 153:2 | 17:19 18:11,21 | 200:18 201:12 | 18:15,22,25 19:3 |
| 153:5,10,14,20 | 19:6 25:14,17,21 | 201:13 205:10 | 21:4 22:4,6,7,15 |
| 153:21 154:1,4,6 | 26:2,7 29:2,5,23 | 207:2 217:22 | 23:22 24:10 |
| 154:7,9 156:4 | 30:3 31:12 | 221:19 | 34:16 37:4,11,16 |
| 157:4 204:14,16 | 32:10,24 33:12 | **understands** | 39:24 44:1,20 |
| 208:3,11,13,14 | 39:15 44:4 45:6 | 196:25 | 55:5,22 58:3,21 |
| 208:15,20 209:1 | 49:3,18 50:23 | **understood**   11:6 | 60:2,21,22 63:16 |
| 209:11,14,20,22 | 54:2 56:22 57:3 | 22:2 52:21 53:5 | 63:18,21 96:22 |
| 210:3,5,5,7,8,9 | 59:14 61:14 | 53:20 77:23 | 97:2,4 151:23 |
| 210:12 221:17 | 65:4 70:9,11,14 | 80:1,20 118:23 | 152:10,18,21 |
| **unable**   169:5,5 | 71:7,18 72:5,8 | 153:8 160:15 | 153:1,11,13,18 |
| **uncomfortable** | 72:20 73:5 74:3 | 196:24 | 153:19,22 |
| 99:22 | 76:4 80:4 81:4 | **undertaken** | 154:11,15,18 |
| **unconvincing** | 87:20 89:17,20 | 74:24 | 155:9 157:1 |
| 164:1 | 90:13,17 91:2 | **unfortunately** | 160:11,12,13,15 |
| **underneath** | 94:19 95:19 | 135:1 212:5 | 161:9,10,15,19 |
| 182:7 187:24 | 105:2,12,17 | **unilaterally** | 161:23 162:1,17 |
| **understand**   17:4 | 106:2,5 112:5,9 | 67:10 | 167:1,21 168:7 |
| 17:18 22:22 | 113:7,16,16,16 | **unique**   40:22 | 169:3,4 170:21 |
| 28:15,19 29:21 | 115:12 119:10 | 43:9,19 63:24 | 171:7,12 172:11 |
| 30:13 31:21 | 119:21 124:18 | 81:9 113:8 | 182:1,7,8,22 |
| 34:7 35:2 45:14 | 126:13,16 | 138:15 140:25 | 183:25 187:13 |
| 45:20,25 46:1 | 129:18 130:10 | 143:17 145:21 | 191:21,24 202:9 |
| 49:17 75:18 | 136:14,17 | 146:23 148:1 | 202:13 204:15 |
| 80:10 88:14 | 137:18 140:9,11 | 200:7 203:6,13 | **unjustly**   45:7 |
| 96:4 98:1,4,18 | 140:19 141:16 | 203:13,18,23 | 57:10,14 58:16 |
| 98:23,25 102:1 | 144:25 145:17 | 204:4,7,8,18 | 59:11 61:6 62:4 |
| 102:14,19 | 145:22 146:1,6 | 205:2,4,5,10,13 | 62:6,11 63:23 |
| 104:19 105:9,18 | 147:12 149:17 | 205:18,24 206:1 | 162:4 |
| 120:12 133:25 | 152:23 153:17 | 206:6 207:22 | **unknowing** |
| 136:2 146:8 | 155:15 158:12 | 218:11,17 222:6 | 104:4 191:7 |
| 152:10 165:1 | 159:2,6,15,23 | 222:11 | **unknowingly** |
| 170:13 172:8 | 163:4,17,18 | **unit**   8:18 | 84:2 103:6 |
| 180:5 184:7 | 165:25 168:14 | **united**   1:1 2:1 | 112:6,19 215:8,9 |
| 185:14 198:23 | 170:18 181:12 | 8:21 | |

Veritext Legal Solutions
866 299-5127

**[unmute - vague]**

| | | | |
|---|---|---|---|
| **unmute** 117:7 | 57:25 58:6,11 | 91:16,21,21 92:1 | 70:17,18 71:2,12 |
| **unnecessarily** | 64:8 82:14,25 | 92:3,3,4,6,8,9,18 | 71:15,22,25 72:2 |
| 59:5 | 83:3,5,7,8 84:16 | 92:22,23 93:3,19 | 72:21,21 73:9 |
| **unprecedented** | 91:12 93:11,12 | 93:19,20 94:1,5 | 74:21 75:8,22 |
| 177:21,21 178:1 | 94:11 99:21 | 94:6,8,9 95:3,6 | 81:15 83:25 |
| 178:4,10 | 101:14 105:9,17 | 102:8 103:5 | 84:17 85:13 |
| **unwilling** 106:23 | 120:13,15 124:3 | 106:18 109:11 | 86:15 89:23 |
| 107:6 108:11,15 | 138:19 142:22 | 115:2 121:11,13 | 93:7 94:4 102:4 |
| 108:18 109:1 | 142:25 143:19 | 122:16,17,19 | 106:14,15,23 |
| 111:22 112:6,16 | 143:21,23 144:2 | 123:24,25 | 107:8 108:11 |
| 112:21 191:3 | 144:17 146:9 | 124:14 132:6,9 | 109:8 120:25 |
| **unwillingly** 84:2 | 150:1 153:19,21 | 135:21,25 | 121:3,6,8,20 |
| 95:11 107:19 | 155:17 157:3,19 | 136:12,19 137:7 | 123:16 124:17 |
| **upper** 193:1,4,5 | 158:8,10,13,14 | 144:13,14 145:2 | 124:19,19 |
| 193:12,19,20,23 | 161:2 174:9,10 | 145:2 146:15 | 127:20 132:8 |
| 194:2,10,12,15 | 179:16 180:20 | 147:1,4,7 157:16 | 133:9 134:15 |
| 194:21 | 185:7 186:2,8 | 158:3,11 166:10 | 135:25 137:14 |
| **ups** 181:6 187:12 | 196:20 203:1 | 168:23 169:3,3,5 | 143:11 155:24 |
| 188:23 189:8,11 | 208:11,13 215:5 | 170:19 180:5,7 | 156:17 157:15 |
| 189:22 195:18 | 215:15 221:12 | 190:16,18 191:3 | 157:23,25 |
| 195:21,25 196:4 | **useful** 58:12 | 191:9,12,18 | 163:19 167:22 |
| 196:11,16 197:4 | 69:11,14 | 214:20 219:23 | 180:18 181:14 |
| 197:16 | **user** 25:23 26:25 | 220:2,4,9,11,15 | 181:14,18 184:3 |
| **upvoice** 6:25 | 27:2,9,11,12 | 220:15 | 185:2 195:12,17 |
| 85:24 131:13 | 30:15 33:25 | **user's** 34:4 35:1 | 196:3,10 197:9 |
| 136:15 137:6,7 | 35:14,17,18,20 | 35:24,25 62:11 | 197:15 202:5 |
| 137:22,23 | 39:3,8,16,20 | 95:9,10,13 98:20 | 221:6 |
| **urquhart** 4:4,20 | 40:14 42:17,23 | 99:2,2 136:7 | **uses** 12:13 105:8 |
| **usage** 130:10 | 45:10,13 46:3,4 | **users** 25:19,25 | 138:11 |
| 148:5,14 149:3,4 | 46:13 47:7 49:4 | 26:5,8,16 45:8 | **usually** 11:7,8 |
| 149:5,12,12 | 49:10 51:5 | 45:15,24 46:1,10 | 11:13 |
| 157:12 | 52:18 56:21 | 47:9,25 48:4,6 | |
| **use** 11:7,8,13,24 | 57:1,7,15,23 | 48:14,16,22,24 | **v** |
| 12:11,13 13:9,14 | 58:16,25 60:25 | 52:21 53:5,20 | **vague** 11:9,11 |
| 14:22 15:2 16:6 | 62:23,25 69:11 | 54:23 55:2,21 | 12:7 21:16 |
| 16:17 20:17 | 72:17 85:23 | 56:2,4 57:20 | 36:19 37:12 |
| 38:14 40:4 | 91:10,11,12,12 | 58:8,10 60:7 | 44:24 56:6 |
| 51:25 55:4 56:4 | 91:13,13,14,14 | 61:15 64:2,8 | 77:11 81:16 |

Page 49

**[vague - way]**

107:10 113:5
121:14,25
158:21 184:16
189:20 209:5
214:2 215:24
218:6,13
**valuable**   58:14
84:3 93:24 94:1
95:12,12 102:8
119:15 121:12
121:24 122:3,5
122:13,14,14,15
122:20,21,22,24
123:1,4,6,9,23
124:12,13
143:12,14,15
155:2,18
**value**   60:6,19
73:2 83:12
86:12 94:21,23
95:2,5,8,8 107:8
108:11 109:8,12
120:24 121:2,18
121:19 122:19
123:12 125:12
143:15,18 154:1
154:6,7,15
155:20 156:7,17
156:18
**valuing**   104:3
**variability**   45:15
45:21 56:12
**variables**   189:7
190:8,9 195:24
196:19,24
**various**   21:2
22:23 23:10
24:1,21 56:16

182:5 188:23
189:11
**vast**   40:4 61:14
61:15,15
**vein**   39:1
**veritext**   9:1,3
20:16 53:10
223:3 226:7,9,11
**versus**   8:20 91:4
103:6 108:15
191:3,6
**video**   8:15,18
**videographer**
4:24 8:8 9:2
10:3 38:18,21
68:3,6 99:23
100:1 125:6,9
138:24 139:2
152:3,6 175:21
175:24 198:1,4
210:19,21 211:8
219:7,11,14
222:25
**videotaped**   1:15
2:15
**view**   24:15,17
63:1 77:16
94:22 95:2,6,20
109:11 124:11
130:11 136:21
143:23
**viola**   4:5 9:11
21:12,17 28:18
38:13 50:4
66:18 113:3
124:24 127:24
158:22

**violation**   199:4,7
199:10,16,18,19
199:20,25 200:1
200:2,24 201:8,9
201:18,20 203:4
203:11,11,21
206:16,20
**violations**
199:14
**violatrebicka**
4:9
**virtual**   8:25
**virtually**   8:12
**visit**   128:19
**visiting**   146:18
**visits**   39:6 40:15
**visual**   182:4
**voluntarily**
110:6
**vpn**   215:20
**vpns**   161:2
**vs**   1:9 2:9 226:4
228:1

**w**

**wacker**   4:12
**wait**   31:16 82:2
109:10 213:12
**waiting**   172:20
**waived**   226:23
226:23
**waiving**   226:20
**walks**   108:19
**want**   13:18,20
13:22,25 14:1,1
14:3,3,3,4,15,18
14:19,20,20
16:22 21:23

32:6 41:12,19
42:1,5 43:7
66:14 70:19
73:16,18,22
74:15 75:1,8,15
75:19,22,22
99:14 102:1
105:18 106:19
106:20 108:8,20
124:18 134:13
150:13,14
151:10,13 173:7
186:1 213:5
218:2
**wanted**   22:9
96:25 107:6
169:12 172:23
**wants**   124:17
**water**   178:3
**watkins**   7:4
176:7 180:16
186:23 216:21
**way**   22:5 35:5
36:13 37:24
38:3,5 40:4,10
55:13 60:21
62:20 64:7 71:7
71:8 72:5,8 73:1
77:8 81:18
90:13,15,19,22
93:6 94:10 95:9
101:12,13,24
107:3,14 108:18
114:20 123:7
141:1 142:2,8,11
143:17,18
153:14 157:1,22
158:17 164:5,24

**[way - works]**

| | | | |
|---|---|---|---|
| 166:7,22 169:17 | **wednesday** 1:18 | **witness** 5:6,12 | 155:14 159:1,20 |
| 174:14 182:17 | 2:19 5:4 8:1 | 8:14 10:5,17 | 162:11,23 |
| 191:1,22,24 | **weekly** 51:5 | 11:13 12:8 13:3 | 164:11,14 |
| 201:18 203:25 | 52:17,20 53:5,20 | 13:9,17 14:8,14 | 165:24 171:20 |
| 204:4 206:3,5 | 54:22,22 | 16:3,13,21 17:23 | 176:14 179:5 |
| 207:10,19 209:3 | **weird** 67:4 | 18:19 21:22 | 184:17 185:4,13 |
| 225:18 | **went** 16:22 67:1 | 23:17 24:13,25 | 185:23 186:13 |
| **ways** 22:6 37:6 | 100:4 112:10,12 | 26:7,15 27:16 | 189:21 190:25 |
| 98:2 141:6,14,15 | 134:6 149:9,14 | 29:5 31:22 | 191:16 194:19 |
| 141:25 142:5 | 152:11 219:22 | 32:16 33:5 | 196:15 199:9 |
| 218:10 221:5 | **whereof** 225:20 | 34:13 36:7,12,20 | 200:18 203:17 |
| **we've** 38:13 59:3 | **wi** 87:14 88:1,20 | 37:13 39:14 | 207:8,18 208:8 |
| 62:19 95:20 | 89:12 90:25 | 43:7 44:4,25 | 209:6 211:1 |
| 108:7 117:5 | 91:4 | 45:18 46:18 | 213:1,20 214:3 |
| 118:3 123:14,14 | **wide** 36:24 98:10 | 48:20 50:6 53:1 | 214:20 215:25 |
| 130:18 138:1 | **william** 1:5 2:5 | 53:25 54:10 | 216:14 217:6,16 |
| 143:9 144:21 | **willing** 93:7 | 55:25 56:7 | 217:22 218:8,15 |
| 176:1 180:11 | 103:15,16,17,18 | 61:11,20 64:25 | 218:21 219:1,4 |
| 200:8 | 104:12,16 107:2 | 65:12,21,25 | 221:11 225:8,9 |
| **web** 35:24 49:13 | 108:15,24,25 | 66:16,18,22,25 | 225:20 226:13 |
| 127:5 128:19 | 109:4,5 111:14 | 69:7,13,25 71:18 | 226:16 227:2,5 |
| 129:7 179:17 | 111:14,16,17,20 | 73:12,24 74:17 | 228:24 |
| 181:7 | 111:21 133:10 | 75:3,17 76:12,23 | **wondering** |
| **website** 16:22 | 191:3,3,12 | 77:12 81:17 | 80:19 199:17 |
| 20:16,18 34:4 | 216:15,17 | 87:9 90:10 | **word** 48:10 |
| 35:17 40:17 | **willingly** 84:5 | 92:13 94:25 | 79:17 80:19 |
| 44:7,7,8,9 117:9 | 101:19 104:18 | 95:23 96:8 | 182:17 183:2 |
| 117:10,15 | 112:17,17 133:8 | 98:14 99:8,11 | **words** 21:6 |
| 118:17 122:22 | 136:17,21,22 | 101:11 102:11 | 153:12 |
| 124:1,11,15 | 137:2 | 102:14 105:6 | **work** 18:11 67:1 |
| 180:15 186:22 | **willingness** | 107:11 109:15 | 115:5 158:17 |
| 188:23 190:19 | 125:22 127:20 | 111:6 112:2 | 159:8 |
| 216:20 | **win** 134:14 | 113:7 116:18 | **worked** 18:3 |
| **websites** 14:1,2 | 135:5,6,10,11 | 118:13 121:15 | **working** 14:25 |
| 16:14,19 43:19 | **window** 179:22 | 122:1,7 128:3 | 34:21 |
| 51:25 123:2 | **winning** 134:19 | 140:2,2,9 141:14 | **works** 6:21 93:6 |
| 187:2 | **withdrawing** | 141:24 145:5 | 131:5 169:18 |
| | 31:17 | 146:21 153:4,25 | |

Veritext Legal Solutions
866 299-5127

[world - zoom]

**world**   149:20,21
   192:5
**world's**   130:8
**worries**   179:23
**worth**   108:16,16
   108:17
**written**   78:4
   101:25
**wrong**   54:12,13
   183:2
**wrongdoing**
   161:16,24
**wrongful**   36:16
   167:15 183:4
   188:1
**wrongfully**   45:8
   45:9 159:24
**wrongly**   80:15

**x**

**x**   5:1 227:1

**y**

**yanchunis**   3:12
   9:14
**yeah**   29:20 36:10
   51:15 59:6,6
   77:22 84:22
   85:22 91:23
   97:10 99:10,16
   101:11 105:16
   106:1 125:3
   135:9,9 167:21
   168:14 171:10
   173:9 182:24
   206:8 208:8
   210:20 222:22
**year**   85:18,18
   135:5 149:22

163:9 174:18
   177:8,8,23,23
**years**   11:16
   12:18,20 13:6
   14:23 15:17
   16:11 173:18
   174:5,9,11 197:6
   197:6
**yep**   79:6
**ygr**   1:9 2:9 8:23
**youtube**   183:8
   187:25

**z**

████████

**zoom**   1:16 2:16

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.