# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2       NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5    CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
 6    CASTILLO, and MONIQUE
      TRUJILLO, individually and on
 7    behalf of all other similarly
      situated,
 8
                  Plaintiffs,
 9                                         No.
            vs.                            4:20-cv-03664-YGR-SVK
10
      GOOGLE LLC,
11
                  Defendant.
12    _____/
13
14
15          VIDEOTAPED DEPOSITION OF BRUCE SCHNEIER
16                 Remote Zoom Proceedings
17                 Cambridge, Massachusetts
18                  Monday, July 18, 2022
19
20
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 233                         Job No. 5312337
```

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5   CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
 6   CASTILLO, and MONIQUE
     TRUJILLO, individually and on
 7   behalf of all other similarly
     situated,
 8
            Plaintiffs,
 9               No.
        vs.       4:20-cv-03664-YGR-SVK
10
     GOOGLE LLC,
11
            Defendant.
12   _____/
13
14
15      Videotaped deposition of BRUCE SCHNEIER,
16   taken on behalf of Defendant, Remote Zoom Proceedings
17   from Cambridge, Massachusetts, beginning at 11:03 a.m.
18   Eastern Daylight Time and ending at 7:20 p.m. Eastern
19   Daylight Time, on Monday, July 18, 2022, before
20   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21   No. 3462.
22
23
24
25
                                                        Page 2
```

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS:
 4      SUSMAN GODFREY LLP
 5      BY: IAN B. CROSBY, ESQ.
 6      1201 Third Avenue, Suite 3800
 7      Seattle, Washington 98101
 8      (206) 516-3861
 9      icrosby@susmangodfrey.com
10        -and-
11      BY: ALEXANDER P. FRAWLEY, ESQ.
12      3201 Avenue of the Americas, 32nd Floor
13      New York, New York 10019
14      (212) 729-2044
15      afrawley@susmangodfrey.com
16
17      BOIES SCHILLER FLEXNER LLP
18      BY: HSIAO (MARK) C. MAO, ESQ.
19      44 Montgomery Street, 41st Floor
20      San Francisco, California 91401
21      (415) 293-6800
22      mmao@bsfllp.com
23
24
25
                                                        Page 3
```

```
 1   APPEARANCES (Continued):
 2
 3      MORGAN & MORGAN
 4      BY: JOHN A. YANCHUNIS, ESQ.
 5      201 North Franklin Street, 7th Floor
 6      Tampa, Florida 33602
 7      (813) 223-5505
 8      jyanchuis@forthepeople.com
 9
10
11   FOR THE DEFENDANT:
12      QUINN EMANUEL URQUHART & SULLIVAN, LLP
13      BY: STEPHEN A. BROOME, ESQ.
14         ALYSSA (ALY) G. OLSON, ESQ.
15      865 South Figueroa Street, 10th Floor
16      Los Angeles, California 90017
17      (213) 443-3285 (Mr. Broome)
18      (213) 443-3000 (Ms. Olson)
19      stephenbroome@quinnemanuel.com
20      alyolson@quinnemanuel.com
21
22   Also Present:
23      Elvert Ling, Quinn & Emanuel summer associate
24      Haimin Zhang, Analysis Group
25      Robert Fenton, Videographer
                                                        Page 4
```

```
 1               I N D E X
 2
 3
 4   MONDAY, JULY 18, 2022
 5
 6   WITNESS                        EXAMINATION
 7   BRUCE SCHNEIER
 8
 9     BY MR. BROOME                    10
10     BY MR. CROSBY                   220
11
12
13
14      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15            (NONE)
16
17
18
19
20
21
22
23
24
25
                                                        Page 5
```

|   | DEPOSITION EXHIBITS |   |
|---|---|---|
|   | BRUCE SCHNEIER |   |
| NUMBER | DESCRIPTION | IDENTIFIED |
| Exhibit 1 | Expert Report of Bruce Schneier, 04/15/22 | 16 |
| Exhibit 2 | Data and Goliath: The Hidden Battles to Collect Your Data and Control Your World, by Bruce Schneier | 58 |
| Exhibit 3 | Data and Goliath: The Hidden Battles to Collect Your Data and Control Your World, by Bruce Schneier | 60 |
| Exhibit 4 | Ask the Decoder: How Private is Private Browsing, Really? By Sara M. Watson, 09/24/14 | 70 |
| Exhibit 5 | Schneier on Security: Click Here to Kill Everybody Endnotes | 72 |
| Exhibit 6 | Google's Chrome Incognito Mode is Way Less Private Than You Think, by Laurie Clarke | 75 |
| Exhibit 7 | Journal of Cybersecurity, Research Paper, Privacy Threats in Intimate Relationships, by Karen Levy and Bruce Schneier | 133 |
| Exhibit 8 | Google Privacy Policy, GOOG-CABR-00001107 - 134 | 163 |
| Exhibit 9 | Expert Rebuttal Report of Bruce Schneier Rebuttal of Expert Georgios Zervas, 06/07/22 | 184 |
| Exhibit 10 | Google Chrome Privacy Notice, Last Modified 05/20/20, GOOG-CABR-00002522 - 539 | 223 |
| Exhibit 11 | Google Privacy Policy, effective 02/10/22 | 224 |

Page 6

Page 7

---

Cambridge, Massachusetts; Monday, July 18, 2022
11:03 a.m. Eastern Daylight Time
--oOo--
PROCEEDINGS
11:02:41

THE VIDEOGRAPHER: Good morning. We are on the record. The time is 11:03 a.m. Eastern Time. Today is July 18th, 2022.

Please note that this deposition is being conducted virtually. The quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Bruce Schneier, taken by counsel for defendant, in the matter of Chasom Brown versus Google LLC, filed in the United States District Court, Northern Division of California, San Jose, Case Number 4:20-cv-03664-YGR-SVK.

This deposition is being conducted remotely using virtual technology. My name is Rob Fenton, representing Veritext Legal Solutions, and I am the videographer. The court reporter is Leslie Rosas from the firm Veritext Legal Solutions.

I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. BROOME: Good morning. Stephen Broome from Quinn Emanuel on behalf of Google, and I'm joined in the room by my colleague Aly Olson and our summer associate, Elvert Ling.

MR. CROSBY: Ian Crosby from Susman Godfrey for the Plaintiff Class and for the witness.

MR. FRAWLEY: Alex Frawley for Susman Godfrey for plaintiffs and the witness.

MR. MAO: Mark Mao, Boies, Schiller & Flexner, also for the plaintiffs.

Just real quickly, if you don't mind, Steve, I also have Mr. John Yanchunis from Morgan & Morgan for the plaintiffs here.

MR. BROOME: Yes. Thank you, Mark.

THE REPORTER: All right. I'll go ahead and swear you in, Mr. Schneier.

If you would raise your right hand, please.

Page 8

Page 9

3 (Pages 6 - 9)

```
 1  Thank you.
 2      You do solemnly state that the evidence you
 3  shall give in this matter shall be the truth, the whole
 4  truth, and nothing but the truth, so help you God?
 5      THE WITNESS:  Can we do that again without the    11:05:31
 6  God part?
 7      THE REPORTER:  Yes.
 8      THE WITNESS:  Thank you.
 9      THE REPORTER:  You do solemnly state and affirm
10  that you will tell the truth, the whole truth, and
11  nothing but the truth?
12      THE WITNESS:  I do.
13      THE REPORTER:  Thank you.
14
15              EXAMINATION
16  BY MR. BROOME:
17  Q.  Good morning, Mr. Schneier.
18  A.  Good morning.
19  Q.  Is it Mr. Schneier or Dr. Schneier, or what do
20  you prefer I use?                                     11:05:56
21  A.  Mister is -- Mister more accurate.
22  Q.  Okay.  You've been deposed before.  "Yes"?
23  A.  I have.
24  Q.  So you're familiar with the process?
25  A.  Yes.  First time on Zoom, though.  Kind of       11:06:08
```
Page 10

```
 1  exciting.
 2  Q.  Okay, good.  And you spent some time yesterday
 3  with plaintiffs' counsel, I assume, and discussed the
 4  process with them?
 5  A.  I did.                                            11:06:19
 6  Q.  Okay.  All right.  So I won't -- I won't bore
 7  you with those questions.
 8      Is anyone in the room with you today?
 9  A.  There is nobody.
10  Q.  On your computer screen, do you have any          11:06:28
11  communication applications open?
12  A.  I have this.  I have Zoom open and I have my
13  browser open.
14  Q.  Okay.  And you've got your browser open for the
15  Exhibit Share?                                        11:06:41
16  A.  Yeah, whatever that system is called.
17  Q.  And do you have that up and running already?
18  A.  I do.  And I'm in the Marked Exhibits folder.
19  Q.  Okay, great.
20      And when we upload an exhibit to Exhibit Share,   11:06:51
21  you may need to refresh your browser.
22  A.  Got it.
23  Q.  Do you have your phone nearby?
24  A.  I do.
25  Q.  Okay.  I just ask that you not communicate       11:07:05
```
Page 11

```
 1  during the course of the deposition on your phone or any
 2  other devices; is that okay?
 3  A.  Yes.
 4  Q.  Except at the breaks, which is fine.
 5      Do you have any documents with you?              11:07:17
 6  A.  Yes, I do.
 7  Q.  What do you have?
 8  A.  I have a bunch of the documents in the case, I
 9  have various expert reports and rebuttals, I have the
10  Third Amended Complaint (indicating).  I have various 11:07:31
11  Google policies printed out.
12  Q.  Okay.
13  A.  I have a copy of Data and Goliath and Click Here
14  to Kill Everybody.
15  Q.  Thank you.                                        11:07:40
16  A.  I thought that might be needed.
17  Q.  Yep.
18  A.  And I have a blank notepad and a pen in case
19  that's needed.
20  Q.  Okay.  All right.                                 11:07:51
21      So with respect to the documents that you have
22  around you, I'd just ask that you not review any of those
23  documents unless you alert me to the fact that you're
24  reviewing the documents in hard copy as opposed to on the
25  Exhibit Share.  I'd like to --                        11:08:06
```
Page 12

```
 1  A.  I prefer to read in hard copy.  It's easier for
 2  me.  So -- so I'd like to, but, yes, not without --
 3  Q.  All right.  Just let me know when you're doing
 4  that as opposed to reviewing on the screen.
 5      You mentioned that you have some of the expert   11:08:22
 6  reports there.  Which -- which expert reports have you
 7  read in this case?
 8  A.  So I have mine, my reports and my rebuttal
 9  (indicating).  And then I have Psounis, I have Schwartz,
10  I have Amir rebuttal, and I did read Hochman, but I don't 11:08:48
11  have it with me.
12      And I -- yeah.  I think that was it.
13  Q.  Okay.  Did you read the plaintiffs' expert
14  reports, aside from your own?
15  A.  What are they?  You've got to remind me what     11:09:03
16  they are and I'll let you know.
17  Q.  Yeah, sure.
18  A.  Are you asking me to review for this case or
19  ever?
20  Q.  Well, I presume that you wouldn't have read any  11:09:11
21  of the plaintiffs' expert reports outside the context of
22  this case.  Is that presumption incorrect?
23  A.  Of course.
24  Q.  Yeah.  Okay.
25      So with respect to the expert reports that the   11:09:23
```
Page 13

```
 1  opine that Google's use of the word "privately" --
 2  "privately" would be understood by a reasonable consumer
 3  to mean a particular thing, and then say that you're not
 4  focused on the users.
 5     A.  Okay.                                    13:46:11
 6     Q.  If you can help me understand that a little bit
 7  better.
 8     A.  I think I have.  You might be at a point where
 9  you can't understand it.
10     Q.  Yeah.  Okay, I'm going to take one more shot at   13:46:20
11  this.
12         Let's go to paragraph 307.
13     A.  All right.
14     Q.  You say:  "Consistent with plaintiffs'
15  deposition testimony, no reasonable user would interpret  13:47:02
16  Google's disclosures as permitting the collection of
17  their private browsing information."
18         Do you see that?
19     A.  I do.
20     Q.  How can you opine that no reasonable user would   13:47:15
21  interpret Google's disclosures as permitting the
22  collection of their private browsing information?
23     A.  And that's looking at Google's disclosures.
24     Q.  Uh-huh.
25     A.  Seeing what they say, applying my experience as   13:47:32
```
Page 94

```
 1  a security and privacy expert, and applying the
 2  methodologies that are used in privacy disclosures and
 3  generally accepted and known by people who write them and
 4  interpret them, and coming up with an opinion.
 5     Q.  The implication of this sentence is that if     13:47:58
 6  somebody interpreted Google's disclosures as permitting
 7  the collection of their private browsing information,
 8  that they would be unreasonable.
 9         Do you agree with that?
10     A.  Ask your sentence again.  I focused on the last  13:48:17
11  word and missed the beginning of it.
12     Q.  Yeah.
13     A.  I'm sorry.
14     Q.  The implication of this sentence is that if a
15  user interpreted Google's disclosures as permitting the   13:48:26
16  collection of their private browsing information, that
17  user would be unreasonable.
18         Do you agree with that?
19     A.  Yes.
20     Q.  And is that your opinion?                        13:48:40
21     A.  What's the difference?
22     Q.  Yeah, fair.
23         Your opinion is that if a user interpreted
24  Google's disclosures as permitting the collection of
25  their private browsing information, that user would be   13:48:54
```
Page 95

```
 1  unreasonable?
 2     A.  No, I'm going to back off again.  I'm not
 3  writing about users.  I'm writing about the disclosures,
 4  and you're moving the focus on users.  When you say it,
 5  it just feels like, no, I didn't opine that.  I'm writing  13:49:07
 6  about the disclosures.
 7     Q.  Well, you're writing about what reasonable users
 8  would interpret.  Those are the words you used; right?
 9     A.  Yeah, those are the words I used, and they're
10  about the disclosures.                                  13:49:27
11     Q.  Do you think that maybe you should have not used
12  the words "reasonable users" in your report?
13     A.  I don't know.  I mean, what else would I use?  I
14  mean, how would you describe this?  Because it's
15  communication.  In sentences that don't have something of  13:49:38
16  a recipient.
17     Q.  Well, you could just say Google's disclosures
18  say X or Y and do not say, A, B, C.  But for some reason,
19  you have -- and look, I understand the reason because the
20  case turns in part on what -- some of the claims turn in  13:49:56
21  part on what reasonable users interpret; right?
22     A.  Right.
23     Q.  And that's why the lawyers are fighting that
24  issue out.  What's a reasonable interpretation, what's an
25  unreasonable interpretation.  And in your report, you   13:50:07
```
Page 96

```
 1  incorporate the concept of the reasonable user, and you
 2  make affirmative statements about what a reasonable user
 3  would expect and what a reasonable user would interpret.
 4         And so I guess what I'm hearing from you is it's
 5  not actually about the users.                           13:50:23
 6         And so my question is:  Do you think it was a
 7  mistake to incorporate the concept of the reasonable user
 8  into your report?
 9     A.  So I don't.  I mean, that's the kind of language
10  we use when we talk about disclosures in general.  So the  13:50:35
11  language is -- the language is right.  But when it's
12  focused on did this user think that, and now what's
13  reasonable, what's not reasonable.
14         What I mean by the reasonable user is what is --
15  what's expected of the discloser.  And I mean, I go back  13:51:04
16  to the nutritional label.  You know, we have a lot of
17  language about nutritional labels and what should be on
18  there.  And they're based on -- on -- on reasonable
19  users, but they're -- but still the focus is on the
20  information and what it says and it conveys facts about  13:51:25
21  the food that we're eating.
22     Q.  Okay.  You just said the focus is not on, you
23  know, what's reasonable to believe and what's not
24  reasonable to believe.  I think that's what you said;
25  right?                                                  13:51:54
```
Page 97

25 (Pages 94 - 97)

**Page 98**

1  A. I trust you. We've done it so many times, I
2 forget.
3  Q. No, this is an important issue so bear with me.
4 I appreciate your patience.
5    But you do actually opine on what is not     13:52:03
6 reasonable for a user to interpret based on Google's
7 disclosures. That's what you said in 307; right?
8  A. Yes.
9  Q. Okay. So at least part of your focus is on what
10 reasonable users would interpret from Google's     13:52:21
11 disclosures; correct?
12  A. It feels like the same phrase but different
13 wording that I'm using throughout.
14  Q. Yeah, but I mean, I guess going back to, you
15 know, you said the focus is not on what reasonable users     13:52:42
16 would or would not interpret, at least with respect to
17 307. Then some of the other paragraphs we looked at, the
18 focus is on -- your focus is on what reasonable users
19 would expect.
20  A. Mine is not. Yours is.     13:52:55
21  Q. Well, you say no reasonable user would interpret
22 Google's disclosures as permitting the collection of
23 their private browsing information. And then I asked you
24 isn't the implication indication of that, that a user who
25 interpreted Google's disclosures as permitting the     13:53:15

**Page 99**

1 collection of their private browsing information, that
2 that user is unreasonable, and you said "yes"?
3    MR. CROSBY: Object to the form.
4    THE WITNESS: Yeah, I keep saying that's not the
5 way I would write it, and I didn't write it that way.     13:53:28
6 And I don't think that the logic holds. And I'm trying
7 to explain why, and it's not working.
8  Q. BY MR. BROOME: Yeah. Well, maybe we just
9 disagree. Okay. I think we can move on from that topic.
10    Okay. So let's go back to Section 1.1 of your     13:53:56
11 report.
12  A. Page number would be useful.
13  Q. Yep, page 8. Are you there?
14  A. Yes, I'm sorry. Yes.
15  Q. The heading there is: "'Private' and 'Privacy'     13:54:34
16 Have Specific Meanings and Implications."
17    Do you see that?
18  A. I do.
19  Q. What is the specific meaning of "private"?
20  A. One hopes it's in this section.     13:54:50
21  Q. Well, you have an Oxford English Dictionary
22 definition, paragraph 24.
23  A. I see it.
24  Q. Is that the specific meaning of "private"?
25  A. Can we call it a specific meaning of private?     13:55:06

**Page 100**

1  Q. Sure, yeah.
2  A. Okay. Then yes.
3  Q. Okay. And you're asking whether it's a specific
4 meaning of "private" as opposed to the specific meaning
5 of "private" because private can mean different things?     13:55:23
6  A. You know, "private" has a meaning and it has a
7 dictionary definition. You know, what is private is very
8 fluid. So you need to think about what aspect of the
9 word you're asking me about.
10  Q. Well, what do you mean by -- does a word have     13:55:45
11 different aspects?
12  A. Yeah. I mean, so by "private," I mean there's
13 private as in what I'm doing, no one else can see.
14 Right? That's consistent. But is it about my salary, is
15 it about my -- I don't know -- my personal proclivities?     13:56:04
16 That is more context dependent.
17  Q. I see. Okay.
18    Can the meaning of the word "private," the words
19 "private" and "privacy" change depending on the context
20 in which they are used?     13:56:22
21  A. I'm pausing because it's actually a more
22 complicated question than you think.
23  Q. Okay.
24  A. The general meaning is the same, but I think
25 like any word in the English language, there are going to     13:56:36

**Page 101**

1 be nuances based on use. I don't think you're asking me
2 that.
3  Q. Well, is there one singularly understood
4 definition of "privacy"?
5  A. I mean the one I liked was, you know, the state     13:56:48
6 or condition of being alone, undisturbed, or free from
7 public attention, et cetera. Now I thought that was a
8 good one, which is why I used it.
9  Q. Okay. In Data and Goliath -- I'm not going to
10 go back to the book. I'll just read you something that     13:57:09
11 you wrote, and I just want to know if you still agree
12 with it. You're welcome to go back to the exhibit if you
13 like.
14    You wrote: "Our personal definitions of privacy
15 are both cultural and situational. They were different a     13:57:18
16 hundred years ago than they are today, and they'll be
17 different a hundred years from now. They're different in
18 the US than they are in Europe, Japan, and elsewhere.
19 And they're different across generations."
20    Do you agree with that?     13:57:31
21  A. I do.
22  Q. Okay.
23  A. And that's what I was talking about before.
24 That's exactly what I was talking about. What is private
25 in Japan is not what is private in the US; right? In     13:57:38

| | |
|---|---|
| 1  this case, there was just a ruling where the salaries of<br>2  a bunch of attorneys was made public.  That has different<br>3  private implications in our culture than it does in<br>4  another culture.<br>5       There will be cultures where your sexual         13:57:54<br>6  proclivities are more or less private.  So I'm really<br>7  meaning by that.  And especially over cultures and over<br>8  times, that what we choose to keep private changes.<br>9  Cultural, all those words I used.  I'm really referring<br>10 to the types of things that we agree to keep private.   13:58:11<br>11 "Agree" is a bad word.  That we might want to keep<br>12 private.<br>13   Q.  Okay.  Do you agree that you can have privacy<br>14 from some but not others?<br>15   A.  I do.                                           13:58:25<br>16   Q.  For example, you could have privacy from other<br>17 people who use your device but not from your ISP; right?<br>18   A.  That is certainly true.<br>19   Q.  And you could have privacy from other people who<br>20 use your device, but not from the websites that you   13:58:41<br>21 visit; right?<br>22   A.  Yes.<br>23   Q.  And so the word "privacy" just in and of itself<br>24 does not convey necessarily that you are free from<br>25 observation from everyone?                            13:58:54<br>Page 102 | 1  wouldn't say now you can pee privately and put a period<br>2  on it.  That's a very crappy analogy.  I'm going to<br>3  change it and do it again.  I'm sorry.<br>4   Q.  I've got to say I actually really like it.<br>5   A.  No, it's a bad analogy.                           14:00:59<br>6   Q.  No, they're good ones.  They're really good ones<br>7  and they're practical real-world examples.  I like it.<br>8   A.  But I want to get one, yes, scatological.<br>9   Q.  Do you agree that by providing -- I guess let<br>10 me -- let me try and formulate a better question here.   14:01:21<br>11      Do you agree that if Incognito mode only<br>12 provides privacy from other people who use your device --<br>13 well, now I put the answer in the question.  Let me try<br>14 again.<br>15      Do you believe that if Incognito mode conceals   14:01:38<br>16 your browsing activity from other people would use your<br>17 device, that Incognito mode provides a measure of<br>18 privacy?<br>19   A.  Yes.<br>20   Q.  Okay.  Actually, maybe we will go to -- well,   14:02:05<br>21 I'll try this again with Data and Goliath, and you can<br>22 tell me if you want to go back to the source.<br>23      You have a statement in there that says:  "Most<br>24 people don't seem to care whether their intimate details<br>25 are collected and used by corporations.  Most people are   14:02:21<br>Page 104 |
| 1   A.  Again, it will depend how it's used.  If I say,<br>2  you know, when you go to the bathroom, you're private in<br>3  there, and you find out later there's a camera.  And I<br>4  say, "Well, don't worry, the camera went to the police; I<br>5  didn't see it," you're going to say what the hell.  So it   13:59:12<br>6  depends on lot on how that word's used.<br>7   Q.  In the splash screen where Google says "now you<br>8  can browse privately and other people who use your<br>9  device" -- "your device won't see your activity," is it<br>10 your opinion that that conveys two separate concepts:   13:59:43<br>11 One, on the one hand, you can browse privately from<br>12 Google, and on the other hand, you can browse privately<br>13 from other people who use your device?<br>14   A.  I think it's actually kind of like the "camera<br>15 in the bathroom" story; right?  What I said is:  You go   14:00:02<br>16 to the bathroom, and it's private.  What the splash<br>17 screen says is it's private.  There's a period at the<br>18 end.  There's not a caveat.  There's not like from me,<br>19 from Google, from your neighbors, from your friends.  It<br>20 is a -- it's given as a categorical.  And that implies   14:00:23<br>21 that it is complete.  That it is from everybody.  Because<br>22 we're not saying only in this way, only in that way.<br>23      If I wanted to convey to you that when you went<br>24 into the bathroom, it would be private from me, but the<br>25 police could watch you, I would kind of say that.  I   14:00:45<br>Page 103 | 1  happy to exchange sensitive personal information for free<br>2  email, web search, or a platform on which to chat with<br>3  their friends."<br>4       Do you agree with those statements?<br>5   A.  You know, I would not write that today.          14:02:39<br>6   Q.  Okay.  What's changed?<br>7   A.  I think people's awareness has changed.  People<br>8  are more aware of -- of in general how they're being<br>9  tracked on the internet.  I think there's a feeling of<br>10 helplessness among people and so "happy," too, is a word   14:02:58<br>11 I would not use anymore.  And I don't even know if it was<br>12 right then.  I think people are more grudgingly<br>13 accepting, in many cases.<br>14      There's a lot of unawareness.  I find this even<br>15 in my classes when I try to teach the stuff, that        14:03:20<br>16 surprised the number of people that are surprised.<br>17      There was a class last year, and there was<br>18 someone from Facebook in the class talking about Facebook<br>19 data collection and how it's used, and people are<br>20 expressing surprise that a lot of this is happening.   14:03:37<br>21      And the former employee, who is now a student<br>22 there, said:  "This is how Facebook works.  Don't you<br>23 realize that?"<br>24      So it is an interesting measure of complicated<br>25 things that are going on.  And you know, that -- those   14:03:52<br>Page 105 |

### Page 106

1  sentences imply a knowing and willing tradeoff that isn't
2  right today and I don't think it was right then.
3      Q. Would you agree that some people just don't care
4  about data collection by companies like Google and
5  Facebook and Amazon?                          14:04:13
6      A. You used the word "some." So I will agree there
7  exists one person that just doesn't care.
8      Q. Would you agree that there's a substantial
9  portion of the population that just don't care?
10     A. Yeah, but I would make you define "substantial"   14:04:24
11 before I answer that one.
12     Q. 40 percent.
13     A. I would not agree with that.
14     Q. Okay. Do you have any basis for refuting that,
15 you know, 40 percent of the population doesn't care?   14:04:40
16     A. It sounds high and I don't have data.
17     Q. Okay.
18     A. Pew Research has data.
19     Q. Okay. Would you agree that incognito, the term
20 "incognito" has a different meaning than private or   14:05:06
21 privacy?
22     A. Yes.
23     Q. Okay. And what is the meaning of "incognito"?
24     A. Can I refer you to paragraph 25 of my report?
25     Q. Yeah.                                      14:05:22

### Page 107

1      A. Good.
2      Q. All right. One of the definitions you use is,
3  you say: "The Oxford English Dictionary defines
4  "incognito" as unknown, whose identity is concealed or
5  unavowed, and therefore not taken as known."   14:05:41
6         Do you see that?
7      A. I do.
8      Q. Okay. And would you agree that in Incognito
9  mode -- well, let me -- let me back up.
10        Do you understand that -- you have an   14:05:53
11 understanding of how Incognito mode functions; correct?
12     A. Basically, yes.
13     Q. And you have an understanding of how other
14 private browsers' modes function -- private browsing
15 modes function?                                14:06:06
16     A. Similarly, basically, yes.
17     Q. Okay. And with respect to Incognito mode, you
18 understand that it automatically logs the user out of
19 their Google account.
20        Do you understand that?                  14:06:16
21     A. Yes.
22     Q. And do you understand that it blocks the sharing
23 of existing cookies with websites and Google and others
24 out there on the web?
25     A. Right. What I understand it does, is it   14:06:28

### Page 108

1  basically opens up a separate compartment --
2      Q. Uh-huh.
3      A. -- which will have no cookies from the regular
4  browsing. So there is a separate set of cookies.
5      Q. Right. So that websites and Google and any   14:06:41
6  other entities on the web who may engage in tracking
7  cannot use the cookies on the browser that existed before
8  the Incognito session to track the user.
9         Is that your understanding?
10     A. No.                                      14:06:55
11     Q. Have you seen -- okay. So what is your
12 understanding on that issue, then?
13     A. It's what I said previously, that the private
14 browsing opens up a separate compartment where the
15 cookies from the regular browsing don't transfer over,   14:07:12
16 and new cookies are created.
17     Q. Right. And then at the end of the session,
18 those cookies in the Incognito compartment are deleted;
19 right?
20     A. That is correct.                          14:07:22
21     Q. Okay. And so to the extent any tracking occurs
22 in an Incognito session, it's based on the cookies in the
23 new Incognito compartment.
24        Do you understand that?
25     A. It is based --                            14:07:35

### Page 109

1         MR. CROSBY: Object to the form.
2         THE WITNESS: -- in part on those cookies, yes.
3      Q. BY MR. BROOME: Okay. And what else is it based
4  on?
5      A. Everything else Google or anybody else does.   14:07:42
6      Q. Is it based on IP address?
7      A. I don't know.
8      Q. Is it based on any other data that Google
9  receives from the user other than cookies?
10     A. Define "receives by the user" better.   14:08:07
11     Q. Any information that is transmitted to Google
12 from, for example, an analytics or ad manager script.
13     A. Okay. So you're saying that if I as a user
14 visit The New York Times --
15     Q. Yeah.                                    14:08:26
16     A. -- and do stuff, that analytics information that
17 goes to Google is from me?
18     Q. For purposes of this question, sure.
19     A. Okay. Got to go to the question again because I
20 lost the question. I'm sorry, I'm actually trying to --   14:08:43
21 this actually is complicated.
22     Q. Yeah. No, let's --
23     A. It's a bit complicated.
24     Q. Okay. Is it your understanding that in the
25 ordinary course, Google uses cookies to track users?   14:08:49

| | |
|---|---|
| 1    A. I do.<br>2    Q. Does this refer to just providing users with<br>3 some control?<br>4    A. No, I think Google is making a stronger<br>5 statement than some. They're saying that you can            19:17:17<br>6 control. They're not saying you can control partly, you<br>7 can control a little bit. You can control in these<br>8 areas, not those areas. They're saying you can control<br>9 it.<br>10    Q. So earlier on in the deposition, you recall       19:17:33<br>11 being asked questions about local privacy that's in<br>12 Incognito or private browsing modes?<br>13    A. Yes.<br>14    Q. And so if you turn to paragraph 285 in your<br>15 report in the last sentence, you reach the ultimate       19:18:04<br>16 conclusion: "Google's disclosures give rise to a<br>17 reasonable expectation that Google will not collect<br>18 users' private browsing information." Correct?<br>19    A. Yes.<br>20    Q. And so is it your opinion that Google's         19:18:18<br>21 representations to users are that it would only not<br>22 collect -- it would only respect local privacy and not<br>23 give any privacy from Google?<br>24        MR. BROOME: Object to the form.<br>25        THE WITNESS: I think Google is deliberately    19:18:35<br>Page 226 | 1        THE WITNESS: Thanks much.<br>2        THE VIDEOGRAPHER: Would counsel like to<br>3 conclude the video record?<br>4        MR. BROOME: Yeah, we can go off the record.<br>5        MR. CROSBY: Yes.                              19:20:24<br>6        THE VIDEOGRAPHER: We are going off the record<br>7 at 7:20 p.m., and this concludes today's testimony given<br>8 by Bruce Schneier. The total number of media used was<br>9 one and will be retained by Veritext Legal Solutions.<br>10        (Time noted: 7:20 p.m. Eastern Daylight Time.)<br>11                 --oOo--<br>Page 228 |
| 1 blurring that distinction in a way that -- to make users<br>2 sort of unaware of the distinction. They use the word<br>3 "we" a lot. You're in control. You know, control what<br>4 we collect. So that taken with the splash screen, which<br>5 says Chrome -- which says Chrome, I think it is -- that    19:19:03<br>6 distinction between Chrome and Google, since Chrome is a<br>7 Google service, is blurred.<br>8    Q. BY MR. CROSBY: Did Google's disclosures that<br>9 you've read ever limit its prudence to privacy to local<br>10 control?                                                     19:19:27<br>11        MR. BROOME: Objection.<br>12        THE WITNESS: You know, "ever" is a lot. I do<br>13 not recall any.<br>14    Q. BY MR. CROSBY: So just to be clear, would<br>15 Google's disclosures that you've read apply to just       19:19:43<br>16 Chrome or to its complete services?<br>17        MR. BROOME: Object to the form.<br>18        THE WITNESS: In many cases, Google talks about<br>19 them as a company. They'll say things like "across our<br>20 services." So they speak in many cases about everything  19:19:59<br>21 they do.<br>22        MR. CROSBY: I'll pass the witness.<br>23        MR. BROOME: And nothing further from me.<br>24        Thanks very much, Mr. Schneier. It was a real<br>25 pleasure to meet you, and I appreciate your time.          19:20:16<br>Page 227 | 1        I declare under the penalty of perjury under the<br>2 laws of the State of California that the foregoing is<br>3 true and correct.<br>4        Executed on _____, 2022, at<br>5 _____, _____.<br>6<br>7<br>8<br>9<br>10<br>11        _____<br>12            SIGNATURE OF THE WITNESS<br>Page 229 |

```
 1  STATE OF CALIFORNIA    ) ss:
 2  COUNTY OF MARIN        )
 3
 4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
 5  hereby certify:
 6      That the foregoing deposition testimony was
 7  taken before me at the time and place therein set forth
 8  and at which time the witness was administered the oath;
 9      That testimony of the witness and all objections
10  made by counsel at the time of the examination were
11  recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16      I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21  this 19th day of July, 2022.
22
23
24
25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```
Page 230

```
 1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2  Transcript - The witness should review the transcript and
 3  make any necessary corrections on the errata pages included
 4  below, noting the page and line number of the corrections.
 5  The witness should then sign and date the errata and penalty
 6  of perjury pages and return the completed pages to all
 7  appearing counsel within the period of time determined at
 8  the deposition or provided by the Federal Rules.
 9  __ Federal R&S Not Requested - Reading & Signature was not
10  requested before the completion of the deposition.
```
Page 232

```
 1  IAN B. CROSBY, ESQ.
 2  icrosby@susmangodfrey.com
 3              July 19, 2022
 4  RE: BROWN VS. GOOGLE LLC
 5  JULY 18, 2022, BRUCE SCHNEIER, JOB NO. 5312337
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
```
Page 231

```
 1  RE: BROWN VS. GOOGLE LLC
 2  BRUCE SCHNEIER, JOB NO. 5312337
 3        E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  WITNESS                  Date
```
Page 233

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.