# Exhibit A

```
1                  UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF CALIFORNIA
3
4     CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
5     CASTILLO, and MONIQUE
      TRUJILLO individually and on
6     behalf of all other similarly  No.
      situated,                      4:20-cv-03664-YGR-SVK
7
                      Plaintiffs,
8
            vs.
9
      GOOGLE LLC,
10
                      Defendant.
11    _____/
12
13
14
            VIDEO-RECORDED DEPOSITION OF DAVID NELSON
15
                   REMOTE ZOOM PROCEEDING
16
                      Tampa, Florida
17
                 Wednesday, July 6, 2022
18
19
20
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 126                        Job No. 5302302

                                                Page 1
```

## Page 2

```
1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4   CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
5   CASTILLO, and MONIQUE
    TRUJILLO individually and on
6   behalf of all other similarly   No.
    situated,              4:20-cv-03664-YGR-SVK
7
8          Plaintiffs,

9          vs.

10  GOOGLE LLC,

11          Defendant.
    _____/
12
13
14      Video-recorded deposition of DAVID NELSON, taken
15  on behalf of the Defendant, Remote Zoom Proceeding from
16  Tampa, Florida, beginning at 12:04 p.m. Eastern Daylight
17  Time and ending at 3:50 p.m. Eastern Daylight Time, on
18  Wednesday, July 6, 2022, before Leslie Rockwood Rosas,
19  RPR, CSR No. 3462.
20
21
22
23
24
25
```

Page 2

## Page 3

```
1   APPEARANCES:
2
3   FOR THE PLAINTIFFS:
4       MORGAN & MORGAN
5       BY: RYAN MCGEE, ESQ.
6         JOHN YANCHUNIS, ESQ.
7       201 North Franklin Street, 7th Floor
8       Tampa, Florida 33602
9       (813) 223-5505
10      rmcgee@forthepeople.com
11      jyanchunis@forthepeople.com
12
13      BOIES SCHILLER FLEXNER LLP
14      BY: HSIAO (MARK) C. MAO, ESQ.
15      44 Montgomery Street, 41st Floor
16      San Francisco, California 91401
17      (415) 293-6800
18      mmao@bsfllp.com
19
20      BY: JAMES LEE, ESQ.
21      100 SE Second Street, Suite 2800
22      Miami, Florida 33131
23      (305) 539-8400
24      jlee@bsfllp.com
25
```

Page 3

## Page 4

```
1   APPEARANCES (Continued):
2
3       BOIES SCHILLER FLEXNER LLP
4       BY: ALISON L. ANDERSON, ESQ.
5       725 South Figueroa Street, 31st Floor
6       Los Angeles, California 90017
7       (213) 995-5720
8       alanderson@bsfllp.com
9
10  FOR THE DEFENDANT:
11      QUINN EMANUEL URQUHART & SULLIVAN, LLP
12      BY: CARL W. SPILLY, ESQ.
13      1300 I Street NW, Suite 900
14      Washington, D.C. 20005
15      (202) 538-8000
16      carlspilly@quinnemanuel.com
17
18      BY: STEPHEN A. BROOME, ESQ.
19      865 South Figueroa Street, 10th Floor
20      Los Angeles, California 90017
21      (213) 443-3000
22      stephenbroome@quinnemanuel.com
23
24
25
```

Page 4

## Page 5

```
1   APPEARANCES (Continued):
2
3   Also Present:
4      Liam Timmons, Summer Associate, Quinn Emanuel
5          Urquhart & Sullivan, LLP
6      Robert Fenton, Videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | |
| 4 | WEDNESDAY, JULY 6, 2022 |
| 5 | |
| 6 | WITNESS                          EXAMINATION |
| 7 | DAVID NELSON |
| 8 | |
| 9 | BY MR. SPILLY              10, 118 |
| 10 | BY MR. MCGEE              107, 120 |
| 11 | |
| 12 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 13 | (NONE) |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 6

1   Tampa, Florida; Wednesday, July 6, 2022
2        12:04 P.M.
3
4        PROCEEDINGS
5        THE VIDEOGRAPHER:  Good afternoon.  We are on        12:03:50
6   the record.  The time is 12:04 p.m. Eastern Time.
7   Today's July 6th, 2022.
8        Please note that this deposition is being
9   conducted virtually.  The quality of recording depends on
10   the quality of camera and internet connection of        12:04:06
11   participants.  What is seen from the witness and heard on
12   screen is what will be recorded.  Audio and video
13   recording will continue to take place unless all parties
14   agree to go off the record.
15        This is Media Unit 1 of the video-recorded        12:04:20
16   deposition of David Nelson, taken by counsel for
17   Defendant, in the matter of Chasom Brown versus Google
18   LLC, filed in the United States District Court, Northern
19   District of California, San Jose Division, Case Number
20   4:20-cv-03664-YGR-SVK.        12:04:40
21        This deposition is being conducted remotely
22   using virtual technology.
23        My name is Robert Fenton, representing Veritext
24   Legal Solutions, and I am the videographer.  The court
25   reporter is Leslie Rockwood from the firm Veritext Legal        12:05:04

Page 8

| | | | |
|---|---|---|---|
| 1 | DEPOSITION EXHIBITS | | |
| 2 | DAVID NELSON | | |
| 3 | NUMBER      DESCRIPTION | | IDENTIFIED |
| 4 | Exhibit 1      Expert Rebuttal Report of | | 17 |
| 5 | David Nelson | | |
| 6 | Exhibit 2      Curriculum Vitae, | | 21 |
| 7 | Confidential | | |
| 8 | Exhibit 3      Report to Congress on the Use | | 72 |
| 9 | of Administrative Subpoena | | |
| 10 | Authorities by Executive | | |
| 11 | Branch Agencies and Entities | | |
| 12 | Exhibit 4      Administrative subpoenas, 18 | | 76 |
| 13 | USCA Section 3486 | | |
| 14 | Exhibit 5      Screenshots from the United | | 85 |
| 15 | States Department of Justice | | |
| 16 | website | | |
| 17 | Exhibit 6      18 USCA Section 2706 | | 99 |
| 18 | Exhibit 7      Order on Plaintiffs' Motion | | 108 |
| 19 | for Sanctions for Discovery | | |
| 20 | Misconduct, Redacted Version | | |
| 21 | of Document Sought to be | | |
| 22 | Sealed | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 7

1   Solutions.  I am not related to any party in this action,
2   nor am I financially interested in the outcome.
3        If there are any objections to proceeding,
4   please state them at the time of your appearance.
5   Counsel and all present, including remotely, will now        12:05:21
6   state their appearances and affiliations for the record,
7   beginning with the noticing attorney.
8        MR. SPILLY:  Carl Spilly from Quinn Emanuel on
9   behalf of Google.  I'm also joined today by Stephen
10   Broome and Liam Timmons from Quinn Emanuel.        12:05:38
11        MR. MCGEE:  Good afternoon.  Ryan McGee from the
12   law firm of Morgan & Morgan.  I will be defending the
13   deposition.  I am joined by John Yanchunis, also of
14   Morgan & Morgan, as well as Mark Mao, James Lee and
15   Alison Anderson of the law firm Boies, Schiller &        12:05:57
16   Flexner.
17        THE REPORTER:  Thank you.
18        Mr. Nelson, if you would raise your right hand,
19   please, I'll swear you in.
20        You do solemnly state that the evidence you
21   shall give in this matter shall be the truth, the whole
22   truth and nothing but the truth, so help you God?
23        THE WITNESS:  I do.
24        THE REPORTER:  Thank you, sir.
25        You may proceed, Counsel.        12:06:17

Page 9

3 (Pages 6 - 9)

1
2                    EXAMINATION
3 BY MR. SPILLY:
4    Q. All right. Good afternoon, Mr. Nelson. My
5 name's Carl Spilly. I represent Google.          12:06:24
6    A. Good afternoon, sir.
7    Q. I will be taking your deposition today.
8       Can you state your full name for the record?
9    A. David E. Nelson.
10    Q. Is there anyone in the room with you today?     12:06:33
11    A. No.
12    Q. And on your computer screen, do you have any
13 applications open?
14    A. I have Apple Safari, which has the Veritext
15 Exhibit Share window open.                        12:06:47
16    Q. Okay. You don't have any communications
17 applications open; is that correct?
18    A. No. I quit all programs on the computer and
19 turned on my focus mode do not disturb.
20    Q. Okay. Is your phone nearby?                 12:07:01
21    A. It's next to me, yes.
22    Q. Okay. Do you have any documents with you?
23    A. I have my expert report printed out next to my
24 computer.
25    Q. Okay. Have you ever been deposed before?     12:07:18

Page 10

1    A. In civil matters, no. In criminal matters, yes.
2    Q. Okay. So I'll go over some rules of the road
3 for you. Sir, I'm going to be asking you a series of
4 questions. My questions and your answers will be
5 recorded by the court reporter. Do you understand that   12:07:31
6 you need to speak loudly and clearly so that the court
7 reporter can hear you?
8    A. Yes.
9    Q. And the court reporter will also have trouble if
10 we talk over each other, so it's important that you wait   12:07:44
11 until I finish my question before you begin answering.
12       Can you do that?
13    A. Yes, sir.
14    Q. All right. And I will take breaks at various
15 points in the questioning. Let me know if you need to    12:07:57
16 take a break at any point. I would only ask that you
17 don't take a break when a question is pending.
18       Can you do that?
19    A. No problem, sir.
20    Q. All right. You've just taken an oath that       12:08:07
21 requires you to tell the truth. Do you understand that
22 you're under oath today?
23    A. Yes, I do.
24    Q. And do you understand that that is the same oath
25 you would take if you were to testify in court?      12:08:18

Page 11

1    A. Yes, sir.
2    Q. Is there anything that would prevent you from
3 testifying fully and truthfully to the best of your
4 ability today?
5    A. No, sir.                                   12:08:34
6    Q. Okay. Are you sick today?
7    A. No.
8    Q. Have you taken any medication in the past
9 48 hours that would impact your ability to testify?
10    A. Nothing that would impact my ability to testify.   12:08:43
11    Q. Okay. So at various points today your attorney
12 will raise objections to my questions. Those objections
13 are primarily directed at me and are for the record.
14 Unless your attorney instructs you not to answer a
15 question, I'd ask that you please answer the question.   12:09:01
16       Can you do that?
17    A. Yes, sir.
18    Q. Did you do anything to prepare for this
19 deposition?
20    A. I met with the lawyers from Morgan & Morgan. We   12:09:10
21 had several conference calls. I worked on my expert
22 report, and I refreshed my memory on some of the legal
23 statutes surrounding the Electronic Communication Privacy
24 Act.
25    Q. Okay. Which lawyers from Morgan & Morgan did     12:09:28

Page 12

1 you meet with?
2    A. Primarily Ryan McGee and John Yanchunis and then
3 some of the other lawyers with the other law firm,
4 Mark -- I don't recall his last name off the top of my
5 head, but I could get it for you, obviously. I don't     12:09:49
6 recall the names of the other attorneys.
7    Q. Is that Mark Mao that you're referring to there?
8    A. Yes, sir.
9    Q. Okay. And how long in total did you spend
10 preparing for this deposition?                     12:10:08
11    A. So preparing for the deposition, probably two
12 weeks. I was initially contacted about a month ago,
13 maybe six weeks ago, by Morgan & Morgan regarding this
14 matter.
15    Q. When was the first time Morgan & Morgan reached   12:10:25
16 out to you about this matter?
17    A. I believe it was around May 29th. I can check
18 my -- I can check a document on my computer and confirm
19 that if you need.
20    Q. How many -- so you said you had some conference   12:10:38
21 calls with them before this deposition. How many did you
22 have?
23    A. Probably five or six.
24    Q. All right. And how long in total did you spend
25 on those calls?                                 12:10:55

Page 13

4 (Pages 10 - 13)

1    A.  Anywhere from 15 minutes to a couple of hours.
2    Q.  Did you review any documents during those
3 meetings?
4    A.  I reviewed Professor Zervas' expert report and
5 my expert report.                              12:11:13
6    Q.  Okay.  And no other documents during those
7 meetings; is that correct?
8    A.  During those meetings, no, I don't believe so.
9    Q.  Okay.  Did you speak to anyone other than
10 plaintiffs' lawyers in preparation for this deposition?   12:11:30
11    A.  No.
12    Q.  Did you take any notes during the meetings with
13 plaintiffs' attorneys to prepare for this deposition?
14    A.  No, no.  Nothing that isn't in my expert report.
15    Q.  Did anyone else take notes during those          12:11:47
16 meetings?
17    A.  I don't know.
18    Q.  Are you familiar with the other experts
19 plaintiffs have retained in this case?
20    A.  I am not.                                 12:11:59
21    Q.  So you have not communicated with any other
22 experts that plaintiffs retained for this case; is that
23 correct?
24    A.  That's correct, sir.
25    Q.  Did you read any of the other expert reports      12:12:09

Page 14

1 written by plaintiffs' experts in this case?
2    A.  No, sir.
3    Q.  So you have not read Jonathan Hochman's expert
4 reports; is that correct?
5    A.  That's correct, sir.                       12:12:22
6    Q.  You have not read Stephen Weisbrot's expert
7 reports; is that correct?
8    A.  That's correct, sir.
9    Q.  You have not read Michael Lasinski's expert
10 report; is that correct?                          12:12:33
11    A.  That's correct, sir.
12    Q.  You have not read Mark Keegan's expert report;
13 correct?
14    A.  That's correct, sir.
15    Q.  And you have not reviewed Bruce Schneier's      12:12:41
16 expert report; is that right?
17    A.  That's correct, sir.
18    Q.  Have you reviewed any of the complaints files by
19 the plaintiffs in this case?
20    A.  I reviewed -- I skimmed the Complaint last night   12:12:54
21 that Ryan McGee from Morgan & Morgan sent me, but I
22 didn't read it thoroughly.
23    Q.  How much time did you spend reviewing the
24 Complaint last night?
25    A.  Probably 30 minutes.                       12:13:09

Page 15

1    Q.  Was that the first time that you reviewed the
2 Complaint?
3    A.  Yes, sir.
4    Q.  So I think you said May 29th was the first time
5 that you were contacted about this case; is that correct?   12:13:20
6    A.  Yes, to the best of my knowledge.  I have it in
7 my computer, and I can confirm if you need the exact
8 date.
9    Q.  When -- maybe at a break you could look up that
10 date and we can clear it up.                       12:13:33
11    A.  Sure.  No problem.
12    Q.  When -- all right.  So you were first contacted
13 May 29th, and then when were you actually signed on or
14 retained by plaintiffs to serve as an expert for them in
15 this case?                                   12:13:57
16    A.  It would have been in early June, and again, I
17 have a recording of that date.  I have -- in my computer
18 file.
19    Q.  Okay.  And who specifically from Morgan & Morgan
20 contacted you?                                12:14:08
21    A.  Initially it was David Reign, one of their
22 investigators.
23    Q.  Okay.  Can you spell that last name for me?
24    A.  R-E-I-G-N.
25    Q.  And what were you asked to do by Mr. Reign when   12:14:24

Page 16

1 he first reached out to you?
2    A.  To have a discussion with Mr. Ryan McGee about a
3 case that they thought I might be able to contribute to.
4    Q.  How did they think you might be able to
5 contribute to the case?                          12:14:45
6    A.  Because of my cyber background with the FBI.
7    Q.  Okay.  And then what were you asked to do after
8 that discussion with Mr. Reign?
9    A.  I was asked to review Professor Zervas' expert
10 report and produce a report rebutting some of the        12:15:02
11 statements in Professor Zervas' report.
12    Q.  Okay.  How many hours have you worked on this
13 matter thus far?
14    A.  Roughly 40.
15    Q.  And that includes all of your initial           12:15:17
16 conversations with plaintiffs and work on the report and
17 then preparation for the deposition; is that correct?
18    A.  Through last night, yes, sir.
19    Q.  Okay.  Do you have any assistants who also work
20 on this matter?                                12:15:33
21    A.  No, sir.
22    Q.  So I'm going to introduce Exhibit 1, which I
23 believe you said you have a copy of in front of you.
24        (Exhibit 1, Expert Rebuttal Report of David
25        Nelson, marked for identification electronically   12:15:46

Page 17

5 (Pages 14 - 17)

Page 18

1        by counsel.)
2    Q.  BY MR. SPILLY:  This is a copy of your expert
3  report.
4        Do you recognize this?
5    A.  Yes, sir, I do.                    12:16:00
6    Q.  Okay.  And this is the report that you filed --
7  or that you prepared for this case; is that correct?
8    A.  Yes, sir.
9    Q.  Go to paragraph 11 of your report, which is --
10  of Exhibit 1, which is on page 4.  Let me know when    12:16:14
11  you're there.
12    A.  I'm here.  I'm there.
13    Q.  Okay.  So paragraph 11 says, "I'm compensated at
14  the rate of $200 an hour."
15        Did I read that correctly?               12:16:31
16    A.  Yes, sir.
17    Q.  Is $200 an hour your standard rate?
18    A.  I don't know that I have a standard rate, sir.
19    Q.  Okay.  Is $200 an hour what you would typically
20  charge for your services?                     12:16:45
21    A.  So I only retired from the FBI in December of
22  last year.  I have not had the occasion to serve as an
23  expert witness before, so I don't have any frame of
24  reference to make that statement.  I will say it does
25  seem fair for my time at this point.            12:17:09

Page 18

Page 19

1    Q.  Okay.  Do you have an additional rate that you
2  might charge for testifying, say in court or at a
3  deposition?
4    A.  No, sir.
5    Q.  How much do you anticipate being paid in total    12:17:26
6  by the end of the trial?
7        MR. MCGEE:  Object to the form, speculation.
8        THE WITNESS:  So I still answer; correct?
9    Q.  BY MR. SPILLY:  Yes, sir.
10        MR. MCGEE:  You can answer.               12:17:41
11        THE WITNESS:  Got it.
12        If today is the last day that I devote time, it
13  will be roughly 50 hours.  50 times 200, by my math, is
14  approximately $10,000.
15    Q.  BY MR. SPILLY:  Okay.  Do you have a budget for    12:18:04
16  the litigation, like the maximum amount of time that
17  you're allowed to spend?
18    A.  No, sir.
19    Q.  All right.  Have you ever worked for any of
20  plaintiffs' law firms in any other capacity?         12:18:15
21    A.  No, sir.
22    Q.  Okay.  So I am going to introduce --
23    A.  Sir, for your last question --
24    Q.  Yes.
25    A.  -- I am working with another attorney from     12:18:32

Page 19

Page 20

1  Morgan & Morgan on a separate matter currently.
2        I don't know if that has bearing on your
3  question.
4    Q.  Sure.  What is that matter?
5    A.  It's a matter examining the role of social media    12:18:43
6  and its influence on hate speech that leads to active
7  shooter events.
8    Q.  Okay.  Who is the attorney from Morgan & Morgan
9  that you're working on in that matter?
10    A.  John -- I'm sorry to interrupt you, sir.    12:19:03
11  John Yanchunis.
12    Q.  Okay.  And is that for a litigation?
13    A.  I don't know if it's for litigation or not.  I
14  was hired to do research on social media platforms and
15  attempt to obtain artifacts, if you will, of subjects who    12:19:26
16  engaged in active shooter events and what was available,
17  what they put on social media platforms prior to the
18  active shooter event.
19    Q.  What hourly rate are you charging for that
20  engagement?                                12:19:45
21    A.  150 an hour, sir.
22    Q.  Okay.  And how much time have you spent on that
23  engagement thus far?
24    A.  I would have to look at a log file.  I would
25  estimate between 20 and 30 hours.              12:19:59

Page 20

Page 21

1    Q.  Okay.  And how long -- how much total time do
2  you anticipate spending on that project?
3    A.  I don't -- I don't know, sir.
4        MR. MCGEE:  Sorry, Mr. Nelson, just, again, give
5  me the opportunity to lodge any objections so that the    12:20:15
6  court reporter is not taking multiple statements at the
7  same time.
8        But, again, I would object to the form and
9  speculation.
10    Q.  BY MR. SPILLY:  Has Mr. Yanchunis given you any    12:20:28
11  indication of how much time that project might take?
12    A.  No, sir.
13    Q.  When did you begin working on that project?
14    A.  Approximately three weeks ago, sir.
15    Q.  And so that was after you started working on    12:20:44
16  this case; is that correct?
17    A.  That's correct, sir.
18    Q.  Okay.  I am going to introduce what has been
19  marked as Exhibit 2.
20        (Exhibit 2, Curriculum Vitae, Confidential,    12:21:08
21        marked for identification electronically by
22        counsel.)
23    Q.  BY MR. SPILLY:  You'll see it in a moment.  It
24  is Attachment 1 to the expert report that you submitted
25  in this case.  Will you let me know when you can see    12:21:16

Page 21

6 (Pages 18 - 21)

1 that?
2    A. I can see it, sir.
3    Q. Okay. This is the curriculum vitae that you
4 submitted with your report in this case; correct?
5    A. That's correct, sir.                    12:21:28
6    Q. All right. If you go to page 3 of Exhibit 2, do
7 you see the header that says, "Education"?
8    A. Yes, sir.
9    Q. All right. So underneath that it says you have
10 a Bachelor's degree in industrial supervision, with    12:21:41
11 photography and printing emphasis; is that correct?
12    A. Printing technology emphasis, yes, sir.
13    Q. Okay. You do not have a Bachelor's degree in
14 computer science; correct?
15    A. No, sir.                               12:21:57
16    Q. You do not have a Bachelor's degree in
17 electrical engineering; correct?
18    A. No, sir.
19    Q. You don't have a Bachelor's degree in any
20 engineering discipline; is that correct?              12:22:09
21    A. Correct, sir.
22    Q. You do not have a Master's degree; is that
23 correct?
24    A. That is correct, sir.
25    Q. You also do not have a Ph.D.; correct?      12:22:17

Page 22

1    A. That is correct, sir.
2    Q. All right. So if you go to the section of
3 Exhibit 2 that starts on page 4 with the header "FBI
4 Official Record of Training," let me know when you are
5 there.                                       12:22:41
6    A. I'm there, sir.
7       MR. MCGEE: And if I could, Mr. Spilly, on
8 Exhibit 2, this was provided with the expert report that
9 was designated as confidential. Mr. Nelson's home
10 address, which I'm not going to read onto the record, is    12:22:56
11 included in Exhibit 2, so we'll just be marking that
12 confidential, and I would ask that due to the nature of
13 Mr. Nelson's prior work with the FBI, that the address
14 not be read into the record here so as to mitigate any
15 leaking of his address to any other sources.      12:23:19
16       THE WITNESS: Thank you, sir.
17    Q. BY MR. SPILLY: So your -- Exhibit 2 lists a
18 number of different conferences and trainings that you
19 attended while you worked at the FBI; is that correct?
20    A. Yes, sir, it is.                        12:23:42
21    Q. You attended the Cyber Criminal Section
22 Conference 13 years ago in 2009; is that correct?
23    A. Yes, sir.
24    Q. You completed Cyber 101 and attended a series of
25 regional cyber conferences 17 years ago, between      12:23:58

Page 23

1 July 2004 and January 2006; is that correct?
2    A. Correct, sir.
3    Q. You also completed an Introduction to Internet
4 Investigations 13 years ago in 2009; correct?
5    A. Yes, sir.                              12:24:13
6    Q. And you completed a half-hour long training in
7 obtaining and analyzing digital records eight years ago
8 in 2014; is that correct?
9    A. Yes, sir.
10    Q. If you go to page 7 of Exhibit 2, if you look at    12:24:28
11 the -- do you see the second row up from the bottom with
12 the title "Bloodborne Pathogens"?
13    A. Yes, sir.
14    Q. Okay. And under hours, which is the third
15 column from the right, about -- for Bloodborne Pathogens    12:24:49
16 it says 2.0.
17       Do you see that?
18    A. I do.
19    Q. Okay. And then under credits, the entry for
20 that row says 2.0.; is that correct?            12:25:01
21    A. Yes, sir.
22    Q. So my question is: Why do the rest of the rows
23 have 0.0 in the credits column?
24    A. I don't know the answer to that, sir.
25    Q. Okay. Do you know one way or another whether or    12:25:21

Page 24

1 not you received credit for participating in these
2 conferences and trainings?
3    A. Yes, I did, sir.
4    Q. Okay. But you don't know one way or another why
5 credits show 0 for every row in this table other than    12:25:46
6 Bloodborne Pathogens on page 7; is that correct?
7    A. Yeah, the credit really isn't used in the FBI.
8 I'm not sure where that column even comes from. It's not
9 like we're working towards a degree.
10    Q. Okay. You are cofounder of Full Nelson       12:26:10
11 Investigations; is that correct?
12    A. Yes, sir.
13    Q. Who else works for Full Nelson Investigations?
14    A. My wife, Leslie Nelson.
15    Q. Okay. And Full Nelson Investigations, LLC, was    12:26:26
16 incorporated in 2021; is that correct?
17    A. Yes, sir.
18    Q. What other engagements has Full Nelson
19 Investigations worked on since it was incorporated in
20 2021?                                       12:26:43
21    A. My wife is working with another investigation
22 firm on a separate matter.
23    Q. What investigation --
24    A. I'm sorry.
25    Q. What investigation -- sorry. I didn't mean to    12:26:58

Page 25

7 (Pages 22 - 25)

1 talk over you.

2     A. No, I'm sorry, sir. I did the same thing.

3     Q. What is the investigation firm that Full Nelson

4 Investigations is working on -- is working with on

5 another matter?              12:27:15

6        MR. MCGEE: I'm going to object. I think we've

7 been fairly liberal with the questioning here, but

8 unless, Mr. Nelson, it's something that you can reveal or

9 it's something that you need to speak with counsel about

10 it and whether you can reveal it, that his wife is    12:27:35

11 conducting something wholly separate from his work here,

12 I don't believe it's relevant, but I do leave it to the

13 witness on whether it's something that he can or cannot

14 discuss.

15        THE WITNESS: Sir, respectfully, my wife, I    12:27:53

16 believe, signed a non-disclosure agreement with the other

17 investigative agency. I'm not working on that matter,

18 and I have no knowledge of the matter, other than the

19 fact that she is working on the matter, so I don't -- I

20 don't believe I can answer that question.      12:28:08

21     Q. BY MR. SPILLY: Okay. Are there any other

22 matters that Full Nelson Investigations, LLC, has worked

23 on since it was incorporated in 2021?

24     A. Just the previously mentioned one with attorney

25 John Yanchunis.            12:28:27

Page 26

---

1     Q. Okay. And then the one with -- that your wife

2 is currently working on; is that correct?

3     A. Yes, sir.

4     Q. All right. If you go back to Exhibit 2, on

5 page 2, look at your professional experience --    12:28:40

6     A. Yes, sir.

7     Q. -- starting with -- starting on page 2, the

8 entry that says, "Organized Crime/Drug Trafficking

9 Investigator."

10      Do you see that?         12:28:58

11     A. Yes, sir, I do.

12     Q. Okay. So your first position at the FBI was

13 organized crime/drug trafficking investigator; is that

14 correct?

15     A. Yes, sir.           12:29:09

16     Q. How long did you hold that position for?

17     A. Until September 2001.

18     Q. Okay. And when did you begin in that position?

19     A. In May of 1998.

20     Q. Okay. And going up to the next one, do you see    12:29:29

21 it says, "Senior Team Leader, FBI Evidence Response

22 Team"?

23     A. Yes, sir.

24     Q. That was your second position at the FBI; is

25 that correct?           12:29:45

Page 27

---

1     A. So that's a collateral duty, sir. I held that

2 position in addition to my investigative duties.

3     Q. Okay. So these two overlapped, then, senior

4 team leader --

5     A. Yes, sir.           12:30:00

6     Q. -- and organized crime?

7     A. Yes. And I was -- I was the senior team leader

8 for the evidence response team also while I was working

9 cyber crime matters in El Paso, Texas.

10     Q. Okay. So when did you start as a senior team    12:30:12

11 leader for the FBI evidence response team?

12     A. It would have been -- I don't have the exact

13 date. I joined the team as a photographer. Again, it's

14 a collateral duty. I became the second in command team

15 leader, if you will, a few months later, and then a    12:30:35

16 couple of years later, I would guess in 2004, I became

17 the senior team leader.

18     Q. When did you finish your tenure as a senior team

19 leader for the FBI evidence response team?

20     A. When I left El Paso, Texas and moved to Tampa,    12:30:56

21 Florida.

22     Q. Okay. What was the date?

23     A. It was September 2006.

24     Q. Okay. So then your third position at the FBI

25 was cyber crimes investigator, InfraGard coordinator and    12:31:14

Page 28

---

1 FBI training instructor; is that correct?

2     A. Yes, that's correct. I was an agent assigned to

3 work cyber crime full-time. The InfraGard coordinator,

4 the training instructor, the evidence response team,

5 those are all collateral duties in addition to my    12:31:35

6 full-time job of being a cyber crime investigator. That

7 began in El Paso, Texas prior to me departing for Tampa,

8 Florida.

9     Q. Okay. What was the date that you began as a

10 crime -- cyber crimes investigator?       12:31:50

11     A. It was September 2001, right after the 911

12 attacks, sir, when the FBI changed its priorities and

13 cyber became the number three priority for the FBI.

14     Q. Okay. How long did you hold that position for?

15     A. A cyber crime investigator?       12:32:05

16     Q. Yes, sir.

17     A. Up until I became the full-time SWAT team leader

18 for the Tampa division, so until -- I believe I would

19 have to look at my expert report to get the exact date,

20 but it was in 2016, if I'm not mistaken.      12:32:25

21     Q. Okay. All right. So how many -- in your role

22 as cyber crimes investigator, how many total cyber crime

23 cases did you investigate?

24     A. Total between El Paso and Tampa, Florida?

25     Q. Yes, sir.           12:32:55

Page 29

8 (Pages 26 - 29)

**Page 30**

1 A. I don't know the total number. Dozens.
2 Q. Okay. So more than 20?
3 A. Yes.
4 Q. Less than 30; is that fair?
5 A. No. I would say more than 30. I would say -- I   12:33:13
6 mean, less than 100, but more than 30. I'm not sure
7 exactly how many. I also -- those are the ones I was
8 case agent for, meaning I was the primary investigator.
9 I was also co-case agent on an equal number of
10 investigations.   12:33:34
11 Q. And what -- at a high level, what was the
12 subject matter of those investigations?
13 A. Anything from innocent images, which is the
14 FBI's child pornography cases, internet fraud, some small
15 amount of intellectual property rights, which used to   12:33:50
16 fall under the cyber program, and computer intrusions,
17 which is the primary focus of the cyber program now.
18 Q. Okay. By computer intrusions, you mean like
19 hacking; is that fair?
20 A. Yes.   12:34:12
21 Q. Any other subject matter of any investigations
22 that you worked on while you were a cyber crime
23 investigator at the FBI?
24 A. So quite a few. As -- as you are likely aware,
25 cyber touches just about every investigative

**Page 31**

1 classification, so I was regularly called to assist on
2 other classifications and work the cyber component, for
3 example, a kidnapping investigation. I worked the cyber
4 crime component of the kidnapping. I did some terrorism
5 investigation for the cyber crime component as it related   12:34:55
6 to analyzing email headers and log files and other cyber
7 crime-related investigative activity.
8 Q. Okay. And you worked with technology companies
9 when you were in that role as a cyber crimes
10 investigator; is that correct?   12:35:18
11 A. Yes, sir. Yes, sir.
12 Q. Other than Google, did you work with any other
13 technology companies when you were submitting and
14 receiving requests for user information as a cyber crimes
15 investigator at the FBI?   12:35:30
16 A. Yes, sir.
17 Q. Which ones?
18 A. I don't know if I'll be able to list them all,
19 but the major ones including Yahoo, local internet
20 service providers, Facebook. I don't know if I could   12:35:50
21 list them all. I won't remember all of them.
22 Q. Did you ever work with Microsoft?
23 A. Yes, sir.
24 Q. Did you ever work with Mozilla?
25 A. I don't believe I worked -- and by worked, do   12:36:08

**Page 32**

1 you mean obtained information from?
2 Q. Submitted requests to.
3 A. I don't believe I submitted any requests to
4 Mozilla, sir.
5 Q. Okay. Did you obtain information from Mozilla   12:36:22
6 in some other way?
7 A. Not that I'm aware of, sir.
8 Q. Okay. Did you ever work with Hotmail? Or did
9 you -- rephrase.
10 Did you ever submit any requests to Hotmail?   12:36:32
11 A. Through Microsoft, yes, and I believe Hotmail
12 was independent prior to Microsoft, so probably both,
13 sir.
14 Q. Okay. And then you said you also submitted some
15 requests to local internet service providers; is that   12:36:53
16 right?
17 A. Yes, sir.
18 Q. Which service providers were those?
19 A. Road Runner, Bright House Cable. Again, I won't
20 have a comprehensive list, but by way of example,   12:37:09
21 Spectrum, Verizon. Those are the ones that come to mind.
22 Q. Okay. When you're using a web browser, do you
23 personally take any steps to hide your device's IP
24 address?
25 A. Not typically.   12:37:31

**Page 33**

1 MR. MCGEE: Object --
2 THE WITNESS: Sorry.
3 MR. MCGEE: You can answer.
4 THE WITNESS: Not typically, sir.
5 Q. BY MR. SPILLY: Why not?   12:37:39
6 A. I'm not sure why that question is relevant, sir.
7 Q. Yeah, so I'm just asking: You said you don't --
8 you typically don't take any steps to hide your device's
9 IP address, and I'm wondering why you do not do that?
10 A. I don't find it necessary, sir.   12:38:05
11 Q. Why not?
12 A. Again, I'm not sure how this is relevant, sir.
13 Q. Okay. Well, I'm just here to ask pretty much
14 any questions that I want, and that -- and then you're
15 here to answer the questions, so I think, like, you know,   12:38:29
16 going back and forth about the relevance of particular
17 inquiries is probably not going to be very productive.
18 So I'm just asking -- you know, you said you
19 don't use -- you don't hide the IP address on your device
20 when you're using it. I'm just asking why do you not   12:38:46
21 think that's necessary?
22 MR. MCGEE: Object to the form.
23 You can answer, Mr. Nelson.
24 THE WITNESS: Typically, I don't. I don't find
25 myself doing things on the internet that need to be   12:38:59

9 (Pages 30 - 33)

Veritext Legal Solutions
866 299-5127

1 secret.
2    Q.   BY MR. SPILLY:  Okay.  By things that need to be
3 secret, you mean, for example, cyber crimes?
4    A.   That would be one example, sir.
5    Q.   Okay.  All right.  So we'll go back to        12:39:19
6 Exhibit 1, and if you go to page 4, paragraph 9, let me
7 know when you're there.
8    A.   Yes, sir.
9    Q.   Okay.  So paragraph 9 says, "Counsel for the
10 Plaintiffs in this action retained me to review and       12:39:40
11 provide opinions in response to the Expert Report of
12 Georgios Zervas, submitted by Google on April 15th,
13 2022."
14        Did I read that correctly?
15    A.   Yes, sir.                               12:39:56
16    Q.   Does this accurately -- does paragraph 9 of
17 Exhibit 1 accurately reflect the full scope of your
18 assignment in this case?
19    A.   Yes, sir.
20    Q.   So you were not retained to do anything else for   12:40:08
21 this case; is that correct?
22    A.   No, sir.  That is correct, sir.
23    Q.   Okay.  And by that I mean you were not asked to
24 respond to any other experts' opinions in this case; is
25 that correct?                                 12:40:18

1    A.   No, sir.
2    Q.   Okay.  So if you go down one paragraph,
3 paragraph 10 of Exhibit 1 says, "I reviewed the Zervas
4 Report and all of the materials appended to it, and I'm
5 offering rebuttal opinions in connection with Professor   12:40:37
6 Zervas' opinions and assertions regarding private
7 browsing functionality (Opinion 1 and Section IV of his
8 report)."
9        Did I read that correctly?
10    A.   Yes, sir.                              12:40:47
11    Q.   You were not asked to respond to any other
12 opinions from Professor Zervas' report; is that correct?
13    A.   That is correct, sir.
14    Q.   All right.  So if we go to paragraph 17 of
15 Exhibit 1.                                   12:41:08
16    A.   Yes, sir, I'm there.
17    Q.   All right.  Do you see there's a footnote 2 and
18 then a footnote 3 that identifies -- or sorry.  I'll
19 start over.
20        Do you see that paragraph 17 of Exhibit 1 has     12:41:18
21 footnote 2 and footnote 3 that cites specific paragraphs
22 from Professor Zervas' report that you're responding to;
23 is that right?
24    A.   I do see that, sir, yes.
25    Q.   Okay.  And so those footnotes identify       12:41:35

1 paragraphs 6, 45, 59 through 61, 70, 80, 82 and 83; is
2 that correct?
3    A.   Yes, sir.
4        MR. MCGEE:  Object to the form.  I think you
5 said 6, Mr. Spilly.  I don't see that on the footnote.    12:41:57
6        MR. SPILLY:  I'll start it again.
7    Q.   Do you see on the next page that there's
8 footnote 4 to paragraph 17 of Exhibit 1?
9    A.   I do see that, sir.
10    Q.   And that has paragraph 6 cited; is that correct?   12:42:17
11    A.   It does, sir.
12    Q.   Okay.  And so you do not identify any other
13 paragraphs from Professor Zervas' report in paragraph 17
14 of Exhibit 1; is that correct?
15        MR. MCGEE:  Object to the form.            12:42:37
16        THE WITNESS:  That's correct, sir.
17    Q.   BY MR. SPILLY:  You also do not identify any
18 other paragraphs from Professor Zervas' report in the
19 same footnotes to paragraph 17 of Exhibit 1; is that
20 correct?                                     12:42:52
21        MR. MCGEE:  Object to the form.
22        THE WITNESS:  That's correct.
23        Sorry, sir.
24    Q.   BY MR. SPILLY:  Okay.  If you go to paragraph 31
25 of Exhibit 1, which is page 7.  Let me know when you're    12:43:01

1 there.
2    A.   I'm there, sir.
3    Q.   Okay.  So paragraph 31 -- in paragraph 31 of
4 Exhibit 1 you include footnotes that cite specific
5 paragraphs from Professor Zervas' report that you're      12:43:17
6 responding to; is that correct?
7    A.   It is, sir.
8    Q.   Okay.  And those are Footnotes 13 through 16; is
9 that right?
10    A.   Yes, sir.                              12:43:29
11    Q.   Footnotes 13 to 16 to paragraph 31 of Exhibit 1
12 cite paragraphs 6, 80, 82, 83 and 119 of Professor
13 Zervas' report; is that correct?
14        MR. MCGEE:  Object to the form.
15        THE WITNESS:  Yes, sir.                   12:43:52
16    Q.   BY MR. SPILLY:  You do not identify any other
17 paragraphs from Professor Zervas' report in paragraphs --
18 or in footnotes 13 to 16 to paragraph 31 of Exhibit 1; is
19 that correct?
20        MR. MCGEE:  Object to the form.            12:44:06
21        THE WITNESS:  No, sir.
22    Q.   BY MR. SPILLY:  All right.  If you go to
23 paragraph 12, do you see it says -- the first sentence of
24 paragraph 12 says -- of Exhibit 1 says, "In preparing
25 this rebuttal report, I've relied upon the documents      12:44:28

1 identified herein, which are listed in Appendix 1"; is

2 that correct?  Did I read that correctly?

3    A. Yes, sir.

4    Q. Okay.  Appendix 1 to your report consists of

5 spreadsheets containing exports of data from Google's          12:44:44

6 transparency report for global requests for user

7 information; is that correct?

8    A. Yes, sir.

9    Q. Appendix 1 of your report does not include any

10 additional documents other than those spreadsheets          12:44:57

11 containing exports of data from Google's transparency

12 report; is that correct?

13    A. Yes, sir.

14    Q. Okay.  And then the second sentence of paragraph

15 12 says, "Because of the discrete nature of my engagement          12:45:13

16 for this case, I did not request and I was not provided

17 access to documents that Google produced in discovery."

18       Did I read that correctly?

19    A. Yes, sir.

20    Q. Okay.  And so you have no opinion on the content          12:45:29

21 or meaning of any documents produced by Google in

22 discovery; is that correct?

23    A. Could you repeat that question, sir?

24    Q. Yes.

25       So you have not reviewed any documents produced          12:45:48

Page 38

---

1 by Google in discovery in this case; is that correct?

2    A. That is correct, sir.

3    Q. And thus you have no opinion on the content or

4 meaning of any documents produced by Google in discovery;

5 is that correct?          12:46:03

6    A. Having not read them, that is correct, sir.

7    Q. All right.  So going to exhibit -- so staying on

8 Exhibit 1, going to paragraph 2, can you read paragraph 2

9 out loud for me, please?

10    A. "As described below, I am offering the following          12:46:25

11 opinion:  Professor Zervas' opinions regarding the

12 functionality of private browsing are incomplete and

13 misleading because he failed to address how Google saves,

14 collects, and routinely produces data to third parties,

15 including Google producing (for a fee) data in response          12:46:42

16 to law enforcement requests tied to IP addresses, where

17 the data produced by Google would include private

18 browsing data that in my experience can be linked to

19 specific individuals and devices."

20    Q. Okay.  Paragraph 2 of Exhibit 1 identifies an          12:46:57

21 opinion that you are providing in this case; is that

22 correct?

23    A. Yes, sir.

24    Q. All right.  If I look below those paragraphs 3

25 through 8 --          12:47:11

Page 39

---

1    A. Yes, sir.

2    Q. -- those -- paragraphs 3 through 8 of Exhibit 1

3 describe your background; correct?

4    A. Yes, sir.

5    Q. These paragraphs do not contain opinions that          12:47:23

6 you're offering in this case; is that correct?

7    A. That's correct, sir.

8    Q. All right.  And paragraphs -- if you go down to

9 9 through 15.  Let me know when you're there.  It's on

10 the next page.          12:47:37

11    A. I'm there, sir.

12    Q. Okay.  Paragraphs 9 through 15 describe the

13 scope of your assignment and the materials you relied on

14 to form your opinions; is that correct?

15    A. Yes, sir.          12:47:51

16    Q. They do not contain opinions that you're

17 offering as an expert in this case; is that correct?

18    A. Correct, sir.

19    Q. If you go down do paragraph 16, paragraph 16

20 says, "Having reviewed Professor Zervas' report, it is my          12:48:12

21 opinion that Professor Zervas' assertions regarding

22 private browsing mode functionality are incomplete and

23 misleading, with Professor Zervas failing to address how

24 private browsing activity associated with IP addresses

25 and other identifying information is saved, persists          12:48:29

Page 40

---

1 after a private browser is closed, and is retained and

2 made available by Google to third parties, including law

3 enforcement."

4       Did I read that correctly?

5    A. Yes, sir.          12:48:41

6    Q. Paragraph 16 is another opinion you're providing

7 in this case; is that correct?

8    MR. MCGEE:  Object to the form.

9    THE WITNESS:  Yes, sir.

10    Q. BY MR. SPILLY:  And underneath that, looking at          12:48:55

11 paragraph 17, can you read paragraph 17 out loud for me?

12    A. "Throughout his report, Professor Zervas

13 presents private browsing as modes that 'work as

14 described by Google' where private browsing information

15 'is not saved' and not available after the private          12:49:12

16 browsing session ends, footnote 2.  For example,

17 Professor Zervas includes one section titled 'Browsing

18 History from a Private Browsing Session Is Not Saved.'

19 Professor Zervas bases this on an assessment of whether

20 specific data was saved and maintained on specific          12:49:32

21 devices and also discusses whether cookies values were

22 being shared between private browsing and other browsing

23 sessions," and "other browsing sessions" is in quotes.

24    Q. Okay.  So paragraph 17 is summarizing Professor

25 Zervas' opinions; is that correct?          12:49:59

Page 41

1     MR. MCGEE:  Object to the form.

2     You can answer.

3     THE WITNESS:  Yeah, I would say it's a summary

4  of his opinions, sir.

5     Q. BY MR. SPILLY:  Paragraph 17 is not an opinion     12:50:09

6  that you are providing in this case; is that correct?

7     MR. MCGEE:  Object to the form.

8     You can answer.

9     THE WITNESS:  No.  I'm restating one of his

10  opinions, sir.                                           12:50:30

11     Q. BY MR. SPILLY:  Okay.  So going down, continuing

12  with the same exercise, paragraph 18 is an opinion you're

13  providing in this case; is that correct?

14     A. Yes, sir.

15     Q. And below that, paragraph 19, do you see that?     12:50:46

16     A. I do see it, sir.

17     Q. Paragraph 19 is also an opinion you're providing

18  in this case; is that correct?

19     A. Yes, sir.

20     Q. Okay.  And then paragraphs 20 through 23     12:51:06

21  underneath describe your experience at the FBI; is that

22  correct?

23     A. Yes, sir.

24     Q. Paragraphs 20 through 23 of Exhibit 1 do not

25  contain opinions that you're providing in this case; is     12:51:26

Page 42

1  that correct?

2     MR. MCGEE:  Object to the form.

3     You can answer.

4     THE WITNESS:  Correct, sir.

5     Q. BY MR. SPILLY:  Okay.  Now, looking at paragraph     12:51:38

6  24.

7     A. Yes, sir, I'm there.

8     Q. Let me know when you've had a chance to review

9  that one.

10     A. Yes, sir, I've reviewed that paragraph.     12:51:59

11     Q. Paragraph 24 describes the legal requirements

12  for obtaining administrative subpoenas, grand jury

13  subpoenas and warrants; is that correct?

14     A. Not necessarily the legal requirements, sir.

15  It's more a summary of what they are, but, yes, sir.     12:52:14

16     Q. Okay.  And you are not presenting paragraph 24

17  of Exhibit 1 as your opinion in this case; is that

18  correct?

19     A. No, sir.

20     MR. MCGEE:  Object to the form.     12:52:27

21     You can answer.

22     Q. BY MR. SPILLY:  Paragraphs 25 through 27, can

23  you take a moment to take a look at those?  And I bet

24  while you're doing that you'll know what my next question

25  is going to be.     12:52:53

Page 43

1     A. Yes, sir, I've read all three paragraphs.

2     Q. Okay.  Paragraphs 25 through 27 of Exhibit 1

3  describe your experience submitting administrative

4  subpoenas to Google; is that correct?

5     A. Yes, sir.     12:53:06

6     Q. All right.  So paragraphs 25 through 27 of

7  Exhibit 1 do not state your expert opinion; is that

8  correct?

9     MR. MCGEE:  Object to the form.

10     You can answer.     12:53:19

11     THE WITNESS:  Correct, sir.

12     Q. BY MR. SPILLY:  Okay.  Moving down to paragraph

13  31.  So if you can take a moment to review that one.

14     A. Yes, sir, I've reviewed it.

15     Q. Okay.  Paragraph 31 of Exhibit 1 summarizes     12:53:47

16  Professor Zervas' opinion; is that correct?

17     A. Yes, sir.

18     Q. And paragraph 31 of Exhibit 1 does not contain

19  your own opinions responding to Professor Zervas; is that

20  correct?     12:54:05

21     MR. MCGEE:  Object to the form.

22     You can answer.

23     THE WITNESS:  Correct, sir.

24     Q. BY MR. SPILLY:  All right.  Staying on

25  Exhibit 1, looking at paragraph 32, so paragraph 32 of     12:54:15

Page 44

1  Exhibit 1 says, "Based on my education, training, and

2  experience at the FBI, in particular my interactions with

3  Google in that capacity, Professor Zervas' position

4  regarding linkability runs contrary to matters I

5  personally observed during my career with the FBI."     12:54:36

6     Did I read that correctly?

7     A. Yes, sir.

8     Q. Paragraph 32 of Exhibit 1 is an opinion you're

9  providing in this case; is that correct?

10     A. Yes, sir.     12:54:49

11     Q. Okay.  And then paragraph 33 below that, will

12  you take a moment to review that one?

13     MR. MCGEE:  And, Mr. Spilly, just when we get to

14  a breaking point, I think we've been going about an hour,

15  so I'd appreciate a chance to refill some water.     12:55:11

16     MR. SPILLY:  Okay.  Cool.

17     THE WITNESS:  I've read it, sir.

18     Q. BY MR. SPILLY:  All right.  And paragraph 33

19  describes your memory of your experiences with Google's

20  production of information in response to law enforcement     12:55:30

21  requests; is that correct?

22     A. It does, sir.

23     Q. Paragraph 33 does not contain an opinion that

24  you're offering as an expert in this case; is that

25  correct?     12:55:44

Page 45

12 (Pages 42 - 45)

Page 46

```
 1      MR. MCGEE:  Object to the form.
 2      You can answer.
 3      THE WITNESS:  No, sir.  No opinion.
 4   Q.  BY MR. SPILLY:  Okay.  So take a look at the
 5   next page, paragraphs 34 through 37, and I am guessing    12:55:58
 6   that you know what I'm going to ask, and want to give
 7   Mr. McGee some water, so I'll start with paragraph 34
 8   describes your recollection of Google's productions in
 9   response to requests from the FBI; is that correct?
10   A.  Yes, sir.                          12:56:37
11   Q.  Paragraph 34 of Exhibit 1 does not contain an
12   expert opinion that you're offering in this case; is that
13   correct?
14      MR. MCGEE:  Object to the form.
15      You can answer.                     12:56:47
16      THE WITNESS:  No, sir, it does not.
17   Q.  BY MR. SPILLY:  All right.  Paragraph 35
18   describes your recollection of a specific cyberstalking
19   investigation you participating in; is that correct?
20   A.  Yes, sir.                          12:57:05
21   Q.  Paragraph 35 of Exhibit 1 does not contain an
22   opinion that you're offering as an expert in this case;
23   is that correct?
24      MR. MCGEE:  Object to the form.
25      You can answer.                     12:57:16
```

Page 47

```
 1      THE WITNESS:  No, sir, it does not.
 2   Q.  BY MR. SPILLY:  Paragraph 36 provides additional
 3   summary of your recollection of Google's productions in
 4   response to requests from the FBI; is that correct?
 5   A.  Yes, sir.                          12:57:39
 6   Q.  Paragraph 36 of Exhibit 1 does not contain any
 7   opinion that you are offering in this case; is that
 8   correct?
 9      MR. MCGEE:  Object to the form.
10      You can answer.                     12:57:51
11      THE WITNESS:  No, sir.
12   Q.  BY MR. SPILLY:  All right.  And then paragraph
13   37 says, "When we interviewed suspects with information
14   provided by Google, some suspects would state that the
15   responsive information was from private browsing    12:58:04
16   activity."
17      Did I read that correctly?
18   A.  Yes, sir.
19   Q.  Paragraph 37 describes your recollection of
20   interviews of suspects whose information was provided by    12:58:15
21   Google in response to requests from the FBI; is that
22   correct?
23   A.  Some of the information, yes.
24   Q.  What do you mean by that?
25   A.  I mean the interviews we conducted with the    12:58:29
```

Page 48

```
 1   suspects would include information provided by Google,
 2   but also other case information, so it wouldn't be
 3   strictly limited to the Google information.
 4   Q.  Okay.  What would be some other information that
 5   you would --                          12:58:49
 6   A.  Followup investigation -- I'm sorry.  I didn't
 7   give you a chance, Mr. McGee.
 8      MR. MCGEE:  No, that's fine.
 9      THE WITNESS:  Followup investigation, results of
10   search warrants, other evidence related to the case.    12:58:59
11   Q.  BY MR. SPILLY:  Okay.  Other evidence related to
12   the case that you obtained from sources other than
13   Google; is that correct?
14   A.  Yes, sir.
15   Q.  And paragraph 37 of Exhibit 1 does not contain    12:59:18
16   an expert opinion that you're offering in this case; is
17   that correct?
18      MR. MCGEE:  Object to the form.
19      You can answer.
20      THE WITNESS:  No, it's not an opinion.  It's a    12:59:34
21   statement of fact as I recalled it.
22      MR. SPILLY:  Okay.  I think we can take -- how
23   long do you need, Ryan?  About ten minutes, Ryan?
24      MR. MCGEE:  That would be great.  Thank you.
25      MR. SPILLY:  Okay.  We can go off the record for    12:59:53
```

Page 49

```
 1   ten minutes then.
 2      THE VIDEOGRAPHER:  Going off the record at
 3   1 o'clock p.m.
 4      (Recess.)
 5      THE VIDEOGRAPHER:  We are back on the record at    13:12:11
 6   1:12 p.m.
 7   Q.  BY MR. SPILLY:  Welcome back, Mr. Nelson.
 8   A.  Thank you, sir.
 9   Q.  Did you speak with your attorneys during the
10   break?                              13:12:24
11   A.  Yes, I did, sir.
12   Q.  What did you talk to them about?
13   A.  Just how the deposition was going, their
14   thoughts on your line of questioning and basically to
15   continue as planned.                    13:12:33
16   Q.  Okay.  If you'd go to Exhibit 1.  Looking at
17   paragraph 2, let me know when you're there.
18   A.  I'm there.
19   Q.  Okay.  In paragraph 2 of Exhibit 1 you say that
20   Professor Zervas "failed to address how Google saves,    13:12:58
21   collects, and routinely produces data to third parties,
22   including law enforcement."
23      Did I read that correctly?
24   A.  Yes, sir.
25   Q.  Aside from the FBI, what third parties are you    13:13:13
```

13 (Pages 46 - 49)

1 referring to in paragraph 2 of Exhibit 1?

2     A. Other government entities, sir.

3     Q. Okay. Which government entities?

4     A. I don't know. I know that they provide

5 information to other government entities besides law     13:13:34

6 enforcement. I don't know exactly which ones.

7     Q. Okay. Do you think it was wrong for Google to

8 provide the FBI with information that the FBI requested

9 in investigating criminal conduct?

10     MR. MCGEE: Object to the form.     13:14:05

11 You can answer.

12     THE WITNESS: It's not my place to say whether

13 it was right or wrong. That's not why I was retained by

14 Morgan & Morgan, sir.

15     Q. BY MR. SPILLY: Okay. But you personally --     13:14:19

16 okay. Hold on. Start over.

17     Google's production of information in response

18 to requests from the FBI helped you solve crimes; is that

19 fair?

20     A. That is fair, sir.     13:14:34

21     Q. Okay. And if Google had not produced

22 information in response to the FBI's requests, it would

23 have been more difficult to solve those crimes; is that

24 correct?

25     MR. MCGEE: Object to the form.     13:14:52

Page 50

---

1 You can answer.

2     THE WITNESS: Yes, sir, that's correct.

3     Q. BY MR. SPILLY: Okay. Do you think that Google

4 investigating law enforcement -- do you think that Google

5 assisting law enforcement with investigations is a     13:15:04

6 problem?

7     MR. MCGEE: Object to the form.

8 You can answer.

9     THE WITNESS: Sir, if you're asking my personal

10 opinion, that might differ than the opinion I've     13:15:17

11 presented for in my expert report.

12     Q. BY MR. SPILLY: I don't think you say this in

13 your expert report, so I'm just looking for your opinion.

14     Do you think that Google assisting law

15 enforcement with investigations is a problem?     13:15:34

16     MR. MCGEE: Object to the form.

17 You can answer.

18     THE WITNESS: As a private citizen, I do think

19 it's a problem. Did it help the FBI and me as an FBI

20 agent in my investigations, yes.     13:15:48

21     Q. BY MR. SPILLY: Okay. Do you think Google

22 should stop cooperating with the FBI?

23     MR. MCGEE: Object to the form.

24 You can answer.

25     THE WITNESS: No.     13:16:02

Page 51

---

1     Q. BY MR. SPILLY: I think you said that other

2 government agencies submit requests to Google for

3 information; is that correct?

4     A. No. I said that Google shares information with

5 other government agencies.     13:16:18

6     Q. Okay. And how do you know that?

7     A. I know it from hearing from other agents discuss

8 it at the FBI.

9     Q. Okay. You don't have first-hand knowledge of

10 that; is that correct?     13:16:42

11     A. I'm going to ask you to repeat that question,

12 sir.

13     Q. Sure.

14     So you don't have first-hand knowledge of Google

15 sharing information with other government agencies other     13:16:58

16 than the FBI; is that correct?

17     MR. MCGEE: Object to the form.

18     You can answer.

19     THE WITNESS: That is correct.

20     Q. BY MR. SPILLY: So you said that Google     13:17:13

21 providing information in response to requests from the

22 FBI helped you solve crimes; is that right?

23     A. That's correct, sir.

24     Q. And potentially, without Google providing

25 information to the FBI, some of those crimes might not     13:17:26

Page 52

---

1 have been solved; is that fair?

2     A. It's a hypothetical, but I would agree with that

3 statement.

4     Q. Okay. How do you know that the information the

5 FBI received in response to the requests referenced in     13:17:45

6 your report that you claim is actually saved by Google

7 and capable of being linked to specific users and devices

8 was private browsing information?

9     A. Because when I interviewed suspects or subjects,

10 they told me it was. They were surprised that we had the     13:18:14

11 information, because they were using private browsing

12 mode whether they conducted those activities.

13     Q. And there's no other source of information that

14 you could review or consult to determine that that

15 information included private browsing information; is     13:18:38

16 that correct?

17     MR. MCGEE: Object to the form.

18     You can answer.

19     THE WITNESS: That's incorrect, sir.

20     Q. BY MR. SPILLY: Okay. You said: When I     13:18:54

21 interviewed suspects, as I asked, "How do you know that

22 information the FBI received was private browsing

23 information," you said, I interviewed suspects, and they

24 told me; is that correct?

25     A. Yes, sir, that's one of the reasons.     13:19:08

Page 53

14 (Pages 50 - 53)

1    Q.  Okay.  What are the other reasons?

2    A.  In material produced by Google, there was a

3  column that had the header for the Google user account.

4  There were times when I reviewed data produced by Google

5  where there was a Google user account associated with the   13:19:34

6  data and where there was nothing in that field.  To me,

7  that is a likely indicator that it was private browsing

8  mode.

9    Q.  Okay.  You're saying the header -- sorry.  What

10  header for the Google user account are you describing   13:20:05

11  there?

12        MR. MCGEE:  Object to the form.

13        You can answer.

14        THE WITNESS:  So in the spreadsheets, there

15  would be a column, and in the column header it would have   13:20:15

16  an indicator for a Google user account, and for the

17  entries on the data provided by Google, there were times

18  where that had a Google user account listed for the entry

19  and times where it did not have a Google user account

20  listed for the entry.        13:20:37

21    Q.  Okay.  Wouldn't it be possible

22  that they just hadn't signed in to their Google account?

23    A.  Possible.

24    Q.  Okay.  So you can't be certain that the absence

25  of a Google account field means that they were in private   13:20:54

Page 54

1  browsing; is that correct?

2        MR. MCGEE:  Object to the form.

3        You can answer.

4        THE WITNESS:  That's correct.  I said it was an

5  indicator that it was likely.        13:21:07

6    Q.  BY MR. SPILLY:  Okay.  But you don't know that

7  for sure; is that fair?

8    A.  Correct, sir.

9    Q.  Okay.  So you reference some spreadsheets that

10  Google will produce in response to some requests for   13:21:41

11  information, so was the information in those spreadsheets

12  from Incognito mode on Chrome?

13        MR. MCGEE:  Object to the form, speculation.

14        You can answer.

15        THE WITNESS:  I don't know, sir.        13:22:03

16    Q.  BY MR. SPILLY:  Was it from Microsoft Edge in

17  private mode?

18        MR. MCGEE:  Object to the form, speculation.

19        You can answer.

20        THE WITNESS:  I don't know, sir.        13:22:15

21    Q.  BY MR. SPILLY:  Okay.  Was it in Firefox private

22  browsing mode?

23        MR. MCGEE:  Object to the form, speculation.

24        You can answer.

25        THE WITNESS:  I don't know, sir.        13:22:32

Page 55

1    Q.  BY MR. SPILLY:  And was it in Safari private

2  browsing mode?

3        MR. MCGEE:  Object to the form, speculation.

4        You can answer.

5        THE WITNESS:  I don't know, sir.        13:22:40

6    Q.  BY MR. SPILLY:  Okay.  You have no special

7  expertise in what the absence of a Google account listed

8  on the spreadsheets that you reference means; is that

9  correct?

10        MR. MCGEE:  Object to the form.        13:22:53

11        You can answer.

12        THE WITNESS:  No, sir.

13    Q.  BY MR. SPILLY:  Okay.  And on paragraph -- okay.

14  So staying on Exhibit 1, paragraph 37.

15    A.  Yes, sir.        13:23:23

16    Q.  Sorry.  Just to run that back one more time.

17        Is it correct that you have no special expertise

18  in what the absence of a Google account listed on the

19  spreadsheets that you referenced means?  Is that correct?

20        MR. MCGEE:  Object to the form.        13:23:47

21        You can answer.

22        THE WITNESS:  I guess I don't know what you mean

23  by "special expertise," sir.

24    Q.  BY MR. SPILLY:  So you said there's a Google

25  account field in some spreadsheets that Google has   13:24:02

Page 56

1  produced; is that correct?

2    A.  Yes, sir.

3    Q.  And you don't know one way or another whether or

4  not that field being empty means that a user was signed

5  out of a Google account when they were browsing?   13:24:22

6    A.  Correct, sir.

7    Q.  Okay.  You don't know one way or another whether

8  or not that -- the absence of that field means that a

9  user was using private browsing mode; is that correct?

10        MR. MCGEE:  Object to the form.        13:24:42

11        You can answer.

12        THE WITNESS:  Yeah, I think I've already

13  answered that question, sir.

14    Q.  BY MR. SPILLY:  Okay.  And so you are saying

15  that you believe that the absence -- sorry.  Let me start   13:25:00

16  over.

17        The absence of that account -- or of that field

18  in the spreadsheets that you referenced could be an

19  indicator that someone is just not signed in to a Google

20  account; is that correct?        13:25:20

21    A.  It could be that.  It also, just as easily,

22  could be that they were in Incognito mode.  I think it's

23  an indicator, potentially, of both.

24    Q.  Okay.  And you have no special expertise on

25  which of those two options the absence of that field   13:25:45

Page 57

15 (Pages 54 - 57)

1 might be an indicator for; is that correct?

2 MR. MCGEE: Object to the form.

3 You can answer.

4 THE WITNESS: I don't. I suspect that there is

5 a way to tell but Google never shared that with us.        13:26:03

6 Q. BY MR. SPILLY: Okay. So other than a witness

7 telling you in an interview that they were using private

8 browsing mode on their browser, you have no way of

9 knowing for certain whether information produced by

10 Google was private browsing information; is that correct?        13:26:30

11 MR. MCGEE: Object to the form.

12 You can answer, Mr. Nelson.

13 THE WITNESS: So no personal knowledge, but I --

14 I would say in Professor Zervas' own report, and I can

15 give you the paragraph number if needed, he discusses        13:26:47

16 that in Incognito mode, it does not prevent a website

17 such as Google from knowing the IP address and following

18 all the locations within that website. In

19 Professor Zervas' own report.

20 Q. BY MR. SPILLY: Okay. When witnesses told you        13:27:14

21 they were using private browsing mode, did you ever

22 confirm those witnesses' statements?

23 A. No, sir. I don't know that there would have

24 been a way to do so.

25 Q. Okay. So the only basis for your opinion that        13:27:28

Page 58

---

1 information produced by Google came from users using a

2 browser in private browsing mode is because the suspects

3 told you they were using private browsing mode on their

4 browser; is that correct?

5 A. And the previously described spreadsheets with        13:27:51

6 the lack of the Google user identifier.

7 Q. How many suspects said that they were using

8 private browsing mode in these interviews?

9 A. At least three, sir. I don't recall how many

10 exactly, but at least three that I can remember.        13:28:18

11 Q. How many of these interviews did you conduct

12 during your time with the FBI?

13 A. I don't understand the question, sir.

14 Q. How many interviews of targets or subjects of

15 FBI cyber crime investigations did you interview during        13:28:35

16 your time at the FBI?

17 A. I don't have that number. Quite a few.

18 Q. Okay. Is it fair to say that it was more than a

19 hundred?

20 A. Probably, sir.        13:28:52

21 Q. Okay. More than 200?

22 A. No, sir.

23 Q. Okay. So somewhere in the range of 100 to 200

24 interviews; is that correct?

25 A. Subject interviews, yes, sir.        13:29:04

Page 59

---

1 Q. And when witnesses told you they were in private

2 browsing mode on their browser, how did that come up in

3 the context of these interviews?

4 A. They volunteered the information, sir. All

5 three of them.        13:29:25

6 Q. Okay. And what did they say?

7 A. All three of them were slightly different, but

8 all three of them were along the lines of: "I'm

9 surprised you have that information because I was in

10 private browsing mode and I thought it was secret."        13:29:41

11 Q. Okay. In the information that was produced

12 related to those three interviewees, was the Google

13 account field that you mentioned earlier absent?

14 A. I don't know, sir.

15 Q. Okay. But you didn't look at the information        13:30:05

16 produced by Google to confirm these witnesses'

17 statements; is that correct?

18 A. So that was not an important thing at the time

19 of these cases, sir.

20 Q. Okay. And the answer, then, to my question is        13:30:20

21 "yes"?

22 A. You'll have to rephrase -- you'll have to

23 restate the question, sir.

24 Q. Okay. You didn't look at the information

25 produced by Google to confirm the three witnesses'        13:30:34

Page 60

---

1 statements about private browsing mode that are

2 referenced in paragraph 37 of Exhibit 1; is that correct?

3 A. That's correct, I had no reason to, sir. I had

4 no reason to doubt that they were in private browsing

5 mode.        13:30:52

6 Q. Okay. Which browsers were those witnesses

7 using?

8 A. I don't have that information, sir.

9 Q. Okay. Were those users signed into a Google

10 account when they were browsing in private browsing mode?        13:31:10

11 MR. MCGEE: Object to the form.

12 THE WITNESS: I don't have that information,

13 sir.

14 Q. BY MR. SPILLY: Okay. Were those -- were those

15 users signed out of a Google account when they were        13:31:21

16 browsing in private browsing mode?

17 MR. MCGEE: Object to the form.

18 You can answer.

19 THE WITNESS: I'm pretty sure that's the same

20 question. But I don't know, sir.        13:31:31

21 Q. BY MR. SPILLY: It was slightly different. It's

22 the inverse, signed into versus signed out of.

23 All right. So staying with Exhibit 1, if you go

24 to paragraph 25.

25 Let me know when you're there.        13:32:02

Page 61

16 (Pages 58 - 61)

1     A.  Yes, sir, I'm there.

2     Q.  So it says -- paragraph 25 of Exhibit 1 says,

3  "During my approximate 18 years performing cyber crime

4  investigations with the FBI, I routinely submitted

5  administrative subpoenas to Google relying on IP          13:32:22

6  addresses (along with the approximate date range or (sic)

7  the suspected activity) of subjects suspected of criminal

8  activity."

9         Did I read that correctly?

10    A.  Not quite, but that's the gist of it, sir.          13:32:36

11    Q.  Sorry.

12        So what do -- in paragraph 25 of Exhibit 1, what

13  do you mean by "relying on IP addresses"?

14    A.  Meaning I submitted a request to Google with an

15  IP address and a date and time range and requested          13:32:57

16  information.

17    Q.  Okay.  And then it says -- the second sentence

18  of paragraph 25 of Exhibit 1 says, "Without a court

19  order, Google regularly produced responsive information

20  associated with the submitted IP address."          13:33:14

21        Do you see that?

22    A.  I do.

23    Q.  Okay.  What do you mean by "responsive

24  information" in this paragraph?

25    A.  They provided information related to the IP          13:33:26

Page 62

1  address in question.

2     Q.  Okay.  And that information would contain search

3  activity; is that correct?

4     A.  It could, yes.  It could -- subscriber

5  information if it was a paid account.  Maybe billing          13:33:43

6  information.  Name, although that's not necessarily

7  verifiable information.  But search terms, yes.

8     Q.  Okay.  And would Gmail be another example of the

9  type of information that might be provided in response to

10  an administrative subpoena, as referenced in paragraph 25          13:34:11

11  of Exhibit 1?

12    A.  Yes, sir.

13    Q.  Okay.  And I heard you say if it was a paid

14  account there may be billing information; is that right?

15    A.  Yes, sir.          13:34:28

16    Q.  What do you mean by "paid account"?

17    A.  If they were hosting a domain or had a Google

18  drive space that they were paying for and they had a

19  credit card on file with their account, we might get that

20  information as well.          13:34:50

21    Q.  Okay.  And did that include browsing activity?

22    A.  Not complete browsing activity.  Limited

23  browsing activity is the way I would characterize it.

24    Q.  Okay.  What is the difference between complete

25  and limited?          13:35:25

Page 63

1     A.  So it would be -- it usually would start with a

2  Google search, and then we would see results from the

3  Google search.

4         And then typically we would see if they went to

5  one of those results from their search.  We would see          13:35:44

6  that in the spreadsheet.

7         But further than that, if they went, say, to

8  another page in the website, we wouldn't see that

9  additional information.

10    Q.  Okay.  So the information -- so the responsive          13:36:03

11  information referenced in paragraph 25 of Exhibit 1 means

12  activity on Google websites; is that correct?

13    A.  Starting on Google websites is one of the pieces

14  of responsive information they provided.

15    Q.  Okay.  And what's the other piece?          13:36:26

16    A.  User information is -- is previously entered.

17  User information:  Name, maybe address.  We would ask

18  for, essentially, any and all account information related

19  to the IP address.

20    Q.  Okay.  And by "account information" you mean you          13:36:44

21  would ask for Google account information; is that

22  correct?

23    A.  Yes, sir.

24    Q.  Okay.  And then -- all right.  How many of these

25  administrative subpoenas did you personally submit?          13:37:08

Page 64

1     A.  I don't have a number, sir.  I don't know.

2  Quite a few.

3     Q.  Would you have used your own name to submit an

4  administrative subpoena to Google?

5     A.  It was signed by an FBI supervisor, so unlikely          13:37:30

6  that my name would be on it.  There was a time when I was

7  the acting supervisor, and I may have signed them as the

8  acting supervisor.  But typically it would be the

9  supervisor's name for an administrative subpoena, not my

10  name.          13:37:49

11    Q.  Okay.  And when you submitted these requests to

12  Google along with an IP address, you also submitted

13  information regarding the approximate dates of the

14  suspected criminal activity; is that correct?

15    A.  Yes, sir.          13:38:09

16    Q.  Okay.  So at the time that you submitted

17  information to Google for one of these administrative

18  subpoenas, is it fair to say that you had already begun

19  investigating suspected illegal activity associated with

20  the IP address?          13:38:26

21    A.  Many times the subpoena to Google for an IP

22  address may have been the first investigative activity

23  after we received either a complaint or information

24  regarding criminal activity.

25    Q.  Okay.  Are you aware that a Google accountholder          13:38:55

Page 65

17 (Pages 62 - 65)

1 can sign in to their account while they're in Incognito

2 mode on the Chrome browser?

3     MR. MCGEE:  Object to the form.

4     You can answer.

5     THE WITNESS:  I don't know if I am -- I don't 13:39:12

6 know if I previously was aware.  I don't know if that's

7 possible or not.  I suspect it is.  It seems logical.

8     Q.  BY MR. SPILLY:  Okay.  So going back to the

9 spreadsheets that you referenced, the Google account

10 field.  Do you recall that? 13:39:27

11     A.  I do.

12     Q.  Okay.  If a user was in Incognito mode on the

13 Chrome browser and signed into their Google account, that

14 account field would not be empty; is that correct?

15     A.  I don't know that that -- 13:39:46

16     MR. MCGEE:  Object to the form, speculation.

17     THE WITNESS:  I don't know.  I don't know.

18 That's -- I don't know if it would have a Google user

19 account or not.

20     MR. SPILLY:  Okay.  Ryan, this is kind of a 13:40:09

21 quick turnaround, but could we take another break?  I

22 need to go also grab some water.

23     MR. MCGEE:  Sure.

24     MR. SPILLY:  Okay.

25     THE VIDEOGRAPHER:  Going off the record at 13:40:17

Page 66

---

1 1:40 p.m.

2     (Recess.)

3     THE VIDEOGRAPHER:  We are back on the record at

4 1:49 p.m.

5     Q.  BY MR. SPILLY:  Welcome back, Mr. Nelson. 13:49:24

6     A.  Thank you very much, sir.

7     Q.  So typically when the FBI asks for Google to

8 provide information associated with an IP address, it

9 wants to know which Google accounts have been logged into

10 from that IP address; is that correct? 13:49:45

11     MR. MCGEE:  Object to the form.

12     THE WITNESS:  Not necessarily.  We might be

13 asking for other information from Google.

14     Q.  BY MR. SPILLY:  Okay.  Would you turn to

15 paragraph 33 of Exhibit 1? 13:50:09

16     You say, "I was able to submit an IP address

17 (sometimes only the IP address, sometimes with additional

18 information) and Google would produce responsive

19 information.  This included private browsing information

20 stored by Google connected to those identifiers." 13:50:38

21     Did I read that correctly?

22     A.  You did, sir.

23     Q.  Okay.  When you say "private browsing

24 information" in this paragraph, do you mean Google

25 searches? 13:50:50

Page 67

---

1     A.  And the results from the searches, yes, sir.

2     Q.  Okay.  And so it says, "Sometimes only the IP

3 address, sometimes with additional information."  When

4 you say, "Sometimes only the IP address," did you -- were

5 you also submitting the date range of the suspected 13:51:17

6 criminal conduct?

7     A.  Yes, sir.

8     Q.  Okay.  So it would be sometimes the IP address

9 and the date range of the criminal conduct; is that fair?

10     A.  That is fair, sir. 13:51:33

11     Q.  Okay.  So there were not acquisitions where you

12 submitted the IP address without a date range of

13 suspected criminal conduct; is that correct?

14     A.  That's correct, sir.

15     Q.  What other additional information might you 13:51:48

16 provide to Google, as referenced in paragraph 33 of

17 Exhibit 1?

18     A.  If we had a Google user account, we would

19 provide that.  If we had a name, we would provide that.

20 We would provide information to help Google produce 13:52:06

21 responsive information.

22     Q.  Okay.  Did you ever provide the email address of

23 the target?

24     A.  Certainly if we had it and we were able to, yes,

25 sir. 13:52:29

Page 68

---

1     Q.  Okay.  Did you ever provide the phone number?

2     A.  I don't recall providing a phone number, but

3 it's possible.

4     Q.  Okay.  Turn to paragraph 35 of Exhibit 1.

5     Let me know when you're there. 13:52:58

6     A.  Okay.  I'm there, sir.

7     Q.  Okay.  So in paragraph 35, you discuss the

8 cyberstalking investigation that you conducted where you

9 submitted an IP address and then got back unique URLs

10 that the IP address accessed.  Is that a fair 13:53:26

11 characterization?

12     A.  Yes, sir.

13     Q.  You received back unique URLs that the IP

14 address accessed because Google identified the account --

15 the Google account that was used by your target for 13:53:43

16 online browsing; is that correct?

17     MR. MCGEE:  Object to the form.

18     THE WITNESS:  I'm going to ask you to repeat the

19 question, sir.

20     Q.  BY MR. SPILLY:  Sure. 13:54:00

21     So in this investigation discussed in

22 paragraph 35, you say that, "After submitting the IP

23 address and receiving responsive information from Google,

24 including unique URLs that the IP address accessed and

25 also accounts that the IP address logged into in close 13:54:20

Page 69

---

18 (Pages 66 - 69)

1 proximity to the time that the cyberstalking email was
2 sent."
3      Do you see that?
4   A. I do, sir.
5   Q. Okay. What -- so when you -- you received     13:54:33
6 unique URLs that the IP address accessed from Google
7 because the target of the investigation referenced in
8 paragraph 35 of Exhibit 1 was signed into a Google
9 account; is that correct?
10      MR. MCGEE: Object to the form.     13:54:56
11      THE WITNESS: I don't know -- I don't know if
12 the target was signed in or not, sir.
13   Q. BY MR. SPILLY: You don't know one way or
14 another whether the target was signed in or signed out of
15 a Google account?     13:55:09
16   A. The target told me they were not signed in and
17 that it was private browsing mode.
18   Q. For Exhibit -- you're talking about the target
19 in paragraph 35 of Exhibit 1?
20   A. I am, sir.     13:55:35
21   Q. Okay. The target of the investigation
22 referenced in paragraph 35 was -- what was the person's
23 name?
24      MR. MCGEE: Object to the form.
25      Mr. Nelson, if you're allowed to answer that.     13:55:52

Page 70

1 I'm not sure what instructions the FBI has on what you
2 can and cannot reveal with regard to your investigation.
3      THE WITNESS: Sir, respectfully I can't answer
4 any questions about case-specific information. Only my
5 actions and activity related to investigations. So I     13:56:12
6 can't provide subject or victim names.
7   Q. BY MR. SPILLY: Was the -- was the investigation
8 referenced in paragraph 35 of Exhibit 1 an investigation
9 of a non-US citizen?
10      MR. MCGEE: Object to the form.     13:56:34
11      Same caution to the witness.
12      THE WITNESS: Respectfully, sir, any questions
13 about the investigation itself would have to -- I would
14 have to have approval from the FBI to discuss specifics
15 of the case.     13:56:48
16   Q. BY MR. SPILLY: Okay. So you can't tell me one
17 way or another whether that was a US citizen or a non-US
18 citizen?
19   A. That's correct, sir.
20   Q. Okay. So turning back to administrative     13:57:14
21 subpoenas, there are limitations on the scope of
22 information an agency can request through an
23 administrative subpoena; is that correct?
24   A. That is correct, sir.
25   Q. Okay. For example, the investigation must be     13:57:50

Page 71

1 conducted pursuant to a legitimate purpose; is that
2 correct?
3   A. Yes, sir. I don't know if that's one of the
4 listed legal requirements for admin subpoenas, but it
5 makes sense.     13:58:07
6      MR. SPILLY: I'm going to introduce another
7 exhibit.
8      (Exhibit 3, Report to Congress on the Use of
9      Administrative Subpoena Authorities by Executive
10      Branch Agencies and Entities, marked for     13:58:13
11      identification electronically by counsel.)
12      MR. SPILLY: This is Exhibit 3.
13   Q. This is obviously an extremely long document.
14 I'm just going to ask you about the text that's on
15 page 4.     13:58:53
16      MR. MCGEE: And, Mr. Nelson, consistent with the
17 other depositions in this case, although the text may
18 appear on page 4, if you do need to review the context
19 surrounding that document, please do take that time.
20      THE WITNESS: So my pages aren't marked. I'm     13:59:18
21 trying to find page 4, sir.
22   Q. BY MR. SPILLY: It should be at the bottom
23 right. It should say 4 out of 200 or so.
24   A. Ah, I see it now, sir.
25   Q. Okay.     13:59:33

Page 72

1   A. I've got it.
2   Q. Okay. So if you look at the second full
3 paragraph on page 4 of Exhibit 3, do you see the section
4 that starts with: "Federal courts subject the exercise"?
5   A. I do see that, sir.     13:59:57
6   Q. Okay. So can you read this paragraph out loud
7 for me, please?
8   A. Sir, I can. I don't understand the purpose of
9 me reading things aloud. I'm obviously begrudgingly
10 willing to do so, I just don't understand what the     14:00:17
11 purpose of that is.
12   Q. Well, I could, but I figure we should -- we
13 could trade off, but -- I can read it. How about that?
14   A. Fair enough, sir.
15   Q. Okay. "Federal courts subject the exercise of     14:00:33
16 administrative subpoena authority to a reasonableness
17 analysis, not the more stringent Fourth Amendment
18 probable cause analysis applied in situations involving
19 search and seizure and issuance of a warrant. In United
20 States v Powell, the Court articulated the deferential     14:00:56
21 standard for judicial review of administrative
22 enforcement actions in a four-factor evaluation of good
23 faith issuance, requiring that: (1) the investigation is
24 conducted pursuant to a legitimate purpose, (2) the
25 information requested under the subpoena is relevant to     14:01:15

Page 73

19 (Pages 70 - 73)

1 that purpose, (3) the agency does not already have the
2 information it is seeking with the subpoena, and (4) the
3 agency has followed the necessary administrative steps in
4 issuing the subpoena."
5       Did I read that correctly?                    14:01:32
6    A. You did, sir.
7    Q. Okay. So an agency that's conducting an
8 investigation and is seeking an administrative subpoena
9 has to -- will only get the administrative subpoena if
10 the investigation is conducted pursuant to a legitimate    14:01:54
11 purpose; is that correct?
12    A. According to the Supreme Court ruling, yes, sir.
13    Q. And the information you are seeking must be
14 relevant to the legitimate purpose; is that correct?
15    A. Again, according to the Supreme Court ruling,    14:02:11
16 yes, sir.
17    Q. Okay. To show that there's a legitimate purpose
18 for a subpoena -- for an administrative subpoena, the
19 agency submitting the subpoena needs to have some idea of
20 who or what they are targeting; is that fair?    14:02:25
21    A. Not necessarily who, sir. That's part of the
22 point in serving the subpoena is to determine who is
23 responsible for the alleged criminal act we're
24 investigating.
25    Q. Okay. But you need to have some idea of what    14:02:53

Page 74

1 you're targeting, meaning some basis to believe that
2 there's criminal conduct associated with the IP address
3 that you're submitting; is that correct?
4       MR. MCGEE: Object to the form, asked and
5 answered.                                  14:03:11
6       THE WITNESS: That's a fair statement.
7    Q. BY MR. SPILLY: Okay. Go back to Exhibit 1. Go
8 to paragraph 24.
9       Let me know when you're there.
10    A. I'm here, sir.                          14:03:35
11    Q. Okay. So paragraph 24, the first sentence -- of
12 Exhibit 1 -- the first sentence reads:  "An
13 administrative subpoena calls for the production of
14 records, relevant items and telephone toll records."
15       Did I read that right?                   14:03:49
16    A. Yes, sir.
17    Q. Okay. And then there's a footnote, footnote 6.
18 And that footnote cites 18 USC Section 3486 as the
19 authority for administrative subpoenas; is that correct?
20    A. Yes, sir.                            14:04:04
21    Q. Okay. And you don't cite any other statutes
22 related to administrative subpoenas in Exhibit 1; is that
23 correct?
24    A. No, sir.
25    Q. Okay. Okay. Introduce now what we'll mark as    14:04:20

Page 75

1 Exhibit 4.
2       (Exhibit 4, Administrative subpoenas, 18 USCA
3       Section 3486, marked for identification
4       electronically by counsel.)
5    Q. BY MR. SPILLY:  Let me know if you can see that.    14:04:34
6    A. Not yet, sir.
7    Q. Okay.
8       MR. MCGEE: It's Exhibit 5 that just says, "Tab
9 4," the Word document?
10       MR. SPILLY: It looks like there's some kind of    14:05:21
11 a lag, and I uploaded it twice.
12       THE WITNESS: I can see it, sir.
13       MR. SPILLY: Let's just -- we can figure that
14 out at a break, but let's just look at Exhibit 4.
15       MR. MCGEE: Okay.                          14:05:36
16    Q. BY MR. SPILLY: Okay. So Exhibit 4 is the text
17 of 18 USC Section 3486 that you cited in paragraph 24 of
18 your report as the authority for administrative
19 subpoenas; is that correct?
20    A. Yes, sir.                            14:05:57
21    Q. Okay. And so 18 USC 3486 permits the filing of
22 an administrative subpoena in an investigation pertaining
23 to a federal healthcare offense; is that correct?
24    A. Or one involving the sexual exploitation of
25 children, sir.                             14:06:24

Page 76

1    Q. Okay. And in either of those instances, either
2 federal healthcare offense or federal offense involving
3 sexual exploitation or abuse of children, the subpoena
4 request would have to be based on a connection between
5 the information requested and either a federal healthcare    14:06:45
6 offense or an offense involving the sexual exploitation
7 or abuse of children; is that correct?
8    A. That's correct, sir.
9    Q. Okay. If you look down to Section 3, the Roman
10 numerals there -- or Section 2 -- the two lowercase Roman    14:07:14
11 numerals there.
12       Let me know when you can see that.
13    A. I believe so, sir.
14    Q. Okay. And that says, "An unregistered sex
15 offender" -- so, "An investigation of an unregistered sex    14:07:28
16 offender conducted by the US Marshal Service, the
17 director of the United States Marshal Service."
18       Did I read that right?
19    A. Yes, sir.
20    Q. Okay. So 18 USC permits the use of an    14:07:44
21 administrative subpoena in an investigation related to an
22 unregistered sex offender conducted by the US Marshal
23 Service or the director of the United States Marshal
24 Service; is that correct?
25    A. For Section 2 or ii, yes, sir.          14:08:05

Page 77

Page 78

1   Q.   Okay.  Other than in that instance, the subpoena
2   request would have to demonstrate a connection between
3   the information requested and an unregistered -- an
4   investigation of an unregistered sex offender; is that
5   correct?                            14:08:28
6   A.   Yes, sir.
7   Q.   Okay.  And then the last bullet -- or last lower
8   case Roman numeral iii says, "An offense under section
9   871 or 879, or a threat against a person protected by the
10  United States Secret Service under paragraph (5) or (6)   14:08:47
11  of section 3056."
12       Did I read that correctly?
13  A.   Yes, sir, you did.
14  Q.   Okay.  So 18 USC 3486 also permits the filing of
15  an administrative subpoena in an investigation pertaining   14:09:02
16  to a threat against a person protected by the United
17  States Secret Service; is that correct?
18  A.   Yes, sir.
19  Q.   And in such an instance, in order to obtain the
20  subpoena, you would have to demonstrate a connection      14:09:16
21  between the information requested and a threat against a
22  person protected by the United States Secret Service;
23  correct?
24  A.   Correct, sir.
25  Q.   So I think you -- you discussed earlier some      14:09:36

Page 79

1   additional information you would submit along with an IP
2   address when you were submitting administrative subpoenas
3   to Google; is that correct?
4       MR. MCGEE:  Object to the form.
5       THE WITNESS:  At times --              14:09:50
6       Sorry.  Go ahead, Mr. McGee.  Sorry.
7       MR. MCGEE:  Object to the form.
8       THE WITNESS:  At times, yes.  Depending on what
9   we had available to us.
10  Q.  BY MR. SPILLY:  And some of that information       14:10:01
11  would be, for example, the name of the suspect?
12  A.   At times, yes, sir.
13  Q.   And another example of information might be the
14  suspect's email address?
15  A.   At times, yes, sir.                14:10:13
16  Q.   Okay.  And did this information that you
17  provided vary from one investigation to another?
18  A.   Yes, it did, sir.
19  Q.   Okay.  So sometimes you would have additional
20  information beyond IP address -- sorry.  Scratch that.   14:10:34
21       Why did it vary by subpoena?
22  A.   Depending on the case information we had, sir.
23  Sometimes all we had was an IP address and a date and
24  time.  Sometimes we had more information.
25  Q.   But you also -- okay.  You said sometimes we     14:10:54

Page 80

1   only had IP address and a date and time.  But you also
2   had evidence that would connect it to one of the three
3   uses of an administrative subpoena that we just
4   discussed; right?
5   A.   When we were serving --              14:11:16
6       THE WITNESS:  Sorry, Mr. McGee.
7       MR. MCGEE:  That's okay.
8       Object to the form.
9       You can answer.
10      THE WITNESS:  When we served administrative       14:11:21
11  subpoenas, yes, that is correct.
12  Q.   BY MR. SPILLY:  Okay.  Okay.  And then in
13  response to administrative subpoena requests -- actually,
14  hold on.
15      So in -- paragraph 35 of Exhibit 1 discusses      14:11:50
16  specific investigation into cyberstalking.
17      Just let me know when you're back on that page.
18  A.   I'm back on that page, sir.
19  Q.   Okay.  For the investigation referenced in
20  paragraph 35, did you seek that information via an        14:12:17
21  administrative subpoena?
22  A.   No, sir.  That would have been either via Grand
23  Jury subpoena or a 2703(d) court order or a search
24  warrant.
25  Q.   Okay.  You don't recall which of those requests   14:12:37

Page 81

1   was submitted in connection with the investigation
2   referenced in paragraph 35 of Exhibit 1?
3   A.   I don't, sir.
4   Q.   Okay.  Staying with Exhibit 1, if you go to
5   paragraph 26, it says, "I reviewed Google's Transparency   14:13:12
6   Report with a focus on responses to subpoenas, which
7   states that Google disclosed information responsive to
8   subpoena requests for a range of 74 and 88 percent from
9   2012 to 2020.  This range of Google's disclosure is
10  consistent with my experience and investigations during   14:13:35
11  my time at the FBI."
12      Did I read that correctly?
13  A.   You did, sir.
14  Q.   What percentage of those responses involved
15  requests for information related to a particular IP       14:13:54
16  address, if you know?
17  A.   From the Google Transparency Report, sir, or my
18  own actions?  Either way, I don't know.
19  Q.   Okay.  And so 74 to 88 percent range is not
20  100 percent; right?                    14:14:23
21  A.   No, sir.
22  Q.   Okay.  So sometimes Google did not provide
23  responsive information in response to requests; is that
24  correct?
25  A.   That is correct.                  14:14:38

21 (Pages 78 - 81)

1    Q.  And why would Google not provide responsive
2  information in response to requests from law enforcement?
3        MR. MCGEE:  Object to the form, speculation.
4        THE WITNESS:  Sir, in my experience, there was
5  an error in the data.  So either we received information   14:14:52
6  that had, say, a transposed IP address or on the request
7  an IP address or other piece of information was incorrect
8  and, therefore, it would return with negative results.
9    Q.  BY MR. SPILLY:  Okay.  Turn down to paragraph 27
10  of Exhibit 1.                              14:15:25
11    A.  Yep.  I'm there, sir.
12    Q.  So in paragraph 27 of Exhibit 1, you state that
13  IPv6 addresses submitted with administrative subpoenas
14  became more prevalent in 2017; is that correct?
15    A.  Yes, sir.                           14:15:44
16    Q.  Okay.  And you transitioned out of the FBI cyber
17  crime unit in 2016; is that correct?
18    A.  In 2016, I became the full time SWAT team
19  leader, but I remained involved in the cyber crime
20  program.                                 14:16:08
21    Q.  Okay.  What do you mean by "I remained
22  involved"?
23    A.  So for the first year, I was the full time SWAT
24  team leader, but I was also the acting supervisor for the
25  squad, the interim supervisor, while we waited for the   14:16:28
Page 82

1  new supervisor to transfer in.
2        After that, I remained as the InfraGard
3  coordinator.  InfraGard is an information sharing program
4  sponsored by the FBI that is a cyber-based program, where
5  we exchange information with the critical infrastructure   14:16:49
6  sectors in the local area.
7        And last, I assisted other agents in the
8  division, even though I was SWAT team leader, with
9  reviewing evidence, formulating investigative plans and
10  other investigative matters when they needed assistance.   14:17:12
11    Q.  After 20- -- after you moved to the SWAT team
12  position, you didn't personally submit administrative
13  subpoenas to Google; is that correct?
14    A.  No, sir.  That is correct, sir.
15    Q.  All right.  Go back to Exhibit 1.  And you can   14:17:43
16  go to paragraph 28, which is on page 6.
17        Let me know when you're there.
18    A.  I'm there, sir.
19    Q.  Okay.  So this is -- paragraph 28 of Exhibit 1
20  says, "Also during my approximate 18 years performing   14:18:02
21  cyber crime investigations with the FBI, I also submitted
22  grand jury subpoenas and search warrants to Google
23  relying on IP addresses (along with the approximate date
24  range of the suspected activity) of subjects suspected of
25  criminal activity.  Google regularly produced responsive   14:18:22
Page 83

1  information associated with the submitted IP address."
2        Did I read that right?
3    A.  You did, sir.
4    Q.  Is the responsive information that Google would
5  produce in response to grand jury subpoena requests the   14:18:37
6  same as the responsive information referenced in
7  connection with administrative subpoenas in your report?
8    A.  Yes, sir.
9        MR. MCGEE:  Object to the form.
10        THE WITNESS:  Sorry.  Sorry, Mr. McGee.   14:18:54
11        MR. MCGEE:  That's okay.
12        So object to the form.
13        You can answer, which you already did.
14    Q.  BY MR. SPILLY:  Okay.  During your time at the
15  FBI, how many grand jury subpoenas with the FBI to Google   14:19:16
16  did you work on?
17    A.  I don't know, sir.  Quite a few.
18    Q.  Can you give me a rough estimate?
19    A.  Certainly dozens.  I can't -- I can't put a
20  number on it.  Certainly dozens.             14:19:33
21    Q.  Okay.  How many grand jury subpoenas did you
22  personally submit?
23    A.  I've answered that question, sir.  I don't know
24  how many I've personally submitted.
25    Q.  Federal law, like administrative subpoenas --   14:19:55
Page 84

1  sorry.  Start over.
2        Like administrative subpoenas, federal law
3  placed limits on grand jury subpoenas; is that correct?
4    A.  Yes, sir.
5    Q.  And so I will introduce --          14:20:19
6        MR. SPILLY:  Actually, should we go off the
7  record for one second?
8        MR. MCGEE:  Sure.
9        MR. SPILLY:  Let's talk to the court reporter.
10        THE VIDEOGRAPHER:  Going off the record at   14:20:26
11  2:20 p.m.
12        (Discussion off the record.)
13        THE VIDEOGRAPHER:  We are back on the record at
14  2:22 p.m.
15        MR. SPILLY:  Okay.  I am going to introduce what   14:22:13
16  has been marked as Exhibit 5.
17        (Exhibit 5, Screenshots from the United States
18        Department of Justice website, marked for
19        identification electronically by counsel.)
20    Q.  BY MR. SPILLY:  Let me know when you can see   14:22:26
21  that one.
22    A.  I can see it, sir.
23    Q.  Okay.  And if you go to page 2 of Exhibit 5.
24        Let me know when you can -- when you found the
25  section that has a header that says, "Power of a Grand   14:22:53
Page 85

22 (Pages 82 - 85)

1 Jury Limited By Its Function."

2 A. I'm there, sir.

3 Q. All right. Okay. So a grand jury is limited by

4 its function for a possible return of an indictment; is

5 that correct?                                    14:23:17

6 A. Yes, sir.

7 Q. And when submitting a grand jury subpoena, the

8 request would have to demonstrate some connection between

9 the information requested and a potential criminal case;

10 is that correct?                                  14:23:30

11 A. Yes, sir.

12 Q. So when submitting a grand jury subpoena, the

13 FBI is requesting -- the FBI, as the requester, would not

14 be able to request information on a user without at least

15 some evidence that the law is being violated; is that  14:23:49

16 correct?

17 A. So the first part of your question indicated a

18 user. I would say, no, we can't use a grand jury

19 subpoena unless there is an allegation of criminal

20 activity.                                         14:24:10

21 Q. Okay. And you have to submit -- you have to

22 request a grand jury subpoena; is that right?

23 A. Yes, sir.

24 Q. And if all you were to submit was an IP address

25 with no allegations or description of any type of  14:24:25

Page 86

1 investigation or criminal conduct, that would not satisfy

2 that requirement; is that correct?

3 MR. MCGEE: Object to the form.

4 You can answer.

5 THE WITNESS: I believe that to be correct, sir.  14:24:36

6 Q. BY MR. SPILLY: Did you ever have to submit

7 additional information beyond an IP address when making a

8 grand jury subpoena request to Google?

9 A. Did I ever have to, sir? I don't recall the

10 grand jury ever coming back and saying, "We need more  14:25:02

11 information." I don't remember any grand jury subpoena

12 requests being denied.

13 Q. Would you go to paragraph 28 of Exhibit 1?

14 Let me know when you're there.

15 A. I'm there, sir.                            14:25:30

16 Q. Okay. Paragraph 28 of Exhibit 1 says, "Also

17 during my approximate 18 years performing cyber crime

18 investigations with the FBI, I also submitted grand jury

19 subpoenas and search warrants to Google relying on IP

20 addresses (along with the approximate date range of the  14:25:50

21 suspected activity) of subjects suspected of criminal

22 activity. Google regularly produced responsive

23 information associated with the submitted IP address."

24 Do you see that?

25 A. I do, sir.                                 14:26:02

Page 87

1 Q. Okay. And the responsive information that

2 you're referencing in paragraph 28 of Exhibit 1, that is

3 information on Google websites, like search history on

4 Google.com and then also IP address; is that correct?

5 MR. MCGEE: Object to the form, mischaracterizes  14:26:27

6 the report.

7 THE WITNESS: So it will be the same answer for

8 the administrative subpoena question you asked prior.

9 Q. BY MR. SPILLY: Okay. All right. Now, turning

10 to search warrants.                               14:26:46

11 To issue a search warrant, investigators need to

12 show probable cause that the search is justified; is that

13 correct?

14 A. That's a fair summary, yes, sir.

15 Q. Okay. Probable cause means a reasonable basis  14:26:57

16 for the belief that a crime has been committed; is that

17 correct?

18 A. That's the first part of it, yes, sir.

19 Q. Okay. What's -- sorry. What's the second part?

20 A. And that evidence of the crime is on the thing  14:27:12

21 that we want to search.

22 Q. Okay. And to make this showing of -- and so --

23 okay. I'll start that one over.

24 So just focusing on the belief that the crime

25 has been committed, to make that showing, you have to  14:27:28

Page 88

1 provide, for example, affidavits from investigators

2 describing where and what they will search; is that

3 correct?

4 A. Yeah, that's typically more of an Attachment A

5 for -- for where and what they will search. But, yes,  14:27:55

6 that has to be outlined in the search warrant.

7 Q. And then you also need to provide affidavits

8 describing why investigators believe the search is likely

9 to uncover relevant evidence; is that correct?

10 A. That's correct, sir.                        14:28:16

11 Q. Okay. And then if you're going to seize

12 anything from the target, you also have to provide

13 affidavits describing what they will seize; is that

14 right? Or what will be seized, rather.

15 A. A list of things we're searching for. That's  14:28:41

16 Attachment B, sir.

17 Q. Okay. During your time at the FBI, how many

18 search warrants involving Google did you personally

19 participate in submitting?

20 A. I don't have that number, sir. I don't know.  14:29:02

21 Multiple search warrants involving Google.

22 Q. Would it be less than five?

23 A. No, I would say it's more than five. But I

24 don't know exactly how many, sir.

25 Q. Okay. Less than ten?                        14:29:19

Page 89

23 (Pages 86 - 89)

1  A.  Sir, I -- I would be guessing, and I don't want
2  to guess in a deposition.
3     Q.  Okay.  You can't recall the number of times that
4  you were involved in search warrants submitted to Google
5  while you worked at the FBI; is that correct?      14:29:37
6     A.  That -- I can't remember the number of times,
7  no.  Because involved in a search warrant doesn't mean
8  I'm the affiant.  So I -- I don't know how many -- I
9  don't know how many I was involved in.
10    Q.  Okay.  That's helpful.            14:29:52
11       How many times were you the affiant?
12    A.  I don't have that number either, sir.
13    MR. SPILLY:  Okay.  Ryan, how about we -- could
14  we take ten again?
15    MR. MCGEE:  Yeah.                14:30:21
16    MR. SPILLY:  We can go off the record.
17    THE VIDEOGRAPHER:  Going off the record at
18  2:30 p.m.
19    (Recess.)
20    THE VIDEOGRAPHER:  We are back on the record at   14:42:15
21  2:42 p.m.
22    Q.  BY MR. SPILLY:  Okay.  Welcome back, Mr. Nelson.
23       So going back to Exhibit 1, your report, will
24  you turn to paragraph 32?
25       Let me know when you're there.       14:42:40

Page 90

1  A.  I'm there, sir.
2     Q.  Okay.  And paragraph 32 says, "Based on my
3  education, training and experience at the FBI, and
4  particularly my interactions with Google in that
5  capacity, Professor Zervas' position regarding      14:42:55
6  linkability runs contrary to matters I personally
7  observed during my career with the FBI."
8       Did I read that correctly?
9     A.  You did, sir.
10    Q.  Okay.  And so 32 states your opinion, and it is   14:43:07
11  based on your education, training and experience at the
12  FBI, and particularly your interactions with Google in
13  that capacity; is that correct?
14    A.  Yes.
15    Q.  You did not rely on any other information,    14:43:23
16  methodology or analysis in disputing Professor Zervas'
17  position regarding linkability; is that correct?
18    A.  I'm going to ask you to repeat that question, if
19  you don't mind, please.
20    Q.  Sure.                     14:43:37
21       You did not rely on any other information,
22  methodology or analysis in disputing Professor Zervas'
23  position regarding linkability; is that correct?
24    A.  And "in my education, training and experience"
25  is pretty broad.  So, yeah, that's what I made the    14:43:51

Page 91

1  observation on.
2     Q.  Okay.  So turn to paragraph 33.
3     A.  Yes, sir.
4     Q.  You state there that Google was able to produce
5  responsive information when it was unclear who the IP   14:44:05
6  address belonged to; correct?
7     A.  Yes, sir.
8     Q.  Why would it be unclear who the IP address
9  belonged to?
10    A.  In this example, sir, if it was a public library   14:44:19
11  or cybercafé-type situation.
12    Q.  Okay.  And what you're saying there is that more
13  than one user can use an IP -- the same IP address in
14  those situations you described; is that correct?
15    A.  That's correct, sir.            14:44:42
16    Q.  Okay.  And users who share a single device will
17  have the same IP address; is that correct?
18    A.  Users who share a single device will have a --
19  the same IP address?  Yes, that's correct, sir.
20    Q.  Users on different devices -- like in the     14:45:06
21  internet café example that you cited, users on different
22  devices connected to the same Wi-Fi router will have the
23  same IP address; is that correct?
24    A.  Depending on how the cybercafé is configured,
25  yes, that is most likely correct.          14:45:24

Page 92

1  Q.  Okay.  Okay.  And so in 33, you say in the
2  second-to-last sentence, "This included private browsing
3  information stored by Google connected to those
4  identifiers."
5       Did I read that right?            14:45:57
6     A.  You did, sir.
7     Q.  Okay.  Those identifiers that you're referring
8  to here is the IP address; is that right?
9     A.  Yes, sir.
10    Q.  Did the responsive information that Google    14:46:18
11  produced ever contain information related to a different
12  individual than the individual you were targeting?
13    A.  Repeat that question, please, sir.
14    Q.  Sure.
15       So when -- when Google produced responsive    14:46:36
16  information, did it ever -- did the responsive
17  information ever contain information related to a
18  different individual than the individual that you were
19  targeting?
20    A.  Individual, yes, on one occasion.  Computer, no.   14:46:57
21    Q.  Okay.  But a different individual.  So that's
22  the shared device scenario that we were discussing; is
23  that right?
24    MR. MCGEE:  Object to the form.
25    THE WITNESS:  Yes, sir.            14:47:20

Page 93

24 (Pages 90 - 93)

1   Q.  BY MR. SPILLY:  Okay.  And when you received --
2   so in the case where that is a shared device -- that is
3   shared by more than one user that has the same IP
4   address, in order to figure out which user was using that
5   device, you would need additional information beyond just   14:47:43
6   the IP address; is that correct?
7   A.  With the IP address and the information provided
8   by Google, we have been able to identify subjects of
9   investigations simply with an IP address, date and time,
10  even though it was a shared IP address, based on the URL   14:48:05
11  information provided by Google where the subject accessed
12  unique URLs linked to the subject.
13  Q.  And they were linked to the subject because
14  those URLs were associated with the subject Google
15  account; is that correct?   14:48:37
16  A.  Or another account, either bank account or
17  different email provider.
18  Q.  Okay.  So bank account, like logging in on Bank
19  of America's website?
20  A.  Yes, sir.   14:48:53
21  Q.  And then a different email provider, by
22  that you mean, like, Yahoo email; is that correct?
23  A.  I do, sir.
24  Q.  Okay.  And that was -- and so that is personally
25  identifiable information, the bank account and email   14:49:11

Page 94

1   provider; is that correct?
2   A.  I don't know if it technically meets the
3   definition of PII, if that's the gist of your question.
4   But it was enough for us to identify the subject.
5   Q.  Okay.  Without that information, if you go back   14:49:32
6   to, like, where you just have the IP address and there's
7   a shared device, you can't use just that IP address to
8   determine who was using the device; is that correct?
9   A.  No, I don't think that's correct.  I can
10  determine who's using the device based on followup   14:49:55
11  investigation and based on an analysis of the URLs that
12  Google provided.
13  Q.  Yeah, I've got you.
14      Okay.  But with -- so I'm just saying if you
15  just had the IP address and none of the other additional   14:50:09
16  information you described just now, you wouldn't be able
17  to identify the user who's using the shared device; is
18  that right?
19  A.  In that very limited instance, yes, that's
20  correct.   14:50:22
21  Q.  Okay.  Was the data -- or the responsive
22  information referenced in paragraph 33 of Exhibit 1 ever
23  associated with private browsing sessions?
24  A.  Yes, it was.
25  Q.  Okay.  And you knew that because you interviewed   14:51:17

Page 95

1   the witness -- or you interviewed the suspect, and they
2   told you in an interview that they were using private
3   browsing mode; is that correct?
4   A.  That's correct, sir.
5   Q.  Okay.  So would you agree with me that an IP   14:51:31
6   address without additional information does not uniquely
7   identify a user?
8   A.  I know we're split hairs.  With an IP address
9   and a date and time and a response from Google, there has
10  not been one occasion I have not been able to identify   14:51:52
11  the subject.
12  Q.  Okay.  But I'm saying, with just an IP address
13  you can't uniquely identify an individual; is that fair?
14  A.  I can identify their device.
15  Q.  Okay.  But if two people used the device,   14:52:11
16  there's no way to use just that IP address to figure out
17  which of the two people was using the device; is that
18  correct?
19  A.  I'm not trying to be argumentative, but that
20  just rarely, if ever, happened.   14:52:28
21      When we did subpoenas, we got the results, and
22  it was a device -- it wasn't a shared device.  There was
23  only -- in all of these hundreds of times, that happened
24  maybe once or twice.
25      So the vast, vast majority of the time, if I   14:52:43

Page 96

1   have an IP address, a date and time, and I get
2   responsive information from Google, it's the person.
3   It's the person who's using that device.  There's not a
4   cybercafé, there's not multiple people using a cell
5   phone.  That's -- nobody does that anymore.   14:52:59
6   Q.  Okay.  What about in the cybercafé example?
7   A.  We were still able to identify the subject.
8       And, again, that was in the vast, vast minority
9   of investigations.
10  Q.  Okay.  But just to be clear, in the cybercafé   14:53:20
11  example, you were able to identify the subject with --
12  via the IP address, the dates and the additional
13  information provided by Google; correct?
14  A.  Correct.
15  Q.  And cybercafés are not the only situation where   14:53:48
16  more than one device might share an IP address; is that
17  correct?
18  A.  In theory, yes.  In practice, it's the only one
19  I came across in my 18 years working cyber crime.  One
20  cybercafé.   14:54:10
21  Q.  You identified a suspect who used a cybercafé?
22  A.  Yeah, and we still identified the suspect.  But,
23  yes, they did -- they did their illegal activity from a
24  computer at a cybercafé.
25  Q.  Okay.  What country was the cybercafé located   14:54:26

Page 97

25 (Pages 94 - 97)

1 in?

2 A. So we're back to the FBI does not authorize me
3 to give specifics about cases, so I can't answer specific
4 questions about when, where, who.
5 Q. Okay. You can't tell me, then, if the cybercafé   14:54:51
6 user that you just referenced was in the United States;
7 is that correct?
8 A. Again, I'm not trying to be argumentative.
9 It's -- I'm not permitted to disclose any details about
10 any cases, no matter how minute they may seem.   14:55:08
11 Q. Okay. So Exhibit 1 -- turn back to Exhibit 1.
12 Paragraph 33, the very last sentence of this
13 paragraph says, "Google charged the government for this
14 data, which the government paid for."
15 Did I read that correctly?   14:55:26
16 A. You did, sir.
17 Q. What do you mean by "Google charged the
18 government for this data"?
19 A. They charged a processing fee for their
20 custodian of records to produce the data. They typically   14:55:36
21 would bill the United States Attorney's Office. But
22 occasionally I would either get those bills by mistake or
23 see those bills if the United States Attorney's Office
24 did not pay in a timely fashion.
25 Q. Okay. And Google requested reimbursement from   14:55:58

Page 98

1 the government pursuant to a statute that authorizes that
2 request; is that correct?
3 A. Yes, sir. I believe that's the case.
4 Q. Okay. If you know, what statute authorizes
5 Google to request reimbursement from the government for   14:56:15
6 its assistance with these types of investigations?
7 A. I don't know what the statute is, sir.
8 Q. Okay.
9 MR. SPILLY: All right. I am going to introduce
10 Exhibit 6.   14:56:46
11 (Exhibit 6, 18 USCA Section 2706, marked for
12 identification electronically by counsel.)
13 Q. BY MR. SPILLY: Let me know when you can see it.
14 A. I can see it, sir.
15 Q. Okay. So Exhibit 6 is a printout of 18 USC   14:57:02
16 Section 2706. And it says at the top, "Cost
17 reimbursement."
18 Are you familiar with this institute?
19 A. I certainly am now. I knew it existed, but I
20 didn't know what the number was until probably today.   14:57:24
21 Q. Okay. And Google requested reimbursement for
22 the work on FBI information requests pursuant to this
23 statute; is that correct?
24 MR. MCGEE: Object to the form, speculation.
25 THE WITNESS: It certainly appears so.   14:57:46

Page 99

1 Q. BY MR. SPILLY: Okay. And this statute
2 authorizes companies like Google to seek that
3 reimbursement; is that correct?
4 MR. MCGEE: Object to the form, speculation.
5 THE WITNESS: It does, sir.   14:58:01
6 Q. BY MR. SPILLY: All right. If you go to
7 paragraph 36 of Exhibit 1.
8 Let me know when you can see that.
9 A. I can see it, sir.
10 Q. Okay. So paragraph 36, you say, "In my   14:58:27
11 approximate 18 years of cyber crime investigations, I am
12 not aware of Google denying production of responsive
13 information (to an administrative subpoena, grand jury
14 subpoena, search warrant or other court order) because it
15 was from private browsing activity."   14:58:48
16 Did I read that correctly?
17 A. You did, sir.
18 Q. Okay. If you know, how would Google know if
19 information came from a private browsing session?
20 MR. MCGEE: Object to the form.   14:59:01
21 You can answer.
22 THE WITNESS: Sir, because of this lawsuit -- I
23 believe in the Complaint, I think there's an indicator
24 that Google has access to for private browsing activity.
25 Q. BY MR. SPILLY: Okay. So you're saying that --   14:59:31

Page 100

1 sorry.
2 You don't have -- so other than -- okay. So
3 you're saying that based on allegations in the Complaint,
4 you believe that to be true; is that fair?
5 MR. MCGEE: Object to the form.   14:59:53
6 You can answer.
7 THE WITNESS: Not the allegations in the
8 Complaint. I believe that there is a marker that Google
9 put on data to indicate it. I certainly wasn't aware of
10 it when I was at the FBI, but I think Google has that   15:00:15
11 information. And a lot more -- and a lot more
12 information that I wished I knew they had when I was
13 working these cases, quite frankly.
14 Q. BY MR. SPILLY: Okay. But you haven't reviewed
15 any documents produced by Google in this case; correct?   15:00:39
16 A. No, I have not.
17 Q. Okay. You don't know for sure that Google has
18 the marker that you just referenced; is that correct?
19 MR. MCGEE: Object to the form.
20 You can answer.   15:00:53
21 THE WITNESS: Yeah, I certainly don't know for
22 sure.
23 Q. BY MR. SPILLY: Okay. So you would be
24 speculating that Google has whatever marker you were just
25 referencing; is that correct?   15:01:04

Page 101

26 (Pages 98 - 101)

1      MR. MCGEE: Object to the form.

2      You can answer.

3      THE WITNESS: I think it's more -- more than a

4  speculation. I believe that in this process, I learned

5  that bit of information. I don't recall exactly where it     15:01:19

6  came from, but I believe it's more than just speculation.

7      Q. BY MR. SPILLY: Did you learn that from counsel?

8      A. I -- I don't know. I just said I don't know

9  where I learned it from. But I believe that Google has

10  that ability. And it makes sense to me.               15:01:44

11     Q. Again, you don't know for sure one way or the

12  other?

13     A. No, I don't. No, I don't.

14     Q. Okay. And you're not offering an expert opinion

15  on that; is that correct?                             15:01:59

16     A. Correct.

17     Q. And if Google said that it has no way to

18  distinguish between private browsing information on the

19  one hand and regular browsing information on the other,

20  based on the information that is stored in Google's    15:02:16

21  server side logs, you wouldn't have any basis to dispute

22  that; is that correct?

23     MR. MCGEE: Objection to the form.

24     You can answer.

25     THE WITNESS: I would have the statements of     15:02:28

Page 102

1  subjects I interviewed who indicated that information was

2  done during private browsing mode.

3      Q. BY MR. SPILLY: Okay. But you're not offering

4  an expert -- you're not opining as an expert that --

5  sorry. Strike that.                                   15:02:59

6      Okay. Going back to paragraph 35 of Exhibit 1.

7      Let me know when you're back there.

8      A. I'm there, sir.

9      Q. Okay. So 35 discusses the cyberstalking

10  investigation that you participated in; is that correct?  15:03:21

11     A. Yes, sir.

12     Q. Okay. And the second sentence, it says, "The

13  email account" -- "This email account was created with

14  false information"; is that correct?

15     A. Yes, sir.                                      15:03:34

16     Q. Was the email account that you're referencing in

17  this paragraph a Gmail account?

18     A. It was, sir.

19     Q. Okay. How many people were involved in the

20  investigation that you described in paragraph 35 of    15:03:59

21  Exhibit 1?

22     A. Can you repeat that question, sir?

23     Q. Sure.

24     So just this investigation in paragraph 35 of

25  Exhibit 1 that you're describing, I just want to know how  15:04:22

Page 103

1  many people were involved in that investigation. And I

2  can clarify, actually.

3      How many people were involved in conducting that

4  investigation?

5      A. So, respectfully, I think that's going to      15:04:40

6  potentially identify which investigation this is. And,

7  therefore, I don't believe I'm at liberty to answer that

8  question, because I believe it could lead to the

9  identification of the investigation, which I am not

10  permitted to disclose.                               15:04:59

11     Q. Okay. But there were multiple people involved;

12  is that correct?

13     A. I'm not saying that. I'm not saying -- I'm not

14  answering the question, sir.

15     Q. Okay. Trained law enforcement personnel were  15:05:13

16  involved in the investigation referenced in paragraph 35

17  of Exhibit 1, though; correct?

18     A. As with any investigation, yes.

19     Q. Okay. And that investigation involved forensic

20  analysis of a fake email account to identify IP address,  15:05:31

21  and then submit that to Google; is that correct?

22     A. When you say "forecast investigation," I mean,

23  we read the email headers. So it wasn't like we had to

24  use a forensic tool to decipher the headers. It was just

25  my expertise being able to decode the headers and know  15:05:55

Page 104

1  what the originating IP address was. So if you want to

2  call that forensic technique, that's fine with me.

3      Q. Okay. The fact that you were able to piece

4  together the identity of the suspect referenced in

5  paragraph 35 of Exhibit 1 does not mean that it's easily  15:06:15

6  done by Google; is that correct?

7      MR. MCGEE: Object to the form, speculation.

8      THE WITNESS: I think it would be very easy

9  knowing what I know now on what Google retains. I think

10  Google easily could have identified this person and    15:06:34

11  probably saved us a whole lot of time in our

12  investigation.

13     Q. BY MR. SPILLY: All right. And just to

14  reiterate, you haven't reviewed any documents produced by

15  Google in this case; correct?                        15:06:48

16     A. Other than the Complaint, no, sir.

17     Q. And that is not -- and you understand that the

18  doc -- that the Complaint is not a document produced by

19  Google; correct?

20     A. That is correct, yes. So the answer to the    15:06:58

21  question is no, I have not reviewed any Google documents

22  for this case, sir.

23     Q. Okay. So when you say that -- when you

24  reference your understanding of what Google retains, that

25  is completely -- that is not based on reviewing any    15:07:14

Page 105

27 (Pages 102 - 105)

1 evidence produced by Google in this case; correct?

2     A. That is correct, sir.

3     Q. Okay. And the goal of the investigation

4 referenced in paragraph 35 -- sorry. Strike that.

5       So what is -- okay. You say that your    15:07:40

6 understanding of what Google retains is not based on

7 reviewing any evidence produced by Google in this case.

8       So my question is: What is that based on? What

9 is your understanding based on?

10     A. My understanding of what, sir?    15:07:58

11     Q. Understanding of what Google retains.

12     A. It's based on information I have learned since

13 signing on to this matter.

14     Q. Where did you learn that information?

15     A. From the -- from the Complaint. It's the root   15:08:16

16 of the case.

17     Q. Okay. So -- and you're not offering -- you're

18 not offering an expert opinion on what information is

19 retained by Google; is that correct?

20     A. Well, it's certainly not in my report. It seems   15:08:42

21 obvious.

22       Again, I think we're splitting hairs here, sir.

23     Q. Okay. Going back to paragraph 35 of Exhibit 1.

24     A. I'm there, sir.

25     Q. Okay. The FBI used that information -- the   15:09:02

                           Page 106

---

1 information referenced in paragraph 35 to identify the

2 individual; is that correct?

3     A. That is correct.

4     Q. Okay. And the goal of the investigation was to

5 identify the person that sent a specific cyberstalking   15:09:17

6 email; is that correct?

7     A. And to gather further evidence of that crime and

8 potentially other crimes.

9     MR. SPILLY: Okay. Why don't we go off the

10 record.    15:09:55

11     THE VIDEOGRAPHER: Going off the record at

12 3:10 p.m.

13     (Recess.)

14     THE VIDEOGRAPHER: We are back on the record at

15 3:26 p.m.    15:26:18

16     MR. SPILLY: Okay. I have no further questions

17 at this time.

18     Ryan, I think you have redirect?

19     MR. MCGEE: I do. Thank you.

20            15:26:27

21         EXAMINATION

22 BY MR. MCGEE:

23     Q. I am going to mark an exhibit first. I have an

24 exhibit that I'd like to introduce.

25     MR. MCGEE: I think we're on Exhibit Number 7;   15:27:04

                           Page 107

---

1 is that right?

2     THE REPORTER: I'm just looking. Could be.

3 That looks right, Exhibit 7.

4     (Exhibit 7, Order on Plaintiffs' Motion for

5 Sanctions for Discovery Misconduct, Redacted   15:27:22

6 Version of Document Sought to be Sealed, marked

7 for identification electronically by counsel.)

8     MR. MCGEE: All right. It shows as uploaded on

9 my end. Mr. Nelson and Counsel, when you have access to

10 that exhibit, please let me know.   15:27:32

11     THE WITNESS: I can see it, sir.

12     Q. BY MR. MCGEE: Carl, is it showing on your end?

13     MR. SPILLY: Yeah, I can see it. So I object to

14 this exhibit as beyond the scope of my direct.

15     Go ahead.   15:27:51

16     Q. BY MR. MCGEE: Mr. Nelson, do you have Exhibit

17 Number 7 in front of you?

18     A. Yes, sir, I do.

19     Q. And that's docket entry 593-3 in the case of

20 Chasom Brown, et al., versus Google LLC, filed in the   15:28:00

21 Northern District of California?

22     A. Yes, sir.

23     Q. This is a document that was filed on May 31st of

24 2022?

25     A. Yes, sir.   15:28:14

                           Page 108

---

1     Q. Previously, when you were being questioned by

2 counsel about the Incognito markers -- do you recall that

3 testimony?

4     A. I do, sir.

5     Q. Do you recall testifying to Counsel that you   15:28:24

6 believe you had reviewed something indicating that Google

7 actually did mark activity as private browsing? Do you

8 recall that testimony?

9     A. I do, sir.

10     MR. SPILLY: Objection. Leading.   15:28:39

11     Q. BY MR. MCGEE: Prior to your testimony here

12 today, do you recall going over this document with

13 counsel, including myself?

14     MR. SPILLY: Same objection.

15     THE WITNESS: I do.   15:28:49

16     Sorry, sir. I'm not giving you a chance to

17 object.

18     MR. SPILLY: Sorry, Mr. Nelson.

19     Same objection. Leading.

20     Q. BY MR. MCGEE: And is this document the document   15:28:55

21 that you were referring to that provided more insight

22 into how Google, as you put it, marked private browsing

23 data?

24     MR. SPILLY: Objection. Objection. Leading.

25     THE WITNESS: Yes, sir.   15:29:10

                           Page 109

28 (Pages 106 - 109)

1    Q. BY MR. MCGEE: And, Mr. Nelson, you reviewed
2    this entire document; correct?
3        MR. SPILLY: Same objection.
4        THE WITNESS: Yes, sir.
5        Q. BY MR. MCGEE: Okay. And, again, that's -- in    15:29:20
6    addition to Plaintiffs' Complaint, that's what forms
7    your -- the basis for your understanding that Google
8    marks certain browsing activity as private; correct?
9        MR. SPILLY: Object to the form and leading.
10       THE WITNESS: Yes, sir, it is.    15:29:36
11       Q. BY MR. MCGEE: And, Mr. Nelson, during your
12   questioning with Counsel, you were asked about various
13   paragraphs in your -- excuse me -- in your expert report
14   and whether those formed opinions in your case -- or in
15   your report. Do you remember that?    15:29:51
16       MR. SPILLY: Object to the form.
17       THE WITNESS: I do, sir.
18       Q. BY MR. MCGEE: Sorry, if you can just give him
19   the two or three seconds.
20       A. I know. My bad. I'm sorry.    15:29:59
21       Q. So, again, Mr. Nelson, during your questioning
22   with Counsel, you were asked about various paragraphs and
23   whether they are opinions in this case. Do you recall
24   that?
25       A. I do, sir.    15:30:16

Page 110

1        Q. And could you please summarize your expert
2    opinion here?
3        A. My expert opinion --
4        MR. SPILLY: Object --
5        Sorry, Mr. Nelson.    15:30:29
6        Object to the form.
7        THE WITNESS: Can you repeat the question,
8    Mr. McGee?
9        Q. BY MR. MCGEE: Sure.
10       Would you please summarize the expert opinion    15:30:39
11   that you are providing in this case?
12       A. My expert opinion is that Professor Zervas'
13   expert report is misleading and doesn't include the fact
14   that Google retains data based on IP address and stores
15   that data.    15:31:06
16       Q. Okay. And I believe that you testified that
17   paragraphs 9 through 15 of your report were experience
18   but not opinions. Do you recall testifying to that?
19       A. Yes, sir.
20       MR. SPILLY: Objection. Mischaracterizes.    15:31:22
21       THE WITNESS: Yes, I do, sir.
22       Q. BY MR. MCGEE: But does your experience help
23   form and support your opinions in this case?
24       A. It does. It's critical to my expert opinion, is
25   my experience, my knowledge, my skills, my abilities.    15:31:40

Page 111

1        Q. And, also, paragraphs 20 through 31, they
2    summarized your experience at the FBI, some legal
3    requirements for the various requests that you made with
4    the FBI, and also Google's responsiveness to those
5    requests. Do you recall providing that testimony to    15:32:02
6    Mr. Spilly's questions?
7        MR. SPILLY: Object to the form.
8        THE WITNESS: Yes, sir, I do.
9        Q. BY MR. MCGEE: So while those paragraphs are not
10   technically opinions, do they still help in forming the    15:32:17
11   opinion that you've provided in this case?
12       MR. MCGEE: Objection. Vague.
13       THE WITNESS: Yes, they absolutely assisted me
14   in developing my expert opinion.
15       Q. BY MR. MCGEE: Okay. And the same with    15:32:34
16   paragraphs 33 through 37, were those -- although they
17   were summaries and your recollection of the
18   responsiveness of Google to FBI requests, they still
19   assisted in forming your opinions in this case; correct?
20       MR. SPILLY: Objection. Leading.    15:32:56
21       THE WITNESS: Yes, sir, they did.
22       Q. BY MR. MCGEE: And do you recall testifying to
23   the absence of an account name in the account column for
24   the Excel spreadsheets that Google provided to you?
25       A. Yes, sir, I do.    15:33:15

Page 112

1        Q. Approximately how many administrative subpoenas
2    did you personally request during your investigations
3    with the FBI?
4        A. It's an estimation, but I believe I personally
5    requested dozens, somewhere between 20 and 60, subpoenas    15:33:36
6    to Google.
7        Q. And that was you personally; correct?
8        A. Correct.
9        Q. Did you also assist with administrative
10   subpoenas that you did not personally author?    15:33:50
11       A. Not only assist, but I assigned many of them as
12   acting supervisor and reviewed results of many of them.
13   I would put them in the hundreds of subpoena category as
14   far as numbers go.
15       Q. Okay. And for grand jury subpoenas, can you    15:34:08
16   approximate how many you personally submitted to Google?
17       A. Again, it's an estimation. Probably less than
18   administrative subpoenas, but somewhere in the 20 to 40
19   range that I personally submitted.
20       Q. And then the same question, not personally    15:34:32
21   submitting but that you are involved with, either in
22   supervising or submitting. Can you put a number on that?
23       MR. SPILLY: Object to the form.
24       THE WITNESS: So, again, it will be another
25   estimation. It will actually be more than the    15:34:48

Page 113

29 (Pages 110 - 113)

1 administrative subpoenas. I would put that number

2 somewhere between 40 and 120.

3    Q. BY MR. MCGEE: Okay. And search warrants.

4 Approximately how many search warrants did you submit

5 personally to Google?                    15:35:07

6        MR. SPILLY: Object to the form.

7        THE WITNESS: Again, an estimation. I would say

8 personally I was the affiant on at least three search

9 warrants at the top end. Maybe as many as ten.

10    Q. BY MR. MCGEE: And then, also, how many did you    15:35:31

11 assist with or supervise that you did not personally

12 swear on?

13       MR. SPILLY: Object to the form.

14       THE WITNESS: So, again, back to the dozens and

15 dozens. I would put it somewhere between 20 and 50.    15:35:41

16 Maybe more.

17    Q. BY MR. MCGEE: Okay. And in those examples that

18 you just testified to, that's where Google would provide

19 these Excel spreadsheets; correct?

20    A. Yes, sir, that's correct.             15:36:01

21    Q. And in your experience with the FBI, you

22 reviewed those spreadsheets in both conducting

23 investigations, assisting -- and also assisting with

24 investigations; correct?

25       MR. SPILLY: Objection. Leading.         15:36:18

Page 114

1       THE WITNESS: Yes. And supervising

2 investigations.

3    Q. BY MR. MCGEE: And would you use the absence of

4 account information in the -- in the column of the Excel

5 spreadsheet to assist with your investigation?    15:36:31

6        MR. SPILLY: Object to the form.

7        THE WITNESS: Yes, I would, sir.

8    Q. BY MR. MCGEE: And how so?

9        MR. SPILLY: Object to the form.

10       THE WITNESS: To me, it was an indicator that it    15:36:46

11 was probable that the information came from an

12 Incognito -- or, I'm sorry, a private browsing session.

13    Q. BY MR. MCGEE: That was based in part on your

14 discussions with the targets and defendants that you were

15 investigating?                          15:37:11

16       MR. SPILLY: Objection. Leading.

17       THE WITNESS: Yes. And with other agents.

18    Q. BY MR. MCGEE: And those targets and defendants

19 confirmed that that activity was done in private

20 browsing; correct?                     15:37:23

21       MR. SPILLY: Objection. Leading.

22       THE WITNESS: Yes, sir, they did.

23    Q. BY MR. MCGEE: Prior to your review of the

24 Exhibit Number 7, the sanctions order, did you have an

25 understanding of what was available from Google to be    15:37:40

Page 115

1 provided to the FBI?

2        MR. SPILLY: Objection. Vague.

3        THE WITNESS: I would say prior to being

4 retained for this matter I did not have anywhere near a

5 full understanding of what Google captures and maintains    15:38:05

6 for its users, whether in normal viewing mode or private

7 viewing mode.

8    Q. BY MR. MCGEE: And the information that Google

9 provided, I think you've testified previously that some

10 of it would start with search terms that targets or    15:38:29

11 defendants used on Google.com. Do you recall testifying

12 to that?

13       MR. SPILLY: Objection. Mischaracterizes prior

14 testimony.

15       THE WITNESS: I do.                   15:38:45

16    Q. BY MR. MCGEE: And some of the other information

17 that would be provided was subscriber information?

18    A. Yes, sir.

19       MR. SPILLY: Objection. Leading.

20    Q. BY MR. MCGEE: The name associated with the    15:38:56

21 account?

22       MR. SPILLY: Same objection.

23       THE WITNESS: Yes, sir.

24    Q. BY MR. MCGEE: Payment information, if it was a

25 paid account, like hosting a domain or paying for Google    15:39:07

Page 116

1 drive space?

2        MR. SPILLY: Same objection. Leading.

3        THE WITNESS: Yes, sir.

4    Q. BY MR. MCGEE: And when you were able to analyze

5 the Excel spreadsheets, do you recall analyzing the    15:39:18

6 browsing activity that was reflected in those Excel

7 spreadsheets provided by Google?

8        MR. SPILLY: Objection. Leading.

9        THE WITNESS: Yes, sir.

10    Q. BY MR. MCGEE: And did that activity start on    15:39:34

11 Google Search?

12       MR. SPILLY: Same objection.

13       THE WITNESS: Yes, sir. It started with a

14 Google search, and then there would be entries for

15 results, and then there would be an entry for if the user    15:39:47

16 clicked on one of those results.

17    Q. BY MR. MCGEE: So the activity that Google

18 shared with you in your role at the FBI included target

19 and defendant activity on non-Google websites; correct?

20       MR. SPILLY: Objection. Leading.       15:40:10

21       THE WITNESS: Correct, sir.

22       MR. MCGEE: If I could have just one moment.

23       I don't have any further questions.

24       THE REPORTER: Any further questions, Counsel?

25       MR. SPILLY: Can you give me five minutes?    15:40:45

Page 117

30 (Pages 114 - 117)

1     MR. MCGEE:  Yeah, sure.

2     MR. SPILLY:  Okay.  Be back in five.

3     THE VIDEOGRAPHER:  Going off the record at

4  3:41 p.m.

5     (Recess.)                    15:44:51

6     THE VIDEOGRAPHER:  We are back on the record at

7  3:46 p.m.

8     MR. SPILLY:  Okay.  Welcome back, Mr. Nelson.

9     So I just have some questions about questions

10  your counsel just asked you.                15:46:03

11

12          FURTHER EXAMINATION

13  BY MR. SPILLY:

14     Q.  So you said a few minutes ago that while you

15  were at the FBI, you came to the conclusion that the    15:46:12

16  absence of account information in the Excel spreadsheets

17  produced by Google was an indicator someone was using

18  private browsing mode; is that fair?

19     A.  That's fair, sir.

20     Q.  Okay.  And you said you came to that conclusion    15:46:32

21  based in part on conversations with suspects; is that

22  correct?

23     A.  That's correct, sir.

24     Q.  Okay.  I believe earlier today you said only

25  three suspects ever told you they were using private    15:46:48

Page 118

1  browsing mode in interviews; is that correct?

2     A.  That's correct.  It also is based on other

3  agents' experiences.

4     Q.  Okay.  What years did the suspects -- the three

5  suspects that you referenced -- sorry.  Strike that    15:47:06

6  again.

7     For the three suspects that volunteered that

8  information to you in interviews, what years did those

9  interviews take place?

10     A.  Respectfully, sir, I can't answer questions    15:47:21

11  about the cases themselves, and that includes the dates.

12     Q.  Okay.  How would it be relevant to your

13  investigation that a subject is using private browsing

14  mode?

15     A.  The only way it would be relevant to my    15:47:44

16  investigation is to show that they were trying to hide

17  the activity.

18     Q.  Okay.  And so do you view trying to hide

19  browsing activity as a reason for suspicion?

20     A.  By itself not necessarily, but in conjunction    15:48:03

21  with other case information, it certainly would be an

22  indicator -- if someone's trying to hide their activity,

23  that -- that is clearly an indicator important in my

24  investigation.

25     Q.  Okay.  And we -- but we also discussed earlier    15:48:28

Page 119

1  that some -- there are users out there that do not have

2  Google accounts; is that correct?

3     A.  Certainly.

4     Q.  Okay.  And so if Google produced information

5  about a user without a Google account, then the Google    15:48:44

6  account field in that Excel would also be empty; correct?

7     A.  I don't know for sure, but that makes sense.

8     Q.  Well, if Google -- if a user doesn't have a

9  Google account, then they won't have any account info; is

10  that correct?                        15:49:09

11     A.  Correct.

12     MR. SPILLY:  Okay.  All right.  I believe that

13  is it for me.

14     MR. MCGEE:  I do have one followup, if you'll

15  indulge me.  I apologize for not asking this.    15:49:19

16

17          FURTHER EXAMINATION

18  BY MR. MCGEE:

19     Q.  Mr. Nelson, during one of the breaks you were

20  asked to look at your records of when you were first    15:49:26

21  contacted by David Reign.  Do you recall doing that?

22     A.  I did, yes.

23     Q.  And what was the date of that contact from

24  Mr. Reign?

25     A.  It was May 5th.                15:49:39

Page 120

1     Q.  And did you also look through those records to

2  determine the first time that you spoke with counsel at

3  Morgan & Morgan?

4     A.  I did, sir.

5     MR. SPILLY:  Objection.  Leading.    15:49:52

6     Q.  BY MR. MCGEE:  And what date was that?

7     A.  It was May 9th, sir.

8     Q.  So when you were earlier testifying to the

9  May 29th date, after refreshing your recollection with

10  these records, are the May 5th and May 9th dates more    15:50:06

11  accurate?

12     MR. SPILLY:  Objection.  Leading and form.

13     THE WITNESS:  Yes, sir, they are.  They're the

14  actual dates.

15     Q.  BY MR. MCGEE:  Okay.  Thank you.    15:50:20

16     MR. MCGEE:  That's all I have.

17     THE REPORTER:  Off the record, Counsel?

18     MR. SPILLY:  Yeah.  That's it for me.

19     Thank you, Mr. Nelson.

20     THE VIDEOGRAPHER:  We are off the record at    15:50:29

21  3:50 p.m., and this concludes today's testimony given by

22  David Nelson.  The total number of media used was one and

23  will be retained by Veritext Legal Solutions.

24     (Time Noted:  3:50 p.m.)

25          --oOo--

Page 121

31 (Pages 118 - 121)

**Page 122**

1  I declare under the penalty of perjury under the

2  laws of the State of California that the foregoing is

3  true and correct.

4      Executed on _____, 2022, at

5  _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 124**

1  RYAN MCGEE, ESQ.

2  rmcgee@forthepeople.com

3               July 11, 2022

4  RE: BROWN VS. GOOGLE LLC

5  JULY 6, 2022, DAVID NELSON, JOB NO. 5302302

6  The above-referenced transcript has been

7  completed by Veritext Legal Solutions and

8  review of the transcript is being handled as follows:

9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10  to schedule a time to review the original transcript at

11  a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13  Transcript - The witness should review the transcript and

14  make any necessary corrections on the errata pages included

15  below, notating the page and line number of the corrections.

16  The witness should then sign and date the errata and penalty

17  of perjury pages and return the completed pages to all

18  appearing counsel within the period of time determined at

19  the deposition or provided by the Code of Civil Procedure.

20  __ Waiving the CA Code of Civil Procedure per Stipulation of

21  Counsel - Original transcript to be released for signature

22  as determined at the deposition.

23  __ Signature Waived – Reading & Signature was waived at the

24  time of the deposition.

25

**Page 123**

1  STATE OF CALIFORNIA     ) ss:

2  COUNTY OF MARIN       )

3

4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5  hereby certify:

6      That the foregoing deposition testimony was

7  taken before me at the time and place therein set forth

8  and at which time the witness was administered the oath;

9      That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16      I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20      IN WITNESS WHEREOF, I have subscribed my name

21  this 11th day of July, 2022.

22

23

24

25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

**Page 125**

1  _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2  Transcript - The witness should review the transcript and

3  make any necessary corrections on the errata pages included

4  below, notating the page and line number of the corrections.

5  The witness should then sign and date the errata and penalty

6  of perjury pages and return the completed pages to all

7  appearing counsel within the period of time determined at

8  the deposition or provided by the Federal Rules.

9  __ Federal R&S Not Requested - Reading & Signature was not

10  requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32 (Pages 122 - 125)

1  RE: BROWN VS. GOOGLE LLC
2  DAVID NELSON, JOB NO. 5302302
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  WITNESS              Date
25

Page 126

Veritext Legal Solutions
866 299-5127

**[& - 3486]**

| & |
| --- |
| **&**   3:4 4:11 5:5 9:12,14,15 12:20 12:25 13:13,15 15:21 16:19 20:1 20:8 50:14 121:3 124:23 125:9 |

| 0 |
| --- |
| **0**   25:5 |
| **0.0**   24:23 |
| **03664**   1:6 2:6 8:20 |

| 1 |
| --- |
| **1**   1:25 7:4 8:15 17:22,24 18:10 21:24 34:6,17 35:3,7,15,20 36:8 36:14,19,25 37:4 37:11,18,24 38:1,4 38:9 39:8,20 40:2 42:24 43:17 44:2 44:7,15,18,25 45:1 45:8 46:11,21 47:6 48:15 49:3 49:16,19 50:1 56:14 61:2,23 62:2,12,18 63:11 64:11 67:15 68:17 69:4 70:8,19 71:8 73:23 75:7,12,22 80:15 81:2,4 82:10,12 83:15,19 87:13,16 88:2 90:23 95:22 98:11 98:11 100:7 103:6 103:21,25 104:17 105:5 106:23 125:1 |
| **10**   6:9 35:3 |
| **10,000**   19:14 |

| 100   3:21 30:6 59:23 81:20 |
| --- |
| **101**   23:24 |
| **107**   6:10 |
| **108**   7:18 |
| **10th**   4:19 |
| **11**   18:9,13 124:3 |
| **118**   6:9 |
| **119**   37:12 |
| **11th**   123:21 |
| **12**   37:23,24 38:15 |
| **120**   6:10 114:2 |
| **126**   1:25 |
| **12:04**   2:16 8:2,6 |
| **13**   23:22 24:4 37:8 37:11,18 |
| **1300**   4:13 |
| **15**   14:1 40:9,12 111:17 |
| **150**   20:21 |
| **15th**   34:12 |
| **16**   37:8,11,18 40:19,19 41:6 |
| **17**   7:4 23:25 35:14 35:20 36:8,13,19 41:11,11,24 42:5 |
| **18**   7:12,17 42:12 62:3 75:18 76:2 76:17,21 77:20 78:14 83:20 87:17 97:19 99:11,15 100:11 |
| **19**   42:15,17 |
| **1998**   27:19 |
| **1:12**   49:6 |
| **1:40**   67:1 |
| **1:49**   67:4 |

| 2 |
| --- |
| **2**   7:6 21:19,20 22:6 23:3,8,11,17 24:10 27:4,5,7 |

| 35:17,21 39:8,8,20 41:16 49:17,19 50:1 73:24 77:10 77:25 85:23 |
| --- |
| **2.0.**   24:16,20 |
| **20**   20:25 30:2 42:20,24 83:11 112:1 113:5,18 114:15 |
| **200**   18:14,17,19 19:13 59:21,23 72:23 |
| **20005**   4:14 |
| **2001**   27:17 29:11 |
| **2004**   24:1 28:16 |
| **2006**   24:1 28:23 |
| **2009**   23:22 24:4 |
| **201**   3:7 |
| **2012**   81:9 |
| **2014**   24:8 |
| **2016**   29:20 82:17 82:18 |
| **2017**   82:14 |
| **202**   4:15 |
| **2020**   81:9 |
| **2021**   25:16,20 26:23 |
| **2022**   1:17 2:18 6:4 8:1,7 34:13 108:24 122:4 123:21 124:3,5 |
| **2025.520**   124:9,12 |
| **21**   7:6 |
| **213**   4:7,21 |
| **223-5505**   3:9 |
| **23**   42:20,24 |
| **24**   43:6,11,16 75:8 75:11 76:17 |
| **25**   43:22 44:2,6 61:24 62:2,12,18 63:10 64:11 |

| 26   81:5 |
| --- |
| **27**   43:22 44:2,6 82:9,12 |
| **2703**   80:23 |
| **2706**   7:17 99:11,16 |
| **28**   83:16,19 87:13 87:16 88:2 |
| **2800**   3:21 |
| **293-6800**   3:17 |
| **29th**   13:17 16:4,13 121:9 |
| **2:20**   85:11 |
| **2:22**   85:14 |
| **2:30**   90:18 |
| **2:42**   90:21 |

| 3 |
| --- |
| **3**   7:8 22:6 35:18 35:21 39:24 40:2 72:8,12 73:3 74:1 77:9 |
| **30**   15:25 20:25 30:4,5,6 125:1 |
| **305**   3:23 |
| **3056**   78:11 |
| **31**   36:24 37:3,3,11 37:18 44:13,15,18 112:1 |
| **31st**   4:5 108:23 |
| **32**   44:25,25 45:8 90:24 91:2,10 |
| **33**   45:11,18,23 67:15 68:16 92:2 93:1 95:22 98:12 112:16 |
| **33131**   3:22 |
| **33602**   3:8 |
| **34**   46:5,7,11 |
| **3462**   1:24 2:19 123:4,25 |
| **3486**   7:13 75:18 76:3,17,21 78:14 |

**[35 - address]**

**35** 46:17,21 69:4,7
69:22 70:8,19,22
71:8 80:15,20
81:2 103:6,9,20,24
104:16 105:5
106:4,23 107:1
**36** 47:2,6 100:7,10
**37** 46:5 47:13,19
48:15 56:14 61:2
112:16
**3:10** 107:12
**3:26** 107:15
**3:41** 118:4
**3:46** 118:7
**3:50** 2:17 121:21
121:24

**4**

**4** 7:12 18:10 23:3
34:6 36:8 72:15
72:18,21,23 73:3
74:2 76:1,2,9,14
76:16
**40** 17:14 113:18
114:2
**415** 3:17
**41st** 3:15
**44** 3:15
**443-3000** 4:21
**45** 36:1
**48** 12:9
**4:20** 1:6 2:6 8:20

**5**

**5** 7:14 76:8 78:10
85:16,17,23
**50** 19:13,13 114:15
**5302302** 1:25
124:5 126:2
**538-8000** 4:15
**539-8400** 3:23

**5411** 123:24
**59** 36:1
**593-3** 108:19
**5th** 120:25 121:10

**6**

**6** 1:17 2:18 6:4
7:17 8:1 36:1,5,10
37:12 75:17 78:10
83:16 99:10,11,15
124:5
**60** 113:5
**61** 36:1
**6th** 8:7

**7**

**7** 7:18 24:10 25:6
36:25 107:25
108:3,4,17 115:24
**70** 36:1
**72** 7:8
**725** 4:5
**74** 81:8,19
**76** 7:12
**7th** 3:7

**8**

**8** 39:25 40:2
**80** 36:1 37:12
**813** 3:9
**82** 36:1 37:12
**83** 36:1 37:12
**85** 7:14
**865** 4:19
**871** 78:9
**879** 78:9
**88** 81:8,19

**9**

**9** 34:6,9,16 40:9,12
111:17
**900** 4:13

**90017** 4:6,20
**911** 29:11
**91401** 3:16
**99** 7:17
**995-5720** 4:7
**9th** 121:7,10

**a**

**abilities** 111:25
**ability** 12:4,9,10
102:10 123:15
**able** 17:3,4 31:18
67:16 68:24 86:14
92:4 94:8 95:16
96:10 97:7,11
104:25 105:3
117:4
**absence** 54:24
56:7,18 57:8,15,17
57:25 112:23
115:3 118:16
**absent** 60:13
**absolutely** 112:13
**abuse** 77:3,7
**access** 38:17
100:24 108:9
**accessed** 69:10,14
69:24 70:6 94:11
**account** 54:3,5,10
54:16,18,19,22,25
56:7,18,25 57:5,17
57:20 60:13 61:10
61:15 63:5,14,16
63:19 64:18,20,21
66:1,9,13,14,19
68:18 69:14,15
70:9,15 94:15,16
94:16,18,25
103:13,13,16,17
104:20 112:23,23
115:4 116:21,25
118:16 120:5,6,9,9

**accountholder**
65:25
**accounts** 67:9
69:25 120:2
**accurate** 121:11
123:13
**accurately** 34:16
34:17
**acquisitions** 68:11
**act** 12:24 74:23
**acting** 65:7,8
82:24 113:12
**action** 9:1 34:10
123:17,18
**actions** 71:5 73:22
81:18
**active** 20:6,16,18
**activities** 53:12
**activity** 31:7 40:24
47:16 62:7,8 63:3
63:21,22,23 64:12
65:14,19,22,24
71:5 83:24,25
86:20 87:21,22
97:23 100:15,24
109:7 110:8
115:19 117:6,10
117:17,19 119:17
119:19,22
**actual** 121:14
**addition** 28:2 29:5
110:6
**additional** 19:1
38:10 47:2 64:9
67:17 68:3,15
79:1,19 87:7 94:5
95:15 96:6 97:12
**address** 23:10,13
23:15 32:24 33:9
33:19 39:13 40:23
49:20 58:17 62:15

[address - assisted]

62:20 63:1 64:17
64:19 65:12,20,22
67:8,10,16,17 68:3
68:4,8,12,22 69:9
69:10,14,23,24,25
70:6 75:2 79:2,14
79:20,23 80:1
81:16 82:6,7 84:1
86:24 87:7,23
88:4 92:6,8,13,17
92:19,23 93:8
94:4,6,7,9,10 95:6
95:7,15 96:6,8,12
96:16 97:1,12,16
104:20 105:1
111:14
**addresses**  39:16
40:24 62:6,13
82:13 83:23 87:20
**admin**  72:4
**administered**
123:8
**administrative**  7:9
7:12 43:12 44:3
62:5 63:10 64:25
65:4,9,17 71:20,23
72:9 73:16,21
74:3,8,9,18 75:13
75:19,22 76:2,18
76:22 77:21 78:15
79:2 80:3,10,13,21
82:13 83:12 84:7
84:25 85:2 88:8
100:13 113:1,9,18
114:1
**affiant**  90:8,11
114:8
**affidavits**  89:1,7
89:13
**affiliations**  9:6

**afternoon**  8:5 9:11
10:4,6
**agencies**  7:11 52:2
52:5,15 72:10
**agency**  26:17
71:22 74:1,3,7,19
**agent**  29:2 30:8,9
51:20
**agents**  52:7 83:7
115:17 119:3
**ago**  13:12,13 21:14
23:22,25 24:4,7
118:14
**agree**  8:14 53:2
96:5
**agreement**  26:16
**ah**  72:24
**ahead**  79:6 108:15
**al**  108:20
**alanderson**  4:8
**alison**  4:4 9:15
**allegation**  86:19
**allegations**  86:25
101:3,7
**alleged**  74:23
**allowed**  19:17
70:25
**aloud**  73:9
**amendment**  73:17
**america's**  94:19
**amount**  19:16
30:15
**analysis**  73:17,18
91:16,22 95:11
104:20
**analyze**  117:4
**analyzing**  24:7
31:6 117:5
**anderson**  4:4 9:15
**angeles**  4:6,20

**answer**  6:12 12:14
12:15 19:8,10
24:24 26:20 33:3
33:15,23 42:2,8
43:3,21 44:10,22
46:2,15,25 47:10
48:19 50:11 51:1
51:8,17,24 52:18
53:18 54:13 55:3
55:14,19,24 56:4
56:11,21 57:11
58:3,12 60:20
61:18 66:4 70:25
71:3 80:9 84:13
87:4 88:7 98:3
100:21 101:6,20
102:2,24 104:7
105:20 119:10
**answered**  57:13
75:5 84:23
**answering**  11:11
104:14
**answers**  11:4
**anticipate**  19:5
21:2
**anymore**  97:5
**apologize**  120:15
**appear**  72:18
**appearance**  9:4
**appearances**  3:1
4:1 5:1 9:6
**appearing**  124:18
125:7
**appears**  99:25
**appended**  35:4
**appendix**  38:1,4,9
**apple**  10:14
**applications**  10:13
10:17
**applied**  73:18

**appreciate**  45:15
**approval**  71:14
**approximate**  62:3
62:6 65:13 83:20
83:23 87:17,20
100:11 113:16
**approximately**
19:14 21:14 113:1
114:4
**april**  34:12
**area**  83:6
**argumentative**
96:19 98:8
**articulated**  73:20
**artifacts**  20:15
**aside**  49:25
**asked**  16:25 17:7,9
34:23 35:11 53:21
75:4 88:8 110:12
110:22 118:10
120:20
**asking**  11:3 33:7
33:18,20 51:9
67:13 120:15
**asks**  67:7
**assertions**  35:6
40:21
**assessment**  41:19
**assigned**  29:2
113:11
**assignment**  34:18
40:13
**assist**  31:1 113:9
113:11 114:11
115:5
**assistance**  83:10
99:6
**assistants**  17:19
**assisted**  83:7
112:13,19

[assisting - career]

**assisting** 51:5,14
 114:23,23
**associate** 5:4
**associated** 40:24
 54:5 62:20 65:19
 67:8 75:2 84:1
 87:23 94:14 95:23
 116:20
**attachment** 21:24
 89:4,16
**attacks** 29:12
**attempt** 20:15
**attended** 23:19,21
 23:24
**attorney** 9:7 12:11
 12:14 19:25 20:8
 26:24
**attorney's** 98:21
 98:23
**attorneys** 13:6
 14:13 49:9
**audio** 8:12
**author** 113:10
**authorities** 7:10
 72:9
**authority** 73:16
 75:19 76:18
**authorize** 98:2
**authorizes** 99:1,4
 100:2
**available** 20:16
 41:2,15 79:9
 115:25
**aware** 30:24 32:7
 65:25 66:6 100:12
 101:9

**b**

**b** 89:16 125:1
**bachelor's** 22:10
 22:13,16,19

**back** 27:4 33:16
 34:5 49:5,7 56:16
 66:8 67:3,5 69:9
 69:13 71:20 75:7
 80:17,18 83:15
 85:13 87:10 90:20
 90:22,23 95:5
 98:2,11 103:6,7
 106:23 107:14
 114:14 118:2,6,8
**background** 17:6
 40:3
**bad** 110:20
**bank** 94:16,18,18
 94:25
**based** 45:1 77:4
 83:4 91:2,11
 94:10 95:10,11
 101:3 102:20
 105:25 106:6,8,9
 106:12 111:14
 115:13 118:21
 119:2
**bases** 41:19
**basically** 49:14
**basis** 58:25 75:1
 88:15 102:21
 110:7
**bearing** 20:2
**began** 29:7,9
**beginning** 2:16 9:7
**begrudgingly** 73:9
**begun** 65:18
**behalf** 1:6 2:6,15
 9:9
**belief** 88:16,24
**believe** 13:17 14:8
 17:23 26:12,16,20
 29:18 31:25 32:3
 32:11 57:15 75:1
 77:13 87:5 89:8

99:3 100:23 101:4
 101:8 102:4,6,9
 104:7,8 109:6
 111:16 113:4
 118:24 120:12
**belonged** 92:6,9
**best** 12:3 16:6
 123:14
**bet** 43:23
**beyond** 79:20 87:7
 94:5 108:14
**bill** 98:21
**billing** 63:5,14
**bills** 98:22,23
**bit** 102:5
**bloodborne** 24:12
 24:15 25:6
**boies** 3:13 4:3 9:15
**bottom** 24:11
 72:22
**branch** 7:11 72:10
**break** 11:16,17
 16:9 49:10 66:21
 76:14
**breaking** 45:14
**breaks** 11:14
 120:19
**bright** 32:19
**broad** 91:25
**broome** 4:18 9:10
**brown** 1:4 2:4
 8:17 108:20 124:4
 126:1
**browser** 32:22
 41:1 58:8 59:2,4
 60:2 66:2,13
**browsers** 61:6
**browsing** 35:7
 39:12,18 40:22,24
 41:13,14,16,17,18
 41:22,22,23 47:15

53:8,11,15,22 54:7
 55:1,22 56:2 57:5
 57:9 58:8,10,21
 59:2,3,8 60:2,10
 61:1,4,10,10,16,16
 63:21,22,23 67:19
 67:23 69:16 70:17
 93:2 95:23 96:3
 100:15,19,24
 102:18,19 103:2
 109:7,22 110:8
 115:12,20 117:6
 118:18 119:1,13
 119:19
**bruce** 15:15
**bsfllp.com** 3:18,24
 4:8
**budget** 19:15
**bullet** 78:7
**byatt** 1:4 2:4

**c**

**c** 3:14
**ca** 124:9,12,20
**cable** 32:19
**café** 92:21
**california** 1:2 2:2
 3:16 4:6,20 8:19
 108:21 122:2
 123:1
**call** 105:2
**called** 31:1
**calls** 12:21 13:21
 13:25 75:13
**camera** 8:10
**capable** 53:7
**capacity** 19:20
 45:3 91:5,13
**captures** 116:5
**card** 63:19
**career** 45:5 91:7

Veritext Legal Solutions
866 299-5127

**carl** 4:12 9:8 10:5
108:12
**carlspilly** 4:16
**case** 8:19 14:19,22
15:1,19 16:5,15
17:3,5 18:7 21:16
21:25 22:4 30:8,9
34:18,21,24 38:16
39:1,21 40:6,17
41:7 42:6,13,18,25
43:17 45:9,24
46:12,22 47:7
48:2,10,12,16 71:4
71:15 72:17 78:8
79:22 86:9 94:2
99:3 101:15
105:15,22 106:1,7
106:16 108:19
110:14,23 111:11
111:23 112:11,19
119:21
**cases** 29:23 30:14
60:19 98:3,10
101:13 119:11
**castillo** 1:5 2:5
**category** 113:13
**cause** 73:18 88:12
88:15
**caution** 71:11
**ccp** 124:9,12
**cell** 97:4
**certain** 54:24 58:9
110:8
**certainly** 68:24
84:19,20 99:19,25
101:9,21 106:20
119:21 120:3
**certify** 123:5,16
**chance** 43:8 45:15
48:7 109:16

**change** 126:4,7,10
126:13,16,19
**changed** 29:12
**characterization**
69:11
**characterize** 63:23
**charge** 18:20 19:2
**charged** 98:13,17
98:19
**charging** 20:19
**chasom** 1:4 2:4
8:17 108:20
**check** 13:17,18
**child** 30:14
**children** 76:25
77:3,7
**christopher** 1:4
2:4
**chrome** 55:12 66:2
66:13
**cite** 37:4,12 75:21
**cited** 36:10 76:17
92:21
**cites** 35:21 75:18
**citizen** 51:18 71:9
71:17,18
**civil** 11:1 124:19
124:20
**claim** 53:6
**clarify** 104:2
**classification** 31:1
**classifications**
31:2
**clear** 16:10 97:10
**clearly** 11:6
119:23
**clicked** 117:16
**close** 69:25
**closed** 41:1
**code** 124:9,12,19
124:20

**cofounder** 25:10
**collateral** 28:1,14
29:5
**collects** 39:14
49:21
**column** 24:15,23
25:8 54:3,15,15
112:23 115:4
**come** 32:21 60:2
**comes** 25:8
**coming** 87:10
**command** 28:14
**committed** 88:16
88:25
**communicated**
14:21
**communication**
12:23
**communications**
10:16
**companies** 31:8,13
100:2
**compensated**
18:13
**complaint** 15:20
15:24 16:2 65:23
100:23 101:3,8
105:16,18 106:15
110:6
**complaints** 15:18
**complete** 63:22,24
**completed** 23:24
24:3,6 124:7,17
125:6
**completely** 105:25
**completion** 125:10
**component** 31:2,4
31:5
**comprehensive**
32:20

**computer** 10:12
10:18,24 13:18
16:7,17 22:14
30:16,18 93:20
97:24
**concludes** 121:21
**conclusion** 118:15
118:20
**conduct** 50:9
59:11 68:6,9,13
75:2 87:1
**conducted** 8:9,21
47:25 53:12 69:8
72:1 73:24 74:10
77:16,22
**conducting** 26:11
74:7 104:3 114:22
**conference** 12:21
13:20 23:22
**conferences** 23:18
23:25 25:2
**confidential** 7:7
21:20 23:9,12
**configured** 92:24
**confirm** 13:18
16:7 58:22 60:16
60:25
**confirmed** 115:19
**congress** 7:8 72:8
**conjunction**
119:20
**connect** 80:2
**connected** 67:20
92:22 93:3
**connection** 8:10
35:5 77:4 78:2,20
81:1 84:7 86:8
**consistent** 72:16
81:10
**consists** 38:4

[consult - cybercafés]

| | | | |
|---|---|---|---|
| **consult**  53:14 | 37:6,13,19 38:2,7 | 107:6 110:2,8 | **crime**  27:8,13 28:6 |
| **contact**  120:23 | 38:12,22 39:1,2,5 | 112:19 113:7,8 | 28:9 29:3,6,10,15 |
| 124:9 | 39:6,22 40:3,6,7 | 114:19,20,24 | 29:22 30:22 31:4 |
| **contacted**  13:12 | 40:14,17,18 41:7 | 115:20 117:19,21 | 31:5,7 59:15 62:3 |
| 16:5,12,20 120:21 | 41:25 42:6,13,18 | 118:22,23 119:1,2 | 82:17,19 83:21 |
| **contain**  40:5,16 | 42:22 43:1,4,13,18 | 120:2,6,10,11 | 87:17 88:16,20,24 |
| 42:25 44:18 45:23 | 44:4,8,11,16,20,23 | 122:3 | 97:19 100:11 |
| 46:11,21 47:6 | 45:9,21,25 46:9,13 | **corrections**  124:14 | 107:7 |
| 48:15 63:2 93:11 | 46:19,23 47:4,8,22 | 124:15 125:3,4 | **crimes**  28:25 |
| 93:17 123:13 | 48:13,17 50:24 | **correctly**  18:15 | 29:10,22 31:9,14 |
| **containing**  38:5,11 | 51:2 52:3,10,16,19 | 34:14 35:9 38:2 | 34:3 50:18,23 |
| **content**  38:20 39:3 | 52:23 53:16,24 | 38:18 41:4 45:6 | 52:22,25 107:8 |
| **context**  60:3 72:18 | 55:1,4,8 56:9,17 | 47:17 49:23 62:9 | **criminal**  11:1 |
| **continue**  8:13 | 56:19 57:1,6,9,20 | 67:21 74:5 78:12 | 23:21 50:9 62:7 |
| 49:15 | 58:1,10 59:4,24 | 81:12 91:8 98:15 | 65:14,24 68:6,9,13 |
| **continued**  4:1 5:1 | 60:17 61:2,3 63:3 | 100:16 | 74:23 75:2 83:25 |
| **continuing**  42:11 | 64:12,22 65:14 | **cost**  99:16 | 86:9,19 87:1,21 |
| **contrary**  45:4 91:6 | 66:14 67:10 68:13 | **counsel**  8:16 9:5 | **critical**  83:5 |
| **contribute**  17:3,5 | 68:14 69:16 70:9 | 9:25 18:1 21:22 | 111:24 |
| **conversations** | 71:19,23,24 72:2 | 26:9 34:9 72:11 | **csr**  1:24 2:19 |
| 17:16 118:21 | 74:11,14 75:3,19 | 76:4 85:19 99:12 | 123:4,25 |
| **cookies**  41:21 | 75:23 76:19,23 | 102:7 108:7,9 | **currently**  20:1 |
| **cool**  45:16 | 77:7,8,24 78:5,17 | 109:2,5,13 110:12 | 27:2 |
| **cooperating**  51:22 | 78:23,24 79:3 | 110:22 117:24 | **curriculum**  7:6 |
| **coordinator**  28:25 | 80:11 81:24,25 | 118:10 121:2,17 | 21:20 22:3 |
| 29:3 83:3 | 82:14,17 83:13,14 | 123:10,16 124:18 | **custodian**  98:20 |
| **copy**  17:23 18:2 | 85:3 86:5,10,16 | 124:21 125:7 | **cv**  1:6 2:6 8:20 |
| **correct**  10:17 14:7 | 87:2,5 88:4,13,17 | **country**  97:25 | **cyber**  17:6 23:21 |
| 14:23,24 15:4,5,7 | 89:3,9,10 90:5 | **county**  123:2 | 23:24,25 28:9,25 |
| 15:8,10,11,13,14 | 91:13,17,23 92:6 | **couple**  14:1 28:16 | 29:3,6,10,13,15,22 |
| 15:17 16:5 17:17 | 92:14,15,17,19,23 | **court**  1:1 2:1 8:18 | 29:22 30:16,17,22 |
| 18:7 19:8 21:16 | 92:25 94:6,15,22 | 8:24 11:5,6,9,25 | 30:25 31:2,3,5,6,9 |
| 21:17 22:4,5,11,14 | 95:1,8,9,20 96:3,4 | 19:2 21:6 62:18 | 31:14 34:3 59:15 |
| 22:17,20,21,23,24 | 96:18 97:13,14,17 | 73:20 74:12,15 | 62:3 82:16,19 |
| 22:25 23:1,19,22 | 98:7 99:2,23 | 80:23 85:9 100:14 | 83:4,21 87:17 |
| 24:1,2,4,8,20 25:6 | 100:3 101:15,18 | **courts**  73:4,15 | 97:19 100:11 |
| 25:11,16 27:2,14 | 101:25 102:15,16 | **created**  103:13 | **cybercafé**  92:11 |
| 27:25 29:1,2 | 102:22 103:10,14 | **credit**  25:1,7 63:19 | 92:24 97:4,6,10,20 |
| 31:10 34:21,22,25 | 104:12,17,21 | **credits**  24:19,23 | 97:21,24,25 98:5 |
| 35:12,13 36:2,10 | 105:6,15,19,20 | 25:5 | **cybercafés**  97:15 |
| 36:14,16,20,22 | 106:1,2,19 107:2,3 | | |

Veritext Legal Solutions
866 299-5127

[cyberstalking - duty]

**cyberstalking**
46:18 69:8 70:1
80:16 103:9 107:5

**d**

**d**  6:1 80:23
**d.c.**  4:14
**data**  38:5,11 39:14
39:15,17,18 41:20
49:21 54:4,6,17
82:5 95:21 98:14
98:18,20 101:9
109:23 111:14,15
**date**  16:8,10,17
28:13,22 29:9,19
62:6,15 68:5,9,12
79:23 80:1 83:23
87:20 94:9 96:9
97:1 120:23 121:6
121:9 124:16
125:5 126:24
**dates**  65:13 97:12
119:11 121:10,14
**david**  1:14 2:14
6:7 7:2,5 8:16
10:9 16:21 17:24
120:21 121:22
124:5 126:2
**davis**  1:4 2:4
**day**  19:12 123:21
**daylight**  2:16,17
**december**  18:21
**decipher**  104:24
**declare**  122:1
**decode**  104:25
**defendant**  1:10
2:10,15 4:10 8:17
117:19
**defendants**  115:14
115:18 116:11
**defending**  9:12

**deferential**  73:20
**definition**  95:3
**degree**  22:10,13
22:16,19,22 25:9
**demonstrate**  78:2
78:20 86:8
**denied**  87:12
**denying**  100:12
**departing**  29:7
**department**  7:15
85:18
**depending**  79:8,22
92:24
**depends**  8:9
**deposed**  10:25
**deposition**  1:14
2:14 7:1 8:8,16,21
9:13 10:7 12:19
13:10,11,21 14:10
14:13 17:17 19:3
49:13 90:2 123:6
124:19,22,24
125:8,10
**depositions**  72:17
**describe**  40:3,12
42:21 44:3
**described**  39:10
41:14 59:5 92:14
95:16 103:20
**describes**  43:11
45:19 46:8,18
47:19
**describing**  54:10
89:2,8,13 103:25
**description**  7:3
86:25
**designated**  23:9
**details**  98:9
**determine**  53:14
74:22 95:8,10
121:2

**determined**
124:18,22 125:7
**developing**  112:14
**device**  33:19 92:16
92:18 93:22 94:2
94:5 95:7,8,10,17
96:14,15,17,22,22
97:3,16
**device's**  32:23
33:8
**devices**  39:19
41:21 53:7 92:20
92:22
**devote**  19:12
**differ**  51:10
**difference**  63:24
**different**  23:18
60:7 61:21 92:20
92:21 93:11,18,21
94:17,21
**difficult**  50:23
**digital**  24:7
**direct**  108:14
**directed**  12:13
**direction**  123:12
**director**  77:17,23
**discipline**  22:20
**disclose**  98:9
104:10
**disclosed**  81:7
**disclosure**  26:16
81:9
**discovery**  7:19
38:17,22 39:1,4
108:5
**discrete**  38:15
**discuss**  26:14 52:7
69:7 71:14
**discussed**  69:21
78:25 80:4 119:25

**discusses**  41:21
58:15 80:15 103:9
**discussing**  93:22
**discussion**  17:2,8
85:12
**discussions**  115:14
**dispute**  102:21
**disputing**  91:16,22
**distinguish**  102:18
**district**  1:1,2 2:1,2
8:18,19 108:21
**disturb**  10:19
**division**  8:19
29:18 83:8
**doc**  105:18
**docket**  108:19
**document**  7:21
13:18 72:13,19
76:9 105:18 108:6
108:23 109:12,20
109:20 110:2
**documents**  10:22
14:2,6 37:25
38:10,17,21,25
39:4 101:15
105:14,21
**doing**  33:25 43:24
120:21
**domain**  63:17
116:25
**doubt**  61:4
**dozens**  30:1 84:19
84:20 113:5
114:14,15
**drive**  63:18 117:1
**drug**  27:8,13
**due**  23:12
**duties**  28:2 29:5
**duty**  28:1,14

[e - expert]

| e |
|---|

**e** 6:1 10:9 16:24
124:9,12 125:1
126:3,3,3
**earlier** 60:13
78:25 118:24
119:25 121:8
**early** 16:16
**easily** 57:21 105:5
105:10
**eastern** 2:16,17
8:6
**easy** 105:8
**edge** 55:16
**education** 22:7
45:1 91:3,11,24
**eight** 24:7
**either** 65:23 77:1,1
77:5 80:22 81:18
82:5 90:12 94:16
98:22 113:21
**el** 28:9,20 29:7,24
**electrical** 22:17
**electronic** 12:23
**electronically**
17:25 21:21 72:11
76:4 85:19 99:12
108:7
**email** 31:6 68:22
70:1 79:14 94:17
94:21,22,25
103:13,13,16
104:20,23 107:6
**emanuel** 4:11 5:4
9:8,10
**emphasis** 22:11,12
**empty** 57:4 66:14
120:6
**ends** 41:16
**enforcement**
39:16 41:3 45:20

49:22 50:6 51:4,5
51:15 73:22 82:2
104:15
**engaged** 20:16
**engagement** 20:20
20:23 38:15
**engagements**
25:18
**engineering** 22:17
22:20
**entered** 64:16
**entire** 110:2
**entities** 7:11 50:2
50:3,5 72:10
**entries** 54:17
117:14
**entry** 24:19 27:8
54:18,20 108:19
117:15
**equal** 30:9
**errata** 124:14,16
125:3,5
**error** 82:5
**esq** 3:5,6,14,20 4:4
4:12,18 124:1
**essentially** 64:18
**estimate** 20:25
84:18
**estimation** 113:4
113:17,25 114:7
**et** 108:20
**evaluation** 73:22
**event** 20:18
**events** 20:7,16
**evidence** 9:20
27:21 28:8,11,19
29:4 48:10,11
80:2 83:9 86:15
88:20 89:9 106:1
106:7 107:7

**exact** 16:7 28:12
29:19
**exactly** 30:7 50:6
59:10 89:24 102:5
**examination** 6:6
10:2 107:21
118:12 120:17
123:10
**examining** 20:5
**example** 31:3
32:20 34:3,4
41:16 63:8 71:25
79:11,13 89:1
92:10,21 97:6,11
**examples** 114:17
**excel** 112:24
114:19 115:4
117:5,6 118:16
120:6
**exchange** 83:5
**excuse** 110:13
**executed** 122:4
**executive** 7:10
72:9
**exercise** 42:12
73:4,15
**exhibit** 7:4,6,8,12
7:14,17,18 10:15
17:22,24 18:10
21:19,20 22:6
23:3,8,11,17 24:10
27:4 34:6,17 35:3
35:15,20 36:8,14
36:19,25 37:4,11
37:18,24 39:7,8,20
40:2 42:24 43:17
44:2,7,15,18,25
45:1,8 46:11,21
47:6 48:15 49:16
49:19 50:1 56:14
61:2,23 62:2,12,18

63:11 64:11 67:15
68:17 69:4 70:8
70:18,19 71:8
72:7,8,12 73:3
75:7,12,22 76:1,2
76:8,14,16 80:15
81:2,4 82:10,12
83:15,19 85:16,17
85:23 87:13,16
88:2 90:23 95:22
98:11,11 99:10,11
99:15 100:7 103:6
103:21,25 104:17
105:5 106:23
107:23,24,25
108:3,4,10,14,16
115:24
**exhibits** 7:1
**existed** 99:19
**experience** 27:5
39:18 42:21 44:3
45:2 81:10 82:4
91:3,11,24 111:17
111:22,25 112:2
114:21
**experiences** 45:19
119:3
**expert** 7:4 10:23
12:21 14:4,5,14,25
15:3,6,9,12,16
16:14 17:9,24
18:2,23 21:24
23:8 29:19 34:11
40:17 44:7 45:24
46:12,22 48:16
51:11,13 102:14
103:4,4 106:18
110:13 111:1,3,10
111:12,13,24
112:14

[expertise - full]

**expertise** 56:7,17
56:23 57:24
104:25
**experts** 14:18,22
15:1 34:24
**exploitation** 76:24
77:3,6
**exports** 38:5,11
**extremely** 72:13

**f**

**facebook** 31:20
**fact** 26:19 48:21
105:3 111:13
**factor** 73:22
**failed** 39:13 49:20
**failing** 40:23
**fair** 18:25 30:4,19
50:19,20 53:1
55:7 59:18 65:18
68:9,10 69:10
73:14 74:20 75:6
88:14 96:13 101:4
118:18,19
**fairly** 26:7
**faith** 73:23
**fake** 104:20
**fall** 30:16
**false** 103:14
**familiar** 14:18
99:18
**far** 17:13 20:23
113:14
**fashion** 98:24
**fbi** 17:6 18:21 23:3
23:13,19 25:7
27:12,21,24 28:11
28:19,24 29:1,12
29:13 30:23 31:15
42:21 45:2,5 46:9
47:4,21 49:25
50:8,8,18 51:19,19

51:22 52:8,16,22
52:25 53:5,22
59:12,15,16 62:4
65:5 67:7 71:1,14
81:11 82:16 83:4
83:21 84:15,15
86:13,13 87:18
89:17 90:5 91:3,7
91:12 98:2 99:22
101:10 106:25
112:2,4,18 113:3
114:21 116:1
117:18 118:15
**fbi's** 30:14 50:22
**federal** 73:4,15
76:23 77:2,2,5
84:25 85:2 125:1
125:8,9
**fee** 39:15 98:19
**fenton** 5:6 8:23
**fi** 92:22
**field** 54:6,25 56:25
57:4,8,17,25 60:13
66:10,14 120:6
**figueroa** 4:5,19
**figure** 73:12 76:13
94:4 96:16
**file** 16:18 20:24
63:19
**filed** 8:18 18:6
108:20,23
**files** 15:18 31:6
**filing** 76:21 78:14
**financially** 9:2
**find** 33:10,24
72:21
**fine** 48:8 105:2
**finish** 11:11 28:18
**firefox** 55:21
**firm** 8:25 9:12,15
13:3 25:22 26:3

**firms** 19:20
**first** 13:15 16:1,4
16:12 17:1 27:12
37:23 52:9,14
65:22 75:11,12
82:23 86:17 88:18
107:23 120:20
121:2
**five** 13:23 89:22
89:23 117:25
118:2
**flexner** 3:13 4:3
9:16
**floor** 3:7,15 4:5,19
**florida** 1:16 2:16
3:8,22 8:1 28:21
29:8,24
**focus** 10:19 30:17
81:6
**focusing** 88:24
**followed** 74:3
**following** 39:10
58:17
**follows** 124:8
**followup** 48:6,9
95:10 120:14
**footnote** 35:17,18
35:21,21 36:5,8
41:16 75:17,17,18
**footnotes** 35:25
36:19 37:4,8,11,18
**forecast** 104:22
**foregoing** 122:2
123:6,13
**forensic** 104:19,24
105:2
**form** 19:7 21:8
33:22 36:4,15,21
37:14,20 40:14
41:8 42:1,7 43:2
43:20 44:9,21

46:1,14,24 47:9
48:18 50:10,25
51:7,16,23 52:17
53:17 54:12 55:2
55:13,18,23 56:3
56:10,20 57:10
58:2,11 61:11,17
66:3,16 67:11
69:17 70:10,24
71:10 75:4 79:4,7
80:8 82:3 84:9,12
87:3 88:5 93:24
99:24 100:4,20
101:5,19 102:1,23
105:7 110:9,16
111:6,23 112:7
113:23 114:6,13
115:6,9 121:12
**formed** 110:14
**forming** 112:10,19
**forms** 110:6
**formulating** 83:9
**forth** 33:16 123:7
**forthepeople.com**
3:10,11 124:2
**found** 85:24
**four** 73:22
**fourth** 73:17
**frame** 18:23
**francisco** 3:16
**franklin** 3:7
**frankly** 101:13
**fraud** 30:14
**frcp** 125:1
**front** 17:23 108:17
**full** 10:8 25:10,13
25:15,18 26:3,22
29:3,6,17 34:17
73:2 82:18,23
116:5 123:13

Veritext Legal Solutions
866 299-5127

**fully** 12:3
**function** 86:1,4
**functionality** 35:7
  39:12 40:22
**further** 64:7 107:7
  107:16 117:23,24
  118:12 120:17
  123:16

## g

**g** 16:24
**gather** 107:7
**georgios** 34:12
**gist** 62:10 95:3
**give** 9:21 21:4 46:6
  48:7 58:15 84:18
  98:3 110:18
  117:25
**given** 21:10
  121:21
**giving** 109:16
**global** 38:6
**gmail** 63:8 103:17
**go** 8:14 11:2 18:9
  22:6 23:2 24:10
  27:4 34:5,6 35:2
  35:14 36:24 37:22
  40:8,19 48:25
  49:16 61:23 66:22
  75:7,7 79:6 81:4
  83:15,16 85:6,23
  87:13 90:16 95:5
  100:6 107:9
  108:15 113:14
**goal** 106:3 107:4
**god** 9:22
**going** 11:3 17:22
  19:22 21:18 23:10
  26:6 27:20 33:16
  33:17 39:7,8
  42:11 43:25 45:14
  46:6 49:2,13

52:11 66:8,25
69:18 72:6,14
85:10,15 89:11
90:17,23 91:18
99:9 103:6 104:5
106:23 107:11,23
109:12 118:3
**good** 8:5 9:11 10:4
  10:6 73:22
**google** 1:9 2:9 8:17
  9:9 10:5 31:12
  34:12 38:17,21
  39:1,4,13,15,17
  41:2,14 44:4 45:3
  47:14,21 48:1,3,13
  49:20 50:7,21
  51:3,4,14,21 52:2
  52:4,14,20,24 53:6
  54:2,3,4,5,10,16
  54:17,18,19,22,25
  55:10 56:7,18,24
  56:25 57:5,19
  58:5,10,17 59:1,6
  60:12,16,25 61:9
  61:15 62:5,14,19
  63:17 64:2,3,12,13
  64:21 65:4,12,17
  65:21,25 66:9,13
  66:18 67:7,9,13,18
  67:20,24 68:16,18
  68:20 69:14,15,23
  70:6,8,15 79:3
  81:7,17,22 82:1
  83:13,22,25 84:4
  84:15 87:8,19,22
  88:3 89:18,21
  90:4 91:4,12 92:4
  93:3,10,15 94:8,11
  94:14 95:12 96:9
  97:2,13 98:13,17
  98:25 99:5,21

100:2,12,18,24
101:8,10,15,17,24
102:9,17 104:21
105:6,9,10,15,19
105:21,24 106:1,6
106:7,11,19
108:20 109:6,22
110:7 111:14
112:18,24 113:6
113:16 114:5,18
115:25 116:5,8,25
117:7,11,14,17,19
118:17 120:2,4,5,5
120:8,9 124:4
126:1
**google's** 38:5,11
  45:19 46:8 47:3
  50:17 81:5,9
  102:20 112:4
**google.com** 88:4
**google.com.**
  116:11
**government** 50:2
  50:3,5 52:2,5,15
  98:13,14,18 99:1,5
**grab** 66:22
**grand** 43:12 80:22
  83:22 84:5,15,21
  85:3,25 86:3,7,12
  86:18,22 87:8,10
  87:11,18 100:13
  113:15
**great** 48:24
**guess** 28:16 56:22
  90:2
**guessing** 46:5 90:1

## h

**h** 126:3
**hacking** 30:19
**hairs** 96:8 106:22

**half** 24:6
**hand** 9:18 52:9,14
  102:19
**handled** 124:8
**happened** 96:20
  96:23
**hate** 20:6
**head** 13:5
**header** 22:7 23:3
  54:3,9,10,15 85:25
**headers** 31:6
  104:23,24,25
**healthcare** 76:23
  77:2,5
**hear** 11:7
**heard** 8:11 63:13
**hearing** 52:7
**held** 28:1
**help** 9:22 51:19
  68:20 111:22
  112:10
**helped** 50:18
  52:22
**helpful** 90:10
**hide** 32:23 33:8,19
  119:16,18,22
**high** 30:11
**hired** 20:14
**history** 41:18 88:3
**hochman's** 15:3
**hold** 27:16 29:14
  50:16 80:14
**home** 23:9
**hosting** 63:17
  116:25
**hotmail** 32:8,10,11
**hour** 18:14,17,19
  20:21 24:6 45:14
**hourly** 20:19
**hours** 12:9 14:1
  17:12 19:13 20:25

24:14
**house** 32:19
**hsiao** 3:14
**hundred** 59:19
**hundreds** 96:23
113:13
**hypothetical** 53:2

**i**

**idea** 74:19,25
**identifiable** 94:25
**identification**
17:25 21:21 72:11
76:3 85:19 99:12
104:9 108:7
**identified** 7:3 38:1
69:14 97:21,22
105:10
**identifier** 59:6
**identifiers** 67:20
93:4,7
**identifies** 35:18
39:20
**identify** 35:25
36:12,17 37:16
94:8 95:4,17 96:7
96:10,13,14 97:7
97:11 104:6,20
107:1,5
**identifying** 40:25
**identity** 105:4
**ii** 77:25
**iii** 78:8
**illegal** 65:19 97:23
**images** 30:13
**impact** 12:9,10
**important** 11:10
60:18 119:23
**include** 37:4 38:9
39:17 48:1 63:21
111:13

**included** 23:11
53:15 67:19 93:2
117:18 124:14
125:3
**includes** 17:15
41:17 119:11
**including** 9:5
31:19 39:15 41:2
49:22 69:24
109:13
**incognito** 55:12
57:22 58:16 66:1
66:12 109:2
115:12
**incomplete** 39:12
40:22
**incorporated**
25:16,19 26:23
**incorrect** 53:19
82:7
**independent** 32:12
**indicate** 101:9
**indicated** 86:17
103:1
**indicating** 109:6
**indication** 21:11
**indicator** 54:7,16
55:5 57:19,23
58:1 100:23
115:10 118:17
119:22,23
**indictment** 86:4
**individual** 93:12
93:12,18,18,20,21
96:13 107:2
**individually** 1:5
2:5
**individuals** 39:19
**indulge** 120:15
**industrial** 22:10

**influence** 20:6
**info** 120:9
**information** 31:14
32:1,5 38:7 40:25
41:14 45:20 47:13
47:15,20,23 48:1,2
48:3,4 50:5,8,17
50:22 52:3,4,15,21
52:25 53:4,8,11,13
53:15,15,22,23
55:11,11 58:9,10
59:1 60:4,9,11,15
60:24 61:8,12
62:16,19,24,25
63:2,5,6,7,9,14,20
64:9,10,11,14,16
64:17,18,20,21
65:13,17,23 67:8
67:13,18,19,19,24
68:3,15,20,21
69:23 71:4,22
73:25 74:2,13
77:5 78:3,21 79:1
79:10,13,16,20,22
79:24 80:20 81:7
81:15,23 82:2,5,7
83:3,5 84:1,4,6
86:9,14 87:7,11,23
88:1,3 91:15,21
92:5 93:3,10,11,16
93:17,17 94:5,7,11
94:25 95:5,16,22
96:6 97:2,13
99:22 100:13,19
101:11,12 102:5
102:18,19,20
103:1,14 106:12
106:14,18,25
107:1 115:4,11
116:8,16,17,24
118:16 119:8,21

120:4
**infragard** 28:25
29:3 83:2,3
**infrastructure**
83:5
**initial** 17:15
**initially** 13:12
16:21
**innocent** 30:13
**inquiries** 33:17
**insight** 109:21
**instance** 78:1,19
95:19
**instances** 77:1
**institute** 99:18
**instructed** 6:12
**instructions** 71:1
**instructor** 29:1,4
**instructs** 12:14
**intellectual** 30:15
**interactions** 45:2
91:4,12
**interested** 9:2
123:18
**interim** 82:25
**internet** 8:10 24:3
30:14 31:19 32:15
33:25 92:21
**interrupt** 20:10
**interview** 58:7
59:15 96:2
**interviewed** 47:13
53:9,21,23 95:25
96:1 103:1
**interviewees**
60:12
**interviews** 47:20
47:25 59:8,11,14
59:24,25 60:3
119:1,8,9

**introduce** 17:22 19:22 21:18 72:6 75:25 85:5,15 99:9 107:24
**introduction** 24:3
**intrusions** 30:16 30:18
**inverse** 61:22
**investigate** 29:23
**investigating** 50:9 51:4 65:19 74:24 115:15
**investigation** 25:21,23,25 26:3 31:3,5 46:19 48:6 48:9 69:8,21 70:7 70:21 71:2,7,8,13 71:25 73:23 74:8 74:10 76:22 77:15 77:21 78:4,15 79:17 80:16,19 81:1 87:1 95:11 103:10,20,24 104:1,4,6,9,16,18 104:19,22 105:12 106:3 107:4 115:5 119:13,16,24
**investigations** 24:4 25:11,13,15 25:19 26:4,22 30:10,12,21 51:5 51:15,20 59:15 62:4 71:5 81:10 83:21 87:18 94:9 97:9 99:6 100:11 113:2 114:23,24 115:2
**investigative** 26:17 28:2 30:25 31:7 65:22 83:9 83:10

**investigator** 27:9 27:13 28:25 29:6 29:10,15,22 30:8 30:23 31:10,15
**investigators** 16:22 88:11 89:1 89:8
**involved** 81:14 82:19,22 90:4,7,9 103:19 104:1,3,11 104:16,19 113:21
**involving** 73:18 76:24 77:2,6 89:18,21
**ip** 32:23 33:9,19 39:16 40:24 58:17 62:5,13,15,20,25 64:19 65:12,20,21 67:8,10,16,17 68:2 68:4,8,12 69:9,10 69:13,22,24,25 70:6 75:2 79:1,20 79:23 80:1 81:15 82:6,7 83:23 84:1 86:24 87:7,19,23 88:4 92:5,8,13,13 92:17,19,23 93:8 94:3,6,7,9,10 95:6 95:7,15 96:5,8,12 96:16 97:1,12,16 104:20 105:1 111:14
**ipv6** 82:13
**issuance** 73:19,23
**issue** 88:11
**issuing** 74:4
**items** 75:14
**iv** 35:7

**j**

**james** 3:20 9:14
**january** 24:1
**jeremy** 1:4 2:4
**jlee** 3:24
**job** 1:25 29:6 124:5 126:2
**john** 3:6 9:13 13:2 20:10,11 26:25
**joined** 9:9,13 28:13
**jonathan** 15:3
**jose** 8:19
**judicial** 73:21
**july** 1:17 2:18 6:4 8:1,7 24:1 123:21 124:3,5
**june** 16:16
**jury** 43:12 80:23 83:22 84:5,15,21 85:3 86:1,3,7,12 86:18,22 87:8,10 87:11,18 100:13 113:15
**justice** 7:15 85:18
**justified** 88:12
**jyanchunis** 3:11

**k**

**keegan's** 15:12
**kidnapping** 31:3,4
**kind** 66:20 76:10
**knew** 95:25 99:19 101:12
**know** 11:15 14:17 18:10,18 20:2,13 21:3,25 23:4 24:24,25 25:4 30:1 31:18,20 33:15,18 34:7 36:25 40:9 43:8

43:24 46:6 49:17 50:4,6 52:6,7 53:4,21 55:6,15,20 55:25 56:5,22 57:3,7 58:23 60:14 61:20,25 65:1 66:5,6,6,15 66:17,17,18 67:9 69:5 70:11,11,13 72:3 75:9 76:5 77:12 80:17 81:16 81:18 83:17 84:17 84:23 85:20,24 87:14 89:20,24 90:8,9,25 95:2 96:8 99:4,7,13,20 100:8,18,18 101:17,21 102:8,8 102:11 103:7,25 104:25 105:9 108:10 110:20 120:7
**knowing** 58:9,17 105:9
**knowledge** 16:6 26:18 52:9,14 58:13 111:25

**l**

**l** 4:4
**lack** 59:6
**lag** 76:11
**lasinski's** 15:9
**law** 9:12,15 13:3 19:20 39:16 41:2 45:20 49:22 50:5 51:4,5,14 82:2 84:25 85:2 86:15 104:15
**laws** 122:2
**lawsuit** 100:22

**lawyers**  12:20,25
13:3 14:10
**lead**  104:8
**leader**  27:21 28:4
28:7,11,15,17,19
29:17 82:19,24
83:8
**leading**  109:10,19
109:24 110:9
112:20 114:25
115:16,21 116:19
117:2,8,20 121:5
121:12
**leads**  20:6
**leaking**  23:15
**learn**  102:7 106:14
**learned**  102:4,9
106:12
**leave**  26:12
**lee**  3:20 9:14
**left**  28:20
**legal**  8:24,25 12:22
43:11,14 72:4
112:2 121:23
124:7
**legitimate**  72:1
73:24 74:10,14,17
**leslie**  1:24 2:18
8:25 25:14 123:4
123:25
**level**  30:11
**liam**  5:4 9:10
**liberal**  26:7
**liberty**  104:7
**library**  92:10
**limitations**  71:21
**limited**  48:3 63:22
63:25 86:1,3
95:19
**limits**  85:3

**line**  49:14 124:15
125:4 126:4,7,10
126:13,16,19
**lines**  60:8
**linkability**  45:4
91:6,17,23
**linked**  39:18 53:7
94:12,13
**list**  31:18,21 32:20
89:15
**listed**  38:1 54:18
54:20 56:7,18
72:4
**lists**  23:17
**litigation**  19:16
20:12,13
**llc**  1:9 2:9 8:18
25:15 26:22
108:20 124:4
126:1
**llp**  3:13 4:3,11 5:5
**local**  31:19 32:15
83:6
**located**  97:25
**locations**  58:18
**locked**  124:12
125:1
**lodge**  21:5
**log**  20:24 31:6
**logged**  67:9 69:25
**logging**  94:18
**logical**  66:7
**logs**  102:21
**long**  13:9,24 21:1
24:6 27:16 29:14
48:23 72:13
**look**  16:9 20:24
24:10 27:5 29:19
39:24 43:23 46:4
60:15,24 73:2
76:14 77:9 120:20

121:1
**looking**  41:10 43:5
44:25 49:16 51:13
108:2
**looks**  76:10 108:3
**los**  4:6,20
**lot**  101:11,11
105:11
**loud**  39:9 41:11
73:6
**loudly**  11:6
**lower**  78:7
**lowercase**  77:10

**m**

**maintained**  41:20
**maintains**  116:5
**major**  31:19
**majority**  96:25
**making**  87:7
**mao**  3:14 9:14
13:7
**marin**  123:2
**mark**  3:14 9:14
13:4,7 15:12
75:25 107:23
109:7
**marked**  17:25
21:19,21 72:10,20
76:3 85:16,18
99:11 108:6
109:22
**marker**  101:8,18
101:24
**markers**  109:2
**marking**  23:11
**marks**  110:8
**marshal**  77:16,17
77:22,23
**master's**  22:22
**material**  54:2

**materials**  35:4
40:13
**math**  19:13
**matter**  8:17 9:21
13:14,16 17:13,20
20:1,4,5,9 25:22
26:5,17,18,19
30:12,21 98:10
106:13 116:4
**matters**  11:1,1
26:22 28:9 45:4
83:10 91:6
**maximum**  19:16
**mcgee**  3:5 6:10
9:11,11 13:2
15:21 17:2 19:7
19:10 21:4 23:7
26:6 33:1,3,22
36:4,15,21 37:14
37:20 41:8 42:1,7
43:2,20 44:9,21
45:13 46:1,7,14,24
47:9 48:7,8,18,24
50:10,25 51:7,16
51:23 52:17 53:17
54:12 55:2,13,18
55:23 56:3,10,20
57:10 58:2,11
61:11,17 66:3,16
66:23 67:11 69:17
70:10,24 71:10
72:16 75:4 76:8
76:15 79:4,6,7
80:6,7 82:3 84:9
84:10,11 85:8
87:3 88:5 90:15
93:24 99:24 100:4
100:20 101:5,19
102:1,23 105:7
107:19,22,25
108:8,12,16

[mcgee - number]

109:11,20 110:1,5
110:11,18 111:8,9
111:22 112:9,12
112:15,22 114:3
114:10,17 115:3,8
115:13,18,23
116:8,16,20,24
117:4,10,17,22
118:1 120:14,18
121:6,15,16 124:1
**mean**   25:25 30:6
30:18 32:1 34:3
34:23 47:24,25
56:22 62:13,23
63:16 64:20 67:24
82:21 90:7 94:22
98:17 104:22
105:5
**meaning**   30:8
38:21 39:4 62:14
75:1
**means**   54:25 56:8
56:19 57:4,8
64:11 88:15
**media**   8:15 20:5
20:14,17 121:22
**medication**   12:8
**meet**   13:1
**meetings**   14:3,7,8
14:12,16
**meets**   95:2
**memory**   12:22
45:19
**mentioned**   26:24
60:13
**met**   12:20
**methodology**
91:16,22
**miami**   3:22
**michael**   15:9

**microsoft**   31:22
32:11,12 55:16
**mind**   32:21 91:19
**minority**   97:8
**minute**   98:10
**minutes**   14:1
15:25 48:23 49:1
117:25 118:14
**mischaracterizes**
88:5 111:20
116:13
**misconduct**   7:20
108:5
**misleading**   39:13
40:23 111:13
**mistake**   98:22
**mistaken**   29:20
**mitigate**   23:14
**mmao**   3:18
**mode**   10:19 40:22
53:12 54:8 55:12
55:17,22 56:2
57:9,22 58:8,16,21
59:2,3,8 60:2,10
61:1,5,10,16 66:2
66:12 70:17 96:3
103:2 116:6,7
118:18 119:1,14
**modes**   41:13
**moment**   21:23
43:23 44:13 45:12
117:22
**monique**   1:5 2:5
**montgomery**   3:15
**month**   13:12
**months**   28:15
**morgan**   3:4,4 9:12
9:12,14,14 12:20
12:20,25,25 13:13
13:13,15,15 15:21
15:21 16:19,19

20:1,1,8,8 50:14
50:14 121:3,3
**motion**   7:18 108:4
**moved**   28:20
83:11
**moving**   44:12
**mozilla**   31:24 32:4
32:5
**multiple**   21:6
89:21 97:4 104:11

**n**

**n**   6:1 16:24
**name**   8:23 10:8
13:4 16:23 63:6
64:17 65:3,6,9,10
68:19 70:23 79:11
112:23 116:20
123:20
**name's**   10:5
**names**   13:6 71:6
**nature**   23:12
38:15
**near**   116:4
**nearby**   10:20
**necessarily**   43:14
63:6 67:12 74:21
119:20
**necessary**   33:10
33:21 74:3 124:14
125:3
**need**   11:6,15 13:19
16:7 26:9 33:25
34:2 48:23 66:22
72:18 74:25 87:10
88:11 89:7 94:5
**needed**   58:15
83:10
**needs**   74:19
**negative**   82:8
**neither**   123:16

**nelson**   1:14 2:14
6:7 7:2,5 8:16
9:18 10:4,9 17:25
21:4 25:10,13,14
25:15,18 26:3,8,22
33:23 49:7 58:12
67:5 70:25 72:16
90:22 108:9,16
109:18 110:1,11
110:21 111:5
118:8 120:19
121:19,22 124:5
126:2
**nelson's**   23:9,13
**never**   58:5
**new**   83:1
**night**   15:20,24
17:18
**non**   26:16 71:9,17
117:19
**normal**   116:6
**north**   3:7
**northern**   1:2 2:2
8:18 108:21
**notating**   124:15
125:4
**note**   8:8
**noted**   121:24
**notes**   14:12,15
**noticing**   9:7
**number**   7:3 8:19
23:18 29:13 30:1
30:9 58:15 59:17
65:1 69:1,2 84:20
89:20 90:3,6,12
99:20 107:25
108:17 113:22
114:1 115:24
121:22 124:15
125:4

Veritext Legal Solutions
866 299-5127

[numbers - opinions]

| | | | |
|---|---|---|---|
| **numbers**  113:14 | **objections**  9:3 | 28:24 29:9,14,21 | 91:10 92:2,12,16 |
| **numeral**  78:8 | 12:12,12 21:5 | 30:2,18 31:8 32:5 | 93:1,1,7,21 94:1 |
| **numerals**  77:10,11 | 123:9 | 32:8,14,22 33:13 | 94:18,21,24 95:5 |
| **nw**  4:13 | **observation**  92:1 | 34:2,5,9,23 35:2 | 95:14,21,25 96:5 |
| | **observed**  45:5 | 35:25 36:12,24 | 96:12,15 97:6,10 |

**o**

o'clock  49:3
oath  11:20,22,24
  123:8
object  19:7 21:8
  26:6 33:1,22 36:4
  36:15,21 37:14,20
  41:8 42:1,7 43:2
  43:20 44:9,21
  46:1,14,24 47:9
  48:18 50:10,25
  51:7,16,23 52:17
  53:17 54:12 55:2
  55:13,18,23 56:3
  56:10,20 57:10
  58:2,11 61:11,17
  66:3,16 67:11
  69:17 70:10,24
  71:10 75:4 79:4,7
  80:8 82:3 84:9,12
  87:3 88:5 93:24
  99:24 100:4,20
  101:5,19 102:1
  105:7 108:13
  109:17 110:9,16
  111:4,6 112:7
  113:23 114:6,13
  115:6,9
objection  102:23
  109:10,14,19,24
  109:24 110:3
  111:20 112:12,20
  114:25 115:16,21
  116:2,13,19,22
  117:2,8,12,20
  121:5,12

objections  9:3
  12:12,12 21:5
  123:9
observation  92:1
observed  45:5
  91:7
obtain  20:15 32:5
  78:19
obtained  32:1
  48:12
obtaining  24:7
  43:12
obvious  106:21
obviously  13:5
  72:13 73:9
occasion  18:22
  93:20 96:10
occasionally  98:22
offender  77:15,16
  77:22 78:4
offense  76:23 77:2
  77:2,6,6 78:8
offering  35:5
  39:10 40:6,17
  45:24 46:12,22
  47:7 48:16 102:14
  103:3 106:17,18
office  98:21,23
  124:11
official  23:4
okay  10:16,20,22
  10:25 11:2 12:6
  12:11,25 13:9
  14:6,9 16:19,23
  17:7,12,19 18:6,13
  18:19 19:1,15,22
  20:8,12,22 21:1,18
  22:3,13 24:14,19
  24:25 25:4,10,15
  26:21 27:1,12,18
  27:20 28:3,10,22

28:24 29:9,14,21
30:2,18 31:8 32:5
32:8,14,22 33:13
34:2,5,9,23 35:2
35:25 36:12,24
37:3,8 38:4,14,20
39:20 40:12 41:24
42:11,20 43:5,16
44:2,12,15 45:11
45:16 46:4 48:4
48:11,22,25 49:16
49:19 50:3,7,15,16
50:21 51:3,21
52:6,9 53:4,20
54:1,9,21,24 55:6
55:9,21 56:6,13,13
57:7,14,24 58:6,20
58:25 59:18,21,23
60:6,11,15,20,24
61:6,9,14 62:17,23
63:2,8,13,21,24
64:10,15,20,24
65:11,16,25 66:8
66:12,20,24 67:14
67:23 68:2,8,11,22
69:1,4,6,7 70:5,21
71:16,20,25 72:25
73:2,6,15 74:7,17
74:25 75:7,11,17
75:21,25,25 76:7
76:15,16,21 77:1,9
77:14,20 78:1,7,14
79:16,19,25 80:7
80:12,12,19,25
81:4,19,22 82:9,16
82:21 83:19 84:11
84:14,21 85:15,23
86:3,21 87:16
88:1,9,15,19,22,23
89:11,17,25 90:3
90:10,13,22 91:2

91:10 92:2,12,16
93:1,1,7,21 94:1
94:18,21,24 95:5
95:14,21,25 96:5
96:12,15 97:6,10
97:25 98:5,11,25
99:4,8,15,21 100:1
100:10,18,25
101:2,14,17,23
102:14 103:3,6,9
103:12,19 104:11
104:15,19 105:3
105:23 106:3,5,17
106:23,25 107:4,9
107:16 110:5
111:16 112:15
113:15 114:3,17
118:2,8,20,24
119:4,12,18,25
120:4,12 121:15
once  96:24
ones  30:7 31:17,19
  32:21 50:6
online  69:16
ooo  121:25
open  10:13,15,17
opining  103:4
opinion  35:7 38:20
  39:3,11,21 40:21
  41:6 42:5,12,17
  43:17 44:7,16
  45:8,23 46:3,12,22
  47:7 48:16,20
  51:10,10,13 58:25
  91:10 102:14
  106:18 111:2,3,10
  111:12,24 112:11
  112:14
opinions  34:11,24
  35:5,6,12 39:11
  40:5,14,16 41:25

Veritext Legal Solutions
866 299-5127

[opinions - please]

42:4,10,25 44:19
110:14,23 111:18
111:23 112:10,19
**opportunity** 21:5
**options** 57:25
**order** 7:18 62:19
78:19 80:23 94:4
100:14 108:4
115:24
**organized** 27:8,13
28:6
**original** 124:10,21
**originating** 105:1
**outcome** 9:2
123:19
**outlined** 89:6
**overlapped** 28:3

**p**

**p.m.** 2:16,17 8:2,6
49:3,6 67:1,4
85:11,14 90:18,21
107:12,15 118:4,7
121:21,24
**page** 18:10 22:6
23:3 24:10 25:6
27:5,7 34:6 36:7
36:25 40:10 46:5
64:8 72:15,18,21
73:3 80:17,18
83:16 85:23
124:15 125:4
126:4,7,10,13,16
126:19
**pages** 1:25 72:20
123:13 124:14,17
124:17 125:3,6,6
**paid** 19:5 63:5,13
63:16 98:14
116:25
**paragraph** 18:9
18:13 34:6,9,16

35:2,3,14,20 36:8
36:10,13,19,24
37:3,3,11,18,23,24
38:14 39:8,8,20
40:19,19 41:6,11
41:11,24 42:5,12
42:15,17 43:5,10
43:11,16 44:12,15
44:18,25,25 45:8
45:11,18,23 46:7
46:11,17,21 47:2,6
47:12,19 48:15
49:17,19 50:1
56:13,14 58:15
61:2,24 62:2,12,18
62:24 63:10 64:11
67:15,24 68:16
69:4,7,22 70:8,19
70:22 71:8 73:3,6
75:8,11 76:17
78:10 80:15,20
81:2,5 82:9,12
83:16,19 87:13,16
88:2 90:24 91:2
92:2 95:22 98:12
98:13 100:7,10
103:6,17,20,24
104:16 105:5
106:4,23 107:1
**paragraphs** 35:21
36:1,13,18 37:5,12
37:17,17 39:24
40:2,5,8,12 42:20
42:24 43:22 44:1
44:2,6 46:5
110:13,22 111:17
112:1,9,16
**part** 74:21 86:17
88:18,19 115:13
118:21

**participants** 8:11
**participate** 89:19
**participated**
103:10
**participating** 25:1
46:19
**particular** 33:16
45:2 81:15
**particularly** 91:4
91:12
**parties** 8:13 39:14
41:2 49:21,25
**party** 9:1 123:17
123:17
**paso** 28:9,20 29:7
29:24
**pathogens** 24:12
24:15 25:6
**pay** 98:24
**paying** 63:18
116:25
**payment** 116:24
**pdf** 124:12 125:1
**penalty** 122:1
124:16 125:5
**pending** 11:17
**people** 96:15,17
97:4 103:19 104:1
104:3,11
**percent** 81:8,19,20
**percentage** 81:14
**performing** 62:3
83:20 87:17
**period** 124:18
125:7
**perjury** 122:1
124:17 125:6
**permits** 76:21
77:20 78:14
**permitted** 98:9
104:10

**persists** 40:25
**person** 78:9,16,22
97:2,3 105:10
107:5
**person's** 70:22
**personal** 51:9
58:13
**personally** 32:23
45:5 50:15 64:25
83:12 84:22,24
89:18 91:6 94:24
113:2,4,7,10,16,19
113:20 114:5,8,11
**personnel** 104:15
**pertaining** 76:22
78:15
**ph.d.** 22:25
**phone** 10:20 69:1
69:2 97:5
**photographer**
28:13
**photography**
22:11
**piece** 64:15 82:7
105:3
**pieces** 64:13
**pii** 95:3
**place** 8:13 50:12
119:9 123:7
**placed** 85:3
**plaintiffs** 1:7 2:7
3:3 7:18 14:10,13
14:19,22 15:1,19
16:14 17:16 19:20
34:10 108:4 110:6
**planned** 49:15
**plans** 83:9
**platforms** 20:14
20:17
**please** 8:8 9:4,19
12:15 39:9 72:19

[please - put]

73:7 91:19 93:13
108:10 111:1,10
**point**  11:16 18:25
45:14 74:22
**points**  11:15 12:11
**pornography**
30:14
**position**  27:12,16
27:18,24 28:2,24
29:14 45:3 83:12
91:5,17,23
**possible**  54:21,23
66:7 69:3 86:4
**potential**  86:9
**potentially**  52:24
57:23 104:6 107:8
**powell**  73:20
**power**  85:25
**practice**  97:18
**preparation**  14:10
17:17
**prepare**  12:18
14:13
**prepared**  18:7
**preparing**  13:10
13:11 37:24
**present**  5:3 9:5
**presented**  51:11
**presenting**  43:16
**presents**  41:13
**pretty**  33:13 61:19
91:25
**prevalent**  82:14
**prevent**  12:2
58:16
**previously**  26:24
59:5 64:16 66:6
109:1 116:9
**primarily**  12:13
13:2

**primary**  30:8,17
**printed**  10:23
**printing**  22:11,12
**printout**  99:15
**prior**  20:17 23:13
29:7 32:12 88:8
109:11 115:23
116:3,13
**priorities**  29:12
**priority**  29:13
**privacy**  12:23
**private**  35:6 39:12
39:17 40:22,24
41:1,13,14,15,18
41:22 47:15 51:18
53:8,11,15,22 54:7
54:25 55:17,21
56:1 57:9 58:7,10
58:21 59:2,3,8
60:1,10 61:1,4,10
61:16 67:19,23
70:17 93:2 95:23
96:2 100:15,19,24
102:18 103:2
109:7,22 110:8
115:12,19 116:6
118:18,25 119:13
**probable**  73:18
88:12,15 115:11
**probably**  13:11,23
15:25 32:12 33:17
59:20 99:20
105:11 113:17
**problem**  11:19
16:11 51:6,15,19
**procedure**  124:19
124:20
**proceed**  9:25
**proceeding**  1:15
2:15 9:3

**proceedings**  8:4
123:14
**process**  102:4
**processing**  98:19
**produce**  17:10
55:10 67:18 68:20
84:5 92:4 98:20
**produced**  38:17
38:21,25 39:4,17
50:21 54:2,4 57:1
58:9 59:1 60:11
60:16,25 62:19
83:25 87:22 93:11
93:15 101:15
105:14,18 106:1,7
118:17 120:4
**produces**  39:14
49:21
**producing**  39:15
**production**  45:20
50:17 75:13
100:12
**productions**  46:8
47:3
**productive**  33:17
**professional**  27:5
**professor**  14:4
17:9,11 35:5,12,22
36:13,18 37:5,12
37:17 39:11 40:20
40:21,23 41:12,17
41:19,24 44:16,19
45:3 49:20 58:14
58:19 91:5,16,22
111:12
**program**  30:16,17
82:20 83:3,4
**programs**  10:18
**project**  21:2,11,13
**property**  30:15

**protected**  78:9,16
78:22
**provide**  34:11
50:4,8 67:8 68:16
68:19,19,20,22
69:1 71:6 81:22
82:1 89:1,7,12
114:18
**provided**  23:8
38:16 47:14,20
48:1 54:17 62:25
63:9 64:14 79:17
94:7,11 95:12
97:13 109:21
112:11,24 116:1,9
116:17 117:7
124:19 125:8
**provider**  94:17,21
95:1
**providers**  31:20
32:15,18
**provides**  47:2
**providing**  39:21
41:6 42:6,13,17,25
45:9 52:21,24
69:2 111:11 112:5
**proximity**  70:1
**public**  92:10
**purpose**  72:1 73:8
73:11,24 74:1,11
74:14,17
**pursuant**  72:1
73:24 74:10 99:1
99:22
**put**  20:17 84:19
101:9 109:22
113:13,22 114:1
114:15

[quality - rely]

| q | | | |
|---|---|---|---|
| **quality**  8:9,10 | 81:8,9,19 83:24 | **recalled**  48:21 | 101:18 104:16 |
| **question**  11:11,17 | 87:20 113:19 | **received**  25:1 53:5 | 105:4 106:4 107:1 |
| 12:15,15 19:23 | **rarely**  96:20 | 53:22 65:23 69:13 | 119:5 124:6 |
| 20:3 24:22 26:20 | **rate**  18:14,17,18 | 70:5 82:5 94:1 | **referencing**  88:2 |
| 33:6 38:23 43:24 | 19:1 20:19 | **receiving**  31:14 | 101:25 103:16 |
| 52:11 57:13 59:13 | **reached**  13:15 | 69:23 | **referring**  13:7 |
| 60:20,23 61:20 | 17:1 | **recess**  49:4 67:2 | 50:1 93:7 109:21 |
| 63:1 69:19 84:23 | **read**  14:25 15:3,6 | 90:19 107:13 | **refill**  45:15 |
| 86:17 88:8 91:18 | 15:9,12,22 18:15 | 118:5 | **reflect**  34:17 |
| 93:13 95:3 103:22 | 23:10,14 34:14 | **recognize**  18:4 | **reflected**  117:6 |
| 104:8,14 105:21 | 35:9 38:2,18 39:6 | **recollection**  46:8 | **refreshed**  12:22 |
| 106:8 111:7 | 39:8 41:4,11 44:1 | 46:18 47:3,19 | **refreshing**  121:9 |
| 113:20 | 45:6,17 47:17 | 112:17 121:9 | **regard**  71:2 |
| **questioned**  109:1 | 49:23 62:9 67:21 | **record**  8:6,14 9:6 | **regarding**  13:13 |
| **questioning**  11:15 | 73:6,13 74:5 | 10:8 12:13 23:4 | 35:6 39:11 40:21 |
| 26:7 49:14 110:12 | 75:15 77:18 78:12 | 23:10,14 48:25 | 45:4 65:13,24 |
| 110:21 | 81:12 84:2 91:8 | 49:2,5 66:25 67:3 | 91:5,17,23 |
| **questions**  6:12 | 93:5 98:15 100:16 | 85:7,10,12,13 | **regional**  23:25 |
| 11:4,4 12:12 | 104:23 | 90:16,17,20 | **regular**  102:19 |
| 33:14,15 71:4,12 | **reading**  73:9 | 107:10,11,14 | **regularly**  31:1 |
| 98:4 107:16 112:6 | 124:23 125:9 | 118:3,6 121:17,20 | 62:19 83:25 87:22 |
| 117:23,24 118:9,9 | **reads**  75:12 | 123:14 | **reign**  16:21,25 |
| 119:10 | **really**  25:7 | **recorded**  1:14 | 17:8 120:21,24 |
| **quick**  66:21 | **reason**  61:3,4 | 2:14 8:12,15 11:5 | **reimbursement** |
| **quinn**  4:11 5:4 9:8 | 119:19 126:6,9,12 | 123:11 | 98:25 99:5,17,21 |
| 9:10 | 126:15,18,21 | **recording**  8:9,13 | 100:3 |
| **quinnemanuel.c...** | **reasonable**  88:15 | 16:17 | **reiterate**  105:14 |
| 4:16,22 | **reasonableness** | **records**  24:7 75:14 | **related**  9:1 31:5,7 |
| **quit**  10:18 | 73:16 | 75:14 98:20 | 48:10,11 60:12 |
| **quite**  30:24 59:17 | **reasons**  53:25 54:1 | 120:20 121:1,10 | 62:25 64:18 71:5 |
| 62:10 65:2 84:17 | **rebuttal**  7:4 17:24 | **redacted**  7:20 | 75:22 77:21 81:15 |
| 101:13 | 35:5 37:25 | 108:5 | 93:11,17 123:17 |
| **quotes**  41:23 | **rebutting**  17:10 | **redirect**  107:18 | **released**  124:21 |
| | **recall**  13:4,6 59:9 | **reference**  18:24 | **relevance**  33:16 |
| r | 66:10 69:2 80:25 | 55:9 56:8 105:24 | **relevant**  26:12 |
| **r**  16:24 126:3,3 | 87:9 90:3 102:5 | **referenced**  53:5 | 33:6,12 73:25 |
| **r&s**  125:1,9 | 109:2,5,8,12 | 56:19 57:18 61:2 | 74:14 75:14 89:9 |
| **raise**  9:18 12:12 | 110:23 111:18 | 63:10 64:11 66:9 | 119:12,15 |
| **range**  59:23 62:6 | 112:5,22 116:11 | 68:16 70:7,22 | **relied**  37:25 40:13 |
| 62:15 68:5,9,12 | 117:5 120:21 | 71:8 80:19 81:2 | **rely**  91:15,21 |
| | | 84:6 95:22 98:6 | |

Veritext Legal Solutions
866 299-5127

[relying - router]

**relying** 62:5,13
83:23 87:19
**remained** 82:19
82:21 83:2
**remember** 31:21
59:10 87:11 90:6
110:15
**remote** 1:15 2:15
**remotely** 8:21 9:5
**repeat** 38:23 52:11
69:18 91:18 93:13
103:22 111:7
**rephrase** 32:9
60:22
**report** 7:4,8 10:23
12:22 14:4,5,14
15:10,12,16 17:10
17:10,11,16,24
18:3,6,9 21:24
22:4 23:8 29:19
34:11 35:4,8,12,22
36:13,18 37:5,13
37:17,25 38:4,6,9
38:12 40:20 41:12
51:11,13 53:6
58:14,19 72:8
76:18 81:6,17
84:7 88:6 90:23
106:20 110:13,15
111:13,17
**reported** 1:23
**reporter** 8:25 9:17
9:24 11:5,7,9 21:6
85:9 108:2 117:24
121:17
**reports** 14:25 15:4
15:7
**represent** 10:5
**representing** 8:23
**request** 38:16
62:14 71:22 77:4

78:2 82:6 86:8,14
86:22 87:8 99:2,5
113:2
**requested** 50:8
62:15 73:25 77:5
78:3,21 86:9
98:25 99:21 113:5
125:1,9,10
**requester** 86:13
**requesting** 86:13
**requests** 31:14
32:2,3,10,15 38:6
39:16 45:21 46:9
47:4,21 50:18,22
52:2,21 53:5
55:10 65:11 80:13
80:25 81:8,15,23
82:2 84:5 87:12
99:22 112:3,5,18
**requirement** 87:2
**requirements**
43:11,14 72:4
112:3
**requires** 11:21
**requiring** 73:23
**research** 20:14
**respectfully** 26:15
71:3,12 104:5
119:10
**respond** 34:24
35:11
**responding** 35:22
37:6 44:19
**response** 27:21
28:8,11,19 29:4
34:11 39:15 45:20
46:9 47:4,21
50:17,22 52:21
53:5 55:10 63:9
80:13 81:23 82:2
84:5 96:9

**responses** 81:6,14
**responsible** 74:23
**responsive** 47:15
62:19,23 64:10,14
67:18 68:21 69:23
81:7,23 82:1
83:25 84:4,6
87:22 88:1 92:5
93:10,15,16 95:21
97:2 100:12
**responsiveness**
112:4,18
**rest** 24:22
**restate** 60:23
**restating** 42:9
**results** 48:9 64:2,5
68:1 82:8 96:21
113:12 117:15,16
**retained** 14:19,22
16:14 34:10,20
41:1 50:13 106:19
116:4 121:23
**retains** 105:9,24
106:6,11 111:14
**retired** 18:21
**return** 82:8 86:4
124:17 125:6
**reveal** 26:8,10
71:2
**review** 14:2 17:9
34:10 43:8 44:13
45:12 53:14 72:18
73:21 115:23
124:8,10,13 125:2
**reviewed** 14:4
15:15,18,20 16:1
35:3 38:25 40:20
43:10 44:14 54:4
81:5 101:14
105:14,21 109:6
110:1 113:12

114:22
**reviewing** 15:23
83:9 105:25 106:7
**right** 9:18 10:4
11:14,20 13:24
15:16 16:12 19:19
22:6,9 23:2 24:15
27:4 29:11,21
32:16 34:5 35:14
35:17,23 37:9,22
39:7,24 40:8 44:6
44:24 45:18 46:17
47:12 50:13 52:22
61:23 63:14 64:24
72:23 75:15 77:18
80:4 81:20 83:15
84:2 86:3,22 88:9
89:14 93:5,8,23
95:18 99:9 100:6
105:13 108:1,3,8
120:12
**rights** 30:15
**rmcgee** 3:10 124:2
**road** 11:2 32:19
**robert** 5:6 8:23
**rockwood** 1:24
2:18 8:25 123:4
123:25
**role** 20:5 29:21
31:9 117:18
**roman** 77:9,10
78:8
**room** 10:10
**root** 106:15
**rosas** 1:24 2:18
123:4,25
**rough** 84:18
**roughly** 17:14
19:13
**router** 92:22

Page 19

**[routinely - sir]**

**routinely** 39:14
49:21 62:4
**row** 24:11,20 25:5
**rows** 24:22
**rpr** 1:24 2:19
123:4,25
**rules** 11:2 125:8
**ruling** 74:12,15
**run** 56:16
**runner** 32:19
**runs** 45:4 91:6
**ryan** 3:5 9:11 13:2
15:21 17:2 48:23
48:23 66:20 90:13
107:18 124:1

**s**

**s** 126:3
**safari** 10:14 56:1
**san** 3:16 8:19
**sanctions** 7:19
108:5 115:24
**satisfy** 87:1
**saved** 40:25 41:15
41:18,20 53:6
105:11
**saves** 39:13 49:20
**saying** 54:9 57:14
87:10 92:12 95:14
96:12 100:25
101:3 104:13,13
**says** 18:13 22:7,9
24:16,20 27:8,21
34:9 35:3 37:23
37:24,24 38:15
40:20 45:1 47:13
62:2,2,17,18 68:2
76:8 77:14 78:8
81:5 83:20 85:25
87:16 91:2 98:13
99:16 103:12

**scenario** 93:22
**schedule** 124:10
**schiller** 3:13 4:3
9:15
**schneier's** 15:15
**science** 22:14
**scope** 34:17 40:13
71:21 108:14
**scratch** 79:20
**screen** 8:12 10:12
**screenshots** 7:14
85:17
**se** 3:21
**sealed** 7:22 108:6
**search** 48:10 63:2
63:7 64:2,3,5
73:19 80:23 83:22
87:19 88:3,10,11
88:12,21 89:2,5,6
89:8,18,21 90:4,7
100:14 114:3,4,8
116:10 117:11,14
**searches** 67:25
68:1
**searching** 89:15
**second** 3:21 24:11
27:24 28:14 38:14
62:17 73:2 85:7
88:19 93:2 103:12
**seconds** 110:19
**secret** 34:1,3 60:10
78:10,17,22
**section** 7:13,17
23:2,21 35:7
41:17 73:3 75:18
76:3,17 77:9,10,25
78:8,11 85:25
99:11,16
**sectors** 83:6
**see** 21:23,25 22:2
22:7 24:11,17

27:10,20 35:17,20
35:24 36:5,7,9
37:23 42:15,16
62:21 64:2,4,5,8
70:3 72:24 73:3,5
76:5,12 77:12
85:20,22 87:24
98:23 99:13,14
100:8,9 108:11,13
**seek** 80:20 100:2
**seeking** 74:2,8,13
**seen** 8:11
**seize** 89:11,13
**seized** 89:14
**seizure** 73:19
**senior** 27:21 28:3
28:7,10,17,18
**sense** 72:5 102:10
120:7
**sent** 15:21 70:2
107:5
**sentence** 37:23
38:14 62:17 75:11
75:12 93:2 98:12
103:12
**separate** 20:1
25:22 26:11
**september** 27:17
28:23 29:11
**series** 11:3 23:24
**serve** 16:14 18:22
**served** 80:10
**server** 102:21
**service** 31:20
32:15,18 77:16,17
77:23,24 78:10,17
78:22
**services** 18:20
**serving** 74:22 80:5
**session** 41:16,18
100:19 115:12

**sessions** 41:23,23
95:23
**set** 123:7
**sex** 77:14,15,22
78:4
**sexual** 76:24 77:3
77:6
**share** 10:15 92:16
92:18 97:16
**shared** 41:22 58:5
93:22 94:2,3,10
95:7,17 96:22
117:18
**shares** 52:4
**sharing** 52:15 83:3
**shooter** 20:7,16,18
**show** 25:5 74:17
88:12 119:16
**showing** 88:22,25
108:12
**shows** 108:8
**sic** 62:6
**sick** 12:6
**side** 102:21
**sign** 66:1 124:16
125:5
**signature** 123:24
124:21,23,23
125:9
**signed** 16:13 26:16
54:22 57:4,19
61:9,15,22,22 65:5
65:7 66:13 70:8
70:12,14,14,16
**signing** 106:13
**similarly** 1:6 2:6
**simply** 94:9
**single** 92:16,18
**sir** 9:24 10:6 11:3
11:13,19 12:1,5,17
13:8 14:24 15:2,5

| | | | |
|---|---|---|---|
| 15:8,11,14,17 16:3 | 69:6,12,19 70:4,12 | **six**   13:13,23 | **specifics**   71:14 |
| 17:18,21 18:5,8,16 | 70:20 71:3,12,19 | **skill**   123:15 | 98:3 |
| 18:18 19:4,9,18,21 | 71:24 72:3,21,24 | **skills**   111:25 | **spectrum**   32:21 |
| 19:23 20:10,21 | 73:5,8,14 74:6,12 | **skimmed**   15:20 | **speculating** |
| 21:3,12,14,17 22:2 | 74:16,21 75:10,16 | **slightly**   60:7 61:21 | 101:24 |
| 22:5,8,12,15,18,21 | 75:20,24 76:6,12 | **small**   30:14 | **speculation**   19:7 |
| 22:24 23:1,6,16,20 | 76:20,25 77:8,13 | **social**   20:5,14,17 | 21:9 55:13,18,23 |
| 23:23 24:2,5,9,13 | 77:19,25 78:6,13 | **solemnly**   9:20 | 56:3 66:16 82:3 |
| 24:21,24 25:3,12 | 78:18,24 79:12,15 | **solutions**   8:24 9:1 | 99:24 100:4 102:4 |
| 25:17 26:2,15 | 79:18,22 80:18,22 | 121:23 124:7 | 102:6 105:7 |
| 27:3,6,11,15,23 | 81:3,13,17,21 82:4 | **solve**   50:18,23 | **speech**   20:6 |
| 28:1,5 29:12,16,25 | 82:11,15 83:14,14 | 52:22 | **spell**   16:23 |
| 31:11,11,16,23 | 83:18 84:3,8,17,23 | **solved**   53:1 | **spend**   13:9,24 |
| 32:4,7,13,17 33:4 | 85:4,22 86:2,6,11 | **someone's**   119:22 | 15:23 19:17 |
| 33:6,10,12 34:4,8 | 86:23 87:5,9,15,25 | **sorry**   20:10 21:4 | **spending**   21:2 |
| 34:15,19,22,22 | 88:14,18 89:10,16 | 25:24,25 26:2 | **spent**   20:22 |
| 35:1,10,13,16,24 | 89:20,24 90:1,12 | 33:2 35:18 36:23 | **spilly**   4:12 6:9 9:8 |
| 36:3,9,11,16,23 | 91:1,9 92:3,7,10 | 48:6 54:9 56:16 | 9:8 10:3,5 18:2 |
| 37:2,7,10,15,21 | 92:15,19 93:6,9,13 | 57:15 62:11 79:6 | 19:9,15 21:10,23 |
| 38:3,8,13,19,23 | 93:25 94:20,23 | 79:6,20 80:6 | 23:7,17 26:21 |
| 39:2,6,23 40:1,4,7 | 96:4 98:16 99:3,7 | 84:10,10 85:1 | 33:5 34:2 36:5,6 |
| 40:11,15,18 41:5,9 | 99:14 100:5,9,17 | 88:19 101:1 103:5 | 36:17,24 37:16,22 |
| 42:4,10,14,16,19 | 100:22 103:8,11 | 106:4 109:16,18 | 41:10 42:5,11 |
| 42:23 43:4,7,10,14 | 103:15,18,22 | 110:18,20 111:5 | 43:5,22 44:12,24 |
| 43:15,19 44:1,5,11 | 104:14 105:16,22 | 115:12 119:5 | 45:13,16,18 46:4 |
| 44:14,17,23 45:7 | 106:2,10,22,24 | **sought**   7:21 108:6 | 46:17 47:2,12 |
| 45:10,17,22 46:3 | 108:11,18,22,25 | **source**   53:13 | 48:11,22,25 49:7 |
| 46:10,16,20 47:1,5 | 109:4,9,16,25 | **sources**   23:15 | 50:15 51:3,12,21 |
| 47:11,18 48:14 | 110:4,10,17,25 | 48:12 | 52:1,20 53:20 |
| 49:8,11,24 50:2,14 | 111:19,21 112:8 | **south**   4:5,19 | 54:21 55:6,16,21 |
| 50:20 51:2,9 | 112:21,25 114:20 | **space**   63:18 117:1 | 56:1,6,13,24 57:14 |
| 52:12,23 53:19,25 | 115:7,22 116:18 | **speak**   11:6 14:9 | 58:6,20 61:14,21 |
| 55:8,15,20,25 56:5 | 116:23 117:3,9,13 | 26:9 49:9 | 66:8,20,24 67:5,14 |
| 56:12,15,23 57:2,6 | 117:21 118:19,23 | **special**   56:6,17,23 | 69:20 70:13 71:7 |
| 57:13 58:23 59:9 | 119:10 121:4,7,13 | 57:24 | 71:16 72:6,12,22 |
| 59:13,20,22,25 | **situated**   1:6 2:6 | **specific**   35:21 37:4 | 75:7 76:5,10,13,16 |
| 60:4,14,19,23 61:3 | **situation**   92:11 | 39:19 41:20,20 | 79:10 80:12 82:9 |
| 61:8,13,20 62:1,10 | 97:15 | 46:18 53:7 71:4 | 84:14 85:6,9,15,20 |
| 63:12,15 64:23 | **situations**   73:18 | 80:16 98:3 107:5 | 87:6 88:9 90:13 |
| 65:1,15 67:6,22 | 92:14 | **specifically**   16:19 | 90:16,22 94:1 |
| 68:1,7,10,14,25 | | | 99:9,13 100:1,6,25 |

[spilly - sure]

101:14,23 102:7
103:3 105:13
107:9,16 108:13
109:10,14,18,24
110:3,9,16 111:4
111:20 112:7,20
113:23 114:6,13
114:25 115:6,9,16
115:21 116:2,13
116:19,22 117:2,8
117:12,20,25
118:2,8,13 120:12
121:5,12,18
**spilly's** 112:6
**split** 96:8
**splitting** 106:22
**spoke** 121:2
**sponsored** 83:4
**spreadsheet** 64:6
115:5
**spreadsheets** 38:5
38:10 54:14 55:9
55:11 56:8,19,25
57:18 59:5 66:9
112:24 114:19,22
117:5,7 118:16
**squad** 82:25
**ss** 123:1
**standard** 18:17,18
73:21
**start** 28:10 35:19
36:6 46:7 50:16
57:15 64:1 85:1
88:23 116:10
117:10
**started** 21:15
117:13
**starting** 27:7,7
64:13
**starts** 23:3 73:4

**state** 9:4,6,20 10:8
44:7 47:14 82:12
92:4 122:2 123:1
124:9,12
**statement** 18:24
48:21 53:3 75:6
**statements** 17:11
21:6 58:22 60:17
61:1 102:25
**states** 1:1 2:1 7:15
8:18 73:20 77:17
77:23 78:10,17,22
81:7 85:17 91:10
98:6,21,23
**statute** 99:1,4,7,23
100:1
**statutes** 12:23
75:21
**staying** 39:7 44:24
56:14 61:23 81:4
**stenographically**
123:11
**stephen** 4:18 9:9
15:6
**stephenbroome**
4:22
**steps** 32:23 33:8
74:3
**stipulation** 124:20
**stop** 51:22
**stored** 67:20 93:3
102:20
**stores** 111:14
**street** 3:7,15,21
4:5,13,19
**strictly** 48:3
**strike** 103:5 106:4
119:5
**stringent** 73:17
**subject** 30:12,21
59:25 71:6 73:4

73:15 94:11,12,13
94:14 95:4 96:11
97:7,11 119:13
**subjects** 20:15
53:9 59:14 62:7
83:24 87:21 94:8
103:1
**submit** 32:10 52:2
64:25 65:3 67:16
79:1 83:12 84:22
86:21,24 87:6
104:21 114:4
**submitted** 21:24
22:4 32:2,3,14
34:12 62:4,14,20
65:11,12,16 68:12
69:9 81:1 82:13
83:21 84:1,24
87:18,23 90:4
113:16,19
**submitting** 31:13
44:3 68:5 69:22
74:19 75:3 79:2
86:7,12 89:19
113:21,22
**subpoena** 7:9
63:10 65:4,9,21
71:23 72:9 73:16
73:25 74:2,4,8,9
74:18,18,19,22
75:13 76:22 77:3
77:21 78:1,15,20
79:21 80:3,13,21
80:23 81:8 84:5
86:7,12,19,22 87:8
87:11 88:8 100:13
100:14 113:13
**subpoenas** 7:12
43:12,13 44:4
62:5 64:25 65:18
71:21 72:4 75:19

75:22 76:2,19
79:2 80:11 81:6
82:13 83:13,22
84:7,15,21,25 85:2
85:3 87:19 96:21
113:1,5,10,15,18
114:1
**subscribed** 123:20
**subscriber** 63:4
116:17
**suite** 3:21 4:13
**sullivan** 4:11 5:5
**summaries** 112:17
**summarize** 111:1
111:10
**summarized** 112:2
**summarizes** 44:15
**summarizing**
41:24
**summary** 42:3
43:15 47:3 88:14
**summer** 5:4
**supervise** 114:11
**supervising**
113:22 115:1
**supervision** 22:10
123:12
**supervisor** 65:5,7
65:8 82:24,25
83:1 113:12
**supervisor's** 65:9
**support** 111:23
**supreme** 74:12,15
**sure** 16:11 20:4
25:8 30:6 33:6,12
52:13 55:7 61:19
66:23 69:20 71:1
85:8 91:20 93:14
101:17,22 102:11
103:23 111:9
118:1 120:7

[surprised - trained]

**surprised** 53:10
60:9
**surrounding**
12:23 72:19
**suspect** 58:4 66:7
79:11 96:1 97:21
97:22 105:4
**suspect's** 79:14
**suspected** 62:7,7
65:14,19 68:5,13
83:24,24 87:21,21
**suspects** 47:13,14
47:20 48:1 53:9
53:21,23 59:2,7
118:21,25 119:4,5
119:7
**suspicion** 119:19
**svk** 1:6 2:6 8:20
**swat** 29:17 82:18
82:23 83:8,11
**swear** 9:19 114:12

**t**

**t** 126:3,3
**tab** 76:8
**table** 25:5
**take** 8:13 11:14,16
11:17,25 14:12,15
21:11 32:23 33:8
43:23,23 44:13
45:12 46:4 48:22
66:21 72:19 90:14
119:9
**taken** 2:14 8:16
11:20 12:8 123:7
**talk** 11:10 26:1
49:12 85:9
**talking** 70:18
**tampa** 1:16 2:16
3:8 8:1 28:20 29:7
29:18,24

**target** 68:23 69:15
70:7,12,14,16,18
70:21 89:12
117:18
**targeting** 74:20
75:1 93:12,19
**targets** 59:14
115:14,18 116:10
**team** 27:21,22
28:4,7,8,10,11,13
28:14,17,18,19
29:4,17 82:18,24
83:8,11
**technically** 95:2
112:10
**technique** 105:2
**technology** 8:22
22:12 31:8,13
**telephone** 75:14
**tell** 11:21 58:5
71:16 98:5
**telling** 58:7
**ten** 48:23 49:1
89:25 90:14 114:9
**tenure** 28:18
**terms** 63:7 116:10
**terrorism** 31:4
**testified** 111:16
114:18 116:9
**testify** 11:25 12:9
12:10
**testifying** 12:3
19:2 109:5 111:18
112:22 116:11
121:8
**testimony** 109:3,8
109:11 112:5
116:14 121:21
123:6,9,14
**texas** 28:9,20 29:7

**text** 72:14,17
76:16
**thank** 9:17,24
23:16 48:24 49:8
67:6 107:19
121:15,19
**theory** 97:18
**thereof** 123:19
**thing** 26:2 60:18
88:20
**things** 33:25 34:2
73:9 89:15
**think** 16:4 17:4
26:6 33:15,21
36:4 45:14 48:22
50:7 51:3,4,12,14
51:18,21 52:1
57:12,22 78:25
95:9 100:23
101:10 102:3
104:5 105:8,9
106:22 107:18,25
116:9
**third** 24:14 28:24
39:14 41:2 49:21
49:25
**thoroughly** 15:22
**thought** 17:3
60:10
**thoughts** 49:14
**threat** 78:9,16,21
**three** 21:14 29:13
44:1 59:9,10 60:5
60:7,8,12,25 80:2
110:19 114:8
118:25 119:4,7
**tied** 39:16
**time** 2:17,17 8:6,6
9:4 13:15 15:23
16:1,4 18:25
19:12,16 20:22

21:1,7,11 29:3,6
29:17 56:16 59:12
59:16 60:18 62:15
65:6,16 70:1
72:19 79:24 80:1
81:11 82:18,23
84:14 89:17 94:9
96:9,25 97:1
105:11 107:17
121:2,24 123:7,8
123:10 124:10,18
124:24 125:7
**timely** 98:24
**times** 19:13 54:4
54:17,19 65:21
79:5,8,12,15 90:3
90:6,11 96:23
**timmons** 5:4 9:10
**title** 24:12
**titled** 41:17
**today** 9:9 10:7,10
11:22 12:4,6,11
19:12 99:20
109:12 118:24
**today's** 8:7 121:21
**told** 53:10,24
58:20 59:3 60:1
70:16 96:2 118:25
**toll** 75:14
**tool** 104:24
**top** 13:4 99:16
114:9
**total** 13:9,24 19:5
21:1 29:22,24
30:1 121:22
**touches** 30:25
**trade** 73:13
**trafficking** 27:8
27:13
**trained** 104:15

Veritext Legal Solutions
866 299-5127

[training - website]

**training** 23:4 24:6
29:1,4 45:1 91:3
91:11,24
**trainings** 23:18
25:2
**transcribed**
123:12
**transcript** 124:6,8
124:10,13,13,21
125:2,2
**transfer** 83:1
**transitioned** 82:16
**transparency** 38:6
38:11 81:5,17
**transposed** 82:6
**trial** 19:6
**trouble** 11:9
**true** 101:4 122:3
123:13
**trujillo** 1:5 2:5
**truth** 9:21,22,22
11:21
**truthfully** 12:3
**trying** 72:21 96:19
98:8 119:16,18,22
**turn** 67:14 69:4
82:9 90:24 92:2
98:11
**turnaround** 66:21
**turned** 10:19
**turning** 71:20 88:9
**twice** 76:11 96:24
**two** 13:11 28:3
57:25 77:10 96:15
96:17 110:19
**type** 63:9 86:25
92:11
**types** 99:6
**typically** 18:19
32:25 33:4,8,24
64:4 65:8 67:7

89:4 98:20

**u**

**unclear** 92:5,8
**uncover** 89:9
**underneath** 22:9
41:10 42:21
**understand** 11:5
11:21,24 59:13
73:8,10 105:17
**understanding**
105:24 106:6,9,10
106:11 110:7
115:25 116:5
**unique** 69:9,13,24
70:6 94:12
**uniquely** 96:6,13
**unit** 8:15 82:17
**united** 1:1 2:1 7:14
8:18 73:19 77:17
77:23 78:10,16,22
85:17 98:6,21,23
**unregistered**
77:14,15,22 78:3,4
**uploaded** 76:11
108:8
**url** 94:10
**urls** 69:9,13,24
70:6 94:12,14
95:11
**urquhart** 4:11 5:5
**usc** 75:18 76:17,21
77:20 78:14 99:15
**usca** 7:13,17 76:2
99:11
**use** 7:8 33:19 72:8
77:20 86:18 92:13
95:7 96:16 104:24
115:3
**user** 31:14 38:6
54:3,5,10,16,18,19
57:4,9 59:6 64:16

64:17 66:12,18
68:18 86:14,18
92:13 94:3,4
95:17 96:7 98:6
117:15 120:5,8
**users** 53:7 59:1
61:9,15 92:16,18
92:20,21 116:6
120:1
**uses** 80:3
**usually** 64:1

**v**

**v** 73:20
**vague** 112:12
116:2
**values** 41:21
**various** 11:14
12:11 110:12,22
112:3
**vary** 79:17,21
**vast** 96:25,25 97:8
97:8
**verifiable** 63:7
**veritext** 8:23,25
10:14 121:23
124:7,9,11
**verizon** 32:21
**version** 7:20 108:6
**versus** 8:17 61:22
108:20
**victim** 71:6
**video** 1:14 2:14
8:12,15
**videographer** 5:6
8:5,24 49:2,5
66:25 67:3 85:10
85:13 90:17,20
107:11,14 118:3,6
121:20
**view** 119:18

**viewing** 116:6,7
**violated** 86:15
**virtual** 8:22
**virtually** 8:9
**vitae** 7:6 21:20
22:3
**volunteered** 60:4
119:7
**vs** 1:8 2:8 124:4
126:1

**w**

**w** 4:12
**wait** 11:10
**waited** 82:25
**waived** 124:23,23
**waiving** 124:20
**want** 33:14 46:6
88:21 90:1 103:25
105:1
**wants** 67:9
**warrant** 73:19
80:24 88:11 89:6
90:7 100:14
**warrants** 43:13
48:10 83:22 87:19
88:10 89:18,21
90:4 114:3,4,9
**washington** 4:14
**water** 45:15 46:7
66:22
**way** 24:25 25:4
32:6,20 57:3,7
58:5,8,24 63:23
70:13 71:17 81:18
96:16 102:11,17
119:15 123:18
**we've** 26:6 45:14
**web** 32:22
**website** 7:16 58:16
58:18 64:8 85:18
94:19

Veritext Legal Solutions
866 299-5127

[websites - zoom]

**websites** 64:12,13
88:3 117:19
**wednesday** 1:17
2:18 6:4 8:1
**weeks** 13:12,13
21:14
**weisbrot's** 15:6
**welcome** 49:7 67:5
90:22 118:8
**went** 64:4,7
**whereof** 123:20
**wholly** 26:11
**wi** 92:22
**wife** 25:14,21
26:10,15 27:1
**william** 1:4 2:4
**willing** 73:10
**window** 10:15
**wished** 101:12
**witness** 6:6,12
8:11 9:23 18:23
19:8,11 23:16
26:13,15 33:2,4,24
36:16,22 37:15,21
41:9 42:3,9 43:4
44:11,23 45:17
46:3,16 47:1,11
48:9,20 50:12
51:2,9,18,25 52:19
53:19 54:14 55:4
55:15,20,25 56:5
56:12,22 57:12
58:4,6,13 61:12,19
66:5,17 67:12
69:18 70:11 71:3
71:11,12 72:20
75:6 76:12 79:5,8
80:6,10 82:4
84:10 87:5 88:7
93:25 96:1 99:25
100:5,22 101:7,21

102:3,25 105:8
108:11 109:15,25
110:4,10,17 111:7
111:21 112:8,13
112:21 113:24
114:7,14 115:1,7
115:10,17,22
116:3,15,23 117:3
117:9,13,21
121:13 123:8,9,20
124:13,16 125:2,5
126:24
**witnesses** 58:20,22
60:1,16,25 61:6
**wondering** 33:9
**word** 76:9
**work** 17:16,19
23:13 26:11 29:3
31:2,12,22,24 32:8
41:13 84:16 99:22
**worked** 12:21
17:12 19:19 23:19
25:19 26:22 30:22
31:3,8,25,25 90:5
**working** 19:25
20:9 21:13,15
25:9,21 26:4,4,17
26:19 27:2 28:8
97:19 101:13
**works** 25:13
**written** 15:1
**wrong** 50:7,13

**x**

**x** 6:1 125:1

**y**

**yahoo** 31:19 94:22
**yanchunis** 3:6
9:13 13:2 20:11
21:10 26:25

**yeah** 25:7 33:7
42:3 57:12 89:4
90:15 91:25 95:13
97:22 101:21
108:13 118:1
121:18
**year** 18:22 82:23
**years** 23:22,25
24:4,7 28:16 62:3
83:20 87:17 97:19
100:11 119:4,8
**yep** 82:11
**ygr** 1:6 2:6 8:20

**z**

**zervas** 14:4 17:9
17:11 34:12 35:3
35:6,12,22 36:13
36:18 37:5,13,17
39:11 40:20,21,23
41:12,17,19,25
44:16,19 45:3
49:20 58:14,19
91:5,16,22 111:12
**zoom** 1:15 2:15

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.