# NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS EXPERT BRUCE SCHNEIER

# Redacted Version Sought to be Sealed

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jomaire Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Counsel for Defendant Google LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CHASOM BROWN, *et al*, individually and on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>GOOGLE LLC,<br><br>     Defendant. | Case No. 4:20-cv-03664-YGR-SVK<br><br>**NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS EXPERT BRUCE SCHNEIER**<br><br>The Honorable Yvonne Gonzalez-Rogers<br>Courtroom 1 - 4th Floor<br>Date: September 20, 2022<br>Time: 2:00 p.m. |

**TABLE OF CONTENTS**

Page

I.     PRELIMINARY STATEMENT ...........................................................................2

II.    ISSUE TO BE DECIDED...............................................................................3

III.   LEGAL STANDARD ....................................................................................4

IV.   ARGUMENT.................................................................................................4

      A.      Opening Opinions 1-6 Regarding "Data and Privacy" Generally Should Be Excluded Because They Do Not Speak Directly to a Disputed Issue ......................5

      B.      Schneier Is Not Qualified to Opine on Consumer Expectations and His Methods For Doing So Are Not Reliable.................................................................8

      C.      Opening Opinions 7-14 Are Biased Summaries of Google Documents, Testimony, and Disclosures and Merely Regurgitate Attorney Argument............14

      D.      Schneier's Opinions About Hypothetical Risks Are Not Relevant.......................15

      E.      Schneier's Irrelevant Opinions Are Highly Prejudicial.........................................16

      F.      Schneier is Not Qualified to Opine on Google's Intent, Google Services, or Google's Receipt of Data Through Those Services.................................................18

V.     CONCLUSION ............................................................................................21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Al Otro Lado v. Mayorkas*,
2021 WL 3929673 (S.D. Cal. Sept. 2, 2021) ................................................................3, 15

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998) .............................................................................. 8

*Claar v. Burlington Northern. R. Co.*,
29 F.3d 499 (9th Cir. 1994) ................................................................................. 8

*Conroy v. Ridge Tool Co.*,
2022 WL 911138 (N.D. Cal. Feb. 3, 2022) ........................................................8, 18

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) .............................................................................. 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...........................................................................................passim

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .............................................................................. 5

*DZ Reserve v. Meta Platforms, Inc.*,
2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ..................................................... 15

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ..................................................13, 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .............................................................................. 4

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................................... 13

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .................................................... 9

*I.C. v. Zynga, Inc.*,
2022 WL 2252636 (N.D. Cal. Apr. 29, 2022) .................................................... 15

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................. 4

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*, 141 S. Ct.
1684 (2021) ......................................................................................................... 15

*In re Seagate Tech. LLC*,
326 F.R.D. 223 (N.D. Cal. 2018) ....................................................................... 14

*Jack v. Borg-Warner Morse TEC LLC*,
  2018 WL 3819027 (W.D. Wash. Aug. 10, 2018) ......................................................8, 18

*Jones v. United States*,
  933 F. Supp. 894 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997)................................ 5

*Lanard Toys Ltd. v. Anker Play Prod., LLC*,
  2020 WL 6873647 (C.D. Cal. Nov. 12, 2020) ........................................................ 20

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
  2014 WL 3417941 (N.D. Cal. July 11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016).......... 14

*Numatics, Inc. v. Balluff, Inc.*,
  66 F. Supp. 3d 934 (E.D. Mich. 2014) ................................................................. 14

*Open Text S.A. v. Box, Inc.*,
  2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ............................................................ 9

*Oracle Am., Inc. v. Google Inc.*,
  798 F. Supp. 2d 1111 (N.D. Cal. 2011)................................................................ 4

*Owners Ins. Co. v. 11380 E. Smith Rd., LLC*
  2021 WL 1015982, at *4 (D. Colo. Mar. 17, 2021) ................................................. 15

*Savings Corcoran v. CVS Pharmacy, Inc.*,
  2021 WL 633809 (N.D. Cal. Feb. 18, 2021)........................................................ 18

*Senne v. Kansas City Royals Baseball Corp.*,
  2022 WL 783941 (N.D. Cal. Mar. 15, 2022)......................................................... 5

*Sinclair Wyo. Ref. Co. v. A&B Builders, Ltd.*,
  2018 WL 4698781 (D. Wyo. Sept. 11, 2018) ........................................................ 15

*Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*,
  927 F. Supp. 2d 1069 (D. Or. 2013)................................................................. 20

*Snyder v. Bank of Am., N.A.*,
  2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ....................................................... 20

*Testone v. Barlean's Organic Oils, LLC*,
  2021 WL 4438391 (S.D. Cal. Sept. 28, 2021) ........................................................ 4

*United States v. Singh*,
  2017 WL 4700042 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v. Sharma*,
  851 F. App'x 708 (9th Cir. 2021) ..................................................................... 15

*Warner Bros. Ent. v. Glob. Asylum, Inc.*,
  544 F. App'x 683 (9th Cir. 2013), *aff'd sub nom. Warner Bros. Ent. v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013)......................................................... 18

*Wells v. Hi Country Auto Grp.*,
  2013 WL 10974254 (D.N.M. Oct. 24, 2013) ....................................................... 15

**Rules and Regulations**

Fed. R. Evid.403 ........................................................................................... 1, 3, 4, 16

Fed. R. Evid.404 ........................................................................................... 18

Fed. R. Evid.702 ...........................................................................................passim

**Notice of Motion and Motion**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE, on September 20, 2022 at 2:00 p.m. or as soon thereafter as this motion may be heard in the above-entitled Court, before the Honorable Yvonne Gonzalez Rogers of the United States District Court, Northern District of California at the Oakland Courthouse, Courtroom 1 – 4th Floor, 1301 Clay Street, Oakland, CA 94612, Defendant Google LLC ("Google") will and hereby does move the Court to exclude the opinions of Plaintiffs' Expert Bruce Schneier. Google's Motion is made pursuant to Federal Rules of Evidence 403 and 702, Civil Local Rule 7, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Google's Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Stephen Broome and accompanying exhibits, all matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and other written or oral argument that Google may present to the Court.

**ISSUES TO BE DECIDED**

Whether Schneier's opinions should be excluded in their entirety under Federal Rules of Evidence 702 and 403 and the standards articulated in *Daubert*.

**RELIEF REQUESTED**

Google requests that the Court exclude the opinions of Schneier as set forth in his April 15, 2022 Expert Report of Bruce Schneier, the June 7, 2022 Rebuttal Expert Report of Bruce Schneier, and in his deposition testimony.

Dated:  August 5, 2022

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro

*Attorneys for Defendant Google*

# I.     <u>PRELIMINARY STATEMENT</u>

Plaintiffs' proffered expert reports from Bruce Schneier—asserting 14 affirmative opinions and six rebuttal opinions—should be stricken in their entirety because they do not meet the standards for expert opinion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*") and its progeny.

*First*, in Opening Opinions 1-6, Schneier offers exceedingly broad and far-reaching opinions about the concepts of "data" and "privacy" generally, based primarily on dozens of paragraphs that he admittedly copied verbatim from a book he published seven years ago. These opinions do not "fit" the specific issues in this case, are presented in inflammatory and prejudicial terms, and are certain to leave the jury confused and wondering how the opinions relate to Plaintiffs' claims.  For example, Schneier opines that "[s]urveillance…makes people feel like prey, just as it makes the surveillors behave like predators." Dkt. 608-7 ("Schneier Opening Rep.") ¶ 29.  Such irrelevant and prejudicial testimony must be excluded.

*Second*, in Opening Opinions 10-13 and Rebuttal Opinions 3 and 6, Schneier offers opinions on the purported expectations, motivations, and misconceptions of "reasonable users" supported by nothing but his own say-so. For example, in his Opening Report, Schneier opines that "[u]sers who choose private browsing modes…reasonably expect to avoid the collection and retention of personal data," *id*. ¶ 261, and that "no reasonable user would interpret Google's disclosures" in the manner Google contends they should be interpreted, *id*. ¶ 307. In his Rebuttal Report, he opines that Google's use of the term "private" to describe Incognito "has exacerbated users' misconceptions." Dkt. 608-6 ("Schneier Rebuttal Rep.") ¶ 1.F.  Yet, Schneier admits he has no basis for these opinions because he conducted no survey or consumer/user research for this case (and in fact has never conducted a survey).  Schneier claims these opinions are based on his own experience as a "privacy expert," but he was unable to  articulate any standard against  which his conclusions could be evaluated. Inexplicably, he claimed in deposition that he actually is not opining on reasonable user expectations and misconceptions, despite the fact that his report does so explicitly and repeatedly.

*Third*, in Opening Opinions 8-12 and Rebuttal Opinion 1, Schneier merely provides summaries of internal or public-facing Google documents and parrots the  arguments Plaintiffs'

attorneys have made throughout the case—akin to a closing argument.  Courts hold that such summaries of the evidence are inadmissible hearsay, not expert opinion.  *See, e.g., Al Otro Lado v. Mayorkas*, 2021 WL 3929673, at *3 (S.D. Cal. Sept. 2, 2021).

*Fourth*, in Opening Opinions 6 and 9 and Rebuttal Opinion 2, Schneier opines on the *risks* associated with a hypothetical parade of horribles that might occur if, for example, Google were to override its policies and protocols and link private browsing data with users' identities, or if a rogue employee or the government were to gain access to and misuse the data, or if there were a data breach. Plainly, Google's theoretical *capability* of linking PBM data to users' identities—despite numerous measures in place to prevent exactly that—is not relevant to its potential liability in this case. Nor is there any relevance to Schneier's opinions about hypothetical risks that are based on pure conjecture.

*Fifth*, many of Schneier's opinions are not only completely irrelevant but so highly prejudicial they can be excluded on that basis alone.  For example, Schneier opines that  "[t]he rise in targeted advertising has enabled an increase in the ability of hostile nations to target American citizens for purposes of political manipulation," Schneier Opening Rep. ¶ 100, and that there allegedly are "numerous instances of sexual harassment by managers" at Google, *id*. ¶ 127, without explaining how these alleged events have anything to do with Plaintiffs' claims.  They obviously have nothing to do with the claims, and are designed solely to inflame the jury.

*Finally*, in Opening Opinions 4, 7, 8, 11, and 14, and Rebuttal Opinions 4 and 5, Schneier offers opinions on topics on which he clearly lacks expertise, including the value of data, Google's business model and market strategy, online advertising, and Google's purported "motivations" for various business practices. Because Schneier admittedly is not an expert in economics, online advertising, marketing, damages, or Google's intent, he is not qualified to render these opinions and they are inherently unreliable.

## II.    ISSUE TO BE DECIDED

Whether Schneier's opinions should be excluded in their entirety as irrelevant and unreliable under Federal Rules of Evidence 702 and 403 and the standards articulated in *Daubert*.

III.   **LEGAL STANDARD**

Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert* and its progeny. Expert testimony is admissible if, and only if, "(1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1114 (N.D. Cal. 2011). A court's gate-keeping function under *Daubert* is equally necessary in assessing a motion for class certification as it is before a trial. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding that same evaluation of the expert's opinion takes place at the class certification stage as it would before trial); *Testone v. Barlean's Organic Oils*, LLC, 2021 WL 4438391, at *2 (S.D. Cal. Sept. 28, 2021) ("expert evidence offered at the class certification stage must meet the standard of relevance and reliability articulated in *Daubert*"). "On a motion for class certification,...the testimony must be relevant in assessing 'whether there was a common pattern and practice that could affect the class as a whole.'" *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 943 (C.D. Cal. 2015) (citation omitted).

Federal Rule of Evidence 403, which bars evidence that is prejudicial, confusing, or misleading, also guides the Court in its gatekeeping function under Rule 702 and *Daubert*. Indeed, because expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it … the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. "It is the proponent of the expert who has the burden of proving admissibility." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (internal quotations and citations omitted).

IV.   **ARGUMENT**

Plaintiffs retained Schneier to "render opinions concerning issues of privacy and the alleged conduct." Schneier Opening Rep. ¶ 2. He submitted an expert report on April 15, 2022 containing 14 opinions separated into three general categories: (1) Data and Privacy Topics (Opinions 1-6); (2) Google-Specific Topics (Opinions 7-10); and (3) Private Browsing and Incognito Topics (Opinions

11-14). *Id.* p. 2 & ¶ 1. Schneier also submitted a Rebuttal Report on June 7, 2021 containing Schneier's six opinions "concerning" the Expert Report of Professor Georgios Zervas. Schneier Rebuttal Rep. ¶¶ 1, 4. These opinions should be excluded for the reasons that follow.

**A.   Opening Opinions 1-6 Regarding "Data and Privacy" Generally Should Be Excluded Because They Do Not Speak Directly to a Disputed Issue**

Schneier's Opening Opinions 1-6 about "Data and Privacy Topics," Schneier Opening Rep. ¶¶ 1.A-1.C, 21-155, must be excluded because they fail to "speak clearly and directly to an issue in dispute in the case." *Daubert v. Merrell Dow Pharms.*, Inc., 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert* II"). His general opinions on disparate topics relating to "data" and "privacy" generally,[1] cribbed from a book he wrote seven years ago,[2] do not "fit" the issues here. *Id.* at 1315 (expert testimony meets "the 'fit' requirement" if it "logically advances a material aspect of the proposing party's case"); *see also Senne v. Kansas City Royals Baseball Corp.*, 2022 WL 783941, at *9 (N.D. Cal. Mar. 15, 2022) (the fit requirement "is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, 'reflecting the special dangers inherent in scientific expert testimony'" (quoting *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997))).

*First*, Opening Opinions 1, 2, and 3 generally describe the concepts of privacy, internet tracking, and the data generated when people use the Internet. Schneier Opening Rep. ¶¶ 1.A., 21-43 (Opinion 1), ¶¶ 1.B. 44-64 (Opinion 2), ¶¶ 1.C, 65-102 (Opinion 3). Nowhere in Schneier's hundred page report does he explain how his prior writings on these broad topics advance any aspect

---

[1] For example, Schneier generally opines that (1) "privacy…is important," (2) "the rise of the Internet" has "created greater threats to privacy online," (3) "privacy concerns are justified by the volume and scope of data generated, collected, and used when people access the Internet [regardless of browser or mode]," (4) unspecified "personal data about Internet users and their browsing activities is highly valuable," (5) "protection of privacy requires disclosures…of what is collected in the first place and how long it is retained" and (6) "expectations about sharing information are easily manipulated by commercial actors." Schneier Opening Rep. ¶¶ 1.A.-1.F.

[2] Broome Decl. Ex. 1 ("Schneier Tr.") 17:2-9 (admitting copying verbatim); *compare* Schneier Opening Rep. ¶¶ 28-31, 33-38, 40-41, 48-49, 51-53, 59, 61, 65-75, 77-78, 88-90, 92-93, 95, 107-114, 123, 125, 131-133, 135-136, 143-147, 152, and 154, *with* Broome Decl. Ex. 2 (*Data and Goliath*) at pp. 9, 11, 15-18, 20-21, 35-36, 40, 42-43, 46, 68-71, 76, 80-81, 84, 88-89, 92-93, 136-37, 140-41, 144-45, 165, 169.

of Plaintiffs' case.[3]   They have no specific application whatsoever, and Schneier's effort to downplay as mere "background," Schneier Tr. at 18:8-11, what his report characterizes as expert "opinion," is unavailing, particularly given how prejudicial these opinions would be to Google and how confusing they would be for the jury.

Schneier opines, for example, that "US citizens have been harmed by the vulnerability of personal information stored online" through "[m]ajor data leaks." Schneier Opening Rep. ¶ 62. But this case is not about data leaks. Further, Schneier opines about "personally identifying information" such as "name, address, Social Security number, passport or driver's license number, banking and credit card information" and "first and last name, address, work telephone number, email address, home telephone number, and general educational credentials." *Id*. ¶¶ 79-80. However, none of that data is at issue here. TAC ¶ 63 (data at issue includes GET request, IP address, information identifying the users' browser software, User-ID, geolocation, and cookies). Nor is there any relevance to Schneier's opinion that "[i]t would be incredibly dangerous to live in a world without privacy where … everything a citizen said and did could be stored and brought forward as evidence against them in the future, or made available to companies that wished to construct cradle-to-grave dossiers on individual citizens." Schneier Opening Rep. ¶ 34. That may well be, but this hypothetical "world without privacy" bears no connection to the facts of this case, where (1) the data at issue is not linked to individual users, but to cookies automatically deleted at the end of the private browsing session, and (2) the so-called "profiles" are not "cradle-to-grave" but, as Schneier admitted in deposition, might be limited to a single website. Schneier Tr. 140:13-15.  Schneier should not be permitted to opine on such broad topics that are not tied to the issues in this case.

*Second*, in Opening Opinion 4, Schneier offers opinions about the value of "data" generally. Schneier Opening Rep. ¶¶ 1.D (opining about revenues of "commercial actors and users" generally),

---

[3]   In the rare instance where Schneier attempts to tie certain of these "background opinions" to the specific issues in the case—*e.g.*, his opinion that consumers have responded to the "[g]rowing awareness of the amount of data produced by Internet users and collected by companies such as Google" by "seek[ing] refuge in the promise and expectation of 'going incognito' online"—he admitted he was not aware of *any* research or evidence that actually supports the connection. Schneier Opening Rep. ¶ 78; Schneier Tr. at 125:23-126:3.

103-119 (opining about "Corporate Revenue"). Specifically, he opines that Google and Facebook earned ████ of dollars in "digital advertising revenue" and therefore these "online companies are highly motivated to use their users' data to generate ████." *Id*. ¶ 103. It is highly prejudicial to imply (based solely on Schneier's *ipse dixit*) that because Google and Facebook earn ████ from digital advertising, Google necessarily engaged in misconduct here.

Additionally, Schneier opines in this section about revenues earned by a company called Datium, and how individuals value their data about car shopping habits less than the car dealerships who pay for aggregated data, without explaining how that is even remotely relevant. *Id*. ¶¶ 104-06. He similarly opines about "modern day data brokers like Acxiom," who buy personal data from private businesses, *id*. ¶¶ 112-114, a process, which again, is not at issue in this case. It would only confuse the jury for Schneier to be permitted to opine about the value to non-parties of data that is not at issue. Indeed, the fact that, generally speaking, certain types of data have value to certain types of entities is not an issue in dispute.

As another example, Schneier opines about the "four basic surveillance streams" that existed "[b]efore the Internet." *Id*. ¶ 109-111. It is confusing and irrelevant in a case about data collection on the Internet since 2016 for Schneier to offer opinions about types of "surveillance" that existed decades ago, before the Internet even existed.

*Third*, in Opening Opinion 5, Schneier states that "effective protection of privacy requires disclosures and controls not just in terms of how data is used but of what is collected in the first place and how long it is retained," and then goes on to explain his interpretation—as a non-lawyer—of various domestic privacy laws (*e.g*., CCPA), foreign privacy laws (*e.g*., GDPR), and international privacy frameworks (*e.g*., OECD) that generally address data collection and use. *Id*. ¶¶ 1.E, 120-130.  But none of those laws or frameworks is at issue in this case, and Schneier does not purport to apply them, or explain their relevance, to the facts of the case. *See* Schneier Tr. at 148:21-149:5. The "fit" between these opinions and the issues in the case is entirely lacking, and the potential for jury confusion abounds.

*Fourth*, in Opening Opinion 6, Schneier opines that "expectations about sharing information are easily manipulated by commercial actors with an economic interest in fabricating the appearance

of consent." Schneier Opening Rep. ¶¶ 1.F, 131-155. But this is irrelevant because it addresses "commercial actors" generally, and says nothing about Google or the specific disclosures at issue here. Plaintiffs cannot be permitted to attempt to prove that *Google's* disclosures mislead users with purported expert testimony that unidentified "commercial actors" have an incentive to "fabricate the appearance of consent."  Moreover, in the limited instance where Schneier tries to tie this general concept to Google, he does so by pointing to a ruling of France's data protection authority, the Commission nationale de l'informatique et des libertés ("CNIL"), about cookie pop-ups displayed on google.fr and youtube.com when accessed from France, purportedly in violation of the French Data Protection Act. *Id*. ¶ 142. But this case is, by class definition, solely about visits to *non*-Google websites by *U.S.*-based users.  Dkt. 608-3 (Pl.'s Mot. for Class Certification) at 1. Similarly, Schneier discusses a study about Google's default settings and its GDPR pop-up, neither of which have any relevance here. Schneier Opening Rep. ¶¶ 250-254.

In sum, Schneier's opinions about what he calls "general data and privacy concepts," Schneier Tr. at 18:8-11, have no direct relevance to the specific issues in the case; they would be extremely prejudicial to Google; and they certainly would confuse the jury.  Accordingly,  Opening Opinions 1-6, including Paragraphs 1.A-1.C and 21-155, should be excluded.

**B.    Schneier Is Not Qualified to Opine on Consumer Expectations and His Methods For Doing So Are Not Reliable**

"Federal Rule of Evidence 702 permits expert opinion testimony by a witness who is qualified and offers a relevant and reliable opinion." *Conroy v. Ridge Tool Co*., 2022 WL 911138, at *6 (N.D. Cal. Feb. 3, 2022). The Federal Rules of Evidence require an expert to be "qualified...by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This means that "an expert must be qualified in the field they will testify about." *Jack v. Borg-Warner Morse TEC LLC*,  2018 WL 3819027, at *18 (W.D. Wash. Aug. 10, 2018).  For an opinion to be reliable, it must "identify [an] objective source" or "follow[] a scientific method embraced by at least some other experts in the field." *See Cabrera v. Cordis Corp*., 134 F.3d 1418, 1423 (9th Cir. 1998); *see also Claar v. Burlington N. R. Co*., 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion of expert affidavits where conclusions were not "based on scientific knowledge," meaning they were not supported by

"scientific methods and procedures," but rather by "mere subjective beliefs or unsupported speculation"); *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (exclusion is required where "the link, if any, between those inputs and [the expert's conclusions] is written in invisible ink" and expert cites only to "her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination"); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *6 (N.D. Cal. Apr. 16, 2014) ("Apple cannot cross-examine Mr. Dansky on his assertions, all of which fundamentally reduce to taking his opinion based on 30 years of experience for granted").

Here, Schneier offers *dozens* of opinions about the purported expectations and understandings of "reasonable users" based on the term "private browsing" and Google's disclosures about Incognito mode. However, he fails to support those opinions with any survey or other case-specific research on actual private browsing mode users. Instead, he relies on a purported industry "standard" that he admitted amounts to little more than "I know it when I see it." *See, e.g.*, Schneier Tr. at 84:15-23, 146:14-147:11, 147:12-148:2, 179:16-23.

Schneier has an MS in Computer Science and a BS in Physics, and currently calls himself a "security technologist." Schneier Opening Rep. ¶¶ 6-7. He also teaches classes as an Adjunct Lecturer on "cybersecurity policy." *Id*. ¶ 8. His areas of expertise include cryptography, computer security, and Internet security. *Id*. ¶ 11. He has no experience with consumer surveys, is not an expert in iconography, and has never been qualified as an expert in marketing or online advertising. Schneier Tr. at 20:20-22:2; 38:1-17; 93:17-23; 166:18-19.

Nevertheless, throughout Schneier's Opening Report, and particularly in Opening Opinions 10 through 13, Schneier repeatedly opines on the purported reasonable assumptions and expectations of browser users, including that:

- "Users who choose private browsing modes not only seek to shield their activity from the prying eyes of friends, family, and coworkers; they also ***reasonably expect*** to avoid the collection and retention of personal data" (Schneier Opening Rep. ¶ 261 (emphasis added));

- "Pairing the term 'incognito' with an icon of a faceless person in disguise suggests ***that a user*** in Incognito mode cannot be seen, traced, or tracked while browsing online" (*id*. ¶ 283 (emphasis added));

- "Google's disclosures give rise to a ***reasonable expectation*** that Google will not collect users' private browsing information" (*id*. ¶ 285 (emphasis added));

- The Incognito Screen "gives rise to a ***reasonable expectation*** that the user's Incognito browsing history will not be collected or saved by Google" (*id*. ¶ 296 (emphasis added));

- "Google's use of the term 'private' to describe Chrome's Incognito mode gives rise to a ***reasonable expectation*** not just that a user's Incognito browsing will not be discoverable by other users of a device, but also that the browsing will not be collected and surveilled by Google" (*id*. ¶ 297 (emphasis added));

- The Incognito Screen "would lead a ***reasonable user to think*** it prevents Google from storing their browsing data" (*id*. ¶ 298 (emphasis added));

- "Using 'incognito' to characterize a mode of web browsing would lead a ***reasonable user to assume*** that by using it, they would remain unidentifiable and untracked" (*id*. ¶ 300 (emphasis added));

- "The word 'privately' in this context would be ***understood by a reasonable consumer to mean*** 'freedom from unwelcome observation,' including observation by Google" (*id*. ¶ 301 (emphasis added));

- "***Reasonable users*** conducting purportedly 'private' online investigations while in Incognito mode would be surprised and dismayed to learn that the 'Spy Guy' is always being tailed by Google itself" (*id*. ¶ 302 (emphasis added));

- "The Splash Screen's omission of 'Google' from the list of entities to whom 'activity might still be visible' gives rise to a ***reasonable expectation*** that Google will not collect Incognito browsing activity" (*id*. ¶ 306 (emphasis added));

- "***[N]o reasonable user would interpret*** Google's disclosures as permitting the collection of their private browsing information" (*id*. ¶ 307 (emphasis added)).[4]

---

[4]   *See also id*. ¶ 2 (opining on "reasonable privacy expectations"); ¶ 63 (data leaks "provide important context for the ***expectations of users*** of private browsing modes"); ¶ 77 (***"[U]sers are persuaded*** to employ browsing modes that are falsely described as 'private browsing'"); ¶ 78 ("***users seek refuge*** in the promise and expectation of 'going incognito' online"); ¶ 246 ("Google's efforts to feature 'control' as one of the core principles for Google…creates certain ***user expectations***"); ¶ 248 (making features available to signed-in users such as My Activity and Google Takeout "reinforces the ***reasonable assumption*** that Google does not collect such data when users are not logged in and browsing in Incognito mode"); ¶ 286 ("Public statements by Google's own executives ***reinforce the perception*** that Chrome Incognito mode provides privacy not only from unspecified others but from Google itself. … A ***Chrome user would reasonably conclude*** that" private browsing provides complete privacy from Google); "no one' would include Google"); ¶ 316 ("[I]t is ***reasonable that users would expect*** that their choice of Incognito mode would protect browsing activity that they regarded as confidential from being discerned by anyone, including

Similarly in his Rebuttal Report, he opines that:

- *"[O]rdinary Internet users do not know* about, do not know how to use, or do not know that it might be advisable to use these 'other settings and available features' during private browsing" (Schneier Rebuttal Rep. ¶ 1.C. (emphasis added));

- "Google's persistence in referring to Incognito mode as a 'private' browsing (both before and throughout the class period) mode has exacerbated *users' misconceptions*…" (*id*. ¶ 1.F. (emphasis added));

- "Google's characterization of Incognito as a 'private browsing' mode creates the impression (and therefore would lead *a reasonable user to assume*, consistent with the testimony by Plaintiffs) that it would not be necessary [to enable cookie blocking], especially in the absence of a visible control for cookie blocking on the Incognito Splash Screen" (*id*. ¶ 63 (emphasis added));

- "Google's characterization of Incognito as a 'private browsing' mode would lead *a reasonable user to assume* that it would not be necessary [to enable JavaScript blocking], especially in the absence of a visible control for JavaScript blocking on the Incognito Splash Screen (*id*. ¶ 64 (emphasis added));

- "Google's characterization of Incognito as a 'private browsing' mode indicates (and would lead *a reasonable user to assume*) that it would not be necessary [to install the Google Analytics Opt-out Add-on extension], especially in the absence of a visible control for analytics blocking on the Incognito Splash Screen" (*id*. ¶ 70 (emphasis added));

- "Google's characterization of Incognito as a 'private browsing' mode would lead a *reasonable user to assume* that it would not be necessary [to use ad blockers], especially in the absence of any explicit recommendation by Google to users who have expressed their desire for privacy by choosing Incognito mode" (*id*. ¶ 75 (emphasis added));

- "Google's inaccurate disclosures and assurances regarding private browsing would lead *reasonable users to conclude* that additional privacy-protecting measures would be unnecessary during private browsing" (*id*. ¶ 79 (emphasis added));

- "[T]he 'Splash Screen's statement that "Chrome won't save [y]our browsing history" gives rise to a *reasonable expectation* that the user's Incognito browsing history will not be collected or saved by Google.'" (*id*. ¶ 101 (emphasis added)); and

---

Google"); ¶ 317 ("Certainly, the word 'private' would not predispose a *user to assume* that Google continues to peer over their shoulders…"); ¶ 356 ("*A reasonable user would interpret* this feature to mean that switching it 'on' would prevent Google from tracking users across the web, since Google cookies would presumably be third-party cookies when used on non-Google websites"). Schneier also opines that what "users want" is "to Browse Privately" and "to Avoid Being Tracked." Id. §§ 11.1, 11.2.

- "[T]he Splash Screen's omission of 'Google' from the list of entities to whom 'activity might still be visible' also gives rise to *a reasonable expectation* that Google will not collect private browsing activity" (*id.* ¶ 102 (emphasis added)).

Despite having opined about "reasonable users'" expectations more than two dozen times in his reports, at his deposition, Schneier repeatedly testified that he was not opining "as to *class members'* expectations or understandings or beliefs based on the documentation." Schneier Tr. at 32:16-24. Instead, he claimed that in offering opinions about reasonable users' expectations, he was merely offering his interpretation of "the documentation itself." *Id.*; *see also id.* 81:24-25, 82:2-5, 82:24-83:7, 83:12-84:1, 85:7-22, 86:17-87:8, 95:23-96:6, 125:23-159:4.

In reaching his conclusions, Schneier did not conduct or rely on any consumer surveys (and in fact has never conducted a consumer survey), nor did he do research on actual private browsing mode users' expectations or interpretations of the documentation at issue. *Id.* at 20:20-22:1, 25:25, 26:6-10, 30:10-22, 31:9-10, 31:17-18, 38:7-12, 80:9-13, 85:19-22, 87:3-17, 93:17-23, 159:2-4; *see also* Declaration of On Amir In Support of Google's Opp. to Pls.' Motion for Class Certification, Ex. 3 (Amir Rebuttal Report) ¶¶ 4-13, 28-58.  Instead, as support for these opinions, Schneier testified that "[s]ecurity and privacy experts have…standards of what disclosure looks like, and we know when it's met and when its not met." Schneier Tr. at 84:15-23; *see also id.* at 147:12-22 (describing the standard as "we as experts know this"); *id.* at 179:16-23 (the standard against which he is "evaluating the adequacy of Google's disclosures" is "according to my expertise as a security and privacy expert and the generally accepted practices of our industry"). When asked what that standard was, he vaguely stated "[t]he standard is what we privacy and securities experts take to be the way these things should be disclosed." *Id.* at 146:14-20. When asked if it was an objective standard, Schneier testified that he was "not sure what an example of an objective standard would be in this case." *Id.* at 146:23-25. Schneier acknowledged that he had not "queried any privacy and security experts" on the issue of whether "Google's notice and consent procedures are inadequate"

1   and that "[i]t is not a formal standard."[5] *Id*. at 147:1-11, 147:23-148:2.  He is thus relying solely on

2   his own, subjective view based on nothing more than reading Google's disclosures.

3        "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

4   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*

5   *Co. v. Joiner*, 522 U.S. 136, 137 (1997).  Schneier's lack of an objective or replicable standard

6   renders his opinions unreliable. For example, he opines that the use of the word "control" in Google

7   documents "creates certain user expectations—including that Google respects user choices, and that

8   users have the ability to stop Google's collection, storage, and use of their data." Schneier Opening

9   Rep. ¶ 246. But, at deposition, Schneier admitted that "Google does offer users some control,"

10  including by "providing a browser mode [i.e., Incognito] that prevents the sharing of existing

11  cookies with websites" and "deletes cookies automatically when you close [the browser]," Schneier

12  Tr. at 153:9-155:8, demonstrating that his untested *ipse dixit* about purported reasonable user

13  expectations—which merely parrot Plaintiffs' allegations—wither under even the slightest scrutiny.

14       A recent decision from this District found that similar expert testimony was improper and

15  should be excluded. In *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348

16  (N.D. Cal. Jan. 27, 2022), the plaintiff's expert opined that the defendant's false reporting of data

17  harmed the plaintiff's reputation and that the defendant's use of certain phrases caused confusion.

18  *Id*. at *9. The district court excluded these opinions because "[w]hile not necessarily required, one

19  standard method for gauging the relevant consumer base's reaction to allegedly false statements is

20  conducting market analysis and consumer surveys," but the expert's report "simply summarize[d]

21  evidence already in the record and assert[ed]" a conclusion. *Id*. at *10. Another section of the report

22  similarly "summarize[d] record evidence while making either obvious or conclusory observations

23  about" the defendant's statements. *Id*.   The court found this exercise was "not based on any

24  specialized expertise," but rather "amounts to nothing more than a recitation of [plaintiff's] theory

25  of the case." *Id*.

26  _____

27  [5]  Schneier also purports to base some of his opinions on the results of "readability calculators"
    which purport to "score" the readability of documents. Schneier Opening Rep. ¶¶ 231-242.

28  However, Schneier admits that he has no experience in readability and has only used these
    calculators before to check the readability of his own work.  Schneier Tr. at 152:6-10.

The same is true here, and Schneier's opinions about user expectations, understandings, and interpretations of Google's disclosures should be excluded for the same reasons.

### C.   Opening Opinions 7-14 Are Biased Summaries of Google Documents, Testimony, and Disclosures and Merely Regurgitate Attorney Argument

"An expert witness who is merely a party's lawyer's avatar contributes nothing useful to the decisional process." *Numatics, Inc. v. Balluff, Inc*., 66 F. Supp. 3d 934, 941 (E.D. Mich. 2014). Schneier's opinions on "Google-Specific Topics" (Opening Opinions 7-10), and "Private Browsing and Incognito Topics" (Opening Opinions 11-14), which consist primarily of summaries imbued with Schneier's selective quotation and mischaracterization of internal Google documents, testimony, and disclosures, Schneier Opening Rep. ¶¶ 156-368, do no more than regurgitate the arguments of Plaintiffs' counsel.  They should be excluded.

For example, Schneier purports to summarize Google documents and testimony about Google's use of cookies, Schneier Opening Rep. ¶¶ 179-184 (Opinion 8), misconceptions about Google selling user data, *id*. ¶¶ 202-204 (Opinion 9), "tracking" and "sensitive searches," *id*. ¶¶ 262-263, 289 (Opinions 11 and 12), Google's decision to block third-party cookies, *id*. ¶¶ 264-272 (Opinions 11 and 12), and Google's public disclosures and internal documents related to those disclosures, *id*. ¶¶ 273-288 (Opinions 11 and 12). In addition, parts of Opening Opinion 10 that "Google's Notice and Consent Procedures Are Inadequate," Schneier Rep. ¶¶ 231-242, and "Google Promises Users Control," *id*. ¶¶ 243-254, and Opinions 13 and 14, *id*. ¶¶ 1.M, 1.N., 296-365, just parrot legal arguments Plaintiffs have made about their purported interpretations of Google' disclosures and documents.  Neither is an appropriate topic for expert testimony.

The law is clear that "[s]uch summaries are not expert opinion within the meaning of *Daubert* and Rule 702 of the Federal Rules of Evidence—they are hearsay." *In re Seagate Tech. LLC*, 326 F.R.D. 223, 243 (N.D. Cal. 2018) (excluding "large portions of [expert's] declarations [that] merely summarize [defendant's] documents and advertisements"); *see also Edwards Lifesciences*, 2022 WL 254348, at *10 (excluding expert opinion that "'merely summarizes the record evidence and gratuitously interprets it' with a conclusion that offers nothing more than what [plaintiff's] counsel could argue to the jury in closing arguments" (quoting *Lord Abbett Mun. Income*

*Fund, Inc. v. Asami*, 2014 WL 3417941, at *13 n.8 (N.D. Cal. July 11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016))); *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) (excluding expert opinions and report where the expert "offered nothing more than his personal interpretation of documents and evidence"); *Al Otro Lado*, 2021 WL 3929673, at *3 (granting motion to exclude expert testimony where expert appears to be retained "exclusively to provide a synopsis of the documents" because "it is traditionally the lawyer's job to summarize the evidence for the jury" (quoting *United States v. Singh*, 2017 WL 4700042, at *2 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v. Sharma*, 851 F. App'x 708 (9th Cir. 2021))).

Schneier's Opening Opinions 7-14 are "not based on…specialized experience or the observations derived from that experience." *Al Otro Lado*, 2021 WL 3929673, at *3. Instead, he "is being offered as a summary witness, reviewing the documents produced by Defendants and opining about key issues in the case."[6] *Id*. Paragraphs 156-368 should be excluded.

### D.     Schneier's Opinions About Hypothetical Risks Are Not Relevant

As explained in Google's concurrently filed opposition to Plaintiffs' motion for class certification, expert opinion about hypothetical risks caused by Google's theoretical capability to link PBM data with users' Accounts or identities is not relevant because Google does not, in fact, engage in this practice and has policies and processes to prevent it. *Cf. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*, 141 S. Ct. 1684 (2021) (considering whether collection of "a comprehensive browsing history of an individual" was highly offensive); *see also I.C. v. Zynga, Inc*., 2022 WL 2252636, at *6-8 (N.D. Cal. Apr. 29, 2022) (Gonzalez Rogers, J.) (no standing for privacy claims where information was not linked to names).

---

[6]   *See also Owners Ins. Co. v. 11380 E. Smith Rd., LLC*, 2021 WL 1015982, at *4 (D. Colo. Mar. 17, 2021) ("Rule 702 requires that expert testimony be 'helpful[] to the trier of fact.' [Citation] '[C]onclusory opinions, which require blind acceptance of the expert's *ipse dixit*, are never helpful.'" (citations omitted)); *Wells v. Hi Country Auto Grp*., 2013 WL 10974254, at *2 (D.N.M. Oct. 24, 2013) (expert opinion "will not aide the trier of fact" where expert "will simply read Defendants' own statements into evidence"); *Sinclair Wyo. Ref. Co. v. A&B Builders*, Ltd., 2018 WL 4698781, at *5 (D. Wyo. Sept. 11, 2018) (expert's opinions did "not assist the trier of fact as the opinions make factual conclusions that are in dispute in this case").

1   Schneier's Opening Opinion 6 discusses how data in general could, in theory, be de-

2   anonymized. Schneier Opening Rep. ¶¶ 143-155. Opening Opinion 9 is that the "scope and quantity

3   of information that Google collects…violated the privacy of users," *id*. ¶ 1.I., based on the "potential

4   for data to be joined" and the hypothetical "risk that data from a users' private browsing will be

5   joined with a user's signed-in data," *id*. ¶¶ 205-207 (addressing "Risks from Google Joining

6   Disparate Data Sets"), and past data breaches and investigations that are not related to PBM data,

7   *id*. ¶¶ 208-30. And Rebuttal Opinion 2 discusses the potential risks from browser fingerprinting,

8   arguing that "the private browsing information collected and stored by Google can be linked with

9   devices and users," Schneier Rebuttal Rep. ¶¶ 1.B., 13-53, and "whether Google currently permits

10  browser fingerprinting…is really beside the point," *id*. ¶ 23.

11      Plaintiffs apparently seek to rely on such opinions for the proposition that "Google *can* link

12  collected data to class members," notwithstanding an overwhelming evidentiary record that it does

13  not.  Pl.'s Mot. for Class Certification at 14 n.6. But capability is not grounds for liability.  This case

14  is about what Google *does*, not what it theoretically *could do* if it were inclined to violate its own

15  policies and override its own systems to link PBM data to individual users.  None of Schneier's

16  opinions on these topics is relevant because Schneier has "not seen evidence about what Google

17  does"; his "report is about what they *could do*." Schneier Tr. at 112:17-18.  And even if Google's

18  theoretical capabilities were relevant, Schneier's "opinion" is not expert opinion because he has not

19  actually investigated Google's systems, *see id*. at 184:18-19, and is merely drawing inferences based

20  on his subjective—and selective—interpretation of internal Google emails. Notably, Schneier

21  misconstrues the documents he relies on,[7]  and then refers back to those documents in his Rebuttal

22  Report, Schneier Rebuttal Rep. ¶ 11.

23          **E.    Schneier's Irrelevant Opinions Are Highly Prejudicial**

24      Many of Schneier's opinions are not only irrelevant, but also highly prejudicial. Federal Rule

25  of Evidence 403, which bars evidence that is prejudicial, confusing, or misleading, also guides the

---

[7]  For example, the part of the document he quotes at Paragraph 205 n.215 relates to non-Incognito browsing. And the author of the quoted language from Paragraph 205 n.216 and Paragraph 207 n. 219 testified that this was a "wrong assessment by me at the time." Broome Decl. Ex. 3 (Halavati Tr.) at 137:1-25.

1    Court in its gatekeeping function under Rule 702 and *Daubert*. Indeed, because expert testimony

2    "can be both powerful and quite misleading because of the difficulty in evaluating it…the judge in

3    weighing possible prejudice against probative force under Rule 403… exercises more control over

4    experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

5           Here, Schneier's Opening Opinions 1-6 include multiple, highly inflammatory statements

6    that have absolutely no bearing on any issue in this case. *See, e.g.*, Schneier Opening Rep. ¶ 29

7    (opining that "[s]urveillance…makes people feel like prey, just as it makes the surveillors behave

8    like predators"); *id*. ¶ 34 (quoting "seventeenth-century French statesman Cardinal Richelieu" and

9    the "head of Joseph Stalin's secret police"); *id*. ¶ 36 ("Governments can and do seek access to data

10   collected and stored by Google and other tech companies. Although such demands often pertain to

11   criminal investigations, they may also be made for the purpose of monitoring and stifling political

12   dissent….Ubiquitous, digital surveillance makes this unseemly sort of work much easier; consider

13   the revelation in 2015 that for years, AT&T collaborated with the NSA to indiscriminately collect

14   US citizens' communications."); *id*. ¶ 37 ("Google, as a platform for advertising, routinely

15   discriminates….Such discrimination can be problematic, and even risks crossing the line into

16   illegality" and then describing redlining and other discriminatory practices by businesses other than

17   Google); *id*. ¶ 39 (opining that "[c]all center employees, manufacturing workers, and warehouse and

18   retail staff are commonly surveilled" by companies other than Google);  *id*. ¶ 41 (describing the

19   "2013 revelations by Edward Snowden regarding the extent of NSA surveillance of the

20   communications of US and foreign residents"); *id*. ¶ 49 ("Today's technology enables mass

21   surveillance, and mass surveillance is dangerous. It enables discrimination based on almost any

22   criterion: race, religion, class, political beliefs. It is being used to control what one sees, what one

23   can do, and, ultimately, what one can say."); *id*. ¶ 71 (describing use of video cameras to prevent

24   against theft or fraud); *id*. ¶ 73 (lamenting government removal of ability to pay tolls in cash, so

25   drivers can avoid being tracked through automated tolls, and taxis' acceptance of credit cards); *id*.

26   ¶ 100 (describing "[t]he rise in targeted advertising has enabled an increase in the ability of hostile

27   nations to target American citizens for purposes of political manipulation"); *id*. ¶ 102 (describing

28   how many tons of carbon dioxide were allegedly "emitted to produce the electricity consumed by

online advertising, and that nearly one-fifth of those emissions was associated with invalid traffic");
*id*. ¶ 114 ("Data brokers use publicly available and purchased data to sort people into various marketable categories."); *id*. ¶ 119 ("both iOS and Android devices communicated with Apple and Google, respectively, an average of once every 4.5 minutes");  *id*. ¶ 127 (discussing the alleged "numerous instances of sexual harassment by managers").

Equally irrelevant and prejudicial are the sections of Schneier's Opening Opinion 9 on Google's alleged "History of Data Breaches," *id*. ¶¶ 208-213, and "History of Privacy and Consent Failures," *id*. ¶¶ 214-230, which have no relevance whatsoever to the fact of this case.  It is black letter law evidence of prior bad acts is impermissible character evidence that is not admissible to show a propensity to cause harm to Plaintiffs. Fed. R. Evid. 404; *see also Savings Corcoran v. CVS Pharmacy, Inc*., 2021 WL 633809, at *4 (N.D. Cal. Feb. 18, 2021) (granting motion *in limine* to exclude evidence and argument related to other lawsuits and government investigations).

Paragraphs supporting Opening Opinions 11 and 12 similarly contain highly prejudicial and inflammatory statements. Schneier Opening Rep. ¶ 288 (likening Google's behavior to "secret cameras in your [hotel] room."); *id*. ¶ 292 (surmising that "[a] user may choose a private browsing mode for searches and browsing tied to their Black friends' names because they hope to avoid being confronted by AdSense-enabled ads for websites featuring arrest records"); *id*. ¶ 293 ("If detected by a tech-savvy abuser, searches and the subsequent browsing activities tied to the[ir]…searches could lead to domestic violence").

### F.    Schneier is Not Qualified to Opine on Google's Intent, Google Services, or Google's Receipt of Data Through Those Services

Schneier's reports also cover myriad disparate issues, for which he has no expertise. Fed. R. Evid. 702; *Warner Bros. Ent. v. Glob. Asylum, Inc*., 2013 WL 12114836, at *7 (C.D. Cal. Jan. 29, 2013) (Court cannot consider expert testimony where the experts "education and experience" are "insufficient to establish that he is an expert in the field"), *aff'd sub nom. Warner Bros. Ent. v. Glob. Asylum, Inc*., 544 F. App'x 683 (9th Cir. 2013); *Conroy*, 2022 WL 911138, at *6; *Jack*,  2018 WL 3819027, at *18.

***Google's Intent***. A sub-part of Opening Opinion 10 states that "Giving Users Privacy and Control Is Important for Google's Brand, and Getting/Keeping Users," Schneier Opening Rep. ¶¶ 255-259. Opening Opinion 11 concludes that "Google offered 'Incognito Mode' in its Chrome browser in response to competitors' 'private browsing' offerings and market demand for the ability to browse the Internet without being monitored by advertisers, and Google understood—and continues to understand—that its branding and positioning of this feature created precisely that expectation." *Id*. ¶¶ 1.K, 260-295. And Opening Opinion 14 claims that Google "was more concerned with being portrayed as a champion of user privacy than actually respecting user privacy." *Id*. ¶¶ 1.N, 366-368.

Relatedly, Schneier opines that "Google counts on most people to access the Internet using Google's Chrome browser, check their messages in Gmail, use Google Search, watch videos on YouTube, or obtain directions from Google Maps, without thinking about how much personal information they're revealing to Google when they search for information, communicate with others, entertain themselves, and get themselves from here to there." *Id*. ¶ 57. In Opinion 7, he claims that "Google has (and throughout the class period had) overwhelming incentives to maximize collection of personal data about Internet users and their browsing activities and unmatched power to do so." *Id*. ¶¶ 1.G, 156-171. And Schneier opines that "Google is motivated to ensure that any privacy controls are difficult to navigate and understand." *Id*. ¶ 255; *see also id*. ¶ 302 ("Incognito mode's simple, bold, and friendly 'Spy Guy' may communicate Google's 'intent' to lead users to believe that Incognito will provide them with a virtual cover of darkness"). Similarly, in his Rebuttal Report, Schneier opines as to Google's "financial incentives to collect as much data and information as it possibly can" and that "Google is incentivized to steer users toward a 'private' browsing mode rather than any settings or features that might impact its collection of browsing data." Schneier Rebuttal Rep. ¶ 1.E.; *see also id*. ¶¶ 83-91.

Schneier admits he has no basis to opine on Google's intent or understanding. Schneier Tr. 53:11-12 ("I don't know Google's intent."). And even if he did, such "opinions as to Defendant's state of mind [a]re improper" because "[t]he jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert

testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury." *Snyder v. Bank of Am*., N.A., 2020 WL 6462400, at *2 (N.D. Cal. Nov. 3, 2020); *see also Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ*., 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (noting that "Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind" and collecting cases); *Lanard Toys Ltd. v. Anker Play Prod., LLC*, 2020 WL 6873647, at *7 (C.D. Cal. Nov. 12, 2020) (excluding "opinions and testimony related to Defendants' intent, motive, or state of mind").

**Real-Time Bidding**. Schneier dedicates an entire section of his Opening Report to descriptions of how "Google uses cookie matching to help identify users in real-time bidding." Schneier Opening Rep. § 8.3 (¶¶ 185-201). But he admits he is not an expert in online advertising. Schneier Tr. at 38:15-17, 181:24-183:17. And he admits that his knowledge about Google's Real-Time Bidding Platform was based on nothing but "reading and understanding Google's documents of how these systems work." *Id*. at 181:24-183:17. Further, even if he were qualified, he does not address whether or how the "cookie matching" he describes works in PBM.

**Value of Data**. Schneier also opines about the value of "data" generally. Schneier Opening Rep. ¶¶ 1.D, 103-119 (Opening Opinion 4) & 1G., 156-171 (Opening Opinion 7). But, Schneier is not offering an opinion on damages, nor offering a way to uniformly "value" the data at issue here. He is simply opining about general corporate revenue earned from online advertising among any number of "commercial actors and users." Further, Opening Opinion 4 is not limited to Google and neither Opening Opinion 4 nor Opening Opinion 7 relate to the value of private browsing data.

**Google's Market Share and Market Penetration**. Schneier is not an economist or marketing expert. Schneier Tr. at 37:13-15, 38:1-6. Nevertheless, he offers opinions about Google's purported "business model," Schneier Opening Rep. ¶¶ 156-159, Google's market share, *id*. ¶¶ 160-168, and Google's market penetration, *id*. ¶¶ 169-171. Based on this information, Schneier concludes that Google has "overwhelming incentives to maximize collection of personal data about Internet users and their browsing activities and unmatched power to do so." *Id*. ¶ 1.G. Similarly, in his Rebuttal Report, Schneier opines as to the effects of "Google's marketing of private browsing mode," Google's "financial incentives to collect as much data and information as it possibly can," and that

"Google is incentivized to steer users toward a 'private' browsing mode rather than any settings or features that might impact its collection of browsing data." Schneier Rebuttal Rep. ¶ 1.E.; *see also id*. ¶¶ 83-91. He is not qualified to offer such opinions.

***Google's Systems***. In Opening Opinion 8, Schneier opines that "Google has constructed an essentially inescapable infrastructure for gathering such information, including without limitation with Google's advertising, analytics, mobile operating system, and browsing platforms." Schneier Rep. ¶¶ 1.H, 172-201. Although Schneier did not investigate Google's systems or run any tests himself, see Schneier Tr. at 184:18-19, he also offers opinions about Google's data collection practices generally (not related to PBM), Schneier Opening Rep. ¶¶ 172-184. Again, he is not qualified to offer such opinions.

Because Schneier is not qualified to offer any of the foregoing opinions, they should be excluded.

## V.    <u>CONCLUSION</u>

Schneier's opinions should be excluded in their entirety.

1   DATED:  August 5, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _____/s/ Andrew H. Schapiro_____
     Andrew H. Schapiro

     Andrew H. Schapiro (admitted *pro hac vice*)
     andrewschapiro@quinnemanuel.com
     Teuta Fani (admitted *pro hac vice*)
     teutafani@quinnemanuel.com
     191 N. Wacker Drive, Suite 2700
     Chicago, IL 60606
     Telephone: (312) 705-7400
     Facsimile: (312) 705-7401

     Stephen A. Broome (CA Bar No. 314605)
     stephenbroome@quinnemanuel.com
     Viola Trebicka (CA Bar No. 269526)
     violatrebicka@quinnemanuel.com
     Crystal Nix-Hines (Bar No. 326971)
     crystalnixhines@quinnemanuel.com
     Alyssa G. Olson (CA Bar No. 305705)
     alyolson@quinnemanuel.com
     865 S. Figueroa Street, 10th Floor
     Los Angeles, CA 90017
     Telephone: (213) 443-3000
     Facsimile: (213) 443-3100

     Diane M. Doolittle (CA Bar No. 142046)
     dianedoolittle@quinnemanuel.com
     Sara Jenkins (CA Bar No. 230097)
     sarajenkins@quinnemanuel.com
     555 Twin Dolphin Drive, 5th Floor
     Redwood Shores, CA 94065
     Telephone: (650) 801-5000
     Facsimile: (650) 801-5100

     Jomaire A. Crawford (admitted *pro hac vice*)
     jomairecrawford@quinnemanuel.com
     51 Madison Avenue, 22nd Floor
     New York, NY 10010
     Telephone: (212) 849-7000
     Facsimile: (212) 849-7100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jomaire A. Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*