# Exhibit 1

1                  UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

3

4

5     CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
6     CASTILLO, and MONIQUE
      TRUJILLO, individually and on
7     behalf of all other similarly
      situated,

8

                        Plaintiffs,
9                                         No.
              vs.                         4:20-cv-03664-YGR-SVK
10

      GOOGLE LLC,
11

                        Defendant.
12     _____/

13

14

15          VIDEOTAPED DEPOSITION OF BRUCE SCHNEIER

16                  Remote Zoom Proceedings

17                  Cambridge, Massachusetts

18                   Monday, July 18, 2022

19

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 233                    Job No. 5312337

                                              Page 1

1        UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
3
4
5   CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
6   CASTILLO, and MONIQUE
    TRUJILLO, individually and on
7   behalf of all other similarly
    situated,
8
          Plaintiffs,
9              No.
    vs.       4:20-cv-03664-YGR-SVK
10
    GOOGLE LLC,
11
          Defendant.
12   _____/
13
14
15     Videotaped deposition of BRUCE SCHNEIER,
16  taken on behalf of Defendant, Remote Zoom Proceedings
17  from Cambridge, Massachusetts, beginning at 11:03 a.m.
18  Eastern Daylight Time and ending at 7:20 p.m. Eastern
19  Daylight Time, on Monday, July 18, 2022, before
20  Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21  No. 3462.
22
23
24
25
                                            Page 2

1   APPEARANCES:
2
3   FOR THE PLAINTIFFS:
4     SUSMAN GODFREY LLP
5     BY: IAN B. CROSBY, ESQ.
6     1201 Third Avenue, Suite 3800
7     Seattle, Washington 98101
8     (206) 516-3861
9     icrosby@susmangodfrey.com
10     -and-
11    BY: ALEXANDER P. FRAWLEY, ESQ.
12    3201 Avenue of the Americas, 32nd Floor
13    New York, New York 10019
14    (212) 729-2044
15    afrawley@susmangodfrey.com
16
17    BOIES SCHILLER FLEXNER LLP
18    BY: HSIAO (MARK) C. MAO, ESQ.
19    44 Montgomery Street, 41st Floor
20    San Francisco, California 91401
21    (415) 293-6800
22    mmao@bsfllp.com
23
24
25
                                            Page 3

1   APPEARANCES (Continued):
2
3     MORGAN & MORGAN
4     BY: JOHN A. YANCHUNIS, ESQ.
5     201 North Franklin Street, 7th Floor
6     Tampa, Florida 33602
7     (813) 223-5505
8     jyanchuis@forthepeople.com
9
10
11  FOR THE DEFENDANT:
12    QUINN EMANUEL URQUHART & SULLIVAN, LLP
13    BY: STEPHEN A. BROOME, ESQ.
14      ALYSSA (ALY) G. OLSON, ESQ.
15    865 South Figueroa Street, 10th Floor
16    Los Angeles, California 90017
17    (213) 443-3285 (Mr. Broome)
18    (213) 443-3000 (Ms. Olson)
19    stephenbroome@quinnemanuel.com
20    alyolson@quinnemanuel.com
21
22  Also Present:
23    Elvert Ling, Quinn & Emanuel summer associate
24    Haimin Zhang, Analysis Group
25    Robert Fenton, Videographer
                                            Page 4

1               I N D E X
2
3
4   MONDAY, JULY 18, 2022
5
6   WITNESS               EXAMINATION
7   BRUCE SCHNEIER
8
9     BY MR. BROOME            10
10    BY MR. CROSBY            220
11
12
13
14    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15        (NONE)
16
17
18
19
20
21
22
23
24
25
                                            Page 5

2 (Pages 2 - 5)

|  | DEPOSITION EXHIBITS | |
|---|---|---|
|  | BRUCE SCHNEIER | |
| NUMBER | DESCRIPTION | IDENTIFIED |
| Exhibit 1 | Expert Report of Bruce | 16 |
|  | Schneier, 04/15/22 | |
| Exhibit 2 | Data and Goliath: The Hidden | 58 |
|  | Battles to Collect Your Data | |
|  | and Control Your World, by | |
|  | Bruce Schneier | |
| Exhibit 3 | Data and Goliath: The Hidden | 60 |
|  | Battles to Collect Your Data | |
|  | and Control Your World, by | |
|  | Bruce Schneier | |
| Exhibit 4 | Ask the Decoder: How Private | 70 |
|  | is Private Browsing, Really? | |
|  | By Sara M. Watson, 09/24/14 | |
| Exhibit 5 | Schneier on Security: Click | 72 |
|  | Here to Kill Everybody | |
|  | Endnotes | |
| Exhibit 6 | Google's Chrome Incognito | 75 |
|  | Mode is Way Less Private Than | |
|  | You Think, by Laurie Clarke | |

Page 6

| Exhibit 7 | Journal of Cybersecurity, | 133 |
|---|---|---|
|  | Research Paper, Privacy | |
|  | Threats in Intimate | |
|  | Relationships, by Karen Levy | |
|  | and Bruce Schneier | |
| Exhibit 8 | Google Privacy Policy, | 163 |
|  | GOOG-CABR-00001107 - 134 | |
| Exhibit 9 | Expert Rebuttal Report of | 184 |
|  | Bruce Schneier Rebuttal of | |
|  | Expert Georgios Zervas | |
|  | 06/07/22 | |
| Exhibit 10 | Google Chrome Privacy Notice, | 223 |
|  | Last Modified 05/20/20, | |
|  | GOOG-CABR-00002522 - 539 | |
| Exhibit 11 | Google Privacy Policy, | 224 |
|  | effective 02/10/22 | |

Page 7

1 Cambridge, Massachusetts; Monday, July 18, 2022
2      11:03 a.m. Eastern Daylight Time
3         --oOo--
4         PROCEEDINGS
5                          11:02:41
6      THE VIDEOGRAPHER: Good morning. We are on the
7 record. The time is 11:03 a.m. Eastern Time. Today is
8 July 18th, 2022.
9      Please note that this deposition is being
10 conducted virtually. The quality of recording depends on    11:03:02
11 the quality of camera and internet connection of
12 participants. What is seen from the witness and heard on
13 screen is what will be recorded.
14      Audio and video recording will continue to take
15 place unless all parties agree to go off the record.    11:03:17
16      This is Media Unit 1 of the video-recorded
17 deposition of Bruce Schneier, taken by counsel for
18 defendant, in the matter of Chasom Brown versus Google
19 LLC, filed in the United States District Court, Northern
20 Division of California, San Jose, Case Number    11:03:37
21 4:20-cv-03664-YGR-SVK.
22      This deposition is being conducted remotely
23 using virtual technology. My name is Rob Fenton,
24 representing Veritext Legal Solutions, and I am the
25 videographer. The court reporter is Leslie Rosas from    11:04:03

Page 8

1 the firm Veritext Legal Solutions.
2      I am not related to any party in this action,
3 nor am I financially interested in the outcome.
4      If there are any objections to proceeding,
5 please state them at the time of your appearance.    11:04:17
6      Counsel and all present, including remotely,
7 will now state their appearances and affiliations for the
8 record, beginning with the noticing attorney.
9      MR. BROOME: Good morning. Stephen Broome from
10 Quinn Emanuel on behalf of Google, and I'm joined in the    11:04:30
11 room by my colleague Aly Olson and our summer associate,
12 Elvert Ling.
13      MR. CROSBY: Ian Crosby from Susman Godfrey for
14 the Plaintiff Class and for the witness.
15      MR. FRAWLEY: Alex Frawley for Susman Godfrey    11:04:51
16 for plaintiffs and the witness.
17      MR. MAO: Mark Mao, Boies, Schiller & Flexner,
18 also for the plaintiffs.
19      Just real quickly, if you don't mind, Steve, I
20 also have Mr. John Yanchunis from Morgan & Morgan for the    11:05:09
21 plaintiffs here.
22      MR. BROOME: Yes. Thank you, Mark.
23      THE REPORTER: All right. I'll go ahead and
24 swear you in, Mr. Schneier.
25      If you would raise your right hand, please.

Page 9

3 (Pages 6 - 9)

1  Thank you.

2      You do solemnly state that the evidence you

3  shall give in this matter shall be the truth, the whole

4  truth, and nothing but the truth, so help you God?

5      THE WITNESS:  Can we do that again without the    11:05:31

6  God part?

7      THE REPORTER:  Yes.

8      THE WITNESS:  Thank you.

9      THE REPORTER:  You do solemnly state and affirm

10  that you will tell the truth, the whole truth, and

11  nothing but the truth?

12      THE WITNESS:  I do.

13      THE REPORTER:  Thank you.

14

15          EXAMINATION

16  BY MR. BROOME:

17      Q.  Good morning, Mr. Schneier.

18      A.  Good morning.

19      Q.  Is it Mr. Schneier or Dr. Schneier, or what do

20  you prefer I use?          11:05:56

21      A.  Mister is -- Mister more accurate.

22      Q.  Okay.  You've been deposed before.  "Yes"?

23      A.  I have.

24      Q.  So you're familiar with the process?

25      A.  Yes.  First time on Zoom, though.  Kind of    11:06:08

Page 10

1  exciting.

2      Q.  Okay, good.  And you spent some time yesterday

3  with plaintiffs' counsel, I assume, and discussed the

4  process with them?

5      A.  I did.          11:06:19

6      Q.  Okay.  All right.  So I won't -- I won't bore

7  you with those questions.

8      Is anyone in the room with you today?

9      A.  There is nobody.

10      Q.  On your computer screen, do you have any    11:06:28

11  communication applications open?

12      A.  I have this.  I have Zoom open and I have my

13  browser open.

14      Q.  Okay.  And you've got your browser open for the

15  Exhibit Share?          11:06:41

16      A.  Yeah, whatever that system is called.

17      Q.  And do you have that up and running already?

18      A.  I do.  And I'm in the Marked Exhibits folder.

19      Q.  Okay, great.

20      And when we upload an exhibit to Exhibit Share,    11:06:51

21  you may need to refresh your browser.

22      A.  Got it.

23      Q.  Do you have your phone nearby?

24      A.  I do.

25      Q.  Okay.  I just ask that you not communicate    11:07:05

Page 11

1  during the course of the deposition on your phone or any

2  other devices; is that okay?

3      A.  Yes.

4      Q.  Except at the breaks, which is fine.

5      Do you have any documents with you?          11:07:17

6      A.  Yes, I do.

7      Q.  What do you have?

8      A.  I have a bunch of the documents in the case, I

9  have various expert reports and rebuttals, I have the

10  Third Amended Complaint (indicating).  I have various    11:07:31

11  Google policies printed out.

12      Q.  Okay.

13      A.  I have a copy of Data and Goliath and Click Here

14  to Kill Everybody.

15      Q.  Thank you.          11:07:40

16      A.  I thought that might be needed.

17      Q.  Yep.

18      A.  And I have a blank notepad and a pen in case

19  that's needed.

20      Q.  Okay.  All right.          11:07:51

21      So with respect to the documents that you have

22  around you, I'd just ask that you not review any of those

23  documents unless you alert me to the fact that you're

24  reviewing the documents in hard copy as opposed to on the

25  Exhibit Share.  I'd like to --          11:08:06

Page 12

1      A.  I prefer to read in hard copy.  It's easier for

2  me.  So -- so I'd like to, but, yes, not without --

3      Q.  All right.  Just let me know when you're doing

4  that as opposed to reviewing on the screen.

5      You mentioned that you have some of the expert    11:08:22

6  reports there.  Which -- which expert reports have you

7  read in this case?

8      A.  So I have mine, my reports and my rebuttal

9  (indicating).  And then I have Psounis, I have Schwartz,

10  I have Amir rebuttal, and I did read Hochman, but I don't    11:08:48

11  have it with me.

12      And I -- yeah.  I think that was it.

13      Q.  Okay.  Did you read the plaintiffs' expert

14  reports, aside from your own?

15      A.  What are they?  You've got to remind me what    11:09:03

16  they are and I'll let you know.

17      Q.  Yeah, sure.

18      A.  Are you asking me to review for this case or

19  ever?

20      Q.  Well, I presume that you wouldn't have read any    11:09:11

21  of the plaintiffs' expert reports outside the context of

22  this case.  Is that presumption incorrect?

23      A.  Of course.

24      Q.  Yeah.  Okay.

25      So with respect to the expert reports that the    11:09:23

Page 13

1 plaintiffs have submitted in this case, have you read any
2 of those?
3     A. So yes.
4     Q. Okay. And do you recall what they were or do
5 you want to go through a list?                    11:09:34
6     A. I'd rather you go through a list.
7     Q. You got it. Keegan?
8     A. Which one was that was?
9     Q. He did surveys and an opening and a rebuttal.
10     A. I did -- yeah, I did look at that. I didn't   11:09:44
11 read it fully. It's got a lot of stuff in it. But yes,
12 I did look at it.
13     Q. Okay. The opening one or the rebuttal one? The
14 rebuttal one has the questions about consent and whether
15 Google collects my data, et cetera.                11:09:57
16     A. You know, I don't remember those questions.
17     Q. Okay.
18     A. I read the one where he wrote about -- he wrote
19 about the reports he did, the survey he conducted.
20     Q. Yeah. Okay. Well, he conducted two.          11:10:08
21     A. And he -- on the other survey.
22     Q. Okay. I'm sorry, say the last part?
23     A. And he also dissed on the other survey.
24     Q. That's right. Yeah. So that's probably the
25 rebuttal -- rebuttal report, but...                11:10:20

                                                  Page 14

1     THE REPORTER: Counsel, can we go off the
2 record. This is the reporter.
3     MR. BROOME: Sure.
4     THE VIDEOGRAPHER: Going off the record at
5 11:10 a.m.                          11:10:31
6     (Recess.)
7     THE VIDEOGRAPHER: We are back on the record at
8 11:12 a.m.
9     (Interruption in proceedings.)
10     Q. BY MR. BROOME: We were talking about the expert   11:12:01
11 reports that you had reviewed, that were submitted by the
12 plaintiffs.
13     Have you read Mr. Hoffman's report?
14     A. I did, yes.
15     Q. Okay. And have you read his rebuttal report as   11:12:10
16 well?
17     A. I think so. I looked at it.
18     Q. That makes two of us. Very long report.
19     What about Mr. Lasinski?
20     A. Which expert is he?          11:12:26
21     Q. Damages.
22     A. No, I did not look at that.
23     Q. Okay. What about Mr. Weisbrot? He was claims
24 administration.
25     A. No, I did not look at that.         11:12:37

                                                  Page 15

1     Q. Okay. And Mr. Nelson? He was a rebuttal
2 expert, former FBI.
3     A. I did not look at that report.
4     Q. Okay. Did you speak to anyone other than the
5 plaintiffs' lawyers in preparing for your deposition   11:13:01
6 today?
7     A. I did not.
8     MR. BROOME: Okay. We are going to mark a copy
9 of your report, your April 15th, your opening report.
10     (Exhibit 1, Expert Report of Bruce Schneier,   11:13:17
11     04/15/22, was marked for identification by
12     counsel electronically.)
13     MR. BROOME: You're going to do it in hard copy.
14 Okay, that's fine. We'll mark it, anyway, just so
15 everyone else has access.                11:13:33
16     All right. It should be up for those not using
17 hard copy.
18     Q. All right. If you can turn to page 4, you have
19 an executive summary of your opinions there; right?
20     A. I do.                    11:14:06
21     Q. All right. And then Opinions 1 to 6 correspond
22 to the heading "Data and Privacy Topics." Correct?
23     A. Yes.
24     Q. Okay. Is it fair to say that you copied a
25 number -- a significant portions -- well, let me -- let   11:14:35

                                                  Page 16

1 me say that slightly differently?
2     In putting together Opinions 1 to 6, you copied
3 a fair amount of material from your book Data and
4 Goliath; correct?
5     A. I started with some material, and then edited   11:14:48
6 and updated as needed.
7     Q. Yeah. Okay. Some of it's verbatim?
8     A. Yeah. I think I even said that somewhere in the
9 report, but yes.
10     Q. Okay. And what was the methodology that you   11:15:00
11 applied in reaching Opinion 1?
12     A. Opinion 1 is based on my expertise as a security
13 and privacy expert over the past bunch of decades.
14 Reading, writing, teaching, speaking. I'm not sure what
15 you mean by "methodology."               11:15:32
16     Q. Well, you were -- yeah, I mean, I think -- I
17 think you answered the question.
18     Was there any sort of standards or process that
19 you applied other than applying your expertise as a
20 security and privacy expert over the past bunch of   11:16:02
21 decades?
22     A. I mean I recall research, writing, editing,
23 reading, rewriting, the process.
24     Q. And when you recall research, writing,
25 editing -- when you say "research, writing, editing," are   11:16:17

                                                  Page 17

                                         5 (Pages 14 - 17)

1  you talking about the research that you did specifically

2  for this case?

3      A.  Research -- yes, anything I did for this case

4  informed by everything I've done in my career.

5      Q.  Okay.  And how do these opinions in 1 through 6      11:16:35

6  relate to the issues in this case?

7          MR. CROSBY:  Object to the form.

8          THE WITNESS:  So Opinions 1 through 6, which is

9  part 4 of the report, are general data and privacy

10  concepts, issues designed to provide background for the      11:17:04

11  case and for my subsequent opinions.

12      Q.  BY MR. BROOME:  Okay.  Opinion 7 says:  "As

13  described in Section 7, it is my opinion that Google has

14  and throughout the class period had overwhelming

15  incentives to maximize collection of personal data about      11:17:50

16  internet users and their browsing activities and

17  unmatched power to do so."

18          What was the methodology that you applied in

19  reaching that opinion?

20      A.  The same methodology as the other opinions,      11:18:02

21  that's based on research and knowledge and expertise.

22  Surveillance is the business model of the internet.

23  Google makes money spying on you.  That's their business

24  model.  That's not kind of a reach.

25      Q.  Sorry, what was the last part you said?  That's      11:18:38

Page 18

1  not a reach?

2      A.  That's not a reach.

3      Q.  What do you mean by that?  Like everyone knows

4  that's Google's business model, is spying on you?

5      A.  I don't know what everybody knows, but their      11:18:49

6  business model is spying on you.

7      Q.  Okay.  And in reaching the conclusion that

8  Google has overwhelming incentive to maximize collection

9  of personal data about internet users and their browsing

10  activities, is that based on internal Google documents or      11:19:22

11  your experience as a privacy and security expert?

12      A.  That's based on an experience as an expert,

13  although I didn't see any Google documents that

14  contradicted that.

15      Q.  Okay.  Opinion 8 says:  "It is my opinion that      11:19:35

16  Google has constructed an essentially inescapable

17  infrastructure for gathering such information, including

18  without limitation, with Google's advertising analytics,

19  mobile operating system, and browsing platforms."

20          Same question about the methodology.  Is the      11:20:00

21  answer going to be the same, that this is based on your

22  experience -- decades of experience as a privacy and

23  security expert?

24      A.  Yes.

25      Q.  Anything else?      11:20:12

Page 19

1      A.  So if you look at Section 8, you'll see

2  references to some documents related to this case.  So

3  those were also relied on.

4      Q.  Right.

5      A.  And that would be true for -- no, Section 7 is      11:20:51

6  all -- there are some in Section as well.

7      Q.  Okay.  Opinion 12 says:  "It is my opinion

8  that Google disclosures give rise to a false expectation

9  that private browsing mode prevents Google from

10  collecting the private browsing information at issue in      11:21:20

11  this lawsuit."

12          Do you see that?

13      A.  I do.

14      Q.  Okay.  What is that opinion based on?

15      A.  It's based on several things.  It's based on my      11:21:36

16  knowledge of security and privacy.  It's based on my

17  knowledge of dark patterns and how they work.  It's based

18  on documents in the case, which I am referencing in

19  that -- in Section 11.

20      Q.  Did you conduct any surveys in reaching that      11:22:02

21  opinion?

22      A.  I conducted no surveys.

23      Q.  Okay.  Have you ever conducted a survey?

24      A.  What do you mean by that?

25      Q.  Have you ever conducted a survey of internet      11:22:16

Page 20

1  users in the context of data privacy?

2          MR. CROSBY:  Object to the form of the question.

3          THE WITNESS:  It's going to depend how you

4  define survey.  You know, if I'm in class and I ask my

5  students have they ever used tour, does that count?      11:22:37

6      Q.  BY MR. BROOME:  No.  I'm thinking more of like a

7  more formal survey, where you have -- you design a

8  survey, and then there's a list of questions that people

9  respond to.

10      A.  I have not.      11:22:49

11      Q.  Okay.  In reaching Opinion 12, did you conduct

12  any focus groups?

13      A.  I did not.

14      Q.  Did you do any research that involved

15  communicating with private browsing users about the      11:23:09

16  issues relevant in Opinion 12?

17      A.  I did not.

18      Q.  Did you base Opinion 12 on the survey conducted

19  by Mark Keegan?

20      A.  I did not.      11:23:22

21      Q.  Did you base Opinion 12 on the survey conducted

22  by On Amir?

23      A.  I did not.

24      Q.  Have you asked any -- did you base Opinion 12 on

25  discussions with private browsing users about Google's      11:23:45

Page 21

6 (Pages 18 - 21)

1 disclosures?

2    A. I did not.

3    Q. You mentioned dark patterns.

4    A. I did.

5    Q. How did dark patterns relate to Opinion 12?        11:24:00

6    A. Hang on.  Give me a second to make sure I'm

7 saying the right things.

8        So dark patterns is a general term that

9 describes ways that websites, tech companies will

10 manipulate or selectively present data in an effort to        11:25:06

11 incentivize, elicit, prioritize, increase the probability

12 of a certain response.  It is -- it's actually a lousy

13 term.  I don't like the term.  But it's what the industry

14 uses.  And it's anything from, you know, the -- the buy

15 button being big and green and the no-thanks button being        11:25:34

16 small and hard to find, or the "X" to close the ad window

17 being not in the place you normally think it is.

18        So that's just a general term we use when --

19 when a company doesn't present the options equitably,

20 fairly.  And to me, that is what's going on, you know, in        11:25:56

21 the Google splash screen or in, you know, some of

22 Google's communications.

23        They are -- they're designed, because I think

24 that's -- that's what makes sense, to elicit certain

25 responses or feelings or reactions.        11:26:18

Page 22

1    Q. Okay.  Is it your opinion that Google used dark

2 patterns in -- in the disclosures that are at issue in

3 this case?

4    A. Which disclosures?

5    Q. Any of them.  Any of the disclosures that are at        11:26:32

6 issue in this case.

7    A. So this is me not understanding.  What is a

8 disclosure?  Is that all the exhibits?  Is that just the

9 public documents?

10    Q. Yeah.  Fair question.        11:26:46

11        You understand that the plaintiffs have alleged

12 that Google misrepresented the purpose and functionality

13 of Incognito mode; right?

14    A. I agree.

15    Q. And that was -- and in their Complaint, they        11:27:04

16 point to a number of disclosures.  The Incognito splash

17 screen, the Privacy Policy, some help center articles,

18 that sort of thing?

19    A. Yes.

20    Q. Okay.  And is it your opinion that those        11:27:16

21 disclosures -- in those disclosures, Google used dark

22 patterns?

23    A. Yes.

24    Q. Okay.  And how did Google use dark patterns in

25 the Incognito screen?        11:27:31

Page 23

1    A. By this you mean the splash screen?

2    Q. Yes.

3    A. So if you look at the splash screen, you'll see

4 the testing now, "Now you can browse privately," it is,

5 you know, it's designed to elicit a feeling of safety,        11:27:47

6 protection.  And you know, it doesn't actually talk about

7 the details, but in its -- you know, in the way it's

8 presented, it's -- it says to someone who's non-technical

9 reading this that you're protected now.

10    Q. Protected from whom?        11:28:12

11    A. It doesn't -- you know, protected, period.

12    Q. It doesn't say you're protected from any

13 particular entity or does it say that you're protected

14 from everybody?

15    A. It says: "Now you can browse privately."  Now        11:28:25

16 what I'm -- when I'm doing something private, I'm

17 protected from everybody.  It says that other people who

18 use this device won't see your activity.  It says that

19 Chrome won't save the following information.  Lists a

20 bunch of information.        11:28:44

21    Q. Okay.  So is it -- is it your opinion that the

22 Incognito splash screen communicates to the average user,

23 the reasonable user, that they're protected from

24 everybody when they browse in Incognito mode?

25    A. It's my feeling that the splash screen is        11:29:02

Page 24

1 intended to communicate that; that it's designed to make

2 people feel safe.  And it's interesting -- and you will

3 see it in my report -- there's a lot of internal Google

4 discussion saying, look, this splash screen isn't good.

5 It's communicating things that aren't true.  This        11:29:23

6 isn't -- so the -- the fact that it's a dark pattern is

7 being debated inside Google that the splash screen is not

8 being accurate.

9    Q. Okay.  Well, I want to be very specific here

10 because you said -- I asked you is it your opinion that        11:29:42

11 the Incognito splash screen communicates to the average

12 user or reasonable user that they are protected from

13 everybody when they browse on the web, and you responded

14 that the splash screen -- it's your feeling that the

15 splash is intended to communicate that.        11:30:04

16        But is it your opinion that that is what the

17 splash screen actually communicates to the average -- do

18 you want to use the term "average user" or "reasonable

19 user"?  What makes more sense to you?

20        MR. CROSBY:  Objection to form.        11:30:18

21        THE WITNESS:  The problem with average user is

22 it's, you know, half of the people, average in what

23 dimension.

24    Q. BY MR. BROOME:  Sure.

25    A. So I did not conduct surveys, as we discussed.        11:30:26

Page 25

7 (Pages 22 - 25)

1  I'm really looking at what is being communicated rather
2  than what is being received.
3      Q.  Okay.  And do you not feel competent to be
4  testifying about what is being received?
5      MR. CROSBY:  Object to the form.          11:30:48
6      THE WITNESS:  It's going to depend on the
7  question.  You're asking me what does the average user
8  want.  I mean, that is definitely a survey question.  And
9  I'm really looking at what is Google disclosing and what
10  do those disclosures say.          11:31:05
11      Q. BY MR. BROOME:  Okay.  You make a number of
12  assertions throughout your report about how a reasonable
13  user may perceive something.
14      Do you feel competent to testify about what a
15  reasonable user would perceive from Google's disclosures,          11:31:18
16  for example, the splash screen?
17      MR. CROSBY:  Object to the form.
18      THE WITNESS:  Within the confines of my report,
19  yes.
20      Q. BY MR. BROOME:  Okay.  What does that mean,          11:31:34
21  within the confines of your report?
22      A.  It means I have no idea what you're going to ask
23  me, and I don't want to agree to every possible thing you
24  could ask.
25      Q.  Sure.  You said you don't feel comfortable          11:31:44

Page 26

1  talking about the average user because that could be
2  half, whereas the reasonable user -- is it your
3  understanding that the reasonable user may be less than
4  half?
5      A.  I don't have any mathematics of reasonable          11:31:59
6  versus average.  We're talking about disclosures.  So in
7  my mind, if I'm going to disclose something to the
8  public, I'm not going to disclose it only so that the
9  smart half understands it and the less smart half
10  doesn't.  I'm not going to disclose it such that just the          11:32:19
11  reasonable percentage, whatever percentage that might be.
12  Maybe it's an unreasonable audience.
13      I'm going to disclose it, if I'm disclosing it
14  to the public, in a way that most people, the majority of
15  people.  And surely there's some equivalent in contracts;          11:32:34
16  right?  You're going to write the contracts so that
17  people who read it understand it.  You know, if I'm going
18  to disclose something.
19      Oddly enough, I just closed on a house today,
20  and I signed like 30 different disclosures.  They're          11:32:49
21  going to be written so that kind of everybody who sits in
22  my seat can understand them.
23      Q.  Did you read them all?
24      A.  I have an attorney.  The attorney told me what I
25  read, told me what they said.  I trusted him.          11:33:13

Page 27

1      Q.  There you go?  Well, congratulations on the
2  purchase.
3      Okay.  Throughout your report, you use this term
4  reasonable user, and I'd like to get a sense of what you
5  mean by that.          11:33:25
6      So is that the majority of people or is that
7  less than the majority?  Can you have one reasonable
8  interpretation and also another reasonable interpretation
9  that's inconsistent?  What do you mean when you say
10  "reasonable user"?          11:33:38
11      A.  I mean that people in general, I mean it to -- I
12  mean it to be the public in general.  Because otherwise
13  you're now figuring who has what great education, who has
14  what English comprehension, who's distracted.  So I
15  really think of it just in terms of like the mortgage          11:34:02
16  signing I did today, it's being designed so that people
17  who it's stuck in front of will understand it.
18      Now there's going to be edge cases; right?  I
19  could come in and have poor English comprehension.  But
20  that's -- you know, really talking about -- it's not          11:34:21
21  majority.  The majority is 51 percent.  It's most
22  everybody.
23      Q.  Okay.  When you opine about how a reasonable
24  user would perceive the splash screen, are you -- so you
25  mean most everybody would interpret it the way you          11:35:13

Page 28

1  explain in your report?
2      A.  So now these are subjective terms.  So what do
3  you mean by "most everybody"?
4      Q.  Well, I was using it the same.  I asked you what
5  do you mean by "reasonable user," and I thought at the          11:35:34
6  end of it you came out at, you know, most everybody.
7      A.  See, I'm trying really not to be there at all.
8  I'm staring at -- here's another analogy.  I'm staring at
9  a piece of food packaging.  There's a label on that food
10  packaging.  It has ingredients, it has health          11:35:50
11  information.  I mean, and it's there so that the
12  reasonable user understands it.
13      Now if you ask me will this person get it or
14  will this person get it, I don't know the details of
15  who's reading it, their state of mind, and everything          11:36:06
16  else about them.  And it is not being written for the
17  lowest common denominator, but it's being written for
18  people.  And that's what I'm trying to capture.
19      Q.  Okay.  And how do you -- how do you determine,
20  without conducting a survey of, you know, what people          11:36:32
21  think or how people interpret Google's splash screen, how
22  do you determine that the reasonable user would perceive
23  from the information conveyed in that screen?
24      A.  We've been doing this for a long time --
25      MR. CROSBY:  Object to the form.          11:36:50

Page 29

8 (Pages 26 - 29)

1    I'm sorry.

2    THE WITNESS:  We've been doing this for a long

3  time.  We've been doing this for a long time with looking

4  at how privacy information is being presented, how screen

5  information, how websites, internet companies use          11:37:06

6  disclosures.  And in security and privacy space, we have

7  a body of knowledge that we can apply and look at

8  different documents, different disclosures.  So this

9  is -- this is our expertise.

10    Q.  BY MR. BROOME:  You look at the different       11:37:35

11  documents and the different disclosures in your practice,

12  but you don't survey the actual users or the people who

13  would be reading those documents or disclosures; correct

14    A.  I personally don't.  There are privacy experts

15  who do.  So there's lots of surveys on how people view    11:37:57

16  different disclosures.  Carnegie Mellon does a lot of

17  work on that.  They're trying to build a privacy and

18  security nutrition label and trying to figure out, you

19  know, what are the plain English ways to explain what

20  sorts of privacy protections that are particular website  11:38:17

21  or service or IOT device might have.  That's an example

22  of a lab that does a whole lot of user testing.

23    Q.  Would it be reasonable for a user to interpret

24  the Incognito -- or sorry, we'll use the term "splash

25  screen."  Would it be reasonable for a user to interpret  11:38:40

Page 30

---

1  the phrase "now you can browse privately and other people

2  who use this device won't see your activity."

3    You're familiar with that phrase; right?

4    A.  I am, yes.

5    Q.  All right.  Would it be reasonable for a user   11:38:54

6  reviewing that splash screen to think Incognito mode

7  provides me privacy from other people who use my device,

8  not from anyone else?

9    A.  So I don't know.  This gets back to me not

10  conducting the survey.                                    11:39:16

11    Q.  Okay.  Would it be reasonable for a user who

12  reads that same sentence to think:  "Great, Incognito

13  mode provides me privacy from Google"?

14    A.  I think that's what was intended.

15    Q.  But you don't know if that's what people in    11:39:42

16  general think?

17    A.  I have not conducted surveys on what people in

18  general think about that sentence.

19    Q.  Okay.  So you don't have an opinion, then, about

20  what Chrome users who use Incognito mode think about that 11:40:00

21  sentence?

22    A.  Right.  My opinions really are about the

23  disclosure, not about how they were received.

24    Q.  Okay.  Given what you just said, in Opinion 13,

25  you state:  "It is my opinion that Google employs         11:41:48

Page 31

---

1  documentation and disclosures throughout the class period

2  and across all class members falsely communicated that

3  Google would not collect information about users during

4  their private browsing activities on non-Google

5  websites."                                                11:42:06

6    Do you see that?  It's Opinion 13.

7    A.  I do.

8    Q.  Okay.  So given what you just said, then,

9  Opinion 13 is based on your review of the documentation,

10  Google documentation itself, and you're not opining on    11:42:21

11  what class members believed or expected based on

12  reviewing that documentation; is that accurate?

13    A.  That opinion is based on reviewing a lot of

14  Google internal documents and their -- Google internal

15  and external documents.                                   11:42:45

16    Q.  Right.  And just so I understand the opinion,

17  you're not opining that class members -- you're not

18  opining as to class members' expectations or

19  understandings or beliefs based on the documentation.

20  You're just opining on the documentation itself?          11:43:07

21    MR. CROSBY:  Object to the form.

22    THE WITNESS:  That is correct.

23    Sorry.

24    That is correct.

25    Q.  BY MR. BROOME:  And then in opinion 14 you say: 11:43:16

Page 32

---

1  "It is my opinion that with respect to private browsing,

2  Google throughout the class period was more concerned

3  with being portrayed as a champion of user privacy than

4  actually respecting user privacy."

5    Is that -- that's based on your review of          11:43:34

6  internal Google documentation; is that right?

7    A.  Internal Google documentation and external

8  Google statements.

9    Q.  Okay.  Anything else?

10    A.  My expertise as a security and privacy expert.  11:43:52

11    Q.  Okay.  If you turn to paragraph 2 of your

12  report.

13    A.  Yes.

14    Q.  In the second sentence, you say:  "My analysis

15  included issues relating to Google's disclosures and      11:44:29

16  practices, the private browsing modes at issue,

17  reasonable privacy expectations."

18    What do you mean there by "reasonable privacy

19  expectations"?

20    A.  I think I meant in general the things we were   11:44:42

21  talking with earlier.  How information is communicated,

22  English language, what I know about security and privacy

23  in general, kind of how things work.

24    Q.  Okay.  But you're not opining as to what

25  reasonable expectations are?                              11:45:09

Page 33

9 (Pages 30 - 33)

1  A. You know, I --
2     MR. CROSBY: Object to the form.
3     THE WITNESS: Again, without knowing what's --
4  what's coming, it's hard to be categorical here.
5  Q. BY MR. BROOME: Okay. Well, can you give me a        11:45:27
6  definition of "reasonable privacy expectations" as you
7  use it in this sentence?
8  A. Other than those words; right? I think it's all
9  the things we talked about. What expectations are of
10 privacy that are reasonable.                            11:45:58
11 Q. Okay. All right.
12    If you go on in that sentence, your analysis --
13 it says your analysis included, and then after reasonable
14 privacy expectations, it says: "Whether certain
15 practices could be highly offensive or constitute a      11:46:22
16 serious invasion of privacy."
17    Do you see that?
18 A. I do.
19 Q. And do you understand that those are legal terms
20 that set a standard for at least one of the claims in    11:46:33
21 this case?
22 A. I do know they're legal terms.
23 Q. Okay. And are you --
24 A. Actually, I want to -- I want to correct you.
25 You keep saying my analysis included and then go to the  11:46:43

Page 34

1  thing. I think relating to -- sorry. Sorry. I think
2  issues related to is important here. And that pulls us
3  back that issues are related to these things.
4  Q. Yeah, that's fair. Let me ask the question
5  again, then, with that -- with that nuance.              11:47:05
6     You said: "My analysis included issues relating
7  to," and then I'm going to jump to the clause that I'm
8  interested in, "whether certain practices could be highly
9  offensive or constitute a serious invasion of privacy."
10    Correct?                                              11:47:24
11 A. That is correct.
12 Q. Okay. And you said you understand that "highly
13 offensive" and "a serious invasion of privacy" are legal
14 terms?
15 A. I do.                                                 11:47:34
16 Q. Okay. And were you using these terms -- let me
17 say that again.
18    Were you -- when you opine about -- well, do you
19 make it -- do you offer any opinions about whether
20 Google's conduct is highly offensive or constitutes a    11:47:53
21 serious invasion of privacy?
22 A. I believe I don't.
23 Q. Okay.
24 A. I don't recall, but that's what this case is
25 about, which means everything we're doing here is related  11:48:06

Page 35

1  to those issues.
2  Q. When you use the terms "highly offensive" and "a
3  serious invasion of privacy," are you use them according
4  to their legal definitions?
5     MR. CROSBY: Object to the form of the question.     11:48:21
6     THE WITNESS: I'm not a lawyer so I'm not sure I
7  can, but I do know those are legal terms.
8  Q. BY MR. BROOME: Were you provided any -- well,
9  let me -- let me do this without invading work product.
10    Have you reviewed -- in forming your opinions       11:48:37
11 have you -- and writing your report, have you reviewed
12 any of the documents that explain what those terms mean?
13 What the legal definition of those terms are?
14 A. I don't remember.
15    MR. CROSBY: You can -- sorry, you can answer.       11:48:56
16    THE WITNESS: Sorry. I'll go slower.
17    MR. CROSBY: I was going to caution you not to
18 reveal work product if there were any such documents that
19 you recall, but there weren't so you can move on.
20 Q. BY MR. BROOME: Have you seen -- have you seen      11:49:20
21 those terms -- well, that's a silly question. Obviously,
22 you've seen the term "highly offensive" before.
23    But have you ever offered any opinions or done
24 any analysis relating to the legal definitions of those
25 terms outside of this case?                              11:49:37

Page 36

1  A. I have not.
2  Q. Okay. You have a Master's of Science in
3  computer science; correct?
4  A. I do.
5  Q. You have a Bachelor of Science in physics?         11:50:01
6  A. I do.
7  Q. Do you have any other degrees?
8  A. I have an honorary Ph.D., but I don't count
9  that, but that might show up in your search.
10 Q. Okay. What is an honorary Ph.D.?                    11:50:14
11 A. It is a great honor, but it is not a Ph.D.
12 Q. Okay. Well said.
13    You're not an economist; correct?
14 A. I am not an economist, although I work with a
15 lot of economists at the Harvard Kennedy school.       11:50:28
16 Q. Do you have any expertise in marketing?
17 A. I think I do. It's not formal.
18 Q. Okay. Do you want -- can you explain that for
19 me?
20 A. I think I'm actually pretty good at marketing.      11:50:44
21 Q. You mean for yourself?
22 A. No, in general. Over the course of my career, I
23 have worked with marketers, I have worked with people
24 selling or positioning products and services, and I find
25 that I do have an expertise.                            11:51:04

Page 37

10 (Pages 34 - 37)

1    Q. Okay. Have you ever offered any expert opinions
2 in the field of marketing?
3    A. No, I have not.
4    Q. Okay. Do you promote yourself as an expert in
5 marketing?                                    11:51:23
6    A. I certainly do not.
7    Q. And we talked before, you don't have any
8 expertise in consumer surveys; correct?
9    A. I do not.
10    Q. Do you have any expertise in measuring consumer    11:51:38
11 expectations?
12    A. I do not.
13    Q. Do you have any expertise in online advertising?
14    A. Some. I know how it works.
15    Q. Okay. Have you ever promoted yourself as an        11:51:55
16 expert in online advertising?
17    A. I have not.
18       MR. CROSBY: Object to the form.
19    Q. BY MR. BROOME: I think your current title is
20 securities technologist; is that right? Or maybe you     11:52:05
21 have many titles.
22    A. What do you mean by "title"?
23    Q. I think in paragraph 7 you say you work
24 internationally as a security technologist.
25    A. That is correct.                                   11:52:31

Page 38

1    Q. Okay. And what is a security technologist?
2    A. A security technologist is to me someone who
3 combines security, technology, and people. So as opposed
4 to a cryptographer, who knows mathematical security. As
5 opposed to an internet security expert, who might know    11:52:51
6 web security or Linux security.
7       I work at the intersection of security,
8 technology, and people. And security technologist is the
9 best phrase I've come up with to describe that. That's
10 why I kind of react to the title because it's not really   11:53:08
11 bestowed on me by anybody.
12       Title to me implies that it's something you're
13 given by your boss or the government or somebody. That's
14 what I call myself. Because I tried to encapsulate that,
15 that security and people and technology, all three.        11:53:27
16    Q. And when you say "security," what are you
17 referring to?
18    A. I refer to security pretty broadly. In a sense,
19 my career has been an endless series of generalizations.
20 I started out in mathematical security and cryptography    11:53:43
21 and then worked in computer security, network security,
22 general security tech, and then really into the economics
23 of security, the psychology of security, the sociology
24 and then public policy of security. So I'm really
25 meaning that very broadly.                                 11:54:05

Page 39

1    Q. Okay. You mentioned computer security and
2 network security. Is security -- do you mean keeping
3 people out of systems in which they should not be in?
4    A. That's part of it; right? If I'm running a
5 prison, it's keeping people into systems where they        11:54:23
6 shouldn't be out.
7       So security is very complex, and you probably
8 don't want to debate this at length. I spend time in my
9 books trying to define this term. It's a very squishy
10 term. Because it really has to do with things that are     11:54:41
11 permitted, which implies a permitter, and what does that
12 mean. Things that are prohibited.
13       And it's not just access. In data, we worry
14 about availability. You know, if someone took this Zoom
15 down, it would be a security violation, even though they   11:54:58
16 might not be eavesdropping on us.
17       It's integrity. If someone went in and changed
18 the transcript of this deposition, we'd both be pissed
19 off, but that -- you know, they may not have stolen
20 anything. Security has a lot of aspects to it.             11:55:13
21    Q. Okay. Paragraph 7 says you presently hold the
22 title of Chief Security Architecture at Inrupt Inc. What
23 is Inrupt?
24    A. Inrupt is a company that is commercializing
25 solid. I'll do this relatively quickly. Solid is a web     11:55:34

Page 40

1 standard invented by Tim Berners-Lee, who actually
2 invented the web -- he's kind of an important guy -- for
3 distributed data ownership.
4       Inrupt is a company that is commercializing that
5 standard. If you know anything about Linux, Inrupt is      11:55:51
6 basically the RedHat of solid.
7    Q. You have formerly been a board member of the
8 Tor Project.
9    A. I was, yes.
10    Q. And what is the Tor Project?                        11:56:17
11    A. The Tor Project is a browser extension that
12 allows people to browse the web anonymously.
13    Q. Including from Google?
14    A. Google employees can browse the web anonymously
15 using Tor, yes.                                            11:56:39
16    Q. Can users of the Tor browser extension browse
17 the web anonymously from Google, meaning Google would not
18 receive any of their data while they browse the web?
19    A. So anonymously doesn't mean not receiving --
20 back to the question. So from Google, I'm interpreting     11:57:01
21 to mean from Google's offices. So I am inside Google and
22 I am using Tor.
23    Q. Okay.
24    A. I think you mean something differently.
25    Q. Yeah, I do. I'm thinking more along the lines        11:57:14

Page 41

11 (Pages 38 - 41)

1 of the data collection described or at issue in this

2 case.

3     Is -- is using the Tor browser extension a way

4 to obtain privacy from Google?  Let me -- I didn't --

5   A. Yeah.                                11:57:33

6   Q. -- solve the problem.

7   A. Yeah.  You need to be careful.

8   Q. Yeah, let me try and solve the problem better.

9     Is using the Tor browser extension a way to

10 prevent Google tracking through analytics and ad        11:57:45

11 services?

12   A. No.

13   Q. So, sorry, explain to me again what it is that

14 Tor provides, how Tor provides privacy.

15   A. So Tor is the anonymity service.  So when you   11:58:09

16 use the Tor browser, the website you visit doesn't know

17 who you are based on browsing.  And it does that through

18 onion routing.

19     So basically what Tor does is it routes your

20 browser requests through a network of other browsers    11:58:33

21 around the world, and it uses three of them, which we can

22 talk about mathematically why that's a good idea if you

23 want.  I suspect you don't.  But the recipient at the

24 other end, let's say it's The New York Times,

25 substantiate it, doesn't know that you are making the   11:58:48

                                                Page 42

1 query.

2     Now it does not protect you if you log in.  And

3 if you log into The New York Times, you've logged in.

4 And you know, this is something that it turns out to be

5 hard to educate Tor users on sometimes.        11:59:05

6     But specifically, it hides your routing on the

7 internet.  So it has uses in evading censorship.  Maybe

8 you are a user in China.  Maybe you are a user in a

9 company that blocks The New York Times.  They don't want

10 you to read the newspaper at work.  Tor will mask that   11:59:22

11 from the network.

12   Q. What -- what is it masking specifically?  Is it

13 masking your IP address, your user agents, or all of the

14 above?

15   A. Now so I don't want to get it wrong.  It will   11:59:41

16 mask the IP address.  Whether it masks the other things

17 depends on the details that I -- I would look it up

18 before I answered.

19   Q. Okay.  Fair.

20     And I asked you whether it would provide privacy   12:00:06

21 or prevent, rather.  I asked you whether it would prevent

22 Google from tracking you using the analytics and

23 advertising services that are at issue in this case, and

24 you said "no."  And why is that?

25   A. So the analytics, as far as I understand it,   12:00:27

                                                Page 43

1 happen at the web server.  The web server contracts with

2 Google, puts Google code on its server, and that

3 communicates back to Google.

4     So what Tor is doing, it's protecting the

5 connection between myself and The New York Times.  It is   12:00:46

6 limiting, but not -- but not to zero the data The New

7 York Times gets about me.  Anything The New York Times

8 gets is transmitted back to Google.

9     So Google is getting the full take of what The

10 New York Times is sending it.        12:01:06

11   Q. But The New York Times doesn't know who you are;

12 right?

13   A. They might.

14     MR. CROSBY:  Object to the form.

15   Q. BY MR. BROOME:  How about if you don't sign in?   12:01:13

16   A. But if there is a cookie from a previous sign

17 in.  I don't know how The New York Times might be

18 figuring out who you are.  I also don't know how Google

19 might figure out who you are based on the information

20 provided.        12:01:29

21     Tor is designed so that people in the middle,

22 like you are the Chinese firewall making sure that I

23 don't go to Wikipedia and look up Falun Gong.  That's the

24 threat model.

25     And what Tor is providing is anonymity so that   12:01:44

                                                Page 44

1 China doesn't know what you're looking up on Wikipedia,

2 Wikipedia doesn't know where they're sending the Falun

3 Gong article to, and the censor in the middle just sees

4 opaque traffic.  That's the threat level.  That's what

5 Tor does.        12:02:03

6     Anything else is going to be ancillary, and it's

7 going to depend on a lot of things that I don't know.

8 But it's not what Tor is intended to do.

9   Q. You've published 12 books; is that right?

10   A. I like to say approximately 12 because it's        12:02:22

11 harder than you think to count books.

12   Q. Okay.  How many -- how many books were on the

13 topic of privacy?

14   A. Many books touch on privacy, but one book was

15 about privacy, and that's Data and Goliath.        12:02:39

16   Q. Okay.  What about Click Here to Kill Everybody?

17   A. Privacy's in there, but it's really about

18 security and safety.

19   Q. Okay.  Do you know approximately how many copies

20 of Data and Goliath were sold?        12:02:51

21   A. I should know that, and the answer is yes, but I

22 can't remember.

23   Q. Can you ballpark it?

24   A. Under a hundred thousand, but not much under a

25 hundred thousand.        12:03:03

                                                Page 45

12 (Pages 42 - 45)

1    Q.   Okay.  And what about Click Here to Kill
2 Everybody?
3    A.   Less.  I'm going to say 35,000.  I'm guessing
4 here, but it will be ballparking.
5    Q.   Do you encourage your students to read your          12:03:18
6 books in any of your classes?
7    A.   You know, I think it's kind of rude to tout your
8 own stuff in your own class.  It feels a little
9 self-serving.  I do assign chapters of some of my books,
10 but I give them a photocopy so they don't have to buy it,    12:03:34
11 but I try to have them read other -- other authors.  I
12 figure they get enough of me in class.  They don't need
13 more of me.
14    Q.   Have you ever testified as an expert in
15 litigation before?                                           12:03:46
16    A.   I have.
17    Q.   How many times?
18    A.   I don't know, but the last page of my CV -- oh,
19 wait.  Cross that out.  I've never testified in trial.
20 You people always settle before it goes to trial.  I have    12:04:00
21 been deposed, and the number of times is in the last page
22 of the CV if you count them up.
23       MR. BROOME:  I won't take offense to the term
24 "you people."
25       Okay.  We've been going a little over an hour          12:04:16

Page 46

1 now.  Why don't we take a ten-minute break.
2       MR. CROSBY:  That's fine.
3       THE WITNESS:  All right.  So I'm going to go on
4 mute.
5       THE VIDEOGRAPHER:  Going off the record at             12:04:25
6 12:04 p.m.
7       (Recess.)
8       THE VIDEOGRAPHER:  We are back on the record at
9 12:15 p.m.
10    Q.   BY MR. BROOME:  Mr. Schneier, can you turn to       12:15:14
11 paragraph 19 of your report.
12    A.   I'm there.
13    Q.   Okay.  It says:  "I have spent my entire career
14 focused on issues relating to privacy, reviewing articles
15 and materials regarding online privacy."                    12:15:40
16       Does that include articles relating to private
17 browsing mode?
18    A.   I mean, it's inconceivable that I didn't read
19 anything about private browsing before this case.  So I'm
20 going to answer yes.                                         12:16:00
21    Q.   Can you recall the gist of any articles you read
22 about private browsing before you got involved in this
23 case?
24    A.   You know, I've read so much after that that's
25 all tainted, and I'm not convinced I can give you a clean    12:16:14

Page 47

1 break before and after.
2    Q.   Do you recall reviewing articles -- well, strike
3 that.  Let me start again.
4       Before you got involved in this case, do you
5 recall reviewing articles saying that Incognito mode or      12:16:30
6 private browsing mode is not really private; it only
7 deletes data locally?
8    A.   Not specifically.  No.
9    Q.   Do you recall any articles explaining that
10 Incognito mode doesn't prevent Google from tracking you?    12:16:56
11    A.   Not specifically, no.
12    Q.   Putting aside whether you can recall the
13 specific articles, can you recall generally reviewing
14 articles on those topics?
15    A.   Again, it's inconceivable that I didn't because     12:17:11
16 I think some were written and things go across my orbit,
17 but I cannot recall specifically.
18    Q.   So you think it might -- sorry.  I didn't mean
19 to interrupt.
20       So you think it's likely that you did read an         12:17:32
21 article explaining that Incognito mode doesn't prevent
22 Google from tracking you?
23    A.   Not --
24       MR. CROSBY:  Object to the form.  Sorry.
25       THE WITNESS:  Google specifically, I'm even less      12:17:46

Page 48

1 sure about, but if there are articles -- if there are
2 articles that talk about the Incognito mode in the press
3 before the lawsuit, I likely will have seen them.
4    Q.   BY MR. BROOME:  Okay.  Before you got involved
5 in this case, you were aware that Incognito mode only       12:18:10
6 deletes data locally from your browser and doesn't
7 prevent Google from tracking you; correct?
8    A.   Before this case, I was aware that browsers in
9 general have a privacy mode that prevents them from
10 storing data locally.  I'm not a Chrome user, and I don't   12:18:32
11 know if I specifically thought about what other means
12 Google as a company has tracking Chrome users when
13 they're using the Chrome-branded Incognito mode.
14    Q.   Okay.  Let me ask the question slightly
15 differently.                                                12:19:01
16       During the class period, you were aware that
17 private browsing mode in general only delete data locally
18 from your browser; correct?
19    A.   So using the word "only," which I would want to
20 strike.  If you strike the word "only," I would agree       12:19:15
21 with your sentence.  And actually, if you add "during at
22 least part of the class period."  Because now it's like
23 when's the class period and when's the first article.  I
24 couldn't give you the dates.
25    Q.   Okay.                                               12:19:31

Page 49

13 (Pages 46 - 49)

1    A.  With the caveat of not sure of the dates and
2  "only," I'll go with that statement.
3    Q.  All right.  So let me ask it one more time.
4        Before the Complaint in this action was filed,
5  you were aware that private browsing mode deletes data      12:19:44
6  locally from your browser; correct?
7    A.  I would say I was aware that that is the intent
8  of private browsing mode.  I know, like any computer
9  security person, that actually deleting data on a hard
10 drive is hard, and I've seen lots of examples where       12:20:06
11 products claim to delete stuff and they just don't
12 actually do it.
13       So, again, given all those caveats, yes.
14   Q.  Okay.  Before the Complaint in this action was
15 filed, you were aware that private browsing modes do not      12:20:19
16 prevent companies like Google from tracking you; correct?
17   MR. CROSBY:  Object to the form.
18   THE WITNESS:  Before -- before the -- before I
19 was involved in this case, I don't know if I thought
20 about that very much.  I had not written about private      12:20:34
21 browsing in general, and I hadn't given it much thought.
22 I knew generally how they worked, but you're asking about
23 details, and I'm not sure I had fully formed opinions on
24 what Google could or couldn't do.
25   Q.  BY MR. BROOME:  Let me try one more time.      12:21:04

Page 50

1        During -- before the class period -- sorry.  No,
2  no.
3        Before the Complaint was filed, you were aware
4  that private browsing modes do not prevent internet
5  tracking.      12:21:19
6    MR. CROSBY:  Object to the form.
7    Q.  BY MR. BROOME:  Correct?
8    A.  Yes.  I was aware that is the intention, that it
9  is -- again, it's hard to -- to separate before and after
10 because so much happened in writing these reports and      12:21:41
11 doing the research.
12       Before the class period, I understood that the
13 intent of the private browsing modes in browsers was to
14 not store information about browsing sessions locally.
15   Q.  Okay.  And what was that understanding -- and      12:22:05
16 you understood that going back years; right?  Like going
17 back to the beginning of the class period, which is 2016?
18   A.  I hesitate to answer that definitively because I
19 don't remember.
20   Q.  Okay.  Well, fair to say that you had that      12:22:22
21 understanding for several years before the Complaint was
22 filed?
23   A.  I think that is correct, yes.
24   Q.  Okay.  And your understanding that the intent of
25 private browsing mode was to not store information about      12:22:34

Page 51

1  browsing sessions locally, what was that based on?
2    A.  When you say "intent," what do you mean by
3  "intent"?
4    Q.  Oh, I was just -- I was just trying to use the
5  same language that you used.      12:22:49
6    A.  Okay.  So let's formalize it since -- to see the
7  matter.
8    Q.  Sure.
9    A.  You said "intent."  That implies an intender.
10 So who is the intender in your question?      12:23:00
11   Q.  Again, you said:  "Before the class period, I
12 understood that the intent was to not store information
13 about browsing sessions locally."
14       So I'm just using your language.  I guess I have
15 to put the question back to you.      12:23:13
16   A.  All right.  So that I would be talking about the
17 intent of the programmers or the company that created it.
18   Q.  So that companies that published the browsers?
19   A.  That published the either the browser or the
20 extension.  You can imagine this not being done by a      12:23:29
21 browser.  I actually don't know for all the browsers
22 whether the private browsing is something the company
23 does or something a third party does.
24       I know for Firefox, Firefox has it embedded in
25 their browser.  That's the one I use so it's the one I'm      12:23:47

Page 52

1  familiar with.
2    Q.  All right.  When you say --
3        All right.  You said:  "Before the class period,
4  I understood that the intent of the private browsing
5  modes" -- "the intent of the private browsing modes in a      12:24:50
6  browser was not to store information about browsing
7  sessions locally."
8        So when we say -- when you say "intent," you're
9  referring to the Google; right?  For Incognito, it would
10 be Google's intent?      12:25:10
11   A.  Yeah, so I guess I'm not; right?  Because I
12 don't know Google's intent.  I'm saying sort of more in
13 generally that private browsing modes were -- are for
14 protecting you from other people using your browser.
15       Now, I mean, I actually didn't see any of      12:25:28
16 Google's corporate communications about this.  I'm not a
17 Chrome user, and I didn't actually write any articles on
18 private browsing, what it does, what it doesn't.
19       So it's not something I researched specifically.
20 I knew in general that private browsing protects you      12:25:43
21 against your roommates.
22       And when I would like talk about this, I would
23 sometimes call it porn mode.  You might actually find
24 something of me saying that.
25       So that is, you know, I know, you know, in my      12:26:02

Page 53

14 (Pages 50 - 53)

1 head, what it's supposed to do.
2      You're asking me, you know, is that Google's
3 intention or did Google have a different intention.  And
4 that, I'm not free to speak about.  You know, I'm reading
5 a lot of documents in the case, and Google's trying to,          12:26:18
6 you know, play both ends.
7      Was I aware of that before I started working on
8 the case?  I don't think so because I wasn't paying
9 attention.
10 Q. When you say Google's trying to play both ends,          12:26:35
11 what do you mean?
12 A. That Google is trying to say to the world that
13 private browsing will protect your privacy and at the
14 same time collect as much information as they can about
15 users using it.                          12:26:57
16 Q. Okay.  In paragraph 19, you go on to say:
17 "Before counsel contacted me about being retained as an
18 expert in this litigation, I was familiar with private
19 browsing modes in general but was unaware of the details
20 of the conduct at issue in this litigation, that is,          12:27:26
21 where plaintiffs allege that Google collects and stores
22 detailed private browsing information when people visit
23 non-Google websites in private browsing modes.  It was
24 only through my access to confidential discovery in this
25 litigation that I understood the extent of these Google          12:27:42
                                                                  Page 54

1 practices."
2      Do you see that?
3 A. Yeah.  That's actually a good answer to a bunch
4 of your previous questions.
5 Q. Yeah, okay.  So what is it that you were unaware          12:27:50
6 of that you only learned in this litigation?  Well,
7 actually, let me -- let me take a step back there and
8 strike that.
9      Is it your testimony that before you got
10 involved in this case, you were not aware that Incognito          12:28:09
11 mode or other private browsing modes do not prevent
12 Google from tracking your activity?
13 A. Yeah, before this litigation, it's not something
14 I devoted time and expertise to.
15 Q. Okay.  So what is it that you learned only after          12:28:32
16 you got involved in this case?
17 A. So you don't want me to read my report back to
18 you.  So can I just say the stuff in the report?
19 Q. Yeah, no, I guess that's -- that's fair.  You
20 say: "That is where plaintiffs allege that Google          12:28:58
21 collects and stores detailed private browsing information
22 when people visit non-Google websites in private browsing
23 modes."  That's what you learned only as a result of
24 getting involved in this case?
25 A. I will say that's one of the things I learned,          12:29:12
                                                                  Page 55

1 yes.
2 Q. Okay.  Do you know how -- are you familiar with
3 the process through which companies like Google and
4 others engage in internet tracking?
5 A. I know some of the processes.  I'm positive I          12:29:23
6 don't know all of them.
7 Q. Okay.
8 A. We learn about new processes that these
9 companies do pretty regularly.  So I don't think -- I
10 would never say that I knew them all.  I could talk about          12:29:36
11 some of them, yes.
12 Q. Well, yeah.  Some of them are described in the
13 Complaint; right?  The installation by a website of
14 Google Analytics or advertising code that then sends a --
15 redirects the user's browser to the Google server hosting          12:29:50
16 that service.  That process you're generally familiar
17 with; right?
18 A. Yes.
19 Q. Okay.  And before you got involved in this case,
20 you were aware that -- of that process, you were aware          12:30:03
21 that process occurred when people are browsing the
22 internet in regular -- I'll call it regular mode, just
23 like a non-private browsing mode.
24 A. Yes.
25 Q. You were familiar with that process; right?          12:30:17
                                                                  Page 56

1 A. Yes.
2 Q. Okay.  And before you got involved in this case,
3 were you aware that that process also occurs when users
4 are in private browsing mode?
5 A. I was neither aware nor not -- strike that.          12:30:29
6      I was not aware of that.  It's not something I
7 thought about.
8      MR. BROOM:  Okay.  Can we load 2A?
9 Q. We're going to load another exhibit for you,
10 Mr. Schneier.                          12:30:51
11 A. Tell me what it is, and I'll see if I have it.
12 Q. It is the book jacket to Data and Goliath.  Yes,
13 I guess you got the actual copy there.  We had to...
14 A. I'm willing to opine on the book jacket.  That's
15 easy.  I'll even take it off.                          12:31:09
16 Q. Then keep the book because we're going to go
17 there next.
18 A. All right.
19      Do you have the hard cover or paperback?  I'm
20 not sure the numbers are the same.                          12:31:38
21 Q. Yeah.  So we have a PDF.  So this may get
22 tricky.  You may actually need to review the PDF we have.
23 A. Let's hope it works.
24 Q. The problem is our PDF doesn't have the page
25 numbers of your book.  So it's got -- we've got PDF          12:31:53
                                                                  Page 57

15 (Pages 54 - 57)

1 numbers but they don't align with the --
2    A. So it's not a scan of the actual book?
3    Q. Good question.
4    A. If it's a scan of the book, the page numbers
5 will be at the top of each page.                12:32:04
6    Q. Yeah, you'd think.  Okay.  So let's start with
7 the book jacket.  You've got the actual book there so
8 we'll figure this out.
9    A. Yeah.
10    Q. I'm just trying to locate the language here.   12:32:26
11    A. There aren't too many words on the book jacket.
12 It should be easy.
13       (Exhibit 2, Data and Goliath: The Hidden Battles
14       to Collect Your Data and Control Your World, by
15       Bruce Schneier, was marked for identification by   12:32:37
16       counsel electronically.)
17    Q. BY MR. BROOME:  You're right.
18       So this is the book jacket.  At least we hope it
19 is.
20    A. Let's hope for the best.            12:32:44
21    Q. I can confirm that because you've got the book
22 right there in front of you.  But on the book jacket, it
23 says:  "Your cell phone provider tracks your location and
24 knows who's with you, your online and in-store purchasing
25 patterns are recorded and reveal if you're unemployed,   12:32:58
Page 58

1    A. I'm kind of surprised the word is there.  It's
2 sort of interesting.
3    Q. All right.  So now we're going to go -- we're
4 going to mark Exhibit 3.
5    A. It has not appeared yet.            12:34:46
6    Q. Yeah, this one may take a while.
7    A. Is it the book?
8    Q. It's a copy of the book that we were able to get
9 electronically.
10    A. All right.                  12:34:57
11    Q. And this may take a little time, first to load,
12 and then as we try to orient you to the relevant pages,
13 which we'll probably have to do by chapter and heading.
14    A. My publisher admonishes you for not buying the
15 actual book, but it's okay.               12:35:10
16       MR. BROOME:  I know.  Google couldn't afford it
17 so...
18       (Exhibit 3, Data and Goliath: The Hidden Battles
19       to Collect Your Data and Control Your World, by
20       Bruce Schneier, was marked for identification by   12:35:14
21       counsel electronically.)
22    Q. BY MR. BROOME:  All right.  It should be there
23 now.  All right.
24       So you've got the actual book.  We've marked
25 what we believe is an accurate scan or printout of the   12:35:33
Page 60

1 sick, or pregnant, your email and text expose your
2 intimate and casual friends.  Google knows what you're
3 thinking because it saves your private searches," and
4 then it goes on.
5       Did I read that accurately?          12:33:12
6    A. You did.
7    Q. And that language appears on the book jacket to
8 your 2015 book Data and Goliath.  Correct?
9    A. Correct.
10    Q. Okay.  Okay.  So what we've used as Exhibit 2 is   12:33:23
11 a printout from the internet archive website where the
12 book is publicly available.
13       Oh, I'm sorry, that's for the next exhibit we're
14 using.  So this one is -- oh, no, that this one.  Okay.
15       Okay.  So what did you mean by "private     12:33:47
16 searches"?  Do you mean searches conducted in private
17 browsing mode or are all searches private?
18    A. So I didn't.  I don't think I even knew about
19 private browsing when I wrote this.  So a couple of
20 things.  This is marketing copy so I am not going to   12:34:00
21 debate meanings of words.  The marketers write this;
22 right?  I read it.  I approved it.  And I'm sure I meant
23 intimate, private as in personal.  It was not a reference
24 to private browsing.
25    Q. Okay.  Helpful.            12:34:19
Page 59

1 book, electronic copy.
2    A. If I was to use this electronic version, how do
3 I --
4    Q. You know what?  Actually, go to your hard copy.
5 I think -- I think I can probably do this.  I think maybe   12:35:55
6 we do -- I can probably orient -- orient you.
7    A. Wow.  Okay.
8    Q. So page 31.
9       MR. BROOME:  And for those in our viewing
10 audience, it's PDF page 27.            12:36:08
11       THE WITNESS:  All right.  I'm there.
12    Q. BY MR. BROOME:  Okay.  Yeah, at the very bottom
13 of 31, there's a paragraph that says:  "I try not to use
14 Google search."
15       Do you see that?            12:36:47
16    A. I do.
17    Q. And then it goes on and it says:  "But Google
18 still collects a lot of information about the websites I
19 visit because so many of them use Google Analytics to
20 track their visitors"?            12:36:57
21    A. Uh-huh.
22    Q. "Again, those sites let Google track me through
23 them."
24       Do you see that?
25    A. I do.                  12:37:03
Page 61

16 (Pages 58 - 61)

**Page 62**

1  Q. So as of 2015, you were aware that Google
2  collects a lot of information through Google Analytics;
3  correct?
4  A. As of 2014, but yes.
5  Q. 2014, okay. But as of 2014 -- and the process  12:37:15
6  through which you understood Google to be tracking users
7  was the same process that's alleged in plaintiffs'
8  Complaint; right? The scripts are embedded in the web
9  page and sends information to Google's servers?
10  A. I would add one of the processes, but yes.  12:37:34
11  Q. Okay. Fair.
12  And then you say here: "Those sites let Google
13  track me through them."
14  What do you mean by that?
15  A. What I'm trying to say in very general terms --  12:37:43
16  because, remember, I'm writing for a general audience
17  here so I'm sloppy with tech, all throughout this book.
18  What I'm saying is, you're reviewing The New York Times.
19  The New York Times has Google Analytics. The New York
20  Times has a relationship with Google that's allowing  12:38:03
21  Google to track what I do on The New York Times.
22  Q. Okay. Okay. Now let's go to -- just for the
23  record, the language that I read to you from your book,
24  I'm reading it from Exhibit 3, but you're reading it from
25  the hard copy of your actual book; right?  12:38:31

**Page 63**

1  A. I am, and I'm verifying that it's the same. If
2  there's a difference, I'll let you know. There shouldn't
3  be.
4  Q. Yeah, and I'll just ask just so there's no
5  disputes down the road between me and plaintiffs'  12:38:44
6  counsel, that if there is a difference between the
7  language that I'm reading in Exhibit 3 and the hard copy
8  of your book, if you would please let us know.
9  A. I will let you know and also by -- figure out
10  why it's wrong.  12:38:57
11  Q. Okay. Excellent.
12  So now if you go to 215 in the hard copy, and
13  it's 153 of the PDF.
14  A. I'm here.
15  Q. Sorry, I think I got it wrong. It might be 152.  12:39:50
16  A. Oh, you're right. It's 215.
17  Q. It's 215. It might be 151 of the PDF, though,
18  for everyone else.
19  A. 215 is the totally the paragraph you want.
20  Q. Yeah. It sounds like you're there already.  12:40:03
21  Okay. Right.
22  So in the -- there's a paragraph there that says
23  "Block Surveillance" in big bold letters. And then the
24  next paragraph says: "Privacy enhancing technologies, or
25  PETs, can help you block mass surveillance. Lots of  12:40:26

**Page 64**

1  technologies are available to protect your data. For
2  example, there are easy-to-use plug-ins for browsers that
3  monitor and block sites that track you as you wander the
4  internet: LightBeam, Privacy Badger, Disconnect,
5  Ghostery, FlashBlock, and others."  12:40:43
6  Do you see that?
7  A. I do.
8  Q. And do you still -- is that still your opinion
9  today, that there are lots of PETs that can help you
10  block mass surveillance?  12:40:52
11  A. Yes.
12  Q. And those include easy-to-use plug-ins such as
13  those that you mention there?
14  A. Now some of those, I don't recognize so they
15  might be gone, but certainly Ghostery and Privacy Badger  12:41:05
16  are still around.
17  Q. And are those popular plug-ins?
18  A. I actually don't know market penetration.
19  Q. Okay. Do you use any of any of these plug-ins?
20  A. I do.  12:41:21
21  Q. Which ones do you use?
22  A. I would rather not say.
23  Q. Okay. That's fine.
24  But you use one of the ones on the list there;
25  is that fair?  12:41:34

**Page 65**

1  A. Yes.
2  Q. Okay.
3  A. Actually for this, I'm willing to say. I use
4  Privacy Badger.
5  Q. Privacy Badger. Okay. And do you know others  12:41:40
6  who use plug-ins?
7  A. I do.
8  Q. And do these plug-ins prevent Google from
9  tracking you?
10  A. You know, plug-ins -- none of these plug-ins are  12:41:52
11  all or nothing. So if you -- I think you're asking me do
12  any of these plug-ins prevent Google from tracking you in
13  any way possible. I don't know, but if you're asking for
14  advice, I would say don't count on it.
15  Q. Do they prevent -- would they prevent the data  12:42:12
16  collection that's at issue in this case?
17  A. It depends. Maybe some of it.
18  Q. Okay. What would it prevent and what would
19  it -- what would they not prevent?
20  A. All right? So which tool are you asking me  12:42:36
21  about?
22  Q. Let's start with Privacy Badger.
23  A. This is hard. So now I have to actually --
24  right? This is where you go into exactly what Privacy
25  Badger blocks. I know it is an ad blocker.  12:42:48

17 (Pages 62 - 65)

1    Q.  Uh-huh.
2    A.  I know it is stripping out a bunch of data that
3  goes with the URL to the recipient sites.  And I mean, I
4  have not done the analysis where I looked at exactly what
5  Privacy Badger strips out, what is collected at issue.  I   12:43:05
6  would hesitate to offer an opinion on that without doing
7  real research.
8    Q.  Okay.  And then in the next sentence, it says:
9  "Remember that the private browsing option on your
10  browser only deletes data locally."  Right?       12:43:23
11   A.  Yep.  So you have it here is me knowing this in
12  2014.
13   Q.  Okay.  And then you go on and you say:  "So
14  while it's useful for hiding your porn viewing habits
15  from your spouse, it doesn't block internet tracking."    12:43:37
16      Correct.
17   A.  Yes.  And I would talk about it as porn mode.
18  That's actually a common way I would refer to it, as porn
19  mode.
20   Q.  All right.  So as of 2014, you were aware that   12:43:48
21  the private browsing option on your browser only deletes
22  data locally; correct?
23   A.  Right.  That is -- in general, private browsing
24  deletes data locally.  And what I'm saying there, it
25  doesn't do anything about who you're visiting; right?   12:44:06

1  The New York Times, when you're logged in, it's still
2  going to be able to identify you with the articles you
3  read, and private browsing doesn't do that.
4      If you're logged into Facebook, and Facebook is
5  doing a whole lot of tracking, it's not preventing that.   12:44:22
6  It is working in the browser.
7    Q.  And it's not preventing Google from tracking
8  you; right?
9    A.  So I'm not convinced I knew about Google's
10  private browsing specifically.  So I'm talking about   12:44:35
11  private browsing in general.
12   Q.  Yes.  No, and I'm not saying -- I'm not talking
13  about Google's private browsing, either.
14      But my point is that you knew in 2014 that
15  private browsing modes in general do not prevent   12:44:49
16  companies like Google from tracking you across the web.
17   A.  Yes.
18      MR. CROSBY:  Object to the form.
19   Q.  BY MR. BROOME:  And you knew in 2014 that
20  private browsing modes in general do not prevent Google   12:45:17
21  from tracking you on non-Google websites; correct?
22   A.  I mean, so the question is did I know it
23  explicitly?  If you'd asked me then, I probably would
24  have said probably not.  Remember, all I'm knowing is
25  sort of how private browsing works in general.  I am not   12:45:40

1  privy to any of Google's marketing, I'm not reading their
2  splash screen, I am not paying attention to what Google's
3  executives are saying about Chrome or private browsing in
4  general.
5      I'm -- you know, just based on what I know about   12:45:56
6  how a private browsing system would work in a browser,
7  I'm saying that.
8      So my -- my knowledge is in a sense specialized.
9  It's as a security expert, not as a browser user.
10   Q.  Right.  And you say that private -- the private   12:46:13
11  browsing mode option on your browser only deletes data
12  locally; right?
13   A.  Yes.
14   Q.  And so you knew in 2014 -- well, let me
15  rephrase.                12:46:26
16      When you say "locally," you mean just from the
17  user's browser; correct?
18   A.  Yes.
19   Q.  Okay.  And how did you learn that fact?
20   A.  I don't remember.        12:46:50
21   Q.  Do you think it was based on sort of reviewing
22  material out there on the web or, you know, did you
23  perform some, you know, technical tests?
24   A.  I did not perform any technical tests.  If
25  others did, I would have read about it.  In that same   12:47:13

1  paragraph, I'm pointing to various documents that I said
2  people should use to protect their privacy.  I'm sure I
3  would have read those.
4      There are people doing research in this area,
5  and I would have known about their research.     12:47:32
6    Q.  Uh-huh.
7      In the end notes, which I think are at page 356
8  of the hard copy, 250 of the PDF.
9    A.  Uh-huh.
10   Q.  Maybe 249 of the PDF, actually.       12:48:17
11   A.  I see it on page 356.
12   Q.  Yep, 356.
13   A.  That's the end notes to page 215.
14   Q.  It says -- there's a sort of blue text -- for
15  us, it's blue.  It may not be for you.        12:48:39
16   A.  It's blue for me.  I know what you're going to
17  tell me.
18   Q.  Remember that the private browsing and then it
19  says Sara M. Watson?
20   A.  Yes.              12:48:49
21   Q.  Does that mean that the statement that you made
22  in your book where you say:  "Remember that private
23  browsing mode clears your browsing history only from
24  your -- I'm sorry, no, I got that wrong.  I was reading
25  the wrong text.                12:49:03

1    Where you say: "Remember that the private
2 browsing option on your browser only deletes data
3 locally," does the -- does the end note indicating that
4 you are basing that statement at least in part on the
5 article by Sara Watson?                    12:49:14
6    A. It doesn't. It implies that. It doesn't
7 necessarily mean that. I'll use references for a bunch
8 of different reasons. I'll use them for giving readers
9 further information, places for them to go. I'll use
10 them as citations. But I'm pretty fast and loose. I'm    12:49:29
11 not even using footnotes in the book. Footnotes scare
12 readers. They are these kind of weird end note that's
13 disassociated. So without seeing the article, I don't
14 think I could tell you. If I saw it, I'm not sure I
15 could tell you. It's a long time ago. But it's         12:49:46
16 certainly something I pointed readers to if they wanted
17 to understand that phrase better.
18    Q. Does it mean that you read the article? Would
19 you have read the article if you had included it in the
20 end notes?                                  12:49:58
21    A. It does mean I read the article.
22    Q. Okay. So let's load the article.
23    A. Oh, cool.
24      (Exhibit 4, Ask the Decoder: How Private is
25      Private Browsing, Really? By Sara M. Watson,    12:50:02

Page 70

1    09/24/14, was marked for identification by
2      counsel electronically.)
3    Q. BY MR. BROOME: All right. We've loaded an
4 article. This one you probably don't have in hard copy.
5    A. I don't. Can it be bigger?               12:50:31
6    Q. I'd be impressed if you did, though. That would
7 be a great anticipation skill there.
8    A. I'm totally well prepared.
9    Q. That's Mark's fault.
10    Are you trying to load another copy? I think   12:50:50
11 we're going to load another copy just to get the exhibit
12 stamp on there.
13    A. I've got it on the screen.
14    All right.
15    Q. All right. So you read this article in       12:51:58
16 connection with your book Data and Goliath. "Yes"?
17    A. In 2014, yes.
18    Q. Okay. And if you look at, let's see, page 3 of
19 the PDF, do you see there's a paragraph beginning: "The
20 real disconnect"?                            12:52:16
21    A. Yes.
22    Q. Okay. It says: "The real disconnect for Jen
23 was that private browsing mode clears your browsing
24 history only from your local machine, whether it's your
25 computer or your phone, not from anywhere else."   12:52:31

Page 71

1    And that was consistent with your understanding
2 of private browsing in 2014; correct?
3    A. Yes.
4    Q. Okay. You can put that one away. Now we're
5 going to load --                              12:53:01
6    A. Sorry. It's fun to read the oldies.
7    Q. Yeah.
8    A. Randomly, I saw Sara two days ago.
9    Q. Mr. Schneier, is it fair to say that any
10 articles that you've cited in your expert report you've   12:54:08
11 read before submitting your report?
12    A. Yes.
13    Q. Okay. Let's load that one.
14    Okay. We're going to load another exhibit, and
15 this one gets a little tricky as well. You have the --   12:54:48
16 your book Kill Everyone?
17    A. The title is Click Here to Kill Everyone.
18    Q. I'm sorry, Click Here to Kill Everyone.
19    A. Which I think demonstrates my marketing
20 expertise. That's my title.                    12:55:07
21    Q. Very creative. Much better than the one I just
22 came up with. Sounds --
23    A. I'm actually good at book titles.
24      (Exhibit 5, Schneier on Security: Click Here to
25      Kill Everybody Endnotes, was marked for       12:55:13

Page 72

1      identification by counsel electronically.)
2    Q. BY MR. BROOME: I think Data and Goliath is a
3 very good one.
4    A. Yeah. You know, some people mispronounce data
5 as data, and they don't get the joke.            12:55:26
6    Q. Okay. So we have loaded Exhibit 5. And this
7 has -- this is on your blog. It has the end notes. At
8 least we think, and I'm hoping you can confirm, to Click
9 Here to Kill Everyone?
10    A. That is correct. And I can match them with what   12:55:48
11 I see in the book.
12    Q. Yeah. So when we go to paragraph 16 -- let me
13 find the actual end note. Or page 16 of the PDF, rather.
14    A. Give me the page number, starts with the end
15 note. That will help me find it.                 12:56:08
16    Q. Yeah, it's -- okay, 58. It says -- are you
17 there?
18    A. I'm there.
19    Q. Okay. It says: "We never lie to our search
20 engines. Settings like Chrome's Incognito mode or   12:56:28
21 Firefox's private browsing keep the browser from saving
22 your browsing history. It does not prevent any websites
23 you visit from tracking you."
24    Do you see that?
25    A. I don't. So let me try to find it.           12:56:41

Page 73

19 (Pages 70 - 73)

| | |
|---|---|
| 1 | What is the highlighted text? |
| 2 | Q.  "We never lie to our search engines."  It should |
| 3 | be 58, I think. |
| 4 | A.  58.  I see.  I got it.  Sorry, I got it.  I was |
| 5 | on 38.  My apologies.                              12:56:58 |
| 6 | Q.  All right.  Do you see that text?  It says:  "We |
| 7 | never lie to our search engines.  Settings like Chrome's |
| 8 | Incognito mode or Firefox's private browsing keep the |
| 9 | browser from saving your browsing history.  It does not |
| 10 | prevent any websites you visit from tracking you"?     12:57:12 |
| 11 | A.  Yes, that is correct. |
| 12 | Q.  And when did you publish this book? |
| 13 | A.  This was published in 2018, I believe.  Correct, |
| 14 | which means it was written in 2017. |
| 15 | Q.  While we're loading the article, I just want to     12:57:59 |
| 16 | go back to your opening report, which I think is |
| 17 | Exhibit 1. |
| 18 | You have a hard copy. |
| 19 | A.  Uh-huh. |
| 20 | Q.  And if you go to paragraph 301, note 326.  I see     12:58:09 |
| 21 | you didn't spare the lawyers the footnotes. |
| 22 | A.  You guys like footnotes. |
| 23 | Q.  We love footnotes. |
| 24 | A.  They're shorter than you guys usually like. |
| 25 | Q.  Well, we just use them to avoid space     12:58:35 |

Page 74

| | |
|---|---|
| 1 | constraints. |
| 2 | A.  Fair. |
| 3 | Q.  Do you see at 326, it says Lori -- it cites to |
| 4 | an article by Lori Clark titled Google's Chrome Incognito |
| 5 | Mode is Way Less Private Than You Think?     12:58:52 |
| 6 | A.  I do. |
| 7 | Q.  Okay.  And that was published July 20th, 2019? |
| 8 | A.  According to me, yes. |
| 9 | Q.  According to you.  We'll confirm that next. |
| 10 | And that's in the -- during the class period;     12:59:04 |
| 11 | right?  Before the Complaint was filed? |
| 12 | A.  Yes. |
| 13 | Q.  Okay.  And did you -- I think you said before |
| 14 | that you would have read this article in preparing your |
| 15 | report?     12:59:13 |
| 16 | A.  I did. |
| 17 | (Exhibit 6, Google's Chrome Incognito Mode is |
| 18 | Way Less Private Than You Think, by Laurie |
| 19 | Clarke, was marked for identification by counsel |
| 20 | electronically.)     12:59:20 |
| 21 | MR. BROOME:  All right.  Now let's go back, |
| 22 | and you should have an Exhibit 6. |
| 23 | Does this look like a -- well, I'll represent to |
| 24 | you this is a printout of the article cited in your |
| 25 | report.     12:59:41 |

Page 75

| | |
|---|---|
| 1 | A.  And I will trust you. |
| 2 | Q.  Okay.  Do you see at the bottom of the first |
| 3 | page, she says:  "Despite the long-known fact that |
| 4 | Incognito isn't truly anonymous, new research has |
| 5 | reemphasized that Google and other web browsers are still     13:00:02 |
| 6 | tracking you in privacy mode, even on the most sensitive |
| 7 | of sites"? |
| 8 | A.  No, I'm not seeing it. |
| 9 | Q.  Yeah, I didn't do a good job of orienting you |
| 10 | there.  On the first page, it's the very last few words     13:00:15 |
| 11 | after the last full sentence. |
| 12 | A.  Yes, I see it.  Thank you. |
| 13 | Q.  "Despite the long-known fact"? |
| 14 | A.  Uh-huh. |
| 15 | Q.  All right.  I'll just read it again.     13:00:28 |
| 16 | "Despite the long-known fact that Incognito |
| 17 | isn't truly anonymous, new research has re-emphasized |
| 18 | that Google and other web browsers are still tracking you |
| 19 | with privacy mode, even in the most sensitive of sites"? |
| 20 | MR. CROSBY:  I'm sorry, Counsel, where exactly     13:00:44 |
| 21 | are you Exhibit 6? |
| 22 | MR. BROOME:  It's a bit tricky to find. |
| 23 | THE WITNESS:  It's the last line of the first |
| 24 | page of Exhibit 6, in the middle of the last line. |
| 25 | MR. CROSBY:  The first page of Exhibit 6 has got     13:00:57 |

Page 76

| | |
|---|---|
| 1 | the picture. |
| 2 | THE WITNESS:  A giant photo and three lines. |
| 3 | Look at the last line of those three lines, starting in |
| 4 | the middle. |
| 5 | MR. CROSBY:  Okay.  Got it.  Thank you very     13:01:06 |
| 6 | much.  Continue. |
| 7 | Q.  BY MR. BROOME:  Okay.  And do you agree with |
| 8 | that statement or the implication of that statement, that |
| 9 | the fact that Incognito isn't truly anonymous is a |
| 10 | long-known fact?     13:01:24 |
| 11 | A.  I don't know.  I'd like to think that everyone |
| 12 | buys my books and reads all the footnotes.  You know, I |
| 13 | can't guarantee.  I keep saying it.  So I -- I mean, so |
| 14 | it's going to depend.  I -- I wouldn't write that.  I |
| 15 | wouldn't write it that way.     13:01:45 |
| 16 | Q.  Do you see on page 2, there's a quote, the third |
| 17 | paragraph down, or I guess the second full paragraph down |
| 18 | says:  "Private modes in web browsers were never designed |
| 19 | as a general privacy fix" -- |
| 20 | A.  I do see that.     13:02:40 |
| 21 | Q.  -- says Mr. Lukasz Olejnik, independent cyber |
| 22 | security and privacy advisor." |
| 23 | Do you know who Lukasz Olejnik is? |
| 24 | A.  I don't know if I've met him.  We email |
| 25 | correspond.  So does that count as knowing who he is?     13:02:56 |

Page 77

1      Q.  Yeah, I mean you know who he is.  Yeah.  Yep.
2          And okay.  And then it says, it goes on to quote
3   him as saying:  "In practice, they offer very little."
4          Do you see that?
5      A.  I do.                        13:03:12
6      Q.  And then the article of the author of the
7   article writes:  "The modes are short-term options that
8   can limit what's recorded on one machine, not an
9   all-encompassing way to be private online.  The main
10  functionality of Incognito mode is not saving cookies or   13:03:28
11  browser history on the hard disk, meaning that private
12  browsing sessions are isolated from normal ones."
13         Do you agree with each of those two statements?
14     A.  Yes.
15     Q.  In the next paragraph, she writes:  "Third-party   13:03:46
16  tracking is generally achieved by websites storing
17  cookies on a visitor's hard drive.  Cookies are generally
18  used to track repeat visits from the same user and build
19  up a profile that's used to serve ads.  In Incognito
20  mode, your data is tracked in exactly the same way as   13:04:07
21  normal mode.  The difference is that in ordinary
22  circumstances, trackers are unable to link a private
23  browsing session with a normal session."
24         Do you see that?
25     A.  I do.                        13:04:21

Page 78

1      Q.  And do you agree with the statements in that
2   paragraph?
3      A.  You know, I would cross out the word "exactly"
4   if I were writing it, and I would probably be more
5   equivocal than unable.               13:04:31
6      Q.  Okay.  And why would you cross out the word
7   "exactly"?
8      A.  Because if there's any difference at all, the
9   statement's incorrect.
10     Q.  Okay.                        13:04:42
11     A.  You asked me if I agree with it.  Right?  If
12  it's like blue instead of red.  Suddenly it's different.
13     Q.  Yeah, that's fair.
14     A.  So without knowing the details, you know, those
15  kind of words are -- can be hard to use.      13:04:53
16     Q.  Okay.  Would you agree that an individual who
17  read this book -- or sorry, this article would understand
18  that private browsing mode does not prevent Google from
19  tracking them across the web?
20     A.  I have no idea --             13:05:21
21         MR. CROSBY:  Object to the form.
22         THE WITNESS:  I have no idea what readers
23  understand.
24     Q.  BY MR. BROOME:  Okay.  Do you have any idea what
25  class members understand?             13:05:30

Page 79

1          MR. CROSBY:  Object to the form.
2          THE WITNESS:  It's not something I have studied
3   so I don't have an opinion on it.
4      Q.  BY MR. BROOME:  Okay.  And you don't have any
5   opinion about what class members understand when they   13:05:43
6   read the disclosures that are at issue in this case; is
7   that accurate?
8          MR. CROSBY:  Object to the form.
9          THE WITNESS:  My opinions are really informed
10  on, you know, what's being disclosed, the general   13:05:55
11  principles we have in the industry of how to disclose
12  things, and it's not based on surveys on what readers
13  understand.
14         MR. BROOME:  Okay.  This is probably a good
15  breaking point.  We can take a short break or we can take   13:06:22
16  a lunch break.  It's really up to you.
17         THE WITNESS:  You know, I'm going with what
18  you're good with.
19         MR. BROOME:  Okay.
20         THE WITNESS:  This discussion's on the record,   13:06:31
21  though.
22         MR. BROOME:  Yeah.  Why don't we go off the
23  record for a minute, if that's okay.
24         MR. CROSBY:  Sure.
25         THE VIDEOGRAPHER:  Going off the record at   13:06:38

Page 80

1   1:07 p.m.
2      (Recess.)
3          THE VIDEOGRAPHER:  We are back on the record at
4   1:25 p.m.
5      Q.  BY MR. BROOME:  Mr. Schneier, I just want to go   13:25:06
6   back to the question I asked you right before the break.
7   I said:  "And you don't have any opinion about what class
8   members understand when they read the disclosures that
9   are at issue in this case; is that accurate?"
10         And your answer was:  "My opinions are really   13:25:23
11  informed, you know, what's being disclosed, the general
12  principles we have in the industry of how to disclose
13  things, and it's not based on surveys on what readers
14  understand."
15         And I take all that, and I think I understand   13:25:34
16  your answer.  But I just -- I just want to try to get a
17  "yes" or "no" to my question, if that's possible.
18         And again, the question was:  You don't have any
19  opinion in this case about what class members understand
20  when they read the disclosures that are at issue in this   13:25:50
21  case?
22     A.  Way to highlight my bad grammar.
23     Q.  No --
24     A.  I was not asked to provide opinions on what
25  class members believe.                13:26:02

Page 81

21 (Pages 78 - 81)

1    Q.  Okay.  Sorry.  Go ahead.  I interrupted you.  Go
2  ahead.
3    A.  So I was not asked to provide opinions on what
4  class members believe.  I was asked to provide opinions
5  on what Google discloses.  So those are my opinions.        13:26:15
6    Q.  Okay.  Prior to the Complaint being filed in
7  this case, have you ever used a private browsing mode.
8    A.  I have not, no.
9    Q.  And why is that?  I mean, if you're a
10  privacy-focused guy; right?  You use extensions and        13:26:42
11  plug-ins.  Why did you never use a private browsing mode?
12    A.  I never used a shared computer.
13    Q.  Okay.
14    A.  I mean that slightly.  And if I happen to be on
15  a shared computer, I'm not doing personal browsing.        13:27:06
16    Q.  Okay.  All right.
17       So on this topic of you not opining about what
18  class members or users in private browsing mode
19  understand, I just want to take a look back at your
20  report, which again is Exhibit 1.  And if we could go      13:27:42
21  to -- we'll start at 285.
22       Let me know when you're there.
23    A.  I'm here.
24    Q.  Okay.  In the last sentence on 285 you say:
25  "Google's disclosures give rise to a reasonable            13:28:09

                                                    Page 82

1  disclosures, yes.
2    Q.  Right.  Okay.
3       So you're not saying that the splash screen did,
4  in fact, give rise to an expectation that the users
5  Incognito browsing history would not be collected or       13:29:58
6  saved by Google.  You're saying if a user had that
7  expectation, it would be a reasonable one.
8       Is that what you're getting at?
9       MR. CROSBY:  Object to the form.
10       THE WITNESS:  I think what I'm saying is that        13:30:15
11  Google's disclosures don't inform users about this
12  difference, and so that the splash screen statement
13  implies that Google is not going to -- not going to save
14  Incognito browsing history.
15    Q.  BY MR. BROOME:  And your opinion is just based       13:30:40
16  on your own reading of the screen?
17    A.  "Just" is a -- is a tough word.  I'm not a
18  random person coming in off the street and reading a
19  screen and telling you what I think.  I mean, I write
20  books on this stuff.  This is what I do.  Security and     13:30:57
21  privacy experts have -- have standards of what disclosure
22  looks like, and we know when it's met and when it's not
23  met.  So I kind of object to the word "just."
24    Q.  In 297, again you say:  "Google's use of the
25  term 'private' to describe Chrome's Incognito mode gives   13:31:40

                                                    Page 84

1  expectation that Google will not collect users' private
2  browsing information."
3       You don't know whether any class members
4  actually had that expectation; correct?
5    A.  That's right.  And if you look at the paragraph,     13:28:19
6  it's about Google's disclosures.  About what is being
7  disclosed, not about recipients.
8    Q.  Uh-huh.  Okay.
9       Then if you will turn to 298 -- sorry, not 298.
10  296.                                                       13:28:53
11    A.  I'm there.
12    Q.  You discuss the splash screen.  You say:  "The
13  splash screen statement that Chrome won't save your
14  browsing history gives rise to a reasonable expectation
15  that the user's Incognito browsing history will not be     13:29:10
16  collected or saved by Google."
17       Do you see that?
18    A.  I do.
19    Q.  And again, you don't know whether any class
20  members or users in private browsing modes actually held   13:29:19
21  that expectation; correct?
22    A.  That's correct.  And again, this sentence talks
23  about what Google discloses and how we in the industry
24  view how disclosures work, what is done, what -- how you
25  disclose to users.  So that sentence is about the          13:29:42

                                                    Page 83

1  rise to a reasonable expectation not just that a user's
2  Incognito browsing will not be discoverable by other
3  users of a device, but also that the browsing will not be
4  collected and surveilled by Google."
5       Do you see that?                                      13:31:56
6    A.  I do.
7    Q.  And again, I guess similar question:  When you
8  say that the use of the word "private" gives rise to this
9  reasonable expectation, you're not opining that any user
10  actually held that expectation; you're just saying that    13:32:11
11  if a user did, in your opinion, that would be reasonable?
12    A.  Yes.
13    Q.  And therefore, would it also be reasonable if a
14  Google -- sorry, if -- yeah, if an Incognito user read
15  the phrase "now you can browse privately and other people  13:32:35
16  who use this device won't see your activity," would it
17  also be reasonable for them to expect that Incognito mode
18  provides only local privacy and not privacy from Google?
19    A.  So I think now you're asking me about users, and
20  again, I go back to that I did not survey users, and I'm    13:32:57
21  really speaking about the disclosures and not about the
22  recipients of those disclosures.
23    Q.  Yes, but I asked you if what you are saying is
24  that Google's use of the term 'private' to describe --
25  when you say, "Google's use of the term 'private' to        13:33:12

                                                    Page 85

                                        22 (Pages 82 - 85)

1  describe Chrome's Incognito mode gives rise to a
2  reasonable expectation not just that a user's Incognito
3  browsing will not be discoverable by other users of the
4  device, but also that the browsing will not be collected
5  and surveilled by Google," I asked you if you were        13:33:29
6  opining that if a user held that expectation, it would be
7  reasonable, and you said "yes."
8       A.  Yeah.  So let's go back and say what I'm opining
9  about are the disclosures and what Google is saying.  So
10 let's -- if you stick with those, I'm good.  If you're    13:33:49
11 asking about what users receive, I didn't do that work,
12 and I was not asked to have opinions on that.  So I don't
13 have opinions on that.
14      I have opinions on what Google wrote and said
15 based on my security and privacy expertise over the       13:34:07
16 decades.
17      Q.  Yeah, I guess the problem I'm having is that
18 you -- in several of these paragraphs you tie your
19 opinion about what Google's disclosures say or don't say
20 to reasonable expectations.                               13:34:22
21      A.  That's hard.  I mean, it's really --
22 I mean, there's no way to like talk about statements
23 without there at least implying there's someone at the
24 other end.  So it's a whole "tree falling in a forest"
25 problem.                                                  13:34:41
Page 86

1       So in the language, you will see recipients, but
2  that's not what the statements are about.  The statements
3  are about the disclosures.  So, you know, reasonable
4  expectation, I mean, I think you should think of it more
5  as a stand in instead of what did this guy think.  That's 13:34:58
6  not -- and there are people who have done surveys in this
7  case.  So they're the, you know, "what did people think"
8  people, not me.
9       Q.  Okay.  I guess how do you determine whether or
10 not, you know, one's expectation is reasonable or         13:35:13
11 unreasonable?
12      A.  You know, in our field, we have people who do
13 surveys.  I mentioned Carnegie Mellon previously.  So,
14 you know, this is a body of knowledge that we have built
15 up over the years and decades about disclosure.  So we    13:35:28
16 know based on our expertise.  And there are people in our
17 fields who do those surveys.
18      Q.  Right.
19      A.  Me in particular, and I didn't do it in this
20 case, what disclosure looks like.  And what is a -- I'll  13:35:49
21 use the word "good," and that's sloppy.  I'll probably
22 retract it if we get into it.  What is a good disclosure?
23 Let's use "accurate" for now.  What is an accurate
24 disclosure versus inaccurate, how things are conveyed.
25 Really based on our knowledge as security experts on how  13:36:07
Page 87

1  these things work.
2       Q.  Okay.  You mentioned that others have done
3  surveys.  But surveys are very context specific; right?
4  I mean, what one person understands from, you know,
5  company A's Privacy Policy would be very different than   13:36:22
6  what somebody understands from company B's Privacy
7  Policy; right?
8       A.  I think you want to talk to survey people on how
9  generalizable their results are.  I think it's going to
10 depend on the survey, but this is not my area of          13:36:39
11 expertise.
12      Q.  Okay.  Well, then I guess I come back to the
13 question, and I may draw an asked and answered objection.
14 But I guess I come back to the question of how do you
15 determine whether an expectation that a -- how do you     13:36:51
16 determine whether Google's disclosures give rise to a
17 reasonable expectation?
18      A.  I look at the disclosures and base it on my
19 knowledge as an expert in this area.
20      Q.  Okay.  And do you have any view -- with respect  13:37:10
21 to the sentence in the splash screen "now you can browse
22 privately and other people who use this device won't see
23 your activity," do you have any view or opinion as to
24 whether it would be reasonable for a person to interpret
25 that sentence to mean that Incognito mode provides only   13:37:30
Page 88

1  local privacy and not privacy from internet tracking more
2  generally?
3       A.  So I know I wrote about that.  Can we find what
4  I wrote and then we can work from there?
5       Q.  Sure.  I'm not sure what you're referring to,   13:37:47
6  but if you can find it, that would be great.
7       A.  I'll take anybody's help finding the paragraph
8  where I -- yeah, so paragraph 301.  I'm talking about --
9  and then 302, also.  And again, 303, I talk about
10 Google's engineers, like raising the exact same           13:38:14
11 objections.
12      Q.  Yep.
13      A.  The splash screen is misleading.
14      Q.  Actually, if you go to 300, that might be where
15 we start it.  The last sentence of 300.                   13:38:24
16      A.  Right.
17      Q.  So just to be -- go ahead.
18      A.  Yeah, if you look at it, it's a number of
19 things.
20      Q.  Could the disclosures that are at issue also     13:38:51
21 give rise to a reasonable expectation that Incognito
22 provides only local privacy?
23      A.  You're asking me if it's humanly possible?
24      Q.  No, I'm asking you as an expert in this case.
25      A.  Are you asking me -- I guess what do you mean by 13:39:11
Page 89

23 (Pages 86 - 89)

1  "could"?  That's what I'm asking.

2      Q.  Well, I mean in 297, you said that the use of

3  the term "private" to describe Incognito gives rise to a

4  reasonable expectation.

5      A.  It does.                          13:39:32

6      Q.  Right?  And they've got the plaintiffs' version.

7          Could the disclosures also -- if a

8  user interpreted Google's disclosures to mean that

9  Incognito provides only local privacy, would that be a

10  reasonable interpretation?            13:39:52

11      A.  I hesitate to say -- I have not done that

12  research.  I still haven't.

13      Q.  If a user interpreted Google's use of the term

14  "private" to describe Chrome's Incognito to mean that a

15  user's Incognito browsing will not be discoverable by   13:40:19

16  other users of the device, but also that the browsing

17  will not be collected and surveilled by Google, would

18  that be a reasonable expectation?

19      A.  That would be consistent with Google's

20  messaging.                             13:40:34

21      Q.  Would it be --

22      A.  I don't think -- I don't think the parallel

23  works the way you think it does.

24      Q.  Well, would it be a reasonable expectation?

25      A.  Ask the question again.        13:40:44

Page 90

1      Q.  Yeah.

2          If a user interpreted Google's use of the term

3  "private" to describe Chrome's Incognito mode such that a

4  user's Incognito browsing will not be discoverable by

5  other users of a device, but also that the browsing will   13:41:02

6  not be collected and surveilled by Google, would that be

7  a reasonable expectation?

8      A.  Yes.  That would be consistent with Google's

9  messaging.

10      Q.  Okay.  And if a -- if a user interpreted the   13:41:14

11  phrase "now you can browse privately and other people who

12  use this device wouldn't see your activity" to mean

13  Incognito provides only local privacy, would that be a

14  reasonable expectation?

15      A.  That, I don't know.            13:41:31

16      Q.  Okay.

17      A.  And that's where the parallelism breaks down.

18      Q.  And why do you think the parallels break down?

19      A.  Because what I'm writing about is what Google is

20  saying.                                13:41:43

21      Q.  Well, you're giving your interpretation of it;

22  right?

23      A.  Interpretation of what?

24      Q.  Of Google's disclosures, about what Google is

25  saying.                                13:41:51

Page 91

1      A.  I think I'm giving -- I'm listing Google's

2  disclosures and then saying based on my expertise as a

3  privacy expert, what they are -- what they are saying,

4  what they are implying, what they're saying.

5      Q.  But you're -- but you're also -- you're going a   13:42:06

6  little bit further than that, in that you're then saying

7  what a reasonable expectation would be after reading

8  those disclosures; right?

9      A.  Yes, but that's more related to -- again, it's

10  more related to the transmission than the individual   13:42:23

11  users.  And this is the language about talking about

12  communication.

13      Q.  Okay.  Well, then in 300, in the last sentence,

14  you say:  "Using Incognito to characterize a mode of web

15  browsing would lead a" -- "would lead a reasonable user   13:42:50

16  to assume that by using it, they would remain

17  unidentifiable and untracked."

18          Do you see that?

19      A.  Yes.  Yes.

20      Q.  So here you're going a little bit further.  In   13:42:59

21  the paragraph before you said that Google's disclosure

22  would give rise to a reasonable expectation.  Here you

23  say that the use of the word "incognito" would lead a

24  reasonable user to assume that by using it, they would

25  remain unidentifiable and untracked.   13:43:17

Page 92

1          And if a user -- so if a user, an actual user,

2  did not hold or did not make that assumption based on the

3  use of the word "incognito," would that be an

4  unreasonable expectation on their part or do you have no

5  opinion?                               13:43:50

6      A.  Again, I'm not speaking to the users.  So I

7  don't know.

8      Q.  Okay.  In 301, in the third sentence, you're

9  talking about the splash screen and its use of the word

10  "privately."  And you say:  "The word 'privately' in this   13:44:59

11  context would be understood by a reasonable consumer to

12  mean freedom from unwelcome observation, including

13  observation by Google."

14          And -- and what's the basis for that opinion?

15      A.  Like the others, it's based on my expertise as a   13:45:16

16  privacy expert.

17      Q.  Okay.  It's not based on any -- certainly not

18  based on any surveys; right?

19      A.  I have not done any surveys in the past minute

20  and a half.                            13:45:30

21      Q.  Okay.  And while I appreciate the humor, for the

22  record, it's not based on any surveys; correct?

23      A.  It is not based on any surveys.

24      Q.  Yeah.  I guess I'm having a tough time sort of

25  understanding how you can opine as to what -- how you can   13:45:51

Page 93

24 (Pages 90 - 93)

1 opine that Google's use of the word "privately" --
2 "privately" would be understood by a reasonable consumer
3 to mean a particular thing, and then say that you're not
4 focused on the users.
5    A. Okay.               13:46:11
6    Q. If you can help me understand that a little bit
7 better.
8    A. I think I have. You might be at a point where
9 you can't understand it.
10    Q. Yeah. Okay, I'm going to take one more shot at   13:46:20
11 this.
12      Let's go to paragraph 307.
13    A. All right.
14    Q. You say: "Consistent with plaintiffs'
15 deposition testimony, no reasonable user would interpret   13:47:02
16 Google's disclosures as permitting the collection of
17 their private browsing information."
18      Do you see that?
19    A. I do.
20    Q. How can you opine that no reasonable user would   13:47:15
21 interpret Google's disclosures as permitting the
22 collection of their private browsing information?
23    A. And that's looking at Google's disclosures.
24    Q. Uh-huh.
25    A. Seeing what they say, applying my experience as   13:47:32

Page 94

1 a security and privacy expert, and applying the
2 methodologies that are used in privacy disclosures and
3 generally accepted and known by people who write them and
4 interpret them, and coming up with an opinion.
5    Q. The implication of this sentence is that if   13:47:58
6 somebody interpreted Google's disclosures as permitting
7 the collection of their private browsing information,
8 that they would be unreasonable.
9      Do you agree with that?
10    A. Ask your sentence again. I focused on the last   13:48:17
11 word and missed the beginning of it.
12    Q. Yeah.
13    A. I'm sorry.
14    Q. The implication of this sentence is that if a
15 user interpreted Google's disclosures as permitting the   13:48:26
16 collection of their private browsing information, that
17 user would be unreasonable.
18      Do you agree with that?
19    A. Yes.
20    Q. And is that your opinion?        13:48:40
21    A. What's the difference?
22    Q. Yeah, fair.
23      Your opinion is that if a user interpreted
24 Google's disclosures as permitting the collection of
25 their private browsing information, that user would be   13:48:54

Page 95

1 unreasonable?
2    A. No, I'm going to back off again. I'm not
3 writing about users. I'm writing about the disclosures,
4 and you're moving the focus on users. When you say it,
5 it just feels like no, I didn't opine that. I'm writing   13:49:07
6 about the disclosures.
7    Q. Well, you're writing about what reasonable users
8 would interpret. Those are the words you used; right?
9    A. Yeah, those are the words I used, and they're
10 about the disclosures.          13:49:27
11    Q. Do you think that maybe you should have not used
12 the words "reasonable users" in your report?
13    A. I don't know. I mean, what else would I use? I
14 mean, how would you describe this? Because it's
15 communication. In sentences that don't have something of   13:49:38
16 a recipient.
17    Q. Well, you could just say Google's disclosures
18 say X or Y and do not say, A, B, C. But for some reason,
19 you have -- and look, I understand the reason because the
20 case turns in part on what -- some of the claims turn in   13:49:56
21 part on what reasonable users interpret; right?
22    A. Right.
23    Q. And that's why the lawyers are fighting that
24 issue out. What's a reasonable interpretation, what's an
25 unreasonable interpretation. And in your report, you   13:50:07

Page 96

1 incorporate the concept of the reasonable user, and you
2 make affirmative statements about what a reasonable user
3 would expect and what a reasonable user would interpret.
4      And so I guess what I'm hearing from you is it's
5 not actually about the users.       13:50:23
6      And so my question is: Do you think it was a
7 mistake to incorporate the concept of the reasonable user
8 into your report?
9    A. So I don't. I mean, that's the kind of language
10 we use when we talk about disclosures in general. So the   13:50:35
11 language is -- the language is right. But when it's
12 focused on did this user think that, and now what's
13 reasonable, what's not reasonable.
14      What I mean by the reasonable user is what is --
15 what's expected of the discloser. And I mean, I go back   13:51:04
16 to the nutritional label. You know, we have a lot of
17 language about nutritional labels and what should be on
18 there. And they're based on -- on -- on reasonable
19 users, but they're -- but still the focus is on the
20 information and what it says and it conveys facts about   13:51:25
21 the food that we're eating.
22    Q. Okay. You just said the focus is not on, you
23 know, what's reasonable to believe and what's not
24 reasonable to believe. I think that's what you said;
25 right?             13:51:54

Page 97

25 (Pages 94 - 97)

1    A. I trust you. We've done it so many times, I
2 forget.
3    Q. No, this is an important issue so bear with me.
4 I appreciate your patience.
5       But you do actually opine on what is not          13:52:03
6 reasonable for a user to interpret based on Google's
7 disclosures. That's what you said in 307; right?
8    A. Yes.
9    Q. Okay. So at least part of your focus is on what
10 reasonable users would interpret from Google's          13:52:21
11 disclosures; correct?
12    A. It feels like the same phrase but different
13 wording that I'm using throughout.
14    Q. Yeah, but I mean, I guess going back to, you
15 know, you said the focus is not on what reasonable users   13:52:42
16 would or would not interpret, at least with respect to
17 307. Then some of the other paragraphs we looked at, the
18 focus is on -- your focus is on what reasonable users
19 would expect.
20    A. Mine is not. Yours is.                            13:52:55
21    Q. Well, no reasonable user would interpret
22 Google's disclosures as permitting the collection of
23 their private browsing information. And then I asked you
24 isn't the implication indication of that, that a user who
25 interpreted Google's disclosures as permitting the       13:53:15

1 collection of their private browsing information, that
2 that user is unreasonable, and you said "yes"?
3       MR. CROSBY: Object to the form.
4       THE WITNESS: Yeah, I keep saying that's not the
5 way I would write it, and I didn't write it that way.     13:53:28
6 And I don't think that the logic holds. And I'm trying
7 to explain why, and it's not working.
8    Q. BY MR. BROOME: Yeah. Well, maybe we just
9 disagree. Okay. I think we can move on from that topic.
10    Okay. So let's go back to Section 1.1 of your      13:53:56
11 report.
12    A. Page number would be useful.
13    Q. Yep, page 8. Are you there?
14    A. Yes, I'm sorry. Yes.
15    Q. The heading there is: "'Private' and 'Privacy'   13:54:34
16 Have Specific Meanings and Implications."
17       Do you see that?
18    A. I do.
19    Q. What is the specific meaning of "private"?
20    A. One hopes it's in this section.                  13:54:50
21    Q. Well, you have an Oxford English Dictionary
22 definition, paragraph 24.
23    A. I see it.
24    Q. Is that the specific meaning of "private"?
25    A. Can we call it a specific meaning of private?    13:55:06

1    Q. Sure, yeah.
2    A. Okay. Then yes.
3    Q. Okay. And you're asking whether it's a specific
4 meaning of "private" as opposed to the specific meaning
5 of "private" because private can mean different things?   13:55:23
6    A. You know, "private" has a meaning and it has a
7 dictionary definition. You know, what is private is very
8 fluid. So you need to think about what aspect of the
9 word you're asking me about.
10    Q. Well, what do you mean by -- does a word have    13:55:45
11 different aspects?
12    A. Yeah. I mean, so by "private," I mean there's
13 private as in what I'm doing, no one else can see.
14 Right? That's consistent. But is it about my salary, is
15 it about my -- I don't know -- my personal proclivities?   13:56:04
16 That is more context dependent.
17    Q. I see. Okay.
18       Can the meaning of the word "private," the words
19 "private" and "privacy" change depending on the context
20 in which they are used?                                 13:56:22
21    A. I'm pausing because it's actually a more
22 complicated question than you think.
23    Q. Okay.
24    A. The general meaning is the same, but I think
25 like any word in the English language, there are going to   13:56:36

1 be nuances based on use. I don't think you're asking me
2 that.
3    Q. Well, is there one singularly understood
4 definition of "privacy"?
5    A. I mean the one I liked was, you know, the state   13:56:48
6 or condition of being alone, undisturbed, or free from
7 public attention, et cetera. Now I thought that was a
8 good one, which is why I used it.
9    Q. Okay. In Data and Goliath -- I'm not going to
10 go back to the book. I'll just read you something that   13:57:09
11 you wrote, and I just want to know if you still agree
12 with it. You're welcome to go back to the exhibit if you
13 like.
14       You wrote: "Our personal definitions of privacy
15 are both cultural and situational. They were different a   13:57:18
16 hundred years ago than they are today, and they'll be
17 different a hundred years from now. They're different in
18 the US than they are in Europe, Japan, and elsewhere.
19 And they're different across generations."
20       Do you agree with that?                          13:57:31
21    A. I do.
22    Q. Okay.
23    A. And that's what I was talking about before.
24 That's exactly what I was talking about. What is private
25 in Japan is not what is private in the US; right? In     13:57:38

Veritext Legal Solutions
866 299-5127

1 this case, there was just a ruling where the salaries of
2 a bunch of attorneys was made public. That has different
3 private implications in our culture than it does in
4 another culture.
5      There will be cultures where your sexual            13:57:54
6 proclivities are more or less private. So I'm really
7 meaning by that. And especially over cultures and over
8 times, that what we choose to keep private changes.
9 Cultural, all those words I used. I'm really referring
10 to the types of things that we agree to keep private.    13:58:11
11 "Agree" is a bad word. That we might want to keep
12 private.
13      Q. Okay. Do you agree that you can have privacy
14 from some but not others?
15      A. I do.                                            13:58:25
16      Q. For example, you could have privacy from other
17 people who use your device but not from your ISP; right?
18      A. That is certainly true.
19      Q. And you could have privacy from other people who
20 use your device, but not from the websites that you      13:58:41
21 visit; right?
22      A. Yes.
23      Q. And so the word "privacy" just in and of itself
24 does not convey necessarily that you are free from
25 observation from everyone?                               13:58:54

Page 102

1      A. Again, it will depend how it's used. If I say,
2 you know, when you go to the bathroom, you're private in
3 there, and you find out later there's a camera. And I
4 say, "Well, don't worry, the camera went to the police; I
5 didn't see it," you're going to say what the hell. So it  13:59:12
6 depends on lot on how that word's used.
7      Q. In the splash screen where Google says "now you
8 can browse privately and other people who use your
9 device" -- "your device won't see your activity," is it
10 your opinion that that conveys two separate concepts:     13:59:43
11 One, on the one hand, you can browse privately from
12 Google, and on the other hand, you can browse privately
13 from other people who use your device?
14      A. I think it's actually kind of like the "camera
15 in the bathroom" story; right? What I said is: You go     14:00:02
16 to the bathroom, and it's private. What the splash
17 screen says is it's private. There's a period at the
18 end. There's not a caveat. There's not like from me,
19 from Google, from your neighbors, from your friends. It
20 is a -- it's given as a categorical. And that implies     14:00:23
21 that it is complete. That it is from everybody. Because
22 we're not saying only in this way, only in that way.
23      If I wanted to convey to you that when you went
24 into the bathroom, it would be private from me, but the
25 police could watch you, I would kind of say that. I       14:00:45

Page 103

1 wouldn't say now you can pee privately and put a period
2 on it. That's a very crappy analogy. I'm going to
3 change it and do it again. I'm sorry.
4      Q. I've got to say I actually really like it.
5      A. No, it's a bad analogy.                           14:00:59
6      Q. No, they're good ones. They're really good ones
7 and they're practical real-world examples. I like it.
8      A. But I want to get one, yes, scatological.
9      Q. Do you agree that by providing -- I guess let
10 me -- let me try and formulate a better question here.    14:01:21
11      Do you agree that if Incognito mode only
12 provides privacy from other people who use your device --
13 well, now I put the answer in the question. Let me try
14 again.
15      Do you believe that if Incognito mode conceals       14:01:38
16 your browsing activity from other people would use your
17 device, that Incognito mode provides a measure of
18 privacy?
19      A. Yes.
20      Q. Okay. Actually, maybe we will go to -- well,      14:02:05
21 I'll try this again with Data and Goliath, and you can
22 tell me if you want to go back to the source.
23      You have a statement in there that says: "Most
24 people don't seem to care whether their intimate details
25 are collected and used by corporations. Most people are   14:02:21

Page 104

1 happy to exchange sensitive personal information for free
2 email, web search, or a platform on which to chat with
3 their friends."
4      Do you agree with those statements?
5      A. You know, I would not write that today.           14:02:39
6      Q. Okay. What's changed?
7      A. I think people's awareness has changed. People
8 are more aware of -- of in general how they're being
9 tracked on the internet. I think there's a feeling of
10 helplessness among people and so "happy," too, is a word  14:02:58
11 I would not use anymore. And I don't even know if it was
12 right then. I think people are more grudgingly
13 accepting, in many cases.
14      There's a lot of unawareness. I find this even
15 in my classes when I try to teach the stuff, that         14:03:20
16 surprised the number of people that are surprised.
17      There was a class last year, and there was
18 someone from Facebook in the class talking about Facebook
19 data collection and how it's used, and people are
20 expressing surprise that a lot of this is happening.      14:03:37
21      And the former employee, who is now a student
22 there, said: "This is how Facebook works. Don't you
23 realize that?"
24      So it is an interesting measure of complicated
25 things that are going on. And you know, that -- those     14:03:52

Page 105

27 (Pages 102 - 105)

1 sentences imply a knowing and willing tradeoff that isn't
2 right today and I don't think it was right then.
3    Q. Would you agree that some people just don't care
4 about data collection by companies like Google and
5 Facebook and Amazon?                                14:04:13
6    A. You used the word "some."  So I will agree there
7 exists one person that just doesn't care.
8    Q. Would you agree that there's a substantial
9 portion of the population that just don't care?
10    A. Yeah, but I would make you define "substantial"   14:04:24
11 before I answer that one.
12    Q. 40 percent.
13    A. I would not agree with that.
14    Q. Okay.  Do you have any basis for refuting that,
15 you know, 40 percent of the population doesn't care?   14:04:40
16    A. It sounds high and I don't have data.
17    Q. Okay.
18    A. Pew Research has data.
19    Q. Okay.  Would you agree that incognito, the term
20 "incognito" has a different meaning than private or   14:05:06
21 privacy?
22    A. Yes.
23    Q. Okay.  And what is the meaning of "incognito"?
24    A. Can I refer you to paragraph 25 of my report?
25    Q. Yeah.                                        14:05:22
                                                    Page 106

1    A. Good.
2    Q. All right.  One of the definitions you use is,
3 you say: "The Oxford English Dictionary defines
4 "incognito" as unknown, whose identity is concealed or
5 unavowed, and therefore not taken as known."       14:05:41
6       Do you see that?
7    A. I do.
8    Q. Okay.  And would you agree that in Incognito
9 mode -- well, let me -- let me back up.
10       Do you understand that -- you have an         14:05:53
11 understanding of how Incognito mode functions; correct?
12    A. Basically, yes.
13    Q. And you have an understanding of how other
14 private browsers' modes function -- private browsing
15 modes function?                                    14:06:06
16    A. Similarly, basically, yes.
17    Q. Okay.  And with respect to Incognito mode, you
18 understand that it automatically logs the user out of
19 their Google account.
20       Do you understand that?                      14:06:16
21    A. Yes.
22    Q. And do you understand that it blocks the sharing
23 of existing cookies with websites and Google and others
24 out there on the web?
25    A. Right.  What I understand it does, is it       14:06:28
                                                    Page 107

1 basically opens up a separate compartment --
2    Q. Uh-huh.
3    A. -- which will have no cookies from the regular
4 browsing.  So there is a separate set of cookies.
5    Q. Right.  So that websites and Google and any    14:06:41
6 other entities on the web who may engage in tracking
7 cannot use the cookies on the browser that existed before
8 the Incognito session to track the user.
9       Is that your understanding?
10    A. No.                                           14:06:55
11    Q. Have you seen -- okay.  So what is your
12 understanding on that issue, then?
13    A. It's what I said previously, that the private
14 browsing opens up a separate compartment where the
15 cookies from the regular browsing don't transfer over,   14:07:12
16 and new cookies are created.
17    Q. Right.  And then at the end of the session,
18 those cookies in the Incognito compartment are deleted;
19 right?
20    A. That is correct.                              14:07:22
21    Q. Okay.  And so to the extent any tracking occurs
22 in an Incognito session, it's based on the cookies in the
23 new Incognito compartment.
24       Do you understand that?
25    A. It is based --                                14:07:35
                                                    Page 108

1       MR. CROSBY:  Object to the form.
2       THE WITNESS:  -- in part on those cookies, yes.
3    Q. BY MR. BROOME:  Okay.  And what else is it based
4 on?
5    A. Everything else Google or anybody else does.   14:07:42
6    Q. Is it based on IP address?
7    A. I don't know.
8    Q. Is it based on any other data that Google
9 receives from the user other than cookies?
10    A. Define "receives by the user" better.         14:08:07
11    Q. Any information that is transmitted to Google
12 from, for example, an analytics or ad manager script.
13    A. Okay.  So you're saying that if I as a user
14 visit The New York Times --
15    Q. Yeah.                                         14:08:26
16    A. -- and do stuff, that analytics information that
17 goes to Google is from me?
18    Q. For purposes of this question, sure.
19    A. Okay.  Got to go to the question again because I
20 lost the question.  I'm sorry, I'm actually trying to --   14:08:43
21 this actually is complicated.
22    Q. Yeah.  No, let's --
23    A. It's a bit complicated.
24    Q. Okay.  Is it your understanding that in the
25 ordinary course, Google uses cookies to track users?   14:08:49
                                                    Page 109

28 (Pages 106 - 109)

1     A. Google -- among other things, Google uses
2  cookies to tracks users, yes.
3     Q. What are the other things that Google uses to
4  track users?
5     A. Google tracks users by unique IDs of devices.        14:09:04
6  Google tracks users by logging in, so your login.  Google
7  tracks users through hidden pixels.  I'm blanking on what
8  they're called -- it's in my report -- and various
9  tracking beacons.  Google tracks users through
10 information it gets from websites.        14:09:24
11     Did I mention browsers and devices?  I think I
12 did.  And there's probably other things, too.  I would --
13 writing this as an article, I would, you know, make sure
14 the list is complete.  That's off the top of my head.
15     Q. Okay.  All right.        14:09:38
16     So going back to the Incognito definition, you
17 used "unknown whose identity is concealed or unavowed."
18     Is -- does Google being the identity of an
19 Incognito user?
20     A. It might.        14:10:04
21     Q. Is that information necessarily conveyed to
22 Google when a user is browsing the internet in Incognito
23 mode on non-Google websites?
24     MR. CROSBY:  Object to the form.
25     THE WITNESS:  Again, this is a bit complicated.        14:10:22

Page 110

1     Q. BY MR. BROOME:  Uh-huh.
2     A. You're asking -- try again.  The problem I think
3  we're having is that these things might be something that
4  Google figures out based on a variety of pieces of
5  information.  So I need to know really what you're saying        14:10:43
6  and is it wholly or is it in parts.  So as you phrase the
7  question, you know, try to be more precise about what you
8  really want to know.
9     Q. Sure.
10     A. And this is legit complicated.        14:10:56
11     Q. Sure.  No, it's okay.
12     Let me try another example.  So user initiates
13 an Incognito session.  All other settings are default.
14     A. Okay.
15     Q. The user initiates an Incognito browsing        14:11:09
16 session.  Goes to The New York Times.  Doesn't log in.
17     A. Right.
18     Q. Goes to The New York Times.  Does Google know
19 the identity of that user?
20     A. Potentially, yes.        14:11:26
21     MR. CROSBY:  Object to the form.
22     Q. BY MR. BROOME:  How so?
23     A. If they can correlate the user's browsing
24 session with other browsing sessions where it knows the
25 identity, then it can link those two.  So in the same way        14:11:38

Page 111

1  you're browsing the web on your computer, and then later
2  you browse the web on your phone, and Google is able to
3  link those two browsing sessions to you, and in one of
4  them, it knows your identity, now it knows your identity
5  in both.  It knows they're the same.        14:12:00
6     Q. Okay.  But in my example, nobody is signed in.
7  They're in Incognito, and nobody has signed into the
8  website and they haven't signed into their Google domain.
9     Have you seen any evidence in this case
10 indicating that Google could then correlate the data from        14:12:14
11 the private browsing session with data from a regular
12 mode browsing session?
13     A. I think in some circumstances, they can, yes.
14     Q. That's not quite my question, though.
15     Have you seen any evidence that Google has        14:12:29
16 actually done that?
17     A. I have not seen evidence about what Google does.
18 Really, my report is about what they could do.  So no, I
19 have not seen reports from Google that show whether they
20 do or do not do these things.        14:12:48
21     Q. Okay.  So if Google does not do these things, if
22 it does not correlate private browsing -- private
23 browsing sessions -- data from private browsing sessions
24 with data from regular mode sessions, and the user has
25 not signed into their account, either at Google or the        14:13:45

Page 112

1  website, in our example The New York Times, does Google
2  know the identity of the user?
3     MR. CROSBY:  Object to the form.
4     THE WITNESS:  There's a lot of hypothetical
5  there.  So you're basically saying -- asking me if Google        14:14:00
6  chooses not to figure out the identity of the user, do
7  they know the user.  That's the way...
8     Q. BY MR. BROOME:  Yeah, that's not how I meant it.
9     A. Okay.
10     Q. I mean, yeah, if Google -- let me think about        14:14:12
11 this.
12     Hypothetical:  A user launches an Incognito
13 window, goes to The New York Times, does not sign into
14 any accounts.  Assume Google does not correlate private
15 browsing data with regular mode data, does Google know        14:14:46
16 the identity of the user?
17     MR. CROSBY:  Object to the form.
18     THE WITNESS:  You know, I'm not -- I don't have
19 access to what Google can do.  And what you -- so I'm
20 going to re-interpret what you're saying.        14:15:03
21     Google chooses not to form the -- what you said.
22 Basically you're asking me is there any other way that
23 Google could identify the user other than not doing the
24 thing they choose not to do.  And the answer is I don't
25 know.  I don't have enough visibility into all of        14:15:22

Page 113

29 (Pages 110 - 113)

1 Google's internal correlation analytics.

2     Is there some AI process that allows Google to

3 identify users? I don't know. You probably don't even

4 know. Is it possible? Sure. Who knows?

5     Q. BY MR. BROOME: Yeah. So let me bring it back     14:15:42

6 to the definition of Incognito; right? Whose identity is

7 concealed. It sounds like you haven't seen any evidence

8 that Google is, you know, revealing or identifying

9 Incognito users, like the actual individual.

10     A. Yeah. I don't think -- I don't think Google     14:16:06

11 shares with anybody what they're doing. I certainly have

12 not seen that data.

13     I think also Incognito is a marketing term. So

14 I think you want to focus it on that more generally than,

15 you know, look at one word in you, you know, a dictionary     14:16:22

16 definition.

17     It's used to create an aura of privacy and --

18 but the -- a lot of -- some of the internal Google

19 conversations talk about that. And that's, I think,

20 really how you want to look at that word and, you know,     14:16:36

21 in situ in the product.

22     Q. Yeah. You know, that's fair. And that's sort

23 of what we're here kind of debating; right? Is what is

24 the aura that's conveyed by Incognito.

25     And you started -- in sort of answering that     14:16:54

Page 114

1 question, you started with a dictionary definition that

2 says -- that offers as one definition "whose identity is

3 concealed or unavowed."

4     And I guess I'm trying to get at whether that is

5 accurate; right? I mean, if for the most part, you know,     14:17:08

6 a user is not identified in Incognito mode, then one

7 would argue, Google perhaps, that -- that the use of the

8 term is accurate.

9     And so I'm just asking if you have seen any

10 evidence to dispute that users' identities are not     14:17:25

11 concealed -- or are disputed that -- well, gosh, I lost

12 the thread.

13     A. I know.

14     Q. Have you seen any evidence that users'

15 identities are revealed when they are in Incognito mode?     14:17:39

16     A. I guess the only thing I've read was the

17 deposition of the former FBI agent who talked about being

18 able to uncover identities of people who are using

19 Incognito.

20     Something that you said earlier, and I -- that I     14:17:57

21 wanted to comment on, and I lost it. I should notes.

22 But I can't take notes.

23     Q. You can. I think I might be entitled to them at

24 the end, if you do, but...

25     A. Right.     14:18:15

Page 115

1     Q. Someone probably told you not to do that.

2     A. No one did. I'm just guessing.

3     Q. Okay. So when you say the former FBI agent, is

4 that Nelson, the expert or the -- or the plaintiff?

5     A. The expert.     14:18:29

6     Q. The expert. Okay. So I asked you whether you'd

7 read his report, and you said no. I guess I should have

8 asked you have you read the deposition transcripts of any

9 of the other experts. And is the answer to that "yes"?

10     A. The answer to Nelson is yes. And I forget if     14:18:42

11 you asked me. If you did ask me, I did answer it that

12 way.

13     Q. Okay. Other than the testimony of the former

14 FBI agent that plaintiffs have retained as an expert,

15 have you seen any evidence that users' identities are     14:19:02

16 revealed in Incognito mode?

17     A. No.

18     MR. CROSBY: Object to the form.

19     THE WITNESS: But -- sorry, I remember what I

20 wanted to say.     14:19:13

21     It is not just whether observation happens --

22 whether it is revealed; it's whether it could be

23 revealed.

24     So if you're doing something where you don't

25 want your identify revealed, and you find out that the     14:19:28

Page 116

1 police could have known your identity, but they chose not

2 to, you still feel your privacy has been violated.

3     So I mean, there's still a chilling effect if

4 you think it's possible that your identity could be

5 revealed or that suddenly you don't trust the privacy.     14:19:44

6     Again, back to, you know, you're having a

7 conversation with your client, and you found out that Ian

8 was on the Zoom. He says, "Don't worry. My microphone

9 was off. I didn't hear anything."

10     You're still going to say what the hell.     14:20:03

11     It's -- it's not just that something doesn't

12 happen that determines whether you are feeling that your

13 privacy is being protected or not.

14     Q. BY MR. BROOME: So in your opinion, the risk

15 that somebody might be -- somebody's identity might be     14:20:21

16 revealed in and of itself renders the term "Incognito"

17 inapplicable to the mode that we're discussing?

18     A. Well, I want to think before I said that, but I

19 think the possibility of being observed is itself a

20 privacy violation. And you can find paragraphs in my     14:20:48

21 book that say that.

22     Q. Okay. In paragraph 28 -- this is under the

23 heading Section 1.2.

24     A. Uh-huh.

25     Q. You say that privacy is a basic human need?     14:21:31

Page 117

30 (Pages 114 - 117)

1   A.  Yes.

2   Q.  Is privacy from Google while browsing in

3  Incognito a basic human need?

4   A.  Wow.  Is Google a basic human need?

5   Q.  For me, yes.            14:21:47

6   A.  Try Duck Duck Go.

7   Q.  I like the convenience.

8      So it's a question.  Is privacy from Google

9  while browsing in Incognito a basic human need?

10   A.  I would say no.         14:22:03

11   Q.  Okay.

12   A.  Although for you, it might be yes.

13   Q.  In paragraph 33, you say:  "Privacy is a value

14  be preserved at all times."

15      Do you see that?        14:22:39

16   A.  Yes.

17   Q.  Are you proposing an internet that prioritizes

18  privacy as all times?

19   A.  Do you mean like right now in this document or

20  during this deposition?         14:23:00

21   Q.  Well, in this deposition and in this document,

22  do you believe that privacy should be prioritized over

23  functionality, for example?

24   A.  So be careful.  Prioritized doesn't mean -- is

25  not all or nothing.  So I believe privacy is a trade-off.  14:23:16

Page 118

---

1   Q.  Uh-huh.

2   A.  That we trade off privacy for functionality, for

3  convenience.  I can't find my phone.  I play Pokeman GO,

4  which is fundamentally a surveillance-driven phone app.

5      So what I'm saying there is that privacy is a   14:23:38

6  value that we need to preserve.  Not that you give up

7  everything else for privacy.  Not that it is all or

8  nothing, but that it is -- I mean, the previous sentence.

9  It's not a luxury.  It's not something that only the rich

10  or well connected or technically sophisticated should  14:23:58

11  have.  It's not something that only kicks in when you're

12  in danger.  I'm saying that it's of value at all times in

13  your life.

14   Q.  Okay.  But you'd agree that there are times when

15  people are happy to forego privacy?      14:24:20

16   A.  I play Pokeman Go.

17   Q.  The answer is "yes"?

18   A.  The answer is yes.

19   Q.  Okay.

20   A.  You use Google searches.     14:24:31

21   Q.  All right.  In 1.3 you say:  "Privacy is crucial

22  for political liberty and justice."

23      Do you see that?

24   A.  Yes.

25   Q.  Is privacy from Google while users are in   14:24:57

Page 119

---

1  private browsing mode crucial for political liberty and

2  justice?

3   A.  It's an interesting question you ask.  I don't

4  know.  We're reaching a point in our society where a lot

5  of these nice-to-haves and optionals have become   14:25:15

6  critical.  And has Google -- has Chrome crossed that?

7  Has Google searches using private browsing mode crossed

8  those lines?  I don't know offhand.  I would really have

9  to think about that.

10      But I think in general, we are late to observe  14:25:35

11  when things that are nice to have on the internet become

12  critical.  It turns out that Facebook is critical to

13  democracy.  Who knew?

14   Q.  In 1.4 you say:  "Privacy is crucial for

15  people's business and personal relationships."   14:25:52

16      Is privacy from Google while users are in

17  private browsing mode crucial for people's personal and

18  business relationships?

19   A.  Again, I would -- I would want to really think

20  about that before I gave an answer.  I wouldn't want to  14:26:05

21  do that off the cuff.

22   Q.  Okay.

23   A.  These things have a way of being becoming

24  infrastructure without us noticing.

25      MR. BROOME:  Uh-huh.  All right.  Why don't we  14:26:15

Page 120

---

1  take -- let's go off the record for a sec, if that's

2  okay.

3      THE VIDEOGRAPHER:  Going off the record at

4  2:27 p.m.

5      (Recess.)         15:00:19

6      THE VIDEOGRAPHER:  We are back on the record at

7  3:04 p.m.

8   Q.  BY MR. BROOME:  Mr. Schneier, if you could turn

9  to paragraph 58 of your report.

10   A.  All right.          15:04:02

11   Q.  Okay.  The last sentence begins:  "It's

12  different when people use private browsing modes.  When

13  people use private browsing, they are actually expressing

14  their expectation of privacy."

15      Do you see that?        15:04:20

16   A.  I do.

17   Q.  From whom are they expressing an expectation of

18  privacy?

19   A.  They're expressing it in general.  I mean,

20  they're making an affirmative statement by taking an  15:04:29

21  action that they want privacy.  So I don't think we can

22  say at this point from whom.

23      The point I'm making is they are making a

24  general statement.

25      Interesting, there was a Google document where  15:04:44

Page 121

31 (Pages 118 - 121)

1 one of the engineers says when a user tells us they're
2 going into private browsing or Incognito -- they might
3 have used that term -- it's a gift. They're telling us
4 that they want privacy. It's a really interesting
5 statement, and that's what I'm trying to convey here. 15:05:00
6    Q. When users launch a Incognito session, they're
7 not necessarily expressing an expectation of privacy from
8 Google; right?
9    A. Again -- again, I'm not giving an opinion on
10 what individual users are expecting. 15:05:17
11   Q. Okay. Sorry. Let me phrase it differently
12 then.
13      When users launch an Incognito session, they're
14 not necessarily expressing -- is that what I said last
15 time? 15:05:35
16   A. That's what you said last time.
17   Q. Okay. But you offer an opinion as to -- that
18 Google -- that -- sorry. That users choosing private
19 browsing are expressing their expectation of privacy,
20 you're just not offering an opinion as to from whom, I 15:05:48
21 guess, they're expecting that privacy?
22   A. I mean, that's correct. I'm saying that they're
23 expressing in general. By taking that action. It's not
24 something that happens by the way. It's not the -- the
25 air bag that automatically deploys. It's the seat belt 15:06:03

Page 122

1 that you deliberately click, I guess without the annoying
2 beeping if you don't.
3      (Discussion off the record.)
4      THE WITNESS: Without the annoying beeping if
5 you don't. 15:06:21
6      You can strike that. It's actually not
7 necessary.
8    Q. BY MR. BROOME: Users who choose private
9 browsing -- well, let me strike that.
10     Users who choose Incognito mode are not 15:06:38
11 expressing their expectation of privacy from their ISP.
12     Do you agree with that?
13   A. I'm not -- I'm not speaking to what users are
14 expecting. Unless you're asking me, you know, would we
15 survey users and list the things they might be expecting 15:06:54
16 privacy from, which ones will come up on top. And I
17 haven't done that research. So I'm hesitant to talk
18 about the ISP or The New York Times you might ask me
19 next, or Google, who you're going to ask me.
20   Q. In your -- in your book Data and Goliath -- and 15:08:02
21 I'm happy to direct you to an actual page if it's
22 necessary -- you make a statement that -- that people
23 have become used to personalized advertising. And
24 then -- and you say: "The definition of 'creepy' is
25 relatively fluid and depends a lot on our familiarity 15:08:23

Page 123

1 with the technologies in question."
2      Do you still agree with those statements or do
3 you want to see it in the book?
4    A. I want to see it in situ.
5    Q. Yeah, that's fine. It's page 55 of your book 15:08:38
6 and 44 of the PDF, which was, I think, Exhibit 3.
7      Based on -- it might have been 44.
8    A. Yeah, I see it. Yes. I would agree with that,
9 still.
10   Q. Okay. All right. 15:09:09
11     Let's go back to your report, Exhibit 1. Let's
12 go to 78, paragraph 78.
13   A. Uh-huh.
14   Q. And you say at the end there: "Growing
15 awareness of the amount of data produced by internet 15:10:23
16 users and collected by companies such as Google explains
17 why users seek refuge in the promise and expectation of
18 going Incognito online."
19     Do you see that?
20   A. I do. 15:10:35
21     MR. CROSBY: Can I get the PDF page for that,
22 please.
23     MR. BROOME: We're back in the report.
24     MR. CROSBY: I'm sorry.
25     THE WITNESS: Last sentence of paragraph 78. 15:10:43

Page 124

1      MR. CROSBY: Apologies.
2      MR. BROOME: That's okay.
3    Q. So based on your prior testimony, you are not
4 opining here that users are, in fact, seeking refuge from
5 Google by going on Incognito online; you're just saying 15:11:09
6 that's a possible explanation?
7      MR. CROSBY: Object to the form.
8      THE WITNESS: I think I'm saying, yeah, Im
9 saying it's an explanation. That the increasing
10 awareness of internet surveillance, think of -- I'm 15:11:25
11 blanking on the name -- Age of Surveillance Capitalism,
12 the book became a New York Times best-seller, and got a
13 lot of people talking about that book. After my book,
14 people are more concerned about collection.
15   Q. BY MR. BROOME: Okay. And does that book or any 15:11:47
16 other book that you've read contain research indicating
17 that people are seeking refuge from this growing data
18 collection by going Incognito?
19   A. It's -- the book is this thick (indicating), and
20 I am not remembering. 15:12:13
21   Q. Okay.
22   A. Shoshana Zuboff is her name. I'm sorry.
23   Q. Have you -- sitting here today, can you recall
24 any research indicating that consumers are responding to
25 the growing amount of data produced by internet users and 15:12:28

Page 125

32 (Pages 122 - 125)

1 collected by companies such as Google by seeking refuge
2 in the promise and expectation of going Incognito online?
3    A.  No.
4    Q.  All right.  Let's go to 86.
5        You say:  "In the context" -- in the        15:13:31
6 second-to-last sentence.  "And in the context of private
7 browsing, users have specifically signaled that they
8 expect their browsing sessions and the associated content
9 to be in fact private.  That data point alone is private
10 in and of itself."        15:13:49
11       Do you see that?
12    A.  I do.
13    Q.  And the last sentence where you say "that data
14 point alone is private in and of itself," do you mean
15 that the fact that a user is in Incognito mode or private        15:14:00
16 browsing mode should be private?
17    A.  You used the word "should."  What do you mean be
18 "should"?
19    Q.  Or is.  I'm not sure.  Is -- what -- when you
20 say "that data point," are you saying -- are you        15:14:11
21 referring to -- let me start over.
22       When you refer to "that data point" in the last
23 sentence of paragraph 86, are you -- do you mean the fact
24 that a user is in private browsing mode?
25    A.  Yes.        15:14:31

                                            Page 126

1    Q.  Okay.  Next question:  Do you -- is it your
2 opinion that the fact that a user is in Incognito mode
3 should be private?
4    A.  So "should" is a hard -- is a tough word.  When
5 you say "should," under what -- where does that "should"        15:14:48
6 come from?  Should implies someone is making a judgment.
7    Q.  Uh-huh.  Okay.  Do you think users have a
8 reasonable expectation of privacy in the fact that
9 they're in a private browsing mode?
10    A.  I don't know.  That's very different than        15:15:08
11 "should."
12    Q.  So when you say that data point is private, what
13 do you mean?  Do you mean -- are you talking about the
14 fact that browsers are designed not to indicate that the
15 user is in private browsing mode?        15:15:29
16    A.  What I mean is that when a user signals that
17 they're wanting to go into a private browsing session,
18 that they want to do something on the internet and that
19 they don't want observed.
20    Q.  I see.        15:15:44
21    A.  The fact that they are doing that, that signal
22 is private information.  I mean, if I know you did that
23 last Thursday at 4:00 p.m., and I then correlated with
24 what you were doing, I had your billing records from your
25 firm, I know your location data.        15:16:01

                                            Page 127

1        So the fact that you chose at that moment to
2 browse the web privately is, in fact, private
3 information.
4    Q.  Okay.  And then -- so if private browsing modes
5 were redesigned to indicate every time -- you know, to        15:16:23
6 websites every time somebody is in a private browsing
7 mode, do you think that would be a good thing or a bad
8 thing?
9    A.  There's no question because it's mixed.  Do I
10 want to tell The New York Times when I'm browsing        15:16:40
11 privately or not; right?  So I'm designing off the top of
12 my head so do not take someone's random designs like
13 off-the-cuff as final.
14       I'd want to give users the choice of signaling
15 or not.  But then, you know, on the other hand, you know,        15:17:00
16 is a user going to be sophisticated enough to be able to
17 do that well.  That's going to be your balance.
18       But I can imagine times when I would want to
19 signal that and times when I wouldn't.
20    Q.  If Google sent an email to a user, Google        15:17:35
21 account holder, and said -- that conveyed, you know,
22 this -- your device was used to browse in private, and
23 let's assume that device is a shared device, does that in
24 and of itself constitute an invasion of privacy?
25    A.  So you're asking me if Google sends an email to        15:18:07

                                            Page 128

1 your personal Gmail account --
2    Q.  Uh-huh.
3    A.  -- and you access on a shared browser, does that
4 constitute an invasion of privacy?  Am I reframing your
5 question right?        15:18:24
6    Q.  Yeah, I think so.
7    A.  I think it doesn't.
8    Q.  And why is that?
9    A.  It doesn't feel like it does.
10    Q.  Well, it might not be you that was doing the        15:18:36
11 private browsing; right?
12    A.  But it's my Gmail account.  So wait, wait, wait
13 a second.  So, yeah.  See, this is why you do not accept
14 design decisions off the cuff in conversation; right?
15    Q.  Fair enough.        15:18:52
16    A.  Because it's all of this stuff.  Stuff you have
17 to think about it, you've got to write it down and look
18 at the flows.  Guess I would back off and say I don't
19 know.  I'd need to think about it because you're right,
20 that is something you would have to consider.        15:19:09
21    Q.  All right.  Well, let's put it this way in more
22 general terms.
23       If Google alerted the owner of a shared device
24 that the other-- that someone else who uses that device
25 had been browsing in private, that in and of itself would        15:19:24

                                            Page 129

                                    33 (Pages 126 - 129)

1 be a privacy violation; right?

2    A. Well, let's give an example. I am an abusive

3 husband. We have a shared computer. My wife used

4 private browsing. I got an email. I suspect she gets

5 beat up over this. It feels like a privacy violation.　15:19:40

6    Q. Okay. 87. You say: "When browsing the

7 internet people often start on a search page and then

8 click from that page to other websites. For example,

9 someone might start with a Google search, then visit a

10 non-Google website based on those search results.　15:20:11

11 Information tied to that search term and subsequent

12 browsing, including individual URLs and the record of an

13 entire browsing session reveals a great deal of personal

14 information about an individual."

15    Do you see that?　15:20:24

16    A. I do.

17    Q. Would you agree that many people do not start

18 their private browsing sessions by going and conducting a

19 Google search?

20    A. I don't have the data on that so I wouldn't　15:20:45

21 necessarily agree to that.

22    Q. Okay. Well, would you agree that if you want to

23 keep your private browsing activity private from Google,

24 then beginning your private browsing session with a

25 Google search is probably not a good way to go about it?　15:21:01

Page 130

---

1    A. I certainly wouldn't do it, but you didn't ask

2 me what I do. I'm three sigma.

3    Q. Paragraph 84. You refer to fingerprinting

4 techniques.

5    A. Uh-huh.　15:21:56

6    Q. Have you seen any evidence that Google has

7 engaged in fingerprinting in this case?

8    A. Yeah, I read internal documents that talk about

9 fingerprinting and internal Google documents, but I don't

10 think they actually said we do this particular practice.　15:22:19

11 And other than that, no.

12    Q. Would you agree that fingerprinting should

13 generally be avoided?

14    A. See, that's a hard question. You're back to

15 "should generally be," by whom. Maybe your at the NSA,　15:22:37

16 you want to do it; right? It's your job. That's what

17 you get paid for. I might not like it personally. So

18 who should be avoiding it?

19    Q. No, that's a fair response. Let me ask it

20 slightly differently.　15:22:54

21    Would you agree that fingerprinting is an

22 invasion of privacy?

23    A. I think that device fingerprinting can be, yes.

24    Q. Okay. Are there circumstances under which it

25 would not be an invasion of privacy?　15:23:05

Page 131

---

1    A. Probably. Again, you know, it would take us a

2 while to eliminate all circumstances. The one that came

3 to mind, which I'm now wondering about, if you call 911

4 on your smartphone, you know, and for some reason the

5 call disconnected, it would be great if I could　15:23:24

6 fingerprint your device and know your location

7 immediately.

8    Now thinking about that more, that's an invasion

9 of privacy. It's one that will be welcome by the person

10 who's being attacked and their cell phone is ripped out　15:23:35

11 of their hands, but you know, there are always edge

12 cases. So I hesitate to make -- to make those

13 categoricals without really thinking about edge cases.

14    Q. Okay. Does fingerprinting identify an

15 individual or does it identify a device?　15:23:55

16    A. Fingerprinting identifies a device, which -- and

17 devices can identify individual.

18    Q. Right. And would you agree that with this

19 statement, this is from -- well --

20    Just confirming something with my colleague.　15:24:30

21 Devices may identify an individual, but they may

22 just identify -- they may not. Is that --

23    A. They may not. I mean, something we're learning

24 over the past few years, it's easier than we thought to

25 go from a device to an individual.　15:24:49

Page 132

---

1    Q. In paragraph -- I'm sorry, in footnote 88, you

2 say this article that you and Karen Levy wrote together?

3    A. Yes.

4    Q. Privacy Threats in Intimate Relationships?

5    A. Yes.　15:25:20

6    Q. And in that article, I think it's at page 10. I

7 can show you the article, if you like. But we'll see if

8 you need it.

9    You say: "Households are not units, devices are

10 not personal, the purchaser of a product is not its only　15:25:29

11 user."

12    Do you agree with those statements?

13    A. Can I see it in situ.

14    Q. Absolutely. Totally fair.

15    A. Just to see it. Just to make sure.　15:25:40

16    MR. BROOME: Yeah.

17    (Exhibit 7, Journal of Cybersecurity, Research

18    Paper, Privacy Threats in Intimate

19    Relationships, by Karen Levy and Bruce Schneier,

20    was marked for identification by counsel

21    electronically.)

22    THE WITNESS: Okay. I'm there.

23    Q. BY MR. BROOME: Let me load it.

24    A. The words sound familiar. Remind me where it

25 is.　15:26:02

Page 133

34 (Pages 130 - 133)

1   Q. So we've loaded Exhibit 7, which is your article
2   Privacy Threats in Intimate Relationships, which you
3   coauthored with Karen Levy; is that accurate?
4   A. Yes.
5   Q. Okay. And let's see. First of all, on page 2,   15:26:13
6   bottom left, very last sentence beginning in the
7   left-hand column on page 2. It says: "People living in
8   the same household may share computers, phones, and other
9   connected devices."
10      Do you see that?                              15:26:31
11   A. That was a long page. Yes, I do see it.
12   Q. Okay. And do you agree with that?
13   A. Yes.
14   Q. And then if you go to -- skip ahead to page 10.
15   A. I'm there.                                     15:26:48
16   Q. Okay. Right in the heading there, Implication 6
17   says: "Realize that households are not units; devices
18   are not personal; the purchaser of a product is not its
19   only user."
20   A. Yes.                                          15:27:24
21   Q. And I had asked you if you agreed with that. Do
22   you agree with that?
23   A. So that is a -- an implication. So what that's
24   saying is that those things are not always true. I mean,
25   it's a person over a product is often its only user in   15:27:36

Page 134

1   the example of a smartphone. So I mean, that's shortened
2   because it's the title of a section so there's a bunch of
3   caveats missing.
4   Q. Okay. But as a general matter, you would agree
5   that households are not units and devices are not --   15:27:57
6   households are not necessarily units and devices are not
7   necessarily personal?
8   A. Yes. As a design assumption.
9   Q. Okay.
10   A. That's who I'm speaking to. I'm speaking to   15:28:12
11   designers of systems.
12   Q. Right. And well, you're speaking to designers
13   of systems, and this is a design assumption, but it is a
14   design assumption that is a -- has a real-world practical
15   application; right?                               15:28:30
16   A. Yes.
17   Q. All right. Okay.
18      Can we go back to your Data and Goliath book for
19   a moment. I think that was 3, Exhibit 3. Page 217 in
20   the book, page 155 in the PDF.                    15:29:08
21   A. I'm here.
22   Q. There's a heading that says "Distort
23   Surveillance."
24      Do you see that?
25   A. I do.                                         15:29:37

Page 135

1   Q. It says: "I have my browser configured to
2   delete my cookies every time I close it, which I do
3   multiple times a day. I am still being surveilled, but
4   now it's much harder to tie all those small surveillances
5   back to me and ads don't follow me around."      15:29:54
6      Do you see that?
7   A. I do.
8   Q. Why did you configure your browser setting to
9   delete cookies every time you close your browser?
10   A. It's an easy thing to do, and I think it -- it   15:30:04
11   helps block surveillance in some cases.
12   Q. Does it provide some degree of privacy?
13   A. I think it provides some degree of privacy, yes.
14   Q. Privacy from internet tracking companies?
15   A. Yes.                                          15:30:21
16   Q. Privacy from Google?
17   A. You know, I've learned a lot more about Google
18   tracking than I knew in 2014 so I'm not sure. You know,
19   these days I think Google is able to join to various
20   sessions of mine, or at least some of them.      15:30:37
21   Q. Right. But you haven't seen any evidence that
22   Google's actually done that; correct?
23   A. No, but I think it would be a bad business model
24   if they didn't. I mean, I can see what they talk about
25   in their writings to analytics customers. For me, it's   15:31:08

Page 136

1   something prudent to do. It's easy to do and provides me
2   some measure.
3   Q. I asked whether you'd seen any evidence that
4   Google's actually done that, and you said no. Just so
5   the record is clear, your answer is no, I have not seen   15:31:23
6   any evidence that Google's actually done that; is that
7   right?
8   A. No. I'm not privy to Google's actual data
9   surveillance practices.
10   Q. Okay. I think we got another record problem   15:31:38
11   because I said "is that right," and you said "no."
12   A. Yeah.
13   Q. Let me ask the question again.
14      Have you seen any evidence that Google is able
15   to join the various sessions?                    15:32:06
16   A. Yes.
17   Q. No, wait. That's not what I meant to ask.
18      Have you seen any evidence that Google has
19   actually joined the various sessions?
20   A. No.                                           15:32:22
21      Wait. Counsel's evidence; right? So we have
22   the deposition of the FBI agent that said speaks to
23   linking private browsing and non-private browsing.
24   Right? We have that article by Sara Watson, of her
25   questioner, who says I was browsing Incognito and the ad   15:32:50

Page 137

35 (Pages 134 - 137)

1 followed me around.
2     So I think the answer is I've seen a bunch of
3 anecdotal evidence, but no direct evidence.
4     Q. In this paragraph here where you talk about
5 deleting -- configuring your browser to delete your    15:33:19
6 cookies every time you close it, you refer to small
7 surveillances. What did you mean by that?
8     A. I need to look at it.
9     I think what I mean is temporally small. So
10 imagine I'm deleting my cookies -- I'm going to make this    15:33:38
11 up -- every four hours. So each block that that cookie
12 knows is a four-hour block. I meaning of small that way.
13 So four hours, four hours, four hours; right? So it's
14 now harder to join those three separate units.
15     Q. So the surveillance -- surveillances would be    15:33:59
16 the websites you visited in your other activity online?
17     A. Yes.
18     Q. And they're small because they're going to be
19 limited from the time you -- or to the time between when
20 you start the session and the time you delete the    15:34:18
21 cookies; is that what you're saying?
22     A. Yeah, that's correct. And remember, this is
23 also written in 2014. I think we're a lot less
24 sophisticated on what else different companies could do,
25 certainly what Google and other companies, also.    15:34:32
Page 138

1     Q. And you understand that this is how Incognito
2 mode and other private browsing modes work; right? That
3 they delete cookies when you close the browser?
4     A. Yes.
5     Q. And therefore, they do provide a measure of    15:34:54
6 privacy; correct?
7     A. I believe I've said that, yes.
8     Q. Paragraph 99. You use the term "eavesdroppers"
9 there. Do you see that?
10     A. Yes.    15:35:32
11     Q. And do you think that's a fair characterization
12 of companies that provide these web services, given that
13 they're only there because the websites want them to be?
14     A. Which web services are you referring to?
15     Q. Well, for example, Google Analytics and Google    15:35:46
16 Ad Manager.
17     A. I think it is in the same way to say
18 surveillance is -- on the internet. Someone can eaves-
19 -- they are. Yes. I mean, in this, I'm -- yeah, I do
20 think it is a -- a fair characterization.    15:36:03
21     Q. Okay. Well, you would agree that the reported
22 eavesdroppers are only there because the websites want
23 them to be; right?
24     A. In the case of Google Analytics, that is true.
25 Actually, in the case of a lot of the trackers that is    15:36:20
Page 139

1 true, yes.
2     Q. In fact, any Google service that exists on a
3 website is only there because the website wants it to be
4 there; right?
5     A. I don't know all of the Google services. So if    15:36:31
6 you find me one that isn't, I wouldn't be shocked.
7     Q. Fair -- fair point.
8     With respect to the services that are at issue
9 in this case, those cases, Google's analytics and
10 advertising services are only there because the website    15:36:47
11 wants them to be there; correct?
12     A. Yes, yes.
13     Q. Do you agree that a private browsing mode
14 session could be limited to just a single website?
15     A. Yes.    15:37:52
16     Q. In paragraph -- if you go to paragraph 201 of
17 your report.
18     A. Uh-huh.
19     Q. Okay. It says: "While Google can present
20 cookie tracking as a necessary part of the internet, this    15:39:13
21 is simply not the case. In fact, there exists a widely
22 proposed protocol (supported in every major browser,
23 including Chrome) called 'Do Not Track.' This is a
24 signal that can be sent in a HTTP header to a website,
25 asking that the site to not track this user, browser, or    15:39:29
Page 140

1 request. Chrome has this feature, which is buried within
2 the settings menu, and is turned off by default. Any
3 sensible 'incognito' or truly 'private' mode would enable
4 this feature by default."
5     Do you see that?    15:39:48
6     A. I do.
7     Q. Okay. Do any other private browsing modes --
8 well, let me make that more limited.
9     Do any of the private browsing modes that are at
10 issue in this case enable Do Not Track by default?    15:39:59
11     A. I don't know, but I do say that Brave prompts
12 users to turn it on. So that's not a default, but it
13 is -- it's a pattern that will incent users to turn it
14 on.
15     Q. Is Brave at issue in this case? Do you know    15:40:22
16 which browsers other than Incognito are -- sorry, which
17 browsers other than Chrome are at issue in this case?
18     A. I do, but I always get them wrong and look it
19 up.
20     Q. That makes two of us.    15:40:34
21     A. Yeah. So look it up if we need it.
22     Q. Yeah, I think it's Safari and Edge.
23     A. Safari and -- not Firefox -- and Edge. I think
24 that's right. Edge is the Microsoft one.
25     Q. Okay. Do you know whether Safari or Microsoft    15:40:51
Page 141

36 (Pages 138 - 141)

1 Edge enable Do Not Track by default?

2   A. I do not.

3   Q. Okay. Why do you agree that Do Not Track is

4 actually not that widely accepted; that many websites do

5 not adhere to this protocol?                    15:41:06

6   A. I do. Doesn't mean you don't try.

7   Q. In paragraph 205, you write: "Google has not

8 taken steps to ensure that a user's choice to sign out of

9 a Google account will prevent Google from associating the

10 user's signed out activity with any signed-in data."   15:41:50

11     Do you see that?

12   A. I do.

13   Q. And what's that based on?

14   A. That's based on the rest of the paragraph.

15   Q. Okay. Okay.                              15:42:20

16     Have you reviewed the deposition of -- the

17 deposition transcript of Ramin Halivati specifically

18 about this document?

19   A. About my documents?

20   Q. No, about the document -- I'm sorry. That was   15:43:16

21 very imprecise.

22     You -- in the -- after the sentence that I just

23 quoted --

24   A. Right.

25   Q. -- I asked you what's that based on. You said   15:43:28

Page 142

1 it's based on the rest of the paragraph, which is a very

2 fair response. And then it says: "The cookies that

3 Google collects 'span signed in and signed out sessions,"

4 allowing Google to 'connect the dots even if it can't

5 write data to a person's account.'"              15:43:45

6     And then it's footnote 215 -- no, I'm on the

7 wrong document.

8   A. No, you're right.

9   Q. Okay. Sorry.

10     I was asking about the wrong document. So   15:44:14

11 strike all of that, and let me direct you to paragraph

12 207.

13   A. I'm there.

14   Q. Okay. You say: "Google employees admit that

15 Google 'logs all user activities in Incognito mode,'   15:44:29

16 server side, and that is more or less linkable to user's

17 signed-in data."

18     Do you see that?

19   A. I do.

20   Q. And then you footnote to GOOGLE-BROWN-00701189.   15:44:38

21 Do you see that?

22   A. I do.

23   Q. And that was the document that you were quoting;

24 right?

25   A. Yes.                                    15:44:48

Page 143

1   Q. And have you reviewed Ramin Halavati's testimony

2 about this document?

3   A. I don't believe so. It does not sound familiar.

4   Q. Okay. He testified that -- well, never mind.

5     So in Mr. Halavati's deposition, he was asked   15:45:51

6 about this document, and he said, quote: "I was under

7 the impression that we could somehow join the data on

8 Google servers, but in later discussions, people who knew

9 more information about Google logs, how these things

10 work, told me that it is not that much possible."   15:46:08

11     So I guess my question to you is: You don't

12 have any -- does that refresh your recollection as to

13 whether you reviewed Mr. Halavati's deposition transcript

14 explaining the quote in this document that you've cited?

15   A. It still doesn't sound familiar, but I'm willing   15:46:30

16 to bet that if I read that, I would have remembered it.

17   Q. Okay. All right.

18     If you go to paragraph 172 of your report.

19   A. I'm there.

20   Q. And the last sentence, you say: "However, in   15:47:40

21 2016, with little fanfare, Google revised its Privacy

22 Policy yet again in an effort to allow Google's

23 combination of DoubleClick's web-browsing data with names

24 and personally identifiable information from Gmail and

25 other login accounts." Do you see that?   15:47:57

Page 144

1   A. I do.

2   Q. And I see that you're citing from an article by

3 Julia Angwin, that says: "Google has quietly dropped ban

4 on personally identifiable web tracking"?

5   A. Yes.                                    15:48:11

6   Q. Are you aware that Google, in fact, launched an

7 entirely new consent campaign in 2016, notifying users

8 that this data would be associated with their personally

9 identifiable information and requesting their consent?

10   A. Can we pull up Julia's article and see what she   15:48:24

11 says?

12   Q. Well, sure, yeah, we can.

13     Is your testimony based exclusively on this

14 article from Julia Angwin?

15   A. Yeah. I'm going to want to read the article   15:48:37

16 first and let you know, but that's my primary source,

17 yes.

18   Q. Okay. Can we have that one?

19     Okay. We'll come back to that one while we

20 locate the article.                            15:48:49

21     But while we're doing that, are you familiar

22 with the Narnia 2 consent campaign that Google launched

23 in 2016?

24   A. I am not.

25   Q. Okay. Are you familiar with any disclosures or   15:49:07

Page 145

37 (Pages 142 - 145)

1  prompts that Google initiated in 2016 to notify users
2  that Google -- with their consent, Google would associate
3  data from their web-browsing data with their Google
4  account?
5      A. I am not.                          15:49:34
6      Q. Let's go to Section 10.1.
7      A. Paragraph numbers are easier.
8      Q. Yeah, let me locate it.  231.
9      A. Yes.
10     Q. And here you have your opinion that Google's   15:50:45
11 notice and consent procedures are inadequate.
12         Do you see that?
13     A. I do.
14     Q. Are you evaluating the adequacy of Google's
15 disclosures against a standard?                  15:51:00
16     A. Yes.
17     Q. What's the standard?
18     A. The standard is what we privacy and securities
19 experts take to be the way these things should be
20 disclosed.                               15:51:20
21     Q. Is that an objective standard or is that -- is
22 it -- well, let me ask that question first.
23         Is that an objective standard?
24     A. I'm not sure what an example of an objective
25 standard would be in this case.          15:51:33

Page 146

1      Q. Well, you say the standard is what we privacy
2  and security experts take to be the way these things
3  should be disclosed.  Do all privacy and security experts
4  believe that Google's notice and consent procedures are
5  inadequate?                           15:51:56
6      A. I have not queried all privacy and security
7  experts.  I don't even know if I would be able to get a
8  list of all privacy and security experts.
9      Q. Have you queried any privacy and security
10 experts on this issue?                 15:52:10
11     A. In this issue, no.
12     Q. Okay.  So then -- then the standard is really --
13 it's not really a standard that you're evaluating
14 Google's -- the adequacy of Google's notice and consent
15 procedures; it's really just your own opinion; right?  15:52:30
16     A. Yeah.
17     MR. CROSBY:  Object to the form.
18     THE WITNESS:  I would call it a standard.  I
19 called it a standard.  I would say yes.  I mean, we as
20 experts know this.  This is what we do.  This is my   15:52:43
21 expertise.  So it's not a random person, what do you
22 think.
23     Q. BY MR. BROOME:  Okay.  Is there anything you can
24 point me to that says what that standard is?
25     A. You're asking is it a formal standard?   15:52:57

Page 147

1      Q. Is it a formal standard?
2      A. It is not a formal standard.
3      Q. Okay.  Is there -- is there any -- are there any
4  criteria or anything like published that I could go to or
5  the Court could go to, to say, you know -- to make a   15:53:11
6  determination as to whether or not Google's notice and
7  consent procedures are inadequate based on this standard?
8      A. I think like many things, other areas have
9  nothing to do with this.  So a Court would go to an
10 expert.                                15:53:45
11     Q. Are you saying Google's notice and consent
12 procedures are inadequate as a legal matter?
13     MR. CROSBY:  Object to the form.
14     THE WITNESS:  Yeah.  So what do you mean as -- I
15 mean, what's a legal matter as opposed to what else?   15:53:59
16 Give me my choice more explicitly.
17     Q. BY MR. BROOME:  Well, you understand as a
18 privacy and security expert that there are various
19 disclosure requirements mandated by law; right?
20     A. Uh-huh.                           15:54:17
21     Q. For example, CCPA imposes certain disclosure
22 requirements.
23         Are you opining that Google's notice and consent
24 procedures are inadequate under CCPA?
25     A. I'd need to read CCPA first.  So I'm not --   15:54:29

Page 148

1      Q. So you're not?
2      A. I'm not opining on that right now.
3      Q. Are you opining that Google's notice and consent
4  procedures are inadequate under any other legal standard?
5      A. I am not.                         15:54:41
6      Q. So when you say they're inadequate, they're
7  inadequate based on the standards applied by data
8  security and privacy experts; is that your opinion?
9      A. That's what I'm saying.  And they could very
10 well be also inadequate under those statutes.  You'd have   15:55:06
11 to read the text of those statutes and see.  I think
12 you'll find them similarly subjective.
13     Q. Are they inadequate because they're too long?
14     A. No.
15     Q. Is Google's Privacy Policy inadequate because   15:55:47
16 it's too long?
17     A. No.
18     Q. Is it problematic -- is it's length problematic?
19     A. I don't know.  I haven't judged it based on
20 length.  So now you're asking a much more subtle   15:56:03
21 question.  So that would be research I would have to do.
22     Q. Okay.  In paragraph 239.
23     A. I'm here.
24     Q. Wait.  Sorry.  Let me go back.
25         Okay.  In 238, you talk about Google's -- Terms   15:57:10

Page 149

38 (Pages 146 - 149)

1 of Service Chrome policy -- Privacy Policy -- excuse
2 me -- and Chrome Privacy Notice.  And you say -- you talk
3 about the amount of time it would take to read all of
4 those documents, all versions of all of those documents.
5      Do you see that?                        15:57:31
6 A.  I do.
7 Q.  And then you say:  "This estimated reading time
8 assumes the reader is capable of comprehending the text,
9 which in many cases is unlikely unless the reader happens
10 to be an attorney."                          15:57:46
11     You've read Google's Privacy Policy; right?
12 A.  I have.
13 Q.  Okay.  And have you read the various versions
14 that are in effect during the class period?
15 A.  You know, I read some and skimmed the others.  I   15:57:57
16 didn't read every word of every one.
17 Q.  Is it your opinion that you need to be an
18 attorney to understand the -- Google's Privacy Policy?
19 A.  No.
20 Q.  Okay.  Is it your opinion that you'd need to be   15:58:09
21 an attorney to understand the Chrome Privacy Notice?
22 A.  No.
23 Q.  Well, what about the Terms of Service?
24 A.  No.
25 Q.  In 239, you say "the time span between revisions   15:58:22

Page 150

1 of these policies has been quite short, with as many as
2 four revisions issued in the space of a year.  Take, for
3 example, revisions to the Privacy Policy."  And then you
4 go on and note that it's been updated.
5      You would agree that Google should update its   15:58:38
6 Privacy Policy as frequently as necessary to make it
7 accurate; right?
8 A.  Yes.
9 Q.  Okay.  So as technologies change or as laws
10 change or practices change, Google should update its   15:58:53
11 Privacy Policy to be current; correct?
12 A.  Yes.
13 Q.  Okay.  And the length of those policies should
14 be essentially as long as they need to be to convey the
15 relevant information.                        15:59:26
16     Do you agree with that?
17 A.  Yes.
18 Q.  And do you agree that it is hard -- when
19 crafting privacy policies, it's difficult to strike a
20 balance between disclosing too much information or   15:59:40
21 disclosing information in such detail that users won't
22 understand it and providing the information in a way that
23 is simple and digestible to the average consumer?
24 A.  I'm not convinced that that balance is that hard
25 to strike.  I think a bigger deal is made of it than it   16:00:01

Page 151

1 has to be.
2 Q.  Okay.  In 241, it looks like you subjected
3 the -- these various Google documents to a Flesch Reading
4 Ease score or a Reading Ease test, I guess?
5 A.  Yes.                                    16:00:55
6 Q.  Okay.  Do you have any expertise in readability?
7 A.  I do not.  So I used the test.
8 Q.  Okay.  Have you ever used these tests before?
9 A.  I have.  Not often, but I have run a writing of
10 mine through it occasionally just to see.       16:01:16
11 Q.  Okay.  And your results showed that generally
12 people with a high school diploma should be able to
13 understand these various Google disclosures; right?
14 A.  You know, what it says is the education needed.
15 So it gives a minimum that needed.  You know, you said if   16:01:39
16 someone above that should be able to.  That's going to
17 have a lot of other elements besides just readability.
18 Q.  Okay.  Section 10.2, paragraph 243.  Let me know
19 when you're there.
20 A.  I'm there.                              16:02:18
21 Q.  Okay.  You opine that Google promises users
22 control.
23     Do you see that?
24 A.  Yes.
25 Q.  Is it your opinion that Google does not deliver   16:02:24

Page 152

1 on that promise?
2 A.  Yeah.
3 Q.  How so?
4      Well, actually, strike that.  Let me ask you
5 another question first.                       16:02:41
6      Are you saying that Google offers users no
7 control?
8 A.  No.
9 Q.  Google does offer users some control; correct?
10 A.  Yes.                                    16:02:51
11 Q.  There are various settings that Google offers
12 across its services that give users control; correct?
13 A.  Yes.
14 Q.  The word "control" can mean a lot of different
15 things depending on context; correct?            16:03:17
16 A.  Yes.
17 Q.  Control is a measure of degree; right?
18 A.  Yes.
19 Q.  You can have some control or you can have total
20 control?                                    16:03:29
21 A.  Yes.
22 Q.  Do you agree that by providing a cookie blocker
23 option in Chrome, Google provides users some control?
24 A.  Yes.
25 Q.  Do you agree that by allowing users to delete   16:03:41

Page 153

1 data associated with their account in My Activity, users
2 provides -- sorry, Google provides users control?
3    A. You went from some control to control. Do you
4 mean to do that?
5    Q. No. That got all muddled.          16:03:56
6       Do you agree that by allowing users to delete
7 data associated with their account in My Activity, Google
8 provides users control?
9    MR. CROSBY: Object to the form.
10      THE WITNESS: Google provides users some control   16:04:08
11 by doing that. And that's a tough one because we're
12 pretty sure that Google doesn't allow you to delete the
13 backups. You know, there are lots of cases in other
14 companies where you delete your data and you change your
15 mind, it comes back. So when deleted data is truly data   16:04:24
16 is an open question.
17    Q. BY MR. BROOME: Do you agree that by providing a
18 browser mode that allows the user to be either signed in
19 or signed out, Google provides users some control?
20    A. Yes.                             16:04:45
21    Q. Do you agree that by providing a browser mode
22 that prevents the sharing of existing cookies with
23 websites, Google provides the user with some control?
24    A. And I'm taking it as read that Google actually
25 does this; right? Because I have no direct knowledge.   16:04:59

Page 154

1 had control over Google's collection of their information
2 with users being able to exercise control by using
3 private browsing."
4       Do you see that?
5    A. I do.                            16:27:14
6    Q. And then you cite the various Google privacy
7 policies in effect during the class period.
8       Do you see that?
9    A. I do.
10    Q. Okay. And that begins in June -- looks like the   16:27:23
11 first one you cite there is June 2016?
12    A. Yes.
13    Q. But you know that Google did not mention
14 Incognito mode or private browsing in the Privacy Policy
15 until 2018; right?                      16:27:41
16    A. Yes.
17    Q. So why did you say that Google's Privacy Policy
18 throughout the class period promised the user had control
19 over Google's collection of their information, with users
20 able to exercise control by using private browsing? Was   16:27:57
21 that a mistake?
22    A. That's interesting. You're saying -- and I
23 remember that; I'm not going to check. We'll say that
24 you say it's right -- that in those older ones, they
25 don't mention private browsing at all.   16:28:18

Page 156

1    Q. Yes.
2    A. And this would be in Chrome?
3    Q. Yes.
4    A. Yes, that it gives users some control.
5    Q. And do you agree that a browser mode that   16:05:09
6 deletes cookies automatically when you close it provides
7 users some control?
8    A. Yes.
9       MR. BROOME: Why don't we take a short break.
10 I'm just going -- we're sort of at the point -- well,   16:05:50
11 let's go off the record for a second, if that's okay.
12       MR. CROSBY: Sure.
13       THE VIDEOGRAPHER: Going off the record at
14 4:06 p.m.
15    (Recess.)                          16:06:33
16       THE VIDEOGRAPHER: We are back on the record at
17 4:26 p.m.
18    Q. BY MR. BROOME: Mr. Schneier, can you please
19 turn to paragraph 279 of your report.
20    A. Yeah, let me turn the light on here. It will be   16:26:41
21 a little better for me.
22    Q. Okay.
23    A. I'm here.
24    Q. Okay. Paragraph 279, you say: Google's Privacy
25 Policy throughout the class period promised that users   16:27:04

Page 155

1    Q. Right.
2    A. Then the Privacy Policy would not say that users
3 are able to exert control using private browsing. The
4 Privacy Policy is silent on that, yes. But yet it's
5 silent both ways.                      16:28:44
6       So, you know, if I was a Google user who might
7 want to use private browsing and let's say I want to
8 check the Privacy Policy, it's not going to tell me
9 either way. So, you know, I would just default to the
10 other things I'm told.                  16:28:56
11    Q. Well, or the Privacy Policy would say we collect
12 this data, and describe all the data we collect, and it
13 wouldn't distinguish between regular or private browsing;
14 right?
15    A. Right. And that would be an omission so that   16:29:10
16 the design -- if you think about it, so that's an
17 omission. It's silent about that. Silent about the
18 difference. So you're postulating, well, that a user
19 would know that it's the same, but if a user's getting
20 information from Google executives, from Google splash   16:29:30
21 screens, thinking one -- thinking -- coming in thinking a
22 certain thing, and they're not being contradicted, it
23 seems more likely to me that they're going to leave with
24 the same impression they came in with.
25    Q. Okay. So if they came in with -- already came   16:29:50

Page 157

40 (Pages 154 - 157)

1  in with the impression that the Incognito mode or private
2  browsing provides them privacy from Google, then they
3  might interpret the Privacy Policy as confirming that
4  belief.
5      Is that what you're saying?            16:30:06
6  A.  Sure.  There are no caveats in that sentence.
7  Q.  Okay.  But if they had no expectation at all,
8  and they're thinking, hmm, I wonder what data Google
9  collects, and they go to the Privacy Policy, and it
10  doesn't distinguish between private browsing and regular  16:30:20
11  mode, wouldn't it be reasonable for that user to assume
12  that Google collects the data regardless of which mode
13  you're in?
14  A.  So that user doesn't know that privacy mode
15  exists.                               16:30:34
16  Q.  No, they know it exists.
17  A.  So they know it exists which means that they
18  learned about it somehow.  How did they learn about it?
19  It actually gets complicated.  And this is why when we do
20  this work, we sort of deal with the disclosures and don't  16:30:47
21  get wrapped up in individual users.
22  Q.  Uh-huh, okay.
23      So basically what you're saying is that any
24  individual user's expectations - any individual user's
25  expectations about private browsing mode are going to   16:31:08

Page 158

1  depend on unique circumstances as to the user.
2  A.  And again, I'm focusing on the disclosures in
3  this report, and that gets back to the user surveys I
4  didn't do.
5  Q.  Okay.  In paragraph -- just going back to      16:31:26
6  paragraph 279, the statement:  "Google's Privacy Policy
7  throughout the class period promised," et cetera,
8  et cetera, et cetera, that is not accurate; correct?
9  A.  You mean the "et cetera" is not accurate?
10  Q.  Yes.  The first sentence of -- let me do it this   16:32:01
11  way.  The first paragraph in paragraph 279 is inaccurate;
12  correct?
13  A.  The second clause, which implies that users are
14  able to exercise control by using private browsing is not
15  reflected in the privacy policies in those days.      16:32:17
16  Q.  Okay.
17  A.  But again, neither is the fact that they are
18  collecting information in private browsing, which to me
19  is a significant omission.
20  Q.  Do you believe, then, that the Privacy Policy   16:32:48
21  should be broken up into modes so that, like Google says,
22  in synch mode, we collect the following, in guest mode,
23  we collect the following, in regular mode, we collect the
24  following.
25      Is that how you think the Privacy Policy needs   16:33:05

Page 159

1  to be laid out?
2  A.  You know, I would hesitate to design a Privacy
3  Policy organization off the cuff.  And you're asking
4  whether you want to do it horizontally or vertically;
5  right?  In this mode, do all these things or, you know,   16:33:18
6  here's the thing, and we do it in these modes.
7      You know, one's going to be more clear than the
8  other.  They both could be equally clear.  You know,
9  maybe we walk the matrix.  I'm not going to do that
10  design right now.  That actually does take work.  But I   16:33:34
11  mean, those are the sorts of questions that you would
12  want to ask and have answered were you writing as complex
13  a Privacy Policy as Google is.
14  Q.  Well, Incognito is a Google service; right?
15  A.  Yes.                             16:33:49
16  Q.  And the Privacy Policy says -- you know,
17  basically describes our services; right?  It uses the
18  terms "services," and it says across our services, you
19  know, we collect the following information.  And so why
20  would somebody assume that Incognito was excepted from    16:34:04
21  that?
22  A.  Because of everything else Google is telling
23  them.  They're constantly being told every time they use
24  it, you know, that splash screen, what they're hearing
25  from Google executives.  It is a lot of reasons you can   16:34:18

Page 160

1  approach Incognito mode with a belief that you're
2  browsing privately.
3  Q.  With the belief that you're browsing privately
4  from Google?
5  A.  You're browsing privately, period.  Let's get   16:34:37
6  back to the -- you know, the camera in the bathroom.
7  Q.  Uh-huh.
8  A.  Right?  You know, if it's there and I didn't
9  disclose it, I didn't not disclose it.  I mean, I might
10  have said when you came into the apartment, you know,   16:34:49
11  we're observing you.
12      But if I say you can go to the bathroom
13  privately, you're going to be a little perturbed if I
14  say, "Well, I didn't mean from me, I meant from everybody
15  else who's in the apartment."  It's --         16:35:02
16  Q.  Unless that's what the screen actually says;
17  right?
18  A.  But a screen doesn't actually say, you know,
19  when you go to the bathroom, there's no sign saying, the
20  door is closed, but Bruce can see you watch the camera.   16:35:14
21  If it said that, that would be a real disclosure.  But if
22  it says, "Now you're in the bathroom privately," I think
23  it would be reasonably expected to think that you're in
24  the bathroom privately.
25  Q.  On paragraph 281, you say -- let's see here.   16:35:32

Page 161

41 (Pages 158 - 161)

1 You say on the same page -- and I guess -- and yeah,
2 right, you're talking about beginning with the May --
3 sorry. Let's go back to 280.
4    A. All right.
5    Q. It says: "Beginning with the May 25th, 2018    16:35:55
6 version, Google's Privacy Policy became even more
7 categorical in emphasizing user's control over collection
8 of their data through private browsing modes such as
9 Incognito. As referenced above, the first two sentences
10 of the first page of these versions of the Privacy Policy    16:36:09
11 promise (in enlarged font): When you use our services,
12 you're trusting us with your information. We understand
13 this is a big responsibility and work hard to protect
14 your information and put you in control."
15    And then in 281 you say: "On the same page,    16:36:27
16 Google tells users: 'You can use (Google's) services in
17 a variety of ways to manage your privacy.' Google then
18 specifically references 'private browsing' and 'Incognito
19 mode' in the same paragraph."
20    A. Right.    16:36:42
21    Q. Yeah. Okay. And then you quote the sentence
22 that I think you were getting at, which is -- in the
23 Privacy Policy, which says: "You can also choose to
24 browse the web privately using Chrome in Incognito mode."
25    A. Uh-huh.    16:36:59

Page 162

1    Q. In the sentence that begins with "Google then
2 specifically references," you put quotes around private
3 browsing. And I'm happy to show you a copy of the
4 Privacy Policy.
5    Why don't we do that.    16:37:22
6    A. Yeah, I kind of do. I'm looking to see if I
7 have that one in my pile the Privacy Policy. I have
8 May 2018.
9    Q. That's it.
10    A. I got it.    16:37:34
11    Q. We'll load it for the benefit --
12    A. May 25th, 2018.
13    MR. BROOME: Yeah, we'll load it for viewers.
14    (Exhibit 8, Google Privacy Policy,
15    GOOG-CABR-00001107 - 134, was marked for    16:37:39
16    identification by counsel electronically.)
17    Q. BY MR. BROOME: It should be there.
18    All right. So on the first page, this has the
19 sentence that you're -- or this has the paragraph that
20 you're referring to in paragraph 281 of your report;    16:38:19
21 right?
22    A. Yes:
23    Q. You can use our services in a variety of ways to
24 manage your privacy"?
25    A. Yes.    16:38:28

Page 163

1    Q. Okay. And then going back to your report --
2 sorry I'm jumping around a bit here -- but in paragraph
3 281, you have a sentences that says: "Google then
4 specifically references 'private browsing -- which is in
5 quotes -- "and 'Incognito mode'" -- in quotes -- "in the    16:38:40
6 same paragraph."
7    And this may seem a little nitpicky, but would
8 you agree withe me that the words "private browsing" are
9 actually not in that paragraph?
10    A. I would, I would. But it's good nitpicky. I    16:38:52
11 don't mind.
12    Q. Okay. And with that -- and I promise there's
13 point to this. I'm not just being nitpicky for the sake
14 of being nitpicky.
15    The sentence that you're referring to that says:    16:39:04
16 "You can also choose to browse the web privately using
17 Chrome in Incognito mode." Right?
18    A. Yes. Yes.
19    Q. It says you can browse the web privately. It
20 doesn't refer to private browsing; right?    16:39:17
21    A. Yes. Browse the web using Incognito mode, which
22 is their private browsing mode. But yes. You are right.
23    Q. Okay. And then I promised there was a point to
24 that so I actually want to get to that.
25    There's actually no reference to any private    16:39:32

Page 164

1 browsing mode other than Incognito in the Privacy Policy;
2 right?
3    A. That is correct.
4    Q. So Google doesn't make any representations about
5 other browsers' private browsing modes in the Privacy    16:39:42
6 Policy; correct?
7    A. Not in this paragraph. I have to read the whole
8 Privacy Policy, but since this is a Privacy Policy about
9 Google's services, I think odds are you are correct.
10    Q. Okay, great.    16:39:56
11    A. Although do they talk about using Gmail? So
12 this is now subtle here. Do we want to find where
13 they're talking about using services such as Gmail or
14 Google Docs and see what they say?
15    So I might want to retract that. You'd have to    16:40:19
16 read it -- read the details and look. We can if you
17 want.
18    Q. Well, when you talk -- I'm not -- can you
19 explain that to me? Like if they talk about Gmail, why
20 would that be relevant to other browsers with private    16:40:31
21 browsing?
22    A. Because Gmail is a private service that you can
23 use from any browser.
24    Q. Uh-huh.
25    A. So it would be nice to know before we    16:40:40

Page 165

42 (Pages 162 - 165)

1 categorically say they're not speaking to -- to this, to
2 see what they say about other Google services that you
3 might use.
4     Now this is saying you can choose a browser
5 using Chrome or Incognito mode, but it doesn't say          16:41:02
6 anything about other browsers.  You don't even know they
7 exist if you just read this paragraph.
8   Q.  Okay.  All right.
9     Paragraph 283, you write:  "Google's Chrome
10 Incognito Splash Screen has also promised privacy without  16:41:33
11 ever disclosing that Google collects users' private
12 browsing activity.  Pairing the term Incognito with an
13 icon of a faceless person in disguise suggests that a
14 user in Incognito mode cannot be seen, traced, or tracked
15 while browsing online."                                    16:41:53
16     Do you see that?
17   A.  Yes.
18   Q.  Are you an expert in iconography?
19   A.  I am not.
20   Q.  What expertise did you bring -- did you apply in     16:42:00
21 reaching this conclusion about pairing a term with a
22 particular icon?
23   A.  This is the expertise of me as a security and
24 privacy expert's understanding disclosures, understanding
25 dark patterns.  Also relevant were the comments from       16:42:21

Page 166

1 Google employees saying that, hey, you know, this icon is
2 misleading.
3   Q.  Okay.  And if we just limit it to your
4 expertise, all right, have you ever analyzed an icon
5 before to determine what, you know, message it sends to    16:42:42
6 consumers?
7   A.  How would you analyze an icon?
8   Q.  How did you analyze the icon in this particular
9 case?
10   A.  It's -- I think I've answered that.  It's, you       16:42:56
11 know, based on what I know about the word, the images,
12 pairing, and you know, what we as security and privacy
13 professionals understand to be adequate disclosures.
14   Q.  Have you ever applied that expertise to an icon
15 before?                                                    16:43:18
16   A.  Almost certainly.
17   Q.  Can you think of that example?
18   A.  I'm working on it.  Nothing comes to mind, but
19 not promising I won't think of something as we go.
20   Q.  Okay.  Okay.  You describe the icon as a             16:43:36
21 faceless person in disguise.  A disguise doesn't mean
22 you're invisible; right?
23   A.  It does not.
24     MR. BROOME:  All right.  I think I interrupted
25 you there.                                                 16:44:00

Page 167

1     (Discussion off the record.)
2     THE WITNESS:  I said, "Unless it's an
3 invisibility suit," which is actually not a useful aside.
4   Q.  BY MR. BROOME:  A disguise doesn't mean that a
5 user can't be traced; right?                               16:44:45
6   A.  That is correct.
7   Q.  Or a disguise doesn't mean a user can't be
8 tracked; right?
9   A.  That is correct.
10   Q.  And as we discussed earlier, it means that a         16:44:58
11 person's identity is concealed; correct?
12   A.  That is correct.  Although let's back up.  If a
13 disguise is -- you know, you're disguised as a minion in
14 a sea of a thousand minions, you're not going to be
15 traced or tracked.                                         16:45:15
16     So there are disguises which will prevent
17 tracing and tracking.  They would be -- you know, a
18 disguise among everybody else.  You know, let's go back
19 to the Tor browser.  That's how that works.  You are
20 amongst everybody else, and that's why you can't be        16:45:29
21 traced or tracked.
22   Q.  Let's take a look at paragraph 293.
23   A.  Uh-huh.
24   Q.  You say that:  "Users may seek privacy and
25 anonymity when searching and browsing non-Google websites  16:46:07

Page 168

1 for information about ways to deal with or exit from an
2 abusive relationship.  As discussed previously, abusers
3 often employ technological knowledge and means to control
4 their victims, including inspecting a shared computer or
5 their victim's computer or phone to spy on their online    16:46:23
6 activity.  If detected by a tech-savvy abuser, searches
7 and the subsequent browsing activities tied to the
8 following searches could lead to domestic violence," and
9 you list a number of searches people might have run.
10     Do you see that?                                       16:46:39
11   A.  I do.
12   Q.  Okay.  How tech savvy would one need to be to
13 figure out somebody's Incognito searches, assuming the
14 user closes their Incognito sessions when they're done?
15   A.  So I haven't done forensic work in Google Chrome     16:46:54
16 and Incognito so I cannot answer that question.
17   Q.  Okay.  I mean, sitting here today, are you aware
18 of any way that somebody outside of Google could
19 determine somebody's Incognito browsing or searches?
20   A.  Off the top of my head, I can think of a key         16:47:14
21 logger as one.
22   Q.  Okay.  That's a third-party software?
23   A.  Software or hardware.  You can use them both
24 ways.
25   Q.  That would record all of the key strokes on the      16:47:29

Page 169

43 (Pages 166 - 169)

1 device; right?

2    A.  Yes.

3    Q.  Okay.  Regardless of whether they're in

4 Incognito or not; right?

5    A.  Yes.                              16:47:37

6    Q.  Okay.  So let's assuming -- let's assume the

7 abuser is not particularly tech savvy.  Incognito should

8 prevent the abuser from finding -- from identifying the

9 searches that somebody ran in Incognito?

10    A.  If it doesn't, we have some serious problems   16:47:56

11 here.  So let's assume it does.

12    Q.  Okay.

13        MR. CROSBY:  I'm sorry, I was on mute.  I

14 objected to the form of the question.

15    Q.  BY MR. BROOME:  And I think we sort of touched   16:48:13

16 on this earlier, but if one engaged in a fingerprinting

17 analysis to identify this device as one that is engaged

18 in private browsing, and then emailed the owner of that

19 device, in this example, the abusive spouse, that it was

20 used for private browsing, that might alert the abusive   16:48:33

21 spouse that his wife had been doing research in private

22 browsing mode to conceal something from him; right?

23    A.  Yes.

24    Q.  And that's a really legitimate concern; right?

25    A.  I think it is, yes.              16:48:48

Page 170

1    Q.  Do you have an opinion as to whether the

2 branding and marketing messages of other private browsing

3 modes is misleading?  Other meaning other than Incognito

4 mode.

5    A.  I did not look at them in relation to this case.   16:49:05

6 And that's not something I pay attention to.  So right

7 now, I don't.

8    Q.  You're a Firefox user; right?

9    A.  I am.

10    Q.  Have you ever used Edge?         16:49:15

11    A.  I have never used Edge.

12    Q.  In Firefox, do you ever use Incognito or their

13 equivalent private browsing mode?

14    A.  I do not.

15    Q.  And why is that?                 16:49:28

16    A.  Can you say asked and answered?

17    Q.  Is it because you don't have any shared

18 computers?

19    A.  That's right.

20    Q.  Okay.  Would you turn to paragraph 311.   16:49:37

21    A.  Uh-huh.

22    Q.  You write:  "In May 2019, Google's CEO Sundar

23 Pichai wrote an op-ed in The New York Times in which he

24 described Incognito mode as a 'popular feature in Chrome

25 that lets you browse the web without linking any activity   16:50:31

Page 171

1 to you.'"

2        Do you see that?

3    A.  I do.

4    Q.  And in fact, as far as you know, Google does not

5 link any private browsing activity to individual users;   16:50:47

6 correct?

7    A.  I know they can.  I don't know if they actually

8 do that.

9    Q.  Okay.

10    A.  We have a lot of incidental antidotes that they   16:50:57

11 do.

12    Q.  Okay.  So far as you know, Pachai's statement

13 was accurate; right?

14    A.  No, I think it's inaccurate.

15    Q.  And why is that?                 16:51:14

16    A.  I think for the reasons I talk about in the rest

17 of that paragraph.

18    Q.  Okay.  Let's look at that.  You say:  "Pichai's

19 statement was incorrect in implying that while in

20 Incognito mode, data regarding a user's browsing activity   16:51:28

21 is not saved or linked to them, when in fact data is

22 continuously collected from Chrome users whether they are

23 browsing in normal or in Incognito mode."

24        Do you see that?

25    A.  I do.                           16:51:42

Page 172

1    Q.  Pichai doesn't say that data's not saved; right?

2    A.  No.  They say that he says that you can browse

3 the web without linking any activity to you.

4    Q.  Right.

5    A.  He's not saying that explicitly, but he's making   16:51:55

6 a statement that when you browse the web using Incognito,

7 data's not linked to you.  And we know that data has been

8 linked to people browsing in Incognito.

9    Q.  And you're talking about the antidotes that

10 you've heard?                          16:52:13

11    A.  Well, that have been testified to.  More than

12 I've heard.

13    Q.  Right.  You're talking about the antidotes

14 discussed in the testimony in this case?

15    A.  Yes.                            16:52:24

16    Q.  Okay.

17        MR. CROSBY:  I'm sorry, could we take a real

18 quick five-minute break here, please.

19        MR. BROOME:  Sure.

20        MR. CROSBY:  Thank you.         16:52:36

21        THE VIDEOGRAPHER:  Going off the record at

22 4:53 p.m.

23        (Recess.)

24        THE VIDEOGRAPHER:  We are back on the record at

25 5:03 p.m.                              17:03:20

Page 173

44 (Pages 170 - 173)

1    Q.  BY MR. BROOME:  Mr. Schneier, we're going to
2  talk a little bit more about paragraph 311 in your
3  report, but first I want to go back to Exhibit 4.
4        Because we keep -- we keep talking about sort of
5  anecdotal evidence that Google does, in fact, link          17:03:39
6  private browsing sessions with regular mode sessions.
7    A.  Uh-huh.
8    Q.  And you've identified the testimony from
9  Mr. Nelson.  And I think the other piece of evidence that
10  you've identified is this article.  I think this is the      17:03:52
11  article.
12        Is this the article you're referring to?
13    A.  It is, yes.
14    Q.  Okay.  And I just want to make sure that we read
15  it the same way.                                             17:04:06
16        Okay.  So on the second page -- wait, sorry,
17  third page -- well, actually, let me back up.
18        This is the article you said this is potentially
19  or this is additional anecdotal evidence that Google
20  connects regular and private browsing mode sessions;         17:04:33
21  right?
22    A.  Yes.
23    Q.  And in this article, the author describes an
24  incident where her friend was surprised by retargeted
25  ads, given that she had been browsing in Incognito;          17:04:45

Page 174

1  right?
2    A.  Yes.
3    Q.  Okay.  And she said she writes:  "Jen was
4  surprised by the retargeted ads because she knew they
5  were based on cookies and history, but she thought she       17:04:54
6  wasn't leaving those trails behind her.  Upon further
7  inspection, she realized that cookies are deleted only
8  after she closes out of all Incognito windows."  Right?
9    A.  Yes.
10    Q.  So that wouldn't be evidence that Google is         17:05:07
11  connecting regular and private -- and Incognito sessions.
12  It just shows that she hasn't closed her Incognito
13  session, and therefore, the session is still open and
14  cookies can still be used to serve ads; right?
15        MR. CROSBY:  Object to the form.                    17:05:25
16        THE WITNESS:  So, wait.  You're saying, I
17  think -- let's read it together.  I guess let me read it.
18        The way I read this -- and I'm reading the first
19  paragraph of the second page, is that Jen -- Jen is using
20  Incognito when she's with Sara, and she's seeing ads        17:05:51
21  based on things she did when she was not in Incognito.
22    Q.  BY MR. BROOME:  Well, she says:  "Upon further
23  inspection, she realized that cookies are deleted only
24  after she closes out of all the Incognito windows."
25        Do you see that?                                    17:06:38

Page 175

1        And you understand that within a particular
2  Incognito session, cookies can still be placed and used
3  to serve ads; right?
4    A.  So I actually don't know whether each window in
5  Incognito is a separate box.                                 17:06:51
6    Q.  Uh-huh.  Okay.
7    A.  I actually don't know that.
8    Q.  But where are you getting -- point me to the
9  part where you think that this shows that Google is
10  connecting regular and Incognito sessions.                   17:07:02
11        MR. CROSBY:  Object to the form.
12        THE WITNESS:  So I'm looking at page -- I think
13  I said numbered page 1, 2, 3.  "Like a lot of us, Jen
14  doesn't often shut down her computer completely, and
15  keeps her regular tabs open most of the time."  All         17:07:27
16  right?
17        So that implies to me she's not in Incognito
18  most of the time.  She's in Incognito in this incident
19  that's being written about, and that there's a linking.
20  I see how you can read it another way, though.               17:07:45
21    Q.  BY MR. BROOME:  All right.  One could read it
22  either way.
23    A.  This is the way I read it.  It's too old ago.
24  No one's going to remember.
25    Q.  Okay.  All right.                                    17:08:01

Page 176

1        Let's go back to 311 of your report.
2    A.  Hang on.  All right.
3    Q.  Oh, I'm sorry, you're there.  Yeah.  Okay.
4        Moving beyond 311 to 312 through 322, is it fair
5  to say that in paragraph 312 through 322, you are            17:09:38
6  essentially summarizing various Google documents?
7        MR. CROSBY:  Object to the form.
8        THE WITNESS:  I'm including a lot of quotes in
9  Google documents.  Also, there's a few non-Google
10  documents in there, but primarily, it's Google documents,    17:09:54
11  yes.
12    Q.  BY MR. BROOME:  In 314, you say:  "The Incognito
13  Splash Screen states that 'other people who use this
14  device won't see your activity.'"  And then you write:
15  Google itself uses every one of its users' devices as a      17:10:35
16  means of data extraction, and that extraction takes place
17  whether a user browses in normal mode or Incognito mode."
18        Do you see that?
19    A.  I do.
20    Q.  Are you saying there that the phrase "other        17:10:47
21  people who use this device won't see your activity"
22  should be construed to include Google?
23        MR. CROSBY:  Object to the form.
24        THE WITNESS:  Yeah, this -- this sentence needs
25  to be looked at in context of everything.  I think this      17:11:02

Page 177

45 (Pages 174 - 177)

1  combined with everything else on the splash screen and
2  what users are hearing from Google say that.
3       (Telephonic interruption.)
4       THE WITNESS:  It's totally not me.
5       Q.  BY MR. BROOME:  You don't think that people who    17:11:24
6  read the splash screen think the phrase "other people who
7  use this device" refers to Google, do you?
8       MR. CROSBY:  Object to the form.
9       Q.  BY MR. BROOME:  Are you there?
10      A.  I'm there.  I'm looking at it.    17:11:43
11      Q.  Okay.
12      A.  That is a clause in a bigger sense.  You can --
13  you can browse the web privately, and other people use
14  this device.  So that clause I think is about other
15  people who are touching the physical object that you're    17:11:55
16  on.  You can browse privately is a more general
17  statement.  And then there's a -- there's a caveat which
18  is the next device.
19      Q.  Yeah.  I'm just referring to the clause.
20  Because I'm trying to understand whether in 314 --    17:12:08
21  because you make this point that Google itself uses every
22  one of its users' devices, I'm trying to understand if
23  you're trying -- are you trying to say there that the
24  phrase "other people who use this device won't see your
25  activity" is inaccurate because Google uses people's    17:12:26

Page 178

1  devices in Incognito mode and does see their activity?
2       MR. CROSBY:  Object to the form.
3       Q.  BY MR. BROOME:  Sorry.  Yeah, and I'm just
4  referring to that clause.  I understand that, you know,
5  there are clauses in the context of a larger sentence.    17:12:42
6       A.  I would agree with you that the other people use
7  this device refers to other human beings who are touching
8  the physical object.
9       Q.  Okay.  So people with whom you share the device
10  or somebody else who might look at your device?    17:13:02
11      A.  Yes.
12      Q.  Okay.  In 12.3, you opine that Google failed to
13  adequately correct its surveillance of Incognito users.
14      Do you see that?
15      A.  I do.    17:13:35
16      Q.  And just so we have a record of it, against what
17  standard are you evaluating the adequacy of Google's
18  disclosures?
19      MR. CROSBY:  Object to the form.
20      THE WITNESS:  Again, like everything else, I'm    17:13:44
21  evaluating it according to my expertise as a securities
22  and privacy expert and the generally accepted practices
23  of our industry.
24      Q.  BY MR. BROOME:  And you're not evaluating it
25  against any legal standards; correct?    17:13:58

Page 179

1       MR. CROSBY:  Object to the form.
2       THE WITNESS:  I am not an attorney.
3       Q.  BY MR. BROOME:  You're not an attorney and you
4  are not evaluating Google's disclosures against any legal
5  standard; correct?    17:14:18
6       A.  That is correct.  But you listed a few
7  potentials in -- previously.  So not by any of those
8  statutes.
9       Q.  You referenced the generally accepted practices
10  of your industry; is that right?    17:14:43
11      A.  Okay.  Okay.
12      Q.  And where do those -- can someone -- are those
13  like in a form that someone can actually look at?
14      A.  They are not formalized, no.
15      Q.  Okay.  Can you turn to paragraph 266, please.    17:14:57
16      A.  I'm there.
17      Q.  You write:  "In June 2017, Apple announced its
18  Intelligent Tracking Protection, a feature for Safari
19  that limited the use of cookies for cross-site tracking
20  by blocking third-party cookies after 24 hours of    17:15:54
21  inactivity and purging all cookies after 30 days."
22      Do you see that?
23      A.  I do.
24      Q.  And does that mean that information sent to
25  Google from non-Google websites using its services would    17:16:13

Page 180

1  be different from a user in Safari after June 2017 than
2  it would be from a user in Chrome?
3       MR. CROSBY:  Object to the form.
4       THE WITNESS:  I don't know.  I actually don't
5  know enough about Chrome right now to answer that.    17:16:32
6       Q.  BY MR. BROOME:  Okay.  If you go to 267.  You
7  wrote:  "In June 2019, Mozilla rolled out its Enhanced
8  Tracking Prevention feature for Firefox, which blocked by
9  default cookies from known third-party trackers when a
10  user downloaded the Firefox browser."    17:17:24
11      Do you see that?
12      A.  I do.
13      Q.  Does that block by default cookies from Google?
14      A.  So I don't know.  Google plays this game about
15  cookies.  They call their third-party cookies first-party    17:17:35
16  cookies, and I actually couldn't tell you right now what
17  Firefox does about that.
18      Q.  Okay.  If you turn to Section 8.3, which starts
19  at paragraph 185.
20      A.  Okay.    17:18:35
21      Q.  There's a section here says:  "Google Uses
22  Cookie Matching to Help Identify Users in Real-Time
23  Bidding."
24      Do you have any expertise in Google's real-time
25  bidding platform?    17:18:46

Page 181

46 (Pages 178 - 181)

1    A.  Define "expertise."

2    Q.  Well, what experience do you have studying

3 Google's real-time bidding platform?

4    A.  I have studied it.

5    Q.  In connection with this case?          17:18:59

6    A.  In connection with this case, yes.  I knew about

7 it generally beforehand, but I learned a lot for this

8 case.

9    Q.  Okay.  And so is the testimony in this case just

10 based off of information you learned -- in this Section   17:19:12

11 8.3 -- let me start again.

12       Is the testimony that you offer in this Section

13 8.3 based on your review of Google's documents?

14       MR. CROSBY:  Object to the form.

15       THE WITNESS:  It is certainly -- you didn't say   17:19:37

16 based solely on.  So I will say yes, this is based on me

17 reading and understanding Google's documents of how these

18 systems work.

19    Q.  BY MR. BROOME:  Okay.  Is this section based --

20 I see there's an article you cite from Brad Bender at      17:20:12

21 footnote 208, and an article you cite at footnote 200.

22 Oh, that's in the previous section.

23       So aside from the article from Brad Bender, what

24 else is this section based on?

25       Let me start again.                   17:20:28

Page 182

---

1       Aside from the article from Brad Bender and

2 Google's documents, what else is this section based on?

3    A.  I did a lot of research to put this together,

4 and it is certainly possible that there are other things

5 I read that didn't rise to the level of citations that I   17:20:45

6 used.

7    Q.  Is it possible that there are other materials

8 that you considered in preparing this section that are

9 not cited?  Is that what you're saying?

10       MR. CROSBY:  Object to the form.          17:21:02

11       THE WITNESS:  I mean, if something doesn't rise

12 to the level of a citation, it's not going in there.  And

13 my guess is there's a lot in here that I either knew

14 beforehand or -- or just figured out.  I mean, you're

15 asking me if we can match every single sentence to a      17:21:28

16 reference, and I'm sure the answer to that is going to be

17 no.

18       MR. BROOME:  Let's take another maybe ten-minute

19 break.  We can go off the record for a minute, if that's

20 all right.                                  17:21:42

21       MR. CROSBY:  Sure.

22       THE VIDEOGRAPHER:  Going off the record at

23 5:22 p.m.

24       (Recess.)

25       THE VIDEOGRAPHER:  We are back on the record at   17:34:43

Page 183

---

1 5:35 p.m.

2       MR. BROOME:  All right.  I'm now going to ask

3 you some questions about your rebuttal report.  So we'll

4 load that as Exhibit 9, and I assume you have your hard

5 copy.                                      17:34:58

6       (Exhibit 9, Expert Rebuttal Report of Bruce

7        Schneier Rebuttal of Expert Georgios Zervas,

8        06/07/22, was marked for identification by

9        counsel electronically.)

10    Q.  BY MR. BROOME:  Okay.  It should be there.     17:35:13

11       All right.  And opinion -- let's see.  I guess

12 this is Opinion 1, Section 3, beginning paragraph 8.  You

13 have an opinion there that says:  "Professor Zervas

14 failed to investigate Google's systems or engage with the

15 actual evidence in this case."               17:35:47

16       Do you see that?

17    A.  I do.

18    Q.  Did you investigate Google's systems?

19    A.  I did not.

20    Q.  You understand that Dr. Zervas performed testing  17:35:57

21 of various browsers and operating systems that show how

22 data are sent to Google in both regular and private

23 browsing modes across different browsers and operating

24 systems?

25    A.  I do.                               17:36:09

Page 184

---

1    Q.  Okay.  All right.  In paragraph 13, 14, and 15,

2 you quote three of Professor Zervas' opinions.

3       Do you see that?

4    A.  I do.

5    Q.  Do you have any basis for opining that those     17:36:38

6 conclusions by Professor Zervas are incorrect?

7       MR. CROSBY:  Object to the form.

8       THE WITNESS:  I do not.  What I say is his

9 analysis is incomplete, not incorrect.

10    Q.  BY MR. BROOME:  Okay.  Paragraph 21, you -- I    17:37:16

11 guess you're referring to Google's internal documents.

12 You say:  "Professor Zervas fails to consider Google's

13 own internal documents that similarly describe

14 fingerprinting as the use of unique or probabilistically

15 unique combinations of one or more device, network, or    17:37:41

16 app browser attributes to identify a device app browser

17 or user across different transactions where no persistent

18 unique identifier is explicitly provided by a user's

19 device, app, or browser."

20       Do you see that?                       17:37:59

21    A.  I do.

22    Q.  Do you agree that fingerprinting is

23 probabilistic; it's not an exact science?

24       MR. CROSBY:  Object to the form.

25       THE WITNESS:  I don't know enough about the       17:38:16

Page 185

---

47 (Pages 182 - 185)

1 details of what Google can do in fingerprinting.  I think
2 it's fair to say that some of it is probabilistic and
3 some of it is exact, but you know, how probabilistic is
4 it?  Does it matter?  Fingerprinting, it's like human
5 fingerprints.  Is probabilistic, yet it is highly          17:38:33
6 accurate.  So there's a lot of nuances in that that I
7 don't know.
8     Q.  BY MR. BROOME:  In paragraph 36, in the fourth
9 sentence, you write:  "Google recognizes the joinability
10 risk posed by the collection of IP address information."   17:39:17
11         Do you see that?
12     A.  I do.
13     Q.  Okay.  IP addresses are -- are dynamic; right?
14         MR. CROSBY:  Object to the form.
15         THE WITNESS:  For most people, they are.          17:39:30
16     Sorry.
17         For most people, they are.  For some people,
18 they're static.
19     Q.  BY MR. BROOME:  Okay.  For most people, the IP
20 address is -- IP address they're -- let me start again.    17:39:39
21     For most people, their IP address changes
22 periodically automatically; correct?
23     A.  Yes.
24     Q.  And do you have any idea as to the frequency
25 with which their IP address changes?                       17:39:52
Page 186

1     A.  No, I don't.  I would look that up.
2     Q.  Okay.  For most people, even their IP address
3 they use at home is dynamic, and therefore, changes
4 periodically; correct?
5         MR. CROSBY:  Object to the form.                   17:40:17
6         THE WITNESS:  So now I'm saying I would start
7 looking this stuff up.
8     Q.  BY MR. BROOME:  Okay.
9     A.  Most people is more than half.  So now we're
10 talking about users.  For some people, it's dynamic.  For  17:40:27
11 some people, it's static.
12     Q.  Okay.
13     A.  I'm willing to say that now.  Anything else, I
14 didn't research for this report, and I want to make sure
15 I'm accurate before I tell you this.                       17:40:37
16     Q.  For a mobile device, the IP address is going to
17 depend on where the user is physically when they connect
18 to the internet; correct?
19     A.  Yes.
20     Q.  So if they're at home using their mobile device,  17:40:54
21 they might be using one IP address, and if they're at
22 work, they would be using a different IP address, and if
23 they're at the shopping mall, they might be using another
24 different IP address.
25         Is that all fair?                                 17:41:13
Page 187

1     A.  Yes.
2     Q.  In paragraph 37, you talk about -- you say:
3 "Another important tool for joinability is the user agent
4 string."
5         Do you see that?                                   17:41:29
6     A.  I do.
7     Q.  A user agent string can't always uniquely
8 identify a user or even a particular device; correct?
9     A.  Say it again.  I'm sorry.
10     Q.  A user agent string cannot necessarily be used     17:41:41
11 to uniquely identify a user or device; correct?
12         MR. CROSBY:  Object to the form.
13         THE WITNESS:  A user agent string is something
14 we do use to identify devices.  You're asking does there
15 exist a case in the history of the internet where it      17:41:59
16 can't be used.  Probably, yes.
17     Q.  BY MR. BROOME:  Fair enough.
18         What does a user agent string include?
19     A.  Oh, God.  I don't remember.
20     Q.  Okay.                                             17:42:09
21     A.  Yeah.  I actually don't remember.  It's getting
22 late.
23     Q.  Yep.  Let me give you a hypothetical.
24         Imagine you've got three people in a crowded
25 coffee shop all working from the same IP address on the   17:42:30
Page 188

1 same latest Mac laptop, with the latest version of Chrome
2 and using default settings.
3         In that scenario, could you use IP address and
4 user agent string to uniquely identify a device?
5         MR. CROSBY:  Object to the form.                   17:42:53
6         THE WITNESS:  So using those two things alone --
7     Q.  BY MR. BROOME:  Yes.
8     A.  -- and nothing else?  So you don't know where
9 they're browsing.  You know nothing about their history.
10 They appear out of thin error, like magically.  You have   17:43:07
11 a new laptop, same configuration.  Open it up at the same
12 time.  Get three different dynamic IPs from the -- from
13 the wireless access point.  Visit the same website?
14     Q.  No, not visiting the same website.
15     A.  Visit three different websites.  Close their      17:43:25
16 computer, and then disappear into thin air.  That's your
17 hypothetical?
18     Q.  Let's start with that one.
19     A.  My guess is it would be hard.  You know, if the
20 FBI did it, I'd be impressed.  I wouldn't be shocked.      17:43:42
21     Q.  Why does it matter whether you have access to
22 their prior browsing history in that hypothetical?
23     A.  Well, in that hypothetical, there isn't any
24 private browsing history.  Right?  They're appearing out
25 of thin air --                                            17:44:05
Page 189

48 (Pages 186 - 189)

1    Q.  Yeah.
2    A.  -- visiting the website, leaving.  There's no
3  history.  It's just like one visit.
4    Q.  Yeah.  So if you did have history, would that
5  allow you to identify -- uniquely identify a device?    17:44:14
6       MR. CROSBY:  Object to the form.
7       THE WITNESS:  So it's a matter of degree.  It's
8  a matter of degree.  History gives you more information.
9  The more you know, the more able you are to identify
10  somebody.                                17:44:28
11       So, you know, we're going to assume that the
12  the FBI is doing this investigation, is going to know
13  something about who they're looking for.  Does a person
14  visit a website that they habitually visit?  It's often
15  not who you -- random people out of thin air.    17:44:44
16       There's a lot of context in these questions.
17  So, you know, the hypotheticals are hard.  But the
18  reality is, I think, much more subtle.
19    Q.  BY MR. BROOME:  Okay.  So if all you had was
20  IP -- IP address and user agent string, could you --    17:45:40
21  could that be used to uniquely identify a user?
22    A.  So --
23       MR. CROSBY:  Object to the form.
24       THE WITNESS:  -- what you're asking me is if I
25  hand you two pieces of paper, one has my IP address and

Page 190

1  one has the user string, and I say go to town.
2    Q.  BY MR. BROOME:  Well, yeah.  Let's start with
3  that.  Does that allow you to uniquely identify a device?
4    A.  You know, in most cases, it doesn't.  Again, you
5  know, if you've got some trick I don't know about.  But,    17:46:12
6  you know, I would like to think that that is not enough.
7    Q.  Okay.  So IP address plus user agent -- well,
8  withdrawn.
9    A.  I mean, it's hard; right?  Because the IP
10  address will tell you like which internet cafe the    17:46:32
11  person's at.  Now you go to the cafe?  Do you interview
12  the people who work there?  Do you learn more
13  information?  It's all part of context.  It's really hard
14  to pull out just one thing and say, you know, we're done
15  here.                                17:46:46
16    Q.  All right.  So multiple people could share the
17  same IP address and user agent; is that fair?
18       MR. CROSBY:  Object to the form.
19       THE WITNESS:  Yes.  Yes.
20    Q.  BY MR. BROOME:  In paragraph 47 -- I'm sorry,    17:47:02
21  paragraph 42.
22    A.  Uh-huh.
23    Q.  You quote this Google document, and it says:
24  "IP address can be very precise, equivalent to GPS for
25  all intents and purposes, depending on the scenario."    17:47:33

Page 191

1       Do you see that?
2    A.  Yes.
3    Q.  Do you agree that although an IP address can be
4  very precise, it can also be quite coarse?
5    A.  Yes.                                17:47:50
6       MR. CROSBY:  Object to the form.
7       THE WITNESS:  Sorry.
8    Q.  BY MR. BROOME:  Meaning that it may not identify
9  much more than where -- what ZIP code a user is in?
10    A.  Yeah, I don't know about ZIP code.  That's a    17:47:59
11  geographical limitation.  Because we're talking about
12  network space, not physical space.  Stick with coarse.
13    Q.  Okay.  Okay.  Paragraph 48.
14    A.  Uh-huh.
15    Q.  You say:  "User-ID is tied to an individual's    17:49:18
16  account with a non-Google website.  User-ID itself
17  thereby qualifies as personally identifiable
18  information."
19       Do you see that?
20    A.  No -- yes, I do.  Sorry.  Apologies.  Yes.    17:49:34
21    Q.  Yeah, last sentence.  Sorry.  I should have been
22  more precise.
23       Do you see that?  Okay.
24       Although the User-ID is tied to an individual's
25  account with a non-Google website, Google does not    17:49:50

Page 192

1  receive the personally identifiable information
2  associated with that site; correct?
3    A.  I don't know.  If you're asserting that, assert
4  that, but I actually don't know what Google receives.
5    Q.  Okay.  Well, why did you include this point that    17:50:06
6  User-ID itself qualifies as personally identifiable
7  information if you're not sure whether Google actually
8  receives that information?
9    A.  Because it does -- so what I'm saying in this is
10  that -- we talked about this earlier, that Google could    17:50:22
11  use this information.  I just asked me whether they do.
12  What Zervas is saying is that Google chooses not to, but
13  that says nothing about whether Google could.  And then
14  see back to my discussions of chilling effects and
15  possibilities of surveillance.                  17:50:46
16    Q.  Okay.  But you're not sure one way or the other
17  whether Google actually receives the PII that is
18  associated with an individual's account at a non-Google
19  website?
20    A.  I am not, nor do I know whether they can infer    17:51:01
21  that through other means.
22    Q.  All right.  Let's go to 53.
23       In 53 you say:  "Based on my experience and
24  consistent with the many internal Google documents I have
25  reviewed that were apparently not considered by Professor    17:51:42

Page 193

49 (Pages 190 - 193)

1 Zervas, it is possible for Google to join a user's
2 private browsing information with the user's device
3 and/or Google account.  This is a common issue, with
4 Google able to accomplish this systematically across
5 enormous sets of data."                          17:52:04
6       Is it your opinion that Google could join a
7 user's private browsing information with that user's
8 Google account?
9   A.  Yes.
10   Q.  For every class member?              17:52:21
11       MR. CROSBY:  Object to the form.
12       THE WITNESS:  So are you asking me does there
13 exist one class member where Google can't?
14   Q. BY MR. BROOME:  I didn't ask it that way, but...
15   A.  I'm rephrasing it to sort of make sure.    17:52:37
16   Q.  Yeah.
17   A.  It is certain plausible that there is one class
18 member for some reason Google can't.
19   Q.  Okay.  But generally speaking, put aside some, I
20 guess, fringe cases.  Generally speaking, your opinion is   17:52:54
21 that Google could identify -- or sorry, Google could join
22 a user's private browsing information his or her Google
23 account for most of the class?
24       MR. CROSBY:  Object to the form.
25       THE WITNESS:  Okay.  So I don't know what    17:53:15

Page 194

1 percentage.  What I -- what I say in my report is that
2 Google spends a lot of effort on joinability, whether it
3 is joining your phone with your computer or joining your
4 work computer with your home computer, and that same
5 technology works equally for your private browsing and    17:53:31
6 non-private browsing sessions on the same computer.
7   Q. BY MR. BROOME:  Okay.
8   A.  And -- you know, looking at what Google says
9 about joinability, what I understand about the
10 information and what could be done, joinability is a    17:53:47
11 possibility.
12   Q.  What method would Google use to join class
13 members' private browsing information with their Google
14 accounts?
15   A.  Now the method's going to depend on the exact    17:54:09
16 data they have and how their database is configured.  So
17 I won't be able to speak to that.  I don't have access to
18 that kind of information.
19   Q.  Well, if you're not certain what the method is,
20 how can you be certain that it can be accomplished?    17:54:25
21       MR. CROSBY:  Object to the form.
22       THE WITNESS:  Okay.  So I think I talk about
23 this in my report.  Let's find out what I -- let's find
24 out what I say about that there.
25   Q. BY MR. BROOME:  Sure.                17:54:36

Page 195

1   A.  That's going to be easier than speculating.
2 Anyone want to help?
3   Q.  Well, I think you talk about IP address and user
4 agent string and you talk about the analytics user ID.
5   A.  In Section 9.2, I talk about joinability.    17:55:06
6   Q.  Yeah.
7   A.  And I mention a Google employee that admits that
8 it's possible.
9   Q.  Where are you?
10   A.  Paragraph 207.                    17:55:19
11   Q.  Oh, in your opening report?
12   A.  Yeah.  That is where I talk about it.  I talk
13 about it someplace else also.  Maybe it's in this report.
14   Q.  207 is the -- you're quoting the document that
15 we discusses before, the Ramin Halavati document?    17:56:03
16   A.  You know, it's a pretty opaque reference so I'll
17 trust you on that.
18       Yeah, paragraph 205 talks about joinability.
19 There's a bunch of internal Google references.
20   Q.  Okay.  And is that what your opinion in    17:56:52
21 paragraph 53 is based on, these internal Google
22 references?
23   A.  So 53 of the -- okay, this is 53 of the
24 rebuttal; right?
25   Q.  Yep.                          17:57:13

Page 196

1   A.  Yeah.  I don't remember when I read the
2 transcript of the FBI agent.  I think I read it after I
3 wrote this.  But you've got to check the dates on that.
4   Q.  Well, so let me ask you this.  You say:  "This
5 is a common issue," and I assume that you used those    17:57:31
6 words intentionally --
7   A.  Yes.
8   Q.  -- to convey that this can be -- this can be
9 done for the class as a whole.
10       Is that accurate or inaccurate?    17:57:41
11       MR. CROSBY:  Object to the form.
12       THE WITNESS:  By "common issue," I mean that
13 data set joinability is a common issue; that it's easier
14 to do this in general than most people think.  There's a
15 lot of research on re-identifying anonymous data sets    17:57:56
16 that involve joining it to other data sets.
17   Q. BY MR. BROOME:  I see.
18   A.  So the whole issue of joinability is common
19 research in security and privacy.
20   Q.  I see.  You're not saying -- because we use the    17:58:10
21 word "common" in class actions to mean it's common to the
22 class as a whole.  You're not using it in that sense?
23   A.  No.  I'm saying common to reality.
24   Q.  Common to reality, yeah.  I dabble in that
25 occasionally, but not very often.            17:58:25

Page 197

50 (Pages 194 - 197)

1        Okay.  With respect to your assertion in
2   paragraph 53 that it is possible for Google to join a
3   user's private browsing information with the user's
4   device and/or Google account, aside from the Google
5   documents that you pointed me to, what else is that        17:58:53
6   opinion based on?
7        A.  It's based on my expertise about data sets and
8   joinability.  I actually know a lot about this.  There's
9   a lot of research in joinability in data sets.  So it's
10  based on that, based on a lot of history and knowledge,    17:59:09
11  and then knowing what kind of data Google has and what I
12  learned in this case.
13       Q.  I think I asked you this before, but I'm just
14  going to have to ask it again because I think I got
15  distracted.                                                17:59:42
16       What method would Google use to join a user's
17  private browsing information with their Google account?
18       A.  Can we undistract you by reading my previous
19  answer back?
20       Q.  Yeah.  Let me take a look at it.  I'll probably   17:59:56
21  still have questions, but --
22       A.  It feels safer.
23       Q.  Ah, here we go.  I asked:  "What method would
24  Google use to join a user's private browsing information
25  with their Google account?"                                18:00:13

Page 198

1        And you said:  "Now the method is going to
2   depend on the exact data they have and how their database
3   is configured so I wouldn't be able to speak to that.  I
4   don't have access to that kind of information."
5        So sitting here today, you're not aware of a          18:00:25
6   method that Google could use to identify -- I'm sorry --
7   to join a user's private browsing information with their
8   Google account; is that correct?
9        A.  So I'm aware of lots of methods that Google
10  could use.  You asked me which ones Google does use.       18:00:39
11       MR. CROSBY:  I don't think my form objection got
12  recorded.
13       THE WITNESS:  Sorry.
14       Q. BY MR. BROOME:  Yeah, I asked you what method
15  would Google use.  Okay.  Let me try again.                18:00:57
16       What method could Google use to join a user's
17  private browsing information with their Google account?
18       A.  In general, the methods of joining involve
19  taking the two data sets, and through a variety of
20  different correlation techniques, matching them.           18:01:15
21       Q.  Taking what two data sets?  Regular -- all
22  regular mode browsing and private browsing mode browsing?
23       A.  It could be all.  It could be all for the -- for
24  an IP address.  It could be all in a geographic location.
25  It could be all in a time period.  It could be all that    18:01:34

Page 199

1   visited Facebook.  So you know, it really depends on the
2   data.  Which is why it's hard to give exact answers.  It
3   really depends a lot on the data.
4        Q.  Okay.
5        A.  When you look at the research that joins data     18:01:50
6   sets, the solutions really are as unique as the data
7   sets.  And you know, if Google did this, they will have
8   looked at data sets and figured out how to do it; right?
9        How do they join your browsing data on your
10  phone with your browsing data on your computer.  I         18:02:10
11  actually can't tell you.  I know they do.  They actually
12  tell their Google Analytics users that they do it.  They
13  don't explain how, but they say they do it.
14       So we know that Google is able to join different
15  data sets of the same user.  We don't know how.  Google    18:02:24
16  doesn't say.  They know.  All we can do is know they can
17  do it.
18       And I'll add one thing.  And we know that when
19  the FBI asks them, they do it.
20       Q.  They do do what?                                  18:03:17
21       A.  They do join data sets.
22       Q.  What kind of data sets?  You mean they join
23  regular and private browsing mode data sets?
24       A.  That is what it looks like from the testimony of
25  the former FBI agent, that they're able to join those      18:03:29

Page 200

1   two.  They're able to pull identity, which would not be
2   in private browsing, from the regular data.
3        Q.  And that's based on Mr. Nelson's testimony that
4   three of the witnesses he interviewed said that they were
5   in private browsing mode?                                  18:03:44
6        A.  Yes.
7        Q.  Okay.  And -- yeah.  Okay.
8        You understand that the Analytics User ID and
9   PPID only apply to websites that utilize those features;
10  right?                                                     18:04:09
11       A.  Yes.
12       Q.  And they apply only when a user is signed into
13  their account on that website; right?
14       A.  I don't know if that's true.
15       Q.  You don't know one way or the other?             18:04:19
16       A.  I don't.  Google Analytics does give information
17  for users who are not signed in.
18       Q.  Right.
19       A.  I'm not a Google Analytics user.  I've seen
20  information that it -- for websites that just don't have   18:04:31
21  sign-in.  It's considerable.
22       Q.  Right.  But websites that don't have sign-in
23  would not have Analytics User ID; right?
24       A.  They would not.
25       Q.  Okay.  Now paragraph in paragraph 56, you say:    18:04:45

Page 201

51 (Pages 198 - 201)

1  "While Professor Zervas presents these settings and
2  features as means by which users can limit Google's data
3  collection while users are browsing privately, he
4  presents no evidence suggesting that any significant
5  number of users have ever employed any of these settings   18:05:51
6  or features while browsing privately."
7       Do you see that?
8  A. I do.
9  Q. He did provide data regarding usage of these
10 tools generally.  You recall that?   18:06:10
11      MR. CROSBY:  Object to the form.
12      THE WITNESS:  I do not.
13 Q. BY MR. BROOME:  Okay.  All right.
14 And then in 59, you say:  "I expect that
15 throughout the class period there was minimal, if any,   18:06:56
16 usage of these settings and feature by users while
17 browsing privately."
18 A. Yes.
19 Q. And you say:  "Many studies have demonstrated
20 that in general, users tend to keep their default privacy   18:07:06
21 settings"?
22 A. Yes.
23 Q. Do you recall writing in Data and Goliath:  "A
24 browser, yes, even Google Chrome, has extensive controls
25 to block or delete cookies and many people enable those   18:07:20

Page 202

---

1  features"?
2  A. I do not.
3  Q. Okay.  Let's go to Exhibit 3, page 49 of your
4  book, page 40 of the PDF.
5  A. I see it.   18:08:09
6  Q. Now give me a chance to find it now.
7  A. In the book, it's -- you're on the web version
8  so it's not going to help you.  It's the paragraph
9  starting with the word "today."
10 Q. Oh, yes.  Here we go.  Today.  Right.  You're   18:08:35
11 right.
12      You write:  "Today internet surveillance is far
13 more inconsistent" -- sorry -- "insistent in cookies.  In
14 fact, there's a minor arms race going on.  Your browser,
15 yes, even Google Chrome, has extensive controls to block   18:08:47
16 or delete cookies, and many people enable those features.
17 Do Not Track Me is one of the most popular browser
18 plug-ins."
19      Is that statement true throughout the class
20 period, that many people enable Chrome features, Chrome   18:09:04
21 controls, to block or delete cookies?
22      MR. CROSBY:  Object to the form.
23      THE WITNESS:  So the truth is -- the truth is I
24 don't know.  I mean, I don't know if Do Not Track Me
25 exists, anymore.  I couldn't tell you if that -- if   18:09:16

Page 203

---

1  that -- that has been overcome by -- browser -- I
2  couldn't tell you if that extension still exists.
3       Now I'm -- you know, in the book I'm using
4  "many" very loosely to meaning like a bunch of people.  I
5  didn't say majority, I didn't say plurality, I didn't say   18:09:37
6  most, I said many.
7       So in a lot of ways what I'm trying to do is
8  make people comfortable with using them because they are
9  part of a group that uses them.
10 Q. BY MR. BROOME:  And in paragraph 63 of your   18:09:52
11 rebuttal report, you say:  "Although cookie blocking
12 through browser settings impacts data transmissions to
13 Google, Google's characterization of Incognito as a
14 private browsing mode creates the impression, and
15 therefore would lead a reasonable user to assume,   18:10:16
16 consistent with the testimony by plaintiffs, that it
17 would not be necessary, especially in the absence of a
18 visible control for cookie blocking on the Incognito
19 splash screen."
20      Do you see that?   18:10:27
21 A. I do.
22 Q. You understand that the plaintiffs allege that
23 the Chrome Privacy Notice is part of their contract in
24 this case?
25 A. I do.   18:10:42

Page 204

---

1  Q. And have you read the Chrome Privacy Notice, at
2  least its description of Incognito mode?
3  A. I have.
4  Q. And it conveys that cookies can still be placed
5  on your browser during Incognito sessions; right?   18:10:53
6  A. I will trust you on that.  I would want to read
7  it again right now to make sure.
8  Q. Do we have that?
9  A. And I have two here if you want to actually go
10 through them.   18:11:10
11 Q. You have what?
12 A. I have two -- I have two versions here if we
13 actually wanted to go into them.
14 Q. Yeah, you're free to look at that, if you like.
15 Just I want you to -- why don't you take a look at that   18:11:19
16 and then I'll ask you my question.
17 A. All right.  Why don't you ask your question
18 first so I know what to look at.
19 Q. Okay.  The Chrome Privacy Notice makes clear
20 that cookies can still be placed on a user's browser   18:11:31
21 during an Incognito session; correct?
22 A. So now I've got to find it.
23      Yes, it does say that.  And for the record, I'm
24 in the September 24th, 2018 version.
25 Q. Okay.  I can represent to you that they're all   18:12:01

Page 205

52 (Pages 202 - 205)

**Page 206**

1 the same with respect to that issue.

2     So a reasonable user reading the Chrome Privacy

3 Notice would know that Incognito mode does not

4 automatically block cookies; right?

5     MR. CROSBY:  Object to the form.    18:12:31

6     THE WITNESS:  This gets back to a reasonable

7 user and what they would know.  I'm focusing on

8 disclosing.

9     What I will say is that Google is disclosing

10 that sites may deposit new cookies on your system while    18:12:40

11 you're in these modes, but they will only be stored and

12 transmitted until you close the last Incognito or guest

13 window.

14     Q.  BY MR. BROOME:  And that would lead a reasonable

15 user to assume that they would need to enable a cookie    18:12:54

16 blocker if they wanted to block cookies; right?

17     MR. CROSBY:  Object to the form.

18     THE WITNESS:  I think you want to go to your

19 survey person and ask them that question.

20     Q.  BY MR. BROOME:  Well, Did you go to a survey    18:13:04

21 person when you said -- when you wrote "Google's

22 characterization of Incognito as private browsing mode

23 would lead a reasonable user to assume that it would not

24 be necessary"?

25     A.  No.    18:13:15

**Page 207**

1     Q.  Well, how is it that you were able to opine on

2 -- on whether Google's characterization of Incognito mode

3 would lead a reasonable user to assume it would not be

4 necessary, but you're not able to answer questions

5 about -- that I ask you about reasonable user    18:13:40

6 expectations?

7     A.  It's based on my knowledge --

8     MR. CROSBY:  Object to the form.

9     THE WITNESS:  -- and expertise of disclosures

10 and how they work and you, know, the practices in the    18:13:47

11 industry.  And again, I'm opining about the disclosures,

12 what's being said.

13     Reasonable user isn't a human being you can

14 find.  It's kind of construct of what we talk about.

15     Q.  BY MR. BROOME:  Okay.  So why is it that we    18:14:13

16 can't use the construct when I ask you questions about

17 the Chrome Privacy Notice?

18     A.  We can, but it's not a human being.

19     Q.  Okay.

20     A.  You're asked me about -- you asked me about    18:14:22

21 people.

22     Q.  No, I asked you about the reasonable user.

23     A.  So you're -- so you're saying this is not a

24 actual human being you're asking me about?

25     Q.  When you say -- when you write in paragraph 64    18:14:33

**Page 208**

1 about what -- how Google leads a reasonable user to

2 assume that it would not be necessary, are you talking

3 about an actual human being or a construct?

4     A.  No, I'm not talking about a human being.  We had

5 this conversation like hours ago, and I feel like we went    18:14:49

6 over this.

7     Q.  I know.  That happens a lot in these things.

8     A.  Yeah, I know, but I'd rather go back to what I

9 said than say it again in a different way.

10     Q.  Anyway, I asked you whether a user who reads the    18:15:01

11 Chrome Privacy Notice would reach the same conclusion

12 about the need to use cookies -- sorry.

13     I asked you whether a reasonable user who reads

14 the Chrome Privacy Notice would reach the same conclusion

15 about the need to use cookie blockers as a user who reads    18:15:17

16 the Incognito screen.

17     Let me back up.  I'll just ask you the question.

18     Your opinion is that Google's characterization

19 of Incognito as a private browsing mode would lead a

20 reasonable user to assume that using a cookie blocker    18:15:38

21 would not be necessary, especially in the absence of a

22 visible control -- I'm sorry.  I'm in the wrong paragraph

23 here.

24     Let me start over a third time.

25     There we go.  Your opinion is that Google's    18:15:58

**Page 209**

1 characterization of Incognito as a private browsing mode

2 creates the impression and therefore would lead a

3 reasonable user to assume that using a cookie blocker

4 would not be necessary, especially in the absence of a

5 visible control for cookie blocking on the Incognito    18:16:22

6 screen."

7     Is that accurate?

8     A.  That is, yes.

9     Q.  But you cannot opine on whether a reasonable

10 user would reach the same conclusion after reading the    18:16:38

11 Chrome Privacy Notice.

12     Is that your testimony?

13     MR. CROSBY:  Object to the form.

14     THE WITNESS:  All right.  So let's go back.

15 Because I did not say that in the -- in the documents.    18:16:48

16 All right.  So I've read the Chrome policy, and I can

17 answer in terms of what the Chrome policy is saying.

18     So ask the question again, and now I have the

19 policy in mind, and I'll be able to answer it.

20     Q.  BY MR. BROOME:  All right.  You opine in    18:17:09

21 paragraph 63 that although cookie blocking through

22 browser settings impacts data transmissions to Google,

23 Google's characterization of Incognito as a private

24 browsing mode creates the impression and therefore would

25 lead a reasonable user to assume, consistent with the    18:17:24

1 testimony by plaintiffs, that it would not be necessary,
2 especially in the absence of a visible control for cookie
3 blocking on the Incognito screen; correct?
4      A. Correct.
5      Q. Are you capable of opining as to whether a          18:17:42
6 reasonable user would reach the same conclusion after
7 reviewing the Chrome Privacy Notice's description of
8 Incognito mode?
9      A. This is a user --
10         MR. CROSBY: Object to the form.          18:17:57
11         THE WITNESS: -- that has never used -- has
12 never used Chrome -- sorry, has never used Incognito.
13 They have not seen the splash screen. They show up.
14 They're curious. They haven't heard anything. They read
15 the Chrome policy and nothing else.          18:18:09
16         This is the user we're talking about?
17      Q. BY MR. BROOME: Let's assume it's the same
18 reasonable user that is being described in paragraph 63.
19         MR. CROSBY: Object to the form.
20         THE WITNESS: Okay. All right. So is this user   18:18:20
21 an Incognito user or not?
22      Q. BY MR. BROOME: It's the same reasonable user
23 that you describe in paragraph 63. Same person.
24      A. It's not a person. Remember, there isn't a
25 person here. Okay? It doesn't work.          18:18:38

                                                    Page 210

1      Q. Same construct.
2      A. In paragraph 63, I'm writing about Google's
3 characterization in general. You're asking me about
4 someone that -- you're asking me about the Chrome Privacy
5 Policy alone in isolation. All right? And so in absence   18:19:03
6 of anything else.
7      Q. No.
8      A. I want to make sure that that's true before I
9 answer.
10      Q. No. Let's --          18:19:12
11      A. Okay. So this is someone who uses Incognito,
12 sees the splash screen every day, you know, possibly has
13 heard about assurances, got the warning that if they turn
14 on different privacy things, it might break stuff.
15      Q. Is that all baked into your -- is that -- do you   18:19:35
16 assume all of those circumstances when you're writing
17 paragraph 63?
18      A. Yeah, it's more complicated than that. I mean,
19 in paragraph 63, I'm writing about Google's
20 characterization in general.          18:19:49
21      Q. Yeah.
22      A. So I'm looking at everything. I'm not looking
23 at one particular thing. Because it's literal, it's
24 never one particular thing.
25         MR. CROSBY: I know you're getting close to   18:20:16

                                                    Page 211

1 winding up, but could we just take another real quick
2 one, please.
3         MR. BROOME: Sure.
4         THE VIDEOGRAPHER: Going off the record at
5 6:20 p.m.                    18:20:27
6      (Recess.)
7         THE VIDEOGRAPHER: We are back on the record at
8 6:30 p.m.
9      Q. BY MR. BROOME: All right. Mr. Schneier, I'm
10 going to try this one more time. Well, I can't commit to   18:30:48
11 that. Maybe it will be two more times.
12         But would Google's characterization of Incognito
13 in the Chrome Privacy Notice create the impression and
14 therefore lead a reasonable user to assume that cookies
15 are still placed on a browser during an Incognito          18:31:12
16 session, and therefore, a cookie-blocking feature would
17 be needed if one wanted to block cookies in Incognito
18 mode?
19         MR. CROSBY: Object to the form.
20         THE WITNESS: And I am muted this time.          18:31:38
21         Given all of that, the answer is yes. Because
22 what you said was if a user wants to block cookies in
23 Incognito, the policies says that sites may deposit new
24 cookies, which we've said that the user doesn't want, the
25 user is going to have to take some other mechanism to      18:32:01

                                                    Page 212

1 make sure that doesn't happen.
2      Q. BY MR. BROOME: Paragraph 72 of your rebuttal
3 report, you talk about the Google Analytics Opt-Out
4 add-on browser extension?
5      A. Yes.                    18:32:26
6      Q. And you say: "A search for the phrase
7 "analytics opt out in either Google Chrome help or in the
8 Chrome support section of the Google website yields no
9 information on the extension, only a single mention of it
10 in a discussion forum."          18:32:40
11      A. Yes.
12      Q. "A search for the same phrase on the entire
13 Google site yields links to the apps Chrome web store
14 pages in a variety of languages and some discussion about
15 it by users, but no press release announcing its          18:32:51
16 availability and no Google-authored pages recommending it
17 to users who wish to opt out of analysis tracking."
18         Do you see that?
19      A. I do.
20      Q. Have you tried Google Analytics opt out?          18:33:03
21      A. I did not. I mean, we're looking at what Google
22 is saying. So I did not in this case.
23      Q. Okay. Would you be surprised to learn that if
24 you Google Analytics opt out, the first link that comes
25 up is a link to download page for the Google Analytics   18:33:21

                                                    Page 213

54 (Pages 210 - 213)

1 opt out browser add-on?

2    A.  That would not surprise me.

3    Q.  In paragraph 78 --

4    A.  Is it true?

5    Q.  It is true.                           18:33:41

6    A.  Okay.

7    Q.  In paragraph 78, you say:  "As for VPNs, even to

8  the extent they are able to mask users' IP addresses,

9  this is an additional piece of third-party software that

10  users need to understand and configure and a service to    18:33:56

11  which they must subscribe.  VPN subscriptions cost 10 to

12  $15 a month on average, a significant deterrent to

13  widespread adoption and beyond the price sensitivity or

14  financial reach of many users."

15      Do you see that?                       18:34:16

16    A.  I do.

17    Q.  You're aware that there are a lot of free VPNs

18  out there?

19    A.  You know, I don't like a lot of the free VPNs.

20    Q.  Why is that?                         18:34:24

21    A.  VPNs are interesting.  You have to trust the VPN

22  provider.  And that can vary.  There's a lot of pages on

23  the internet on VPNs, who's trustworthy, who's not.  I

24  have my own opinions.  I get asked this question a lot at

25  the Kennedy School.  And, you know, the ones I like and    18:34:39

Page 214

1  think are trustworthy are the ones you have to pay for.

2      So, yeah, there are free ones out there.  I

3  don't -- they're not as good.

4    Q.  All right.  Is it your testimony that the free

5  VPNs available on the internet do not mask your IP        18:34:54

6  address?

7    A.  That is not my testimony, but this is a much

8  more complex security issue than that simple question.

9    Q.  All right.  Many people use free VPNs; correct?

10      MR. CROSBY:  Object to the form.        18:35:13

11      THE WITNESS:  I don't know that market

12  penetration.

13    Q.  BY MR. BROOME:  Okay.  How about more generally;

14  many people use VPNs?  Do you agree with that?

15      MR. CROSBY:  Object to the form.        18:35:26

16      THE WITNESS:  I would, yes.

17    Q.  BY MR. BROOME:  Do you have an opinion on

18  whether reasonable -- the reasonable user would

19  understand the difference between Chrome and Google?

20      MR. CROSBY:  Object to the form.        18:36:58

21      THE WITNESS:  I think Google blurs that in some

22  of their writings.

23    Q.  BY MR. BROOME:  That was a pretty vague

24  question.  Let me try giving you a more precise one.

25      In the Incognito screen, you recall that there's   18:37:11

Page 215

1  a -- on the left-hand side, it says "Chrome won't save

2  the following activity," and then it lists some bullets

3  of the activity that Chrome won't save.

4      Do you believe that there, Google has blurred

5  the distinction between Google and Chrome?              18:37:25

6    A.  I think they have, in there and in everything

7  else.  You can browse privately, the use of the word "we"

8  in other documents.  I mean, taken together, it's --

9  it's Google doesn't go out of their way to make that

10  distinction clear in the users' minds.                 18:37:43

11    Q.  Do you think people understand that Chrome can

12  save browsing history locally?

13    A.  Again, this feels like a survey question you're

14  asking.

15    Q.  Well, I mean, people can see their history;      18:37:56

16  right?  They can see that their browser is saving their

17  history.

18    A.  And now we're assuming people look.

19    Q.  At their history tab?  Yeah.  You don't think

20  that's a fair assumption?                              18:38:08

21    A.  Yeah, I think some people will look at their

22  entry tab.

23    Q.  All right.  Almost at the end.  Let's see here.

24  Paragraph 106.

25    A.  Rebuttal -- rebuttal report again; right?        18:38:30

Page 216

1    Q.  Yeah.

2    A.  Okay.  One paragraph.

3    Q.  Yeah, I'd focus on the -- near the end you

4  say:  "None of the articles cited by Google suggest let

5  alone establish that any users were aware of or consented   18:38:49

6  to Google's collection of their private browsing

7  information."

8      Do you see that?

9    A.  I do.

10    Q.  Can you go back to Exhibit 5.  Oh, no, I'm        18:39:04

11  sorry.  Not 5.  6, Exhibit 6.

12    A.  Sorry, I hit the wrong button.  I'm hitting 6

13  and I'm getting 7.

14      I got it.  I got it.

15    Q.  Okay.  Do you remember this article?             18:39:44

16    A.  I do.

17    Q.  A user who reads this article would understand

18  that Incognito mode does not prevent Google from

19  collecting browsing activity; correct?

20    A.  You know, that's hard to say; right?             18:40:01

21      MR. CROSBY:  Object to the form.

22      THE WITNESS:  Now you're going to ask me is a

23  user reading this, are they going to believe it?  I mean,

24  are they going to believe this article as opposed

25  everything else they've read?  You're living in the world   18:40:13

Page 217

55 (Pages 214 - 217)

1 today.  You know that just because something's in print
2 doesn't mean someone who reads it automatically and
3 magically believes what it says.
4        So it's a big step between the author said it
5 and a user believes what was written.            18:40:26
6    Q.  BY MR. BROOME:  Well, okay, putting aside the
7 issue of whether the user believed it, this article at a
8 minimum suggests that Incognito mode does not prevent
9 Google from tracking you; right?
10        MR. CROSBY:  Object to the form.            18:40:43
11        THE WITNESS:  All right.  Let me check what I
12 wrote about it.  Which article is it in my appendix?
13 Just make sure.
14    Q.  BY MR. BROOME:  Which article is it in your
15 appendix?  Oh, yeah.  Okay.  So this article is not in    18:40:54
16 the appendix.
17    A.  Okay.  So I did not have an opinion about it.  I
18 thought it was based on you going to me from that
19 paragraph.
20    Q.  No, that's fair.  Okay.            18:41:15
21        So in that paragraph, you go on to say:  "None
22 of the articles disclosed that Google has since 2017 been
23 using Incognito detection bits, including is Chrome
24 Incognito, to tag incoming traffic within its logs as
25 Incognito."                              18:42:24

Page 218

1        Do you see that?
2    A.  Yes.
3    Q.  How is that relevant to whether users understand
4 that Google's receiving their data in Incognito mode?
5        MR. CROSBY:  Object to the form.            18:42:43
6        THE WITNESS:  I think what I'm saying here is
7 that the fact that Google is tagging information as
8 Incognito information would be evidence that Google is
9 collecting Incognito information.
10    Q.  BY MR. BROOME:  All right.  You refer to it as a    18:43:19
11 failure to disclose; right?
12    A.  Yes.
13    Q.  Okay.  So if a user understood that Incognito
14 mode does not prevent Google from receiving the data it
15 receives in regular mode, but they did not know about    18:43:34
16 Incognito detection bits, would that be relevant in this
17 case, in your opinion?
18    A.  Well --
19        MR. CROSBY:  Object to the form.
20    Q.  BY MR. BROOME:  Yeah, I know it's late.    18:43:50
21    A.  It's all relevant.
22    Q.  Is it -- is it a further -- I guess let me take
23 one last shot at this.
24        Is it a further violation of privacy if Google
25 is identifying traffic as Incognito traffic?            18:44:07

Page 219

1        MR. CROSBY:  Object to the form.
2        THE WITNESS:  I think it is.  We had this
3 conversations earlier, where the fact of you're in
4 Incognito is itself a private piece of information.
5        MR. BROOME:  No more questions from me unless    18:44:24
6 your attorney has any, in which case I'll have another
7 hour.
8        THE WITNESS:  That's not a threat.  That's a
9 promise.
10        MR. BROOME:  I'm just kidding.  All I mean is I    18:44:33
11 reserve my right to ask more questions.  But we can take
12 a break if you need to, Ian, or if you're ready to
13 proceed.
14        MR. CROSBY:  I do need a break before redirect.
15        MR. BROOME:  Okay.                        18:44:46
16        THE VIDEOGRAPHER:  Going off the record at
17 6:45 p.m.
18        (Recess.)
19        THE VIDEOGRAPHER:  We are back on the record at
20 7:10 p.m.                                19:09:44
21
22        EXAMINATION
23 BY MR. CROSBY:
24    Q.  So Mr. Schneier, Professor Schneier, can you
25 please look to paragraph 279 of your opening report and    19:09:50

Page 220

1 tell me if you recall discussing this with Mr. Broome.
2    A.  Yes.
3    Q.  Okay.  And this and the following paragraphs you
4 discuss specifically Google's Privacy Policy in effect
5 from June 1st, 2016, through May 24th, 2018?            19:10:22
6    A.  Their privacy policies, yes.
7    Q.  Yes.  And according to your report, your
8 opinions, that these versions imply the Incognito mode
9 would provide users with control over the data that
10 Google collects?                            19:10:41
11    A.  Sorry, repeat that.
12    Q.  So do the portions of those policies that you
13 quote in your report imply, in your opinion, that
14 Incognito mode would provide users with control over the
15 data that Google collects?                    19:11:03
16        MR. BROOME:  Object to the form.
17        THE WITNESS:  They talk about Google in general,
18 but not private browsing specifically.  So I think, yes,
19 they're meant to talk about Google as a whole.
20    Q.  BY MR. CROSBY:  And do any of these policies    19:11:23
21 ever state that Google will collect private browsing
22 activity affirmatively disclose that?
23    A.  They do not.
24    Q.  And does the splash screen in Incognito
25 affirmatively state or disclose that Google collects    19:11:39

Page 221

56 (Pages 218 - 221)

1 private browsing information?

2    A. I'm looking to make sure once again.

3      It does not.

4    Q. And what does the statement on the splash screen

5 that users can browse privately imply with respect to    19:11:56

6 that sort of collection?

7    MR. BROOME: Object to the form.

8    THE WITNESS: I think that's a general statement

9 from Google to users that they are now private.

10    Q. BY MR. CROSBY: It doesn't make any exception    19:12:12

11 for private browsing data; correct?

12    A. I think it's essentially about private browsing

13 data. It says now you can browse privately.

14    Q. So let's look specifically to the quotes in

15 paragraph 21 of your report. Just take a moment to look    19:12:33

16 at that paragraph and refamiliarize yourself with those.

17      And do you see that it says that your quotation

18 from the policy -- this is the May 25th, 2018 policy

19 says: "Across Google's services you can adjust your

20 privacy settings to control what we collect and how your    19:13:01

21 information is used." Correct?

22    A. Yes.

23    Q. Is there anything in this language that would

24 limit the control to just Chrome?

25    MR. BROOME: Object to the form.    19:13:14

Page 222

---

1    THE WITNESS: No. And I think specifically it's

2 chatty. It's saying we collect. Like we is not Chrome.

3 We is us. We is Google. We is the writer of this

4 document.

5    Q. BY MR. CROSBY: And so someone who read this    19:13:29

6 document would expect that Google would honor those

7 controls on any browser; correct?

8    MR. BROOME: Object to the form.

9    THE WITNESS: You know, I still hesitate to talk

10 about what users expect, but I think Google is certainly    19:13:41

11 saying that as a company, this is what we do.

12    Q. BY MR. CROSBY: They don't make an exception.

13 Let me ask you. Do these disclosures make any exception

14 for controlling your -- what Google collects on other

15 browsers?    19:13:58

16    A. They do not.

17    MR. CROSBY: So if you can go back to the

18 Exhibit Share. Hopefully, we can do this under the

19 Susman Godfrey. There's an exhibit, the current Google

20 Privacy Policy. Could we mark that as the next exhibit    19:14:16

21 number?

22    MR. MAO: Yeah, I can do that. Yes.

23    (Exhibit 10, Google Chrome Privacy Notice, Last

24    Modified 05/20/20, GOOG-CABR-00002522 - 539, was

25    marked for identification by counsel    19:14:33

Page 223

---

1    electronically.)

2    THE WITNESS: This is a new Privacy Policy?

3    Q. BY MR. CROSBY: This are -- you able to access

4 the exhibit?

5    A. Up to Exhibit 10. Which one are you?    19:14:43

6    MR. FRAWLEY: I'm going to introduce it in a

7 second. I'm adding the stamp.

8    MR. BROOME: That's it. It's there.

9 Exhibit 10.

10    Q. BY MR. CROSBY: All right. So this says    19:14:56

11 effective February 10, 2022. Do --

12    A. Mine says last modified May 2022.

13    MR. FRAWLEY: No, no. Exhibit 10 is the Chrome

14 Privacy Notice. We're introducing a new exhibit now.

15    MR. CROSBY: All right. So it will be    19:15:12

16 Exhibit 11.

17      Right. And so I'm asking is this is the court

18 reporter, are you able to mark this from the Susman and

19 Godfrey photo in the Veritext Exhibit Share.

20    (Exhibit 11, Google Privacy Policy, effective    19:15:24

21    02/10/22, was marked for identification by

22    counsel electronically.)

23    MR. FRAWLEY: I just introduced it. It

24 should --

25    THE WITNESS: I see it now. Exhibit 11. I'm    19:15:31

Page 224

---

1 there. Yes, dated February 10th of this year.

2    Q. BY MR. CROSBY: All right. And I've highlighted

3 on this document, it says you can choose to browse the

4 web in a private mode like Chrome Incognito mode;

5 correct?    19:15:49

6    A. Interesting.

7    Q. So based on this document, what's your

8 understanding with respect to whether Google's now

9 expressly addressing other private browsing modes besides

10 the Chrome Incognito mode specifically?    19:16:04

11    A. I think this pretty much explicitly says, you

12 know, like Incognito mode. There are others, and here's

13 an example of one. They're not saying only Chrome

14 Incognito. They're saying you can choose to browse the

15 web in a private mode, for example, Chrome Incognito    19:16:21

16 mode.

17    Q. So going back to paragraph 281 of your report.

18      And the quotation I want to draw your attention

19 to is again: "You can adjust your privacy settings to

20 control what we collect and how your information is    19:16:50

21 used."

22    A. Uh-huh.

23    Q. Do you recall discussing aspects in which

24 Mr. Broome contended Google offered some control over

25 users' privacy earlier in the deposition?    19:17:03

Page 225

57 (Pages 222 - 225)

1    A. I do.

2    Q. Does this refer to just providing users with

3 some control?

4    A. No, I think Google is making a stronger

5 statement than some. They're saying that you can          19:17:17

6 control. They're not saying you can control partly, you

7 can control a little bit. You can control in these

8 areas, not those areas. They're saying you can control

9 it.

10    Q. So earlier on in the deposition, you recall          19:17:33

11 being asked questions about local privacy that's in

12 Incognito or private browsing modes?

13    A. Yes.

14    Q. And so if you turn to paragraph 285 in your

15 report in the last sentence, you reach the ultimate          19:18:04

16 conclusion: "Google's disclosures give rise to a

17 reasonable expectation that Google will not collect

18 users' private browsing information." Correct?

19    A. Yes.

20    Q. And so is it your opinion that Google's          19:18:18

21 representations to users are that it would only not

22 collect -- it would only respect local privacy and not

23 give any privacy from Google?

24       MR. BROOME: Object to the form.

25       THE WITNESS: I think Google is deliberately          19:18:35

Page 226

1 blurring that distinction in a way that -- to make users

2 sort of unaware of the distinction. They use the word

3 "we" a lot. You're in control. You know, control what

4 we collect. So that taken with the splash screen, which

5 says Chrome -- which says Chrome, I think it is -- that          19:19:03

6 distinction between Chrome and Google, since Chrome is a

7 Google service, is blurred.

8    Q. BY MR. CROSBY: Did Google's disclosures that

9 you've read ever limit its prudence to privacy to local

10 control?          19:19:27

11       MR. BROOME: Objection.

12       THE WITNESS: You know, "ever" is a lot. I do

13 not recall any.

14    Q. BY MR. CROSBY: So just to be clear, would

15 Google's disclosures that you've read apply to just          19:19:43

16 Chrome or to its complete services?

17       MR. BROOME: Object to the form.

18       THE WITNESS: In many cases, Google talks about

19 them as a company. They'll say things like "across our

20 services." So they speak in many cases about everything          19:19:59

21 they do.

22       MR. CROSBY: I'll pass the witness.

23       MR. BROOME: And nothing further from me.

24       Thanks very much, Mr. Schneier. It was a real

25 pleasure to meet you, and I appreciate your time.          19:20:16

Page 227

1       THE WITNESS: Thanks much.

2       THE VIDEOGRAPHER: Would counsel like to

3 conclude the video record?

4       MR. BROOME: Yeah, we can go off the record.

5       MR. CROSBY: Yes.          19:20:24

6       THE VIDEOGRAPHER: We are going off the record

7 at 7:20 p.m., and this concludes today's testimony given

8 by Bruce Schneier. The total number of media used was

9 one and will be retained by Veritext Legal Solutions.

10       (Time noted: 7:20 p.m. Eastern Daylight Time.)

11          --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 228

1       I declare under the penalty of perjury under the

2 laws of the State of California that the foregoing is

3 true and correct.

4    Executed on _____, 2022, at

5 _____, _____.

6

7

8

9

10

11       _____

12       SIGNATURE OF THE WITNESS

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 229

58 (Pages 226 - 229)

1 STATE OF CALIFORNIA    ) ss:
2 COUNTY OF MARIN        )
3
4       I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5 hereby certify:
6       That the foregoing deposition testimony was
7 taken before me at the time and place therein set forth
8 and at which time the witness was administered the oath;
9       That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16       I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20       IN WITNESS WHEREOF, I have subscribed my name
21 this 19th day of July, 2022.
22
23
24
25       LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 230

---

1 IAN B. CROSBY, ESQ.
2 icrosby@susmangodfrey.com
3        July 19, 2022
4 RE: BROWN VS. GOOGLE LLC
5 JULY 18, 2022, BRUCE SCHNEIER, JOB NO. 5312337
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, noting the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

Page 231

---

1 _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2 Transcript - The witness should review the transcript and
3 make any necessary corrections on the errata pages included
4 below, noting the page and line number of the corrections.
5 The witness should then sign and date the errata and penalty
6 of perjury pages and return the completed pages to all
7 appearing counsel within the period of time determined at
8 the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10 requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

---

1 RE: BROWN VS. GOOGLE LLC
2 BRUCE SCHNEIER, JOB NO. 5312337
3    E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 WITNESS              Date
25

Page 233

---

59 (Pages 230 - 233)

[& - 30]

| & |
|---|
| **&**   4:3,12,23 9:17 |
| 9:20 231:23 232:9 |

| **0** |
|---|
| **00001107**   7:7 |
| 163:15 |
| **00002522**   7:14 |
| 223:24 |
| **00701189**   143:20 |
| **02/10/22**   7:16 |
| 224:21 |
| **03664**   1:9 2:9 8:21 |
| **04/15/22**   6:5 16:11 |
| **05/20/20**   7:13 |
| 223:24 |
| **06/07/22**   7:11 |
| 184:8 |
| **09/24/14**   6:16 71:1 |

| **1** |
|---|
| **1**   1:25 6:4 8:16 |
| 16:10,21 17:2,11 |
| 17:12 18:5,8 |
| 74:17 82:20 |
| 124:11 176:13 |
| 184:12 232:1 |
| **1.1**   99:10 |
| **1.2.**   117:23 |
| **1.3**   119:21 |
| **1.4**   120:14 |
| **10**   5:9 7:12 133:6 |
| 134:14 214:11 |
| 223:23 224:5,9,11 |
| 224:13 |
| **10.1.**   146:6 |
| **10.2**   152:18 |
| **10019**   3:13 |
| **106**   216:24 |
| **10th**   4:15 225:1 |
| **11**   7:15 20:19 |
| 224:16,20,25 |

**11:03**   2:17 8:2,7
**11:10**   15:5
**11:12**   15:8
**12**   20:7 21:11,16
  21:18,21,24 22:5
  45:9,10
**12.3**   179:12
**1201**   3:6
**12:04**   47:6
**12:15**   47:9
**13**   31:24 32:6,9
  185:1
**133**   7:1
**134**   7:7 163:15
**14**   32:25 185:1
**15**   185:1 214:12
**151**   63:17
**152**   63:15
**153**   63:13
**155**   135:20
**15th**   16:9
**16**   6:4 73:12,13
**163**   7:6
**172**   144:18
**18**   1:18 2:19 5:4
  8:1 231:5
**184**   7:8
**185**   181:19
**18th**   8:8
**19**   47:11 54:16
  231:3
**19th**   230:21
**1:07**   81:1
**1:25**   81:4
**1st**   221:5

| **2** |
|---|
| **2**   6:6 33:11 58:13 |
| 59:10 77:16 134:5 |
| 134:7 145:22 |
| 176:13 |

**200**   182:21
**201**   4:5 140:16
**2014**   62:4,5,5
  66:12,20 67:14,19
  68:14 71:17 72:2
  136:18 138:23
**2015**   59:8 62:1
**2016**   51:17 144:21
  145:7,23 146:1
  156:11 221:5
**2017**   74:14 180:17
  181:1 218:22
**2018**   74:13 156:15
  162:5 163:8,12
  205:24 221:5
  222:18
**2019**   75:7 171:22
  181:7
**2022**   1:18 2:19 5:4
  8:1,8 224:11,12
  229:4 230:21
  231:3,5
**2025.520**   231:9,12
**205**   142:7 196:18
**206**   3:8
**207**   143:12 196:10
  196:14
**208**   182:21
**20th**   75:7
**21**   185:10 222:15
**212**   3:14
**213**   4:17,18
**215**   63:12,16,17,19
  69:13 143:6
**217**   135:19
**220**   5:10
**223**   7:12
**223-5505**   4:7
**224**   7:15
**231**   146:8

**233**   1:25
**238**   149:25
**239**   149:22 150:25
**24**   99:22 180:20
**241**   152:2
**243**   152:18
**249**   69:10
**24th**   205:24 221:5
**25**   106:24
**250**   69:8
**25th**   162:5 163:12
  222:18
**266**   180:15
**267**   181:6
**27**   61:10
**279**   155:19,24
  159:6,11 220:25
**28**   117:22
**280**   162:3
**281**   161:25 162:15
  163:20 164:3
  225:17
**283**   166:9
**285**   82:21,24
  226:14
**293**   168:22
**293-6800**   3:21
**296**   83:10
**297**   84:24 90:2
**298**   83:9,9
**2:27**   121:4
**2a**   57:8

| **3** |
|---|
| **3**   6:10 60:4,18 |
| 62:24 63:7 71:18 |
| 124:6 135:19,19 |
| 176:13 184:12 |
| 203:3 |
| **30**   27:20 180:21 |
| 232:1 |

[300 - account]

**300**   89:14,15 92:13
**301**   74:20 89:8
  93:8
**302**   89:9
**303**   89:9
**307**   94:12 98:7,17
**31**   61:8,13
**311**   171:20 174:2
  177:1,4
**312**   177:4,5
**314**   177:12 178:20
**3201**   3:12
**322**   177:4,5
**326**   74:20 75:3
**32nd**   3:12
**33**   118:13
**33602**   4:6
**3462**   1:24 2:21
  230:4,25
**35,000**   46:3
**356**   69:7,11,12
**36**   186:8
**37**   188:2
**38**   74:5
**3800**   3:6
**3:04**   121:7

**4**

**4**   6:14 16:18 18:9
  70:24 174:3
**40**   106:12,15 203:4
**415**   3:21
**41st**   3:19
**42**   191:21
**44**   3:19 124:6,7
**443-3000**   4:18
**443-3285**   4:17
**47**   191:20
**48**   192:13
**49**   203:3
**4:00**   127:23

**4:06**   155:14
**4:20**   1:9 2:9 8:21
**4:26**   155:17
**4:53**   173:22

**5**

**5**   6:17 72:24 73:6
  217:10,11
**51**   28:21
**516-3861**   3:8
**53**   193:22,23
  196:21,23,23
  198:2
**5312337**   1:25
  231:5 233:2
**539**   7:14 223:24
**5411**   230:24
**55**   124:5
**56**   201:25
**58**   6:6 73:16 74:3
  74:4 121:9
**59**   202:14
**5:03**   173:25
**5:22**   183:23
**5:35**   184:1

**6**

**6**   6:20 16:21 17:2
  18:5,8 75:17,22
  76:21,24,25
  134:16 217:11,11
  217:12
**60**   6:10
**63**   204:10 209:21
  210:18,23 211:2
  211:17,19
**64**   207:25
**6:20**   212:5
**6:30**   212:8
**6:45**   220:17

**7**

**7**   7:1 18:12,13
  20:5 38:23 40:21
  133:17 134:1
  217:13
**70**   6:14
**72**   6:17 213:2
**729-2044**   3:14
**75**   6:20
**78**   124:12,12,25
  214:3,7
**7:10**   220:20
**7:20**   2:18 228:7,10
**7th**   4:5

**8**

**8**   7:6 19:15 20:1
  99:13 163:14
  184:12
**8.3**   181:18 182:11
  182:13
**813**   4:7
**84**   131:3
**86**   126:4,23
**865**   4:15
**87**   130:6
**88**   133:1

**9**

**9**   7:8 184:4,6
**9.2**   196:5
**90017**   4:16
**911**   132:3
**91401**   3:20
**98101**   3:7
**99**   139:8

**a**

**a.m.**   2:17 8:2,7
  15:5,8
**ability**   230:15
**able**   60:8 67:2
  112:2 115:18

128:16 136:19
137:14 147:7
152:12,16 156:2
156:20 157:3
159:14 190:9
194:4 195:17
199:3 200:14,25
201:1 207:1,4
209:19 214:8
224:3,18
**absence**   204:17
  208:21 209:4
  210:2 211:5
**absolutely**   133:14
**abuser**   169:6
  170:7,8
**abusers**   169:2
**abusive**   130:2
  169:2 170:19,20
**accept**   129:13
**accepted**   95:3
  142:4 179:22
  180:9
**accepting**   105:13
**access**   16:15 40:13
  54:24 113:19
  129:3 189:13,21
  195:17 199:4
  224:3
**accomplish**   194:4
**accomplished**
  195:20
**account**   107:19
  112:25 128:21
  129:1,12 142:9
  143:5 146:4 154:1
  154:7 192:16,25
  193:18 194:3,8,23
  198:4,17,25 199:8
  199:17 201:13

[accounts - analysis]

**accounts** 113:14
144:25 195:14
**accurate** 10:21
25:8 32:12 60:25
80:7 81:9 87:23
87:23 115:5,8
134:3 151:7 159:8
159:9 172:13
186:6 187:15
197:10 209:7
230:13
**accurately** 59:5
**achieved** 78:16
**action** 9:2 50:4,14
121:21 122:23
230:17,18
**actions** 197:21
**activities** 18:16
19:10 32:4 143:15
169:7
**activity** 24:18 31:2
55:12 85:16 88:23
91:12 103:9
104:16 130:23
138:16 142:10
154:1,7 166:12
169:6 171:25
172:5,20 173:3
177:14,21 178:25
179:1 216:2,3
217:19 221:22
**actual** 30:12 57:13
58:2,7 60:15,24
62:25 73:13 93:1
114:9 123:21
137:8 184:15
207:24 208:3
**ad** 22:16 42:10
65:25 109:12
137:25 139:16

**add** 49:21 62:10
200:18 213:4
214:1
**adding** 224:7
**additional** 174:19
214:9
**address** 43:13,16
109:6 186:10,20
186:20,21,25
187:2,16,21,22,24
188:25 189:3
190:20,25 191:7
191:10,17,24
192:3 196:3
199:24 215:6
**addresses** 186:13
214:8
**addressing** 225:9
**adequacy** 146:14
147:14 179:17
**adequate** 167:13
**adequately** 179:13
**adhere** 142:5
**adjust** 222:19
225:19
**administered**
230:8
**administration**
15:24
**admit** 143:14
**admits** 196:7
**admonishes** 60:14
**adoption** 214:13
**ads** 78:19 136:5
174:25 175:4,14
175:20 176:3
**advertising** 19:18
38:13,16 43:23
56:14 123:23
140:10

**advice** 65:14
**advisor** 77:22
**affiliations** 9:7
**affirm** 10:9
**affirmative** 97:2
121:20
**affirmatively**
221:22,25
**afford** 60:16
**afrawley** 3:15
**age** 125:11
**agent** 115:17
116:3,14 137:22
188:3,7,10,13,18
189:4 190:20
191:7,17 196:4
197:2 200:25
**agents** 43:13
**ago** 70:15 72:8
101:16 176:23
208:5
**agree** 8:15 23:14
26:23 49:20 77:7
78:13 79:1,11,16
95:9,18 101:11,20
102:10,11,13
104:9,11 105:4
106:3,6,8,13,19
107:8 119:14
123:12 124:2,8
130:17,21,22
131:12,21 132:18
133:12 134:12,22
135:4 139:21
140:13 142:3
151:5,16,18
153:22,25 154:6
154:17,21 155:5
164:8 179:6
185:22 192:3
215:14

**agreed** 134:21
**ah** 198:23
**ahead** 9:23 82:1,2
89:17 134:14
**ai** 114:2
**air** 122:25 189:16
189:25 190:15
**alert** 12:23 170:20
**alerted** 129:23
**alex** 9:15
**alexander** 3:11
**align** 58:1
**allege** 54:21 55:20
204:22
**alleged** 23:11 62:7
**allow** 144:22
154:12 190:5
191:3
**allowing** 62:20
143:4 153:25
154:6
**allows** 41:12 114:2
154:18
**aly** 4:14 9:11
**alyolson** 4:20
**alyssa** 4:14
**amazon** 106:5
**amended** 12:10
**americas** 3:12
**amir** 13:10 21:22
**amount** 17:3
124:15 125:25
150:3
**analogy** 29:8
104:2,5
**analysis** 4:24
33:14 34:12,13,25
35:6 36:24 66:4
170:17 185:9
213:17

Veritext Legal Solutions
866 299-5127

[analytics - associated]

analytics  19:18
42:10 43:22,25
56:14 61:19 62:2
62:19 109:12,16
114:1 136:25
139:15,24 140:9
196:4 200:12
201:8,16,19,23
213:3,7,20,24,25
analyze  167:7,8
analyzed  167:4
ancillary  45:6
anecdotal  138:3
174:5,19
angeles  4:16
angwin  145:3,14
announced  180:17
announcing
213:15
annoying  123:1,4
anonymity  42:15
44:25 168:25
anonymous  76:4
76:17 77:9 197:15
anonymously
41:12,14,17,19
answer  5:14 19:21
36:15 45:21 47:20
51:18 55:3 81:10
81:16 104:13
106:11 113:24
116:9,10,11
119:17,18 120:20
137:5 138:2
169:16 181:5
183:16 198:19
207:4 209:17,19
211:9 212:21
answered  17:17
43:18 88:13
160:12 167:10

171:16
answering  114:25
answers  200:2
anticipation  71:7
antidotes  172:10
173:9,13
anybody  39:11
109:5 114:11
anybody's  89:7
anymore  105:11
203:25
anyway  16:14
208:10
apartment  161:10
161:15
apologies  74:5
125:1 192:20
app  119:4 185:16
185:16,19
apparently  193:25
appear  189:10
appearance  9:5
appearances  3:1
4:1 9:7
appeared  60:5
appearing  189:24
231:18 232:7
appears  59:7
appendix  218:12
218:15,16
apple  180:17
application  135:15
applications  11:11
applied  17:11,19
18:18 149:7
167:14
apply  30:7 166:20
201:9,12 227:15
applying  17:19
94:25 95:1

appreciate  93:21
98:4 227:25
approach  161:1
approved  59:22
approximately
45:10,19
apps  213:13
april  16:9
architecture  40:22
archive  59:11
area  69:4 88:10,19
areas  148:8 226:8
226:8
argue  115:7
arms  203:14
article  45:3 48:21
49:23 70:5,13,18
70:19,21,22 71:4
71:15 74:15 75:4
75:14,24 78:6,7
79:17 110:13
133:2,6,7 134:1
137:24 145:2,10
145:14,15,20
174:10,11,12,18
174:23 182:20,21
182:23 183:1
217:15,17,24
218:7,12,14,15
articles  23:17
47:14,16,21 48:2,5
48:9,13,14 49:1,2
53:17 67:2 72:10
217:4 218:22
aside  13:14 48:12
168:3 182:23
183:1 194:19
198:4 218:6
asked  21:24 25:10
29:4 43:20,21
67:23 79:11 81:6

81:24 82:3,4
85:23 86:5,12
88:13 98:23 116:6
116:8,11 134:21
137:3 142:25
144:5 171:16
193:11 198:13,23
199:10,14 207:20
207:20,22 208:10
208:13 214:24
226:11
asking  13:18 26:7
50:22 54:2 65:11
65:13,20 85:19
86:11 89:23,24,25
90:1 100:3,9
101:1 111:2 113:5
113:22 115:9
123:14 128:25
140:25 143:10
147:25 149:20
160:3 183:15
188:14 190:24
194:12 207:24
211:3,4 216:14
224:17
asks  200:19
aspect  100:8
aspects  40:20
100:11 225:23
assert  193:3
asserting  193:3
assertion  198:1
assertions  26:12
assign  46:9
associate  4:23
9:11 146:2
associated  126:8
145:8 154:1,7
193:2,18

Veritext Legal Solutions
866 299-5127

[associating - belief]

| | | | |
|---|---|---|---|
| **associating** 142:9 | **availability** 40:14 | 136:5 145:19 | 130:10 142:13,14 |
| **assume** 11:3 92:16 | 213:16 | 149:24 154:15 | 142:25 143:1 |
| 92:24 113:14 | **available** 59:12 | 155:16 159:3,5 | 145:13 148:7 |
| 128:23 158:11 | 64:1 215:5 | 161:6 162:3 164:1 | 149:7,19 167:11 |
| 160:20 170:6,11 | **avenue** 3:6,12 | 168:12,18 173:24 | 175:5,21 182:10 |
| 184:4 190:11 | **average** 24:22 | 174:3,17 177:1 | 182:13,16,16,19 |
| 197:5 204:15 | 25:11,17,18,21,22 | 183:25 193:14 | 182:24 183:2 |
| 206:15,23 207:3 | 26:7 27:1,6 | 198:19 206:6 | 193:23 196:21 |
| 208:2,20 209:3,25 | 151:23 214:12 | 208:8,17 209:14 | 198:6,7,10,10 |
| 210:17 211:16 | **avoid** 74:25 | 212:7 217:10 | 201:3 207:7 |
| 212:14 | **avoided** 131:13 | 220:19 223:17 | 218:18 225:7 |
| **assumes** 150:8 | **avoiding** 131:18 | 225:17 | **basic** 117:25 118:3 |
| **assuming** 169:13 | **aware** 49:5,8,16 | **background** 18:10 | 118:4,9 |
| 170:6 216:18 | 50:5,7,15 51:3,8 | **backups** 154:13 | **basically** 41:6 |
| **assumption** 93:2 | 54:7 55:10 56:20 | **bad** 81:22 102:11 | 42:19 107:12,16 |
| 135:8,13,14 | 56:20 57:3,5,6 | 104:5 128:7 | 108:1 113:5,22 |
| 216:20 | 62:1 66:20 105:8 | 136:23 | 158:23 160:17 |
| **assurances** 211:13 | 145:6 169:17 | **badger** 64:4,15 | **basing** 70:4 |
| **attacked** 132:10 | 199:5,9 214:17 | 65:4,5,22,25 66:5 | **basis** 93:14 106:14 |
| **attention** 54:9 | 217:5 | **bag** 122:25 | 185:5 |
| 68:2 101:7 171:6 | **awareness** 105:7 | **baked** 211:15 | **bathroom** 103:2 |
| 225:18 | 124:15 125:10 | **balance** 128:17 | 103:15,16,24 |
| **attorney** 9:8 27:24 | | 151:20,24 | 161:6,12,19,22,24 |
| 27:24 150:10,18 | **b** | **ballpark** 45:23 | **battles** 6:7,11 |
| 150:21 180:2,3 | | **ballparking** 46:4 | 58:13 60:18 |
| 220:6 | **b** 3:5 96:18 231:1 | **ban** 145:3 | **beacons** 110:9 |
| **attorneys** 102:2 | 232:1 | **base** 21:18,21,24 | **bear** 98:3 |
| **attributes** 185:16 | **b's** 88:6 | 88:18 | **beat** 130:5 |
| **audience** 27:12 | **bachelor** 37:5 | **based** 17:12 18:21 | **becoming** 120:23 |
| 61:10 62:16 | **back** 15:7 31:9 | 19:10,12,21 20:14 | **beeping** 123:2,4 |
| **audio** 8:14 | 35:3 41:20 44:3,8 | 20:15,15,16,17 | **beginning** 2:17 9:8 |
| **aura** 114:17,24 | 47:8 51:16,17 | 32:9,11,13,19 33:5 | 51:17 71:19 95:11 |
| **author** 78:6 | 52:15 55:7,17 | 42:17 44:19 52:1 | 130:24 134:6 |
| 174:23 218:4 | 74:16 75:21 81:3 | 68:5,21 80:12 | 162:2,5 184:12 |
| **authored** 213:16 | 81:6 82:19 85:20 | 81:13 84:15 86:15 | **begins** 121:11 |
| **authors** 46:11 | 86:8 88:12,14 | 87:16,25 92:2 | 156:10 163:1 |
| **automatically** | 96:2 97:15 98:14 | 93:2,15,17,18,22 | **behalf** 1:7 2:7,16 |
| 107:18 122:25 | 99:10 101:10,12 | 93:23 97:18 98:6 | 9:10 |
| 155:6 186:22 | 104:22 107:9 | 101:1 108:22,25 | **beings** 179:7 |
| 206:4 218:2 | 110:16 114:5 | 109:3,6,8 111:4 | **belief** 158:4 161:1 |
| | 117:6 121:6 | 124:7 125:3 | 161:3 |
| | 124:11,23 129:18 | | |
| | 131:14 135:18 | | |

**beliefs** 32:19

**believe** 35:22
60:25 74:13 81:25
82:4 97:23,24
104:15 118:22,25
139:7 144:3 147:4
159:20 216:4
217:23,24

**believed** 32:11
218:7

**believes** 218:3,5

**belt** 122:25

**bender** 182:20,23
183:1

**benefit** 163:11

**berners** 41:1

**best** 39:9 58:20
125:12 230:14

**bestowed** 39:11

**bet** 144:16

**better** 42:8 70:17
72:21 94:7 104:10
109:10 155:21

**beyond** 177:4
214:13

**bidding** 181:23,25
182:3

**big** 22:15 63:23
162:13 218:4

**bigger** 71:5 151:25
178:12

**billing** 127:24

**bit** 76:22 92:6,20
94:6 109:23
110:25 164:2
174:2 226:7

**bits** 218:23 219:16

**blank** 12:18

**blanking** 110:7
125:11

**block** 63:23,25
64:3,10 66:15
136:11 138:11,12
181:13 202:25
203:15,21 206:4
206:16 212:17,22

**blocked** 181:8

**blocker** 65:25
153:22 206:16
208:20 209:3

**blockers** 208:15

**blocking** 180:20
204:11,18 209:5
209:21 210:3
212:16

**blocks** 43:9 65:25
107:22

**blog** 73:7

**blue** 69:14,15,16
79:12

**blurred** 216:4
227:7

**blurring** 227:1

**blurs** 215:21

**board** 41:7

**body** 30:7 87:14

**boies** 3:17 9:17

**bold** 63:23

**book** 17:3 45:14
57:12,14,16,25
58:2,4,7,7,11,18
58:21,22 59:7,8,12
60:7,8,15,24 61:1
62:17,23,25 63:8
69:22 70:11 71:16
72:16,23 73:11
74:12 79:17
101:10 117:21
123:20 124:3,5
125:12,13,13,15
125:16,19 135:18

135:20 203:4,7
204:3

**books** 40:9 45:9,11
45:12,14 46:6,9
77:12 84:20

**bore** 11:6

**boss** 39:13

**bottom** 61:12 76:2
134:6

**box** 176:5

**brad** 182:20,23
183:1

**branded** 49:13

**branding** 171:2

**brave** 141:11,15

**break** 47:1 48:1
80:15,16 81:6
91:18 155:9
173:18 183:19
211:14 220:12,14

**breaking** 80:15

**breaks** 12:4 91:17

**bring** 114:5
166:20

**broadly** 39:18,25

**broken** 159:21

**broom** 57:8

**broome** 4:13,17
5:9 9:9,9,22 10:16
15:3,10 16:8,13
18:12 21:6 25:24
26:11,20 30:10
32:25 34:5 36:8
36:20 38:19 44:15
46:23 47:10 49:4
50:25 51:7 58:17
60:16,22 61:9,12
67:19 71:3 73:2
75:21 76:22 77:7
79:24 80:4,14,19
80:22 81:5 84:15

99:8 109:3 111:1
111:22 113:8
114:5 117:14
120:25 121:8
123:8 124:23
125:2,15 133:16
133:23 147:23
148:17 154:17
155:9,18 163:13
163:17 167:24
168:4 170:15
173:19 174:1
175:22 176:21
177:12 178:5,9
179:3,24 180:3
181:6 182:19
183:18 184:2,10
185:10 186:8,19
187:8 188:17
189:7 190:19
191:2,20 192:8
194:14 195:7,25
197:17 199:14
202:13 204:10
206:14,20 207:15
209:20 210:17,22
212:3,9 213:2
215:13,17,23
218:6,14 219:10
219:20 220:5,10
220:15 221:1,16
222:7,25 223:8
224:8 225:24
226:24 227:11,17
227:23 228:4

**brown** 1:5 2:5
8:18 143:20 231:4
233:1

**browse** 24:4,15,24
25:13 31:1 41:12
41:14,16,18 85:15

[browse - careful]

88:21 91:11 103:8
103:11,12 112:2
128:2,22 162:24
164:16,19,21
171:25 173:2,6
178:13,16 216:7
222:5,13 225:3,14
**browser** 11:13,14
11:21 41:11,16
42:3,9,16,20 49:6
49:18 50:6 52:19
52:21,25 53:6,14
56:15 66:10,21
67:6 68:6,9,11,17
70:2 73:21 74:9
78:11 108:7 129:3
136:1,8,9 138:5
139:3 140:22,25
154:18,21 155:5
165:23 166:4
168:19 181:10
185:16,16,19
202:24 203:14,17
204:1,12 205:5,20
209:22 212:15
213:4 214:1
216:16 223:7
**browsers** 42:20
49:8 51:13 52:18
52:21 64:2 76:5
76:18 77:18
107:14 110:11
127:14 141:16,17
165:5,20 166:6
184:21,23 223:15
**browses** 177:17
**browsing** 6:15
18:16 19:9,19
20:9,10 21:15,25
32:4 33:1,16
42:17 47:17,19,22

48:6 49:17 50:5,8
50:15,21 51:4,13
51:14,25 52:1,13
52:22 53:4,5,6,13
53:18,20 54:13,19
54:22,23 55:11,21
55:22 56:21,23
57:4 59:17,19,24
66:9,21,23 67:3,10
67:11,13,15,20,25
68:3,6,11 69:18,23
69:23 70:2,25
71:23,23 72:2
73:21,22 74:8,9
78:12,23 79:18
82:7,11,15,18 83:2
83:14,15,20 84:5
84:14 85:2,3 86:3
86:4 90:15,16
91:4,5 92:15
94:17,22 95:7,16
95:25 98:23 99:1
104:16 107:14
108:4,14,15
110:22 111:15,23
111:24 112:1,3,11
112:12,22,23,23
113:15 118:2,9
120:1,7,17 121:12
121:13 122:2,19
123:9 126:7,8,16
126:24 127:9,15
127:17 128:4,6,10
129:11,25 130:4,6
130:12,13,18,23
130:24 137:23,23
137:25 139:2
140:13 141:7,9
144:23 146:3
156:3,14,20,25
157:3,7,13 158:2

158:10,25 159:14
159:18 161:2,3,5
162:8,18 163:3
164:4,8,20,22
165:1,5,21 166:12
166:15 168:25
169:7,19 170:18
170:20,22 171:2
171:13 172:5,20
172:23 173:8
174:6,20,25
184:23 189:9,22
189:24 194:2,7,22
195:5,6,13 198:3
198:17,24 199:7
199:17,22,22,22
200:9,10,23 201:2
201:5 202:3,6,17
204:14 206:22
208:19 209:1,24
216:12 217:6,19
221:18,21 222:1
222:11,12 225:9
226:12,18
**bruce** 1:15 2:15
5:7 6:2,4,9,13 7:5
7:9 8:17 16:10
58:15 60:20
133:19 161:20
184:6 228:8 231:5
233:2
**bsfllp.com** 3:22
**build** 30:17 78:18
**built** 87:14
**bullets** 216:2
**bunch** 12:8 17:13
17:20 24:20 55:3
66:2 70:7 102:2
135:2 138:2
196:19 204:4

**buried** 141:1
**business** 18:22,23
19:4,6 120:15,18
136:23
**button** 22:15,15
217:12
**buy** 22:14 46:10
**buying** 60:14
**buys** 77:12
**byatt** 1:5 2:5

---

**c**

**c** 3:18 96:18
**ca** 231:9,12,20
**cabr** 7:7,14 163:15
223:24
**cafe** 191:10,11
**california** 1:2 2:2
3:20 4:16 8:20
229:2 230:1
**call** 39:14 53:23
56:22 99:25 132:3
132:5 147:18
181:15
**called** 11:16 110:8
140:23 147:19
**cambridge** 1:17
2:17 8:1
**camera** 8:11 103:3
103:4,14 161:6,20
**campaign** 145:7
145:22
**capable** 150:8
210:5
**capitalism** 125:11
**capture** 29:18
**care** 104:24 106:3
106:7,9,15
**career** 18:4 37:22
39:19 47:13
**careful** 42:7
118:24

[carnegie - class]

**carnegie** 30:16
87:13
**case** 8:20 12:8,18
13:7,18,22 14:1
18:2,3,6,11 20:2
20:18 23:3,6
34:21 35:24 36:25
42:2 43:23 47:19
47:23 48:4 49:5,8
50:19 54:5,8
55:10,16,24 56:19
57:2 65:16 80:6
81:9,19,21 82:7
87:7,20 89:24
96:20 102:1 112:9
131:7 139:24,25
140:9,21 141:10
141:15,17 146:25
167:9 171:5
173:14 182:5,6,8,9
184:15 188:15
198:12 204:24
213:22 219:17
220:6
**cases** 28:18 105:13
132:12,13 136:11
140:9 150:9
154:13 191:4
194:20 227:18,20
**castillo** 1:6 2:6
**casual** 59:2
**categorical** 34:4
103:20 162:7
**categorically**
166:1
**categoricals**
132:13
**caution** 36:17
**caveat** 50:1 103:18
178:17

**caveats** 50:13
135:3 158:6
**ccp** 231:9,12
**ccpa** 148:21,24,25
**cell** 58:23 132:10
**censor** 45:3
**censorship** 43:7
**center** 23:17
**ceo** 171:22
**certain** 22:12,24
34:14 35:8 148:21
157:22 194:17
195:19,20
**certainly** 38:6
64:15 70:16 93:17
102:18 114:11
131:1 138:25
167:16 182:15
183:4 223:10
**certified** 2:20
**certify** 230:5,16
**cetera** 14:15 101:7
159:7,8,8,9
**champion** 33:3
**chance** 203:6
**change** 100:19
104:3 151:9,10,10
154:14 233:4,7,10
233:13,16,19
**changed** 40:17
105:6,7
**changes** 102:8
186:21,25 187:3
**chapter** 60:13
**chapters** 46:9
**characterization**
139:11,20 204:13
206:22 207:2
208:18 209:1,23
211:3,20 212:12

**characterize** 92:14
**chasom** 1:5 2:5
8:18
**chat** 105:2
**chatty** 223:2
**check** 156:23
157:8 197:3
218:11
**chief** 40:22
**chilling** 117:3
193:14
**china** 43:8 45:1
**chinese** 44:22
**choice** 128:14
142:8 148:16
**choose** 102:8
113:24 123:8,10
162:23 164:16
166:4 225:3,14
**chooses** 113:6,21
193:12
**choosing** 122:18
**chose** 117:1 128:1
**christopher** 1:5
2:5
**chrome** 6:20 7:12
24:19 31:20 49:10
49:12,13 53:17
68:3 75:4,17
83:13 120:6
140:23 141:1,17
150:1,2,21 153:23
155:2 162:24
164:17 166:5,9
169:15 171:24
172:22 181:2,5
189:1 202:24
203:15,20,20
204:23 205:1,19
206:2 207:17
208:11,14 209:11

**209**:16,17 210:7
210:12,15 211:4
212:13 213:7,8,13
215:19 216:1,3,5
216:11 218:23
222:24 223:2,23
224:13 225:4,10
225:13,15 227:5,5
227:6,6,16
**chrome's** 73:20
74:7 84:25 86:1
90:14 91:3
**circumstances**
78:22 112:13
131:24 132:2
159:1 211:16
**citation** 183:12
**citations** 70:10
183:5
**cite** 156:6,11
182:20,21
**cited** 72:10 75:24
144:14 183:9
217:4
**cites** 75:3
**citing** 145:2
**civil** 231:19,20
**claim** 50:11
**claims** 15:23 34:20
96:20
**clark** 75:4
**clarke** 6:22 75:19
**class** 9:14 18:14
21:4 32:1,2,11,17
32:18 33:2 46:8
46:12 49:16,22,23
51:1,12,17 52:11
53:3 75:10 79:25
80:5 81:7,19,25
82:4,18 83:3,19
105:17,18 150:14

Veritext Legal Solutions
866 299-5127

155:25 156:7,18
159:7 194:10,13
194:17,23 195:12
197:9,21,22
202:15 203:19
**classes** 46:6
105:15
**clause** 35:7 159:13
178:12,14,19
179:4
**clauses** 179:5
**clean** 47:25
**clear** 137:5 160:7
160:8 205:19
216:10 227:14
**clears** 69:23 71:23
**click** 6:17 12:13
45:16 46:1 72:17
72:18,24 73:8
123:1 130:8
**client** 117:7
**close** 22:16 136:2
136:9 138:6 139:3
155:6 189:15
206:12 211:25
**closed** 27:19
161:20 175:12
**closes** 169:14
175:8,24
**coarse** 192:4,12
**coauthored** 134:3
**code** 44:2 56:14
192:9,10 231:9,12
231:19,20
**coffee** 188:25
**colleague** 9:11
132:20
**collect** 6:7,11 32:3
54:14 58:14 60:19
83:1 157:11,12
159:22,23,23

160:19 221:21
222:20 223:2
225:20 226:17,22
227:4
**collected** 66:5
83:16 84:5 85:4
86:4 90:17 91:6
104:25 124:16
126:1 172:22
**collecting** 20:10
159:18 217:19
219:9
**collection** 18:15
19:8 42:1 65:16
94:16,22 95:7,16
95:24 98:22 99:1
105:19 106:4
125:14,18 156:1
156:19 162:7
186:10 202:3
217:6 222:6
**collects** 14:15
54:21 55:21 61:18
62:2 143:3 158:9
158:12 166:11
221:10,15,25
223:14
**column** 134:7
**combination**
144:23
**combinations**
185:15
**combined** 178:1
**combines** 39:3
**come** 28:19 39:9
88:12,14 123:16
127:6 145:19
**comes** 154:15
167:18 213:24
**comfortable** 26:25
204:8

**coming** 34:4 84:18
95:4 157:21
**comment** 115:21
**comments** 166:25
**commercializing**
40:24 41:4
**commit** 212:10
**common** 29:17
66:18 194:3 197:5
197:12,13,18,21
197:21,23,24
**communicate**
11:25 25:1,15
**communicated**
26:1 32:2 33:21
**communicates**
24:22 25:11,17
44:3
**communicating**
21:15 25:5
**communication**
11:11 92:12 96:15
**communications**
22:22 53:16
**companies** 22:9
30:5 50:16 52:18
56:3,9 67:16
106:4 124:16
126:1 136:14
138:24,25 139:12
154:14
**company** 22:19
40:24 41:4 43:9
49:12 52:17,22
88:5,6 223:11
227:19
**compartment**
108:1,14,18,23
**competent** 26:3,14
**complaint** 12:10
23:15 50:4,14

51:3,21 56:13
62:8 75:11 82:6
**complete** 103:21
110:14 227:16
**completed** 231:7
231:17 232:6
**completely** 176:14
**completion** 232:10
**complex** 40:7
160:12 215:8
**complicated**
100:22 105:24
109:21,23 110:25
111:10 158:19
211:18
**comprehending**
150:8
**comprehension**
28:14,19
**computer** 11:10
37:3 39:21 40:1
50:8 71:25 82:12
82:15 112:1 130:3
169:4,5 176:14
189:16 195:3,4,4,6
200:10
**computers** 134:8
171:18
**conceal** 170:22
**concealed** 107:4
110:17 114:7
115:3,11 168:11
**conceals** 104:15
**concept** 97:1,7
**concepts** 18:10
103:10
**concern** 170:24
**concerned** 33:2
125:14
**conclude** 228:3

[concludes - corporations]

concludes  228:7
conclusion  19:7
  166:21 208:11,14
  209:10 210:6
  226:16
conclusions  185:6
condition  101:6
conduct  20:20
  21:11 25:25 35:20
  54:20
conducted  8:10,22
  14:19,20 20:22,23
  20:25 21:18,21
  31:17 59:16
conducting  29:20
  31:10 130:18
confidential  54:24
configuration
  189:11
configure  136:8
  214:10
configured  136:1
  195:16 199:3
configuring  138:5
confines  26:18,21
confirm  58:21
  73:8 75:9
confirming  132:20
  158:3
congratulations
  28:1
connect  143:4
  187:17
connected  119:10
  134:9
connecting  175:11
  176:10
connection  8:11
  44:5 71:16 182:5
  182:6

connects  174:20
consent  14:14
  145:7,9,22 146:2
  146:11 147:4,14
  148:7,11,23 149:3
consented  217:5
consider  129:20
  185:12
considerable
  201:21
considered  183:8
  193:25
consistent  72:1
  90:19 91:8 94:14
  100:14 193:24
  204:16 209:25
constantly  160:23
constitute  34:15
  35:9 128:24 129:4
constitutes  35:20
constraints  75:1
construct  207:14
  207:16 208:3
  211:1
constructed  19:16
construed  177:22
consumer  38:8,10
  93:11 94:2 151:23
consumers  125:24
  167:6
contact  231:9
contacted  54:17
contain  125:16
  230:13
contended  225:24
content  126:8
context  13:21 21:1
  88:3 93:11 100:16
  100:19 126:5,6
  153:15 177:25
  179:5 190:16

191:13
continue  8:14 77:6
continued  4:1
continuously
  172:22
contract  204:23
contracts  27:15,16
  44:1
contradicted
  19:14 157:22
control  6:8,12
  58:14 60:19
  152:22 153:7,9,12
  153:14,17,19,20
  153:23 154:2,3,3,8
  154:10,19,23
  155:4,7 156:1,2,18
  156:20 157:3
  159:14 162:7,14
  169:3 204:18
  208:22 209:5
  210:2 221:9,14
  222:20,24 225:20
  225:24 226:3,6,6,7
  226:7,8 227:3,3,10
controlling  223:14
controls  202:24
  203:15,21 223:7
convenience  118:7
  119:3
conversation
  117:7 129:14
  208:5
conversations
  114:19 220:3
convey  102:24
  103:23 122:5
  151:14 197:8
conveyed  29:23
  87:24 110:21
  114:24 128:21

conveys  97:20
  103:10 205:4
convinced  47:25
  67:9 151:24
cookie  44:16
  138:11 140:20
  153:22 181:22
  204:11,18 206:15
  208:15,20 209:3,5
  209:21 210:2
  212:16
cookies  78:10,17
  78:17 107:23
  108:3,4,7,15,16,18
  108:22 109:2,9,25
  110:2 136:2,9
  138:6,10,21 139:3
  143:2 154:22
  155:6 175:5,7,14
  175:23 176:2
  180:19,20,21
  181:9,13,15,15,16
  202:25 203:13,16
  203:21 205:4,20
  206:4,10,16
  208:12 212:14,17
  212:22,24
cool  70:23
copied  16:24 17:2
copies  45:19
copy  12:13,24
  13:1 16:8,13,17
  57:13 59:20 60:8
  61:1,4 62:25 63:7
  63:12 69:8 71:4
  71:10,11 74:18
  163:3 184:5
corporate  53:16
corporations
  104:25

Page 10

**[correct - data]**

**correct** 16:22 17:4
30:13 32:22,24
34:24 35:10,11
37:3,13 38:8,25
49:7,18 50:6,16
51:7,23 59:8,9
62:3 66:16,22
67:21 68:17 72:2
73:10 74:11,13
83:4,21,22 93:22
98:11 107:11
108:20 122:22
136:22 138:22
139:6 140:11
151:11 153:9,12
153:15 159:8,12
165:3,6,9 168:6,9
168:11,12 172:6
179:13,25 180:5,6
186:22 187:4,18
188:8,11 193:2
199:8 205:21
210:3,4 215:9
217:19 222:11,21
223:7 225:5
226:18 229:3
**corrections** 231:14
231:15 232:3,4
**correlate** 111:23
112:10,22 113:14
**correlated** 127:23
**correlation** 114:1
199:20
**correspond** 16:21
77:25
**cost** 214:11
**counsel** 8:17 9:6
11:3 15:1 16:12
54:17 58:16 60:21
63:6 71:2 73:1
75:19 76:20

133:20 163:16
184:9 223:25
224:22 228:2
230:10,16 231:18
231:21 232:7
**counsel's** 137:21
**count** 21:5 37:8
45:11 46:22 65:14
77:25
**county** 230:2
**couple** 59:19
**course** 12:1 13:23
37:22 109:25
**court** 1:1 2:1 8:19
8:25 148:5,9
224:17
**cover** 57:19
**crafting** 151:19
**crappy** 104:2
**create** 114:17
212:13
**created** 52:17
108:16
**creates** 204:14
209:2,24
**creative** 72:21
**creepy** 123:24
**criteria** 148:4
**critical** 120:6,12
120:12
**crosby** 3:5 5:10
9:13,13 18:7 21:2
25:20 26:5,17
29:25 32:21 34:2
36:5,15,17 38:18
44:14 47:2 48:24
50:17 51:6 67:18
76:20,25 77:5
79:21 80:1,8,24
84:9 99:3 109:1
110:24 111:21

113:3,17 116:18
124:21,24 125:1,7
147:17 148:13
154:9 155:12
170:13 173:17,20
175:15 176:11
177:7,23 178:8
179:2,19 180:1
181:3 182:14
183:10,21 185:7
185:24 186:14
187:5 188:12
189:5 190:6,23
191:18 192:6
194:11,24 195:21
197:11 199:11
202:11 203:22
206:5,17 207:8
209:13 210:10,19
211:25 212:19
215:10,15,20
217:21 218:10
219:5,19 220:1,14
220:23 221:20
222:10 223:5,12
223:17 224:3,10
224:15 225:2
227:8,14,22 228:5
231:1
**cross** 46:19 79:3,6
180:19
**crossed** 120:6,7
**crowded** 188:24
**crucial** 119:21
120:1,14,17
**cryptographer**
39:4
**cryptography**
39:20
**csr** 1:24 230:4,25

**cuff** 120:21 128:13
129:14 160:3
**cultural** 101:15
102:9
**culture** 102:3,4
**cultures** 102:5,7
**curious** 210:14
**current** 38:19
151:11 223:19
**customers** 136:25
**cv** 1:9 2:9 8:21
46:18,22
**cyber** 77:21
**cybersecurity** 7:1
133:17

---

**d**

**d** 5:1
**dabble** 197:24
**damages** 15:21
**danger** 119:12
**dark** 20:17 22:3,5
22:8 23:1,21,24
25:6 166:25
**data** 6:6,7,10,11
12:13 14:15 16:22
17:3 18:9,15 19:9
21:1 22:10 40:13
41:3,18 42:1 44:6
45:15,20 48:7
49:6,10,17 50:5,9
57:12 58:13,14
59:8 60:18,19
64:1 65:15 66:2
66:10,22,24 68:11
70:2 71:16 73:2,4
73:5 78:20 101:9
104:21 105:19
106:4,16,18 109:8
112:10,11,23,24
113:15,15 114:12
123:20 124:15

Veritext Legal Solutions
866 299-5127

**[data - determined]**

125:17,25 126:9
126:13,20,22
127:12,25 130:20
135:18 137:8
142:10 143:5,17
144:7,23 145:8
146:3,3 149:7
154:1,7,14,15,15
157:12,12 158:8
158:12 162:8
172:20,21 173:7
177:16 184:22
194:5 195:16
197:13,15,16
198:7,9,11 199:2
199:19,21 200:2,3
200:5,6,8,9,10,15
200:21,22,23
201:2 202:2,9,23
204:12 209:22
219:4,14 221:9,15
222:11,13
**data's**   173:1,7
**database**   195:16
199:2
**date**   231:16 232:5
233:24
**dated**   225:1
**dates**   49:24 50:1
197:3
**davis**   1:5 2:5
**day**   136:3 211:12
230:21
**daylight**   2:18,19
8:2 228:10
**days**   72:8 136:19
159:15 180:21
**deal**   130:13
151:25 158:20
169:1

**debate**   40:8 59:21
**debated**   25:7
**debating**   114:23
**decades**   17:13,21
19:22 86:16 87:15
**decisions**   129:14
**declare**   229:1
**decoder**   6:14
70:24
**default**   111:13
141:2,4,10,12
142:1 157:9 181:9
181:13 189:2
202:20
**defendant**   1:11
2:11,16 4:11 8:18
**define**   21:4 40:9
106:10 109:10
182:1
**defines**   107:3
**definitely**   26:8
**definition**   34:6
36:13 99:22 100:7
101:4 110:16
114:6,16 115:1,2
123:24
**definitions**   36:4,24
101:14 107:2
**definitively**   51:18
**degree**   136:12,13
153:17 190:7,8
**degrees**   37:7
**delete**   49:17 50:11
136:2,9 138:5,20
139:3 153:25
154:6,12,14
202:25 203:16,21
**deleted**   108:18
154:15 175:7,23
**deletes**   48:7 49:6
50:5 66:10,21,24

68:11 70:2 155:6
**deleting**   50:9
138:5,10
**deliberately**   123:1
226:25
**deliver**   152:25
**democracy**   120:13
**demonstrated**
202:19
**demonstrates**
72:19
**denominator**
29:17
**depend**   21:3 26:6
45:7 77:14 88:10
103:1 159:1
187:17 195:15
199:2
**dependent**   100:16
**depending**   100:19
153:15 191:25
**depends**   8:10
43:17 65:17 103:6
123:25 200:1,3
**deploys**   122:25
**deposed**   10:22
46:21
**deposit**   206:10
212:23
**deposition**   1:15
2:15 6:1 8:9,17,22
12:1 16:5 40:18
94:15 115:17
116:8 118:20,21
137:22 142:16,17
144:5,13 225:25
226:10 230:6
231:19,22,24
232:8,10
**describe**   39:9
84:25 85:24 86:1

90:3,14 91:3
96:14 157:12
167:20 185:13
210:23
**described**   18:13
42:1 56:12 171:24
210:18
**describes**   22:9
160:17 174:23
**description**   6:3
205:2 210:7
**design**   21:7 129:14
135:8,13,14
157:16 160:2,10
**designed**   18:10
22:23 24:5 25:1
28:16 44:21 77:18
127:14
**designers**   135:11
135:12
**designing**   128:11
**designs**   128:12
**despite**   76:3,13,16
**detail**   151:21
**detailed**   54:22
55:21
**details**   24:7 29:14
43:17 50:23 54:19
79:14 104:24
165:16 186:1
**detected**   169:6
**detection**   218:23
219:16
**determination**
148:6
**determine**   29:19
29:22 87:9 88:15
88:16 167:5
169:19
**determined**
231:18,22 232:7

Veritext Legal Solutions
866 299-5127

determines  117:12
deterrent  214:12
device  24:18 30:21
    31:2,7 85:3,16
    86:4 88:22 90:16
    91:5,12 102:17,20
    103:9,9,13 104:12
    104:17 128:22,23
    128:23 129:23,24
    131:23 132:6,15
    132:16,25 170:1
    170:17,19 177:14
    177:21 178:7,14
    178:24 179:7,9,10
    185:15,16,19
    187:16,20 188:8
    188:11 189:4
    190:5 191:3 194:2
    198:4
devices  12:2 110:5
    110:11 132:17,21
    133:9 134:9,17
    135:5,6 177:15
    178:22 179:1
    188:14
devoted  55:14
dictionary  99:21
    100:7 107:3
    114:15 115:1
difference  63:2,6
    78:21 79:8 84:12
    95:21 157:18
    215:19
different  27:20
    30:8,8,10,11,16
    54:3 70:8 79:12
    88:5 98:12 100:5
    100:11 101:15,17
    101:17,19 102:2
    106:20 121:12
    127:10 138:24

153:14 181:1
    184:23 185:17
    187:22,24 189:12
    189:15 199:20
    200:14 208:9
    211:14
differently  17:1
    41:24 49:15
    122:11 131:20
difficult  151:19
digestible  151:23
dimension  25:23
diploma  152:12
direct  123:21
    138:3 143:11
    154:25
direction  230:12
disagree  99:9
disappear  189:16
disassociated
    70:13
disclose  27:7,8,10
    27:13,18 80:11
    81:12 83:25 161:9
    161:9 219:11
    221:22,25
disclosed  80:10
    81:11 83:7 146:20
    147:3 218:22
discloser  97:15
discloses  82:5
    83:23
disclosing  26:9
    27:13 151:20,21
    166:11 206:8,9
disclosure  23:8
    31:23 84:21 87:15
    87:20,22,24 92:21
    148:19,21 161:21
disclosures  20:8
    22:1 23:2,4,5,16

23:21,21 26:10,15
    27:6,20 30:6,8,11
    30:13,16 32:1
    33:15 80:6 81:8
    81:20 82:25 83:6
    83:24 84:1,11
    85:21,22 86:9,19
    87:3 88:16,18
    89:20 90:7,8
    91:24 92:2,8
    94:16,21,23 95:2,6
    95:15,24 96:3,6,10
    96:17 97:10 98:7
    98:11,22,25
    145:25 146:15
    152:13 158:20
    159:2 166:24
    167:13 179:18
    180:4 207:9,11
    223:13 226:16
    227:8,15
disconnect  64:4
    71:20,22
disconnected
    132:5
discoverable  85:2
    86:3 90:15 91:4
discovery  54:24
discuss  83:12
    221:4
discussed  11:3
    25:25 168:10
    169:2 173:14
discusses  196:15
discussing  117:17
    221:1 225:23
discussion  25:4
    123:3 168:1
    213:10,14
discussion's  80:20

discussions  21:25
    144:8 193:14
disguise  166:13
    167:21,21 168:4,7
    168:13,18
disguised  168:13
disguises  168:16
disk  78:11
dispute  115:10
disputed  115:11
disputes  63:5
dissed  14:23
distinction  216:5
    216:10 227:1,2,6
distinguish  157:13
    158:10
distort  135:22
distracted  28:14
    198:15
distributed  41:3
district  1:1,2 2:1,2
    8:19
division  1:2 2:2
    8:20
docs  165:14
document  118:19
    118:21 121:25
    142:18,20 143:7
    143:10,23 144:2,6
    144:14 191:23
    196:14,15 223:4,6
    225:3,7
documentation
    32:1,9,10,12,19,20
    33:6,7
documents  12:5,8
    12:21,23,24 19:10
    19:13 20:2,18
    23:9 30:8,11,13
    32:14,15 36:12,18
    54:5 69:1 131:8,9

[documents - essentially]

142:19 150:4,4
152:3 177:6,9,10
177:10 182:13,17
183:2 185:11,13
193:24 198:5
209:15 216:8
**doing** 13:3 24:16
29:24 30:2,3
35:25 44:4 51:11
66:6 67:5 69:4
82:15 100:13
113:23 114:11
116:24 127:21,24
129:10 145:21
154:11 170:21
190:12
**domain** 112:8
**domestic** 169:8
**door** 161:20
**dots** 143:4
**doubleclick's**
144:23
**download** 213:25
**downloaded**
181:10
**dr** 10:19 184:20
**draw** 88:13 225:18
**drive** 50:10 78:17
**driven** 119:4
**dropped** 145:3
**duck** 118:6,6
**dynamic** 186:13
187:3,10 189:12

**e**

**e** 5:1 231:9,12
232:1 233:3,3,3
**earlier** 33:21
115:20 168:10
170:16 193:10
220:3 225:25
226:10

**ease** 152:4,4
**easier** 13:1 132:24
146:7 196:1
197:13
**eastern** 2:18,18
8:2,7 228:10
**easy** 57:15 58:12
64:2,12 136:10
137:1
**eating** 97:21
**eaves** 139:18
**eavesdroppers**
139:8,22
**eavesdropping**
40:16
**economics** 39:22
**economist** 37:13
37:14
**economists** 37:15
**ed** 171:23
**edge** 28:18 132:11
132:13 141:22,23
141:24 142:1
171:10,11
**edited** 17:5
**editing** 17:22,25
17:25
**educate** 43:5
**education** 28:13
152:14
**effect** 117:3
150:14 156:7
221:4
**effective** 7:16
224:11,20
**effects** 193:14
**effort** 22:10
144:22 195:2
**either** 52:19 67:13
112:25 154:18
157:9 176:22

183:13 213:7
**electronic** 61:1,2
**electronically**
16:12 58:16 60:9
60:21 71:2 73:1
75:20 133:21
163:16 184:9
224:1,22
**elements** 152:17
**elicit** 22:11,24
24:5
**eliminate** 132:2
**elvert** 4:23 9:12
**email** 59:1 77:24
105:2 128:20,25
130:4
**emailed** 170:18
**emanuel** 4:12,23
9:10
**embedded** 52:24
62:8
**emphasized** 76:17
**emphasizing**
162:7
**employ** 169:3
**employed** 202:5
**employee** 105:21
196:7
**employees** 41:14
143:14 167:1
**employs** 31:25
**enable** 141:3,10
142:1 202:25
203:16,20 206:15
**encapsulate** 39:14
**encompassing**
78:9
**encourage** 46:5
**endless** 39:19
**endnotes** 6:19
72:25

**ends** 54:6,10
**engage** 56:4 108:6
184:14
**engaged** 131:7
170:16,17
**engineers** 89:10
122:1
**engines** 73:20 74:2
74:7
**english** 28:14,19
30:19 33:22 99:21
100:25 107:3
**enhanced** 181:7
**enhancing** 63:24
**enlarged** 162:11
**enormous** 194:5
**ensure** 142:8
**entire** 47:13
130:13 213:12
**entirely** 145:7
**entities** 108:6
**entitled** 115:23
**entity** 24:13
**entry** 216:22
**equally** 160:8
195:5
**equitably** 22:19
**equivalent** 27:15
171:13 191:24
**equivocal** 79:5
**errata** 231:14,16
232:3,5
**error** 189:10
**especially** 102:7
204:17 208:21
209:4 210:2
**esq** 3:5,11,18 4:4
4:13,14 231:1
**essentially** 19:16
151:14 177:6
222:12

[establish - extension]

**establish** 217:5
**estimated** 150:7
**et** 14:15 101:7
  159:7,8,8,9
**europe** 101:18
**evading** 43:7
**evaluating** 146:14
  147:13 179:17,21
  179:24 180:4
**everybody** 6:18
  12:14 19:5 24:14
  24:17,24 25:13
  27:21 28:22,25
  29:3,6 45:16 46:2
  72:25 103:21
  161:14 168:18,20
**evidence** 10:2
  112:9,15,17 114:7
  115:10,14 116:15
  131:6 136:21
  137:3,6,14,18,21
  138:3,3 174:5,9,19
  175:10 184:15
  202:4 219:8
**exact** 89:10 185:23
  186:3 195:15
  199:2 200:2
**exactly** 65:24 66:4
  76:20 78:20 79:3
  79:7 101:24
**examination** 5:6
  10:15 220:22
  230:10
**example** 26:16
  30:21 64:2 102:16
  109:12 111:12
  112:6 113:1
  118:23 130:2,8
  135:1 139:15
  146:24 148:21
  151:3 167:17

  170:19 225:13,15
**examples** 50:10
  104:7
**excellent** 63:11
**excepted** 160:20
**exception** 222:10
  223:12,13
**exchange** 105:1
**exciting** 11:1
**exclusively** 145:13
**excuse** 150:1
**executed** 229:4
**executive** 16:19
**executives** 68:3
  157:20 160:25
**exercise** 156:2,20
  159:14
**exert** 157:3
**exhibit** 6:4,6,10,14
  6:17,20 7:1,6,8,12
  7:15 11:15,20,20
  12:25 16:10 57:9
  58:13 59:10,13
  60:4,18 62:24
  63:7 70:24 71:1
  72:14,24 73:6
  74:17 75:17,22
  76:21,24,25 82:20
  101:12 124:6,11
  133:17 134:1
  135:19 163:14
  174:3 184:4,6
  203:3 217:10,11
  223:18,19,20,23
  224:4,5,9,13,14,16
  224:19,20,25
**exhibits** 6:1 11:18
  23:8
**exist** 166:7 188:15
  194:13

**existed** 108:7
**existing** 107:23
  154:22
**exists** 106:7 140:2
  140:21 158:15,16
  158:17 203:25
  204:2
**exit** 169:1
**expect** 85:17 97:3
  98:19 126:8
  202:14 223:6,10
**expectation** 20:8
  83:1,4,14,21 84:4
  84:7 85:1,9,10
  86:2,6 87:4,10
  88:15,17 89:21
  90:4,18,24 91:7,14
  92:7,22 93:4
  121:14,17 122:7
  122:19 123:11
  124:17 126:2
  127:8 158:7
  226:17
**expectations**
  32:18 33:17,19,25
  34:6,9,14 38:11
  86:20 158:24,25
  207:6
**expected** 32:11
  97:15 161:23
**expecting** 122:10
  122:21 123:14,15
**experience** 19:11
  19:12,22,22 94:25
  182:2 193:23
**expert** 6:4 7:8,10
  12:9 13:5,6,13,21
  13:25 15:10,20
  16:2,10 17:13,20
  19:11,12,23 33:10
  38:1,4,16 39:5

  46:14 54:18 68:9
  72:10 88:19 89:24
  92:3 93:16 95:1
  116:4,5,6,14
  148:10,18 166:18
  179:22 184:6,7
**expert's** 166:24
**expertise** 17:12,19
  18:21 30:9 33:10
  37:16,25 38:8,10
  38:13 55:14 72:20
  86:15 87:16 88:11
  92:2 93:15 147:21
  152:6 166:20,23
  167:4,14 179:21
  181:24 182:1
  198:7 207:9
**experts** 30:14
  84:21 87:25 116:9
  146:19 147:2,3,7,8
  147:10,20 149:8
**explain** 29:1 30:19
  36:12 37:18 42:13
  99:7 165:19
  200:13
**explaining** 48:9,21
  144:14
**explains** 124:16
**explanation** 125:6
  125:9
**explicitly** 67:23
  148:16 173:5
  185:18 225:11
**expose** 59:1
**expressing** 105:20
  121:13,17,19
  122:7,14,19,23
  123:11
**expressly** 225:9
**extension** 41:11,16
  42:3,9 52:20

Veritext Legal Solutions
866 299-5127

[extension - following]

204:2 213:4,9
**extensions** 82:10
**extensive** 202:24
  203:15
**extent** 54:25
  108:21 214:8
**external** 32:15
  33:7
**extraction** 177:16
  177:16

**f**

**facebook** 67:4,4
  105:18,18,22
  106:5 120:12
  200:1
**faceless** 166:13
  167:21
**fact** 12:23 25:6
  68:19 76:3,13,16
  77:9,10 84:4
  125:4 126:9,15,23
  127:2,8,14,21
  128:1,2 140:2,21
  145:6 159:17
  172:4,21 174:5
  203:14 219:7
  220:3
**facts** 97:20
**failed** 179:12
  184:14
**fails** 185:12
**failure** 219:11
**fair** 16:24 17:3
  23:10 35:4 43:19
  51:20 55:19 62:11
  64:25 72:9 75:2
  79:13 95:22
  114:22 129:15
  131:19 133:14
  139:11,20 140:7,7
  143:2 177:4 186:2

187:25 188:17
  191:17 216:20
  218:20
**fairly** 22:20
**falling** 86:24
**false** 20:8
**falsely** 32:2
**falun** 44:23 45:2
**familiar** 10:24
  31:3 53:1 54:18
  56:2,16,25 133:24
  144:3,15 145:21
  145:25
**familiarity** 123:25
**fanfare** 144:21
**far** 43:25 172:4,12
  203:12
**fast** 70:10
**fault** 71:9
**fbi** 16:2 115:17
  116:3,14 137:22
  189:20 190:12
  197:2 200:19,25
**feature** 141:1,4
  171:24 180:18
  181:8 202:16
  212:16
**features** 201:9
  202:2,6 203:1,16
  203:20
**february** 224:11
  225:1
**federal** 232:1,8,9
**feel** 25:2 26:3,14
  26:25 117:2 129:9
  208:5
**feeling** 24:5,25
  25:14 105:9
  117:12
**feelings** 22:25

**feels** 46:8 96:5
  98:12 130:5
  198:22 216:13
**fenton** 4:25 8:23
**field** 38:2 87:12
**fields** 87:17
**fighting** 96:23
**figueroa** 4:15
**figure** 30:18 44:19
  46:12 58:8 63:9
  113:6 169:13
**figured** 183:14
  200:8
**figures** 111:4
**figuring** 28:13
  44:18
**filed** 8:19 50:4,15
  51:3,22 75:11
  82:6
**final** 128:13
**financial** 214:14
**financially** 9:3
**find** 22:16 37:24
  53:23 73:13,15,25
  76:22 89:3,6
  103:3 105:14
  116:25 117:20
  119:3 140:6
  149:12 165:12
  195:23,23 203:6
  205:22 207:14
**finding** 89:7 170:8
**fine** 12:4 16:14
  47:2 64:23 124:5
**fingerprint** 132:6
**fingerprinting**
  131:3,7,9,12,21,23
  132:14,16 170:16
  185:14,22 186:1,4
**fingerprints** 186:5

**firefox** 52:24,24
  141:23 171:8,12
  181:8,10,17
**firefox's** 73:21
  74:8
**firewall** 44:22
**firm** 9:1 127:25
**first** 10:25 49:23
  60:11 76:2,10,23
  76:25 134:5
  145:16 146:22
  148:25 153:5
  156:11 159:10,11
  162:9,10 163:18
  174:3 175:18
  181:15 205:18
  213:24
**five** 173:18
**fix** 77:19
**flashblock** 64:5
**flesch** 152:3
**flexner** 3:17 9:17
**floor** 3:12,19 4:5
  4:15
**florida** 4:6
**flows** 129:18
**fluid** 100:8 123:25
**focus** 21:12 96:4
  97:19,22 98:9,15
  98:18,18 114:14
  217:3
**focused** 47:14
  82:10 94:4 95:10
  97:12
**focusing** 159:2
  206:7
**folder** 11:18
**follow** 136:5
**followed** 138:1
**following** 24:19
  159:22,23,24

[following - gives]

160:19 169:8
216:2 221:3
**follows** 231:8
**font** 162:11
**food** 29:9,9 97:21
**footnote** 133:1
143:6,20 182:21
182:21
**footnotes** 70:11,11
74:21,22,23 77:12
**forego** 119:15
**foregoing** 229:2
230:6,13
**forensic** 169:15
**forest** 86:24
**forget** 98:2 116:10
**form** 18:7 21:2
25:20 26:5,17
29:25 32:21 34:2
36:5 38:18 44:14
48:24 50:17 51:6
67:18 79:21 80:1
80:8 84:9 99:3
109:1 110:24
111:21 113:3,17
113:21 116:18
125:7 147:17
148:13 154:9
170:14 175:15
176:11 177:7,23
178:8 179:2,19
180:1,13 181:3
182:14 183:10
185:7,24 186:14
187:5 188:12
189:5 190:6,23
191:18 192:6
194:11,24 195:21
197:11 199:11
202:11 203:22
206:5,17 207:8

209:13 210:10,19
212:19 215:10,15
215:20 217:21
218:10 219:5,19
220:1 221:16
222:7,25 223:8
226:24 227:17
**formal** 21:7 37:17
147:25 148:1,2
**formalize** 52:6
**formalized** 180:14
**formed** 50:23
**former** 16:2
105:21 115:17
116:3,13 200:25
**formerly** 41:7
**forming** 36:10
**formulate** 104:10
**forth** 230:7
**forthepeople.com**
4:8
**forum** 213:10
**found** 117:7
**four** 138:11,12,13
138:13,13 151:2
**fourth** 186:8
**francisco** 3:20
**franklin** 4:5
**frawley** 3:11 9:15
9:15 224:6,13,23
**frcp** 232:1
**free** 54:4 101:6
102:24 105:1
205:14 214:17,19
215:2,4,9
**freedom** 93:12
**frequency** 186:24
**frequently** 151:6
**friend** 174:24
**friends** 59:2
103:19 105:3

**fringe** 194:20
**front** 28:17 58:22
**full** 44:9 76:11
77:17 230:13
**fully** 14:11 50:23
**fun** 72:6
**function** 107:14
107:15
**functionality**
23:12 78:10
118:23 119:2
**functions** 107:11
**fundamentally**
119:4
**further** 70:9 92:6
92:20 175:6,22
219:22,24 227:23
230:16

### g

**g** 4:14
**game** 181:14
**gathering** 19:17
**general** 18:9 22:8
22:18 28:11,12
31:16,18 33:20,23
37:22 39:22 49:9
49:17 50:21 53:20
54:19 62:15,16
66:23 67:11,15,20
67:25 68:4 77:19
80:10 81:11 97:10
100:24 105:8
120:10 121:19,24
122:23 129:22
135:4 178:16
197:14 199:18
202:20 211:3,20
221:17 222:8
**generalizable** 88:9
**generalizations**
39:19

**generally** 48:13
50:22 53:13 56:16
78:16,17 89:2
95:3 114:14
131:13,15 152:11
179:22 180:9
182:7 194:19,20
202:10 215:13
**generations**
101:19
**geographic** 199:24
**geographical**
192:11
**georgios** 7:10
184:7
**getting** 44:9 55:24
84:8 157:19
162:22 176:8
188:21 211:25
217:13
**ghostery** 64:5,15
**giant** 77:2
**gift** 122:3
**gist** 47:21
**give** 10:3 20:8 22:6
34:5 46:10 47:25
49:24 73:14 82:25
84:4 88:16 89:21
92:22 119:6
128:14 130:2
148:16 153:12
188:23 200:2
201:16 203:6
226:16,23
**given** 31:24 32:8
39:13 50:13,21
103:20 139:12
174:25 212:21
228:7
**gives** 83:14 84:25
85:8 86:1 90:3

Page 17

[gives - google]

152:15 155:4
190:8
**giving**  70:8 91:21
92:1 122:9 215:24
**gmail**  129:1,12
144:24 165:11,13
165:19,22
**go**  8:15 9:23 14:5
14:6 15:1 28:1
34:12,25 36:16
44:23 47:3 48:16
50:2 54:16 57:16
60:3 61:4 62:22
63:12 65:24 66:13
70:9 73:12 74:16
74:20 75:21 80:22
81:5 82:1,1,20
85:20 86:8 89:14
89:17 94:12 97:15
99:10 101:10,12
103:2,15 104:20
104:22 109:19
118:6 119:3,16
121:1 124:11,12
126:4 127:17
130:25 132:25
134:14 135:18
140:16 144:18
146:6 148:4,5,9
149:24 151:4
155:11 158:9
161:12,19 162:3
167:19 168:18
174:3 177:1 181:6
183:19 191:1,11
193:22 198:23
203:3,10 205:9,13
206:18,20 208:8
208:25 209:14
216:9 217:10
218:21 223:17

228:4
**god**  10:4,6 188:19
**godfrey**  3:4 9:13
9:15 223:19
224:19
**goes**  46:20 59:4
61:17 66:3 78:2
109:17 111:16,18
113:13
**going**  15:4 16:8,13
19:21 21:3 22:20
26:6,22 27:7,8,10
27:13,16,17,21
28:18 35:7 36:17
45:6,7 46:3,25
47:3,5,20 51:16,16
57:9,16 59:20
60:3,4 67:2 69:16
71:11 72:5,14
77:14 80:17,25
84:13,13 88:9
92:5,20 94:10
96:2 98:14 100:25
101:9 103:5 104:2
105:25 110:16
113:20 117:10
121:3 122:2
123:19 124:18
125:5,18 126:2
128:16,17 130:18
138:10,18 145:15
152:16 155:10,13
156:23 157:8,23
158:25 159:5
160:7,9 161:13
164:1 168:14
173:21 174:1
176:24 183:12,16
183:22 184:2
187:16 190:11,12
195:15 196:1

198:14 199:1
203:8,14 212:4,10
212:25 217:22,23
217:24 218:18
220:16 224:6
225:17 228:6
**goliath**  6:6,10
12:13 17:4 45:15
45:20 57:12 58:13
59:8 60:18 71:16
73:2 101:9 104:21
123:20 135:18
202:23
**gong**  44:23 45:3
**good**  8:6 9:9 10:17
10:18 11:2 25:4
37:20 42:22 55:3
58:3 72:23 73:3
76:9 80:14,18
86:10 87:21,22
101:8 104:6,6
107:1 128:7
130:25 164:10
215:3
**goog**  7:7,14 163:15
223:24
**google**  1:10 2:10
7:6,12,15 8:18
9:10 12:11 14:15
18:13,23 19:8,10
19:13,16 20:8,9
22:21 23:1,12,21
23:24 25:3,7 26:9
31:13,25 32:3,4,10
32:14,14 33:2,6,7
33:8 41:13,14,17
41:17,20,21 42:4
42:10 43:22 44:2
44:2,3,8,9,18
48:10,22,25 49:7
49:12 50:16,24

53:9 54:3,12,21,23
54:25 55:12,20,22
56:3,14,15 59:2
60:16 61:14,17,19
61:22 62:1,2,6,12
62:19,20,21 65:8
65:12 67:7,16,20
67:21 76:5,18
79:18 82:5 83:1
83:16,23 84:6,13
85:4,14,18 86:5,9
86:14 90:17 91:6
91:19,24 93:13
103:7,12,19 106:4
107:19,23 108:5
109:5,8,11,17,25
110:1,1,3,5,6,6,9
110:18,22,23
111:4,18 112:2,8
112:10,15,17,19
112:21,25 113:1,5
113:10,14,15,19
113:21,23 114:2,8
114:10,18 115:7
118:2,4,8 119:20
119:25 120:6,7,16
121:25 122:8,18
123:19 124:16
125:5 126:1
128:20,20,25
129:23 130:9,10
130:19,23,25
131:6,9 136:16,17
136:19 137:14,18
138:25 139:15,15
139:24 140:2,5,19
142:7,9,9 143:3,4
143:14,15,20
144:8,9,21 145:3,6
145:22 146:1,2,2,3
151:5,10 152:3,13

Veritext Legal Solutions
866 299-5127

[google - hard]

| | | | h |
|---|---|---|---|
| 152:21,25 153:6,9 | 223:3,6,10,14,19 | 222:19 225:8 | |
| 153:11,23 154:2,7 | 223:23 224:20 | 226:16,20 227:8 | **h**  233:3 |
| 154:10,12,19,23 | 225:24 226:4,17 | 227:15 | **habits**  66:14 |
| 154:24 156:6,13 | 226:23,25 227:6,7 | **gosh**  115:11 | **habitually**  190:14 |
| 157:6,20,20 158:2 | 227:18 231:4 | **government**  39:13 | **haimin**  4:24 |
| 158:8,12 159:21 | 233:1 | **gps**  191:24 | **halavati**  196:15 |
| 160:13,14,22,25 | **google's**  6:20 19:4 | **grammar**  81:22 | **halavati's**  144:1,5 |
| 161:4 162:16,17 | 19:18 21:25 22:22 | **great**  11:19 28:13 | 144:13 |
| 163:1,14 164:3 | 26:15 29:21 33:15 | 31:12 37:11 71:7 | **half**  25:22 27:2,4,9 |
| 165:4,14 166:2,11 | 35:20 41:21 53:10 | 89:6 130:13 132:5 | 27:9 93:20 187:9 |
| 167:1 168:25 | 53:12,16 54:2,5,10 | 165:10 | **halivati**  142:17 |
| 169:15,18 172:4 | 62:9 67:9,13 68:1 | **green**  22:15 | **hand**  9:25 103:11 |
| 174:5,19 175:10 | 68:2 75:4,17 | **group**  4:24 204:9 | 103:12 128:15 |
| 176:9 177:6,9,9,10 | 82:25 83:6 84:11 | **groups**  21:12 | 134:7 190:25 |
| 177:15,22 178:2,7 | 84:24 85:24,25 | **growing**  124:14 | 216:1 |
| 178:21,25 179:12 | 86:19 88:16 89:10 | 125:17,25 | **handled**  231:8 |
| 180:25,25 181:13 | 90:8,13,19 91:2,8 | **grudgingly**  105:12 | **hands**  132:11 |
| 181:14,21 184:22 | 91:24 92:1,21 | **guarantee**  77:13 | **hang**  22:6 177:2 |
| 186:1,9 191:23 | 94:1,16,21,23 95:6 | **guess**  52:14 53:11 | **happen**  44:1 82:14 |
| 192:16,25,25 | 95:15,24 96:17 | 55:19 57:13 77:17 | 117:12 213:1 |
| 193:4,7,10,12,13 | 98:6,10,22,25 | 85:7 86:17 87:9 | **happened**  51:10 |
| 193:17,18,24 | 114:1 136:22 | 88:12,14 89:25 | **happening**  105:20 |
| 194:1,3,4,6,8,13 | 137:4,6,8 140:9 | 93:24 97:4 98:14 | **happens**  116:21 |
| 194:18,21,21,22 | 144:22 146:10,14 | 104:9 115:4,16 | 122:24 150:9 |
| 195:2,8,12,13 | 147:4,14,14 148:6 | 116:7 122:21 | 208:7 |
| 196:7,19,21 198:2 | 148:11,23 149:3 | 123:1 129:18 | **happy**  105:1,10 |
| 198:4,4,11,16,17 | 149:15,25 150:11 | 144:11 152:4 | 119:15 123:21 |
| 198:24,25 199:6,8 | 150:18 155:24 | 162:1 175:17 | 163:3 |
| 199:9,10,15,16,17 | 156:1,17,19 159:6 | 183:13 184:11 | **hard**  12:24 13:1 |
| 200:7,12,14,15 | 162:6,16 165:9 | 185:11 189:19 | 16:13,17 22:16 |
| 201:16,19 202:24 | 166:9 171:22 | 194:20 219:22 | 34:4 43:5 50:9,10 |
| 203:15 204:13 | 179:17 180:4 | **guessing**  46:3 | 51:9 57:19 61:4 |
| 206:9 208:1 | 181:24 182:3,13 | 116:2 | 62:25 63:7,12 |
| 209:22 213:3,7,8 | 182:17 183:2 | **guest**  159:22 | 65:23 69:8 71:4 |
| 213:13,16,20,21 | 184:14,18 185:11 | 206:12 | 74:18 78:11,17 |
| 213:24,25 215:19 | 185:12 202:2 | **guy**  41:2 82:10 | 79:15 86:21 127:4 |
| 215:21 216:4,5,9 | 204:13 206:21 | 87:5 | 131:14 151:18,24 |
| 217:4,18 218:9,22 | 207:2 208:18,25 | **guys**  74:22,24 | 162:13 184:4 |
| 219:7,8,14,24 | 209:23 211:2,19 | | 189:19 190:17 |
| 221:10,15,17,19 | 212:12 217:6 | | 191:9,13 200:2 |
| 221:21,25 222:9 | 219:4 221:4 | | 217:20 |

Veritext Legal Solutions
866 299-5127

[harder - imagine]

**harder** 45:11 136:4 138:14
**hardware** 169:23
**harvard** 37:15
**haves** 120:5
**head** 54:1 110:14 128:12 169:20
**header** 140:24
**heading** 16:22 60:13 99:15 117:23 134:16 135:22
**health** 29:10
**hear** 117:9
**heard** 8:12 173:10 173:12 210:14 211:13
**hearing** 97:4 160:24 178:2
**held** 83:20 85:10 86:6
**hell** 103:5 117:10
**help** 10:4 23:17 63:25 64:9 73:15 89:7 94:6 181:22 196:2 203:8 213:7
**helpful** 59:25
**helplessness** 105:10
**helps** 136:11
**hesitant** 123:17
**hesitate** 51:18 66:6 90:11 132:12 160:2 223:9
**hey** 167:1
**hidden** 6:6,10 58:13 60:18 110:7
**hides** 43:6
**hiding** 66:14
**high** 106:16 152:12

**highlight** 81:22
**highlighted** 74:1 225:2
**highly** 34:15 35:8 35:12,20 36:2,22 186:5
**history** 69:23 71:24 73:22 74:9 78:11 83:14,15 84:5,14 175:5 188:15 189:9,22 189:24 190:3,4,8 198:10 216:12,15 216:17,19
**hit** 217:12
**hitting** 217:12
**hmm** 158:8
**hochman** 13:10
**hoffman's** 15:13
**hold** 40:21 93:2
**holder** 128:21
**holds** 99:6
**home** 187:3,20 195:4
**honor** 37:11 223:6
**honorary** 37:8,10
**hope** 57:23 58:18 58:20
**hopefully** 223:18
**hopes** 99:20
**hoping** 73:8
**horizontally** 160:4
**hosting** 56:15
**hour** 46:25 138:12 220:7
**hours** 138:11,13 138:13,13 180:20 208:5
**house** 27:19
**household** 134:8

**households** 133:9 134:17 135:5,6
**hsiao** 3:18
**http** 140:24
**huh** 61:21 66:1 69:6,9 74:19 76:14 83:8 94:24 108:2 111:1 117:24 119:1 120:25 124:13 127:7 129:2 131:5 140:18 148:20 158:22 161:7 162:25 165:24 168:23 171:21 174:7 176:6 191:22 192:14 225:22
**human** 117:25 118:3,4,9 179:7 186:4 207:13,18 207:24 208:3,4
**humanly** 89:23
**humor** 93:21
**hundred** 45:24,25 101:16,17
**husband** 130:3
**hypothetical** 113:4,12 188:23 189:17,22,23
**hypotheticals** 190:17

**i**

**ian** 3:5 9:13 117:7 220:12 231:1
**icon** 166:13,22 167:1,4,7,8,14,20
**iconography** 166:18
**icrosby** 3:9 231:2

**idea** 26:22 42:22 79:20,22,24 186:24
**identifiable** 144:24 145:4,9 192:17 193:1,6
**identification** 16:11 58:15 60:20 71:1 73:1 75:19 133:20 163:16 184:8 223:25 224:21
**identified** 6:3 115:6 174:8,10
**identifier** 185:18
**identifies** 132:16
**identify** 67:2 113:23 114:3 116:25 132:14,15 132:17,21,22 170:17 181:22 185:16 188:8,11 188:14 189:4 190:5,5,9,21 191:3 192:8 194:21 199:6
**identifying** 114:8 170:8 197:15 219:25
**identities** 115:10 115:15,18 116:15
**identity** 107:4 110:17,18 111:19 111:25 112:4,4 113:2,6,16 114:6 115:2 117:1,4,15 168:11 201:1
**ids** 110:5
**images** 167:11
**imagine** 52:20 128:18 138:10

[imagine - information]

188:24
immediately  132:7
impacts  204:12
    209:22
implication  77:8
    95:5,14 98:24
    134:16,23
implications  99:16
    102:3
implies  39:12
    40:11 52:9 70:6
    84:13 103:20
    127:6 159:13
    176:17
imply  106:1 221:8
    221:13 222:5
implying  86:23
    92:4 172:19
important  35:2
    41:2 98:3 188:3
imposes  148:21
imprecise  142:21
impressed  71:6
    189:20
impression  144:7
    157:24 158:1
    204:14 209:2,24
    212:13
inaccurate  87:24
    159:11 172:14
    178:25 197:10
inactivity  180:21
inadequate  146:11
    147:5 148:7,12,24
    149:4,6,7,10,13,15
inapplicable
    117:17
incent  141:13
incentive  19:8
incentives  18:15

incentivize  22:11
incident  174:24
    176:18
incidental  172:10
include  47:16
    64:12 177:22
    188:18 193:5
included  33:15
    34:13,25 35:6
    70:19 231:14
    232:3
including  9:6
    19:17 41:13 93:12
    130:12 140:23
    169:4 177:8
    218:23
incognito  6:20
    23:13,16,25 24:22
    24:24 25:11 30:24
    31:6,12,20 48:5,10
    48:21 49:2,5,13
    53:9 55:10 73:20
    74:8 75:4,17 76:4
    76:16 77:9 78:10
    78:19 83:15 84:5
    84:14,25 85:2,14
    85:17 86:1,2
    88:25 89:21 90:3
    90:9,14,15 91:3,4
    91:13 92:14,23
    93:3 104:11,15,17
    106:19,20,23
    107:4,8,11,17
    108:8,18,22,23
    110:16,19,22
    111:13,15 112:7
    113:12 114:6,9,13
    114:24 115:6,15
    115:19 116:16
    117:16 118:3,9
    122:2,6,13 123:10

124:18 125:5,18
    126:2,15 127:2
    137:25 139:1
    141:3,16 143:15
    156:14 158:1
    160:14,20 161:1
    162:9,18,24 164:5
    164:17,21 165:1
    166:5,10,12,14
    169:13,14,16,19
    170:4,7,9 171:3,12
    171:24 172:20,23
    173:6,8 174:25
    175:8,11,12,20,21
    175:24 176:2,5,10
    176:17,18 177:12
    177:17 179:1,13
    204:13,18 205:2,5
    205:21 206:3,12
    206:22 207:2
    208:16,19 209:1,5
    209:23 210:3,8,12
    210:21 211:11
    212:12,15,17,23
    215:25 217:18
    218:8,23,24,25
    219:4,8,9,13,16,25
    220:4 221:8,14,24
    225:4,10,12,14,15
    226:12
incoming  218:24
incomplete  185:9
inconceivable
    47:18 48:15
inconsistent  28:9
    203:13
incorporate  97:1,7
incorrect  13:22
    79:9 172:19 185:6
    185:9

increase  22:11
increasing  125:9
independent  77:21
indicate  127:14
    128:5
indicating  12:10
    13:9 70:3 112:10
    125:16,19,24
indication  98:24
individual  79:16
    92:10 114:9
    122:10 130:12,14
    132:15,17,21,25
    158:21,24,24
    172:5
individual's
    192:15,24 193:18
individually  1:6
    2:6
industry  22:13
    80:11 81:12 83:23
    179:23 180:10
    207:11
inescapable  19:16
infer  193:20
inform  84:11
information  19:17
    20:10 24:19,20
    29:11,23 30:4,5
    32:3 33:21 44:19
    51:14,25 52:12
    53:6 54:14,22
    55:21 61:18 62:2
    62:9 70:9 83:2
    94:17,22 95:7,16
    95:25 97:20 98:23
    99:1 105:1 109:11
    109:16 110:10,21
    111:5 127:22
    128:3 130:11,14
    144:9,24 145:9

[information - job]

151:15,20,21,22
156:1,19 157:20
159:18 160:19
162:12,14 169:1
180:24 182:10
186:10 190:8
191:13 192:18
193:1,7,8,11 194:2
194:7,22 195:10
195:13,18 198:3
198:17,24 199:4,7
199:17 201:16,20
213:9 217:7 219:7
219:8,9 220:4
222:1,21 225:20
226:18
**informed**   18:4
80:9 81:11
**infrastructure**
19:17 120:24
**ingredients**   29:10
**initiated**   146:1
**initiates**   111:12,15
**inrupt**   40:22,23,24
41:4,5
**ins**   64:2,12,17,19
65:6,8,10,10,12
82:11 203:18
**inside**   25:7 41:21
**insistent**   203:13
**inspecting**   169:4
**inspection**   175:7
175:23
**installation**   56:13
**instructed**   5:14
**integrity**   40:17
**intelligent**   180:18
**intended**   25:1,15
31:14 45:8
**intender**   52:9,10

**intent**   50:7 51:13
51:24 52:2,3,9,12
52:17 53:4,5,8,10
53:12
**intention**   51:8
54:3,3
**intentionally**
197:6
**intents**   191:25
**interested**   9:3 35:8
230:18
**interesting**   25:2
60:2 105:24 120:3
121:25 122:4
156:22 214:21
225:6
**internal**   19:10
25:3 32:14,14
33:6,7 114:1,18
131:8,9 185:11,13
193:24 196:19,21
**internationally**
38:24
**internet**   8:11
18:16,22 19:9
20:25 30:5 39:5
43:7 51:4 56:4,22
59:11 64:4 66:15
89:1 105:9 110:22
118:17 120:11
124:15 125:10,25
127:18 130:7
136:14 139:18
140:20 187:18
188:15 191:10
203:12 214:23
215:5
**interpret**   28:25
29:21 30:23,25
88:24 94:15,21
95:4 96:8,21 97:3

98:6,10,16,21
113:20 158:3
**interpretation**
28:8,8 90:10
91:21,23 96:24,25
**interpreted**   90:8
90:13 91:2,10
95:6,15,23 98:25
**interpreting**   41:20
**interrupt**   48:19
**interrupted**   82:1
167:24
**interruption**   15:9
178:3
**intersection**   39:7
**interview**   191:11
**interviewed**   201:4
**intimate**   7:3 59:2
59:23 104:24
133:4,18 134:2
**introduce**   224:6
**introduced**   224:23
**introducing**
224:14
**invading**   36:9
**invasion**   34:16
35:9,13,21 36:3
128:24 129:4
131:22,25 132:8
**invented**   41:1,2
**investigate**   184:14
184:18
**investigation**
190:12
**invisibility**   168:3
**invisible**   167:22
**involve**   197:16
199:18
**involved**   21:14
47:22 48:4 49:4
50:19 55:10,16,24

56:19 57:2
**iot**   30:21
**ip**   43:13,16 109:6
186:10,13,19,20
186:21,25 187:2
187:16,21,22,24
188:25 189:3
190:20,20,25
191:7,9,17,24
192:3 196:3
199:24 214:8
215:5
**ips**   189:12
**isolated**   78:12
**isolation**   211:5
**isp**   102:17 123:11
123:18
**issue**   20:10 23:2,6
33:16 42:1 43:23
54:20 65:16 66:5
80:6 81:9,20
89:20 96:24 98:3
108:12 140:8
141:10,15,17
147:10,11 194:3
197:5,12,13,18
206:1 215:8 218:7
**issued**   151:2
**issues**   18:6,10
21:16 33:15 35:2
35:3,6 36:1 47:14

**j**

**jacket**   57:12,14
58:7,11,18,22 59:7
**japan**   101:18,25
**jen**   71:22 175:3,19
175:19 176:13
**jeremy**   1:5 2:5
**job**   1:25 76:9
131:16 231:5
233:2

**john** 4:4 9:20

**join** 136:19 137:15
138:14 144:7
194:1,6,21 195:12
198:2,16,24 199:7
199:16 200:9,14
200:21,22,25

**joinability** 186:9
188:3 195:2,9,10
196:5,18 197:13
197:18 198:8,9

**joined** 9:10 137:19

**joining** 195:3,3
197:16 199:18

**joins** 200:5

**joke** 73:5

**jose** 8:20

**journal** 7:1 133:17

**judged** 149:19

**judgment** 127:6

**julia** 145:3,14

**julia's** 145:10

**july** 1:18 2:19 5:4
8:1,8 75:7 230:21
231:3,5

**jump** 35:7

**jumping** 164:2

**june** 156:10,11
180:17 181:1,7
221:5

**justice** 119:22
120:2

**jyanchuis** 4:8

**k**

**karen** 7:4 133:2,19
134:3

**keegan** 14:7 21:19

**keep** 34:25 57:16
73:21 74:8 77:13
99:4 102:8,10,11
130:23 174:4,4

202:20

**keeping** 40:2,5

**keeps** 176:15

**kennedy** 37:15
214:25

**key** 169:20,25

**kicks** 119:11

**kidding** 220:10

**kill** 6:18 12:14
45:16 46:1 72:16
72:17,18,25 73:9

**kind** 10:25 18:24
27:21 33:23 39:10
41:2 46:7 60:1
70:12 79:15 84:23
97:9 103:14,25
114:23 163:6
195:18 198:11
199:4 200:22
207:14

**knew** 50:22 53:20
56:10 59:18 67:9
67:14,19 68:14
120:13 136:18
144:8 175:4 182:6
183:13

**know** 13:3,16
14:16 19:5 21:4
22:14,20,21 24:5,6
24:7,11 25:22
27:17 28:20 29:6
29:14,20 30:19
31:9,15 33:22
34:1,22 36:7
38:14 39:5 40:14
40:19 41:5 42:16
42:25 43:4 44:11
44:17,18 45:1,2,7
45:19,21 46:7,18
47:24 49:11 50:8
50:19 52:21,24

53:12,25,25,25
54:2,4,6 56:2,5,6
60:16 61:4 63:2,8
63:9 64:18 65:5
65:10,13,25 66:2
67:22 68:5,5,22,23
69:16 73:4 77:11
77:12,23,24 78:1
79:3,14 80:10,17
81:11 82:22 83:3
83:19 84:22 87:3
87:7,10,12,14,16
88:4 89:3 91:15
93:7 96:13 97:16
97:23 98:15 100:6
100:7,15 101:5,11
103:2 105:5,11,25
106:15 109:7
110:13 111:5,7,8
111:18 113:2,7,15
113:18,25 114:3,4
114:8,15,15,20,22
115:5,13 117:6
120:4,8 123:14
127:10,22,25
128:5,15,15,21
129:19 132:1,4,6
132:11 136:17,18
140:5 141:11,15
141:25 145:16
147:7,20 148:5
149:19 150:15
152:14,15,18
154:13 156:13
157:6,9,19 158:14
158:16,17 160:2,5
160:7,8,16,19,24
161:6,8,10,18
165:25 166:6
167:1,5,11,11,12
168:13,17,18

172:4,7,7,12 173:7
176:4,7 179:4
181:4,5,14 185:25
186:3,7 189:8,9,19
190:9,11,12,17
191:4,5,5,6,14
192:10 193:3,4,20
194:25 195:8
196:16 198:8
200:1,7,11,14,15
200:16,16,18
201:14,15 203:24
203:24 204:3
205:18 206:3,7
207:10 208:7,8
211:12,25 214:19
214:25 215:11
217:20 218:1
219:15,20 223:9
225:12 227:3,12

**knowing** 34:3
66:11 67:24 77:25
79:14 106:1
198:11

**knowledge** 18:21
20:16,17 30:7
68:8 87:14,25
88:19 154:25
169:3 198:10
207:7

**known** 69:5 76:3
76:13,16 77:10
95:3 107:5 117:1
181:9

**knows** 19:3,5 39:4
58:24 59:2 111:24
112:4,4,5 114:4
138:12

Veritext Legal Solutions
866 299-5127

[lab - look]

**l**

**lab** 30:22
**label** 29:9 30:18
  97:16
**labels** 97:17
**laid** 160:1
**language** 33:22
  52:5,14 58:10
  59:7 62:23 63:7
  87:1 92:11 97:9
  97:11,11,17
  100:25 222:23
**languages** 213:14
**laptop** 189:1,11
**larger** 179:5
**lasinski** 15:19
**late** 120:10 188:22
  219:20
**latest** 189:1,1
**launch** 122:6,13
**launched** 145:6,22
**launches** 113:12
**laurie** 6:22 75:18
**law** 148:19
**laws** 151:9 229:2
**lawsuit** 20:11 49:3
**lawyer** 36:6
**lawyers** 16:5
  74:21 96:23
**lead** 92:15,15,23
  169:8 204:15
  206:14,23 207:3
  208:19 209:2,25
  212:14
**leads** 208:1
**learn** 56:8 68:19
  158:18 191:12
  213:23
**learned** 55:6,15,23
  55:25 136:17
  158:18 182:7,10

198:12
**learning** 132:23
**leave** 157:23
**leaving** 175:6
  190:2
**lee** 41:1
**left** 134:6,7 216:1
**legal** 8:24 9:1
  34:19,22 35:13
  36:4,7,13,24
  148:12,15 149:4
  179:25 180:4
  228:9 231:7
**legit** 111:10
**legitimate** 170:24
**length** 40:8 149:18
  149:20 151:13
**leslie** 1:24 2:20
  8:25 230:4,25
**letters** 63:23
**level** 45:4 183:5,12
**levy** 7:4 133:2,19
  134:3
**liberty** 119:22
  120:1
**lie** 73:19 74:2,7
**life** 119:13
**light** 155:20
**lightbeam** 64:4
**liked** 101:5
**limit** 78:8 167:3
  202:2 222:24
  227:9
**limitation** 19:18
  192:11
**limited** 138:19
  140:14 141:8
  180:19
**limiting** 44:6
**line** 76:23,24 77:3
  231:15 232:4

233:4,7,10,13,16
  233:19
**lines** 41:25 77:2,3
  120:8
**ling** 4:23 9:12
**link** 78:22 111:25
  112:3 172:5 174:5
  213:24,25
**linkable** 143:16
**linked** 172:21
  173:7,8
**linking** 137:23
  171:25 173:3
  176:19
**links** 213:13
**linux** 39:6 41:5
**list** 14:5,6 21:8
  64:24 110:14
  123:15 147:8
  169:9
**listed** 180:6
**listing** 92:1
**lists** 24:19 216:2
**literal** 211:23
**litigation** 46:15
  54:18,20,25 55:6
  55:13
**little** 46:8,25 60:11
  72:15 78:3 92:6
  92:20 94:6 144:21
  155:21 161:13
  164:7 174:2 226:7
**living** 134:7
  217:25
**llc** 1:10 2:10 8:19
  231:4 233:1
**llp** 3:4,17 4:12
**load** 57:8,9 60:11
  70:22 71:10,11
  72:5,13,14 133:23
  163:11,13 184:4

**loaded** 71:3 73:6
  134:1
**loading** 74:15
**local** 71:24 85:18
  89:1,22 90:9
  91:13 226:11,22
  227:9
**locally** 48:7 49:6
  49:10,17 50:6
  51:14 52:1,13
  53:7 66:10,22,24
  68:12,16 70:3
  216:12
**locate** 58:10
  145:20 146:8
**location** 58:23
  127:25 132:6
  199:24
**locked** 231:12
  232:1
**log** 43:2,3 111:16
**logged** 43:3 67:1,4
**logger** 169:21
**logging** 110:6
**logic** 99:6
**login** 110:6 144:25
**logs** 107:18 143:15
  144:9 218:24
**long** 15:18 29:24
  30:2,3 70:15 76:3
  76:13,16 77:10
  134:11 149:13,16
  151:14
**look** 14:10,12
  15:22,25 16:3
  20:1 24:3 25:4
  30:7,10 43:17
  44:23 71:18 75:23
  77:3 82:19 83:5
  88:18 89:18 96:19
  114:15,20 129:17

Veritext Legal Solutions
866 299-5127

**[look - mean]**

138:8 141:18,21 165:16 168:22 171:5 172:18 179:10 180:13 187:1 198:20 200:5 205:14,15 205:18 216:18,21 220:25 222:14,15

**looked** 15:17 66:4 98:17 177:25 200:8

**looking** 26:1,9 30:3 45:1 94:23 163:6 176:12 178:10 187:7 190:13 195:8 211:22,22 213:21 222:2

**looks** 84:22 87:20 152:2 156:10 200:24

**loose** 70:10

**loosely** 204:4

**lori** 75:3,4

**los** 4:16

**lost** 109:20 115:11 115:21

**lot** 14:11 25:3 30:16,22 32:13 37:15 40:20 45:7 54:5 61:18 62:2 67:5 97:16 103:6 105:14,20 113:4 114:18 120:4 123:25 125:13 136:17 138:23 139:25 152:17 153:14 160:25 172:10 176:13 177:8 182:7 183:3 183:13 186:6

190:16 195:2 197:15 198:8,9,10 200:3 204:7 208:7 214:17,19,22,24 227:3,12

**lots** 30:15 50:10 63:25 64:9 154:13 199:9

**lousy** 22:12

**love** 74:23

**lowest** 29:17

**lukasz** 77:21,23

**lunch** 80:16

**luxury** 119:9

**m**

**m** 6:16 69:19 70:25

**mac** 189:1

**machine** 71:24 78:8

**magically** 189:10 218:3

**main** 78:9

**major** 140:22

**majority** 27:14 28:6,7,21,21 204:5

**making** 42:25 44:22 121:20,23 121:23 127:6 173:5 226:4

**mall** 187:23

**manage** 162:17 163:24

**manager** 109:12 139:16

**mandated** 148:19

**manipulate** 22:10

**mao** 3:18 9:17,17 223:22

**marin** 230:2

**mark** 3:18 9:17,22 16:8,14 21:19 60:4 223:20 224:18

**mark's** 71:9

**marked** 11:18 16:11 58:15 60:20 60:24 71:1 72:25 75:19 133:20 163:15 184:8 223:25 224:21

**market** 64:18 215:11

**marketers** 37:23 59:21

**marketing** 37:16 37:20 38:2,5 59:20 68:1 72:19 114:13 171:2

**mask** 43:10,16 214:8 215:5

**masking** 43:12,13

**masks** 43:16

**mass** 63:25 64:10

**massachusetts** 1:17 2:17 8:1

**master's** 37:2

**match** 73:10 183:15

**matching** 181:22 199:20

**material** 17:3,5 68:22

**materials** 47:15 183:7

**mathematical** 39:4,20

**mathematically** 42:22

**mathematics** 27:5

**matrix** 160:9

**matter** 8:18 10:3 52:7 135:4 148:12 148:15 186:4 189:21 190:7,8

**maximize** 18:15 19:8

**mean** 17:15,16,22 19:3 20:24 24:1 26:8,20 28:5,9,11 28:11,12,25 29:3,5 29:11 33:18 36:12 37:21 38:22 40:2 40:12 41:19,21,24 47:18 48:18 52:2 53:15 54:11 59:15 59:16 62:14 66:3 67:22 68:16 69:21 70:7,18,21 77:13 78:1 82:9,14 84:19 86:21,22 87:4 88:4,25 89:25 90:2,8,14 91:12 93:12 94:3 96:13,14 97:9,14 97:15 98:14 100:5 100:10,12,12 101:5 113:10 115:5 117:3 118:19,24 119:8 121:19 122:22 126:14,17,23 127:13,13,16,22 132:23 134:24 135:1 136:24 138:7,9 139:19 142:6 147:19 148:14,15 153:14 154:4 159:9 160:11 161:9,14 167:21 168:4,7

[mean - modified]

169:17 180:24
183:11,14 191:9
197:12,21 200:22
203:24 211:18
213:21 216:8,15
217:23 218:2
220:10
**meaning**   39:25
41:17 78:11 99:19
99:24,25 100:4,4,6
100:18,24 102:7
106:20,23 138:12
171:3 192:8 204:4
**meanings**   59:21
99:16
**means**   26:22 35:25
49:11 74:14
158:17 168:10
169:3 177:16
193:21 202:2
**meant**   33:20 59:22
113:8 137:17
161:14 221:19
**measure**   104:17
105:24 137:2
139:5 153:17
**measuring**   38:10
**mechanism**
212:25
**media**   8:16 228:8
**meet**   227:25
**mellon**   30:16
87:13
**member**   41:7
194:10,13,18
**members**   32:2,11
32:17,18 79:25
80:5 81:8,19,25
82:4,18 83:3,20
195:13

**mention**   64:13
110:11 156:13,25
196:7 213:9
**mentioned**   13:5
22:3 40:1 87:13
88:2
**menu**   141:2
**message**   167:5
**messages**   171:2
**messaging**   90:20
91:9
**met**   77:24 84:22
84:23
**method**   195:12,19
198:16,23 199:1,6
199:14,16
**method's**   195:15
**methodologies**
95:2
**methodology**
17:10,15 18:18,20
19:20
**methods**   199:9,18
**microphone**   117:8
**microsoft**   141:24
141:25
**middle**   44:21 45:3
76:24 77:4
**mind**   9:19 27:7
29:15 132:3 144:4
154:15 164:11
167:18 209:19
**minds**   216:10
**mine**   13:8 98:20
136:20 152:10
224:12
**minimal**   202:15
**minimum**   152:15
218:8
**minion**   168:13

**minions**   168:14
**minor**   203:14
**minute**   47:1 80:23
93:19 173:18
183:18,19
**misleading**   89:13
167:2 171:3
**mispronounce**
73:4
**misrepresented**
23:12
**missed**   95:11
**missing**   135:3
**mistake**   97:7
156:21
**mister**   10:21,21
**mixed**   128:9
**mmao**   3:22
**mobile**   19:19
187:16,20
**mode**   6:21 20:9
23:13 24:24 31:6
31:13,20 47:17
48:5,6,10,21 49:2
49:5,9,13,17 50:5
50:8 51:25 53:23
55:11 56:22,23
57:4 59:17 66:17
66:19 68:11 69:23
71:23 73:20 74:8
75:5,17 76:6,19
78:10,20,21 79:18
82:7,11,18 84:25
85:17 86:1 88:25
91:3 92:14 104:11
104:15,17 107:9
107:11,17 110:23
112:12,24 113:15
115:6,15 116:16
117:17 120:1,7,17
123:10 126:15,16

126:24 127:2,9,15
128:7 139:2
140:13 141:3
143:15 154:18,21
155:5 156:14
158:1,11,12,14,25
159:22,22,23
160:5 161:1
162:19,24 164:5
164:17,21,22
165:1 166:5,14
170:22 171:4,13
171:24 172:20,23
174:6,20 177:17
177:17 179:1
199:22,22 200:23
201:5 204:14
205:2 206:3,22
207:2 208:19
209:1,24 210:8
212:18 217:18
218:8 219:4,14,15
221:8,14 225:4,4
225:10,12,15,16
**model**   18:22,24
19:4,6 44:24
136:23
**modes**   33:16 50:15
51:4,13 53:5,5,13
54:19,23 55:11,23
67:15,20 77:18
78:7 83:20 107:14
107:15 121:12
128:4 139:2 141:7
141:9 159:21
160:6 162:8 165:5
171:3 184:23
206:11 225:9
226:12
**modified**   7:13
223:24 224:12

Veritext Legal Solutions
866 299-5127

[moment - object]

**moment** 128:1
135:19 222:15
**monday** 1:18 2:19
5:4 8:1
**money** 18:23
**monique** 1:6 2:6
**monitor** 64:3
**montgomery** 3:19
**month** 214:12
**morgan** 4:3,3 9:20
9:20
**morning** 8:6 9:9
10:17,18
**mortgage** 28:15
**move** 36:19 99:9
**moving** 96:4 177:4
**mozilla** 181:7
**muddled** 154:5
**multiple** 136:3
191:16
**mute** 47:4 170:13
**muted** 212:20

**n**

**n** 5:1
**name** 8:23 125:11
125:22 230:20
**names** 144:23
**narnia** 145:22
**near** 217:3
**nearby** 11:23
**necessarily** 70:7
102:24 110:21
122:7,14 130:21
135:6,7 188:10
**necessary** 123:7
123:22 140:20
151:6 204:17
206:24 207:4
208:2,21 209:4
210:1 231:14
232:3

**need** 11:21 42:7
46:12 57:22 100:8
111:5 117:25
118:3,4,9 119:6
129:19 133:8
138:8 141:21
148:25 150:17,20
151:14 169:12
206:15 208:12,15
214:10 220:12,14
**needed** 12:16,19
17:6 152:14,15
212:17
**needs** 159:25
177:24
**neighbors** 103:19
**neither** 57:5
159:17 230:16
**nelson** 16:1 116:4
116:10 174:9
**nelson's** 201:3
**network** 39:21
40:2 42:20 43:11
185:15 192:12
**never** 46:19 56:10
73:19 74:2,7
77:18 82:11,12
144:4 171:11
210:11,12,12
211:24
**new** 3:13,13 42:24
43:3,9 44:5,6,7,10
44:11,17 56:8
62:18,19,19,21
67:1 76:4,17
108:16,23 109:14
111:16,18 113:1
113:13 123:18
125:12 128:10
145:7 171:23
189:11 206:10

212:23 224:2,14
**newspaper** 43:10
**nice** 120:5,11
165:25
**nitpicky** 164:7,10
164:13,14
**non** 24:8 32:4
54:23 55:22 56:23
67:21 110:23
130:10 137:23
168:25 177:9
180:25 192:16,25
193:18 195:6
**normal** 78:12,21
78:23 172:23
177:17
**normally** 22:17
**north** 4:5
**northern** 1:2 2:2
8:19
**notating** 231:15
232:4
**note** 8:9 70:3,12
73:13,15 74:20
151:4
**noted** 228:10
**notepad** 12:18
**notes** 69:7,13
70:20 73:7 115:21
115:22
**notice** 7:12 146:11
147:4,14 148:6,11
148:23 149:3
150:2,21 204:23
205:1,19 206:3
207:17 208:11,14
209:11 212:13
223:23 224:14
**notice's** 210:7
**noticing** 9:8
120:24

**notify** 146:1
**notifying** 145:7
**nsa** 131:15
**nuance** 35:5
**nuances** 101:1
186:6
**number** 6:3 8:20
16:25 23:16 26:11
46:21 73:14 89:18
99:12 105:16
169:9 202:5
223:21 228:8
231:15 232:4
**numbered** 176:13
**numbers** 57:20,25
58:1,4 146:7
**nutrition** 30:18
**nutritional** 97:16
97:17

**o**

**oakland** 1:2 2:2
**oath** 230:8
**object** 18:7 21:2
26:5,17 29:25
32:21 34:2 36:5
38:18 44:14 48:24
50:17 51:6 67:18
79:21 80:1,8 84:9
84:23 99:3 109:1
110:24 111:21
113:3,17 116:18
125:7 147:17
148:13 154:9
175:15 176:11
177:7,23 178:8,15
179:2,8,19 180:1
181:3 182:14
183:10 185:7,24
186:14 187:5
188:12 189:5
190:6,23 191:18

[object - omission]

192:6 194:11,24
195:21 197:11
202:11 203:22
206:5,17 207:8
209:13 210:10,19
212:19 215:10,15
215:20 217:21
218:10 219:5,19
220:1 221:16
222:7,25 223:8
226:24 227:17
**objected** 170:14
**objection** 25:20
88:13 199:11
227:11
**objections** 9:4
89:11 230:9
**objective** 146:21
146:23,24
**observation** 93:12
93:13 102:25
116:21
**observe** 120:10
**observed** 117:19
127:19
**observing** 161:11
**obtain** 42:4
**obviously** 36:21
**occasionally**
152:10 197:25
**occurred** 56:21
**occurs** 57:3
108:21
**oddly** 27:19
**odds** 165:9
**offense** 46:23
**offensive** 34:15
35:9,13,20 36:2,22
**offer** 35:19 66:6
78:3 122:17 153:9
182:12

**offered** 36:23 38:1
225:24
**offering** 122:20
**offers** 115:2 153:6
153:11
**offhand** 120:8
**office** 231:11
**offices** 41:21
**oh** 46:18 52:4
59:13,14 63:16
70:23 177:3
182:22 188:19
196:11 203:10
217:10 218:15
**okay** 10:22 11:2,6
11:14,19,25 12:2
12:12,20 13:13,24
14:4,13,17,20,22
15:15,23 16:1,4,8
16:14,24 17:7,10
18:5,12 19:7,15
20:7,7,14,23 21:11
23:1,20,24 24:21
25:9 26:3,11,20
28:3,23 29:19
31:11,19,24 32:8
33:9,11,24 34:5,11
34:23 35:12,16,23
37:2,10,12,18 38:1
38:4,15 39:1 40:1
40:21 41:23 43:19
45:12,16,19 46:1
46:25 47:13 49:4
49:14,25 50:14
51:15,20,24 52:6
54:16 55:5,15
56:2,7,19 57:2,8
58:6 59:10,10,14
59:15,25 60:15
61:7,12 62:5,11,22
62:22 63:11,21

64:19,23 65:2,5,18
66:8,13 68:19
70:22 71:18,22
72:4,13,14 73:6,16
73:19 75:7,13
76:2 77:5,7 78:2
79:6,10,16,24 80:4
80:14,19,23 82:1,6
82:13,16,24 83:8
84:2 87:9 88:2,12
88:20 91:10,16
92:13 93:8,17,21
94:5,10 97:22
98:9 99:9,10
100:2,3,17,23
101:9,22 102:13
104:20 105:6
106:14,17,19,23
107:8,17 108:11
108:21 109:3,13
109:19,24 110:15
111:11,14 112:6
112:21 113:9
116:3,6,13 117:22
118:11 119:14,19
120:22 121:2,11
122:11,17 124:10
125:2,15,21 127:1
127:7 128:4 130:6
130:22 131:24
132:14 133:22
134:5,12,16 135:4
135:9,17 137:10
139:21 140:19
141:7,25 142:3,15
142:15 143:9,14
144:4,17 145:18
145:19,25 147:12
147:23 148:3
149:22,25 150:13
150:20 151:9,13

152:2,6,8,11,18,21
155:11,22,24
156:10 157:25
158:7,22 159:5,16
162:21 164:1,12
164:23 165:10
166:8 167:3,20,20
169:12,17,22
170:3,6,12 171:20
172:9,12,18
173:16 174:14,16
175:3 176:6,25
177:3 178:11
179:9,12 180:11
180:11,15 181:6
181:18,20 182:9
182:19 184:10
185:1,10 186:13
186:19 187:2,8,12
188:20 190:19
191:7 192:13,13
192:23 193:5,16
194:19,25 195:7
195:22 196:20,23
198:1 199:15
200:4 201:7,7,25
202:13 203:3
205:19,25 207:15
207:19 210:20,25
211:11 213:23
214:6 215:13
217:2,15 218:6,15
218:17,20 219:13
220:15 221:3
**old** 176:23
**older** 156:24
**oldies** 72:6
**olejnik** 77:21,23
**olson** 4:14,18 9:11
**omission** 157:15
157:17 159:19

[once - paragraph]

once  222:2
one's  87:10 160:7
  176:24
ones  64:21,24
  78:12 104:6,6
  123:16 156:24
  199:10 214:25
  215:1,2
onion  42:18
online  38:13,16
  47:15 58:24 78:9
  124:18 125:5
  126:2 138:16
  166:15 169:5
ooo  8:3 228:11
op  171:23
opaque  45:4
  196:16
open  11:11,12,13
  11:14 154:16
  175:13 176:15
  189:11
opening  14:9,13
  16:9 74:16 196:11
  220:25
opens  108:1,14
operating  19:19
  184:21,23
opine  28:23 35:18
  57:14 93:25 94:1
  94:20 96:5 98:5
  152:21 179:12
  207:1 209:9,20
opining  32:10,17
  32:18,20 33:24
  82:17 85:9 86:6,8
  125:4 148:23
  149:2,3 185:5
  207:11 210:5
opinion  17:11,12
  18:12,13,19 19:15

19:15 20:7,7,14,21
21:11,16,18,21,24
22:5 23:1,20
24:21 25:10,16
31:19,24,25 32:6,9
32:13,16,25 33:1
64:8 66:6 80:3,5
81:7,19 84:15
85:11 86:19 88:23
93:5,14 95:4,20,23
103:10 117:14
122:9,17,20 127:2
146:10 147:15
149:8 150:17,20
152:25 171:1
184:11,12,13
194:6,20 196:20
198:6 208:18,25
215:17 218:17
219:17 221:13
226:20
opinions  16:19,21
  17:2 18:5,8,11,20
  31:22 35:19 36:10
  36:23 38:1 50:23
  80:9 81:10,24
  82:3,4,5 86:12,13
  86:14 185:2
  214:24 221:8
opposed  12:24
  13:4 39:3,5 100:4
  148:15 217:24
opt  213:3,7,17,20
  213:24 214:1
option  66:9,21
  68:11 70:2 153:23
optionals  120:5
options  22:19 78:7
orbit  48:16
ordinary  78:21
  109:25

organization
  160:3
orient  60:12 61:6
  61:6
orienting  76:9
original  231:10,21
outcome  9:3
  230:19
outside  13:21
  36:25 169:18
overcome  204:1
overwhelming
  18:14 19:8
owner  129:23
  170:18
ownership  41:3
oxford  99:21
  107:3

**p**

p  3:11
p.m.  2:18 47:6,9
  81:1,4 121:4,7
  127:23 155:14,17
  173:22,25 183:23
  184:1 212:5,8
  220:17,20 228:7
  228:10
pachai's  172:12
packaging  29:9,10
page  16:18 46:18
  46:21 57:24 58:4
  58:5 61:8,10 62:9
  69:7,11,13 71:18
  73:13,14 76:3,10
  76:24,25 77:16
  99:12,13 123:21
  124:5,21 130:7,8
  133:6 134:5,7,11
  134:14 135:19,20
  162:1,10,15
  163:18 174:16,17

175:19 176:12,13
203:3,4 213:25
231:15 232:4
233:4,7,10,13,16
233:19
pages  1:25 60:12
  213:14,16 214:22
  230:13 231:14,17
  231:17 232:3,6,6
paid  131:17
pairing  166:12,21
  167:12
paper  7:2 133:18
  190:25
paperback  57:19
paragraph  33:11
  38:23 40:21 47:11
  54:16 61:13 63:19
  63:22,24 69:1
  71:19 73:12 74:20
  77:17,17 78:15
  79:2 83:5 89:7,8
  92:21 94:12 99:22
  106:24 117:22
  118:13 121:9
  124:12,25 126:23
  131:3 133:1 138:4
  139:8 140:16,16
  142:7,14 143:1,11
  144:18 146:7
  149:22 152:18
  155:19,24 159:5,6
  159:11,11 161:25
  162:19 163:19,20
  164:2,6,9 165:7
  166:7,9 168:22
  171:20 172:17
  174:2 175:19
  177:5 180:15
  181:19 184:12
  185:1,10 186:8

Page 29

[paragraph - photocopy]

188:2 191:20,21
192:13 196:10,18
196:21 198:2
201:25,25 203:8
204:10 207:25
208:22 209:21
210:18,23 211:2
211:17,19 213:2
214:3,7 216:24
217:2 218:19,21
220:25 222:15,16
225:17 226:14
**paragraphs** 86:18
98:17 117:20
221:3
**parallel** 90:22
**parallelism** 91:17
**parallels** 91:18
**part** 10:6 14:22
18:9,25 40:4
49:22 70:4 93:4
96:20,21 98:9
109:2 115:5
140:20 176:9
191:13 204:9,23
**participants** 8:12
**particular** 24:13
30:20 87:19 94:3
131:10 166:22
167:8 176:1 188:8
211:23,24
**particularly** 170:7
**parties** 8:15
**partly** 226:6
**parts** 111:6
**party** 9:2 52:23
78:15 169:22
180:20 181:9,15
181:15 214:9
230:17,17

**pass** 227:22
**patience** 98:4
**pattern** 25:6
141:13
**patterns** 20:17
22:3,5,8 23:2,22
23:24 58:25
166:25
**pausing** 100:21
**pay** 171:6 215:1
**paying** 54:8 68:2
**pdf** 57:21,22,24,25
61:10 63:13,17
69:8,10 71:19
73:13 124:6,21
135:20 203:4
231:12 232:1
**pee** 104:1
**pen** 12:18
**penalty** 229:1
231:16 232:5
**penetration** 64:18
215:12
**people** 21:8 24:17
25:2,22 27:14,15
27:17 28:6,11,16
29:18,20,21 30:12
30:15 31:1,7,15,17
37:23 39:3,8,15
40:3,5 41:12
44:21 46:20,24
53:14 54:22 55:22
56:21 69:2,4 73:4
85:15 87:6,7,8,12
87:16 88:8,22
91:11 95:3 102:17
102:19 103:8,13
104:12,16,24,25
105:7,10,12,16,19
106:3 115:18
119:15 121:12,13

123:22 125:13,14
125:17 130:7,17
134:7 144:8
152:12 169:9
173:8 177:13,21
178:5,6,13,15,24
179:6,9 186:15,17
186:17,19,21
187:2,9,10,11
188:24 190:15
191:12,16 197:14
202:25 203:16,20
204:4,8 207:21
215:9,14 216:11
216:15,18,21
**people's** 105:7
120:15,17 178:25
**perceive** 26:13,15
28:24 29:22
**percent** 28:21
106:12,15
**percentage** 27:11
27:11 195:1
**perform** 68:23,24
**performed** 184:20
**period** 18:14
24:11 32:1 33:2
49:16,22,23 51:1
51:12,17 52:11
53:3 75:10 103:17
104:1 150:14
155:25 156:7,18
159:7 161:5
199:25 202:15
203:20 231:18
232:7
**periodically**
186:22 187:4
**perjury** 229:1
231:17 232:6

**permitted** 40:11
**permitter** 40:11
**permitting** 94:16
94:21 95:6,15,24
98:22,25
**persistent** 185:17
**person** 29:13,14
50:9 84:18 88:4
88:24 106:7 132:9
134:25 147:21
166:13 167:21
190:13 206:19,21
210:23,24,25
**person's** 143:5
168:11 191:11
**personal** 18:15
19:9 59:23 82:15
100:15 101:14
105:1 120:15,17
129:1 130:13
133:10 134:18
135:7
**personalized**
123:23
**personally** 30:14
131:17 144:24
145:4,8 192:17
193:1,6
**perturbed** 161:13
**pets** 63:25 64:9
**pew** 106:18
**ph.d.** 37:8,10,11
**phone** 11:23 12:1
58:23 71:25 112:2
119:3,4 132:10
169:5 195:3
200:10
**phones** 134:8
**photo** 77:2 224:19
**photocopy** 46:10

Page 30

[phrase - prevent]

**phrase** 31:1,3 39:9 70:17 85:15 91:11 98:12 111:6 122:11 177:20 178:6,24 213:6,12
**physical** 178:15 179:8 192:12
**physically** 187:17
**physics** 37:5
**pichai** 171:23 173:1
**pichai's** 172:18
**picture** 77:1
**piece** 29:9 174:9 214:9 220:4
**pieces** 111:4 190:25
**pii** 193:17
**pile** 163:7
**pissed** 40:18
**pixels** 110:7
**place** 8:15 22:17 177:16 230:7
**placed** 176:2 205:4,20 212:15
**places** 70:9
**plain** 30:19
**plaintiff** 9:14 116:4
**plaintiffs** 1:8 2:8 3:3 9:16,18,21 11:3 13:13,21 14:1 15:12 16:5 23:11 54:21 55:20 62:7 63:5 90:6 94:14 116:14 204:16,22 210:1
**platform** 105:2 181:25 182:3
**platforms** 19:19

**plausible** 194:17
**play** 54:6,10 119:3 119:16
**plays** 181:14
**please** 8:9 9:5,25 63:8 124:22 155:18 173:18 180:15 212:2 220:25
**pleasure** 227:25
**plug** 64:2,12,17,19 65:6,8,10,10,12 82:11 203:18
**plurality** 204:5
**plus** 191:7
**point** 23:16 67:14 80:15 94:8 120:4 121:22,23 126:9 126:14,20,22 127:12 140:7 147:24 155:10 164:13,23 176:8 178:21 189:13 193:5
**pointed** 70:16 198:5
**pointing** 69:1
**pokeman** 119:3,16
**police** 103:4,25 117:1
**policies** 12:11 151:1,13,19 156:7 159:15 212:23 221:6,12,20
**policy** 7:6,15 23:17 39:24 88:5 88:7 144:22 149:15 150:1,1,11 150:18 151:3,6,11 155:25 156:14,17 157:2,4,8,11 158:3

158:9 159:6,20,25 160:3,13,16 162:6 162:10,23 163:4,7 163:14 165:1,6,8,8 209:16,17,19 210:15 211:5 221:4 222:18,18 223:20 224:2,20
**political** 119:22 120:1
**poor** 28:19
**popular** 64:17 171:24 203:17
**population** 106:9 106:15
**porn** 53:23 66:14 66:17,18
**portion** 106:9
**portions** 16:25 221:12
**portrayed** 33:3
**posed** 186:10
**positioning** 37:24
**positive** 56:5
**possibilities** 193:15
**possibility** 117:19 195:11
**possible** 26:23 65:13 81:17 89:23 114:4 117:4 125:6 144:10 183:4,7 194:1 196:8 198:2
**possibly** 211:12
**postulating** 157:18
**potentially** 111:20 174:18
**potentials** 180:7
**power** 18:17
**ppid** 201:9

**practical** 104:7 135:14
**practice** 30:11 78:3 131:10
**practices** 33:16 34:15 35:8 55:1 137:9 151:10 179:22 180:9 207:10
**precise** 111:7 191:24 192:4,22 215:24
**prefer** 10:20 13:1
**pregnant** 59:1
**prepared** 71:8
**preparing** 16:5 75:14 183:8
**present** 4:22 9:6 22:10,19 140:19
**presented** 24:8 30:4
**presently** 40:21
**presents** 202:1,4
**preserve** 119:6
**preserved** 118:14
**press** 49:2 213:15
**presume** 13:20
**presumption** 13:22
**pretty** 37:20 39:18 56:9 70:10 154:12 196:16 215:23 225:11
**prevent** 42:10 43:21,21 48:10,21 49:7 50:16 51:4 55:11 65:8,12,15 65:15,18,19 67:15 67:20 73:22 74:10 79:18 142:9 168:16 170:8

| | | | |
|---|---|---|---|
| 217:18 218:8 | 65:4,5,22,24 66:5 | 204:23 205:1,19 | 106:20 107:14,14 |
| 219:14 | 69:2 76:6,19 | 206:2 207:17 | 108:13 112:11,22 |
| **preventing** 67:5,7 | 77:19,22 82:10 | 208:11,14 209:11 | 112:22,23 113:14 |
| **prevention** 181:8 | 84:21 85:18,18 | 210:7 211:4,14 | 120:1,7,17 121:12 |
| **prevents** 20:9 49:9 | 86:15 88:5,6 89:1 | 212:13 219:24 | 121:13 122:2,18 |
| 154:22 | 89:1,22 90:9 | 221:4,6 222:20 | 123:8 126:6,9,9,14 |
| **previous** 44:16 | 91:13 92:3 93:16 | 223:20,23 224:2 | 126:15,16,24 |
| 55:4 119:8 182:22 | 95:1,2 99:15 | 224:14,20 225:19 | 127:3,9,12,15,17 |
| 198:18 | 100:19 101:4,14 | 225:25 226:11,22 | 127:22 128:2,4,6 |
| **previously** 87:13 | 102:13,16,19,23 | 226:23 227:9 | 128:22 129:11,25 |
| 108:13 169:2 | 104:12,18 106:21 | **privacy's** 45:17 | 130:4,18,23,23,24 |
| 180:7 | 114:17 117:2,5,13 | **private** 6:14,15,21 | 137:23,23 139:2 |
| **price** 214:13 | 117:20,25 118:2,8 | 20:9,10 21:15,25 | 140:13 141:3,7,9 |
| **primarily** 177:10 | 118:13,18,22,25 | 24:16 32:4 33:1 | 156:3,14,20,25 |
| **primary** 145:16 | 119:2,5,7,15,21,25 | 33:16 47:16,19,22 | 157:3,7,13 158:1 |
| **principles** 80:11 | 120:14,16 121:14 | 48:6,6 49:17 50:5 | 158:10,25 159:14 |
| 81:12 | 121:18,21 122:4,7 | 50:8,15,20 51:4,13 | 159:18 162:8,18 |
| **print** 218:1 | 122:19,21 123:11 | 51:25 52:22 53:4 | 163:2 164:4,8,20 |
| **printed** 12:11 | 123:16 127:8 | 53:5,13,18,20 | 164:22,25 165:5 |
| **printout** 59:11 | 128:24 129:4 | 54:13,18,22,23 | 165:20,22 166:11 |
| 60:25 75:24 | 130:1,5 131:22,25 | 55:11,21,22 56:23 | 170:18,20,21 |
| **prior** 82:6 125:3 | 132:9 133:4,18 | 57:4 59:3,15,16,17 | 171:2,13 172:5 |
| 189:22 | 134:2 136:12,13 | 59:19,23,24 66:9 | 174:6,20 175:11 |
| **prioritize** 22:11 | 136:14,16 139:6 | 66:21,23 67:3,10 | 184:22 189:24 |
| **prioritized** 118:22 | 144:21 146:18 | 67:11,13,15,20,25 | 194:2,7,22 195:5,6 |
| 118:24 | 147:1,3,6,8,9 | 68:3,6,10,10 69:18 | 195:13 198:3,17 |
| **prioritizes** 118:17 | 148:18 149:8,15 | 69:22 70:1,24,25 | 198:24 199:7,17 |
| **prison** 40:5 | 150:1,2,11,18,21 | 71:23 72:2 73:21 | 199:22 200:23 |
| **privacy** 7:2,6,12 | 151:3,6,11,19 | 74:8 75:5,18 | 201:2,5 204:14 |
| 7:15 16:22 17:13 | 155:24 156:6,14 | 77:18 78:9,11,22 | 206:22 208:19 |
| 17:20 18:9 19:11 | 156:17 157:2,4,8 | 79:18 82:7,11,18 | 209:1,23 217:6 |
| 19:22 20:16 21:1 | 157:11 158:2,3,9 | 83:1,20 84:25 | 220:4 221:18,21 |
| 23:17 30:4,6,14,17 | 158:14 159:6,15 | 85:8,24,25 90:3,14 | 222:1,9,11,12 |
| 30:20 31:7,13 | 159:20,25 160:2 | 91:3 94:17,22 | 225:4,9,15 226:12 |
| 33:3,4,10,17,18,22 | 160:13,16 162:6 | 95:7,16,25 98:23 | 226:18 |
| 34:6,10,14,16 35:9 | 162:10,17,23 | 99:1,15,19,24,25 | **privately** 24:4,15 |
| 35:13,21 36:3 | 163:4,7,14,24 | 100:4,5,5,6,7,12 | 31:1 85:15 88:22 |
| 42:4,14 43:20 | 165:1,5,8,8 166:10 | 100:13,18,19 | 91:11 93:10,10 |
| 45:13,14,15 47:14 | 166:24 167:12 | 101:24,25 102:3,6 | 94:1,2 103:8,11,12 |
| 47:15 49:9 54:13 | 168:24 179:22 | 102:8,10,12 103:2 | 104:1 128:2,11 |
| 63:24 64:4,15 | 197:19 202:20 | 103:16,17,24 | 161:2,3,5,13,22,24 |

[privately - question]

162:24 164:16,19
178:13,16 202:3,6
202:17 216:7
222:5,13
**privy**  68:1 137:8
**probabilistic**
185:23 186:2,3,5
**probabilistically**
185:14
**probability**  22:11
**probably**  14:24
40:7 60:13 61:5,6
67:23,24 71:4
79:4 80:14 87:21
110:12 114:3
116:1 130:25
132:1 188:16
198:20
**problem**  25:21
42:6,8 57:24
86:17,25 111:2
137:10
**problematic**
149:18,18
**problems**  170:10
**procedure**  231:19
231:20
**procedures**  146:11
147:4,15 148:7,12
148:24 149:4
**proceed**  220:13
**proceeding**  9:4
**proceedings**  1:16
2:16 8:4 15:9
230:14
**process**  10:24 11:4
17:18,23 56:3,16
56:20,21,25 57:3
62:5,7 114:2
**processes**  56:5,8
62:10

**proclivities**  100:15
102:6
**produced**  124:15
125:25
**product**  36:9,18
114:21 133:10
134:18,25
**products**  37:24
50:11
**professionals**
167:13
**professor**  184:13
185:2,6,12 193:25
202:1 220:24
**profile**  78:19
**programmers**
52:17
**prohibited**  40:12
**project**  41:8,10,11
**promise**  124:17
126:2 153:1
162:11 164:12
220:9
**promised**  155:25
156:18 159:7
164:23 166:10
**promises**  152:21
**promising**  167:19
**promote**  38:4
**promoted**  38:15
**prompts**  141:11
146:1
**proposed**  140:22
**proposing**  118:17
**protect**  43:2 54:13
64:1 69:2 162:13
**protected**  24:9,10
24:11,12,13,17,23
25:12 117:13
**protecting**  44:4
53:14

**protection**  24:6
180:18
**protections**  30:20
**protects**  53:20
**protocol**  140:22
142:5
**provide**  18:10
43:20 81:24 82:3
82:4 136:12 139:5
139:12 202:9
221:9,14
**provided**  36:8
44:20 185:18
231:19 232:8
**provider**  58:23
214:22
**provides**  31:7,13
42:14,14 85:18
88:25 89:22 90:9
91:13 104:12,17
136:13 137:1
153:23 154:2,2,8
154:10,19,23
155:6 158:2
**providing**  44:25
104:9 151:22
153:22 154:17,21
226:2
**prudence**  227:9
**prudent**  137:1
**psounis**  13:9
**psychology**  39:23
**public**  23:9 27:8
27:14 28:12 39:24
101:7 102:2
**publicly**  59:12
**publish**  74:12
**published**  45:9
52:18,19 74:13
75:7 148:4

**publisher**  60:14
**pull**  145:10 191:14
201:1
**pulls**  35:2
**purchase**  28:2
**purchaser**  133:10
134:18
**purchasing**  58:24
**purging**  180:21
**purpose**  23:12
**purposes**  109:18
191:25
**put**  52:15 72:4
104:1,13 129:21
162:14 163:2
183:3 194:19
**puts**  44:2
**putting**  17:2 48:12
218:6

**q**

**qualifies**  192:17
193:6
**quality**  8:10,11
**queried**  147:6,9
**query**  43:1
**question**  17:17
19:20 21:2 23:10
26:7,8 35:4 36:5
36:21 41:20 49:14
52:10,15 58:3
67:22 81:6,17,18
85:7 88:13,14
90:25 97:6 100:22
104:10,13 109:18
109:19,20 111:7
112:14 115:1
118:8 120:3 124:1
127:1 128:9 129:5
131:14 137:13
144:11 146:22
149:21 153:5

Veritext Legal Solutions
866 299-5127

[question - rebuttal]

154:16 169:16
170:14 205:16,17
206:19 208:17
209:18 214:24
215:8,24 216:13
**questioner**   137:25
**questions**   5:14
11:7 14:14,16
21:8 55:4 160:11
184:3 190:16
198:21 207:4,16
220:5,11 226:11
**quick**   173:18
212:1
**quickly**   9:19 40:25
**quietly**   145:3
**quinn**   4:12,23 9:10
**quinnemanuel.c...**
4:19,20
**quite**   112:14 151:1
192:4
**quotation**   222:17
225:18
**quote**   77:16 78:2
144:6,14 162:21
185:2 191:23
221:13
**quoted**   142:23
**quotes**   163:2
164:5,5 177:8
222:14
**quoting**   143:23
196:14

**r**

**r**   233:3,3
**r&s**   232:1,9
**race**   203:14
**raise**   9:25
**raising**   89:10
**ramin**   142:17
144:1 196:15

**ran**   170:9
**random**   84:18
128:12 147:21
190:15
**randomly**   72:8
**reach**   18:24 19:1,2
208:11,14 209:10
210:6 214:14
226:15
**reaching**   17:11
18:19 19:7 20:20
21:11 120:4
166:21
**react**   39:10
**reactions**   22:25
**read**   13:1,7,10,13
13:20 14:1,11,18
15:13,15 27:17,23
27:25 43:10 46:5
46:11 47:18,21,24
48:20 55:17 59:5
59:22 62:23 67:3
68:25 69:3 70:18
70:19,21 71:15
72:6,11 75:14
76:15 79:17 80:6
81:8,20 85:14
101:10 115:16
116:7,8 125:16
131:8 144:16
145:15 148:25
149:11 150:3,11
150:13,15,16
154:24 165:7,16
165:16 166:7
174:14 175:17,17
175:18 176:20,21
176:23 178:6
183:5 197:1,2
205:1,6 209:16
210:14 217:25

223:5 227:9,15
**readability**   152:6
152:17
**reader**   150:8,9
**readers**   70:8,12,16
79:22 80:12 81:13
**reading**   17:14,23
24:9 29:15 30:13
54:4 62:24,24
63:7 68:1 69:24
84:16,18 92:7
150:7 152:3,4
175:18 182:17
198:18 206:2
209:10 217:23
231:23 232:9
**reads**   31:12 77:12
208:10,13,15
217:17 218:2
**ready**   220:12
**real**   9:19 66:7
71:20,22 104:7
135:14 161:21
173:17 181:22,24
182:3 212:1
227:24
**reality**   190:18
197:23,24
**realize**   105:23
134:17
**realized**   175:7,23
**really**   6:15 26:1,9
28:15,20 29:7
31:22 39:10,22,24
40:10 45:17 48:6
70:25 80:9,16
81:10 85:21 86:21
87:25 102:6,9
104:4,6 111:5,8
112:18 114:20
120:8,19 122:4

132:13 147:12,13
147:15 170:24
191:13 200:1,3,6
**reason**   96:18,19
132:4 194:18
233:6,9,12,15,18
233:21
**reasonable**   24:23
25:12,18 26:12,15
27:2,3,5,11 28:4,7
28:8,10,23 29:5,12
29:22 30:23,25
31:5,11 33:17,18
33:25 34:6,10,13
82:25 83:14 84:7
85:1,9,11,13,17
86:2,7,20 87:3,10
88:17,24 89:21
90:4,10,18,24 91:7
91:14 92:7,15,22
92:24 93:11 94:2
94:15,20 96:7,12
96:21,24 97:1,2,3
97:7,13,13,14,18
97:23,24 98:6,10
98:15,18,21 127:8
158:11 204:15
206:2,6,14,23
207:3,5,13,22
208:1,13,20 209:3
209:9,25 210:6,18
210:22 212:14
215:18,18 226:17
**reasonably**   161:23
**reasons**   70:8
160:25 172:16
**rebuttal**   7:8,9 13:8
13:10 14:9,13,14
14:25,25 15:15
16:1 184:3,6,7
196:24 204:11

[rebuttal - report]

213:2 216:25,25
**rebuttals** 12:9
**recall** 14:4 17:22
  17:24 35:24 36:19
  47:21 48:2,5,9,12
  48:13,17 125:23
  202:10,23 215:25
  221:1 225:23
  226:10 227:13
**receive** 41:18
  86:11 193:1
**received** 26:2,4
  31:23
**receives** 109:9,10
  193:4,8,17 219:15
**receiving** 41:19
  219:4,14
**recess** 15:6 47:7
  81:2 121:5 155:15
  173:23 183:24
  212:6 220:18
**recipient** 42:23
  66:3 96:16
**recipients** 83:7
  85:22 87:1
**recognize** 64:14
**recognizes** 186:9
**recollection**
  144:12
**recommending**
  213:16
**record** 8:7,15 9:8
  15:2,4,7 47:5,8
  62:23 80:20,23,25
  81:3 93:22 121:1
  121:3,6 123:3
  130:12 137:5,10
  155:11,13,16
  168:1 169:25
  173:21,24 179:16
  183:19,22,25

205:23 212:4,7
  220:16,19 228:3,4
  228:6 230:14
**recorded** 8:13,16
  58:25 78:8 199:12
  230:11
**recording** 8:10,14
**records** 127:24
**red** 79:12
**redesigned** 128:5
**redhat** 41:6
**redirect** 220:14
**redirects** 56:15
**reemphasized**
  76:5
**refamiliarize**
  222:16
**refer** 39:18 66:18
  106:24 126:22
  131:3 138:6
  164:20 219:10
  226:2
**reference** 59:23
  164:25 183:16
  196:16
**referenced** 162:9
  180:9 231:6
**references** 20:2
  70:7 162:18 163:2
  164:4 196:19,22
**referencing** 20:18
**referring** 39:17
  53:9 89:5 102:9
  126:21 139:14
  163:20 164:15
  174:12 178:19
  179:4 185:11
**refers** 178:7 179:7
**reflected** 159:15
**reframing** 129:4

**refresh** 11:21
  144:12
**refuge** 124:17
  125:4,17 126:1
**refuting** 106:14
**regarding** 47:15
  172:20 202:9
**regardless** 158:12
  170:3
**regular** 56:22,22
  108:3,15 112:11
  112:24 113:15
  157:13 158:10
  159:23 174:6,20
  175:11 176:10,15
  184:22 199:21,22
  200:23 201:2
  219:15
**regularly** 56:9
**relate** 18:6 22:5
**related** 9:2 20:2
  35:2,3,25 92:9,10
  230:17
**relating** 33:15
  35:1,6 36:24
  47:14,16
**relation** 171:5
**relationship** 62:20
  169:2
**relationships** 7:4
  120:15,18 133:4
  133:19 134:2
**relatively** 40:25
  123:25
**release** 213:15
**released** 231:21
**relevant** 21:16
  60:12 151:15
  165:20 166:25
  219:3,16,21

**relied** 20:3
**remain** 92:16,25
**remember** 14:16
  36:14 45:22 51:19
  62:16 66:9 67:24
  68:20 69:18,22
  70:1 116:19
  138:22 156:23
  176:24 188:19,21
  197:1 210:24
  217:15
**remembered**
  144:16
**remembering**
  125:20
**remind** 13:15
  133:24
**remote** 1:16 2:16
**remotely** 8:22 9:6
**renders** 117:16
**repeat** 78:18
  221:11
**rephrase** 68:15
**rephrasing** 194:15
**report** 6:4 7:8
  14:25 15:13,15,18
  16:3,9,9,10 17:9
  18:9 25:3 26:12
  26:18,21 28:3
  29:1 33:12 36:11
  47:11 55:17,18
  72:10,11 74:16
  75:15,25 82:20
  96:12,25 97:8
  99:11 106:24
  110:8 112:18
  116:7 121:9
  124:11,23 140:17
  144:18 155:19
  159:3 163:20
  164:1 174:3 177:1

[report - right]

184:3,6 187:14
195:1,23 196:11
196:13 204:11
213:3 216:25
220:25 221:7,13
222:15 225:17
226:15
**reported**  1:23
139:21
**reporter**  2:20 8:25
9:23 10:7,9,13
15:1,2 224:18
**reports**  12:9 13:6
13:6,8,14,21,25
14:19 15:11 51:10
112:19
**represent**  75:23
205:25
**representations**
165:4 226:21
**representing**  8:24
**request**  141:1
**requested**  232:1,9
232:10
**requesting**  145:9
**requests**  42:20
**requirements**
148:19,22
**research**  7:2 17:22
17:24,25 18:1,3,21
21:14 51:11 66:7
69:4,5 76:4,17
90:12 106:18
123:17 125:16,24
133:17 149:21
170:21 183:3
187:14 197:15,19
198:9 200:5
**researched**  53:19
**reserve**  220:11

**respect**  12:21
13:25 33:1 88:20
98:16 107:17
140:8 198:1 206:1
222:5 225:8
226:22
**respecting**  33:4
**respond**  21:9
**responded**  25:13
**responding**  125:24
**response**  22:12
131:19 143:2
**responses**  22:25
**responsibility**
162:13
**rest**  142:14 143:1
172:16
**result**  55:23
**results**  88:9
130:10 152:11
**retained**  54:17
116:14 228:9
**retargeted**  174:24
175:4
**retract**  87:22
165:15
**return**  231:17
232:6
**reveal**  36:18 58:25
**revealed**  115:15
116:16,22,23,25
117:5,16
**revealing**  114:8
**reveals**  130:13
**review**  12:22
13:18 32:9 33:5
57:22 182:13
231:8,10,13 232:2
**reviewed**  15:11
36:10,11 142:16
144:1,13 193:25

**reviewing**  12:24
13:4 31:6 32:12
32:13 47:14 48:2
48:5,13 62:18
68:21 210:7
**revised**  144:21
**revisions**  150:25
151:2,3
**rewriting**  17:23
**rich**  119:9
**right**  9:23,25 11:6
12:20 13:3 14:24
16:16,18,19,21
20:4 22:7 23:13
27:16 28:18 31:3
31:5,22 32:16
33:6 34:8,11
38:20 40:4 44:12
45:9 47:3 50:3
51:16 52:16 53:2
53:3,9,11 56:13,17
56:25 57:18 58:17
58:22 59:22 60:3
60:10,22,23 61:11
62:8,25 63:16,21
65:20,24 66:10,20
66:23,25 67:8
68:10,12 71:3,14
71:15 74:6 75:11
75:21 76:15 79:11
81:6 82:10,16
83:5 84:2 87:18
88:3,7 89:16 90:6
91:22 92:8 93:18
94:13 96:8,21,22
97:11,25 98:7
100:14 101:25
102:17,21 103:15
105:12 106:2,2
107:2,25 108:5,17
108:19 110:15

111:17 114:6,23
115:5,25 118:19
119:21 120:25
121:10 122:8
124:10 126:4
128:11 129:5,11
129:14,19,21
130:1 131:16
132:18 134:16
135:12,15,17
136:21 137:7,11
137:21,24 138:13
139:2,23 140:4
141:24 142:24
143:8,24 144:17
147:15 148:19
149:2 150:11
151:7 152:13
153:17 154:25
156:15,24 157:1
157:14,15 160:5
160:10,14,17
161:8,17 162:2,4
162:20 163:18,21
164:17,20,22
165:2 166:8 167:4
167:22,24 168:5,8
170:1,4,22,24
171:6,8,19 172:13
173:1,4,13 174:21
175:1,8,14 176:3
176:16,21,25
177:2 180:10
181:5,16 183:20
184:2,11 185:1
186:13 189:24
191:9,16 193:22
196:24 200:8
201:10,13,18,22
201:23 202:13
203:10,11 205:5,7

[right - search]

205:17 206:4,16
209:14,16,20
210:20 211:5
212:9 215:4,9
216:16,23,25
217:20 218:9,11
219:10,11 220:11
224:10,15,17
225:2
**ripped**  132:10
**rise**  20:8 82:25
83:14 84:4 85:1,8
86:1 88:16 89:21
90:3 92:22 183:5
183:11 226:16
**risk**  117:14 186:10
**road**  63:5
**rob**  8:23
**robert**  4:25
**rockwood**  1:24
2:20 230:4,25
**rolled**  181:7
**room**  9:11 11:8
**roommates**  53:21
**rosas**  1:24 2:20
8:25 230:4,25
**routes**  42:19
**routing**  42:18 43:6
**rpr**  1:24 2:20
230:4,25
**rude**  46:7
**rules**  232:8
**ruling**  102:1
**run**  152:9 169:9
**running**  11:17
40:4

**s**

**s**  233:3
**safari**  141:22,23
141:25 180:18
181:1

**safe**  25:2
**safer**  198:22
**safety**  24:5 45:18
**sake**  164:13
**salaries**  102:1
**salary**  100:14
**san**  3:20 8:20
**sara**  6:16 69:19
70:5,25 72:8
137:24 175:20
**save**  24:19 83:13
84:13 216:1,3,12
**saved**  83:16 84:6
172:21 173:1
**saves**  59:3
**saving**  73:21 74:9
78:10 216:16
**savvy**  169:6,12
170:7
**saw**  70:14 72:8
**saying**  22:7 25:4
34:25 48:5 53:12
53:24 62:18 66:24
67:12 68:3,7
77:13 78:3 84:3,6
84:10 85:10,23
86:9 91:20,25
92:2,3,4,6 99:4
103:22 109:13
111:5 113:5,20
119:5,12 122:22
125:5,8,9 126:20
134:24 138:21
148:11 149:9
153:6 156:22
158:5,23 161:19
166:4 167:1 173:5
175:16 177:20
183:9 187:6 193:9
193:12 197:20,23
207:23 209:17

213:22 219:6
223:2,11 225:13
225:14 226:5,6,8
**says**  18:12 19:15
20:7 24:8,15,17,18
34:13,14 40:21
47:13 58:23 61:13
61:17 63:22,24
66:8 69:14,19
71:22 73:16,19
74:6 75:3 76:3
77:18,21 78:2
97:20 103:7,17
104:23 115:2
117:8 122:1 134:7
134:17 135:22
136:1 137:25
140:19 143:2
145:3,11 147:24
152:14 159:21
160:16,18 161:16
161:22 162:5,23
164:3,15,19 173:2
175:22 181:21
184:13 191:23
193:13 195:8
212:23 216:1
218:3 222:13,17
222:19 224:10,12
225:3,11 227:5,5
**scan**  58:2,4 60:25
**scare**  70:11
**scatological**  104:8
**scenario**  189:3
191:25
**schedule**  231:10
**schiller**  3:17 9:17
**schneier**  1:15 2:15
5:7 6:2,5,9,13,17
7:5,9 8:17 9:24
10:17,19,19 16:10

47:10 57:10 58:15
60:20 72:9,24
81:5 121:8 133:19
155:18 174:1
184:7 212:9
220:24,24 227:24
228:8 231:5 233:2
**school**  37:15
152:12 214:25
**schwartz**  13:9
**science**  37:2,3,5
185:23
**score**  152:4
**screen**  8:13 11:10
13:4 22:21 23:17
23:25 24:1,3,22,25
25:4,7,11,14,17
26:16 28:24 29:21
29:23 30:4,25
31:6 68:2 71:13
83:12,13 84:3,12
84:16,19 88:21
89:13 93:9 103:7
103:17 160:24
161:16,18 166:10
177:13 178:1,6
204:19 208:16
209:6 210:3,13
211:12 215:25
221:24 222:4
227:4
**screens**  157:21
**script**  109:12
**scripts**  62:8
**sea**  168:14
**search**  37:9 61:14
73:19 74:2,7
105:2 130:7,9,10
130:11,19,25
213:6,12

[searches - services]

searches  59:3,16
59:16,17 119:20
120:7 169:6,8,9,13
169:19 170:9
searching  168:25
seat  27:22 122:25
seattle  3:7
sec  121:1
second  22:6 33:14
77:17 126:6
129:13 155:11
159:13 174:16
175:19 224:7
section  18:13 20:1
20:5,6,19 99:10,20
117:23 135:2
146:6 152:18
181:18,21 182:10
182:12,19,22,24
183:2,8 184:12
196:5 213:8
securities  38:20
146:18 179:21
security  6:17
17:12,20 19:11,23
20:16 30:6,18
33:10,22 38:24
39:1,2,3,4,5,6,6,7
39:8,15,16,18,20
39:21,21,22,23,23
39:24 40:1,2,2,7
40:15,20,22 45:18
50:9 68:9 72:24
77:22 84:20 86:15
87:25 95:1 147:2
147:3,6,8,9 148:18
149:8 166:23
167:12 197:19
215:8
see  19:13 20:1,12
24:3,18 25:3 29:7

31:2 32:6 34:17
52:6 53:15 55:2
57:11 61:15,24
64:6 69:11 71:18
71:19 73:11,24
74:4,6,20 75:3
76:2,12 77:16,20
78:4,24 83:17
85:5,16 87:1
88:22 91:12 92:18
94:18 99:17,23
100:13,17 103:5,9
107:6 118:15
119:23 121:15
124:3,4,8,19
126:11 127:20
129:13 130:15
131:14 133:7,13
133:15 134:5,10
134:11 135:24
136:6,24 139:9
141:5 142:11
143:18,21 144:25
145:2,10 146:12
149:11 150:5
152:10,23 156:4,8
161:20,25 163:6
165:14 166:2,16
169:10 172:2,24
175:25 176:20
177:14,18,21
178:24 179:1,14
180:22 181:11
182:20 184:11,16
185:3,20 186:11
188:5 192:1,19,23
193:14 197:17,20
202:7 203:5
204:20 213:18
214:15 216:15,16
216:23 217:8

219:1 222:17
224:25
seeing  70:13 76:8
94:25 175:20
seek  124:17
168:24
seeking  125:4,17
126:1
seen  8:12 36:20,20
36:22 49:3 50:10
108:11 112:9,15
112:17,19 114:7
114:12 115:9,14
116:15 131:6
136:21 137:3,5,14
137:18 138:2
166:14 201:19
210:13
sees  45:3 211:12
selectively  22:10
self  46:9
seller  125:12
selling  37:24
sending  44:10
45:2
sends  56:14 62:9
128:25 167:5
sense  22:24 25:19
28:4 39:18 68:8
178:12 197:22
sensible  141:3
sensitive  76:6,19
105:1
sensitivity  214:13
sent  128:20 140:24
180:24 184:22
sentence  31:12,18
31:21 33:14 34:7
34:12 49:21 66:8
76:11 82:24 83:22
83:25 88:21,25

89:15 92:13 93:8
95:5,10,14 119:8
121:11 124:25
126:6,13,23 134:6
142:22 144:20
158:6 159:10
162:21 163:1,19
164:15 177:24
178:18 179:5
183:15 186:9
192:21 226:15
sentences  96:15
106:1 162:9 164:3
separate  51:9
103:10 108:1,4,14
138:14 176:5
september  205:24
series  39:19
serious  34:16 35:9
35:13,21 36:3
170:10
serve  78:19 175:14
176:3
server  44:1,1,2
56:15 143:16
servers  62:9 144:8
service  30:21
42:15 56:16 140:2
150:1,23 160:14
165:22 214:10
227:7
services  37:24
42:11 43:23
139:12,14 140:5,8
140:10 153:12
160:17,18,18
162:11,16 163:23
165:9,13 166:2
180:25 222:19
227:16,20

Page 38

**serving** 46:9
**session** 78:23,23
  108:8,17,22
  111:13,16,24
  112:11,12 122:6
  122:13 127:17
  130:13,24 138:20
  140:14 175:13,13
  176:2 205:21
  212:16
**sessions** 51:14
  52:1,13 53:7
  78:12 111:24
  112:3,23,23,24
  126:8 130:18
  136:20 137:15,19
  143:3 169:14
  174:6,6,20 175:11
  176:10 195:6
  205:5
**set** 34:20 108:4
  197:13 230:7
**sets** 194:5 197:15
  197:16 198:7,9
  199:19,21 200:6,7
  200:8,15,21,22,23
**setting** 136:8
**settings** 73:20 74:7
  111:13 141:2
  153:11 189:2
  202:1,5,16,21
  204:12 209:22
  222:20 225:19
**settle** 46:20
**sexual** 102:5
**share** 11:15,20
  12:25 134:8 179:9
  191:16 223:18
  224:19
**shared** 82:12,15
  128:23 129:3,23

130:3 169:4
  171:17
**shares** 114:11
**sharing** 107:22
  154:22
**shocked** 140:6
  189:20
**shop** 188:25
**shopping** 187:23
**short** 78:7 80:15
  151:1 155:9
**shortened** 135:1
**shorter** 74:24
**shorthand** 2:20
**shoshana** 125:22
**shot** 94:10 219:23
**show** 37:9 112:19
  133:7 163:3
  184:21 210:13
**showed** 152:11
**shows** 175:12
  176:9
**shut** 176:14
**sick** 59:1
**side** 143:16 216:1
**sigma** 131:2
**sign** 44:15,16
  113:13 142:8
  161:19 201:21,22
  231:16 232:5
**signal** 127:21
  128:19 140:24
**signaled** 126:7
**signaling** 128:14
**signals** 127:16
**signature** 229:12
  230:24 231:21,23
  231:23 232:9
**signed** 27:20 112:6
  112:7,8,25 142:10
  142:10 143:3,3,17

154:18,19 201:12
  201:17
**significant** 16:25
  159:19 202:4
  214:12
**signing** 28:16
**silent** 157:4,5,17
  157:17
**silly** 36:21
**similar** 85:7
**similarly** 1:7 2:7
  107:16 149:12
  185:13
**simple** 151:23
  215:8
**simply** 140:21
**single** 140:14
  183:15 213:9
**singularly** 101:3
**site** 140:25 180:19
  193:2 213:13
**sites** 61:22 62:12
  64:3 66:3 76:7,19
  206:10 212:23
**sits** 27:21
**sitting** 125:23
  169:17 199:5
**situ** 114:21 124:4
  133:13
**situated** 1:7 2:7
**situational** 101:15
**skill** 71:7 230:15
**skimmed** 150:15
**skip** 134:14
**slightly** 17:1 49:14
  82:14 131:20
**sloppy** 62:17
  87:21
**slower** 36:16
**small** 22:16 136:4
  138:6,9,12,18

**smart** 27:9,9
**smartphone** 132:4
  135:1
**society** 120:4
**sociology** 39:23
**software** 169:22
  169:23 214:9
**sold** 45:20
**solely** 182:16
**solemnly** 10:2,9
**solid** 40:25,25 41:6
**solutions** 8:24 9:1
  200:6 228:9 231:7
**solve** 42:6,8
**somebody** 39:13
  88:6 95:6 117:15
  128:6 160:20
  169:18 170:9
  179:10 190:10
**somebody's**
  117:15 169:13,19
**someone's** 128:12
**someplace** 196:13
**something's** 218:1
**sophisticated**
  119:10 128:16
  138:24
**sorry** 14:22 18:25
  30:1,24 32:23
  35:1,1 36:15,16
  42:13 48:18,24
  51:1 59:13 63:15
  69:24 72:6,18
  74:4 76:20 79:17
  82:1 83:9 85:14
  95:13 99:14 104:3
  109:20 116:19
  122:11,18 124:24
  125:22 133:1
  141:16 142:20
  143:9 149:24

Veritext Legal Solutions
866 299-5127

[sorry - studies]

154:2 162:3 164:2 170:13 173:17 174:16 177:3 179:3 186:16 188:9 191:20 192:7,20,21 194:21 199:6,13 203:13 208:12,22 210:12 217:11,12 221:11
**sort** 17:18 23:18 53:12 60:2 67:25 68:21 69:14 93:24 114:22,25 155:10 158:20 170:15 174:4 194:15 222:6 227:2
**sorts** 30:20 160:11
**sound** 133:24 144:3,15
**sounds** 63:20 72:22 106:16 114:7
**source** 104:22 145:16
**south** 4:15
**space** 30:6 74:25 151:2 192:12,12
**span** 143:3 150:25
**spare** 74:21
**speak** 16:4 54:4 195:17 199:3 227:20
**speaking** 17:14 85:21 93:6 123:13 135:10,10,12 166:1 194:19,20
**speaks** 137:22
**specialized** 68:8
**specific** 25:9 48:13 88:3 99:16,19,24

99:25 100:3,4
**specifically** 18:1 43:6,12 48:8,11,17 48:25 49:11 53:19 67:10 126:7 142:17 162:18 163:2 164:4 221:4 221:18 222:14 223:1 225:10
**speculating** 196:1
**spend** 40:8
**spends** 195:2
**spent** 11:2 47:13
**splash** 22:21 23:16 24:1,3,22,25 25:4 25:7,11,14,15,17 26:16 28:24 29:21 30:24 31:6 68:2 83:12,13 84:3,12 88:21 89:13 93:9 103:7,16 157:20 160:24 166:10 177:13 178:1,6 204:19 210:13 211:12 221:24 222:4 227:4
**spouse** 66:15 170:19,21
**spy** 169:5
**spying** 18:23 19:4 19:6
**squishy** 40:9
**ss** 230:1
**stamp** 71:12 224:7
**stand** 87:5
**standard** 34:20 41:1,5 146:15,17 146:18,21,23,25 147:1,12,13,18,19 147:24,25 148:1,2 148:7 149:4

179:17 180:5
**standards** 17:18 84:21 149:7 179:25
**staring** 29:8,8
**start** 48:3 58:6 65:22 82:21 89:15 126:21 130:7,9,17 138:20 182:11,25 186:20 187:6 189:18 191:2 208:24
**started** 17:5 39:20 54:7 114:25 115:1
**starting** 77:3 203:9
**starts** 73:14 181:18
**state** 9:5,7 10:2,9 29:15 31:25 101:5 221:21,25 229:2 230:1 231:9,12
**statement** 50:2 69:21 70:4 77:8,8 83:13 84:12 104:23 121:20,24 122:5 123:22 132:19 159:6 172:12,19 173:6 178:17 203:19 222:4,8 226:5
**statement's** 79:9
**statements** 33:8 78:13 79:1 86:22 87:2,2 97:2 105:4 124:2 133:12
**states** 1:1 2:1 8:19 177:13
**static** 186:18 187:11

**statutes** 149:10,11 180:8
**stenographically** 230:11
**step** 55:7 218:4
**stephen** 4:13 9:9
**stephenbroome** 4:19
**steps** 142:8
**steve** 9:19
**stick** 86:10 192:12
**stipulation** 231:20
**stolen** 40:19
**store** 51:14,25 52:12 53:6 58:24 213:13
**stored** 206:11
**stores** 54:21 55:21
**storing** 49:10 78:16
**story** 103:15
**street** 3:19 4:5,15 84:18
**strike** 48:2 49:20 49:20 55:8 57:5 123:6,9 143:11 151:19,25 153:4
**string** 188:4,7,10 188:13,18 189:4 190:20 191:1 196:4
**stripping** 66:2
**strips** 66:5
**strokes** 169:25
**stronger** 226:4
**stuck** 28:17
**student** 105:21
**students** 21:5 46:5
**studied** 80:2 182:4
**studies** 202:19

Veritext Legal Solutions
866 299-5127

[studying - talks]

studying  182:2
stuff  14:11 46:8
  50:11 55:18 84:20
  105:15 109:16
  129:16,16 187:7
  211:14
subjected  152:2
subjective  29:2
  149:12
submitted  14:1
  15:11
submitting  72:11
subscribe  214:11
subscribed  230:20
subscriptions
  214:11
subsequent  18:11
  130:11 169:7
substantial  106:8
  106:10
substantiate  42:25
subtle  149:20
  165:12 190:18
suddenly  79:12
  117:5
suggest  217:4
suggesting  202:4
suggests  166:13
  218:8
suit  168:3
suite  3:6
sullivan  4:12
summarizing
  177:6
summary  16:19
summer  4:23 9:11
sundar  171:22
supervision
  230:12
support  213:8

supported  140:22
supposed  54:1
sure  13:17 15:3
  17:14 22:6 25:24
  26:25 36:6 44:22
  49:1 50:1,23 52:8
  57:20 59:22 69:2
  70:14 80:24 89:5
  89:5 100:1 109:18
  110:13 111:9,11
  114:4 126:19
  133:15 136:18
  145:12 146:24
  154:12 155:12
  158:6 173:19
  174:14 183:16,21
  187:14 193:7,16
  194:15 195:25
  205:7 211:8 212:3
  213:1 218:13
  222:2
surely  27:15
surprise  105:20
  214:2
surprised  60:1
  105:16,16 174:24
  175:4 213:23
surveillance  18:22
  63:23,25 64:10
  119:4 125:10,11
  135:23 136:11
  137:9 138:15
  139:18 179:13
  193:15 203:12
surveillances
  136:4 138:7,15
surveilled  85:4
  86:5 90:17 91:6
  136:3
survey  14:19,21
  14:23 20:23,25

21:4,7,8,18,21
  26:8 29:20 30:12
  31:10 85:20 88:8
  88:10 123:15
  206:19,20 216:13
surveys  14:9 20:20
  20:22 25:25 30:15
  31:17 38:8 80:12
  81:13 87:6,13,17
  88:3,3 93:18,19,22
  93:23 159:3
susman  3:4 9:13
  9:15 223:19
  224:18
susmangodfrey....
  3:9,15 231:2
suspect  42:23
  130:4
svk  1:9 2:9 8:21
swear  9:24
synch  159:22
system  11:16
  19:19 68:6 206:10
systematically
  194:4
systems  40:3,5
  135:11,13 182:18
  184:14,18,21,24

t

t  233:3,3
tab  216:19,22
tabs  176:15
tag  218:24
tagging  219:7
tainted  47:25
take  8:14 44:9
  46:23 47:1 55:7
  57:15 60:6,11
  80:15,15 81:15
  82:19 89:7 94:10
  115:22 121:1

128:12 132:1
  146:19 147:2
  150:3 151:2 155:9
  160:10 168:22
  173:17 183:18
  198:20 205:15
  212:1,25 219:22
  220:11 222:15
taken  2:16 8:17
  107:5 142:8 216:8
  227:4 230:7
takes  177:16
talk  24:6 42:22
  49:2 53:22 56:10
  66:17 86:22 88:8
  89:9 97:10 114:19
  123:17 131:8
  136:24 138:4
  149:25 150:2
  165:11,18,19
  172:16 174:2
  188:2 195:22
  196:3,4,5,12,12
  207:14 213:3
  221:17,19 223:9
talked  34:9 38:7
  115:17 193:10
talking  15:10 18:1
  27:1,6 28:20
  33:21 52:16 67:10
  67:12 89:8 92:11
  93:9 101:23,24
  105:18 125:13
  127:13 162:2
  165:13 173:9,13
  174:4 187:10
  192:11 208:2,4
  210:16
talks  83:22 196:18
  227:18

[tampa - thinking]

tampa  4:6
teach  105:15
teaching  17:14
tech  22:9 39:22
  62:17 169:6,12
  170:7
technical  24:8
  68:23,24
technically  119:10
techniques  131:4
  199:20
technological
  169:3
technologies  63:24
  64:1 124:1 151:9
technologist  38:20
  38:24 39:1,2,8
technology  8:23
  39:3,8,15 195:5
telephonic  178:3
tell  10:10 57:11
  69:17 70:14,15
  104:22 128:10
  157:8 181:16
  187:15 191:10
  200:11,12 203:25
  204:2 221:1
telling  84:19 122:3
  160:22
tells  122:1 162:16
temporally  138:9
ten  47:1 183:18
tend  202:20
term  22:8,13,13
  22:18 25:18 28:3
  30:24 36:22 40:9
  40:10 46:23 78:7
  84:25 85:24,25
  90:3,13 91:2
  106:19 114:13
  115:8 117:16

122:3 130:11
  139:8 166:12,21
terms  28:15 29:2
  34:19,22 35:14,16
  36:2,7,12,13,21,25
  62:15 129:22
  149:25 150:23
  160:18 209:17
test  152:4,7
testified  46:14,19
  144:4 173:11
testify  26:14
testifying  26:4
testimony  55:9
  94:15 116:13
  125:3 144:1
  145:13 173:14
  174:8 182:9,12
  200:24 201:3
  204:16 209:12
  210:1 215:4,7
  228:7 230:6,9,14
testing  24:4 30:22
  184:20
tests  68:23,24
  152:8
text  59:1 69:14,25
  74:1,6 149:11
  150:8
thank  9:22 10:1,8
  10:13 12:15 76:12
  77:5 173:20
thanks  22:15
  227:24 228:1
thereof  230:19
thick  125:19
thin  189:10,16,25
  190:15
thing  23:18 26:23
  35:1 94:3 113:24
  115:16 128:7,8

136:10 157:22
  160:6 191:14
  200:18 211:23,24
things  20:15 22:7
  25:5 33:20,23
  34:9 35:3 40:10
  40:12 43:16 45:7
  48:16 55:25 59:20
  80:12 81:13 87:24
  88:1 89:19 100:5
  102:10 105:25
  110:1,3,12 111:3
  112:20,21 120:11
  120:23 123:15
  134:24 144:9
  146:19 147:2
  148:8 153:15
  157:10 160:5
  175:21 183:4
  189:6 208:7
  211:14 227:19
think  6:22 13:12
  15:17 17:8,16,17
  22:17,23 28:15
  29:21 31:6,12,14
  31:16,18,20 33:20
  34:8 35:1,1 37:17
  37:20 38:19,23
  41:24 45:11 46:7
  48:16,18,20 51:23
  54:8 56:9 58:6
  59:18 61:5,5,5
  63:15 65:11 68:21
  69:7 70:14 71:10
  72:19 73:2,8 74:3
  74:16 75:5,13,18
  77:11 81:15 84:10
  84:19 85:19 87:4
  87:4,5,7 88:8,9
  90:22,22,23 91:18
  92:1 94:8 96:11

97:6,12,24 99:6,9
  100:8,22,24 101:1
  103:14 105:7,9,12
  106:2 110:11
  111:2 112:13
  113:10 114:10,10
  114:13,14,19
  115:23 117:4,18
  117:19 120:9,10
  120:19 121:21
  124:6 125:8,10
  127:7 128:7 129:6
  129:7,17,19
  131:10,23 133:6
  135:19 136:10,13
  136:19,23 137:10
  138:2,9,23 139:11
  139:17,20 141:22
  141:23 147:22
  148:8 149:11
  151:25 157:16
  159:25 161:22,23
  162:22 165:9
  167:10,17,19,24
  169:20 170:15,25
  172:14,16 174:9
  174:10 175:17
  176:9,12 177:25
  178:5,6,14 186:1
  190:18 191:6
  195:22 196:3
  197:2,14 198:13
  198:14 199:11
  206:18 215:1,21
  216:6,11,19,21
  219:6 220:2
  221:18 222:8,12
  223:1,10 225:11
  226:4,25 227:5
thinking  21:6
  41:25 59:3 132:8

Veritext Legal Solutions
866 299-5127

[thinking - trujillo]

132:13 157:21,21
157:21 158:8
**third** 3:6 12:10
52:23 77:16 78:15
93:8 169:22
174:17 180:20
181:9,15 208:24
214:9
**thought** 12:16
29:5 49:11 50:19
50:21 57:7 101:7
132:24 175:5
218:18
**thousand** 45:24,25
168:14
**thread** 115:12
**threat** 44:24 45:4
220:8
**threats** 7:3 133:4
133:18 134:2
**three** 39:15 42:21
77:2,3 131:2
138:14 185:2
188:24 189:12,15
201:4
**thursday** 127:23
**tie** 86:18 136:4
**tied** 130:11 169:7
192:15,24
**tim** 41:1
**time** 2:18,19 8:2,7
8:7 9:5 10:25 11:2
29:24 30:3,3 40:8
50:3,25 54:14
55:14 60:11 70:15
93:24 122:15,16
128:5,6 136:2,9
138:6,19,19,20
150:3,7,25 160:23
176:15,18 181:22
181:24 182:3

189:12 199:25
208:24 212:10,20
227:25 228:10,10
230:7,8,10 231:10
231:18,24 232:7
**times** 42:24 43:3,9
44:5,7,7,10,11,17
46:17,21 62:18,19
62:20,21 67:1
98:1 102:8 109:14
111:16,18 113:1
113:13 118:14,18
119:12,14 123:18
125:12 128:10,18
128:19 136:3
171:23 212:11
**title** 38:19,22
39:10,12 40:22
72:17,20 135:2
**titled** 75:4
**titles** 38:21 72:23
**today** 8:7 11:8
16:6 27:19 28:16
64:9 101:16 105:5
106:2 125:23
169:17 199:5
203:9,10,12 218:1
**today's** 228:7
**told** 27:24,25
116:1 144:10
157:10 160:23
**tool** 65:20 188:3
**tools** 202:10
**top** 58:5 110:14
123:16 128:11
169:20
**topic** 45:13 82:17
99:9
**topics** 16:22 48:14
**tor** 41:8,10,11,15
41:16,22 42:3,9,14

42:14,15,16,19
43:5,10 44:4,21,25
45:5,8 168:19
**total** 153:19 228:8
**totally** 63:19 71:8
133:14 178:4
**touch** 45:14
**touched** 170:15
**touching** 178:15
179:7
**tough** 84:17 93:24
127:4 154:11
**tour** 21:5
**tout** 46:7
**town** 191:1
**traced** 166:14
168:5,15,21
**tracing** 168:17
**track** 61:20,22
62:13,21 64:3
78:18 108:8
109:25 110:4
140:23,25 141:10
142:1,3 203:17,24
**tracked** 78:20
105:9 166:14
168:8,15,21
**trackers** 78:22
139:25 181:9
**tracking** 42:10
43:22 48:10,22
49:7,12 50:16
51:5 55:12 56:4
62:6 65:9,12
66:15 67:5,7,16,21
73:23 74:10 76:6
76:18 78:16 79:19
89:1 108:6,21
110:9 136:14,18
140:20 145:4
168:17 180:18,19

181:8 213:17
218:9
**tracks** 58:23 110:2
110:5,6,7,9
**trade** 118:25
119:2
**tradeoff** 106:1
**traffic** 45:4 218:24
219:25,25
**trails** 175:6
**transactions**
185:17
**transcribed**
230:12
**transcript** 40:18
142:17 144:13
197:2 231:6,8,10
231:13,13,21
232:2,2
**transcripts** 116:8
**transfer** 108:15
**transmission**
92:10
**transmissions**
204:12 209:22
**transmitted** 44:8
109:11 206:12
**tree** 86:24
**trial** 46:19,20
**trick** 191:5
**tricky** 57:22 72:15
76:22
**tried** 39:14 213:20
**true** 20:5 25:5
102:18 134:24
139:24 140:1
201:14 203:19
211:8 214:4,5
229:3 230:13
**trujillo** 1:6 2:6

Veritext Legal Solutions
866 299-5127

[truly - use]

**truly** 76:4,17 77:9
141:3 154:15
**trust** 76:1 98:1
117:5 196:17
205:6 214:21
**trusted** 27:25
**trusting** 162:12
**trustworthy**
214:23 215:1
**truth** 10:3,4,4,10
10:10,11 203:23
203:23
**try** 42:8 46:11
50:25 60:12 61:13
73:25 81:16
104:10,13,21
105:15 111:2,7,12
118:6 142:6
199:15 212:10
215:24
**trying** 29:7,18
30:17,18 40:9
52:4 54:5,10,12
58:10 62:15 71:10
99:6 109:20 115:4
122:5 178:20,22
178:23,23 204:7
**turn** 16:18 33:11
47:10 83:9 96:20
121:8 141:12,13
155:19,20 171:20
180:15 181:18
211:13 226:14
**turned** 141:2
**turns** 43:4 96:20
120:12
**two** 14:20 15:18
72:8 78:13 103:10
111:25 112:3
141:20 162:9
189:6 190:25

199:19,21 201:1
205:9,12,12
212:11
**types** 102:10

**u**

**uh** 61:21 66:1 69:6
69:9 74:19 76:14
83:8 94:24 108:2
111:1 117:24
119:1 120:25
124:13 127:7
129:2 131:5
140:18 148:20
158:22 161:7
162:25 165:24
168:23 171:21
174:7 176:6
191:22 192:14
225:22
**ultimate** 226:15
**unable** 78:22 79:5
**unavowed** 107:5
110:17 115:3
**unaware** 54:19
55:5 227:2
**unawareness**
105:14
**uncover** 115:18
**understand** 23:11
27:17,22 28:17
32:16 34:19 35:12
43:25 70:17 79:17
79:23,25 80:5,13
81:8,14,15,19
82:19 94:6,9
96:19 107:10,18
107:20,22,25
108:24 139:1
148:17 150:18,21
151:22 152:13
162:12 167:13

176:1 178:20,22
179:4 184:20
195:9 201:8
204:22 214:10
215:19 216:11
217:17 219:3
**understanding**
23:7 27:3 51:15
51:21,24 72:1
93:25 107:11,13
108:9,12 109:24
166:24,24 182:17
225:8
**understandings**
32:19
**understands** 27:9
29:12 88:4,6
**understood** 51:12
51:16 52:12 53:4
54:25 62:6 93:11
94:2 101:3 219:13
**undistract** 198:18
**undisturbed** 101:6
**unemployed** 58:25
**unidentifiable**
92:17,25
**unique** 110:5
159:1 185:14,15
185:18 200:6
**uniquely** 188:7,11
189:4 190:5,21
191:3
**unit** 8:16
**united** 1:1 2:1 8:19
**units** 133:9 134:17
135:5,6 138:14
**unknown** 107:4
110:17
**unmatched** 18:17
**unreasonable**
27:12 87:11 93:4

95:8,17 96:1,25
99:2
**untracked** 92:17
92:25
**unwelcome** 93:12
**update** 151:5,10
**updated** 17:6
151:4
**upload** 11:20
**url** 66:3
**urls** 130:12
**urquhart** 4:12
**usage** 202:9,16
**use** 10:20 22:18
23:24 24:18 25:18
28:3 30:5,24 31:2
31:7,20 34:7 36:2
36:3 42:16 52:4
52:25 61:2,13,19
64:2,12,19,21,24
65:3,6 69:2 70:7,8
70:9 74:25 79:15
82:10,11 84:24
85:8,16,24,25
87:21,23 88:22
90:2,13 91:2,12
92:23 93:3,9 94:1
96:13 97:10 101:1
102:17,20 103:8
103:13 104:12,16
105:11 107:2
108:7 115:7
119:20 121:12,13
139:8 157:7
160:23 162:11,16
163:23 165:23
166:3 169:23
171:12 177:13,21
178:7,13,24 179:6
180:19 185:14
187:3 188:14

Veritext Legal Solutions
866 299-5127

**[use - viewing]**

189:3 193:11
195:12 197:20
198:16,24 199:6
199:10,10,15,16
207:16 208:12,15
215:9,14 216:7
227:2
**useful** 66:14 99:12
168:3
**user** 24:22,23
25:12,12,18,19,21
26:7,13,15 27:1,2
27:3 28:4,10,24
29:5,12,22 30:22
30:23,25 31:5,11
33:3,4 43:8,8,13
49:10 53:17 68:9
78:18 84:6 85:9
85:11,14 86:6
90:8,13 91:2,10
92:15,24 93:1,1,1
94:15,20 95:15,17
95:23,25 97:1,2,3
97:7,12,14 98:6,21
98:24 99:2 107:18
108:8 109:9,10,13
110:19,22 111:12
111:15,19 112:24
113:2,6,7,12,16,23
115:6 122:1
126:15,24 127:2
127:15,16 128:16
128:20 133:11
134:19,25 140:25
143:15 154:18,23
157:6,18 158:11
158:14 159:1,3
166:14 168:5,7
169:14 171:8
177:17 181:1,2,10
185:17 187:17

188:3,7,8,10,11,13
188:18 189:4
190:20,21 191:1,7
191:17 192:9,15
192:16,24 193:6
196:3,4 200:15
201:8,12,19,23
204:15 206:2,7,15
206:23 207:3,5,13
207:22 208:1,10
208:13,15,20
209:3,10,25 210:6
210:9,16,18,20,21
210:22 212:14,22
212:24,25 215:18
217:17,23 218:5,7
219:13
**user's** 56:15 68:17
83:15 85:1 86:2
90:15 91:4 111:23
142:8,10 143:16
157:19 158:24,24
162:7 172:20
185:18 194:1,2,7,7
194:22 198:3,3,16
198:24 199:7,16
205:20
**users** 18:16 19:9
21:1,15,25 30:12
31:20 32:3 41:16
43:5 49:12 54:15
57:3 62:6 82:18
83:1,20,25 84:4,11
85:3,19,20 86:3,11
90:16 91:5 92:11
93:6 94:4 96:3,4,7
96:12,21 97:5,19
98:10,15,18
109:25 110:2,4,5,6
110:7,9 114:3,9
115:10,14 116:15

119:25 120:16
122:6,10,13,18
123:8,10,13,15
124:16,17 125:4
125:25 126:7
127:7 128:14
141:12,13 145:7
146:1 151:21
152:21 153:6,9,12
153:23,25 154:1,2
154:6,8,10,19
155:4,7,25 156:2
156:18,19 157:2
158:21 159:13
162:16 166:11
168:24 172:5,22
177:15 178:2,22
179:13 181:22
187:10 200:12
201:17 202:2,3,5
202:16,20 213:15
213:17 214:8,10
214:14 216:10
217:5 219:3 221:9
221:14 222:5,9
223:10 225:25
226:2,18,21 227:1
**uses** 22:14 42:21
43:7 109:25 110:1
110:3 129:24
160:17 177:15
178:21,25 181:21
204:9 211:11
**usually** 74:24
**utilize** 201:9

**v**

**vague** 215:23
**value** 118:13
119:6,12
**variety** 111:4
162:17 163:23

199:19 213:14
**various** 12:9,10
69:1 110:8 136:19
137:15,19 148:18
150:13 152:3,13
153:11 156:6
177:6 184:21
**vary** 214:22
**verbatim** 17:7
**verifying** 63:1
**veritext** 8:24 9:1
224:19 228:9
231:7,9,11
**version** 61:2 90:6
162:6 189:1 203:7
205:24
**versions** 150:4,13
162:10 205:12
221:8
**versus** 8:18 27:6
87:24
**vertically** 160:4
**victim's** 169:5
**victims** 169:4
**video** 8:14,16
228:3
**videographer** 4:25
8:6,25 15:4,7 47:5
47:8 80:25 81:3
121:3,6 155:13,16
173:21,24 183:22
183:25 212:4,7
220:16,19 228:2,6
**videotaped** 1:15
2:15
**view** 30:15 83:24
88:20,23
**viewers** 163:13
**viewing** 61:9
66:14

**[violated - windows]**

| | | | |
|---|---|---|---|
| violated 117:2 | 37:18 40:8 42:23 | 116:12 120:23 | 192:16,25 193:19 |
| violation 40:15 | 43:9,15 49:19 | 122:24 129:21 | 201:13 213:8 |
| 117:20 130:1,5 | 55:17 63:19 74:15 | 130:25 138:12 | websites 22:9 30:5 |
| 219:24 | 81:5,16 82:19 | 139:17 146:19 | 32:5 54:23 55:22 |
| violence 169:8 | 88:8 101:11 | 147:2 151:22 | 61:18 67:21 73:22 |
| virtual 8:23 | 102:11 104:8,22 | 157:9 159:11 | 74:10 78:16 |
| virtually 8:10 | 111:8 114:14,20 | 169:18 174:15 | 102:20 107:23 |
| visibility 113:25 | 116:25 117:18 | 175:18 176:20,22 | 108:5 110:10,23 |
| visible 204:18 | 120:19,20 121:21 | 176:23 193:16 | 128:6 130:8 |
| 208:22 209:5 | 122:4 124:3,4 | 194:14 201:15 | 138:16 139:13,22 |
| 210:2 | 127:18,19 128:10 | 208:9 216:9 227:1 | 142:4 154:23 |
| visit 42:16 54:22 | 128:14,18 130:22 | 230:18 | 168:25 180:25 |
| 55:22 61:19 73:23 | 131:16 139:13,22 | ways 22:9 30:19 | 189:15 201:9,20 |
| 74:10 102:21 | 145:15 157:7,7 | 157:5 162:17 | 201:22 |
| 109:14 130:9 | 160:4,12 164:24 | 163:23 169:1,24 | weird 70:12 |
| 189:13,15 190:3 | 165:12,15,17 | 204:7 | weisbrot 15:23 |
| 190:14,14 | 174:3,14 187:14 | we've 29:24 30:2,3 | welcome 101:12 |
| visited 138:16 | 196:2 205:6,9,15 | 46:25 57:25 59:10 | 132:9 |
| 200:1 | 206:18 211:8 | 60:24 71:3 98:1 | went 40:17 103:4 |
| visiting 66:25 | 212:24 225:18 | 134:1 212:24 | 103:23 154:3 |
| 189:14 190:2 | wanted 70:16 | web 25:13 39:6 | 208:5 |
| visitor's 78:17 | 103:23 115:21 | 40:25 41:2,12,14 | when's 49:23,23 |
| visitors 61:20 | 116:20 205:13 | 41:17,18 44:1,1 | whereof 230:20 |
| visits 78:18 | 206:16 212:17 | 62:8 67:16 68:22 | wholly 111:6 |
| vpn 214:11,21 | wanting 127:17 | 76:5,18 77:18 | widely 140:21 |
| vpns 214:7,17,19 | wants 140:3,11 | 79:19 92:14 105:2 | 142:4 |
| 214:21,23 215:5,9 | 212:22 | 107:24 108:6 | widespread |
| 215:14 | warning 211:13 | 112:1,2 128:2 | 214:13 |
| vs 1:9 2:9 231:4 | washington 3:7 | 139:12,14 144:23 | wife 130:3 170:21 |
| 233:1 | watch 103:25 | 145:4 146:3 | wikipedia 44:23 |
| **w** | 161:20 | 162:24 164:16,19 | 45:1,2 |
| wait 46:19 129:12 | watson 6:16 69:19 | 164:21 171:25 | william 1:5 2:5 |
| 129:12,12 137:17 | 70:5,25 137:24 | 173:3,6 178:13 | willing 57:14 65:3 |
| 137:21 149:24 | way 6:21 24:7 | 203:7 213:13 | 106:1 144:15 |
| 174:16 175:16 | 27:14 28:25 42:3 | 225:4,15 | 187:13 |
| waived 231:23,23 | 42:9 65:13 66:18 | website 30:20 | winding 212:1 |
| waiving 231:20 | 75:5,18 77:15 | 42:16 56:13 59:11 | window 22:16 |
| walk 160:9 | 78:9,20 81:22 | 112:8 113:1 | 113:13 176:4 |
| wander 64:3 | 86:22 90:23 99:5 | 130:10 140:3,3,10 | 206:13 |
| want 14:5 25:9,18 | 99:5 103:22,22 | 140:14,24 189:13 | windows 175:8,24 |
| 26:8,23 34:24,24 | 111:25 113:7,22 | 189:14 190:2,14 | |

**[wireless - yeah]**

**wireless**  189:13
**wish**  213:17
**withdrawn**  191:8
**withe**  164:8
**witness**  5:6,14
   8:12 9:14,16 10:5
   10:8,12 18:8 21:3
   25:21 26:6,18
   30:2 32:22 34:3
   36:6,16 47:3
   48:25 50:18 61:11
   76:23 77:2 79:22
   80:2,9,17,20 84:10
   99:4 109:2 110:25
   113:4,18 116:19
   123:4 124:25
   125:8 133:22
   147:18 148:14
   154:10 168:2
   175:16 176:12
   177:8,24 178:4
   179:20 180:2
   181:4 182:15
   183:11 185:8,25
   186:15 187:6
   188:13 189:6
   190:7,24 191:19
   192:7 194:12,25
   195:22 197:12
   199:13 202:12
   203:23 206:6,18
   207:9 209:14
   210:11,20 212:20
   215:11,16,21
   217:22 218:11
   219:6 220:2,8
   221:17 222:8
   223:1,9 224:2,25
   226:25 227:12,18
   227:22 228:1
   229:12 230:8,9,20

231:13,16 232:2,5
   233:24
**witnesses**  201:4
**wonder**  158:8
**wondering**  132:3
**word**  49:19,20
   60:1 79:3,6 84:17
   84:23 85:8 87:21
   92:23 93:3,9,10
   94:1 95:11 100:9
   100:10,18,25
   102:11,23 105:10
   106:6 114:15,20
   126:17 127:4
   150:16 153:14
   167:11 197:21
   203:9 216:7 227:2
**word's**  103:6
**wording**  98:13
**words**  34:8 58:11
   59:21 76:10 79:15
   96:8,9,12 100:18
   102:9 133:24
   164:8 197:6
**work**  20:17 30:17
   33:23 36:9,18
   37:14 38:23 39:7
   43:10 68:6 83:24
   86:11 88:1 89:4
   139:2 144:10
   158:20 160:10
   162:13 169:15
   182:18 187:22
   191:12 195:4
   207:10 210:25
**worked**  37:23,23
   39:21 50:22
**working**  54:7 67:6
   99:7 167:18
   188:25

**works**  38:14 57:23
   67:25 90:23
   105:22 168:19
   195:5
**world**  6:8,12
   42:21 54:12 58:14
   60:19 104:7
   135:14 217:25
**worry**  40:13 103:4
   117:8
**wow**  61:7 118:4
**wrapped**  158:21
**write**  27:16 53:17
   59:21 77:14,15
   84:19 95:3 99:5,5
   105:5 129:17
   142:7 143:5 166:9
   171:22 177:14
   180:17 186:9
   203:12 207:25
**writer**  223:3
**writes**  78:7,15
   175:3
**writing**  17:14,22
   17:24,25 36:11
   51:10 62:16 79:4
   91:19 96:3,3,5,7
   110:13 152:9
   160:12 202:23
   211:2,16,19
**writings**  136:25
   215:22
**written**  27:21
   29:16,17 48:16
   50:20 74:14
   138:23 176:19
   218:5
**wrong**  43:15 63:10
   63:15 69:24,25
   141:18 143:7,10
   208:22 217:12

**wrote**  14:18,18
   59:19 86:14 89:3
   89:4 101:11,14
   133:2 171:23
   181:7 197:3
   206:21 218:12

| x |
| --- |

**x**  5:1 22:16 96:18
   232:1

| y |
| --- |

**y**  96:18
**yanchunis**  4:4
   9:20
**yeah**  11:16 13:12
   13:17,24 14:10,20
   14:24 17:7,8,16
   23:10 35:4 41:25
   42:5,7,8 53:11
   55:3,5,13,19 56:12
   57:21 58:6,9 60:6
   61:12 63:4,20
   72:7 73:4,12,16
   76:9 78:1,1 79:13
   80:22 85:14 86:8
   86:17,21 89:8,18
   91:1 93:24 94:10
   95:12,22 96:9
   98:14 99:4,8
   100:1,12 106:10
   106:25 109:15,22
   113:8,10 114:5,10
   114:22 124:5,8
   125:8 129:6,13
   131:8 133:16
   137:12 138:22
   139:19 141:21,22
   145:12,15 146:8
   147:16 148:14
   153:2 155:20
   162:1,21 163:6,13

Veritext Legal Solutions
866 299-5127

**[yeah - zuboff]**

177:3,24 178:19
179:3 188:21
190:1,4 191:2
192:10,21 194:16
196:6,12,18 197:1
197:24 198:20
199:14 201:7
205:14 208:8
211:18,21 215:2
216:19,21 217:1,3
218:15 219:20
223:22 228:4
**year**   105:17 151:2
225:1
**years**   51:16,21
87:15 101:16,17
132:24
**yep**   12:17 66:11
69:12 78:1 89:12
99:13 188:23
196:25
**yesterday**   11:2
**ygr**   1:9 2:9 8:21
**yields**   213:8,13
**york**   3:13,13
42:24 43:3,9 44:5
44:7,7,10,11,17
62:18,19,19,21
67:1 109:14
111:16,18 113:1
113:13 123:18
125:12 128:10
171:23

**z**

**zero**   44:6
**zervas**   7:10 184:7
184:13,20 185:2,6
185:12 193:12
194:1 202:1
**zhang**   4:24

**zip**   192:9,10
**zoom**   1:16 2:16
10:25 11:12 40:14
117:8
**zuboff**   125:22

Page 48

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.