# EXHIBIT 21

# Redacted Version of Document Sought to be Sealed

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3

4

5

6

7

8

9

10

11

CHASOM BROWN, WILLIAM BYATT,
JEREMY DAVIS, CHRISTOPHER
CASTILLO, and MONIQUE TRUJILLO
individually and on behalf of all other
similarly situated,

                   Plaintiffs,

   v.

GOOGLE LLC,

                   Defendant.

Case No.  5:20-cv-03664-LHK-SVK

12

13

**PLAINTIFF WILLIAM BYATT'S OBJECTIONS AND RESPONSES**
**TO DEFENDANT'S THIRD SET OF REQUESTS FOR ADMISSION**

14

15

16

17

18

19

20

Pursuant to Federal Rule of Civil Procedure Rule 36, Plaintiff William Byatt ("Byatt")
hereby objects and responds to Defendant's, Google LLC ("Google"), Third Set of Requests for
Admission (Nos. 22–29). These objections and responses are made solely for the purpose of and
in relation to this action. In addition, the objections and responses set forth in this document are
based on Plaintiff Byatt's knowledge, investigations, and analysis to date. As discovery proceeds,
Plaintiff Byatt may become aware of additional facts or evidence and his analysis of the case may
change. Plaintiff Byatt reserves all rights to supplement and amend his objections and responses
accordingly.

21

**REQUEST FOR ADMISSION NO. 22:**

22

23

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the
terms of Google's then-current TERMS OF SERVICE.

24

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

25

26

27

Plaintiff Byatt objects to this Request to the extent it purports to suggest that agreement to
Google's Terms of Service is a necessary predicate for any claim in this litigation (aside from
breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully

28

intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Byatt admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Terms of Service, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the terms of Google's then-current PRIVACY POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Plaintiff Byatt objects to this Request to the extent it purports to suggest that agreement to Google's Privacy Policy is a necessary predicate for any claim in this litigation (aside from breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito

mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Byatt admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Privacy Policy, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME TERMS OF SERVICE.

**ORIGINAL RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Plaintiff Byatt admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Terms of Service, he indicated to Google that he generally agreed to Google's then-current Chrome Terms of Service, and he recalls Google's disclosures, including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME PRIVACY NOTICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Plaintiff Byatt admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Privacy Notice, he indicated to Google that he generally agreed to Google's then-current Chrome Privacy Notice, and he recalls the disclosures,

including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that YOU have never paid any money to Google to use CHROME.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Plaintiff Byatt objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Byatt responds that, to the best of his recollection, he has not directly paid any money to Google to use Chrome. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU have never paid any money to Google to use GMAIL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Plaintiff Byatt objects to this Request as irrelevant, as Gmail is not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment

to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Byatt responds that, to the best of his recollection, he has not directly paid any money to Google to use Gmail. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have never paid any money to Google to use any SERVICES offered by Google.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Plaintiff Byatt objects to the term "Services" insofar as it is irrelevant, vague, and ambiguous, as Google has defined it to include a non-exhaustive list of "Google apps, sites, and devices, like Search, YouTube, and Google Home, Google platforms like the Chrome browser and Android operating system, and Google products that are integrated into third-party apps and sites, like ads and embedded Google Maps." Plaintiff's use of YouTube, Maps, and other irrelevant "services" are not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their

respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Byatt responds that, to the best of his recollection, he has paid to Google approximately ▮ per month for Google One (since approximately ▮▮▮▮), ▮ per month for YouTube Premium (since approximately ▮▮▮▮ as a Google Play Music subscriber, which was converted into a YouTube premium subscription in approximately ▮▮▮▮), and approximately ▮▮▮ per month for Google Fi (since approximately ▮▮▮). Additionally, Plaintiff has provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 29:**

Admit that in YOUR GOOGLE ACCOUNT WEB & APP ACTIVITY SETTINGS, YOU consented to Google saving information about your activity on sites that use Google services in Your Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Plaintiff Byatt objects to this Request as irrelevant, as Web & App Activity is not at issue in this litigation. Otherwise denied.

Dated: July 30, 2021

**MORGAN & MORGAN**

*/s/ John A. Yanchunis*

John A. Yanchunis (*pro hac vice*)
Ryan J. McGee (*pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 222-4736
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

William S. Carmody
Shawn Rabin
Steven M. Shepard
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Amanda K. Bonn (270891)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiffs*

**<u>PROOF OF SERVICE</u>**

I, Jennifer Cabezas, declare:

I am a citizen of the United States and employed in the County of Hillsborough, Florida. I am over the age of 18 and not a party to the within action; my business address is 201 N. Franklin St., 7th Floor, Tampa, FL 33602.

On July 30, 2021, I served the following document described as:

**Plaintiff's Objections and Responses to Defendant's Third Set of Requests for Admission**

By electronic mail transmission from jcabezas@forthepeople.com on July 30, 2021, by transmitting a PDF format copy of such document to each person at the e-mail addresses listed below. The document was transmitted by electronic transmission and such transmission was reported as complete and without error:

Andrew H. Schapiro (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: 312-705-7400
Fax: 312-705-7401
andrewschapiro@quinnemanuel.com

*Attorney for Defendant*

Stephen A. Broome
Viola Trebicka
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: 213-443-3000
Fax: 213-443-3100
stephenbroome@quinnemanuel.com
violatrebicka@quinnemanuel.com

*Attorneys for Defendant*

Diane M. Doolittle
Thao Thai
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor

Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-8015100
dianedoolittle@quinnemanuel.com
thaothai@quinnemanuel.com

*Attorneys for Defendant*

William Burck (pro hac vice)
Josef Ansorge (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C., 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
josefansorge@quinnemanuel.com

*Attorneys for Defendant*

Jonathan Tse
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6600
Fax: 415-875-6700
jonathantse@quinnemanuel.com

*Attorneys for Defendant*

     Executed on July 30, 2021, at Tampa, Florida.


                */s/ Jennifer Cabezas*
                Jennifer Cabezas

# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CHASOM BROWN, WILLIAM BYATT,
JEREMY DAVIS, CHRISTOPHER
CASTILLO, and MONIQUE TRUJILLO
individually and on behalf of all other
similarly situated,

               Plaintiffs,

   v.

GOOGLE LLC,

               Defendant.

Case No.  5:20-cv-03664-LHK-SVK

**PLAINTIFF CHRISTOPHER CASTILLO'S OBJECTIONS AND RESPONSES
TO DEFENDANT'S THIRD SET OF REQUESTS FOR ADMISSION**

      Pursuant to Federal Rule of Civil Procedure Rule 36, Plaintiff Christopher Castillo
("Castillo") hereby objects and responds to Defendant's, Google LLC ("Google"), Third Set of
Requests for Admission (Nos. 22–29). These objections and responses are made solely for the
purpose of and in relation to this action. In addition, the objections and responses set forth in this
document are based on Plaintiff Castillo's knowledge, investigations, and analysis to date. As
discovery proceeds, Plaintiff Castillo may become aware of additional facts or evidence and his
analysis of the case may change. Plaintiff Castillo reserves all rights to supplement and amend his
objections and responses accordingly.

**REQUEST FOR ADMISSION NO. 22:**

      Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the
terms of Google's then-current TERMS OF SERVICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

      Plaintiff Castillo objects to this Request to the extent it purports to suggest that agreement
to Google's Terms of Service is a necessary predicate for any claim in this litigation (aside from
breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully

intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Castillo admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Terms of Service, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the terms of Google's then-current PRIVACY POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Plaintiff Castillo objects to this Request to the extent it purports to suggest that agreement to Google's Privacy Policy is a necessary predicate for any claim in this litigation (aside from breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito

mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Castillo admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Privacy Policy, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME TERMS OF SERVICE.

**ORIGINAL RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Plaintiff Castillo admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Terms of Service, he indicated to Google that he generally agreed to Google's then-current Chrome Terms of Service, and he recalls Google's disclosures, including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME PRIVACY NOTICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Plaintiff Castillo admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Privacy Notice, he indicated to Google that he generally agreed to Google's then-current Chrome Privacy Notice, and he recalls the disclosures,

including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that YOU have never paid any money to Google to use CHROME.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Plaintiff Castillo objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Castillo responds that, to the best of his recollection, he has not directly paid any money to Google to use Chrome. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU have never paid any money to Google to use GMAIL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Plaintiff Castillo objects to this Request as irrelevant, as Gmail is not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary

payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Castillo responds that, to the best of his recollection, he has not directly paid any money to Google to use Gmail. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have never paid any money to Google to use any SERVICES offered by Google.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Plaintiff Castillo objects to the term "Services" insofar as it is irrelevant, vague, and ambiguous, as Google has defined it to include a non-exhaustive list of "Google apps, sites, and devices, like Search, YouTube, and Google Home, Google platforms like the Chrome browser and Android operating system, and Google products that are integrated into third-party apps and sites, like ads and embedded Google Maps." Plaintiff's use of YouTube, Maps, and other irrelevant "services" are not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their

respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Castillo responds that, to the best of his recollection, he has not directly paid any money to Google to use services offered by Google. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 29:**

Admit that in YOUR GOOGLE ACCOUNT WEB & APP ACTIVITY SETTINGS, YOU consented to Google saving information about your activity on sites that use Google services in Your Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Plaintiff Castillo objects to this Request as irrelevant, as Web & App Activity is not at issue in this litigation. Otherwise denied.

Dated: July 30, 2021

**MORGAN & MORGAN**

*/s/ John A. Yanchunis*

John A. Yanchunis (*pro hac vice*)
Ryan J. McGee (*pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 222-4736
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

William S. Carmody
Shawn Rabin
Steven M. Shepard
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Amanda K. Bonn (270891)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiffs*

**PROOF OF SERVICE**

I, Jennifer Cabezas, declare:

I am a citizen of the United States and employed in the County of Hillsborough, Florida. I am over the age of 18 and not a party to the within action; my business address is 201 N. Franklin St., 7th Floor, Tampa, FL 33602.

On July 30, 2021, I served the following document described as:

**Plaintiff's Objections and Responses to Defendant's Third Set of Requests for Admission**

By electronic mail transmission from jcabezas@forthepeople.com on July 30, 2021, by transmitting a PDF format copy of such document to each person at the e-mail addresses listed below. The document was transmitted by electronic transmission and such transmission was reported as complete and without error:

Andrew H. Schapiro (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: 312-705-7400
Fax: 312-705-7401
andrewschapiro@quinnemanuel.com

*Attorney for Defendant*

Stephen A. Broome
Viola Trebicka
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: 213-443-3000
Fax: 213-443-3100
stephenbroome@quinnemanuel.com
violatrebicka@quinnemanuel.com

*Attorneys for Defendant*

Diane M. Doolittle
Thao Thai
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor

Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-8015100
dianedoolittle@quinnemanuel.com
thaothai@quinnemanuel.com

*Attorneys for Defendant*

William Burck (pro hac vice)
Josef Ansorge (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C., 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
josefansorge@quinnemanuel.com

*Attorneys for Defendant*

Jonathan Tse
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6600
Fax: 415-875-6700
jonathantse@quinnemanuel.com

*Attorneys for Defendant*

Executed on July 30, 2021, at Tampa, Florida.


*/s/ Jennifer Cabezas*
Jennifer Cabezas

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CHASOM BROWN, WILLIAM BYATT,
JEREMY DAVIS, CHRISTOPHER
CASTILLO, and MONIQUE TRUJILLO
individually and on behalf of all other
similarly situated,

               Plaintiffs,

  v.

GOOGLE LLC,

               Defendant.

Case No.  5:20-cv-03664-LHK-SVK

**PLAINTIFF JEREMY DAVIS' OBJECTIONS AND RESPONSES**
**TO DEFENDANT'S THIRD SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rule of Civil Procedure Rule 36, Plaintiff Jeremy Davis ("Davis")
hereby objects and responds to Defendant's, Google LLC ("Google"), Third Set of Requests for
Admission (Nos. 22–29). These objections and responses are made solely for the purpose of and
in relation to this action. In addition, the objections and responses set forth in this document are
based on Plaintiff Davis' knowledge, investigations, and analysis to date. As discovery proceeds,
Plaintiff Davis may become aware of additional facts or evidence and his analysis of the case may
change. Plaintiff Davis reserves all rights to supplement and amend his objections and responses
accordingly.

**REQUEST FOR ADMISSION NO. 22:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the
terms of Google's then-current TERMS OF SERVICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Plaintiff Davis objects to this Request to the extent it purports to suggest that agreement to
Google's Terms of Service is a necessary predicate for any claim in this litigation (aside from
breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully

intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Davis admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Terms of Service, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the terms of Google's then-current PRIVACY POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Plaintiff Davis objects to this Request to the extent it purports to suggest that agreement to Google's Privacy Policy is a necessary predicate for any claim in this litigation (aside from breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito

mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Davis admits that, when he signed up for his Google Account, although he does not recall the exact details of the then-current Privacy Policy, he indicated to Google that he generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and he recalls the disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME TERMS OF SERVICE.

**ORIGINAL RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Plaintiff Davis admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Terms of Service, he indicated to Google that he generally agreed to Google's then-current Chrome Terms of Service, and he recalls Google's disclosures, including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME PRIVACY NOTICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Plaintiff Davis admits that, when he used the Chrome browser, although he does not recall the exact details of the then-current Chrome Privacy Notice, he indicated to Google that he generally agreed to Google's then-current Chrome Privacy Notice, and he recalls the disclosures,

including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect his private browsing activity, and he did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that YOU have never paid any money to Google to use CHROME.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Plaintiff Davis objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Davis responds that, to the best of his recollection, he has not directly paid any money to Google to use Chrome. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU have never paid any money to Google to use GMAIL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Plaintiff Davis objects to this Request as irrelevant, as Gmail is not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment

to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Davis responds that, to the best of his recollection, he has not directly paid any money to Google to use Gmail. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have never paid any money to Google to use any SERVICES offered by Google.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Plaintiff Davis objects to the term "Services" insofar as it is irrelevant, vague, and ambiguous, as Google has defined it to include a non-exhaustive list of "Google apps, sites, and devices, like Search, YouTube, and Google Home, Google platforms like the Chrome browser and Android operating system, and Google products that are integrated into third-party apps and sites, like ads and embedded Google Maps." Plaintiff's use of YouTube, Maps, and other irrelevant "services" are not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their

respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Davis responds that, to the best of his recollection, he has not directly paid any money to Google to use services offered by Google. Plaintiff has, however, provided valuable consideration in the form of his personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 29:**

Admit that in YOUR GOOGLE ACCOUNT WEB & APP ACTIVITY SETTINGS, YOU consented to Google saving information about your activity on sites that use Google services in Your Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Plaintiff Davis objects to this Request as irrelevant, as Web & App Activity is not at issue in this litigation. Otherwise denied.

1  Dated: July 30, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MORGAN & MORGAN**

*/s/ John A. Yanchunis*

John A. Yanchunis (*pro hac vice*)
Ryan J. McGee (*pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 222-4736
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

William S. Carmody
Shawn Rabin
Steven M. Shepard
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Amanda K. Bonn (270891)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiffs*

**PROOF OF SERVICE**

I, Jennifer Cabezas, declare:

I am a citizen of the United States and employed in the County of Hillsborough, Florida. I am over the age of 18 and not a party to the within action; my business address is 201 N. Franklin St., 7th Floor, Tampa, FL 33602.

On July 30, 2021, I served the following document described as:

**Plaintiff's Objections and Responses to Defendant's Third Set of Requests for Admission**

By electronic mail transmission from jcabezas@forthepeople.com on July 30, 2021, by transmitting a PDF format copy of such document to each person at the e-mail addresses listed below. The document was transmitted by electronic transmission and such transmission was reported as complete and without error:

Andrew H. Schapiro (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: 312-705-7400
Fax: 312-705-7401
andrewschapiro@quinnemanuel.com

*Attorney for Defendant*

Stephen A. Broome
Viola Trebicka
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: 213-443-3000
Fax: 213-443-3100
stephenbroome@quinnemanuel.com
violatrebicka@quinnemanuel.com

*Attorneys for Defendant*

Diane M. Doolittle
Thao Thai
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor

Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-8015100
dianedoolittle@quinnemanuel.com
thaothai@quinnemanuel.com

*Attorneys for Defendant*

William Burck (pro hac vice)
Josef Ansorge (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C., 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
josefansorge@quinnemanuel.com

*Attorneys for Defendant*

Jonathan Tse
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6600
Fax: 415-875-6700
jonathantse@quinnemanuel.com

*Attorneys for Defendant*

Executed on July 30, 2021, at Tampa, Florida.


*/s/ Jennifer Cabezas*
Jennifer Cabezas

# EXHIBIT 24

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all other similarly situated,

                 Plaintiffs,

   v.

GOOGLE LLC,

                 Defendant.

Case No.  5:20-cv-03664-LHK-SVK

**PLAINTIFF MONIQUE TRUJILLO'S OBJECTIONS AND RESPONSES TO DEFENDANT'S THIRD SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rule of Civil Procedure Rule 36, Plaintiff Monique Trujillo ("Trujillo") hereby objects and responds to Defendant's, Google LLC ("Google"), Third Set of Requests for Admission (Nos. 22–29). These objections and responses are made solely for the purpose of and in relation to this action. In addition, the objections and responses set forth in this document are based on Plaintiff Trujillo's knowledge, investigations, and analysis to date. As discovery proceeds, Plaintiff Trujillo may become aware of additional facts or evidence and her analysis of the case may change. Plaintiff Trujillo reserves all rights to supplement and amend her objections and responses accordingly.

**REQUEST FOR ADMISSION NO. 22:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the terms of Google's then-current TERMS OF SERVICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Plaintiff Trujillo objects to this Request to the extent it purports to suggest that agreement to Google's Terms of Service is a necessary predicate for any claim in this litigation (aside from breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully

intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Trujillo admits that, when she signed up for her Google Account, although she does not recall the exact details of the then-current Terms of Service, she indicated to Google that she generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and she recalls the disclosures promising that Google would not intercept and collect her private browsing activity, and she did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that, when YOU signed up for YOUR GOOGLE ACCOUNT, YOU agreed to the terms of Google's then-current PRIVACY POLICY.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Plaintiff Trujillo objects to this Request to the extent it purports to suggest that agreement to Google's Privacy Policy is a necessary predicate for any claim in this litigation (aside from breach of contract). Plaintiff's allegations relate to Google's conduct of secretly and unlawfully intercepting, collecting data from, analyzing, and monetizing Plaintiff's (and class members') browsing activity conducted in private browsing mode, despite Google's representations (including without limitation in the Incognito private browsing mode) that private browsing mode was private and that Plaintiff's (and class members') private browsing information would not be collected by Google. Users did not need any Google account to browse privately, using Incognito

mode or otherwise. Further, to the best of Plaintiff's knowledge, he has never logged into any Google accounts in Chrome when using Chrome's private browsing mode.

Notwithstanding and subject to these objections, Plaintiff Trujillo admits that, when she signed up for her Google Account, although she does not recall the exact details of the then-current Privacy Policy, she indicated to Google that she generally agreed to Google's then-current Terms of Service—which incorporates the Google Chrome and Chrome OS Additional Terms of Service, the Chrome Privacy Notice, the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen—and she recalls the disclosures promising that Google would not intercept and collect her private browsing activity, and she did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME TERMS OF SERVICE.

**ORIGINAL RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Plaintiff Trujillo admits that, when she used the Chrome browser, although she does not recall the exact details of the then-current Chrome Terms of Service, she indicated to Google that she generally agreed to Google's then-current Chrome Terms of Service, and she recalls Google's disclosures, including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect her private browsing activity, and she did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that, when YOU used the Chrome browser, YOU agreed to the terms of Google's then-current CHROME PRIVACY NOTICE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Plaintiff Trujillo admits that, when she used the Chrome browser, although she does not recall the exact details of the then-current Chrome Privacy Notice, she indicated to Google that she generally agreed to Google's then-current Chrome Privacy Notice, and she recalls the

disclosures, including Google's Terms of Service, Privacy Policy, Incognito Screen, and other disclosures promising that Google would not intercept and collect her private browsing activity, and she did not consent to that interception and collection. Otherwise Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that YOU have never paid any money to Google to use CHROME.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Plaintiff Trujillo objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Trujillo responds that, to the best of her recollection, she has not directly paid any money to Google to use Chrome. Plaintiff has, however, provided valuable consideration in the form of her personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU have never paid any money to Google to use GMAIL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Plaintiff Trujillo objects to this Request as irrelevant, as Gmail is not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary

payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Trujillo responds that, to the best of her recollection, she has not directly paid any money to Google to use Gmail. Plaintiff has, however, provided valuable consideration in the form of her personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have never paid any money to Google to use any SERVICES offered by Google.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Plaintiff Trujillo objects to the term "Services" insofar as it is irrelevant, vague, and ambiguous, as Google has defined it to include a non-exhaustive list of "Google apps, sites, and devices, like Search, YouTube, and Google Home, Google platforms like the Chrome browser and Android operating system, and Google products that are integrated into third-party apps and sites, like ads and embedded Google Maps." Plaintiff's use of YouTube, Maps, and other irrelevant "services" are not at issue in this litigation. Plaintiff further objects to this Request to the extent it purports to suggest that monetary payment to Google is a necessary predicate for any claim in this litigation. Plaintiff and class members provided valuable consideration in the form of their

respective personal information they agreed to share with Google in non-private browsing mode, which has ascertainable and demonstrated value by its use and sale by Google. Because Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's (and class members') browsing activity conducted in private browsing mode, this private and personally identifiable data and content has been diminished in value, and Plaintiff and class members have been deprived of their right to control the dissemination and use of their respective personal information and communications.

Notwithstanding and subject to these objections, Plaintiff Trujillo responds that, to the best of her recollection, she has not directly paid any money to Google to use services offered by Google. Plaintiff has, however, provided valuable consideration in the form of her personal information for the use of Google products, but Google unlawfully intercepted, collected data from, analyzed, and monetized Plaintiff's browsing activity conducted in private browsing mode, the value of which has been diminished and Google has used to its benefit to increase its profits and revenues from targeted advertising and improvements of Google's other products. Otherwise denied.

**REQUEST FOR ADMISSION NO. 29:**

Admit that in YOUR GOOGLE ACCOUNT WEB & APP ACTIVITY SETTINGS, YOU consented to Google saving information about your activity on sites that use Google services in Your Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Plaintiff Trujillo objects to this Request as irrelevant, as Web & App Activity is not at issue in this litigation. Otherwise denied.

Dated: July 30, 2021

**MORGAN & MORGAN**

*/s/ John A. Yanchunis*

John A. Yanchunis (*pro hac vice*)
Ryan J. McGee (*pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 222-4736
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

William S. Carmody
Shawn Rabin
Steven M. Shepard
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Amanda K. Bonn (270891)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiffs*

## **PROOF OF SERVICE**

I, Jennifer Cabezas, declare:

I am a citizen of the United States and employed in the County of Hillsborough, Florida. I am over the age of 18 and not a party to the within action; my business address is 201 N. Franklin St., 7th Floor, Tampa, FL 33602.

On July 30, 2021, I served the following document described as:

**Plaintiff's Objections and Responses to Defendant's Third Set of Requests for Admission**

By electronic mail transmission from jcabezas@forthepeople.com on July 30, 2021, by transmitting a PDF format copy of such document to each person at the e-mail addresses listed below. The document was transmitted by electronic transmission and such transmission was reported as complete and without error:

Andrew H. Schapiro (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: 312-705-7400
Fax: 312-705-7401
andrewschapiro@quinnemanuel.com

*Attorney for Defendant*

Stephen A. Broome
Viola Trebicka
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: 213-443-3000
Fax: 213-443-3100
stephenbroome@quinnemanuel.com
violatrebicka@quinnemanuel.com

*Attorneys for Defendant*

Diane M. Doolittle
Thao Thai
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor

Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-8015100
dianedoolittle@quinnemanuel.com
thaothai@quinnemanuel.com

*Attorneys for Defendant*

William Burck (pro hac vice)
Josef Ansorge (pro hac vice)
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C., 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
josefansorge@quinnemanuel.com

*Attorneys for Defendant*

Jonathan Tse
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6600
Fax: 415-875-6700
jonathantse@quinnemanuel.com

*Attorneys for Defendant*

Executed on July 30, 2021, at Tampa, Florida.


*/s/ Jennifer Cabezas*
Jennifer Cabezas

# EXHIBIT 25

# Redacted Version of Document Sought to be Sealed

1      UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA
2            SAN JOSE DIVISION
3

    CHASOM BROWN, WILLIAM BYATT,
4    JEREMY DAVIS, CHRISTOPHER
    CASTILLO, and MONIQUE TRUJILLO,
5    individually and on behalf of
    all other similarly situated
6

       Plaintiffs,          CASE NO.
7                       5:20-CV-03664-LHK-SVK
    VS.
8

    GOOGLE LLC
9

       Defendant.
10
11
       *****************************************
12    ZOOM VIDEOTAPED DEPOSITION OF WILLIAM BYATT
               December 20, 2021
13              11:04 a.m. EST
       *****************************************
14
15
16    TAKEN BY:
17       VIOLA TREBICKA, ESQ.
       ATTORNEY FOR DEFENDANT
18
19    REPORTED BY:
20       BELLE VIVIENNE, CRR
       CERTIFIED STENOGRAPHIC
21       REALTIME COURT REPORTER
       VERITEXT LEGAL SOLUTIONS
22       JOB NO. 5001125
       866 299-5127
23
24
25

                                          Page 1

```
 1        A P P E A R A N C E S
 2
    FOR THE PLAINTIFFS:
 3
    JAMES W  LEE, ESQ
 4  ROSSANA BAEZA, ESQ
    MARK MAO, ESQ  (San Francisco)
 5  BOIES SCHILLER FLEXNER LLP
    100 SE 2nd Street, Suite 2800
 6  Miami, Florida 33131
    305 539 8400
 7  jlee@bsfllp com
 8
    RYAN J  MCGEE, ESQ
 9  MORGAN & MORGAN, P A
    201 North Franklin Street, 7th Floor
10  Tampa, Florida 33602
    813 223 5505
11  rmcgee@forthepeople com
12  FOR THE DEFENDANT:
13  VIOLA TREBICKA, ESQ
    TRACY GAO, ESQ
14  QUINN EMANUEL URQUHART & SULLIVAN LLP
    865 S  Figueroa St, 10th Floor
15  Los Angeles, California 90017
    213 443 3000
16  Violatrebicka@quinnemanuel com
17
    VIDEOGRAPHER:
18  JoAnn Yager
19
20
21
22
23
24
25
                                      Page 2
```

```
 1              -  -  -
 2      E X H I B I T S (Continued.)
 3              -  -  -
 4
 5  NO.        DESCRIPTION           PAGE
 6  Exhibit 6    Google Terms of Services
 7             effective dates
 8             04/16/2007 to 02/29/2012...104
 9  Exhibit 7    Google Privacy Policy......112
10  Exhibit 8    Screenshot of Chrome's
11             You've Gone Incognito
12             pop-up screen from
13             08/20/2020................123
14  Exhibit 9    How Private Browsing
15             Works in Chrome Google
16             document..................142
17  Exhibit 10   Google Search Help
18             Document..................148
19  Exhibit 11   Second Amended Complaint...156
20  Exhibit 12   May 12, 2021 Amended
21             Responses and Objections
22             to Google's
23             Interrogatories Number 1,
24             4 and 5....................166
25
                                      Page 4
```

```
 1              -  -  -
 2            I N D E X
 3              -  -  -
 4
 5  Testimony of:
 6      WILLIAM BYATT
 7  MS. TREBICKA............................ 9
 8  MR. LEE................................ 253
 9
10              -  -  -
11        E X H I B I T S
12              -  -  -
13
14  NO.        DESCRIPTION           PAGE
15  Exhibit 1    Screenshot................ 32
16  Exhibit 2    The New York Times
17             Privacy Policy, Updated
18             July 1, 2021.............. 50
19  Exhibit 3    Google Analytics Opt-out
20             Browser Add-on document.... 70
21  Exhibit 4    Twitter Privacy Policy..... 76
22  Exhibit 5    Google Ad Personalization
23             Settings.................. 88
24
25
                                      Page 3
```

```
 1              -  -  -
 2      E X H I B I T S (Continued.)
 3              -  -  -
 4  NO.        DESCRIPTION           PAGE
 5  Exhibit 13   Byatt's Revised Responses
 6             to Defendant's Rog 2.......174
 7  Exhibit 14   Google Subscriber
 8             Information Sheet..........195
 9  Exhibit 15   Google Subscriber
10             Information Sheet..........195
11  Exhibit 16   Google Subscriber
12             Information Sheet..........195
13  Exhibit 17   Google Subscriber
14             Information Sheet..........195
15  Exhibit 18   Google Subscriber
16             Information Sheet..........195
17  Exhibit 19   Plaintiff William Byatt's
18             Objections and Responses
19             to Defendant's First Set
20             of Interrogatories.........205
21  Exhibit 20   Plaintiff William Byatt's
22             Amended Objections and
23             Responses to Defendant's
24             Second Set of
25             Interrogatories............206
                                      Page 5
```

```
 1    Q.   Good morning, Mr. Byatt.        11:06:42
 2    A.   Good morning.                   11:06:45
 3    Q.   Could you please state your full   11:06:45
 4  name for the record?                   11:06:47
 5    A.   My name is William Joshua Byatt.   11:06:47
 6    Q.   And what is your home address?   11:06:52
 7    A.   ██████████████████,             11:06:54
 8  ████████████████████████.              11:06:59
 9  I did recently move like last week.    11:07:04
10    Q.   All right.  Okay.               11:07:06
11         On your computer screen, do you   11:07:10
12  have any communication applications open   11:07:11
13  other than Zoom?                       11:07:14
14    A.   I have Zoom and I have the      11:07:15
15  Exhibit Share.  That's it.             11:07:20
16    Q.   Excellent.                      11:07:23
17         Do you have your phone nearby   11:07:25
18  too?                                   11:07:27
19    A.   I do, but it's been turned off.   11:07:28
20    Q.   Perfect, thank you.  Have you   11:07:31
21  ever had your deposition taken before?   11:07:33
22    A.   No.                            11:07:35
23    Q.   So let me just start with some   11:07:36
24  questions.  At any point in time if you   11:07:41
25  have a question about what I'm asking you,   11:07:44
```

```
 1  if you don't understand something, just   11:07:46
 2  let me know.  I will be asking you      11:07:47
 3  questions.  Your counsel, who is in the   11:07:49
 4  room with you -- well, let me take a step   11:07:52
 5  back and say, you are represented today,   11:07:55
 6  correct?                               11:07:58
 7    A.   Yes.                           11:07:58
 8    Q.   And Mr. Lee is your counsel?   11:07:58
 9    A.   Yes.                           11:08:01
10    Q.   If -- one -- while I am asking   11:08:01
11  you questions, there may be a moment in   11:08:03
12  which Mr. Lee may object to my question.   11:08:07
13  Unless Mr. Lee instructs you not to     11:08:11
14  answer, you will answer my question to the   11:08:14
15  best of your ability.  Do you understand   11:08:16
16  that?                                  11:08:18
17    A.   I do, yeah.                    11:08:19
18    Q.   And you also under -- you also   11:08:20
19  understand that you are under oath today,   11:08:22
20  correct?                               11:08:24
21    A.   I do.                          11:08:24
22    Q.   Great.  So, Mr. Byatt, what do   11:08:25
23  you understand by the term "private     11:08:29
24  browsing"?                             11:08:30
25    A.   I understand that to mean that   11:08:32
```

```
 1  my behavior and activity while I am      11:08:35
 2  browsing the Internet or using, you know,   11:08:40
 3  web software, won't be shared with anyone   11:08:44
 4  that I don't want it shared with.  It will   11:08:48
 5  be private to me.                       11:08:50
 6    Q.   So -- so your understanding of   11:08:56
 7  private browsing is that it won't be     11:08:59
 8  shared with anyone that you don't want it   11:09:02
 9  shared with, correct?                   11:09:04
10    MR. LEE:  Objection to form.         11:09:06
11    A.   Yes, that -- that is my          11:09:09
12  understanding.  That I have control over   11:09:11
13  who it's shared with and -- and that --   11:09:14
14  that -- yeah, that it's limited to       11:09:18
15  who I sort of affirm that it's going to --   11:09:20
16  to be shared with, yeah.                11:09:24
17  BY MS. TREBICKA:                        11:09:24
18    Q.   And what's your understanding of   11:09:24
19  how you affirm this consent to share your   11:09:25
20  information?                            11:09:30
21    A.   I think that I -- pardon me --   11:09:33
22  agree to share information when I accept   11:09:39
23  various terms of service or privacy      11:09:47
24  policies.  I think that in the case of --   11:09:50
25  I mean, I do most of my browsing on      11:09:55
```

```
 1  Chrome, so when I think about private    11:09:59
 2  browsing, I think about the Incognito    11:10:01
 3  modem, that little splash screen that    11:10:06
 4  comes up and tells me what I'm sharing and   11:10:08
 5  opening Incognito is agreeing to that    11:10:10
 6  splash screen.                          11:10:15
 7    Q.   So if you're aware that your     11:10:17
 8  information is being shared with a       11:10:18
 9  particular party and you continue to     11:10:20
10  browse so that your information is shared,   11:10:24
11  that means that you understand your      11:10:26
12  information will be shared, correct?     11:10:29
13    MR. LEE:  Objection to form.         11:10:32
14    A.   I -- I'm -- I'm not sure I       11:10:34
15  understood that question.  Could you --   11:10:36
16  BY MS. TREBICKA:                        11:10:36
17    Q.   That was -- you're right.  That   11:10:37
18  was not a very good question.  Let me    11:10:39
19  withdraw it and ask you -- so you        11:10:41
20  mentioned Incognito browsing, right?     11:10:43
21    A.   Uh-huh.                         11:10:47
22    Q.   What do you understand -- and,   11:10:47
23  sorry.  Just one more thing, because the   11:10:47
24  court reporter will be taking down       11:10:50
25  everything that we say, while in common   11:10:52
```

1  speech, it -- it's all right and I          11:10:56
2  understand what you mean when you say        11:10:59
3  uh-huh or something that's not verbal.       11:11:01
4  Please do verbalize your answers for the     11:11:04
5  court reporter.                              11:11:07
6      A.  I may require reminders, but         11:11:07
7  I'll certainly try.                          11:11:10
8      Q.  I will remind you.                   11:11:11
9         So you -- earlier you talked          11:11:12
10  about private -- about Incognito, correct?  11:11:14
11     A.  I did, yes.                          11:11:19
12     Q.  So you do browsing in Incognito,     11:11:20
13  correct?                                    11:11:22
14     A.  Yes.                                 11:11:22
15     Q.  Do you continue to browse in         11:11:23
16  Incognito today?                            11:11:25
17     A.  Occasionally, yes.                   11:11:25
18     Q.  How often, presently, how often     11:11:28
19  do you browse?                              11:11:32
20     A.  That I wouldn't be able to tell      11:11:33
21  you.  I don't particularly keep track.      11:11:36
22  Certainly -- yeah, I don't think I could    11:11:40
23  say with specificity.  It comes in fits     11:11:46
24  and bursts.  You know, sometimes I might    11:11:49
25  spend several hours browsing multiple days  11:11:52
Page 14

1  in a week and sometimes I might go weeks     11:11:58
2  without opening it.                          11:12:01
3      Q.  And when you say "it," you mean      11:12:02
4  Incognito?                                   11:12:04
5      A.  I mean Incognito, yes.              11:12:05
6      Q.  Understood.  Have you changed        11:12:06
7  your browsing behavior on Incognito since    11:12:07
8  the filing of this lawsuit?                  11:12:10
9      A.  I have wanted to.  I may have        11:12:12
10  some, but I felt that it would be best to   11:12:16
11  try to continue my behavior as sort of      11:12:20
12  normally as possible.  I'm not sure how     11:12:24
13  effective that is with sort of the --       11:12:29
14  awareness and thinking about this more.     11:12:34
15  But it's been -- it's been roughly pretty   11:12:35
16  similar.                                    11:12:40
17     Q.  You say you -- that you have         11:12:40
18  tried to -- or you said that you -- it      11:12:43
19  would be best to try to continue your       11:12:47
20  behavior as normal.                         11:12:48
21        What do you mean by that?            11:12:51
22     A.  Yeah.  So when -- when this          11:12:52
23  lawsuit is over, I will probably quit       11:12:53
24  using Chrome altogether, but I have felt    11:12:58
25  that for -- you know, I've been advised by  11:13:03
Page 15

1  my attorneys --                             11:13:08
2      MR. LEE:  Hold on.  Hold on.            11:13:09
3      So let me just give you a quick         11:13:11
4  instruction.  It is -- in these             11:13:14
5  depositions, you should not reveal any      11:13:16
6  communications you've had with your         11:13:18
7  attorneys.                                  11:13:20
8      THE WITNESS:  Okay.                     11:13:20
9      MR. LEE:  So if you can answer          11:13:21
10  this question without revealing any        11:13:22
11  communications that you've had with        11:13:23
12  any of your attorneys, happy for you       11:13:24
13  to do that; if you can't, then don't       11:13:29
14  answer the question.                       11:13:30
15     THE WITNESS:  Okay.                     11:13:31
16     A.  But, yeah.  So it -- it has         11:13:32
17  seemed as though continuing to behave as   11:13:33
18  normally as possible until the end of the  11:13:37
19  lawsuit is what would make the most sense. 11:13:40
20  BY MS. TREBICKA:                           11:13:40
21     Q.  And what do you understand by       11:13:46
22  the term "Incognito browsing"?             11:13:47
23     A.  I understand it to mean -- well,    11:13:51
24  first of all, what Google tells me it      11:13:53
25  means when I open it and there's this      11:13:56
Page 16

1  splash screen, I understand it to mean      11:13:59
2  that my information is -- that -- that my    11:14:02
3  browsing information is going to be         11:14:07
4  private, that it's not going to be          11:14:10
5  recorded by Google, that it is, you know,   11:14:12
6  a level of affirmative anonymity when I am  11:14:18
7  browsing.                                   11:14:26
8      Q.  You used the term affirmative       11:14:34
9  and anonymity, correct?                     11:14:37
10     A.  I did, yes.                         11:14:39
11     Q.  And "anonymity" means someone       11:14:40
12  not knowing your identity, correct?        11:14:42
13     A.  Or my behavior, things that can     11:14:45
14  be used to identify things that are -- are 11:14:47
15  just things that I'm doing that are --     11:14:51
16  that are me, that are my behavior and that 11:14:53
17  I might not want shared.                   11:14:56
18     Q.  Okay.  And by that, you             11:14:58
19  understand things that are linked to you   11:14:59
20  as an individual, correct?                 11:15:00
21     MR. LEE:  Objection to form.           11:15:03
22     A.  Things that are linked to me as    11:15:05
23  an individual or my behavior, my property, 11:15:07
24  things that I own, you know, my Internet   11:15:12
25  connections, things like that, yep.        11:15:15
Page 17

Veritext Legal Solutions
866 299-5127

| | |
|---|---|
| 1 | A. I -- I -- I am, first of all, 11:19:10 |
| 2 | not 100 percent certain. I am, by no 11:19:15 |
| 3 | means, you know, an expert in -- I don't 11:19:18 |
| 4 | know personally identifiable information 11:19:22 |
| 5 | or how those systems work, but I would 11:19:24 |
| 6 | think that, information that is about me, 11:19:28 |
| 7 | that is what I'm doing, is not anonymous 11:19:37 |
| 8 | if -- if they know that I'm doing 11:19:44 |
| 9 | something or that my property or my 11:19:46 |
| 10 | computers or my Internet connections are 11:19:49 |
| 11 | doing something, that I -- that doesn't 11:19:50 |
| 12 | seem anonymous. 11:19:53 |
| 13 | BY MS. TREBICKA: 11:19:53 |
| 14 | Q. And it's fair to say, Mr. Byatt, 11:20:14 |
| 15 | that maintaining the privacy of your 11:20:16 |
| 16 | information is important to you while 11:20:18 |
| 17 | you're browsing the Internet? 11:20:19 |
| 18 | A. Yes. You know, I do voluntarily 11:20:21 |
| 19 | share information at times. So it's not, 11:20:28 |
| 20 | you know an absolute at all times. But I 11:20:34 |
| 21 | think, you know, sort of perhaps more than 11:20:37 |
| 22 | privacy, which is important, is consent to 11:20:40 |
| 23 | what information is being shared. I want 11:20:44 |
| 24 | to know with what of my information is 11:20:46 |
| 25 | being shared and I want to agree to that 11:20:48 |

Page 22

| | |
|---|---|
| 1 | information being shared. 11:20:50 |
| 2 | Q. How -- what steps do you take to 11:20:55 |
| 3 | know that certain information is -- about 11:20:58 |
| 4 | you is being shared when you browse? 11:21:00 |
| 5 | A. I -- as a -- as a rule, I tend 11:21:03 |
| 6 | to read, you know, privacy policies, terms 11:21:06 |
| 7 | of service, things like that. I -- I 11:21:10 |
| 8 | actually think about when -- when a 11:21:14 |
| 9 | website asks me what they can track or 11:21:17 |
| 10 | what they're going to put on my computer, 11:21:20 |
| 11 | I do think about what was, you know, 11:21:24 |
| 12 | default to hitting okay all the time. 11:21:27 |
| 13 | So -- so yeah, I think it's -- 11:21:30 |
| 14 | it's -- you know, that sort of thing, 11:21:33 |
| 15 | paying attention to what is being 11:21:34 |
| 16 | represented to me as being shared and 11:21:36 |
| 17 | thinking about whether or not I want that 11:21:38 |
| 18 | shared. 11:21:40 |
| 19 | Q. And do you -- would you agree 11:21:49 |
| 20 | that you take careful precautions to 11:21:50 |
| 21 | protect your privacy online? 11:21:53 |
| 22 | A. I wouldn't use the word 11:21:55 |
| 23 | "careful" or -- I'm not even sure I would 11:21:56 |
| 24 | use the word necessarily "precautions." I 11:22:01 |
| 25 | would say that I am aware of and -- and 11:22:03 |

Page 23

| | |
|---|---|
| 1 | cognizant of what I am consenting to 11:22:06 |
| 2 | share, yeah. 11:22:09 |
| 3 | Q. When you browse the web, are you 11:22:11 |
| 4 | generally aware that websites display ads? 11:22:32 |
| 5 | A. Yes, certainly. 11:22:37 |
| 6 | Q. You've seen those ads, right? 11:22:38 |
| 7 | A. Yeah. I've definitely seen ads, 11:22:40 |
| 8 | yeah. 11:22:42 |
| 9 | Q. Do you ever click on the ads? 11:22:43 |
| 10 | A. I do. 11:22:45 |
| 11 | Q. Do you get some value out of 11:22:46 |
| 12 | clicking out of some ads? 11:22:48 |
| 13 | A. I do, yeah. 11:22:50 |
| 14 | Q. What's the value that you get? 11:22:51 |
| 15 | Tell me about it. 11:22:53 |
| 16 | A. I -- I enjoy getting new 11:22:55 |
| 17 | products and services that I maybe hadn't 11:23:02 |
| 18 | been aware of. I think finding, you know, 11:23:04 |
| 19 | new brands or new information or new 11:23:08 |
| 20 | content that -- that appeals to me is 11:23:12 |
| 21 | nice. 11:23:14 |
| 22 | Q. What else do you like about 11:23:14 |
| 23 | seeing those ads? 11:23:16 |
| 24 | A. I don't know. That -- sometimes 11:23:22 |
| 25 | the ads are for sales. I like sales. 11:23:25 |

Page 24

| | |
|---|---|
| 1 | Q. Who doesn't? 11:23:28 |
| 2 | A. Yeah. 11:23:29 |
| 3 | Q. And you're also aware that 11:23:44 |
| 4 | websites also use certain services to 11:23:46 |
| 5 | display those ads, right? 11:23:47 |
| 6 | A. I am, yes. 11:23:50 |
| 7 | Q. In other words, The New York 11:23:51 |
| 8 | Times -- do you frequent The New York 11:23:53 |
| 9 | Times? 11:23:56 |
| 10 | A. I do. I visit The New York 11:23:56 |
| 11 | Times. I don't know if there's 11:23:58 |
| 12 | distinctions around the word "frequent," 11:23:59 |
| 13 | but I definitely visit and go to The New 11:24:01 |
| 14 | York Times website, yeah. 11:24:05 |
| 15 | Q. That was an unnecessarily fancy 11:24:05 |
| 16 | word on my part. We can agree then that 11:24:09 |
| 17 | you visit The New York Times website 11:24:11 |
| 18 | online? 11:24:12 |
| 19 | A. Yes, absolutely. 11:24:13 |
| 20 | Q. And you see that The New York 11:24:14 |
| 21 | Times sometimes displays ads to you when 11:24:16 |
| 22 | you visit, correct? 11:24:18 |
| 23 | A. I do, yeah. 11:24:19 |
| 24 | Q. And you understand that those 11:24:20 |
| 25 | ads may be powered by entities other than 11:24:21 |

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1 The New York Times, right?          11:24:24 | 1 is not in Incognito mode or in          11:26:36 |
| 2   A.  I understand that some of them   11:24:27 | 2 Incognito mode or both?          11:26:38 |
| 3 may be, yes.          11:24:28 | 3      MS. TREBICKA:  I'm speaking     11:26:40 |
| 4   Q.  And you understand that some of  11:24:30 | 4 generally here about Mr. Byatt     11:26:41 |
| 5 them may be powered by Google?     11:24:31 | 5 visiting the web.          11:26:44 |
| 6   A.  Yes.  Well, let me just say that  11:24:34 | 6      MR. LEE:  I don't know what that  11:26:46 |
| 7 I -- I can't say specifically whether I  11:24:38 | 7 means.  Mr. Byatt visits the Internet   11:26:47 |
| 8 know that to be true for The New York   11:24:40 | 8 in non-Incognito mode and in Incognito   11:26:52 |
| 9 Times.  You know, I know that The New York  11:24:42 | 9 mode.  So when you say generally, I    11:26:55 |
| 10 Times sells ads directly so I don't know.  11:24:46 | 10 don't know what that means.          11:26:57 |
| 11 I can't, you know, specifically recall  11:24:50 | 11      MS. TREBICKA:  Well, why don't   11:26:59 |
| 12 having seen Google-powered ads on The New  11:24:52 | 12 we ask Mr. Byatt.          11:27:00 |
| 13 York Times, but I do know that happens in  11:24:55 | 13 BY MS. TREBICKA:          11:27:00 |
| 14 general.          11:24:58 | 14   Q.  Mr. Byatt, do you need the     11:27:01 |
| 15   Q.  Right.  So you said that you   11:24:59 | 15 question read back to you?          11:27:04 |
| 16 know that New York Times sells ads     11:25:00 | 16   A.  At this point, I would love it   11:27:07 |
| 17 directly.  Tell me about -- tell me what  11:25:02 | 17 read back to me.          11:27:08 |
| 18 you know about any web publisher selling  11:25:05 | 18   Q.  I can do that.  Generally     11:27:10 |
| 19 ads on their websites?          11:25:11 | 19 speaking on the web, you understand that  11:27:12 |
| 20   A.  Not a lot.  I know that for some  11:25:13 | 20 there are certain advertisements that may  11:27:13 |
| 21 of those web publishers, you can pay them  11:25:18 | 21 be shown on the basis of certain     11:27:15 |
| 22 to put up advertising images and copy like  11:25:24 | 22 characteristics that the advertisers or  11:27:17 |
| 23 old school newspapers, you know.  Yeah, I  11:25:27 | 23 the website knows about the user; is that  11:27:20 |
| 24 don't know too much about the details of  11:25:31 | 24 right?          11:27:23 |
| 25 those processes.          11:25:34 | 25      MR. LEE:  Objection to form.   11:27:24 |
| Page 26 | Page 28 |

| | |
|---|---|
| 1   Q.  And -- and do you also     11:25:36 | 1   A.  Yeah.  In the -- in the broad   11:27:25 |
| 2 understand that the ads that are shown may  11:25:37 | 2 sense, I do know that that is certainly  11:27:27 |
| 3 depend on information that The New York   11:25:41 | 3 something that happens, yes.          11:27:29 |
| 4 Times may know about you?  For example,  11:25:43 | 4 BY MS. TREBICKA:          11:27:29 |
| 5 you know, what websites you visited before  11:25:46 | 5   Q.  You mentioned earlier that you   11:27:55 |
| 6 The New York Times?          11:25:49 | 6 also try to review or generally review  11:27:58 |
| 7   A.  Well, I -- I can't speculate as  11:25:49 | 7 privacy policies of the websites that you  11:28:03 |
| 8 to, you know, targeting implementations at  11:25:51 | 8 go to.  Do you recall that testimony?  11:28:05 |
| 9 The New York Times, but I certainly     11:25:55 | 9   A.  I do, yes.          11:28:07 |
| 10 understand that that kind of thing is of  11:25:58 | 10   Q.  And The New York Times is a     11:28:08 |
| 11 value to advertisers.  Advertisers want to  11:26:02 | 11 website that you sometimes visit; is that  11:28:11 |
| 12 do that.  I have no idea if New York Times  11:26:06 | 12 right?          11:28:13 |
| 13 specifically is doing that.          11:26:08 | 13   A.  It is.          11:28:14 |
| 14   Q.  I don't mean to limit it to The  11:26:09 | 14   Q.  Is Twitter another of those   11:28:14 |
| 15 New York Times specifically.          11:26:16 | 15 websites that you sometimes visit?     11:28:17 |
| 16   A.  Yeah.          11:26:16 | 16   A.  Yes.          11:28:18 |
| 17   Q.  Generally speaking on the web,  11:26:16 | 17   Q.  Is it fair to say that you've  11:28:21 |
| 18 you understand that there's advertisement  11:26:18 | 18 read their privacy policies?          11:28:23 |
| 19 that's shown and that it may also be shown  11:26:20 | 19   A.  I'm certain that I have, yes.  11:28:25 |
| 20 on the basis of certain characteristics  11:26:25 | 20 Yeah, I'm sure I have.          11:28:28 |
| 21 that they know about the users who those  11:26:28 | 21   Q.  Do you recall when?          11:28:31 |
| 22 ads are displayed to?          11:26:30 | 22   A.  No, not with specificity.  I   11:28:34 |
| 23   A.  Yeah --          11:26:32 | 23 certainly would have read the Twitter   11:28:37 |
| 24      MR. LEE:  Hold on.  Are these   11:26:32 | 24 privacy policy at minimum when I created a  11:28:41 |
| 25 questions directed towards when a user  11:26:35 | 25 Twitter account, although I don't remember  11:28:44 |
| Page 27 | Page 29 |

Veritext Legal Solutions
866 299-5127

1  when that would have been.  I suppose the    11:28:46
2  same would probably be true for The New    11:28:48
3  York Times.  I do recall having seen The    11:28:53
4  New York Times, the little GDPR notice    11:28:59
5  that comes up a few times, you know,    11:29:03
6  pretty frequently, but more details and    11:29:05
7  dates, I couldn't -- I couldn't tell you.    11:29:08
8     Q.   Would you be able to narrow it    11:29:12
9  down to a range for me?  Let's start with    11:29:13
10 The New York Times when you may have    11:29:16
11 reviewed the privacy policy, a date range?    11:29:18
12    A.   Yeah, I probably could figure it    11:29:24
13 out with time, but, no, I -- I wouldn't be    11:29:29
14 able to remember.  Yeah, I've been -- I've    11:29:31
15 been -- you know, on the Internet for as    11:29:34
16 long as I can remember.  So I certainly    11:29:37
17 couldn't remember when I first started    11:29:40
18 going to The New York Times and first    11:29:41
19 started looking at their -- their privacy    11:29:43
20 policy.    11:29:46
21    I have -- you know, when I get    11:29:47
22 e-mails saying that terms of service or    11:29:50
23 privacy policies are updated, as a rule, I    11:29:53
24 tend to review those as well, but again, I    11:29:56
25 couldn't tell you exactly when that would    11:29:59

Page 30

1  have happened for either of those two    11:30:01
2  websites.    11:30:04
3     Q.   You mentioned the GDPR notice;    11:30:04
4  do you recall that testimony?    11:30:08
5     A.   I do.    11:30:09
6     Q.   What did you mean by that?    11:30:09
7     A.   A bunch of websites have like a    11:30:11
8  little pop-up that comes up that has like    11:30:14
9  notifications about cookies and data and    11:30:15
10 privacy stuff.    11:30:18
11    Q.   Okay.    11:30:19
12    A.   And that -- that's -- that's the    11:30:20
13 notice that -- it is my understanding that    11:30:21
14 it exists because of some European laws.    11:30:24
15    Q.   I'd like to mark as Exhibit 1 --    11:30:34
16 actually, let me stop there.    11:30:36
17    MS. TREBICKA:  This is the first    11:30:39
18 deposition of plaintiffs so I don't    11:30:40
19 need to stop.  Let's just mark as    11:30:42
20 Exhibit 1, tab 38, Tracy.    11:30:43
21    MR. LEE:  So I don't mean to    11:30:54
22 interrupt, Viola, but this is    11:30:56
23 Mr. Byatt's first time being deposed    11:30:57
24 and certainly his first time being    11:30:59
25 deposed remotely, so I just wanted to    11:31:01

Page 31

1  let him know that when you mark a    11:31:03
2  deposition exhibit, it should show up    11:31:05
3  in his Exhibit Share, which he, I    11:31:07
4  believe he has up on his -- on his    11:31:11
5  computer.  And if you hit refresh, I    11:31:18
6  think that that's been marked as    11:31:22
7  Exhibit 1 should -- should be visible    11:31:24
8  to you, Mr. Byatt.    11:31:26
9     THE WITNESS:  I see it now.    11:31:27
10    MR. LEE:  I encourage you to    11:31:28
11 open them and make sure that they are    11:31:30
12 and you're able to read them before we    11:31:33
13 move on.    11:31:35
14    (Exhibit 1, Screenshot, marked    11:31:35
15 for identification.)    11:31:38
16    THE WITNESS:  I have opened it    11:31:38
17 and I can see it.    11:31:39
18    MR. LEE:  Okay.    11:31:41
19 BY MS. TREBICKA:    11:31:41
20    Q.   All right.  Thank you.    11:31:42
21    Mr. Byatt, you'll be a pro by    11:31:43
22 the end of this.  So you see this    11:31:45
23 screenshot that was taken of the cookie    11:31:52
24 banner?    11:31:54
25    A.   This screenshot that was taken    11:31:56

Page 32

1  on the cookie banner, I -- so I see    11:31:58
2  several screenshots here, maybe one really    11:32:01
3  long screenshot, yeah.  By the cookie    11:32:03
4  banner, you're referring to this thing at    11:32:08
5  the bottom of page 1 of the document?    11:32:10
6     Q.   Correct.    11:32:14
7     A.   Okay.  I do see this, yes.    11:32:15
8     Q.   Do you see that?  I'm calling it    11:32:16
9  cookie banner.  You can call it a cookie    11:32:18
10 pop-up.  Do you see a little X in the    11:32:21
11 lower left corner?    11:32:25
12    A.   I do.    11:32:26
13    Q.   And do you -- when you mentioned    11:32:27
14 a GDPR notice pop-up, I believe you called    11:32:30
15 it, is this what you were referring to?    11:32:33
16    A.   This would be similar to it,    11:32:36
17 yes.  This is sort of roughly, generally    11:32:39
18 the kind of thing that I was talking    11:32:41
19 about, yes.    11:32:43
20    Q.   And if there's any differences    11:32:43
21 between what you were talking about and    11:32:47
22 this, can you describe them for me?    11:32:50
23    A.   No, certainly not.  I don't know    11:32:52
24 if there are specifics that are compliant    11:32:54
25 with certain regulatory bodies.  Yeah,    11:32:58

Page 33

9 (Pages 30 - 33)

1    Q.   And what did you do before that?   11:46:43
2    A.   Nothing.  I was a child.  I       11:46:47
3   worked at a movie theater one summer.      11:46:53
4    Q.   So your entire professional      11:46:56
5   career, you have been a software         11:46:58
6   developer?               11:46:59
7    A.   That's correct.      11:47:00
8    Q.   Do you ever -- when you go on     11:47:07
9   the Internet, do you ever look at the    11:47:09
10   underlying code of the website?          11:47:11
11   A.   So that doesn't make a ton of    11:47:21
12   sense.  Most code on websites is         11:47:26
13   obfuscated.  I can look at the code, but     11:47:33
14   it's -- like humans can't read a lot of    11:47:40
15   it.  So I -- I have looked at some of that   11:47:41
16   on websites, but it -- that -- it's very    11:47:45
17   rare because I generally am a human who     11:47:48
18   can't read it.           11:47:52
19   Q.   You browse on Chrome, right?     11:47:54
20   A.   Yes.                11:47:57
21   Q.   Sometimes?           11:47:58
22   A.   Yeah, yeah.  Primarily I'd say,    11:47:59
23   yeah.                   11:48:02
24   Q.   Primarily.  Do you use any other   11:48:02
25   browsers?                11:48:04

1    A.   I -- I have used other browsers,   11:48:05
2   but the vast majority of my -- my browsing   11:48:07
3   is -- is on Chrome.  If I -- if I use       11:48:12
4   other browsers, it's for things like, you    11:48:15
5   know, testing things that I'm working on.     11:48:17
6    Q.   Understood.  And what other      11:48:20
7   browsers do you use for -- to test things    11:48:21
8   that you're working on?         11:48:24
9    A.   All of them.  I have used all of   11:48:25
10   them.  But, you know, for some of these     11:48:28
11   we're talking about, I've opened, you       11:48:30
12   know, three times in -- in, you know, the    11:48:32
13   past ten years.  I would say that probably    11:48:35
14   Firefox and Edge or Internet Explorer        11:48:39
15   before Edge would be the ones that have      11:48:42
16   gotten any other significant usage.          11:48:46
17   Q.   On Chrome, are you aware of       11:48:48
18   developer tools, that option?           11:48:53
19   A.   I am, yes.          11:48:55
20   Q.   Have you ever looked at that     11:48:57
21   when you go on the Internet and browse a     11:48:58
22   site?                   11:49:00
23   A.   I can't say with specificity.     11:49:06
24   Have I ever?  Probably.  It's not        11:49:10
25   something I make any kind of habit of.       11:49:12

1    Q.   What does it tell you if you go   11:49:15
2   to the developer tools on the particular     11:49:16
3   website, generally speaking?           11:49:20
4    A.   A lot.  You can -- you can get    11:49:22
5   all kinds of -- that's -- that's very,      11:49:25
6   very broad.              11:49:27
7    Q.   Does it tell you where your --    11:49:29
8   let me back up.              11:49:33
9        Does it tell you what types of    11:49:34
10   services the website uses?          11:49:37
11   A.   Some of them.  It -- it can tell   11:49:41
12   you some of them.  It -- there's no         11:49:44
13   mechanism for it to tell you everything.      11:49:47
14   There's also no mechanism for it to tell     11:49:50
15   you what some of those services that it       11:49:53
16   can tell you about is doing with any          11:49:57
17   information that it gets.           11:49:59
18   Q.   Does it show what -- whether      11:50:01
19   your information is being sent to another    11:50:05
20   domain?                  11:50:08
21   A.   It can.  It -- again, it's the    11:50:09
22   same answer as the last one.  It -- it can    11:50:12
23   show you some of that information.  It is     11:50:15
24   not the only way.  There are ways that one    11:50:18
25   can share information that would not         11:50:22

1   appear in developer tools, and developer     11:50:24
2   tools does not have a way of telling me       11:50:26
3   what happens when the information gets         11:50:28
4   over there.              11:50:29
5    Q.   Have you ever looked at          11:50:32
6   developer tools while you've been in an       11:50:33
7   Incognito browsing session?           11:50:36
8    A.   Again, I -- I can't point to      11:50:37
9   ever having done it specifically.  That      11:50:40
10   one, I can't even say that I probably        11:50:44
11   have.  I -- I really don't know, but I       11:50:48
12   certainly don't remember.           11:50:50
13       MS. TREBICKA:  James -- or        11:51:19
14   Mr. Lee or Mr. Byatt, I'm about to go        11:51:19
15   on a line of questioning that will           11:51:22
16   take about 20 minutes or so.  Do you         11:51:24
17   want to take a break now or after that       11:51:26
18   line of questioning?            11:51:28
19       MR. LEE:  Yeah, let's take a      11:51:29
20   break now.               11:51:30
21       MS. TREBICKA:  Okay.  Let's do    11:51:31
22   that.                   11:51:32
23       THE VIDEOGRAPHER:  Going off the   11:51:32
24   record.  The time is 1:51 a.m. --        11:51:33
25   11:51 a.m.               11:51:54

| | |
|---|---|
| 1    (Whereupon, a brief recess is    12:01:16 | page 3.    12:03:57 |

Page 50:

```
 1        (Whereupon, a brief recess is    12:01:16
 2    taken.)                        12:01:38
 3        THE VIDEOGRAPHER: Back on the    12:01:38
 4    record. The time is 12:01 p.m.    12:01:52
 5    BY MS. TREBICKA:                12:01:52
 6    Q.   Good morning, Mr. Byatt, again.    12:01:57
 7    A.   Good morning.                12:02:00
 8    Q.   Just a quick reminder that you    12:02:01
 9    are still under oath; you understand that?    12:02:03
10    A.   I do understand that, yes.    12:02:05
11    Q.   Earlier, you testified about    12:02:07
12    visiting The New York Times on occasion;    12:02:14
13    do you remember that?            12:02:16
14    A.   I do, yes.                12:02:17
15    Q.   And you also testified that you    12:02:18
16    reviewed The New York Times's privacy    12:02:20
17    policy; do you remember that?        12:02:23
18    A.   Yes.                    12:02:24
19        MS. TREBICKA: I will mark as    12:02:25
20    Exhibit 2, The New York Times privacy    12:02:26
21    policy currently available on The New    12:02:35
22    York Times website.            12:02:37
23        (Exhibit 2, The New York Times    12:02:38
24    Privacy Policy, Updated July 1, 2021,    12:02:38
25    marked for identification.)        12:02:39
                                    Page 50
```

Page 51:

```
 1    BY MS. TREBICKA:                12:02:39
 2    Q.   And if you refresh your Exhibit    12:02:39
 3    Share, you will see it at some point.    12:02:43
 4    Just let me know when you see it.    12:02:44
 5    A.   I certainly shall. It's not    12:02:46
 6    there yet.                    12:02:48
 7    Q.   Okay.                    12:02:50
 8    A.   I -- there is an Exhibit 2 in    12:03:04
 9    here. I'm opening it.            12:03:11
10    Q.   Okay.                    12:03:11
11    A.   Okay. I am looking at The New    12:03:12
12    York -- I'm looking at what says that is    12:03:13
13    The New York Times privacy policy, last    12:03:14
14    updated on July 1, 2021.            12:03:16
15    Q.   Okay. Do you remember reviewing    12:03:18
16    this policy?                    12:03:19
17    A.   Not necessarily with            12:03:22
18    specificity. I remember reviewing a    12:03:24
19    document that looks like this. I -- I    12:03:30
20    could not tell you if it was the exact    12:03:33
21    same thing.                    12:03:35
22    Q.   Understood. If you could scroll    12:03:35
23    down to page 3 of the PDF.            12:03:37
24    A.   I think I'm there. Hold on.    12:03:45
25    The page numbers aren't marked. I am on    12:03:47
                                    Page 51
```

Page 52:

```
 1    page 3.                        12:03:57
 2    Q.   At the end of page 3, do you see    12:04:07
 3    the bolded heading Information Collected    12:04:08
 4    Automatically?                12:04:11
 5    A.   I do.                    12:04:13
 6    Q.   And if you scroll down to        12:04:15
 7    page 4, you see the first bullet point    12:04:16
 8    there with Tracking Technologies in Your    12:04:21
 9    Browsing and Mobile Apps?            12:04:26
10    A.   I do see that.                12:04:27
11    Q.   Okay. And I will read the words    12:04:28
12    underneath that bolded bullet point into    12:04:30
13    the record. It says "These technologies    12:04:33
14    include cookies, web beacons, tags and    12:04:35
15    scripts, software development kits (or    12:04:39
16    SDKs) and beyond. We track and store data    12:04:41
17    about how you visit and use Times        12:04:45
18    Services, particularly through our    12:04:47
19    websites and apps. The items we log    12:04:50
20    include," and then it has a bulleted list.    12:04:53
21        Do you see that?            12:04:56
22    A.   I do.                    12:04:57
23        MR. LEE: Viola, before we go    12:04:57
24    on, can I get a standing objection to    12:04:59
25    this line of questioning based on lack    12:05:01
                                    Page 52
```

Page 53:

```
 1    of foundation, please?            12:05:03
 2        MS. TREBICKA: Noted, James.    12:05:06
 3    MR. LEE: Is that a yes?            12:05:08
 4        MS. TREBICKA: Yes, I noted.    12:05:09
 5    MR. LEE: Thank you.            12:05:11
 6        MS. TREBICKA: It is -- I        12:05:12
 7    understand that you have a standing    12:05:12
 8    objection.                    12:05:14
 9        MR. LEE: Great.            12:05:14
10    BY MS. TREBICKA:                12:05:14
11    Q.   Do you see the bulleted list of    12:05:17
12    information?                    12:05:19
13    A.   Yes, I do.                12:05:20
14    Q.   And actually, it's a bulleted    12:05:21
15    list of the items that The New York Times    12:05:23
16    says it logs; do you see that?        12:05:25
17    A.   I do see that, yes.            12:05:27
18    Q.   So of these pieces of data, of    12:05:30
19    items that they log, do you consider any    12:05:34
20    of it to be your personal information?    12:05:36
21    A.   Yes, I would say so.            12:05:39
22    Q.   Okay. Which ones?            12:05:48
23    A.   Well, I -- I would say all of    12:05:53
24    them really. Other usage information, the    12:05:58
25    last one is pretty broad so I don't know    12:06:00
                                    Page 53
```

14 (Pages 50 - 53)

1  Analytics." So if we can mark for the          12:25:36
2  record tab 16 as Exhibit 3.                     12:25:38
3       (Exhibit 3, Google Analytics            12:25:40
4  Opt-out Browser Add-on document,               12:25:40
5  marked for identification.)                     12:25:43
6       MR. LEE: Viola, do I have the           12:25:43
7  same standing objection as to                   12:25:44
8  Exhibit 3 regarding lack of                     12:25:47
9  foundation?                                     12:25:49
10      MS. TREBICKA: Do you want to           12:25:49
11 see it first?                                   12:25:50
12      MR. LEE: I already know based          12:25:51
13 on the response to the last question            12:25:52
14 that I don't need to see it.                    12:25:53
15      MS. TREBICKA: You may have the        12:25:55
16 same standing objections.                       12:25:57
17      MR. LEE: Thanks.                        12:25:58
18 A.  I have Exhibit 3 open.                      12:26:00
19 BY MS. TREBICKA:                                12:26:00
20 Q.  Have you seen this document              12:26:09
21 before?                                         12:26:10
22 A.  I couldn't say.                             12:26:10
23 Q.  And I said document, but do you          12:26:11
24 recall ever seeing this website before?         12:26:14
25 A.  Yeah, I don't recall.                       12:26:17

1  Q.  What is a browser add-on?                12:26:18
2       MR. LEE: Objection to form.          12:26:26
3  BY MS. TREBICKA:                                12:26:26
4  Q.  Let me take a step back and say,         12:26:29
5  Mr. Byatt, you -- you responded earlier to      12:26:31
6  my questions about your professional            12:26:33
7  career that you've been a software              12:26:35
8  developer for the past ten years, right?        12:26:37
9  A.  That's right.                               12:26:40
10 Q.  In your time as a software               12:26:40
11 developer, have you understood -- have you      12:26:41
12 obtained an understanding as to what a          12:26:44
13 browser add-on is?                              12:26:46
14 A.  Some understanding, yes.                     12:26:48
15 Q.  So in that understanding, what          12:26:49
16 is a browser add-on?                            12:26:51
17 A.  As I understand it, it is a                 12:26:53
18 piece of maybe third-party software that        12:26:56
19 does not come with the browser that             12:27:00
20 changes the browser's behavior.                 12:27:02
21 Q.  Do you have any browser add-ons         12:27:05
22 on your Chrome browser?                         12:27:08
23 A.  Yes, I -- I believe so.                     12:27:13
24 Q.  What are those browser add-ons          12:27:16
25 that you have installed on your Chrome          12:27:18

1  browser?                                        12:27:22
2  A.  I couldn't say. I couldn't list            12:27:22
3  them.                                           12:27:24
4  Q.  Any that you remember sitting           12:27:25
5  here today?                                     12:27:27
6  A.  I believe I have an ad blocker            12:27:37
7  on there. I do not remember which one and       12:27:40
8  I know that there are many. I may have          12:27:45
9  others. I don't know. I haven't reviewed        12:27:53
10 that in some time.                              12:27:55
11 Q.  Do you have a Google Analytics          12:27:57
12 opt-out browser add-on to your browser?         12:27:59
13 A.  I -- I don't know. I doubt it              12:28:04
14 since I don't recall having seen this           12:28:08
15 screen, but, yeah, I -- I don't know.           12:28:10
16 Probably not.                                   12:28:17
17 Q.  This Google Analytics Opt-out          12:28:30
18 Browser Add-on page explains "To provide        12:28:32
19 website visitors the ability to prevent         12:28:35
20 their data from being used by Google            12:28:38
21 Analytics, we have developed the Google         12:28:41
22 Analytics opt-out browser add-on for            12:28:43
23 websites using the supported version of         12:28:46
24 using Google Analytics JavaScript              12:28:49
25 (analytics.js, gtag.js)."                       12:28:54

1       Do you see that?                       12:28:57
2  A.  I do see it.                               12:28:58
3  Q.  It further says "If you want to         12:28:58
4  opt-out, download and install the add-on        12:29:00
5  for your web browser. The Google               12:29:03
6  Analytics opt-out add-on is designed to be      12:29:03
7  compatible with Chrome, Safari, Firefox         12:29:09
8  and Microsoft Edge. In order to function,       12:29:11
9  the opt-out add-on must be able to load         12:29:14
10 and execute properly on your browser.           12:29:16
11 Learn more about the opt-out and how to         12:29:18
12 properly install the browser add-on."           12:29:22
13      Do you see that?                       12:29:25
14 A.  I do see that.                              12:29:26
15 Q.  So you agree that had you been         12:29:28
16 aware of this analytics browser opt-out         12:29:29
17 add-on, you would have had the ability to       12:29:36
18 prevent your data from -- for -- from           12:29:40
19 being used by Google Analytics, correct?        12:29:42
20 A.  Well, I don't particularly trust          12:29:44
21 Google and what they tell me about their        12:29:47
22 privacy and opt-outs at this point, so I'm      12:29:48
23 not sure I do agree to that right now, but      12:29:53
24 I do agree that that is what Google is          12:29:54
25 representing with this.                         12:29:57

19 (Pages 70 - 73)

1  to use my sort of behavioral data, what do    15:09:03
2  you mean by that?                    15:09:06
3     A.   I mean for Google to have access    15:09:09
4  to my data, basically all of the things    15:09:15
5  that I asked them to not collect    15:09:19
6  temporarily when I am in Incognito mode.    15:09:21
7        MR. LEE:  You know what, Belle,    15:09:31
8  can you just read the answer back for    15:09:33
9  me?                          15:09:35
10        (Answer read back.)        15:09:36
11  BY MS. TREBICKA:                15:09:36
12     Q.   And what are those things?    15:09:54
13     A.   I -- I don't have an exhaustive    15:09:58
14  list, but one list would be that -- that    15:09:59
15  we were looking at from the privacy    15:10:02
16  policy.                        15:10:06
17     Q.   Are you referring to the bullet    15:10:06
18  pointed list that I asked you about in the    15:10:12
19  privacy policy?                  15:10:15
20     A.   I believe there was a bullet    15:10:17
21  pointed list and then I think there was    15:10:19
22  also a list of data that might have been    15:10:21
23  in paragraph form.  I don't remember    15:10:23
24  exactly, but I am referring to lists that    15:10:25
25  we've gotten on the record here, yes.    15:10:29

Page 150

1     Q.   For the record to be clear, why    15:10:37
2  don't we go back to Exhibit 7?    15:10:39
3     A.   I am in Exhibit 7.        15:10:56
4     Q.   Okay.  If you could scroll to    15:10:58
5  page 2.                        15:11:00
6     A.   I'm there.              15:11:05
7     Q.   And it's the second paragraph    15:11:05
8  from the bottom that's the one that starts    15:11:08
9  with the "information we collect"?    15:11:11
10     A.   Yes.  So I would mean, at    15:11:13
11  minimum, that information listed there    15:11:18
12  starting with "the information we    15:11:19
13  collect," ending with "refer URL of your    15:11:21
14  request," I also think, yeah, the next    15:11:24
15  page under "Your activity," it also has    15:11:28
16  some activity that I think I might have    15:11:31
17  included with that as information that I'm    15:11:36
18  agreeing to give Google when I sign those    15:11:41
19  contracts or agree to those contracts, I    15:11:45
20  guess.                        15:11:47
21     Q.   Have you ever tried to sell the    15:11:50
22  personal information that's the subject of    15:11:53
23  this lawsuit?                  15:11:55
24     A.   Have I tried to sell it?  No, I    15:11:57
25  have not.                      15:12:00

Page 151

1     Q.   Do you have a sense of how much    15:12:01
2  your personal information is worth if you    15:12:04
3  were to try to sell it?          15:12:06
4        MR. LEE:  Do you mean this    15:12:09
5  Incognito personal -- Incognito data    15:12:10
6  or generally?                  15:12:12
7        MS. TREBICKA:  Well, why don't    15:12:14
8  we take it in steps then.          15:12:15
9  BY MS. TREBICKA:                15:12:15
10     Q.   Mr. Byatt, do you have a    15:12:17
11  sense -- well, first off, have you ever    15:12:19
12  tried to sell any of your personal    15:12:21
13  information related to your browsing?    15:12:23
14     A.   Not that I recall.        15:12:31
15     Q.   So as far as your -- the    15:12:33
16  browsing information when you are not in    15:12:38
17  Incognito mode, do you have a sense for    15:12:42
18  how much that is worth?          15:12:43
19     A.   I would imagine the market cap    15:12:46
20  of Google divided by its user base.    15:12:47
21     Q.   Because you understand that all    15:12:51
22  of Google's market cap is as a result of    15:12:53
23  the use of this information?      15:12:59
24     A.   Probably not all of it, but I do    15:13:04
25  understand that Google pours lots of money    15:13:07

Page 152

1  and resources into collecting that    15:13:13
2  information and monetizing that    15:13:15
3  information.  I'm not sure what the    15:13:17
4  specific dollar value of my information    15:13:19
5  is, but I certainly understand that it's    15:13:22
6  worth quite a bit to Google.      15:13:24
7     Q.   And how do you understand that    15:13:27
8  Google's poor -- that Google collects    15:13:30
9  information and monetizes information?    15:13:34
10     A.   I'm sorry, could you -- could    15:13:44
11  you clarify?                  15:13:46
12     Q.   How -- you want me to clarify.    15:13:47
13  I'll re-ask.                  15:13:51
14     A.   Yes, go ahead.          15:13:52
15     Q.   How do you know that Google    15:13:54
16  collects information and monetizes that    15:13:55
17  information?                  15:13:58
18     A.   It's common knowledge, I think.    15:14:03
19  I don't know how to say that more    15:14:08
20  specifically, but I think everyone knows    15:14:09
21  that that's Google's business model.    15:14:11
22     Q.   Has Google's conduct, as you    15:14:16
23  understand it, affected your ability to    15:14:18
24  monetize yourself, your personal    15:14:23
25  information?                  15:14:27

Page 153

39 (Pages 150 - 153)

1    MR. LEE:  Again, are we still          15:14:28
2    talking about non-Incognito              15:14:29
3    information?                             15:14:31
4        MS. TREBICKA:  Yes.                  15:14:31
5    A.  I don't know because I haven't       15:14:40
6    sort of explored that market to see how my   15:14:43
7    data is priced or how Google having that   15:14:47
8    information would have affected the price.   15:14:51
9    So I -- I don't know.                    15:14:56
10   BY MS. TREBICKA:                         15:14:56
11   Q.  And has Google's conduct that's      15:14:59
12   the subject of this lawsuit affected your   15:15:01
13   ability to use this information in any    15:15:03
14   way?                                     15:15:09
15   A.  Well, one way that I would like      15:15:12
16   to sort of use the information is to      15:15:14
17   control how it's shared.  By             15:15:16
18   misrepresenting how my information is     15:15:22
19   shared, that is impacting my ability to   15:15:23
20   make, you know, accurate and informed     15:15:26
21   decisions about the use of my data.  So,   15:15:27
22   yes.                                     15:15:29
23   Q.  Any other way?                       15:15:31
24   A.  Maybe.  I -- I'm wary to rule        15:15:33
25   anything out specifically, but that is   15:15:36

Page 154

1    certainly what comes to mind.            15:15:40
2    Q.  Now, specifically, I'm going to      15:15:44
3    switch my -- the same line of questioning   15:15:48
4    but now specific to Incognito.  Have you   15:15:50
5    ever tried to sell any of the browsing    15:15:55
6    information related to your Incognito     15:15:57
7    sessions?                                15:15:59
8    A.  Absolutely not.  The point of        15:16:01
9    going into Incognito mode is for nobody to   15:16:03
10   have that information.                   15:16:05
11   Q.  Do you have a sense for how much      15:16:07
12   the browsing information related to your   15:16:09
13   Incognito browsing is worth?             15:16:13
14   A.  Again, same as before, actual        15:16:18
15   dollar value, no, I do not, but I am      15:16:23
16   certain that it is substantial as is      15:16:25
17   evidenced by the fact that we're here     15:16:30
18   today talking about this.                15:16:34
19   Q.  And has Google's conduct that's      15:16:39
20   the subject of this lawsuit affected your   15:16:42
21   ability to monetize this information?    15:16:45
22   A.  I do not know.                       15:16:49
23   Q.  Has it affected your ability to      15:16:52
24   use this information?                    15:16:54
25   A.  Yes, on the same grounds as          15:16:57

Page 155

1    previously at minimum.                   15:16:59
2        (Exhibit 11, Second Amended          15:17:11
3    Complaint, marked for identification.)   15:17:11
4    BY MS. TREBICKA:                         15:17:11
5    Q.  We've marked as Exhibit 10 the       15:17:11
6    Second Amended Complaint in this lawsuit.   15:17:17
7    So -- I believe it's Exhibit 10.         15:17:21
8        THE COURT REPORTER:  I thought       15:17:26
9    there was a previous Exhibit 10.         15:17:27
10       MS. TREBICKA:  Exhibit 11.  I        15:17:28
11   apologize.                               15:17:34
12   A.  I have Exhibit 11 open.              15:17:37
13   BY MS. TREBICKA:                         15:17:37
14   Q.  Do you recognize this document,      15:17:54
15   Mr. Byatt?                               15:17:55
16   A.  Yes.                                 15:17:56
17   Q.  What is it?                          15:17:56
18   A.  It's the second amended              15:17:57
19   complaint in this lawsuit.               15:18:00
20   Q.  Have you read it?                    15:18:02
21   A.  I have.                              15:18:03
22   Q.  Did you read it before it was        15:18:03
23   filed?                                   15:18:06
24   A.  I did.                               15:18:06
25   Q.  Did you have any changes to it?      15:18:10

Page 156

1    A.  I don't recall.  That also           15:18:13
2    sounds privileged.  I don't know -- it   15:18:16
3    sounds like you're talking about         15:18:17
4    conversations between me and my attorney   15:18:19
5    so I -- I don't know, I -- I don't recall   15:18:22
6    either way.                              15:18:24
7        MR. LEE:  It's a very good           15:18:25
8    point, Mr. Byatt.  Thank you.            15:18:26
9    BY MS. TREBICKA:                         15:18:26
10   Q.  And I'm certainly not asking         15:18:28
11   about the contents of any communications.   15:18:29
12   It was a different question, but thank you   15:18:32
13   for that.                                15:18:34
14   A.  Yeah.                                15:18:35
15   Q.  That you are attuned to those        15:18:36
16   issues.  Let me direct your attention to   15:18:38
17   paragraph 282.                           15:18:43
18   A.  Do you know what page number         15:18:51
19   just to make my life a little easier?    15:18:52
20   Q.  I will give it you in a second.      15:18:54
21   A.  Okay.                                15:18:54
22   Q.  You may know before I do.  I'm       15:18:58
23   still scrolling.                         15:19:01
24   A.  Me too.  I'm at 147.  I'm almost     15:19:02
25   there.                                   15:19:08

Page 157

40 (Pages 154 - 157)

| | | | | |
|---|---|---|---|---|
| 1 | (Time noted:  5:45 p.m.) | | 1 | VIOLA TREBICKA, ESQ. |
| 2 | | | 2 | violatrebicka@quinnemanuel.com |
| 3 | _____ | | 3 | December 23, 2021 |
| | WILLIAM BYATT | | 4 | RE: BROWN VS. GOOGLE LLC |
| 4 | | | 5 | DECEMBER 20, 2021, WILLIAM BYATT, JOB NO. 5001125 |
| 5 | _____ | | 6 | The above-referenced transcript has been |
| | | | 7 | completed by Veritext Legal Solutions and |
| 6 | Subscribed and sworn to | | 8 | review of the transcript is being handled as follows: |
| | before me this _____ | | 9 | __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext |
| 7 | day of _____ 2022. | | 10 | to schedule a time to review the original transcript at |
| 8 | _____ | | 11 | a Veritext office. |
| | Notary Public | | 12 | __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF |
| 9 | | | 13 | Transcript - The witness should review the transcript and |
| 10 | | | 14 | make any necessary corrections on the errata pages included |
| 11 | | | 15 | below, notating the page and line number of the corrections. |
| 12 | | | 16 | The witness should then sign and date the errata and penalty |
| 13 | | | 17 | of perjury pages and return the completed pages to all |
| 14 | | | 18 | appearing counsel within the period of time determined at |
| 15 | | | 19 | the deposition or provided by the Code of Civil Procedure. |
| 16 | | | 20 | __ Waiving the CA Code of Civil Procedure per Stipulation of |
| 17 | | | 21 | Counsel - Original transcript to be released for signature |
| 18 | | | 22 | as determined at the deposition. |
| 19 | | | 23 | __ Signature Waived – Reading & Signature was waived at the |
| 20 | | | 24 | time of the deposition. |
| 21 | | | 25 | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| | | Page 258 | | Page 260 |

| | | | | |
|---|---|---|---|---|
| 1 | CERTIFICATION | | 1 | __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF |
| 2 | | | 2 | Transcript - The witness should review the transcript and |
| 3 | I, BELLE VIVIENNE, a Nationally | | 3 | make any necessary corrections on the errata pages included |
| 4 | Certified Realtime Reporter, do hereby | | 4 | below, notating the page and line number of the corrections. |
| 5 | certify: | | 5 | The witness should then sign and date the errata and penalty |
| 6 | That the witness whose testimony as | | 6 | of perjury pages and return the completed pages to all |
| 7 | herein set forth, was duly sworn by me; | | 7 | appearing counsel within the period of time determined at |
| 8 | and that the within transcript is a true | | 8 | the deposition or provided by the Federal Rules. |
| 9 | record of the testimony given by said | | 9 | _X_ Federal R&S Not Requested - Reading & Signature was not |
| 10 | witness. | | 10 | requested before the completion of the deposition. |
| 11 | I further certify that I am not | | 11 | |
| 12 | related to any of the parties to this | | 12 | |
| 13 | action by blood or marriage, and that I am | | 13 | |
| 14 | in no way interested in the outcome of | | 14 | |
| 15 | this matter. | | 15 | |
| 16 | IN WITNESS WHEREOF, I have hereunto | | 16 | |
| 17 | set my hand this 23rd day of December | | 17 | |
| 18 | 2021. | | 18 | |
| 19 | | | 19 | |
| 20 | *Belle Vivienne* | | 20 | |
| 21 | BELLE VIVIENNE, CRR, CCR, RPR | | 21 | |
| 22 | | | 22 | |
| 23 | *   *   * | | 23 | |
| 24 | | | 24 | |
| 25 | | | 25 | |
| | | Page 259 | | Page 261 |

66 (Pages 258 - 261)

# EXHIBIT 26

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3
 4   CHASOM BROWN, WILLIAM BYALL,
     JEREMY DAVIS, CHRISTOPHER
 5   CASTILLO, and MONIQUE
     TRUJILLO individually and on
 6   behalf of all other similarly  No.
     situated,                      5:20-cv-03664-LHK-SVK
 7
                    Plaintiff,
 8
              vs.
 9
     GOOGLE LLC,
10
                    Defendant.
11   _____/
12
13
14
15        VIDEO-RECORDED DEPOSITION OF JEREMY DAVIS
16                REMOTE ZOOM PROCEEDING
17                 Little Rock, Arkansas
18                 Friday, January 7, 2022
19
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 183                      Job No. 5019103
```

Page 1

**Page 2**

1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3
4  CHASOM BROWN, WILLIAM BYALL,
   JEREMY DAVIS, CHRISTOPHER
5  CASTILLO, and MONIQUE
   TRUJILLO individually and on
6  behalf of all other similarly  No.
   situated,              5:20-cv-03664-LHK-SVK
7
8       Plaintiff,
9       vs.
10  GOOGLE LLC,
11       Defendant.
    _____/
12
13
14       Video-recorded deposition of JEREMY DAVIS, taken
15  on behalf of the Defendant, Remote Zoom Proceeding from
16  Little Rock, Arkansas, beginning at 10:06 A.M. Central
17  Standard Time and ending at 4:29 P.M. Central Standard
18  Time, on Friday, January 7, 2022, before Leslie Rockwood
19  Rosas, RPR, CSR No. 3462.
20
21
22
23
24
25

**Page 3**

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4     BOIES SCHILLER FLEXNER LLP
5     BY: JAMES LEE, ESQ.
6        ROSSANA (ROSY) BAEZA, ESQ.
7     100 SE Second Street, Suite 2800
8     Miami, Florida 33131
9     (305) 539-8400
10    jlee@bsfllp.com
11    rbaeza@bsfllp.com
12
13    BY: HSIAO (MARK) C. MAO, ESQ.
14    44 Montgomery Street, 41st Floor
15    San Francisco, California 91401
16    (415) 293-6800
17    mmao@bsfllp.com
18
19    MORGAN & MORGAN
20    BY: RYAN MCGEE, ESQ.
21    201 North Franklin Street, 7th Floor
22    Tampa, Florida 33602
23    (813) 223-5505
24    rmcgee@forthepeople.com
25

**Page 4**

1  APPEARANCES (Continued):
2
3  FOR THE DEFENDANT:
4     QUINN EMANUEL URQUHART & SULLIVAN, LLP
5     BY: ANDREW H. SCHAPIRO, ESQ.
6     191 North Wacker Drive, Suite 2700
7     Chicago, Illinois 60606
8     (312) 705-7400
9     andrewschapiro@quinnemanuel.com
10
11    BY: MARIE M. HAYRAPETIAN, ESQ.
12    865 South Figueroa Street, 10th Floor
13    Los Angeles, California 90017
14    (213) 443-3000
15    mariehayrapetian@quinnemanuel.com
16
17  Also Present:
18    JoAnn Yager, Videographer
19
20
21
22
23
24
25

**Page 5**

1               I N D E X
2
3
4  FRIDAY, JANUARY 7, 2022
5
6  WITNESS                    EXAMINATION
7  JEREMY DAVIS
8
9     BY MR. SCHAPIRO                9
10    BY MR. LEE                    169
11
12  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13
                Page    Line
14
                162       6
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Q. And has that always been the case when you've used Chrome?

A. Obviously I couldn't have used it before the feature was available. But I have distinct memory of being an early user of Chrome. And when the incognito    10:47:02 feature was launched or available, I very quickly started adopting that as a standard practice, to use incognito mode.

Q. And I think you said a moment ago you said you found it convenient to use that as the -- to use    10:47:18 incognito as the default. Can you elaborate? What do you mean by that?

A. I can. So there's basically -- and this is a little bit technical, but there's an executable on the computer, which is the -- the bytecode or the program for    10:47:43 Chrome, the browser.

For those executables, you can pass something called a parameter. And this is a bit of extra text after the thing that when you click on the link on your computer it passes an extra command to the browser. And    10:48:01 this is a standard and supported command from Google. So it's nothing I've created on my own. It's all Google support.

But if I put dash incognito at the end of that parameter, when I click the icon for Chrome, it will    10:48:16

Page 34

automatically launch in incognito mode. But that's the convenience part.

So rather than -- if I switch between, and I generally enjoy everything that I can do to enhance privacy, for me, that made sense.    10:48:33

Q. Okay. So when you were talking about convenient, you were talking about just the way you enable incognito; is that --

A. Correct. So rather -- that's fair. Instead of launching in non-incognito mode and having to launch a    10:48:56 new incognito mode tab every time I launch Chrome, I just set it as the default. That saves me -- that saves me time.

Q. Sure.

So I want to ask you about the why, then. And    10:49:07 you mentioned a moment ago -- I think you used the phrase "enhancing privacy." Why do you choose to use incognito as your default mode, recognizing there might be multiple reasons?

A. Sure. Again, I can speak for my person, I can't    10:49:36 speak for others. But privacy is important to me. And if there is a feature that advertises itself as an enhancement to privacy, I have an interest in that.

I use Chrome quite a bit for searching, for all activities online. Again, not because I'm a nefarious    10:49:59

Page 35

person or I'm some super spy or I want to do something bad or I'm hiding it, it's just I appreciate my privacy and I value it. And this was something that just become an automatic part of my day of an additional barrier to protect my privacy in a world that increasingly seems    10:50:19 like privacy is more and more difficult to be had. And so to me, that made sense. That's why I use it.

Q. And when you're browsing the internet, is it fair to say you -- you take careful precautions to protect your privacy?    10:50:46

MR. LEE:  Objection to form.

THE WITNESS:  I would say I take reasonable action to protect my privacy.

Q. BY MR. SCHAPIRO:  Well, do you remember answering some interrogatories in this case?    10:51:06

A. Yes, I believe I reviewed those with -- with counsel.

Q. And do you recall in response to one of those, Interrogatory Number 3, responding that your privacy is a human right and you take careful precautions to protect    10:51:28 your privacy?

MR. LEE:  Are you asking him if he remembers our phase 3?

MR. SCHAPIRO:  No, I'm asking him if he remembers Interrogatory 3.    10:51:41

Page 36

Q. I'm happy to show it to you if you want. That's fine. I just thought it would be quicker if you recall.

So let's look at Exhibit 3.

(Exhibit 3, Plaintiff Jeremy Davis' Objections and Responses to Defendant's First Set of    10:51:52 Interrogatories, marked for identification electronically by counsel.)

Q. BY MR. SCHAPIRO:  Mine is taking a moment to load. I don't know about yours.

A. Just refreshing now. I see it now.    10:52:12

Q. All right. So feel free to scroll through the document, and let me know at your convenience if these are interrogatories to which you provided -- in -- in conjunction with your lawyers to which you provided some answers.    10:52:37

A. And the question was regarding Interrogatory 3; is that correct?

Q. Yes.

A. Okay. Do you have a line number?

Q. Yeah. This would be -- let's see here.    10:52:46

MR. LEE:  It's line 7 and 8, Mr. Schapiro.

MR. SCHAPIRO:  Thanks, James.

Q. Yeah, lines 7 and 8. There are. It's right after "Notwithstanding and subject to these objections."

A. I see this now. Yes. Yeah, that is familiar to    10:53:22

Page 37

10 (Pages 34 - 37)

1 me.

2    Q.  And is it accurate that you take careful

3 precautions to protect your privacy?

4    A.  Yes, I think I take careful and reasonable

5 precautions to protect my privacy.          10:53:35

6    Q.  All right.  We can close out of this, if you

7 want.

8        So what are some of the careful precautions you

9 take to protect your privacy?

10   A.  Yeah, I -- I thought Google incognito was going    10:53:49

11 to be one of those steps.  And so my perspective has

12 changed once I've understood what has happened.  But

13 that's one.

14       And I make sure that I use a wireless mesh

15 system at the house.  It's a retail mesh, eero.  But it    10:54:15

16 basically has a very strong firewall on it, and it

17 prevents leakage and serves as a strong internet router.

18       And then obviously for work and/or other times,

19 I may periodically use a VPN technology.

20   Q.  Do you use a VPN at home?          10:54:42

21   A.  Primarily for work.

22   Q.  Do you consider yourself more privacy conscious

23 than the average person?

24       MR. LEE:  Objection to form.

25       THE WITNESS:  It's tough for me to know what the    10:55:11

Page 38

1 average person's perspective of privacy is, and privacy

2 is a complicated topic.  I would say I have a reasonable

3 understanding of privacy concerns.

4        I think any informed individual would probably

5 be interested in the same level -- have the same level of    10:55:29

6 interest in privacy that I have.

7    Q.  BY MR. SCHAPIRO:  So you mentioned the wireless

8 setup you have at your house with the firewall and

9 sometimes using a VPN at work.  Are there any other

10 precautions that you take to protect your privacy while    10:55:49

11 you browse the internet that you can think of while you

12 sit here?

13   A.  I mean, incognito was my primary response

14 because of the claims that I understood from -- from

15 Google.  That's the primary one.          10:56:08

16       I will occasionally use a personal VPN, but it's

17 not on all the time.  Like every once in a while I may

18 use a product called NordVPN, I believe is the product.

19 But it's not something I use all the time.

20   Q.  And how about when using apps?  Is there    10:56:25

21 anything additional or different?  Because I guess I was

22 just asking, you know, while you browse the internet.

23 But while you use apps, do you take in anything

24 additional you do to protect privacy?

25   A.  If I can use an app anonymously and get utility    10:56:41

Page 39

1 out of it, I will.  So if I don't have to authenticate or

2 identify myself, I won't.  But if the app requires me to

3 identify myself to get utility, I'll obviously do that.

4        That's the -- I think that's about the only

5 distinction I could make there.  Like, if it's possible    10:57:01

6 to use an application anonymously, I probably will.

7    Q.  And is the same true of websites, that sometimes

8 in order to get the full utility of the site you need to

9 sign in or identify yourself in some way?

10   A.  Yeah, that's true.  Like, think about your bank;    10:57:18

11 right?  Obviously if you're going to do online banking

12 you have to identify yourself.

13   Q.  And is it important to you that websites you

14 visit function properly?

15   A.  Yes.  I mean, like I would like them to function    10:57:41

16 properly.  I think everybody has that interest.

17   Q.  Yeah.

18       So as someone in the tech space, you understand

19 that in order to serve up a site to you -- or sort of

20 serve up the content to you, a website has to know, for    10:58:02

21 example, your IP address so it knows where the -- where

22 the content should go?

23   A.  It knows an IP address; right?  Like it knows

24 either the gateway specifically that you're behind, your

25 firewall; right?  It might not know your device's    10:58:19

Page 40

1 specific IP.

2        But in general, yes, I understand that in the

3 request response cycle between a user and an application

4 or website, it has to know where to route that traffic

5 response back to.  And the mechanism that it uses    10:58:36

6 primarily to do that is IP.

7    Q.  Okay.  Well, that's a fair distinction you make.

8 So you're saying an IP address doesn't necessarily

9 identify a user?

10       MR. LEE:  Objection to form, mischaracterizes.    10:58:47

11       THE WITNESS:  I mean, alone maybe not.  But if

12 you correlate with data -- like, for example, if -- if my

13 home internet provider, right, infrequently refreshes or

14 changes my IP, then that's very identifiable information;

15 right?          10:59:09

16       Versus if you're on a network that dynamically

17 reassigns you an IP.  It's much more difficult to

18 associate that -- that information.

19       So to give you a complete understanding of what

20 my understanding of that is, IPs are, indeed,    10:59:32

21 identifiable information for human users.  Just the IP

22 alone can be identifiable.

23   Q.  BY MR. SCHAPIRO:  Well, you used the term --

24   A.  Does that answer the question?

25   Q.  You used the term "dynamic" when you were    10:59:51

Page 41

11 (Pages 38 - 41)

1 remembering correctly?

2 MR. LEE: He said was.

3 THE WITNESS: Yeah, I said --

4 Q. BY MR. SCHAPIRO: Was. Sorry. Was incognito;

5 right?                              11:05:42

6 A. Yes, correct. I mean, I will be changing my --

7 I'm not changing my behavior during the course of the

8 case, but I very likely will change my behavior after the

9 case completes.

10 Because my confidence in the privacy claims of   11:05:51

11 Google incognito are, let's say, challenged at this

12 point.

13 Q. So just to make sure I've got that right, what

14 you're saying is that currently you're continuing to use

15 incognito when you're surfing the web; is that right?   11:06:12

16 A. That's correct. I didn't want to change my

17 behavior during the course of the case. But based on

18 the -- the results of the findings, I will likely change

19 that behavior once the case concludes.

20 MR. LEE: Mr. Schapiro, we've been going for   11:06:39

21 about an hour. Whenever a nice time for a break is in

22 the next few minutes would be appreciated.

23 MR. SCHAPIRO: This is fine. This would be

24 fine.

25 So why don't we go off the record.   11:06:50

Page 46

1 MR. LEE: Sure. Take ten?

2 MR. SCHAPIRO: Yep. See you back here in ten

3 minutes.

4 THE VIDEOGRAPHER: Going off the record. The

5 time is 11:07 a.m.                  11:06:58

6 (Recess.)

7 THE VIDEOGRAPHER: Back on the record. The time

8 is 11:17 a.m.

9 Q. BY MR. SCHAPIRO: Mr. Davis, do you have

10 particular concerns about what information Google, as   11:17:07

11 opposed to other entities on the web, collect?

12 A. Yes. In this case, yeah, I have concern around

13 what data Google is collecting. Specifically when I'm in

14 incognito mode using the Chrome browser.

15 Q. And what have you done to understand Google's   11:17:38

16 data collection?

17 MR. LEE: You can answer this question,

18 Mr. Davis, but only to the extent it doesn't reveal any

19 communications you've had with your attorneys. Okay?

20 THE WITNESS: Understood.          11:17:53

21 No, it's my understanding from the claims that

22 Google has improperly collected information it said it

23 wouldn't, in accordance with its Privacy Policy.

24 Q. BY MR. SCHAPIRO: Yeah, I apologize. My

25 question might not have been well formed.   11:18:11

Page 47

1 Prior to -- let's start with prior to your --

2 any involvement in this lawsuit, did you have -- was your

3 desire to maintain privacy vis-a-vis Google identical

4 with your -- the same as your desire to maintain privacy

5 versus any other entity on the web? Or was there   11:18:41

6 something in particular about Google that maybe you want

7 to stay private from Google?

8 A. I would say before the case, the same general

9 approach.

10 Q. And is it important for you to know what   11:19:01

11 information the websites you visit collect?

12 A. Yes. In general, I'd prefer to know the

13 information that is being collected.

14 Q. And is it your practice to review disclosures

15 about what's collected on websites that you visit?   11:19:38

16 A. Yes. In general, I'm familiar with the

17 information. And I try, as best a human can, to be

18 informed about those disclosures.

19 Q. So are you a person who typically reads the

20 privacy policies of websites you visit to make sure you   11:20:03

21 understand what information they're collecting?

22 A. I would say definitely I've reviewed policies at

23 sites, as well as in this case. And in Google's case, I

24 believe I was directed to those as I accepted the Terms

25 of Service when the account was created and as well as   11:20:28

Page 48

1 the materials that's there on every splash screen of

2 incognito mode.

3 So I can't attest that I've seen absolutely

4 every version. Of course I'm not building my life around

5 the flow of those documents. But as -- as it catches my   11:20:43

6 eye or interest, yeah, I'll read through them.

7 Q. Right.

8 So I just want to be clear. I mean, there

9 are -- I think it's fair to say there are some people who

10 never read privacy policies and they click "I accept, I   11:20:56

11 agree," and I suppose there are some people all the way

12 at the other end of the spectrum who read every word of

13 everything anytime they go anywhere on the web. As best

14 as you're able, where would you place yourself on that

15 spectrum?                          11:21:18

16 MR. LEE: Object to form, incomplete

17 hypothetical.

18 You can answer.

19 THE WITNESS: Sure. I would -- I would

20 definitely not put myself on either end of that extreme   11:21:24

21 per your example. I'm probably somewhere fairly in the

22 middle, where there's times where I review it, and then

23 there's definitely -- probably because I'm very busy --

24 there's times that I don't read through it as careful.

25 Q. BY MR. SCHAPIRO: And do you expect websites   11:21:41

Page 49

13 (Pages 46 - 49)

1 that you visit to tell you if they might be sharing your

2 data with their business partners?

3    A. Yeah, I believe that that may even be a legal

4 requirement now. It probably hasn't been that way and

5 may not be that way in every jurisdiction, but I would       11:22:02

6 know that it is becoming more frequent that when I visit

7 a cite, like, you'll see a footer where it says, "Hey, in

8 order to use this site, we're going to use cookies," or,

9 "We're collecting this type of information about you." I

10 would say that that's becoming more -- more common.       11:22:20

11    Q. And would you expect a website to list all of

12 its business partners, or would it be sufficient in your

13 view to refer to sharing with business partners?

14       MR. LEE: Objection to form.

15       THE WITNESS: I won't speculate on what's proper       11:22:35

16 for one business to do or not. Their disclosures are

17 their discloses.

18    Q. BY MR. SCHAPIRO: Well, I understand that, but I

19 guess I'm asking about what your -- what your

20 expectations are, your -- including your expectations of       11:22:48

21 privacy.

22       Do you expect that when you -- if you were

23 looking at the disclosures on a website, it would list

24 every business partner that it shares data with, or would

25 tell you in more general terms that it shares with       11:23:07

Page 50

1 business partners?

2    A. I guess my expectation is not as relevant as

3 what the companies are doing; right? I've seen both

4 examples to your example. I've seen where some companies

5 exhaustively list -- or list off the partners that they       11:23:25

6 sell to or they may just make a blanket claim. And then

7 I think it's up to the individual to interpret whether or

8 not they perceive that as an acceptable term to them.

9    Q. Are you familiar with the website CoinMarketCap?

10    A. I am, yes.       11:23:47

11    Q. And that's one of the websites that -- in some

12 of the submissions in this case, you indicated that's --

13 that's one that you visit regularly; is that correct?

14    A. That's correct.

15    Q. Have you read the Privacy Policy of       11:24:07

16 CoinMarketCap.com?

17    A. I believe I may have reviewed it at some point,

18 but I don't have specific recollection of when.

19       MR. SCHAPIRO: Let's load it up as an exhibit.

20 This will now be Exhibit 4.       11:24:35

21       (Exhibit 4, CoinMarketCap Privacy and Cookie

22       Policy, marked for identification electronically

23       by counsel.)

24       MR. LEE: Andy, while we wait for the Exhibit

25 Share to load, do you have an effective date for the       11:24:46

Page 51

1 Exhibit 4?

2       MR. SCHAPIRO: Not off the top of my head.

3 Let's see if one is indicated here.

4       Effective date is January 1st, 2020.

5       MR. LEE: Thank you.       11:25:15

6       THE WITNESS: Okay. I have that document.

7    Q. BY MR. SCHAPIRO: Okay. And if you take a look

8 at this first page here, do you see the large heading

9 "What Information Do We Collect?"

10    A. I see that section.       11:25:30

11    Q. And by the way, do you remember one way or

12 another whether you've ever looked at the CoinMarketCap

13 Privacy Policy?

14       MR. LEE: Are you asking if he's seen this one?

15    Q. BY MR. SCHAPIRO: Well, let me ask first more       11:25:47

16 generally.

17       Any version of it?

18    A. Yes, this is familiar to me in terms of I recall

19 there being a Privacy Policy for CoinMarketCap. And this

20 is generally familiar. I, of course, can't tell you if I       11:26:02

21 looked at this exact version.

22    Q. All right. And do you see here under "What

23 Information Do We Collect?" CoinMarket states that they

24 correct -- and I'm looking down at letter E, quote,

25 "Information related to your use of the website and/or       11:26:19

Page 52

1 the mobile application, including IP address, geographic

2 location, and date and time of your request"?

3       Do you see that?

4    A. Yes, I see that.

5    Q. And do you have any objection to CoinMarketCap       11:26:35

6 collecting that data?

7    A. As they're disclosing it, obviously no. It

8 seems that they're disclosing this because it's necessary

9 for the functionality of their site and service.

10    Q. And would it be objectionable to you if they       11:27:01

11 were, rather than collecting it themselves, sharing the

12 data with some other companies?

13    A. If they do not disclose that they are selling or

14 sharing that information, yes.

15    Q. Let's take a look at page 3 under the section       11:27:15

16 entitled "Cookies and Web Beacons."

17       Let me know when you see that.

18    A. Okay. I see that section.

19    Q. And you'll see that it indicates here -- this is

20 towards the end of the very first paragraph,       11:27:48

21 "CoinMarketCap and its ad management partners ('Ad

22 Partners') use cookies to record current session

23 information. Our ad partners may also from time to time

24 use web beacons (also known as internet tags, pixel tags,

25 and clear GIFs). These web beacons are provided by our       11:28:20

Page 53

14 (Pages 50 - 53)

1 fundamental claim in the Privacy Policy by Google that my
2 activities are actually private when I'm in incognito
3 mode but, in fact, it seems even anonymized profiles of
4 that information are being collected and stored.
5    Q. If in fact anonymized profiles are not being      11:51:15
6 created, if in fact what you've been informed or led to
7 believe is not true, would you still believe that Google
8 is violating representations that it made to you?
9       MR. LEE: Objection to the extent it calls for a
10 legal conclusion.                                        11:51:45
11      THE WITNESS: The fact that the information is
12 being -- is collected, right, is cause for concern. I
13 would have to think very carefully about whether or not
14 it would change my opinion if no collection was
15 occurring.                                               11:52:11
16      Again, it's a hypothetical. Like, I understand
17 that anonymized profiles are being collected.
18    Q. BY MR. SCHAPIRO: What about if anything that is
19 collected is deleted or anonymized every time you end
20 your session? Would that change your view?              11:52:36
21      MR. LEE: Objection. Incomplete hypothetical.
22 Also, to the extent it calls for a legal conclusion.
23      THE WITNESS: I've not considered this notion
24 before, so give me a moment. I'm considering it.
25      If this was a hypothetical future change to       11:53:22

Page 66

1 behavior, if that's the question, I think that would be a
2 step in the right direction. But I don't think that that
3 would preclude any of the damages or violation of privacy
4 that may have occurred if that stuff was being stored and
5 not deleted. I think that's the fairest way I could      11:53:43
6 answer that question.
7    Q. BY MR. SCHAPIRO: You mentioned in your answer a
8 moment ago logging in. What were you referring to there?
9    A. Oh, sure. Logging in. That is to provide a
10 username and password in, for example, Gmail account. I  11:54:05
11 have a Gmail account. If I want to check Gmail, I would
12 have to authenticate to access that service.
13    Q. And do you understand that if you log in to your
14 Gmail account, is it still your expectation that Google
15 will receive no information about you? Or does that --    11:54:25
16    A. No, I -- no. In the case in which I'm
17 identifying myself to Google, I -- I understand that they
18 are aware of what my activities are. When I have
19 identified myself to them.
20    Q. Do you still have the Complaint handy?            11:55:00
21    A. I have it here, yes.
22    Q. So can I ask you to look at paragraph 163 of the
23 Second Amended Complaint? And, you know, just for the
24 record, even though it's a document on the docket, why
25 don't we go ahead and introduce it.                     11:55:20

Page 67

1       Feel free to refer to the version that you have
2 there, the hard copy, if that's easier. But let's
3 introduce as the next exhibit the Second Amended
4 Complaint, just to have a complete record.
5       So this will be Exhibit 6, I think.               11:55:35
6    A. Sir, what was that paragraph number again?
7    Q. Paragraph 163.
8    A. 163. Okay.
9       (Exhibit 6, Second Amended Complaint, marked for
10       identification electronically by counsel.)       11:56:03
11      THE WITNESS: I see it at the bottom of a page,
12 and it starts with: "It is common knowledge that Google
13 collects." Is that the paragraph in question?
14    Q. BY MR. SCHAPIRO: It is.
15    A. All right.                                        11:56:15
16    Q. So, actually, why don't you go ahead, if you
17 don't mind, just read that first sentence out loud.
18    A. Sure. What I see here is, paragraph 163, "It is
19 common knowledge that Google collects information about
20 web-browsing activity of users who are not in private    11:56:31
21 browsing mode, is also common knowledge" --
22    Q. You can stop. I just want to ask you first
23 about that first sentence.
24    A. Okay.
25    Q. Feel free to read the whole thing, so you -- if   11:56:45

Page 68

1 you want to, to yourself, but...
2       So -- so this is referring to users who are not
3 in private browsing mode; correct?
4    A. Correct. I see the emphasis on not in private
5 browsing mode.                                           11:57:06
6    Q. Yes. And is that -- so your Complaint here says
7 that this is common knowledge. Is that knowledge that --
8 that you, Jeremy Davis, had also prior to this lawsuit?
9    A. Yes, that's my understanding.
10    Q. And do you agree, as someone who works in the     11:57:24
11 space that you work in, that it is -- it's common
12 knowledge that Google collects information about web
13 browsing activity when people are not in private mode?
14    A. Yeah, I would say that's a fair statement.
15    Q. And is that impacted one way or the other by      11:57:57
16 whether the user has Google's -- had Chrome's sync
17 feature enabled? S-Y-N-C.
18    A. I'm not 100 percent sure if that is solely
19 required.
20    Q. No, I guess I'm just asking you -- well, let me    11:58:17
21 back up.
22       Are you aware that -- that Chrome has various
23 modes? For example, incognito is one mode; right?
24    A. (Nods head.)
25    Q. You have to answer verbally so the court         11:58:30

Page 69

18 (Pages 66 - 69)

**Page 70**

1 reporter can get it.

2    A. Yes, I understand incognito to be a mode of

3 operation for Chrome.

4    Q. And you understand that there's something that

5 is sometimes called basic mode, which is just regular old   11:58:42

6 Chrome right out of the box?

7    A. Yeah, it's the standard wide screen. I would

8 call that normal Chrome. That's how I refer to it. So a

9 normal Chrome session and an incognito session, yes.

10    Q. And do you understand that users can sometimes   11:58:58

11 choose to enable a feature called sync, S-Y-N-C, as well,

12 if they have multiple devices?

13    A. I believe I'm familiar with this in the profile

14 settings of Google. Like once you're logged in, I think

15 that's an option that is presented to you.   11:59:15

16    Q. And do you have any belief that just using plain

17 old Chrome right out of the box, without Sync enabled,

18 gives you privacy protection so that Google won't see

19 what you're doing?

20      MR. LEE: Objection to form, calls for   11:59:38

21 speculation, lack of foundation.

22      THE WITNESS: I would assume that -- I can give

23 you my personal perspective. I don't assume privacy in,

24 quote/unquote, "normal Chrome sessions." Why else would

25 the incognito mode exist and why else would the Privacy   12:00:01

**Page 71**

1 Policy refer to it as the prescribed way to browse

2 privately?

3      So my assert-- -- my impact of understanding

4 privacy assumptions are fundamentally different between

5 the two.   12:00:19

6    Q. BY MR. SCHAPIRO: All right. So here in this

7 same sentence, a paragraph of your Complaint, it also

8 says, "It is also common knowledge that Google causes

9 targeted advertisements to be sent based on that

10 information."   12:01:01

11      Do you see that?

12    A. Yes, I've read that sentence.

13    Q. And do you generally understand that on what for

14 you, I guess, are the rare occasions when you are not

15 incognito, if you see ads tailored to your interests it's   12:01:17

16 because Google or some other entity has received

17 information about your past browsing?

18    A. Yes, I understand that.

19    Q. When you've used Chrome, have you ever seen ads

20 that appear to be tailored to you?   12:01:37

21    A. In normal mode, yes.

22    Q. And I assume the flip side, but not in incognito

23 mode?

24    A. I have actually experienced rarely a term that I

25 have searched for or a topic, I've seen those things show   12:01:59

**Page 72**

1 up even in incognito mode. It is rare. It is rate, not

2 the rule, but I have seen that occur in incognito mode.

3    Q. Has that been when you're within a single

4 incognito session, that is you might have multiple tabs

5 open but you've been using incognito during the -- you   12:02:24

6 know, without closing out of it?

7    A. It's possible. I'm not sure of the conditions

8 specifically, but I suppose that's possible.

9    Q. Do you have any belief as to whether a targeted

10 advertising can be beneficial to users such as yourself?   12:02:52

11      MR. LEE: Objection to form, vague as to scope.

12      THE WITNESS: I would say that I understand that

13 there's a whole industry and business around targeted

14 advertising. And I suppose there could be some utility.

15 I think it varies by person. But, yeah, I would say   12:03:15

16 there's probably utility in those ads.

17    Q. BY MR. SCHAPIRO: Is Chrome the browser -- the

18 primary browser that you use to surf the internet?

19    A. Yes, it is the primary.

20    Q. What other browsers, if any, do you use? And   12:03:56

21 maybe just to narrow it a little bit, I guess I would

22 say -- why don't we start with currently.

23    A. Yeah, the big three that I generally find

24 installed on any of my devices would be the native OS

25 browser, so like if I'm on a Windows device there would   12:04:23

**Page 73**

1 be what historically was Internet Explorer or Mount Edge.

2 I will generally load Mozilla Firefox on most of the

3 computing devices.

4      And then on the Apple devices, I have, of

5 course, Safari. So I would say the primaries that I   12:04:41

6 would use, it's always Google -- sorry, Chrome has been

7 my go-to for a long time. For a long time it was the

8 fastest, and so it ingrained a preference in faster

9 browsing in me. That's why I use it as primary. Along

10 with the existence of incognito mode for private   12:05:01

11 browsing. They were there first, I think, before many of

12 the other browsers introduced those features.

13      But those would be the mix of browsers that I

14 might use.

15    Q. And when you use other browsers, let's say   12:05:16

16 Safari, for example, or Firefox Mozilla, do you typically

17 use their private browsing mode?

18    A. Yes, I do.

19    Q. And is that with the same -- roughly the same

20 breakdown that you've described earlier? I can't   12:05:43

21 actually remember what the percentage was, but it was the

22 overwhelming percentage of time.

23    A. Yes. I generally use -- if you'll recall in my

24 earlier testimony, we talked about those parameters to

25 set them into default --   12:05:59

19 (Pages 70 - 73)

1    Q.  Uh-huh.

2    A.  -- private mode.  Those other browsers support

3  the same mechanism.  And I configure them in a similar

4  way.

5        MR. LEE:  Hey, everybody.  I'm getting a frozen          12:06:09

6  screen.  Are you guys getting a frozen screen?

7        MR. SCHAPIRO:  Let's see.  Yeah, although I can

8  hear perfectly well.

9        MR. LEE:  Yeah, the audio is through the phone.

10        MR. SCHAPIRO:  I'm no longer frozen.  Do you          12:06:23

11  want to wave your hands, James?  Let me see if I -- yeah,

12  I see you moving.

13        MR. LEE:  I don't see Mr. Davis moving.  That's

14  the one I'm concerned of.

15        THE WITNESS:  Oh, my Zoom session just dropped.          12:06:36

16        THE REPORTER:  Shall we go off the record,

17  Counsel?

18        MR. LEE:  Yeah, let's take a break and figure

19  this out.

20        THE VIDEOGRAPHER:  Going off the record.  The          12:06:41

21  time is 12:07 p.m.

22        (Recess.)

23        THE VIDEOGRAPHER:  Back on the record.  The time

24  is 2:19 p.m. -- 12:19.  Sorry.

25        MR. LEE:  Oh, you know what?  I should mention          12:19:50

Page 74

1  it's 1:20 here our time.

2        THE WITNESS:  It's 12:20.

3        MR. LEE:  I'm sorry, 12:20 here.  I think we can

4  go one more session before lunch.

5        THE WITNESS:  I'm good, yeah.          12:20:02

6        MR. LEE:  Okay.  But I think after the next hour

7  block, Andy, we'll probably need to take lunch.

8        MR. SCHAPIRO:  Whatever is best for the witness

9  is fine for us.  I happen to be in the Central Time Zone

10  as well, so this one will work out nicely.          12:20:14

11        MR. LEE:  Okay.  Great.  I forgot about that.

12  That's good.

13    Q.  BY MR. SCHAPIRO:  All right.  Mr. Davis, you'll

14  recall a little bit earlier we were talking about steps

15  that you take to protect your privacy.  Do you remember          12:20:26

16  that?

17    A.  Yes, I do.

18    Q.  And are you aware that in Chrome settings you

19  can enable a feature called "block all cookies"?

20    A.  I'll have to take your word for it.  I don't          12:20:49

21  have specific recollection of that capability.

22    Q.  Do you know --

23        THE REPORTER:  Was there an objection, Mr. Lee?

24        MR. SCHAPIRO:  No.  James made a comment.

25        MR. LEE:  I was being silly.  Go ahead.          12:21:06

Page 75

1    Q.  BY MR. SCHAPIRO:  Are you aware of whether in

2  Chrome settings you can enable something called "block

3  third party cookies"?

4    A.  I've seen that on the updated splash screen for

5  incognito mode.          12:21:21

6    Q.  Are you aware of whether in Chrome settings you

7  can enable something called "clear cookies and site data

8  when you close all windows"?

9    A.  Yes, I think I'm familiar with that.

10    Q.  Are you aware that you can disable JavaScript in          12:21:45

11  Chrome settings?

12    A.  Yes, I believe I'm familiar with that ability.

13    Q.  Do you know that you can install ad blocking

14  extensions in Chrome, like ad block or ad lock plus -- ad

15  block plus?          12:22:13

16    A.  I'm aware of the extension capabilities.  I

17  don't have specific knowledge of the -- I know there's a

18  general -- there used to be a general capability to block

19  ads, but I think they've retired Chrome plug-ins or

20  something at some point.  But, yeah, in general, I'm          12:22:30

21  aware of that historically being a capability.

22    Q.  Are you aware that you can opt-out of

23  personalized ads when using Chrome?

24    A.  I believe I recall seeing that in the settings

25  features, yeah.          12:22:52

Page 76

1    Q.  I'm going to pause here.  I'm going to ask you

2  about some others, but have you -- of this list that

3  we've just gone through of features that you can enable,

4  do -- do you recall whether you have enabled or used any

5  of them in Chrome?          12:23:08

6    A.  No, I don't have a specific recollection of

7  using them.  I think I may have deleted sessions and

8  cookies before incognito.  Like I would manually go do

9  that after a browsing session.  But once I understood

10  that was happening with -- or at least purported to be          12:23:28

11  happening with incognito, I stopped that practice.

12    Q.  You have at least one Google account; is that

13  correct?

14    A.  That's correct, I have one account -- one Google

15  account.          12:24:01

16    Q.  And are you aware that you can visit the "My

17  Activity" page to review and manage and delete

18  information that Google has associated with your Google

19  account?

20    A.  I don't believe I'm familiar with that.          12:24:16

21    Q.  And I think you told us a little earlier that

22  you -- you have an understanding of what a VPN is but

23  you've used it only -- used one only on certain

24  occasions; is that correct?

25    A.  That's correct.          12:24:53

Page 77

20 (Pages 74 - 77)

1   Q. And your view in -- in this case is that Google
2   does not alert you that the data -- that your data might
3   be received by Google when you browse the internet in
4   private browsing mode; is that correct?
5   A. Yeah, that's -- that's correct. Like, I don't    12:25:15
6   see any disclosure on that primary incognito screen. I
7   don't -- I don't see disclosures saying Google is going
8   to collect -- like, they go out of their way to say what
9   might be visible and what I should be concerned with, but
10  they do not call out themselves as an entity to be       12:25:41
11  concerned with the collection of that data.
12  Q. You mentioned a few minutes ago that you've
13  sometimes used private browsing mode with other browsers;
14  correct?
15  A. I do.                                      12:26:03
16  Q. And have you ever looked into if you -- whether
17  your data will be sent to Google in the way that you
18  allege happens here when you're using other browsers in
19  private mode as well?
20       MR. LEE:  Objection to form.                  12:26:28
21       THE WITNESS:  I'm not sure of the relevance of
22  that, and I haven't -- I haven't considered that.  I'm
23  focused primarily on Google's claims of their own product
24  and their own browser in the collection.
25       I suppose that's something.  You're raising a       12:26:46

Page 78

1   good question.  I should maybe look into that further.
2   Q. BY MR. SCHAPIRO:  On what devices do you use
3   Chrome?
4   A. Sure.  I use them on my laptop computers,
5   desktop computers, mobile phone, iPhone.  And I believe I   12:27:14
6   even have it installed on an iPad.
7   Q. It sounded like you used plural when you
8   said laptop computers, desktop computers.  Do you have
9   more than one laptop, more than one desktop?
10  A. I do.  I have multiple in my home.  Being in the    12:27:35
11  industry, right, computers are pretty common for me.
12  Q. And do -- do any other family members or friends
13  ever use any of your devices?
14  A. On very rare occasions.  Like, if someone needs
15  to get online to do something, I might let them -- I       12:28:00
16  might log them in as a guest on one of the machines.
17       But as a practice and a rule, no.  Everyone in
18  the home has their own devices and generally stick to
19  those devices.
20  Q. And the practice you have of using incognito for    12:28:24
21  your browsing that you just described, is that the same
22  across your devices, or is there some difference
23  depending on what device you're using?
24  A. No, it's my general practice, common practice,
25  across all of the devices.                        12:28:42

Page 79

1   Q. When you have an incognito session open, about
2   how long do you usually keep it open?
3       Let me make that more clear.  Do you ever keep
4   tabs or windows open for -- for more than a day?
5   A. Yeah, there's occasions where I do.  As a        12:29:03
6   general practice, I generally will close out of the
7   browser session.  But there have been occasions where I'm
8   in the middle of researching something or in the middle
9   of working on something and I'll leave it open, suspend
10  the computer, and come back to it the next day.       12:29:22
11  Q. How about leaving tabs or windows open for more
12  than a week?  Is that something that you commonly do?
13  A. There are occasions in which I have, yes.
14  Q. Is that common or -- or rare?
15  A. It's -- I would say it's -- it's on the rarer    12:29:47
16  side, yeah.  Because most of the times I'm getting in,
17  getting out, doing what I need to do.  But it does --
18  there are occasions in which I'll -- yeah, I'll leave
19  them long running.
20  Q. So I think earlier in the deposition today you    12:30:09
21  were telling us about your understanding of the -- the
22  incognito splash screen.  Do you recall that?
23  A. Yes.
24  Q. And prior to your involvement in this case, was
25  that splash screen the only document that contributed to    12:30:47

Page 80

1   your understanding or your belief about what incognito
2   does, or were there other documents that you had
3   reviewed?
4       MR. LEE:  Objection to form, mischaracterizes
5   his prior testimony.                           12:31:11
6       You can answer.
7       THE WITNESS:  Yeah.  No, so I had reviewed both
8   the Google Terms of Service, the Google Privacy Policy,
9   as well as material, maybe blog posts, on incognito.  So
10  I was not solely informed by the splash screen.       12:31:27
11  Q. BY MR. SCHAPIRO:  And this is -- so this prior
12  to involvement in the lawsuit, you had looked at, you
13  say, the Privacy Policy and maybe some blog posts?
14  A. That's correct.
15  Q. By the way, you said that when you saw the story    12:31:55
16  or advertisement about this lawsuit, it peaked your
17  interest.  Had you, prior to that point, ever seen any
18  articles or blog posts suggesting that incognito -- not
19  by Google, suggesting that incognito mode might not be
20  private in the way that you expected?                 12:32:23
21       MR. LEE:  Hold on.
22       I just want to object to the extent that you are
23  mischaracterizing Mr. Davis' testimony.  He did not -- he
24  did not testify that he responded to an advertisement.
25       MR. SCHAPIRO:  I withdraw the point about the       12:32:37

Page 81

21 (Pages 78 - 81)

1 advertisement.

2    Q.   So my question, nevertheless, is:  You said when

3 you saw this, I'll just say a story about this lawsuit,

4 it piqued your interest.  And I was asking prior to that

5 point, had you ever seen any articles or blog posts,          12:32:53

6 presumably not from Google, suggesting -- causing you to

7 suspect or suggesting that incognito might not be private

8 in the way you had thought?

9    A.   Fairly recently, prior to the case, I believe

10 there was a journal entry or a hypothetical post that          12:33:19

11 said it was hypothetically possible that Google could be

12 aggregating information.  I think there was an article

13 written about that.  And I even think I recall reading

14 Google responding to that article and saying that they --

15 perhaps that they did not.                  12:33:42

16         And so that's my recollection of any materials

17 that might have indicated that maybe things were not as

18 they appear with regard to incognito.

19    Q.   And do you remember about how long before the

20 lawsuit that was?                  12:34:04

21    A.   I'm pretty sure it was within a year.  Like, it

22 was less than a year.

23    Q.   And then since filing the lawsuit, I believe you

24 told us earlier that you continued to use Chrome because

25 you didn't want to change your -- your activity.  Am I          12:34:35

Page 82

1 characterizing that right?

2    A.   Yeah.  I thought it would be best to be

3 consistent with my activity during the course of the

4 lawsuit.

5    Q.   While you're continuing to use Chrome, have you          12:34:52

6 taken any -- have you taken any steps to -- to prevent

7 what you contend is the improper collection of your

8 information?

9    A.   Again, I'll restate.  I haven't changed my

10 behavior.  I've kept my behavior consistent since the          12:35:17

11 lawsuit started.

12    Q.   And by that, I assume that means including the

13 things like extensions, add-ons, settings, et cetera?

14    A.   Yeah, I have not taken additional action or

15 leveraged any of those capabilities.  If you're -- if          12:35:34

16 you're specifically asking me, like, have I installed the

17 ad blocker or the ad -- extension add-on, the answer is

18 no.  I have not made use of those things you mentioned

19 earlier on the call.

20    Q.   Mr. Davis, do you believe that you entered into          12:36:01

21 a contract with Google?

22    A.   The answer is yes.  And not only do I believe

23 that, I believe the Court has affirmed that a contract

24 exists.  Not excluding -- not exclusive to, but I believe

25 including the splash screen, the Google Terms of Service          12:36:23

Page 83

1 and the Google Privacy Policy.

2        I'm not a lawyer.  I'm sure there may be other

3 documents that the Court considers constitution to that

4 contract, but that's my understanding in this case.

5    Q.   Recognizing that you're not a lawyer, but do you          12:36:40

6 have any thoughts, as the person who entered into the

7 contract, of what other documents might be part of it?  I

8 think you just listed the splash screen, the Google Terms

9 of Service and the Google Privacy Policy.

10        You said maybe there are some others.  Any          12:37:00

11 thoughts on what those might be?

12    A.   Oh, yeah, the other one I think that's of

13 interest may be in the health file related to Google

14 Analytics.  I believe it made specific mention of the

15 Google Privacy Policy.  That would be one additional I          12:37:17

16 would add to that list.

17        And it said that Google Analytics would adhere

18 to the Privacy Policy, which clearly states that I am put

19 in control of what information Google collects about me

20 and that we can use Google services to manage our          12:37:38

21 privacy.  And if I choose to browse privately, I can

22 browse the web privately using Chrome in incognito mode.

23        And so the way that I would assert that privacy

24 would be to use incognito mode.

25    Q.   And in connection with this contract, did you          12:38:04

Page 84

1 provide anything to Google in return to the use of

2 Chrome?

3    A.   Of course.  I provided my activity and data;

4 right?  Clearly that -- there is value to the data

5 provided.  And that is -- that is the -- that is the          12:38:37

6 exchange of the parties in that contract; right?

7    Q.   So you agreed to provide data to Google?

8    A.   In normal -- in normal browsing mode.  Nowhere

9 in the Terms of Service, the Google Privacy Policy or the

10 splash screen did it provide me an opportunity to consent          12:39:03

11 to the exchange of data while in incognito mode.

12        Again, Google tells me I can browse privately.

13 I have no expectation of exchange of data when in

14 incognito mode.

15    Q.   Can you take a look at paragraph 275 of the          12:39:20

16 Complaint, the Second Amended Complaint?

17    A.   Sure.  Let me just turn to it.  You said 275?

18    Q.   Yes, sir.

19    A.   It's almost to the end.  Let's see.  Okay.  I

20 have it in front of me.                  12:40:03

21    Q.   Do you see where it says, "Plaintiffs and class

22 members also did not receive the benefit of the bargain

23 for which they contracted and for which they paid

24 valuable consideration in the form of the personal

25 information they agreed to share, which has ascertainable          12:40:20

Page 85

22 (Pages 82 - 85)

1    Q. It's between lines 5 and 6. And it has the 2005
2  date.
3        MR. LEE: Why don't you read the whole
4  paragraph?
5        MR. SCHAPIRO: James, I won't object, even        12:46:36
6  though you're in the same room, if you want to point,
7  but...
8        MR. LEE: No. I'm sorry. I just told him it
9  would be easier if he read the whole paragraph.
10       THE WITNESS: That's what I'm saying. I can't       12:46:49
11 locate it on the page. I don't think I'm on the same
12 page you are.
13   Q. BY MR. SCHAPIRO: So we're in Exhibit 8.
14 Exhibit 8. And it is -- I don't know if there's a page
15 number, but it's the Amended --                        12:47:01
16   A. "Notwithstanding" -- is it line 10 and 11?
17       THE WITNESS: Or which lines was he saying?
18   Q. BY MR. SCHAPIRO: I'm sorry, Exhibit 7.
19 Exhibit 7. No, Exhibit 8.
20   A. Oh, I'm in the wrong exhibit.                      12:47:17
21   Q. No, no, I'm wrong. It is Exhibit 8. I was
22 there a second ago.
23   A. Okay. I see it now. Okay. Thank you.
24   Q. Okay. Sorry about that.
25   A. Let me just read this really quickly.              12:47:29

Page 90

1    Q. Sure.
2    A. Sure. So we must have checked the dates around
3  that time, then.
4    Q. Okay. So you can -- I don't have any other
5  questions about this exhibit.                          12:47:50
6        But let's take a look at Exhibit 7, which is the
7  Google Terms of Service that were effective through
8  November 4th, 2005.
9    A. Okay. I have that document up.
10   Q. And I'll ask you if you remember which portions     12:48:12
11 you reviewed. Did you review only certain portions or
12 all of it?
13   A. I'm just checking to see how familiar this is.
14 This is from 2001 to 2003; is that right?
15   Q. My understanding is this is 2003 to 2005.          12:48:46
16   A. I only ask that question because it's
17 copyrighted 2001/2003.
18   Q. I think that's just when the copyright was. I
19 don't know.
20       MR. LEE: Yeah, Mr. Schapiro, I think you need      12:49:05
21 to make a representation of the date. You either know --
22 you can make that representation or you don't. I don't
23 think we can say --
24       MR. SCHAPIRO: Yeah, my understanding, but I
25 want to be careful, because the witness has just pointed  12:49:15

Page 91

1  out this copyright point. But I -- my understanding is
2  that this is the Terms of Service that were in effect
3  through November -- from March 29th, 2003, to
4  November 4th, 2005.
5        MR. LEE: And are you making that representation    12:49:40
6  to this witness today?
7        MR. SCHAPIRO: I'm making that representation to
8  this witness today. And if I'm wrong, we can, of course,
9  clear it up later, but...
10       MR. LEE: Okay.                                     12:49:50
11       THE WITNESS: So if you don't mind, I'd like to
12 read through this just to see if it's familiar to me.
13 There's a lot of information here, and it's quite old.
14   Q. BY MR. SCHAPIRO: Of course. You're entitled.
15   A. Okay. Thanks for give me the opportunity to        12:50:54
16 review.
17   Q. All right. Do you recall if you agreed to the
18 Google Terms of Service when you opened your account?
19   A. I would have absolutely had to. I think it was
20 a prerequisite to get the account, is my recollection.   12:51:08
21   Q. And in these Terms of Service, did Google
22 represent to you that you could control what information
23 Google collects by enabling private browsing mode?
24   A. I don't think that was temporarily possible,
25 because I don't think incognito existed at this time,    12:51:30

Page 92

1  when -- when Gmail was first launched.
2    Q. So I'll ask you to take a look at the Second
3  Amended Complaint again, paragraph 31, please.
4    A. Paragraph 31?
5    Q. Yes, sir.                                          12:51:56
6    A. Okay. I'm there.
7    Q. And do you see there's a citation to the Google
8  Privacy Policy? And this is in the -- to the May -- the
9  May 28th -- I guess in the Complaint it just says,
10 "May 2018 modification to the Privacy Policy."          12:52:32
11       Do you see that?
12   A. Yes, I see that line.
13   Q. And do you know whether you reviewed that
14 version of the -- ever reviewed that version of the
15 Privacy Policy?                                          12:52:45
16   A. I did.
17   Q. And do you recall whether that was before or
18 after your involvement in this litigation?
19   A. Yes, I believe I rereviewed it when the
20 incognito feature was launched. And this seems to be    12:52:58
21 aligned with that timeline.
22   Q. And did you agree to the Google Privacy Policy?
23       MR. LEE: Objection to form.
24       THE WITNESS: I don't know -- I don't know that
25 there's -- like, you agree to Terms of Service; right?   12:53:17

Page 93

24 (Pages 90 - 93)

1 But I don't believe there's a -- I just don't understand

2 the question.  Did I agree to it?

3     Q.  BY MR. SCHAPIRO:  Did you ever indicate --

4     A.  Did I agree with the terms?  Or did I -- did I

5 agree with what they were communicating?  Or are you        12:53:33

6 asking if I told Google that I agreed to the Privacy

7 Policy?  I'm just unclear on your question.

8     Q.  Did you ever indicate to Google in any way that

9 you did not agree to its Privacy Policy?

10     MR. LEE:  Objection to form.            12:53:51

11     THE WITNESS:  No.  No.  To my recollection, I

12 never told Google that I disagreed with its statements in

13 its updated Privacy Policy.

14     Q.  BY MR. SCHAPIRO:  Let's take a look at the --

15 what I will represent to you is the updated Privacy        12:54:08

16 Policy referred to in your Complaint, effective from

17 May 28th, 2018, to January 21st, 2019.

18     (Exhibit 9, Google Privacy Policy, marked for

19     identification electronically by counsel.)

20     Q.  BY MR. SCHAPIRO:  And can you tell me what        12:54:36

21 sections in here, if any, you believe promised you that

22 browsing in private mode would prevent Google from

23 receiving your information?

24     A.  One second.  This is the evidence 12 -- or

25 the --                                     12:55:08

1     Q.  Yes.  Exhibit 12, yeah.

2     A.  -- Exhibit 12?

3     MR. LEE:  You have a paper copy, too.

4     Q.  BY MR. SCHAPIRO:  Yeah, if you have a paper

5 copy, you can look at it as well.            12:55:18

6     A.  Yeah.  The paper copy I have has section numbers

7 on it.  And this one --

8     MR. LEE:  No.

9     THE WITNESS:  Oh, sorry.  No, it's the Privacy

10 Policy.  Excuse me.                         12:55:30

11     Yeah, just one second.

12     Yeah, I can call out the specific language in

13 the Privacy Policy.

14     So at the end of the first sentence, there are

15 the words "Put you in control"; right?  So I understand,    12:55:47

16 through Google's Privacy Policy, that I am in control;

17 right?

18     Q.  BY MR. SCHAPIRO:  Do you believe that --

19     MR. LEE:  Wait.  Were you done with your answer?

20     Excuse me.  Excuse me.  I'm not sure he was        12:56:06

21 done.  I just want to confirm.

22     THE WITNESS:  No, I wasn't.  I wasn't.

23     MR. LEE:  Why don't you finish.

24     THE WITNESS:  If you scroll further down, below

25 the three bullet points on the first page, there's a       12:56:17

1 paragraph that begins with, "You can use our services in

2 a variety of ways."

3     Do you see that?

4     Q.  BY MR. SCHAPIRO:  Yeah.

5     A.  That first sentence, "You can use our services    12:56:30

6 in a variety of ways to manage your privacy."

7     Again, the assertion of privacy and the Privacy

8 Policy from Google to its users.

9     The last two sentences of that paragraph, I'd

10 like to read.  "You can also choose to browse the web      12:56:51

11 privately using Chrome in incognito mode."  You've heard

12 me say that numerous times today.

13     Next sentence, "And across our services, you can

14 adjust your privacy settings to control what we collect

15 and how your information is used."            12:57:10

16     Again, this implies to me that Google is stating

17 that I have control; right?  And that any data that I

18 provide to Google, I can -- I would explicitly consent to

19 their collection of that data.

20     They have stated that I can browse privately        12:57:32

21 using Chrome in incognito mode.  I've -- I've testified

22 earlier that when I am browsing privately, I never

23 consent to collection.

24     So, again, in the Privacy Policy, I'm taking

25 Google at their words that when I am browsing privately,    12:57:51

1 that is the method by which I notify Google that I do not

2 consent to collection.

3     Q.  Are you finished?

4     A.  Yes, I'm finished.  Thank you.

5     Q.  So you have emphasized the use of this word      12:58:24

6 "control"; correct?

7     A.  Correct.

8     Q.  And so what have you done -- strike that.

9     And it says that -- the Privacy Policy says that

10 you can control -- or that you can -- that they can --     12:59:00

11 that Google puts you in control.  Is that a fair

12 paraphrase of that first sentence that you've cited?

13     A.  That's -- yes.

14     Q.  So what -- so being in control, what did you do

15 to prevent Google from receiving, let's say, your IP       12:59:27

16 address when you visited a site that ran Google

17 Analytics?  How did you exercise that control?

18     A.  So the control that I exercised is I used the

19 feature incognito mode in Chrome that they expressly

20 called out in this Privacy Policy as a means for me to     12:59:49

21 privately browse the web.

22     So, again, my control in this situation, the

23 recourse that Google has indicated to me in their own

24 Privacy Policy, that if I want to browse privately and

25 not be observed by Google, is to use Chrome in incognito    13:00:12

**Page 178**

1  your time.
2       MR. LEE:  Thanks, everybody.
3       THE VIDEOGRAPHER:  This completes today's
4  deposition.  We're going off the record.  The time is
5  4:29 p.m.                              16:29:21
6       (Time Noted:  4:29 p.m.)
7            --oOo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 180**

1  STATE OF CALIFORNIA   ) ss:
2  COUNTY OF MARIN       )
3
4       I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6       That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9       That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16      I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21 this 11th day of January, 2022.
22
23
24
25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

**Page 179**

1       I declare under the penalty of perjury under the
2  laws of the State of California that the foregoing is
3  true and correct.
4       Executed on _____, 2022, at
5  _____, _____.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 181**

1  JAMES LEE, ESQ.
2  jlee@bsfllp.com
3                    January 11, 2022
4  RE: BROWN VS. GOOGLE LLC
5  JANUARY 7, 2022, JEREMY DAVIS, JOB NO. 5019103
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

46 (Pages 178 - 181)

# EXHIBIT 27

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5    CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
 6    CASTILLO, and MONIQUE
      TRUJILLO, individually and on
 7    behalf of all other similarly
      situated,
 8
                      Plaintiffs,
 9                                      No.
            vs.                         5:20-cv-03664-LHK-SVK
10
      GOOGLE LLC,
11
                      Defendant.
12    _____/
13
14
15          VIDEOTAPED DEPOSITION OF CHASOM BROWN
16                 Remote Zoom Proceedings
17                 Los Angeles, California
18                Thursday, January 13, 2022
19
20
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 208                    Job No. 5028094
```

Page 1

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4
5
6  CHASOM BROWN, WILLIAM BYATT,
   JEREMY DAVIS, CHRISTOPHER
7  CASTILLO, and MONIQUE
   TRUJILLO, individually and on
8  behalf of all other similarly
   situated,
9
          Plaintiffs,
10
      vs.            No.
11              5:20-cv-03664-LHK-SVK
   GOOGLE LLC,
12
          Defendant.
13  _____/
14
15
16      Videotaped deposition of CHASOM BROWN, taken on
17  behalf of the Defendant, Remote Zoom Proceedings from
18  Los Angeles, California, beginning at 9:52 a.m. Pacific
19  Standard Time and ending at 5:20 p.m. Pacific Standard
20  Time, on Thursday, January 13, 2022, before
21  Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
22  No. 3462.
23
24
25
                                                      Page 2

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4      BOIES SCHILLER FLEXNER LLP
5      BY: JAMES LEE, ESQ.
6      100 SE Second Street, Suite 2800
7      Miami, Florida 33131
8      (305) 539-8400
9      jlee@bsfllp.com
10
11     BY: HSIAO (MARK) C. MAO, ESQ.
12     44 Montgomery Street, 41st Floor
13     San Francisco, California 91401
14     (415) 293-6800
15     mmao@bsfllp.com
16
17     MORGAN & MORGAN
18     BY: RYAN MCGEE, ESQ.
19     201 North Franklin Street, 7th Floor
20     Tampa, Florida 33602
21     (813) 223-5505
22     rmcgee@forthepeople.com
23
24
25
                                                      Page 3

1  APPEARANCES (Continued):
2
3  FOR THE DEFENDANT:
4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
5      BY: SARA JENKINS, ESQ.
6          TRACY XI GAO, ESQ.
7      555 Twin Dolphin Drive, 5th Floor
8      Redwood Shores, California 94065
9      (650) 801-5040
10     sarajenkins@quinnemanuel.com
11     tracygao@quinnemanuel.com
12
13
14  Also Present:
15     Scott Slater, Videographer
16
17
18
19
20
21
22
23
24
25
                                                      Page 4

1              I N D E X
2
3
4  THURSDAY, JANUARY 13, 2022
5
6  WITNESS                    EXAMINATION
7  CHASOM BROWN
8
9  BY MS. JENKINS             11, 201
10 BY MR. LEE                 195
11
12
13
14
15  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
16       Page    Line
17        56      7
18       155      1
19       202      3
20
21
22
23
24
25
                                                      Page 5

2 (Pages 2 - 5)

1    Q.  Did you appear in court for that small claims
2  case?
3    A.  Yeah.  Yes, I did.
4    Q.  And where was that court located?
5    A.  In Westminster, California.          10:16:04
6    Q.  Do you know approximately what year that was?
7    A.  Around the -- around 2007, give or take a
8  couple -- a couple of years.  I'm sorry if I'm off on
9  that.
10    Q.  That's okay.                        10:16:28
11       Would you say that maintaining the privacy of
12  your information while you're browsing the internet is
13  important to you?
14    A.  Yeah, I would say it is.
15    Q.  And why is that?                    10:16:45
16    A.  I -- I think privacy in general is important,
17  like on the internet, off the internet.  So probably not
18  more than the average person, but I do think it is
19  important.
20    Q.  Do you take precautions to protect your privacy  10:17:06
21  while you're on the internet?
22    A.  Yeah.
23    Q.  And what -- what do you -- what precautions do
24  you take?
25    A.  Well, I was going in Incognito mode.  10:17:24

1    Q.  And what other precautions?
2    A.  I think now and again, there are some options to
3  change settings or cookie settings, things like that, and
4  so when things pop up, I generally -- generally will try
5  to look at them and see if something makes sense or not  10:17:46
6  for what I'm doing.
7    Q.  And so by that, do you mean that some -- that
8  sometimes when given the option, you will opt out of
9  cookies?  Is that accurate?
10    A.  Yeah, sometimes.  Or like if -- and I don't know  10:18:06
11  if this really works, but sometimes not accepting the
12  cookies when I'm on a website real quick.  I sometimes
13  will avoid that if I can or have to, or if I have the
14  option, I guess.
15    Q.  And sometimes do you allow cookies when given  10:18:24
16  the option?
17    A.  Sometimes.
18    Q.  How do you make that decision about whether to
19  allow cookies or not?
20    A.  Well, sometimes they're kind of tricky, and  10:18:35
21  they -- they put it in a place where you would
22  accidentally hit it.  So I do, and it happens, and then
23  sometimes you -- you have to give an answer, and then --
24  and then sometimes the content of what I'm going on, it
25  really doesn't bother me or I'm fine with giving cookies.  10:18:52

1       So I guess that's how I make the decision.
2  Sometimes it's ease and then sometimes it's content.
3    Q.  And what types of content would you be likely to
4  accept cookies for?
5    A.  I guess something that's benign, that I don't  10:19:11
6  consider private in any way, or something that maybe if I
7  am doing some shopping and I would like, you know, some
8  more tailored ads or something like that, like I'm -- in
9  those instances, I'm -- I'm perfectly fine clicking on
10  that button.                              10:19:34
11    Q.  And you said if it's benign.  What types of
12  information would you consider to be benign that you're
13  not worried about accepting cookies for?
14    A.  Looking up at the score of my favorite sports
15  team or maybe something that I'm shopping or something  10:19:55
16  along those lines.  Those seem pretty benign to me.
17    Q.  What about like reading the news; would you
18  consider that to be benign?
19       MR. LEE:  Objection to form.
20       THE WITNESS:  Is -- I guess it depends on the  10:20:21
21  contents.  Some things seem to be a little more
22  contentious and things like that.  So I don't know.  I
23  think there's a sensitivity if I'm reading about pottery
24  versus my -- my feeling about lesbian rights or
25  something.                               10:20:46

1    Q.  BY MS. JENKINS:  All right.  And are there types
2  of websites where you would always object to cookies to
3  the extent that you can or types of information where you
4  would think that it's sensitive that you always want to
5  object to cookies?                        10:21:02
6    A.  No, I don't think I have any -- any hard lines
7  in that sense.  Like generally, if I'm really concerned
8  about the content I would go into, I would go into
9  Incognito mode.
10    Q.  All right.  Other than Incognito mode and  10:21:23
11  sometimes objecting to cookies, are there any other
12  precautions you take to protect your privacy on the
13  internet?
14    A.  Nothing's coming to mind.
15    Q.  Okay.  Are you in particular concerned about  10:21:39
16  information that Google collects from you as opposed to
17  other web entities that may also be collecting
18  information?
19    A.  I think both.  Like -- like Google obviously is,
20  you know, a juggernaut when it comes to information and  10:22:03
21  data collection, and so to a degree, I'm probably a
22  little more concerned versus some minor small website.
23       But I think in general, I think both.  I'm
24  concerned about, you know, data privacy, data collection.
25    Q.  What have you done to understand Google's data  10:22:26

Veritext Legal Solutions
866 299-5127

1  collection?

2     MR. LEE:  Again, Mr. Brown, I think you can

3  answer this question, but you should do it without

4  revealing any communications you've had with your

5  attorneys.                          10:22:45

6     THE WITNESS:  What have I done to understand

7  data collection?  Probably -- well, not probably.  I've

8  done some reading.  And I've read like Google about some

9  items, like the Terms of Service.  So I've gone through

10 and read -- more things come to me I would say than I go   10:23:08

11 seek as far as data collection, like when you're saying,

12 oh, hey, if the cookies comes up, or if like some things

13 will pop up, and then you have the opportunity to learn a

14 little bit about what you're doing, what you're reading,

15 what data is being collected and isn't.        10:23:24

16    And so I've probably been a little more vigilant

17 with looking at stuff -- you know, a lot of it's right

18 there so you can kind of see what's happening.

19    Q.  BY MS. JENKINS:  Prior to becoming involved in

20 this lawsuit, had you reviewed Google's disclosures about  10:23:44

21 what data it collects?

22    A.  Just your -- yes.

23    Q.  Do you know which disclosures you had reviewed?

24    A.  Well, just in -- not the top of my head, but I

25 do -- like I've seen the Google Terms of Service.  I've   10:24:09

Page 30

1  seen the privacy policy.

2     Q.  And -- did you do any outside research

3  trying to understand what data Google -- Google was

4  collecting?

5     A.  Not that I recall.  I mainly just went straight  10:24:34

6  to the source and went into what Google was saying.

7     Q.  When you mentioned before that you had seen some

8  odd things, odd things happening with advertising, was

9  that specifically when you were browsing on the Chrome

10 browser?                             10:24:55

11    A.  I -- as I stated before, I don't exactly recall,

12 and I don't want to mislead you.

13    Q.  And if you've already stated this, I apologize,

14 but as far as the odd things that were happening with

15 advertising, can you provide a better description of what  10:25:17

16 was happening that you considered to be odd?

17    A.  You know, sometimes you get advertisements that

18 seemed tailored -- tailored to yourself, and you're

19 wondering how -- how did they -- how did they tailor that

20 to me, or is it a coincidence or that's an odd     10:25:43

21 coincidence.  So -- but it was along those lines.

22    Q.  Would it have been times when you had been

23 searching for something on the internet and then later

24 received advertisements for products that are related to

25 those searches that you had been performing?       10:26:02

Page 31

1     A.  I don't find it odd when I'm doing normal

2  searching and I get an advertisement later for that,

3  so...

4     Q.  Okay.  So can you help me understand in what --

5  what sort of thing you would consider odd?      10:26:25

6     A.  If -- like, you know -- you know how a lot of

7  people say that, oh, we were just talking about something

8  and then all the sudden we got this ad for it.  Or if I

9  was browsing something in Incognito mode and you, know, I

10 got an ad for it.  Or if -- like I'm assuming through a    10:26:46

11 pattern of things that I look for, something pops up,

12 like that's just some advertising that is tailored to me

13 seemed odd.  It seemed like I -- I would like to inquire

14 about this.

15    Q.  You mentioned when you're browsing in Incognito   10:27:12

16 mode and you receive an ad.  Do you mean that within a

17 specific Incognito session, ads that you might receive

18 within that session, you would find that odd to be

19 receiving ads, or do you mean something else?

20    A.  Again, I don't recall exactly what it was, but   10:27:37

21 it was just, you know, a pattern of ads that made me

22 think, hmm, that's odd.

23    Q.  Okay.  Is it important for you to know what

24 information websites other than Google are collecting

25 when you're browsing the web?             10:27:57

Page 32

1     A.  It would be nice.

2     Q.  Do you review privacy policies of other websites

3  that you visit on the web?

4     A.  Yeah, sometimes.

5     Q.  When you read those privacy policies, would you   10:28:22

6  expect the websites to tell you that they may be sharing

7  your data with business partners if they're doing that?

8     A.  I guess I have the expectation that anybody

9  who's giving a privacy policy is being transparent and

10 accurate as to what they're doing and what they're    10:28:44

11 collecting so I can understand what's happening as a

12 consumer and a user.

13    THE REPORTER:  Excuse me, Sara.  Someone is at

14 my door.  Can we take a five-minute break?

15    MR. LEE:  Sure.                    10:29:06

16    MS. JENKINS:  Yeah, sure.  That's fine.

17    THE VIDEOGRAPHER:  We are off the record.  The

18 time is 10:19 a.m.

19    (Recess.)

20    THE VIDEOGRAPHER:  We are back on the record.   10:38:34

21 The time is 10:39 a.m.

22    Q.  BY MS. JENKINS:  All right.  Mr. Brown, is it

23 important for you to know what data websites are

24 collecting about you?

25    A.  Yeah, that would be very nice to know.  I would   10:39:17

Page 33

9 (Pages 30 - 33)

Page 34

1  like to know that.
2      Q.  And do you take any action to try to determine
3  what data websites might be collecting about you?
4      A.  I don't think I take any specific action to
5  know.  I think I have an idea of the general things that    10:39:38
6  are collected.
7      Q.  And what is that general idea?
8      A.  Several identifiers about myself, my location,
9  my habits, my browsing, my preferences, my -- my IP
10 address, my -- pretty much everything -- everything about   10:40:04
11 me.  The old cliche, like Google knows you better than
12 your own family; right?
13     Q.  Okay.  Would you expect a website other than
14 Google to put in their privacy policy if they were
15 sending any data they've collected about you to Google?    10:40:31
16     MR. LEE:  Are you talking about in normal mode
17 or Incognito mode?
18     MS. JENKINS:  Well, I'm just talking about in
19 general about what is on the privacy policy.
20     You can answer if you understand.    10:40:49
21     THE WITNESS:  I -- I would expect there to be,
22 you know, transparency.  And if they were sending data in
23 Incognito mode, yes, I would expect there to be
24 transparency to that.
25     Q.  BY MS. JENKINS:  Would you want a website that    10:41:14

Page 35

1  you're visiting to know whether you are in Incognito mode
2  or not?
3      A.  If I'm in Incognito mode, I don't want any --
4  anybody to know anything.  That's the point.
5      Q.  So would it be correct to say you wouldn't want    10:41:36
6  a website to know that you're in Incognito mode if you're
7  browsing that website using Incognito mode?
8      MR. LEE:  Objection to the extent this is a
9  hypothetical question, it's an incomplete hypothetical.
10     THE WITNESS:  I would think there would -- it's    10:42:01
11 almost like the "chicken and the egg" question you're
12 asking me, like how will they know I'm in Incognito mode
13 unless they know I'm in Incognito mode.
14     I don't know -- like I guess my answer is:  I
15 don't want -- in Incognito mode, I don't want anybody to    10:42:17
16 know anything about me.  That's why I go into Incognito
17 mode.
18     The technicals of how that can happen I'm sure
19 are figured out or could be figured out.  But I feel like
20 I would go on this weird like feedback loop if it's --    10:42:37
21 like I feel like it's a "chicken and the egg" question a
22 little bit.
23     Q.  BY MS. JENKINS:  All right.  How frequently do
24 you visit the Redfin website?
25     A.  Maybe once a month.    10:42:59

Page 36

1      Q.  And how frequently do you visit that website
2  using Incognito mode?
3      A.  I don't know exactly.  I guess that would be
4  if -- yeah, I don't know exactly.
5      Q.  Do you believe you have visited that website    10:43:22
6  using Incognito mode?
7      A.  Yeah, I believe I have.
8      Q.  You've read the Redfin privacy policy?
9      A.  Yeah, I'm sure -- I'm sure it's come up.
10     Q.  When you read privacy policies, do you pay    10:43:41
11 special attention to the section discussing what
12 information is collected about you?
13     MR. LEE:  Objection to "special attention,"
14 vague.
15     THE WITNESS:  Yeah, I -- I pay attention to if    10:44:09
16 they're -- like generally I would like to know what
17 they're collecting or not, and I would like to know if --
18 and I haven't seen it, but I would like -- I would like
19 to know if they are sending data and it's being
20 collected.  But let me rephrase that.    10:44:37
21     I would like to know -- like can you repeat the
22 question?  I'm losing myself here trying to answer this.
23     Q.  BY MS. JENKINS:  The question was when you read
24 privacy policies, do you pay special attention to the
25 section discussing what information is being collected    10:44:53

Page 37

1  about you?
2      A.  I wouldn't say I pay special attention.  I
3  was -- I read it as I would read, you know, any privacy
4  policy.
5      Q.  When you read privacy policies, do you generally    10:45:10
6  read the whole thing?
7      A.  Generally, no.  Generally, I'll peruse them.  So
8  certain things will catch your eye.
9      Q.  And what sorts of information are you generally
10 looking for as you peruse the privacy policy?    10:45:30
11     A.  Just anything that -- that stands out, like I
12 don't look for anything in particular, but you -- you
13 know, I'm not like this privacy policy -- like very anal
14 about I look at every privacy policy and I read it down
15 to every word and like analyze it and -- because there's    10:45:56
16 a lot of like legal mumbo-jumbo in there, too.
17     So it's a matter of -- you know, I look at it
18 generally for what it is, and if anything stands out that
19 seems odd to me, then maybe I'll read further or look
20 into it further.    10:46:14
21     Q.  Have you ever decided to stop visiting a website
22 after reading its privacy policy?
23     A.  Sure, yeah.
24     Q.  And which -- can you name one of those websites?
25     A.  No.  I don't recall a specific website.  Just    10:46:30

10 (Pages 34 - 37)

1 already said that you've not downloaded the browser
2 add-on, but is it fair to say that if you'd read this
3 page, you would have learned how to prevent your data
4 from being used by Google Analytics?
5        MR. LEE: Objection. Lacks foundation, calls        11:19:49
6 for speculation, improper hypothetical.
7        You can try to answer.
8        THE WITNESS: If I -- I'm sorry, can you repeat
9 your question, Sara?
10 Q. BY MS. JENKINS: Yeah. I'm -- I'm just             11:20:00
11 wondering, after reading this, do you -- do you now
12 understand that there is -- that you could download this,
13 which would then prevent your data from being used by
14 Google Analytics?
15 A. I understand it as one of the options, Google      11:20:18
16 offers to do that, it seems.
17 Q. After going through the Redfin privacy policy --
18 privacy notice, as we have to today, and these links,
19 would you still use the Redfin website?
20 A. Yeah, I would still use the Redfin website        11:20:45
21 depending on the context of why I'm using that website
22 and when, how, what. Again, context matters. And so
23 there's times where I understand that a -- like my
24 information is being shared. I understand that data is
25 going to be collected, my personal information is going   11:21:06

Page 58

1 to be collected. There's times I understand that. And
2 then there's times that I want it more private.
3        And so, again, context matters. Would I visit
4 the website? Yes, in certain situations and under
5 certain circumstances.                                   11:21:23
6        If the darned Google Incognito button really did
7 what it's supposed to do and what it says it's supposed
8 to do, then I can go on there worry free.
9 Q. What would you consider to be personal user
10 data?                                                    11:21:43
11 A. Personal user data. Well, that is in all the --
12 you know, the information about myself, my use, my
13 location, my habits, my preferences. What I do before I
14 go to a website, what I do after I go to a website, what
15 color hair I prefer on a woman. Like all of that seems   11:22:08
16 to be personal data.
17 Q. Would it be fair to say that to be personal user
18 data, it would need to be data that is linked to you?
19        MR. LEE: Objection to form, asked and answered.
20        You can answer.                                   11:22:32
21        THE WITNESS: I believe it's all linked to me.
22 Q. BY MS. JENKINS: But if -- if a piece of data
23 were not linked --
24 A. I guess I would need to understand how you
25 disassociate everything about me from me.                11:22:45

Page 59

1        MR. LEE: Did we lose, Sara?
2        MS. JENKINS: No, sorry. I'm just looking back
3 at a question.
4        MR. LEE: Okay.
5 Q. BY MS. JENKINS: All right. What -- what        11:23:08
6 information would you consider to be sensitive user data?
7        MR. LEE: Objection to form.
8        THE WITNESS: Anything where I click on the
9 Incognito mode now becomes sensitive user data. Because
10 I'm saying this is off limits. So any data from that     11:23:26
11 point forward is now sensitive user data. And it's
12 basically because I'm saying, look, I don't -- this --
13 this part of it, I don't want you to hear, see. Like
14 this is my private information. So it's all sensitive.
15 Q. BY MS. JENKINS: So, for example, if you were to   11:23:53
16 visit the Redfin website in regular mode, you would not
17 consider that to be sensitive, but if you are using
18 Incognito mode, that same visit you would consider to be
19 sensitive user data?
20 A. Yes, I would. Because I'm there -- I'm saying     11:24:13
21 that -- if I just said something normally to somebody,
22 then that's one thing. But if I, you know what, say,
23 hey, this is a -- this is a secret, then I'm putting up a
24 sign saying, hey, this is private, this is sensitive.
25        So it - -it doesn't really matter actually the   11:24:33

Page 60

1 website that I'm going to; it matters the context. Am I
2 deciding is this going to be private or not? And because
3 I understand that, hey, if I go do normal browsing, I'm
4 doing normal browsing and I'm giving up data and -- an my
5 data's being collected, and that's the deal we have.     11:24:53
6        But when I go into Incognito mode, hey, the deal
7 we have is, no, Google's not to be collecting my data.
8 So that's how it matters.
9 Q. Have you -- okay. Sorry to interrupt you.
10        Have you used other browsers' private browsing   11:25:12
11 modes?
12 A. I think I've tried one -- one or maybe two at
13 some point. But -- oh, sorry. Sorry to interrupt.
14 Q. No, you go ahead and finish your answer.
15 A. But it -- yeah, I -- I tried one or two at some   11:25:34
16 point. Because I did find it interesting that, oh, they
17 have a private browsing mode as well.
18 Q. And you've tried Microsoft's private browsing
19 mode; is that correct?
20 A. I don't recall Microsoft's.                        11:26:03
21 Q. Which private browsing modes do you recall
22 using?
23 A. I believe it was on Safari one time, and then
24 I'd have to recall what the other browsers that are out
25 there. Because I -- like 99.9 percent of what I do is    11:26:29

Page 61

16 (Pages 58 - 61)

1 on -- on Google Chrome. So I don't really use the other
2 browsers very often.
3     I do -- the reason why I'm saying yes is I do
4 remember being prompted on some other browser that, hey,
5 there's a -- there's a -- I don't think they called it     11:26:48
6 Incognito mode. I don't even recall what they called it.
7 But it was a -- saying, hey, there's a private browsing
8 mode here.
9     And so I do recall clicking on one of them. I
10 think it was Safari.                                       11:27:02
11     Q. Do you believe that Google will be receiving
12 data from the Redfin website if you browse using Safari's
13 private browsing mode?
14     A. Do I think that Google will be...
15     Yeah, I guess that's possible.                        11:27:29
16     Q. And does that cause you concern?
17     A. No, because I -- like even when I clicked on it,
18 I didn't even -- I don't even think I went to a website.
19 I just clicked on it to open it because it was -- it was
20 prompted to me. So I don't have any concerns because,     11:27:49
21 again, 99.9 percent of what I do is on Google, and Google
22 has Incognito mode.
23     Q. Do you consider sensitive user data and personal
24 information to be the same thing?
25     A. Yeah, I think they're -- they're synonymous. It    11:28:20

Page 62

1 depends on, you know, like everybody's definition and
2 context. But, yeah, yes. In general, yes.
3     MS. JENKINS: All right. Can we take like a
4 five-minute break?
5     MR. LEE: Sure. Let's take ten.                         11:28:41
6     MS. JENKINS: Okay. Sounds good.
7     THE VIDEOGRAPHER: We are off the record. The
8 time is 11:29 a.m.
9     (Recess.)
10     THE VIDEOGRAPHER: We are back on the record.          11:45:38
11 The time is 11:46 a.m.
12     Q. BY MS. JENKINS: Mr. Brown, before the -- the
13 break, I asked you a few questions about private browsing
14 mode other than Incognito mode for Chrome, and I was
15 wondering, you'd mentioned that you had tried them but     11:46:06
16 only rarely. I was wondering, you mentioned that you
17 didn't have the same concern if Google would receive
18 information when you were private browsing using a
19 browser other than Chrome.
20     And so I was wondering if you mean that it's          11:46:23
21 okay for Google to receive your browsing information when
22 you browse in another browser's private browsing mode,
23 but not if you're browsing in Incognito mode because
24 Incognito mode is a Google product.
25     MR. LEE: Objection to form. That               11:46:41

Page 63

1 mischaracterizes his prior testimony.
2     THE WITNESS: No. I guess -- well, I didn't
3 have the concern because I don't use them. So I haven't
4 given it any thought because I don't -- I don't use them.
5 Like when I went on it, I -- I don't even believe I went  11:47:01
6 on a website. So there's not much cause for concern
7 there.
8     Q. BY MS. JENKINS: All right. If you are in
9 Incognito mode and you visit Google.com, do you
10 understand that Google will receive certain of your data?  11:47:18
11     A. From in Incognito mode and I go to Google.com?
12 No, I think that's why I go into Incognito mode. So they
13 don't collect my data.
14     Q. So if you were to go into Google.com and, for
15 instance, search for something, you don't think that       11:47:46
16 Google should receive any information about what you're
17 searching for?
18     A. Well, yeah, if I go into Incognito mode, I
19 don't -- I don't think they should collect anything on
20 me. If I type in something that I'm seeking, then like a   11:48:02
21 water bottle, I would expect water bottles to come up.
22     Q. So you would expect information about your
23 request to be sent to Google; is that correct?
24     A. I would expect it to come up. I wouldn't expect
25 to be collected. Because Google said they wouldn't do      11:48:23

Page 64

1 that. That's why I went into Incognito mode.
2     Q. So what is the difference between having results
3 for your search come up and having Google collect the
4 information that you've input?
5     A. Well, if I go -- if I like -- as an example, if    11:48:41
6 I go onto -- if I'm in Incognito mode and I go into a
7 website, I would expect that website to come up, but I
8 wouldn't expect things to be collected on the -- while
9 that's happening.
10     And so I guess in your example, I guess it would      11:49:01
11 be the same thing.
12     Q. But you understand that Google will have to
13 receive some information from you in order to provide you
14 search results if you're searching for something; is that
15 right?                                                     11:49:22
16     A. I -- I understand that if I go onto Google, and
17 I go into the Google search bar, and I'm in Incognito
18 mode, that some magic in the background happens, and then
19 that comes up. I don't -- I don't really know how that
20 works, but I do understand that if I search in the Google  11:49:40
21 search bar and I'm in Incognito mode, I do understand
22 that what I search for would come up.
23     Q. So doesn't that mean that Google will have to
24 receive the information that you input?
25     MR. LEE: Objection. Asked and answered, calls   11:49:57

Page 65

17 (Pages 62 - 65)

1  Q. Okay. But you don't -- you don't know if you
2 specifically enabled the instruction which is clear
3 cookies and site data when you close all windows within
4 your Chrome setting?
5  A. I don't believe I've -- I've done that in        12:20:53
6 regular Chrome settings, no. And I wouldn't really have
7 a reason to do that because, again, I don't hate the idea
8 of data collection in normal Chrome browsing. I hate the
9 idea of being told that my data isn't being collected and
10 then it being collected in Incognito browsing.          12:21:12
11  Q. Did you know that you can disable JavaScript in
12 Chrome settings?
13  A. I don't -- I don't know if I'm aware of that,
14 no.
15  Q. Are you aware of ad blocking Chrome extensions?   12:21:28
16  A. No, not particularly.
17  Q. Have you heard of a Chrome extension called
18 AdBlock?
19  A. This may be a dumb question, but was that the
20 one that you showed me earlier today?                  12:21:54
21  Q. I -- I don't believe that that has been in any
22 of the documents we've looked at today.
23  A. Okay. Because I thought you'd showed me
24 something that did that or something like that. Maybe
25 I'm getting confused. But so then apparently, no.      12:22:11

Page 82

1  Q. So other than today, it's correct to say you're
2 not familiar with AdBlock or --
3  A. Yeah. No, I think that's fair to say. And all
4 of these that you're mentioning, they seem to be, you
5 know, the over-arching theme is, you know, other options  12:22:30
6 of ways that I can, you know, block things and do that.
7 But I don't -- again, when I'm in normal Google browsing
8 mode or Chrome browsing mode, I'm -- I'm okay with that
9 stuff, generally. It's when I go into Incognito mode.
10 And I wouldn't need to search for all that            12:22:52
11 stuff. Like, look, ten things you just named, and I've
12 got to like figure out the labyrinth of that? No, I have
13 Incognito mode, and I can just go into Incognito mode and
14 my data won't be collected. That's what Google told me.
15  Q. Do you have an understanding of VPN, like        12:23:08
16 virtual private network?
17  A. I -- I have a limited understanding.
18  Q. Have you ever used a VPN?
19  A. I think, yes, it would have been -- oh, yes, I
20 did for sure. When I -- early on, just to be accurate,   12:23:27
21 so I was with T-Mobile for 13-and-a-half years, but for
22 half of that time, I was with MetroPCS before they were
23 acquired by T-Mobile, so...
24 But in the Metro days, we did use a VPN to
25 access our -- you know, our server to be able to get onto  12:23:52

Page 83

1 our work email. It seemed like another layer of
2 protection there, something like that.
3  Q. Have you ever used a VPN specifically to try to
4 protect your privacy while browsing on the web?
5  MR. LEE: I'm sorry, could you repeat that        12:24:07
6 question, Sara?
7  Q. BY MS. JENKINS: I said have you -- have you
8 ever used a VPN specifically to try to protect your
9 privacy while browsing on the web?
10  A. No, not specifically for that.                  12:24:20
11  Q. Have you used any standalone ad-blocker
12 programs, so as opposed to an extension for Chrome, just
13 in any -- any type of ad blocker?
14  A. No, not -- I don't believe so.
15  Q. Is it your view that Google does not alert you   12:24:46
16 that your data may be received by Google when you browse
17 the internet in a private browsing mode?
18  A. Can you repeat that question?
19  Q. Is it your view that Google does not alert you
20 that your data may be received by Google when you browse  12:25:01
21 the internet in private browsing mode?
22  A. That they -- they don't alert me when they --
23 when I'm in Incognito mode. That -- so it's my
24 understanding that Google does not alert me that they're
25 collecting my data when they're in Incognito mode. It's  12:25:25

Page 84

1 actually quite the opposite. They -- from top to bottom,
2 from the privacy policy to the splash screen, they're
3 indicating that they're not doing that.
4  Q. How would you expect Google to alert you to the
5 fact that it is receiving information from you when       12:25:49
6 you're browsing in Incognito mode?
7  A. I would expect them -- well, okay, let me back
8 up. Let me back up here. Because that's -- it's a
9 slippery slope I can go down there.
10 I expect them not to collect my data in those     12:26:15
11 modes. And you're asking me, okay, well, hey, if they
12 were going to, how -- how would they do it? They don't
13 need to. I would just do -- use normal Google Chrome
14 if -- or if they were going to do it, I would be -- it
15 should be completely transparent and explained, hey, I    12:26:32
16 know you just went into Incognito mode, but we're going
17 to be tracking you -- like, now. We're going to be
18 collecting, like, your data, which kind of defeats the
19 purpose of Incognito mode.
20 So like how would I expect them to do that? I    12:26:52
21 expect them not to do that. I expect them to not say
22 we're not going to do it and then -- and then do it.
23 It's like -- yeah, I don't expect my girlfriend to cheat
24 on me. How do I want her to tell me when she does cheat
25 on me? I'm more concerned that she cheated on me,        12:27:13

Page 85

22 (Pages 82 - 85)

| | |
|---|---|
| 1   A. Yes, or when it was first introduced to me. I'm | 1   technicalities of that, but I -- I could -- I think |
| 2   assuming that's when it first came out because I was | 2   that's reasonable to think. |
| 3   unaware of it before that. So when it was first | 3   Q. And you can -- sorry. My -- pardon me. My |
| 4   introduced to me through the -- how it popped up or | 4   light is on a motion detector. It thinks I'm not here. |
| 5   something, it seemed like a new feature. So that's when   12:34:50 | 5   Even since this case started, is it -- it's true   12:38:33 |
| 6   I started using it. | 6   that you've continued to use Chrome as your main browser; |
| 7   That might not have answered your question. I'm | 7   is that right? |
| 8   sorry. | 8   A. Yes. |
| 9   Q. That's all right. | 9   Q. And have you continued to use Incognito mode |
| 10   How often do you use Incognito mode?   12:35:01 | 10   since the case started?   12:38:44 |
| 11   A. It -- it -- it ranges, but maybe a couple times | 11   A. I have. |
| 12   a week. | 12   Q. So you've continued to use Incognito mode |
| 13   Q. And do you ever keep Incognito sessions open for | 13   despite the fact that you now have the understanding that |
| 14   longer than just while you're browsing? | 14   Google is receiving personal information when you're |
| 15   A. Sometimes.   12:35:28 | 15   using Incognito mode.   12:39:05 |
| 16   Q. Have you left Incognito sessions open for days | 16   Is that true? |
| 17   at a time? | 17   MR. LEE: Objection to form. |
| 18   A. I have. | 18   THE WITNESS: Yes, that is true. And obviously, |
| 19   Q. How about for more than a week or two weeks at a | 19   a lot more has come to light about what it is. And so |
| 20   time?   12:35:46 | 20   I'm very skeptical of it now. But I think it was prudent   12:39:20 |
| 21   A. I would say that's rare, but I believe it's | 21   to not change my behavior and habits so we can get, you |
| 22   happened. | 22   know, a good idea of what's going on. |
| 23   Q. As we sit here today, can you tell me your | 23   Q. BY MS. JENKINS: Can you explain further why -- |
| 24   understanding of the difference between Chrome basic mode | 24   why wouldn't you want to change your behavior or habits? |
| 25   and Chrome Incognito mode?   12:36:04 | 25   A. Because I just got involved in a lawsuit with   12:39:45 |
| Page 90 | Page 92 |

| | |
|---|---|
| 1   MR. LEE: Objection. Lack of foundation. | 1   Google. Yes, I wouldn't want to change my habits when it |
| 2   THE WITNESS: Yeah. Chrome is normal browsing | 2   pertains to my habits. |
| 3   with traditional data collection. Incognito mode is a | 3   MS. JENKINS: All right. I'm moving onto a |
| 4   private browsing mode that doesn't -- where Google does | 4   different topic now. So if people would like to break |
| 5   not collect your data.   12:36:23 | 5   for lunch, I'm happy to do it, or we can continue on for   12:40:13 |
| 6   Q. BY MS. JENKINS: Apart from the Chrome mode of | 6   a bit, if you want. |
| 7   Incognito, do you know what the term "incognito" means? | 7   MR. LEE: Obviously, I'll defer to Chasom, but |
| 8   A. Yeah, hidden. Like it's probably synonymous | 8   it might help in our decision making if we get a sense of |
| 9   with invisible. | 9   how close we are to the finish line. |
| 10   Q. You think that "incognito" and "invisible" are   12:36:58 | 10   If it's going to be a lot more, then I think we   12:40:25 |
| 11   the same? | 11   should just take lunch. If you think you can power |
| 12   A. Yeah. Well, yes, I think "incognito" means it's | 12   through, then we'll talk about it. |
| 13   probably closer to hidden, but both. It's like if I were | 13   MS. JENKINS: I don't -- I do not think we'll |
| 14   to define it, that would probably -- say something like | 14   power through without taking a lunch. So maybe we take |
| 15   that. Yes, I assume it to be not seen, hidden, you know,   12:37:20 | 15   lunch now and -- do you want to take 30 minutes? Does   12:40:38 |
| 16   like something like that. | 16   that work for you? |
| 17   Q. Prior to taking part in this case, did you think | 17   MR. LEE: Let's take 40 and get back on the |
| 18   that Incognito mode would completely conceal your | 18   record in 40. |
| 19   internet activity from everyone? | 19   MS. JENKINS: All right. |
| 20   A. From Google.   12:37:44 | 20   THE REPORTER: Off the record.   12:40:55 |
| 21   Q. Does that mean there are other parties that you | 21   THE VIDEOGRAPHER: We are -- we are off the |
| 22   didn't have that expectation for? | 22   record. The time is 12:41 p.m. |
| 23   A. Yes, because I don't believe that Google | 23   (Recess.) |
| 24   can control like everything outside of Google. I | 24   THE VIDEOGRAPHER: We are back on the record. |
| 25   don't -- yeah, I -- I don't really know the   12:38:10 | 25   The time is 1:29 p.m.   13:29:03 |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

1 I'm -- if I'm paying for data, then I will run out and

2 have to pay for more. If I am on an unlimited plan,

3 which I am, it actually will throttle my plan. So now

4 my -- my data plan on my phone will run out of data

5 sooner. And so then now all my data is going to take       15:22:59

6 longer. And so now everything I'm trying to do on my

7 phone takes longer, and my time is very valuable.

8       So when like just in -- in browsing alone, you

9 could start adding up that time and -- and that's even

10 more. So those are just some -- off the top of my head,       15:23:16

11 some ways that I was damaged.

12   Q. I want to make sure I understand what you're

13 saying.

14       Are you saying that your phone uses more energy

15 to -- when it uses Incognito mode rather than basic mode?       15:23:34

16   A. Yes, that's my understanding. And just by

17 sending out data when it's not supposed to. So that does

18 take, you know, energy as well.

19   Q. How did you come to that understanding?

20   A. Well, I've been in the cell phone industry for       15:23:52

21 20 years.

22   Q. Have you done any personal experiments to see

23 whether that is the case?

24   A. No. I'll leave that up to the experts. I

25 haven't done any personal experiments.       15:24:09

Page 154

1   Q. Do you have any evidence to support that belief?

2       MR. LEE: You know what? I'm going to direct

3 you not to answer that question as it may reveal

4 attorney-client communications.

5       THE WITNESS: I won't be answering the question.       15:24:28

6       MS. JENKINS: That's fine. I'm -- I'm -- I'm

7 just -- all right, James, is it your

8 representation that there's no information that he could

9 give on that question that would not be privileged?

10       MR. LEE: I think he's given you a ton of       15:24:43

11 information already. So to the extent you're asking for

12 more, I think that's where you're now getting into

13 privilege territory.

14   Q. BY MS. JENKINS: Do you have any evidence, not

15 related to your involvement in this litigation, that       15:24:58

16 using Incognito mode takes more energy on your phone

17 rather than basic mode?

18   A. Well, sending out more data just in general

19 takes more energy from a phone, as -- as much as I

20 understand phones and data.       15:25:25

21   Q. Have you seen any effect on the amount of data

22 that you're using on your cell phone plan that you can

23 directly relate to your use of Incognito mode?

24   A. Nothing that I could point to right now. I

25 haven't done the -- the calculation.       15:25:48

Page 155

1   Q. Is there any other -- other than the additional

2 energy that you mentioned and potentially an effect on

3 your cell phone plan, is there any other harm that you

4 have suffered as a result of Google's conduct?

5   A. Yes. When you have your -- your privacy       15:26:22

6 breached, I consider that harm. And/or when you sign,

7 you know, a contract and the other party doesn't live up

8 to their side of the contract, I consider that harm.

9   Q. What type of harm is that?

10       MR. LEE: Objection to the extent it calls for a       15:26:50

11 legal conclusion.

12       THE WITNESS: Well, I believe in the -- in the

13 Amended Complaint, I think one of the complaints is a

14 breach of contract. So that's where we point out the

15 harm.       15:27:14

16   Q. BY MS. JENKINS: All right. Is there any -- any

17 harm in addition to the ones that you've just named?

18   A. Well, that's the biggest thing. I think

19 probably a lot of what I named isn't the biggest thing.

20 It's all of my data that has been collected that is being       15:27:31

21 used to -- without my knowledge, without my consent, with

22 not even knowing what it is and what's being done with

23 it, how it's being monetized, like that -- there's a

24 whole, you know, unknown harm out there as well.

25   Q. Have you lost any property as a result of       15:27:59

Page 156

1 Google's conduct?

2   A. I don't believe I lost any property.

3   Q. Have you ever purchased any products as a result

4 of digital advertisements that you believe were targeted

5 by Google?       15:28:24

6   A. I -- yeah, I've purchased products online

7 through targeted advertising. It was most likely Google.

8 I didn't really take the time to figure out where it was,

9 but yes, very much most likely by Google. And I could

10 probably, you know, look at the search or something like       15:28:45

11 that to figure out that.

12       But, yeah, the short version of that long-winded

13 horrible answer is yes, I've -- I've purchased product

14 from targeted advertising.

15   Q. Are you aware that many free services and       15:29:00

16 content on the internet are paid for by advertising?

17   A. Yeah, I'm aware. I'm aware.

18   Q. And you understand that includes targeted

19 advertising?

20   A. Yeah.       15:29:18

21   Q. And do you generally understand that users' data

22 is being used for targeted advertising?

23   A. Yeah.

24   Q. And you've seen tailored ads when you've been

25 using Chrome; correct?       15:29:39

Page 157

40 (Pages 154 - 157)

1    A. Yeah.

2    Q. What is your opinion about targeted advertising?

3        MR. LEE: In normal mode?

4        MS. JENKINS: We can say in normal mode. I was

5    looking for a general opinion about targeted advertising.    15:29:54

6        THE WITNESS: I'll do you one better. I'll do

7    all three: General, normal mode, and Incognito.

8        Well, yeah, just in general, I think targeted

9    advertising is a good thing. And normal browsing mode, I

10   think that, again, it's I've given consent. We have a    15:30:18

11   deal. I get the deal. Thank you for showing me, you

12   know, a -- the surfboard I like.

13       And then when I'm in -- when I'm not in

14   Incognito mode -- or I'm sorry, when I am in Incognito

15   mode, I don't think that that's appropriate because you    15:30:37

16   shouldn't be collecting anything about me. I'm supposed

17   to be hidden. I'm supposed to be incognito. I'm

18   supposed to be an invisible spy guy. That's why I click

19   on the button.

20       And so I think anything along those lines is    15:30:57

21   inappropriate at minimum and, you know, a breach in our

22   deal otherwise.

23   Q. BY MS. JENKINS: Sometimes Chrome will suggest

24   searches for you when you start typing into the search

25   bar. Are you familiar with that?    15:31:16

Page 158

1    A. I am.

2    Q. Do you think that is a helpful feature?

3    A. Yeah, it's helpful.

4    Q. And have you taken steps to disable that

5    feature, ever?    15:31:31

6        MR. LEE: Go ahead and answer if you can.

7        THE WITNESS: In -- no, I haven't taken any

8    steps to disable that feature outside of if I go in

9    Incognito mode, I wouldn't think they would be predicting

10   what I'm about to text because they shouldn't know    15:31:51

11   anything about me.

12   Q. BY MS. JENKINS: Have you ever noticed that it

13   was providing you with suggestions when you were

14   searching in Incognito mode?

15   A. I don't have a particular recollection of that.    15:32:08

16   Q. Are you aware that the suggestions that it makes

17   are sometimes -- I'm talking about in non -- in regular

18   mode --

19   A. Okay.

20   Q. -- are based on previous searches that you've    15:32:31

21   done?

22   A. Yeah, that makes sense.

23   Q. Do you currently use your Gmail accounts?

24   A. I do currently use my Gmail accounts.

25   Q. And I believe you disclosed to us three    15:32:51

Page 159

1    different Gmail accounts. Do you currently use all three

2    of them?

3    A. Yeah, some more than others, but yeah.

4    Q. Would you say that the one that you use the

5    most, would you say you use it daily?    15:33:11

6    A. Yeah, pretty much.

7    Q. And is that a valuable service that Google

8    provides to you?

9        MR. LEE: Objection.

10       THE WITNESS: Oh, email?    15:33:28

11   Q. BY MS. JENKINS: Yes.

12   A. You know, email is a fantastic service.

13       THE REPORTER: I'm sorry. I didn't get that.

14   Can you repeat, please?

15       THE WITNESS: Email is a fantastic service.    15:33:42

16       MR. LEE: I also objected to the form of the

17   question.

18   Q. BY MS. JENKINS: Do you use -- well, I know you

19   already testified about something you did on YouTube, but

20   do you currently use YouTube?    15:33:52

21   A. Yes.

22   Q. About how often do you use YouTube?

23   A. I watch a lot of YouTube. So every day. In my

24   defense, I have YouTube Red, and it actually make --

25   allows me to watch videos without advertisement. So    15:34:14

Page 160

1    that's why I like that service. But it makes me watch it

2    more, I guess. So I use YouTube a lot, yes.

3    Q. And do you understand that YouTube is owned by

4    Google?

5    A. Yes.    15:34:26

6    Q. Do you use Google Hangouts?

7    A. I have. Not normally. I've got to be honest.

8    Hangouts is kind of an inferior product to its

9    competitors. I generally like Google stuff, but that one

10   they need to work on a little bit more.    15:34:45

11   Q. What do you prefer?

12   A. I don't -- most people invite me to their

13   things. I don't really know like which one I would -- I

14   would prefer or I would go to. But nobody ever invites

15   me to Google Hangout. I know that. And I don't really    15:35:06

16   use it, although I have used it before.

17   Q. What about Google Calendar; do you use that?

18   A. Yes, I use Google Calendar.

19   Q. Do you use that as your main calendar?

20   A. Yeah, I would say so.    15:35:19

21   Q. And how about Google Play Music; do you use

22   that?

23   A. Rarely.

24   Q. And all of these services, you agree that Google

25   provides these services for free?    15:35:36

Page 161

41 (Pages 158 - 161)

1  has; is that correct?
2      A.  Correct.
3      Q.  And on what basis has your understanding of the
4  way that Incognito works changed?
5          MR. LEE:  And now I'm going to ask you to not          17:19:44
6  answer that question because it's based on
7  attorney-client privilege.
8          MS. JENKINS:  James, you're the one who brought
9  this up; right?  You're the one who asked the question.
10         MR. LEE:  I asked has it changed.  You're asking          17:19:58
11  for the bases.  Those are two different things.
12     Q.  BY MS. JENKINS:  All right.  Mr. Brown, will you
13  adhere to your counsel's instruction?
14     A.  Yes.
15         MS. JENKINS:  All right.  Then I have no further          17:20:10
16  questions.
17         MR. LEE:  Thanks, everyone.  We'll take the
18  rough.  We'll take the rough copy, please.
19         THE REPORTER:  Fine.  Thank you.  Can we go off
20  the record?                                                    17:20:25
21         THE VIDEOGRAPHER:  We are off the record.  The
22  time is 5:20 p.m. on January 13th, 2022.
23         This concludes today's testimony given by
24  Chasom Brown.  The total number of media units used was
25  eight and will be retained by Veritext Legal Solutions.       17:20:38

Page 202

1      (Time noted: 5:20 p.m. Pacific Standard Time.)
2                  --oOo--
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 203

1      I declare under the penalty of perjury under the
2  laws of the State of California that the foregoing is
3  true and correct.
4      Executed on _____, 2022, at
5  _____, _____.
6
7
8
9
10
11      _____
12          SIGNATURE OF THE WITNESS
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 204

1  STATE OF CALIFORNIA      ) ss:
2  COUNTY OF MARIN          )
3
4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6          That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9          That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16      I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21 this 17th day of January, 2022.
22
23
24
25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 205

52 (Pages 202 - 205)

# EXHIBIT 28

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    CHASOM BROWN, WILLIAM BYATT,

5    JEREMY DAVIS, CHRISTOPHER

6    CASTILLO, and MONIQUE

7    TRUJILLO, individually and on

8    behalf of all other similarly

9    situated,

10                 Plaintiffs,

11         vs.                    Case No.

12   GOOGLE LLC,                  5:20-cv-03664-LHK-SVK

13                 Defendant.

14   _____/

15

16      VIDEOTAPED DEPOSITION OF CHRISTOPHER CASTILLO

17               Remote Zoom Proceedings

18               Sacramento, California

19               Tuesday, February 8, 2022

20

21   REPORTED BY:

22   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23   JOB No. 5077508

24

25   Pages 1 - 266

                                          Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   CHASOM BROWN, WILLIAM BYATT,
 5   JEREMY DAVIS, CHRISTOPHER
 6   CASTILLO, and MONIQUE
 7   TRUJILLO, individually and on
 8   behalf of all other similarly
 9   situated,
10          Plaintiffs,
11      vs.          Case No.
12   GOOGLE LLC,          5:20-cv-03664-LHK-SVK
13          Defendant.
14   _____/
15
16
17          Videotaped deposition of CHRISTOPHER CASTILLO,
18   taken on behalf of the Defendant, Remote Zoom Proceedings
19   from Sacramento, California, beginning at 9:06 a.m.
20   Pacific Standard Time and ending at 5:53 p.m. Pacific
21   Standard Time, on Tuesday, February 8, 2022, before
22   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
23   No. 3462.
24
25
                                                    Page 2
```

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS:
 4      MORGAN & MORGAN
 5      BY: RYAN MCGEE, ESQ.
 6      201 North Franklin Street, 7th Floor
 7      Tampa, Florida 33602
 8      (813) 223-5505
 9      rmcgee@forthepeople.com
10        -and-
11      BOIES SCHILLER FLEXNER LLP
12      BY: JAMES LEE, ESQ.
13      100 SE Second Street, Suite 2800
14      Miami, Florida 33131
15      (305) 539-8400
16      jlee@bsfllp.com
17        -and-
18      BY: HSIAO (MARK) C. MAO, ESQ.
19        ERIKA NYBORG-BURCH, ESQ.
20      44 Montgomery Street, 41st Floor
21      San Francisco, California 91401
22      (415) 293-6800
23      mmao@bsfllp.com
24      enyborg-burch@bsfllp.com
25
                                                    Page 3
```

```
 1   APPEARANCES (Continued):
 2
 3   FOR THE DEFENDANT:
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5      BY: STEPHEN A. BROOME, ESQ.
 6      865 South Figueroa Street, 10th Floor
 7      Los Angeles, California 90017
 8      (213) 443-3285
 9      stephenbroome@quinnemanuel.com
10        -and-
11      BY: TRACY XI GAO, ESQ.
12      555 Twin Dolphin Drive, 5th Floor
13      Redwood Shores, California 94065
14      (650) 801-5000
15      tracygao@quinnemanuel.com
16        -and-
17      BY: JOMAIRE A. CRAWFORD, ESQ.
18      51 Madison Avenue, 22nd Floor
19      New York, New York 10010
20      (212) 849-7581
21      jomairecrawford@quinnemanuel.com
22
23   Also Present:
24      Scott Slater, Videographer
25
                                                    Page 4
```

```
 1             I N D E X
 2
 3
 4   TUESDAY, FEBRUARY 8, 2022
 5
 6   WITNESS                    EXAMINATION
 7   CHRISTOPHER CASTILLO
 8
 9   BY MR. BROOME            10, 247
10   BY MR. MCGEE            237
11
12
13
14
15   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
16        (NONE)
17
18
19
20
21
22
23
24
25
                                                    Page 5
```

2 (Pages 2 - 5)

1 this case?

2     A. No.

3     Q. Have you ever been involved in another class

4 action?

5     A. As an end user, yes. As a -- as a class member,   09:19:47

6 yes.

7     Q. And which class action was that?

8     A. Multiple ones dealing with purchases I've made

9 of products that were defective in some capacity. I've

10 signed up and -- and received compensation for the fact   09:20:02

11 that I purchased a product, like whether it be a shampoo

12 or a, you know, a -- pet food or what have you. I have

13 signed up for class-action lawsuits in which I've

14 purchased those products and received compensation for

15 it.                         09:20:25

16     MR. MCGEE: Mr. Broome, can I ask: Are you

17 asking whether he was a named plaintiff or a class

18 representative as opposed to an absent class member or a

19 settlement class member for the purposes of the question?

20     MR. BROOME: Yeah. No, that's a fair question.   09:20:36

21 My question was -- as phrased was a little -- a little

22 broader, and I think he answered it appropriately.

23     Q. So next question: Have you ever been involved

24 in a class action as a named plaintiff or as a class

25 representative?                  09:20:49

Page 18

---

1     A. No. Not to my knowledge.

2     Q. All right. So aside from being within the class

3 and receiving some compensation as a -- as a class

4 member, you've never been involved in a class action

5 beyond that?                 09:21:09

6     A. That's correct.

7     Q. And the class actions through which you received

8 compensation were for defective products?

9     A. That's correct.

10     Q. Have you ever been involved -- involved -- I   09:21:20

11 guess -- well, let me strike that.

12     Have you ever participated in a class action in

13 any way that involved privacy?

14     A. No.

15     Q. Is maintaining the privacy of your information   09:21:35

16 while you browse the internet important to you?

17     A. Yes.

18     Q. And do you take precautions to protect your

19 privacy while you browse the internet?

20     MR. MCGEE: Object to the form.   09:21:56

21 You can answer. You can answer, Mr. Castillo.

22     THE WITNESS: Okay. So can you ask the question

23 again?

24     Q. BY MR. BROOME: Sure.

25     Do you take precautions to protect your privacy   09:22:10

Page 19

---

1 while you browse the internet?

2     MR. MCGEE: Object to the form.

3     You can answer.

4     THE WITNESS: Yeah, I do. Some. I mean, not --

5 nothing outrageous. I mean, I will use Incognito mode on   09:22:21

6 occasion.

7     Q. BY MR. BROOME: Aside from using Incognito mode

8 on occasion, what other precautions do you take to

9 protect your privacy while you browse the internet?

10     A. Sometimes I remove cookies, but other than that,   09:22:42

11 not really much else.

12     Q. When you remove cookies, do you do that during a

13 private browsing session or do you do that during regular

14 browsing sessions?

15     A. I usually do it during regular browsing sessions   09:22:55

16 because on occasion they interfere with performance on my

17 computer.

18     Q. In what way?

19     A. They slow it down.

20     Q. And what -- what's the basis for your belief   09:23:15

21 that cookies slow down your computer?

22     A. Articles I read on the -- on the computer.

23     Q. And did you do research into this issue about

24 cookies?

25     A. No, I wouldn't classify it as research. I would   09:23:29

Page 20

---

1 just classify it as casual reading on the internet.

2     Q. Okay. All right.

3     Aside from -- well, how often do you delete

4 cookies?

5     A. I don't recall. Maybe once or twice a year.   09:23:51

6     Q. Have you ever enabled cookie blockers?

7     A. I don't recall. I don't think so. Possibly,

8 but I don't recall doing it. I use Norton Internet

9 Security, and I think it -- it -- I think it -- I may

10 have set the setting to block cookies on occasion, but   09:24:18

11 then I end up turning it back on because I need some of

12 the services that some of the websites have that, you

13 know, if I want to purchase something, I have to accept

14 their cookies.

15     Q. Are you familiar with the cookie-blocker feature   09:24:31

16 in Chrome?

17     A. I know about it, but I haven't really researched

18 it or -- or played with it. I mean, I don't think

19 I've -- I think possibly in the past, I've engaged it and

20 turned it on and off.             09:24:48

21     Q. And you mentioned -- I think you mentioned

22 Norton Internet Security. What's that?

23     A. It is a -- it's a third-party service that keeps

24 your computer safe.

25     Q. Safe from what?            09:25:04

Page 21

6 (Pages 18 - 21)

1    A.  Malware, viruses, intrusions on your computer,
2  as far as best I know.  I'm not a -- I'm not a computer
3  engineer.
4    Q.  And Norton Internet Services you said has a
5  cookie-blocking option?                    09:25:27
6    A.  I believe it does.  I -- I don't utilize it, to
7  the best of my knowledge, but I think it has that.
8    Q.  All right.  And I think you said that you've --
9  you've -- you may have set the setting to block cookies
10 on occasion, but then you end up turning it back after  09:25:54
11 some period of time; is that accurate?
12   A.  Yes.
13   Q.  Do you understand the functionality of cookies
14 at a high level?
15       MR. MCGEE:  Object to the form.          09:26:08
16       You can answer.
17       THE WITNESS:  I don't understand the question.
18 Can you say that again?
19   Q.  BY MR. BROOME:  Yeah.
20       Do you understand the purpose of cookies, at    09:26:15
21 least at a high level?
22       MR. MCGEE:  Object to the form.
23       You can answer.
24       THE WITNESS:  I don't know if I would say high
25 level.  I think in general I understand cookies are like  09:26:24

Page 22

1  placeholders or something that somehow help with the
2  functionality of websites.
3    Q.  BY MR. BROOME:  Are you aware that cookies are
4  used for tracking purposes?
5        MR. MCGEE:  Object to the form.          09:26:37
6        You can answer.
7        THE WITNESS:  I believe that's one of the things
8  they do as well.
9    Q.  BY MR. BROOME:  And were you aware that cookies
10 were used for tracking purposes before you participated  09:26:46
11 in this case?
12       MR. MCGEE:  Object to the form.
13       You can answer.
14       THE WITNESS:  I -- can you ask the question
15 again?                                       09:26:59
16   Q.  BY MR. BROOME:  Sure.
17       Before becoming involved in this case, or let's
18 take it even back before, let's say the class period
19 here, 2016 to 2020, were you generally aware that cookies
20 are used for tracking purposes?               09:27:16
21       MR. MCGEE:  Object to the --
22       THE WITNESS:  Yes.  Yeah, I think I was.
23   Q.  BY MR. BROOME:  And were you -- during that same
24 period of time, were you generally aware that companies
25 that -- used cookies to show personalized ads?  09:27:31

Page 23

1        MR. MCGEE:  Object to the form.
2        You can answer.
3        THE WITNESS:  Yeah.  I think -- yes.  I think
4  cookies were used to help the functionality of the
5  website, which included ads.  But, yeah, I don't know the  09:27:47
6  specifics of how ads appear on websites.
7    Q.  BY MR. BROOME:  All right.  Going back to the
8  precautions that you take to protect your privacy while
9  you browse the internet, you mentioned using Incognito on
10 occasion, you occasionally delete cookies, you have on  09:28:09
11 occasion enabled cookie blockers, and you use Norton
12 Internet Services or security.
13       Anything else that you take -- any other
14 precautions that you take to protect your privacy online?
15       MR. MCGEE:  Object to the form insofar as it    09:28:31
16 misstates testimony.
17       THE WITNESS:  I would say no.
18   Q.  BY MR. BROOME:  Well, do you read privacy
19 policies of companies that you encounter online?
20   A.  I'd like you to clarify that question.  Are you  09:28:59
21 specifically talking about Google?
22   Q.  No, I'm not.
23   A.  Okay.  So I would say occasionally I've looked
24 at the Privacy Policy on a specific website I've been on,
25 but that's not my normal practice.            09:29:16

Page 24

1    Q.  How frequently or how many times would you say
2  that you've read the Privacy Policy on a website?
3    A.  I can't even recall.  Maybe once or twice, two
4  or three times in the course of my use of the internet.
5    Q.  But you read Google's Privacy Policy; right?    09:30:01
6    A.  I'm familiar with it.  I've read it.
7    Q.  Okay.  Did you read it during the class period?
8  And when I say "class period," I mean 2016 to the date
9  the Complaint was filed.
10   A.  Yes.  Yes, I've read it.                09:30:16
11   Q.  Did you read it when you signed up for your
12 Google Account?
13   A.  I'm familiar with it.  Yeah, I looked at it.
14   Q.  Yeah, that's not quite the question I'm asking.
15 Let me break it down into bite-sized pieces.    09:30:30
16       You signed up for a Google Account in or around
17 2012; right?
18   A.  (Nods head.)
19   Q.  "Yes"?  You have to answer --
20   A.  Yes.  Yes.                             09:30:45
21   Q.  I'm sorry.  Just because the court reporter's
22 typing everything down, you need to.  She can't get the
23 head nods.
24       Okay.  And when you signed up for your Google
25 Account in or around 2012, did you at that time read  09:30:54

Page 25

7 (Pages 22 - 25)

1 Google's Privacy Policy?
2      MR. MCGEE:  Object to the form.
3      You can answer.
4      THE WITNESS:  Yes.  And I -- I read it, and I
5 had to -- I think at the time -- I don't recall exactly      09:31:07
6 because it was so long ago, but I think I had to scroll
7 to the bottom and accept it.
8      Q.  BY MR. BROOME:  Are you referring to the Terms
9 of Service or are you referring to the Google Privacy
10 Policy?      09:31:23
11      A.  Well, when I refer to the Terms of Service, the
12 Privacy Policy is part of the Terms of Service, and it is
13 embedded in the Terms of Service.  At least on the last
14 one I reviewed, it's on page 2.  And it is an
15 over-arching policy that is contained in the Terms of      09:31:38
16 Service.  So yes.
17      Q.  Well, let's be clear about what we mean here.
18      When you say it's embedded, you mean there's a
19 link to the Privacy Policy; right?
20      A.  No.  I mean that the Privacy Policy is a      09:31:54
21 document that says in it that it encompasses all
22 activities of Google.  So I am inferring from that and
23 reading the Terms of Service that it is part of the Terms
24 of Service.  Or else it wouldn't be included in the Terms
25 of Service.      09:32:13

1      Q.  Right.  But you're not -- when you say that
2 you -- that when you signed up for your account, you read
3 the Google Privacy Policy, you said, "I had to scroll to
4 the bottom and accept it."
5      A.  Right.  That was the Terms of Service.      09:32:24
6      Q.  Okay.  And those Terms of Service, did they
7 actually copy in -- well, withdrawn.
8      You understand that the Terms of Service and the
9 Google Privacy Policy are two separate documents.
10      MR. MCGEE:  Object to the form --      09:32:41
11      THE WITNESS:  Yeah, I don't -- I don't agree
12 with that.  I think that the Terms of Service on page 2
13 states that -- it says on page 2 Privacy Policy.  So it's
14 part of the Terms of Service.
15      Q.  BY MR. BROOME:  What are you looking at,      09:32:58
16 Mr. Castillo?
17      A.  I'm looking at your Terms of Service
18 (indicating).
19      Q.  Do you have a binder of documents in front of
20 you right now?      09:33:05
21      A.  No, I do not.  I have three documents in front
22 of me.  One of them is the Terms of Service.
23      Q.  I'm sorry, what are the three documents you
24 have?
25      A.  One is the Terms of Service, one is the Privacy      09:33:12

1 Policy, and one is the splash screen, a copy of the
2 splash screen for the Incognito mode.
3      Oh, and I have a fourth document.  It is the
4 Second Amendment -- Amended Complaint (indicating).
5      Q.  All right.  Do you have any notations or      09:33:26
6 highlighting or anything like that on those documents?
7      A.  No.  I specifically underlined the Privacy
8 Policy.  I underlined some things on the Privacy Policy.
9      Q.  Yeah.  Okay.  So we're going to -- we're
10 definitely going to take a look at those documents.      09:33:39
11      Which - which version do you have in front of
12 you?
13      A.  Of -- are you talking about the Terms of
14 Service?  Because that's what we were referring to.  The
15 version I have of the Terms of Service -- let's see.      09:33:52
16 Looking to see if you have a version number.
17      It says "Terms of Service."  It doesn't have a
18 version number on it.  It just says:  "Google Terms of
19 Service via personal use."  No version number.
20      Q.  All right.  Let me help you out a little bit.      09:34:20
21 It should say "last modified" at the very top or
22 something to that effect.
23      A.  No, it doesn't say that.
24      Q.  No date?
25      A.  No date.      09:34:31

1      MR. BROOME:  All right.  So Ryan, can we get
2 copies of each of the documents that is currently sitting
3 in front of Mr. Castillo.
4      MR. MCGEE:  Certainly.
5      Q.  BY MR. BROOME:  Okay.  All right.      09:34:46
6      So we'll come back to those.  I definitely want
7 to ask you some questions about the versions that are in
8 front of you, Mr. Castillo.
9      A.  Okay.
10      Q.  But your testimony is that the Terms of Service      09:34:57
11 and the Privacy Policy are the same document?
12      A.  Well, the Privacy Policy is contained in the
13 Terms of Service.  It says on page 2 Privacy Policy.
14      Q.  What's the full sentence?
15      A.  It says:  "Privacy Policy.  Click here to review      09:35:16
16 the Google Privacy Policy."
17      Q.  Right.  And then if you click there, it takes
18 you to a different document; right?
19      A.  Yeah.
20      Q.  Okay.  So the Terms of Service -- and let me --      09:35:28
21 let me just to give you some context here.  I'm not
22 quibbling with you about whether the Terms of Service
23 incorporates the Privacy Policy in some legal sense.  The
24 lawyers can argue about that if they'd like.  I'm just
25 asking if you understand -- because I want to -- when you      09:35:51

1   A. That doesn't seem right. Because it doesn't say

2   make any reference to key terms.

3   Q. Momentito. Momentito.

4   A. Yeah. It seems just to my initial observation,

5   it seems this document's incomplete.              10:39:53

6   Q. Okay. Put aside -- putting that aside, the key

7   terms, do you see any reference in here to Incognito or

8   private browsing?

9       MR. MCGEE: I would again renew my objection

10  about the hyperlinks that are represented in the document   10:40:35

11  that seem incomplete. So object to the form and --

12      MR. BROOME: You have a standing objection on

13  that, I think.

14      MR. MCGEE: Okay.

15      THE WITNESS: I've reviewed the document. I      10:40:50

16  can't find anything that says Incognito in here. Did I

17  miss it? I don't -- I don't see it.

18  Q. BY MR. BROOME: Is there a -- my question's a

19  little broader.

20      Do you see anything referencing Incognito,      10:41:04

21  private browsing, or any other sort of similar concept --

22  A. Okay.

23  Q. -- in this document?

24  A. There's a section on information security. "We

25  offer two-step verification when you access your Google   10:41:32

Page 66

1   Account and a Safe Browsing feature in Google Chrome."

2       That's hyperlinked and there's no -- there's no

3   explanation of what that's about. So that could be in

4   there. I don't -- but I don't see it.

5   Q. You're just speculating; right?              10:41:49

6   A. I'm speculating, but more importantly -- yeah.

7   Q. Okay. More importantly what?

8   A. I don't see it.

9   Q. You don't see any reference to Incognito or

10  private browsing in this document; right?            10:42:18

11  A. No.

12  Q. Okay. Do you see it on page 2? Well, actually,

13  let me go off of it.

14      MR. BROOME: Sorry, Ryan. You said at 11:00 you

15  need to break, or when do you need to break?          10:42:43

16      MR. MCGEE: Yeah, at 10:55. So about

17  12 minutes.

18      MR. BROOME: That should be fine.

19  Q. Let me go up to page 1, Mr. Castillo.

20  A. Okay.                                10:42:55

21  Q. "Information We Collect." Do you see that

22  heading?

23  A. Okay, I see it.

24  Q. All right. It says: "We collect information to

25  provide better services to all of our users, from      10:43:04

Page 67

1   figuring out basic stuff, like which language you speak,

2   more complex things, like which ads you'll find more" --

3   "most useful, or the people who matter most to you

4   online."

5       Do you see that?                      10:43:15

6   A. Yes, I see that.

7   Q. And below that, it says: "We collect

8   information in two ways."

9       Do you see that?

10  A. Okay.                                10:43:20

11  Q. All right. And then if you go to the second

12  bullet, it says -- and now we're on page 2. It says:

13  "Information We Get From Your Use of Our Services."

14      Do you see that?

15  A. Yes, I see that paragraph.                  10:43:37

16  Q. All right. It says: "We may collect

17  information about the services that you use and how you

18  use them, like when you visit a website that uses our

19  advertising services or you view and interact with our

20  ads and content."                          10:43:49

21      Do you see that?

22  A. I see it.

23  Q. And is it clear to you -- is that statement

24  clear to you that when you visit a website that uses

25  our -- the Google's advertising services or you view or   10:43:59

Page 68

1   interact with Google's ads and content, that Google may

2   receive information?

3       MR. MCGEE: Object to the form.

4       You can answer.

5       THE WITNESS: So when I -- when I see this --   10:44:12

6   when I read this paragraph, I see that Google may collect

7   information when -- you know, Google may collect

8   information on the websites I'm visiting. Yes, I see

9   that.

10  Q. BY MR. BROOME: Okay. And that's clear to you;   10:44:28

11  right?

12  A. That's clear.

13  Q. Okay. And then the next bullet says: "Device

14  Information." It says: "We may" -- and it's sort of

15  indented. Well, actually, let me back up.           10:44:39

16      At the sentence we just read says: "We may

17  collect information about the services that you use and

18  how you use them, like when you visit a website that uses

19  our advertising services or you view and interact with

20  our ads and content."                       10:44:55

21      Right? Did I read that correctly?

22  A. Are you asking me if you read that correctly?

23  Yes, you read that correctly.

24  Q. And then it says: "This information includes,"

25  colon. Do you see that?                      10:45:06

Page 69

18 (Pages 66 - 69)

1    A.  Yes, I see it.

2    Q.  And then the next bullet says:  "Device

3  Information."  It says:  "We may collect device specific

4  information such as your hardware model, operating system

5  version, unique device identifiers, and mobile network        10:45:19

6  information, including phone number.  Google may

7  associate your device identifiers or phone number with

8  your Google Account."

9       Do you see that?

10    A.  I see it.                      10:45:33

11    Q.  Okay.  And is that clear to you?

12    A.  It's clear to me that when I'm searching Google

13  in regular mode, and not Incognito mode, that you collect

14  this data.

15    Q.  Okay.  And then there's log information and        10:45:46

16  location information, unique application numbers, local

17  storage, cookies, and anonymous identifiers.

18       Do you see all those headings?

19    A.  Yes.  I see the log information and all the

20  details you have in that paragraph.            10:46:07

21    Q.  And it's clear to you that Google may

22  receive that information when you visit a website that

23  uses Google's advertising services; correct?

24    A.  That's a very broad question --

25       MR. MCGEE:  Objection.            10:46:20

Page 70

---

1       THE WITNESS:  -- because it does not specific

2  apply to all the times that I'm using Google.

3    Q.  BY MR. BROOME:  Well, it says when -- the

4  limiter is in the -- the bullet, information we get from

5  your use of our services.                10:46:33

6       Do you see that?

7    A.  So does this paragraph mean that when I'm in

8  Incognito mode and I'm specifically not consenting -- not

9  consenting in a third-party state like California -- that

10  you're collecting that data?  Is that what you are        10:46:48

11  representing that Google does by that question?

12    Q.  I'm -- you're going pretty far afield there,

13  Mr. Castillo.  Respectfully, I'd just like ask you to

14  focus on the question.

15    A.  Okay.  Fair enough.            10:47:04

16    Q.  I understand you have your allegations and you

17  have your theory about the case, and the lawyers will --

18  you know, you've got a very capable lawyer.

19    A.  Fair enough.

20    Q.  We'll all argue about that.            10:47:12

21    A.  That was a broad question, to be -- to be fair.

22  It was a very broad question.

23    Q.  I'm just asking you about the document in front

24  of you.  It says:  "We may collect information about the

25  services that you use and how you use them, like when you    10:47:24

Page 71

---

1  visit a website that uses our advertising services or you

2  view and interact with our ad or contents."  And you said

3  that's clear to you.

4       MR. MCGEE:  Object to the form.

5    Q.  BY MR. BROOME:  Are you following me so far?        10:47:36

6  I'm just trying to break it down into bite size --

7    A.  Okay.  So ask your question again because that

8  was more like a statement.

9    Q.  I'm just trying to orient you.

10    A.  All right.  I got it.            10:47:46

11    Q.  Then it says:  "This information includes," and

12  it lists, you know, six categories of information.

13       Do you see that?

14    A.  I see five.  I don't see six.

15    Q.  You don't see six.  Device information?        10:48:03

16    A.  Wait.  I'm still on log information.  Details of

17  how you use our services, such as search queries,

18  telephone log, internet protocol addresses, device event

19  information, cookies.  That's five items.  You said six.

20    Q.  Yeah.  I'm looking at the bolded headings;        10:48:21

21  right?  Do you see it says:  "This information includes,"

22  and then it has --

23    A.  Oh, I see.  You're looking at a multi pages at

24  the same time.  I'm sorry.  I'm limited here.  I can only

25  go one page at a time.                10:48:33

Page 72

---

1       So let's see, one, two, three, four, five, six.

2  Now I understand what you mean by six.  You're not just

3  talking about log information.  You're talking about in

4  addition to the things they collect.  Log information,

5  device information, location information, unique        10:48:50

6  application numbers, local storage, cookies, and

7  anonymous identifiers, all things you're saying Google

8  collects.  Okay, I see it.

9    Q.  Yeah.  Is that clear to you, that Google

10  collects that information when you visit a web -- well,        10:49:02

11  strike that.  Let me -- let me start again.

12       Based on this document, as you're reading this

13  document, is it clear to you that Google receives that

14  information, those categories that you just listed, when

15  you visit a website that uses Google's advertising        10:49:15

16  services or you view or you're at Google's ads and

17  content?

18       MR. MCGEE:  Object to the form.

19       THE WITNESS:  This document states that Google

20  collects these information.  This document from --        10:49:31

21  from -- from -- from 2012 states that Google collects all

22  these items when I go to a website.  Yes.

23    Q.  BY MR. BROOME:  Okay.

24    A.  That's clear to me.

25    Q.  And there's nothing in this document, at least,        10:49:44

Page 73

19 (Pages 70 - 73)

1 websites?

2    A.  Yes, I did -- I understand that, and I

3 understand that as an --

4        MR. MCGEE:  Mr. Castillo, I just want to lodge

5 an objection to the use of the term "basic mode."  So        12:36:30

6 object to the form.  It's been previously --

7        MR. BROOME:  Objection, Ryan.  You literally

8 just interrupted the witness in the middle of an answer,

9 and now you're -- now you're putting words in his mouth.

10 Come on.                                        12:36:45

11       MR. MCGEE:  What words have I put in his mouth,

12 Steve?  I'm trying to lodge an objection.  I held my

13 hands up on the screen to try to indicate to Mr. Castillo

14 that I'm trying to lodge an objection, and I am just

15 simply making -- I am lodging an objection to the use of        12:36:58

16 the term "basic mode."

17       I didn't tell him what to say, didn't say what

18 it says in the discovery, or anything else.

19       So I take -- take umbrage to your

20 characterization there.                         12:37:12

21    Q.  BY MR. BROOME:  Okay.  Let me ask the question

22 again.

23    A.  Okay.

24    Q.  Mr. McGee will have another objection, I'm sure.

25       If you're just in Chrome's -- well, let me ask        12:37:30

Page 98

1 it this way:  Do you understand that Chrome has various

2 modes?

3    A.  Please explain various mode -- modes.  Are you

4 referring to Incognito mode?  I'm familiar with Incognito

5 mode.                                           12:37:42

6    Q.  No.  There's five modes in Chrome:  There's

7 basic mode, which is you just download the browser and

8 start using it; there's sign-in mode, where you can sign

9 in to your Google Account; there's synch mode, which I

10 don't know if you know anything about that one; and then        12:37:58

11 there's Incognito mode and guest mode.

12       Are you familiar with those modes?

13    A.  All those modes.  There's a lot of modes.  I

14 would say after you've explained them that way, I'm

15 familiar with each of those, but I've never heard it        12:38:15

16 explained to me in five different modes of signing into

17 Google.

18    Q.  Okay.  And then I was asking you if you

19 understand that Google is, to use your term, intercepting

20 your data when you visit third-party websites, non-Google        12:38:28

21 websites.  Let's use that term.

22       And you understand that in the modes that

23 don't -- that aren't Incognito mode, your understanding,

24 based on reading the Privacy Policy, is that Google

25 receives your data when you -- when you visit non-Google        12:38:44

Page 99

1 websites; is that accurate?

2        MR. MCGEE:  Object to the form.

3        THE WITNESS:  So to answer your question, I

4 understand when I am not in Incognito mode that Google

5 will intercept my communications and that you've        12:39:04

6 characterized it that I've given some kind of passive

7 consent based on my review of the Terms of Service and

8 the Privacy Policy at that point to -- for them to

9 collect data and to show me ads and what have you related

10 to my searches.                                12:39:24

11       But your question is only referred to when I'm

12 searching -- making browser searches in a mode that is

13 other than Incognito mode; is that correct?

14    Q.  BY MR. BROOME:  Yeah, and I'm not touching on

15 consent.  I didn't mention consent.  I'm just trying to        12:39:38

16 get your understanding of the Google Privacy Policy and

17 the type of information Google receives when you visit

18 third-party sites and apps that use Google services.

19    A.  Right.

20    Q.  And I specifically limited my question to, you        12:39:53

21 know, modes other than Incognito mode.

22    A.  Okay.  So I would -- it's my understanding that

23 Google collects that kind of data when I am not in

24 Incognito mode, per the statements that are written in

25 the Google Privacy Policy.                     12:40:12

Page 100

1    Q.  Okay.  And was that your understanding before

2 you got involved in this case?

3    A.  Yes.

4    Q.  Based on -- that was your understanding based on

5 reading the Google Privacy Policy?                12:40:25

6    A.  That was based on my understanding reading the

7 Terms of Service, which incorporate the Google Privacy

8 Policy.

9    Q.  Great.  Thank you.

10       If you look at page 7.                   12:40:48

11    A.  Page 7.  Okay.

12    Q.  Yes.

13    A.  The weeds here.  Okay, I'm on page 7.

14    Q.  The heading there that says:  "Managing,

15 Reviewing and Updating Your Information"?        12:41:07

16    A.  Okay.  I see it.

17    Q.  And it says:  "We also built a place for you to

18 review and control information saved in your Google

19 Account.  Your Google Account includes."

20       Do you see that?                        12:41:23

21    A.  "We also built a place for you to review and

22 control information saved in your Google Account.  Your

23 Google Account includes."  Yeah, I see that.

24    Q.  Yeah.  And then it lists privacy controls and

25 activity controls.                             12:41:43

Page 101

26 (Pages 98 - 101)

1    A. I was identifying my particular computer or
2 device.
3    Q. All right. And is it your testimony that if
4 Google -- Google had said in this sentence that we've
5 just been discussing, had said sites may deposit new        13:55:47
6 cookies on your local system, adding the word "local"
7 before "system," then you would understand this sentence?
8 But because the word "local" is not there, you can't
9 understand it?
10       MR. MCGEE: Object to the -- mischaracterizes        13:56:00
11 testimony.
12       THE WITNESS: Yeah. The only reason I used the
13 term "local" is you brought it up earlier, and it's up
14 above in the above pages. So it is clear above. Here,
15 it's vague.                                                 13:56:15
16    Q. BY MR. BROOME: Okay. So when Google says
17 "local system," you understand that?
18    A. Yeah, it makes it more defined. It makes it
19 more specific.
20    Q. Okay. So when Google says "your system," you're     13:56:26
21 not sure what Google means?
22    A. Yeah, because earlier it said your local system
23 and now, this says your system.
24    Q. Okay.
25    A. As if there's a difference. And there might be.     13:56:35

Page 142

1 I'm not an engineer. I don't know.
2    Q. When did you start using Incognito mode?
3    A. Is -- was your question when did I start using
4 Incognito mode? Is that in reference to when I ever used
5 it?                                                         13:56:57
6    Q. When did you -- when did you first use Incognito
7 mode, approximately? I know you're not going to be able
8 to tell me an exact date.
9    A. I don't recall. I don't recall. I started
10 using it when it was -- when it was available to me. I     13:57:09
11    Q. Can you give me any -- any -- any temporal
12 context whatsoever?
13    A. Some time prior to the class period.
14    Q. So some time prior to 2016?
15    A. Yes.                                                 13:57:27
16    Q. And how frequently would you say you used it
17 over the years?
18    A. I've used it I would say fairly frequently.
19    Q. Once a day, once a week, once a month, once a
20 year?                                                       13:57:51
21    A. I'm not -- I'm not exactly sure. I use it
22 fairly frequently.
23    Q. And are you still using it?
24    A. Yes.
25    Q. Are you still using it frequently?                   13:58:23

Page 143

1    A. I use it frequently, but I'm not exactly sure
2 how often I use it. I don't know if it's once a day,
3 twice a day, four times a week, five times a week. I use
4 it -- I use it frequently.
5    Q. Okay. And that -- you've been using it            13:58:45
6 frequently including in the time period after you became
7 involved in this litigation?
8    A. Yes.
9    Q. And have you enabled cookie blockers within
10 Incognito mode?                                           13:59:01
11    A. Not to my knowledge, and the -- and not that I
12 recall. And more importantly, I don't see why I would
13 need to. Do I need to put cookie blockers while I'm in
14 Incognito mode? I mean, think about the definition of
15 Incognito mode. You just said you're not -- that Google   13:59:19
16 won't -- we went through all the things Google won't do,
17 and why would I need to use a cookie blocker when I'm in
18 Incognito?
19    Q. Well, we just looked at the Chrome Privacy
20 Notice; right? It says sites may deposit new cookies on   13:59:32
21 your system while you are in these modes. So you know
22 from this document that Google may be putting cookies on
23 your browser while you're in Incognito mode; right?
24    A. Right. But Google's not supposedly recording
25 that. That's what you said in your Google Privacy         13:59:50

Page 144

1 Policy. You said I was in control. You said that I can
2 control what -- what Google retains and stores. And you
3 said I had this way to view the web privately using
4 Chrome Incognito mode.
5       And across our services, you can adjust your       14:00:06
6 privacy settings to control what we collect and how your
7 information is used, and you identified as the only thing
8 in here as Incognito mode is the choice to choose that
9 in your privacy statement.
10    Q. But your testimony is that in the Privacy Policy   14:00:21
11 that only privacy settings Google identifies in the
12 entire Privacy Policy is Incognito mode?
13       MR. MCGEE: Object to the form, mischaracterizes
14 prior testimony.
15    Q. BY MR. BROOME: (Inaudible.)                        14:00:46
16       THE REPORTER: Excuse me, Counsel. Can you
17 start your question again, please.
18       MR. BROOME: Are you talking to me?
19       THE REPORTER: I was. I was, yes.
20       (Interruption in proceedings.)
21       (Discussion off the record.)
22    Q. BY MR. BROOME: You were referring to the
23 March 2018 Privacy Policy, I believe. And you said:
24 "The only thing in here in Incognito mode" -- or sorry.
25 Let me back up.                                           14:01:34

Page 145

37 (Pages 142 - 145)

1 STATE OF CALIFORNIA    ) ss:
2 COUNTY OF MARIN        )
3
4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5 hereby certify:
6      That the foregoing deposition testimony was
7 taken before me at the time and place therein set forth
8 and at which time the witness was administered the oath;
9      That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16      I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21 this 10th day of February, 2022.
22
23
24
25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 262

---

1 xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2 Transcript - The witness should review the transcript and
3 make any necessary corrections on the errata pages included
4 below, noting the page and line number of the corrections.
5 The witness should then sign and date the errata and penalty
6 of perjury pages and return the completed pages to all
7 appearing counsel within the period of time determined at
8 the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10 requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 264

---

1 RYAN MCGEE, ESQ.
2 rmcgee@forthepeople.com
3            February 11, 2022
4 RE: BROWN vs. GOOGLE LLC
5 FEBRUARY 8, 2022, CHRISTOPHER CASTILLO, JOB NO. 5077508
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10 to schedule a time to review the original transcript at
11 a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13 Transcript - The witness should review the transcript and
14 make any necessary corrections on the errata pages included
15 below, noting the page and line number of the corrections.
16 The witness should then sign and date the errata and penalty
17 of perjury pages and return the completed pages to all
18 appearing counsel within the period of time determined at
19 the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21 Counsel - Original transcript to be released for signature
22 as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24 time of the deposition.
25

Page 263

---

1      I declare under the penalty of perjury under the
2 laws of the State of California that the foregoing is
3 true and correct.
4      Executed on _____, 2022, at
5 _____, _____.
6
7
8
9
10
11      _____
12      CHRISTOPHER CASTILLO
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

---

67 (Pages 262 - 265)

# EXHIBIT 29

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   CHASOM BROWN, WILLIAM BYATT,     ) Case No.
    JEREMY DAVIS, CHRISTOPHER        ) 5:20-cv-03664-LHK-
5   CASTILLO, and MONIQUE TRUJILLO   ) SVK
    individually and on behalf of    )
6   all other similarly situated,    )
                                     )
7              Plaintiffs,           )
                                     )
8              vs.                   )
                                     )
9   GOOGLE LLC,                      )
                                     )
10             Defendant.            )
    _____ )

11

12

13       VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

14           DEPOSITION OF MONIQUE TRUJILLO

15

16             Friday, February 11, 2022

17    Remotely Testifying from Los Angeles, California

18

19

20

21

22

23   Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 5077549

                                              Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4  CHASOM BROWN, WILLIAM BYATT,  )  Case No.
    JEREMY DAVIS, CHRISTOPHER     )  5:20-cv-03664-LHK-
 5  CASTILLO, and MONIQUE TRUJILLO )  SVK
    individually and on behalf of )
 6  all other similarly situated, )
                                  )
 7      Plaintiffs,               )
                                  )
 8      vs.                       )
                                  )
 9  GOOGLE LLC,                   )
                                  )
10      Defendant.                )
    _____)
11
12
13
14       Virtual videoconference video-recorded
15       deposition of MONIQUE TRUJILLO, remotely
16       testifying from Los Angeles, California,
17       taken on behalf of the Defendant, on
18       Friday, February 11, 2022, before Hanna
19       Kim, CLR, CSR No. 13083.
20
21
22
23
24
25
                                              Page 2
```

```
 1  REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2
 3  For Plaintiffs:
 4      BOIES SCHILLER FLEXNER LLP
 5      BY:  ROSSANA BAEZA, ESQ.
 6      BY:  MARK C. MAO, ESQ.
 7      100 SE 2nd St., 28th Floor
 8      Miami, Florida 33131
 9      305.539.8400
10      rbaeza@bsfllp.com
11      mgao@bsfllp.com
12      -and-
13      MORGAN & MORGAN
14      BY:  RYAN J. McGEE, ESQ.
15      201 N. Franklin Street, 7th Floor
16      Tampa, Florida 33602
17      813.223.5505
18      rmcgee@forthepeople.com
19
20
21
22
23
24
25
                                              Page 3
```

```
 1  REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
 2
 3  For Defendant:
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5      BY:  JOMAIRE A. CRAWFORD, ESQ.
 6      BY:  TRACY GAO, ESQ.
 7      51 Madison Avenue, 22nd Floor
 8      New York, New York 10010
 9      212.849.7000
10      jomairecrawford@quinnemanuel.com
11
12  Also Present:
13      SCOTT SLATER, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 4
```

```
 1            INDEX OF EXAMINATION
 2
 3  WITNESS:  MONIQUE TRUJILLO
 4  EXAMINATION                      PAGE
 5       BY MS. CRAWFORD:            11, 287
 6       BY MS. BAEZA:               276, 293
 7
 8  QUESTIONS INSTRUCTED NOT TO ANSWER:
 9  PAGE.......LINE
10  17.........17
11  82.........6
12  87.........2
13            --o0o--
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5
```

1    A.  Yes.
2    Q.  Okay.  Do you use the internet in
3  connection with your position?
4    A.  Yes.
5    Q.  Okay.  What's the highest level of --      09:40:53
6  actually, let me take a step back.
7       Have you had any other jobs before
8  becoming a regional manager at Curative two years
9  ago?
10   A.  Yes.                            09:41:08
11   Q.  Okay.  What positions have you held and
12  when?
13   A.  Before Curative, I was a senior associate
14  at Nordstrom.
15   Q.  And how long were you a senior associate   09:41:30
16  at Nordstrom?
17   A.  About a year and a half.
18   Q.  And before that?
19   A.  Before that, I was in a showroom in
20  Santa Monica.                        09:41:54
21   Q.  What kind of showroom?
22   A.  The company was Farrow & Ball.  And it --
23  it's paint and wallpaper.
24   Q.  Okay.  And how long were you at the
25  showroom in Santa Monica?            09:42:14

Page 26

1    A.  A little over a year.
2    Q.  Any other jobs that we haven't covered
3  yet?
4    A.  I -- before Farrow & Ball, I was working
5  on sets doing costuming.             09:42:41
6    Q.  Costume design?
7    A.  Yes.
8    Q.  Okay.  And how long did you do that?
9    A.  I've been doing that on and off since
10  2000.                               09:42:56
11   Q.  Okay.  What's the highest level of
12  education you've completed?
13   A.  An associate's in college.
14   Q.  Okay.  And when did you get your
15  associate's degree?                  09:43:14
16   A.  2006.
17   Q.  And what did you study and where?
18   A.  That was from Los Angeles City College.
19   Q.  And you studied?
20   A.  English.                        09:43:38
21   Q.  Okay.  How did you get involved in this
22  case?
23   A.  I saw -- I saw the article, and I read it
24  and reached out to the firm.
25   Q.  Which article are you referring to?       09:44:01

Page 27

1    A.  The article that talked about how
2  incognito was not sticking to its privacy policy.
3    Q.  And do you remember where you saw this
4  article?  Was it online, was it in print -- print
5  form, or some other medium?          09:44:46
6    A.  It was online.
7    Q.  And was the article published by a -- a
8  law firm, or was it something like you would read,
9  let's say, you know, in the daily news or, you
10  know, the -- The Washington Post?    09:45:02
11   A.  It was -- I don't recall.  It was not
12  posted by the law firm itself.
13   Q.  But it instructed you to contact the law
14  firm --
15       MS. BAEZA:  Objection.  Mischar- --   09:45:24
16  BY MS. CRAWFORD:
17   Q.  -- without the --
18       MS. BAEZA:  Sorry, Jomaire.
19       MS. CRAWFORD:  Well, give me a second,
20  Rosy.  Sorry.  I'm -- I'm -- I wasn't finished with  09:45:30
21  the question.
22  BY MS. CRAWFORD:
23   Q.  Did the article instruct you to contact
24  counsel?
25   A.  No.                            09:45:37

Page 28

1    Q.  Okay.  What did the article say?
2    A.  It just spoke about its findings and...
3    Q.  And when did you -- do you remember when
4  you viewed that article?
5    A.  I do not.                       09:46:04
6    Q.  Roughly speaking, was it in, you know,
7  2000- -- 2022?  Was it in 2016, '17, '18?  Again,
8  roughly speaking.
9    A.  I would say 2020.
10   Q.  After this lawsuit was filed?    09:46:35
11   A.  I don't have the exact dates of when it
12  was filed and when the article was put out.
13   Q.  Okay.  And do you happen to know who
14  published the article that you're referring to?
15   A.  I do not.                       09:47:00
16   Q.  Okay.  And how did you ultimately get
17  involved in this lawsuit?
18   A.  I --
19       MS. BAEZA:  Objection.  Form.  Vague.
20  BY MS. CRAWFORD:                     09:47:29
21   Q.  You can answer.
22   A.  I contacted the law firm and asked to
23  speak with somebody because what I had read was
24  what I had experienced myself, and it was just
25  maddening.                          09:47:52

Page 29

8 (Pages 26 - 29)

1  follow, you'll browse the web and then click out
2  of the browser window once you're done browsing to
3  ensure that there is no record, perhaps, of --
4  of -- of your visit to a specific site; is that
5  right?                                09:55:21
6      A.  That's right.
7      Q.  Okay.  Do you do anything -- actually, let
8  me ask.
9          Do you do that when you're both browsing
10 in private mode and a non-private mode?        09:55:34
11     A.  It depends on what I am searching for.  So
12 if it's something that I don't want anybody else
13 to see and I'm in private mode, I will exit the
14 window.
15     Q.  And if you're searching for something that  09:55:58
16 you don't want someone to see when you're not in
17 private mode, would you follow the same practice?
18     A.  Yes.
19     Q.  Okay.  Are there any other precautions --
20 oh, it looked like you were going to say        09:56:16
21 something.  Were you --
22     A.  No.
23     Q.  -- not done answering the question?  Okay.
24     A.  No.  Go on.
25     Q.  Are there any other precautions that you   09:56:23

Page 34

1  take when you're browsing the web to ensure your
2  activity remains private?
3      A.  Those three precautions are mostly what
4  I -- mainly the precautions I take.
5      Q.  Okay.  Do you take any precautions to     09:56:54
6  protect your privacy while you're using apps as
7  distinct from web browsing?
8      A.  While -- while I'm using apps?
9      Q.  Yes.
10     A.  I'll exit the screen.              09:57:22
11     Q.  Okay.  Anything else?
12     A.  Not for -- I can't think of precautions on
13 apps.  Let me see, actually...
14         That's it for now.
15     Q.  And when you exit a screen on an app, for  09:58:03
16 example, is it to ensure that, let's say, you
17 know, someone using your phone wouldn't be able to
18 see what you were looking at or what you were, you
19 know -- what you were doing?
20     A.  Yes, that's correct.              09:58:19
21     Q.  Okay.  Are you familiar with something
22 called a privacy policy?
23         I believe so, based on some of the
24 documents that you've looked at to prepare, but I
25 just want to confirm.                  09:58:34

Page 35

1      A.  Yes, I'm familiar.
2      Q.  And do you read privacy policies of the
3  companies whose websites you visit online?
4      A.  Yes, I do.
5      Q.  Okay.  Is that an additional precaution    09:58:48
6  that you take, for example, reading the privacy
7  policies of the websites that you visit?
8      A.  Yes.
9      Q.  Would you say that you read the privacy
10 policies of most websites that you visit, some, or  09:59:06
11 none?
12     A.  Most.
13     Q.  Approximately how many times do you do
14 that in a given week?
15     A.  In a given week, that's -- I read the      09:59:23
16 privacy policies when there's an initial account
17 setup or if there's an update.
18     Q.  And how would you know whether there's an
19 update to a website's privacy policy?
20     A.  I will receive an alert.            09:59:51
21     Q.  Do you always -- do you know if you -- if
22 every website that you visit sends alerts when
23 their privacy policies are updated?
24     A.  I don't know if every websites [sic] sends
25 a updated policy.                      10:00:11

Page 36

1      Q.  But you imagine that some send such
2  notifications; right?
3      A.  I've seen updated policies.  I've received
4  them, but I don't know if every website does that
5  or how often they do it.                10:00:33
6      Q.  Okay.  Well, it sounds like you have a
7  habit of reading privacy policies.
8          Is that a fair characterization of what
9  you just described to me?
10     A.  I don't know if I would say "a habit," but  10:00:45
11 it is something I read when it's initially
12 presented to me to move forward.
13     Q.  And let's say it's -- it's not presented
14 to you in the context of an account creation
15 process.                            10:01:12
16         Would you, nonetheless, view a privacy
17 policy that's on a -- a -- a website that you
18 visit?
19     A.  It depends on the website.
20     Q.  And how would you decide which websites'   10:01:36
21 privacy policies you might want to review and
22 which ones you maybe don't need to?
23     A.  Well, for example, if I'm on the Ralphs
24 supermarket website, I wouldn't read their privacy
25 policy.                              10:02:05

Page 37

10 (Pages 34 - 37)

1 that you purchased, you consider that to be
2 personal information?
3   A.  Absolutely.  Yes.
4   Q.  Even if those products are not personally
5 tied to your name or to your identity?          10:42:08
6   A.  Yes, even if I mean -- yes.  Absolutely.
7   Q.  So if you purchased let's say a -- a
8 spatula from Williams-Sonoma, you would
9 consider -- a simple line item that says "Spatula
10 purchased," you would consider that information to   10:42:34
11 be personal information to you, even if it doesn't
12 identify Monique Trujillo as the person who
13 purchased the spatula?
14   A.  I would -- yes, I would consider that
15 personal, because even if it doesn't say my name,   10:42:47
16 it says everything else -- I mean, there's
17 everything else about me, and it wouldn't just be
18 a spatula.
19       If I'm shopping at Williams-Sonoma, I am
20 looking for a Star Wars spatula.  You know,        10:43:05
21 it's -- if I'm -- it's something personal and
22 special to me.
23   Q.  So I think I heard you say, you know,
24 there would be other information about you, but
25 what if it's just that someone purchased a Star   10:43:24

Page 54

1   Q.  And these -- and -- and these different
2 types of information appears under a disclaimer
3 that reads "Collecting Information About You,"
4 "Categories and Types of Personal Information We
5 Collect."                                          10:44:41
6       Do you see that?
7   A.  Yes.
8   Q.  Are you comfortable with Williams-Sonoma
9 collecting these different types of data on when
10 you visit its website?                             10:44:50
11   A.  Well, if I'm in regular mode, then I am
12 aware that information is being collected.  If I'm
13 in incognito mode, I am not okay that information
14 is being collected without my consent.
15   Q.  Now, looking at the section entitled      10:45:17
16 "Collecting Information About You," does it say
17 anything in here about whether you're visiting the
18 website and in incognito mode or not?
19   A.  It does not.
20   Q.  And so this section does not distinguish   10:45:46
21 between data collected when you're browsing in
22 incognito versus a non-incognito mode; is that
23 right?
24   A.  It doesn't say that here, but it would
25 have been my choice to search in incognito mode or   10:46:07

Page 56

1 Wars spatula?  There's no other information about
2 you.  There's no other -- there -- your name's not
3 associated with it; neither your first name nor
4 your last name is associated.  It's just that a
5 spatula with a Star Wars branding was purchased   10:43:39
6 from Williams-Sonoma.
7       Would that be personal to you?
8   A.  Yes, it would be personal to me.
9   Q.  How is that?
10   A.  Because it's my choice what I chose to    10:43:49
11 purchase.
12       MS. BAEZA:  Let me just assert my
13 object- -- objection here.
14       Objection.  Form.  Asked and answered.
15       Ms. Trujillo, if you could just give me   10:44:03
16 just one second after Jomaire finishes her
17 questions in case I have an objection.
18       THE WITNESS:  Yes.
19       MS. BAEZA:  That way I don't have to
20 interrupt you.  I'm sorry.                          10:44:14
21 BY MS. CRAWFORD:
22   Q.  Now, we just went through this nine-point
23 bulleted list, and you said all this information
24 is your personal information; right?
25   A.  Right.                                    10:44:23

Page 55

1 in regular mode.
2   Q.  That's right.  But I'm asking about the
3 Williams-Sonoma privacy policy and the information
4 that it tells you in here that it collects when
5 you visit its website.                             10:46:22
6       So I just want to be clear that nothing in
7 Williams-Sonoma's disclosure here says that the
8 type of data they collect depends on whether
9 you're searching in private mode or not; is that
10 right?                                             10:46:43
11   A.  That's right.  But what I'm concerned with
12 is -- I understand that Williams-Sonoma is
13 disclaiming here -- or giving a disclosure here
14 that they will collect all this information.
15 That's fine.                                        10:47:04
16       But if I'm in incognito mode, I do not
17 want third parties or Google collecting
18 information without my consent.
19   Q.  How would Williams-Sonoma know if you're
20 in incognito mode or private -- sorry, in a        10:47:20
21 private mode or not when you're visiting its
22 website?
23   A.  It doesn't matter if Williams-Sonoma
24 knows.  It would be Google's responsibility to
25 know that I'm in incognito mode and not collect my   10:47:42

Page 57

15 (Pages 54 - 57)

1  information.
2    Q.  Right.  We're going to get to Google in
3  one second, but if we could just stick with
4  Williams-Sonoma.  I want to make sure I get a
5  clear answer to the question.          10:47:57
6        How would Williams-Sonoma, in your view,
7  know that you're visiting its website in
8  incognito mode versus a regular browsing mode?
9        MS. BAEZA:  Objection.  Form.  Asked and
10  answered.                              10:48:12
11  BY MS. CRAWFORD:
12    Q.  You can answer.
13    A.  I don't know how Williams-Sonoma would
14  know if I'm in incognito mode or in regular mode.
15    Q.  Okay.  Now, we talked about this section   10:48:26
16  here which talks about the information that
17  Williams-Sonoma collects about you.
18        I'm going to ask that you turn to the
19  fifth page of this document, which talks about
20  information -- actually, the fourth page of this   10:48:42
21  document, which talks about information that
22  Williams-Sonoma shares with third parties.
23        If you go to the bottom of page 3,
24  actually, which is where the heading "Third
25  Parties" appears, can you let me know once you've   10:49:06
                                           Page 58

1  scrolled to the third page of this document?
2    A.  Hold on.  It's a little blurry.
3        MS. BAEZA:  I'm sorry.  Jomaire, you said
4  the third page that says "Third Parties"?
5        MS. CRAWFORD:  Yep, at the very bottom it   10:49:25
6  says "When We Share Information with Third
7  Parties."
8        MS. BAEZA:  Okay.  Thank you.
9        MS. CRAWFORD:  You're welcome.
10  BY MS. CRAWFORD:                        10:49:39
11    Q.  And, Ms. Trujillo, just let us all know
12  when you're here.
13    A.  Okay.  Is it in -- is it emboldened?
14  Because I do not see -- 1, 2 --
15    Q.  Yes, ma'am.                       10:49:48
16    A.  -- 3.  I see.  Okay.  I see.
17    Q.  Okay.  So you're at the section that's
18  titled "When We Share Information with Third
19  Parties."  And underneath it it lists "Service
20  Providers."                            10:50:05
21        It says, "We may contract with companies
22  or persons to provide certain services including
23  credit card processing, shipping, data analysis
24  and management, promotional services, et cetera.
25  We call them our Service Providers.  We provide   10:50:18
                                           Page 59

1  our Service Pro-" -- "Providers with the
2  information needed for them to perform these
3  services.  We ask that our Service Providers
4  confirm that their privacy practices are
5  consistent with ours."  [As read]      10:50:53
6        Do you see that?
7    A.  I do.
8    Q.  Now, if you turn to page 5, you'll see,
9  three paragraphs in, a section that begins with
10  "We use."                              10:51:02
11        Let me know once you're there.
12    A.  I see it.
13    Q.  And this paragraph, do you mind reading
14  this one aloud into the record?
15    A.  "We use Google Analytics on our web sites   10:51:06
16  to collect usage data, to analyze how users use
17  the web sites and to provide advertisements to you
18  on other websites.  For more information about how
19  to opt out of having your information used by
20  Google Analytics, visit..." [As read]   10:51:24
21    Q.  And then there's a URL, mm-hmm.
22    A.  Right.
23    Q.  What do you understand this paragraph to
24  mean, Ms. Trujillo?
25    A.  That when I'm on the Williams-Sonoma   10:51:37
                                           Page 60

1  website in regular mode, Google Analytics has
2  access to my information.
3    Q.  But this paragraph here doesn't contain
4  the words "regular mode," does it?
5    A.  It does not contain the words -- the   10:52:02
6  word [verbatim] "regular mode," but in the Google
7  policy -- it does say "Google Analytics" on there.
8  And in the Google policy, it says that if I choose
9  to set -- to search in incognito mode, I can
10  control what is collected.             10:52:31
11    Q.  Are you reviewing from a document that you
12  have in front of you?
13    A.  I am.
14    Q.  Okay.  I would ask that while we're --
15  while we're looking at a particular document,   10:52:43
16  namely Exhibit Number 1, that you set aside the
17  other documents that you have in front of you.
18        I'll let you know if there's a point where
19  it would be helpful for you to look at one of the
20  documents that you have.  But I ask that our --   10:52:57
21  the questions I'm asking you are limited to the
22  document and exhibit that we're focused on right
23  now.
24        And I'll let you know, again, if I need
25  you to reference any of the other materials in   10:53:07
                                           Page 61

16 (Pages 58 - 61)

Page 62

```
 1  front of you.
 2       Do you mind doing that for me?
 3   A.  I do not mind.
 4   Q.  Okay.  So then in -- in this paragraph
 5  here that begins with "We use Google Analytics on    10:53:17
 6  our web sites," I just want to confirm that
 7  nowhere in that paragraph does it reference
 8  "regular mode."
 9       Would you agree with that?
10   A.  Well, I can't agree with it because even    10:53:36
11  if I don't reference any documents or other
12  policies, I know that in regular mode I am
13  consenting to Google Analytics collecting my
14  information.
15   Q.  But, Ms. Trujillo -- oh, sorry.  Go ahead    10:53:52
16  if you're still answering the question.
17       Okay.
18   A.  If I'm --
19       MS. BAEZA:  Go -- go ahead, Ms. Trujillo.
20  You can finish.                                      10:54:10
21       THE WITNESS:  Without referencing any
22  documents or policies, I know that if I'm in
23  cogni- -- incognito mode, Google has promised not
24  to collect my information.
25  BY MS. CRAWFORD:                                     10:54:29
```
Page 62

```
 1   Q.  Right.  But, again, I -- I mentioned a
 2  moment ago we're going to talk about Google and
 3  Google's privacy policy and Google's disclosures
 4  and the information that you consider to be
 5  relevant in those documents.                         10:54:40
 6       But before we get there, I'm just asking
 7  about the Williams-Sonoma policy that's in front
 8  of you.
 9       Can I get a straight answer, yes or no, to
10  the -- two questions, whether or not this portion    10:54:51
11  of Williams-Sonoma's policy mentions "incognito
12  mode" or -- or pri- -- or "non-private browsing
13  mode" specifically?  Yes or no?
14       MS. BAEZA:  Objection.  Form.  Asked and
15  answered.                                            10:55:06
16       The -- Ms. -- Ms. Crawford, Ms. Trujillo
17  is trying to give answers to the best of her
18  ability.  I think it's improper to ask her to
19  answer just a yes-or-no question.
20       MS. CRAWFORD:  Well, the witness can say    10:55:23
21  if -- if she's incapable of -- of answering yes or
22  no as to whether or not certain words appear in the
23  context of language she's just read.  And if the
24  witness is unable to do so, she can let us know
25  that.                                                10:55:35
```
Page 63

```
 1  BY MS. CRAWFORD:
 2   Q.  But, Ms. Trujillo, I do ask that you
 3  answer this narrow question, it's very simple,
 4  whether or not "private browsing mode" is
 5  mentioned anywhere in the paragraph that you just    10:55:44
 6  read aloud; yes or no?
 7   A.  Well, in this specific paragraph, it is
 8  telling me, "We use Google Analytics on our web
 9  site to collect usage data" [as read].
10       I know if I'm in regular mode or if I'm    10:56:05
11  [verbatim] incognito mode, so it doesn't matter if
12  Williams-Sonoma is mentioning to me "regular mode"
13  or "incognito mode."
14   Q.  But Williams-Sonoma didn't say here, "We
15  only share your information with Google when    10:56:20
16  you're in regular mode."  It doesn't say that
17  here, does it?
18   A.  I mean, it's not Williams-Sonoma's
19  responsibility.  It's Google's responsibility to
20  stand by their privacy policy where it says if I'm    10:56:40
21  in incognito mode, they will not collect my
22  information without my consent.
23   Q.  Are you aware of the data flow at issue in
24  this case and how Google gets the data that you're
25  suing Google for?                                    10:56:59
```
Page 64

```
 1       MS. BAEZA:  Objection.  Form.  Vague as to
 2  "data form" [sic].
 3  BY MS. CRAWFORD:
 4   Q.  You can answer.
 5       MS. BAEZA:  "Data flow."  My apologies.    10:57:09
 6       THE WITNESS:  No, I'm not.
 7  BY MS. CRAWFORD:
 8   Q.  Okay.  So then in the lawsuit that's been
 9  filed in this case, the basic allegation is that
10  when you visit a website like Williams-Sonoma    10:57:23
11  using incognito mode, you were led to believe that
12  Williams-Sonoma would not share or Google would
13  not receive information from your private browsing
14  session.
15       When you visit websites like    10:57:46
16  Williams-Sonoma, this specific disclosure -- let
17  me know if this is your understanding -- this
18  specific disclosure says Williams-Sonoma is
19  sharing your information with Google.  That is the
20  same information that you've alleged Google    10:58:03
21  improperly collected in the context of your
22  lawsuit; isn't that right?
23   A.  No, that's not right.
24   Q.  What kind of information are you alleging
25  Google has collected on you without your consent,    10:58:18
```
Page 65

17 (Pages 62 - 65)

1  asked what was the supporting evidence for the
2  assertion that Google tracking -- sorry --
3  collecting data without consent was a known fact,
4  you testified, quote, "Attorneys and experts
5  looking into this."              11:48:05
6      Do you remember that?
7   A.  Yes.
8   Q.  And when I asked which attorneys, you
9  responded, quote, "The attorneys that work for the
10 law firm that I hired in this case."       11:48:18
11     Do you remember that?
12  A.  Yes.
13  Q.  So can you tell me in what context did the
14 attorneys from the law firm that you hired in the
15 context of this case made that representation?  11:48:31
16 Was it in the form of the news article that you
17 reviewed or in some other capacity?
18     MS. BAEZA:  I'm going to instruct
19 Ms. Trujillo not to answer to the extent you're
20 asking questions about communications outside of  11:48:44
21 the article that she saw about the lawsuit.
22 BY MS. CRAWFORD:
23  Q.  You can answer, Ms. Trujillo.
24  A.  I can't answer that question.
25  Q.  Is it because it call-- you believe that  11:48:59

Page 90

1  it calls for privileged information?
2   A.  Yes.
3   Q.  So then, is it the case that your basis
4  for believing that it was a known fact that Google
5  is collecting this data, does it derive from     11:49:15
6  information that you've obtained from lawyers that
7  you've hired in this case, yes or no?
8      MS. BAEZA:  Objection to form.
9  Mischaracterizes testimony.
10     She -- she said it came from an article.  11:49:28
11 BY MS. CRAWFORD:
12  Q.  Can you please clarify, Ms. Trujillo?
13  A.  I was initially informed of this from the
14 article I read.
15  Q.  And what did the article say specifically  11:49:50
16 about Google's data collection without user
17 consent?
18  A.  It specifically said that Google is
19 tracking information while on incognito mode.
20  Q.  And did they cite -- did the article cite  11:50:11
21 any evidence or support or offer facts to
22 support -- to justify that assertion, yes or no?
23  A.  Yes.
24  Q.  What were those facts or supporting
25 justifications?                    11:50:40

Page 91

1      MS. BAEZA:  Objection.  Form.  Asked and
2  answered.
3  BY MS. CRAWFORD:
4   Q.  You can answer.
5   A.  I can't give you an answer about    11:50:54
6  statistics, but the article did state that
7  attorneys and experts have found to be true that
8  Google is tracking and collecting information
9  while users are in incognito mode.
10  Q.  And the article represented that that was  11:51:27
11 done without user consent?
12  A.  Yes.
13  Q.  And the lawyers that you just mentioned,
14 the article did state -- I'm quoting from your
15 testimony now.  "The article did state that    11:51:47
16 attorneys and experts have found to be true that
17 Google is tracking and collecting information."
18     Which lawyers are you referring to when
19 you say that?
20  A.  The lawyers at the firm I contacted.    11:52:00
21  Q.  Okay.  So that would be counsel
22 representing you in this case?  Yes?
23  A.  Yes.  Correct.
24  Q.  You're aware that there was a com- --
25     MR. MAO:  Hey, Jomaire.  This is --

Page 92

1  Jomaire.  Jomaire, this is Mark.  This is Mark
2  Mao.
3      MS. CRAWFORD:  Yes?
4      MR. MAO:  Just real quick.  Just for the
5  record -- and I'll put it on the record.  Okay?    11:52:30
6      MS. CRAWFORD:  Sure.
7      MR. MAO:  Because Rosy was not involved in
8  the case at the beginning of the case.  There is no
9  solicitation, like, article, that the firm's put
10 out there.  If that's what, like, this is all    11:52:40
11 about, although she's answered this, like --
12     (Interruption in audio/video.)
13     -- times.
14     And I will make the representation to you
15 that the lawyers did not send out a solicitation,    11:52:45
16 like publishing anywhere that has not been produced
17 in the case.  I -- and -- and there is none.
18 That's why.  Okay?  So I've been --
19     MS. CRAWFORD:  Yeah, but you were --
20     MR. MAO:  -- listening to this for a    11:52:57
21 while --
22     MS. CRAWFORD:  Mm-hmm.  I appreciate
23 your --
24     MR. MAO:  -- right?
25     MS. CRAWFORD:  -- attentiveness, so

Page 93

24 (Pages 90 - 93)

1    Q.  You can answer.
2    A.  Yes, I do.
3    Q.  And that's -- what evidence is that?
4        MS. BAEZA:  Objection.  One moment.
5        Monique, to the extent that this calls for   12:17:30
6    communications between you and counsel, I'm
7    instructing you not to answer.  But you can answer
8    if you -- if you can without revealing those
9    communications.
10       THE WITNESS:  The evidence I have is       12:17:40
11   the -- what the -- what my attorneys and what --
12       MS. BAEZA:  One moment.  One moment.
13   Don't -- Monique, as -- as -- you can answer the
14   question as long as you're not revealing the
15   communications that you've had with your attorneys.   12:18:02
16       Okay?
17       THE WITNESS:  Yes.
18       MS. BAEZA:  Okay.  Go ahead.
19       THE WITNESS:  What the experts have found.
20   BY MS. CRAWFORD:                             12:18:18
21   Q.  Okay.  Are you aware, Ms. Trujillo, that
22   you can opt out of Google's use of certain of your
23   data by visiting ad settings, a website to -- that
24   Google offers, adsettings.google.com, and turning
25   off something that's called ad personalization?   12:18:46

Page 110

1    Are you aware of that?
2    A.  No, I'm not.
3    Q.  I think I -- I -- I asked earlier if you
4    had done any research online about protecting your
5    privacy, and I think that you said you had not.   12:19:01
6        But if you uncovered information like what
7    I'm describing to you now, "my activity" and the
8    ads personalization feature that I mentioned you
9    could disable, is that something that at the very
10   least you would be interested in learning more   12:19:17
11   about?
12   A.  Yes, it's something I would look into.
13   Q.  All right.
14       Do you have any understanding of what a
15   VPN or a proxy server is?                     12:19:37
16   A.  No, I do not.
17   Q.  Okay.  So to your knowledge, you've --
18   have you -- you've never used a VPN or a proxy
19   server on any browser?
20   A.  To my knowledge, I have not.             12:19:49
21   Q.  What about a firewall?
22   A.  I have not used a firewall.
23   Q.  What about something called "AdGuard" or
24   "AdLock," which are ad blocker programs?
25   A.  I have not.                              12:20:19

Page 111

1    Q.  Do you have an opinion, one way or the
2    other, about the kinds of advertising that you see
3    when you visit websites online?
4    A.  Yes, I have an opinion on the
5    advertisements I see.                        12:20:40
6    Q.  And what opinion is that?
7    A.  It depends on what the advertisement is.
8    Q.  Can you say a little bit more there?  For
9    example, is it, you know, your belief that some
10   ads are helpful or useful, other ads maybe less   12:20:58
11   so?
12   A.  Yes, that's how I feel about it.  I mean,
13   some ads are helpful, useful.  Some ads are
14   just -- some are helpful and useful.
15   Q.  Can you give me an example of one ad, you   12:21:38
16   know, over the years, perhaps, or recently that
17   you encountered online that you did consider to be
18   helpful or useful?
19   A.  Let's see.
20       Around the holidays when I get a -- an   12:22:16
21   advertisement for a store and there's a coupon,
22   that's helpful and useful.
23   Q.  And by getting an advertisement for a
24   coupon, you mean like you may be visiting a
25   website, let's say williams-sonoma.com, and an ad   12:22:38

Page 112

1    pops up informing you that a retailer is offering
2    a discount or a coupon?  Is that the context that
3    you're describing generally?
4    A.  If it's a store that I like, then it is
5    helpful and useful.                          12:22:57
6    Q.  Okay.  Can you give me a couple examples
7    of -- of sites or stores, where getting an ad from
8    them might be more helpful or useful than not?
9    Would you say Williams-Sonoma is one such store,
10   for example?                                12:23:14
11   A.  Yes, getting an ad from Williams-Sonoma
12   would be helpful and useful.
13   Q.  Any other stores that you can think of,
14   websites that you might visit online?
15   A.  Do you just want me to list off which   12:23:30
16   stores I would like to get advertisements from?
17   Q.  You can.  Yeah, just, again, I'm not
18   looking for an exhaustive list because this is
19   certainly not a memory test.
20       Any examples that immediately come to   12:23:57
21   mind?
22   A.  I would say Macy's, Target.
23   Q.  And do you recall whether you've ever seen
24   any ads for Macy's or Target while you were
25   browsing online?                            12:24:29

Page 113

29 (Pages 110 - 113)

1   A.  Yes, I have seen ads for Macy's and
2   Target.
3   Q.  Have you ever clicked on those ads?
4   A.  Yes.
5   Q.  Okay.  I want to ask a couple questions   12:24:38
6   now about your use of the Chrome browser, which,
7   as you know, is at the heart of this lawsuit.
8        To the best of your recollection,
9   Ms. Trujillo, when did you first start using
10  Chrome?                              12:24:58
11  A.  I would say around 2008.
12  Q.  What did you like about Chrome when you
13  started using it in 2008?
14  A.  The Google search engine.
15  Q.  Okay.  Anything else?              12:25:26
16  A.  I preferred Chrome over the browser I had
17  at the time in 2008, which I think was -- I can't
18  recall what -- I can't recall the other browser,
19  but I -- did -- when I discovered Chrome, I did
20  prefer it.                           12:26:11
21  Q.  Does Safari jog your memory any?  You
22  might have --
23  A.  No, it's not Safari.
24  Q.  You might have submitted dis- -- it's not
25  Safari.  Okay.                        12:26:18

Page 114

1        I was going to say you might have
2   submitted discovery responses in this case where
3   you listed Safari as another browser that you've
4   used, so I just thought I'd mention that.
5        But it wasn't Safari that you were using   12:26:29
6   prior to 2008?
7   A.  I've used Safari, but in 2008 I can't
8   recall what I was using.
9   Q.  Okay.
10  A.  It just --                        12:26:38
11  Q.  And --
12  A.  Chrome was --
13  Q.  I'm sorry.  Go ahead.
14  A.  Chrome was new to me, and I liked it.
15  Q.  And I think you mentioned having        12:26:45
16  discovered Chrome.  Can you tell me how you
17  discovered the browser?
18  A.  I don't know who it was.  It was a -- a
19  friend or a loved one said, "Why are you using
20  that browser?  You should" -- it was -- it was     12:27:08
21  suggested to me.
22  Q.  Okay.  Someone suggested that you switch
23  from the browser you were using prior to 2008 or
24  into -- up to 2008 on to Chrome.  And safe to say
25  you did that?                        12:27:25

Page 115

1   A.  Yes.
2   Q.  Tried it out for a bit?
3   A.  Yes.
4   Q.  Safe to say you enjoyed the experience?
5   A.  Yes.  And I found over time that some --   12:27:34
6   in the workplace, I had to have -- or they were
7   using primarily Chrome.
8   Q.  Okay.  So was that beneficial to you, in
9   any way?
10  A.  Yes, it was beneficial because I could    12:27:59
11  access the different services.
12  Q.  And what services do you have in mind or
13  were you using back then?
14  A.  Being able to browse the web at a decent
15  pace or a decent speed.              12:28:30
16  Q.  Okay.  Anything else beyond using the
17  Chrome browser in terms of the Google services
18  that you just mentioned?
19  A.  Anything else such as?
20  Q.  You mentioned that it was beneficial      12:28:55
21  because you could access the different services.
22  A.  Mm-hmm.
23  Q.  So I'm wondering, besides using Chrome to
24  browse the web, were there any other Google
25  services that you had in mind?       12:29:05

Page 116

1   A.  Gmail.
2   Q.  Okay.  Anything else?  It's okay if -- if
3   you -- if you don't have anything.  Again, it's
4   not designed to be a memory test.  If you happen
5   to know.                             12:29:32
6   A.  Gmail, Google search.
7   Q.  Okay.  So you used Chrome in 2008.  You
8   used it in the years that followed as well; is
9   that -- is that right?
10  A.  Yes.                             12:29:51
11  Q.  Okay.  Do you still use Chrome to this
12  day?
13  A.  Yes.
14  Q.  Okay.  How often would you say that you
15  use Chrome this year, in 2022?  Do you use it      12:30:01
16  every day, a couple times per week, or on some
17  other cadence?
18  A.  On a daily basis.
19  Q.  Okay.  Do you use Chrome in both modes,
20  incognito and a non-incognito mode daily?        12:30:22
21  A.  It depends on what I'm looking at or what
22  I'm visiting.  I'll use incognito if I want it to
23  be private.  And that varies from day-to-day.
24  Q.  Okay.  When did you first start having
25  concerns, Ms. Trujillo, about Google's collection   12:30:48

Page 117

30 (Pages 114 - 117)

1  about your data?
2  A.  I would say six or seven years ago when I
3  started using incognito, I started noticing
4  things.  And when I read the article about Google
5  tracking information while I'm in incognito mode,   12:31:36
6  it really resonated with me because it angered me
7  that this was affecting my privacy and my
8  browsing.
9  Q.  Okay.  And you started using Chrome in
10  2008.  When did you start using incognito mode for   12:31:58
11  Chrome?
12  A.  About 2015, 2016 -- 2016.
13  Q.  Any reason why you weren't using incognito
14  mode to safeguard your privacy online before 2015?
15  A.  It was 2016.  And I hadn't known about   12:32:21
16  incognito mode before then.
17  Q.  So from 2008 to 2016, that eight-year --
18  entire eight-year period where you were using
19  Chrome, you were not aware that there was a
20  feature in the browser called "incognito mode"?   12:32:42
21  A.  That's correct, I was not aware.
22  Q.  Okay.  And is it your testimony that at no
23  point prior to 2016 did you review -- sorry, did
24  you use Chrome in incognito mode?
25  A.  That's correct.  Before that time, I had   12:33:02

Page 118

1  not used incognito mode because I did not know
2  about incognito mode.
3  Q.  Okay.  And when you first started using
4  incognito mode in 2016, did you trust the browser
5  with your personal data?   12:33:20
6  A.  Yes.
7  Q.  Why is that?
8  A.  Because the privacy policy said that I was
9  in control and that when I was in incognito mode
10  that my information would not be collected.   12:33:41
11  Q.  Okay.  And -- and, again, we're going to
12  get to the privacy policy and incognito -- the
13  incognito screen in a minute.  And I'm going to
14  ask that when we talk through that disclosure, you
15  show me where in there it contains that specific   12:33:59
16  representation.
17  But until then, let me ask just a couple
18  more questions about your browsing history.
19  You mentioned using Safari and Chrome.
20  Are you aware of any other browsers you've used   12:34:19
21  within the past decade?  Would Internet Explorer,
22  for example, be a browser you might have used?
23  A.  Internet Explorer, yes.
24  Q.  Was that the one you were using back in
25  2008?   12:34:42

Page 119

1  A.  I do believe it was Internet Explorer that
2  I was using.
3  Q.  Okay.  Did you review any documents or
4  information online at or around the time you
5  switched from Internet Explorer to Chrome?   12:34:54
6  MS. BAEZA:  Objection.  Form.  Vague.
7  THE WITNESS:  Did I review any documents?
8  Such as?
9  BY MS. CRAWFORD:
10  Q.  Like any information online about Chrome,   12:35:14
11  for example, before switching over to it from
12  Internet Explorer.
13  A.  No, I did not.
14  Q.  Okay.  What type of devices have you used
15  Chrome on in the past?  I think you mentioned   12:35:30
16  having a mobile phone; is that right?
17  A.  Yes.
18  Q.  Do you have any other types of devices?
19  A.  Yes.  I've used Chrome on desktops,
20  laptops, and mobile phones.   12:35:50
21  Q.  Okay.  So the desktop computer that you
22  mentioned, would that be a work PC or a Mac?
23  A.  Work PC.
24  Q.  Okay.  Do you also have a home computer?
25  A.  Yes.   12:36:10

Page 120

1  Q.  Is that a PC or a Mac?
2  A.  My home computer now is my laptop; it's a
3  Mac.  And I have also a laptop PC.  And I do not
4  currently have a desktop.
5  Q.  Okay.  Do you share any of those devices   12:36:42
6  you just mentioned with other people?
7  A.  Yes, I do, all three.
8  Q.  Okay.  You mentioned a work computer and
9  two laptops.
10  Are those the three devices that you share   12:37:02
11  with other users?
12  A.  It's work computer, one -- one PC that's
13  used often, another PC that's used not as often,
14  and my mobile phone.
15  Q.  Okay.  And those are the three devices   12:37:34
16  that you share with other users?
17  A.  Those are the devices I share.
18  Q.  Okay.  How many other people use each of
19  those devices, starting with your work computer?
20  A.  My work computer is -- it's just me; but,   12:37:58
21  you know, maybe sometimes I'll let somebody, if
22  they need to look something up or -- use my
23  computer.  They -- you know, just something quick.
24  The other devices, just whenever.  I mean,
25  they're just shared.  My mobile phone is -- say if   12:38:34

Page 121

31 (Pages 118 - 121)

JURAT

I, MONIQUE TRUJILLO, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken remotely on the 11th day of February, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this _____ day of _____, 2022, at _____.

_____
MONIQUE TRUJILLO

Page 294

1 JOMAIRE CRAWFORD, ESQ.
2 jomairecrawford@quinnemanuel.com
3                    FEBRUARY 16, 2022
4 RE: BROWN V. GOOGLE LLC
5 FEBRUARY 11, 2022, MONIQUE TRUJILLO, JOB NO. 5077549
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10 to schedule a time to review the original transcript at
11 a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13 Transcript - The witness should review the transcript and
14 make any necessary corrections on the errata pages included
15 below, notating the page and line number of the corrections.
16 The witness should then sign and date the errata and penalty
17 of perjury pages and return the completed pages to all
18 appearing counsel within the period of time determined at
19 the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21 Counsel - Original transcript to be released for signature
22 as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24 time of the deposition.
25

Page 296

CERTIFICATE OF REPORTER
I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:
That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;
That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;
I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.
Further, that if the foregoing pertains to the original transcript of a deposition in a federal case. before completion of the proceedings, review _____ ] was not reques
I _____ hereunto subscr
I _____ UARY, 2022

Hanna Kim, CLR, CSR No. 13083

Page 295

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2 Transcript - The witness should review the transcript and
3 make any necessary corrections on the errata pages included
4 below, notating the page and line number of the corrections.
5 The witness should then sign and date the errata and penalty
6 of perjury pages and return the completed pages to all
7 appearing counsel within the period of time determined at
8 the deposition or provided by the Federal Rules.
9 _x_ Federal R&S Not Requested - Reading & Signature was not
10 requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 297

75 (Pages 294 - 297)

# EXHIBIT 30

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4    CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
 5    CASTILLO, and MONIQUE
      TRUJILLO individually and on
 6    behalf of all other similarly  No.
      situated,                      4:20-cv-03664-YGR-SVK
 7
                    Plaintiffs,
 8
            vs.
 9
      GOOGLE LLC,
10
                    Defendant.
11    _____/
12
13
14
           VIDEO-RECORDED DEPOSITION OF DAVID NELSON
15
                  REMOTE ZOOM PROCEEDING
16
                     Tampa, Florida
17
                 Wednesday, July 6, 2022
18
19
20
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 126                     Job No. 5302302
```

Page 1

**Page 2**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4  CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
 5  CASTILLO, and MONIQUE
    TRUJILLO individually and on
 6  behalf of all other similarly   No.
    situated,              4:20-cv-03664-YGR-SVK
 7
        Plaintiffs,
 8
        vs.
 9
    GOOGLE LLC,
10
        Defendant.
11  _____/
12
13
14      Video-recorded deposition of DAVID NELSON, taken
15  on behalf of the Defendant, Remote Zoom Proceeding from
16  Tampa, Florida, beginning at 12:04 p.m. Eastern Daylight
17  Time and ending at 3:50 p.m. Eastern Daylight Time, on
18  Wednesday, July 6, 2022, before Leslie Rockwood Rosas,
19  RPR, CSR No. 3462.
20
21
22
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFFS:
 4      MORGAN & MORGAN
 5      BY: RYAN MCGEE, ESQ.
 6        JOHN YANCHUNIS, ESQ.
 7      201 North Franklin Street, 7th Floor
 8      Tampa, Florida 33602
 9      (813) 223-5505
10      rmcgee@forthepeople.com
11      jyanchunis@forthepeople.com
12
13      BOIES SCHILLER FLEXNER LLP
14      BY: HSIAO (MARK) C. MAO, ESQ.
15      44 Montgomery Street, 41st Floor
16      San Francisco, California 91401
17      (415) 293-6800
18      mmao@bsfllp.com
19
20      BY: JAMES LEE, ESQ.
21      100 SE Second Street, Suite 2800
22      Miami, Florida 33131
23      (305) 539-8400
24      jlee@bsfllp.com
25
```

**Page 4**

```
 1  APPEARANCES (Continued):
 2
 3      BOIES SCHILLER FLEXNER LLP
 4      BY: ALISON L. ANDERSON, ESQ.
 5      725 South Figueroa Street, 31st Floor
 6      Los Angeles, California 90017
 7      (213) 995-5720
 8      alanderson@bsfllp.com
 9
10  FOR THE DEFENDANT:
11      QUINN EMANUEL URQUHART & SULLIVAN, LLP
12      BY: CARL W. SPILLY, ESQ.
13      1300 I Street NW, Suite 900
14      Washington, D.C. 20005
15      (202) 538-8000
16      carlspilly@quinnemanuel.com
17
18      BY: STEPHEN A. BROOME, ESQ.
19      865 South Figueroa Street, 10th Floor
20      Los Angeles, California 90017
21      (213) 443-3000
22      stephenbroome@quinnemanuel.com
23
24
25
```

**Page 5**

```
 1  APPEARANCES (Continued):
 2
 3  Also Present:
 4      Liam Timmons, Summer Associate, Quinn Emanuel
 5        Urquhart & Sullivan, LLP
 6      Robert Fenton, Videographer
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1 might be an indicator for; is that correct?

2     MR. MCGEE: Object to the form.

3     You can answer.

4     THE WITNESS: I don't. I suspect that there is

5 a way to tell but Google never shared that with us.   13:26:03

6     Q. BY MR. SPILLY: Okay. So other than a witness

7 telling you in an interview that they were using private

8 browsing mode on their browser, you have no way of

9 knowing for certain whether information produced by

10 Google was private browsing information; is that correct?   13:26:30

11     MR. MCGEE: Object to the form.

12     You can answer, Mr. Nelson.

13     THE WITNESS: So no personal knowledge, but I --

14 I would say in Professor Zervas' own report, and I can

15 give you the paragraph number if needed, he discusses   13:26:47

16 that in Incognito mode, it does not prevent a website

17 such as Google from knowing the IP address and following

18 all the locations within that website. In

19 Professor Zervas' own report.

20     Q. BY MR. SPILLY: Okay. When witnesses told you   13:27:14

21 they were using private browsing mode, did you ever

22 confirm those witnesses' statements?

23     A. No, sir. I don't know that there would have

24 been a way to do so.

25     Q. Okay. So the only basis for your opinion that   13:27:28

Page 58

---

1     Q. And when witnesses told you they were in private

2 browsing mode on their browser, how did that come up in

3 the context of these interviews?

4     A. They volunteered the information, sir. All

5 three of them.   13:29:25

6     Q. Okay. And what did they say?

7     A. All three of them were slightly different, but

8 all three of them were along the lines of: "I'm

9 surprised you have that information because I was in

10 private browsing mode and I thought it was secret."   13:29:41

11     Q. Okay. In the information that was produced

12 related to those three interviewees, was the Google

13 account field that you mentioned earlier absent?

14     A. I don't know, sir.

15     Q. Okay. But you didn't look at the information   13:30:05

16 produced by Google to confirm these witnesses'

17 statements; is that correct?

18     A. So that was not an important thing at the time

19 of these cases, sir.

20     Q. Okay. And the answer, then, to my question is   13:30:20

21 "yes"?

22     A. You'll have to rephrase -- you'll have to

23 restate the question, sir.

24     Q. Okay. You didn't look at the information

25 produced by Google to confirm the three witnesses'   13:30:34

Page 60

---

1 information produced by Google came from users using a

2 browser in private browsing mode is because the suspects

3 told you they were using private browsing mode on their

4 browser; is that correct?

5     A. And the previously described spreadsheets with   13:27:51

6 the lack of the Google user identifier.

7     Q. How many suspects said that they were using

8 private browsing mode in these interviews?

9     A. At least three, sir. I don't recall how many

10 exactly, but at least three that I can remember.   13:28:18

11     Q. How many of these interviews did you conduct

12 during your time with the FBI?

13     A. I don't understand the question, sir.

14     Q. How many interviews of targets or subjects of

15 FBI cyber crime investigations did you interview during   13:28:35

16 your time at the FBI?

17     A. I don't have that number. Quite a few.

18     Q. Okay. Is it fair to say that it was more than a

19 hundred?

20     A. Probably, sir.   13:28:52

21     Q. Okay. More than 200?

22     A. No, sir.

23     Q. Okay. So somewhere in the range of 100 to 200

24 interviews; is that correct?

25     A. Subject interviews, yes, sir.   13:29:04

Page 59

---

1 statements about private browsing mode that are

2 referenced in paragraph 37 of Exhibit 1; is that correct?

3     A. That's correct, I had no reason to, sir. I had

4 no reason to doubt that they were in private browsing

5 mode.   13:30:52

6     Q. Okay. Which browsers were those witnesses

7 using?

8     A. I don't have that information, sir.

9     Q. Okay. Were those users signed into a Google

10 account when they were browsing in private browsing mode?   13:31:10

11     MR. MCGEE: Object to the form.

12     THE WITNESS: I don't have that information,

13 sir.

14     Q. BY MR. SPILLY: Okay. Were those -- were those

15 users signed out of a Google account when they were   13:31:21

16 browsing in private browsing mode?

17     MR. MCGEE: Object to the form.

18     You can answer.

19     THE WITNESS: I'm pretty sure that's the same

20 question. But I don't know, sir.   13:31:31

21     Q. BY MR. SPILLY: It was slightly different. It's

22 the inverse, signed into versus signed out of.

23     All right. So staying with Exhibit 1, if you go

24 to paragraph 25.

25     Let me know when you're there.   13:32:02

Page 61

16 (Pages 58 - 61)

1   A.  Yes, sir, I'm there.

2   Q.  So it says -- paragraph 25 of Exhibit 1 says,

3  "During my approximate 18 years performing cyber crime

4  investigations with the FBI, I routinely submitted

5  administrative subpoenas to Google relying on IP          13:32:22

6  addresses (along with the approximate date range or (sic)

7  the suspected activity) of subjects suspected of criminal

8  activity."

9        Did I read that correctly?

10   A.  Not quite, but that's the gist of it, sir.          13:32:36

11   Q.  Sorry.

12        So what do -- in paragraph 25 of Exhibit 1, what

13  do you mean by "relying on IP addresses"?

14   A.  Meaning I submitted a request to Google with an

15  IP address and a date and time range and requested        13:32:57

16  information.

17   Q.  Okay.  And then it says -- the second sentence

18  of paragraph 25 of Exhibit 1 says, "Without a court

19  order, Google regularly produced responsive information

20  associated with the submitted IP address."                13:33:14

21        Do you see that?

22   A.  I do.

23   Q.  Okay.  What do you mean by "responsive

24  information" in this paragraph?

25   A.  They provided information related to the IP           13:33:26

Page 62

---

1   A.  So it would be -- it usually would start with a

2  Google search, and then we would see results from the

3  Google search.

4        And then typically we would see if they went to

5  one of those results from their search.  We would see      13:35:44

6  that in the spreadsheet.

7        But further than that, if they went, say, to

8  another page in the website, we wouldn't see that

9  additional information.

10   Q.  Okay.  So the information -- so the responsive        13:36:03

11  information referenced in paragraph 25 of Exhibit 1 means

12  activity on Google websites; is that correct?

13   A.  Starting on Google websites is one of the pieces

14  of responsive information that they provided.

15   Q.  Okay.  And what's the other piece?                    13:36:26

16   A.  User information is -- is previously entered.

17  User information:  Name, maybe address.  We would ask

18  for, essentially, any and all account information related

19  to the IP address.

20   Q.  Okay.  And by "account information" you mean you      13:36:44

21  would ask for Google account information; is that

22  correct?

23   A.  Yes, sir.

24   Q.  Okay.  And then -- all right.  How many of these

25  administrative subpoenas did you personally submit?        13:37:08

Page 64

---

1  address in question.

2   Q.  Okay.  And that information would contain search

3  activity; is that correct?

4   A.  It could, yes.  It could -- subscriber

5  information if it was a paid account.  Maybe billing        13:33:43

6  information.  Name, although that's not necessarily

7  verifiable information.  But search terms, yes.

8   Q.  Okay.  And would Gmail be another example of the

9  type of information that might be provided in response to

10  an administrative subpoena, as referenced in paragraph 25   13:34:11

11  of Exhibit 1?

12   A.  Yes, sir.

13   Q.  Okay.  And I heard you say if it was a paid

14  account there would be billing information; is that right?

15   A.  Yes, sir.                                             13:34:28

16   Q.  What do you mean by "paid account"?

17   A.  If they were hosting a domain or had a Google

18  drive space that they were paying for and they had a

19  credit card on file with their account, we might get that

20  information as well.                                        13:34:50

21   Q.  Okay.  And did that include browsing activity?

22   A.  Not complete browsing activity.  Limited

23  browsing activity is the way I would characterize it.

24   Q.  Okay.  What is the difference between complete

25  and limited?                                               13:35:25

Page 63

---

1   A.  I don't have a number, sir.  I don't know.

2  Quite a few.

3   Q.  Would you have used your own name to submit an

4  administrative subpoena to Google?

5   A.  It was signed by an FBI supervisor, so unlikely       13:37:30

6  that my name would be on it.  There was a time when I was

7  the acting supervisor, and I may have signed them as the

8  acting supervisor.  But typically it would be the

9  supervisor's name for an administrative subpoena, not my

10  name.                                                       13:37:49

11   Q.  Okay.  And when you submitted these requests to

12  Google along with an IP address, you also submitted

13  information regarding the approximate dates of the

14  suspected criminal activity; is that correct?

15   A.  Yes, sir.                                             13:38:09

16   Q.  Okay.  So at the time that you submitted

17  information to Google for one of these administrative

18  subpoenas, is it fair to say that you had already begun

19  investigating suspected illegal activity associated with

20  the IP address?                                            13:38:26

21   A.  Many times the subpoena to Google for an IP

22  address may have been the first investigative activity

23  after we received either a complaint or information

24  regarding criminal activity.

25   Q.  Okay.  Are you aware that a Google accountholder      13:38:55

Page 65

---

17 (Pages 62 - 65)

1    MR. MCGEE:  Object to the form.

2    You can answer.

3    THE WITNESS:  I think it's more -- more than a

4  speculation.  I believe that in this process, I learned

5  that bit of information.  I don't recall exactly where it    15:01:19

6  came from, but I believe it's more than just speculation.

7    Q.  BY MR. SPILLY:  Did you learn that from counsel?

8    A.  I -- I don't know.  I just said I don't know

9  where I learned it from.  But I believe that Google has

10  that ability.  And it makes sense to me.              15:01:44

11    Q.  Again, you don't know for sure one way or the

12  other?

13    A.  No, I don't.  No, I don't.

14    Q.  Okay.  And you're not offering an expert opinion

15  on that; is that correct?                              15:01:59

16    A.  Correct.

17    Q.  And if Google said that it has no way to

18  distinguish between private browsing information on the

19  one hand and regular browsing information on the other,

20  based on the information that is stored in Google's     15:02:16

21  server side logs, you wouldn't have any basis to dispute

22  that; is that correct?

23    MR. MCGEE:  Objection to the form.

24    You can answer.

25    THE WITNESS:  I would have the statements of    15:02:28

Page 102

1  subjects I interviewed who indicated that information was

2  done during private browsing mode.

3    Q.  BY MR. SPILLY:  Okay.  But you're not offering

4  an expert -- you're not opining as an expert that --

5  sorry.  Strike that.                                    15:02:59

6    Okay.  Going back to paragraph 35 of Exhibit 1.

7  Let me know when you're back there.

8    A.  I'm there, sir.

9    Q.  Okay.  So 35 discusses the cyberstalking

10  investigation that you participated in; is that correct?    15:03:21

11    A.  Yes, sir.

12    Q.  Okay.  And the second sentence, it says, "The

13  email account" -- "This email account was created with

14  false information"; is that correct?

15    A.  Yes, sir.                                      15:03:34

16    Q.  Was the email account that you're referencing in

17  this paragraph a Gmail account?

18    A.  It was, sir.

19    Q.  Okay.  How many people were involved in the

20  investigation that you described in paragraph 35 of     15:03:59

21  Exhibit 1?

22    A.  Can you repeat that question, sir?

23    Q.  Sure.

24    So just this investigation in paragraph 35 of

25  Exhibit 1 that you're describing, I just want to know how    15:04:22

Page 103

1  many people were involved in that investigation.  And I

2  can clarify, actually.

3    How many people were involved in conducting that

4  investigation?

5    A.  So, respectfully, I think that's going to     15:04:40

6  potentially identify which investigation this is.  And,

7  therefore, I don't believe I'm at liberty to answer that

8  question, because I believe it could lead to the

9  identification of the investigation, which I am not

10  permitted to disclose.                                 15:04:59

11    Q.  Okay.  But there were multiple people involved;

12  is that correct?

13    A.  I'm not saying that.  I'm not saying -- I'm not

14  answering the question, sir.

15    Q.  Okay.  Trained law enforcement personnel were    15:05:13

16  involved in the investigation referenced in paragraph 35

17  of Exhibit 1, though; correct?

18    A.  As with any investigation, yes.

19    Q.  Okay.  And that investigation involved forensic

20  analysis of a fake email account to identify IP address,    15:05:31

21  and then submit that to Google; is that correct?

22    A.  When you say "forecast investigation," I mean,

23  we read the email headers.  So it wasn't like we had to

24  use a forensic tool to decipher the headers.  It was just

25  my expertise being able to decode the headers and know    15:05:55

Page 104

1  what the originating IP address was.  So if you want to

2  call that forensic technique, that's fine with me.

3    Q.  Okay.  The fact that you were able to piece

4  together the identity of the suspect referenced in

5  paragraph 35 of Exhibit 1 does not mean that it's easily    15:06:15

6  done by Google; is that correct?

7    MR. MCGEE:  Object to the form, speculation.

8    THE WITNESS:  I think it would be very easy

9  knowing what I know now on what Google retains.  I think

10  Google easily could have identified this person and     15:06:34

11  probably saved us a whole lot of time in our

12  investigation.

13    Q.  BY MR. SPILLY:  All right.  And just to

14  reiterate, you haven't reviewed any documents produced by

15  Google in this case; correct?                         15:06:48

16    A.  Other than the Complaint, no, sir.

17    Q.  And that is not -- and you understand that the

18  doc -- that the Complaint is not a document produced by

19  Google; correct?

20    A.  That is correct, yes.  So the answer to the    15:06:58

21  question is no, I have not reviewed any Google documents

22  for this case, sir.

23    Q.  Okay.  So when you say that -- when you

24  reference your understanding of what Google retains, that

25  is completely -- that is not based on reviewing any    15:07:14

Page 105

27 (Pages 102 - 105)

1    MR. MCGEE:  Yeah, sure.

2    MR. SPILLY:  Okay.  Be back in five.

3    THE VIDEOGRAPHER:  Going off the record at

4  3:41 p.m.

5    (Recess.)                    15:44:51

6    THE VIDEOGRAPHER:  We are back on the record at

7  3:46 p.m.

8    MR. SPILLY:  Okay.  Welcome back, Mr. Nelson.

9    So I just have some questions about questions

10  your counsel just asked you.              15:46:03

11

12         FURTHER EXAMINATION

13  BY MR. SPILLY:

14    Q.  So you said a few minutes ago that while you

15  were at the FBI, you came to the conclusion that the    15:46:12

16  absence of account information in the Excel spreadsheets

17  produced by Google was an indicator someone was using

18  private browsing mode; is that fair?

19    A.  That's fair, sir.

20    Q.  Okay.  And you said you came to that conclusion    15:46:32

21  based in part on conversations with suspects; is that

22  correct?

23    A.  That's correct, sir.

24    Q.  Okay.  I believe earlier today you said only

25  three suspects ever told you they were using private    15:46:48

Page 118

1  browsing mode in interviews; is that correct?

2    A.  That's correct.  It also is based on other

3  agents' experiences.

4    Q.  Okay.  What years did the suspects -- the three

5  suspects that you referenced -- sorry.  Strike that    15:47:06

6  again.

7      For the three suspects that volunteered that

8  information to you in interviews, what years did those

9  interviews take place?

10    A.  Respectfully, sir, I can't answer questions    15:47:21

11  about the cases themselves, and that includes the dates.

12    Q.  Okay.  How would it be relevant to your

13  investigation that a subject is using private browsing

14  mode?

15    A.  The only way it would be relevant to my    15:47:44

16  investigation is to show that they were trying to hide

17  the activity.

18    Q.  Okay.  And so do you view trying to hide

19  browsing activity as a reason for suspicion?

20    A.  By itself not necessarily, but in conjunction    15:48:03

21  with other case information, it certainly would be an

22  indicator -- if someone's trying to hide their activity,

23  that -- that is clearly an indicator important in my

24  investigation.

25    Q.  Okay.  And we -- but we also discussed earlier    15:48:28

Page 119

1  that some -- there are users out there that do not have

2  Google accounts; is that correct?

3    A.  Certainly.

4    Q.  Okay.  And so if Google produced information

5  about a user without a Google account, then the Google    15:48:44

6  account field in that Excel would also be empty; correct?

7    A.  I don't know for sure, but that makes sense.

8    Q.  Well, if Google -- if a user doesn't have a

9  Google account, then they won't have any account info; is

10  that correct?                    15:49:09

11    A.  Correct.

12    MR. SPILLY:  Okay.  All right.  I believe that

13  is it for me.

14    MR. MCGEE:  I do have one followup, if you'll

15  indulge me.  I apologize for not asking this.    15:49:19

16

17         FURTHER EXAMINATION

18  BY MR. MCGEE:

19    Q.  Mr. Nelson, during one of the breaks you were

20  asked to look at your records of when you were first    15:49:26

21  contacted by David Reign.  Do you recall doing that?

22    A.  I did, yes.

23    Q.  And what was the date of that contact from

24  Mr. Reign?

25    A.  It was May 5th.                15:49:39

Page 120

1    Q.  And did you also look through those records to

2  determine the first time that you spoke with counsel at

3  Morgan & Morgan?

4    A.  I did, sir.

5    MR. SPILLY:  Objection.  Leading.    15:49:52

6    Q.  BY MR. MCGEE:  And what date was that?

7    A.  It was May 9th, sir.

8    Q.  So when you were earlier testifying to the

9  May 29th date, after refreshing your recollection with

10  these records, are the May 5th and May 9th dates more    15:50:06

11  accurate?

12    MR. SPILLY:  Objection.  Leading and form.

13    THE WITNESS:  Yes, sir, they are.  They're the

14  actual dates.

15    Q.  BY MR. MCGEE:  Okay.  Thank you.    15:50:20

16    MR. MCGEE:  That's all I have.

17    THE REPORTER:  Off the record, Counsel?

18    MR. SPILLY:  Yeah.  That's it for me.

19    Thank you, Mr. Nelson.

20    THE VIDEOGRAPHER:  We are off the record at    15:50:29

21  3:50 p.m., and this concludes today's testimony given by

22  David Nelson.  The total number of media used was one and

23  will be retained by Veritext Legal Solutions.

24    (Time Noted:  3:50 p.m.)

25       --oOo--

Page 121

31 (Pages 118 - 121)

1  I declare under the penalty of perjury under the
2  laws of the State of California that the foregoing is
3  true and correct.
4      Executed on _____, 2022, at
5  _____, _____.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 122

1  RYAN MCGEE, ESQ.
2  rmcgee@forthepeople.com
3              July 11, 2022
4  RE: BROWN VS. GOOGLE LLC
5  JULY 6, 2022, DAVID NELSON, JOB NO. 5302302
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10  to schedule a time to review the original transcript at
11  a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13  Transcript - The witness should review the transcript and
14  make any necessary corrections on the errata pages included
15  below, notating the page and line number of the corrections.
16  The witness should then sign and date the errata and penalty
17  of perjury pages and return the completed pages to all
18  appearing counsel within the period of time determined at
19  the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21  Counsel - Original transcript to be released for signature
22  as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24  time of the deposition.
25

Page 124

1  STATE OF CALIFORNIA    ) ss:
2  COUNTY OF MARIN        )
3
4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6      That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9      That testimony of the witness and all objections
10  made by counsel at the time of the examination were
11  recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16      I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21  this 11th day of July, 2022.
22
23
24
25      LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 123

1  _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2  Transcript - The witness should review the transcript and
3  make any necessary corrections on the errata pages included
4  below, notating the page and line number of the corrections.
5  The witness should then sign and date the errata and penalty
6  of perjury pages and return the completed pages to all
7  appearing counsel within the period of time determined at
8  the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10  requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

32 (Pages 122 - 125)

# EXHIBIT 31

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   CHASOM BROWN, WILLIAM BYATT,    ) Case No.

    JEREMY DAVIS, CHRISTOPHER       ) 5:20-cv-03664-LHK-

5   CASTILLO, and MONIQUE TRUJILLO ) SVK

    individually and on behalf of    )

6   all other similarly situated,    )

                                  )

7           Plaintiffs,        )

                                  )

8           vs.                )

                                  )

9   GOOGLE LLC,                 )

                                  )

10          Defendant.         )

    _____ )

11

12

13      VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

14           DEPOSITION OF MARK KEEGAN

15

16           Friday, July 15, 2022

17      Remotely Testifying from Rye, New York

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 5302317

1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3
4  CHASOM BROWN, WILLIAM BYATT,   ) Case No.
   JEREMY DAVIS, CHRISTOPHER      ) 5:20-cv-03664-LHK-
5  CASTILLO, and MONIQUE TRUJILLO ) SVK
   individually and on behalf of  )
6  all other similarly situated,  )
                                  )
7        Plaintiffs,              )
                                  )
8        vs.                      )
                                  )
9  GOOGLE LLC,                    )
                                  )
10       Defendant.               )
   _____ )
11
12
13
14       Virtual videoconference video-recorded
15       deposition of MARK KEEGAN, remotely
16       testifying from Rye, New York, taken on
17       behalf of the Defendant, on Friday,
18       July 15, 2022, before Hanna Kim, CLR,
19       Certified Shorthand Reporter, No. 13083.
20
21
22
23
24
25
                                              Page 2

1  REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
2
3  For Plaintiffs:
4      BOIES SCHILLER FLEXNER LLP
5      BY:  JAMES LEE, ESQ.
6      BY:  MARK C. MAO, ESQ.
7      BY:  BEKO O. REBLITZ-RICHARDSON, ESQ.
8      100 SE 2nd St., 28th Floor
9      Miami, Florida 33131
10     305.539.8400
11     jlee@bsfllp.com
12
13
14  For Defendant:
15     QUINN EMANUEL URQUHART & SULLIVAN, LLP
16     BY:  ALYSSA "ALY" OLSON, ESQ.
17     BY:  STEPHEN BROOME, ESQ.
18     865 S. Figueroa Street, 10th Floor
19     Los Angeles, California 90017
20     213.443.3000
21     alyolson@quinnemanuel.com
22
23
24
25
                                              Page 3

1  REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
2
3  Also Present:
4      AN TRUONG, ESQ, Simmons Hanly Conroy
5      (For Plaintiffs in Calhoun v. Google)
6      LAURA O'LAUGHLIN, Analysis Group
7      ANUSHKA SIKDAR, Boies Schiller Flexner
8      ROBERT FENTON, Video Operator
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 4

1              INDEX OF EXAMINATION
2
3  WITNESS:  MARK KEEGAN
4  EXAMINATION                          PAGE
5      BY MS. OLSON:                    10, 243
6      BY MR. LEE:                      241
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5

2 (Pages 2 - 5)

1 of -- of any information that would guide me

2 otherwise.

3    Q.  You knew that your browsing wasn't

4 nonexistent completely because the Incognito screen

5 explains that it's visible to your ISP and websites    19:57:07

6 you visit; right?

7    A.  I can't say that I did.  I had confidence,

8 as I can recall now, as best I can recall now, I had

9 confidence that when I was in Incognito, that --

10 that this, you know, never happened.  Yeah, I -- I    19:57:37

11 didn't sit around and -- and debate the issue like

12 we are now.  And -- and if you asked me these --

13 these questions prior to my involvement in this

14 case, and I -- and I thought harder about these

15 issues, you know, maybe -- maybe I'd have some more    19:57:55

16 clarity there.  It's hard to say.  But my

17 recollection of using Incognito was that this --

18 this never happened.

19    Q.  But were you trying to get privacy from

20 Google specifically or from all companies that    19:58:18

21 engage in tracking?

22    A.  I would say all companies that -- when

23 using Incognito, I was under the impression and the

24 hope that -- that, as I said, that this -- this was

25 not something that was being retained in the data    19:58:52

Page 222

1 BY MS. OLSON:

2    Q.  And so, you wouldn't want to facilitate

3 Google's receipt of this data from private browsing

4 mode users; is that correct -- or is that accurate?

5        MR. LEE:  Wait, what?  Say that again.    20:00:57

6 BY MS. OLSON:

7    Q.  Is it accurate that you wouldn't want to

8 facilitate Google's receipt of this data from

9 private browsing mode users?

10    A.  Yes.  That's -- that I -- of -- of -- of    20:01:09

11 me or of other users?

12        MR. LEE:  Yeah, let me object to the --

13 beyond the scope of his expert opinion.  If

14 Ms. Olson wants to ask you about your personal

15 beliefs for the next 20 minutes, it's fine, but I'd    20:01:29

16 ask for a running objection on beyond the scope.

17 BY MS. OLSON:

18    Q.  The question was, is it accurate that you

19 wouldn't want to facilitate Google's receipt of data

20 from other private browsing mode users?    20:01:44

21    A.  Correct.  Yes.  I -- I would not want to

22 be a party to that.

23    Q.  Does your website currently use Google

24 Analytics?

25    A.  I -- I think it does, but I'm not the    20:01:57

Page 224

1 sphere.

2    Q.  And later in the paragraph, you say

3 that -- that you "did not know that Google receives

4 and saves from my private browsing mode activities,

5 including in particular when I am visiting    19:59:23

6 non-Google websites without being signed in to any

7 Google account.  This was something I first learned

8 when I became engaged as an expert for this

9 litigation." [As read]

10    What exactly was it that you learned that    19:59:36

11 you did not know before after you were engaged in

12 this litigation?

13        MR. LEE:  Document speaks for itself.

14        THE WITNESS:  Well, I learned that there

15 is a immense amount of data collection that's going    19:59:51

16 on at the user level when you're in Incognito.  So

17 that's -- that's what I learned.  That was a --

18 quite a surprise to me personally.

19 BY MS. OLSON:

20    Q.  Were you offended by it?    20:00:17

21    A.  Offended?  I --

22        MR. LEE:  Beyond the scope.

23        THE WITNESS:  Yeah, I -- I wouldn't use

24 the word "offended."  I was surprised.  I -- I felt

25 a little naive.    20:00:38

Page 223

1 person that deals with that.

2    Q.  Does your website currently use Google Tab

3 Manager?

4        MR. LEE:  Beyond the scope.

5        THE WITNESS:  I don't know what that is.    20:02:19

6 BY MS. OLSON:

7    Q.  Are you aware if those services -- well,

8 I'll just stick with Google Analytics since you said

9 you didn't know what Google Tab Manager was.

10    Are you aware if the Google Analytics    20:02:39

11 services on your websites continues [verbatim] to

12 function whether or not users are in Incognito mode?

13        MR. LEE:  Beyond the scope.

14        THE WITNESS:  As I sit here, to the extent

15 that we have Google Analytics, and I think we do.    20:02:52

16 So yes, I hadn't thought about this until you just

17 asked this question.  But, yes, it -- it does appear

18 that I am now a party to this, that people who come

19 to our website because if we're using analytics,

20 that -- that from what I've learned in this case,    20:03:20

21 that Google is, you know, tracking them, if -- if

22 they're in private browsing mode and -- and

23 collecting data and doing -- doing -- doing what

24 they do.

25    So this is one of those, you know, gun to    20:03:34

Page 225

1 your head situations that we were discussing
2 earlier. Not thrilled about that. But analytics is
3 an important tool for a small company like mine and
4 for a big company like somebody else's, which is why
5 it's as successful as it is.                20:03:55
6        So will my disappointment in -- in
7 participating in this behavior, which I now know
8 very clearly users do not expect to happen, I don't
9 love it, but you don't see myself removing analytics
10 from my website.                       20:04:19
11 BY MS. OLSON:
12    Q.  Okay. Let's turn to the next paragraph,
13 26.
14    A.  Okay.
15    Q.  In paragraph 26, you say, "This study of    20:04:37
16 1,075 U.S. respondents was designed and executed in
17 accordance with accepted standards of survey
18 research. This survey followed the guide" -- "the
19 guiding principles for survey research for the
20 purpose of litigation as outlined by Shari Diamond."  20:04:59
21 [As read]
22        Do you see that?
23    A.  I do.
24    Q.  Would you agree that Shari Diamond is an
25 authority on best practices for survey research used   20:05:10

Page 226

1 in litigation?
2    A.  I would.
3    Q.  And you cite this paragraph in both of
4 your reports? Or a similar paragraph in both of
5 your reports?                        20:05:24
6    A.  I do.
7    Q.  And you believe that a reliable and valid
8 survey should follow these principles, the ones
9 listed in the bullets of paragraph 26?
10    A.  I do.                         20:05:35
11    Q.  The second bullet is a "Rigorous and valid
12 survey design that is probative of the relevant
13 issues in the matter."
14        Do you see that?
15    A.  I do.                          20:05:48
16    Q.  And we briefly mentioned it earlier, but
17 did you conduct any pretesting?
18    A.  I did not.
19    Q.  Why not?
20    A.  Well, for both of these surveys, I did not   20:05:56
21 see the need to -- to pretest the survey. There was
22 nothing that concerned me about the design. There
23 was nothing that stood out to me as potentially
24 problematic. So in that scenario, I -- I would not.
25 And in this case, did not do any pretesting.      20:06:19

Page 227

1    Q.  And in the approximately 1,000 consumer
2 surveys I believe you said you've conducted, in
3 approximately how many would you say you've
4 pretested versus not pretested?
5    A.  Those surveys expand over my, you know,    20:06:36
6 20-plus year career. So there's going to be recency
7 bias in this answer, just to warn you. But so I --
8 I don't know. I would speculate that pretesting is
9 certainly a tool in the -- in the tool kit,
10 available when I have concerns about whatever they    20:07:06
11 are. And they -- they vary wildly -- widely for a
12 particular survey. So there's certainly
13 circumstances pretesting is appropriate. And I've
14 used it. In what percentage, I don't know. But
15 it -- it is something that I've done when I have    20:07:32
16 certain concerns about a survey. And it can be
17 helpful. This was not one of the cases.
18    Q.  What is your methodology for determining
19 whether a case, it would be helpful to do a pretest,
20 and when it would not be helpful?             20:07:53
21    A.  Sure.
22        Well, I -- I have and I do conduct a great
23 many surveys. So when I have -- when I have a --
24 a -- or when I don't have a comfort level to say the
25 inverse, that this survey -- again, it's -- it's   20:08:15

Page 228

1 really hard to -- to put this in a group because
2 there are lots of reasons that I might pretest.
3        But if -- if I don't have a sufficient
4 comfort level that some component or the survey or
5 the flow or the questions or wording or, you know,   20:08:36
6 any -- any number of things may be problematic for
7 any number of reasons, then that would trigger a
8 concern about pretests and something that I would
9 bring up with the client and suggest that we engage
10 in so that we can get the survey right. And maybe   20:08:57
11 we have it right.
12        But there's a sufficient concern of
13 whatever it is that we want to bring this to --
14 however you do the pretest. And there's -- you
15 know, there's a number of ways to do that. But we   20:09:15
16 want to bring this to some small group of -- of
17 respondents and -- and evaluate something. And then
18 regroup and see if it's -- see if we've learned
19 anything and if any changes can be made.
20    Q.  Without conducting pretest for either of   20:09:38
21 your surveys, how do you have scientific evidence
22 that respondents found your survey questions clear?
23    A.  Well, pretests are typically not
24 quantitative, right. They're qualitative. So
25 that's not scientific evidence, as you describe it.   20:10:05

Page 229

JURAT

I, MARK KEEGAN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken remotely on Friday, July 15, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this _____ day of _____, 2022,

at _____.

_____
MARK KEEGAN

Page 246

---

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, b_____ _____oceedings, review of the t_____ _____ot requested.

I_____ _____ _____ hereunto subscri_____

Dated:

Hanna Kim
CLR, CSR No. 13083

Page 247

---

Mr. Mark Keegan

mark@keegandonato.com

July 20, 2022

RE: CHASOM BROWN vs. GOOGLE LLC

July 15, 2022, Mark Keegan (JOB NO. 5302317)

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 248

---

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 249

---

63 (Pages 246 - 249)

# EXHIBIT 32

1                  UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
3
4
5    CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
6    CASTILLO, and MONIQUE
     TRUJILLO, individually and on
7    behalf of all other similarly
     situated,
8
                    Plaintiffs,
9                                        No.
          vs.                            4:20-cv-03664-YGR-SVK
10
     GOOGLE LLC,
11
                    Defendant.
12   _____/
13
14
15         VIDEOTAPED DEPOSITION OF BRUCE SCHNEIER
16                Remote Zoom Proceedings
17                Cambridge, Massachusetts
18                 Monday, July 18, 2022
19
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 233                    Job No. 5312337

                                              Page 1

```
 1        UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5   CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
 6   CASTILLO, and MONIQUE
     TRUJILLO, individually and on
 7   behalf of all other similarly
     situated,
 8
            Plaintiffs,
 9                          No.
     vs.        4:20-cv-03664-YGR-SVK
10
     GOOGLE LLC,
11
            Defendant.
12   _____/
13
14
15        Videotaped deposition of BRUCE SCHNEIER,
16   taken on behalf of Defendant, Remote Zoom Proceedings
17   from Cambridge, Massachusetts, beginning at 11:03 a.m.
18   Eastern Daylight Time and ending at 7:20 p.m. Eastern
19   Daylight Time, on Monday, July 18, 2022, before
20   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21   No. 3462.
22
23
24
25
                                                    Page 2
```

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS:
 4       SUSMAN GODFREY LLP
 5       BY: IAN B. CROSBY, ESQ.
 6       1201 Third Avenue, Suite 3800
 7       Seattle, Washington 98101
 8       (206) 516-3861
 9       icrosby@susmangodfrey.com
10          -and-
11       BY: ALEXANDER P. FRAWLEY, ESQ.
12       3201 Avenue of the Americas, 32nd Floor
13       New York, New York 10019
14       (212) 729-2044
15       afrawley@susmangodfrey.com
16
17       BOIES SCHILLER FLEXNER LLP
18       BY: HSIAO (MARK) C. MAO, ESQ.
19       44 Montgomery Street, 41st Floor
20       San Francisco, California 91401
21       (415) 293-6800
22       mmao@bsfllp.com
23
24
25
                                                    Page 3
```

```
 1   APPEARANCES (Continued):
 2
 3       MORGAN & MORGAN
 4       BY: JOHN A. YANCHUNIS, ESQ.
 5       201 North Franklin Street, 7th Floor
 6       Tampa, Florida 33602
 7       (813) 223-5505
 8       jyanchuis@forthepeople.com
 9
10
11   FOR THE DEFENDANT:
12       QUINN EMANUEL URQUHART & SULLIVAN, LLP
13       BY: STEPHEN A. BROOME, ESQ.
14          ALYSSA (ALY) G. OLSON, ESQ.
15       865 South Figueroa Street, 10th Floor
16       Los Angeles, California 90017
17       (213) 443-3285 (Mr. Broome)
18       (213) 443-3000 (Ms. Olson)
19       stephenbroome@quinnemanuel.com
20       alyolson@quinnemanuel.com
21
22   Also Present:
23       Elvert Ling, Quinn & Emanuel summer associate
24       Haimin Zhang, Analysis Group
25       Robert Fenton, Videographer
                                                    Page 4
```

```
 1              I N D E X
 2
 3
 4   MONDAY, JULY 18, 2022
 5
 6   WITNESS                 EXAMINATION
 7   BRUCE SCHNEIER
 8
 9   BY MR. BROOME              10
10   BY MR. CROSBY              220
11
12
13
14   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15          (NONE)
16
17
18
19
20
21
22
23
24
25
                                                    Page 5
```

2 (Pages 2 - 5)

1    Q.  Okay.  Have you ever offered any expert opinions
2  in the field of marketing?
3    A.  No, I have not.
4    Q.  Okay.  Do you promote yourself as an expert in
5  marketing?                        11:51:23
6    A.  I certainly do not.
7    Q.  And we talked before, you don't have any
8  expertise in consumer surveys; correct?
9    A.  I do not.
10   Q.  Do you have any expertise in measuring consumer   11:51:38
11  expectations?
12   A.  I do not.
13   Q.  Do you have any expertise in online advertising?
14   A.  Some.  I know how it works.
15   Q.  Okay.  Have you ever promoted yourself as an    11:51:55
16  expert in online advertising?
17   A.  I have not.
18      MR. CROSBY:  Object to the form.
19   Q.  BY MR. BROOME:  I think your current title is
20  securities technologist; is that right?  Or maybe you   11:52:05
21  have many titles.
22   A.  What do you mean by "title"?
23   Q.  I think in paragraph 7 you say you work
24  internationally as a security technologist.
25   A.  That is correct.              11:52:31

Page 38

1    Q.  Okay.  And what is a security technologist?
2    A.  A security technologist is to me someone who
3  combines security, technology, and people.  So as opposed
4  to a cryptographer, who knows mathematical security.  As
5  opposed to an internet security expert, who might know   11:52:51
6  web security or Linux security.
7      I work at the intersection of security,
8  technology, and people.  And security technologist is the
9  best phrase I've come up with to describe that.  That's
10  why I kind of react to the title because it's not really   11:53:08
11  bestowed on me by anybody.
12      Title to me implies that it's something you're
13  given by your boss or the government or somebody.  That's
14  what I call myself.  Because I tried to encapsulate that,
15  that security and people and technology, all three.   11:53:27
16   Q.  And when you say "security," what are you
17  referring to?
18   A.  I refer to security pretty broadly.  In a sense,
19  my career has been an endless series of generalizations.
20  I started out in mathematical security and cryptography   11:53:43
21  and then worked in computer security, network security,
22  general security tech, and then really into the economics
23  of security, the psychology of security, the sociology
24  and then public policy of security.  So I'm really
25  meaning that very broadly.           11:54:05

Page 39

1    Q.  Okay.  You mentioned computer security and
2  network security.  Is security -- do you mean keeping
3  people out of systems in which they should not be in?
4    A.  That's part of it; right?  If I'm running a
5  prison, it's keeping people into systems where they    11:54:23
6  shouldn't be out.
7      So security is very complex, and you probably
8  don't want to debate this at length.  I spend time in my
9  books trying to define this term.  It's a very squishy
10  term.  Because it really has to do with things that are   11:54:41
11  permitted, which implies a permitter, and what does that
12  mean.  Things that are prohibited.
13      And it's not just access.  In data, we worry
14  about availability.  You know, if someone took this Zoom
15  down, it would be a security violation, even though they   11:54:58
16  might not be eavesdropping on us.
17      It's integrity.  If someone went in and changed
18  the transcript of this deposition, we'd both be pissed
19  off, but that -- you know, they may not have stolen
20  anything.  Security has a lot of aspects to it.     11:55:13
21   Q.  Okay.  Paragraph 7 says you presently hold the
22  title of Chief Security Architecture at Inrupt Inc.  What
23  is Inrupt?
24   A.  Inrupt is a company that is commercializing
25  solid.  I'll do this relatively quickly.  Solid is a web   11:55:34

Page 40

1  standard invented by Tim Berners-Lee, who actually
2  invented the web -- he's kind of an important guy -- for
3  distributed data ownership.
4      Inrupt is a company that is commercializing that
5  standard.  If you know anything about Linux, Inrupt is   11:55:51
6  basically the RedHat of solid.
7    Q.  You have formerly been a board member of the
8  Tor Project?
9    A.  I was, yes.
10   Q.  And what is the Tor Project?         11:56:17
11   A.  The Tor Project is a browser extension that
12  allows people to browse the web anonymously.
13   Q.  Including from Google?
14   A.  Google employees can browse the web anonymously
15  using Tor, yes.                 11:56:39
16   Q.  Can users of the Tor browser extension browse
17  the web anonymously from Google, meaning Google would not
18  receive any of their data while they browse the web?
19   A.  So anonymously doesn't mean not receiving --
20  back to the question.  So from Google, I'm interpreting   11:57:01
21  to mean from Google's offices.  So I am inside Google and
22  I am using Tor.
23   Q.  Okay.
24   A.  I think you mean something differently.
25   Q.  Yeah, I do.  I'm thinking more along the lines   11:57:14

Page 41

11 (Pages 38 - 41)

1 of the data collection described or at issue in this

2 case.

3       Is -- is using the Tor browser extension a way

4 to obtain privacy from Google?  Let me -- I didn't --

5    A.  Yeah.                          11:57:33

6    Q.  -- solve the problem.

7    A.  Yeah.  You need to be careful.

8    Q.  Yeah, let me try and solve the problem better.

9       Is using the Tor browser extension a way

10 to prevent Google tracking through analytics and ad      11:57:45

11 services?

12    A.  No.

13    Q.  So, sorry, explain to me again what it is that

14 Tor provides, how Tor provides privacy.

15    A.  So Tor is the anonymity service.  So when you    11:58:09

16 use the Tor browser, the website you visit doesn't know

17 who you are based on browsing.  And it does that through

18 onion routing.

19       So basically what Tor does is it routes your

20 browser requests through a network of other browsers    11:58:33

21 around the world, and it uses three of them, which we can

22 talk about mathematically why that's a good idea if you

23 want.  I suspect you don't.  But the recipient at the

24 other end, let's say it's The New York Times,

25 substantiate it, doesn't know that you are making the    11:58:48

Page 42

1 query.

2       Now it does not protect you if you log in.  And

3 if you log into The New York Times, you've logged in.

4 And you know, this is something that it turns out to be

5 hard to educate Tor users on sometimes.         11:59:05

6       But specifically, it hides your routing on the

7 internet.  So it has uses in evading censorship.  Maybe

8 you are a user in China.  Maybe you are a user in a

9 company that blocks The New York Times.  They don't want

10 you to read the newspaper at work.  Tor will mask that    11:59:22

11 from the network.

12    Q.  What -- what is it masking specifically?  Is it

13 masking your IP address, your user agents, or all of the

14 above?

15    A.  Now so I don't want to get it wrong.  It will    11:59:41

16 mask the IP address.  Whether it masks the other things

17 depends on the details that I -- I would look it up

18 before I answered.

19    Q.  Okay.  Fair.

20       And I asked you whether it would provide privacy   12:00:06

21 or prevent, rather.  I asked you whether it would prevent

22 Google from tracking you using the analytics and

23 advertising services that are at issue in this case, and

24 you said "no."  And why is that?

25    A.  So the analytics, as far as I understand it,    12:00:27

Page 43

1 happen at the web server.  The web server contracts with

2 Google, puts Google code on its server, and that

3 communicates back to Google.

4       So what Tor is doing, it's protecting the

5 connection between myself and The New York Times.  It is    12:00:46

6 limiting, but not -- but not to zero the data The New

7 York Times gets about me.  Anything The New York Times

8 gets is transmitted back to Google.

9       So Google is getting the full take of what The

10 New York Times is sending it.                   12:01:06

11    Q.  But The New York Times doesn't know who you are;

12 right?

13    A.  They might.

14       MR. CROSBY:  Object to the form.

15    Q.  BY MR. BROOME:  How about if you don't sign in?    12:01:13

16    A.  But if there is a cookie from a previous sign

17 in.  I don't know how The New York Times might be

18 figuring out who you are.  I also don't know how Google

19 might figure out who you are based on the information

20 provided.                                      12:01:29

21       Tor is designed so that people in the middle,

22 like you are the Chinese firewall making sure that I

23 don't go to Wikipedia and look up Falun Gong.  That's the

24 threat model.

25       And what Tor is providing is anonymity so that    12:01:44

Page 44

1 China doesn't know what you're looking up on Wikipedia,

2 Wikipedia doesn't know where they're sending the Falun

3 Gong article to, and the censor in the middle just sees

4 opaque traffic.  That's the threat level.  That's what

5 Tor does.                                      12:02:03

6       Anything else is going to be ancillary, and it's

7 going to depend on a lot of things that I don't know.

8 But it's not what Tor is intended to do.

9    Q.  You've published 12 books; is that right?

10    A.  I like to say approximately 12 because it's    12:02:22

11 harder than you think to count books.

12    Q.  Okay.  How many -- how many books were on the

13 topic of privacy?

14    A.  Many books touch on privacy, but one book was

15 about privacy, and that's Data and Goliath.     12:02:39

16    Q.  Okay.  What about Click Here to Kill Everybody?

17    A.  Privacy's in there, but it's really about

18 security and safety.

19    Q.  Okay.  Do you know approximately how many copies

20 of Data and Goliath were sold?                 12:02:51

21    A.  I should know that, and the answer is yes, but I

22 can't remember.

23    Q.  Can you ballpark it?

24    A.  Under a hundred thousand, but not much under a

25 hundred thousand.                              12:03:03

Page 45

12 (Pages 42 - 45)

Page 46

1  Q.  Okay.  And what about Click Here to Kill
2  Everybody?
3  A.  Less.  I'm going to say 35,000.  I'm guessing
4  here, but it will be ballparking.
5  Q.  Do you encourage your students to read your      12:03:18
6  books in any of your classes?
7  A.  You know, I think it's kind of rude to tout your
8  own stuff in your own class.  It feels a little
9  self-serving.  I do assign chapters of some of my books,
10 but I give them a photocopy so they don't have to buy it,   12:03:34
11 but I try to have them read other -- other authors.  I
12 figure they get enough of me in class.  They don't need
13 more of me.
14 Q.  Have you ever testified as an expert in
15 litigation before?                                          12:03:46
16 A.  I have.
17 Q.  How many times?
18 A.  I don't know, but the last page of my CV -- oh,
19 wait.  Cross that out.  I've never testified in trial.
20 You people always settle before it goes to trial.  I have  12:04:00
21 been deposed, and the number of times is in the last page
22 of the CV if you count them up.
23    MR. BROOME:  I won't take offense to the term
24 "you people."
25    Okay.  We've been going a little over an hour    12:04:16

Page 47

1  now.  Why don't we take a ten-minute break.
2     MR. CROSBY:  That's fine.
3     THE WITNESS:  All right.  So I'm going to go on
4  mute.
5     THE VIDEOGRAPHER:  Going off the record at       12:04:25
6  12:04 p.m.
7     (Recess.)
8     THE VIDEOGRAPHER:  We are back on the record at
9  12:15 p.m.
10 Q.  BY MR. BROOME:  Mr. Schneier, can you turn to    12:15:14
11 paragraph 19 of your report.
12 A.  I'm there.
13 Q.  Okay.  It says:  "I have spent my entire career
14 focused on issues relating to privacy, reviewing articles
15 and materials regarding online privacy."                   12:15:40
16    Does that include articles relating to private
17 browsing mode?
18 A.  I mean, it's inconceivable that I didn't read
19 anything about private browsing before this case.  So I'm
20 going to answer yes.                                        12:16:00
21 Q.  Can you recall the gist of any articles you read
22 about private browsing before you got involved in this
23 case?
24 A.  You know, I've read so much after that that's
25 all tainted, and I'm not convinced I can give you a clean   12:16:14

Page 48

1  break before and after.
2  Q.  Do you recall reviewing articles -- well, strike
3  that.  Let me start again.
4     Before you got involved in this case, do you
5  recall reviewing articles saying that Incognito mode or    12:16:30
6  private browsing mode is not really private; it only
7  deletes data locally?
8  A.  Not specifically.  No.
9  Q.  Do you recall any articles explaining that
10 Incognito mode doesn't prevent Google from tracking you?   12:16:56
11 A.  Not specifically, no.
12 Q.  Putting aside whether you can recall the
13 specific articles, can you recall generally reviewing
14 articles on those topics?
15 A.  Again, it's inconceivable that I didn't because  12:17:11
16 I think some were written and things go across my orbit,
17 but I cannot recall specifically.
18 Q.  So you think it might -- sorry.  I didn't mean
19 to interrupt.
20    So you think it's likely that you did read an     12:17:32
21 article explaining that Incognito mode doesn't prevent
22 Google from tracking you?
23 A.  Not --
24    MR. CROSBY:  Object to the form.  Sorry.
25    THE WITNESS:  Google specifically, I'm even less  12:17:46

Page 49

1  sure about, but if there are articles -- if there are
2  articles that talk about the Incognito mode in the press
3  before the lawsuit, I likely will have seen them.
4  Q.  BY MR. BROOME:  Okay.  Before you got involved
5  in this case, you were aware that Incognito mode only      12:18:10
6  deletes data locally from your browser and doesn't
7  prevent Google from tracking you; correct?
8  A.  Before this case, I was aware that browsers in
9  general have a privacy mode that prevents them from
10 storing data locally.  I'm not a Chrome user, and I don't  12:18:32
11 know if I specifically thought about what other means
12 Google as a company has tracking Chrome users when
13 they're using the Chrome-branded Incognito mode.
14 Q.  Okay.  Let me ask the question slightly
15 differently.                                               12:19:01
16    During the class period, you were aware that
17 private browsing mode in general only delete data locally
18 from your browser; correct?
19 A.  So using the word "only," which I would want to
20 strike.  If you strike the word "only," I would agree      12:19:15
21 with your sentence.  And actually, if you add "during at
22 least part of the class period."  Because now it's like
23 when's the class period and when's the first article.  I
24 couldn't give you the dates.
25 Q.  Okay.                                                  12:19:31

13 (Pages 46 - 49)

Page 62

1    Q.  So as of 2015, you were aware that Google
2  collects a lot of information through Google Analytics;
3  correct?
4    A.  As of 2014, but yes.
5    Q.  2014, okay.  But as of 2014 -- and the process    12:37:15
6  through which you understood Google to be tracking users
7  was the same process that's alleged in plaintiffs'
8  Complaint; right?  The scripts are embedded in the web
9  page and sends information to Google's servers?
10   A.  I would add one of the processes, but yes.    12:37:34
11   Q.  Okay.  Fair.
12      And then you say here:  "Those sites let Google
13  track me through them."
14      What do you mean by that?
15   A.  What I'm trying to say in very general terms --    12:37:43
16  because, remember, I'm writing for a general audience
17  here so I'm sloppy with tech, all throughout this book.
18  What I'm saying is, you're reviewing The New York Times.
19  The New York Times has Google Analytics.  The New York
20  Times has a relationship with Google that's allowing    12:38:03
21  Google to track what I do on The New York Times.
22   Q.  Okay.  Okay.  Now let's go to -- just for the
23  record, the language that I read to you from your book,
24  I'm reading it from Exhibit 3, but you're reading it from
25  the hard copy of your actual book; right?    12:38:31

Page 63

1    A.  I am, and I'm verifying that it's the same.  If
2  there's a difference, I'll let you know.  There shouldn't
3  be.
4    Q.  Yeah, and I'll just ask just so there's no
5  disputes down the road between me and plaintiffs'    12:38:44
6  counsel, that if there is a difference between the
7  language that I'm reading in Exhibit 3 and the hard copy
8  of your book, if you would please let us know.
9    A.  I will let you know and also by -- figure out
10  why it's wrong.    12:38:57
11   Q.  Okay.  Excellent.
12      So now if you go to 215 in the hard copy, and
13  it's 153 of the PDF.
14   A.  I'm here.
15   Q.  Sorry, I think I got it wrong.  It might be 152.    12:39:50
16   A.  Oh, you're right.  It's 215.
17   Q.  It's 215.  It might be 151 of the PDF, though,
18  for everyone else.
19   A.  215 is the totally the paragraph you want.
20   Q.  Yeah.  It sounds like you're there already.    12:40:03
21      Okay.  Right.
22      So in the -- there's a paragraph there that says
23  "Block Surveillance" in big bold letters.  And then the
24  next paragraph says:  "Privacy enhancing technologies, or
25  PETs, can help you block mass surveillance.  Lots of    12:40:26

Page 64

1  technologies are available to protect your data.  For
2  example, there are easy-to-use plug-ins for browsers that
3  monitor and block sites that track you as you wander the
4  internet:  LightBeam, Privacy Badger, Disconnect,
5  Ghostery, FlashBlock, and others."    12:40:43
6      Do you see that?
7    A.  I do.
8    Q.  And do you still -- is that still your opinion
9  today, that there are lots of PETs that can help you
10  block mass surveillance?    12:40:52
11   A.  Yes.
12   Q.  And those include easy-to-use plug-ins such as
13  those that you mention there?
14   A.  Now some of those, I don't recognize so they
15  might be gone, but certainly Ghostery and Privacy Badger    12:41:05
16  are still around.
17   Q.  And are those popular plug-ins?
18   A.  I actually don't know market penetration.
19   Q.  Okay.  Do you use any of any of these plug-ins?
20   A.  I do.    12:41:21
21   Q.  Which ones do you use?
22   A.  I would rather not say.
23   Q.  Okay.  That's fine.
24      But you use one of the ones on the list there;
25  is that fair?    12:41:34

Page 65

1    A.  Yes.
2    Q.  Okay.
3    A.  Actually for this, I'm willing to say.  I use
4  Privacy Badger.
5    Q.  Privacy Badger.  Okay.  And do you know others    12:41:40
6  who use plug-ins?
7    A.  I do.
8    Q.  And do these plug-ins prevent Google from
9  tracking you?
10   A.  You know, plug-ins -- none of these plug-ins are    12:41:52
11  all or nothing.  So if you -- I think you're asking me do
12  any of these plug-ins prevent Google from tracking you in
13  any way possible.  I don't know, but if you're asking for
14  advice, I would say don't count on it.
15   Q.  Do they prevent -- would they prevent the data    12:42:12
16  collection that's at issue in this case?
17   A.  It depends.  Maybe some of it.
18   Q.  Okay.  What would it prevent and what would
19  it -- what would they not prevent?
20   A.  All right?  So which tool are you asking me    12:42:36
21  about?
22   Q.  Let's start with Privacy Badger.
23   A.  This is hard.  So now I have to actually --
24  right?  This is where you go into exactly what Privacy
25  Badger blocks.  I know it is an ad blocker.    12:42:48

1   Q. Uh-huh.
2   A. I know it is stripping out a bunch of data that
3   goes with the URL to the recipient sites. And I mean, I
4   have not done the analysis where I looked at exactly what
5   Privacy Badger strips out, what is collected at issue. I   12:43:05
6   would hesitate to offer an opinion on that without doing
7   real research.
8   Q. Okay. And then in the next sentence, it says:
9   "Remember that the private browsing option on your
10  browser only deletes data locally." Right?   12:43:23
11  A. Yep. So you have it here is me knowing this in
12  2014.
13  Q. Okay. And then you go on and you say: "So
14  while it's useful for hiding your porn viewing habits
15  from your spouse, it doesn't block internet tracking."   12:43:37
16      Correct.
17  A. Yes. And I would talk about it as porn mode.
18  That's actually a common way I would refer to it, as porn
19  mode.
20  Q. All right. So as of 2014, you were aware that   12:43:48
21  the private browsing option on your browser only deletes
22  data locally; correct?
23  A. Right. That is -- in general, private browsing
24  deletes data locally. And what I'm saying there, it
25  doesn't do anything about who you're visiting; right?   12:44:06

Page 66

1   The New York Times, when you're logged in, it's still
2   going to be able to identify you with the articles you
3   read, and private browsing doesn't do that.
4       If you're logged into Facebook, and Facebook is
5   doing a whole lot of tracking, it's not preventing that.   12:44:22
6   It is working in the browser.
7   Q. And it's not preventing Google from tracking
8   you; right?
9   A. So I'm not convinced I knew about Google's
10  private browsing specifically. So I'm talking about   12:44:35
11  private browsing in general.
12  Q. Yes. No, and I'm not saying -- I'm not talking
13  about Google's private browsing, either.
14      But my point is that you knew in 2014 that
15  private browsing modes in general do not prevent   12:44:49
16  companies like Google from tracking you across the web.
17  A. Yes.
18      MR. CROSBY: Object to the form.
19  Q. BY MR. BROOME: And you knew in 2014 that
20  private browsing modes in general do not prevent Google   12:45:17
21  from tracking you on non-Google websites; correct?
22  A. I mean, so the question is did I know it
23  explicitly? If you'd asked me then, I probably would
24  have said probably not. Remember, all I'm knowing is
25  sort of how private browsing works in general. I am not   12:45:40

Page 67

1   privy to any of Google's marketing, I'm not reading their
2   splash screen, I am not paying attention to what Google's
3   executives are saying about Chrome or private browsing in
4   general.
5       I'm -- you know, just based on what I know about   12:45:56
6   how a private browsing system would work in a browser,
7   I'm saying that.
8       So my -- my knowledge is in a sense specialized.
9   It's as a security expert, not as a browser user.
10  Q. Right. And you say that private -- the private   12:46:13
11  browsing mode option on your browser only deletes data
12  locally; right?
13  A. Yes.
14  Q. And so you knew in 2014 -- well, let me
15  rephrase.   12:46:26
16      When you say "locally," you mean just from the
17  user's browser; correct?
18  A. Yes.
19  Q. Okay. And how did you learn that fact?
20  A. I don't remember.   12:46:50
21  Q. Do you think it was based on sort of reviewing
22  material out there on the web or, you know, did you
23  perform some, you know, technical tests?
24  A. I did not perform any technical tests. If
25  others did, I would have read about it. In that same   12:47:13

Page 68

1   paragraph, I'm pointing to various documents that I said
2   people should use to protect their privacy. I'm sure I
3   would have read those.
4       There are people doing research in this area,
5   and I would have known about their research.   12:47:32
6   Q. Uh-huh.
7       In the end notes, which I think are at page 356
8   of the hard copy, 250 of the PDF.
9   A. Uh-huh.
10  Q. Maybe 249 of the PDF, actually.   12:48:17
11  A. I see it on page 356.
12  Q. Yep, 356.
13  A. That's the end notes to page 215.
14  Q. It says -- there's a sort of blue text -- for
15  us, it's blue. It may not be for you.   12:48:39
16  A. It's blue for me. I know what you're going to
17  tell me.
18  Q. Remember that the private browsing and then it
19  says Sara M. Watson?
20  A. Yes.   12:48:49
21  Q. Does that mean that the statement that you made
22  in your book where you say: "Remember that private
23  browsing mode clears your browsing history only from
24  your -- I'm sorry, no, I got that wrong. I was reading
25  the wrong text.   12:49:03

Page 69

18 (Pages 66 - 69)

1    Q.  Yeah, I mean you know who he is.  Yeah.  Yep.
2        And okay.  And then it says, it goes on to quote
3  him as saying:  "In practice, they offer very little."
4        Do you see that?
5    A.  I do.                                    13:03:12
6    Q.  And then the article of the author of the
7  article writes:  "The modes are short-term options that
8  can limit what's recorded on one machine, not an
9  all-encompassing way to be private online.  The main
10 functionality of Incognito mode is not saving cookies or   13:03:28
11 browser history on the hard disk, meaning that private
12 browsing sessions are isolated from normal ones."
13       Do you agree with each of those two statements?
14   A.  Yes.
15   Q.  In the next paragraph, she writes:  "Third-party   13:03:46
16 tracking is generally achieved by websites storing
17 cookies on a visitor's hard drive.  Cookies are generally
18 used to track repeat visits from the same user and build
19 up a profile that's used to serve ads.  In Incognito
20 mode, your data is tracked in exactly the same way as      13:04:07
21 normal mode.  The difference is that in ordinary
22 circumstances, trackers are unable to link a private
23 browsing session with a normal session."
24       Do you see that?
25   A.  I do.                                    13:04:21

1    Q.  And do you agree with the statements in that
2  paragraph?
3    A.  You know, I would cross out the word "exactly"
4  if I were writing it, and I would probably be more
5  equivocal than unable.                         13:04:31
6    Q.  Okay.  And why would you cross out the word
7  "exactly"?
8    A.  Because if there's any difference at all, the
9  statement's incorrect.
10   Q.  Okay.                                    13:04:42
11   A.  You asked me if I agree with it.  Right?  If
12 it's like blue instead of red.  Suddenly it's different.
13   Q.  Yeah, that's fair.
14   A.  So without knowing the details, you know, those
15 kind of words are -- can be hard to use.        13:04:53
16   Q.  Okay.  Would you agree that an individual who
17 read this book -- or sorry, this article would understand
18 that private browsing mode does not prevent Google from
19 tracking them across the web?
20   A.  I have no idea --                         13:05:21
21       MR. CROSBY:  Object to the form.
22       THE WITNESS:  I have no idea what readers
23 understand.
24   Q.  BY MR. BROOME:  Okay.  Do you have any idea what
25 class members understand?                       13:05:30

1        MR. CROSBY:  Object to the form.
2        THE WITNESS:  It's not something I have studied
3  so I don't have an opinion on it.
4    Q.  BY MR. BROOME:  Okay.  And you don't have any
5  opinion about what class members understand when they     13:05:43
6  read the disclosures that are at issue in this case; is
7  that accurate?
8        MR. CROSBY:  Object to the form.
9        THE WITNESS:  My opinions are really informed
10 on, you know, what's being disclosed, the general          13:05:55
11 principles we have in the industry of how to disclose
12 things, and it's not based on surveys on what readers
13 understand.
14       MR. BROOME:  Okay.  This is probably a good
15 breaking point.  We can take a short break or we can take  13:06:22
16 a lunch break.  It's really up to you.
17       THE WITNESS:  You know, I'm going with what
18 you're good with.
19       MR. BROOME:  Okay.
20       THE WITNESS:  This discussion's on the record,     13:06:31
21 though.
22       MR. BROOME:  Yeah.  Why don't we go off the
23 record for a minute, if that's okay.
24       MR. CROSBY:  Sure.
25       THE VIDEOGRAPHER:  Going off the record at         13:06:38

1  1:07 p.m.
2        (Recess.)
3        THE VIDEOGRAPHER:  We are back on the record at
4  1:25 p.m.
5    Q.  BY MR. BROOME:  Mr. Schneier, I just want to go     13:25:06
6  back to the question I asked you right before the break.
7  I said:  "And you don't have any opinion about what class
8  members understand when they read the disclosures that
9  are at issue in this case; is that accurate?"
10       And your answer was:  "My opinions are really       13:25:23
11 informed, you know, what's being disclosed, the general
12 principles we have in the industry of how to disclose
13 things, and it's not based on surveys on what readers
14 understand."
15       And I take all that, and I think I understand       13:25:34
16 your answer.  But I just -- I just want to try to get a
17 "yes" or "no" to my question, if that's possible.
18       And again, the question was:  You don't have any
19 opinion in this case about what class members understand
20 when they read the disclosures that are at issue in this   13:25:50
21 case?
22   A.  Way to highlight my bad grammar.
23   Q.  No --
24   A.  I was not asked to provide opinions on what
25 class members believe.                          13:26:02

Q. Okay. Sorry. Go ahead. I interrupted you. Go ahead.

A. So I was not asked to provide opinions on what class members believe. I was asked to provide opinions on what Google discloses. So those are my opinions. 13:26:15

Q. Okay. Prior to the Complaint being filed in this case, have you ever used a private browsing mode?

A. I have not, no.

Q. And why is that? I mean, if you're a privacy-focused guy; right? You use extensions and 13:26:42 plug-ins. Why did you never use a private browsing mode?

A. I never used a shared computer.

Q. Okay.

A. I mean that slightly. And if I happen to be on a shared computer, I'm not doing personal browsing. 13:27:06

Q. Okay. All right.

So on this topic of you not opining about what class members or users in private browsing mode understand, I just want to take a look back at your report, which again is Exhibit 1. And if we could go 13:27:42 to -- we'll start at 285.

Let me know when you're there.

A. I'm here.

Q. Okay. In the last sentence on 285 you say: "Google's disclosures give rise to a reasonable 13:28:09

Page 82

expectation that Google will not collect users' private browsing information."

You don't know whether any class members actually had that expectation; correct?

A. That's right. And if you look at the paragraph, 13:28:19 it's about Google's disclosures. About what is being disclosed, not about recipients.

Q. Uh-huh. Okay.

Then if you will turn to 298 -- sorry, not 298. 296. 13:28:53

A. I'm there.

Q. You discuss the splash screen. You say: "The splash screen statement that Chrome won't save your browsing history gives rise to a reasonable expectation that the user's Incognito browsing history will not be 13:29:10 collected or saved by Google."

Do you see that?

A. I do.

Q. And again, you don't know whether any class members or users in private browsing modes actually held 13:29:19 that expectation; correct?

A. That's correct. And again, this sentence talks about what Google discloses and how we in the industry view how disclosures work, what is done, what -- how you disclose to users. So that sentence is about the 13:29:42

Page 83

disclosures, yes.

Q. Right. Okay.

So you're not saying that the splash screen did, in fact, give rise to an expectation that the users Incognito browsing history would not be collected or 13:29:58 saved by Google. You're saying if a user had that expectation, it would be a reasonable one.

Is that what you're getting at?

MR. CROSBY: Object to the form.

THE WITNESS: I think what I'm saying is that 13:30:15 Google's disclosures don't inform users about this difference, and so that the splash screen statement implies that Google is not going to -- not going to save Incognito browsing history.

Q. BY MR. BROOME: And your opinion is just based 13:30:40 on your own reading of the screen?

A. "Just" is a -- is a tough word. I'm not a random person coming in off the street and reading a screen and telling you what I think. I mean, I write books on this stuff. This is what I do. Security and 13:30:57 privacy experts have -- have standards of what disclosure looks like, and we know when it's met and when it's not met. So I kind of object to the word "just."

Q. In 297, again you say: "Google's use of the term 'private' to describe Chrome's Incognito mode gives 13:31:40

Page 84

rise to a reasonable expectation not just that a user's Incognito browsing will not be discoverable by other users of a device, but also that the browsing will not be collected and surveilled by Google."

Do you see that? 13:31:56

A. I do.

Q. And again, I guess similar question: When you say that the use of the word "private" gives rise to this reasonable expectation, you're not opining that any user actually held that expectation; you're just saying that 13:32:11 if a user did, in your opinion, that would be reasonable?

A. Yes.

Q. And therefore, would it also be reasonable if a Google -- sorry, if -- yeah, if an Incognito user read the phrase "now you can browse privately and other people 13:32:35 who use this device won't see your activity," would it also be reasonable for them to expect that Incognito mode provides only local privacy and not privacy from Google?

A. So I think now you're asking me about users, and again, I go back to that I did not survey users, and I'm 13:32:57 really speaking about the disclosures and not about the recipients of those disclosures.

Q. Yes, but I asked you if what you are saying is that Google's use of the term 'private' to describe -- when you say, "Google's use of the term 'private' to 13:33:12

Page 85

1  this case, there was just a ruling where the salaries of
2  a bunch of attorneys was made public.  That has different
3  private implications in our culture than it does in
4  another culture.
5      There will be cultures where your sexual          13:57:54
6  proclivities are more or less private.  So I'm really
7  meaning by that.  And especially over cultures and over
8  times, that what we choose to keep private changes.
9  Cultural, all those words I used.  I'm really referring
10  to the types of things that we agree to keep private.      13:58:11
11  "Agree" is a bad word.  That we might want to keep
12  private.
13      Q.  Okay.  Do you agree that you can have privacy
14  from some but not others?
15      A.  I do.                                        13:58:25
16      Q.  For example, you could have privacy from other
17  people who use your device but not from your ISP; right?
18      A.  That is certainly true.
19      Q.  And you could have privacy from other people who
20  use your device, but not from the websites that you      13:58:41
21  visit; right?
22      A.  Yes.
23      Q.  And so the word "privacy" just in and of itself
24  does not convey necessarily that you are free from
25  observation from everyone?                           13:58:54

Page 102

1  A.  Again, it will depend how it's used.  If I say,
2  you know, when you go to the bathroom, you're private in
3  there, and you find out later there's a camera.  And I
4  say, "Well, don't worry, the camera went to the police; I
5  didn't see it," you're going to say what the hell.  So it      13:59:12
6  depends on lot on how that word's used.
7      Q.  On the splash screen where Google says "now you
8  can browse privately and other people who use your
9  device" -- "your device won't see your activity," is it
10  your opinion that that conveys two separate concepts:      13:59:43
11  One, on the one hand, you can browse privately from
12  Google, and on the other hand, you can browse privately
13  from other people who use your device?
14      A.  I think it's actually kind of like the "camera
15  in the bathroom" story; right?  What I said is:  You go      14:00:02
16  to the bathroom, and it's private.  What the splash
17  screen says is it's private.  There's a period at the
18  end.  There's not a caveat.  There's not like from me,
19  from Google, from your neighbors, from your friends.  It
20  is a -- it's given as a categorical.  And that implies      14:00:23
21  that it is complete.  That it is from everybody.  Because
22  we're not saying only in this way, only in that way.
23      If I wanted to convey to you that when you went
24  into the bathroom, it would be private from me, but the
25  police could watch you, I would kind of say that.  I      14:00:45

Page 103

1  wouldn't say now you can pee privately and put a period
2  on it.  That's a very crappy analogy.  I'm going to
3  change it and do it again.  I'm sorry.
4      Q.  I've got to say I actually really like it.
5      A.  No, it's a bad analogy.                        14:00:59
6      Q.  No, they're good ones.  They're really good ones
7  and they're practical real-world examples.  I like it.
8      A.  But I want to get one, yes, scatological.
9      Q.  Do you agree that by providing -- I guess let
10  me -- let me try and formulate a better question here.      14:01:21
11      Do you agree that if Incognito mode only
12  provides privacy from other people who use your device --
13  well, now I put the answer in the question.  Let me try
14  again.
15      Do you believe that if Incognito mode conceals      14:01:38
16  your browsing activity from other people would use your
17  device, that Incognito mode provides a measure of
18  privacy?
19      A.  Yes.
20      Q.  Okay.  Actually, maybe we will go to -- well,      14:02:05
21  I'll try this again with Data and Goliath, and you can
22  tell me if you want to go back to the source.
23      You have a statement in there that says:  "Most
24  people don't seem to care whether their intimate details
25  are collected and used by corporations.  Most people are      14:02:21

Page 104

1  happy to exchange sensitive personal information for free
2  email, web search, or a platform on which to chat with
3  their friends."
4      Do you agree with those statements?
5      A.  You know, I would not write that today.      14:02:39
6      Q.  Okay.  What's changed?
7      A.  I think people's awareness has changed.  People
8  are more aware of -- of in general how they're being
9  tracked on the internet.  I think there's a feeling of
10  helplessness among people and so "happy," too, is a word      14:02:58
11  I would not use anymore.  And I don't even know if it was
12  right then.  I think people are more grudgingly
13  accepting, in many cases.
14      There's a lot of unawareness.  I find this even
15  in my classes when I try to teach the stuff, that      14:03:20
16  surprised the number of people that are surprised.
17      There was a class last year, and there was
18  someone from Facebook in the class talking about Facebook
19  data collection and how it's used, and people are
20  expressing surprise that a lot of this is happening.      14:03:37
21      And the former employee, who is now a student
22  there, said:  "This is how Facebook works.  Don't you
23  realize that?"
24      So it is an interesting measure of complicated
25  things that are going on.  And you know, that -- those      14:03:52

Page 105

27 (Pages 102 - 105)

1    A. Google -- among other things, Google uses
2  cookies to tracks users, yes.
3    Q. What are the other things that Google uses to
4  track users?
5    A. Google tracks users by unique IDs of devices.    14:09:04
6  Google tracks users by logging in, so your login.  Google
7  tracks users through hidden pixels.  I'm blanking on what
8  they're called -- it's in my report -- and various
9  tracking beacons.  Google tracks users through
10  information it gets from websites.    14:09:24
11    Did I mention browsers and devices?  I think I
12  did.  And there's probably other things, too.  I would --
13  writing this as an article, I would, you know, make sure
14  the list is complete.  That's off the top of my head.
15    Q. Okay.  All right.    14:09:38
16    So going back to the Incognito definition, you
17  used "unknown whose identity is concealed or unavowed."
18    Is -- does Google being the identity of an
19  Incognito user?
20    A. It might.    14:10:04
21    Q. Is that information necessarily conveyed to
22  Google when a user is browsing the internet in Incognito
23  mode on non-Google websites?
24    MR. CROSBY:  Object to the form.
25    THE WITNESS:  Again, this is a bit complicated.    14:10:22
Page 110

1    Q. BY MR. BROOME:  Uh-huh.
2    A. You're asking -- try again.  The problem I think
3  we're having is that these things might be something that
4  Google figures out based on a variety of pieces of
5  information.  So I need to know really what you're saying    14:10:43
6  and is it wholly or is it in parts.  So as you phrase the
7  question, you know, try to be more precise about what you
8  really want to know.
9    Q. Sure.
10    A. And this is legit complicated.    14:10:56
11    Q. Sure.  No, it's okay.
12    Let me try another example.  So user initiates
13  an Incognito session.  All other settings are default.
14    A. Okay.
15    Q. The user initiates an Incognito browsing    14:11:09
16  session.  Goes to The New York Times.  Doesn't log in.
17    A. Right.
18    Q. Goes to The New York Times.  Does Google know
19  the identity of that user?
20    A. Potentially, yes.    14:11:26
21    MR. CROSBY:  Object to the form.
22    Q. BY MR. BROOME:  How so?
23    A. If they can correlate the user's browsing
24  session with other browsing sessions where it knows the
25  identity, then it can link those two.  So in the same way    14:11:38
Page 111

1  you're browsing the web on your computer, and then later
2  you browse the web on your phone, and Google is able to
3  link those two browsing sessions to you, and in one of
4  them, it knows your identity, now it knows your identity
5  in both.  It knows they're the same.    14:12:00
6    Q. Okay.  But in my example, nobody is signed in.
7  They're in Incognito, and nobody has signed into the
8  website and they haven't signed into their Google domain.
9    Have you seen any evidence in this case
10  indicating that Google could then correlate the data from    14:12:14
11  the private browsing session with data from a regular
12  mode browsing session?
13    A. I think in some circumstances, they can, yes.
14    Q. That's not quite my question, though.
15    Have you seen any evidence that Google has    14:12:29
16  actually done that?
17    A. I have not seen evidence about what Google does.
18  Really, my report is about what they could do.  So no, I
19  have not seen reports from Google that show whether they
20  do or do not do these things.    14:12:48
21    Q. Okay.  So if Google does not do these things, if
22  it does not correlate private browsing -- private
23  browsing sessions -- data from private browsing sessions
24  with data from regular mode sessions, and the user has
25  not signed into their account, either at Google or the    14:13:45
Page 112

1  website, in our example The New York Times, does Google
2  know the identity of the user?
3    MR. CROSBY:  Object to the form.
4    THE WITNESS:  There's a lot of hypothetical
5  there.  So you're basically saying -- asking me if Google    14:14:00
6  chooses not to figure out the identity of the user, do
7  they know the user.  That's the way...
8    Q. BY MR. BROOME:  Yeah, that's not how I meant it.
9    A. Okay.
10    Q. I mean, yeah, if Google -- let me think about    14:14:12
11  this.
12    Hypothetical:  A user launches an Incognito
13  window, goes to The New York Times, does not sign into
14  any accounts.  Assume Google does not correlate private
15  browsing data with regular mode data, does Google know    14:14:46
16  the identity of the user?
17    MR. CROSBY:  Object to the form.
18    THE WITNESS:  You know, I'm not -- I don't have
19  access to what Google can do.  And what you -- so I'm
20  going to re-interpret what you're saying.    14:15:03
21    Google chooses not to form the -- what you said.
22  Basically you're asking me is there any other way that
23  Google could identify the user other than not doing the
24  thing they choose not to do.  And the answer is I don't
25  know.  I don't have enough visibility into all of    14:15:22
Page 113

29 (Pages 110 - 113)

1 collected by companies such as Google by seeking refuge
2 in the promise and expectation of going Incognito online?
3   A. No.
4   Q. All right. Let's go to 86.
5     You say: "In the context" -- in the          15:13:31
6 second-to-last sentence. "And in the context of private
7 browsing, users have specifically signaled that they
8 expect their browsing sessions and the associated content
9 to be in fact private. That data point alone is private
10 in and of itself."                              15:13:49
11     Do you see that?
12   A. I do.
13   Q. And the last sentence where you say "that data
14 point alone is private in and of itself," do you mean
15 that the fact that a user is in Incognito mode or private   15:14:00
16 browsing mode should be private?
17   A. You used the word "should." What do you mean be
18 "should"?
19   Q. Or is. I'm not sure. Is -- what -- when you
20 say "that data point," are you saying -- are you          15:14:11
21 referring to -- let me start over.
22     When you refer to "that data point" in the last
23 sentence of paragraph 86, are you -- do you mean the fact
24 that a user is in private browsing mode?
25   A. Yes.                                        15:14:31

Page 126

1   Q. Okay. Next question: Do you -- is it your
2 opinion that the fact that a user is in Incognito mode
3 should be private?
4   A. So "should" is a hard -- is a tough word. When
5 you say "should," under what -- where does that "should"    15:14:48
6 come from? Should implies someone is making a judgment.
7   Q. Uh-huh. Okay. Do you think users have a
8 reasonable expectation of privacy in the fact that
9 they're in a private browsing mode?
10   A. I don't know. That's very different than      15:15:08
11 "should."
12   Q. So when you say that data point is private, what
13 do you mean? Do you mean -- are you talking about the
14 fact that browsers are designed not to indicate that the
15 user is in private browsing mode?                 15:15:29
16   A. What I mean is that when a user signals that
17 they're wanting to go into a private browsing session,
18 that they want to do something on the internet and that
19 they don't want observed.
20   Q. I see.                                       15:15:44
21   A. The fact that they are doing that, that signal
22 is private information. I mean, if I know you did that
23 last Thursday at 4:00 p.m., and I then correlated with
24 what you were doing, I had your billing records from your
25 firm, I know your location data.                  15:16:01

Page 127

1     So the fact that you chose at that moment to
2 browse the web privately is, in fact, private
3 information.
4   Q. Okay. And then -- so if private browsing modes
5 were redesigned to indicate every time -- you know, to    15:16:23
6 websites every time somebody is in a private browsing
7 mode, do you think that would be a good thing or a bad
8 thing?
9   A. There's no question because it's mixed. Do I
10 want to tell The New York Times when I'm browsing         15:16:40
11 privately or not; right? So I'm designing off the top of
12 my head so do not take someone's random designs like
13 off-the-cuff as final.
14     I'd want to give users the choice of signaling
15 or not. But then, you know, on the other hand, you know,   15:17:00
16 is a user going to be sophisticated enough to be able to
17 do that well. That's going to be your balance.
18     But I can imagine times when I would want to
19 signal that and times when I wouldn't.
20   Q. If Google sent an email to a user, Google       15:17:35
21 account holder, and said -- that conveyed, you know,
22 this -- your device was used to browse in private, and
23 let's assume that device is a shared device, does that in
24 and of itself constitute an invasion of privacy?
25   A. So you're asking me if Google sends an email to   15:18:07

Page 128

1 your personal Gmail account --
2   Q. Uh-huh.
3   A. -- and you access on a shared browser, does that
4 constitute an invasion of privacy? Am I reframing your
5 question right?                                   15:18:24
6   Q. Yeah, I think so.
7   A. I think it doesn't.
8   Q. And why is that?
9   A. It doesn't feel like it does.
10   Q. Well, it might not be you that was doing the     15:18:36
11 private browsing; right?
12   A. But it's my Gmail account. So wait, wait, wait
13 a second. So, yeah. See, this is why you do not accept
14 design decisions off the cuff in conversation; right?
15   Q. Fair enough.                                 15:18:52
16   A. Because it's all of this stuff. Stuff you have
17 to think about it, you've got to write it down and look
18 at the flows. Guess I would back off and say I don't
19 know. I'd need to think about it because you're right,
20 that is something you would have to consider.      15:19:09
21   Q. All right. Well, let's put it this way in more
22 general terms.
23     If Google alerted the owner of a shared device
24 that the other-- that someone else who uses that device
25 had been browsing in private, that in and of itself would   15:19:24

Page 129

33 (Pages 126 - 129)

1 be a privacy violation; right?

2 A. Well, let's give an example. I am an abusive

3 husband. We have a shared computer. My wife used

4 private browsing. I got an email. I suspect she gets

5 beat up over this. It feels like a privacy violation.   15:19:40

6 Q. Okay. 87. You say: "When browsing the

7 internet people often start on a search page and then

8 click from that page to other websites. For example,

9 someone might start with a Google search, then visit a

10 non-Google website based on those search results.   15:20:11

11 Information tied to that search term and subsequent

12 browsing, including individual URLs and the record of an

13 entire browsing session reveals a great deal of personal

14 information about an individual."

15     Do you see that?   15:20:24

16 A. I do.

17 Q. Would you agree that many people do not start

18 their private browsing sessions by going and conducting a

19 Google search?

20 A. I don't have the data on that so I wouldn't   15:20:45

21 necessarily agree to that.

22 Q. Okay. Well, would you agree that if you want to

23 keep your private browsing activity private from Google,

24 then beginning your private browsing session with a

25 Google search is probably not a good way to go about it?   15:21:01

Page 130

1 A. I certainly wouldn't do it, but you didn't ask

2 me what I do. I'm three sigma.

3 Q. Paragraph 84. You refer to fingerprinting

4 techniques.

5 A. Uh-huh.   15:21:56

6 Q. Have you seen any evidence that Google has

7 engaged in fingerprinting in this case?

8 A. Yeah, I read internal documents that talk about

9 fingerprinting and internal Google documents, but I don't

10 think they actually said we do this particular practice.   15:22:19

11 And other than that, no.

12 Q. Would you agree that fingerprinting should

13 generally be avoided?

14 A. See, that's a hard question. You're back to

15 "should generally be," by whom. Maybe your at the NSA,   15:22:37

16 you want to do it; right? It's your job. That's what

17 you get paid for. I might not like it personally. So

18 who should be avoiding it?

19 Q. No, that's a fair response. Let me ask it

20 slightly differently.   15:22:54

21     Would you agree that fingerprinting is an

22 invasion of privacy?

23 A. I think that device fingerprinting can be, yes.

24 Q. Okay. Are there circumstances under which it

25 would not be an invasion of privacy?   15:23:05

Page 131

1 A. Probably. Again, you know, it would take us a

2 while to eliminate all circumstances. The one that came

3 to mind, which I'm now wondering about, if you call 911

4 on your smartphone, you know, and for some reason the

5 call disconnected, it would be great if I could   15:23:24

6 fingerprint your device and know your location

7 immediately.

8     Now thinking about that more, that's an invasion

9 of privacy. It's one that will be welcome by the person

10 who's being attacked and their cell phone is ripped out   15:23:35

11 of their hands, but you know, there are always edge

12 cases. So I hesitate to make -- to make those

13 categoricals without really thinking about edge cases.

14 Q. Okay. Does fingerprinting identify an

15 individual or does it identify a device?   15:23:55

16 A. Fingerprinting identifies a device, which -- and

17 devices can identify individual.

18 Q. Right. And would you agree that with this

19 statement, this is from -- well --

20     Just confirming something with my colleague.   15:24:30

21     Devices may identify an individual, but they may

22 just identify -- they may not. Is that --

23 A. They may not. I mean, something we're learning

24 over the past few years, it's easier than we thought to

25 go from a device to an individual.   15:24:49

Page 132

1 Q. In paragraph -- I'm sorry, in footnote 88, you

2 say this article that you and Karen Levy wrote together?

3 A. Yes.

4 Q. Privacy Threats in Intimate Relationships?

5 A. Yes.   15:25:20

6 Q. And in that article, I think it's at page 10. I

7 can show you the article, if you like. But we'll see if

8 you need it.

9     You say: "Households are not units, devices are

10 not personal, the purchaser of a product is not its only   15:25:29

11 user."

12     Do you agree with those statements?

13 A. Can I see it in situ.

14 Q. Absolutely. Totally fair.

15 A. Just to see it. Just to make sure.   15:25:40

16     MR. BROOME: Yeah.

17     (Exhibit 7, Journal of Cybersecurity, Research

18     Paper, Privacy Threats in Intimate

19     Relationships, by Karen Levy and Bruce Schneier,

20     was marked for identification by counsel

21     electronically.)

22     THE WITNESS: Okay. I'm there.

23 Q. BY MR. BROOME: Let me load it.

24 A. The words sound familiar. Remind me where it

25 is.   15:26:02

Page 133

34 (Pages 130 - 133)

1   Q. So we've loaded Exhibit 7, which is your article
2   Privacy Threats in Intimate Relationships, which you
3   coauthored with Karen Levy; is that accurate?
4   A. Yes.
5   Q. Okay. And let's see. First of all, on page 2,   15:26:13
6   bottom left, very last sentence beginning in the
7   left-hand column on page 2. It says: "People living in
8   the same household may share computers, phones, and other
9   connected devices."
10   Do you see that?   15:26:31
11   A. That was a long page. Yes, I do see it.
12   Q. Okay. And do you agree with that?
13   A. Yes.
14   Q. And then if you go to -- skip ahead to page 10.
15   A. I'm there.   15:26:48
16   Q. Okay. Right in the heading there, Implication 6
17   says: "Realize that households are not units; devices
18   are not personal; the purchaser of a product is not its
19   only user."
20   A. Yes.   15:27:24
21   Q. And I had asked you if you agreed with that. Do
22   you agree with that?
23   A. So that is a -- an implication. So what that's
24   saying is that those things are not always true. I mean,
25   it's a person over a product is often its only user in   15:27:36

Page 134

1   the example of a smartphone. So I mean, that's shortened
2   because it's the title of a section so there's a bunch of
3   caveats missing.
4   Q. Okay. But as a general matter, you would agree
5   that households are not units and devices are not --   15:27:57
6   households are not necessarily units and devices are not
7   necessarily personal?
8   A. Yes. As a design assumption.
9   Q. Okay.
10   A. That's who I'm speaking to. I'm speaking to   15:28:12
11   designers of systems.
12   Q. Right. And well, you're speaking to designers
13   of systems, and this is a design assumption, but it is a
14   design assumption that is a -- has a real-world practical
15   application; right?   15:28:30
16   A. Yes.
17   Q. All right. Okay.
18   Can we go back to your Data and Goliath book for
19   a moment. I think that was 3, Exhibit 3. Page 217 in
20   the book, page 155 in the PDF.   15:29:08
21   A. I'm here.
22   Q. There's a heading that says "Distort
23   Surveillance."
24   Do you see that?
25   A. I do.   15:29:37

Page 135

1   Q. It says: "I have my browser configured to
2   delete my cookies every time I close it, which I do
3   multiple times a day. I am still being surveilled, but
4   now it's much harder to tie all those small surveillances
5   back to me and ads don't follow me around."   15:29:54
6   Do you see that?
7   A. I do.
8   Q. Why did you configure your browser setting to
9   delete cookies every time you close your browser?
10   A. It's an easy thing to do, and I think it -- it   15:30:04
11   helps block surveillance in some cases.
12   Q. Does it provide some degree of privacy?
13   A. I think it provides some degree of privacy, yes.
14   Q. Privacy from internet tracking companies?
15   A. Yes.   15:30:21
16   Q. Privacy from Google?
17   A. You know, I've learned a lot more about Google
18   tracking than I knew in 2014 so I'm not sure. You know,
19   these days I think Google is able to join to various
20   sessions of mine, or at least some of them.   15:30:37
21   Q. Right. But you haven't seen any evidence that
22   Google's actually done that; correct?
23   A. No, but I think it would be a bad business model
24   if they didn't. I mean, I can see what they talk about
25   in their writings to analytics customers. For me, it's   15:31:08

Page 136

1   something prudent to do. It's easy to do and provides me
2   some measure.
3   Q. I asked whether you'd seen any evidence that
4   Google's actually done that, and you said no. Just so
5   the record is clear, your answer is no, I have not seen   15:31:23
6   any evidence that Google's actually done that; is that
7   right?
8   A. No. I'm not privy to Google's actual data
9   surveillance practices.
10   Q. Okay. I think we got another record problem   15:31:38
11   because I said "is that right," and you said "no."
12   A. Yeah.
13   Q. Let me ask the question again.
14   Have you seen any evidence that Google is able
15   to join the various sessions?   15:32:06
16   A. Yes.
17   Q. No, wait. That's not what I meant to ask.
18   Have you seen any evidence that Google has
19   actually joined the various sessions?
20   A. No.   15:32:22
21   Wait. Counsel's evidence; right? So we have
22   the deposition of the FBI agent that said speaks to
23   linking private browsing and non-private browsing.
24   Right? We have that article by Sara Watson, of her
25   questioner, who says I was browsing Incognito and the ad   15:32:50

Page 137

35 (Pages 134 - 137)

1 followed me around.
2       So I think the answer is I've seen a bunch of
3 anecdotal evidence, but no direct evidence.
4       Q. In this paragraph here where you talk about
5 deleting -- configuring your browser to delete your          15:33:19
6 cookies every time you close it, you refer to small
7 surveillances.  What did you mean by that?
8       A. I need to look at it.
9       I think what I mean is temporally small.  So
10 imagine I'm deleting my cookies -- I'm going to make this    15:33:38
11 up -- every four hours.  So each block that that cookie
12 knows is a four-hour block.  I meaning of small that way.
13 So four hours, four hours, four hours; right?  So it's
14 now harder to join those three separate units.
15      Q. So the surveillance -- surveillances would be     15:33:59
16 the websites you visited in your other activity online?
17      A. Yes.
18      Q. And they're small because they're going to be
19 limited from the time you -- or to the time between when
20 you start the session and the time you delete the           15:34:18
21 cookies; is that what you're saying?
22      A. Yeah, that's correct.  And remember, this is
23 also written in 2014.  I think we're a lot less
24 sophisticated on what else different companies could do,
25 certainly what Google and other companies, also.            15:34:32
Page 138

1       Q. And you understand that this is how Incognito
2 mode and other private browsing modes work; right?  That
3 they delete cookies when you close the browser?
4       A. Yes.
5       Q. And therefore, they do provide a measure of       15:34:54
6 privacy; correct?
7       A. I believe I've said that, yes.
8       Q. Paragraph 99.  You use the term "eavesdroppers"
9 there.  Do you see that?
10      A. Yes.                                    15:35:32
11      Q. And do you think that's a fair characterization
12 of companies that provide these web services, given that
13 they're only there because the websites want them to be?
14      A. Which web services are you referring to?
15      Q. Well, for example, Google Analytics and Google    15:35:46
16 Ad Manager.
17      A. I think it is in the same way to say
18 surveillance is -- on the internet.  Someone can eaves-
19 -- they are.  Yes.  I mean, in this, I'm -- yeah, I do
20 think it is a -- a fair characterization.                   15:36:03
21      Q. Okay.  Well, you would agree that the reported
22 eavesdroppers are only there because the websites want
23 them to be; right?
24      A. In the case of Google Analytics, that is true.
25 Actually, in the case of a lot of the trackers that is      15:36:20
Page 139

1 true, yes.
2       Q. In fact, any Google service that exists on a
3 website is only there because the website wants it to be
4 there; right?
5       A. I don't know all of the Google services.  So if   15:36:31
6 you find me one that isn't, I wouldn't be shocked.
7       Q. Fair -- fair point.
8       With respect to the services that are at issue
9 in this case, those cases, Google's analytics and
10 advertising services are only there because the website     15:36:47
11 wants them to be there; correct?
12      A. Yes, yes.
13      Q. Do you agree that a private browsing mode
14 session could be limited to just a single website?
15      A. Yes.                                    15:37:52
16      Q. In paragraph -- if you go to paragraph 201 of
17 your report.
18      A. Uh-huh.
19      Q. Okay.  It says: "While Google can present
20 cookie tracking as a necessary part of the internet, this   15:39:13
21 is simply not the case.  In fact, there exists a widely
22 proposed protocol (supported in every major browser,
23 including Chrome) called 'Do Not Track.'  This is a
24 signal that can be sent in a HTTP header to a website,
25 asking that the site to not track this user, browser, or    15:39:29
Page 140

1 request.  Chrome has this feature, which is buried within
2 the settings menu, and is turned off by default.  Any
3 sensible 'incognito' or truly 'private' mode would enable
4 this feature by default."
5       Do you see that?                             15:39:48
6       A. I do.
7       Q. Okay.  Do any other private browsing modes --
8 well, let me make that more limited.
9       Do any of the private browsing modes that are at
10 issue in this case enable Do Not Track by default?          15:39:59
11      A. I don't know, but I do say that Brave prompts
12 users to turn it on.  So that's not a default, but it
13 is -- it's a pattern that will incent users to turn it
14 on.
15      Q. Is Brave at issue in this case?  Do you know       15:40:22
16 which browsers other than Incognito are -- sorry, which
17 browsers other than Chrome are at issue in this case?
18      A. I do, but I always get them wrong and look it
19 up.
20      Q. That makes two of us.                          15:40:34
21      A. Yeah.  So look it up if we need it.
22      Q. Yeah, I think it's Safari and Edge.
23      A. Safari and -- not Firefox -- and Edge.  I think
24 that's right.  Edge is the Microsoft one.
25      Q. Okay.  Do you know whether Safari or Microsoft     15:40:51
Page 141

36 (Pages 138 - 141)

1  of Service Chrome policy -- Privacy Policy -- excuse
2  me -- and Chrome Privacy Notice.  And you say -- you talk
3  about the amount of time it would take to read all of
4  those documents, all versions of all of those documents.
5      Do you see that?                    15:57:31
6  A.  I do.
7  Q.  And then you say:  "This estimated reading time
8  assumes the reader is capable of comprehending the text,
9  which in many cases is unlikely unless the reader happens
10 to be an attorney."                     15:57:46
11     You've read Google's Privacy Policy; right?
12 A.  I have.
13 Q.  Okay.  And have you read the various versions
14 that are in effect during the class period?
15 A.  You know, I read some and skimmed the others.  I   15:57:57
16 didn't read every word of every one.
17 Q.  Is it your opinion that you need to be an
18 attorney to understand the -- Google's Privacy Policy?
19 A.  No.
20 Q.  Okay.  Is it your opinion that you'd need to be    15:58:09
21 an attorney to understand the Chrome Privacy Notice?
22 A.  No.
23 Q.  Well, what about the Terms of Service?
24 A.  No.
25 Q.  In 239, you say "the time span between revisions    15:58:22

Page 150

1  of these policies has been quite short, with as many as
2  four revisions issued in the space of a year.  Take, for
3  example, revisions to the Privacy Policy."  And then you
4  go on and note that it's been updated.
5      You would agree that Google should update its    15:58:38
6  Privacy Policy as frequently as necessary to make it
7  accurate; right?
8  A.  Yes.
9  Q.  Okay.  So as technologies change or as laws
10 change or practices change, Google should update its    15:58:53
11 Privacy Policy to be current; correct?
12 A.  Yes.
13 Q.  Okay.  And the length of those policies should
14 be essentially as long as they need to be to convey the
15 relevant information.                   15:59:26
16     Do you agree with that?
17 A.  Yes.
18 Q.  And do you agree that it is hard -- when
19 crafting privacy policies, it's difficult to strike a
20 balance between disclosing too much information or    15:59:40
21 disclosing information in such detail that users won't
22 understand it and providing the information in a way that
23 is simple and digestible to the average consumer?
24 A.  I'm not convinced that that balance is that hard
25 to strike.  I think a bigger deal is made of it than it    16:00:01

Page 151

1  has to be.
2  Q.  Okay.  In 241, it looks like you subjected
3  the -- these various Google documents to a Flesch Reading
4  Ease score or a Reading Ease test, I guess?
5  A.  Yes.                               16:00:55
6  Q.  Okay.  Do you have any expertise in readability?
7  A.  I do not.  So I used the test.
8  Q.  Okay.  Have you ever used these tests before?
9  A.  I have.  Not often, but I have run a writing of
10 mine through it occasionally just to see.    16:01:16
11 Q.  Okay.  And your results showed that generally
12 people with a high school diploma should be able to
13 understand these various Google disclosures; right?
14 A.  You know, what it says is the education needed.
15 So it gives a minimum that needed.  You know, you said if    16:01:39
16 someone above that should be able to.  That's going to
17 have a lot of other elements besides just readability.
18 Q.  Okay.  Section 10.2, paragraph 243.  Let me know
19 when you're there.
20 A.  I'm there.                         16:02:18
21 Q.  Okay.  You opine that Google promises users
22 control.
23     Do you see that?
24 A.  Yes.
25 Q.  Is it your opinion that Google does not deliver    16:02:24

Page 152

1  on that promise?
2  A.  Yeah.
3  Q.  How so?
4      Well, actually, strike that.  Let me ask you
5  another question first.                 16:02:41
6      Are you saying that Google offers users no
7  control?
8  A.  No.
9  Q.  Google does offer users some control; correct?
10 A.  Yes.                               16:02:51
11 Q.  There are various settings that Google offers
12 across its services that give users control; correct?
13 A.  Yes.
14 Q.  The word "control" can mean a lot of different
15 things depending on context; correct?    16:03:17
16 A.  Yes.
17 Q.  Control is a measure of degree; right?
18 A.  Yes.
19 Q.  You can have some control or you can have total
20 control?                              16:03:29
21 A.  Yes.
22 Q.  Do you agree that by providing a cookie blocker
23 option in Chrome, Google provides users some control?
24 A.  Yes.
25 Q.  Do you agree that by allowing users to delete    16:03:41

Page 153

Veritext Legal Solutions
866 299-5127

1 data associated with their account in My Activity, users
2 provides -- sorry, Google provides users control?
3    A. You went from some control to control. Do you
4 mean to do that?
5    Q. No. That got all muddled.          16:03:56
6       Do you agree that by allowing users to delete
7 data associated with their account in My Activity, Google
8 provides users control?
9    MR. CROSBY: Object to the form.
10      THE WITNESS: Google provides users some control   16:04:08
11 by doing that. And that's a tough one because we're
12 pretty sure that Google doesn't allow you to delete the
13 backups. You know, there are lots of cases in other
14 companies where you delete your data and you change your
15 mind, it comes back. So when deleted data is truly data   16:04:24
16 is an open question.
17    Q. BY MR. BROOME: Do you agree that by providing a
18 browser mode that allows the user to be either signed in
19 or signed out, Google provides users some control?
20    A. Yes.                             16:04:45
21    Q. Do you agree that by providing a browser mode
22 that prevents the sharing of existing cookies with
23 websites, Google provides the user with some control?
24    A. And I'm taking it as read that Google actually
25 does this; right? Because I have no direct knowledge.   16:04:59

1    Q. Yes.
2    A. And this would be in Chrome?
3    Q. Yes.
4    A. Yes, that it gives users some control.
5    Q. And do you agree that a browser mode that   16:05:09
6 deletes cookies automatically when you close it provides
7 users some control?
8    A. Yes.
9    MR. BROOME: Why don't we take a short break.
10 I'm just going -- we're sort of at the point -- well,   16:05:50
11 let's go off the record for a second, if that's okay.
12    MR. CROSBY: Sure.
13    THE VIDEOGRAPHER: Going off the record at
14 4:06 p.m.
15    (Recess.)                          16:06:33
16    THE VIDEOGRAPHER: We are back on the record at
17 4:26 p.m.
18    Q. BY MR. BROOME: Mr. Schneier, can you please
19 turn to paragraph 279 of your report.
20    A. Yeah, let me turn the light on here. It will be   16:26:41
21 a little better for me.
22    Q. Okay.
23    A. I'm here.
24    Q. Okay. Paragraph 279, you say: Google's Privacy
25 Policy throughout the class period promised that users   16:27:04

1 had control over Google's collection of their information
2 with users being able to exercise control by using
3 private browsing."
4       Do you see that?
5    A. I do.                            16:27:14
6    Q. And then you cite the various Google privacy
7 policies in effect during the class period.
8       Do you see that?
9    A. I do.
10    Q. Okay. And that begins in June -- looks like the   16:27:23
11 first one you cite there is June 2016?
12    A. Yes.
13    Q. But you know that Google did not mention
14 Incognito mode or private browsing in the Privacy Policy
15 until 2018; right?                     16:27:41
16    A. Yes.
17    Q. So why did you say that Google's Privacy Policy
18 throughout the class period promised users had control
19 over Google's collection of their information, with users
20 able to exercise control by using private browsing? Was   16:27:57
21 that a mistake?
22    A. That's interesting. You're saying -- and I
23 remember that; I'm not going to check. We'll say that
24 you say it's right -- that in those older ones, they
25 don't mention private browsing at all.          16:28:18

1    Q. Right.
2    A. Then the Privacy Policy would not say that users
3 are able to exert control using private browsing. The
4 Privacy Policy is silent on that, yes. But yet it's
5 silent both ways.                       16:28:44
6       So, you know, if I was a Google user who might
7 want to use private browsing and let's say I want to
8 check the Privacy Policy, it's not going to tell me
9 either way. So, you know, I would just default to the
10 other things I'm told.                   16:28:56
11    Q. Well, or the Privacy Policy would say we collect
12 this data, and describe all the data we collect, and it
13 wouldn't distinguish between regular or private browsing;
14 right?
15    A. Right. And that would be an omission so that   16:29:10
16 the design -- if you think about it, so that's an
17 omission. It's silent about that. Silent about the
18 difference. So you're postulating, well, that a user
19 would know that it's the same, but if a user's getting
20 information from Google executives, from Google splash   16:29:30
21 screens, thinking one -- thinking -- coming in thinking a
22 certain thing, and they're not being contradicted, it
23 seems more likely to me that they're going to leave with
24 the same impression they came in with.
25    Q. Okay. So if they came in with -- already came   16:29:50

1 categorically say they're not speaking to -- this, to
2 see what they say about other Google services that you
3 might use.
4      Now this is saying you can choose a browser
5 using Chrome or Incognito mode, but it doesn't say      16:41:02
6 anything about other browsers.  You don't even know they
7 exist if you just read this paragraph.
8 Q.  Okay.  All right.
9      Paragraph 283, you write:  "Google's Chrome
10 Incognito Splash Screen has also promised privacy without      16:41:33
11 ever disclosing that Google collects users' private
12 browsing activity.  Pairing the term Incognito with an
13 icon of a faceless person in disguise suggests that a
14 user in Incognito mode cannot be seen, traced, or tracked
15 while browsing online."      16:41:53
16      Do you see that?
17 A.  Yes.
18 Q.  Are you an expert in iconography?
19 A.  I am not.
20 Q.  What expertise did you bring -- did you apply in      16:42:00
21 reaching this conclusion about pairing a term with a
22 particular icon?
23 A.  This is the expertise of me as a security and
24 privacy expert's understanding disclosures, understanding
25 dark patterns.  Also relevant were the comments from      16:42:21

Page 166

1 Google employees saying that, hey, you know, this icon is
2 misleading.
3 Q.  Okay.  And if we just limit it to your
4 expertise, all right, have you ever analyzed an icon
5 before to determine what, you know, message it sends to      16:42:42
6 consumers?
7 A.  How would you analyze an icon?
8 Q.  How did you analyze the icon in this particular
9 case?
10 A.  It's -- I think I've answered that.  It's, you      16:42:56
11 know, based on what I know about the word, the images,
12 pairing, and you know, what we as security and privacy
13 professionals understand to be adequate disclosures.
14 Q.  Have you ever applied that expertise to an icon
15 before?      16:43:18
16 A.  Almost certainly.
17 Q.  Can you think of that example?
18 A.  I'm working on it.  Nothing comes to mind, but
19 not promising I won't think of something as we go.
20 Q.  Okay.  Okay.  You describe the icon as a      16:43:36
21 faceless person in disguise.  A disguise doesn't mean
22 you're invisible; right?
23 A.  It does not.
24 MR. BROOME:  All right.  I think I interrupted
25 you there.      16:44:00

Page 167

1      (Discussion off the record.)
2      THE WITNESS:  I said, "Unless it's an
3 invisibility suit," which is actually not a useful aside.
4 Q.  BY MR. BROOME:  A disguise doesn't mean that a
5 user can't be traced; right?      16:44:45
6 A.  That is correct.
7 Q.  Or a disguise doesn't mean a user can't be
8 tracked; right?
9 A.  That is correct.
10 Q.  And as we discussed earlier, it means that a      16:44:58
11 person's identity is concealed; correct?
12 A.  That is correct.  Although let's back up.  If a
13 disguise is -- you know, you're disguised as a minion in
14 a sea of a thousand minions, you're not going to be
15 traced or tracked.      16:45:15
16      So there are disguises which will prevent
17 tracing and tracking.  They would be -- you know, a
18 disguise among everybody else.  You know, let's go back
19 to the Tor browser.  That's how that works.  You are
20 amongst everybody else, and that's why you can't be      16:45:29
21 traced or tracked.
22 Q.  Let's take a look at paragraph 293.
23 A.  Uh-huh.
24 Q.  You say that:  "Users may seek privacy and
25 anonymity when searching and browsing non-Google websites      16:46:07

Page 168

1 for information about ways to deal with or exit from an
2 abusive relationship.  As discussed previously, abusers
3 often employ technological knowledge and means to control
4 their victims, including inspecting a shared computer or
5 their victim's computer or phone to spy on their online      16:46:23
6 activity.  If detected by a tech-savvy abuser, searches
7 and the subsequent browsing activities tied to the
8 following searches could lead to domestic violence," and
9 you list a number of searches people might have run.
10      Do you see that?      16:46:39
11 A.  I do.
12 Q.  Okay.  How tech savvy would one need to be to
13 figure out somebody's Incognito searches, assuming the
14 user closes their Incognito sessions when they're done?
15 A.  So I haven't done forensic work in Google Chrome      16:46:54
16 and Incognito so I cannot answer that question.
17 Q.  Okay.  I mean, sitting here today, are you aware
18 of any way that somebody outside of Google could
19 determine somebody's Incognito browsing or searches?
20 A.  Off the top of my head, I can think of a key      16:47:14
21 logger as one.
22 Q.  Okay.  That's a third-party software?
23 A.  Software or hardware.  You can use them both
24 ways.
25 Q.  That would record all of the key strokes on the      16:47:29

Page 169

43 (Pages 166 - 169)

1 device; right?

2    A.  Yes.

3    Q.  Okay.  Regardless of whether they're in

4 Incognito or not; right?

5    A.  Yes.                              16:47:37

6    Q.  Okay.  So let's assuming -- let's assume the

7 abuser is not particularly tech savvy.  Incognito should

8 prevent the abuser from finding -- from identifying the

9 searches that somebody ran in Incognito?

10    A.  If it doesn't, we have some serious problems    16:47:56

11 here.  So let's assume it does.

12    Q.  Okay.

13        MR. CROSBY:  I'm sorry, I was on mute.  I

14 objected to the form of the question.

15    Q.  BY MR. BROOME:  And I think we sort of touched    16:48:13

16 on this earlier, but if one engaged in a fingerprinting

17 analysis to identify this device as one that is engaged

18 in private browsing, and then emailed the owner of that

19 device, in this example, the abusive spouse, that it was

20 used for private browsing, that might alert the abusive    16:48:33

21 spouse that his wife had been doing research in private

22 browsing mode to conceal something from him; right?

23    A.  Yes.

24    Q.  And that's a really legitimate concern; right?

25    A.  I think it is, yes.                  16:48:48

Page 170

1    Q.  Do you have an opinion as to whether the

2 branding and marketing messages of other private browsing

3 modes is misleading?  Other meaning other than Incognito

4 mode.

5    A.  I did not look at them in relation to this case.    16:49:05

6 And that's not something I pay attention to.  So right

7 now, I don't.

8    Q.  You're a Firefox user; right?

9    A.  I am.

10    Q.  Have you ever used Edge?              16:49:15

11    A.  I have never used Edge.

12    Q.  In Firefox, do you ever use Incognito or their

13 equivalent private browsing mode?

14    A.  I do not.

15    Q.  And why is that?                  16:49:28

16    A.  Can you say asked and answered?

17    Q.  Is it because you don't have any shared

18 computers?

19    A.  That's right.

20    Q.  Okay.  Would you turn to paragraph 311.    16:49:37

21    A.  Uh-huh.

22    Q.  You write:  "In May 2019, Google's CEO Sundar

23 Pichai wrote an op-ed in The New York Times in which he

24 described Incognito mode as a 'popular feature in Chrome

25 that lets you browse the web without linking any activity    16:50:31

Page 171

1 to you.'"

2        Do you see that?

3    A.  I do.

4    Q.  And in fact, as far as you know, Google does not

5 link any private browsing activity to individual users;    16:50:47

6 correct?

7    A.  I know they can.  I don't know if they actually

8 do that.

9    Q.  Okay.

10    A.  We have a lot of incidental antidotes that they    16:50:57

11 do.

12    Q.  Okay.  So far as you know, Pachai's statement

13 was accurate; right?

14    A.  No, I think it's inaccurate.

15    Q.  And why is that?                  16:51:14

16    A.  I think for the reasons I talk about in the rest

17 of that paragraph.

18    Q.  Okay.  Let's look at that.  You say:  "Pichai's

19 statement was incorrect in implying that while in

20 Incognito mode, data regarding a user's browsing activity    16:51:28

21 is not saved or linked to them, when in fact data is

22 continuously collected from Chrome users whether they are

23 browsing in normal or in Incognito mode."

24        Do you see that?

25    A.  I do.                              16:51:42

Page 172

1    Q.  Pichai doesn't say that data's not saved; right?

2    A.  No.  They say that he says that you can browse

3 the web without linking any activity to you.

4    Q.  Right.

5    A.  He's not saying that explicitly, but he's making    16:51:55

6 a statement that when you browse the web using Incognito,

7 data's not linked to you.  And we know that data has been

8 linked to people browsing in Incognito.

9    Q.  And you're talking about the antidotes that

10 you've heard?                            16:52:13

11    A.  Well, that have been testified to.  More than

12 I've heard.

13    Q.  Right.  You're talking about the antidotes

14 discussed in the testimony in this case?

15    A.  Yes.                              16:52:24

16    Q.  Okay.

17        MR. CROSBY:  I'm sorry, could we take a real

18 quick five-minute break here, please.

19        MR. BROOME:  Sure.

20        MR. CROSBY:  Thank you.              16:52:36

21        THE VIDEOGRAPHER:  Going off the record at

22 4:53 p.m.

23        (Recess.)

24        THE VIDEOGRAPHER:  We are back on the record at

25 5:03 p.m.                                17:03:20

Page 173

44 (Pages 170 - 173)

1  combined with everything else on the splash screen and
2  what users are hearing from Google say that.
3      (Telephonic interruption.)
4      THE WITNESS:  It's totally not me.
5      Q.  BY MR. BROOME:  You don't think that people who        17:11:24
6  read the splash screen think the phrase "other people who
7  use this device" refers to Google, do you?
8      MR. CROSBY:  Object to the form.
9      Q.  BY MR. BROOME:  Are you there?
10     A.  I'm there.  I'm looking at it.                         17:11:43
11     Q.  Okay.
12     A.  That is a clause in a bigger sense.  You can --
13 you can browse the web privately, and other people use
14 this device.  So that clause I think is about other
15 people who are touching the physical object that you're     17:11:55
16 on.  You can browse privately is a more general
17 statement.  And then there's a -- there's a caveat which
18 is the next sentence.
19     Q.  Yeah.  I'm just referring to the clause.
20 Because I'm trying to understand whether in 314 --          17:12:08
21 because you make this point that Google itself uses every
22 one of its users' devices, I'm trying to understand if
23 you're trying -- are you trying to say there that the
24 phrase "other people who use this device won't see your
25 activity" is inaccurate because Google uses people's        17:12:26

Page 178

1  devices in Incognito mode and does see their activity?
2      MR. CROSBY:  Object to the form.
3      Q.  BY MR. BROOME:  Sorry.  Yeah, and I'm just
4  referring to that clause.  I understand that, you know,
5  there are clauses in the context of a larger sentence.      17:12:42
6      A.  I would agree with you that the other people use
7  this device refers to other human beings who are touching
8  the physical object.
9      Q.  Okay.  So people with whom you share the device
10 or somebody else who might look at your device?             17:13:02
11     A.  Yes.
12     Q.  Okay.  In 12.3, you opine that Google failed to
13 adequately correct its surveillance of Incognito users.
14     Do you see that?
15     A.  I do.                                                 17:13:35
16     Q.  And just so we have a record of it, against what
17 standard are you evaluating the adequacy of Google's
18 disclosures?
19     MR. CROSBY:  Object to the form.
20     THE WITNESS:  Again, like everything else, I'm          17:13:44
21 evaluating it according to my expertise as a securities
22 and privacy expert and the generally accepted practices
23 of our industry.
24     Q.  BY MR. BROOME:  And you're not evaluating it
25 against any legal standards; correct?                        17:13:58

Page 179

1      MR. CROSBY:  Object to the form.
2      THE WITNESS:  I am not an attorney.
3      Q.  BY MR. BROOME:  You're not an attorney and you
4  are not evaluating Google's disclosures against any legal
5  standard; correct?                                          17:14:18
6      A.  That is correct.  But you listed a few
7  potentials in -- previously.  So not by any of those
8  statutes.
9      Q.  You referenced the generally accepted practices
10 of your industry; is that right?                            17:14:43
11     A.  Okay.  Okay.
12     Q.  And where do those -- can someone -- are those
13 like in a form that someone can actually look at?
14     A.  They are not formalized, no.
15     Q.  Okay.  Can you turn to paragraph 266, please.        17:14:57
16     A.  I'm there.
17     Q.  You write:  "In June 2017, Apple announced its
18 Intelligent Tracking Protection, a feature for Safari
19 that limited the use of cookies for cross-site tracking
20 by blocking third-party cookies after 24 hours of          17:15:54
21 inactivity and purging all cookies after 30 days."
22     Do you see that?
23     A.  I do.
24     Q.  And does that mean that information sent to
25 Google from non-Google websites using its services would   17:16:13

Page 180

1  be different from a user in Safari after June 2017 than
2  it would be from a user in Chrome?
3      MR. CROSBY:  Object to the form.
4      THE WITNESS:  I don't know.  I actually don't
5  know enough about Chrome right now to answer that.          17:16:32
6      Q.  BY MR. BROOME:  Okay.  If you go to 267.  You
7  wrote:  "In June 2019, Mozilla rolled out its Enhanced
8  Tracking Prevention feature for Firefox, which blocked by
9  default cookies from known third-party trackers when a
10 user downloaded the Firefox browser."                      17:17:24
11     Do you see that?
12     A.  I do.
13     Q.  Does that block by default cookies from Google?
14     A.  So I don't know.  Google plays this game about
15 cookies.  They call their third-party cookies first-party   17:17:35
16 cookies, and I actually couldn't tell you right now what
17 Firefox does about that.
18     Q.  Okay.  If you turn to Section 8.3, which starts
19 at paragraph 185.
20     A.  Okay.                                                17:18:35
21     Q.  There's a section there says:  "Google Uses
22 Cookie Matching to Help Identify Users in Real-Time
23 Bidding."
24     Do you have any expertise in Google's real-time
25 bidding platform?                                            17:18:46

Page 181

46 (Pages 178 - 181)

Page 182

1    A.  Define "expertise."

2    Q.  Well, what experience do you have studying

3  Google's real-time bidding platform?

4    A.  I have studied it.

5    Q.  In connection with this case?              17:18:59

6    A.  In connection with this case, yes.  I knew about

7  it generally beforehand, but I learned a lot for this

8  case.

9    Q.  Okay.  And so is the testimony in this case just

10 based off of information you learned -- in this Section     17:19:12

11 8.3 -- let me start again.

12       Is the testimony that you offer in this Section

13 8.3 based on your review of Google's documents?

14       MR. CROSBY:  Object to the form.

15       THE WITNESS:  It is certainly -- you didn't say     17:19:37

16 based solely on.  So I will say yes, this is based on me

17 reading and understanding Google's documents of how these

18 systems work.

19    Q.  BY MR. BROOME:  Okay.  Is this section based --

20 I see there's an article you cite from Brad Bender at       17:20:12

21 footnote 208, and an article you cite at footnote 200.

22 Oh, that's in the previous section.

23       So aside from the article from Brad Bender, what

24 else is this section based on?

25       Let me start again.                        17:20:28

Page 182

---

1       Aside from the article from Brad Bender and

2  Google's documents, what else is this section based on?

3    A.  I did a lot of research to put this together,

4  and it is certainly possible that there are other things

5  I read that didn't rise to the level of citations that I     17:20:45

6  used.

7    Q.  Is it possible that there are other materials

8  that you considered in preparing this section that are

9  not cited?  Is that what you're saying?

10       MR. CROSBY:  Object to the form.           17:21:02

11       THE WITNESS:  I mean, if something doesn't rise

12 to the level of a citation, it's not going in there.  And

13 my guess is there's a lot in here that I either knew

14 beforehand or -- or just figured out.  I mean, you're

15 asking me if we can match every single sentence to a       17:21:28

16 reference, and I'm sure the answer to that is going to be

17 no.

18       MR. BROOME:  Let's take another maybe ten-minute

19 break.  We can go off the record for a minute, if that's

20 all right.                                      17:21:42

21       MR. CROSBY:  Sure.

22       THE VIDEOGRAPHER:  Going off the record at

23 5:22 p.m.

24       (Recess.)

25       THE VIDEOGRAPHER:  We are back on the record at     17:34:43

Page 183

---

1  5:35 p.m.

2       MR. BROOME:  All right.  I'm now going to ask

3  you some questions about your rebuttal report.  So we'll

4  load that as Exhibit 9, and I assume you have your hard

5  copy.                                          17:34:58

6       (Exhibit 9, Expert Rebuttal Report of Bruce

7        Schneier Rebuttal of Expert Georgios Zervas,

8        06/07/22, was marked for identification by

9        counsel electronically.)

10    Q.  BY MR. BROOME:  Okay.  It should be there.     17:35:13

11       All right.  And opinion -- let's see.  I guess

12 this is Opinion 1, Section 3, beginning paragraph 8.  You

13 have an opinion there that says:  "Professor Zervas

14 failed to investigate Google's systems or engage with the

15 actual evidence in this case."                   17:35:47

16       Do you see that?

17    A.  I do.

18    Q.  Did you investigate Google's systems?

19    A.  I did not.

20    Q.  You understand that Dr. Zervas performed testing     17:35:57

21 of various browsers and operating systems that show how

22 data are sent to Google in both regular and private

23 browsing modes across different browsers and operating

24 systems?

25    A.  I do.                                    17:36:09

Page 184

---

1    Q.  Okay.  All right.  In paragraph 13, 14, and 15,

2  you quote three of Professor Zervas' opinions.

3       Do you see that?

4    A.  I do.

5    Q.  Do you have any basis for opining that those     17:36:38

6  conclusions by Professor Zervas are incorrect?

7       MR. CROSBY:  Object to the form.

8       THE WITNESS:  I do not.  What I say is his

9  analysis is incomplete, not incorrect.

10    Q.  BY MR. BROOME:  Okay.  Paragraph 21, you -- I     17:37:16

11 guess you're referring to Google's internal documents.

12 You say:  "Professor Zervas fails to consider Google's

13 own internal documents that similarly describe

14 fingerprinting as the use of unique or probabilistically

15 unique combinations of one or more device, network, or     17:37:41

16 app browser attributes to identify a device app browser

17 or user across different transactions where no persistent

18 unique identifier is explicitly provided by a user's

19 device, app, or browser."

20       Do you see that?                           17:37:59

21    A.  I do.

22    Q.  Do you agree that fingerprinting is

23 probabilistic; it's not an exact science?

24       MR. CROSBY:  Object to the form.

25       THE WITNESS:  I don't know enough about the     17:38:16

Page 185

47 (Pages 182 - 185)

1  details of what Google can do in fingerprinting.  I think
2  it's fair to say that some of it is probabilistic and
3  some of it is exact, but you know, how probabilistic is
4  it?  Does it matter?  Fingerprinting, it's like human
5  fingerprints.  Is probabilistic, yet it is highly          17:38:33
6  accurate.  So there's a lot of nuances in that that I
7  don't know.
8      Q.  BY MR. BROOME:  In paragraph 36, in the fourth
9  sentence, you write:  "Google recognizes the joinability
10  risk posed by the collection of IP address information."   17:39:17
11      Do you see that?
12      A.  I do.
13      Q.  Okay.  IP addresses are -- are dynamic; right?
14      MR. CROSBY:  Object to the form.
15      THE WITNESS:  For most people, they are.             17:39:30
16      Sorry.
17      For most people, they are.  For some people,
18  they're static.
19      Q.  BY MR. BROOME:  Okay.  For most people, the IP
20  address is -- IP address they're -- let me start again.   17:39:39
21      For most people, their IP address changes
22  periodically automatically; correct?
23      A.  Yes.
24      Q.  And do you have any idea as to the frequency
25  with which their IP address changes?                      17:39:52

Page 186

1      A.  No, I don't.  I would look that up.
2      Q.  Okay.  For most people, even their IP address
3  they use at home is dynamic, and therefore, changes
4  periodically; correct?
5      MR. CROSBY:  Object to the form.                     17:40:17
6      THE WITNESS:  So now I'm saying I would start
7  looking this stuff up.
8      Q.  BY MR. BROOME:  Okay.
9      A.  Most people is more than half.  So now we're
10  talking about users.  For some people, it's dynamic.  For  17:40:27
11  some people, it's static.
12      Q.  Okay.
13      A.  I'm willing to say that now.  Anything else, I
14  didn't research for this report, and I want to make sure
15  I'm accurate before I tell you this.                     17:40:37
16      Q.  For a mobile device, the IP address is going to
17  depend on where the user is physically when they connect
18  to the internet; correct?
19      A.  Yes.
20      Q.  So if they're at home using their mobile device,  17:40:54
21  they might be using one IP address, and if they're at
22  work, they would be using a different IP address, and if
23  they're at the shopping mall, they might be using another
24  different IP address.
25      Is that all fair?                                   17:41:13

Page 187

1      A.  Yes.
2      Q.  In paragraph 37, you talk about -- you say:
3  "Another important tool for joinability is the user agent
4  string."
5      Do you see that?                                    17:41:29
6      A.  I do.
7      Q.  A user agent string can't always uniquely
8  identify a user or even a particular device; correct?
9      A.  Say it again.  I'm sorry.
10      Q.  A user agent string cannot necessarily be used   17:41:41
11  to uniquely identify a user or device; correct?
12      MR. CROSBY:  Object to the form.
13      THE WITNESS:  A user agent string is something
14  we do use to identify devices.  You're asking does there
15  exist a case in the history of the internet where it     17:41:59
16  can't be used.  Probably, yes.
17      Q.  BY MR. BROOME:  Fair enough.
18      What does a user agent string include?
19      A.  Oh, God.  I don't remember.
20      Q.  Okay.                                           17:42:09
21      A.  Yeah.  I actually don't remember.  It's getting
22  late.
23      Q.  Yep.  Let me give you a hypothetical.
24      Imagine you've got three people in a crowded
25  coffee shop all working from the same IP address on the   17:42:30

Page 188

1  same latest Mac laptop, with the latest version of Chrome
2  and using default settings.
3      In that scenario, could you use IP address and
4  user agent string to uniquely identify a device?
5      MR. CROSBY:  Object to the form.                    17:42:53
6      THE WITNESS:  So using those two things alone --
7      Q.  BY MR. BROOME:  Yes.
8      A.  -- and nothing else?  So you don't know where
9  they're browsing.  You know nothing about their history.
10  They appear out of thin error, like magically.  You have  17:43:07
11  a new laptop, same configuration.  Open it up at the same
12  time.  Get three different dynamic IPs from the -- from
13  the wireless access point.  Visit the same website?
14      Q.  No, not visiting the same website.
15      A.  Visit three different websites.  Close their    17:43:25
16  computer, and then disappear into thin air.  That's your
17  hypothetical?
18      Q.  Let's start with that one.
19      A.  My guess is it would be hard.  You know, if the
20  FBI did it, I'd be impressed.  I wouldn't be shocked.     17:43:42
21      Q.  Why does it matter whether you have access to
22  their prior browsing history in that hypothetical?
23      A.  Well, in that hypothetical, there isn't any
24  private browsing history.  Right?  They're appearing out
25  of thin air --                                          17:44:05

Page 189

48 (Pages 186 - 189)

1   Q.  Yeah.

2   A.  -- visiting the website, leaving.  There's no

3   history.  It's just like one visit.

4   Q.  Yeah.  So if you did have history, would that

5   allow you to identify -- uniquely identify a device?        17:44:14

6       MR. CROSBY:  Object to the form.

7       THE WITNESS:  So it's a matter of degree.  It's

8   a matter of degree.  History gives you more information.

9   The more you know, the more able you are to identify

10  somebody.                                                  17:44:28

11      So, you know, we're going to assume that the

12  the FBI is doing this investigation, is going to know

13  something about who they're looking for.  Does a person

14  visit a website that they habitually visit?  It's often

15  not who you -- random people out of thin air.              17:44:44

16      There's a lot of context in these questions.

17  So, you know, the hypotheticals are hard.  But the

18  reality is, I think, much more subtle.

19  Q.  BY MR. BROOME:  Okay.  So if all you had was

20  IP -- IP address and user agent string, could you --       17:45:40

21  could that be used to uniquely identify a user?

22  A.  So --

23      MR. CROSBY:  Object to the form.

24      THE WITNESS:  -- what you're asking me is if I

25  hand you two pieces of paper, one has my IP address and     17:45:56

Page 190

1   one has the user string, and I say go to town.

2   Q.  BY MR. BROOME:  Well, yeah.  Let's start with

3   that.  Does that allow you to uniquely identify a device?

4   A.  You know, in most cases, it doesn't.  Again, you

5   know, if you've got some trick I don't know about.  But,    17:46:12

6   you know, I would like to think that that is not enough.

7   Q.  Okay.  So IP address plus user agent -- well,

8   withdrawn.

9   A.  I mean, it's hard; right?  Because the IP

10  address will tell you like which internet cafe the          17:46:32

11  person's at.  Now you go to the cafe?  Do you interview

12  the people who work there?  Do you learn more

13  information?  It's all part of context.  It's really hard

14  to pull out just one thing and say, you know, we're done

15  here.                                                       17:46:46

16  Q.  All right.  So multiple people could share the

17  same IP address and user agent; is that fair?

18      MR. CROSBY:  Object to the form.

19      THE WITNESS:  Yes.  Yes.

20  Q.  BY MR. BROOME:  In paragraph 47 -- I'm sorry,           17:47:02

21  paragraph 42.

22  A.  Uh-huh.

23  Q.  You quote this Google document, and it says:

24  "IP address can be very precise, equivalent to GPS for

25  all intents and purposes, depending on the scenario."        17:47:33

Page 191

1       Do you see that?

2   A.  Yes.

3   Q.  Do you agree that although an IP address can be

4   very precise, it can also be quite coarse?

5   A.  Yes.                                                   17:47:50

6       MR. CROSBY:  Object to the form.

7       THE WITNESS:  Sorry.

8   Q.  BY MR. BROOME:  Meaning that it may not identify

9   much more than where -- what ZIP code a user is in?

10  A.  Yeah, I don't know about ZIP code.  That's a           17:47:59

11  geographical limitation.  Because we're talking about

12  network space, not physical space.  Stick with coarse.

13  Q.  Okay.  Okay.  Paragraph 48.

14  A.  Uh-huh.

15  Q.  You say:  "User-ID is tied to an individual's          17:49:18

16  account with a non-Google website.  User-ID itself

17  thereby qualifies as personally identifiable

18  information."

19      Do you see that?

20  A.  No -- yes, I do.  Sorry.  Apologies.  Yes.             17:49:34

21  Q.  Yeah, last sentence.  Sorry.  I should have been

22  more precise.

23      Do you see that?  Okay.

24      Although the User-ID is tied to an individual's

25  account with a non-Google website, Google does not          17:49:50

Page 192

1   receive the personally identifiable information

2   associated with that site; correct?

3   A.  I don't know.  If you're asserting that, assert

4   that, but I actually don't know what Google receives.

5   Q.  Okay.  Well, why did you include this point that        17:50:06

6   User-ID itself qualifies as personally identifiable

7   information if you're not sure whether Google actually

8   receives that information?

9   A.  Because it does -- so what I'm saying in this is

10  that -- we talked about this earlier, that Google could     17:50:22

11  use this information.  I just asked me whether they do.

12  What Zervas is saying is that Google chooses not to, but

13  that says nothing about whether Google could.  And then

14  see back to my discussions of chilling effects and

15  possibilities of surveillance.                             17:50:46

16  Q.  Okay.  But you're not sure one way or the other

17  whether Google actually receives the PII that is

18  associated with an individual's account at a non-Google

19  website?

20  A.  I am not, nor do I know whether they can infer         17:51:01

21  that through other means.

22  Q.  All right.  Let's go to 53.

23      In 53 you say:  "Based on my experience and

24  consistent with the many internal Google documents I have

25  reviewed that were apparently not considered by Professor   17:51:42

Page 193

49 (Pages 190 - 193)

1 STATE OF CALIFORNIA   ) ss:
2 COUNTY OF MARIN      )
3
4     I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5 hereby certify:
6     That the foregoing deposition testimony was
7 taken before me at the time and place therein set forth
8 and at which time the witness was administered the oath;
9     That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16     I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20     IN WITNESS WHEREOF, I have subscribed my name
21 this 19th day of July, 2022.
22
23
24
25     LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 230

---

1 IAN B. CROSBY, ESQ.
2 icrosby@susmangodfrey.com
3     July 19, 2022
4 RE: BROWN VS. GOOGLE LLC
5 JULY 18, 2022, BRUCE SCHNEIER, JOB NO. 5312337
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, noting the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25

Page 231

---

1 _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, noting the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

---

1 RE: BROWN VS. GOOGLE LLC
2 BRUCE SCHNEIER, JOB NO. 5312337
3     E R R A T A   S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 WITNESS                   Date
25

Page 233

# EXHIBIT 33

"The public conversation about surveillance in the digital age would be a good deal more intelligent if we all read Bruce Schneier first."

—MALCOLM GLADWELL

**Exhibit 0003**
7/18/2022
Bruce Schneier

# DATA

## AND

# GOLIATH

## The Hidden Battles to Collect Your Data and Control Your World

# BRUCE SCHNEIER



# DATA AND GOLIATH

The Hidden Battles to Collect
Your Data and Control Your World

## BRUCE SCHNEIER



W. W. NORTON & COMPANY
NEW YORK · LONDON

being monitored. We use electronic payment systems, not thinking about how they're keeping a record of our purchases. We carry our cell phones with us, not understanding that they're constantly tracking our location.

Buzzfeed is an entertainment website that collects an enormous amount of information about its users. Much of the data comes from traditional Internet tracking, but Buzzfeed also has a lot of fun quizzes, some of which ask very personal questions. One of them —"How Privileged Are You?"—asks about financial details, job stability, recreational activities, and mental health. Over two million people have taken that quiz, not realizing that Buzzfeed saves data from its quizzes. Similarly, medical information sites like WebMD collect data on what pages users search for and read.

Lest you think it's only your web browsing, e-mails, phone calls, chats, and other electronic communications that are monitored, old-fashioned paper mail is tracked as well. Through a program called Isolation Control and Tracking, the US Postal Service photographs the exterior, front and back, of *every piece of mail sent in the US*. That's about 160 billion pieces annually. This data is available to law enforcement, and certainly other government agencies as well.

Off the Internet, many surveillance technologies are getting smaller and less obtrusive. In some cities, video cameras capture our images hundreds of times a day. Some are obvious, but we don't see a CCTV camera embedded in a ceiling light or ATM, or a gigapixel camera a block away. Drones are getting smaller and harder to see; they're now the size of insects and soon the size of dust.

Add identification software to any of these image collection systems, and you have an automatic omnipresent surveillance system. Face recognition is the easiest way to identify people on camera, and the technology is getting better every year. In 2014, face recognition algorithms started outperforming people. There are other image identification technologies in development: iris scanners that work at a distance, gait recognition systems, and so on.

There's more hidden surveillance going on in the streets. Those contactless RFID chip cards in your wallet can be used to track people. Many retail stores are surreptitiously tracking people by the MAC addresses and Bluetooth IDs—which are basically identification numbers—broadcast by their smartphones. The goal is to record which aisles they walk down, which products they stop to look at, and so on. People can be tracked at public events by means of both these approaches.

In 2014, a senior executive from the Ford Motor Company told an audience at the Consumer Electronics Show, "We know everyone who breaks the law, we know when you're doing it. We have GPS in your car, so we know what you're doing." This came as a shock and surprise, since no one knew Ford had its car owners under constant surveillance. The company quickly retracted the remarks, but the comments left a lot of wiggle room for Ford to collect data on its car owners. We know from a Government Accountability Office report that both automobile companies and navigational aid companies collect a lot of location data from their users.

Radar in the terahertz range can detect concealed weapons on people, and objects through eight inches of concrete wall. Cameras can "listen" to phone conversations by focusing on nearby objects like potato chip bags and measuring their vibrations. The NSA, and presumably others, can turn your cell phone's microphone on remotely, and listen to what's going on around it.

There are body odor recognition systems under development, too. On the Internet, one company is working on identifying people by their typing style. There's research into identifying people by their writing style. Both corporations and governments are harvesting tens of millions of voiceprints—yet another way to identify you in real time.

This is the future. Store clerks will know your name, address, and income level as soon as you walk through the door. Billboards will know who you are, and record how you respond to them. Grocery store shelves will know what you usually buy, and exactly how to entice you to buy more of it. Your car will know who is in it, who is driving, and what traffic laws that driver is following or ignoring. Even now, it feels a lot like science fiction.

As surveillance fades into the background, it becomes easier to ignore. And the more intrusive a surveillance system is, the more likely it is to be hidden. Many of us would refuse a drug test before being hired for an office job, but many companies perform invasive background checks on all potential employees. Likewise, being tracked by hundreds of companies on the Internet—companies you've never interacted with or even heard of—feels much less intrusive than a hundred market researchers following us around taking notes.

In a sense, we're living in a unique time in history; many of our surveillance systems are still visible to us. Identity checks are common, but they still require us to show our ID. Cameras are everywhere, but we can still see them. In the near future, because these systems will be hidden, we may unknowingly acquiesce to even more surveillance.

# AUTOMATIC SURVEILLANCE

A surprising amount of surveillance happens to us automatically, even if we do our best to opt out. It happens because we interact with others, and *they're* being monitored.

Even though I never post or friend anyone on Facebook—I have a professional page, but not a personal account—Facebook tracks me. It maintains a profile of non-Facebook users in its database. It tracks me whenever I visit a page with a Facebook "Like" button. It can probably make good guesses about who my friends are based on tagged photos, and it may well have the profile linked to other information it has purchased from various data brokers. My friends, and those sites with the Like buttons, allow Facebook to surveil me through them.

I try not to use Google search. But Google still collects a lot of information about the websites I visit, because so many of them use Google Analytics to track their visitors. Again, those sites let Google track me through them. I use various blockers in my browser so Google can't track me very well, but it's working on technologies that will circumvent

my privacy practices.

I also don't use Gmail. Instead, I use a local ISP and store all of my e-mail on my computer. Even so, Google has about a third of my messages, because many of the people I correspond with use Gmail. It's not just Gmail.com addresses; Google hosts a lot of organizations' e-mail, even though those organizations keep their domain name addresses. There are other examples. Apple has a worldwide database of Wi-Fi passwords, including my home network's, from people backing up their iPhones. Many companies have my contact information because my friends and colleagues back up their address books in the cloud. If my sister publishes her genetic information, then half of mine becomes public as well.

Sometimes data we only intend to share with a few becomes surveillance data for the world. Someone might take a picture of a friend at a party and post it on Facebook so her other friends can see it. Unless she specifies otherwise, that picture is public. It's still hard to find, of course—until it's tagged by an automatic face recognition system and indexed by a search engine. Now that photo can be easily found with an image search.

I am constantly appearing on other people's surveillance cameras. In cities like London, Chicago, Mexico City, and Beijing, the police forces have installed surveillance cameras all over the place. In other cities, like New York, the cameras are mostly privately owned. We saw the difference in two recent terrorism cases. The London subway bombers were identified by government cameras, and the Boston Marathon bombers by private cameras attached to businesses.

That data is almost certainly digital. Often it's just stored on the camera, on an endless loop that erases old data as it records new data. But increasingly, that surveillance video is available on the Internet and being saved indefinitely—and a lot of it is publicly searchable.

Unless we take steps to prevent it, being captured on camera will get even less avoidable as life recorders become more prevalent. Once enough people regularly record video of what they are seeing, you'll be in enough of their video footage that it'll no longer matter whether or not you're wearing one. It's kind of like herd immunity, but in reverse.

## UBIQUITOUS SURVEILLANCE

Philosopher Jeremy Bentham conceived of his "panopticon" in the late 1700s as a way to build cheaper prisons. His idea was a prison where every inmate could be surveilled at any time, unawares. The inmate would have no choice but to assume that he was always being watched, and would therefore conform. This idea has been used as a metaphor for mass personal data collection, both on the Internet and off.

On the Internet, surveillance is ubiquitous. All of us are being watched, all the time, and that data is being stored forever. This is what an information-age surveillance state looks like, and it's efficient beyond Bentham's wildest dreams.

The primary goal of all this corporate Internet surveillance is advertising. There's a little market research and customer service in there, but those activities are secondary to the goal of more effectively selling you things.

Internet surveillance is traditionally based on something called a cookie. The name sounds benign, but the technical description "persistent identifier" is far more accurate. Cookies weren't intended to be surveillance devices; rather, they were designed to make surfing the web easier. Websites don't inherently remember you from visit to visit or even from click to click. Cookies provide the solution to this problem. Each cookie contains a unique number that allows the site to identify you. So now when you click around on an Internet merchant's site, you keep telling it, "I'm customer #608431." This allows the site to find your account, keep your shopping cart attached to you, remember you the next time you visit, and so on.

Companies quickly realized that they could set their own cookies on pages belonging to other sites—with their permission and by paying for the privilege—and the third-party cookie was born. Enterprises like DoubleClick (purchased by Google in 2007) started tracking web users across many different sites. This is when ads started following you around the web. Research a particular car or vacation destination or medical condition, and for weeks you'll see ads for that car or city or a related pharmaceutical on every commercial Internet site you visit.

This has evolved into a shockingly extensive, robust, and profitable surveillance architecture. You are being tracked pretty much everywhere you go on the Internet, by many companies and data brokers: ten different companies on one site, a dozen on another. Facebook tracks you on every site with a Facebook Like button (whether you're logged in to Facebook or not), and Google tracks you on every site that has a Google Plus +1 button or that simply uses Google Analytics to monitor its own web traffic.

Most of the companies tracking you have names you've never heard of: Rubicon Project, AdSonar, Quantcast, Pulse 260, Undertone, Traffic Marketplace. If you want to see who's tracking you, install one of the browser plugins that let you monitor cookies. I guarantee you will be startled. One reporter discovered that 105 different companies tracked his Internet use during one 36-hour period. In 2010, a seemingly innocuous site like Dictionary.com installed over 200 tracking cookies on your browser when you visited.

It's no different on your smartphone. The apps there track you as well. They track your location, and sometimes download your address book, calendar, bookmarks, and search history. In 2013, the rapper Jay-Z and Samsung teamed up to offer people who downloaded an app the ability to hear the new Jay-Z album before release. The app required the ability to view all accounts on the phone, track the phone's location, and track who the user was talking to on the phone. And the Angry Birds game even collects location data when you're not playing.

Broadband companies like Comcast also conduct surveillance on their users. These days they're mostly monitoring to see whether you illegally download copyrighted songs and videos, but other applications aren't far behind. Verizon, Microsoft, and others are working on a set-top box that can monitor what's going on in the room, and serve ads

based on that information.

It's less Big Brother, and more hundreds of tattletale little brothers.

Today, Internet surveillance is far more insistent than cookies. In fact, there's a minor arms race going on. Your browser—yes, even Google Chrome—has extensive controls to block or delete cookies, and many people enable those features. DoNotTrackMe is one of the most popular browser plug-ins. The Internet surveillance industry has responded with "flash cookies"—basically, cookie-like files that are stored with Adobe's Flash player and remain when browsers delete their cookies. To block those, you can install FlashBlock. But there are other ways to uniquely track you, with esoteric names like evercookies, canvas fingerprinting, and cookie synching. It's not just marketers; in 2014, researchers found that the White House website used evercookies, in violation of its own privacy policy. I'll give some advice about blocking web surveillance in Chapter 15.

Cookies are inherently anonymous, but companies are increasingly able to correlate them with other information that positively identifies us. You identify yourself willingly to lots of Internet services. Often you do this with only a username, but increasingly usernames can be tied to your real name. Google tried to compel this with its "real name policy," which mandated that users register for Google Plus with their legal names, until it rescinded that policy in 2014. Facebook pretty much demands real names. Anytime you use your credit card number to buy something, your real identity is tied to any cookies set by companies involved in that transaction. And any browsing you do on your smartphone is tied to you as the phone's owner, although the website might not know it.

## FREE AND CONVENIENT

Surveillance is the business model of the Internet for two primary reasons: people like free, and people like convenient. The truth is, though, that people aren't given much of a choice. It's either surveillance or nothing, and the surveillance is conveniently invisible so you don't have to think about it. And it's all possible because US law has failed to keep up with changes in business practices.

Before 1993, the Internet was entirely noncommercial, and free became the online norm. When commercial services first hit the Internet, there was a lot of talk about how to charge for them. It quickly became clear that, except for a few isolated circumstances like investment and porn websites, people weren't willing to pay even a small amount for access. Much like the business model for television, advertising was the only revenue model that made sense, and surveillance has made that advertising more profitable. Websites can charge higher prices for personally targeted advertising than they can for broadcast advertising. This is how we ended up with nominally free systems that collect and sell our data in exchange for services, then blast us with advertising.

"Free" is a special price, and there has been all sorts of psychological research showing that people don't act rationally around it. We overestimate the value of free. We consume more of something than we should when it's free. We pressure others to consume it. Free warps our normal sense of cost vs. benefit, and people end up trading their

personal data for less than its worth.

This tendency to undervalue privacy is exacerbated by companies deliberately making sure that privacy is not salient to users. When you log on to Facebook, you don't think about how much personal information you're revealing to the company; you chat with your friends. When you wake up in the morning, you don't think about how you're going to allow a bunch of companies to track you throughout the day; you just put your cell phone in your pocket.

The result is that Internet companies can improve their product offerings to their actual customers by reducing user privacy. Facebook has done it systematically over the years, regularly updating its privacy policy to obtain more access to your data and give you less privacy. Facebook has also changed its default settings so that more people can see your name, photo, wall posts, photos you post, Likes, and so on. Google has done much the same. In 2012, it announced a major change: Google would link its data about you from search, Gmail, YouTube (which Google owns), Google Plus, and so on into one large data set about you.

Apple is somewhat of an exception here. The company exists to market consumer products, and although it could spy on iCloud users' e-mail, text messages, calendar, address book, and photos, it does not. It uses iTunes purchase information only to suggest other songs and videos a user might want to buy. In late 2014, it started using this as a market differentiator.

Convenience is the other reason we willingly give highly personal data to corporate interests, and put up with becoming objects of their surveillance. As I keep saying, surveillance-based services are useful and valuable. We like it when we can access our address book, calendar, photographs, documents, and everything else on any device we happen to be near. We like services like Siri and Google Now, which work best when they know tons about you. Social networking apps make it easier to hang out with our friends. Cell phone apps like Google Maps, Yelp, Weather, and Uber work better and faster when they know our location. Letting apps like Pocket or Instapaper know what we're reading feels like a small price to pay for getting everything we want to read in one convenient place. We even like it when ads are targeted to exactly what we're interested in. The benefits of surveillance in these and other applications are real, and significant.

We especially don't mind if a company collects our data and uses it within its own service to better serve us. This is why Amazon recommendations are rarely mentioned when people complain about corporate surveillance. Amazon constantly recommends things for you to buy based on the things you've bought and the things other people have bought. Amazon's using your data in the same context it was collected, and it's completely transparent to the user. It's very big business for Amazon, and people largely accept it. They start objecting, though, when their data is bought, sold, and used without their knowledge or consent.

# THE DATA BROKER INDUSTRY

study by the Information Technology and Innovation Foundation foresees the loss of revenue at $22 to $35 billion over three years; that's 10% to 20% of US cloud providers' foreign market share. The Internet analysis firm Forrester Research believes that's low; it estimates three-year losses at $180 billion because some US companies will also move to foreign cloud providers.

US computer and networking companies are also taking severe hits. Cisco reported 2013 fourth quarter revenue declines of 8% to 10%. AT&T also reported earnings losses, and had problems with its European expansion plans. IBM lost sales in China. So did Qualcomm. Verizon lost a large German government contract. There's more. I have attended private meetings where large US software companies complained about significant loss of foreign sales. Cisco's CEO John Chambers wrote to the Obama administration, saying that NSA's hacking of US equipment "will undermine confidence in our industry and in the ability of technology companies to deliver products globally."

Chambers's comments echo the third aspect of the competitiveness problem facing US companies in the wake of Snowden: they're no longer trusted. The world now knows that US telcos give the NSA access to the Internet backbone and that US cloud providers give it access to user accounts. The world now knows that the NSA intercepts US-sold computer equipment in transit and surreptitiously installs monitoring hardware. The world knows that a secret court compels US companies to make themselves available for NSA eavesdropping, and then orders them to lie about it in public. Remember the Lavabit story from Chapter 5?

All of this mistrust was exacerbated by the Obama administration's repeated reassurances that only non-Americans were the focus of most of the NSA's efforts. More than half of the revenue of many cloud companies comes from outside the US. Facebook's Mark Zuckerberg said it best in a 2013 interview: "The government response was, 'Oh don't worry, we're not spying on any Americans.' Oh, wonderful: that's really helpful to companies trying to serve people around the world, and that's really going to inspire confidence in American internet companies."

To be fair, we don't know how much of this backlash is a temporary blip because NSA surveillance was in the news, and how much of it will be permanent. We know that several countries—Germany is the big one—are trying to build a domestic cloud infrastructure to keep their national data out of the NSA's hands. German courts have recently ruled against data collection practices by Google, Facebook, and Apple, and the German government is considering banning all US companies that cooperate with the NSA. Data privacy is shaping up to be the new public safety requirement for international commerce.

It's also a new contractual requirement. Increasingly, large US companies are requiring their IT vendors to sign contracts warranting that there are no backdoors in their IT systems. More specifically, the contractual language requires the vendors to warrant that there is nothing that would allow a third party to access their corporate data. This makes it harder for IT companies to cooperate with the NSA or with any other government agency, because it exposes them to direct contractual liability to their biggest and most sophisticated customers. And to the extent they cannot sign such a guarantee, they're

going to lose business to companies who can.

We also don't know what sort of increase to expect in competitive products and services from other countries around the world. Many firms in Europe, Asia, and South America are stepping in to take advantage of this new wariness. If the 1990s crypto wars are any guide, hundreds of non-US companies are going to provide IT products that are beyond the reach of US law: software products, cloud services, social networking sites, networking equipment, everything. Regardless of whether these new products are actually more secure—other countries are probably building backdoors in the products they can control—or even beyond the reach of the NSA, the cost of NSA surveillance to American business will be huge.

## CORPORATE SURVEILLANCE COSTS BUSINESS

It's been almost an axiom that no one will pay for privacy. This generalization may have been true once, but the attitudes are changing.

People are now much more cognizant of who has access to their data, and for years there have been indications that they're ready to pay for privacy. A 2000 study found that US Internet spending would increase by $6 billion a year if customers felt their privacy was being protected when they made purchases. And a 2007 study found that customers were willing to pay more to have their privacy protected: $0.60 per $15 item. Post-Snowden, many companies are advertising protection from government surveillance.

Most companies don't offer privacy as a market differentiating feature, but there are exceptions. DuckDuckGo is a search engine whose business model revolves around *not* tracking its users. Wickr offers encrypted messaging. Ello is a social network that doesn't track its users. These are nowhere near as big as their established competitors, but they're viable businesses. And new ones are opening up shop all the time.

We are seeing the rising importance of customer and user privacy in the increasing number of corporations with chief privacy officers: senior executives responsible for managing the legal and reputational risk of the personal data the corporation holds. These executives have their own organization, the International Association of Privacy Professionals, and are establishing rules and regulations even in the absence of government impetus. They're doing this because it's good for business.

# 10

# Privacy

The most common misconception about privacy is that it's about having something to hide. "If you aren't doing anything wrong, then you have nothing to hide," the saying goes, with the obvious implication that privacy only aids wrongdoers.

If you think about it, though, this makes no sense. We do nothing wrong when we make love, go to the bathroom, or sing in the shower. We do nothing wrong when we search for a job without telling our current employer. We do nothing wrong when we seek out private places for reflection or conversation, when we choose not to talk about something emotional or personal, when we use envelopes for our mail, or when we confide in a friend and no one else.

Moreover, even those who say that don't really believe it. In a 2009 interview, Google CEO Eric Schmidt put it this way: "If you have something that you don't want anyone to know, maybe you shouldn't be doing it in the first place." But in 2005, Schmidt banned employees from talking to reporters at CNET because a reporter disclosed personal details about Schmidt in an article. Facebook's Mark Zuckerberg declared in 2010 that privacy is no longer a "social norm," but bought the four houses abutting his Palo Alto home to help ensure his own privacy.

There are few secrets we don't tell *someone*, and we continue to believe something is private even after we've told that person. We write intimate letters to lovers and friends, talk to our doctors about things we wouldn't tell anyone else, and say things in business meetings we wouldn't say in public. We use pseudonyms to separate our professional selves from our personal selves, or to safely try out something new.

Facebook's CEO Mark Zuckerberg showed a remarkable naïveté when he stated, "You have one identity. The days of you having a different image for your work friends or co-workers and for the other people you know are probably coming to an end pretty quickly. Having two identities for yourself is an example of a lack of integrity."

We're not the same to everyone we know and meet. We act differently when we're with our families, our friends, our work colleagues, and so on. We have different table manners at home and at a restaurant. We tell different stories to our children than to our drinking buddies. It's not necessarily that we're lying, although sometimes we do; it's that we reveal different facets of ourselves to different people. This is something innately human. Privacy is what allows us to act appropriately in whatever setting we find ourselves. In the privacy of our home or bedroom, we can relax in a way that we can't when someone else is around.

Privacy is an inherent human right, and a requirement for maintaining the human condition with dignity and respect. It is about choice, and having the power to control how

# 15

# Solutions for the Rest of Us

Surveillance is both a technological and a legal problem. Technological solutions are often available to the user. We can use various privacy and anonymity technologies to protect our data and identities. These are effective, but can be thwarted by secret government orders. We need to fight the political battle as well.

Political solutions require group effort, but are generally limited to specific countries. Technological solutions have the potential to be global. If Microsoft designs its Windows operating system with ubiquitous file encryption, or if the Internet Engineering Task Force decides that all Internet traffic will be encrypted by default, then those changes will affect everyone in the world who uses those products and protocols.

The point is that politics can undermine technology, and also that technology can undermine politics. Neither trumps the other. If we are going to fix things, we need to fight on both the technological and the political fronts. And it's not just up to governments and corporations. We the people have a lot of work to do here.

## DEFEND AGAINST SURVEILLANCE

Law professor Eben Moglen wrote, "If we are not doing anything wrong, then we have a right to do everything we can to maintain the traditional balance between us and power that is listening. We have a right to be obscure. We have a right to mumble. We have a right to speak languages they do not get. We have a right to meet when and where and how we please." If a policeman sits down within earshot, it's within your rights to move your conversation someplace else. If the FBI parks a van bristling with cameras outside your house, you are perfectly justified in closing your blinds.

Likewise, there are many ways we personally can protect our data and defend ourselves against surveillance. I'm going to break them down into categories.

**Avoid Surveillance.** You can alter your behavior to avoid surveillance. You can pay for things in cash instead of using a credit card, or deliberately alter your driving route to avoid traffic cameras. You can refrain from creating Facebook pages for your children, and tagging photos of them online. You can refrain from using Google Calendar, or webmail, or cloud backup. You can use DuckDuckGo for Internet searches. You can leave your cell phone at home: an easy, if inconvenient, way to avoid being tracked. More pointedly, you can leave your computer and cell phone at home when you travel to countries like China and Russia, and only use loaner equipment.

You can avoid activating automatic surveillance systems by deliberately not tripping their detection algorithms. For example, you can keep your cash transactions under the threshold over which financial institutions must report the transaction to the feds. You can

decline to discuss certain topics in e-mail. In China, where automatic surveillance is common, people sometimes write messages on paper, then send photographs of those messages over the Internet. It won't help at all against targeted surveillance, but it's much harder for automatic systems to monitor. Steganography—hiding messages in otherwise innocuous image files—is a similar technique.

**Block Surveillance.** This is the most important thing we can do to defend ourselves. The NSA might have a larger budget than the rest of the world's national intelligence agencies combined, but it's not made of magic. Neither are any of the world's other national intelligence agencies. Effective defense leverages economics, physics, and math. While the national security agencies of the large powerful countries are going to be able to defeat anything you can do if they want to target you personally, mass surveillance relies on easy access to our data. Good defense will force those who want to surveil us to choose their targets, and they simply don't have the resources to target everyone.

Privacy enhancing technologies, or PETs, can help you block mass surveillance. Lots of technologies are available to protect your data. For example, there are easy-to-use plug-ins for browsers that monitor and block sites that track you as you wander the Internet: Lightbeam, Privacy Badger, Disconnect, Ghostery, FlashBlock, and others. Remember that the private browsing option on your browser only deletes data locally. So while it's useful for hiding your porn viewing habits from your spouse, it doesn't block Internet tracking.

The most important PET is encryption. Encrypting your hard drive with Microsoft's BitLocker or Apple's FileVault is trivially easy and completely transparent. (Last year, I recommended TrueCrypt, but the developers stopped maintaining the program in 2014 under mysterious circumstances, and no one knows what to think about it.) You can use a chat encryption program like Off the Record, which is user-friendly and secure. Cryptocat is also worth looking at. If you use cloud storage, choose a company that provides encryption. I like Spideroak, but there are others. There are encryption programs for Internet voice: Silent Circle, TORFone, RedPhone, Blackphone.

Try to use an e-mail encryption plug-in like PGP. Google is now offering encrypted e-mail for its users. You'll lose some search and organization functionality, but the increased privacy might be worth it.

TLS—formerly SSL—is a protocol that encrypts some of your web browsing. It's what happens automatically, in the background, when you see "https" at the beginning of a URL instead of "http." Many websites offer this as an option, but not as a default. You can make sure it's always on wherever possible by running a browser plug-in called HTTPS Everywhere.

This is not meant to be a comprehensive list. That would take its own book, and it would be obsolete within months. Technology is always changing; go on the Internet to find out what's being recommended.

I'm not going to lead you on; many PETs will be beyond the capabilities of the average reader of this book. PGP e-mail encryption, especially, is very annoying to use.

The most effective encryption tools are the ones that run in the background even when you're not aware of them, like HTTPS Everywhere and hard-drive encryption programs. In Chapter 14, I discussed some things companies are doing to secure the data of their users. Much more is going on behind the scenes. The standards bodies that run the Internet are sufficiently incensed at government surveillance that they're working to make encryption more ubiquitous online. Hopefully there will be more options by the time this book is published.

Also remember that there's a lot that encryption can't protect. Google encrypts your connection to Gmail by default, and encrypts your mail as it sits on its servers and flows around its network. But Google processes your mail, so it has a copy of the keys. The same is true for anything you send to any social networking site.

Most metadata can't be encrypted. So while you can encrypt the contents of your e-mail, the To and From lines need to be unencrypted so the e-mail system can deliver messages. Similarly, your cell phone can encrypt your voice conversations, but the phone numbers you dial, the location of your phone, and your phone's ID number all need to be unencrypted. And while you can encrypt your credit card data when you send it over the Internet to an online retailer, that company needs your name and address so it can mail your purchases to you.

And finally, encryption doesn't protect your computer while in use. You can still be hacked, either by criminals or governments. But, again, this is likely to be targeted surveillance rather than mass. All this means that while encryption is an important part of the solution, it's not the whole of it.

The current best tool to protect your anonymity when browsing the web is Tor. It's pretty easy to use and, as far as we know, it's secure. Similarly, various proxies can be used to evade surveillance and censorship. The program Onionshare anonymously sends files over the Internet using Tor. Against some adversaries, web proxies are adequate anonymity tools.

There are more low-tech things you can do to block surveillance. You can turn location services off on your smartphone when you don't need it, and try to make informed decisions about which apps may access your location and other data. You can refrain from posting identifying details on public sites. When Snowden first met journalists in Hong Kong, he made them all put their cell phones in a refrigerator to block all signals to and from the devices, so they couldn't be remotely turned into listening devices.

Sometimes surveillance blocking is remarkably simple. A sticker placed over a computer's camera can prevent someone who controls it remotely from taking pictures of you. You can leave the return address off an envelope to limit what data the post office can collect. You can hire someone to walk behind your car to obscure your license plate from automatic scanners, as people do in Tehran. Sometimes it is as easy as saying "no": refusing to divulge personal information on forms when asked, not giving your phone number to a sales clerk at a store, and so on.

Some sorts of blocking behaviors are illegal: you're not allowed to actually cover your

encrypt-its-internet-traffic/2013/11/26/44236b48-56a9-11e3-8304-caf30787c0a9_story.html.

**Several large e-mail providers:** Some examples. Danny Yadron (3 Jun 2014), "Comcast to encrypt email for security," *Wall Street Journal*, http://online.wsj.com/articles/comcast-to-encrypt-email-for-security-1401841512. Mikey Campbell (13 Jun 2014), "Apple will soon encrypt iCloud emails in transit between service providers," *Apple Insider*, http://appleinsider.com/articles/14/06/13/apple-will-soon-encrypt-icloud-emails-in-transit-between-service-providers-.

**Other companies are doing more:** Nate Cardozo, Parker Higgins, and Kurt Opsahl (13 Mar 2014), "Update: Encrypt the web report: Who's doing what," Electronic Frontier Foundation, https://www.eff.org/deeplinks/2013/11/encrypt-web-report-whos-doing-what. Claire Cain Miller (13 Jun 2013), "Secret court ruling put tech companies in data bind," *New York Times*, http://www.nytimes.com/2013/06/14/technology/secret-court-ruling-put-tech-companies-in-data-bind.html.

**Both iPhones and Android phones:** In late 2014, Apple modified its system so everything is encrypted. Android phones had encryption capability since 2011, but Google made it the default in 2014 to match Apple. David E. Sanger and Brian X. Chen (26 Sep 2014), "Signaling post-Snowden era, new iPhone locks out NSA," *New York Times*, http://www.nytimes.com/2014/09/27/technology/iphone-locks-out-the-nsa-signaling-a-post-snowden-era-.html. Craig Timberg (18 Sep 2014), "Newest Androids will join iPhones in offering default encryption, blocking police," *Washington Post*, http://www.washingtonpost.com/blogs/the-switch/wp/2014/09/18/newest-androids-will-join-iphones-in-offering-default-encryption-blocking-police.

**Google is now offering:** Google (3 Jun 2014), "Transparency report: Protecting emails as they travel across the web," *Google Official Blog*, http://googleblog.blogspot.com/2014/06/transparency-report-protecting-emails.html.

**Yahoo secretly fought the NSA:** Claire Cain Miller (13 Jun 2013), "Secret court ruling put tech companies in data bind," *New York Times*, http://www.nytimes.com/2013/06/14/technology/secret-court-ruling-put-tech-companies-in-data-bind.html. Craig Timberg (11 Sep 2014), "U.S. threatened massive fine to force Yahoo to release data," *Washington Post*, http://www.washingtonpost.com/business/technology/us-threatened-massive-fine-to-force-yahoo-to-release-data/2014/09/11/38a7f69e-39e8-11e4-9c9f-ebb47272e40e_story.html.

**Twitter unsuccessfully fought:** Kim Zetter (28 Aug 2012), "Twitter fights back to protect 'Occupy Wall Street' protester," *Wired*, http://www.wired.com/2012/08/twitter-appeals-occupy-order. Tiffany Kary (14 Sep 2012), "Twitter turns over Wall Street protester posts under seal," *Bloomberg News*, http://www.bloomberg.com/news/2012-09-14/twitter-turns-over-wall-street-protester-posts-under-seal.html.

**Facebook is fighting a court order:** Vindu Goel and James C. McKinley Jr. (26 Jun 2014), "Forced to hand over data, Facebook files appeal," *New York Times*, http://www.nytimes.com/2014/06/27/technology/facebook-battles-manhattan-da-over-warrants-for-user-data.html.

**none of the big e-mail providers:** Amicus curiae briefs were filed by three nonprofit organizations: EFF, ACLU, and Empeopled LLC. Electronic Frontier Foundation (24 Oct 2013), "Brief of amicus curiae," *United States of America v. Under Seal 1; Under Seal 2* [Lavabit], Case Nos. 13-4625, 13-4626, United States Court of Appeals for the Fourth Circuit, https://www.eff.org/document/lavabit-amicus. American Civil Liberties Union (25 Oct 2013), "Brief of amicus curiae," *United States of America v. Under Seal 1; Under Seal 2* [Lavabit], Case Nos. 13-4625, 13-4626, United States Court of Appeals for the Fourth Circuit, https://www.aclu.org/sites/default/files/assets/stamped_lavabit_amicus.pdf. Empeopled LLC (24 Oct 2013), "Brief of amicus curiae," *United States of America v. Under Seal 1; Under Seal 2* [Lavabit], Case Nos. 13-4625, 13-4626, United States Court of Appeals for the Fourth Circuit, http://justsecurity.org/wp-content/uploads/2013/10/empeopled-lavabit-amicus.

**On four occasions in the early 2000s:** Rebecca MacKinnon (2006), "'Race to the bottom': Corporate complicity in Chinese Internet censorship," Human Rights Watch, http://www.hrw.org/reports/2006/china0806/5.htm.

**lobbying for legislative restrictions:** Thomas Lee (25 May 2014), "Mind your business: Slow flex of tech's lobbying muscle," *San Francisco Chronicle*, http://www.sfgate.com/technology/article/Mind-Your-Business-Slow-flex-of-tech-s-lobbying-5504172.php. Joseph Menn (5 Jun 2014), "U.S. technology companies beef up security to thwart mass spying," Reuters, http://www.reuters.com/article/2014/06/05/us-cybersecurity-tech-idUSKBN0EG2BN20140605. Reform Government Surveillance (2014), https://www.reformgovernmentsurveillance.com.

**The EU has been trying to pass:** Zack Whittaker (4 Feb 2013), "Privacy groups call on US government to stop lobbying against EU data law changes," *ZDNet*, http://www.zdnet.com/privacy-groups-call-on-us-government-to-stop-lobbying-against-eu-data-law-changes-7000010721. James Fontanella-Khan (26 Jun 2013), "Brussels: Astroturfing takes root," *Financial Times*, http://www.ft.com/cms/s/0/74271926-dd9f-11e2-a756-

00144feab7de.html. David Meyer (12 Mar 2014), "Web firms face a strict new set of privacy rules in Europe: Here's what to expect," *Gigaom*, http://gigaom.com/2014/03/12/web-firms-face-a-strict-new-set-of-privacy-rules-in-europe-heres-what-to-expect.

**a new Magna Carta:** Tim Berners-Lee (Dec 2010), "Long live the Web," *Scientific American*, http://www.cs.virginia.edu/~robins/Long_Live_the_Web.pdf.

**that imposes responsibilities:** Jemima Kiss (11 Mar 2014), "An online Magna Carta: Berners-Lee calls for bill of rights for web," *Guardian*, http://www.theguardian.com/technology/2014/mar/12/online-magna-carta-berners-lee-web.

**the prevailing political philosophy:** Thomas Hobbes (1651), *Leviathan*, Printed for Andrew Crooke, http://www.gutenberg.org/files/3207/3207-h/3207-h.htm.

**John Locke argued:** John Locke (1690), *Two Treatises of Government*, Printed for Awnsham Churchill, http://books.google.com/books/?id=LqA4nQEACAAJ.

**Madrid Privacy Declaration (2009):** The Public Voice (3 Nov 2009), "The Madrid Privacy Declaration," International Conference of Data Protection and Privacy Commissioners, Madrid, Spain, http://privacyconference2011.org/htmls/adoptedResolutions/2009_Madrid/2009_M1.2.pdf.

**Rebecca MacKinnon makes this point:** Rebecca MacKinnon (2012), *Consent of the Networked: The Worldwide Struggle for Internet Freedom*, Basic Books, http://www.owlasylum.net/owl_underground/social/ConsentoftheNetworked.pdf.

**15: Solutions for the Rest of Us**

**Law professor Eben Moglen wrote:** Eben Moglen (27 May 2014), "Privacy under attack: The NSA files revealed new threats to democracy," *Guardian*, http://www.theguardian.com/technology/2014/may/27/-sp-privacy-under-attack-nsa-files-revealed-new-threats-democracy.

**I'm going to break them down:** Sociologist Gary Marx cataloged 11 different ways people resist surveillance; I'm going to be drawing on his taxonomy in this section. Gary T. Marx (May 2003), "A tack in the shoe: Neutralizing and resisting the new surveillance," *Journal of Social Issues* 59, http://web.mit.edu/gtmarx/www/tack.html.

**Privacy enhancing technologies:** R. Jason Cronk (25 Nov 2013), "Thoughts on the term 'privacy enhancing technologies,'" *Privacy Maverick*, http://privacymaverick.com/2013/11/25/thoughts-on-the-term-privacy-enhancing-technologies.

**Privacy Badger:** Jon Brodkin (2 May 2014), "EFF 'Privacy Badger' plugin aimed at forcing websites to stop tracking users," *Ars Technica*, http://arstechnica.com/information-technology/2014/05/eff-privacy-badger-plugin-aimed-at-forcing-websites-to-stop-tracking-users.

**and others:** Electronic Privacy Information Center (2014), "EPIC online guide to practical privacy tools," http://epic.org/privacy/tools.html.

**Remember that the private browsing:** Sara M. Watson (24 Sep 2014), "Ask the Decoder: How private is private browsing, really?" Al Jazeera, http://america.aljazeera.com/articles/2014/9/24/private-browsing.html.

**Microsoft's BitLocker:** Microsoft Corporation (21 Aug 2013), "BitLocker overview," http://technet.microsoft.com/en-us/library/hh831713.aspx.

**Apple's FileVault:** Apple Corporation (Aug 2012), "Best practices for deploying FileVault 2," http://training.apple.com/pdf/WP_FileVault2.pdf.

**I recommended TrueCrypt:** James Lyne (29 May 2014), "Open source crypto TrueCrypt disappears with suspicious cloud of mystery," *Forbes*, http://www.forbes.com/sites/jameslyne/2014/05/29/open-source-crypto-truecrypt-disappears-with-suspicious-cloud-of-mystery.

**a chat encryption program:** Nikita Borisov, Ian Goldberg, and Eric Brewer (28 Oct 2004), "Off-the-record communication, or, Why not to use PGP," ACM Workshop on Privacy in the Electronic Society (WPES'04), Washington, D.C., https://otr.cypherpunks.ca/otr-wpes.pdf.

**Google is now offering encrypted e-mail:** Stephan Somogyi (3 Jun 2014), "Making end-to-end encryption easier to use," *Google Online Security Blog*, http://googleonlinesecurity.blogspot.com/2014/06/making-end-to-end-encryption-easier-to.html.

**TLS—formerly SSL—is a protocol:** Tim Dierks and Eric Rescorla (17 Apr 2014), "The Transport Layer Security (TLS) Protocol Version 1.3," Internet Engineering Task Force Trust, Network Working Group, http://tools.ietf.org/html/draft-ietf-tls-rfc5246-bis-00.

**You can make sure it's always on:** Electronic Frontier Foundation (2014), "HTTPS Everywhere," https://www.eff.org/Https-everywhere.

**go on the Internet to find out:** Here's a good guide. Electronic Privacy Information Center (2014), "EPIC online guide to practical privacy tools," http://epic.org/privacy/tools.html.

**very annoying to use:** Peter Bright and Dan Goodin (14 Jun 2013), "Encrypted e-mail: How much annoyance will you tolerate to keep the NSA away?" *Ars Technica*, http://arstechnica.com/security/2013/06/encrypted-e-mail-how-much-annoyance-will-you-tolerate-to-keep-the-nsa-away.

**The standards bodies that run the Internet:** Here's the Internet Engineering Task Force's statement on security and pervasive monitoring. Jari Arkko and Stephen Farrell (7 Sep 2014), "Security and pervasive monitoring," Internet Engineering Task Force, https://www.ietf.org/blog/2013/09/security-and-pervasive-monitoring.

**various proxies can be used:** Mirimir (2014), "Advanced privacy and anonymity using VMs, VPN's, Tor, etc," *IVPN*, https://www.ivpn.net/privacy-guides/advanced-privacy-and-anonymity-part-1.

**The program Onionshare:** Andy Greenberg (21 May 2014), "Free app lets the next Snowden send big files securely and anonymously," *Wired*, http://www.wired.com/2014/05/onionshare.

**cell phones in a refrigerator:** Most modern refrigerators are not metal boxes, and don't make good Faraday cages. Check the details of your model before trying this yourself.

**hire someone to walk behind your car:** John Farrier (16 Apr 2014), "What is a job that exists only in your country?" *Neatorama*, http://www.neatorama.com/2014/04/16/What-Is-a-Job-That-Exists-Only-in-Your-Country.

**face paint to fool facial recognition:** Robinson Meyer (24 Jul 2014), "Anti-surveillance camouflage for your face," *Atlantic*, http://www.theatlantic.com/features/archive/2014/07/makeup/374929. Joseph Cox (14 Sep 2014), "The rise of the anti-facial recognition movement," *Kernel*, http://kernelmag.dailydot.com/issue-sections/features-issue-sections/10247/anti-facial-recognition-movement.

**special clothing to confuse drones:** Adam Harvey (2013), "Stealth wear," *AH Projects*, http://ahprojects.com/projects/stealth-wear.

**there are lots of tricks:** A good list of techniques is here. Finn Brunton and Helen Nissenbaum (2 May 2011), "Vernacular resistance to data collection and analysis: A political theory of obfuscation," *First Monday* 15, http://firstmonday.org/article/view/3493/2955.

**puts rocks in his shoes:** That trick also appears in Robert A. Heinlein's *Double Star*. Robert A. Heinlein (1956), *Double Star*, Doubleday, http://books.google.com/books?id=bnoGAQAAIAAJ.

**your kids do it all the time:** danah boyd et al. (7 Nov 2011), "Why parents help their children lie to Facebook about age: Unintended consequences of the 'Children's Online Privacy Protection Act,'" *First Monday* 16, http://firstmonday.org/ojs/index.php/fm/article/view/3850/3075.

**that was socially awkward:** Overcoming this awkwardness is important. There's a story where a customer refused to give Comcast a reason why he was disconnecting. At first, it seems rude. But when you think about it, Comcast is not entitled to this information. Xeni Jardin (14 Jul 2014), "Listen to Comcast torture Ryan Block and Veronica Belmont as they try to cancel service," *Boing Boing*, http://boingboing.net/2014/07/14/listen-to-comcast-torture-ryan.html.

**You'll find your own sweet spot:** Julia Angwin wrote an excellent account of her year-long quest to evade surveillance in the Internet age. Julia Angwin (2014), *Dragnet Nation: A Quest for Privacy, Security, and Freedom in a World of Relentless Surveillance*, Times Books, http://books.google.com/books?id=bbS6AQAAQBAJ.

**Geopolitical conflicts aren't going away:** Stewart Baker makes this point. Stewart A. Baker (29 Oct 2013), "Potential amendments to the Foreign Intelligence Surveillance Act," Testimony before the Permanent Select Committee on Intelligence of the United States House of Representatives, http://intelligence.house.gov/sites/intelligence.house.gov/files/documents/Baker10292013.pdf.

**NSA director General Keith Alexander said:** David E. Sanger (13 Aug 2013), "NSA leaks make plan for cyberdefense unlikely," *New York Times*, http://www.nytimes.com/2013/08/13/us/nsa-leaks-make-plan-for-cyberdefense-unlikely.html.

**You're going to be affected:** DLA Piper (7 Mar 2013), "Data protection laws of the world," DLA Piper, http://files.dlapiper.com/files/Uploads/Documents/Data_Protection_Laws_of_the_World_2013.pdf.

**because Microsoft is a US company:** In 2014, Microsoft unsuccessfully challenged a US demand for data stored solely in Ireland. The court demanded that the company turn it over to the US government. The decision is currently stayed while it is being appealed. Joseph Ax (31 Jul 2014), "U.S. judge orders Microsoft to submit

# Exhibit 34

# Schneier on Security

**Exhibit 0005**
7/18/2022
Bruce Schneier

Blog   Newsletter   **Books**   Essays   News   Talks   Academic   About Me

Home > Books > Click Here To Kill Everybody

## Endnotes

### Introduction: Everything Is Becoming A Computer

1 **A video shows the driver's terrified expression:** Andy Greenberg (21 Jul 2015), "Hackers remotely kill a Jeep on the highway—with me in it," *Wired*, https://www.wired.com/2015/07/hackers-remotely-kill-jeep-highway, https://www.youtube.com/watch?v=MK0SrxBC1xs (video).

1 **They hacked in through the diagnostics port:** Andy Greenberg (1 Aug 2016), "The Jeep hackers are back to prove car hacking can get much worse," *Wired*, https://www.wired.com/2016/08/jeep-hackers-return-high-speed-steering-acceleration-hacks.

1 **They hacked in through the DVD player:** Ishtiaq Rouf et al. (12 Aug 2010), "Security and privacy vulnerabilities of in-car wireless networks: A tire pressure monitoring system case study," *19th USENIX Security Symposium*, http://www.winlab.rutgers.edu/~Gruteser/papers/xu_tpms10.pdf.

1 **through the OnStar navigation system:** Jim Finkle and Bernie Woodall (30 Jul 2015), "Researcher says can hack GM's OnStar app, open vehicle, start engine," *Reuters*, http://www.reuters.com/article/us-gm-hacking-idUSKCN0Q42FI20150730.

1 **and the computers embedded in the tires:** Ishtiaq Rouf et al. (12 Aug 2010), "Security and privacy vulnerabilities of in-car wireless networks: A tire pressure monitoring system case study," *19th USENIX Security Symposium*, http://www.winlab.rutgers.edu/~Gruteser/papers/xu_tpms10.pdf.

1 **via the entertainment system:** Kim Zetter (16 Jun 2016), "Feds say that banned researcher commandeered plane," *Wired*, https://www.wired.com/2015/05/feds-say-banned-researcher-commandeered-plane.

1 **through air-to-ground communications systems:** Sam Grobart (12 Apr 2013), "Hacking an airplane with only an Android phone," *Bloomberg*, http://www.bloomberg.com/news/articles/2013-04-12/hacking-an-airplane-with-only-an-android-phone.

2 **remote hack of a Boeing 757:** Calvin Biesecker (8 Nov 2017), "Boeing 757 testing shows airplanes vulnerable to hacking, DHS says," *Aviation Today*, http://www.aviationtoday.com/2017/11/08/boeing-757-testing-shows-airplanes-vulnerable-hacking-dhs-says.

2 **In 2016, hackers—presumably Russian:** Kim Zetter (12 Jun 2017), "The malware used against the Ukrainian power grid is more dangerous than anyone thought," *Vice Motherboard*, https://motherboard.vice.com/en_us/article/zmeyg8/ukraine-power-grid-malware-crashoverride-industroyer. Kevin Poulsen (12 Jun 2017), "U.S. power companies warned 'nightmare' cyber weapon already causing blackouts," *Daily Beast*, https://www.thedailybeast.com/newly-discovered-nightmare-cyber-weapon-is-already-causing-blackouts.

2 **The CrashOverride attack was different:** Kim Zetter (3 Mar 2016), "Inside the cunning, unprecedented hack of Ukraine's power grid," *Wired*, https://www.wired.com/2016/03/inside-cunning-unprecedented-hack-ukraines-power-grid.

2 **There, the attackers:** Jim Finkle (7 Jan 2016), "U.S. firm blames Russian 'Sandworm' hackers for Ukraine outage," *Reuters*, https://www.reuters.com/article/us-ukraine-cybersecurity-sandworm/u-s-firm-blames-russian-sandworm-hackers-for-ukraine-outage-idUSKBN0UM00N20160108.

2 **One of the station operators recorded:** C&M News (24 Jun 2017), "Watch how hackers took over a Ukrainian power station," *YouTube*, https://www.youtube.com/watch?v=8ThgK1WXUgk.

## Search

Powered by *DuckDuckGo*

[                    ] Go

○ Blog   ○ Essays   ● Whole site

## Subscribe



## About Bruce Schneier



I am a public-interest technologist, working at the intersection of security, technology, and people. I've been writing about security issues on my blog since 2004, and in my monthly newsletter since 1998. I'm a fellow and lecturer at Harvard's Kennedy School, a board member of EFF, and the Chief of Security Architecture at Inrupt, Inc. This personal website expresses the opinions of none of those organizations.

## Featured Essays

The Value of Encryption

Data Is a Toxic Asset, So Why Not Throw It Out?

How the NSA Threatens National Security

Terrorists May Use Google Earth, But Fear Is No Reason to Ban It

In Praise of Security Theater

Refuse to be Terrorized

The Eternal Value of Privacy

Terrorists Don't Do Movie Plots

More Essays

## Latest Book

58   **Did an automatic license plate scanner:** Catherine Crump et al. (17 Jul 2013), "You are being tracked: How license plate readers are being used to record Americans' movements," *American Civil Liberties Union*, https://www.aclu.org/files/assets/071613-aclu-alprreport-opt-v05.pdf.

58   **Surveillance companies know a lot about us:** Dylan Curren (30 Mar 2018), "Are you ready? Here's all the data Facebook and Google have on you," *Guardian*, https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy.

58   **We never lie to our search engines:** Settings like Chrome's "incognito mode" or Firefox's "private browsing" keep the browser from saving your browsing history. It does not prevent any websites you visit from tracking you.

59   **Already, all new Toyota cars track speed:** Hans Greimel (6 Oct 2015), "Toyota unveils new self-driving safety tech, targets 2020 autonomous drive," *Automotive News*, http://www.autonews.com/article/20151006/OEM06/151009894/toyota-unveils-new-self-driving-safety-tech-targets-2020-autonomous.

59   **In 2015, John Deere told:** Dana Bartholomew (2015), "Long comment regarding a proposed exemption under 17 U.S.C. 1201," *Deere and Company*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf.

60   **Apple censored apps that tracked:** Stuart Dredge (30 Sep 2015), "Apple removed drone-strike apps from App Store due to 'objectionable content,'" *Guardian*, https://www.theguardian.com/technology/2015/sep/30/apple-removing-drone-strikes-app. Lorenzo Franceschi-Bicchierai (28 Mar 2017), "Apple just banned the app that tracks U.S. drone strikes again," *Vice Motherboard*, https://motherboard.vice.com/en_us/article/538kan/apple-just-banned-the-app-that-tracks-us-drone-strikes-again.

60   **"content that ridicules public figures":** Jason Grigsby (19 Apr 2010), "Apple's policy on satire: 16 apps rejected for 'ridiculing public figures,'" *Cloudfour*, https://cloudfour.com/thinks/apples-policy-on-satire-16-rejected-apps.

60   **in 2017, Apple removed security apps:** Telegraph Reporters (31 Jul 2017), "Apple removes VPN apps used to evade China's internet censorship," *Telegraph*, http://www.telegraph.co.uk/technology/2017/07/31/apple-removes-vpn-apps-used-evade-chinas-internet-censorship.

60   **Google has also banned an app:** AdNauseam (5 Jan 2017), "AdNauseam banned from the Google Web Store," https://adnauseam.io/free-adnauseam.html.

61   **"Some of us have pledged our allegiance":** Bruce Schneier (26 Nov 2012), "When it comes to security, we're back to feudalism," *Wired*, https://www.wired.com/2012/11/feudal-security.

61   **Companies owning fleets of autonomous cars:** Judith Donath (16 Nov 2017), "UberFREE: The ultimate advertising experience," *Medium*, https://medium.com/@judithd/the-future-of-self-driving-cars-and-of-advertising-will-be-promoted-rides-free-transportation-b5f7acd702d4.

62   **Because the machines use software:** After years of refusing to allow consumers to use refillable pods, Keurig now allows consumers to use any coffee they want, as long as they buy a special add-on. Alex Hern (11 May 2015), "Keurig takes steps towards abandoning coffee-pod DRM," *Guardian*, https://www.theguardian.com/technology/2015/may/11/keurig-takes-steps-towards-abandoning-coffee-pod-drm.

62   **HP printers no longer allow:** Brian Barrett (23 Sep 2016), "HP has added DRM to its ink cartridges. Not even kidding (updated)," *Wired*, https://www.wired.com/2016/09/hp-printer-drm.

62   **And while some companies have overreached:** Electronic Frontier Foundation (last updated 31 Aug 2004), *Chamberlain Group Inc. v. Skylink Technologies Inc.*, https://www.eff.org/cases/chamberlain-group-inc-v-skylink-technologies-inc. *Tech Law Journal* (31 Aug 2004), "Federal Circuit rejects anti-circumvention claim in garage door opener case," http://www.techlawjournal.com/topstories/2004/20040831.asp. US Supreme Court (25 Mar 2014), "Opinion," *Lexmark International, Inc. v. Static Control Components, Inc.*, No. 12–873, https://www.supremecourt.gov/opinions/13pdf/12-873_3dq3.pdf.

63   **The data is owned by the companies:** Hugo Campos (24 Mar 2015), "The heart of the matter," *Slate*, http://www.slate.com/articles/technology/future_tense/2015/03/patients_should_be_allowed_to_access_data_generated_by_implanted_devices.html.

63   **Similarly, people have been hacking:** Darren Murph (6 Apr 2007), "Mileage maniacs hack

# EXHIBIT 35



*Journal of Cybersecurity*, 2020, 1–13
doi: 10.1093/cybsec/tyaa006
Research paper

Research paper

# Privacy threats in intimate relationships

## Karen Levy [1,2,]* and Bruce Schneier[3,4]

[1]Department of Information Science, Cornell University; [2]Cornell Law School, Ithaca, NY, USA; [3]Berkman Klein Center for Internet and Society, Harvard University; and [4]Belfer Center for Science and International Affairs, Harvard Kennedy School, Cambridge, MA, USA

*Corresponding address: Department of Information Science, Cornell University, Ithaca, NY, USA. Tel: +1 317-682-8287. Email: karen.levy@cornell.edu

Received 11 December 2018; revised 10 March 2020; accepted 8 April 2020

## Abstract

This article provides an overview of *intimate threats*: a class of privacy threats that can arise within our families, romantic partnerships, close friendships, and caregiving relationships. Many common assumptions about privacy are upended in the context of these relationships, and many otherwise effective protective measures fail when applied to intimate threats. Those closest to us know the answers to our secret questions, have access to our devices, and can exercise coercive power over us. We survey a range of intimate relationships and describe their common features. Based on these features, we explore implications for both technical privacy design and policy, and offer design recommendations for ameliorating intimate privacy risks.

**Keywords:** intimacy; family; abuse; children; relationships; privacy

## Introduction

The information security community tends to focus its attention on a canonical set of attackers: companies tracking our activities online, criminals looking to steal our data, government agencies surveilling us to gather information, and hackers out for the "lulz." But a huge number of threats are much more quotidian, performed by much less powerful and less technically savvy actors with very different motives and resources. These attackers know their victims well, and have much greater access to their information, devices, and lives in general. We call these attacks *intimate threats*, in which one member of an intimate relationship—a spouse, a parent, a child, or a friend, for example—violates the privacy of the other.

Intimate threats have garnered little explicit attention from the security and privacy communities and from system designers. For example, a recent review of 40 academic analyses of smart home security anticipated 29 different threat actors and 100 different types of threats—but the threat model of a domestic abuser was almost entirely absent across the literature [1]. We argue that these threats ought to be treated as a primary concern.

Intimate threats represent the way a huge number of people actually experience insecurity and privacy invasions every day. These threats are so common as to be treated as routine and often overlooked, but they are experienced much more frequently—and

often with greater direct impact on victims' lives—than many of the threats that dominate the security discussion. And they disproportionally impact society's most vulnerable and least powerful people, often including women, children, the elderly, and the physically or cognitively impaired. Though these threats are, by their nature, difficult to definitively quantify, the indicators we have suggest the scope and scale of intimate threats. In one survey, 31% of participants admitted to snooping through another person's phone without permission in the past year [2]. A recent Pew survey found that the majority of parents check their teenagers' browsing histories and social media profiles. Forty-eight percent looked through phone records and text messages, and 16% tracked teens' locations via their cell phones; half reported knowing the password to their teenager's email account [3]. An NPR survey of US domestic violence shelters indicated that 85% of shelters had worked with survivors who had been stalked using GPS devices, and that 75% had helped survivors who had been subject to eavesdropping using remote tools [4]. A survey in the UK found that 85% of abuse survivors reported being subject to online abuse as part of a pattern of their abuse more generally [5]. Taken together, figures like these suggest that privacy invasions by intimates are pervasive and deserving of focused study.

In addition to being important on their own, intimate threats can be precursors to more traditional forms of privacy and security

© The Author(s) 2020. Published by Oxford University Press.

This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted reuse, distribution, and reproduction in any medium, provided the original work is properly cited.

1

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Electronic copy available at: https://ssrn.com/abstract=3620883

threat. Intimate privacy invasions can result in the destruction of valuable or personal data, like financial records or family photographs. They can be the first step in financial fraud. In abusive partner situations, they can be a precursor to physical, emotional, and sexual abuse [6, 7]. And even well-intentioned intimate monitoring can create a slippery slope of acceptability, inuring users to accepting surveillance as a mode of social control in other contexts [8].

Finally, a more systematic consideration of intimate threats stands to benefit socio-technical security research as a field. These threats pose difficult technical challenges, made more complex by the social relationships in which they are embedded—which are marked by different degrees of authority and autonomy within relationships. They present a mixture of motivations for privacy invasion, often including beneficent motivations like protection and care. They pose novel and interesting questions about privacy boundaries: what degree of monitoring is socially and normatively acceptable in intimate relationships, and how system designers might best accommodate divergent and dynamic preferences. Directly addressing these issues extends the field and provides designers with an opportunity to better address real-world situations. In this way, our work fits into a broader scheme of research that prioritizes the sociotechnical and behavioral dimensions of security and privacy across different social contexts, and which recognizes the critical importance of interdisciplinary approaches to developing solutions [9–11].

Our goals in this article are twofold. While emerging research has begun to examine privacy threats within particular intimate relationships, we are aware of no work that synthesizes common characteristics or design considerations of these threats from across intimate contexts. Our first goal, then, is to describe intimate threats as a *class* of privacy problems, drawing out the features that characterize the category. Many of these features involve the violation of implicit assumptions that hold more readily in other contexts of privacy threat. A better understanding of these common features is required to more adequately protect against intimate threats.

Our second goal is to articulate a set of design considerations that is cognizant of intimate threats. These are difficult problems, and our intention is not to prescribe an exhaustive "checklist" that will immunize a technological system against all intimate threats. Rather, we aim to supply researchers, designers, and policymakers with a conceptual toolkit for recognizing and taking these threats seriously, as well as a critical assessment of the design trade-offs they entail.

## Monitoring in intimate relationships

An extensive amount of monitoring routinely occurs across many types of intimate relations, from romantic partners, to parent–child relationships, to roommates, to caregivers. Family members, roommates, and close friends often know each other's whereabouts and with whom the other spends time. Long-term partners often share bank accounts and keep track of each other's financial activities. Roommates answer each other's phone calls—regularly on a shared home landline, and sometimes on each other's cell phones. People living in the same household may share computers, phones, and other connected devices. Intimates might share social media and

email accounts [12]—and even if they have separate accounts, they may know one another's passwords [13–15]. Depending on how their devices and accounts are configured, they may have access (intentionally or not) to each other's files, browsing history, and more. Smart home devices are shared by necessity, and give family members access to a great deal of information about each other's whereabouts and activities.

People may willingly share access to accounts and devices for a number of benign and useful social, cultural, and economic reasons [12, 16]. They may do so as a practical component of household management and communication [16], or because it is cost-effective to pool resources within the family. They may do so to establish and demonstrate intimacy [17] or trust [18, 19] in a partner, or as a condition of access. Personal preferences and cultural expectations further complicate matters.[1] Some partners may desire not only to monitor an intimate partner, but also to *be* monitored, for convenience (e.g., "I like my partner to know when I'm on my way home so we can make evening plans") [21], for safety (e.g., to inform trusted contacts of one's location to provide a "virtual escort" while walking alone) [22], or for other reasons. In other contexts, there may be social or cultural assumptions of family access and sharing, often along gendered lines [23, 24]. (In fact, some industry groups have gone so far as to say that because devices are often shared within households and families, device identifiers should not be considered "personally identifying" under privacy laws [25].)

Much of this access is not necessarily nefarious, intentional, or even unwelcome. In many cases, it simply reflects how people choose to organize their households and relationships, and the role of digital technologies within them. But intimacy also presents distinct informational vulnerabilities. Those who sit in intimate relation to us hold unique resources that can be brought to bear to gain access to our data or devices. Intimates may marshal those resources for a variety of purposes, up to and including abuse. And even in non-abusive situations, members of close relationships may find it almost impossible to protect their own privacy interests against one another, thanks in large part to assumptions built into common technical infrastructures.

Intimate monitoring brings unique ethical complications to the fore [26, 27]. In most privacy contexts, there's little question about the impropriety of unauthorized access. But in intimate settings, some unauthorized access would strike many as warranted—or even required—as a component of a duty of care [28]. Family members have a moral, economic, and often legal responsibility to take care of one another and ensure each other's safety, security, and wellbeing; they often leverage data-gathering technologies in doing so. Indeed, there are many cases in which it seems both normatively and practically unfathomable that intimates *not* be privy to one another's data. For instance, medical and educational data from minor children must be made available to their parents—who bear responsibility for children's care in both respects—and applicable laws specifically provide that parents should have such access in many cases.[2]

The fact that intimate information-sharing is widespread and often accepted should not lead us to be unreflective about very real privacy threats within intimate relationships. Rather, it makes it all the more important to consider how intimate privacy threats occur,

---

1  For an example of such monitoring that many would find abhorrent, see this about women in Saudi Arabia [20].

2  For example, in the USA, the Family Educational Rights and Privacy Act (FERPA) gives parents access to their children's educational records up until age 18; even after age 18, schools may *choose* to disclose certain

records to parents in some cases (e.g., in cases of an emergency, or if the child is claimed as a dependent) [29]. Indeed, the tension between parental notification and a child's privacy can be a difficult one for institutions to navigate, as when colleges do not notify parents of children's psychological difficulties [30].

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Electronic copy available at: https://ssrn.com/abstract=3620883

when they are unwelcome, and how to reason about them conceptually. The line between *watching* and *watching over* is a blurry one. Even in close, loving, and generally functional relationships, privacy invasions can at times be cause for conflict and anxiety [31]. There are no bright-line rules for determining when duties of care and protection override privacy interests in intimate relationships, nor for whether intimate monitoring crosses a line of appropriateness. Intentions can be intertwined in the same monitoring relationship ("I want to see when my wife is on her way home so I can start dinner, but I also want to make sure she isn't going near X's house") and can change over time and circumstance. Variable preferences and norms about data sharing in intimate relationships present special challenges to designing privacy into these systems; they are not a reason to ignore these threats.

Victims of intimate privacy threat typically lack legal recourse. Judges and legislators are generally loath to intervene too strongly in what is often considered the "sacred" space of the intimate sphere, tending to protect the privacy *of* families vis-à-vis the state rather than privacy *within* the family [32–34]. This is even more true in patriarchal societies that grant men in the family stronger rights and freedoms (e.g., Turkey [35]); in Saudi Arabia, for example, where all women are required to have a male guardian, a government-run website permits men to grant or deny women under their guardianship the right to travel, and to set up notifications so that they receive a text message should a woman in their family try to get on an airplane [20]. In the USA, some legal protections do exist against the most egregious abuses—protections against nonconsensual pornography [36, 37], no-contact orders following episodes of intimate partner violence, and so on—but the law has generally had trouble keeping up with the challenges of digitally mediated intimate abuse [38–40]. And in the contexts of intimate privacy violations that do *not* rise to the level of abuse (like child tracking), the law offers virtually no remedy, often due to the assumption that a caretaker's preferences are aligned with the interests of the person being monitored [41, 42].

We conceive of intimate privacy threats broadly in this article. Though we use the words "attack," "attacker," and "victim" to characterize aspects of these threats, these may sometimes seem to describe normal—even accidental—interactions between people with no specific malicious motivations toward one another. Our use of these words aligns our inquiry with the dominant discourse in security discussions and threat modeling, in which the terms merely indicate who is attacking and defending a system and do not have any moral or pejorative connotations [43, 44]. Many of the privacy invasions we discuss in this article are quite casual; attackers need not necessarily act with bad intent, nor plan to use the information gleaned for abusive or illegal purposes. It may be helpful to conceptualize some intimate threats as *involuntary disclosure* of a victim's information to an attacker, at times even without the attacker having a specific intent to obtain that information.

## Types of intimate attackers and victims

All intimate relationships—and the privacy practices and expectations within them—are different. We characterize here some of the most prevalent relationships that may give rise to privacy threats and summarize some of the existing research that examines each context. The scope of intimate relationships with which we concern ourselves follows Hasday's definition of intimates as including "dates, sexual and/or romantic partners, and family members such as spouses, parents, and children" [34, p. 6]; we consider in-family

caregivers (e.g., nannies) and friends/roommates, as well. (Hasday argues that no "ideal and unassailable definition of intimacy exists"; like her, we adopt a "working definition" based on common understanding of the term, without firmly fixed boundaries.)

### Intimate partners

Privacy threats commonly emerge in romantic partnerships. Significant others may invade one another's privacy for a variety of reasons, ranging from casual to abusive, over the course of a romantic relationship.

Perhaps the most alarming example of privacy invasion in a romantic relationship is in the case of intimate partner violence and abuse. Nearly one in three women and one in six men will experience abuse at some point over the course of their lives [45]. In an increasing proportion of these cases, abusers use digital tools to perpetuate abuse and control over the victim: tracking a victim's location, monitoring their communications, harassing and threatening them, and otherwise surveilling or restricting their activities [6, 7, 46, 47]. These behaviors commonly begin in early dating relationships, and often accompany or prefigure other forms of abuse [47].

Abusers have used a variety of digital tools to spy on or exert control over their victims, most of which require minimal technical sophistication. Some abusers use off-the-shelf spyware apps, which are commonly available online and on app stores; these applications run in the background on victims' mobile phones and computers, reporting their activities back to an abuser surreptitiously [48, 49].

Abusers also make use of a number of commonplace digital tools for abusive purposes. Smart home and IoT technologies such as remote web-enabled cameras, home appliances, thermostats, speakers, and other home sensors can be used by abusers to stalk, harass, and monitor their activities [50, 51]. One company markets a mattress that detects and reports "suspicious movements in the bed" [52].

Even more commonly, abusers rely on the ease of access facilitated by knowledge of the victim's passwords (sometimes shared under threat, other times voluntarily as a sign of trust [19, 53]), answers to security questions, and other authentication mechanisms. Sometimes authentication can by bypassed altogether—for example, the abuser may be able to keep track of the victim's communications because they share a family plan for cellular service, or via browser history on a shared computer [46, 54]. Child-tracking apps and employee-tracking apps are easily repurposed for surreptitiously monitoring intimate partners, and there are some indications that their developers are aware of and condone such use [48]. Social media also presents an easy route toward tracking, as many platforms offer up information like a user's location while posting or an indicator of whether the user is actively on the site. Many shared services record usage history, which can be used to monitor a partner.

Privacy invasions in the context of intimate partner abuse are especially egregious and provide a noncontroversial (and important) rallying point for taking intimate threats seriously. But privacy invasions between romantic partners aren't restricted to these extreme cases, and we ought to take intimate privacy seriously even in the *absence* of abusive circumstances. For instance, many partners collect data about one another routinely and harmlessly in the context of courtship (e.g., "Facebook stalking" a prospective date), sexual relationships, relationship management, or as a way to "gamify" aspects of romantic love [17, 32, 55, 56]. Many fertility- and pregnancy-focused apps grant partners a degree of surveillance over one another (most commonly, male partners over female partners)

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Electronic copy available at: https://ssrn.com/abstract=3620883

[57]. For example, one service prompts a man to offer his pregnant partner a glass of water if his version of the app suggests she may be dehydrated [32]. Several period trackers issue "alerts" to men when their partners are menstruating; one even provides the capability to track several women's periods at once, tracking each with a separate password "so when you punch it in, it only looks like you're tracking her" [32].

In other cases, partners may monitor each other when they doubt the responsibility of each other's behavior; for example, parents who travel commonly report "checking in" on their partner via web-enabled baby monitor to see if the baby has been put to bed properly. Soberlink, a facial-recognition-augmented breathalyzer, is sometimes ordered by courts as a condition of visitation when one parent has a history of alcoholism. If the alcoholic parent (the "monitored client") fails to breathe clean, a text is sent to the other partner (the "concerned party") as an indication that it is not safe for the children to visit that day [58].

Additionally, partners are sometimes "caught" being unfaithful via monitoring unbeknownst to them. For example, the governor of Alabama's furtive texts to his paramour were being synced to his wife's iPad [59]. In another story, an Internet-connected smart scale sent the weight measurement of someone's illicit lover to his partner's phone [60]. In these cases, there's a tendency to view the unfaithful partner as a villain who had it coming, rather than as a person whose privacy preferences were disrespected by poor design [12]. But from a privacy-protective perspective, we ought to be agnostic as to the nature of the behavior or content detected, and be fundamentally concerned with how technology may facilitate involuntary information-sharing.

### Parents and minor children

Parents routinely monitor their children in the course of caring for them, from infancy (and even beforehand, *in utero*) through adolescence [61]. Some degree of parental monitoring is essential to ensure children's safety and well-being. Indeed, as parents' lives become busier, parents are often lambasted or punished for giving children significant autonomy—a burden disproportionately felt by women of color and at the lower end of the socioeconomic scale. Mothers have been charged with child abuse and endangerment for letting their children wait in the car or play in a park unsupervised while they run errands or attend job interviews [62]. This risk of being perceived as a neglectful parent, combined with a lack of social or governmental infrastructure for providing childcare resources, provides an incentive for parents to digitally track their children. Fear-based marketing exacerbates this impetus by cultivating a sense of generalized anxiety in parents—one that can most readily be ameliorated through monitoring [28].

Monitoring often continues well into the teenage years, as different risks become salient to parents. Many parents know the passwords of their children's accounts and regularly check on their online activities, perhaps as a condition of use [63]. Parents have been held responsible for their children's illegal file downloads or sexting behavior, creating legal obligations that result from *failing to* supervise teens' online activity [64, 65]. As discussed earlier, a Pew survey found that most parents engaged in some form of monitoring of teens' browsing histories and social media profiles, and half had their teens' email passwords [3]. A separate study found that parents with home-entryway surveillance systems routinely monitor the comings and goings of their teenage children [66]. Parental monitoring software is commonly marketed to aid parents in many of these activities [28, 48]. On the more extreme end of the

spectrum, parents may purchase tamperproof ankle bracelets and GPS monitoring services for "high-risk" teens [67].

The balance between essential caretaking and privacy invasion can be unclear [68, 69]. On one hand, parents have a duty to supervise their children, and implicit authority to place limits on their activities and communications. Parental control apps like Google's Family Link allow parents to view children's online activity and device location, under the advertised purpose of letting parents "set digital ground rules to help guide" their children online [70]. On the other hand, some have raised concerns that the normalization of parental surveillance quashes developmentally important childhood freedoms and trust-building—particularly as children get older—as well as children's freedom of expression and access to information [71–73]. Child monitoring apps like Bark, for example, alert parents when its algorithms detect profanity, sexting, or indicators of depression in a child's social media or text exchanges [74]. Toys like Hello Barbie record children's conversations with the doll and, unbeknownst to them, email the audio files to their parents [75]. A recent Google patent proposes that its smart home system can "infer mischief" if its audio and motion sensors detect that children are occupying a room—but are *too* quiet [76]. All have prompted scrutiny from privacy researchers.

Parents may also violate their children's privacy for reasons wholly unrelated to caretaking. Parents may fraudulently use a child's identity for purposes of opening lines of credit and other accounts. Though the prevalence of such fraud is difficult to establish empirically, research suggests that when a child's identity is stolen, their parents are the most likely perpetrators [77].

In other contexts, the tables may be turned: young children may be privacy threats *to* their parents. Children are often the savviest technology consumers in their own families, and often act as "sysadmins" within them; in the course of this role, they may incidentally or deliberately gain access to detailed digital information about their parents [78]. And children may have motivations to use this information for personal gain—stealing money from parents' bank accounts, using parents' passwords to gain access to proscribed media, using their credit cards, and the like. Notably, some authentication mechanisms may be less effective for one's children for reasons having to do with biological similarity. The chance of a random person unlocking someone else's Apple's Face ID—used for authentication on the iPhone X—is only one in one million, according to Apple's whitepaper on the topic—but "[t]he probability of a false match is different for twins and siblings that look like you as well as among children under the age of 13, because their distinct facial features may not have fully developed" [79]. Indeed, cases of children unlocking their parents' iPhones with the children's own faces have been reported in the media [80].

### Adult children and elderly parents

As the world's population ages, a growing number of families find themselves charged with caring for elderly relatives [42]. The corresponding demand for care—along with meager state resource allocations to support such care—leave many families dependent on remote monitoring technologies to make these burdens tractable.

Some families use video monitoring equipment, colloquially known as "granny cams," to keep tabs on the safety and well-being of elderly relatives [42, 81]. In nursing homes and assisted living facilities, families often deploy web-enabled cameras in residents' rooms. The use of these cameras is often motivated by concern about the resident being abused or neglected at the hands of staff or another resident [42]. Roughly 10% of elderly adults (across all care

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

settings) are estimated to be victims of physical, sexual, or psychological abuse, neglect, or financial exploitation [82]. And nursing home residents are considered to be among the most vulnerable: approximately half of nursing home residents suffer from Alzheimer's disease or related dementias [83], and abuse is believed to be significantly underreported among populations afflicted with these conditions [84].

But familial monitoring of elderly relatives presents its own set of privacy threats. The same cognitive impairments that make nursing home residents susceptible to abuse may also make them unable to give meaningful consent to being monitored by a relative. When this is the case, the capacity for consent typically defaults to the resident's "representative," who is most commonly the family member who is instigating monitoring in the first place [42]. A huge variety of intimate activities—including bathing, dressing, medical care, sexual activity, and personal conversations—takes place in residents' rooms. Since 2001, seven states have implemented statutes and regulations governing families' use of cameras there—but the majority of such legislation does not account for inconsistent privacy preferences between the resident and the family representative (nor do they account for potential abuse situations within the familial relationship). Instead, they tend to treat the family member's decisions as a precise extension of the interests of the elderly resident [42].

Alternatively, families may monitor an elderly relative to support "aging in place"—that is, as a condition of permitting the relative to remain in a private home, often alone, rather than moving them to a facility where they would have better access to medical services but might lose desired independence [85]. Cameras are also often used in these contexts, as well as a variety of other technologies that give a family member oversight over the activities of the elderly relative. These commonly include monitoring of health outcomes and behaviors, like adherence to prescriptions (like "smart" pills and pill bottles that notify someone if a family member fails to take medicines on time [86, 87]), safety and mobility issues (like Lifeline systems that detect falls [88]), and a variety of smartphone apps, GPS trackers, and in-home sensor systems that track things like temperature, doors opening and closing, and the presence of visitors [89]. The common denominator among such technologies is a rhetoric of enablement: but for the peace of mind that they ensure, the elderly relative would no longer be able to live independently [90]. As is the case in other intimate relationships, family members' monitoring of elderly relatives is very often motivated by care and a desire to protect. Yet, research suggests that the privacy preferences of monitored relatives often diverge. In one study, adult children of elderly mothers had consistently more favorable views of sensor, camera, and location tracking technologies than their mothers did—but the adult children typically thought they could persuade their mothers to give consent to being monitored [91].

### Other caregivers and their charges/patients/dependents
Similar intimate threats arise in the context of paid care work. An increasing amount of intimate care is outsourced to nannies, babysitters, and workers who care for the elderly and infirm. The presence of these workers as intermediaries in care relations introduces further opportunities and incentives for intimate monitoring, as well as additional complexities related to the employment relationship.

These workers may themselves monitor their charges, using the same sorts of tools, and based on the same sorts of motivations, as described above. They may also be the targets of monitoring by their employer (or by a government agency that subsidizes the care)—to ensure that they do their work to a satisfactory level, to allay

concerns that they may steal from the household, and to ensure the safety and health of their charges [92]. This monitoring commonly occurs via nanny cams and distributed surveillance platforms like Nannysightings.com, through which parents can report to one another on caregivers' behaviors [28]. Extensive monitoring can also occur in the context of hiring and screening caregivers: the service Predictim, for instance, analyzed prospective babysitters' social media histories in order to predict their propensity for drug abuse and bullying (before Facebook and Twitter curtailed their access to do so) [93].

Besides being attackers or victims of attacks themselves, paid caretakers can also be used as a justification for more monitoring of the dependent by the person who contracts for their care. For example, the threat of abuse at the hands of nursing home workers is used as a justification for putting elderly residents on cameras monitored by family members (despite the fact that most elder abuse is perpetrated by family members, not care workers), potentially resulting in invasions of the elderly resident's privacy by their family [42, 81]. Similarly, some day-care centers offer web cameras for parents to monitor the type and quality of care their children receive (see, for example, [94]).

### Friends
Of course, privacy threats can also arise within friendships. Friends often share intimate details of their lives with each other; in fact, the willingness to reveal private information to one another can be understood as an indicator of trust and closeness in the relation [8]. Friends may be roommates and share common physical space. But as with other sorts of intimate relations, friends can be controlling and retaliatory, and friendships can sour. As such, they can share many of the same characteristics as other intimate relationships.

This class of risk can be further exacerbated by the inexperience and naïveté of youth, and by the transitory nature of friendships and partnerships among teens and tweens [53]. Young people manage, define, and maintain their relationships with one another by differentiating the access they allow to some friends versus others (e.g., allowing some friends—but not others—to know one's location on a "Find My Friends" app) [8].

## Common features of intimate threats

Having reviewed various relations in which intimate threats can reside, we turn now to drawing out features that frequently characterize intimate threats across these relational contexts, as described in existing research—many of which set them apart from traditional privacy contexts. Clearly, individual situations will vary; these features will be present and more or less salient in different relationships. We enumerate four such features here, and in the following section describe their implications for policy and design.

### Feature 1: Attackers may have multiple motivations—including beneficent ones—often tied to emotion
Attacker motivations in intimate settings are often very different than in other privacy contexts. Although there are certainly instances of intimates stealing money and other things of value from each other, in general, intimate attacks are more likely to be motivated by an attacker seeking knowledge of, and possibly control over, another's behaviors [95]. Sometimes these motivations are premised on positive inclinations like love, caretaking, and perceived protection from internal and external dangers. There may be a strongly held (and legally supported) sense of duty to "look after" intimate

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

relations, and privacy invasions may be justified as being "for their own good"—particularly when one party is much more vulnerable, like a child, elderly adult, or a family member with reduced physical or cognitive capacity.

In other cases, the motivation may be control for control's sake, jealousy, or fear. In abusive situations, the motivations may be a desire to cause emotional or even physical harm, retaliation for a perceived wrong, or preventing a victim from seeking help or extrication from the situation [6]. On both ends of the spectrum, emotion plays a strong role in motivating behavior, and advertising often plays on those emotions to market monitoring tools [28].

These emotional motivations mean that normal considerations about whether an attack is "worth it" can fail in the context of intimate relations. Because an attacker may be motivated by a range of factors—ranging from deep love and care to obsession, jealousy, or desire for control, and with a good deal of variation in individual, cultural, and relational preferences—dispassionate, rational cost-benefit analysis of threats and resources is unlikely to be easily applied to intimate threats. One of us (Bruce) remembers that as a child he once brute-forced a combination padlock in his house. A four-digit lock's 10,000 possible combinations might be enough to keep out a burglar, but fail against a child with unlimited access and nothing better to do that day.

### Feature 2: Copresence facilitates device and account access

In many privacy contexts, attackers and victims are assumed, at least implicitly, to occupy physically separate spaces. Physical separation helps to ensure that authentication mechanisms and access credentials create security. This assumption rarely holds true in intimate relationships. We borrow here from Goffman's use of the term *copresence* to describe situations in which two actors share physical space, facilitating "rich[] information flow" between them such that people "are close enough to be perceived in whatever they are doing" [96, p. 17]. In intimate relationships, people very commonly share physical space—they live together in households, spend time together in public and private settings, and otherwise have high degrees of physical access that facilitates information transmission about each other. Copresence has a number of implications for intimate threats, as we describe here.

Shared physical spaces and proximity among threat, victim, and devices create different vulnerabilities than those threats premised solely on remote digital access [46]. Copresence allows attackers to access a victim's devices physically, facilitating information visibility (including "over the shoulder" threats such as reading the victim's screen, watching them enter their passwords, and so on [19, 54, 97]), as well as easier installation of spyware [48]. Many smartphone apps default to presenting messages and communications on the phone's locked screen, a potential vulnerability if a user's intimate also has access to the physical device. Other information may be transmitted through jointly used resources in a shared space: a family might have a single shared computer, or a common backup system for all the household's computers.

Copresence can also reduce the effectiveness of security measures like two-factor authentication. The most common second factor is a smartphone, to which intimate attackers often have at least intermittent access. This can enable them to read any one-time access codes displayed on the locked screen. Copresence can even defeat biometric authentication. In one published incident, a woman unlocked her husband's smartphone by placing his sleeping hand on the finger-print reader [98].

Further, copresence compounds the forms of attack to which a victim is vulnerable. Unlike a physically distant privacy threat whose access to the victim is entirely digital,[3] an intimate attacker may expose a victim to other forms of attack, like physical, sexual, emotional, and financial abuse. In some cases, to avoid escalation via other abuse vectors, victims' advocates may advise a victim *not* to cut off the abuser's digital access, because doing so can lead to escalation of abuse in other forms [6]. Counterintuitively, then, it may be in the victim's best interest *not* to immediately ameliorate digital threats, or even to indicate their awareness of them.

Finally, because many people are involved in family relationships, attackers may leverage *other* co-present family members in the service of monitoring another. For example, some survivors of intimate partner abuse report that even if they maintain digital security on their own devices, they can be indirectly monitored via devices controlled by a shared child [46].

### Feature 3: Intimate relationships have inherent, dynamic power differentials, backed by explicit or implicit authority

Privacy invasion often accompanies and extends existing vectors of relational power [6]. In many cases, the monitored party has relatively less power in the relation by virtue of age, various forms of dependency (legal, financial, and so on), social norms (men having authority over women in some cultures), or reduced capacity (children, victims of intimate partner violence, elderly adults with dementia, and so on). Intimate threats are very likely the threats most frequently experienced by women, children, and those with disabilities. Power dynamics are also likely to change over time—as the nature of a romantic relationship changes, as children age, as an adult's cognitive abilities decline and he becomes more dependent on caregivers, and so on.

In many cases of intimate threat, the attacker has decision-making authority over the victim: granted either explicitly by law, or implicitly by the design of the system. Examples of explicit authority are parental rights and responsibilities to access a child's data or to vicariously consent to monitoring on that child's behalf [99], or a power of attorney for someone with diminished capacity. This authority may undermine consent-based models of privacy protection: the attacker both has authority to consent on behalf of the victim and *is themselves* a threat to the victim's privacy, creating a circular (and nonprotective) situation [42]. And some legal frameworks explicitly permit or require data sharing between intimates, like the provision of student data to parents under FERPA, court-ordered alcohol monitoring for parental visitation, or state statutes that permit families to record their loved ones in nursing homes.

An attacker's authority may also be implicit, based on ownership or expertise. For example, the person who pays for a phone family plan may have the capability of accessing data for all users. Decisions about installation and use of smart home monitoring systems are often driven by the individual in the house with the most expertise and control over the household; Geeng and Roesner [100] found that these decision-makers often didn't consult other members of the household about these decisions because "they did not consider them equal decision-makers in the home." Power differentials also imply that coercion can be an important enabler of surveillance

---

3   But see some complications of this in contexts like swatting.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

in intimate relationships. Intimate attackers can coerce or threaten their victims to keep their smartphones unlocked, divulge the passwords to their social media accounts, or enable location tracking [101].

## Feature 4: Attackers may bring deep knowledge resources to bear in order to exploit relational vulnerabilities

Privacy infringements in intimate relationships tend to be technically simple. They can involve no more than using readily available device and account interfaces, and attackers need not have great technical skill to execute attacks. But what these attacks lack in technical sophistication, they make up in relational complexity. Simply because of their extensive knowledge of the victim, intimate attackers have deep relational resources that they can leverage in several ways.

Attackers may use intimate knowledge of the victim to gain access to accounts [46]. Much of this information is shared willingly during a relationship and may be shared without consent afterwards. Intimate social knowledge negates certain forms of authentication, which often rely on knowledge of a person's history and social life, under the assumption that attackers would not have access to such information. Some banks authenticate users by asking them for prior addresses; security questions often seek information like a mother's maiden name, a favorite pet or teacher, or a birthday. These types of information, of course, are commonly shared with one's intimates. One of Facebook's backup authentication systems involves showing the person photographs of people and requiring them to accurately identify the ones they know [102]. This is something that an intimate partner or family member can do as well. In one recently publicized incident, an Australian woman's ex-boyfriend stalked her with the assistance of an app integrated with her vehicle, which reported her location to him; because he'd helped her purchase the vehicle, he had access to the car's registration information [103].

What's more, thick relational ties complicate amelioration of privacy threats, and create leverage for the attacker. A distant hacker likely has no knowledge of a person's immigration status, health conditions, or personal "dirt" that can be exposed to others online; an intimate associate has access to all of these [6]. Partners may also have access to intimate photos of each other, enabling revenge porn. Control over a spouse's finances, a child's curfew, or an elderly relative's ability to live at home further gives the intimate attacker control; all of these may be conditioned on intimate monitoring, further complicating consent and amelioration.

## Implications for policy and design

While many of the threats we have described here are technically unsophisticated, we should not misread this as an indication that they are easy to solve. The social complexity and heterogeneity underlying intimate threats make them very challenging to address technically—which is, perhaps, why they are often ignored by engineers and designers. (Other researchers have pointed out the very low proportion of cybersecurity professionals who are women and minorities, and have suggested that this lack of representation may also lead to underemphasis on threats predominantly experienced by those groups [104].). Intimate privacy invasions are often diffuse and covert, unlike the high-profile data breaches regularly reported in the news and may therefore also garner less attention and concern in system design.

Some aspects of this problem must be mitigated by law and policy. A recent Citizen Lab report on stalkerware concluded with a list of detailed policy recommendations to regulate that industry [49]. Further, we need increased penalties for abuse cases that include digital tracking. Eva Galperin of the Electronic Frontier Foundation has called on US law enforcement to prosecute stalkerware companies on hacking charges [105]. Legal scholar Danielle Citron has also articulated a policy agenda to increase civil and criminal penalties against these companies, and to increase digital forensic training for state and local agencies [38]. Some laws have attempted to criminalize the usage of more general IoT devices for surveillance purposes.

The degree to which system designers should be held morally responsible—or legally liable—for every misuse of the technologies they develop is a policy question without easy answers, particularly for general purpose technologies put to unintended uses, and we do not attempt to address it here. However, by taking intimate threat models seriously from the outset, system designers can take some steps to proactively mitigate the risks of intimate partner threats. Importantly, many forms of design may have important roles to play in this mitigation, from visual aspects of a user interface to core system functionalities, and including both the design of physical "things" and of information flows and processes [106].

All engineering involves trade-offs, involving both security and functionality. The same capability that allows a parent to monitor where their child goes online can also allow a spouse to monitor their partner. And some attacks simply can't be detected by technology: a remote website, for example, will very likely not be able to tell when someone is authenticating under the duress of threatened physical violence from an abuser. It is not our intention to demand that system designers prioritize intimate privacy threats ahead of all other design considerations. Rather, by bringing to the fore considerations about an underspecified privacy threat, we suggest that designers take into account the concerns described in this article during systems design, understanding that they will need to be weighed against other goals and requirements.

Figure 1 offers a heuristic for understanding common relationships between the features of intimate threats and their design implications. It summarizes the four common features of intimate threats we have described in the previous section, and how recognition of these features might inform more thoughtful design. We offer the heuristic not as a definitive, exhaustive list, but as an analytic guide for assessing the risks of intimate threats, the resources they bring to bear, and potential remediations against them. We also do not claim that any one feature is necessarily *exclusive* to intimate threats—indeed, some are shared by other contexts of insider attack, for example—but we believe the constellation of features we describe here is distinctive enough to merit treating intimate threats as their own class of privacy threat.

With all this in mind, we offer the following general design considerations, drawing from the common features we have enumerated, for system designers to help prevent and ameliorate intimate threats.

## Implication 1: Recognize privacy in intimate contexts as a balance among multiple interests and values

As we have discussed, some degree of monitoring is inevitable, desirable, and perhaps even necessary in intimate relationships. Designing for intimate privacy means acknowledging this and finding ways to balance among legitimate interests in privacy protection, safety and caretaking, trust and closeness, and authority—while also

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020



**Figure 1:** Some common features of intimate threats and their design implications. The list offered here is non-exhaustive but offers a heuristic for thinking about designing with intimate threats in mind. The arrows in the diagram are intended to indicate what design considerations we consider to be especially salient in the presence of particular threat features.

acknowledging that these interests may carry very different weights across different relationships, cultures, and points in time.

There are some good examples of tools that strike this difficult balance well. For example, License+ is a teen driver monitoring app that aims to provide parents with "just the right amount of information so they can stay up-to-date…and the driver doesn't feel spied on" [107]. This is accomplished by giving parents access to a teen's city-level location data (not finer-grained GPS coordinates) and bounding use of the app to 100 total hours—enough to coach new drivers into good practices, but not enough to surveil them indefinitely. The design of the app recognizes parents' legitimate interests in their children's safety, but balances that against a teen's desire for privacy. Balancing these competing interests is difficult and context-specific; a good first step is simply to specify and acknowledge the values at stake and how they may be in tension with one another.

### Implication 2: Recognize different data sensitivities to intimate threats

Intimate threats may have impacts on the types of data that require extra protection. For example, location data, friends lists, calendar data, and communications are likely targets for an intimate attacker, who wants to know where the victim is and with whom they are talking [108]. Data that are normally considered sensitive (like financial account numbers and identification information) may or may not be as salient given an intimate attacker's motivations.[4]

Intimate attacks can also intersect with more conventional privacy concerns in non-obvious ways. For example, a victim might regularly receive confidential information in the course of their work: for example, as a doctor, lawyer, or therapist. This information might be accessed as part of an intimate attack, and then either disclosed or used as a coercive lever. Traditional threat models often

fail in these contexts, and system designers should consider whether they have addressed threats against sensitive data from an intimate perspective, and not just a financial or political one.

### Implication 3: Evaluate what information may be inadvertently transmitted through visual display

As we have discussed, some intimate privacy threats occur by virtue of copresence between victim, attacker, and device. Designers should be attentive to what information is displayed visually on the user interface, recognizing that this can be a vector for a privacy breach. Such disclosures are likely to be inadvertent on the part of the user, and information may be actively or passively received by an intimate adversary. In either case, these common disclosures demonstrate how a device can inadvertently divulge information that its owner may prefer to keep private [110, 111].

For example, most mobile operating systems display the content and sender of text messages on the lock screen of a device by default, as well as playing an audio alert indicating that a message has been received. When another app is in use, iOS displays an incoming text as a notification at the top of the screen. Operating systems on laptop and desktop computers also commonly display headers of incoming emails, text messages, Twitter direct messages, or other forms of contacts on-screen as they come in. Such design choices, while intended to be convenient for users, often lead to disclosures of private information when a device screen is in view of another person. Because such notifications typically "push" instantly upon receipt of a message, they further reduce a user's capacity to manage her privacy temporally (e.g., receiving notifications when she can view them without the presence of an intimate).

Targeted online ads are another example. Much can be inferred about a person's interests and characteristics based on what ads are

---

4  However, see findings suggesting that users have similar reported data-type sensitivities for insider (i.e., friend) access as stranger access [109].

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

targeted to them. If a browser is shared between family members, ads may "follow" a user around the web and could, quite by accident, reveal to subsequent users what sorts of things a parent, child, or intimate partner has been searching for [112]. Predictive features can also be revealing if viewed visually. Many systems predict recipients of communications based on previous activity. iOS suggests recipients of texts based, presumably, on the frequency and recency of contacts with them; Google Inbox's interface similarly suggests frequent contacts when new messages are being composed. Predictive text within conversations can be similarly disclosive. For instance, iOS's personalized autocorrect dictionary learns and suggests proper names, such as contacts' names, which may reveal information about a user's communication *patterns* should another person see or use the device.

When Firefox first introduced its private browsing feature, it was indicated by a purple bar across the browser window. This could by easily noticed from across the room, making it harder for someone in the same physical location as another to use the feature without it being obvious. Firefox has since changed the indication to a more discreet purple circle in the upper-right corner of the browser window. Apple's Safari is still problematic: when the user enables private browsing, the normally white address bar turns grey. A better design would be to allow the user to disable any visual indication of private browsing. Other researchers propose inconspicuous forms of data entry, including haptic modalities and coded information [113].

There are other contexts in which designers are attentive to visual privacy invasion without significantly impeding usability. ATMs are designed with keyboard blockers to allow PINs to be entered privately; most websites mask entered passwords as bullets to prevent them from being revealed to screen onlookers [97]. Security mechanisms for the visually impaired are particularly attentive to visual and aural eavesdropping; Azenkot et al. [114] developed a multitouch authentication method to protect against these risks. Google researchers developed a facial–recognition–based security feature to alert smartphone users when a gaze other than the user's is detected looking at the screen [115]. Mac laptops turn off visual notifications when the display is being projected externally, in recognition of the fact that users showing their screen to a group likely do not want their private messages displayed. The NCAA built a "boss button" into its March Madness streaming site: if employees are watching basketball at work and the boss walks by, they can click the button and an unremarkable spreadsheet pops up temporarily to create the appearance of productivity [116]. Similar "escape" features appear on some intimate partner violence resource sites, to take the user to a generic webpage should an abuser walk into the room.

### Implication 4: Recognize the importance of default-setting and the "blank slate" problem

Privacy defaults are important in all contexts: in general, people are unlikely to change the default settings of a system or service, due to inattention, lack of awareness, or technical difficulty. But in intimate contexts, default-setting is even more important. The launch of Google Buzz in 2010 serves as an illustrative example of the power of defaults. This early microblogging service automatically created a circle of friends for new users based on their most frequent email and chat contacts in Gmail. This was a privacy disaster for many in (or having left) abusive relationships, in some cases leading to physical endangerment for abuse survivors [117]. Having a different default would have prevented this problem from arising.

Furthermore: in intimate contexts, even when disclosive settings can be manually overridden by the user, overriding a default can *itself* create suspicion that the user has something to hide [6]. In most contexts, if an attacker compromises an account or device, we advise the victim to change the access credentials, to open a new account, to cut up the credit card, or otherwise to insulate themselves from the invasion. But in intimate contexts, this is fraught advice, given its limited effectiveness and the risks of escalation. Changing settings to protect one's privacy might be a dangerous "tell," signaling that the victim does not trust the attacker. Therefore, even taking steps to protect oneself against privacy invasion can create danger.

We call this the "blank slate" problem: removing an attacker's access to data, without plausible deniability, may be the worst thing one can do. In abusive relationships, enabling additional privacy protections may result in escalating levels of abuse, thus further endangering the victim. The assumption that one has nothing to hide and thus will not take steps to protect their privacy is an example of what Marques et al. [19] term "performative vulnerability": taking too many affirmative steps to prevent another's access suggests a lack of trust. The same can be true of explicit conversations about access expectations. Stuart Schechter points out that "least privilege may be among the most sacred and respected principles of information security, but starting a conversation on appropriate use of household resources by informing children their privileges are restricted to a prescribed set of allowable behaviors is a sure way to incite or escalate a conflict" [118]. More generally, the lack of trust that is often the foundation of an effective privacy policy can actively erode relations between intimate partners, family, and friends.

In this vein, Griggio et al. [55] advocate for allowing "discreet changes to privacy preferences" to avoid the unwanted communicative aspect of turning on a privacy setting against an intimate partner. Apple's iOS offers an example in clear contravention of this advice. When Alice takes an affirmative step to stop sharing her location information with Bob, Bob is explicitly notified in the iMessage chat that "Alice has stopped sharing location with you." This setting, which is not to our knowledge overridable by users, may pose real danger to users trying to protect themselves from intimate threats.

### Implication 5: Recognize that privacy and sharing preferences are dynamic

System designers should take into account that sharing preferences will change: couples will break up, children will grow up, roommates will move in and out [12, 100]. Over the course of relationships, intimates' uses of technology and their sharing and privacy preferences are likely to evolve to best suit their current relational aims. And more broadly, sharing norms and societal privacy expectations change over time. Technologies that fail to allow for change run the risk of ossifying outdated privacy expectations to the detriment of users' current preferences.

This fluidity has two primary implications for designers. First, to the greatest extent possible, systems should accommodate changes to preferences. The ability to make discreet changes to privacy settings, discussed above in implication 4, is one aspect of this flexibility; designers may also take steps to avoid the ossification of sharing preferences, for example, by periodically prompting users to ensure that preferences have not changed and that they are aware of what is being shared.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Second, intimate privacy threats often become most salient at discrete moments of relationship transition [7, 54]. Systems should support users when they try to separate joint accounts and help account owners monitor their accounts for login attempts by ex-partners. This means recognizing and accounting for changing privacy preferences over time, not just at the discrete moment of account setup. Facebook has taken some positive steps in this regard. When a user changes their relationship status on the site to indicate a breakup, Facebook proactively displays a prompt asking them if they wish to adjust privacy settings with respect to the ex-partner (for example, hiding future posts from their ex, untagging their ex in past posts) [119].

## Implication 6: Realize that households are not units; devices are not personal; the purchaser of a product is not its only user

System designers build in assumptions about intrafamilial privacy expectations, and often treat a household as a "unit" for purposes of information sharing. These assumptions are incorrect if a privacy threat comes from within one's own household. Often when an account is shared (a cell phone family plan, a TV streaming subscription, a smart home service, health insurance coverage), all users' data associated with that account is accessible to whoever is responsible for payment. But this need not be the case. For example, a single Netflix account is regularly shared amongst an entire household, even though individual users may watch content on different screens. Netflix's security architecture supports multiple profiles in one account, but there is no privacy between them [120]. On the other hand, YouTube TV also supports multiple profiles, but allows those profiles to be individually password-protected, enabling people in a household to better balance their individual needs for sharing and privacy (see also [121]).

Similar failures may occur when households share common channels for information transmission. This often arises when information collected from Internet use is transferred to the real world. Unsolicited email is delivered to an individual email box, while unsolicited paper is delivered to a (shared) household physical mailbox. This difference was illustrated in a widely read privacy anecdote when Target Corporation deduced that a young woman was pregnant and sent her a paper flyer with baby-related offers, alerting the woman's father to the pregnancy before she told him [122]. Similarly, Pakistani law enforcement assures legal adult victims of cyber-harassment of confidentiality when they register complaints online, but then delivers further communication to the victim's house—which is predominantly a family home [123]. A similar issue can occur in cars, which increasingly offer a Bluetooth interface to connect with the driver's phone—and may announce when and from whom a driver receives a text message or a phone call, despite the fact that the car is often a shared space. Smart home technologies present particular challenges in this regard; taking steps like providing visible indicators of data capture (e.g., lights that flash when audio or video is being recorded) can be one way to allow multiple users with divergent privacy preferences to better protect their privacy interests vis-à-vis one another [100, 124].

The converse of the above assumption is that devices considered "personal" are used by only one person. But abundant research demonstrates that this is often not the case, and that device sharing can facilitate unwanted information disclosure [16, 125]. For example, many user interfaces offer seamless integration of content across devices, under the apparent assumption that each of a user's devices will be used by that user alone. For instance, if a user has an iCloud account to which two devices—say, an iPhone and an iPad—are registered, iOS will by default sync iMessages across both devices. But in a family, devices are often shared, rather than being used solely by one iCloud registrant. The seamlessness of this integration fails to realistically reflect typical device usage patterns, and can facilitate inadvertent disclosures in so doing.

System designers should design with *all* potential users' privacy in mind. Companies have a market incentive to build devices for the benefit of the paying customer. But if the use of a device increases privacy risk to another person who is *not* the direct customer, the interests of that person must be protected as well.

Most fundamentally, data access should not be covert. An app to monitor a loved one's cell phone that has no visible icon seems more likely to be used without consent than one that reveals itself [48]. Another approach to preventing covert access is to leave an "access trail" letting users know when their data has been viewed. For example, in Norway, all salary data is public—but searches can't be conducted anonymously, and people can see who has viewed their salary [126]. Facebook employees similarly get a "Sauron alert" from the company if a colleague accesses their account [127]. Though measures like these do not prevent access, they do prevent *covert* access, making it more likely that privacy preferences will be governed by social and relational norms. Improving the discoverability of monitoring is not a silver bullet to the problem of intimate privacy threat, but it can be a useful tool to help prevent and provide recourse against unwanted surveillance.

## Conclusion

Data gathering in intimate relationships is likely to increase in the near future, both due to the increased digital traces on social media and the proliferation of data-gathering devices in homes. An enormous number of consumer IoT products are explicitly marketed for the protection, supervision, and care of intimates [28]. Even IoT devices that are not specifically so marketed often allow us to draw inferences about an intimate's activities, and often without their awareness [128]: web-enabled security cameras that capture the behaviors of anyone in the home [129], or the sleep tracker that records the activities of anyone using the bed [52]. The growth of this consumer market and the continuing normalization of monitoring across intimate relationships makes this a class of threats to be taken seriously.

There are some signs that intimate threats are beginning to be recognized by the tech industry. For example, Kaspersky recently announced an effort to alert users to the presence of stalkerware apps covertly installed on Android products [130], and Google made some efforts to scrub similar apps from its Play Store following research about their prevalence [48]. We take heart at these developments, but suggest that consideration of intimate threat models should be more thoroughly integrated into system design broadly, rather than only in response to the most egregious apps for covert intimate monitoring.

Addressing these threats not only extends the field of cybersecurity to meet the needs of vulnerable communities, but also brings it into fruitful dialogue with other disciplines and modes of inquiry. It requires an integrated sociotechnical approach to understanding privacy. It requires focusing our attention both on new problems and new tools for addressing them, taking seriously the social and cultural sites within which technologies and users are situated, and acknowledging the full range of harms privacy threats can pose. It requires thinking more broadly about how we design secure systems.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

By recognizing the class of intimate threats and characterizing their common features, we can begin to articulate design principles to address them.

## Acknowledgments

This work was supported by the National Science Foundation [CNS-1916096]. The authors would like to thank Kendra Albert, Nighat Dad, Jessica Dawson, Shauna Dillavou, Beth Friedman, Vicki Laidler, Damon McCoy, Barath Raghavan, Stuart Schechter, and Adam Shostack for their helpful comments on a draft version of this article, as well as Clara Berridge, Rahul Chatterjee, Nicki Dell, Periwinkle Doerfler, Diana Freed, Jodi Halpern, Sam Havron, Lauren Kilgour, Damon McCoy, Tom Ristenpart, and Luke Stark for prior research collaborations that informed this work. Finally, the authors would like to thank the interdisciplinary workshop on Security and Human Behavior (SHB) for sparking this collaboration.

## References

1. Slupska J. Safe at home: Towards a feminist critique of cybersecurity. *St. Antony's International Review* 2019; **15**:83–100.
2. Marques D, Muslukhov I, Guerreiro T, *et al*. Snooping on mobile phones: prevalence and trends. In *Twelfth Symposium on Usable Privacy and Security (SOUPS 2016)* 2016;**2**:77.
3. Pew Research Center. Parents, teens and digital monitoring. 2016. http://www.pewinternet.org/2016/01/07/parents-teens-and-digital-monitoring/ (26 April 2020, last accessed).
4. Shahani A. Smartphones are used to stalk, control domestic abuse victims. *NPR* 2014 September 25, https://www.npr.org/sections/alltechconsidered/2014/09/15/346149979/smartphones-are-used-to-stalk-control-domestic-abuse-victims (26 April 2020, last accessed).
5. Women's Aid. Online and Digital Abuse. https://www.womensaid.org.uk/information-support/what-is-domestic-abuse/onlinesafety/ (5 March 2020, date last accessed).
6. Freed D, Palmer J, Minchala DE *et al*. Digital technologies and intimate partner violence: a qualitative analysis with multiple stakeholders. In: *Proceedings of the ACM on Human-Computer Interaction*, 2017; Art. 1(CSCW):46.
7. Matthews T, O'Leary K, Turner A *et al*. Stories from survivors: privacy & security practices when coping with intimate partner abuse. In: *Proceedings of the 2017 CHI Conference on Human Factors in Computing Systems*, Denver, CO, 2 May 2017, pp. 2189–201. ACM.
8. Levy K. Relational big data. *Stanford Law Review Online* 2013;**66**: 73–79.
9. Moore T, Anderson R. Economics and internet security: a survey of recent analytical, empirical, and behavioral research. In: Peitz M, Waldfogel J (eds), *The Oxford Handbook of the Digital Economy*, Oxford University Press, 2011, https://www.cl.cam.ac.uk/~rja14/Papers/moore-anderson-infoeconsurvey2011.pdf.
10. Schneier B. The psychology of security. In *International Conference on Cryptology in Africa*. Berlin, Heidelberg: Springer, 2008, 50–79.
11. Odlyzko A. Economics, psychology, and sociology of security. In *International Conference on Financial Cryptography*. Berlin, Heidelberg: Springer, 2003, 182–9.
12. Park CY, Faklaris C, Zhao S *et al*. Share and share alike? An exploration of secure behaviors in romantic relationships. In *Fourteenth Symposium on Usable Privacy and Security (SOUPS)* 2018. USENIX.
13. Kaye JJ. Self-reported password sharing strategies. In: *Proceedings of the SIGCHI Conference on Human Factors in Computing* Systems, 2011, pp. 2619–22. ACM.
14. Singh S, Cabraal A, Demosthenous C *et al*. Password sharing: implications for security design based on social practice. In: *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, 2007, pp. 895–904. ACM.
15. Helkala K, Bakas TH. National password security survey: results. In: *European Information Security Multi-Conference (EISMC)*, Lisbon, Portugal, 2013, pp. 23–33.
16. Matthews T, Liao K, Turner A *et al*. She'll just grab any device that's closer: a study of everyday device & account sharing in households. In: *Proceedings of the 2016 CHI Conference on Human Factors in Computing Systems*, 2016, pp. 5921–32. ACM.
17. Danaher J, Nyholm S, Earp BD. The quantified relationship. *American Journal of Bioethics* 2018;**18**:3–19.
18. Trust Builder. https://trustbuilder.davehirsch.com/index.html.
19. Marques D, Guerreiro T, Carriço L *et al*. Vulnerability & blame: making sense of unauthorized access to smartphone. In: *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, 4 May 2019. ACM.
20. Hubbard B, Paddock RC. Saudi women, tired of restraints, find ways to flee. *New York Times* 2019 Jan 11. https://www.nytimes.com/2019/01/11/world/middleeast/saudi-arabia-women-flee.html.
21. Marshall A. Google Maps supercharges location sharing, begins drooling over your data. *Wired* 2017, March 22. https://www.wired.com/2017/03/google-maps-share-location/.
22. Rave Guardian. https://www.ravemobilesafety.com/rave-guardian.
23. Ahmed SI, Haque R, Chen J *et al*. Digital privacy challenges with shared mobile phone use in Bangladesh. In: *Proceedings of the ACM on Human-Computer Interaction* 2017;**1**:1–20.
24. Sambasivan N, Checkley G, Batool A *et al*. "Privacy is not for me, it's for those rich women": Performative Privacy Practices on Mobile Phones by Women in South Asia. In *Fourteenth Symposium on Usable Privacy and Security (SOUPS)* 2018, pp. 127–42.
25. Letter to Senator Bill Dodd (Business Community Requests to be Included in AB 375 Clean-Up Legislation), 6 August 2018 , https://t.co/0JXNY2DJQm.
26. Allen AL, The Hegeler Institute. The virtuous spy: privacy as an ethical limit. *The Monist* 2008;**91**:3–22.
27. Newell BC, Metoyer CA, Adam D, Moore AD. Privacy in the family. In: Roessler B, Mokrosinska D (eds). *Social Dimensions of Privacy: Interdisciplinary Perspectives*. Cambridge: Cambridge University Press, 2015, 104–121.
28. Stark L, Levy K. The surveillant consumer. *Media, Culture & Society* 2018;**40**:1202–20.
29. U.S. Department of Education. Parents' guide to the Family Educational Rights and Privacy Act: Rights regarding children's education records. 2007. https://www2.ed.gov/policy/gen/guid/fpco/brochures/parents.html.
30. Hartocollis A. His college knew of his despair. His parents didn't, until it was too late. *New York Times*, 2018 May 12. https://www.nytimes.com/2018/05/12/us/college-student-suicide-hamilton.html.
31. Mancini C, Rogers Y, Thomas K *et al*. In the best families: tracking and relationship. In: *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, 7 May 2011, pp. 2419–28. ACM.
32. Levy K. Intimate surveillance. *Idaho Law Review* 2014;**51**:679.
33. Suk J. *At Home in the Law: How the Domestic Violence Revolution is Transforming Privacy*. New Haven: Yale University Press, 2009.
34. Hasday J. *Intimate Lies and the Law*. New York: Oxford University Press, 2019.
35. Özdemir N. My diary is your diary: the right to privacy in a marriage in Turkey. *International Journal of Jurisprudence of the Family* 2017; **8**; 1–14.
36. Citron DK, Franks MA. Criminalizing revenge porn. *Wake Forest Law Review* 2014;**49**:345.
37. Levendowski A. Using copyright to combat revenge porn. *NYU Journal of Intellectual Property and Entertainment Law* 2014;**3**:422–446.
38. Citron DK. Spying Inc. *Washington & Lee Law Review* 2015;**72**:1243.
39. Citron DK. Sexual privacy. *Yale Law Journal* 2019;**128**:1870–1960.
40. Fetters A. Why it's so hard to protect domestic-violence survivors online. *The Atlantic*, 2018 Jul 11. https://www.theatlantic.com/family/archive/2018/07/restraining-orders-social-media/564614.
41. Lupton D, Williamson B. The datafied child: the dataveillance of children and implications for their rights. *New Media & Society* 2017;**19**: 780–794.
42. Levy K, Kilgour L, Berridge C. Regulating privacy in public/private space: the case of nursing home monitoring laws. *Elder Law Journal* 2018; **26**:323–363.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Electronic copy available at: https://ssrn.com/abstract=3620883

43. Shostack A. *Threat Modeling: Designing for Security*. Indianapolis: John Wiley & Sons; 2014.

44. Schneier B. *Secrets and Lies: Digital Security in an Networked World*. Indianapolis: John Wiley & Sons; 2015.

45. Smith SG, Basile KC, Gilbert LK *et al*. *National Intimate Partner and Sexual Violence Survey (NISVS)*: 2010-2012 State Report.

46. Freed D, Palmer J, Minchala D *et al*. "A stalker's paradise": How intimate partner abusers exploit technology. In: *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems* (CHI), 2018, p. 667. ACM.

47. Gámes-Gaudix M, Borrajo E, Calvete E. Partner abuse, control and violence through internet and smartphones: characteristics, evaluation and prevention. *Psychological Papers* 2018;**39**:218–27.

48. Chatterjee R, Ristenpart T, Doerfler P *et al*. The spyware used in intimate partner violence. In *2018 IEEE Symposium on Security and Privacy (S&P)* (pp. 441–58). IEEE, 2018.

49. Parsons C, Molnar A, Dalek J *et al*. The predator in your pocket: A multidisciplinary assessment of the stalkerware application industry. CitizenLab, 2019 Jun 12. https://citizenlab.ca/2019/06/the-predator-in-your-pocket-a-multidisciplinary-assessment-of-the-stalkerware-application-industry/.

50. Bowles N. Thermostats, locks and lights: Digital tools of domestic abuse. *The New York Times* (2018); https://www.nytimes.com/2018/06/23/technology/smart-home-devices-domestic-abuse.html

51. University College London Digital Policy Lab. Report on Gender, IoT, and Tech Abuse. https://www.ucl.ac.uk/steapp/research/digital-technologies-policy-laboratory/gender-and-iot.

52. Badcock J. Smart mattress lets you know if your partner is cheating. *The Telegraph*, 2016 April 15. https://www.telegraph.co.uk/news/2016/04/15/smart-mattress-lets-you-know-if-your-partner-is-cheating/.

53. Richtel M. Young, in love, and sharing everything, including a password. *New York Times*, 2012 Jan 17. https://www.nytimes.com/2012/01/18/us/teenagers-sharing-passwords-as-show-of-affection.html

54. Elliott A, Brody S. Straight Talk: New Yorkers on mobile messaging and implications for privacy. SimplySecure Report. 2015. https://simplysecure.org/resources/techreports/NYC15-MobMsg.pdf.

55. Griggio CF, Nouwens M, Mcgrenere J *et al*. Augmenting couples' communication with lifelines: shared timelines of mixed contextual information. In: *Proceedings of the 2019 CHI Conference on Human Factors in Computing Systems*, 18 April 2019, p. 623. ACM.

56. Utz S, Beukeboom CJ. The role of social network sites in romantic relationships: effects on jealousy and relationship happiness. *Journal of Computer-Mediated Communication* 2011;**16**:511–27.

57. Tiffany K. Period-tracking apps are not for women. *Vox*, 2018 Nov 16. https://www.vox.com/the-goods/2018/11/13/18079458/menstrual-tracking-surveillance-glow-clue-apple-health.

58. Soberlink Family Law. https://www.soberlink.com/family-law/.

59. Savransky R. Messages exchanged between Bentley, Mason synced to ex-wife's iPad. *The Hill* 2017 Apr 10. https://thehill.com/homenews/state-watch/328202-messages-exchanged-between-bentley-mason-synced-to-ex-wifes-ipad/.

60. Susskind J. personal communication, 2018.

61. Lupton D. Caring dataveillance: Women's use of apps to monitor pregnancy and children. Forthcoming manuscript, 2018. https://www.researchgate.net/publication/326647795_Caring_Dataveillance_Women's_Use_of_Apps_to_Monitor_Pregnancy_and_Children.

62. Brooks K. Motherhood in the age of fear. *New York Times* 27 July 2018. https://www.nytimes.com/2018/07/27/opinion/sunday/motherhood-in-the-age-of-fear.html

63. Boyd D. How parents normalized teen password sharing. Apophenia, January 2012, http://www.zephoria.org/thoughts/archives/2012/01/23/how-parents-normalized-teen-password-sharing.html.

64. Lorang MR, McNiel DE, Binder RL. Minors and sexting: legal implications. *The Journal of the American Academy of Psychiatry and the Law* 2016;**44**:73–81.

65. Vondran S. Can parents be held liable for their kids' illegal downloading of movies, games, software, videos online? Steve Vondran blog, 2016 June 10, https://www.vondranlegal.com/can-parents-be-held-liable-for-their-kids-illegal-downloading-of-movies-games-films-videos-online.

66. Ur B, Jung J, Schechter S. Intruders versus intrusiveness: teens' and parents' perspectives on home-entryway surveillance. In: *Proceedings of the 2014 ACM International Joint Conference on Pervasive and Ubiquitous Computing* 2014, pp. 129–39. ACM.

67. Tampa B. Monitoring. GPS tracking devices for teens. https://tampabaymonitoring.com/products/personal-gps-devices/gps-tracking-devices-for-teens/.

68. Petronio S. Communication privacy management theory: what do we know about family privacy regulation? *Journal of Family Theory & Review* 2010;**2**:175–96.

69. Ghosh AK, Badillo-Urquiola K, Rosson MB *et al*. A matter of control or safety?: Examining parental use of technical monitoring apps on teens' mobile device. In: *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems* 2018, p. 194. ACM.

70. Google. FamilyLink Overview. https://families.google.com/familylink/.

71. Damour L. Should you track your teen's location? *New York Times*, 29 August 2018. https://www.nytimes.com/2018/08/29/well/family/should-you-track-your-teens-location.html.

72. Kaysen R. Home alone, with a spy cam. *New York Times*, 31 August 2018. https://www.nytimes.com/2018/08/31/realestate/home-alone-with-a-spy-cam.html.

73. Viola de Azevedo Cunha M. Child privacy in the age of web 2.0 and 3.0: Challenges and opportunities for policy. UNICEF Discussion Paper. 2017. https://www.unicef-irc.org/publications/926-child-privacy-in-the-age-of-web-20-and-30-challenges-and-opportunities-for-policy.html.

74. Cook J. Bark, the app that sees all your kids' sexts, has scanned over 2 million phones. *Huffington Post*, 24 September 2018. https://www.huffpost.com/entry/bark-children-smartphone-monitoring-app-parental-control_n_5ba15d5fe4b046313fc02f17./.

75. McReynolds E, Hubbard S, Lau T *et al*. Toys that listen: A study of parents, children, and internet-connected toy. In: *Proceedings of the 2017 CHI Conference on Human Factors in Computing Systems*, pp. 5197–207. ACM.

76. Consumer Watchdog. Google, Amazon patent filings reveal digital home assistant privacy problems. 2017. https://www.consumerwatchdog.org/sites/default/files/2017-12/Digital%20Assistants%20and%20Privacy.pdf.

77. Betz A. The experiences of adult/child identity theft victims. Dissertation. 2012. https://lib.dr.iastate.edu/cgi/viewcontent.cgi?article=3764&context=etd.

78. Little L, Sillence E, Briggs P. Ubiquitous systems and the family: thoughts about the networked home. In: *Proceedings of the 5th Symposium on Usable Privacy and Security*, p. 6. ACM, 2009.

79. Apple. Face ID Security whitepaper. November 2017. https://www.apple.com/business/site/docs/FaceID_Security_Guide.pdf.

80. Greenberg A. Watch a 10-year-old's face unlock his mom's iPhone X. *WIRED* 14 November 2017, https://www.wired.com/story/10-year-old-face-id-unlocks-mothers-iphone-x/.

81. Berridge C, Halpern J, Levy K. Cameras on beds: the ethics of surveillance in nursing home rooms. *American Journal of Bioethics: Empirical Bioethics* 2019;**10**:55–62.

82. Acierno R, Hernandez MA, Amstadter AB *et al*. Prevalence and correlates of emotional, physical, sexual, and financial abuse and potential neglect in the United States: the national elder mistreatment study. *American Journal of Public Health* 2010;**100**:292–97.

83. Harris-Kojetin L, Sengupta M, Park-Lee E *et al*. Long-term care providers and services users in the United States: data from the National Study of Long-Term Care Providers, 2013-2014. *Vital & Health Statistics. Series 3, Analytical and Epidemiological Studies* 2016:x–ii.

84. National Center on Elder Abuse. Research. https://ncea.acl.gov/whatwedo/research/statistics.html#14.

85. Kenner AM. Securing the elderly body: dementia, surveillance, and the politics of "aging in place". *Surveillance & Society* 2002;**5**:252–269.

86. Belluck P. First digital pill approved to worries about biomedical 'big brother.' *New York Times*, 13 November 2017. https://www.nytimes.com/2017/11/13/health/digital-pill-fda.html.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

87. Hernandez D. This pill bottle is a smartphone wannabe. *Wired*, 25 March 2013. https://www.wired.com/2013/03/adhere-tech-smart-pill-bottle/.

88. Philips Lifeline. https://www.lifeline.philips.com/.

89. BT. How the Canary Care system can monitor elderly relatives remotely. *BT*, 1 September 2017 . http://home.bt.com/tech-gadgets/canary-care-system-home-monitor-elderly-relatives-remotely-11364172731108.

90. Abrahms S. New technology could allow you or your parents to age at home. *AARP Bulletin*, 2014 March. https://www.aarp.org/home-family/personal-technology/info-2014/is-this-the-end-of-the-nursing-home.html.

91. Berridge C, Wetle TF. Why older adults and their children disagree about in-home surveillance technology, sensors, and tracking. *The Gerontologist*, 18 May 2019.

92. Ticona J, Mateescu A, Rosenblat A. Beyond disruption: how tech shapes labor across domestic work and ridehailing. *Data and Society*, 2018. https://datasociety.net/output/beyond-disruption/.

93. Harwell D. Facebook Twitter crack down on AI babysitter-rating service. *Washington Post*, 27 November 2018. https://www.washingtonpost.com/technology/2018/11/27/facebook-twitter-crack-down-ai-babysitter-rating-service/.

94. WatchMeGrow. https://watchmegrow.com/.

95. Usmani WA, Marques D, Beschastnikh I *et al*. Characterizing social insider attacks on Facebook. In: *Proceedings of the 2017 CHI Conference on Human Factors in Computing Systems* 2017, pp. 3810–20. ACM.

96. Goffman E. *Behavior in Public Places: Notes on the Social Organization of Gatherings*. New York: Free Press, 1966.

97. Sidi D, Brandimarte L. Talk at Security and Human Behavior Workshop, Pittsburgh, PA, 2018.

98. Dehghan SK. Qatar Airways plane forced to land after wife discovers husband's affair midflight. *The Guardian*, 8 November 2017. https://www.theguardian.com/world/2017/nov/08/qatar-airways-plane-forced-to-land-after-wife-discovers-husbands-affair-midflight.

99. *People v. Anthony Badalamenti*. New York Court of Appeals. https://www.nycourts.gov/ctapps/Decisions/2016/Apr16/71opn16-Decision.pdf.

100. Geeng C, Roesner F. Who's in control? Interactions in multi-user smart home. In: *Proceedings of the 2019 CHI Conference on Human Factors in Computing Systems* 2019. ACM.

101. Marques D, Guerreiro T, Carriço L *et al*. Non-stranger danger: examining the effectiveness of smartphone locks in preventing intrusions by socially-close adversaries. In *USENIX Symposium on Usable Privacy and Security (SOUPS 2018)* 2018.

102. Constine J. Facebook has users identify friends in photos to verify accounts, prevent unauthorized access. *AdWeek*, 26 July 2010. https://www.adweek.com/digital/facebook-photos-verify/.

103. Thebault R. A woman's stalker used an app that allowed him to stop, start and track her car. *Washington Post*, 6 November 2019, https://www.washingtonpost.com/technology/2019/11/06/womans-stalker-used-an-app-that-allowed-him-stop-start-track-her-car/.

104. Poster W. Cybersecurity needs women. *Nature* 2018;**555**:577–80.

105. Greenberg A. Hacker Eva Galperin has a plan to eradicate stalkerware. *WIRED*, 3 April 2019. https://www.wired.com/story/eva-galperin-stalkerware-kaspersky-antivirus/.

106. Friedman B, Hendry DG. *Value Sensitive Design: Shaping Technology with Moral Imagination*. Cambridge, MA: MIT Press, 2019.

107. Automatic. Introducing License+ for new drivers. *Automatic blog*, 27 October 2014. https://blog.automatic.com/introducing-license-for-parents-and-teen-drivers-2f24b04a5888.

108. Nissenbaum H. *Privacy in Context: Technology, Policy, and the Integrity of Social Life*. Stanford: Stanford University Press, 2009.

109. Muslukhov I, Boshmaf Y, Kuo C *et al*. Know your enemy: the risk of unauthorized access in smartphones by insider. In: *Proceedings of the 15th International Conference on Human-Computer Interaction with Mobile Devices and Services* 2013, pp. 271–80. ACM.

110. Levy K. The phallus-y fallacy: on unsexy intimate tracking. *American Journal of Bioethics* 2018;**18**:22–4.

111. Eiband M, Khamis M, Von Zezschwitz E *et al*. Understanding shoulder surfing in the wild: Stories from users and observer. In: *Proceedings of the 2017 CHI Conference on Human Factors in Computing Systems*, 2 May 2017, pp. 4254–65. ACM.

112. Castelluccia C, Kaafar MA, Tran MD. Betrayed by your ads! In: *International Symposium on Privacy Enhancing Technologies Symposium* 2012, pp. 1–17.

113. Marques D, Duarte L, Carriço L. Privacy and secrecy in ubiquitous text messaging. In: *Proceedings of the 14th International Conference on Human-Computer Interaction with Mobile Devices and Services Companion* 2012, pp. 95–100. ACM.

114. Azenkot S, Rector K, Ladner R *et al*. PassChords: secure multi-touch authentication for blind people. In: *Proceedings of the 14th International ACM SIGACCESS Conference on Computers and Accessibility*, 22 October 2012, pp. 159–66. ACM.

115. Ryu HJ, Schroff F. Electronic screen protector with efficient and robust mobile vision. Presented at NIPS 2017. https://nips.cc/Conferences/2017/Schedule? showEvent=9757.

116. Calfas J. The NCAA's March Madness Live site has an emergency 'boss button.' *Time*, 17 March 2017. http://time.com/money/4705081/ncaa-march-madness-boss-button/.

117. TechCrunch. Google Buzz privacy issues have real life implications. *TechCrunch*, 12 February 2010. https://techcrunch.com/2010/02/12/google-buzz-privacy/.

118. Schechter S. The user is the enemy, and (s) he keeps reaching for that bright shiny power button. In: *Workshop on Home Usable Privacy and Security (HUPS) 2013*. https://www.microsoft.com/en-us/research/publication/the-user-is-the-enemy-and-she-keeps-reaching-for-that-bright-shiny-power-button/.

119. Winters K. Improving the experience when relationships end. *Facebook Newsroom*, 19 November 2015. https://newsroom.fb.com/news/2015/11/improving-the-experience-when-relationships-end/.

120. Sandoval G. >Netflix debuts multiple user profiles so your roommate won't screw up your recommendations. *The Verge*, 1 August 2013. https://www.theverge.com/2013/8/1/4563718/netflix-multiple-user-profiles.

121. Egelman S, Brush AJ, Inkpen KM. Family accounts: a new paradigm for user accounts within the home environment. In: *Proceedings of the 2008 ACM Conference on Computer Supported Cooperative Work*, 8 November 2008, pp. 669–78. ACM.

122. Hill K. How target figured out a teen girl was pregnant before her father did. *Forbes*, 16 February 2012. https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was-pregnant-before-her-father-did/#5f5a82596668.

123. Office of the Director General "Directions and Guidelines Regarding Verification, Enquiry Proceedings, Investigation of Cases, Change/Transfer of Enquiry/Investigation and Matters Connected Therewith," Standing Order No. 01/2018, Federal Investigation Agency, 2018.

124. Zeng E, Mare S, Roesner F. End user security and privacy concerns with smart homes. In: *Thirteenth Symposium on Usable Privacy and Security* (SOUPS 2017) 2017, pp. 65–80.

125. Jacobs M, Cramer H, Barkhuus L. Caring about sharing: couples' practices in single user device access. In: *Proceedings of the 19th International Conference on Supporting Group Work*, 13 November 2016, pp. 235–43. ACM.

126. Bevanger L. Norway: the country where no salaries are secret. *BBC News*, 22 July 2017. https://www.bbc.com/news/magazine-40669239.

127. Kanter J. Facebook staff have a special codename for the security alert they get if a colleague snoops on their account. *Business Insider*, 4 May 2018. https://www.businessinsider.com/facebook-staff-sauron-alert-accounts-2018-5.

128. Jones ML. Privacy without screens & the internet of other people's things. *Idaho Law Review* 2014;**51**:639.

129. Lipton AB. Privacy protections for secondary users of communications-capturing technologies. *NYU Law Review* 2016;**91**:396.

130. Franceschi-Bicchierai L. Kaspersky Lab will now alert users to 'stalkerware' used in domestic abuse. *Vice*, 3 April 2019. https://www.vice.com/en_us/article/vbw9g8/kaspersky-lab-alert-stalkerware-domestic-abuse.

Downloaded from https://academic.oup.com/cybersecurity/article-abstract/6/1/tyaa006/5849222 by guest on 02 June 2020

Electronic copy available at: https://ssrn.com/abstract=3620883

# Exhibit. 36

# Redacted Version of Document Sought to be Sealed

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5    CHASOM BROWN,

6             Plaintiff,    Case No.

7    vs.              4:20-cv-03664-YGR-SVK

8    GOOGLE LLC,

              Defendant.

9      *********************************

              CONFIDENTIAL

10      ZOOM VIDEOTAPED DEPOSITION OF

              JONATHAN E. HOCHMAN

11            July 20, 2022

12             10:15 a.m.

13      ***************************************

14

15   TAKEN BY:

16      JOSEF ANSORGE, ESQ.

17      ATTORNEY FOR DEFENDANT

18

19   REPORTED BY:

20      BELLE VIVIENNE, RPR, CRR, NJ-CRR,

21      WA/CO/NM-CCR

22      NATIONALLY CERTIFIED REALTIME

23      COURT REPORTER

24      JOB NO. 5308381

25

                              Page 1

```
 1      A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3    MARK MAO
      BOIES SCHILLER FLEXNER LLP
 4    44 Montgomery Street, 41st Floor
      San Francisco, California 94104
 5    415 293 6800
      mmao@bsfllp.com
 6
      RYAN MCGEE
 7    MORGAN & MORGAN
      201 North Franklin Street
 8    7th Floor
      Tampa, Florida 33602
 9    813 223 0931
      rmcgee@forthepeople.com
10
      ALEXANDER FRAWLEY
11    IAN CROSBY
      SUSMAN GODFREY
12    1301 Avenue of the Americas
      32nd Floor
13    New York, New York 10019
      Afrawley@susmangodfrey.com
14
   COUNSEL FOR PLAINTIFF IN CALHOUN MATTER:
15    ADAM PROM
      DICELLO LEVITT & GUTZLER
16    10 North Dearborn Street, Sixth Floor
      Chicago, Illinois 60602
17    312 214 7900
      aprom@dicellolevitt.com
18
   COUNSEL FOR DEFENDANT:
19
      JOSEF ANSORGE
20    JOHN WILSON, IV
      QUINN EMANUEL URQUHART & SULLIVAN LLP
21    51 Madison Avenue
      New York, New York 10010
22    josefansorge@quinnemanuel.com
23    CARL SPILLY
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
24    1300 I Street, NW, Suite 900
      Washington, D C  20005
25    202 538 8277
      carlspilly@quinnemanuel.com
                                          Page 2
```

```
 1  APPEARANCES:  (Continued)
 2    CRYSTAL NIX-HINES
      865 South Figueroa Street, 10th Floor
 3    Los Angeles, California 90017
      crystalnixhines@quinnemanuel.com
 4
 5  VIDEOGRAPHER:
      Sean Grant
 6
    ALSO PRESENT:
 7    Konstantinos Psounis, Ph.D.
      Julie Burns
 8    John Wilson, IV - Quinn Emanuel
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 3
```

```
 1                  - - -
 2              I N D E X
 3                  - - -
 4  Testimony of:
 5      JONATHAN E. HOCHMAN
 6  MR. ANSORGE.............................. 10
 7
 8                  - - -
 9            E X H I B I T S
10                  - - -
11
12  NO.        DESCRIPTION              PAGE
13  Exhibit 1    Expert Report of Jonathan
14              Hochman.................... 30
15  Exhibit 2    Jonathan Hochman's
16              Curriculum Vitae........... 55
17  Exhibit 3    Article entitled
18              Personally Identifiable
19              Information (PII)..........146
20  Exhibit 4    Snapshot of a Google
21              policy.....................163
22  Exhibit 5    Document entitled
23              Mitigating Browser
24              Fingerprinting in Web
25              Specifications.............184
                                          Page 4
```

```
 1                  - - -
 2         E X H I B I T S (Continued.)
 3                  - - -
 4
 5  NO.        DESCRIPTION              PAGE
 6  Exhibit 6    E-mail from
 7              jkarlin@google.com dated
 8              July 31, 2019..............201
 9  Exhibit 7    Jonathan Hochman's
10              Supplemental Report........235
11  Exhibit 8    Document titled Table of
12              Contents...................236
13  Exhibit 9    Article entitled W3C TAG
14              Observations on Private
15              Browsing Modes.............246
16  Exhibit 10   Google Analytics Terms of
17              Service....................264
18  Exhibit 11   URL document...............268
19  Exhibit 12   Declaration of Jonathan
20              E. Hochman.................289
21  Exhibit 13   Expert Report provided in
22              Rockwood Select Asset
23              Fund XI v Devine,
24              Millimet & Branch..........293
25
                                          Page 5
```

1  profile of users"?                          13:24:35
2      A.   I think I've heard that before.    13:24:38
3      Q.   And what's your understanding of   13:24:39
4  that phrase?                                 13:24:41
5      A.   The way I would describe it is      13:24:45
6  that, as applies to this, is that Google     13:24:46
7  is logging -- collecting, logging,           13:24:53
8  whenever it can, all the activity of users   13:24:56
9  from when they first start, on and on and    13:25:00
10 on.                                          13:25:04
11     Q.   You do not use the phrase           13:25:08
12 "complete cradle-to-grave profile of         13:25:10
13 users" in your report, correct?             13:25:14
14     A.   I'll take your word for it.         13:25:15
15     Q.   And you do not opine that Google    13:25:16
16 maintains a complete cradle-to-grave        13:25:20
17 profile of users, correct?                   13:25:25
18     A.   By the way, when you said           13:25:26
19 "report," I'm thinking of the opening        13:25:27
20 report.                                      13:25:29
21     Q.   In either report.                   13:25:29
22     A.   In either report.  I'll take        13:25:31
23 your word for it.  Okay.                     13:25:32
24          And then the next question was?     13:25:33
25     Q.   You do not opine that Google        13:25:35

1  maintains a complete cradle-to-grave        13:25:36
2  profile of users, correct?                   13:25:39
3      A.   Well, I believe that Google is      13:25:41
4  engaged in complete cradle-to-grave         13:25:44
5  profiling of users.  I haven't used that     13:25:49
6  word formulation, but I believe that        13:25:50
7  that's true.                                 13:25:51
8      Q.   What is your understanding of       13:25:52
9  the distinction between "profile" and        13:25:54
10 "profiling"?                                 13:25:58
11         MR. MAO:  Objection,                 13:25:59
12 argumentative.  You're harassing the        13:26:00
13 witness.                                     13:26:02
14         MR. ANSORGE:  It's not               13:26:02
15 argumentative.                               13:26:03
16         MR. MAO:  May I have the             13:26:05
17 question read back?  Maybe I                 13:26:06
18 misunderstood the question.  I               13:26:08
19 apologize if I did, Joey.  The               13:26:10
20 question back, please.                       13:26:14
21         (Whereupon, the question is read     13:26:14
22 back by the reporter.)                       13:26:14
23     A.   I don't agree with you.             13:26:36
24 BY MR. ANSORGE:                              13:26:36
25     Q.   Where do you opine that Google      13:26:37

1  maintains a complete cradle-to-grave        13:26:39
2  profile of users?                            13:26:39
3      A.   Yeah, in my report --              13:26:39
4          (Reporter clarification.)           13:26:43
5          MR. MAO:  Objection, asked and      13:26:43
6  answered.                                    13:26:46
7          Go ahead.                            13:26:46
8      A.   So in my report, I opine that       13:26:47
9  Google tracking beacons, which are located   13:26:51
10 on at least ████████ of websites, by         13:26:56
11 some measure, consistently beam             13:27:00
12 information back to Google, including a      13:27:06
13 indication of the content that the user is   13:27:12
14 viewing, specifically the URL, among other  13:27:14
15 information, that this is consistently       13:27:18
16 done by the tracking beacons I've           13:27:20
17 mentioned, that it's done the same for all   13:27:24
18 the users, whether they're in incognito     13:27:26
19 mode or regular mode.  And I am saying --   13:27:32
20 when I say "the users," I mean the users     13:27:35
21 in class 1 or class 2.                       13:27:37
22 BY MR. ANSORGE:                              13:27:43
23     Q.   And that wasn't my question,        13:27:44
24 Mr. Hochman.                                 13:27:46
25     A.   I think it was.                     13:27:50

1      Q.   My -- do you opine anywhere in      13:27:51
2  your report that the information from        13:27:55
3  these individual tracking beacons is         13:27:58
4  correlated into a single cradle-to-grave     13:28:00
5  profile of class 1 or class 2 members?       13:28:04
6          MR. MAO:  Objection, asked and      13:28:07
7  answered.                                    13:28:08
8      A.   All right.  So the data comes in    13:28:13
9  and is stored by Google, and it is stored    13:28:15
10 with a sufficient amount of identifiers,     13:28:18
11 cookie identifiers, fingerprinting data     13:28:23
12 that it can be linked up.                     13:28:29
13         And I've shown even, using the      13:28:33
14 data available through the special master   13:28:37
15 process, how these records can be linked    13:28:39
16 up.  And the simple fact that Google might  13:28:42
17 store the data fragments separately is not   13:28:46
18 really consequential because it's not at    13:28:50
19 all hard to link them up.                     13:28:54
20 BY MR. ANSORGE:                              13:28:54
21     Q.   Your opinion is that the data       13:28:58
22 could be linked up, not that it is linked    13:29:00
23 up; is that correct?                         13:29:03
24         MR. MAO:  Objection, misstates      13:29:05
25 his testimony.                               13:29:06

1    A.   I think that if you were to look    13:29:07
2  at how database systems work, data can be    13:29:10
3  stored -- it can be stored in a single    13:29:16
4  data structure or it can be separated out    13:29:18
5  into pieces, and that doesn't really    13:29:20
6  matter because Google has the    13:29:23
7  cradle-to-grave profile of the user.  The    13:29:25
8  fact that they might store it in pieces,    13:29:29
9  it would be like if your doctor had a file    13:29:31
10 about you and -- but he had it in three    13:29:34
11 different file folders and maybe they were    13:29:38
12 in two different file cabinets, but he had    13:29:41
13 access to all of them.  He's got your    13:29:45
14 medical history.  It doesn't -- it's not    13:29:46
15 required that they all be put together in    13:29:47
16 the same manilla folder.    13:29:49
17 BY MR. ANSORGE:    13:29:49
18    Q.   Mr. Hochman, do you opine    13:29:58
19 anywhere that Google stores all of the    13:29:59
20 data it receives?    13:30:01
21    A.   According to our test, it looks    13:30:06
22 like the data that's being transmitted    13:30:08
23 back to Google by the tracking beacons is    13:30:11
24 being received and stored.  We haven't    13:30:14
25 found yet, and Google hasn't presented    13:30:17

Page 118

1  evidence or information, showing that the    13:30:20
2  data is not being stored and saved at    13:30:24
3  least for some length of time.    13:30:29
4    Q.   Mr. Hochman, you do not opine    13:30:38
5  anywhere your report that all the domains    13:30:40
6  that belong to Google all share data with    13:30:43
7  each other; is that correct?    13:30:45
8        MR. MAO:  Objection, misstates    13:30:48
9  his testimony, the document speaks for    13:30:49
10 itself.    13:30:51
11     Go ahead.    13:30:51
12    A.   I'm not sure I understood the    13:30:53
13 question because I think it might have    13:30:54
14 like a double negative in it.  So maybe    13:30:55
15 can you just say it again so I can be sure    13:30:57
16 I understand it?    13:31:00
17 BY MR. ANSORGE:    13:31:00
18    Q.   Do you opine anywhere in your    13:31:01
19 report that all the domains that belong to    13:31:03
20 Google all share data with each other?    13:31:05
21    A.   I may have said something like    13:31:08
22 that.  I just -- I don't recall if you --    13:31:14
23 if you think that I've said that, you    13:31:16
24 could show me where.  I don't know that    13:31:19
25 I've said the opposite of it, and you're    13:31:21

Page 119

1  sort of creating a -- a question that's    13:31:24
2  without context so I'm not sure --    13:31:28
3    Q.   Yeah.    13:31:31
4    A.   -- where I'm going to look -- I    13:31:32
5  can search the whole report, but that will    13:31:34
6  be slow.  Maybe you want to draw my    13:31:36
7  attention to something.  It will be    13:31:38
8  faster.    13:31:40
9    Q.   The problem here, Mr. Hochman,    13:31:40
10 is that we're trying to ask you questions    13:31:42
11 about the limits of your opinions.  We    13:31:45
12 have reviewed your report.  It is my    13:31:48
13 understanding that you do not opine that    13:31:51
14 Google maintains a complete    13:31:54
15 cradle-to-grave profile of users.  It is    13:31:56
16 my understanding that you do not opine    13:31:58
17 that Google engages in fingerprinting    13:32:00
18 techniques to build a profile of    13:32:01
19 plaintiffs.  It is my understanding that    13:32:04
20 you do not opine on domains sharing data    13:32:06
21 with each other.  And what we're    13:32:12
22 attempting to do is clarify that with you.    13:32:15
23     So with respect -- if you do    13:32:18
24 opine on that anywhere, we'd expect you to    13:32:21
25 at this point inform us and not vice    13:32:23

Page 120

1  versa.    13:32:27
2    A.   Okay.    13:32:28
3        MR. MAO:  Objection, it's just a    13:32:29
4  mischaracterization, but I don't even    13:32:32
5  think there's a question pending so...    13:32:35
6    A.   That's right, there's not a    13:32:37
7  question there.  So I'll wait for a    13:32:38
8  question.    13:32:42
9      (Reporter clarification.)    13:32:43
10       MR. MAO:  And we disagree,    13:32:43
11 Mr. Ansorge.    13:32:50
12 BY MR. ANSORGE:    13:32:50
13    Q.   Mr. -- the question was,    13:32:52
14 Mr. Hochman, do you opine anywhere in your    13:32:54
15 report that all the domains that belong to    13:32:56
16 Google all share data with each other?    13:32:59
17    A.   I mean, I think I'd have to ask    13:33:12
18 you to enumerate which domains you're    13:33:14
19 referring to because -- and are you    13:33:18
20 referring to Google or Alphabet?  It    13:33:20
21 starts to get complicated.  I mean, Google    13:33:22
22 owns a bunch of subsidiaries.  They have,    13:33:25
23 you know, all sorts of companies and    13:33:27
24 things.  I don't think you're referring to    13:33:30
25 those, so I think we need to narrow it    13:33:32

Page 121

31 (Pages 118 - 121)

1  issue in this case is stored in GAIA logs?    16:16:39
2       MR. MAO:  Objection.  I just    16:16:44
3  want to make a standing objection,    16:16:45
4  okay?  Mr. Ansorge, you're asking    16:16:47
5  about documents and data in which    16:16:50
6  Google has been refusing to produce    16:16:52
7  and has been sanctioned for and    16:16:54
8  subject to a pending sanction motion,    16:16:56
9  okay?    16:16:59
10      I'll leave that as a standing    16:16:59
11  objection, and I'll just leave it as a    16:17:01
12  standing objection going forward.    16:17:12
13      Go ahead.    16:17:14
14      MR. ANSORGE:  Mr. Mao, I believe    16:17:15
15  you already made that standing    16:17:18
16  objection earlier.    16:17:19
17      MR. MAO:  Yeah, and you're not    16:17:20
18  standing down, so I have to sometimes    16:17:21
19  reassert a standing objection to    16:17:23
20  remind you.    16:17:26
21      A.  Mr. Ansorge, I just also want to    16:17:28
22  add that if to the extent I'm changing    16:17:30
23  anything by saying "is linked" versus    16:17:32
24  "could be linked," you know, subsequent to    16:17:36
25  this opening report being produced, there    16:17:37

Page 230

1  was some additional data that came from    16:17:40
2  Google, okay?  And although that    16:17:41
3  production is still incomplete, there was    16:17:44
4  some additional data that came from Google    16:17:46
5  and resulted in the supplemental opinions,    16:17:48
6  where I was actually able to go ahead and    16:17:52
7  link and show how this stuff is linked.    16:17:53
8       So I just want that to be there    16:17:55
9  as a clarification on prior answers.    16:17:58
10      Now, prior to Mark's objection,    16:18:01
11  Mr. Mao's objection, you had a question    16:18:05
12  and I would like that question read back,    16:18:07
13  and I will answer it.    16:18:09
14      MR. ANSORGE:  Court reporter,    16:18:15
15  could you read the question back,    16:18:17
16  please?    16:18:18
17      (Whereupon, the question is read    16:18:19
18  back by the reporter.)    16:18:19
19      A.  Okay.  So I think I've sort of    16:18:39
20  explained that the -- that --    16:18:42
21  BY MR. ANSORGE:    16:18:42
22      Q.  I'm sorry, that was actually not    16:18:46
23  my question.  I'll read out the question.    16:18:47
24      A.  Okay.    16:18:49
25      Q.  Do you opine anywhere in your    16:18:49

Page 231

1  report that the private browsing data at    16:18:51
2  issue in this case is stored in GAIA logs?    16:18:54
3      A.  Private browsing data stored in    16:18:54
4  GAIA logs.  I think the private browsing    16:19:04
5  data is stored in B logs, not P logs, and    16:19:06
6  that the B logs and the P logs can be    16:19:11
7  linked.    16:19:15
8      Q.  So the answer would be no, you    16:19:15
9  do not opine anywhere in your report that    16:19:17
10  the private browsing data at issue in this    16:19:19
11  case store in GAIA logs, correct?    16:19:22
12      A.  I like my answer more than    16:19:25
13  yours.    16:19:27
14      Q.  Can you point us to any part of    16:19:27
15  your report where you show that the    16:19:34
16  private browsing data at issue is stored    16:19:37
17  in GAIA logs?    16:19:42
18      A.  I haven't asserted that the    16:19:43
19  private browsing data is stored in GAIA    16:19:45
20  logs.  I've said, either in this report or    16:19:46
21  in the supplemental report, that the    16:19:48
22  private browsing data is stored in B logs,    16:19:50
23  and that the B logs are linked in a    16:19:54
24  variety of manners to the P logs.    16:19:58
25      Q.  How are the B logs linked to the    16:20:06

Page 232

1  P logs?    16:20:08
2      A.  I've addressed that in prior    16:20:08
3  answers, so I would just include that as    16:20:10
4  part of this answer.  And I can also point    16:20:12
5  you to the analysis that's been done in    16:20:17
6  this report and the supplemental report    16:20:18
7  and the supporting information that    16:20:21
8  appears in the appendices to the report,    16:20:22
9  but I've shown how these things are    16:20:25
10  linked.    16:20:27
11      Q.  Well, let's pull up your report,    16:20:31
12  please, and take the time to show me in    16:20:33
13  what passage you're stating that these    16:20:35
14  things are linked because we've read in    16:20:39
15  your report to describe how everything    16:20:40
16  could be linked.  And it sounds like this    16:20:42
17  is a slightly different opinion that    16:20:44
18  you're offering today.    16:20:46
19      A.  I think I've addressed this    16:20:47
20  already.  It's just the philosophical    16:20:49
21  difference between "are linked" and "is    16:20:51
22  linked," okay?    16:20:56
23      The data may being stored in    16:20:57
24  separate places, but there's a common --    16:20:58
25  there are common keys between them and    16:20:59

Page 233

59 (Pages 230 - 233)

1 that, in effect, this common key forms a      16:21:02
2 linkage, okay?                                16:21:05
3      Q.   What is the --                       16:21:07
4      A.   Someone could take and put them      16:21:08
5 together in the same place, or they can be     16:21:10
6 left in separate places, but they're still    16:21:12
7 effectively a pointer back and forth          16:21:14
8 between them.                                  16:21:16
9      Q.   Would it be fair to say that         16:21:18
10 your opinion is that they are joinable?        16:21:19
11     A.   Yes, they're -- I've said that        16:21:24
12 they are joinable.  I believe I've talked      16:21:26
13 about joinability.                             16:21:29
14     In any case, I think it would be           16:21:31
15 good at this point to introduce the            16:21:33
16 supplemental report as a exhibit because I     16:21:37
17 may want to point to things in there in        16:21:40
18 answering some of these questions.             16:21:43
19     MR. MAO:  And I just note this             16:21:45
20 is the second time that the witness            16:21:47
21 has requested that.  So I will have            16:21:49
22 that standing objection for any other          16:21:50
23 subsequent questions you raise without         16:21:52
24 giving him what he requested.                  16:21:54
25     MR. ANSORGE:  All right.  Let's            16:21:58

Page 234

1 the home front as well.  And then if           16:22:54
2 Mr. Mao is fine with that, we'll go            16:22:55
3 off the record.                                16:22:58
4     MR. MAO:  All right.  Go ahead.            16:23:01
5     THE VIDEOGRAPHER:  Going off the            16:23:03
6 record.  The time is 4:23 p.m.                 16:23:03
7     (Whereupon, a brief recess is              16:23:13
8 taken.)                                        16:37:14
9     THE VIDEOGRAPHER:  Back on the              16:37:14
10 record.  The time is 4:38 p.m.                 16:38:05
11 BY MR. ANSORGE:                                16:38:05
12     Q.   Mr. Hochman, you had requested        16:38:10
13 your rebuttal report to be introduced as       16:38:12
14 an exhibit, and I believe we're ready to       16:38:15
15 load it now.  We will also thereafter load     16:38:18
16 as an exhibit the document that you            16:38:23
17 referenced that Mr. Frawley sent us a few      16:38:25
18 minutes ago.                                   16:38:29
19     (Exhibit 8, Document titled                16:38:30
20 Table of Contents, marked for                  16:38:30
21 identification.)                               16:38:30
22     A.   Perfect.                              16:38:32
23     MR. MAO:  Were you introducing             16:38:58
24 both?  I'm only seeing an Exhibit 7.           16:38:59
25 It appears to be the rebuttal report.          16:39:02

Page 236

1 pull up the supplemental report now.           16:22:02
2 I have a whole bunch of questions              16:22:04
3 about your opening report still, but           16:22:07
4 you require it before you.  We'll --           16:22:10
5 we are going to have somebody load it,         16:22:11
6 and we can pull that up for you,               16:22:12
7 Mr. Hochman.                                   16:22:14
8     MR. MAO:  Thank you.                        16:22:15
9     (Exhibit 7, Jonathan Hochman's             16:22:16
10 Supplemental Report, marked for                16:22:16
11 identification.)                               16:22:16
12     A.   Since we're working across two        16:22:18
13 reports now, I actually have created a         16:22:20
14 master index that's like a table of            16:22:22
15 contents for both reports and all the          16:22:24
16 appendices.  I've just sort of copied and      16:22:26
17 pasted that stuff into one place.              16:22:29
18     I would like to use that because           16:22:33
19 it will expedite my answering your             16:22:34
20 questions, and I'm willing to have the         16:22:36
21 lawyer send you a copy of that, as well,       16:22:38
22 if you -- if you don't mind me using that.     16:22:41
23     MR. ANSORGE:  Yeah.  So let's             16:22:44
24 take a break then, and he can send it          16:22:46
25 now.  I need to address something on           16:22:49

Page 235

1     MR. ANSORGE:  I don't even see             16:39:04
2 Exhibit 7 yet.  Oh, there we go.               16:39:05
3 BY MR. ANSORGE:                                16:39:06
4     Q.   And Mr. Hochman, we were --           16:39:13
5 before the break, we had -- we were            16:39:14
6 discussing whether the private browsing        16:39:16
7 data at issue in this case was linked with     16:39:21
8 Google account, and I believe you said you     16:39:25
9 had wanted to look at the rebuttal report      16:39:28
10 to make sure you hadn't opined on -- on        16:39:31
11 that in any way here.                          16:39:35
12     A.   I'm not sure -- can you just          16:39:39
13 read what you just said?                       16:39:41
14     Q.   Why did you ask for the rebuttal      16:39:42
15 report to be pulled up, Mr. Hochman?           16:39:48
16     A.   Oh, I see.  Yeah, because             16:39:50
17 there's some content in there that I think     16:39:51
18 is relevant to the questions that you've       16:39:53
19 been asking, and I wanted to point out,        16:39:56
20 for example, the -- the content that           16:39:58
21 begins at page 7, section 5-A.                 16:40:01
22     Q.   And what in particular did you        16:40:19
23 want to point out there?                       16:40:21
24     A.   "Private browsing data collected      16:40:22
25 and stored by Google can readily be linked     16:40:27

Page 237

60 (Pages 234 - 237)

1  you see the last sentence where it says      18:12:54
2  "Usage of a cookie is in no way linked to      18:12:56
3  any personally identifiable information on      18:12:59
4  our site"?                         18:13:01
5      A.   Yes, that's what our belief was.      18:13:03
6      Q.   And what was your understanding      18:13:10
7  of personally identifiable information at      18:13:13
8  that time?                         18:13:16
9      A.   It -- it wasn't as detailed as      18:13:18
10 it is now, and I think it would have just      18:13:20
11 been sort of the common business           18:13:23
12 understanding of -- that it's something      18:13:26
13 that -- you know, PII has been an evolving      18:13:29
14 concept.  Privacy is an ascendant concern.      18:13:33
15      I've been studying it since this      18:13:38
16 time, so I've learned a lot more, but this      18:13:40
17 is a reflection of what we understood,      18:13:45
18 sort of how we understood things at the      18:13:47
19 time.                            18:13:50
20      Q.   And at the time, did you         18:13:52
21 understand a user agent to constitute      18:13:55
22 personally identifiable information?      18:13:57
23      MR. MAO:  Objection, asked and      18:14:00
24 answered.                         18:14:01
25      A.   I don't -- yeah, I don't think      18:14:02

Page 306

1  we got to see user agent.  See, I -- I --      18:14:03
2  Google Analytics is a black box.  I hadn't      18:14:07
3  known at the time -- I had no insight into      18:14:11
4  what data was actually being logged.  That      18:14:13
5  stuff is kind of super secret, according      18:14:16
6  to Google.  I think you guys fought us      18:14:18
7  tooth and nail not to give it and, you      18:14:21
8  know, there's a lot of difficulty in      18:14:24
9  getting that information.               18:14:26
10      I, of course, had no access to      18:14:27
11 any of that at the time this was written.      18:14:28
12 I didn't understand the extent -- the      18:14:30
13 miles of data that Google was collecting      18:14:34
14 from people.  All I understood was what I      18:14:37
15 could see in the Google Analytics         18:14:40
16 dashboard that I would log in to, and I      18:14:43
17 didn't see any PII in there.            18:14:45
18      I just saw, you know, bulk,         18:14:47
19 anonymous data of activity on my site.  I      18:14:51
20 didn't see anything in there that was tied      18:14:53
21 to individual users.                 18:14:56
22      MR. ANSORGE:  We'll move to      18:14:59
23 strike as nonresponsive.               18:15:01
24      I'll provide another exhibit and      18:15:05
25 this will be Exhibit 15.               18:15:06

Page 307

1      (Exhibit 15, Current privacy      18:15:09
2  policy for HochmanConsultants.com,         18:15:09
3  marked for identification.)            18:15:10
4  BY MR. ANSORGE:                      18:15:10
5      Q.   Please let me know once you have      18:15:10
6  it.                              18:15:12
7      A.   Yeah, I have it.               18:15:32
8      Q.   Do you recognize Exhibit 15?      18:15:35
9      A.   Yes.                        18:15:36
10      Q.   And this is the current privacy      18:15:37
11 policy for HochmanConsultants.com,         18:15:40
12 correct?                          18:15:43
13      A.   I'm not sure, but if you say it      18:15:47
14 is, I'll take your word for it.         18:15:50
15      Q.   I represent to you that we      18:15:54
16 pulled this off of the                18:15:55
17 HochmanConsultants.com website.         18:15:57
18      Do you have any reason to think,      18:16:00
19 looking at it, that this is not the      18:16:03
20 current privacy policy?                18:16:05
21      A.   Yeah, this looks like the      18:16:07
22 current privacy policy.               18:16:08
23      Q.   Do you see on page 2 of the PDF,      18:16:16
24 there's a bolded in the middle section      18:16:20
25 that's titled "Website Provider"?      18:16:25

Page 308

1      Do you see that?                 18:16:27
2      A.   Yes.                        18:16:29
3      Q.   And the text after Website      18:16:31
4  Provider, it's one of the definitions that      18:16:34
5  your privacy policy provides, correct?      18:16:35
6      A.   Yes.                        18:16:38
7      Q.   And your website's privacy      18:16:42
8  policy states that "Website Provider means      18:16:45
9  any natural or legal person who processes      18:16:46
10 the data on behalf of the Company.  It      18:16:50
11 refers to third-party companies or      18:16:54
12 individuals employed by the Company to      18:16:55
13 facilitate the Website, to provide the      18:16:57
14 Website on behalf of the Company, to      18:17:00
15 perform websites related to the Website or      18:17:03
16 to assist the Company in analyzing how the      18:17:05
17 Website is used."                   18:17:08
18      Did I read that correctly?      18:17:09
19      A.   Yeah, and I see there's a typo      18:17:10
20 there.                            18:17:13
21      Q.   Google Analytics is a website      18:17:17
22 provider under this definition, correct?      18:17:18
23      A.   I think that you're asking me      18:17:21
24 for legal conclusions.  And it -- this      18:17:23
25 document says what it says.            18:17:31

Page 309

78 (Pages 306 - 309)

1  consider it.                          19:34:07
2      MR. ANSORGE:  Well, can you let    19:34:10
3  us know later today whether you'll     19:34:12
4  oblige us or not, or should we expect  19:34:14
5  to be provided with a list of all the  19:34:17
6  sources that Mr. Hochman considered    19:34:20
7  and relied upon in forming his         19:34:22
8  conclusions in this case?             19:34:25
9      MR. MAO:  We've heard your        19:34:26
10  request.  We believe we complied with  19:34:27
11  the statute, but we will consider it.  19:34:29
12  I'd like -- I prefer less arguments    19:34:31
13  rather than more.                     19:34:33
14  BY MR. ANSORGE:                       19:34:37
15      Q.   Well, Mr. Hochman, two minutes  19:34:38
16  remaining.                            19:34:43
17      (Reporter clarification.)         19:34:43
18  BY MR. ANSORGE:                       19:34:43
19      Q.   Okay.  How is it now?        19:34:56
20      A.   The Internet gods have given you  19:34:59
21  a reprieve.  Go ahead.                19:35:01
22      Q.   Yes.  Well, I wanted to thank  19:35:03
23  you for your time today.  I look forward  19:35:06
24  to spending more time with you tomorrow.  19:35:08
25  I appreciate your patience.           19:35:10

Page 358

1  MR. ANSORGE:  For the documents   19:35:12
2  that we have provided to -- which      19:35:13
3  we've also produced, we can tomorrow   19:35:17
4  or tonight provide you with the        19:35:20
5  produced documents.  I don't know if   19:35:23
6  you'll want them tomorrow or not.      19:35:25
7      But with that, I look forward to   19:35:27
8  seeing you tomorrow at 10:00 a.m.      19:35:29
9      THE WITNESS:  10:00 a.m.          19:35:33
10      MR. MAO:  Thank you.  Thank you   19:35:35
11  everyone.                             19:35:36
12      THE VIDEOGRAPHER:  This           19:35:37
13  concludes -- this concludes volume 1   19:35:37
14  of the videotaped deposition of       19:35:46
15  Jonathan Hochman.  We are off the      19:35:48
16  record at 7:36 p.m.                   19:35:49
17      MR. MAO:  I would like a rough.    19:36:05
18      THE COURT REPORTER:  Do you want   19:36:17
19  an expedite transcript?               19:36:19
20      MR. MAO:  Yes, please.           19:36:22
21      (Time noted:  7:36 p.m.)
22
23
24
25

Page 359

1  _____
   JONATHAN E. HOCHMAN
2
3

   _____
4  Subscribed and sworn to
   before me this _____
5  day of _____  2022.
6  _____
   Notary Public
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 360

1          CERTIFICATION
2
3      I, BELLE VIVIENNE, a Nationally
4  Certified Realtime Reporter, do hereby
5  certify:
6      That the witness whose testimony as
7  herein set forth, was duly sworn by me;
8  and that the within transcript is a true
9  record of the testimony given by said
10  witness.
11      I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome of
15  this matter.
16      IN WITNESS WHEREOF, I have hereunto
17  set my hand this 25th day of July  2022.
18
19
20      _Belle Vivienne_
21  BELLE VIVIENNE, CRR, CCR, RPR
22
23          *    *    *
24
25

Page 361

91 (Pages 358 - 361)

# EXHIBIT 37

CONFIDENTIAL

1           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2                OAKLAND DIVISION
3      CHASOM BROWN,
4              Plaintiff,     Case No.
       vs.
5                        4:20-cv-03664-YGR-SVK
6      GOOGLE LLC,
7              Defendant.
8      ***********************************
                     CONFIDENTIAL
9                     VOLUME II
       CONTINUED ZOOM VIDEOTAPED DEPOSITION OF
10                  JONATHAN HOCHMAN
                    July 21, 2022
11                   10:09 a.m.
       ***************************************

12
13
14     TAKEN BY:
15         JOSEF ANSORGE, ESQ.
           ATTORNEY FOR DEFENDANT
16
17     REPORTED BY:
18         BELLE VIVIENNE, RPR, CRR, NJ-CRR,
           WA/CO/NM-CCR
19         NATIONALLY CERTIFIED REALTIME
           COURT REPORTER
20         VERITEXT LEGAL SOLUTIONS
           JOB NO. 5312353
21         866.299.5127
22
23
24
25

                                          Page 365

CONFIDENTIAL

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3    MARK MAO
      BOIES SCHILLER FLEXNER LLP
 4    44 Montgomery Street, 41st Floor
      San Francisco, California 94104
 5    415.293.6800
      mmao@bsfllp.com
 6
      RYAN MCGEE
 7    MORGAN & MORGAN
      201 North Franklin Street
 8    7th Floor
      Tampa, Florida 33602
 9    813.223.0931
      rmcgee@forthepeople.com
10
      ALEXANDER FRAWLEY
11    IAN CROSBY
      SUSMAN GODFREY
12    1301 Avenue of the Americas
      32nd Floor
13    New York, New York 10019
      Afrawley@susmangodfrey.com
14
    COUNSEL FOR PLAINTIFF IN CALHOUN MATTER:
15    ADAM PROM
      DICELLO LEVITT & GUTZLER
16    10 North Dearborn Street, Sixth Floor
      Chicago, Illinois 60602
17    312.214.7900
      aprom@dicellolevitt.com
18
    COUNSEL FOR DEFENDANT:
19
      JOSEF ANSORGE
20    JOHN WILSON, IV
      QUINN EMANUEL URQUHART & SULLIVAN LLP
21    51 Madison Avenue
      New York, New York 10010
22    josefansorge@quinnemanuel.com
23    CARL SPILLY
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
24    1300 I Street, NW, Suite 900
      Washington, D.C. 20005
25    202.538.8277
      carlspilly@quinnemanuel.com
```
Page 366

```
 1  APPEARANCES:  (Continued)
 2    CRYSTAL NIX-HINES
      QUINN EMANUEL URQUHART & SULLIVAN LLP
 3    865 South Figueroa Street, 10th Floor
      Los Angeles, California 90017
 4    crystalnixhines@quinnemanuel.com
 5
    VIDEOGRAPHER:
 6    Sean Grant
 7  ALSO PRESENT:
      Konstantinos Psounis, Ph.D.
 8    Julie Burns
      John Wilson, IV - Quinn Emanuel
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 367

```
 1                  - - -
 2                I N D E X
 3                  - - -
 4  Testimony of:
 5    JONATHAN HOCHMAN
 6  MR. ANSORGE............................ 372
 7
 8                  - - -
 9              E X H I B I T S
10                  - - -
11  NO.         DESCRIPTION          PAGE
```
```
12  Exhibit 17    Appendix F.................374
13  Exhibit 18    Dr. Glen Bernston's
14                deposition.........379
15  Exhibit 19    Excerpt from Glen
16                Berston's deposition.......384
17  Exhibit 20    Two-page policy document...414
18  Exhibit 21    Log Data Usage Rules.......439
19  Exhibit 22    Article entitled Privacy
20                Threats in Intimate
21                Relationships..............496
22  Exhibit 24    Understanding Dual
23                Stacking of IPv4 and PIv6
24                Unicast Addresses..........503
25
```
Page 368

```
 1                  - - -
 2          E X H I B I T S (Continued.)
 3                  - - -
 4  NO.         DESCRIPTION          PAGE
```
```
 5  Exhibit 25    Ad Personalization
 6                Settings...................512
 7  Exhibit 26    Expert Report of
 8                Konstantinos Psounis.......520
 9  Exhibit 29    Document Bates numbered
10                GOOG-BRWN-00630517.........558
11  Exhibit 30    Document Bates numbered
12                GOOG-CABR03923580..........561
13  Exhibit 31    Document Bates numbered
14                GOOG-CABR-00894408.........567
15  Exhibit 32    PII document...............568
16
17
18
19
20
21
22
23
24
25
```
Page 369

2 (Pages 366 - 369)

1 something else. I think -- Mr. Ansorge, I 10:53:12
2 think you misspoke because you said if 10:53:15
3 deleting logged-in stuff. I don't think 10:53:17
4 you want to ask me about deleting 10:53:20
5 logged-in stuff because I've never 10:53:22
6 suggested deleting any logged-in stuff. 10:53:25
7 BY MR. ANSORGE: 10:53:25
8    Q. Deleting system records of all 10:53:31
9 signed-out browsing communications would 10:53:32
10 include deleting data Google received when 10:53:35
11 users were not in a private browsing mode, 10:53:37
12 correct? 10:53:40
13    A. Okay. So, theoretically, what 10:53:42
14 you're saying is logical, but it's also 10:53:47
15 not what I'm suggesting because, in many 10:53:49
16 cases, Google can prove that a record is 10:53:51
17 not in private browsing mode because 10:53:56
18 Google has this reliable incognito 10:53:58
19 detection process, logic, and it's even 10:54:02
20 recorded incognito detection bits in many 10:54:09
21 cases. 10:54:12
22    So if it knows that a 10:54:13
23 transaction is not incognito, if it can 10:54:15
24 prove that the transaction is not 10:54:19
25 incognito or is not a private browsing, 10:54:21

Page 406

1 then it could retain that record. 10:54:24
2    Q. Does your opinion 31 only relate 10:54:31
3 to class 1, or does it also relate to 10:54:33
4 class 2? 10:54:35
5    A. I haven't -- I don't think that 10:54:38
6 opinion 31 has -- is limited to class 1 or 10:54:40
7 class 2, and I'm aware that the incognito 10:54:43
8 detection bits only exist for a 10:54:45
9 significant subset of class 1 in that 10:54:51
10 they're -- I wouldn't expect to find 10:54:56
11 incognito detection bits for class 2, but 10:54:58
12 we still don't know what the unknowns are. 10:55:01
13 Maybe there is something that just hasn't 10:55:03
14 been revealed to us yet. 10:55:06
15    Q. And apart from that speculation, 10:55:08
16 Mr. Hochman, you're not opining that 10:55:12
17 Google distinguishes between non-Chrome 10:55:15
18 private browsing data and non-Chrome 10:55:19
19 browsing data, correct? 10:55:22
20    MR. MAO: Objection, assumes 10:55:23
21 facts not in evidence. 10:55:26
22    Go ahead. 10:55:27
23    A. Okay. So I'm going to start 10:55:27
24 with the part where you suggested that I 10:55:28
25 was speculating. 10:55:30

Page 407

1    It's not speculation for me to 10:55:31
2 think that you may have withheld something 10:55:33
3 from me when it's already proven that you 10:55:35
4 did withhold stuff from me that was 10:55:37
5 serious. And so it's not speculation. 10:55:40
6 It's an inference. 10:55:42
7    Now, if you take out that part 10:55:45
8 of the question, that you take out the 10:55:47
9 false premise, then maybe re-ask it 10:55:49
10 without that, I'll be happy to answer. 10:55:52
11 BY MR. ANSORGE: 10:55:52
12    Q. I'll move to strike the -- your 10:55:55
13 answer as nonresponsive. 10:55:58
14    Mr. Hochman -- 10:56:03
15    THE COURT REPORTER: Did you say 10:56:06
16 something, Mark? I'm sorry. 10:56:07
17    MR. MAO: I said disagree. 10:56:08
18 There's a court order on this. There 10:56:10
19 is a finding on this. 10:56:13
20 BY MR. ANSORGE: 10:56:13
21    Q. And Mr. Hochman, you're not 10:56:16
22 opining that Google distinguishes between 10:56:17
23 non-Chrome private browsing data and 10:56:20
24 non-Chrome browsing data, correct? 10:56:25
25    MR. MAO: Objection to the form 10:56:26

Page 408

1 of the question. 10:56:27
2    Go ahead. 10:56:27
3    A. I don't think that I've yet 10:56:31
4 found any incognito detection bit that 10:56:33
5 relates to non-Chrome browsing. The 10:56:37
6 method I know that Google used for 10:56:41
7 incognito detection was applicable to the 10:56:43
8 Chrome browser, not -- when not on iOS. 10:56:48
9 BY MR. ANSORGE: 10:56:55
10    Q. Do you offer any opinion on how 10:56:57
11 Google should distinguish between private 10:56:58
12 browsing mode data at issue for class 2 10:57:03
13 and signed-out non-private browsing data 10:57:04
14 for any non-Chrome browser? 10:57:06
15    A. I understand that you're 10:57:13
16 commenting that this could pose some 10:57:14
17 difficulty for Google, that they might 10:57:16
18 have to delete a lot of data that they 10:57:19
19 would rather not delete. 10:57:21
20    I haven't proposed a solution 10:57:22
21 for them, but it is a problem of their own 10:57:24
22 making. 10:57:27
23    Q. Move to strike as nonresponsive. 10:57:36
24    Mr. Hochman, do you offer any 10:57:37
25 opinion on how Google should distinguish 10:57:39

Page 409

12 (Pages 406 - 409)

1  between private browsing mode data at    10:57:42
2  issue for class 2 and signed-out    10:57:46
3  non-private browsing data from any    10:57:48
4  non-Chrome browser?    10:57:50
5      MR. MAO:  Objection to the form    10:57:53
6  of the question, incomplete    10:57:56
7  hypothetical.    10:57:58
8      Go ahead.    10:57:58
9  A.   So per my prior answer, which I    10:58:00
10  will further summarize, I haven't found    10:58:03
11  yet a method that Google uses to    10:58:08
12  distinguish private browsing from    10:58:12
13  non-private browsing for the members of    10:58:15
14  class 2.    10:58:19
15  BY MR. ANSORGE:    10:58:19
16  Q.   And as you sit here before us    10:58:22
17  today, can you think of any method that    10:58:24
18  you would propose?    10:58:26
19  A.   I haven't -- I would have to see    10:58:33
20  more information from Google about their    10:58:37
21  systems to address that.    10:58:39
22  Q.   Mr. Hochman, yesterday you    10:58:45
23  testified that you don't see a statement    10:58:48
24  in your report that asserts that Google is    10:58:51
25  using fingerprinting, but you're drawing    10:58:53

Page 410

1  inferences that this fingerprinting data    10:58:55
2  is likely to be used or could be used by    10:58:57
3  Google for fingerprinting.    10:58:59
4      Do you recall that?    10:59:00
5      MR. MAO:  Objection, misstates    10:59:01
6  his testimony, completely misstates    10:59:02
7  his testimony.    10:59:05
8      Go ahead.    10:59:06
9  A.   I think I have reasonable    10:59:07
10  inferences that fingerprinting is likely    10:59:09
11  to be used.  I know that fingerprinting    10:59:14
12  is -- is often used to defend computer    10:59:20
13  systems from things like ad fraud or    10:59:26
14  denial-of-service attacks.    10:59:29
15      I think that fingerprinting, as    10:59:31
16  I said, can sometimes be a legitimate    10:59:34
17  security technique.  At other times,    10:59:38
18  depending on how it's used, it can be    10:59:40
19  invasive of privacy, okay?    10:59:42
20      So per my prior answers, what I    10:59:46
21  said yesterday, which I've then just    10:59:48
22  summed up here, it depends how it's being    10:59:50
23  used.    10:59:54
24  BY MR. ANSORGE:    10:59:54
25  Q.   Mr. Hochman, in the hundreds of    10:59:56

Page 411

1  hours you spent reviewing documents to    10:59:58
2  form your opinions in this case, did you    11:00:00
3  ever come across Google's    11:00:02
4  Device/App/Browser Fingerprinting and    11:00:03
5  Immutable Identifiers Policy?    11:00:03
6      (Reporter clarification.)    11:00:03
7      MR. ANSORGE:  Immutable,    11:00:16
8  I-M-M-U-T-A-B-L-E.    11:00:16
9      MR. MAO:  Objection, misstates    11:00:20
10  his prior testimony, asked and    11:00:22
11  answered, incomplete hypothetical,    11:00:23
12  vague.    11:00:24
13      Go ahead.    11:00:24
14  A.   I might have.  And I'm -- I'm    11:00:26
15  somewhat aware of such policies that are    11:00:30
16  in use by major tech companies in -- in    11:00:34
17  sort of the history of their evolution.    11:00:37
18  BY MR. ANSORGE:    11:00:37
19  Q.   How are you aware of those    11:00:42
20  policies?    11:00:43
21  A.   It's something that I've    11:00:45
22  researched.  It's something that I've seen    11:00:47
23  in prior cases.  I know, for example, that    11:00:49
24  Apple has phased out something called    11:00:52
25  UDID, which used to be in use, but then    11:00:57

Page 412

1  sometime in 2014, 2015, it was decided    11:01:00
2  that these immutable identifiers were a    11:01:02
3  really big problem for -- for privacy.    11:01:05
4  Q.   So, Mr. Hochman, as you sit here    11:01:10
5  before us today, you are aware that Google    11:01:11
6  has an anti-fingerprinting policy; is that    11:01:13
7  correct?    11:01:13
8      (Reporter clarification.)    11:01:32
9      MR. MAO:  Objection, misstates    11:01:32
10  the record.    11:01:34
11      Go ahead.    11:01:35
12      MR. ANSORGE:  Counsel, I was not    11:01:38
13  summarizing the record at all, please.    11:01:39
14  Those are improper objections,    11:01:42
15  Mr. Mao.    11:01:43
16      MR. MAO:  You're referring to a    11:01:44
17  Google policy that is not part of the    11:01:45
18  record.  I mean, then are you saying    11:01:47
19  you didn't produce it?  Okay.  Sounds    11:01:49
20  like it's part of the record.  My    11:01:54
21  objection stands.  Thank you.    11:01:56
22  BY MR. ANSORGE:    11:01:57
23  Q.   Mr. Hochman, do you understand    11:01:57
24  my question?    11:01:58
25  A.   I do understand your question.    11:02:00

Page 413

13 (Pages 410 - 413)

1  used to look in the -- the logs of --      12:39:20
2  containing logged-out activity and see if  12:39:25
3  there were matching examples within some   12:39:28
4  reasonable time frame. You know, I         12:39:31
5  recognize that IP addresses sometimes get  12:39:34
6  changed, but if you can find activity      12:39:36
7  temporally close together, you can infer   12:39:41
8  that that's the same person. So there      12:39:43
9  would be a way for Google to verify that   12:39:45
10 claim sometimes.                           12:39:49
11     Q.  And have you done any work to      12:39:49
12 quantify when it might be able to verify a 12:39:51
13 claim and when it might not be able to     12:39:55
14 verify a claim?                            12:39:58
15     A.  It would be difficult for me to    12:39:58
16 do that work with the restricted data that 12:40:00
17 Google produced. If Google had produced    12:40:08
18 more of the data that we requested, it     12:40:09
19 might have been possible to do more        12:40:11
20 analysis.                                  12:40:12
21     Q.  When you're saying more data,      12:40:12
22 Mr. Hochman, do you mean non-plaintiff     12:40:14
23 class member data or are you referring to  12:40:17
24 something else?                            12:40:19
25     A.  I'm referring essentially to all  12:40:19

Page 470

1  the data that was requested that wasn't    12:40:21
2  produced.                                  12:40:24
3     Q.  Are you referring to specific       12:40:25
4  plaintiff's data that was not produced     12:40:27
5  that --                                    12:40:30
6     A.  I think --                          12:40:31
7        MR. MAO: Objection, asked and        12:40:31
8  answered.                                  12:40:32
9     A.  Yeah. As I said, what I -- what     12:40:33
10 I said was all the data that was asked for 12:40:39
11 that wasn't produced, so I don't want to   12:40:41
12 be criticized for not doing some analysis  12:40:45
13 which I couldn't do because I wasn't given 12:40:47
14 the data to do it. That's sort of          12:40:50
15 Catch-22. And --                           12:40:53
16 BY MR. ANSORGE::                           12:40:54
17     Q.  Yeah.                              12:40:54
18     A.  -- and I appreciate that it may    12:40:55
19 be painful for you to hear that            12:40:57
20 explanation, but that's the fact of it.    12:40:59
21     Q.  Mr. Hochman, I'm just trying to    12:41:03
22 understand the bases for your opinions in  12:41:04
23 this case. And my question was, do you     12:41:06
24 believe that there's some specific         12:41:10
25 plaintiffs' data that has not been         12:41:12

Page 471

1  produced to you that you would have        12:41:15
2  benefitted from and which you could have   12:41:17
3  used to validate your analysis?            12:41:19
4        MR. MAO: Objection, the             12:41:22
5  document speaks for itself.                12:41:24
6     A.  I like the way I -- I said it       12:41:25
7  before, that what I'm looking for is all   12:41:27
8  the data that was requested that wasn't    12:41:29
9  produced that constrained my ability to do 12:41:31
10 analysis.                                  12:41:34
11     The -- the lack of production          12:41:35
12 hindered me, and, you know, I can't say    12:41:37
13 for sure what I could have done with       12:41:42
14 unknown data that I wasn't given.          12:41:44
15 BY MR. ANSORGE::                           12:41:44
16     Q.  Yes, Mr. Hochman. My question      12:41:49
17 was a bit different. It relates to, do     12:41:51
18 you believe that there's some specific     12:41:55
19 plaintiff data that you or plaintiffs have 12:41:57
20 requested and that they have not received, 12:42:01
21 and that if you had received it, you would 12:42:04
22 have been able to validate your analysis?  12:42:06
23        MR. MAO: Objection, asked and      12:42:09
24 answered.                                  12:42:10
25     A.  If I said something about it in    12:42:14

Page 472

1  my report, then it stands. And otherwise, 12:42:15
2  I have to answer I don't know because if I 12:42:20
3  haven't seen some data -- if we've         12:42:23
4  requested some data and haven't received   12:42:25
5  it, then I can't know the utility of data  12:42:27
6  without actually seeing it.                12:42:30
7        Maybe there's some extra fields     12:42:32
8  that we still haven't been given that      12:42:33
9  would be very informative, and I don't     12:42:37
10 know what to expect within the unknowns.   12:42:39
11 These are literally unknown unknowns.      12:42:41
12 BY MR. ANSORGE::                           12:42:41
13     Q.  And as you sit here before us,     12:42:46
14 you're not aware of any particular         12:42:48
15 plaintiffs' data that you've requested and 12:42:50
16 have not received; is that correct?        12:42:52
17        MR. MAO: Objection, asked and      12:42:55
18 answered, misstates his testimony.         12:42:56
19     A.  I -- I don't have some specific    12:43:01
20 data in mind, but I wouldn't expect that I 12:43:03
21 would because I don't know what the        12:43:06
22 unknown unknowns are.                      12:43:08
23 BY MR. ANSORGE::                           12:43:08
24     Q.  Mr. Hochman, do you agree that     12:43:12
25 people living in the same household may    12:43:13

Page 473

28 (Pages 470 - 473)

1  share computers, phones, and other      12:43:16
2  connected devices?                      12:43:18
3      A.   This is a perennial issue for   12:43:21
4  online businesses.  This is something that 12:43:25
5  is dealt with all the time.  I would point 12:43:27
6  you to my prior answers that talk about    12:43:31
7  this.                        12:43:32
8          I would also point you to my      12:43:33
9  additional statement that Google in its    12:43:34
10 fingerprinting policy considers, you know, 12:43:38
11 less than a thousand; if there are less    12:43:41
12 than a thousand users identified by some   12:43:44
13 data, then that's considered to be unique  12:43:47
14 data.                         12:43:50
15         So that's -- you know, Google's   12:43:51
16 threshold in that policy is a thousand,    12:43:54
17 and I don't know many households that have 12:43:55
18 a thousand people in them.      12:43:57
19     Q.   You don't think that might be a  12:44:00
20 policy that -- to prevent identification?  12:44:02
21 Do you believe that as a statement of      12:44:04
22 fact, that if a thousand people share an   12:44:06
23 identifier, they're identified?    12:44:08
24     A.   I think --             12:44:12
25         MR. MAO:  I'm sorry, objection    12:44:13

Page 474

1  to the form of the question, asked and  12:44:14
2  answered.                    12:44:14
3      A.   I think it highlights the danger 12:44:15
4  of -- of what we might call an       12:44:18
5  identification of -- of a group.  Google   12:44:24
6  is considering under a thousand to be some 12:44:27
7  sort of small group.           12:44:29
8          Once you narrow things down that 12:44:30
9  much, in any sort of case where somebody   12:44:32
10 is trying to identify a user, and I've     12:44:38
11 said this before in prior answers, there's 12:44:40
12 always some additional information         12:44:44
13 available.                   12:44:46
14         There are always some            12:44:47
15 circumstances around that, some other     12:44:47
16 things that are known, and those can be    12:44:49
17 used in a process of elimination to        12:44:52
18 whittle down any small group down to       12:44:55
19 identify the individual.        12:44:57
20         And I know that Dave Nelson will  12:44:58
21 come forward and offer to testify that the 12:45:01
22 FBI does that all the time, that they're   12:45:04
23 not hindered by this scenario of multiple  12:45:08
24 people in a household.  It's a red herring 12:45:11
25 issue.                       12:45:15

Page 475

1      It's a losing issue that you're   12:45:16
2  trying to argue.  I would encourage you to 12:45:17
3  just drop it because it's really      12:45:20
4  frivolous.                   12:45:22
5  BY MR. ANSORGE::               12:45:22
6      Q.   Mr. Hochman, in your report, do 12:45:24
7  you cite any studies that analyze the     12:45:26
8  frequency of device sharing?    12:45:27
9      A.   I'm not aware of any that I have 12:45:32
10 cited.                       12:45:34
11     Q.   And in your report, you do not   12:45:36
12 discuss device sharing at all; isn't that  12:45:38
13 correct?                     12:45:41
14         MR. MAO:  Objection, misstates   12:45:42
15 his testimony.  The document speaks        12:45:43
16 for itself.                  12:45:46
17     A.   Yeah, whatever I said in my      12:45:47
18 report stands.               12:45:48
19         And I would just further add     12:45:50
20 that I'm aware, and have always been       12:45:52
21 aware, of the issue and the potential for  12:45:54
22 device sharing.  Same as Google is.  And   12:45:56
23 Google still gets over it when they do     12:45:59
24 their, you know, allow log-ins, when they  12:46:02
25 allow conversion tracking.      12:46:05

Page 476

1      You know, Google, when someone   12:46:09
2  logs in to your account, how do they know  12:46:11
3  it's actually you and not someone else?    12:46:15
4  They don't -- they don't worry about it    12:46:17
5  too much.  It's just -- there's so much    12:46:20
6  that you can do.  And, you know, that's    12:46:21
7  the state of online identification.   12:46:24
8  BY MR. ANSORGE::               12:46:31
9      Q.   Mr. Hochman, can you point to   12:46:31
10 any paragraphs in your report in which you 12:46:32
11 discuss device sharing?         12:46:34
12     A.   I'm not sure that I've discussed 12:46:38
13 device sharing, but I've talked about this 12:46:40
14 before and given you a bunch of answers on 12:46:42
15 this question.  So I will reiterate by     12:46:44
16 reference all those answers, and further   12:46:47
17 add that the -- I'm aware of the potential 12:46:50
18 for device sharing.  And this is nothing   12:46:53
19 surprising or new or that alters any of my 12:46:55
20 opinions.                    12:46:59
21     Q.   And, Mr. Hochman, two users who  12:47:01
22 share a single device that uses the same   12:47:03
23 Wi-Fi connection will have the same IP     12:47:08
24 address; is that correct?       12:47:10
25         MR. MAO:  Objection, incomplete  12:47:11

Page 477

29 (Pages 474 - 477)

1  question is, both possibilities. One   12:55:47
2  possibility is that Google could have come   12:55:50
3  forward and just offered this argument in   12:55:53
4  their defense if they wanted to, but they   12:55:55
5  didn't. And you had three experts rebut   12:55:58
6  me. I'm one guy and you had to get three   12:56:01
7  people to rebut me. That's not really a   12:56:04
8  fair fight.   12:56:06
9       But beyond that, we've requested   12:56:06
10  evidence, which if it -- that request had   12:56:08
11  been fulfilled, we might have been able to   12:56:12
12  do this analysis ourselves. So it's --   12:56:14
13  kind of the answer is both.   12:56:16
14  BY MR. ANSORGE::   12:56:17
15    Q.  Let's go back to the scenario of   12:56:18
16  the five different users. They're on the   12:56:19
17  same device with the same browser on the   12:56:21
18  same Wi-Fi network.   12:56:24
19       Would they have the same user   12:56:25
20  agent?   12:56:30
21    A.  If they're using the same piece   12:56:30
22  of software, then they would have the same   12:56:32
23  user agent, but I must reiterate that five   12:56:35
24  users on one device is extremely unlikely.   12:56:41
25  It's an edge case, and there's no evidence   12:56:45
Page 486

1  that it's happened with any material   12:56:48
2  frequency.   12:56:50
3    Q.  Are you aware of user agents   12:56:50
4  changing over time similar to how IP   12:56:54
5  addresses may change over time?   12:56:56
6    A.  Yes.   12:56:57
7    Q.  Have you accounted for that in   12:56:58
8  your opinions in this report at all?   12:57:04
9    A.  I have considered it, and I   12:57:06
10  am -- I am aware of it. It's certainly   12:57:09
11  something that I have kept in mind. And   12:57:14
12  you telling me that user agent strings   12:57:17
13  change over time doesn't alter any of my   12:57:20
14  opinions.   12:57:23
15    Q.  Separate from me telling you   12:57:24
16  anything, Mr. Hochman, are you aware of   12:57:29
17  user agent strings changing over time?   12:57:31
18    A.  Yes.   12:57:33
19    Q.  And can you tell us something   12:57:36
20  else about that? How frequently do user   12:57:37
21  agent strings change over time in your   12:57:42
22  opinion?   12:57:44
23    A.  My understanding is that if the   12:57:44
24  user updates their browser software to a   12:57:47
25  new version because that browser software   12:57:50
Page 487

1  version is often included in the user   12:57:52
2  agent string, so every time you update   12:57:54
3  your browser and get a new version,   12:57:56
4  potentially the user agent string could   12:57:58
5  change.   12:58:01
6       But I would say that that   12:58:01
7  progression is predictable. It occurs   12:58:03
8  around known dates and someone who is   12:58:07
9  trying to match things up could account   12:58:10
10  for that with logic.   12:58:13
11    Q.  As you sit here before us today,   12:58:17
12  do you have a rough understanding of how   12:58:19
13  often Chrome updates to a new version?   12:58:21
14    A.  My sensation is that it might   12:58:25
15  update once or twice a month.   12:58:27
16    Q.  Would you consider the scenario,   12:58:29
17  Mr. Hochman, where you have two users.   12:58:39
18  They're sharing a single device, but only   12:58:41
19  one has ever used private browsing mode on   12:58:44
20  that shared device.   12:58:46
21       In your report, you don't   12:58:49
22  propose a method for identifying what   12:58:50
23  specific user was using private browsing   12:58:52
24  mode; isn't that correct?   12:58:54
25       MR. MAO:  Objection, misstates   12:58:56
Page 488

1  the document, incomplete hypothetical,   12:58:57
2  argumentative, asked and answered.   12:59:00
3       Go ahead.   12:59:02
4    A.  Yeah, so as -- anything I've   12:59:04
5  said previously on this issue, I -- I   12:59:06
6  continue to hold that, and I'm not   12:59:10
7  altering that prior testimony and include   12:59:17
8  that here.   12:59:19
9       But further, I've considered   12:59:20
10  this possibility, and if there are two   12:59:22
11  people sharing the device like that   12:59:25
12  frequently, it would seem that they're   12:59:27
13  part of the same household. They know   12:59:31
14  each other. And I have proposed a   12:59:34
15  solution because part of what I've   12:59:37
16  suggested is that users can self-identify.   12:59:40
17       So if one of the users or the   12:59:43
18  other user self-identifies, Google could   12:59:46
19  then verify that, yeah, they were doing   12:59:49
20  some private browsing. I don't see how   12:59:52
21  that really changes things in a   12:59:55
22  significant way.   12:59:58
23  BY MR. ANSORGE::   13:00:01
24    Q.  But in the scenario we're just   13:00:01
25  discussing, Mr. Hochman, where there's two   13:00:04
Page 489

32 (Pages 486 - 489)

1 users, shared device, same browser, Wi-Fi, 13:00:07
2 household, you're saying that Google could 13:00:14
3 verify which one of those users was in 13:00:17
4 private browsing mode; is that correct? 13:00:22
5    A.  No.  What I would say is that 13:00:25
6 this isn't going to happen often enough to 13:00:27
7 cause a material problem because the same 13:00:29
8 problem you're highlighting here for -- 13:00:32
9 and maybe "problem" is the wrong word. 13:00:35
10       The same thing that you're 13:00:37
11 highlighting here also would occur within 13:00:38
12 conversion tracking, right?  Google 13:00:43
13 reports to an advertiser, hey, this ad 13:00:44
14 rendered a conversion, but how does Google 13:00:46
15 know that it wasn't me who looked at the 13:00:49
16 ad and said, no, I don't want to buy that, 13:00:52
17 and then my wife, from the same device, 13:00:54
18 later on came along and bought that thing 13:00:56
19 without ever having talked to me?  Google 13:00:58
20 is now going to tell that advertiser, hey, 13:01:00
21 this ad caused this sale for you, but 13:01:02
22 actually it didn't. 13:01:06
23       So that kind of slippage is part 13:01:07
24 and parcel of things online, and Google 13:01:10
25 accepts it and lives with it very happily 13:01:12

Page 490

1 in their business endeavors.  And it seems 13:01:16
2 rather strange that they would suddenly 13:01:19
3 say, whoa, this is a big problem here when 13:01:21
4 they're perfectly happy to go charge 13:01:27
5 advertisers billions and billions of 13:01:28
6 dollars based on this level -- this -- 13:01:31
7 sort of the accuracy of tracking where 13:01:34
8 that may also happen. 13:01:35
9    Q.  Is it fair to say that 13:01:37
10 conversion tracking doesn't always 13:01:38
11 identify the individual precisely? 13:01:41
12    A.  I think I've said this in many 13:01:44
13 prior answers, that online, you generally 13:01:47
14 don't have access to the -- to the camera 13:01:50
15 on the computer to be able to look and ID 13:01:53
16 the person who's sitting at the keyboard. 13:01:55
17 That's -- that would be creepy if that 13:01:57
18 existed for this kind of application.  So 13:01:59
19 you have to tolerate a certain amount 13:02:02
20 of -- of -- a certain level of 13:02:05
21 imprecision.  There's always a bit of 13:02:08
22 error rate. 13:02:10
23       But I don't -- I haven't seen 13:02:11
24 any statistics to say that this is not an 13:02:12
25 edge case, to say that this is, you know, 13:02:15

Page 491

1 material that's going to alter the outcome 13:02:17
2 so much that it's going to be unfair. 13:02:20
3    Q.  Mr. Hochman, would you agree 13:02:25
4 that individuals might share social media, 13:02:29
5 e-mail accounts and even if they have 13:02:32
6 separate accounts, they may sometimes know 13:02:33
7 each other's passwords; would you agree 13:02:35
8 with that? 13:02:39
9    A.  It's possible.  I mean, I -- I 13:02:39
10 think that that's something that I've 13:02:42
11 considered, yes. 13:02:45
12    Q.  And how has that impacted the 13:02:47
13 opinions that you're proffering in this 13:02:51
14 case? 13:02:52
15    A.  I think that the way to address 13:02:54
16 this -- and I think some of your experts 13:02:57
17 have pointed out the danger of abusive 13:02:59
18 spouses or parents or children, and if you 13:03:08
19 mail some notice to someone and saying 13:03:09
20 Hey, we saw that you are in incognito 13:03:12
21 mode, and there's this class action, that 13:03:12
22 that could have consequences. 13:03:14
23       So the way to mitigate that is 13:03:15
24 to mail a neutral notice to every Google 13:03:16
25 account holder so that you don't give away 13:03:20

Page 492

1 any information.  You just say, hey, this 13:03:22
2 is class action.  It affects Google 13:03:24
3 accounts.  If you were an incognito user, 13:03:26
4 you can go here to fill a claim.  I think 13:03:29
5 you can get across that bridge with a 13:03:31
6 little bit of thinking without putting 13:03:33
7 anyone at risk. 13:03:35
8       And I'm sensitive to that issue. 13:03:36
9 I don't want to put anyone at risk.  I 13:03:37
10 agree that we don't put anyone at risk. 13:03:40
11    Q.  Can you explain a little bit 13:03:44
12 more when you're saying -- I want to make 13:03:46
13 sure I understand this.  Your opinion, 13:03:50
14 Mr. Hochman, is that an e-mail should be 13:03:51
15 sent in a neutral note to every Google 13:03:54
16 account holder to describe the case 13:03:58
17 overall and then ask them to 13:04:04
18 self-identify; is that correct? 13:04:06
19    A.  Actually -- 13:04:08
20    MR. MAO:  Sorry, sorry. 13:04:11
21 Objection.  Are you referring to a 13:04:12
22 specific document, or are you just 13:04:13
23 asking the question generally, sitting 13:04:14
24 here? 13:04:16
25    MR. ANSORGE:  I was referring to 13:04:17

Page 493

33 (Pages 490 - 493)

1    4:16 p.m.  Thank you.          16:16:51
2        MR. MAO:  Can I get an expedited  16:16:55
3    copy?                    16:16:57
4        THE COURT REPORTER:  And a       16:17:06
5    rough?                  16:17:06
6        MR. MAO:  Yes, please.         16:17:06
7        (Time noted:  4:16 p.m.)
8
9    _____
        JONATHAN HOCHMAN
10
11   _____
12   Subscribed and sworn to
      before me this _____
13   day of _____ 2022.
14   _____
        Notary Public
15
16
17
18
19
20
21
22
23
24
25
                                        Page 614

1  JONATHAN HOCHMAN
2  jonathan@hochmanconsultants.com
3              July 26, 2022
4  RE: BROWN VS. GOOGLE LLC
5  JULY 21, 2022, JONATHAN HOCHMAN, VOLUME II, JOB NO. 5312353
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                                        Page 616

1        CERTIFICATION
2
3      I, BELLE VIVIENNE, a Nationally
4    Certified Realtime Reporter, do hereby
5    certify:
6      That the witness whose testimony as
7    herein set forth, was duly sworn by me;
8    and that the within transcript is a true
9    record of the testimony given by said
10   witness.
11     I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I am
14   in no way interested in the outcome of
15   this matter.
16     IN WITNESS WHEREOF, I have hereunto
17   set my hand this 26th day of July 2022.
18
19     *Belle Vivienne*
20   BELLE VIVIENNE, CRR, CCR, RPR
21
22     *   *   *
23
24
25
                                        Page 615

1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, notating the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 617

                                        64 (Pages 614 - 617)

# EXHIBIT 38

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

3

4

5    CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
6    CASTILLO, and MONIQUE
     TRUJILLO, individually and on
7    behalf of all other similarly
     situated,
8              Plaintiffs,
                                    No.
9         vs.                       4:20-cv-03664-YGR-SVK
     GOOGLE LLC,
10             Defendant.
     _____/

11

12

13              -- CONFIDENTIAL --

14

15    CORRECTED VIDEOTAPED DEPOSITION OF MICHAEL LASINSKI

16             Remote Zoom Proceedings

17              Ann Arbor, Michigan

18            Wednesday, July 20, 2022

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 228                    Job No. 5308350

                                        Page 1

```
 1          UNITED STATES DISTRICT COURT
 2    NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5  CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
 6  CASTILLO, and MONIQUE
    TRUJILLO, individually and on
 7  behalf of all other similarly
    situated,
 8
           Plaintiffs,
 9                No.
    vs.        4:20-cv-03664-YGR-SVK
10
    GOOGLE LLC,
11
           Defendant.
12  _____/
13
14        -- CONFIDENTIAL --
15      Videotaped deposition of MICHAEL LASINSKI,
16  taken on behalf of Defendant, Remote Zoom Proceedings
17  from Cambridge, Massachusetts, beginning at 10:59 a.m.
18  Eastern Daylight Time and ending at 8:28 p.m. Eastern
19  Daylight Time, on Wednesday, July 20, 2022, before
20  Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21  No. 3462.
22
23
24
25
                                              Page 2
```

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFFS:
 4    BOIES SCHILLER FLEXNER LLP
 5    BY: JAMES LEE, ESQ.
 6    100 SE Second Street, Suite 2800
 7    Miami, Florida 33131
 8    (305) 539-8400
 9    jlee@bsfllp.com
10
11    MORGAN & MORGAN
12    BY: JOHN A. YANCHUNIS, ESQ.
13    201 North Franklin Street, 7th Floor
14    Tampa, Florida 33602
15    (813) 223-5505
16    jyanchuis@forthepeople.com
17
18    DICELLO LEVITT GUTZLER
19    BY: SHARON CRUZ, ESQ.
20    Ten North Dearborn Street, Sixth Floor
21    Chicago, Illinois 60602
22    (312) 214-7900
23    szruz@dicellolevitt.com
24
25
                                              Page 3
```

```
 1  APPEARANCES (Continued):
 2
 3  FOR THE DEFENDANT:
 4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5    BY: VIOLA TREBICKA, ESQ.
 6     865 South Figueroa Street, 10th Floor
 7    Los Angeles, California 90017
 8    (213) 443-3000
 9    violatrebicka@quinnemanuel.com
10     -and-
11    BY: TEUTA FANI, ESQ.
12    191 N. Wacker Drive, Suite 2700
13    Chicago, Illinois 60606
14    (312) 705-7400
15    teutafani@quinnemanuel.com
16
17  Also Present:
18    Amna Qamer, Boies Schiller Flexner LLP, summer
19      associate
20    Angela Peterson, Quinn Emanuel Urquhart & Sullivan,
21      LLP, summer associate
22    Denisha Bacchus, Google LLC
23    Christina Bartlett, Analysis Group
24    Robert Fenton, Videographer
25
                                              Page 4
```

```
 1              I N D E X
 2
 3
 4  WEDNESDAY, JULY 20, 2022
 5
 6  WITNESS                    EXAMINATION
 7  MICHAEL LASINSKI
 8
 9    BY MS. TREBICKA          10, 219
10    BY MR. LEE               211
11
12  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13          (NONE)
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5
```

2 (Pages 2 - 5)

CONFIDENTIAL

1    A.  Right.  I just want to make sure that I don't --
2  I could answer a question incorrectly because I could
3  assume that it's Incognito mode or private browsing mode,
4  and it's not.
5    Q.  I think you can safely -- I don't want to say        12:10:10
6  assume, because obviously you need to listen to my
7  question very carefully.  But most of our conversation
8  will involve private browsing modes.  I will make it
9  clear in my question whether it's private browsing
10  or regular browsing.  And I will make it extra clear if        12:10:24
11  I'm talking about all browsing, including regular
12  browsing.
13    A.  Okay.  Okay.
14    Q.  But my question, it was actually a specific
15  limitation in the question, where I said that this -- the        12:10:35
16  hypothetical scenario involved a private browsing mode
17  user.
18    A.  Okay.  Could you repeat the question, though,
19  because I -- I was starting to answer, and then I
20  couldn't remember if you asked that question or not -- or        12:10:51
21  made that qualifier or not.
22    Q.  That's fine.
23       So user is in private browsing mode, not signed
24  into her Google account during the class period, does a
25  search on Google.com, is shown an ad and clicks on that        12:11:03

Page 42

1  ad.
2       So my question is:  Would that activity be
3  something that you are quantifying in your restitution
4  damages opinion?
5    MR. LEE:  Incomplete hypothetical.        12:11:20
6       Go ahead and answer.
7    THE WITNESS:  Well, I mean, again, I just want
8  to make clear what I'm doing in my restitution damages.
9  And that is looking at the number of unique monthly
10  browser instances.        12:11:44
11       So if that results in an instance, as collected
12  by a browser -- a browser, if that results in an
13  instance, yes, that could be included -- that would be
14  included.  But all the rest of their browsing that they
15  did that month also would be included in Incognito mode.        12:12:14
16  Because I'm only -- I'm only calculating one instance per
17  month.
18       So even if there were 24 instances and even if
19  they clicked on 37 websites in unique browsing mode, that
20  only counts as one instance.        12:12:37
21    Q.  BY MS. TREBICKA:  And the same hypothetical --
22  do you need me to repeat it?
23    A.  I guess so, because I thought I just answered
24  the question.
25    Q.  No, now the question is:  Would it be included        12:12:53

Page 43

1  in your unjust enrichment damages model?  But it's the
2  same hypothetical.
3    MR. LEE:  Asked and answered.
4    THE WITNESS:  So if I'm -- if I'm understanding
5  the hypothetical correctly, they go -- just so -- just to        12:13:45
6  restate it, they go to private browsing mode, they go to
7  a website, and then that website -- and then that
8  website, they're displayed an ad, and then they go to
9  another website where that ad was displayed.
10    Q.  BY MS. TREBICKA:  Correct.        12:14:06
11    A.  I think that it could be.  But the reality is I
12  take a lot of cuts.  And so -- in my -- in my analysis.
13  So, I mean, if it's something that they click on and
14  they -- like a mobile ad, that would not be included,
15  because I've cut that out of my analysis.  Any app        12:14:44
16  traffic I've cut out of my analysis.
17       So it really would depend on how that -- how
18  that actually all transpired.
19    Q.  That's fair, Mr. Lasinski.  And we'll be talking
20  in a lot more detail about the unjust enrichment damages        12:15:00
21  model.
22       Now, what is the injury for which you're
23  quantifying damages?
24    MR. LEE:  Vague, beyond the scope.
25    THE WITNESS:  I think you're asking for a legal        12:15:27

Page 44

1  conclusion there.
2    Q.  BY MS. TREBICKA:  You don't have any other
3  answer, other than one that you believe is a legal
4  conclusion?
5    A.  I do believe that it's a legal conclusion.  So        12:15:36
6  from an injury standpoint, my understanding is that
7  Google was unjustly enriched in this case, as well as
8  the -- the private browsing users were wrongfully -- had
9  their data wrongfully taken.
10    Q.  Is one of your assumptions that every user who        12:16:08
11  falls within the class definitions was actually harmed by
12  the alleged misconduct?
13    A.  Yes, every user was harmed.
14    Q.  Now, you understand that there's some
15  variability in what users believe or are aware of about        12:16:48
16  what they let Google collect?
17    MR. LEE:  Objection.  Compound.
18    THE WITNESS:  I don't -- I don't believe that
19  anyone is fully aware of what Google collects.
20    Q.  BY MS. TREBICKA:  Do you understand that there's        12:17:10
21  at least variability in what people are aware of, as far
22  as what Google collects?
23    A.  When you're talking about the class, I don't
24  think that they -- they -- I don't think that users would
25  understand what Google collects.  I don't think class        12:17:33

Page 45

12 (Pages 42 - 45)

1 users would understand what they collect or -- or are

2 aware of what they collect.

3     Q. So your opinion is that no user is aware of what

4 Google collects when a user is in private browsing mode?

5     A. I don't think that they could be aware of what     12:17:56

6 Google collects. I don't think Google -- I mean, I read

7 the testimony of Ms. Borsay. She doesn't even know what

8 Google collects, and she's a key person in their private

9 browsing mode group.

10     So users -- it would -- in my opinion, would be     12:18:16

11 beyond reasonable to assume that they're aware of what

12 Google is collecting.

13     Q. So your assumption is that every single user in

14 the class has the same level of awareness of what Google

15 collects when they are browsing in private browsing mode?     12:18:34

16     MR. LEE: Objection. Mischaracterizes his prior

17 testimony.

18     THE WITNESS: I don't think I have to have an assumption

19 that they -- I don't have to have an assumption what

20 level of awareness they -- they have. I just know that     12:18:48

21 they're not aware. And they can't -- they can't be

22 aware.

23     I'm not aware of any place, or I've -- and I've

24 searched the data to see if there's anywhere that Google,

25 like, publicly states: Here's all the information that     12:19:06

Page 46

---

1 we collect on you when you're in private browsing mode.

2 I'm not aware of anything like that.

3     So I've talked to Mr. Hochman. He's not aware

4 before this case what Google collects. And probably is

5 still not aware of everything that they collect.     12:19:31

6     Ms. Borsay isn't aware of what is collected. So

7 I -- I don't believe that any user can be aware of what

8 Google is collecting.

9     Q. BY MS. TREBICKA: Do you believe that some users

10 may be aware of some of the data that Google collects but     12:19:47

11 not other pieces, while they're in private browsing mode?

12     A. I -- maybe some -- some people might suspect

13 that there's collection, but I don't think that they

14 could be aware, because I don't think it's published

15 anywhere. So I don't know how they could be aware of     12:20:10

16 what they collect.

17     Q. What do you mean by "might suspect that there is

18 collection"?

19     A. Well, people -- I mean, certainly there's press

20 from this case right now that's out there. So people     12:20:26

21 know that something is going on here. People may just be

22 paying attention to that, and so they might suspect

23 something is going on. But they cannot be aware of what

24 is going on, in my opinion.

25     Q. So in your opinion, would users know, for     12:21:16

Page 47

---

1 example, that Google knows their location when they are

2 in an Incognito mode session?

3     A. I -- I don't have an opinion on what specific

4 users know or don't know.

5     Again, I'm not -- I haven't done a study of what     12:22:07

6 users would say that they know. I mean, I think, again,

7 it would be hard to know something, because people aren't

8 aware of everything that Google is collecting. They

9 can't be aware of it because it's not published.

10     Q. Are you drawing a difference between the word     12:22:32

11 "aware" and "know"?

12     A. I'm -- in that case, I don't think I was trying

13 to draw a difference between them.

14     Q. So do you believe that Google -- that users are

15 aware that within an Incognito mode session, Google     12:22:55

16 learns things about the user to personalize their

17 experience when using Google products?

18     MR. LEE: Calls for speculation, beyond the

19 scope.

20     THE WITNESS: Could you repeat that question?     12:23:59

21     Q. BY MS. TREBICKA: Do you believe that Google

22 users are aware that within Incognito mode session,

23 Google is aware -- I apologize. Let me start again.

24     Do you believe that Google users are aware that

25 within their Incognito mode session, Google knows     12:24:19

Page 48

---

1 their -- things about them in order to personalize their

2 experience when using Google products?

3     A. I mean, I think if I'm understanding the

4 question correctly, you're asking me about what a user

5 would think when they go into Incognito mode..     12:24:51

6     And, I mean, I'm just looking at my report, and

7 it says, "Chrome won't save the following information:

8 Your browser history, cookies and site data/information

9 entered into forms."

10     And so if you were to read -- if you were a user     12:25:06

11 and you were to read that definition, it would seem like

12 you would not be aware that they're actually using

13 information to personalize your web browsing history.

14     Q. Okay.

15     A. And I -- I'll also say that, you know, I read a     12:25:22

16 lot of the emails that were in this case, and it seems

17 like the Google people also understand that people don't

18 have an understanding of what is being collected. And

19 their -- their expectations or awareness is different

20 than what Google Incognito mode actually does.     12:25:48

21     MS. TREBICKA: Let me mark as Exhibit 3 --

22     (Exhibit 3, GOOG-CABR-04431207 - 271, marked for

23     identification electronically by counsel.)

24     MS. TREBICKA: -- a Google document, which is

25 Tab 3 for tag purposes, with the Bates label     12:25:57

Page 49

13 (Pages 46 - 49)

1 points that we've just gone through.

2    Q. Did you identify any other data points that you

3 decided not to include in your report?

4    A. I may have, but I can't recall as I sit here. I

5 can't recall any other data points.          16:24:15

6    Q. Now, moving on to allocation of the restitution

7 damages that you calculate, you propose two possible

8 methods to allocate restitution damages in paragraph 197

9 of your report; correct?

10    A. That is correct.          16:25:10

11    Q. One refers to -- or one method uses the number

12 of UMPBI attributable to each class member; correct?

13    A. Yes, it does.

14    Q. And UMPBI stands for?

15    A. Unique monthly private browsing instances.          16:25:26

16    Q. And the other method is according to the number

17 of class members or putative class members now; correct?

18    A. I know that we're switching topics, and I know

19 that this is short, but I have to quickly use the

20 restroom. I'm sorry about this. I just -- it can          16:25:45

21 literally be less than five minutes.

22    Q. It's all right.

23    A. Okay.

24         THE VIDEOGRAPHER: Going off the record at

25 4:26 p.m.          16:25:56

Page 138

1    (Recess.)

2         THE VIDEOGRAPHER: We are back on the record at

3 4:30 p.m.

4    Q. BY MS. TREBICKA: Okay. Mr. Lasinski, you

5 propos two possible methods to allocate restitution          16:29:50

6 damages; correct?

7    A. I do, yes.

8    Q. And we briefly touched on them before the break;

9 correct?

10    A. I believe that we talked about UMPBI.          16:30:01

11    Q. The other method is according to the number of

12 class members?

13    A. Yes, it is.

14    Q. And is one of them preferable to the other, in

15 your opinion?          16:30:29

16    A. I have not provided a preference.

17    Q. Have you calculated the number of UMPBI deemed

18 attributable to each class member?

19    A. You mean for the entire class, have I calculated

20 the number of UMPBI of each individual class member?          16:30:56

21    Q. Right, attributable to each class member.

22         MR. LEE: Let me object subject to the Court's

23 sanction order for Google's discovery misconduct.

24         Are you representing that that data has been

25 produced, Counsel?          16:31:14

Page 139

1         MS. TREBICKA: I have a question for the

2 witness. I think I need the witness to answer.

3         MR. LEE: Okay. So you're not going to answer

4 my question?

5         MS. TREBICKA: We can take it up after, not on          16:31:26

6 the record.

7         MR. LEE: All right. Let me object based on the

8 sanction order then.

9         THE WITNESS: So my understanding is that not --

10 that data is not available to -- for the entire class.          16:31:40

11    Q. BY MS. TREBICKA: Do you have an understanding

12 of how it can be --

13    A. Can I finish or --

14    Q. Oh, I didn't know you were not finished. With

15 the long pauses, it's making it hard for me know to when          16:31:52

16 you're finished.

17         Go ahead.

18    A. I appreciate that comment. Thank you.

19         So my understanding is that data is not

20 available, and so I have not attempted to do it.          16:32:08

21    Q. Do you know whether -- well, how do you propose

22 that it be done, given that this is one of your

23 methodologies?

24    A. So to the extent that Google produces the data,

25 one could calculate the number of unique private browsing          16:32:49

Page 140

1 instances for the class members. Another way one could

2 do it if that data is not available or only partially

3 available would be through attestation. Class members

4 could attest what they did over the -- over the period.

5         But to be clear, I'm not -- I'm not the          16:33:22

6 administrator in this case. Those are two ways that seem

7 reasonable to me to do this calculation, but again, I'm

8 not the administrator, so I'm not sure exactly how they

9 would do it.

10    Q. So how it would be done is not part of your          16:33:39

11 opinion; correct?

12         MR. LEE: Objection to form, mischaracterizes

13 paragraph 197.

14         THE WITNESS: I just provided two ways that it

15 could be done or a combination of those ways, but my          16:33:50

16 understanding is that at some point there will be an

17 administrator and they will determine how to -- how to do

18 this if UMPBI is selected as the correct method.

19    Q. BY MS. TREBICKA: And you, sitting here today,

20 do not have an opinion on how to do this if UMPBI is          16:34:16

21 selected as the correct method?

22         MR. LEE: Objection subject to the Court's

23 sanction order for Google's discovery misconduct.

24         THE WITNESS: I mean, again, I have two -- as I

25 sit here, I haven't -- I mean, I have ways that it could          16:34:31

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

1 be done.  I mean, it could be done -- if Google produces
2 the information, it could be done that way.  If Google
3 doesn't produce the information or it produces only a
4 portion of the information, it could be done through
5 attestation.  Those are two ways that it could be done --    16:34:50
6    Q.  BY MS. TREBICKA:  And this is --
7    A.  -- to get this -- to get the information
8 necessary to do it this way.
9    Q.  This is your opinion, that it can be done
10 through attestations?                                        16:35:02
11    A.  That seems like a reasonable way to do it, to
12 the extent that the information isn't available from
13 Google.
14    Q.  Do either of your two methodologies propose
15 allocation of restitution damages in proportion to the      16:35:23
16 amount of at issue data that Google collected from each
17 class member?
18    A.  Yes.
19    Q.  Which one?
20    A.  So UPM -- UMPBI would consider the amount of         16:35:56
21 information collected by Google.  It obviously --
22 obviously considers use, and so, therefore, the amount of
23 information that was collected.
24    Q.  So in your opinion, there's a direct
25 relationship between use and the amount of relationship      16:36:26
                                                          Page 142

1 get one UMPBI.  If you logged on twice in two consecutive
2 months, you'd get two, so it's got -- it considers use.
3    Q.  But in any given month, you are provided one
4 UMPBI whether you logged on just once for five minutes or
5 every single day for the entire month; correct?             16:38:54
6    A.  Correct.
7    Q.  So in your opinion, do you believe there is a
8 direct relationship between the number of UMPBI
9 attributable to each class member and the amount of at
10 issue data Google collected from each class member?         16:39:32
11    A.  I'm not sure if there is a direct relationship
12 between UMPBI and the amount on an individual basis.
13 However, how that user is treated and -- and the
14 information that Google is able to obtain on a user,
15 whether or not they spent a long time or a short time,      16:40:16
16 which is what I think you're asking here, is important to
17 Google, and, therefore, using this measurement of use is
18 an appropriate measure for allocation.
19       We also see -- we also see this measure of
20 allocation -- you know, this measure used in the            16:40:37
21 marketplace, like what we've been talking about earlier.
22 People pay, including Google through its Ipsos study, a
23 flat monthly rate per device.
24    Q.  But you also testified earlier that Google is --
25 that in your understanding at least, Google is not able     16:41:27
                                                          Page 144

1 -- of data that was collected?
2    A.  Yes, there is.
3    Q.  What is your opinion based on?
4    A.  My discussions with Mr. Hochman.
5    Q.  What is --                          16:36:42
6    A.  So my -- go ahead, please.
7    Q.  If you haven't finished your answer, please
8 go ahead.
9    A.  So we've talked about this earlier today.  My
10 discussions with Mr. Hochman are that when you            16:36:59
11 calculate -- when Google collects information from users
12 about their browsing history, that's valuable to Google.
13 Knowing that they're on for a long time or a short time
14 or that type of information is very valuable -- very
15 valuable to Google, and so they value that information.     16:37:33
16       And a monthly browser instance, or in this case
17 a unique monthly browser instance, is an appropriate way
18 to consider that value to Google and an appropriate way
19 to apportion it, because it considers use by the class
20 member.                                   16:38:07
21    Q.  UMPBI does not measure use, however; correct?
22    A.  No, that's incorrect.
23    Q.  In your view, UMPBI measures use?
24    A.  It does.  I mean, you have to log on each month
25 to get a UMPBI, so if you only logged once, you'd only     16:38:24
                                                          Page 143

1 to link to separate private browsing sessions for a
2 logged-out user to each other, correct, if the user logs
3 out after every single browsing session?
4       MR. LEE:  Mischaracterizes.  Objection.
5       THE WITNESS:  I did not -- I did not testify to    16:41:52
6 that.  You asked -- I believe that you asked me a
7 question could they link that, and I said that it's not
8 necessary for my damages calculation -- for my
9 restitution calculation to assume -- to have assumed
10 that.                                      16:42:09
11    Q.  BY MS. TREBICKA:  So for purposes of your
12 restitution calculation, you did not assume that Google
13 is able to link two separate private browsing sessions;
14 correct?
15    A.  No, that's not correct.                16:42:31
16    Q.  What is not correct about it?
17    A.  Well, so my understanding is that they would be
18 able to link two private browsing sessions, so long as
19 they came from the client -- from the same device.
20       So I think what you are trying to get at is do   16:42:53
21 I -- have I double-counted, you know, unique monthly
22 browsing instances, and my understanding is that I have
23 not, that they can -- if there are two or three or four
24 or five browsing instances in a month, that they can say
25 that those browsing instances came from the same device.   16:43:13
                                                          Page 145

37 (Pages 142 - 145)

CONFIDENTIAL

1  Q. And your answer was it is not very difficult to

2  perform that calculation. Do you recall that?

3  A. Yes, I do.

4  Q. What is your answer that it is not, and I quote,

5  "very difficult to perform that calculation" based on?        20:26:40

6  A. Well, if you had unique monthly browsing

7  instances -- private browsing instances by class member

8  and that data were -- as an example, were produced, then

9  you would know that -- I mean, you would know that

10  information with certainty, because you could determine        20:26:58

11  unique monthly private browsing instances by class

12  member.

13  Q. So you're -- when you were answering counsel's

14  question, you were relying on a type of data which

15  identifies the private browsing instances by class        20:27:18

16  member; correct?

17  A. I thought that that was the question is if that

18  were available by class member, yes, then you could do

19  that calculation.

20  MS. TREBICKA: Okay. No further questions.        20:27:47

21  MR. LEE: All right. We didn't have to fight.

22  MS. TREBICKA: Yeah, that's true.

23  THE REPORTER: Off the record, Counsel?

24  MS. TREBICKA: Yes.

25  THE VIDEOGRAPHER: We are off the record at        20:27:58

Page 222

---

1  8:28 p.m., and this concludes today's testimony given by

2  Michael Lasinski. The total number of media used was one

3  and will be retained by Veritext Legal Solutions.

4  (Time Noted: 8:28 p.m.)

5  --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 223

---

1  I declare under the penalty of perjury under the

2  laws of the State of California that the foregoing is

3  true and correct.

4  Executed on _____, 2022, at

5  _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 224

---

1  STATE OF CALIFORNIA        ) ss:

2  COUNTY OF MARIN        )

3

4  I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5  hereby certify:

6  That the foregoing deposition testimony was

7  taken before me at the time and place therein set forth

8  and at which time the witness was administered the oath;

9  That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16  I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20  IN WITNESS WHEREOF, I have subscribed my name

21  this 2nd day of August, 2022.

22

23

24

25        LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 225

57 (Pages 222 - 225)

# EXHIBIT 39



**LATHAM & WATKINS** LLP

| 🏠 | Industries ▼ | Practices ▼ | Knowledge Library ▼ | Global Directory ▼ | Join Us ▼ | | Events ▼ |

# LATHAM ADVISES CONSORTIUM ON LANDMARK ACQUISITION OF CHELSEA FOOTBALL CLUB

£4.25 billion transaction represents one of the largest sports M&A deals in history.

view ▶

FOOTBALL MATCH TODAY LIVE    FOOTBALL MATCH TODAY LIVE    FOOTBALL MATCH TODAY LIVE    FOOTBALL MATCH TODAY LIVE

**The cookies we use**

Latham & Watkins uses cookies which are essential for the operation of our website. We would also like to use analytics cookies to help us understand how visitors use our site so we can continue to improve it, but we will only do so with your consent. We use a cookie to remember your preferences. You can access and change your preferences at any time by clicking on the gear icon.

**Essential cookies**

Essential cookies enable the core functionality of our website such as security, authentication, and accessibility. You can change your browser settings to disable these cookies, but it may affect your ability to access and use the site.

**Analytics cookies**    [Off]

We would like to use Google Analytics to analyse how visitors interact with our site so that we can continue to develop and improve it. These services are provided in Europe by Google Ireland Limited and elsewhere by Google LLC and affiliated Google Entities. Google Analytics uses cookies to collect information about visitors to our site (data related to the device/browser, IP address and on-site activity). They measure and report on user interactions, such as the volume and nature of visits to our site. If you agree to the use of these analytics cookies, please move the slider to "On." Please refer to the Cookies Policy on our Privacy page for more information.

Save and close

Bridging the Gap Between Infrastructure and PE Requires a

Healthcare & Life Sciences: Drug Pricing Digest

view all articles ▶

© 2022 Latham & Watkins    Prior results do not guarantee a similar outcome. ⚙    Email Scam Warning | Attorney Advertising & Terms of Use | Privacy | Site Map ▼

Latham & Watkins LLP has office locations in Austin, Beijing, Boston, Brussels, Century City, Chicago, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, Houston, London, Los Angeles, Madrid, Milan, Moscow, Munich, New York, Orange County, Paris, Riyadh,* San Diego, San Francisco, Shanghai, Seoul, Silicon Valley, Singapore, Tel Aviv, Tokyo, and Washington, D.C.
*In cooperation with the Law Firm of Salman M. Al-Sudairi LLC

**Exhibit 0015**

7/20/2022
Michael Lasinski

# EXHIBIT 40

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      OAKLAND DIVISION

 4                        ---o0o---

 5   CHASOM BROWN, et al.,          )

     on behalf of themselves and    )

 6   all others similarly           )

     situated,                      )

 7                                  )

             Plaintiffs,            )Case No.

 8                                  )4:20-cv-03664-YGR-SVK

     vs.                            )

 9                                  )

     GOOGLE LLC,                    )

10                                  )

             Defendant.             )

11   _____)

12

13                        ---o0o---

14            Videotaped Zoom Deposition of

15                   STEVEN WEISBROT

16                Tuesday, August 2, 2022

17                        ---o0o---

18

19

20

21

22

23   Katy E. Schmidt

24   RPR, RMR, CRR, CSR 13096

25   Veritext Job No.: 5345799
```

Page 1

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                OAKLAND DIVISION
 4               ---o0o---
 5   CHASOM BROWN, et al.,      )
     on behalf of themselves and )
 6   all others similarly       )
     situated,                  )
 7                              )
          Plaintiffs,           )Case No.
 8                              )4:20-cv-03664-YGR-SVK
     vs.                        )
 9                              )
     GOOGLE LLC,                )
10                              )
          Defendant.            )
11   _____)
12        BE IT REMEMBERED that, pursuant to Notice,
13   and on Tuesday, the 2nd day of August, 2022,
14   commencing at the hour of 9:32 a.m., thereof, in
15   Parkland, Florida, before me, KATY E. SCHMIDT, a
16   Certified Shorthand Reporter in and for the County of
17   Yolo, State of California, there virtually personally
18   appeared
19
             STEVEN WEISBROT
20
21   called as a witness herein, who, being by me first
22   duly sworn, was thereupon examined and interrogated as
23   hereinafter set forth.
24
25
```

**Page 3**

```
 1 APPEARANCES:
 2 For The Brown Plaintiffs:
 3        (Appeared via Zoom)
 4    MORGAN & MORGAN
      BY: JOHN YANCHUNIS, Esq.
 5    BY: RYAN MCGEE, Esq.
      201 North Franklin Street, Suite 700
 6    Tampa, Florida 33602
      813.223.0931
 7    jyanchunis@forthepeople.com
 8        (Appeared via Zoom)
 9    BOIES SCHILLER FLEXNER LLP
      BY: MARK MAO, Esq.
10    BY: ALISON ANDERSON, Esq.
      44 Montgomery Street, 41st Floor
11    San Francisco, California 94104
      415.293.6800
12    mmao@bsfllp.com
13 For the Calhoun Plaintiffs:
14        (Appeared via Zoom)
15    BLEICHMAR FONTI & AULD LLP
      BY: ANGELICA M. ORNELAS, Esq.
16    555 12th Street, Suite 1600
      Oakland, California 94607-3616
17    aornelas@bfalaw.com
18 For The Defendants:
19        (Appeared via Zoom)
20    QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: ALY G. OLSON, Esq.
21    BY: STEPHEN BROOME, Esq.
      865 S Figueroa Street, Floor 10
22    Los Angeles, California 90017-5003
      213.443.3000
23    stephenbroome@quinnemanuel.com
24 Also present:
25    Sean Grant, Videographer
             ---o0o---
```

**Page 4**

```
 1              INDEX OF EXAMINATION
 2                ---o0o---
 3                            Page
 4   Examination by Ms. Olson          08
 5   Examination by Mr. Yanchunis      79
 6   Examination by Ms. Olson          87
 7   Examination by Mr. Yanchunis      89
 8
 9                ---o0o---
10
11      QUESTIONS INSTRUCTED NOT TO ANSWER
12
13        Page    Line
14
15        (NOTHING OFFERED.)
16
17                ---o0o---
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              INDEX OF EXHIBITS
 2                ---o0o---
 3                            Page
 4   Exhibit 1     Document: Expert Report    23
     of Steven Weisbrot, Esq.
 5
     Exhibit 2     Document: Claim Forms      80
 6
     Exhibit 3     Document: Google+ Claim Form  84
 7
 8                ---o0o---
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1   A.  If you want to explain to me what it is,   11:11
2   there's a chance that I know it by another term of   11:11
3   art, but I don't want to say I'm not using it without   11:11
4   understanding what I'm saying I'm not using.   11:11
5   Q.  Sure.   11:11
6       Are you planning to use IP addresses and   11:11
7   user agents of claimants in order to identify putative   11:11
8   class members or verify claims of putative class   11:11
9   members?   11:11
10   A.  I actually suspected that's what you were   11:11
11   referring to, but I didn't want to jump in and say,   11:11
12   hey, one way or another.  But, no, we will not.   11:11
13   That's not something we would use to identify class   11:12
14   members.   11:12
15   Q.  And is it something you intend to use to   11:12
16   verify class membership or claims submitted by class   11:12
17   members?   11:12
18   A.  No.  The reason -- the reason I made that   11:12
19   sort of distinction is we do look at IPs in a   11:12
20   different context and that's in the context of   11:12
21   identifying potential fraud.  If we're seeing a   11:12
22   tremendous amount of claims filed from one IP address,   11:12
23   well, that's going to trigger a manual review on our   11:12
24   part to see what's going on there.  That's all I was   11:12
25   getting at.   11:12

Page 70

1   Q.  I see.   11:12
2       So you may use IP addresses to detect   11:12
3   potential fraud in terms of a bot submitting a claim.   11:12
4   Is that --   11:12
5   A.  Exactly.  That's right.   11:12
6   Q.  Any other situations where you would use   11:12
7   IP addresses to identify potential fraud?   11:12
8   A.  Yeah.  I think I mentioned it in my report   11:12
9   as well.  If we notice IP addresses switching mid   11:13
10   claim, that can sometimes be indicative of fraud and   11:13
11   that would come up on our IP logs and would get a   11:13
12   second look.   11:13
13       But, again, it would never be used to verify   11:13
14   claimant information, which I believe was your initial   11:13
15   question.   11:13
16   Q.  Just to confirm, so you're not proposing   11:13
17   that Google engage in any analysis to confirm class   11:13
18   membership here?   11:13
19   A.  Oh, that's not what I'm saying at all.  If   11:13
20   they have a way to do it that I'm not privy to,   11:13
21   certainly we're willing to take a look at that.   11:13
22       What I'm saying is my understanding, based   11:13
23   on the sanctions order, is that they -- is that they   11:13
24   can't -- they can't challenge claims verification   11:13
25   based on whether or not they have some sort of list of   11:13

Page 71

1   affected people because they would be prohibited from   11:13
2   bringing that forth, or affected accounts, or whatever   11:13
3   the term of art might be.   11:13
4   Q.  But sitting here today, as of today, you are   11:14
5   not proposing that Google engage in any analysis to   11:14
6   confirm class membership?   11:14
7   A.  I am merely saying that we've worked with   11:14
8   Google in similar situations before and we could   11:14
9   administer this case and administer it well without a   11:14
10   need for some cross-check of verification based on   11:14
11   records.   11:14
12       Would I prefer to have them if they weren't   11:14
13   prohibited from being used?  Sure.  I think that's   11:14
14   fine.  But we can still do it without them.   11:14
15   Q.  So is it your understanding that the   11:15
16   records -- that Google is prohibited from using   11:15
17   records to verify class membership?   11:15
18   A.  I think the challenge claims verification   11:15
19   was something more accurate.  But I don't have the   11:15
20   order in front of me, but it was pretty clear.   11:15
21   Q.  So you don't have a proposal sitting here   11:15
22   today for Google to engage in analysis to confirm the   11:15
23   amount of data Google received per claimant; correct?   11:15
24   A.  I don't understand the term "amount of data"   11:16
25   in that context.   11:16

Page 72

1   Q.  For example, if Google received one URL   11:16
2   versus if Google received a thousand URLs.   11:16
3   A.  It's my understanding that they're   11:16
4   prohibited from using that information in th claims   11:16
5   verification process.   11:16
6   Q.  And so you don't intend to use it for the   11:16
7   claims verification process?   11:16
8   A.  If it's not available to me, because of the   11:16
9   order, I can't use it.   11:16
10   Q.  And if it is available to you, do you intend   11:16
11   to use it?   11:16
12   A.  If it were available to me and that was part   11:16
13   of either a negotiated settlement or an order, I would   11:16
14   be pleased to use it.   11:16
15   Q.  Let's turn to paragraph 77.  And I believe   11:17
16   this is what we were discussing before, fraud   11:18
17   prevention measures using an IP address.   11:18
18       The -- so in paragraph 77, you say:   11:18
19       "Other fraud prevention measures   11:18
20   that we typically apply include:   11:18
21   IP Duplication Detection."   11:18
22       Do you see that?   11:18
23   A.  I do.  And you're right.  That is what we   11:18
24   were just previously discussing.   11:18
25   Q.  How does that work?   11:18

Page 73

19 (Pages 70 - 73)

1    A.  We are aware of and log the IP addresses        11:18
2  that are visiting the dedicated case website and we     11:18
3  derive reports of those.  And my technology team is    11:18
4  able to flag instances when -- where initial fraud,     11:18
5  like IP duplication, requires further review and then   11:18
6  hands that off to the claims review team to take a      11:18
7  look at those particular instances.                     11:19
8    Q.  And does the dedicated website notify users      11:19
9  that you will be collecting their IP address?           11:19
10    A.  I believe our privacy policy that's on all      11:19
11  of them does notify them, but...                        11:19
12    Q.  When a claim is submitted with the same IP      11:19
13  address, are they automatically excluded from the       11:19
14  process?                                                11:19
15    A.  They are not.  There's a lot about reasons      11:19
16  that multiple -- that a single IP address could have    11:19
17  multiple claimants.                                     11:19
18       What we're really looking for when it's --        11:19
19  is at scale, when there's a hundred, 200, a thousand,   11:20
20  more than that, coming from the same IP address.        11:20
21       If two or three people from the same IP           11:20
22  address, that could -- there's a million -- million     11:20
23  may be an overstatement.  There's multiple reasons      11:20
24  that could happen.  It could be -- you know, it could   11:20
25  be the same household.  It could be a computer lab.     11:20

Page 74

1  It could be the New York Public Library.  I mean,       11:20
2  there are instances where IP addresses, it would make   11:20
3  sense for them to have multiple claims.                 11:20
4       But thousands of claims -- and even when           11:20
5  they are thousands of claims, they're not               11:20
6  automatically excluded.  They're flagged for manual     11:20
7  review to determine whether or not they should be       11:20
8  excluded.                                               11:20
9    Q.  And the next bullet point is "IP Switching        11:20
10  Detection."                                             11:20
11       Do you see that?                                   11:20
12    A.  Right.  Yes.                                      11:20
13    Q.  Why do you find it important to flag whether      11:20
14  a claimant is trying to avoid a static IP capture?      11:20
15    A.  Because my technology team has explained to      11:20
16  me that's kind of like a criminal trying to cover       11:21
17  their tracks, and that in their estimation, it's worth  11:21
18  a manual review.                                        11:21
19       MS. OLSON:  Why don't we take another             11:21
20  10-minute break and I'll just -- I'm finishing up so I  11:21
21  just want to kind of look through my notes and make    11:21
22  sure.                                                   11:21
23       THE WITNESS:  Sure.                               11:21
24       THE VIDEOGRAPHER:  Going off the record.          11:21
25  The time is 2:21 p.m.                                   11:21

Page 75

1       (Break taken in proceedings.)                      11:21
2       THE VIDEOGRAPHER:  Back on the record.  The        11:31
3  time is 2:31 p.m.                                        11:31
4  BY MS. OLSON:                                            11:31
5    Q.  What is your proposal for determining how         11:31
6  much each claim -- claimant will receive?                11:31
7    A.  Again, it's so often a negotiated point          11:31
8  between counsel.  That depends on so many things.        11:31
9       I do not independently come up typically          11:31
10  with a damages model.  I implemented them as well, so    11:31
11  I don't have a proposal as to how it will be done.       11:31
12  I'm giving certain inputs and I make sure that it's      11:31
13  done properly and that the math checks out and that      11:31
14  people get what they are entitled to under whatever      11:31
15  the operative document may be, whether it's a            11:32
16  settlement agreement or a court order.                   11:32
17    Q.  I believe you testified at the beginning of      11:32
18  the deposition today that you had reviewed               11:32
19  Mr. Lasinski's deposition transcript.                    11:32
20       Is that right?                                    11:32
21    A.  That's correct.                                  11:32
22    Q.  Are you aware that he's proposed using           11:32
23  unique monthly private browsing instances in order to   11:32
24  determine how much claimants will receive?              11:32
25    A.  That wasn't my exact recollection but if         11:32

Page 76

1  that's what you're proffering, I'll accept that.        11:32
2    Q.  Okay.  Assuming that is the accepted damages      11:32
3  model wayed on unique monthly private browsing          11:32
4  instances, how would you implement that in the claims   11:32
5  administration process?                                 11:32
6    A.  It would largely -- it would largely be          11:32
7  specific to the documentation that I was able to        11:32
8  receive in a particular class.  Speaking of that in     11:33
9  the abstract doesn't make -- doesn't make sense.  I     11:33
10  couldn't tell you how I would implement it without      11:33
11  looking at what I had to start with.                     11:33
12       And whether that be self-identification,          11:33
13  then we would -- we would accept what was on the         11:33
14  self-identification.                                    11:33
15       If for some reason Google was able to             11:33
16  provide information despite the order that allowed us    11:33
17  to monitor that, we would implement -- we would         11:33
18  implement it based on what was provided to us.           11:33
19       We also -- just to sort of put a little           11:33
20  context around that, we are often in a situation where  11:33
21  people can self-identify the amount of products they    11:33
22  bought, for instance, and therefore that changes what   11:33
23  their damages -- what damages they would be entitled    11:33
24  to under a settlement agreement.                         11:33
25       And we always have specifications that if         11:33

Page 77

20 (Pages 74 - 77)

| | |
|---|---|
| 1     MS. OLSON: Objection to form.    11:54 | 1       REPORTER'S CERTIFICATE |

**Page 90**

1     MS. OLSON: Objection to form.    11:54
2     THE WITNESS: Yes. That's right.    11:54
3     MR. YANCHUNIS: Thank you.    11:54
4   I have no further questions.    11:54
5     MS. OLSON: Okay. Nothing more from me.   11:54
6     THE WITNESS: Thank you, everyone.   11:54
7     THE VIDEOGRAPHER: This concludes today's  11:54
8 videotaped deposition of Stephen Weisbrot. We are off  11:54
9 the record at 2:55 p.m.    11:54
10    Thank you.    11:55
11     THE COURT REPORTER: Thank you, Counsel.  11:55
12   Are we going with the standard orders today?  11:55
13     MS. OLSON: No. I think we need the   11:55
14 transcript tomorrow, if possible.    11:55
15     THE COURT REPORTER: Yes. That was my   11:55
16 understanding.    11:55
17     MS. OLSON: Okay. Then yes.   11:55
18     MR. YANCHUNIS: We'll take the same.   11:55
19     THE COURT REPORTER: Okay. And I was also  11:55
20 told a rough draft today?    11:55
21     MS. OLSON: Yes, please.    11:55
22     THE COURT REPORTER: Same for plaintiffs?  11:55
23     MR. YANCHUNIS: Same here.    11:55
24     THE COURT REPORTER: Okay. Sounds good.  11:55
25    Does anybody need anything from me?   11:55

Page 90

1     MR. MCGEE: Sorry. This is Ryan. We just  11:55
2 wanted to make sure that it was --    11:55
3     THE COURT REPORTER: Read and sign?   11:55
4     MR. MCGEE: Yes, ma'am.    11:55
5     THE COURT REPORTER: Okay. And this is   11:55
6 attorney's eyes only?    11:55
7     MR. MCGEE: I don't think, Aly, there was  11:55
8 anything confidential and his report wasn't   11:55
9 confidential.    11:55
10     MS. OLSON: Yeah. I don't think so.   11:56
11     MR. MCGEE: So we can designate   11:56
12 preliminarily confidential if you want, but I don't --  11:56
13 I don't think there's anything confidential.   11:56
14     MS. OLSON: No. I don't think so.   11:56
15     THE COURT REPORTER: Very good. Thank you,  11:56
16 everyone.    11:56
17   (Whereupon, the deposition adjourned at 11:56 a.m.)
18    ---o0o---
19
20
21
22
23
24
25

Page 91

REPORTER'S CERTIFICATE
---o0o---
STATE OF CALIFORNIA   )
          ) ss.
COUNTY OF YOLO   )
    I, KATY E. SCHMIDT, a Certified Shorthand
Reporter in and for the State of California, duly
commissioned and a disinterested person, certify:
    That the foregoing deposition was taken before
me at the time and place herein set forth;
    That STEVEN WEISBROT, the deponent herein, was
put on oath by me;
    That the testimony of the witness and all
objections made at the time of the examination were
recorded stenographically by me to the best of my
ability and thereafter transcribed into typewriting;
    That the foregoing deposition is a record of
the testimony of the examination.
    IN WITNESS WHEREOF, I subscribe my name on this
3rd day of August, 2022.

Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
Certified Shorthand Reporter in and for the
County of Sacramento, State of California

Page 92

1 JOHN YANCHUNIS, Esq.
2 jyanchunis@forthepeople.com
3     AUGUST 3, 2022
4 RE: BROWN V. GOOGLE
5 AUGUST 2, 2022, STEVEN WEISBROT, JOB NO. 5345799
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 _X_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, noting the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25

Page 93

24 (Pages 90 - 93)