# Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - x

CHASOM BROWN; MARIA NGUYEN; WILLIAM
BYATT; JEREMY DAVIS; and CHRISTOPHER
CASTILLO, individually and on behalf
of all other similarly situated,

       Plaintiffs,

               No. 5:20-cv-03664-LHK

   -against-

GOOGLE LLC,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - x

    Zoom video conference deposition of
RORY McCLELLAND, taken pursuant to
notice, was held remotely, commencing
February 18, 2022, 5:30 a.m. Eastern
Standard Time, before Leslie Fagin, a
Stenographic Court Reporter and Notary
Public in the State of New York.

               - - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



```
                                                    Page 2
 1
 2      A P P E A R A N C E S:
        (All Parties Present Via Zoom.)
 3
 4
        BOIES SCHILLER & FLEXNER LLP
 5      Attorneys for Plaintiffs
            44 Montgomery Street, 41st Floor
 6          San Francisco, California 94104
        BY:    MARK MAO, ESQUIRE
 7             ROSANNA BAEZA, ESQUIRE
 8
        QUINN EMANUEL URQUHART & SULLIVAN
 9      Attorneys for Defendant
            51 Madison Avenue, 22nd Floor
10          New York, New York 10010
        BY:    JOMAIRE A. CRAWFORD, ESQUIRE
11             CARL SPILLY, ESQUIRE
12
        BAILEY GLASSER
13      Attorneys for Witness
            209 Capitol Street
14          Charleston, West Virginia 25301
        BY:    BENJAMIN L. BAILEY, ESQUIRE
15             ELLIOTT McGRAW, ESQUIRE
16
        ALSO PRESENT:
17
        LESLEY WEAVER, ESQUIRE
18      BLEICHMAR FONTI
           For the Calhoun Plaintiffs
19
        VANESSA WHEELER, Exhibit Tech
20        Magna Legal Services
21
22
23
24
25
```

```
                                                    Page 3
 1                R. McClelland
 2      R O R Y  M c C L E L L A N D, called as a
 3      witness, having been duly sworn by a
 4      Notary Public, was examined and testified
 5      as follows:
 6           MS. BAEZA:  Good morning this is
 7      Rosanna Baeza on behalf of plaintiffs
 8      and with me is Mark Mao, also from Boies
 9      Schiller Flexner.
10           MS. WEAVER:  Good morning.  Lesley
11      Weaver, Bleichmar Fonti on behalf of the
12      Calhoun plaintiffs.
13           MS. CRAWFORD:  Jomaire Crawford
14      from Quinn Emanuel Urquhart for the
15      defendant, Google LLC.  I am joined this
16      morning by my colleague, Carl Spilly.
17           MR. BAILEY:  I'm Ben Baily with
18      Bailey Glasser and my colleague, Elliott
19      McGraw is on.  We represent the witness.
20           Even if one steps out, there will
21      always be one of us here.
22  EXAMINATION BY
23  MS. BAEZA:
24      Q.  Good morning.  My name is Rosanna
25  Baeza and I represent the plaintiffs in this
```

```
                                                    Page 4
 1                R. McClelland
 2  case.
 3           Can you state your full name for
 4  the record?
 5      A.  My full name is Rory James
 6  McClelland.
 7      Q.  Before we begin, where are you
 8  located presently?
 9      A.  I'm in London, United Kingdom.
10      Q.  Where exactly in London?
11      A.  In the Boies Schiller office.  The
12  address is No. 5 New Street Square.
13      Q.  Is there anybody in the room with
14  you today?
15      A.  No, there is not.
16      Q.  Mr. McClelland, have you ever
17  testified under oath before?
18      A.  No, I haven't.
19      Q.  Do you understand that you are
20  under the same oath today as if you were in a
21  courtroom?
22      A.  I do.
23      Q.  I'm going to assume that you
24  understand the questions that I ask you,
25  unless you tell me that you don't understand
```

```
                                                    Page 5
 1                R. McClelland
 2  them, is that fair?
 3      A.  I understand, yes.
 4      Q.  Is there anything that would
 5  prevent you from testifying truthfully today?
 6      A.  No, there is nothing.
 7      Q.  If at any time you need to take a
 8  break during the deposition, will you let me
 9  know?
10      A.  I will.
11      Q.  Do you have an undergraduate
12  degree?
13      A.  I do, yes.
14      Q.  What did you study?
15      A.  Electronic and computer
16  engineering.
17      Q.  Where did you earn your
18  undergraduate degree?
19      A.  At the University of Birmingham.
20      Q.  When did you graduate from the
21  University of Birmingham?
22      A.  September 2001.
23      Q.  Do you have a graduate degree?
24      A.  I do.  I have a master's in
25  computer science from the same university.
```



Page 226

```
 1           R. McClelland
 2   travel to another location in order to give
 3   testimony in connection with this matter or
 4   was it presented as something that you were
 5   doing voluntarily or at your own election?
 6       A.  The whole thing was at my election
 7   and voluntarily, but if I did want to do it,
 8   the interpretation I took away was that I had
 9   to do it outside of Germany.
10       Q.  During the course of that
11   conversation, were you made aware that you,
12   as a German resident, were not obligated or
13   were not under the subpoena power of the
14   United States Courts, did that come up in
15   your conversation at all?
16       A.  I don't believe it did.
17       Q.  But, nonetheless, it appears that
18   you were asked to give testimony and you
19   agreed to fly to London for that?
20       A.  That is right, yeah.
21       Q.  Did you have any other
22   conversations with either plaintiffs' counsel
23   at Boies Schiller or any of the other
24   plaintiffs that are present -- did you have
25   any other conversations, I don't know the one
```

Page 227

```
 1           R. McClelland
 2   you just mentioned, with Mr. Richardson?
 3           MS. BAEZA:  Objection, form, vague.
 4       A.  There was an email thread, if I
 5   remember correctly, around the logistics part
 6   of it, but, basically, the conversation moved
 7   at that stage.
 8       Q.  Was the email conversation, the one
 9   you just mentioned -- actually, do you recall
10   the timing of that email exchange and whether
11   it was in the latter portion of 2021 or
12   whether it was in early 2022?
13       A.  May I check?
14           MS. BAEZA:  Objection, form,
15   mischaracterizes testimony.
16       Q.  Yes, please.
17       A.  It was early 2022, if I remember
18   correctly.
19       Q.  If you needed to check, obviously,
20   feel free to ensure the accuracy of your
21   testimony.
22       A.  I'm checking now.
23           So I have the email deleted here.
24   I first reached out on the 27th of December,
25   the very end of the year, so, apologies, that
```

Page 228

```
 1           R. McClelland
 2   was somewhat incorrect, and the conversation
 3   continued into early January and we moved on
 4   to the logistics part of that around the 7th
 5   of January.
 6       Q.  That's helpful.  Thank you.
 7           Outside of the communications or
 8   conversations that you have told me about so
 9   far, any other communications with
10   plaintiffs' counsel that come to mind?
11       A.  No, no others.
12       Q.  Did plaintiffs' counsel indicate
13   that they were going to be referring you to
14   an attorney who would be representing you in
15   connection with your deposition?
16       A.  I'm not sure referring was the
17   right word.  They recommended one and I was
18   happy to take their recommendation.
19       Q.  Understood.
20           Again, not looking to delve into
21   privileged conversations that you might have
22   had with Mr. Bailey, but I'm going to ask at
23   a high level, do you understand Mr. Bailey to
24   be charging you in connection with his
25   representation of you at today's deposition?
```

Page 229

```
 1           R. McClelland
 2       A.  No, the costs are being covered by
 3   the plaintiffs.
 4       Q.  Was that something promised to you
 5   or suggested to you in any way in connection
 6   with the communications that you had with
 7   plaintiffs' counsel?
 8       A.  It was made clear from the
 9   beginning that they would cover those costs.
10       Q.  Any other costs that either they
11   offered to cover or that you understood would
12   be covered in connection with your testimony
13   today?
14       A.  Yes, they offered to cover the
15   travel costs for being here in London.
16       Q.  Is it safe to assume those costs,
17   since you are currently residing in Berlin,
18   includes a flight and perhaps overnight
19   accommodations?
20       A.  That's right, flight, hotel, Covid
21   tests, the usual things nowadays, like a
22   business trip.
23       Q.  Understood.  I haven't traveled in
24   a bit, but that's an important context.
25           Any other expenses that you think
```



Page 274

```
 1        R. McClelland
 2   unreliable, would you have any basis to
 3   dispute his conclusion?
 4        A.  I'm not really sufficiently
 5   technical to have a strong view there,
 6   however, it was known that this was
 7   notoriously difficult to do and finicky and,
 8   suddenly took a lot of time before we got a
 9   model that we had confidence in.
10        Q.  Can you explain for us why that is,
11   why it was tricky or finicky?
12        A.  Well, there are different ways of
13   measuring Incognito usage.  Simple sessions,
14   number of pages, an understanding of what is
15   important, different pages have different
16   number of ad impressions on them, some pages
17   have none at all, some have three or four ads
18   and that's not represented in the simple page
19   load in Incognito metric, so where you are
20   trying to find a model that was the best
21   proxy to revenue impact was quite hard.
22   Beyond that, the technical reasons, too
23   technical for me, I'm afraid.
24        Q.  That's okay.
25            Now, I would like to ask a couple
```

Page 275

```
 1        R. McClelland
 2   of questions about joinability and the logs
 3   that you were asked about and you testified
 4   about.
 5            Do you remember counsel asking you
 6   questions regarding segmentation of regular
 7   browsing mode profiles and Incognito mode
 8   profiles?
 9        A.  Yes, I do.
10        Q.  If we can, let's introduce tab 6,
11   which is a document that was produced by
12   Google during discovery.  It bears the Bates
13   No. GOOG-CABR-00892455.  It should be up in
14   front of you as T-06.
15        A.  I'm looking at it now.
16        Q.  Appreciate that if you could take a
17   look at it and just let me know whenever you
18   are done?
19            (Exhibit 23, documents beginning
20   with Bates stamp No. GOOG-CABR-00892455,
21   marked for identification.)
22            THE EXHIBIT TECH:  Just let me know
23   when you need me to turn the page.
24            THE WITNESS:  I'm looking at the
25   actual document, so I'm fine.
```

Page 276

```
 1        R. McClelland
 2        A.  I have read the document.  Thank
 3   you.
 4        Q.  Are you familiar with this document
 5   or the general policy that this document
 6   describes?
 7        A.  Yes, I am.
 8        Q.  Can you tell us what this is?
 9        A.  It defines how data should be
10   treated by Google employees, and particularly
11   how certain types of data should be handled
12   with more care and certain things that must
13   never happen.  It's a data usage policy
14   document.
15        Q.  Did you consult this policy in
16   connection with your work for Google?
17        A.  Certainly.  This document was used
18   regularly.
19        Q.  How did you -- how was this
20   document used regularly?
21        A.  Both in terms of how we would use
22   data in our own features, but would also be
23   referenced when we were quality auditing
24   other feature teams features, perhaps
25   pointing to something in this just to draw
```

Page 277

```
 1        R. McClelland
 2   their attention to it.
 3        Q.  If you could please scroll to the
 4   page that ends in 455 and I'm looking
 5   specifically at the Go/Loss-Usage header.
 6            Do you see where that appears?
 7        A.  Page 455?
 8        Q.  That's right.  First page -- it's
 9   at the very top of the page.
10        A.  I see.  Yes, I skipped over it.
11        Q.  If we could call that up on the
12   screen.
13            Do you mind rereading this sentence
14   and letting me know when you are done?
15        A.  I have read it.
16        Q.  Based on your understanding of this
17   portion of the document, do you understand
18   that Google prohibits reidentifying any
19   individuals using anonymous or synonymous
20   data?
21        A.  I do, but that doesn't seem to
22   apply to the particular bit of tech shown,
23   but, yes, I do.
24        Q.  If we get to a portion of the
25   document where there is support for that
```



Page 278

1           R. McClelland
2   understanding, can you just call it out and
3   let me know?
4       A.  Sure.
5       Q.  Google prohibits, based on your
6   understanding of this policy, correlating
7   authenticated and non-authenticated
8   information, is that right?
9       A.  That is right, yes.
10      Q.  Can you explain why that is?
11      A.  An example would be in Incognito
12  mode, again, a user who signed in in regular
13  mode, one use of Incognito may be to
14  temporarily present as a non-signed-in user
15  and, therefore, it's important, from the
16  user's point of view, they have chosen to do
17  that to segment their browsing activity and,
18  therefore, it is important that Google does
19  not attempt to rejoin that data.
20      Q.  Are you aware of Google rejoining
21  that data?
22      A.  No, as far as I am aware, Google
23  never did that.
24      Q.  Why is that?
25      A.  Because it would be a breach of

Page 279

1           R. McClelland
2   user trust, potential PR incident.
3       Q.  Google also prohibits
4   fingerprinting users for the purpose of
5   associating their activity over time or
6   across contexts, is that right?
7           MS. BAEZA:  Objection to form, lack
8   of foundation, compound.
9       A.  Yes, that is my understanding, that
10  fingerprinting was also not allowed to be
11  used.
12      Q.  Is your understanding of why it was
13  not allowed to be used any different than the
14  explanation you just provided for why Google
15  doesn't correlate authenticated and
16  non-authenticated data?
17      A.  Exactly, same reasons, user trust
18  perception, PR.
19      Q.  In the context of Incognito mode
20  for Chrome specifically, is it also true that
21  Google prohibits joining authenticated
22  information with non-authenticated data?
23      A.  Exactly, the policy still applies
24  for Incognito mode.
25      Q.  If a user opens an Incognito window

Page 280

1           R. McClelland
2   and does not log into a Google account, the
3   information from their Incognito browsing
4   session would be considered unauthenticated,
5   is that right?
6       A.  Not necessarily a user.  There is
7   nothing to prevent a user from signing into
8   to a regular account within Incognito mode,
9   upon which they would then be authenticated,
10  but, by default, when you first launch an
11  Incognito window, you would be signed out of
12  all Google services and, therefore,
13  unauthenticated.
14      Q.  If the user in that Incognito
15  session does not log in at all to any Google
16  account, is the information from that
17  browsing session unauthenticated?
18      A.  That is right, it's
19  unauthenticated.
20      Q.  And Google team members, would you
21  agree, are tasked with preventing the joining
22  of data from non-Incognito browsing instances
23  with Incognito browsing instances?
24      A.  Tasked with preventing, my
25  understanding more that it was prohibited, it

Page 281

1           R. McClelland
2   wasn't allowed.  Whether there were efforts
3   to actually make that harder, I don't know or
4   not, but my understanding of the policy was
5   that as employees, we must never do that,
6   must never endeavor to do that.
7       Q.  Are you aware of any instance where
8   you endeavored to do that or anyone who
9   reported to you?
10      A.  No.
11          MS. BAEZA:  Objection to form,
12  compound, asked and answered.
13      A.  No, I am not aware of any incident
14  where that was tried.
15      Q.  Were you, in connection with your
16  work as Chrome browser privacy manager,
17  responsible for enforcing this policy?
18      A.  No, that was outside of my
19  responsibilities.  There were teams who were
20  more responsible for it, but everyone had a
21  responsibility to adhere to the policy.
22      Q.  Would you say you did that in
23  connection with your employment at Google?
24      A.  Yes, that's right.
25      Q.  I would now like to introduce tab



```
                                        Page 326
 1
 2                   ---
 3              E X H I B I T
 4                   ---
 5   EXHIBIT                              PAGE
 6   Exhibit 13 Documents bearing Bates    189
 7       Stamp No. GOOG-CABR-00173728
 8       through GOOG-CABR-00173735
 9   Exhibit 14 Documents bearing Bates    192
10       Stamp No. GOOG-CABR-01561563
11       through GOOG-CABR-01561579
12   Exhibit 16 Documents bearing Bates    199
13       Stamp No. GOOG-CABR-00358713
14       and GOOG-CABR-00358714
15   Exhibit 17 Document bearing Bates     208
16       Stamp No. GOOG-CABR-00799341
17   Exhibit 15 Documents bearing Bates    209
18       Stamp No. GOOG-CABR-05256755
19       through GOOG-CABR-05256760
20   Exhibit 18 Documents beginning with   231
21       Bates stamp No. GOOG-CABR-05145880
22   Exhibit 19 Documents beginning with   248
23       Bates stamp No. GOOG-CABR-0502836
24   Exhibit 20 Documents beginning with   260
25       Bates stamp No. GOOG-CABR-00503128
```

```
                                        Page 327
 1
 2                   ---
 3              E X H I B I T
 4                   ---
 5   EXHIBIT                              PAGE
 6   Exhibit 21 Documents beginning with   265
 7       Bates stamp No. GOOG-BRWN-0045551
 8   Exhibit 22 Documents beginning with   268
 9       Bates stamp No. GOOG-CABR-00483672
10   Exhibit 23 Documents beginning with   275
11       Bates stamp No. GOOG-CABR-00892455
12   Exhibit 24 Documents beginning with   281
13       Bates stamp No. GOOG-CABR-05236676
14   Exhibit 25 Excerpt from 75-page       288
15       complaint
16   Exhibit 26 Documents beginning with   300
17       Bates stamp No. GOOG-BRWN-00029326
18   Exhibit 27 Excerpt from complaint     302
19   Exhibit 28 Document bearing Bates     322
20       Stamp No. GOOG-CABR-05786200
21
22
23
24
25
```

```
                                        Page 328
 1
 2                   ---
 3        DEPOSITION SUPPORT INDEX
 4                   ---
 5   Direction to Witness Not to Answer
     Page Line    Page Line   Page Line
 6   None
                     ---
 7
     Request for Production of Documents
 8   Page Line    Page Line   Page Line
     None
 9
                     ---
10
     Stipulations
11   Page Line    Page Line   Page Line
     None
12                   ---
13   Questions Marked
     Page Line    Page Line   Page Line
14   None
                     ---
15
     To Be Filled In
16   Page Line    Page Line   Page Line
     None
17                   ---
18
19
20
21
22
23
24
25
```

```
                                        Page 329
 1
 2             CERTIFICATE
 3
          I HEREBY CERTIFY that the witness,
 4   RORY McCLELLAND, was duly sworn by me and
     that the deposition is a true record of the
 5   testimony given by the witness.
 6
          _____
 7        Leslie Fagin,
          Registered Professional Reporter
          Dated: February 18, 2022
 8
 9
10
          (The foregoing certification of
11   this transcript does not apply to any
     reproduction of the same by any means, unless
12   under the direct control and/or supervision
     of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

