**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted *pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5270
alanderson@bsfllp.com

*Attorneys for Plaintiffs*

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all similarly situated,

        Plaintiffs,

  v.

GOOGLE LLC,

        Defendant.

Case No.:  4:20-cv-03664-YGR-SVK

**PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT MICHAEL J. LASINSKI**

The Honorable Yvonne Gonzalez Rogers
Date:  September 20, 2022
Time: 2:00 p.m.

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION ........................................................................................ 1

3   II.   LEGAL STANDARD ................................................................................ 2

4   III.  ARGUMENT ............................................................................................. 2

5         A.   Mr. Lasinski Is Qualified to Render Expert Opinions. ........................................ 2

6         B.   Mr. Lasinski Was Not Required to Make Deductions Based on Google's
7              Unfounded "Consent" Defense. ........................................................................ 3

8              1.   Lasinski Need Not Assume Google's Consent Defense Is Valid .................. 3

9              2.   No Class Members Explicitly Consented to Google's Conduct ................... 3

10             3.   Google's Implied Consent Defense Is Legally Barred. ............................... 4

11             4.   Regardless, Mr. Lasinski's Assumption Was Proper as Common Evidence
12                  Defeats Implied Consent on a Class-Wide Basis .......................................... 5

13        C.   Mr. Lasinski's Actual Damages Model Is Not Subject to Exclusion ................. 7

14             1.   Mr. Lasinski's Calculation Was Based on Google's Actual Payments to
               Users for Giving Up Privacy and Other Inputs ............................................. 7

15             2.   Google's Critique of Mr. Lasinski's $3 Input Goes to Weight ..................... 8

16             3.   No Deduction Is Required for Personalized Ads ......................................... 10

17             4.   No Deduction Is Required for Class Members' Supposedly Varying
18                  Subjective Views About the "Value" of their Privacy ................................ 12

19             5.   Google's Bad Math Does Not Justify Exclusion .......................................... 13

20        D.   Mr. Lasinski's Unjust Enrichment Model Is Not Subject to Exclusion ............ 13

21             1.   Mr. Lasinski Properly Calculated Class-Wide Unjust Enrichment Using
22                  Google's Own Internal Analysis .................................................................. 13

23             2.   Mr. Lasinski Did Not Deduct Costs Because There Are No Incremental
                    Costs to Google ............................................................................................ 14

24             3.   Google's Other Unjust Enrichment Critiques Are Fatally Flawed .............. 16

25        E.   Google's Objections to Mr. Lasinski's Proposed Methods for Apportioning an
26             Aggregate Damage Award Amongst the Class Are Meritless .......................... 17

27

28

1          1.   Mr. Lasinski Calculated Aggregate, Class-Wide Awards from the "Top Down" Using Google's Own Data. .............................................. 17

2
       2.   Google Ignores Black Letter Law that It Lacks Standing to Complain About
3             Apportionment.............................................................................. 18

4          3.   Mr. Lasinski Proffers Valid Apportionment Methods ................................ 20

5          4.   Google's Apportionment Critiques Lack Merit ........................................... 21

6          5.   Mr. Lasinski's Methods for Calculating Statutory Damages Are Reliable .. 24

7   IV.   CONCLUSION ............................................................................................ 25

1

2

## **TABLE OF AUTHORITIES**

**Cases:**

*Ajaxo Inc. v. E\*Trade Group, Inc.*, 135 Cal. App. 4th 21 (2005) ............................... 24

*Aoki v. Gilbert*, 2020 WL 6741693 (E.D. Cal. Nov. 17, 2020).................................. 14

*Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014).................... 9

*Aramark Mgmt., LLC v. Borgquist*, 2021 WL 4860692 (C.D. Cal. Sept. 29, 2021)................... 3

*Area 55, Inc. v. Amazon.com, Inc.*, 2012 WL 12846975 (S.D. Cal. July 24, 2012).................. 12

*Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288 (N.D. Cal. 2020) ........................... 4

*Bazemore v. Friday*, 478 U.S. 385 (1986)........................................................... 9

*Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652 (9th Cir. 2022) ........................... 19

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)................................ 20

*Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489 (N.D. Cal. Mar. 13, 2019).......................................................................... 22

*Doyle v. Chrysler Group, LLC*, 663 F. App'x 576 (9th Cir. Oct. 24, 2016) ..................... 19

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) ....................... 23

*F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 881 (9th Cir. 2014)................................. 9

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018)........... 2

*Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665 (9th Cir. Apr. 26, 2010) ....... 24

*Gray v. Perry*, 2019 WL 2992007 (C.D. Cal. July 5, 2019) .................................... 16

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107 (N.D. Cal. 2018)....................... 2

*Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 38 Cal. App. 4th 1532 (1995) .... 5

*Harris v. comScore, Inc.*, 292 F.R.D. 579 (N.D. Ill. 2013) ..................................... 4

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) .................................... 9

*In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ................ 22

*In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020). ............................ 11, 24

*In re Facebook, Inc. Consumer Priv. User Profile*, 402 F. Supp. 3d 767 (N.D. Cal. 2019)........ 4

*In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102 (9th Cir. 2021) .................. 20

*In re Hulu Privacy Litig.*, 2014 WL 2758598 (N.D. Cal. June 17, 2014)................................. 20

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2022 WL 1814440 (N.D. Cal. June 2, 2022). ..................................................................................................... 8

*In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ........ 2

*In re RTB Consumer Privacy Litig.*, 2022 WL 2165489 (N.D. Cal. June 13, 2022). ............... 25

*In re Tobacco Cases II*, 240 Cal. App. 4th 779 (2015) ................................................. 10

*In re Toy Asbestos*, 2021 WL 1167638 (N.D. Cal. Mar. 26, 2021)................................... 11

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014)..................................... 18

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013)..................................... 8

*McCrary v. Elations Co. LLC*, 2014 WL 12589137 (C.D. Cal. Dec. 2, 2014) ...................... 12

*Meister v. Mensinger*, 230 Cal. App. 4th 381 (2014) ................................................. 14

*Meyer v. Bebe Stores, Inc.*, 2017 WL 558017 (N.D. Cal. Feb. 10, 2017)............................. 20

*MSC. Software Corp. v. Heroux-Devtek Inc.*, 2022 WL 2189500 (C.D. Cal. Apr. 12, 2022) ... 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). ........................................................................................................ 18, 19, 23

*Opperman v. Path, Inc.*, 2016 WL 3844326 (N.D. Cal. July 15, 2016)............................... 12

*Patel v. Facebook*, 932 F.3d 1264 (9th Cir. 2019) ..................................................... 25

*Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694 (N.D. Cal. Apr. 4, 2019)......................... 3

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010), as amended (Apr. 27, 2010) ..................... 2

*Ruiz Torres v. Mercer Canyons*, 835 F.3d 1125 (9th Cir. 2016)..................................... 18

*Siqueiros v. Gen. Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ............................. 3

*Six (6) Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990). ................... 18

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931). ..................... 18

*Tebbets v. Fidelity & Cas. Co. of New York*, 155 Cal. 137, 139 (1909). ............................... 5

*True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018) ................... 7

*Tunica Web Advert., Inc. v. Barden Mississippi Gaming, LLC*, 2008 WL 3833225 (N.D. Miss. Aug. 14, 2008) ......................................................................................... 23

*Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021)............................................. 4

*Zaklit v. Nationstar Mortg.*, 2017 WL 3174901 (C.D. Cal. July 24, 2017) ........................... 25

*Zamora v. Lehman*, 153 Cal. Rptr. 3d 724 (Ct. App. 2013)........................................... 5

1

**Other Authorities:**

2

4 Newberg and Rubenstein on Class Actions § 12:2 ............................................................. 18, 19

3

Restatement (Second) of Contracts § 371 ................................................................................ 10

4

Restatement (Third) of Restitution and Unjust Enrichment § 49 ............................................ 11

5

**Rules:**

6

Fed. R. Civ. P. 23 ............................................................................................................... 20, 23

7

**Regulations:**

8

Cal. Civ. Code § 1708.8(d) ...................................................................................................... 24

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

## I.      INTRODUCTION

There is no basis for Google's request to exclude any of the opinions offered by Michael Lasinski. Courts universally recognize that the trier of fact is entitled to weigh for itself evidence presented by a qualified expert. Mr. Lasinski is a qualified expert offering detailed opinions based on reliable methods to calculate damages in this case. Google nevertheless seeks to exclude Mr. Lasinski's opinions based on arguments that are illogical, factually incorrect, or simply irrelevant under *Daubert*. None of Google's complaints warrants any exclusion:

1.   Mr. Lasinski's damages calculations are based on assumptions consistent with Plaintiffs' theory of liability, which is that Google collected, saved, and used private browsing data without users' consent. There is no basis for Google's contention that Mr. Lasinski should have instead adopted Google's defense premised on alleged "consent," a defense that is legally barred and meritless.

2.   Mr. Lasinski's actual damages calculations are based on the *same* key input Google used in a contemporaneous market-derived study. Google's argument that Mr. Lasinski should have deducted for the supposed "benefit" some users received from personalized advertising is absurd—it is Google, not users, who "benefitted" from Google's theft of their private browsing data.

3.   Mr. Lasinski did not fail to account for costs in his unjust enrichment calculation; to the contrary, ████████████████████████████████████████ ██████████████████████████████████████.

4.   Mr. Lasinski's methods for calculating statutory damages—which are correct and consistent with the requirements prescribed by the relevant statutes—simply lead to penalties that Google does not like.

5.   Mr. Lasinski is not required to adopt Google's preferred approach of apportioning damages, especially where Google itself concedes that its preferred apportionment method ███████████████████ Instead, Mr. Lasinski proposed two sensible apportionment options consistent with the theories of liability in this case.

Google effectively asks the Court to rule in its favor on the merits of its implied consent defense and grant its *Daubert* on that basis. Failing that, Google attacks Mr. Lasinski's inputs or conclusions rather than his methodology—attacks that misrepresent Mr. Lasinski's analysis and, in any event, are simply fodder for cross-examination. Google's Motion should be denied.

## II.     LEGAL STANDARD

"Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107 (N.D. Cal. 2018). The Court's duty on a *Daubert* motion "is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Id.* (quoting *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc*., 326 F.R.D. 592, 599 (N.D. Cal. 2018)). Under this "flexible" inquiry, even "shaky but admissible evidence is to be attacked on cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010)). At the class certification stage, the court "does not make an ultimate determination of the admissibility" of the expert testimony and "considers only whether the expert evidence is useful in evaluating whether class certification requirements have been met." *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *6 (N.D. Cal. Apr. 12, 2017) (Gonzalez Rogers, J.) (cleaned up).

## III.    ARGUMENT

### A.     Mr. Lasinski Is Qualified to Render Expert Opinions.

Michael Lasinski is a leading authority in evaluating the financial aspects of intellectual property and business assets. He is a Senior Managing Director at Ankura Consulting Group and head of the Intellectual Property Group. Dkt. 608-9 ¶ 2. Mr. Lasinski holds a Bachelor of Science in Electrical Engineering and a Master of Business Administration from the University of Michigan. *Id.* ¶ 6. He is certified in public accounting, financial forensics, and licensing. *Id.* He is President-Elect of the Licensing Executives Society International and a past President of the Licensing Executives Society United States and Canada. *Id.* ¶ 4. He is a past Division Chair of the American Bar Association's IP Section, former Chair of the Valuation and Taxation Committee of LES, and a former Vice-Chair of the Intellectual Property Owners Association's Valuation and Taxation Committee. *Id.* Since 1995, Mr. Lasinski's consulting practice has focused on the financial aspects of intellectual property and business assets. *Id.* ¶ 3. He has testified as a damages expert in more than 60 cases, at least 15 of which have included trial

testimony. *Id.* Appendix A at 90-98. Mr. Lasinski is qualified, and Google does not contend otherwise.

**B.      Mr. Lasinski Was Not Required to Make Deductions Based on Google's Unfounded "Consent" Defense.**

Google argues that rather than adopt Plaintiffs' theory of liability, Mr. Lasinski should have instead adopted *Google's* unsupported consent defense. Dkt. 661-3 at 8, 12-14. This fails for several reasons.

**1.      Lasinski Need Not Assume Google's Consent Defense Is Valid.**

Mr. Lasinski properly relied on factual assumptions consistent with Plaintiffs' theory of liability. *See Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at \*10 (N.D. Cal. Jan. 7, 2022) (damages expert was "entitled to assume liability in order to model the damages" and assume "all Class Vehicles are defective"). That Google disagrees with Mr. Lasinski's assumptions "is not a ground to exclude [his] testimony altogether under *Daubert*." *See id*. at \*11 ("Where a party challenges the expert's assumptions, the challenges may go to impeachment, rather than admissibility."). "Plaintiffs' expert is not required to accept Defendants' version of the facts." *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 4860692, at \*3 (C.D. Cal. Sept. 29, 2021). "[A]ny arguments that [an expert] based his opinions on an improper assumption go to the weight, not the admissibility of his testimony." *Perez v. Rash Curtis & Assocs.,* 2019 WL 1491694, at \*3 (N.D. Cal. Apr. 4, 2019) (Gonzalez Rogers, J.).

**2.      No Class Members Explicitly Consented to Google's Conduct.**

Mr. Lasinski's assumption that no class member consented (Dkt. 662-3, Lasinski Tr. 55:2-56:1) is consistent with the Court's rulings. In both failed attempts to dismiss Plaintiffs' claims, Google argued private browsing mode "users expressly consented to Google's alleged data collection" because portions of "Google's Privacy Policy disclosed that Google would receive the data from its third-party services [that Google provides to websites]." Dkt. 113[1] at 15; Dkt. 363 at 20. This Court disagreed, holding Google's Privacy Policy fails to "disclose

---

[1] Unless otherwise stated, all pincites are to the Bates number in the upper right of the document.

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

Google's alleged data collection while Plaintiffs were in private browsing mode." Dkt. 113 at 15-16. The Court also found that the Google's Incognito Splash Screen represents that "Incognito mode provided privacy ***from Google*** and privacy from other people who use the same device." *Id.* at 18 (emphasis added). This Court rejected Google's "consent" defense because one cannot consent to what was not specifically disclosed.

### 3.    Google's Implied Consent Defense Is Legally Barred.

To the extent Google's motion is somehow based on any theory of implied consent, this defense is legally barred for all claims. All class members were bound by form contacts with Google. The "objective meaning of a contract is determined by reading the contract 'from the perspective of a reasonable [Google] user.'" Dkt. 363 at 23 (quoting *In re Facebook, Inc. Consumer Priv. User Profile*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)) (internal quotation marks omitted). "[W]hen there is a standardized agreement like the form contract at issue in this case, the agreement is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge of understanding of the standard terms of the writing." *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638 (N.D. Cal. 2021) (quoting *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 302 (N.D. Cal. 2020)). This eliminates any implied consent defense. *See id.* at 644 (rejecting argument that "class members would have been uninjured if they encountered 'widely circulated articles spanning the Class Period that disclosed Apple's practice,' as contrary to "settled contract law and Ninth Circuit precedent"); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 585 (N.D. Ill. 2013) (rejecting defendant's argument that "the scope of consent will vary for each plaintiff depending on his subjective understanding of the agreement and the surrounding circumstances" and in certifying CFAA and federal wiretap claims held "a variety of common questions . . . can be resolved on a classwide basis," including "the scope of the consent" since "each Class Member agreed to a form contract").

Google also ignores that it agreed to an *explicit* consent standard on a class-wide basis within its form contract. Plaintiffs' class certification motion explained that Google's Privacy Policy states: "We will not reduce your rights under this Privacy Policy ***without your explicit***

1     *consent.*" Dkt. 608-3 at 27 (emphasis added). When an affirmative defense constitutes a

2     "personal right for the benefit of the individual" (such as, for instance, a statute of limitations

3     defense), it "may be waived" by contract. *Id.* (quoting *Tebbets v. Fidelity & Cas. Co. of New*

4     *York*, 155 Cal. 137, 139 (1909). This "waiver analysis" from *Tebbets* has "withstood the test

5     of time" for well over 100 years. *Zamora v. Lehman*, 153 Cal. Rptr. 3d 724, 733-34 (Ct. App.

6     2013). Google's waiver of any implied consent defense, for all claims, is no different from

7     Google waiving or modifying any applicable California statute of limitations. *See Hambrecht*

8     *& Quist Venture Partners v. Am. Med. Int'l, Inc.*, 38 Cal. App. 4th 1532, 1547, (1995) ("In

9     general, California courts have permitted contracting parties to modify the length of the

10    otherwise applicable California statute of limitations.").

11       Google's opposition and *Daubert* motion ignored *all* of this law. Dkt. 659-3 at 21-22;

12    Dkt 661-3 (*passim*). The only response Google musters is the following, obtuse sentence: "But

13    a user's implied consent—*i.e.*, their choice to use a service while aware of the conduct—is

14    neither an action by Google nor an instance of reducing the user's rights." Dkt. 659-3 at 21. Of

15    course, Google is attempting to reduce users' rights with something other than "your explicit

16    consent" by raising an *implied consent defense*. Mr. Lasinski was not required to assume as

17    true this nonsensical argument, which also happens to be irrelevant to any *Daubert* analysis.

**4.    Regardless, Mr. Lasinski's Assumption Was Proper as Common Evidence Defeats Implied Consent on a Class-Wide Basis.**

19       Even if the issue of implied consent mattered for this Court's *Daubert* analysis (it does

20    not), common evidence overwhelmingly defeats it. To establish consent, Google must identify

21    evidence that "explicitly notif[ied]" users of the "specific practice" at issue. Dkt. 113 at 14.

22    Google plainly did not do so. Upon reviewing the relevant disclosures made by Google, this

23    Court found "Google's representations regarding private browsing present private browsing as

24    a way that users can manage their privacy and omit Google as an entity that can view users'

25    activity while in private browsing mode." *Id.* at 16.

5

1  Discovery in the case confirmed the same. As detailed in Plaintiffs' class certification

2  motion, internal Google documents provide evidence on this common issue, ███████████

3  ████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████  Even Sabine Borsay—Google's Product Manager of

8  Chrome Privacy—testified that █████████████████████████████████████████

9  ███████  from Incognito browsing. Lee Decl. Ex. 1 (Borsay Tr.) at 191:12-14. ██████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████  It is no wonder Google at least internally

15 admits ██████████████████████  Dkt. 608-18 (Class Cert. Ex. 6).

16  Google's suggestion that at least some users consented to Google's collection of private

17 browsing information because they may have read news articles or used Google's developer

18 tools is also disproven by common evidence. None of the papers and articles that Google points

19 to "explicitly" discloses the "specific practice" at issue in this case: Google collecting private

20 browsing information from users' browsers while they are (a) in a private browsing mode, (b)

21 while signed out of their Google accounts, and (c) visiting a non-Google website. Dkt. 608-6

22 ¶¶ 106-07, App'x 2 at 392-404. Google also repeatedly and publicly denied that such articles

23 were true. Lee Decl. Ex. 2 (Google spokesperson discrediting Vanderbilt study discussed in

24 Exhibit 112 to Google's opposition to class certification). Similarly, Dr. Amir's surveys

25 ───────────────────
   [2] Dkt. 608-14 (Class Cert. Ex. 2) at -26; Dkt. 608-17 (Class Cert. Ex. 5) at -43; Dkt. 608-18 (Class

26 Cert. Mot. Ex. 6); Dkt. 608-13 (Class Cert. Ex. 1) at -67; Dkt. 608-15 (Class Cert. Ex. 3) at -86,
   Dkt. 608-20 (Class Cert. Ex. 8) at -12; Dkt. 608-21 (Class Cert. Ex. 9) at -82; Dkt. 608-24 (Class

27 Cert. Ex. 12) at -97; Dkt. 680-41 (Class Cert. Ex. 30) at -21.

28 PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

1   admittedly ███████████████████████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████ Lee Decl. Ex. 3 (Amir Tr.) at 42:21-48:15, 257:2-261:22.

5   Given Google's failure to demonstrate the existence of any non-injured class members

6   who supposedly "consented," no adjustments are needed. *See, e.g.*, *True Health Chiropractic,*

7   *Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) ("[W]e do not consider the consent

8   defense that McKesson might advance or for which it has presented no evidence."). Since

9   Google's consent defense is legally infirm and unsupported by the evidence Google cites, Mr.

10  Lasinski properly assumed no class members consented.

11          **C.     Mr. Lasinski's Actual Damages Model Is Not Subject to Exclusion.**

12                  **1.     Mr. Lasinski's Calculation Was Based on Google's Actual Payments
                           to Users for Giving Up Privacy and Other Inputs.**

13  To quantify actual damages, Mr. Lasinski analyzed the payments necessary to

14  incentivize an individual to knowingly relinquish the choice to keep certain browsing private

15  from Google.[3] Dkt. 608-9 ¶ 137. Mr. Lasinski identified several factors to render his opinion:

16  (1) payments Google made or considered making to users for their data; (2) users' willingness

17  to pay to prevent data collection; and (3) research organizations' willingness to pay for data

18  collection. *Id*. ¶ 140. As detailed by Mr. Lasinski, the most reliable input comes from Google.

19  *Id.* ¶ 165. Since 2012, Google has used a market research company named Ipsos to collect

20  information on how users browse the Internet. *Id.* ¶ 143 n.289. Ipsos conducted a consumer

21  research study for Google called the Screenwise Panel, where Google paid participants to

22  provide Google unfettered collection and use of their online browsing data. *Id.* ¶¶ 143-44.

23          As part of that Google research study, all participants were paid $3 per month per device

24  as the minimum baseline payment to allow Google to collect their online browsing information.

25

26  [3] Google calls this model "restitution," whereas Mr. Lasinski's report identifies it as "actual
    damages" which may include restitution. The Court need not parse which label is correct,

27  however, because Google's arguments fail even under the label it advances here.

28
PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

*Id.* ¶ 150. Since Google collects much of their non-private browsing activity already, participants necessarily accepted $3 per month per devices for the additional, incremental data they believed Google was not already tracking. *Id.* ¶ 138. Put another way, Google paid $3 per month per device for those participants to relinquish their right to browse privately from Google. Lasinski Tr. 108:4-7. The $3 rate Google paid was constant, regardless of any variability among those participants with respect to how often or how much they browsed. Lasinski Rep. ¶ 149. To calculate damages, Mr. Lasinski used the same $3 rate amount as an input, and he then multiplied that amount by the number of unique monthly private browsing instances ("UMPBI") during the class period for both proposed classes, which was derived from data produced by Google and supplemented by data provided by Plaintiffs' survey expert, Mark Keegan. Lasinski Rep. § 8. Mr. Lasinski calculated that restitution damages across both classes amounted to ████████████████████. *Id.*

### 2. Google's Critique of Mr. Lasinski's $3 Input Goes to Weight.

Google first challenges the "primary input for calculating class-wide restitution damages," claiming the $3 rate is a "speculative" input even though this is what Google itself has paid users (each month, per device) to participate in studies that allow Google to track, collect, save and use their browsing data, regardless of browsing mode. Mot. at 21.

Criticisms about the "inputs used" are "classic criticisms that go to weight, not admissibility." *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2022 WL 1814440, at *20 (N.D. Cal. June 2, 2022). The "selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807-08 (7th Cir. 2013) (reversing the exclusion of an expert opinion where "[w]hat the district court took issue with was not [the expert's methodology] . . . but rather his selection of certain data from which to extrapolate."). The weight of authority confirms that Google's complaints about the data input Mr. Lasinski used go to the weight and not the admissibility of an expert's analysis unless the data set is "so

1    incomplete as to be irrelevant." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.

2    2002) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

3            In any event, Google's critiques are meritless because it cannot escape reality: the $3

4    rate is a market-derived and market-tested indicator of the monthly payment necessary for an

5    individual to knowingly relinquish the choice to keep certain browsing private and allow

6    Google to track all online activity, regardless of browsing mode. This real-world focus is

7    proper. *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 881, 889 (9th Cir. 2014) (finding expert's

8    testimony was "relevant and reliable" and therefore admissible where defendant's "own data"

9    "show[ed] how [its] business worked in practice"); *see also Apple iPod iTunes Antitrust Litig.*,

10   2014 WL 4809288 at *5 (N.D. Cal. Sept. 26, 2014) (overruling challenges to expert opinion

11   when the data was provided by the defendant and supported by "non-trivial" evidence).

12           Google also incorrectly suggests Mr. Lasinski somehow failed to account for

13   Screenwise differences. Mot. at 22-23. In doing so, Google strains both the relevant facts and

14   Mr. Lasinski's testimony. Although Google highlights Mr. Lasinski's testimony that the full

15   scope of data Google obtains from Screenwise participants is "qualitatively and quantitatively

16   different from the at-issue data" (*id*. at 22), Google conveniently omits all reference to Mr.

17   Lasinski's testimony that he considered and excluded the incremental compensation to

18   Screenwise panelists that is directly tied to those differences and only included the $3 baseline

19   that was paid to all users:

20           Q.    Now, Mr. Lasinski, you were asked about how the Ipsos survey requires things
                   of respondents other than just allowing their data to be collected in order for
21                 them to participate in that study. Do you remember questions about that?

22           A.    Yes.

23                                           * * * * *

24           Q.    Okay. And did you include that $20 payment in your restitution calculations?

25           A.    No, I did not.

26   Lasinski Tr. 211:16-212:20. *See also* Lasinski Rep. ¶¶ 147-50; Lasinski Tr. 83:16-84:17,

27   86:18-87:11, 87:25-88:10, 213:15-213:20.

28   PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

Google next attacks Mr. Lasinski for stating the $3 rate he used was "conservative" because that is the rate willing sellers of data would accept whereas here class members are, by definition, unwilling sellers. Mot. at 22. Google claims that Mr. Lasinski does not support this simple logic with "analysis, study, literature, economic logic, or other reliable methods," but Google misses the point. *Id.* There is no literature or study needed to understand that unwilling sellers are less likely to accept the same payment as willing sellers. Regardless, Mr. Lasinski did not increase the rate beyond the $3 rate willing Screenwise sellers accepted. He was simply illustrating the $3 rate he employed was conservative. Google's complaints are much ado about nothing and are, at best, issues for cross examination, not exclusion.

### 3.    No Deduction Is Required for Personalized Ads.

Google also incorrectly suggests that Mr. Lasinski somehow failed to account for users who purportedly "benefitted" from Google's non-consensual collection of their browsing information because they like being shown personalized ads. *Id*. at 6.

*First*, Google is wrong on the law. Google cites a particular type of restitution case in which the plaintiff pays a "price premium," which is the difference in what she paid for the product and the value of the defective product she received. *Id*. at 24-25. But that is not the only potential measure of restitutionary relief under California law. *See, e.g.*, *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 791 (2015) (noting that while the *Vioxx* case "stated the difference between the price paid and actual value received is *a* measure of restitution . . . [w]e agree that *Vioxx* does not purport to set forth the exclusive measure of restitution *potentially* available in a UCL case") (emphasis in original). For example, when restitutionary relief is awarded in a breach of contract case like this one, "it may as justice requires be measured by . . . the reasonable value to the other party of what he received in terms of ***what it would have cost him to obtain it from a person in the claimant's position***." Restatement (Second) of Contracts § 371 (emphasis added). Similarly, "[e]nrichment from the receipt of nonreturnable benefits may be measured" by either "the market value of the benefit" or "a price the defendant has expressed a willingness to pay, if the defendant's assent may be treated as valid on the

question of price." Restatement (Third) of Restitution and Unjust Enrichment § 49. *See also, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020). Under any of these formulations, that is precisely what Mr. Lasinski measured: the value that Google has actually paid to Internet users to give up their right to browse privately from Google.

*Second*, there was no need for Mr. Lasinski to account for personalized advertisements benefitting *Google*. Google itself recognized that its Display Ads and YouTube Ads revenues from Chrome Incognito users would be ████████████████████ ████████████████████████████████████████ Lee Decl. Ex. 4 (GOOG-CABR-04324934) at -938, -940. Class members are people who chose to browse privately. Google's argument is like a home burglar who claims that a restitution award should be offset with a cleaning fee for "decluttering" his victims' homes. Google has not cited any law or facts that would support Google's claim that it should be rewarded for its illegal conduct.

*Third*, Google presents no evidence that class members benefitted, let alone in some way that outweighed all harm. The only basis for Google's claim of "strong evidence" is a footnote citing to a few online articles it found online addressing perceptions of personalized content and advertising generally. Mot. at 24, n.17. That of course has nothing to do with user perceptions while browsing privately. Even if such "evidence" could be credited, it is no basis for exclusion of Mr. Lasinski's opinions. *In re Toy Asbestos*, 2021 WL 1167638, at *2, 5 (N.D. Cal. Mar. 26, 2021) (rejecting argument that expert's methodology was "flawed" for failure to consider "competing evidence" which went to the weight of the conclusions).

### 4. No Deduction Is Required for Class Members' Supposedly Varying Subjective Views About the "Value" of their Privacy.

Google next argues along similar lines that "the values users put on the At-Issue Data or their privacy" may differ. Mot. at 24-25. But this argument likewise provides no basis for exclusion. As set forth above, the appropriate restitutionary measure of relief may be (a) "what it would have cost [Google] to obtain it from a person in the claimant's position," (b) the "market value of the benefit," or (c) "a price the defendant has expressed a willingness to

pay….” *Supra* § III.C.3 (quoting the Restatement). None of these measures turn on the subjective beliefs of each class member. Mr. Lasinski properly considered the $3 rate Google *actually paid* to a "representative sample" of users to give up their right to browse privately from Google. Lasinski Rep. ¶ 143; Lasinski Tr. 92:22-93:13, Lee Decl. Ex. 5 (Walker Tr.) at 16:5-17:12. Google did not pay Screenwise participants more or less money based on an individual's subjective beliefs about their data or privacy. And Mr. Lasinski's admission that some users would not part with their private browsing data even if given "$20, or $30, or $40 per month" (Mot. at 18) only underscores his opinion that the baseline $3 rate is conservative.

In any event, it is clear in this case that every class member values privacy. Class members are by definition people who used one or more of the *private* browsing modes. For Google to now suggest that private browsing users may not care about privacy is nonsense. Besides, simply pointing to potential "individualized differences" is not a basis for finding a restitution model unreliable. *McCrary v. Elations Co. LLC*, 2014 WL 12589137, at *7, 10 (C.D. Cal. Dec. 2, 2014) (rejecting argument that "restitution models are unreliable because they fail to account for individualized differences in decision-making among class members").

Google makes much ado about *Opperman v. Path, Inc.*, 2016 WL 3844326 (N.D. Cal. July 15, 2016), but that decision is easily distinguishable. In *Opperman*, the court excluded an expert opinion based on inferences based entirely on a survey, which posed hypotheticals to potential class members. *Id.* at *14. No such speculative inferences exist here. Mr. Lasinski's key input was Google's real-world payment of a uniform rate users actually accepted to give Google access to all their browsing data, regardless of browsing mode. Here, no inferences based on hypotheticals needed to be drawn. *See Area 55, Inc. v. Amazon.com, Inc.*, 2012 WL 12846975, at *6 (S.D. Cal. July 24, 2012) (expert's "reliance on sales information and Amazon's practices is reasonable; sales data and business practices are typical facts relied upon by damages experts, constituting a sound economic and factual predicate").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 5.      Google's Bad Math Does Not Justify Exclusion.

For dramatic effect, Google claims that "applying [Mr. Lasinski's] assumption that $3 per month per device is the baseline value of the At-Issue data would mean that the value of all data from all traffic would be ███████████████ . . . more than Alphabet's operating profits from all products and services sold in the U.S." Mot. at 11. This is bad math. First, it is illogical for Google to contend that the "value [to Google] of *all data from all traffic*" can be determined as a function of the dollar value of *actual damages* to class members. Second, Google omits discussion of how the optics change when considered on an annual basis. For example, dividing ████████████████ by 5.5 years (June 2016 – December 2021) yields ███████████ ████████ just ████████████████████████████. Third, even accepting under Google's illogical leap from *actual damages* to the purported value of *all data*, █████████ of annual damages translates to ██████████ of purported "all data" value, or ███ ████████████.

### D.      Mr. Lasinski's Unjust Enrichment Model Is Not Subject to Exclusion.

Mr. Lasinski quantified class-wide unjust enrichment damages based on Google's own internal calculations and data. Lasinski Rep. § 7. Google's attacks on Mr. Lasinski's unjust enrichment model—which is based on Google's own assessment of the profits it would lose if it stopped tracking merely *one type* of Incognito data—are also futile.

#### 1.      Mr. Lasinski Properly Calculated Class-Wide Unjust Enrichment Using Google's Own Internal Analysis.

In 2019 and 2020, Google considered a new initiative called ████████████ in which Google would begin blocking one type of tracking called third-party cookies (or 3P cookies) in Chrome's Incognito mode. Lasinski Rep. ¶ 30; Lee Decl. Ex. 4 (GOOG-CABR-04324934); Lee Decl. Ex. 6 (GOOG-CABR-04820567) at -577. Google would not undertake this change without carefully studying the profits it would expect to lose and attempting to mitigate them. And so, ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ Lee Decl. Ex. 4 (GOOG-CABR-04324934). ████████████████

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ████████████████████ Lasinski Rep. ¶ 57. ██████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ████████████ Lee Decl. Ex. 4 (GOOG-CABR-04324934).

7       Mr. Lasinski used the same methodology ████████████████████████

8  applied many of the same inputs, and similarly segmented his calculations across the same key

9  business segments within Google. Lasinski Rep. ¶¶ 59, 61. After making appropriate

10  adjustments to these calculations and extrapolating the financial impact for private browsing

11  traffic across the relevant browsers, Mr. Lasinski quantified Google's unjust enrichment as

12  between █████████████████████, depending on liability scenario. *Id.* ¶¶ 131-34.

**2.  Mr. Lasinski Did Not Deduct Costs Because There Are No Incremental Costs to Google.**

14       Unable to evade the fact Mr. Lasinski calculated class-wide unjust enrichment based

15  on Google's own internal analysis, Google instead claims Mr. Lasinski's opinion should be

16  excluded because he did not deduct any costs. Mot. at 25-26. But the reason for this is

17  straightforward: it is *Google*'s burden to prove costs and the record shows there are no costs.

18       It is black-letter law that, as the party seeking disgorgement based on Google's unjust

19  enrichment, Plaintiffs "may present evidence of the total or gross amount of the benefit, or a

20  reasonable approximation thereof, and then [Google] may present evidence of costs, expenses,

21  and other deductions to show the actual or net benefit the defendant received." *Meister v.*

22  *Mensinger*, 230 Cal. App. 4th 381, 399 (2014); *see also, e.g.*, *Aoki v. Gilbert*, 2020 WL

23  6741693, at *32 (E.D. Cal. Nov. 17, 2020) (same). The "[r]esidual risk of uncertainty in

24  calculating net profit is assigned to the wrongdoer" (here, Google). *Meister*, 230 Cal. App. 4th

25  at 399 (internal quotation marks and citation omitted).

1    Here, Mr. Lasinski relied in part on Plaintiffs' technical expert, Mr. Hochman, who

2    explained that ████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████ Lasinski Tr. 165:20-166:8 ████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████ Mr. Hochman also explained how ████████████████

9    ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████

11   ████████ Dkt. 608-12 (Hochman Rep.) ¶ 94; Lasinski Tr. 163:15-23.[4]

12   In addition, Google's own ████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████ Lee Decl. Ex. 4 (GOOG-

15   CABR-04324934). The notion that there are incremental costs is contradicted by ████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████ When asked whether Google's costs "would vary with a change in

18   incognito traffic" Google's representative answered: ████████████████████████

19   ████████ Lee Decl. Ex. 7 (Singhal Tr.) at 23:25-24:9; *see also* Lasinski Tr. 162:23-163:3 Indeed,

20   Google's expert Dr. Strombom ████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████

22   ████████████████ Lee Decl. Ex. 8 (Strombom Tr.) at 93:1–13, 111:21–119:10, 119:11–17.

23   The only "evidence" of potential costs comes from an untimely and improper

24   declaration by a Google employee named Mr. Levitte, who did not issue an expert report and

---

25   [4] Google suggests Mr. Hochman never discussed this point with Mr. Lasinski because he did not

26   recall discussing "muling". Mot. at 9. While the specific term "muling" may not have been used,
     the concept of Google passing off costs to its users was discussed and is specifically included in

27   Mr. Hochman's report. Hochman Rep. § 94, 113; Lasinski Tr. 163:15-23.

28

violated this Court's Standing Order Standing Order § 10.[5] Dkt. 659-8 (Levitte Decl.). Mr. Levitte does not appear to have any first-hand, personal knowledge of ███████████ ██████████████████████████████████████ Google produced thousands of documents with the term █████████████ in this case, only *one* of which also includes Mr. Levitte. That document was dated July 31, 2019 and simply makes a single, passing reference to the ████████████ project. Lee Decl. Ex. 9 (GOOG-CABR-04010128) at -132.

Mr. Levitte's declaration, not surprisingly, does not purport to analyze the ███████ ████████████ Dkt. 659-8. In any event, his declaration makes only vague allusions to fee sharing arrangements without sufficient detail, values, or documentary support. *Id.* ¶¶ 12-13. Google essentially attacks Mr. Lasinski for not deducting costs that do not exist anywhere in the record. If Mr. Levitte's testimony is allowed to stand, Google remains free to cross-examine Mr. Lasinski concerning these purported costs at trial. *See Gray v. Perry*, 2019 WL 2992007, at *19 (C.D. Cal. July 5, 2019) (any purported "failure to consider costs when calculating profits goes to the weight of [expert] testimony and can be addressed on cross-examination.").

**3.    Google's Other Unjust Enrichment Critiques Are Fatally Flawed.**

Google's other complaints lie even further on the margins. For instance, Google's argument that a deduction was required because some users may have opted into third-party cookie tracking after ████████████ was implemented in 2020 is off base. Mot. at 26-27. Any meaningful measure of profits Google would not have expected to lose by virtue of a subset of users "opting in" to third-party cookie blocking would, by definition, already be excluded from Google's analysis.  Google's own internal documents show ████████████████████ ████████████████████████████████████████████████ Lee Decl. Ex 10 (GOOG-BRWN-00230425) at -426 (emphasis added). Google offers no evidence establishing any significant number of users have turned third-party blocking off or that this would meaningfully alter the aggregate amount of Google's unjust enrichment across the class (though Google remains free to cross-examine Mr. Lasinski on this issue if it so desires).

---

[5] Plaintiffs are filing a motion to strike on that basis.

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

Google's next argument that Mr. Lasinski failed to account for websites' "pop up" consent banners since 2020 (Mot. at 18) misses the mark. What Google fails to mention is that *none* of these pop-up consent banners state that data collection occurs when users are in private browsing mode. Mot. 20; Dkt. 662-5. Given that glaring omission, there was simply no adjustment for Mr. Lasinski to make. Lasinski Tr. 216:18-217:16 ("Q. Does the pop-up say anything about Google collecting data in Incognito mode or any other private browsing mode? A. No, it does not.").

Google's last-ditch critique that Mr. Lasinski failed to exclude "non-programmatic" (Mot. at 27) revenues is once again based on the untimely declaration of Mr. Levitte. But Mr. Levitte, as described above, has no first-hand, personal knowledge of the ████████ document and what it included or excluded. *Supra* § III.D.2. Regardless, the representations in the Levitte declaration regarding non-programmatic revenues are purely qualitative and unsupported by actual numbers, actual data, or citations to the actual record. Plaintiffs are unaware of any information Google produced that would allow for the quantification of so called non-programmatic revenue. Google improperly seeks to penalize Mr. Lasinski for its endless discovery gamesmanship, where Mr. Lasinski properly considered actual discovery.

### E. Google's Objections to Mr. Lasinski's Proposed Methods for Apportioning an Aggregate Damage Award Amongst the Class Are Meritless.

Unable to meaningfully critique Mr. Lasinski's aggregate Screenwise and unjust enrichment calculations, Google next claims he fails to apportion an aggregate award to individuals in a manner that satisfies Google's specifications. This is also baseless.

#### 1. Mr. Lasinski Calculated Aggregate, Class-Wide Awards from the "Top Down" Using Google's Own Data.

For both his actual damages and unjust enrichment models, Mr. Lasinski calculates an aggregate, class-wide award using Google's own data. For actual damages, Mr. Lasinski multiplied the $3 rate by the total number of unique monthly private browsing instances ("UMPBI"), where a single UMPBI represents one or more pageloads in Incognito mode or the other private browsing modes at issue on a single device during a one-month period.

Lasinski Rep. § 10. Far from arbitrary, the UMPBI was calculated based on ████████ ████████████████████████████████ Lasinski Rep. ¶¶ 166-82. In other words, UMPBI is ████████████████████████████████████████████████████ For unjust enrichment, Mr. Lasinski calculated the aggregate profits Google would have lost based on ████████████████████████████████████████████████████████ Lasinski Rep. ¶¶ 57-59. Mr. Lasinski quantified the size of the metaphorical "pie."

### 2.    Google Ignores Black Letter Law that It Lacks Standing to Complain About Apportionment.

Google now essentially tells this Court that given its feigned concerns about how to fairly cut the pie for class members, it would be best if Google just kept the pie. Not surprisingly, the law forbids just this sort of attack: "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). As long as aggregate damages are "calculable," they "may be all that plaintiffs need to prove." Cert. Mot. at 25 (quoting Newberg on Class Actions § 12:2). That is because when "the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members." *Six (6) Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). Where "partitioning" aggregate damages among class members "would not impact a defendant's liability for the total amount of damages," the defendant has no standing to complain and any "individual calculations" required to divide the pie would not defeat certification. *Ruiz Torres v. Mercer Canyons*, 835 F.3d 1125, 1140-41 (9th Cir. 2016).

In just one example, the Tenth Circuit approved a claims process for distributing an aggregate, class-wide judgment of over $400 million following a jury trial in a case the Ninth Circuit has cited with approval. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014), *cited with approval* in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

31 F.4th 651, 669 (9th Cir. 2022). The court affirmed that a defendant simply has "no interest in the method of distributing the aggregate damages award among class members." *Id.*

Instead, Google cites off-point cases that fail to overcome the clear authority outlined above. Mot. at 23. The individualized inquiries that doomed class certification in *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 662 (9th Cir. 2022) stemmed from "an issue of individualized *liability*," not "individualized *damages*" (emphasis in original). *Bowerman* was an overtime case in which there were individualized issues as to (a) whether each class member was actually "misclassified" and (b) if so, "whether that particular class member *ever* worked overtime or *ever* incurred any 'necessary' business expenses." *Id.* (emphasis in original). In addition, the court noted that there was no method of calculating an aggregate damages model other than by considering testimony from each individual class member about how many "overtime hours they worked and the business expenses they incurred," which was "excessive[ly] difficult[]." *Id.* at 663. Similarly, in *Doyle v. Chrysler Group, LLC*, 663 F. App'x 576, 579 (9th Cir. Oct. 24, 2016), the plaintiffs sought "partial reimbursement" for replacing defective windows in Chrysler cars. The court, not surprisingly, noted that there was no class-wide method of determining "whether the proposed damages model measures damages that are solely attributable to the theory of liability." *Id.*

That is not the case here. The leading treatise, Newberg on Class Actions, is instructive where aggregate, class-wide damages can be calculated from the "top down":

> Assume a class of employees has a $50 million pension fund with each employee's share determinable only by a complex formula concerning age, years in service, retirement age, etc. Further assume that the fund's trustee simply transfers the full $50 million to her own personal account. In a case for conversion or fraud, the class would have to demonstrate damage to show liability. They could make that showing simply by demonstrating the aggregate damage the class has suffered—the amount the defendant converted. Individual damages could be worked out later or in subsequent proceedings.

4 Newberg and Rubenstein on Class Actions § 12:2 (Aggregate compensatory damages). Here, as in the example above, Mr. Lasinski has demonstrated the aggregate size of the class award using Google's own data. How the aggregate award calculated by Mr. Lasinski may be divided

amongst class members does not affect Google's overall liability for harming the class and unjustly profiting from their private browsing data.

### 3. Mr. Lasinski Proffers Valid Apportionment Methods.

Mr. Lasinski proposes two valid methodologies for apportioning aggregate damages to individual class members, outlined as follows (Lasinski Rep. § 10):

<u>Notice:</u> Plaintiffs' survey expert Mr. Keegan—whose opinions Google does not challenge—confirmed exceedingly high percentages of Google account holders used one or more of the relevant private browsing modes. Dkt. 608-10 (Keegan Rep.) ¶ 4. Plaintiffs' claims administration expert Mr. Weisbrot—whose opinions Google does not challenge—outlined an efficient and reliable notice and attestation process. Dkt. 608-27 Ex. A (Weisbrot Rep.) ¶¶ 24-66. Google itself has already agreed to a similar process in a recent class-wide settlement. Lee Decl. Ex. 11 (Weisbrot Tr.) at 11:20-12:9, 36:11-19.

<u>Self-Attestation of Class Membership:</u> As part of that attestation process, class members can confirm that they used one of the private browsing modes to visit a non-Google website within the class period and note the months and devices with which they did so. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) (holding Rule 23 "neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification"); *see also Meyer v. Bebe Stores, Inc.*, 2017 WL 558017, at *3 (N.D. Cal. Feb. 10, 2017) (affirming self-identification as a method for proving class membership). Google's contrary case law is either off-point or predates *Briseno*. *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1107-08 (9th Cir. 2021) involved Google Street View Vehicles indiscriminately collecting data over Wi-Fi networks while driving, which made it impossible for class members to know if they fell within the class definition. And *In re Hulu Privacy Litig.*, 2014 WL 2758598, at *13-16 (N.D. Cal. June 17, 2014), was a pre-*Briseno* administrative feasibility decision.

<u>Two Apportionment Methods:</u> Mr. Lasinski then proposes distributing the aggregate class-wide award among class members using UMPBI data in precisely the same way Google

20

internally tracks this information, where a single UMPBI represents one or more pageloads in a private browsing mode on a single device during a one-month period. Lasinski Rep. ¶¶ 196-97. Damages requiring allocation can be distributed to class members in the claims administration process as a function of the number of UMPBI deemed attributable to each class member. *Id.* This method would allocate damages to individual class members based on the months they used Incognito mode or another private browsing mode. *Id.*

Alternatively, Mr. Lasinski's second proposed method contemplates distributing the class-wide damages equally among class members.[6] Lasinski Tr. 154:10-19. This approach is sensible given the way Google monetizes and pays for user data. As Mr. Lasinski explained, "Google doesn't collect revenue from class members . . . . [T]he value proposition that Google has is its reach and the fact that it collects information on all of the class members and can determine and represent to its [advertising] customers that it has such a large reach and has information on all of these users . . ." *Id.* at 155:15-24. Based on Google's business model, Mr. Lasinski testified it would be "reasonable" to "consider class members on an equal basis. . . ." *Id.* at 157:1-2. His rationale is further supported by Google's equal monthly payment to Screenwise Panel participants regardless of how often or how long they browsed the Internet.

### 4.  Google's Apportionment Critiques Lack Merit.

Google, by contrast, suggests that Plaintiffs are somehow required to distribute an unjust enrichment award based on the precise amount of profit Google derived from each individual class member or varying Screenwise portions based on (a) the particular types of data Google collected from that particular user, (b) how frequently Google did so, and (c) how

---

[6] Google contends Mr. Lasinski did not calculate the number of class members. Mot. at 23. Untrue—he estimates ██████████████████████████ Lasinski Rep. ¶ 194.

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

much each user subjectively "valued" her data. Mot. at 28-29. Google has zero legal support for this proposition and the cases Google cites are off point.[7]

With respect to distributing an award based on the Screenwise model, Plaintiffs' theory of liability is premised upon the fact that Google did not live up to its promise to give users control over what browsing activity Google collects, saves, and uses. Dkt. 113 at 18. Accordingly, damages (or restitution) awards in this case are premised upon the value of making users relinquish the ability to keep certain browsing private and allow Google to track all online activity. That harm is shared by *all* class members. When not engaged in litigation, Google agrees, as evidenced by the market-derived and market-tested Screenwise payment structure in which Google paid the same fixed amount to all participants, regardless of variations in users' online browsing activity or in the value users place on their privacy. Google's willingness to make those fixed payments is fundamentally at odds with its current attack on Mr. Lasinski. With respect to the unjust enrichment model, Google's Levitte Declaration admits that "Google does not calculate advertising profits on a per-individual-user basis," and states "it would be impossible to calculate Google's advertising profits from each Putative Class Member." Levitte Decl. ¶ 7. Google now seeks exclusion because Mr. Lasinski failed to do the "impossible."

Google's critique that there are differences in "various user controls each class member may employ to limit Google's receipt of their browsing data" is belied by the record. Mot. at 22. *First*, Mr. Lasinski's "top down" aggregate models are based on data *Google* utilized. To the extent users employ some unique means of limiting Google's data collection attempts, the financial effect of those users' activity is already reflected in the starting point of Mr. Lasinski's unjust enrichment analysis such that no further adjustment would be necessary. *Second*, Mr.

---

[7] *See In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16 (N.D. Cal. Mar. 29, 2022) (Gonzalez Rogers, J.) (plaintiff proposed damages model *after* trial and conceded 15% of the model included non-injured accounts, making it "speculative"); *Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489, at *5 (N.D. Cal. Mar. 13, 2019) (finding damages "model doesn't have anything to do with Expedia's alleged conduct in this case").

1    Hochman confirms ████████████████████████████████████████████

2    ████████████████. Hochman Rep. at 8 (opinion 28); Dkt. 608-11 § E (Hochman

3    Rebuttal). *Third*, Google has presented no evidence that anything more than a *de minimis*

4    number of users employ such settings when in private browsing mode, as Mr. Lasinski

5    confirmed at his deposition. Lasinski Tr. 216:2-17. *Olean Wholesale Grocery Coop.*, 31 F.4th

6    at 669 ("reject[ing] the … argument that Rule 23 does not permit the certification of a class

7    that potentially includes more than a de minimis number of uninjured class members").

8         Finally, Google raises vague concerns about the reliability of class members' self-

9    attestations, but that is a product of Google's own making. Google has refused to produce any

10   data about users other than the named Plaintiffs; refused to preserve class member data since

11   the inception of this lawsuit; hid the existence of Incognito-detection bits that isolate Incognito

12   traffic; and has been sanctioned by this Court for its discovery misconduct. Dkt. 588. Given all

13   that, it is truly remarkable that Google now claims Mr. Lasinski should have come up with a

14   methodology Google admits is "impossible" and has intentionally thwarted throughout this

15   case.

16        Plaintiffs' expert Mr. Hochman—whose opinion Google does not challenge—has

17   engaged in extensive testing of the limited data Google *did* produce in the Special Master

18   process and concluded that it could be used to identify Incognito traffic and class members

19   with nearly 100% accuracy. Hochman Rep. § F, Appendix G at ¶ 25; Hochman Rebuttal ¶¶ 28-

20   30. The fact that Google's deletion of and refusal to produce such data makes "verification"

21   challenging is a problem of Google's own making. *See Tunica Web Advert., Inc. v. Barden

22   Mississippi Gaming, LLC*, 2008 WL 3833225, at *2 (N.D. Miss. Aug. 14, 2008) (quoting

23   *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927)) ("[A]

24   defendant whose wrongful conduct has rendered difficult the ascertainment of the precise

25   damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with

26   the same exactness and precision as would otherwise be possible.").

27

28

Google's critiques are, quite simply, shameless. Google has *already* been precluded from (a) contesting that any non-Google website lacks a Google tracker (Dkt. 288-1 at 1-2) and (b) using "the fact that only sampled data, not complete data, is available to challenge class certification generally or attestations by individuals they are members of the class." Dkt. 587 at 7. And yet Google now asks this Court to require Mr. Lasinski to measure damages with the "exactness and precision" that Google has prevented through its own discovery misconduct and which Google now admits is "impossible." That is not the law or any basis for exclusion under *Daubert. Story Parchment Co.*, 282 U.S. at 563 (1931) ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").[8]

### F.    Mr. Lasinski's Methods for Calculating Statutory Damages Are Reliable.

Google's final argument to strike Mr. Lasinski's statutory damage calculations puts to rest its Motion with a whimper. Seeking to not intrude upon the Court's role in terms of assessing any statutory damages, Plaintiffs asked Mr. Lasinski to provide calculations regarding four separate bases that could be used by the Court to determine the total amount of "violations" of the ECPA and CIPA to calculate damages. Lasinski Report ¶ 186. Those four calculations are based on Google's self-described "ground truth" records for tracking Incognito

---

[8] In a footnote, Google argues that "restitution and unjust enrichment damages are not available for certain claims." Mot. at 21 n.13. This argument is not the proper purview of a *Daubert* motion and, in any event, is wrong. The Court already rejected Google's argument about the UCL. Dkt. 363 at 30. "Under California law, disgorgement of improperly obtained profits can be an appropriate remedy for breach of a contract protecting trade secrets and proprietary confidential information." *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 668-69 (9th Cir. Apr. 26, 2010) (citing *Ajaxo Inc. v. E*Trade Group, Inc.*, 135 Cal. App. 4th 21 (2005); *see also MSC. Software Corp. v. Heroux-Devtek Inc.*, 2022 WL 2189500, at *6 (C.D. Cal. Apr. 12, 2022) ("restitution" has also been an "alternative remedy for breach of contract"). The same is true for the common-law privacy tort claims. *See, e.g., In re Facebook Internet Tracking Litig.*, 956 F.3d at 599 (in case alleging CIPA, CDAFA, breach of contract, invasion of privacy, and intrusion upon seclusion "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss"). California's statutory privacy claims allow for "disgorgement to the plaintiff of any proceeds or other consideration obtained," Cal. Civ. Code § 1708.8(d), and Google provides no reason why courts would conclude otherwise when considering a common-law privacy tort.

page-loads and certain other adjustments. Lasinski Report § 9. As reiterated during his deposition, Mr. Lasinski takes no position on which basis is superior. Lasinski Tr. 200:10-21. This is uncontroversial since the Court determines the remedies outlined in the wiretap statutes.

Google claims Mr. Lasinski fails to account for instances where Google would not have intercepted users' private browsing information but offers only theoretical possibilities without a shred of data. Google then complains Mr. Lasinski did not provide a way to calculate damages should this Court find the CIPA claim applies to California residents only. But Google ignores that Plaintiffs have already limited their CIPA claim to California to remain consistent with this Court's recent ruling in *In re RTB Consumer Privacy Litig.*, 2022 WL 2165489, at *11 (N.D. Cal. June 13, 2022). Cert. Mot. at 21. In any event, Mr. Lasinski already outlined a way to limit damages from CIPA to California residents in his report. Lasinski Rep. ¶¶ 196-97. Finally, Google recycles the same flawed apportionment arguments discussed above. *Supra* § III.E.4. None of these issues have any relevance to the Mr. Lasinski's proposed method of calculation, which are, without dispute, consistent with the statutory scheme outlined under the ECPA and CIPA. Google complains that the numbers these methods would produce are too high, but that is an issue for the Court to consider at a later juncture on the merits—not as a *Daubert* challenge. *See, e.g.*, *Patel v. Facebook*, 932 F.3d 1264, 1276 (9th Cir. 2019) ("Where neither the statutory language nor legislative history indicates that the legislature intended to place a cap on statutory damages, denying class certification on that basis would subvert legislative intent.") (cleaned up); *Zaklit v. Nationstar Mortg.*, 2017 WL 3174901, at *9 (C.D. Cal. July 24, 2017) ("[C]oncerns about excessive damages are better suited to a later stage of litigation."). Google's criticisms of Mr. Lasinski's statutory damage methodology are baseless.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny Google's Motion.

Dated:  August 19, 2022                                   Respectfully submitted,

By: */s/ John A. Yanchunis*

**MORGAN & MORGAN**

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted *pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
Erika Nyborg-Burch (CA Bar No. 342125)
enyborg-burch@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293 6858
Fax: (415) 999 9695

James Lee (admitted pro hac vice)
jlee@bsfllp.com
Rossana Baeza (admitted *pro hac vice*)
rbaeza@bsfllp.com
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (305) 539-1307

Alison L. Anderson (CA Bar No. 275334)
alanderson@bsfllp.com
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
Tel.: (213) 629-9040

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
abonn@susmangodfrey.com

**Attorneys for Plaintiffs**

PLAINTIFFS' RESPONSE TO GOOGLE'S MOTION TO EXCLUDE LASINSKI'S OPINIONS 4:20-CV-03664-YGR-SVK