# EXHIBIT 16

To the Mao Declaration ISO Plaintiffs' Administrative Motion re: Google's Production of Documents Improperly Withheld as Privileged

REDACTED DOCUMENT SOUGHT TO BE SEALED

*CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| CHASOM BROWN, *et al*, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br>　v.<br><br>GOOGLE LLC,<br>　　　　　　　　　Defendant. | Case No. 5:20-cv-03664-YGR |

# EXPERT REPORT OF PROFESSOR ON AMIR

# APRIL 15, 2022

# CONFIDENTIAL
# SUBJECT TO PROTECTIVE ORDER

*CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

# Table of Contents

I.  EXECUTIVE SUMMARY ........................................................................................1
II. QUALIFICATIONS .................................................................................................6
III. ASSIGNMENT..........................................................................................................7
IV. BACKGROUND .......................................................................................................9
    A. Allegations ..........................................................................................................9
    B. Private Browsing Mode ...................................................................................11
    C. Relevant Policies and Disclosures ..................................................................15
V.  CONSUMER PREFERENCES FOR BROWSERS AND BROWSER
    FEATURES VARY, AND CONSUMER PERCEPTIONS AND
    EXPECTATIONS OF PRIVACY ARE CONTEXT SPECIFIC ...................18
    A. Consumer Preferences of Browsers and Browser Features Vary ..................18
    B. Consumers' Concerns About Privacy Depend on The Context.....................20
VI. CONSUMER PERCEPTIONS AND EXPECTATIONS STUDY ...............22
    A. Study Design...................................................................................................23
    B. Analysis and Results.......................................................................................24
VII. INTERPRETATION STUDY................................................................................28
    A. Study Design...................................................................................................28
    B. Analysis and Results.......................................................................................30
VIII. LIKELIHOOD OF USE STUDY .........................................................................35
    A. Study Design...................................................................................................36
    B. Analysis and Results.......................................................................................40

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## I. EXECUTIVE SUMMARY

1. Based on my experience, the materials I reviewed in this matter, and the studies I designed and conducted in this case, I have reached the following opinions:

**Opinion 1** (See **Section V**)

2. Literature shows that consumer preferences vary when it comes to internet browsers and browser features.[1] This variation in preferences is dependent on the context and scenario, such as *which* people or entities have access to consumer information, *what* types of consumer information people or entities have access to, and *how* people or entities use this consumer information. Therefore, to evaluate consumer understanding, perceptions, and expectations specific to the facts of this case, and to evaluate whether and to what extent consumers' understanding, perceptions, and expectations affect their likelihood of using a specific internet browser or browser feature, I designed and conducted empirical studies to address my assignment in a way that is consistent with the facts and context relevant to it.

**Opinion 2** (See **Section VI**)

3. I designed and conducted my Consumer Perceptions and Expectations Study to assess whether and to what extent users expect different types of entities to receive or to not receive data (such as IP address, URLs of the sites users visit, and cookies) when they visit websites while in private browsing mode.[2] Users' perceptions and expectations were assessed after viewing the private browsing splash screens for Chrome, Safari, or Firefox, as well as the "Learn More" pages that are linked to the Chrome and Firefox private browsing splash screens.

4. In this study, my target population consists of 500 adults residing in the US who use a private browsing mode. Respondents were assigned to one of three groups (with a minimum of 200 respondents in the Chrome group, a minimum of 50 respondents in the Safari group, and a minimum of 50 respondents in the Firefox group) based on their answers to the screening question regarding the internet browser(s) they currently use to browse the internet.[3] Respondents were then presented with the private browsing splash

---

[1] See **Section V** for a review of the literature.

[2] See footnote 11 in **Section III** for rationale on the types of data tested.

[3] QS7, "Thinking about the device(s) you use to browse the internet (such as your phone, your personal laptop, or your office computer), which internet browser(s) do you currently use? (*Select all that apply*)." See **Appendix F.1**.

1

*CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

screens for Chrome, Safari, or Firefox, as well as with the "Learn More" pages that are linked to the Chrome (for those in the Chrome group) and Firefox (for those in the Firefox group) private browsing splash screens. Respondents were asked to express their understanding of whether and to what extent the three enumerated entities receive or do not receive data (such as IP address, URLs of the sites visited, and cookies) when they visit websites while in private browsing mode. The types of entities were companies that provide analytics and advertising services to websites visited, internet service providers, or companies that own the websites visited.

5. My Consumer Perceptions and Expectations Study shows that, overall, respondents expect that companies that provide analytics and advertising services to websites visited, internet service providers, and companies that own the websites visited *receive* data from their private browsing session (such as IP address, URLs of the sites visited, and cookies). ▮▮▮▮ of the respondents in the Chrome group ▮▮▮▮ expect that companies that provide analytics and advertising services to websites visited, internet service providers, and companies that own the websites visited *probably* or *do* receive the data from their private browsing session.

6. ▮▮▮▮ of respondents in the Chrome group expect that companies that provide analytics and advertising services to websites visited, internet service providers, and companies that own the websites visited *do not* receive the data from their private browsing session. Even including respondents who answered *probably do not* receive, ▮▮▮▮ of respondents in the Chrome group expect that these entities *do not* or *probably do not* receive the data from their private browsing session. Results are similar when analyzing responses from respondents across all three internet browsers.

7. These findings are not consistent with Plaintiffs' claim that "Class members reasonably believed that their data would not be collected by Google and that Google would not intercept their communications when they were in 'private browsing mode.'"[4]

---

[4] Third Amended Complaint, *Chasom Brown, et al., Plaintiffs, v. Google LLC, Defendant,* United States District Court, Northern District of California – Oakland Division, No. 5:20-cv-03664-YGR, February 3, 2022 ("TAC"), ¶ 3.

*CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

**Opinion 3** (See **Section VII**)

8. I designed and conducted my Interpretation Study to assess whether and to what extent users expect Google to receive or to not receive URLs of the sites users visit, IP addresses, and cookies placed on users' browsers during their Incognito session after reviewing the Incognito Splash Screen and "Learn More" page, as well as the Google Privacy Policy and Chrome Privacy Notice, the New Account Creation Agreement, or the Consent Bump Agreement for some respondents.[5,6]

9. In this study, my target population consists of 1,000 adults residing in the US who use a private browsing mode. Respondents were randomly assigned to one of four groups with a target of 250 respondents per group. The four groups were presented with different sets of screens and policies: "Splash Screen Only," "Splash Screen with Policies (Highlighted)," "Splash Screen with New Account Creation Agreement," and "Splash Screen with Consent Bump Agreement and FAQ Page." All respondents were shown the Incognito Splash Screen and the "Learn More" page that is linked to the Incognito Splash Screen. Based on which group they were assigned to, respondents were also shown either no additional documents (Splash Screen Only group), the Google Privacy Policy and the Chrome Privacy Notice (with and without highlights) (Splash Screen with Policies (Highlighted) group), the New Account Creation Agreement (Splash Screen with New Account Creation Agreement group), or the Consent Bump Agreement and FAQ Page (Splash Screen with Consent Bump Agreement and FAQ Page). Each respondent was asked a series of three scale questions. These questions required respondents to express their understanding of whether Google receives or does not receive three types of data from their Incognito mode internet browsing session: URLs of the sites visited, IP addresses, and cookies placed on the browser.

10. My Interpretation Survey results show that, overall, respondents expect that Google receives the URLs of the sites visited, IP addresses, and cookies placed on the browser while in Incognito mode. ▓▓▓▓▓ of respondents in each group ▓▓▓▓▓ expect that Google *probably* receives or *does* receive URLs of the sites visited while in Incognito

---

[5] See footnote 11 in **Section III** for rationale on the types of data tested.
[6] See **Section IV.C** for descriptions of the policies and disclosures.

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

mode, ▆▆▆ of respondents in each group ▆▆▆ expect that Google *probably* receives or *does* receive IP addresses while in Incognito mode, and ▆▆▆ of respondents in each group ▆▆▆ expect that Google *probably* receives or *does* receive cookies placed on the browser while in Incognito mode.

11. In each group, only ▆▆▆ of respondents expect that Google *does not* receive URLs of the sites visited while in Incognito mode, ▆▆▆ of respondents expect that Google *does not* receive IP addresses while in Incognito mode, and ▆▆▆ of respondents expect that Google *does not* receive cookies placed on the browser while in Incognito mode. Even including respondents who answered *probably does not* receive, ▆▆▆ respondents expect that Google *does not* or *probably does not* receive the URLs of sites visited while in Incognito mode. The percentage of respondents that expect that Google *does not* or *probably does not* receive (1 or 2 on the scale) IP addresses is ▆▆▆ and for cookies placed on the browser is ▆▆▆

12. These findings are not consistent with Plaintiffs' claim that "[n]othing in Google's Privacy Policy or Incognito Screen leads users to believe that during private browsing Google continues to persistently monitor them […] In fact, when the Privacy Policy and Incognito Screen are read together, the user necessarily reaches the opposite conclusion."[7]

**Opinion 4** (See **Section VIII**)

13. I designed and conducted my Likelihood of Use Study to assess whether and to what extent modification of certain language on the Incognito Splash Screen and the "Learn More" page that address Plaintiffs' criticisms of those documents—namely, that these documents should have identified Google as an entity that may receive data when an Incognito user visits a website using Google services—impacts users' likelihood of using Chrome in Incognito mode for private browsing.

14. Because this survey is about users' actual behavior and because context matters, I presented a scenario to simulate the browsing experience. This scenario was the same across all respondents. This scenario asked respondents to imagine that they were researching online about a sensitive topic and they decided to browse the web in private browsing mode.

---

[7] TAC, ¶ 57.

4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

15. In this study, my target population consists of 1,000 adults residing in the US who use a private browsing mode. I used a test/control experimental design, where respondents were randomly assigned to either the Actual Language group or the Alternative Language group, with a target of 500 respondents in each group. Following the presentation of the scenario, respondents were shown either the actual version of the Incognito Splash Screen (Actual Language group), or the alternative version with modification of certain language (Alternative Language group). Specifically, in the alternative version of the Incognito Splash Screen, the introductory sentence, "Now you can browse privately, and other people who use this device won't see your activity" was modified to say, "Now you can browse privately, which means other people who use this device won't see your activity." Similarly, under the heading, "Your activity might still be visible to," I added a bullet that stated: "Companies that provide services to websites you visit (such as Google Analytics, Adobe Analytics, Google Ad Manager, Facebook Ads)."[8] These language modifications address Plaintiffs' allegations as to how the actual language in the Incognito Splash Screen allegedly is misleading. Respondents that clicked the link to the "Learn More" page on the Incognito Splash Screen saw either actual or alternative language depending on the condition to which they were assigned. After viewing the stimuli, respondents were asked how likely or unlikely they were to use the Chrome browser in Incognito mode to do online research on a sensitive topic.

16. My Likelihood of Use Study results show that for online research on a sensitive topic, the average respondent would use Chrome in Incognito mode to do online research on a sensitive topic after viewing the Incognito Splash Screen and for some respondents, the "Learn More" page. Importantly, modifying certain language on the Incognito Splash Screen and the "Learn More" page (*i.e.*, the second phrase in the introductory sentence and information regarding the list of entities to which users' activity might still be visible) to address Plaintiffs' criticisms regarding what those documents *should* disclose *has no statistically significant impact* on respondents' likelihood of using Chrome in Incognito mode to do online research on a sensitive topic. This finding shows that including language that Plaintiffs claim "Google could have disclosed on [the] Incognito Screen [to describe]

---

[8] See **Appendices H.1 and H.2**.

5

*CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

that Google would track users and collect their data while they were browsing privately"[9] does not have an impact on respondents' likelihood of using Chrome.

## II.   QUALIFICATIONS

17. I am the Wolfe Family Presidential Endowed Chair in Life Sciences, Innovation, and Entrepreneurship, and Professor of Marketing at the Rady School of Management, University of California, San Diego. I have been a professor of marketing for the past nineteen years. I received my PhD in Management Science and Marketing from the Massachusetts Institute of Technology in 2003. From 2003 to 2005, I was an Assistant Professor of Marketing at Yale University. In 2005, I moved to help found the Rady School of Management at UC San Diego, where I was the first founding member of the marketing department and have served as an associate dean of academic programs.

18. I have taught Marketing Management, Pricing, Consumer Behavior, Business Analytics, Marketing Strategy, Market Research, Applied Market Research, Lab to Market, and Data Driven Decision Making at the MBA and Executive levels, as well as many specific programs for major corporations (both nationally and internationally). I have also taught MBA Marketing Management courses at Northwestern University's Kellogg School of Management, Yale School of Management, Recanati School of Business of Tel Aviv University, IDC Herzelia, and Cheung Kong Graduate School of Business in Shanghai, China.

19. I have consulted with numerous companies in many industries on topics relating to market analysis, market research, business strategy, customer insights, branding, customer analysis, new product launches, pricing, promotions, and customer relationship management. I am also the Chief Behavioral Science Officer at Fiverr, Inc and serve on the advisory board of several companies.

20. I have published numerous highly cited and award-winning articles in leading marketing, management, and psychology journals, and I am often invited to lecture in leading business school and professional meetings. I have also designed and conducted hundreds of consumer surveys, both for my academic research and consulting work. My professional

---

[9]   TAC, ¶ 53.