# EXHIBIT 17

## To the Mao Declaration ISO Plaintiffs' Administrative Motion re: Google's Production of Documents Improperly Withheld as Privileged

## REDACTED DOCUMENT SOUGHT TO BE SEALED

*Confidential*
*Subject to Protective Order*

NLIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, et al.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendants. | Case No. 5:20-cv-03664-LHK |

# EXPERT REPORT OF BRUCE A. STROMBOM
## MAY 27, 2022

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

*Confidential*
*Subject to Protective Order*

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Summary of Opinions | 1 |
| II. | Introduction | 10 |
| | A. Qualifications | 10 |
| | B. Assignment | 11 |
| | C. Materials Relied Upon | 12 |
| III. | Summary of Plaintiffs' Allegations | 12 |
| IV. | Summary of Mr. Lasinski's Proposed Methodologies for Calculating Class-Wide Damages | 15 |
| | A. Unjust enrichment | 16 |
| | B. Restitution | 17 |
| | C. Allocation of unjust enrichment and restitution damages | 17 |
| | D. Statutory Damages | 18 |
| V. | Opinion 1: Mr. Lasinski's unjust enrichment and restitution opinions fail to account for uninjured class members and provide no way to reliably exclude them from his damages analysis | 18 |
| | A. Mr. Lasinski has no methodology to account for Class members who may have explicitly and/or implicitly consented to the alleged wrongful data collection | 20 |
| | B. The classes include users who may not have suffered economic injury because they derived more value from Google's personalization using their At-Issue Data than their data is worth | 27 |
| VI. | Opinion 2: Mr. Lasinski's Proposed Method for Calculating and Allocating Google's Unjust Enrichment Is Speculative and Overstates Google's Unjust Enrichment From the Alleged Wrongful Acts | 31 |
| | A. Summary of Mr. Lasinski method for calculating and allocating unjust enrichment | 31 |
| | B. Mr. Lasinski's proposed calculation of unjust enrichment is unreliable, speculative, and overstated | 34 |
| |    1. Mr. Lasinski speculates that the effect of many of the factors used in the ▮▮▮▮▮▮ on Google's revenue and profits remained constant over the class period, and ignores information which indicates that Google's impact analysis did not take into account factors that could have decreased the impact of the automatic disabling of third-party cookies in Incognito mode on Google's revenues and profits | 34 |

- 2. Mr. Lasinski speculates that the percentage of users with Google accounts, which he calculates using results from the 2022 survey of Plaintiffs' expert Mark Keegan, would have remained constant over the class period ................................................... 38

C. Even assuming Mr. Lasinski's method for calculating Google's unjust enrichment was reliable and non-speculative, which it is not, his calculation grossly overstates Google's profits obtained from the At-Issue Data ..................................................................................................................40
  1. Mr. Lasinski fails to subtract costs that Google incurred to earn the allegedly unjust revenue that he calculates ................................. 40
  2. Mr. Lasinski overstates class-wide unjust enrichment because he overstates the percentage of traffic in private browsing mode.................................................................................................. 46
  3. Mr. Lasinski's unjust enrichment is overstated because he overstates the impact of autobidding on Google's revenue ...................... 49
  4. Summary of the combined effect of the quantified errors in Mr. Lasinski's calculation of alleged unjust enrichment ......................... 55

D. Mr. Lasinski has not proposed a reliable method for allocating unjust enrichment damages to class members in proportion to the harm they suffered or their contribution to Google's alleged unjust enrichment ........................56
  1. Google received different amount of data from different class members .................................................................................. 58
  2. Google earned different amount of revenue and profit from different class members ................................................................. 60

VII. Opinion 3: Mr. Lasinski's Proposed Methods for Calculating and Allocating Class-Wide Restitution Damages are Unreliable and Overstate Damages..........................64

A. Summary of Mr. Lasinski's method for calculating class-wide restitution damages and allocating those damages to individual class members ................................................................................................................66

B. Mr. Lasinski's use of Google's payment to panelists as the value for the At-Issue data is economically unreasonable ...........................................................69

C. Mr. Lasinski's proposed method for calculating class-wide restitution damages is unreliable and grossly overstates restitution damages ............................72
  1. Mr. Lasinski has not proposed a reliable method for calculating the value of the At-Issue Data ................................................ 73
  2. Mr. Lasinski's proposed method for calculating class-wide restitution damages is further flawed because it overstates the number of devices to which his proposed ▮ value should be applied .............................................................................................. 89
  3. Mr. Lasinski's examples of payments from market research companies for user information are not relevant because they do not measure the value of the At-Issue Data ............................... 91

*Confidential*
*Subject to Protective Order*

    D.   Mr. Lasinski has not proposed a reliable method for allocating restitution damages to Class members in proportion to the harm they suffered ...........................................................................................................93

        1.  Mr. Lasinski's proposed methods for allocating the class-wide restitution damages fail to account for variation in the amount and type of At-Issue Data Google received from individual class members, and therefore fail to account for the variation in restitution damages that each class member would be entitled to from an economic perspective ................................. 94

        2.  Mr. Lasinski's Instance-based Method also fails to account for the fact that multiple class members may use the same instance and multiple browser instances could be associated with the same device in the same period ..................................................... 98

        3.  Mr. Lasinski's Class member-based Method is flawed because (a) he overstates the number of class members and (b) the method is inconsistent with the per-device payment structure that he uses to calculate damages............................................... 99

VIII.  Opinion 4: Mr. Lasinski's assumption that a Claims administrator could implement his proposed methodology is speculative ...........................................101

IX.  Opinion 5: Rebuttal to Mr. Lasinski's Opinions Regarding Statutory Damages...................................................................................................................103

    A.   Mr. Lasinski's estimate of the number of individual pageloads in private browsing modes during the Class period is overstated and unreliable..................................................................................................................104

        1.  Summary of Mr. Lasinski's method to estimate private browsing pageloads across the classes during the class period ........................................................................................................ 104

        2.  Mr. Lasinski's estimate of the number of private browsing pageloads is not an economically reasonable base for calculating statutory damages ................................................................ 105

    B.   Mr. Lasinski's estimate of the number of unique monthly private browsing instances or "UMPBI" across the Classes during the Class Period is also overstated and unreliable...................................................................107

        1.  Summary of Mr. Lasinski's method to estimate the number of monthly private browsing instances across the classes during the class period ............................................................................ 107

        2.  Issues with Mr. Lasinski's estimate of the number of monthly private browsing instances.......................................................... 107

    C.   Mr. Lasinski's estimate of the unique private browsing instances across the classes and class period is also unreliable...................................110

        1.  Summary of Mr. Lasinski's method to estimate the number of unique private browsing instances across the classes during the class period ............................................................................ 110

*Confidential*
*Subject to Protective Order*

|   |   |   |
|---|---|---|
| | 2. Issues with Mr. Lasinski's estimate of the number of private browsing instances | 110 |
| D. | Mr. Lasinski's estimate of the number of class members in each class during the class period is overstated and unreliable | 111 |
| | 1. Summary of Mr. Lasinski's method to estimate the number of class members | 111 |
| | 2. Issues with Mr. Lasinski's estimate of the number of class members | 112 |
| E. | It does not appear that Mr. Lasinski has proposed how statutory damages could be allocated to individual class members, or that this allocation can be done on a class-wide basis | 113 |
| F. | Mr. Lasinski fails to consider whether there is a reasonable economic purpose for the allegedly wrongful data collection | 114 |

*Confidential*
*Subject to Protective Order*

For example, the New Account Creation Agreement explained that Google collects information such as "device IDs, IP addresses, cookies data, and location" when a user uses "apps or sites that use Google services like ads, Analytics, and the YouTube video player," and that this data could be used to "[d]eliver personalized ads,... both on Google services and on sites and apps that partner with Google."[33] Further, the FAQs to the Consent Bump Agreement explained that as users browse websites that use Google's services, such as advertising services or analytics tools, their "web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google." It further explains that "[t]he features described today don't change the types of data collected from these websites and apps - they simply change how that data is stored and used." ▮▮▮▮▮ of U.S. Google Account Holders who were shown the Consent Bump Agreement selected "I Agree" and ▮▮▮▮▮ of U.S. Google Account Holders who viewed the New Account Holder Agreement selected "I agree."[34] Further, I understand that class members may not have been injured if they were aware of Google's data collection practices. Class members could have become aware of Google's data collection practices through a variety of means, which I detail below:

---

[33] GOOG-CABR-04067825-867 at 829.

[34] GOOG-CABR-05424629; GOOG-CABR-05435660. I understand that Plaintiffs acknowledged they were aware of, and consented to, Google's collection of the At-Issue Data when they were in a browser mode other than private mode. Plaintiffs allege that "[i]t is *common knowledge* that Google collects information about the web-browsing activity of users" and "causes targeted advertisements to be sent based on that information." TAC ¶ 163. In depositions, Plaintiffs confirmed they were aware Google collected the disputed data when they browsed the web in a mode other than private mode. *See, e.g.,* Deposition of William Byatt, December 20, 20201 ("Byatt Depo"), p. 153; Deposition of Jeremy Davis, January 7, 2022, pp. 69, 70-71; Deposition of Christopher Castillo, February 8, 2022, pp. 70, 100; Deposition of Chasom Brown, January 13, 2022 ("Brown Depo"), pp. 61, 82, 134, 158; Deposition of Monique Trujillo, February 11, 2022 ("Trujillo Depo"), pp. 56, 62. Plaintiffs understood that the Privacy Policy specifically disclosed the data collect at issue while they were in basic mode. Castillo Depo, pp. 96-98, 100-101; Byatt Depo, pp. 116-118, 120-122; Brown Depo, p. 112.

*Confidential*
*Subject to Protective Order*

36. *Google and other companies' help pages inform users of Google's data collection.*

Class members could have learned of Google's data collection through various support and other publicly available pages that inform users of what data Google used to serve them ads. For example, the Google help page called "How private browsing works in Chrome" explains that "[c]ookies and site data are remembered while you're browsing, but deleted when you exit Incognito mode."[35] It further explains that "[y]our activity, like your location, might still be visible to: [w]ebsites you visit, including the ads and resources on those sites[;] [w]ebsites you sign in to; [y]our employer, school, or whoever runs the networks you're using[;] [y]our internet service provider[; and] [s]earch engine." This page also specifically discloses that "[a] web service, website, search engine, or provider may be able to see [y]our IP address, which can be used to identify the general area you're in[;] [y]our activity when you use a web service[;] [y]our identity if you sign into a web services, like Gmail."[36] Another Google help page, "How Chrome Incognito keeps your browsing private," explains that "Chrome doesn't tell websites, including Google, when you're browsing privately in incognito mode." It explains "[w]hat Incognito mode doesn't do" including: "[p]revent your activity or location from being visible to the websites you visit, your school, employer, or your Internet Service provider" or "[p]revent the websites you visit from serving ads based on your activity during an Incognito session." It explains that "[a]fter you close all Incognito windows, websites won't be able to serve ads to you based on your signed-out activity during that closed session."[37]

---

[35] Google Chrome Help, "How private browsing works in Chrome," available at https://perma.cc/Q5JW-H45J.

[36] Google Chrome Help, "How private browsing works in Chrome," available at https://perma.cc/Q5JW-H45J.

[37] Google Chrome Help, "How Chrome Incognito keeps your browsing private," available at https://perma.cc/W2P3-WJ58.

*Confidential*
*Subject to Protective Order*

37. Similarly, Microsoft Edge's private browsing page explains that private browsing does not "[h]ide our browsing from your school, employer, or internet service providers[;] [g]ive you additional protection from tracking by default[;] [or] [a]dd additional protection to what's available in normal browsing." A Microsoft Edge help page also provides details of "[w]hat data is collected or stored, and why" and provides instructions to limit the amount of data collected.[38] Another Microsoft help page notes that "[w]ebsites can still personalize content for you during your InPrivate browsing session because cookies and other site permissions aren't deleted until you close all InPrivate windows."[39]

38. And Safari's private browsing pop-up also explains that "[a]fter you close this window, Safari won't remember the pages you visited, your search history, or your Autofill information."

39. *Advertising campaigns to educate users on privacy awareness*. Google is a member of industry groups such as Digital Advertising Alliance (DAA) and Network Advertising Initiative (NAI) that create and follow disclosure standards in online advertising.[40] When users see ads on non-Google websites, including while in a private browsing mode, the ads are accompanied by an "AdChoices" icon that, when clicked, shows users that the ad is served through Google Ads.[41] The

---

[38] Microsoft, "Microsoft Edge, browsing data, and privacy," available at https://perma.cc/NPA2-N523.

[39] Microsoft, "Browse InPrivate in Microsoft Edge," available at https://perma.cc/GZ52-TJTC and https://support microsoft.com/en-us/microsoft-edge/browse-inprivate-in-microsoft-edge-cd2c9a48-0bc4-b98e-5e46-ac40c84e27e2.

[40] "Why you're seeing an ad," available at https://perma.cc/M4YC-J5QK.

[41] Google, "AdChoices for the Google Display Network – Google Ad Manager Help," available at https://perma.cc/XX3X-M6N9.

23

"AdChoices" icon also allows users to click on an icon titled "Why this ad?" that provides information on what type of data Google used to serve the ad.[42]

40. Apple also actively promotes privacy awareness by educating users through pop-ups and advertising campaigns.[43]

41. *Various media sources, such as public media sources that discussed Google's collection of data in Incognito mode and/or private browsing mode more generally,* as far back as 2008. **Exhibit 1** shows examples of 50 articles discussing Google's collection of data while users were browsing in private browsing mode. For example:

- A 2008 CMP TechWeb article states that "Incognito, according to Google's statement, is intended to prevent information from being left on the user's computer. It is not, in other words, an anonymization service… Consumer Watchdog argues that Chrome's Incognito mode does not confer the privacy that the mode's name suggests."[44]

- A 2014 Al Jazeera article explained that "[d]epending on what information you are trying to protect and from whom, private browsing might not be the right solution" because "private browsing doesn't mask your activity from Internet service providers, search engines or websites that you visit. Sites that you go to still receive information about you like location, browser information and IP address. Cookies are still dropped and are cleared only when you close the window."[45]

---

[42] Ads Help, "Why you're seeing an ad," available at https://perma.cc/M4YC-J5QK. Based on Google's "Why you're seeing an ad" support page, there are many explanations that may appear as reasons why a user may see an ad, including: (1) User info in the user's Google account, "like age range and gender," and the user's general location; (2) User activity, like "[y]our current search query," "[p]revious search activity," "[y]our activity while you were signed in to Google;" "[y]our previous interactions with ads," and "[t]ypes of websites you visit," and "[y]our activity on another device"; and (3) other info, such as "[i]nfo you gave to an advertiser, like if you signed up for a newsletter with your email address." The AdChoices icon also allows users to learn when information about their interests may be received or used, and gives users control over how their data is received and used for ads.

[43] Apple and Privacy, available at https://perma.cc/95B9-4KXC.

[44] CMP TechWeb, "Google Chrome Privacy Issues Prompts Plea to Google Execs," November 4, 2008, available at https://perma.cc/HJ3T-Z8ER.

[45] Sara M. Watson (24 Sep 2014). "As the Decoder: How private is private browsing, really?" Al Jazeera, available at https://perma.cc/88KC-BHDK.

*Confidential*
*Subject to Protective Order*

- A 2017 article from CNET reported that "[a] lot of people think their searches aren't tracked in private browsing mode. Unfortunately, that's not true."[46]
- A 2018 article published by The Sun and NYPost explains that "Google can still record the websites you browse while in Incognito Mode on the Chrome browser and link them to your identity."[47]
- A 2019 Wired article discussed "the long-known fact that Incognito isn't truly anonymous" and that "new research has re-emphasised that Google and other web browsers are still tracking you in privacy mode, even on the most sensitive of sites."[48]

42. *Certain class members could have also known about Google's data collection by virtue of being employed in the computer technology industry or utilizing browser developer tools*. More than four million people in the U.S. work in "Computer Occupations," which is a Bureau of Labor Statistics occupation group that includes computer system analysts, information security analysts, computer programmers, and software and web developers.[49] It is reasonable to assume that at least some of the workers in Computer Occupations would have known that Google receives the At-Issue Data when in private browsing modes.

43. Additionally, Chrome, Safari, and Edge provide Developer Tools that allow users to see transmission to Google while they are in private browsing mode. A user can right click on the webpage and click "Inspect" and a list of entities receiving transmissions will be visible.[50]

---

[46] CNET, "Brave Browser Offers to Boost Your Online Search Privacy," December 14, 2017, available at https://perma.cc/AM7Y-QTN5.

[47] Sean Keach, "Google's incognito mode isn't as private as you thought," *The Sun*, August 22, 2018, available at https://perma.cc/UWU4-MHHE.

[48] Clarke, Laurie, "Google Chrome's Incognito Mode is Way Less Private Than You Think," July 20, 2019, Wired, available at https://perma.cc/2HGJ-GWHN, accessed on May 12, 2022.

[49] Bureau of Labor Statistics, Occupational Employment and Wage Statistics, May 2020 data, available at https://perma.cc/H9G2-XGZ3.

[50] *See, e.g.,* TAC ¶ 86.