# Plaintiffs' Opposition to Google's Motion to Exclude Plaintiffs' Expert Bruce Schneier

# Redacted Version of Document Sought to Be Sealed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No.
238027
Erika Nyborg-Burch, CA Bar No. 342125
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720
alanderson@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CHASOM BROWN, WILLIAM BYATT,
JEREMY DAVIS, CHRISTOPHER
CASTILLO, and MONIQUE TRUJILLO
individually and on behalf of all other similarly
situated,

                    Plaintiffs,

    v.

GOOGLE LLC,

                    Defendant.

Case No.: 4:20-cv-03664-YGR-SVK

**PLAINTIFFS' OPPOSITION TO MOTION
TO EXCLUDE OPINIONS OF
PLAINTIFFS' EXPERT BRUCE
SCHNEIER (DKT. 664)**

Judge: Hon. Yvonne Gonzalez Rogers
Date: September 20, 2022
Time:  2:00 p.m.
Location: Courtroom 1 – 4th Floor

1

**TABLE OF CONTENTS**

2
Page

3      I.      INTRODUCTION ................................................................................ 1

4      II.     LEGAL STANDARD ......................................................................... 1

5      III.    ARGUMENT ..................................................................................... 2

6              A.      Professor Schneier is a leading authority on digital privacy. ........................... 2

7              B.      Opinions 1-6 regarding "Data And Privacy" provide relevant context for other
8                      opinions. ......................................................................................... 3

9              C.      Professor Schneier is qualified to opine on the likely effect of Google's
                       disclosures on reasonable users. .......................................................... 7
10
11             D.      Opinions 7-14 properly cite Google documents to lay a foundation for
                       Professor Schneier's opinions. ........................................................... 10
12
13             E.      Professor Schneier's opinions about the risks of data retention are relevant to
                       the offensiveness of Google's conduct. ............................................... 13
14
15             F.      Professor Schneier's opinions are not unfairly prejudicial............................. 15

16             G.      Professor Schneier is qualified to opine about Google's incentives and
                       services. ........................................................................................ 17
17
       IV.     CONCLUSION ............................................................................... 19

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Otro Lado v. Mayorkas*,
    2021 WL 3929673 (S.D. Cal. Sept. 2, 2021) ........................................................................13

*In re Bard IVC Filters Prod. Liab. Litig.*,
    2017 WL 6523833 (D. Ariz. Dec. 21, 2017)............................................................................3

*Berman v. Freedom Financial Network, LLC*,
    400 F.Supp.3d 964 (N.D. Cal. 2019) (Gonzalez, Rogers, J.) ............................................7, 8

*Borges v. City of Eureka*,
    2017 WL 363212 (N.D. Cal. Jan. 25, 2017) .........................................................................10

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ................................................................................................1

*Corcoran v. CVS Pharmacy, Inc.*,
    2021 WL 633809 (N.D. Cal. Feb. 18, 2021) (Gonzalez, Rogers, J.) ...................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    43 F.3d 1311 (9th Cir. 1995)............................................................................................2, 16

*DZ Rsrv. v. Meta Platforms, Inc.*,
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022) .......................................................................13

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
    2022 WL 254348 (N.D. Cal. Jan. 27, 2022)......................................................................8, 12

*EEOC v. S&B Indus., Inc.*,
    2017 WL 345641 (N.D. Tex. Jan. 24, 2017) ..........................................................................3

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ............................................................................................4, 13

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ..................................................................................................1

*Hernandez v. Hillsides, Inc.*,
    211 P.3d 1063 (Cal. 2009)......................................................................................................5

*Hill v. National Collegiate Athletic Assn.*,
    865 P.2d 633 (Cal. 1994)......................................................................................................13

*Humetrix v. Gemplus*,
    268 F.3d 910 (9th Cir. 2001) ................................................................................................10

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

*I.C. v. Zynga, Inc.*,
   2022 WL 2252636 (N.D. Cal. Apr. 29, 2022) (Gonzalez Rogers, J.) ..................................14

*Jones v. United States*,
   933 F.Supp. 894 (N.D. Cal. 1996)..................................................................................3

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010)..............................................................................15, 16

*Miller v. Holzmann*,
   563 F. Supp. 2d 54 (D.D.C. 2008)..................................................................................3

*In re Platinum-Beechwood Litig.*,
   469 F. Supp. 3d 105 (S.D.N.Y. 2020) ...........................................................................9

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010)..........................................................................................2

*In re Seagate Tech. LLC*,
   326 F.R.D. 223 (N.D. Cal. 2018) ................................................................................12

*U.S.A v. Jackson*,
   2016 WL 6998557 (C.D. Cal. Nov. 28, 2016) ...............................................................3

*Waite v. AII Acquisition Corp.*,
   194 F. Supp. 3d 1298 (S.D. Fla. 2016) .......................................................................12

**Other Authorities**

Fed. R. Civ. P. 23(a) ................................................................................................................2

Fed. R. Evid. 403 ..................................................................................................................15

Fed. R. Evid. 404 ...............................................................................................................7, 15

Fed. R. Evid. 702 ............................................................................................................3, 4, 18

## I.   INTRODUCTION

Bruce Schneier is America's leading scholar, technologist, and public intellectual on the subject of online security and privacy. Google's real objection to his testimony is that he will accurately, effectively, and persuasively cast its collection of private browsing data in defiance of the revealed preferences of its users not to be observed as the breach of trust that it is. His opinions are based not just on his decades of professional experience developing and applying the standards of his field, but on pervasive corroboration by his peers who work at Google. Schneier's testimony does not merely summarize their pleas for help. It supplies the context that explains why those pleas are so disturbing.

Google's evidentiary objections to Schneier's testimony fail to connect. Testimony from "teaching experts" is routinely admitted to give the finder of fact background information about specialized fields. Testimony about the risk that information Google collects could be misused is obviously relevant to the reasonability of objecting to its collection regardless of Google's claim not to misuse it. Professional experience is an established basis for assessing the adequacy of disclosures. Testimony about market structure and incentives is not the same as testimony about intent or state of mind. The risk of history repeating itself is not character evidence. Truthful and relevant testimony that hurts is not unfairly prejudicial. Google can address any deficiency it perceives in Schneier's testimony through cross-examination and rebuttal testimony at trial.

## II.   LEGAL STANDARD

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Courts should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) Even "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

### III.   ARGUMENT

#### A.   Schneier is a leading authority on digital privacy.

Bruce Schneier is a computer scientist and a renowned expert and leading public intellectual in the field of data privacy and security. Dkt. 608-7 ("Schneier Report") at App. 2 (Schneier CV). He is a fellow at the Berkman Klein Center for Internet and Society at Harvard University and a Lecturer in Public Policy at the Harvard Kennedy School of Government, where he teaches on cybersecurity technology, law, and policy. *Id.* He has testified about Internet security and privacy to the United States Senate and House of Representatives and to the United Kingdom's House of Lords. *Id.*

Schneier is the *New York Times* best-selling author of fourteen books and of hundreds of articles on digital security, privacy, cryptography, and related topics, including seven academic titles and over one hundred scholarly publications. *Id.* Hundreds of thousands of readers follow his influential *Crypto-Gram* newsletter and *Schneier on Security* blog. *Id.* His work and views have been the subject of hundreds of articles and shows in both specialist and popular media. *Id.* He has been the recipient of numerous industry and academic awards and honors. *Id.* He is an inventor of over eighty patents. *Id.* He coined the term "security theater." *Id.*¶ 367.

Schneier's 2015 book *Data and Goliath: The Hidden Battles to Capture Your Data and Control Your World*—published just before the beginning of the class period—concerns the origins, development, structure, incentives, and policy implications of the "surveillance capitalism" business model at the heart of this case.[1] Google's sneering dismissal of Schneier as

---

[1] Google faults Schneier for relying in part on his prior work. Mot. at 5 & n.1. But Schneier's reliance on prior work makes his opinions more credible—not less. As explained in a case that Google cites (Mot. at 5): "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were derived by the scientific method." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Another case that Google cites makes the same point: "Testimony that grows naturally out of an expert's own independent research is generally more reliable than opinions an expert has developed for the sole purpose of testifying in court." *Jones v. United States*, 933 F.Supp. 894, 898 (N.D. Cal. 1996). Google also misleadingly suggests that Scheneir "cribbed" from his book. In fact, Schneier explained in his report that: "In my 2015 book, *Data and Goliath*, I explored at length

an "Adjunct Lecturer," Mot. 9, is like calling Einstein a patent clerk. There is no other expert on the planet who is more qualified to educate the finder of fact in this case about the field of digital privacy than Bruce Schneier.

### B.    Opinions 1-6 regarding "Data and Privacy" provide relevant context for other opinions.

Rule 702 "does not alter the venerable practice of using expert testimony to educate the factfinder on general principles." Rule 702, Advisory Committee Notes. Courts routinely admit "teaching witness" testimony from qualified experts about specialized areas of knowledge that aid in understanding the subject matter of the case.[2] The "concepts of privacy, internet tracking, and the data generated when people use the Internet" that "Opening Opinions 1, 2, and 3 generally describe," Mot. at 5, are, by Google's own characterization, self-evidently pertinent to understanding the subject matter of this case.

Google's complaint that such opinions "have no specific application whatsoever" has no bearing on the admissibility of "background" or "teaching" testimony under Rule 702:

> If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably. Yet it might also be important in some cases for an expert to educate the factfinder about general principles, without ever

---

the competing demands for surveillance and privacy that have emerged in the two decades that followed Barlow's prescient statement; I echo some of the language and many of the sentiments expressed in that book in the remarks that follow here." Schneier ¶ 50. At his deposition, Schneier likewise explained that "I started with some material, and then edited and updated as needed." Mot. Ex. 1 ("Schneier Tr.") 17:5-6.

[2] *See, e.g.*, *Miller v. Holzmann*, 563 F. Supp. 2d 54, 94 (D.D.C. 2008), *aff'd in relevant part, vacated in part, remanded sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) ("The Court concludes McAfee's testimony as a 'teaching witness' educated the jury about theoretical characteristics of collusive behavior in an auction setting and assisted them in determining whether events in this case bore the hallmarks of such collusion."); *In re Bard IVC Filters Prod. Liab. Litig.*, 2017 WL 6523833, at *4 (D. Ariz. Dec. 21, 2017) ("Instruction on relevant matters beyond the understanding of a typical juror is an appropriate function of an expert witness."); *EEOC v. S&B Indus., Inc.*, 2017 WL 345641, at *4 (N.D. Tex. Jan. 24, 2017) ("If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a 'teaching witness.'"); *U.S.A v. Jackson*, 2016 WL 6998557, at *4 (C.D. Cal. Nov. 28, 2016), *aff'd sub nom. United States v. Jackson*, 757 F. App'x 547 (9th Cir. 2018) ("Tuller testified as a teaching witness in support of defendant's diminished capacity defense.").

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

> attempting to apply these principles to the specific facts of the case. … For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

*Id.* Rule 702, Advisory Committee Notes. Google does not (and could not) contend that Schneier is unqualified to testify regarding online privacy, that a lay juror would not be assisted by his knowledge about the subject, or that his testimony on the subject is broadly unreliable.[3] Its only objection to such testimony under Rule 702 concerns its "fit" to the facts of the case. But its examples evince a wishful and impoverished understanding of the issues in dispute.

Plaintiffs' claims for intrusion on seclusion and invasion of privacy in particular place the overall context of Google's collection of private browsing information and the risk of its disclosure squarely in issue. The focus of those claims is whether Google's conduct is "highly offensive to a reasonable person," and the "degree to which the intrusion is unacceptable as a matter of public policy." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). Google's claim that "this case is not about data leaks," Mot. 6 (citing Schneier Report ¶ 62), ignores the bearing of past major data leaks on the offensiveness and unacceptability of collecting private browsing data that could be leaked in the future. Indeed, Schneier states that "[s]uch incidents provide important context for the expectations of users of private browsing modes" and cites examples of Google data breaches in that connection. Schneier Report ¶ 63 & n.55.

---

[3] Contrary to Google's suggestion (Mot. at 6 n.3), Schneier provides ample evidence for his conclusion that "[g]rowing awareness of the amount of data produced by Internet users and collected by companies such as Google" led users to "seek refuge in the promise" of "Incognito." Schneier Report ¶ 78. That evidence includes Google's own internal communications. *See id*. ¶ 262 ("In a 2019 internal Google slide deck entitled, 'Incognito in the context of our brand,' the author stated that, 'People are driven to use this mode primarily because they want to limit what others can see and dislike the idea of being 'tracked'" (citing Frawley Decl. Ex. 1 [GOOG-CABR-00128941 at -77]). Google also ignores Schneier's discussion during his deposition of the New York Times best-seller, *Age of Surveillance Capitalism* (also cited in his report at ¶ 54) to explain "the increasing awareness of internet surveillance." Tr. 125:8-14. (Google omitted this portion of the deposition transcript when it filed its motion to exclude (Mot. Ex. 1), so it is included as Exhibit 2 to the Frawley Declaration, concurrently filed herewith.)

1    Google similarly ignores the policy aspect of Plaintiffs' claims in asserting that various

2    privacy "laws and frameworks" are "not at issue in this case." Mot. 7. These claims involve

3    showing, for example, that Plaintiffs "possess a legally protected privacy interest ... as determined

4    by 'established social norms' derived from such sources as the 'common law' and 'statutory

5    enactment.'" *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009) (quoting

6    *Hill v. National Collegiate Athletic Assn.*, 865 P.2d 633 (Cal. 1994)). Schneier derives from the

7    enactments he reviews a consistent concern with limiting collection of data in addition to

8    regulating use of data once it has been collected. Schneier Report ¶¶ 120-135. The establishment

9    of such norms through such sources directly refutes Google's central refrain that its policies

10   governing the use of private browsing data somehow renders innocuous its collection of that data

11   in the first place. Mot. at 3, 16; *see also* Google's Opp'n to Pls.' Mot. for Class Certification

12   (Dkt. 665) at 18, 25.

13   Google's objection that certain kinds of personally identifying information ("for example,

14   name, address Social Security number" etc.) often collected during account creation are not "at

15   issue here," *see* Mot. 6 (quoting Schneier Report ¶¶ 79-80), is similarly obtuse. Schneier

16   identifies such familiar categories of information to introduce and contrast the understanding of

17   technologists that other information Google does collect from private browsing users can also be

18   identifying. *See, e.g.*, Schneier Report ¶¶ 81-84. This discussion also provides relevant context

19   for Mr. Hochman's opinion, which Google has not sought to exclude, that private browsing data

20   can be linked to Google accounts,[4] which do contain precisely the kind of classic personally

21   identifying information that Google pretends is not in suit.[5]

22   This undisputed fact underscores the relevance of Schneier's reference to the "danger [of]

23   liv[ing] in a world without privacy where … everything a citizen said and did could be stored

24

25   [4] *See* Dkt. 608-12 (Hochman Opening Report) §§ VIII.F, VIII.H; Dkt. 608-11 (Hochman

26   Rebuttal Report) §§ V.A, V.D.

27   [5] Google's tired refrain about what it deems relevant to this case has already led to severe
     discovery sanctions, Dkt. 588, with another sanctions motion pending, Dkt. 656.

28

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

1    and brought forward as evidence against them in the future, or made available to companies that

2    wished to construct cradle-to-grave dossiers on individual citizens." Schneier Report ¶ 34 (*see*

3    Mot. at 6). Google's claim (untested due to its discovery misconduct) that it does not in fact

4    perform such linking does not sever the demonstrated fact that it could do so if it wished from

5    "the issues in this case." Mot. 6.

6        Schneier does not "opine" that Google earns ███████ from using data about its users to

7    generate advertising revenue. *See* Mot. 7. It is fact. *See* Schneier Report ¶ 103 & n.92. His opinion

8    that Google and its competitors are "highly motivated" to do so is not "*ipse dixit*," but a structural

9    observation about the online advertising market that, in view of this fact, is beyond reasonable

10   dispute. Google is projecting when it attributes to Schneier the further inference that it

11   "necessarily engaged in misconduct here" because of this incentive. Mot. 7.

12       Google claims that it would be confusing to permit Schneier to testify about the value of

13   user data in general based on this and other examples[6] because this fact "is not an issue in

14   dispute." *Id.* But Google's incentive to maximize user data collection is highly relevant context

15   for understanding its internal resistance to addressing persistent recognition within its own ranks

16   that, as one Googler put it, Incognito is "effectively a lie." Pls'. Class Cert Mot. Ex. 2 (Dkt. 608-

17   14).

18       Schneier's opinions regarding the ease with which users may be manipulated into sharing

19   information by commercial actors summarizes with undeniable accuracy both the structure of the

20   market for data collection in which Google operates and the revealed psychology of those from

21   whom such data is collected. *See* Schneier Report ¶¶ 131–155; Mot. at 8. The examples in which

22   Google and others have used confusing interface designs and incomplete disclosures to obtain

23   uninformed manifestations of consent to tracking from users (*see* Schneier Report ¶¶ 142 (CNIL);

24   ¶¶ 250-54 (GDPR)) are relevant background and admissible for the permitted purpose of showing

25   that the use of similarly misleading "dark patterns" in the design of Google's Incognito splash

26

27   [6] Schneier's discussion of the "four basic surveillance streams" that existed "[b]efore the
     Internet," ¶ 109–111 is relevant as historical framing and shows the value of data however
28   collected. *See* Mot. at 7.

6

screen, privacy controls, and private browsing disclosures was no accident. *See* Fed. R. Evid. 404(b)(2).

Such dark patterns are also relevant to punitive damages. "The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future." CACI No. 3945. Among other factors, California law instructs juries to consider whether the defendant "acted with trickery or deceit." *Id.* Google's use of dark patterns in connection with designing its private browsing disclosures—i.e., "subversive user-design tricks intended to manipulate users into doing things they wouldn't normally want to do" (Schneier Report ¶ 138)— is squarely relevant to any consideration of punitive damages.

### C.    Professor Schneier is qualified to opine on the likely effect of Google's disclosures on reasonable users.

Schneier's decades of academic and industry experience eminently qualify him to opine on the reasonable expectations that users would derive from Google's user interfaces and related privacy disclosures. This Court has specifically found that "formal training in business process-focused software engineering, the design of user interface and registration pages, and user-experience design to ensure that users understand how their personal information will be used and disclosed when interacting with a web page" supplies a sufficient basis to "offer opinions on the issue of whether the design of [a] website would be likely to mislead or confuse a *typical* user." *Berman v. Freedom Financial Network, LLC*, 400 F.Supp.3d 964, 972 (N.D. Cal. 2019) (Gonzalez, Rogers, J.) (emphasis added).[7]

This Court's decision in *Berman* rejects Google's contention that "survey or other case-specific research on actual private browsing mode users," Mot. 9, is required to testify about the understanding of a reasonable user. So long as Schneier does "not testify as to whether a

---

[7] Google's citations to cases addressing the admissibility of scientific expert testimony are not pertinent to Schnieier's testimony about the application of professional industry standards to Google's disclosures. *See* Mot. at 8-9 (citing *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) and *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) regarding admission of scientific testimony). Its cases regarding reasonable royalty calculations in patent cases are similarly wide of the mark. *See id.* (citing *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) and *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *6 (N.D. Cal. Apr. 16, 2014)).

particular user or group of users was confused or misled" without such a factual basis, *Berman* permits his testimony. 400 F. Supp. at 972. And, as Google acknowledges, Schneier has made clear that he is not offering such opinions about particular class members. *See* Mot. 12 (quoting Schneier Tr. at 32:16-24).

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348 (N.D. Cal. Jan. 27, 2022), concerned exactly the kind of opinion about the effect of statements on particular people that *Berman* distinguished and Schneier is not offering. The excluded testimony in *Edwards* was offered to prove that allegedly false and confusing statements *had* harmed the plaintiff's reputation among other physicians in his field. *Id.* at *9. Consistent with *Berman*, *Edwards* observed that a survey would be one method to assess the *actual* reaction of the subject population to the information. *Id.* at *10. With respect to whether the character of the information would be expected to undermine the plaintiff's reputation, *Edwards* held that the witness, unlike in *Berman*, had not applied any specialized knowledge in addressing that issue. *Id.* Like the witness in *Berman*, and unlike in *Edwards*, Schneier has applied his specialized knowledge of professional standards for user experience and documentation in the field of online privacy to assess the substance of Google's disclosures.

Schneier's standard for evaluating Google's disclosures is not "I know it when I see it." Mot. at 9. As he put it a portion of his deposition testimony that Google cites for this false assertion:

> I'm not a random person coming in off the street and reading a screen and telling you what I think. I mean, I write books on this stuff. This is what I do. Security and privacy experts have -- have standards of what disclosure looks like, and *we* know when it's met and when it's not met.

Schneier Tr. 84:15-24 (cited at Mot. 9) (emphasis added). The standards by which privacy experts as a profession make such assessments are, as Schneier explains, embodied in "the generally accepted practices of our industry." Schneier Tr. 179:16–23. Google's sniping that he "not an expert in iconography, and has never been qualified as an expert in marketing or online advertising," Mot. 9, does not go to his familiarity with those generally accepted practices. Such

familiarity with relevant industry practices, this Court found in Berman, lays "a foundation for … opinions regarding the deceptiveness of [a] web interface" similar to those that Schneier expresses here. 400 F. Supp. at 972; *see also, e.g.*, *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 116 (S.D.N.Y. 2020) ("Post may testify as to (1) what a fiduciary or investment manager in a given context would ordinarily do according to relevant industry standards, (2) what the defendants here did instead, and (3) why the latter had the effect of defrauding or harming PPVA").

Schneier corroborates his professional judgment about the character of Google's disclosures with sources Google itself trusts implicitly: its own employees. For example, he supports his opinion that "[u]sers who choose private browsing modes … reasonably expect to avoid the collection and retention of personal data," (*see* Mot. at 9 (citing Schneier Report ¶ 261)), with citations to numerous examples of Google employees drawing the same conclusion. *See* Schneier Report ¶¶ 262–63 (citing Frawley Decl. Ex. 3 [GOOG-CABR-00111416 at -19]) and Frawley Decl. Ex. 4 [GOOG-BRWN-00051239 at -67]).[8] His opinion that "[p]airing the term 'incognito' with an icon of a faceless person in disguise suggests that a user in Incognito mode cannot be seen, traced, or tracked while browsing online" (*see* Mot. 9 (citing Schneier Report ¶ 283)), is corroborated by, among other cited sources, a Googler attributing fault for misconceptions about Incognito to "the name and the iconography" chosen by Google, Schneier Report ¶ 303 (citing Pls.' Class Cert Mot. Ex. 65 at -79). He supports his assertion that "Google's disclosures give rise to a reasonable expectation that Google will not collect users' private browsing information," (*see* Mot. at 9 (citing Schneier Report ¶ 285)), with a 2014 statement from Google's then-CEO Eric Schmidt that "you can browse in what is called 'incognito mode' where no one sees anything about you." Schneier Report ¶ 286 (citing Frawley Decl. Ex. 5).

---

[8] Schneier at ¶¶ 262-63 cites a January 2019 internal Google slide deck where the author acknowledged "Users want to be able to browse the web without feeling as though they are being tracked or having to sacrifice their privacy to do so." Frawley Decl. Ex. 3 at -19. Schneier also cites a 2020 internal Google slide deck where the author noted "users use Incognito mode mainly for sensitive searches or for more privacy and security," that "users are concerned about (Google) collecting data in Incognito," and that users incorrectly believe that using a private mode "hides browsing activity from Google." Frawley Decl. Ex. 4 at -58, -67, -72.

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

Schneier is not, as Google claims, "relying solely on his own, subjective view based on nothing more than reading Google's disclosures." Mot. at 13. He has supported his informed professional judgment about Google's disclosures with voluminous confirmation by fellow privacy technologists in Google's own employ. His opinions are *omnis dicit*, not *ipse dixit*.

The framing of Schneier's opinion that the "use of the word 'control' in Google documents "creates certain user expectations—and that users have the ability to stop Google's collection, storage, and use of their data," refutes Google's claim that Schneier has failed to employ an "objective or replicable standard." Mot. at 13. Schneier precedes this opinion with a close reading of interrelated provisions of Google policies such as the ability of users to "access and review their data" and "delete it entirely" to "make it easy for people to control their privacy." Schneier Report ¶¶ 244-25. It is no mystery how Schneier arrived at his conclusions about the kind and degree of control that Google leads users to expect: he lays the whole chain of reasoning out on the page. Google's assertion that this opinion "wither[ed] under even the slightest scrutiny" in view of Schneier's "admission" that "Google does offer users *some* control," Mot. at 13 (citing Schnieir Tr. 153:9–155:8), is not just deeply weird (one has control over a car with no brakes or steering wheel because the gas pedal works?) but exemplifies Google's repeated failure to read a paragraph ahead or beyond or to check the footnotes before claiming that Schneier has not explained his opinions. In any event, such devastating cross examination is grist for trial—not exclusion.

### D.     Opinions 7-14 properly cite Google documents to lay a foundation for Professor Schneier's opinions.

Google's complaint that Opinions 7-14 are "imbued with … selective quotation and mischaracterization of Google documents" is likewise a matter for cross-examination and refutation, not exclusion. *Humetrix v. Gemplus*, 268 F.3d 910, 919 (9th Cir. 2001) ("To the extent Gemplus sought to challenge the correctness of Humetrix's experts' testimony, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses."); *Borges v. City of Eureka*, 2017 WL 363212, at *3 (N.D. Cal. Jan. 25, 2017) (Gonzalez Rogers, J.) ("If defendants believe Lichten has 'misdescribed' what is

10

depicted on the video, then they will have the opportunity to cross-examine him regarding the factual basis for his opinions, and to offer their own expert witness to interpret the events on the video."). Its claim that these opinions "do no more than regurgitate the arguments of Plaintiffs' counsel" does not bear scrutiny. As discussed above and further below, Schneier relies on Google documents to support his professional opinions about the adequacy of Google's disclosures and the acceptability of its conduct.

Paragraphs 179 to 184 of Opinion 8 explain some of the technology that Google uses to collect user data from third-party websites whether or not users are in a private browsing mode—the core subject of this case. The paragraphs are written mostly in Schneier's own words and synthesize information from a variety of sources, including published articles as well as deposition transcripts and Google documents. They do not merely "summarize Google documents and testimony about Google's use of cookies." Mot. at 14.

Paragraphs 202 to 204 are but three of twenty-eight paragraphs of Opinion 9 concerning risks caused by Google's data collection. *See* Mot. at 14. Paragraph 202 does not merely quote a Google document stating on the one hand that "we will never sell your data to anyone" but on the other that Google may "share" data with customers who pay for its advertising services. It expresses the opinion that the latter provision renders the former substantively meaningless. Paragraphs 203 and 204 quote additional Google documents to show Google's own awareness of the slipperiness of the distinction.

With respect to Opinions 11 and 12, as previously noted, paragraphs 262-63 quote Google documents to the same effect of the opinion in paragraph 262 that Incognito mode users expect not to be surveilled. Paragraph 289 quotes a Google report about ████████████████ ████████████████████████████████████████ ████ Paragraphs 264 to 272 synthesize often technical information from a variety of sources to show how Google's data-collection incentives influenced its decision to defer deploying cookie-blocking technology that could have benefited Incognito users long after competing browsers had done so. Paragraphs 273 to 288 discuss the disconnect between Google's

11

competitive positioning of Incognito mode and its actual functionality. All of these paragraphs pertain to relevant topics, are integrated into the larger structure of Opinions 11 and 12, and will be helpful to the jury who could not otherwise digest the many sources they incorporate. *See Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1311 (S.D. Fla. 2016) ("A jury could not possibly examine every single letter, note, article, and publication reviewed and analyzed by Dr. Castleman ….").

Google is similarly wide of the mark in its claim that certain other paragraphs of Opinions 10, 13, and 14 "just parrot legal arguments" Plaintiffs have made about their purported interpretations of Google disclosures and documents. Paragraphs 231 to 242 show the difficulty of understanding Google's main privacy disclosures by several measures, including assessing their readability using tools that Schneier employs to evaluate the clarity of his own professional writing. Paragraphs 243 to 254 analyze the substance of Google's promises of "control," as previously discussed, and then compare those promises to the barriers that Google's product designs erect to their fulfillment. Paragraphs 296 to 365 analyze the disconnect between Google's promises and the reality of Incognito mode that are at the heart of this case. All of these discussions are in the nature of substantiating Plaintiffs' arguments—not "parroting" them— through the testimony of a qualified privacy and security expert.

*In re Seagate Tech. LLC*, 326 F.R.D. 223, 243 (N.D. Cal. 2018), did not exclude expert declarations for summarizing evidence as Google claims. *See* Mot. 14. It held that even if the declarations were admissible, finding liability would "still require a level of individualized inquiry for which Plaintiffs have proposed no manageable plan to resolve" and denied class certification on that basis. *Seagate*, 326 F.R.D. at 244. *Seagate's* criticism of the summaries was premised in part on the witness having conceded some of the documents "would not require any expertise to understand, and [that] many [were] not included in the record before the Court" *Id.* at 243. Unlike in *Seagate*, and as discussed above, in *Edwards* as well, Schneier's assessment of Google's disclosures does draw upon his professional expertise, and his citation of Google

documents corroborates his judgments.[9]

**E.    Professor Schneier's opinions about the risks of data retention are relevant to the offensiveness of Google's conduct.**

Google's claim that its asserted policies against linking private browsing mode data render testimony about how this data could be linked "not relevant" is like saying it's fine to take a person's diary as long as one promises to keep it safe and not to read it. The thesis is absurd on its face and contrary to law. "Legally recognized privacy interests" are not limited to "interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy')" but also include "interests in making intimate personal decisions or conducting personal activities *without observation*, intrusion, or interference ('autonomy privacy')." *Hill*, 865 P.2d at 654 (emphasis added). Google's attempt to reframe this case around what it does or doesn't do with the private browsing mode data it collects ignores the gravamen of Plaintiffs' claims that Google was wrong to collect that data in the first place.

In particular, as shown above, Plaintiffs' state-law privacy claims turn on the offensiveness and unacceptability of Google collecting data from people who reasonably believe that it will not do so when they are engaged in private browsing. *See* Section III.B, *supra*. Whether that data *could* be linked to their identities—whether as a result of a legal demand, the actions of a rogue employee or bad actor, or a policy change by Google—is highly and obviously relevant to those issues. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). *Facebook* does not hold, as Google suggests, that Google must actually connect the dots

---

[9] Google's remaining cases are readily distinguishable. Mot. at 15. As a threshold matter, the portion of the *Meta* opinion that Google quotes was attorney argument—not the court's analysis. *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) ("*Meta says* that Mr. McFarlane offered nothing more than his personal interpretation of documents and evidence." (emphasis added)). More fundamentally, *Meta* is far afield because that expert did not "offer any speciailized or scientific expertise, or anything beyond the typical knowledge and experience of a jury." *Id.* Google, by contrast, does not challenge Schneier's expertise in plainly relevant areas, including computer science. *See* Mot. at 9. *Al Otro Lado v. Mayorkas*, 2021 WL 3929673, at *1 (S.D. Cal. Sept. 2, 2021) is inapposite for the same reason. The expert there issued opinions based on documents about topics where she did not have "any particular experience." *Id.* Schneier, unlike the expert in *Al Otro*, has "particular expertise" in privacy and the relevant technology, and he is deriving his opinions directly from that expertise.

into a "comprehensive browsing history of an individual" for its collection of private browsing data to be "highly offensive." *See* Mot. 15. Rather, it held that "*both* the nature of collection *and* the sensitivity of the collected information are important*" to that determination. *Id.* at 603. Whether the data that Google collects about private browsing is truly pseudonymous or can readily be deanonymized—and if so, what could be done with it—goes to the heart of the latter consideration.

Case-in-point is Google's August 18, 2022 declaration from employee Martin Sramek— filed in connection with Plaintiffs' supplemental sanctions motion. Dkt. 695-4. Sramek explained that it would take "multiple months-long investigations" to determine every place where Incognito data goes within Google after its collected (in addition to the two years of discovery the parties have already engaged in). *Id.* ¶ 7. Google is storing troves of sensitive information— linkable to users—that users never expected Google to collect in the first place, and even Google doesn't know where the data is. Google stole the diary, made copies, and now has no idea where they are.

This Court's decision in *I.C. v. Zynga, Inc.*, 2022 WL 2252636, at *6-8 (N.D. Cal. Apr. 29, 2022) (Gonzalez Rogers, J.), found that gamers whose basic contact information was leaked had not suffered any harm that could confer standing precisely because that information was not alleged to be connected with sensitive facts about the Plaintiffs. *See id.* at *8 n.9 (distinguishing cases in which contact information was associated with debt amounts). It did not hold that the release of such information was harmless when it could be connected to such facts.

Finally, Google incorrectly suggests Schneier "misconstrues" the internal Google documents that he relied on. Mot. at 16 & n.7 Tellingly, Google offers just 2 examples, ignoring the other 123 documents cited in his opening report (*see* Schneier Report App. 1) and the 71 examples from his rebuttal report (*see* Rebuttal App. 1 (Dkt. 608-6)). With Google employees admitting that "from a legal perspective, we would never sa[y] that Google doesn't know who you are while you're Incognito," *see* Rebuttal Report ¶ 41 (citing Frawley Decl. Ex. 6 [GOOG-CABR-04780837.R at -40.R]), it's no wonder Google avoids the substance of its own

1   documents.[10]

2        **F.      Professor Schneier's opinions are not unfairly prejudicial.**

3        Schneier's "teaching" opinions about the history and hazards of mass data collection are

4   at times vivid, sobering, and even shocking. *See* Mot. at 17. They are also undisputedly true.

5   Google does in fact receive subpoenas from law enforcement for information and its policy is in

6   fact to divulge such information when it is legally required. *See* Schneier Report ¶ 129. Despots

7   can and have taken over government and can and have used state power to coerce corporations

8   to assist in persecuting their citizens. Schneier Report ¶¶ 34, 36-37. Anyone who thinks it can't

9   happen here or that Google's good intentions ensure that it won't doesn't read the news. What

10  has happened with other sources of data could happen to data that Google collects about private

11  browsing, and, as explained above, what could happen to that information is highly relevant to

12  the outrageousness of Google's having collected that data when it said it wouldn't. *See* Section

13  III.B, *supra*. Schneier can't opine about the risk of bad things happening to that data without

14  talking about bad things that can happen. *See U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,

15  608 F.3d 871, 896 (D.C. Cir. 2010) ("[I]t is difficult to conceive of expert testimony relevant to

16  the issues of this case in which the witness would not employ terms like 'cartel members' and

17  'colluders.'").

18        Testimony about the "History of Data Breaches" and "Privacy and Consent Failures" is

19  also not "impermissible character evidence that is not admissible to show a propensity to cause

20  harm" under Rule 404. *See* Mot. at 18 (citing Schneier Report ¶¶ 208-230). Historical context

21  ───────────────

22  [10] As for the two examples that Google identifies, Schneier did not "misconstrue" anything. The
    document cited in Schneier ¶ 205 n.215 addressed how Google can "connect the dots" between

23  signed-in data and signed-out data, which plainly supports the sentence in the report for which
    Schneier cited it—that is, "Google has not taken steps to ensure that a user's choice to sign out

24  of a Google account will prevent Google from associating the user's signed-out activity with any
    signed-in data." Schneier Report ¶ 205 (citing Frawley Decl. Ex. 7 [GOOG-BRWN-00060463

25  at -63]. As for Google's only other example, Google does not even contend that Schneier
    misrepresented this document. *See* Mot. at 16 (citing Schneier Report ¶ 205 n.216 (Frawley Decl.

26  Ex. 8 [GOOG-CABR-00358713 at -13])). That the author of the document during his deposition
    attempted to walk-back his plain admission has no bearing on whether Schneier properly

27  interpreted the document. If anything, the employee's testimony confirms that Scheneir
    interpreted the document correctly.

28

about how Google and other prominent insitutions have compromised information they collected despite the best of intentions is not evidence of bad character. Quite the opposite. Its purpose is to show that even good character is no insurance against the misuse or leakage of data that should not have been collected in the first place. This purpose is not prohibited by Rule 404. Rule 404 only prohibits admission of character evidence "in order to show that *on a particular occasion* the person acted in accordance with the character." Showing the "opportunity" to misuse private browsing data is a purpose that Rule 404 expressly permits.

Google's claim that some of Schneier's analogies and hypotheticals are "highly prejudicial and inflammatory," Mot. 18, likewise misunderstands Rule 403.

> Rule 403 provides for the exclusion of evidence if its "probative value is substantially outweighed by the danger of *unfair* prejudice," not simply "prejudice." In some sense, any evidence that is probative might be arguably prejudicial. That is, the purpose of offering evidence is to influence the decision of the jury.

*Miller*, 608 F.3d at 896.[11] Google does not contend—much less explain why—the comparison of its collection of private browsing data to a "secret cameras in your [hotel] room" is inapt. Mot. at 18. (█████████████████████████████████████████████████████████████ █████████████████. *See* Schneier Report ¶ 289.) Targeting ads that suggest the existence of an arrest record based on searching for names that are more frequently assigned to Black babies is an actual thing that Google did—and that users might reasonably seek to prevent by using private browsing. *See* Schneier Report ¶ 292. Targeting of ads based on private browsing activity that could tip off an abuser is likewise a real thing that could happen. *See* Schneier Report ¶ 101 & n. 88. Damning is not unfairly prejudicial.

---

[11] Google's reliance (Mot. at 18) on *Corcoran v. CVS Pharmacy, Inc.*, 2021 WL 633809, at *2 (N.D. Cal. Feb. 18, 2021) (Gonzalez, Rogers, J.) is misplaced. That was not a *Daubert* opinion, but rather a motion *in limine* ruling where the court explicitly qualified its exclusion of evidence by explaining that "it is reasonable that plaintiffs will be able to introduce the fact of lawsuits within the industry," and instructed the plaintiffs to seek permission from the court "so that a more considered evaluation can be made." *Corcoran* thus supports Plaintiffs here, showing that it is far too early to exclude Schneier's opinions.

### G.     Professor Schneier is qualified to opine about Google's incentives and services.

Schneier never address the issue of Google's intent. *See* at Mot. 19. His opinions about the competitive importance to Google of giving the appearance of offering privacy concern market demand for Internet browsing software that protects privacy on the one hand, and Google's incentives to collect user data to support its advertising business on the other. *See* Schneier Report ¶¶ 255-259. His opinions about what Google "understood" users to expect from private browsing are densely cited to Google's own documents stating what Google knew. *See* Schneier Report ¶¶ 260-295. He opined that Google's *conduct*—not its fictional corporate *mind*—was "more concerned with managing users' impressions than with respecting their privacy intentions." Schneier Report ¶ 368. It's a fair conclusion.

Schneier's opinions regarding what "Google counts on," its "incentives," what it is "motivated to ensure," and the like, are all structural observations about the market for online user data that Google does not substantively contradict. *See* Mot. at 19. Google's complaint is not that Schneier seeks to testify to its ultimate state of mind, only that the conclusion is so readily apparent.

Google's objection that Schneier only knows "about Google's Real-Time Bidding Platform ... based on nothing but 'reading and understanding Google's documents of how these systems work'" is odd given Google's acknowledgement that Schneier is a computer scientist who presumably knows how to read and understand documents about computers. Mot. at 9 (acknowledging that "Schneier has an MS in Computer Science" and that "his areas of expertise include . . . computer security"). Schneier's citation to Google documents admitting that it can join Incognito with regular browsing data refutes Google's contentions that this testimony has nothing to do with private browsing. *See* Schneier ¶ 200 (citing Frawley Decl. Ex. 9 [GOOG-CABR-00501220 at -20]).

Google is correct that Schneier "is not offering an opinion on damages, nor offering a way to uniformly 'value' the data at issue here." Mot. 20. Plaintiffs have submitted a report from Michael Lasinski for that purpose. *See* Dkt. 608-9. Schneier's report supports that report by

17

1  showing that user data, however collected, is the coin of the realm for Google and its competitors.

2  Schneier Report ¶¶ 103-19. And it demonstrates the offensiveness of Google's conduct by

3  showing how Google put the value of that data over its promise not to collect it from private

4  browsing users.

5  Google's observation that Schneier is not an "economist or marketing expert" in general,

6  Mot. at 20, does not detract from his expertise in the market for sensitive data and the

7  technologies that protect it. There is a reason that governments, universities, and professional

8  societies clamor for his advice on such matters. Even so, his opinions that Google's business

9  model and financial incentives to collect as much data as it can about its users are hardly subject

10  to reasonable dispute. Google does not claim they are substantively erroneous. Its complaint boils

11  down to an objection to stating to average jurors what is apparent to knowledgeable people. This

12  is the reason that expert witnesses exist, not grounds for exclusion.

13  Google's objection to Schneier's conclusion that its tracking infrastructure is "essentially

14  inescapable" on the grounds that he did not actually test Google's systems is rich given that

15  Google's own experts never claimed that the countermeasures they suggest for avoiding that

16  infrastructure are completely effective. *See* Hochman Rebuttal Report (Dkt. 608-11) ¶¶ 72-121

17  (explaining how many of the countermeasures discussed by Google's technical experts "do not

18  even prevent Google from collecting private browsing information" and how others are

19  "unworkable"). Even if this point were telling, it is one for cross-examination, not exclusion. In

20  fact, Schneier backs up this opinion with statistics on the overwhelming proportion of websites

21  that incorporate Google tracking technologies. *See, e.g.*, Schneier Report ¶ 174 ("One study

22  found that visitors to 86% of the world's most-visited 50,000 websites contained Google

23  trackers."). The fact that these technologies are not specific to private browsing data (Mot. at 21)

24  is just the point of this case: despite its promises, Google soaks up such data without distinction.

25  Once again, Google's objection is not to the accuracy of Schneier's conclusion, but to the

26  indecency of pointing it out.

27

28

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

IV.    **CONCLUSION**

Plaintiffs have carried their burden of showing that Bruce Schneier's testimony is admissible under Rule 702, and Google has failed to show that it is inadmissible under that or any other rule. Schneier is a renowned, credentialed, and experienced expert on computer privacy and security, and his opinions should be admitted to help the finder of fact understand the historical context of data collection in general as well as the implications of Google's specific conduct in this case.

Dated: August 19, 2022

By */s/ Mark Mao*
Mark C. Mao (CA Bar No. 236165)

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted *pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
Erika Nyborg-Burch (CA Bar No. 342125)
enyborg-burch@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293 6858
Fax: (415) 999 9695

James Lee (admitted pro hac vice)
jlee@bsfllp.com
Rossana Baeza (admitted *pro hac vice*)
rbaeza@bsfllp.com
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (305) 539-1307

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK

Alison L. Anderson (CA Bar No. 275334)
alanderson@bsfllp.com
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
Tel.: (213) 629-9040

**MORGAN & MORGAN**
John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
abonn@susmangodfrey.com

**Attorneys for Plaintiffs**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Plaintiffs' Opposition to Motion to Exclude Expert Bruce Schneier 4:20-cv-03664-YGR-SVK