# EXHIBIT 3
[Filed Under Seal]

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   CHASOM BROWN, WILLIAM BYATT,    ) Case No.
 5   JEREMY DAVIS, CHRISTOPHER       ) 5:20-cv-03664-LHK-
 6   CASTILLO, and MONIQUE TRUJILLO  ) SVK
 7   individually and on behalf of   )
 8   all other similarly situated,   )
 9            Plaintiffs,            )
10            vs.                    )
11   GOOGLE LLC,                     )
12            Defendant.             )
     _____ )
13
14                    CONFIDENTIAL
15
16     VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
17          DEPOSITION OF ON AMIR, PH.D.
18             Tuesday, August 16, 2022
19   Remotely Testifying from La Jolla, California
20
21   Stenographically Reported By:
22   Hanna Kim, CLR, CSR No. 13083
23   Job No. 5344524
24
25   PAGES 1 - 310
```

Page 1

## Page 2

```
 1      UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3
 4  CHASOM BROWN, WILLIAM BYATT,    ) Case No.
 5  JEREMY DAVIS, CHRISTOPHER       ) 5:20-cv-03664-LHK-
 6  CASTILLO, and MONIQUE TRUJILLO  ) SVK
 7  individually and on behalf of   )
 8  all other similarly situated,   )
 9       Plaintiffs,                )
10       vs.                        )
11  GOOGLE LLC,                     )
12       Defendant.                 )
13  _____ )
14
15
16      Confidential, virtual videoconference
17      video-recorded deposition of ON AMIR,
18      PH.D., remotely testifying from La Jolla,
19      California, taken pursuant to the
20      stipulations of counsel thereof, on
21      Tuesday, August 16, 2022, before Hanna
22      Kim, CLR, Certified Shorthand Reporter,
23      No. 13083.
24
25
```

## Page 3

```
 1   REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2
 3  For Plaintiffs:
 4      BOIES SCHILLER FLEXNER LLP
 5      BY:  BEKO O REBLITZ-RICHARDSON, ESQ
 6      BY:  MARK C MAO, ESQ
 7      BY:  ALISON ANDERSON, ESQ
 8      100 SE 2nd St , 28th Floor
 9      Miami, Florida 33131
10      305 539 8400
11      brichardson@bsfllp com
12      -and-
13      MORGAN & MORGAN LAW FIRM
14      BY:  MICHAEL RAM, ESQ
15      711 Van Ness Avenue, Suite 500
16      San Francisco, California 94102-3275
17      415 358 6913
18      mram@forthepeople com
```

## Page 4

```
 1   REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
 2
 3  For Defendant:
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5      BY:  ALYSSA "ALY" OLSON, ESQ.
 6      865 S. Figueroa Street, 10th Floor
 7      Los Angeles, California 90017
 8      213.443.3000
 9      alyolson@quinnemanuel.com
10
11  For Plaintiffs:  (Calhoun vs. Google)
12      SIMMONS HANLY CONROY
13      BY:  AN TRUONG, ESQ,
14      112 Madison Avenue, 7th Floor
15      New York, New York 10016-7416
16      212.257.8482
17      atruong@simmonsfirm.com
18
19
20  Also Present:
21      MARK KEEGAN, for Plaintiffs
22      Haimin Zhang, Analysis Group
23      SEAN GRANT, Videographer
```

## Page 5

```
 1           INDEX OF EXAMINATION
 2
 3  WITNESS:  ON AMIR, PH.D.
 4  EXAMINATION                         PAGE
 5     BY MR. REBLITZ-RICHARDSON:     10, 303
 6     BY MS. OLSON:                      296
 7
 8
 9  QUESTIONS INSTRUCTED NOT TO ANSWER:
10  PAGE.....LINE
11  56.......13
12              --o0o--
```

### Page 6

INDEX OF EXHIBITS

AMIR DEPOSITION EXHIBITS — PAGE

- Exhibit 1  "Expert Report of Professor On Amir," April 15, 2022; 311 pages — 15
- Exhibit 2  "Rebuttal Report of Professor On Amir," May 20, 2022; 76 pages — 15
- Exhibit 3  "Supplemental Report of Professor On Amir," June 30, 2022; 53 pages — 15
- Exhibit 4  "Google Brand Studio, Today's User on Privacy, Ads, and Consent"; Bates nos. GOOG-CABR-00422093 through '422182 — 179
- Exhibit 5  "Brand Studio, Incognito in the context of our brand, go/sinrastro-brand-research 2019"; Bates nos. GOOG-BRWN-00156752 through '824 — 198
- Exhibit 6  "Brand Studio, Incognito Icon Redesign April 18, 2019"; Bates nos. GOOG-BRWN-00028191 through '28375 — 206

### Page 7

INDEX OF EXHIBITS (CONTINUED)

AMIR DEPOSITION EXHIBITS — PAGE

- Exhibit 7  "Expert Report of Bruce A. Strombom, May 27, 2022; 183 pages — 216
- Exhibit 8  Order Denying Motion to Dismiss; 41 pages — 221
- Exhibit 9  E-mail from Steve Hamilton, 1/27/2021; Bates nos. GOOG-BRWN-00406075 through '406076 — 240
- Exhibit 10  "Incognito mode Awareness and Landscape"; Bates nos. GOOG-BRWN-00477546 through '477604 — 265
- Exhibit 11  "Incognito Mode UXR Review"; Bates nos. GOOG-BRWN-00042388 through '42418 — 289

--o0o--

### Page 8

1    Remotely Testifying from La Jolla, California
2    Tuesday, August 16, 2022; 8:05 a.m., PDT
3              --o0o--
4         THE VIDEOGRAPHER: Good morning. We're on
5 the record. The time is 8:05 a.m., and the date is    08:05:33
6 August 16th, 2022.
7         Please note that this deposition is being
8 conducted virtually.
9         Audio recording depends on the quality of
10 camera and internet connection of participants.    08:05:45
11 What is seen from the witness and heard on screen is
12 what will be recorded.
13         Audio and video recording will continue to
14 take place unless all parties agree to go off the
15 record.    08:06:00
16         This is Media Unit Number 1 of the
17 video-recorded deposition of Dr. On Amir.
18         This deposition is being taken on behalf
19 of counsel for Plaintiffs in the matter of Chasom
20 Brown, et al., versus Google LLC, filed in the    08:06:10
21 United States District Court, Northern District of
22 California. Case Number: 5:20-cv-03664-YGR-SVK.
23         And is being conducted remotely using
24 virtual technology.
25         My name is Sean Grant from the firm    08:06:29

### Page 9

1 Veritext. I'm the videographer.
2         And the court reporter is Hanna Kim, also
3 from Veritext.
4         I am not related to any party, nor am I
5 financially interested in the outcome.    08:06:42
6         If there are any objections to proceeding,
7 please state them at the time of your appearance.
8         Counsel and all present, including
9 remotely, will now state their appearances and
10 affiliations for the recording, beginning with the    08:06:52
11 noticing attorney.
12         MR. REBLITZ-RICHARDSON: Good morning.
13 Beko Reblitz-Richardson of Boies Schiller Flexner on
14 behalf of the Plaintiffs.
15         With me are Mark Mao and Alison Anderson,    08:07:10
16 also of Boies Schiller Flexner; Michael Ram from the
17 Morgan & Morgan Law Firm; and also Mark Keegan, an
18 expert retained by the Plaintiffs in this matter.
19         MS. OLSON: Aly Olson from Quinn Emanuel
20 on behalf of Google and the witness.    08:07:19
21         And with me is Haimin Zhang, who is a
22 consulting expert from Analysis Group.
23         THE VIDEOGRAPHER: Ms. Troung.
24         MS. TROUNG: An Troung, Simmons Hanly
25 Conroy, appearing pursuant to court order for the    08:07:31

```
 1  Calhoun Plaintiffs in the related case.
 2       THE VIDEOGRAPHER:  Thank you.
 3       Will the certified court reporter please
 4  swear in the witness.
 5
 6            ON AMIR, PH.D.,
 7    having been duly administered an oath over
 8  videoconference as stipulated by all counsel, was
 9       examined and testified as follows:
10       THE VIDEOGRAPHER:  Counsel.
11
12            EXAMINATION
13  BY MR. REBLITZ-RICHARDSON:
14     Q.  Good morning, Professor.
15     A.  Good morning.                  08:08:04
16     Q.  Please state your full name.
17     A.  On Amir.
18     Q.  Do you understand that you are under oath?
19     A.  I do.
20     Q.  If there is -- is there any reason you   08:08:12
21  cannot testify truthfully today?
22     A.  No.
23     Q.  If my question is unclear, would you
24  please let me know.
25     A.  Certainly will.                08:08:24
```
Page 10

```
 1     Q.  Is Google's counsel representing you for
 2  this deposition?
 3     A.  Yes, she is.
 4     Q.  And where are you right now for this
 5  deposition?                           08:08:34
 6     A.  I'm in my office at UC San Diego.
 7     Q.  Do you have anyone in the room there with
 8  you?
 9     A.  I do not.
10     Q.  Do you have any documents with you for the  08:08:43
11  deposition?
12     A.  I do not.
13     Q.  What, if anything, did you do to prepare
14  for today's deposition?
15     A.  I reread my three reports and many of the   08:08:54
16  related documents that I used to formulate these
17  reports.
18         I met with my support team at Analysis
19  Group to go over the data and analysis and met with
20  counsel to discuss this --              08:09:19
21         MS. OLSON:  Dr. Amir, I just -- you don't
22  need to say what you discussed with counsel.
23         THE WITNESS:  Thank you.
24  BY MR. REBLITZ-RICHARDSON:
25     Q.  Anything else to prepare for today's   08:09:31
```
Page 11

```
 1  deposition?
 2     A.  I tried to have a good breakfast.
 3     Q.  Anything else?
 4     A.  No.
 5     Q.  In total, how much time did you spend   08:09:39
 6  preparing for this deposition?
 7     A.  Probably eight to ten hours.
 8     Q.  And you said you reviewed not only your
 9  three reports, but some additional documents.
10         Do you recall that?             08:10:00
11     A.  I did.
12     Q.  And -- and were the -- those the documents
13  cited in your reports?
14     A.  Yes, they are.
15     Q.  Did you review any documents not cited in   08:10:09
16  your reports in preparation for your deposition
17  today?
18     A.  I don't think so.
19     Q.  Who hired you?
20     A.  The counsel firm that Aly represents.   08:10:22
21     Q.  And when were you hired?
22     A.  I'm not sure, to be honest.  I don't
23  remember the date.
24     Q.  Approximately?
25     A.  I honestly don't remember.     08:10:48
```
Page 12

```
 1     Q.  Was it this year?
 2     A.  I don't want to give you the wrong answer.
 3  I don't remember.
 4     Q.  It was before you submitted your first
 5  report; correct?                       08:11:09
 6     A.  It was obviously before -- way before I
 7  submitted my first report.  It was way before I
 8  conducted the affirmative studies.  I just don't
 9  remember the dates.
10     Q.  Okay.  And what were you hired to do?   08:11:21
11     A.  As stated in my report, I was hired to
12  offer an opinion on specific questions raised.
13     Q.  And those specific questions are detailed
14  in your reports; right?
15     A.  Yes, they are detailed in my report.   08:11:41
16     Q.  And who first contacted you about being an
17  expert in this matter?
18     A.  It was someone from Aly's firm through
19  Analysis Group that contacted me.
20     Q.  Do you know the person's name?   08:12:03
21     A.  I don't remember.  It's been a while.
22     Q.  Who explained your assignment to you?
23     A.  As usually in these matters, I had the
24  first meeting with attorneys, and they raised the
25  question.  I judged that it's a question that I can   08:12:20
```
Page 13

4 (Pages 10 - 13)

**Page 42**

```
 1  collecting information?
 2     A.  Well, there is information collected
 3  during the session that I -- that I use, that is
 4  then removed when I close the browser at the end of
 5  the session.                              08:48:05
 6         And there's information being collected or
 7  received -- sorry -- there's -- the information, I
 8  don't know where they -- whether they collect it or
 9  not.  But it's information received by various
10  third-party entities when I log in to different  08:48:19
11  websites.
12     Q.  I'm going to make sure I understand.  So
13  it's your testimony that when you're in incognito
14  mode, Google collects certain information during
15  that browsing that is then removed; is that correct?  08:48:34
16     A.  No, that's not what I said.
17         MS. OLSON:  Sorry.  I meant to -- I
18  accidentally was on mute, but I meant to interpose
19  an objection.
20  BY MR. REBLITZ-RICHARDSON:                 08:48:47
21     Q.  Okay.  Can you explain to me again what
22  you understand to happen when you're in incognito
23  mode in terms of Google collecting information?
24     A.  But first, you understand I'm not an
25  expert on -- in this case on any computer science.  08:48:57
```

**Page 43**

```
 1  So I'm providing you my lay understanding as a user;
 2  right?  Is that --
 3     Q.  Okay.
 4     A.  Okay.
 5         So as a user, I understand that if I use  08:49:11
 6  incognito mode, then certain types of
 7  information's -- of information are -- are stored on
 8  my device only temporarily.  And when I close the
 9  session, those would disappear.
10         This is the reason I use incognito mode to  08:49:28
11  access my finances on a public computer abroad.  I
12  did not want anybody to have using that machine
13  after me to have traces of my finances.
14         And I also understand that when I use the
15  internet in general, then third-party -- various  08:49:48
16  third-party players receive certain types of
17  information from my browsing session.
18     Q.  And if you know, when you are using
19  incognito mode, can you stop Google from collecting
20  that private browsing information?          08:50:17
21         MS. OLSON:  Objection to the form.
22         THE WITNESS:  I think you're also
23  restating my testimony.  Let -- let me just be
24  clear.  I do not know what "collected" means.  I
25  know that information is received.  If an algorithm  08:50:30
```

**Page 44**

```
 1  goes and crunches that information and then throws
 2  away the rest, then it might no be collected.
 3         So I'll tell you what I think I know, and
 4  that is that different third parties receive some of
 5  my browsing information.  For example, if I use  08:50:47
 6  incognito and go to Amazon, Amazon knows I'm there.
 7  So Amazon knows what I looked at.  Or, you know,
 8  what -- what this user using incognito looked at and
 9  what this user might have purchased.
10         And if I'm not clever enough, and I       08:51:05
11  actually, in incognito mode, log in to my Amazon
12  account, then Amazon knows exactly who I am, despite
13  incognito mode because I -- I just logged into my
14  account and told them who I was.
15         So, yes, there -- you know, third-party    08:51:24
16  members receive information.  I also imagine that my
17  internet service provider can look at traffic going
18  through its servers and -- and -- and -- and see
19  information.
20  BY MR. REBLITZ-RICHARDSON:                 08:51:43
21     Q.  I just want to make sure I understand.
22  You don't know what "collect" means; is that right?
23     A.  I don't know what you mean when you ask me
24  about collect.  And I didn't study anything in this
25  case about data collection.                  08:51:54
```

**Page 45**

```
 1     Q.  You didn't study anything in this case
 2  regarding Google's collection?
 3     A.  "Data collection," I said.
 4     Q.  Did you study anything in this case
 5  regarding Google's collection?              08:52:04
 6     A.  I don't know what you mean by
 7  "collection."  I -- I -- I said exactly.  I said I
 8  studied what people perceive, what entities receive
 9  their data.  And then I studied what types of data
10  users think Google receives.               08:52:20
11         And I did not use the term "collect"
12  because "collect" is -- is a term that's downstream.
13  I focused on what kind of data is received by
14  different parties, including Google.
15     Q.  I -- I need you to under- -- explain to me  08:52:39
16  what you understand the difference between collect
17  and receive to be.
18     A.  I -- I tried.  I'll try again.  If I
19  receive information that goes into a realtime
20  algorithm, that creates KPIs, key performance     08:52:55
21  indicators, and then I throw that data away, then I
22  receive data, and I didn't collect it.
23         For example, if my algorithm is supposed
24  to show you the next ad, so I could have an
25  ad-related algorithm that receives information,  08:53:12
```


Page 46

```
 1  process it, and did not save it.
 2         When I think of data collection, when I
 3  collect data, I save it.  That means I can come back
 4  to it in the future.
 5         That's how I interpret your question when      08:53:27
 6  you -- when you say "collect."  I didn't study
 7  whether information is collected in this particular
 8  case.
 9    Q.   So, in your opinion, "collect" means save;
10  is that correct?                                      08:53:43
11    A.   That's how I think about data.
12    Q.   And "receive" means maybe save, maybe
13  don't save; is that correct?
14    A.   Receive is have access to.  What you do
15  with it is, you know, kind of different from          08:53:53
16  receive.
17    Q.   So receive has nothing to do with what you
18  do with the data; is that correct?
19    A.   No.  I just -- I just explained an example
20  that you could do with the data something upon        08:54:05
21  receiving, but that doesn't require collecting.  So
22  nothing is a wrong description of my testimony.
23    Q.   If someone receives data, are they saving
24  that data?
25    A.   They don't have to.                            08:54:23
```

Page 47

```
 1    Q.   If someone receives data, are they using
 2  that data?
 3    A.   They can.
 4    Q.   But they don't have to?
 5    A.   They don't have to.                            08:54:28
 6    Q.   If someone collects data, it's your
 7  opinion that that involves saving data; is that
 8  right?
 9    A.   I -- that's my interpretation of
10  collection.  But again, this is my lay               08:54:37
11  interpretation of -- you know, of the English
12  language.  Collecting means storing, and receiving
13  does not necessarily mean storing.
14    Q.   And so, you studied receiving, not
15  collecting; is that right?                            08:54:54
16    A.   Yes.
17    Q.   And if you know, from your experience as a
18  user, can you have Google delete all of the
19  information that Google received from your private
20  browsing?                                             08:55:08
21         MS. OLSON:  Objection to the form.
22         THE WITNESS:  Yeah, I'm not sure I
23  understand that.  As I said, I think that when I use
24  private browsing using Chrome, the information of my
25  session, when I close the browser, is not stored on   08:55:19
```

Page 48

```
 1  my local machine, which is why I used it when I was
 2  abroad on a public machine.  And that's what was
 3  important to me as a user.
 4  BY MR. REBLITZ-RICHARDSON:
 5    Q.   So when you use incognito, and close          08:55:35
 6  incognito, it's your understanding that the
 7  information is not stored on your local machine; is
 8  that right?
 9    A.   That's my understanding.
10    Q.   What about Google servers, not on your        08:55:48
11  local machine, but Google servers?
12    A.   I don't know.  But what -- what's
13  important here is what I studied is what -- how
14  users and potential users understand this and what
15  do they think about it.                              08:56:02
16    Q.   Okay.  Do you know someone named Dan
17  Ariely?
18    A.   Yes, I do.
19    Q.   For a time, was Dr. Ariely your advisor?
20    A.   He was one of my two advisors.                08:56:18
21    Q.   Have you coauthored research papers with
22  Dr. Ariely?
23    A.   I think it's obvious from my CV that I
24  have.
25    Q.   The answer is "yes"?                          08:56:24
```

Page 49

```
 1    A.   Yes.
 2    Q.   Yes, you have coauthored research papers
 3  with Dr. Ariely?
 4    A.   Yes.
 5    Q.   How many papers have you coauthored with     08:56:31
 6  Dr. Ariely?
 7    A.   Five or six, maybe.  I can count, if you
 8  want.
 9    Q.   In 2008, did you publish an article
10  coauthored with Dr. Ariely titled "The Dishonesty of  08:56:43
11  Honest People:  A Theory of Self-Concept
12  Maintenance"?
13    A.   Yes, I did.
14    Q.   Was that your first home run paper?
15    A.   Define "home run paper."                      08:56:54
16    Q.   Have you written that that was your first
17  home run paper?
18    A.   I may have at some interview with a
19  reporter.
20    Q.   Was it a home run paper for you?              08:57:04
21    A.   I think it still is a home run paper.
22    Q.   Among of all of your published articles,
23  is that your favorite article?
24    A.   It's one of my favorite articles.
25    Q.   It's not your favorite.  It's just one of     08:57:18
```

Page 254:

1  answered.
2      THE WITNESS: -- I'm responding -- yeah.
3  I'm responding to your question about Mr. Keegan's
4  questions actually asked.
5  BY MR. REBLITZ-RICHARDSON:                02:15:13
6      Q. Okay. The questions actually asked, do
7  you dispute that they concerned private browsing?
8      MS. OLSON: Objection. Asked and
9  answered.
10     THE WITNESS: What I dispute is -- so --  02:15:24
11 so what I dispute is that responders understand what
12 the questions mean.
13 BY MR. REBLITZ-RICHARDSON:
14     Q. I'm not asking that question. Just asking
15 you whether you dispute that the questions concerned   02:15:38
16 private browsing.
17     A. No.
18     Q. You don't dispute that?
19     A. If you want me to -- you know -- do -- do
20 I think they're related to private browsing? I'm   02:15:49
21 answering that question. I think they are related
22 to private browsing.
23     Q. Thank you.
24        What additional questions relating to
25 private browsing do you think Mr. Keegan could have   02:16:00

Page 255:

1  added to his survey?
2      A. I'm sorry. Are you asking me to design
3  Mr. Keegan's flawed survey for him?
4      Q. You are criticizing Mr. Keegan on the
5  basis that he could find a large proposition      02:16:17
6  [verbatim] simply by adding more questions. And I'm
7  asking what questions related to private browsing
8  could he add?
9      A. And --
10     MS. OLSON: Objection to the form.       02:16:29
11     THE WITNESS: My point is he already has.
12 Look at his study. That's what he did. I'm -- I'm
13 not saying that he should have. I'm saying he
14 already did. He asked more questions than --
15 than -- than -- than you -- than you have to in   02:16:41
16 order to understand this issue until the point he
17 got to a very high number. Because of the structure
18 and the logic of his design, any additional question
19 you ask, by definition, because it is additive, is
20 going to get you a higher number. By definition.   02:16:56
21 If you take -- let me finish.
22        If you take the average number of -- of
23 correct responses, quote/unquote, for each question
24 as judged by the actual people responding to it, not
25 the numbers Keegan com- -- computed based on the    02:17:10

Page 256:

1  original thousand and four or whatever responders,
2  you will find that on average, people get it right
3  about 50 percent of the time, close to 50 percent,
4  which is consistent with my affirmative study.
5  That's exactly the point.                    02:17:27
6  BY MR. REBLITZ-RICHARDSON:
7      Q. Are you done?
8      A. I hope so.
9      Q. I read your report to suggest that by
10 adding more questions, Mr. Keegan would get a higher   02:17:35
11 percentage.
12        Was that wrong?
13     A. Sorry.
14        You read -- so you read my report. Not
15 completely correctly.                        02:17:44
16     Q. What --
17     A. What I said was, in this methodology, one
18 could add questions to get a higher response, which
19 is what Keegan did. Not could do; did. He added
20 more questions until he got a higher number because   02:17:57
21 it's purely additive.
22     Q. And the questions he added concerned
23 non-Google websites, logged-out activity, and the
24 specific data that Google collects; fair?
25     MS. OLSON: Objection to the form.      02:18:11

Page 257:

1  BY MR. REBLITZ-RICHARDSON:
2      Q. I mean, you're familiar with the questions
3  he asked; right?
4      A. Yes.
5      Q. We already established they deal with   02:18:25
6  private browsing; right?
7      A. Well, so --
8      Q. Let's just look at them. You have a chart
9  in your report; right?
10     A. Yeah. Let's look at them.           02:18:32
11     Q. Page 12. All right.
12        All right.
13        What's Figure 1, on page 12?
14     A. Sorry?
15     Q. What's Figure 1 on page 12 of your     02:18:44
16 supplemental report?
17     A. Figure 1 seems to be the flowchart through
18 Keegan's study.
19     Q. Did you prepare this?
20     A. I prepared this.                     02:18:56
21     Q. Seems to be or it is?
22     A. Is.
23     Q. Okay. So this is the flowchart through
24 Mr. Seegan -- Mr. Keegan's rebuttal survey; right?
25     A. Well, the -- the -- the main question   02:19:08

**Page 258**

1  parts.
2   Q.  Right.
3   A.  Yes.
4   Q.  And so, you see there in Question 16,
5  Mr. Keegan asked about consent; right?      02:19:14
6   A.  Yes -- Question 16.  Well, you jumped one.
7  Consent.  He asked about consent.
8   Q.  And then with Question 17, you see --
9   A.  Wait, wait, wait.  Stop.
10      My point is it's not clear -- I don't    02:19:32
11  understand what consent means.  Why would responders
12  understand what consent means?
13   Q.  Did you test whether people understand
14  what consent means?
15   A.  No, because it's a legal question.  It's   02:19:44
16  not -- it has nothing to do with actual perceptions.
17   Q.  Did you ask any questions regarding
18  consent?
19   A.  No.  Exactly for that point.
20   Q.  And then Question 17, Mr. Keegan asked    02:19:55
21  about people visiting non-Google websites; right?
22      MS. OLSON:  Objection to the form.
23      THE WITNESS:  Question 17, he says, "Which
24  of the following best reflects your opinion?  I
25  believe that when I am in private browsing mode, I   02:20:13

**Page 259**

1  have given con-" -- sorry.  Question 17.  Which
2  question did you say?
3  BY MR. REBLITZ-RICHARDSON:
4   Q.  The next one, Question 17.
5   A.  Q17, "Which of the following best reflects   02:20:26
6  your opinion?  I believe when I'm in private
7  browsing mode, I've given consent to Google."  We
8  talked about that.  That's not Question 17.
9   Q.  Do you see right below that --
10   A.  Oh --                                    02:20:41
11      (Interruption in audio/video.)
12      THE COURT REPORTER:  Could you, please,
13  repeat what you said.  Do you see right below that?
14  BY MR. REBLITZ-RICHARDSON:
15   Q.  Do you see right below that, where it    02:20:46
16  states, "when I am visiting a non-Google website"?
17   A.  Yeah, but that's about consent again;
18  right?
19   Q.  Consent with respect to whether or not
20  you're visiting a non-Google website; right?   02:20:58
21   A.  Yes.
22   Q.  That's what Question 17 asks about, and if
23  it says -- do you see that?  The, like, red box off
24  to the left?
25   A.  Yep.                                     02:21:13

**Page 260**

1   Q.  So that's a Google website and then down
2  below, there's a non-Google website; right?
3   A.  That's right.
4   Q.  And so, this is the survey design here in
5  terms of distinguishing between whether it's a    02:21:21
6  Google website or a non-Google website; right?
7      MS. OLSON:  Objection to the form.
8      THE WITNESS:  But based on the survey
9  design, only for a very small sample of the original
10  sample.                                       02:21:33
11  BY MR. REBLITZ-RICHARDSON:
12   Q.  Right.
13   A.  But he dropped most of the people by now.
14   Q.  And did any of your survey questions asked
15  about -- ask about visiting a non-Google website?   02:21:40
16   A.  I think we established that.  I don't
17  explicitly ask for either Google or non-Google.  I
18  ask for websites.
19   Q.  Right.  And if you go to Question 18,
20  there's a question that elicits information as to   02:21:52
21  whether or not the respondent has a Google account;
22  right?
23   A.  That's right.
24   Q.  And none of your survey questions asked
25  about whether respondents had a Google account;   02:22:03

**Page 261**

1  right?
2   A.  That's right.
3   Q.  And then if you go to Question 19,
4  Mr. Keegan sought information regarding browsing
5  while signed out of any Google account; right?    02:22:08
6   A.  That's right.  But do you know how many
7  people responded to this question?
8   Q.  Again, none of your survey questions asked
9  about browsing while signed out of any Google
10  account; correct?                             02:22:27
11   A.  That's not the --
12      MS. OLSON:  Objection to the form.
13      THE WITNESS:  That's not the -- the
14  original question is that -- the sample size for the
15  people who responded to this in Keegan's report is   02:22:32
16  so small as to be reliable.
17  BY MR. REBLITZ-RICHARDSON:
18   Q.  I'm not asking about sample size.  I'm
19  asking whether you asked any questions of any of
20  your respondents concerning signed out private   02:22:39
21  browsing?
22   A.  I did not --
23      MS. OLSON:  Objection.  Asked and
24  answered.
25      (Interruption in audio/video.)    02:22:54

**Page 262**

1  THE COURT REPORTER: Excuse me. I'm
2  getting the objection -- I'm get- -- I'm not getting
3  the objection because of the speaking over, so could
4  you please repeat.
5  MS. OLSON: Yeah, just give me a little    02:22:58
6  bit more of a beat. Thank you.
7  I said, objection. Asked and answered.
8  BY MR. REBLITZ-RICHARDSON:
9  Q. Can you go, please, to page 19, paragraph
10  31.    02:23:08
11  A. Yes.
12  Q. Is one of your criticisms that Mr. Keegan
13  carried forward respondents who answered "don't
14  know" or "don't know, no opinion" in the main
15  questions?    02:23:31
16  A. My criticism is -- is a bit more elaborate
17  on that. But it's in part based on this logic, yes,
18  that if you pass people who have no idea, they never
19  drop, and you're left with most -- more people who
20  have no clue throughout the survey.    02:23:53
21  And I think I have an exhibit that said --
22  that shows exactly the proportion of that is -- is
23  growing. So the very small sample that -- that
24  Keegan carries over is -- is -- becomes
25  predominantly occupied by people who don't know or    02:24:08

**Page 263**

1  have no opinion, meaning they don't care.
2  Q. Do you know what happens to Mr. Keegan's
3  survey results for his rebuttal survey, if you
4  remove the don't knows or don't know, no opinion?
5  A. Well, I think you can do the math. If you    02:24:31
6  look at Table 2, what happens is, he very quickly
7  gets to a non-reliable sample. So calling that out
8  as results would be unprofessional.
9  Q. You reviewed Mr. Keegan's rebuttal report;
10  right?    02:24:54
11  A. I have.
12  Q. And do you recall that he had a section of
13  his report where he evaluated Google internal
14  documents?
15  A. Maybe. It's been a while.    02:25:06
16  Q. Do you recall that he had an exhibit that
17  included a summary of 40 Google internal documents?
18  A. I don't remember.
19  Q. Did you at least review those 40
20  documents?    02:25:16
21  A. I don't know if I reviewed all 40
22  documents. No.
23  Q. Do you know if you reviewed any of them?
24  A. I don't remember. If you want to put them
25  in front, I can take a look, but I don't remember.    02:25:26

**Page 264**

1  Q. Well, let's look at one.
2  MS. OLSON: Before we do that, it's been
3  about another hour. Could we take a quick break if
4  you're transitioning with exhibits?
5  MR. REBLITZ-RICHARDSON: Okay.    02:25:38
6  THE VIDEOGRAPHER: Are we off the record?
7  Are we going off the record?
8  MR. REBLITZ-RICHARDSON: Yes, please.
9  THE VIDEOGRAPHER: Going off the record,
10  the time is 2:25 p.m.    02:25:48
11  (Short recess taken.)
12  THE VIDEOGRAPHER: Back on the record, the
13  time is 2:34 p.m.
14  BY MR. REBLITZ-RICHARDSON:
15  Q. Professor Amir, welcome back.    02:34:46
16  A. Thank you.
17  Q. Can we go to paragraph 36 of your
18  supplemental report, which is on page 24.
19  A. Give me a second.
20  36, I'm there.    02:35:12
21  Q. Would you, please, read aloud the second
22  sentence in that paragraph.
23  A. You're talking about the "one study"?
24  Q. Correct.
25  A. [redacted]    02:35:35

**Page 265**

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted] [As read].
5  Q. Did you write that sentence?    02:35:55
6  A. Yes.
7  Q. Is that an accurate statement?
8  A. I hope so. It's from a document I cite.
9  It's page 7554.
10  Q. Did you review that document?    02:36:05
11  A. Yes, otherwise, I wouldn't cite it.
12  Q. Okay. Let's -- let's bring up that
13  document. This is GOOG-BRWN-00477546, which is
14  being marked as Exhibit 10. And that's Tab 13, for
15  Miguel.    02:36:32
16  (Amir Deposition Exhibit 10 was marked
17  electronically.)
18  A. Got it.
19  BY MR. REBLITZ-RICHARDSON:
20  Q. All right.    02:36:44
21  Is this Exhibit 10 the document cited in
22  Footnote 34 of your report?
23  A. '77546, hold on.
24  I need to switch between things. Sorry.
25  Q. No problem.    02:37:07

```
 1           CERTIFICATE OF REPORTER
 2
 3        I, Hanna Kim, a Certified Shorthand
 4  Reporter, do hereby certify:
 5        That prior to being examined, the witness
 6  in the foregoing proceedings was by me duly sworn to
 7  testify to the truth, the whole truth, and nothing
 8  but the truth;
 9        That said proceedings were taken before me
10  at the time and place therein set forth remotely and
11  were taken down by me in shorthand and thereafter
12  transcribed into typewriting under my direction and
    supervision;
13        I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17        Further, that if the foregoing pertains to
18  the original transcript of a deposition in a federal
19  case,                   proceedings, review
20  of th                   not requested.
21                          e hereunto
22  subsc                   lay of August, 2022.
23
24
25       Hanna Kim, CLR, CSR No. 13083
                                              Page 306
```

```
 1  ALYSSA "ALY" OLSON, ESQ.
 2  alyolson@quinnemanuel.com
 3                  August 19, 2022
 4  RE: BROWN vs. GOOGLE LLC
 5  AUGUST 16, 2022, ON AMIR, PH.D., JOB NO. 5344524
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25
                                              Page 307
```

```
 1  xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, noting the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  __ Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 308
```

```
 1                    JURAT
 2
 3        I, ON AMIR, PH.D., do hereby certify under
 4  penalty of perjury that I have read the foregoing
 5  transcript of my deposition taken remotely on
 6  Tuesday, August 16, 2022; that I have made such
 7  corrections as appear noted herein in ink, initialed
 8  by me; that my testimony as contained herein, as
 9  corrected, is true and correct.
10
11      Dated this _____ day of _____, 2022,
12  at _____.
13
14
15
16          _____
17               ON AMIR, PH.D.
18
19
20
21
22
23
24
25
                                              Page 309
```