# EXHIBIT 1

# Redacted Version of Document Sought to be Sealed

```
 1         UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
 2              OAKLAND DIVISION
 3    CHASOM BROWN,
 4           Plaintiff,    Case No.
      vs.
 5                   4:20-cv-03664-YGR-SVK
 6    GOOGLE LLC,
 7           Defendant.
 8    ***********************************
                    CONFIDENTIAL
 9                   VOLUME II
       CONTINUED ZOOM VIDEOTAPED DEPOSITION OF
10                JONATHAN HOCHMAN
                   July 21, 2022
11                  10:09 a.m.
      ***************************************
12
13
14    TAKEN BY:
15       JOSEF ANSORGE, ESQ.
         ATTORNEY FOR DEFENDANT
16
17    REPORTED BY:
18       BELLE VIVIENNE, RPR, CRR, NJ-CRR,
         WA/CO/NM-CCR
19       NATIONALLY CERTIFIED REALTIME
         COURT REPORTER
20       VERITEXT LEGAL SOLUTIONS
         JOB NO. 5312353
21       866.299.5127
22
23
24
25
```

```
                    APPEARANCES
FOR THE PLAINTIFF:
     MARK MAO
     BOIES SCHILLER FLEXNER LLP
     44 Montgomery Street, 41st Floor
     San Francisco, California 94104
     415 293 6800
     mmao@bsfllp.com

     RYAN MCGEE
     MORGAN & MORGAN
     201 North Franklin Street
     7th Floor
     Tampa, Florida 33602
     813 223 0931
     rmcgee@forthepeople.com

     ALEXANDER FRAWLEY
     IAN CROSBY
     SUSMAN GODFREY
     1301 Avenue of the Americas
     32nd Floor
     New York, New York 10019
     Afrawley@susmangodfrey.com

COUNSEL FOR PLAINTIFF IN CALHOUN MATTER:
     ADAM PROM
     DICELLO LEVITT & GUTZLER
     10 North Dearborn Street, Sixth Floor
     Chicago, Illinois 60602
     312 214 7900
     aprom@dicellolevitt.com

COUNSEL FOR DEFENDANT:
     JOSEF ANSORGE
     JOHN WILSON, IV
     QUINN EMANUEL URQUHART & SULLIVAN LLP
     51 Madison Avenue
     New York, New York 10010
     josefansorge@quinnemanuel.com
     CARL SPILLY
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
     1300 I Street, NW, Suite 900
     Washington, D C  20005
     202 538 8277
     carlspilly@quinnemanuel.com
```
Page 366

```
APPEARANCES: (Continued)
     CRYSTAL NIX-HINES
     QUINN EMANUEL URQUHART & SULLIVAN LLP
     865 South Figueroa Street, 10th Floor
     Los Angeles, California 90017
     crystalnixhines@quinnemanuel.com

     VIDEOGRAPHER:
     Sean Grant

     ALSO PRESENT:
     Konstantinos Psounis, Ph.D.
     Julie Burns
     John Wilson, IV - Quinn Emanuel
```
Page 367

                    I N D E X

Testimony of:
    JONATHAN HOCHMAN
MR. ANSORGE.............................. 372


                    E X H I B I T S

NO.          DESCRIPTION                   PAGE
Exhibit 17   Appendix F.................374
Exhibit 18   Dr. Glen Bernston's
             deposition..................379
Exhibit 19   Excerpt from Glen
             Berston's deposition........384
Exhibit 20   Two-page policy document...414
Exhibit 21   Log Data Usage Rules.......439
Exhibit 22   Article entitled Privacy
             Threats in Intimate
             Relationships..............496
Exhibit 24   Understanding Dual
             Stacking of IPv4 and PIv6
             Unicast Addresses..........503

Page 368

                    E X H I B I T S (Continued.)

NO.          DESCRIPTION                   PAGE
Exhibit 25   Ad Personalization
             Settings...................512
Exhibit 26   Expert Report of
             Konstantinos Psounis.......520
Exhibit 29   Document Bates numbered
             GOOG-BRWN-00630517.........558
Exhibit 30   Document Bates numbered
             GOOG-CABR03923580..........561
Exhibit 31   Document Bates numbered
             GOOG-CABR-00894408.........567
Exhibit 32   PII document...............568

Page 369

2 (Pages 366 - 369)

```
 1        Policy is nice.  It's nice to      12:04:10
 2   have a policy to -- to say that you're   12:04:12
 3   doing the right thing.  I don't know what 12:04:15
 4   exemptions exist.  I don't know how      12:04:16
 5   closely this policy's been followed in   12:04:18
 6   practice, and the policy can't control for 12:04:22
 7   things like legal risk, data breaches.  As 12:04:27
 8   I said before, there's -- there's a great 12:04:31
 9   danger in logging sensitive data.        12:04:34
10       Q.   Mr. Hochman, in reaching the    12:04:39
11   conclusions that you have proffered in   12:04:41
12   this case, did you investigate which     12:04:43
13   internal Google policies have been in    12:04:47
14   place over the course of the class period? 12:04:49
15       A.   I think I alluded to this in a  12:04:53
16   prior answer, so I'll point to that and  12:04:55
17   add, for security and privacy, as a      12:04:58
18   computer scientist -- I'm not a          12:05:04
19   sociologist.  I'm not an expert on       12:05:08
20   business management.  I'm talking about  12:05:10
21   data security and privacy.               12:05:12
22            And from that standpoint, it's a 12:05:14
23   question of what could be done with things 12:05:16
24   the way they are stored and the way      12:05:18
25   they're retained.  Policy is all fine and 12:05:20
```
Page 446

```
 1   good, but there have been a huge number of 12:05:24
 2   examples where policy isn't followed by  12:05:30
 3   either an internal actor or an external  12:05:32
 4   actor.  There are an enormous number of  12:05:35
 5   data breaches.  Very embarrassing to large 12:05:37
 6   companies and it's sort of only a matter 12:05:39
 7   of time until all this data gets stolen  12:05:41
 8   and exploited by someone hostile.        12:05:43
 9       Q.   Well, Mr. Hochman, is it fair to 12:05:51
10   say that what Google's internal policy is 12:05:54
11   has no bearing on the conclusions that   12:05:56
12   you've reached in this case?             12:06:00
13       A.   I am not, off the top of my     12:06:03
14   head, thinking of an opinion I gave which 12:06:06
15   talks about policy.  I'm talking about   12:06:09
16   what Google is doing versus what they've 12:06:15
17   told people they're doing.  And I've also, 12:06:18
18   I think, highlighted some of the ways that 12:06:25
19   the data can be joined together.         12:06:27
20            And the fact that Google says   12:06:30
21   "don't join the data together," that's all 12:06:32
22   nice, but that's not -- that's not       12:06:35
23   security.  That's just policy.           12:06:40
24       Q.   Turn back to the page ending    12:06:47
25   with the Bates designation 006.  We were 12:06:49
```
Page 447

```
 1   talking about the "Re-Identifying logs   12:06:52
 2   data" section.  And let me know if -- when 12:06:55
 3   you're there.  And in particular, the    12:06:58
 4   first bullet that I read out earlier in  12:07:00
 5   red that begins with "you must not       12:07:03
 6   re-identify."                            12:07:06
 7            Do you see that?                12:07:06
 8       A.   Yes, I do see that Google       12:07:09
 9   recognizes the danger of reidentification. 12:07:11
10       Q.   And my question to you,         12:07:14
11   Mr. Hochman, is what is reidentify?      12:07:17
12       A.   Reidentify.  So I'll give you a 12:07:24
13   quick summary of it.  If you have a record 12:07:26
14   that looks like it's anonymous data,     12:07:28
15   reidentifying means figuring out         12:07:31
16   specifically who that data is associated 12:07:34
17   with or what entity that data is         12:07:37
18   associated with.                         12:07:38
19       Q.   Would taking logged-out private 12:07:42
20   browsing data at issue in this case and  12:07:46
21   then using that to reidentify individuals 12:07:49
22   who may have been associated with the    12:07:53
23   browsing be reidentification in your     12:07:55
24   opinion?                                 12:08:01
25            MR. MAO:  Objection to the form 12:08:02
```
Page 448

```
 1   of the question.                         12:08:03
 2            Please, go ahead.               12:08:04
 3       A.   Sure.  If you take some         12:08:05
 4   logged-out browsing data and you figure  12:08:07
 5   out, for example, the GAIA ID of that    12:08:10
 6   person, or you -- you take the -- the IP 12:08:15
 7   address and user agent, which essentially 12:08:20
 8   is identifying, and you -- you track down 12:08:22
 9   the person, I think if you've identified 12:08:25
10   someone based on an otherwise anonymous  12:08:32
11   record, it's reidentification.           12:08:35
12            Now, that raises sort of a      12:08:37
13   philosophical question.  If Google is    12:08:39
14   logging this private browsing activity   12:08:41
15   with the user agent and the IP address,  12:08:45
16   then it's arguable that that's not really 12:08:51
17   an anonymous record because it's already 12:08:53
18   identified by that data.                 12:08:56
19   BY MR. ANSORGE::                         12:08:56
20       Q.   Let's turn to the second        12:09:02
21   sentence, where it says "If a log does not 12:09:03
22   include GAIA IDs or similar authenticated 12:09:05
23   Personally Identifiable Information, you 12:09:10
24   must not re-identify the log records in  12:09:14
25   any way."                                12:09:17
```
Page 449

```
 1        Did I read that out correctly?   12:09:17
 2     A.   Just a second.  So this is --   12:09:20
 3  this is a very carefully crafted sentence   12:09:28
 4  here with some gymnastics in it because it   12:09:31
 5  talks about -- in limitations, it talks   12:09:34
 6  about a log that does not include GAIA   12:09:35
 7  IDs -- I'm sorry.  I'm going too far.   12:09:39
 8        Yes, I think you read it   12:09:44
 9  correctly.   12:09:45
10     Q.   I believe yesterday you   12:09:45
11  testified that the data at issue in this   12:09:46
12  case is stored in B logs, but that it   12:09:48
13  could be joined with P logs.   12:09:52
14        Do you recall that?   12:09:54
15     A.   I think I said something to that   12:09:55
16  effect.  Whatever I said is -- is on the   12:09:57
17  record, and that's my answer again.   12:10:00
18     Q.   So does a B log contain GAIA   12:10:07
19  IDs?   12:10:11
20     A.   B log is a Biscotti log.  I   12:10:14
21  don't recall instances of B logs   12:10:19
22  containing GAIA IDs, although I do know   12:10:22
23  that GAIA logs, which are P logs, may   12:10:25
24  contain sort of blinded Biscotti IDs or   12:10:30
25  encrypted Biscotti IDs.   12:10:38
                                              Page 450
```

```
 1        And I think we are going to have   12:10:41
 2  to be really careful when we review this   12:10:42
 3  transcript because "B" and "P" sound very   12:10:45
 4  similar.   12:10:47
 5     Q.   Turn to the next bullet below   12:10:47
 6  where it states "You must not correlate   12:10:49
 7  authenticated and non-authenticated   12:10:51
 8  information."   12:10:52
 9        What's your understanding of   12:10:52
10  nonauthenticated information, Mr. Hochman?   12:10:56
11     A.   My understanding of that is   12:10:58
12  logged out.   12:11:00
13     Q.   So would the data at issue in   12:11:03
14  this case in the private browsing data   12:11:07
15  when users do not log in during the   12:11:11
16  private browsing session be authenticated   12:11:13
17  or unauthenticated information?   12:11:16
18        MR. MAO:  Objection, asked and   12:11:18
19     answered.   12:11:19
20     A.   So if the user is not logged in,   12:11:24
21  I -- I understand unauthenticated to mean   12:11:28
22  not logged in at that moment.   12:11:35
23  BY MR. ANSORGE::   12:11:41
24     Q.   If you turn to the third bullet,   12:11:42
25  please.  You see where it says "You must   12:11:43
                                              Page 451
```

```
 1  not fingerprint users for the purpose of   12:11:45
 2  associating a user's activity over time or   12:11:47
 3  across contexts ("tracking") or   12:11:51
 4  reidentifying them when you do not have   12:11:55
 5  access to actual identifiers such as   12:11:59
 6  cookies or GAIA IDs."   12:12:02
 7        Do you see that?   12:12:07
 8     A.   I do see that.   12:12:07
 9     Q.   And what's your understanding of   12:12:08
10  cookies and GAIA IDs that are being   12:12:11
11  referred to here?   12:12:16
12     A.   Cookies are cookies, and the   12:12:18
13  GAIA ID is the logged-in user ID.  And my   12:12:20
14  understanding of the sentence is that   12:12:24
15  fingerprinting would then be allowed if   12:12:26
16  you have access to these actual   12:12:28
17  identifiers.   12:12:30
18     Q.   So your understanding of this   12:12:32
19  policy is that if a person has access to   12:12:34
20  GAIA ID, then they're permitted to   12:12:41
21  fingerprint them for reidentification?   12:12:44
22     A.   That's one scenario where it's   12:12:47
23  permitted.  Another scenario is when   12:12:48
24  there -- they have access to actual   12:12:51
25  identifiers such as cookies.  And I don't   12:12:54
                                              Page 452
```

```
 1  see any limitation placed on cookies in   12:12:57
 2  this sentence.   12:13:00
 3        So I'm aware that there are   12:13:01
 4  logged-out cookies like Biscotti and   12:13:03
 5  Zwieback.   12:13:06
 6     Q.   I think we can put this exhibit   12:13:08
 7  to the side for now.  Thank you,   12:13:16
 8  Mr. Hochman.   12:13:18
 9     A.   Okay.   12:13:24
10     Q.   You can turn to Exhibit 1, which   12:13:25
11  is your opening report at page 94,   12:13:28
12  paragraph 226.  And let me know once   12:13:33
13  you're there.   12:13:35
14        MR. MAO:  Sorry, quick   12:13:40
15     procedural question.  Are we taking   12:13:41
16     suggestion from your team that we put   12:13:44
17     Exhibit 1 into this deposition?   12:13:46
18        MR. ANSORGE:  Can we go off the   12:13:51
19     record to work it out?  I believe the   12:13:52
20     court reporter had an opinion on it   12:13:53
21     too.   12:13:55
22        MR. MAO:  Oh, okay.   12:13:56
23        THE VIDEOGRAPHER:  Do you want   12:13:59
24     to go off, Counsel?   12:13:59
25        MR. MAO:  Sure.   12:14:01
                                              Page 453
```

Page 470

```
 1   used to look in the -- the logs of --      12:39:20
 2   containing logged-out activity and see if   12:39:25
 3   there were matching examples within some    12:39:28
 4   reasonable time frame. You know, I          12:39:31
 5   recognize that IP addresses sometimes get   12:39:34
 6   changed, but if you can find activity       12:39:36
 7   temporally close together, you can infer    12:39:40
 8   that that's the same person. So there       12:39:43
 9   would be a way for Google to verify that    12:39:45
10   claim sometimes.                            12:39:49
11      Q.   And have you done any work to       12:39:49
12   quantify when it might be able to verify a  12:39:51
13   claim and when it might not be able to      12:39:55
14   verify a claim?                             12:39:58
15      A.   It would be difficult for me to     12:39:58
16   do that work with the restricted data that  12:40:00
17   Google produced. If Google had produced     12:40:08
18   more of the data that we requested, it      12:40:09
19   might have been possible to do more         12:40:11
20   analysis.                                   12:40:12
21      Q.   When you're saying more data,       12:40:12
22   Mr. Hochman, do you mean non-plaintiff      12:40:14
23   class member data or are you referring to   12:40:17
24   something else?                             12:40:19
25      A.   I'm referring essentially to all    12:40:19
```

Page 471

```
 1   the data that was requested that wasn't     12:40:21
 2   produced.                                   12:40:24
 3      Q.   Are you referring to specific       12:40:25
 4   plaintiff's data that was not produced      12:40:27
 5   that --                                     12:40:30
 6      A.   I think --                          12:40:31
 7           MR. MAO: Objection, asked and       12:40:31
 8       answered.                               12:40:32
 9      A.   Yeah. As I said, what I -- what     12:40:33
10   I said was all the data that was asked for  12:40:39
11   that wasn't produced, so I don't want to    12:40:41
12   be criticized for not doing some analysis   12:40:45
13   which I couldn't do because I wasn't given  12:40:47
14   the data to do it. That's sort of           12:40:50
15   Catch-22. And --                            12:40:53
16   BY MR. ANSORGE::                            12:40:54
17      Q.   Yeah.                               12:40:54
18      A.   -- and I appreciate that it may     12:40:55
19   be painful for you to hear that             12:40:57
20   explanation, but that's the fact of it.     12:40:59
21      Q.   Mr. Hochman, I'm just trying to     12:41:03
22   understand the bases for your opinions in   12:41:04
23   this case. And my question was, do you      12:41:06
24   believe that there's some specific          12:41:10
25   plaintiffs' data that has not been          12:41:12
```

Page 472

```
 1   produced to you that you would have         12:41:15
 2   benefitted from and which you could have    12:41:17
 3   used to validate your analysis?             12:41:19
 4           MR. MAO: Objection, the             12:41:22
 5       document speaks for itself.             12:41:24
 6      A.   I like the way I -- I said it       12:41:25
 7   before, that what I'm looking for is all    12:41:27
 8   the data that was requested that wasn't     12:41:29
 9   produced that constrained my ability to do  12:41:31
10   analysis.                                   12:41:34
11           The -- the lack of production       12:41:35
12   hindered me, and, you know, I can't say     12:41:37
13   for sure what I could have done with        12:41:42
14   unknown data that I wasn't given.           12:41:44
15   BY MR. ANSORGE::                            12:41:44
16      Q.   Yes, Mr. Hochman. My question       12:41:49
17   was a bit different. It relates to, do      12:41:51
18   you believe that there's some specific      12:41:55
19   plaintiff data that you or plaintiffs have  12:41:57
20   requested and that they have not received,  12:42:01
21   and that if you had received it, you would  12:42:04
22   have been able to validate your analysis?   12:42:06
23           MR. MAO: Objection, asked and       12:42:09
24       answered.                               12:42:10
25      A.   If I said something about it in     12:42:14
```

Page 473

```
 1   my report, then it stands. And otherwise,   12:42:15
 2   I have to answer I don't know because if I  12:42:20
 3   haven't seen some data -- if we've          12:42:23
 4   requested some data and haven't received    12:42:25
 5   it, then I can't know the utility of data   12:42:27
 6   without actually seeing it.                 12:42:30
 7           Maybe there's some extra fields     12:42:32
 8   that we still haven't been given that       12:42:33
 9   would be very informative, and I don't      12:42:37
10   know what to expect within the unknowns.    12:42:39
11   These are literally unknown unknowns.       12:42:41
12   BY MR. ANSORGE::                            12:42:41
13      Q.   And as you sit here before us,      12:42:46
14   you're not aware of any particular          12:42:48
15   plaintiffs' data that you've requested and  12:42:50
16   have not received; is that correct?         12:42:52
17           MR. MAO: Objection, asked and       12:42:55
18       answered, misstates his testimony.      12:42:56
19      A.   I -- I don't have some specific     12:43:01
20   data in mind, but I wouldn't expect that I  12:43:03
21   would because I don't know what the         12:43:06
22   unknown unknowns are.                       12:43:08
23   BY MR. ANSORGE::                            12:43:08
24      Q.   Mr. Hochman, do you agree that      12:43:12
25   people living in the same household may     12:43:13
```

```
 1  share computers, phones, and other      12:43:16
 2  connected devices?                       12:43:18
 3      A.  This is a perennial issue for   12:43:21
 4  online businesses.  This is something that  12:43:25
 5  is dealt with all the time.  I would point  12:43:27
 6  you to my prior answers that talk about     12:43:31
 7  this.                                    12:43:32
 8          I would also point you to my    12:43:33
 9  additional statement that Google in its  12:43:34
10  fingerprinting policy considers, you know,  12:43:38
11  ████████████████████                     12:43:41
12  ████████████████████████████             12:43:44
13  ██████████████████████                   12:43:47
14  ██.                                      12:43:50
15          So that's -- you know, Google's  12:43:51
16  ████████████████████████,                12:43:54
17  and I don't know many households that have  12:43:55
18  ████████ people in them.                 12:43:57
19      Q.  You don't think that might be a  12:44:00
20  policy that -- to prevent identification?  12:44:02
21  Do you believe that as a statement of    12:44:04
22  fact, that if ████████ people share an   12:44:06
23  identifier, they're identified?          12:44:08
24      A.  I think --                       12:44:12
25          MR. MAO:  I'm sorry, objection   12:44:13
                                              Page 474
```

```
 1  to the form of the question, asked and   12:44:14
 2  answered.                                12:44:14
 3      A.  I think it highlights the danger  12:44:15
 4  of -- of what we might call an           12:44:18
 5  identification of -- of a group.  Google  12:44:24
 6  is considering under ████████ to be some  12:44:27
 7  sort of small group.                     12:44:29
 8          Once you narrow things down that  12:44:30
 9  much, in any sort of case where somebody  12:44:32
10  is trying to identify a user, and I've    12:44:38
11  said this before in prior answers, there's  12:44:40
12  always some additional information       12:44:44
13  available.                               12:44:46
14          There are always some            12:44:47
15  circumstances around that, some other    12:44:47
16  things that are known, and those can be  12:44:49
17  used in a process of elimination to      12:44:52
18  whittle down any small group down to     12:44:55
19  identify the individual.                 12:44:57
20          And I know that Dave Nelson will  12:44:58
21  come forward and offer to testify that the  12:45:01
22  FBI does that all the time, that they're  12:45:04
23  not hindered by this scenario of multiple  12:45:08
24  people in a household.  It's a red herring  12:45:11
25  issue.                                   12:45:15
                                              Page 475
```

```
 1          It's a losing issue that you're   12:45:16
 2  trying to argue.  I would encourage you to  12:45:17
 3  just drop it because it's really           12:45:20
 4  frivolous.                                 12:45:22
 5  BY MR. ANSORGE::                           12:45:22
 6      Q.  Mr. Hochman, in your report, do   12:45:24
 7  you cite any studies that analyze the     12:45:26
 8  frequency of device sharing?              12:45:27
 9      A.  I'm not aware of any that I have  12:45:32
10  cited.                                    12:45:34
11      Q.  And in your report, you do not    12:45:36
12  discuss device sharing at all; isn't that  12:45:38
13  correct?                                  12:45:41
14          MR. MAO:  Objection, misstates    12:45:42
15      his testimony.  The document speaks   12:45:43
16      for itself.                           12:45:46
17      A.  Yeah, whatever I said in my       12:45:47
18  report stands.                            12:45:48
19          And I would just further add     12:45:50
20  that I'm aware, and have always been      12:45:52
21  aware, of the issue and the potential for  12:45:54
22  device sharing.  Same as Google is.  And  12:45:56
23  Google still gets over it when they do    12:45:59
24  their, you know, allow log-ins, when they  12:46:02
25  allow conversion tracking.                12:46:05
                                              Page 476
```

```
 1          You know, Google, when someone    12:46:09
 2  logs in to your account, how do they know  12:46:11
 3  it's actually you and not someone else?   12:46:15
 4  They don't -- they don't worry about it   12:46:17
 5  too much.  It's just -- there's so much   12:46:20
 6  that you can do.  And, you know, that's   12:46:21
 7  the state of online identification.       12:46:24
 8  BY MR. ANSORGE::                          12:46:31
 9      Q.  Mr. Hochman, can you point to    12:46:31
10  any paragraphs in your report in which you  12:46:32
11  discuss device sharing?                   12:46:34
12      A.  I'm not sure that I've discussed  12:46:38
13  device sharing, but I've talked about this  12:46:40
14  before and given you a bunch of answers on  12:46:42
15  this question.  So I will reiterate by    12:46:44
16  reference all those answers, and further  12:46:47
17  add that the -- I'm aware of the potential  12:46:50
18  for device sharing.  And this is nothing  12:46:53
19  surprising or new or that alters any of my  12:46:55
20  opinions.                                 12:46:59
21      Q.  And, Mr. Hochman, two users who   12:47:01
22  share a single device that uses the same  12:47:03
23  Wi-Fi connection will have the same IP    12:47:08
24  address; is that correct?                 12:47:10
25          MR. MAO:  Objection, incomplete   12:47:11
                                              Page 477
```

**Page 522**

```
 1   questions.                                  14:08:01
 2   BY MR. ANSORGE::                            14:08:01
 3      Q.  Is this the appendice you were       14:08:13
 4   referring to yesterday, Mr. Hochman?        14:08:16
 5      A.  I think that I was referring to     14:08:19
 6   the section in his report, which I think    14:08:21
 7   then may reference this appendix.           14:08:23
 8      Q.  Have you reviewed this appendix      14:08:28
 9   on entropy?                                 14:08:29
10      A.  Yes, I think I've looked at it.      14:08:31
11      Q.  And earlier when you stated that     14:08:35
12   you disagree with all of his opinions that  14:08:36
13   relate to your work, were you thinking of   14:08:39
14   any specific opinions that are expressed    14:08:42
15   in this appendix?                           14:08:45
16      A.  When I made that comment, I'm        14:08:50
17   thinking of the main opinions that are      14:08:52
18   listed in his executive summary.  So if     14:08:54
19   you were to go to the executive summary in  14:08:56
20   his report, I could show you the opinions   14:08:58
21   that I disagree with.                       14:09:00
22          I'm not necessarily disagreeing      14:09:04
23   with his summary of math and information    14:09:06
24   theory.  I think my criticism of this is    14:09:10
25   that it's -- it's irrelevant to the issues  14:09:14
```

**Page 523**

```
 1   at hand, that it's unnecessary and that     14:09:17
 2   it's -- has a greater tendency to confuse   14:09:22
 3   than to enlighten.                          14:09:28
 4      Q.  Why do you believe --                14:09:30
 5          MR. MAO:  He's asked for the         14:09:34
 6      document, Counsel.                       14:09:35
 7          MR. ANSORGE:  I don't think he       14:09:37
 8      has, Mr. Mao, but I'm asking questions   14:09:38
 9      about this now, and I'd really           14:09:39
10      appreciate if you wouldn't interrupt     14:09:41
11      me in my line of questioning.            14:09:43
12   BY MR. ANSORGE::                            14:09:43
13      Q.  Mr. Hochman, why do you believe      14:09:45
14   that an appendice setting out how entropy   14:09:46
15   be calculated is irrelevant to this case?   14:09:52
16      A.  Well, okay, I'm happy to answer      14:09:55
17   that question.  I would formally request    14:09:59
18   the whole Psounis report because I may      14:10:01
19   want to refer to things in that report in   14:10:04
20   order to explain my answer to that          14:10:07
21   question.  So I -- I don't have an          14:10:09
22   intention of reading the whole report       14:10:12
23   while you wait around.  I'm not looking to  14:10:13
24   do that.                                    14:10:16
25      Q.  Yeah, maybe we can get to that       14:10:18
```

**Page 524**

```
 1   part later, but let me first ask you a few  14:10:20
 2   questions about this appendice, if you      14:10:24
 3   don't mind.                                 14:10:28
 4          MR. MAO:  Subject to his             14:10:28
 5      request.  So any answer you get, I may   14:10:30
 6      move to just throw out.  Up to you.      14:10:32
 7          MR. ANSORGE:  Mr. Mao, are you       14:10:33
 8      instructing the witness not to respond   14:10:35
 9      to my questions?                         14:10:37
10          MR. MAO:  Do you want me to read     14:10:37
11      back my answer on the record or are      14:10:38
12      you just asking me?                      14:10:40
13          MR. ANSORGE:  I'm asking you         14:10:41
14      because I believe you're aware that      14:10:42
15      there's -- only very specific bases      14:10:44
16      are appropriate for instructing a        14:10:46
17      witness not to answer a question.  And   14:10:48
18      here is a document that Mr. Hochman      14:10:49
19      referred to yesterday.  It's written     14:10:51
20      by an expert Mr. Hochman referred to     14:10:53
21      this morning.  It is on a topic that     14:10:55
22      we have been discussing for the last     14:10:57
23      two days.  I believe it's appropriate    14:10:58
24      for us to ask some questions about it.   14:11:01
25   BY MR. ANSORGE::                            14:11:02
```

**Page 525**

```
 1      Q.  Mr. Hochman, have you reviewed       14:11:03
 2   this document?                              14:11:04
 3      A.  Actually, I think you -- you are     14:11:06
 4   of a erroneous perception, which is that I  14:11:08
 5   was referring to this document because I    14:11:13
 6   was actually thinking about his expert      14:11:15
 7   report, the section where he begins         14:11:17
 8   talking about entropy.  And that section    14:11:18
 9   is then -- I guess references this, which   14:11:22
10   provides a very thorough discussion of the  14:11:25
11   math.                                       14:11:28
12          And my criticism is not that         14:11:29
13   he's somehow gotten the math wrong.  My --  14:11:31
14   my point, as I said yesterday, is that his  14:11:33
15   analysis here is completely beside the      14:11:36
16   point.  He seems to have missed the boat    14:11:38
17   on what I was doing in my analysis, and     14:11:40
18   he's run off into the blue with this long   14:11:43
19   exposition on entropy, which is             14:11:48
20   unnecessary.                                14:11:50
21      Q.  Well, and then this might be a       14:11:52
22   very short module, Mr. Hochman.  Is it      14:11:53
23   fair to say that you haven't identified     14:11:55
24   any errors in appendix E to Dr. Psounis'    14:11:57
25   rebuttal report?                            14:12:04
```

41 (Pages 522 - 525)

**Page 526**

```
 1        MR. MAO: Same objection. The       14:12:05
 2   witness has requested the entire         14:12:10
 3   document. You're refusing to give it    14:12:12
 4   to him. And secondly, misstates his     14:12:14
 5   testimony.                               14:12:17
 6      A.  I think there may be errors in   14:12:25
 7   here. I'd have to go give it a thorough 14:12:27
 8   read-through to point them out because I 14:12:30
 9   think he makes his sort of neutral      14:12:32
10   mathematical explanation with some faulty 14:12:34
11   conclusions. So I'd have to go through it 14:12:36
12   carefully to make sure I diagnose it    14:12:38
13   properly.                                14:12:40
14          And I'd also -- before I would   14:12:40
15   even do that, I would want to see the main 14:12:42
16   report so I could see what he said in the 14:12:44
17   main report before he dives into this   14:12:45
18   because that section in the main report is 14:12:50
19   context for this.                        14:12:51
20   BY MR. ANSORGE::                         14:12:51
21      Q.  And we'll see if we can load    14:12:54
22   that, but I'd like to ask you some      14:12:58
23   specific questions about these, not    14:13:00
24   general ones?                            14:13:01
25          Do you --                         14:13:02
```

**Page 527**

```
 1        MR. MAO: Same objections.         14:13:02
 2        MR. ANSORGE: Understood. We're    14:13:03
 3   going to see if we can get the report   14:13:04
 4   with, I believe, Mr. Hochman's          14:13:08
 5   assurance that he would not read each   14:13:09
 6   line because I want us to be able to    14:13:13
 7   move more quickly than we did this      14:13:13
 8   morning, Mr. Hochman.                   14:13:13
 9        (Crosstalk.)                       14:13:13
10        MR. MAO: Go ahead.                 14:13:13
11      A.  Mr. Ansorge, I actually enjoy   14:13:19
12   talking to you about the substance of this 14:13:20
13   case. I'm excited to continue talking to 14:13:22
14   you about substantive issues. I'm not   14:13:24
15   looking to waste your time.             14:13:25
16        MR. ANSORGE: Excellent. Could     14:13:25
17   you please --                           14:13:27
18        MR. MAO: At the same time --      14:13:27
19   stop. Stop. Stop. At the same time,     14:13:29
20   he is entitled to do what he needs to   14:13:30
21   do in order to read your -- in order    14:13:32
22   to be able to answer your question.     14:13:33
23   Okay?                                   14:13:34
24        MR. ANSORGE: And we're seeing     14:13:37
25   if we can load the report, but I would  14:13:38
```

**Page 528**

```
 1   like to ask a few questions about this  14:13:40
 2   appendix.                                14:13:42
 3   BY MR. ANSORGE::                         14:13:44
 4      Q.  Mr. Hochman, could you please   14:13:46
 5   turn to paragraphs 43 and 44 of         14:13:47
 6   Exhibit 26? And let me know once you're 14:13:52
 7   there.                                   14:13:54
 8      A.  If we're going to do this, then 14:13:54
 9   what I'm going to do is I'm going to start 14:13:57
10   reading this appendix. Okay? I'll try to 14:13:58
11   read it as quickly as I can. And while  14:14:01
12   I'm doing that, if you load the report,  14:14:03
13   then we're not wasting time.             14:14:05
14          And after I've had a read       14:14:08
15   through this, I'll see if I can answer  14:14:09
16   your questions, okay? I at least have to 14:14:12
17   go skim the whole thing to see what's in 14:14:15
18   here to refresh my memory.               14:14:17
19      Q.  Please do. I believe the report 14:14:18
20   is loaded as well, but please skim this  14:14:20
21   Exhibit 26.                              14:14:22
22      A.  Okay. Let me just have a look.  14:14:24
23   If the report's loaded, I might start   14:14:26
24   there.                                   14:14:28
25          Okay. Great. The report is     14:14:30
```

**Page 529**

```
 1   loaded.                                  14:14:32
 2   BY MR. ANSORGE::                         14:14:43
 3      Q.  And my questions, Mr. Hochman,  14:14:43
 4   are about appendix E of the report --    14:14:44
 5      A.  Why don't you -- why don't --   14:14:44
 6      Q.  -- that is loaded as Exhibit 26. 14:14:55
 7        (Reporter clarification.)         14:14:59
 8        MR. MAO: Mr. Hochman, if you     14:14:59
 9   need to read what you need to read to    14:15:00
10   answer the question, please do so.       14:15:02
11      A.  I will take time to read,      14:15:05
12   Mr. Ansorge, but first, why don't you ask 14:15:06
13   the question because then I'll know what 14:15:09
14   I'm looking for, and that's more         14:15:12
15   efficient -- that way, I can skip over  14:15:13
16   sections that aren't relevant.           14:15:16
17   BY MR. ANSORGE::                         14:15:18
18      Q.  Have you read paragraphs 43 and 14:15:18
19   44 of Exhibit 26?                        14:15:22
20      A.  Not recently. I would want to  14:15:23
21   read them and the paragraphs around them 14:15:25
22   to refresh my memory, and I'd actually   14:15:26
23   want to skim the whole thing too.        14:15:28
24      Q.  Please do.                       14:15:30
25      A.  Okay. I'm just going to open   14:15:31
```

**Page 530**

1  the door to my office so I can get a       14:15:40
2  little more air conditioning in here.  I'm  14:15:42
3  not leaving.  Just one second.              14:15:44
4        I don't have a vent in this          14:15:51
5  room.  Okay.  Okay.  So if you'd like to   14:15:53
6  start with appendix E, we could.  It might 14:17:28
7  be more productive to start with the       14:17:31
8  sections of the report, section E of the   14:17:34
9  report, but I'll do it whichever way you   14:17:37
10 want because it's your deposition.          14:17:40
11     Q.  Thanks, Mr. Hochman.  I would       14:17:42
12 like to start with appendix E.              14:17:43
13     A.  All right.  So I need to go and    14:17:45
14 skim over it.  Give me a little bit of      14:17:47
15 time to do that.                            14:17:49
16     Q.  Would it help if I ask a            14:21:26
17 question, Mr. Hochman, to focus             14:21:28
18 discussion?                                 14:21:30
19     A.  You know, I'm -- actually, my       14:21:31
20 review is proceeding very quickly because  14:21:32
21 most of the stuff --                        14:21:34
22     Q.  Sorry for interrupting.             14:21:36
23     A.  Sure.  Basically, this stuff is    14:21:38
24 all just basic course work or basic         14:21:40
25 lecture, so I'm familiar with it.  So I'm  14:21:44

**Page 531**

1  just zooming through it.  So I'm already   14:21:46
2  up to paragraph 29 in my review.  Just     14:21:48
3  give me a couple more minutes.  I'll get   14:21:50
4  right through the paragraphs you want, and 14:21:52
5  then I'll be able to answer questions      14:21:54
6  without further delay.                     14:21:57
7        Okay.  I'm now to paragraph 43.     14:23:50
8  And why don't you give me your question,   14:23:53
9  and I'm going to read this paragraph       14:23:55
10 closely and answer your question, okay?    14:23:57
11     Q.  Because you've read everything     14:23:59
12 leading up to it, let me set it up this    14:24:01
13 way.  In paragraph 12, Dr. Psounis states  14:24:05
14 that "If there is no reliable mapping      14:24:08
15 relating an identifier value to a device   14:24:12
16 because," for instance "an identifier      14:24:16
17 value may correspond to multiple devices,  14:24:18
18 then, regardless of the entropy bits of    14:24:21
19 the identifier, we cannot reliably         14:24:23
20 identify a device."                        14:24:27
21        Do you see that?                    14:24:28
22     A.  Yes.                               14:24:28
23     Q.  Did I read that correctly?         14:24:29
24     A.  Yes.                               14:24:32
25     Q.  And do you agree with this         14:24:33

**Page 532**

1  statement by Dr. Psounis?                  14:24:35
2     A.  No.  He's suffering from            14:24:37
3  professoritis, which is he's thinking too  14:24:39
4  hard about things in theory and not taking 14:24:42
5  in enough real-world experience.           14:24:45
6     Q.  And how would real-world            14:24:49
7  experience change his statement in         14:24:52
8  paragraph 12?                              14:24:54
9     A.  Knowing that users are routinely    14:24:56
10 identified by IP address and user agent,   14:24:59
11 that this is commonly used to identify     14:25:03
12 people, and that anyone in the security    14:25:05
13 field who has real-world experience would  14:25:09
14 recognize that this is a noncontroversial  14:25:12
15 assertion, and that he has somehow gone    14:25:14
16 about using a lot of math and sophistry to 14:25:17
17 reach an incorrect result, because he's, I 14:25:21
18 think, asserting the possibility or        14:25:25
19 existence of conditions that don't match   14:25:27
20 real-world conditions.                     14:25:32
21     Q.  Can you please turn to the last    14:25:33
22 page of Exhibit 26?  And this will be      14:25:36
23 below paragraph 44, and there should be a  14:25:39
24 graph there.  Let me know if you see it.   14:25:42
25        MR. MAO:  Objection.  You led       14:25:44

**Page 533**

1  the witness to believe that you were       14:25:47
2  only going to ask him about questions      14:25:48
3  in which he read up to, okay?  And now     14:25:51
4  you're proceeding to move past that.       14:25:52
5        MR. ANSORGE:  I thought --           14:25:52
6        (Reporter clarification.)            14:25:52
7        MR. MAO:  I already made my          14:26:00
8  objections on that.  Please allow him      14:26:01
9  to finish the document if you're going     14:26:02
10 to proceed beyond what you represented     14:26:04
11 to him, please.                            14:26:06
12     A.  Yeah, just a second.  I'll just    14:26:09
13 need to do a little further reading and    14:26:11
14 I'll get to that.  Just give me a minute.  14:26:14
15 BY MR. ANSORGE::                           14:26:16
16     Q.  Mr. Hochman, I apologize, but      14:26:17
17 hadn't you said that you had reviewed the  14:26:18
18 document?  Sorry if I rushed you.          14:26:20
19     A.  No, no, I just wanted your         14:26:24
20 question, but then I am going to -- why    14:26:26
21 don't you go ahead and ask your question,  14:26:27
22 and then I'm going to read 43 onward as    14:26:28
23 far as I need to in order to answer your   14:26:32
24 question, okay?                            14:26:34
25     Q.  Yeah.  So my question is going     14:26:35

43 (Pages 530 - 533)

```
 1   4:16 p.m.  Thank you.              16:16:51
 2        MR. MAO:  Can I get an expedited  16:16:55
 3   copy?                               16:16:57
 4        THE COURT REPORTER:  And a     16:17:06
 5   rough?                              16:17:06
 6        MR. MAO:  Yes, please.         16:17:06
 7        (Time noted:  4:16 p.m.)
 8
 9   _____
         JONATHAN HOCHMAN
10
11
     _____
12   Subscribed and sworn to
     before me this _____
13   day of _____ 2022.
14   _____
              Notary Public
15
16
17
18
19
20
21
22
23
24
25
                                              Page 614
```

```
 1              CERTIFICATION
 2
 3        I, BELLE VIVIENNE, a Nationally
 4   Certified Realtime Reporter, do hereby
 5   certify:
 6        That the witness whose testimony as
 7   herein set forth, was duly sworn by me;
 8   and that the within transcript is a true
 9   record of the testimony given by said
10   witness.
11        I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I am
14   in no way interested in the outcome of
15   this matter.
16        IN WITNESS WHEREOF, I have hereunto
17   set my hand this 26th day of July 2022.
18
19        Belle Vivienne
20        BELLE VIVIENNE, CRR, CCR, RPR
21
22           *   *   *
23
24
25
                                              Page 615
```

```
 1  JONATHAN HOCHMAN
 2  jonathan@hochmanconsultants.com
 3                   July 26, 2022
 4  RE: BROWN VS GOOGLE LLC
 5  JULY 21, 2022, JONATHAN HOCHMAN, VOLUME II, JOB NO 5312353
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025 520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office
12  __ Per CA State Code (CCP 2025 520 (a)-(e)) – Locked PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, notating the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition
25
                                              Page 616
```

```
 1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, notating the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  __ Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
                                              Page 617
```

64 (Pages 614 - 617)