# EXHIBIT 3

# Redacted Version of Document Sought to be Sealed

CONFIDENTIAL

```
 1       UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3             OAKLAND DIVISION
 4
 5   CHASOM BROWN,
 6          Plaintiff,    Case No.
 7   vs.                4:20-cv-03664-YGR-SVK
 8   GOOGLE LLC,
            Defendant.
 9   *********************************
                 CONFIDENTIAL
10      ZOOM VIDEOTAPED DEPOSITION OF
             JONATHAN E. HOCHMAN
11              July 20, 2022
12               10:15 a.m.
13   ****************************************
14
15   TAKEN BY:
16      JOSEF ANSORGE, ESQ.
17      ATTORNEY FOR DEFENDANT
18
19   REPORTED BY:
20      BELLE VIVIENNE, RPR, CRR, NJ-CRR,
21      WA/CO/NM-CCR
22      NATIONALLY CERTIFIED REALTIME
23      COURT REPORTER
24      JOB NO. 5308381
25
```

```
                          APPEARANCES
 1
 2    FOR THE PLAINTIFF:
 3       MARK MAO
         BOIES SCHILLER FLEXNER LLP
 4       44 Montgomery Street, 41st Floor
         San Francisco, California 94104
 5       415 293 6800
         mmao@bsfllp.com
 6
         RYAN MCGEE
 7       MORGAN & MORGAN
         201 North Franklin Street
 8       7th Floor
         Tampa, Florida 33602
 9       813 223 0931
         rmcgee@forthepeople.com
10
         ALEXANDER FRAWLEY
11       IAN CROSBY
         SUSMAN GODFREY
12       1301 Avenue of the Americas
         32nd Floor
13       New York, New York 10019
         Afrawley@susmangodfrey.com
14
      COUNSEL FOR PLAINTIFF IN CALHOUN MATTER:
15       ADAM PROM
         DICELLO LEVITT & GUTZLER
16       10 North Dearborn Street, Sixth Floor
         Chicago, Illinois 60602
17       312 214 7900
         aprom@dicellolevitt.com
18
      COUNSEL FOR DEFENDANT:
19
         JOSEF ANSORGE
20       JOHN WILSON, IV
         QUINN EMANUEL URQUHART & SULLIVAN LLP
21       51 Madison Avenue
         New York, New York 10010
22       josefansorge@quinnemanuel.com
23       CARL SPILLY
         QUINN EMANUEL URQUHART & SULLIVAN, LLP
24       1300 I Street, NW, Suite 900
         Washington, D C  20005
25       202 538 8277
         carlspilly@quinnemanuel.com
                                                      Page 2
```

```
 1                            - - -
 2                          I N D E X
 3                            - - -
 4    Testimony of:
 5       JONATHAN E. HOCHMAN
 6    MR. ANSORGE.............................  10
 7
 8                            - - -
 9                         E X H I B I T S
10                            - - -
11
12    NO.         DESCRIPTION                      PAGE
13    Exhibit 1   Expert Report of Jonathan
14                Hochman....................  30
15    Exhibit 2   Jonathan Hochman's
16                Curriculum Vitae...........  55
17    Exhibit 3   Article entitled
18                Personally Identifiable
19                Information (PII)..........146
20    Exhibit 4   Snapshot of a Google
21                policy.....................163
22    Exhibit 5   Document entitled
23                Mitigating Browser
24                Fingerprinting in Web
25                Specifications.............184
                                                      Page 4
```

```
 1    APPEARANCES:  (Continued)
 2       CRYSTAL NIX-HINES
         865 South Figueroa Street, 10th Floor
 3       Los Angeles, California 90017
         crystalnixhines@quinnemanuel.com
 4
 5    VIDEOGRAPHER:
         Sean Grant
 6
      ALSO PRESENT:
 7       Konstantinos Psounis, Ph.D.
         Julie Burns
 8       John Wilson, IV - Quinn Emanuel
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      Page 3
```

```
 1                            - - -
 2                   E X H I B I T S (Continued.)
 3                            - - -
 4
 5    NO.         DESCRIPTION                      PAGE
 6    Exhibit 6   E-mail from
 7                jkarlin@google.com dated
 8                July 31, 2019..............201
 9    Exhibit 7   Jonathan Hochman's
10                Supplemental Report........235
11    Exhibit 8   Document titled Table of
12                Contents...................236
13    Exhibit 9   Article entitled W3C TAG
14                Observations on Private
15                Browsing Modes.............246
16    Exhibit 10  Google Analytics Terms of
17                Service....................264
18    Exhibit 11  URL document...............268
19    Exhibit 12  Declaration of Jonathan
20                E. Hochman.................289
21    Exhibit 13  Expert Report provided in
22                Rockwood Select Asset
23                Fund XI v Devine,
24                Millimet & Branch..........293
25
                                                      Page 5
```

```
                                                                Page 50
 1   Q.   In what capacity?                11:01:15
 2   A.   As an expert.                    11:01:16
 3   Q.   In what cases?                   11:01:17
 4   A.   I was retained by Susman Godfrey 11:01:21
 5   in two other matters that I recall.   11:01:24
 6   Q.   And that was in connection to    11:01:31
 7   Ian Crosby you mentioned earlier; is that 11:01:35
 8   correct?                              11:01:39
 9   A.   Yes.                             11:01:39
10   Q.   And how much were you paid for   11:01:39
11   those engagements?                    11:01:41
12   A.   I don't remember.                11:01:42
13   Q.   Can you provide us with an       11:01:42
14   estimate?                             11:01:46
15   A.   I don't think I can provide a    11:01:52
16   good estimate on that, but it's -- let me 11:01:53
17   think about it a little bit.  You know, I 11:01:58
18   think that my -- my sense of both of these 11:02:01
19   two cases is that they were both under -- 11:02:03
20   probably under $100,000 each.         11:02:06
21   Q.   Mr. Hochman, in an average year, 11:02:12
22   what percentage of your work is as a  11:02:14
23   consulting or testifying expert?      11:02:17
24   A.   Okay.  So there's several ways   11:02:21
25   to look at it, and one way to look at it 11:02:23
```

```
                                                                Page 51
 1   is by how I spend my time.  So I -- I 11:02:26
 2   typically spend about one-third of my time 11:02:29
 3   as a expert.  I spend another third of my 11:02:31
 4   time in start-up development and/or   11:02:37
 5   academic-type work in recent years.  And 11:02:42
 6   then I also spend about a third of my time 11:02:46
 7   assisting my wife in -- in her business 11:02:50
 8   endeavors.                            11:02:53
 9   Q.   And what are her business        11:02:54
10   endeavors?                            11:02:57
11   A.   She's a real estate developer.   11:02:58
12   Q.   So one-third as an expert in     11:03:03
13   formulative {audio glitch} litigation, 11:03:09
14   one-third academic or start-up, and   11:03:10
15   one-third working in real estate; is that 11:03:13
16   correct?                              11:03:15
17   A.   That's sort of a rough           11:03:15
18   breakdown, just roughly, yes.         11:03:17
19   Q.   When was the first time you      11:03:19
20   acted as a testifying expert?         11:03:23
21   A.   Okay.  So, again, there's        11:03:28
22   several ways to look at that, but if you 11:03:30
23   look at my CV, you will see the list of my 11:03:32
24   depositions in reverse chronological  11:03:35
25   order, meaning that the newest is at the 11:03:40
```

```
                                                                Page 52
 1   top of the list.                      11:03:43
 2        So if you go down to the bottom  11:03:44
 3   of the list, you'll see a case from   11:03:45
 4   approximately 2014.  I think it's the 11:03:49
 5   first time I testified, and then for a 11:03:53
 6   number of years before that, I had been a 11:03:58
 7   consulting expert.  I just hadn't been 11:04:00
 8   deposed up to that point.             11:04:03
 9   Q.   And so --                        11:04:07
10   A.   If I may.                        11:04:10
11        (Reporter clarification.)        11:04:10
12   A.   Yeah, I'm sorry.  If I may.  Why 11:04:11
13   don't you introduce my CV and we'll just 11:04:13
14   take a look at that?  Because I don't want 11:04:15
15   to give you inaccurate information, so it 11:04:17
16   will be good for me just to look at it 11:04:19
17   just to make sure I'm remembering it  11:04:22
18   correctly.                            11:04:24
19   BY MR. ANSORGE:                       11:04:24
20   Q.   Yeah.  We'll -- we'll turn to    11:04:24
21   that right away as well.              11:04:27
22        Prior to this engagement,        11:04:30
23   Mr. Hochman, have you ever proffered  11:04:32
24   expert opinions on informational entropy? 11:04:34
25        MR. MAO:  Objection, vague and   11:04:41
```

```
                                                                Page 53
 1   ambiguous.  Go ahead.                 11:04:42
 2   A.   I'm not sure because entropy is  11:04:45
 3   just a fancy way of saying the quantity of 11:04:49
 4   information.                          11:04:52
 5   BY MR. ANSORGE:                       11:04:52
 6   Q.   And did you provide any expert   11:04:57
 7   opinions on the quantity of information? 11:04:59
 8   A.   I mean, entropy is sort of a --  11:05:03
 9   is a concept in computer science that kind 11:05:08
10   of spans across a bunch of different  11:05:11
11   things.  So I don't know that -- I just 11:05:13
12   don't want to slice this too finely and 11:05:22
13   exclude something.                    11:05:26
14        So I -- the answer is I'm not    11:05:26
15   sure whether I've provided that kind of 11:05:29
16   opinion or not because it becomes a   11:05:30
17   boundary question, you know.  You might 11:05:32
18   consider some other opinion I've given to 11:05:34
19   be relevant and I might not, so I don't 11:05:37
20   want to confuse you by -- maybe it will be 11:05:39
21   more helpful if you ask the question in a 11:05:44
22   slightly different way.               11:05:46
23   Q.   Have you proffered any expert    11:05:50
24   opinions about information theory?    11:05:53
25        MR. MAO:  Objection, vague and   11:05:57
```

```
 1  ambiguous.  Objection to the form of      11:05:59
 2    the question.                           11:06:01
 3        Please, Mr. Hochman, go ahead.      11:06:03
 4    A.  Yeah, so information theory         11:06:06
 5  comes about in the context of -- of a     11:06:08
 6  variety of areas in computer science.  So 11:06:11
 7  I've offered, you know, a fairly large set 11:06:14
 8  of opinions just because I've worked on   11:06:19
 9  hundreds of cases.                        11:06:23
10        So I'm thinking about expert        11:06:25
11  reports I've written, times when I've     11:06:26
12  said, you know, there are a lot of        11:06:31
13  possibilities here; there are a few       11:06:33
14  possibilities.                            11:06:34
15        So if you get into a discussion     11:06:35
16  of probability and counting, then that's a 11:06:38
17  discussion of entropy because entropy is  11:06:41
18  just the sum of the different ways of a   11:06:44
19  system being arranged that -- where the   11:06:49
20  sum of each element -- the sum where      11:06:51
21  the -- the components are each multiplied 11:06:53
22  by the probability of that arrangement    11:06:56
23  being the one.                            11:06:59
24        So it's -- it's sort of a           11:07:01
25  concept that becomes intertwined in a lot 11:07:04
```
Page 54

```
 1  of different issues.                      11:07:09
 2  BY MR. ANSORGE:                           11:07:10
 3    Q.  Prior to this engagement,           11:07:11
 4  Mr. Hochman, have you proffered any expert 11:07:12
 5  opinions about online privacy?            11:07:14
 6        MR. MAO:  Objection, vague and      11:07:19
 7    ambiguous, form of the question.        11:07:20
 8    Please go ahead.                        11:07:22
 9    A.  I think I have.                     11:07:24
10  BY MR. ANSORGE:                           11:07:24
11    Q.  Can you describe those for us?      11:07:27
12    A.  I think we should look at my CV     11:07:30
13  if I'm going to do that because I don't   11:07:32
14  want to give you an incomplete list and -- 11:07:34
15    Q.  Yep.                                11:07:37
16    A.  -- the list of cases would be       11:07:38
17  helpful to make sure I give you a thorough 11:07:40
18  answer.                                   11:07:42
19    Q.  Yeah, let's -- let's do that.       11:07:43
20  So as Exhibit 2, I'd like to enter the CV 11:07:47
21  that you provided with your opening       11:07:51
22  report.  Let me know when you have that.  11:07:53
23        (Exhibit 2, Jonathan Hochman's      11:07:54
24        Curriculum Vitae, marked for        11:07:54
25        identification.)                    11:07:54
```
Page 55

```
 1    A.  I'm going to -- I think I have a    11:08:12
 2  copy of the CV locally, so I'm going to   11:08:14
 3  open that locally.                        11:08:17
 4  BY MR. ANSORGE:                           11:08:21
 5    Q.  That's fine.                        11:08:21
 6        MR. MAO:  Dr. Hochman, if you're    11:08:30
 7    going to do that, can you just make     11:08:32
 8    sure that the exhibits match?           11:08:34
 9        THE WITNESS:  Yeah, let me take     11:08:38
10    a look at what you've got in Exhibit    11:08:41
11    Share because that will help me.        11:08:44
12    A.  So this is Exhibit A.  So I will    11:08:48
13  open a local copy of Exhibit A.  All      11:08:50
14  right.  I've got that open.               11:08:58
15  BY MR. ANSORGE:                           11:08:58
16    Q.  Right.  And you recognize that      11:09:01
17  as your CV that you provided with your    11:09:03
18  opening report?                           11:09:06
19    A.  Yes.                                11:09:08
20    Q.  And is this your current and        11:09:10
21  accurate list of credentials?             11:09:12
22    A.  I think there have been some        11:09:15
23  updates since this, but -- since this was 11:09:16
24  provided.                                 11:09:21
25    Q.  And what are the updates?           11:09:23
```
Page 56

```
 1    A.  Let me take a look here.  I         11:09:26
 2  think there's been one additional         11:09:43
 3  deposition.  I think there's been one     11:09:45
 4  additional trial.                         11:09:49
 5    Q.  What is the additional              11:09:54
 6  deposition?                               11:09:56
 7    A.  The additional deposition -- and    11:09:58
 8  I'm sorry, there might be other changes   11:10:01
 9  too.  Those are just the first two things 11:10:02
10  I notice.                                 11:10:05
11        The additional deposition is a     11:10:06
12  case called Black v CNN.                  11:10:07
13    Q.  In general terms, what opinion      11:10:12
14  did you proffer in that case?             11:10:23
15    A.  That was a case about online       11:10:26
16  reputation, and my opinions related to    11:10:29
17  the -- the number of people who viewed    11:10:33
18  allegedly defamatory content, whether that 11:10:38
19  number views was significant and some     11:10:43
20  further related opinions.                 11:10:48
21    Q.  And you also stated that there's    11:10:50
22  a trial that's missing from this CV.  What 11:10:51
23  was that trial?                           11:10:54
24    A.  So this was a arbitration           11:10:56
25  evidentiary hearing.  I guess it's the    11:10:59
```
Page 57

15 (Pages 54 - 57)

Page 62

```
 1   in the beginning, but could you agree to      11:16:47
 2   have your phone off while we're doing the     11:16:50
 3   questioning and then during the breaks --     11:16:53
 4       A.  I can't do that -- I can't do         11:16:55
 5   that because my father is deathly ill, and    11:16:59
 6   I'm one of the primary caregivers so I'm      11:17:01
 7   just potentially on call to help him, so      11:17:03
 8   I'm monitoring for that.  And I'm not         11:17:06
 9   taking calls or information from anyone       11:17:08
10   connected to this case.                       11:17:11
11           MR. MAO:  Mr. Hochman --              11:17:14
12           MR. ANSORGE:  Mark, do you want       11:17:15
13   a five-minute break?                          11:17:19
14           (Reporter clarification.)             11:17:20
15           MR. MAO:  I can assure you that       11:17:20
16   we're not texting him.  Yeah.                 11:17:22
17           MR. ANSORGE:  With that               11:17:22
18   assurance, let's take a break.                11:17:22
19           MR. MAO:  Yeah.  I appreciate         11:17:25
20   the break.  I can kiss my kids on             11:17:34
21   their way out and a cup of coffee.            11:17:37
22           MR. ANSORGE:  Let's take a            11:17:39
23   ten-minute break off the record.  Does        11:17:40
24   that work?                                    11:17:42
25           MR. MAO:  Thanks so much.             11:17:45
```

Page 63

```
 1           MR. ANSORGE:  Or let's make           11:17:46
 2   it -- in 13 minutes, let's do it at           11:17:47
 3   the bottom exactly on the half of the         11:17:49
 4   hour, we'll start again.                      11:17:50
 5           THE VIDEOGRAPHER:  Going off the      11:17:52
 6   record.  The time is 11:18 a.m.               11:17:53
 7           (Whereupon, a brief recess is         11:18:07
 8   taken.)                                       11:32:22
 9           THE VIDEOGRAPHER:  Back on the        11:32:22
10   record.  The time is 11:32 a.m.               11:32:35
11   BY MR. ANSORGE:                               11:32:37
12       Q.  Welcome back, Mr. Hochman.            11:32:39
13   Prior to the break, we were looking at        11:32:41
14   Exhibit 2, your CV that you provided with     11:32:42
15   your opening report, and we were              11:32:47
16   discussing cases in which you provided        11:32:50
17   some type of testimony regarding online       11:32:53
18   privacy.                                      11:32:56
19           Apart from line 15 and line 3,       11:33:00
20   have you thought of any other cases where     11:33:03
21   you provided testimony regarding online       11:33:05
22   privacy?                                      11:33:08
23       A.  Yes.  Although -- well, there's       11:33:11
24   a case -- another case that related to        11:33:17
25   privacy.  So I'm going to -- I just want      11:33:19
```

Page 64

```
 1   to be sure that I include anything because    11:33:22
 2   I don't want to skip something.               11:33:24
 3           So if you look at Trial               11:33:26
 4   Testimony Number 5, Borg v Cloutier, that     11:33:27
 5   was a State Court case, a dispute between     11:33:32
 6   neighbors that involved things such as one    11:33:36
 7   neighbor videotaping the other neighbor's     11:33:39
 8   backyard and children playing, and it also    11:33:42
 9   involved an accusation of one neighbor        11:33:46
10   publishing defamatory information or          11:33:51
11   private information or, you know,             11:33:54
12   intruding upon seclusion.  There were a       11:33:55
13   whole passel of claims there, so I'll just    11:33:59
14   alert you to that case.                       11:34:04
15       Q.  Okay.  So apart from the line 15      11:34:06
16   and line 3 and -- that we were discussing     11:34:09
17   earlier, there's also line 5.                 11:34:15
18           Can you identify any others          11:34:18
19   apart from those three?                       11:34:19
20       A.  Let me take a look.  Nothing          11:34:21
21   else springs to mind, and so those are the    11:34:51
22   ones that I can identify as I sit here.       11:35:00
23       Q.  Prior to the break, we were also      11:35:02
24   discussing your experience providing          11:35:05
25   opinions regarding informational entropy.     11:35:09
```

Page 65

```
 1           Do you recall that?                   11:35:12
 2       A.  Yes.                                  11:35:13
 3       Q.  And I believe you'd stated then       11:35:13
 4   that it would be easier having the CV         11:35:17
 5   before you to identify whether -- or what     11:35:18
 6   cases you had provided any testimony          11:35:21
 7   regarding informational entropy; is that      11:35:23
 8   correct?                                      11:35:30
 9       A.  Sure.  I'll take a look.  I           11:35:31
10   mean, I would say the concept of entropy      11:35:33
11   or information content is sort of part and    11:35:35
12   parcel of a bunch of different things.        11:35:38
13   You know, it's an aspect of cartography       11:35:40
14   and computer security as well.                11:35:45
15           So, you know, it may at some          11:35:47
16   level be involved in some things, but         11:35:51
17   it's -- I'll take a look through here and     11:35:54
18   see if there's anything in particular         11:35:56
19   where I would say it's, you know -- stands    11:35:57
20   out or jumps out.  I'll let you know.  Let    11:36:00
21   me just have a quick look through the         11:36:03
22   list.                                         11:36:05
23       Q.  Please do.                            11:36:05
24       A.  Yeah, I don't see anything on         11:36:51
25   this list that jumps out at me.  So, you      11:36:52
```

**Page 66**

1  know, it might be baked into some issue in        11:36:54
2  some of these cases, but I'm not recalling        11:37:01
3  it specifically now.                              11:37:03
4      Q.   Do you have any peer-reviewed            11:37:03
5  publications on information entropy?              11:37:05
6           MR. MAO:  Objection to the form          11:37:08
7      of the question, vague and ambiguous.         11:37:09
8      Go ahead.                                     11:37:11
9      A.   So I would -- you're aware of            11:37:14
10 the article I published last year related         11:37:16
11 to identifying records in medical                 11:37:18
12 databases?                                        11:37:23
13 BY MR. ANSORGE:                                   11:37:25
14     Q.   Yes.                                     11:37:25
15     A.   So that issue is -- is sort of           11:37:26
16 intertwined with entropy because there's a        11:37:29
17 very big problem in medical databases, a          11:37:35
18 problem of reidentification of the                11:37:37
19 records.                                          11:37:39
20          So for example, when a                   11:37:39
21 researcher goes to National Cancer                11:37:40
22 Database and wants to do a study and              11:37:44
23 requisitions a bunch of anonymous records,        11:37:46
24 the idea is they don't want the researcher        11:37:49
25 to be able to reidentify the patients.            11:37:53

**Page 67**

1           And the challenge is that if you        11:37:57
2  provide the researcher with a large enough        11:37:58
3  number of data fields, the entropy in             11:38:01
4  those data fields combines to make it             11:38:05
5  feasible to reidentify the patient.               11:38:09
6           So as a policy, the medical              11:38:11
7  databases are required to restrict the            11:38:15
8  number of data fields to essentially limit        11:38:18
9  the amount of entropy that's released to a        11:38:22
10 researcher, the amount of entropy in any          11:38:27
11 given record, so that the patients will           11:38:30
12 remain anonymous.  And so that's an issue         11:38:33
13 that is related to that paper.                    11:38:37
14          I would have to look at the              11:38:39
15 paper.  If you want to introduce it, I can        11:38:40
16 take a look and see if -- to what extent          11:38:43
17 we covered that issue in the paper.               11:38:44
18     Q.   And was that a peer-reviewed             11:38:46
19 paper?                                            11:38:48
20     A.   That was a -- a peer-reviewed            11:38:49
21 paper.  It was submitted for an                   11:38:51
22 international conference called -- let's          11:38:54
23 see, the 23rd International Symposium on          11:39:01
24 Stabilization, Safety and Security of             11:39:08
25 Distributed Systems, in November 2021.  So        11:39:10

**Page 68**

1  that was a -- an invited paper, and then          11:39:13
2  it was reviewed by the conference                 11:39:16
3  committee or people, and it was accepted.         11:39:21
4  And then it was published in Springer's           11:39:26
5  Lecture Notes in Computer Science.                11:39:31
6      Q.   If you turn to the first page of        11:39:33
7  your CV, which is Exhibit 2, it states            11:39:36
8  there, as a past position, 2008 to 2019,          11:39:39
9  SEMNE, the Search Engine Marketing New            11:39:43
10 England, chair and founding member.               11:39:48
11          Do you see that?                         11:39:50
12     A.   Yes.                                     11:39:50
13     Q.   How do I -- is that pronounced           11:39:52
14 as SEMNE, S-E-M-N-E?  How would you refer         11:39:55
15 to it?                                            11:39:58
16     A.   Yes, that's fine.                        11:39:59
17     Q.   What is SEMNE?                           11:39:59
18     A.   It was an association of search         11:40:03
19 engine marketers that existed up until the        11:40:07
20 pandemic.  It was conducting in-person            11:40:12
21 events and because of the pandemic, it            11:40:15
22 wasn't feasible to continue doing that so         11:40:18
23 it went dormant.                                  11:40:21
24          And then subsequently, I and my         11:40:22
25 partner sold it to another search marketer        11:40:26

**Page 69**

1  who I'm not sure what he's -- his plans           11:40:29
2  are for it right now, but it's -- it's no         11:40:33
3  longer ours.                                      11:40:35
4      Q.   What is search engine marketing?        11:40:36
5           MR. MAO:  Objection, vague and          11:40:41
6      ambiguous.  Go ahead.                         11:40:42
7      A.   So there's -- there are a couple        11:40:45
8  of ways to look at it.  One definition of         11:40:46
9  search engine marketing that is narrower          11:40:49
10 that it's the practice of placing paid            11:40:51
11 advertisements on search engine listings.         11:40:55
12 So, you know, these (search ads are search        11:40:58
13 engine market.                                    11:41:05
14          A slightly broader view of it           11:41:06
15 would also include activities called              11:41:08
16 "search engine optimization," that would          11:41:11
17 involve increasing the prevalence or              11:41:14
18 quality of listings in the natural search         11:41:18
19 results.                                          11:41:21
20          So at various points in time,           11:41:22
21 that definition has sort of evolved.  So          11:41:23
22 at one point in time, it included both SEO        11:41:26
23 and SEM, or SEO and PPC.  And more                11:41:29
24 recently, I think it's limited to just,           11:41:34
25 you know, PPC.                                    11:41:36

```
 1  which information was available.          12:06:34
 2  BY MR. ANSORGE:                           12:06:38
 3     Q.  In which of your opinions do you   12:06:43
 4  state that Google uses fingerprinting     12:06:44
 5  techniques to build profiles?             12:06:48
 6         MR. MAO:  Objection, the           12:06:51
 7     document speaks for itself.            12:06:51
 8     A.  I can look through the document    12:06:57
 9  here.  I just -- we should be cognizant   12:06:59
10  it's 155 pages, and it may take me a bit  12:07:01
11  of time to look through it and point out  12:07:04
12  some things.  If you want me to take the  12:07:06
13  time and do that, I will.                 12:07:08
14         Or if you would prefer, if you     12:07:09
15  know where those sections are already, you 12:07:11
16  might just want to go to them and ask me  12:07:14
17  about them for economy of time.  I'll     12:07:16
18  leave that to you to choose which way you 12:07:17
19  want me to do it.                         12:07:20
20  BY MR. ANSORGE:                           12:07:23
21     Q.  Let's turn to paragraph 223, the   12:07:24
22  last sentence.                            12:07:28
23     A.  Just a moment.  I'm going to       12:07:34
24  read that and also some of the surrounding 12:07:37
25  content.                                  12:07:39
                                               Page 90
```

```
 1     Q.  Sure.                              12:07:40
 2     A.  Okay.  Go ahead.  I've looked      12:08:29
 3  through this.                             12:08:31
 4     Q.  Do you see in the last sentence    12:08:32
 5  where it says "Regardless of whether or   12:08:33
 6  not Google actively 'fingerprints' its    12:08:35
 7  users, the voluminous amount of           12:08:38
 8  fingerprinting data it collects and stores 12:08:40
 9  - including from private browsing -       12:08:42
10  certainly allows data to be tied to       12:08:44
11  individual users."                        12:08:47
12         Did I read that out loud           12:08:48
13  correctly?                                12:08:51
14     A.  I think so.                        12:08:52
15     Q.  So, Mr. Hochman, your opinion is   12:08:52
16  that Google could fingerprint users, not  12:08:57
17  that it does fingerprint users, correct?  12:08:59
18         MR. MAO:  Objection,               12:09:04
19     argumentative, the document speaks for 12:09:04
20     itself.                                12:09:06
21     A.  I think there may be other         12:09:07
22  places in the document where I talk more  12:09:09
23  about that.  I think there is             12:09:11
24  circumstantial evidence that Google is    12:09:13
25  engaged in fingerprinting.  I think a     12:09:17
                                               Page 91
```

```
 1  reasonable inference could be drawn that  12:09:22
 2  Google would use fingerprinting.          12:09:25
 3  BY MR. ANSORGE:                           12:09:27
 4     Q.  And do you draw that reasonable    12:09:27
 5  inference anywhere in your report?        12:09:29
 6     A.  I think there are a few examples   12:09:33
 7  in the report that -- that suggest this.  12:09:34
 8  I've talked about some of the systems that 12:09:38
 9  Google has for correlating different      12:09:42
10  identifiers.  I think one of them is      12:09:46
11  called ▆▆▆.  And I think there's another  12:09:49
12  system in there called ▆▆▆▆▆▆▆▆.          12:09:54
13         So there are a number of systems   12:09:57
14  that are discussed in the report that --  12:09:59
15  where Google hasn't given me a transparent 12:10:03
16  disclosure of what all these things are   12:10:07
17  doing in total, but there's indications or 12:10:10
18  at least circumstantial indications of    12:10:14
19  fingerprinting.                           12:10:17
20         And another one that comes to      12:10:18
21  mind is that I'm aware that Google has    12:10:19
22  security, as all web services of the scope 12:10:23
23  and scale of Google must have.  And an    12:10:27
24  important method in security is -- is     12:10:32
25  fingerprinting.  It's used to fend off    12:10:39
                                               Page 92
```

```
 1  attacks.  So it's likely that there is    12:10:44
 2  fingerprinting going on.                  12:10:47
 3     Q.  And holding aside fingerprinting   12:10:50
 4  to prevent abuse for security purposes    12:10:53
 5  which you were just referencing, earlier  12:10:57
 6  you said that there's two different       12:11:00
 7  systems, ▆▆▆ and ▆▆▆▆▆▆▆▆.                12:11:02
 8         Is it your opinion that Google     12:11:06
 9  uses ▆▆▆ to fingerprint plaintiffs in this 12:11:08
10  action?                                   12:11:16
11         MR. MAO:  Objection, vague and     12:11:18
12     ambiguous, asked and answered,         12:11:20
13     argumentative, document speaks for     12:11:21
14     itself.                                12:11:23
15         Go ahead.                          12:11:23
16     A.  Just a second because I have to    12:11:24
17  look through this section.                12:11:27
18  BY MR. ANSORGE:                           12:11:30
19     Q.  Please do.                         12:11:30
20     A.  So I'm just looking in this, and   12:12:12
21  I don't see a statement in here that      12:12:14
22  asserts that Google is using              12:12:15
23  fingerprinting, but my inference is that, 12:12:17
24  based on circumstances, that this data -- 12:12:21
25  this fingerprinting data is being         12:12:28
                                               Page 93
```

**Page 94**

1  collected and saved, and that it is likely   12:12:32
2  to be used by -- could be used by Google   12:12:34
3  for fingerprinting.   12:12:36
4      And then there's an additional   12:12:38
5  risk.  I'm aware that Google does   12:12:40
6  sometimes provide its data to law   12:12:41
7  enforcement, that there are thousands of   12:12:46
8  requests to Google, and that sometimes   12:12:48
9  this data, including fingerprinting data,   12:12:49
10 can be provided to law enforcement, and   12:12:54
11 that law enforcement can use that to   12:12:56
12 identify users.   12:13:00
13     In this -- in current events, I   12:13:02
14 think you've seen numerous news articles   12:13:06
15 that talk about how people have become   12:13:08
16 worried that this type of data could be   12:13:10
17 used by -- I'll just call it "oppressive   12:13:14
18 government factions," to do things like   12:13:24
19 identify women who are seeking abortion   12:13:28
20 care and use that information to persecute   12:13:33
21 them.  So there's a great worry about   12:13:35
22 this.  This is a -- in current events, is   12:13:37
23 a big topic of interest.   12:13:39
24    Q.   And just to clarify,   12:13:43
25 Mr. Hochman, in your opinion, Google could   12:13:51

**Page 95**

1  use fingerprinting to identify individual   12:13:55
2  class members from the data at issue in   12:14:02
3  this case, correct?   12:14:05
4    A.   I think I'd --   12:14:09
5       MR. MAO:  Objection,   12:14:11
6  argumentative, vague and ambiguous,   12:14:12
7  asked and answered, calls for   12:14:14
8  speculation.   12:14:17
9       Go ahead.   12:14:18
10   A.   I think in the report, I've   12:14:20
11 demonstrated how the fingerprinting   12:14:22
12 information can be used to join records   12:14:24
13 from different logs and to reidentify   12:14:26
14 private browsing activity.   12:14:31
15     In other words, to be clear, to   12:14:39
16 associate private activity with a -- a   12:14:41
17 personal identity such as a GAIA ID.   12:14:44
18 That's G-A-I-A.   12:14:48
19 BY MR. ANSORGE:   12:14:50
20   Q.   And your opinion is that the   12:14:56
21 private browsing information at issue in   12:14:57
22 this case could be reidentified through   12:15:01
23 fingerprinting techniques, correct?   12:15:07
24     MR. MAO:  Objection, the   12:15:11
25  document speaks for itself, asked and   12:15:12

**Page 96**

1  answered.   12:15:17
2    A.   Well, in fact, I think I know   12:15:17
3  that it has been -- private browsing   12:15:19
4  information has been reidentified.  There   12:15:22
5  are examples of it happening.  I think --   12:15:24
6  I spoke with Dave Nelson and I think --   12:15:26
7  and I read his deposition.  And I think   12:15:29
8  you've heard him say that the FBI has gone   12:15:31
9  and arrested people who said, How did you   12:15:34
10 find me?  I was in incognito mode, or I   12:15:37
11 was in private mode.   12:15:41
12     And so we know that that's   12:15:42
13 happened.  There are instances where --   12:15:46
14 where it actually has happened.   12:15:50
15 BY MR. ANSORGE:   12:15:50
16   Q.   And, Mr. Hochman, I'm just   12:15:53
17 asking about the opinions you're   12:15:56
18 proffering in this case and the opinions   12:15:57
19 in your report, which is lengthy and we   12:15:59
20 have read.  And I want to make clear that   12:16:03
21 you do not opine in your report that   12:16:07
22 Google uses fingerprinting techniques to   12:16:09
23 build profiles of plaintiffs from the   12:16:13
24 private browsing information at issue in   12:16:15
25 this case; is that correct?   12:16:17

**Page 97**

1    A.   The way I put it is that I'm   12:16:20
2  being conservative, and that I don't want   12:16:22
3  to assert something without having proof   12:16:25
4  of it.  But I think there is   12:16:33
5  circumstantial evidence to suggest that   12:16:37
6  Google very well may be fingerprinting   12:16:40
7  users as part of its profiling activities,   12:16:44
8  not just security.   12:16:49
9       And to that, I want to add a   12:16:52
10 comment because I did mention security   12:16:54
11 before.  I'm trying to be fair here, okay?   12:16:56
12 We talk about -- I've talked about --   12:17:01
13 we've been talking about fingerprinting,   12:17:04
14 and I've talked about fingerprinting as   12:17:06
15 something that's potentially abusive.  It   12:17:08
16 also -- you know, has potentially proper   12:17:11
17 uses, but it's a tool in that it needs to   12:17:15
18 be used carefully, and it needs to be   12:17:18
19 communicated to users clearly what's going   12:17:22
20 on so that they can understand.   12:17:26
21     So I just want to be balanced   12:17:29
22 and clear that fingerprinting is a tool.   12:17:30
23 It has good uses and bad uses.   12:17:32
24   Q.   So do you have any proof that   12:17:37
25 Google used the private browsing   12:17:42

25 (Pages 94 - 97)

Page 114

```
1   profile of users"?                          13:24:35
2       A.  I think I've heard that before.     13:24:38
3       Q.  And what's your understanding of    13:24:39
4   that phrase?                                13:24:41
5       A.  The way I would describe it is      13:24:45
6   that, as applies to this, is that Google    13:24:46
7   is logging -- collecting, logging,          13:24:53
8   whenever it can, all the activity of users  13:24:56
9   from when they first start, on and on and   13:25:00
10  on.                                         13:25:04
11      Q.  You do not use the phrase           13:25:08
12  "complete cradle-to-grave profile of        13:25:10
13  users" in your report, correct?             13:25:14
14      A.  I'll take your word for it.         13:25:15
15      Q.  And you do not opine that Google    13:25:16
16  maintains a complete cradle-to-grave        13:25:20
17  profile of users, correct?                  13:25:25
18      A.  By the way, when you said           13:25:26
19  "report," I'm thinking of the opening       13:25:27
20  report.                                     13:25:29
21      Q.  In either report.                   13:25:29
22      A.  In either report. I'll take         13:25:31
23  your word for it.  Okay.                    13:25:32
24          And then the next question was?     13:25:33
25      Q.  You do not opine that Google        13:25:35
```

Page 115

```
1   maintains a complete cradle-to-grave        13:25:36
2   profile of users, correct?                  13:25:39
3       A.  Well, I believe that Google is      13:25:41
4   engaged in complete cradle-to-grave         13:25:44
5   profiling of users. I haven't used that     13:25:49
6   word formulation, but I believe that        13:25:50
7   that's true.                                13:25:51
8       Q.  What is your understanding of       13:25:52
9   the distinction between "profile" and       13:25:54
10  "profiling"?                                13:25:58
11          MR. MAO:  Objection,                13:25:59
12      argumentative. You're harassing the     13:26:00
13      witness.                                13:26:02
14          MR. ANSORGE:  It's not              13:26:02
15      argumentative.                          13:26:03
16          MR. MAO:  May I have the            13:26:05
17      question read back? Maybe I             13:26:06
18      misunderstood the question. I           13:26:08
19      apologize if I did, Joey. The           13:26:10
20      question back, please.                  13:26:14
21          (Whereupon, the question is read    13:26:14
22      back by the reporter.)                  13:26:14
23      A.  I don't agree with you.             13:26:36
24  BY MR. ANSORGE:                             13:26:36
25      Q.  Where do you opine that Google      13:26:37
```

Page 116

```
1   maintains a complete cradle-to-grave        13:26:39
2   profile of users?                           13:26:39
3       A.  Yeah, in my report --               13:26:39
4           (Reporter clarification.)           13:26:43
5           MR. MAO:  Objection, asked and      13:26:43
6       answered.                               13:26:46
7           Go ahead.                           13:26:46
8       A.  So in my report, I opine that       13:26:47
9   Google tracking beacons, which are located  13:26:51
10  on at least [redacted] of websites, by      13:26:56
11  some measure, consistently beam             13:27:00
12  information back to Google, including a     13:27:06
13  indication of the content that the user is  13:27:12
14  viewing, specifically the URL, among other  13:27:14
15  information, that this is consistently      13:27:18
16  done by the tracking beacons I've           13:27:20
17  mentioned, that it's done the same for all  13:27:24
18  the users, whether they're in incognito     13:27:26
19  mode or regular mode. And I am saying --    13:27:32
20  when I say "the users," I mean the users    13:27:35
21  in class 1 or class 2.                      13:27:37
22  BY MR. ANSORGE:                             13:27:43
23      Q.  And that wasn't my question,        13:27:44
24  Mr. Hochman.                                13:27:46
25      A.  I think it was.                     13:27:50
```

Page 117

```
1       Q.  My -- do you opine anywhere in      13:27:51
2   your report that the information from       13:27:55
3   these individual tracking beacons is        13:27:58
4   correlated into a single cradle-to-grave    13:28:00
5   profile of class 1 or class 2 members?      13:28:04
6           MR. MAO:  Objection, asked and      13:28:07
7       answered.                               13:28:08
8       A.  All right. So the data comes in     13:28:13
9   and is stored by Google, and it is stored   13:28:15
10  with a sufficient amount of identifiers,    13:28:18
11  cookie identifiers, fingerprinting data     13:28:23
12  that it can be linked up.                   13:28:29
13          And I've shown even, using the      13:28:33
14  data available through the special master   13:28:37
15  process, how these records can be linked    13:28:39
16  up. And the simple fact that Google might   13:28:42
17  store the data fragments separately is not  13:28:46
18  really consequential because it's not at    13:28:50
19  all hard to link them up.                   13:28:54
20  BY MR. ANSORGE:                             13:28:54
21      Q.  Your opinion is that the data       13:28:58
22  could be linked up, not that it is linked   13:29:00
23  up; is that correct?                        13:29:03
24          MR. MAO:  Objection, misstates      13:29:05
25      his testimony.                          13:29:06
```

**Page 118**

```
 1    A.   I think that if you were to look        13:29:07
 2  at how database systems work, data can be      13:29:10
 3  stored -- it can be stored in a single         13:29:16
 4  data structure or it can be separated out      13:29:18
 5  into pieces, and that doesn't really           13:29:20
 6  matter because Google has the                  13:29:23
 7  cradle-to-grave profile of the user.  The      13:29:25
 8  fact that they might store it in pieces,       13:29:29
 9  it would be like if your doctor had a file     13:29:31
10  about you and -- but he had it in three        13:29:34
11  different file folders and maybe they were     13:29:38
12  in two different file cabinets, but he had     13:29:41
13  access to all of them.  He's got your          13:29:45
14  medical history.  It doesn't -- it's not       13:29:46
15  required that they all be put together in      13:29:47
16  the same manilla folder.                       13:29:49
17  BY MR. ANSORGE:                                13:29:49
18    Q.   Mr. Hochman, do you opine               13:29:58
19  anywhere that Google stores all of the         13:29:59
20  data it receives?                              13:30:01
21    A.   According to our test, it looks         13:30:06
22  like the data that's being transmitted         13:30:08
23  back to Google by the tracking beacons is      13:30:11
24  being received and stored.  We haven't         13:30:14
25  found yet, and Google hasn't presented         13:30:17
```

**Page 119**

```
 1  evidence or information, showing that the      13:30:20
 2  data is not being stored and saved at          13:30:24
 3  least for some length of time.                 13:30:29
 4    Q.   Mr. Hochman, you do not opine           13:30:38
 5  anywhere your report that all the domains      13:30:40
 6  that belong to Google all share data with      13:30:43
 7  each other; is that correct?                   13:30:45
 8       MR. MAO:  Objection, misstates            13:30:48
 9    his testimony, the document speaks for       13:30:49
10    itself.                                      13:30:51
11       Go ahead.                                 13:30:51
12    A.   I'm not sure I understood the           13:30:53
13  question because I think it might have         13:30:54
14  like a double negative in it.  So maybe        13:30:55
15  can you just say it again so I can be sure     13:30:57
16  I understand it?                               13:31:00
17  BY MR. ANSORGE:                                13:31:00
18    Q.   Do you opine anywhere in your           13:31:01
19  report that all the domains that belong to     13:31:03
20  Google all share data with each other?         13:31:05
21    A.   I may have said something like          13:31:08
22  that.  I just -- I don't recall if you --      13:31:14
23  if you think that I've said that, you          13:31:16
24  could show me where.  I don't know that        13:31:19
25  I've said the opposite of it, and you're       13:31:21
```

**Page 120**

```
 1  sort of creating a -- a question that's        13:31:24
 2  without context so I'm not sure --             13:31:28
 3    Q.   Yeah.                                   13:31:31
 4    A.   -- where I'm going to look -- I         13:31:32
 5  can search the whole report, but that will     13:31:34
 6  be slow.  Maybe you want to draw my            13:31:36
 7  attention to something.  It will be            13:31:38
 8  faster.                                        13:31:40
 9    Q.   The problem here, Mr. Hochman,          13:31:40
10  is that we're trying to ask you questions      13:31:42
11  about the limits of your opinions.  We         13:31:45
12  have reviewed your report.  It is my           13:31:48
13  understanding that you do not opine that       13:31:51
14  Google maintains a complete                    13:31:54
15  cradle-to-grave profile of users.  It is       13:31:56
16  my understanding that you do not opine         13:31:58
17  that Google engages in fingerprinting          13:32:00
18  techniques to build a profile of               13:32:01
19  plaintiffs.  It is my understanding that       13:32:04
20  you do not opine on domains sharing data       13:32:06
21  with each other.  And what we're               13:32:12
22  attempting to do is clarify that with you.     13:32:15
23       So with respect -- if you do              13:32:18
24  opine on that anywhere, we'd expect you to     13:32:21
25  at this point inform us and not vice           13:32:23
```

**Page 121**

```
 1  versa.                                         13:32:27
 2    A.   Okay.                                   13:32:28
 3       MR. MAO:  Objection, it's just a          13:32:29
 4    mischaracterization, but I don't even        13:32:32
 5    think there's a question pending so...       13:32:35
 6    A.   That's right, there's not a             13:32:37
 7  question there.  So I'll wait for a            13:32:38
 8  question.                                      13:32:42
 9       (Reporter clarification.)                 13:32:43
10       MR. MAO:  And we disagree,                13:32:43
11    Mr. Ansorge.                                 13:32:50
12  BY MR. ANSORGE:                                13:32:50
13    Q.   Mr. -- the question was,                13:32:52
14  Mr. Hochman, do you opine anywhere in your     13:32:54
15  report that all the domains that belong to     13:32:56
16  Google all share data with each other?         13:32:59
17    A.   I mean, I think I'd have to ask         13:33:12
18  you to enumerate which domains you're          13:33:14
19  referring to because -- and are you            13:33:18
20  referring to Google or Alphabet?  It           13:33:20
21  starts to get complicated.  I mean, Google     13:33:22
22  owns a bunch of subsidiaries.  They have,      13:33:25
23  you know, all sorts of companies and           13:33:27
24  things.  I don't think you're referring to     13:33:30
25  those, so I think we need to narrow it         13:33:32
```

```
 1   consider it.                        19:34:07
 2       MR. ANSORGE: Well, can you let  19:34:10
 3   us know later today whether you'll  19:34:12
 4   oblige us or not, or should we expect 19:34:14
 5   to be provided with a list of all the 19:34:17
 6   sources that Mr. Hochman considered 19:34:20
 7   and relied upon in forming his      19:34:22
 8   conclusions in this case?           19:34:25
 9       MR. MAO: We've heard your       19:34:26
10   request. We believe we complied with 19:34:27
11   the statute, but we will consider it. 19:34:29
12   I'd like -- I prefer less arguments 19:34:31
13   rather than more.                   19:34:33
14   BY MR. ANSORGE:                     19:34:37
15   Q.  Well, Mr. Hochman, two minutes  19:34:38
16   remaining.                          19:34:43
17       (Reporter clarification.)       19:34:43
18   BY MR. ANSORGE:                     19:34:43
19   Q.  Okay. How is it now?            19:34:56
20   A.  The Internet gods have given you 19:34:59
21   a reprieve. Go ahead.               19:35:01
22   Q.  Yes. Well, I wanted to thank    19:35:03
23   you for your time today. I look forward 19:35:06
24   to spending more time with you tomorrow. 19:35:08
25   I appreciate your patience.         19:35:10
                                           Page 358
```

```
 1       MR. ANSORGE: For the documents  19:35:12
 2   that we have provided to -- which   19:35:13
 3   we've also produced, we can tomorrow 19:35:17
 4   or tonight provide you with the     19:35:20
 5   produced documents. I don't know if 19:35:23
 6   you'll want them tomorrow or not.   19:35:25
 7       But with that, I look forward to 19:35:27
 8   seeing you tomorrow at 10:00 a.m.   19:35:29
 9       THE WITNESS: 10:00 a.m.         19:35:33
10       MR. MAO: Thank you. Thank you   19:35:35
11   everyone.                           19:35:36
12       THE VIDEOGRAPHER: This          19:35:37
13   concludes -- this concludes volume 1 19:35:37
14   of the videotaped deposition of    19:35:46
15   Jonathan Hochman. We are off the   19:35:48
16   record at 7:36 p.m.                19:35:49
17       MR. MAO: I would like a rough.  19:36:05
18       THE COURT REPORTER: Do you want 19:36:17
19   an expedite transcript?             19:36:19
20       MR. MAO: Yes, please.           19:36:22
21       (Time noted: 7:36 p.m.)
22
23
24
25
                                           Page 359
```

```
 1   _____
     JONATHAN E. HOCHMAN
 2
 3
     _____
 4   Subscribed and sworn to
     before me this _____
 5   day of _____ 2022.
 6   _____
     Notary Public
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                           Page 360
```

```
 1                CERTIFICATION
 2
 3       I, BELLE VIVIENNE, a Nationally
 4   Certified Realtime Reporter, do hereby
 5   certify:
 6       That the witness whose testimony as
 7   herein set forth, was duly sworn by me;
 8   and that the within transcript is a true
 9   record of the testimony given by said
10   witness.
11       I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I am
14   in no way interested in the outcome of
15   this matter.
16       IN WITNESS WHEREOF, I have hereunto
17   set my hand this 25th day of July  2022.
18
19
20       Belle Vivienne
21       BELLE VIVIENNE, CRR, CCR, RPR
22
23             *  *  *
24
25
                                           Page 361
```