# EXHIBIT 5

```
 1              UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5    CHASOM BROWN, WILLIAM BYATT,
      JEREMY DAVIS, CHRISTOPHER
 6    CASTILLO, and MONIQUE
      TRUJILLO, individually and on
 7    behalf of all other similarly
      situated,
 8
                   Plaintiffs,
 9                                      No.
           vs.                          4:20-cv-03664-YGR-SVK
10
      GOOGLE LLC,
11
                   Defendant.
12    _____/
13
14
15          VIDEOTAPED DEPOSITION OF BRUCE SCHNEIER
16                 Remote Zoom Proceedings
17                 Cambridge, Massachusetts
18                  Monday, July 18, 2022
19
20
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 233                         Job No. 5312337
```

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
 3
 4
 5   CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
 6   CASTILLO, and MONIQUE
     TRUJILLO, individually and on
 7   behalf of all other similarly
     situated,
 8
              Plaintiffs,
 9                  No.
        vs.         4:20-cv-03664-YGR-SVK
10
     GOOGLE LLC,
11
              Defendant.
12   _____/
13
14
15      Videotaped deposition of BRUCE SCHNEIER,
16   taken on behalf of Defendant, Remote Zoom Proceedings
17   from Cambridge, Massachusetts, beginning at 11:03 a.m.
18   Eastern Daylight Time and ending at 7:20 p.m. Eastern
19   Daylight Time, on Monday, July 18, 2022, before
20   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
21   No. 3462.
22
23
24
25
                                                Page 2
```

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS:
 4     SUSMAN GODFREY LLP
 5     BY: IAN B. CROSBY, ESQ.
 6     1201 Third Avenue, Suite 3800
 7     Seattle, Washington 98101
 8     (206) 516-3861
 9     icrosby@susmangodfrey.com
10        -and-
11     BY: ALEXANDER P. FRAWLEY, ESQ.
12     3201 Avenue of the Americas, 32nd Floor
13     New York, New York 10019
14     (212) 729-2044
15     afrawley@susmangodfrey.com
16
17     BOIES SCHILLER FLEXNER LLP
18     BY: HSIAO (MARK) C. MAO, ESQ.
19     44 Montgomery Street, 41st Floor
20     San Francisco, California 91401
21     (415) 293-6800
22     mmao@bsfllp.com
23
24
25
                                                Page 3
```

```
 1   APPEARANCES (Continued):
 2
 3     MORGAN & MORGAN
 4     BY: JOHN A. YANCHUNIS, ESQ.
 5     201 North Franklin Street, 7th Floor
 6     Tampa, Florida 33602
 7     (813) 223-5505
 8     jyanchuis@forthepeople.com
 9
10
11   FOR THE DEFENDANT:
12     QUINN EMANUEL URQUHART & SULLIVAN, LLP
13     BY: STEPHEN A. BROOME, ESQ.
14        ALYSSA (ALY) G. OLSON, ESQ.
15     865 South Figueroa Street, 10th Floor
16     Los Angeles, California 90017
17     (213) 443-3285 (Mr. Broome)
18     (213) 443-3000 (Ms. Olson)
19     stephenbroome@quinnemanuel.com
20     alyolson@quinnemanuel.com
21
22   Also Present:
23     Elvert Ling, Quinn & Emanuel summer associate
24     Haimin Zhang, Analysis Group
25     Robert Fenton, Videographer
                                                Page 4
```

```
 1              I N D E X
 2
 3
 4   MONDAY, JULY 18, 2022
 5
 6   WITNESS                         EXAMINATION
 7   BRUCE SCHNEIER
 8
 9     BY MR. BROOME                      10
10     BY MR. CROSBY                     220
11
12
13
14     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15           (NONE)
16
17
18
19
20
21
22
23
24
25
                                                Page 5
```

2 (Pages 2 - 5)

```
 1  collected by companies such as Google by seeking refuge
 2  in the promise and expectation of going Incognito online?
 3       A.  No.
 4       Q.  All right.  Let's go to 86.
 5           You say:  "In the context" -- in the          15:13:31
 6  second-to-last sentence.  "And in the context of private
 7  browsing, users have specifically signaled that they
 8  expect their browsing sessions and the associated content
 9  to be in fact private.  That data point alone is private
10  in and of itself."                                     15:13:49
11           Do you see that?
12       A.  I do.
13       Q.  And the last sentence where you say "that data
14  point alone is private in and of itself," do you mean
15  that the fact that a user is in Incognito mode or private  15:14:00
16  browsing mode should be private?
17       A.  You used the word "should."  What do you mean be
18  "should"?
19       Q.  Or is.  I'm not sure.  Is -- what -- when you
20  say "that data point," are you saying -- are you       15:14:11
21  referring to -- let me start over.
22           When you refer to "that data point" in the last
23  sentence of paragraph 86, are you -- do you mean the fact
24  that a user is in private browsing mode?
25       A.  Yes.                                         15:14:31
```
Page 126

```
 1       Q.  Okay.  Next question:  Do you -- is it your
 2  opinion that the fact that a user is in Incognito mode
 3  should be private?
 4       A.  So "should" is a hard -- is a tough word.  When
 5  you say "should," under what -- where does that "should"  15:14:48
 6  come from?  Should implies someone is making a judgment.
 7       Q.  Uh-huh.  Okay.  Do you think users have a
 8  reasonable expectation of privacy in the fact that
 9  they're in a private browsing mode?
10       A.  I don't know.  That's very different than    15:15:08
11  "should."
12       Q.  So when you say that data point is private, what
13  do you mean?  Do you mean -- are you talking about the
14  fact that browsers are designed not to indicate that the
15  user is in private browsing mode?                     15:15:29
16       A.  What I mean is that when a user signals that
17  they're wanting to go into a private browsing session,
18  that they want to do something on the internet and that
19  they don't want observed.
20       Q.  I see.                                       15:15:44
21       A.  The fact that they are doing that, that signal
22  is private information.  I mean, if I know you did that
23  last Thursday at 4:00 p.m., and I then correlated with
24  what you were doing, I had your billing records from your
25  firm, I know your location data.                      15:16:01
```
Page 127

```
 1       So the fact that you chose at that moment to
 2  browse the web privately is, in fact, private
 3  information.
 4       Q.  Okay.  And then -- so if private browsing modes
 5  were redesigned to indicate every time -- you know, to   15:16:23
 6  websites every time somebody is in a private browsing
 7  mode, do you think that would be a good thing or a bad
 8  thing?
 9       A.  There's no question because it's mixed.  Do I
10  want to tell The New York Times when I'm browsing        15:16:40
11  privately or not; right?  So I'm designing off the top of
12  my head so do not take someone's random designs like
13  off-the-cuff as final.
14       I'd want to give users the choice of signaling
15  or not.  But then, you know, on the other hand, you know, 15:17:00
16  is a user going to be sophisticated enough to be able to
17  do that well.  That's going to be your balance.
18       But I can imagine times when I would want to
19  signal that and times when I wouldn't.
20       Q.  If Google sent an email to a user, Google      15:17:35
21  account holder, and said -- that conveyed, you know,
22  this -- your device was used to browse in private, and
23  let's assume that device is a shared device, does that in
24  and of itself constitute an invasion of privacy?
25       A.  So you're asking me if Google sends an email to 15:18:07
```
Page 128

```
 1  your personal Gmail account --
 2       Q.  Uh-huh.
 3       A.  -- and you access on a shared browser, does that
 4  constitute an invasion of privacy?  Am I reframing your
 5  question right?                                          15:18:24
 6       Q.  Yeah, I think so.
 7       A.  I think it doesn't.
 8       Q.  And why is that?
 9       A.  It doesn't feel like it does.
10       Q.  Well, it might not be you that was doing the   15:18:36
11  private browsing; right?
12       A.  But it's my Gmail account.  So wait, wait, wait
13  a second.  So, yeah.  See, this is why you do not accept
14  design decisions off the cuff in conversation; right?
15       Q.  Fair enough.                                  15:18:52
16       A.  Because it's all of this stuff.  Stuff you have
17  to think about it, you've got to write it down and look
18  at the flows.  Guess I would back off and say I don't
19  know.  I'd need to think about it because you're right,
20  that is something you would have to consider.          15:19:09
21       Q.  All right.  Well, let's put it this way in more
22  general terms.
23       If Google alerted the owner of a shared device
24  that the other-- that someone else who uses that device
25  had been browsing in private, that in and of itself would 15:19:24
```
Page 129

**Page 130**

1  be a privacy violation; right?
2      A. Well, let's give an example. I am an abusive
3  husband. We have a shared computer. My wife used
4  private browsing. I got an email. I suspect she gets
5  beat up over this. It feels like a privacy violation.    15:19:40
6      Q. Okay. 87. You say: "When browsing the
7  internet people often start on a search page and then
8  click from that page to other websites. For example,
9  someone might start with a Google search, then visit a
10 non-Google website based on those search results.    15:20:11
11 Information tied to that search term and subsequent
12 browsing, including individual URLs and the record of an
13 entire browsing session reveals a great deal of personal
14 information about an individual."
15     Do you see that?    15:20:24
16     A. I do.
17     Q. Would you agree that many people do not start
18 their private browsing sessions by going and conducting a
19 Google search?
20     A. I don't have the data on that so I wouldn't    15:20:45
21 necessarily agree to that.
22     Q. Okay. Well, would you agree that if you want to
23 keep your private browsing activity private from Google,
24 then beginning your private browsing session with a
25 Google search is probably not a good way to go about it?    15:21:01

**Page 131**

1      A. I certainly wouldn't do it, but you didn't ask
2  me what I do. I'm three sigma.
3      Q. Paragraph 84. You refer to fingerprinting
4  techniques.
5      A. Uh-huh.    15:21:56
6      Q. Have you seen any evidence that Google has
7  engaged in fingerprinting in this case?
8      A. Yeah, I read internal documents that talk about
9  fingerprinting and internal Google documents, but I don't
10 think they actually said we do this particular practice.    15:22:19
11 And other than that, no.
12     Q. Would you agree that fingerprinting should
13 generally be avoided?
14     A. See, that's a hard question. You're back to
15 "should generally be," by whom. Maybe your at the NSA,    15:22:37
16 you want to do it; right? It's your job. That's what
17 you get paid for. I might not like it personally. So
18 who should be avoiding it?
19     Q. No, that's a fair response. Let me ask it
20 slightly differently.    15:22:54
21     Would you agree that fingerprinting is an
22 invasion of privacy?
23     A. I think that device fingerprinting can be, yes.
24     Q. Okay. Are there circumstances under which it
25 would not be an invasion of privacy?    15:23:05

**Page 132**

1      A. Probably. Again, you know, it would take us a
2  while to eliminate all circumstances. The one that came
3  to mind, which I'm now wondering about, if you call 911
4  on your smartphone, you know, and for some reason the
5  call disconnected, it would be great if I could    15:23:24
6  fingerprint your device and know your location
7  immediately.
8      Now thinking about that more, that's an invasion
9  of privacy. It's one that will be welcome by the person
10 who's being attacked and their cell phone is ripped out    15:23:35
11 of their hands, but you know, there are always edge
12 cases. So I hesitate to make -- to make those
13 categoricals without really thinking about edge cases.
14     Q. Okay. Does fingerprinting identify an
15 individual or does it identify a device?    15:23:55
16     A. Fingerprinting identifies a device, which -- and
17 devices can identify individual.
18     Q. Right. And would you agree that with this
19 statement, this is from -- well --
20     Just confirming something with my colleague.    15:24:30
21     Devices may identify an individual, but they may
22 just identify -- they may not. Is that --
23     A. They may not. I mean, something we're learning
24 over the past few years, it's easier than we thought to
25 go from a device to an individual.    15:24:49

**Page 133**

1      Q. In paragraph -- I'm sorry, in footnote 88, you
2  say this article that you and Karen Levy wrote together?
3      A. Yes.
4      Q. Privacy Threats in Intimate Relationships?
5      A. Yes.    15:25:20
6      Q. And in that article, I think it's at page 10. I
7  can show you the article, if you like. But we'll see if
8  you need it.
9      You say: "Households are not units, devices are
10 not personal, the purchaser of a product is not its only    15:25:29
11 user."
12     Do you agree with those statements?
13     A. Can I see it in situ.
14     Q. Absolutely. Totally fair.
15     A. Just to see it. Just to make sure.    15:25:40
16     MR. BROOME: Yeah.
17     (Exhibit 7, Journal of Cybersecurity, Research
18     Paper, Privacy Threats in Intimate
19     Relationships, by Karen Levy and Bruce Schneier,
20     was marked for identification by counsel
21     electronically.)
22     THE WITNESS: Okay. I'm there.
23     Q. BY MR. BROOME: Let me load it.
24     A. The words sound familiar. Remind me where it
25 is.    15:26:02

```
 1  categorically say they're not speaking to -- to this, to
 2  see what they say about other Google services that you
 3  might use.
 4      Now this is saying you can choose a browser
 5  using Chrome or Incognito mode, but it doesn't say         16:41:02
 6  anything about other browsers.  You don't even know they
 7  exist if you just read this paragraph.
 8   Q.  Okay.  All right.
 9      Paragraph 283, you write:  "Google's Chrome
10  Incognito Splash Screen has also promised privacy without  16:41:33
11  ever disclosing that Google collects users' private
12  browsing activity.  Pairing the term Incognito with an
13  icon of a faceless person in disguise suggests that a
14  user in Incognito mode cannot be seen, traced, or tracked
15  while browsing online."                                    16:41:53
16      Do you see that?
17   A.  Yes.
18   Q.  Are you an expert in iconography?
19   A.  I am not.
20   Q.  What expertise did you bring -- did you apply in      16:42:00
21  reaching this conclusion about pairing a term with a
22  particular icon?
23   A.  This is the expertise of me as a security and
24  privacy expert's understanding disclosures, understanding
25  dark patterns.  Also relevant were the comments from      16:42:21
                                                             Page 166
```

```
 1  Google employees saying that, hey, you know, this icon is
 2  misleading.
 3   Q.  Okay.  And if we just limit it to your
 4  expertise, all right, have you ever analyzed an icon
 5  before to determine what, you know, message it sends to    16:42:42
 6  consumers?
 7   A.  How would you analyze an icon?
 8   Q.  How did you analyze the icon in this particular
 9  case?
10   A.  It's -- I think I've answered that.  It's, you        16:42:56
11  know, based on what I know about the word, the images,
12  pairing, and you know, what we as security and privacy
13  professionals understand to be adequate disclosures.
14   Q.  Have you ever applied that expertise to an icon
15  before?                                                    16:43:18
16   A.  Almost certainly.
17   Q.  Can you think of that example?
18   A.  I'm working on it.  Nothing comes to mind, but
19  not promising I won't think of something as we go.
20   Q.  Okay.  Okay.  You describe the icon as a              16:43:36
21  faceless person in disguise.  A disguise doesn't mean
22  you're invisible; right?
23   A.  It does not.
24      MR. BROOME:  All right.  I think I interrupted
25  you there.                                                 16:44:00
                                                             Page 167
```

```
 1      (Discussion off the record.)
 2      THE WITNESS:  I said, "Unless it's an
 3  invisibility suit," which is actually not a useful aside.
 4   Q.  BY MR. BROOME:  A disguise doesn't mean that a
 5  user can't be traced; right?                               16:44:45
 6   A.  That is correct.
 7   Q.  Or a disguise doesn't mean a user can't be
 8  tracked; right?
 9   A.  That is correct.
10   Q.  And as we discussed earlier, it means that a         16:44:58
11  person's identity is concealed; correct?
12   A.  That is correct.  Although let's back up.  If a
13  disguise is -- you know, you're disguised as a minion in
14  a sea of a thousand minions, you're not going to be
15  traced or tracked.                                        16:45:15
16      So there are disguises which will prevent
17  tracing and tracking.  They would be -- you know, a
18  disguise among everybody else.  You know, let's go back
19  to the Tor browser.  That's how that works.  You are
20  amongst everybody else, and that's why you can't be       16:45:29
21  traced or tracked.
22   Q.  Let's take a look at paragraph 293.
23   A.  Uh-huh.
24   Q.  You say that:  "Users may seek privacy and
25  anonymity when searching and browsing non-Google websites 16:46:07
                                                             Page 168
```

```
 1  for information about ways to deal with or exit from an
 2  abusive relationship.  As discussed previously, abusers
 3  often employ technological knowledge and means to control
 4  their victims, including inspecting a shared computer or
 5  their victim's computer or phone to spy on their online    16:46:23
 6  activity.  If detected by a tech-savvy abuser, searches
 7  and the subsequent browsing activities tied to the
 8  following searches could lead to domestic violence," and
 9  you list a number of searches people might have run.
10      Do you see that?                                      16:46:39
11   A.  I do.
12   Q.  Okay.  How tech savvy would one need to be to
13  figure out somebody's Incognito searches, assuming the
14  user closes their Incognito sessions when they're done?
15   A.  So I haven't done forensic work in Google Chrome     16:46:54
16  and Incognito so I cannot answer that question.
17   Q.  Okay.  I mean, sitting here today, are you aware
18  of any way that somebody outside of Google could
19  determine somebody's Incognito browsing or searches?
20   A.  Off the top of my head, I can think of a key         16:47:14
21  logger as one.
22   Q.  Okay.  That's a third-party software?
23   A.  Software or hardware.  You can use them both
24  ways.
25   Q.  That would record all of the key strokes on the      16:47:29
                                                             Page 169
```

```
 1  device; right?
 2     A. Yes.
 3     Q. Okay. Regardless of whether they're in
 4  Incognito or not; right?
 5     A. Yes.                               16:47:37
 6     Q. Okay. So let's assuming -- let's assume the
 7  abuser is not particularly tech savvy. Incognito should
 8  prevent the abuser from finding -- from identifying the
 9  searches that somebody ran in Incognito?
10     A. If it doesn't, we have some serious problems  16:47:56
11  here. So let's assume it does.
12     Q. Okay.
13        MR. CROSBY: I'm sorry, I was on mute. I
14  objected to the form of the question.
15     Q. BY MR. BROOME: And I think we sort of touched  16:48:13
16  on this earlier, but if one engaged in a fingerprinting
17  analysis to identify this device as one that is engaged
18  in private browsing, and then emailed the owner of that
19  device, in this example, the abusive spouse, that it was
20  used for private browsing, that might alert the abusive  16:48:33
21  spouse that his wife had been doing research in private
22  browsing mode to conceal something from him; right?
23     A. Yes.
24     Q. And that's a really legitimate concern; right?
25     A. I think it is, yes.                16:48:48
```
Page 170

```
 1     Q. Do you have an opinion as to whether the
 2  branding and marketing messages of other private browsing
 3  modes is misleading? Other meaning other than Incognito
 4  mode.
 5     A. I did not look at them in relation to this case.  16:49:05
 6  And that's not something I pay attention to. So right
 7  now, I don't.
 8     Q. You're a Firefox user; right?
 9     A. I am.
10     Q. Have you ever used Edge?              16:49:15
11     A. I have never used Edge.
12     Q. In Firefox, do you ever use Incognito or their
13  equivalent private browsing mode?
14     A. I do not.
15     Q. And why is that?                    16:49:28
16     A. Can you say asked and answered?
17     Q. Is it because you don't have any shared
18  computers?
19     A. That's right.
20     Q. Okay. Would you turn to paragraph 311.   16:49:37
21     A. Uh-huh.
22     Q. You write: "In May 2019, Google's CEO Sundar
23  Pichai wrote an op-ed in The New York Times in which he
24  described Incognito mode as a 'popular feature in Chrome
25  that lets you browse the web without linking any activity  16:50:31
```
Page 171

```
 1  to you.'"
 2     Do you see that?
 3     A. I do.
 4     Q. And in fact, as far as you know, Google does not
 5  link any private browsing activity to individual users;  16:50:47
 6  correct?
 7     A. I know they can. I don't know if they actually
 8  do that.
 9     Q. Okay.
10     A. We have a lot of incidental antidotes that they  16:50:57
11  do.
12     Q. Okay. So far as you know, Pachai's statement
13  was accurate; right?
14     A. No, I think it's inaccurate.
15     Q. And why is that?                   16:51:14
16     A. I think for the reasons I talk about in the rest
17  of that paragraph.
18     Q. Okay. Let's look at that. You say: "Pichai's
19  statement was incorrect in implying that while in
20  Incognito mode, data regarding a user's browsing activity  16:51:28
21  is not saved or linked to them, when in fact data is
22  continuously collected from Chrome users whether they are
23  browsing in normal or in Incognito mode."
24     Do you see that?
25     A. I do.                              16:51:42
```
Page 172

```
 1     Q. Pichai doesn't say that data's not saved; right?
 2     A. No. They say that he says that you can browse
 3  the web without linking any activity to you.
 4     Q. Right.
 5     A. He's not saying that explicitly, but he's making  16:51:55
 6  a statement that when you browse the web using Incognito,
 7  data's not linked to you. And we know that data has been
 8  linked to people browsing in Incognito.
 9     Q. And you're talking about the antidotes that
10  you've heard?                              16:52:13
11     A. Well, that have been testified to. More than
12  I've heard.
13     Q. Right. You're talking about the antidotes
14  discussed in the testimony in this case?
15     A. Yes.                                16:52:24
16     Q. Okay.
17        MR. CROSBY: I'm sorry, could we take a real
18  quick five-minute break here, please.
19        MR. BROOME: Sure.
20        MR. CROSBY: Thank you.              16:52:36
21        THE VIDEOGRAPHER: Going off the record at
22  4:53 p.m.
23        (Recess.)
24        THE VIDEOGRAPHER: We are back on the record at
25  5:03 p.m.                                 17:03:20
```
Page 173

44 (Pages 170 - 173)

| | |
|---|---|
| 1  details of what Google can do in fingerprinting. I think | 1     A. Yes. |
| 2  it's fair to say that some of it is probabilistic and | 2     Q. In paragraph 37, you talk about -- you say: |
| 3  some of it is exact, but you know, how probabilistic is | 3  "Another important tool for joinability is the user agent |
| 4  it? Does it matter? Fingerprinting, it's like human | 4  string." |
| 5  fingerprints. Is probabilistic, yet it is highly        17:38:33 | 5         Do you see that?                              17:41:29 |
| 6  accurate. So there's a lot of nuances in that that I | 6     A. I do. |
| 7  don't know. | 7     Q. A user agent string can't always uniquely |
| 8     Q. BY MR. BROOME: In paragraph 36, in the fourth | 8  identify a user or even a particular device; correct? |
| 9  sentence, you write: "Google recognizes the joinability | 9     A. Say it again. I'm sorry. |
| 10 risk posed by the collection of IP address information."  17:39:17 | 10    Q. A user agent string cannot necessarily be used   17:41:41 |
| 11        Do you see that? | 11 to uniquely identify a user or device; correct? |
| 12    A. I do. | 12        MR. CROSBY: Object to the form. |
| 13    Q. Okay. IP addresses are -- are dynamic; right? | 13        THE WITNESS: A user agent string is something |
| 14       MR. CROSBY: Object to the form. | 14 we do use to identify devices. You're asking does there |
| 15       THE WITNESS: For most people, they are.       17:39:30 | 15 exist a case in the history of the internet where it    17:41:59 |
| 16       Sorry. | 16 can't be used. Probably, yes. |
| 17       For most people, they are. For some people, | 17    Q. BY MR. BROOME: Fair enough. |
| 18 they're static. | 18        What does a user agent string include? |
| 19    Q. BY MR. BROOME: Okay. For most people, the IP | 19    A. Oh, God. I don't remember. |
| 20 address is -- IP address they're -- let me start again.  17:39:39 | 20    Q. Okay.                                           17:42:09 |
| 21       For most people, their IP address changes | 21    A. Yeah. I actually don't remember. It's getting |
| 22 periodically automatically; correct? | 22 late. |
| 23    A. Yes. | 23    Q. Yep. Let me give you a hypothetical. |
| 24    Q. And do you have any idea as to the frequency | 24        Imagine you've got three people in a crowded |
| 25 with which their IP address changes?                 17:39:52 | 25 coffee shop all working from the same IP address on the  17:42:30 |
| Page 186 | Page 188 |
| 1     A. No, I don't. I would look that up. | 1  same latest Mac laptop, with the latest version of Chrome |
| 2     Q. Okay. For most people, even their IP address | 2  and using default settings. |
| 3  they use at home is dynamic, and therefore, changes | 3         In that scenario, could you use IP address and |
| 4  periodically; correct? | 4  user agent string to uniquely identify a device? |
| 5        MR. CROSBY: Object to the form.             17:40:17 | 5         MR. CROSBY: Object to the form.                17:42:53 |
| 6        THE WITNESS: So now I'm saying I would start | 6         THE WITNESS: So using those two things alone -- |
| 7  looking this stuff up. | 7     Q. BY MR. BROOME: Yes. |
| 8     Q. BY MR. BROOME: Okay. | 8     A. -- and nothing else? So you don't know where |
| 9     A. Most people is more than half. So now we're | 9  they're browsing. You know nothing about their history. |
| 10 talking about users. For some people, it's dynamic. For   17:40:27 | 10 They appear out of thin error, like magically. You have  17:43:07 |
| 11 some people, it's static. | 11 a new laptop, same configuration. Open it up at the same |
| 12    Q. Okay. | 12 time. Get three different dynamic IPs from the -- from |
| 13    A. I'm willing to say that now. Anything else, I | 13 the wireless access point. Visit the same website? |
| 14 didn't research for this report, and I want to make sure | 14    Q. No, not visiting the same website. |
| 15 I'm accurate before I tell you this.                 17:40:37 | 15    A. Visit three different websites. Close their    17:43:25 |
| 16    Q. For a mobile device, the IP address is going to | 16 computer, and then disappear into thin air. That's your |
| 17 depend on where the user is physically when they connect | 17 hypothetical? |
| 18 to the internet; correct? | 18    Q. Let's start with that one. |
| 19    A. Yes. | 19    A. My guess is it would be hard. You know, if the |
| 20    Q. So if they're at home using their mobile device,   17:40:54 | 20 FBI did it, I'd be impressed. I wouldn't be shocked.    17:43:42 |
| 21 they might be using one IP address, and if they're at | 21    Q. Why does it matter whether you have access to |
| 22 work, they would be using a different IP address, and if | 22 their prior browsing history in that hypothetical? |
| 23 they're at the shopping mall, they might be using another | 23    A. Well, in that hypothetical, there isn't any |
| 24 different IP address. | 24 private browsing history. Right? They're appearing out |
| 25       Is that all fair?                            17:41:13 | 25 of thin air --                                         17:44:05 |
| Page 187 | Page 189 |

**Page 190**

1  Q. Yeah.
2  A. -- visiting the website, leaving. There's no
3  history. It's just like one visit.
4  Q. Yeah. So if you did have history, would that
5  allow you to identify -- uniquely identify a device?    17:44:14
6     MR. CROSBY: Object to the form.
7     THE WITNESS: So it's a matter of degree. It's
8  a matter of degree. History gives you more information.
9  The more you know, the more able you are to identify
10 somebody.    17:44:28
11    So, you know, we're going to assume that the --
12 the FBI is doing this investigation, is going to know
13 something about who they're looking for. Does a person
14 visit a website that they habitually visit? It's often
15 not who you -- random people out of thin air.    17:44:44
16    There's a lot of context in these questions.
17 So, you know, the hypotheticals are hard. But the
18 reality is, I think, much more subtle.
19    Q. BY MR. BROOME: Okay. So if all you had was
20 IP -- IP address and user agent string, could you --    17:45:40
21 could that be used to uniquely identify a user?
22    A. So --
23    MR. CROSBY: Object to the form.
24    THE WITNESS: -- what you're asking me is if I
25 hand you two pieces of paper, one has my IP address and    17:45:56

**Page 191**

1  one has the user string, and I say go to town.
2  Q. BY MR. BROOME: Well, yeah. Let's start with
3  that. Does that allow you to uniquely identify a device?
4  A. You know, in most cases, it doesn't. Again, you
5  know, if you've got some trick I don't know about. But,    17:46:12
6  you know, I would like to think that that is not enough.
7  Q. Okay. So IP address plus user agent -- well,
8  withdrawn.
9  A. I mean, it's hard; right? Because the IP
10 address will tell you like which internet cafe the    17:46:32
11 person's at. Now you go to the cafe? Do you interview
12 the people who work there? Do you learn more
13 information? It's all part of context. It's really hard
14 to pull out just one thing and say, you know, we're done
15 here.    17:46:46
16    Q. All right. So multiple people could share the
17 same IP address and user agent; is that fair?
18    MR. CROSBY: Object to the form.
19    THE WITNESS: Yes. Yes.
20    Q. BY MR. BROOME: In paragraph 47 -- I'm sorry,    17:47:02
21 paragraph 42.
22    A. Uh-huh.
23    Q. You quote this Google document, and it says:
24 "IP address can be very precise, equivalent to GPS for
25 all intents and purposes, depending on the scenario."    17:47:33

**Page 192**

1     Do you see that?
2     A. Yes.
3     Q. Do you agree that although an IP address can be
4  very precise, it can also be quite coarse?
5     A. Yes.    17:47:50
6        MR. CROSBY: Object to the form.
7        THE WITNESS: Sorry.
8     Q. BY MR. BROOME: Meaning that it may not identify
9  much more than where -- what ZIP code a user is in?
10    A. Yeah, I don't know about ZIP code. That's a    17:47:59
11 geographical limitation. Because we're talking about
12 network space, not physical space. Stick with coarse.
13    Q. Okay. Okay. Paragraph 48.
14    A. Uh-huh.
15    Q. You say: "User-ID is tied to an individual's    17:49:18
16 account with a non-Google website. User-ID itself
17 thereby qualifies as personally identifiable
18 information."
19    Do you see that?
20    A. No -- yes, I do. Sorry. Apologies. Yes.    17:49:34
21    Q. Yeah, last sentence. Sorry. I should have been
22 more precise.
23    Do you see that? Okay.
24    Although the User-ID is tied to an individual's
25 account with a non-Google website, Google does not    17:49:50

**Page 193**

1  receive the personally identifiable information
2  associated with that site; correct?
3     A. I don't know. If you're asserting that, assert
4  that, but I actually don't know what Google receives.
5     Q. Okay. Well, why did you include this point that    17:50:06
6  User-ID itself qualifies as personally identifiable
7  information if you're not sure whether Google actually
8  receives that information?
9     A. Because it does -- so what I'm saying in this is
10 that -- we talked about this earlier, that Google could    17:50:22
11 use this information. I just asked me whether they do.
12 What Zervas is saying is that Google chooses not to, but
13 that says nothing about whether Google could. And then
14 see back to my discussions of chilling effects and
15 possibilities of surveillance.    17:50:46
16    Q. Okay. But you're not sure one way or the other
17 whether Google actually receives the PII that is
18 associated with an individual's account at a non-Google
19 website?
20    A. I am not, nor do I know whether they can infer    17:51:01
21 that through other means.
22    Q. All right. Let's go to 53.
23    In 53 you say: "Based on my experience and
24 consistent with the many internal Google documents I have
25 reviewed that were apparently not considered by Professor    17:51:42

**Page 230**

```
 1  STATE OF CALIFORNIA    ) ss:
 2  COUNTY OF MARIN        )
 3
 4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
 5  hereby certify:
 6      That the foregoing deposition testimony was
 7  taken before me at the time and place therein set forth
 8  and at which time the witness was administered the oath;
 9      That testimony of the witness and all objections
10  made by counsel at the time of the examination were
11  recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16      I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21  this 19th day of July, 2022.
22
23
24          [signature]
25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

**Page 231**

```
 1  IAN B. CROSBY, ESQ.
 2  icrosby@susmangodfrey.com
 3                  July 19, 2022
 4  RE: BROWN VS. GOOGLE LLC
 5  JULY 18, 2022, BRUCE SCHNEIER, JOB NO. 5312337
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25
```

**Page 232**

```
 1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, notating the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  __ Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
```

**Page 233**

```
 1  RE: BROWN VS. GOOGLE LLC
 2  BRUCE SCHNEIER, JOB NO. 5312337
 3         E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____    _____
24  WITNESS                           Date
25
```