# Mao Declaration

# Exhibit 95

Redacted Version of Document
Sought to Be Sealed

# Amir Transcript

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    CHASOM BROWN, WILLIAM BYATT,    ) Case No.

5    JEREMY DAVIS, CHRISTOPHER       ) 5:20-cv-03664-LHK-

6    CASTILLO, and MONIQUE TRUJILLO  ) SVK

7    individually and on behalf of   )

8    all other similarly situated,   )

9            Plaintiffs,             )

10             vs.                    )

11   GOOGLE LLC,                      )

12           Defendant.              )

     _____  )

13

14                  CONFIDENTIAL

15

16      VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

17          DEPOSITION OF ON AMIR, PH.D.

18           Tuesday, August 16, 2022

19     Remotely Testifying from La Jolla, California

20

21   Stenographically Reported By:

22   Hanna Kim, CLR, CSR No. 13083

23   Job No. 5344524

24

25   PAGES 1 - 310

                                         Page 1

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    CHASOM BROWN, WILLIAM BYATT,     ) Case No.

5    JEREMY DAVIS, CHRISTOPHER        ) 5:20-cv-03664-LHK-

6    CASTILLO, and MONIQUE TRUJILLO   ) SVK

7    individually and on behalf of    )

8    all other similarly situated,    )

9            Plaintiffs,              )

10            vs.                      )

11   GOOGLE LLC,                       )

12            Defendant.               )

13   _____  )

14

15

16            Confidential, virtual videoconference

17            video-recorded deposition of ON AMIR,

18            PH.D., remotely testifying from La Jolla,

19            California, taken pursuant to the

20            stipulations of counsel thereof, on

21            Tuesday, August 16, 2022, before Hanna

22            Kim, CLR, Certified Shorthand Reporter,

23            No. 13083.

24

25

                                            Page  2

CONFIDENTIAL

```
 1       REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

 2

 3    For Plaintiffs:

 4             BOIES SCHILLER FLEXNER LLP

 5             BY:  BEKO O. REBLITZ-RICHARDSON, ESQ.

 6             BY:  MARK C. MAO, ESQ.

 7             BY:  ALISON ANDERSON, ESQ.

 8             100 SE 2nd St., 28th Floor

 9             Miami, Florida 33131

10             305.539.8400

11             brichardson@bsfllp.com

12             -and-

13             MORGAN & MORGAN LAW FIRM

14             BY:  MICHAEL RAM, ESQ.

15             711 Van Ness Avenue, Suite 500

16             San Francisco, California 94102-3275

17             415.358.6913

18             mram@forthepeople.com

19

20

21

22

23

24

25

                                        Page  3
```

```
 1          REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)

 2

 3   For Defendant:

 4            QUINN EMANUEL URQUHART & SULLIVAN, LLP

 5            BY:  ALYSSA "ALY" OLSON, ESQ.

 6            865 S. Figueroa Street, 10th Floor

 7            Los Angeles, California 90017

 8            213.443.3000

 9            alyolson@quinnemanuel.com

10

11   For Plaintiffs:  (Calhoun vs. Google)

12            SIMMONS HANLY CONROY

13            BY:  AN TRUONG, ESQ,

14            112 Madison Avenue, 7th Floor

15            New York, New York 10016-7416

16            212.257.8482

17            atruong@simmonsfirm.com

18

19

20   Also Present:

21            MARK KEEGAN, for Plaintiffs

22            Haimin Zhang, Analysis Group

23            SEAN GRANT, Videographer

24

25
```

Page  4

CONFIDENTIAL

```
 1                INDEX OF EXAMINATION

 2

 3   WITNESS:  ON AMIR, PH.D.

 4   EXAMINATION                               PAGE

 5        BY MR. REBLITZ-RICHARDSON:      10, 303

 6        BY MS. OLSON:                       296

 7

 8

 9   QUESTIONS INSTRUCTED NOT TO ANSWER:

10   PAGE.....LINE

11   56.......13

12                     --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1                    INDEX OF EXHIBITS

 2

 3    AMIR DEPOSITION EXHIBITS                       PAGE

 4    Exhibit 1      "Expert Report of Professor On     15

 5                   Amir," April 15, 2022; 311 pages

 6    Exhibit 2      "Rebuttal Report of Professor On    15

 7                   Amir," May 20, 2022; 76 pages

 8    Exhibit 3      "Supplemental Report of             15

 9                   Professor On Amir," June 30,

10                   2022; 53 pages

11    Exhibit 4      "Google Brand Studio, Today's      179

12                   User on Privacy, Ads, and

13                   Consent"; Bates nos.

14                   GOOG-CABR-00422093 through

15                   '422182

16    Exhibit 5      "Brand Studio, Incognito in the    198

17                   context of our brand,

18                   go/sinrastro-brand-research

19                   2019"; Bates nos.

20                   GOOG-BRWN-00156752 through '824

21    Exhibit 6      "Brand Studio, Incognito Icon      206

22                   Redesign April 18, 2019"; Bates

23                   nos. GOOG-BRWN-00028191 through

24                   '28375

25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2

 3   AMIR DEPOSITION EXHIBITS                        PAGE

 4   Exhibit 7    "Expert Report of Bruce A.          216

 5                Strombom, May 27, 2022; 183

 6                pages

 7   Exhibit 8    Order Denying Motion to Dismiss;    221

 8                41 pages

 9   Exhibit 9    E-mail from Steve Hamilton,         240

10                1/27/2021; Bates nos.

11                GOOG-BRWN-00406075 through

12                '406076

13   Exhibit 10   "Incognito mode Awareness and       265

14                Landscape"; Bates nos.

15                GOOG-BRWN-00477546 through

16                '477604

17   Exhibit 11   "Incognito Mode UXR Review";        289

18                Bates nos. GOOG-BRWN-00042388

19                through '42418

20                       --o0o--

21

22

23

24

25

                                          Page 7
```

CONFIDENTIAL

```
 1          Remotely Testifying from La Jolla, California

 2            Tuesday, August 16, 2022; 8:05 a.m., PDT

 3                           --oOo--

 4          THE VIDEOGRAPHER:  Good morning.  We're on

 5   the record.  The time is 8:05 a.m., and the date is     08:05:33

 6   August 16th, 2022.

 7          Please note that this deposition is being

 8   conducted virtually.

 9          Audio recording depends on the quality of

10   camera and internet connection of participants.         08:05:45

11   What is seen from the witness and heard on screen is

12   what will be recorded.

13          Audio and video recording will continue to

14   take place unless all parties agree to go off the

15   record.                                                 08:06:00

16          This is Media Unit Number 1 of the

17   video-recorded deposition of Dr. On Amir.

18          This deposition is being taken on behalf

19   of counsel for Plaintiffs in the matter of Chasom

20   Brown, et al., versus Google LLC, filed in the          08:06:10

21   United States District Court, Northern District of

22   California.  Case Number:  5:20-cv-03664-YGR-SVK.

23          And is being conducted remotely using

24   virtual technology.

25          My name is Sean Grant from the firm              08:06:29
```

                                                        Page 8

1    Veritext.  I'm the videographer.

2            And the court reporter is Hanna Kim, also

3    from Veritext.

4            I am not related to any party, nor am I

5    financially interested in the outcome.            08:06:42

6            If there are any objections to proceeding,

7    please state them at the time of your appearance.

8            Counsel and all present, including

9    remotely, will now state their appearances and

10   affiliations for the recording, beginning with the   08:06:52

11   noticing attorney.

12           MR. REBLITZ-RICHARDSON:  Good morning.

13   Beko Reblitz-Richardson of Boies Schiller Flexner on

14   behalf of the Plaintiffs.

15           With me are Mark Mao and Alison Anderson,   08:07:10

16   also of Boies Schiller Flexner; Michael Ram from the

17   Morgan & Morgan Law Firm; and also Mark Keegan, an

18   expert retained by the Plaintiffs in this matter.

19           MS. OLSON:  Aly Olson from Quinn Emanuel

20   on behalf of Google and the witness.              08:07:19

21           And with me is Haimin Zhang, who is a

22   consulting expert from Analysis Group.

23           THE VIDEOGRAPHER:  Ms. Troung.

24           MS. TROUNG:  An Troung, Simmons Hanly

25   Conroy, appearing pursuant to court order for the   08:07:31

Page 9

1    Calhoun Plaintiffs in the related case.

2              THE VIDEOGRAPHER:   Thank you.

3              Will the certified court reporter please

4    swear in the witness.

5

6                   ON AMIR, PH.D.,

7         having been duly administered an oath over

8     videoconference as stipulated by all counsel, was

9             examined and testified as follows:

10             THE VIDEOGRAPHER:   Counsel.

11

12                  EXAMINATION

13   BY MR. REBLITZ-RICHARDSON:

14        Q.   Good morning, Professor.

15        A.   Good morning.                         08:08:04

16        Q.   Please state your full name.

17        A.   On Amir.

18        Q.   Do you understand that you are under oath?

19        A.   I do.

20        Q.   If there is -- is there any reason you    08:08:12

21   cannot testify truthfully today?

22        A.   No.

23        Q.   If my question is unclear, would you

24   please let me know.

25        A.   Certainly will.                       08:08:24

                                              Page 10

```
 1         Q.    Is Google's counsel representing you for

 2    this deposition?

 3         A.    Yes, she is.

 4         Q.    And where are you right now for this

 5    deposition?                                        08:08:34

 6         A.    I'm in my office at UC San Diego.

 7         Q.    Do you have anyone in the room there with

 8    you?

 9         A.    I do not.

10         Q.    Do you have any documents with you for the  08:08:43

11    deposition?

12         A.    I do not.

13         Q.    What, if anything, did you do to prepare

14    for today's deposition?

15         A.    I reread my three reports and many of the   08:08:54

16    related documents that I used to formulate these

17    reports.

18               I met with my support team at Analysis

19    Group to go over the data and analysis and met with

20    counsel to discuss this --                           08:09:19

21               MS. OLSON:  Dr. Amir, I just -- you don't

22    need to say what you discussed with counsel.

23               THE WITNESS:  Thank you.

24    BY MR. REBLITZ-RICHARDSON:

25         Q.    Anything else to prepare for today's        08:09:31
```

Page 11

CONFIDENTIAL

1   deposition?

2          A.   I tried to have a good breakfast.

3          Q.   Anything else?

4          A.   No.

5          Q.   In total, how much time did you spend          08:09:39

6   preparing for this deposition?

7          A.   Probably eight to ten hours.

8          Q.   And you said you reviewed not only your

9   three reports, but some additional documents.

10              Do you recall that?                            08:10:00

11         A.   I did.

12         Q.   And -- and were the -- those the documents

13   cited in your reports?

14         A.   Yes, they are.

15         Q.   Did you review any documents not cited in     08:10:09

16   your reports in preparation for your deposition

17   today?

18         A.   I don't think so.

19         Q.   Who hired you?

20         A.   The counsel firm that Aly represents.         08:10:22

21         Q.   And when were you hired?

22         A.   I'm not sure, to be honest.  I don't

23   remember the date.

24         Q.   Approximately?

25         A.   I honestly don't remember.                    08:10:48

                                                     Page 12

CONFIDENTIAL

1        Q.   Was it this year?

2        A.   I don't want to give you the wrong answer.

3   I don't remember.

4        Q.   It was before you submitted your first

5   report; correct?                                    08:11:09

6        A.   It was obviously before -- way before I

7   submitted my first report.  It was way before I

8   conducted the affirmative studies.  I just don't

9   remember the dates.

10        Q.   Okay.  And what were you hired to do?     08:11:21

11        A.   As stated in my report, I was hired to

12   offer an opinion on specific questions raised.

13        Q.   And those specific questions are detailed

14   in your reports; right?

15        A.   Yes, they are detailed in my report.      08:11:41

16        Q.   And who first contacted you about being an

17   expert in this matter?

18        A.   It was someone from Aly's firm through

19   Analysis Group that contacted me.

20        Q.   Do you know the person's name?            08:12:03

21        A.   I don't remember.  It's been a while.

22        Q.   Who explained your assignment to you?

23        A.   As usually in these matters, I had the

24   first meeting with attorneys, and they raised the

25   question.  I judged that it's a question that I can   08:12:20

Page 13

```
 1    actually attempt to address.

 2            And I believe after that there was a

 3    meeting with the attorneys, with the Google internal

 4    attorneys.  And then they decided that I would be

 5    the right person for the job.  I believe that was     08:12:47

 6    the process.

 7        Q.   Were there any changes in your assignment

 8    over time?

 9        A.   I don't believe there were changes, no.

10        Q.   Other than this lawsuit, have you ever        08:13:03

11    done any work for the Quinn Emanuel law firm?

12        A.   I don't think I have.

13        Q.   Other than this lawsuit, have you ever

14    done any work for Google?

15        A.   I -- no.                                       08:13:16

16        Q.   Have you ever received any funding from

17    Google?

18        A.   No.

19        Q.   What about Alphabet?

20        A.   No.                                            08:13:25

21        Q.   Okay.

22            Do you see that you have what's been

23    premarked as Amir Exhibit 1, Amir Exhibit 2, and

24    Amir Exhibit 3?

25        A.   Yes.                                           08:13:40
```

Page 14

```
 1              (Amir Deposition Exhibit 1 was marked

 2              electronically.)

 3     BY MR. REBLITZ-RICHARDSON:

 4         Q.   Just for the record, can you tell me what

 5     Amir Exhibit 1 is?                               08:13:42

 6         A.   Amir Exhibit 1 seems to be my affirmative

 7     report in this case.

 8              (Amir Deposition Exhibit 2 was marked

 9              electronically.)

10     BY MR. REBLITZ-RICHARDSON:                       08:13:52

11         Q.   And what is Amir Exhibit 2?

12         A.   Amir Exhibit 2 seems to be the rebuttal

13     report I submitted after reading the other side's

14     experts' reports.

15              (Amir Deposition Exhibit 3 was marked   08:14:11

16              electronically.)

17     BY MR. REBLITZ-RICHARDSON:

18         Q.   And what is Amir Exhibit 3?

19         A.   Amir Exhibit 3 is the supplemental report

20     I submitted after reading Keegan's rebuttal report  08:14:23

21     that contained new data.

22         Q.   And so Amir Exhibit 1, 2, and 3, are those

23     the three reports you served in this matter?

24         A.   Yes, they seem to be the re- -- my

25     reports.                                          08:14:43
```

Page 15

CONFIDENTIAL

```
 1          Q.    And do Amir Exhibits 1, 2, and 3 contain a

 2   complete statement of all opinions you will express

 3   in this case?

 4          A.    They contain the opinions I provided.

 5          Q.    Are those the opinions you plan to express   08:14:57

 6   in this case?

 7          A.    Unless new data shows up, yes.

 8          Q.    And do Amir Exhibits 1, 2, and 3 contain

 9   all the bases for your opinions?

10          A.    Yes, they do.                                08:15:09

11          Q.    And in preparing for your deposition

12   today, you reviewed these three reports again;

13   correct?

14          A.    That is correct.

15          Q.    In doing so, did you identify anything       08:15:18

16   inaccurate in any of your three reports?

17          A.    No.

18          Q.    Did you write your reports?

19          A.    Yes, I did.

20          Q.    Did you write every word?                    08:15:35

21          A.    I wrote every word.

22          Q.    Did anyone help you prepare your three

23   reports?

24          A.    Yes.

25          Q.    Who helped you write these three reports?    08:15:43
```

Page 16

```
 1          A.   I have a team in Analysis Group.  Haimin

 2     here on the call is representing this team.  They

 3     provide research support, and they certainly helped

 4     generate parts of the reports.

 5          Q.   Did Google's counsel perform any part of     08:16:03

 6     the work for these three reports?

 7          A.   No.

 8          Q.   The team at AG, what are the names of

 9     those people?

10          A.   Haimin, Brad, and Harriet.                   08:16:13

11          Q.   What's Brad's last name?

12          A.   I don't remember.

13          Q.   What's Harriet's last name?

14          A.   I don't remember.

15          Q.   Had you worked with Haimin Zhang            08:16:30

16     previously?

17          A.   I think I have.  I have several teams that

18     help me at Analysis Group.

19          Q.   What did you work -- what did you work on

20     with him previously?                                   08:16:46

21          A.   Her.  I don't remember actually which case

22     Haimin helped me with.

23          Q.   What about Brad, had you worked with Brad

24     before?

25          A.   I believe that on the same case I worked     08:16:57
```

                                              Page 17

1   with Haimin before.

2       Q.   And what was that case?

3       A.   I don't remember.

4       Q.   What about Harriet?

5       A.   Same answer.                          08:17:05

6       Q.   Same answer, you believe you worked with

7   Harriet before, but you don't know Harriet's last

8   name and you don't know what case it was?

9       A.   Yes.  I can find out easily if you allow

10  me to pull an e-mail, but I don't remember by heart.  08:17:24

11      Q.   Well, we can follow up with your counsel

12  at the break.

13           Did any Google employees assist you with

14  these three reports?

15      A.   No.                                    08:17:31

16      Q.   In connection with your work on this

17  matter, did you talk to any Google employees?

18      A.   No.

19      Q.   Did you select the people from Analysis

20  Group that you worked with on this case?         08:17:39

21      A.   No.

22      Q.   How many hours have you spent on this

23  matter so far?

24      A.   I don't remember.

25      Q.   Approximately.                         08:17:56

Page 18

```
 1        A.    I can check.

 2        Q.    Approximately.

 3        A.    Probably 40 to 50 hours, maybe more.  I

 4   don't remember.

 5        Q.    Do you know how much time the Analysis    08:18:21

 6   Group team has spent on this matter so far?

 7        A.    Not by heart, certainly.

 8        Q.    More than 40 to 50 hours?

 9        A.    I'm sure, because it's many people.

10        Q.    Fair to say that Analysis Group has spent  08:18:35

11   more time on this matter than you have?

12        A.    In total, I sent them to do different

13   tasks, and they performed the tasks.  That's the

14   type of the relationship.  And so I presume that

15   those tasks take time.  I don't know how much      08:18:50

16   relative to mine.  As I told you, I don't remember

17   exactly how many hours I spent.

18        Q.    Have you communicated with any other

19   expert retained by Google?

20        A.    No.                                       08:19:07

21        Q.    Have you reviewed any reports served by

22   any of Google's other experts?

23        A.    No.

24        Q.    Are you familiar with the opinions

25   Google's other experts are offering in this case?   08:19:17
```

Page 19

CONFIDENTIAL

```
 1          A.   I don't believe I am.

 2          Q.   You're a marketing professor; correct?

 3          A.   Yes.

 4          Q.   And you received your Ph.D. in 2003; is

 5     that right?                                      08:19:30

 6          A.   Yes.

 7          Q.   Have you been teaching marketing ever

 8     since 2003?

 9          A.   I'm not sure exactly what you mean by

10     "teaching marketing," but I've taught           08:19:41

11     marketing-related courses, different courses, since

12     2003.

13          Q.   Have you previously been an expert in

14     other lawsuits?

15          A.   I have.                               08:19:51

16          Q.   How many times?

17          A.   Maybe nine or ten.

18          Q.   When was the first time you were retained

19     as a litigation expert?

20          A.   I don't remember.                     08:20:06

21          Q.   Do you recall what lawsuit it was?

22          A.   Yes.

23          Q.   What was the name of that lawsuit?

24          A.   I don't remember the formal name, but it

25     was a -- a consumer protection lawsuit against a   08:20:18
```

Page 20

1   company called Vince.

2        Q.   How do you spell that company name?

3        A.   V-I-N-C-E.

4        Q.   Did you prepare a report in that matter?

5        A.   I did.  By the way, if we want to scroll        08:20:33

6   down to my CV that's on the exhibit that's open, we

7   could probably see the details.

8        Q.   Great.

9             So you're looking at Amir Exhibit 1; is

10  that right?                                               08:20:46

11       A.   I think so.

12       Q.   And could you direct us to the page that

13  has the details?

14       A.   Certainly.  So Appendix A is my CV.

15       Q.   And Appendix B is your prior testimony;        08:21:17

16  correct?

17       A.   And the second case listed there, Arechiga

18  versus Kellwood Company/Vince LLC, that was the

19  first case I submitted a report for.

20             There was another case I was retained, but    08:21:37

21  nothing ever happened in that case.

22       Q.   And when you say "nothing ever happened,"

23  you mean you never served a report; is that right?

24       A.   Yeah.  It was a big lawsuit that was

25  un- -- was already undergoing for ten years.  And        08:21:53

Page 21

CONFIDENTIAL

```
 1    I've done some work and discovered that there should

 2    be documents that would provide the data needed, and

 3    then the lawyers disappeared.  It turns out sadly

 4    that one of them died of cancer.

 5            And every year I get a call from the law      08:22:14

 6    firm saying, "Hey, you know, we still have this

 7    lawsuit.  Would you still be able to help us?"  And

 8    I say yes, but I don't -- I don't know what the

 9    status of that lawsuit is.

10        Q.    So Appendix B has six separate actions      08:22:24

11    there.

12            Do you see that?

13        A.    Yes.

14        Q.    And is it correct that you provided

15    testimony in each of those six actions?             08:22:36

16        A.    Yes.

17        Q.    Have you previously testified in any other

18    case?

19        A.    I have not.

20        Q.    Have you previously designed a survey for   08:22:46

21    litigation?

22        A.    When you say "previously," what do you

23    mean?

24        Q.    Before this case.

25        A.    Of course.                                  08:22:59
```

Page 22

CONFIDENTIAL

1      Q.    When?

2      A.    I designed a survey in the San Diego

3  Credit Union case, in the Yamagata/Reckitt Benckiser

4  case and -- yeah, and there was a case that I was

5  the internals that was advocated, but I ended up          08:23:26

6  designing a study.  But I'm not the expert on

7  record, so it's not listed here.

8      Q.    What was that case?

9      A.    I don't know if I'm at liberty to say.

10  I'm not -- you know, I'm not -- I'm not on record,        08:23:42

11  and I think it's a -- a confidential case.

12      Q.    Well, is it a case that's been filed?

13      A.    I think it has.

14      Q.    Can you just tell me the name of the case?

15      A.    I don't remember, but it's -- has to do        08:23:57

16  with the components of setup boxes in TV viewing

17  devices.

18      Q.    And it's your testimony that you designed

19  a survey for that matter?

20      A.    Yeah, I helped design a survey there as --      08:24:15

21  as one of the team members.

22      Q.    For -- for what -- what party were you

23  working for on that case?

24      A.    You know, I don't know if I'm at liberty

25  to reveal details for that case, so that's -- you         08:24:44

Page 23

1    know, it's -- it's not listed here.  You -- you can

2    ignore that.  I don't want to say things that I'm

3    not supposed to say.

4         Q.   So --

5         A.   I believe it settled, so...              08:25:00

6         Q.   Your -- your counsel is -- is free to

7    object to questions and instruct you not to answer,

8    but I'd ask that you otherwise answer my question.

9             So are you unwilling to tell me the name

10   of that case where you designed this study?        08:25:10

11        A.   Yes.

12        Q.   Okay.  We'll follow up with that later.

13             Other than the Yamagata and San Diego

14   County cases that you identified, before this case,

15   had you ever designed a survey for litigation?     08:25:28

16        A.   No, I don't think I designed a study in

17   the rest of the cases.

18        Q.   So you had done this twice before this

19   case; is that fair?

20        A.   For litigation.                           08:25:49

21        Q.   For litigation, yes.

22        A.   I've designed hundreds of studies just in

23   the last few years, but not for litigation purposes.

24        Q.   Right.

25             And I'm trying to understand for          08:26:01

                                                         Page 24

1    litigation purposes, prior to this case, you had

2    done that twice before; is that right?

3         A.   In two different cases, but more than one

4    study per case.

5         Q.   So how many studies were there in the          08:26:13

6    Yamagata case?

7         A.   Four studies in the Yamagata case.

8         Q.   And how many studies were there in the

9    San Diego County Credit Union case?

10        A.   There was one study in the San -- in the        08:26:27

11   San Diego case.

12        Q.   So prior to this case, you had designed

13   five studies for litigation in two cases; is that

14   correct?

15        A.   I think so, yes.                                08:26:36

16        Q.   Have you ever testified at trial?

17        A.   I have.

18        Q.   How many times?

19        A.   Once.

20        Q.   And when was that?                              08:26:53

21        A.   This was in the San Diego Credit Union

22   case.

23        Q.   When was that trial testimony?

24        A.   Approximately two years ago.

25        Q.   Have you ever had any opinion excluded by       08:27:08

                                                        Page 25

CONFIDENTIAL

1    any court?

2         A.   Yes.

3         Q.   What happened?

4         A.   In the Brown case, the other side did not

5    produce an actual survey, but 20-year-old reports        08:27:20

6    describing the survey.

7              I submitted an expert opinion based on the

8    reports.  The judge concluded that since there was

9    no actual survey, she did not need a survey expert,

10   and that counsel can use my insights about the         08:27:39

11   report in their cross-examination.

12             There were many experts in that report and

13   so -- in that case, and so she felt that the fewer

14   experts she had to deal with was better.

15        Q.   What was the name of that case?           08:27:57

16        A.   This is the Warner Records versus Charter

17   Communications.

18        Q.   So in the Warner Records case, your

19   testimony was excluded; is that correct?

20        A.   Yes.                                       08:28:08

21        Q.   Any other case where a court has excluded

22   your testimony?

23        A.   No.

24        Q.   Have you ever had your -- any opinion

25   criticized by any court?                              08:28:18

Page 26

```
 1          A.    In the San Diego Credit Union case, the

 2     four matt- -- five matters, four basically we won.

 3     And then the fifth was not something that I was

 4     retained to opine on.

 5          The lawyers still thought that the data I      08:28:40

 6     collected would be useful for that.  The judge said

 7     that given that it wasn't -- this data wasn't

 8     collected for that purpose, he's going to put less

 9     weight on it.  If you call that criticism, then --

10     then yes.                                          08:28:57

11          Q.    So in the San Diego County case, it's your

12     testimony that the judge simply concluded that your

13     opinions were entitled to less weight?  Is that what

14     you're testimony?

15          MS. OLSON:  Objection.  Misstates the        08:29:09

16     testimony.

17          Go ahead.

18          THE WITNESS:  Yeah, he said that given

19     that the data wasn't collected for the purpose of

20     that fifth question, he's going to put less weight   08:29:17

21     on that data when he reaches an -- an opinion -- or

22     a decision, sorry.

23     BY MR. REBLITZ-RICHARDSON:

24          Q.    San Diego County, that was a trademark

25     case; right?                                       08:29:34
```

Page 27

1      A.    Yes.

2      Q.    And what were you retained to do?

3      A.    I was retained to assess the degree of

4   potential confusion between an existing mark and --

5   and new mark in a particular location and                    08:29:46

6   population.

7      Q.    And in the San Diego County case, was that

8   the first time you had conducted a survey used in

9   litigation?

10     A.    Yes.                                                 08:29:58

11     Q.    And when did you conduct that survey?

12     A.    I don't remember.

13     Q.    And you conducted just one survey; right?

14     A.    Yes.

15     Q.    And in that case, the Court said your            08:30:08

16   survey was flawed; correct?

17     A.    Incorrect.  That's -- that's entirely not

18   what I said.

19     Q.    But it's your testimony that the Court did

20   not find your survey flawed?                             08:30:23

21     A.    Yes.  There were five different matters.

22   Four of them the -- the Court relied on my survey to

23   rule in favor of the side that -- that I opined for.

24          In the fifth matter that was out of my

25   assignment, it wasn't something I was retained to       08:30:44

Page 28

1    do.  But the -- I don't know how these things work.

2    The -- the attorney said that each side is entitled

3    for two experts only, two witnesses, in that

4    particular issue.

5              They wanted me to describe how auxiliary       08:31:00

6    data that I collected could speak to the matter at

7    hand.  They were right; it could.  And the judge

8    said that given that this is not the -- this was not

9    the goal for which I was originally retained and the

10   data that I showed wasn't the standard methodology      08:31:21

11   the court is used to seeing for that particular

12   matter -- again, this is not the matter that I was

13   hired to opine on originally or designed a study

14   for -- he's not going to put a lot of weight on that

15   data.                                                   08:31:41

16        Q.   If you recall, in the San Diego County

17   case, what weight did the Court give your testimony?

18        A.   I don't know.

19        Q.   Do you recall that the Court gave your

20   testimony little or minimal weight?                     08:31:52

21        A.   I don't know.  As I said, I told you

22   exactly what the judge ruled.  I think I'm not

23   saying this verbatim from the decision, but it's

24   pretty close to what I said.

25        Q.   You read the decision, though?                08:32:08

                                                   Page 29

CONFIDENTIAL

```
1          A.    Yes.
2          Q.    And you don't recall the Court writing
3     that it gave your testimony little or minimal
4     weight?
5          A.    I said what I recall the judge saying is    08:32:17
6     he's not going to put a lot of weight on the data
7     that was not collected for the purpose of that
8     particular legal question.
9          Q.    But you don't recall specifically the
10    Court stating that it gives your testimony little or   08:32:32
11    minimal weight --
12         A.    No.
13         Q.    -- is that correct?
14         A.    I do not.
15         Q.    Who won that case?                           08:32:40
16         A.    Again, the case had five different --
17    different matters.  Four matters, I think, were won
18    by CEFCU, which is the side that hired me.  And the
19    last one, I think, was won by SDCCU, the other side.
20         Q.    Did the Court grant judgment against your    08:33:06
21    client?
22         A.    I don't know what that means.
23         Q.    The Yamagata case, what was that about?
24         A.    The Yamagata case was a case about -- the
25    issue was with labeling on the package.                08:33:25
```

Page 30

 1      Q.   And what were you retained to do?

 2      A.   The question was to what extent and how

 3  does -- how do different aspects of labeling on the

 4  packaging of particular products impact the -- the

 5  perceptions of customers and potential customers,      08:33:52

 6  their understandings of what this product does, and

 7  the likelihood that they would buy that product.

 8      Q.   The BBK Tobacco case, the last one you

 9  list here, what -- what is that case about?

10      A.   It's a trademark case between two          08:34:15

11  companies that sell different things related to the

12  marijuana industry.

13      Q.   And what -- what is the plaintiff in that

14  case?  Who is the plaintiff?  Is that BBK Tobacco &

15  Foods?                                                08:34:44

16      A.   I think so.

17      Q.   Is that a tobacco company?  They sell

18  tobacco?

19      A.   I don't know if they also sell tobacco.

20  They -- it is my understanding that both companies    08:34:55

21  sell materials right now that -- that are sold in

22  CBD and THC dispensaries.

23      Q.   All right.

24           So both the plaintiff and the defense --

25  the defendant in this case are marijuana-selling      08:35:09

Page 31

 1    companies; is that right?

 2         A.    And materials, yeah.

 3         Q.    And material --

 4         A.    So one of them primarily sells the paper

 5    that, I guess, you roll weed in.                    08:35:18

 6         Q.    And what were you retained to do?

 7         A.    There are plenty of market research

 8    reports that describe the behavior of users and

 9    potential users of these products.

10              And the question was whether and to what   08:35:40

11    extent customers in this industry exercise care in

12    selecting what products they purchase.

13         Q.    And for purposes of your assignment in

14    that case, you went ahead and observed customers of

15    cannabis dispensaries; is that correct?             08:36:05

16         A.    Not really.  I --

17         Q.    You didn't do that?

18         A.    Wait.  So I -- I didn't do that for the

19    purpose of providing my opinion.  So that's your

20    question.  The answer is no.                        08:36:19

21              What I did is I analyzed the data in the

22    reports.  And I also described going to dispensaries

23    and observing customers, not for the purpose of

24    forming a -- my opinion, but for the purpose of

25    making sure that I understand how this industry      08:36:35

                                              Page 32

```
1    works.   None of my opinions is actually based on the

2    casual observation in six dispensaries.

3         Q.   Did you conduct a survey?

4         A.   I did not, as I testified earlier.

5         Q.   Do you know what claims Plaintiffs are        08:36:52

6    asserting against Google in this case?

7         A.   Are you asking whether I read the

8    Complaint?

9         Q.   I'm asking whether or not you know what

10   claims are being asserted against Google in this      08:37:05

11   case.

12        A.   I think I do to the extent they're

13   represented in the Complaint.

14        Q.   Okay.  What do you understand the claims

15   to be?                                                 08:37:13

16        A.   I think the -- the -- the claims have to

17   do with users not correctly understanding what

18   incognito mode does.

19        Q.   Anything else?

20        A.   No, not that I can think of.                 08:37:33

21        Q.   Have you ever testified as an expert

22   witness in any case involving a claim under the

23   Federal Wiretap Act [verbatim]?

24        A.   I have not.

25        Q.   Have you ever testified as an expert         08:37:52
```

Page 33

```
 1    witness in any case involving a claim under the

 2    California Invasion of Privacy Act?

 3         A.   No, I did not.

 4         Q.   Have you ever testified as an expert

 5    witness in any case involving a claim under the      08:38:04

 6    Comprehensive Computer Data Access and Fraud Act?

 7         A.   No, I did not.

 8         Q.   Have you ever testified as an expert

 9    witness in any case involving a claim for invasion

10    of privacy?                                          08:38:19

11         A.   No.

12         Q.   Have you ever testified as an expert

13    witness in any case involving a claim for intrusion

14    upon seclusion?

15         A.   No.                                        08:38:28

16         Q.   Have you ever testified as an expert

17    witness in any case involving a claim for breach of

18    contract?

19         A.   I think not.

20         Q.   Have you ever testified as an expert      08:38:43

21    witness in any case involving a claim under

22    California Business and Professions Code Section

23    17200?

24         A.   I'm not sure.  I think not, but I'm not

25    sure.  I don't know what that section is.            08:38:58
```

Page 34

CONFIDENTIAL

1        Q.   Have you ever published any papers dealing

2   with online privacy?

3        A.   I have not.

4        Q.   Have you ever published any papers dealing

5   with privacy policies?                              08:39:10

6        A.   I have not.

7        Q.   Have you ever published any papers dealing

8   with privacy disclosures?

9        A.   I have not.

10        Q.   Have you ever published any papers dealing  08:39:19

11   with the issue of consumer consent?

12             MS. OLSON:  Objection.  Vague.

13             THE WITNESS:  I don't think directly.

14   BY MR. REBLITZ-RICHARDSON:

15        Q.   Indirectly?                               08:39:36

16        A.   I mean, it depends what you mean by

17   "consumer consent."  I -- I publish many papers

18   including various consumer decision-making where you

19   expose consumers to stimuli, often from companies.

20   So depending on what you think is consent, maybe.   08:39:55

21        Q.   Do you have an understanding of what

22   consent is?

23        A.   I have a lay understanding of what consent

24   is.  I certainly do not have a legal understanding

25   what consent is.                                    08:40:12

                                                    Page 35

CONFIDENTIAL

```
 1          Q.   What is your lay understanding of consent?

 2          A.   When I give consent to something,

 3     hopefully, people understand that I agree to some

 4     condition or proposition that I conceded to.

 5          Q.   Have you published any papers dealing with    08:40:28

 6     consumer web browser preferences?

 7          A.   Preferences between browsers, no.

 8          Q.   Have you published any papers regarding

 9     Chrome Incognito mode?

10          A.   I have not.                                   08:40:45

11          Q.   Have you published any papers dealing with

12     private browsing?

13          A.   I have not.

14          Q.   Are you claiming any privacy expertise?

15          A.   I do not.                                     08:40:52

16          Q.   Has any court ever certified you as a

17     privacy expert?

18          A.   I sure hope not.

19          Q.   Has any court ever certified you as an

20     expert in connection with any privacy issues?          08:41:03

21               MS. OLSON:  Objection to the form.

22               THE WITNESS:  Not that I know.

23     BY MR. REBLITZ-RICHARDSON:

24          Q.   Has any court ever certified you as a

25     survey expert?                                          08:41:16
```

Page 36

```
 1          A.   I don't know what you mean by that.

 2          Q.   Have you ever had a court certify you as

 3    an expert on anything?

 4          A.   I don't know what you mean by that

 5    question.                                      08:41:27

 6          Q.   You've never had the process where a court

 7    evaluates your credentials and assesses whether or

 8    not you're an expert on any topic?

 9          A.   As I said, the -- the San Diego Credit

10    Union case, the four -- first -- first four counts   08:41:41

11    in -- in the issue, the court used my expert report

12    and survey to come to a -- an opinion that was

13    consistent with my recommendations.

14               So I don't know if it means that the court

15    certified me as an expert or not, but they certainly  08:42:01

16    followed my recommendations.

17          Q.   Apart from the San Diego County case, can

18    you identify any case where any court, in your

19    words, followed your recommendations?

20          A.   None of these cases actually made it to   08:42:18

21    court with my -- most -- you know, most of these

22    settled or used my report.  But I didn't testify.

23               So, for example, Town of Apple Valley --

24    of Apple Valley, the court accepted my report as an

25    expert.  They saved me as a rebuttal witness for   08:42:41
```

Page 37

1    what it means.  And it wasn't needed because the

2    court ruled in favor of the water company.

3         Q.   In this case, are you offering any

4    opinions concerning whether Google acted

5    intentionally?                                   08:43:03

6              MS. OLSON:  Objection to the form.

7              THE WITNESS:  I believe in my report,

8    there's a section that I make the opinion that given

9    that, you know, basic marketing principles,

10   companies should do well by doing good.  Google has  08:43:22

11   done many things intentionally in order to provide a

12   good product.

13             Do you mean that?

14   BY MR. REBLITZ-RICHARDSON:

15        Q.   No.                                    08:43:32

16             Do you understand that one of the issues

17   in this case is whether or not Google acted

18   intentionally when it collected private browsing

19   data?

20        A.   I don't think it was part of my assignment  08:43:43

21   to opine on that.

22        Q.   So just so to be clear, it wasn't part of

23   your assignment to opine on whether Google acted

24   intentionally when it collected private browsing

25   data; is that right?                             08:44:01

Page 38

1    A.   I think I specify exactly what my

2  assignment was in my report, and it -- and it -- my

3  assignment did not include any conclusions about

4  what Google did.

5        My assignment was primarily focused on how   08:44:11

6  users and potential users understand, perceive, and

7  choose which browser to use.

8    Q.   In this case, are you offering any

9  opinions concerning whether Google intercepted any

10  private browsing communications?                   08:44:29

11        MS. OLSON:  Objection to the form.

12        THE WITNESS:  I don't -- I don't believe

13  I've used the word "intercepted" in any of my

14  studies.  I use the term -- when it asks for

15  people's understanding, I use the term whether      08:44:46

16  Google receives data or not, and I think that's the

17  closest.

18  BY MR. REBLITZ-RICHARDSON:

19    Q.   Professor, you understand that Plaintiffs

20  are asserting certain claims in this case; right?   08:44:58

21    A.   Yes.

22    Q.   And you understand that Google is

23  asserting certain defenses; correct?

24    A.   Yes.

25    Q.   Do your opinions in this case relate to    08:45:07

                                                    Page 39

```
1    any specific claims that Plaintiffs are asserting?

2         A.   I believe they are.

3         Q.   Okay.  Which ones?

4         A.   I believe that my opinions relates to

5    whether and to what extent people understand what      08:45:26

6    private browsing in the Chrome browser does or

7    doesn't do with respect to various entities and

8    various types of information.

9              And specifically, in study 2, whether

10   Google receives different types of information.  And   08:45:48

11   in study 3, whether the language on the incognito

12   splash screen is -- had it been different, would

13   have affected consumer behavior.

14        Q.   Those are the three studies detailed in

15   your first report; correct?                            08:46:11

16        A.   Yes.

17        Q.   Professor Amir, have you ever used any

18   private browsing mode?

19        A.   Yes.

20        Q.   Which ones?                                  08:46:17

21        A.   I've used both Google Chrome Incognito and

22   the Safari private browsing mode.

23        Q.   Any others?

24        A.   Not that I remember.  But if you ask me

25   about five years, maybe.                               08:46:31
```

Page 40

1        Q.    When did you last use incognito mode?

2        A.    I last used incognito mode about a month

3    ago when I was traveling abroad and I had to log

4    into from a public computer, and I wanted to check

5    my bank statement.                                    08:46:50

6        Q.    And when did you last use Safari private

7    browsing mode?

8        A.    I believe the "when" is difficult.  Maybe

9    three or four months ago when my daughter's school

10   changed their system, and I couldn't log in.  And    08:47:06

11   the IT person asked me to use Inc- -- the private --

12   the private browsing mode so that past information

13   that may have -- be -- may have been stored on my

14   device doesn't interfere with the login process.

15       Q.    Professor Amir, do you know what            08:47:26

16   information Google collects when you're in incognito

17   mode?

18            MS. OLSON:  Objection to the form.

19            THE WITNESS:  I certainly know some.

20   BY MR. REBLITZ-RICHARDSON:                            08:47:38

21       Q.    What do you know?

22       A.    I also don't understand exactly what you

23   mean by "Google collects."  Can you specify, what

24   does that mean?

25       Q.    What is it that's unclear about Google      08:47:48

Page 41

1    collecting information?

2        A.   Well, there is information collected

3    during the session that I -- that I use, that is

4    then removed when I close the browser at the end of

5    the session.                                    08:48:05

6            And there's information being collected or

7    received -- sorry -- there's -- the information, I

8    don't know where they -- whether they collect it or

9    not.  But it's information received by various

10   third-party entities when I log in to different    08:48:19

11   websites.

12       Q.   I'm going to make sure I understand.  So

13   it's your testimony that when you're in incognito

14   mode, Google collects certain information during

15   that browsing that is then removed; is that correct?  08:48:34

16       A.   No, that's not what I said.

17           MS. OLSON:  Sorry.  I meant to -- I

18   accidentally was on mute, but I meant to interpose

19   an objection.

20   BY MR. REBLITZ-RICHARDSON:                          08:48:47

21       Q.   Okay.  Can you explain to me again what

22   you understand to happen when you're in incognito

23   mode in terms of Google collecting information?

24       A.   But first, you understand I'm not an

25   expert on -- in this case on any computer science.   08:48:57

                                                Page  42

1    So I'm providing you my lay understanding as a user;

2    right?  Is that --

3         Q.   Okay.

4         A.   Okay.

5              So as a user, I understand that if I use      08:49:11

6    incognito mode, then certain types of

7    information's -- of information are -- are stored on

8    my device only temporarily.  And when I close the

9    session, those would disappear.

10             This is the reason I use incognito mode to    08:49:28

11   access my finances on a public computer abroad.  I

12   did not want anybody to have using that machine

13   after me to have traces of my finances.

14             And I also understand that when I use the

15   internet in general, then third-party -- various       08:49:48

16   third-party players receive certain types of

17   information from my browsing session.

18        Q.   And if you know, when you are using

19   incognito mode, can you stop Google from collecting

20   that private browsing information?                      08:50:17

21             MS. OLSON:  Objection to the form.

22             THE WITNESS:  I think you're also

23   restating my testimony.  Let -- let me just be

24   clear.  I do not know what "collected" means.  I

25   know that information is received.  If an algorithm    08:50:30

Page 43

```
 1    goes and crunches that information and then throws

 2    away the rest, then it might no be collected.

 3            So I'll tell you what I think I know, and

 4    that is that different third parties receive some of

 5    my browsing information.  For example, if I use        08:50:47

 6    incognito and go to Amazon, Amazon knows I'm there.

 7    So Amazon knows what I looked at.  Or, you know,

 8    what -- what this user using incognito looked at and

 9    what this user might have purchased.

10            And if I'm not clever enough, and I            08:51:05

11    actually, in incognito mode, log in to my Amazon

12    account, then Amazon knows exactly who I am, despite

13    incognito mode because I -- I just logged into my

14    account and told them who I was.

15            So, yes, there -- you know, third-party        08:51:24

16    members receive information.  I also imagine that my

17    internet service provider can look at traffic going

18    through its servers and -- and -- and -- and see

19    information.

20    BY MR. REBLITZ-RICHARDSON:                             08:51:43

21        Q.   I just want to make sure I understand.

22    You don't know what "collect" means; is that right?

23        A.   I don't know what you mean when you ask me

24    about collect.  And I didn't study anything in this

25    case about data collection.                            08:51:54
```

Page 44

CONFIDENTIAL

```
 1        Q.   You didn't study anything in this case

 2   regarding Google's collection?

 3        A.   "Data collection," I said.

 4        Q.   Did you study anything in this case

 5   regarding Google's collection?                    08:52:04

 6        A.   I don't know what you mean by

 7   "collection."  I -- I -- I said exactly.  I said I

 8   studied what people perceive, what entities receive

 9   their data.  And then I studied what types of data

10   users think Google receives.                      08:52:20

11           And I did not use the term "collect"

12   because "collect" is -- is a term that's downstream.

13   I focused on what kind of data is received by

14   different parties, including Google.

15        Q.   I -- I need you to under- -- explain to me   08:52:39

16   what you understand the difference between collect

17   and receive to be.

18        A.   I -- I tried.  I'll try again.  If I

19   receive information that goes into a realtime

20   algorithm, that creates KPIs, key performance        08:52:55

21   indicators, and then I throw that data away, then I

22   receive data, and I didn't collect it.

23           For example, if my algorithm is supposed

24   to show you the next ad, so I could have an

25   ad-related algorithm that receives information,       08:53:12
```

Page 45

```
1     process it, and did not save it.

2            When I think of data collection, when I

3     collect data, I save it.  That means I can come back

4     to it in the future.

5            That's how I interpret your question when    08:53:27

6     you -- when you say "collect."  I didn't study

7     whether information is collected in this particular

8     case.

9         Q.   So, in your opinion, "collect" means save;

10    is that correct?                                    08:53:43

11        A.   That's how I think about data.

12        Q.   And "receive" means maybe save, maybe

13    don't save; is that correct?

14        A.   Receive is have access to.  What you do

15    with it is, you know, kind of different from         08:53:53

16    receive.

17        Q.   So receive has nothing to do with what you

18    do with the data; is that correct?

19        A.   No.  I just -- I just explained an example

20    that you could do with the data something upon       08:54:05

21    receiving, but that doesn't require collecting.  So

22    nothing is a wrong description of my testimony.

23        Q.   If someone receives data, are they saving

24    that data?

25        A.   They don't have to.                         08:54:23
```

Page 46

CONFIDENTIAL

1       Q.   If someone receives data, are they using

2   that data?

3       A.   They can.

4       Q.   But they don't have to?

5       A.   They don't have to.                        08:54:28

6       Q.   If someone collects data, it's your

7   opinion that that involves saving data; is that

8   right?

9       A.   I -- that's my interpretation of

10  collection.  But again, this is my lay             08:54:37

11  interpretation of -- you know, of the English

12  language.  Collecting means storing, and receiving

13  does not necessarily mean storing.

14      Q.   And so, you studied receiving, not

15  collecting; is that right?                         08:54:54

16      A.   Yes.

17      Q.   And if you know, from your experience as a

18  user, can you have Google delete all of the

19  information that Google received from your private

20  browsing?                                          08:55:08

21          MS. OLSON:  Objection to the form.

22          THE WITNESS:  Yeah, I'm not sure I

23  understand that.  As I said, I think that when I use

24  private browsing using Chrome, the information of my

25  session, when I close the browser, is not stored on  08:55:19

Page 47

```
 1    my local machine, which is why I used it when I was

 2    abroad on a public machine.  And that's what was

 3    important to me as a user.

 4    BY MR. REBLITZ-RICHARDSON:

 5         Q.   So when you use incognito, and close        08:55:35

 6    incognito, it's your understanding that the

 7    information is not stored on your local machine; is

 8    that right?

 9         A.   That's my understanding.

10         Q.   What about Google servers, not on your      08:55:48

11    local machine, but Google servers?

12         A.   I don't know.  But what -- what's

13    important here is what I studied is what -- how

14    users and potential users understand this and what

15    do they think about it.                               08:56:02

16         Q.   Okay.  Do you know someone named Dan

17    Ariely?

18         A.   Yes, I do.

19         Q.   For a time, was Dr. Ariely your advisor?

20         A.   He was one of my two advisors.              08:56:18

21         Q.   Have you coauthored research papers with

22    Dr. Ariely?

23         A.   I think it's obvious from my CV that I

24    have.

25         Q.   The answer is "yes"?                        08:56:24
```

Page 48

CONFIDENTIAL

```
1          A.   Yes.

2          Q.   Yes, you have coauthored research papers

3     with Dr. Ariely?

4          A.   Yes.

5          Q.   How many papers have you coauthored with      08:56:31

6     Dr. Ariely?

7          A.   Five or six, maybe.  I can count, if you

8     want.

9          Q.   In 2008, did you publish an article

10    coauthored with Dr. Ariely titled "The Dishonesty of   08:56:43

11    Honest People:  A Theory of Self-Concept

12    Maintenance"?

13         A.   Yes, I did.

14         Q.   Was that your first home run paper?

15         A.   Define "home run paper."                      08:56:54

16         Q.   Have you written that that was your first

17    home run paper?

18         A.   I may have at some interview with a

19    reporter.

20         Q.   Was it a home run paper for you?             08:57:04

21         A.   I think it still is a home run paper.

22         Q.   Among of all of your published articles,

23    is that your favorite article?

24         A.   It's one of my favorite articles.

25         Q.   It's not your favorite.  It's just one of    08:57:18
```

Page 49

CONFIDENTIAL

```
 1    them?

 2         A.   You know, time passes.  It -- it was in

 3    2008.  I've done things recently that I think I'm

 4    proud of.  So I don't know if it's the.  It's one of

 5    my favorite papers.                              08:57:32

 6         Q.   Currently, it's not your favorite article;

 7    is that right?

 8         A.   I believe I have answered this.  I don't

 9    have a single favorite article.

10         Q.   Are you aware that Dr. Ariely has been     08:57:42

11    accused of using fraudulent data?

12         A.   Of course.

13         Q.   Are you aware that members of a research

14    group who worked with Dr. Ariely have admitted the

15    data in their study was fab- -- fabricated?         08:57:52

16         A.   I think you're talking about one

17    particular paper, and I'm very much aware of that

18    paper.

19         Q.   And in connection with that paper, are you

20    aware that the research group who worked with        08:58:04

21    Dr. Ariely have admitted that the data was

22    fabricated?

23         A.   You mean the research group, you mean

24    coauthored?

25         Q.   Yes.                                       08:58:15
```

Page 50

1       A.   Yes, of course.

2       Q.   You -- you're aware that Dr. Ariely's

3  coauthors have admitted that their data was based on

4  fabricated data; correct?

5       A.   So I -- I'm aware because I read like        08:58:24

6  everybody else, all the reports that one study that

7  they have conducted, a field experiment that was

8  supposed to be run with an insurance company, I

9  believe, had fabricated data.

10      Q.   Are you aware that there was a replication   08:58:43

11  attempt in connection with your 2008 Dishonesty

12  paper that you coauthored with Dr. Ariely?

13      A.   Certainly.  I participated in that.

14      Q.   Are you aware that replication attempt was

15  unsuccessful?                                         08:58:57

16      A.   Yes.  And let me tell you about that.

17  There was a protocol for that --

18      Q.   You understand, Professor Amir, that I

19  have a limited amount of time today, and that your

20  counsel will have an opportunity to ask any           08:59:09

21  questions she wants.  Do you understand --

22          MS. OLSON:  No, no.  Beko, he gets to

23  repeat -- he gets to answer his questions, and

24  you -- you can't interrupt.  Please let him answer.

25  BY MR. REBLITZ-RICHARDSON:                            08:59:22

Page 51

1      Q.   Are you aware that replication attempt was

2   unsuccess- --

3           MS. OLSON:  Please let him finish his

4   answer.  He wasn't done.

5           THE WITNESS:  I can ask -- go ahead and        08:59:28

6   ask your question.

7   BY MR. REBLITZ-RICHARDSON:

8      Q.   Are you aware that replication attempt was

9   unsuccessful?

10     A.   I'm aware that that's what's reported in       08:59:34

11   the replication paper that was published.  I have

12   correspondence with the authors of that and the

13   editor of that suggesting -- showing that we found

14   errors in the replication attempt protocol precisely

15   showing that the study run before us that was not      08:59:53

16   related to our paper, that condition that

17   participants were in predict behavior in our

18   replicated attempt -- attempt to replicate

19   experiment.

20          And so, we are now in process of clearing       09:00:06

21   that up and showing that the replication attempt was

22   faulty.  In addition to that, I have run a

23   preregistered rep- -- the exact replication here in

24   the lab, well-powered replication, that replicated

25   the 2000- -- actually, the data -- the data is from    09:00:24

Page 52

 1    2002.  That was published in the 2008 paper.  That

 2    was Study 1.

 3              There is no issue with replicating the

 4    rest of the studies from that paper.  And about more

 5    than a thousand papers have replicated conceptually    09:00:37

 6    that -- that paper.  And so, I'm not really worried

 7    about that theory being incorrect.

 8         Q.   Can honest people be dishonest?

 9         A.   Say that again, sorry.

10         Q.   Can honest people be dishonest?            09:00:53

11         A.   I think that's the point of the paper,

12    that people can be dishonest up to a point while

13    still viewing themselves as honest people.

14         Q.   Were you honest in conducting the research

15    presented in your reports in this case?              09:01:07

16         A.   Very much so.

17         Q.   Were you honest in your critiques of

18    Mr. Keegan's work?

19         A.   Very much so.  And let me -- let me just

20    add that everything that I've reported and written    09:01:18

21    was not only based on facts and all the facts.  But

22    also, I had a team with me to make sure that I

23    didn't, you know -- that I -- that I didn't miss

24    anything while presenting all the evidence.

25              THE COURT REPORTER:  This is the court      09:01:47

                                                    Page 53

CONFIDENTIAL

```
 1    reporter.  I'm going to request a break soon,

 2    please.  Thank you.

 3              MR. REBLITZ-RICHARDSON:  Okay.  We can

 4    take a break now.

 5              THE VIDEOGRAPHER:  Going off the record.    09:01:55

 6    The time is 9:01 a.m.

 7              (Short recess taken.)

 8              THE VIDEOGRAPHER:  Back on the record, the

 9    time is 9:08 a.m.

10    BY MR. REBLITZ-RICHARDSON:                            09:09:07

11        Q.   Professor Amir, would you, please, look at

12    Amir Exhibit 1, and let me know when you have that

13    in front of you.

14        A.   Give me a second.

15              I have it in front of me.                    09:09:18

16        Q.   Good.  Amir Exhibit 1 discusses three

17    surveys; correct?

18        A.   Yes.

19        Q.   And that first is the Consumer Perceptions

20    Expectations Survey; is that right?                    09:09:29

21        A.   Yes.

22        Q.   And the second is the Interpretation

23    Survey; is that right?

24        A.   Yes.

25        Q.   And the third is the Likelihood of Use        09:09:35
```

Page 54

1   Survey; is that right?

2        A.   Yes.

3        Q.   Is it okay if I refer to those as the

4   first, second, and third surveys?

5        A.   Yes.                                    09:09:44

6        Q.   Thank you.

7             Who created the questions included in

8   those three surveys?

9        A.   I did.

10       Q.   Did Google's counsel offer any suggestions   09:09:52

11  on any of those survey questions?

12       A.   Not on the survey questions, no.

13       Q.   And did you make any changes to any survey

14  question based on input from Google's counsel?

15            MS. OLSON:  Beko, I think this might go      09:10:11

16  against the expert stipulation in this case.

17            MR. REBLITZ-RICHARDSON:  Are you objecting

18  and instructing him not to answer, or are you asking

19  a question?  I'm -- my question is, did he make any

20  changes to any survey question based on input from    09:10:32

21  Google's counsel; yes or no?

22            MS. OLSON:  Yes, I am instructing him not

23  to answer.  I think this is an improper question

24  based on the expert stipulation.

25            (Record marked.)                             09:10:42

                                                Page 55

1    BY MR. REBLITZ-RICHARDSON:

2        Q.    Professor Amir, are you going to follow

3    your counsel's instruction and not answer that

4    question?

5        A.    Of course.                                    09:10:45

6        Q.    Did you do any survey pretesting?

7        A.    Yes.

8        Q.    What is survey pretesting?

9        A.    Survey pretesting is -- is part of best

10   practices for a survey.  It's intended to make sure    09:10:54

11   that your survey is error free and clear and does

12   what you hope your survey will do.

13              And in particular, the way I did it here

14   is, I had a number of people from the relevant

15   respondent population going through the survey while   09:11:21

16   speaking out loud with a third-party observer that

17   wasn't aware of the goals of this survey to try to

18   catch any issues.  Such as, for example, if I want

19   them to be able to magnify an image and they can't

20   do it and to see that the -- the language makes        09:11:40

21   sense and people understand the questions.

22       Q.    Is survey pretesting required?

23       A.    In best practices world, it is required.

24       Q.    Is it a matter of researcher discretion

25   whether to conduct survey pretesting?                  09:12:00

                                                   Page 56

1        A.    Anything to do with surveys is a matter of

2    researcher discretion.  You can easily choose to do

3    a bad survey or not follow best practices, or you

4    can choose not to.

5        Q.    Is survey pretesting a matter of                09:12:16

6    researcher discretion?

7        A.    As I said, any matter of survey work is a

8    researcher discretion, but you can do a better or

9    worse job doing it.  And that's why there are some

10   standards that have been agreed upon as best          09:12:25

11   practices to try to help researchers avoid the

12   pitfalls of mistakes and issues with the survey and

13   other potential problems.

14       Q.    Did you re- -- refine any of your surveys

15   based on pretesting?                                    09:12:42

16       A.    I think I describe in my report that at

17   least in one survey, there were issues with the

18   image, being able to magnify it, which required

19   refinement.  But I don't think I had questions that

20   were unclear and needed correction.  But it's all    09:13:02

21   stated in my reports in the appendix.

22       Q.    Are you referring to Appendix E, "Pretest

23   Summary"?

24       A.    Yeah, but I think also mention, either in

25   the report or footnote, whether I changed anything   09:13:17

Page 57

1    or not.

2         Q.   Have you produced the survey questions

3    used during your pretesting?

4         A.   I believe I didn't change the questions

5    themselves to a degree.  But everything is described    09:13:30

6    in the report.  If I did, it's described.  But I

7    produced exactly the questions that were in the

8    actual survey.  They were very close.  It might have

9    been small changes.  If you want, I can go find the

10   spot in the report, where I discussed that.    09:13:48

11        Q.   Are you referring to footnote 13?

12        A.   Let me go to footnote 13.  I don't

13   remember the footnote numbers by heart.

14             Footnote 13.

15        Q.   On page 8, discussing pretesting; do you    09:14:11

16   see that?

17        A.   Yep, yep.  And I say, in response to

18   confusion about whether the hyperlink worked, I

19   added a pop-up text.  Yes, that's what I'm referring

20   to.  That means that the questions themselves are    09:14:23

21   pretty -- they're -- they're identical to what was

22   in the pretest.  But I changed this functionality.

23   I added the pop-up and the instruction, "please drag

24   the image to scroll," so it's clear to respondents

25   what they can and can't do.    09:14:43

Page 58

```
 1        Q.   So in footnote 13 of your report, you

 2   state, "Based on the results of pretesting, which

 3   are shown in more detail in Appendix E, I was able

 4   to refine each of my surveys."

 5             Do you see that?                        09:14:57

 6        A.   Yes.

 7        Q.   So you made changes to each of your

 8   surveys based on the pretesting; is that right?

 9        A.   Maybe.  I -- detailed here in the -- in

10   this second part of footnote 13, a specific change   09:15:09

11   that I made.

12        Q.   Professor Amir, you state in your report,

13   "I was able to refine each of my surveys."

14             Do you see that?

15        A.   Yeah, I said I was able to refine each of   09:15:22

16   my survey.

17        Q.   Did you refine each of your surveys?

18        A.   As I said, I refined what's detailed here.

19   I don't believe I needed to refine the other two

20   surveys.                                             09:15:36

21        Q.   You don't believe --

22        A.   The third survey.  This hyperlink with a

23   "learn more" appeared in all three surveys.  And I

24   think that's what this refers to.

25        Q.   Professor Amir, were there no changes to    09:15:50
```

Page 59

```
 1    your three surveys based on pretesting, other than

 2    what's described in footnote 13?

 3         A.   I believe that I described exactly what

 4    needed to be changed.  And that means there were

 5    changes to the three surveys.  Do you mean there      09:16:08

 6    were no other changes?

 7         Q.   Correct.  Are -- is it your testimony that

 8    there are no changes to your three surveys, other

 9    than the changes described in the second part of

10    footnote 13?                                          09:16:22

11         A.   I believe that's true.

12         Q.   And have you produced anything backing

13    that up?

14         A.   I produced the surveys, and I produced

15    the -- the pretest result, if I'm not mistaken.       09:16:34

16         Q.   Did you produce what was shown as part of

17    the pretesting?

18         A.   As I said -- so you -- you could -- I

19    produced -- as the best practice, I produced a

20    survey that I -- that I administered that             09:16:51

21    respondents actually saw and generated the data

22    reported in the report.  I also produced, if I'm

23    going to scroll down to it, give me a second, the

24    right appendix.

25         Q.   Appendix E; right?                          09:17:11
```

Page 60

1        A.    Yeah, yeah.  There are many appendixes.

2              I also produced the actual summary of the

3    pretest, and it did not yield any requirement to

4    change things other than what I wrote, I think.  But

5    let me just verify.                          09:17:38

6              Summary of pretests.  Yeah, it gives a

7    detail of -- of the responses in the pretests were

8    [verbatim].  And the conclusion I had was that

9    change to the hyperlink functionality was necessary,

10   and the change to the instruction that it can drag    09:18:07

11   the image if needed was necessary.  I believe that

12   no other changes resulted from my pretests.

13       Q.    So it's your testimony that no changes

14   resulted to any of your three surveys, other than

15   what's described in footnote 13; is that correct?     09:18:27

16       A.    Yes.

17             MS. OLSON:  Objection.  Asked and

18   answered.

19             Go ahead.

20   BY MR. REBLITZ-RICHARDSON:                            09:18:33

21       Q.    And have you provided the questions used

22   during your pretesting?

23       A.    So now -- now I'm not sure I understand

24   your question.  I -- Appendix E describes the

25   questions, the follow-up questions used in the        09:18:51

                                          Page 61

 1   pretests.

 2        Q.   Right.  But it doesn't describe the

 3   questions that were presented as part of the survey;

 4   right?

 5        A.   So, the survey, other than the changes I        09:19:00

 6   mentioned, is the same.  And so, effectively, it

 7   does show the questions other than this change that

 8   I describe in footnote 13.

 9        Q.   Right.  But we don't actually have what

10   you showed your survey pretesters, do we?              09:19:13

11        A.   We don't have the -- the page that had --

12   without the pop-up and without the -- the additional

13   instruction for the drag, we don't have that.  But

14   you can imagine exactly what it looks like.  The

15   pop-up only happens when you scroll onto it.  So in      09:19:34

16   a -- in a printed report it looks exactly the same

17   as we have here.  And we have an added instruction

18   that you can drag the image, which was not there

19   prior to the pretest.

20        Q.   I'm sorry if my question's not clear.        09:19:48

21             I'm just trying to clarify that it has not

22   been produced to us what was shown as part of your

23   survey of pretesting; is that correct or not?

24             MS. OLSON:  Objection.  Asked and

25   answered.                                              09:20:01

                                                    Page 62

1          THE WITNESS:  Again, I think I answered it

2     many times.  What you see here produced is nearly

3     identical.  And some of the pages are identical to

4     what was shown in the pretest.  The only change that

5     would be visible in a printed version is that          09:20:19

6     drag -- the extra drag image instruction.

7          Now, but just let me -- as best practices,

8     I've never seen the actual pre-pretest survey that's

9     part of the -- of the stages of design of a survey

10    produced in these reports.                            09:20:41

11    BY MR. REBLITZ-RICHARDSON:

12         Q.   And similarly, you have not produced the

13    pretest survey; is that correct?

14         MS. OLSON:  Objection.  Asked and

15    answered.                                             09:20:51

16         THE WITNESS:  No.  I think I answered it

17    four times.

18    BY MR. REBLITZ-RICHARDSON:

19         Q.   Is it a yes or a no?

20         MS. OLSON:  Same objection.                      09:20:58

21         THE WITNESS:  Yeah.  So other than the one

22    instruction, this is what was shown.

23    BY MR. REBLITZ-RICHARDSON:

24         Q.   How many pretest respondents did you have?

25         A.   If you look at Exhibit E, I've had about    09:21:07

                                                   Page 63

1    30 response -- total pretests, respondents, which

2    usually means that I divided ten each per pretest

3    because you do it on one-on-one, speak out loud,

4    third-party observation.  It's -- it's a -- it's an

5    involved process but very helpful.              09:21:35

6         Q.   And how were those 30 people selected?

7         A.   They were randomly selected from the

8    sample population or similar to the sample

9    population.

10        Q.   What is the sample population?       09:21:48

11        A.   Again, so I used a survey vendor called

12   Dynata with their panel, and I've asked Dynata to

13   provide ten people from their panel to do a pretest.

14        Q.   Of all the surveys you've conducted, have

15   you always done pretesting?                     09:22:09

16        A.   Of all the surveys I've done in

17   litigation?  Is that the question?  Or all the

18   surveys I've ever done?

19        Q.   Let's start with all surveys you've ever

20   done.                                           09:22:20

21        A.   Not all the surveys I've ever done I've

22   pretested.

23        Q.   With respect to the five surveys you've

24   previously conducted in connection with litigation,

25   have you always done pretesting?                09:22:29

Page 64

1       A.    Yes.  I've always pretested.

2       Q.    So I want to look at this Appendix E,

3  which is -- it says E-1 on the bottom.

4       Do you see that?

5       A.    Yes.                                    09:22:41

6       Q.    And so, these are notes from that

7  pretesting; is that right?

8       A.    Yes.

9       Q.    And would you -- note Number 2, would you,

10 please, read aloud that note Number two.          09:22:51

11      A.    "One respondent had issues with the

12 hyperlink on the private browsing splash screen.  A

13 second respondent had a question about what was

14 meant by Google receiving information."

15      Q.    In pretesting, did you ask about Google    09:23:05

16 receiving information?

17      A.    Survey 2, or the second survey as you

18 asked to refer to it, asked participants one of the

19 questions in that survey has to do with does Google

20 receive this kind of information.  I think this is    09:23:22

21 what the stud- -- this -- this person's referring

22 to.

23      Q.    And was any response provided to that

24 person in terms of what was meant by Google

25 receiving information?                                09:23:35

Page 65

1      A.   No.  So this is -- this pretest is not a

2  two-directional communication.  We're not trying to

3  explain a third -- as I said, the third party

4  observing this doesn't even know what the survey is

5  for.  They would not be able to respond to this.  We      09:23:47

6  record the speak-out-loud protocol, and the person

7  responding to the question must have said, you know,

8  I'm not sure what you mean when you say that.  But

9  only one person out of ten raised that question.

10      Q.   Was it your decision to use the               09:24:05

11  term "receiving" as part of your surveys here?

12      A.   Yes.  It seemed like the -- the -- the

13  cleanest version to test.  As we spoke before, it

14  gets very complicated once you move beyond the --

15  the transmission or reception of information.  And I      09:24:29

16  didn't think that most lay users would be informed

17  enough or understand what is meant by downstream,

18  you know, potential terminologies.  And since

19  receiving information is precursor to anything else,

20  I chose to focus on that.                                09:24:51

21      Q.   Did you consider using the

22  term "collecting" instead of "receiving"?

23      A.   I did not because, as I said, I -- I felt

24  that -- that is way more complex and not at the

25  heart of the issue of -- as I understood it, of          09:25:11

Page 66

1   what's in the case, is -- is -- is using private

2   browsing allowing information to be received.

3       Q.   And so, it's your testimony that Google's

4   collection is not at the heart of this case; is that

5   right?                                          09:25:34

6       A.   No.  I said -- that's not what I said.  I

7   said that in order to anything -- to do anything

8   downstream like collecting, you would first need to

9   receive the information.  And trying to explain a

10  survey so that -- let me take a step back.      09:25:48

11          The biggest critique of market research is

12  garbage in/garbage out.  That is if your responder

13  doesn't understand what you're asking about, they'll

14  answer something, but that something is

15  uninterpretable.  And the -- and the slang of it is  09:26:06

16  garbage in/garbage out.

17          I wanted to avoid garbage in/garbage out.

18  So I wanted to come up with questions that were

19  clear for lay users such that I can trust the

20  response to mean what I think it means.         09:26:20

21      Q.   So you referred to "downstream."  Is

22  collecting downstream from receiving?

23      A.   In my lay understanding of the world, yes.

24  One must happen before the first -- before --

25      Q.   And is -- is saving downstream from   09:26:32

                                                Page 67

1    receiving?

2          A.   As -- as I -- as we discussed before, I

3    view collecting as related to saving.  So it has to

4    be the case.  I mean, you can't save or collect or

5    do anything with the data that you don't receive.    09:26:49

6          Q.   Is using downstream from receiving?

7          A.   Of course.  I also explained that.

8          Q.   Is logging downstream from receiving?

9          A.   I don't exactly know what you mean by

10   logging.  But to the extent that logging is          09:27:05

11   registering that you received information, you had

12   to receive it in order to log it.

13         Q.   Is using incognito detection bits to track

14   private browsing downstream from receiving?

15              MS. OLSON:  Objection to the form.         09:27:23

16              THE WITNESS:  I don't know -- exactly know

17   what you mean.

18   BY MR. REBLITZ-RICHARDSON:

19         Q.   Do you know what incognito detection bits

20   are?                                                 09:27:32

21         A.   Not thoroughly.

22         Q.   Do you have any understanding?

23         A.   I have a vague understanding.  It

24   doesn't -- doesn't feel good enough to answer a

25   question.  If you want to explain what it is, I'll   09:27:40

                                             Page 68

1    try to -- to -- you know, to extrapolate and see

2    whether I think it's downstreaming from receiving or

3    not.

4         Q.   What is your vague understanding of what

5    incognito detection bits are?                         09:27:50

6              MS. OLSON:  Objection to the form.

7              THE WITNESS:  Yeah, I don't have a vague

8    understanding even.

9    BY MR. REBLITZ-RICHARDSON:

10        Q.   Okay.  Did any of your three surveys ask    09:27:54

11   about Google collecting private browsing data?

12        A.   I believe I testified that they -- that

13   the surveys do not directly ask about collecting.

14   And I explained why.

15        Q.   Did any of your three surveys ask about     09:28:10

16   Google saving private browsing data?

17        A.   I believe it's exactly the same answer I

18   just gave you.

19        Q.   Which is?

20        A.   Which is, as I answered before, my surveys  09:28:20

21   have to do with the understanding of -- you know,

22   the survey Number 2, that we just talked about, the

23   understanding of whether Google receives

24   information.  Survey Number 1 -- let me just go to

25   it so I can give you an exact answer -- asks whether  09:28:40

                                                  Page 69

1    various entities -- let me go to the exact --

2    receive information or data from a private --

3    private browsing session.  And my third survey has

4    to do with the likelihood of use of a browser that

5    displayed certain language on the incognito splash      09:29:23

6    screen and learn more screen.

7         Q.   So your first two surveys use the

8    term "receive" or "receiving"; correct?

9         A.   Yes.

10        Q.   And they never used the terms "collect" or    09:29:36

11   "save" or "use."  Right?

12        A.   Yes, and I explained why.

13        Q.   And your third survey asks about

14   likelihood of use.  It doesn't even get into the

15   issues of receive or collect or save or use; right?    09:29:52

16        A.   Not directly.

17        Q.   Okay.  Are you aware that Google

18   previously conducted studies regarding user

19   understanding in connection with private browsing?

20        A.   I've certainly seen documents that           09:30:09

21   summarize what must have been studied, conducted by

22   Google or for Google, on some of these questions.

23        Q.   And when designing your three surveys, did

24   you consider the work that Google previously

25   conducted regarding user understanding with private    09:30:24

Page 70

CONFIDENTIAL

1    browsing mode?

2          A.    No.

3          Q.    In connection with the three surveys you

4    conducted for this case, did you use an outside

5    programmer?                                          09:30:36

6          A.    I used Dynata, the sur- -- the survey

7    provider.  They also provide programming services.

8    And I used their services to do it.

9          Q.    And is that why you prepared programmer

10   instructions?                                        09:30:55

11         A.    Yes.

12         Q.    And those programmer instructions are

13   Appendices F-1, F-2 and F-3; correct?

14         A.    You know, as I said, I don't remember the

15   appendix name by heart.  Give me a second to scroll  09:31:05

16   there.

17               This is not very conducive of scrolling.

18   One second.

19               Yes.  So these appendices include

20   programmer instructions, but they also include the   09:31:35

21   actual survey questions.

22         Q.    Right.

23               And so, Appendices F-1, F-2 and F-3

24   include the programmer instructions, but then

25   Appendices G-1, G-2 and G-3 include the actual       09:31:49

                                                    Page 71

CONFIDENTIAL

```
1    screens showed to your respondents; is that right?

2        A.    Yes.

3             MS. OLSON:   Objection.   Compound.

4    BY MR. REBLITZ-RICHARDSON:

5        Q.    Okay.  Did you check whether the          09:31:57

6    programmer correctly implemented the instructions in

7    Appendices F-1, F-2 and F-3?

8        A.    Yes, I did.

9        Q.    Okay.  And what did you discover?

10       A.    I discovered that they had eventually      09:32:10

11   programmed it exactly as I requested.

12       Q.    Okay.  And so, the programming

13   instructions in Appendices F-1, F-2 and F-3

14   accurately described your three surveys in this

15   case; is that right?                                 09:32:26

16       A.    Yes, that is correct.

17       Q.    Have you ever programmed your own survey?

18       A.    Many, many times.

19       Q.    Have you ever used the Qualtrics survey

20   software program to program your own survey?         09:32:38

21       A.    More than 700 times in the last four

22   years.

23       Q.    When you did that, did you prepare

24   programmer instructions?

25       A.    I did not.                                 09:32:50
```

Page 72

CONFIDENTIAL

1      Q.   You don't create a set of programmer

2   instructions for yourself, do you?

3      A.   I don't create them for myself.  When I

4   work with Ph.D. students, which is quite often, or

5   colleagues, we create a document that -- usually we      09:33:00

6   call it an outline that explains exactly what the

7   survey should do.

8           But when you program something yourself,

9   you don't usually -- especially for academic

10  purposes, you don't need more than the survey itself     09:33:12

11  to present later.

12     Q.   Are you familiar with the phrase "survey

13  universe"?

14     A.   Of course.

15     Q.   What is survey universe?                         09:33:21

16     A.   Survey universe is the target population

17  for a survey.

18     Q.   Is it important to select the right survey

19  universe?

20     A.   It certainly is.  It's best practices.          09:33:34

21     Q.   Why is that?

22     A.   Remember my critique about garbage

23  in/garbage out.  If you ask the wrong people, their

24  opinions that they provide might not be relevant to

25  the question you were interested in.                     09:33:52

Page 73

1          Q.   Do you agree that selection of the proper

2     universe is a crucial step?

3          A.   Of course.

4          Q.   In conducting a survey for litigation, is

5     it important to ensure that the appropriate          09:34:01

6     participants are represented?

7          A.   It's true -- it's important for any

8     purpose of a survey.  Litigation included.

9          Q.   If you don't have the right survey

10    universe, the results are pointless; right?          09:34:13

11         A.   They're not --

12              MS. OLSON:  Objection to the form.

13              THE WITNESS:  They might not be pointless,

14    but they certainly don't make your point.

15              In order to have the proper survey that     09:34:26

16    will speak to the question you're interested in, you

17    need to have the right survey universe.

18    BY MR. REBLITZ-RICHARDSON:

19         Q.   Can results be pointless if you have the

20    wrong survey universe?                               09:34:37

21         A.   They can be pointless.

22         Q.   Do you agree that even if proper questions

23    are asked in a proper manner, if the wrong persons

24    are asked, the results are likely to be irrelevant?

25              MS. OLSON:  Objection to the form.          09:34:54

```
1              THE WITNESS:  I -- I agree with you that

2     the right survey universe is key to the -- to coming

3     up with the conclusions that would answer the

4     question you're interested in.

5     BY MR. REBLITZ-RICHARDSON:                        09:35:03

6         Q.   How did you define the survey universe in

7     this case?

8         A.   I defined it as internet users above the

9     age of 18 who have used private browsing in the past

10    six month [verbatim] and have used some of -- you    09:35:20

11    know, the -- the browsers that are at issue or

12    mentioned in the Complaint.

13        Q.   Did you have a different survey universe

14    for your pretesting?

15        A.   I did not.                                  09:35:40

16        Q.   Did you have a different sur- -- survey

17    universe for each of your three surveys?

18        A.   I did not.

19        Q.   It was the same survey universe for all

20    three of your surveys; is that correct?             09:35:54

21        A.   I believe that's correct.

22        Q.   What part of your report explains what the

23    survey universe was that you used for each of your

24    three surveys?

25        A.   So Appendix -- Appendices F 1, 2, and 3    09:36:10
```

Page 75

CONFIDENTIAL

```
1    detailed the criteria set and the screening

2    questions used to get there.

3            Let me scroll back up where I describe the

4    actual surveys.

5            Yeah, I believe -- I believe the details      09:36:47

6    are in Appendices F.1, F.2, and F.3.

7        Q.   And in Appendices F.1, F.2, and F.3, you

8    describe how you qualified respondents to

9    participate in your three surveys; correct?

10       A.   Yes.                                          09:37:15

11       Q.   And did you use the same qualification

12   questions for all three surveys?

13       A.   I believe so.

14            (Simultaneous speaking.)

15            (Interruption in audio/video.)               09:37:20

16   BY MR. REBLITZ-RICHARDSON:

17       Q.   And for all three of -- sorry, were you

18   done?

19       A.   I just said it's been a while.  I believe

20   that I used the same questions for all three.         09:37:28

21       Q.   And for all three surveys, Question 5

22   asked whether the respondent or any member of their

23   household had ever worked for certain types of

24   companies; is that correct?

25       A.   Yes, that's correct.                          09:37:43
```

Page 76

CONFIDENTIAL

1      Q.    If someone checked that they or a member

2   of their household had ever worked for a law firm,

3   legal services organization, or court, what

4   happened?

5      A.    They did not continue to the survey.  So      09:37:56

6   they're -- people like that are not included in the

7   data.

8      Q.    Why not?

9      A.    I think it's best practice in almost every

10  survey work for lawsuits that I've seen because        09:38:11

11  these people might understand the -- the -- and --

12  and maybe empathize with a specific side of -- of

13  legal cases.

14        And so you -- there's -- you suspect these

15  people might not have an -- an objective, unbiassed    09:38:34

16  response to questions in the survey.

17     Q.    And -- and your -- your goal in not

18  including them is to omit people who might have an

19  objective unbias -- who might not have an objective,

20  unbiassed response to the questions; is that right?    09:38:54

21     A.    Yeah.  So the goal was to, you know, in --

22  in the first study to get the -- the unbiassed,

23  objective perceptions and understandings and

24  expectations.

25        So -- and the second study was the -- the        09:39:06

Page  77

CONFIDENTIAL

```
 1   same for the understandings.

 2            And in the third study, it was the same

 3   for likelihood of usage.

 4            And so, yes, the screening questions are

 5   meant to screen in the right survey universe.  And    09:39:18

 6   by doing that, avoid potential pitfalls.  Not that I

 7   believe that there are many respondents in their

 8   database anyway that marked this, but it's -- this

 9   is best practices.

10        Q.   For any of your three surveys, did you ask   09:39:35

11   whether the respondent had ever worked for Google?

12        A.   I did not ask whether they worked for

13   Google.

14        Q.   Why not?

15        A.   It didn't seem relevant.                     09:39:46

16        Q.   Have any of the respondents included in

17   your surveys ever worked for Google?

18        A.   I don't know.

19        Q.   Did you obtain any information from your

20   respondents that can be used to determine whether      09:40:03

21   they ever worked for Google?

22        A.   No, because it doesn't seem relevant.

23        Q.   Question -- for all three surveys,

24   Question 7, you asked what internet browsers the

25   person currently used; right?                          09:40:15
```

Page 78

1        A.   Yes.  I asked, "Thinking about devices you

2    use to browse the internet" -- I don't know what --

3    where you came up with "currently" -- oh, "do you

4    currently" -- "which internet browser do you use

5    currently use," yes.                            09:40:32

6        Q.   You see that in your question you asked

7    "which internet browsers do you currently use?"

8        A.   Yes.

9        Q.   Do you see that?

10           Did you ask all of your respondents to      09:40:39

11   identify which internet browsers they currently used

12   at the time they took the survey?

13       A.   Yes.

14       Q.   And why did you limit that question to

15   current usage?                                  09:40:50

16       A.   This -- this is not a choose one question.

17   And this is, again -- so let me -- let me go a step

18   back.

19           In these questions -- type of questions,

20   what you really worry about, as we talked about, is  09:41:07

21   potential bias, but you also worry about recall

22   biases.

23           So if I ask you which browser you used,

24   you know, Tuesday last year, the -- the response is

25   not going to be reliable.                        09:41:20

                                            Page 79

1          So asking people what browsers they

2     currently use is, you know, standard practice to get

3     a reliable response.

4          Q.   Is it your testimony that asking a person

5     what browsers they used last year would necessarily    09:41:35

6     be unreliable?

7               MS. OLSON:  Objection.  Misstates the

8     testimony.

9               THE WITNESS:  Yeah, I said on a Tuesday,

10    specific Tuesday last year, that would probably be     09:41:45

11    unreliable.  And by "last year," I mean a year ago.

12              Yes, as -- as the more time passes between

13    now and the past, the less reliable the response is.

14    There are a lot of studies that show that.

15              It's best practice, for example, instead     09:42:02

16    of telling -- of asking you which foods did you eat

17    last week, which is -- even -- even that is going to

18    be not easy to answer, if I asked you which food did

19    you eat yesterday, it will be much more reliable.

20    BY MR. REBLITZ-RICHARDSON:                             09:42:19

21         Q.   So is it your testimony that you asked

22    your respondents which internet browsers they

23    currently use because you thought it would be

24    unreliable to ask them what browsers they had used

25    in the past?                                           09:42:31

                                                 Page 80

```
 1        A.    No.  I said it's more -- it's way more

 2    reliable to -- to ask this question than to ask

 3    about the distant past.

 4            And, again, this is -- there's a reason

 5    for this question, which is a little different in       09:42:46

 6    the -- you know, in the different surveys.  And this

 7    is the question that I want -- this is the -- the

 8    data that I wanted to use in order to know, for

 9    example, which condition they should be in in -- in

10    the first survey.                                       09:43:01

11        Q.    So how did you use the information

12    provided in response to Question 7 regarding the

13    browsers currently used by your respondents?

14        A.    Again, so if you -- if you scroll to page

15    F.1-6 -- let me know when you get there.                09:43:18

16        Q.    Yes, I'm there.

17        A.    -- so it says -- this -- this study had

18    three conditions:  Chrome, Safari, and Firefox.

19            And based on that response to Question 7,

20    it says, "AMONG 'GOOGLE CHROME,' 'SAFARI,' AND          09:43:35

21    'MOZILLA FIREFOX' IN QS7, IF RESPONDENTS SELECTED

22    ONLY 'GOOGLE CHROME,' ASSIGN TO THE 'CHROME' GROUP."

23            And it basically describes the entire

24    logic among Google Chrome, Safari, and Mozilla

25    Firefox.                                                09:43:48
```

Page 81

```
 1              "IN QS7, IF RESPONDENT SELECTED ONLY

 2     'SAFARI'" [as read] --

 3              THE COURT REPORTER:  Excuse me.

 4     Counsel -- excuse me.  Sir, if you could slow down,

 5     please.                                        09:43:59

 6              THE WITNESS:  Yeah, sorry.  I apologize.

 7              "AMONG 'GOOGLE CHROME,' 'SAFARI,' AND

 8     'MOZILLA FIREFOX' IN QS7, IF RESPONDENT SELECTED

 9     ONLY 'MOZILLA FIREFOX,' ASSIGN TO 'FIREFOX' GROUP."

10              Now, "AMONG 'GOOGLE CHROME,' 'SAFARI,' AND   09:44:13

11     'MOZILLA FIREFOX' IN QS7, IF RESPONDENT SELECTED

12     MORE THAN ONE OPTION, RANDOMIZE BROWSER GROUP AMONG

13     THE SELECTED OPTIONS." [As read]

14              "AMONG 'GOOGLE CHROME,' 'SAFARI,' AND

15     'MOZILLA FIREFOX' IN QS7, IF RESPONDENT DID NOT    09:44:23

16     SELECT ANY OPTION, RANDOMIZE BROWSER GROUP."

17              And now it shows you below that that I set

18     criteria for minimums of completes for the different

19     conditions.

20              I put more in Chrome because I felt that I   09:44:38

21     needed more -- even more reliable responses for

22     Chrome given that this is the browser at issue.

23              And then -- then there's a secondary

24     assignment, which is assigning to mobile or desktop

25     based on the current device they're using, because I   09:45:00
```

Page 82

```
1    added a question that detects which type of device

2    they're logging in from.

3            And in Chrome, I wanted to make sure I had

4    representation from both.  But -- but at -- at the

5    very least, I have enough respondents for the          09:45:14

6    desktop version.

7    BY MR. REBLITZ-RICHARDSON:

8        Q.   Professor Amir, is it correct that the

9    page F.1-6 at the bottom describes how you used the

10   information provided in response to Question 7 to      09:45:27

11   assign people to a Chrome, Safari, or Firefox group?

12       A.   Yes.

13       Q.   And those were your three brow- -- browser

14   groups for Survey 1:  Chrome, Safari, and Firefox;

15   correct?                                                09:45:46

16       A.   Yes.

17       Q.   For your second and third survey, did you

18   only have a Chrome group?

19       A.   Let me scroll down there.

20            So in my second survey, I believe that         09:46:13

21   there are four conditions, and respondents were

22   randomly assigned to these four conditions, again,

23   either in mobile or desktop, based on the device

24   they're currently using to log in to the survey.

25       Q.   Can you clarify what page you're looking        09:46:41
```

Page 83

```
 1    at for the record?  Is --

 2         A.   F.2-6.

 3         Q.   Okay.  So F.1-6 describes the use of the

 4    information for groups in the first survey.  And

 5    F.2-6 describes the use of information for your          09:46:57

 6    second survey --

 7         A.   Yeah.

 8         Q.   -- is that right?

 9         A.   But let me -- let me go back to your

10    question.  When you -- when you said "only," I don't   09:47:08

11    think that was accurate because in -- after the

12    study, I used data from QS7 to do sensitivity

13    analysis --

14         Q.   Mm-hmm.

15         A.   -- which were very informative to answer      09:47:18

16    some potential critiques and to test for reliability

17    and things like that.

18              So it's not -- I didn't only use it to

19    assign.  I also used it in analysis.

20         Q.   Okay.  Thanks for that clarification.         09:47:34

21              But just -- just to be clear, as reflected

22    in F.1-6, you had three browser groups for your

23    first survey:  Chrome, Safari, and Firefox; correct?

24         A.   I had three conditions.  I don't know what

25    browser groups is.                                      09:47:49
```

Page 84

```
 1        Q.   Well, you say "Browser Groups" [verbatim]

 2   on F.1-6 on the left side of your table.

 3        A.   Yeah.

 4        Q.   You see that?

 5        A.   Yeah, so those are the conditions, yes.    09:47:55

 6        Q.   Well, you -- you said "Browser Group";

 7   right?

 8        A.   Yeah.

 9        Q.   Okay.  And you have three browser

10   groups --                                            09:48:01

11        A.   Yeah.

12        Q.   -- Chrome, Safari, and Firefox; right?

13        A.   Yes.

14        Q.   On the second survey, do you also have

15   three browser groups, Chrome, Safari and Firefox, or 09:48:07

16   is it just Chrome?

17        A.   It's just Chrome.

18        Q.   Okay.  And the third survey, is it just

19   Chrome?

20        A.   Whatever you say -- the second survey      09:48:19

21   is -- is -- one of the conditions -- I don't know

22   what you mean by "just Chrome"; but just to clarify,

23   one of the conditions is the Chrome Splash Screen

24   and Learn More.

25             The other conditions also show various     09:48:29
```

Page 85

1    other text to the responders.  So there's four

2    groups or --

3         Q.    Right.

4         A.    Mm-hmm.

5         Q.    But all of those are people who clicked      09:48:37

6    that they used Chrome in response to Question 7?

7         A.    No.  No.

8         Q.    No.  Okay.

9         A.    I don't think that's true.

10        Q.    So Group A, B, C, and D, where -- where      09:48:47

11   are they coming from?  Does it matter what they

12   clicked in response to Question 7?

13        A.    It matters to the extent that they could

14   be terminated if they clicked a nonexisting browser

15   called Odeon or any combinations.  So that's sort of   09:49:05

16   a qualitative trap.

17             But to the extent they clicked an existing

18   browser, they all moved to -- to respond to one of

19   four conditions.

20        Q.    So Survey 2 isn't limited to Chrome users;   09:49:19

21   is that right?

22        A.    Survey 2 is not limited to only Chrome

23   users.

24        Q.    And what about Survey 3, is that limited

25   to Chrome users or not?                                09:49:31

Page 86

```
 1        A.    Let me get there just to be -- give you a
 2   solid answer, but I believe the answer's very
 3   similar.
 4        Q.    Yeah.  And just let us know which page
 5   you're looking at.                               09:49:42
 6        A.    So I'm looking at F.3-4.  It only
 7   terminates people who have -- who click Odeon in
 8   some combination.  The rest continue to question
 9   QS8.
10             And then, again, people are randomized to 09:50:03
11   one of two conditions later on and are shown to
12   desktop versus mobile.
13             Yeah, so the sur- -- the third survey is
14   also not only limited to people who only use Chrome.
15        Q.    So your second and third surveys are not  09:50:24
16   limited to people who use Chrome; is that correct?
17        A.    Yes.  Neither is my first one.
18        Q.    Right.  And your first one has three
19   different browser groups:  Chrome, Safari, and
20   Firefox; right?                                  09:50:38
21        A.    Yes.
22        Q.    But your second and third surveys don't
23   have any limited browser group; is that right?
24        A.    That's right.
25        Q.    Okay.  Thank you.                     09:50:46
```

Page 87

CONFIDENTIAL

```
 1               For any of your surveys, did you create a

 2     browser group of Edge users?

 3          A.   So, again, I don't -- I don't want to --

 4     to use the wrong terminology when you say "create a

 5     browser group."                                  09:51:01

 6               Browser group in Study 1 refers to the

 7     condition, the -- the stimuli that -- that

 8     respondents were shown.  They were either shown

 9     Chrome stimuli or Safari stimuli or Firefox stimuli.

10               Given that I don't terminate people who    09:51:15

11     don't only use Chrome, I do have people who use Edge

12     or Internet Explorer in my studies.  And in

13     sensitivity analysis subsequent, I can look and see

14     exactly what they respond.

15               So that's how I would address it.  I don't  09:51:33

16     know what you mean by create a study group for.

17          Q.   So going back to F.1-6, you've got three

18     browser groups there, Chrome, Safari, and Firefox,

19     but you don't have any browser group for Edge or

20     Internet Explorer; correct?                        09:51:45

21          A.   I think you --

22               MS. OLSON:  Objection.  Asked and

23     answered.

24               THE WITNESS:  Yeah, I think you

25     misunderstand what is meant by "browser group," so   09:51:54
```

Page 88

```
 1    let me explain and clarify.

 2             Let me just get to that page so we're all

 3    looking on the same page.

 4    BY MR. REBLITZ-RICHARDSON:

 5        Q.   Yeah, so I'm looking at F.1-6.  And at the    09:52:01

 6    top it says:  "FIRST, ASSIGN RESPONDENT TO BROWSER

 7    GROUP:"

 8             Do you see that?

 9        A.   I see that.  Hold on.  I saw that.  Let me

10    just go to the right page.  F.1-6.                     09:52:11

11             Yes.

12             So when --

13             (Simultaneous speaking.)

14             (Interruption in audio/video.)

15             THE COURT REPORTER:  Wait.  One second,        09:52:23

16    please.  There are two people speaking, and it's

17    cancelling both of you out.  Thank you.

18    BY MR. REBLITZ-RICHARDSON:

19        Q.   My only question is, do you see that?

20    I -- I -- can I ask a question, or do you want to      09:52:27

21    just talk here?

22        A.   I -- I thought you asked a question, and I

23    scrolled to this page in order to answer.  But you

24    can ask a question, if you want.

25        Q.   So my question is, right there at the top      09:52:38
```

Page 89

1   of F.1-6, you say "FIRST, ASSIGN RESPONDENT TO

2   BROWSER GROUP"; right?

3        A.   It does say that.

4        Q.   And then you have programming instructions

5   on how to assign people to the Chrome group, the        09:52:49

6   Firefox group, and the Safari group.

7             Do you see that?

8        A.   Yes.  I think -- I believe I read them out

9   loud before.

10        Q.   Okay.  You -- you did not have any            09:53:02

11   assignment to a specific Edge or Internet Explorer

12   group; correct?

13        A.   In this study, that is correct.  And

14   that's because this was before the -- the claim was

15   amended.                                                09:53:17

16             The -- and -- and when I designed the

17   study, Edge wasn't actually explicitly mentioned in

18   the claim.

19             But just to answer your previous question

20   which you've glossed over, browser group in this       09:53:30

21   first survey relate -- re- -- relates to the

22   condition, the type of stimuli respondents saw.

23             In the other studies, you asked me you

24   didn't create browser group for -- in the other

25   studies, the other studies don't have the same         09:53:50

Page 90

1    design.

2         Q.   Mm-hmm.

3         A.   So there are no conditions that are

4    specific to certain browsers, but I can expose --

5    because of my QS7, I can create groupings of people      09:54:01

6    who use different browsers and analyze whether they

7    respond differently to the questions the survey

8    asked.

9         Q.   Now -- and why would -- why did you have

10   Firefox here as -- as one of the browser groups?        09:54:18

11        A.   So the goal of the study was to look at

12   the expectations and perceptions based on private

13   browsing.  And so I picked Chrome both because it's

14   in the Complaint -- the main thing, in the

15   Complaint, and because it's the highest market share    09:54:40

16   browser based on third-party data, which I cite.

17             Safari was the second on desktop, and

18   Firefox was the third.

19        Q.   So you included Chrome, Safari, and

20   Firefox because they had the highest market share;      09:54:55

21   is that right?

22        A.   Yes, they are the most -- most used

23   browsers in the market based on -- you know,

24   consistently based on third-party data.

25        Q.   And in collection -- in -- in -- in          09:55:04

Page 91

1    connection with this decision, did you investigate

2    whether Google receives information when people use

3    the private browsing mode in Firefox?

4         A.   This wasn't part of the assignment and

5    wasn't related to what I was trying to do.          09:55:19

6         Q.   Did you discuss that with anyone?

7         A.   No.

8         Q.   Okay.  To qualify for any of your three

9    surveys, did you require that the person had used

10   any specific private browsing mode?                 09:55:30

11        A.   Let's scroll up to QS8.

12        Q.   Mm-hmm.

13        A.   QS8 is actually an example of best

14   practices, how do you do this kind of screening in a

15   nonleading way.  I suggest -- I -- I include various  09:55:48

16   aspects of browsers, and I asked participants, "In

17   the past six-month [verbatim], which of the

18   following features, if any, have you used in your

19   internet browsers?" [As read].

20             I then only allow people to continue the   09:56:08

21   survey if they had clicked at least "Private

22   browsing mode" in their responses.

23        Q.   So in order to participate in your survey,

24   someone has to have currently used a browser other

25   than Odeon and within the past six months have used  09:56:30

Page 92

1    private browsing mode; is that right?

2         A.   That is -- that is almost accurate.  So in

3    some sense -- another way to think about it, has

4    used any of the browsers that -- that have any --

5    any decent market share in the market is using and        09:56:50

6    have -- recalls using private browsing in the last

7    six month [verbatim].

8         Q.   And did you then ask the respondents to

9    identify specifically which private browsing mode or

10   modes they had used?                                      09:57:04

11        A.   Do you mean on which browser?

12        Q.   Correct.

13        A.   I did not.

14        Q.   Okay.  Do you have any information

15   regarding specifically which private browsing mode        09:57:16

16   or modes were used by any of the respondents in your

17   surveys?

18        A.   Of course I do.

19        Q.   Where?

20        A.   Because my sample is large enough, I can        09:57:26

21   look at people -- this is kind of what you can do in

22   the analysis.  I can look at people who only marked

23   using Chrome or who only marked using Safari or, if

24   you want, only marked using Edge.

25             Given that all my sample has marked using       09:57:45

                                                    Page 93

1    private browsing in the last six month [verbatim],

2    those people I know for certain which private

3    browsing they used.

4         Q.   How do you know that for certain?

5         A.   Because they say which browsers they used.   09:57:57

6    And if you -- if they only used Chrome and they say

7    that they have used private browsing, it needs to

8    have been in Chrome.

9         Q.   What about someone who currently uses

10   Chrome, but previously used Safari and used private   09:58:10

11   browsing mode on Safari?

12        A.   You know, that -- there's a possibility

13   that those people, I don't know for sure what they

14   used on.

15        Q.   So you asked about current browser usage;   09:58:22

16   right?

17        A.   Yes.  But current doesn't mean which

18   browser are you currently logging in to the survey

19   with, because then I would only get one response.

20             When you ask people what current -- what    09:58:35

21   they currently use, that's a general question.  They

22   don't take current literally.  They don't respond --

23   I actually know which browser they're logging in

24   from.  I don't -- so the question doesn't -- and the

25   data supports that.                                   09:58:49

                                                    Page 94

1              The question doesn't get interpreted

2    literally.  It basically -- it asks kind of

3    generally what do you currently use.  And people

4    list the kind of browsers they currently use.

5              So there is some chance that somebody has      09:59:01

6    used Safari all their life until two days ago and

7    have switched to Chrome.  Chances are when -- the

8    browser you currently use, they'll list both of

9    them.  But there -- there is some chance that --

10   that there's a small proportion which will be        09:59:19

11   missed.

12       Q.   So it's -- it's your opinion that

13   currently means recently?  Is that what you're

14   testifying?

15       A.   What I mean is that respondents interpret     09:59:27

16   currently not literally.  They don't respond which

17   browser they're currently using to log in to the

18   survey.  Because, otherwise, every respondent would

19   have responded just with one.  They don't do that.

20             People who log from the desktop also say       09:59:44

21   Safari if that's what they use on their phone.

22   That's how participants in surveys interpret this

23   kind of question.

24       Q.   What backup do you have for that

25   assertion, if any?                                     09:59:57

CONFIDENTIAL

```
 1        A.    Data.

 2        Q.    From this survey?

 3        A.    Of course.

 4        Q.    Any other?

 5        A.    Yeah, I've run over 700 studies in the      10:00:04

 6   last four years.

 7        Q.    And so whenever you use the word

 8   "currently," it's your understanding that people

 9   interpret that to mean recently?

10        A.    Yeah, or -- or in general, yes.  They      10:00:09

11   don't -- they -- respondents don't interpret this

12   literally most of the time.  If you want the

13   literal, you have to emphasize and explain "what are

14   you using now."

15        Q.    For the people who identified the browser  10:00:22

16   that they were using to conduct your survey, did you

17   follow up to clarify that they understood that

18   currently meant recently and not currently as in

19   during that survey?

20        A.    I did not -- so you see the survey in       10:00:40

21   front of you.  I did not follow up with any of this.

22   I do this analysis.  It looks at people who use --

23   who re- -- report using a single browser exposed

24   once I have the data, not before.

25        Q.    And do you have data indicating what        10:00:56
```

                                              Page 96

CONFIDENTIAL

1    browser's being used to conduct the survey and

2    whether or not that corresponds to the browser they

3    selected in response to Question 7?

4         A.   I'll have to look at that and see.

5         Q.   So Question 7, you asked about current        10:01:08

6    browser usage; right?

7         A.   And I explained it when I said you -- what

8    browsers, and I have brackets with -- you know, with

9    a plural "S."  And because I have browsers --

10   browsers or -- or browser or browsers, respondents    10:01:24

11   understand that I am not asking about the browser

12   they are currently logged in now and respond with

13   multiple browsers.  Most responders respond with

14   more than one browser.

15        Q.   So what do you mean by "currently"?          10:01:41

16        A.   And I think I explained it, but I'll

17   explain again.

18             When I ask, What browser or browsers do

19   you currently use, respondents generally understand

20   this as the set of browsers that I currently use in   10:01:55

21   my daily life, that I generally, currently use in my

22   gen- -- in my daily life, which is why they respond

23   with more than one browser, not just the browser

24   they're logged in.

25             You -- you need to work hard to get them     10:02:05

Page 97

1    to understand that you want to be literal now.  And

2    the fact that I have an -- a plural "S" on

3    "browsers" pretty much explains that I'm not

4    interested in the single browser that you're

5    currently logged in; otherwise, it wouldn't be          10:02:20

6    plural.

7         Q.   Why did you ask about current browser

8    usage, but then ask about private browsing usage

9    over the past six months?

10        A.   Well, current browser usage give           10:02:36

11   [verbatim] me the set of browsers they're using.

12   And private browsing is a rare event for most

13   people.  And, therefore, you know, antic- -- you

14   know, asking people if they're currently using

15   incognito mode is not going to be specific enough.      10:02:47

16            And so, I have people try to tell me have

17   they recently used incognito mode, and I want to be

18   clear, so I define recently as in the past six month

19   [verbatim], which is, you know, not a short period,

20   but -- but a decent period for people to try to         10:03:06

21   recall a behavior that's not distinct as -- as some

22   other behavioral events in life that is incognito

23   or -- or -- sorry -- private browsing mode usage.

24        Q.   What basis do you have to say that usage

25   of "private browsing mode is a rare event," other      10:03:26

Page 98

CONFIDENTIAL

```
 1    than your own experience?

 2         A.   So anecdotally, my own experience.  There

 3    is -- Aly, can I say what's in the report for

 4    attorney eye [verbatim] only?

 5              MS. OLSON:  Yeah, you can -- you can say      10:03:44

 6    it.  And we'll mark that part confidential.

 7              THE WITNESS:  Okay.  So one of the Google

 8    documents reported that the -- ███████████████████

 9    ███████████████████████████████████████████████████

10    ███████████████████████████████████████████████      10:04:02

11    ████████████████████████████████████   ████████

12    █████████████████████████████████████████

13    ███████████████████████████████████████.  And

14    that's the basis for my statement.

15    BY MR. REBLITZ-RICHARDSON:                           10:04:20

16         Q.   Any other basis for that statement?

17         A.   Yeah -- yeah, I mean, you -- you know, if

18    you read the memory literature and you look at

19    events that are distinct, the death of relative, the

20    breakup, divorce, in my world view, those are a      10:04:32

21    different level than incognito mode using.

22         Q.   With respect to Questions 7 and 8, if

23    someone had selected Chrome and Opera but it only

24    used private browsing mode in Opera, how did you

25    deal with that?                                      10:04:50
```

1        A.   Again, so in my post-study analysis, the

2   main overall data does not deal with that directly.

3   The main overall data is -- is everyone who have

4   used these browsers and reports having used private

5   browsing mode.                                    10:05:09

6            In subsequent sensitivity analysis when I

7   look at Chrome-only users or Safari-only users, that

8   data does not include those people you just

9   mentioned.

10       Q.   Did you ask your respondents whether they   10:05:26

11  had, in the past three months, taken any other

12  survey related to private browsing mode?

13       A.   Let me go to the study and see how I

14  worded these post-study questions.

15       Q.   I can direct you to F.1 -- F.1-15.          10:05:50

16       A.   Thank you.

17            So "QF4.  In the past three months, have

18  you or have you not taken any other survey related

19  to private browsing" --

20            THE COURT REPORTER:  Excuse me.  Sir,        10:06:10

21  could you read a little slower into the record.

22  Thank you.

23            THE WITNESS:  Yes.  I apologize again.

24            And QF4 states:  "In the past three

25  months, have you or have you not taken any other       10:06:19

1    survey related to private browsing mode?"

2    BY MR. REBLITZ-RICHARDSON:

3         Q.   Is that a question that you asked all of

4    your respondents?

5         A.   Yes.                                  10:06:28

6         Q.   Why did you ask that?

7         A.   As -- as we've discussed before, I would

8    like to present results that are not potentially

9    biassed or tainted by external influences.  And so,

10   I asked this question.                          10:06:46

11            And then I subsequently do sensitivity

12   analysis to look at what's the difference between

13   respondents who say they did or -- or say that they

14   did not, and does omitting these responders change

15   the nature of my conclusion or impacts the results.  10:07:03

16   That's what sensitivity analyses do.

17            And in this particular case, whether

18   because the sample -- the proportion is not that

19   large or because there is no bias caused by that,

20   these respondents do not actually respond          10:07:19

21   differently and so omitting them or including them

22   does not change the nature of results.

23        Q.   Did you remove respondents who had, in the

24   past three months, taken another survey related to

25   private browsing mode?                           10:07:34

```
 1        A.   As I said, after conducting sensitivity

 2   analysis and finding out that these respondents do

 3   not respond differently, I kept them in to -- to

 4   provide a more complete dataset.

 5        Q.   In other surveys, have you removed        10:07:46

 6   participants for having taken a similar or identical

 7   study beforehand?

 8        A.   And you mean in this case?

 9        Q.   Not in this case.  I know in this case,

10   you did not.                                        10:07:59

11        A.   Yeah.

12        Q.   In other cases, have you removed

13   participants for having taken a similar or identical

14   study beforehand?

15        A.   The best practices are to do sensitivity  10:08:07

16   analysis and test whether the -- as I said, they

17   respond differently.

18             If they respond differently, then you

19   worry about bias, and you present the results

20   without them.  I don't think that I ran into a case  10:08:24

21   where that was the case.  But I suspect the best

22   practices there, because some cases are so famous

23   and known such that overlap between surveys can

24   produce bias.

25        Q.   Right.                                    10:08:40
```

Page 102

```
 1              And my question is just:  In any other

 2    study that you've conducted, have you removed

 3    participants for having taken a similar or identical

 4    study beforehand?

 5         A.   I don't think I --                      10:08:50

 6              MS. OLSON:  Objection.  Asked and

 7    answered.

 8              Just want to repeat your answer?  I don't

 9    know if it got written down.

10              Professor Amir, will you just repeat what  10:09:03

11    you said.  I -- I cut you off.

12              THE WITNESS:  Yeah.  Sorry.

13              I don't think I -- I have had the case

14    where that caused bias in my studies.

15    BY MR. REBLITZ-RICHARDSON:                        10:09:13

16         Q.   Okay.  So you don't think you've had a

17    case where you've removed participants for having

18    taken a similar or identical study beforehand;

19    correct?

20         A.   As far as I can remember, that's correct.  10:09:23

21         Q.   How many of your respondents were people

22    who had, in the past three months, taken another

23    survey related to private browsing mode?

24         A.   I don't know if I remember the number by

25    heart.  Let me try to think about it.            10:09:41
```

                                                      Page 103

```
 1              I -- I don't remember the percentage by

 2    heart.  I think it was a small percentage.

 3         Q.   Less than 5 percent?

 4         A.   I don't remember.

 5         Q.   Less than 10 percent?                  10:10:03

 6         A.   Again, if I say "I don't remember," then

 7    you can -- I'm not going to guess.

 8         Q.   Would it surprise you if it was more than

 9    10 percent?

10         A.   I mean, it's not necessarily out of the   10:10:14

11    question because Keegan and I used the same data

12    provider, sample provider.  But I know for a fact

13    that I did sensitivity analysis and it didn't change

14    the results.  That's what's important.

15         Q.   Professor, you stated it was a small      10:10:32

16    percentage.  I'm just trying to understand is

17    that -- what do you mean by "small percentage"?

18         A.    I said that I don't remember.  I don't

19    remember it being a large percentage.  What I know

20    for sure is that my studies excluded past           10:10:44

21    participants.  So my studies do not have overlap in

22    their samples.

23         Q.   So sitting here today, you don't know what

24    percentage of the respondents included in your

25    results were people who had, in the past three      10:11:01
```

Page 104

```
 1   months, taken another survey related to private

 2   browsing mode; is that correct?

 3        A.   I don't remember by heart.  That's what

 4   I'm saying.

 5             (Interruption in audio/video.)          10:11:16

 6             THE COURT REPORTER:  I'm sorry.  You -- I

 7   missed the first part of your answer.  Professor,

 8   please repeat.

 9             THE WITNESS:  Yeah.  Sorry.

10             I said that I don't remember it by heart,   10:11:17

11   and I don't want to give you a wrong number because

12   I'm testifying under oath.

13   BY MR. REBLITZ-RICHARDSON:

14        Q.   Do you know whether the results for all

15   three of your surveys included people who had, in     10:11:26

16   the past three months, taken another survey related

17   to private browsing mode?

18        A.   I think I explained this, but I'll try

19   again.

20             When I did sensitivity analysis to see      10:11:39

21   whether people who have answered this question this

22   way responded in any different pattern than the rest

23   of the sample, and found out that they did not, in

24   fact.  So if you omit them, you get pretty much the

25   same results.                                         10:12:01
```

                                                    Page 105

```
 1              I decided for completeness to include

 2     those in the sample provided.  And so, I know for a

 3     fact that they were not removed for responding so,

 4     after being -- you know, passing the sensitivity

 5     test.                                           10:12:16

 6         Q.   And as part of your sensitivity test, you

 7     understand that each and every one of your surveys

 8     includes people who had, in fact, in the past three

 9     months, taken another survey related to private

10     browsing mode; correct?                        10:12:29

11         A.   I don't --

12              MS. OLSON:  Objection.  Misstates the

13     testimony.

14              THE WITNESS:  This wasn't my testimony.  I

15     don't -- I said I don't remember the proportions by   10:12:35

16     heart.  I remember testing each and every survey for

17     sensitivity.  And if there were people like that,

18     because they didn't change the results, they are

19     included in the survey.  That's what I testified to.

20     BY MR. REBLITZ-RICHARDSON:                      10:12:49

21         Q.   Do you know if there were those people in

22     each of your surveys?

23         A.   As I said, I don't remember by heart.  If

24     I knew, I would give you percentages.

25         Q.   Do you know if there was at least one?    10:12:57
```

Page 106

1          A.   No.

2          Q.   And you -- you don't know if any of the

3    people -- you -- you have no idea whether each of

4    your three surveys include at least one person who

5    had, in the past three months, taken another survey    10:13:08

6    related to private browsing mode?

7          A.   Again, since this is not a number I

8    reported in my report, I think, I don't want to give

9    you a wrong number, and so I said "I don't

10   remember."  So I'm not going to commit to any         10:13:23

11   question about the number because I want to give you

12   correct answers.

13         Q.   In the -- we talked about the surveys you

14   had conducted for litigation before.  In those

15   surveys, did you limit the participants to people      10:13:36

16   who had not participated in a similar study in the

17   previous month?

18              MS. OLSON:  Objection.  Asked and

19   answered.

20              THE WITNESS:  Yeah, I don't see -- I don't   10:13:45

21   see why you would ask me the same question.  I said

22   that I follow best practices, and I ask this

23   question and then I do a sensitivity analysis.

24              And what I responded before when you asked

25   me did you ever remove participants like this, and I   10:13:59

                                                    Page 107

```
 1    said, in my studies for litigation experience, I did

 2    not find a case where those were materially

 3    different responses, and so, I did not omit those

 4    responses.  I believe I said that twice already.

 5    BY MR. REBLITZ-RICHARDSON:                        10:14:16

 6         Q.   This is a different question.

 7         A.   So I misunderstood your question.  Please

 8    repeat.

 9         Q.   My question before was whether or not you

10    removed people from your results where they had    10:14:21

11    participated in an iden- -- in a study beforehand;

12    right?

13         A.   Yes.

14         Q.   My question now is in connection with your

15    litigation surveys.                               10:14:32

16              Have you ever limited the participants,

17    not excluded, but limited the participants to people

18    who had not participated in a similar study

19    previously?

20              Do you understand the difference?        10:14:47

21         A.   I understand.

22              You're asking whether I screened them out

23    before they responded to the survey.

24         Q.   You got it.

25         A.   I don't think so, but I don't remember by  10:15:02
```

1    heart every study that I ran, the exact screening

2    criteria.

3         Q.   Now, I'm asking about the five litigation

4    surveys you've run.

5         A.   Oh.                                    10:15:08

6         Q.   Do you understand --

7         A.   But you're talking about studies I've done

8    years ago, and we've already established that asking

9    for recall for a distant past is unreliable.  And I

10   don't want to go there.                          10:15:18

11        Q.   Well, I'm just asking about the five

12   litigation studies you've conducted and whether or

13   not -- separate from whether you've removed

14   participants, is whether or not you've limited the

15   participants, screened them, to people who had not   10:15:30

16   participated in a similar study before.

17        A.   And I understood your question, and I

18   responded that I don't believe I did.  But that

19   because these studies were done years ago and I

20   conduct a lot of studies, I don't know that I      10:15:42

21   remember for sure that that's the case.

22        Q.   And so, in this case, it's your position

23   that you conducted a sensitivity analysis regarding

24   recent survey takers; right?

25        A.   Yes.                                    10:15:59

                                              Page 109

CONFIDENTIAL

```
 1        Q.   And in -- and it's your opinion that based

 2    on those sensitivity analyses, your results still

 3    hold?

 4        A.   Yes.

 5        Q.   What does that mean, "results still hold"?   10:16:10

 6        A.   Well, I -- I think I -- I gave you a

 7    different, more detailed answer before.  But I'll --

 8    I'll repeat that.

 9             The people that responded in this way to

10    this question provided results that were in the same   10:16:26

11    pattern as the people who responded that have not

12    been exposed to maybe a related study.  And

13    therefore, if you omit them from the analysis, or

14    include them in the analysis, the conclusions from

15    the analysis do not change.                            10:16:49

16        Q.   Did you produce documentation regarding

17    the sensitivity analysis that you're now describing?

18        A.   I ran a lot of sensitivity analysis.  I

19    don't think the -- the expert -- the report includes

20    all of them.                                           10:17:05

21        Q.   Did you produce them?

22        A.   Yeah, I don't -- I don't think that I did

23    for this question.

24        Q.   How many of the respondents included in

25    your survey results have a Google account?            10:17:20
```

Page 110

1      A.   This is not a question I asked, so I don't

2   know for sure.  I -- I can extrapolate based on --

3   on market shares, since this sample is pretty

4   representative, it should be the majority.  But I

5   don't -- I did not ask the question.          10:17:43

6      Q.   In qualifying respondents for your three

7   surveys, did you ask any of those respondents

8   whether they have a Google account?

9      A.   I did not.  I think that you can see in my

10   screening questions that I did not ask anything    10:17:58

11   about a Google account.

12      Q.   Did you obtain any information from your

13   respondents that you could use to determine which of

14   those respondents have a Google account?

15      A.   I don't think I have.              10:18:11

16      Q.   On F.1-8 --

17      A.   Don't know.  F.1-8.  Hold on.

18           F.1-8.

19      Q.   Do you see the incognito screen there?

20      A.   Yes.                        10:18:32

21      Q.   Did you use that incognito screen in all

22   three of your surveys?

23      A.   With the exception of my third survey that

24   has a modified version, I used the same incognito

25   screen or splash screen in the three studies.    10:18:51

                                   Page 111

1      Q.   And in your third study, did you modify

2    this incognito screen?

3      A.   I believe that I did.

4      Q.   Where did you obtain this incognito

5    screen?                                          10:19:04

6      A.   I believe that I've asked counsel for the

7    version of incognito screen that would be the most

8    representative of that issue period.

9           And I think the answer I got was that, you

10   know, the current one is -- is a -- is a good      10:19:28

11   representation.  And I used the one that was

12   active -- no, not one.  Sorry.  That one's a bit

13   different.

14          So I think I used the one before some

15   substantial changes were made after the -- the claim  10:19:47

16   period.

17     Q.   So let me break that down.

18          You obtained this incognito screen from

19   counsel; correct?

20          MS. OLSON:  Objection.  Misstates the        10:20:04

21   testimony.

22          THE WITNESS:  Yeah.  So I've -- I've

23   looked at -- you know, I've asked my research

24   assistants at Analysis Group to bring different

25   versions of -- of incognito screen to the extent    10:20:15

                                                   Page 112

CONFIDENTIAL

```
 1    that there were different versions.

 2            And this version, I judge to be the most

 3    representative of the claims period because I think

 4    the -- the -- the one currently might have some

 5    switch that didn't exist most of the period.  And        10:20:32

 6    so, I used this one.

 7    BY MR. REBLITZ-RICHARDSON:

 8        Q.   So you looked at different versions and

 9    you made the decision to use this one; is that

10    correct?                                                  10:20:43

11        A.   Yes.

12        Q.   Does Google currently use this screen with

13    incognito?

14        A.   I think they've made a -- as a -- as I

15    said, I think they've made a change.                      10:20:50

16        Q.   Okay.  Do you know when Google last used

17    this screen with incognito?

18        A.   I don't remember by heart.

19        Q.   Had Google used this screen during the six

20    months prior to your surveys?                             10:21:01

21        A.   I don't know.  I don't remember.  I think

22    I --

23        Q.   Did any of --

24        A.   -- the answer --

25            (Simultaneous speaking.)                          10:21:09
```

Page 113

```
 1                (Interruption in audio/video.)

 2      BY MR. REBLITZ-RICHARDSON:

 3           Q.   Go ahead.

 4           A.   I think I knew the answer to that when I

 5      chose this.  I just don't remember the dates off the    10:21:13

 6      top of my head.

 7           Q.   Okay.  Did any --

 8           A.   But I think in my report I say which --

 9      which incognito screen I use; right?  I can -- if

10      you let me --                                           10:21:28

11           Q.   You used this one; right?

12           A.   Yeah, yeah.  But I -- I think in my

13      report, I -- I -- I -- it may be in a footnote that

14      I describe exactly when -- from -- from what period

15      this incognito screen is.                               10:21:43

16                So I can find that point and give you an

17      exact answer.  It's going to take me a bit, because

18      I can't find -- I can't search for the

19      word "incognito."  That's not going to help.

20                MS. OLSON:  If I might just help, and         10:22:33

21      direct you to Footnote 32.  That might be what

22      you're looking for.

23                THE WITNESS:  Hold on.  Hold on.  Maybe.

24                Yeah, okay.

25                So Footnote 32 describes the change that      10:22:50
```

Page 114

1    was made just before the Complaint to the splash

2    screen.  So I used the one prior to that change.

3    BY MR. REBLITZ-RICHARDSON:

4         Q.   And so, that would have been prior to the

5    six-month period that you were asking your          10:23:10

6    respondents about; correct?

7         A.   Possibly.

8         Q.   Possibly or you -- you don't know?

9         A.   Yeah, I think -- I think that -- I think

10   that's true.                                        10:23:22

11        Q.   Okay.  Do you think it is important to

12   make sure that your survey results are not an

13   artifact of the artificial environment that actually

14   occur in real life?

15            MS. OLSON:  Objection to the form.          10:23:33

16            THE WITNESS:  Yeah, can you -- can you

17   unpack that.

18   BY MR. REBLITZ-RICHARDSON:

19        Q.   Do you think it's important that survey

20   results are not an artifact of an artificial         10:23:42

21   environment?

22            MS. OLSON:  Same objection.

23            THE WITNESS:  So, let's unpack that, too.

24            Surveys have different purposes.  And

25   sometimes a survey to be -- to produce useful        10:23:58

1      results needs to be as realistic as possible.

2              Other times, a survey to -- to -- to

3      produce useful results needs to be abstracted from

4      reality and not be as realistic as possible.

5              So the -- the exact design of the survey      10:24:20

6      depends on the goals of the survey.  For example, if

7      I want to make sure, as I did in my studies, that

8      people -- to see what people understand when they

9      read something, I need to make sure they can read

10     that something and that they do read it, subject to    10:24:35

11     the same garbage in/garbage out critique that I

12     described in the past.

13              If I want to make sure that I assess

14     people's perceptions about a -- an under- -- and

15     expectations about a particular stimuli, then I want   10:24:51

16     to make sure that they see that stimuli.  And if I

17     want to try to forecast behavior in the real world,

18     then I want to try to make sure that the situation

19     is -- which is never going to be identical unless

20     you do a field experiment, is as close to the          10:25:10

21     situation people find themselves as I can.

22              MS. OLSON:  And it's been a -- over an

23     hour.  Do you mind if we take a quick break?  I

24     think the court reporter would appreciate that as

25     well.                                                  10:25:24

                                                       Page 116

CONFIDENTIAL

```
1              MR. REBLITZ-RICHARDSON:  Sure.

2              MS. OLSON:  Thank you.

3              THE VIDEOGRAPHER:  Going off the record.

4   The time is 10:25 a.m.

5              (Short recess taken.)                    10:25:36

6              THE VIDEOGRAPHER:  Back on the record.

7   The time is 10:36 a.m.

8   BY MR. REBLITZ-RICHARDSON:

9        Q.   Professor Amir, before the break, I had

10  asked you whether you think it's important to make    10:36:44

11  sure that survey results are not an artifact of the

12  artificial environment but actually occur in real

13  life.

14             Do you recall that?

15       A.   Yes.                                       10:36:54

16       Q.   And do you understand what that means, "an

17  artifact of the artificial environment"?

18       A.    Of course.

19       Q.    Okay.  And so real life, that's how a user

20  would actually experience it; correct?              10:37:07

21       A.    Yeah.  That's, you know, up to some

22  philosophical debate, but yes.  For the sake of

23  this, yes.

24       Q.    And do you believe that a survey should be

25  similar to the actual consumer experience?          10:37:22
```

Page 117

CONFIDENTIAL

```
 1              MS. OLSON:  Objection.  Asked and

 2    answered.

 3              THE WITNESS:  Yes.  Sorry, Aly.

 4              I responded to this with, actually, a more

 5    detailed answer than the question warranted for      10:37:29

 6    because the question is incorrect.  The question

 7    assumes that there is only one goal for surveys, and

 8    that's entirely incorrect.

 9              And what I've stated was that for some

10    goals of the surveys, you really want high realism,   10:37:42

11    and for other goals of the sur- -- of a -- of

12    surveys, you do not.  It really depends on your

13    goal.  And I detailed in my previous response even

14    more.

15    BY MR. REBLITZ-RICHARDSON:                            10:37:57

16         Q.   And with respect to the surveys you

17    conducted in this case, were you seeking what you

18    referred to as "high realism"?

19         A.   So -- and that's -- was part of my

20    response to the -- you know, previously, previous to  10:38:11

21    the break.

22              When I want to see, for example, in my

23    second survey, how people understand a certain text,

24    I want to make sure that they are exposed to that

25    text and even appointed [verbatim] to a particular    10:38:24
```

Page 118

1    point of interest in the text.  And so, otherwise, I

2    might get garbage in/garbage out.  If I ask people

3    how you understand it, they actually didn't read it.

4    Their response would be, at the best, irrelevant.

5           In my first study, I wanted to see how          10:38:44

6    people -- what their perceptions and expectations

7    are based on exposure to the splash screen and, when

8    relevant, a -- potentially, a Learn More screen.

9           And so, I tested it in a -- in a situation

10   in which makes sure that people can attend to the        10:39:03

11   stimuli they're supposed to respond to.

12          In my third study, it's a different design

13   because the goal is different.  That's likelihood of

14   use.  And in my third study, therefore, I did not

15   make sure people saw the Learn More screen if they        10:39:21

16   didn't click it themselves.

17          So each study has its own goals.  Each

18   goal of the study warrants a specific design that's

19   best suited to -- to address the question at hand.

20      Q.   And so, your goal with the second survey        10:39:31

21   would -- was to understand how people understood

22   certain texts; correct?

23      A.   Yes.

24      Q.   And your goal with the first survey was to

25   assess people's understandings based on their            10:39:43

Page 119

CONFIDENTIAL

 1    exposure to certain stimuli; correct?

 2        A.   Well, their perceptions and expectations.

 3    You could call them understandings, but that's

 4    specifically how I called them.

 5        Q.   And in connection with your first survey,    10:39:56

 6    were you seeking to design it in a way that was

 7    similar to how the actual -- to the actual consumer

 8    experience with private browsing?

 9            MS. OLSON:   Objection to the form.

10            THE WITNESS:   If -- if I had done so, I       10:40:12

11    wouldn't have forced people to spend 30 seconds on

12    the screen.  No.  I wanted to see what people, when

13    they do attend to the stimuli, what their

14    expectations, perceptions are.

15            And that is because my assumption was that     10:40:28

16    people that don't care enough to attend, they don't

17    care.  The world has people that don't care.  And I

18    didn't want to have results that were not

19    conservative where you can say, Well, you didn't

20    find people thinking this and that because people     10:40:45

21    just don't care, and they didn't spend time reading

22    this.

23            So my design was especially made to

24    conditioning people caring enough to read this, what

25    do they expect happens.                               10:41:00

                                              Page 120

CONFIDENTIAL

1    BY MR. REBLITZ-RICHARDSON:

2        Q.   So you wanted to make sure that the

3    respondents actually read the materials; correct?

4        A.   We're exposed to the materials.  I can't

5    force people to read.  But we're exposed to the          10:41:08

6    material for a sufficient amount of time and

7    quantity that allows them to actually attend to the

8    stimuli.

9        Q.   In real life, are consumers forced to

10   review the materials used in your surveys for a          10:41:23

11   minimum amount of time?

12       A.   Of course not.

13       Q.   In real life, are consumers forced to

14   review all the materials used in your surveys?

15       A.   Well, in real life, when consumers or          10:41:32

16   users open an incognito or private browsing mode,

17   they are, by definition, exposed to the splash

18   screen.  So that's why in my third study, that was

19   aimed at -- at looking at intentions of use, I only

20   expose them to the splash screen.                        10:41:52

21       Q.   Okay.  Other than the splash screen, in

22   real life, are consumers forced to review all the

23   materials used in your surveys?

24       A.   Of course not.

25       Q.   Why --                                          10:42:03

                                                    Page 121

1      A.   Because that was the point; right?  If

2  people don't care enough to read this, then they, by

3  definition, don't care.

4      Q.   With all three surveys, did you require

5  the respondents to review the stimuli for fixed          10:42:17

6  periods of time?

7      A.   I believe that I required them to review

8  the splash -- to look at a splash screen for 30

9  seconds.

10     Q.   And why did you do that?                         10:42:31

11     A.   Because I wanted to make sure they see the

12  splash screen.  The third study tested a particular

13  question about the language on the splash screen.

14  If you're not going to even have a chance to attend

15  to the language, then the study is not testing what    10:42:45

16  it was designed to do.  Therefore, I did that.

17     Q.   How did you decide how much time to give

18  people with each stimuli?

19     A.   So based on my experience with previous --

20  with many, many previous studies, 30 seconds seems     10:42:57

21  enough to attend to the splash screen and at a

22  minimum, look at what's at the learn more page if

23  you didn't actually click on it.  If you clicked on

24  it, you had as much time as you wanted to read

25  what's there.                                           10:43:14

Page 122

1    Q.   And so, when you say "click on it," you're

2    talking about using a hyperlink; right?

3    A.   Yeah, sorry.  The -- the splash screen in

4    Incognito in Firefox had a learn more or -- or

5    something like that, hyperlink that opens a page      10:43:29

6    that details to a greater extent what was described

7    on the splash screen.

8    Q.   And so, in your first two studies, you

9    included act- -- those active hyperlinks; right?

10   A.   I included the active hyperlinks in all      10:43:46

11   studies, all three studies.

12   Q.   Did you record how often those respondents

13   used those active hyperlinks?

14   A.   I did.

15   Q.   And did you produce those results?      10:43:56

16   A.   I don't think they're in my report.  But

17   let me just -- I think it's relevant to a point you

18   made earlier about the sensitivity analysis.  All of

19   the sensitivity analysis I conducted and -- and the

20   answer to this question that you just asked can be      10:44:09

21   easily deduct -- deduced or -- or observed from the

22   data that I did provide.

23        I provided all the data, not just the

24   completes, all the data that I had in my survey.

25   And -- and from that production, you can answer all      10:44:24

Page 123

1    of these questions yourself.  But I -- I -- I

2    actually looked, and I happen to remember on average

3    how many people clicked on the learn more page in

4    the different studies.

5        Q.   I -- I understand that you produced the          10:44:37

6    data.  But you didn't produce any of the sensitivity

7    analysis that you've -- you've referred to in your

8    testimony today; right?

9        A.   Well, I didn't produce some of the

10   sensitivity analysis.  I didn't produce those that       10:44:50

11   we discussed.  But I produced the data, and you can

12   run the sensitivity analysis easily from the data I

13   produced.  Just like you can tell that on average

14   about two and a half percent of the people click

15   learn more page because you have the data.             10:45:07

16       Q.   What is the two and a half percent?

17       A.   As I said, on average across three

18   studies, slightly less than two and a half percent

19   of the people click on the learn more page.

20       Q.   Let's go to paragraph 3 of your report,       10:45:24

21   Amir Exhibit 1.  If you could just --

22       A.   Hold on.  Paragraph 3?

23       Q.   Yeah.

24       A.   What page?

25       Q.   Page 1.                                        10:45:38

                                                  Page 124

CONFIDENTIAL

```
 1        A.   Just one second.  Page 1, 3, yes, opinion

 2   2.

 3        Q.   Could you please read aloud the first

 4   sentence there.

 5        A.   Yes, and I'll do it slowly for the          10:45:53

 6   reporter.

 7             "I designed and conducted my Consumer

 8   Perceptions and Expectations Study to assess whether

 9   and to what extent users expect different types of

10   entities to receive or to not receive data (such as    10:46:07

11   IP addresses, URLs of the site users visit, and

12   cookies) when they visit websites while in private

13   browsing mode."  [As read].

14        Q.   And thank you.

15             Why did you ask about different types of     10:46:26

16   entities?  Do you see the reference to different

17   types of entities?

18        A.   Yes.

19        Q.   Why did you ask about different types of

20   entities?                                              10:46:41

21        A.   Well, I believe that the Complaint talks

22   about a lot of types of entities that might get the

23   data.  And not -- not being able to ask about all of

24   them in a -- in a reasonable survey that users can

25   respond to, and not wanting to taint results with      10:47:00
```

Page 125

```
 1   specific brand names where people might have

 2   preexisting attitudes that might taint the results,

 3   positive or negative, I opted for a general

 4   description of -- which, you know, amounted to

 5   different types of entities.                    10:47:18

 6           And in the survey, it's not different

 7   types of entities.  If you want to go down to the

 8   survey, you can see how exactly I describe them.  I

 9   believe I have three types.  But let me just go to

10   the study questions.                            10:47:33

11       Q.   And if you can just identify for the

12   record what you're looking at.

13       A.   Yeah, yeah, let me just -- sorry,

14   scrolling is not very fast for me on the system.

15           So hold on.                             10:47:46

16       Q.   If you don't mind, maybe we can look at

17   G-1.  I think that's your first study in terms of

18   what was actually shown.

19       A.   G-1, let me go there.  I was in the

20   F appendix.                                     10:48:09

21       Q.   Or F, whatever is useful for you to --

22       A.   Yeah, that's okay.  Let me -- let me go to

23   G-1.

24           Okay.  So I believe the first question is

25   G.1-16.                                         10:48:27
```

Page 126

CONFIDENTIAL

```
 1          Q.   Okay.

 2          A.   It says, "While in Incognito mode, do the

 3     companies that own the websites you visit during the

 4     session receive or not receive the data from your

 5     Incognito session?"                                10:48:41

 6               And then it says, "(such as IP addresses,

 7     URLs of the site you visit, and cookies)."  [As

 8     read].

 9               The next question says, this is G.1-17,

10     "While in Incognito mode, does your internet service  10:48:55

11     provider receive or not receive data from your

12     Incognito session (such as IP addresses, URLs of the

13     sites visit, and cookies.)"  [As read]

14               And the third type of entity I tested is

15     in G.1-18, "While in Incognito mode, do companies    10:49:11

16     that provide analytics and advertising services to

17     the websites you visited during this session" --

18     "the session" -- sorry -- "receive or not receive

19     the data of your Incognito session (such as IP

20     addresses, URLs of the sites you visit, and          10:49:27

21     cookies.)"  [As read].

22               So those are the three types of entities

23     that my survey tested.

24          Q.   All right.  Thank you.  That's helpful.

25               So focusing on the first one you tested,    10:49:37
```

Page 127

1    G.1-16, that's the companies that own the websites

2    you visit; right?

3         A.   Yes.

4         Q.   And that's clear right there on the

5    Incognito screen -- screen where it says websites      10:49:48

6    you visit; right, that's at G.1-13?

7         A.   Maybe --

8              MS. OLSON:  Objection to the form.

9              THE WITNESS:  Yeah, maybe.  That's an

10   empirical question; right?  If it's clear or not       10:49:58

11   clear and what -- what do users -- that's exactly

12   what the study is trying to assess; right?

13   BY MR. REBLITZ-RICHARDSON:

14        Q.   If you go to G.1-13, do you see where it

15   says "websites you visit"?                             10:50:08

16        A.   G.1-13, "websites you visit."  You just

17   assume that websites you visit and companies that

18   own the websites you visit are the same thing.  I'm

19   not -- I'm not assuming anything.

20        Q.   Okay.  But is -- is that question, G.1-16,   10:50:20

21   linked to that first bullet, websites you visit?

22             MS. OLSON:  Objection to the form.

23             THE WITNESS:  Clearly companies that own

24   the websites you visit is related to the websites

25   you visit.                                             10:50:34

                                            Page 128

CONFIDENTIAL

```
 1    BY MR. REBLITZ-RICHARDSON:

 2        Q.   Okay.  And then G.1-17, "your internet

 3    service provider," do you see that's the third

 4    bullet here; right?  Your internet service provider

 5    on G.1-17?                                        10:50:48

 6        A.   Yeah, clearly.

 7        Q.   Okay.  Why didn't you ask about your

 8    employer or school?

 9        A.   Because I felt that that could be

10    biassing.                                         10:50:58

11        Q.   Okay.  But then you went ahead and asked

12    about something that's not on the Incognito screen,

13    which is companies that provide analytics and

14    advertising services.

15             Do you see that in G.1-18?               10:51:12

16             MS. OLSON:  Objection to the preamble of

17    the question.

18             THE WITNESS:  Yes, I think -- I think that

19    you're assuming that I constructed the study purely

20    based on the Incognito splash screen, and I did not.  10:51:25

21    BY MR. REBLITZ-RICHARDSON:

22        Q.   Is there anything on the Incognito screen

23    that references companies that provide analytics and

24    advertising services?

25             MS. OLSON:  Objection to the form.        10:51:38
```

Page 129

```
 1              THE WITNESS:  Not that I can tell.

 2    BY MR. REBLITZ-RICHARDSON:

 3        Q.   And why did you ask about analytics and

 4    advertising services?  Why not ask about Google?

 5        A.   That's a good question.              10:51:52

 6             As I said before, I asked about this

 7    general class of companies because this general

 8    class of companies was mentioned in the Complaint.

 9    And as I said, including any specific brand names

10    such as Google, Amazon, Facebook, Adobe, would have   10:52:10

11    the possibility to bias the -- the response to this

12    question because of prior familiarity or preexisting

13    attitudes, positive or negative, to those companies.

14    And I wanted to avoid such noise sources to the

15    data.                                         10:52:31

16        Q.   What about an Incognito user who might be

17    under the impression that some third-party analytics

18    company would collect their Incognito browsing

19    session information, but that Google would not, how

20    are they supposed to answer this question?     10:52:50

21             MS. OLSON:  Objection.  Incomplete

22    hypothetical.

23             THE WITNESS:  Yeah, I'm not -- not exactly

24    sure what -- what you're referring to.  When -- when

25    you say -- when you give a general term, "companies   10:52:59
```

Page 130

1    that provide analytics," the responder is free to

2    understand this as -- as they want.  And if they --

3    respondents is [verbatim] thinking about Google,

4    they might answer about Google.  If they're thinking

5    about Amazon, they might be thinking about Amazon.     10:53:15

6    BY MR. REBLITZ-RICHARDSON:

7        Q.   Did you ask the respondents whether --

8             (Interruption in audio/video.)

9             THE COURT REPORTER:  Excuse me, one

10   second.  Sir, there was an interruption in audio.      10:53:27

11   If you'd please start over.

12   BY MR. REBLITZ-RICHARDSON:

13       Q.   Did you ask any of the respondents whether

14   they were thinking about Google when they answered

15   the question on G.1-18 regarding companies that        10:53:33

16   provide analytics and advertising services?

17       A.   In survey -- in my first survey, as you

18   refer to it, I don't ask them any specific questions

19   beyond this general understanding.  My second

20   question -- my second survey was specifically about    10:53:52

21   Google.

22       Q.   Did -- in your first survey, did you test

23   whether the respondents understood that Google is a

24   company that provides analytics or advertising

25   services?                                               10:54:06

                                                    Page 131

```
 1        A.   Again, you're -- you're assuming too much

 2   from -- of what this -- what this -- what the study

 3   was supposed to do.  The study was supposed to test

 4   for users' perceptions of this general category.

 5   They can -- they can -- they can think of whoever      10:54:21

 6   they can think of.

 7        Q.   And it was not designed to test anything

 8   about Google; right?

 9             MS. OLSON:  Objection to the form.

10             THE WITNESS:  Actually wrong.  It was        10:54:31

11   designed to test whatever people thought about when

12   they thought about these kind of companies.  So

13   Google is probably included.  But this study wasn't

14   meant to separate Google out from the rest of such

15   companies when responding to this question.  I         10:54:49

16   designed my second survey to test specifically

17   understandings about Google.

18   BY MR. REBLITZ-RICHARDSON:

19        Q.   Professor Amir, you've conducted studies

20   before; right?                                         10:55:00

21        A.   Yes.

22        Q.   And here you are saying what people

23   probably understood but without testing it.  Why is

24   that?

25        A.   Because for this -- for the purposes --      10:55:06
```

Page 132

1   again, I think that it goes back to what the goal of

2   a study is, which I think arguably, based on

3   Mr. Keegan's rebuttal report, he did not quite

4   understand this point so I'll -- I'll try to clear

5   it up.                                          10:55:23

6          Every study has its own goal and purpose.

7   This study's goal was to look at users' perceptions

8   and expectations of different entities, which we

9   just mentioned, three different classes of entities,

10  whether they receive or not receive information from   10:55:43

11  this private browsing session on three different

12  browsers, on Chrome, on Safari, and on Firefox.

13  That was the goal of this study.

14          And therefore, asking -- you know, asking

15  further questions about other goals are going to get   10:56:06

16  you the same answer.  This wasn't the goal of this

17  study.

18      Q.   Okay.  G-14.  Do you see the Google Chrome

19  help page -- web page there?

20      A.   Sorry, where?                            10:56:21

21      Q.   G.1-14?

22      A.   G.1-14, going there.  Yes.

23      Q.   Is it possible that the respondent in your

24  survey would have already reviewed this, and here

25  been presented with it for a second time?          10:56:33

```
 1        A.   Do you mean that they have seen it in

 2   their private life before?

 3        Q.   Sorry.  That's a good clarification.

 4             In the -- in the survey, could they have

 5   already seen it by clicking on the hyperlink?          10:56:47

 6        A.   No.

 7        Q.   There are no occasions when a respondent

 8   in your survey would have seen this screen twice?

 9        A.   No.  If they click the hyperlink, they

10   was -- they were not shown this screen.                10:57:02

11        Q.   Okay.

12        A.   They --

13        Q.   Go ahead, sorry.

14        A.   Sorry, they would not be shown this screen

15   in additional time.                                    10:57:12

16        Q.   Okay.

17        A.   They would be directed to the screen, and

18   if -- if they did it before the 30 seconds ended,

19   there was the -- you know, the minimum timer

20   still -- still held.                                   10:57:22

21        Q.   How did that work?  So if -- if I'm not

22   yet to my 30 seconds and I click "learn more," does

23   it not pop up until the 30 seconds has passed?

24        A.   Well, in this study, it -- it waits until

25   30 seconds, and then it pops up.                       10:57:33
```

                                                       Page 134

CONFIDENTIAL

1          Q.    Okay.

2          A.    In the third study, it's -- it's not.

3          Q.    But you wouldn't see this twice?

4          A.    You would not see this twice.

5          Q.    Okay.  Would an Incognito user necessarily    10:57:40

6    see this Google Chrome help page?

7          A.    I think we discussed this before.  An

8    Incognito user who clicked on the learn more page

9    would -- would see this.  An Incognito user who did

10   not click would not see this page.                      10:57:56

11         Q.    Okay.  And hyperlinks on this page were

12   disabled; right?

13         A.    That's right.  There is a limit to how

14   much information people could see in this particular

15   survey.                                                 10:58:08

16         Q.    So why did you disable those hyperlinks?

17         A.    Because, you know, you need to design a

18   study that people can answer and respond to.  And if

19   you send them down the rabbit hole with hyperlinks,

20   it's almost a certain way to lose this respondent.      10:58:23

21         Q.    If you go to G.1-18, do you see where you

22   said "You can click the thumbnails to see the

23   enlarged versions of these images"?  [As read].

24         A.    Yes.

25         Q.    And why did you allow people to view        10:58:37

1    enlarged versions of these images --

2         A.    Yeah --

3         Q.    -- while answering this question?

4         A.    Sorry.

5              We are going back to the goal of this        10:58:46

6    study.  The goal of the study is not to create a

7    memory test, where you read something -- I don't

8    remember if you remember this from school -- you

9    read something and then you were tested on what was

10   written there.                                          10:58:54

11             The goal of this study was to see what you

12   expect and -- and perceive to happen given that you

13   actually read the splash screen or was exposed to

14   the splash screen and -- and the learn more page in

15   the conditions where a learn more page existed,        10:59:14

16   which I think excludes Safari.

17             And so, if responders get to this point,

18   and they realize, oh, I don't remember, or I haven't

19   looked, they have the option to look at it again.

20   Because what I'm trying to assess here is what would   10:59:28

21   be their expectations given the actual stimuli, not

22   what they might remember from the past.

23        Q.    Did you produce data regarding the number

24   of people who enlarged versions of these images?

25        A.    I'm not sure I have the data for those --   10:59:46

                                                  Page 136

1    for that information.

2         Q.   Okay.  Let's talk about your second

3    survey, the interpretation study.

4         A.   Okay.

5         Q.   How did you select the documents used in        10:59:57

6    your interpretation study?

7         A.   Yeah, so I started out by looking at the

8    Complaint.  And I think the Complaint implicates --

9    let me just -- sorry, let me -- let me go to that.

10   I'll tell you which -- which page I'm on.  One        11:00:17

11   second.

12            So there were four conditions in this

13   study.  The splash screen only is obvious; right?

14   That's in the learn more page --

15        Q.   Where is that?        11:00:47

16        A.   -- that's at the heart of the claim.  I

17   believe that the splash screen with policies, the

18   Google policies that are mentioned there, are

19   actually mentioned in the Complaint.  But then I

20   wanted to test whether it might be some -- the        11:00:58

21   understanding might be specific to these documents

22   or whether it's -- it's a more -- it's a more

23   general phenomena.

24            And so, I looked at various potential

25   Google documents, and I believe that I asked counsel        11:01:14

1    what other documents might inform users of

2    relevant -- what might be relevant to Incognito.

3    And I chose this of the list of many possible

4    documents, again, because it's not feasible to test

5    all possible documents.  And I felt this is a                    11:01:35

6    representative sample of relevant documents.

7         Q.   Can you identify for me the documents that

8    you considered but decided to not include in your

9    survey 2?

10        A.   Not on the top of my head [verbatim], no.       11:01:50

11        Q.   With respect to the documents you did

12   include in survey 2, did you carefully review them?

13        A.   At one point, yes.

14        Q.   Based on your careful review of those

15   documents, do you know what private browsing              11:02:04

16   information Google collects?

17             MS. OLSON:  Objection to the form.

18             THE WITNESS:  As -- as I said, this is --

19   this is a memory test, and I read them quite a while

20   ago.  So I don't remember what every document said.       11:02:17

21   BY MR. REBLITZ-RICHARDSON:

22        Q.   Well, based on your careful review of

23   those documents, sitting here today, can you

24   describe for me how Google collects private browsing

25   information?                                              11:02:29

                                                    Page 138

```
 1        A.   Are you asking me to --

 2             MS. OLSON:  I instruct --

 3             THE WITNESS:  Sorry.

 4             MS. OLSEN:  Go ahead.  You were -- I think

 5   you were going to say what I was going to say.        11:02:33

 6             THE WITNESS:  Are you asking me to go now

 7   and review those documents carefully and then

 8   answer?  Because I can do that because they're --

 9   they're included in my report in the appendix.

10   BY MR. REBLITZ-RICHARDSON:                             11:02:48

11        Q.   I suspect that's going to take an enormous

12   amount of time.  And so, I would ask that you not do

13   that.  But without refreshing your recollection,

14   based on your prior careful review of those

15   documents, do you have any understanding as to what   11:03:02

16   private browsing information Google collects?

17             MS. OLSON:  Objection.  Asked and

18   answered.

19             THE WITNESS:  Yeah, as I said before, from

20   my -- from my private use of Incognito mode, what     11:03:08

21   I -- what I think I know is that information from

22   the session is not saved on my local machine.  And

23   that's my primary reason for using Incognito mode.

24   And, you know, from reviewing the policies, some of

25   my usage is observable to anybody I -- I use the --    11:03:32
```

Page 139

1    so I use the browser with.

2          So as I said before, if I go to Amazon and

3    I buy something, Amazon knows that someone bought

4    something.  If I log into my Amazon account, Amazon

5    definitely knows it's me even though I'm in          11:03:56

6    Incognito mode.

7    BY MR. REBLITZ-RICHARDSON:

8        Q.   Was your second study limited to people

9    with a Google account?

10          MS. OLSON:  Objection.  Asked and           11:04:03

11   answered.

12          THE WITNESS:  Yeah, I think I answered

13   that.  The answer is no.

14   BY MR. REBLITZ-RICHARDSON:

15       Q.   Was your second study specifically about   11:04:08

16   visits to non-Google websites?

17       A.   I'm not sure I understand the question.  I

18   think, you know, let's go to the second study and

19   clarify what -- what it does, if -- if you want.

20       Q.   Well, if you need to do that, but my       11:04:25

21   question is pretty simple.  You understand that

22   Google has certain websites like google.com; right?

23       A.   Yes.

24       Q.   And do you understand that this lawsuit is

25   about people visiting non-Google websites?          11:04:41

                                          Page 140

CONFIDENTIAL

1          A.   I understand that this lawsuit is about --

2    yes.

3          Q.   Right.  And you understand that this

4    lawsuit is about Google collecting data when people

5    visit non-Google websites in a non-private browsing      11:04:51

6    mode; right?

7               MS. OLSON:  Objection to the form.

8               THE WITNESS:  Yeah, I understand it's --

9    it's at least some of the -- of where the Complaint

10   lies.                                                    11:05:01

11   BY MR. REBLITZ-RICHARDSON:

12         Q.   Okay.  And did your second study, in any

13   way ask or focus on -- focus on the issue of someone

14   visiting a non-Google website, as opposed to a

15   Google website?                                          11:05:11

16         A.   So my second study does not limit

17   non-Google websites, but let's go -- I think it's

18   important to go and see what the questions were.  So

19   I'm in F.2-17.

20         Q.   Okay.  Thanks for the page number.           11:05:25

21              Okay.  Go ahead.

22         A.   So question Q10 says, "Based on the

23   screens that you reviewed," which we described

24   before what they were, "please select one of the

25   following regarding URLs of the sites you visit" --      11:05:41

                                                   Page 141

CONFIDENTIAL

1    Q.   Mm-hmm.

2    A.   -- "during an Incognito mode internet

3    browsing session (e.g., watching a video or shopping

4    for a product.)"

5         And then the scale goes from "Google does    11:05:54

6    not receive this information" to "Google probably

7    does not" to "It is uncertain whether Google

8    receives this" to "Google probably receives this" to

9    Google does receive this." [As read].

10        So to the extent that responders use any    11:06:11

11   websites, especially with the example of watching a

12   video or shopping for a product, that's what

13   responders are going to be thinking about.  So it's

14   not limited to non-Google websites, but it's

15   probably for the most part is related to every    11:06:24

16   websites [verbatim] they visit.

17   Q.   Right.  But it's possible when someone's

18   thinking about this question 10, that they're

19   thinking when you write "sites you visit," about a

20   website like google.com; fair?    11:06:39

21   A.   Not quite.  Because I say watching a

22   video, you can't watch a video on google.com and

23   shopping for a product -- and you can shop for a

24   product on google.com.

25   Q.   Can you watch a video on YouTube?    11:06:53

Page 142

CONFIDENTIAL

```
 1        A.   You certainly can.

 2        Q.   Can you shop on google.com?

 3        A.   You can't shop on google.com.  It'll take

 4   you to somewhere to shop for.  Google.com is --

 5   is -- is the simplest page, which is just a search      11:07:08

 6   bar -- a search bar.

 7        Q.   Are you familiar with something called

 8   Google shopping?

 9        A.   Yeah, and that's -- and that's after you

10   have search results you can -- you can shop through      11:07:14

11   there.  But -- but, for example, if you think about

12   shopping -- when I think about shopping, I think

13   about Amazon.  I do most of my shopping on Amazon.

14   And if you look at market shares of people -- where

15   people shop, google.com is not the first one.           11:07:30

16           Also, if you look at data that I actually

17   cite referenced in the case from -- from Google

18   about the kinds of things people use Incognito mode

19   for, the top three are -- are probably not done on

20   Google websites.                                         11:07:47

21        Q.   So, Professor --

22        A.   So -- yeah.  Sorry.  So it's -- so it's --

23   it's extremely likely the majority of responders

24   here, based on -- on all the preexisting data and

25   facts, are not thinking about google.com.               11:08:03
```

Page 143

1      Q.   Did you test that?

2      A.   I did not.

3      Q.   Did you have any questions to assess that?

4      A.   As I said, I -- I had these questions that

5   look at -- the first question looks at general sites    11:08:12

6   you visit.  The second one has exactly the same

7   prompt.  And the third one has exactly the same

8   prompt.

9      Q.   Right.

10          You ask about sites you visit without          11:08:25

11   limiting it to non-Google websites; correct?

12      A.   Of course.

13      Q.   And then you have this parenthetical about

14   watching a video or shopping for a product; right?

15      A.   As an example, yes.                           11:08:38

16      Q.   And you didn't include that in the first

17   survey; right?

18      A.   It wasn't relevant for the sur- -- for the

19   first survey.

20      Q.   Were you the one that came up with these      11:08:46

21   two examples, watching a video or shopping for a

22   product?

23      A.   Yes.  I said I wrote the questions.

24      Q.   Would you agree that there's at least a

25   risk that the reference to watching a video would      11:08:57

1    prime people to they're visiting Google-owned

2    youtube.com?

3        A.   I think there's some risk that that's --

4    that some of the sample might have thought about

5    that.  But it's certainly not -- it's -- given these    11:09:11

6    two examples, it's certainly not going to be the

7    majority.

8        Q.   Let's go back to -- I was going to say --

9    let's go to G.2 of 11, which is one of the --

10           THE COURT REPORTER:  Could you please    11:09:32

11   repeat.

12   BY MR. REBLITZ-RICHARDSON:

13       Q.   G.2-11.

14       A.   I'm in -- sorry, G.2-11?

15       Q.   G.2-11.    11:09:41

16       A.   Sorry.  I went to F.  One second.

17            G.2-11, I'm there.

18       Q.   Does G.2-11 include an instruction that

19   you provided to every respondent included in your

20   Survey 2?    11:10:10

21       A.   Of course.

22       Q.   Would you please read aloud the first two

23   sentences.

24       A.   Yes.

25            "This survey is about private browsing    11:10:16

Page 145

CONFIDENTIAL

1    mode," full stop.  You have been selected to answer

2    questions about Chrome, which is a browser from a

3    company named Google."

4         Q.   And why did you instruct your respondents

5    that Chrome is a browser from a company named        11:10:33

6    Google?

7         A.   I wanted to set up the situation so that

8    responders understand where -- what context they

9    need to imagine.  I'm later going to show them the

10   Chrome incognito mode and other potential documents.  11:10:52

11        And so it's important to set up the

12   setting so that responders know exactly what we're

13   referring to.

14        Q.   Would you agree with me that telling your

15   respondents that Chrome is a browser from Google      11:11:07

16   will influence their answers?

17        A.   No, because -- not in this survey, because

18   I do this, and then I say -- if you want to read the

19   next, I say, "Next, you will see images of a screen

20   that appears when you enable Chrome's Incognito mode   11:11:24

21   and a page that includes additional information for

22   private browsing, as well as Google's Privacy Policy

23   and Chrome's Privacy Notice." [As read].

24        Now, if I hadn't said that Chrome is from

25   Google, it might have been strange.  If you're a      11:11:38

                                        Page 146

1    person that doesn't realize this or doesn't know,

2    why am I showing you Google's private policy.  And

3    so it's important to set up the setting correctly.

4           In pages afterwards I show them documents

5    from Google with the brand name Google, and -- and        11:11:52

6    every one of them has mention of -- of -- or almost

7    every one of them, has mention of Google.

8           So telling them up front that Chrome is a

9    browser named Google, preceding the second

10   sentence -- the second paragraph which I read the         11:12:12

11   first sentence from, makes no difference for their

12   responses, absolutely no difference.

13        Q.   Did you test whether the respondents in

14   your Survey 2 understood there is a difference in

15   terms of how Chrome stores information and how            11:12:25

16   Google stores information on its remote servers?

17        A.   Again, I'll go back to the question -- the

18   three questions, and I -- I read them, but I just

19   basically ask, "Based on the screens that you

20   reviewed, please select one of the following             11:12:46

21   regarding," and then there's three types of -- or

22   classes of data.

23          The -- the question in G.2-24 says, "Based

24   on the screens you reviewed, please select one of

25   the following regarding URLs of the sites you visit      11:13:00

                                              Page 147

1    during an Incognito mode internet browsing session"

2    [as read], with the e.g. in parentheticals.

3              And then the options are "Google does not

4    receive this information" to "Google does not" [as

5    read] -- sorry, "Google does receive this          11:13:14

6    information" in this example to "Google does not

7    receive this information," right, on a scale.  So

8    what I test is whether they think Google receives

9    this information.

10        Q.   And after telling your respondents that    11:13:26

11   Chrome is a browser offered by Google, do you think

12   it's possible that your respondents answered your

13   questions focused on what Chrome, the browser,

14   receives?

15        A.   No.                                        11:13:42

16             MS. OLSON:  Objection.  Incomplete

17   hypothetical.

18             THE WITNESS:  Sorry.

19             No, I -- I -- no, there's no reason to

20   think that would be the case.                        11:13:46

21   BY MR. REBLITZ-RICHARDSON:

22        Q.   Did you test that?

23        A.   There's no reason to test that.

24        Q.   But you didn't test it?

25        A.   You -- you could go to every survey         11:13:52

                                                    Page 148

CONFIDENTIAL

1    question and ask, Is there a reason to believe

2    that -- that respondents are answering a different

3    question?  This is what you're asking me.

4            There's no reason to believe here --

5    and -- and I pretested this.  Remember, we talked        11:14:03

6    about the pretest.  There's no reason here to

7    believe that respondents are answering not the

8    questions I asked them.

9        Q.   Well, did you clarify for your respondents

10   that you were asking about what Google receives on        11:14:15

11   its remote servers?

12       A.   I don't know what remote servers are.  It

13   doesn't matter.  I asked them whether they think

14   Google received -- this is a far more conservative

15   question.                                                 11:14:28

16           Because if they thought Google received it

17   in any way, they would say that Google received this

18   information.  If they thought Google did not receive

19   this is any way, they would say it does not.

20       Q.   Right.                                           11:14:38

21       A.   Trying to unpack this would be less

22   conservative.

23       Q.   And -- and they would say Google probably

24   receives this information if they thought, Oh, this

25   is about visiting google.com logged in to my Google       11:14:46

CONFIDENTIAL

```
 1    account; fair?

 2         A.    No.

 3               MS. OLSON:   Objection to the form.

 4    BY MR. REBLITZ-RICHARDSON:

 5         Q.    That's not fair?                         11:14:54

 6         A.    Not fair at all.  And I -- and I'll --

 7    I'll tell you something about the logging in to my

 8    Google account.

 9               Every incognito screen I've shown in my

10    studies shows you logged out, which is the          11:15:01

11    default -- when you open incognito mode, you're

12    always logged out.  And that's important because I

13    did not show people them logged in to a Google

14    account.  All of my stimuli are logged out.

15               There's no reason for the user to think   11:15:15

16    we're talking about a case they logged in, which I

17    don't know how -- you know, how often it happens.  I

18    never log in on incognito mode because that kind of

19    would, you know, defy the whole point.

20               And so I asked them a question, and       11:15:28

21    there's no reason to think they're answering a

22    different question.

23               The question you're suggesting is less

24    conservative.  If Google, in any way, does not

25    receive this data or receives this data, that       11:15:42
```

Page 150

1    subsumes sub- -- sub-questions of how different

2    aspects, at Google, received this data.

3            Do you agree?

4        Q.   I don't agree, but I'm not under the --

5    I'm not answering questions today.              11:15:56

6        A.   But --

7        Q.   When I see sites -- sites you visit, I

8    think that includes google.com, and I think that

9    includes the possibility of logged in browsing.  But

10   you're the one who constructed the survey.  I'm      11:16:09

11   trying to understand what you did to test whether or

12   not any respondents had that understanding.

13           And my ans- -- my understanding is you

14   didn't test that; is that correct?

15       A.   I did not test --                         11:16:24

16           MS. OLSON:  Objection to the form and the

17   preamble.

18           THE WITNESS:  Yeah.  I -- I -- so I -- I

19   told you exactly what I -- what I do test.  And

20   we've talked about what's the likelihood that       11:16:32

21   somebody imagined google.com with this question.

22   And based on my expertise, it's quite low.  But I

23   also said that to have a conservative question, I

24   did not include specifics such that you mentioned.

25   BY MR. REBLITZ-RICHARDSON:                         11:16:47

                                              Page 151

1      Q.    Right.

2            G.2-16.   Why did you instruct your

3      respondents to carefully read the Google privacy

4      policy?

5      A.    I think we have discussed this before.        11:16:57

6      I'll -- I'll -- I'll repeat my answer.

7            This study is designed -- the goal of the

8      study is to assess the understanding that users

9      might have when they read the privacy policy.

10           So before I ask them question that assess    11:17:16

11     the understanding, I want to make sure -- or I want

12     to try to make sure they read the privacy policy

13     because, otherwise, what am I asking about?

14     Q.    And when you get to G.2-18 with the

15     highlighting, were you asking them to review the    11:17:32

16     Google pol- -- privacy policy again?

17     A.    I think that these are different

18     conditions; right?

19     Q.    You're the expert.  I'm asking you.

20           Were you asking them to read the Google       11:17:55

21     policy -- Google privacy policy twice?

22     A.    No, I did not.  Every one of them saw this

23     just once.  And you can see that G 20 also has the

24     same slide, because it had four conditions.

25     Q.    Okay.  So in your second study, no one saw    11:18:09

                                                    Page 152

1   the Google privacy policy twice; is that correct?

2       A.   Yeah, that was the design.

3       Q.   Okay.  So you only showed them the Google

4   privacy policy once, but you had a minimum

5   30 seconds of review; is that right?              11:18:24

6       A.   I think it says 25 seconds of this

7   policy -- or -- yeah, 30 seconds, sorry.  These are

8   screen captures, so they must ran [verbatim].  But

9   I'll -- I'll -- I'll correct your assumptions --

10          THE COURT REPORTER:  So they must --        11:18:41

11   excuse me.  So they must what?

12          THE WITNESS:  Can you read that sentence

13   to me?  I'll complete it.

14          (Record read back by the reporter.)

15          THE WITNESS:  Yeah, they must have          11:19:00

16   captured it after the timer started -- started

17   ticking.  But I'll say that not every condition

18   watched the same policies.  But no one in this

19   experiment saw any policy twice.

20   BY MR. REBLITZ-RICHARDSON:                          11:19:17

21       Q.   Okay.

22       A.   The Google privacy policy was shown in --

23   for Group B only.  What I think you're referring to

24   is the Learn More page that was shown to every

25   group.                                             11:19:30

                                              Page 153

CONFIDENTIAL

1      Q.   In your second study, was this stimuli

2   exposure reflective of the way that a typical

3   consumer engages with Chrome incognito?

4           MS. OLSON:  Objection to the form.

5           THE WITNESS:  And -- and I answered it          11:19:43

6   three times already.  The goal of the study was not

7   to assess what a typical consumer does because a

8   typical consumer doesn't care.

9           The typical consumer doesn't even click

10  this as the click rate for the Learn More page hints   11:20:00

11  to us are very low.  The typical consumer is not

12  what I'm testing.  I'm testing consumers who

13  actually care about the privacy policy and have the

14  opportunity to attend and read it, how do they

15  understand what incognito mode -- what -- while in     11:20:18

16  incognito mode, what types of information does

17  Google receive or does not receive.

18          And, you know, I think -- I think --

19  again, I think that it -- it was obvious from

20  Keegan's rebuttons re- [verbatim] -- rebuttal report   11:20:37

21  that he did not understand the different goals of

22  the different studies because he keeps bringing up

23  this critique.  This critique is nonsensical given

24  the goal of the study.

25          The goal of the study is to assess what       11:20:48

 1   people understand when they do read these things.

 2   BY MR. REBLITZ-RICHARDSON:

 3        Q.   And how did you decide what to highlight

 4   in terms of your second study?

 5        A.   I tried to help responders by making sure      11:21:00

 6   I highlight the -- the points that are relevant to

 7   the incognito mode, questions that -- that are at

 8   issue here.

 9        Q.   Did you select the text, or was that

10   someone else?                                            11:21:14

11        A.   I selected the text.  I had my Analysis

12   Group research assistants also take a look and see

13   whether I had missed anything of importance.  And

14   that's how these things were highlighted.

15            Again, we provided the images.  The study      11:21:28

16   itself was programmed by Dynata, by their

17   programers.

18        Q.   Did you miss anything of importance with

19   your highlighting?

20        A.   I hope not.                                   11:21:39

21        Q.   Well, they checked; right?

22        A.   Yeah.  No, they didn't actually find

23   things that I missed.

24        Q.   So they didn't make any changes to your

25   highlighting?  You did that, and no one made any        11:21:47

1    changes?

2         A.   Yes.

3         Q.   Okay.  And was that just you reviewing the

4    document and being like, This looks relevant, or did

5    you look at any of the case materials?          11:21:56

6         A.   As I said, I did this after reviewing the

7    Complaint.

8         Q.   Okay.  Anything else other than reviewing

9    the Complaint?

10        A.   You know, I must have seen some other       11:22:06

11   documents related.  There is a judge decision, a

12   denial of something, which I cite in my --

13        Q.   In the first report?

14        A.   Yeah.  I viewed those.

15        Q.   Okay.  Did you review those as part of      11:22:21

16   your decision on what to highlight?

17        A.   I viewed those as -- as -- you know, as

18   part of my design process for the studies, not just

19   this decision.

20        Q.   Okay.  But did it influence what you        11:22:32

21   decided to highlight?

22        A.   I'm sure it must have influenced in some

23   way.

24        Q.   Would you agree that highlighting is

25   leading?                                             11:22:45

                                              Page 156

CONFIDENTIAL

1        A.    Highlighting is directing attention to.

2    Leading is a different term.

3        Q.    Okay.  Would you agree that highlighting

4    at least biases the responses?

5        A.    No, I disagree.                           11:22:53

6        Q.    Okay.

7        A.    Because I highlight, I say, "Look at

8    this," and I ask you, "What do you think is true?

9    Well, how you understand this?"  There's no bias in

10   this process.  It just increases the likelihood that  11:23:05

11   you've actually seen this.

12            So when I ask you about your

13   understanding, if for some reason you do not

14   misunderstand, it decreases the likelihood that you

15   did not -- did not understand because you didn't     11:23:21

16   read it or you didn't see it or you didn't attend to

17   it.

18       Q.    With your third study, did you ask any

19   questions regarding those respondents' understanding

20   of any Google disclosures with respect to receiving  11:23:33

21   information?

22       A.    You know, I -- with -- with the risk of

23   repeating myself, I think you're missing the goal of

24   the third study, or this question at least misses

25   the goal of the third study.                         11:23:48

CONFIDENTIAL

1        Q.   Let me try again.

2        A.   Okay.

3        Q.   The goal of your third study was not to

4   assess anyone's understanding of Google receiving

5   information; is that fair?                           11:23:57

6        A.   Not directly, yes.

7        Q.   It was to test these two different

8   versions of the incognito screen; right?

9        A.   Yeah, the third study exposes respondents

10  between subjects, so it's an experimental study, to   11:24:12

11  two different versions of the incognito screen.

12            One version is the one I used in the rest

13  of the studies, and we've talked about where it came

14  from.

15            The other version is one with an amended    11:24:24

16  text.

17            And then the question I asked respondents

18  is what's the likelihood of use for this browser for

19  browsing the internet for sensitive material.

20            And I assessed the degree of willingness    11:24:40

21  to use this browser as a test of whether the change

22  in the language influences the likelihood of usage

23  for a browser in this setting.

24        Q.   And who made the change to the language?

25        A.   I did.                                     11:24:55

                                        Page 158

CONFIDENTIAL

1          Q.     Okay.   And what changes did you make?

2          A.     Let -- let's -- if -- if you allow me to

3     go to the study --

4          Q.     Yep.

5          A.     -- I'll go to G.3.  But I'll -- I'll tell       11:25:11

6     you which -- which page in a second.

7          Q.     Can I help you?  And we go to Appendix H.2

8     and H.1.  But maybe you have a different page in

9     mind.

10          A.     Yeah, H.1 and H.2 will do the trick.          11:25:39

11               So I'm in H.1-1.  H.1-1 is the incognito

12     splash screen that I've used in the other studies.

13     We've talked about where it comes from.  I'll call

14     that the original language one.

15               And H.2-1 describes the incognito with        11:25:55

16     slightly changed language, which I changed based on

17     what the judge ruled in that decision might be

18     issues with the original incognito screen.

19               In particular, the judge said that the

20     first two sentences could either be understood as        11:26:26

21     separate or combined and that could lead to

22     different understandings.

23               And so I modified that to show that the

24     second one explains the first.  So I said, "Now you

25     can browse privately, which means other people who       11:26:39

1    use this device," et cetera, et cetera.

2          And then the judge also ruled that the

3    splash screen did not actually state specific

4    companies, including Google, that might be private

5    to information, and so I added a bullet point that     11:26:58

6    says, "Companies that provide services to websites

7    you visit," in parentheses, "such as Google

8    Analytics, Adobe Analytics, Google Ad Manager, and

9    Facebook Ads" [as read], close parenthetic.

10         Q.    Are you aware that Google, in 2021,         11:27:16

11   planned certain changes to the incognito screen?

12         A.    I've read about it.

13         Q.    Okay.  And are you aware that in 2021

14   Google planned to remove the phrase "now you can

15   browse privately" from the incognito splash screen?   11:27:29

16         A.    I'm actually not aware of the details.

17         Q.    Okay.  Did you do that with your study?

18   Did you remove the phrase "now you can browse

19   privately"?

20         A.    I made the changes.  I just described I    11:27:49

21   made two changes to the splash screen.  And it was,

22   in particular, based on what the judge ruled or

23   concluded would be issues.

24         And I wanted to test whether those issues,

25   if amended, made a difference to the likelihood of     11:28:03

Page 160

1    use of Chrome in incognito mode when browsing the

2    web for sensitive materials.

3        Q.   But you kept the same incognito name;

4    right?

5        A.   Well, the nature of an experiment is that        11:28:16

6    you only manipulate what you want to test and

7    nothing else.  And that's what I did.

8        Q.   And so the only thing you wanted to

9    chest -- test were the two changes you described;

10   right?                                                     11:28:34

11       A.   Yes.

12       Q.   Okay.

13           MR. REBLITZ-RICHARDSON:  Let's take a

14   break there.

15           THE WITNESS:  Okay.  How long?                     11:28:38

16           MS. OLSON:  Let's go off the record and we

17   can discuss.

18           THE VIDEOGRAPHER:  Going off the record.

19   The time is 11:28 a.m.

20           (Lunch recess taken.)                              12:15:54

21           THE VIDEOGRAPHER:  Back on the record.

22   The time is 12:15 p.m.

23   BY MR. REBLITZ-RICHARDSON:

24       Q.   Professor Amir, I'd like to ask you some

25   questions regarding your rebuttal report, which has        12:16:13

                                                    Page 161

```
 1    been marked as Amir Exhibit 2.

 2            Do you have that in front of you?

 3       A.   One second.

 4            I do now.

 5       Q.   And you have 11 rebuttal opinions stated    12:16:24

 6    in this -- this report; right?

 7       A.   I didn't count them.  Maybe.

 8       Q.   Sorry.  I was just referring to the

 9    "EXECUTIVE SUMMARY" where you have Amir Rebuttal

10    Opinions 1 through 11.                               12:16:40

11            Do you see --

12       A.   Yeah.

13       Q.   -- that?

14       A.   I do see that.

15       Q.   And 10 of those 11 rebuttal opinions are    12:16:46

16    with respect to Professor Schneier?

17       A.   Professor Schneier's report, yes.

18       Q.   And then one is regarding Mr. Keegan's

19    report; right?

20       A.   I believe that's true, yes.                 12:17:02

21       Q.   Okay.  And so you reviewed Professor

22    Schneier's opening report; correct?

23       A.   Yes.

24       Q.   Was there anything in Professor Schneier's

25    opening report that you agreed with?                12:17:16
```

Page 162

```
 1        A.    That's a too general of a question to ask

 2   me now.

 3        Q.    Anything that you recall that you agreed

 4   with from that report?

 5        A.    I don't recall all of the details of the    12:17:24

 6   report, so it's very hard to answer that question.

 7        Q.    Okay.

 8              And same question with respect to

 9   Mr. Keegan's report, anything you can recall that

10   you agreed with?                                        12:17:36

11        A.    I agree that -- that in general using

12   Dynata's sample was a -- a good idea.

13        Q.    Okay.  So we're in agreement on using

14   Dynata; right?

15        A.    Yes, we are.                                 12:17:47

16        Q.    Okay.  Is it correct that your

17   disagreement with Professor Schneier's opinions is,

18   in part, based on the three surveys you conducted

19   that we discussed previously?

20        A.    Some of my opinions, and I state when --     12:18:06

21   when that's relevant, are exactly based on the

22   notion that Professor Schneier raises opinions that

23   are not actually backed by in-context data.  And I

24   have in-context data.  And so that raised my

25   objection to the claims made.                           12:18:25
```

Page 163

```
 1        Q.   Right.

 2             So, for example, paragraph 4 that's

 3   describing your first rebuttal opinion, you

 4   referenced your "Interpretation Study"; right?

 5        A.   Yes.                                   12:18:36

 6        Q.   And then for paragraph 7 regarding your

 7   third rebuttal opinion, you reference your "Consumer

 8   Perceptions and Expectations Study"; right?

 9        A.   Which paragraph again?

10        Q.   Paragraph 7.                           12:18:54

11        A.   Yes.

12        Q.   And you reference your "Consumer

13   Perceptions and Expectations Study" again in

14   paragraph 8; right?

15        A.   Yes.                                   12:19:05

16        Q.   And so in this "EXECUTIVE SUMMARY," you

17   identify the various opinions -- the various

18   rebuttal opinions that are tied to your prior

19   studies; right?

20             MS. OLSON:  Objection to the form.     12:19:21

21             THE WITNESS:  Yes.  So as I mentioned,

22   some of them are based on my three empirical

23   studies, and I -- and I note exactly where.

24   BY MR. REBLITZ-RICHARDSON:

25        Q.   Right.                                 12:19:30
```

Page 164

1          A.    Some of them are -- are not.

2          Q.    Okay.  Is it your position that Professor

3    Schneier's opinions are inconsistent with findings

4    from in- -- internal Google documents?

5          A.    I believe in my report I mention exactly        12:19:42

6    where Mr. Schneier's opinions are contradicted by

7    specific documents that I looked at.

8                I -- I must say, though, that my task is a

9    little easier than Professor Schneier's.  He's

10   trying to make some overarching claims, and so it's      12:20:03

11   sufficient to find evidence that refutes that claim

12   to say, you know, clearly his claim is not true

13   everywhere, whereas his opinions that are based on

14   anecdotes from some of the Google documents that he

15   cites are -- are just that, they're anecdotes.  And     12:20:24

16   from anecdotes to generalizations is long, long

17   distance and usually incorrect.

18         Q.    Let me just focus your attention on

19   paragraph 13.  Do you see where you wrote,

20   "Mr. Schneier's opinions and claims regarding class     12:20:40

21   members' expectations (Schneier Opinions 10, 11, 12,

22   and 13) are not only contradicted by my empirical

23   studies, but they are also inconsistent with

24   findings from internal Google and public documents"?

25               Do you see that?                             12:21:00

                                              Page 165

CONFIDENTIAL

1       A.   Yes.

2       Q.   In preparing this rebuttal report, did you

3   evaluate the extent to which Professor Schneier's

4   opinions were consistent with internal Google

5   documents?                                      12:21:13

6       A.   I'm not sure exactly what your question

7   is, so let me try to answer, and let me know if

8   it's -- if it's your question.

9           In order to conclude, as I did, that this

10  particular opinion or these four opinions for     12:21:27

11  Mr. Schneier are not consistent with -- with

12  findings from Google and public documents, I of

13  course evaluated the consistency between his

14  claim -- general claim, overarching claim, and

15  evidence that exists in those documents.          12:21:47

16      Q.   And -- and why did you do that?  Why did

17  you evaluate whether Professor Schneier's opinions

18  were consistent with findings from internal Google

19  documents?

20      A.   So -- so, first, they're inconsistent with  12:22:01

21  my empirical studies.  But then Professor Schneier

22  cherry-picks anecdotes from Google documents.

23          And so by going to Google documents, I

24  wanted to see if -- if his opinions are backed by

25  all evidence presented in Google documents.       12:22:22

```
 1              And, as I said before, it's -- from my
 2    position, it's sufficient to say, "Oh, wait a
 3    minute.  Here are evidence that are inconsistent
 4    with his claim from these documents," meaning his
 5    overarching generalized claim cannot be true.        12:22:34
 6         Q.   So you were looking for documents that
 7    were inconsistent with Professor Schneier's
 8    opinions; is that correct?
 9              MS. OLSON:  Objection.  Objection.
10    Misstates the testimony.                             12:22:46
11              THE WITNESS:  Yeah, it's not exactly.
12    I -- sometimes I look at the documents cited by
13    Mr. Schneier and in other places in that document,
14    the evidence is simply inconsistent with his claim.
15    BY MR. REBLITZ-RICHARDSON:                           12:22:56
16         Q.   In Amir Exhibit 2, what is Appendix C.  It
17    has "Materials Relied Upon" at the top there --
18              (Interruption in audio/video.)
19              THE COURT REPORTER:  Excuse me.  There was
20    some audio -- something going on over there that I   12:23:14
21    couldn't hear the entirety of the --
22              THE WITNESS:  I couldn't hear you, either.
23    BY MR. REBLITZ-RICHARDSON:
24         Q.   What is Amir Exhibit 2, Appendix C, which
25    is the last page of the PDF?                         12:23:20
```

Page 167

```
 1        A.    Let me go there.

 2              So I don't know what Exhibit 2 is.  But

 3    are you talking to Appendix -- about Appendix C?

 4        Q.    Sorry.

 5              Amir Exhibit 2 is your rebuttal report --   12:23:39

 6        A.    Oh, yes.

 7        Q.    -- correct?

 8        A.    Yes.  Appendix C --

 9        Q.    Appendix C to your Amir Exhibit 2, what is

10    that?                                                12:23:47

11        A.    Appendix C lists the materials I

12    investigated and relied upon in forming this

13    rebuttal report.

14        Q.    Right.

15              Do you see there where you have a section   12:23:58

16    titled "Bates-Stamped Documents"?

17        A.    I do.

18        Q.    And you have 11 documents there; right?

19        A.    Yes.

20        Q.    And who identified the 11 Bates-stamped     12:24:06

21    documents included there in Appendix C?

22        A.    So I don't remember by heart is whether

23    some of them are cited by Mr. Schneier himself.  And

24    others might have been brought when I asked my

25    support team, my research assistants, to say, Can we   12:24:28
```

Page 168

1    locate documents that address this issue.

2        Q.   Did you yourself run any searches for

3    internal Google documents?

4        A.   I didn't run a search for internal Google

5    documents.  I looked within Google documents that      12:24:45

6    were either cited by Mr. Schneier or that my

7    research assistants suggested may be relevant.

8        Q.   And who -- who were the research

9    assistants that were doing that work?

10       A.   These are the team of people I mentioned    12:25:00

11   before from Analysis Group.

12       Q.   The three people from Analysis Group; is

13   that right?

14       A.   Haimin, Brad and Harriet.

15       Q.   If anyone was searching for documents for    12:25:14

16   you, it would have been one of those three people;

17   is that right?

18       A.   Yes.

19       Q.   Were you ever granted full access to all

20   internal Google documents produced in this           12:25:26

21   litigation?

22       A.   I did not request it.

23       Q.   Do you know whether or not those three

24   individuals received full access to those internal

25   Google documents produced in this litigation?        12:25:39

                                                    Page 169

CONFIDENTIAL

```
1          A.    I do not.

2          Q.    When you say that certain of Professor

3    Schneier's opinions are inconsistent with findings

4    from internal Google documents, what documents are

5    you referencing?                                    12:25:50

6          A.    We should go to -- to my report.

7                You said this was paragraph 7.  Let me get

8    there slowly.  I'll tell you where I'm -- where I'm

9    at.  Paragraph 7 speaks about Opinion 3.  So let me

10   go to Opinion 3.                                    12:26:20

11               Sorry.  It's hard to scroll over this

12   DocuShare.  I guess I structured it a little

13   differently, so we'll have to scroll through all of

14   it.

15         Q.    Perhaps I can direct your attention to   12:27:21

16   page 38 where you have the sub

17   header "Mr. Schneier's Opinions and Claims Regarding

18   Class Members' Expectations are Not Consistent with

19   Internal Google and Public Documents."

20               Is that the section you're looking for?   12:27:35

21         A.    Perhaps.  Let me go there and see.

22               Yeah, we could start there.  So...

23         Q.    I want you to identify for me the internal

24   Google documents that you believe are inconsistent

25   with Mr. Schneier's opinions.                        12:28:08
```

Page 170

1        A.    So Footnote 110 --

2        Q.    Okay.

3        A.    --- lists a document and the locations of

4    where I looked in that document that I'm referring

5    to exactly.                                          12:28:35

6        Q.    Okay.  Other than the one document

7    identified in Footnote 110, are there any documents

8    that you believe -- any internal Google documents

9    that you believe are inconsistent with Professor

10   Schneier's opinions and claims regarding class       12:28:55

11   members' expectations?

12       A.    Well, I think Footnotes 111 to 113 note to

13   another document.

14       Q.    Okay.  Other than the two documents

15   identified in Footnotes 110 through 113, are there    12:29:13

16   any other internal Google documents that you contend

17   are inconsistent with Professor Schneier's opinions

18   and claims regarding class members' expectations?

19       A.    Give me a second.  The next document is a

20   public thing.  So I say -- and you're saying with    12:29:36

21   Google and public.  So this --

22       Q.    Right.

23       A.    -- a public document that Schneier lists.

24       Q.    Can you focus on my question?

25       A.    Yeah.                                       12:29:44

                                              Page 171

1          Q.    I'm asking about internal Google documents

2     because that's what you referred to.  You

3     referred --

4          A.    Well, in --

5          Q.    -- to internal Google documents.          12:29:49

6          A.    So, you know, at least these -- these two

7     documents for sure.  I didn't review the entire

8     report.  You directed me to the section.  So I don't

9     know if I mentioned others in other sections.  But

10    in this section, it's definitely these two documents   12:30:01

11    in several locations in one of them.

12         Q.    Do you need a few minutes to review your

13    report and see if you can identify anything else in

14    your report that you claim is an internal Google

15    document that is inconsistent with Mr. Schneier's      12:30:12

16    opinions and claims regarding class member

17    expectations?

18         A.    I could.

19                So in Footnote 132, there are two

20    documents mentioned.  And a third -- I guess that's    12:30:46

21    a deposition.

22         Q.    Does that have anything to do with your

23    opinion that Mr. Schneier's opinions and claims

24    regarding class member expectations are not

25    consistent with internal Google documents?            12:31:16

                                              Page 172

```
 1        A.   Well, you said "Mr. Schneier's opinions."

 2   This one is regarding privacy.  It's not regarding

 3   the expectations.

 4        Q.   Right.

 5             I'm focused on the class member            12:31:32

 6   expectations.

 7        A.   So I think those two documents are the

 8   ones I refer to.

 9        Q.   Okay.  And those are referred to in

10   paragraph -- is it 57?                               12:31:40

11        A.   Let me go back.  Sorry.  I scrolled away

12   to look at the next.  This is 57 and 58.

13        Q.   Okay.  And going back to paragraph --

14   well, let me just -- let me just ask.

15             Is it your opinion that Google's internal  12:32:06

16   documents show that users generally understand that

17   Google receives their data while they're in private

18   browsing mode?

19        A.   I think that is you look at the -- at the

20   Google documents, at least those that I looked at,   12:32:21

21   you get an interesting picture of a mixed -- mixed

22   answer to your question.

23             There's -- there's ev- -- there's

24   certainly evidence, anecdotal in most of the

25   documents by the way, that some users do and         12:32:35
```

```
 1    anecdotes that some users don't.  It's very hard to

 2    scientifically rely on these documents because we

 3    don't know how this data was generated.  We don't

 4    know, for example, if Google interviewed the users

 5    that most care about privacy to -- to see what they    12:32:51

 6    think or -- or not.

 7            So personally as a -- as in kind of a

 8    professional conduct, I wouldn't rely on these

 9    documents to form a general, overarching opinion

10    because we don't know how this data was generated.     12:33:10

11            But when you look at the documents, and

12    this is my point in my -- in my rebuttal report, you

13    see a mixture.  So you see what's -- you know, I --

14    I don't claim that -- that Mr. Schneier reports what

15    he reports falsely, but I -- he definitely cherry      12:33:29

16    picks and doesn't look at the -- the entirety of the

17    data to come up with a generalized, overarching

18    conclusion because he's ignoring, you know, anec- --

19    just as -- just as relevant anecdotal evidence

20    that -- that are inconsistent with his general view.   12:33:48

21        Q.   Right.

22            But my question was simply whether it's

23    your opinion that Google's internal documents show

24    that users generally understand that Google receives

25    their data while they are in private browsing mode.    12:34:04
```

CONFIDENTIAL

1          A.    And I re- --

2               MS. OLSON:  Objection.  Asked and

3     answered.

4               THE WITNESS:  Yeah.  And I responded that

5     there is no evidence that suggests any general          12:34:11

6     understanding that is reliable in these documents.

7     So your question assumes and sort of is -- is

8     relying on a -- on a false assumption.

9     BY MR. REBLITZ-RICHARDSON:

10          Q.    So the -- the -- the documents don't        12:34:24

11     establish any general understanding as to whether or

12     not Google receives users' data while they're in

13     private browsing mode; is that right?

14               MS. OLSON:  Objection to the form.

15               THE WITNESS:  That is close to what I        12:34:39

16     said.  I said that the -- what the documents show is

17     anecdotal evidence of quite a wide heterogeneity of

18     responses to the various probes from Google or third

19     party, we don't know or third-party entities that

20     Google employed with respect to understanding of      12:34:57

21     private browsing, so -- such that there is no one

22     general view that you can conclude, which was my

23     point about Mr. Schneier's opinion.

24     BY MR. REBLITZ-RICHARDSON:

25          Q.    Okay.  So having reviewed Google's          12:35:12

                                             Page 175

1    internal documents, it's your opinion that they do

2    not establish any general -- general understanding;

3    is that right?

4           MS. OLSON:  Objection.  Asked and

5    answered.                                    12:35:22

6           THE WITNESS:  Yeah.  I say that the only

7    general understanding that you can conclude is that

8    there is vast heterogeneity in responses to their

9    questions about this.

10   BY MR. REBLITZ-RICHARDSON:                   12:35:33

11       Q.   Are you intending to offer the opinion in

12   this case that Google's internal documents show that

13   users generally understand that Google receives

14   their data while they're in private browsing mode?

15       A.   So I intend to offer the opinions that I  12:35:48

16   offered in my opinion report.  So if I'm going to

17   offer an opinion, which I have, that what you find

18   is pretty large heterogeneity in perceptions, it's

19   going to rely on my studies, not on anecdotal

20   evidence from Google, which we do not know what     12:36:04

21   generated that information.

22       Q.   Right --

23           (Simultaneous speaking.)

24           (Interruption in audio/video.)

25       A.   Knowing some of these things, whether they  12:36:11

                                                    Page 176

1    were surveys or interviews.  We -- we -- you know,

2    it's -- it's basically, from a -- you know, from a

3    professional perspective, it's unreliable data.

4    It's anecdotes.  It's suggestive.  It can inform and

5    it should inspire doing formal market research,          12:36:26

6    which I have done.  But it's not something I would

7    read and draw some overarching conclusions for.

8         Q.   Right.

9              I understand that you're intending to

10   offer opinions based on your three studies; right?       12:36:35

11             Now, I also understand that you've

12   reviewed some internal Google documents, and you

13   reference 11 in Amir Exhibit 2; correct?

14        A.   Yes.

15        Q.   And my question is whether or not you're       12:36:50

16   intending to offer an opinion in this case, based on

17   your review of those internal doc- -- Google

18   documents, that users generally understand that

19   Google receives their data while they are in private

20   browsing mode, or if you're just going to be            12:37:04

21   offering this opinion that there is heterogeneity.

22             Do you understand the difference?

23        A.   I -- of course I understand the

24   difference.

25             And I --                                       12:37:13

                                                    Page 177

CONFIDENTIAL

```
 1          Q.   So --
 2          A.   -- I -- I think I answered this more than
 3     once, but I'll try again.  What I can tell for sure
 4     from these Google documents is that what they
 5     reflect or represent is heterogeneity of            12:37:23
 6     understandings.
 7               It may -- in some sense, Mr. Schneier says
 8     they -- they -- they imply some generalization, and
 9     I say, no, they do not.  In a -- in fact, the only
10     generalizations you could try to -- to make, which I  12:37:42
11     will not because this data is not re- -- what I
12     would call reliable data, is that there is
13     heterogeneity.  And so at best, it raises the
14     hypothesis that there is heterogeneity, which should
15     be tested with primary data in context.            12:37:56
16          Q.   Do you use the word "heterogeneity" in
17     your report?
18          A.   I don't remember if I use that term or
19     not.  I can search for it.
20          Q.   You -- you identified the two documents   12:38:13
21     that you cite in paragraph 57.  I'd like to look --
22     you -- you reviewed these documents in preparation
23     for your deposition; right, the 11?
24          A.   Yes.
25          Q.   Okay.  So you're familiar with these      12:38:30
```

Page 178

1    documents?

2         A.   I reviewed them.

3         Q.   And you -- you -- you wanted to make sure

4    that there wasn't any errors in your report based on

5    your -- your review of those documents; right?        12:38:39

6              MS. OLSON:  Objection to the form.

7              THE WITNESS:  Yes.

8    BY MR. REBLITZ-RICHARDSON:

9         Q.   All right.

10             MR. REBLITZ-RICHARDSON:  Can we -- and I     12:38:47

11   guess I'm going to ask whether or not Dina can mark

12   as Exhibit 4, what is Tab 5, which is the document

13   with GOOG-CABR-00422093.  And it's cited in Footnote

14   110.

15             (Amir Deposition Exhibit 4 was marked       12:39:22

16             electronically.)

17   BY MR. REBLITZ-RICHARDSON:

18        Q.   Professor, are you seeing an exhibit?

19        A.   Wait one second.

20             MR. REBLITZ-RICHARDSON:  I guess Dina will   12:39:27

21   tell us when it's moved over?

22             THE WITNESS:  It's not yet.

23             THE CONCIERGE:  It's loading in now.

24             MR. REBLITZ-RICHARDSON:  And, Dina, are

25   you able to put Exhibit 4 up on the screen so that     12:39:43

                                            Page 179

1    we can go to a few pages here?

2           THE CONCIERGE:  Yes, I can.

3    BY MR. REBLITZ-RICHARDSON:

4       Q.   Professor Amir, do you have what's marked

5    as Exhibit 4 in front of you?                    12:39:55

6       A.   Not yet.

7       Q.   Did you press refresh?

8       A.   I did.  It's not here.

9           MS. OLSON:  I don't see it, either.

10          THE WITNESS:  Now it's there.           12:40:04

11   BY MR. REBLITZ-RICHARDSON:

12      Q.   Can you open that up and tell me whether

13   Exhibit 4 is the first of the two documents you cite

14   in paragraph 57?

15      A.   I don't remember, to be honest.  It's not  12:40:16

16   marked -- oh, wait a minute.  GOOGLE CABR '442093

17   [verbatim], yes.

18      Q.   Okay.  And you -- you reviewed this

19   document in preparation for your deposition here

20   today?                                          12:40:33

21      A.   I reviewed it when I prepared my reports.

22   I didn't review it in preparation for deposition.

23      Q.   Does this document include any mention of

24   incognito anywhere?

25      A.   I don't know.  Do you want me to read the  12:40:44

                                              Page 180

```
 1    entire document?

 2         Q.   Well, I was just wondering.  I -- I mean,

 3    I -- I don't want to read every word.  I'm just

 4    wondering whether you can tell me whether this has

 5    any mention anywhere of incognito or private        12:40:53

 6    browsing.

 7         A.   Again, I would have to read it in order to

 8    respond.

 9         Q.   Okay.  Did you talk to any Google

10    employees about this document?                      12:41:04

11         A.   I think you asked me in the beginning have

12    I asked any Google employees, period, and I said

13    "No."  So I certainly didn't talk to them about this

14    document.

15         Q.   Let's go to the page ending -- I'm going   12:41:16

16    to refer to the last three numbers on the bottom

17    right.

18              So I'm going to ask to go to the page

19    ending '097.

20              Does this -- is this a slide you're --     12:41:34

21    you're recalling as part of your review?

22         A.   Yes.

23         Q.   And do you see the third point there where

24    it states "████████████████████████████████

25    ████████████████████████████████████████████"?     12:41:47
```

                                                   Page 181

CONFIDENTIAL

```
 1         A.    I see it -- I see the sentence.

 2         Q.    Yeah.

 3               Was one of -- was that one of the findings

 4    reported in this internal Google document that you

 5    cite in your report?                                 12:41:56

 6         A.    I'm not sure.  It's a very vague

 7    statement.  We could probably go to that page to see

 8    more explanation, which is page '100.

 9         Q.    So page '100 has more explanation of that

10    statement?                                           12:42:17

11         A.    I -- I believe so, if I understand the

12    document correctly.  It's that "███████████████████

13    ████████████████████," which, I think, is

14    the beginning of the sentence you pointed out.

15         Q.    Right.                                    12:42:30

16               And I -- I -- I was going to the page

17    ending in '115.  Let's -- let's go there and see if

18    that triggers any recollection for you.

19               And you see that says "US:  Cultural

20    alignment" at the top left?                          12:42:57

21         A.    '115, yes.

22         Q.    Right.

23               And you see on the right, there's a set of

24    text with "COMPREHENSION" at the top?

25         A.    Yeah.                                     12:43:06
```

                                                    Page 182

1      Q.   And under "COMPREHENSION," do you see

2   where the Google employees are saying in this

3   document that "███████████████████████████" in the

4   United States?

5           MS. OLSON:  Objection to the          12:43:16

6   characterization of the document.

7           THE WITNESS:  Yeah, I -- I see this -- I

8   see this on the slide.  I don't know if Google

9   employees are saying that.

10  BY MR. REBLITZ-RICHARDSON:                     12:43:25

11     Q.   Well, what do you understand that to be

12  referring to, "██████████████████," under

13  "COMPREHENSION"?

14     A.   I'm not sure; right?  And that's -- that's

15  part of my point.  Most of these documents are --  12:43:35

16  you know, if you wanted to come up with some

17  generalization, are not very useful because it's

18  hard to tell what, exactly, they're referring to and

19  what data they're actually relying on.

20     Q.   Well, does this document show that Chrome   12:43:50

21  users understand their data is being collected?

22     A.   I don't believe that I use the document in

23  this way.  I think that if you go back to my report,

24  I say "Internal Google documents show that Chrome

25  users understand their data is being collected, and  12:44:09

                                              Page 183

CONFIDENTIAL

```
1    they're also aware of the benefits and have become

2    accustomed to data collection for enhanced

3    performing personalized ads" --

4              THE COURT REPORTER:  Excuse me.  Could you

5    slow down.  I didn't get the end of that.          12:44:21

6              THE WITNESS:  Sorry.  Where did I -- where

7    did I los- -- where did I lose you?

8              (Record read back by the reporter.)

9              THE WITNESS:  So I'll start with internal.

10   So "Internal Google documents show that Chrome users  12:44:44

11   understand their data is being collected, and they

12   are also aware of the benefits and have become

13   accustomed to data collection for enhanced

14   performance and personalized ads."

15             And in Footnote 110, I cite several          12:44:56

16   places.  So if you want to go to '182 -- sorry.

17   There was '98, '99, '102, and '182, which I cite to.

18             '98 says, "████████████████████████

19   ████████████████      ████████████████████████

20   ████████████████████████████████████             12:45:24

21   ███████████████████████████████████████

22   ████████████████████████    ████████████████

23   ███████████████████████████████████

24   ██████████"

25             And then it says, "We have come to terms    12:45:42
```

                                              Page 184

CONFIDENTIAL

```
 1    with the fact that companies are going to have

 2    profiles of us.  If they can use that to our

 3    advantage in some way, so be it."  So that's --

 4    BY MR. REBLITZ-RICHARDSON:

 5        Q.   So that last part you just read, what --    12:45:51

 6    what does that mean, "London"?

 7        A.   My guess is that it's a -- it's a quote

 8    from someone because it has quotation marks under

 9    it.  But the conclusion for whoever wrote

10    this generated this presentation is -- is on top.    12:46:09

11             And it says, "███████████████████

12    ████████████████████████████████████████████

13    ████████████," which I think when I say in my study

14    "and has become accustomed to data collection for

15    enhanced performance and personalized ads," that's    12:46:23

16    exactly one point that I mention.  And if you go

17    to --

18        Q.   Well, just -- just stay on this slide for

19    a second.

20             Does this have anything to do with your     12:46:32

21    assertion that Chrome users understand their data is

22    being collected?

23        A.   Chrome users understand their data is

24    being collected.  If -- you know, we -- we have to

25    make -- when we read this, we have to make           12:46:46
```

Page 185

```
 1    assumptions.  The assumption is that this document

 2    relates to Chrome, which is consistent with other

 3    places in the -- in the document, and -- and I think

 4    that this is one.  And as I said, I -- I cite four

 5    points for this point, so let me --                    12:47:03

 6        Q.   Before you go on to another slide, I want

 7    to make sure that you're saying there's two clauses

 8    in your sentence in paragraph 57; right?

 9        A.   Yes.

10        Q.   And so you're saying this references the     12:47:13

11    second clause about performance and personalized

12    ads; is that right?

13             MS. OLSON:  Objection.  Misstates the

14    testimony.

15             THE WITNESS:  I said that -- I used --       12:47:21

16    your -- my sentence is based on four places in this

17    document -- or three places in this document.

18    Sorry.  That was one.  Here is another.

19             So if you go to '99, "

20                                                          12:47:40

21

22

23

24

25             So that was the second point I used.         12:47:57
```

Page 186

```
 1              And then if I go to '102 --

 2   BY MR. REBLITZ-RICHARDSON:

 3       Q.   Well, I want to take these one at a time.

 4       A.   Okay.

 5       Q.   So the -- the second --                 12:48:03

 6       A.   And --

 7            (Simultaneous speaking.)

 8            (Interruption in audio/video.)

 9            THE COURT REPORTER:  Excuse me.

10            THE WITNESS:  The part of the same

11   presentation.

12            THE COURT REPORTER:  Wait.  One second.

13   I'm getting speaking over and it's actually muting

14   you both out.  So if we could slow down, please.

15   Thank you.                                        12:48:15

16   BY MR. REBLITZ-RICHARDSON:

17       Q.   Before we leave this slide, I want to ask

18   some questions about this slide.

19            Is that okay?

20       A.   I don't think it's okay because you're    12:48:20

21   trying to break an argument that I relied on three

22   points together into -- and then you say, But this

23   doesn't say the whole thing.  Of course, it's not

24   because I relied on three points.  I want to share

25   the three points.  And I wanted to show you the     12:48:34
```

                                                    Page 187

1    three points that I relied on as you requested.

2         Q.   Go ahead.

3         A.   My third point relies on slide -- which I

4    guess is page '102, which says, "█████████████████

5    ███████████████████████████  ████     12:48:46

6    ████████████████████  ████████████████

7    ███████████████████████████████████

8    ███████"  --

9              THE COURT REPORTER:  Sir, you have to slow

10   down if you're reading into the record, please.   12:48:59

11             THE WITNESS:  Sorry.

12             "████████████████████████

13   ████████████████████████  ████████████████

14   █████████████  █████████████████████

15   ██████████████████████████████        12:49:13

16   ████████  ████████████████████████████"

17   end quote.

18   BY MR. REBLITZ-RICHARDSON:

19        Q.   Are you done?

20        A.   Yes.  So -- I used these three to come up   12:49:26

21   with my conclusion in that sentence.

22        Q.   Okay.  Can I ask you some questions about

23   those three?

24        A.   Of course.

25        Q.   Any of those mention incognito anywhere?    12:49:37

                                              Page 188

 1      A.   These points do not mention incognito, but

 2  neither does my sentence.

 3      Q.   Any of these slides mention private

 4  browsing mode in any way?

 5      A.   No, but neither does my sentence.  My        12:49:51

 6  sentence does not speak about incognito or of prior

 7  browsing.  My sentence says, "Internal Google

 8  documents show that Chrome users."

 9      Q.   Does anything in this document support any

10  assertion -- oh, scrap that.                           12:50:10

11          Two of these are quotes from London and

12  Paris; right?

13      A.   Actually, I didn't read the quotes now

14  when I read them.  I just read the conclusions for

15  whoever generated the slides from Google.             12:50:25

16      Q.   The three slides you quo- -- you cited

17  include quotes from Paris and London; correct?

18      A.   Yes.  And I did not read them.  I mean, I

19  read the first one from London.  But afterwards, for

20  the two additional slides, I did not read the         12:50:35

21  quotes.  I just read the conclusion.

22      Q.   Right.

23          And you didn't cite the slide on the page

24  ending '115 that we looked at, that showed that

25  understanding is fairly low in the United States;     12:50:45

                                              Page 189

CONFIDENTIAL

1    right?

2         A.   So --

3              MS. OLSON:   Objection to the

4    characterization of the document.

5    BY MR. REBLITZ-RICHARDSON:                              12:50:52

6         Q.   Let's go back to '115.  I'm not trying to

7    mischaracterize it.  Let's go back to '115.

8              Did you cite the page ending '115 in your

9    report?

10        A.   I did not cite the page ending in '115.      12:51:04

11        Q.   Okay.  In assessing the application of

12   this document, the relevance of this document, did

13   you look at the slide ending in '115?

14        A.   I looked at the entire exhibit.

15        Q.   Okay.  And you understand that this slide   12:51:19

16   focuses on U.S. users of Chrome; correct?

17        A.   It says "U.S. Cultural Alignment."  I

18   assume this is U.S. users of Chrome, but that's an

19   assumption.

20        Q.   And -- and here, with respect to the U.S.,  12:51:34

21   whoever prepared this presentation wrote

22   "███████████████████████."  Correct?

23             MS. OLSON:   Objection to incompletely

24   quoting the document.

25             THE WITNESS:   Yeah.  So the sentence        12:51:51

                                                 Page 190

1   starts with " ███████████████████████

2   ████████████████████████████

3   ████████████████████████████

4   ████████████ "

5        What -- and then it says "WHAT THIS      12:52:08

6   MEANS."  Is it -- means, " ████████████████

7   ████████████████████████

8   █████████████ "

9   BY MR. REBLITZ-RICHARDSON:

10       Q.   That reference to " █████████████ ,"   12:52:14

11  that's talking about American's understanding of

12  Google's data collection; right?

13            MS. OLSON:  Objection.  Calls for

14  speculation.

15            THE WITNESS:  Yeah, I have no idea that   12:52:22

16  that's true.

17  BY MR. REBLITZ-RICHARDSON:

18       Q.   You -- you have no idea what it means when

19  it says " ███████████████████████

20  ████████████████ " in this slide talking about   12:52:30

21  U.S. Chrome users?

22            MS. OLSON:  Same objection.

23            THE WITNESS:  Yeah, it -- it doesn't say

24  what exactly is the ████████████████ relating

25  to.  It just -- and if you -- if you look at the   12:52:42

```
 1    conclusion, the conclusion is, "███████████
 2    ██████████████████████████████████████████
 3    ███████████████"
 4            So what -- what I take from that is,
 5    ██████████████████████████████████████         12:52:54
 6    ███████████████████████████████
 7    ███████████████████████████████████
 8    ████████████████████████████████████
 9    █████████████████████████.
10    BY MR. REBLITZ-RICHARDSON:                      12:53:15
11        Q.   And do you agree that honesty is
12    important?
13        A.   We already covered it.  I -- I -- I
14    completely agree that honesty is important.
15        Q.   Are you aware that Google employees have   12:53:25
16    discussed internally how Incognito is effectively a
17    lie?
18            MS. OLSON:  Objection to the form.
19            THE WITNESS:  Yeah, I -- I've -- I've -- I
20    might have seen this mentioned in a document.  But   12:53:39
21    that's anecdotal evidence from -- from someone.  It
22    doesn't -- when you say "Google employees think,"
23    you're making a generalization, which I -- I doubt
24    is true, but I've now seen evidence for.
25    BY MR. REBLITZ-RICHARDSON:                      12:53:57
```

Page 192

CONFIDENTIAL

```
 1        Q.   Do you even know which Google employee

 2   wrote that Incognito is effectively a lie?

 3             MS. OLSON:   Objection.  Assumes facts.

 4             THE WITNESS:   Yeah, when I -- when I --

 5   when I read what you're referring to, I might have     12:54:07

 6   read it in Mr. Schneier's report.  And I think

 7   Mr. Schneier mentions a name.  I certainly don't

 8   remember it by heart.

 9   BY MR. REBLITZ-RICHARDSON:

10        Q.   Are you aware that Google has produced an    12:54:21

11   internal document describing Incognito branding as

12   misleading?

13             MS. OLSON:   Objection to the form.

14             THE WITNESS:   Yeah, I mean, only if it

15   was -- if it was mentioned in Mr. Schneier's report.   12:54:33

16   BY MR. REBLITZ-RICHARDSON:

17        Q.   Well, was that mentioned in Mr. Schneier's

18   report?

19        A.   I don't remember it by heart.  Do you want

20   us to go and look for it in Mr. Schneier's report?     12:54:42

21        Q.   No.  I'm just trying to understand what

22   you recall.

23        A.   Yeah.  So, you know, Mr. Schneier, as I

24   said, picks various anecdotes, and that -- what

25   you're describing is exactly what I would call an      12:54:54
```

Page 193

1    anecdote, and tries to make vast overarching

2    generalizations, which is a practice that's

3    nonscientific and unreliable.

4              At best, Mr. Schneier's quote/unquote

5    opinions are hypotheses that need to be tested.        12:55:09

6    Most of them can empirically be tested, some of

7    which I've done myself.  Some of which are

8    inconsistent with scientific and, you know,

9    textbooks and best practices, and I try to note that

10   all in my response to some of Mr. Schneier's          12:55:29

11   opinions.

12        Q.   In terms of developing your opinion as to

13   whether or not Mr. Schneier's opinions are

14   consistent or inconsistent with Google documents,

15   internal Google documents, did you review the         12:55:45

16   document produced by Google that describes the

17   Incognito branding as misleading?

18              MS. OLSON:  Objection to the form.

19              THE WITNESS:  Again, I -- I think that

20   you -- you know exactly what I reviewed because I      12:55:58

21   cite it.  So you know the answer to that.  But my

22   point is very -- you know, I'll repeat it again.  If

23   somebody's making an overarching generalization

24   hypothesis, in order to see whether that's true, you

25   need to see whether there's -- there's -- there       12:56:16

Page 194

1    exists evidence or anecdotes -- because, you know,

2    Mr. Schneier treats anecdotes as evidence --

3    that's -- are inconsistent with that.

4              And I cite to two documents that contain

5    anecdotes that are inconsistent with that.  The          12:56:32

6    burden of proof, when you try to generalize, is on

7    the person trying to generalize.  And when you find

8    existence of contradicting evidence, that suggests

9    their generalization might not be true.

10   BY MR. REBLITZ-RICHARDSON:                                12:56:51

11       Q.  So you didn't feel an obligation to review

12   everything that Mr. Schneier cited.  You felt like

13   you only needed to determine whether or not there

14   was evidence inconsistent with that.  Is that fair?

15             MS. OLSON:  Objection to the form.             12:57:03

16             THE WITNESS:  So I -- I -- at the time

17   when I -- I looked at what Mr. Schneier cites,

18   but -- but, yes, the -- the question of do you

19   believe a hypothetical empirical generalization with

20   no empirics only requires you to find evidence          12:57:16

21   that's inconsistent with it to say, you know what, I

22   do not believe it with -- with enough confidence.

23   BY MR. REBLITZ-RICHARDSON:

24       Q.  You just said you reviewed what

25   Mr. Schneier's -- what Mr. Schneier cites.               12:57:29

                                                    Page 195

1        A.    I said I may have reviewed what

2    Mr. Schneier cites.

3        Q.    But only if it's within the 11 cited in

4    your appendix here; right?

5        A.    I relied on these 11 while forming my          12:57:40

6    opinion.  That doesn't mean I did -- I reviewed

7    other documents and felt they were not relevant to

8    my opinion.

9        Q.    Well, did you review the documents cited

10   by Professor Schneier?                                    12:57:50

11       A.    As I -- and I said, I reviewed many of

12   them, and they were not relevant to my opinion.

13       Q.    Did you bother to read the document, the

14   internal Google document, where a Google employee

15   described Incognito as effectively a lie?                 12:58:06

16       A.    I --

17             MS. OLSON:  Objection to form.

18             THE WITNESS:  I think I -- you know, I

19   recall that mentioned.  And as I said, I don't

20   remember if I read the entire document or I remember      12:58:17

21   it from Schneier's report.  And I'm trying to give

22   you an accurate response.  So I don't remember.

23             But that anecdote is irrelevant because

24   you can't from -- from an anecdote like that, draw

25   an overarching conclusion unless all the evidence         12:58:31

                                              Page 196

```
1    suggests that you may be right.  And so, all I

2    needed to do is ask myself, is it true that all the

3    evidence suggests that Mr. Schneier's claim is --

4    is -- is valid and -- and very quickly found out

5    that even some of the same documents that he refers    12:58:48

6    to do not.

7    BY MR. REBLITZ-RICHARDSON:

8         Q.   Right.

9              And these are the two we're looking at, we

10   looked at one; right?                                  12:58:56

11        A.   Yep.

12        Q.   And that one included slides you cited

13   that don't mention Incognito or private browsing

14   anywhere; right?

15        A.   Again, I think you're -- you're            12:59:02

16   mischaracterizing my opinion.  In -- in chap- --

17   in -- in paragraph 57, the -- the sentence that

18   you're trying to unpack says, "Internal Google

19   documents show that Chrome users understand their

20   data is being collected, and they're also aware of    12:59:19

21   the benefits and have become accustomed to data

22   collection for enhanced performance and personalized

23   ad."

24             Nowhere in the sentence did I mention

25   Incognito, and nowhere in the sentence did I          12:59:31
```

Page 197

CONFIDENTIAL

```
 1    mention, you know, anything but Chrome users as the

 2    population for which the Google documents provide

 3    some information for.

 4        Q.   So fair to say that you're not citing,

 5    what we have here as Exhibit 4, as relevant to the      12:59:48

 6    issue of private browsing; is that right?

 7            MS. OLSON:  Objection to the form.

 8            THE WITNESS:  As I -- as I said, in this

 9    sentence, I do not.

10    BY MR. REBLITZ-RICHARDSON:                              01:00:06

11        Q.   Okay.  Can we look at the next one.   I

12    know you have another document cited in Footnote 111

13    through 113.  And I want to make sure you get a

14    chance to look at that one as well.

15            Okay?                                           01:00:17

16        A.   Okay.

17            MR. REBLITZ-RICHARDSON:  So, let's mark as

18    Exhibit 5, what is Tab 6, and that is

19    GOOG-BRWN-00156752.  And, Professor, would you

20    please let me know when you have that up.               01:00:29

21            THE WITNESS:  Will do.  It's not there

22    yet.

23            (Amir Deposition Exhibit 5 was marked

24            electronically.)

25            THE CONCIERGE:  Counsel, would you like me   01:01:32
```

Page 198

```
 1    to pull this up on the screen as well?

 2              MR. REBLITZ-RICHARDSON:  Yes, please.

 3              THE WITNESS:  I'm not there yet, sorry.

 4              Now it's there.  I have it.

 5    BY MR. REBLITZ-RICHARDSON:                          01:01:43

 6         Q.   Professor Amir, is Exhibit 5 the second

 7    document you cite in paragraph 57?

 8         A.   Yes.

 9         Q.   And did you talk to any Google employees

10    about this document?                                01:01:55

11         A.   Same answer to the previous question.  I

12    did not talk to any Google employees in the

13    preparation for this reports [verbatim].

14         Q.   And what is this document?

15         A.   This appears to be a -- kind of some       01:02:11

16    report on research on Incognito in the context of

17    the Google brand from 2019.

18         Q.   Okay.  Unlike Exhibit 4, this one actually

19    talks about Incognito specifically; right?

20              MS. OLSON:  Objection to the form.         01:02:35

21              THE WITNESS:  This talks about Incognito

22    specifically.

23    BY MR. REBLITZ-RICHARDSON:

24         Q.   All right.

25              MR. REBLITZ-RICHARDSON:  Can we go to the  01:02:41
```

                                                    Page 199

```
 1    page ending in '788.

 2              THE WITNESS:  But I cite '782.

 3    BY MR. REBLITZ-RICHARDSON:

 4         Q.   We'll get there.

 5         A.   Okay.                                    01:02:48

 6         Q.   Would you like to go there first?

 7         A.   It doesn't matter.  You're the -- you're

 8    the one asking the questions.

 9         Q.   Well, I think you're going to lead me

10    there.  So let's go to '782 first.                 01:02:56

11         A.   Okay.  Getting there in a second.

12              MR. REBLITZ-RICHARDSON:  We need to get us

13    there.

14              THE WITNESS:  '782, I'm there.

15    BY MR. REBLITZ-RICHARDSON:                         01:03:09

16         Q.   All right.

17              And so, for what -- what purpose were you

18    citing this '782 page?

19         A.   Yeah, so back to my reports, the sentence,

20    I'm going to read it slowly.  "Consumers" -- sorry.  01:03:27

21              "Consumer preferences" -- sorry again.

22              "Consumer preference and benefits are

23    context-specific and vary by individual.  For

24    example, in research conducted by Google and cited

25    by Mr. Schneier, one respondent noted that Google   01:03:45
```

Page 200

CONFIDENTIAL

1    Chrome quote/unquote, 'cares about the user

2    experience getting a local restaurant recommendation

3    so they take the data, but you get something back.'"

4    End quote.

5         Q.   And do you see that quote here in this        01:04:02

6    page?

7         A.   Let me look at it.

8         Q.   Do you see that under the slide "DE

9    consumer"?

10        A.   Yeah.                                          01:04:14

11        Q.   And what do you -- what do you understand

12   "DE consumer" to mean?

13        A.   Consumer from Germany.

14        Q.   So you're quite -- you're quoting in your

15   report what someone in Germany said; is that right?    01:04:31

16        A.   Yeah, I'm -- I'm getting so -- this --

17   this study from -- that Mr. Schneier cites, wasn't

18   only done, you know, if at all, in the U.S.  So it

19   shows us some consumers.  Some from Germany, some

20   from England, and some from -- I don't know what DC    01:04:50

21   stands for.

22             But, yes, so I -- what I wanted to show is

23   that even the study that Mr. Schneier relies on

24   suggests that there's heterogeneity in preferences

25   and opinions.  That was the point of the -- of my      01:05:13

                                              Page 201

1    sentence.  If I say, consumer preference and

2    benefits are context-specific and vary by

3    individual, that means that there's heterogeneity by

4    individuals and by context.  And in this study that

5    Mr. Schneier cites, you see this.                    01:05:28

6         Q.   So let's -- let's now go to the page I

7    wanted to go to, which is '788.

8         A.   '788.  Yes.

9         Q.   It's right there.  Do you see the blue

10   box?                                                 01:05:44

11        A.   Yes.

12        Q.   It says, "The role of Incognito in our

13   brand."

14        A.   Okay.

15        Q.   Do you see that?                           01:05:48

16             This is a slide in this Google

17   presentation that both you and Mr. Schneier cited

18   to; right?

19        A.   Yes.

20        Q.   Now, you see that -- that second para- --  01:05:54

21   paragraph that states, "████████████████████

22   ██████████████████████████████████████████

23   ███████████████████████████████████████

24   ████████████████████████████████████"

25             Do you see that?                           01:06:16

1          A.    I see that statement.

2          Q.    Okay.  Is that a statement you quoted in

3     your report?

4          A.    No.

5          Q.    Is that a statement you considered in          01:06:22

6     preparing your report?

7          A.    Yes.

8          Q.    Is that statement, in any way,

9     inconsistent with Professor Schneier's opinions?

10         A.    No, but that's exactly my point.             01:06:33

11    Professor Schneier takes that statement and

12    overgeneralizes it.  And what we find in this

13    report, if you actually look at the details, is that

14    you find heterogeneity.  You find some people that

15    find this trade-off between privacy and -- and --     01:06:51

16    and benefits of customization to be worthwhile and

17    others that probably do not.  And that was my point.

18            My point is, I was not trying to make

19    overgeneralization claim.  I was trying to show that

20    the overgeneralization claim made by Mr. Schneier is   01:07:09

21    actually incorrect.  It's incorrect to

22    overgeneralize anecdotes if some of the anecdotes

23    don't agree with you.

24         Q.    Are there any anecdotes on this slide?

25         A.    This slide does not provide details.         01:07:22

                                                    Page 203

```
 1          Q.   Do you see where --

 2          A.   So --

 3          Q.   Do you see where it continues, "███████

 4  ██████████████████████████████████████████

 5  █████████████████████████████████████          01:07:33

 6  ████████"

 7               Do you see that?

 8          A.   Let me find this -- yes.

 9          Q.   Did you evaluate those documents?

10          A.   Again --                           01:07:54

11          Q.   Did you ask for them?

12          A.   I did not.  Because this is not an opinion

13     that I was trying to make.  I, as I said, can rely

14     on my data to show that there is heterogeneity.  So

15     as I pointed in my affirmative report, there is a    01:08:08

16     small proportion of users that actually don't seem

17     to understand what private browsing does.  And I --

18     and I measure the exact percentages there.

19               But what I also point out is that that's

20     not a -- an opinion or a perception shared by        01:08:29

21     everybody.  In fact, there is -- there is quite a

22     variance of opinion.  And if you want to add up some

23     groups, the group that seems to understand tends to

24     be at least 50 percent of the population with

25     respect to different questions.                      01:08:47
```

Page 204

```
 1              So in that sense, I used my empirical

 2    data, as I pointed out before, as the basis for

 3    rejecting several of Mr. Schneier's quote/unquote

 4    "opinions," which are hypotheses.  And you are

 5    questioning me now on the one point where I said I    01:09:08

 6    even find evidence in Google documents for -- you

 7    know, which means there exists evidence in Google

 8    documents that is inconsistent with Mr. Schneier's

 9    generalization.

10         Q.   Professor Amir, is it your testimony here    01:09:24

11    today that this document somehow suggests that more

12    than 50 percent of people understand Google's

13    collection and use of private browsing information?

14              MS. OLSON:  Objection.  Misstates the

15    testimony.                                             01:09:40

16              THE WITNESS:  If you hadn't said that, I

17    would have said that.  That's exactly not what I

18    said.  Right?  Let me repeat what I said.

19              My affirmative study results suggests that

20    around 50 percent and sometimes more seem to           01:09:53

21    understand what private browsing is about.  This

22    document contains anecdotes, so there exists

23    anecdotes, even in this document, that suggests that

24    people are willing to make the trade-off between

25    sharing their -- their information and the benefits    01:10:16
```

Page 205

1    they get, which is contrary -- contrary to

2    Mr. Schneier's expressed opinion to which my

3    paragraph in my rebuttal report relates to.

4    BY MR. REBLITZ-RICHARDSON:

5        Q.   Let's look at another document you cite.   01:10:33

6             MR. REBLITZ-RICHARDSON:  Could we mark as

7    what will be Exhibit 6, what is Tab 8.

8             (Amir Deposition Exhibit 6 was marked

9             electronically.)

10            THE WITNESS:  While -- while this is      01:11:08

11   loading, at some point, when -- when it works for

12   your questions, if we could have a restroom break,

13   that would be great.  Not urgent.

14            MR. REBLITZ-RICHARDSON:  Why don't we do

15   it now before we launch into this document.        01:11:19

16            THE WITNESS:  Okay.  All I need is five

17   minutes.

18            THE VIDEOGRAPHER:  Going off the record.

19   The time is 1:11 p.m.

20            (Short recess taken.)                      01:11:32

21            THE VIDEOGRAPHER:  Back on the record, the

22   time is 1:19 p.m.

23   BY MR. REBLITZ-RICHARDSON:

24       Q.   Professor Amir, I have pulled up here what

25   is marked as Exhibit 6, which is also the second    01:20:17

                                            Page 206

```
 1    document cited in Appendix C to your rebuttal

 2    report.

 3              Is this a document you're familiar with?

 4        A.   Yes.

 5        Q.   Do you know who created this document?        01:20:31

 6        A.   I'm not sure.

 7        Q.   Did you talk to any Google employees about

 8    this document?

 9        A.   No.

10        Q.   In April 2019, do you know whether Google     01:20:44

11    was considering rebranding Incognito?

12              MS. OLSON:  Objection to the form.

13              THE WITNESS:  So I don't know anything of

14    that sort.  This document suggests to be one of

15    something that you might find in many companies that   01:21:05

16    I work with.  And that is studies considering

17    whether some -- someone should rebrand either a

18    product, a product line, or the entire company.

19    BY MR. REBLITZ-RICHARDSON:

20        Q.   And do you recall looking at this document    01:21:19

21    about the Incognito icon redesign?

22        A.   Yeah.  In fact, I think I cite it in my

23    report.

24        Q.   Do -- do you know whether or not Google

25    redesigned the Incognito icon?                         01:21:31
```

Page 207

CONFIDENTIAL

```
 1          A.   I do not.

 2          Q.   Do you know why Google was considering

 3   redesigning Incognito?

 4          MS. OLSON:  Calls for speculation.

 5          THE WITNESS:  Yeah, I have no idea.        01:21:45

 6   BY MR. REBLITZ-RICHARDSON:

 7          Q.   Can we go to the page ending '255.

 8          A.   Getting there.  '255.  I'm sorry, '355.

 9   One second.  Sorry.

10          Q.   If you could cite shorter documents, this  01:22:17

11   would all be easier.

12          A.   Sorry about that.  This is not short and

13   with graphics.  One second.

14              '255.  Yes, I see '255.

15          Q.   Right in the middle there, do you see     01:22:39

16   where it says "███████████   ███████████████

17   ████████████████████████████████████"?

18          A.   Yes, I see that.

19          Q.   Do you understand that to be a reference

20   to the messaging for Incognito?                      01:22:54

21          MS. OLSON:  Objection to the form.

22          THE WITNESS:  It's actually -- you know,

23   in general, this document talks about the branding

24   of Incognito.  It's not clear what this particular

25   quotes suggests because it says "███████████        01:23:16
```

CONFIDENTIAL

```
1   ████████████    ██████████████████████ ."

2          So I'm not -- not exactly sure what ██████

3   is.

4   BY MR. REBLITZ-RICHARDSON:

5          Q.    Okay.  Do you -- where this refers to      01:23:35

6   "█████████████████████████████████████████

7   ████████████████," do you have -- can you identify

8   any product that that's referring to other than

9   Chrome Incognito?

10         MS. OLSON:  Objection to the form.              01:23:50

11         THE WITNESS:  You know, the -- the

12  previous page says, "In Chrome, Search, YouTube and

13  Maps."  You know, as I said, these are not -- this

14  is not how you evaluate a brand study by looking at

15  some -- some representation that doesn't give you      01:24:15

16  all the information about exactly what it refers to.

17         When I cited that -- this -- this

18  document, I cited it for -- again, a particular

19  anecdote, where, if I recall correctly, it looked at

20  what users value most in terms of privacy.  And it     01:24:40

21  was privacy from other users and stuff like that.

22  That's what I used this for.  And I treat it as an

23  anecdote because I have no idea whether this study

24  was run with any adherence to best practices.  I

25  don't know exactly how and who and when this study     01:24:58
```

Page 209

CONFIDENTIAL

1    was run.

2          And so, I'm careful not to draw

3    conclusions from this data.  It's certainly not

4    clear what this relates to.  When -- when you just

5    look at the presentation.  It's possible that the          01:25:15

6    speaker that presented this gave context to the

7    speakers when they spoke, but the context is missing

8    from these slides.

9    BY MR. REBLITZ-RICHARDSON:

10       Q.   Based on your review of these slides, in          01:25:26

11   April 2019, was Google considering rebranding

12   Incognito so that Google would confuse users less?

13          MS. OLSON:  Objection to the form.

14          THE WITNESS:  Yeah, I'm not sure.  I --

15   you know, someone at Google paid someone or                01:25:43

16   conducted research that -- that addressed the --

17   seem to address the question based on the title of

18   this of whether they should amend or change or -- or

19   revitalize the brand- -- branding of Incognito.  Any

20   other kind of conclusions are -- are -- will -- will       01:26:03

21   be speculations from this document.

22   BY MR. REBLITZ-RICHARDSON:

23       Q.   Let's go to the next page.  Do you see on

24   the next page where this states, "█████████████████

25   ████████████████"?                                         01:26:17

                                                        Page 210

1      A.   Yeah.

2      Q.   Do you understand the reference there to

3  the name to be the name Incognito?

4           MS. OLSON:  Objection to the form.

5           THE WITNESS:  Again, I -- you know, as --      01:26:28

6  as a -- as a speculation, I would tend to agree.

7  But it's hard to know for sure.  But let me just say

8  that -- that some -- there's something interesting

9  that I think is inherent in -- in all the questions

10  you've asked so far.                                  01:26:42

11          Suppose there are ten percent of the users

12  that Google thinks are misunderstanding Incognito.

13  That could be sufficient for them to consider to do

14  something about it.  And whether they do or do

15  not -- you know, and then they would issue a study.   01:26:58

16  And whether they do or do not, often is a decision

17  of whether the investment and the -- the result in

18  confusion from rebranding is going to be worth it.

19          So the fact that they say, this could

20  reduce confusion, doesn't tell us the extent of      01:27:13

21  confusion.  It -- it just -- it just says, you know,

22  there exists customers that are confused or that

23  misunderstand, and as I pointed out in my

24  affirmative study, I also find a small proportion

25  of -- of responders that seem to not understand some  01:27:31

                                              Page 211

```
 1      of the aspects of using Incognito that I tested.
 2              So, you know, this is not inconsistent,
 3      but it's certainly not -- you know, you cannot
 4      assume that this tells you something about the
 5      magnitude of the issue.                          01:27:52
 6      BY MR. REBLITZ-RICHARDSON:
 7          Q.   Professor Amir, do you recall my question?
 8          A.   Yes.
 9          Q.   What was my question?
10          A.   So would I -- would it be reasonable to   01:27:58
11      assume that this refers to Incognito.
12          Q.   Well, this states, "█████████████████
13      ██████████████████████"
14              Do you read that to be referring to the
15      Incognito name?                                   01:28:15
16          A.   Sorry --
17              MS. OLSON:  Objection.  Asked and
18      answered.
19              THE WITNESS:  I'm also -- I think you --
20      you are confusing the question, "██████████████   01:28:21
21      ███████████."  You said "█████████████████
22      █████████████"
23      BY MR. REBLITZ-RICHARDSON:
24          Q.   Oh, I apologize.
25          A.   Yeah.  So --                              01:28:26
```

Page 212

1      Q.   Let me do my question --

2           (Simultaneous speaking.)

3           (Interruption in audio/video.)

4      A.   And I said -- I said -- I -- I answered

5  this, and I said, if you want me to speculate,        01:28:30

6  because that's the only thing I can do from this

7  document, I would speculate that it refers to

8  incognito, but I don't know exactly.

9      Q.   And where this states " ███████████████

10 █████████████████████████," do you have any           01:28:47

11 reason to believe that the reference there to the

12 "logo" is anything other than the incognito logo?

13          MS. OLSON:  Objection to the form.

14          THE WITNESS:  Again, speaking kind of as a

15 lay reader of this and speculating, I have no reason    01:29:02

16 to think it's talking about something else.

17 BY MR. REBLITZ-RICHARDSON:

18     Q.   Do you agree that the incognito logo

19 conveys secrecy?

20     A.   I would agree that that is an empirical       01:29:11

21 question which I did not test.

22     Q.   So you don't know, one way or another,

23 ███████████████████████████████████████████████?

24     A.   I do not.  That is an empirical question.

25 And I've done studies like this for companies, but I   01:29:28

                                            Page 213

```
 1    didn't do a study like this in this case.

 2         Q.   And let's go two more pages to '258.

 3              And do you see where it says "██████████

 4    ███████"?

 5         A.   Yes.                                        01:29:48

 6         Q.   What do you understand that to mean?

 7              MS. OLSON:  Objection to the form.

 8              THE WITNESS:  It says "Goals" in a very

 9    small font, so I take this slide to reflect the

10    goals of some effort or activity or whatever.        01:30:01

11              It says "████████████████," and then it

12    goes, "██████████████████████."

13              I don't -- you know, it's not clear here

14    what "it" is, but that's what the slide says.

15              This seemed to be the goal for whatever    01:30:19

16    they were doing.

17    BY MR. REBLITZ-RICHARDSON:

18         Q.   And where it says, "████████████████████

19    ████████████████████████████████████████████

20    ███████," do you have any reason to believe that the 01:30:28

21    reference there to "it" is anything other than

22    incognito?

23              MS. OLSON:  Objection to the form.

24              THE WITNESS:  Again, you know, it's

25    speculation.  I have no reason to believe it's not.  01:30:40
```

Page 214

CONFIDENTIAL

```
1    BY MR. REBLITZ-RICHARDSON:

2        Q.   For your likelihood of use survey, did you

3    consider any of the changes to the incognito

4    branding described in this document?

5        A.   I did not.                              01:30:52

6        Q.   Going back to Exhibit 2, in paragraph 58

7    you cite a July 2019 Wired article.

8             Do you recall that?

9        A.   Yeah, give me a second to go there.

10            Paragraph 52?                           01:31:23

11       Q.   58.

12       A.   58, sorry.  Sorry about that.

13       Q.   It's okay.

14       A.   58, yes.

15       Q.   You see you cite a July 2019 Wired      01:31:32

16   article; correct?

17       A.   Yes.

18       Q.   In your three studies, did you ask whether

19   anyone had read that article?

20       A.   I did not.                              01:31:42

21       Q.   Have you conducted any empirical study to

22   evaluate the extent to which any class members

23   reviewed that July 2019 Wired article?

24       A.   I do not.  But I also don't think that it

25   would matter for the goals of my study.         01:31:56
```

Page 215

```
 1              MR. REBLITZ-RICHARDSON:  I'd like to mark

 2    what will be Exhibit 7, what is Tab 16, which is a

 3    copy of Dr. Strombom's report.

 4              (Amir Deposition Exhibit 7 was marked

 5              electronically.)                      01:32:06

 6    BY MR. REBLITZ-RICHARDSON:

 7         Q.   Professor Amir, are you -- are you

 8    familiar with someone named Dr. Strombom?

 9         A.   I'm not familiar with someone named

10    Dr. Strombom.  But I still don't have the exhibit.   01:32:37

11    This is not one that I cited.

12         Q.   Okay.

13         A.   You can't blame me for this big long

14    document.

15         Q.   Well, I -- I'm only going to ask you about  01:32:44

16    two very discrete portions.

17         A.   Okay.  I have it, Exhibit 7.

18         Q.   Do you see on the front here it states

19    "EXPERT REPORT OF BRUCE STROMBOM"? [As read]

20         A.   Yes.                                  01:32:54

21         Q.   This isn't something you've seen before;

22    right?

23         A.   Never seen this before.

24         Q.   Okay.  I want to go all the way to

25    Exhibit 1 of this report, which lists a bunch of  01:33:02
```

                                              Page 216

1    articles.

2         A.   Exhibit 1, I'm there.

3         Q.   Okay.

4              MS. OLSON:  Sorry, I'm not there yet.

5              MR. REBLITZ-RICHARDSON:  No problem.      01:33:15

6              MS. OLSON:  Okay.

7    BY MR. REBLITZ-RICHARDSON:

8         Q.   And do you see that Exhibit 1 in this

9    Exhibit 7 to Dr. Strombom's report lists various

10   articles?                                          01:33:29

11        A.   Yes.

12        Q.   Did you conduct any survey concerning any

13   of the articles identified by Dr. Strombom in this

14   Exhibit 1?

15        A.   Well, first, I don't know because I'm     01:33:42

16   seeing it for the first time.  So do you want me to

17   read them carefully and seen if I've -- anything

18   might be included?

19        Q.   Sure.

20        A.   Give me a second.                         01:33:52

21        Q.   I mean, I can ask at a higher level.  Did

22   you conduct any survey regarding any articles at

23   all?

24        A.   If you don't include the Google text that

25   I exposed to responders in my second study, then the  01:34:02

                                            Page 217

```
 1    answer is no.

 2        Q.   Okay.  Well, why don't you go --

 3        A.   But let me just -- I'll point out that I

 4    do have the question that I conducted sensitivity

 5    analysis around with awareness of lawsuits related      01:34:18

 6    to incognito mode, and then I have an open-ended

 7    response.  You can see what people are actually --

 8    if they mention something specific.  And I do

 9    conduct sensitivity analysis with respect to that.

10            And so to the extent that -- I don't know      01:34:39

11    these articles.  To the extent that they mention

12    this lawsuit or related, then I do have some way to

13    capture that.

14        Q.   Okay.  But if you go through the articles

15    listed in this Exhibit 1 to Dr. Strombom's report,      01:34:49

16    none of your surveys included any questions tied

17    specifically to any of these articles; is that fair?

18        A.   Yes, I -- so I have -- I have not seen

19    this report before.  I'll just say to the extent

20    that any of these articles are talking about           01:35:16

21    perceptions or expectations from Google's and

22    others' private browsing splash screen or their

23    understanding of Google policies, then I did have

24    questions that are specifically about that.

25            I don't know what these articles are            01:35:32
```

CONFIDENTIAL

1    about.  But if they -- if they mention, if they

2    discuss some of the topics that I asked directly

3    about, then I do have.

4          But I did not design my study questions

5    with respect to any of these articles directly.        01:35:44

6          Q.   Right.

7          And did you design any of your surveys to

8    obtain information regarding whether any class

9    members had seen any of these specific articles?

10         A.   I think that -- that my previous answer    01:35:59

11   about awareness of lawsuits and issues with

12   incognito is the only one that potentially addresses

13   that.

14         Q.   So unless any of these articles are

15   specifically referred to in response to your          01:36:11

16   question about awareness of the lawsuit, you haven't

17   separately asked any questions about whether or not

18   any class members have seen these articles; is that

19   fair?

20         A.   I --                                        01:36:28

21         MS. OLSON:  Objection to the form.

22         THE WITNESS:  So I -- there's -- there's

23   several components there.  Just -- just to sharpen,

24   yes, I have not asked direct questions about any of

25   these documents.                                       01:36:36

                                                  Page 219

```
 1              If these documents refer to a lawsuit

 2    or -- or lawsuits, then -- then they're -- then they

 3    might be captured by that question.  But I don't

 4    have any specific question about any of these

 5    specific articles.                          01:36:52

 6    BY MR. REBLITZ-RICHARDSON:

 7        Q.   And what about Exhibit 2 to this report,

 8    which is something that references "Cookie

 9    Disclosures," do you have any specific questions in

10    your surveys about those specific cookie      01:37:05

11    disclosures?

12             MS. OLSON:  And I'm just going to

13    interpose an objection to this exhibit on the basis

14    that Dr. Amir has not seen this before.

15             THE WITNESS:  Yeah, I -- I've -- I've not  01:37:17

16    seen this before.

17    BY MR. REBLITZ-RICHARDSON:

18        Q.   Professor Amir, have you seen Exhibit 2 to

19    Dr. Strombom's report before?

20        A.   No.                                 01:37:26

21        Q.   No. Okay.

22             Did you, as part of your surveys, ask any

23    questions specifically about any of the cookie

24    disclosures included in this Exhibit 2 to

25    Dr. Strombom's report?                       01:37:38
```

```
 1         A.   So -- let me look at this.  It's a long
 2    exhibit.  Hold on.
 3              The -- the -- so I have -- I have one
 4    question directly about understanding about cookies.
 5    And I have -- I expose respondents in different        01:37:59
 6    conditions to various Google policies.
 7              So to the extent that this exhibit does
 8    not talk about the Google policies, then I have not
 9    directly asked about any of these.
10         Q.   Okay.  We can set that aside.               01:38:16
11              MR. REBLITZ-RICHARDSON:  Let's go ahead
12    and mark as Exhibit 8 what is Tab 17.
13              (Amir Deposition Exhibit 8 was marked
14              electronically.)
15              THE WITNESS:  Got it.                        01:38:57
16    BY MR. REBLITZ-RICHARDSON:
17         Q.   Do you have in front of you Exhibit 8,
18    which is a copy of the Court's Motion to Dismiss
19    order?
20         A.   Yes.                                         01:39:05
21         Q.   And is this the order you referred to
22    previously that you had reviewed in connection with
23    your decisions on what to highlight for your second
24    survey?
25         A.   Yes.                                         01:39:16
```

Page 221

1      Q.   So this is a -- this is an order you're

2   familiar with; right?  You read this?

3      A.   I've read this.

4      Q.   And you relied upon this order; right?

5           MS. OLSON:  Objection to the form.          01:39:27

6           THE WITNESS:  I've relied about -- you

7   know, I've relied on parts of this.

8   BY MR. REBLITZ-RICHARDSON:

9      Q.   Okay.  Fair.

10          It's just -- it's -- you listed it in your   01:39:34

11   materials relied upon; correct?

12     A.   Yes.  And then specifically when I

13   described it, I described page 17 of this.  Now that

14   I scrolled, this is what I relied upon.

15     Q.   Okay.  Going to page 15 --                  01:39:49

16          MR. REBLITZ-RICHARDSON:  And maybe we can

17   just pull this up so I can see it as well.

18          Dina, do you have a copy of Exhibit 8,

19   just going to page 15?

20   BY MR. REBLITZ-RICHARDSON:                         01:40:19

21     Q.   And starting at line 14, Professor Amir,

22   do you see where this states, "Google cannot

23   demonstrate that Plaintiffs expressly consented

24   because Google did not notify users that it would be

25   engaging in the alleged data collection while        01:40:33

                                          Page 222

1    Plaintiffs were in private browsing mode"?

2         A.   Yes, I see this line.

3         Q.   Okay.  So that's a -- that's a line from

4    the Court's order; right?

5         A.   Yes.                                    01:40:51

6         Q.   And do you agree that Google did not

7    notify users that it would be engaging in the

8    alleged data collection while they were in private

9    browsing mode?

10              MS. OLSON:  Objection to the form and    01:40:59

11   outside the scope.  Calls for a legal conclusion.

12              THE WITNESS:  Yeah, so if -- if this came

13   up, I would ask my wife.  She knows about law a lot

14   more than -- than I do.  I -- I -- I'm not a -- I'm

15   not a lawyer.  This seems to be a legal question.  I    01:41:14

16   don't exactly know what you mean by "consent," and

17   I'm certainly not qualified to judge this.

18   BY MR. REBLITZ-RICHARDSON:

19        Q.   Now, I was only asking about the part of

20   the sentence that states, "Google did not notify    01:41:27

21   users that it would be engaging in the alleged data

22   collection while Plaintiffs were in private browsing

23   mode."

24              Do you see that part?

25        A.   Yes.                                    01:41:39

                                             Page 223

1        Q.   And are you intending to offer any opinion

2    that's contrary to the Court's statement there that

3    "Google did not notify users that it would be

4    engaging in the alleged data collection while

5    Plaintiffs were in private browsing mode"?          01:41:51

6              MS. OLSON:  Objection to the form.

7              THE WITNESS:  Yeah, so -- so I think

8    that -- I don't know what Google did or didn't do,

9    but -- but I measured users' perceptions.

10             And to the extent that users' perceptions   01:42:08

11   are useful as representations of what users

12   understood and knew, then a sizable portion of

13   the -- of the users do understand that Google will

14   receive data such as mentioned here.

15             And so I didn't drill down to track how     01:42:27

16   they understand this or why they understand this.  I

17   know they do.

18   BY MR. REBLITZ-RICHARDSON:

19        Q.   And then just going back to your survey

20   design, we talked earlier about your use of the       01:42:39

21   word "receiving"; right?

22        A.   Yes.

23        Q.   And you see here that the Court's

24   discussing "collection"; right?

25        A.   Yes.                                         01:42:50

                                                    Page  224

1          Q.    Okay.  And so in terms of designing your

2     survey, after this order, you determined to use the

3     term "receiving" instead of "collecting"; right?

4          A.    Yes.

5               MS. OLSON:  Objection to the form.          01:43:02

6     BY MR. REBLITZ-RICHARDSON:

7          Q.    Going on to line 24 here, do you see where

8     it states, "Google's Privacy Policy does not

9     disclose Google's alleged data collection while

10    Plaintiffs were in private browsing"?               01:43:19

11         A.    I see that sentence.

12         Q.    Are you offering -- are you intending to

13    offer any opinion inconsistent with that statement

14    there?

15               MS. OLSON:  Objection to the form.          01:43:33

16               THE WITNESS:  As I said before, my

17    opinion, based on my second survey, is that people

18    who have read and attended to the privacy policy

19    report understanding that Google does receive this

20    data.  So that's -- you know, that's the extent of    01:43:48

21    the opinion that I can -- that I can provide on this

22    question.

23    BY MR. REBLITZ-RICHARDSON:

24         Q.    Do you have a single group or survey

25    anywhere that assesses only the Google privacy        01:44:02

                                              Page 225

CONFIDENTIAL

1    policy?

2         A.    Let me -- let me just look at my -- my

3    report, because I think that it's never going to be

4    only the privacy policy because you have -- you --

5    you are exposed to the incognito splash screen when      01:44:21

6    you open it, and so --

7         Q.    Right.

8               But your -- your testimony just said the

9    people who read, attended to the privacy policy,

10   report understanding that Google receives this data.     01:44:33

11              And I just want to be clear, you didn't

12   test anyone based on just reading the Google privacy

13   policy; right?

14        A.    That's right.  The people in that

15   condition saw the incognito splash screen, the Learn     01:44:49

16   More, the Google privacy policy, and the Chrome

17   privacy policy.  So those people who were exposed to

18   this report understanding -- or -- or, sorry.

19              A sizable majority of them re- -- re- --

20   report understanding that Google will receive the       01:45:02

21   three data types that I asked about.

22        Q.    And are you offering the opinion that

23   Google's privacy policy does disclose Google's

24   alleged data collection while users are in private

25   browsing mode?                                           01:45:19

```
 1            MS. OLSON:  Objection to the form.

 2            THE WITNESS:  Yeah, I only offer the

 3   opinion that I just stated.

 4   BY MR. REBLITZ-RICHARDSON:

 5       Q.   Okay.  Page 17, line 16.              01:45:26

 6            Do you -- do you see where this states,

 7   "the Incognito Splash Screen omits Google from the

 8   list of entities that can view a user's activity in

 9   private browsing mode"?

10            Do you see that?                       01:45:47

11       A.   Yes, I do.

12       Q.   Do you agree with that?

13       A.   As evident from my third study, I have the

14   original language that doesn't include "Google."

15   And then I have the amended or adjusted language     01:46:03

16   which does include "Google."  So clearly I agree

17   that the original language doesn't explicitly state

18   "Google."

19       Q.   I'm not asking about explicitly states.  I

20   asking, do you agree that the incognito screens --   01:46:17

21   the splash screen omits Google from the list of

22   entities that can view a user's activity in private

23   browsing mode?

24            MS. OLSON:  Objection to the form.  Asked

25   and answered.                                        01:46:29
```

                                            Page 227

```
 1              THE WITNESS:  Yeah, I don't -- I don't
 2   actually know what you mean by "omits."  Omits
 3   suggest some intentionality.  And I don't know
 4   anything that that's -- I don't have evidence that
 5   that's the case or not.  So I'm not going to opine      01:46:40
 6   on whether "omits" is the right description.
 7   BY MR. REBLITZ-RICHARDSON:
 8       Q.   You can see the incognito screen there on
 9   page 17; right?
10       A.   Yes.                                           01:46:50
11       Q.   Does it say "Google"?
12       A.   As I -- as I already testified, the
13   original screen I used does not say "Google" in the
14   list of parties that collect data.  But it doesn't
15   also say "Adobe Analytics," and it also doesn't say     01:47:03
16   "Amazon" or "Facebook."  It doesn't say any.
17       Q.   Does it omit Google?
18              MS. OLSON:  Objection.  Asked and
19   answered.
20              THE WITNESS:  Yeah, let me give you my lay    01:47:15
21   understanding of this.  If you gave specific
22   entities but did not include Google, then you could
23   maybe argue that you omit from a list that you
24   provide.  But if you don't provide the list, I don't
25   know if you omitted it.                                 01:47:29
```

```
 1    BY MR. REBLITZ-RICHARDSON:

 2         Q.   What do you understand the word "omit" to

 3    mean?

 4         A.   Omit is that you are -- you are -- you had

 5    a decision of not to include a certain term.  So the    01:47:38

 6    term -- you omitted that term.  That's how I

 7    understand it.

 8         Q.   And I don't understand how you can look at

 9    this and just -- and -- and say anything other than

10    this omits Google.  It doesn't include Google;           01:48:03

11    right?

12              MS. OLSON:  Objection.  Asked and answered

13    three times now.

14              THE WITNESS:  Yeah, as I testified, it's

15    clear it does not include Google, but it doesn't         01:48:11

16    include any of the other entities that usually

17    collect data.

18              So it's not -- it -- it doesn't appear as

19    if Google was intentionally omitted while including

20    all the other like data collectors.  It's just this     01:48:23

21    entire set of entities does not appear on the

22    original screen.  But that's why in my alternative

23    language study I added them explicitly.

24    BY MR. REBLITZ-RICHARDSON:

25         Q.   But you understand this incognito screen,      01:48:40
```

Page 229

```
 1   this comes from Google; right?

 2        A.   Of course.

 3        Q.   Doesn't that make a difference in terms of

 4   whether or not Google is included here?

 5             MS. OLSON:  Objection to the form.        01:48:50

 6             THE WITNESS:  No.

 7   BY MR. REBLITZ-RICHARDSON:

 8        Q.   Okay.  Let's go back to your rebuttal

 9   report, paragraph 5.

10             MR. REBLITZ-RICHARDSON:  You can take that  01:49:05

11   down.

12             THE WITNESS:  Paragraph --

13   BY MR. REBLITZ-RICHARDSON:

14        Q.   Paragraph 5, do you see where you discuss

15   a "readability calculator"?                        01:49:19

16        A.   Yes.

17        Q.   In assessing Professor Schneier's

18   opinions, did you identify any errors in terms of

19   the numbers generated by Professor Schneier in

20   connection with that readability calculator?       01:49:35

21        A.   I don't believe that I wrote that there

22   are errors in the actual application of the

23   calculator.  I opined on the use of this calculator

24   to begin with and of providing pieces of,

25   quote/unquote, "numerical evidence" out of context;  01:49:54
```

                                        Page 230

```
 1   and, therefore, drawing an overarching conclusion

 2   that seems to be out of -- you know, out of place at

 3   the very least.

 4       Q.   I'm just asking whether or not you

 5   identified any errors in terms on how he ran the        01:50:13

 6   documents using the readability character --

 7   calculator?

 8       A.   It's hard to get errors.

 9            MS. OLSON:  Objection.  Asked and

10   answered.                                               01:50:23

11            THE WITNESS:  Yeah, it's hard to get

12   errors.  You upload a document, and you get a

13   number.

14   BY MR. REBLITZ-RICHARDSON:

15       Q.   Okay.  Let's look at page 23.  You've got      01:50:27

16   a -- got a "Table 1" there.

17            Do you see that?

18       A.   Let me get there.  Page 20- -- 23?  Yes,

19   I'm in -- I'm there.

20       Q.   And under "Google Policies," you have          01:50:52

21   "Google Terms of Service," "Google Privacy Policy,"

22   and "Google Chrome Privacy Notice."

23            Do you see that?

24       A.   Yes.

25       Q.   What are the dates of those three             01:51:00
```

Page 231

1    Google pri- -- Google policies?

2         A.   Oh, wait.  I don't remember it by heart.

3         Q.   Are the numbers in this Table 1, the same

4    numbers reported by Professor Schneier?

5         A.   I don't remember.  We can put Professor      01:51:14

6    Schneier's reports.  You know, he used, I think, one

7    or two of these, and I tested six.  So some of them

8    might be similar, if we -- if -- you know, if we

9    used the same one.

10        Q.   Okay.  Who selected the additional          01:51:31

11   policies and articles included in this Table 1?

12        A.   I -- I -- in discussion with my support

13   group at Analysis Group, we picked various other

14   types of documents.

15             To put these results in contexts, because   01:51:49

16   it -- it's very obvious that if you take these

17   results just as a number without context, you're

18   easily misleading the audience.  It's very easy to

19   understand the wrong thing.

20             If you're going to assess documents with     01:52:06

21   this methodology, which I actually registered an

22   objection for because these document -- this --

23   these algorithms do very simplistic things, then you

24   need to assess them in context.  And I picked just

25   as -- you know, as anecdotal evidence other          01:52:28

1    documents as context.

2        Q.   Would users go to any of these other

3    documents to try and figure out whether or not

4    Google's collecting their private browsing

5    information?                                          01:52:44

6             MS. OLSON:  Objection.  Calls for

7    speculation.

8             THE WITNESS:  Yeah, and that's -- and

9    that's be- -- that's totally not the point.  I'm

10   sure they will not go to -- to -- to some of          01:52:49

11   Mr. Schneier's documents, nor to your company's

12   privacy policy.

13            But -- but the point is, if you're going

14   to strow [verbatim] -- throw a number out there, you

15   have to bring -- to give context.                     01:53:14

16            I'll give you a very simple example for

17   context dependence.  If I tell you that something

18   costs a hundred dollars, is that a lot, or is that

19   cheap?  You don't know.

20            In absolute, assessing any number, and       01:53:23

21   price is a number you are familiar with, it's going

22   to be extremely hard, if not possible.

23            So the way to assess these kind of

24   algorithms that throw numbers on some scale you

25   don't understand is to put them in context.           01:53:38

Veritext Legal Solutions
866 299-5127

```
 1              And I picked some examples of other

 2    documents, some of which, for example, Mr. Schneier

 3    should be very familiar with, like his papers, to

 4    just put them in context and say, Oh, this is --

 5    this got 42; therefore, it must be very bad.        01:53:54

 6    Really?  Is that very bad compared to what?

 7              And I provided here the compared to what

 8    to show you a little bit as to kind of how Mr. --

 9    Professor Schneier took things out of context to try

10    to make a point.                                    01:54:11

11    BY MR. REBLITZ-RICHARDSON:

12        Q.   Right.

13              But you didn't look at other technology

14    companies' privacy policies, terms of service, or

15    privacy notices; right?                             01:54:19

16        A.   I looked at --

17              MS. OLSON:  Objection to the form.

18              THE WITNESS:  Yeah, I looked at other

19    companies' privacy policies.  And, you know, they're

20    listed here.  And that gives you a pretty good      01:54:31

21    context to show that the Google policies that

22    Mr. Schneier tests are really not out of line with,

23    you know, a lot of the things out there.  I didn't

24    test, but it's very easy to test whether, you know,

25    Facebook is going to fare better, and I -- my guess 01:54:50
```

Page 234

1    is it's probably not.

2    BY MR. REBLITZ-RICHARDSON:

3        Q.   Any of the comparisons you included here,

4    are those companies offering browsers with or

5    without private browsing mode?                    01:55:02

6        A.   I hope not.

7        Q.   I just -- you know, you're throwing in

8    here law firm disclosures.

9            Is it your understanding that -- that

10   users are going to law firm disclosures to try and   01:55:14

11   figure out how private browsing mode works?

12           MS. OLSON:  Objection.  Asked and

13   answered.

14           THE WITNESS:  And -- and -- and I -- I

15   think -- you know that I've never argued they do.  I   01:55:23

16   wanted to show you that these documents, when judged

17   by these super simplistic algorithms, produce

18   numbers, but those numbers are meaningless unless

19   you put them on a scale.

20           And I picked documents familiar to many of   01:55:43

21   the people in- -- involved in this legal action who

22   I directed my reports to to show you what that scale

23   means.

24   BY MR. REBLITZ-RICHARDSON:

25       Q.   Did you read any of those other materials   01:55:59

                                              Page 235

1    here, either the law firm policies or the other

2    entities or Schneier's articles?

3         A.   I did not read most of these.  I read -- I

4    may have read one of -- or two of these Schneier

5    articles, if he cites them at the time, but          01:56:12

6    certainly did not read the law firms' privacy

7    policies.

8              But that's not the point because the point

9    is Mr. Schneier did not actually pro- -- create a

10   test based on actual user reading.  Mr. Schneier     01:56:27

11   used an algorithm that produces an arbitrary number,

12   and I wanted to -- to allow the readers of this

13   report to understand what that number is by putting

14   it in context.

15        Q.   Professor, I know it's been a long day.     01:56:43

16   I'm just asking whether you read these.

17        A.   And I responded.

18        Q.   Did you read Professor Schneier's

19   articles, the three you listed here?

20        A.   And I said --                               01:56:59

21             MS. OLSON:  Objection.  Asked and

22   answered.

23             THE WITNESS:  Yeah.  And I said that to

24   the extent -- I don't remember all of his.  He has

25   lots of articles.  I read some of those mentioned in  01:57:04

1    the report.  I don't know if those are mentioned in

2    the report.  I don't remember.

3    BY MR. REBLITZ-RICHARDSON:

4        Q.   But sitting here today, you can't say

5    whether you've read any of the three articles that     01:57:12

6    you list there; is that fair?

7        A.   I said I just I don't remember.

8        Q.   Okay.  In connection with your third

9    rebuttal opinion -- let's just go to your third

10   rebuttal opinion, the Executive Summary.               01:57:26

11       A.   I'm there.

12       Q.   This is Google's offering of incognito

13   mode; right?

14       A.   Yes.

15       Q.   Did you talk to anyone at Google about why    01:57:40

16   Google offers incognito mode?

17       A.   With the risk of repeating myself, I did

18   not talk to any Google employee in the context of

19   making these reports.

20       Q.   Did you review the deposition testimony by    01:57:56

21   Brian Rakowski?

22       A.   I don't remember.  I did -- I mean, if

23   it's cited in this report, I did.

24       Q.   Do you know who Brian Rakowski is?

25       A.   I don't remember.                             01:58:12

1      Q.   Are you aware Google's counsel has

2   referred to him as the father of incognito mode?

3      A.   No.

4      Q.   Did you bother to review any of the

5   documents marked as exhibits during Mr. Rakowski's      01:58:25

6   deposition?

7           MS. OLSON:  Objection to the form.

8           THE WITNESS:  Again, I -- I reviewed the

9   documents I cite in this report.

10  BY MR. REBLITZ-RICHARDSON:                               01:58:39

11     Q.   Okay.  Let's go to your last rebuttal

12  opinion, which concerns Mr. Keegan's --

13          (Interruption in audio/video.)

14          THE COURT REPORTER:  Excuse me.  Could you

15  repeat that.  I can't hear you very well.              01:58:48

16          MR. REBLITZ-RICHARDSON:  Sorry.

17  BY MR. REBLITZ-RICHARDSON:

18     Q.   Let's go to page 9 of Amir Exhibit 2,

19  which includes your "Amir Rebuttal Opinion 11."

20          Are you there?                                  01:59:02

21     A.   Yes, I'm there.

22     Q.   Okay.  And so looking at paragraph 18, you

23  state "For example, while my studies report that

24  just 42% of Chrome users have used Incognito mode in

25  the past six months, his study reports an estimate     01:59:11

Page 238

```
 1    of 64% recall using Incognito mode."

 2           Do you see that?

 3       A.   Yes.

 4       Q.   So the 42 percent that you have is based

 5    on the past six months; right?                    01:59:24

 6       A.   Yes, on recall for the past six months.

 7       Q.   And you understand that Mr. Keegan asked

 8    about incognito usage over the previous past five

 9    years; correct?

10       A.   I certainly am aware that he did that.    01:59:38

11       Q.   Okay.  And other than the 42 percent from

12    your studies and the 64 percent from Mr. Keegan's

13    survey, have you identified any other evidence

14    regarding the frequency of incognito use by Chrome

15    users in terms of the percentage of Chrome users who 01:59:55

16    use incognito mode?

17           MS. OLSON:  Objection to the form.

18           THE WITNESS:  Yeah.  So as I stated

19    earlier, none of this -- none of the empirical

20    studies in this case actually address that point    02:00:10

21    directly.

22           What we do know from some Google documents

23    is that only ███████████████████████, on

24    average, comes from incognito usage.

25    BY MR. REBLITZ-RICHARDSON:                         02:00:22
```

                                        Page 239

1      Q.   Right.

2           And my question is:  Have you seen any

3      Google documents that deal with incognito usage by

4      Chrome users as a percentage of Chrome users?

5      A.   I don't think I have.                    02:00:32

6      Q.   Right.

7           So you've got the 42 percent, Keegan's got

8      the 64 percent, and then you're not aware of any

9      Google documents addressing this; is that right?

10          MS. OLSON:  Objection to the form.        02:00:46

11          THE WITNESS:  I think that's right.  But

12     note that there are other estimates that arise from

13     Keegan's study that you can directly compare to

14     market share where he find exaggerated results,

15     which are very consistent with a recall bias.      02:01:02

16     BY MR. REBLITZ-RICHARDSON:

17     Q.   So, let's look at Exhibit 9, which --

18          MR. REBLITZ-RICHARDSON:  Dina, it's Tab

19     18, which is the document GOOG-BRWN-00406075.

20          (Amir Deposition Exhibit 9 was marked      02:01:23

21          electronically.)

22     BY MR. REBLITZ-RICHARDSON:

23     Q.   And, Professor, could you tell me when you

24     have Exhibit 9 in front of you?

25     A.   I got it.                                 02:01:28

                                        Page 240

```
 1        Q.   All right.

 2             So I'm showing you a document that was

 3   produced by Google.

 4             Is this a document you've seen before?

 5   You can take a moment to take a look.          02:01:48

 6        A.   (Witness reviews.)

 7             Yeah.  I don't think I've seen this

 8   document.

 9        Q.   It's an internal Google e-mail; right?

10   You see the google.com e-mails at the top?      02:02:12

11        A.   Yeah.

12        Q.   And on the first page, do you see where

13   this states, "Incognito mode is used by ███ of

14   Chrome users, and ███ use it at least once per

15   week"?                                          02:02:30

16        A.   I do see this.

17        Q.   Now, that ████████, that's -- that's

18   higher than the 64 percent reported in Mr. Keegan's

19   report; right?

20             MS. OLSON:  And I just object to this   02:02:38

21   document.  Mr. -- or Professor Amir testified he

22   hasn't seen it before.

23             But you can answer the question.

24             THE WITNESS:  Yeah, so this document is

25   from 2021, and it does say what you say it says.   02:02:48
```

                                              Page 241

```
 1    BY MR. REBLITZ-RICHARDSON:

 2         Q.   And in col- -- connection with your

 3    rebuttal report, did you consider this document?

 4         A.   As I testified not seeing this document

 5    before, the answer is "no."                    02:03:05

 6         Q.   And in connection with your rebuttal

 7    report, did anyone inform you that Google had

 8    conducted its own study finding that incognito mode

 9    is used by ██████████ of Chrome users?

10         MS. OLSON:  Objection to the form.         02:03:21

11         THE WITNESS:  Yeah, so -- so the answer's

12    "no," otherwise, I would have looked at this

13    document.  I should say, though, that when you say

14    "incognito mode is used by ██████████ of Chrome

15    users," what does that mean?  Once in their        02:03:37

16    lifetime?  Ever?  What do you make of this -- so --

17    so the danger with -- with citing an e-mail that is

18    based on some unknown, quote/unquote, "study

19    methodology" is that you don't really know what this

20    data means.                                      02:03:58

21    BY MR. REBLITZ-RICHARDSON:

22         Q.   And you didn't do any research to figure

23    out what this meant because you didn't know about

24    it; right?

25         A.   That's right.  And --                  02:04:04
```

Page 242

```
 1         Q.   Can you go --

 2         A.   -- again, you know, you could see that

 3    there's some study that was done.  Very hard to --

 4    to conclude whether it was done well, and whether it

 5    would be up to standard for legal purposes.  So you      02:04:18

 6    need to take whatever is found here with a grain of

 7    salt.

 8         Q.   I'd like to look at Amir Exhibit 3, which

 9    is your supplemental report.

10         A.   Okay.  Hold on.                                02:04:34

11              I have that.

12         Q.   All right.

13              Let's go to paragraph 3.

14         A.   Paragraph 3.

15         Q.   In paragraph 3, do you see where you           02:04:47

16    describe Mr. Keegan's approach as a "non-standard

17    additive approach"?

18         A.   Yeah.

19         Q.   Okay.  Are you aware of any other surveys

20    using an additive approach?                              02:05:03

21         A.   Let me -- let -- let me cut to the chase.

22              This additive methodology, as I explained,

23    is so flawed that I've never in my life seen anyone

24    use methodology like that and pass any level of

25    scrutiny, because the answer -- the total answer for     02:05:25
```

Page 243

1    the additive number is going to directly depend on

2    the number of questions you ask.

3              So if you want to get a high number, ask

4    more questions.  If you want to get a low number,

5    ask few questions.  this is if most leading design I    02:05:37

6    have seen in a long while, and I've seen a lot of

7    studies.  This is bizarre.

8         Q.   Having seen a lot of studies, have you

9    ever seen a study using an additive approach?

10        A.   What do you mean --                            02:05:56

11             MS. OLSON:  Objection.  Asked and

12   answered.

13             THE WITNESS:  Yeah.  What do you mean when

14   you're saying an "additive approach," this approach?

15   BY MR. REBLITZ-RICHARDSON:                               02:05:59

16        Q.   An addi- -- you described this as an

17   additive approach; correct?

18        A.   I described it as many things.  One of

19   them was additive.

20        Q.   Okay.  Have you ever seen a study using an    02:06:08

21   additive approach?

22        A.   I've seen studies that's used additive

23   approach when used properly.  But they didn't --

24   the -- the goal was very different than Keegan's

25   study.                                                   02:06:22

                                              Page 244

1        Q.   I understand that you have criticisms of

2   Mr. Keegan's studies --

3        A.   This is not --

4        Q.   -- were not --

5             (Simultaneous speaking.)                02:06:23

6             (Interruption in audio/video.)

7             THE COURT REPORTER:  Excuse me.  One --

8   one person at a time, please.

9   BY MR. REBLITZ-RICHARDSON:

10       Q.   You can't inter- -- interrupt me.        02:06:27

11       A.   Sorry.

12       Q.   I understand that you have criticisms of

13  Mr. Keegan's rebuttal survey.  My question is

14  focusing on other surveys you've seen in your work

15  and whether or not you've seen other surveys using  02:06:39

16  an additive approach.  I think that's a question I'm

17  entitled to get a clear answer to.

18            MS. OLSON:  He was trying to answer that

19  question, and you interrupted him.

20            THE WITNESS:  Let -- let me give -- let    02:06:51

21  me -- let me give a clear answer.  The term "an

22  additive approach" describes many different

23  methodologies.

24            Sometimes additive approaches are

25  appropriate.  That is, when you look at different    02:07:03

                                                Page 245

1    sub-samples and you say, What's the proportion in

2    this sub-sample, What's the proportion in this

3    sub-sample, where they're mutually exclusive.  And

4    these sub-samples spanned a population, and you add

5    them up to say, This is a proportion in the                02:07:18

6    population weighted by the size of the segments.

7    That's an additive approach that can work.

8            When you're trying to estimate the -- some

9    number, as Mr. Keegan tried to estimate, and you

10   repeatedly ask questions of the same -- as --              02:07:35

11   declining populations that you threw out the rest,

12   you are so biassing the result that no one would

13   accept this as -- as a -- as a result.  I've never

14   ever seen this additive approach in a serious study.

15           I -- you know, I -- I teach -- I teach              02:08:00

16   market research.  I've taught it for years.  If an

17   undergraduate student submitted -- would have

18   submitted this, they would have gotten a big 0 on

19   their assignment.

20   BY MR. REBLITZ-RICHARDSON:                                  02:08:12

21       Q.   You've taught marketing research, yeah?

22       A.   I teach.  I still do.  I teach an applied

23   market re- -- marketing -- applied marketing

24   research course.

25       Q.   Have you ever heard of a funnel format for    02:08:21

                                                          Page 246

1    a survey?

2         A.   I've heard of funnel formats.  Again,

3    for -- for specific goals where they might actually

4    be a good fit.

5         Q.   Is it your opinion that a funnel format      02:08:32

6    for a survey is necessarily impermissible?

7              MS. OLSON:  Objection to form.

8              THE WITNESS:  Yeah, it is -- it is -- so

9    for the goal of this study, the way Keegan tried to

10   implement what would be called, quote/unquote, 'a      02:08:47

11   funnel approach,' which is not exactly what he

12   implemented, but that -- that produced such a --

13   a -- a poor design, that -- that it -- it would

14   clearly be inadmissible.

15   BY MR. REBLITZ-RICHARDSON:                             02:09:07

16        Q.   So it's your understanding that the funnel

17   format can be used in some cases, but not in this

18   one; is that correct?

19        A.   My understanding is is when you say "the

20   funnel format," I -- I interpret this as something     02:09:18

21   very different from what Mr. Keegan did.

22              So when I say an appropriate funnel format

23   for some goals of studies, this is as -- as far as

24   you can find from Keegan's actual design.  Whether

25   by intention or not, what -- what was produced is a    02:09:31

Page 247

```
 1    ridiculous use of questions to come up with a number

 2    that's meaningless.

 3         Q.   In paragraph 5 you say that Mr. Keegan

 4    "could find a large proposition [verbatim] simply by

 5    adding more questions to the survey."  [As read]        02:09:46

 6              Do you see that?

 7         A.   Yes.

 8         Q.   And how would that work?

 9         A.   Let's suppose --

10              (Interruption in audio/video.)               02:09:57

11              THE COURT REPORTER:  Sorry.

12              THE WITNESS:  Sorry.

13              THE COURT REPORTER:  -- could you repeat

14    the last part, please.

15    BY MR. REBLITZ-RICHARDSON:                             02:09:57

16         Q.   How would that work and what questions

17    would you add?  And I'm happy to break that down

18    into two questions if that's easier for you.

19         A.   That's okay.  I can explain the logic.

20    Suppose you had a true underlying population where      02:10:08

21    the answer is 50 percent.  Okay.  If you ask one

22    question, you would get 50 percent.

23              Now, if you eliminate everybody that --

24    that remained and you ask another question, you

25    would probably get 50 percent plus or minus noise.     02:10:23
```

Page 248

1    So you would be approximating, say, 70 percent.

2            Add another question, and you would also

3    get something like that.  And now you would be

4    getting, say, another 12 and a half percent.  You

5    will be already about at 80 percent.  Keep adding          02:10:41

6    questions, you'll get to 100 percent for sure.

7            There is no topic on Earth that -- that

8    you could find where -- where -- where -- were just

9    samples' ability of error, even by noise, even by

10   trembling hand, clicking the wrong thing.  Where by        02:10:55

11   adding enough questions, you will not converge to a

12   very high number.

13           That's just the logic which is flawed

14   here, would suggest that -- that if you, you know,

15   that -- that six questions gets you the right            02:11:06

16   number.

17       Q.   Is it your testimony that any question you

18   ask, you're going to get a 50/50 answer?  I don't

19   understand what you're saying there.

20       A.   Okay.  And that's --                             02:11:18

21           MS. OLSON:  Objec- -- objection.

22   Misstates the testimony.

23           THE WITNESS:  Yeah, I -- I -- I never

24   actually said that.

25   BY MR. REBLITZ-RICHARDSON:                                02:11:23

                                                    Page 249

```
 1          Q.   That is what you said.

 2          A.   No.  I said let's assume that you're

 3    asking a question and the true distribution is

 4    50 percent.  I started with that; right?

 5               So ask a question, say, around 50 percent    02:11:33

 6    gets eliminated by this methodology.  Now you're

 7    left with 50 percent of the sample.

 8               So by the way, you should actually count

 9    it as 50 percent and not use a denominator, what

10    Keegan did with the original number.  But anyway,       02:11:51

11    that's a -- that's a separate point.

12               Ask another question and -- and you will

13    get to, you know, some -- with some noise, somewhere

14    around 50 percent will answer it correctly or not.

15               And so, if you throw out another and add     02:12:03

16    these up, you will converge to a very high number.

17          Q.   Well, I'm try- -- I'm trying to focus on

18    the specific questions asked here.  You understand

19    that Mr. Keegan asked questions focused on private

20    browsing; right?                                        02:12:21

21          A.   I understand that Mr. Keegan hoped he's

22    doing that.  Mr. Keegan asked questions that most

23    responders -- don't interrupt, please -- that

24    Mr. Keegan asked questions that most responders

25    don't even understand what he asked about because he    02:12:34
```

Page 250

```
1    used terms that most users don't understand, and

2    is -- that's especially helpful if you're -- if

3    you're going try to find a high number.  That's --

4    you know, that's, by design, you're tricking people

5    into not knowing.                              02:12:45

6              And evidenced as I suggested in my report,

7    as evidenced by the growing number of people in

8    Keegan's design, that say, Well, I don't know what's

9    going on.  I'm not sure.  Growing very, very fast,

10   to a sample that's shrinking.  These particular    02:13:00

11   questions, you know, really don't teach us anything,

12   except maybe the first question, if it was a good

13   question, could tell you something about -- about

14   the proportion.

15             But the moment you start adding them up,   02:13:15

16   you're committing a logical error.  And in this

17   logic, all you have to do -- if you want a higher

18   number as evidenced by the data, if you want a

19   higher number, just keep adding questions.  People

20   don't understand and will drop out.              02:13:29

21             MR. REBLITZ-RICHARDSON:  Move to strike.

22   Nonresponsive.

23   BY MR. REBLITZ-RICHARDSON:

24        Q.   Professor Amir, can you focus on my

25   questions, please?                               02:13:37
```

                                                    Page 251

```
 1              MS. OLSON:  He answered your question.

 2              THE WITNESS:  I -- I have to say this --

 3    BY MR. REBLITZ-RICHARDSON:

 4        Q.   Do you understand?  Do you dispute that

 5    Mr. Keegan asked questions regarding private        02:13:44

 6    browsing?

 7              MS. OLSON:  Asked -- asked and answered.

 8    BY MR. REBLITZ-RICHARDSON:

 9        Q.   Do you dispute that?

10        A.   So, I do not dispute that he intended to    02:13:54

11    ask questions about private browsing.  I disputed

12    the questions -- let me -- let me finish this

13    sentence.

14              I disputed the questions he actually asked

15    were meaningful to responders.  So he intended to    02:14:04

16    ask private browsing questions, but he asked many

17    questions with terms that -- that responders don't

18    even understand.

19              And -- and with respect to your question,

20    Hanna swore me to say the truth and the whole truth,  02:14:18

21    and that's what I'm trying to do.

22              MR. REBLITZ-RICHARDSON:  Move to strike.

23    Nonresponsive.

24    BY MR. REBLITZ-RICHARDSON:

25        Q.   I'm not asking about Mr. Keegan's           02:14:26
```

1    intentions.  Do you understand that Mr. -- Professor

2    Amir?

3            MS. OLSON:  He -- he's answering your

4    question.

5    BY MR. REBLITZ-RICHARDSON:                          02:14:33

6        Q.  Do you understand that I'm not asking

7    about Mr. Keegan's intentions?

8        A.  Yes.

9        Q.  Okay.  Do you understand that I'm asking

10   about the actual questions that Mr. Keegan asked his    02:14:38

11   respondents?

12       A.  I understand that.  And I tried to answer.

13   The fact that there -- there -- let me just -- the

14   fact that there's a statement there that the

15   engineers know is related to private browsing          02:14:48

16   doesn't mean that responders understand what it

17   means.

18           MR. REBLITZ-RICHARDSON:  Move to strike.

19   Nonresponsive.

20   BY MR. REBLITZ-RICHARDSON:                          02:14:59

21       Q.  Do you understand that I'm asking about

22   the actual questions that Mr. Keegan asked his

23   respondents, yes or no?

24       A.  Yes --

25           MS. OLSON:  Objection.  Asked and          02:15:08

```
 1   answered.
 2          THE WITNESS:  -- I'm responding -- yeah.
 3   I'm responding to your question about Mr. Keegan's
 4   questions actually asked.
 5   BY MR. REBLITZ-RICHARDSON:                          02:15:13
 6      Q.   Okay.  The questions actually asked, do
 7   you dispute that they concerned private browsing?
 8          MS. OLSON:  Objection.  Asked and
 9   answered.
10          THE WITNESS:  What I dispute is -- so --   02:15:24
11   so what I dispute is that responders understand what
12   the questions mean.
13   BY MR. REBLITZ-RICHARDSON:
14      Q.   I'm not asking that question.  Just asking
15   you whether you dispute that the questions concerned  02:15:38
16   private browsing.
17      A.   No.
18      Q.   You don't dispute that?
19      A.   If you want me to -- you know -- do -- do
20   I think they're related to private browsing?  I'm   02:15:49
21   answering that question.  I think they are related
22   to private browsing.
23      Q.   Thank you.
24          What additional questions relating to
25   private browsing do you think Mr. Keegan could have  02:16:00
```

Page 254

1    added to his survey?

2        A.    I'm sorry.  Are you asking me to design

3    Mr. Keegan's flawed survey for him?

4        Q.    You are criticizing Mr. Keegan on the

5    basis that he could find a large proposition          02:16:17

6    [verbatim] simply by adding more questions.  And I'm

7    asking what questions related to private browsing

8    could he add?

9        A.    And --

10            MS. OLSON:  Objection to the form.           02:16:29

11            THE WITNESS:  My point is he already has.

12   Look at his study.  That's what he did.  I'm -- I'm

13   not saying that he should have.  I'm saying he

14   already did.  He asked more questions than --

15   than -- than -- than you -- than you have to in       02:16:41

16   order to understand this issue until the point he

17   got to a very high number.  Because of the structure

18   and the logic of his design, any additional question

19   you ask, by definition, because it is additive, is

20   going to get you a higher number.  By definition.     02:16:56

21   If you take -- let me finish.

22            If you take the average number of -- of

23   correct responses, quote/unquote, for each question

24   as judged by the actual people responding to it, not

25   the numbers Keegan com- -- computed based on the      02:17:10

                                                    Page 255

```
 1    original thousand and four or whatever responders,

 2    you will find that on average, people get it right

 3    about 50 percent of the time, close to 50 percent,

 4    which is consistent with my affirmative study.

 5    That's exactly the point.                         02:17:27

 6    BY MR. REBLITZ-RICHARDSON:

 7         Q.   Are you done?

 8         A.   I hope so.

 9         Q.   I read your report to suggest that by

10    adding more questions, Mr. Keegan would get a higher  02:17:35

11    percentage.

12              Was that wrong?

13         A.   Sorry.

14              You read -- so you read my report.  Not

15    completely correctly.                             02:17:44

16         Q.   What --

17         A.   What I said was, in this methodology, one

18    could add questions to get a higher response, which

19    is what Keegan did.  Not could do; did.  He added

20    more questions until he got a higher number because  02:17:57

21    it's purely additive.

22         Q.   And the questions he added concerned

23    non-Google websites, logged-out activity, and the

24    specific data that Google collects; fair?

25              MS. OLSON:  Objection to the form.      02:18:11
```

Page 256

```
 1    BY MR. REBLITZ-RICHARDSON:

 2        Q.   I mean, you're familiar with the questions

 3    he asked; right?

 4        A.   Yes.

 5        Q.   We already established they deal with        02:18:25

 6    private browsing; right?

 7        A.   Well, so --

 8        Q.   Let's just look at them.  You have a chart

 9    in your report; right?

10        A.   Yeah.  Let's look at them.                    02:18:32

11        Q.   Page 12.  All right.

12             All right.

13             What's Figure 1, on page 12?

14        A.   Sorry?

15        Q.   What's Figure 1 on page 12 of your           02:18:44

16    supplemental report?

17        A.   Figure 1 seems to be the flowchart through

18    Keegan's study.

19        Q.   Did you prepare this?

20        A.   I prepared this.                             02:18:56

21        Q.   Seems to be or it is?

22        A.   Is.

23        Q.   Okay.  So this is the flowchart through

24    Mr. Seegan -- Mr. Keegan's rebuttal survey; right?

25        A.   Well, the -- the -- the main question       02:19:08
```

Page 257

1    parts.

2         Q.   Right.

3         A.   Yes.

4         Q.   And so, you see there in Question 16,

5    Mr. Keegan asked about consent; right?                02:19:14

6         A.   Yes -- Question 16.  Well, you jumped one.

7    Consent.  He asked about consent.

8         Q.   And then with Question 17, you see --

9         A.   Wait, wait, wait.  Stop.

10         My point is it's not clear -- I don't           02:19:32

11    understand what consent means.  Why would responders

12    understand what consent means?

13         Q.   Did you test whether people understand

14    what consent means?

15         A.   No, because it's a legal question.  It's   02:19:44

16    not -- it has nothing to do with actual perceptions.

17         Q.   Did you ask any questions regarding

18    consent?

19         A.   No.  Exactly for that point.

20         Q.   And then Question 17, Mr. Keegan asked     02:19:55

21    about people visiting non-Google websites; right?

22              MS. OLSON:  Objection to the form.

23              THE WITNESS:  Question 17, he says, "Which

24    of the following best reflects your opinion?  I

25    believe that when I am in private browsing mode, I   02:20:13

                                             Page 258

```
 1    have given con-" -- sorry.  Question 17.  Which

 2    question did you say?

 3    BY MR. REBLITZ-RICHARDSON:

 4         Q.   The next one, Question 17.

 5         A.   Q17, "Which of the following best reflects   02:20:26

 6    your opinion?  I believe when I'm in private

 7    browsing mode, I've given consent to Google."  We

 8    talked about that.  That's not Question 17.

 9         Q.   Do you see right below that --

10         A.   Oh --                                        02:20:41

11              (Interruption in audio/video.)

12              THE COURT REPORTER:  Could you, please,

13    repeat what you said.  Do you see right below that?

14    BY MR. REBLITZ-RICHARDSON:

15         Q.   Do you see right below that, where it        02:20:46

16    states, "when I am visiting a non-Google website"?

17         A.   Yeah, but that's about consent again;

18    right?

19         Q.   Consent with respect to whether or not

20    you're visiting a non-Google website; right?          02:20:58

21         A.   Yes.

22         Q.   That's what Question 17 asks about, and if

23    it says -- do you see that?  The, like, red box off

24    to the left?

25         A.   Yep.                                         02:21:13
```

Page 259

1        Q.    So that's a Google website and then down

2    below, there's a non-Google website; right?

3        A.    That's right.

4        Q.    And so, this is the survey design here in

5    terms of distinguishing between whether it's a          02:21:21

6    Google website or a non-Google website; right?

7              MS. OLSON:   Objection to the form.

8              THE WITNESS:   But based on the survey

9    design, only for a very small sample of the original

10   sample.                                                 02:21:33

11   BY MR. REBLITZ-RICHARDSON:

12       Q.    Right.

13       A.    But he dropped most of the people by now.

14       Q.    And did any of your survey questions asked

15   about -- ask about visiting a non-Google website?       02:21:40

16       A.    I think we established that.  I don't

17   explicitly ask for either Google or non-Google.  I

18   ask for websites.

19       Q.    Right.  And if you go to Question 18,

20   there's a question that elicits information as to        02:21:52

21   whether or not the respondent has a Google account;

22   right?

23       A.    That's right.

24       Q.    And none of your survey questions asked

25   about whether respondents had a Google account;         02:22:03

                                                  Page 260

1     right?

2          A.    That's right.

3          Q.    And then if you go to Question 19,

4     Mr. Keegan sought information regarding browsing

5     while signed out of any Google account; right?        02:22:08

6          A.    That's right.  But do you know how many

7     people responded to this question?

8          Q.    Again, none of your survey questions asked

9     about browsing while signed out of any Google

10    account; correct?                                      02:22:27

11         A.    That's not the --

12              MS. OLSON:  Objection to the form.

13              THE WITNESS:  That's not the -- the

14    original question is that -- the sample size for the

15    people who responded to this in Keegan's report is     02:22:32

16    so small as to be reliable.

17    BY MR. REBLITZ-RICHARDSON:

18         Q.    I'm not asking about sample size.  I'm

19    asking whether you asked any questions of any of

20    your respondents concerning signed out private         02:22:39

21    browsing?

22         A.    I did not --

23              MS. OLSON:  Objection.  Asked and

24    answered.

25              (Interruption in audio/video.)              02:22:54

                                              Page 261

1          THE COURT REPORTER:  Excuse me.  I'm

2     getting the objection -- I'm get- -- I'm not getting

3     the objection because of the speaking over, so could

4     you please repeat.

5          MS. OLSON:  Yeah, just give me a little          02:22:58

6     bit more of a beat.  Thank you.

7          I said, objection.  Asked and answered.

8     BY MR. REBLITZ-RICHARDSON:

9     Q.   Can you go, please, to page 19, paragraph

10    31.                                                  02:23:08

11    A.   Yes.

12    Q.   Is one of your criticisms that Mr. Keegan

13    carried forward respondents who answered "don't

14    know" or "don't know, no opinion" in the main

15    questions?                                           02:23:31

16    A.   My criticism is -- is a bit more elaborate

17    on that.  But it's in part based on this logic, yes,

18    that if you pass people who have no idea, they never

19    drop, and you're left with most -- more people who

20    have no clue throughout the survey.                  02:23:53

21          And I think I have an exhibit that said --

22    that shows exactly the proportion of that is -- is

23    growing.  So the very small sample that -- that

24    Keegan carries over is -- is -- becomes

25    predominantly occupied by people who don't know or   02:24:08

 1    have no opinion, meaning they don't care.

 2        Q.   Do you know what happens to Mr. Keegan's

 3    survey results for his rebuttal survey, if you

 4    remove the don't knows or don't know, no opinion?

 5        A.   Well, I think you can do the math.  If you    02:24:31

 6    look at Table 2, what happens is, he very quickly

 7    gets to a non-reliable sample.  So calling that out

 8    as results would be unprofessional.

 9        Q.   You reviewed Mr. Keegan's rebuttal report;

10    right?                                                 02:24:54

11        A.   I have.

12        Q.   And do you recall that he had a section of

13    his report where he evaluated Google internal

14    documents?

15        A.   Maybe.  It's been a while.                    02:25:06

16        Q.   Do you recall that he had an exhibit that

17    included a summary of 40 Google internal documents?

18        A.   I don't remember.

19        Q.   Did you at least review those 40

20    documents?                                             02:25:16

21        A.   I don't know if I reviewed all 40

22    documents.  No.

23        Q.   Do you know if you reviewed any of them?

24        A.   I don't remember.  If you want to put them

25    in front, I can take a look, but I don't remember.     02:25:26

```
1          Q.   Well, let's look at one.

2               MS. OLSON:  Before we do that, it's been

3     about another hour.  Could we take a quick break if

4     you're transitioning with exhibits?

5               MR. REBLITZ-RICHARDSON:  Okay.              02:25:38

6               THE VIDEOGRAPHER:  Are we off the record?

7     Are we going off the record?

8               MR. REBLITZ-RICHARDSON:  Yes, please.

9               THE VIDEOGRAPHER:  Going off the record,

10    the time is 2:25 p.m.                                 02:25:48

11         (Short recess taken.)

12              THE VIDEOGRAPHER:  Back on the record, the

13    time is 2:34 p.m.

14    BY MR. REBLITZ-RICHARDSON:

15         Q.   Professor Amir, welcome back.               02:34:46

16         A.   Thank you.

17         Q.   Can we go to paragraph 36 of your

18    supplemental report, which is on page 24.

19         A.   Give me a second.

20              36, I'm there.                              02:35:12

21         Q.   Would you, please, read aloud the second

22    sentence in that paragraph.

23         A.   You're talking about the "one study"?

24         Q.   Correct.

25         A.   "███████████████████████████             02:35:35
```

CONFIDENTIAL

```
1    ██████████████████████████████████████
2    ██████████████████████████████████████████
3    ████████████████████████████████████████
4    ████████████████."  [As read].
5         Q.   Did you write that sentence?              02:35:55
6         A.   Yes.
7         Q.   Is that an accurate statement?
8         A.   I hope so.  It's from a document I cite.
9    It's page 7554.
10        Q.   Did you review that document?              02:36:05
11        A.   Yes, otherwise, I wouldn't cite it.
12        Q.   Okay.  Let's -- let's bring up that
13   document.  This is GOOG-BRWN-00477546, which is
14   being marked as Exhibit 10.  And that's Tab 13, for
15   Miguel.                                              02:36:32
16             (Amir Deposition Exhibit 10 was marked
17             electronically.)
18        A.   Got it.
19   BY MR. REBLITZ-RICHARDSON:
20        Q.   All right.                                 02:36:44
21             Is this Exhibit 10 the document cited in
22   Footnote 34 of your report?
23        A.   '77546, hold on.
24             I need to switch between things.  Sorry.
25        Q.   No problem.                                02:37:07
```

Page 265

CONFIDENTIAL

```
 1        A.   So you said this is 36.  So this was
 2   Footnote 34, '77546.
 3             THE CONCIERGE:  And, Counsel, this is
 4   Miguel.  Please let me know if you want me to
 5   display a certain page on the screen share.  Thank    02:38:05
 6   you.
 7             MR. REBLITZ-RICHARDSON:  Thank you,
 8   Miguel.
 9             THE WITNESS:  This seems to be the
10   document.                                             02:38:08
11   BY MR. REBLITZ-RICHARDSON:
12        Q.   So Exhibit 10 is the document that you're
13   citing in Footnote 34; correct?
14        A.   Yes.
15        Q.   And can we go to the page that you cite,    02:38:14
16   which is '7554.
17        A.   Yes.
18        Q.   And so, for purposes of the statement in
19   your report with Footnote 34, what information on
20   this slide are you referring to?                      02:38:37
21        A.   So if you see --
22        Q.   You see the ██████████ there on the
23   right; correct?
24        A.   Hold on.  Let me get to it.
25   ████████████████████████████████████                 02:39:06
```

Page 266

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1    ███████████████████████████
 2            (Interruption in audio/video.)
 3            THE COURT REPORTER:  Excuse me, sir.  I
 4    don't know if you're reading into the record, but if
 5    you can --                                    02:39:17
 6            THE WITNESS:  Sorry, I wasn't thinking
 7    that I was reading into the record.  Let me do this
 8    properly.
 9            This says, "████████████████████████
10    █████████████████████████████████████████     02:39:25
11    █████████   ████████████████████████████
12    █████████████   ██████████████████████████
13    ████████████████████.
14       Q.   Okay.  Can we blow that up, that question
15    or that statement "███████████████████████████"?  02:39:45
16    It's in the right-hand column, the second row --
17       A.   Yeah.
18       Q.   -- which has the ███████████  and
19    ████████████.
20            You see that there, Professor Amir?   02:40:01
21       A.   Yes.
22       Q.   And so, this has "██████████████████████
23    ████████████"
24            Do you see that?
25       A.   This has percentage?  Where is       02:40:09
```

                                              Page 267

```
 1    percentage -- where do you see ███████████████
 2    ██████?
 3         Q.   All right.  Let's -- let's break this
 4    down.
 5              You see that there's a table here; right?   02:40:19
 6         A.   Yes.
 7         Q.   And on the right-hand side at the top of
 8    the table, it says, "███████████████████████." [As
 9    read]
10              Do you see that?                            02:40:26
11         A.   Yes.
12         Q.   Okay.  And the second row down it states,
13    "████████████████████████████████████████
14    █████████████████████████████████."
15              Do you see that?                            02:40:36
16         A.   Yeah.
17         Q.   Is that a true or false statement?
18         A.   Well, I believe based on the fact that
19    it's the correct answer here, the person who ran
20    this study treated it as a false answer.            02:40:49
21         Q.   As a false statement; correct?
22         A.   As a false -- well, it says the correct
23    answer is false.
24         Q.   So the correct answer to this statement,
25    "█████████████████████████████████            02:41:03
```

Page 268

CONFIDENTIAL

```
 1   ██████████████████████████," is false?

 2        A.   That's what the -- that's what it says,

 3   yes.

 4        Q.   Okay.  And what does the ██████████

 5   represent?                                    02:41:16

 6        A.   It's hard to tell actually.  ████████

 █   ████████████  Yeah.

 8        Q.   That's the percentage of people that

 9   correctly stated that that statement was false;

10   right?                                        02:41:32

11             MS. OLSON:  Objection to the form.

12             THE WITNESS:  Yeah, maybe.

13   BY MR. REBLITZ-RICHARDSON:

14        Q.   Well, just look at the bottom of this

15   screen, "████████████████████████████████."  02:41:39

16             Do you see that?

17        A.   Yes.

18        Q.   So only ██████████ of the respondents in

19   this study got that correct; is that right?

20        A.   Possibly, yes.                      02:41:53

21        Q.   ██████████ answered false; is that right?

22             MS. OLSON:  Objection.  Asked and

23   answered.

24             THE WITNESS:  Possibly, yes.

25   BY MR. REBLITZ-RICHARDSON:                    02:42:09
```

Page 269

CONFIDENTIAL

```
 1          Q.   Professor Amir, your report has it

 2     backwards; right?  Your report suggests that

 3     ███████████████████████████████████████████████

 4     ██████████████████████████ - -- let me --

 5     let me break that down.                    02:42:29

 6          A.   I think -- I think -- you know, let me

 7     save it here.  I think you're right.  I think I

 8     misinterpreted the false -- the true -- you know,

 9     the false/false negation of this table.

10          Q.   And so, in paragraph 36, the ████████   02:42:44

11     there should be ████████████; right?

12          A.   Well, we don't know what the other options

13     were.  But -- but in this study, I might have gotten

14     it -- I might have interpreted this wrong based on

15     the true/false.                            02:43:01

16          Q.   Would you agree that this sentence should

17     be stricken from your report?

18          A.   Yeah, I'd be happy if it's stricken from

19     my report, given that I'm not sure I understood this

20     correctly.                                 02:43:13

21          Q.   Reviewing this page that you cited

22     including that "██████████████████████████████████

23     ██████████" at the bottom, would you agree that that

24     second sentence in paragraph 36 is inaccurate?

25          A.   Are you -- are you asking again the same   02:43:25
```

                                            Page 270

```
 1    question, or is it a different sentence now?

 2         Q.   Oh, sorry.

 3              Same sentence.  The sentence in your

 4    report that states, "████████████████████████

 5    ████████████████████████████████████       02:43:38

 6    ██████████████████████████████████████

 7    ████████████████████████████████████████

 8    ████████████████████████," you agree that's an

 9    incorrect statement; right?

10         A.   I already agreed that -- that we should  02:43:54

11    strike it, so --

12         Q.   Okay.

13         A.   That was --

14              (Interruption in audio/video.)

15              THE COURT REPORTER:  What was the last  02:44:02

16    part?

17              THE WITNESS:  I agree that that is a

18    misinterpretation on my part of this data point from

19    this exhibit.

20    BY MR. REBLITZ-RICHARDSON:                       02:44:11

21         Q.   And just looking at this, in this survey,

22    Google used the word "collect" instead

23    of "received"; right?

24         A.   Yes.  They used the word "collect."

25         Q.   And did you consider the design of this  02:44:29
```

Page 271

CONFIDENTIAL

```
 1    survey when you were deciding to use the

 2    word "receive" in your surveys instead of "collect"?

 3         A.   I would say that it's very hard to

 4    consider the design of this study because all we get

 5    are reports of the results.  We don't know the          02:44:44

 6    design of the study.

 7         Q.   Did you ask for the design of the study?

 8         A.   I did not ask for the design of the study,

 9    but what we have here is executive reports of a

10    study.                                                  02:44:56

11         Q.   Are you aware that this study involved

12    nearly ████ respondents in the United States?

13         A.   I believe I do remember that detail, but

14    I'm not sure where it was in the document.  But yes.

15         Q.   But you're familiar with this study;         02:45:11

16    right?

17         A.   I'm familiar with this report.

18         Q.   Right.  And this report includes

19    information about a study that Google collected

20    sometime after this lawsuit was filed; correct?        02:45:21

21              MS. OLSON:  Objection to the form.

22              THE WITNESS:  This is -- this report is

23    from March 2020.

24    BY MR. REBLITZ-RICHARDSON:

25         Q.   March 2020?                                  02:45:31
```

Page 272

CONFIDENTIAL

```
 1       A.   Yes.

 2       Q.   Where are you looking at?

 3       A.   First page, "this report was generated

 4   March 2020."

 5       Q.   All right.                           02:45:40

 6            Page ending '554.  Let's see here.  Let's

 7   go to the top.

 8            Do you see the subtitle there, "overall"?

 9       A.   Wait, wait.  '554.

10       Q.   Sorry, the same page.               02:46:04

11            Do you see there's a yellow title and then

12   under that, there's a subtitle that

13   starts "overall"?

14       A.   I may not -- are you sure '554?

15       Q.   We're on the same page.            02:46:19

16       A.   Okay.  Where -- where to you see --

17   there's -- I see a yellow title that says, "Chrome

18   Incognito mode:  Understanding and misconceptions."

19       Q.   Right.  And right under that, do you see

20   where it states, "Overall," --               02:46:32

21       A.   Yeah.

22       Q.   -- "███████████████████████████████

23   ██████████████████████."

24            Do you see that?

25       A.   Yes.                                02:46:39
```

CONFIDENTIAL

```
 1        Q.   So here this is talking about Chrome

 2   Incognito mode; right?  We don't dispute that?

 3        A.   Yes.

 4        Q.   And they're talking about ███████████

 5   ████████████████████████████████; right?      02:46:49

 6        A.   Yes, but it says, "███████████████████

 7   ████████████████████████████████."

 8        Q.   Right.  And would you agree that based on

 9   this study, ███████████████████████████████

10   ████████████████████████████████             02:47:04

11   ██████████████████?

12             MS. OLSON:  Objection to the form.

13             THE WITNESS:  Yeah, I -- I will say that

14   whoever generated this report thought so.

15   BY MR. REBLITZ-RICHARDSON:                   02:47:19

16        Q.   All right.

17             Let's -- let's go to the prior page, '553.

18        A.   Yes.

19        Q.   Do you see the subheading there states,

20   ████████████████████████████████             02:47:33

21   ████████████████████████████."

22             Do you see that?

23        A.   Yes.

24        Q.   Would you agree with me that that's

25   referring to Chrome Incognito mode?           02:47:46
```

Page 274

CONFIDENTIAL

1   A. Well, I assume so, yes.

2   Q. Okay.  And so, at least the Google

3 employees involved with this presentation, it was

4 their opinion that both users and non-users

5 overestimate the protections provided by Chrome  02:47:58

6 Incognito mode; right?

7   A. You know, you're assuming that this is

8 Google employees, and in the -- you know, it -- it

9 could have been some third-party vendor that

10 presented to them the results of the study they  02:48:12

11 issued.  So I'm not going to go there.  But whoever

12 generated this report certainly mentioned this.

13   Q. Okay.  And when you say "mentioned this,"

14 they mentioned that generally, ██████████████

15 ████████████████████████████████████████████  02:48:29

16 ████████████; correct?

17   A. That's what it says in the slide.

18   Q. Okay.  Let's go back one more slide, to

19 '552.  And do you see where this one states, "████

20 ████████████████████████████████████████  02:48:43

21 ████████████████████████████."

22   Do you see that?

23   A. I do see that.

24   Q. And the reference there to ████████████

25 ████████████, that's in connection with Chrome  02:48:54

Page 275

```
 1    Incognito mode; right?

 2         A.   That's right, but --

 3              MS. OLSON:  Objection to the form of the

 4    question.

 5              THE WITNESS:  Yeah, but I'll say that, you    02:49:03

 6    know, what -- what -- what I don't want to do is

 7    overinterpret what you mean by "significant."

 8    BY MR. REBLITZ-RICHARDSON:

 9         Q.   Right.

10         A.   Is 5 percent significant?  Is 10 percent     02:49:14

11    significant?

12         Q.   Did you ask anyone?

13         A.   Why would I ask anyone?  I didn't talk to

14    anyone, remember?

15         Q.   Okay.  I'd like to go back in your report    02:49:27

16    to paragraph 10C.

17              MR. REBLITZ-RICHARDSON:  You can take that

18    down, Miguel.

19         A.   Do you mean the -- the supplemental

20    report?                                                02:49:38

21    BY MR. REBLITZ-RICHARDSON:

22         Q.   Correct.  We're still on the supplemental

23    report.

24         A.   Paragraph 10C, let me go there.

25              Yes.                                         02:49:57
```

                                                Page 276

 1          Q.    In paragraph 10C, do you see where you

 2     referenced "doubled-barrelled"?  [As written].

 3          A.    Questions, yes.

 4          Q.    Is that just a typo?

 5          A.    What?                                      02:50:09

 6          Q.    Is that double-barrelled or

 7     doubled-barrelled?

 8          A.    Oh, it should be double-barrelled.

 9          Q.    And what do you mean by "double-barrelled

10     questions"?                                            02:50:22

11          A.    So one known critique of market

12     research -- and by "known," I mean that every

13     textbook describing how to build surveys deals with

14     this.  When a question -- I think Aly even objected

15     to a question that you asked that was comprised of     02:50:34

16     actually two questions.

17               When you ask a question comprised of two

18     questions, it's very hard to interpret the results

19     because users may be responding to one or the other,

20     and users often find it difficult or confusing to     02:50:46

21     respond to this.  And so you should avoid

22     double-barrelled questions.  Sorry about the typo.

23          Q.    Oh, no problem.

24               So here you say, "For example, questions

25     about 'collect and save,' which are two different      02:51:00

                                                  Page  277

CONFIDENTIAL

1   concepts."

2        Do you see that?

3        A.   Yes.

4        Q.   How -- how are those two different

5   concepts?                                        02:51:04

6        A.   Well, collect could be gather.  And as I

7   said, you could gather information, use it in an

8   algorithm, and then discard it.  Save usually

9   ref- -- refers to for some period of time.  Maybe

10  indefinitely.                                     02:51:25

11       Q.   Are there situation [verbatim] where

12  Google collects but does not save private browsing

13  information?

14            MS. OLSON:  Objection to the form.

15            THE WITNESS:  I don't know.             02:51:38

16  BY MR. REBLITZ-RICHARDSON:

17       Q.   Did you investigate that?

18       A.    No, but I -- there are situations where I

19  collect and don't save information.  So it's

20  strictly possible.  Companies that I work with often  02:51:44

21  do that when they collect information they're

22  allowed to collect, but by some regulation, they're

23  not allowed to save it.  And so, they, as I said,

24  apply some algorithm to the data and create some

25  KPIs or something that's obstructed away from the   02:51:58

Veritext Legal Solutions
866 299-5127

1    data and don't actually save the data.

2        Q.   But you didn't investigate the extent to

3    which that possibility applies to private browsing

4    information collected by Google; right?

5        A.   I'll say that --                        02:52:11

6             MS. OLSON:  Objected to the form.

7             THE WITNESS:  Yeah, I'll say that it

8    doesn't actually matter because the critique here is

9    not whether Google does it or not, it's whether the

10   user responding to the survey understands what      02:52:21

11   you're asking.

12   BY MR. REBLITZ-RICHARDSON:

13       Q.   So is it your position that you should be

14   asking separately about collect and save?

15       A.   No.  It's my position that if you wanted   02:52:29

16   to run a self-study looking at collecting or saving,

17   you should separate them.

18       Q.   Okay.  Other than Mr. Keegan's questions

19   about collect and save, are there any other aspects

20   of Mr. Keegan's study that you identify here in your  02:52:46

21   report as double-barrelled questions?

22       A.   I don't remember.

23       Q.   Okay.

24       A.   I can go and look.  But most of the issues

25   with Mr. Keegan's survey are spelled out in my       02:52:59

                                        Page 279

```
 1    report.

 2         Q.   So if -- if there is another one, it would

 3    be in your report; fair?

 4         A.   Possibly.

 5         Q.   Okay.  Let's -- let's look at              02:53:09

 6    paragraph 10E, where you talk about "awareness of

 7    lawsuits on similar topics or previous surveys

 8    recently taken on similar topics."

 9              Do you see that?

10         A.   Yeah.                                      02:53:26

11         Q.   Is it your opinion that Mr. Keegan should

12    have asked respondents about their awareness of

13    lawsuits on similar topics?

14         A.   It is not just my opinion.  It is best

15    practices.  Best practices suggest that when you     02:53:37

16    conduct a survey, you leave space at the end for

17    open comments because you discover some interesting

18    things about your data and reliability and what

19    people understand or misunderstand.  And you can

20    also find out important information about unknown    02:53:49

21    unknowns, so it's best practices to do so.

22              And in addition to that, it is best --

23    best practices in legal cases to ask what for

24    awareness of lawsuits and be able to test

25    sensitivity of your results to that awareness, as    02:54:05
```

Page 280

 1    we've already discussed quite a bit.

 2        Q.   Right.  And you've at various times

 3    referred to "best practices."  Do you recall those

 4    answers?

 5        A.   Yes.                                    02:54:16

 6        Q.   Okay.  And what is the source for your

 7    opinion regarding best practices?

 8        A.   So there are many sources for my opinion

 9    for best practices.  And best practices span legal

10    and nonlegal cases for survey work.  Many of these   02:54:28

11    nonlegal sources are going to be textbooks for

12    market research.  And in the legal world, people

13    often rely on Shari Diamond's treatises for survey

14    work.

15             But if you want, you know, I can show you   02:54:48

16    my slides of teaching market research for many years

17    that are based on textbooks that suggest that an

18    open-ended response at the end of a survey is best

19    practice.

20        Q.   Sitting here today, are -- is it your       02:54:57

21    testimony that the Diamond source you referred to

22    establishes that it's best practice to ask

23    respondents about their awareness of lawsuits on

24    similar topics?

25        A.   I don't --                                  02:55:09

                                                    Page 281

CONFIDENTIAL

```
 1              MS. OLSON:  Objection.

 2              THE WITNESS:  Sorry.

 3              MS. OLSON:  Misstates the testimony.

 4              THE WITNESS:  Yeah, I said that I relied

 5     upon -- you asked what I relied upon.  I gave you a      02:55:17

 6     list.  I don't remember which source exactly talked

 7     about that point.  But it's -- it's sort of a

 8     well-known fact that it's something that you should

 9     do.

10     BY MR. REBLITZ-RICHARDSON:                              02:55:28

11         Q.   Right.

12              But I'm just asking, can you identify

13     specifically any single source of this, what you

14     claim is a best practice, that you should ask

15     respondents about their awareness of lawsuits on        02:55:40

16     similar topics?

17              MS. OLSON:  Objection.  Asked and

18     answered.

19              THE WITNESS:  Yeah, I don't know off the

20     top of my head, but I could probably offline find       02:55:50

21     out -- find sources and send to you.

22     BY MR. REBLITZ-RICHARDSON:

23         Q.   In paragraph 10e, what do you

24     mean "tainted by lawsuit awareness"?

25         A.   Sorry, going back to 10e -- I just             02:56:08
```

Page 282

```
 1    scrolled down -- I think that we discussed this

 2    already.  So with the risk of repeating what I said,

 3    I said that it's possible that people who are aware

 4    of the lawsuit either are guessing what your survey

 5    is meant to be and, therefore, would -- that would      02:56:29

 6    generate some demand effects, or people have strong

 7    opinions about the lawsuit; and, therefore, that's

 8    what your study is going to discover regardless

 9    of -- of what exactly you ask.

10            And so asking people whether they're aware      02:56:50

11    and doing sensitivity analysis to see if it is, in

12    fact, the case, as I sort of -- we discussed

13    earlier, is best practice.

14        Q.   Let's go to paragraph 38.

15        A.   Which one?                                      02:57:08

16        Q.   Paragraph 38.

17        A.   Your -- your voice -- 38?

18        Q.   38.

19        A.   Okay.  Yeah, before that, I heard 30 and

20    then the rest --                                         02:57:21

21            MS. OLSON:  I -- I couldn't hear it

22    either, so...

23            MR. REBLITZ-RICHARDSON:  Sorry.

24            MS. OLSON:  But I got you now.

25            MR. REBLITZ-RICHARDSON:  I'll try and keep       02:57:26
```

CONFIDENTIAL

```
 1    my voice up.

 2           THE WITNESS:  Sorry.  38, I'm there.

 3    BY MR. REBLITZ-RICHARDSON:

 4        Q.   All right.

 5           At the end of that paragraph, do you see      02:57:31

 6    where you write, "Mr. Keegan fails to provide

 7    respondents relevant context and information,

 8    specifically the documents through which users

 9    provide their consent and that explain how private

10    browsing mode works, rendering his findings          02:57:48

11    invalid"?

12        A.   I see that sentence.

13        Q.   What do you mean by "consent"?

14        A.   That's probably a poor choice of word with

15    all this legal stuff.                                 02:58:08

16           So if you look at the sentence above that,

17    it says, "Mr. Keegan's survey attempts to study

18    respondents' understanding of Google's data

19    collection and their consent to that collection, in

20    the context of using private browsing mode."          02:58:20

21           And I think that's based on Keegan's

22    report itself.

23           And then I said, However, Mr. Keegan fails

24    to provide those documents.  So I guess I used

25    consent because that's how he refers to his           02:58:33
```

Page 284

```
 1   assignment.

 2          "Mr. Keegan fails to provide respondents

 3   relevant context and information, specifically the

 4   documents through which users provide their

 5   consent."  So I think I base this off of Keegan's       02:58:43

 6   point.

 7       Q.   Right.

 8          And you're attacking Mr. Keegan for not

 9   showing his respondents the documents through which

10   users provide consent.  Is that what you say in your    02:58:58

11   report?

12       A.   That's what the report says.

13       Q.   Okay.  What are the documents through

14   which users provide their consent?

15       A.   Again, that's a legal question, but Keegan     02:59:11

16   doesn't provide any documents.

17       Q.   You know that's not true, sir.

18       A.   I'm sorry, Keegan shows the -- I -- I

19   don't think Keegan provides them the documents that

20   users can access if they're interested to find out      02:59:27

21   anything about the policy.

22       Q.   What documents?

23       A.   I mean, I'll be more specific.  If you

24   look at the time spent in the Keegan study, there

25   are many reviewers -- many, sorry, responders that      02:59:43
```

Page 285

1    spend, on average, four seconds or less on a

2    question in Keegan's study.  So people there are not

3    actually seeing any documents.

4        Q.   You know that Mr. Keegan presented copies

5    of the splash screen to the respondents in his          03:00:02

6    survey; right, sir?

7        A.   Yes.  So other than the splash screen, he

8    does not show any other documents.

9        Q.   But sitting here today, can you tell me

10   what documents you're referring to here when you say   03:00:15

11   "the documents through which users provide consent"?

12   [As read]

13       A.   So my guess is that the -- the stud- --

14   the documents --

15       Q.   I'm not asking you to guess.  This is in      03:00:24

16   your report.

17            MS. OLSON:  Please don't interrupt.

18            THE WITNESS:  Yeah.  So the way I

19   understand this complaint, the documents that I use

20   in Group B in my second study would be those kind      03:00:37

21   [verbatim] of documents.

22   BY MR. REBLITZ-RICHARDSON:

23       Q.   Professor Amir, did you conduct any survey

24   concerning Google's account creation agreement?

25       A.   I -- you know, I -- I think I used that.       03:00:58

                                                  Page 286

```
 1    I may have used -- is that a document I used in my

 2    second study?  I don't remember.  Let me check.

 3    It's been a long day.

 4           Yes, so in my -- in my Group C, in my

 5    second study, I showed new account creation      03:01:14

 6    agreement.

 7       Q.   Okay.  Can you tell me what page you're

 8    looking at?

 9       A.   Sorry.  This is my affirmative report,

10    which I believe is Exhibit 1, and I'm looking at  03:01:25

11    page 29, Table 4, "Interpretation Survey Groups."

12           And then the third group, or what I called

13    Group C in later parts of the document, says "Splash

14    Screen with New Account Creation Agreement."

15       Q.   Got it.                                  03:01:52

16           Okay.  And so Table 4 in Amir Exhibit 1 is

17    the set of documents you presented to the different

18    groups in your second study; is that right?

19       A.   Yes.

20       Q.   And it's your understanding that these are 03:02:09

21    the documents through which users provide their

22    consent; is that right?

23           MS. OLSON:  Objection to the form.

24           THE WITNESS:  Yes, I think that in these

25    kind of documents, "New Account Creation Agreement," 03:02:24
```

Page 287

```
 1   and in Group 4 "Consent Bump Agreement and FAQ

 2   page," those probably involved consent.  But as I

 3   stated earlier, consent is a legal matter in which

 4   I'm not an expert on.

 5   BY MR. REBLITZ-RICHARDSON:                          03:02:39

 6       Q.   Let's go back to Amir Exhibit 3, which is

 7   your supplemental report.  We were looking at

 8   paragraph 38, and I want to go back to paragraph 37.

 9       A.   One second.

10            THE CONCIERGE:  And, Counsel, did you want  03:03:00

11   me to display it on the Zoom?

12            MR. REBLITZ-RICHARDSON:  No.  I'll get you

13   a document in a moment.  First I just want to go to

14   paragraph 37.

15            THE WITNESS:  I'm there.                    03:03:11

16   BY MR. REBLITZ-RICHARDSON:

17       Q.   All right.

18            And do you see where you state, "the same

19   research from Google suggests that the percentage of

20   respondents who are not 'misinformed' is at least    03:03:18

21   ███████████"?

22       A.   I do see that sentence.

23       Q.   All right.

24            And so let's -- what's the -- what's the

25   document you're citing there?  It's                  03:03:30
```

Page 288

1    GOOGLE-BROWN-00042388 [as read]; is that right?

2         A.   '42- -- yeah, '42388.

3         Q.   All right.

4              MR. REBLITZ-RICHARDSON:   And so let's pull

5    that up as our next, which is Tab 20, Miguel.      03:03:46

6              (Amir Deposition Exhibit 11 was marked

7              electronically.)

8    BY MR. REBLITZ-RICHARDSON:

9         Q.   All right.

10             Professor Amir, is Exhibit 11 the        03:04:22

11   Google-produced document you reference in Footnote

12   39 of your supplemental report?

13        A.   Yes.

14        Q.   All right.

15             And let's go to the page you cite, '2404.   03:04:33

16        A.   Heading there.

17             Yes.

18        Q.   And how did you calculate what you say is

19   at least ███████████ in your paragraph 37 of your

20   supplemental report?                               03:05:03

21        A.   This comes out -- I can't magnify it no

22   more.  Let me download it.  One second.

23             It's pretty poor quality.

24             It's hard to read.  I had a better

25   version, maybe.                                    03:06:01

                                            Page 289

1          Let me go back to the sentence and see

2     exactly what I'm looking for.

3          Which section was this, sorry, in my -- in

4     the report?

5          Q.   Paragraph 37 of your supplemental report.   03:06:36

6          A.   Thirty-seven.  I'm there.

7          So expect session-based tracking.  So the

8     first -- the first answer is ████████████████

9     ████████████████████████, if I read this correctly.

10    And that means at least ████████ in this one do   03:07:20

11    not think that.

12          And if you look at the rest of the topics,

13    a larger proportion is actually not misinformed.  So

14    the way I interpret this graph, is that the red are

15    the misinformed based on this -- on this definition   03:07:40

16    here.

17          Q.   And do you see the gray?

18          A.   Yeah, I do see the gray.

19          Q.   Do you see it's ████████ there?

20          A.   Yeah.                                    03:07:54

21          Q.   So ████████ of your ████████ answered

22    unsure; is that correct?

23          MS. OLSON:  Objection to the form.

24          THE WITNESS:  If -- if gray is unsure.

25    BY MR. REBLITZ-RICHARDSON:                          03:08:07

                                                      Page 290

1      Q.   Well, you tell me what gray is.

2      A.   Yeah, gray is unsure.

3      Q.   So when you refer to ███████   in

4   paragraph 37, that includes ███████, people who

5   answered unsure?                               03:08:19

6      A.   Yes.

7      Q.   Is there anything on this slide that is --

8   causes you to doubt the accuracy of that statement

9   right there at the top, "████████████████████

10  █████████████████"?                            03:08:31

11      A.   So no, and I don't actually say that this

12  statement is incorrect.  I said that the same

13  research suggests that the -- the -- you know,

14  the -- to reciprocal to ████████  are not

15  misinformed.  They don't hold the opposite opinion.  03:09:02

16          And then it's a much higher percentage in

17  other aspects -- areas of understanding of private

18  browsing mode.  That's what I interpret this.

19      Q.   But the ███████  who answered "unsure,"

20  do you consider them informed?                  03:09:20

21      A.   I'm not -- no.  But what I say is they're

22  not misinformed.

23      Q.   Do you consider them to have consented?

24          MS. OLSON:  Objection to the form.

25          THE WITNESS:  Yeah, I don't -- I don't   03:09:29

Page 291

1    think I speak about consent at all in this.  As I

2    said before, consent is a legal matter, which I

3    don't get into.

4    BY MR. REBLITZ-RICHARDSON:

5        Q.   Do you have any reason to dispute that the      03:09:53

6    majority of incognito users expect no session-based

7    tracking?

8             MS. OLSON:  Objection to the form and

9    mischaracterizes the document.

10            THE WITNESS:  Yeah, so I would say I have       03:09:54

11    no reason to believe that there -- this -- the

12    respondents to whatever market research this is

13    answered this way.

14            I had reason to believe, based on my own

15    affirmative studies, which I trust a lot more           03:10:06

16    because I know exactly how they were done and who

17    the population was.  And in that case, you can see

18    that the majority, in some cases, does expect to be

19    tracked specifically by Google and specifically with

20    cookies when I asked about that.                        03:10:22

21    BY MR. REBLITZ-RICHARDSON:

22        Q.   Did any of your survey questions ask about

23    tracking?

24        A.   Did -- I didn't directly ask about

25    tracking.  I asked whether Google receives this        03:10:32

Page 292

1    information, and I asked about cookies, and

2    respondents responded that Google receives that

3    information from cookies.

4         Q.   This slide right here states majority of

5    users expect no session-based tracking; right?          03:10:47

6         A.   Hold on.  Let me zoom out.

7              Yes.

8         Q.   Did you ask any questions about

9    session-based tracking in incognito mode?

10        A.   As I said before, I asked my second survey   03:11:01

11   about Google receiving information related to

12   cookies.  And that's -- my opinion was about that

13   question.

14        Q.   And did you form any opinions about this

15   question, whether or not incognito users expect       03:11:25

16   session-based tracking while in incognito mode?

17             MS. OLSON:  Objection to the form.

18             THE WITNESS:  I -- you know, the only

19   opinion I have is -- is what I stated, that

20   Mr. Keegan cites this research with the majority of    03:11:44

21   users expecting no session.  And I said, but notice

22   that there is -- you know, that majority,

23   quote/unquote, on that particular question is -- is

24   ■ point something, which is why I said at least ■

25   are not answering that they're misinformed and --     03:12:00

1    and much higher in other categories, as you can see

2    from this chart.  That's all I said.

3    BY MR. REBLITZ-RICHARDSON:

4         Q.   Okay.  And I just want to clarify.  Your

5    questions in your surveys did not specifically ask          03:12:18

6    about session-based tracking in incognito mode; is

7    that right?

8              MS. OLSON:  Objection to the form.

9              THE WITNESS:  Yeah, let me -- let me --

10   let me go back to my expert report so I can give you        03:12:30

11   kind of an exact answer how I defined cookies

12   because I did ask about cookies.  So I'm going to

13   go -- I'll tell you where I'm at in the report.

14   BY MR. REBLITZ-RICHARDSON:

15        Q.   I'm not asking about cookies.                     03:12:48

16        A.   But I defined cookies in a certain way, so

17   I want to make sure that -- to answer your question,

18   that my definition didn't talk about anything like

19   that.  So I just need to find the point where I

20   defined it.                                                 03:13:12

21             Yeah, so the question says "Cookies placed

22   on your browser."  And when respondents hovered over

23   the word "cookies," I said "a small file containing

24   a string of characters that is sent" --

25             THE COURT REPORTER:  Excuse me.  Sir,             03:14:03

                                                    Page 294

1      could you slow down, please.

2              THE WITNESS:   Sorry.  I caught myself.

3              "A small file containing a string of

4      characters that is sent to your computer when you

5      visit the website.  When you visit the site again,      03:14:12

6      the cookie allows that site to recognize your

7      browser.  Cookies may store user preference and

8      other information."

9              So to the extent -- and, again,

10     session-based tracking is not necessarily something     03:14:24

11     users understand what it is.  So to the extent that

12     session-based tracking talks about cookies, then I

13     did ask about cookies, and I explained in lay terms

14     what cookies mean.

15     BY MR. REBLITZ-RICHARDSON:                              03:14:40

16         Q.   But you didn't use the phrase

17     session-based tracking?

18         A.   Of course I didn't use it, and that's part

19     of the point.  Engineers use terms that lay people

20     don't understand.                                       03:14:51

21         Q.   Right.

22              And so it's your position that

23     session-based tracking is not something that people

24     would understand, so you used something differently

25     in your survey; is that right?                          03:14:59

                                                       Page 295

A. Yes.
Q. Okay.
MR. REBLITZ-RICHARDSON: Let's take a break.
THE WITNESS: Okay. 03:15:04
MS. OLSON: Okay.
THE VIDEOGRAPHER: We're going off the record. The time is 3:15 p.m.
(Short recess taken.)
THE VIDEOGRAPHER: Back on the record. 03:21:53 The time is 3:21 p.m.
MR. REBLITZ-RICHARDSON: Professor Amir, thank you for your time. I have no further questions at this time.
THE WITNESS: Thank you. 03:22:05
EXAMINATION
BY MS. OLSON:
Q. Okay. I have a few questions.
If you'll pull back up Exhibit 1, which is your opening report. 03:22:11
A. Yes.
Q. And do you recall that counsel asked you about the screen on your appendix G.2-11?
A. Yes. Let me get there.
Yes, I'm there. 03:22:33

1       Q.   Did each of the respondents who took this

2    Survey 2 see this exact screen?

3       A.   Well, more or less.  So each respondent

4    who took the survey saw the screen relevant to their

5    condition.                                          03:22:52

6            So in the second paragraph -- I mean, I

7    think it's explained in the -- in the programming

8    instructions.  In the second paragraph here it says

9    "Google's Privacy Policy."

10           That's not true for every condition.  So    03:23:03

11   every condition had their own welcome screen that

12   specified the relevant policies to that condition.

13   Here, it just shows, I think, Group B.

14      Q.   Okay.  And if you scroll down now to

15   G.2-16 --                                            03:23:22

16      A.   I'm there.

17      Q.   -- and -- and G .2-18.

18           Do you recall counsel asking you about

19   these screens?

20      A.   Yes.                                         03:23:37

21      Q.   So for respondents in this condition

22   group, did respondents see the privacy policy once

23   with no highlighting and then saw it again with

24   highlighting?

25           MR. REBLITZ-RICHARDSON:  Object to the       03:23:53

                                              Page 297

1    form.

2            THE WITNESS:  Yeah, so they first saw the

3    privacy policy.  And -- and the instructions, the

4    programming instructions show exactly for how long.

5            And then when they click "next," they        03:24:05

6    showed the highlighted version, which counsel asked

7    me about, which is the same policy, but with a

8    highlight on the place we wanted to focus their

9    opinion on.

10   BY MS. OLSON:                                         03:24:23

11       Q.   Do you recall also questioning by counsel

12   about documents that you opine are inconsistent with

13   Mr. Schneier's opinions?

14       A.   Yeah, but not -- this is in my rebuttal

15   report; right?                                        03:24:34

16       Q.   Yes.  Sorry, we can turn to Exhibit 2.

17       A.   Yes.  I remember that question.

18       Q.   And he directed you to two documents in

19   paragraph 57.

20            Do you recall that?                          03:24:48

21       A.   Yes.  And we went over them.

22       Q.   And I -- I believe you also pointed to

23   documents in Footnote 32.

24            Do you recall that?

25       A.   Yes.                                         03:24:59

                                                    Page 298

1         Q.    Okay.  Let's take a look at Paragraph 41

2    of your rebuttal report, which is Exhibit 2.

3         A.    Yeah.

4         Q.    Are there also documents that you cite in

5    this paragraph that -- that fall into the bucket of      03:25:15

6    internal Google documents that are inconsistent with

7    Mr. Schneier's opinions?

8              MR. REBLITZ-RICHARDSON:  Object to the

9    form.

10             THE WITNESS:  Yeah, so I -- I think I           03:25:26

11   mentioned to counsel that -- that there could be

12   others in other areas of the document, and he didn't

13   focus on that.  So here in Footnote 61 and 62 are

14   other examples.  And I believe that -- now that I

15   look at the location, I believe that if we scroll      03:25:46

16   down slightly further, we might find some more.  Let

17   me just look for them.

18             Yeah, so -- so in Footnote 70, I point to

19   another document.  Which if you go to the text, I

20   think it's Paragraph 44, on top of the page, it          03:26:12

21   says, "According to Google internal documents that

22   Mr. Schneier cites in his report, ███████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████," open quote, "██████████████████        03:26:29

                                              Page 299

CONFIDENTIAL

```
 1   ████████████████████████████████████████████

 2   ████████," and in square brackets, "[████████

 3   ████████████████████   end quote.

 4            And this is from Footnote 70, which is a

 5   document that Mr. Schneier cites in his Footnote      03:26:45

 6   289 -- sorry, Footnote 317 on page 289.

 7            So --

 8   BY MS. OLSON:

 9       Q.   Are there --

10            (Simultaneous speaking.)                     03:26:59

11            (Interruption in audio/video.)

12       A.   Sorry, go ahead.

13       Q.   I'm sorry.

14            Are there -- are there any other documents

15   from your report that are -- that you opine are       03:27:05

16   inconsistent with Mr. Schneier's opinions?

17       A.   There could be.  I didn't -- you know, I

18   didn't have time to -- to -- you know, kind of look

19   at all of them.  You mentioned the Footnote 61, 62

20   and that reminded me that there are a couple more     03:27:19

21   below.  There could be others.  Every document

22   should be cited in my materials covered.

23       Q.   Okay.  And if we could just pull back up

24   Exhibit 11.

25       A.   Which one is that?  Hold on.                 03:27:39
```

Page 300

CONFIDENTIAL

```
 1        Q.   Okay.

 2             THE CONCIERGE:  Counsel, did you want me

 3   to display it on Zoom?

 4             MS. OLSON:  Sure.  And we'll go back to

 5   the same page that we were looking at right before    03:27:54

 6   the break, which I think is the page that ends on

 7   '404.

 8             THE WITNESS:  I'm there.

 9   BY MS. OLSON:

10        Q.   Okay.  And I know we discussed that it's a  03:28:05

11   little bit blurry.  But are you able to read the

12   questions that are next to the red bars?

13        A.   Yes.  I think to some extent.

14        Q.   Okay.  Are you able to read the top

15   question that was next to the longer -- the -- the    03:28:26

16   top question next to the red bar?

17        A.   Yeah.  It says, " ███████████████████

18   ███████████████████████████████████████████████

19   ███████████████████████."

20        Q.   Was this -- did this survey ask about       03:28:48

21   session-based tracking as far as you can tell?

22        A.   This question certainly doesn't mention

23   session or tracking.

24        Q.   This question just mentions cookie

25   placement?                                            03:29:06
```

CONFIDENTIAL

```
 1        A.   Yeah, it says as I said, "████████████████

 2   ███████████████████████████████████████████

 3   ████████████████"

 4        Q.   And this is the question on the slide

 5   counsel was asking you about related to            03:29:18

 6   session-based tracking; correct?

 7        A.   I believe so.  I don't think we've

 8   discussed any of the other questions specifically.

 9        Q.   Okay.

10        MS. OLSON:  I have no further question.       03:29:33

11        MR. REBLITZ-RICHARDSON:  Just two quick

12   followups.

13                  FURTHER EXAMINATION

14   BY MR. REBLITZ-RICHARDSON:

15        Q.   Going back to Amir Exhibit 1, G.2-11, that  03:29:43

16   counsel asked you about.

17        A.   Let me get there.  Hold on, my computer

18   stopped responding to this.  Let me try Exhibit

19   Share.

20             Overburdening Adobe.  One second.  G.2-11,  03:30:05

21   G.2-11, I'm there.

22        Q.   And do you recall that Google's counsel

23   asked you about some variation with respect to the

24   second paragraph there in G.2-11?

25        A.   Yes.                                     03:31:02
```

                                                   Page 302

1      Q.   And with respect to every respondent

2   included in your second survey, did this welcome

3   screen include the statement "you have been selected

4   to answer the questions about Chrome, which is a

5   browser from a company named Google"?          03:31:14

6      A.   I believe so.  If you want to scroll for

7   sure that in F-2 something, I can find that in a

8   second.  It'll tell us exactly what was varied.  So

9   give me a second, and I'll give you the exact answer

10  to your question.                               03:31:30

11         Yeah, so F.2-7 shows Q1 and shows the

12  first sentence you just read that doesn't vary.  And

13  the second paragraph has square brackets with a

14  capital stimuli, and that, in the paragraph below,

15  says "pipe into stimuli," and it shows the three   03:32:05

16  other versions for group A, B, and C or D.

17     Q.   And so, just to confirm, there was no

18  variation in that first paragraph, which includes

19  the statement "you have been selected to answer

20  questions about Chrome, which is a browser from a   03:32:23

21  company named Google"; right?

22     A.   That's right.

23     Q.   Okay.  And then you were asked about

24  G.2-16 and whether or not certain respondents were

25  shown the Google privacy policy twice.             03:32:38

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1              Do you recall that?

 2      A.   Yes.

 3      Q.   And do you recall that I asked you that

 4  question earlier today, and you stated that no

 5  respondent would have viewed the Google privacy      03:32:48

 6  policy more than once.

 7              Do you recall that?

 8      A.   I recall that.

 9      Q.   And prior testimony was incorrect; right?

10      A.   Well, I -- you -- they would not be shown    03:32:57

11  this screen twice, but I think that conceptually, it

12  was inaccurate because the emphasis came with the

13  next screen of the same policy, with the -- the

14  highlighted section.

15      Q.   So were there respondents who were shown     03:33:12

16  the Google privacy policy twice?

17      A.   Again, they see the same document with the

18  added highlight.  So if you want to think about it

19  as shown twice, then yes.  Or respondents would

20  likely see it as the same document.  They didn't see  03:33:29

21  the document change, but this highlight appearing.

22      Q.   Right.  But earlier I asked you just

23  simply whether any respondent saw the Google privacy

24  policy twice; right?

25      A.   Yes.                                          03:33:42
```

Page 304

1        Q.   I asked you that question, and you said

2    no, that wouldn't happen?

3        A.   Yes.

4        Q.   And -- and that was incorrect?

5        A.   Again, it wasn't exactly incorrect.  But I        03:33:48

6    think that for the goal of your questions, it was an

7    accurate response.  Because the next click -- the

8    next click kept the same policy on the screen but

9    had an added highlight to it.

10       Q.   Right.  So for those respondents, you        03:34:04

11   would show them the Google privacy policy again, but

12   this time with highlights?

13       A.   Yes.

14            MR. REBLITZ-RICHARDSON:  I have no further

15   questions.        03:34:15

16            MS. OLSON:  Go off the record.

17            THE VIDEOGRAPHER:  This concludes today's

18   videotaped deposition of Dr. On Amir.  We are off

19   the record at 3:34 p.m.  Thank you.

20            (Proceedings concluded, 3:34 p.m., PDT, on

21            August 16, 2022.)

22

23

24

25

Page 305

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, Hanna Kim, a Certified Shorthand

 4    Reporter, do hereby certify:

 5         That prior to being examined, the witness

 6    in the foregoing proceedings was by me duly sworn to

 7    testify to the truth, the whole truth, and nothing

 8    but the truth;

 9         That said proceedings were taken before me

10    at the time and place therein set forth remotely and

11    were taken down by me in shorthand and thereafter

12    transcribed into typewriting under my direction and

      supervision;

13         I further certify that I am neither

14    counsel for, nor related to, any party to said

15    proceedings, not in anywise interested in the

16    outcome thereof.

17         Further, that if the foregoing pertains to

18    the original transcript of a deposition in a federal

19    case, before completion of the proceedings, review

20    of the transcript [x] was [ ] was not requested.

21         In witness whereof, I have hereunto

22    subscribed my name this 19th day of August, 2022.

23

24

25         Hanna Kim, CLR, CSR No. 13083

                                        Page 306
```

1    ALYSSA "ALY" OLSON, ESQ.

2    alyolson@quinnemanuel.com

3                                        August 19, 2022

4    RE: BROWN vs. GOOGLE LLC

5    AUGUST 16, 2022, ON AMIR, PH.D., JOB NO. 5344524

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10        to schedule a time to review the original transcript at

11        a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13        Transcript - The witness should review the transcript and

14        make any necessary corrections on the errata pages included

15        below, noting the page and line number of the corrections.

16        The witness should then sign and date the errata and penalty

17        of perjury pages and return the completed pages to all

18        appearing counsel within the period of time determined at

19        the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21        Counsel - Original transcript to be released for signature

22        as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24        time of the deposition.

25

                                          Page 307

1    xx Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        Page 308

CONFIDENTIAL

```
 1                        JURAT

 2

 3          I, ON AMIR, PH.D., do hereby certify under

 4    penalty of perjury that I have read the foregoing

 5    transcript of my deposition taken remotely on

 6    Tuesday, August 16, 2022; that I have made such

 7    corrections as appear noted herein in ink, initialed

 8    by me; that my testimony as contained herein, as

 9    corrected, is true and correct.

10

11          Dated this _____ day of _____, 2022,

12    at _____.

13

14

15

16               _____

17                    ON AMIR, PH.D.

18

19

20

21

22

23

24

25

                                           Page 309
```

CONFIDENTIAL

```
1    RE: BROWN vs. GOOGLE LLC

2    ON AMIR, PH.D. (JOB NO. 5344524)

3               E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   ON AMIR, PH.D.                          Date

25
```

Page 310

**[& - 2022]**

| & |
|---|
| **&**   3:13 4:4 9:17 31:14 307:23 308:9 |

| 0 |
|---|
| **0**   246:18 |
| **00028191**   6:23 |
| **00042388**   7:18 289:1 |
| **00156752**   6:20 198:19 |
| **00406075**   7:11 240:19 |
| **00422093**   6:14 179:13 |
| **00477546**   7:15 265:13 |
| **03664**   1:5 2:5 8:22 |
| **097**   181:19 |

| 1 |
|---|
| **1**   1:25 6:4 8:16 14:23 15:1,5,6 15:22 16:1,8 21:9 53:2 54:12 54:16 65:3 69:24 71:13,23 71:25 72:7,13 75:25 83:14 88:6 124:21,25 125:1 126:17,19 126:23 162:10 216:25 217:2,8 217:14 218:15 231:16 232:3,11 257:13,15,17 287:10,16 |

296:19 302:15
308:1
**1/27/2021**   7:10
**10**   5:5 7:13
104:5,9 142:18
162:15 165:21
265:14,16,21
266:12 276:10
**100**   3:8 182:8,9
249:6
**10016-7416**   4:15
**102**   184:17 187:1
188:4
**10:25**   117:4
**10:36**   117:7
**10c**   276:16,24
277:1
**10e**   280:6 282:23
282:25
**10th**   4:6
**11**   7:17 145:9
162:5,10,15
165:21 168:18
168:20 177:13
178:23 196:3,5
238:19 289:6,10
300:24
**110**   171:1,7,15
179:14 184:15
**111**   171:12
198:12
**112**   4:14
**113**   171:12,15
198:13
**115**   182:17,21
189:24 190:6,7,8
190:10,13

**11:28**   161:19
**12**   165:21 249:4
257:11,13,15
**12:15**   161:22
**13**   5:11 58:11,12
58:14 59:1,10
60:2,10 61:15
62:8 165:19,22
265:14
**13083**   1:22 2:23
306:25
**132**   172:19
**14**   133:18 222:21
**15**   6:4,5,6,8
222:15,19
**16**   1:18 2:21 8:2
216:2 227:5
258:4,6 305:21
307:5 309:6
**16th**   8:6
**17**   221:12 222:13
227:5 228:9
258:8,20,23
259:1,4,8,22
**17200**   34:23
**179**   6:11
**18**   6:22 75:9
238:22 240:19
260:19
**182**   184:16,17
**183**   7:5
**19**   261:3 262:9
307:3
**198**   6:16
**19th**   306:22
**1:11**   206:19
**1:19**   206:22

| 2 |
|---|
| **2**   6:6 14:23 15:8 15:11,12,22 16:1 16:8 40:9 65:9 65:17 69:22 71:13,23,25 72:7 72:13 75:25 86:20,22 125:2 138:9,12 145:20 147:14 162:1 167:16,24 168:2 168:5,9 177:13 215:6 220:7,18 220:24 238:18 263:6 297:2 298:16 299:2 303:7 |
| **2-18**   297:17 |
| **20**   6:7 26:5 152:23 231:18 289:5 290:19,21 291:4,19 |
| **2000**   52:25 |
| **2002**   53:1 |
| **2003**   20:4,8,12 |
| **2008**   49:9 50:3 51:11 53:1 |
| **2019**   6:19,22 199:17 207:10 210:11 215:7,15 215:23 |
| **2020**   272:23,25 273:4 |
| **2021**   160:10,13 241:25 |
| **2022**   1:18 2:21 6:5,7,10 7:5 8:2 8:6 305:21 |

**[2022 - 70]**

306:22 307:3,5
309:6,11
**2025.520**   307:9
307:12
**206**   6:21
**212.257.8482**
4:16
**213.443.3000**   4:8
**216**   7:4
**221**   7:7
**23**   231:15,18
**24**   225:7 264:18
**240**   7:9
**2404**   289:15
**25**   153:6 264:25
266:22 267:12
267:18 269:4,15
269:18,21 270:3
270:10,22 271:5
**255**   208:7,8,14
208:14
**258**   214:2
**265**   7:13
**27**   7:5
**28375**   6:24
**289**   7:17 300:6,6
**28th**   3:8
**29**   265:1 266:22
267:13,19 271:5
287:11
**296**   5:6
**2:25**   264:10
**2:34**   264:13
**2nd**   3:8

**3**

**3**   6:8 14:24
15:15,18,19,22

16:1,8 40:11
71:13,23,25 72:7
72:13 75:25
86:24 124:20,22
125:1 170:9,10
243:8,13,14,15
288:6
**30**   6:9 64:1,6
120:11 122:8,20
134:18,22,23,25
153:5,7 283:19
308:1
**303**   5:5
**305.539.8400**
3:10
**31**   262:10
**310**   1:25
**311**   6:5
**317**   300:6
**32**   114:21,25
298:23
**33131**   3:9
**34**   265:22 266:2
266:13,19
**35**   288:21 289:19
290:10,21 291:3
293:24
**355**   208:8
**36**   264:17,20
266:1 270:10,24
**37**   288:8,14
289:19 290:5
291:4
**38**   170:16 283:14
283:16,17,18
284:2 288:8
**39**   289:12

**3:15**   296:8
**3:21**   296:11
**3:34**   305:19,20

**4**

**4**   6:11 99:10,13
164:2 179:12,15
179:25 180:5,13
198:5 199:18
239:23 287:11
287:16 288:1
**40**   19:3,8 263:17
263:19,21
**404**   301:7
**406076**   7:12
**41**   7:8 299:1
**415.358.6913**
3:17
**42**   234:5 238:24
239:4,11 240:7
289:2
**422182**   6:15
**42388**   289:2
**42418**   7:19
**44**   299:20
**442093**   180:16
**477604**   7:16

**5**

**5**   6:16 76:21
104:3 179:12
198:18,23 199:6
230:9,14 248:3
276:10
**5,000**   272:12
**50**   19:3,8 204:24
205:12,20
248:21,22,25
250:4,5,7,9,14

256:3,3
**50/50**   249:18
**500**   3:15
**52**   215:10
**53**   6:10
**5344524**   1:23
307:5 310:2
**552**   275:19
**553**   274:17
**554**   273:6,9,14
**56**   5:11 241:14
**57**   173:10,12
178:21 180:14
186:8 197:17
199:7 298:19
**58**   173:12 215:6
215:11,12,14
**5:20**   1:5 2:5 8:22

**6**

**6**   6:21 198:18
206:7,8,25
**61**   299:13 300:19
**62**   299:13 300:19
**64**   239:1,12
240:8 241:18
290:8 291:14
293:24
**6538**   306:24

**7**

**7**   7:4 78:24
81:12,19 83:10
86:6,12 97:3,5
99:22 164:6,10
170:7,9 216:2,4
216:17 217:9
**70**   249:1 299:18
300:4

**[700 - adobe]**

| | | | |
|---|---|---|---|
| **700** 72:21 96:5 | **ability** 249:9 | **accused** 50:11 | 251:19 255:6 |
| **71** 241:13,17 | **able** 22:7 56:19 | **accustomed** | 256:10 |
| 242:9,14 | 57:18 59:3,13,15 | 184:2,13 185:14 | **addition** 52:22 |
| **711** 3:15 | 66:5 125:23 | 186:19 197:21 | 280:22 |
| **75** 270:11 | 179:25 280:24 | **acknowledge** | **additional** 12:9 |
| **7554** 265:9 | 301:11,14 | 186:21 | 62:12 134:15 |
| 266:16 | **abroad** 41:3 | **act** 33:23 34:2,6 | 146:21 189:20 |
| **76** 6:7 | 43:11 48:2 | 123:9 | 232:10 254:24 |
| **77546** 265:23 | **absence** 184:23 | **acted** 38:4,17,23 | 255:18 |
| 266:2 | **absolute** 233:20 | **action** 235:21 | **additive** 243:17 |
| **782** 200:2,10,14 | **absolutely** | **actions** 22:10,15 | 243:20,22 244:1 |
| 200:18 | 147:12 | **active** 112:12 | 244:9,14,17,19 |
| **788** 200:1 202:7 | **abstracted** 116:3 | 123:9,10,13 | 244:21,22 |
| 202:8 | **academic** 73:9 | **activity** 214:10 | 245:16,22,24 |
| **7th** 4:14 | 204:5 | 227:8,22 256:23 | 246:7,14 255:19 |
| **8** | **accept** 246:13 | **actual** 26:5,9 | 256:21 |
| **8** 7:7 58:15 | **accepted** 37:24 | 58:8 61:2 63:8 | **address** 14:1 |
| 99:22 164:14 | **access** 34:6 | 71:21,25 76:4 | 88:15 119:19 |
| 206:7 221:12,13 | 43:11 46:14 | 117:25 120:7,7 | 169:1 210:17 |
| 221:17 222:18 | 169:19,24 | 136:21 230:22 | 239:20 |
| **80** 249:5 | 285:20 299:23 | 236:10 247:24 | **addressed** |
| **824** 6:20 | 300:1 | 253:10,22 | 210:16 |
| **865** 4:6 | **accidentally** | 255:24 258:16 | **addresses** |
| **8:05** 8:2,5 | 42:18 | **ad** 45:24,25 | 125:11 127:6,12 |
| **9** | **account** 44:12 | 160:8 197:23 | 127:20 219:12 |
| **9** 7:9 238:18 | 44:14 110:25 | **add** 53:20 | **addressing** |
| 240:17,20,24 | 111:8,11,14 | 204:22 246:4 | 240:9 |
| **90017** 4:7 | 140:4,9 150:1,8 | 248:17 249:2 | **adherence** |
| **94102-3275** 3:16 | 150:14 260:21 | 250:15 255:8 | 209:24 |
| **98** 184:17,18 | 260:25 261:5,10 | 256:18 | **adjusted** 227:15 |
| **99** 184:17 186:19 | 286:24 287:5,14 | **added** 58:19,23 | **administered** |
| **9:01** 54:6 | 287:25 | 62:17 83:1 | 10:7 60:20 |
| **9:08** 54:9 | **accuracy** 291:8 | 160:5 229:23 | **admitted** 50:14 |
| **a** | **accurate** 84:11 | 255:1 256:19,22 | 50:21 51:3 |
| **a.m.** 8:2,5 54:6,9 | 93:2 196:22 | 304:18 305:9 | **adobe** 130:10 |
| 117:4,7 161:19 | 265:7 305:7 | **addi** 244:16 | 160:8 228:15 |
| | **accurately** 72:14 | **adding** 248:5 | 302:20 |
| | | 249:5,11 251:15 | |

[ads - analysis]

**ads** 6:12 160:9
184:3,14 185:15
186:12,22 188:6
188:14
**advantage** 185:3
**advertising**
127:16 129:14
129:24 130:4
131:16,24
**advisor** 48:19
**advisors** 48:20
**advocated** 23:5
**affiliations** 9:10
**affirmative** 13:8
15:6 204:15
205:19 211:24
256:4 287:9
292:15
**ag** 17:8
**age** 75:9
**ago** 25:24 41:3,9
80:11 95:6
109:8,19 138:20
**agree** 8:14 36:3
74:1,22 75:1
144:24 146:14
151:3,4 156:24
157:3 163:11
192:11,14
203:23 211:6
213:18,20 223:6
227:12,16,20
270:16,23 271:8
271:17 274:8,24
**agreed** 57:10
162:25 163:3,10
271:10

**agreement**
163:13 286:24
287:6,14,25
288:1
**ahead** 27:17
32:14 52:5
61:19 114:3
129:11 134:13
139:4 141:21
188:2 221:11
300:12
**aimed** 121:19
**al** 8:20
**algorithm** 43:25
45:20,23,25
236:11 278:8,24
**algorithms**
232:23 233:24
235:17
**alignment**
182:20 190:17
**alison** 3:7 9:15
**alleged** 222:25
223:8,21 224:4
225:9 226:24
**allow** 18:9 92:20
135:25 159:2
236:12
**allowed** 278:22
278:23
**allowing** 67:2
**allows** 121:7
295:6
**aloud** 65:10
125:3 145:22
264:21
**alphabet** 14:19

**alternative**
229:22
**aly** 4:5 9:19
12:20 99:3
118:3 277:14
307:1
**aly's** 13:18
**alyolson** 4:9
307:2
**alyssa** 4:5 307:1
**amazon** 44:6,6,7
44:11,12 130:10
131:5,5 140:2,3
140:4,4 143:13
143:13 228:16
**amend** 210:18
**amended** 90:15
158:15 160:25
227:15
**american's**
191:11
**amir** 1:17 2:17
5:3 6:3,5,7,9 7:3
8:17 10:6,17
11:21 14:23,23
14:24 15:1,5,6,8
15:11,12,15,18
15:19,22 16:1,8
21:9 40:17
41:15 51:18
54:11,12,16 56:2
59:12,25 83:8
103:10 117:9
124:21 132:19
161:24 162:1,9
167:16,24 168:5
168:9 177:13
179:15 180:4

198:23 199:6
205:10 206:8,24
212:7 216:4,7
220:14,18
221:13 222:21
238:18,19
240:20 241:21
243:8 251:24
253:2 264:15
265:16 267:20
270:1 286:23
287:16 288:6
289:6,10 296:12
302:15 305:18
307:5 309:3,17
310:2,24
**amount** 51:19
121:6,11 139:12
**amounted** 126:4
**analyses** 101:16
110:2
**analysis** 4:22
9:22 11:18,19
13:19 17:1,18
18:19 19:5,10
84:13,19 88:13
93:22 96:22
100:1,6 101:12
102:2,16 104:13
105:20 107:23
109:23 110:13
110:14,15,17,18
112:24 123:18
123:19 124:7,10
124:12 155:11
169:11,12 218:5
218:9 232:13
283:11

**[analytics - approximately]**

**analytics** 127:16
129:13,23 130:3
130:17 131:1,16
131:24 160:8,8
228:15
**analyze** 91:6
**analyzed** 32:21
**anderson** 3:7
9:15
**anec** 174:18
**anecdotal**
173:24 174:19
175:17 176:19
192:21 232:25
**anecdotally** 99:2
**anecdote** 194:1
196:23,24
209:19,23
**anecdotes**
165:14,15,16
166:22 174:1
177:4 193:24
195:1,2,5 203:22
203:22,24
205:22,23
**angeles** 4:7
**anonymous**
214:19
**ans** 151:13
**answer** 5:9 13:2
18:5,6 24:7,8
32:20 48:25
51:23,24 52:4
55:18,23 56:3
67:14 68:24
69:17,25 75:3
80:18 84:15
87:2 89:23

90:19 103:8
105:7 110:7
112:9 113:24
114:4,17 118:5
123:20,25
130:20 131:4
133:16 135:18
139:8 140:13
146:1 152:6
163:6 166:7
173:22 194:21
199:11 218:1
219:10 241:23
242:5 243:25,25
245:17,18,21
248:21 249:18
250:14 253:12
267:23 268:2,8
268:19,20,23,24
269:7 290:8
294:11,17 303:4
303:9,19
**answer's** 87:2
242:11
**answered** 50:8
61:18 62:25
63:1,15,16 69:20
88:23 103:7
105:21 107:19
118:2 131:14
139:18 140:11
140:12 148:12
154:5 175:3
176:5 178:2
212:18 213:4
227:25 228:19
229:12 231:10
235:13 236:22

244:12 252:1,7
254:1,9 261:24
262:7,13 269:21
269:23 282:18
290:21 291:5,19
292:13
**answering** 136:3
149:2,7 150:21
151:5 253:3
254:21 293:25
**answers** 107:12
146:16 281:4
**antic** 98:13
**anybody** 43:12
139:25
**anyone's** 158:4
**anyway** 78:8
188:8,16 250:10
**anywise** 306:15
**apart** 37:17
**apologize** 82:6
100:23 212:24
**appear** 191:3,19
229:18,21 309:7
**appearance** 9:7
**appearances** 3:1
4:1 9:9
**appeared** 59:23
**appearing** 9:25
304:21 307:18
308:7
**appears** 146:20
199:15
**appendices**
71:13,19,23,25
72:7,13 75:25
76:6,7

**appendix** 21:14
21:15 22:10
57:21,22 59:3
60:24,25 61:24
65:2 71:15
75:25 126:20
139:9 159:7
167:16,24 168:3
168:3,8,9,11,21
196:4 207:1
296:23
**appendixes** 61:1
**apple** 37:23,24
**application**
190:11 230:22
**applied** 246:22
246:23
**applies** 279:3
**apply** 278:24
**appointed**
118:25
**appreciate**
116:24
**approach** 243:16
243:17,20 244:9
244:14,14,17,21
244:23 245:16
245:22 246:7,14
247:11
**approaches**
245:24
**appropriate**
74:5 245:25
247:22
**approximately**
12:24 18:25
19:2 25:24

[approximating - assumption]

| | | | |
|---|---|---|---|
| **approximating** | 65:18,18 74:23 | 305:1 | 152:8,10 154:7 |
| 249:1 | 74:24 76:22 | **asking** 33:7,9 | 154:25 158:4 |
| **april** 6:5,22 | 78:24 79:1,6 | 55:18 67:13 | 232:20,24 |
| 207:10 210:11 | 80:18,21 88:22 | 80:1,4,16 97:11 | 233:23 |
| **arbitrary** 236:11 | 89:22 90:23 | 98:14 108:22 | **assessed** 158:20 |
| **areas** 291:17 | 91:8 92:16 | 109:3,8,11 115:5 | **assesses** 37:7 |
| 299:12 | 94:15 97:5 | 133:14,14 139:1 | 225:25 |
| **arechiga** 21:17 | 101:3,10 103:6 | 139:6 149:3,10 | **assessing** 190:11 |
| **arguably** 133:2 | 107:18,24 111:1 | 152:13,15,19,20 | 230:17 233:20 |
| **argue** 228:23 | 112:6,23 117:10 | 172:1 200:8 | **assign** 81:22 |
| **argued** 235:15 | 118:1 123:20 | 223:19 227:19 | 82:9 83:11 |
| **argument** | 129:11 130:6 | 227:20 231:4 | 84:19 89:6 90:1 |
| 187:21 | 137:25 139:17 | 236:16 250:3 | 90:5 |
| **ariely** 48:17,19 | 140:10 149:8,13 | 252:25 253:6,9 | **assigned** 83:22 |
| 48:22 49:3,6,10 | 150:20 158:17 | 253:21 254:14 | **assigning** 82:24 |
| 50:10,14,21 | 168:24 175:2 | 254:14 255:2,7 | **assignment** |
| 51:12 | 176:4 181:11,12 | 261:18,19 | 13:22 14:7 |
| **ariely's** 51:2 | 211:10 212:17 | 270:25 279:11 | 28:25 32:13 |
| **article** 49:9,23 | 219:2,17,24 | 279:14 282:12 | 38:20,23 39:2,3 |
| 50:6,9 215:7,16 | 221:9 226:21 | 283:10 286:15 | 39:5 82:24 |
| 215:19,23 | 227:24 228:18 | 294:15 297:18 | 90:11 92:4 |
| **articles** 49:22,24 | 229:12 231:9 | 302:5 | 246:19 285:1 |
| 217:1,10,13,22 | 235:12 236:21 | **asks** 39:14 69:25 | **assist** 18:13 |
| 218:11,14,17,20 | 239:7 244:11 | 70:13 95:2 | **assistants** |
| 218:25 219:5,9 | 250:18,19,22,24 | 259:22 | 112:24 155:12 |
| 219:14,18 220:5 | 250:25 252:5,7,7 | **aspects** 31:3 | 168:25 169:7,9 |
| 232:11 236:2,5 | 252:14,16 | 92:16 151:2 | **associations** |
| 236:19,25 237:5 | 253:10,22,25 | 212:1 279:19 | 209:1 |
| **artifact** 115:13 | 254:4,6,8 255:14 | 291:17 | **assume** 128:17 |
| 115:20 117:11 | 257:3 258:5,7,20 | **asserted** 33:10 | 190:18 212:4,11 |
| 117:17 | 260:14,24 261:8 | **asserting** 33:6 | 250:2 275:1 |
| **artificial** 115:13 | 261:19,23 262:7 | 39:20,23 40:1 | **assumes** 118:7 |
| 115:20 117:12 | 269:22 277:15 | **assertion** 95:25 | 175:7 193:3 |
| 117:17 | 280:12 282:5,17 | 185:21 189:10 | **assuming** 128:19 |
| **aside** 221:10 | 292:20,25 293:1 | **assess** 28:3 | 129:19 132:1 |
| **asked** 41:11 | 293:10 296:22 | 116:13 119:25 | 181:25 275:7 |
| 61:17 62:24 | 298:6 302:16,23 | 125:8 128:12 | **assumption** |
| 63:14 64:12 | 303:23 304:3,22 | 136:20 144:3 | 120:15 175:8 |

Veritext Legal Solutions
866 299-5127

**[assumption - bates]**

186:1 190:19
**assumptions**
153:9 186:1
**atruong** 4:17
**attacking** 285:8
**attempt** 14:1
51:11,14 52:1,8
52:14,18,18,21
**attempts** 284:17
**attend** 119:10
120:13,16 121:7
122:14,21
154:14 157:16
**attended** 225:18
226:9
**attention** 157:1
165:18 170:15
**attitude** 188:6
188:14
**attitudes** 126:2
130:13
**attorney** 9:11
29:2 99:4
**attorneys** 13:24
14:3,4
**audience** 232:18
**audio** 8:9,13
76:15 89:14
105:5 114:1
131:8,10 167:18
167:20 176:24
187:8 213:3
238:13 245:6
248:10 259:11
261:25 267:2
271:14 300:11
**august** 1:18 2:21
8:2,6 305:21

306:22 307:3,5
309:6
**authors** 52:12
**auxiliary** 29:5
**avenue** 3:15 4:14
**average** 124:2
124:13,17
239:24 255:22
256:2 286:1
**avoid** 57:11
67:17 78:6
130:14 277:21
**aware** 50:10,13
50:17,20 51:2,5
51:10,14 52:1,8
52:10 56:17
70:17 160:10,13
160:16 184:1,12
192:15 193:10
197:20 238:1
239:10 240:8
243:19 272:11
283:3,10 291:9
**awareness** 7:13
184:22 185:12
218:5 219:11,16
280:6,12,24,25
281:23 282:15
282:24

**b**

**b** 21:15 22:10
86:10 153:23
286:20 297:13
303:16 308:1
**back** 46:3 54:8
67:10 76:3
79:18 84:9

88:17 117:6
133:1 136:5
145:8 147:17
153:14 161:21
173:11,13
183:23 184:8
190:6,7 200:19
201:3 206:21
215:6 224:19
230:8 264:12,15
275:18 276:15
282:25 288:6,8
290:1 294:10
296:10,19
300:23 301:4
302:15
**backed** 163:23
166:24
**backing** 60:12
**backup** 95:24
**backwards**
270:2
**bad** 57:3 234:5,6
**balanced** 184:19
184:21 185:12
**bank** 41:5
**bar** 143:6,6
301:16
**barrelled** 277:2
277:6,7,8,9,22
279:21
**bars** 301:12
**base** 285:5
**based** 26:7 33:1
51:3 53:21
55:14,20,24
57:15 59:2,8
60:1 81:19

82:25 83:23
91:12,16,23,24
110:1 111:2
119:7,25 122:19
129:20 133:2
138:14,22
139:14 141:22
143:24 147:19
147:23 151:22
159:16 160:22
163:18,21
164:22 165:13
177:10,16 179:4
186:16 210:10
210:17 225:17
226:12 236:10
239:4 242:18
255:25 260:8
262:17 268:18
270:14 274:8
281:17 284:21
290:7,15 291:10
292:6,14 293:5,9
293:16 294:6
295:10,12,17,23
301:21 302:6
**bases** 16:9
**basic** 38:9
**basically** 27:2
81:23 95:2
147:19 177:2
**basis** 98:24
99:14,16 205:2
220:13 255:5
**bates** 6:13,19,22
7:10,14,18
168:16,20

[bbk - browser]

bbk 31:8,14
beat 262:6
beginning 9:10
181:11 182:14
behalf 1:7 2:7
8:18 9:14,20
behavior 32:8
40:13 52:17
98:21 116:17
behavioral
98:22
beko 3:5 9:13
51:22 55:15
believe 14:2,5,9
17:25 18:6 20:1
24:5 38:7 39:12
40:2,4 41:8 50:8
51:9 58:4 59:19
59:21 60:3,11
61:11 69:12,17
75:21 76:5,5,13
76:19 78:7
83:20 87:2 90:8
108:4 109:18
112:3,6 117:24
122:7 125:21
126:9,24 137:17
137:25 149:1,4,7
162:20 165:5
170:24 171:8,9
182:11 183:22
195:19,22
213:11 214:20
214:25 230:21
258:25 259:6
265:2 268:18
272:13 287:10
292:11,14

298:22 299:14
299:15 302:7
303:6
believed 271:6
benckiser 23:3
benefits 184:1
184:12,22
185:13 197:21
200:22 202:2
203:16 205:25
275:21
best 56:9,23 57:3
57:10 60:19
63:7 73:20 77:9
78:9 80:15
92:13 102:15,21
107:22 119:4,19
178:13 194:4,9
209:24 258:24
259:5 280:14,15
280:21,22,23
281:3,7,9,9,18
281:22 282:14
283:13
better 26:14
57:8 208:16
209:6 234:25
289:24
beyond 66:14
131:19
bias 79:21
101:19 102:19
102:24 103:14
130:11 157:9
240:15
biases 79:22
157:4

biassed 101:9
biassing 129:10
246:12
big 21:24 216:13
246:18
biggest 67:11
bit 112:12
114:17 234:8
262:6,16 281:1
301:11
bits 68:13,19
69:5
bizarre 244:7
blame 216:13
blow 267:14
blue 202:9
267:13
blurry 301:11
boies 3:4 9:13,16
book 99:13
bother 196:13
238:4
bottom 65:3
83:9 181:16
269:14 270:23
bought 140:3
box 202:10
259:23
boxes 23:16
brackets 97:8
300:2 301:19
303:13
brad 17:10,23,23
169:14
brad's 17:11
brand 6:11,16
6:17,18,21 126:1
130:9 147:5

199:17 202:13
209:14 210:19
branding 193:11
194:17 208:23
210:19 215:4
breach 34:17
breaches 184:23
break 18:12 54:1
54:4 112:17
116:23 117:9
118:21 161:14
187:21 206:12
248:17 264:3
268:3 270:5
296:4 301:6
breakfast 12:2
breakup 99:20
brian 237:21,24
brichardson
3:11
bring 112:24
233:15 265:12
bringing 154:22
brought 168:24
brow 83:13
brown 1:4 2:4
8:20 26:4 289:1
307:4 310:1
browse 79:2
159:25 160:15
160:18
browser 36:6
39:7 40:6 42:4
47:25 70:4 79:4
79:23 82:12,16
82:22 83:13
84:22,25 85:1,6
85:9,15 86:14,18

**[browser - case]**

87:19,23 88:2,5
88:6,18,19,25
89:6 90:2,20,24
91:10,16 92:24
93:11 94:15,18
94:23 95:8,17
96:15,23 97:2,6
97:10,11,14,18
97:23,23 98:4,7
98:10 99:9,11
140:1 146:2,5,15
147:9 148:11,13
158:18,21,23
294:22 295:7
303:5,20
**browser's** 97:1
**browsers** 36:7
75:11 78:24
79:7,11 80:1,5
80:22,24 81:13
91:4,6,23 92:16
92:19 93:4 94:5
95:4 97:8,9,10
97:10,13,18,20
98:3,11 100:4
133:12 235:4
**browsing** 36:12
38:18,24 39:10
40:6,18,22 41:7
41:12 42:15
43:17,20 44:5
47:20,24 65:12
67:2 68:14
69:11,16 70:3,19
71:1 75:9 91:13
92:3,10,22 93:1
93:6,9,15 94:1,3
94:7,11 98:8,12

98:23,25 99:24
100:5,12,19
101:1,25 103:23
105:2,17 106:10
107:6 120:8
121:16 125:13
130:18 133:11
138:15,24
139:16 141:5
142:3 145:25
146:22 148:1
151:9 158:19
161:1 173:18
174:25 175:13
175:21 176:14
177:20 181:6
189:4,7 192:8
197:13 198:6
202:22 204:17
205:13,21
218:22 223:1,9
223:22 224:5
225:10 226:25
227:9,23 233:4
235:5,11 250:20
252:6,11,16
253:15 254:7,16
254:20,22,25
255:7 257:6
258:25 259:7
261:4,9,21 265:4
271:8 278:12
279:3 284:10,20
291:18 300:2
301:18 302:2
**bruce** 7:4 216:19
**brwn** 6:20,23
7:11,15,18

198:19 240:19
265:13
**bsfllp.com** 3:11
**bucket** 299:5
**build** 192:6
277:13
**bullet** 128:21
129:4 160:5
**bump** 288:1
**bunch** 216:25
**burden** 195:6
**business** 34:22
**buy** 31:7 140:3
**byatt** 1:4 2:4

**c**

**c** 3:6 21:3 86:10
167:16,24 168:3
168:8,9,11,21
207:1 287:4,13
303:16
**ca** 307:9,12,20
**cabr** 6:14 179:13
180:16
**calculate** 289:18
**calculator**
230:15,20,23,23
231:7
**calhoun** 4:11
10:1
**california** 1:2,19
2:2,19 3:16 4:7
8:1,22 34:2,22
**call** 17:2 22:5
27:9 73:6 120:3
159:13 178:12
193:25

**called** 21:1 64:11
86:15 120:4
143:7 247:10
287:12
**calling** 263:7
**calls** 191:13
208:4 223:11
233:6
**camera** 8:10
**cancelling** 89:17
**cancer** 22:4
**cannabis** 32:15
**capital** 303:14
**capture** 218:13
**captured** 153:16
220:3
**captures** 153:8
**care** 32:11
120:16,17,17,21
122:2,3 154:8,13
174:5 263:1
**careful** 138:14
138:22 139:14
210:2
**carefully** 138:12
139:7 152:3
217:17
**cares** 201:1
**caring** 120:24
**carried** 262:13
**carries** 262:24
**case** 1:4 2:4 8:22
10:1 15:7 16:3,6
17:21,25 18:2,8
18:20 19:25
21:17,19,20,21
22:18,24 23:3,4
23:4,8,11,12,14

Page 9

[case - chrome]

| | | | |
|---|---|---|---|
| 23:23,25 24:10 | categories 294:1 | cetera 160:1,1 | chasom 1:4 2:4 |
| 24:14,19 25:1,4 | category 132:4 | chance 95:5,9 | 8:19 |
| 25:6,7,9,11,12 | caught 295:2 | 122:14 198:14 | cheap 233:19 |
| 25:22 26:4,13,15 | caused 101:19 | chances 95:7 | check 19:1 41:4 |
| 26:18,21 27:1,11 | 103:14 | change 58:4 | 72:5 287:2 |
| 27:25 28:7,15 | causes 291:8 | 59:10 61:4,9,10 | checked 77:1 |
| 29:17 30:15,16 | cbd 31:22 | 62:7 63:4 | 155:21 |
| 30:23,24,24 31:8 | ccp 307:9,12 | 101:14,22 | cherry 166:22 |
| 31:9,10,14,25 | cefcu 30:18 | 104:13 106:18 | 174:15 |
| 32:14 33:6,11,22 | centered 274:7 | 110:15 113:15 | chest 161:9 |
| 34:1,5,9,13,17 | certain 39:20,23 | 114:25 115:2 | choice 284:14 |
| 34:21 37:10,17 | 42:14 43:6,16 | 158:21,24 | choose 39:7 57:2 |
| 37:18 38:3,17 | 70:5 76:23 91:4 | 210:18 304:21 | 57:4 79:16 |
| 39:8,20,25 42:25 | 94:2,4 118:23 | 310:4,7,10,13,16 | chose 66:20 |
| 44:25 45:1,4 | 119:22 120:1 | 310:19 | 114:5 138:3 |
| 46:8 53:15 | 135:20 140:22 | changed 41:10 | christopher 1:5 |
| 55:16 67:1,4 | 160:11 170:2 | 57:25 58:22 | 2:5 |
| 68:4 71:4 72:15 | 229:5 266:5 | 60:4 159:16,16 | chrome 36:9 |
| 75:7 101:17 | 294:16 303:24 | changes 14:7,9 | 40:6,21 47:24 |
| 102:8,9,9,20,21 | certainly 10:25 | 55:13,20 58:9 | 81:18,20,22,22 |
| 103:13,17 108:2 | 17:3 19:7 21:14 | 59:7,25 60:5,6,8 | 81:24 82:7,10,14 |
| 109:21,22 | 35:24 37:15 | 60:9 61:12,13 | 82:20,22 83:3,11 |
| 118:17 143:17 | 41:19 51:13 | 62:5 112:15 | 83:14,18 84:23 |
| 148:20 150:16 | 70:20 73:20 | 155:24 156:1 | 85:12,15,16,17 |
| 156:5 176:12 | 74:14 143:1 | 159:1 160:11,20 | 85:19,22,23 86:6 |
| 177:16 214:1 | 145:5,6 173:24 | 160:21 161:9 | 86:20,22,25 |
| 228:5 239:20 | 181:13 193:7 | 215:3 | 87:14,16,19 88:9 |
| 283:12 292:17 | 210:3 212:3 | chap 197:16 | 88:11,18 90:5 |
| 306:19 | 223:17 236:6 | character 231:6 | 91:13,19 93:23 |
| cases 24:14,17 | 239:10 275:12 | characterization | 94:6,8,10 95:7 |
| 25:3,13 37:20 | 301:22 | 183:6 190:4 | 99:9,10,23 100:7 |
| 77:13 102:12,22 | certificate 306:1 | characters | 133:12,18 135:6 |
| 247:17 280:23 | certified 2:22 | 294:24 295:4 | 146:2,5,10,15,24 |
| 281:10 292:18 | 10:3 36:16,19,24 | chart 257:8 | 147:8,15 148:11 |
| castillo 1:6 2:6 | 37:15 306:3 | 294:2 | 148:13 154:3 |
| casual 33:2 | certify 37:2 | charter 26:16 | 161:1 183:20,24 |
| catch 56:18 | 306:4,13 309:3 | chase 243:21 | 184:10 185:21 |
| | | | 185:23 186:2 |

Veritext Legal Solutions
866 299-5127

[chrome - collecting]

| | | | |
|---|---|---|---|
| 189:8 190:16,18 | 201:17 202:5 | 215:22 219:8,18 | 256:3 |
| 191:21 197:19 | 236:5 293:20 | **classes** 133:9 | **closest** 39:17 |
| 198:1 201:1 | 299:22 300:5 | 147:22 | **clr** 1:22 2:22 |
| 209:9,12 226:16 | **citing** 198:4 | **clause** 186:11 | 306:25 |
| 231:22 238:24 | 200:18 242:17 | **clauses** 186:7 | **clue** 262:20 |
| 239:14,15 240:4 | 266:13 288:25 | **cleanest** 66:13 | **coauthored** |
| 240:24 241:14 | **civil** 307:19,20 | **clear** 38:22 | 48:21 49:2,5,10 |
| 242:9,14 273:17 | **claim** 33:22 34:1 | 43:24 56:11 | 50:24 51:12 |
| 273:23 274:1,5 | 34:5,9,13,17,21 | 58:24 62:20 | **coauthors** 51:3 |
| 274:10,25 275:5 | 90:14,18 112:15 | 67:19 84:21 | **code** 34:22 307:9 |
| 275:25 303:4,20 | 137:16 165:11 | 98:18 128:4,10 | 307:12,19,20 |
| **chrome's** 146:20 | 165:12 166:14 | 128:11 133:4 | **col** 242:2 |
| 146:23 | 166:14,14 167:4 | 208:24 210:4 | **colleagues** 73:5 |
| **cite** 91:16 143:17 | 167:5,14 172:14 | 214:13 226:11 | **collect** 42:8 |
| 156:12 178:21 | 174:14 197:3 | 229:15 245:17 | 44:22,24 45:11 |
| 180:13 182:5 | 203:19,20 | 245:21 258:10 | 45:12,16,22 46:3 |
| 184:15,17 186:4 | 282:14 | **clearing** 52:20 | 46:6,9 68:4 |
| 189:23 190:8,10 | **claiming** 36:14 | **clearly** 128:23 | 70:10,15 130:18 |
| 194:21 195:4 | **claims** 33:5,10 | 129:6 165:12 | 188:7,15 228:14 |
| 199:7 200:2 | 33:14,16 39:20 | 227:16 247:14 | 229:17 265:2 |
| 206:5 207:22 | 40:1 113:3 | **clever** 44:10 | 267:1,10 268:14 |
| 208:10 215:7,15 | 163:25 165:10 | **click** 87:7 119:16 | 269:1,15 270:22 |
| 238:9 265:8,11 | 165:20 170:17 | 122:23 123:1 | 271:7,22,24 |
| 266:15 289:15 | 171:10,18 | 124:14,19 134:9 | 272:2 277:25 |
| 299:4 | 172:16,23 | 134:22 135:10 | 278:6,19,21,22 |
| **cited** 12:13,15 | **clarification** | 135:22 154:9,10 | 279:14,19 |
| 167:12 168:23 | 84:20 134:3 | 298:5 305:7,8 | **collected** 27:6,8 |
| 169:6 179:13 | **clarifies** 214:3 | **clicked** 86:5,12 | 27:19 29:6 30:7 |
| 189:16 195:12 | 214:11 | 86:14,17 92:21 | 38:18,24 42:2,6 |
| 196:3,9 197:12 | **clarify** 62:21 | 122:23 124:3 | 43:24 44:2 46:7 |
| 198:12 200:24 | 83:25 85:22 | 135:8 | 183:21,25 |
| 202:17 207:1 | 89:1 96:17 | **clicking** 134:5 | 184:11 185:22 |
| 209:17,18 | 140:19 149:9 | 249:10 | 185:24 197:20 |
| 216:11 237:23 | 294:4 | **client** 30:21 | 272:19 279:4 |
| 265:21 270:21 | **class** 130:7,8 | **close** 29:24 42:4 | **collecting** 42:1 |
| 300:22 | 165:20 170:18 | 43:8 47:25 48:5 | 42:23 43:19 |
| **cites** 165:15 | 171:10,18 | 58:8 116:20 | 46:21 47:12,15 |
| 195:17,25 196:2 | 172:16,24 173:5 | 160:9 175:15 | 66:22 67:8,22 |

**[collecting - conclusion]**

68:3 69:11,13
141:4 225:3
233:4 279:16
**collection** 44:25
45:2,3,5,7 46:2
47:10 67:4
91:25 184:2,13
184:20 185:14
186:21 191:12
197:22 205:13
222:25 223:8,22
224:4,24 225:9
226:24 275:21
284:19,19
**collectors**
229:20
**collects** 41:16,23
42:14 47:6
138:16,24
139:16 256:24
270:4 278:12
**column** 267:11
267:16
**com** 255:25
**combination**
87:8
**combinations**
86:15
**combined**
159:21 213:9
**come** 37:12 46:3
67:18 174:17
183:16 184:25
188:20 248:1
**comes** 159:13
230:1 239:24
289:21

**comfortable**
299:23 300:1
**coming** 75:2
86:11
**comments**
280:17
**commit** 107:10
**committing**
251:16
**communicated**
19:18
**communication**
66:2
**communications**
26:17 39:10
191:7 192:2,5
**companies** 31:11
31:20 32:1
35:19 38:10
76:24 127:3,15
128:1,17,23
129:13,23 130:7
130:8,13,25
131:15 132:12
132:15 160:4,6
185:1 207:15
213:25 234:14
234:19 235:4
278:20
**company** 21:1,2
21:18 31:17
38:2 51:8
130:18 131:24
146:3,5 207:18
303:5,21
**company's**
233:11

**compare** 240:13
**compared** 234:6
234:7
**comparisons**
235:3
**complaint** 33:8
33:13 75:12
91:14,15 115:1
125:21 130:8
137:8,8,19 141:9
156:7,9 286:19
**complete** 16:2
102:4 153:13
**completed** 307:7
307:17 308:6
**completely**
192:14 256:15
**completeness**
106:1
**completes** 82:18
123:24
**completion**
306:19 308:10
**complex** 66:24
**complicated**
66:14
**components**
23:16 219:23
**compound** 72:3
**comprehension**
182:24 183:1,13
191:4,10,20,24
**comprehensive**
34:6
**comprised**
277:15,17
**computed**
255:25

**computer** 34:6
41:4 42:25
43:11 295:4
301:18 302:2,17
**con** 259:1
**conceded** 36:4
**concept** 49:11
**concepts** 278:1,5
**conceptually**
53:5 304:11
**concern** 184:18
184:21 185:11
**concerned**
184:20 254:7,15
256:22
**concerning** 38:4
39:9 217:12
261:20 286:24
**concerns** 238:12
**concierge** 179:23
180:2 198:25
266:3 288:10
301:2
**conclude** 166:9
175:22 176:7
243:4
**concluded** 26:8
27:12 160:23
299:24 305:20
**concludes**
305:17
**conclusion** 61:8
101:15 174:18
185:9 188:21
189:21 192:1,1
196:25 223:11
231:1

**[conclusions - contradicting]**

**conclusions** 39:3
75:3 110:14
177:7 189:14
210:3,20
**condition** 36:4
52:16 81:9 88:7
90:22 153:17
226:15 297:5,10
297:11,12,21
**conditioning**
120:24
**conditions** 81:18
82:19 83:21,22
84:24 85:5,21,23
85:25 86:19
87:11 91:3
136:15 137:12
152:18,24 221:6
**conducive** 71:17
**conduct** 28:11
33:3 56:25
96:16 97:1
109:20 174:8
217:12,22 218:9
280:16 286:23
**conducted** 8:8
8:23 13:8 28:8
28:13 51:7
64:14,24 70:18
70:21,25 71:4
103:2 107:14
109:12,23
118:17 123:19
125:7 132:19
163:18 200:24
210:16 215:21
218:4 242:8

**conducting**
53:14 74:4
102:1
**confidence**
195:22
**confidential** 1:14
2:16 23:11 99:6
**confirm** 303:17
**confuse** 208:17
209:7 210:12
**confused** 211:22
**confusing**
212:20 277:20
**confusion** 28:4
58:18 211:18,20
211:21 214:4,11
**conjures** 209:1
**connection** 8:10
18:16 36:20
50:19 51:11
64:24 70:19
71:3 92:1
108:14 120:5
221:22 230:20
237:8 242:2,6
275:25
**conroy** 4:12 9:25
**consent** 6:13
35:11,17,20,22
35:23,25 36:1,2
223:16 258:5,7,7
258:11,12,14,18
259:7,17,19
284:9,13,19,25
285:5,10,14
286:11 287:22
288:1,2,3 292:1
292:2

**consented**
222:23 291:23
**conservative**
120:19 149:14
149:22 150:24
151:23
**consider** 66:21
70:24 211:13
215:3 242:3
271:25 272:4
291:20,23
**considered**
138:8 203:5
**considering**
207:11,16 208:2
210:11
**consistency**
166:13
**consistent** 37:13
166:4,11,18
170:18 172:25
186:2 194:14
240:15 256:4
**consistently**
91:24 204:4
**constructed**
129:19 151:10
**consulting** 9:22
**consumer** 20:25
35:11,17,18 36:6
40:13 54:19
117:25 120:7
125:7 154:3,7,8
154:9,11 164:7
164:12 200:21
200:22 201:9,12
201:13 202:1

**consumers** 35:19
121:9,13,15,22
154:12 200:20
201:19 299:22
**contact** 307:9
**contacted** 13:16
13:19
**contain** 16:1,4,8
195:4
**contained** 15:21
309:8
**containing**
294:23 295:3
**contains** 205:22
**contend** 171:16
**content** 186:20
**context** 6:17
146:8 163:23,24
178:15 199:16
200:23 202:2,4
210:6,7 230:25
232:17,24 233:1
233:15,17,25
234:4,9,21
236:14 237:18
284:7,20 285:3
**contexts** 232:15
**continue** 8:13
77:5 87:8 92:20
192:5
**continued** 4:1
7:1
**continues** 204:3
**contract** 34:18
**contradicted**
165:6,22
**contradicting**
195:8

**[contrary - creation]**

**contrary** 206:1,1
224:2
**contributes**
210:24 212:12
212:20,21
**controls** 181:24
182:13
**converge** 249:11
250:16
**conveys** 213:19
213:23
**cookie** 220:8,10
220:23 295:6
301:24
**cookies** 125:12
127:7,13,21
221:4 290:9
292:20 293:1,3
293:12 294:11
294:12,15,16,21
294:23 295:7,12
295:13,14
301:17 302:1
**copies** 286:4
**copy** 216:3
221:18 222:18
**correct** 13:5
16:13,14 20:2
21:16 22:14
25:14 26:19
28:16 30:13
32:15 39:23
40:15 42:15
46:10,13,18 51:4
54:17 60:7
61:15 62:23
63:13 70:8
71:13 72:16

75:20,21 76:9,24
76:25 83:8,15
84:23 87:16
88:20 90:12,13
93:12 103:19,20
105:2 106:10
107:12 112:19
113:10 115:6
117:20 119:22
120:1 121:3
144:11 151:14
153:1,9 162:22
163:16 167:8
168:7 177:13
189:17 190:16
190:22 215:16
222:11 239:9
244:17 247:18
255:23 261:10
264:24 266:13
266:23 267:22
268:1,8,19,21,22
268:24 269:7,15
269:19 270:23
272:20 275:16
276:22 290:22
302:6 309:9
**corrected** 309:9
**correction** 57:20
**corrections**
307:14,15 308:3
308:4 309:7
**correctly** 33:17
72:6 147:3
182:12 209:19
250:14 256:15
269:9 270:20
290:9

**correspondence**
52:12
**corresponds**
97:2
**costs** 186:23
233:18
**counsel** 2:20 3:1
4:1 8:19 9:8
10:8,10 11:1,20
11:22 12:20
17:5 18:11 24:6
26:10 51:20
55:10,14,21 82:4
112:6,19 137:25
198:25 238:1
266:3 288:10
296:22 297:18
298:6,11 299:11
301:2 302:5,16
302:22 306:14
307:18,21 308:7
**counsel's** 56:3
**count** 49:7 162:7
250:8
**counts** 37:10
**county** 24:14
25:9 27:11,24
28:7 29:16
37:17
**couple** 300:20
**course** 22:25
50:12 51:1 56:5
68:7 73:14 74:3
93:18 96:3
117:18 121:12
121:24 144:12
145:21 166:13
177:23 187:23

188:24 230:2
246:24 295:18
**courses** 20:11,11
**court** 1:1 2:1
8:21 9:2,25 10:3
26:1,21,25 28:15
28:19,22 29:11
29:17,19 30:2,10
30:20 36:16,19
36:24 37:2,6,11
37:14,18,21,24
38:2 53:25,25
77:3 82:3 89:15
100:20 105:6
116:24 131:9
145:10 153:10
167:19 184:4
187:9,12 188:9
238:14 245:7
248:11,13
259:12 262:1
267:3 271:15
294:25
**court's** 221:18
223:4 224:2,23
**covered** 192:13
300:22
**cracks** 191:3,19
**create** 73:1,3,5
88:1,4,16 90:24
91:5 136:6
236:9 278:24
**created** 55:7
207:5
**creates** 45:20
**creation** 286:24
287:5,14,25

[credentials - deduced]

**credentials** 37:7
**credit** 23:3 25:9
  25:21 27:1 37:9
**crises** 184:24
**criteria** 76:1
  82:18 109:2
**criticism** 27:9
  262:16
**criticisms** 245:1
  245:12 262:12
**criticized** 26:25
**criticizing** 255:4
**critique** 67:11
  73:22 116:11
  154:23,23
  277:11 279:8
**critiques** 53:17
  84:16
**cross** 26:11
**crucial** 74:2
**crunches** 44:1
**csr** 1:22 306:25
**cultural** 182:19
  190:17
**current** 79:15
  82:25 94:15,17
  94:20,22 97:5
  98:7,10 112:10
  214:19
**currently** 50:6
  78:25 79:3,4,5,7
  79:11 80:2,23
  81:13 83:24
  92:24 94:9,18,21
  95:3,4,8,13,16
  95:17 96:8,18,18
  97:12,15,19,20
  97:21 98:5,14

113:4,12
**customers** 31:5
  31:5 32:11,14,23
  211:22
**customization**
  203:16
**cut** 103:11
  243:21
**cv** 1:5 2:5 8:22
  21:6,14 48:23

**d**

**d** 86:10 303:16
**daily** 97:21,22
**dan** 48:16
**danger** 242:17
**data** 11:19 15:21
  16:7 22:2 27:5,7
  27:19,21 29:6,10
  29:15 30:6
  32:21 34:6
  38:19,25 39:16
  44:25 45:3,9,9
  45:13,21,22 46:2
  46:3,11,18,20,23
  46:24 47:1,2,6,7
  50:11,15,21 51:3
  51:4,9 52:25,25
  60:21 68:5
  69:11,16 70:2
  77:7 81:8 84:12
  91:16,24 94:25
  96:1,24,25 100:2
  100:3,8 104:11
  123:22,23,24
  124:6,11,12,15
  125:10,23 127:4
  127:11,19

130:15 136:23
136:25 141:4
143:16,24
147:22 150:25
150:25 151:2
163:23,24
173:17 174:3,10
174:17,25
175:12 176:14
177:3,19 178:11
178:12,15
181:24 182:13
183:19,21,25
184:2,11,13,21
185:14,21,23
186:22 188:7,15
191:12 197:20
197:21 201:3
204:14 205:2
210:3 222:25
223:8,21 224:4
224:14 225:9,20
226:10,21,24
228:14 229:17
229:20 242:20
251:18 256:24
265:2 267:1,10
268:14 269:1,15
270:4,22 271:7
271:18 275:21
278:24 279:1,1
280:18 284:18
299:23 300:2
**database** 78:8
**dataset** 102:4
**date** 8:5 12:23
  307:16 308:5
  310:24

**dated** 309:11
**dates** 13:9 114:5
  231:25
**daughter's** 41:9
**davis** 1:5 2:5
**day** 236:15
  287:3 306:22
  309:11
**days** 95:6
**dc** 201:20
**de** 201:8,12
**deal** 26:14 99:25
  100:2 240:3
  257:5
**dealing** 35:1,4,7
  35:10 36:5,11
**deals** 277:13
**death** 99:19
**debate** 117:22
**decent** 93:5
  98:20
**decide** 122:17
  155:3
**decided** 14:4
  106:1 138:8
  156:21
**deciding** 272:1
**decision** 27:22
  29:23,25 35:18
  66:10 92:1
  113:9 156:11,16
  156:19 159:17
  211:16 229:5
**decisions** 221:23
**declining** 246:11
**decreases** 157:14
**deduced** 123:21

Veritext Legal Solutions
866 299-5127

**[deduct - different]**

| | | | |
|---|---|---|---|
| **deduct** 123:21 | 11:11,14 12:1,6 | 228:6 | **detects** 83:1 |
| **deeply** 191:2 | 12:16 15:1,8,15 | **design** 23:20 | **determine** 78:20 |
| **default** 150:11 | 16:11 172:21 | 63:9 91:1 116:5 | 111:13 195:13 |
| **defendant** 1:12 | 178:23 179:15 | 119:12,18 120:6 | **determined** |
| 2:12 4:3 31:25 | 180:19,22 | 120:23 135:17 | 225:2 307:18,22 |
| **defense** 31:24 | 198:23 206:8 | 153:2 156:18 | 308:7 |
| **defenses** 39:23 | 216:4 221:13 | 219:4,7 224:20 | **developing** |
| **define** 49:15 | 237:20 238:6 | 244:5 247:13,24 | 194:12 |
| 75:6 98:18 | 240:20 265:16 | 251:4,8 255:2,18 | **device** 41:14 |
| **defined** 75:8 | 289:6 305:18 | 260:4,9 271:25 | 43:8 82:25 83:1 |
| 294:11,16,20 | 306:18 307:19 | 272:4,6,7,8 | 83:23 160:1 |
| **definitely** 140:5 | 307:22,24 308:8 | **designed** 22:20 | **devices** 23:17 |
| 172:10 174:15 | 308:10 309:5 | 23:2,18 24:10,15 | 79:1 |
| **definition** | **describe** 29:5 | 24:16,22 25:12 | **diamond** 281:21 |
| 121:17 122:3 | 32:8 57:16 62:2 | 29:13 90:16 | **diamond's** |
| 255:19,20 | 62:8 76:3,8 | 122:16 125:7 | 281:13 |
| 290:15 294:18 | 114:14 126:8 | 132:7,11,16 | **died** 22:4 |
| **defy** 150:19 | 138:24 243:16 | 152:7 | **diego** 11:6 23:2 |
| **degree** 28:3 58:5 | **described** 32:22 | **designing** 23:6 | 24:13 25:9,11,21 |
| 158:20 | 58:5,6 60:2,3,9 | 70:23 225:1 | 27:1,11,24 28:7 |
| **delete** 47:18 | 61:15 72:14 | **desktop** 82:24 | 29:16 37:9,17 |
| **demand** 283:6 | 116:12 123:6 | 83:6,23 87:12 | **difference** 45:16 |
| **demonstrate** | 141:23 160:20 | 91:17 95:20 | 101:12 108:20 |
| 222:23 | 161:9 196:15 | **desktops** 99:11 | 147:11,12,14 |
| **denial** 156:12 | 215:4 222:13,13 | **despite** 44:12 | 160:25 177:22 |
| **denominator** | 244:16,18 | **detail** 59:3 61:7 | 177:24 230:3 |
| 250:9 | 299:24 | 272:13 | **different** 19:12 |
| **denying** 7:7 | **describes** 61:24 | **detailed** 13:13 | 20:11 25:3 |
| **depend** 244:1 | 81:23 83:9 84:3 | 13:15 40:14 | 28:21 30:16,17 |
| **dependence** | 84:5 114:25 | 59:9,18 76:1 | 31:3,11 40:10,12 |
| 233:17 | 159:15 194:16 | 110:7 118:5,13 | 42:10 44:4 |
| **depending** 35:20 | 245:22 | **details** 21:7,13 | 45:14 46:15 |
| **depends** 8:9 | **describing** 26:6 | 23:25 76:5 | 75:13,16 81:5,6 |
| 35:16 116:6 | 110:17 164:3 | 123:6 160:16 | 82:18 87:19 |
| 118:12 | 193:11,25 | 163:5 203:13,25 | 91:6 99:21 |
| **deposition** 1:17 | 277:13 | **detection** 68:13 | 105:22 108:3,6 |
| 2:17 6:3 7:3 8:7 | **description** | 68:19 69:5 | 110:7 112:13,24 |
| 8:17,18 11:2,5 | 46:22 126:4 | | 113:1,8 115:24 |

**[different - documents]**

119:12,13 124:4
125:9,15,16,19
126:5,6 133:8,9
133:11 149:2
150:22 151:1
152:17 154:21
154:22 157:2
158:7,11 159:8
159:22 204:25
221:5 244:24
245:22,25
247:21 271:1
277:25 278:4
287:17
**differently** 91:7
101:21 102:3,17
102:18 170:13
295:24
**difficult** 41:8
277:20
**dina** 179:11,20
179:24 222:18
240:18
**direct** 21:12
100:15 114:21
170:15 219:24
**directed** 134:17
172:8 235:22
298:18
**directing** 157:1
**direction** 306:12
**directional** 66:2
**directly** 35:13
69:13 70:16
100:2 158:6
219:2,5 221:4,9
239:21 240:13
244:1 292:24

**disable** 135:16
**disabled** 135:12
**disagree** 157:5
**disagreement**
163:17
**disappear** 43:9
**disappeared**
22:3
**discard** 278:8
**disclose** 225:9
226:23
**disclosures** 35:8
157:20 220:9,11
220:24 235:8,10
**discover** 72:9
280:17 283:8
**discovered** 22:1
72:10
**discrete** 216:16
**discretion** 56:24
57:2,6,8
**discuss** 11:20
92:6 161:17
219:2 230:14
**discussed** 11:22
58:10 68:2
101:7 124:11
135:7 152:5
163:19 192:16
281:1 283:1,12
301:10 302:8
**discusses** 54:16
**discussing** 58:15
224:24
**discussion**
232:12
**dishonest** 53:8
53:10,12

**dishonesty** 49:10
51:11
**dismiss** 7:7
221:18
**dispensaries**
31:22 32:15,22
33:2
**display** 266:5
288:11 301:3
**displayed** 70:5
**dispute** 252:4,9
252:10 254:7,10
254:11,15,18
274:2 292:5
**disputed** 252:11
252:14
**distance** 165:17
**distant** 81:3
109:9
**distinct** 98:21
99:19
**distinguishing**
260:5
**distribution**
250:3
**district** 1:1,2 2:1
2:2 8:21,21
**divided** 64:2
**divorce** 99:20
**doc** 177:17
**document** 73:5
138:20 156:4
167:13 171:3,4,6
171:13,19,23
172:15 179:12
180:19,23 181:1
181:10,14 182:4
182:12 183:3,6

183:20,22 186:1
186:3,17,17
189:9 190:4,12
190:12,24
192:20 193:11
194:16 196:13
196:14,20
198:12 199:7,10
199:14 205:11
205:22,23 206:5
206:15 207:1,3,5
207:8,14,20
208:23 209:18
210:21 213:7
215:4 216:14
231:12 232:22
240:19 241:2,4,8
241:21,24 242:3
242:4,13 265:8
265:10,13,21
266:10,12
272:14 287:1,13
288:13,25
289:11 292:9
299:12,19,24
300:5,21 304:17
304:20,21
**documentation**
110:16
**documents**
11:10,16 12:9,12
12:15 22:2
70:20 99:8
137:5,21,25
138:1,4,5,6,7,11
138:15,23 139:7
139:15 146:10
147:4 156:11

[documents - employees]

165:4,7,14,24
166:5,12,15,19
166:22,23,25
167:4,6,12
168:16,18,21
169:1,3,5,5,15
169:20,25 170:4
170:4,19,24
171:7,8,14,16
172:1,5,7,10,20
172:25 173:7,16
173:20,25 174:2
174:9,11,23
175:6,10,16
176:1,12 177:12
177:18 178:4,20
178:22 179:1,5
180:13 183:15
183:24 184:10
189:8 194:14,15
195:4 196:7,9
197:5,19 198:2
204:9 205:6,8
208:10 219:25
220:1 231:6
232:14,20 233:1
233:3,11 234:2
235:16,20 238:5
238:9 239:22
240:3,9 263:14
263:17,20,22
284:8,24 285:4,9
285:13,16,19,22
286:3,8,10,11,14
286:19,21
287:17,21,25
298:12,18,23
299:4,6,21

300:14
**docushare**
170:12
**doing** 16:15
38:10 57:9 78:6
169:9 177:5
214:16 250:22
265:3 267:11
268:14 269:1
271:7 283:11
**dollars** 233:18
**double** 277:6,8,9
277:22 279:21
**doubled** 277:2,7
**doubt** 192:23
291:8
**download**
289:22
**downstream**
45:12 66:17
67:8,21,22,25
68:6,8,14
**downstreaming**
69:2
**dr** 8:17 11:21
48:19,22 49:3,6
49:10 50:10,14
50:21 51:2,12
216:3,8,10 217:9
217:13 218:15
220:14,19,25
305:18
**drag** 58:23 61:10
62:13,18 63:6,6
**draw** 177:7
196:24 210:2
**drawing** 231:1

**drill** 224:15
**drop** 251:20
262:19
**dropped** 260:13
**duly** 10:7 306:6
**dynata** 64:12,12
71:6 155:16
163:14
**dynata's** 163:12

e

**e** 7:9 18:10 21:3
57:22 59:3
60:25 61:24
63:25 65:2,3
241:9,10 242:17
307:9,12 308:1
310:3,3,3
**e.g.** 142:3 148:2
**earlier** 33:4
123:18 224:20
239:19 283:13
288:3 304:4,22
**earth** 249:7
**easier** 165:9
208:11 248:18
**easily** 18:9 57:2
123:21 124:12
186:20 232:18
**easy** 80:18
232:18 234:24
**eat** 80:16,19
**edge** 88:2,11,19
90:11,17 93:24
**editor** 52:13
**effectively** 62:6
192:16 193:2
196:15

**effects** 283:6
**effort** 214:10
**eight** 12:7
**either** 57:24
83:23 88:8
159:20 167:22
169:6 180:9
207:17 236:1
260:17 283:4,22
**elaborate** 262:16
**electronically**
15:2,9,16 179:16
198:24 206:9
216:5 221:14
240:21 265:17
289:7
**elicits** 260:20
**eliminate** 248:23
**eliminated** 250:6
**emanuel** 4:4
9:19 14:11
**empathize** 77:12
**emphasis** 304:12
**emphasize** 96:13
**empirical** 128:10
164:22 165:22
166:21 195:19
205:1 213:20,24
215:21 239:19
**empirically**
194:6
**empirics** 195:20
**employed**
175:20
**employee** 193:1
196:14 237:18
**employees** 18:13
18:17 181:10,12

[employees - examples]

183:2,9 192:15
192:22 199:9,12
207:7 274:9
275:3,8
**employer**  129:8
**enable**  146:20
**ended**  23:5
134:18 218:6
281:18
**ends**  301:6
**engages**  154:3
**engaging**  222:25
223:7,21 224:4
**engineers**  253:15
295:19
**england**  201:20
**english**  47:11
**enhanced**  184:2
184:13 185:15
197:22
**enlarged**  135:23
136:1,24
**enormous**
139:11
**ensure**  74:5
**entire**  81:23
172:7 181:1
190:14 196:20
207:18 229:21
**entirely**  28:17
118:8
**entirety**  167:21
174:16
**entities**  40:7
42:10 45:8 70:1
125:10,16,17,20
125:22 126:5,7
127:22 133:8,9

175:19 227:8,22
228:22 229:16
229:21 236:2
**entitled**  27:13
29:2 245:17
**entity**  127:14
**environment**
115:13,21
117:12,17
**errata**  307:14,16
308:3,5
**error**  56:11
249:9 251:16
**errors**  52:14
179:4 230:18,22
231:5,8,12
**especially**  73:9
120:23 142:11
251:2
**esq**  3:5,6,7,14
4:5,13 307:1
**essentially**  188:7
188:14
**establish**  175:11
176:2
**established**
109:8 257:5
260:16
**establishes**
281:22
**estimate**  238:25
246:8,9
**estimates**  240:12
**et**  8:20 160:1,1
**ev**  173:23
**evaluate**  166:3
166:17 204:9
209:14 215:22

**evaluated**
166:13 263:13
**evaluates**  37:7
**event**  98:12,25
**events**  98:22
99:19
**eventually**  72:10
**everybody**  51:6
204:24 248:23
**evidence**  53:24
165:11 166:15
166:25 167:3,14
173:24 174:19
175:5,17 176:20
192:21,24 195:1
195:2,8,14,20
196:25 197:3
205:6,7 228:4
230:25 232:25
239:13
**evidenced**  251:6
251:7,18
**evident**  227:13
**exact**  52:23
69:25 70:1
109:1 114:17
116:5 204:18
294:11 297:2
303:9
**exactly**  19:17
20:9 29:22 39:1
41:22 44:12
45:7 58:7 60:3
62:14,16 68:9,16
69:17 72:11
73:6 88:14
114:14 126:8
128:11 130:23

144:6,7 146:12
151:19 163:21
164:23 165:5
166:6 167:11
171:5 183:18
185:16 191:24
193:25 194:20
203:10 205:17
209:2,16,25
213:8 223:16
247:11 256:5
258:19 262:22
282:6 283:9
290:2 292:16
298:4 303:8
305:5
**exaggerated**
240:14
**examination**  5:1
5:4 10:12 26:11
296:16 302:13
**examined**  10:9
306:5
**example**  37:23
44:5 45:23
46:19 56:18
80:15 81:9
92:13 116:6
118:22 142:11
143:11 144:15
148:6 164:2
174:4 200:24
233:16 234:2
238:23 277:24
**examples**  144:21
145:6 234:1
299:14

Veritext Legal Solutions
866 299-5127

[exception - extent]

| | | | |
|---|---|---|---|
| **exception** 111:23 | 240:17,20,24 | **expecting** 293:21 | 297:7 |
| **excluded** 25:25 | 243:8 262:21 | **experience** 47:17 | **explains** 73:6 |
| 26:19,21 104:20 | 263:16 265:14 | 99:1,2 108:1 | 75:22 98:3 |
| 108:17 | 265:16,21 | 117:20,25 120:8 | 159:24 |
| **excludes** 136:16 | 266:12 271:19 | 122:19 201:2 | **explanation** |
| **exclusive** 246:3 | 287:10,16 288:6 | **experiment** 51:7 | 182:8,9 |
| **excuse** 82:3,4 | 289:6,10 296:19 | 52:19 116:20 | **explicitly** 90:17 |
| 100:20 131:9 | 298:16 299:2 | 153:19 161:5 | 227:17,19 |
| 153:11 167:19 | 300:24 302:15 | **experimental** | 229:23 260:17 |
| 184:4 187:9 | 302:18 | 158:10 | **explorer** 88:12 |
| 238:14 245:7 | **exhibits** 6:1,3 | **expert** 6:4 7:4 | 88:20 90:11 |
| 262:1 267:3 | 7:1,3 16:1,8 | 9:18,22 13:17 | **expose** 35:19 |
| 294:25 | 238:5 264:4 | 19:19 20:13,19 | 91:4 121:20 |
| **executive** 162:9 | **exist** 113:5 | 23:6 26:7,9 | 191:3,19 221:5 |
| 164:16 237:10 | 273:23 274:11 | 33:21,25 34:4,8 | **exposed** 96:23 |
| 272:9 | **existed** 136:15 | 34:12,16,20 | 110:12 118:24 |
| **exercise** 32:11 | **existence** 195:8 | 36:17,20,25 37:3 | 121:4,5,17 |
| **exhibit** 6:4,6,8 | **existing** 28:4 | 37:8,11,15,25 | 136:13 217:25 |
| 6:11,16,21 7:4,7 | 86:17 | 42:25 55:16,24 | 226:5,17 |
| 7:9,13,17 14:23 | **exists** 166:15 | 110:19 152:19 | **exposes** 158:9 |
| 14:23,24 15:1,5 | 195:1 205:7,22 | 216:19 288:4 | **exposure** 119:7 |
| 15:6,8,11,12,15 | 211:22 | 294:10 | 120:1 154:2 |
| 15:18,19,22 21:6 | **expect** 120:25 | **expertise** 36:14 | **express** 16:2,5 |
| 21:9 54:12,16 | 125:9 136:12 | 151:22 | **expressed** 206:2 |
| 63:25 124:21 | 202:24 290:7 | **experts** 15:14 | **expressly** 222:23 |
| 162:1 167:16,24 | 292:6,18 293:5 | 19:22,25 26:12 | **extent** 31:2 |
| 168:2,5,9 177:13 | 293:15 | 26:14 29:3 | 32:11 33:12 |
| 179:12,15,18,25 | **expectations** | 192:8 | 40:5 68:10 |
| 180:5,13 190:14 | 54:20 77:24 | **explain** 42:21 | 86:13,17 112:25 |
| 198:5,18,23 | 91:12 116:15 | 45:15 66:3 67:9 | 123:6 125:9 |
| 199:6,18 206:7,8 | 119:6 120:2,14 | 68:25 89:1 | 142:10 166:3 |
| 206:25 215:6 | 125:8 133:8 | 96:13 97:17 | 211:20 215:22 |
| 216:2,4,10,17,25 | 136:21 164:8,13 | 248:19 284:9 | 218:10,11,19 |
| 217:2,8,9,14 | 165:21 170:18 | **explained** 13:22 | 221:7 224:10 |
| 218:15 220:7,13 | 171:11,18 | 46:19 68:7 | 225:20 236:24 |
| 220:18,24 221:2 | 172:17,24 173:3 | 69:14 70:12 | 279:2 295:9,11 |
| 221:7,12,13,17 | 173:6 218:21 | 97:7,16 105:18 | 301:13 |
| 222:18 238:18 | | 243:22 295:13 | |

[external - firm]

external   101:9
extra   63:6
extrapolate   69:1
   111:2
extreme   184:18
extremely
   143:23 233:22
eye   99:4

**f**

f   71:13,13,13,23
   71:23,23 72:7,7
   72:7,13,13,13
   75:25 126:20,21
   145:16 303:7
f.1   76:6,7 100:15
f.1-15.   100:15
f.1-6   81:15 83:9
   84:3,22 85:2
   88:17 90:1
f.1-6.   89:5,10
f.1-8   111:16
f.1-8.   111:17,18
f.2   76:6,7
f.2-17.   141:19
f.2-6   84:5
f.2-6.   84:2
f.2-7   303:11
f.3   76:7
f.3-4.   87:6
f.3.   76:6
fab   50:15
fabricated   50:15
   50:22 51:4,9
facebook   130:10
   160:9 228:16
   234:25

fact   98:2 104:12
   105:24 106:3,8
   178:9 185:1
   186:22 204:21
   207:22 211:19
   253:13,14
   268:18 282:8
   283:12
facts   53:21,21
   143:25 193:3
fails   284:6,23
   285:2
fair   19:10 24:19
   142:20 150:1,5,6
   158:5 195:14
   198:4 218:17
   219:19 222:9
   237:6 256:24
   280:3
fairly   183:3,12
   189:25 190:22
   191:1
fall   299:5
false   175:8
   268:17,20,21,22
   268:23 269:1,9
   269:15,21 270:8
   270:9,9,15,22
falsely   174:15
familiar   19:24
   73:12 143:7
   178:25 207:3
   216:8,9 222:2
   233:21 234:3
   235:20 257:2
   272:15,17
familiarity
   130:12 181:25

184:22 185:12
   208:25
famous   102:22
faq   288:1
far   18:23 19:6
   103:20 149:14
   211:10 247:23
   301:21
fare   234:25
fast   126:14
   251:9
father   238:2
faulty   52:22
favor   28:23 38:2
favorite   49:23
   49:24,25 50:5,6
   50:9
feasible   138:4
features   92:18
   275:20
federal   33:23
   306:18 308:1,8,9
feel   68:24 195:11
felt   26:13 66:23
   82:20 129:9
   138:5 195:12
   196:7
fewer   26:13
field   51:7 116:20
fifth   27:3,20
   28:24
figueroa   4:6
figure   233:3
   235:11 242:22
   257:13,15,17
file   294:23 295:3
filed   8:20 23:12
   272:20

finances   43:11
   43:13
financially   9:5
find   18:9 28:20
   58:9 108:2
   114:16,18
   116:21 120:20
   155:22 165:11
   176:17 195:7,20
   203:12,14,14,15
   204:8 205:6
   207:15 211:24
   240:14 247:24
   248:4 249:8
   251:3 255:5
   256:2 277:20
   280:20 282:20
   282:21 285:20
   294:19 299:16
   303:7
finding   102:2
   242:8
findings   165:3
   165:24 166:12
   166:18 170:3
   182:3 284:10
finish   52:3
   252:12 255:21
firefox   81:18,21
   81:25 82:8,9,9
   82:11,15 83:11
   83:14 84:23
   85:12,15 87:20
   88:9,18 90:6
   91:10,18,20 92:3
   123:4 133:12
firm   3:13 8:25
   9:17 12:20

**[firm - four]**

| | | | |
|---|---|---|---|
| 13:18 14:11 22:6 77:2 235:8 235:10 236:1 | **flawed** 28:16,20 243:23 249:13 255:3 | **footnote** 57:25 58:11,12,13,14 59:1,10 60:2,10 | 214:7,23 219:21 222:5 223:10 224:6 225:5,15 |
| **firms** 236:6 | **flexner** 3:4 9:13 9:16 | 61:15 62:8 114:13,21,25 | 227:1,24 230:5 234:17 238:7 |
| **first** 13:4,7,16,24 20:18 21:19 28:8 37:10,10 40:15 42:24 49:14,16 54:19 55:4 67:8,24 70:7 77:22 81:10 84:4,23 87:17,18 89:6 90:1,21 105:7 119:5,24 120:5 123:8 125:3 126:17,24 127:25 128:21 131:17,22 143:15 144:5,16 144:19 145:22 147:11 156:13 159:20,24 164:3 166:20 180:13 189:19 200:6,10 217:15,16 241:12 251:12 273:3 288:13 290:8,8 298:2 303:12,18 | **floor** 3:8 4:6,14 **florida** 3:9 **flowchart** 257:17,23 **focus** 66:20 141:13,13 165:18 171:24 250:17 251:24 298:8 299:13 **focused** 39:5 45:13 148:13 173:5 250:19 **focuses** 190:16 **focusing** 127:25 245:14 **follow** 18:11 24:12 56:2 57:3 61:25 96:17,21 107:22 **followed** 37:16 37:19 **following** 92:18 141:25 147:20 147:25 258:24 259:5 | 171:1,7 172:19 179:13 184:15 198:12 265:22 266:2,13,19 289:11 298:23 299:13,18 300:4 300:5,6,19 **footnotes** 171:12 171:15 **force** 121:5 **forced** 120:11 121:9,13,22 **forecast** 116:17 **foregoing** 306:6 306:17 309:4 **form** 36:21 38:6 39:11 41:18 43:21 47:21 68:15 69:6 74:12,25 115:15 120:9 128:8,22 129:25 132:9 138:17 141:7 150:3 151:16 154:4 164:20 | 239:17 240:10 242:10 247:7 255:10 256:25 258:22 260:7 261:12 269:11 272:21 274:12 276:3 278:14 279:6 287:23 290:23 291:24 292:8 293:14,17 294:8 298:1 299:9 **formal** 20:24 177:5 **format** 246:25 247:5,17,20,22 **formats** 247:2 **forming** 32:24 168:12 196:5 **formulate** 11:16 **forth** 306:10 **forthepeople.c...** 3:18 |
| **fit** 247:4 **five** 25:13 27:2 28:21 30:16 40:25 49:7 64:23 109:3,11 206:16 239:8 **fixed** 122:5 | **follows** 10:9 307:8 **followups** 302:12 **font** 214:9 **food** 80:18 **foods** 31:15 80:16 | 174:9 175:14 179:6 192:18 193:13 194:18 195:15 196:17 198:7 199:20 207:12 208:21 209:10 210:13 211:4 213:13 | **forward** 262:13 **found** 52:13 105:23 197:4 243:6 264:25 271:4 **four** 25:7 27:2,2 28:22 30:17 37:10,10 41:9 63:17 72:21 83:21,22 86:1,19 |

[four - go]

96:6 137:12
152:24 166:10
186:4,16 256:1
286:1
**francisco** 3:16
**fraud** 34:6
**fraudulent** 50:11
**frcp** 308:1
**free** 24:6 56:11
131:1 186:21
**frequency**
239:14
**front** 54:13,15
96:21 147:8
162:2 180:5
192:6 216:18
221:17 240:24
263:25
**full** 10:16 146:1
169:19,24
**functionality**
58:22 61:9
**funding** 14:16
**funnel** 246:25
247:2,5,11,16,20
247:22
**further** 133:15
296:13 299:16
302:10,13
305:14 306:13
306:17
**future** 46:4

**g**

**g** 71:25,25,25
126:17,19,23
133:18 152:23
297:17

**g.1-13** 128:6,14
128:16
**g.1-14** 133:21,22
**g.1-16** 128:1,20
**g.1-16.** 126:25
**g.1-17** 127:9
129:2,5
**g.1-18** 127:15
129:15 131:15
135:21
**g.2** 145:9
**g.2-11** 145:14,17
145:18 296:23
302:15,20,21,24
**g.2-11.** 145:13
145:15
**g.2-16** 297:15
303:24
**g.2-16.** 152:2
**g.2-18** 152:14
**g.2-24** 147:23
**g.3.** 159:5
**garbage** 67:12
67:12,16,16,17
67:17 73:22,23
116:11,11 119:2
119:2
**gather** 278:6,7
**gen** 97:22
**general** 43:15
94:21 96:10
126:3 130:7,7,25
131:19 132:4
137:23 144:5
163:1,11 166:14
174:9,20 175:5
175:11,22 176:2
176:2,7 208:23

**generalization**
178:8 183:17
192:23 194:23
195:9,19 205:9
**generalizations**
165:16 178:10
194:2
**generalize** 195:6
195:7
**generalized**
167:5 174:17
**generally** 95:3
97:19,21 173:16
174:24 176:13
177:18 274:20
275:14
**generate** 17:4
283:6
**generated** 60:21
174:3,10 176:21
185:10 189:15
230:19 273:3
274:14 275:12
**germany** 201:13
201:15,19
**getting** 186:20
187:13 200:11
201:2,16 208:8
249:4 262:2,2
**give** 13:2 29:17
36:2 54:14
60:23 69:25
71:15 87:1
98:10 105:11
106:24 107:8,11
114:16 122:17
130:25 171:19
196:21 209:15

215:9 217:20
228:20 233:15
233:16 245:20
245:21 262:5
264:19 294:10
303:9,9
**given** 27:7,18
29:8 38:8 82:22
88:10 93:25
99:10 136:12,21
145:5 154:23
259:1,7 270:19
**gives** 30:10 61:6
234:20
**glossed** 90:20
**go** 6:18 8:14
11:19 27:17
44:6 52:5 55:15
58:9,12 61:19
69:24 70:1
79:17 84:9
89:10 100:13
109:10 114:3
124:20 126:7,9
126:19,22
128:14 134:13
135:21 137:9
139:4,6 140:2,18
141:17,18,21
145:8,9 147:17
148:25 159:3,5,7
161:16 168:1
170:6,10,21
173:11 180:1
181:15,18 182:7
182:17 183:23
184:16 185:16
186:6,19 187:1

**[go - google]**

| | | | |
|---|---|---|---|
| 188:2 190:6,7 | 214:12 | **good**   8:4 9:12 | 138:16,24 |
| 193:20 199:25 | **going**   27:8,20 | 10:14,15 12:2 | 139:16 140:9,16 |
| 200:6,10 202:6,7 | 29:14 30:6 | 38:10,12 54:16 | 140:22,25 141:4 |
| 208:7 210:23 | 32:22 42:12 | 68:24 99:12 | 141:5,14,15,17 |
| 214:2 215:9 | 44:17 54:1,5 | 112:10 130:5 | 142:5,6,7,8,9,14 |
| 216:24 218:2,14 | 56:2,15 60:23 | 134:3 163:12 | 143:8,17,20 |
| 221:11 230:8 | 79:25 80:17 | 234:20 247:4 | 144:11 145:1 |
| 233:2,10 237:9 | 88:17 98:15 | 251:12 | 146:3,6,15,25 |
| 238:11,18 243:1 | 104:7 107:10 | **goog**   6:14,20,23 | 147:5,5,7,9,16 |
| 243:13 260:19 | 114:17,19 | 7:11,15,18 | 148:3,4,5,6,8,11 |
| 261:3 262:9 | 116:19 117:3 | 179:13 198:19 | 149:10,14,16,17 |
| 264:17 266:15 | 122:14 133:15 | 240:19 265:13 | 149:18,23,25 |
| 273:7 274:17 | 133:22 136:5 | **google**   1:11 2:11 | 150:8,13,24 |
| 275:11,18 | 139:5,5,11 | 4:11 6:11 8:20 | 151:2 152:3,16 |
| 276:15,24 | 142:13 145:6,8 | 9:20 14:3,14,17 | 152:20,21 153:1 |
| 279:24 283:14 | 146:9 161:18 | 18:13,17 19:19 | 153:3,22 154:17 |
| 288:6,8,13 | 166:23 167:20 | 33:6,10 38:4,10 | 157:20 158:4 |
| 289:15 290:1 | 173:13 176:16 | 38:17,23 39:4,9 | 160:4,7,8,10,14 |
| 294:10,13 | 176:19 177:20 | 39:16,22 40:10 | 165:4,14,24 |
| 299:19 300:12 | 179:11 181:15 | 40:21 41:16,23 | 166:4,12,18,22 |
| 301:4 305:16 | 181:18 182:16 | 41:25 42:14,23 | 166:23,25 169:3 |
| **goal**   29:9 77:17 | 185:1 188:7,15 | 43:19 45:10,14 | 169:4,5,20,25 |
| 77:21 91:11 | 192:8 200:9,20 | 47:18,19 48:10 | 170:4,19,24 |
| 118:7,13 119:13 | 206:18 211:18 | 48:11 65:14,15 | 171:8,16,21 |
| 119:18,20,24 | 215:6 216:15 | 65:19,24 69:11 | 172:1,5,14,25 |
| 133:1,6,7,13,16 | 220:12 222:15 | 69:16,23 70:17 | 173:17,20 174:4 |
| 136:5,6,11 152:7 | 222:19 224:19 | 70:22,22,24 | 174:24 175:12 |
| 154:6,24,25 | 225:7 226:3 | 78:11,13,17,21 | 175:18,20 |
| 157:23,25 158:3 | 228:5 232:20 | 81:20,22,24 82:7 | 176:13,20 |
| 214:15 244:24 | 233:13,21 | 82:10,14 92:2 | 177:12,17,19 |
| 247:9 305:6 | 234:25 235:10 | 99:7 110:25 | 178:4 180:16 |
| **goals**   56:17 | 244:1 249:18 | 111:8,11,14 | 181:9,12 182:4 |
| 116:6 118:10,11 | 251:3,9 255:20 | 113:12,16,19 | 183:2,8,24 |
| 119:17 133:15 | 264:7,9 275:11 | 130:4,10,19 | 184:10 189:7,15 |
| 154:21 214:8,10 | 281:11 282:25 | 131:3,4,14,21,23 | 192:5,15,22 |
| 215:25 247:3,23 | 283:8 294:12 | 132:8,13,14,17 | 193:1,10 194:14 |
| **goes**   44:1 45:19 | 296:7 302:15 | 133:18 135:6 | 194:15,16 |
| 133:1 142:5 | | 137:18,25 | 196:14,14 |

**[google - hard]**

| | | | |
|---|---|---|---|
| 197:18 198:2 | 300:1 303:5,21 | **greater** 123:6 | **guessing** 283:4 |
| 199:9,12,17 | 303:25 304:5,16 | **green** 267:11 | **h** |
| 200:24,25 | 304:23 305:11 | **group** 4:22 9:22 | **h** 310:3 |
| 202:16 205:6,7 | 307:4 310:1 | 11:19 13:19 | **h.1** 159:10 |
| 207:7,10,24 | **google's** 11:1 | 17:1,18 18:20 | **h.1-1** 159:11 |
| 208:2 210:11,12 | 17:5 19:22,25 | 19:6,10 50:14,20 | **h.1-1.** 159:11 |
| 210:15 211:12 | 45:2,5 55:10,14 | 50:23 81:22 | **h.1.** 159:8 |
| 217:24 218:23 | 55:21 67:3 | 82:9,12,16 83:11 | **h.2** 159:7,10 |
| 221:6,8 222:22 | 146:22 147:2 | 83:18 85:6 | **h.2-1** 159:15 |
| 222:24 223:6,20 | 173:15 174:23 | 86:10 87:23 | **haimin** 4:22 9:21 |
| 224:3,8,13 | 175:25 176:12 | 88:2,5,6,16,19 | 17:1,10,15,22 |
| 225:19,25 | 191:12 205:12 | 88:25 89:7 90:2 | 18:1 169:14 |
| 226:10,12,16,20 | 218:21 225:8,9 | 90:5,6,6,12,20 | **half** 124:14,16 |
| 227:7,14,16,18 | 226:23,23 233:4 | 90:24 112:24 | 124:18 249:4 |
| 227:21 228:11 | 237:12 238:1 | 153:23,25 | **hamilton** 7:9 |
| 228:13,17,22 | 274:9 284:18 | 155:12 169:11 | **hand** 29:7 |
| 229:10,10,15,19 | 286:24 297:9 | 169:12 204:23 | 119:19 249:10 |
| 230:1,4 231:20 | 302:22 | 225:24 232:13 | 267:16 268:7 |
| 231:21,21,22 | **google.com** | 232:13 286:20 | **handled** 307:8 |
| 232:1,1 234:21 | 140:22 142:20 | 287:4,12,13 | **hanly** 4:12 9:24 |
| 237:15,16,18 | 142:22 143:2,4 | 288:1 297:13,22 | **hanna** 1:22 2:21 |
| 239:22 240:3,9 | 143:15 149:25 | 303:16 | 9:2 252:20 |
| 241:3,9 242:7 | 151:8,21 241:10 | **groupings** 91:5 | 306:3,25 |
| 256:23,24 | **google.com.** | **groups** 83:14 | **happen** 42:22 |
| 258:21 259:7,16 | 142:24 143:3,25 | 84:4,22,25 85:1 | 67:24 124:2 |
| 259:20 260:1,2,6 | **gotten** 246:18 | 85:10,15 86:2 | 136:12 305:2 |
| 260:6,15,17,17 | 270:13 | 87:19 88:18 | **happened** 21:21 |
| 260:21,25 261:5 | **grain** 243:6 | 91:10 204:23 | 21:22 26:3 77:4 |
| 261:9 263:13,17 | **grant** 4:23 8:25 | 287:11,18 | **happens** 62:15 |
| 265:2 266:25 | 30:20 | **growing** 251:7,9 | 120:25 150:17 |
| 267:10 268:13 | **granted** 169:19 | 262:23 | 263:2,6 |
| 268:25 270:3 | **graph** 290:14 | **guess** 32:5 104:7 | **happy** 248:17 |
| 271:6,22 272:19 | **graphics** 208:13 | 170:12 172:20 | 270:18 |
| 275:2,8 278:12 | **gray** 290:17,18 | 179:11,20 185:7 | **hard** 97:25 |
| 279:4,9 288:19 | 290:24 291:1,2 | 188:4 192:9 | 163:6 170:11 |
| 289:1,11 292:19 | **great** 21:8 | 234:25 284:24 | 174:1 183:18 |
| 292:25 293:2,11 | 206:13 | 286:13,15 | 211:7 231:8,11 |
| 299:6,21,23 | | | |

Veritext Legal Solutions
866 299-5127

**[hard - ignore]**

233:22 243:3
269:6 272:3
277:18 289:24
**harriet** 17:10
18:4,7 169:14
**harriet's** 17:13
18:7
**head** 114:6
138:10 282:20
**header** 170:17
**heading** 289:16
**hear** 167:21,22
238:15 283:21
**heard** 8:11
246:25 247:2
283:19
**heart** 18:10 19:7
58:13 66:25
67:4 71:15
103:25 104:2
105:3,10 106:16
106:23 109:1
113:18 137:16
168:22 193:8,19
232:2
**held** 134:20
**help** 16:22 17:18
22:7 57:11
114:19,20
133:19 135:6
155:5 159:7
192:6
**helped** 16:25
17:3,22 23:20
**helpful** 64:5
127:24 251:2
**hereunto** 306:21

**heterogeneity**
175:17 176:8,18
177:21 178:5,13
178:14,16
201:24 202:3
203:14 204:14
**hey** 22:6
**high** 118:10,18
184:23 244:3
249:12 250:16
251:3 255:17
**higher** 217:21
241:18 251:17
251:19 255:20
256:10,18,20
291:16 294:1
**highest** 91:15,20
**highlight** 155:3
155:6 156:16,21
157:7 221:23
298:8 304:18,21
305:9
**highlighted**
155:14 298:6
304:14
**highlighting**
152:15 155:19
155:25 156:24
157:1,3 297:23
297:24
**highlights**
305:12
**hints** 154:10
**hired** 12:19,21
13:10,11 29:13
30:18
**history** 300:3

**hmm** 84:14 86:4
91:2 92:12
142:1
**hold** 89:9 110:3
110:5 111:17
114:23,23
124:22 126:15
221:2 243:10
265:23 266:24
291:15 293:6
300:25 302:17
**hole** 135:19
**home** 49:14,15
49:17,20,21
**honest** 12:22
49:11 53:8,10,13
53:14,17 180:15
191:6 192:1,6
**honestly** 12:25
**honesty** 192:11
192:14
**hope** 36:18
56:12 155:20
235:6 256:8
265:8
**hoped** 250:21
**hopefully** 36:3
**hour** 116:23
264:3
**hours** 12:7 18:22
19:3,8,17
**household** 76:23
77:2
**hovered** 294:22
**hundred** 233:18
**hundreds** 24:22
**hyperlink** 58:18
59:22 61:9

65:12 123:2,5
134:5,9
**hyperlinks** 123:9
123:10,13
135:11,16,19
**hypotheses**
194:5 205:4
**hypothesis**
178:14 194:24
**hypothetical**
130:22 148:17
195:19

**i**

**icon** 6:21 207:21
207:25
**idea** 107:3
163:12 191:15
191:18 208:5
209:23 262:18
**iden** 108:11
**identical** 58:21
63:3,3 102:6,13
103:3,18 116:19
**identified** 24:14
96:15 168:20
171:7,15 178:20
217:13 231:5
239:13
**identify** 16:15
37:18 79:11
93:9 126:11
138:7 164:17
170:23 172:13
209:7 230:18
279:20 282:12
**ignore** 24:2

[ignoring - incorrect]

ignoring   174:18
image   56:19
    57:18 58:24
    61:11 62:18
    63:6
images   135:23
    136:1,24 146:19
    155:15
imagine   44:16
    62:14 146:9
imagined   151:21
impact   31:4
impacts   101:15
impermissible
    247:6
implement
    247:10
implemented
    72:6 247:12
implicates   137:8
imply   178:8
importance
    155:13,18
important   48:3
    48:13 73:18
    74:5,7 104:14
    115:11,19
    117:10 141:18
    146:11 147:3
    150:12 192:7,12
    192:14 280:20
impression
    130:17
improper   55:23
inaccurate   16:16
    270:24 304:12
inadmissible
    247:14

include   39:3
    71:19,20,24,25
    92:15 100:8
    106:1 107:4
    110:14 138:8,12
    144:16 145:18
    151:24 180:23
    189:17 217:24
    227:14,16
    228:22 229:5,10
    229:15,16 303:3
included   55:7
    74:8 77:6 78:16
    91:19 104:24
    105:15 106:19
    110:24 123:9,10
    132:13 139:9
    145:19 168:21
    197:12 217:18
    218:16 220:24
    230:4 232:11
    235:3 263:17
    303:2 307:14
    308:3
includes   106:8
    110:19 146:21
    151:8,9 188:6,13
    238:19 272:18
    291:4 303:18
including   9:8
    35:18 45:14
    77:18 101:21
    130:9 160:4
    229:19 270:22
incognito   6:16
    6:21 7:13,17
    33:18 36:9
    40:11,21 41:1,2

41:16 42:13,22
    43:6,10,19 44:6
    44:8,11,13 48:5
    48:6 68:13,19
    69:5 70:5 98:15
    98:17,22 99:9,21
    111:19,21,24
    112:2,4,7,18,25
    113:13,17 114:9
    114:15,19
    121:16 123:4
    127:2,5,10,12,15
    127:19 128:5
    129:12,20,22
    130:16,18 135:5
    135:8,9 138:2
    139:20,23 140:6
    142:2 143:18
    146:10,20 148:1
    150:9,11,18
    154:3,15,16
    155:7 158:8,11
    159:11,15,18
    160:11,15 161:1
    161:3 180:24
    181:5 188:25
    189:1,6 192:16
    193:2,11 194:17
    196:15 197:13
    197:25 199:16
    199:19,21
    202:12,22
    207:11,21,25
    208:3,20,24
    209:9 210:12,19
    211:3,12 212:1
    212:11,13,15,22
    213:8,12,18,23

214:22 215:3
    218:6 219:12
    226:5,15 227:7
    227:20 228:8
    229:25 237:12
    237:16 238:2,24
    239:1,8,14,16,24
    240:3 241:13
    242:8,14 265:1,1
    266:25 267:9,12
    267:15 268:13
    268:25 271:5,6
    273:18,23 274:2
    274:5,11,21,25
    275:6,16 276:1
    292:6 293:9,15
    293:16 294:6
incomplete
    130:21 148:16
incompletely
    190:23
inconsistent
    165:3,23 166:20
    167:3,7,14 170:3
    170:24 171:9,17
    172:15 174:20
    194:8,14 195:3,5
    195:14,21 203:9
    205:8 212:2
    225:13 298:12
    299:6 300:16
incorrect   28:17
    53:7 118:6,8
    165:17 203:21
    203:21 271:9
    291:12 304:9
    305:4,5

[increases - interpret]

| | | | |
|---|---|---|---|
| **increases** 157:10 | 65:25 66:15,19 | **instruct** 24:7 | **interesting** |
| **increasing** | 67:2,9 68:11 | 139:2 146:4 | 173:21 211:8 |
| 184:20 | 69:24 70:2 | 152:2 | 280:17 |
| **increasingly** | 78:19 81:11 | **instructed** 5:9 | **interfere** 41:14 |
| 184:21 185:12 | 83:10 84:4,5 | **instructing** | **internal** 14:3 |
| **indefinitely** | 92:2 93:14 | 55:18,22 | 165:4,24 166:4 |
| 278:10 | 111:12 130:19 | **instruction** 56:3 | 166:18 169:3,4 |
| **index** 5:1 6:1 7:1 | 133:10 135:14 | 58:23 61:10 | 169:20,24 170:4 |
| **indicating** 96:25 | 137:1 138:16,25 | 62:13,17 63:6,22 | 170:19,23 171:8 |
| **indication** 99:12 | 139:16,21 142:6 | 145:18 | 171:16 172:1,5 |
| **indicators** 45:21 | 146:21 147:15 | **instructions** | 172:14,25 |
| **indignant** | 147:16 148:4,6,7 | 71:10,12,20,24 | 173:15 174:23 |
| 186:23 | 148:9 149:18,24 | 72:6,13,24 73:2 | 176:1,12 177:12 |
| **indirectly** 35:15 | 154:16 157:21 | 90:4 297:8 | 177:17 182:4 |
| **individual** | 158:5 160:5 | 298:3,4 | 183:24 184:9,10 |
| 200:23 202:3 | 176:21 198:3 | **insurance** 51:8 | 189:7 193:11 |
| **individually** 1:7 | 205:13,25 | **intend** 176:15 | 194:15 196:14 |
| 2:7 | 209:16 219:8 | **intended** 56:10 | 197:18 241:9 |
| **individuals** | 233:5 260:20 | 252:10,15 | 263:13,17 299:6 |
| 169:24 202:4 | 261:4 266:19 | **intending** 176:11 | 299:21 |
| **industry** 31:12 | 272:19 278:7,13 | 177:9,16 224:1 | **internally** |
| 32:11,25 | 278:19,21 279:4 | 225:12 | 192:16 |
| **influence** 146:16 | 280:20 284:7 | **intention** 247:25 | **internals** 23:5 |
| 156:20 | 285:3 293:1,3,11 | **intentionality** | **internet** 8:10 |
| **influenced** | 295:8 | 228:3 | 43:15 44:17 |
| 156:22 | **information's** | **intentionally** | 75:8 78:24 79:2 |
| **influences** 101:9 | 43:7 | 38:5,11,18,24 | 79:4,7,11 80:22 |
| 158:22 | **informative** | 229:19 | 88:12,20 90:11 |
| **inform** 138:1 | 84:15 | **intentions** | 92:19 127:10 |
| 177:4 242:7 | **informed** 66:16 | 121:19 253:1,7 | 129:2,4 142:2 |
| **information** | 291:20 | **inter** 245:10 | 148:1 158:19 |
| 40:8,10 41:12,16 | **inherent** 211:9 | **intercepted** 39:9 | **interpose** 42:18 |
| 42:1,2,6,7,9,14 | **initialed** 309:7 | 39:13 | 220:13 |
| 42:23 43:7,17,20 | **ink** 309:7 | **interest** 119:1 | **interpret** 46:5 |
| 43:25 44:1,5,16 | **input** 55:14,20 | **interested** 9:5 | 95:15,22 96:9,11 |
| 44:19 45:19,25 | **insights** 26:10 | 73:25 74:16 | 247:20 277:18 |
| 46:7 47:19,24 | **inspire** 177:5 | 75:4 98:4 | 290:14 291:18 |
| 48:7 65:14,16,20 | | 285:20 306:15 | |

[interpretation - know]

**interpretation**
47:9,11 54:22
137:3,6 164:4
287:11
**interpreted** 95:1
270:14
**interrupt** 51:24
245:10 250:23
286:17
**interrupted**
245:19
**interruption**
76:15 89:14
105:5 114:1
131:8,10 167:18
176:24 187:8
213:3 238:13
245:6 248:10
259:11 261:25
267:2 271:14
300:11
**interview** 49:18
**interviewed**
174:4
**interviews** 177:1
**intrusion** 34:13
**invalid** 284:11
**invasion** 34:2,9
**investigate** 92:1
278:17 279:2
**investigated**
168:12
**investment**
211:17
**invisible** 214:19
**involved** 64:5
235:21 272:11
275:3 288:2

**involves** 47:7
**involving** 33:22
34:1,5,9,13,17
34:21
**ip** 125:11 127:6
127:12,19
**irrelevant** 74:24
119:4 196:23
**issue** 29:4 30:25
35:11 37:11
53:3 66:25
75:11 82:22
112:8 141:13
155:8 169:1
198:6 211:15
212:5 255:16
**issued** 275:11
**issues** 36:20
38:16 56:18
57:12,17 65:11
70:15 159:18
160:23,24
219:11 279:24
**it'll** 143:3 303:8

**j**

**jeremy** 1:5 2:5
**job** 1:23 14:5
57:9 307:5
310:2
**jolla** 1:19 2:18
8:1
**judge** 26:8 27:6
27:12 29:7,22
30:5 113:2
156:11 159:17
159:19 160:2,22
223:17

**judged** 13:25
235:16 255:24
**judgment** 30:20
**july** 215:7,15,23
**jumped** 258:6
**june** 6:9
**jurat** 309:1

**k**

**keegan** 4:21 9:17
104:11 239:7
246:9 247:9,21
248:3 250:10,19
250:21,22,24
252:5 253:10,22
254:25 255:4,25
256:10,19 258:5
258:20 261:4
262:12,24
280:11 284:6,23
285:2,8,15,18,19
285:24 286:4
293:20
**keegan's** 15:20
53:18 133:3
154:20 162:18
163:9 238:12
239:12 240:7,13
241:18 243:16
244:24 245:2,13
247:24 251:8
252:25 253:7
254:3 255:3
257:18,24
261:15 263:2,9
279:18,20,25
284:17,21 285:5
286:2

**keep** 249:5
251:19 283:25
**keeps** 154:22
**kellwood** 21:18
**kept** 102:3 161:3
305:8
**key** 45:20 75:2
**kim** 1:22 2:22
9:2 306:3,25
**kind** 45:13 46:15
65:20 92:14
93:21 95:2,4,23
132:12 150:18
174:7 199:15
210:20 213:14
233:23 234:8
286:20 287:25
294:11 300:18
**kinds** 143:18
**knew** 106:24
114:4 224:12
**know** 10:24
13:20 18:7,8
19:5,15 22:6,8
23:9,10,24,24
24:1 29:1,18,21
30:22 31:19
33:5,9 34:25
36:22 37:1,4,14
37:21 38:9
41:15,19,21 42:8
43:18,24,25 44:3
44:7,15,22,23
45:6 46:15
47:11,17 48:12
48:16 50:2,4
53:23 54:12
66:4,7,18 68:9

**[know - legal]**

68:16,16,19 69:1
69:21 71:14
75:11 77:21
78:18 79:2,24
80:2 81:6,8,15
84:24 85:21
87:4 88:16
91:23 94:2,4,12
94:13,23 97:8
98:13,14,19
99:13,17 102:9
103:9,24 104:12
104:19,23
105:14 106:2,4
106:21,25 107:2
109:20 111:2,17
112:10,23
113:16,21 115:8
117:21 118:20
126:4 133:14
134:19 135:17
138:15 139:21
139:24 140:18
146:12 147:1
149:12 150:17
150:17,19
154:18 156:10
156:17 157:22
165:12 166:7
168:2 169:23
172:6,9 174:3,4
174:10,13,18
175:19 176:20
177:1,2 180:25
183:8,16 185:24
193:1,23 194:8
194:20,21,22
195:1,21 196:18

198:1,12,20
201:18,20 205:7
207:5,10,13,24
208:2,22 209:11
209:13,25
210:15 211:5,7
211:15,21 212:2
212:3 213:8,22
214:13,24
217:15 218:10
218:25 222:7
223:16 224:8,17
225:20 228:2,3
228:25 231:2
232:6,8,25
233:19 234:19
234:23,24 235:7
235:15 236:15
237:1,24 239:22
242:19,23 243:2
246:15 249:14
250:13 251:4,8
251:11 253:15
254:19 261:6
262:14,14,25
263:2,4,21,23
266:4 267:4
270:6,8,12 272:5
275:7,8 276:6
278:15 281:15
282:19 285:17
286:4,25 291:13
292:16 293:18
293:22 300:17
300:18 301:10
**knowing** 176:25
251:5

**known** 102:23
277:11,12 282:8
**knows** 44:6,7,12
140:3,5 223:13
263:4
**kpis** 45:20
278:25

**l**

**la** 1:19 2:18 8:1
**lab** 52:24
**labeling** 30:25
31:3
**landscape** 7:14
**language** 40:11
47:12 56:20
70:5 122:13,15
158:22,24
159:14,16
227:14,15,17
229:23
**large** 93:20
101:19 104:19
176:18 248:4
255:5
**larger** 290:13
**largest** 99:11
**launch** 206:15
**law** 3:13 9:17
14:11 22:5 77:2
223:13 235:8,10
236:1,6
**lawsuit** 14:10,13
20:21,23,25
21:24 22:7,9
140:24 141:1,4
218:12 219:16
220:1 272:20

282:24 283:4,7
**lawsuits** 20:14
77:10 218:5
219:11 220:2
280:7,13,24
281:23 282:15
**lawyer** 223:15
**lawyers** 22:3
27:5
**lay** 35:23 36:1
43:1 47:10
66:16 67:19,23
213:15 228:20
295:13,19
**lead** 159:21
200:9
**leading** 156:25
157:2 244:5
**leans** 213:10
**learn** 59:23 70:6
85:24 119:8,15
122:22 123:4
124:3,15,19
134:22 135:8
136:14,15
137:14 153:24
154:10 226:15
**leave** 187:17
280:16
**left** 85:2 182:20
250:7 259:24
262:19
**legal** 30:8 35:24
77:3,13 223:11
223:15 235:21
243:5 258:15
280:23 281:9,12
284:15 285:15

**[legal - looked]**

288:3 292:2
307:7
**level** 99:21
217:21 243:24
**lhk** 1:5 2:5
**liberty** 23:9,24
**lie** 192:17 193:2
196:15
**lies** 141:10
**life** 95:6 97:21
97:22 98:22
115:14 117:13
117:19 121:9,13
121:15,22 134:2
186:22 243:23
**lifetime** 242:16
**likelihood** 31:7
54:25 70:4,14
78:3 119:13
151:20 157:10
157:14 158:18
158:22 160:25
215:2
**limit** 79:14
107:15 135:13
141:16
**limited** 51:19
86:20,22,24
87:14,16,23
108:16,17
109:14 140:8
142:14
**limiting** 144:11
**line** 5:10 207:18
222:21 223:2,3
225:7 227:5
234:22 307:15
308:4 310:4,7,10

310:13,16,19
**linked** 128:21
**list** 31:9 95:4,8
138:3 227:8,21
228:14,23,24
237:6 282:6
**listed** 21:17 23:7
24:1 218:15
222:10 234:20
236:19
**lists** 168:11
171:3,23 216:25
217:9
**literal** 96:13
98:1
**literally** 94:22
95:2,16 96:12
**literature** 99:18
**litigation** 20:19
22:21 24:15,20
24:21,23 25:1,13
28:9 64:17,24
74:4,8 107:14
108:1,15 109:3
109:12 169:21
169:25
**little** 29:20 30:3
30:10 81:5
100:21 165:9
170:12 234:8
262:5 301:11
**llc** 1:11 2:11
8:20 21:18
307:4 310:1
**llp** 3:4 4:4
**loading** 179:23
206:11

**local** 48:1,7,11
139:22 201:2
**locate** 169:1
**location** 28:5
299:15
**locations** 171:3
172:11
**locked** 307:12
308:1
**log** 41:3,10
42:10 44:11
68:12 83:24
95:17,20 140:4
150:18
**logged** 44:13
97:12,24 98:5
149:25 150:10
150:12,13,14,16
151:9 256:23
301:19 302:3
**logging** 68:8,10
68:10 83:2
94:18,23 150:7
**logic** 81:24
248:19 249:13
251:17 255:18
262:17
**logical** 251:16
**login** 41:14
**logo** 213:9,12,12
213:18,23
214:19
**london** 185:6
189:11,17,19
**long** 161:15
165:16,16
216:13 221:1
236:15 244:6

287:3 298:4
**longer** 301:15
**look** 44:17 54:11
63:25 65:2
88:13 91:11
93:21,22 97:4
99:18 100:7
101:12 122:8,22
126:16 133:7
136:19 143:14
143:16 144:5
155:12 156:5
157:7 167:12
173:12,19
174:11,16
178:21 190:13
191:25 193:20
198:11,14 201:7
203:13 206:5
210:5 221:1
226:2 229:8
231:15 234:13
240:17 241:5
243:8 245:25
255:12 257:8,10
263:6,25 264:1
269:14 279:24
280:5 284:16
285:24 290:12
299:1,15,17
300:18
**looked** 44:7,8
112:23 113:8
124:2 136:19
137:24 165:7
169:5 171:4
173:20 189:24
190:14 195:17

Page 31

**[looked - meaning]**

**looked** 197:10 209:19 234:16,18 242:12
**looking** 21:9 83:25 87:5,6 89:3,5 114:22 121:19 126:12 137:7 167:6 170:20 197:9 207:20 209:14 238:22 271:21 273:2 279:16 287:8,10 288:7 290:2 301:5
**looks** 62:14,16 96:22 144:5 156:4
**los** 4:7 184:7
**lose** 135:20 184:7
**lot** 29:14 30:6 80:14 109:20 110:18 125:22 223:13 233:18 234:23 244:6,8 292:15
**lots** 236:25
**loud** 56:16 64:3 66:6 90:9
**low** 151:22 154:11 183:3,12 189:25 190:22 191:1 244:4
**lunch** 161:20

**m**

**machine** 43:12 48:1,2,7,11

139:22
**madison** 4:14
**magnify** 56:19 57:18 289:21
**magnitude** 212:5
**mail** 7:9 18:10 241:9 242:17
**mails** 241:10
**main** 91:14 100:2,3 257:25 262:14
**maintaining** 191:7 192:2
**maintenance** 49:12
**majority** 111:4 143:23 145:7 226:19 292:6,18 293:4,20,22
**making** 32:25 35:18 155:5 192:23 194:23 237:19
**manager** 160:8
**manipulate** 161:6
**manner** 74:23
**mao** 3:6 9:15
**maps** 209:13
**march** 272:23,25 273:4
**marijuana** 31:12 31:25
**mark** 3:6 4:21 9:15,17 28:4,5 99:6 179:11 198:17 206:6 216:1 221:12

**marked** 15:1,8 15:15 55:25 78:8 93:22,23,24 93:25 162:1 179:15 180:4,16 198:23 206:8,25 216:4 221:13 238:5 240:20 265:14,16 289:6
**market** 32:7 67:11 91:15,20 91:23 93:5,5 99:11 111:3 143:14 177:5 240:14 246:16 246:23 277:11 281:12,16 292:12
**marketing** 20:2 20:7,10,11 38:9 246:21,23,23
**marks** 185:8
**material** 32:3 121:6 158:19
**materially** 108:2
**materials** 31:21 32:2 121:3,4,10 121:14,23 156:5 161:2 167:17 168:11 222:11 235:25 300:22
**math** 263:5
**matt** 27:2
**matter** 8:19 9:18 13:17 15:23 18:17,23 19:6,11 21:4 23:19 28:24 29:6,12,12

56:24 57:1,5,7 86:11 149:13 200:7 215:25 279:8 288:3 292:2
**matters** 13:23 27:2 28:21 30:17,17 86:13
**mean** 20:9 21:23 22:23 35:16,16 37:1,4 38:13 41:23,24 44:23 45:6 47:13 50:23,23 60:5 66:8 67:20 68:4 68:9,17 80:11 85:22 88:16 93:11 94:17 95:15 96:9 97:15 99:17 102:8 104:10,17 110:5 134:1 181:2 185:6 189:18 193:14 196:6 201:12 214:6 217:21 223:16 228:2 229:3 237:22 242:15 244:10 244:13 253:16 254:12 257:2 276:7,19 277:9 277:12 282:24 284:13 285:23 295:14 297:6
**meaning** 167:4 263:1

Page 32

[meaningful - mode]

meaningful
  252:15
meaningless
  235:18 248:2
means  30:22
  37:14 38:1
  43:24 44:22
  46:3,9,12 47:12
  58:20 60:4 64:2
  67:20 95:13
  117:16 159:25
  191:2,6,6,18
  202:3 205:7
  235:23 242:20
  253:17 258:11
  258:12,14
  290:10
meant  42:17,18
  65:14,24 66:17
  78:5 88:25
  96:18 132:14
  242:23 283:5
measure  204:18
measured  224:9
media  8:16
meeting  13:24
  14:3
member  76:22
  77:1 172:16,24
  173:5
members  23:21
  44:16 50:13
  165:21 170:18
  171:11,18
  215:22 219:9,18
memory  99:18
  136:7 138:19

mention  57:24
  147:6,7 165:5
  180:23 181:5
  185:16 188:25
  189:1,3 197:13
  197:24 198:1
  218:8,11 219:1
  301:22
mentioned  62:6
  75:12 90:17
  100:9 130:8
  133:9 137:18,19
  151:24 164:21
  169:10 172:9,20
  192:20 193:15
  193:17 196:19
  224:14 236:25
  237:1 275:12,13
  275:14 299:11
  300:19
mentions  193:7
  301:24
messaging
  208:16,20 209:6
met  11:18,19
methodologies
  245:23
methodology
  29:10 232:21
  242:19 243:22
  243:24 250:6
  256:17
miami  3:9
michael  3:14
  9:16
middle  208:15
miguel  265:15
  266:4,8 276:18

289:5
mind  116:23
  126:16 159:9
mine  19:16
minimal  29:20
  30:3,11
minimum
  121:11 122:22
  134:19 153:4
minimums  82:18
minus  248:25
minute  167:3
  180:16
minutes  172:12
  206:17
mischaracterize
  190:7
mischaracterizes
  292:9
mischaracteriz...
  197:16
misconceptions
  204:4 273:18,22
  274:5,10 275:20
  275:25
misinformed
  288:20 290:13
  290:15 291:15
  291:22 293:25
misinterpretati...
  271:18
misinterpreted
  270:8
misleading
  193:12 194:17
  232:18
missed  95:11
  105:7 155:13,23

misses  157:24
missing  157:23
  210:7
misstates  27:15
  80:7 106:12
  112:20 167:10
  186:13 205:14
  249:22 282:3
mistake  181:25
mistaken  60:15
mistakes  57:12
misunderstand
  88:25 157:14
  211:23 280:19
misunderstand...
  211:12
misunderstood
  108:7
mixed  173:21,21
mixture  174:13
mm  84:14 86:4
  91:2 92:12
  142:1
mobile  82:24
  83:23 87:12
mode  7:13,17
  33:18 36:9
  40:18,22 41:1,2
  41:7,12,17 42:14
  42:23 43:6,10,19
  44:11,13 71:1
  92:3,10,22 93:1
  93:9,15 94:11
  98:15,17,23,25
  99:9,21,24 100:5
  100:12 101:1,25
  103:23 105:2,17
  106:10 107:6

**[mode - nonexisting]**

121:16 125:13
127:2,10,15
139:20,23 140:6
141:6 142:2
143:18 146:1,10
146:20 148:1
150:11,18
154:15,16 155:7
161:1 173:18
174:25 175:13
176:14 177:20
189:4 218:6
223:1,9,23 224:5
226:25 227:9,23
235:5,11 237:13
237:16 238:2,24
239:1,16 241:13
242:8,14 258:25
259:7 265:4
266:25 267:10
267:15 268:13
268:25 271:8
273:18,23 274:2
274:5,11,21,25
275:6,16 276:1
284:10,20
291:18 293:9,16
294:6
**moderately**
300:1
**modes**  93:10,16
**modified**  111:24
159:23
**modify**  112:1
**moment**  241:5
251:15 288:13
**moments**  202:24

**monique**  1:6 2:6
**month**  41:2
75:10 92:17
93:7 94:1 98:18
99:10 107:17
115:5 239:23
**months**  41:9
92:25 98:9
100:11,17,25
101:24 103:22
105:1,16 106:9
107:5 113:20
238:25 239:5,6
**morgan**  3:13,13
9:17,17
**morning**  8:4
9:12 10:14,15
**motion**  7:7
221:18
**move**  66:14
251:21 252:22
253:18
**moved**  86:18
179:21
**mozilla**  81:21,24
82:8,9,11,15
**mram**  3:18
**multiple**  97:13
**mute**  42:18
**muting**  187:13
**mutually**  246:3

---

**n**

---

**n**  21:3
**name**  8:25 10:16
13:20 17:11,13
18:8 20:23,24
21:2 23:14 24:9

26:15 71:15
147:5 161:3
193:7 210:24
211:3,3 212:12
212:15,20,21
306:22
**named**  48:16
146:3,5 147:9
216:8,9 303:5,21
**names**  17:8
126:1 130:9
**nature**  101:15
101:22 161:5
**nearly**  63:2
272:12
**necessarily**
47:13 80:5
104:10 135:5
247:6 295:10
**necessary**  61:9
61:11 307:14
308:3
**need**  11:22 26:9
45:15 67:8
73:10 74:17
97:25 116:9
135:17 140:20
146:9 172:12
194:5,25 200:12
206:16 232:24
243:6 265:24
294:19
**needed**  22:2 38:1
57:20 59:19
60:4 61:11
82:21 195:13
197:2

**needs**  94:7 116:1
116:3
**negation**  270:9
**negative**  126:3
130:13 209:1
**neither**  87:17
189:2,5 306:13
**ness**  3:15
**never**  21:23 37:6
63:8 70:10
116:19 150:18
216:23 226:3
235:15 243:23
246:13 249:23
262:18 265:2
267:1,10 268:13
268:25 269:15
270:22 271:6
**new**  4:15,15
15:21 16:7 28:5
287:5,14,25
**nine**  20:17
**noise**  130:14
248:25 249:9
250:13
**non**  140:16,25
141:5,5,14,17
142:14 144:11
243:16 256:23
258:21 259:16
259:20 260:2,6
260:15,17 263:7
265:1 267:12
271:6 274:20
275:4,15
**nonexisting**
86:14

Veritext Legal Solutions
866 299-5127

[nonleading - occur]

**nonleading**
    92:15
**nonlegal**   281:10
    281:11
**nonresponsive**
    251:22 252:23
    253:19
**nonscientific**
    194:3
**nonsensical**
    154:23
**northern**   1:2 2:2
    8:21
**nos**   6:13,19,23
    7:10,14,18
**notating**   307:15
    308:4
**note**   8:7 65:9,10
    164:23 171:12
    194:9 240:12
**noted**   200:25
    309:7
**notes**   65:6
**notice**   146:23
    231:22 293:21
**notices**   234:15
**noticing**   9:11
**notify**   222:24
    223:7,20 224:3
**notion**   163:22
**number**   8:16,22
    56:14 65:9,10
    69:22,24 103:24
    105:11 107:7,9
    107:11 136:23
    141:20 231:13
    232:17 233:14
    233:20,21

236:11,13 244:1
244:2,3,4 246:9
248:1 249:12,16
250:10,16 251:3
251:7,18,19
255:17,20,22
256:20 307:15
308:4
**numbers**   58:13
    181:16 230:19
    232:3,4 233:24
    235:18,18
    255:25
**numerical**
    230:25

---

**o**

**o**   3:5
**o0o**   5:12 7:20
    8:3
**oath**   10:7,18
    105:12
**objec**   249:21
**object**   24:7
    241:20 297:25
    299:8
**objected**   277:14
    279:6
**objecting**   55:17
**objection**   27:15
    35:12 36:21
    38:6 39:11
    41:18 42:19
    43:21 47:21
    61:17 62:24
    63:14,20 68:15
    69:6 72:3 74:12
    74:25 80:7

88:22 103:6
106:12 107:18
112:20 115:15
115:22 118:1
120:9 128:8,22
129:16,25
130:21 132:9
138:17 139:17
140:10 141:7
148:16 150:3
151:16 154:4
163:25 164:20
167:9,9 175:2,14
176:4 179:6
183:5 186:13
190:3,23 191:13
191:22 192:18
193:3,13 194:18
195:15 196:17
198:7 199:20
205:14 207:12
208:21 209:10
210:13 211:4
212:17 213:13
214:7,23 219:21
220:13 222:5
223:10 224:6
225:5,15 227:1
227:24 228:18
229:12 230:5
231:9 232:22
233:6 234:17
235:12 236:21
238:7 239:17
240:10 242:10
244:11 247:7
249:21 253:25
254:8 255:10

256:25 258:22
260:7 261:12,23
262:2,3,7 269:11
269:22 272:21
274:12 276:3
278:14 282:1,17
287:23 290:23
291:24 292:8
293:17 294:8
**objections**   9:6
**objective**   77:15
    77:19,19,23
**obligation**
    195:11
**observable**
    139:25
**observation**   33:2
    64:4
**observed**   32:14
    123:21
**observer**   56:16
**observing**   32:23
    66:4
**obstructed**
    278:25
**obtain**   78:19
    111:12 112:4
    219:8
**obtained**   112:18
**obvious**   48:23
    137:13 154:19
    232:16
**obviously**   13:6
**occasions**   134:7
**occupied**   262:25
**occur**   115:14
    117:12

**[odeon - olson]**

| | | | |
|---|---|---|---|
| **odeon** 86:15 | 117:19 121:21 | 264:5 265:12 | 148:16 150:3 |
| 87:7 92:25 | 126:22,24 127:1 | 267:14 268:12 | 151:16 154:4 |
| **offer** 13:12 | 128:20 129:2,7 | 269:4 271:12 | 161:16 164:20 |
| 55:10 176:11,15 | 129:11 133:18 | 273:16 275:2,13 | 167:9 175:2,14 |
| 176:17 177:10 | 134:11,16 135:1 | 275:18 276:15 | 176:4 179:6 |
| 177:16 224:1 | 135:5,11 137:2,4 | 279:18,23 280:5 | 180:9 183:5 |
| 225:13 227:2 | 141:12,20,21 | 281:6 283:19 | 186:13 190:3,23 |
| **offered** 148:11 | 152:25 153:3,21 | 285:13 287:7,16 | 191:13,22 |
| 176:16 | 156:3,8,15,20 | 294:4 296:2,5,6 | 192:18 193:3,13 |
| **offering** 19:25 | 157:3,6 158:2 | 296:18 297:14 | 194:18 195:15 |
| 38:3 39:8 | 159:1 160:13,17 | 299:1 300:23 | 196:17 198:7 |
| 177:21 225:12 | 161:12,15 | 301:1,10,14 | 199:20 205:14 |
| 226:22 235:4 | 162:21 163:7,13 | 302:9 303:23 | 207:12 208:4,21 |
| 237:12 | 163:16 165:2 | **old** 26:5 | 209:10 210:13 |
| **offers** 237:16 | 171:2,6,14 173:9 | **olsen** 139:4 | 211:4 212:17 |
| **office** 11:6 | 173:13 175:25 | **olson** 4:5 5:6 | 213:13 214:7,23 |
| 307:11 | 178:25 180:18 | 9:19,19 11:21 | 217:4,6 219:21 |
| **offline** 282:20 | 181:9 187:4,19 | 27:15 35:12 | 220:12 222:5 |
| **oh** 79:3 109:5 | 187:20 188:22 | 36:21 38:6 | 223:10 224:6 |
| 136:18 149:24 | 190:11,15 | 39:11 41:18 | 225:5,15 227:1 |
| 167:2 168:6 | 198:11,15,16 | 42:17 43:21 | 227:24 228:18 |
| 180:16 189:10 | 199:18 200:5,11 | 47:21 51:22 | 229:12 230:5 |
| 212:24 232:2 | 202:14 203:2 | 52:3 55:15,22 | 231:9 233:6 |
| 234:4 259:10 | 206:16 209:5 | 61:17 62:24 | 234:17 235:12 |
| 271:2 277:8,23 | 215:13 216:12 | 63:14,20 68:15 | 236:21 238:7 |
| **okay** 13:10 | 216:17,24 217:3 | 69:6 72:3 74:12 | 239:17 240:10 |
| 14:21 24:12 | 217:6 218:2,14 | 74:25 80:7 | 241:20 242:10 |
| 33:14 40:3 | 220:21 221:10 | 88:22 99:5 | 244:11 245:18 |
| 42:21 43:3,4 | 222:9,15 223:3 | 103:6 106:12 | 247:7 249:21 |
| 48:16 54:3 55:3 | 225:1 227:5 | 107:18 112:20 | 252:1,7 253:3,25 |
| 69:10 70:17 | 230:8 231:15 | 114:20 115:15 | 254:8 255:10 |
| 72:5,9,12 84:3 | 232:10 237:8 | 115:22 116:22 | 256:25 258:22 |
| 84:20 85:9,18 | 238:11,22 | 117:2 118:1 | 260:7 261:12,23 |
| 86:8 87:25 | 239:11 243:10 | 120:9 128:8,22 | 262:5 264:2 |
| 90:10 92:8 | 243:19 244:20 | 129:16,25 | 269:11,22 |
| 93:14 99:7 | 248:19,21 | 130:21 132:9 | 272:21 274:12 |
| 103:16 113:16 | 249:20 253:9 | 138:17 139:2,17 | 276:3 278:14 |
| 114:7,24 115:11 | 254:6 257:23 | 140:10 141:7 | 279:6 282:1,3,17 |

**[olson - owned]**

283:21,24
286:17 287:23
290:23 291:24
292:8 293:17
294:8 296:6,17
298:10 300:8
301:4,9 302:10
305:16 307:1
**omit** 77:18
105:24 108:3
110:13 228:17
228:23 229:2,4
**omits** 227:7,21
228:2,2,6 229:10
**omitted** 228:25
229:6,19
**omitting** 101:14
101:21
**once** 25:19 66:14
96:24 152:23
153:4 178:3
241:14 242:15
297:22 304:6
**one's** 112:12
**ones** 40:3,20
173:8
**online** 35:2
**open** 21:6
121:16 150:11
180:12 188:5,12
218:6 226:6
280:17 281:18
299:25
**opening** 162:22
162:25 296:20
**opens** 123:5
**opera** 99:23,24

**opine** 27:4 29:13
38:21,23 228:5
298:12 300:15
**opined** 28:23
230:23
**opinion** 13:12
25:25 26:7,24
27:21 32:19,24
37:12 38:8 46:9
47:7 95:12
110:1 125:1
164:3,7 166:10
170:9,10 172:23
173:15 174:9,23
175:23 176:1,11
176:16,17
177:16,21
194:12 196:6,8
196:12 197:16
204:12,20,22
206:2 224:1
225:13,17,21
226:22 227:3
237:9,10 238:12
238:19 247:5
258:24 259:6
262:14 263:1,4
275:4 280:11,14
281:7,8 291:15
293:12,19 298:9
**opinions** 16:2,4
16:5,9 19:24
27:13 33:1 38:4
39:9,25 40:4
73:24 162:5,10
162:15 163:17
163:20,22
164:17,18 165:3

165:6,13,20,21
166:4,10,17,24
167:8 170:3,17
170:25 171:10
171:17 172:16
172:23 173:1
176:15 177:10
194:5,11,13
201:25 203:9
205:4 230:18
283:7 293:14
298:13 299:7
300:16
**opportunity**
51:20 154:14
208:16 209:1
**opposed** 141:14
**opposite** 291:15
**opted** 126:3
**option** 82:12,16
136:19
**options** 82:13
148:3 270:12
**order** 7:7 9:25
38:11 67:7
68:12 74:15
81:8 89:23
92:23 166:9
181:7 194:24
221:19,21 222:1
222:4 223:4
225:2 255:16
**organization**
77:3
**original** 159:14
159:18 227:14
227:17 228:13
229:22 250:10

256:1 260:9
261:14 306:18
307:10,21
**originally** 29:9
29:13
**outcome** 9:5
306:16
**outline** 73:6
**outside** 71:4
223:11
**overall** 100:2,3
273:8,13,20
**overarching**
165:10 166:14
167:5 174:9,17
177:7 194:1,23
196:25 231:1
**overburdening**
302:20
**overestimate**
202:21 274:20
275:5,15
**overgeneraliza...**
203:19,20
**overgeneralize**
203:22
**overgeneralizes**
203:12
**overinterpret**
276:7
**overlap** 102:23
104:21
**overpromise**
210:25 212:21
**owned** 145:1

Page 37

[p.m. - passes]

| p | | | |
|---|---|---|---|
| **p.m.** 161:22 | 273:10,15 | 262:9 264:17,22 | 92:16 95:22 |
| 206:19,22 | 274:17 287:7,11 | 270:10,24 | 102:6,13 103:3 |
| 264:10,13 296:8 | 288:2 289:15 | 276:16,24 277:1 | 103:17 104:21 |
| 296:11 305:19 | 299:20 300:6 | 280:6 282:23 | 107:15,25 |
| 305:20 | 301:5,6 307:15 | 283:14,16 284:5 | 108:16,17 |
| **package** 30:25 | 308:4 310:4,7,10 | 288:8,8,14 | 109:14,15 |
| **packaging** 31:4 | 310:13,16,19 | 289:19 290:5 | **participate** 76:9 |
| **page** 5:4,10 6:3 | **pages** 1:25 6:5,7 | 291:4 297:6,8 | 92:23 |
| 7:3 21:12 58:15 | 6:10 7:6,8 63:3 | 298:19 299:1,5 | **participated** |
| 62:11 81:14 | 147:4 180:1 | 299:20 302:24 | 51:13 107:16 |
| 83:9,25 87:4 | 214:2 307:14,17 | 303:13,14,18 | 108:11,18 |
| 89:2,3,10,23 | 307:17 308:3,6,6 | **parentheses** | 109:16 |
| 122:22 123:5 | **paid** 210:15 | 160:7 | **particular** 28:5 |
| 124:3,15,19,24 | **panel** 64:12,13 | **parenthetic** | 29:4,11 30:8 |
| 124:25 125:1 | **paper** 32:4 49:14 | 160:9 | 31:4 46:7 50:17 |
| 133:19,19 135:6 | 49:15,17,20,21 | **parenthetical** | 56:13 101:17 |
| 135:8,10,11 | 50:17,18,19 | 144:13 | 116:15 118:25 |
| 136:14,15 | 51:12 52:11,16 | **parentheticals** | 122:12 135:14 |
| 137:10,14 | 53:1,4,6,11 | 148:2 | 159:19 160:22 |
| 141:20 143:5 | **papers** 35:1,4,7 | **paris** 189:12,17 | 166:10 208:24 |
| 146:21 153:24 | 35:10,17 36:5,8 | **part** 17:5 38:20 | 209:18 251:10 |
| 154:10 159:6,8 | 36:11 48:21 | 38:22 56:9 | 293:23 |
| 167:25 170:16 | 49:2,5 50:5 53:5 | 59:10 60:9,16 | **parties** 8:14 44:4 |
| 181:15,18 182:7 | 234:3 | 62:3,22 63:9 | 45:14 228:14 |
| 182:8,9,16 188:4 | **para** 202:20 | 66:11 75:22 | **parts** 17:4 222:7 |
| 189:23 190:8,10 | **paragraph** | 92:4 99:6 105:7 | 258:1 287:13 |
| 200:1,18 201:6 | 124:20,22 | 106:6 118:19 | **party** 9:4 23:22 |
| 202:6 208:7 | 147:10 164:2,6,9 | 142:15 156:15 | 42:10 43:15,16 |
| 209:12 210:23 | 164:10,14 | 156:18 163:18 | 44:15 56:16 |
| 210:24 222:13 | 165:19 170:7,9 | 181:21 183:15 | 64:4 66:3 91:16 |
| 222:15,19 227:5 | 173:10,13 | 185:5 187:10 | 91:24 130:17 |
| 228:9 231:15,18 | 178:21 180:14 | 220:22 223:19 | 175:19,19 275:9 |
| 238:18 241:12 | 186:8 197:17 | 223:24 248:14 | 306:14 |
| 257:11,13,15 | 199:7 202:21 | 262:17 271:16 | **pass** 243:24 |
| 262:9 264:18 | 206:3 215:6,10 | 271:18 295:18 | 262:18 |
| 265:9 266:5,15 | 230:9,12,14 | **participants** | **passed** 134:23 |
| 270:21 273:3,6 | 238:22 243:13 | 8:10 52:17 | **passes** 50:2 |
| | 243:14,15 248:3 | 65:18 74:6 | 80:12 |

Veritext Legal Solutions
866 299-5127

**[passing - picked]**

passing   106:4
pattern   105:22
  110:11
pdf   167:25
  307:12 308:1
pdt   8:2 305:20
penalty   307:16
  308:5 309:4
people   17:9
  18:19 19:9 36:3
  40:5 45:8 49:11
  53:8,10,12,13
  56:14,21 64:6,13
  73:23 77:6,11,15
  77:18 80:1
  83:11 86:5 87:7
  87:10,14,16
  88:10,11 89:16
  90:5 91:5 92:2
  92:20 93:21,22
  94:2,13,20 95:3
  95:20 96:8,15,22
  98:13,14,16,20
  100:8 103:21
  104:25 105:15
  105:21 106:8,17
  106:21 107:3,15
  108:10,17
  109:15 110:9,11
  116:8,8,21
  118:23 119:2,6
  119:10,15,21
  120:11,12,16,17
  120:20,20,24
  121:5 122:2,18
  124:3,14,19
  126:1 132:11,22
  135:14,18,25

136:24 140:8,25
141:4 143:14,15
143:18 145:1
150:13 155:1
159:25 169:10
169:12,16
186:21 203:14
205:12,24 218:7
225:17 226:9,14
226:17 235:21
251:4,7,19
255:24 256:2
258:13,21
260:13 261:7,15
262:18,19,25
269:8 280:19
281:12 283:3,6
283:10 286:2
291:4 295:19,23
people's   39:15
  116:14 119:25
perceive   39:6
  45:8 136:12
percent   99:10,13
  104:3,5,9 124:14
  124:16,18
  204:24 205:12
  205:20 211:11
  239:4,11,12,23
  240:7,8 241:17
  241:18 242:9,14
  248:21,22,25
  249:1,4,5,6
  250:4,5,7,9,14
  256:3,3 266:22
  267:12,13,18,19
  269:4,6,18,21
  270:3,10,11

271:5,5 276:10
276:10 288:21
289:19 290:8,10
290:19,21,21
291:3,4,14,19
percentage
  104:1,2,16,17,19
  104:24 239:15
  240:4 256:11
  267:22,25 268:1
  268:1,8 269:8
  288:19 291:16
percentages
  106:24 204:18
perception
  204:20
perceptions   31:5
  54:19 77:23
  91:12 116:14
  119:6 120:2,14
  125:8 132:4
  133:7 164:8,13
  176:18 218:21
  224:9,10 258:16
perform   17:5
performance
  45:20 184:14
  185:15 186:11
  197:22
performed   19:13
performing
  184:3
period   98:19,20
  112:8,16 113:3,5
  114:14 115:5
  181:12 278:9
  307:18 308:7

periods   122:6
perjury   307:17
  308:6 309:4
person   14:5
  41:11 65:24
  66:6,9 78:25
  80:4 92:9 107:4
  147:1 195:7
  245:8 268:19
person's   13:20
  65:21
personalization
  188:5,13 274:7
personalized
  184:3,14 185:15
  186:11 188:6,14
  197:22
personally   174:7
persons   74:23
perspective
  177:3
pertains   306:17
ph.d.   1:17 2:18
  5:3 10:6 20:4
  73:4 307:5
  309:3,17 310:2
  310:24
phenomena
  137:23
philosophical
  117:22
phone   95:21
phrase   73:12
  160:14,18
  295:16
picked   91:13
  232:13,24 234:1
  235:20

[picks - practices]

| | | | |
|---|---|---|---|
| **picks**  166:22 | 188:10 198:20 | **pointless**  74:10 | **portion**  224:12 |
| 174:16 193:24 | 199:2 245:8 | 74:13,19,21 | **portions**  216:16 |
| **picture**  173:21 | 248:14 250:23 | **points**  155:6 | **position**  109:22 |
| **pieces**  230:24 | 251:25 259:12 | 186:5 187:22,24 | 165:2 167:2 |
| **pinecone**  204:5 | 262:4,9 264:8,21 | 187:25 188:1 | 279:13,15 |
| **pipe**  303:15 | 266:4 286:17 | 189:1 | 295:22 |
| **pitfalls**  57:12 | 295:1 | **pol**  152:16 | **positive**  126:3 |
| 78:6 | **plenty**  32:7 | **policies**  35:5 | 130:13 214:12 |
| **place**  8:14 231:2 | **plural**  97:9 98:2 | 137:17,18 | **possibility**  94:12 |
| 298:8 306:10 | 98:6 | 139:24 153:18 | 130:11 151:9 |
| **placed**  294:21 | **plus**  248:25 | 218:23 221:6,8 | 279:3 |
| **placement** | **point**  53:11,12 | 231:20 232:1,11 | **possible**  116:1,4 |
| 301:25 | 74:14 114:16 | 234:14,19,21 | 133:23 138:3,5 |
| **places**  167:13 | 119:1 122:1 | 236:1,7 297:12 | 142:17 148:12 |
| 184:16 186:3,16 | 123:17 133:4 | **policy**  146:22 | 210:5 233:22 |
| 186:17 | 136:17 138:13 | 147:2 152:4,9,12 | 278:20 283:3 |
| **plaintiff**  31:13 | 150:19 160:5 | 152:16,21,21 | **possibly**  115:7,8 |
| 31:14,24 | 174:12 175:23 | 153:1,4,7,19,22 | 269:20,24 280:4 |
| **plaintiffs**  1:9 2:9 | 181:23 183:15 | 154:13 225:8,18 | **post**  100:1,14 |
| 3:3 4:11,21 8:19 | 185:16 186:5,25 | 226:1,4,9,13,16 | **potential**  28:4 |
| 9:14,18 10:1 | 188:3 194:22 | 226:17,23 | 31:5 32:9 39:6 |
| 33:5 39:19 40:1 | 201:25 203:10 | 231:21 233:12 | 48:14 57:13 |
| 222:23 223:1,22 | 203:17,18 | 285:21 297:9,22 | 66:18 78:6 |
| 224:5 225:10 | 204:19 205:5 | 298:3,7 303:25 | 79:21 84:16 |
| **plan**  16:5 | 206:11 218:3 | 304:6,13,16,24 | 137:24 146:10 |
| **planned**  160:11 | 233:9,13 234:10 | 305:8,11 | **potentially** |
| 160:14 | 236:8,8 239:20 | **poor**  247:13 | 101:8 119:8 |
| **players**  43:16 | 250:11 255:11 | 284:14 289:23 | 202:23 219:12 |
| **please**  8:7 9:7 | 255:16 256:5 | **pop**  58:19,23 | **powered**  52:24 |
| 10:3,16,24 51:24 | 258:10,19 | 62:12,15 134:23 | **practice**  60:19 |
| 52:3 54:2,11 | 271:18 282:7 | **pops**  134:25 | 77:9 80:2,15 |
| 58:23 65:10 | 285:6 293:24 | **population**  28:6 | 194:2 281:19,22 |
| 82:5 89:16 | 294:19 295:19 | 56:15 64:8,9,10 | 282:14 283:13 |
| 105:8 108:7 | 299:18 | 73:16 198:2 | **practices**  56:10 |
| 125:3 131:11 | **pointed**  182:14 | 204:24 246:4,6 | 56:23 57:3,11 |
| 141:24 145:10 | 204:15 205:2 | 248:20 292:17 | 63:7 73:20 78:9 |
| 145:22 147:20 | 211:23 298:22 | **populations** | 92:14 102:15,22 |
| 147:24 187:14 | | 246:11 | 107:22 194:9 |

Veritext Legal Solutions
866 299-5127

[practices - private]

209:24 280:15
280:15,21,23
281:3,7,9,9
**pre** 63:8
**preamble** 129:16
151:17
**preceding** 147:9
**precisely** 52:14
**precursor** 66:19
**predict** 52:17
**predominantly**
262:25
**preexisting**
126:2 130:12
143:24
**prefer** 188:5,13
**preference**
200:22 202:1
295:7
**preferences** 36:6
36:7 200:21
201:24
**premarked**
14:23
**preparation**
12:16 178:22
180:19,22
199:13
**prepare** 11:13
11:25 16:22
21:4 72:23
257:19
**prepared** 71:9
180:21 190:21
257:20
**preparing** 12:6
16:11 166:2
203:6

**preregistered**
52:23
**present** 4:20 9:8
73:11 101:8
102:19
**presentation**
185:10 187:11
190:21 202:17
210:5 275:3
**presented** 53:15
62:3 133:25
166:25 210:6
275:10 286:4
287:17
**presenting** 53:24
**press** 180:7
**presume** 19:14
**pretest** 57:22
58:22 60:15
61:3 62:19 63:4
63:8,13,24 64:2
64:13 66:1
149:6
**pretested** 64:22
65:1 149:5
**pretesters** 62:10
**pretesting** 56:6,8
56:9,22,25 57:5
57:15 58:3,15
59:2,8 60:1,17
61:22 62:23
64:15,25 65:7,15
75:14
**pretests** 61:6,7
61:12 62:1 64:1
**pretty** 29:24
58:21 98:3
99:12 105:24

111:3 140:21
176:18 192:9
234:20 289:23
**prevalent** 274:6
**previous** 90:19
107:17 118:13
118:20 122:19
122:20 199:11
209:12 219:10
239:8 280:7
**previously** 17:16
17:20 20:13
22:17,20,22
64:24 70:18,24
94:10 108:19
118:20 163:19
221:22
**pri** 232:1
**price** 233:21
**primarily** 32:4
39:5
**primary** 139:23
178:15
**prime** 145:1
**principles** 38:9
**printed** 62:16
63:5
**prior** 21:15 25:1
25:12 62:19
113:20 115:2,4
130:12 139:14
164:18 189:6
274:17 304:9
306:5
**privacy** 6:12
34:2,10 35:2,5,8
36:14,17,20
146:22,23 152:3

152:9,12,16,21
153:1,4,22
154:13 173:2
174:5 184:19,23
202:22,24
203:15 209:20
209:21 214:12
225:8,18,25
226:4,9,12,16,17
226:23 231:21
231:22 233:12
234:14,15,19
236:6 297:9,22
298:3 303:25
304:5,16,23
305:11
**private** 36:12
38:18,24 39:10
40:6,18,22 41:6
41:11,12 43:20
47:19,24 65:12
67:1 68:14
69:11,16 70:2,3
70:19,25 75:9
91:12 92:3,10,21
93:1,6,9,15 94:1
94:2,7,10 98:8
98:12,23,25
99:24 100:4,12
100:19 101:1,25
103:23 105:1,17
106:9 107:6
120:8 121:16
125:12 133:11
134:2 138:15,24
139:16,20 141:5
145:25 146:22
147:2 160:4

Page 41

**[private - provide]**

| | | | |
|---|---|---|---|
| 173:17 174:25 | **proceeding** 9:6 | **professions** | **programmed** |
| 175:13,21 | **proceedings** | 34:22 | 72:11,17 155:16 |
| 176:14 177:19 | 305:20 306:6,9 | **professor** 6:4,6,9 | **programmer** |
| 181:5 189:3 | 306:15,19 | 10:14 20:2 | 71:5,9,12,20,24 |
| 197:13 198:6 | **process** 14:6 | 39:19 40:17 | 72:6,24 73:1 |
| 202:22 204:17 | 37:6 41:14 46:1 | 41:15 51:18 | **programming** |
| 205:13,21 | 52:20 64:5 | 54:11 56:2 | 71:7 72:12 90:4 |
| 218:22 223:1,8 | 156:18 157:10 | 59:12,25 83:8 | 297:7 298:4 |
| 223:22 224:5 | **produce** 26:5 | 103:10 104:15 | **prompt** 144:7,8 |
| 225:10 226:24 | 60:16 102:24 | 105:7 117:9 | **proof** 195:6 |
| 227:9,22 233:4 | 110:16,21 | 132:19 143:21 | **proper** 74:1,15 |
| 235:5,11 250:19 | 115:25 116:3 | 161:24 162:16 | 74:22,23 |
| 252:5,11,16 | 123:15 124:6,9 | 162:17,21,24 | **properly** 244:23 |
| 253:15 254:7,16 | 124:10 136:23 | 163:17,22 165:2 | 267:8 |
| 254:20,22,25 | 235:17 | 165:9 166:3,17 | **proportion** |
| 255:7 257:6 | **produced** 58:2,7 | 166:21 167:7 | 95:10 101:18 |
| 258:25 259:6 | 60:12,14,14,19 | 170:2 171:9,17 | 204:16 211:24 |
| 261:20 265:3 | 60:19,22 61:2 | 179:18 180:4 | 246:1,2,5 251:14 |
| 271:8 278:12 | 62:22 63:2,10,12 | 196:10 198:19 | 262:22 290:13 |
| 279:3 284:9,20 | 124:5,11,13 | 199:6 203:9,11 | **proportions** |
| 291:17 | 169:20,25 | 205:10 206:24 | 106:15 |
| **privately** 159:25 | 193:10 194:16 | 212:7 216:7 | **proposition** 36:4 |
| 160:15,19 | 241:3 247:12,25 | 220:18 222:21 | 248:4 255:5 |
| **pro** 236:9 | 289:11 | 230:17,19 232:4 | **protection** 20:25 |
| **probably** 12:7 | **produces** 236:11 | 232:5 234:9 | **protections** |
| 19:3 21:7 80:10 | **product** 31:6,7 | 236:15,18 | 202:22 274:21 |
| 132:13,23 142:6 | 38:12 142:4,12 | 240:23 241:21 | 275:5,15 |
| 142:8,15 143:19 | 142:23,24 | 251:24 253:1 | **protocol** 51:17 |
| 149:23 182:7 | 144:14,22 204:4 | 264:15 267:20 | 52:14 66:6 |
| 203:17 235:1 | 207:18,18 | 270:1 286:23 | **proud** 50:4 |
| 248:25 282:20 | 208:17 209:6,8 | 289:10 296:12 | **provide** 17:3 |
| 284:14 288:2 | **production** | **profile** 184:23 | 22:2 38:11 |
| **probes** 175:18 | 123:25 | **profiles** 185:2 | 64:13 71:7 |
| **problem** 217:5 | **products** 31:4 | **program** 72:20 | 73:24 102:4 |
| 265:25 277:23 | 32:9,12 | 72:20 73:8 | 123:22 127:16 |
| **problems** 57:13 | **professional** | **programers** | 129:13,23 131:1 |
| **procedure** | 174:8 177:3 | 155:17 | 131:16 160:6 |
| 307:19,20 | | | 198:2 203:25 |

Veritext Legal Solutions
866 299-5127

[provide - question]

225:21 228:24
228:24 284:6,9
284:24 285:2,4
285:10,14,16
286:11 287:21
**provided** 16:4
22:14 61:21
65:23 81:12
83:10 106:2
110:10 123:23
145:19 155:15
234:7 274:21
275:5,15 307:19
308:8
**provider** 44:17
71:7 104:12,12
127:11 129:3,4
**provides** 131:24
202:23 285:19
**providing** 32:19
43:1 230:24
**public** 41:4
43:11 48:2
165:24 166:12
170:19 171:20
171:21,23
**publish** 35:17
49:9
**published** 35:1,4
35:7,10 36:5,8
36:11 49:22
52:11 53:1
**pull** 18:10 199:1
222:17 289:4
296:19 300:23
**pulled** 206:24
**purchase** 32:12

**purchased** 44:9
**purely** 129:19
256:21
**purpose** 27:8,19
30:7 32:19,23,24
74:8 133:6
200:17
**purposes** 24:23
25:1 32:13
73:10 115:24
132:25 243:5
266:18
**pursuant** 2:19
9:25
**pushed** 191:3,19
**put** 27:8,20
29:14 30:6
82:20 179:25
232:5,15 233:25
234:4 235:19
263:24
**putting** 202:23
236:13

**q**

**q1** 303:11
**q10** 141:22
**q17** 259:5
**qf4** 100:17,24
**qs7** 81:21 82:1,8
82:11,15 84:12
91:5
**qs8** 87:9 92:11
92:13
**qualification**
76:11
**qualified** 76:8
223:17

**qualify** 92:8
**qualifying** 111:6
**qualitative**
86:16
**quality** 8:9
289:23
**qualtrics** 72:19
**quantity** 121:7
**question** 10:23
13:25,25 24:8
27:20 30:8 31:2
32:10,20 37:5
46:5 52:6 55:14
55:19,19,20,23
56:4 61:24
64:17 65:13
66:7,9 68:25
73:25 74:16
75:4 76:21
78:23,24 79:6,14
79:16 81:2,5,7
81:12,19 83:1,10
84:10 86:6,12
87:8 89:19,20,22
89:24,25 90:19
94:21,24 95:1,23
97:3,5 101:3,10
103:1 104:11
105:21 107:11
107:21,23 108:6
108:7,9,14
109:17 110:10
110:23 111:1,5
118:5,6,6 119:19
122:13 123:20
126:24 127:9
128:10,20
129:17 130:5,12

130:20 131:15
131:20 132:15
136:3 140:17,21
141:22 142:18
144:5 147:17,23
149:1,3,15
150:20,22,23
151:21,23
152:10 157:24
158:17 163:1,6,8
166:6,8 171:24
173:22 174:22
175:7 177:15
191:2 195:18
199:11 210:17
212:7,9,20 213:1
213:21,24 218:4
219:16 220:3,4
221:4 223:15
225:22 240:2
241:23 245:13
245:16,19
248:22,24 249:2
249:17 250:3,5
250:12 251:12
251:13 252:1,19
253:4 254:3,14
254:21 255:18
255:23 257:25
258:4,6,8,15,20
258:23 259:1,2,4
259:8,22 260:19
260:20 261:3,7
261:14 267:14
271:1 276:4
277:14,15,17
285:15 286:2
293:13,15,23

**[question - readability]**

294:17,21
298:17 301:15
301:16,22,24
302:4,10 303:10
304:4 305:1
**question's** 62:20
**questioning**
205:5 298:11
**questions** 5:9
13:12,13 24:7
51:21,23 55:7,11
55:12 56:21
57:19 58:2,4,7
58:20 61:21,25
61:25 62:3,7
65:19 67:18
70:22 71:21
74:22 76:2,12,20
77:16,20 78:4
79:19,19 91:7
99:22 100:14
111:10 124:1
126:10 131:18
133:15 141:18
144:3,4,23 146:2
147:18 148:13
149:8 151:1,5
155:7 157:19
161:25 176:9
187:18 188:22
200:8 204:25
206:12 211:9
218:16,24 219:4
219:17,24 220:9
220:23 244:2,4,5
246:10 248:1,5
248:16,18 249:6
249:11,15

250:18,19,22,24
251:11,19,25
252:5,11,12,14
252:16,17
253:10,22 254:4
254:6,12,15,24
255:6,7,14
256:10,18,20,22
257:2 258:17
260:14,24 261:8
261:19 262:15
277:3,10,16,18
277:22,24
279:18,21
292:22 293:8
294:5 296:14,18
301:12 302:8
303:4,20 305:6
305:15
**quick** 116:23
264:3 302:11
**quickly** 186:20
197:4 263:6
**quinn** 4:4 9:19
14:11
**quinnemanuel....**
4:9 307:2
**quite** 73:4 133:3
138:19 142:21
151:22 175:17
201:14 204:21
281:1
**quo** 189:16
**quotation** 185:8
**quote** 185:7
188:15,17 194:4
201:1,4,5 205:3
230:25 242:18

247:10 255:23
293:23 299:25
300:3
**quoted** 203:2
**quotes** 189:11,13
189:17,21
208:25
**quoting** 190:24
201:14

**r**

**r** 310:3,3
**r&s** 308:1,9
**rabbit** 135:19
**raised** 13:12,24
66:9 163:24
**raises** 163:22
178:13
**rakowski** 237:21
237:24
**rakowski's**
238:5
**ram** 3:14 9:16
**ran** 102:20 109:1
110:18 153:8
231:5 268:19
**randomize** 82:12
82:16
**randomized**
87:10
**randomly** 64:7
83:22
**rare** 98:12,25
99:13
**rate** 154:10
**reaches** 27:21
**read** 29:25 33:7
51:5 65:10 82:2

82:13 90:8
92:19 99:18
100:21 116:9,9
116:10 119:3
120:24 121:3,5
122:2,24 125:3
125:13 127:8,13
127:21 135:23
136:7,9,13
138:19 142:9
145:22 146:18
146:23 147:10
147:18 148:2,5
152:3,9,12,20
153:12,14
154:14 155:1
157:16 160:9,12
177:7 180:25
181:3,7 184:8
185:5,25 189:13
189:14,14,18,19
189:20,21 193:5
193:6 196:13,20
200:20 212:14
215:19 216:19
217:17 222:2,3
225:18 226:9
235:25 236:3,3,4
236:6,16,18,25
237:5 248:5
256:9,14,14
264:21 265:4
268:9 286:12
289:1,24 290:9
301:11,14
303:12 309:4
**readability**
230:15,20 231:6

**[reader - recall]**

| | | | |
|---|---|---|---|
| **reader** 213:15 | 36:23 38:14 | 206:4,6,14,23 | 288:16 289:4,8 |
| **readers** 236:12 | 39:18 41:20 | 207:19 208:6 | 290:25 292:4,21 |
| **reading** 15:13,20 | 42:20 44:20 | 209:4 210:9,22 | 294:3,14 295:15 |
| 120:21 188:10 | 48:4 51:25 52:7 | 212:6,23 213:17 | 296:3,12 297:25 |
| 226:12 236:10 | 54:3,10 55:17 | 214:17 215:1 | 299:8 302:11,14 |
| 267:4,7 307:23 | 56:1 61:20 | 216:1,6 217:5,7 | 305:14 |
| 308:9 | 63:11,18,23 | 220:6,17 221:11 | **rebrand** 207:17 |
| **real** 115:14 | 68:18 69:9 72:4 | 221:16 222:8,16 | **rebranding** |
| 116:17 117:12 | 74:18 75:5 | 222:20 223:18 | 207:11 210:11 |
| 117:19 121:9,13 | 76:16 80:20 | 224:18 225:6,23 | 211:18 |
| 121:15,22 | 83:7 89:4,18 | 227:4 228:7 | **rebuttal** 6:6 |
| **realism** 118:10 | 99:15 101:2 | 229:1,24 230:7 | 15:12,20 37:25 |
| 118:18 | 103:15 105:13 | 230:10,13 | 133:3 154:20 |
| **realistic** 116:1,4 | 106:20 108:5 | 231:14 234:11 | 161:25 162:5,9 |
| **reality** 116:4 | 113:7 114:2 | 235:2,24 237:3 | 162:15 164:3,7 |
| **realize** 136:18 | 115:3,18 117:1,8 | 238:10,16,17 | 164:18 166:2 |
| 147:1 | 118:15 121:1 | 239:25 240:16 | 168:5,13 174:12 |
| **really** 32:16 53:6 | 128:13 129:1,21 | 240:18,22 242:1 | 206:3 207:1 |
| 79:20 118:10,12 | 130:2 131:6,12 | 242:21 244:15 | 230:8 237:9,10 |
| 234:6,22 242:19 | 132:18 138:21 | 245:9 246:20 | 238:11,19 242:3 |
| 251:11 | 139:10 140:7,14 | 247:15 248:15 | 242:6 245:13 |
| **realtime** 45:19 | 141:11 145:12 | 249:25 251:21 | 257:24 263:3,9 |
| **reason** 10:20 | 148:21 150:4 | 251:23 252:3,8 | 298:14 299:2 |
| 43:10 81:4 | 151:25 153:20 | 252:22,24 253:5 | **rebuttons** |
| 139:23 148:19 | 155:2 161:13,23 | 253:18,20 254:5 | 154:20 |
| 148:23 149:1,4,6 | 164:24 167:15 | 254:13 256:6 | **recall** 12:10 |
| 150:15,21 | 167:23 175:9,24 | 257:1 259:3,14 | 20:21 29:16,19 |
| 157:13 213:11 | 176:10 179:8,10 | 260:11 261:17 | 30:2,5,9 79:21 |
| 213:15 214:20 | 179:17,20,24 | 262:8 264:5,8,14 | 98:21 109:9 |
| 214:25 292:5,11 | 180:3,11 183:10 | 265:19 266:7,11 | 117:14 163:3,5,9 |
| 292:14 310:6,9 | 185:4 187:2,16 | 269:13,25 | 193:22 196:19 |
| 310:12,15,18,21 | 188:18 190:5 | 271:20 272:24 | 207:20 209:19 |
| **reasonable** | 191:9,17 192:10 | 274:15 276:8,17 | 212:7 215:8 |
| 125:24 212:10 | 192:25 193:9,16 | 276:21 278:16 | 239:1,6 240:15 |
| **reblitz** 3:5 5:5 | 195:10,23 197:7 | 279:12 282:10 | 263:12,16 281:3 |
| 9:12,13 10:13 | 198:10,17 199:2 | 282:22 283:23 | 296:22 297:18 |
| 11:24 15:3,10,17 | 199:5,23,25 | 283:25 284:3 | 298:11,20,24 |
| 27:23 35:14 | 200:3,12,15 | 286:22 288:5,12 | 302:22 304:1,3,7 |

**[recall - regarding]**

304:8
**recalling** 181:21
**recalls** 93:6
**receive** 43:16
44:4,16 45:8,17
45:19,22 46:12
46:14,16,17
65:20 67:9 68:5
68:12 70:2,8,15
125:10,10 127:4
127:4,11,11,18
127:18 133:10
133:10 142:6,9
148:4,5,7 149:18
150:25 154:17
154:17 224:14
225:19 226:20
272:2
**received** 14:16
20:4 42:7,9
43:25 45:13
47:19 67:2
68:11 149:14,16
149:17 151:2
169:24 271:23
**receives** 39:16
40:10 45:10,25
46:23 47:1
69:23 92:2
142:8,8 148:8,14
149:10,24
150:25 173:17
174:24 175:12
176:13 177:19
226:10 292:25
293:2
**receiving** 46:21
47:12,14 65:14

65:16,25 66:11
66:19,22 67:22
68:1,6,8,14 69:2
70:8 157:20
158:4 224:21
225:3 293:11
**reception** 66:15
**recess** 54:7
117:5 161:20
206:20 264:11
296:9
**reciprocal**
291:14
**reckitt** 23:3
**recognize** 295:6
**recognized**
274:9
**recollection**
139:13 182:18
**recommendation**
201:2
**recommendati...**
37:13,16,19
**record** 8:5,15
15:4 23:7,10
54:5,8 55:25
66:6 84:1
100:21 117:3,6
123:12 126:12
153:14 161:16
161:18,21 184:8
188:10 206:18
206:21 264:6,7,9
264:12 267:4,7
296:8,10 305:16
305:19
**recorded** 1:16
2:17 8:12,17

**recording** 8:9,13
9:10
**records** 26:16,18
**red** 259:23
290:14 301:12
301:16
**redesign** 6:22
207:21
**redesigned**
207:25
**redesigning**
208:3
**reduce** 211:20
**ref** 278:9
**refer** 55:3 65:18
131:18 173:8
181:16 220:1
291:3
**reference** 125:16
144:25 164:7,12
177:13 191:10
208:19 211:2
213:11 214:21
275:24 289:11
**referenced**
143:17 164:4
277:2 307:6
**references**
129:23 186:10
220:8
**referencing**
170:5
**referred** 67:21
118:18 124:7
172:2,3 173:9
219:15 221:21
238:2 281:3,21

**referring** 57:22
58:11,19 65:21
130:24 146:13
153:23 162:8
171:4 183:12,18
193:5 209:8
212:14 266:20
274:25 286:10
**refers** 59:24 88:6
197:5 209:5,16
212:11 213:7
278:9 284:25
**refine** 57:14 59:4
59:13,15,17,19
**refined** 59:18
**refinement**
57:19
**reflect** 178:5
208:17 209:6
214:9
**reflected** 84:21
**reflective** 154:2
**reflects** 258:24
259:5
**refresh** 180:7
**refreshing**
139:13
**refutes** 165:11
**regarding** 36:8
45:2,5 70:18,25
81:12 93:15
109:23 110:16
131:15 136:23
141:25 147:21
147:25 157:19
161:25 162:18
164:6 165:20
170:17 171:10

Page 46

[regarding - report]

171:18 172:16
172:24 173:2,2
217:22 219:8
239:14 252:5
258:17 261:4
281:7
**regardless** 283:8
**registered**
232:21
**registering**
68:11
**regulation**
278:22
**rejecting** 205:3
**relate** 39:25
90:21
**related** 9:4 10:1
11:16 20:11
31:11 45:25
52:16 68:3 92:5
100:12,18 101:1
101:24 103:23
105:1,16 106:9
107:6 110:12
128:24 142:15
156:11 218:5,12
253:15 254:20
254:21 255:7
293:11 302:5
306:14
**relates** 40:4
90:21 186:2
206:3 210:4
**relating** 191:24
254:24
**relationship**
19:14

**relative** 19:16
99:19
**relatively** 99:13
**released** 307:21
**relevance** 190:12
**relevant** 56:14
73:24 78:15,22
119:8 123:17
138:2,2,6 144:18
155:6 156:4
163:21 169:7
174:19 196:7,12
198:5 284:7
285:3 297:4,12
**reliability** 84:16
280:18
**reliable** 79:25
80:3,13,19 81:2
82:21 175:6
178:12 261:16
263:7
**relied** 28:22
167:17 168:12
187:21,24 188:1
196:5 222:4,6,7
222:11,14 282:4
282:5
**relies** 188:3
201:23
**rely** 174:2,8
176:19 204:13
281:13
**relying** 175:8
183:19
**remained** 248:24
**remember** 12:23
12:25 13:3,9,21
17:12,14,21 18:3

18:10,24 19:4,16
20:20,24 23:15
28:12 40:24
58:13 71:14
73:22 103:20,24
104:1,4,6,18,19
105:3,10 106:15
106:16,23
107:10 108:25
109:21 113:18
113:21 114:5
124:2 136:8,8,18
136:22 138:20
149:5 168:22
178:18 180:15
193:8,19 196:20
196:20,22 232:2
232:5 236:24
237:2,7,22,25
263:18,24,25
272:13 276:14
279:22 282:6
287:2 298:17
**reminded**
300:20
**remote** 3:1 4:1
147:16 149:11
149:12
**remotely** 1:19
2:18 8:1,23 9:9
306:10 309:5
**remove** 101:23
107:25 160:14
160:18 263:4
**removed** 42:4,15
102:5,12 103:2
103:17 106:3
108:10 109:13

**rendering**
284:10
**rep** 52:23
**repeat** 51:23
103:8,10 105:8
108:8 110:8
145:11 152:6
194:22 205:18
238:15 248:13
259:13 262:4
**repeatedly**
246:10
**repeating** 157:23
237:17 283:2
**replicate** 52:18
**replicated** 52:18
52:24 53:5
**replicating** 53:3
**replication**
51:10,14 52:1,8
52:11,14,21,23
52:24
**report** 6:4,6,8
7:4 13:5,7,11,15
15:7,13,19,20
21:4,19,23 26:11
26:12 37:11,22
37:24 38:7 39:2
40:15 57:16,25
58:6,10 59:1,12
60:22 62:16
75:22 96:23
99:3 107:8
110:19 114:8,13
123:16 124:20
133:3 139:9
154:20 156:13
161:25 162:6,17

[report - respondent]

| | | | |
|---|---|---|---|
| 162:19,22,25 | 299:2,22 300:15 | **representation** | 281:16 288:19 |
| 163:4,6,9 165:5 | **reported** 1:21 | 83:4 112:11 | 291:13 292:12 |
| 166:2 168:5,13 | 52:10 53:20 | 209:15 | 293:20 |
| 170:6 172:8,13 | 60:22 99:8 | **representations** | **researcher** 56:24 |
| 172:14 174:12 | 107:8 182:4 | 224:11 | 57:2,6,8 |
| 176:16 178:17 | 232:4 241:18 | **representative** | **researchers** |
| 179:4 182:5 | 299:25 | 111:4 112:8 | 57:11 |
| 183:23 190:9 | **reporter** 2:22 | 113:3 138:6 | **reserve** 186:23 |
| 193:6,15,18,20 | 9:2 10:3 49:19 | **represented** | **respect** 40:7 |
| 196:21 199:16 | 53:25 54:1 82:3 | 33:13 74:6 | 64:23 99:22 |
| 201:15 203:3,6 | 89:15 100:20 | **representing** | 118:16 138:11 |
| 203:13 204:15 | 105:6 116:24 | 11:1 17:2 | 157:20 162:16 |
| 206:3 207:2,23 | 125:6 131:9 | **represents** 12:20 | 163:8 175:20 |
| 216:3,19,25 | 145:10 153:10 | **request** 54:1 | 190:20 204:25 |
| 217:9 218:15,19 | 153:14 167:19 | 169:22 | 218:9 219:5 |
| 220:7,19,25 | 184:4,8 187:9,12 | **requested** 72:11 | 252:19 259:19 |
| 225:19 226:3,10 | 188:9 238:14 | 188:1 306:20 | 302:23 303:1 |
| 226:18,20 230:9 | 245:7 248:11,13 | 308:1,9,10 | **respond** 66:5 |
| 236:13 237:1,2 | 259:12 262:1 | **require** 46:21 | 86:18 88:14 |
| 237:23 238:9,23 | 267:3 271:15 | 92:9 122:4 | 91:7 94:22 |
| 241:19 242:3,7 | 294:25 306:1,4 | **required** 56:22 | 95:16 97:12,13 |
| 243:9 251:6 | **reports** 11:15,17 | 56:23 57:18 | 97:22 101:20 |
| 256:9,14 257:9 | 12:9,13,16 13:14 | 122:7 | 102:3,17,18 |
| 257:16 261:15 | 15:14,23,25 | **requirement** | 119:11 125:25 |
| 263:9,13 264:18 | 16:12,16,18,23 | 61:3 | 135:18 181:8 |
| 265:22 266:19 | 16:25 17:4,6 | **requires** 195:20 | 277:21 |
| 270:1,2,17,19 | 18:14 19:21 | **reread** 11:15 | **responded** 95:19 |
| 271:4 272:17,18 | 26:5,8 32:8,22 | **research** 6:18 | 105:22 107:24 |
| 272:22 273:3 | 51:6 53:15 | 17:3 32:7 48:21 | 108:23 109:18 |
| 274:14 275:12 | 57:21 63:10 | 49:2 50:13,20,23 | 110:9,11 118:4 |
| 276:15,20,23 | 100:4 174:14,15 | 53:14 67:11 | 175:4 236:17 |
| 279:21 280:1,3 | 180:21 199:13 | 112:23 155:12 | 261:7,15 293:2 |
| 284:22 285:11 | 200:19 232:6 | 168:25 169:7,8 | **respondent** |
| 285:12 286:16 | 235:22 237:19 | 177:5 199:16 | 56:15 65:11,13 |
| 287:9 288:7 | 238:25 272:5,9 | 200:24 204:5,5 | 76:22 78:11 |
| 289:12,20 290:4 | **represent** 178:5 | 210:16 242:22 | 82:1,8,11,15 |
| 290:5 294:10,13 | 269:5 | 246:16,21,24 | 89:6 90:1 95:18 |
| 296:20 298:15 | | 277:12 281:12 | 133:23 134:7 |

Veritext Legal Solutions
866 299-5127

[respondent - richardson]

| | | | |
|---|---|---|---|
| 135:20 145:19 | **responder**   67:12 | 158:12 246:11 | 138:12,14,22 |
| 200:25 260:21 | 131:1 | 283:20 290:12 | 139:7,14 152:15 |
| 297:3 303:1 | **responders**   86:1 | **restating**   43:23 | 153:5 156:15 |
| 304:5,23 | 97:13 101:14 | **restaurant**   201:2 | 172:7,12 177:17 |
| **respondents** | 136:17 142:10 | **restroom**   206:12 | 179:5 180:22 |
| 58:24 60:21 | 142:13 143:23 | **result**   60:15 | 181:21 194:15 |
| 63:24 64:1 72:1 | 146:8,12 155:5 | 211:17 246:12 | 195:11 196:9 |
| 76:8 78:7,16,20 | 211:25 217:25 | 246:13 | 210:10 237:20 |
| 79:10 80:22 | 250:23,24 | **resulted**   61:12 | 238:4 263:19 |
| 81:13,21 83:5,21 | 252:15,17 | 61:14 | 265:10 306:19 |
| 88:8 90:22 93:8 | 253:16 254:11 | **results**   59:2 | 307:8,10,13 |
| 93:16 95:15 | 256:1 258:11 | 74:10,19,24 | 308:2 |
| 96:11 97:10,19 | 285:25 | 101:8,15,22 | **reviewed**   12:8 |
| 100:10 101:4,13 | **responding**   66:7 | 102:19 104:14 | 16:12 19:21 |
| 101:20,23 102:2 | 106:3 132:15 | 104:25 105:14 | 133:24 141:23 |
| 103:21 104:24 | 254:2,3 255:24 | 105:25 106:18 | 147:20,24 |
| 110:24 111:6,7 | 277:19 279:10 | 108:10 110:2,5 | 162:21 175:25 |
| 111:13,14 115:6 | 302:18 | 110:10,25 | 177:12 178:22 |
| 121:3 122:5 | **response**   58:17 | 115:12,20 116:1 | 179:2 180:18,21 |
| 123:12 131:3,7 | 64:1 65:23 | 116:3 117:11 | 194:20 195:24 |
| 131:13,23 146:4 | 67:20 77:16,20 | 120:18 123:15 | 196:1,6,11 |
| 146:15 147:13 | 79:24 80:3,13 | 125:25 126:2 | 215:23 221:22 |
| 148:10,12 149:2 | 81:12,19 83:10 | 143:10 205:19 | 238:8 263:9,21 |
| 149:7,9 151:12 | 86:6,12 94:19 | 232:15,17 | 263:23 |
| 152:3 157:19 | 97:3 118:13,20 | 240:14 263:3,8 | **reviewers** |
| 158:9,17 221:5 | 119:4 130:11 | 272:5 275:10 | 285:25 |
| 253:11,23 | 194:10 196:22 | 277:18 280:25 | **reviewing** |
| 260:25 261:20 | 218:7 219:15 | **retained**   9:18 | 139:24 156:3,6,8 |
| 262:13 269:18 | 256:18 281:18 | 19:19 20:18 | 270:21 |
| 272:12 280:12 | 305:7 | 21:20 27:4 28:2 | **reviews**   241:6 |
| 281:23 282:15 | **responses**   61:7 | 28:3,25 29:9 | **revitalize**   210:19 |
| 284:7,18 285:2,9 | 82:21 92:22 | 31:1 32:6 | **richardson**   3:5 |
| 286:5 288:20 | 108:3,4 147:12 | **return**   307:17 | 5:5 9:12,13 |
| 292:12 293:2 | 157:4 175:18 | 308:6 | 10:13 11:24 |
| 294:22 297:1,21 | 176:8 255:23 | **reveal**   23:25 | 15:3,10,17 27:23 |
| 297:22 299:25 | **rest**   24:17 44:2 | **review**   7:17 | 35:14 36:23 |
| 303:24 304:15 | 53:4 87:8 | 12:15 121:10,14 | 38:14 39:18 |
| 304:19 305:10 | 105:22 132:14 | 121:22 122:5,7 | 41:20 42:20 |

Veritext Legal Solutions
866 299-5127

**[richardson - right]**

| | | | |
|---|---|---|---|
| 44:20 48:4 | 209:4 210:9,22 | 294:3,14 295:15 | 152:1,18 153:5 |
| 51:25 52:7 54:3 | 212:6,23 213:17 | 296:3,12 297:25 | 155:21 158:8 |
| 54:10 55:17 | 214:17 215:1 | 299:8 302:11,14 | 161:4,10 162:6 |
| 56:1 61:20 | 216:1,6 217:5,7 | 305:14 | 162:19 163:14 |
| 63:11,18,23 | 220:6,17 221:11 | **ridiculous**   248:1 | 164:1,4,8,14,19 |
| 68:18 69:9 72:4 | 221:16 222:8,16 | **right**   11:4 13:14 | 164:25 168:14 |
| 74:18 75:5 | 222:20 223:18 | 14:5 20:5 21:10 | 168:18 169:13 |
| 76:16 80:20 | 224:18 225:6,23 | 21:23 24:24 | 169:17 171:22 |
| 83:7 89:4,18 | 227:4 228:7 | 25:2 27:25 | 173:4 174:21 |
| 99:15 101:2 | 229:1,24 230:7 | 28:13 29:7 | 175:13 176:3,22 |
| 103:15 105:13 | 230:10,13 | 31:21,23 32:1 | 177:8,10 178:23 |
| 106:20 108:5 | 231:14 234:11 | 38:25 39:20 | 179:5,9 181:17 |
| 113:7 114:2 | 235:2,24 237:3 | 43:2 44:22 47:8 | 182:15,22,23 |
| 115:3,18 117:1,8 | 238:10,16,17 | 47:15 48:8 50:7 | 183:14 186:8,12 |
| 118:15 121:1 | 239:25 240:16 | 54:20,23 55:1 | 186:23 189:12 |
| 128:13 129:1,21 | 240:18,22 242:1 | 59:8 60:24,25 | 189:22 190:1 |
| 130:2 131:6,12 | 242:21 244:15 | 62:2,4,9 65:7 | 191:12 196:4 |
| 132:18 138:21 | 245:9 246:20 | 67:5 70:11,15 | 197:1,8,10,14 |
| 139:10 140:7,14 | 247:15 248:15 | 71:22 72:1,15 | 198:6 199:19,24 |
| 141:11 145:12 | 249:25 251:21 | 73:18 74:9,10,17 | 200:16 201:15 |
| 148:21 150:4 | 251:23 252:3,8 | 75:2 77:20 78:5 | 202:9,18 205:18 |
| 151:25 153:20 | 252:22,24 253:5 | 78:25 84:8 85:7 | 208:15 216:22 |
| 155:2 161:13,23 | 253:18,20 254:5 | 85:12 86:3,21 | 219:6 222:2,4 |
| 164:24 167:15 | 254:13 256:6 | 87:18,20,23,24 | 223:4 224:21,24 |
| 167:23 175:9,24 | 257:1 259:3,14 | 89:10,25 90:2 | 225:3 226:7,13 |
| 176:10 179:8,10 | 260:11 261:17 | 91:21 93:1 | 226:14 228:6,9 |
| 179:17,20,24 | 262:8 264:5,8,14 | 94:16 97:6 | 229:11 230:1 |
| 180:3,11 183:10 | 265:19 266:7,11 | 102:25 108:12 | 234:12,15 |
| 185:4 187:2,16 | 269:13,25 | 109:24 114:9,11 | 237:13 239:5 |
| 188:18 190:5 | 271:20 272:24 | 122:1 123:2,9 | 240:1,6,9,11 |
| 191:9,17 192:10 | 274:15 276:8,17 | 124:8 127:24 | 241:1,9,19 |
| 192:25 193:9,16 | 276:21 278:16 | 128:2,4,6,10,12 | 242:24,25 |
| 195:10,23 197:7 | 279:12 282:10 | 129:4 132:8,20 | 243:12 249:15 |
| 198:10,17 199:2 | 282:22 283:23 | 135:12,13 | 250:4,20 256:2 |
| 199:5,23,25 | 283:25 284:3 | 137:13 140:22 | 257:3,6,9,11,12 |
| 200:3,12,15 | 286:22 288:5,12 | 141:3,6 142:17 | 257:24 258:2,5 |
| 206:4,6,14,23 | 288:16 289:4,8 | 144:9,14,17 | 258:21 259:9,13 |
| 207:19 208:6 | 290:25 292:4,21 | 148:7 149:20 | 259:15,18,20 |

Page 50

**[right - schneier's]**

260:2,3,6,12,19
260:22,23 261:1
261:2,5,6 263:10
265:20 266:23
267:16 268:3,5,7
269:10,19,21
270:2,3,7,11
271:9,23 272:16
272:18 273:5,19
273:19 274:2,5,8
274:16 275:6
276:1,2,9 279:4
281:2 282:11
284:4 285:7
286:6 287:18,22
288:17,23 289:1
289:3,9,14 291:9
293:4,5 294:7
295:21,25
298:15 301:5
303:21,22 304:9
304:22,24
305:10
**risk** 144:25
145:3 157:22
202:23 237:17
283:2
**role** 202:12
**roll** 32:5
**room** 11:7
**row** 267:16
268:12
**rule** 28:23
**ruled** 29:22 38:2
159:17 160:2,22
**rules** 308:8
**run** 49:14,15,17
49:20,21 51:8

52:15,22 96:5
109:4 124:12
169:2,4 209:24
210:1 279:16

**s**

**s** 4:6 97:9 98:2
310:3
**sadly** 22:3
**safari** 40:22 41:6
81:18,20,24 82:2
82:7,10,14 83:11
83:14 84:23
85:12,15 87:19
88:9,18 90:6
91:17,19 93:23
94:10,11 95:6,21
100:7 133:12
136:16
**sake** 117:22
**salt** 243:7
**sample** 64:8,8,10
93:20,25 101:18
104:12 105:23
106:2 111:3
138:6 145:4
163:12 246:2,3
250:7 251:10
260:9,10 261:14
261:18 262:23
263:7
**samples** 104:22
246:1,4 249:9
**san** 3:16 11:6
23:2 24:13 25:9
25:10,11,21 27:1
27:11,24 28:7
29:16 37:9,17

**save** 46:1,3,9,12
46:13 68:4
70:11,15 270:7
277:25 278:8,12
278:19,23 279:1
279:14,19
**saved** 37:25
139:22
**saving** 46:23
47:7 67:25 68:3
69:16 279:16
**saw** 60:21 89:9
90:22 119:15
152:22,25
153:19 226:15
297:4,23 298:2
304:23
**saying** 22:6
29:23 30:5
105:4 132:22
171:20 183:2,9
186:7,10 244:14
249:19 255:13
255:13
**says** 65:3 81:17
81:20 89:6
127:2,6,9 128:5
128:15 141:22
147:23 153:6
160:6 178:7
182:19 184:18
184:25 185:11
188:4 189:7
190:17 191:5,19
192:5 197:18
202:12 208:16
208:25 209:12
211:21 214:3,8

214:11,14,18
241:25 258:23
259:23 267:9
268:8,22 269:2
273:17 274:6
275:17 284:17
285:12 287:13
294:21 297:8
299:21 301:17
302:1 303:15
**scale** 142:5
148:7 233:24
235:19,22
**schedule** 307:10
**schiller** 3:4 9:13
9:16
**schneier** 162:16
163:22 165:21
166:11,21
167:13 168:23
169:6 171:23
174:14 178:7
193:7,23 195:2
195:12,17,25
196:2,10 200:25
201:17,23 202:5
202:17 203:11
203:20 230:19
232:4 234:2,9,22
236:4,9,10
299:22 300:5
**schneier's**
162:17,22,24
163:17 165:3,6,9
165:20 166:3,17
167:7 170:3,17
170:25 171:10
171:17 172:15

**[schneier's - see]**

172:23 173:1
175:23 193:6,15
193:17,20 194:4
194:10,13
195:25 196:21
197:3 203:9
205:3,8 206:2
230:17 232:6
233:11 236:2,18
298:13 299:7
300:16
**school**  41:9
129:8 136:8
**science**  42:25
**scientific**  194:8
**scientifically**
174:2
**scope**  223:11
**scrap**  189:10
**screen**  8:11
40:12 65:12
70:6,6 78:5
85:23 111:19,21
111:25,25 112:2
112:5,7,18,25
113:12,17,19
114:9,15 115:2
119:7,8,15
120:12 121:18
121:20,21 122:8
122:12,13,21
123:3,7 128:5,5
129:12,20,22
134:8,10,14,17
136:13,14
137:13,17
146:19 150:9
153:8 158:8,11

159:12,18 160:3
160:11,15,21
179:25 199:1
218:22 226:5,15
227:7,21 228:8
228:13 229:22
229:25 266:5
269:15 286:5,7
287:14 296:23
297:2,4,11 303:3
304:11,13 305:8
**screened**  108:22
109:15
**screening**  76:1
78:4 92:14
109:1 111:10
**screens**  72:1
141:23 147:19
147:24 227:20
297:19
**scroll**  21:5 58:24
60:23 62:15
71:15 76:3
81:14 83:19
92:11 170:11,13
297:14 299:15
303:6
**scrolled**  89:23
173:11 222:14
283:1
**scrolling**  71:17
126:14
**scrutiny**  243:25
**sdccu**  30:19
**se**  3:8
**sean**  4:23 8:25
**search**  114:18
143:5,6,10 169:4

178:19 209:12
300:3
**searches**  169:2
**searching**
169:15
**seclusion**  34:14
**second**  21:17
54:14,22 55:4
59:10 60:9,23
65:13,17 71:15
71:18 77:25
83:17,20 84:6
85:14,20 87:15
87:22 89:15
91:17 118:23
119:20 125:1
131:10,19,20
132:16 133:25
137:2,11 140:8
140:15,18
141:12,16 144:6
145:16 147:9,10
152:25 154:1
155:4 159:6,24
162:3 171:19
179:19 185:19
186:11,25 187:5
187:12 199:6
200:11 202:20
206:25 208:9,13
215:9 217:20,25
221:23 225:17
264:19,21
267:16 268:12
270:24 286:20
287:2,5,18 288:9
289:22 293:10
297:6,8 302:20

302:24 303:2,8,9
303:13
**secondary**  82:23
**seconds**  120:11
122:9,20 134:18
134:22,23,25
153:5,6,7 286:1
**secrecy**  213:10
213:19,23
**section**  34:22,25
38:8 168:15
170:20 172:8,10
263:12 290:3
304:14
**sections**  172:9
**security**  275:21
**see**  14:22 21:7
22:12 44:18
56:20 58:16
59:5,14 63:2
65:4 69:1 79:6,9
85:4 88:13 89:8
89:9,19 90:7
96:20 97:4
100:13 105:20
107:20,21 111:9
111:19 116:8,16
118:22 119:5
120:12 122:11
125:16 126:8
128:14 129:3,15
133:18 135:3,4,6
135:9,10,14,21
135:22 136:11
141:18 146:19
151:7 152:23
155:12 157:16
162:11,14

**[see - set]**

| | | | |
|---|---|---|---|
| 165:19,25 | 297:2,22 304:17 | selling 31:25 | separate 22:10 |
| 166:24 168:15 | 304:20,20 | sells 32:4 | 109:13 132:14 |
| 170:21 172:13 | seegan 257:24 | send 135:19 | 159:21 250:11 |
| 174:5,13,13 | seeing 29:11 | 282:21 | 279:17 |
| 180:9 181:23 | 179:18 217:16 | sense 56:21 93:3 | separately |
| 182:1,1,7,17,19 | 242:4 286:3 | 178:7 205:1 | 219:17 279:14 |
| 182:23 183:1,7,8 | seeking 118:17 | sensitive 158:19 | serious 246:14 |
| 194:24,25 201:5 | 120:6 | 161:2 | served 15:23 |
| 201:8 202:5,9,15 | seen 8:11 63:8 | sensitivity 84:12 | 19:21 21:23 |
| 202:20,25 203:1 | 70:20 77:10 | 88:13 100:6 | servers 44:18 |
| 204:1,3,7 208:14 | 134:1,5,8 156:10 | 101:11,16 102:1 | 48:10,11 147:16 |
| 208:15,18 | 157:11 192:20 | 102:15 104:13 | 149:11,12 |
| 210:23 214:3 | 192:24 204:3 | 105:20 106:4,6 | service 44:17 |
| 215:15 216:18 | 216:21,23 | 106:17 107:23 | 127:10 129:3,4 |
| 217:8 218:7 | 217:17 218:18 | 109:23 110:2,17 | 231:21 234:14 |
| 222:17,22 223:2 | 219:9,18 220:14 | 110:18 123:18 | services 71:7,8 |
| 223:24 224:23 | 220:16,18 240:2 | 123:19 124:6,10 | 77:3 127:16 |
| 225:7,11 227:6 | 241:4,7,22 | 124:12 218:4,9 | 129:14,24 130:4 |
| 227:10 228:8 | 243:23 244:6,6,8 | 280:25 283:11 | 131:16,25 160:6 |
| 230:14 231:17 | 244:9,20,22 | sent 19:12 | 186:20 |
| 231:23 239:2 | 245:14,15 | 294:24 295:4 | session 42:3,5 |
| 241:10,12,16 | 246:14 | sentence 125:4 | 43:9,17 47:25 |
| 243:2,15 248:6 | segments 246:6 | 147:10,11 | 70:3 127:4,5,12 |
| 258:4,8 259:9,13 | select 18:19 | 153:12 182:1,14 | 127:17,18,19 |
| 259:15,23 | 73:18 82:16 | 186:8,16 188:21 | 130:19 133:11 |
| 266:21,22 | 137:5 141:24 | 189:2,5,6,7 | 139:22 142:3 |
| 267:20,24 268:1 | 147:20,24 155:9 | 190:25 197:17 | 148:1 274:7 |
| 268:5,10,15 | selected 64:6,7 | 197:24,25 198:9 | 290:7 291:10 |
| 269:16 273:6,8 | 81:21 82:1,8,11 | 200:19 202:1 | 292:6 293:5,9,16 |
| 273:11,16,17,19 | 82:13 97:3 | 223:20 225:11 | 293:21 294:6 |
| 273:24 274:19 | 99:23 146:1 | 252:13 264:22 | 295:10,12,17,23 |
| 274:22 275:19 | 155:11 232:10 | 265:5 270:16,24 | 301:21,23 302:6 |
| 275:22,23 277:1 | 303:3,19 | 271:1,3,3 284:12 | set 73:1 76:1 |
| 278:2 280:9 | selecting 32:12 | 284:16 288:22 | 82:17 97:20 |
| 283:11 284:5,12 | selection 74:1 | 290:1 303:12 | 98:11 146:7,11 |
| 288:18,22 290:1 | self 49:11 279:16 | sentences 145:23 | 147:3 182:23 |
| 290:17,18,19 | sell 31:11,17,19 | 159:20 | 221:10 229:21 |
| 292:17 294:1 | 31:21 | | 287:17 306:10 |

[setting - slide]

setting 146:12
147:3 158:23
settled 24:5
37:22
setup 23:16
seven 290:6
shallow 181:25
182:13 191:3,10
191:20,24
share 91:15,20
93:5 99:8,11
187:24 240:14
266:5 302:19
shared 204:20
shares 111:3
143:14
shari 281:13
sharing 205:25
sharpen 219:23
shop 142:23
143:2,3,4,10,15
shopping 142:3
142:12,23 143:8
143:12,12,13
144:14,21
short 54:7 98:19
117:5 206:20
208:12 264:11
296:9
shorter 208:10
shorthand 2:22
306:3,11
show 45:24 62:7
80:14 85:25
146:9 147:4
150:13 159:23
173:16 174:23
175:16 176:12

183:20,24
184:10 187:25
189:8 197:19
201:22 203:19
204:14 234:8,21
235:16,22
281:15 286:8
298:4 305:11
showed 29:10
62:10 72:1
153:3 189:24
287:5 298:6
showing 52:13
52:15,21 147:2
241:2 285:9
shown 59:3
60:16 62:22
63:4,22 87:11
88:8,8 126:18
134:10,14 150:9
153:22,24
303:25 304:10
304:15,19
shows 16:7
82:17 150:10
201:19 262:22
285:18 297:13
303:11,11,15
shrinking
251:10
side 26:4 28:23
29:2 30:18,19
77:12 85:2
268:7
side's 15:13
sign 307:16
308:5

signature 306:24
307:21,23,23
308:9
signed 261:5,9
261:20
significant
275:20,24 276:7
276:10,11
similar 64:8 87:3
102:6,13 103:3
103:18 107:16
108:18 109:16
117:25 120:7
232:8 280:7,8,13
281:24 282:16
similarly 1:8 2:8
63:12
simmons 4:12
9:24
simmonsfirm.c...
4:17
simple 140:21
233:16
simplest 143:5
simplistic 232:23
235:17
simply 27:12
167:14 174:22
248:4 255:6
304:23
simultaneous
76:14 89:13
113:25 176:23
187:7 213:2
245:5 300:10
single 50:9 96:23
98:4 225:24
282:13

sinrastro 6:18
sir 82:4 100:20
131:10 188:9
267:3 285:17
286:6 294:25
site 125:11 127:7
295:5,6
sites 127:13,20
141:25 142:19
144:5,10 147:25
151:7,7
sitting 104:23
138:23 237:4
281:20 286:9
situated 1:8 2:8
situation 116:18
116:21 119:9
146:7 278:11
situations
278:18
six 22:10,15 33:2
49:7 75:10
92:17,25 93:7
94:1 98:9,18
113:19 115:5
232:7 238:25
239:5,6 249:15
sizable 224:12
226:19
size 246:6
261:14,18
slang 67:15
slide 152:24
181:20 183:8
185:18 186:6
187:17,18 188:3
189:23 190:13
190:15 191:20

Page 54

[slide - spoke]

201:8 202:16
203:24,25 214:9
214:14 266:20
275:17,18 291:7
293:4 302:4
**slides** 189:3,15
189:16,20
197:12 210:8,10
281:16
**slightly** 124:18
159:16 299:16
**slow** 82:4 184:5
187:14 188:9
295:1
**slower** 100:21
**slowly** 125:5
170:8 200:20
**small** 58:9 95:10
104:2,15,17
204:16 211:24
214:9 260:9
261:16 262:23
294:23 295:3
**software** 72:20
**sold** 31:21
**solid** 87:2
**solutions** 307:7
**somebody** 95:5
151:21
**somebody's**
194:23
**someone's**
142:17
**soon** 54:1
**sorry** 27:22 42:7
42:17 53:9
62:20 76:17
82:6 98:23

103:12 105:6,9
112:12 118:3
123:3 126:13
127:18 133:20
134:3,13,14
136:4 137:9
139:3 143:22
145:14,16 148:5
148:18 153:7
162:8 168:4
170:11 173:11
184:6,16 186:18
188:11 199:3
200:20,21 208:8
208:9,12 212:16
215:12,12 217:4
226:18 238:16
245:11 248:11
248:12 255:2
256:13 257:14
259:1 265:24
267:6 271:2
273:10 277:22
282:2,25 283:23
284:2 285:18,25
287:9 290:3
295:2 298:16
300:6,12,13
**sort** 86:15 175:7
186:24 207:14
282:7 283:12
**sought** 261:4
**source** 281:6,21
282:6,13
**sources** 130:14
281:8,11 282:21
**space** 280:16

**span** 281:9
**spanned** 246:4
**speak** 29:6 64:3
66:6 74:16
189:6 292:1
**speaker** 210:6
**speakers** 210:7
**speaking** 56:16
76:14 89:13,16
113:25 176:23
187:7,13 213:2
213:14 245:5
262:3 300:10
**speaks** 170:9
**specific** 13:12,13
40:1 59:10
77:12 80:10
90:11 91:4
92:10 98:15
119:18 126:1
130:9 131:18
137:21 160:3
165:7 200:23
202:2 218:8
219:9 220:4,5,9
220:10 228:21
247:3 250:18
256:24 285:23
**specifically** 30:9
40:9 93:9,15
120:4 131:20
132:16 140:15
199:19,22
218:17,24
219:15 220:23
222:12 282:13
284:8 285:3
292:19,19 294:5

302:8
**specifics** 151:24
**specified** 297:12
**specify** 39:1
41:23
**speculate** 213:5
213:7
**speculating**
213:15
**speculation**
191:14 208:4
211:6 214:25
233:7
**speculations**
210:21
**spell** 21:2
**spelled** 279:25
**spend** 12:5
120:11,21 286:1
**spent** 18:22 19:6
19:10,17 285:24
**splash** 40:12
65:12 70:5
85:23 111:25
115:1 119:7
121:17,20,21
122:8,8,12,13,21
123:3,7 129:20
136:13,14
137:13,17
159:12 160:3,15
160:21 218:22
226:5,15 227:7
227:21 286:5,7
287:13
**spoke** 66:13
210:7

Page 55

[spot - study]

| | | | |
|---|---|---|---|
| **spot**  58:10 | 271:9 291:8,12 | **store**  295:7 | **studies**  13:8 |
| **square**  300:2 | 303:3,19 | **stored**  41:13 | 24:22 25:5,7,8 |
| 301:18 303:13 | **states**  1:1 2:1 | 43:7 47:25 48:7 | 25:13 39:14 |
| **st**  3:8 | 8:21 100:24 | 290:9 301:17 | 40:14 53:4 |
| **stages**  63:9 | 181:24 183:4 | 302:2 | 70:18 80:14 |
| **stamped**  168:16 | 189:25 202:21 | **stores**  147:15,16 | 88:12 90:23,25 |
| 168:20 | 210:24 212:12 | **storing**  47:12,13 | 90:25 96:5 |
| **standard**  29:10 | 213:9 216:18 | **story**  214:12 | 103:14 104:20 |
| 80:2 243:5,16 | 222:22 223:20 | **strange**  146:25 | 104:21 108:1 |
| **standards**  57:10 | 225:8 227:6,19 | **street**  4:6 | 109:7,12,19,20 |
| **stands**  201:21 | 241:13 259:16 | **stricken**  270:17 | 111:25 116:7 |
| **start**  64:19 | 268:12 271:4 | 270:18 | 122:20 123:8,11 |
| 131:11 170:22 | 272:12 273:20 | **strictly**  278:20 | 123:11 124:4,18 |
| 184:9 251:15 | 274:19 275:19 | **strike**  251:21 | 132:19 150:10 |
| **started**  137:7 | 293:4 | 252:22 253:18 | 154:22 156:18 |
| 153:16,16 250:4 | **stating**  30:10 | 271:11 | 158:13 159:12 |
| **starting**  222:21 | **status**  22:9 | **string**  294:24 | 164:19,23 |
| **starts**  191:1 | **stay**  185:18 | 295:3 | 165:23 166:21 |
| 273:13 | **stenographically** | **strombom**  7:5 | 176:19 177:10 |
| **state**  9:7,9 10:16 | 1:21 | 216:8,10,19 | 204:6 207:16 |
| 59:2,12 160:3 | **step**  67:10 74:2 | 217:13 | 213:25 215:18 |
| 163:20 227:17 | 79:17 | **strombom's** | 238:23 239:12 |
| 238:23 288:18 | **steve**  7:9 | 216:3 217:9 | 239:20 244:7,8 |
| 307:9,12 | **stimuli**  35:19 | 218:15 220:19 | 244:22 245:2 |
| **stated**  13:11 | 88:7,9,9,9 90:22 | 220:25 | 247:23 292:15 |
| 57:21 104:15 | 116:15,16 | **strong**  283:6 | **studio**  6:11,16 |
| 118:9 162:5 | 119:11 120:1,13 | **strow**  233:14 | 6:21 |
| 227:3 239:18 | 121:8 122:5,18 | **structure**  255:17 | **study**  23:6 24:10 |
| 269:9 288:3 | 136:21 150:14 | **structured** | 24:16 25:4,10 |
| 293:19 304:4 | 154:1 303:14,15 | 170:12 | 29:13 40:9,11 |
| **statement**  16:2 | **stipulated**  10:8 | **stud**  65:21 | 44:24 45:1,4 |
| 41:5 99:14,16 | **stipulation** | 286:13 | 46:6 50:15 51:6 |
| 182:7,10 203:1,2 | 55:16,24 307:20 | **student**  246:17 | 52:15 53:2 |
| 203:5,8,11 224:2 | **stipulations**  2:20 | **students**  73:4 | 77:22,25 78:2 |
| 225:13 253:14 | **stop**  43:19 146:1 | **studied**  45:8,9 | 81:17 84:12 |
| 265:7 266:18 | 258:9 | 47:14 48:13 | 88:6,16 90:13,17 |
| 267:15 268:17 | **stopped**  302:18 | 70:21 | 91:11 100:1,13 |
| 268:21,24 269:9 | | | 100:14 102:7,14 |

Veritext Legal Solutions
866 299-5127

**[study - survey]**

| | | | |
|---|---|---|---|
| 103:2,4,18 | 271:4 272:4,6,7 | 280:15 281:17 | **supposed** 24:3 |
| 107:16 108:11 | 272:8,10,11,15 | **suggested** 169:7 | 45:23 51:8 |
| 108:18 109:1,16 | 272:19 274:9 | 251:6 | 119:11 130:20 |
| 110:12 112:1 | 275:10 279:16 | **suggesting** 52:13 | 132:3,3 |
| 119:5,12,14,17 | 279:20 283:8 | 150:23 | **sur** 71:6 75:16 |
| 119:18 121:18 | 284:17 285:24 | **suggestions** | 87:13 118:11 |
| 122:12,15 125:8 | 286:2,20 287:2,5 | 55:10 | 144:18 |
| 126:10,17 | 287:18 | **suggestive** 177:4 | **sure** 12:22 19:9 |
| 128:12 129:19 | **study's** 133:7 | **suggests** 175:5 | 20:9 32:25 |
| 132:2,3,13 133:2 | **stuff** 209:21 | 195:8 197:1,3 | 34:24,25 36:18 |
| 133:6,13,17 | 284:15 | 201:24 205:11 | 42:12 44:21 |
| 134:24 135:2,18 | **sub** 151:1,1 | 205:19,23 | 47:22 53:22 |
| 136:6,6,11 137:3 | 170:16 246:1,2,3 | 207:14 208:25 | 56:10 61:23 |
| 137:6,13 140:8 | 246:4 | 270:2 288:19 | 66:8 83:3 94:13 |
| 140:15,18 | **subheading** | 291:13 | 104:20 109:21 |
| 141:12,16 152:7 | 274:19 | **suite** 3:15 | 111:2 115:12 |
| 152:8,25 154:1,6 | **subject** 116:10 | **suited** 119:19 | 116:7,9,13,16,18 |
| 154:24,25 155:4 | **subjects** 158:10 | **sullivan** 4:4 | 117:1,11 118:24 |
| 155:15 157:18 | **submitted** 13:4,7 | **summarize** | 119:10,15 121:2 |
| 157:24,25 158:3 | 15:13,20 21:19 | 70:21 | 122:11 130:24 |
| 158:9,10 159:3 | 26:7 246:17,18 | **summary** 57:23 | 136:25 140:17 |
| 160:17 164:4,8 | **subscribed** | 61:2,6 162:9 | 152:11,12 155:5 |
| 164:13 185:13 | 306:22 | 164:16 237:10 | 156:22 166:6 |
| 201:17,23 202:4 | **subsequent** | 263:17 | 172:7 178:3 |
| 205:19 209:14 | 88:13 100:6 | **super** 235:17 | 179:3 182:6 |
| 209:23,25 | **subsequently** | **supervision** | 183:14 186:7 |
| 211:15,24 214:1 | 101:11 | 306:12 | 198:13 207:6 |
| 215:21,25 | **substantial** | **supplemental** | 209:2 210:14 |
| 217:25 219:4 | 112:15 273:22 | 6:8 15:19 243:9 | 211:7 217:19 |
| 227:13 229:23 | 274:4,10 | 257:16 264:18 | 233:10 249:6 |
| 238:25 240:13 | **subsumes** 151:1 | 276:19,22 288:7 | 251:9 270:19 |
| 242:8,18 243:3 | **subtitle** 273:8,12 | 289:12,20 290:5 | 272:14 273:14 |
| 244:9,20,25 | **sufficient** 121:6 | **support** 11:18 | 294:17 301:4 |
| 246:14 247:9 | 165:11 167:2 | 17:3 168:25 | 303:7 |
| 255:12 256:4 | 211:13 | 189:9 232:12 | **surprise** 104:8 |
| 257:18 264:23 | **suggest** 92:15 | **supports** 94:25 | **survey** 22:20 |
| 264:25 268:20 | 214:20 228:3 | **suppose** 211:11 | 23:2,19,20 24:15 |
| 269:19 270:13 | 249:14 256:9 | 248:9,20 | 26:5,6,9,9 28:8 |

Veritext Legal Solutions
866 299-5127

**[survey - takes]**

| | | | |
|---|---|---|---|
| 28:11,13,16,20 | 116:2,5,6 117:11 | 70:7,23 71:3 | 216:2 221:12 |
| 28:22 33:3 | 117:24 118:23 | 72:14 75:17,20 | 240:18 265:14 |
| 36:25 37:12 | 119:20,24 120:5 | 75:24 76:4,9,12 | 289:5 |
| 54:20,23 55:1,11 | 123:24 125:24 | 76:21 78:10,17 | **table** 85:2 |
| 55:12,13,20 56:6 | 126:6,8 127:23 | 78:23 81:6 | 231:16 232:3,11 |
| 56:8,9,10,11,12 | 131:17,17,20,22 | 87:15,22 88:1 | 263:6 268:5,8 |
| 56:15,17,22,25 | 132:16 133:24 | 92:9 93:17 | 270:9 287:11,16 |
| 57:3,5,7,12,17 | 134:4,8 135:15 | 95:22 102:5,23 | **taint** 125:25 |
| 58:2,8 59:16,22 | 137:3 138:9,12 | 105:15 106:7,22 | 126:2 |
| 60:20 62:3,5,10 | 144:17,19 | 107:4,13,15 | **tainted** 101:9 |
| 62:23 63:8,9,13 | 145:20,25 | 108:15 109:4 | 282:24 |
| 64:11 65:17,17 | 146:17 147:14 | 111:7,22 113:20 | **take** 8:14 19:15 |
| 65:19 66:4 | 148:25 151:10 | 115:24 118:7,10 | 54:4 67:10 |
| 67:10 69:22,24 | 215:2 217:12,22 | 118:12,16 | 94:22 114:17 |
| 70:3,13 71:6,21 | 221:24 224:19 | 121:10,14,23 | 116:23 139:11 |
| 72:17,19,20 73:7 | 225:2,17,24 | 122:4 163:18 | 143:3 155:12 |
| 73:10,12,15,16 | 239:13 245:13 | 177:1 218:16 | 161:13 187:3 |
| 73:17,18 74:4,8 | 247:1,6 248:5 | 219:7 220:10,22 | 192:4 201:3 |
| 74:9,15,17,20 | 255:1,3 257:24 | 243:19 245:14 | 214:9 230:10 |
| 75:2,6,13,16,19 | 260:4,8,14,24 | 245:15 272:2 | 232:16 241:5,5 |
| 75:23 77:5,10,16 | 261:8 262:20 | 277:13 280:7 | 243:6 255:21,22 |
| 78:5 79:12 | 263:3,3 271:21 | 294:5 | 263:25 264:3 |
| 81:10 83:14,17 | 272:1 279:10,25 | **suspect** 77:14 | 276:17 296:3 |
| 83:20,24 84:4,6 | 280:16 281:10 | 102:21 139:11 | 299:1 |
| 84:23 85:14,18 | 281:13,18 283:4 | **svk** 1:6 2:6 8:22 | **taken** 2:19 8:18 |
| 85:20 86:20,22 | 284:17 286:6,23 | **swear** 10:4 | 54:7 100:11,18 |
| 86:24 87:13 | 287:11 292:22 | **switch** 113:5 | 100:25 101:24 |
| 90:21 91:7 | 293:10 295:25 | 265:24 | 102:6,13 103:3 |
| 92:21,23 94:18 | 297:2,4 299:24 | **switched** 95:7 | 103:18,22 105:1 |
| 95:18 96:2,16,19 | 301:20 303:2 | **swore** 252:20 | 105:16 106:9 |
| 96:20 97:1 | **surveys** 54:17 | **sworn** 306:6 | 107:5 117:5 |
| 100:12,18 101:1 | 55:4,8 57:1,14 | **system** 41:10 | 161:20 206:20 |
| 101:24 103:23 | 59:4,8,13,17,20 | 126:14 | 264:11 280:8 |
| 105:1,16 106:9 | 59:23 60:1,5,8 | | 296:9 306:9,11 |
| 106:16,19 107:5 | 60:14 61:14 | **t** | 309:5 |
| 108:23 109:24 | 64:14,16,18,19 | **t** 310:3,3 | **takers** 109:24 |
| 110:25 111:23 | 64:21,23 66:11 | **tab** 179:12 | **takes** 203:11 |
| 115:12,19,25 | 69:10,13,15,20 | 198:18 206:7 | |

Page 58

[talk - texts]

| | | | |
|---|---|---|---|
| **talk** 18:17 89:21 | **technology** 8:24 | **terminates** 87:7 | 228:12 229:14 |
| 137:2 181:9,13 | 234:13 | **terminologies** | 241:21 242:4 |
| 199:9,12 207:7 | **tell** 15:4 23:14 | 66:18 | **testify** 10:21 |
| 221:8 237:15,18 | 24:9 44:3 51:16 | **terminology** | 37:22 306:7 |
| 276:13 280:6 | 98:16 124:13 | 88:4 | **testifying** 1:19 |
| 294:18 | 130:1 137:10 | **terms** 42:23 | 2:18 8:1 95:14 |
| **talked** 69:22 | 150:7 159:5 | 65:24 70:10 | 105:12 |
| 79:20 107:13 | 170:8 178:3 | 126:17 147:15 | **testimony** 21:15 |
| 149:5 151:20 | 179:21 180:12 | 155:4 184:25 | 22:15 23:18 |
| 158:13 159:13 | 181:4 183:18 | 194:12 209:20 | 25:23 26:19,22 |
| 224:20 259:8 | 211:20 233:17 | 225:1 230:3,18 | 27:12,14,16 |
| 282:6 | 240:23 251:13 | 231:5,21 234:14 | 28:19 29:17,20 |
| **talking** 50:16 | 269:6 286:9 | 239:15 251:1 | 30:3,10 42:13 |
| 109:7 123:2 | 287:7 291:1 | 252:17 260:5 | 43:23 46:22 |
| 150:16 168:3 | 294:13 301:21 | 295:13,19 | 60:7 61:13 67:3 |
| 191:11,20 | 303:8 | **test** 66:13 84:16 | 80:4,8,21 106:13 |
| 213:16 218:20 | **telling** 80:16 | 102:16 106:5,6 | 106:14 112:21 |
| 264:23 274:1,4 | 146:14 147:8 | 131:22 132:3,7 | 124:8 167:10 |
| **talks** 125:21 | 148:10 | 132:11,16 136:7 | 186:14 205:10 |
| 199:19,21 | **tells** 212:4 | 137:20 138:4,19 | 205:15 226:8 |
| 208:23 295:12 | 214:12 | 144:1 147:13 | 237:20 249:17 |
| **target** 73:16 | **temporarily** | 148:8,22,23,24 | 249:22 281:21 |
| **task** 165:8 | 43:8 | 151:11,14,15,19 | 282:3 304:9 |
| **tasks** 19:13,13 | **ten** 12:7 20:17 | 158:7,21 160:24 | 309:8 |
| 19:15 | 21:25 64:2,13 | 161:6,9 213:21 | **testing** 106:16 |
| **taught** 20:10 | 66:9 211:11 | 226:12 234:24 | 122:15 132:23 |
| 246:16,21 | **tend** 211:6 | 234:24 236:10 | 154:12,12 |
| **teach** 246:15,15 | **tends** 204:23 | 258:13 280:24 | **tests** 234:22 |
| 246:22,22 | **term** 39:14,15 | **tested** 119:9 | **text** 58:19 86:1 |
| 251:11 | 45:11,12 66:11 | 122:12 127:14 | 118:23,25 119:1 |
| **teaching** 20:7,10 | 66:22 70:8 | 127:23,25 136:9 | 155:9,11 158:16 |
| 281:16 | 130:25 157:2 | 178:15 194:5,6 | 182:24 217:24 |
| **team** 11:18 17:1 | 178:18 225:3 | 212:1 232:7 | 299:19 |
| 17:2,8 19:6 | 229:5,6,6 245:21 | **testified** 10:9 | **textbook** 277:13 |
| 23:21 53:22 | **terminate** 88:10 | 22:17 25:16 | **textbooks** 194:9 |
| 168:25 169:10 | **terminated** | 33:4,21,25 34:4 | 281:11,17 |
| **teams** 17:17 | 86:14 | 34:8,12,16,20 | **texts** 119:22 |
| | | 69:12 106:19 | |

**[thank - three]**

| | | | |
|---|---|---|---|
| **thank** 10:2 11:23 | 39:1,16 43:22 | 173:7,19 174:6 | 87:13,15,22 |
| 54:2 55:6 87:25 | 44:3 45:10 46:2 | 178:2 181:11 | 91:16,18,24 |
| 89:17 100:16,22 | 46:11 47:23 | 182:13 183:23 | 111:23 112:1 |
| 117:2 125:14 | 48:15,23 49:21 | 185:13 186:3 | 119:12,14 |
| 127:24 187:15 | 50:3,16 53:11 | 187:20 192:22 | 121:18 122:12 |
| 254:23 262:6 | 55:15,23 57:16 | 193:6 194:19 | 127:14 129:3 |
| 264:16 266:5,7 | 57:19,24 59:24 | 196:18 197:15 | 130:17 135:2 |
| 296:13,15 | 61:4 63:1,16 | 200:9 207:22 | 144:7 157:18,24 |
| 305:19 | 65:20 66:16 | 211:9 212:19 | 157:25 158:3,9 |
| **thanks** 84:20 | 67:20 69:2 77:9 | 213:16 215:24 | 164:7 172:20 |
| 141:20 | 84:11 86:9 | 219:10 224:7 | 175:18,19 |
| **thc** 31:22 | 88:21,24 90:8 | 226:3 232:6 | 181:23 188:3 |
| **themes** 213:10 | 93:3 97:16 | 235:15 240:5,11 | 227:13 237:8,9 |
| **theory** 49:11 | 102:20 103:5,13 | 241:7 245:16 | 275:9 287:12 |
| 53:7 | 103:16,25 104:2 | 254:20,21,25 | **thirty** 290:6 |
| **thereof** 2:20 | 105:18 107:8 | 260:16 262:21 | **thoroughly** |
| 306:16 | 108:25 110:6,19 | 263:5 270:6,6,7 | 68:21 |
| **thing** 91:14 | 110:22 111:9,15 | 270:7 277:14 | **thought** 27:5 |
| 128:18 161:8 | 112:9,14 113:3 | 283:1 284:21 | 80:23 89:22 |
| 171:20 187:23 | 113:14,15,21 | 285:5,19 286:25 | 132:11,12 145:4 |
| 213:6 232:19 | 114:4,8,12 115:9 | 287:24 290:8,11 | 149:16,18,24 |
| 249:10 | 115:9,9,11,19 | 292:1 297:7,13 | 274:14 |
| **things** 24:2 29:1 | 116:24 117:10 | 299:10,20 301:6 | **thousand** 53:5 |
| 31:11 38:11 | 123:16,17 | 301:13 302:7 | 256:1 |
| 50:3 61:4 84:17 | 126:17 129:18 | 304:11,18 305:6 | **three** 11:15 12:9 |
| 143:18 155:1,14 | 129:18 132:5,6 | **thinking** 79:1 | 15:23 16:12,16 |
| 155:23 176:25 | 133:1,2 135:7 | 120:20 131:3,4,5 | 16:22,25 17:6 |
| 232:23 234:9,23 | 136:16 137:8 | 131:14 142:13 | 18:14 40:14 |
| 244:18 265:24 | 139:4,21 140:12 | 142:18,19 | 41:9 54:16 55:8 |
| 280:18 | 140:18 141:17 | 143:25 267:6 | 59:23 60:1,5,8 |
| **think** 12:18 | 143:11,12,12 | **thinks** 211:12 | 61:14 69:10,15 |
| 14:12 17:17 | 145:3 148:8,11 | **third** 42:10 | 70:23 71:3 |
| 21:11 23:11,13 | 148:20 149:13 | 43:15,16 44:4,15 | 72:14 75:17,20 |
| 24:16 25:15 | 150:15,21 151:8 | 54:25 55:4 | 75:24 76:9,12,17 |
| 29:22 30:17,19 | 151:8 152:5,17 | 56:16 59:22 | 76:20,21 78:10 |
| 31:16 33:12,16 | 153:6,23 154:18 | 64:4 66:3,3 70:3 | 78:23 81:18 |
| 33:20 34:19,24 | 154:18,19 157:8 | 70:13 78:2 | 83:13 84:22,24 |
| 35:13,20 38:20 | 157:23 171:12 | 83:17 85:18 | 85:9,15 87:18 |

**[three - true]**

| | | | |
|---|---|---|---|
| 88:17 92:8 | 96:12 117:4,7 | **told** 19:16 29:21 | **transcript** |
| 100:11,17,24 | 120:21 121:6,11 | 44:14 151:19 | 306:18,20 307:6 |
| 101:24 103:22 | 122:6,17,24 | **top** 89:6,25 | 307:8,10,13,13 |
| 104:25 105:15 | 133:25 134:15 | 114:6 138:10 | 307:21 308:2,2 |
| 105:16 106:8 | 139:12 161:19 | 143:19 167:17 | 309:5 |
| 107:4,5 111:6,22 | 161:22 187:3 | 182:20,24 | **transitioning** |
| 111:25 122:4 | 195:16 206:19 | 185:10 241:10 | 264:4 |
| 123:11 124:17 | 206:22 217:16 | 268:7 273:7 | **transmission** |
| 126:9 127:22 | 236:5 245:8 | 282:20 291:9 | 66:15 |
| 133:9,11 143:19 | 256:3 264:10,13 | 299:20 301:14 | **transparency** |
| 147:18,21 154:6 | 278:9 285:24 | 301:16 | 191:8 192:3 |
| 163:18 164:22 | 296:8,11,13,14 | **topic** 37:8 249:7 | **trap** 86:16 |
| 169:12,16,23 | 300:18 305:12 | **topics** 219:2 | **traveling** 41:3 |
| 177:10 181:16 | 306:10 307:10 | 280:7,8,13 | **treat** 209:22 |
| 186:17 187:21 | 307:18,24 308:7 | 281:24 282:16 | **treated** 268:20 |
| 187:24,25 188:1 | **timer** 134:19 | 290:12 | **treatises** 281:13 |
| 188:20,23 | 153:16 | **total** 12:5 19:12 | **treats** 195:2 |
| 189:16 215:18 | **times** 20:16 | 64:1 243:25 | **trembling** |
| 226:21 229:13 | 25:18 63:2,17 | **totally** 233:9 | 249:10 |
| 231:25 236:19 | 72:18,21 116:2 | **town** 37:23 | **trial** 25:16,23 |
| 237:5 303:15 | 154:6 229:13 | **traces** 43:13 | **trick** 159:10 |
| **threw** 246:11 | 281:2 | **track** 68:13 | **tricking** 251:4 |
| **throw** 45:21 | **title** 210:17 | 224:15 | **tried** 12:2 45:18 |
| 233:14,24 | 273:11,17 | **tracked** 292:19 | 155:5 246:9 |
| 250:15 | **titled** 49:10 | **tracking** 290:7 | 247:9 253:12 |
| **throwing** 235:7 | 168:16 | 291:10 292:7,23 | **tries** 194:1 |
| **throws** 44:1 | **tobacco** 31:8,14 | 292:25 293:5,9 | **triggers** 182:18 |
| **thumbnails** | 31:17,18,19 | 293:16 294:6 | **troung** 9:23,24 |
| 135:22 | **today** 10:21 | 295:10,12,17,23 | 9:24 |
| **ticking** 153:17 | 12:17 16:12 | 301:21,23 302:6 | **true** 60:11 74:7 |
| **tied** 164:18 | 51:19 104:23 | **trade** 203:15 | 86:9 115:10 |
| 218:16 | 124:8 138:23 | 205:24 | 157:8 162:20 |
| **time** 8:5 9:7 12:5 | 151:5 180:20 | **trademark** | 165:12 167:5 |
| 14:8 19:5,11,15 | 205:11 237:4 | 27:24 31:10 | 191:16 192:9,24 |
| 20:18 28:8 | 281:20 286:9 | **traffic** 44:17 | 194:24 195:9 |
| 48:19 50:2 | 304:4 | 99:8 239:23 | 197:2 248:20 |
| 51:19 54:6,9 | **today's** 6:11 | **transcribed** | 250:3 268:17 |
| 79:12 80:12 | 11:14,25 305:17 | 306:12 | 270:8,15 285:17 |

Page 61

**[true - understanding]**

297:10 309:9
**trujillo**   1:6 2:6
**truong**   4:13
**trust**   67:19
191:1,7 192:2,7
192:7 292:15
**truth**   252:20,20
306:7,7,8
**truthfully**   10:21
**try**   45:18 56:17
57:11 69:1
98:16,20 103:25
105:18 116:17
116:18 133:4
152:12 158:1
166:7 178:3,10
194:9 195:6
233:3 234:9
235:10 250:17
251:3 283:25
302:18
**trying**   24:25
62:21 66:2 67:9
92:5 104:16
128:12 136:20
149:21 151:11
165:10 187:21
190:6 193:21
195:7 196:21
197:18 203:18
203:19 204:13
245:18 246:8
250:17 252:21
**tuesday**   1:18
2:21 8:2 79:24
80:9,10 309:6
**turn**   298:16

**turns**   22:3
**tv**   23:16
**twice**   24:18 25:2
108:4 134:8
135:3,4 152:21
153:1,19 303:25
304:11,16,19,24
**two**   25:3,13,24
29:3,3 31:10
48:20 59:19
65:10 66:2 70:7
87:11 89:16
95:6 123:8
124:14,16,18
144:21 145:6,22
158:7,11 159:20
160:21 161:9
171:14 172:6,10
172:19 173:7
178:20 180:13
186:7 189:11,20
195:4 197:9
214:2 216:16
232:7 236:4
248:18 277:16
277:17,25 278:4
298:18 302:11
**type**   19:14 79:19
83:1 90:22
127:14
**types**   40:8,10
43:6,16 45:9
76:23 125:9,15
125:17,19,22
126:5,7,9 127:22
147:21 154:16
226:21 232:14

**typewriting**
306:12
**typical**   154:2,7,8
154:9,11
**typo**   277:4,22

**u**

**u.s.**   190:16,17,18
190:20 191:2,21
201:18
**uc**   11:6
**un**   21:25
**unbias**   77:19
**unbiassed**   77:15
77:20,22
**uncertain**   142:7
**unclear**   10:23
41:25 57:20
**undergoing**
21:25
**undergraduate**
246:17
**underlying**
248:20
**understand**
10:18 24:25
32:25 33:14
36:3 38:16 39:6
39:19,22 40:5
41:22 42:12,22
42:24 43:5,14
44:21 45:16
47:23 48:14
51:18,21 56:21
61:23 66:17
67:13 77:11
97:11,19 98:1
104:16 106:7

108:20,21 109:6
116:8 117:16
118:23 119:3,21
124:5 131:2
133:4 140:17,21
140:24 141:1,3,8
146:8 151:11
154:15,21 155:1
157:9,15 173:16
174:24 176:13
177:9,11,18,22
177:23 182:11
183:11,21,25
184:11 185:21
185:23 190:15
193:21 197:19
201:11 204:17
204:23 205:12
205:21 208:19
211:2,25 214:6
224:13,16,16
229:2,7,8,25
232:19 233:25
236:13 239:7
245:1,12 249:19
250:18,21,25
251:1,20 252:4
252:18 253:1,6,9
253:12,16,21
254:11 255:16
258:11,12,13
280:19 286:19
295:11,20,24
**understanding**
31:20 33:17
35:21,23,24 36:1
39:15 43:1 48:6
48:9 67:23

Veritext Legal Solutions
866 299-5127

**[understanding - users]**

| | | | |
|---|---|---|---|
| 68:22,23 69:4,8 | **united**  1:1 2:1 | 141:25 147:25 | 295:18,19 |
| 69:21,23 70:19 | 8:21 183:4 | **urquhart**  4:4 | **useful**  27:6 |
| 70:25 96:8 | 189:25 272:12 | **usage**  78:3 79:15 | 115:25 116:3 |
| 131:19 137:21 | **universe**  73:13 | 94:15 97:6 98:8 | 126:21 183:17 |
| 139:15 151:12 | 73:15,16,19 74:2 | 98:8,10,23,24 | 224:11 |
| 151:13 152:8,11 | 74:10,17,20 75:2 | 139:25 158:22 | **user**  6:12 43:1,5 |
| 157:13,19 158:4 | 75:6,13,17,19,23 | 239:8,24 240:3 | 44:8,9 47:18 |
| 175:6,11,20 | 78:5 | **use**  26:10 39:7 | 48:3 70:18,25 |
| 176:2,7 181:24 | **unknown**  242:18 | 39:14,15 41:1,6 | 117:19 130:16 |
| 182:12 183:3,12 | 280:20 | 41:11 42:3 43:5 | 135:5,8,9 150:15 |
| 189:25 190:22 | **unknowns** | 43:10,14 44:5 | 201:1 236:10 |
| 191:1,11 218:23 | 280:21 | 45:11 47:23 | 267:11,12 |
| 221:4 225:19 | **unpack**  115:17 | 48:5 54:25 | 279:10 295:7 |
| 226:10,18,20 | 115:23 149:21 | 66:10 70:4,7,11 | **user's**  227:8,22 |
| 228:21 235:9 | 197:18 | 70:14,15 71:4 | **users**  32:8,9 |
| 247:16,19 | **unprofessional** | 76:11 79:2,4,5,7 | 33:17 39:6,6 |
| 273:18 284:18 | 263:8 | 80:2,23 81:8,11 | 45:10 48:14,14 |
| 287:20 291:17 | **unquote**  188:15 | 84:3,5,18 87:14 | 66:16 67:19 |
| **understandings** | 194:4 201:1 | 87:16 88:4,11,11 | 75:8 86:20,23,25 |
| 31:6 77:23 78:1 | 205:3 230:25 | 91:6 92:2 94:21 | 88:2 100:7,7 |
| 119:25 120:3 | 242:18 247:10 | 95:3,4,8,21 96:7 | 121:16 125:9,11 |
| 132:17 159:22 | 255:23 293:23 | 96:22 97:19,20 | 125:24 128:11 |
| 178:6 | **unreliable**  80:6 | 97:21 111:13,21 | 132:4 133:7 |
| **understands** | 80:11,24 109:9 | 113:9,12 114:9 | 138:1 152:8 |
| 279:10 | 177:3 194:3 | 119:14 121:19 | 173:16,25 174:1 |
| **understood** | **unsuccess**  52:2 | 139:20,25 140:1 | 174:4,24 175:12 |
| 66:25 96:17 | **unsuccessful** | 142:10 143:18 | 176:13 177:18 |
| 109:17 119:21 | 51:15 52:9 | 158:18,21 160:1 | 183:21,25 |
| 131:23 132:23 | **unsure**  290:22 | 161:1 178:16,18 | 184:10,19 |
| 147:14 159:20 | 290:24 291:2,5 | 183:22 185:2 | 185:21,23 |
| 224:12 270:3,19 | 291:19 | 186:22 205:13 | 186:19 188:4,12 |
| **uninterpretable** | **unwilling**  24:9 | 215:2 224:20 | 189:8 190:16,18 |
| 67:15 | **upfront**  191:6 | 225:2 230:23 | 191:2,21 192:7 |
| **union**  23:3 25:9 | 192:2 | 239:14,16 | 197:19 198:1 |
| 25:21 27:1 | **upload**  231:12 | 241:14 243:24 | 202:21,23 |
| 37:10 | **urgent**  206:13 | 248:1 250:9 | 204:16 208:17 |
| **unit**  8:16 | **urls**  125:11 | 272:1 278:7 | 209:7,20,21 |
| | 127:7,12,20 | 286:19 295:16 | 210:12 211:11 |

Page 63

**[users - want]**

222:24 223:7,21
224:3,9,10,11,13
226:24 233:2
235:10 238:24
239:15,15 240:4
240:4 241:14
242:9,15 251:1
265:1,1 271:5,6
274:20,20 275:4
275:4,14,15
277:19,20 284:8
285:4,10,14,20
286:11 287:21
291:9 292:6
293:5,15,21
295:11
**uses** 94:9
**usually** 13:23
64:2 73:5,9
165:17 229:16
278:8
**uxr** 7:17

**v**

**v** 21:3
**vague** 35:12
68:23 69:4,7
182:6
**valid** 197:4
**valley** 37:23,24
**value** 184:19
209:20
**van** 3:15
**variance** 204:22
**variation** 302:23
303:18
**varied** 303:8

**various** 35:18
40:7,8 42:9
43:15 70:1
85:25 92:15
137:24 164:17
164:17 175:18
193:24 217:9
221:6 232:13
281:2
**vary** 200:23
202:2 303:12
**vast** 176:8 194:1
**vendor** 64:11
275:9
**verbatim** 29:23
33:23 61:8
75:10 85:1
92:17 93:7 94:1
98:11,19 99:4
118:25 131:3
138:10 142:16
153:8 154:20
180:17 199:13
212:13 233:14
248:4 255:6
278:11 286:21
**verify** 61:5
**veritext** 9:1,3
307:7,9,11
**version** 63:5
66:13 83:6
111:24 112:7
113:2 158:12,15
289:25 298:6
**versions** 112:25
113:1,8 135:23
136:1,24 158:8
158:11 303:16

**versus** 8:20
21:18 26:16
87:12
**video** 1:16 2:17
8:13,17 76:15
89:14 105:5
114:1 131:8
142:3,12,22,22
142:25 144:14
144:21,25
167:18 176:24
187:8 213:3
238:13 245:6
248:10 259:11
261:25 267:2
271:14 300:11
**videoconference**
1:16 2:16 3:1
10:8
**videographer**
4:23 8:4 9:1,23
10:2,10 54:5,8
117:3,6 161:18
161:21 206:18
206:21 264:6,9
264:12 296:7,10
305:17
**videotaped**
305:18
**view** 68:3 99:20
135:25 174:20
175:22 227:8,22
**viewed** 156:14
156:17 304:5
**viewing** 23:16
53:13
**vince** 21:1,18

**virtual** 1:16 2:16
8:24
**virtually** 8:8
**visible** 63:5
**visid** 209:1,2
**visit** 125:11,12
127:3,7,13,20
128:2,6,15,16,17
128:18,21,24,25
141:5,25 142:16
142:19 144:6,10
147:25 151:7
160:7 295:5,5
**visited** 127:17
**visiting** 140:25
141:14 145:1
149:25 258:21
259:16,20
260:15
**visits** 140:16
**voice** 283:17
284:1
**vs** 1:10 2:10 4:11
307:4 310:1

**w**

**wait** 32:18 89:15
167:2 179:19
180:16 187:12
232:2 258:9,9,9
273:9,9
**waits** 134:24
**waived** 307:23
307:23
**waiving** 307:20
**want** 13:2 21:5
24:2 43:12
44:21 49:8

Veritext Legal Solutions
866 299-5127

**[want - witness]**

| | | | |
|---|---|---|---|
| 56:18 58:9 65:2 | 236:12 279:15 | 259:16,20 260:1 | 27:18 33:22 |
| 68:25 81:7 88:3 | 298:8 | 260:2,6,6,15 | 34:1,5,9,13,17 |
| 89:20,24 93:24 | **wanting** 125:25 | 295:5 | 34:21 35:13 |
| 96:12 98:1,17 | **wants** 51:21 | **websites** 42:11 | 36:22 37:25 |
| 103:8 105:11 | **warner** 26:16,18 | 125:12 127:3,17 | 38:7 39:12 |
| 107:8,11 109:10 | **warranted** 118:5 | 128:1,5,15,16,17 | 41:19 43:22 |
| 116:7,13,15,17 | **warrants** 119:18 | 128:18,21,24,24 | 47:22 52:5 63:1 |
| 116:18 118:10 | **watch** 142:22,25 | 140:16,22,25 | 63:16,21 68:16 |
| 118:22,24 | **watched** 153:18 | 141:5,17 142:11 | 69:7 74:13 75:1 |
| 120:18 126:7 | **watching** 142:3 | 142:14,16 | 80:9 82:6 88:24 |
| 131:2 140:19 | 142:11,21 | 143:20 144:11 | 99:7 100:23 |
| 146:18 152:11 | 144:14,21,25 | 160:6 256:23 | 103:12 105:9 |
| 152:11 161:6 | **water** 38:2 | 258:21 260:18 | 106:14 107:20 |
| 170:23 180:25 | **way** 13:6,7 21:5 | **weed** 32:5 | 112:22 114:23 |
| 181:3 184:16 | 56:13 66:24 | **week** 80:17 | 115:16,23 118:3 |
| 186:6 187:3,17 | 81:1 92:15 93:3 | 241:15 | 120:10 128:9,23 |
| 187:24 193:19 | 105:22 110:9 | **weekly** 267:11 | 129:18 130:1,23 |
| 198:13 204:22 | 120:6 135:20 | **weight** 27:9,13 | 132:10 138:18 |
| 213:5 216:24 | 141:13 149:17 | 27:20 29:14,17 | 139:3,6,19 |
| 217:16 226:11 | 149:19 150:24 | 29:20 30:4,6,11 | 140:12 141:8 |
| 244:3,4 251:17 | 154:2 156:23 | **weighted** 246:6 | 148:18 151:18 |
| 251:18 254:19 | 173:25 183:23 | **welcome** 264:15 | 153:12,15 154:5 |
| 263:24 266:4 | 185:3 189:4 | 297:11 303:2 | 161:15 164:21 |
| 276:6 281:15 | 203:8 213:22 | **went** 32:14 | 167:11,22 175:4 |
| 288:8,10,13 | 216:24 218:12 | 129:11 145:16 | 175:15 176:6 |
| 294:4,17 301:2 | 233:23 247:9 | 298:21 | 179:7,22 180:10 |
| 303:6 304:18 | 250:8 286:18 | **whereof** 306:21 | 183:7 184:6,9 |
| **wanted** 29:5 | 290:14 292:13 | **wide** 175:17 | 186:15 187:10 |
| 41:4 67:17,18 | 294:16 | **wife** 223:13 | 188:11 190:25 |
| 81:8 83:3 119:5 | **we've** 101:7 | **william** 1:4 2:4 | 191:15,23 |
| 120:12 121:2 | 109:8 151:20 | **willing** 205:24 | 192:19 193:4,14 |
| 122:11,24 | 158:13 159:13 | **willingness** | 194:19 195:16 |
| 130:14 137:20 | 204:3 281:1 | 158:20 | 196:18 198:8,21 |
| 146:7 160:24 | 302:7 | **wired** 215:7,15 | 199:3,21 200:2 |
| 161:8 166:24 | **web** 36:6 133:19 | 215:23 | 200:14 205:16 |
| 179:3 183:16 | 161:2 | **wiretap** 33:23 | 206:10,16 |
| 187:25 201:22 | **website** 141:14 | **witness** 5:3 8:11 | 207:13 208:5,22 |
| 202:7 235:16 | 141:15 142:20 | 9:20 10:4 11:23 | 209:11 210:14 |

Veritext Legal Solutions
866 299-5127

**[witness - yeah]**

| | | | |
|---|---|---|---|
| 211:5 212:19 | **word**  16:20,21 | **worthwhile** | 99:5,17,17 |
| 213:14 214:8,24 | 39:13 96:7 | 203:16 | 102:11 103:12 |
| 219:22 220:15 | 114:19 178:16 | **write**  16:18,20 | 105:9 107:20 |
| 221:15 222:6 | 181:3 224:21 | 16:25 142:19 | 110:22 112:22 |
| 223:12 224:7 | 229:2 271:22,24 | 265:5 284:6 | 114:12,12,24 |
| 225:16 227:2 | 272:2 284:14 | **writing**  30:2 | 115:9,16 117:21 |
| 228:1,20 229:14 | 294:23 | **written**  49:16 | 123:3 124:23 |
| 230:6,12 231:11 | **worded**  100:14 | 53:20 103:9 | 126:13,13,22 |
| 233:8 234:18 | **words**  37:19 | 136:10 277:2 | 128:9 129:6 |
| 235:14 236:23 | **work**  14:11,14 | **wrong**  13:2 | 130:23 136:2 |
| 238:8 239:18 | 17:6,19,19 18:16 | 46:22 73:23 | 137:7 139:19 |
| 240:11 241:6,24 | 22:1 29:1 53:18 | 74:20,23 88:4 | 140:12 141:8 |
| 242:11 244:13 | 57:7 70:24 73:4 | 105:11 107:9 | 143:9,22 151:18 |
| 245:20 247:8 | 77:10 97:25 | 132:10 232:19 | 153:2,7,15 |
| 248:12 249:23 | 134:21 169:9 | 249:10 256:12 | 155:22 156:14 |
| 252:2 254:2,10 | 207:16 245:14 | 270:14 | 158:9 159:10 |
| 255:11 258:23 | 246:7 248:8,16 | **wrote**  16:21 61:4 | 162:12 167:11 |
| 260:8 261:13 | 278:20 281:10 | 144:23 165:19 | 170:22 171:25 |
| 266:9 267:6 | 281:14 | 185:9 190:21 | 175:4 176:6 |
| 269:12,24 | **worked**  17:15,23 | 193:2 230:21 | 182:2,25 183:7 |
| 271:17 272:22 | 17:25 18:6,20 | **x** | 190:25 191:15 |
| 274:13 276:5 | 50:14,20 58:18 | | 191:23 192:19 |
| 278:15 279:7 | 76:23 77:2 | **x**  306:20 | 193:4,14,23 |
| 282:2,4,19 284:2 | 78:11,12,17,21 | **xx**  308:1 | 200:19 201:10 |
| 286:18 287:24 | **working**  23:23 | **y** | 201:16 207:22 |
| 288:15 290:24 | **works**  33:1 | | 208:5 210:14 |
| 291:25 292:10 | 206:11 235:11 | **yamagata**  23:3 | 211:1 212:25 |
| 293:18 294:9 | 284:10 | 24:13 25:6,7 | 215:9 220:15 |
| 295:2 296:5,15 | **world**  56:23 | 30:23,24 | 223:12 224:7 |
| 298:2 299:10 | 67:23 99:20 | **yeah**  21:24 23:4 | 227:2 228:1,20 |
| 301:8 306:5,21 | 116:17 120:17 | 23:20 27:18 | 229:14 231:11 |
| 307:13,16 308:2 | 281:12 | 32:2 47:22 | 233:8 234:18 |
| 308:5 | **worried**  53:6 | 57:24 59:15 | 236:23 239:18 |
| **witnesses**  29:3 | **worry**  79:20,21 | 61:1,1,6 63:21 | 241:7,11,24 |
| **won**  27:2 30:15 | 102:19 | 69:7 76:5 77:21 | 242:11 243:18 |
| 30:17,19 | **worse**  57:9 | 80:9 82:6 84:7 | 244:13 246:21 |
| **wondering** | **worth**  211:18 | 85:3,5,8,11 87:4 | 247:8 249:23 |
| 181:2,4 | | 87:13 88:24 | 254:2 257:10 |
| | | 89:5 96:5,10 | |

Page 66

**[yeah - zoom]**

| | |
|---|---|
| 259:17 262:5 | **zoom**   288:11 |
| 267:17 268:16 | 293:6 301:3 |
| 269:7,12 270:18 | |
| 273:21 274:13 | |
| 276:5 279:7 | |
| 280:10 282:4,19 | |
| 283:19 286:18 | |
| 289:2 290:18,20 | |
| 291:2,25 292:10 | |
| 294:9,21 298:2 | |
| 298:14 299:3,10 | |
| 299:18 301:17 | |
| 302:1 303:11 | |
| **year**   13:1 22:5 | |
| 26:5 79:24 80:5 | |
| 80:10,11,11 | |
| **years**   21:25 | |
| 24:23 25:24 | |
| 40:25 72:22 | |
| 96:6 109:8,19 | |
| 239:9 246:16 | |
| 281:16 | |
| **yellow**   273:11,17 | |
| **yep**   58:17,17 | |
| 159:4 197:11 | |
| 259:25 | |
| **yesterday**   80:19 | |
| **ygr**   8:22 | |
| **yield**   61:3 | |
| **york**   4:15,15 | |
| **youtube**   142:25 | |
| 209:12 | |
| **youtube.com** | |
| 145:2 | |
| **z** | |
| **zhang**   4:22 9:21 | |
| 17:15 | |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.