# EXHIBIT A

2022 WL 4359556
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Eva Solis
v.
American Airlines, Inc., et al.

Case No. CV 19-10181 PSG (AFMx)
|
Filed 09/13/2022

**Attorneys and Law Firms**

[Wendy Hernandez](), Deputy Clerk, Attorneys Present for Plaintiff(s): Not Present

Not Reported, Court Reporter, Attorneys Present for Defendant(s): Not Present

**Proceedings (In Chambers): Order DENYING Plaintiff's motion for class certification**

The Honorable [Philip S. Gutierrez](), United States District Judge

 *1  Before the Court is a motion for class certification filed by Plaintiff Jasmin Pradia ("Plaintiff"). *See* Dkt. # 56 ("*Mot.*").[1] Defendant American Airlines, Inc. ("Defendant") opposed. *See* Dkt. # 57 ("*Opp.*"). Plaintiff replied. *See* Dkt. # 58 ("*Reply*"). Defendant then filed a motion for leave to file a sur-reply, Dkt. # 64, and its proposed sur-reply, Dkt. # 65. Plaintiff opposed. Dkt. # 66.[2] The Court finds the matter appropriate for decision without oral argument. *See* [Fed. R. Civ. P. 78](); L.R. 7-15. Having considered the moving papers, the Court **DENIES** the motion.[3]

I. Background

  A. Overview

This is a wage and hour putative class action. Plaintiff worked as a passengers service agent for Defendant at Los Angeles International Airport ("LAX") in Los Angeles County, California. *Declaration of Jasmin Pradia*, Dkt. # 57, Ex. 6 ("*Pradia Decl.*") ¶ 2. She was classified as a non-exempt, hourly employee. *Id.* Defendant operates out of several airports in the state of California: LAX, Hollywood Burbank Airport, San Francisco International Airport, Sacramento International Airport, San Jose International Airport, Ontario International Airport, Long Beach Airport, and Santa Ana Airport. *See Declaration of Lisa Valiente*, Dkt. # 58-2, Ex. 3 ("*Valiente Decl.*") ¶ 3. From around 2015, Defendant has employed over 100 agents, over 100 maintenance employees, over 100 fleet service clerks, and about 200 non-union administrative staff members. *See Deposition of Alexandra Vivoli*, Dkt. # 57, Ex. 23 ("*Vivoli Dep.*") at 38–41.

  B. The Badge and Clock/Punch System

Defendant uses a system called Workbrain to track when certain employees log, punch, or badge into its systems before beginning or ending a work shift. *Valiente Decl.* ¶ 4. Non-exempt employees badge-in at various locations and in various ways. *Id.* ¶ 6. For example, some employees use a badge to access the employee parking lot and others use it to move through secure terminal areas. *See, e.g., Declaration of Mark Rabatin*, Dkt. # 58-1, Ex. H ("*Rabatin Decl.*") ¶ 3 ("I enter doors near the bag conveyor belts at the airport. I badge in right when I enter those doors[.]"); *Declaration of Lilliam Granda*, Dkt. # 58-1, Ex. P ("*Granda Decl.*") ¶ 8 ("When I arrive at work, I badge in to open the door behind the ticket counter[.]"); Declaration of Jonathan Barkley, Dkt. # 58-1, Ex. Y ("*Barkley Decl.*") ¶ 7 ("I have a badge that I use to enter the employee parking lot."); *Pradia Decl.* ¶ 16 ("When employees arrive at work they are required to use as special badge to get through airport security.").

 *2  Once an employee badges-in, they go through a separate clocking/punching-in process before starting a shift. *See Granda Decl.* ¶ 8 ("[B]adging in is not the same as clocking in."). Like badging, employees clock/punch-in at various locations and in various ways. Some do so at a shuttle drop-off point or near their work area or breakroom. *See, e.g., Declaration of John Soriano*, Dkt. # 58-1, Ex. F ("*Soriano Decl.*") ¶ 7 ("I clock in using a Kronos time clock. I typically clock in close to my office location."); *Declaration of Odalys Cutz*, Dkt. # 58-1, Ex. G ("*Cutz Decl.*") ¶ 5 ("I clock in at a biometric clock-in location. Sometimes I clock in ... near the shuttle that I take to work, but sometimes I clock in at the time clock that is located inside the office."); *Declaration of Brittany Crenshaw*, Dkt. # 58-1, Ex. X ("*Crenshaw Decl.*") ¶ 5 ("My clock-in location is downstairs from my office location, down by the shuttle drop off."); *see also Pradia Decl.* ¶ 16. A similar process occurs when employees end a shift. *See generally Pradia Decl.*; Dkt. # 58-1.

This process is not officially part of an employee's work shift. *See Valiente Decl.* ¶¶ 4–8. While non-exempt employees must follow the process and purportedly other rules, including not " 'piggy-backing'—a practice of one employee using their badge to get through security with another worker at the same time," *Pradia Decl.* ¶ 16, employees are free to arrive as early as they want and engage in personal activities before the start of their shift. Employees often put on makeup, get coffee, relax in the breakroom, or socialize. *See, e.g., Declaration of Pragna Patel*, Dkt. # 58-1, Ex. B ("*Patel Decl.*") ¶ 5; *Declaration of Deisy Duran*, Dkt. # 58-1, Ex. D ("*Duran Decl.*") ¶ 7; *Declaration of Anthony Perez*, Dkt. # 58-1, Ex. E ("*Perez Decl.*") ¶ 5; *Soriano Decl.* ¶ 7. Then, when an employee's shift is about to begin, she goes to her workstation. *Pradia Decl.* ¶ 16.

### C. Defendant's Employment Policies

Defendant provides passenger service agents with uniforms. *See, e.g., Deposition of Jasmin Pradia*, Dkt. # 58-2, Ex. 2C ("*Pradia Dep.*") 27:15–24. Employees must clean and maintain their uniforms, which Defendant provides an allowance for. *See, e.g., Declaration of Thao Lam*, Dkt. # 58-1, Ex. A ("*Lam Decl.*") ¶ 18. The parties agree that at the end of 2015, Defendant was paying $4.62 per pay period and $7.50 per pay period from September 2018 to present. *See Mot.* 6; *Opp.* 4. Defendant notes the absence of evidence of an official dry-cleaning policy and states that dry cleaning is not required. *See Opp.* 24. Although, some employees choose to do so as a personal preference. *See, e.g., Declaration of Daniel Sauri*, Dkt. # 58-1, Ex. J ("*Sauri Decl.*") ¶ 10 ("I chose to dry clean some articles of my uniform each week, but I am not required to do so."); *Declaration of Rachelle Robinson*, Dkt. # 58-1, Ex. L ("*Robinson Decl.*") ¶ 12 ("I machine wash all of my uniform[s].... I do not expect any of the Agents I supervise to dry clean any pieces of their uniform."); *Declaration of Ronald Rodriguez*, Dkt. # 58-1 Ex. N ("*Rodriguez Decl.*") ¶ 20 ("I dry clean the jacket of my uniform because I am afraid I will destroy it if I iron it. No one has ever told me that I have to dry clean my jacket."); *Pradia Dep.* 28:2–25.

Defendant has an attendance policy that facially applies to passenger service employees. The policy title is "Attendance and performance guidelines for passenger service employees —Effective 5/15/19" and the bolded line just below states that "[t]he following performance guidelines apply to all passenger service team members represented by the CWA-IBT." Defendant Attendance Policy, Dkt. # 57, Ex. 6-1 ("*Attendance Policy*"). Part of this policy relates to sick leave and provides a point system to be assessed when certain conditions are met. *See generally id.*

Defendant also has a policy of providing non-exempt employees with unpaid, uninterrupted meal breaks. Those who work a shift longer than five hours receive a thirty-minute meal period; those who work a shift longer than ten hours receive a second thirty-minute meal period. *See Valiente Decl.* ¶ 12, Ex. A (Defendant Meal and Rest Break Policy) ("*Meal Policy*"). If an employee works through a meal period, she is instructed to report that missed meal or break time, and Defendant's policy is to pay for the time and reflect the payment on the employee's wage statement. *See Valiente Decl.* ¶¶ 13–15; *Rodriguez Decl.* ¶ 8 ("When I fill out an exception log, I receive a full hour of pay to compensate me for missing my meal period or taking it late."); *Dr. Singer Expert Report, Wage Statement Example*, Dkt. # 58-2, Ex. 4-1 ("*Wage Statement Ex.*").

### D. Procedural History

*3 On November 29, 2019, Plaintiff filed a putative class action in this Court, *see* Dkt. # 1, and filed a First Amended Complaint on March 19, 2020, *see* Dkt. # 13 ("*FAC*"), alleging the following ten causes of action:

First Cause of Action: Failure to provide rest breaks and meal periods, Cal. Lab. Code §§ 226.7, 512. *See FAC* ¶¶ 52–59.

Second Cause of Action: Failure to provide adequate pay stubs, Cal. Lab. Code § 226. *See id.* ¶¶ 60–64.

Third Cause of Action: Failure to properly reimburse for uniform-maintenance expenses, Cal. Lab. Code § 2802. *See id.* ¶¶ 65–67.

Fourth Cause of Action: Unlawful deductions, Cal. Lab. Code §§ 221, 224. *See id.* ¶¶ 68–71.

Fifth Cause of Action: Failure to maintain accurate payroll time records, Cal. Lab. Code § 1174; IWC Wage Order No. 9. *See id.* ¶¶ 72–75.

Sixth Cause of Action: Failure to pay overtime and minimum wages, Cal. Lab. Code §§ 510, 1194, 1197; IWC Wage Order No. 9. *See id.* ¶¶ 76–83.

Seventh Cause of Action: Violation of Division 10, Chap. 1, Art. 11, §§ 10.37 et seq. of the City of Los Angeles Administrative Code. *See id.* ¶¶ 84–87.

Eighth Cause of Action: Violation of California Business and Professions Code §§ 17200 et seq. *See id.* ¶¶ 88–90.

Ninth Cause of Action: Failure to pay overtime and/or minimum wage compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203 et seq. *See id.* ¶¶ 91–95.

Tenth Cause of Action: Failure to provide a compliant sick leave policy, Cal. Lab. Code §§ 233, 234. *See id.* ¶ 96.

Defendant moved to strike two of Plaintiff's causes of action, which this Court denied. *See* Dkt. # 28. Defendant answered the FAC, denying all liability and asserting numerous affirmative defenses. *See* Dkt. # 29. Defendant then moved for partial judgment on the pleadings, arguing it was entitled to judgment on three of Plaintiff's causes of action. *See* Dkt. # 36.

The Court granted in part and denied in part Defendant's motion for judgment on the pleadings. *See* Dkt. # 45. Defendant's motion was granted for to the fifth cause of action; granted for the sixth cause of action for the period beginning December 1, 2015 but denied for the two-day period of November 29 and 30, 2015; and granted for the ninth cause of action for the FLSA overtime wage claim but denied as to the minimum wage claim. *Id.*

On May 16, 2022, Plaintiff filed this motion to certify the following class under Federal Rule of Civil Procedure 23(b)(3):

The 17200 Class: "All AA California non-exempt employees, excluding Pilots and Flight attendants, who worked for AA for at least four hours on any day during the period from November 29, 2015 to date."

Plaintiff also moves to certify the following subclasses:

The Overtime Subclass: "All AA California non-exempt employees, excluding Pilots and Flight attendants, who worked for AA for more than eight hours on November 29 and/or 30, 2015."

The 17200 Uniform Maintenance Expense Subclass: "All AA California Passenger Service Agents who worked for AA for at least four hours on any day during the period from November 29, 2016 to date."

The Sick Leave Subclass: "All AA California non-exempt employees, excluding Pilots and Flight attendants, who worked for AA for at least four hours on any day during the period from November 29, 2016 to date."

**\*4** The Wage Statement Subclass: "All AA California non-exempt employees, excluding Pilots and Flight attendants, who worked for AA for at least four hours on any day during the period from November 29, 2018 to date."

*See Mot.* 1:22–25, 2:1–12.

II. Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348–49 (citation omitted).

Federal Rule of Civil Procedure 23 governs the structure of class certification motions in federal court. Rule 23(a) ensures that the named plaintiffs are "appropriate representatives of the class whose claims they wish to litigate." *See Dukes*, 564 U.S. at 349. Plaintiffs must satisfy all of Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).

The plaintiff has the burden to show by a preponderance of the evidence that class certification is appropriate. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). And the court must conduct a "rigorous analysis" to determine whether the class certification requirements have been met. *See id.* at 664; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The plaintiff must be prepared to "prove" that there are "in fact" sufficiently numerous parties or that common questions exist, and frequently this will require some "overlap with the merits of the plaintiff's underlying claim." *See Dukes*, 564 U.S. at 350. Rule 23 does not, however, grant a court license to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant

to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Here, Plaintiff moves to certify under Rule 23(b)(3). [4] Rule 23(b)(3) requires the Court to find that (1) "questions of law or fact common to class members predominate over any questions affecting only individual class members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These two requirements are commonly known as "predominance" and "superiority." In evaluating both, a court must consider "the likely difficulties in managing a class action." See *Briseno v. ConAgra Foods*, 844 F.3d 1121, 1126 (9th Cir. 2017).

III. Discussion

The Court concludes that the Plaintiff has failed to show that certification is appropriate for the class and four subclasses.

A. 17200 Class and Overtime Subclass

**\*5** The proposed class and subclass overlap with similar theories, so the Court will address them together.

Plaintiff's arguments see-saw throughout the briefs, but the thrust of her argument for the 17200 class is that Defendant failed to pay minimum wages to putative class members for the time before and after a scheduled shift where employees were under the Defendant's control. *See Mot.* 8–9. According to Plaintiff, "as soon as [she] go[es] through security [she] [is] subject to the control of [her] employer" and should be paid for the "reasonable amount of time" it takes to move from the badge-in area to the clock/punch-in station and from that station to her workstation. *Id.* 15–16 (citing *Pradia Decl.* ¶ 16). The same goes for ending a shift. *Id.* Plaintiff makes an identical argument for the overtime subclass, *see Mot.* 9–10, but also includes a shift-trade overtime argument in her Reply. Her theory for certifying this subclass, however, is mostly identical to that of the 17200 class.

Defendant rebuts on several grounds. *See Opp.* 6–17. Most persuasively, Defendant notes the disparities in how employees perform the badging and clocking/punching-in process. *See id.* 13.

The Court concludes that for both the class and subclass, Plaintiff has failed to show that a class action is superior to other available methods for fairly and efficiently adjudicating the action. Thus, only that factor will be addressed.

*i. Superiority*

Under the superiority requirement of Rule 23(b)(3), a plaintiff must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As part of the analysis, the Court must weigh several factors outlined in Rule 23(b)(3), including "the likely difficulties in managing a class action." *Id.* "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001).

And "[a]lthough individualized damages would not defeat the predominance requirement, they are considered when analyzing the superiority requirement, specifically when deciding whether class action will be manageable." *Madrigal v. Tommy Bahama Grp., Inc.*, No. CV 09-08924 SJO (CWx), 2011 WL 10511339, at \*8 (C.D. Cal. June 27, 2011). "Uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds*, 139 S. Ct. 710 (2019).

Plaintiff has failed to carry her burden of showing that a class action would be superior. Although putative class members likely have an interest in bringing a collective action due to the differences between litigation costs and potential damages, manageability issues overwhelm here. The damages inquiry would be highly individualized, and Plaintiff has not provided a way to manage those calculations on a class-wide basis for the hundreds or thousands of employees that Plaintiff contends are part of the class and subclass. *See Mot.* 7:3–5.

**\*6** The Court interprets Plaintiff's core theory for the 17200 class and Overtime subclass to be that putative class members are entitled to compensation for the time it takes between the badging and clocking/punching-in process before and after work shifts. *See Mot.* 8–9, 15–16. But this theory requires considering countless permutations. Defendant operates out of eight different airports throughout California. *Valiente Decl.* ¶ 3. And the evidence shows that employees can badge and clock/punch-in at various locations and in various ways. For example, one employee states he "enter[s] doors near the bag conveyor belts at the airport[,] [and] badge[s] in right when [he] enter[s] those doors." *Rabatin Decl.* ¶ 3.

Another says, "[w]hen I arrive at work, I badge in to open the door behind the ticket counter[.]" *Granda Decl.* ¶ 8. And yet another uses a badge "to enter the employee parking lot." *Barkley Decl.* ¶ 7. Once an employee badges-in, and before starting a shift, she then clocks/punches-in at various locations and in various ways. For example, one employee says that "I clock in using a Kronos time clock.... I typically clock in close to my office location." *Soriano Decl.* ¶ 7. Another says that "I clock in at a biometric clock-in location. Sometimes I clock in ... near the shuttle that I take to work, but sometimes I clock in at the time clock that is located inside the office." *Cutz Decl.* ¶ 5. And yet another states that "[m]y clock-in location is downstairs from my office location, down by the shuttle drop off." *Crenshaw Decl.* ¶ 5. Any damages amount for reasonable ingress and egress time will necessarily depend on the airport, the badging location, the clock/punch-in location, and the consistency of each employee in following a pattern.

To deal with the uncertainty on managing damages, Plaintiff offers no plan. She cites to her expert's report stating that he can provide some analysis about employee identities based on the punch data. *See Declaration of Scott L. Sternberg*, Dkt. # 56 ("*Sternberg Decl.*"), ¶ 16. But he does not say that he can ascertain any type of ingress or egress time. *See id.* Sternberg also assumes badging data exists but does not say he analyzed any badging data. *See generally id.* Most significantly, Plaintiff has not provided any feasible, concrete strategy for dealing with the challenge of calculating damages on these facts, where Plaintiff contends that the Overtime subclass "obviously consists of hundreds of persons" and "[t]he state-wide Class and other Subclasses consist of hundreds of persons, up to a total of about 4,000." *Mot.* 7:5–12.

While the Ninth Circuit has stressed that "damage calculations alone cannot defeat class certification," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (citation omitted), it has also noted the importance of feasibly determining damages. For example, in *Bowerman v. Field Asset Services, Inc.*, the court held that class members failed to show that damages could be determined without excessive difficulty because "[a]s it turns out, using the individual testimony of self-interested class members to calculate the overtime hours they worked and the business expenses they incurred isn't easy." 39 F.4th 652, 663 (9th Cir. 2022). Instead, the court said, "such an approach has predictably caused the excessive difficulty" courts have tried to avoid. *Id.* (cleaned up); *cf. Leyva*, 716 F.3d at 51–16 (highlighting that "damages could feasibly and efficiently be calculated" with a computerized timekeeping database).

Similarly here, damages calculations are likely to be excessively difficult. With hundreds—or thousands—of class and subclass members and no proposed plan for determining damages, any trial will likely "devolve into an endless series of mini-trials." *Kevari v. Scottrade, Inc.*, No. CV 18-819 JFW (GJSx), 2018 WL 6136822, at *8 (C.D. Cal. Aug. 31, 2018) (quoting *Madrigal*, 2011 WL 10511339, at *8). The Plaintiff has thus failed to carry her burden of showing how the class and subclass can be managed.

The Court thus **DENIES** Plaintiff's motion for class certification for the 17200 Class and Overtime Subclass.

B. Uniform Maintenance Expense Subclass

Plaintiff submits that the core issue is whether putative class members are entitled to uniform maintenance costs, including costs for dry cleaning, under Cal. Lab. Code § 2802 and Wage Order 9. *See FAC*, ¶¶ 18, 67; *Mot.* 6, 9–10. Defendant argues that the subclass fails on commonality and predominance. *See Opp.* 24–25. There is no policy, Defendant argues, "requiring employees to dry clean their uniform (or clean their uniform in any particular way)," so the inquiry within this subclass will necessarily be highly individualized. *See id.* 24:10–11.

*7 The Court agrees with Defendant that individual questions predominate, and only that dispositive factor will be addressed.

*i. Predominance*

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (cleaned up) (citations omitted).

"Predominance is not, however, a matter of nose-counting." *Id.* "Rather, more important questions apt to drive the

resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class. It is an assessment of whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (citation omitted). This inquiry is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

Here, Plaintiff may be correct that a common question exists for this subclass. Defendant provides passenger service agents with uniforms. *See, e.g., Pradia Dep.* 27:15–24. Employees must clean and maintain their uniforms, which Defendant now provides an allowance for. *See, e.g., Lam Decl.* ¶ 18. The parties agree that at the end of 2015, Defendant was paying $4.62 per pay period and $7.50 per pay period from September 2018 to present. *See Mot.* 6; *Opp.* 4. From this, Plaintiff argues that from December 2015 to August 2018, Defendant failed to meet its obligation to pay employees anything for uniform maintenance. *See Mot.* 6. This, Plaintiff argues, leads to the common question of "were the agents entitled to reimbursement of these expenses and, if so, how much was reasonable." *Mot.* 10:8–9.

But even if the contention that *some* amount of reimbursement was required under California labor law can be answered "in one stroke," C.R. *Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017) (citation omitted), Plaintiff's theory for liability includes more—dry cleaning. And that is a highly individualized inquiry here. Defendant shows that dry cleaning is not required as an official policy; rather, some employees choose to do so as a personal preference. *See, e.g., Sauri Decl.* ¶ 10 ("I chose to dry clean some articles of my uniform each week, but I am not required to do so."); *Robinson Decl.* ¶ 12 ("I machine wash all of my uniform[s].... I do not expect any of the Agents I supervise to dry clean any pieces of their uniform."); *Rodriguez Decl.* ¶ 20 ("I dry clean the jacket of my uniform because I am afraid I will destroy it if I iron it. No one has ever told me that I have to dry clean my jacket."); *see also Opp.* 24. Thus, whether specialty care—dry cleaning—is a reimbursable expense will involve highly individualized inquiries, especially about whether certain employees were required by supervisors or other conditions to dry clean their uniforms.

**\*8** This Court has come to a similar conclusion before. In *Madrigal*, the Court ruled that predominance could not be met when the defendant had no official dry-cleaning policy and plaintiff's claims were based on oral instructions from management. 2011 WL 10511339, at \*8–10. The Court reasoned that "[w]ithout a company-wide written policy, liability could only be demonstrated after individualized inquiry as to that employee's work history, and would reflect specific-and potentially idiosyncratic-instructions by location managers." *Id.*, at \*7 (citation omitted). The same type of individual inquires engulf the analysis here and will predominate over the potential common question of whether employees were entitled to any amount of uniform maintenance reimbursements.

Plaintiff's response is to point to a distinguishable case. In *Ochoa v. McDonald's Corp.*, the defendant had a policy requiring employees to "wash and iron their ... uniforms regularly, but were not reimbursed for their time and expense." No. CV 14-02098 JD, 2016 WL 3648550, at \*7 (N.D. Cal. July 7, 2016) (cleaned up). Distinguishing *Madrigal*, the court ruled that defendant and its employees "had a shared understanding about how the uniforms were to be maintained," which was evidenced by supervisors of five restaurants "confirm[ing] that all crew members were required to wash and iron their uniforms." *Id.* Any variations in the frequency of washing or method of washing, the Court said, went to damages "because they speak to the extent, rather than type, of expenses incurred." *Id.* at \*8. But here, the inquiry speaks to the type, rather than extent, of expenses incurred—whether dry cleaning was required.

For those reasons, the Court finds that individual issues predominate here and **DENIES** Plaintiff's motion for class certification of the 17200 Uniform Maintenance Expense Subclass.

C. Sick Leave Subclass

Plaintiff argues that Defendant's sick leave policy subjects class members to "points" and negative consequences for using sick leave and so "the predominantly common issue is whether [Defendant's] policies were per se violations" of Cal. Lab. Code §§ 233 and 234. *Mot.* 10:10–13, 14:12–13. The Defendant points out, however, that the subclass is overbroad, as the attendance policy applies only to passenger service employees. *See Opp.* 21.

Defendant's point is well-taken, and the Court will only address predominance.

#### i. Predominance

As part of the predominance inquiry, courts "must ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Torres*, 835 F.3d at 1138 (cleaned up) (citation omitted). And "[i]f many class members have no claim whatsoever because they were never exposed to the challenged conduct to begin with, the class does not satisfy Rule 23(b)(3)." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (quoting *Torres*, 835 F.3d at 1136).

Here, the subclass fails for overbreadth. The attendance policy on its face applies to only passenger service agents. The policy title is "Attendance and performance guidelines for passenger service employees—Effective 5/15/19" and the bolded line just below states that "[t]he following performance guidelines apply to all passenger service team members represented by the CWA-IBT." *Attendance Policy*. But Plaintiff's defined class applies to "[a]ll AA California non-exempt employees, excluding Pilots and Flight attendants." *Mot.* 2:7–8. Plaintiff did narrow the class by excluding Pilots and Flight attendants, but she declined to narrow the subclass any further to only passenger service employees. Plaintiff, however, clearly knew how to limit the subclass because she limited the Uniform subclass to "[a]ll AA California Passenger Service Agents." *Id.* What's fatal is that Plaintiff does not explain how the inclusion of all non-exempt employees will not scoop-up hundreds of employees who were unexposed to the policy. *See Torres*, 835 F.3d at 1136–38. And the Court will not now exercise its discretion to save the subclass by redefining it. *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1093 (C.D. Cal. 2015) ("Where the court determines the class definition is overbroad, the court has the discretion to narrow the class[.]").

**\*9** The Court thus **DENIES** Plaintiff's motion to certify the Sick Leave Subclass.

#### D. Wage Statement Subclass

Attempting to understand Plaintiff's theory for this subclass, like with others, is like attempting to read a book through frosted glass. But the Court's best understanding of Plaintiff's core argument is that Defendant has failed to comply with Cal. Lab. Code § 226(a)(4) by "fail[ing] to reflect the automatic deductions of thirty minutes of paid time for meal periods on employees' itemized pay stub statements." *Mot.* 19:9–11; *see also Reply* 10.

Defendant rebuts by raising commonality and predominance concerns. It argues that "[i]f an employee submits an exception log or informs a supervisor that they were unable to take a 30-minute, uninterrupted meal period, Workbrain is adjusted to reflect that the employee worked through part or all of their meal period, and the employee is paid accordingly." *Opp.* 5:15–18. Thus, Plaintiff has failed to "establish a policy or practice that [it] automatically deducts 30-minutes from employee wages—even though they work through their meal period." *Opp.* 18:7–10.

The Court agrees with Defendant's concerns. Because Plaintiff has failed to show predominance, only that factor will be addressed.

#### i. Predominance

While murky as to the exact scope of Plaintiff's claim, Plaintiff contends, at least in part, that Defendant has automatically deducted wages for time worked during meal periods without providing wage statements reflecting that. But no evidence cited by the Plaintiff shows any uniform policy to that effect. Indeed, Defendant has presented evidence to the contrary. Those who work a shift longer than five hours receive a thirty-minute meal period; those who work a shift longer than ten hours receive a second thirty-minute meal period. *See Meal Policy.* If an employee works through a meal period, she is instructed to report that missed meal or break time, and Defendant's policy is to pay for the time and reflect the payment on the wage statement. *See Valiente Decl.* ¶¶ 13–15; *Rodriguez Decl.* ¶ 8 ("When I fill out an exception log, I receive a full hour of pay to compensate me for missing my meal period or taking it late."); *Wage Statement Ex.*

There are thus many individualized inquiries here about liability. The subclass will require high-volume determinations about which employees missed meal periods, why they did so, whether they were paid, and whether that was reflected on their wage statements. The Plaintiff has not met her burden to the satisfaction of the Court.

The Court thus **DENIES** Plaintiff's motion to certify the Wage Statement Subclass.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for class certification of the class and all subclasses.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 4359556

## Footnotes

| | |
|---|---|
| 1 | In a previous Order, this Court granted a stipulation to withdraw Eva Solis as class representative and substitute Jasmin Pradia in her place. *See* Dkt. # 49. |
| 2 | Defendant did not notify the Court as to whether the parties met and conferred as required by L.R. 7-3. The rule is not a suggestion; it is a command. The Court thus **DENIES** the motion and **STRIKES** the proposed sur-reply from the record. |
| 3 | Plaintiff challenges Defendant's expert witness, Dr. Ethan Singer, in her Reply. But she does not cite a single legal standard or authority in support of her argument. *See Reply* 14–15. The argument is thus waived. *See* [A&I Transp. Inc. v. KG Admin. Servs., Inc.](), No. CV 19-01992 SB (ADSx), 2021 WL 2792327, at *2 (C.D. Cal. Mar. 26, 2021) ("The failure to provide any argument or supporting case law constitutes a waiver."). Plaintiff also moves the Court to take judicial notice of court and public records. But because the Court does not rely on the records in this Order, it need not take notice. |
| 4 | Plaintiff makes a passing reference to certification under Rule 23(b)(2), *see Mot.* 3:19, but she does not make any legal argument or cite to legal authority to support certification on that basis. The argument is waived. *See* [A&I Transp. Inc.](), 2021 WL 2792327, at *2. |

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.