Pages 1 - 97

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CHASOM BROWN, ET AL.,              )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )      **NO. CV 20-03664-YGR**
                                   )
GOOGLE LLC,                        )
                                   )
          Defendant.               )
_____    )


                         Oakland, California
                         Tuesday, October 11, 2022


                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                    MORGAN & MORGAN, P.A.
                    201 North Franklin Street, 7th Floor
                    Tampa, FL  33602
               BY:  **JOHN YANCHUNIS, ESQUIRE**
                    **JEAN MARTIN, ESQUIRE**
                    **RYAN J. MCGEE, ESQUIRE**

                    BOIES SCHILLER FLEXNER LLP
                    100 SE 2nd Street,Suite 2800
                    Miami, FL  33131
               BY:  **JAMES W. LEE, ESQUIRE**

                    BOIES SCHILLER FLEXNER LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA  94104
               BY:  **MARK C. MAO, ESQUIRE**


Reported By:   Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
               Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

                              SUSMAN GODFREY LLP
                              1900 Avenue of the Stars, Suite 1400
                              Los Angeles, CA  90067
                   BY:  **AMANDA K. BONN, ESQUIRE**

                              SUSMAN GODFREY LLP
                              1301 Avenue of the Americas
                              New York, NY  10019
                   BY:  **ALEXANDER P. FRAWLEY, ESQUIRE**


For Defendant Google LLC:

                              QUINN EMANUEL URQUHART & SULLIVAN LLP
                              191 N. Wacker Drive, Suite 2700
                              Chicago, IL  60606
                   BY:  **ANDREW H. SCHAPIRO, ESQUIRE**

                              QUINN EMANUEL URQUHART & SULLIVAN LLP
                              51 Madison Avenue, 22nd Floor
                              New York, NY  10010
                   BY:  **DONALD SETH FORTENBERY, ESQUIRE**

                              QUINN EMANUEL URQUHART & SULLIVAN LLP
                              865 S. Figueroa Street, 10th Floor
                              Los Angeles, CA  90017
                   BY:  **VIOLA TREBICKA, ESQUIRE**
                              **STEPHEN BROOME, ESQUIRE**
                              **ALYSSA G. OLSON, ESQUIRE**

                              QUINN EMANUEL URQUHART & SULLIVAN LLP
                              1300 I Street NW, Suite 900
                              Washington, DC  20005
                   BY:  **DR. JOSEF T. ANSORGE, ESQUIRE**

| | |
|---|---|
| 1 | **Tuesday - October 11, 2022**                              **2:00 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Now calling CV 20-3664-YGR, Brown, et al. |
| 5 | vs. Google LLC, et al. |
| 6 | Counsel, please approach the podium.  Starting with the |
| 7 | plaintiff, state your appearances for the record. |
| 8 | **MS. BONN:**  Good morning, Your Honor -- excuse me. |
| 9 | Afternoon.  My -- |
| 10 | **THE COURT:**  People can't even remember if it's morning |
| 11 | or afternoon. |
| 12 | **MS. BONN:**  It's tough on a day like today. |
| 13 | I'm with Susman Godfrey on behalf of the plaintiffs. |
| 14 | **THE COURT:**  And you are? |
| 15 | **MS. BONN:**  Amanda Bonn. |
| 16 | **THE COURT:**  Good afternoon. |
| 17 | **MR. SCHAPIRO:**  Good afternoon, Your Honor.  I'm Andrew |
| 18 | Schapiro from Quinn Emanuel for Google. |
| 19 | Would you like me to introduce my colleagues who will be |
| 20 | speaking today or have them -- |
| 21 | **THE COURT:**  So I appreciate that, Mr. Schapiro.  Let's |
| 22 | go back to -- Ms. Boon, is it? |
| 23 | **MS. BONN:**  Bonn. |
| 24 | **THE COURT:**  Bonn. |
| 25 | Are you going to be doing the entirety of the argument |

today?

      **MS. BONN:**  No, Your Honor.

      **THE COURT:**  All right.  Why don't you go ahead and tell me who is going to accompany you and what issues.

      **MS. BONN:**  Thank you, your Honor.  I will be arguing portions of our motion for class certification dealing with the breach of contract claim, Google's consent arguments, Article III standing arguments, and Google's arguments regarding ascertainability and class member identification in part.

    My colleague, Mr. Mark Mao from the Boies Schiller firm, will be addressing arguments regarding the Federal Wiretap Act, the California Invasion of Privacy Act, the CDAFA, and to the extent the Court has questions about ways in which class members could be identified other than through self-certification, he will be addressing that as well.

      **THE COURT:**  Okay.

      **MS. BONN:**  Mr. Lee, James Lee from the Boies Schiller firm, will be handling the *Daubert* motion that they filed as to our damages expert, Mr. Lasinski, and to the extent there are questions regarding how damages play into the class certification decision, he may answer some of those questions as well.

    Mr Yanchunis from the Morgan & Morgan firm will be addressing issues concerning our UCL claim and our request that an injunctive relief class be certified under Rule 23(b)(2).

1          Ms. Jean Martin from the Morgan & Morgan firm will be

2    addressing Google's *Daubert* as to our expert, Mr. Schneier.

3          And finally, my colleague, Alex Frawley from Susman

4    Godfrey, will be addressing our motion to strike some of the

5    Google declarations that were filed.

6          And I'm realizing, as I'm rounding the bend, that I forget

7    to mention Mr. Mao will also be addressing the Psounis *Daubert*.

8          And Mr. Ryan McGee the Morgan & Morgan will be handling

9    Google's *Daubert* as to our expert, Mr. Nelson.

10          **THE COURT:**  Okay.  So there is one unfortunate lonely

11    person whose name didn't get called at your table.  Might as

12    well tell me who that is.

13          **MS. BONN:**  That is our wonderful graphics person in

14    case we have the opportunity to use some slides.

15          **THE COURT:**  Okay.  Welcome.  You don't have to be a

16    lawyer.

17          Okay.  Mr. Schapiro, on your side, sir.

18          **MR. SCHAPIRO:**  Thank you, Your Honor.

19          I hope we're not jumping up and down too much during the

20    presentations.  I'm going to be handling implied consent and

21    issues that relate to that.

22          My colleague, Stephen Broome, is going to be covering the

23    individual causes of action and also, if it comes up, the

24    motion to strike that opposing counsel just mentioned.

25          My colleague, Viola Trebicka, is going to be discussing

1  the difficulties that damages models present for class

2  certification and also the Lasinski *Daubert*.

3      Our associate, Alyssa Olson, will be covering the Schneier

4  *Daubert*.

5      Our associate, Seth Fortenbery, will be covering --

6  handling the Nelson *Daubert*.

7      And our counsel, Josef Ansorge, will be handling the

8  Psounis *Daubert*.

9      I think that covers everything, but if there are topics

10  that we haven't covered, we'll find a way.

11          **THE COURT:**  Okay.  All right.

12      Let's go ahead, since you're both at the mic and since it

13  is just a large issue, and deal with implied consent.

14          **MR. SCHAPIRO:**  Can I grab my binder, Your Honor?

15          **THE COURT:**  You may.

16      All right.  So with respect to the issue of implied

17  consent, given that you haven't had a chance, Ms. Bonn, to

18  respond to the reply, we'll start with you.

19          **MS. BONN:**  Thank you, Your Honor.

20      As plaintiffs have set forth in our papers, we think that

21  the issue of implied consent will be resolved using common

22  classwide proof and common issues of law that are applicable to

23  the class as a whole.  Those are the issues that will

24  predominate, and I will explain why.

25      First and foremost, throughout the entirety of the class

1  period, it is undisputed that Google's form contract in its

2  Privacy Policy included a provision that says, "We will not

3  reduce your rights under this Privacy Policy without your

4  explicit consent."  And as we set forth in our moving papers,

5  in light of that classwide common promise, in order for Google

6  to even be heard to raise an implied consent defense, they

7  would somehow have to demonstrate that that provision had been

8  modified.  And yet here, Google has no argument that they have

9  presented that there was a contractual modification of that

10  provision, that there was an oral agreement to modify that

11  provision, or that there is any evidence whatsoever that a

12  single class member waived Google's contractual promise only to

13  reduce rights with the users' explicit consent.

14      And, in fact, in response to that argument, Google has

15  made only one argument in one sentence of its opposition brief,

16  and in that sentence --

17      **THE COURT:**  Let me ask you a question that has been --

18  I've been toying with, and that is, are you aware of any law or

19  any case where there is evidence proffered of some non-party to

20  a contract that can be used to modify a contract between two

21  parties?

22      **MS. BONN:**  I am not, Your Honor.

23      **THE COURT:**  I didn't think you were.

24      Mr. Schapiro.

25      **MR. SCHAPIRO:**  Your Honor, I think that the position

1  that opposing counsel is taking puts the cart before the horse

2  because we do not believe that a user's choice to use a service

3  while aware of the conduct --

4      **THE COURT:**  How do you know, though?  All of the

5  evidence that you have proffered is indirect, circumstantial

6  evidence -- who's got their phone on?  Somebody has a phone on.

7      **MR. SCHAPIRO:**  Mine is on silent, but I don't think

8  it's -- nope.

9      **THE COURT:**  Make sure your phones are off.  It's

10  amazing what mics will pick up and what I can hear up here.

11      So you have -- Google makes references to news articles,

12  academic reports, all sorts of stuff that is not customer

13  specific and yet wants to use that kind of generic evidence to

14  presumably modify an agreement between a particular person and

15  Google.  I just don't understand -- I don't know, is there any

16  case -- can you cite to me any case where that's done?

17      **MR. SCHAPIRO:**  I think the closest I have, though I

18  agree I would not call it modifying a contract because, for

19  reasons I'll explain, I don't think that's what's happening

20  here -- certainly the *Gmail* case or the *Backhaut* case or the

21  *Facebook vs. Campbell* case were cases where there was evidence

22  out in the world of disclosures that had been made that in an

23  individual action, the defendant would have had every right to

24  question the plaintiffs about.  And even in this case, two of

25  the five plaintiffs admitted that they had seen articles about

1   the supposed collection of data that they're suing on in this

2   matter.

3       So if this were an individual case and there were a

4   plaintiff on the stand, we would have every right to ask that

5   plaintiff, "Well, do you subscribe to *USA Today*, did you see

6   the book that sold a hundred thousand copies published by

7   plaintiffs' own expert, Mr. Schneier, who wrote that being in a

8   private browsing mode does not mean that you are not seen on

9   the web.  It just means that you have local privacy."  We would

10  have the right to do that, and I think it is a fair

11  interpretation of *Gmail*, *Backhaut*, *Facebook vs. Campbell*, and

12  the two other cases that we cite.

13      **THE COURT:**  All right.  Response as to those cases and

14  their applicability here.

15      **MS. BONN:**  Yes, Your Honor.

16      In none of those cases was there a claim that the

17  collection at issue breached an express contract that forbade

18  the collection or that the contract at issue had an explicit

19  consent standard in writing.

20      In *Backhaut*, the facts were that former Apple iPhone users

21  brought a claim under the ECPA that even after they stopped

22  using their Apple iPhones, when they sent text messages to

23  other iPhone users, Apple was intercepting those.  So these are

24  people out in the world who no longer had a contractual

25  relationship with Apple whatsoever.

1    In *Gmail*, likewise, some of the classes included non-Gmail

2   users who were sending emails to other people who had a Gmail

3   account.  And I think it's worth noting that in *Gmail* where

4   plaintiffs raised the argument that these types of news

5   articles should not be considered on the issue of consent, the

6   court expressly said that the plaintiffs might have a point if

7   there was a breach of contract claim, but there was not one in

8   that case.

9    And finally, in the *Campbell vs. Facebook* case, there is

10   actually an interesting discussion on the topic of consent, and

11   the court specifically pointed to the fact that Facebook had

12   not notified users that this type of conduct would be

13   collected.  And the court expressed great skepticism that

14   public articles could override the fact that Facebook itself

15   had failed to make the disclosure.

16    **THE COURT:**  The *Gmail* case -- I'm looking at your

17   table of contents.  It's not referenced as "Gmail."  What is

18   the full cite?

19    **MS. BONN:**  It should start with "In re Gmail."

20    **THE COURT:**  No.  I'm not talking to you.

21    Mr. Schapiro.

22    **MR. SCHAPIRO:**  Yes, Your Honor.  It's *In re Gmail*, and

23   it is 2014 Westlaw 1102660.

24    **THE COURT:**  Did you cite that in your briefs because

25   I'm looking at your Table of Authorities, and I don't see it.

1      **MR. SCHAPIRO:**  Yes.  We cited it in five different

2  places, according to our Table of Authorities.  This is our

3  brief in opposition to the motion for class certification.

4      **THE COURT:**  I see it now.  All right.

5  Any comment on --

6      **MR. SCHAPIRO:**  Yes.

7      **THE COURT:**  -- her argument?

8      **MR. SCHAPIRO:**  Yes, Your Honor.

9  So, first of all, Ms. Bonn began by saying well, in none

10  of those cases was there an express contract, and of course

11  here, as I think Mr. Broome is going to amply demonstrate,

12  there is no express contract saying that Google is not going to

13  collect this data.  There are statements from which some

14  plaintiffs claim to have inferred that this data would not be

15  collected.  So that's not a distinction.

16  But in the *Campbell vs. Facebook* itself -- that's 315

17  F.R.D. 250, Northern District of California -- the court denied

18  class certification stating individual issues of implied

19  consent do predominate due to the media reports on the practice

20  because, quote, as long as users heard about it from somewhere

21  and continued to use the relevant features, that can be enough

22  to establish implied consent.

23  Also in the *Backhaut* case, Northern District of

24  California, the court determined -- here I'm paraphrasing --

25  implied consent defeats predominance where, quote, numerous

1    sources of information could have put some -- could have put

2    some proposed class members on notice of the interception.

3        We also cite *Torres vs. Nutrisystem*, 289 F.R.D. 587, and

4    *Federated University Police Officers Association* --

5          **THE COURT:**  Right.  And these are all district court

6    cases.  None of them are binding, but I take your point.

7          **MR. SCHAPIRO:**  That is correct, Your Honor.

8        I would say what I hope might be persuasive in addition to

9    the cases is logic and common sense.  We have a situation here

10    where not only is there --

11          **THE COURT:**  Let me tell you what concerns me about

12    logic and common sense.

13        Logic and common sense suggests to me that when mega

14    corporations make promises and do not fulfill those promises

15    and do not want to resolve their cases by settlement, that a

16    jury should decide.  So I don't know if that means that in this

17    particular case, part of it gets decided or nothing gets

18    decided, but it concerns me that somehow you don't want to be

19    held accountable for what you say.  And by "you," I obviously

20    mean your client.

21          **MR. SCHAPIRO:**  Sure.  Respectfully, Your Honor, it

22    won't surprise you to hear our position is that everything we

23    have said is accurate and --

24          **THE COURT:**  Then what's the concern?  Then what's the

25    concern?  If what you have said is accurate and if that is what

1   the evidence shows, then you should have no concern.

2          **MR. SCHAPIRO:**  Your Honor, it would nevertheless,

3   under *Wal-Mart vs. Dukes* and its progeny be improper to take

4   for -- to treat as a class action a case in which there is a

5   very strong individualized affirmative defense --

6          **THE COURT:**  But there it was very different because in

7   *Wal-Mart vs. Dukes*, you were talking about individual

8   employees.  Very different from this kind of circumstance where

9   you have users of a product and statements -- policy statements

10  which explain to people what they can expect and what there is

11  an agreement for using your product.  That's different than --

12  it's much more like a consumer class action, which is routinely

13  certified, than it is an employee labor circumstance, which is

14  quite different.

15         **MR. SCHAPIRO:**  Your Honor, I agree a hundred percent

16  that the factual background of the *Wal-Mart vs. Dukes* case is

17  different in substantial ways.  The point that I was citing it

18  for is that a defendant cannot be deprived of a meaningful

19  defense that it would have in an individual case just because a

20  class is going to be treated in an aggregated way as a class

21  action.

22         And what is the statement -- the statements that were made

23  here were that you can browse privately and others who use your

24  device won't see your activity.  The surveys that are in the

25  record from both sides show that a substantial portion of users

understand that perfectly well.  They say, "We know what that means.  It means that if I'm doing something on my device, it's not going to be seen by people who are using my device," but not that it somehow makes them invisible on the web.

Article after article, including statements by the -- published statements by the plaintiffs' own expert also showed they understood precisely what Incognito does, but if we're faced with a class where we have a few representatives who say, "Well, I never saw this," or "I didn't understand it," we will be at a --

**THE COURT:**  So how many millions of people then did not?  How many millions of people did not understand it, even based on your survey?

**MR. SCHAPIRO:**  It's hard to know because this gets into another problem with class certification.  It is impossible to truly know how many people --

**THE COURT:**  Ballpark, Mr. Schapiro.

**MR. SCHAPIRO:**  Ballpark, tens of millions.

**THE COURT:**  Tens of millions of people did not even -- even in your best case, did not understand.

**MR. SCHAPIRO:**  I'm sorry.  I misunderstood you.  How many people on our surveys?  Yes.  We're talking -- when we're talking about a class of hundreds of millions of people, if you have a large percentage that had awareness and another percentage who did not have awareness, the numbers are going to

1   be large no matter what.  But all of those people then -- not

2   all of those people are entitled to recover.

3           **THE COURT:**  But tens of millions of people would be.

4           **MR. SCHAPIRO:**  No.  They would not be entitled to

5   recover.  There are other reasons why they would not be

6   entitled to recover.

7           **THE COURT:**  I'm just saying that this notion that

8   you're too big to be held accountable concerns me.

9       Response.

10          **MS. BONN:**  Your Honor, every single class member,

11  whether this case was tried one by one or as a class action,

12  would have available to them the same common argument that

13  Google promised in its form contract not to reduce rights

14  without explicit consent.

15      These class members were bound by a form contract.

16  Mr. Schapiro says, "Well, we don't think the contract means

17  what plaintiffs think it means."  That is a common issue and a

18  common argument that will rise or fall in one stroke.  That is

19  all that *Wal-Mart* demands.

20      And so the notion that somehow this case will turn on what

21  individual class members privately believed goes against basic

22  contract law in California and every other jurisdiction.  It is

23  an objective manifestation theory of consent.  Private,

24  unexpressed, subjective beliefs don't control and especially

25  not where a company like Google has chosen affirmatively to

1  place in its own Privacy Policy a promise that says "We will

2  not reduce your rights without your explicit consent."

3       And now effectively what Google is arguing is that "We can

4  promise people in our contract that we won't collect your

5  private browsing data.  We can promise to rely on an explicit

6  consent standard, but if some news organizations begin to

7  suspect what we might be doing and publish articles, well, that

8  means that our contractual promises aren't worth the paper

9  they're printed on.  We cannot be held accountable, and

10  Americans cannot control in any way what we collect, even when

11  we have a contract that says they can."

12       **THE COURT:**  Mr. Schapiro, can you tell me whether -- I

13  just want to make sure I understand the evidence.

14       Can you identify users who clicked on the FAQs?  Can you

15  identify who they are?

16       **MR. SCHAPIRO:**  Specifically who they are, no -- well,

17  it depends.  I think if -- there would be some unusual

18  circumstances, but, no.  We know that there were numbers of --

19  the numbers of people who did.  I think that's in our brief.

20       **THE COURT:**  Can you identify the individuals who used

21  the developer tools?

22       **MR. SCHAPIRO:**  Other than, of course, by

23  cross-examination, which, you know, as --

24       **THE COURT:**  I'm talking about technology.  Can you

25  identify any of the individuals who used the developer tools?

1      **MR. SCHAPIRO:**  Not as far as I'm aware, Your Honor.

2      **THE COURT:**  Can you identify any of the individuals

3  who read any of these disclosures that you rely on?

4      **MR. SCHAPIRO:**  Well, we can identify people who

5  read -- if they were setting up Google accounts, for example,

6  Terms of Service or at times the Privacy Policy -- which, by

7  the way said, nothing about private browsing until mid 2018,

8  contrary to what was just said.

9      So in some circumstances, yes; in some circumstances, no,

10  would be the short answer, Your Honor.

11      **THE COURT:**  So it seems to me the best you have is

12  really kind of circumstantial class evidence that in many ways

13  you don't have any evidence that is specific to the person like

14  what existed in the *True Health* decision by the Ninth Circuit.

15      **MR. SCHAPIRO:**  Your Honor, I think actually it cuts

16  the other way.  If we can't overall in some aggregate way say

17  all right, well, here is a way we can pick out individuals who

18  did or didn't have awareness of what Incognito actually does

19  before using the service, then we should have the right -- and

20  I think under *Wal-Mart vs. Dukes* the Court has to assume we're

21  going to present that defense --

22      **THE COURT:**  In *Wal-Mart vs. Dukes*, there was specific

23  evidence; that is, the employees' interactions with their

24  supervisors, that was all specific to the employee.  That's why

25  I'm asking whether you can identify or whether you can --

1    whether you can take that evidence that you've thrown out there

2    as evidence of implied consent and actually connect it to

3    anybody.

4            MR. SCHAPIRO:  Your Honor, a finder of fact, if this

5    were an individual case and we had a witness there, would be

6    entitled to find, based on cross-examination, about that

7    person's habits, that person's knowledge, that person's use of

8    developer tools, what magazines that person reads -- to

9    conclude that that person had awareness, and that's why the

10   *Campbell* case came out the way it did, the *Gmail* case came out

11   the way it did, the *Backhaut* case and others.

12           I would also point out that the contract here, of course,

13   does not affect the other -- the claims other than breach of

14   contract here, the individual causes of action that I gather

15   Mr. Mao is going to be speaking about and that Mr. Broome is

16   going to be speaking about.

17           But, again, we, during discovery, would have the right --

18   and in this case, two of the plaintiffs said that they read

19   such articles.  Two of the 40 percent of the plaintiffs in this

20   case agreed that they had read such articles.

21           So if this case were just treated in an aggregated fashion

22   where we would not have the right to conduct discovery of or

23   ask similar questions of tens of millions of people but instead

24   could be found liable to all of those people if certain other

25   conditions are met would be -- would not be fair and would not

1    be --

2          **THE COURT:**  Only as to damages, not as to injunctive

3    relief.

4          **MR. SCHAPIRO:**  I can address --

5          **THE COURT:**  All of your arguments in that regard go to

6    damages.

7          **MR. SCHAPIRO:**  They go to -- correct.  They go to the

8    causes of action -- that is true.  I can address injunctive

9    relief if --

10         **THE COURT:**  I'm just making clear that none of the

11   arguments with respect to implied consent really impact a claim

12   for injunctive relief.

13         **MR. SCHAPIRO:**  I mean, the one way I would say that

14   the points I've just been making do affect a claim for

15   injunctive relief is that the sweeping injunctive relief that

16   the plaintiffs are asking for here is injunctive --

17         **THE COURT:**  Which would affect tens of millions of

18   people.

19         **MR. SCHAPIRO:**  That we believe many people would not

20   want.  Okay?  So the fact that there are many people out there

21   who understand exactly how private browsing works and who want

22   it to work that way, that is a relevant fact that I think, if

23   we were fighting about an injunction, would be before this

24   Court because an injunction would not be practical or sensible.

25   Certainly the injunction that --

1          THE COURT:  But, again, that doesn't have anything to
2     do with implied consent.
3          MR. SCHAPIRO:  It has only to do with the knowledge
4     and awareness that I was speaking of.  Yes.  There is not an
5     implied consent defense that I can think of that is specific to
6     injunction.
7          THE COURT:  All right.  Let's go ahead and move on.
8          MR. SCHAPIRO:  Just can I, in closing, state again,
9     Your Honor, that the --
10         THE COURT:  Why would you state again, Mr. Schapiro?
11         MR. SCHAPIRO:  Sorry.  I would just like to make sure
12    that I've emphasized that the implied consent defense -- so
13    the -- it is -- the implied consent defense we believe knocks
14    out not only the contract claim that we've been talking about
15    but all of the others, and there is no argument about an
16    express contract somehow superseding the implied consent as to
17    those claims.
18         MS. BONN:  May I respond to that briefly, Your Honor?
19         THE COURT:  You may.
20         MS. BONN:  Thank you.
21      We disagree fundamentally that Google's contractual
22    promise, "We won't reduce your rights without your explicit
23    consent," only applies to a breach of contract claim.  It
24    doesn't say, "We won't reduce your rights in contract without
25    your explicit consent."

1          And California law, which governs here, recognizes that

2     parties may contract around defenses.  Parties may contract

3     around a statute of limitations.  And if Your Honor looks at

4     the *In Re Pharmatrak* decision from the First Circuit, it is a

5     Wiretap Act case in which the court declined to find implied

6     consent precisely because the express contract, when it was

7     being drafted, helped provide, quote, assurances to the

8     plaintiff that the data would not be collected.

9          There's a second case we cite, *Harris vs. Comscore*, that

10    likewise applies this question of is there an express contract

11    not only to a contract claim but to wiretap claims.

12          **MR. SCHAPIRO:**  Your Honor, the *Harris vs. Comscore*

13    case that the plaintiffs rely on, which is an out-of-circuit

14    case, was rejected by Judge Koh in the *Gmail* case who wrote

15    that she finds it, quote, unpersuasive because, quote, express

16    and implied consent are analytically distinct, and, quote, a

17    finder of fact is allowed to consider a broader set of

18    materials in answering the factual question whether users

19    impliedly consented.

20          On this point about we won't reduce your rights, I think

21    our position is clear and correct, which is this isn't a

22    dispute about whether anybody reduced rights in a contract one

23    way or another.  This is a question about whether, with regard

24    to the contract claim, Google breached the contract or did not,

25    and one question that is relevant to that is whether plaintiffs

1   impliedly consented or waived their claims by using the service

2   with full knowledge of what it does, and it does what it's

3   supposed to do.

4           **THE COURT:**  Moving on, let's go ahead and talk about

5   the *Dauberts*.  We'll start with Lasinski.  That's Mr. Lee?

6           **MR. LEE:**  Yes, Your Honor.

7           **THE COURT:**  And -- let's see.

8           **MS. TREBICKA:**  Viola Trebicka for Google, Your Honor.

9           **THE COURT:**  I'm looking for your -- well, your last

10  name?

11          **MS. TREBICKA:**  "T," as in "Tom," R-E-B as in "boy,"

12  I-C-K-A.

13          **THE COURT:**  Okay.  I have you.  Thank you.

14      Let's go ahead and start with you, Ms. Trebicka.  Go

15  ahead.

16          **MS. TREBICKA:**  Yes, Your Honor.

17      And the Lasinski *Daubert* is really intertwined with the

18  damages issues that are discussed in plaintiffs' motion for

19  class certification as well.  And looking at the damages

20  inquiries here, there's several -- there's four fundamental

21  issues that preclude class certification.

22      The first is that individualized injury determinations

23  will --

24          **THE COURT:**  So I'm not talking about class cert.  What

25  I'm talking about -- I want to focus on the *Daubert*.

1      **MS. TREBICKA:**  Absolutely, Your Honor.  Then I will

2   focus on Mr. Lasinski's method.

3      He has three damages opinions:  A restitution opinion, an

4   unjust enrichment opinion, and half a statutory damages

5   opinion.

6      The unjust enrichment and restitution models that

7   Mr. Lasinski puts forth violate *Comcast*, Your Honor, because

8   they do not measure the damages that flow as a result of the

9   alleged wrong.  And I'm not talking here about the damages --

10      **THE COURT:**  You understand that damages models can be

11   aggregate in nature.

12      **MS. TREBICKA:**  Yes, Your Honor.  They can be aggregate

13   in nature, but for -- so this is where we intersect with class

14   certification.  Damages models can be aggregate in nature.

15   Mr. Lasinski's damages models are deeply flawed, and I'm -- I

16   would like to discuss that.

17      In addition to that, Mr. Lasinski's allocation methods

18   that are necessary for plaintiffs to prove --

19      **THE COURT:**  You need to get to the point.  I've read

20   your stuff.

21      **MS. TREBICKA:**  Uh-huh.

22      **THE COURT:**  So let's get to the point here.

23      **MS. TREBICKA:**  Let's get to the point, Your Honor.

24   The question is --

25      **THE COURT:**  I don't want to talk about allocation.

1    You don't have standing, but we'll get -- let's focus on the

2    other.

3         **MS. TREBICKA:**  So restitution model first, Your Honor.

4    It is entirely arbitrary.  Mr. Lasinski uses a $3 per month per

5    device --

6         **THE COURT:**  That's not arbitrary, is it?  It's, in

7    fact, what your client pays individuals.  How is that

8    arbitrary?

9         **MS. TREBICKA:**  It's arbitrary, Your Honor, because

10   what it is based on is the Ipsos study that pays for data that

11   is qualitatively and quantitatively different, and these are

12   not my words.  These are Mr. Lasinski's words.

13       So it's the same, Your Honor, as if a farmer --

14       **THE COURT:**  Can I --

15       **MS. TREBICKA:**  May I explain?

16       **THE COURT:**  No.

17       Can you remind me how many cases you've tried to a jury?

18       **MS. TREBICKA:**  Myself, Your Honor?

19       **THE COURT:**  Yourself, yes.

20       **MS. TREBICKA:**  A couple.  Two.

21       **THE COURT:**  So every day --

22       **MS. TREBICKA:**  Not as a first-chair lawyer,

23   Your Honor, but, yes.  And many more that did not reach

24   verdict, but, yes.

25       **THE COURT:**  Okay.  Well, I'm talking about jury

1    verdicts, jury trials.

2        Every day in courtrooms across the country, juries are

3    instructed in slightly probably different -- slightly different

4    terms, but they're basically instructed that with respect to

5    damages, they cannot be speculative.  Damages -- especially

6    aggregate damages and especially in patent cases, I would say,

7    are not always mathematically precise nor do they have to be.

8    Juries are instructed in that way.  That's the law.  They just

9    can't be speculative.

10        When I have an expert who analyzes the opposing party's

11   practices and finds a payment method where they have -- that

12   party has decided that that's reasonable compensation for a

13   good, that is data in this case, that doesn't seem to me to be

14   speculative.

15        Now, I may agree with it or not agree with it.  I may

16   challenge it, but there seems to be a reasonable basis for the

17   number that he's chosen.  He didn't pick it out of thin air.

18            **MS. TREBICKA:**  May I respond?

19            **THE COURT:**  You may.

20            **MS. TREBICKA:**  Two bases, Your Honor.  First is that

21   it is the same as if a farmer who believes that his avocado

22   should be sold for $3 would -- if the -- a bushel of corn is

23   taken from him, we'll say well, that bushel of corn should also

24   be valued at $3.  Yes, they're both produce; yes they're both

25   agricultural produce, but they are not the same, Your Honor.

1  That is how different the data is here.

2       **THE COURT:**  Why are they the same?  She is saying

3  they're not the same.  It's not the same product.

4       **MR. LEE:**  Sure.  I will start, Your Honor, with I

5  think we can all agree that the $3 is an input and *In Re Juul*

6  *Labs, Inc. Marketing, Sales Practices* -- it's 2022 Westlaw

7  1814440, which was cited in our opposition -- says criticisms

8  about the input that are used are classic criticisms that go to

9  weight, not admissibility.  So we can have this fight but it

10  will have to be a jury that decides whether these differences

11  matter.  And I'll get to the differences.

12       So it's sort of strange that Google is saying that this

13  input is somehow unreliable given, as Your Honor pointed out,

14  that it's the exact amount of minimum payment that's given to

15  users --

16       **THE COURT:**  Get to the product.

17       **MR. LEE:**  Sure.

18       So here is the differences that they say, right?  They say

19  that Google says that Screenwise asks for more personal

20  information, like your phone number, your address, things like

21  that, had certain rules and requirements to participate, and

22  collected more data.  What they don't say is that Mr. Lasinski

23  backed all of that out, and he did not include any of those

24  additional payments for those extra -- for that extra

25  information.

1     For instance, $20 for providing personal -- your personal
2  information and agreeing to the survey rules, Lasinski excluded
3  that.  Five dollars for having WiFi devices connected to a
4  special Screenwise router that could collect more information,
5  Lasinski excluded that.  Two dollars for allowing Google to
6  track across multiple devices within the home, Lasinski
7  excluded that.  All he kept was the $3, and that $3 is what
8  they pay in order to track their online browsing.  That's it.
9        **THE COURT:**  So if the $3 doesn't track online -- well,
10  let me ask.  Does the $3 track online browsing?
11        **MS. TREBICKA:**  It tracks more than that, Your Honor,
12  and I'd like to show you a slide, if you have an interest in
13  that because --
14        **THE COURT:**  Okay.  Go ahead.
15        **MS. TREBICKA:**  Would that be okay, with permission?
16  Ms. Olson is putting that up for me.
17        **THE COURT:**  So the $3 does track online browsing?
18        **MS. TREBICKA:**  It tracks online browsing for not
19  private browsing mode, all online browsing and more.
20     And, Your Honor --
21        **THE COURT:**  So you're suggesting it should be less
22  than $3 because it tracks more than just online browsing?
23        **MS. TREBICKA:**  No, Your Honor.  I'm suggesting that it
24  is entirely unconnected to the private browsing de-identified
25  data that Mr. Lasinski's job is to value to say look at this

1    other data that Google collects in another circumstance, that

2    data is valued at $3 per month per device, according to

3    Mr. Lasinski.  They should be the same.  They are not,

4    Your Honor.

5         And to the product question that you -- may I also answer

6    the product issue because I think that's -- that's a very, very

7    good question.

8              THE COURT:  Do you have a hard copy for me of that

9    slide?

10             MS. TREBICKA:  Hard copy?

11             MR. SCHAPIRO:  I might have one.

12             MS. TREBICKA:  We're looking, Your Honor.

13             THE COURT:  Go ahead.

14             MS. TREBICKA:  Your Honor, the product question is a

15   very -- is a very good one, and I direct Your Honor's attention

16   to the *Freitas vs. Cricket* case.  It's a recent case out of the

17   Northern District of California.  And in that case, Your Honor,

18   the judge found this model to be unreliable where the expert

19   looked at a 4G phone to identify what the damages would be

20   related to a 5G phone, and said yes, it's a phone; yes, it's a

21   G phone; however, the problem is that there are so many

22   additional qualities and features --

23             THE COURT:  Yeah.  But why doesn't that go to weight

24   as opposed to admissibility?

25             MS. TREBICKA:  It doesn't, Your Honor, because it's so

1    arbitrary.  There is a rigorous --

2          THE COURT:  It's not arbitrary.  Arbitrary means he

3    has gotten it from nowhere.  He just pulled a number.  And, by

4    the way, I have had economists that do that.  That's not what

5    it is.

6       There has to be a substantive difference, and if that's

7    all it is, which is a substantive difference, then it goes to

8    weight.

9          MS. TREBICKA:  Your Honor, with due respect, we

10   disagree.  We think that the data --

11         THE COURT:  Mr. Schapiro, do have you that slide or

12   not?

13         MR. SCHAPIRO:  We do not have a hard copy of that.  I

14   apologize, Your Honor.

15         MS. TREBICKA:  The data issue, the private browsing

16   de-identified data is so different from the data --

17         THE COURT:  So why?  That's the heart of it.  So why?

18   He says it's online browsing.  You're collecting the same

19   stuff.  All you're saying is that there's more.  We're

20   collecting more.  So that means to me maybe it's $2, not $3.

21         MS. TREBICKA:  No, Your Honor.  We're saying it's --

22   again, Mr. Lasinski words -- qualitatively and quantitatively

23   different, so it's not just more.  It's actually qualitatively

24   different from the data at issue here.

25         These differences matter, Your Honor.  If this case goes

to the jury --

**THE COURT:**  I'm still waiting to hear what the differences are that matter so much.

**MS. TREBICKA:**  Your Honor, the private browsing data is de-identified.  It is not connected to an individual.  This data is connected to your specific name.  The data that -- that -- that is attached to the $3 per device per month.  That is a fundamental difference because if Google does not know who the de-identified pseudonymous data is related to, then that data is necessarily a lot -- a lot less worth, and Mr. Lasinski has done nothing to identify that.

**THE COURT:**  Except that data was never supposed to be taken if we get to a damages stage; that is, if you get to a damages stage, then a jury has decided that it should have never been taken in the first place, and that makes it perhaps more valuable since it shouldn't have been taken in the first place.

**MS. TREBICKA:**  Your Honor, I think that is not necessarily a distinction that governs when we're talking about why this number, the $3 number, should be attached to this data that Your Honor is suggesting may not have -- should not have been taken in the first place.  It's just not -- logically does not follow.  Just because the data was -- should not have been taken, it does not mean that it is valued at a certain amount of money that that data that was properly taken is valued at.

1          THE COURT:  Okay.  Let's move to a different model.

2          MS. TREBICKA:  Yes, Your Honor.  And we are very happy

3    to email the slide as an email to the clerk.  Would that be

4    appropriate?

5          MR. LEE:  If that's the case, Your Honor, may I

6    respond to the slide?

7          THE COURT:  Well, we need -- we are going to move on.

8    I won't -- I didn't read it, so we'll just stand on the briefs.

9          MR. LEE:  Okay.

10          MS. TREBICKA:  Your Honor, may I also address

11   Mr. Lasinski's unjust enrichment model?

12          THE COURT:  Yes.

13          MS. TREBICKA:  Mr. Lasinski's unjust enrichment model

14   is -- overstates damages because in all three scenarios, it

15   evaluates -- it values data that for unjust enrichment --

16          THE COURT:  Okay.  But overstating damages is not --

17   again, that goes typically to weight as opposed to

18   admissibility.  His math isn't wrong; right?

19          MS. TREBICKA:  No, Your Honor, but the biggest problem

20   with it is that there is no way to actually subtract the data

21   that should not have been valued as part of the unjust

22   enrichment, and that is a fundamental flaw in his -- in his

23   methodology.  He has no way to actually value the data at

24   issue.  It is not connected to the damages -- I'm sorry -- it

25   is not connected to the offending conduct.

1                   **THE COURT:**  Response.

2                   **MR. LEE:**  Yeah, Your Honor.

3          Mr. Lasinski used the key input for unjust enrichment.  He

4     used Google's own internal analysis.  So the internal analysis

5     that Google prepared, I won't say it's name, but it was a

6     financial impact analysis for -- which analyzed the percentage

7     of Google Incognito traffic across its different business

8     segments.

9          So he used that percentage to determine how much Google

10    enriches itself from Incognito traffic and then he extrapolated

11    that out for other relevant private browsing data.  And Google

12    actually in the papers does not take issue with this

13    methodology.

14         Their main concern here is what they say -- is what

15    Ms. Trebicka just said.  She said it's too high.  Why is it too

16    high?  Because they said he didn't look at enough of the costs.

17                  **THE COURT:**  Right.

18                  **MR. LEE:**  Right?  And let's be clear.  Mr. Lasinski

19    read our papers.  He did consider the costs.  There just

20    weren't any.

21         At his deposition, he explained the four things he did to

22    discount whether there were any costs or not.  The first thing

23    he did is he looked at Google's expert, Dr. Strombom's report,

24    to see if he identified any costs.  Now, Dr. Strombom

25    calculated costs from Google's overall business, but he never

1    isolated costs that were tied specifically to private browsing

2    traffic, so Mr. Lasinski didn't find that helpful.

3        What did he do next?  Mr. Lasinski then spoke to the

4    plaintiffs' technical expert, Mr. Hochman, and Mr. Hochman

5    explained that Google has already built the infrastructure to

6    collect all browsing data.  It's a sunk cost so it's not an

7    incremental cost.  So if Google stopped collecting private

8    browsing data, which is just a tiny sliver of all the browsing

9    Google collects, there are no cost savings.

10       Mr. Hochman also explained the true cost of data

11   collection actually comes from processing power and energy, and

12   that cost is passed off to users because it comes from their

13   device.

14           **THE COURT:**  So, again, why isn't that an issue of

15   weight?  As I understood it, that was the main concern or

16   argument that the defendants had, which is that he didn't back

17   out costs.  But there's evidence in the record -- and I'm not

18   here to decide one way or the other -- but there's evidence in

19   the record that Google doesn't have costs relative to this

20   slice of the pie.

21           **MS. TREBICKA:**  Your Honor, that is only part of the

22   challenge that we have to the unjust enrichment model, and I'd

23   like to reserve some time to talk to the other part of the

24   challenge that we have.

25       On the issue of costs, our motion to exclude is to exclude

1    the opinion that says costs do not have to be taken into

2    account for unjust enrichment damages.  Whether those costs

3    exist or not, we're happy to duke out in front of the jury.

4    The problem is that Mr. Lasinski here is essentially rendering

5    a legal opinion saying costs should not be excluded.

6            **THE COURT:**  That's not a legal opinion.

7         Next issue.  What else did you want to --

8            **MS. TREBICKA:**  The issue is -- yes, Your Honor.  So we

9    were talking about the three scenarios of unjust enrichment.

10   The problem is one of methodology.  It's not one of we don't

11   like how high the damages are.  And the methodology that the

12   problem -- and the methodological problem is that the fact that

13   Mr. Lasinski values all revenue from transmissions, whether or

14   not -- on the basis of third-party cookies, assuming that there

15   was no consent for those third-party cookies, whether or not

16   there is evidence that there was actually consent given in the

17   form of -- for the third-party cookies -- in the form of the

18   triggering of the new tab page to consent to third-party

19   cookies.  That is a new trigger on the new tab page that comes

20   up with every Incognito browsing session that says it's okay to

21   allow third-party cookies to track you.  Those should be

22   admittedly excluded, and he's not excluding them.

23           **THE COURT:**  All right.  A response.

24           **MR. LEE:**  Sure.

25        Counsel didn't tell you what percentage that actually

1   amounts to.  Based on what Google has produced in the case,

2   that's less than one percent of all users.  There is a Google

3   internal document that says "99.1 percent of our Incognito

4   users have not opted in to this third-party tracking."  And

5   Google's response is, "Well, it may have gone up since it

6   launched."  Not a shred of evidence of that in the record.

7         THE COURT:  Any response?

8         MS. TREBICKA:  Your Honor, the document that Mr. Lee

9   is pointing to was a month after this feature was launched, and

10  of course it has gone up since.

11        THE COURT:  And the date of it was?

12        MS. TREBICKA:  It was July-- so it was launched in

13  June 2020 and the date is July 2020.  It was within a month of

14  the launch, so it's not proper evidence.

15      Your Honor, there is an additional point with respect to

16  unjust enrichment and how the methodology -- the methodology is

17  wrong because there's also evidence in the record of pop-ups

18  that a user -- of individual websites, not Google, that a

19  user -- with which a user can provide consent to allow

20  third-party cookie tracking.

21        THE COURT:  Okay.  Pop-ups.

22        MR. LEE:  Sure.

23      I really want to say one more thing about the third-party

24  tracking, but if Your Honor wants me to go to pop-ups, I will

25  go to pop-ups.

1      **THE COURT:**  Pop-ups.

2      **MR. LEE:**  Okay.

3      So the pop-ups that counsel is referring to, they pop up

4  on third-party websites.  The thing she didn't tell you is that

5  none of them say in their -- when it pops up, "you are

6  consenting to data collection in private browsing mode."  None

7  of them say that.  So that's not something that can be deducted

8  here because what we're focused on, what Mr. Lasinski is

9  focused on is the traffic when you're in private browsing mode.

10     **THE COURT:**  Okay.

11     **MS. TREBICKA:**  May I respond?

12     **THE COURT:**  You may.

13     **MS. TREBICKA:**  Users are obviously aware of the fact

14 that they are in private browsing mode when the pop-up comes

15 up, so the consent to the third-party cookie tracking is

16 proper.

17     **THE COURT:**  All right.  Let's see.  We've got

18 statutory damages.

19     **MS. TREBICKA:**  Yes, Your Honor.  May I go first?

20     **THE COURT:**  Uh-huh, you may.

21     **MS. TREBICKA:**  Mr. Lasinski's bases for statutory

22 damages have a major issue, Your Honor, and that is the fact

23 that -- sorry, Your Honor.  I'm trying to find my notes.

24     **THE COURT:**  I will tell you what the major issue is.

25 He hasn't identified California -- how he is going to get to a

1   number for the California subclass.  It's not in the report.

2          MR. LEE:  What's in the report, Your Honor, is that he

3   has an aggregate statutory word for California that he says can

4   be performed, and the way he is going to do that is extrapolate

5   the private browsing use by California residents.

6          THE COURT:  But how do you get that number?

7          MR. LEE:  He uses the California population as a

8   percentage of the total U.S. population, and he already has the

9   aggregate damages.  He has the whole pie.  So if we are trying

10  to figure out which part of the pie goes to California, you

11  extrapolate by the population based in California.  And Google

12  offers no legal authority that it can't be done this way.

13         THE COURT:  Okay.

14         MS. TREBICKA:  The California -- yes, Your Honor.  The

15  California issue --

16         THE COURT:  You can say whatever.  That's the one I

17  wanted to hear from.

18         MS. TREBICKA:  Yes, Your Honor.

19      The methodology used is unreliable as to the California

20  issue, and we have addressed it in our papers.

21      There is a manageability issue that goes with the

22  statutory damages as Mr. Lasinski has framed them, Your Honor,

23  and that's what I would like to talk about with your

24  permission.  And that issue is --

25         THE COURT:  So manageability is not, as I recall, a

1    *Daubert*-specific issue.  Can we focus -- can we stay focused on

2    *Daubert*?

3           **MS. TREBICKA:**  Yes, Your Honor.

4       We believe that Mr. Lasinski's statutory bases are

5    improper because they are -- they will necessitate

6    individualized damages into how many of these violations that

7    he claims each of the bases will calculate will go for each

8    class member.  So it's essentially -- it's not so much a

9    *Daubert* issue as it is a manageability class certification

10   issue, Your Honor, so if you'd --

11          **THE COURT:**  So I'm not talking about class cert right

12   now.

13          **MS. TREBICKA:**  I understand that, Your Honor.

14          **MR. LEE:**  May I have the last word on the California

15   issue, Your Honor?

16          **THE COURT:**  You may.

17          **MR. LEE:**  Okay.

18      So what happened was Mr. Lasinski initially assumed that

19   the California wiretap statute would apply nationwide.  He did

20   create a carve-out just in case Your Honor would decide that it

21   was to California only.  And given your decision in the *RTB*

22   case, that ended up being prescient.  So at the time that he

23   wrote his report, though, he didn't know that the claims would

24   be limited to California.

25      The truth of the matter is that based on the discovery

1    taken in this case, we can hone in on California usage much

2    more than population percentages if that's what Your Honor is

3    concerned about.  For instance, we can do it by IP address.  We

4    can do it by Geolocation.  This is Google.  Of course they can

5    do this.  There was just a case settled about this less than a

6    month ago.

7       So if we need to limit it in some way by California

8    residents and Your Honor requires a little more precision, that

9    can easily be done on the back end.

10           **MS. TREBICKA:**  May I respond, Your Honor?

11           **THE COURT:**  You may.

12           **MS. TREBICKA:**  That is speculation that we're hearing

13   today for the first time.  Mr. Lasinski's methodology, which we

14   are here to address, does not do any of that work, and it is

15   extremely doubtful that it is able to be done.

16           **THE COURT:**  Okay.  Moving on.  The next expert I have

17   is Mr. Nelson.

18           **MR. BROOME:**  Your Honor, before we get to Mr. Nelson,

19   may I just briefly address the issue of confidentiality of

20   documents and ask all parties to be mindful of discussing

21   documents that are under seal?

22           **THE COURT:**  So far I haven't heard anything that is so

23   specific that there would be a problem.

24           **MR. BROOME:**  I understand, Your Honor.  I believe one

25   document that is in fact under seal was just referenced but --

1          **THE COURT:**  So a generic reference is not a violation

2     of a sealing order.  I think everybody -- I'm not going to kick

3     out everybody in this courtroom.

4        Everybody be cognizant of it.  I don't want to -- if

5     there's a document reference you want me to pull up, I can do

6     that.  You all have -- are professionals, and you're all

7     operating under Rule 11.

8          **MR. BROOME:**  Understood, Your Honor.  Thank you.

9          **THE COURT:**  Okay.  Mr. Nelson.  So I have -- all

10    right.  Remind me who you are.

11         **MR. FORTENBERY:**  Good afternoon, Your Honor.  This is

12    Seth Fortenbery.  I'm an associate at Quinn Emanuel and a

13    Google attorney.

14         **THE COURT:**  Okay.  Hold on.  How do you spell your

15    last name?

16         **MR. FORTENBERY:**  F-O-R-T-E-N-B-E-R-Y.

17         **THE COURT:**  Okay.  And?

18         **MR. MCGEE:**  Good afternoon, Your Honor.  Ryan McGee of

19    the law firm of Morgan & Morgan.

20         **THE COURT:**  Okay.  So Mr. Nelson.  I think the main

21    issue that there is with Mr. Nelson is his inability to connect

22    his years of service as an FBI agent with information that may

23    or may not exist in private browsing mode specifically.  That's

24    the concern.  I don't see where he does that.  It's one thing

25    to say generically, "I have 30 years of experience working with

1   Google and getting information."  We all get them.  We see

2   them.  I try criminal cases, and it's based on that kind of

3   evidence, so I understand that.  That's not the concern.

4        If he was just saying generically or if Google was saying

5   generically that they can't do it and he's saying, "Yes, you

6   can, you've been doing it for 30 years," it would seem to be

7   fine.  The problem is that he's making representations

8   regarding a specific mode and yet there doesn't seem to be a

9   sufficient basis upon which he's making that opinion.

10       What am I missing, Mr. Fortenbery?

11            **MR. FORTENBERY:**  I think you've got it exactly right,

12   Your Honor.

13            **THE COURT:**  So nice; right?  All right.

14            **MR. MCGEE:**  Your Honor, Mr. Nelson is offered as a

15   rebuttal expert to Google's expert, Georgios Zervas, who says

16   essentially the data from private browsing is orphaned on the

17   islands, and Google is never able to find it, locate it, or

18   produce it to a third party.  And with Mr. Nelson's experience

19   with the FBI, he testified that he was involved in hundreds of

20   investigations where information was produced based on an IP

21   address.  Google never denied him production saying, "This

22   section of this data is private browsing information and we

23   can't give that to you."  They never denied one of his requests

24   saying, "We need consent from these people because certain of

25   this information may be subject to private browsing information

1    or private browsing mode."  And he testified that he had had

2    hundreds of interactions with Google attempting to obtain and

3    successfully obtaining information from Google just based on an

4    IP address and a date range.

5         THE COURT:  Right.  And I don't disagree with that

6    assessment, but how does he get to the link, because I don't

7    see it in the report --

8         MR. MCGEE:  Sure.  The link, Your Honor, would be the

9    three individuals that he spoke with, the subjects of his

10   investigations.  I believe it's paragraph 35 of the report.  It

11   says that he had spoken with people during his investigations

12   who admitted, when confronted with the evidence, that activity

13   was done in a private browsing mode and that they were

14   surprised to see that he had that level of detail and that

15   level of information.

16        THE COURT:  So doesn't -- doesn't Mr.-- and I don't

17   know if I am saying this right, Hochman?

18        MR. MCGEE:  Hochman, Your Honor.

19        THE COURT:  Doesn't Mr. Hochman address this issue in

20   his report from a technical perspective?

21        MR. MCGEE:  I believe so, Your Honor.

22        THE COURT:  So why do you need someone who's not able

23   to make that connection other than those -- I'll grant you the

24   three people, but is it -- it sounds duplicative at best.

25        MR. MCGEE:  It's a real-life observation of this

1    information being produced.

2           **THE COURT:**  All right.  A response.

3           **MR. FORTENBERY:**  Yes, Your Honor.

4        I think a couple points.  First, Mr. McGee, on behalf of

5    plaintiffs, opened saying that well, this is a rebuttal report,

6    and it's a rebuttal to Mr. Zervas' report.  And I just want to

7    point out for the Court that Mr. Zervas, the report that's

8    being identified there, is a 211-page technical report.

9        Here in that report, Mr. Zervas doesn't purport to talk

10   about Google's server side information:  What's saved, what's

11   collected.  The only thing that Mr. Zervas is saying in the

12   paragraphs that plaintiffs quote is that in -- on the browser

13   side of things, on the Chrome side of things, Chrome is not

14   storing data locally on the computer -- on the particular

15   person's computer.

16       So when it comes to Mr. Nelson trying to say what Google

17   does or whether Google can link IP addresses to particular

18   private browsing data, that's wholly out of cloth and has

19   nothing to do with what Mr. Zervas was opining on, and so it

20   can't properly be characterized as a rebuttal.

21       Second, I think Your Honor hits on a very good point.

22   Mr. Nelson doesn't simply purport to say that "I worked with

23   Google over my" -- "my," you know, "decade" -- "several

24   decade-long career, and in those" -- "in that career, I

25   received data from Google."  That would be a wholly different

1    opinion.  Instead, he wants to make another analytical leap,

2    and that analytical leap is that, "The information I received

3    from Google was private browsing mode data," one, and, two,

4    that private browsing mode data through IP address alone and a

5    date range can be linked back to individual users and devices.

6        Now, that alone is an analytical leap.  And you put the

7    question to Mr. McGee, how do you connect those two things.

8    And Mr. Nelson, in his deposition, plaintiffs today, say that

9    the reliance there is the statements of three accused criminals

10   in investigation saying they were surprised the FBI had data

11   because at some point, when they were conducting those actions

12   that were being investigated, they used a private browsing

13   mode.

14       Now --

15       **THE COURT:**  So can I -- let me interrupt you.

16       **MR. FORTENBERY:**  Yeah.

17       **THE COURT:**  Mr. McGee, is it also true that Mr. Nelson

18   never identified the actual people, so there's no way that

19   Google could even verify or not verify what it is he's claiming

20   to know?

21       **MR. MCGEE:**  That's correct, Your Honor.  In the --

22       **THE COURT:**  Why didn't he?

23       **MR. MCGEE:**  He cited confidentiality issues with the

24   Federal Bureau of Investigation.  He provided details related

25   to one of the investigations that he was questioned on, but

1   when it ultimately came to details that would sufficiently

2   identify victims and subjects of those investigations,

3   Mr. Nelson cited confidentiality concerns.

4           **THE COURT:**  Okay.

5           **MR. MCGEE:**  And he was not questioned on the two other

6   investigations, Your Honor, at all.

7           **MR. FORTENBERY:**  Your Honor, if I may respond to that

8   last point.  This is something in their brief that we very much

9   dispute.

10          During the deposition when we asked Mr. Nelson about

11  his -- the statements of the suspects, he stated that he would

12  not provide any details about any cases no matter how minute

13  they may seem.  So while plaintiffs have characterized

14  Mr. Nelson's testimony as simply saying that he won't provide

15  the identity of suspects or that type of thing, in reality --

16  or that Google should have asked more questions of Mr. Nelson

17  to get more details on the second and third suspects, that just

18  doesn't comport with what he testified about or what he was

19  willing to give Google.

20          **THE COURT:**  Yeah.  I'm not sure the plaintiffs can

21  have it both ways.

22          **MR. MCGEE:**  And, Your Honor, that was briefed, and I'm

23  not going to belabor that point.  But one thing the

24  defendant -- excuse me -- Google in this case -- it really

25  comes down to a dispute about reliability.  They don't dispute

that the practice occurs.  They don't dispute that they provide

information that is from a private browsing session to law

enforcement and that that can be retrieved with an IP address

and a date range.  So in a reliability analysis, which is the

third prong of the *Daubert* inquiry, it's whether it's

independently verifiable, and just like with the prior analysis

that you discussed with counsel before us on Lasinski, it's not

arbitrary.  He didn't pick this out of thin air.  It's from his

own experience, and he was providing that as the foundation for

the rebuttal opinion that he was providing in rebuttal to

Professor Zervas.

THE COURT:  Well, if they don't dispute it, then you

don't need an expert to -- an expert who's -- you don't need an

expert to rebut something that's not being disputed.

MR. MCGEE:  I think that what Professor -- what

Mr. Nelson provided was that Professor Zervas' opinion was

misleading and incomplete, Your Honor.  But if you're

suggesting that Mr. Nelson should be a percipient witness and a

fact witness, then that's something that could be discussed,

but I think right now, we would contend that he's not subject

to a *Daubert* and that it's a weight/credibility issue.

THE COURT:  Like I said, my concern with him is that

he hasn't -- he hasn't justified the basis for his analytical

leap, and -- well, is that -- are you, in fact, disputing -- is

Google disputing that they can identify individuals who -- with

1   an IP address and a date range in a private browsing -- are you

2   disputing that or not?

3          MR. FORTENBERY:  Yes, Your Honor, we are disputing

4   that.  The fact that I think -- one thing that plaintiffs say

5   in their response is that this was -- Mr. Nelson's opinion was

6   confirmed by the special master process, and I think two points

7   to that, Your Honor.  First, we would disagree with that

8   characterization, but I think it goes back to something else

9   Your Honor said.  Then why is Mr. Nelson needed as an expert in

10  this case if it's duplicative of what can be found in the

11  record elsewhere, and Mr. Nelson is clearly making an

12  analytical leap based on, one, a field and a spreadsheet that

13  during his deposition he admitted that he did not know one way

14  or another whether that absence of that field indicated a user

15  was in private browsing mode.  He is simply saying, "I asked

16  Google during my career for data.  They provided data, and I'm

17  assuming that that was private browsing mode data," and he does

18  not have the -- the required --

19         THE COURT:  It's probably not a bad assumption.  I

20  just don't know that I can verify it.

21     Okay.  We're going to move on.

22         MR. MCGEE:  Thank you, Judge.

23         MR. FORTENBERY:  Thank you, Your Honor.

24         THE COURT:  Let's go to Schneier.  Who do I have?

25         MS. OLSON:  Aly Olson from Quinn Emanuel.

1          **MS. MARTIN:**  Jean Martin, Your Honor, from Morgan &

2     Morgan for plaintiffs.

3          **THE COURT:**  Okay.  June Martin.

4          **MS. MARTIN:**  Jean Martin.

5          **THE COURT:**  And you said Olson?

6          **MS. OLSON:**  Olson, yes.  Aly Olson.

7          **THE COURT:**  Alyssa Olson?

8          **MS. OLSON:**  Alyssa, yes.

9          **THE COURT:**  See, this is so great.  So many issues.

10    Everybody gets a turn at the podium.

11         Okay.  We'll start with you, Ms. Olson.

12         **MS. OLSON:**  Thank you, Your Honor.

13         Professor Schneier's reports read more like a closing

14    argument than an expert opinion, and this is because his

15    opinions are improper for a couple of reasons.  First, he's

16    opining on the ultimate issue of fact; that is, what a

17    reasonable person would expect or understand approximately 30

18    different times.  And even if such an opinion were a proper

19    opinion, his opinion is further not reliable because the

20    standards that he claims to apply are "I know it when I see

21    it," which is the quintessential unreliable method.

22         **THE COURT:**  Well, you've got about five different

23    arguments, so let's just take them one at a time.  That way I

24    can get a response from Ms. Martin.

25         With respect to this argument that there needs to be a

1    fit, that seems to me, at least with respect to that argument,

2    a stretch too far.

3        Ms. Martin.

4        **MS. MARTIN:**  My apologies, Your Honor.  Are you

5    agreeing with us that there is a fit or are you agreeing with

6    the defendant --

7        **THE COURT:**  No.

8        **MS. MARTIN:**  -- that we are stretching with the fit?

9        **THE COURT:**  I am agreeing that there is a fit.  That

10   is, this isn't -- you're not going to agree.  Rarely, if ever,

11   do I have an opposing party come in and agree with the opposing

12   party's expert.  That's why you have experts.

13       This issue of a fit is -- it's almost a relevance

14   objection, which is not a *Daubert* issue.

15       Now, there are some other arguments, but with respect to

16   that one, as I tell the law clerks, when we have 403 objections

17   at this point in the proceedings, you know that's the bottom of

18   the barrel.  Just if you're a young associate, 403 objections

19   don't get you very far at this point.  Maybe if we're in day

20   three of trial, that would be different.

21       So I -- yeah.  If you want to address the fit; otherwise,

22   we will move on to the next one.

23       **MS. OLSON:**  I'll just briefly respond, if I may,

24   Your Honor, that I think fit actually is one of the *Daubert*

25   requirements.

1          **THE COURT:**  Not by the United States Supreme Court.

2     There was a mention of it in a Ninth Circuit case, but it is

3     not the bread and butter of *Daubert*.

4          **MS. OLSON:**  Understood, Your Honor.  Then I'm happy to

5     move on to the other issues.

6          **THE COURT:**  Consumer expectation opinions.  Here, I

7     think there are numerous opinions that seem to be, "Yeah,

8     because I said so."

9        Ms. Martin, that's not enough for me.  Go ahead.

10         **MS. MARTIN:**  I agree, Your Honor.  It is not enough to

11    say "because I said so," but yet defendants' brief is replete

12    with *ipse dixit* statements in and of itself.

13       Here, Professor Schneier has decades of relevant

14    experience in cybersecurity and data security, and it is

15    well-known that the application of an expert's specialized

16    experience is in and of itself an appropriate expert

17    methodology.

18         **THE COURT:**  Right.  But it's a step further to say

19    that -- an expert can sit on the stand and say, "Based upon my

20    research, this is my analysis."  It's quite different to say,

21    "And all consumers believe as I do."  That, I think, is a step

22    too far when you've done no analysis, no research, no surveys

23    on consumer expectation.

24         **MS. MARTIN:**  And I appreciate that, Your Honor, and we

25    have read your admonishments in other cases and also what was

1    brought forth in the Calhoun hearing, and we understand -- we

2    believe that we understand the contours of proper testimony for

3    Professor Schneier and the other experts, and we anticipate and

4    expect to fully appreciate those contours and abide by them in

5    the context of a trial in presenting these experts' opinions.

6         I mean, here plaintiffs are seeking to establish that they

7    have a reasonable expectation of privacy and that -- in their

8    private browsing communications, and that Google's habit and

9    collection of data is highly offensive to a reasonable user.

10   We do not anticipate Professor Schneier going further to say

11   what is unreasonable.  He will be presented to use his

12   background and experience to give the historical context of the

13   evolution of privacy, to talk about the motivations of

14   companies to collect and monetize data, why companies collect

15   and retain data, and also the deceptive nature of the

16   disclosures and Google's context from a standpoint of data

17   privacy.

18              **THE COURT:**  All right.  Ms. Olson.

19              **MS. OLSON:**  So I appreciate that.  I think maybe that

20   plaintiffs are conceding that they are not -- that Mr. Schneier

21   will not be making the arguments that he makes in those 30 or

22   so paragraphs, but this is -- this is our -- one of our three

23   *Dauberts* that we're arguing now, and I think this applies for

24   the entire case, not for just class certification.  But I also

25   don't think that the promises that they make resolve the issue.

1          Comments about the motivation of various companies, again,

2     I don't think that Mr. Schneier has indicated that he is

3     qualified to opine on motivations of companies in the industry

4     or Google specifically.

5          She talked about the disclosures themselves, and I think

6     that ties in to one of our other issues with Mr. Schneier's

7     report, which is that he is just summarizing internal

8     documents, summarizing disclosures, and saying that they are

9     unreasonable.  And I know plaintiffs cite to the *Berman*

10    opinion, but I think Mr. Schneier is not like the expert in

11    that opinion, who, in his daily work, was designing user

12    consent interfaces.

13         Mr. Schneier doesn't -- he is a security expert, as was

14    mentioned, and I think that --

15         **THE COURT:**  Well, I certainly agree that he cannot

16    testify as to intent.

17         **MS. MARTIN:**  We agree, Your Honor, and Professor

18    Schneier is not opining as to intent.  He is opining as to the

19    incentives and services and how Google's conduct conforms or

20    does not conform to privacy standards and disclosures, how

21    those disclosures do not conform to industry standards.

22         It is appropriate here to talk about why companies collect

23    and retain data.  That is an issue that can assist the jury in

24    this matter, and that is what Professor Schneier will be

25    discussing.

1          THE COURT:  Okay.  Any further comments?  On this one,

2     it really is a paragraph-by-paragraph analysis.  There's lots

3     in his report, I think, that is objectionable, so if there's

4     anything else you want to say.  But there's plenty there that

5     is not, but there is stuff in there that is.

6          MS. MARTIN:  If I may, Your Honor, Google has sought

7     to strike or exclude Professor Schneier in its entirety.  We

8     believe that is overreaching.  We do not believe that that is

9     appropriate.

10          THE COURT:  Any comments?

11          MS. OLSON:  So we disagree with that, obviously,

12     Your Honor.  I think we cite the specific paragraphs that fall

13     under kind of each of the buckets of issues that we have for

14     Mr. Schneier.  We cite on the bottom of page 9 to top of page

15     12 of our motion the various paragraphs where Mr. Schneier is

16     opining on what reasonable people expect or understand.  We

17     cite to the various -- the very many paragraphs, the more than

18     a hundred paragraphs where he is just summarizing internal

19     Google emails.

20          The first six opinions which plaintiffs are claiming are

21     teaching opinions, which don't really fall into what is

22     normally a teaching opinion, a complex issue like

23     thermodynamics, blood clocking, cardiopulmonary bypass --

24          THE COURT:  I hope that if this ever gets to trial

25     you're all going to have some nice demonstratives about how

1    things work because I know my jurors -- and some of them are

2    going to know what you're talking about and some of them are

3    not.  And experts actually -- I mean, look, I got a

4    presentation on Fortnite, and I never played it in my life.

5        So you are going to have to -- you do have to -- it is

6    helpful to have people who can explain those things to you.

7    And he does.  My view is that if -- you know, some of this will

8    stay in; some of it will come out.

9            MS. MARTIN:  Your Honor, may I address the summaries

10   of the documents?  That it is appropriate for experts to render

11   opinions based on information and data that they have reviewed

12   personally.  And in the *Borges* case, Dr. Barry Castleman -- it

13   was found that on his years of experience and expertise, you

14   know, it was more than just casual research for him to provide

15   a description of the documents that he read to lay a foundation

16   for his opinions, and that's what Professor Schneier is doing

17   here.

18       And if he misdescribes, as Google has said, any of the

19   findings or any of the documents, then that is fodder for

20   cross-examination.  That is not fodder for *a Daubert* motion.

21           THE COURT:  Okay.  Ms. Olson, you have the last word.

22           MS. OLSON:  Sure.

23       I'll also just add to what Your Honor was saying earlier.

24   Mr. Schneier was asked if he knows what Google does or what

25   Google does not do, and Mr. Schneier said no, and while I

1   think -- I totally agree with you that there will be helpful

2   testimony from experts about the technology, about what Google

3   does, that's not Mr. Schneier.  And --

4        **THE COURT:**  But rarely, if ever, do I have one person

5   who is the entirety of the case.  This is a puzzle.  That's

6   what I tell my jurors.  Lots of pieces, and he's just one of

7   those pieces.  That's all it is.

8        Okay.  Next, Mr. Psounis.  I'm not saying that right, I'm

9   sure.  My apologies to that person for butchering the name.

10       **MR. MAO:**  Good afternoon, Your Honor.

11       **THE COURT:**  And -- go ahead.

12       **DR. ANSORGE:**  Good afternoon, Your Honor.  Josef

13   Ansorge.

14       **MR. MAO:**  Sorry.  Good afternoon, Your Honor.  Mark

15   Mao, Boies Schiller Flexner.

16       **THE COURT:**  Josef Ansorge.

17       And you said?

18       **MR. MAO:**  Mark Mao, M-A-O.

19       **THE COURT:**  Got it.  Okay.  All right.

20       Your motion, Mr. Ansorge.

21       **DR. ANSORGE:**  We're actually defending this one.

22       **THE COURT:**  Plaintiffs' motion.  Mr. Mao.

23       **MR. MAO:**  Yeah.  I will summarize pretty quickly,

24   Your Honor.

25       Our motion is to strike certain portions of Dr. Psounis'

1    expert rebuttal report where he purports to be a rebuttal

2    expert but has not actually looked at the data in which our

3    moving expert analyzed and provided.

4        There were 160 sources identified by Google as relevant.

5    Our expert looked at over 40, I believe 47 sources, and

6    Dr. Psounis looked at one and came up with his alleged

7    conclusions.  These alleged conclusions was also tested by not

8    Dr. Psounis himself and instead by an associate whose

9    qualifications opposing counsel refuses to give.  And therefore

10   we believe that Dr. Psounis' portions on the data and what

11   Google supposedly can and cannot do with the data should be

12   stricken.

13           **THE COURT:**  Well, what case, if any, do you have for

14   the basic proposition that any expert must do or must perform

15   the exact analysis of your own?  They can attack it without

16   having done the exact analysis.  Why doesn't this just go to

17   weight?

18           **MR. MAO:**  Your Honor, it's because Dr. Psounis is a

19   purported rebuttal expert, and he was only providing rebuttal

20   opinions, so his rebuttal opinions do not look at and address

21   the analysis that was provided by the expert in which he was

22   supposedly rebutting nor the data in which he actually looked

23   at.

24           **THE COURT:**  All right.  A response.

25           **DR. ANSORGE:**  Yes, Your Honor.

1   Mr. Mao just stated that they are only seeking to strike

2   certain portions of his report.  There is 219 paragraphs in

3   Dr. Psounis' report.  Plaintiffs are striking 115.  We don't

4   believe that is an appropriate thing to ask for, and for the

5   specific reason, as you have already put your finger on,

6   Your Honor, there is no requirement for a rebuttal expert,

7   especially at class certification under these conditions, to

8   recreate the exact same analysis that the other expert

9   conducted, nor did Mr. Hochman exclusively rely on the tests

10  that plaintiffs are now referring to.  Even a cursory glance of

11  Mr. Hochman's report and appendices will show that there is

12  many sources that are considered and looked at.  And just like

13  each one of his 31 opinions don't exclusively rely on any data

14  tests, it would follow that they can also easily be rebutted

15  without having to recreate the specific data tests.

16  With regard to the "tested by an associate" comment

17  Mr. Mao made, he is referring there to a specific appendix,

18  Appendix F, in which Dr. Psounis conducted an analysis of the

19  distribution of IP address and user agent.  That analysis -- am

20  I too close?

21  **THE COURT:**  You are having an issue with yours.

22  **DR. ANSORGE:**  That analysis --

23  **THE COURT:**  And, if you will, slow down.

24  **DR. ANSORGE:**  Yes, Your Honor.  I'm sorry for trying

25  to get in so many words so quickly.

1    That analysis is discussed in four paragraphs in

2    Dr. Psounis' report.  So we don't believe it's appropriate or

3    proportional to strike any parts of the Psounis report, but to

4    the extent focus should be on the data tests, those are 4 out

5    of the 219 paragraphs.  None of his opinions exclusively rely

6    on the tests and, indeed, they don't have to because

7    Mr. Hochman in essence opined that individual class members

8    could be identified by taking an IP address and a user agent,

9    and that information combined had sufficient entropy to

10   identify the class members.

11        And Dr. Psounis shows that that's contrary to the

12   established information theory principles.  He actually teaches

13   courses on entropy.  Mr. Hochman, at his deposition, said that

14   well, Dr. Psounis' description of entropy appeared to be fine.

15   He wasn't contesting any of the math, and it seemed to just be

16   what was in textbooks.

17        So Dr. Psounis' opinions are both relevant and reliable,

18   and for those reasons, we would ask that you deny plaintiffs'

19   motion to strike Dr. Psounis' opinions.

20        **MR. MAO:**  Your Honor, if I may address that real

21   quickly?

22        **THE COURT:**  You may.

23        **MR. MAO:**  So counsel just pointed out exactly why

24   there must be a direct rebuttal.  Counsel conceded that

25   Dr. Psounis was supposed to address Mr. Hochman's use of the

1   special master data, Google's data that produced -- that helped

2   identify class members, and yet Dr. Psounis is supposedly

3   looking at some other data sources and saying well, when Mr.--

4   without looking at what Mr. Hochman used in order to identify

5   the class members.  How in the world is a rebuttal expert that

6   is supposed to rebut an identification process going to rebut

7   the identification by looking somewhere else?

8           DR. ANSORGE:  May I respond, Your Honor?

9           THE COURT:  You may.

10          DR. ANSORGE:  So that's not what I was saying.

11   Dr. Psounis relied on a lot of different sources of

12   information:  9 filed documents, 3 expert reports, hearing

13   transcripts, 31 deposition transcripts, 118 public documents,

14   368 produced documents, which include all of the produced

15   documents that Mr. Hochman cited and relied on in his report.

16   Mr. Hochman's opinions didn't exclusively rely on tests, and

17   they can easily be rebutted without having to rely on tests.

18       Indeed, Mr. Hochman states in his report that he was

19   unable to identify class members at this time, and the reason

20   for that is that the special master process was focused on the

21   named plaintiff data.  So to rebut it under those conditions is

22   not necessary nor appropriate to reproduce data and analysis

23   when the overall picture and theory are insufficient.

24       In any event, tests and which tests he conducted would all

25   go to weight and admissibility, and we believe you explained

1    very clearly in your standing order in paragraph 11 neither of

2    those are sufficient bases.

3            **MR. MAO:**   Your Honor, that's just not true that

4    Dr. Hoch -- Mr. Hochman's report obviously identified the class

5    members and went through the entire exercise.   If you just look

6    at the rebuttal report, for example, pages 17, all the way

7    through page 53 proved numerous ways and numerous examples of

8    how class members were reidentified using the same data.   We

9    did the same thing in the opening report.

10           In a case like this involving what Google alleges it does

11   not do with the data and our expert has actually identified,

12   using Google's own data, where class members are being

13   identified, the rebuttal expert -- we cited opinions as to what

14   the rebuttal expert's job needs to be limited to be.   The

15   rebuttal expert needs to address that data to give examples of

16   why the identification was either inaccurate or untrue.

17   Dr. Psounis didn't do any of that in his purported rebuttal.

18   If he wanted to offer something else as a moving expert, Google

19   should have provided that.

20           Your Honor, lastly, this is particularly important in a

21   case about what Google -- about what Google collects from

22   private browsing in which Google has repeatedly refused to

23   proffer and provide to the Court and to the public.   Here the

24   expert himself does not even have the data, Your Honor.

25           **THE COURT:**   All right.   We are going to move to the

1   balance of the class cert motion.

2       My reading with --

3       **DR. ANSORGE:**  May I have two sentences to respond,

4   Your Honor?

5       **THE COURT:**  No.  Rule 23(a), no one is really

6   disputing numerosity; correct?

7       **MR. BROOME:**  No.

8       **THE COURT:**  And typicality; correct?  You are not

9   disputing that?

10      **MR. BROOME:**  We have not made a typicality challenge,

11  Your Honor.

12      **THE COURT:**  Or adequacy?

13      **MR. BROOME:**  We have not made an adequacy challenge.

14      **THE COURT:**  Just getting it in the record.

15      **MR. BROOME:**  Yep.

16      **THE COURT:**  So the commonality, not really except

17  we've got predominance; right?

18      **MR. BROOME:**  We're at predominance.

19      **THE COURT:**  So predominance is the big issue.

20      **MR. BROOME:**  Yes.

21      **THE COURT:**  Okay.  So we've talked about implied

22  consent.  Assuming for purposes of argument we get past implied

23  consent and then there is an analysis of the individual counts,

24  we'll start from the top.  Count 1 -- Count 1 and 2 I think can

25  be done together.

1          **MR. BROOME:**  Sorry.  I have them organized -- is that

2     the wiretapping and the CIPA claims, I think, Your Honor?

3          **THE COURT:**  Correct.

4          **MR. BROOME:**  Yes.  So the argument that we make there,

5     Your Honor, is that the issue of whether Google intercepted the

6     contents of communications, which is required for both

7     wiretapping claims under federal and state law -- that analysis

8     requires individualized inquiries because URLs on their own do

9     not qualify as content in every circumstance, and to determine

10    whether a particular URL qualifies --

11         **THE COURT:**  Didn't Judge Koh already decide at the

12    class -- motion to dismiss stage that we are dealing with

13    confidential communications?

14         **MR. BROOME:**  Confidential is not the question in this

15    analysis, Your Honor.  The statute requires contents, the

16    contents of a communication.

17         **THE COURT:**  It is under Count 2; right?  Under CIPA?

18         **MR. BROOME:**  Sorry.  Under CIPA 632.  I was going to

19    address that separately.  That's correct, yeah.

20         But if we are talking about 631, the federal -- the ECPA

21    wiretapping claim and the CIPA 631 claim, there there is a

22    requirement that the plaintiffs show Google intercepted

23    contents.  And the Ninth Circuit in *Zynga* held very clearly

24    that just a URL on its own without any sort of search terms

25    associated with it or other user-generated content --

1          THE COURT:  Right.  But that's not what this is, is

2   it?

3          MR. BROOME:  It's not what it is.

4          THE COURT:  All right.  Go ahead.

5          MR. MAO:  Your Honor, so you are absolutely right.

6   Not only did this Court find that URL was sufficient for

7   content for wiretap claims in the *RTB* case, as Your Honor just

8   pointed out, all of the data, all the browsing histories at

9   issue in this case involves private communications, things in

10  which the user has explicitly identified as private.  And under

11  not only *Pharmatrak* but the statute itself of 28 U.S.C. 2510,

12  which is the ECPA statute, content is merely defined as any

13  information concerning the substance, purport, or meaning of

14  those communications.

15      And Your Honor, as you may recall, specifically Google

16  tries to identify whether or not a communication is actually

17  confidential by the -- by the absence or the existence of the

18  ex-client data header, for example.  And here there is no

19  dispute ever raised by Google that all of the communications at

20  issue in this case, as defined by the Complaints, have ever

21  been anything other than private browsing.

22          MR. BROOME:  Again, Your Honor, I think we're talking

23  about the federal and state -- Federal Wiretap Act and the CIPA

24  631 claim.  If the issue is contents, whether it's private or

25  not private is irrelevant.  The issue is whether the

1    communication contains some user-generated message to the other

2    party.  And there is a controlling case on this.  It's the

3    *Zynga* case.  It is the only Ninth Circuit case that has

4    addressed this issue --

5            THE COURT:  But that only addressed, right, the

6    information that was in the header.

7            MR. BROOME:  That's right.  And that's the information

8    that plaintiffs are claiming Google has intercepted uniformly

9    across the class.  Now, if they had said that we are uniformly

10   intercepting URLs that contain search terms, while we would

11   have the argument that that's not an analysis --

12           THE COURT:  So Hochman argues that the URLs here as

13   opposed to in the *In Re Zynga* case contain folders, subfolders,

14   and precise files requested from web servers which are

15   different and distinct from the URLs in *Zynga*.  So talk to me

16   about that specific distinction.

17           MR. BROOME:  Sure.  That's not something that could be

18   established classwide, Your Honor.  We're talking about a

19   private browsing session.  That may be one individual goes to

20   one website, looks at one web page, and signs out.  That

21   person's a class member, but that person hasn't conveyed any

22   content to Google.

23       Conversely or differently, you could have a class member

24   who goes to google.com in their private browsing mode, conducts

25   a search --

1     **THE COURT:**  So what I'm concerned here -- the inquiry

2     here is not a complete merits analysis.  The inquiry here is

3     whether or not there's sufficient common evidence for the

4     plaintiffs to make their case with respect to this topic, and

5     presumably you have an expert who's going to provide common

6     evidence to rebut that.  So isn't that sufficient?

7     **MR. BROOME:**  No, Your Honor, because there is no

8     evidence that Google intercepted contents from every class

9     member.  They have to establish that.  They have a burden under

10    *Olean* to show by a preponderance of the evidence that Google --

11    that -- on this claim that Google intercepted contents

12    uniformly across the class, and there are multiple scenarios.

13    I just gave Your Honor one, where Google would not have

14    intercepted contents as that term has been defined by the Ninth

15    Circuit.  And that's why this claim can't be certified.

16    **THE COURT:**  All right.  A response.

17    **MR. MAO:**  Real quickly, Your Honor.

18    We identified three types of contents.  First, we do

19    identify search terms, okay; however, we also identified full

20    URLs.

21    **THE COURT:**  The search terms aren't going to be

22    sufficient under *Zynga*.  Would you agree with that?

23    **MR. MAO:**  I tend to agree with that except to the

24    extent that there may be a subclass on search terms alone.  But

25    for URLs, we have alleged, Your Honor, and we've demonstrated

```
1   with our expert reports that these are full URLs.  It has never

2   been rebutted by the other side.

3        And then lastly, Your Honor, very important, all of the

4   contents, all the communications here, all contain content

5   because they are all tagged "private."  Whether a message --

6   when I'm trying to look and ask from another person and say,

7   "Hey, this conversation is private, I don't want you to let

8   anybody know, please do not track this, please do not save

9   this, please don't do anything with this communication," that,

10  Your Honor, comports with the definition of a communication.

11  And that is exactly what Your Honor just identified in terms of

12  why this is so critical for Americans to be able to actually

13  believe in Google's proffer of a choice.

14          MR. BROOME:  Your Honor, if I may?

15          THE COURT:  Hold on.

16       What you're talking about, it seems to me, is a nature of

17  a communication as opposed to the communication.  I make that

18  distinction in this way.  If Party A and Party B are

19  communicating and then you have Party G, Google, where Party A

20  tells Google, "I'm going to communicate with someone else, and

21  I want it to be private," that's the nature of the

22  communication as opposed to the communication itself.  If the

23  communication itself is just the URL, the Ninth Circuit says

24  that that's not enough.

25       What you're talking about is some other communication with
```

1    Google, at least that's what I understood your argument to be;

2    that the mere nature of the communication, that is, the mere

3    agreement with Google that this is going to be private is

4    somehow transformed into the communication between A and B.

5    And I'm not sure that that gets -- that that's enough under the

6    statute.

7         **MR. MAO:**  I don't know if I quite agree with that,

8    Your Honor, respectfully --

9         **THE COURT:**  And that's fine.  But that's what I want

10   you to address.

11        **MR. MAO:**  Sure, sure, sure.

12        Again, as Your Honor recognized in *RTB*, that

13   qualifications of 28 U.S.C. 2510 is that it's any information

14   concerning the substance, purport, and meaning of that

15   communication.  That's how -- at least how that's defined under

16   the ECPA.  For CIPA 631, the word is "communication."

17        However, Your Honor, I do want to cite an additional case

18   in which we had sent to the other side yesterday, which is S,

19   period, D vs. Hytto, which is H-Y-T-T-O.  It's a 2019 Westlaw

20   8333519, where vibration intensities sent via a body chat app

21   constitute content because the court went back to read

22   definition of "communications," which included substance,

23   purport, and meaning of what was intended to be sent by the

24   user.

25        And here, Your Honor, if we may just take a step back and

1   look at the idea of communications, if I communicate something

2   and if that's not necessarily flagged for the other side --

3   although I would disagree with that here, particularly for

4   Incognito because Google does flag that as confidential --

5   regardless of whether the receiving party, okay, fully

6   appreciates that it's been labeled "private" I don't think is a

7   requirement under the statute, so I do believe the fact that I

8   actually want to communicate a private message, especially if

9   it's understood by interceptor, that is communications,

10  Your Honor.

11       **THE COURT:**  You are trying to identify the tagging

12  itself as a communication as opposed to the underlying

13  communication.

14       **MR. MAO:**  Yes, Your Honor.  But the fact that I flag

15  something as confidential -- for example, Your Honor, if I were

16  looking at a political cite because I happen to be a Republican

17  within the Ninth Circuit where, you know, it's a little more

18  sensitive, the fact that I flagged what I'm reading as

19  confidential, that would give an extra layer of meaning to that

20  communication to the website to request that full page URL

21  during a different situation.  So I do respectfully disagree,

22  Your Honor, at least on that.

23       **THE COURT:**  Response.

24       **MR. BROOME:**  Yes, Your Honor.

25       I think if you look at the *Zynga* opinion, the Court

1    distinguishes --

2         **THE COURT:**  Remind me, *Zynga*, though, didn't have this

3    extra layer of the privacy zone into which the party who --

4    let's assume for purposes of argument that the interception

5    occurred.  Here the argument is that the mere fact that you've

6    entered into the zone that is a special privacy zone, whatever

7    it is that I say in that zone of -- cone of silence is, in

8    fact, a communication.  That wasn't the case in *Zynga*.

9         **MR. BROOME:**  I actually think it was, Your Honor.  I'm

10   just trying to locate the argument.  I think plaintiff did make

11   the argument that because it was -- they did not expect their

12   communication to be intercepted, that there was an expectation

13   of confidentiality, that that -- the court rejected that

14   because the question -- again, you come back to is it contents,

15   and the court's distinguishing between record information,

16   right, addressing information, and that's what a URL is, right?

17   If you go to a website or a web page -- and I have the exact

18   quote here, Your Honor.

19        The court says, "The web page address identifies the

20   location of a web page a user is viewing on the Internet and

21   therefore it functions like an address.  Congress excluded this

22   sort of record information from the definition of 'contents'."

23        And if we come back to this case, the only information

24   that plaintiffs can show Google intercepted uniformly across

25   the class while users were in private browsing mode are web

1    page addresses, URLs.  That's not contents.

2            **THE COURT:**  So what are then the folders, sub-folders,

3    and files referenced by Hochman?

4            **MR. MAO:**  Your Honor, when it's a folder and

5    sub-folder, it basically tells you it's pointing to a specific

6    page; in other words, if you're looking in the *New York Times*,

7    what particular story you're looking at.  And I'm glad that

8    Mr. Broome concedes that that is uniform and typical across the

9    class because that is exactly what we've alleged.

10            But I want to add one more point real fast, Your Honor,

11   which is that please note that even if you have to ponder a

12   little bit more about this idea of tagging specific

13   communications private, okay, with regard to a URL, if you are

14   looking at full page URL, Your Honor, and I've tagged what I'm

15   looking at private, I believe that that would certainly for

16   anybody in the United States believe that that is communication

17   when I'm requesting a specific page --

18            **THE COURT:**  He is saying in *Zynga* it was private, and

19   the Ninth Circuit said no, that's not enough.

20            **MR. MAO:**  What Mr. Broome is talking about is

21   different, Your Honor.  I'm talking about the communication

22   being tagged private.

23            What Mr. Broome is talking about is that in that context,

24   they thought they were having a private moment.  I profess that

25   I do not recall that being in the *Zynga* case other than they

1  were making a claim on the basis of privacy and not that their

2  communication, their request to the web page was private, but

3  what we're talking about here, Your Honor, is where a specific

4  page request, "hey, I want to see this following story," right,

5  and I want to tag that private, Your Honor, I want to view that

6  in my privacy -- in my private moment, I'm sorry --

7      **THE COURT:**  Your reference -- and I apologize because

8  I threw the word into the discussion.  Define for me how you're

9  using the word "tag."  Is your use of the word "tag" the mere

10  fact that you're in this mode?

11      **MR. MAO:**  It's both, actually, but let me -- recall,

12  Your Honor, there is a -- how would I call this -- a gigantic

13  dispute in discovery over Incognito bits.  Each Incognito bit

14  was designed by Google to flag what was or what was not a

15  private moment requested page, okay, in Chrome.  And where you

16  have a full URL and Google is specifically tracking "Hey, this

17  person has specifically requested that I want to be in

18  control," okay, "do not track me, I'm in my private moment,"

19  Your Honor, surely that that is communications.

20      **THE COURT:**  So the argument is that when you're in

21  Incognito mode, anything you do has an Incognito bit which tags

22  it as private?

23      **MR. MAO:**  Yes.  And they are full-page URLs which

24  Mr. Broome does not disagree in each and every moment, and they

25  are also not disagreeing that it's tagged private.

1          **MR. BROOME:**  Your Honor, first of all, we would

2     disagree that the Incognito bit that Google was using is

3     relevant at all to this.  I mean, I don't think -- there is

4     nothing in *Zynga* that suggests that because somebody is in a

5     private mode, that somehow is conveying to a website that the

6     communication -- or to Google that the communication --

7     sorry -- is conveying the content of a communication to Google.

8          The private browsing modes are actually designed not to

9     indicate to the websites or Google that they are in private

10    browsing mode.  The ex-client -- the Incognito bit that Mr. Mao

11    referenced was a more recent development later in the case, and

12    that is not used to sort of uniformly across the class identify

13    private browsing mode users.  It was an inference based off of

14    the absence of a header in Chrome -- it only applies in

15    Chrome -- and the testimony throughout discovery, I think, has

16    pretty much been unassailed, is that that is not uniform across

17    the class.  There are many instances in which that -- the

18    ex-client data header -- the absence of the ex-client data

19    header may not reliably identify a user as being in Incognito

20    mode.

21          **MR. MAO:**  Your Honor, respectfully, if you're not

22    trying to -- so, first of all, we have not gotten all the

23    evidence, but if you're not trying to identify users and you're

24    not trying to identify Incognito sessions, I'm not sure why a

25    bit to indicate whether or not the person is in Incognito or

1    not would be necessary.  So I -- we fully disagree with that

2    statement and representation, Your Honor.

3            **THE COURT:**  Okay.  Let's move on to Count 3.

4            **MR. BROOME:**  So we are at CIPA 632, Your Honor?

5            **THE COURT:**  You want to say more about that?  I wanted

6    to move to 3.

7            **MR. BROOME:**  If you can remind me, Your Honor.  I

8    don't have them listed out by counts.  I'm sorry.

9            **THE COURT:**  Count 3 is the Comprehensive Computer Data

10   Access and Fraud Act.

11           **MR. BROOME:**  Yes.  So this is an anti-hacking statute,

12   Your Honor.  It's the California equivalent of the Federal

13   Computer Fraud and Abuse Act, and right in the text of the

14   statute it requires that the authorization -- the access be

15   without permission.  So the statute requires that the defendant

16   accesses the plaintiff's computer without permission.

17       We would argue, Your Honor, this comes back to implied

18   consent, that many users are well aware that Incognito --

19           **THE COURT:**  That doesn't need to be reargued.

20           **MR. BROOME:**  Okay.  Thank you, Your Honor.

21           **THE COURT:**  4 and 5.

22           **MR. BROOME:**  All right.

23           **THE COURT:**  Invasion of privacy and intrusion upon

24   seclusion.

25           **MR. BROOME:**  Thank you, Your Honor.

1     So there are three additional reasons why the privacy

2  claims cannot be certified.   The first is standing.   At least

3  one named plaintiff must have standing, and here, Your Honor,

4  we would argue that none has standing to insert invasion of

5  privacy or intrusion upon seclusion because these common law

6  claims require that the privacy invasion be highly offensive.

7  But the data collection at issue here consists of orphaned

8  islands of browsing activity that are not identified with any

9  particular user so Google's collection of it cannot meet the

10 highly offensive --

11     **THE COURT:**   I'm not going to make that kind of merits

12 determination at this juncture.

13     The question is if there's sufficient evidence to support

14 that at this juncture.   So if you don't have anything to say on

15 that particular issue, we can move to 6.

16     **MR. BROOME:**   Well, I have additional arguments with

17 respect to 4 and 5, Your Honor, although under both claims,

18 there is a requirement that they show a reasonable expectation

19 of privacy and here we --

20     **THE COURT:**   Someone is saying, "I want to go to into

21 Incognito mode," that's a reasonable expectation arguably.

22 We're moving to 6.

23     **MR. BROOME:**   Arguably, but not --

24     **THE COURT:**   We're moving on.   You've got stronger

25 arguments.   That's not one of them.

1          **MR. BROOME:**  Pardon me?

2          **THE COURT:**  You have stronger arguments.  That's not

3    one of them.

4          **MR. BROOME:**  Thank you, Your Honor.

5          **THE COURT:**  Breach of contract.

6          **MR. BROOME:**  Breach of contract.  Thank you.

7      So certification of the contract claim should be denied

8    because the contract was not uniform throughout the class

9    period.

10         **THE COURT:**  Yeah.  But why can't I -- even if I buy

11   that argument, that's why we have subclasses.

12         **MR. BROOME:**  Yes.  Exactly, Your Honor.

13         **THE COURT:**  So subclasses take care of that entire

14   argument.

15         **MR. BROOME:**  They don't here, Your Honor.  They don't

16   here because there are material variations throughout the class

17   period in the alleged contract that give rise to very specific

18   defenses that Google has that would be claim-defeating.  The

19   question is which defenses apply to which class members.

20     In order to -- we don't know -- we don't -- we are not

21   able to tell when a given class member used any of the private

22   browsing modes at issue here, so the only way -- well, let me

23   take a step back.

24     We can't just assume that class members used Incognito

25   mode or one of the other two private browsing modes

1    consistently throughout the class period.  And we know that

2    because we asked the plaintiffs when did they use private

3    browsing mode.  Well, they responded in response -- in --

4           **THE COURT:**  Isn't that an issue with respect to

5    damages?

6           **MR. BROOME:**  No, Your Honor.  It's an issue as to

7    what -- which defenses apply to which class members because if,

8    for example -- let me give you an example.  One of the

9    plaintiffs said, "I used Incognito mode in 2016 and 2017."

10    Well, for that class member, we would say the alleged contract,

11    which sort of starts at the Terms of Service and then goes to

12    the Privacy Policy -- the Privacy Policy doesn't have any

13    representations about Incognito mode in that period of time,

14    right?  So that class member would not have a claim.

15        In addition to that, during that same time period, there

16    is a limitation of liability that limits that class member's

17    damages to the amount they paid for the service, which is zero

18    dollars here, right?

19           **THE COURT:**  Didn't I just say doesn't that go to

20    damages?

21           **MR. BROOME:**  Well, it goes to damages.  It also goes

22    to predominance because we're talking about whether or not a

23    class member actually has a claim in the first place.  I agree,

24    Your Honor.  The liability issue, limitation does go to

25    damages.

1      But the point is, is that depending on when a class member
2  used private browsing mode, there are different defenses that
3  apply, and if the plaintiffs themselves in response to
4  interrogatory requests cannot reliably recall exactly when they
5  used the private browsing mode and which private browsing mode
6  they used -- I mean, some of these people -- I have some quotes
7  here.  We asked Plaintiff Brown, and he said, "I may have tried
8  the private browsing mode with Microsoft's web browser once or
9  twice," but he wasn't certain.  He had also used Incognito
10  mode.

11      We asked Plaintiff Byatt which other private browsing
12  modes he used, and he said, "I may have browsed privately in
13  Firefox but cannot recall any specific details of the
14  activity."

15      And more generally, Your Honor, when we asked them this
16  question, "which private browsing modes did you use and when
17  did you use them," plaintiffs responded that this request was
18  unreasonable, not proportional to the needs of the litigation.
19  They said that because they used private browsing mode so that
20  their activity would not be memorialized, they could not
21  recall -- quote, they cannot recall the particular details of
22  each and every time they engaged in private browsing mode.

23          **THE COURT:**  All right.  A response.

24          **MS. BONN:**  Yes, Your Honor.

25      This is absolutely a damage allocation and proof-of-claim

issue for this reason, and I'll use just one example.  Google in their brief says, "Well, we think Class 2, the contract, doesn't give rise to a claim between 2016 and 2018."  That is a common argument.  They could move for summary judgment on that, and if the Court were to agree, then that means we would have to make an adjustment to our aggregate damage model, and at a proof-of-claims post-judgment process, a plaintiff would have to sign an affidavit that says what time period did you use this private browser between 2018 and on.  And anyone who put in an affidavit saying, "I browsed in 2016 isn't entitled to an allocation."

    I will also say that Google itself has been from -- precluded from using the absence of complete data in order to challenge class certification generally or self-attestation in particular, and yet what I just heard from Google is that we no longer have records that can reliably identify who did what.  So this is nothing more than an issue that, number one, can be taken care of with subclasses; number two, it is a common argument on the basis of a form contract that applied during a particular time period; and, number three, at best it's an argument about how an aggregate pie should be allocated amongst class members, and Google doesn't have standing under plain Ninth Circuit law, *Ruiz Torres vs. Mercer Canyons*, *Hilao vs. Estate of Marcos*, *Six (6) Mexican* to make any such argument.  And moreover, they've been precluded from making precisely that

type of argument because of their refusal to fully produce and
preserve data in this case.

**MR. BROOME:**  Your Honor, that last point is a gross
misrepresentation of the sanction that was imposed by
Judge van Keulen, and the argument that we are making here that
Google does not have the ability to identify private browsing
users is not because Google failed to preserve data or Google
deleted data that it should have preserved.  The fact is that
the data never existed in the first place.  And the order does
not preclude us from making that argument.

Ms. Bonn's assertion that class members can just put in an
affidavit, well, we asked the plaintiffs to put in
interrogatory responses, and their responses -- their response
was, "This is burdensome.  This is not proportional to the
needs of the case.  We can't remember the specific details."
Now that it serves their interest, they want to have class
member, tens of millions of class members, right, come forward
and say, "I used this particular private browsing mode on these
particular months" because their damages model is a
month-by-month period --

**THE COURT:**  It's a legitimate approach.  It has been
used in other cases.

**MR. BROOME:**  It has but not in a case where the
plaintiffs themselves have said, "We can't remember these kinds
of details."

1      And, remember, Your Honor, it's not every private browsing

2  mode at this point.  That was the case when plaintiffs filed

3  their Third Amended Complaint.  We thought we were litigating a

4  case about all private browsing modes.  For some reason during

5  expert discovery or before expert discovery, plaintiffs

6  determined that not all private browsing modes created the same

7  issue, and so they've narrowed the private browsing modes at

8  issue to just three.  We're going to ask tens of millions of

9  class members to submit affidavits saying, "I used this" --

10      **THE COURT:**  If you defrauded tens of millions of

11  users -- if a jury found you defrauded them, then perhaps yes.

12      **MR. BROOME:**  Well, respectfully, Your Honor, we did

13  not defraud anyone.

14      **THE COURT:**  I understand that's your perspective.

15  That's not what I'm here to decide.

16      The question is whether the class can be certified so that

17  those tens of millions of users don't have to sue you for $3 or

18  $10 or whatever it is.  That's the point of a class action.

19      **MR. BROOME:**  I understand that, Your Honor.  But

20  Google also has rights in this proceeding, and we have defenses

21  that are viable as to many, many class members.

22      **THE COURT:**  Well, let's talk about certification of

23  issues, bifurcation, liability findings without monetary

24  damages.

25      Who wants to be heard?

1        **MR. BROOME:**  I'm not sure -- I may step down,

2   Your Honor, depending on what the question is.  I'm not sure.

3        **THE COURT:**  All right.  I've got someone at the mic on

4   this side.

5        **MR. YANCHUNIS:**  So, Your Honor, in --

6        **THE COURT:**  What is your name, sir?

7        **MR. YANCHUNIS:**  I'm sorry, Your Honor.  John Yanchunis

8   of the law firm of Morgan & Morgan.

9        **THE COURT:**  All right.  Go ahead.

10       **MR. YANCHUNIS:**  If one of the issues that you want to

11  address is our request for certification under 23(b)(2) --

12       **THE COURT:**  Go ahead.

13       **MR. YANCHUNIS:**  I'm sorry, Your Honor?

14       **THE COURT:**  Go ahead.

15       **MR. YANCHUNIS:**  Yes.  Thank you.

16       So in that request we seek an injunction to address four

17  different activities.  One is to stop the collection of

18  browsing information data in connection with anyone using

19  Incognito mode; in other words, make the button work or stop

20  using the button.

21       Second of all, we seek that to the extent that information

22  that we know has been collected and stored, that that be

23  deleted.

24       The third element is -- and we've indicated in

25  Mr. Hochman's report, the ways in which that information has

been used in the development of products and services, that

that information either be extracted out or those products and

services that use unlawfully collected information be

destroyed.

And fourth, that the Court appoint an assessor to

determine that Google has, in fact, complied with the

injunctive relief if it's ordered by the Court.

The argument, which is really one sentence in the

opposition to our request, is that we have an adequate remedy

at law.  Well, this deals with prospective conduct going

forward as well as addressing the fact that they have

information that they're going to continue to use in connection

with their products and services.  So an adequate remedy of law

does not satisfy those elements that we seek in our injunctive

relief.

They claim --

**THE COURT:**  I've heard a lot of argument here,

Mr. Schapiro, that none of these damages models work.  If I

accept your argument, then clearly they don't have an adequate

remedy at law, and so injunctive relief is the only remedy that

would be appropriate.

**MR. SCHAPIRO:**  Two answers to that, Your Honor.  First

of all, a classwide damages model doesn't work.  That doesn't

automatically mean that injunctive relief is available.  But I

believe the law is also fairly clear that if the primary remedy

1   that the plaintiffs are seeking, even though we say you can't

2   apply this classwide -- but if the primary remedy they are

3   seeking --

4        **THE COURT:**  This is an alternative, and it's a new --

5   I don't -- I don't think that's a strong argument.

6        **MR. SCHAPIRO:**  Well, then let me give you an argument

7   that I hope you will find is stronger, and that is, Your Honor,

8   even if injunctive relief were somehow appropriate in this

9   case, the relief -- the injunctive relief that the plaintiffs

10  are asking for here is not feasible, goes well beyond the

11  alleged harm, and I want to explain why, and would --

12       **THE COURT:**  Yeah, but that -- again, isn't that

13  something to be fought about later as opposed to whether or not

14  a class can be certified to provide injunctive relief?

15       **MR. SCHAPIRO:**  No, I don't think so, Your Honor,

16  because also it would detrimentally affect users inside and

17  outside the class whose rights are not going to be represented

18  in an aggregate hearing, so there would be --

19       **THE COURT:**  Again, that -- so you could -- assuming

20  for the sake of argument that the tens of millions of people

21  who you think like the way you've got this structured could

22  continue to use it doesn't necessarily mean that you couldn't

23  create two options:  Incognito Total and Incognito, the way we

24  used to have it, Original.

25       **MR. SCHAPIRO:**  Incognito Classic.

1          **THE COURT:** Classic.  There you go.  Zero Incognito

2   and Incognito Classic.

3          **MR. SCHAPIRO:** Well, Incognito Zero, we submit, would

4   ultimately be a -- would lead to an Internet that doesn't even

5   work for reasons that we've described.  But I want to address

6   your point head on about class certification here, which is --

7   and I would ask the Court if after this argument you are going

8   back and you're thinking about injunctive relief, you look at

9   specifically what the plaintiffs would be asking the jury --

10         **THE COURT:** Mr. Schapiro, I don't -- certainly if I'm

11  going to issue injunctive relief, it seems to me that I

12  shouldn't do it without hearing from the parties.  It seems to

13  be a judicious thing, to wait to hear from the parties before

14  you do injunctive relief.  That's not the question.  The

15  question is do I certify the class so that we can in fact have

16  that discussion.

17         **MR. SCHAPIRO:** Respectfully, Your Honor, I don't

18  think -- I can have -- take a position here where I don't think

19  we can reach a resolution at the class certification stage

20  without at least inquiring as to what it is they are seeking in

21  their Complaint and in their papers, and what they are seeking

22  is to delete -- is, first of all, to identify what information,

23  what private browsing information has -- has been -- could

24  somehow be linked to users and delete that.  That would require

25  violation of privacy standards.

1    Secondly, they're asking Google to remove any services

2    that were developed or improved with private browsing

3    information.  That not only faces the problems above because

4    they don't tell us what these are --

5         **THE COURT:**  Mr. Schapiro, the fundamental thing they

6    are asking for is that Google stop profiting off of data that

7    is collected -- assuming their argument is true, right -- that

8    is collected by people who are using Incognito with the

9    understanding that you aren't collecting their data.  In many

10   ways, it's quite simple.

11        Now, all this other stuff, yeah, maybe you're right, maybe

12   you're wrong, I don't know, but that's not a hugely complicated

13   issue if in fact you are collecting data from users, the

14   millions, the tens of millions of users that think you're not.

15        **MR. SCHAPIRO:**  Your Honor, this case is about -- I

16   don't think we will have a dispute from the plaintiffs about

17   this -- is about people in private browsing mode who go to a

18   site, let's call it the *New York Times*, although sometimes

19   there might be different kinds of sites, and had thought, they

20   say, that not only would their browsing history not be stored

21   on their computers at that time, but that if they clicked an ad

22   that was served up by Google, there would be no indication that

23   that ad -- excuse me -- that the device that was clicking on

24   that ad existed in any way, that you wouldn't know there was a

25   URL or other device, because all that is identified in any way,

1    it's not a human being, it's there's a device somewhere that

2    was in private browsing mode that clicked on an ad.  I think

3    there is no dispute that the cookies are all deleted at the end

4    of a session.

5            **THE COURT:**  Okay.  Is there no dispute?

6            **MR. YANCHUNIS:**  There is a dispute that the private

7    browsing information of consumers is collected, stored, and

8    used by Google.

9            **THE COURT:**  See, that's the problem, Mr. Schapiro.  I

10   have got all of these plaintiffs' lawyers on this side shaking

11   their head "no" when you're talking.  They're shaking their

12   head "no," which means there's a dispute.

13           **MR. SCHAPIRO:**  I don't think they can reasonably

14   dispute that the "you" who they are talking about when they say

15   "you now" -- "you" -- the "your."  "Your browsing isn't

16   visible" --

17           **THE COURT:**  Maybe I --

18           **MR. SCHAPIRO:**  -- "to data; it's just a device."

19       There is a reason that we're permitted to undertake some

20   discovery before a class cert hearing.  And there is a record

21   in this case, and the record is clear that the only thing that

22   is collected is information that some computer somewhere

23   clicked on an ad and then that is deleted.  We have spent a lot

24   of time in front of the magistrate, in front of the special

25   master.  If they had the goods on that, they would come forward

1   with it.  They're not.

2         THE COURT:  Maybe I need to have an evidentiary

3   hearing in this case, too.

4         MR. SCHAPIRO:  That's obviously up to the Court, but

5   when we're talking about an injunction here, the reason I was

6   raising that is that it is impossible to think of -- although

7   at a high level, you would say, "Okay, well, stop profiting."

8   What that would actually mean in a context like that, it means

9   there should be no Google Analytic, we should identify people

10  who are in private browsing so that when a web page, the *New*

11  *York Times*, is visited by someone who is in private browsing

12  mode, *New York Times* knows that person is in private browsing

13  and doesn't serve ads.  The Court would be heading down into a

14  deep rabbit hole there, and so an injunctive class would not be

15  feasible.

16        MR. YANCHUNIS:  May I have the last word on this,

17  Your Honor, or have you heard enough?

18        THE COURT:  No.  Go ahead.

19        MR. YANCHUNIS:  Let me make clear that, again, that in

20  connection with the 23(b)(2), the injunctive relief deals with

21  prospective conduct.  Damages deals with what happened in the

22  past.

23     I think the Court has hit the issue right on the head.

24  What we're talking about is the lick-log issue here, the

25  merits.  Whether it's feasible, not feasible, we certainly have

1   an expert, Mr. Hochman, who talks about the ways in which this

2   information is collected and used, and to say it's not

3   feasible, that doesn't -- isn't synonymous with "it hurts,"

4   "it's too hard."  But at the heart of our UCL claim is the

5   unfairness of the collection of this information.

6           **THE COURT:**  Okay.  I'll give you each five minutes for

7   any parting comments, or you can yield back.

8           **MS. BONN:**  Thank you, Your Honor.

9           **THE COURT:**  Would you like five minutes?

10          **MS. BONN:**  Thank you, Your Honor.

11          **THE COURT:**  Go ahead.

12          **MS. BONN:**  I would like to pick up with the argument

13  that Mr. Schapiro just made, which I think sort of permeates

14  the entirety of their brief, which is even if we made a promise

15  that we won't collect private browsing information, that we

16  won't collect the data if you're in a private mode, it's

17  actually perfectly fine for us to collect it, use it to profit

18  to the tune of billions of dollars, as long as we promise that

19  we'll blur your face.  We won't link it to the other set of

20  data we have about you.

21          But that's not the promise at issue here.  The promise we

22  are alleging in the contracts is not that Google told its

23  users, "Hey, you understand we're collecting all your data in

24  private mode, but we promise we'll anonymize it.  We promise we

25  will pseudonymize it."  No, the promise, as the Court found was

1    a plausible interpretation, was not to collect it in the first

2    place.  And all of the arguments that we have heard from Google

3    today are ones that are common to the class.  They don't raise

4    individualized issues.

5         If Google's argument against injunctive relief is that

6    it's too hard or this conduct isn't so offensive, that's a

7    common argument.  Their argument that well, some class members

8    might have browsed in 2016 and we might have a better argument

9    on the form contract during that period, well, then, they will

10   bring a summary judgment motion, and it would bind the class

11   during that time period.  And at a proof of claim time after a

12   judgment, that can be dealt with.  That happens all the time.

13        What Google is really arguing here is that even though

14   they have a form contract with every single one of our class

15   members, even though that contract has been plausibly

16   construed -- plausibly construed to support our interpretation,

17   even though they've made a commitment in that form contract

18   throughout the class period that they will not reduce rights

19   without your explicit consent, that they can then come into

20   court, object to class certification, which we all know means

21   avoiding accountability, and say the contract's not worth the

22   paper it's printed on, that is effectively the argument Google

23   has made.

24        I would like to address a couple of other things that came

25   up in the argument, and I just want to make sure we make our

1    points.  One is there was a question about the survey evidence

2    and how many people may have misunderstood things under

3    Google's survey.

4         One thing I want to say is before we even get to the

5    question of a survey, we have objective manifestation theory of

6    contract and the promise of an explicit consent standard, so I

7    don't think we're ever even going to get there.  But even if we

8    do, it's a classic battle of the experts.  Google has their

9    expert who performed a survey, admittedly not of Google

10   accountholders, admittedly didn't ask about consent, admittedly

11   didn't ask about the specific conduct in this case, being in a

12   private mode on a non-Google website while signed out of your

13   account, and we have a survey expert, Mr. Keegan, who did a

14   rebuttal.  He accounted for those errors, and what his survey

15   demonstrates is that over 93 percent of respondents believed

16   they have not consented in that particular circumstance, and

17   that is over a hundred million Americans.  So each of these

18   issues is a common and classwide issue, even if we get there.

19        But at the end of the day what Google is effectively

20   saying is you have no choice.  You have no choice to have your

21   private browsing data not be collected by Google because even

22   if we promise not to collect it, even if we promise to rely on

23   explicit consent, if you ever try to bring us into court, we

24   are going to argue we can just collect it with impunity if we

25   de-anonymize it, and, hey, maybe you guessed that was the case

1  because you read some article generally about tracking that

2  doesn't even specifically address the contours of this case.

3      And that is why fundamentally this case should be

4  certified as a (b)(3) class.  Common issues predominate, and a

5  class action is clearly the superior method of adjudication

6  when there is a common form contract, common evidence of

7  Google's tracking and interception behavior, and an aggregate

8  damage model that's calculated from the top down using Google's

9  own internal records, Google's own calculations of profits.  If

10  ever there is a case, a consumer case that fits the criteria to

11  certify a class action, we respectfully submit that on our

12  claims and our record, that is it.

13      And let's consider the alternative.  If there were

14  individualized cases, the same evidence would be presented.  A

15  plaintiff like Mr. Brown would come to court and present the

16  form contract, the explicit consent provision, and would say,

17  "I browsed privately during this time period," and Google would

18  be precluded under the Court's prior order from contesting that

19  because its data hasn't been fully produced.

20      Thank you, Your Honor.

21          THE COURT:  Mr. Schapiro, five minutes.

22      MR. SCHAPIRO:  Your Honor, if a trial of a class

23  action were to proceed here, Google would face the very real

24  prospect of being found liable to tens of millions of people

25  who have not been wronged but with no way to show it.  And the

law is clear that regardless of the difficulties that someone

might face in an individual case, that a defendant has a right

to raise defenses that are individualized, and when those

individualized defenses predominate, class treatment is not

proper.

I would ask the Court, because this is one of those

instances in which there is some overlap between the merits

arguments and the class certification arguments -- I think

we've just heard some of them -- to read the disclosures that

are at issue.  I know Your Honor has.  But to look again at

them because the supposed promises do not appear in the form

that opposing counsel has described them.  And that's important

because it goes to the variability in terms of what people

understood, and it goes to the unworkability of class

treatment.

That is particularly so, strongest, I think, for the

contract case.  And we have laid this out in more detail in our

brief.  Mr. Broome touched on it.  But that is one area where

subclasses would be entirely unworkable, and I think we would

be on day two of a trial and the Court and the parties and the

lawyers would be saying what have we done here because this is

not a simple case where you would say oh, everybody before 2017

was subject to this contract and everyone after 2017 or 2018

was subject to that contract.  The matrix is a Rubik's Cube

essentially, and in each of the sides of that Rubik's Cube, we

have defenses that we are entitled to raise.  It's laid out in
our brief, and if we were required to try to argue against a
contract, which again here is not a specific statement anywhere
in one document but it is a series of inferences drawn from
multiple documents -- without our ability to point to the
specific documents at issue, we would be prejudiced unfairly
and in violation of the governing law.

     Ms. Bonn referred to the surveys a moment ago, and surveys
of course are often used at the class certification stage here.
And even Mr. Keegan's surveys -- even Mr. Keegan's surveys show
that 35 percent of individuals were -- had knowledge and
awareness of what the plaintiffs claim was the improper
collection of their data here.

     If you have a situation where both sides' survey experts
show that a substantial portion of the public understood
perfectly well what the question was but not everyone, that is
not a case that is suitable for class certification.  It's as
if you had a case where there was someone who was using a taxi
service and the agreement with that taxi service said we will
use electric vehicles, and repeatedly the vehicles show up, and
sometimes they're electric and sometimes they have combustion,
and people go on using.  It's quite evident that they are.  And
some people continue to use the taxi service; some people
don't.  That would not be suitable for class treatment.  You
would have implied consent, or if you don't want to call it

1    implied consent, waiver for some significant portion of the

2    class.

3        I believe that the Ninth Circuit in this case would not

4    approve of a certification that deprived Google of such

5    fundamental defenses.  We have laid out in our brief why the

6    damages model is inappropriate for class treatment as well here

7    and the standing problems that the plaintiffs face.

8        I guess I will close by saying I understand that the

9    allegations here might at times seem salacious or

10   extraordinary, and the plaintiffs at times in their statements,

11   I think, have tried to rely on sort of a gut feeling that

12   someone might have and say, "Oh, well if I wanted to be private

13   and I was not able to be private," that there is something that

14   screams out for a remedy here, and I would just again ask

15   Your Honor to look at what the actual promises are here, what

16   Incognito actually does, and I would respectfully suggest that

17   if there are some people, like some of the named plaintiffs

18   here, who had some different expectation, the world will not

19   end if they are required to bring their cases as individuals.

20       **THE COURT:**  Well, it might end for all of us in the

21   Northern District who would have to try those tens of millions

22   of cases.

23       Okay.  You're plaintiff.  Two minutes.

24       **MS. BONN:**  Thank you, Your Honor.

25       I think the arguments we just heard are merits arguments.

They're common to the class.

There is a form contract in this case, and if Google thinks that the contract claim is a weak one during a particular time period, I presume they'll file a summary judgment motion, and if a class is certified and Google happens to prevail, then that would bind the class, but it is not a claim that varies on an individual-by-individual basis.  It is not a reason to deny class certification under rule (b)(3).

And what it ultimately comes down to is that in this case, we have calculated the aggregate damage on a whole, so the arguments that have been made about well, maybe a contract claim won't exist during this discrete time period, that may result in a reduction of the aggregate damage award and then a proof-of-claim issue.

The other thing I want to say is that there has been a heavy emphasis on the notion of implied consent, but throughout this hearing -- I mean, in their briefs, Google said one sentence about the promise in the form contract throughout the class period with every class member:  "We will not reduce your rights without your explicit consent."  "Without your explicit consent."

Google doesn't seem to have an argument why that issue alone doesn't preclude them from raising an implied consent defense and therefore resolve the entire issue in one stroke. The only argument they made in their papers and the only

1    argument I've heard today is, "Well, you know, I don't think

2    that's really what we're doing here."

3        Google is arguing that class members' rights under the

4    contract not to have their private data collected should be

5    reduced because people implicitly consented if they read a news

6    article.  That is a common and classwide issue that will

7    resolve the issue of implied consent in one stroke, and this

8    Court and the jury will never even need to question what did

9    any person privately think in their mind if they read this

10   article because it doesn't matter.  It doesn't matter under the

11   law and it doesn't matter under the contract.

12       Thank you.

13           **THE COURT:**  Okay.

14           **MR. SCHAPIRO:**  Your Honor --

15           **THE COURT:**  This isn't a new argument.  It's all over

16   the briefs, so you don't need to respond.  They're the

17   plaintiffs.  They get to close.  That's the way it works in

18   trial.  That's the way it will work today.

19       I want to just compliment all the attorneys on both sides

20   with respect to your briefing and the clarity of your work.

21   It's a big issue and there's a big record, but it -- we do

22   notice when we get good briefs, and we really do appreciate

23   that.

24       So thanks for spending the time to come in.  This, in my

25   view, is so much better than anything that could happen on

1   Zoom.  I think we're all very wary of doing this kind of work

2   that way.  I certainly can't interrupt and give you hand

3   signals in the same way as I can in the courtroom.  And, you

4   know, it's nice to be back in the courtroom.  So thank you very

5   much.

6          And I'll take it under submission.

7               **MS. BONN:**  Thank you, Your Honor.

8               **MR. SCHAPIRO:**  Thank you, Your Honor.

9                    (Proceedings adjourned at 4:24 p.m.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Thursday, October 13, 2022

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25