# EXHIBIT 2

# Redacted Version of Document Sought to be Sealed

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

- - -

| | | |
|---|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO and MONIQUE TRUJILLO, individually and on behalf of all other similarly situated, | : : : : : : : : | Case No. 5:20-cv-03664- LHK CONFIDENTIAL |
| Plaintiffs, | : : | |
| v. | : | |
| GOOGLE, LLC, | : : | |
| Defendant. | : | |

- - -

Wednesday, June 16, 2021

- - -

Videotaped 30(b)(6) deposition of GLENN BERNTSON held pursuant to notice, beginning at 10:27 AM, on the above date, and recorded stenographically by Constance S. Kent, a Certified Court Reporter, Registered Professional Reporter and Notary Public.

\* \* \*

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
                                                Page 2
 1   A P P E A R A N C E S:
 2   BOIES SCHILLER FLEXNER LLP
     BY:  MARK C. MAO, ESQ.
 3        BEKO REBLITZ-RICHARDSON, ESQ.
     44 Montgomery Street, 41st Floor
 4   San Francisco, California 94104
     (415) 293-6800
 5   mmao@bsfllp.com
     brichardson@bsfllp.com
 6   Attorneys for Plaintiffs
 7
     BOIES SCHILLER FLEXNER LLP
 8   BY:  ROSSANA BAEZA, ESQ.
          (pro hac vice)
 9   100 SE 2nd Street, 28th Floor
     Miami, Florida 33131
10   (305) 539-8400
     rbaeza@bsfllp.com
11   Attorney for Plaintiffs
12   MORGAN & MORGAN
13   BY:  RYAN McGEE, ESQ.
     201 N. Franklin Street, 7th Floor
14   Tampa, Florida 33602
     (813) 223-5505
15   rmcgee@forthepeople.com
     Attorney for the Plaintiff
16
17   SUSMAN GODFREY L L P
     BY:  ALEXANDER FRAWLEY, ESQ.
18   1900 Avenue of the Stars, Suite 1400
     Los Angeles, California 90067
19   (310) 789-3100
     afrawley@susmangodfrey.com
20   Attorneys for Plaintiffs
21
22
23
24
```

```
                                                Page 3
 1   APPEARANCES, continued
 2   QUINN EMANUEL URQUHART & SULLIVAN,
     LLP
 3   BY:  STEPHEN BROOME, ESQUIRE
          JOSEF ANSORGE, ESQUIRE
 4   1300 I Street, NW, Suite 900
     Washington, D.C. 20005
 5   (202) 538.8000
     stephenbroome@quinnemanuel.com
 6   josefansorge@quinnemanuel.com
     Counsel for Defendants
 7
     ALSO PRESENT:
 8
     Matthew Gubiotti, Esquire
 9   In-house counsel for Google
10   Jay Bhatia
11   Chris Thompson, 233 Analytics, LLC
12   Adam Depew, Video Specialist
13   Noah Fox, Trial Technician
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                Page 4
 1                  - - -
                  I N D E X
 2                  - - -
 3   Testimony of:  GLENN BERNTSON
 4   By Mr. Mao            9
     By Mr. Broome       372
 5   By Mr. Mao          378
 6
                    - - -
 7               E X H I B I T S
                    - - -
 8
     NO      DESCRIPTION            PAGE
 9
     Exhibit 1  Plaintiff's Notice of     10
10       30(b)(6) Deposition
     Exhibit 2  Confidential-Google       15
11       Display Server for
12       ████ by ██████,
         Bates
13       GOOG-BRWN-000029458
14   Exhibit 3  Highly                   107
         Confidential-Document
15       Entitled Fantastic
         Identifiers and Where to
16       Find Them, Bates
         GOOG-BRWN- 00078278
17       through 78385
18   Exhibit 4  Confidential-Document    124
         entitled ████, Bates
19       GOOG-BRWN- 00027305
         through 27313
20
     Exhibit 5  Confidential-Document,   193
21       http://g█████████-
         coverage-ratio,
22       GOOG-BRWN-00026161
         through 26168
23
24
```

```
                                                Page 5
 1   NO      DESCRIPTION            PAGE
 2   Exhibit 6  Highly Confidential-     222
         Document entitled
 3       Biscotti Identifiers,
         Bates GOOG-BRWN-00078361
 4       through 78363
 5   Exhibit 7  Highly Confidential-     258
         Document entitled ████
 6       ████, Bates
         GOOG-BRWN-00078370
 7       through 78371
 8   Exhibit 8  Confidential-Document    302
         entitled Logs Sources
 9       and Access Types, Bates
         GOOG-BRWN-00029445
10       through 29453
11   Exhibit 9  Confidential-Document    312
         entitled Chrome Logs,
12       Bates GOOG-BRWN-
         00029381 through 29385
13
     Exhibit 10  Highly Confidential-    335
14       Document entitled
         Unified ID Linkage
15       Service, Bates
         GOOG-BRWN-00078389
16       through 78390
17   Exhibit 11  Confidential-Document   350
         entitled Google
18       Analytics, Backend Core
         Processing Pipelines,
19       GOOG-BRWN- 00078439
         through 78452
20
     Exhibit 12  Documents reviewed by   356
21       Mr. Berntson in
         preparation for
22       deposition (not
         attached)
23
     Exhibit 13  Berntson Fact Sheet     357
24       (not attached)
```



Page 198

1  measurement; that is, if at some point a
2  Biscotti is sent in that we don't have
3  the Gaia ID, we're still able to
4  attribute, for example, that somebody
5  purchased something in relation to an ad
6  that was shown.
7        So [redacted] and my
8  understanding of it is specifically Gaia-
9  keyed sets of IDs that are used to
10 support inference about conversions cross
11 device.
12       Q.  So let's explore that for a
13 little bit.  Generally as a use case, are
14 Google products allowed to blend the data
15 between Biscotti and Gaia?
16       A.  No.
17       Q.  Why is it in this case
18 [redacted] Group IDs are allowed to, I
19 don't know if you'd use the word
20 leveraged or linked, or whatever you
21 would choose, you know, for this
22 instance, why is it for the purposes of
23 conversion of ads you're allowed to use
24 both Gaia and Biscotti?

Page 199

1        A.  Google has a set of, as --
2  as you noted, policies that are meant to
3  prevent reidentifiability, prevent
4  joining of sort of sensitive IDs in terms
5  of, say, signed in and signed out.  So
6  the vast majority of the way all of our
7  systems work, we maintain a very strict
8  separation.
9        The exception in this
10 particular case is because conversions
11 are always recorded in aggregate and
12 they're not associated to an individual
13 user, we're not leaking any data about an
14 individual user by being able to count
15 the number of conversions associated with
16 a given campaign.
17       And so [redacted] used in
18 this way is specifically has a carve out
19 set of permissions that are linked to the
20 fact that individual users are not being
21 tracked, only aggregate level insights as
22 it relates to conversions are being
23 provided.
24       Q.  Right.  But a conversion is

Page 200

1  a one-to-one, right, it's the user -- the
2  Gaia user specifically has somehow
3  converted on an ad, it, you know, where
4  there was a Biscotti instead of a Gaia
5  ID; isn't that correct?
6        A.  The way that conversions are
7  surfaced and presented to advertisers, et
8  cetera is in aggregate.  So an advertiser
9  will created a campaign that says, I'd
10 like to serve this 7-Up ad and here --
11 here are the criteria for where I want
12 the ad to show up, et cetera, and then if
13 they want to actually see how many people
14 then buy that soda because they saw the
15 ad, what we provide back to the -- the
16 advertiser is not a list of IDs of users
17 that converted, but just how many
18 conversions happened because of their
19 campaign.  So --
20       Q.  Is that an exact count?  But
21 that is an exact count that Google
22 provides, right, how many conversions?
23       A.  That is correct.
24       Q.  And that conversion is based

Page 201

1  off of both Gaia and Biscotti IDs; isn't
2  that correct?
3        A.  In the -- if a
4  [redacted] graph -- if the
5  [redacted] graph is used to be able to
6  make the imprints in terms of a cross
7  device conversion, then the answer is
8  yes.
9        Q.  Okay.  And you charged the
10 advertiser a specific amount of dollars
11 based on the number of conversions; isn't
12 that correct?
13       A.  Advertising campaigns can be
14 set up based on a number of certain
15 criteria.  It could be that if, let's
16 say, a brand-related campaign, it's the
17 number of impressions; that is, how many
18 people saw the ad.  Conversions is simply
19 one of the metrics that an advertiser can
20 choose as the metrics associated with
21 what they pay.
22       Q.  Right.  But for whether it
23 be for conversions or number of
24 impressions; in other words, whether it's

Page 370

1  MR. BROOME: Are you done?
2  Are you done, Mark?
3  MR. MAO: I am not done.
4  I'm reserving my rights.
5  MR. BROOME: You're done,
6  right? I mean, do you have -- let
7  me -- let me put it this way: Do
8  you have any more questions for
9  the witness to ask right now?
10 We're not bringing him back
11 because you want to reserve time
12 hypothetically.
13 MR. MAO: We are off the
14 clock, my clock. If you want to
15 go on your clock --
16 MR. BROOME: Yeah, I do.
17 I'm just asking are you done with
18 your questioning? It's a pretty
19 straightforward question. Are you
20 done with your questioning of this
21 witness?
22 MR. MAO: I'm reserving my
23 rights.
24 MR. BROOME: Reserving your

Page 371

1  rights for what?
2  MR. MAO: I'm reserving my
3  rights to ask additional questions
4  of a witness that's properly
5  prepared to testify to the topics,
6  including the topics which the
7  court had actually ordered.
8  MR. BROOME: Okay. But you
9  don't have any more questions for
10 Mr. Berntson?
11 MR. MAO: Disagree. I don't
12 know.
13 MR. BROOME: You don't know
14 if you have any more questions for
15 him?
16 MR. MAO: Steve, stop
17 burning my time.
18 MR. BROOME: Do you have any
19 more questions for Mr. Berntson?
20 MR. MAO: I'm pausing my
21 portion.
22 MR. BROOME: Okay. I'm
23 going to take that as a no.
24 Did -- can I -- can I ask my

Page 372

1  questions now? I'm going to take
2  your silence, your non-response as
3  a yes.
4        - - -
5     E X A M I N A T I O N
6        - - -
7  BY MR. BROOME:
8     Q. Mr. Berntson, do you recall
9  that Mr. Mao asked you some questions
10 today about Google mapping Biscotti IDs
11 and [redacted] and conversion
12 tracking?
13    A. Yes.
14    Q. And I believe you testified
15 that mapping in [redacted] requires a
16 Gaia ID; is that -- is that right?
17    A. That is correct.
18    Q. For the dataflow that's at
19 issue in this case where users are on
20 their browsers, they're signed out of
21 their Google accounts, they're in private
22 browsing mode, would there be any mapping
23 from Gaia to Biscotti?
24    A. No, because when you go into

Page 373

1  private browsing mode, you start off with
2  a completely empty cookie jar. A
3  Biscotti is created, and if you don't
4  sign in to Google, there's no Gaia to map
5  that new Biscotti to. The Biscotti that
6  is present on the non-incognito browser
7  instance is not shared with the incognito
8  browser instance so there's no way of
9  creating that mapping from an incognito
10 session.
11    Q. Okay. And -- and conversely
12 would there be any mapping from Biscotti
13 to Gaia under those same conditions?
14    A. No. Again for similar
15 reasons, there is no Gaia to map that
16 Biscotti to.
17    Q. Mr. Mao asked -- also asked
18 you a number of questions about the
19 X-Client-Data header.
20       Do you recall that?
21    A. Yes.
22    Q. Do you understand that the
23 plaintiffs in this case have proposed
24 that Google could use the absence of the

Page 374

1  X-Client-Data header to identify users
2  who are in incognito mode?
3      A.   Yes.
4      Q.   And does Google use the
5  absence of the X-Client-Data header to
6  identify users who are in incognito mode?
7      A.   No.
8      Q.   And would that be a good way
9  to identify incognito users?
10     A.   No.
11     Q.   And why is that?
12     A.   Because there are cases that
13 will lead to false positives; that is,
14 where you see an empty X-Client-Data
15 header and you assume it's incognito but
16 not and false negatives where the reverse
17 is also true.  There are processes that
18 can result in empty client -- empty
19 X-Client-Data headers and to take an
20 empty client -- X-Client-Data header and
21 populate values.
22     Q.   Can you give us a couple of
23 examples?
24     A.   Sure.  For the first case

Page 375

1  where there are instances where the
2  X-Client-Data header is empty and it's
3  not in incognito browsing, there -- there
4  are quite a few different ways that that
5  can happen.  One is if it's a new browser
6  instance, no X-client header is present
7  in any call out from the browser.
8           The second is if you haven't
9  used your browser for ▌▌▌▌ or more,
10 the X-client header data is considered to
11 be stale and just purged and no
12 X-Client-Data header is passed.
13          Another case is if the
14 variation IDs that are carried in the
15 X-Client-Data header, if too many are
16 returned to Chrome to prevent the
17 requests coming from Chrome from being
18 too large, they just delete them all and
19 so you'd see no X-Client-Data header.
20          Yet another permutation is
21 the presence of a firewall can also
22 prevent Chrome, the browser, from getting
23 the variation IDs that are used to
24 populate the X-Client-Data header, and

Page 376

1  this is because the variation IDs are
2  basically instructions as to what new
3  features are enabled in the browser, and
4  so Chrome, after it starts out, will make
5  an asynchronous call to retrieve these
6  data from the server, and if that server
7  endpoint is blocked by a firewall, no
8  X-Client-Data header is provided, none of
9  the variation IDs.  So that's another
10 case where you can have an empty
11 X-Client-Data header.
12     Q.   Thank you.  That's very
13 helpful.
14          Mr. Berntson, do -- do you
15 understand that you have been designated
16 by Google to testify on topics, with the
17 exception of Topic No. 5 to which Google
18 objected to producing a witness, Topics 1
19 through 4 and 6 through 12?  You
20 understand that you've been designated to
21 testify on those topics?
22     A.   Yes, I do.
23     Q.   On behalf of Google?
24     A.   Yes, I do.

Page 377

1      Q.   And -- and did you -- did
2  you indeed prepare to testify on all of
3  those topics?
4      A.   I did.
5      Q.   How much time do you think
6  you spent preparing to testify on those
7  topics?
8      A.   At least 25 hours.
9      Q.   And did you conduct
10 interviews with relevant subject matter
11 experts in order to educate yourself on
12 the topics for which you've been
13 designated?
14     A.   I did.  I interviewed eight
15 different people.
16     Q.   Okay.  And -- and did you
17 review documents in order to educate
18 yourself on the topics for which you've
19 been designated?
20     A.   Yes, and those have been
21 entered as Exhibits 12 and 13.
22     Q.   Okay.  And that's -- that's
23 a -- a binder of 61 documents by my
24 count; is that right?

Page 394

ERRATA SHEET FOR THE TRANSCRIPT OF
1  Case:          Calhoun, et al. v. Google LLC
2  Deposition Date: June 11, 2021
3  Deponent:      David Monsees
4

| # | Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|---|
| 6 | 27:21; | | | |
| 7 | 174:12, 17; | | | |
| 8 | 175:1; | | | |
| 9 | 178:17; | | | |
| 10 | 181:5; | | | |
| 11 | 244:4, 15, 19, 21; | | | |
| 12 | 253:14; | | | |
| 13 | 309:22 | STKs | SDKs | transcription error |
| 14 | 28:11, 15; | | | |
| 15 | 37:5; | | | |
| 16 | 38:8; | | | |
| 17 | 88:6, 10, 15; | | | |
| 18 | 97:19; | | | |
| 19 | 102:5; | | | |
| 20 | 105:8; | | | |
| 21 | 117:22, 23; | | | |
| 22 | 118:1, 4; | | | |
| 23 | 120:5, 14, 18; | | | |
| 24 | 131:7, 8; | STK | SDK | transcription error |

Page 395

| cont | Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|---|
| 1 | 158:4; | | | |
| 2 | 172:19, 22; | | | |
| 3 | 174:20, 23; | | | |
| 4 | 175:6; | | | |
| 5 | 176:3, 8, 9, 12, 18, 20, | | | |
| 6 | 23; | | | |
| 7 | 226:5; | | | |
| 8 | 228:5; | | | |
| 9 | 245:1, 2, 4, 13; | | | |
| 10 | 254:21, 22; | | | |
| 11 | 255:3, 8, 13, 15; | | | |
| 12 | 256:19; | | | |
| 13 | 274:7, 8, 10, 13; | | | |
| 14 | 276:13; | | | |
| 15 | 277:19; | | | |
| 16 | 310:10 | STK | SDK | transcription error |
| 17 | 54:9, 11, 12, 14, 18, 19, | | | |
| 18 | 23, 24; | | | |
| 19 | 55:6, 10, 17; 56:3, 7, 9; | | | |
| 20 | 58:3, 9; | | | |
| 21 | 59:3, 5, 10; 61:4, 11, | | | |
| 22 | 12; | | | |
| 23 | 62:2, 8, 11, 13, 16, 17, | | | |
| 24 | 22; | ■ | ■ | transcription error |

Page 396

| cont | Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|---|
| 1 | 63:2, 3, 8, 10; | | | |
| 2 | 65:24; | | | |
| 3 | 66:2; | | | |
| 4 | 68:24; | | | |
| 5 | 69:2; | | | |
| 6 | 71:13, 15; | | | |
| 7 | 121:9, 10, 13; | | | |
| 8 | 126:5, 15; | | | |
| 9 | 243:4, 7; | | | |
| 10 | 294:3, 4; | | | |
| 11 | 298:20, 23; | | | |
| 12 | 299:2, 4, 5; | | | |
| 13 | 300:23; | | | |
| 14 | 331:1, 3 | ■ | ■ | transcription error |
| 15 | 88:6 | A, the | The | transcription error |
| 16 | 107:10 | 00078278 | 00078378 | transcription error |
| 17 | 109:12 | up-to-date | out-of-date | misspoke |
| 18 | 157:19 | If Biscotti | A Biscotti | transcription error |
| 19 | 166:11; | | | |
| 20 | 202:23; | conversation | | |
| 21 | 203:3; 15 | s | conversions | transcription error |
| 22 | 204:6 | conversation | conversion | transcription error |

Page 397

_____
Signature of Deponent

7/27/2021
_____
Date