1

2

3

4              **UNITED STATES DISTRICT COURT**

5           **NORTHERN DISTRICT OF CALIFORNIA**

6

7    **CHASOM BROWN, ET AL.**              CASE NO.  20-cv-3664-YGR

8                    Plaintiffs,           **ORDER GRANTING IN PART MOTION FOR
                                           CLASS CERTIFICATION; GRANTING IN
9             v.                           PART *DAUBERT* MOTIONS; AND DENYING
                                           MOTION TO STRIKE GOOGLE'S NON-
10   **GOOGLE, LLC**,                      RETAINED EXPERTS**

11                   Defendant.            Re: Dkt. Nos. 609, 662, 663, 664, 703, 705

12          Plaintiffs Chasom Brown, William Byatt, Jeremy Davis, Christopher Castillo, and

13   Monique Trujillo bring this action against defendant Google, LLC, alleging seven counts based on

14   Google's alleged data collection practices: (1) violation of the Federal Wiretap Act, 18 U.S.C. §

15   2510, *et. seq.*, also known as the Electronic Communications Privacy Act ("ECPA"); (2) violation

16   of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 632; (3) violation

17   of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502

18   *et. seq.*; (4) invasion of privacy; (5) intrusion upon seclusion; (6) breach of contract; (7) violation

19   of California's Unfair Competition Law ("UCL").

20          Pending before the Court are plaintiffs' Motion for Class Certification, the parties'

21   corresponding *Daubert* motions, plaintiffs' Motion to Strike Google's Non-Retained Experts, and

22   several administrative motions to seal.[1] Having carefully considered the parties' briefing, the

23   admissible evidence, the record in this case, and upon further consideration after oral argument

24   which occurred on October 11, 2022, plaintiffs' motion for class certification is **GRANTED IN**

25

26          [1] *See* Dkt. Nos. 609, 662, 663, 664, 703 and 705; *see also Daubert v. Merrell Dow
     Pharms., Inc.*, 509 U.S. 579 (1993).

27
            As to the administrative motions to seal, these motions are **DENIED** to the extent the
28   information is referenced and included in this Order. The specific motions will be addressed by
     separate court order.

United States District Court
Northern District of California

United States District Court
Northern District of California

**PART**. Many of Google's arguments hinge on the general proposition that Google's customer base is too big for class treatment. The notion that Google is too big to be held accountable does not persuade. The Court finds certification for injunctive relief only appropriate. Moreover, the *Daubert* motions are **GRANTED IN PART** and plaintiffs' Motion to Strike is **DENIED**.

## I.   BACKGROUND

The Court incorporates the background provided in Judge Koh's 31-page order denying Google's motion to dismiss. (Dkt. No. 363, at 1-8.) In sum, plaintiffs allege that Google surreptitiously intercepts and collects users' data even while users are in a private browsing mode. (Dkt. 395-2, Third Amended Complaint, ("TAC") at ¶ 1.) The at-issue data includes: (i) "[t]he 'GET request' sent from the user's computer to the website"; (ii) "[t]he IP address of the user's connection to the internet"; (iii) "[i]nformation identifying the browser software that the user is using, including any 'fingerprint' data"; (iv) "[a]ny 'user-ID' issued by the website to the user, if available"; (v) "[g]eolocation of the user, if available"; and (vi) "[i]nformation contained in 'Google cookies,' which were saved by the user's web browser on the user's device at any time prior." (TAC at ¶ 63(a)-(f).)

## II.   LEGAL STANDARDS

### A.   *Daubert* Motions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and based upon that qualification, the witness's opinion is relevant and reliable. An expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the subject matter of the opinion. Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. *Id.*, Advisory Committee Notes (2000 amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). For scientific opinions, they must be based on scientifically valid principles. *Daubert*, 509 U.S. at 589. Experts assist the fact finder in their own evaluation of

United States District Court
Northern District of California

the evidence by providing the fact finder with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

### B.      Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted).

The party moving for certification first must show that the four requirements of Rule 23(a) are met. Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

///

///

United States District Court
Northern District of California

### III. DISCUSSION

#### A. *Daubert* Motions

The Court addresses the parties' various *Daubert* motions as they inform the Court's analysis of the plaintiffs' motion for class certification. Four such motions are pending: (1) Google's Motion to Exclude Opinions of Plaintiffs' Damages Expert Michael J. Lasinski (Dkt. No. 661-3); (2) Google's Motion to Exclude Opinions of Plaintiffs' Expert David Nelson (Dkt. No. 663); (3) Google's Motion to Exclude Opinions of Plaintiffs' Expert Bruce Schneier (Dkt. No. 661-4); and (4) Plaintiffs' Motion to Exclude Portions of Rebuttal Expert Report of Konstantinos Psounis (Dkt. No. 702-1). The Court addresses each motion in turn.

##### 1. *Daubert* as to Michael J. Lasinski

Google moves to exclude the testimony of plaintiffs' damages expert, Michael Lasinski, under Federal Rule of Evidence 702 and *Daubert*. (Dkt. No. 661-3.) Lasinski is a Senior Managing Director at Ankura Consulting Group ("Ankura") and head of the Intellectual Property Group. (Dkt. No. 608-9, Lasinski Report ¶ 2.) He has twenty-seven years of experience assisting clients in understanding and evaluating the financial aspects of intellectual property. (*Id.*) Lasinski received his Bachelor of Science degree in Electrical Engineering and a Master of Business Administration from the University of Michigan. (*Id.* ¶ 6.) As assigned, he assessed the feasibility of identifying and quantifying various measures of monetary relief tied to plaintiffs' claims, including unjust enrichment, actual damages (restitution), and statutory damages. (*Id.* ¶ 12.) To do so, he relied on his review of discovery produced by Google, deposition testimony, publicly available materials, deposition testimony of Google personnel, plaintiffs' experts' reports, as well as other materials listed in Appendix B of his report. (*Id.* ¶ 17.)

Lasinski offers an opinion on a methodology for determining three types of damages: (a) unjust enrichment, (b) restitution damages, and (c) statutory damages, and asserts eight opinions, summarized as follows: (1) discovery in this case can be used to quantify relief on a class-wide basis; (2) Google's ChromeGuard analysis provides a reliable basis for quantifying certain relief; (3) Google's internal analyses of the financial impact to Google because of third-party cookie blocking can be adjusted to reliably quantify Google's unjust enrichment; (4) calculation of unjust

United States District Court
Northern District of California

enrichment can be determined under a range of potential liability scenarios; (5) restitution damages can be determined as a function of the payments necessary to incentivize an individual to knowingly relinquish the choice to keep certain browsing private and allow a company to track all online activity; (6)  an appropriate damages rate can be applied in calculating statutory damages; (7) these statutory rates can be readily updated to cover subsequent periods through the date of trial; and (8) that his analyses can be readily used as common proof in part because they can be adjusted to calculate and assess unjust enrichment, actual damages, and statutory damages for different time periods. (*Id.* ¶ 1.)

The Court starts with a high-level summary of the disputed parts of Lasinski's models before addressing the parties' arguments.

### a.    *Overview of the Methods*

### i.    **Unjust Enrichment Model**

In opining on the methodology for determining classwide unjust enrichment damages, Lasinski looks to Google's internal analyses that describe the financial impact to Google of blocking third-party cookies by default in Chrome Incognito mode ("ChromeGuard"). (*Id.* ¶ 52.) He segments his analyses by product area (Display Ads, YouTube ads, and Search Ads), private browsing mode (incognito mode or other browsing modes), revenue source (personalization or conversion tracking), and the scope of conversion tracking (conversion tracking from traffic with third-party cookies or conversion tracking from all traffic). (*Id.* ¶ 60.) In doing so, he calculates unjust enrichment damages from Google's U.S. revenues from Display Ads, Search Ads, and YouTube Ads in three scenarios. (*Id.* ¶¶ 133-36.)

In Scenario One, Lasinski arrives at the unjust enrichment amount by calculating: (a) all of Google's U.S. Display Ads shown to users in private browsing mode, (b) U.S. search revenue attributable to conversion from all private browsing traffic, and (c) U.S. YouTube Ads revenue attributable to personalization from third-party cookies and conversion from all private browsing traffic. (*Id.* ¶¶ 133-35.) By using this approach, Lasinski calculates a damages amount of $3.87 billion. (*Id.* ¶ 136.)

///

In Scenario Two, he arrives at the unjust enrichment amount by calculating Google's Display, Search, and YouTube revenue that is attributable to personalization from third-party cookies and conversion from all private browsing traffic. Here, he calculates a damages amount of $3.61 billion. (*Id.* ¶¶ 133-36.)

In Scenario Three, he arrives at the unjust enrichment amount by calculating Google's Display, Search, and YouTube that is attributable to personalization and conversion from third-party cookies. With this model, he calculates a damages amount of $567.4 million. (*Id.*)

Lasinski explains that such segmentation is intended to assist the trier of fact in determining Google's unjust enrichment under a range of liability scenarios. (*Id.* ¶ 133.)

### ii.   Restitution Model

Next, Lasinski opines on a methodology for calculating classwide restitution damages. Here, he uses the payment amount necessary to incentivize individuals to knowingly relinquish their online privacy as a base rate. He then takes that rate and multiplies it by the number of unique monthly private browsing instances ("UMPBI"). (*Id.* ¶ 184.)[2] In doing so, Lasinski calculates a restitution damages amount of approximately $9.1 billion. (*Id.* at Fig. 72.)

In arriving at the base rate, Lasinski analyzed payments that Google made or considered making to users for their data, users' willingness to pay to prevent data collection, and research organizations' willingness to pay for data collection. (*Id.* ¶ 140.) Lasinski explains that the most reliable input comes from Google itself. (*Id.* ¶ 165.) Since 2012, Google has used a market research company called Ipsos to collect information on how users use the Internet. (*Id.* ¶ 143.) Through Ipsos, Google conducts what are known as Screenwise Panel studies. (*Id.*) These studies allow selected participants to get paid if they voluntarily link their devices and allow Google to collect certain information about the users' online activities.  (*Id.*) Some examples of the data collected through the Screenwise Panel studies include: the content and advertising shown on devices, interactions with that content and advertising, webpages, information you type into your devices, cookies, and device information. (*Id.* ¶ 144, Fig. 57.)

---

[2]  "[A] single UMPBI represents one or more pageloads in Incognito mode or an Other Private Browsing Mode on a single device during a one-month period." (Lasinski Report ¶ 139.)

United States District Court
Northern District of California

As part of the Screenwise Panel, participants are paid a baseline minimum of $3 per month per device. This base rate does not decrease based on one's browsing activity, but it can increase based on other factors. (*Id.* ¶¶ 149-50.) To calculate damages, Lasinski uses this $3 rate that Google pays survey participants as an input. (*Id.* ¶ 183.) He then multiplies that by the number of UMPBI during the class period for both classes. (*Id.* ¶ 184.)

### iii.   **Statutory Damages Model**

Third, in opining on a methodology for calculating statutory damages on a classwide basis, Lasinski used data and internal documents produced by Google which quantified incognito traffic. This quantified traffic was then used to calculate the four bases that Lasinski offers as common proof of calculating statutory damages: (1) the total number of individual pageloads in the relevant browsers; (2) the total UMPBI with one UMPBI referring to a specific browse that used a private browsing mode at least once a month; (3) calculation of UMPBI based on the peak UMPBI for one month; and (4) the total number of class members for each of the classes. (*Id.* ¶¶ 185-195.) Lasinski opines that all four bases would allow the Court to calculate statutory damages and can be used as common proof because they can be adjusted to account for different time periods and subclasses. (*Id.* ¶ 198.)

### iv.   **Damages Allocation Method**

Finally, Lasinski opines on two methods to allocate individual damages. The first method includes taking the aggregate damages number and dividing it by the total number of UMPBI during the class period. Awards would be distributed to class members based on the number of UMPBI attributable to each class member.[3] The second method includes calculating individual damages on a *per capita* basis based on the number of class members. (*Id.* ¶ 197.)

### b.   *Overview of Parties' Contentions*

Google moves to exclude Lasinski's opinions and methodologies for computing damages on the grounds that: (1) Lasinski fails to account for uninjured users who consented to the at-issue

---

[3] Based on Lasinski's calculations, the Court calculates an average UMPBI of about .725 per class member. (*See id.* at Figs. 74 and 75.)

1   data collection; (2) his primary input for calculating class-wide restitution damages is speculative

2   and unreliable; (3) his restitution opinions fail to account for variability in user benefit from

3   personalization and valuation of privacy; (4) his failure to deduct costs from the unjust enrichment

4   analysis is contrary to the law and has no basis in the facts; (5) all of his unjust enrichment

5   scenarios are flawed and unreliable; (6) his proposed methods for apportioning damages ignore

6   individual differences and are not efficient or feasible for distributing damages; and (7) his

7   opinions on calculating statutory damages are unreliable.

8       Plaintiffs oppose arguing: (1) Lasinski's damages calculations are based on assumptions

9   consistent with their theory of the case; (2) his actual damages calculations are based on the same

10  key input Google used in the Screenwise Panel study; (3) Google documents and testimony

11  confirm that incremental costs do not exist for private browsing traffic; (4) Lasinski's method for

12  calculating statutory damages are sound and simply lead to penalties Google does not like; and (5)

13  Lasinski is not required to adopt Google's preferred method of apportioning damages.

14                  i.      **Assumption of Harm to Every Class Member**[4]

15      First, Google argues that all of Lasinski's opinions should be excluded because he fails to

16  account for uninjured class members.

17      A plaintiff seeking certification under Rule 23(b)(3) must show that damages are capable

18  of measurement on a class-wide basis, and such calculations "need not be exact."  *Comcast*, 569

19  U.S. at 35.  Under *Comcast*, a plaintiff must show that its proposed damages model is consistent

20  with its theory of liability in the case.  *Id.*

21      As an initial matter, Google's arguments "reflect[] a merits dispute about the scope of [its]

22  liability, and is not appropriate for resolution at the class certification stage of this proceeding."

23  *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016). Relatedly,

24  Lasinski's methodology is consistent with plaintiffs' class definition and theory of liability.

25  Google's disagreement with Lasinski's assumption is no reason to exclude his opinions. *Perez v.*

26

27      4  The Court notes that both parties used part of their *Daubert* briefing to argue the merits
    of their consent arguments. Counsel is aware of the legal standard under *Daubert* and should know
28  that such argument is wholly inappropriate. The parties are warned that future conduct will result
    in the briefing being stricken and/or sanctions.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Rash Curtis & Assocs.*, 2019 WL 1491694, at *3 (N.D. Cal. Apr. 4, 2019) ("any arguments that [an expert] based his opinions on an improper assumption go to the weight, not the admissibility of the testimony.")

Accordingly, the motion is **DENIED** on this ground.

### ii.      $3 Input for Calculating Restitution Damages

Second, Google argues that Lasinski's restitution opinion should be excluded because the $3 input that he uses is speculative and unreliable. Google does not persuade. The $3 rate is derived from looking at what Google actually pays Screenwise participants for agreeing to allow Google to collect their browsing data. In arriving at this number, Lasinski acknowledged that the full scope of the data collected in the Screenwise studies differs in some respects from the at-issue data and accounted for that in using the baseline of $3 rather than some higher amount that some participants receive through the Screenwise program. (Lasinski Report ¶¶ 147-50.) Lasinski opines that this rate is conservative because that is the rate willing people would accept to give up their data and that unwilling users, hence users in private browsing mode, will likely require more incentive to give up their data. (Dkt. No. 661-3, Lasinski Dep. 101:13-102:22.) The Court finds such considerations and analysis logical and reliable. The question is one of weight, not admissibility.

Accordingly, the motion is **DENIED** on this ground.

### iii.      Variability in User Benefit and Valuation of Privacy

Third, Google avers that Lasinski's restitution opinions should be excluded as unreliable because he ignores: (i) the strong evidence of variability in the benefits that users may have received from ad personalization and (ii) the value users place on their private browsing data and their privacy. In response, plaintiffs argue that under their theory of restitution such subjective valuations are not necessary.

Where there is "enrichment from the receipt of nonreturnable benefits," restitution can be measured by either: (a) the value of benefit to the defendant; (b) the cost to plaintiff of conferring such benefit; (c) the market value of the benefit; or (d) the price the defendant has expressed a willingness to pay, if the defendant's asset may be treated valid on the question of price.

United States District Court
Northern District of California

Restatement (Third) of Restitution and Unjust Enrichment § 49.

The Court finds that under any of these formulations, this is precisely what Lasinski's method measures. He measures the value that Google actually pays to users who voluntarily give up their right to privately browse the Internet. Lasinski's method does not turn on the subjective feelings and beliefs of class members. Rather, he employs an objective standard focused on paying users to relinquish their right to browse privately.

Indeed, Google employs a similarly objective standard in compensating Screenwise participants. The amount Google pays participants does not fluctuate depending on the participants' subjective beliefs. Rather, Google sets a base rate and then compensates based on objective measures such as how many devices are registered and what kinds of devices are used. These same objective criteria that Google employs in its Screenwise panel study is what Lasinski uses as a base for his calculation of restitution damages. Therefore, Google's disagreement with the restitution method applied and the outcome of that method does not make Lasinski's method unreliable. Google's concerns go to weight, not admissibility.

Accordingly, the motion on this ground is **DENIED**.

### iv.      Unjust Enrichment Model and Costs

Fourth, Google seeks to exclude Lasinski's unjust enrichment model on the grounds that it looks at Google's revenue and does not take into account Google's costs. Plaintiffs argue that Lasinski did not deduct costs from his calculation because there are no incremental costs to Google.

"Disgorgement is a remedy in which a court orders a wrongdoer to turn over all profits obtained by violating the law." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016). A party that is wronged and seeks unjust enrichment "may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then [the defendant] may present evidence of costs, expenses, and other deductions to show the accrual or net benefit the defendant received." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014). Importantly, "the residual risks of uncertainty in calculating net profit is assigned to the wrongdoer." *Id.*

United States District Court
Northern District of California

In proffering his unjust enrichment model, Lasinski did not account for costs in calculating Google's profits. He testified that he did not include costs because there was no proof of incremental costs to Google included in the record. Lasinski relied on plaintiffs' other expert, Hochman, who explained to Lasinski that there are no costs to Google for maintaining the advertising infrastructure that Google has already built. (Lasinski Dep. 165:20-166:8.) Hochman also explained to Lasinski that many of the costs associated with the at-issue data collection is passed down to users by way of Google's tracking beacons. (*Id.* at 163:15-23.) In response, Google argues that Strombom's Report identifies many components of Google's costs including those associated with generating the at-issue data.

Google misstates the evidence. Strombom testified during his deposition that Google does not account for costs associated with private data, and that he had no evidence of actual costs saved because of Google launching ChromeGuard. (Dkt. No. 698-8, Strombom Dep. 93:1-13, 111:21-119:10, 119:11-17.) Google's 30(b)(6) witness, Sonal Singhal, did not contradict him. Ms. Singhal was designated to talk about an Ads Impact document that looked at the impact of ChromeGuard on Google's finances. She testified that, while questions about costs are outside of her expertise, she "[didn't] think that there is any cost that would vary." (Dkt. No. 698-7, Singhal Dep. 23:25-24:9.) Plaintiffs may rely on those admissions.

Thus, the only evidence of any potential costs is in the form of a declaration by George Levitte, a Google employee, who testifies generally about form-sharing agreements with publishers. (Dkt. No. 659-8, Levitt Decl., ¶¶ 11-13.)[5] Levitte explains that there are costs

---

[5] Pending before the Court is plaintiffs' Motion to Strike Google's Non-Retained Expert Declarations for Glenn Berntson, Steve Ganem, George Levitte, and Jonathan McPhie. (Dkt. No. 704-2.) Having considered the parties' briefing, and the record in this case, the Court **DENIES** the motion because plaintiffs have not shown harm. Plaintiffs admit that Google disclosed three of the four witnesses (Ganem, Levitte, and Bernston) in its initial disclosures before the close of discovery, and plaintiffs were able to depose these witnesses. While Google did not disclose McPhie in its amended disclosures, Google explains that it did disclose Gregory Fair, who was McPhie's former supervisor. Fair has since left the company and Google substituted McPhie as a declarant in lieu of Fair. (Dkt. No. 746-3, Opposition to Motion to Strike, at 5.) McPhie's declaration covers the topics Google disclosed for Fair in its amended disclosures. (*See* Dkt. No. 705-6.) Accordingly, the Court finds that any harm to plaintiffs is minimal, and the motion is **DENIED** on that ground. However, the Court will allow plaintiffs to depose the witnesses on the topics contained in their declarations to the extent relevant. The parties shall meet and confer regarding a schedule for depositions. A joint proposed schedule shall be filed within seven (7)

associated with Google generating revenue but that the profits (which would reflect costs) cannot be calculated for "individuals who browsed while in Incognito mode, or those individuals who use any other browser's private browsing mode." (*Id.* ¶ 20.) While possible, this conflicting evidence reflects on the weight of the testimony, not admissibility.

Accordingly, the motion is **DENIED** on this ground.

### v.   **Method for Apportionment**

Next, Google's attempt to exclude Lasinski's method for apportioning the aggregate damages does not persuade. With respect to Lasinski's method of apportionment, Google does not have standing to complain. The Ninth Circuit counsels that when "the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members." *Six (6) Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990); *see also Story Parchment Co. v. Paterson Parchment* Paper Co., 282 U.S. 555, 563 (1931) ("[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.") Further, the argument is premature.

Accordingly, the motion is **DENIED** on this ground.

### vi.   **Statutory damages**

Lastly, Google moves to exclude Lasinski's methods for calculating statutory damages on the basis that the proposed methods fail: (1) to account for instances where Google would not have received the at-issue data—like when a user starts a private browsing session but closes it before navigating to a third party website; (2) to provide a way to calculate statutory claims for the California CIPA class; and (3) to opine on a method for apportioning statutory damages.

Google does not persuade. As to the first argument, Google offers only a hypothetical situation with no proof or data to support the idea that Lasinski should have accounted for instances where Google did not receive data. That Google can think of different ways in which

_____

days from the date of this order.

United States District Court
Northern District of California

Lasinski ought to have created his model does not make it unreliable and is thus no reason to exclude. Google's second argument is merely a rehash of its arguments about Lasinski's apportionment method. As previously explained, Google does not have standing to raise such arguments. Moreover, none of Google's concerns about apportionment render Lasinski's methods and opinions unreliable. As to the third argument regarding the California CIPA class, Lasinski explained both in his report, and during the hearing, that his model could be adapted to account for just California residents by extrapolating the percentage of California users based on publicly available information from the general United States population. (Lasinski Report ¶ 197; *see also* Dkt. No. 775, Hearing Transcript, at 36:24-39:9.) Plaintiffs also explained that this information can also be collected by using Geolocation data and users' IP addresses. (Hearing Transcript, at 36:24-39:9.) The Court finds the proffered explanations reasonable.

Thus, the Court finds the proffered statutory damages method reliable for calculating statutory damages. Accordingly, the motion is **DENIED** on this ground.

### 2. *Daubert as to David Nelson*

Google moves to exclude plaintiffs' expert, David Nelson, report under *Daubert* and Rule 702. (Dkt. No. 663). Nelson is the co-founder of Full Nelson Investigations, LLC ("FNI") and a former agent for the Federal Bureau of Investigation ("FBI"). (Dkt. No. 608-8, Nelson Report ¶¶ 3-4.) Prior to co-founding FNI, Nelson spent twenty-four years as an FBI agent. (*Id.* ¶ 4.) Approximately eighteen of those years were devoted to investigating and instructing cyber crime matters as a Cyber Special Agent. (*Id.* ¶¶ 5-6.) His investigations in the cyber division of the FBI included obtaining and enforcing administrative subpoenas, grand jury subpoenas, court orders, and search warrants to obtain additional information to investigate criminal conduct. (*Id.* ¶ 23.) Nelson's investigations also included extensive interactions with Google where IP addresses or other information would be provided to Google to obtain information from Google. (*Id.*)

Nelson offers one main opinion: that Professor Zervas' opinions regarding the functionality of private browsing are incomplete and misleading because he failed to address how Google saves, collects, and routinely produces private browsing data tied to IP addresses that can be linked to specific individuals and devices. (*Id.* ¶ 2.)

13

United States District Court
Northern District of California

1      Google moves to exclude Nelson's opinion on the basis that Nelson's opinion is: (1) based

2 on statements from three unidentified individuals that Nelson allegedly interviewed but about

3 whom he refused to provide any information due to ongoing confidentiality obligations to the FBI,

4 and (2) admitted speculation about the meaning of an empty field in certain spreadsheets Google

5 provided to the FBI.

6      In response, plaintiffs argue that: (1) Nelson's opinion is reliable given his experience as a

7 FBI agent; and (2) Nelson provided sufficient details about the three individuals he bases his

8 opinion on. The Court addresses each argument in turn.

9      Here, Nelson opines that Google routinely collects, saves, and produces private browsing

10 data to third parties, including the FBI, that can be linked to specific individuals and devices.

11 When asked about the basis of this opinion, Nelson testified that his opinion that the information

12 the FBI received in response to requests is private browsing information is based on his interview

13 of three suspects and subjects who told him, during interviews, that they "were surprised that he

14 had the information [] because they were using private browsing mode whe[n] they conducted

15 those activities." (Dkt. No. 663-2, Nelson Dep. 53:4-25.) He also testified that the only other

16 source for his opinion was his recollection of receiving spreadsheets from Google when he was an

17 FBI agent and seeing that certain entries under the "Google user account" column were left blank.

18 (*Id.,* 54:1-20.) Nelson did not review any documents produced by Google in discovery, nor does

19 he have an opinion on the content or meaning of any documents that Google has produced. (*Id.,*

20 38:14-39:2.)

21      Here, the Court finds that Nelson's opinion that the information Google produced was

22 from private browsing sessions is not sufficiently reliable. First, Nelson testified that he did not

23 verify the witnesses' statement at the time to determine whether they were in fact identified using

24 information obtain from private browsing sessions. Rather, Nelson merely accepted their words as

25 true. However, it is possible that the suspects, who were being interviewed and interrogated for

26 crimes, had an incentive to say that they were in private browsing mode as a way to not have

27 whatever evidence that was had against them. Without knowing more about the witnesses and

28 their specific circumstances, the Court finds Nelson's reliance on such information unreliable.

Similarly, Nelson's testimony that he was not for certain why Google's spreadsheets had an empty space also renders his opinion unreliable. During his deposition Nelson testified that the empty column on the spreadsheet could mean various things and does not necessarily mean that the blank space means the user was in private browsing mode. (Nelson Dep. 54:14-58:5.)

Based on the foregoing, the Court finds Nelson's opinion to be unreliable. Accordingly, the motion is **GRANTED** on this ground.

### 3.  *Daubert as to Bruce Schneier*

Next, Google seeks to exclude the entirety of plaintiffs' expert, Bruce Schneier, reports (both opening and rebuttal) under *Daubert* and Rule 702. (Dkt. No. 661-4). Schneier is an international security technologist. (Dkt. No. 608-7, Schneier Report ¶ 7.) Schneier received his master's degree in computer science from American University in 1986, a bachelor's degree in physics from the University of Rochester in 1984, and an honorary Ph.D. in Computer Science from the University of Westminster in 2011. (*Id.* ¶ 6.)

Schneier currently serves as the Chief of Security Architecture at Inrupt, Inc. (*Id.*) He also serves as an Adjunct Lecturer and fellow at the Harvard Kennedy School where he teaches cybersecurity policy. (*Id.* ¶ 8.)  Schneier has authored approximately twelve books on the topics of cryptography, computer security, general security technology, trust, surveillance, and privacy. (*Id.* ¶ 10.) He has also authored or coauthored over 100 academic publications on many of these same subjects. (*Id.* ¶ 12.)

Schneier filed two expert reports in this case: (1) an opening report from April 15, 2022 (Dkt. No. 608-7, "Schneier Opening Report") and (2) a rebuttal report from June 7, 2022 (Dkt. No. 608-6, "Schneier Rebuttal Report"). Schneier offers a total of twenty opinions, fourteen in the opening report and six in his rebuttal report. The parties separate Schneier's opinions into four separate categories: (a) data and privacy topics (opinions 1-6); (b) Google specific topics (opinions 7-10); (c) private browsing and incognito topics (opinions 11-14); and (d) rebuttal opinions concerning the expert report of Professor Zervas. Google argues that these opinions should be excluded for five different sets of reasons. The Court addresses each category below.

///

*a.      Data and Privacy Topics*

First, Google seeks to exclude Schneier's data and privacy opinion, not because of a lack of qualifications, but on the basis that those opinions do not "fit" the allegations in the case and fail to speak clearly and directly to a disputed issue in the case. Specifically, Google argues that Schneier's opinions on broad privacy topics such as "major data leaks" and other topics that are not directly at issue in this case.

Plaintiffs counter that Schneier's data and privacy opinions provide relevant context for other opinions and are thereby generalized opinions admissible under Rule 702. The Court agrees.

Rule 702 permits generalized testimony without application to the underlying facts of the case. The Committee Notes of Rule 702 (2000) explains:

> It might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or blood clotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

To past the *Daubert* test, the expert's testimony must be "relevant to the task at hand" and must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).

Here, Schneier offers the following six main opinions under the data and privacy category: (1) "privacy, including freedom from unwanted surveillance, is important and has historical roots in political liberty, commercial fairness, and economic competition"; (2) the rise of the Internet has created greater threats to online privacy; (3) "such privacy concerns are justified by the volume and scope of data generated, collected, and used when people access the Internet"; (4) personal data and peoples' browsing activities are highly valuable to commercial actors and users; (5) "effective protection of privacy requires disclosures and controls" in terms of how data is used,

what is collected, and how long such information is retained; and (6) "expectations about sharing information are easily manipulated by commercial actors with an economic interesting in fabricating the appearance of consent." (Schneier Opening Report ¶ 1.A.-1.F.)

The Court finds that such opinions, while largely general in nature, fit the allegations and issues of this case. These opinions provide background and context information about what privacy is, the importance of privacy, the different types of data, pervasive data collection and tracking of users as a function of the Internet, and the impact and negative consequences of the misuse of one's data. Schneier explains that such opinions are a "general overview of data privacy in the context of internet usage" that "provide context for how a reasonable user would have reasonably expected privacy over their browsing information, and to understand the considerations relating to why Google's collection of use and use of private browsing information data is highly offensive." (*Id.* ¶ 23.) Such background information is permitted under Rule 702 and *Daubert*.

Accordingly, the *Daubert* motion is **DENIED** on these grounds.[6]

### b.    *Consumer Expectation Opinions*

Second, Google seeks to exclude Schneier's consumer expectation opinions (mostly in opening opinions 10-13 and rebuttal opinions 3 and 5) on the basis that Schneier is not qualified to opine on consumer expectations and his methods for doing so are not reliable.

Schneier offers several opinions about the purported expectations and understandings of "reasonable users." (*See* Schneier Opening Report ¶¶ 261, 283, 285, 286, 296, 297, 298, 300, 301, 302, 306, 307, 356; Schneier Rebuttal Report ¶¶ 1.C, 1.F, 63, 64, 70, 75, 79, 101, and 102.)[7]

---

[6] Google also seeks to exclude these opinions and others under Rule 403 on the grounds that they are highly prejudicial. (Schneier Daubert at 16-18.) The motion to exclude on these grounds strains credulity and is **DENIED**. Any trial in this action will have time limitations. Google can review the 403 objections during trial if appropriate.

[7] Google also argues that Schneier's following opinions should also be excluded for the same reasons. (*See* Schneier Opening Report ¶¶ 2, 63, 77, 78, 246, 248, 316, and 317.) As to these opinions, the motion is **DENIED**. The Court finds Schneier has the necessary background and experience to render these specific opinions.

These opinions, which rely on Schneier's interpretation of certain Google documents and a purported "industry standard," fall outside the scope of Schneier's expertise and are not reliable.[8] While experts are allowed to opine as to a reasonable consumer's expectation, such opinion must be rooted in the expert's relevant expertise. *Chamberlan v. Ford Motor Co*, 369 F. Supp. 2d 1138, 1145 n.3 (N.D. Cal. 2005). While Schneier is a security technologist, and can opine generally about relevant privacy issues, he does not have specialized expertise in opining about the purported understandings and expectations of consumers specifically. Nor can he merely impute his own opinions to those of a reasonable consumer.

Further, plaintiffs have not established that the methodology employed to arrive at such opinions are reliable. When asked about the methodology for arriving at his opinions on what reasonable users would think of Google's disclosures, Schneier testified that he is "not a random person coming in off the street and reading a screen and telling you what I think. I mean, I write books on this stuff. This is what I do. Security and privacy experts have [] standards of what disclosure looks like, and we know when it's met and when it's not met."  (Dkt. No. 664-2, Schneier Dep. 84:17-23.) When questioned about the industry standard, Schneier testified that the standard is not really an objective one but is instead one that is based on his personal opinion. (*See id.,* 146:21-147:22.) Schneier also acknowledged that he had not "queried any privacy and security expert" relating to whether Google's disclosures were adequate. (*Id.*, 147:1-11.) Nor has he conducted any consumer surveys regarding these issues. (*Id.*, 20:20-22.).

---

[8]  Google's argument that Schneier's opinions are also unreliable because he failed to conduct any consumer surveys does not persuade. An expert who offers testimony on the question on what a reasonable consumer is likely to do and/or think is not required to conduct a consumer survey if his or her testimony is otherwise reliable. *See Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 401 (N.D. Cal. 2021); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (holding that an expert need not conduct a consumer survey to reliably opine on likelihood of deception and materiality); *see also Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 681-82, 38 Cal.Rptr.3d 36 (2006) (noting that California courts have "reject[ed] [the] view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation" under the FAL, CLRA, or UCL) (citation and internal quotation marks omitted). Thus, Schneier's failure to conduct a survey is not necessarily dispositive. However, a survey might have helped in this case given his lack of relevant expertise on the specific opinions at issue.

18

United States District Court
Northern District of California

In essence, Schneier's opinions are based on nothing more than his personal interpretation of the at-issue disclosures and Google documents and the idea that such interpretations are reasonable. While Schneier may have a relevant *personal* view, plaintiffs fail to explain why Schneier's interpretation of Google's policies and documents qualify him to opine on how a *reasonable consumer* would understand them, or what expectations they would derive from them.

Accordingly, Google's motion to exclude the consumer expectations opinions found at the following paragraphs is **GRANTED**: Schneier Opening Report ¶¶ 261, 283, 285, 286, 296, 297, 298, 300, 301, 302, 306, 307, 356; Schneier Rebuttal Report ¶¶ 1.C, 1.F, 63, 64, 70, 75, 79, 101, and 102.[9]

### c.    *Opinions Based on Summarization of Google Documents*

Third, Google moves to excludes Schneier's opinions seven through fourteen of his opening report on the basis that such opinions are "biased summaries of Google documents testimony, and disclosures that merely regurgitate attorney argument." In opposition, plaintiffs argue that exclusion is not warranted because such opinions do more than just summarize Google's documents and are necessary to lay a foundation for Schneier's other opinions.

The Court agrees with plaintiffs. The Court finds that Schneier does more than summarize Google's documents, testimonies, and disclosures. While some of the opinions reference such documents, the opinions analyze them by synthesizing information from a variety of different sources, including both Google's internal documents and public documents. (*See* Schneier Report ¶¶ 179-84.) The opinions also provide Schneier's interpretation and meaning of certain trends seen within Google and the risks associated with such trends. (*Id.* ¶¶ 202-30.) Further, Schneier employs a readability tool in paragraphs 231 to 242 and opines on the accessibility and readability

---

[9] Plaintiffs' reliance on *Berman v. Freedom Financial Network, LLC* 400 F.Supp.3d 964, 972 (N.D. Cal. 2019) does not persuade. In *Berman*, the Court found that the proffered expert was qualified to offer opinions on the issue of whether the design of a website would be likely to mislead or confuse a typical user. *Id.* The Court found the expert's training and work as a web development practitioner and Chief Technology Officer of a web development and consultancy firm sufficient because "his daily work include[d] the design of websites that solicit a user's consent to receive marketing communications." *Id.* He was not imputing his view but explaining why the design would mislead and should be designed differently. Plaintiffs have not established that Schneier's experience is like the expert's experience in *Berman*. Thus, plaintiffs fail to persuade.

United States District Court
Northern District of California

of Google's polices. These are just some of the many ways in which Schneier does more than summarize facts and "regurgitate" legal arguments.

Thus, Google's motion on this ground is **DENIED**.

### d.   *Opinions about Hypothetical Risks*

Fourth, Google seeks to exclude Schneier's opinions about hypothetical risks on the grounds that such opinions are irrelevant to the issues in this case. (*See* Schneier Report ¶¶ 29, 34, 36, 37, 39, 41, 49, 71, 73, 100, 102, 114, 119, 127, 288, 292, 293.) Plaintiffs oppose, contending that such opinions about the potential risks of data retention are relevant to the offensive of Google's conduct.

Again, the challenge is not one of expertise or methodology. Whether plaintiffs' data can be linked to other data such that plaintiffs' identity can be revealed is relevant to the issues in this case. At this juncture, it appears such information is at least relevant to the analysis of plaintiffs' intrusion upon seclusion and invasion of privacy claims, both which turns on the offensiveness of Google's conduct. Google's argument does not change the Court's *Daubert* analysis. The Court will not engage in a merits analysis or fact-finding at this stage.

Accordingly, Google's motion on this ground is **DENIED**.

### e.   *Google's Intent, Services, or Receipt of Data*

Fifth, Google argues that Schneier's opinions based on what Google calls "Google's intent, services, or receipt of data" should be excluded because he does not have the requisite knowledge or expertise to opine on such subjects.

In general, an expert may only testify as to "scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue" and may not testify as to legal conclusions. *U.S. v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015).

The Court has considered the parties' arguments and agrees that some of Schneier's opinions impermissibly opine on Google's intent or state of mind. For example, he opines that "Incognito mode's simple, bold, and friendly 'Spy Guy' may communicate Google's 'intent' to lead users to believe that Incognito will provide them with virtual cover of darkness." (Schneier Report ¶ 302.) Similarly, Schneier opines that "Google counts on most people to access the

Internet using Google's Chrome browser, check their messages in Gmail, use Google search, watch videos on YouTube, or obtain directions from Google Maps, without thinking about how much personal information they're revealing to Google when they search for information, communicate with others, entertain themselves, and get themselves from here to there." (*Id.* ¶ 57.) Schneier also impermissibly opines that "Google is motivated to ensure that any privacy controls are difficult to understand."  (*Id.* ¶ 255.)

However, with respect to the other opinions, Google does not persuade. Schneier's has offered opinions about Google's services and receipt of data based on conclusions that he drew after reviewing the discovery and Google's documents in this case. He cites to such documents in his report. Further, given his computer scientist background, the Court finds that he has the necessary skill and expertise to provide general opinions about Google's services so long as those opinions are tied to documents and/or discovery relevant to this case.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the motion to exclude. The motion is granted with respect to the opinions in paragraphs 57, 255, and 302 of the Opening Report and denied as to the remaining opinions.

### 4.    *Daubert as to Konstantinos Psounis*

Plaintiffs move to exclude six opinions by Google's computer scientist expert, Konstantinos Psounis, under *Daubert* and Rule 702. (Dkt. No. 702-1.) Psounis is a Professor and Associate Chair of the Electrical and Computer Engineering and Professor of Computer Science at the University of Southern California ("USC"). (Dkt. No. 659-10, Psounis Report ¶ 16.) He joined USC's faculty in 2003 after completing his Ph.D. at Sanford University as a Stanford Graduate Fellow. (*Id.*)

Throughout his career, Psounis has analyzed, designed, and developed efficient, privacy-preserving networked distributed systems, for the Internet and the world wide web, content delivery networks, data centers and cloud computing, and wireless mobile networking systems. (*Id.* ¶ 19.) He has also published more than 100 technical papers in these fields. (*Id.* ¶ 18.)  Psounis also has practical experience with networked distributed systems designed and developed to operate in the World Wide Web deployed over the Internet. (*Id.* ¶ 22.) For instance, he has

United States District Court
Northern District of California

designed and developed systems to accelerate the delivery of content over the Internet. (*Id.*)

Psounis offers a total of thirteen opinions to rebut plaintiffs' expert, Johnathan Hochman. Of the thirteen opinions, plaintiffs seek to exclude six: (1) Hochman' opinion that users can readily be identified from the data at issue is incorrect (first opinion); (2) Hochman's opinions on private browsing profiles, server-side processes, and data joinability are inaccurate (third opinion); (3) Hochman's proposal to identify Class I (Chrome Class) is unreasonable and unreliable (seventh opinion); (4) Hochman's opinion that the "maybe_chrome_incognito" bit reliably detects incognito traffic is incorrect (eighth opinion); (5) Hochman's proposal to identify Class 2 is unreasonable and unreliable (ninth opinion) and (6) Hochman's proposed methods for identifying class members do not and cannot account for shared devices or accounts (tenth opinion). (Psounis Report § 1.) Plaintiffs seeks to exclude these opinions on the grounds that: (1) Psounis did not employ any methodology to evaluate the data that he opines about and (2) Google's lawyers performed his (limited) analyses. Neither argument persuades.

As an initial matter, the Court notes that plaintiffs primarily object because Psounis did not conduct a competing analysis of the data sets Hochman analyzed. The Court disagrees. Plaintiffs do not point to any binding authority, nor is the Court aware of any, that mandates such testing requirement to meet *Daubert's* test. *See Linares v. Crown Equip. Corp.*, 2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) ("While one of the Daubert factors suggests that the reliability of expert testimony can be judged by whether the expert's technique or theory can be and has been empirically tested, such testing is not required."); *Wyman v. Sunbeams Prods. Inc.*, 2021 WL 1531000, *3 (N.D. Cal. Apr. 19, 2021). Indeed, plaintiffs concede in their reply brief that "failing to conduct a study is not always an automatic ticket to exclusion." (Psounis *Daubert* at 5:25-26.)

Next, the Court finds that Psounis opinions are based on reliable principles of information theory and networked distribution systems and relevant documentation. In arriving at the challenged opinions, Psounis reviewed the Hochman Report and the corresponding exhibits, appendices, and sources on which he relied, Google documents and discovery responses produced in this case, including Google's logging polices and infrastructure, issues surrounding fingerprinting and IP addresses, publicly available sources, and existing technical and academic

United States District Court
Northern District of California

22

research. (Psounis Report ¶ 33.) For example, Psounis' first opinion, which rebuts Hochman's, is based on Psounis' experience researching browser communications, review of documents upon which Hochman relied, and review of relevant testimony and documents in this case. (*Id.* ¶¶ 37, 58.) Psounis also reviewed and analyzed Google's policies regarding technical barriers and polices meant to prevent identification of private browser users. (*Id.* ¶¶ 65-68.)

With respect to opinion three, Psounis not only relied on his experience in the industry and relevant documents, but he also analyzed certain data produced under the Special Master process and to which Hochman cites in his report. (*Id.* ¶¶ 79-83.) Psounis uses this data, plus his industry knowledge, to arrive at his opinion.

Similarly, Psounis' opinions seven through ten are based not only on Psounis' industry experience but also on additional principles such as the characteristics of IP addresses and networked distributed systems. Psounis then reaches the conclusion that one's IP addresses and User Agent cannot reliably identify devices or class members. Psounis also relies on studies and research that show that people share devices and accounts to support his conclusions that Hochman's proposed methods of identifying class members are unreasonable and unreliable. (*Id.* ¶¶ 162-169.) The Court finds that Psounis relied on a sound methodology to support his opinions.

That Google's lawyers assisted Psounis in gathering the data and running the testing that Psounis conducted in this case does not change the result. Plaintiffs have not pointed to any error or discrepancies in the testing that is attributed to such assistance. Nor do plaintiffs argue as much. If anything, the fact that Google's lawyers were involved in the process goes to the weight of the opinions not the admissibility.

Accordingly, the motion on this ground is **DENIED**.

## IV.   CLASS CERTIFICATION

Plaintiffs move for certification of a proposed nationwide class under Rules 23(b)(2) and 23(b)(3) based on the following Counts: (I) violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.*; (II) violation of CIPA; (III) violation of CDAFA.; (IV) invasion of privacy; (V) intrusion upon seclusion; (VI) breach of contract; (VII) violation of California's UCL.  Plaintiffs' theory of the case is that Google collects users' private browsing data after promising not to do so.

In their class certification motion, plaintiffs seek to certify the following proposed classes under Rules 23(b)(2) and 23 (b)(3):

> Class 1 – All Chrome browser users with a Google account who accessed a non- Google website containing Google tracking or advertising code using such browser and who were (a) in "Incognito mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

> Class 2 – All Safari, Edge, and Internet Explorer users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in a "private browsing mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

Docket No. 608-3 at 1. Plaintiffs seek to certify nationwide classes for Counts I, III, IV, V, VI, and VII of their complaint and California-resident only classes for Count II. (*See* generally TAC.)[10]

### A.    Rule 23(a)

#### 1.    Numerosity

The requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable.  Fed. R. Civ. P. 23(a)(1).  "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members."  *See Krzesniak v. Cendant Corp.*, No. 05–05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).

---

[10]  Excluded from the classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons. (*Id.* at 55-56.)

Plaintiffs contend that this requirement is met because there are tens of millions of class members. (*See* Lasinski Report ¶¶ 194-95.) Google does not dispute this estimate. Accordingly, the Court concludes that plaintiffs have satisfied the numerosity requirement.

### 2.    Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, the common question must be of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Id.* at 359 (internal quotations and brackets omitted). The requirements of Rule 23(a)(2) have "been construed permissively," and '[a]ll questions of fact and law need not be common to satisfy the rule." *Ellis*, 657 F.3d at 981 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). A district court must analyze the persuasiveness of the evidence submitted to establish the commonality requirement and may not simply conclude that the commonality requirement is met on the basis that the plaintiff's evidence in support of that requirement is admissible. *See Grodzitsky,* 957 F.3d at 986 (holding that "[a] district court errs when it 'limit[s] its analysis of whether there was commonality to a determination of whether Plaintiffs' evidence on that point was admissible" and that a "district court must engage in a 'rigorous analysis' of commonality, rather than 'merely conclud[ing] that, because . . . evidence was admissible, a finding of commonality was appropriate' ") (quoting *Ellis*, 657 F.3d at 984).

Here, plaintiffs argue that common issues include whether: (1) Google promised not to collect private browsing information; (2) Google collected, stored, and used private browsing information; (3) Google's conduct was highly offensive to a reasonable person; and (4) Google uniformly attempted to and actually intercepted private browsing communications between class members and non-Google websites. Plaintiffs submit that Google's standardized contracts and actions constitute common evidence capable of answering the common questions above. Google does not dispute that the commonality requirement is met.

The Court agrees and finds that, at least for commonality purposes, Google's form contract is proof that could resolve the question of whether Google promised not to collect users' private browsing data. Having found at least one common question among the class members' claims, the Court need not consider, for commonality purposes, the other questions. *Wal-Mart Stores,* 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2)[,] even a single common question will do.") Thus, the commonality requirement is satisfied.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).  Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). The requirement is "permissive," and the representative's claims need only be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998)).

Plaintiffs argue that this requirement is satisfied because:

> [E]ach named Plaintiff browsed in Chrome Incognito (Class 1) and one, Ms. Trujillo, also used a non-Chrome private browsing mode (Class 2). For both classes, the "injuries arise from a common wrong" based on Google's broken promises and systematic collection.

Docket No. 608-3 at 5 (referencing plaintiffs' declarations and citing Hochman Report § VIII.A (detailing Google's practices)). Google does not dispute that this requirement is met. Accordingly, the Court finds that plaintiffs have pointed to sufficient evidence to show that named plaintiffs'

claims and defenses are typical of the classes. Thus, the typicality requirement is satisfied.

### 4.    Adequacy

The requirement of adequate representation requires a showing that the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether the plaintiff and its counsel have any conflicts of interest with other class members, and whether the plaintiff and its counsel will prosecute the action vigorously on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Google does not dispute that counsel and plaintiffs adequately represent the class.

With respect to plaintiffs, the Court finds that they have already expended a substantial amount of time litigating this case, including by responding to discovery, sitting for depositions, and allowing for Google to pull information from their accounts. (*See e.g.,* Dkt. No. 609-3. at ¶ 13.) As to counsel, the Court finds that counsel has extensive experience litigating privacy class actions and that given Counsel's experience, proposed class counsel can adequately represent the proposed class.  Accordingly, the Court finds that the adequacy requirement is met with respect to counsel and named plaintiffs.

In sum, the Court finds that plaintiffs have satisfied all the requirements of Rule 23(a).

### B.    Rule 23(b)(3)

Having found that plaintiffs satisfy Rule 23(a), and consistent with plaintiffs' order of briefing, the Court starts with its analysis under Rule 23(b)(3) first, namely predominance of the elements and damages.

### 1.    Predominance of Evidence re Liability Inquiry

Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (citation omitted). The "predominance inquiry

asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed.)). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (citation omitted).

Here, plaintiffs argue that the predominance requirement is satisfied with respect to all seven counts. Unsurprisingly, Google disagrees. The Court begins with the parties' primary dispute over implied consent.

### a.   *Implied Consent*

With respect to all seven of plaintiffs' claims, Google argues that the affirmative defense of implied consent raises individualized issues that defeat predominance.

Defenses that must be litigated on an individual basis can defeat class certification. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). However, courts may certify a Rule 23(b)(3) class "even though [ ] important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members." *Id.* (original alterations omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

The Ninth Circuit's decision in *True Health* is instructive. In *True Health*, the Ninth Circuit affirmed in part, reversed in part, and remanded a district court's denial of class certification. *True Health Chiropractic, Inc.,* 896 F.3d at 931. In that case, the plaintiff moved to certify a class of all persons who received faxes from the defendant where the faxes failed to inform the recipient that they could opt out of future faxes. *Id.* at 928. In opposing class certification, the defendant argued that the consent defense available against class members could

United States District Court
Northern District of California

not be resolved without individualized inquires. *Id.* The Ninth Circuit held that consent is an affirmative defense on which the defendant bears the burden of proof. *Id.* That said, the plaintiff nonetheless maintains the burden of predominance. *Id.* Thus, in assessing this issue, the Ninth Circuit started by "analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence." *Id.*[11]

---

[11] In *True Health*, the defendant produced evidence with respect to individual class members, namely three exhibits listing putative class members that eventually provided the bases for subclasses. *Id.* at 927.  Exhibit A listed all putative class members that provided their fax numbers when registering a product purchased from a business unit of the defendant or entered into a software-licensing agreement. *Id.* Exhibit B listed class members that checked a box during their software registration that indicated their express permission to be sent faxes, completed a written consent form where they provided express permission, and/or confirmed via phone that they would like to continue to receive faxes. *Id.*  Exhibit C listed class members that gave consent in individual oral or email communications with sales representatives. *Id.*

The Ninth Circuit reversed with respect to the class members listed in Exhibit A. The Ninth Circuit found that this group may have given consent by providing their fax numbers when registering a product or when entering into a software-licensing agreement. *Id.* The Ninth Circuit held that "consent, or lack thereof, is ascertainable by simply examining the product registrations and the [software-licensing agreements]." *Id.* at 932-33. The Ninth Circuit remanded with respect to the class members list in Exhibit B, explaining that the record was somewhat unclear as to that group. *Id.*

With respect to the class members in Exhibit C, those that arguably gave consent in individual communications with sales representatives, the Ninth Circuit affirmed the district court's denial of class certification. *Id.* There, the defendant argued that "because of . . . long-standing and well-developed relationships . . . sales representatives would learn and know that a particular customer exclusively preferred to receive faxes[.]" *Id.* In support of this position, defendant submitted a declaration from one of its sales representatives who testified that many customers specifically asked him to send them faxes. *Id.* In affirming the denial of plaintiff's class certification motion, the Ninth Circuit held:

> [Defendant] provided evidence in the district court that its consent defenses to these claims would be based on individual communications and personal relationships between [Defendant's] representatives and their customers. The variation in such communications and relationships, as evidenced by the declaration [of a sales representative] and deposition testimony of [a separate sales representative], is enough to support denial of class certification under Rule 23(b)(3) for the putative class members listed in Exhibit C.

*Id.* at 932.

*True Health* instructs that a defendant must present non-speculative evidence that an affirmative defense would require individualized inquiries to defeat the predominance inquiry. *Id.* at 932 (quoting *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016)); *cf. Gene And Gene, LLC v. Biopay, LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("predominance of individual issues necessary to decide an affirmative defense may preclude class certification."); *True Health Chiropractic, Inc.,* 896 F.3d at 931 ("Since [defendant] bears the burden, we assess predominance by analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence.") Thus, the Court analyzes Google's proffered evidence in light of its burden to show consumers consented to, or had adequate notice of, the data collected, stored, and disclosed.

First, Google points both to its and plaintiffs' experts' surveys detailing how class members had divergent knowledge and expectations regarding their privacy in private browsing mode. Google also relies on several statistics included in its consumer expectations expert's, On Amir, report. For instance, Google points to Amir's findings that after being shown just the incognito screen, 44% of chrome users answered that they expect companies like Google "probably do or do" receive IP addresses, URLs of sites visited, and cookies versus the 35% of participants that expect that such companies "probably do not or do not" receive such information. (Dkt. 659-9, Amir Report ¶ 56 & Tables 2 & 3 (summarizing similar results for other browsers).) Amir's report also indicates that participants, when shown the documents plaintiffs claim comprise their contract (the Incognito Screen, the Privacy Policy, and the Chrome Privacy Notice), 63% of respondents expect Google receives their IP addresses in Incognito mode, while 55% expect that Google receives the URLs of sites visited and cookies. (*Id.* ¶¶ 69, 73 & Tables 5 & 6.)

Google also points to plaintiffs' rebuttal consumer expectations expert, Mark Keegan, who showed that class members knowledge of the alleged conduct varies. Keegan's report shows that respondents, after only being shown the splash screens, 20.2% indicated a belief that they had not given consent to Google to collect and save their Internet browsing activity when they browser the Internet in private browsing mode. (Dkt. No. 608-10, Report of Keegan ¶ 187.) Further, roughly half of respondents who were asked whether they agreed that Google "collects and saves" "URL

30

United States District Court
Northern District of California

information," "IP address," "browsing activity," and "cookies" in private browsing mode confirmed that they did agree, which represents more than three times the number of respondents who disagreed. (*Id.* at Ex. 72.)

Second, Google identifies several media and academic reports that publicly disclosed the alleged conduct and the fact that 40% of named plaintiffs were aware of media and academic reports discussing the privacy limitations of private browsing mode. (Dkt. No. 659-3, Opposition to Class Certification Motion "Class Cert. Opp." at 5-6.)

Third, Google submits a declaration by Jonathan McPhie, a Group Product Manager for Google's Privacy and Data Protection Office, that describes a developer tool that users can use to see, in real time, what data is being collected when users are browsing in private mode. (Dkt. No. 659-6, Declaration of Jonathan McPhie "McPhie declaration" ¶ 99.) At least one plaintiff, Byatt, testified that he is aware of this developer tool and that the tool shows a lot of information. (Dkt. 666-2, Ex. 25, 47:17-49:12.) However, plaintiff does not recall ever using the tool in private browsing mode. (*Id.*)

Lastly, Google submitted the McPhie declaration which discusses various other ways users' knowledge of the alleged conduct could vary. McPhie explains that the Incognito Screen included a "Learn More" hyperlink that took users to different pages throughout the class period. (McPhie declaration ¶ 73.) The "Learn More" hyperlink has been clicked more than 14 million times between August 1, 2016, and January 1, 2022. (*Id.*) For half the class period, the button linked to the "How private browsing works in Chrome" page in the Google Help Center explaining that "Incognito mode stops Chrome from saving your browsing history to your local history," but "[y]our activity . . . might still be visible to," among others: "websites you visit, including the ads and resources used on those sites"; "Search engines" and "web-service[s]." (*Id.* ¶¶ 59, 73.) This page was visited about 30 million times between its launch in July 2017 and January 2022. (*Id.* ¶ 59 & Ex. 17.)

Plaintiffs proffer three reasons why predominance is not defeated: (1) Google waived any implied consent defense in its form contract throughout the class period; (2) Google's internal documents from Google employees recognize that Google collects private browsing data without

1   consent; and (3) none of the news articles identified by Google discloses the collection at issue

2   here.

3        The Court finds that the inquiry into implied consent that Google advances, and which it

4   also presents evidence, creates individualized issues that defeat predominance. Here, as in *Truth*

5   *Health*, Google provides evidence that its consent defense would be based on individual, and

6   subjective, interactions of what certain class members knew, read, saw, or encountered.[12]

7   Evidence shows variation between what users knew or did not know.

8        A factfinder, in determining whether class members impliedly consented to the alleged

9   conduct would have to determine the sources of information to which each class member was

10  exposed. Given the plaintiffs' strategy, this would require individualized assessment into class

11  members' experience. Thus, the Court finds that if the class was certified, the jury would be tasked

12  with filtering out what members consented to the alleged conduct, and how. Identifying what

13  members impliedly consented to the alleged conduct, and what members did not, would

14  undoubtedly drive the litigation. That is because consent is a defense to all of plaintiffs' claims.

15  (Dkt. No. 113, at 14.) Unsurprisingly, consent remains the central disputed issue in this case.

16  Indeed, both sides have heavily litigated this issue at every stage of this litigation. The Court

17  expects that the parties will also litigate the issue at trial. Accordingly, for the reasons set forth

18  above, the Court finds that individual issues of implied consent are likely to predominate over any

19  common issues. Accordingly, the Court **DENIES** plaintiffs' motion to certify a damages class under

20  Rule 23(b)(3).

21

22

23

24        [12]  However, the nature of the evidence in *True Health* slightly differs from the evidence in
     this case. In *True Heath*, the defendant pointed to actual evidence with respect to specific class
25   members in the subclass that arguably "gave consent in individual 'oral or email' communications
     with [defendant's sales representatives.]" *True Health Chiropractic, Inc.*, 896 F.3d at 927. Here,
26   with the exception of the developer tool data, Google's data is not connected to any particular
     class member, but general data that shows that class members have differing experiences and
27   knowledge of the alleged conduct. Nonetheless, Google's evidence, like the evidence in *True
     Health*, establishes that individual and subjective interactions require individualized inquiries into
28   the consent defense.

United States District Court
Northern District of California

1

**C.     Rule 23(b)(2)**

Plaintiffs also seek certification under Rule 23(b)(2). Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

To obtain certification under Rule 23(b)(2), plaintiffs must "describe[] the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony."  B.K. *by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014))

Google argues that plaintiffs cannot obtain certification under Rule 23(b)(2) because plaintiffs are precluded from seeking Rule 23(b)(2) certification because they also seek monetary relief, and such relief is not "incidental." Here, plaintiffs are not precluded from seeking certification of a Rule 23(b)(2) class for injunctive relief merely because they also seek certification of a Rule 23(b)(3) class. Indeed, "Ninth Circuit precedent indicates that the court can separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages class."  *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 573 (C.D. Cal. 2014) (rejecting the argument that "the court can certify a Rule 23(b)(2) class only if monetary relief sought is purely incidental to the injunctive relief").

Moreover, plaintiffs describe the "general contours" of the injunction they seek. Injunctive relief would (1) preclude Google from collecting further private browsing information; (2) require Google to delete the private browsing information that it previously collected and is currently storing; (3) require Google to remove any services that were developed or improved with the private browsing information; and (4) appointment of an independent third-party to verify that the

33

injunctive relief has been implemented. These would be important changes to reflect transparency in the system.

Plaintiffs' description sufficiently identifies the specific course of conduct that plaintiffs seek to enjoin, and it establishes that this course of conduct applies to the entire proposed class. *See Broomfield v. Craft Brew All., Inc.,* No. 17-CV-01027-BLF, 2018 WL 4952519, at *8 (N.D. Cal. Sept. 25, 2018) (certifying Rule 23(b)(2) class where the injunctive relief sought was to enjoin defendant's "uniform policy and practice of misrepresenting on its packaging the brewing location of the Kona Beers").

Accordingly, the Court concludes that plaintiffs have met their burden under 23(b)(2). Having previously found that plaintiffs meet all the requirements under Rule 23(a), the Court **GRANTS** plaintiffs' motion to certify a class under Rule 23(b)(2).

## V.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** plaintiffs' motion for class certification and certifies an injunctive class under Rule 23(b)(2). Plaintiffs' Motion to Strike Google's Non-Retained Experts is **DENIED**, but the Court will allow plaintiffs to depose the witnesses based on the topics covered in their declarations. The parties shall file a joint proposed schedule for completing these depositions within seven (7) days from the date of this Order. The parties' pending motions to seal will be addressed by separate court order.

The Court sets a case management conference for **JANUARY 30, 2023, AT 2:00 P.M**. Parties shall meet and confer on a schedule for the balance of the action and file a statement with respect to scheduling no later than **JANUARY 23, 2023**. If sufficient, the Court will issue a scheduling order without a conference unless requested.

This Order terminates Docket Numbers 609, 662, 663, 664, 703, 705.

**IT IS SO ORDERED.**

Dated: December 12, 2022

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**