# EXHIBIT 82

# 6/7/22 EXPERT REPORT OF KONSTANTINOS PSOUNIS, PH.D.

# Redacted Version of Document Sought to be Sealed

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO, individually and on behalf of all similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-03664-YGR-SVK

**EXPERT REPORT OF KONSTANTINOS PSOUNIS, PH.D.**

**June 7, 2022**

**TABLE OF CONTENTS**

**I. EXECUTIVE SUMMARY OF OPINIONS** **1**

**II. INTRODUCTION** **12**

A. Personal Background And Qualifications 12

B. Summary Of Plaintiffs' Allegations 15

C. Assignment 17

D. Facts And Data Considered 19

**III. REBUTTAL TO MR. HOCHMAN** **20**

**A. Opinion 1: Mr. Hochman's Opinion That Users Can Readily Be Identified From The Data At Issue (# 18) Is Incorrect** **20**

1. The Data At Issue Is Not Associated With A Google Account 20

2. The Data At Issue Is Stored In An Orphaned And Unidentified State 25

3. Privacy-Preserving Technical Barriers And Policies Prevent Google From Re-Identifying Logs Data 32

**B. Opinion 2: Mr. Hochman's Opinions On Interception, Notice, And Deletion Of Private Browsing Information (# 4, 5, 6, 26, 31) Are Contrary To Industry Guidelines On Private Browsing** **34**

**C. Opinion 3: Mr. Hochman's Opinions On "Private Browsing Profiles," Server-Side Processes, And Data Joinability (# 10, 18, 19, 20) Are Inaccurate** **38**

1. Orphaned And Unidentified Interest Segments Are Not Cradle-To-Grave Profiles 38

2. Mr. Hochman's Claims Regarding Google's Retention Policies Show That These Policies Prevent The Creation Of Such Profiles 42

**D. Opinion 4: Mr. Hochman's Assertion That Google Used Private Browsing Information To Measure Conversions (# 14) Is Misleading** **43**

**E. Opinion 5: Mr. Hochman's Description Of Entropy (# 18) Is Incorrect** **45**

**F. Opinion 6: Mr. Hochman's Assertions On Fingerprinting (# 9, 18) Are Misleading And Unfounded** **47**

1. Google Does Not Engage In Fingerprinting 48

2. Google's Internal Policies Expressly Prohibit Fingerprinting 50

3. Google's System Architecture Supports Google's Anti-Fingerprinting Policy 52

**G. Opinion 7: Mr. Hochman's Proposal To Identify Class I (Chrome Class) (# 22) Is Unreasonable and Unreliable** **54**

1. Hochman's IP + UA Fingerprinting Method Will Not Work 56

a. IP Addresses Are Neither Unique Nor Static 56

b. User Agent Strings Are Neither Unique Nor Static 61

c. The Combination Of An IP Address And A User Agent String Is Neither

Unique Nor Static 63
2. Pseudonymous IDs Can Not Be Used To Reliably Identify Individuals 65
a. UMA ID 65
b. PPID-Mapped Biscotti ID & Analytics User-ID 69
c. Biscotti ID 71
**H. Opinion 8: Mr. Hochman's Opinion That The "maybe_chrome_incognito" Bit Reliably Detects Incognito Traffic (# 23) Is Incorrect 72**
**I. Opinion 9: Mr. Hochman's Proposal To Identify Class II (# 22) Is Unreasonable And Unreliable 75**
1. Mr. Hochman's Proposed Email Notification To All Google Account Holders Is Overly Broad And He Does Not Propose A Workable Methodology For Limiting The Notification To Class Members 77
2. Mr. Hochman's Proposed Methodology For Limiting Class II To Private Browsing Mode Users After Notification Is Unreliable 80
**J. Opinion 10: Mr. Hochman's Proposed Methods For Identifying Class Members (# 22) Do Not–And Cannot–Account For Shared Devices Or Accounts 84**
1. Mr. Hochman's Proposed Methods Do Not Account For Shared Devices 84
2. Mr. Hochman's Proposed Methods Do Not Account For Shared Accounts 94

**IV. REBUTTAL TO MR. SCHNEIER 97**
**A. Opinion 11: Mr. Schneier's Assertion That "Browsing Information Is Unique For Each User" Is Unsupported And Misleading 97**
**B. Opinion 12: Mr. Schneier's Claim That "Personal Data Is Difficult To Anonymize And Easy To De-Anonymize" Is Unsupported And Is Incorrect For The Data At Issue 100**
**C. Opinion 13: Mr. Schneier's Assertion That Google Has Not Taken Steps To Ensure That A User's Choice To Sign Out Of A Google Account Will Prevent Google From Associating The User's Signed-Out Activity With Any Signed-In Data Is Incorrect 106**
1. The Documents Mr. Schneier Cites Do Not Support His Conclusion 107
2. Additional Documents And Testimony Contradict Mr. Schneier's Claim That Google Has Not Undertaken Steps To Prevent Joining of Signed-Out And Signed-In Data 110
3. Google's Policy Restrictions And Pseudonymization Procedures Closely Align With Best Practices For Research Involving User Data 113
4. Google's Security Practices Closely Align With Best Practices In The Network Security Industry 116

**V. APPENDICES** **121**
**A. Curriculum Vitae** **121**
**B. Table Of Opinions** **142**
**C. Hochman To Psounis Mapping** **146**
**D. Psounis To Hochman And Schneier Mapping** **155**
**E. Entropy, Entropy Bits and Fingerprinting: Formal Exposition** **157**
**F. IP Address + User Agent Data Analysis** **176**
**G. “Profile” Data** **188**
**H. Sources Considered** **192**

# I. EXECUTIVE SUMMARY OF OPINIONS

1. **Opinion 1: Mr. Hochman's Opinion That Users Can Readily Be Identified From The Data At Issue (# 18) Is Incorrect.** In my opinion, Google cannot readily use the site activity data from users who, like putative class members, are (i) in private browsing mode, (ii) not logged into a Google Account, (iii) visiting a non-Google website that uses Google web services (the "Data At Issue"), to identify users or their devices. *See infra* § III.A. My opinion rests on the following grounds.

- ❖ ***First***, the Data At Issue is not associated with a Google Account. Google receives the data in an unidentified state, without any Google Account information. *See infra* § III.A.1.
- ❖ ***Second***, the Data At Issue is stored in an orphaned and unidentified state. The Data At Issue is either (i) keyed by a pseudonymous identifier unique to each private browsing session (*e.g.* Biscotti, Zwieback) that is not linked to an identified user or device during the session, and is not linked to anything after the session is closed, (ii) keyed by a pseudonymous identifier unique to the website publisher (PPID-mapped Biscotti, Analytics UserID) that is not linked to activity on other websites and cannot be used to identify a user, or (iii) not keyed to any identifier at all. *See infra* § III.A.2.
- ❖ ***Third***, Google's privacy-preserving technical barriers and policies prevent the identification of users from signed-out private browsing data. *See infra* § III.A.3.

2. **Opinion 2: Mr. Hochman's Opinions On Interception, Notice, And Deletion Of Private Browsing Information (# 4, 5, 6, 26, 31) Are Contrary To Industry Guidelines On Private Browsing.** Mr. Hochman contends that Google could have (i) redesigned Chrome or Google's "tracking beacons" to "limit Google's collection of private browsing information" (Hochman # 4); (ii) notified users, at the time of collection, that it was collecting private

browsing information (Hochman # 5); and could have notified websites when it received private browsing information (Hochman # 6). Mr. Hochman asserts that Google "uniformly attempted to intercept all private browsing communications with non-Google websites that have a Google tracking beacon" (Hochman # 26). Finally, Mr. Hochman claims that "Google could delete from its systems records of Chrome Incognito browsing communications" (Hochman # 31). All five opinions are misguided because Mr. Hochman failed to consider industry guidelines on private browsing, including by one of the key standard-setting organizations, the W3C Technical Architecture Group ("TAG") Observations on Private Browsing Mode, which set forth in 2019 that: (i) "the Web should be accessible in private and normal browsing modes," and (ii) "the use of private browsing mode should not be detectable by websites." Mr. Hochman fails to recognize that Google's practice is consistent with these design principles. Providing a notice to websites at the time of collection or redesigning Chrome or Google scripts (Mr. Hochman's "tracking beacons") to "limit Google's collection of private browsing information" would violate these fundamental principles. *See infra* § III.B.

3. **Opinion 3: Mr. Hochman's Opinions On "Private Browsing Profiles," Server-Side Processes, And Data Joinability (# 10, 18, 19, 20) Are Inaccurate.** Mr. Hochman opines that: (1) "Google, throughout the class period, created detailed profiles … based on the private browsing information it collected" (Hochman # 10); (2) private browsing information could be linked to information tied to the user's Google account (Hochman # 18) and/or the user's account with non-Google websites (Hochman # 19) but for Google's deletion of the data (Hochman # 20). All of these opinions are inaccurate, for at least the following reasons. *See infra* § III.C.

- ***First***, what Mr. Hochman calls "private browsing profiles" are interest segments and

verticals based on orphaned and unidentified data limited to single private browsing sessions, that are not joined across sessions, not joined with Google Account profiles, and not the "cradle-to-grave" profiles Plaintiffs have alleged. The activity in these so-called "profiles" is limited to discrete private browsing session activity that does not identify the user and is not linked to the user or her device after the session is closed. *See infra* § III.C.1.

- ***Second***, Google's retention, deletion, and anonymization of certain data from private browsing mode sessions align with industry best practices for data security and further prevent the creation of "cradle-to-grave" profiles. Mr. Hochman's assertion that Google should retain private browsing mode data indefinitely in order to "[aid] the process of linking (or joining) a user's private browsing information to that user's account" would conflict with these best practices and increase the risk of fingerprinting by bad actors. *See infra* § III.C.2.

- ***Third***, although Mr. Hochman cites to DBL █ data associated with Biscotti IDs extracted from IDE cookies or mapped from PPIDs to claim that Google maintains detailed user profiles, the DBL █ data itself shows that the purported profile is keyed to pseudonymous identifiers unique to each discrete private browsing session or unique to the website publisher. *See infra* § III.C.1.

4. Accordingly, it is my opinion that, for the private browsing mode sessions at issue (where a user does not sign into a Google account), Google stores data from private browsing sessions keyed at most to pseudonymous identifiers unique to each private browsing session or website publisher—and sometimes to no identifier at all—subject to Google's data retention policy. Such discrete data sets do not remotely resemble "cradle-to-grave" user

profiles Plaintiffs alleged in their Complaint.

5. **Opinion 4: Mr. Hochman's Assertion That Google Used Private Browsing Information To Measure Conversions (# 14) Is Misleading.** Mr. Hochman contends that "[t]hrough Google's server-side processes such as . . . [REDACTED] (linking a user's signed-out Biscotti IDs across different sessions) . . . Google creates 'a single-view of the user in all Display products' for ad targeting and measurement purposes." In my opinion, these assertions are misleading because they create the impression that Google maps the Biscotti ID from one of the signed-out private browsing sessions at issue in this case to the Biscotti ID from a different signed-out private browsing session. However, based on my review of documents and deposition testimony, there is no such mapping because [REDACTED] can only map a signed-in cookie (Google Accounts and ID Administration ID ("GAIA ID")) to a signed-out cookie (*e.g.*, Biscotti) if they are in the same cookie jar. That never happens for putative class members because private browsing mode creates a new (empty) cookie jar, and Plaintiffs allege that the Class members never signed in to their Google Accounts while browsing in private mode. Accordingly, Class members could never have a signed-in and signed-out cookie in the same cookie jar, and therefore there could be no mapping. *See infra* § III.D.

6. **Opinion 5: Mr. Hochman's Description Of Entropy (# 18) Is Incorrect.** Mr. Hochman takes a categorical approach to defining PII, and describes entropy as a "metric for user identifiability … measured in number of bits of data needed to uniquely identify a person" to aid his conclusion that "IP address and User Agent 'carries 29.8 bits' of entropy, which is more than sufficient to uniquely identify individuals in the United States." In my opinion, Mr. Hochman's description is incorrect and shows a profound misunderstanding of information entropy. To support my opinions, I have provided a detailed technical discussion in

Appendix E. In summary, there are three errors in Mr. Hochman's opinion. *See infra* § III.E.

- ***First***, contrary to Mr. Hochman's description, entropy is not a "metric for user identifiability" but rather a measure of the uncertainty of the outcome of a process. Therefore, entropy does not—and cannot be used to—establish what specific information is necessary to uniquely identify any specific person, or how many bits of data are "more than sufficient to identify a person." *See infra* § III.E.
- ***Second***, whether IP address and User Agent (IP + UA) carry 29.8 bits, or 20 bits, or 40 bits has no bearing on user identification in this case because there is no reliable mapping from an IP + UA to an individual. Because an IP + UA pair: (i) may correspond to multiple devices and change dynamically, *see infra* § III.G.1, and (ii) may be shared by multiple users, *see infra* § III.G.1 and § III.J, there is no reliable mapping from an IP + UA pair to an individual. Therefore, an IP + UA pair will not reliably identify the person who is using the browser regardless of the entropy bits of the identifier. *See infra* § III.E.
- ***Third***, entropy is an average-case metric that can provide insight into a system, but not individuals. *See infra* § III.E.

7. **Opinion 6: Mr. Hochman's Assertions On Fingerprinting (# 9, 18) Are Misleading And Unfounded.** In his Opinion 18, Mr. Hochman opines "that Google throughout the class period and across the two classes systematically collected and stored detailed private browsing data that constitutes what is commonly understood to be sensitive fingerprinting data, which can be used to identify users and join data." Mr. Hochman does not describe a method to distinguish "fingerprinting data" from "sensitive fingerprinting data" and, in my experience, there is no common understanding of what fingerprinting data is "sensitive." In his Opinion 9,

Mr. Hochman claims that "'pseudonymous' cookies such as Zwieback and Biscotti cookies for signed-out mode … in fact, can be linked to users through fingerprinting information Google collects in its logs, such as IP address, user agents, websites visited, and more)." In my opinion, Mr. Hochman's assertions on fingerprinting are misleading and unfounded for the following reasons:

- ***First***, Mr. Hochman does not directly address whether Google is engaged in fingerprinting but leaves the reader with the impression that Google may be engaged in fingerprinting. *See infra* § III.F.1.
- ***Second***, Mr. Hochman fails to mention that Google's internal policies, including policies cited by Mr. Hochman, expressly prohibit fingerprinting. *See infra* § III.F.2.
- ***Third***, Mr. Hochman neglects to discuss the technical barriers Google has constructed within its systems to prevent fingerprinting. *See infra* § III.F.3.

8. **Opinion 7: Mr. Hochman's Proposal to Identify Class I (Chrome Class) (# 22) Is Unreasonable and Unreliable.**

- ***First***, Mr. Hochman proposes using the combination of IP address and User Agent (IP + UA) to identify class members. In short, he proposes to engage in the very fingerprinting analysis that he and Plaintiffs condemn. Even if engaging in fingerprinting were appropriate—particularly in a privacy case—this method cannot reliably identify class members because (i) it is rarely the case that a device has a unique, static IP address, and (ii) the User Agent string (UA), which contains information about the type of the browser (e.g. Chrome, Edge, Mozilla, Safari), the version of the browser, and the operating system over which the browser is running (e.g. Windows, macOS, iOS, Linux), is likely to be shared by many users. In fact, the top 10 most popular UAs

correspond to 26 percent of daily traffic. Therefore, the identical combination of IP address and UA may be shared by multiple class members, and by other individuals, some of whom are in the class and some of whom are not. *See infra* § III.G.1.

- ***Second***, Mr. Hochman proposes using pseudonymous identifiers to identify class members. This method cannot reliably identify class members because (i) only a subset of users will even be assigned a pseudonymous identifier (*i.e.*, if they opt-in to Chrome metrics for UMA ID or if they visit websites that use PPID and/or User ID and the user signs-in to their account on those websites); (ii) UMA data is designed for aggregate analysis and is not joined with authenticated identifiers; and (iii) PPID and/or User ID are assigned by websites, purposely processed before they are sent to Google to ensure they do not contain personal identifying information, and will have the same value for users who share an account for a given website. *See infra* § III.G.2.
- ***Third***, Mr. Hochman proposes using Biscotti IDs from signed-in private browsing activity to identify signed-out private browsing activity by the same user. Signed-in private browsing mode sessions cannot be joined with signed-out private browsing mode sessions via Mr. Hochman's proposed method because (i) the Biscotti ID for signed-in activity will be different than the Biscotti ID for signed-out activity; and (ii) Mr. Hochman does not propose a way to otherwise link these two sessions together. *See infra* § III.G.2.c.

9. **Opinion 8: Mr. Hochman's Opinion That "maybe_chrome_incognito" Bit Reliably Identifies Incognito Traffic (# 23) Is Incorrect.** Mr. Hochman proposes using the "maybe_chrome_incognito" bit to identify web traffic by proposed class members. This method cannot reliably identify Incognito web traffic because the "maybe_chrome_incognito" bit relies

on the absence of the X-Client-Data header. But the X-Client-Data header may be absent for any number of reasons that have nothing to do with whether the browser was in Incognito mode. *See infra* § III.H.

10. **Opinion 9: Mr. Hochman's Proposal To Identify Class II (# 22) Is Unreasonable And Unreliable.** Mr. Hochman proposes identifying members of Class II (Google account holders who used private browsing modes in Safari or Internet Explorer) by notifying all Google account holders based on the flawed assumption that "most" Google account holders have used a private browsing mode. Then, Mr. Hochman intends to rely on (i) self-reporting, (ii) disclosure or identification through Google records of IP address plus User Agent, and/or (iii) using Biscotti IDs from signed-in private browsing activity to identify signed-out private browsing activity by the same user. None of these methods is reliable, for at least three reasons. *See infra* § III.I.

- ❖ ***First***, because private browsing modes do not save browsing history to a user's browser, self-reporting would rely solely on the user's memory of what websites she visited in private browsing mode on one of the browsers at issue, which is obviously unreliable. *See infra* § III.I.2.
- ❖ ***Second***, for the reasons stated in my Opinion 7, neither (i) IP address plus User Agent nor (ii) attempted mapping of Biscotti IDs from signed-in private browsing mode sessions to Biscotti IDs from signed-out private browsing mode sessions method can reliably identify class members. *See infra* § III.G.
- ❖ ***Third***, further highlighting the unreliability of Mr. Hochman's method, named Plaintiffs' data shows that each potential class member's Google account may be associated with multiple combinations of IP address plus User Agent. *See infra* § III.I.2.

11. **Opinion 10: Mr. Hochman's Proposed Methods For Identifying Class Members (# 22) Do Not—And Cannot—Account For Shared Devices.** Even if Mr. Hochman's proposed methods for class member identification could reliably link the private browsing activity at issue to a specific device or account identifier (and as I explain in my Opinions 7 through 9, it cannot), the method would still not be able to identify class members because it does not address the issue of device and Google account sharing.

- ***First***, there is a significant body of research (including research by one of Plaintiffs' other experts, Mr. Schneier) showing that sharing of devices is common, and likely even more common among private browsing users because Incognito mode and other private browsing modes' primary use case is to provide on-device privacy for shared devices. *See infra* § III.J.1.
- ***Second***, users may share Google accounts and accounts for non-Google websites, such as for websites that require a paid subscription. *See infra* § III.J.2.
- ***Third***, in conjunction with Mr. Hochman's proposal to send email notifications based on device or account, his failure to address shared devices and accounts may put those private browsing users who seek to keep that activity private from users who share those devices and/or accounts at risk (*e.g.*, an abused spouse or child doing research on how to find help). *See infra* § III.J.

12. **Opinion 11: Mr. Schneier's Assertion That "Browsing Information Is Unique For Each User" Is Unsupported and Misleading**. Mr. Schneier purports to support his opinion with studies and documents that do not actually support his opinion because they do not conclude that browsing information is in fact unique for each user, as Mr. Schneier claims. His opinions are particularly misleading for the Data At Issue because the studies and

documents Mr. Schneier cites rely on data and methodologies that are inapplicable to the data in this case. *See infra* § IV.A.

13. **Opinion 12: Mr. Schneier's Claim That "Personal Data Is Difficult to Anonymize and Easy to De-anonymize" Is Unsupported And Is Incorrect For The Data At Issue.** As explained further below, Mr. Schneier's assertion is unsupported by the sources he cites and incorrect for the Data At Issue for the following reasons:

- ***First***, the examples Mr. Schneier cites as examples of purported difficulties associated with anonymization analyze data that is readily distinguishable from the Data at Issue—for example, surveillance camera footage of Israeli assassins, birth dates, ZIP codes, and voter registration databases. *See infra* § IV.B.
- ***Second***, the Google documents that Mr. Schneier characterizes as "admissions" do not support his conclusion that "Google can connect individuals to private browsing sessions." *See infra* § IV.B.
- ***Third***, Mr. Schneier's assertion that "data is difficult to anonymize and easy to de-anonymize" is incorrect for the Data At Issue because my review of Google documents and testimony produced in this case confirms that Google has been successful in its efforts to anonymize the Data At Issue and prevent its re-identification. *See infra* § IV.B.

14. **Opinion 13: Mr. Schneier's Assertion That Google Has Not Taken Steps To Ensure That A User's Choice To Sign Out Of A Google Account Will Prevent Google From Associating The User's Signed-Out Activity With Any Signed-In Data Is Incorrect.** In short, Mr. Schneier's opinion is incorrect for the following reasons:

- ***First***, the documents that Mr. Schneier cites do not support his conclusion that Google

"has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data;" in fact, they support the opposite conclusion because they outline the extensive steps Google takes to maintain strict separation between signed-in and signed-out data. *See infra* § IV.C.1.

❖ ***Second***, additional documents and testimony in this case further demonstrate the steps that Google has taken to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data. *See infra* § IV.C.2.

❖ ***Finally***, upon review of Google's security and pseudonymization policies and practices, they closely align with best practices for research involving user data and with best practices in the network security industry. *See infra* § IV.C.3.

15. For an overview of my opinions, please refer to Appendix B. Table Of Opinions. For tables mapping Mr. Hochman's opinions to my report and my report to his opinions, please *see* Appendix C. Hochman to Psounis Mapping and Appendix D. Psounis To Hochman Mapping.

## II. INTRODUCTION

### A. Personal Background And Qualifications

16. I am a Professor and Associate Chair of Electrical and Computer Engineering and Professor of Computer Science at the University of Southern California. I joined the University of Southern California in 2003, after completing my PhD at Stanford University as a Stanford Graduate Fellow.

17. My professional career has spanned more than 20 years. As set forth in Appendix A. Curriculum Vitae, I have extensive experience in the field of networked distributed systems, including the Internet and the world wide web, content-delivery networks, data centers and cloud computing, and wireless mobile networking systems.

18. I have published more than 100 technical papers in these fields, which have been cited tens of thousands of times. I have also been awarded numerous grants and significant funding from the government and industry leaders to advance these fields. As a result, I have been named an Institute of Electrical and Electronics Engineers (IEEE) Fellow, the highest grade of membership, and a Distinguished Member of the Association of Computing Machinery (ACM) for my contributions to the theory and practice of networked, distributed systems.

19. Throughout my career, I have analyzed, designed, and developed efficient, privacy-preserving networked distributed systems for the Internet and the Web, content-delivery networks, data centers and cloud systems, and wireless mobile networking systems. As such, I have acquired extensive expertise in the analysis and development of those systems and associated products.

20. I have extensive experience with and made contributions specifically towards designing efficient, privacy-preserving networked distributed systems, as established by my funding and publication record. Over the last decade, I have received multiple awards from the National Science Foundation (NSF), the leading governmental agency for funding computer engineering and computer science research, to work on privacy-preserving architectures for networked distributed systems, including the world wide web, mobile systems, and spectrum sharing systems. For example, I am a lead Principal Investigator (PI) of the NSF Secure and Trustworthy Cyberspace Frontiers (SaTC Frontiers) grant on Protecting Personal Data Flow on

the Internet and the sole lead PI of the NSF grant on Spectrum Sharing Systems for Wireless Networks: Performance and Privacy Challenges. During my professional career of more than 20 years I have also received multiple awards from NSF and industry leaders, to work on network routing, for example, I was the sole lead PI on the NSF grant on Efficient Routing in Delay Tolerant Networking.

21. I have published several papers in selective academic journals and conferences on protecting the privacy of user and system data. Recent work of mine in the area of privacy-preserving distributed systems concerns the protection of the privacy of personal data during web browsing and during usage of popular applications and systems, touching upon implications of cookies and fingerprinting.[1] In addition, I have a large body of publications in the most selective academic journals and conferences related to network routing and IP addresses.[2] I have also been the faculty in charge of the entire networking curriculum at the Electrical and Computer Engineering department at USC for more than a decade and teach networking classes as well as probability theory classes which cover entropy and other related concepts to graduate students yearly.

22. I also have extensive practical experience with networked distributed systems designed and developed to operate in the World Wide Web deployed over the Internet. For example, I was the Technology Architect for Fineground Networks (later acquired by Cisco

---

[1] *See, e.g.*, M. Clark and K. Psounis,"Optimizing Primary User Privacy in Spectrum Sharing Systems," IEEE/ACM Transactions on Networking, https://ieeexplore.ieee.org/document/8985324 (Apr. 2020); J. Zhang, K. Psounis, M. Zaroon, and Z. Shafiq, "HARPO: Learning to Subvert Online Behavioral Advertising," NDSS, https://web.cs.ucdavis.edu/~zubair/files/harpo-ndss2022.pdf (Apr. 2022).

[2] *See, e.g.*, T. Spyropoulos, K. Psounis, and C. Raghavendra, "Efficient Routing in Intermittently Connected Mobile Networks: The Multiple-copy Case, "IEEE/ACM Transactions on Networking, https://cpb-us-e1.wpmucdn.com/sites.usc.edu/dist/b/364/files/2019/05/multiton.pdf (Feb. 2008); T. Spyropoulos, K. Psounis, and C. Raghavendra, "Efficient Routing in Intermittently Connected Mobile Networks: The Single-Copy Case," IEEE/ACM Transactions on Networking, https://ee.usc.edu/netpd/assets/001/51984.pdf (Feb. 2008).

Systems), where I designed and developed systems to accelerate the delivery of content over the World Wide Web via web proxy caches and content delivery networks. Also, I was a co-founder of SpaceMUX (whose IP was later acquired by Quantenna Communications), where I designed and developed systems to increase the speed of wireless networked systems. In addition, for over 20 years both at Stanford University and at the University of Southern California I have designed and implemented efficient algorithms, protocols and systems for web caching, web farms, and web browsing, and I have consulted for industrial leaders, and produced prototype systems. I have also applied for and been granted numerous patents, e.g. "Method and System for Class-based Management of Dynamic Content in a Networked Environment"[3] about dynamic web content, owned by Cisco Systems.

23. In sum, I have extensive experience in and familiarity with the fields of networked distributed systems including the Internet and the world wide web, content-delivery networks, data centers and cloud computing, and wireless mobile networking systems, and extensive experience and contributions towards the analysis, design and implementation of efficient routing and privacy-preserving architecture for such systems.

24. My C.V. is attached as Appendix A. Curriculum Vitae.

25. I am being compensated at the rate of $600 per hour for my work on this case. My compensation is not contingent upon my findings, the testimony I may give, or the outcome of this litigation.

**B. Summary Of Plaintiffs' Allegations**

26. I understand that Plaintiffs, Chasom Brown, William Byatt, Jeremy Davis, Christopher Castillo, and Monique Trujillo, allege that Google violated various statutes and

[3] U.S. Patent No. 7,603,483B2 (issued Oct. 13, 2009).

privacy laws since June 1, 2016 (the "Class Period").[4] Specifically, Plaintiffs allege that Google improperly received or collected data from browsers when (i) a Google Account holder not signed into their Google Account, (ii) uses a browser in private browsing mode, (iii) to visit a non-Google website containing "Google tracking or advertising code."[5] The Data At Issue includes the following:

- "The 'GET request' sent from the user's computer to the website;"
- "The IP address of the user's connection to the internet;"
- "Information identifying the browser software that the user is using, including any 'fingerprinting' data;"
- "Any 'User-ID' issued by the website to the user, if available;"
- "Geolocation of the user, if available;" and
- "Information contained in 'Google cookies,' which were saved by the user's web browser on the user's device at any prior time."[6]

27. Plaintiffs allege that Google uses "fingerprinting"[7] techniques to (i) intercept and collect the Data At Issue[8] and (ii) build "its profile of users (including Plaintiffs and class members)."[9] In their Third Amended Complaint, Plaintiffs claim that "Google Identifies You with 'Fingerprinting' Techniques."[10] Plaintiffs further allege "Google Ad Manager is set up to automatically retarget a user based on information that Google has previously collected"

---

[4] Third Amended Class Action Complaint, *Chasom Brown, et al., v. Google LLC*, United States District Court Northern District of California, Febr. 3, 2022, Dkt. 395-2 ("Complaint") ¶ 2.
[5] *Id.* ¶ 192.
[6] *Id.* ¶ 63.
[7] In the context of browser communications, fingerprinting refers to the combination of various bits of information to probabilistically identify a browser. Probabilistic identification of a browser through fingerprinting is different from the deterministic identification of an individual through an account log-in. For more on fingerprinting *see infra* § III.F, § III.G.1, Appendix E.
[8] Complaint ¶ 8.
[9] *Id.* ¶ 100.
[10] *Id.* at 31.

through "Google's fingerprinting."[11] Plaintiffs allege that Google engages in "[c]oncurrent retargeting of ads by matching private browsing user data with other user data."[12]

28. Plaintiffs allege that Google "gained a complete, cradle-to-grave profile of users" by correlating and aggregating data associated with:

- **Analytics User-ID.** ("Google is able to associate the data collected from users in "private browsing mode" with specific and unique user profiles through Google Analytics User-ID.")
- **Google Cookies.** ("Information collected from Google Cookies, which includes identifying information regarding the user from private browsing sessions and non-private browsing sessions, across multiple sessions[.]")
- **Fingerprinting Data.** ("Identifying information regarding the consumer from various Google fingerprinting technologies that uniquely identify the device, such as X-Client-Data Header, GStatic, and Approved Pixels[.]")
- **Geolocation Data.** ("Geolocation data that Google collects from concurrent Google processes and system information, such as from the Android Operating System[.]")
- **IP Address.** ("The IP address information, which is transmitted to Google's servers during the private and non-private browsing sessions. Google correlates and aggregates all of this information to create profiles on the consumers.")[13]

29. Plaintiffs propose two classes:

- **Class 1** – "All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such a browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the 'Class Period')."[14]
- **Class 2** – "All non-Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using any such browser and who were (a) in 'private browsing mode' on that browser, and (b) were not logged into their Google account on that browser, but whose communications, including

---

[11] *Id.* ¶ 81.
[12] *Id.* at 25.
[13] *Id.* ¶ 93.
[14] *Id.* ¶ 192.

identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the 'Class Period')."[15]

**C. Assignment**

30. I have been engaged in this matter by counsel for Google LLC ("Google") to evaluate the April 15, 2022 Expert Report of Jonathan E. Hochman ("Hochman Report")[16] and the April 15, 2022 Expert Report of Bruce Schneier ("Schneier Report").[17]

31. In particular, counsel has asked me to analyze and respond to the following Opinions in the Hochman report.

- **A.** "Google Interception: Throughout the class period, Google intentionally intercepted private browsing communications between users and non-Google websites while those communications were in transit." (Hochman ¶¶ 78-133.)
- **B. "**User Notification & Choice: Throughout the class period, Google collected this private browsing information without notifying users or offering a choice at the time of or in connection with any of the interceptions." (Hochman ¶¶ 134-135).
- **C.** "Website Notification & Choice: Throughout the class period, Google collected this private browsing information without notifying websites at the time of or in connection with any of the interceptions or providing websites with a choice." (Hochman ¶¶ 136-137).
- **D.** "Google Storage: Throughout the class period, Google stored private browsing information in many Google data sources, sometimes permanently." (Hochman ¶¶ 138-165).
- **E.** "Google Use: Throughout the class period, Google exploited private browsing information to generate revenue for Google by creating profiles, serving ads, tracking conversions, and in other ways that benefited Google." (Hochman ¶¶ 166-222).
- **F.** "Google Joinability: Throughout the class period, Google collected and stored private browsing information in ways that can be joined to other Google user information, but Google withheld and destroyed data that would be relevant to further assessing and demonstrating that joinability." (Hochman ¶¶ 223-258).

---

[15] *Id.* ¶ 192.

[16] Apr. 15, 2022 Expert Report of Jonathan E. Hochman and Appendices and Exhibits Attached Thereto.

[17] Apr. 15, 2022 Expert Report of Bruce Schneier and Appendices and Exhibits Attached Thereto.

- **H.** "Class Member Identification: Throughout the class period, Google collected private browsing information in ways that can be used to identify class members, though Google also withheld and destroyed data relevant to that identification." (Hochman ¶¶ 262-307).
- **I.** "Attempt: Google's attempted interception and collection uniformly impacted all class members." (Hochman ¶¶ 308-317).

32. Counsel has also asked me to analyze and respond to the following specific statements in the Schneier Report:

- "Browsing Information Is Unique For Each User."[18]
- "Personal Data Is Difficult to Anonymize and Easy to De-anonymize."[19]
- "Google has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data."[20]

**D. Facts And Data Considered**

33. I have reviewed the Hochman Report, exhibits, and appendices, and sources relied on, as well as the Schneier Report. I have also requested and reviewed Google log data provided pursuant to the Special Master process, Google documents and discovery responses produced in this case, including regarding Google's logging policies and infrastructure, its anti-fingerprinting policies and infrastructure, all transcripts of Google deposition witnesses in this case discussing Google's logging policies and infrastructure, issues surrounding fingerprinting and IP addresses, publicly available data and reports, and existing technical and academic research. The sources I considered in forming my opinions are identified in this report, the accompanying exhibits, and are listed in Appendix H. Sources Considered.

34. Should additional relevant documents or information be made available to me, I reserve the right to supplement my opinions as appropriate.

---

[18] Schneier at 27.
[19] Schneier at 41.
[20] Schneier ¶ 205.

## III. REBUTTAL TO MR. HOCHMAN

### A. Opinion 1: Mr. Hochman's Opinion That Users Can Readily Be Identified From The Data At Issue (# 18) Is Incorrect

35. I disagree with Mr. Hochman's "opinion that Google can readily use the data at issue in this lawsuit (collected from private browsing during the class period) to identify users and their devices."[21] In my opinion, Google cannot readily use the collected site activity data from (i) browsers in private browsing mode, (ii) with no user logged in to a Google Account, (iii) visiting a non-Google website that uses Google web services (the "Data At Issue"), to identify users or their devices for the following reasons:

- ***First***, the Data At Issue is not associated with a Google Account. Google receives the data in an unidentified state, without any Google Account information. See *infra* § III.A.1.
- ***Second***, the Data At Issue is stored in an orphaned and unidentified state. The Data At Issue is either (i) keyed by a pseudonymous identifier unique to each private browsing session (Biscotti, Zwieback), (ii) keyed by a pseudonymous identifier unique to the website publisher (PPID-mapped Biscotti, Analytics UserID), or (iii) not keyed to any identifier. See *infra* § III.A.2.
- ***Third***, Google's privacy-preserving technical barriers and policies prevent the identification of users from signed-out private browsing data. See *infra* § III.A.3.

#### 1. The Data At Issue Is Not Associated With A Google Account

36. Mr. Hochman recognizes that, according to Plaintiffs' Class definition, Class members are not signed-in to Google Accounts when Google receives the data. He states that "for the private browsing information at issue in this case . . . class members are not signed into

[21] Hochman ¶ 227.

any Google account"[22] and "[w]hen a user starts a new private browsing session, they are automatically signed-out of any signed-in Google account."[23] In addition, he states that "Google distinguishes between signed-in and signed-out modes by using different cookies."[24] Finally, Mr. Hochman states that "Google stores . . . data in different logs depending on the signed-in vs. signed-out mode."[25] Yet, despite these acknowledgments, he goes on to conclude that "Google can readily use the data at issue in this lawsuit (collected from private browsing during the class period) to identify users and their devices."[26]

37. Based on my experience researching browser communications, review of documents upon which Mr. Hochman relied, review of deposition testimony and data produced in this litigation, I conclude that Mr. Hochman's opinion is incorrect. That the Data At Issue is not associated with a Google Account is easily illustrated:

| 38. This empty jar represents a browser's local cookie storage on a brand new browser. |  |
|---|---|

[22] Hochman ¶ 156.
[23] Hochman ¶ 161.
[24] Hochman ¶ 160 ("Google uses GAIA cookies for signed-in mode and what Google calls 'pseudonymous' cookies such as Zwieback and Biscotti cookies for signed-out mode.").
[25] *Id.* ("[I]n signed-out mode, Google logs data to Biscotti logs (B logs) for display ads data and Zwieback logs for search ads data.").
[26] Hochman ¶ 227.

| | |
|---|---|
| 39. If a user signs in to a Google Account on that browser (*e.g.*, by logging in at https://mail.google.com), a cookie associated with that Google Account is set on the browser. This cookie contains an encrypted ID, called a GAIA, which is used to identify the specific Google Account. This cookie remains on the browser while the user is signed in to their Google Account. | <br>• GAIA ID for USER@gmail.com |
| 40. Over time, depending on the browser's cookie settings and the web pages visited, other cookies may be set. For example, if the browser is used to visit a non-Google web page on which the web page publisher has installed Google Ad Manager scripts, a cookie containing a unique encrypted Biscotti ID may be set. | <br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158) |
| 41. If the browser is used to visit a web page Google owns and operates, a cookie containing a unique encrypted Zwieback ID may be set. All of these cookies can exist on a browser at the same time. | <br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158)<br>• Zwieback ID # 1 (0xf5c156f144b9aa7f) |

<table>
<tr>
<td>42. When a private browsing mode is enabled on a browser (e.g., Incognito on Chrome), the browser creates a new cookie jar for the duration of that private browsing session. That cookie jar does not contain any of the previously set cookies, or encrypted IDs stored in those cookies.[27]</td>
<td><br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158)<br>• Zwieback ID # 1 (0xf5c156f144b9aa7f)<br></td>
</tr>
</table>

<table>
<tr>
<td>43. Because class members (Class I and Class II) are not signed into any Google account for the private browsing sessions at issue in this case,[28] Google never receives the Data At Issue with a GAIA ID, and the data is not associated with a Google Account.</td>
<td></td>
</tr>
</table>

44. Mr. Hochman states that "Google stores … data in different logs depending on the signed-in vs. signed-out mode."[29] These "signed-out mode" logs store data keyed to an unauthenticated identifier—not a GAIA.[30] Data stored in these logs is therefore not keyed to a specific user's identity.[31] This data is unauthenticated (*i.e.*, not associated with a specific user's

[27] Hochman ¶ 161. ("When a user starts a new private browsing session, they are automatically signed-out of any signed-in Google account.").
[28] Hochman ¶ 156.
[29] Hochman ¶ 160.
[30] *See* GOOG-CABR-00059431, at -431 ("[redacted]
[31] *See* GOOG-CABR-00073880, at -881 ("Unauthenticated User Data is User Data that is not tied to a signed-in user.").

identity), and Google implements policies and technical controls to prevent its re-identification.[32]

45. In 2016, Google undertook a worldwide effort to "give signed-in users better control and transparency for their ads experience."[33] The program introduced a schism in how Google's systems identified users. Prior to , Google's ad systems used an unauthenticated Biscotti ID, or doubleclick ID, as the sole identifier, whether or not users were signed in to their Google Account. With the introduction of , Google's ad systems " introduced similar changes to Google Analytics to ."[35] With the introduction of GAIA-keyed storage and processing, Google implemented changes to its logging pipelines to maintain and enforce separation between GAIA-keyed authenticated logs and Biscotti-keyed unauthenticated logs.[36]

---

[32] *See id.* at -882

[33] GOOG-CABR-04750983, at -984.

[34] GOOG-CABR-00101695, at -696.

[35] *Id.*

[36] *Id.* at -697

46. The serving stack for Display Ads uses encryption to maintain the separation between Biscotti and GAIA-keyed data and limit the risk of joinability. *See* GOOG-CABR-04717111, at -138:

47. In my opinion, because (i) the Data At Issue is not received with a GAIA ID and (ii) Google maintains separation between GAIA-keyed data and non-GAIA-keyed data, this Data is not associated with a Google Account.

**2. The Data At Issue Is Stored In An Orphaned And Unidentified State**

48. While Google does not receive the Data At Issue with a GAIA ID, it can receive the Data At Issue with the pseudonymous Biscotti and Zwieback IDs discussed above. That those pseudonymous IDs are unique to each private browsing session can easily be illustrated with our prior example.

| | |
|---|---|
| 49. When a user enables private browsing mode on a browser (*e.g.* starts an Incognito session on Chrome), a new cookie jar is created that is only in operation until the end of the private browsing session. |  |
| 50. When a user visits a non-Google web page on which the web page publisher has installed Google Ad Manager scripts, and the browser permits third-party cookies to be set, a cookie containing a unique encrypted Biscotti ID may be set. That Biscotti ID is unique to the specific private browsing session. It has no relation to, and is not joined with, any cookies set during regular (what Hochman calls "non-private" browsing) mode, or even a Biscotti ID set during a different private browsing session.[37] |  • Biscotti ID # 2 (2483711983363751938) |
| 51. When a user visits a web page Google owns and operates, a cookie containing a unique encrypted Zwieback ID may be set. The Zwieback ID is unique to the private browsing session. It has no relation to, and is not joined with, any cookies set during regular mode, or even a Zwieback ID set during a different private browsing session. |  • Biscotti ID # 2 (2483711983363751938) • Zwieback ID # 2 (0x43b763007d1ff50d) |

[37] *See* Berntson June 16, 2021 Tr. 279:1-11 ("When you create an incognito session, the incognito session starts off with an empty cookie jar that is not shared with anything else on your device. So yes, when an ad request is made from an incognito session for the first time, there is no Biscotti, so it will generate a brand new Biscotti that has no mapping to anything else.").

| | |
|---|---|
| 52. When a user closes the private browsing session, the cookies that were set during that private browsing session are deleted from the browser. | |
| 53. When a user opens a new private browsing session, a new cookie jar is created that is only in operation until the end of the private browsing session. | |
| 54. If a user returns to the same web pages they visited in the prior private browsing sessions, new cookies containing new Zwieback and Biscotti IDs will be set. | • Biscotti ID # 3 (2464002382754152675)<br>• Zwieback ID # 3 (0x6e21bea56616853b) |
| 55. When a user closes the private browsing session, the cookies that were set during that private browsing session are deleted from the browser. | |

56. As a consequence of the interaction shown above, when Google receives the Data At Issue with a Biscotti ID or a Zwieback ID, that ID is unique to the specific private browsing session and the Data At Issue is stored in an orphaned state.

57. As former Google employee Rory McClelland explained at his deposition:

> For example, [if] a user who launched an Incognito window . . . navigated to Google.com and undertook a search, the Google.com web service in this instance would create a new cookie for that user, that user presenting as a whole new user that has never been seen before due to the nature of Incognito mode. They are given a new cookie that holds the unique identifier for that profile. That cookie is held in memory on the user's computer because it's in Incognito mode. For the duration of that search, session data is logged against the ID that represents that profile on the server. When the user closes the last Incognito tab or window, locally, that cookie is erased from memory . . . That profile, with its corresponding data will become–best way of explaining, orphaned, so it will continue to exist, but it would never be supplemented with any additional data.

McClelland Feb. 18, 2022 Tr. 80:12-81:11.[38]

58. Based on my experience in the industry and review of data and documents for this case, I agree with Mr. McClelland's description. When a user does not sign into a Google account in Incognito mode (or private browsing mode on Safari, Internet Explorer, or Edge), any cookies (and the identifiers contained therein) that are set will be unauthenticated (*i.e.*, not associated with a specific user's identity by Google). When the private browsing session is terminated, the cookies are deleted from the browser.

59. Google can also receive the Data At Issue with a pseudonymous first-party ID called PPID.[39] Notably, Mr. Hochman has proposed in published research that the use of "local patient identifiers (LPIDs) that can be used to identify the medical records of a given patient within the context of a single health care provider" provides an effective way to facilitate

---

[38] *See also* Berntson June 16, 2021 Tr. 279:1-11.

[39] Google Ad Manager Help, "About publisher provided identifiers," https://perma.cc/H8L4-FYTM, (last visited June 6, 2022).

sharing of medical records for research purposes while protecting patients' privacy.[40] This LPID is "obtained from a patient's PII via a one-way cryptographic function . . . [that] prevents the local identifier from being reverse engineered to obtain PII."[41] PPIDs function in the same way as Mr. Hochman's proposed LPIDs. The PPID is a "[p]ublisher provided identifier [that] allows publishers to send Google Ad Manager an identifier for use in frequency capping, audience segmentation and targeting, sequential ad rotation and other audience-based ad delivery controls across devices."[42] The PPID is set by publishers and Google requires publishers to send the PPID in a form to Google that does not contain any identifying information: "This identifier [PPID] . . . must be hashed, anonymous, and must not contain any personal information, third-party identifiers or device IDs."[43]

60. Google does not link PPIDs to other identifiers and does not use PPIDs for Google's own purposes.[44] They are controlled by the publisher and are specific to individual publishers and their websites.[45] Because publishers are in full control, not all publishers use

[40] M. Fischer, J. Hochman, and D. Boffa, "Privacy-Preserving Data Sharing for Medical Research," International Symposium on Stabilization, Safety, and Security of Distributed Systems, https://cpsc.yale.edu/sites/default/files/files/TR1558.pdf (November 17–20, 2021), at 5.

[41] *Id.*

[42] GOOG-CABR-00021811, at -811.

[43] *Id.*

[44] Berntson Mar. 18, 2022 Tr. 119:17-23 ("In addition, from an implementation perspective, for the PPID, it's never ever linked to any other ID. [Its] representation changes externally and then internally, but it's all only ever one ID that is never joined to any other ID in any business case."); *id.* at 123:24-124:15 ("PPID doesn't help with conversions because the ID only exists on the publisher's site. And once a user has, say, clicked on an ad and gone to an advertiser site, the PPID is not relevant anymore. And in fact, I'll make a linkage here. One of the uses of modeled conversions is specifically when we don't have an ID that spans cross-site. And in those cases, PPID is a good example. We can't measure conversions using a PPID because it only exists on the publisher's site, not on the advertiser's site. And when PPID is the ID that is used, it's -- for example, if -- if a user has disabled third-party cookies, there is no Biscotti. And in those cases, there is no cross-site identifier that can be used to infer conversions.").

[45] *Id.* at 167:3-14 ("So [a] design attribute to our products is to put the publisher in control of the data that they want used in their system. That's different than the controls we have relating to the e-privacy directive, because for that, even if the data is present, we wouldn't use it. The

PPIDs,[46] and different publishers may provide Google a hashed PPID value that is the same for the same user.[47]

61. When Google receives a PPID value from a publisher, Google hashes it further,[48] and then uses a table to map it to a random ID.[49] The random ID is called a PPID-mapped Biscotti ID because "'Biscotti' was originally named for the internal system [Google] use[s] to generate random numbers."[50] It is not the same Biscotti ID as stored in a cookie on the user's browser.[51] The mapping table records the double-hashed PPID value, and the hashing is one-way so there is no way to retrieve the original PPID input.[52]

62. For the Data At Issue, the PPID-mapped Biscotti ID is only written to logs that are not associated with a Google Account. For cases when a user is signed into their Google Account and the publisher provides a PPID to Google, the PPID-mapped Biscotti ID is stored in an encrypted format to prevent logged-out private browsing traffic from being joined with a user's Google Account.[53]

---

second set of controls is a publisher saying, 'I don't want you to introduce that data' or 'I'm not going to provide it to you.' So those are two different pathways where there could be limitations or restrictions placed on whether or not we have access to data.").

[46] *Id.* at 166:16-20 ("[I]f a publisher chooses to not use PPID, they wouldn't provide PPID, and so therefore there would be no PPID. And so, it is a publisher choice as to whether the PPID [is] available in the first place for our systems").

[47] *Id.* at 121:20-24 ("[I]f two different publishers have the same e-mail address and they happen to use the same hashing function, it is possible that two different publishers can pass us what -- a PPID value that's the same for the same user.").

[48] *Id.* at 120:12-13 ("when we receive this [PPID] value, we hash it").

[49] *Id.* at 120:22-121:1 ("And when this comes in the first time, we generate a new random number, and we associate that random number -- which is an integer -- and we store it alongside what we get from the publisher.").

[50] *Id.* at 122:11-15.

[51] *Id.* at 122:15-24 ("And that internal system that generated a random integer is also what we happen to call the cookie that we publish client-side. . . . That mapped Biscotti ID is never present external to our systems.").

[52] *Id.* at 121:8-11 ("[T]hey hash it into, say, another string, which is an opaque reputation with a one-way mapping from the prior string.").

[53] GOOG-CABR-00058751, at -756.

63. Similarly, Google Analytics User-ID is also a first-party ID generated, assigned, and used by Google Analytics customers.[54] A publisher who is a Google Analytics customer can provide a hash of their signed-in User ID to Google; that signed-in User ID is called an Analytics User-ID.[55] Because publishers have full control of Analytics User-ID, not all publishers choose to use Analytics User-ID (some publishers do not have a signed-in user base and thus cannot use Analytics User-ID[56]), and different publishers may provide Google a hashed Analytics value that is the same for the same user.

64. In my opinion, Google can not readily use the Data At Issue to identify users because the Data is stored in an orphaned and unidentified state.

[54] Google Analytics Help, "About User-ID views," https://perma.cc/9MGV-G8XP (last visited June 6, 2022).

[55] Berntson June 16, 2021 Tr. 235:16-236:2 ("If a publisher has a signed-in user base, they can provide a hash of say their signed-in User ID, which means that when they're using Google Analytics to look at a user's activity on a mobile device and on a desktop, et cetera, because the publisher is providing a stable identifier across those devices, they can have the view of all the activity associated with one user across devices.").

[56] *Id.* at 240:12-13 ("Many publishers don't have a signed-in user base"); Chung Mar. 10, 2022 Tr. 132:14-17 ("[T]he customer would have to implement the user ID feature, which is in the -- the large minority of Google Analytics' customers and sites use user ID and send event data in with user ID.").

### 3. Privacy-Preserving Technical Barriers And Policies Prevent Google From Re-Identifying Logs Data

65. In my opinion, Google can not readily identify users from the Data At Issue due to technical barriers and policies designed to prevent such identification. Google has strict policies against re-identifying logs data. *See, e.g.,* GOOG-BRWN-00029004, at -006:



66. Additional policies preventing re-identification include Google's policies against fingerprinting are discussed in § III.F.2. Google also performs "cookie scrubbing," which is a process where

67. Additional relevant technical barriers to re-identification include architecture and encryption (*infra* § III.F.3), UMA timestamps (*infra* § III.G.2.a), PPID hashing and encryption (*supra* § III.A.2), and Google's data deletion practices (*infra* § III.C.2).

[57] GOOG-BRWN-00029002, at -002-003.

68. In my opinion, Google's logging practices and server-side architecture for the Data at Issue, which is keyed by a pseudonymous identifier and stored in an orphaned state, renders Mr. Hochman's proposal for identifying purported class members technically and practically impossible. *See infra* § III.G.

**B. Opinion 2: Mr. Hochman's Opinions On Interception, Notice, And Deletion Of Private Browsing Information (# 4, 5, 6, 26, 31) Are Contrary To Industry Guidelines On Private Browsing**

69. Mr. Hochman contends that Google could have (i) redesigned Chrome or Google's "tracking beacons" to "limit Google's collection of private browsing information" (Hochman # 4) and (ii) notified users, at the time of collection, that it was collecting private browsing information (Hochman # 5). He opines that Google could have notified websites when it received private browsing information (Hochman # 6). Mr. Hochman asserts that Google "uniformly attempted to intercept all private browsing communications with non-Google websites that have a Google tracking beacon" (Hochman # 26). Finally, Mr. Hochman claims that "Google could delete from its systems records of Chrome Incognito browsing communications" (Hochman # 31). In my opinion, these five opinions are not credible because Mr. Hochman failed to consider the impact of the industry guideline that a website should not be able to detect whether a website visitor is in private browsing mode.

70. In my opinion, Mr. Hochman's opinions on what Google could or should have done regarding private browsing (# 4, 5, 6, 26, 31) are marred by his failure to consider whether Apple, Firefox, Google and Edge are and should continue to intentionally take steps—in compliance with W3C TAG guidelines—to ensure that (i) the web remains accessible in private and normal browsing modes and (ii) the use of private browsing mode is not detectable by websites.

71. Although Mr. Hochman refers to a number of different standards issued by Standard-Setting Organizations ("SSOs"),[58] he fails to acknowledge the industry guidelines most relevant to the allegations at issue: The W3C Technical Architecture Group ("TAG") Observations on Private Browsing Mode. The World Wide Web Consortium (W3C) is the main international standards organization for the World Wide Web (WWW).[59] It was founded in 1994 by Tim Berners-Lee, the inventor of the WWW. The Technical Architecture Group (TAG) of W3C[60] consists of full-time W3C staff and representatives from industry leaders in web browsers and WWW, including Apple, Google, Microsoft, and Samsung.

72. In particular, Mr. Hochman fails to address the W3C TAG Observations on Private Browsing Modes published on July 5, 2019, which set forth the following guidelines on private browsing mode:

- "The Web should be accessible in private and normal browsing modes[.]"[61]
- "[T]he use of private browsing mode should not be detectable by websites[.]"[62]

[58] *See, e.g.*, Hochman ¶ 49 ("Google, other search engines, and website publishers have together adopted the Robot Exclusion Standard that prevents data from being harvested from websites by search engine robots, such as Google's Googlebot, when a publisher opts out."); ¶ 50 ("A specific example of Google failing to work with other browser vendors to establish privacy standards is the universal Do Not Track ('DNT') signal, which was first proposed in 2009.").
[59] W3C, https://www.w3.org (last visited June 3, 2022).
[60] W3C, "W3C Tag," https://tag.w3.org (last visited June 3, 2022).
[61] W3C, "W3C TAG Observations on Private Browsing Modes," W3C TAG Finding, https://www.w3.org/2001/tag/doc/private-browsing-modes/ (July 5, 2019) ("When the differences in browser behavior between privacy and standard browsing modes can be detected because of standardization or implementation details, websites might choose to degrade browsing experience (for example, not displaying content) when they detect the users in private browsing modes. This is undesirable.").
[62] *Id.* ("[B]rowser vendors should work towards achieving private browsing mode work in a way indistinguishable [ ]from the normal mode, to respect the users' privacy in choosing it.").

73. Mr. Hochman writes that Google designed Incognito mode on Chrome "so that no system like ads or Google Analytics can know whether or not you're in incognito mode,"[63] but he fails to recognize that Google's practice is consistent with the design principle set forth in the W3C TAG guidelines. In my opinion, providing a notice to websites at the time of collection (Hochman # 6) or redesigning Chrome or Google scripts (Mr. Hochman's "tracking beacons") to "limit Google's collection of private browsing information" (Hochman # 4) would violate the W3C TAG principle that "the use of private browsing mode should not be detectable by websites[.]"[64]

74. Similarly, Mr. Hochman appears to either have ignored or not have been aware of the W3C TAG guidelines when he suggested in Opinion 5 that "Google could have included either a pop-up notification or a choice to users at the time [of] collection [of information by Google services on third party websites], but it did not."[65] As documents Google produced show, configuring Google scripts on third party websites to provide such a notification only to users in private browsing modes would require either (i) configuring the browser to send information flagging the user's use of private browsing mode;[66] or (ii) configuring the embedded Google services to detect the use of Incognito mode.[67] In my opinion, both of these options would violate the W3C TAG guidelines discussed above and facilitate websites detecting the use of private browsing mode.

---

[63] Hochman ¶ 117 (quoting Berntson June 16, 2021 Tr. 282:11-15 ("Incognito mode was designed so that no system like ads or Google Analytics can know whether or not you're in incognito mode . . .")).

[64] W3C, "W3C TAG Observations on Private Browsing Modes," W3C TAG Finding, https://www.w3.org/2001/tag/doc/private-browsing-modes/ (July 5, 2019).

[65] Hochman ¶ 135.

[66] GOOG-BRWN-00554317, at -319; Adhya Nov. 19, 2021 Tr. 185:9-185:10; McClelland Feb. 18, 2022 Tr. 255:14-257:16.

[67] GOOG-BRWN-00554317, at -319; GOOG-CABR-03646925, at -927; Berntson, Mar. 18, 2022 Tr. 141:5-143:14.

75. Third-party discovery indicates that web browser developers including Microsoft, Mozilla, and Apple are operating private browsing modes on Edge, Firefox, and Safari to comply with this W3C TAG guideline. In response to a subpoena Plaintiffs issued in this case requesting "ALL DOCUMENTS sufficient to IDENTIFY all individuals who have used InPrivate Browsing mode in Microsoft IE/Edge from June 1, 2016 to the present," Microsoft responded that it "does not have documents responsive to the Request."[68] In response to a subpoena Plaintiffs issued requesting "ALL DOCUMENTS sufficient to IDENTIFY all individuals who have used a Private Window or Private Browsing mode in Firefox from June 1, 2016 to the present," Mozilla responded that it "does not possess documents or information sufficient to ascertain the identity of individuals who have used a Private Window or Private Browsing mode in Firefox."[69] And in response to a subpoena seeking "ALL DOCUMENTS sufficient to IDENTIFY all individuals who have used a Private Window or Private Browsing mode in Safari," Apple responded that it is "not in possession of the requested records."[70]

76. Mr. Hochman also asserts that Google uniformly attempted to intercept and collect data from all private browsing communications (Hochman # 26),[71] and seems to suggest that Google could have avoided collecting data from private browsing communications. But browser vendors, following the W3C TAG guidelines, do not send an explicit signal from a browser instance to websites to detect whether a visitor is in private browsing mode. When Google receives the Data At Issue through its web-services (*i.e.*, Analytics, Ad Manager) from a Safari or Edge browser, then Google does not know whether the data it received came from a

[68] Microsoft's Response to *Brown* Plaintiffs' Subpoena (Aug. 27, 2021), at 4.
[69] Mozilla's Response to *Brown* Plaintiffs' Subpoena (Aug. 27, 2021), at 4.
[70] Apple's Response to *Brown* Plaintiffs' Subpoena (Sept. 20, 2021).
[71] Hochman ¶ 308.

browser in private browsing mode.[72] Similarly, when Google receives the Data At Issue through its web-services from a Chrome browser the data does not arrive with an explicit signal designating it as coming from a browser in private browsing mode.[73]

### C. Opinion 3: Mr. Hochman's Opinions On "Private Browsing Profiles," Server-Side Processes, And Data Joinability (# 10, 18, 19, 20) Are Inaccurate

77. I disagree with Mr. Hochman's opinions that: (1) "Google, throughout the class period, created detailed profiles … based on the private browsing information it collected" (Hochman # 10);[74] (2) private browsing information could be linked to information tied to the same user's Google account (Hochman # 18) and the same user's account with non-Google websites (Hochman # 19), but for Google's deletion of the data (Hochman # 20).

#### 1. Orphaned And Unidentified Interest Segments Are Not Cradle-To-Grave Profiles

78. I understand that Plaintiffs in this case have alleged that "[b]y tracking, collecting and intercepting users' (including Plaintiffs' and Class members') personal communications indiscriminately—regardless of whether users attempted to avoid such tracking pursuant to Google's instructions—Google has gained a complete, cradle-to-grave profile of users."[75] This is incorrect. "Cradle-to-grave" means "from the beginning to end of life."[76] Given the brief and isolated nature of the Data At Issue, it clearly does not meet this definition. Indeed, Mr. Hochman's report concedes, at various points, that Google does not in fact combine data from regular browsing with the Data At Issue to create the "cradle-to-grave" profile Plaintiffs

---

[72] *See infra* § III.H. for my rebuttal regarding Mr. Hochman's opinion that the maybe_Chrome_incognito boolean field reliably detects Incognito mode.
[73] *Id.*
[74] Hochman ¶ 11.
[75] Complaint ¶ 93.
[76] Merriam-Websters.com Dictionary, ""From (the) cradle to (the) grave." https://www.merriam-webster.com/dictionary/from%20%28the%29%20cradle%20to%20%28the%29%20grave (last visited June 6, 2022).

have alleged.[77] Mr. Hochman does not show that the information contained in these profiles, which he concedes are limited to discrete Incognito browsing sessions, is combined with a user's signed-in or signed-out profile consisting of information from browsing that takes place outside of Incognito mode (or outside of other browsers' private browsing modes).[78] Notably, Mr. Hochman has used Chrome's Incognito mode in the past in other litigation to highlight this profile separation, while criticizing other experts for failing to do so.[79]

79. Mr. Hochman cites to DBL[REDACTED] data associated with Biscotti IDs extracted from IDE cookies or mapped from PPIDs provided by the named Plaintiffs to claim that Google maintains detailed user profiles.[80] But as the DBL[REDACTED] data shows, the purported "profiles" are inferred interest segments keyed to pseudonymous identifiers unique to each discrete private browsing session or unique to the website publisher. Mr. Hochman opines that "[t]here may be several Google user profiles associated with a user, including GAIA-keyed user data and Biscotti-keyed user data."[81] It is true that there may be multiple so-called user profiles

---

[77] *See, e.g.*, Hochman ¶ 181 ("during the time-span of one incognito session personalization can happen based on the activities happening in that incognito session" (quoting Mardini Nov. 24, 2021 Tr. [294:4-8])); ¶ 187 ("[F]or purposes of Chrome Incognito, cookies such as Biscotti are specific to a particular session").

[78] *See, e.g.*, Hochman ¶ 176 (stating that "[t]he stored user profile information from Incognito sessions contains similar content as user profile information from non-Incognito sessions based on my review of Plaintiffs' data" without contending that these profiles are linked or contain the same information).

[79] *See, e.g.*, Declaration of Jonathan E. Hochman, *Telebrands Corp., v. Tinnus Enterprises, LLC*, Case No. PGR2015-00018 (USPTO 2015) ¶ 27 ("Amazon personalizes search results. In testing, I used the incognito feature of the Chrome browser to hide my identity from Amazon so that they would not personalize my search results based on my past search history."); Expert Report of Jonathan E. Hochman, *Rockwood Select Asset Fund XI, (6)-1, LLC v. Devine, Millimet & Branch, P.A.*, Case No. 1:14-cv-00303-LM, 2016 WL 4260622 (D.N.H. Jan. 29, 2016) at ¶ 8 ("Google personalizes search results based on a user's location and past search history. Mr. Levine's report does not indicate that he took any steps (such as using a Chrome Incognito window) to limit the personalization of the search results that he found.").

[80] Hochman ¶¶ 174-75, Appendix H.

[81] Hochman ¶ 169 ("There may be several Google user profiles associated with a user, including GAIA-keyed user data and Biscotti-keyed user data.").

associated with the browsing activities of one user, but Google does not link these so-called profiles or re-identify any user from the pseudonymous private browsing data stored in an orphaned state. Simply put, it is my opinion that Google stores information keyed to pseudonymous identifiers unique to each private browsing session or unique to the website publisher subject to Google's data retention policy, and it does not maintain anything remotely resembling a cradle-to-grave profile of private browsing data for an individual user.

80. For example, Mr. Hochman states in Appendix H that "from the '2022-03-14 Brown v. Google - DBL [REDACTED] – AEO' production, [REDACTED] contains Plaintiff Chasom Brown's Incognito user profile information associated with Biscotti ID [REDACTED]."[82] Mr. Hochman also notes that "this Biscotti ID corresponds to four Biscotti cookies," and that "[w]hile the cookie values have changed over time, the embedded uid (Biscotti ID) has not."[83] To illustrate, Mr. Hochman included the following table:[84]

| Item | Biscotti Cookie | uid | Creation Timestamp |
|---|---|---|---|
| 1 | [REDACTED] | [REDACTED] | [REDACTED] |
| 2 | [REDACTED] | [REDACTED] | [REDACTED] |
| 90 | [REDACTED] | [REDACTED] | [REDACTED] |
| 98 | [REDACTED] | [REDACTED] | [REDACTED] |

[82] *See* Hochman Appendix H ¶ 2.
[83] *Id.* ¶ 4.
[84] *Id.*

81. Mr Hochman's opinion is wrong for several reasons. *First*, Mr. Hochman suggests, but conspicuously stops short of saying, that the Data is associated with different cookie values from different private browsing sessions. It is not. As Mr. Hochman's table shows, the creation timestamp for these cookies are exactly the same: [REDACTED] which can be translated to human-readable time January 31, 2022 8:43:14 AM PT.[85] These four IDE cookies are simply re-encrypted versions of the same Biscotti ID unique to this one private browsing session.[86] Google resets the cookie value to prevent third-parties from using the IDE cookie value for tracking purposes.[87]

82. *Second*, Google also produced DBL [REDACTED] data associated with other Biscotti IDs extracted from other IDE cookies provided by Plaintiff Brown, *see, e.g.,* [REDACTED] but Mr. Hochman does not even attempt to show that Google or anyone could link these two datasets to the same user. The data proves the opposite. For example, based on the produced DBL [REDACTED] data stored in column [REDACTED] on the same day associated with the two different Biscotti IDs, the user associated with Biscotti ID [REDACTED] while the user associated with Biscotti ID [REDACTED]. In my opinion, one cannot infer from the data that these two data sets keyed to different Biscotti IDs are associated with the same user. *See* Appendix G. "Profile" Data.

[85] Epoch Converter, "Epoch & Unix Timestamp Conversion Tools" https://www.epochconverter.com/ (last visited June 6, 2022).
[86] GOOG-CABR-04206179 at -185.
[87] *Id.*

83. Further, the DBL ██ data was pulled using Biscotti IDs decrypted from IDE cookies provided to Google by Plaintiff Brown under the Special Master process, which were copied from his browser before he closed the private browsing session (when the cookies would be deleted from the browser). But for Plaintiffs' representation that these cookies were pulled from his browser while in an Incognito session, Google does not know the identity of the user, or whether the data is private browsing data.

**2. Mr. Hochman's Claims Regarding Google's Retention Policies Show That These Policies Prevent The Creation Of Such Profiles**

84. Mr. Hochman also states that "it is my opinion that Google's deletion of certain data … hinders the process of linking (or joining) a user's private browsing information to that user's Google account, and in some cases may make it impossible to do so where it would have been possible but for Google's deletion of the data."[88] As discussed *infra* at § IV.C.4, Google's retention, deletion, and anonymization of certain private browsing data aligns with best practices for data retention as outlined in CSC No. 3.[89] In my opinion, retaining data in perpetuity in order to "[aid] the process of linking (or joining) a user's private browsing information to that user's Google account," as Mr. Hochman appears to propose, would (i) conflict with CSC No. 3's guidance that "[d]ata retention must include both minimum and maximum timelines";[90] and (ii) increase the risk of fingerprinting by a bad actor. It is also my opinion that Google's deletion and anonymization of certain private browsing data undermines any claim that Google maintains "cradle-to-grave" profiles that track a user's private browsing mode activity for all time because, in addition to the session-based limitations that

---

[88] Hochman ¶ 21.

[89] "CSC No. 3" refers to Critical Security Control No. 3 from Version 8 of the Center for Internet Security's ("CIS") Critical Security Controls, which are recommendations for network security best practices issued by CIS. *See infra* § IV.C.4.

[90] Center for Internet Security, "CIS Critical Security Controls Version 8" https://www.cisecurity.org/controls/v8 (last visited June 3, 2022), at -16.

Mr. Hochman concedes, any tracking is expressly time-limited (rather than indefinite) by virtue of Google's standard retention periods.

85. Based on my experience in the industry and the documents and testimony I have reviewed in this case, it is my opinion that the "private browsing profiles" on which Mr. Hochman opines are unidentified and orphaned, and not "cradle-to-grave" profiles.

**D. Opinion 4: Mr. Hochman's Assertion That Google Used Private Browsing Information To Measure Conversions (# 14) Is Misleading**

86. Mr. Hochman contends that "Google, throughout the class period, used private browsing information to measure and model conversions" (Hochman # 14).[91] In particular, he asserts that "[t]hrough Google's server-side processes such as . . . [redacted] (linking a user's signed-out Biscotti IDs across different sessions) . . . Google creates 'a single-view of the user in all Display products' for ad targeting and measurement purposes."[92]

87. In my opinion, these assertions are misleading because they create the impression that Google maps the Biscotti ID from one of the signed-out private browsing sessions at issue in this case to the Biscotti ID from a different signed-out private browsing session at issue in this case. Based on my review of documents and deposition testimony, there is no such mapping because the private browsing Biscotti IDs in this case are never in the same cookie jar as a GAIA ID.

---

[91] Hochman ¶ 15.
[92] Hochman ¶ 184 (citing GOOG-CABR-03652751).

| No Mapping / Measurement | Mapping / Measurement Could Occur |
|---|---|
| • Biscotti ID # 2 (2483711983363751938)<br>• Zwieback ID # 2 (0x43b763007d1ff50d) | • GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158) |

88. Conversions are measured through mapping a GAIA ID to a Biscotti ID.

GOOG-CABR-03662096 at -100.

89. As Google employees have explained in sworn testimony, there is no such mapping for the Data at Issue because the relevant Biscotti cookies are never in the same cookie jar as the GAIA cookie.[93] In other words, it does not affect putative Class members.

[93] Berntson June 16, 2021 Tr. 372:14-273:10 ("Q. And I believe you testified that mapping in [REDACTED] requires a Gaia ID; is that -- is that right? A. That is correct. Q. For the dataflow that's at issue in this case where users are on their browsers, they're signed out of their Google accounts, they're in private browsing mode, would there be any mapping from Gaia to Biscotti? A. No, because when you go into private browsing mode, you start off with a completely empty cookie jar. A Biscotti is created, and if you don't sign in to Google, there's no Gaia to map that new Biscotti to. The Biscotti that is present on the non-incognito browser instance is not shared

**E. Opinion 5: Mr. Hochman's Description Of Entropy (# 18) Is Incorrect**

90. Mr. Hochman describes entropy as a "metric for user identifiability . . . measured in number of bits of data needed to uniquely identify a person."[94] He states that "[w]ith around 330 million people in the United States, 29 bits of data is more than sufficient to identify a person (2^29 = 537 million)."[95] He states that "IP address and User Agent 'carries 29.8 bits' of entropy, which is more than sufficient to uniquely identify individuals in the United States."[96]

91. In my opinion, Mr. Hochman's description is incorrect and shows a profound misunderstanding of information entropy. Computing entropy bits and interpreting them correctly requires familiarity with probability and information theory.[97] To support my opinions, I have provided a detailed technical description of the relevant theory and formulas in Appendix E. For readers without a background in probability and information theory, I explain the primary errors in Mr. Hochman's approach using general terms below.

92. ***First***, contrary to Mr. Hochman's description, entropy is not a "metric for user identifiability."[98] Entropy is a measure of the uncertainty of the outcome of a process.[99] Entropy

with the incognito browser instance so there's no way of creating that mapping from an incognito session.").

[94] Hochman ¶ 231.

[95] *Id.*

[96] Hochman ¶ 233 (citing GOOG-CABR-04635379 at -380); *see also* Hochman ¶ 231 (asserting that "Google engineers measure that IP address alone contributes to 26.5 bits of entropy" (citing GOOG-BRWN-00601937)).

[97] Patrick Billingsley, "Probability and Measure," Wiley, (3rd ed. 1995); Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014); T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006).

[98] Hochman ¶ 231.

[99] For a detailed technical explanation, *see* Appendix E. Entropy Bits and Fingerprint-ability: Formal Exposition, § V.E.2; see also T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006).

does not—and cannot be used to—establish what specific information is necessary to uniquely identify any specific person, or how many bits of data are "more than sufficient to identify a person."[100] *See infra* § V.E.2-3.

93. ***Second***, whether IP address and User Agent (IP + UA) carry 29.8 bits, or 20 bits, or 40 bits has no bearing on user identification in this case because there is no reliable mapping relating IP + UA to an individual.[101] Because an IP + UA pair: (i) may correspond to multiple devices and change dynamically, *see infra* § III.G.1, and (ii) may be shared by multiple users, *see infra* § III.G.1 and § III.J, there is no reliable mapping from an IP + UA pair to an individual. Therefore, an IP + UA pair will not reliably identify the person who is using the browser regardless of the entropy bits of the identifier. Mr. Hochman explained this basic relationship of identifier to an individual in a recent publication:

> "***An identifier by itself is meaningless and is just a code***. For example, any random combination of nine numbers very well may be a social security number, but without identifying information, there is no relevance, utility or vulnerability. . . . Identifying information alone is not overly relevant, because it simply notes the existence of a person, without any detail of that person . . . sensitive information that cannot be linked to a specific person poses no risk to privacy and is the principal [sic] that allows large databases to exist for medical research."[102]

[100] Hochman ¶ 231.

[101] *See* Appendix E, § V.E.3 for a discussion on the necessity of a reliable mapping and § V.E.7 for an example.

[102] M. Fischer, J. Hochman, and D. Boffa, "Privacy-Preserving Data Sharing for Medical Research," International Symposium on Stabilization, Safety, and Security of Distributed Systems, https://cpsc.yale.edu/sites/default/files/files/TR1558.pdf (Nov. 17–20, 2021) ("Hochman Paper") at 2-3 (emphasis added).

94. ***Third***, entropy is an average-case metric.[103] It can provide insight into a system but not individuals. This limitation of entropy was explained by Martin Thomson, Distinguished Engineer at Mozilla, in a recent post:

> "Information entropy remains useful as a means of understanding the overall utility of the information that a system provides. Understanding key statistics as part of a design is valuable. However, for entropy measures in particular, this is only useful from a perspective that seeks to reduce overall utility; ***entropy provides almost no information about the experience of individuals***."[104]

Think of information entropy as analogous to average household income in the United States. Just like the single metric of average household income does not provide useful information regarding the actual finances of any specific household, entropy can provide insight to a system but not into any individual experience in it.

### F. Opinion 6: Mr. Hochman's Assertions On Fingerprinting (# 9, 18) Are Misleading And Unfounded

95. In his Opinion 18, Mr. Hochman opines "that Google throughout the class period and across the two classes ***systematically collected and stored detailed private browsing data*** that constitutes ***what is commonly understood to be sensitive fingerprinting data***, which can be used to identify users and join data."[105] Mr. Hochman does not describe a method to distinguish "fingerprinting data" from "sensitive fingerprinting data" and, in my experience, there is no common understanding of what fingerprinting data is "sensitive." In his Opinion 9, Mr. Hochman claims that "'pseudonymous' ***cookies such as Zwieback and Biscotti*** cookies for

---

[103] Specifically, it is calculated as the average information conveyed by an outcome, averaged over all possible outcomes by weighting the information conveyed by an outcome with the likelihood of this outcome, *see* Appendix E, Equation (2) in § V.E.2 and associated discussion in § V.E.3.

[104] "Entropy and Privacy Analysis," Low Entropy, https://lowentropy.net/posts/entropy-privacy/ (last visited June 3, 2022) (emphasis added).

[105] Hochman ¶ 223 (emphasis added).

signed-out mode … in fact, ***can be linked to users through fingerprinting information Google*** collects in its logs, such as IP address, user agents, websites visited, and more).”[106]

96. In my opinion, Mr. Hochman’s assertions on fingerprinting[107] are misleading for the following reasons:

- ❖ ***First***, Mr. Hochman does not directly address whether Google is engaged in fingerprinting thereby leaving the reader with the impression that Google may be engaged in fingerprinting. *See infra* § III.F.1.
- ❖ ***Second***, Mr. Hochman fails to acknowledge that Google’s internal policies, including policies cited by Mr. Hochman, expressly prohibit fingerprinting. *See infra* § III.F.2.
- ❖ ***Third***, Mr. Hochman fails to discuss or take into account the technical barriers that prevent fingerprinting. *See infra* § III.F.3.

### 1. Google Does Not Engage In Fingerprinting

97. In the context of browser communications, fingerprinting refers to the combination of various bits of information to probabilistically identify a browser. Probabilistic identification of a browser through fingerprinting is different from the deterministic

---

[106] Hochman ¶ 160 (emphasis added).

[107] In the context of browser communications, fingerprinting refers to the combination of various bits of information to probabilistically identify a browser. Probabilistic identification of a browser through fingerprinting is different from the deterministic identification of an individual through an account log-in. Actors attempting fingerprinting most commonly use network-related information such as an IP address and web browser-related information such as the type and version of the browser (*i.e.*, User Agent). Other popular sources for fingerprinting attempts include presentation-related information (font sizes and screen resolution), hardware-related information (GPU characteristics), and applications-related information (installed browser extensions). *See* P. Laperdrix, W. Rudametkin, and B. Baudry, “Beauty and the Beast: Diverting Modern Web Browsers to Build Unique Browser Fingerprints,” IEEE Symposium on Security and Privacy, San Jose CA, https://ieeexplore.ieee.org/abstract/document/7546540 (2016); Y. Cao, S. Li, and E. Wijmans, “(Cross-)Browser Fingerprinting via OS and Hardware Level Features,” NDSS, San Diego CA, https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf (2017).

identification of an individual through an account log-in. Actors attempting fingerprinting most commonly use network-related information such as an IP address and web browser-related information such as the type and version of the browser (i.e. User Agent). Other popular sources for fingerprinting attempts include presentation-related information (font sizes and screen resolution), hardware-related information (GPU characteristics), and applications-related information (installed browser extensions).[108]

98. In my opinion, Mr. Hochman's statements on fingerprinting are misleading because they create the impression that Google may be engaged in fingerprinting to identify users. Plaintiffs allege that "Google also builds its profile of users (including Plaintiffs and Class members) by 'fingerprinting' techniques."[109] Plaintiffs also allege that "Google accomplishes its surreptitious interception and data collection through means that include Google Analytics, Google 'fingerprinting' techniques, concurrent Google applications and processes on a consumer's device, and Google's Ad Manager."[110] Mr. Hochman's report does not address Plaintiffs' bold and completely unsupported assertions of fingerprinting.

99. Mr. Hochman does not show that Google actually engages in fingerprinting. Instead, he merely states that "Google *receives* a myriad of fingerprinting information."[111] There is a profound difference between engaging in fingerprinting and "receiv[ing] . . . fingerprinting information." The former requires a recipient of "fingerprinting information" to use such

---

[108] *See* P. Laperdrix, W. Rudametkin, and B. Baudry, "Beauty and the Beast: Diverting Modern Web Browsers to Build Unique Browser Fingerprints," IEEE Symposium on Security and Privacy, San Jose CA, https://ieeexplore.ieee.org/abstract/document/7546540 (2016); Y. Cao, S. Li, and E. Wijmans, "(Cross-)Browser Fingerprinting via OS and Hardware Level Features," NDSS, San Diego CA, https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf (2017).

[109] Complaint ¶ 100.

[110] *Id.* ¶ 8.

[111] Hochman ¶ 107 (emphasis added).

information to attempt to probabilistically identify a particular user or device. In my opinion, Google does not engage in fingerprinting as Plaintiffs allege in their complaint,[112] and Mr. Hochman's failure to directly address whether Google engages in fingerprinting is misleading.

**2. Google's Internal Policies Expressly Prohibit Fingerprinting**

100. Mr. Hochman fails to acknowledge that Google has long-standing internal policies that expressly prohibit Googlers from engaging in (i) the fingerprinting that Plaintiffs alleged and (ii) the fingerprinting that Mr. Hochman is proposing Google engages in an attempt to identify class members. *See infra* § III.G.1.

101. Google has a number of policies and guidelines concerning the collection, storage, usage and deletion of data. These policies and guidelines include, for example:

- the Device/App/Browser Fingerprinting and Immutable Identifiers Policy;[113]
- the User Data Access Policy;[114] and
- the User Data Retention and Deletion Policy.[115]

102. Google's internal policies expressly prohibit fingerprinting unless it is to prevent spam, abuse, fraud, or other such user-beneficial usages completely unrelated to Plaintiffs'

[112] Complaint ¶¶ 8, 100.
[113] GOOG-BRWN-00029326.
[114] GOOG-CABR-05455683.
[115] GOOG-CABR-00073922.

allegations.[116] Additionally, Google identified requests for exceptions to Google's fingerprinting policies described in Google's Initial and Supplemental Responses and Objections to Plaintiffs' Interrogatory No. 17.[117] These exceptions are completely unrelated to Plaintiffs' allegations that Google "builds its profile of users (including Plaintiffs and Class members) by 'fingerprinting' techniques."[118] Last, Google's strict enforcement of this policy was confirmed by every deposed Google employee or former employee who Plaintiffs asked about Google's fingerprinting policy.[119]

---

[116] *See* GOOG-CABR-04720562, at -563; GOOG-CABR-00073873, at -873 [redacted] GOOG-BRWN-00029433, at -435 [redacted] GOOG-CABR-00086797, at -797 [redacted]

[117] *See* Google's Supplemental Objections and Responses to Plaintiffs' Interrogatories (No. 17), at 4 ("In the context of web browsing on non-Google websites, exceptions to Google's anti-fingerprinting policy have been requested for (i) analyzing entropy in Javascript APIs as part of 'efforts at throttling browser fingerprinting on the web' . . . ; and (ii) analyzing certain ad blocker features.").

[118] Complaint ¶ 100.

[119] *See, e.g.*, McClelland Tr. 279:3-11 ("Q. Google also prohibits fingerprinting users for the purpose of associating their activity over time or across contexts, is that right? . . . A. Yes, that is my understanding, that fingerprinting was also not allowed to be used."); *id.* at 303:10-304:3 ("Q. Based on your work as product lead for Chrome browser privacy, would you agree that Google identifies users with fingerprinting techniques? A. I know that it was not allowed by policy and I never saw any evidence of it happening either. Q. Does Google use fingerprinting to identify users and personalize advertising, to your knowledge? A. I believe there may be some legitimate uses for fingerprinting around anti-fraud with sign-in, but understanding, again, is that it's not used for ad targeting and, again, I never saw any evidence to counter that."); Adkins Apr. 14, 2021 Tr. 188:5-10 ("[T]he Google services do not use any combination of identifiers to try to uniquely identify users, other than the Google logged in cookie and so, therefore, it's impossible because we don't conduct -- that's against our privacy policy."); *id.* at 314:2-8 ("[N]ot only is the practice discouraged or forbidden, but I am aware of there are active measures taken to prevent teams from being able to do fingerprinting within Google, so that it's not accidentally done, so fingerprinting is not accidentally done."); Bindra Feb. 8, 2022 Tr. 123:1-3 ("Q. So Google does not engage in fingerprinting; is that what you're saying? A. Correct."); Halavati Jan. 18, 2022 Tr. 151:2-5 ("Google has . . . strong regulations against

**3. Google's System Architecture Supports Google's Anti-Fingerprinting Policy**

103. Google has implemented a server architecture referred to as the [REDACTED] [REDACTED],[120] which is a single service that handles all raw user identity and privacy signals (in order to, *inter alia*, reduce the risk of re-identification of pseudonymous data[121]), enabling the rest of the Display Ads stack to become user identifier-agnostic.

104. Because only [REDACTED] has access to sensitive information that is required to engage in the fingerprinting that Plaintiffs allege in their complaint, this architecture reduces the risk of mistaken violations of the anti-fingerprinting policy, and makes it hard for a bad actor (*i.e.*, a rogue employee) to fingerprint.

---

fingerprinting and all -- all user identifiable data that is collected should be by direct user consent or signing into a Google account."); Monsees Apr. 9, 2021 Tr. 314:23-315:3 ("Q. So why is it Google's policy that you must not fingerprint users for the purpose of associating a user's activity over time or across contexts tracking? A. That would violate our policies and, I think, statements to our users and regulators."); Shelton Mar. 2, 2022 Tr. 141:10-16 ("Q. When you were working at Google, to your knowledge, was Google engaged in fingerprinting? . . . [A.] I'm not aware of Google doing what I have characterized here as fingerprinting.").

[120] GOOG-BRWN-00160342; GOOG-CABR-04715843.

[121] GOOG-CABR-00058557, at -585-586; GOOG-CABR-00058926, at -963.

105. ██ uses encryption to ensure that GAIA and Biscotti-keyed data is segregated:[122]

106. The encryption keys for GAIA and Biscottis stored in these logs are stored separately, which reduces the risk of re-identification of unauthenticated data.[123]

107. ██ processing takes place "offline," which refers to automated processes that occur without direct human involvement.[124] This further reduces the risk of joining of signed-in

[122] GOOG-CABR-05466323, at -333; *see also* Berntson June 16, 2021 Tr. 121:13-122:9 ("[W]hat ██ does is it extracts all user identifiers, device identifiers, et cetera, and it partitions them, so that within a given ad request you -- you really are only going to be able to use one identifier, and all the downstream systems have sort of additional combinations of identifiers made unavailable. And we designed this system because we have a number of internal policies at Google that say you can't reidentify users, you can't combine logged-in users and non-logged-in users, and that goes with what we call a data minimization philosophy that we design our systems very explicitly to make available only the information that's necessary to run the business, because at the end of the day, we believe it's important to protect user privacy.").

[123] Berntson June 16, 2021 Tr. 121:10-122:9.

[124] *Id.* at 126:4-11; GOOG-CABR-03841628; GOOG-CABR-04721001.

and signed-out data by, for example, preventing engineers working on [REDACTED] from directly accessing the data that [REDACTED] processes.

108. Based on my experience in the industry and the reports, documents and testimony I have reviewed in this case, I have not seen *any* evidence of Google engaging in fingerprinting. In my opinion, Google's policies prohibit and practices prevent it from engaging in the fingerprinting Plaintiffs alleged and Mr. Hochman is proposing Google use to identify Class I. My conclusion is consistent with Google's anti-fingerprinting policies and testimony from Google employees (discussed above at ¶¶ 100-102). Certainly Mr. Hochman has not pointed to any evidence that Google engages in fingerprinting.

### G. Opinion 7: Mr. Hochman's Proposal To Identify Class I (Chrome Class) (# 22) Is Unreasonable and Unreliable

109. Mr. Hochman's proposal to identify class members for Class I (Chrome Class)[125] consists of the following steps:

a. Query Google's logs to "find instances of users browsing within Incognito on [a] non-Google website while signed out of Google."[126]

b. Extract information (IP Address, User Agent, PPID, Analytics User ID, UMA ID) from log data associated with a user browsing within Incognito on a non-Google website.[127]

c. Run the extracted information (IP Address, User Agent, PPID, Analytics User ID, UMA ID) over logs that are written when a user is signed in to Google.[128]

---

[125] Complaint ¶ 192 ("All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such a browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the 'Class Period').").

[126] Hochman ¶ 288.

[127] Hochman ¶ 293.

[128] *Id*.

d. If the extracted information (IP Address, User Agent, PPID, Analytics User ID, UMA ID) from step b exists in logs associated with Google Accounts, then pull the associated account information and include the account holder in the class.[129]

110. In my opinion, this would be a highly unreliable method for identifying class members and would result in widespread mis-identification for the following reasons:

- ***First,*** As I explain in my Opinion 2 there is no explicit signal sent from the Chrome browser to Google's web-services to detect Incognito traffic, *see supra* § III.B. As I explain in my Opinion 8, Google's web-services can not reliably detect Incognito traffic in Google's logs due to false positives associated with the "maybe_chrome_incognito" bit. *See infra* § III.H. Therefore, since the first step in Mr. Hochman's proposal to identify Class I requires the accurate detection of Incognito traffic, and Google can not reliably detect Incognito traffic, his method will not accurately identify class members.
- ***Second***, while combining IP address + User Agent can, in some cases, result in sufficiently unique information to distinguish between distinct devices, it cannot be used to reliably identify the specific device from which data was received or the individual that was browsing. And the process of trying to do so definitely cannot be replicated to identify millions of potential devices used in private browsing *and* the purported class members (composed of individuals) who did the private browsing. *See infra* § III.G.1.
- ***Third***, the pseudonymous identifiers Mr. Hochman proposes for joining logged-out Incognito traffic with the user's Google Account (*e.g.*, UMA ID, PPID, Analytics User ID, Biscotti ID) will not reliably identify class members. *See infra* § III.G.2.

[129] *Id*.

**1. Hochman's IP + UA Fingerprinting Method Will Not Work**

111. I disagree with Mr. Hochman's opinion that "an IP address, especially when combined with a user-agent string, constitutes personally identifiable information ('PII') because this data can be used to uniquely identify a user with a high probability of success."[130] The combination of IP address and User Agent that Mr. Hochman proposes for identifying class members via his proposed fingerprinting methodology is not sufficiently unique to identify class members because there are many situations where more than one user will have an identical IP address and user agent. Specifically, I will explain that neither the IP address, nor the User Agent, nor their combination is a reliable method to identify class members because there is no reliable one to one mapping from IP + UA to an individual class member.

***a. IP Addresses Are Neither Unique Nor Static***

112. An IPv4 address is a set of four numbers, each ranging from 0 to 255, assigned to an internet-connected device or devices. Each address consists of 32 bits, yielding a total of 2^32 possible addresses. With the increase of the number of devices per person and the people using the Internet, these IP addresses were not enough and a newer version of the IP protocol, IPv6, defined new IP addresses each consisting of 128 bits. Adoption of IPv6 worldwide is still less than 40 percent and currently at 46.74 percent in US,[131] and thus at least 50 percent of the IP addresses in the US are IPv4 addresses. Unless otherwise stated, I use the term IP address to refer to both IPv4 and 1Pv6 addresses.

113. It is rarely the case that a device has a unique, static IP address. For example, devices inside the home of a family of four who own a total of eight devices combined will all share the same external IP address, which is then internally translated to eight distinct local IP

---

[130] Hochman ¶ 105.
[131] GoogleIPv6, https://www.google.com/intl/en/ipv6/statistics.html (last visited June 3, 2022).

addresses using the so-called NAT (Network Address Translation) protocol.[132] There is no way to tell which of the eight devices is the one that accesses a website, if all one has as an identifier is the external IP address of the device.

114. As another example, employees of a large company who are working from home are connected to their company via what is called a VPN (Virtual Private Network). For the vast majority of VPN services, if any of these employees access a website, the external IP address will be the same for each employee and will equal the IP address of the VPN server.[133] Again, there is no way to know which of the hundreds of potential devices connected to the VPN server is the one that accessed the website, if the only identifier is the external IP address.

115. As one more example, consider a company which assigns dynamic rather than static IP addresses to devices inside the company's network, using the so-called DHCP (Dynamic Host Configuration) Protocol.[134] Note that due to the flexibility of DHCP over static IP addresses, it is the preferred method to assign IP addresses to end-user devices across large organizations.[135] Identifying a device by its IP address when DHCP is used is very unreliable because one cannot know for sure which device has a specific dynamic IP among the possible set of IP addresses at any given time, since the assignment of IP addresses to devices changes dynamically. For example, in a company with 200 devices and 256 IP addresses, any device

[132] J.F. Kurose & K.W. Ross, *Computer Networking: A Top-Down Approach*, Ch. 4 (8th ed. 2020).

[133] Some VPN service providers offer, for an additional cost, the option of a dedicated IP address. In this case, the client IP address will still be hidden, but the client's internet traffic will not show the shared VPN server IP address but rather this dedicated IP address. *See, e.g.*, NordVPN, https://nordvpn.com/features/dedicated-ip/ (last visited June 3, 2022). This feature does not target institutional clients of VPN services like employers, but rather individual clients who want to avoid the so-called "bad neighbor" effect.

[134] J.F. Kurose & K.W. Ross, *Computer Networking: A Top-Down Approach* Ch. 4 (8th ed. 2020).

[135] Microsoft, "Dynamic Host Configuration Protocol (DHCP)," https://perma.cc/7N5L-QKCQ (July 29, 2021); J.F. Kurose & K.W. Ross, *Computer Networking: A Top-Down Approach* Ch. 4 (8th ed. 2020).

may have any of the 256 IP addresses at any given time. There is no way to know for sure which of the 200 devices is the one that accesses a website, if the only identifier is the external IP address of the device that accesses the website.

116. One more reason why a device may not have a unique, static IP address is the use of Onion Routing, known to most as Tor.[136] Tor directs internet traffic through an overlay network consisting of thousands of relays and uses a series of layered nodes to hide the IP address of a device. In practice, a device that uses Tor to access a website cannot be identified by the observed IP address, which is the IP address of the so-called exit node.

117. Because the number of possible IPv6 addresses is so vast, there is a misconception that an IPv6 address always identifies a single device. This is a gross misconception. First, VPN services that support IPv6, hide both IPv4 and IPv6 device addresses in a seamless fashion.[137] Second, IPv6 NAT products (*see*, for example, IPv6 NAT functionality within Junos OS of Juniper Networks) not only support address translation between IPv4 and IPv6 addresses, but also between IPv6 hosts. In particular, NAT between IPv6 hosts is done in a similar manner as IPv4 NAT, and, in this case, a single, public IPv6 address may correspond to a large number of private IPv6 addresses. In addition, to address privacy concerns with dynamic IPv6 addresses assigned by DHCPv6, privacy extensions allow clients to use random lower 64bit IIDs.[138] For the upper 64bit IID, providers employ prefix rotation via what is known as temporary mode DHCPv6,[139] made possible thanks to the sheer number of IPv6 addresses which

---

[136] Tor Project, https://www.torproject.org/about/history/ (last visited June 3, 2022).

[137] NordVPN, https://nordvpn.com/features/hide-ip/ (last visited June 3, 2022); Surfshark, https://surfshark.com/use-cases (last visited June 3, 2022).

[138] T. Narten, R. Draves, and S. Krishnan, "Privacy Extensions for Stateless Address Autoconfiguration in IPv6," RFC 4941 (Draft Standard), https://www.rfc-editor.org/rfc/pdfrfc/rfc4941.txt.pdf (Sept. 2007).

[139] Tomek Mrugalski, et al., "Dynamic Host Configuration Protocol for IPv6 (DHCPv6)," RFC 8415 (Proposed Standard), https://www.rfc-editor.org/rfc/pdfrfc/rfc8415.txt.pdf (Nov. 2018).

has resulted in single residential customers often having more IPv6 addresses assigned than the entire IPv4 address space.[140] The combined result of the above random selection of IPv6 address bits, together with the large IPv6 address space, has resulted in many IPv6 addresses being used only once, *see*, for example, data from a large CDN[141] which found that more than 90 percent of IPv6 addresses appear only once in a long-running data collection campaign.[142] Last, Tor has recently added support for IPv6 addresses.[143]

118. Additionally, Google applies [redacted]

[140] E. Rye, R. Beverly, and K. Claffy, "Follow the Scent: Defeating IPv6 Prefix Rotation Privacy," Proceedings of ACM Internet Measurement Conference (IMC), https://arxiv.org/pdf/2102.00542.pdf (Nov. 2-4, 2021).
[141] D. Plonka and A. Berger, "Temporal and Spatial Classification of Active IPv6 Addresses," Proceedings of ACM Internet Measurement Conference (IMC), https://www.akamai.com/site/en/documents/research-paper/temporal-and-spatial-classification-of-active-ipv6-addresses-technical-publication.pdf (Oct. 28-30, 2015).
[142] While the use of one-time IPv6 addresses is prevalent among non-mobile devices, cellular providers may assign static IPv6 addresses to their clients.
[143] The State of IPv6 support on the Tor Network, https://blog.torproject.org/state-of-ipv6-support-tor-network/ (last visited June 3, 2022).
[144] GOOG-BRWN-00029002, at -002.

119. Mr. Hochman does not account for this IP address redaction process. And in my opinion, it makes IP addresses even less suitable for joining authenticated and unauthenticated data via Mr. Hochman's proposed fingerprinting methodology because IP addresses are even less identifiable when the lower 8 bits from IPv4 and the lower 80 bits from IPv6 are removed.

120. That an IP address cannot reliably identify a device due to the widespread adoption of NAT, VPN and DHCP is also evident by analyzing data Google produced under the Special Master process. Out of the 4,945 distinct IP addresses, there are 159 that have multiple GAIAs associated with them, and three of these IP addresses, specifically 172.58.30.176, 72.58.27.240, and 172.58.110.200, have multiple GAIAs that correspond to *more than one* plaintiff.[145] In other words, Plaintiffs' own data which correspond to five different individuals who presumably do not share the same household (hence they would not live on the same hose behind a NAT) and presumably do not work for the same company (hence they would not be

[145] *See* Appendix F, IP Address + User Agent Data Analysis .

behind the same VPN or served by the same DHCP server), *show common IP addresses for two different Plaintiffs*.

***b. User Agent Strings Are Neither Unique Nor Static***

121. A User Agent string (UA) contains information about the type of the browser (e.g. Chrome, Edge, Mozilla, Safari), the version of the browser, and the operating system over which the browser is running (e.g. Windows, macOS, iOS, Linux).[146] It is used to identify the type and version of the browser and the operating system such that the behavior and content of web browsing can be customized accordingly. It should be evident even to a layman that millions of users share the same UA. What is more, it should be equally evident that some UAs are more common than others, for example, recent versions of popular web browsers running on top of popular operating systems are very common across devices. In fact, a recent study, which collected UAs from an Internet measurement company over the course of two years, found that the top 10 most popular UAs correspond to 26 percent of daily traffic.[147] With about 50 billion total HTTP requests per day in the collected data, this implies that more than one billion daily HTTP requests correspond to the same UA.[148] If a device makes on average 10-100 HTTP requests during a day, this would imply that tens of millions of devices from which data have been collected share the same UA.

122. The fact that a UA is usually shared by many devices is also evident by merely looking into the data submitted by the Plaintiffs. Out of the 1,237 unique UAs across all HTTP

---

[146] MDN Plus, "User-Agent," https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent (last visited June 3, 2022); Chrome Developers, "User-Agent Strings," https://developer.chrome.com/docs/multidevice/user-agent/ (updated Nov. 9, 2021).

[147] J. Kline, P. Barford, A. Cahn, and G. Sommers, "On the structure and characteristics of user agent strings", ACM Sigcomm, https://conferences.sigcomm.org/imc/2017/papers/imc17-final253.pdf (Nov. 1-3, 2017).

[148] 26 percent of the 50B HTTP requests is more than 12.5B HTTP requests. Hence, on average, each of the 10 most popular UAs corresponds to more than 1.25B HTTP requests.

requests of the five Plaintiffs, 113 of these UAs have multiple GAIAs associated with them, and, more telling, 73 of these UAs are *common* among multiple Plaintiffs. For example, three of these UAs are common among four out of the five Plaintiffs, namely "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/95.0.4638.69 Safari/537.36,gzip(gfe)" and "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.45 Safari/537.36,gzip(gfe)," and "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.102 Safari/537.36,gzip(gfe),gzip(gfe)."[149] As another example from the data shared by the Plaintiffs, Mr. Hochman's Appendix H contains 17 data entries corresponding to the five Plaintiffs, and even in this small data set of merely 17 entries of five people, three (60 percent) of them share the same UA.[150]

123. Additionally, as Mr. Hochman has recognized in public statements, UA is not static and can be changed by the user via the use of, *e.g.*, a "user agent switcher" plugin.[151] Mr. Hochman does not account for the ability of users to change their UA through the use of such tools. In situations where an IP address is shared by multiple users, the use of such tools could lead to false positives and render Mr. Hochman's proposed class member identification methodology over-inclusive. Consider, for example, a shared Wifi connection where one user changes his or her user agent (the "Switcher") to a user agent string that matches another user

---

[149] *See* Appendix F. IP Address + User Agent Data Analysis .

[150] *See* Hochman Appendix H ¶¶ 13, 27, 31 (Plaintiffs Brown, Byatt, and Davis share the same UA: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/97.0.4692.99 Safari/537.36").

[151] Twitter, https://twitter.com/Jehochman/status/1153277584542711808 (last visited June 3, 2022) (citing Lawrence Abrams, "How to Switch Back to the Old Twitter Layout," Bleeping Computer, https://www.bleepingcomputer.com/news/technology/how-to-switch-back-to-the-old-twitter-layout/ (July 16, 2019)) ("A method that continues to work is to change the browser's user agent string to the one used by Internet Explorer 11 when using Twitter. As Twitter's new layout does not support Internet Explorer 11, they switch you to [the old] layout.").

connected to the same Wifi who has never used private browsing mode (the "Regular Browsing User"). The IP address and user agent of the Switcher using private browsing mode would match the IP address and user agent of the Regular Browsing User, which could lead to the Regular Browsing User's (incorrect) inclusion in the class because searching for the Switcher's IP address and user agent will return results for the Regular Browsing User.

#### *c. The Combination Of An IP Address And A User Agent String Is Neither Unique Nor Static*

124. Mr. Hochman argues that the combination of an IP address and the UA may be used to identify class members. However, this method is unreliable. First, it is evident that devices which have the same IP address may also have the same UA. As a matter of fact, it is more likely for two devices to have the same UA when they have the same IP address, than when they do not. To see this, consider, for example, a virtual private network (VPN) used by a business organization for 100 remote workers.[152] All devices connected to the VPN will show an identical external IP address. Because IT departments often maintain and upgrade company devices in batches, browser types and versions as well as operating systems will likely match

[152] VPNs are also used by individual users for a number of reasons, including to specifically mask a device's IP address in order to access content or services that are not available in the state or country where a device is physically located. *See, e.g.*, Arjun Ruparelia, "Best DraftKings Sportsbook VPN in 2022: Unblock DraftKings From Anywhere With a VPN," Cloudwards, https://www.cloudwards.net/draftkings-sportsbook-vpn/ (Apr. 27, 2022) ("Planning a quick trip to a state where DraftKings is inaccessible? You'll need a DraftKings Sportsbook VPN to get your daily dose of sports betting. If you're confused about which VPN to choose, we give you the five best ones that can access DraftKings from anywhere."); Osman Husain, "How to watch ESPN anywhere with a VPN," Comparitech, https://www.comparitech.com/blog/vpn-privacy/best-vpn-espn/ (Jan. 19, 2022) ("Unfortunately, ESPN isn't available everywhere. This can cause problems, for instance, if you're trying to watch your favorite team play while on vacation abroad (outside of the US). Even assuming you can stream ESPN where you are, there's a good chance that some sports are subject to regional restrictions (sometimes called blackouts) . . . On the plus side, it's fairly easy to stream ESPN live online with the right VPN. Short for Virtual Private Network, a VPN connection masks your real location so that you can browse safely and regain access to your usual services while traveling.").

across company devices, resulting in the same UA. Therefore, assuming the organization provides its employees with identical laptops with Chrome (or any other browser) as the default browser (and automatic updates enabled), the user agent and IP address will be identical for all 100 employees' laptops.

125. Consider, as another example, a wifi connection on a commercial passenger jet. If the wifi is configured to use one external public IP address with NAT configured to translate all local IP addresses to that same public IP address, then everyone using the jet's wifi router will have the same IP address. If for example, there are 100 passengers connected to the same router, and ten of them are using the most recent version of the Safari browser on the same model of iPhone,[153] all ten of those users will have an identical user agent and IP address.

126. Because IT departments often maintain and upgrade company devices in batches, browser types and versions as well as operating systems will likely match across company devices, resulting in the same UA. With potentially thousands of devices sharing a single VPN IP address,[154] hundreds of millions of devices connecting to the Internet via a VPN services in

---

[153] This scenario is not implausible in light of (i) the popularity of certain models of handheld devices, *see* M.. Levin and J. Lowitz, "iPhone 13 Models Have Biggest Share in Years," Consumer Intelligence Research Partners LLC, https://files.constantcontact.com/150f9af2201/06eda1e6-cb00-4462-836f-73aa0120e439.pdf?rdr=true (Apr. 21, 2022) ("Among all individual models, the iPhone 13 had the largest [market] share of any single model [in Q1 2022], with 38%, which was the largest share for any single model in many quarters. In the year-ago March 2021 quarter, the year-old iPhone 11 had the largest share, at 24%, while the iPhone 12, comparable to the current iPhone 13, had 22% of sales. The iPhone 13 share of 38% in this quarter nearly doubles last year's iPhone 12 share."); and (ii) broad enabling of automatic updates on such devices, *see* S. O'Dea, "App-updating habits of smartphone users in the United States 2016," Statista, https://www.statista.com/statistics/747569/united-states-survey-smartphone-users-app-update-frequency/#statisticContainer (Feb. 28, 2020) (2016 survey results showing 32 percent of users enabled automatic updates on their smartphone).

[154] There is no limit on how many connections may be served under the same VPN IP address, as VPN services use load-balancing among multiple servers clustered together to scale the number of supported connections. *See, e.g.*, Microsoft, "High Availability," https://docs.microsoft.com/en-us/windows-server/remote/remote-access/vpn/always-on-vpn/deploy/always-on-vpn-adv-options#high-availability (last visited June 3, 2022).

the United States,[155] and within the general population of users/devices, the 10 most popular UAs corresponding to at least a quarter of the total traffic/devices,[156] it is evident that the combination of an IP address and a UA is not unique since it may correspond to many different users. Moreover, since IP addresses are not static, for example, due to DHCP, and UAs are not static either, for example, because every browser update will change the UA, the combination of an IP address and a UA is not static either. For these reasons, the combination of an IP address and a UA cannot reliably identify devices, much less class members.

127. In sum, neither IPv4 nor IPv6 addresses can be used on their own right to consistently identify devices with high enough probability of success to reliably identify class members, and, for the reasons explained above, neither type of IP address in combination with UA may be used to reliably identify class members.

**2. Pseudonymous IDs Can Not Be Used To Reliably Identify Individuals**

128. The second step in Mr. Hochman's proposal is to extract information (IP Address, User Agent, PPID, Analytics User ID, UMA ID) from log data associated with a user browsing within Incognito on a non-Google website. I disagree with his opinion that these can be used to identify individuals, and I take each in turn below.

***a. UMA ID***

129. Mr. Hochman describes the process as follows for using UMA ID:

> "Even if a user can no longer locate their UMA ID in an old device that they no longer possess or if the user factory resets a device, it is possible for Google to find a user's UMA ID by correlating the user's Gaia logs and UMA logs with search actions and timestamps. Knowing that detailed event level data are stored with timestamps, IP

[155] Aleksandar Kochovski, "The Top 25 VPN Statistics, Facts & Trends for 2022," https://www.cloudwards.net/vpn-statistics/ (Mar. 18, 2022).

[156] J. Kline, P. Barford, A. Cahn, and G. Sommers, "On the structure and characteristics of user agent strings," ACM Sigcomm, https://conferences.sigcomm.org/imc/2017/papers/imc17-final253.pdf (Nov. 1-3, 2017).

address and user agent in these logs, it is my opinion that UMA can be joined with ads event logs."[157]

130. In my opinion, UMA IDs cannot be used, either independently or in conjunction with other data, to identify individual users. As an initial matter, Google witnesses have testified that UMA data cannot be used independently to identify individual users.[158] This is so for a number of reasons:

a. UMA data is only sent for users who have opted into Chrome metrics, and opt-in rates vary by device type. *See, e.g.*, GOOG-CABR-00057895, at -896:

b. UMA data regarding Incognito usage is an approximation obtained via sampling (*i.e.*, an approximation of the total rate of Incognito usage extrapolated from a

---

[157] Hochman ¶ 258 (citing GOOG-CABR-00430662).

[158] *See* Apr. 21, 2022 Hrg. Tr. 204:4-6 (Ms. Sadowski: "UMA is very privacy preserving, which is why it's the data set we use and we still track metrics even in Incognito mode."); *id.* at 204:11-12 ("Q. Can UMA data be used to identify individual users? A. No. So UMA data is keyed by a Client ID, which roughly corresponds to a Chrome install. So you could have one user, like for example, myself, I have two different versions of Chrome running on my laptop, a Canary version, like an early version that might be buggy, and then the main, normal Chrome version. I also have a version of Chrome running on my phone, and all of those will have different ID's associated with the same person, me. You could also have multiple people using the same Chrome install and have the same Client ID associated with multiple people.").

subset of users' UMA data), and it is not sufficiently reliable or accurate to use to identify class members.[159]

c. UMA data is designed for aggregate analysis and not for identifying specific users.[160]

d. UMA data is not joined with authenticated identifiers.[161]

---

[159] *See* GOOG-CABR-00057895, at -895 ("[E]xtrapolating [UMA metrics across all users] should only be used to give a ballpark estimate, as there are subtle biases in the UMA/UKM populations."); GOOG-CABR-00057779, at -779 ("UMA data is only collected for users who have UMA enabled. This is controlled by a checkbox presented at installation, and through advanced Settings. After M55, UMA became opt-out on all platforms for new users, and Stable channel of Android and Windows Chrome further reduce the population, by randomly sampling a subset of clients.").

[160] *See* Monsees Apr. 9, 2021 Tr. 212:10-16 ("[T]he user metrics analysis, my understanding is that for a signal like Chrome sync, which is a feature, right, within the -- the Chrome app itself, a [verbatim] engineer could configure UMA to say, 'Pull me some aggregate statistics so I know how many Chrome device installs have sync enabled.'"); Svitkine Oct. 4, 2021 Tr. 159:15-17 ("UMA is not meant to compare like two specific Chrome instances. It is meant to look at aggregated data across many, many instances.").

[161] *See* Svitkine Tr. 44:20-22 ("[T]ak[ing] the existing UMA data and somehow join[ing] it with Gaia . . . there's many reasons why that can't be done."); *id.* at 53:5-10 ("To be clear, the UMA system is not associated with a specific Gaia account with a specific user account in Chrome. It is a separate system that, as we previously discussed, cannot be joined with a user's e-mail address or their Gaia ID."); Apr. 21, 2022 Hrg. Tr. 205:3-5 ("205:3-5 (Ms. Sadowski: "There isn't a way to directly join UMA data with Google account information. We do not have a mapping from UMA Client ID's to Google user names."); *id.* at 205:23-25 ("Q. In your understanding as a Chrome engineer, can these bits found in these identified search logs be mapped to UMA data? A. No, they cannot."); *id.* at 208:24-25 ("There's no key that you can join UMA with another data set that is a . . . User ID based data set."); *see also* GOOG-CABR-00057918, at -918 ("[T]he primary metrics data sources for Chrome usage statistics (UMA and UKM) are not keyed by Gaia ID, and so are not joinable with other data about specific users (e.g. data from [REDACTED]). Furthermore, these two data sources are not joinable with each other. If we started keying UMA by Gaia ID, then the metrics would no longer be 'anonymous', which could mean that all previously acquired user consents for its collection would be invalid . . . This restriction means that anyone wanting to perform an analysis which joins, say, UMA data with some other data source is currently out of luck."); GOOG-CABR-00056264, at -264 ("[T]he Chrome Data team is not planning on enabling gaia-keyed logging." (emphasis in original)).

131. Nor does the process of using activity and "timestamps" in conjunction with UMA data that Mr. Hochman references work to identify class members.[162] Publicly available Chromium source code[163] describes the process by which timestamps are created:

```
// The timestamp for the event, in seconds.
// This value comes from Chromium's TimeTicks::Now(), which is an abstract
// time value that is guaranteed to always be non-decreasing (regardless of
// Daylight Saving Time or any other changes to the system clock).
// These numbers are only comparable within a session. To sequence events
// across sessions, order by the |session_id| from the
// ChromeUserMetricsExtension message.
```

132. Publicly available Chromium source code further explains that:[164]

```
// `TimeTicks` and `ThreadTicks` represent an abstract time that is most of the
// time incrementing, for use in measuring time durations. Internally, they are
// represented in microseconds. They cannot be converted to a human-readable
// time, but are guaranteed not to decrease (unlike the `Time` class). Note
// that `TimeTicks` may "stand still" (e.g., if the computer is suspended), and
// `ThreadTicks` will "stand still" whenever the thread has been de-scheduled
// by the operating system.
```

[162] Hochman ¶ 258.
[163] Chromium Code Search, "user_action_event.proto," "https://source.chromium.org/chromium/chromium/src/+/main:third_party/metrics_proto/user_action_event.proto;l=21-27?q=time_sec (last visited June 3, 2022).
[164] Chromium Code Search, "time.h," https://source.chromium.org/chromium/chromium/src/+/main:base/time/time.h;l=16-22?q=TimeTicks (last visited June 3, 2022).

133. Mr. Hochman states that "[k]nowing that detailed event level data are stored with timestamps, IP address and user agent in these logs, it is my opinion that UMA can be joined with ads event logs."[165]

134. In my opinion, the timestamps Mr. Hochman references are not recorded in a way that can facilitate joining of UMA data with ads event logs. That is because the timestamp value "comes from Chromium's TimeTicks," which publicly-available Chromium source code shows are abstract values that cannot be compared across sessions. Thus, they are not, for example, a universal GMT time record that will apply across data sources, but are instead an abstract value that "cannot be converted to a human-readable time"[166] and not joined with universal time. Therefore, in my opinion, these records are not suitable for joining UMA and ads event logs.

***b. PPID-Mapped Biscotti ID & Analytics User-ID***

135. *First*, as discussed above (¶¶ 60-64), PPIDs and Analytics User-IDs are hashed first-party IDs generated, assigned, and used by some publisher websites. Google cannot readily use PPID-Mapped Biscotti IDs or Analytics User-IDs to identify class members for a number of reasons, including: (i) they are controlled by the publisher and are provided to Google by the publishers in an encrypted form that does not contain PII; (ii) not all publishers use PPIDs or Analytics User-IDs; (iii) different publishers may provide the same hashed value for the same user.

136. *Second*, based on my review of documents and data produced in this case, the PPID-mapped Biscottis and Analytics User-IDs are only keyed to a user's activity on the

[165] Hochman ¶ 258.
[166] Chromium Code Search, "time.h," https://source.chromium.org/chromium/chromium/src/+/main:base/time/time.h;l=16-22?q=TimeTicks (last visited June 3, 2022).

specific website that has elected to use PPID or User-ID. Therefore, even if Mr. Hochman's method located the PPID-mapped Biscotti or Analytics User-ID of a purported class member, the only private browsing data associated with that ID would be from when that class member logged into the specific website that uses PPID or User-ID.

137. *Third*, Mr. Hochman also does not account for the prevalence of account-sharing in his claims regarding PPID-Mapped Biscotti IDs and Analytics User IDs. Sharing of accounts on third-party websites is a well-documented phenomenon that renders his methodology for identifying class members via PPIDs and Analytics User ID over-inclusive in certain common scenarios.[167] Consider, for example, a situation where User 1 and User 2 share a NYTimes.com account login and password in order to use features that require a user to log in to a NYTimes.com account (*e.g.*, to read articles that are protected by a paywall). Whenever User 1 or User 2 signs into NYTimes.com, the PPID will be the same for both users. If User 1 does not log in to NYTimes.com in Incognito mode, but User 2 does, then the shared PPID's presence in logs of both User 1 and User 2's activity will (incorrectly) point to User 1 as an Incognito mode user. Mr. Hochman does not account for this scenario, which is likely a common occurrence in light of the widespread prevalence of account-sharing. In my opinion, this failure would render Mr. Hochman's proposed use of PPIDs to identify class members as over-inclusive and inaccurate.

[167] *See, e.g.*, Alex Sherman, "Netflix estimates 100 million households are sharing passwords and suggests a global crackdown is coming," CNBC, https://www.cnbc.com/2022/04/19/netflix-warns-password-sharing-crackdown-is-coming.html (Apr. 20, 2022); Matt Richtel, "Young, in Love and Sharing Everything, Including a Password," N.Y. Times, https://www.nytimes.com/2012/01/18/us/teenagers-sharing-passwords-as-show-of-affection.html (Jan. 17, 2012) ("In a 2011 telephone survey, the Pew Internet and American Life Project found that 30 percent of teenagers who were regularly online had shared a password with a friend, boyfriend or girlfriend. The survey, of 770 teenagers aged 12 to 17, found that girls were almost twice as likely as boys to share. And in more than two dozen interviews, parents, students and counselors said that the practice had become widespread.").

***c. Biscotti ID***

138. Mr. Hochman proposes that "[i]f a user has signed into their Google Account in private browsing mode within the past 90 days, then Google can also retrieve the user's Biscotti IDs from GAIA logs and use those Biscotti IDs to locate the user's private browsing records while they are not signed into Google from the Biscotti logs."[168]

139. As an initial matter, a user who signs into a Google Account in private browsing mode is, by definition, outside of the scope of the proposed classes because the class is limited to users who "were not logged into their Google account."[169] Therefore, Mr. Hochman is proposing identifying users who expressly fall outside of the class in the hope that they may also have some activity that meets the class definition.

140. But Mr. Hochman's proposal will not work to identify those potential class members because the "Biscotti IDs from GAIA logs" that Mr. Hochman references will not be the same across separate private browsing mode sessions (discussed *supra* at § III.A.2). Thus, the Biscotti IDs from a "signed-in Incognito session" cannot be used to "locate the user's private browsing records" from a separate "signed-out Incognito session" because the Biscotti to which data from the two sessions is keyed will not be the same. Mr. Hochman does not explain how he would do so, and in my opinion, he cannot.

141. Additionally, Mr. Hochman's proposed methodology does not account for device or account sharing (discussed *infra* at § III.J) and suffers from the same defects identified above related to PPID and User ID (at § III.G.2).

[168] Hochman ¶ 304.
[169] Complaint ¶ 192.

### H. Opinion 8: Mr. Hochman's Opinion That The "maybe_chrome_incognito" Bit Reliably Detects Incognito Traffic (# 23) Is Incorrect

142. An important step in Mr. Hochman's proposed method is to use the maybe_chrome_incognito bit to query Google's logs to "find instances of users browsing within Incognito on [a] non-Google website while signed out of Google."[170] As explained above, the industry guideline is for private browsing mode to not be detectable by websites. Google Chrome's Incognito mode aligns with these guidelines, as Google has intentionally designed Chrome not to send an explicit signal to websites for the purpose of detecting Incognito mode.[171]

143. The ***maybe_chrome_incognito*** bit is a boolean field that relies on the absence of the X-Client-Data header to approximate and monitor traffic Google receives from Chrome instances in Incognito mode.[172] In my opinion, the absence of the X-Client-Data header cannot

---

[170] Hochman ¶ 288.

[171] *See, e.g.*, GOOG-CABR-00059864, at -864 ("Today, some sites use an unintended loophole to detect when people are browsing in Incognito Mode. Chrome's FileSystem API is disabled in Incognito Mode to avoid leaving traces of activity on someone's device. Sites can check for the availability of the FileSystem API and, if they receive an error message, determine that a private session is occurring and give the user a different experience. With the release of Chrome 76 scheduled for July 30, the behavior of the FileSystem API will be modified to remedy this method of Incognito Mode detection. Chrome will likewise work to remedy any other current or future means of Incognito Mode detection."); Adhya Tr. 188:18-21 ("Chrome does its best to make sure that -- and -- and it's a principle around all the work they do around this space to make sure servers can't detect Incognito Mode."); Barb Palser, "Protecting private browsing in Chrome," Google, https://www.blog.google/outreach-initiatives/google-news-initiative/protecting-private-browsing-chrome/ (Jul. 18, 2019) (Chrome blogpost announcement disabling FileSystem API, which was used as a loophole to detect Incognito Mode (citing W3C, "W3C TAG Observations on Private Browsing Modes," https://w3ctag.github.io/private-browsing-modes/#features-supporting-private-browsing (Apr. 9, 2020)).

[172] GOOG-CABR-04470006, at -009 ("For Chrome, we have the x-client-data header in addition as a signal. But again, this will be heuristics-based, and can never [be] 100% accurate. The goal is to keep an eye on an envelop[e] of such traffic."). Similarly, the "is_chrome_incognito" and "is_chrome_non_incognito" bits also rely on the absence of the X-Client-Data header. *See* Sadowski Tr. 76:5-16 (explaining that the value of the "is_chrome_non_incognito" bit is determined by whether an "X-Client-Data header [is] in the

be used to reliably detect Incognito traffic because there are a variety of cases in which the X-Client-Data header *is not* sent by a Chrome browser when a user is using a browser in non-Incognito mode (false positives).[173] Scenarios that can lead to false positives include the following:

a. User has opted out of Chrome experiments.[174]

b. New browser instances.[175]

c. Browser not used for 30 days or more.[176]

d. Number of variation IDs in X-Client-Data header is too large.[177]

e. Population of X-Client-Data Header is blocked by a firewall.[178]

144. Mr. Hochman contends that the false positives identified by Google witnesses "range from merely theoretical to exceedingly rare."[179] Mr. Hochman does not explain how he arrived at this conclusion or make any attempt to quantify how often these scenarios occur.[180] As

---

request that is sent" and "that is all that it looks for."); *id.* 77:20–78:2 (stating the "is_chrome_incognito" bit "is not derived through some other mechanism than presence or absence of X-Client-Data header, and suffers from the same limitations.").

[173] *See* Berntson June 16, 2021 Tr. 374:12-376:11.

[174] GOOG-BRWN-00847297, at -298 ("However, Chrome doesn't send this header in Incognito mode (privacy concern) or the user opted-out in Chrome.").

[175] Berntson June 16, 2021 Tr. 374:24-375:7 ("For the first case where there are instances where the X-Client-Data header is empty and it's not in incognito browsing, there -- there are quite a few different ways that that can happen. One is if it's a new browser instance, no X-client header is present in any call out from the browser.").

[176] *Id.* at 375:8-12 ("[I]f you haven't used your browser for 30 days or more, the X-client header data is considered to be stale and just purged and no X-Client-Data header is passed.").

[177] *Id.* at 375:13-19 ("Another case is if the variation IDs that are carried in the X-Client-Data header, if too many are returned to Chrome to prevent the requests coming from Chrome from being too large, they just delete them all and so you'd see no X-Client-Data header.").

[178] *Id.* at 375:20-376:11 ("Yet another permutation is the presence of a firewall can also prevent Chrome, the browser, from getting the variation IDs that are used to populate the X-Client-Data header, and this is because the variation IDs are basically instructions as to what new features are enabled in the browser, and so Chrome, after it starts out, will make an asynchronous call to retrieve these data from the server, and if that server endpoint is blocked by a firewall, no X-Client-Data header is provided, none of the variation IDs. So that's another case where you can have an empty X-Client-Data header.").

such, Mr. Hochman does not propose a method for accounting for false positives that would exclude false positives from the class. And as documents Google produced show, false positives based on analysis of UserAgent and the absence of the X-Client-Data header are not uncommon (and in some cases cannot be excluded):[181]

[179] Hochman Appendix G ¶ 27.

[180] As to the scenario where the X-Client-Data header is not sent because the number of variation IDs is too large, Hochman contends that Dr. Berntson testified that "when directly asked, 'how often' this occurs, he admitted that 'I have not seen this flagged as a problem.'" Hochman Appendix G ¶ 30 (citing Berntson June 16, 2021 Tr. 385:4-5). However, Dr. Berntson did not testify that this does not occur—he merely noted that it is not a "problem" that Google has attempted to resolve. *See* Berntson June 16, 2021 Tr. 388:13-18 ("I am not aware of any bugs that are currently open that are describing this as a problem. Whether it's actually a problem or not is different than whether or not it's happening.").

[181] GOOG-CABR-04470006, at -016; *see also* Berntson June 16, 2021 Tr. 373:22-376:11; GOOG-BRWN-00845673, at -674 ("There is one condition in which the header also isn't sent, which we cannot exclude: If the browser hasn't received any experiment config yet, it will not send the header. This accounts for roughly 1.5-2% of browsing.").

145. Based on my experience in the industry and review of the documents and testimony provided by Google in this case,[182] there is no way to identify and exclude the false positives in logs (and exclude logs associated with false positives from the logs used to identify the class) because the reason for false positives is not "observable from a server perspective."[183] As such, it is my opinion that the maybe_chrome_incognito field can not be used to reliably detect Incognito traffic, let alone identify purported members of Class I.

**I. Opinion 9: Mr. Hochman's Proposal To Identify Class II (# 22) Is Unreasonable And Unreliable[184]**

146. Mr. Hochman's proposal to identify class members for Class II (Non-Chrome Class)[185] consists of the following steps:

a. Identifying the email addresses of all Google account holders.[186]

b. Sending an email notification "limited to email accounts associated with people in the United States, based on Google's own records"[187] that, if

---

[182] *See*, *e.g.*, GOOG-CABR-04470006, at -009 ("For Chrome, we have the x-client-data header in addition as a signal. But again, this will be heuristics-based, and can never [be] 100% accurate. The goal is to keep an eye on an envelop[e] of such traffic."); McClelland Tr. 166:11-19 ("Q. Wouldn't the absence of the X-Client Data Header indicate a user is in Incognito mode? A. No, not necessarily. It's not a strong enough signal to be confident that the user is in Incognito mode."); Berntson June 16, 2021 Tr. 373:22-376:11.

[183] *See* Berntson June 16, 2021 Tr. 384:23-24.

[184] To the extent Mr. Hochman proposes using this methodology for identifying members of Class I (Chrome Class), I also disagree for the same reasons discussed in this section.

[185] Complaint ¶ 192 ("All non-Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using any such browser and who were (a) in "private browsing mode" on that browser, and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the "Class Period").").

[186] Hochman ¶ 296.

[187] *Id.* Mr. Hochman contends that "given the broad usage of the private browsing modes throughout the class period, it is [his] opinion that most of those people would be class members. If required, it would also be possible to use Google data to further limit email notification to accounts associated with some private browsing behavior." *Id.*

required before notification, would purportedly be limited to "accounts associated with some private browsing behavior" via Mr. Hochman's proposed fingerprinting methods.[188]

c. After notification, users who seek to become class members could "provide additional information regarding their private browsing during the class period, or those users could provide certain identifying information to be used to search for records in Google's data sources" that could purportedly "readily be used to verify whether that user was a Google Account holder during the class period and otherwise assess any response to any notifications."[189] This "additional information" provided by users would include (i) an identification of non-Google websites they visited during the class period along with any available IP address and user agent information; (ii) if the IP address and user agent are not available to the user, this would be "obtained from Google's own GAIA records" and then used to identify private browsing data via Mr. Hochman's proposed fingerprinting methodology.[190]

d. "If a user has signed into their Google Account in private browsing mode within the past 90 days, then Google can also retrieve the user's Biscotti IDs from GAIA logs and use those Biscotti IDs to locate the user's private browsing records while they are not signed into Google from the Biscotti logs."[191]

---

[188] *Id.*
[189] *Id.* ¶ 300.
[190] *Id.* ¶ 302.
[191] *Id.* ¶ 304.

e. Alternatively, tasking users with extracting cookies from the browser[192] or non-Google sign-in IDs from third party websites[193] "with the help of technology professionals" while browsing in private mode and then using those cookies or identifiers to identify private browsing data in Google logs.

f. As another alternative, configuring Google code on third party websites to provide a notification to users when they visit a page in private browsing mode.[194]

147. In my opinion, this proposed method is unreasonable, unreliable, and will result in widespread mis-identification for the following reasons:

- ***First***, sending an email notification to all Google account holders would be overly broad because, even if it were limited to account holders in the United States, that notification would be sent to many non-class members, and Mr. Hochman does not propose a methodology for limiting the notification to class members. *See infra* § III.I.1.
- ***Second***, the steps that Mr. Hochman proposes for limiting Class II to private browsing mode users "after notification" would not reliably identify users of private browsing modes on non-Chrome browsers. *See infra* § III.I.2.

**1. Mr. Hochman's Proposed Email Notification To All Google Account Holders Is Overly Broad And He Does Not Propose A Workable Methodology For Limiting The Notification To Class Members**

148. Mr. Hochman's proposed email notification is overly broad, and he does not propose a method for limiting the scope of such a notification.

---

[192] *Id.* ¶ 305.
[193] *Id.* ¶ 306.
[194] *Id.* ¶ 298.

149. *First*, the proposed first step would be overly broad because a record of all Google account holders would include many accounts associated with users, entities, and other organizations that are not members of the class (where, for example, the user or entity associated with the account never used private browsing mode in the United States to visit a site using Google web-services). Sending an email notification to all Google account holders would be overly broad because only a minority of the recipients of such a notification would be eligible for membership in the class.

150. *Second,* Mr. Hochman's proposed second step attempts to address this overbreadth by limiting the list of Google account holders to "email accounts associated with people in the United States."[195] Mr. Hochman indicates that he believes this limitation would be sufficient because "given the broad usage of the private browsing modes throughout the class period, it is [his] opinion that most of those people would be class members."[196] As such, he appears to be assuming that "most" Google account holders who have used a non-Chrome browser have used that browser in private browsing mode. But he does not provide any support for this assumption, and user research shows that (i) most users *do not* use private browsing modes;[197] and (ii) at least for Chrome, a significant portion of users are not even aware of private browsing modes' existence.[198]

151. *Third,* Mr. Hochman concedes that both of the proposed classes "are necessarily limited to individuals,"[199] and he states that the "notification could be limited to email accounts

[195] Hochman ¶ 296.
[196] *Id.*
[197] *See, e.g.*, GOOG-CABR-03751927, at -931 (only 35 percent of respondents indicated that they use private browsing mode).
[198] *See, e.g.*, GOOG-CABR-00422906, at -921 (20.3 percent of Chrome users surveyed reported that they never use Incognito mode and 11.7 percent were not even aware of Incognito mode at all).
[199] Hochman ¶ 295.

associated with people in the United States."[200] In other words, he admits that the classes are composed of individuals, rather than, *e.g.*, organizations. But documents Google has produced show that Google accounts may be associated with organizations, rather than individual users.[201] Mr. Hochman does not propose a method for excluding these accounts from Class II (by, *e.g.*, explaining how the initial list of all Google account holders would be limited to "email accounts associated with people," rather than email accounts associated with entities or organizations).

152. *Fourth,* Mr. Hochman states that "[i]f required, it would also be possible to use Google data to further limit email notification to accounts associated with some private browsing behavior,"[202] but he does not explain how he would limit the email notification in this way for Class II. In my opinion, there is no way to reliably identify users who used private browsing mode on non-Chrome browsers before notification because Google is unable to determine if browsing data received from non-Chrome browsers came from a user in private browsing mode,[203] and Mr. Hochman's proposed methodology does not explain how this could be done. To the extent he proposes that, e.g., "individuals could provide additional information regarding their private browsing during the class period, or those users could provide certain identifying information to be used to search for records in Google's data sources," he states that this step would be performed "[a]fter notification."[204]

---

[200] Id. ¶ 295.
[201] GOOG-CABR-00086881, at -882 [redacted]
[202] Hochman ¶ 296.
[203] *See* Berntson Mar. 18, 2022 Tr. 141:5-144:12; Monsees Apr. 9, 2021 Tr. 68:10-25; Monsees June 11, 2021 Tr. 452:20-454:19.
[204] Hochman ¶ 300.

### 2. Mr. Hochman's Proposed Methodology For Limiting Class II To Private Browsing Mode Users After Notification Is Unreliable

153. As to the steps that Mr. Hochman proposes for limiting Class II to private browsing mode users "after notification," these methods are also unreliable and unreasonable. For example, Mr. Hochman proposes that "individuals could provide additional information regarding their private browsing during the class period, or those users could provide certain identifying information to be used to search for records in Google's data sources."[205] As to the "additional information regarding their private browsing during the class period," Mr. Hochman proposes that potential members of Class II would identify "any non-Google websites they visited during the class period" and provide "any available IP address and user agent information." As discussed *supra* (at § III.G.1.), attempting to identify records of signed-out private browsing via the use of IP address and user agent is not reliable because (i) the combination of IP address and user agent is not sufficient to identify an individual user (and in many cases will not even identify an individual device); and (ii) this proposed fingerprinting methodology would lead to false positives in light of widespread sharing of devices. Additionally, Mr. Hochman does not propose a methodology for users to confirm the non-Google websites that they visited in private browsing mode during the class period (if any), which cannot be determined by, *e.g.*, reviewing browsing history saved on a client because such histories are deleted when a private browsing session ends (by, for example, closing the only open private browsing window).

154. Mr. Hochman further proposes that "[i]f the IP address and user agent are not available, this information may be obtained from Google's own GAIA records."[206] Google's "GAIA records" show IP addresses and UAs associated with Google Account sign-ins, which

[205] Hochman ¶ 300.
[206] Hochman ¶ 302.

could be, for example, an IP address and UA from a public library computer shared by hundreds of people. Therefore, this approach is not sufficiently reliable for the same reasons as Mr. Hochman's proposed method based on a user-supplied IP address and UA, discussed in Section III.G.1. In addition, Mr. Hochman's proposed method does not account for the many different IP addresses and user agents that may be associated with a particular GAIA. Consider, for example, the 8,965 unique IP address and UA combinations associated with the seven GAIA IDs for the five named Plaintiffs from just the retained records that do not contain third-party confidential data.[207] Mr. Hochman's proposed methodology would call for Google to search potentially billions of "orphaned" log entries for hundreds of different IP addresses and UAs for *each* Google account. And because the combination of IP address and UA is not sufficiently reliable to identify orphaned logs that correspond to the GAIA account holder, it would lead to over-inclusiveness and misidentification (where, *e.g.*, the IP address and UA from the GAIA records match the IP address and UA from logs of a *different user's* private browsing on a shared device).

155.   I understand that pursuant to the Special Master process, Plaintiffs requested searches of 19 IPv4 + User Agent pairs and eight IPv6 + UserAgent pairs.[208] The Special Master denied Plaintiffs' request for IPv4 + User Agent searches but allowed iterative searches using IPv6 + User Agent pairs, provided that Plaintiffs provide attestation that they are the only individuals who used the devices as indicated in their provided User Agent strings at the provided IPv6 addresses on a certain specific date and time.[209] Plaintiffs then provided the

---

[207] Appendix F. IP Address + User Agent Data Analysis .
[208] Consolidated 2022-04-08 3rd Round Search and Identifiers v2.
[209] Apr. 14, 2022 Special Master Hrg. Tr. 83:22-84:24 ("IP addresses are not the named plaintiffs. It's the individuals themselves that we have to map to these actions. And if we can show that, that gives us the degree of confidence that allows us to move forward to, if there's a search result with that IPv6, with that user agent string, on that date and time, and we decrypt any of the IDs that are the result of that, it's improbable that it's anybody else other than the

required attestations for three new IPv6 + User Agent pairs they claim were copied from their devices.[210] Notably, none of the three IPv6 + User Agent pairs appears in the preserved data associated with seven GAIA IDs provided by the five named Plaintiffs that I reviewed, which contains 8,965 unique IP addresses + User Agent combinations.[211] In my opinion, this indicates that Mr. Hochman's proposed IP + UA identification method is not viable.

156. Mr. Hochman also proposes using information from a user who "has signed into their Google Account in private browsing mode within the past 90 days" to "retrieve the user's Biscotti IDs from GAIA logs and use those Biscotti IDs to locate the user's private browsing records while they are not signed into Google from the Biscotti logs."[212] This proposed method would not reliably identify members of Class II for the same reasons it would not reliably identify members of Class I, which is discussed *supra* § III.G.2.c. This proposal (i) would require decrypting Biscotti IDs that are always encrypted when stored with GAIA IDs (discussed *supra* § III.A.2); and (ii) ignores the fact that each signed-out private browsing mode session will have a new Biscotti ID that will not match a Biscotti ID from a separate signed-out browsing session (and will not be stored in any GAIA logs if the user does not sign into a Google account). Because these signed-out private browsing mode Biscotti IDs will be distinct from any signed-in Biscotti IDs, it is not possible to "use those [signed-in] Biscotti IDs to locate the user's private browsing records while they are not signed into Google."[213]

---

named plaintiff. … So it's -- if we can narrow down on the IPv6s, because it's associated with the device, and show me confidence for each one of those sessions that are listed, you know, for the IP address UA -- what was that? Like about 27, 28? Yeah, that is, hey, Mr. Brown was the one doing it from that IPv6 address on this device, then we have some confidence that it's the person, not the machine.").

[210] 2022-05-09 - Plaintiff Brown Attestation; 2022-05-09 - Plaintiff Castillo Attestation; 2022-05-09 - Plaintiff Trujillo Attestation.

[211] Appendix F. IP Address + User Agent Data Analysis .

[212] Hochman ¶ 304.

[213] *Id.*

157. Alternatively, Mr. Hochman proposes that "from any private browsing session (Incognito in Chrome or private browsing mode in other browsers), a user can (with the help of technology professionals) extract cookies from their browsers in private browsing mode (e.g., Biscotti cookies, GFP cookies and _ga cookies containing Analytics CIDs)."[214] According to Mr. Hochman, "[t]hese cookies are unique to that private browsing session and can be used to identify the user's browsing activities in that session," and, "[u]pon receiving these cookies, it is possible to locate the user's private browsing data in Google logs and identify every website visited during that session that Google tracks.[215]

158. As explained above (§ III.A.2), unauthenticated identifiers set in a signed-out private browsing mode session are specific to a single session and are deleted once that session ends. In my opinion, this renders Mr. Hochman's proposal unreasonable and unreliable for a number of reasons:

a. *First*, Mr. Hochman's proposed methodology could not be used to retrieve any identifiers from private browsing mode sessions that have already ended because those identifiers have already been deleted. Instead, he proposes that users could initiate a new private browsing session under the supervision of technology professionals and then use the results of this supervised session to establish membership in the class.

*b.* *Second*, attempting to employ this methodology at scale (*i.e.*, for potentially millions of users) would not be feasible because it would require millions of individual users to each engage unspecified "technology professionals" and re-enact the testing that Mr. Hochman conducted for the named Plaintiffs.

---

[214] Hochman ¶ 305.
[215] *Id.*

159. As another alternative, Mr. Hochman proposes that "Google could require non-Google websites to provide pop-up notification whenever users visit websites for which Google will collect private browsing information."[216] In my opinion, if Google were to require non-Google websites to provide such a pop-up notification, it would violate the W3C TAG guidelines discussed *supra* § III.B, and it would not identify prior private browsing activity.

160. As another alternative, Mr. Hochman proposes that "a user can extract their non-Google sign-in IDs (with the help of technology professionals) from websites that they visit in private browsing mode, including PPID, Analytics User ID and Google Ads User ID. Upon receiving these IDs, Google can locate the user's private browsing data from those websites in logs."[217]

161. In my opinion, Mr. Hochman's proposed use of signed-in identifiers on non-Google websites to identify class members is unreliable for the reasons discussed *supra* § III.G.2 and § III.A.2. Additionally, as discussed *infra* § III.G.2, Mr. Hochman's proposed use of third party publisher sign-in IDs fails to account for shared accounts.

**J. Opinion 10: Mr. Hochman's Proposed Methods For Identifying Class Members (# 22) Do Not–And Cannot–Account For Shared Devices Or Accounts**

**1. Mr. Hochman's Proposed Methods Do Not Account For Shared Devices**

162. As explained further below, Mr. Hochman's proposed methods for identifying both classes do not account for shared devices, which renders his proposed methods over-inclusive for the following reasons:

- ***First***, there is a significant body of research (including a published paper by Mr. Schneier, whom Plaintiffs have retained as an expert in this case) showing that

[216] Hochman ¶ 298.
[217] Hochman ¶ 306.

sharing of devices is common. However, Mr. Hochman's methodology improperly assumes that identifying web browsing information from a device is sufficient to also identify the user of that device.

- ❖ ***Second***, Incognito mode and other private browsing modes are specifically designed to provide on-device privacy for shared devices.
- ❖ ***Third***, the failure to account for shared devices will lead to misidentification of class members based on the browsing activity of other users on these shared devices.

163. ***First***, there is a significant body of research demonstrating that sharing of devices by more than one user is commonplace.[218] In fact, each of the named Plaintiffs testified

[218] *See, e.g.*, Tara Matthews, et. al., "'She'll just grab any device that's closer': A Study of Everyday Device and Account Sharing in Households," Proceedings of the ACM Conference on Human Factors in Computing Systems, ACM, https://dl.acm.org/doi/pdf/10.1145/2858036.2858051 (2016), at 2 ("Among our key findings are that device and account sharing is common, and that mobile phones were shared as much as computers and more often than tablets."); K. Levy and B. Schneier, "Privacy threats in intimate relationships," Journal of Cybersecurity, https://academic.oup.com/cybersecurity/article/6/1/tyaa006/5849222 (2020), at 10 ("[H]ouseholds are not units; devices are not personal; the purchaser of a product is not its only user."); *id.* (criticizing the "assumption . . . that devices considered 'personal' are used by only one person" because "abundant research demonstrates that this is often not the case"); A. Brush and K. Inkpen, "Yours, Mine and Ours? Sharing and Use of Technology in Domestic Environments," Proceedings of the 9th International Conference on Ubiquitous Computing, https://www.microsoft.com/en-us/research/wp-content/uploads/2007/09/brushinkpenyoursmineours.pdf (2007); B. Busse and M. Fuchs, "Prevalence of Cell Phone Sharing," Survey Methods: Insights from the Field, https://surveyinsights.org/?p=1019 (2013); H. Muller, J. Gove, and J. Webb, "Understanding Tablet Use: A Multi-Method Exploration," Proceedings of the 14th international conference on Human-computer interaction with mobile devices and services, https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/38135.pdf (2012).

that they share their devices with others.[219] But Mr. Hochman does not propose a method for accounting for shared devices. Instead, his proposed methodology for identifying class members incorrectly assumes that there is a one-to-one ratio between devices and users.[220]

164. Publicly-available studies conducted by Google employees and other researchers confirm that users often share devices. For example, a 2016 research study found that "[m]any technologies rely on the assumption that they will be used by a single person," but the "'single-user' assumption may not consider the many account and device sharing situations that arise during everyday life."[221] Based on a study of U.S.-based households, the authors determined that "device and account sharing is common, and that mobile phones were shared as much as computers and more often than tablets—even though participants typically perceived phones as personal devices and did not realize how often they were shared until participating in our diary study."[222]

---

[219] *See, e.g.,* Brown Tr. 89:16-23 (Q. Does anyone else ever use any of your devices? A. From time to time . . . like my business partner might hop on my laptop or my brother or my girlfriend may hop on my phone."); Trujillo Tr. 121:5-122-6 ("Okay. Do you share any of those devices you just mentioned with other people? A. Yes, I do, all three . . . It's work computer, one -- one PC that's used often, another PC that's used not as often, and my mobile phone . . . Q. Okay. Has anyone ever used any of those devices to browse the internet? A. Yes.); Byatt Tr. 239:25-240:4 (Q. Does anybody else have access to that laptop? A. Same as with the phone, where other people have certainly used it, but not -- not regularly."); Davis Tr. 79:12-15 ("Q. And do -- do any other family members or friends ever use any of your devices? A. On very rare occasions. Like, if someone needs to get online to do something, I might let them."); Castillo Tr. 260:17-22 ("Q. And your fiancé was upset at you because she learned of the – A. I remember her being specifically annoyed that her surprise, her wedding engagement surprise was sitting on my computer and in her face every time she logged on to the computer.").

[220] *See, e.g.*, Hochman ¶ 293 ("[T]he IP addresses and User Agent strings can be used to join a user's private browsing activities on non-Google websites with the user's Google account identity, and Google could then notify the class member via the email address associated with that Google account.").

[221] Tara Matthews, et. al., "'She'll just grab any device that's closer': A Study of Everyday Device and Account Sharing in Households," Proceedings of the ACM Conference on Human Factors in Computing Systems, ACM, https://dl.acm.org/doi/pdf/10.1145/2858036.2858051 (2016) ("Device Sharing Study") at 5921.

[222] *Id.* at 5922.

165. Their research yielded the following figures:[223]

**Figure 1. Diary study results. (a) Sharing by device, shown as the average percent of sharing instances per participant (591 total instances reported by 25 participants). (b) Who participants shared with, shown as the average percent of relations reported per participant (533 total relations reported by 25 participants during 468 sharing instances; 1 relation listed in 413 instances, >1 relation listed in 55 instances). Sig. others and children were most common relations shared with. Error bars represent 95% CIs.**

166. The same study further determined that "'personal' devices are often shared; and sharing occurs in multiple ways and for a variety of reasons beyond the most obvious or visible."[224]

167. Research surveys further confirm that device sharing is common. For example, in a 2015 study by the White House Council of Economic Advisers, "26 percent [of respondents] complain[ed] about having to share a computer with too many people in their household."[225]

168. Other research on the prevalence of device sharing has reached similar conclusions, including a research paper authored by Plaintiffs' expert Bruce Schneier.[226] Mr. Schneier's research notes that "People living in the same household may share computers,

[223] *Id.* at 5925.
[224] *Id.* at 5930.
[225] Rick Paulus, "The Digital Divide Is About Much More Than Access," Pacific Standard, https://psmag.com/environment/digital-divide-more-complicated-than-access (June 14, 2017).
[226] *See* K. Levy and B. Schneier, "Privacy threats in intimate relationships," Journal of Cybersecurity, https://academic.oup.com/cybersecurity/article/6/1/tyaa006/5849222 (2020), at 1 ("[P]rivacy invasions by intimates are pervasive and deserving of focused study."); *id.* at 2 ("In abusive partner situations, [technological privacy invasions by the abusive partner] can be a precursor to physical, emotional, and sexual abuse."); *id.* ("People living in the same household may share computers, phones, and other connected devices.").

phones, and other connected devices."[227] His research further explains that the frequency with which devices are shared among users undercuts "[s]ystem designers['] buil[t] in assumptions about intrafamilial privacy expectations," which leads to incorrectly "treat[ing] a household as a 'unit' for purposes of information sharing."[228] Instead, Mr. Schneier urges that we should "realize that households are not units[,] devices are not personal[,] [and] the purchaser of a product is not its only user."[229] Based on my experience in the industry and review of the materials regarding device sharing cited above, I agree with Mr. Schneier's conclusions on this point. However, Mr. Hochman does not make any attempt to account for these issues.

169. Indeed, Mr. Hochman's proposed methodology for identifying class members equates "devices" with "users" in a way that assumes a one-to-one ratio between users and devices. This assumption is incorrect in light of the body of research determining that device sharing is common, including, *inter alia*, Mr. Schneier's conclusion that "households are not units[,] devices are not personal[,] [and] the purchaser of a product is not its only user."[230] Further steps are required to identify specific *users* on shared devices. In my opinion, Mr. Hochman does not propose a method for doing so.

170. ***Second***, documents Google produced in this case confirm that one of the primary reasons users use private browsing modes is to limit local storage of certain browsing information in order to prevent other users who may share their device from viewing locally-stored browsing histories.[231]

---

[227] *Id.* at 2.
[228] *Id.* at 10.
[229] *Id.*
[230] *Id.*
[231] *See, e.g.*, GOOG-CABR-05171191, at -198 (noting that many users valued private browsing mode because [redacted] id. at -212 [redacted] id. [redacted]

171. Indeed, the paradigmatic "engagement ring shopping" use case for Incognito mode is expressly directed to a shared device.[232] This involves a user using Incognito mode on a shared device to avoid his or her fiancé-to-be seeing browsing history related to engagement rings (or auto-filled URLs of websites where engagement rings are sold) when he or she uses the device. *See, e.g.*:

a. GOOG-BRWN-00166360, at -365:

[redacted]

---

[redacted]

[232] *See* GOOG-CABR-05171191, at -198 (noting that many users valued private browsing mode because [redacted] *id.* at -212 [redacted] *id.* [redacted] *see also* GOOG-CABR-00148254 (user survey research report discussing variations between users' reasons for using Incognito mode).

b. GOOG-BRWN-00742713 at -887:

[redacted]

172. Google's internal initiatives also recognize that [redacted][233] A number of social work organizations who provide resources for victims of domestic violence recommend the use of private browsing modes to limit an abuser's ability to view their partner's browsing history on a shared device.[234]

---

[233] *See* GOOG-CABR-05468204.

[234] *See, e.g.*, Day One Services, "Maintaining Privacy When You Browse The Internet," http://dayoneservices.org/be-safe/ (last visited June 3, 2022) (recommending use of private browsing to prevent local saving of browsing history); Sahara Cares, "Protect Yourself Online," https://saharacares.org/protect-yourself-online/ (last visited June 3, 2022) ("If you are concerned about internet and browser safety, you have two options . . . Erase your browsing history after

173. ***Third***, Mr. Hochman's failure to account for shared devices will lead to misidentification of class members based on the browsing activity of other users on these shared devices. Mr. Hochman's methodology for identifying members of Class I and Class II does not account for shared devices because it assumes that, by identifying a device, you have also conclusively identified the Google account holder who used that device in Incognito or other private browsing modes.[235] Indeed, Mr. Hochman does not propose a methodology for identifying a *single user* based on an IP address and user agent that will be identical when multiple users share a single device. In my opinion, this necessarily makes Mr. Hochman's proposed methodology over-inclusive and inaccurate.

174. Mr. Hochman's proposed method for linking signed-out Incognito browsing activity to signed-in identifiers also does not account for shared devices.[236] Consider, for

---

visiting this site [or] Use private browsing or incognito mode to browse this site so the visit is not logged in your history."); WNY Postpartum Connection, Inc., "Domestic Abuse Support," https://www.wnypostpartum.com/domestic-violence-assistance (last visited June 3, 2022) ("If you are in danger and believe someone could possibly be tracking your Internet usage, we highly recommend viewing this page in your browser's incognito mode. You can do this by right-clicking the browser icon and selecting 'New Incognito Window.' If not using incognito, we recommend deleting your web history after viewing this page."); Betty Griffin Center, "Safe Browsing," https://bettygriffincenter.org/help/ (last visited June 3, 2022) ("Your browser stores and records the webpages you visit on your computer/device. This is called a web history or a browser cache. You may want [to] conceal your activity online for safety reasons. There are a few ways to accomplish this . . . [for example,] Use private browsing. Most browsers have a privacy mode that allows you to visit websites without storing any record of your activity on your computer or device.").

[235] *See, e.g.*, Hochman ¶ 291 (stating that "applying Google's Incognito detection methodology using X-Client-Data and user agent accurately identifies Incognito data from the Second Iterative Search in the Special Masters process" without specifying how, in the case of a shared device, this data would be attributed to a particular user); ¶ 293 (stating that "the combination of IP address and User Agent" can be used to "attribute particular log entries to people" without addressing the reality that IP address and user agent will be identical for multiple "people" using the same browser on, *e.g.*, a shared family computer).

[236] *See, e.g.*, Hochman ¶ 295 ("IP addresses and User Agent strings can be used to join a user's private browsing activities on non-Google websites with the user's Google account identity, and Google could then notify the class member via the email address associated with that Google account."); ¶ 304 ("If a user has signed into their Google Account in private browsing mode within the past 90 days, then Google can also retrieve the user's Biscotti IDs from GAIA logs

example, a desktop computer a family of four share. If (i) only one family member signs into a Google account on this shared device (the "Lone Signed In User"); and (ii) the IP address and user agent of the shared device is used to link private browsing information with the Lone Signed In User's account, any use of Incognito mode by the other three family members would be attributed to the Lone Signed-In User and cause the Lone Signed-In User to be included in the class (even if he or she never personally used Incognito mode on the shared device). The proposed Chrome class is composed of *users* (not devices), but Mr. Hochman does not propose any way to determine which of the four family members in this example actually used Incognito mode on the shared family computer. In my opinion, the failure to account for shared devices makes Mr. Hochman's proposed methodology for linking signed-out Incognito browsing activity to signed-in identifiers over-inclusive and inaccurate.

175. As another example, consider a publicly-available computer available for visitors to use in, *e.g.*, a public library. This shared device does not require users to log in to use the computer (or log out when they are finished). Over the course of a day, one hundred users use this machine at various points. If, for example, only one user uses Incognito mode (or another private browsing mode) on the same day, Mr. Hochman does not propose any way to determine which of these one hundred users actually used Incognito mode on this publicly-available device (where all one hundred users will have the exact same user agent and IP address). Indeed, if (i) a user logged into his or her Google account (the "Logged In User") while using the device (and did not use Incognito mode at all), and (ii) the next user (the "Subsequent Incognito Mode User") did not log into his or her own Google account, but proceeded to open an Incognito mode window and browsed a non-Google website that uses Google Analytics or

and use those Biscotti IDs to locate the user's private browsing records while they are not signed into Google from the Biscotti logs.").

Ad Manager code, then (iii) the proposed methodology would lead to a false positive because it would incorrectly identify the Logged In User as a class member based on the Subsequent Incognito Mode User's browsing activity on the shared machine, as the Logged In User's activity keyed to his GAIA ID would contain the same IP address and user agent as the Subsequent Incognito Mode User's browsing activity keyed to an "orphaned" Biscotti ID. Mr. Hochman's proposed methodology does not account for this scenario, which is not uncommon.[237]

176. Mr. Hochman's methodology for identifying class members by sending notifications to Google account holders, whose accounts are associated with some private browsing activity, also fails to account for shared devices because it relies on browsing activity on the same device (without providing any way to confirm that the browsing activity is actually attributable to the same Google account holder, rather than a different individual who used the device). Consider, for example, a laptop used by two different members of the same household. One of the users of this shared device (call him User_1) signed into a Google account on the shared machine once but never enabled private browsing. Another user of the shared device (User_2) uses the device exclusively for private browsing and has never logged in to a Google account on that shared device. Mr. Hochman's proposed methodology would result in a notification being sent to User_1, not the actual class member who browsed in private mode, User_2. In the domestic violence use case of private browsing mode mentioned above, the abuser may get notification based on the private browsing activities of the victim.

---

[237] *See, e.g.*, Google Help Page: Sign out of Chrome, https://support.google.com/chrome/answer/9159867?hl=en&co=GENIE.Platform%3DDesktop (last visited June 7, 2022) ("Sign out remotely . . . You can remove your account from one of your devices, even if you don't have that device with you. You'll be signed out from any computer you've used before, including the one you're using now.").

177. By failing to account for shared devices, Mr. Hochman's proposed methods for identifying members of both the Chrome Class and the non-Chrome Class are over-inclusive because they identify individual users as class members based on other users' browsing activity on the same device (where their user agent and IP address will be the same). In my opinion, he does not propose a methodology for excluding these cases, which, as discussed above, are quite common.

**2. Mr. Hochman's Proposed Methods Do Not Account For Shared Accounts**

178. Mr. Hochman's proposed methodology for identifying class members does not account for shared accounts, which is also common.[238] Mr. Hochman's proposed methodology for using "Biscotti encryption keys" to "locate additional user's [sic] signed-out private browsing activities via their GAIA IDs for users who may have, on occasion, signed into their Google account in a private browsing session"[239] (i) does not account for the prevalence of account sharing; and (ii) fails to propose a method for determining which user (or users) of a shared account would be a class member in situations where a subset of users with access to the shared account did not use private browsing modes during the class period. For example, consider an account shared between two grandparents with limited technical ability and a

[238] *See, e.g.*, K. Levy and B. Schneier, "Privacy threats in intimate relationships," Journal of Cybersecurity, https://academic.oup.com/cybersecurity/article/6/1/tyaa006/5849222 (2020), at 2 ("Intimates might share social media and email accounts–and even if they have separate accounts, they may know one another's passwords."); C. Park, et al., "Share and share alike? An exploration of secure behaviors in romantic relationships," Fourteenth Symposium on Usable Privacy and Security (SOUPS), https://www.researchgate.net/publication/325608530_Share_and_Share_Alike_An_Exploration_of_Secure_Behaviors_in_Romantic_Relationships (2018).

[239] Hochman ¶ 244.

grandchild in their care who is more technically capable.[240] The Google account in this scenario is registered only to the grandfather, who has never used Incognito mode (and is in fact not aware of the existence of this feature at all).[241] If the grandchild used Incognito mode, and at least once logged into the grandfather's Google account in Incognito mode during the class period, but the grandparents did not, Mr. Hochman's proposed methodology would nonetheless include the grandfather in the class by joining the grandchild's private browsing mode activity with the grandfather's Google account identifier.

179. Similarly, Mr. Hochman's proposed methodology for identifying class members via PPIDs fails to account for sharing of accounts on third party websites. Third party websites that use PPIDs may require or allow users to log into their site for a number of reasons, including for example, to access "premium" content which is only made available to paid subscribers (*e.g.*, paywall-protected articles on NYTimes.com or washingtonpost.com). Sharing of login and password information by more than one user to access premium content is common.[242] Like shared devices, Mr. Hochman does not attempt to account for this practice.

180. Mr. Hochman's methodology also fails to account for GAIA IDs that are not associated with a specific individual. Documents Google produced indicate that [redacted]

---

[240] *See, e.g.*, Juliette Garside, "Ofcom: six-year-olds understand digital technology better than adults," The Guardian, https://www.theguardian.com/technology/2014/aug/07/ofcom-children-digital-technology-better-than-adults (Aug. 6, 2014) ("[T]he average six-year-old child understands more about digital technology than a 45-year-old adult."); Laveh Waddel, "Will Today's Kids Be Stumped by the Technology of the Future?," The Atlantic, https://www.theatlantic.com/technology/archive/2016/01/will-todays-kids-be-stumped-by-the-technology-of-the-future/425082/ (Jan. 26, 2016).

[241] *See* GOOG-CABR-00422906, at -068 (20.3 percent of survey respondents reported that they never use Incognito mode, and 11.7 percent were not aware of the feature).

[242] *See, e.g.*, Alex Sherman, "Netflix estimates 100 million households are sharing passwords and suggests a global crackdown is coming," CNBC, https://www.cnbc.com/2022/04/19/netflix-warns-password-sharing-crackdown-is-coming.html (Apr. 19, 2022).

[redacted][243] Mr. Hochman does not propose a method for, *e.g.*, (i) identifying these multi-user accounts; and (ii) limiting the inclusion of class members to individual users of such accounts who actually used private browsing modes. Thus, if a single user of such an account used private browsing mode on a device with the same IP address and user agent as the multi-user account, applying Mr. Hochman's methodology would include "entire businesses, groups of users and even services" in the class. This failure to account for multi-user accounts thereby renders Mr. Hochman's proposed methodology over-inclusive.

[243] GOOG-CABR-00086881, at -882.

## IV. REBUTTAL TO MR. SCHNEIER

### A. Opinion 11: Mr. Schneier's Assertion That "Browsing Information Is Unique For Each User" Is Unsupported And Misleading

181. According to Mr. Schneier: "Browsing Information Is Unique For Each User."[244]

182. In support of this claim, Mr. Schneier states that:

a. "American citizens are justified in taking measures to minimize access to their browsing information, since it can be used to identify them. A 2013 study of 368,284 Internet users detected a unique browsing history for 69% of participants, and found that out of users for whom at least four visited websites were detected, 97% could be uniquely identified by their browsing history."[245]

b. "This browsing information is a rich target for those online businesses that deploy CSSbased detection techniques to collect it. (CSS is an initialism for cascading style sheets, which are used to format web pages.) An attacker can ascertain URLs visited by a target's browser through applying CSS styles that differentiate visited and unvisited links. A study of results obtained from over a quarter-million web users found that over 94% of Google Chrome users were vulnerable to CSS-based browser history detection by sites they visited; a test of popular websites detected an average of 62.6% visited locations per client."[246]

c. "A 2015 research paper illustrated how third-party cookies can be used by eavesdroppers— these are people who are not the owners of the websites visited or the cookies issued and used— to track people on the Internet. Simulating users browsing the web, the authors found that 'the adversary can reconstruct 62–73% of a typical user's browsing history.'"[247]

---

[244] Schneier at 27.

[245] Schneier ¶ 97 (citing L. Olejnik, C. Castelluccia and A. Janc, "Why Johnny can't browse in peace: On the uniqueness of web browsing history patterns," Annals of Telecommunications 1-2, https://hal.inria.fr/file/index/docid/747841/filename/johnny2hotpet-finalcam.pdf (June 2013)).

[246] Schneier ¶ 98 (citing A. Janc and L. Olejnik, "Web browser history detection as a real-world privacy threat," ESORICS'10:Proceedings of the 15th European Conference on Research in Computer Security, http://cds.cern.ch/record/1293097/files/LHCb-PROC-2010-036.pdf (September 20, 2010)).

[247] Schneier ¶ 99 (citing S. Englehardt, et al., "Cookies that give you away: The surveillance implications of web tracking," WWW '15: Proceedings of the 24th International Conference on World Wide Web, https://senglehardt.com/papers/www15_cookie_surveil.pdf (May 18, 2015)).

183. As explained further below, Mr. Schneier's assertion is unsupported and particularly misleading for the Data At Issue for the following reasons:

- ***First***, the study cited by Mr. Schneier (¶ 97) concluded that only 50 percent of the "Google profiles" that the authors analyzed when they limited their analysis to "sites on which [they] detected scripts from Google" were unique.[248] As such, the remaining 50 percent of "Google profiles" were *not unique*. This research also did not conclude that 100 percent of any other browsing information was unique. Thus, Mr. Schneier's assertion that "Browsing Information Is Unique For Each User" (i) is not supported by this study, which did not conclude that browsing information is in fact unique for each user because it did not determine that any set of browsing information or profiles were 100 percent unique; and (ii) is particularly misleading for the Data At Issue because the authors of that study used different data (*i.e.*, URLs provided to the researchers via an experimental system), and they determined that only half of the "profiles" they generated—using a different methodology and a different definition of "profiles" than any proposed by Plaintiffs—from visits to sites with embedded Google scripts were "unique."
- ***Second***, the security study cited by Mr. Schneier regarding potential vulnerabilities to "CSS-based browser history detection" (¶ 98) merely identifies a potential vulnerability and does not address whether or not particular browsing histories are "unique," let alone show that each user has a unique browsing history.[249]

---

[248] Lukasz Olejnik, Claude Castelluccia and Artur Janc, "Why Johnny can't browse in peace: On the uniqueness of web browsing history patterns," Annals of Telecommunications at 13 https://hal.inria.fr/file/index/docid/747841/filename/johnny2hotpet-finalcam.pdf (June 2013).
[249] S. Englehardt, et al., "Cookies that give you away: The surveillance implications of web tracking," WWW '15: Proceedings of the 24th International Conference on World Wide Web, https://senglehardt.com/papers/www15_cookie_surveil.pdf (May 18, 2015).

- ***Third***, the research paper cited by Mr. Schneier (¶ 99) regarding third-party cookie "eavesdroppers" addresses potential vulnerabilities and modeling of potential reconstruction of browsing histories, rather than analyzing the uniqueness of actual histories.[250]

184. In my opinion, the study cited by Mr. Schneier regarding the relative uniqueness of browsing histories does not support his claim that browsing information is "unique for each user" because the authors did not find that 100% of the browsing profiles analyzed were unique (*i.e.*, the "only one" or "able to be distinguished from all others of its class or type").[251] And Mr. Schneier's characterization of this study as supporting his conclusion is particularly misleading for the Data At Issue because (i) the authors of that study used different data collected via a different methodology (*i.e.*, URLs provided to the researchers via an experimental system); and (ii) they determined that only half of the "profiles" they generated–using a different methodology and a different definition of "profiles" than any proposed by Plaintiffs–from visits to sites with embedded Google scripts were "unique." Mr. Schneier does not account for these methodological differences or address the authors' conclusion that only 50 percent of the "profile" histories from sites using Google scripts that they generated were unique.[252]

---

[250] *Id.*

[251] "Unique" means "the only one" or "able to be distinguished from all others of its class or type." Merriam-Websters.com Dictionary, "Unique," https://www.merriam-webster.com/dictionary/unique#:~:text=1%20%3A%20being%20the%20only%20one%20of%20its%20kind%20Every%20snowflake,from%20Merriam%2DWebster%20on%20unique (last visited June 6, 2022).

[252] L. Olejnik, C. Castelluccia and A. Janc, "Why Johnny can't browse in peace: On the uniqueness of web browsing history patterns," Annals of Telecommunications at 13 https://hal.inria.fr/file/index/docid/747841/filename/johnny2hotpet-finalcam.pdf (June 2013)).

185. It is also my opinion that the study Mr. Schneier cites regarding CSS vulnerabilities[253] does not support his conclusion that browsing information is unique for each individual user because the authors simply analyzed the susceptibility of certain users of internet browsers to attacks designed to obtain their browsing histories, and they did not evaluate the relative uniqueness of the histories. Whether or not a vulnerability could be exploited to obtain browsing information is orthogonal to a determination of whether or not the information that may be obtained by an attacker is unique for each user.

186. It is also my opinion that the study Mr. Schneier cites regarding potential "eavesdropping" via accessing third party cookies[254] does not support his conclusion that browsing information is unique for each user because this research merely describes certain techniques that might be used by bad actors to obtain cookie values and unencrypted PII. Whether or not a certain attack might be suitable for a bad actor to obtain information is a distinct question from a determination of whether or not browsing information is unique for each user.

**B. Opinion 12: Mr. Schneier's Claim That "Personal Data Is Difficult To Anonymize And Easy To De-Anonymize" Is Unsupported And Is Incorrect For The Data At Issue**

187. According to Mr. Schneier: "Personal Data Is Difficult to Anonymize and Easy to De-anonymize."[255] In support, Mr. Schneier:

a. Claims that maintaining online anonymity is purportedly difficult "in the face of a focused and determined investigation." In support of this claim, Mr. Schneier states that "[e]ven a team of highly trained Israeli assassins

[253] A. Janc and L. Olejnik, "Web browser history detection as a real-world privacy threat," ESORICS'10:Proceedings of the 15th European Conference on Research in Computer Security, http://cds.cern.ch/record/1293097/files/LHCb-PROC-2010-036.pdf (September 20, 2010)).
[254] S. Englehardt, et al., "Cookies that give you away: The surveillance implications of web tracking," WWW '15: Proceedings of the 24th International Conference on World Wide Web, https://senglehardt.com/papers/www15_cookie_surveil.pdf (May 18, 2015).
[255] Schneier at 41.

was quickly identified in Dubai, based on surveillance camera footage from around the city."[256]

b. Asserts that "[m]ost techniques for anonymizing data don't work, and ostensibly anonymized data can be de-anonymized with surprisingly little information."[257] In support of this claim, Mr. Schneier cites the following:

1. A 1997 study and follow up research from 2000 and 2006 in which the researcher deanonymized certain records by combining zip codes with gender and birth date records from census data or other data (*e.g.*, healthcare records).[258]

2. A 2006 study analyzing the effectiveness of attempted anonymization of "three months of search data for 657,000 users: 20 million searches in all" released by American Online ("AOL").[259]

3. A 2008 study of "10 million movie rankings by 500,000 anonymized customers" published by Netflix from which researchers were able to determine the identity of certain

---

[256] Schneier ¶ 143 (citing Natasha Lomas, "France fines Google $120M and Amazon 42M for dropping tracking cookies without consent," Tech Crunch, https://techcrunch.com/2020/12/10/france-fines-google-120m-and-amazon-42m-for-droppingtracking- cookies-without-consent (Dec. 10, 2020)).

[257] Schneier ¶ 144 (citing Paul Ohm, "Broken promises of privacy: Responding to the surprising failure of anonymization," UCLA Law Review 57, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1450006 (August 13, 2009)).

[258] Schneier ¶ 145 (citing Latanya Sweeney, "Simple demographics often identify people uniquely," Carnegie Mellon University Data Privacy Working Paper 3, https://dataprivacylab.org/projects/identifiability/paper1.pdf (2000); Philippe Golle, "Revisiting the uniqueness of simple demographics in the U.S. population," 5th ACM Workshop on Privacy in the Electronic Society (WPES'06), Alexandria, Virginia, https://crypto.stanford.edu/~pgolle/papers/census.pdf (Oct. 30, 2006); L. Sweeney, A. Abu and J. Winn, "Identifying participants in the Personal Genome Project by name (A re-identification experiment)," arxiv.org, https://arxiv.org/abs/1304.7605 (2013); Latanya Sweeney, "Only you, your doctor, and many others may know," Technology Science 2018, https://techscience.org/a/2015092903 (September 28, 2015); Ji Su Yoo, et al., "Risks to patient privacy: A re-identification of patients in Maine and Vermont statewide hospital data," Technology Science 2018, https://techscience.org/a/2018100901 (Oct. 8, 2018); Katherine E. Boronow, et al., "Privacy risks of sharing data from environmental health studies," Environmental Health Perspectives 128, no. 1, https://ehp.niehs.nih.gov/doi/10.1289/EHP4817 (Jan. 2020)).

[259] Schneier ¶ 146 (citing M. Barbaro and T. Zeller Jr., "A face is exposed for AOL Search No. 4417749," New York Times, http://www.nytimes.com/2006/08/09/technology/09aol.html (Aug. 9, 2006)).

individuals "by comparing rankings and time stamps with public rankings and time stamps in the Internet Movie Database."[260]

4. A 2015 study analyzing the relative anonymity of certain credit card data.[261]

5. A 2019 study analyzing certain demographic data.[262]

6. A 2018 study analyzing the volume of data sent to Google's servers in connection with the use of certain Google web applications (*e.g.*, Gmail) and browsing on websites that use Google Analytics.[263]

7. Studies analyzing attempts to deanonymize data sets by combining them with location data or school records.[264]

8. Mr. Schneier's assertion that (i) telephone records could be partially deanonymized by correlating them with a database of telephone order information; and (ii) "Amazon's online book reviews could be the key to partially de-anonymizing a database of credit card purchase details."[265]

c. Claims that "Joinability is a risk whether or not data is actually being joined," and Google could purportedly use its "database of users' Internet searches . . . [to] de-anonymize a public database of Internet purchases, or

---

[260] Schneier ¶ 147 (citing A. Narayanan and V. Shmatikov, "Robust de-anonymization of large sparse datasets," 2008 IEEE Symposium on Security and Privacy, Oakland, California, https://web.stanford.edu/class/cs245/win2020/readings/netflix-deanonymization.pdf (May 18-20, 2008)).

[261] Schneier ¶ 148 (citing Yves-Alexandre de Montjoye, et al., "Unique in the shopping mall: On the re-identifiability of credit card metadata," Science 347, no. 6221, https://www.science.org/doi/full/10.1126/science.1256297 (Jan. 30, 2015)).

[262] Schneier ¶ 149 (citing L. Rocher, J. Jendrickx and Y. de Montjoye, "Estimating the success of re-identifications in incomplete datasets using generative models," Nature Communications 10, https://www.nature.com/articles/s41467-019-10933-3 (July 23, 2019)).

[263] Schneier ¶ 150 (citing Douglas C. Schmidt, et al., "Google data collection," Vanderbilt University, https://digitalcontentnext.org/wpcontent/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf (Aug. 15, 2018)).

[264] Schneier ¶ 151 (citing Dániel Kondor, et al., "Towards matching user mobility traces in large-scale datasets," arXiv:1709.05772, https://arxiv.org/pdf/1709.05772.pdf (Aug. 13, 2018); Eli Yacobson, et al., "De-identification is insufficient to protect student privacy, or What can a field trip reveal?" Journal of Learning Analytics 8, no 2, https://www.learning-analytics.info/index.php/JLA/article/view/7353 (2021)).

[265] Schneier ¶ 152.

zero in on searches of medical terms to de-anonymize a public health database."[266]

d. Characterizes certain documents produced by Google as purportedly containing admissions that the Data At Issue can be joined to signed-in authenticated Google data that support Mr. Schneier's opinion regarding joinability.[267]

188. As explained further below, Mr. Schneier's assertion is unsupported by the sources he cites and incorrect for the Data At Issue for the following reasons:

- ❖ ***First***, Mr. Schneier cite examples of purported difficulties associated with anonymization that do not address the Data At Issue, which is readily distinguishable from, *e.g.*, surveillance camera footage of Israeli assassins, birth dates, ZIP codes, voter registration databases, AOL Search data, Netflix movie rankings, publicly-posted IMDB ratings, credit card numbers, "user location data . . . combined with anonymized credit card data," "telephone records . . correlat[ed] . . . with a catalog merchant's telephone order database," Amazon online book reviews, and "Google['s] database of users' Internet searches."
- ❖ ***Second***, the Google documents that Mr. Schneier characterizes as "admissions" do not support his contentions because, *inter alia*, (i) they involve discussions of theoretical possibilities in a hypothetical world without Google's policies and server-side architecture that prevent deanonymization of the Data At Issue; and (ii) these statements do not support his conclusion that "Google can connect individuals to private browsing sessions."

[266] Schneier ¶ 153 (citing Pern Hui Chia, et al., "KHyperLogLog: Estimating reidentifiability and joinability of large data at scale," Proceedings of the IEEE Symposium on Security and Privacy, https://milinda-perera.com/pdf/CDPSLDWG19.pdf (2019)).

[267] Schneier ¶ 155 (citing GOOG-BRWN-00705010; GOOG-CABR-05270014; Mardini Nov. 24, 2021 Tr. 346-347).

- ***Third***, Google documents and testimony produced in this case show that Mr. Schneier's assertion that "data is difficult to anonymize and easy to de-anonymize" is incorrect for the Data At Issue in light of Google's successful efforts to anonymize the Data At Issue and prevent its re-identification.

189. In my opinion, the video surveillance story that Mr. Schneier cites does not support any claim that the Data At Issue is "difficult to anonymize" and "easy to deanonymize" because that is a wholly different type of data and analysis than the instant case (*i.e.*, surveillance camera footage of a few Israeli agents analyzed to identify a match for facial images in a database, rather than unauthenticated private browsing data that Plaintiffs claim can be reliably tied to the identity of millions of individual users). The Data At Issue does not include surveillance camera footage, nor does analysis of such data involve attempts to match images of individuals with such footage.

190. It is also my opinion that the vast majority of the studies that Mr. Schneier cites do not support his opinion in this case because they address categories of information that are different from the Data At Issue. For example, the Data At Issue does not include (i) birth dates, zip codes, or medical records; (ii) search requests that users input into Google's search engine (or other search engines that do not use Google services like Bing or DuckDuckGo); (iii) Netflix movie rankings; (iv) credit card numbers; (v) demographic data (such as users' age, gender and marital status); (vi) school records tied to location data; (vii) telephone records; or (viii) Amazon review and purchase histories. Importantly, the Data At Issue is also not merely anonymized by, *e.g.*, obscuring the identity of the individual user with whom the Data At Issue is associated. By contrast, the Data At Issue is never "authenticated" or otherwise tied to a specific user's identity in the first place. *See supra* § III.A.1. And as discussed above, it cannot

be reliably tied to a specific user via Plaintiffs' proposed fingerprinting methodologies. *See supra* §§ III.G.1; III.F.1.

191. As to the lone study regarding certain Google services that Mr. Schneier cites,[268] it is also my opinion that this research does not support Mr. Schneier's claim that the Data At Issue is difficult to anonymize because the researchers tested the exact opposite scenario that is at issue here: the researchers tested the potential for Google to associate data from a private browsing mode session with a user's identity *when a user signs into a Google account or service*.[269] In this situation, the authors determined that Google can use a signed-in identifier received *when a user logs into Google* to associate signed-out activity with the user's Google account. For the Data At Issue, no such signed-in identifier will be sent to Google because Plaintiffs allege that the putative class members have *not signed into a Google account*, and thus the results of this test do not apply.

192. Additionally, the Google-produced documents that Mr. Schneier characterizes as "admissions" do not support his claims regarding joinability for the following reasons:

a. GOOG-BRWN-00705010: Mr. Schneier contends that this document shows that "Google employees have admitted that 'it is possible for Google to join regular and Incognito sessions,'" and Google "can [therefore] connect individuals to private browsing sessions."[270] But the document notes that "the promise not to do this is effectively already being applied," and the author of this email explained at his deposition that such joining does not occur.[271] This email also does not state that

[268] Douglas C. Schmidt, et al., "Google data collection," Vanderbilt University, https://digitalcontentnext.org/wpcontent/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf (Aug. 15, 2018).
[269] *Id.* at 21-22 ("("The experiment presented below assessed whether Google can connect such identifiers (and hence information associated with them) with a user's personal information. This experiment involved the following ordered steps: 1. Opened a new (no saved cookies, e.g. Private or Incognito) browser session (Chrome or other), 2. Visited a 3rd-party website that used Google's DoubleClick ad network, 3. Visited the website of a widely used Google service (Gmail in this case), 4. Signed in to Gmail.").
[270] Schneier ¶ 155.
[271] McClelland Feb. 18, 2022 Tr. 80:12-81:11.

such joining would be possible by applying Plaintiffs' proposed methods for joining the data, nor does it state that Incognito sessions would be joined to specific users' identities.

b. GOOG-CABR-05270014: Mr. Schneier cites a comment in an email chain stating [redacted] In light of this email, Mr. Schneier concludes that "[i]n other words, Google can connect individuals to private browsing sessions." Thus, Mr. Schneier states that the theoretical possibility that private browsing sessions can be joined with signed-in browsing is a sufficient condition for linking private browsing mode sessions with an individual user's identity. But as discussed above at § III.J., this incorrectly assumes a one-to-one connection between devices and users that does not account for shared devices or align with Mr. Schneier's own published research concluding that "households are not units; devices are not personal; [and] the purchaser of a product is not its only user."[272]

193. Finally, Mr. Schneier's claim that data is difficult to anonymize and easy to de-anonymize is incorrect as to the Data At Issue because, for the reasons discussed *supra* § III.A.3, § III.F.3, Google's policies, procedures, and technical solutions designed to anonymize the Data At Issue and prevent its de-anonymization have been effective.

### C. Opinion 13: Mr. Schneier's Assertion That Google Has Not Taken Steps To Ensure That A User's Choice To Sign Out Of A Google Account Will Prevent Google From Associating The User's Signed-Out Activity With Any Signed-In Data Is Incorrect

194. According to Mr. Schneier:

> Google has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data. The cookies that Google collects "span signed in and signed out sessions," allowing Google to "connect the dots even if [it] can't write data to a person's account." And even if Google is not building user profiles across signed-in and signed-out data, Google's decision to collect and log this data creates the potential for data to be joined in this way. For example, Google's storage of unique identifiers and IP addresses together in logs introduces a risk

[272] K. Levy and B. Schneier, "Privacy threats in intimate relationships," Journal of Cybersecurity, https://academic.oup.com/cybersecurity/article/6/1/tyaa006/5849222 (2020), at 10.

that data from a users' private browsing will be joined with a user's signed-in data.[273]

195. As explained further below, Mr. Schneier's assertion is incorrect for the following reasons:

- ***First***, the documents that Mr. Schneier cites do not support his conclusion that Google "has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data" and in many cases they show extensive steps to maintain strict separation between signed-in and signed-out data. *See infra* § IV.C.1.
- ***Second***, additional documents and testimony produced in this case further demonstrate the steps that Google has taken to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data. *See infra* § IV.C.2.
- ***Third***, Google's policy restrictions and pseudonymization procedures closely align with best practices for research involving user data. *See infra* § IV.C.3.
- ***Fourth***, Google's security practices closely align with best practices in the network security industry. *See infra* § IV.C.4.

**1. The Documents Mr. Schneier Cites Do Not Support His Conclusion**

196. In my opinion, none of the documents that Mr. Schneier cites supports his conclusion that Google "has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data."

[273] Schneier ¶ 205 (citing GOOG-BRWN-00060463; GOOG-CABR-00358713; GOOG-BRWN-00386570; GOOG-BRWN-00613801; GOOG-BRWN-00386402; GOOG-CABR-00799341).

197. GOOG-BRWN-00060463 is a draft of potential issues and discussion points identified by a Google employee, and the discussion Mr. Schneier quotes is not directed to Incognito mode. Indeed, the document undermines Mr. Schneier's opinion because it states that the use of Incognito mode is an effective way to prevent joining of signed-in and signed-out browsing data, as it notes that [REDACTED] ."[274]

198. GOOG-CABR-00358713 identifies a potential risk of joining Incognito data with signed-in data, but (i) does not say that any such joining takes place; and (ii) notes that [REDACTED][275] As discussed above (*supra* § III.B), allowing Chrome to "tell Google (or all sites) that a user went Incognito"[276] would conflict with the W3C Guidelines recommending that the use of private browsing mode should not be detectable to websites. This discussion confirms that Google decided not to pursue solutions that would require the Chrome browser to send a signal to Google or third party websites that the browser was in incognito mode.

199. GOOG-BRWN-00386570 is an email discussing potential implementation of Incognito mode in the Google Search App (*i.e.*, a non-Browser app that is distinct from Chrome), and an email in the thread notes that "aside from the potential linking to the user's GAIA cookie ID in regular [mode] IF the IP is static, there is no way to link that signed-out/incognito zwieback cookie to Gaia."[277] Again, this email discusses potential

---

[274] GOOG-BRWN-00060463, at -463 (emphasis added).

[275] GOOG-CABR-00358713, at -713.

[276] Id.

[277] GOOG-BRWN-00386570, at -570.

joinability *risks* related to a non-browser app (regarding search activity), rather than actual joining of user browsing data by Google. And as discussed above (*supra* § III.G.1.), static IPs are exceedingly rare, so the risk identified in this email does not appear to be substantial.

200. GOOG-BRWN-00613801 is a comment notification showing a discussion between Google employees regarding joining of data from a private browsing session with a "Google account . . . if [users] sign into it from incognito mode." Since Plaintiffs' proposed classes consist of users who are *not* signed into a Google account while using private browsing mode, this type of joining is not relevant to the Data At Issue.[278] This discussion also notes that the proposal to send a signal to prohibit collection of data from an Incognito mode session raises: "concerns . . . about altering the behavior of Google sites during the session because it makes incognito in Chrome and other browsers less consistent and has the risk of actually decreasing privacy if some use-cases are broken in incognito mode and therefore force users to use regular mode." Making "incognito in Chrome and [private browsing mode on] other browsers less consistent" would increase the risk that a third party website could detect the use of Incognito mode, which would violate the aforementioned W3C principles.

201. GOOG-BRWN-00386402 is an email where a Google employee notes that [redacted]." Like GOOG-BRWN-00386570, this is a discussion of potential risks (regarding activity on Google websites)[279] that

[278] Complaint ¶ 192.

[279] A Zwieback identifier is used for activity on Google "Owned and Operated" ("O&O") properties like searches on google.com. *See* GOOG-CABR-00543864, at -958 [redacted] GOOG-BRWN-00078348. The use of Google owned and operated properties like google.com is outside of the scope of Plaintiffs' proposed classes, which are limited to users "who accessed a non-Google website." Complaint ¶ 192.

affirmatively states that Google does not actually join such data. And as discussed above (*supra* § III.G.1.), static IPs are exceedingly rare, so the risk identified in this email does not appear to be substantial.

202. These documents do not support Mr. Schneier's conclusion that Google "has not taken steps to ensure that a user's choice to sign out of a Google account will prevent Google from associating the user's signed-out activity with any signed-in data."[280] Indeed, none of the documents cited by Mr. Schneier (or any other documents or testimony I have reviewed) state that joining of signed-in and signed-out user data actually takes place, which indicates that Google's myriad policies and technical restrictions (discussed further *infra* § IV.C.2.) have been effective in preventing *actual joining* of signed-in and signed-out data. In my opinion, Google's implementation of (and adherence to) policies and technical restrictions to prevent joining of signed-out and signed-in data shows that Google *has* "taken steps" to segregate signed-in from signed-out data. And the documents Mr. Schneier cites indicate that Google employees investigate joinability risks regularly and propose steps for mitigating those risks. This process of self-evaluation, identification of risks, and introduction of mitigations is consistent with a proactive compliance regime designed to prevent the joining of signed-in and signed-out data, rather than evidence that such a regime has not been put into place. As discussed further below, additional documents Google has produced in this case also support this conclusion.

### 2. Additional Documents And Testimony Contradict Mr. Schneier's Claim That Google Has Not Undertaken Steps To Prevent Joining of Signed-Out And Signed-In Data

203. The efforts Google has undertaken to prevent joining of signed-out and signed-in browsing data are further evidenced by additional documents produced in this action, including the following examples:

---

[280] Schneier ¶ 205.

a. GOOG-CABR-04716372, at -375 [redacted] his design document from 2016 indicates that identifying and mitigating factors that may increase the risk of joining of signed-out and signed-in logs was and is a foundational principle in the design of Google's logging infrastructure.

b. GOOG-BRWN-00426550, at -551 [redacted] at -553 [redacted]; at -555 [redacted] design document shows that Google has implemented technical processes to prevent the joining of logged-in and logged-out activity.

[redacted]

This retention policy further illustrates steps that Google has taken to mitigate the risk of joining of signed-in and signed-out browsing activity via "scrubbing" of "cookies and any other stable identifiers [in unauthenticated logs]. . . to lower . . . re-identification risk."

d. GOOG-CABR-00063770, at -770-71 [redacted]

[REDACTED] This logging policy shows additional restrictions that Google has implemented in order to maintain separation between authenticated (i.e., "Gaia keyed") and unauthenticated (i.e., "anonymous") user data.

e. GOOG-BRWN-00027368, at -404:

This slide (i) underscores that preventing the joining of signed-in and signed-out user data is a core privacy requirement; and (ii) shows how Google uses encryption in [REDACTED] to prevent such joining.

f. *Id.* at -406:

This slide shows how [REDACTED] uses encryption to further restrict joining of authenticated and unauthenticated data.

204. I have also reviewed deposition testimony from a third-party ex-Google product manager (whose legal fees associated with the deposition were paid by Plaintiffs' counsel[281]) that further confirms that Google does not join private and non-private browsing mode information to create "cradle-to-grave" profiles.[282] Additional testimony from other Google witnesses confirms that Google does not join signed-in and signed-out browsing mode information.[283]

205. Assessments by independent auditors also describe the extensive steps Google has undertaken to implement privacy controls related to user data.[284]

**3. Google's Policy Restrictions And Pseudonymization Procedures Closely Align With Best Practices For Research Involving User Data**

206. Throughout my professional career as an academic, and in particular during the last handful of years that I have been working on efficient, privacy-preserving systems in the

---

[281] *See* McClelland Tr. 228:23-229:3 ("[Q.] [D]o you understand Mr. Bailey to be charging you in connection with his representation of you at today's deposition? A. No, the costs are being covered by the plaintiffs.").

[282] *See* McClelland Tr. 290:10-24 ("Q. Specifically[,] [is] the allegation that Google creates a cradle to grave profile that [combines] log[ged] out private browsing data with non-private browsing data [accurate]? A. My understanding and my experience at Google would indicate that that is not the case. From memory, tracking data after [REDACTED] is discarded, it's no longer useful, so the longest profile is based upon [REDACTED]' worth of data. Signed-in data is never -- there is no attempt to link signed in -- authenticate[d] user data with non-signed in data and certainly Incognito sessions were not joined with regular sessions.").

[283] *See* Berntson June 16, 2021 Tr. 199:1-8 ("Google has a set of, as -- as you noted, policies that are meant to prevent reidentifiability, prevent joining of sort of sensitive IDs in terms of, say, signed in and signed out. So the vast majority of the way all of our systems work, we maintain a very strict separation."); Berntson Mar. 18, 2022 Tr. 105:10-12 ("I'm not aware of an instance where [REDACTED] is joining IDs together for the purpose of serving personalized ads."); Jun Mar. 1, 2022 Tr. 146:10-19 ("[O]ne of the privacy principle[s] I learned during the project was we wanted to honor civilians' privacy and wanted to make sure it's not easy to map from device ID or biscotti ID to GAIA ID because GAIA ID might be linked to Gmail account which Google might be asked to retrieve the Gmail account contents through any government order, something like that. So vice versa. So we wanted to prevent such ID joinability to protect civilians' privacy.").

[284] *See, e.g.*, GOOG-BRWN-00526782; GOOG-BRWN-00468598; GOOG-BRWN-00041778; GOOG-BRWN-00468530.

context of three National Science Foundation (NSF) grants, I have been involved in a number of research efforts that require collection of data related to human subjects.[285] Both the National Institute of Health (NIH) and NSF have policies that researchers need to follow to protect the privacy rights of human subjects.[286] These regulations make grantee institutions responsible for setting up "Institutional Review Boards" (IRBs) to review research protocols and designs and ensure the protection of the rights of human subjects including privacy rights. IRBs review research protocols and designs and are charged with approving (or not) exceptions to ensure the protection of the rights of human subjects including privacy rights in research institutions per NSF/NIH regulations. Researchers collecting and working with sensitive data need to adhere to university privacy policies. *See, e.g.*, the University of Southern California's (USC's) policy[287] and Stanford University's policy.[288]

207. Like these IRBs, Google used an "Internal Privacy Policy Team" that (i) maintains privacy, data access, and other associated policies; and (ii) maintains control over those policies.[289]

[285] National Science Foundation, SaTC: Frontiers: Collaborative: Protecting Personal Data Flow on the Internet, Award# (USC): 1956435; National Science Foundation, CNS Core: Medium: Collaborative Research: Privacy-Preserving Mobile Crowdsourcing, Award# (USC): 1901488; National Science Foundation, NeTS: Spectrum Sharing Systems for Wireless Networks: Performance and Privacy Challenges.

[286] National Science Foundation, "Human Subjects," https://www.nsf.gov/bfa/dias/policy/human.jsp (last visited June 3, 2022); National Institutes of Health, "Protecting Sensitive Data and Information Used in Research," https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.3.12_protecting_sensitive_data_and_information_used_in_research.htm (updated Dec. 2021).

[287] Office for the Protection of Research Subjects, USC, https://oprs.usc.edu/policies/ (last visited June 3, 2022); Office for the Protection of Research Subjects, USC, "Chapter 10: Privacy, Confidentiality and HIPAA," https://oprs.usc.edu/policies/privacy-confidentiality-and-hipaa/ (last visited June 3, 2022).

[288] Research Compliance Office, Stanford University, HRPP Policy Manual.pdf, https://researchcompliance.stanford.edu/panels/hs/policies (last visited June 3, 2022).

[289] GOOG-BRWN-00200355, at -361-65.

208. To protect sensitive data, researchers are required to, for example, maintain systems where (i) "[t]he re-identification algorithm, code, or pseudonym is maintained in a separate system, with the appropriate controls in place to prevent unauthorized access to re-identification information"; and (ii) "[a]ll of the identifying PII fields can be removed, and the patient ID numbers can be obscured using pseudo-random data that is associated with a cross- reference table located in a separate system."[290] Similarly, Google separates the so called [REDACTED] which handles PII from the rest of the services: "Because we want [REDACTED] to be the only service in Display Ads to have raw access to both Gaia and Biscotti identifier spaces, [REDACTED] has to run under a separate MDB group from those running other existing services."[291]

209. To protect sensitive data, researchers are required to "Limit access to personally identifiable information using the principle of strict need-to-know."[292] Similarly, Google's user data access policy[293] dictates that "[a]uthorization is granted only for a specific purpose" and "[a]uthorized access to User Data for one purpose does not mean it can be used for another purpose."

210. Encryption of data is also required in the research context by established federal entities and established educational research institutes. For example, NIH policy says "If portable electronic devices must be used, they should be encrypted to safeguard data and

[290] National Institute of Standards and Technology, "Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)" https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf (Apr. 2010).

[291] GOOG-CABR-04715843, at -876; *see also* GOOG-CABR-00058926, at -963 ("Gaia encrypted with [REDACTED] . . . Biscotti encrypted with [REDACTED]

[292] Office for the Protection of Research Subjects, USC, "Chapter 10: Privacy, Confidentiality and HIPAA," https://oprs.usc.edu/policies/privacy-confidentiality-and-hipaa/ (last visited June 3, 2022).

[293] GOOG-CABR-05455683, at -683.

information."[294] USC's policy further specifies that researchers should "[e]ncrypt data" and use "[e]ncryption for transmission."[295] Google's users data access policy similarly states that "[u]ser Data must be strongly encrypted at rest and in transit."[296]

211. Anonymization of data is strongly encouraged and anonymization policies are thoroughly tested. For example, Stanford's policy states that "[the IRB] evaluates the proposed anonymizing techniques, (e.g., de-identification, coding), storage plans, access restrictions, data security methods (e.g., encryption) and other relevant factors in making its final determination concerning the appropriateness and adequacy of confidentiality protections,"[297] and the corresponding Google's policy states that "[a]ll User Data anonymization schemes should be approved by the Privacy Working Group's Anonymization Team [because] [a]nonymizing data is difficult to get right."[298]

**4. Google's Security Practices Closely Align With Best Practices In The Network Security Industry**

212. As discussed further below, it is my opinion that Google's information security practices regarding the Data At Issue are aligned with best practices in the network security industry.

213. There are a number of organizations that promulgate standards prescribing best practices for information security. For example, the Center for Internet Security (CIS) issues periodic "Criticial Security Controls" guidelines that have been cited by the California Attorney

---

294 National Institute of Health, "NIH Grants Policy Statement," https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.3.12_protecting_sensitive_data_and_information_used_in_research.htm (updated Dec. 2021).

295 Office for the Protection of Research Subjects, USC, "Chapter 10: Privacy, Confidentiality and HIPAA," https://oprs.usc.edu/policies/privacy-confidentiality-and-hipaa/ (last visited June 3, 2022).

296 GOOG-CABR-05455683, at -684.

297 Research Compliance Office, Stanford Univ., HRPP Policy Manual.pdf, https://researchcompliance.stanford.edu/panels/hs/policies (last visited June 2022), at 144.

298 GOOG-CABR-05455683, at -684.

General as "security measures with a high payoff . . . [that are] the priority actions that should be taken as the starting point of a comprehensive program to provide reasonable security."[299] CIS recently released Version 8 of this standard, which consists of eighteen recommended security measures.[300] "The CIS Controls were developed starting in 2008 by an international, grass-roots consortium bringing together companies, government agencies, institutions, and individuals from every part of the ecosystem (cyber analysts, vulnerability-finders, solution providers, users, consultants, policy-makers, executives, academia, auditors, etc.) who banded together to create, adopt, and support the CIS Controls."[301] "The expert volunteers who develop the Controls apply their first-hand experience to develop the most effective actions for cyber defense."[302]

214. A number of the CIS recommendations are particularly pertinent to the Data At Issue:

a. CIS Critical Security Control 3 ("CSC No. 3"): Data Protection ("Develop processes and technical controls to identify, classify, securely handle, retain, and dispose of data.")

b. CIS Critical Security Control 6 ("CSC No. 6"): Access Control Management ("Use processes and tools to create, assign, manage, and revoke access credentials and privileges for user, administrator, and service accounts for enterprise assets and software.")

---

[299] Kamala D. Harris, "California Data Breach Report," Cal. Dept. of Justice, https://oag.ca.gov/breachreport2016 (2016), at 31.

[300] Center For InternetSecurity, CIS Critical Security Controls Version 8 ("CIS Controls"), https://www.cisecurity.org/controls/v8 (last visited June 6, 2022).

[301] Center for Internet Security, "CIS Critical Security Controls FAQ,: https://www.cisecurity.org/controls/cis-controls-faq (last visited June 3, 2022).

[302] *Id.*

215. CSC No. 3 states that "[i]t is important for an enterprise to develop a data management process that includes a data management framework, data classification guidelines, and requirements for protection, handling, retention, and disposal of data."[303] This data management process should "address data sensitivity, data owner, handling of data, data retention limits, and disposal requirements, based on sensitivity and retention standards for the enterprise."[304] Retention policy enforcement entails "[r]etain[ing] data according to the enterprise's data management process," and "[d]ata retention must include both minimum and maximum timelines."[305] CSC No. 3 further recommends that sensitive data be encrypted "at rest" and "in transit."[306]

216. In my opinion, Google's policies and restrictions applicable to logs containing user data align with CSC No. 3 for the following reasons:

a. Google's policies applicable to logs containing user data clearly define the scope of logs to which the policies apply.[307]

b. Google's policies must be followed by all employees or other representatives.[308]

---

[303] CIS Controls at 15.
[304] *Id.*
[305] *Id.*
[306] *Id.*
[307] *See, e.g.*, GOOG-CABR-00892455, at -455 [redacted]
[308] *Id.* ("This policy applies to all full-time and part-time employees, the extended workforce, and other authorized representatives of Google and its subsidiaries.").

    c.      Pursuant to Google's User Data Access Policy, "[a]ll User Data at Google has a Data Owner."[309]

    d.      Google's User Data Access Policy also requires that "User Data must be **strongly** encrypted at rest and in transit."[310]

    e.      Google's retention policies applicable to user data establish retention periods applicable to user data in logs.[311]

217.    CSC No. 6 states that "[t]here should be a process where privileges are granted and revoked for user accounts . . ideally . . . based on enterprise role and need through role-based access."[312] "Role-based access is a technique to define and manage access requirements for each account based on: need to know, least privilege, privacy requirements, and/or separation of duties."[313]

218.    In my opinion, Google's policies and restrictions applicable to logs containing user data align with CSC No. 6 for the following reasons:

    a.      Google's policies establish "special rules" that, *inter alia*, govern "[a]uthorization and access control," "[a]ccessing data about users," "[r]e-identifying users from the data," "[c]onducting multi-day analysis," "[s]haring this data with others," and "[b]uilding tools that read or analyze this data."[314]

---

[309] GOOG-CABR-00073875, at -875.
[310] *Id.* at -876 (emphasis in original).
[311] *See, e.g.*, GOOG-CABR-00051478; GOOG-CABR-04717190; GOOG-CABR-00057420.
[312] CIS Controls at 24.
[313] *Id.*
[314] GOOG-CABR-00892455, at -455.

b. These special rules are contained in a "User Data Access Policy," and "User Data Access Authorization Guidelines," that "apply to logs data."[315]

c. Pursuant to Google's User Data Access Policy, "User Data access is only granted for authorized, valid Google business purposes," "[a]ll User Data access must be authorized by the appropriate User Data Delegate," and "[a]uthorized access to User Data for one purpose does not mean it can be used for another purpose . . . [which means that you can] not access User Data for anything other than the original authorized purpose without seeking additional authorization."[316]

***

219. The analyses and opinions in this report are based on the results of my research, my review and analysis of the materials provided to me, my education and training, and my experience on related topics. As additional materials and information become available or if the scope of discovery or the causes of action change in any material way, I reserve the right to amend, supplement, or update my analysis and conclusions.

Respectfully submitted by,

________________________

Dr. Konstantinos Psounis
Date: June 7, 2022

[315] *Id.*
[316] GOOG-CABR-00073875, at -875.

## V. APPENDICES

### A. Curriculum Vitae

#### EDUCATION

STANFORD UNIVERSITY Stanford, CA
*Department of Electrical Engineering* Jan. 1999 - Dec. 2002
**Ph.D. degree in Electrical Engineering.** Thesis title: "Probabilistic Methods for Web Caching and Performance Prediction of IP Networks and Web Farms", supervised by Prof. Balaji Prabhakar.

STANFORD UNIVERSITY Stanford, CA
*Department of Electrical Engineering* Sep. 1997 - Jan. 1999
**M.S. degree in Electrical Engineering.** GPA: 4.0/4.0. (Actual GPA 4.05/4.0.)

NATIONAL TECHNICAL UNIVERSITY OF ATHENS Athens, Greece
*Electrical and Computer Engineering* Department Sep. 1992 - June 1997
**Diploma in Electrical and Computer Engineering.** GPA: 9.74/10.0. (Graduated ranking 1st in the class of '97.)

#### WORK IN ACADEMIA

UNIVERSITY OF SOUTHERN CALIFORNIA Los Angeles, CA
Professor Nov. 2017 - now
*Associate Chair of ECE* department Jan. 2019 - Aug 2019
*Associate* Professor May. 2009 - Nov. 2017
*Assistant Professor* Sep. 2003 - Apr. 2009
*Electrical and Computer Engineering (ECE) and (jointly) Computer Science departments*
Research interests: Modeling, performance analysis, algorithm design, and system implementation for efficient and privacy-preserving networked, distributed systems, including the Internet and the web, data centers, CDNs and cloud systems, WiFi/cellular and spectrum sharing systems, sensor and IoT systems, mobile ad hoc and delay tolerant networks, peer to peer systems, and autonomous vehicles systems.

STANFORD UNIVERSITY Stanford, CA
*Visiting Associate* Professor Aug. 2009 - Dec. 2009
*Electrical Engineering department*.

STANFORD UNIVERSITY Stanford, CA
*Postdoctoral Research* Fellow Jan. 2003 - Aug. 2003
Scheduling of Internet flows and multi-server systems.

**WORK IN INDUSTRY**

ADANT TECHNOLOGIES
Consultant Jan. 2017 - May 2018
WiFi 802.11ax and smart antennas.

QUANTENNA COMMUNICATIONS
Consultant Jan. 2015 - 2016
Advanced MAC and PHY layer techniques applied to next generation wireless networks.

HONEYWELL
Consultant Sep. 2013 - Jun. 2014
Sensor-network based fire alarm systems.

SPACEMUX, INC.
*Co-founder and* CEO May 2013 - Dec. 2014
Increasing wireless bandwidth and speed tenfold.

CISCO SYSTEMS San Jose, CA
Consultant Sep. 2009 - Dec. 2009
Vehicular multi-technology wireless connectivity.

FINEGROUND NETWORKS INC. Cambell, CA
*Technology* Architect Sep. 2000 - June 2001
Accelerating web downloads using delta encoding.

**TEACHING EXPERIENCE**

- Co-creator and instructor for the USC graduate class EE597: “Wireless Networks”. Content: Introduction to current and next generation wireless networking technologies, detailed exploration of fundamental architectural and design principles used at all layers.
- Instructor for the USC graduate class EE503: “Probability for Electrical and Computer Engineering”. Content: Probability, discrete and continuous time Markov chains, basic queueing theory.
- Instructor for the USC undergrad class EE465: “Probabilistic Methods in Computer Systems Modelling”. Content: Probability, Markov chains, simulations.
- Creator and instructor for the USC graduate class EE650: “Advance Topics in Computer Networks: Mathematical tools for analyzing wired and wireless networks”. Content: Applications to networking problems of probability, queueing, Lyapunov functions, fluid limits, bipartite matchings, stable marriages, random walks on graphs, deterministic and stochastic optimization, statistical analysis, information theory, game theory.

**PHD STUDENT SUPERVISION**

- Namo Asavisanu (Aug. 2021 - now)
- Sean Hackett (co-advised with Prof. Aleksandra Korolova, Aug. 2021 - now)
- Jiang Zhang (Aug. 2019 - now)
- Lillian Clark (co-advised with Prof. Bhaskar Krisnamachari, Sep. 2018 - now)
- Hang Qiu (co-advised with Prof. Ramesh Govindan, Jan. 2015 - June 2021, currently a Post Doctoral Fellow at Stanford University)
- Po-Han Huang (Sep. 2015 - Jan. 2020, currently at Facebook, California)
- Kaidong Wang (Sep. 2014 - Dec. 2019, currently at Qualcomm, California)
- Yonglong Zhang (Sep. 2013 - Dec. 2018, currently at Facebook, California)
- Matthew Clark (Sep. 2013 - Dec. 2017, currently at Aerospace Corporation, California)
- Weng Chon Ao (Sep. 2012 - Dec. 2017, currently at Qualcomm, California)
- Antonios Michaloliakos (Aug. 2010 - Sep. 2016, currently at Broadcom, California)
- Ranjan Pal (co-advised with Prof. Leana Golubchik, Jan. 2009 - Aug. 2014, currently Assistant Research Professor at the University of Michigan, Ann Arbor)
- Vlad Horia Balan (Sep. 2007 - Aug. 2013, currently at Google, California)
- Wei-Cherng Liao (Sep. 2004 - Dec. 2008, currently at MediaTek, Taiwan)
- Apoorva Jindal (Sep. 2003 - Dec. 2008, currently at Uber, California)
- Fragkiskos Papadopoulos (Sep. 2003 - Dec. 2007, currently Associate Professor at Cyprus University of Technology, Cyprus)
- Thrasyvoulos Spyropoulos (Sep. 2003 - Jun. 2006, currently Associate Professor at Eurecom, France)

**PROPOSALS FUNDED**

NSF SATC GRANT Oct. 2020 - Sep. 2025
National Science foundation (NSF) award under the Secure and Trustworthy Computing (SaTC) call.
Proposal title: SaTC: Frontiers: Collaborative: Protecting Personal Data Flow on the Internet.

NSF CNS GRANT Oct. 2020 - Sep. 2023

National Science foundation (NSF) award under the Computer and Networked Systems (CNS) call.
Proposal title: CNS Core: Medium: Network-Enabled Cooperative Perception for Future Autonomous Vehicles.

NSF NETS GRANT Sep. 2019 - Aug. 2022
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal Title: CNS Core: Medium: Collaborative Research: Privacy-Preserving Mobile Crowdsourcing.

CISCO SYSTEMS GRANT April 2019
Research grant from the Cisco University Research Program.
Proposal Title: Virtual and augmented reality over next generation WiFi.

CISCO SYSTEMS GRANT Dec. 2016
Research grant from the Cisco University Research Program. Proposal Title: Data-driven formal optimization of data centers.

NSF NETS GRANT Sep. 2016 - Aug. 2020
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal Title: Spectrum Sharing Systems for Wireless Networks: Performance and Privacy Challenges.

ADANT TECHNOLOGIES GRANT June 2016
Research grant from Adant Technologies.
Proposal Title: Using reconfigurable antenna systems with WiFi communication devices.

HUAWEI GRANT May 2016
Research grant from Huawei.
Proposal Title: Addressing wireless bandwidth demand via asynchronously coordinated multi-cell deployments.

ADANT TECHNOLOGIES GRANT Dec. 2015
Research grant from Adant Technologies.
Proposal Title: Asynchronous coordination of WiFi transmitters equipped with smart antennas for enhanced spectral efficiency.

NSF EARS GRANT Sep. 2014 - Aug. 2019
National Science foundation (NSF) award under the Enhancing Access to the Radio Spectrum (EARS) crosscutting program.
Proposal Title: Future Wireless Broadband Access: Cross-Optimizing Hardware, Physical and Network Layers.

CISCO SYSTEMS GRANT May 2014

Research grant from the Cisco University Research Program.
Proposal Title: Rateless encoded UDP for error-resilient wireless links.

ARMY RESEARCH LABORATORY (ARL) GRANT Sep. 2009 - Aug. 2014
CTA: Communications and Networking Academic Research Center.
Proposal Title: QUANTA: Quality of Information-Aware Networks for Tactical Applications.

DOCOMO LABS GRANT Sep. 2011 - 2013
Research support from the DoCoMo Labs, US. Proposal Title: MIMO systems with TDD

CISCO SYSTEMS GRANT Sep. 2011 - 2013
Research grant from the Cisco University Research Program. Proposal Title: Efficient airtime allocation in wireless networks.

MING HSIEH INSTITUTE (MHI) GRANT May 2011 - 2013
MHI grant to build a large scale software radio testbed and implement distributed MIMO, interference alignment and massive MIMO systems, as well as perform channel sounding and modelling.
Proposal Title: Large-Scale Software-Radio Testbed.

METRANS TRANSPORTATION CENTER GRANT Aug. 2009 - Aug. 2010
METRANS Transportation Center grant to conduct research on metropolitan transportation issues.
Proposal title: End-to-end performance in vehicular networks with an emphasis on safety and security applications.

CISCO SYSTEMS GRANT Sep. 2008
Research grant from the Cisco University Research Program.
Proposal Title: Neighborhood centric transport for home networking environments.

NSF NETS GRANT Aug. 2008 - Aug. 2011
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal title: Contention-Awareness in Mesh Transport: Theory and Practice.

CISCO SYSTEMS GRANT Apr. 2008
Research grant from the Cisco University Research Program.
Proposal Title: TCP challenges in multi-hop wireless networks. From the networking workshop “The Future of TCP: Train-wreck or Evolution?”.

NSF REU SITE GRANT Mar. 2008 - Mar. 2011
Grant to establish a National Science Foundation (NSF) Research Experiences for Under-graduates (REU) site within the Computer Science department at the Viterbi School of Engineering.
Proposal Title: Coordination, Communication, Autonomy: Principles and Technologies.

VSOE INNOVATIVE RESEARCH FUND GRANT Dec. 2007 - Dec. 2008
Fund to initiate a Viterbi School of Engineering (VSoE) invited workshop on Wireless Networks. Proposal title: Establishing a New USC Invited Workshop on Theory and Practice in Wireless Networks.

METRANS TRANSPORTATION CENTER GRANT Oct. 2007 - Dec. 2008
METRANS Transportation Center grant to conduct research on metropolitan transportation issues.
Proposal title: Efficient Routing for Safety Applications in Vehicular Networks.

NSF NETS GRANT Aug. 2005 - Aug. 2008
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal title: Efficient Routing in Delay Tolerant Networking.

ZUMBERGE FACULTY RESEARCH AND INNOVATION GRANT July 2005 - June 2006
The James H. Zumberge faculty research and innovation award is granted to a selected number of Professors at the University of Southern California. Proposal title: Routing in Intermittently Connected Mobile Networks.

CHARLES LEE POWELL SCHOLARSHIP GRANT Dec. 2003 - Dec. 2004
The Charles Lee Powell grant is granted to a selected number of Assistant Professors at the University of Southern California.

**AWARDS**

ACM DISTINGUISHED MEMBER Nov. 2019
The ACM Distinguished Member program recognizes up to 10 percent of ACM worldwide membership with at least 15 years of professional experience who have achieved significant accomplishments or have made a significant impact on the computing field.

IEEE FELLOW Jan. 2018
The IEEE Grade of Fellow is conferred by the IEEE Board of Directors upon a person with an outstanding record of accomplishments in any of the IEEE fields of interest. The total number selected in any one year cannot exceed one-tenth of one- percent of the total voting membership. IEEE Fellow is the highest grade of membership and is recognized by the technical community as a prestigious honor and an important career achievement.

DISTINGUISHED MEMBER OF 2018 IEEE INFOCOM TPC AWARD 2018
The IEEE Communications Society awards annually a select number of TPC members of its flagship conference IEEE Infocom with a Distinguished Member award.

DISTINGUISHED MEMBER OF 2016 IEEE INFOCOM TPC AWARD 2016

The IEEE Communications Society awards annually a select number of TPC members of its flagship conference IEEE Infocom with a Distinguished Member award.

ACM NOTABLE ARTICLE IN COMPUTING - BEST OF 2013 2014
Selection of paper "Modelling BitTorrent-like systems with many classes of users", W.-C. Liao, F. Papadopoulos, K. Psounis, and C. Psomas, ACM Transactions on Modelling and Computer Simulation, Vol. 23, Issue 2, Article No. 13, May 2013.

MEPC BUSINESS PLAN COMPETITION - 2ND PLACE 2013
Presentation of SpaceMUX Inc., a USC spinoff startup specializing in advanced physical layer techniques applied to next generation wireless networks.

ACM SENIOR MEMBER AWARD Jan. 2009
The Senior Member grade recognizes those ACM members with at least 10 years of prof essional experience and 5 years of continuous professional membership who have demonstrated performance that sets them apart from their peers.

IEEE SENIOR MEMBER AWARD Nov. 2008
Qualifications for this distinction are at least ten years of professional practice and five years of significant performance as demonstrated by substantial engineering responsibility or achievement, publication of engineering and technical papers, books or inventions, and the development and teaching of engineering courses.

FUTURE OF TCP BEST PRESENTATION AWARD Apr. 2008
"Best and Most Compelling Presentation and Demonstration Award" at the networking workshop "The Future of TCP: Train-wreck or Evolution?" held at Stanford University and sponsored by Cisco Systems.

ZUMBERGE FACULTY RESEARCH AND INNOVATION AWARD July 2005
The James H. Zumberge faculty research and innovation award is granted to a selected number of Professors at the University of Southern California.

CHARLES LEE POWELL SCHOLARSHIP AWARD Dec. 2003
The Charles Lee Powell award is granted to a selected number of Assistant Professors at the University of Southern California.

ILLEANA AND ERIC BENHAMOU STANFORD GRADUATE FELLOWSHIP 1997 - 2002
Fellowship is awarded for four years to a very select number of PhD students based on academic merit.

BEST-STUDENT NATIONAL TECHNICAL UNIVERSITY OF ATHENS AWARD 1997
Awarded yearly to the student that graduates with the highest GPA across all departments of National Technical University of Athens.

OTHER GRADUATE STUDIES AWARDS 1997 - 1998
Regent's Fellowship by University of California Berkeley, Charles Lee Powell Foundation Graduate Fellowship by Caltech, Gordon Y. S. Wu Fellowship in Engineering by Princeton University, Sage Fellowship by Cornell University.

**PUBLICATIONS**

**REFEREED JOURNALS**

1. L. Clark, J. Galante, B. Krishnamachari, and K. Psounis. "A Queue-Stabilizing Framework for Networked Multi-Robot Exploration", *IEEE Robotics and Automation Letters*, February 2021.

2. W. Chon Ao, P. Huang and K. Psounis. "Joint Workload Distribution and Capacity Augmentation in Hybrid Datacenter Networks", *IEEE/ACM Transactions on Net-working*, October 2020.

3. R. Pal, K. Psounis, J. Crowcroft, F. Kelly, P. Hui, J. Kelly, A. Chatterjee, L. Golubchil, and S. Tarkoma. "When Are Cyber Blackouts in Modern Service Networks Likely? A Network Oblivious Theory On Cyber (Re)Insurance Feasibility", *ACM Transactions on Management Information Systems*, Article No.: 5, June 2020.

4. M. Clark and K. Psounis. "Optimizing Primary User Privacy in Spectrum Sharing Systems", *IEEE/ACM Transactions on Networking*, Vol. 28, Issue 2, April 2020.

5. W. Chon Ao and K. Psounis. "Resource-constrained Replication Strategies for Hierarchical and Heterogeneous Tasks", *IEEE Transactions on Parallel and Distributed Systems*, Vol. 31, Issue 4, June 2020.

6. K. Wang and K. Psounis. "Efficient scheduling and resource allocation in 802.11ax multi-user transmissions", *Computer Communications, Elsevier*, Vol. 152, pp.171-186, February 2020.

7. R. Pal, L. Golubchik, K. Psounis and T. Bandyopadhyay. "On Robust Estimates of Correlated Risk in Cyber-Insured IT Firms: A First Look at Optimal AI-Based Estimates under Small Data", *ACM Transactions on Management Information Systems*, Article No.: 9, October 2019.

8. Y. Zhang and K. Psounis. "Efficient Indoor Localization via Switched-beam Antennas", *IEEE Transactions on Mobile Computing*, June 2019.

9. P. Huang and K. Psounis, "Optimal Backhauling for Dense Small-Cell Deployments Using mmWave Links", *Computer Communications Journal, Elsevier*, Vol: 139, April 2019.

10. R. Pal, L. Golubchik, K. Psounis, and P. Hui, "Security Pricing as Enabler of Cyber-Insurance: A First Look at Differentiated Pricing Markets", *IEEE Transactions on Dependable and Secure Computing*, Vol. 16, Issue 2, March-April 2019.

11. W. Chon Ao and K. Psounis. "Data-locality-aware User Grouping in Cloud Radio Access Networks", *IEEE Transactions on Wireless Communications*, Vol: 17, Issue: 11, Nov. 2018.

12. Y. Zhang and K. Psounis. "Consistently High MIMO Rates via Switched-beam Antennas", *IEEE/ACM Transactions on Networking*, Vol: 26, Issue: 5, Oct. 2018.

13. W. Chon Ao and K. Psounis. "Fast Content Delivery via Distributed Caching and Small Cell Cooperation", *IEEE Transactions on Mobile Computing*, Vol: 17, Issue: 5, May 2018.

14. R. Pal, L. Golubchik, K. Psounis, "Improving Cyber-Security via Profitable Insurance Markets", *ACM SIGMETRICS Performance Evaluation Review*, Vol: 45, Issue 4, Mar. 2018.

15. M. Clark and K. Psounis. "Trading Utility for Privacy in Shared Spectrum Access Systems", *IEEE/ACM Transactions on Networking*, Vol. 26, Issue 1, February 2018.

16. A. Michaloliakos, W. C. Ao, K. Psounis and Y. Zhang. "Asynchronously Coordinated Multi-timescale beamforming architecture for multi-cell networks", *IEEE/ACM Transactions on Networking*, Vol. 26, Issue 1, February 2018.

17. W. Chon Ao and K. Psounis. "Approximation Algorithms for Online User Association in Multi-Tier Multi-Cell Mobile Networks", *IEEE/ACM Transactions on Networking*, Vol: 25, Issue: 4, August 2017.

18. M. Clark and K. Psounis. "Equal Interference Power Allocation for Efficient Shared Spectrum Resource Scheduling", *IEEE Transactions on Wireless Communications*, Vol: 16, Issue 1, January 2017.

19. A. Michaloliakos, R. Rogalin, Y. Zhang, K. Psounis and G. Caire. "Performance Modeling of Next-Generation WiFi Networks", *Computer Networks Journal*, Vol. 105, pp.150-165, August 2016.

20. R. Rogalin, O. Y. Bursalioglu, H. Papadopoulos, G. Caire, A. Molisch, A. Michaloli-akos, V. Balan, and K. Psounis. "Scalable Synchronization and Reciprocity Calibration for Distributed Multiuser MIMO", *IEEE Transactions on Wireless Communications*, Vol. 13, Issue 4, pp. 1815 - 1831, April 2014.

21. H. V. Balan, R. Rogalin, A. Michaloliakos, K. Psounis and G. Caire. "AirSync: Enabling Distributed Multiuser MIMO with Full Spatial Multiplexing", *IEEE/ACM Transactions on Networking*, Vol. 21, Issue 6, pp. 1681 - 1695, December 2013.

22. A. Jindal and K. Psounis. "On the Efficiency of CSMA-CA Scheduling in Wireless Multihop Networks", *IEEE/ACM Transactions on Networking*, Vol. 21, Issue 5, pp. 1392 - 1406, October 2013.

23. W.-C. Liao, F. Papadopoulos, K. Psounis, and C. Psomas. "Modelling BitTorrent-like systems with many classes of users", *ACM Transactions on Modelling and Computer Simulation*, Vol. 23, Issue 2, Article No. 13, May 2013.

24. A. Jindal, K. Psounis, and M. Liu, "CapEst: A Measurement-based Approach to Estimating Link Capacity in Wireless Networks", *IEEE Transactions on Mobile Computing*, Vol. 11, Iss. 12, pp. 2098–2108, May 2012.

25. S. Rangwala, A. Jindal, K.-Y. Jang, K. Psounis, and R. Govindan. "Neighborhood-centric congestion control for multi-hop wireless mesh networks", *IEEE/ACM Transactions on Networking*, Vol. 19, No. 6, pp. 1797–1810, December 2011.

26. W.-J. Hsu, T. Spyropoulos, K. Psounis and A. Helmy. "Modelling Spatial and Temporal Dependencies of User Mobility in Wireless Mobile Networks", *IEEE/ACM Trans-actions on Networking*, Vol. 17, Iss. 5, pp. 1564–1577, October 2009.

27. A. Jindal and K. Psounis. "The Achievable Rate Region of 802.11-Scheduled Multihop Networks", *IEEE/ACM Transactions on Networking*, Vol. 17, Iss. 4, pp. 1118–1131, August 2009.

28. A. Jindal, and K. Psounis. "Contention-Aware Performance Analysis of Mobility-Assisted Routing", *IEEE Transactions on Mobile Computing*, Vol. 8, No. 2, 145-161, February 2009.

29. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Efficient Routing in Intermittently Connected Mobile Networks: The Multiple-copy Case", *IEEE/ACM Transactions on Networking*, Vol. 16, Iss. 1, pp. 77–90, February 2008.

30. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Efficient Routing in Intermittently Connected Mobile Networks: The Single-copy Case", *IEEE/ACM Transactions on Networking*, Vol. 16, Iss. 1, pp. 63–76, February 2008.

31. F. Papadopoulos and K. Psounis. "Efficient Identification of Uncongested Internet Links for Topology Downscaling", *ACM SIGCOMM Computer Communication Review (CCR)*, Vol. 37, Issue 5, pp. 39–52, October 2007.

32. W.-C. Liao, F. Papadopoulos and K. Psounis. "Performance Analysis of BitTorrent-like Systems with Heterogeneous Users", *Performance Evaluation Journal*, Vol. 64, Issues 9–12, pp. 876-891, October 2007.

33. F. Papadopoulos, K. Psounis, and R. Govindan. "Performance Preserving Topological Downscaling of Internet-like Networks", *IEEE Journal on Selected Areas in Communications (JSAC)*, special issue on "Sampling the Internet: Techniques and Applications", Vol. 24, No. 12, pp. 2313-2326, December 2006.

34. W.-C. Liao, F. Papadopoulos, and K. Psounis. "A Peer-to-peer Cooperation Enhancement Scheme and its Performance Analysis", *Journal of Communications (JCM)*, Vol. 1, No. 7, pp. 24–35, November/December 2006.

35. A. Jindal and K. Psounis. "Modelling Spatially Correlated Data in Sensor Networks", *ACM Transactions on Sensor Networks*, Vol. 2, Issue 4, pp. 466 - 499, November 2006.

36. S. Rangwala, R. Gummandi, R. Govindan, and K. Psounis. "Interference-aware Fair Rate Control in Wireless Sensor Networks", *ACM SIGCOMM Computer Communication Review (CCR)*, Vol. 36, Issue 4, pp. 63–74, October 2006.

37. W.-C. Liao, F. Papadopoulos, and K. Psounis. "An Efficient Algorithm for Resource Sharing in Peer-to-peer Networks", *Lecture Notes in Computer Science, Springer*, Vol. 3976/2006, pp. 592–605, April 2006.

38. K. Psounis, P. Molinero Fernandez, B. Prabhakar, and F. Papadopoulos. "Systems with Multiple Servers under Heavy-tailed Workloads", *Performance Evaluation Jour-nal*, Vol. 62, Issue 1–4, pp. 456–474, October 2005.

39. R. Pan, K. Psounis, B. Prabhakar, and D. Wischik. "SHRiNK: A Method for Enabling Scaleable Performance Prediction and Efficient Network Simulation", *IEEE/ACM Transactions on Networking*, Vol. 13, No. 5, pp. 975–988, October 2005.

40. J. Faruque, K. Psounis, and A. Helmy. "Analysis of Gradient-based Routing Protocols in Sensor Networks", *Lecture Notes in Computer Science, Springer-Verlag*, Vol. 3560/2005, pp. 258–275, July 2005.

41. K. Psounis, A. Zhu, B. Prabhakar, and R. Motwani. "Modelling Correlations in Web-Traces and Implications for Designing Replacement Policies", *Computer Networks Journal*, Vol. 45, No. 4, pp. 379–398, July 2004.

42. K. Psounis, R. Pan, B. Prabhakar, and D. Wischik. "The Scaling Hypothesis: Simplifying the Prediction of Network Performance Using Scaled-down Simulations", *ACM SIGCOMM Computer Communication Reviews*, Vol. 33, No. 1, pp. 35–40, January 2003.

43. K. Psounis and B. Prabhakar. "Efficient Randomized Web-Cache Replacement Schemes Using Samples from Past Eviction-Times", *IEEE/ACM Transactions on Networking*, Vol. 10, No. 4, pp. 441-454, August 2002.

44. K. Psounis, R. Pan, and B. Prabhakar. "An Approximate Fair Dropping Scheme for Variable Length Packets", *IEEE Micro*, Vol. 21, No. 1, pp. 48–56, January/February 2001.

45. K. Psounis. "Active Networks, Applications, Security, Safety, and Architectures", *IEEE Communications Surveys Magazine*, Vol. 2, No. 1, pp. 1–16, 1st quarter 1999.

**CONFERENCE, PEER-REVIEWED, FULL-LENGTH PAPERS**

1. J. Zhang, K. Psounis, H. Muhammad, and Z. Shafiq, "HARPO: Learning to Subvert Online Behavioral Advertising", to appear in *NDSS*, 2022.

2. L. Clark, C. Andre, J. Galante, B.Krishnamachari, and K. Psounis, "TEAM: Trilat-eration for Exploration and Mapping with Robotic Networks", in *Proceedings of the 18th International Conference on Ubiquitous Robots*, July 2021.

3. L. Clark, J. Galante, B.Krishnamachari, and K. Psounis, "A Queue-Stabilizing Framework for Networked Multi-Robot Exploration", in *Proceedings of IEEE International Conference on Robotics and Automation (ICRA)*, May 2021.

4. P.-H. Huang and K. Psounis, "Efficient User-Cell Association for 360 Video Streaming over Wireless Networks", in *Proceedings of IFIP Networking*, June 2020.

5. A. Petropulu, K. Psounis, and A. Al Hilli, "MIMO Radar Privacy Protection Through Gradient Enforcement in Shared Spectrum Scenarios", in *Proceedings of IEEE Inter-national Symposium on Dynamic Spectrum Access Networks (DySPAN)*, Newark, NJ, November 2019.

6. E. Alimpertis, A. Markopoulou, C. T. Butts and K. Psounis, "City-Wide Signal Strength Maps: Prediction with Random Forests", in *Proceedings of WWW*, San Fransisco, CA, May 2019. (acceptance rate 15 percent)

7. A. Dimas, M. Clark, B. Li, K. Psounis and A. Petropulu, "On Radar Privacy in Shared Spectrum Scenarios", in *Proceedings of the International Conference on Acoustics, Speech, and Signal Processing (ICASSP)*, Brighton, UK, May 2019.

8. K. Wang and K. Psounis. "Scheduling and Resource Allocation in 802.11ax", in *Proceedings of IEEE Infocom*, Honolulu, Hi, April 2018. (acceptance rate 19.2 percent)

9. M. Clark and K. Psounis. "Achievable Privacy-Performance Tradeoffs for Spectrum Sharing with a Sensing Infrastructure", in *Proceedings of the 14th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP WONS)*, 8 pages (no pp. avail.), Isola, France, February 2018.

10. Y. Zhang and K. Psounis. "Efficient MU-MIMO via Switched-beam Antennas", in *Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Madras, India, July 2017. (acceptance rate 17 percent)

11. M. Clark and K. Psounis. "Designing Sensor Networks to Protect Primary Users in Spectrum Access Systems", in *Proceedings of the 13th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, 8 pages (no pp. avail.), Jackson, WY, February 2017. (acceptance rate 30 percent)

12. P.-H. Huang and K. Psounis. "Efficient mmwave wireless backhauling for dense small-cell deployments", in *Proceedings of the 13th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, 8 pages (no pp. avail.), Jackson, WY, February 2017. (acceptance rate 30 percent)

13. W. Chon Ao and K. Psounis. "An Efficient Approximation Algorithm for Online Multi-Tier Multi-Cell User Association", in *Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Paderborn, Germany, July 2016. (acceptance rate 18.7 percent)

14. H. Qiu, K. Psounis, G. Caire, K. Chugg and K. Wang. "High-Rate WiFi Broadcasting in Crowded Scenarios via Lightweight Coordination of Multiple Access Points", in

*Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Paderborn, Germany, July 2016. (acceptance rate 18.7 percent)

15. M. Clark and K. Psounis. "Can the Privacy of Primary Networks in Shared Spectrum be Protected?", in *Proceedings of IEEE INFOCOM*, 9 pages (no pp. avail.), San Fransisco, April 2016. (acceptance rate 18.2 percent)

16. G. Zois, A. Michaloliakos, K. Psounis, V. Vassalos and I. Mourtos. "Non-asymptotic performance bounds for downlink MU-MIMO scheduling", in *Proceedings of the 12th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP WONS)*, 8 pages (no pp. avail.), Italy, January 2016. (acceptance rate 30%)

17. W. Chon Ao and K. Psounis. "Distributed Caching and Small Cell Cooperation for Fast Content Delivery", in *Proceedings of ACM MOBIHOC*, pp. 127–136, Hangzhou, China, June 2015. (acceptance rate 14.8%)

18. M. Clark and K. Psounis. "Efficient Resource Scheduling for a Secondary Network in Shared Spectrum", in *Proceedings of IEEE INFOCOM*, pp. 1257–1265, Hong Kong, April 2015. (acceptance rate 19.0 percent)

19. R. Pal, L. Golubchik, K. Psounis, and P. Hui. "Will Cyber-Insurance Improve Network Security? A Market Analysis", in *Proceedings of IEEE INFOCOM*, pp. 235–243, Toronto, Canada, April 2014. (acceptance rate 19.4 percent)

20. E. N. Ciftcioglu, A. Michaloliakos, K. Psounis, T. La Porta, and A. Yener. "Power Minimization with Quality-of-Information Outages", in *Proceedings of the IEEE Wire-less Communications and Networking Conference (WCNC)*, pp. 1655–1660, Istanbul, Turkey, April 2014.

21. R. Pal, L. Golubchik, K. Psounis, and P. Hui. "On A Way to Improve Cyber-Insurer Profits: When A Security Vendor Becomes the Cyber-Insurer", in *Proceedings of IFIP NETWORKING*, 9 pages (no pp. avail.), New York, May 2013. (acceptance rate 26.2 percent)

22. H. V. Balan, M. Segura, S. Deora, A. Michaloliakos, R. Rogalin, K. Psounis and G. Caire. "USC SDR, an easy-to-program, high data rate, real time software radio platform", in *Proceedings of the ACM SIGCOMM workshop of Software Radio Implementation Forum (SRIF 2013)*, pp. 25–30, Hong Kong, China, August 2013.

23. A. Michaloliakos, R. Rogalin, H. V. Balan, K. Psounis and G. Caire. "Efficient MAC for distributed multiuser MIMO systems", in *Proceedings of the 10th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, pp. 52–59, Alberta, March 2013.

24. H. V. Balan, R. Rogalin, A. Michaloliakos, K. Psounis and G. Caire, "Achieving High Data Rates in a Distributed MIMO System", in *Proceedings of ACM MOBICOM*, pp. 41–52, Istanbul, Turkey, August 2012. (acceptance rate 15.1 percent)

25. M. Mongiovi, A. Singh, X. Yan, B. Zong, and K. Psounis, "Efficient multicasting for delay tolerant networks using graph indexing", in *Proceedings of IEEE INFOCOM*, pp. 1386–1394, Orlando, Florida, March 2012. (acceptance rate 18.0 percent)

26. R. Pal, L. Golubchik, and K. Psounis. "Aegis: A Novel Cyber-Insurance Model", in *Proceedings of the 2nd Conference on Decision and Game Theory for Security (GameSec 2011)*, pp. 131–150, College Park, Maryland, November 2011.

27. E. N. Ciftcioglu, A. Yener, R. Govindan, and K. Psounis. "Operational Information Content Sum Capacity: Formulation and Examples", in *Proceedings of the 14th International Conference on Information Fusion (FUSION)*, pp. 1–7, Chicago, July 2011.

28. K.-Y. Jang, K. Psounis, and R. Govindan. "Simple Yet Efficient, Transparent Airtime Allocation for TCP in Wireless Mesh Networks", in *Proceedings of ACM CoNEXT*, article no. 28, 12 pages, Philadelphia, December 2010. (acceptance rate 19 percent)

29. A. Jindal and K. Psounis. "Making the Case for Random Access Scheduling in Wireless Multi-hop Networks", in *Proceedings of IEEE INFOCOM*, (mini-conference), pp. 1–5, San Diego, California, March 2010. (acceptance rate 24 percent)

30. S. Rangwala, A. Jindal, K.-Y. Jang, K. Psounis, and R. Govindan. "Understanding Congestion Control in Multi-hop Wireless Mesh Networks", in *Proceedings of ACM MOBICOM*, pp. 291–302, San Fransisco, California, September 2008. (acceptance rate 12 percent)

31. F. Papadopoulos and K. Psounis. "Scaling Properties of IEEE 802.11 Wireless Networks", in *Proceedings of the 6th Intl. Symposium on Modeling and Optimization in Mobile, Ad Hoc and Wireless Networks (WiOpt)*, 8 pages (no pp. avail.), Berlin, Germany, March 2008.

32. W.-C. Liao, F. Papadopoulos and K. Psounis. "Performance Analysis of BitTorrent-like Systems with Heterogeneous Users", in *Proceedings of the 26th International Sym-posium on Computer Performance, Modeling, Measurements and Evaluation (IFIP Performance)*, pp. 876–891, Cologne, Germany, October 2007. (acceptance rate 23 percent)

33. W.-J. Hsu, T. Spyropoulos, K. Psounis and A. Helmy. "Modeling Time-variant User Mobility in Wireless Mobile Networks", in *Proceedings of IEEE INFOCOM*, pp. 758–766, Anchorage , Alaska, USA, May 2007. (acceptance rate 18 percent)

34. A. Jindal, and K. Psounis. "Contention-Aware Analysis of Routing Schemes for Mobile Opportunistic Networks", in *Proceedings of ACM MOBISYS, on the 1st International Workshop on Mobile Opportunistic Networking (MobiOpp)*, pp. 1–8, San Juan, Puerto Rico, June 2007.

35. F. Papadopoulos and K. Psounis. "Predicting the Performance of Mobile Ad hoc Networks Using Scaled-down Replicas", in *Proceedings of IEEE International Conference on Communications (ICC)*, pp. 3928-3935, Glasgow, Scotland, June 2007.

36. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Spray and Focus: Efficient Mobility-Assisted Routing for Heterogeneous and Correlated Mobility", in *Proceedings of IEEE PERCOM, on the International Workshop on Intermittently Connected Mobile Ad hoc Networks (ICMAN)*, pp. 79–85, New York City, USA, March 2007.

37. A. Jindal and K. Psounis. "Fundamental Mobility Properties for Realistic Performance Analysis of Intermittently Connected Mobile Networks", in *Proceedings of IEEE PERCOM, on the International Workshop on Intermittently Connected Mobile Ad hoc Networks (ICMAN)*, pp. 59–64, New York City, USA, March 2007.

38. S. Rangwala, R. Gummandi, R. Govindan, and K. Psounis. "Interference-aware fair rate control in wireless sensor networks", in *Proceedings of ACM SIGCOMM*, pp. 63–74, Pisa, Italy, September 2006. (acceptance rate 12 percent)

39. T. Spyropoulos, K. Psounis, and C. Raghavendra, "Performance Analysis of Mobility-assisted Routing, in *Proceedings of ACM MOBIHOC*, pp. 49–60, Florence, Italy, May 2006. (acceptance rate 10 percent)

40. W.-C. Liao, F. Papadopoulos, and K. Psounis. "An Efficient Algorithm for Resource Sharing in Peer-to-peer Networks", in *Proceedings of IFIP Networking*, pp. 592–605, Coimbra, Portugal, May 2006. (acceptance rate 20 percent)

41. A. Jindal and K. Psounis. "Performance Analysis of Epidemic Routing under Contention", in *Proceedings of IWCMC*, pp. 539–544, Vancouver, Canada, July 2006.

42. K. Psounis, P. Molinero Fernandez, B. Prabhakar, and F. Papadopoulos. "Systems with Multiple Servers under Heavy-tailed Workloads", in *Proceedings of the 24th International Symposium on Computer Performance, Modeling, Measurements and Evaluation (IFIP Performance)*, pp. 456–474, Juan-les-Pins, France, October 2005. (acceptance rate 22 percent)

43. A. Jindal and K. Psounis. "Modeling Spatially-correlated Data of Sensor Networks with Irregular Topologies", in *Proceedings of IEEE SECON*, pp. 305–316, Santa Clara, California, USA, October 2005. (acceptance rate 27 percent)

44. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Spary and Wait: An Efficient Routing Scheme for Intermittently Connected Mobile Networks", in *Proceedings of ACM SIGCOMM workshop on Delay Tolerant Networking (WDTN)*, pp. 252–259 Philadelphia, Philadelphia, USA, August 2005. (acceptance rate 22 percent)

45. J. Faruque, K. Psounis, and A. Helmy. "Analysis of Gradient-based Routing Protocols in Sensor Networks", in *Proceedings of IEEE/ACM DCOSS*, pp. 258–275, Marina Del Rey, California, USA, June 2005. (acceptance rate 28 percent)

46. K. Psounis, A. Ghosh, B. Prabhakar, and G. Wang. "SIFT: a Simple Algorithm for Trucking Elephant Flows and Taking Advantage of Power Laws", in *Proceedings of the 43rd Allerton Conference on Communication, Control, and Computing*, 10 pages (no pp. avail.), Urbana-Champaign, Illinois, USA, September 2005.

47. F. Papadopoulos, K. Psounis, and R. Govindan. "Performance-Preserving Network Downscaling", in *Proceedings of the 38th Annual Simulation Symposium (ANSS)*, pp. 285–294, San Diego, California, April 2005.

48. A. Jindal and K. Psounis. "Modelling Spatially-correlated Sensor Network Data", in *Proceedings of IEEE SECON*, pp. 162–171, Santa Clara, California, USA, October 2004. (acceptance rate 19 percent)

49. T. Spyropoulos, K.Psounis, and C. Raghavendra. "Single-copy Routing in Intermit-tently Connected Mobile Networks", in *Proceedings of IEEE SECON*, pp. 235–244, Santa Clara, California, USA, October 2004. (acceptance rate 19 percent)

50. R. Pan, B. Prabhakar, K. Psounis, and D. Wischik. "SHRiNK: A Method for Scalable Performance Prediction and Efficient Network Simulation", in *Proceedings of IEEE INFOCOM*, Vol. 3, pp. 1943–1953, San Fransisco, California, USA, April 2003. (acceptance rate 21percent)

51. K. Psounis, R. Pan, B. Prabhakar, and D. Wischik. "The Scaling Hypothesis: Sim-plifying the Prediction of Network Performance Using Scaled-down Simulations", in *Proceedings of ACM HOTNETS*, pp. 35–40, Princeton, New Jersey, USA, October 2002.

52. R. Pan, B. Prabhakar, K. Psounis, and M. Sharma. "A Study of the Applicability of a Scaling Hypothesis", in *Proceedings of ASCC*, 6 pages (no pp. avail.), Singapore, Singapore, September 2002.

53. K. Psounis. "Class-based Delta Encoding: A Scalable Scheme for Caching Dynamic Web Content", in *Proceedings of IEEE ICDCS Workshops*, pp. 799 - 805, Vienna, Austria, July 2002.

54. K. Psounis and B. Prabhakar. "A Randomized Web-cache Replacement Scheme", in *Proceedings of IEEE INFOCOM*, Vol. 3, pp. 1407–1415, Anchorage, Alaska, USA, April 2001. (acceptance rate 23 percent)

55. R. Pan, B. Prabhakar, and K. Psounis. "CHOKe, A Stateless Active Queue Manage-ment Scheme for Approximating Fair Bandwidth Allocation", in *Proceedings of IEEE INFOCOM*, Vol. 2, pp. 942–951, Tel Aviv, Israel, March 2000. (acceptance rate 26 percent)

56. K. Psounis, R. Pan, and B. Prabhakar. "An Approximate Fair Dropping Scheme for Variable Length Packets", in *Proceedings of Hot Interconnects 8*, pp. 2–10, Stanford, California, USA, August 2000.

57. K. Psounis, B. Prabhakar, and D. Engler. "A Randomized Cache Replacement Scheme Approximating LRU", in *Proceedings of the 34th annual conference on Information Sciences and Systems*, 6 pages (no pp. avail.), Princeton, New Jersey, USA, March 2000.

**BOOK CHAPTERS**

1. K. Psounis and M. Clark. Privacy in Spectrum Sharing Systems with Applications to Communications and Radar, In *Signal Processing for Joint Radar-Communications*, Wiley-IEEE Press, 2021.

**INVITED JOURNALS**

1. T. Spyropoulos, A. Jindal, and K. Psounis. "An Analytical Study of Fundamental Mobility Properties for Encounter-based Protocols", *International Journal of Au-tonomous and Adaptive Communications Systems*, Vol. 1, Issue 1, pp. 440, July 2008.

**INVITED CONFERENCE PAPERS**

1. L. Clark, M. Clark, K. Psounis and P. Kairouz. "Privacy-utility trades in wireless data via optimization and learning", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2019.

2. A. Dimas, B. Li, M. Clark, K. Psounis, A. Petropulu. "Spectrum Sharing Between Radar and Communication systems: Can the Privacy of the Radar be Preserved?", in *Proceedings of the Asilomar Conference on Signals, Systems and Computers*, Pacific Grove, California, USA, October 2017.

3. A. Michaloliakos, W. Chon Ao and K. Psounis. "Joint user-beam selection for hybrid beamforming in asynchronously coordinated multi-cell networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2016.

4. Y. Zhang, D. Bethanabhotla, T. Hao and K. Psounis. "Near-optimal user-cell associ-ation schemes for real-world networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2015.

5. A. Jindal, K. Psounis, and M. Liu. "CapEst: Estimating wireless link capacity in multi-hop networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 6 pages (no pp. avail.), San Diego, California, USA, February 2011.

6. D. Antonellis, A. Mansy, K. Psounis, and M. Ammar. "Real time, distributed network classification for routing protocol selection in mobile ad hoc networks", in *Proceedings of the fourth international wireless Internet conference (WICON)*, 8 pages (no pp. avail.), Maui, Hawaii, November 2008.

7. Y. Wang, A. Ahmed, B. Krishnamachari, and K. Psounis. "IEEE 802.11p perfor-mance evaluation and protocol enhancement", in *Proceedings of the IEEE Interna-tional*

*Conference on Vehicular Electronics and Safety*, pp. 317–322, Columbus, Ohio, USA, September 2008.

8. A. Jindal and K. Psounis. "Achievable Rate Region and Optimality of Multi-hop Wireless 802.11-Scheduled Networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 7 pages (no pp. avail.), San Diego, California, USA, January 2008.

9. F. Papadopoulos and K. Psounis. "Application of the many sources asymptotic in downscaling Internet-like networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, pp. 314–322, San Diego, California, USA, January 2007.

10. A. Jindal and K. Psounis. "Optimizing Multi-Copy Routing Schemes for Resource Constrained Intermittently Connected Mobile Networks", in *Proceedings of the Forti-eth Asilomar Conference on Signals, Systems and Computers*, pp. 2142–2146, Pacific Grove, California, USA, October 2006.

**CITATIONS**

- Total citations: 12997
- ·h-index: 38

(source: google scholar, accessed: Fall 2021)

**ISSUED PATENTS**

- G. Caire, K. Psounis. Composite beamforming to coordinate concurrent WLAN links. Quantenna Communications, Inc.
- *US Patent No. 9,479,240*, issued Oct. 2016.
- K. Psounis, G. Caire, H. V. Balan. AirSync: enabling distributed multiuser MIMO with full multiplexing gain. USC.
- *US Patent No. 61,651,964*, issued Jan. 2015.
- K. Psounis and J. Jawahar. Method and System for Class-based Management of Dynamic Content in a Networked Environment. Cisco Systems, Inc.
- *US Patent No. 7,802,014*, issued Sep. 2010.
- R. Pan, B. Prabhakar and K. Psounis. A Stateless Active Queue Management Scheme for Approximating Fair Bandwidth Allocation. Stanford.
- *US Patent No. 7,324,442*, issued Jan. 2008.

**SELECTED PROFESSIONAL SERVICE**

**INTERNATIONAL CONFERENCES – ORGANIZING/EXECUTIVE COMMITTEE**

- Steering Committee, IFIP/IEEE WONS, 2017 - now.
- General Chair, ACM SIGMETRICS, 2018.
- General Chair, IFIP/IEEE WONS, 2017.
- Program Chair, IFIP/IEEE WONS, 2016.
- Program Chair, IEEE DCOSS workshop on Wireless Sensor Networks (PWSN), 2014.
- Program Chair, ACM MOBICOM workshop on Challenged Networks (CHANTS), 2008.
- Workshop Chair, ACM SIGMETRICS 2008.
- Workshop Chair, USC Workshop on Theory and Practice in Wireless Networks, 2008.
- Publication Chair, ACM SIGMETRICS 2007.
- Panel Chair, ACM MOBIHOC, 2009.
- Panel Chair, IEEE CCW, 2008.

**INTERNATIONAL CONFERENCES – TECHNICAL PROGRAM COMMITTEE**

- IFIP/IEEE WONS 2013 - 2014, 2018, 2022
- IEEE INFOCOM 2005 - 2020.
- ACM SIGMETRICS 2008, 2014, 2015, 2017, 2020.
- ACM MOBIHOC, 2008 - 2010, 2017-2020.
- WiOpt 2016-2017.
- IEEE SECON 2007 - 2010.
- IFIP NETWORKING 2006 - 2010.
- ACM MOBICOM, 2009.
- IEEE ICNP 2009.
- IEEE WOWMOM workshop on Autonomic and Opportunistic Communications (AOC), 2008 -2009.
- IEEE ICDCS workshop on Delay Tolerant Mobile Networks (DTMN), 2008.
- ACM MOBISYS workshop on Mobile Opportunistic Networks (MOBIOPP), 2007.
- IEEE PERCOM workshop on Intermittently Connected Mobile Ad hoc Networks (IC-MAN), 2007.

## JOURNALS

- Editorial Board, IEEE/ACM Transactions on Networking (ToN), 2015 - 2020.
- Editorial Board, IEEE Transactions on Mobile Computing (TMC), 2009 - 2019.
- Editorial Board, Computer Networks Journal, Elsevier, 2009 - 2010.
- Editorial Board, International Journal of Autonomous and Adaptive Communications Systems (IJAACS), 2008.
- Reviewer of IEEE/ACM Transactions on Networking, IEEE Journal on Selected Ar-eas in Communication, IEEE Transactions on Parallel and Distributed Systems, IEEE Transactions on Mobile Computing, ACM Transactions on Sensor networks, Elsevier Computer Networks Journal, Elsevier Performance Evaluation Journal, Elseviers Ad Hoc Networks Journal, Transportation Research Journal Part C, IEEE Transactions on Automatic Control.

## GOVERNMENTAL AGENCIES

- NSF ML panel, 2020.
- NSF CAREER panel, 2019.
- NSF EARS meeting, 2016.
- NSF Future Internet Architecture Summit participant, 2009.
- NSF CRI panel member, 2008.
- NSF Wireless mobile workshop participant, 2007.
- NSF NeTS-NOSS panel member, 2005.
- Reviewer of NSF NeTS proposals.

## PROFESSIONAL ASSOCIATIONS

- Institute of Electrical and Electronic Engineers (IEEE):
  IEEE Fellow, 2018 - now.
  Senior Member, 2008 - 2017.
  Member, 1998 - 2008.
- Association for Computing Machinery (ACM):
  ACM Distinguished Member, 2019 - now.
  Senior Member, 2009 - 2018.
  Member, 2001 - 2008.
- Technical Institution of Greece (TEE), 1997 - now.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**LANGUAGES**

English, Greek, French.

**PRIOR TESTIMONY**

January 19, 2022 Deposition in *CA, Inc. et al v. Netflix, Inc.*, Case No. 2:21-cv-00080-JRG-RSP (E.D. Tex.).

140

**B. Table Of Opinions**

| § | Opinion | Pages | ¶¶ | Sub-Headings | Pages | ¶¶ |
|---|---|---|---|---|---|---|
| **III.A.** | **Opinion 1:** Mr. Hochman's Opinion That Users Can Readily Be Identified From The Data At Issue (# 18) Is Incorrect. | 20-33 | 35-68 | 1. The Data At Issue Is Not Associated With A Google Account | 20-25 | 36-47 |
| | | | | 2. The Data At Issue Is Stored In An Orphaned And Unidentified State | 25-31 | 48-64 |
| | | | | 3. Privacy-Preserving Technical Barriers And Policies Prevent Google From Re-Identifying Logs Data | 31-33 | 65-68 |
| **III.B.** | **Opinion 2:** Mr. Hochman's Opinions On Interception, Notice, And Deletion Of Private Browsing Information (# 4, 5, 6, 26, 31) Are Contrary To Industry Guidelines On Private Browsing. | 33-37 | 69-76 | | | |
| **III.C.** | **Opinion 3:** Mr. Hochman's Opinions On "Private Browsing Profiles," Server-Side Processes, And Data Joinability (# 10, 18, 19, 20) Are Inaccurate. | 37-42 | 77-85 | 1. Orphaned And Unidentified Interest Segments Are Not Cradle-To-Grave Profiles | 37-41 | 78-83 |
| | | | | 2. Mr. Hochman's Claims Regarding Google's Retention Policies Show That These Policies Prevent The Creation Of Such Profiles | 41-42 | 84-85 |

| § | Opinion | Pages | ¶¶ | Sub-Headings | Pages | ¶¶ |
|---|---|---|---|---|---|---|
| **III.D.** | **Opinion 4:** Mr. Hochman's Assertion That Google Used Private Browsing Information To Measure Conversions (# 14) Is Misleading. | 42-43 | 86-89 | | | |
| **III.E.** | **Opinion 5:** Mr. Hochman's Description Of Entropy (# 18) Is Incorrect. | 44-46 | 90-96 | | | |
| **III.F.** | **Opinion 6:** Mr. Hochman's Assertions On Fingerprinting (# 9, 18) Are Misleading And Unfounded. | 46-53 | 97-108 | 1. Google Does Not Engage In Fingerprinting | 47-49 | 97-99 |
| | | | | 2. Google's Internal Policies Expressly Prohibit Fingerprinting | 49-50 | 100-102 |
| | | | | 3. Google's System Architecture Supports Google's Anti-Fingerprinting Policy | 51-53 | 103-108 |
| **III.G.** | **Opinion 7:** Mr. Hochman's Proposal to Identify Class I (Chrome Class) (# 22) Is Unreasonable and Unreliable. | 53-70 | 109-141 | 1. Hochman's IP + UA Fingerprinting Method Will Not Work | 55-64 | 111-127 |
| | | | | 2. Pseudonymous IDs Can Not Be Used To Reliably Identify Individuals | 64-70 | 128-141 |
| **III.H** | **Opinion 8:** Mr. Hochman's Opinion That The "maybe_Chrome_incognito" Bit Reliably Detects Incognito Traffic (# 23) Is Incorrect. | 71-74 | 142-145 | | | |

| § | Opinion | Pages | ¶¶ | Sub-Headings | Pages | ¶¶ |
|---|---|---|---|---|---|---|
| **III.I** | **Opinion 9:** Mr. Hochman's Proposal To Identify Class II (# 22) Is Unreasonable And Unreliable. | 74-83 | 146-161 | 1. Mr. Hochman's Proposed Email Notification To All Google Account Holders Is Overly Broad And He Does Not Propose A Workable Methodology For Limiting The Notification To Class Members | 76-78 | 148-152 |
| | | | | 2. Mr. Hochman's Proposed Methodology For Limiting Class II To Private Browsing Mode Users After Notification Is Unreliable | 79-83 | 153-161 |
| **III.J** | **Opinion 10:** Mr. Hochman's Proposed Methods For Identifying Class Members (# 22) Do Not–And Cannot–Account For Shared Devices or Accounts. | 83-95 | 162-180 | | | |
| **IV.A.** | **Opinion 11:** Mr. Schneier's Assertion That "Browsing Information Is Unique For Each User" Is Unsupported And Misleading. | 96-99 | 181-186 | | | |
| **V.B** | **Opinion 12:** Mr. Schneier's Claim That "Personal Data Is Difficult to Anonymize and Easy to De-anonymize" Is Unsupported And Is Incorrect For The Data At Issue. | 99-105 | 187-193 | | | |

| § | Opinion | Pages | ¶¶ | Sub-Headings | Pages | ¶¶ |
|---|---|---|---|---|---|---|
| **V.C.** | **Opinion 13:** Mr. Schneier's Assertion That Google Has Not Taken Steps To Ensure That A User's Choice To Sign Out Of A Google Account Will Prevent Google From Associating The User's Signed-Out Activity With Any Signed-In Data Is Incorrect. | 105-119 | 194-219 | 1. The Documents Mr. Schneier Cites Do Not Support His Conclusion | 106-109 | 196-202 |
| | | | | 2. Additional Documents And Testimony Contradict Mr. Schneier's Claim That Google Has Not Undertaken Steps To Prevent Joining of Signed-Out And Signed-In Data | 109-112 | 203-205 |
| | | | | 3. Google's Policy Restrictions And Pseudonymization Procedures Closely Align With Best Practices For Research Involving User Data | 112-115 | 206-211 |
| | | | | 4. Google's Security Practices Closely Align With Best Practices In The Network Security Industry | 115-119 | 212-218 |

### C. Hochman To Psounis Mapping

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| VIII. A | **Google Interception:** Throughout the class period, Google intentionally intercepted private browsing communications between users and non-Google websites while those communications were in transit | 20-48 | A.1 Google designed tracking and advertising code to run on non-Google websites for Google's interception | 82-94 | **# 1** | "[T]hroughout the class period, Google, by way of various tracking beacons, intercepted private browsing communications between users and non-Google websites while those communications were in transit." | |
| | | | A.2 Google intercepted (and continues to intercept) private browsing communications between users and non-Google websites, with Google obtaining personal information from those communications | 95-109 | **# 2** | "[A] major function of the tracking beacons is to collect highly personal information about users' browsing activities, including users who choose a private browsing mode, such as the contents of their communications with non-Google websites in the form of detailed URL requests, webpage and video interactions, and more." | |
| | | | A.3 Google designed its tracking beacons to collect information by intercepting communications while they were in transit | 110-112 | **# 3** | "[T]hroughout the class period, the Google tracking beacons which cause private browsing communications to be intercepted neither facilitate nor are incidental to the communications between users and non-Google websites. The Google tracking beacons functioned (and continue to function) to listen in and collect information from these private browsing communications." | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | A.4 Google's tracking beacons neither facilitate nor are they incidental to communications between users and non-Google websites | 113-116 | | | |
| | | | A.5 This functionality was not an accident; Google designed its tracking and advertising code this way | 117-119 | **# 4** | "Google could have at any point before or during the class period, redesigned Chrome Incognito to either stop or limit Google's collection of private browsing information from the private communications between users and non-Google websites." | **§ III.B** |
| | | | A.6 Google could have designed its products differently | 120-133 | | | |
| **VIII. B** | **User Notification & Choice:** Throughout class period, Google collected this private browsing information without notifying users or offering a choice at the time of or in connection with any of the interceptions | 48-49 | n.a. | 134-135 | **# 5** | "Google, throughout the class period, intercepted private browsing communications without notifying users or providing a choice at the time of collection. Google could have provided such notification but did not." | **§ III.B** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| **VIII. C** | **Website Notification & Choice:** Throughout class period, Google collected this private browsing information without notifying websites at the time of or in connection with any of the interceptions or providing websites with a choice | 49-50 | n.a. | 136-137 | **# 6** | "Google, throughout the class period, intercepted private browsing communications without notifying websites or providing a choice at the time of collection. Google could have done that but did not." | **§ III.B** |
| **VIII. D** | **Google Storage:** Throughout the class period, Google stored private browsing information in many Google data sources, sometimes permanently | 50-61 | n.a. | | **# 7** | "Google, throughout the class period, has stored the private browsing information it has collected in many Google data sources, sometimes permanently." | |
| | | | D.1 With the Special Master process, Google identified some but not all sources that include private browsing information | 140-152 | **# 8** | "Google, within the Special Master process, did not identify all logs or data sources that contain private browsing information, omitting key logs." | |
| | | | D.2 Google keeps some private browsing information permanently, with no option for users to review or request deletion of that information | 154-161 | **# 9** | "Google, throughout the class period, has not provided an option for users to review or request deletion of their private browsing information. Google only provided such controls for activities when users are signed into Google, while giving private browsing users no controls when they are not signed into Google." | **§ III.F** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | D.3 Google merged private and non-private browsing information in its logs and other data sources | 162-165 | **n.a.** | **n.a.** | **§ III.B** |
| **VIII. E** | **Google Use:** Throughout the class period, Google exploited private browsing information to generate revenue for Google by creating profiles, serving ads, tracking conversions, and in other ways that benefited Google | 61-93 | E.1 Google Tracking & Profiling: Throughout the class period, Google tracked private browsing communications to create detailed profiles | 167-178 | **# 10** | "Google, throughout the class period, created detailed profiles tied to various Google identifiers (that remain undisclosed to users) based on the private browsing information it collected." | **§ III.C** |
| | | | | | **# 11** | "Google, throughout the class period, collected valuable data (including private browsing information collected from users' visits to non-Google websites while signed out of any Google account) to feed and develop Google's machine learning algorithms, which Google in turn uses to generate advertising revenues." | |
| | | | E.2 Advertising: Throughout the class period, Google used private browsing information to serve ads (including targeted ads) | 179-191 | **# 12** | "Google's tracking beacons have, throughout the class period, enabled Google to serve advertisements to users visiting non-Google websites within their private browsing sessions while not signed into any Google account." | |
| | | | | | **# 13** | "Google, throughout the class period, used private browsing information to serve personalized advertisements to private browsing users, including on non-Google websites and while not signed into any Google account, using their private browsing | |

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | | | | information." | |
| | | | E.3 Conversion Tracking: Throughout the Class Period, Google used private browsing information to track conversions | 192-211 | **# 14** | "Google, throughout the class period, used private browsing information to measure and model conversions." | **§ III.D** |
| | | | E.4 Google has attempted to circumvent the blocking of Google tracking beacons by Firefox's private browsing mode and blocking of cookies by Apple's Intelligent Tracking Prevention (ITP) | 212-214 | **# 15** | "Google before and during the class period attempted to circumvent efforts by other companies to block Google tracking beacons (including with Firefox private browsing's Tracking Protection and Enhanced Tracking Protection) and to block tracking cookies (including with Apple's Intelligent Tracking Prevention)." | |
| | | | E.5 Analytics: Throughout the class period, Google used private browsing information to provide information to Google's Analytics customers and increase Google's total ads revenues | 215-220 | **# 16** | "Google, throughout the class period, used private browsing information collected through Google Analytics tracking beacons for purposes of delivering advertisements, including personalized advertisements and remarketing." | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | E.6 Google also used private browsing information to enhance Search revenue and develop and improve other Google products and algorithms | 221-222 | **# 17** | "Google, throughout the class period, included private browsing information in the data sets used to enhance Google Search revenues and to develop and improve other Google products and algorithms." | |
| **VIII. F** | **Google Joinability:** Throughout the class period, Google collected and stored private browsing information in ways that can be joined to other Google user information, but Google withheld and destroyed data that would be relevant to further assessing and demonstrating that joinability | 93-113 | n.a. | 223-258 | **# 18** | "[T]hroughout the class period, information tied to a user's Google account could be linked to the same individual's private browsing information stored within Google logs and data sources." | **§ III.A; § III.C; § III.E.; § III.F.;** |
| | | | | | **# 19** | "[T]hroughout the class period, information tied to a user's account with non-Google websites could be linked to the same individual's private browsing information stored within Google logs and data sources." | **§ III.C** |
| | | | | | **# 20** | "Google's deletion of certain data (including data Google deleted after this lawsuit was filed) hinders the process of linking (or joining) a user's private browsing information to that user's Google account, and in some cases may make it impossible to do so where it would have been possible but for Google's deletion of the data." | **§ III.C** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| **VIII. G** | **California:** Google designed its systems to provide its California-based employees with access to private browsing information collected nationwide, and Google employees routinely access that information in California | 114-115 | n.a. | 259-261 | **# 21** | "[T]hroughout the class period, Google's systems have provided Google's California-based employees with access to private browsing information that Google collected from users nationwide, with Google employees routinely accessing that information in California." | |
| **VIII. H** | **Class Member Identification:** Throughout the class period, Google collected private browsing information in ways that can be used to identify class members, though Google also withheld and destroyed data relevant to that identification | 115-135 | H.3 Class Identification | 285-286 | **# 22** | "[T]here are several ways to use Google's records to identify class members. For example, for Class I, the Chrome class, Google's records can be used to (1) identify Incognito traffic, and (2) link that Incognito traffic to users' Google accounts or to users' accounts with non-Google websites. As another example, for both Classes, if users were to come forward and self-identify, Google's records can be used to verify that the individual is a Google account holder who visited a non Google website that contains Google tracking beacons." | **§ III.G; § III.I; § III.J** |
| | | | H.3.1 Class I (Chrome Class) | 287-294 | | | |
| | | | H.3.2 All Class Members | 295-307 | | | |
| | | | | | **# 23** | "Google's "maybe_chrome_incognito" bit reliably identifies Incognito traffic." | **§ III.H** |
| | | | | | **# 24** | "Google's deletion of certain data throughout the class period will hinder the class identification methods I propose, and in some cases may make it impossible to identify certain class members." | **§ III.B** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | | | # 25 | "Google obstructed the parties' discovery efforts within the Special Master process, including by failing to identify logs that contain private browsing information, producing incomplete log schemas that omitted key fields, not properly formatting search queries and parameters, and delaying productions." | |
| VIII. I | **Attempt:** Google's attempted interception and collection uniformly impacted all class members | 135-139 | | | # 26 | "Google, throughout the class period, uniformly attempted to intercept all private browsing communications with non-Google websites that have a Google tracking beacon—regardless of which private browsing mode the user employed." | § III.B |
| | | | | | # 27 | "Google's tracking beacons were so ubiquitous throughout the class period that there is a near certainty that almost every person using the private browsing modes at issue (in Chrome, Safari, and Edge/IE) during the class period had their private browsing information intercepted by Google, including while visiting non-Google websites without being signed into any Google account." | |
| VIII. J | **Incognito Functionality:** Throughout the class period, Google's Chrome Incognito mode functioned in ways that were different than represented | 139-149 | J.1 Incognito Splashscreen | 319-324 | # 28 | "Google does not offer users any control to escape Google's tracking beacons, which are almost impossible to avoid for Internet users in the United States." | |

| § | TOC | pages | sub-heading | ¶¶ | # | Executive Summary | Psounis |
|---|---|---|---|---|---|---|---|
| | | | J.2 Google's Chrome Incognito mode functioned in ways that were different than how Google represented it | 325-334 | **# 29** | "[T]hroughout the class period, Google's Chrome Incognito mode functioned in ways that differed from how Google represented to users that Chrome Incognito functions." | |
| **VIII. K** | **Incognito Changes:** Google could have changed Chrome Incognito mode to match user expectations and address misconceptions, but Google chose not to | 149-152 | | | **# 30** | "Google, before or at any point during the class period, could have changed Chrome Incognito mode to address what Google referred to as user misconceptions, but Google did not." | |
| **VIII. L** | Google can change its processes going forward and purge its systems of private browsing information | 153-155 | | | **# 31** | "Google could delete from its systems records of Chrome Incognito browsing communications. Google could also delete from its systems records of users' signed-out browsing communications." | **§ III.B** |

### D. Psounis To Hochman And Schneier Mapping

| § | Psounis Opinion | Hochman, Schneier ¶¶ |
|---|---|---|
| III.A | **Opinion 1:** Mr. Hochman's Opinion That Users Can Readily Be Identified From The Data At Issue (# 18) Is Incorrect. | *Hochman* ¶¶ 223-258 |
| III.B | **Opinion 2:** Mr. Hochman's Opinions On Interception, Notice, And Deletion Of Private Browsing Information (# 4, 5, 6, 26, 31) Are Contrary To Industry Guidelines On Private Browsing. | *Hochman* ¶¶ 78-137, 308-317, 342-349 |
| III.C | **Opinion 3:** Mr. Hochman's Opinions On "Private Browsing Profiles," Server-Side Processes, And Data Joinability (# 10, 18, 19, 20) Are Inaccurate. | *Hochman* ¶¶ 166-258 |
| III.D | **Opinion 4:** Mr. Hochman's Assertion That Google Used Private Browsing Information To Measure Conversions (# 14) Is Misleading. | *Hochman* ¶¶ 166-222 |
| III.E | **Opinion 5:** Mr. Hochman's Description Of Entropy (# 18) Is Incorrect. | *Hochman* ¶¶ 231-233 |
| III.F | **Opinion 6:** Mr. Hochman's Assertions On Fingerprinting (# 9, 18) Are Misleading And Unfounded. | *Hochman* ¶¶ 223-258 |
| III.G | **Opinion 7:** Mr. Hochman's Proposal to Identify Class I (Chrome Class) (# 22) Is Unreasonable and Unreliable. | *Hochman* ¶¶ 262-307 |
| III.H | **Opinion 8:** Mr. Hochman's Opinion That The "maybe_Chrome_incognito" Bit Reliably Detects Incognito Traffic (# 23) Is Incorrect. | *Hochman* ¶¶ 287-294 |
| III.I | **Opinion 9:** Mr. Hochman's Proposal To Identify Class II (# 22) Is Unreasonable And Unreliable. | *Hochman* ¶¶ 262-307 |
| III.J | **Opinion 10:** Mr. Hochman's Proposed Methods For Identifying Class Members (# 22) Do Not–And Cannot–Account For Shared Devices or Accounts. | *Hochman* ¶¶ 285-307 |
| IV.A | **Opinion 11:** Mr. Schneier's Assertion That "Browsing Information Is Unique For Each User" Is Unsupported And Misleading. | *Schneier* ¶¶ 97-99 |
| IV.B | **Opinion 12:** Mr. Schneier's Claim That "Personal Data Is Difficult to Anonymize and Easy to De-anonymize" Is Unsupported And Is Incorrect For The Data At Issue. | *Schneier* ¶¶ 143-155 |
| IV.C | **Opinion 13:** Mr. Schneier's Assertion That Google Has Not Taken Steps To Ensure That A User's Choice To Sign Out Of A Google Account Will Prevent Google From Associating The User's Signed-Out Activity With Any Signed-In Data Is Incorrect. | *Schneier* ¶ 205 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXPERT REPORT OF KOSTANTINOS PSOUNIS

**June 7, 2022**

# APPENDIX E

## E. Entropy, Entropy Bits and Fingerprinting: Formal Exposition

### 1. Preliminaries: Random Experiment, Events, Probability Of Events, Random Variables, Distribution Of A Random Variable

1. To understand how to correctly compute entropy bits of identifiers and what is their fingerprinting effectiveness, we need to start with the concept of an experiment whose outcome is random. When the experiment takes place, the outcome can be any among a set of possible events each of which is assigned a probability representing its likelihood of occurring.[317]

2. The simplest possible example to consider is a coin toss. The random experiment in this example is the act of tossing a coin. There are two possible outcomes, heads or tails, and the set of possible events is thus $\{H, T\}$ where $H$ represents heads and $T$ represents tails. If the coin is fair, the likelihood of either $H$ or $T$ is the same. If we toss this coin a very large number of times and record how many times it lands heads and how many times it lands tails, we will record that 50 percent of the times we get $H$ and 50 percent of the times we get $T$.[318] We thus assign a probability of 0.5 to the event $H$, and we write $P(H) = 0.5$, with $P(\cdot)$ representing the probability of an event, and we assign a probability 0.5 to the event $T$, and we write $P(T) = 0.5$.

---

[317] Patrick Billingsley, "Probability and Measure," Wiley, (3rd ed. 1995); Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014).

[318] In theory, this statement is precise if we toss the coin (independently) an infinite amount of times.

3. The next concept we need to introduce is that of a random variable.[319] A random variable is a function which maps events to probabilities. In the simple fair coin toss example, let $X$ be the random variable representing the outcome of the coin toss. Then, the random variable takes two possible values, $H$ or $T$, the probability of the events $\{X = H\}$ and $\{X = T\}$ is equal to 0.5, and we write $P(X = H) = P(X = T) = 0.5$. The coin may not be fair, for example, it may land heads way more often than tails, say 98 percent of the time. In this case, $P(X = H) = 0.98$ and $P(X = T) = 0.02$.

4. In order to introduce the concept of entropy and thus entropy bits, we need one more concept, that of the distribution of a random variable. Thankfully, for the (discrete) random variables we are considering, the distribution of a random variable is simply the probability that the random variable assumes any of its possible values. Specifically, if the random variable $X$ may assume some values $x$ with some probability, we define by $p_X(x)$ the distribution of the random variable $X$ as follows:[320]

$p_X(x) = P(X = x)$. (Equation (1) – probability distribution)

$p_X(x)$ is a function which maps each possible value $x$ of $X$ to the probability that the random variable $X$ assumes this value $x$. In our fair coin example, $p_X(H) = p_X(T) = 0.5$.

---

[319] We will restrict the discussion to discrete random variables, see Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014), as this is the type of random variables which are relevant to our discussion about digital fingerprinting.

[320] For the discrete random variables we are considering, this distribution is formally referred to as the probability mass function, see Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014).

**2. Entropy And Entropy Bits Of A Random Experiment**

5. We are now ready to define the concept of entropy. The entropy $H(X)$ of a random variable $X$ with distribution $p_X(x)$ is defined as follows: [321]

$$H(X) = -\sum_{all\ x} p_X(x) \cdot log_2(p_X(x)).$$ (Equation (2) - entropy)

6. The entropy is a measure of uncertainty. The more random an experiment is, the more the uncertainty of its outcome, the larger the entropy. To see this, consider the simple coin toss example. If the coin is fair, $p_X(H) = p_X(T) = 0.5$ and Equation (2) yields $H(X) = 1$. If, however, the coin is not fair but instead $p_X(H) = 0.98$ and $p_X(T) = 0.02$, then $H(X) = 0.14$ which is a lot less than 1. As a matter of fact, if the coin is so biased that it only lands heads, i.e. $p_X(H) = 1$, then we get $H(X) = 0$. This makes sense as there is no uncertainty anymore about the outcome of the coin toss.

7. Consider again the fair coin toss example, where we calculated that the entropy $H(X) = 1$. We say that the entropy of a fair coin toss experiment is 1 entropy bit. Similarly, we say that the entropy of a coin toss with $p_X(H) = 0.98$ is 0.14 entropy bits.

8. Another useful interpretation of the entropy is that it is the expectation of $log_2(p_X(x))$. Specifically, it is calculated as the average information conveyed by an outcome, $log_2(p_X(x))$, averaged over all possible outcomes, $x$, by weighting the information conveyed by an outcome with the likelihood of this outcome, $p_X(x)$, see Equation (2).

---

321 T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006).

**3. Entropy Bits And Fingerprinting**

9. Fingerprinting refers to the process of using an identifier to identify a member of a set. For example, an IP+UA pair may be used to identify a device which accesses a web site. In this example the identifier is the combination of an IP address and a User Agent string, and the set consists of all possible devices.

10. The first step in this process is to recognize that guessing the device that accesses the web site is the outcome of a random experiment. In the absence of any information about the devices, any device is equally likely to be the one that accesses the web site. Hence, if there are $2^K$ possible devices, each accessing the web site with probability $1/2^K$, using Equation (2) yields that the entropy equals $K$ entropy bits.

11. The second step in this process is to recognize that observing a particular identifier value is the outcome of another random experiment. To compute the entropy of the identifier, one needs to know, or estimate from a dataset, the distribution of the values of the identifier, and then use Equation (2). In general, we want the entropy bits of the identifier to be as large as possible, hopefully as large as $K$. That said, having many entropy bits is only a necessary condition, it is not sufficient, as we also need to have a way to go from identifier values to devices.

12. The third step in this process is to have a mapping which reliably maps the observed value of the identifier to a single device. If there is no reliable mapping relating an identifier value to a device, because, for example, an identifier value may correspond to multiple devices, then, regardless of the entropy bits of the identifier, obviously we cannot reliably identify a device, see § V.E.7 below for a simple example..

***a. A simple numerical example***

13. Let's consider a simple example to illustrate some of the points we have discussed. Suppose that our identifier is a UA, there are only two possible UA values, say $UA_1$ an $UA_2$, and we are trying to guess which web browser among, say, $64 = 2^6$ possible web browsers, is the one with the UA we just observed. In the absence of any information, any of the 64 web browsers are equally likely to be the one, each with probability 1/64. Let *X* denote the random variable representing the web browser, say *X*=1,2,…,64. We have $p_X(x) = 1/64$ for all *x* and, using Equation (2), $H(X) = 6$, that is, our uncertainty is six entropy bits.

14. The fingerprinting effectiveness of an identifier has to do with how much it can reduce this uncertainty. If $P(UA = UA_1) = P(UA = UA_2) = 0.5$, the identifier has 1 entropy bit and can reduce the uncertainty from 6 bits to 6-1=5 entropy bits. This makes intuitive sense: Since $P(UA_1) = P(UA_2) = 0.5$, it must be that 32 of the 64 web browsers have $UA_1$, and 32 have $UA_2$. Thus, knowing that $UA = UA_1$ restricts the set of possible browsers from 64 to 32, and the remaining entropy is 5 as the remaining $32 = 2^5$ web browsers are equally likely to be the one.

15. How much would the *UA* identifier decrease the uncertainty if its two possible values are not equally likely but instead one is much more likely than the other? As an example, assume that $P(UA_1) = 63/64$, because 63 of the 64 web browsers have this *UA* value. We already know the answer to this, as 63/64 is about 0.98 and we have already computed the entropy of a binary random variable with distribution {0.98, 0.02} to be equal to 0.14.[322] Hence,

[322] 63/64=0.984375 > 0.98, so, as a matter of fact, the identifier is even weaker than our calculations here, though by very little.

the uncertainty is now reduced from 6 bits to $6 - 0.14 = 5.86$ entropy bits. Intuitively, the reason why the identifier is so ineffective now is because with probability 0.98 we will observe $UA_1$ and this will give us very little information, we will merely restrict the set of possible browsers from 64 to 63. While it is true that if we observe a $UA_2$ we will uniquely identify one of the 64 web browsers, the probability of this event is so low that, on average, we are really learning very little from this identifier.

16. Notice that even though the identifier only has 0.14 entropy bits, if we observe $UA_2$ we will uniquely identify one web browser. This has to do with the fact that entropy is an expectation thus the entropy of an identifier represents its average ability to perform fingerprinting. An identifier with low entropy may perform bad on average but it does not guarantee that no browser can be reliably identified. Similarly, an identifier with high entropy may perform well on average but it does not guarantee that all browsers can be reliably identified.

17. The fact that more skewed distributions yield less entropy bits is not merely a numerical observation. It can be proved that a uniform distribution, that is, a distribution where all outcomes are equally likely, maximizes uncertainty and thus entropy bits,[323] and the more skewed a distribution is, the deterministic case being the most skewed of all as only one outcome is possible (with probability 1), the less the uncertainty and the less the entropy bits (0 in the deterministic case).

---

323 T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006).

**4. More Preliminaries: Independence, Conditional Probability, Jointly Distributed Random Variables**

18. To understand how to compute and interpret the joint entropy of more than one identifier and what is the fingerprinting effectiveness of multiple identifiers used together, we first need to introduce the concepts of independence, conditional probability, and jointly distributed random variables.

19. Two events are independent if the outcome of one does not affect the outcome of the other. As an example, if one has two coins in one's pocket, tosses the first coin, and then tosses the second coin, it makes intuitive sense to argue that whether the first coin lands heads or tails (first event) does not affect whether the second coin lands heads or tails (second event). If we denote by $H_1$ the event that the first coin lands heads, and by $H_2$ the event that the second coin lands heads, then, formally, $H_1$ and $H_2$ are independent if:

$P(H_1 \; and \; H_2) = P(H_1) \cdot P(H_2)$, (Equation (3) – independent events)

where $P(H_1)$ is the probability of the event $H_1$, $P(H_2)$ is the probability of the event $H_2$, and $P(H_1 \; and \; H_2)$ is the probability that both $H_1$ and $H_2$ occur, a.k.a. the intersection of the two events.

20. The intuition about the independence of two events carries over for random variables as well. If we use $X_1$ to denote the random variable associated with the first coin toss, and $X_2$ to denote the random variable associated with the second coin toss, one may argue that $X_1$ and $X_2$ are independent random variables, in the sense that the value that one assumes does not affect the value that the other assumes, or, knowing what value one assumes, does not change our guess about what value the other may assume.

21. To formally define the concept of independent random variables (and later the concept of joint entropy which is directly related with the fingerprinting effectiveness of multiple identifiers used together) we first define the concept of a joint distribution of two random variables $X_1$ and $X_2$ as follows:

$p_{X_1,X_2}(x_1, x_2) = P(X_1 = x_1, X_2 = x_2)$. (Equation (4) – joint distribution)

Similar to the case of one random variable, the joint distribution of two random variables is a function that yields the probability that $X_1 = x_1$ and $X_2 = x_2$ for all possible values $x_1$ and $x_2$. In our simple example of two coin tosses, there are four possible joint cases to consider, $\{H_1, H_2\}$ (both coins land heads), $\{H_1, T_2\}$, $\{T_1, H_2\}$ and $\{T_1, T_2\}$, and the joint distribution gives the probability of each of these four cases.

22. We are now ready to formally define the concept of independent random variables. Two random variables $X_1$ and $X_2$ are independent if and only if:

$p_{X_1,X_2}(x_1, x_2) = p_{X_1}(x_1) \cdot p_{X_2}(x_2)$, (Equation (5) – independent random variables)

that is, the joint distribution of the two random variables equals the product of the two individual distributions of each random variable.[324] If the two coin tosses are independent and both coins are fair, it is easy to see that each of the 4 possible outcomes occurs with probability $1/2 \cdot 1/2 = 1/4$.

23. Not all events / random variables are independent. For example, suppose $X_1$ represents whether there are clouds in the sky on a particular day ($X_1 = 1$ indicates there are

[324] Individual distributions are called marginal distributions.

clouds and 0 otherwise) and $X_2$ represents whether it will rain this day ($X_2 = 1$ indicates it will rain and 0 otherwise). Knowing that there are clouds in the sky does increase the chance that it will rain hence $X_1$ and $X_2$ are dependent. The concept of conditional probability allows us to figure out how this dependence changes the corresponding probabilities. Let $C$ represent the event "clouds in the sky" and R the event "rain". We formally define the conditional probability of event $R$ given event $C$, i.e. the probability $R$ occurs given that we know $C$ occurred, as follows:

$P(R|C) = P(R \; and \; C)/P(C)$, (Equation (6) – conditional probability)

where $P(C)$ is the probability of the event that there are clouds, considered non-zero, and $P(R \; and \; C)$ is the probability of the event that there are clouds and it is raining, i.e. the intersection of the two events. The key here is to observe that it is more likely to rain if there are clouds in the sky, hence $P(R|C) > P(R)$, where $P(R)$ is the unconditional probability of whether it will rain or not. Also, one may argue that it is impossible to rain without clouds, in which case one may argue that $P(R|C) = 1$, since, given that there is rain, there must be clouds.

24. Note that if two events, $H_1$ and $H_2$, are independent, then from Equations (3) and (6) we get that $P(H_2|H_1) = P(H_2)$, which makes intuitive sense as knowledge of whether $H_1$ has occurred or not does not have any effect on the likelihood of $H_2$, since they are independent.

25. Going back to the concept of the joint distribution, with $X_1$ and $X_2$ representing clouds and rain respectively, it is obvious that the 4 possible events {clouds, rain}, {clouds, no rain}, {no clouds, rain}, {no clouds, no rain} are not equally likely. For example, it is

impossible to rain without clouds hence the probability of the outcome {no clouds, rain} equals $P(X_1 = 0, X_2 = 1) = 0$.

26. Last, we define the conditional distribution of a random variable $X_2$ given the value of another random variable $X_1$, as a function that yields the probability that $X_2$ may assume a value $x$, given that $X_1$ has assumed a known value $x_1$. Formally, the conditional distribution of $X_2$ given $X_1$ is given by:

$p_{X_2|X_1}(x|x_1) = p_{X_2,X_1}(x, x_1)/p_{X_1}(x_1)$, (Equation (7) – conditional distribution)

for all possible values $x$ of $X_2$, where $p_{X_1}(x_1)$ is non-zero. Note that if $X_1$ and $X_2$ are independent, Equations (5) and (7) imply that $p_{X_2|X_1}(x|x_1) = p_{X_2}(x)$, that is, the conditional distribution equals the individual (marginal) distribution. This makes intuitive sense, as conditioning on the value of $X_1$ does not change the distribution of $X_2$ since they are independent.

**5. Joint Entropy And Conditional Entropy**

27. We have defined entropy in Equation (2) and explained how entropy bits are directly related to the effectiveness of an identifier to perform fingerprinting by reducing uncertainty. To understand how to calculate the entropy and entropy bits of multiple identifiers used together, we first define the concepts of joint entropy and conditional entropy.[325]

28. The joint entropy of two random variables $X_1$ and $X_2$ is defined as follows:

---

[325] T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006).

$$H(X_1, X_2) =- \sum_{all\ x_1,x_2} p_{X_1,X_2}(x_1, x_2) \cdot log_2(p_{X_1,X_2}(x_1, x_2)).$$ (Equation (8) – joint entropy)

The joint entropy, similar to the entropy of a single random variable, measures the uncertainty of a pair of random variables. Note that because $P(X_1 = x_1, X_2 = x_2) = P(X_2 = x_2, X_1 = x_1)$, it follows that $p_{X_1,X_2}(x_1, x_2) = p_{X_2,X_1}(x_2, x_1)$ and $H(X_1, X_2) = H(X_2, X_1)$.

29. The conditional entropy of $X_2$ given $X_1$ is defined as follows:

$$H(X_2|X_1) =- \sum_{all\ x_1,x_2} p_{X_1,X_2}(x_1, x_2) \cdot log_2(p_{X_2|X_1}(x_2|x_1)).$$ (Equation (9) – conditional entropy)

To understand the intuition behind conditional entropy, note the following equation which relates the joint entropy of two random variables $X_1$ and $X_2$ with the entropy of $X_1$ alone:[326]

$$H(X_1, X_2) = H(X_1) + H(X_2|X_1).$$ (Equation (10) – meaning of conditional entropy)

Equation (10) implies that $H(X_2|X_1)$ is the additional uncertainty in $\{X_1, X_2\}$ due to $X_2$, when the uncertainty of $X_1$ is already accounted for.

30. It can be shown that $H(X_2|X_1) \leq H(X_2)$ with equality if and only if they are independent. Thus, from Equation (10) we conclude that $H(X_1, X_2) = H(X_1) + H(X_2)$ if and only if $X_1$ and $X_2$ are independent.

31. There are two methods to compute $H(X_1, X_2)$. One is to use Equation (8) if the joint distribution of $X_1$ and $X_2$ is known, or it can be estimated from a dataset. The other is to

[326] *Id.*

use Equation (10), which is particularly easy to do if $X_1$ and $X_2$ are independent, since in this case the joint entropy is simply the sum of the individual entropies.

### 6. Entropy Bits And Fingerprinting Effectiveness Of Multiple Identifiers

32. We can now explain the fingerprinting effectiveness of multiple identifiers used together. Without loss of generality, consider two identifiers, represented by the random variables $X_1$ and $X_2$, since we do not know in advance which value the identifiers may assume. First, let's consider the case where the identifiers are independent. In this case, $H(X_1, X_2) = H(X_1) + H(X_2)$ and the total entropy bits of the pair of identifiers equals the sum of the individual entropy bits, where, as already discussed, the individual entropy bits depend on how skewed the distributions of $X_1$ and $X_2$ are.

33. Now, let's consider the case where the identifiers are not independent. In this case, $H(X_1, X_2) = H(X_1) + H(X_2|X_1)$. The first term in this equation depends on how skewed the distribution of $X_1$ is. The second term depends on how skewed the conditional distribution of $X_2$ is, given $X_1$. Even if the marginal distribution of $X_2$ is, say, uniform, which, as discussed, would maximize the entropy $H(X_2)$, the conditional distribution may be very skewed. As a matter of fact, conditioning on $X_1$ may even reduce the possible values that $X_2$ may assume to 1, yielding a deterministic case and zero additional entropy bits.

#### *a. A numerical example involving multiple identifiers*

34. We present a simple numerical example involving two popular identifiers often used jointly, the UA and the IP address. Say $X_1$ represents the UA and $X_2$ the IP address of a device / web browser. Suppose there are a total of 64 possible browsers, thus the entropy bits

associated with guessing which browser accesses a web site is 6 bits, since $2^6 = 64$ and all browsers, in the absence of any other information, are equally likely to be the one. How much can we reduce the uncertainty of this estimate by observing the UA and the IP address? This depends not only on how skewed the individual distributions of the two identifiers are, $p_{X_1}$ and $p_{X_2}$, but also on how dependent they are, which is captured by the conditional distribution $p_{X_2|X_1}$.

35. Like in our previous example, assume there are two possible UA values, that is, $X_1$ is equal to $UA_1$ or $UA_2$. Also, assume that there are $4 = 2^2$ possible IP addresses, that is, $X_2$ is equal to $IP_1$,$IP_2$,$IP_3$,$IP_4$. If $X_1$ and $X_2$ have uniform distributions and are independent, then the entropy bits of the two identifiers combined is 1+2 = 3, and the uncertainty of guessing the web browser is reduced from 6 to 6-3 = 3 bits. We have essentially narrowed down our guess from 64 to 8 possible browsers. But, in practice, none of these assumptions may hold: the distributions of both $X_1$ and $X_2$ are skewed,[327] and $X_1$ and $X_2$ may not be independent.[328]

36. To illustrate the drastic effect of lifting the uniform assumption, assume that the distribution of $X_1$ equals, like before, {0.98, 0.02}, that is, $P(X_1 = UA_1) = 0.98$ and $P(X_1 = UA_2) = 0.02$. Then, $H(X_1) = 0.14$, which is a lot less than 1 entropy bit (uniform distribution case). Also, assume the distribution of $X_2$ is skewed, say equal to {0.48, 0.48, 0.02, 0.02}, because, for example, 31 out of the 64 web browsers have the same IP address equal to

[327] J. Kline, P. Barford, A. Cahn, and G. Sommers, "On the structure and characteristics of user agent strings", ACM Sigcomm, https://conferences.sigcomm.org/imc/2017/papers/imc17-final253.pdf (Nov. 1-3, 2017), at Figure 4.

[328] For example, if devices have the same IP address because they sit behind a VPN, it is likely to also share the same UA if the devices belong to the same company and the IT department is updating the software of the company devices in batches.

$IP_1$, another 31 have the same IP address $IP_2$, and the last two web browsers have IP addresses $IP_3$ and $IP_4$ respectively.[329] Then, from Equation (2) we compute $H(X_2) = 1.24$, which is sizably less than 2 entropy bits (uniform distribution case). Even if we assume $X_1$ and $X_2$ are independent, to get the maximum entropy, the combined fingerprinting effectiveness of UA and IP is reduced from 3 bits (uniform case) to merely 0.14+1.24 = 1.38, representing a more than 55 percent reduction in fingerprinting effectiveness.

37. To illustrate the drastic effect of lifting the independence assumption, we will first assume that $X_1$ is uniform, that is, $UA_1$ and $UA_2$ are equally likely, such that $H(X_1) = 1$. This is the maximum possible entropy bits for UA. And, we will also assume that $X_1$ and $X_2$ are not independent. Specifically, assume that all 31 browsers with IP address equal to $IP_1$ have the same UA,[330] equal to $UA_1$, all 31 browsers with IP address equal to $IP_2$ have the same UA, equal to $UA_2$, and for the remaining 2 browsers with IP addresses $IP_3$ and $IP_4$, we assume it is equally likely to have a UA equal to either $UA_1$ or $UA_2$. Essentially, we described the conditional distribution of $X_2$ given $X_1$ to be {31/64, 0, 1/64, 1/64} when $X_1 = UA_1$, and {0, 31/64, 1/64, 1/64} when $X_1 = UA_2$. We can now use Equations (7) and (9) and compute $H(X_2|X_1) = 0.22$. Notice how few entropy bits $X_2$ adds given $X_1$. This is because UA ($X_1$) reveals a lot about the IP ($X_2$), for example, $X_1 = UA_1$ informs us that the set of possible browsers is very likely to be one of the 31 with $IP_1$ and for sure none of the browsers with $IP_2$.

---

[329] This may be the case because 31 IP addresses connect to the internet via the same VPN server and thus share the same IP address, *IP_1*, and the same is true for *IP_2*.

[330] As discussed in the main text, when devices share the same IP address, e.g. because they are behind a VPN server of an organization, it is likely they also share UAs, as the IT department of the organization may centrally control the software updates on organizations' devices.

Equation (1) yields $H(X_1, X_2)$ = 1+0.22 = 1.22, which is again a lot less than the 3 bits under the assumptions of uniform distributions and independence, representing an almost 60 percent reduction in fingerprint-ability.

**7. On The Entropy Bits Reported By Mr. Hochman**

38. Mr. Hochman states that "[w]ith around 330 million people in the United States, 29 bits of data is more than sufficient to identify a person (2^29 = 537 million)."[331] He states that "IP address and User Agent 'carries 29.8 bits' of entropy, which is more than sufficient to uniquely identify individuals in the United States."[332]

39. Mr. Hochman's description of entropy as a measure for user identifiability is incorrect, see *infra* § V.E.2. Entropy is a measure of the uncertainty of the outcome of a random process. Entropy can not be used to establish what specific information is necessary to uniquely identify any specific person, or how many bits of data are "more than sufficient to uniquely identify individuals in the United States" in the absence of a one to one mapping which maps identifier values to specific individuals, see *infra* § V.E.3, and the example below in § V.E.7.a.

40. Neither Hochman nor the document he cites, GOOG-CABR-04635379, provide any information about the mathematical methodology or dataset used to derive the 29.8 entropy bits value number for the IP address and User Agent pair. This is required to establish credibility for the reported number of entropy bits. At a minimum, is the dataset restricted to individuals in the United States or is it collected by Google from one of its services offered worldwide and thus this dataset relates to the global population? In an attempt to predict which individual in the U.S. (1 out of 330 million) is accessing a private browsing session, in the

---

331 Hochman ¶ 231.

332 Hochman ¶ 233, citing GOOG-CABR-04635379 at -380. *See* also Hochman ¶ 231 (asserting that "Google engineers measure that IP address alone contributes to 26.5 bits of entropy (GOOG-BRWN-00601937).").

absence of any information, and assuming it is equally likely for any individual in the US to be the one accessing a private browsing session, applying the definition of entropy for 330 million people yields an entropy of 28.3 bits ($2^{28.3} \simeq 330M$). Doing the same exercise with a global population of 8 billion yields 32.9 bits ($2^{32.9} \simeq 8B$), which is obviously larger than 29.8.

41. As discussed already in § V.E.3, there are two entropy bits calculations related to fingerprinting. The first concerns the entropy of the task at hand, e.g. identifying an individual accessing a web site among the U.S. population. The second concerns the entropy of the identifier used to do so, which depends on the number of distinct values it may assume and on how skewed the distribution of the popularity of these values is.

42. A necessary but not sufficient condition for an identifier to perform well on average is to have more entropy bits than the entropy of the task at hand. Contrary to what Mr. Hochman states, we do not know if the IP+UA pair satisfies the necessary condition, because we do not know if the dataset is collected over the global population, or over the U.S. population, or any other population. But we do know for sure that it does not satisfy the requirement for a reliable one-to-one mapping of IP+UA values to individuals. A fundamental reason for this is that an IP+UA pair may correspond to multiple users because: (i) devices belonging to different users may have the same IP+UA, see *infra* § III.G.1, and (ii) users may share a device, see *infra* § III.J.

***a. A simple mapping example***

43. Consider three persons, John, Mary, and Peter. John and Mary live in the same house. John owns a phone and shares a home laptop with Mary. Mary owns a phone, the same model as John's, and a work laptop. When at home, John's and Mary's devices connect to the home WiFi and sit behind a NAT. Mary and Peter are co-workers. Peter owns a phone and a

work laptop. Sometimes they work from home and connect to their employer's network via the same VPN server. When they work in the office, their employer uses DHCP to assign IP addresses to their work laptops, and the IT department updates the software on the company's devices.[333]

44. The following graph shows the complex mapping between IP+UA values. devices, and persons. John's and Mary's phones, when at home, share the same IP+UA. John's and Mary's browsing sessions via their shared home laptop share the same IP+UA. John's and another coffee shop client's phone may share the same IP+UA, if the other client has the same phone model as John. Mary's and Peter's work laptops, when working from home, share the same IP+UA. Mary's and Peter's work laptops, when in the office, may have the same IP+UA on different days. Peter's phone may share the same IP+UA with the phone of a visitor in his home or a passenger on the same plane, if the other person has the same phone model as Peter. In all these cases, merely involving less than a handful of people, it is impossible to uniquely identify an individual through an IP+UA.

[333] See § III.G.1 for more information on NAT, VPN and DHCP.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

People
Device
Identifier Not Unique Not Static
Shared Device
John
Mary
Peter
Same Home
Same Work
John phone
John + Mary home laptop
Mary phone
Mary work laptop
Other coffee shop phone
Peter work laptop
Peter phone
Peter's visitor phone
Other passenger phone
Home NAT
Coffee Shop NAT
VPN
DHCP Day 1
DHCP Day 2
Peter's Home NAT
Airplane NAT
$IP_1+UA_1$
$IP_4+UA_1$
$IP_1+UA_2$
$IP_2+UA_3$
$IP_5+UA_3$
$IP_6+UA_3$
$IP_3+UA_4$
$IP_7+UA_5$

173



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXPERT REPORT OF KOSTANTINOS PSOUNIS

**June 7, 2022**

## APPENDIX F

174

**F. IP Address + User Agent Data Analysis**

1. I understand that Google preserved authenticated data associated with seven GAIA IDs provided by the five named Plaintiffs from relevant data sources pursuant to a litigation hold and produced to Plaintiffs on March 9, 2022 the preserved data from all relevant logs that do not contain confidential third-party information (GOOG-BRWN-00847947-GOOG-BRWN-00847948).

2. The retained data (in total 144,937 records) contains **4,945** distinct IP addresses, **three** of which correspond to multiple different Plaintiffs' GAIA IDs:

| IP Address | Corresponding GAIA ID/Plaintiff | Timestamp |
|---|---|---|
| [REDACTED] | [REDACTED] | [REDACTED] |
| | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| | [REDACTED] | [REDACTED] |

3. According to the public IP address lookup tool available at https://whatismyipaddress.com/, IP address [REDACTED] corresponds to ISP T-mobile USA Inc. located in Los Angeles, California:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4. According to the public IP address lookup tool available at https://whatismyipaddress.com/, IP address [REDACTED] also corresponds to ISP T-mobile USA Inc. located in Los Angeles, California:

176

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5. According to the public IP address lookup tool available at https://whatismyipaddress.com/, IP address [REDACTED] corresponds to ISP T-mobile USA Inc. located in Dallas, Texas:

177

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



6.     The data also contains **1,237** distinct User Agent strings, **73** of which correspond to multiple different Plaintiffs' GAIA IDs:

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| ████████████ | ████████████ |
| ████████████ | ████████████ |
| ████████████ | ████████████ |
| ████████████ | ████████████ |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |
| [illegible] | [illegible] |

179

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |
| ███████████████████ | ████████████ |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

181

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| User Agent | Corresponding GAIA ID & Plaintiff |
|---|---|
| ████████████████ | ████████ |
| ████████████████ | ████████ |
| ████████████████ | ████████ |
| ████████████████ | ████████ |
| ████████████████ | ████████ |
| ████████████████ | ██████ |
| ████████████████ | ██████ |
| ████████████████ | ██████ |
| ████████████████ | ██████ |
| ████████████████ | ████ |
| ████████████████ | ██████ |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7. The data also contains **8,965** unique IP address and UA combinations. For details, *see* backup material titled "IP + UA Analysis (Source Material: GOOG-BRWN-00847947-948) (CONFIDENTIAL)."

185

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXPERT REPORT OF KOSTANTINOS PSOUNIS

## June 7, 2022

## APPENDIX G

186

**G. "Profile" Data**

1. Below is a side-by-side comparison of the produced DBL [redacted] data stored in the column "[redacted]" on the same day associated with the two different Biscotti IDs[334]. I used Google produced files to decode the information and added my notes in red.

| [redacted] | [redacted] |
| --- | --- |
| [redacted] } | [redacted] |

[334] *See* GOOG-BRWN-00229628.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

188





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2. Below is a side-by-side comparison of the decoded inferred interest segments pulled from the table above:

190



## H. Sources Considered

**Filed Documents:**

- Third Amended Class Action Complaint, Chasom Brown, et al., v. Google LLC, United States District Court Northern District of California, February 3, 2022 (Dkt. 395-2)
- Microsoft's Response to Brown Plaintiffs' Subpoena (Aug. 27, 2021)
- Mozilla's Response to Brown Plaintiffs' Subpoena (Aug. 27, 2021)
- Apple's Response to Brown Plaintiffs' Subpoena (Sept. 20, 2021)
- Google's Supplemental Objections and Responses to Plaintiffs' Interrogatories (No. 17) (Apr. 7, 2022)
- Declaration of Jonathan E. Hochman, Telebrands Corp., v. Tinnus Enterprises, LLC, Case No. PGR2015-00018 (USPTO 2015)
- 2022-05-09 - Plaintiff Brown Attestation
- 2022-05-09 - Plaintiff Castillo Attestation
- 2022-05-09 - Plaintiff Trujillo Attestation

**Expert Reports:**

- Apr. 15, 2022 Expert Report of Jonathan E. Hochman and Appendices and Exhibits Attached Thereto
- Apr. 15, 2022 Expert Report of Bruce Schneier and Appendices and Exhibits Attached Thereto
- Expert Report of Jonathan E. Hochman, *Rockwood Select Asset Fund XI, (6)-1, LLC v. Devine, Millimet & Branch, P.A.*, Case No. 1:14-cv-00303-LM, 2016 WL 4260622 (D.N.H. Jan. 29, 2016)

**Depositions and Hearings:**

- April 14, 2022 Special Master Hearing Transcript
- April 21, 2022 Hearing Transcript
- Deposition Transcript of Abdelkarim Mardini, Nov. 24, 2021
- Deposition Transcript of Adrienne Porter-Felt, Nov. 16, 2021

- Deposition Transcript of Alexei Svitkine, Oct. 4, 2021
- Deposition Transcript of Brian Rakowski, Aug. 19, 2021
- Deposition Transcript of Chasom Brown, Jan. 13, 2022
- Deposition Transcript of Chetna Bindra, Feb. 8, 2022
- Deposition Transcript of Chris Palmer, Jan. 5, 2022
- Deposition Transcript of Christopher Castillo, Feb. 11, 2022
- Deposition Transcript of David Monsees, Apr. 9, 2021
- Deposition Transcript of David Monsees, June 11, 2021
- Deposition Transcript of Caitlin Sadowski, Mar. 10, 2022
- Deposition Transcript of Glenn Berntson, June 16, 2021
- Deposition Transcript of Glenn Berntson, Mar. 18, 2022
- Deposition Transcript of Gregory Lon Fair, Dec. 14, 2021
- Deposition Transcript of Huei-Hung Chris Liao, Dec. 3, 2021
- Deposition Transcript of Hyewon Jun, Mar. 1, 2022
- Deposition Transcript of Jeremy Davis, Jan. 7, 2022
- Deposition Transcript of Jesse Adkins, Apr. 4, 2021
- Deposition Transcript of Justin Schuh, Jan. 6, 2022
- Deposition Transcript of Mandy Liu, Mar. 8, 2022
- Deposition Transcript of Martin Shelton, Mar. 2, 2022
- Deposition Transcript of Michael Kleber, Mar. 18, 2022
- Deposition Transcript of Michael Kleber, Jan. 14, 2022
- Deposition Transcript of Monique Trujillo, Feb. 22, 2022
- Deposition Transcript of Ramin Halavati, Jan. 18, 2022
- Deposition Transcript of Rory McClelland, Feb. 18, 2022
- Deposition Transcript of Sammit Adhya, Nov. 19, 2021
- Deposition Transcript of Stephen Chung, Mar. 10, 2022

- Deposition Transcript of Steve Ganem, Mar. 23, 2022
- Deposition Transcript of William Byatt, Dec. 20, 2021
- Deposition Transcript of Wing Pan "Bert" Leung, Mar. 4, 2022

**Public Documents:**

- M. Clark and K. Psounis,"Optimizing Primary User Privacy in Spectrum Sharing Systems," IEEE/ACM Transactions on Networking, https://ieeexplore.ieee.org/document/8985324 (Apr. 2020)
- J. Zhang, K. Psounis, M. Zaroon, and Z. Shafiq, "HARPO: Learning to Subvert Online Behavioral Advertising," NDSS, https://web.cs.ucdavis.edu/~zubair/files/harpo-ndss2022.pdf (Apr. 2022)
- T. Spyropoulos, K. Psounis, and C. Raghavendra, "Efficient Routing in Intermittently Connected Mobile Networks: The Multiple-copy Case, "IEEE/ACM Transactions on Networking, https://cpb-us-e1.wpmucdn.com/sites.usc.edu/dist/b/364/files/2019/05/multiton.pdf (Feb. 2008)
- T. Spyropoulos, K. Psounis, and C. Raghavendra, "Efficient Routing in Intermittently Connected Mobile Networks: The Single-Copy Case," IEEE/ACM Transactions on Networking, https://ee.usc.edu/netpd/assets/001/51984.pdf (Feb. 2008)
- Alex Sherman, "Netflix estimates 100 million households are sharing passwords and suggests a global crackdown is coming," CNBC, https://www.cnbc.com/2022/04/19/netflix-warns-password-sharing-crackdown-is-coming.html (Apr. 20, 2022)
- Matt Richtel, "Young, in Love and Sharing Everything, Including a Password," N.Y. Times, https://www.nytimes.com/2012/01/18/us/teenagers-sharing-passwords-as-show-of-affection.html (Jan. 17, 2012)
- Arjun Ruparelia, "Best DraftKings Sportsbook VPN in 2022: Unblock DraftKings From Anywhere With a VPN," Cloudwards, https://www.cloudwards.net/draftkings-sportsbook-vpn/ (Apr. 27, 2022)
- Osman Husain, "How to watch ESPN anywhere with a VPN," Comparitech, https://www.comparitech.com/blog/vpn-privacy/best-vpn-espn/ (Jan. 19, 2022)
- M. Levin and J. Lowitz, "iPhone 13 Models Have Biggest Share in Years," Consumer Intelligence Research Partners LLC,

https://files.constantcontact.com/150f9af2201/06eda1e6-cb00-4462-836f-73aa0120e439.pdf?rdr=true (Apr. 21, 2022)

- S. O'Dea, "App-updating habits of smartphone users in the United States 2016," Statista, https://www.statista.com/statistics/747569/united-states-survey-smartphone-users-app-update-frequency/#statisticContainer (Feb. 28, 2020)
- J. Kline, P. Barford, A. Cahn, and G. Sommers, "On the structure and characteristics of user agent strings", ACM Sigcomm, https://conferences.sigcomm.org/imc/2017/papers/imc17-final253.pdf (Nov. 1-3, 2017).
- E. Rye, R. Beverly, and K. Claffy, "Follow the Scent: Defeating IPv6 Prefix Rotation Privacy," Proceedings of ACM Internet Measurement Conference (IMC), https://arxiv.org/pdf/2102.00542.pdf (Nov. 2-4, 2021).
- D. Plonka and A. Berger, "Temporal and Spatial Classification of Active IPv6 Addresses," Proceedings of ACM Internet Measurement Conference (IMC), https://www.akamai.com/site/en/documents/research-paper/temporal-and-spatial-classification-of-active-ipv6-addresses-technical-publication.pdf (Oct. 28-30, 2015).
- Tara Matthews, et. al., "'She'll just grab any device that's closer': A Study of Everyday Device and Account Sharing in Households," Proceedings of the ACM Conference on Human Factors in Computing Systems, ACM, https://dl.acm.org/doi/10.1145/2858036.2858051 (2016)
- K. Levy and B. Schneier, "Privacy threats in intimate relationships," 6 Journal of Cybersecurity 1, https://academic.oup.com/cybersecurity/article/6/1/tyaa006/5849222 (2020)
- A. Brush and K. Inkpen, "Yours, Mine and Ours? Sharing and Use of Technology in Domestic Environments," Proceedings of the 9th International Conference on Ubiquitous Computing, https://www.microsoft.com/en-us/research/wp-content/uploads/2007/09/brushinkpenyoursmineours.pdf (2007)
- B. Busse and M. Fuchs, "Prevalence of Cell Phone Sharing," Survey Methods: Insights from the Field, https://surveyinsights.org/?p=1019 (2013)
- H. Muller, J. Gove, and J. Webb, "Understanding Tablet Use: A Multi-Method Exploration," Proceedings of the 14th international conference on Human-computer interaction with mobile devices and services, https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/38135.pdf (2012).
- Rick Paulus, "The Digital Divide Is About Much More Than Access," Pacific Standard, https://psmag.com/environment/digital-divide-more-complicated-than-access (June 14, 2017)

- C. Park, et al., "Share and share alike? An exploration of secure behaviors in romantic relationships," Fourteenth Symposium on Usable Privacy and Security (SOUPS), https://www.researchgate.net/publication/325608530_Share_and_Share_Alike_An_Exploration_of_Secure_Behaviors_in_Romantic_Relationships (2018).
- Juliette Garside, "Ofcom: six-year-olds understand digital technology better than adults," The Guardian, https://www.theguardian.com/technology/2014/aug/07/ofcom-children-digital-technology-better-than-adults (Aug. 6, 2014)
- Laveh Waddel, "Will Today's Kids Be Stumped by the Technology of the Future?" The Atlantic, https://www.theatlantic.com/technology/archive/2016/01/will-todays-kids-be-stumped-by-the-technology-of-the-future/425082/ (Jan. 26, 2016)
- Research Compliance Office, Stanford University, HRPP Policy Manual.pdf, https://researchcompliance.stanford.edu/panels/hs/policies (last visited June 3, 2022).
- Kamala D. Harris, "California Data Breach Report," Cal. Dept. of Justice, https://oag.ca.gov/breachreport2016 (2016),
- M. Fischer, J. Hochman, and D. Boffa, "Privacy-Preserving Data Sharing for Medical Research," International Symposium on Stabilization, Safety, and Security of Distributed Systems, https://cpsc.yale.edu/sites/default/files/files/TR1558.pdf (November 17–20, 2021)
- L. Olejnik, C. Castellucia, and A. Janc, "Why Johnny can't browse in peace: On the uniqueness of web browsing history patterns," Annals of Telecommunications 1-2, https://hal.inria.fr/file/index/docid/747841/filename/johnny2hotpet-finalcam.pdf (June 2013)
- A. Janc and L. Olejnik, "Web browser history detection as a real-world privacy threat," ESORICS'10:Proceedings of the 15th European Conference on Research in Computer Security, http://cds.cern.ch/record/1293097/files/LHCb-PROC-2010-036.pdf (Sept. 20, 2010)
- S. Englehardt, et al., "Cookies that give you away: The surveillance implications of web tracking," WWW '15: Proceedings of the 24th International Conference on World Wide Web, https://senglehardt.com/papers/www15_cookie_surveil.pdf (May 18, 2015)
- Natasha Lomas, "France fines Google $120M and Amazon 42M for dropping tracking cookies without consent," Tech Crunch, https://techcrunch.com/2020/12/10/france-fines-google-120m-and-amazon-42m-for-droppingtracking- cookies-without-consent (Dec. 10, 2020)
- Paul Ohm, "Broken promises of privacy: Responding to the surprising failure of anonymization," UCLA Law Review 57, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1450006 (August 13, 2009).

- Latanya Sweeney, "Simple demographics often identify people uniquely," Carnegie Mellon University Data Privacy Working Paper 3, https://dataprivacylab.org/projects/identifiability/paper1.pdf (2000)
- Philippe Golle, "Revisiting the uniqueness of simple demographics in the U.S. population," 5th ACM Workshop on Privacy in the Electronic Society (WPES'06), Alexandria, Virginia, https://crypto.stanford.edu/~pgolle/papers/census.pdf (Oct. 30, 2006)
- L. Sweeney, A. Abu and J. Winn, "Identifying participants in the Personal Genome Project by name (A re-identification experiment)," arxiv.org, https://arxiv.org/abs/1304.7605 (2013)
- Latanya Sweeney, "Only you, your doctor, and many others may know," Technology Science 2018, https://techscience.org/a/2015092903 (Sep. 28, 2015)
- Ji Su Yoo, et al., "Risks to patient privacy: A re-identification of patients in Maine and Vermont statewide hospital data," Technology Science 2018, https://techscience.org/a/2018100901 (Oct. 8, 2018)
- Katherine E. Boronow, et al., "Privacy risks of sharing data from environmental health studies," Environmental Health Perspectives 128, no. 1, https://ehp.niehs.nih.gov/doi/10.1289/EHP4817 (January 2020)
- M. Barbaro and T. Zeller Jr., "A face is exposed for AOL Search No. 4417749," New York Times, http://www.nytimes.com/2006/08/09/technology/09aol.html (August 9, 2006)
- A. Narayanan and V. Shmatikov, "Robust de-anonymization of large sparse datasets," 2008 IEEE Symposium on Security and Privacy, Oakland, California, https://web.stanford.edu/class/cs245/win2020/readings/netflix-deanonymization.pdf (May 18-20, 2008)
- Yves-Alexandre de Montjoye, et al., "Unique in the shopping mall: On the re-identifiability of credit card metadata," Science 347, no. 6221, https://www.science.org/doi/full/10.1126/science.1256297 (Jan. 30, 2015)
- L. Rocher, J. Jendrickx and Y. de Montjoye, "Estimating the success of re-identifications in incomplete datasets using generative models," Nature Communications 10, https://www.nature.com/articles/s41467-019-10933-3 (July 23, 2019)).
- Douglas C. Schmidt, et al., "Google data collection," Vanderbilt University, https://digitalcontentnext.org/wpcontent/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf (Aug. 15, 2018)
- Dániel Kondor, et al., "Towards matching user mobility traces in large-scale datasets," arXiv:1709.05772, https://arxiv.org/pdf/1709.05772.pdf (Aug. 13, 2018)

- Eli Yacobson, et al., "De-identification is insufficient to protect student privacy, or What can a field trip reveal?" Journal of Learning Analytics 8, no 2, https://www.learning-analytics.info/index.php/JLA/article/view/7353 (2021)
- Pern Hui Chia, et al., "KHyperLogLog: Estimating reidentifiability and joinability of large data at scale," Proceedings of the IEEE Symposium on Security and Privacy, https://milinda-perera.com/pdf/CDPSLDWG19.pdf (2019)
- P. Laperdrix, W. Rudametkin,and B. Baudry, "Beauty and the Beast: Diverting Modern Web Browsers to Build Unique Browser Fingerprints," IEEE Symposium on Security and Privacy, https://ieeexplore.ieee.org/abstract/document/7546540 (2016)
- Y. Cao, S. Li, and E. Wijmans, "(Cross-)Browser Fingerprinting via OS and Hardware Level Features," NDSS, San Diego CA, https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf (2017)
- Patrick Billingsley, "Probability and Measure," Wiley, (3rd ed. 1995); Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014)
- Sheldon Ross, "Introduction to Probability Models," Academic Press, https://www.academia.edu/17872355/Introduction_to_Probability_Models_Tenth_Edition (10th ed. 2014)
- T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley, https://www.academia.edu/25024538/Elements_of_Information_Theory_2nd_ed_T_Cover_J_Thomas_Wiley_2006_WW (2nd ed. 2006)
- T. Narten, R. Draves, and S. Krishnan, "Privacy Extensions for Stateless Address Autoconfiguration in IPv6," RFC 4941 (Draft Standard), https://www.rfc-editor.org/rfc/pdfrfc/rfc4941.txt.pdf (Sept. 2007)
- Tomek Mrugalski, et al., "Dynamic Host Configuration Protocol for IPv6 (DHCPv6)," RFC 8415 (Proposed Standard), https://www.rfc-editor.org/rfc/pdfrfc/rfc8415.txt.pdf (Nov. 2018).
- J.F. Kurose &K.W. Ross, *Computer Networking: A Top-Down Approach* Ch. 4 (8th ed. 2020).
- W3C, https://www.w3.org (last visited June 3, 2022).
- W3C, "W3C Tag," https://tag.w3.org (last visited June 3, 2022).
- W3C, "W3C TAG Observations on Private Browsing Modes," W3C TAG Finding, https://www.w3.org/2001/tag/doc/private-browsing-modes/ (July 5, 2019)

- Chromium Code Search, “user_action_event.proto,” http://xn--https-hw3b//source.chromium.org/chromium/chromium/src/+/main:third_party/metrics_proto/user_action_event.proto;l=21-27?q=time_sec%20(last%20visited%20June%203,%202022).
- Chromium Code Search, “time.h,” https://source.chromium.org/chromium/chromium/src/+/main:base/time/time.h;l=16-22?q=TimeTicks (last visited June 3, 2022).
- NordVPN, https://nordvpn.com/features/dedicated-ip/ (last visited June 3, 2022)
- Microsoft, "Dynamic Host Configuration Protocol (DHCP)," https://perma.cc/7N5L-QKCQ (July 29, 2021)
- MDN Plus, "User-Agent," https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent (last visited June 2, 2022)
- Chrome Developers, "User-Agent Strings," https://developer.chrome.com/docs/multidevice/user-agent/ (updated Nov. 9, 2021)
- Microsoft, “High Availability,” https://docs.microsoft.com/en-us/windows-server/remote/remote-access/vpn/always-on-vpn/deploy/always-on-vpn-adv-options#high-availability (last visited June 3, 2022).
- Aleksandar Kochovski, “The Top 25 VPN Statistics, Facts & Trends for 2022,” https://www.cloudwards.net/vpn-statistics/ (Mar. 18, 2022).
- Low Entropy, “Entropy and Privacy Analysis,” https://lowentropy.net/posts/entropy-privacy/ (last visited June 3, 2022).
- GoogleIPv6, https://www.google.com/intl/en/ipv6/statistics.html (last visited June 3, 2022).
- Nord VPN, https://nordvpn.com/features/hide-ip/ (last visited June 3, 2022)
- Surfshark, https://surfshark.com/use-cases (last visited June 3, 2022)
- Day One Services, “Maintaining Privacy When You Browse The Internet,” http://dayoneservices.org/be-safe/ (last visited June 3, 2022)
- Sahara Cares, “Protect Yourself Online,” https://saharacares.org/protect-yourself-online/ (last visited June 3, 2022)
- WNY Postpartum Connection, Inc., “Domestic Abuse Support,” https://www.wnypostpartum.com/domestic-violence-assistance (last visited June 3, 2022)

- Betty Griffin Center, "Safe Browsing," https://bettygriffincenter.org/help/ (last visited June 3, 2022)
- Center for Internet Security, "CIS Critical Security Controls Version 8" https://www.cisecurity.org/controls/v8 (last visted June 3, 2022)
- National Science Foundation, "Human Subjects," https://www.nsf.gov/bfa/dias/policy/human.jsp (last visited June 3, 2022)
- National Institutes of Health, "Protecting Sensitive Data and Information Used in Research," https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.3.12_protecting_sensitive_data_and_information_used_in_research.htm (updated Dec. 2021)
- Office for the Protection of Research Subjects, USC, https://oprs.usc.edu/policies/ (last visited June 3, 2022)
- Office for the Protection of Research Subjects, USC, "Chapter 10: Privacy, Confidentiality and HIPAA," https://oprs.usc.edu/policies/privacy-confidentiality-and-hipaa/ (last visited June 3, 2022).
- Center for Internet Security, "CIS Critical Security Controls FAQ,: https://www.cisecurity.org/controls/cis-controls-faq (last visited June 3, 2022)
- Google Ad Manager Help, "About publisher provided identifiers," https://support.google.com/admanager/answer/2880055?hl=en, (last visited June 6, 2022)
- Google Analytics Help, "bout User-ID views," https://support.google.com/analytics/answer/3123669?hl=en (last visited June 6, 2022)
- Merriam-Websters.com Dictionary, ""From (the) cradle to (the) grave." https://www.merriam-webster.com/dictionary/from%20%28the%29%20cradle%20to%20%28the%29%20grave (last visited June 6, 2022).
- Epoch Converter, "Epoch & Unix Timestamp Conversion Tools" https://www.epochconverter.com/ (last visited June 6, 2022).
- Twitter, https://twitter.com/Jehochman/status/1153277584542711808 (last visited June 3, 2022)
- Lawrence Abrams, "How to Switch Back to the Old Twitter Layout," Bleeping Computer, https://www.bleepingcomputer.com/news/technology/how-to-switch-back-to-the-old-twitter-layout/ (July 16, 2019))
- W3C, https://www.w3.org (last visited June 3, 2022).

- W3C, "W3C Tag," https://tag.w3.org (last visited June 3, 2022).
- W3C, "W3C TAG Observations on Private Browsing Modes," W3C TAG Finding, https://www.w3.org/2001/tag/doc/private-browsing-modes/ (July 5, 2019)
- Chromium Code Search, "user_action_event.proto," http://xn--https-hw3b//source.chromium.org/chromium/chromium/src/+/main:third_party/metrics_proto/user_action_event.proto;l=21-27?q=time_sec%20(last%20visited%20June%203,%202022).
- Chromium Code Search, "time.h," https://source.chromium.org/chromium/chromium/src/+/main:base/time/time.h;l=16-22?q=TimeTicks (last visited June 3, 2022).
- NordVPN, https://nordvpn.com/features/dedicated-ip/ (last visited June 3, 2022)
- Microsoft, "Dynamic Host Configuration Protocol (DHCP)," https://perma.cc/7N5L-QKCQ (July 29, 2021)
- MDN Plus, "User-Agent," https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent (last visited June 2, 2022)
- Chrome Developers, "User-Agent Strings," https://developer.chrome.com/docs/multidevice/user-agent/ (updated Nov. 9, 2021)
- Microsoft, "High Availability," https://docs.microsoft.com/en-us/windows-server/remote/remote-access/vpn/always-on-vpn/deploy/always-on-vpn-adv-options#high-availability (last visited June 3, 2022).
- Aleksandar Kochovski, "The Top 25 VPN Statistics, Facts & Trends for 2022," https://www.cloudwards.net/vpn-statistics/ (Mar. 18, 2022).
- Low Entropy, "Entropy and Privacy Analysis," https://lowentropy.net/posts/entropy-privacy/ (last visited June 3, 2022).
- GoogleIPv6, https://www.google.com/intl/en/ipv6/statistics.html (last visted June 3, 2022).
- Nord VPN, https://nordvpn.com/features/hide-ip/ (last visited June 3, 2022)
- Surfshark, https://surfshark.com/use-cases (last visited June 3, 2022)
- Day One Services, "Maintaining Privacy When You Browse The Internet," http://dayoneservices.org/be-safe/ (last visited June 3, 2022)
- Sahara Cares, "Protect Yourself Online," https://saharacares.org/protect-yourself-online/ (last visited June 3, 2022)

- WNY Postpartum Connection, Inc., "Domestic Abuse Support," https://www.wnypostpartum.com/domestic-violence-assistance (last visited June 3, 2022)
- Betty Griffin Center, "Safe Browsing," https://bettygriffincenter.org/help/ (last visited June 3, 2022)
- Center for Internet Security, "CIS Critical Security Controls Version 8" https://www.cisecurity.org/controls/v8 (last visted June 3, 2022)
- National Science Foundation, "Human Subjects," https://www.nsf.gov/bfa/dias/policy/human.jsp (last visited June 3, 2022)
- National Institutes of Health, "Protecting Sensitive Data and Information Used in Research," https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.3.12_protecting_sensitive_data_and_information_used_in_research.htm (updated Dec. 2021)
- Office for the Protection of Research Subjects, USC, https://oprs.usc.edu/policies/ (last visited June 3, 2022)
- Office for the Protection of Research Subjects, USC, "Chapter 10: Privacy, Confidentiality and HIPAA," https://oprs.usc.edu/policies/privacy-confidentiality-and-hipaa/ (last visited June 3, 2022).
- Center for Internet Security, "CIS Critical Security Controls FAQ,: https://www.cisecurity.org/controls/cis-controls-faq (last visited June 3, 2022)
- Google Ad Manager Help, "About publisher provided identifiers," https://support.google.com/admanager/answer/2880055?hl=en, (last visited June 6, 2022)
- Google Analytics Help, "About User-ID views," https://support.google.com/analytics/answer/3123669?hl=en (last visited June 6, 2022)
- Merriam-Websters.com Dictionary, ""From (the) cradle to (the) grave." https://www.merriam-webster.com/dictionary/from%20%28the%29%20cradle%20to%20%28the%29%20grave (last visited June 6, 2022).
- Epoch Converter, "Epoch & Unix Timestamp Conversion Tools" https://www.epochconverter.com/ (last visited June 6, 2022).
- Twitter, https://twitter.com/Jehochman/status/1153277584542711808 (last visited June 3, 2022)
- Lawrence Abrams, "How to Switch Back to the Old Twitter Layout," Bleeping Computer,

https://www.bleepingcomputer.com/news/technology/how-to-switch-back-to-the-old-twitter-layout/ (July 16, 2019))

- U.S. Patent No. 7,603,483B2 (issued Oct. 13, 2009)
- National Science Foundation, SaTC: Frontiers: Collaborative: Protecting Personal Data Flow on the Internet, Award# (USC): 1956435
- National Science Foundation, CNS Core: Medium: Collaborative Research: Privacy-Preserving Mobile Crowdsourcing, Award# (USC): 1901488
- National Science Foundation, NeTS: Spectrum Sharing Systems for Wireless Networks: Performance and Privacy Challenges

**Produced Documents**

| | | |
|---|---|---|
| GOOG-BRWN-00016645 | GOOG-BRWN-00072761 | GOOG-BRWN-00204684 |
| GOOG-BRWN-00023909 | GOOG-BRWN-00078348 | GOOG-BRWN-00207020 |
| GOOG-BRWN-00026812 | GOOG-BRWN-00078361 | GOOG-BRWN-00226894 |
| GOOG-BRWN-00026913 | GOOG-BRWN-00140297 | GOOG-BRWN-00229628 |
| GOOG-BRWN-00026989 | GOOG-BRWN-00144320 | GOOG-BRWN-00229632 |
| GOOG-BRWN-00027090 | GOOG-BRWN-00147864 | GOOG-BRWN-00232201 |
| GOOG-BRWN-00027102 | GOOG-BRWN-00147873 | GOOG-BRWN-00386402 |
| GOOG-BRWN-00027314 | GOOG-BRWN-00148029 | GOOG-BRWN-00386511 |
| GOOG-BRWN-00027368 | GOOG-BRWN-00148738 | GOOG-BRWN-00386570 |
| GOOG-BRWN-00028052 | GOOG-BRWN-00149515 | GOOG-BRWN-00388293 |
| GOOG-BRWN-00029002 | GOOG-BRWN-00149849 | GOOG-BRWN-00390418 |
| GOOG-BRWN-00029326 | GOOG-BRWN-00152199 | GOOG-BRWN-00397243 |
| GOOG-BRWN-00029378 | GOOG-BRWN-00153850.C | GOOG-BRWN-00406065 |
| GOOG-BRWN-00029433 | GOOG-BRWN-00155943 | GOOG-BRWN-00408322 |
| GOOG-BRWN-00029445 | GOOG-BRWN-00156752 | GOOG-BRWN-00410076 |
| GOOG-BRWN-00032906 | GOOG-BRWN-00157001 | GOOG-BRWN-00410821 |
| GOOG-BRWN-00033024 | GOOG-BRWN-00157528 | GOOG-BRWN-00424253 |
| GOOG-BRWN-00041778 | GOOG-BRWN-00160342 | GOOG-BRWN-00426550 |
| GOOG-BRWN-00042388 | GOOG-BRWN-00161432 | GOOG-BRWN-00432838 |
| GOOG-BRWN-00047390 | GOOG-BRWN-00162235 | GOOG-BRWN-00433264 |
| GOOG-BRWN-00047399 | GOOG-BRWN-00164056 | GOOG-BRWN-00433503 |
| GOOG-BRWN-00048773 | GOOG-BRWN-00164626 | GOOG-BRWN-00441285 |
| GOOG-BRWN-00048967.C | GOOG-BRWN-00165626 | GOOG-BRWN-00457255 |
| GOOG-BRWN-00051239 | GOOG-BRWN-00165706 | GOOG-BRWN-00466617 |
| GOOG-BRWN-00060463 | GOOG-BRWN-00166360 | GOOG-BRWN-00466897 |
| GOOG-BRWN-00061607 | GOOG-BRWN-00176433 | GOOG-BRWN-00467569 |
| GOOG-BRWN-00066643 | GOOG-BRWN-00176481 | GOOG-BRWN-00468530 |
| GOOG-BRWN-00072051 | GOOG-BRWN-00184875 | GOOG-BRWN-00468598 |
| GOOG-BRWN-00072055 | GOOG-BRWN-00186446 | GOOG-BRWN-00471401 |

| | | |
|---|---|---|
| GOOG-BRWN-00475063 | GOOG-BRWN-00708814 | GOOG-BRWN-00847297 |
| GOOG-BRWN-00490767 | GOOG-BRWN-00711561 | GOOG-BRWN-00847947 |
| GOOG-BRWN-00491711 | GOOG-BRWN-00727369 | GOOG-BRWN-00847948 |
| GOOG-BRWN-00526782 | GOOG-BRWN-00742713 | GOOG-BRWN-00847949 |
| GOOG-BRWN-00529122 | GOOG-BRWN-00817563 | GOOG-BRWN-00848368 |
| GOOG-BRWN-00535100 | GOOG-BRWN-00819269 | GOOG-CABR-00000015 |
| GOOG-BRWN-00536949 | GOOG-BRWN-00819272 | GOOG-CABR-00021811 |
| GOOG-BRWN-00549861 | GOOG-BRWN-00819441 | GOOG-CABR-00051478 |
| GOOG-BRWN-00554317 | GOOG-BRWN-00819830 | GOOG-CABR-00056264 |
| GOOG-BRWN-00555073 | GOOG-BRWN-00820370 | GOOG-CABR-00057420 |
| GOOG-BRWN-00555100 | GOOG-BRWN-00826130 | GOOG-CABR-00057779 |
| GOOG-BRWN-00555223 | GOOG-BRWN-00826401 | GOOG-CABR-00057895 |
| GOOG-BRWN-00561172 | GOOG-BRWN-00826529 | GOOG-CABR-00057918 |
| GOOG-BRWN-00562313 | GOOG-BRWN-00826530 | GOOG-CABR-00058557 |
| GOOG-BRWN-00571757 | GOOG-BRWN-00826531 | GOOG-CABR-00058751 |
| GOOG-BRWN-00572220 | GOOG-BRWN-00826532 | GOOG-CABR-00058926 |
| GOOG-BRWN-00601937 | GOOG-BRWN-00826534 | GOOG-CABR-00059431 |
| GOOG-BRWN-00605636 | GOOG-BRWN-00826535 | GOOG-CABR-00059481 |
| GOOG-BRWN-00613409 | GOOG-BRWN-00826536 | GOOG-CABR-00059774 |
| GOOG-BRWN-00613801 | GOOG-BRWN-00826537 | GOOG-CABR-00059864 |
| GOOG-BRWN-00613802 | GOOG-BRWN-00826550 | GOOG-CABR-00060364 |
| GOOG-BRWN-00615433 | GOOG-BRWN-00840745 | GOOG-CABR-00063770 |
| GOOG-BRWN-00630517 | GOOG-BRWN-00844093 | GOOG-CABR-00073873 |
| GOOG-BRWN-00650016 | GOOG-BRWN-00845312 | GOOG-CABR-00073875 |
| GOOG-BRWN-00663644 | GOOG-BRWN-00845569 | GOOG-CABR-00073878 |
| GOOG-BRWN-00680546 | GOOG-BRWN-00845585 | GOOG-CABR-00073880 |
| GOOG-BRWN-00697719 | GOOG-BRWN-00845673 | GOOG-CABR-00073922 |
| GOOG-BRWN-00699213 | GOOG-BRWN-00845676 | GOOG-CABR-00086797 |
| GOOG-BRWN-00699534 | GOOG-BRWN-00846508 | GOOG-CABR-00086881 |

| | | |
|---|---|---|
| GOOG-CABR-00101695 | GOOG-CABR-00801323 | GOOG-CABR-03841628 |
| GOOG-CABR-00140102 | GOOG-CABR-00832014 | GOOG-CABR-03849022 |
| GOOG-CABR-00148254 | GOOG-CABR-00891629 | GOOG-CABR-03907818 |
| GOOG-CABR-00228748 | GOOG-CABR-00892264 | GOOG-CABR-03921989 |
| GOOG-CABR-00358713 | GOOG-CABR-00892455 | GOOG-CABR-03922755 |
| GOOG-CABR-00374449 | GOOG-CABR-00901787 | GOOG-CABR-03923580 |
| GOOG-CABR-00377968 | GOOG-CABR-00903677 | GOOG-CABR-03923893 |
| GOOG-CABR-00381312 | GOOG-CABR-03611484 | GOOG-CABR-03958924 |
| GOOG-CABR-00391277 | GOOG-CABR-03618845 | GOOG-CABR-03959283 |
| GOOG-CABR-00392675 | GOOG-CABR-03622146 | GOOG-CABR-03983354 |
| GOOG-CABR-00399988 | GOOG-CABR-03631556 | GOOG-CABR-03983707 |
| GOOG-CABR-00411167 | GOOG-CABR-03646925 | GOOG-CABR-03987880 |
| GOOG-CABR-00421851 | GOOG-CABR-03652549 | GOOG-CABR-04005165 |
| GOOG-CABR-00422906 | GOOG-CABR-03652751 | GOOG-CABR-04006287 |
| GOOG-CABR-00427432 | GOOG-CABR-03653330 | GOOG-CABR-04007375 |
| GOOG-CABR-00429070 | GOOG-CABR-03662975 | GOOG-CABR-04011132 |
| GOOG-CABR-00430076 | GOOG-CABR-03665840 | GOOG-CABR-04073287 |
| GOOG-CABR-00430662 | GOOG-CABR-03667366 | GOOG-CABR-04076570 |
| GOOG-CABR-00487012 | GOOG-CABR-03669893 | GOOG-CABR-04077431 |
| GOOG-CABR-00489377 | GOOG-CABR-03670580 | GOOG-CABR-04081967 |
| GOOG-CABR-00501220 | GOOG-CABR-03710192 | GOOG-CABR-04082091 |
| GOOG-CABR-00543418 | GOOG-CABR-03710213 | GOOG-CABR-04118321 |
| GOOG-CABR-00543864 | GOOG-CABR-03716577 | GOOG-CABR-04122554 |
| GOOG-CABR-00545997 | GOOG-CABR-03717199 | GOOG-CABR-04126517 |
| GOOG-CABR-00547295 | GOOG-CABR-03718983 | GOOG-CABR-04134430 |
| GOOG-CABR-00585454 | GOOG-CABR-03738741 | GOOG-CABR-04141174 |
| GOOG-CABR-00710970 | GOOG-CABR-03742530 | GOOG-CABR-04141705 |
| GOOG-CABR-00799341 | GOOG-CABR-03751927 | GOOG-CABR-04147060 |
| GOOG-CABR-00800511 | GOOG-CABR-03827263 | GOOG-CABR-04177585 |

| | | |
|---|---|---|
| GOOG-CABR-04206179 | GOOG-CABR-04635379 | GOOG-CABR-04772394 |
| GOOG-CABR-04207454 | GOOG-CABR-04635593 | GOOG-CABR-04773853 |
| GOOG-CABR-04215325 | GOOG-CABR-04639899 | GOOG-CABR-04782100 |
| GOOG-CABR-04240756 | GOOG-CABR-04641725 | GOOG-CABR-04782308 |
| GOOG-CABR-04261880 | GOOG-CABR-04648434 | GOOG-CABR-04786706 |
| GOOG-CABR-04293141 | GOOG-CABR-04678169 | GOOG-CABR-04795991 |
| GOOG-CABR-04294727 | GOOG-CABR-04687283 | GOOG-CABR-04801490 |
| GOOG-CABR-04307614 | GOOG-CABR-04691939 | GOOG-CABR-04804158 |
| GOOG-CABR-04309395 | GOOG-CABR-04692144 | GOOG-CABR-04819485 |
| GOOG-CABR-04324934 | GOOG-CABR-04695140 | GOOG-CABR-04820567 |
| GOOG-CABR-04333674 | GOOG-CABR-04695672 | GOOG-CABR-04821454 |
| GOOG-CABR-04408590 | GOOG-CABR-04696292 | GOOG-CABR-04828303 |
| GOOG-CABR-04410117 | GOOG-CABR-04697357 | GOOG-CABR-04899841 |
| GOOG-CABR-04417613 | GOOG-CABR-04705124 | GOOG-CABR-04959606 |
| GOOG-CABR-04419756 | GOOG-CABR-04706890 | GOOG-CABR-04970427 |
| GOOG-CABR-04423260 | GOOG-CABR-04715843 | GOOG-CABR-04986312 |
| GOOG-CABR-04466637 | GOOG-CABR-04716372 | GOOG-CABR-05136994 |
| GOOG-CABR-04470006 | GOOG-CABR-04717190 | GOOG-CABR-05145417 |
| GOOG-CABR-04473461 | GOOG-CABR-04720562 | GOOG-CABR-05149122 |
| GOOG-CABR-04477378 | GOOG-CABR-04721001 | GOOG-CABR-05163088 |
| GOOG-CABR-04489649 | GOOG-CABR-04722666 | GOOG-CABR-05171191 |
| GOOG-CABR-04508088 | GOOG-CABR-04724084 | GOOG-CABR-05173779 |
| GOOG-CABR-04511160 | GOOG-CABR-04732430 | GOOG-CABR-05248101 |
| GOOG-CABR-04606185 | GOOG-CABR-04737403 | GOOG-CABR-05269357.R |
| GOOG-CABR-04609856 | GOOG-CABR-04743125 | GOOG-CABR-05270014 |
| GOOG-CABR-04616196 | GOOG-CABR-04750983 | GOOG-CABR-05280050 |
| GOOG-CABR-04618590 | GOOG-CABR-04761793 | GOOG-CABR-05280756 |
| GOOG-CABR-04624189 | GOOG-CABR-04763333 | GOOG-CABR-05280966 |
| GOOG-CABR-04626237 | GOOG-CABR-04763527 | GOOG-CABR-05305495 |

| GOOG-CABR-05362596 |
|---|
| GOOG-CABR-05404845 |
| GOOG-CABR-05405676 |
| GOOG-CABR-05435664 |
| GOOG-CABR-05454633 |
| GOOG-CABR-05455683 |
| GOOG-CABR-05461707 |
| GOOG-CABR-05466323 |
| GOOG-CABR-05468204 |
| GOOG-CABR-05673102 |
| GOOG-CABR-05737898 |
| GOOG-CABR-05741188 |
| GOOG-CABR-05756666 |
| GOOG-CABR-05860125 |
| GOOG-CABR-05864545 |
| GOOG-CABR-05876612 |
| GOOG-CABR-05876730 |
| GOOG-CABR-05876763 |
| GOOG-CABR-05876831 |
| GOOG-CABR-05876933 |

**Source Files**:

- dbl-row-22ce947e70d000b1
- dbl-row-229a0a196fd000dc
- Consolidated 2022-04-08 3rd Round Search and Identifiers v2
- IP + UA Analysis (Source Material: GOOG-BRWN-00847947-948) (CONFIDENTIAL)

# EXHIBIT 83

# DECLARATION OF GLENN BERNTSON REGARDING GOOGLE AD MANAGER AND GOOGLE ADSENSE

# Redacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

CHASOM BROWN, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-03664-YGR-SVK

**DECLARATION OF GLENN BERNTSON REGARDING GOOGLE AD MANAGER AND GOOGLE ADSENSE**

Judge: Hon. Yvonne Gonzalez Rogers
Date: September 20, 2022
Time: 2:00 p.m.
Location: Courtroom 1 – 4th Floor

I, Glenn Berntson, declare as follows:

1. I am the Engineering Director and a Lead of the Google Ad Manager team at Google. I oversee a team that facilitates and supports publishers advertising on their websites. In this declaration, I provide a summary of Google's Ad Manager platform and how it is used by publishers. I also describe the data that Google Ad Manager may receive when a user in private browsing mode ("PBM") visits a website that uses Google Ad Manager. I next describe multiple factors that affect whether Google Ad Manager actually receives, stores, and/or uses that data for any given visit to a website that uses Google Ad Manager. Finally, I address some errors and false assumptions made in Mr. Jonathan Hochman's expert report, submitted in this case. Except where otherwise indicated, I make this declaration based on my own personal knowledge and could competently testify thereto.

2. Google AdSense and Ad Manager are Google services for publishers to manage advertising on their inventory.[1] To use Google AdSense or Google Ad Manager, the publisher must create an account, accept the relevant Google terms and program policies, and add ad tag code / script for each ad unit (location on the webpage where an ad will be shown) to the HTML code for their webpage. When a user visits a page to which the ad tag(s) have been added, the ad tags will be included in the HTML code delivered to the user's browser in response to the browser's request. When the user's browser encounters the ad tag, it will make a request for an ad from Ad Manager or AdSense.

3. I am informed that Plaintiffs are asking the Court to certify two classes:

Class 1 - "All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present" (the "Class Period").

[1] In Google Ad Manager, inventory is the ad space on a publisher's website or app where ads will be displayed; inventory is what publishers sell to advertisers or buyers. *See* GOOG-CABR-00024989 (https://support.google.com/admanager/answer/10064557).

Class 2 - "All Safari, Edge, and Internet Explorer browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present."

4.     I am informed that Plaintiffs allege that "Google Ad Manager is set up to automatically retarget a user based on information that Google has previously collected, whether this information is based on a persistent identifier (e.g., Google Analytics User-ID, X-Client-Data Header, supra), Google's fingerprinting (e.g., Approved Pixels, supra), or geolocation." TAC, ¶ 81. Google Ad Manager does not use "fingerprinting" to retarget a user, and has long-standing policies against using "fingerprinting" for any such purpose.[2] Nor does Google Ad Manager use "Google Analytics User-ID," "Chrome's X-Client Data Header," or "geolocation" for retargeting.

5.     I am informed that Plaintiffs allege that "Google has gained a complete, cradle-to-grave profile of users" and that Google "correlates and aggregates" PBM data-at-issue with non-PBM data through "fingerprinting," "Google cookies," "geolocation data," and "IP address information". TAC, ¶ 93. There is no single "complete, cradle-to-grave profile" of any user that includes the PBM data-at-issue. Google does not join the PBM data-at-issue with non-PBM or Google Account data, and has long-standing policies against joining unauthenticated data (i.e. PBM data Google received when users were not logged in to a Google Account) with authenticated data (i.e. data Google received when users were logged in to a Google Account).[3]

---

[2]  GOOG-BRWN-00029326, "Device/App/Browser Fingerprinting and Immutable Identifiers Policy" ("Device/App/Browser Fingerprinting or Immutable Identifiers must not be used by any Google products or services for the purpose of: Tracking user behavior, including Ad measurement and prediction, Ad targeting, Recording preferences").

[3]  GOOG-BRWN-00029004 at -006, "Log Data Usage Rules" ("You must not re-identify any individual from Anonymous or Pseudonymous data, in accordance with the User Data Anonymization Policy." "You must not correlate authenticated and non-authenticated information." "You must not fingerprint users for the purpose of associating a user's activity over time or across contexts ("tracking") or re-identifying them when you do not have access to actual identifiers such as cookies or GAIA IDs.")

6. I am informed that Plaintiffs allege Google improperly collected the following categories of information during the Class Period when users with a Google Account visited non-Google websites that use certain Google web-services—such as Google Analytics and Google advertising services (the "Services")—when those users were not logged into their Google Account and were browsing in Incognito mode or the PBMs offered by Safari, Edge, or Internet Explorer: (1) "[t]he 'GET request'"; (2) "[t]he IP address of the user's connection to the internet"; (3) "[i]nformation identifying the browser software that the use is using, including any 'fingerprint' data"; (4) "[a]ny 'User-ID' issued by the website to the user"; (5) "[g]eolocation of the user, if available"; and (6) "[i]nformation contained in 'Google cookies'" (the "Data"). Third Amended Complaint ("TAC") ¶¶ 63, 192. I am further informed that Plaintiffs refer to the X-Client-Data header as a field they contend could be used to identify Incognito users. TAC, ¶ 96.

**A. Overview of the Data Google Ad Manager Receives**

7. Before Google Ad Manager can receive *any* of the categories of data at issue in Paragraph 6 related to a user's visit to a specific website, Google Ad Manager scripts must have been installed in the website's HTML code. These scripts may be viewed by any Chrome user by visiting the webpage using Google Ad Manager and right-clicking on the webpage, selecting "Inspect," and then viewing the "Sources." Other browsers have similar functionality.

8. The Google Ad Manager scripts website administrators install on their properties are not designed to know whether a user is browsing using a private browsing mode ("PBM"), or to operate differently in that circumstance.

9. When a user (in any brand of browser, whether in PBM or not) visits a website that uses Google Ad Manager, Google Ad Manager may receive: (1) cookies that specific Google domains previously set on the user's browser; (2) the HTTP request sent by the user's browser, including the hostname, browser type, and language, and depending on the browser used, Java support, Flash support, and screen resolution; (3) the URL of the website making the ad request to Google Ad Manager, and/or the referrer URL; (4) the IP address assigned to the device on which the browser is running; (5) the request for an ad to be served on a non-Google website and the ad

slot to be filled; (6) event data such as ad impressions or ad clicks; and (7) if the user is in Chrome and a mode other than Incognito,[4] the browser's X-Client-Data Header.

10. Google Ad Manager uses the data it receives from publisher websites to help its customers (publishers) sell advertising space on their websites, *i.e.* monetize their inventory. The type and source of data that Google Ad Manager uses for this purpose depends on many factors. For example, if the user is signed into a Google Account, consented to the New Ads Control, and has enabled Ad Personalization, and the publisher has enabled use of signed-in Google users' identities in their Ad Manager settings to help the publisher monetize their inventory via personalized advertising, and the user has not disabled the use of 3P cookies or is using a browser or mode that automatically disables 3P cookies, then Google uses a cookie to identify the Google Account the user is signed into. This is known as GAIA Keyed Serving ("GKS"). If the user is on a browser that supports third-party cookies and is not signed into a Google Account while browsing, then Google uses a cookie associated with a pseudonymous identifier called Biscotti. This is known as Biscotti Keyed Serving ("BKS").

11. Google does not link or join Biscotti Keyed Serving data with GAIA Keyed Serving data, and maintains strict server-side segregation between these two types of data. Google has implemented many protocols and processes to ensure that Biscotti values are not used to personally identify users, and that data associated with Biscotti identifiers is not linked to information that personally identifies a user. Additionally, a user can delete cookies, which includes Biscotti, from their browser at any time, and in PBM mode, these cookies are deleted automatically at the end of the session.

12. As indicated in paragraph 6, Plaintiffs refer to IP address and "[i]nformation identifying the browser software" as two separate categories of data. I am informed that Plaintiffs have argued that by combining a user's IP address with the user-agent information about the user's

[4] Additional scenarios exist in which the X-Client-Data Header is empty even when the browser is not in Incognito mode, including: (i) a new browser instance (ii) the browser has not been used for 30 days or more; (iii) the Chrome server sends too many variation IDs to the Chrome browser thereby causing the Chrome browser to delete the header to keep it from becoming too large; and (iv) a firewall prevents Chrome from receiving the variation IDs that are used to populate the X-Client-Data Header.

device, Google can uniquely identify users. This practice is referred to as "browser fingerprinting" in the online advertising industry. Google does not engage in "browser fingerprinting"—such as combining IP address and user-agent information—to identify or track users and, indeed, has policies that expressly prohibit that practice.

**B. A Multitude of Factors Affect Whether Google Ad Manager Receives, Stores, and/or Uses the Data**

13. If a PBM user visits a website that does not have Ad Manager scripts embedded in the website's HTML code, Google Ad Manager does not receive any data relating to that visit, regardless of the mode in which Chrome is being used.

14. Whether Google *in fact* receives the categories of data identified above in paragraph 9, and whether or how Google stores and uses that data if it is received, depends on numerous factors, including (1) features and settings enabled by the particular website publisher, (2) features and settings enabled by the user in Chrome or in the user's Google Account settings, and (3) use of third-party software by the user. Each of these factors is explained in detail below.

**1. Publisher Actions and Publisher-Enabled Settings Affect Whether Google Ad Manager Uses The Data**

15. Whether Google Ad Manager uses the categories of data identified in paragraph 9 depends on the features and settings enabled by the particular website publisher. Publishers can use privacy controls in Google Ad Manager that limit, in whole or in part, how data is collected and used by Google Ad Manager when users visit their website, including in PBM. Google explains these Google Ad Manager publisher controls in documents that are publicly available online.[5]

16. For example, a publisher can use the privacy & messaging tools in Google Ad Manager to create and display messages to present users with information about the publisher's advertising practices and obtain user consent for personalized ads. There are multiple mechanisms by which a publisher can prompt the user for consent to personalized ads, and for the user's response

[5] *See, e.g.*, GOOG-CABR-05558152 - 8155 (https://support.google.com/admanager/answer/10075997); GOOG-CABR-05558141 - 8143 (https://blog.google/products/admanager/making-it-easier-publishers-manage-privacy-and-messaging/).

to be sent to Google Ad Manager.[6] When Google Ad Manager receives an indication that a user does not consent to personalized ads, Google Ad Manager will not use the user's GAIA identity or any Biscotti cookie values, such as those associated with PBM activity, for providing personalized ads.[7] Instead, the user is shown ads on the basis of other data, such as the content of the website the user is visiting, time of day, and the user's coarse location (such as city-level, but not precise location).

17. The publisher can also opt in or opt out of delivering personalized ads. If a publisher has opted out of personalized ads, Google Ad Manager will not use a user's GAIA identity or any Biscotti cookie values, such as those associated with PBM activity, for delivery of personalized ads, though Google Ad Manager may still use cookies for frequency capping (ensuring a user doesn't see the same ad over and over again), aggregated ad reporting, and to combat fraud and abuse. With respect to these latter uses, if the user is in PBM, Google Ad Manager would only use the cookie placed during the PBM session (and later automatically deleted from the user's browser), since previously existing cookies are not shared.

**2. User Actions and User-Enabled Features That Affect Whether Google Receives, Stores, And/Or Uses The Data**

18. Individual user actions also affect whether Google Ad Manager receives, stores, and/or uses the categories of data described in paragraph 9 through (a) browser-level settings on their Chrome browser; and (b) account-level settings on their Google Account. If a user uses a PBM without signing into their Google Account to visit a website that uses Google Ad Manager, the data that Google receives is not tied to the user's identity or information that could personally identify the user such as name, address, email address, or phone number. Google may associate certain of the data it receives through Google Ad Manager with a cookie value, but the user can delete that cookie from her browser anytime, and, Incognito mode (and other PBMs), the browser deletes

[6] *See, e.g.*, GOOG-CABR-00024684 - 4687 (https://support.google.com/admanager/answer/7678538).
[7] *See, e.g.*, GOOG-CABR-00025259 - 5260 (https://support.google.com/admanager/answer/9005435).

cookies automatically when the user closes the session. Since summer 2020, third-party cookies are blocked by default in Incognito mode on Chrome.

19. When a user enters PBM on a browser, the browser creates a new cookie jar that only stores first-party cookies and third-party cookies if not blocked (the default setting on Chrome is for third-party cookies to be blocked in Incognito mode) for the duration of that PBM session, and those cookies are deleted when the PBM session ends. Because browsers create a new cookie jar for the PBM session, Google Ad Manager will not receive any cookie values set in a prior session (whether PBM or non-PBM). The diagrams below illustrates how cookies are stored in a browser for the PBM session.

| | |
|---|---|
| 20. This empty jar represents a browser's local cookie storage on a brand new browser. |  |
| 21. If a user signs in to a Google Account on that browser (*e.g.*, by logging in at https://mail.google.com), a cookie associated with that Google Account is set on the browser. This cookie contains an encrypted ID, called a GAIA, which is used to identify the specific Google Account. This cookie remains on the browser while the user is signed in to their Google Account. | <br>• GAIA ID for USER@gmail.com |

<table>
<tr>
<td colspan="2">22. Over time, depending on the browser's cookie settings and the web pages visited, other cookies may be set. For example, if the browser is used to visit a non-Google web page on which the web page publisher has installed Google Ad Manager scripts, a cookie containing a unique encrypted Biscotti ID may be set.</td>
<td colspan="2"><br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158)</td>
</tr>
<tr>
<td colspan="2">23. If the browser is used to visit a web page Google owns and operates, a cookie containing a unique encrypted Zwieback ID may be set. All of these cookies can exist on a browser at the same time.</td>
<td colspan="2"><br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158)<br>• Zwieback ID # 1 (0xf5c156f144b9aa7f)</td>
</tr>
<tr>
<td>24. When the user enables PBM on her browser (e.g., Incognito on Chrome), the browser creates a new cookie jar for the duration of that PBM session. That cookie jar does not contain any of the previously set cookies, or encrypted IDs stored in those cookies.</td>
<td colspan="2"><br><br>• GAIA ID for USER@gmail.com<br>• Biscotti ID # 1 (2515782358150873158)<br>• Zwieback ID # 1 (0xf5c156f144b9aa7f)</td>
<td></td>
</tr>
</table>

| | |
|---|---|
| 25. The new cookie jar is only in operation until the end of the private browsing session. |  |
| 26. When the PBM user visits a non-Google web page on which the web page publisher has installed Google Ad Manager scripts, and the browser permits third-party cookies to be set, a cookie containing a unique encrypted Biscotti ID may be set. That Biscotti ID is unique to the specific PBM. It has no relation to, and is not joined with, any cookies set during regular mode, or even a Biscotti ID set during a different PBM session. |  • Biscotti ID # 2 (2483711983363751938) |
| 27. When the PBM user visits a web page Google owns and operates, a cookie containing a unique encrypted Zwieback ID may be set. The Zwieback ID is also unique to the PBM session. It has no relation to, and is not joined with, any cookies set during regular mode, or even a Zwieback ID set during a different PBM session. |  • Biscotti ID # 2 (2483711983363751938) • Zwieback ID # 2 (0x43b763007d1ff50d) |
| 28. When the PBM user closes the session, the cookies that were set during that private browsing session are automatically and permanently deleted from the browser. |  |

| | |
|---|---|
| 29. When the user opens a new PBM session, a new cookie jar is created that is only in operation until the end of the private browsing session. |  |
| 30. If a user returns to the same web pages they visited in the prior PBM session, new cookies containing new Zwieback and Biscotti IDs will be set. |  • Biscotti ID # 3 (2464002382754152675) • Zwieback ID # 3 (0x6e21bea56616853b) |
| 31. When a user closes the new PBM session, the cookies that were set during that session are automatically and permanently deleted from the browser. |  |

**a) Browser-level settings on a user's browser affect data collection and/or use**

32. Browser-level features and settings that affect whether Google Ad Manager receives the data described in paragraph 9 when a user is in a PBM, or how that data is used if received, include (a) opting out of ad personalization (when not signed in to a Google Account); (b) disabling "Block third-party cookies" on Chrome New Tab Page ("NTP"); (c) cookie blocking options in browser settings; (d) disabling JavaScript; and (e) installing ad-blocking extensions.

i. Opting Out of Personalized Ads (for users not signed into a Google Account). A user can opt out of personalized ads even if they are not signed into a Google Account

(Google Account holders can also opt out of Ad Personalization, as described below), and even if they are in PBM. There are multiple ways for a user to do so. For example, a user can navigate to https://adssettings.google.com/anonymous or they could navigate to https://adssettings.google.com/whythisad, where they can select a setting to disable "Ad personalization on the Web," as shown in the following exemplary screenshot:

Ad personalization settings

Search YouTube Web

These settings apply when you're using this browser and device. If you're over 18, you can control your personalized ad settings across your browsers and devices when you sign in to your account.

Ad personalization on the Web

When Ad personalization is on, Google will use information like your visits to other websites to show you more relevant ads.

Learn more about how Google ads work

Google adheres to advertising industry privacy standards. Learn why you're seeing an ad

You can install a browser plugin to maintain your preference to opt out of personalized ads from Google, even if you've cleared your cookies. Learn how to save settings for the browser

Google is just one of 100+ ad networks that show you personalized ads. You can turn off ads personalization from Google or any of the other participating ad networks here:

Visit AdChoices

If a user opts out of ad personalization in this way, the browser in PBM will rewrite the stored Biscotti cookie value to contain an "opt-out" value. If Google Ad Manager receives an ad request with this "opt-out" value, Google Ad Manager will not use the Biscotti cookie value for personalized ads.

A user can access the same ad personalization settings for Google by clicking on the AdChoices icon -- -- in an ad that is displayed in their browser. If the ad was served by Google, clicking on that icon will take the user to adssettings.google.com/whythisad, which has a link to the ad settings page shown above.

    ii. Disabling "Block third-party cookies" on Chrome New Tab Page (NTP). Since July 2020, third-party cookies have been blocked by default in Chrome incognito. If a user disables "Block third-party cookies" on Chrome's NTP, and visits a website that uses Google Ad Manager, then Google may receive the data described in paragraph 6 with a third-party cookie that contains a Biscotti ID that is unique to the PBM session. If a user does not disable "Block third-party cookies" on Chrome's NTP and visits a website that uses Google Ad Manager, then Chrome does not set and Google does not receive any Biscotti cookie during the Incognito session.

iii. Enabling "block all cookies" in Chrome settings. Chrome's cookie settings, which are accessible via a drop-down menu or by navigating to chrome://settings/cookies, include an option to "block all cookies." When the user enables this feature, Chrome prevents websites and Google Ad Manager from setting or receiving any cookies. If all cookies are blocked in this manner, the Chrome browser will not send any cookies to Google Ad Manager. If the user elects to block all cookies in Chrome settings, all cookies will be blocked in Incognito mode. Below is an exemplary screenshot of this Chrome setting:

iv. Disabling JavaScript in Chrome settings. Chrome's JavaScript settings, which are accessible via a drop-down menu or by navigating to chrome://settings/content/javascript, include the following option: "Don't allow sites to use Javascript." When a user selects "Don't allow sites to use JavaScript," Chrome prevents websites from using JavaScript, including Google Ad Manager tags based

on JavaScript. If enabled, this setting will also work in Incognito mode. If JavaScript is disabled in this manner, the Google Ad Manager JavaScript tag will not be able to send information to Google Ad Manager when a Chrome user in PBM visits a website that uses Google Ad Manager. Below is an exemplary screenshot of this Chrome setting:

JavaScript

Search

Sites usually use Javascript to display interactive features, like video games or web forms

Default behavior

Sites automatically follow this setting when you visit them

Sites can use Javascript

Don't allow sites to use Javascript

v. Installing ad-blocking extensions. There are multiple ad-blocking extensions available on the Chrome Web Store that, when installed, can be configured to block Chrome from sending ad requests. Popular examples of those extensions are AdBlock and Adblock Plus.[8] When installed by a user, these ad-blocking extensions may, depending on their configuration, prevent Chrome from sending ad requests to Google Ad Manager. As one example, if a user installs the Adblock Plus extension in PBM mode, enables extensions in PBM mode, and unchecks the "Allow Acceptable Ads" option in the extension's settings, Adblock Plus will prevent Chrome from sending all ad requests to Google Ad Manager.[9] As a result, Google Ad Manager will not receive any of the information described in paragraph 9 above.

[8] GOOG-CABR-05558156 - 8161 (https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom?hl=en-US); https://chrome.google.com/webstore/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdccddilifddb?hl=en-US.
[9] GOOG-CABR-05558162 - 8167 (https://adblockplus.org/en/acceptable-ads#optout).

Below is a screenshot of the description of the Adblock Plus extension on the Chrome Web Store:

Adblock Plus - free ad blocker

Offered by: adblockplus.org

175,347 | Productivity | 10,000,000+ users

Add to Chrome

Overview

Compatible with your device

Block YouTube™ ads, pop-ups & fight malware!

The Adblock Plus for Chrome™ ad blocker has been downloaded over 500 million times and is one of the most popular and trusted on the market. Users get fast, sleek ad-blocking capabilities to enjoy sites like YouTube™ interruption free.

✓ Block annoying video ads and banners
✓ Block pop ups
✓ Stop tracking and give yourself more privacy
✓ Fight off destructive malvertising that can hide in ads
✓ Give yourself faster browsing (as resources are blocked from loading)
✓ Customize features, like whitelisting for favorite sites
✓ Get free and constant support
✓ Give yourself simply more control of the experience you want

Adblock Plus for Chrome™ is the adblocker to help you fall in love with the internet again, and gives you the chance to customize your experience.

ⓘ To use Adblock Plus, just click on "Add to Chrome". Click on the ABP icon to see how many ads you've blocked, to change your settings, or report an error. It's that easy!

Adblock Plus supports the Acceptable Ads (AA) (www.acceptableads.com) initiative by default, a project that looks for a middle way, to support websites that rely on advertising revenue yet take into account the customer experience. If you do not wish to see Acceptable Ads, this can be turned off at any time: https://adblockplus.org/de/acceptable-ads#optout.

A user can also opt out of personalized ads by installing the Interest-Based Ads Opt-out Add-on.[10] This add-on is a Chrome browser extension available for download at the Chrome Web Store, which indicates that it has "500,000+ users." When installed by a user, and enabled for PBM sessions, this browser extension will similarly rewrite the Biscotti cookie to an "opt-out" value, preventing Google Ad Manager from using the cookie value for personalized ads. Below is a screenshot of the description of the IBA Opt-out Browser Add-on on the Chrome Web Store:

Overview

Compatible with your device

Opt out of Google's interest-based ads as you browse the web with Chrome.

This extension opts you out of the DoubleClick advertising cookie, which Google uses to show you interest-based ads on partnering websites.

- Stops interest-based ads on some of the websites that partner with Google
- One-time install on Chrome
- Opt out remains in effect, even after you clear your browser's cookies

For developers
IBA Opt out extension by Google is available as open source at http://code.google.com/p/google-opt-out-plugin/

Terms of Service
By using IBA Opt out, you agree to the Terms of Service at https://chrome.google.com/extensions/intl/en/gallery_tos.html

[10] *See* GOOG-CABR-05558168 - 8172 (https://chrome.google.com/webstore/detail/iba-opt-out-by-google/gbiekjoijknlhijdjbaadobpkdhmoebb).

Yet another way that users can opt out of Google advertising cookies is by visiting the Network Advertising Initiative's ("NAI's") Opt-Out page.[11] That page allows a user to select "Manage My Browser's Opt-Outs" to detect which NAI members, including Google, may engage in personalized advertising on the browser. If a user opts out of personalized advertising by Google on the NAI webpage during a PBM session, the browser will rewrite the Biscotti cookie to an "opt-out" value, in a similar manner as described above. This will prevent Google Ad Manager from using that cookie value for personalized advertising.

**b) Account-level settings on a user's Google Account can affect whether data sent to Ad Manager is stored and how it is used**

33. I understand that Plaintiffs have defined the class as users who are not signed in to their Google Account during a PBM session and am therefore only including Google Account controls for completeness. For users who sign in to their Google Accounts during a PBM session, Account-level features and settings in a user's Google Account will affect what data is stored by Google Ad Manager, and how that data is used, including the user's Google Ad Personalization ("GAP") setting. Further, a Google Account holder can visit his or her My Activity when signed into their account to review, manage, and delete the information Google has associated with his or her Google Account, including a list of websites they have visited that use certain Google Services while signed into their Google Account (whether in PBM or not), such as Google's advertising services.

34. As to GAP, users can opt out of Google's use of cookies for personalized advertising by visiting the Google Ad Settings page at adssettings.google.com and turning off "Ad personalization."[12]

35. A user can access the same ad personalization setting for their Google Account by clicking on the AdChoices icon -- ▷ -- in an ad that is displayed in their browser. If the ad was served by Google, clicking on that icon will take the user to adssettings.google.com/whythisad,

[11] GOOG-CABR-05558173 (https://optout.networkadvertising.org/?c=1).
[12] A user can access the same Google Account settings at myaccount.google.com/data-and-privacy and myactivity.google.com/activitycontrols.

which has a link to the ad settings page shown above (note, the above page is shown when the user is signed in to their Google Account; a different page is shown to users who are not signed in).

36. When Ad Personalization is turned off for a user, Google will not use the information associated with GAIA or Biscotti cookies for personalizing ads, though that information is still collected and used for other purposes like frequency capping, aggregated ad reporting, and to combat fraud and abuse. This means that neither GKS nor BKS are used to serve the user a personalized ad. Instead, that user is shown ads on the basis of other data, such as the website the user is visiting, the time of day, or the user's coarse location.

37. At myactivity.google.com/activitycontrols, a signed-in user is given the option to click on "Manage activity." If a user does so, the user is taken to their My Activity page which lists websites that use certain Google Services from which Google received data when the user visited those sites, searches conducted, and other activity saved by Google based on a user's interaction with Google Services. Users can also filter their activity based on the type of Google Service that caused the Data to be sent to Google (e.g. "Ads," "Google Analytics," "Search").

38. If the user chooses not to enable Web & App Activity and has not opted out via AdChoices (https://optout.aboutads.info/), data received by Google Ads is not stored in the user's Account or keyed to information that personally identifies her. Rather, it would be keyed to a pseudonymous cookie that the user can delete from her browser at any time.

**3. Third-party software installed by users can also affect data collection**

39. There are also a number of third-party privacy programs and features that users can employ that affect whether Google Ad Manager receives the PBM data at issue, including proxy servers and VPNs, firewalls, ad blockers, and opt-out features.

i. Using a VPN or proxy server. If a PBM user or their network administrator employs a proxy server or VPN (Virtual Private Network) that masks the sending device's IP address, then Google Ad Manager would not receive the user's real IP address. Instead, Google Ad Manager would receive only the IP address assigned by the VPN or proxy server.

ii. Using a firewall. If a PBM user or their network administrator employs a firewall that is configured to allow traffic only to specific domains (not including domains associated with Google Ad Manager), or to prevent traffic to specific domains (including domains associated with Google Ad Manager), then any transmissions that the Chrome browser attempts to send to Google Ad Manager will be blocked by the firewall. Additionally, as described in footnote 2 above, firewalls can also prevent Chrome from receiving the variation IDs that are used to populate the X-Client-Data Header.

iii. Using a standalone ad blocker program. As described above, there are multiple ad-blocking extensions publicly available that, when installed, may block the browser from retrieving ads. Extensions can be downloaded in a non-PBM session and enabled to function in PBM sessions. There are also multiple standalone (not browser extension/plug-in) ad blocker programs that are designed to provide the same ad-blocking functionality. Popular examples of those programs are AdGuard and AdLock.[13] When installed by a user, these ad-blocking programs may, depending on their configuration, prevent a browser from sending any ad requests to Google Ad Manager, thus preventing Google Ad Manager from receiving any of the information described in paragraph 9 above.

**C. Mr. Hochman's Opinions On Conversions And Proposed Approach For Identifying Class Members**

40. I understand that Mr. Hochman opines that "Cross-device conversion tracking in private browsing mode while the user is signed-out uses Google's internal tools such as [REDACTED] [REDACTED] [REDACTED]" (Hochman, Appendix F, ¶ 11.) Mr. Hochman is incorrect. As I testified at my first deposition in this case, because (a) mapping for conversions relies on the GAIA and the Biscotti cookie being on a browser at the same

[13] https://adguard.com/en/adguard-windows/overview.html; GOOG-CABR-05558146 -8149 (https://adlock.com/adlock-for-windows/).

time and (b) for the data at issue in this case the GAIA and the Biscotti cookie are not on a browser at the same time because users are not signed in to their Google Account, there is (c) no mapping from authenticated (GAIA) to the unauthenticated (Biscotti) ID that is unique to a PBM session.[14]

41. I understand that Mr. Hochman opines that "Google's "maybe_chrome_incognito" bit reliably identifies Incognito traffic." (Hochman ¶ 24.) As I testified at my first deposition in this case, "Incognito mode was designed so that no system like ads or Google Analytics can know whether or not you're in incognito mode . . .". Berntson 30(b)(6) June Tr. 282:11-15. Due to a number of false positives, the "maybe_chrome_incognito" boolean field does not reliably identify Incognito traffic. The "maybe_chrome_incognito" boolean field is based on the absence of the X-Client-Data header. Because the X-Client-Data header—as I testified at my first deposition in this case—is not designed to detect Incognito traffic and is absent for reasons other than a Chrome instance being in Incognito mode,[15] any heuristic that relies on the absence of the header will not reliably detect Incognito traffic.

42. I understand that Mr. Hochman opines that Google can identify class members by fingerprinting IP addresses and User-Agent. (Hochman ¶ 227, "Google can readily use the data at issue in this lawsuit (collected from private browsing during the class period) to identify users and their devices.") Google does not combine IP addresses and User-Agent to identify, or re-identify, users and has long-standing policies against engaging in such fingerprinting.[16]

43. I understand that Mr. Hochman states that "Through Google's server-side processes such as the [REDACTED] Google creates 'a single-view of the user in all Display products' for ad targeting and measurement purposes." Hochman ¶ 184 (cleaned up). Mr. Hochman appears to assume that [REDACTED]

[14] Berntson Tr. (Brown v. Google) 372:8-373:16.
[15] Berntson Tr. (Brown v. Google) 374:11-376:11.
[16] GOOG-BRWN-00029326, "Device/App/Browser Fingerprinting and Immutable Identifiers Policy" ("Device/App/Browser Fingerprinting or Immutable Identifiers must not be used by any Google products or services for the purpose of: Tracking user behavior, including Ad measurement and prediction, Ad targeting, Recording preferences").

maps GAIA IDs to Biscotti and Zwieback Not-GAIA IDs. That is a flawed assumption. In fact, ███ ████████████████████████████████████████ ████████████████. As I testified at length at my first deposition in this case, ████████████████████████████████████████ ██████████████████████████.[17] ███████████ ████████████████████████████████████████ ████████████.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[17] Berntson Tr. (Brown v. Google) 121:10-123:7.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Jersey City, New Jersey on August 4, 2022.

DocuSigned by:
Glenn Berntson
048F0F988D984AA...
Glenn Berntson

# EXHIBIT 84

# DECLARATION OF STEVE GANEM REGARDING GOOGLE ANALYTICS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

CHASOM BROWN, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-03664-YGR-SVK

**DECLARATION OF STEVE GANEM REGARDING GOOGLE ANALYTICS**

Judge: Hon. Yvonne Gonzalez Rogers
Date: September 20, 2022
Time: 2:00 p.m.
Location: Courtroom 1 – 4th Floor

I, Steve Ganem, declare as follows:

1. I am a Group Product Manager at Google. In my role as Group Product Manager, I am familiar with the Google Analytics product and practices regarding handling of data received by Google Analytics when a user visits a website that uses this product. In this declaration, I provide a summary of Google's Analytics product and how it is used by Google's customers. I also describe the data that Google Analytics may receive when a user visits a website that uses Google Analytics. I next describe multiple factors that affect whether Google Analytics actually receives, stores, and/or uses that data. Finally, I describe the factors that affect Google's revenue from the Analytics product. Except where otherwise indicated, I make this declaration based on my own personal knowledge and could competently testify thereto.

2. Google Analytics is a measurement product offered by Google to help app and website owners better understand how visitors interact with their properties. To use Google Analytics on a website, customers must create an account, accept the relevant Google Analytics terms, and add a Google Analytics script—a block of JavaScript code—to the HTML source code for one or more pages of the website. When a user visits a page to which the Google Analytics customer has added a Google Analytics script, the script will be included in the HTML source code delivered to the user's browser in response to the browser's request. When the user's browser encounters the Google Analytics script, it will fetch JavaScript code that, when executed by the browser, performs certain tracking functions and may send related data to Google Analytics.

3. I am informed that Plaintiffs are asking the Court to certify two classes:

**Class 1** - "All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present (the 'Class Period')."

**Class 2** - "All Safari, Edge, and Internet Explorer browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such

browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present."

Dkt. 609 at 1.

4. I am informed that Plaintiffs allege Google improperly collected the following categories of information during the Class Period when users with a Google Account visited non-Google websites that use certain Google web-services—such as Google Analytics and Google advertising services (the "Services")—when those users were not logged into their Google Account and were browsing in Incognito mode or the private browsing modes offered by Safari, Edge, or Internet Explorer: (1) "[t]he 'GET request'"; (2) "[t]he IP address of the user's connection to the internet"; (3) "[i]nformation identifying the browser software that the user is using, including any 'fingerprint' data"; (4) "[a]ny 'User-ID' issued by the website to the user, if available"; (5) "[g]eolocation of the user, if available"; and (6) "[i]nformation contained in 'Google cookies'" (the "Data"). Third Amended Complaint ("TAC") ¶ 63. I am further informed that Plaintiffs refer to the X-Client-Data header as a field they contend to be used to identify Incognito users. TAC, ¶ 96.

**A. Overview of the Data Google Analytics Receives**

5. When used on a website, Google Analytic does not receive certain of the categories of data described in Paragraph 4. For example, Google Analytics does not receive the X-Client-Data header, and does not receive geolocation data aside from IP address (from which a geolocation may be approximated). Before Google Analytics can receive *any* of the categories of data at issue in Paragraph 4 related to a user's visit to a specific website, that website's owner must have installed Google Analytics scripts in the website's HTML code. These scripts may be viewed by any Chrome user by visiting the webpage using Google Analytics and right-clicking on the webpage, selecting "Inspect," and then viewing the "Sources." Other browsers have similar functionality.

6. The Google Analytics JavaScript code used by Google Analytics customers is not designed to know whether a user is browsing using a private browsing mode ("PBM") such as Chrome's Incognito Mode, or to operate differently in that circumstance.

7. When a user visits a website that uses Google Analytics, whether in a PBM or not, the following categories of data may potentially be sent to Google Analytics:

- The HTTP request from the user's browser, including the hostname, browser type, referrer, and language, and depending on the browser used, Java support, Flash support, and screen resolution;
- IP address;
- Metrics concerning on-site activities
- Data associated with first party cookies; and
- User-ID (if this feature is used by the customer (i.e. the website) and the browser user logs into their account on that website).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

8. The categories of data potentially received by Google Analytics are explained in Google's public disclosures[1]:

Data Collected by Google Analytics

### First-party Cookies

Google Analytics collects first-party cookies, data related to the device/browser, IP address and on-site/app activities to measure and report statistics about user interactions on the websites and/or apps that use Google Analytics. Customers may customize cookies and the data collected with features like cookie settings, User-ID, Data Import, and Measurement Protocol. Learn more

Google Analytics customers who have for instance, enabled the analytics.js or gtag.js collection method can control whether or not they use cookies to store a pseudonymous or random client identifier. If the customer decides to set a cookie, the information stored in the local first-party cookie is reduced to a random identifier (e.g., 12345.67890).

For customers who use the Google Analytics for Apps SDK, we collect an App Instance Identifier, which is a number that is randomly generated when the user installs an app for the first time.

### Advertising identifiers

Where customers use Google Analytics Advertising Features, Google advertising cookies are collected and used to enable features like Remarketing on the Google Display Network. These features are subject to the users' Ads Settings, the Policy requirements for Google Analytics Advertising Features and Google's EU User Consent policy, which requires customers to obtain consent for cookies where legally required—including consent for personalized ads. For more information about how Google uses advertising cookies, visit the Google Advertising Privacy FAQ. It is possible to implement Google Analytics without affecting normal data collection where Advertising features are disabled until consent is obtained (see Privacy Controls in Google Analytics), as well as prevent certain data from being used for advertising personalization purposes (See Advertising Personalization below).

### IP Address

Google Analytics uses IP addresses to derive the geolocation of a visitor, and to protect the service and provide security to our customers. Customers may apply IP masking so that Google Analytics uses only a portion of an IP address collected, rather than the entire address. In addition, customers can override IPs at will using our IP Override feature.

### PII Prohibition

Our contracts prohibit customers from sending Personally Identifiable Information to Google Analytics. Customers should follow these Best Practices to ensure PII is not sent to Google Analytics.

9. As explained in the "First-party Cookies" section of these public disclosures, "Google Analytics collects first-party cookies" and other information "to measure and report statistics about user interactions on the websites and/or apps that use Google Analytics." The measurement and reporting functionality provided by Google Analytics primarily relies on first-

[1] *See* GOOG-CABR-00007815 - 7818 (https://support.google.com/analytics/answer/6004245#zippy=%2Cdata-collected-by-google-analytics).

party cookies that are associated with the customer's website. This is because Google receives and processes this measurement information on behalf of the customer; Google does not share a Google Analytics customer's data with third parties except in limited circumstances as described in the Google Analytics Terms of Service.[2]

10. A minority of Google Analytics customers use the "User-ID" feature, which lets the customer "associate a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."[3] Google Analytics will only receive a User-ID value if the Google Analytics customer has enabled that feature, and Google's public disclosures further describe that User-ID values are not assigned by Google Analytics, but instead are typically generated by the customer based on a visitor having signed into their website[4]:

> **User-ID values are not assigned by Analytics**
>
> Analytics cannot generate, assign, or manage the unique IDs that are assigned as User IDs. In a typical scenario, IDs can be generated through your authentication system, passed to an account when a user signs-in, and then sent to Analytics. (You can, however, set up User-ID in different ways, and are not limited to associating it with account sign-ins.)

11. Because the User-ID is assigned by the website, it is not shared across any other sites not owned by the same owner and therefore cannot be used for cross-site tracking: "[User-ID] data collected in one property cannot be shared or mixed with data in another property."[5]

12. Google Analytics' policies relating to the User-ID feature also state that in using this feature, a Google Analytics customer "must not upload any data that allows Google to personally identify an individual (such as certain names, Social Security Numbers, email addresses, or any similar data), or data that permanently identifies a particular device (such as a unique device identifier if such an identifier cannot be reset)."[6]

---

[2] *See, e.g.,* GOOG-CABR-00894408 - 4415 (https://marketingplatform.google.com/about/analytics/terms/us/).
[3] *See* GOOG-CABR-00006041 (https://support.google.com/analytics/answer/3123662).
[4] *See* GOOG-CABR-00008365 (https://support.google.com/analytics/answer/3123668).
[5] *See* GOOG-CABR-00008365 (https://support.google.com/analytics/answer/3123668).
[6] *See* https://developers.google.com/analytics/devguides/collection/protocol/policy; https://developers.google.com/analytics/devguides/collection/protocol/ga4/policy.

13. As explained in the "IP Address" section of Google's public disclosures of "Data Collected by Google Analytics" (referenced above), "Google Analytics uses IP addresses to derive the geolocation of a visitor." However, as described below, Google Analytics customers can enable a feature to mask (anonymize) the visitor's IP address as soon as technically feasible. Prior to April, 2022, this IP address anonymization feature was enabled by default and immutable in the current generation Google Analytics 4 ("GA4") product. Currently, Google Analytics discards all IP addresses in the GA4 product upon collection, after determining an approximate geographic location.

14. As explained in the "Advertising identifiers" section of Google's public disclosures of "Data Collected by Google Analytics" (referenced above), "[w]here customers use Google Analytics Advertising Features, Google advertising cookies are collected and used to enable features like Remarketing on the Google Display Network." Most Analytics customers do not enable this feature. These Advertising Features are subject to the user's Ads settings (e.g., consent to the New Ads Control and Ad personalization) and policy requirements relating to Google Analytics Advertising Features. The policy requirements applicable to Analytics customers in relation to Google Analytics Advertising Features are also described in Google's public disclosures, including requirements relating to notifications to visitors[7]:

> If you've enabled any Google Analytics Advertising features, you are required to notify your visitors by disclosing the following information in your privacy policy:
>
> - The Google Analytics Advertising Features you've implemented.
> - How you and third-party vendors use first-party cookies (such as the Google Analytics cookie) or other first-party identifiers, and third-party cookies (such as Google advertising cookies) or other third-party identifiers together.
> - How visitors can opt-out of the Google Analytics Advertising Features you use, including through Ads Settings, Ad Settings for mobile apps, or any other available means (for example, the NAI's consumer opt-out).
>
> We also encourage you to point users to Google Analytics' currently available opt-outs for the web.

[7] *See* GOOG-CABR-00004459 - 4460 (https://support.google.com/analytics/answer/2700409).

15. Chrome includes the X-Client-Data header only in messages it sends to certain domains, not including domains associated with Google Analytics. Therefore, Google Analytics does not receive the X-Client-Data header.

**B. A Multitude of Factors Affect Whether Google Analytics Receives, Stores, and/or Uses the Data**

16. Whether Google *in fact* receives the data described in paragraph 7 above depends on numerous factors, including (1) features and settings enabled by the particular Google Analytics customer, and (2) features and settings enabled by the user.

**1. Customer-Enabled Features That Affect Whether Google Receives The Data**

17. Google receives and processes the information it receives through Google Analytics on behalf of Google Analytics customers.[8] Customers can view reports about visitors' interactions with their properties by logging into Google Analytics.

18. Google Analytics customers can use a variety of privacy controls that limit, in whole or in part, the data sent to Google Analytics when users visit their website. Google explains the controls available to Google Analytics customers in documents that are publicly available online.[9]

19. For example, a Google Analytics customer has the option to disable Google Analytics functionality on a webpage, without removing the Google Analytics tag itself.[10] A customer might use this control to implement its own privacy policy. If the customer gives its users the option to opt-out of Google Analytics measurement, then the customer may disable the Google Analytics functionality for that user without removing the Google Analytics tag itself. To disable Google Analytics measurement, the customer (website owner) sets a window property to "true" for each page on which Google Analytics measurement should be disabled. Before sending any measurement data to Google Analytics servers, the Google Analytics Javascript code executing on

[8] *See, e.g.,* GOOG-CABR-00894408 - 4415 (https://marketingplatform.google.com/about/analytics/terms/us/).
[9] *See, e.g.,* GOOG-CABR-00004757 - 4759 (https://support.google.com/analytics/answer/9019185#zippy=%2Cin-this-article).
[10] *See, e.g.,* GOOG-CABR-05558144 (https://developers.google.com/analytics/devguides/collection/analyticsjs/user-opt-out).

the user's browser will check the value of that property. If it is set to true, the Google Analytics Javascript code will not send the measurement data to the Google Analytics servers.

20. As another example and as described above, a minority of Google Analytics customers have enabled the User-ID feature. Because each customer that enables User-ID will assign its own ID to its users, the same user is likely to have a different User-ID assigned by each website that has enabled the feature. If a customer has not enabled the User-ID feature for a website (or the user does not log into the website), Google Analytics will not receive a User-ID when a user visits the website:[11]

> **Data collection begins after implementation**
>
> User-ID can only collect data after you've implemented the feature. Implementation includes the generating unique IDs, assigning IDs to returning users, and sending IDs and all related engagement data to Analytics. Any data in your Analytics account collected and recorded prior to implementation cannot be reprocessed and associated with a User ID.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[11] *See* GOOG-CABR-00008365 (https://support.google.com/analytics/answer/3123668).

21. As another example, a Google Analytics customer can request IP address anonymization in the Universal Analytics product. This feature is designed to help site owners comply with their own privacy policies or recommendations from local data protection authorities, which may prevent the transfer or storage of full IP address information. When a customer requests IP anonymization, the IP address is anonymized as soon as technically feasible, shortly after it is sent to Google. This IP anonymization feature sets the last octet of IPv4 user IP addresses and the last 80 bits of IPv6 addresses to zeros in memory. The full IP address is never written to disk in this case. This IP address anonymization feature is described in Google's public disclosures[12]:

> Since 25 May 2010, Analytics has provided the _anonymizeIp feature in the ga.js JavaScript library (and more recently ga('set', 'anonymizeIp', true) in the analytics.js library) to allow website owners to request that all of their users' IP addresses are anonymized within the product. This feature is designed to help site owners comply with their own privacy policies or, in some countries, recommendations from local data protection authorities, which may prevent the storage of full IP address information. The IP anonymization/masking takes place as soon as data is received by the Analytics Collection Network, before any storage or processing takes place.
>
> The process of IP anonymization in Analytics takes place within two steps in the collection pipeline: the JavaScript Tag and the Collection Network. These steps are explained below.

22. In Universal Analytics, a prior generation product offered by Google Analytics, IP anonymization is a controllable setting by the customer. To request IP anonymization in the Universal Analytics product, the Google Analytics customer sets a corresponding parameter for their website to "true."[13] Prior to April 2022, IP address anonymization was enabled by default and immutable in the current generation GA4 product. Currently, Google

---

[12] *See, e.g.*, GOOG-CABR-00005790 - 5791 (https://support.google.com/analytics/answer/2763052).

[13] *See, e.g.*, GOOG-CABR-00055916 - 5941 (https://developers.google.com/analytics/devguides/collection/analyticsjs/field-reference#anonymizeIp).

Analytics discards all IP addresses in the GA4 product upon collection, after determining an approximate geographic location.

23. As yet another example, a Google Analytics customer can prevent the Google Analytics Javascript code from setting cookies on the user's device.[14] To disable cookies, the Google Analytics customer sets a "storage" field on their website to "none." If a customer disables cookies in this manner, Google Analytics will not receive any value corresponding to the disabled cookies.

24. Google Analytics customers have the option to activate certain features called Analytics Advertising Features and Google Signals. Google Analytics Advertising Features are described in Google's public disclosures:[15]

# About Advertising Features

Analytics Advertising Features is a collection of features that takes advantage of the Google advertising cookies so you can do things like:

- Create Remarketing Audiences based on specific behavior, demographic, and interest data, and share those lists with Google Ads
- Use demographic and interest data in your Analytics reports
- Create Segments based on demographic and interest data

If you're an Analytics 360 user, you have access to the additional features of being able to see Campaign Manager 360 data in your reports, and being able to create remarketing lists in Analytics and share them with Display & Video 360.

You enable Analytics Advertising Features so that Analytics can collect information about your users from the Google advertising cookies when they are present, along with the information Analytics normally collects.

For more information about the Google's advertising cookies, visit the Google Advertising Privacy FAQ.

If you implement Advertising Features, you must also adhere to the Analytics Advertising Features Policy.

/ / /

/ / /

/ / /

/ / /

---

[14] *See, e.g.*, GOOG-CABR-00073994 - 3997 (https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id#disabling_cookies).

[15] *See, e.g.*, GOOG-CABR-00002870 - 2871 (https://support.google.com/analytics/answer/3450482).

25. When an Analytics customer enables Advertising Features for a given web property, Analytics collects the information it normally does, as well as Google advertising cookies if such cookies are present, as described in Google's public disclosures[16]:

> **Enable Remarketing and Advertising Reporting Features for a web property**
>
> When you enable Remarketing for a web property, you can create remarketing audiences from your Analytics data, and share those audiences with your linked advertising accounts (e.g., Google Ads and Display & Video 360) and with Optimize.
>
> When you enable Advertising Reporting Features for a web property, Analytics collects the information it normally does, as well as Google advertising cookies when those cookies are present.

26. Google Analytics will only process data associated with advertising cookies in certain scenarios. In the case of a website visitor (user) who is either browsing in a signed-out state (like all members of the Class) or not a Google Account holder, Google Analytics will only process data associated with advertising cookies if the Analytics customer has enabled Analytics Advertising Features and the website visitor (user) has not opted out, as described in paragraph 8 above.

27. Additionally, even if a Google Analytics customer has enabled Google Analytics Advertising Features, they can disable those features programmatically by setting a value (e.g., "allowAdFeatures") to false.[17] Doing so will prevent the Google Analytics Javascript code from sending advertising features signals to Google Analytics.

28. Google Analytics customers may also choose to limit use of their data for advertising personalization purposes.[18] Customers may choose to disable advertising personalization for data collected from their entire property, or to disable it for individual events or users (for apps, websites,

---

[16] *See, e.g.,* GOOG-CABR-00005544 - 5546 (https://support.google.com/analytics/answer/2444872).
[17] *See* https://developers.google.com/analytics/devguides/collection/analyticsjs/display-features#disable-advertising-features.
[18] *See* GOOG-CABR-00007709 - 7710 (https://support.google.com/analytics/answer/9626162); GOOG-CABR-00007815 - 7818 (https://support.google.com/analytics/answer/6004245#zippy=%2Cadvertising-personalization).

and measurement protocol). Advertising personalization features can also be disabled by Google Analytics customers programmatically by setting a value (e.g., "allowAdPersonalizationSignals") to false.[19]

**2. User-Enabled Features That Affect Whether Google Receives Or Uses The Data**

29. Users browsing in a PBM can affect Google Analytics' data collection through (a) device-level settings on their browser and (b) third party privacy features.

**a) Device-level settings on a user's Chrome browser can affect data collection**

30. Device-level features and settings in Chrome affect whether Google Analytics receives the data described in paragraph 7 when a user is in PBM, or how that data is used. As an initial matter, if a user uses a PBM (such as Chrome's Incognito Mode) without signing into their Google Account to visit a website that uses Google Analytics, the data that Google receives is not tied to the user's identity or information that could personally identify the user such as name, address, email address, or phone number. Google may associate certain of the data it receives through Google Analytics with a cookie value, but the user can delete that cookie from her browser anytime, and, in Incognito mode (and other PBMs), the browser deletes cookies automatically when the user closes the session.

31. For example, when a user activates Incognito mode, Chrome will create a new cookie jar that only stores cookies for the duration of that Incognito session, and those cookies are deleted when the Incognito session ends. Because Chrome creates a new cookie jar for the Incognito session, Google Analytics will not receive data associated with any cookies set in a prior session. And if the user visits the site again in a new Incognito or regular mode session, Google Analytics cannot tell that it is the same user from the previous Incognito session. It is my understanding that other browsers' PBMs handle cookies in a similar manner.

32. Other device-level features and settings that affect whether Google Analytics receives the data described in paragraph 7 when a user is in PBM, or how that data is used, include

[19] *See* https://developers.google.com/analytics/devguides/collection/analyticsjs/display-features#disable-advertising-features.

cookie and JavaScript blocking options in browser settings, and the Google Analytics Opt-out extension:

a. Enabling "block third-party cookies". For example, Chrome's settings, which are accessible via a drop-down menu or by navigating to chrome://settings/cookies, include an option to "block third-party cookies." I am informed that since approximately May 2020, the "Block third-party cookies" toggle on the Incognito Screen is on by default. If this feature is enabled, Google Analytics does not receive data associated with any third-party cookies. Below is a screenshot of this Chrome setting:

Block third-party cookies

Sites can use cookies to improve your browsing experience, for example, to keep you signed in or to remember items in your shopping cart

Sites can't use your cookies to see your browsing activity across different sites, for example, to personalize ads. Features on some sites may not work.

b. Enabling "block all cookies". For example, Chrome's settings include an option to "block all cookies." When the user enables this feature, Chrome prevents websites and Google Analytics from setting any cookies. If all cookies are blocked in this manner, the Google Analytics tag will not be able to send those cookie values to Google Analytics. Below is a screenshot of this Chrome setting:

Block all cookies (not recommended)

Sites can't use cookies to improve your browsing experience, for example, to keep you signed in or to remember items in your shopping cart

Sites can't use your cookies to see your browsing activity across different sites, for example, to personalize ads

Features on many sites may not work

c. Disabling JavaScript in Chrome settings. Chrome's JavaScript settings, which are accessible via a drop-down menu or by navigating to chrome://settings/content/javascript, include the following option: "Don't allow sites to use Javascript." Below is a screenshot of this Chrome setting:

JavaScript
Search

Sites usually use Javascript to display interactive features, like video games or web forms

Default behavior

Sites automatically follow this setting when you visit them

Sites can use Javascript

Don't allow sites to use Javascript

When a user selects "Don't allow sites to use JavaScript," Chrome prevents websites from using JavaScript, including Google Analytics tags based on JavaScript. As a result, if JavaScript is disabled in this manner, the Google Analytics tag will not be able to send information to Google Analytics when a Chrome user visits a website that uses Google Analytics.

d. Installing the Google Analytics Opt-out Browser Extension.[20] This add-on is a Chrome browser extension available for download at the Chrome Web Store, which indicates that it has "1,000,000+ users." When installed by a user, this browser extension will prevent the Google Analytics JavaScript executing in Chrome from sharing information with Google Analytics about the user's website visit. Certain browsers, including Chrome, disable extensions such as the Google Analytics Opt-Out extension by default in Private Browsing Mode. However, users can enable the Google Analytics Opt-Out extension such that it continues to operate in Private

[20] *See* GOOG-CABR-00051336 (https://tools.google.com/dlpage/gaoptout); GOOG-CABR-00073998 - 4002 (https://chrome.google.com/webstore/detail/google-analytics-opt-out/fllaojicojecljbmefodhfapmkghcbnh?hl=en).

Browsing Mode. Below is a screenshot of the description of the Google Analytics Opt-out Browser Add-on from the Analytics Help Center[21]:

## Google Analytics opt-out browser add-on

You can opt-out of having your site activity available to Google Analytics by installing the Google Analytics opt-out browser add-on. The add-on prevents the Google Analytics JavaScript (gtag.js, analytics.js) that is running on websites from sharing information with Google Analytics about visit activity.

Using the Google Analytics opt-out browser add-on will not prevent site owners from using other tools to measure site analytics. It does not prevent data from being sent to the website itself or in other ways to web analytics services.

Give feedback about this article

Was this helpful? Yes No

**b) Use of third-party software by the Chrome user can also affect data collection**

33. There are also a number of third-party privacy programs and tools users can employ that affect whether Google Analytics receives the data at issue in this case when users are in PBM, including proxy servers, VPNs, and firewalls.

a. Using a proxy server or VPN. If a Chrome user or her network administrator employs a proxy server or VPN (Virtual Private Network) that masks the sending device's IP address, then Google Analytics would not receive the user's real IP address. Instead, Google Analytics would receive only the IP address associated with the VPN or proxy server.

b. Using a firewall. If a Chrome user or her network administrator employs a firewall that is configured to allow traffic only to specific domains (not including domains associated with Google Analytics), or to prevent traffic to specific domains (including domains associated with Google Analytics), then any transmissions that

[21] GOOG-CABR-00011290 (https://support.google.com/analytics/answer/181881).

the Chrome browser attempts to send to Google Analytics will be blocked by the firewall.

**C. Factors That Affect Google's Revenue From Google Analytics**

34. There are two versions of Google Analytics: (1) Google Analytics 360, which is the paid version of Google Analytics; and (2) Google Analytics, which is the free version of this product. The revenue Google receives for Google Analytics services will vary depending on whether the Google Analytics customers are using a cost-free or paid version of Google Analytics.

35. Revenue from Google Analytics 360 is based on the contract with each customer; the revenue per contract depends on the volume of hits Google Analytics processes for the customer, which is distinct from the number of visitors (users) that have visited the customer's website. The free version of Google Analytics is available freely to any internet website, up to a certain volume of hits sent to Google Analytics. The customer must use the Google Analytics 360 product if it wants any traffic over that volume threshold to be included in the analytics tools provided by Google Analytics. The overwhelming number of websites on the internet use the free Google Analytics version.

36. Google Analytics does not calculate revenue or profits on a per-individual-website visitor (user) basis. Nor does Google Analytics calculate profits on the basis of the data Plaintiffs allege Google improperly collected, described in paragraph 4 above. Further, it would be impossible to calculate Google Analytics' revenue or profits on a per-individual-website visitor (user) basis or to calculate Google Analytics' revenue or profits tied only to traffic from Incognito users or PBM users in Safari, Edge, or Internet Explorer who are not signed-in to their Google Account. However, if one were to attempt to do so, I expect that the revenue and profit over a fixed period of time would vary widely from one individual to the next on the basis of which Google Analytics customer websites are visited, and the frequency and volume of these individuals' browsing while they are in PBM.

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Huntington Beach, California on August 4, 2022.

DocuSigned by:
Steve Ganem
3D40119E57FF4AC...
Steve Ganem

# EXHIBIT 85

# DECLARATION OF J. McPHIE REGARDING GOOGLE'S DISCLOSURES

# Redacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

CHASOM BROWN, *et al*., on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-03664-YGR-SVK

**DECLARATION OF JONATHAN MCPHIE REGARDING GOOGLE'S DISCLOSURES**

The Honorable Yvonne Gonzalez Rogers
Courtroom 1 – 4th Floor
Date: September 20, 2022
Time: 2:00 p.m.

I, Jonathan McPhie, declare as follows:

1. I am a Group Product Manager for Google's Privacy and Data Protection Office ("PDPO") and have been in this role since September 8, 2020. Prior to that time, I have worked in a variety of teams across Google, including YouTube (identity and privacy), Search (results quality and personalization), and Identity (account systems and settings). I have been employed by Google since September 2007. In the regular course of my duties while at Google, I participated in the management of Google's framework for obtaining user consent, and I reviewed and approved related disclosures, including disclosure to users about Google's data collection practices. As a result of my role and responsibilities at Google, I am familiar with Google's processes for obtaining consent from Google Account holders and users of Google's various services. In particular, I am familiar with Google's processes for obtaining consent to the data Google receives when a user visits a Google website or a third-party website that uses certain Google services, such as Analytics and Ad Manager. Except where otherwise stated below, I make this declaration of personal knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2. I am informed that Plaintiffs are asking the Court to certify two classes:

**Class 1** - "All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present" (the "Class Period").

**Class 2** - "All Safari, Edge, and Internet Explorer browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in 'Incognito mode' on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present."

Dkt. 609 at 1.

3. I am informed that Incognito Mode provides privacy in three ways. *First,* websites visited while in Incognito mode are not saved in the user's Chrome browsing history, so that other people who use the same device cannot review it in Chrome's "History" tab. *Second*, Incognito mode automatically logs users out of their Google Account and any other website account. This means that so long as the user does not sign-in to those accounts during the session, the private browsing activity will not be stored in their Google Account and therefore is not linked to their identity (or other browsing activity). It also means that (again assuming the user does not sign-in) ads served to a user based on Google Account-keyed data in non-private modes are not personalized based on a user's browsing activity in Incognito mode. *Third*, in Incognito mode, Chrome does not share any existing cookies with the websites visited and any new cookies placed on the browser during an Incognito mode session are deleted once all Incognito mode windows are closed. This means that the data transmitted during private browsing sessions is not linked through cookies to data transmitted during regular browsing sessions, to the user's device, or to the user herself. It also ensures that data from a given private browsing session is not used, for example, to serve ads during any other session in any other mode (private or non-private).

4. Google's disclosures about Incognito mode, and private browsing generally, are consistent with the features I am informed Incognito mode provides (as described above). For example, the Incognito Screen states: "Now you can browse privately, and other people who use this device won't see your activity." Additionally, Google Help pages explain that "[y]our activity, like your location, might still be visible to: [w]ebsites you visit, including the ads and resources on those sites" and that "you might see search results and suggestions based on your location or other searches you've done during your current browsing session." And the Chrome Private Notice explains that "[s]ites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window."

5. I am informed that Plaintiffs allege Google improperly collected the following categories of information during the Class Period when users with a Google Account visited non-

Google websites that use certain Google web-services—such as Google Analytics and Google advertising services (the "Services")—when those users were not logged into their Google Account and were browsing in Incognito mode or the private browsing modes offered by Safari, Edge, or Internet Explorer:  (1) "[t]he 'GET request'"; (2) "[t]he IP address of the user's connection to the internet"; (3) "[i]nformation identifying the browser software that the use is using, including any 'fingerprint' data"; (4) "[a]ny 'User-ID' issued by the website to the user, if available"; (5) "[g]eolocation of the user, if available"; and (6) "[i]nformation contained in 'Google cookies'" (the "Data").  Third Amended Complaint ("TAC") ¶¶ 63, 192. Google discloses that it collects such Data in its Privacy Policy, Account Holder Agreements, and other disclosures described below.  I am not aware of any Google disclosure stating that Incognito mode, or any other private browsing mode, would block all transmissions of Data to Google. As explained above, Google's disclosures accurately described that Incognito mode provides privacy from others who use the same device, by not saving users' activity to their browsing history, and prevents the sharing of pre-existing cookies, deletes any new cookies placed on the browser during the private browsing session when the session is closed, and logs the user out of her accounts by default.

6.      In this declaration, I explain the various disclosures that Google makes available to Google Account holders about the Data collection that I understand to be at issue in this case. In section A, I describe the relevant portions of the Google Terms of Service. In Section B, I describe the relevant portions of the various versions of Google's Privacy Policy that were in effect during the Class Period, and Help articles that are linked to the Privacy Policy.  In section C, I describe the New Account Holder Agreements that were shown to some Plaintiffs and members of the proposed Class. In section D.1, I describe the relevant portions of the various versions of the Chrome Privacy Notice that were in effect during the Class Period, and Help articles that are linked to the Chrome Privacy Notice. In section D.2., I describe the relevant portions of the various versions of the Chrome Privacy Whitepaper that were available during the Class Period. In section D.3., I describe the Incognito Screen, and the Google Help pages that were linked from that screen during the Class Period. In section E, I describe relevant requirements Google has of its

Ads and Analytics customers to disclose their use of Google services, and examples of website privacy policies that do so. In section F, I describe the other ways in which users can see that Incognito does not block Google services, including Chrome developer tools, website pop-ups, and links from advertisements. In section G, I describe disclosures made by other browser publishers about their private browsing modes.

**A. Google Modified Its Terms Of Service Throughout The Class Period**

7. Google maintained a publicly available Terms of Service online throughout the Class Period. A true and correct copy of the Terms of Service can be viewed online at https://policies.google.com/terms, and true and correct copies of archived versions of the Terms of Service in effect throughout the Class Period can be viewed by clicking the "Archived versions" link at the top of the same page.

8. The Google Terms of Service in effect between April 14, 2014 and March 30, 2020 contained a section titled "Our Warranties and Disclaimers." This section stated:

> We provide our Services using a commercially reasonable level of skill and care and we hope that you will enjoy using them. But there are certain things that we don't promise about our Services.
>
> OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTIONS OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES "AS IS".
>
> SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, LIKE THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. TO THE EXTENT PERMITTED BY LAW, WE EXCLUDE ALL WARRANTIES.

9. The Terms of Service during that time period included a section titled "Liability for our services." This section stated:

> WHEN PERMITTED BY LAW, GOOGLE, AND GOOGLE'S SUPPLIERS AND DISTRIBUTORS, WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES.
>
> TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, FOR ANY CLAIMS UNDER THESE

TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS LIMITED TO THE AMOUNT YOU PAID US TO USE THE SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE SERVICES AGAIN).

IN ALL CASES, GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE THAT IS NOT REASONABLY FORESEEABLE.

10. These two paragraphs were modified in the Terms of Service Effective as of March 31, 2020. This version has separate "Warranty," "Disclaimers," and "Liabilities" paragraphs:

**Warranty**

We provide our services using reasonable skill and care. If we don't meet the quality level described in this warranty, you agree to tell us and we'll work with you to try to resolve the issue.

**Disclaimers**

The only commitments we make about our services (including the content in the services, the specific functions of our services, or their reliability, availability, or ability to meet your needs) are (1) described in the Warranty section, (2) stated in the service-specific additional terms, or (3) provided under applicable laws. We don't make any other commitments about our services.

And unless required by law, we don't provide implied warranties, such as the implied warranties of merchantability, fitness for a particular purpose, and non-infringement.

**Liabilities**

…

These terms only limit our responsibilities as allowed by applicable law. Specifically, these terms don't limit Google's liability for death or personal injury, fraud, fraudulent misrepresentation, gross negligence, or willful misconduct.

Other than the rights and responsibilities described in this section (In case of problems or disagreements), Google won't be responsible for any other losses, unless they're caused by our breach of these terms or service-specific additional terms.

11. Additionally, the Google Terms of Service in effect between April 14, 2014 and March 30, 2020 stated that:

Google's privacy policies explain how we treat your personal data and protect your privacy when you use our Services. By using our Services, you agree that Google can use such data in accordance with our privacy policies.

12. The Terms of Service effective March 31, 2020 instead stated that

Besides these terms, we also publish a Privacy Policy. Although it's not part of these terms, we encourage you to read it to better understand how you can update, manage, export, and delete your information.

13. Finally, the current Terms of Service, effective January 5, 2022 says this:

> Besides these terms, we also publish a Privacy Policy. We encourage you to read it to better understand how you can update, manage, export, and delete your information

**B. <u>Google's Privacy Policy Discloses That Google Receives Data When Users Visit Websites that Use Google's Services</u>**

14. Google maintained a publicly available Privacy Policy online throughout the Class Period. A true and correct copy of the Privacy Policy can be viewed online at https://policies.google.com/privacy, and true and correct copies of archived versions of the Privacy Policy in effect throughout the Class Period can be viewed by clicking the "Archived versions" link at the top of the same page. Throughout the Class Period, internet users (whether or not they have a Google Account) could access the Privacy Policy by, among other things, searching for "Google Privacy Policy" in their preferred search engine, or by clicking on links to the Privacy Policy from the homepage or menu of other Google apps, websites, or products, in other Google disclosures, such as the Chrome Privacy Notice and Google's Terms of Service. A link to the Privacy Policy was also provided in the Account Holder Agreements that some of the Plaintiffs were shown and accepted.

15. The Privacy Policy discloses that Google collects the Data described in paragraph 5 above when users visit websites that use Google Services. For example, the March 25, 2016 Privacy Policy, which was in effect at the beginning of the Class Period, explained in relevant part:

> We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful,[1] the people who matter most to you online, or which YouTube videos you might like.
>
> We collect information in the following ways:
>
> - **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card to store with your account. If you want to take full advantage of the sharing features we offer, we might also ask

[1] The phrase "ads you'll find most useful" is blue and links to a definition at the bottom of the Privacy Policy that states: "For example, if you frequently visit websites and blogs about gardening, you may see ads related to gardening as you browse the web."

you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We collect information about the services that you use and how you use them, like when you watch a video on YouTube, visit a website that uses our advertising services, or view and interact with our ads and content. This information includes:

  - **Device information**

    We collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we automatically collect and store certain information in server logs. This includes:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - Internet protocol address.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**
    When you use Google services, we may collect and process information about your actual location. We use various technologies to determine location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points and cell towers.

  - **Unique application numbers**
    Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

***

  - **Cookies and similar technologies**

> We and our partners use various technologies to collect and store information when you visit a Google service, and this may include using cookies or similar technologies to identify your browser or device. We also use these technologies to collect and store information when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites. Our Google Analytics product helps businesses and site owners analyze the traffic to their websites and apps. When used in conjunction with our advertising services, such as those using the DoubleClick cookie, Google Analytics information is linked, by the Google Analytics customer or by Google, using Google technology, with information about visits to multiple sites.

> Information we collect when you are signed in to Google, in addition to information we obtain about you from partners, may be associated with your Google Account. When information is associated with your Google Account, we treat it as personal information. For more information about how you can access, manage or delete information that is associated with your Google Account, visit the Transparency and choice section of this policy.

16. The Privacy Policy also explains that Google uses the data to, among other things, give users "more relevant search results and ads." The Privacy Policy also explains:

> We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. One of the products we use to do this on our own services is Google Analytics. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health.

17. The Privacy Policy also directs users to their settings, including signed-out settings:

> Review and update your Google activity controls to decide what types of data, such as videos you've watched on YouTube or past searches, you would like saved with your account when you use Google services. You can also visit these controls to manage whether certain activity is stored in a cookie or similar technology on your device when you use our services while signed-out of your account.

18. The Privacy Policy does not state that using a private browsing mode will prevent Google from collecting the information described above. To the contrary, the Privacy Policy broadly describes Google's collection when you use "our services," which includes Chrome and its various modes, like Incognito mode. In fact, the Privacy Policy did not even mention Incognito mode specifically or private browsing modes generally before the version effective beginning May 25, 2018.

19. The Privacy Policy also directs readers to additional materials:

> Further privacy and security related materials can be found through Google's policies and principles pages, including:
>
> - Information about our technologies and principles, which includes, among other things, more information on
>   - how Google uses cookies.
>   - technologies we use for advertising.
>   - how we recognize patterns like faces.
> - A page that explains what data is shared with Google when you visit websites that use our advertising, analytics and social products.

20. The webpage hyperlinked to the word "page" in the final bullet takes users to https://policies.google.com/technologies/partner-sites, which explains "HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICES." Attached as **Exhibit 1** is a true and correct copy of the Help Center Article titled "HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICE," which is also publicly available at https://policies.google.com/technologies/partner-sites. Specifically, that page explains:

> Many websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google.
>
> For example, when you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may also set cookies on your browser or read cookies that are already there. Apps that use Google advertising services also share information with Google, such as the name of the app and a unique identifier for advertising.
>
> Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps. See our Privacy Policy to learn more about how we process data for each of these purposes and our Advertising page for more about Google ads, how your information is used in the context of advertising, and how long Google stores this information.
>
> ***
>
> Sometimes, when processing information shared with us by sites and apps, those sites and apps will ask for your consent before allowing Google to process your information. For example, a banner may appear on a site asking for consent for Google to process the information that site collects. When that happens, we will respect the purposes described in

> the consent you give to the site or app, rather than the legal grounds described in the Google Privacy Policy. If you want to change or withdraw your consent, you should visit the site or app in question to do so.
>
> ***
>
> If ad personalization is turned on, Google will use your information to make your ads more useful for you. For example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google.
>
> If ad personalization is off, Google will not collect or use your information to create an ad profile or personalize the ads Google shows to you. You will still see ads, but they may not be as useful. Ads may still be based on the topic of the website or app you're looking at, your current search terms, or on your general location, but not on your interests, search history, or browsing history. Your information can still be used for the other purposes mentioned above, such as to measure the effectiveness of advertising and protect against fraud and abuse.
>
> When you interact with a website or app that uses Google services, you may be asked to choose whether you want to see personalized ads from ad providers, including Google. Regardless of your choice, Google will not personalize the ads you see if your ad personalization setting is off or your account is ineligible for personalized ads.
>
> ***
>
> Here are some ways you can control the information that is shared by your device when you visit or interact with sites and apps that use Google services:
>
> ***
>
> Incognito mode in Chrome allows you to browse the web without recording webpages and files in your browser or Account history (unless you choose to sign in). Cookies are deleted after you've closed all of your incognito windows and tabs, and your bookmarks and settings are stored until you delete them. Learn more about cookies.

21. As explained further below, the statements in this page about how Incognito works—*i.e.*, that Incognito mode allows you to "browse the web without recording webpages and files *in your browser* or *Account history (unless you choose to sign-in)*," and that cookies placed on the browser during an Incognito session "are deleted *after* you've closed all of your incognito windows and tabs"—are accurate. This is exactly how Incognito mode works.

22. Similar to the March 25, 2016 Privacy Policy, the March 31, 2020 Privacy Policy, which was in effect when Plaintiffs filed the Complaint, explained, in relevant part:

> We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:
>
> - Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system
- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps[2]

***

INFORMATION GOOGLE COLLECTS

We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.[3]

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

***

**Information we collect as you use our services**

**Your apps, browsers & devices**

We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

[2] The current version of the Privacy Policy includes "Products that are integrated into third-party apps and sites, like ads, analytics, and embedded Google Maps."

[3] The current version of the Privacy Policy has added to this sentence and states: "This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."

**Your activity**

We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for
- Videos you watch
- Views and interactions with content and ads
- Voice and audio information when you use audio features
- Purchase activity
- People with whom you communicate or share content
- Activity on third-party sites and apps that use our services
- Chrome browsing history you've synced with your Google Account

***

**Your location information**

We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS
- IP address
- Sensor data from your device
- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

***

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

23. This version of the Privacy Policy also stated that "[t]here are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more."

24. Like the March 25, 2016 Privacy Policy, and all iterations of the Privacy Policy in effect during the Class Period, the March 31, 2020 Privacy Policy explains that Google uses the data it collects to, among other things, personalize ads:

> **Provide personalized services, including content and ads**
>
> We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results….[4]
>
> ***
>
> Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.….
>
> Go to Ad Settings
>
> ***
>
> When you're signed out, you can manage information associated with your browser or device, including:
>
> - Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.
> - YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.
> - Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads.
>
> ***
>
> There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

[4] Since the May 25, 2018 version of the Privacy Policy, clicking on "customized search results" links to a definition at the bottom of the Privacy Policy that states: "For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization." Clicking on "search and browse private" takes users to the "Search & Browse Privately page discussed below.

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.

25. As described above, Google provides signed-out users, including those browsing in Incognito mode, with the option to turn Ads Personalization off, which prevents Google from using information from that user's browsing for advertising. The image below is a true and correct copy of a screenshot of the current signed-out ad personalization setting, visited in Incognito mode, which is publicly available at https://adssettings.google.com/.

26. Like the March 25, 2016 Privacy Policy, the March 31, 2020 Privacy Policy does not suggest that browsing in Incognito Mode in particular, or private browsing mode in general, will prevent Google from receiving the disputed data when a user visits third-party sites that use Google Services. Like the preceding versions of the Privacy Policy, the March 31, 2020 Privacy Policy says Google collects the data when you use "our services," which includes "the Chrome browser."

27. The only mention in the March 31, 2020 Privacy Policy of private browsing or Incognito Mode, identifies Incognito mode as one way users can "manage [their] privacy":

> You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode.[5] And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

28. I am informed that Plaintiffs are basing their claims, in part, on the sentence "You can also choose to browse the web privately using Chrome in Incognito mode." This sentence first appeared in the Privacy Policy effective May 25, 2018. As the sentence at the beginning of the paragraph states, Incognito mode is simply one of "a variety of ways to manage your privacy" generally. Incognito mode provides privacy in the manner described above in paragraph 3. This paragraph in the Privacy Policy also refers to other ways of managing privacy that provide different degrees of privacy–*e.g.*, using Google services "when you're signed out" of a Google Account, in which case the data Google collects is associated with a delete-able and pseudonymous cookie, rather than with a Google Account (which may contain information reflecting the user's identity). Neither this sentence nor any other sentence in Google's Privacy Policies from the date Plaintiffs filed the complaint back to the start of the class period makes any reference to private browsing modes in non-Chrome browsers.

[5] This sentence was added in the May 25, 2018 version of the Privacy Policy. In the current version of the Privacy Policy, this sentence reads: "You can also choose to browse the web in a private mode, like Chrome Incognito mode."

29. I am further informed that Plaintiffs are basing their claims, in part, on the sentence "And across our services, you can adjust your privacy settings to control what we collect and how your information is used." This sentence also first appeared in the Privacy Policy effective May 25, 2018. The sentence does not refer to Chrome or Incognito mode specifically; rather, it refers to the fact that Google has many services, each with its own variety of privacy settings that may be used to affect the information Google collects and how the information is used. Chrome, for example, has a variety of privacy settings, including cookie blocker settings, sign-in and Sync modes, and Incognito and Guest modes, which affect the data Google collects and/or how the data is used.

30. Neither of these sentences should be interpreted to mean that Incognito mode prevents Google from collecting the data that the Privacy Policy makes clear Google receives to provide its analytics and advertising services.

31. Google keeps statistics on how many times its Privacy Policy and other disclosure pages are viewed and how much time users spent on the page. I have consulted these records, and they show that Google's Privacy Policy was viewed more than [REDACTED] times by U.S.-based users between March 23, 2018 (the date Google started collecting this data) and July 27, 2020 (the date the related *Calhoun* complaint was filed). On average during this same time period, users spent [REDACTED] reviewing the Privacy Policy. Attached hereto as **Exhibit 2** is a true and correct copy of a screenshot of the Google system that measures these statistics that Google produced as GOOG-CABR-05424608.

32. Like the March 25, 2016 Privacy Policy, the March 31, 2020 Privacy Policy (and all versions in between), provided a link to the page titled "How Google uses information from sites or apps that use our services" that is described above in paragraph 20. Google's records show that the "How Google uses information from sites or apps that use our services" webpage was viewed more than [REDACTED] times between March 23, 2018 (the date Google started collecting this data) and July 27, 2020 by U.S.-based users. Attached hereto as **Exhibit 3** is a true and correct copy of a screenshot of the Google system that measures these statistics that Google produced as GOOG-CABR-05424610.

**C. Users Creating New Google Accounts During The Class Period Agreed to New Account Creation Agreements That Specifically Disclose Google's Receipt of the Disputed Data Through The Services**

33. Users signing up for a new Google Account are required to view the New Account Creation Agreement.

34. Users creating new accounts prior to 2013 were shown a New Account Creation Agreement that told users to "review the Terms of Service below" and that "[w]ith Gmail, you won't see blinking banner ads. Instead we display ads you might find useful that are relevant to the content of your messages." The Agreement then stated "By clicking on 'I accept' below you are agreeing to the Terms of Service [which was hyperlinked and also included directly on the screen] above and both the Program Policy [which was hyperlinked] and the Privacy Policy [which was also hyperlinked]." To create an account, users were required to select "I accept. Create my account." Attached hereto as **Exhibit 4** is a true and correct copy of a New Account Creation Agreement from before 2013 that Google produced as GOOG-CABR-04981576.

35. Users creating new accounts between 2013 and June 2016 were shown a modified New Account Creation Agreement. This screen required users to select that they "agree to the Google Terms of Service [which was hyperlinked] and Privacy Policy [which was also hyperlinked]." I agree to the Google Terms of Service and Privacy Policy Attached hereto as **Exhibit 5** is a true and correct copy of the New Account Creation Agreement from approximately 2013-June 2016 that Google produced as GOOG-CABR-04981575.

36. Beginning in or around June 2016, Google updated its New Account Creation Agreement. Attached hereto as **Exhibit 6** is a true and correct copy of a presentation showing the launched user experience for the Consent Bump and New Account Creation Agreements that Google produced as GOOG-CABR-04067825-67. Unless stated otherwise, the screenshots pasted in this section are taken from Exhibit 6. However, as further explained below, Google has also produced—and I enclose as exhibits herein—true and correct copies of printouts of the precise text of the New Account Creation Agreements shown to each Plaintiff, where applicable.

37. First, the New Account Creation screen was modified so that the checkbox for "I agree to the Google Terms of Service and Privacy Policy" was removed from the page where users enter in their information:

Ex. 6 at GOOG-CABR-04067829.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

38. After the user input the required information and selected "Next step," the user was shown the updated New Account Creation Agreement:

# Privacy and Terms

By choosing "I agree" below you agree to Google's Terms of Service.

You also agree to our Privacy Policy, which describes how we process your information, including these key points:

## Data we process when you use Google

- When you use Google services to do things like write a message in Gmail or comment on a YouTube video, we store the information you create.
- When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity – including information like the video you watched, device IDs, IP addresses, cookie data, and location.
- We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player.

Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data at My Account (myaccount.google.com).

## Why we process it

We process this data for the purposes described in our policy, including to:

- Help our services deliver more useful, customized content such as more relevant search results;
- Improve the quality of our services and develop new ones;
- Deliver personalized ads, both on Google services and on sites and apps that partner with Google;
- Improve security by protecting against fraud and abuse; and
- Conduct analytics and measurement to understand how our services are used.

## Combining data

We also combine data among our services and across your devices for these purposes. For example, we show you ads based on information from your use of Search and Gmail, and we use data from trillions of search queries to build spell-correction models that we use across all of our services.

CANCEL I AGREE

Ex. 6 at GOOG-CABR-04067829-30.

39. The New Account Creation Agreement states: "By choosing '**I agree**' below you agree to Google's Terms of Service. You also agree to our Privacy Policy, which describes how we process your information, including these key points…." The phrases "Terms of Service" and "Privacy Policy" linked to the then-current versions of Google's Terms of Service and Privacy Policy.

40. The New Account Creation Agreement disclosed the "Data we process when you use Google." Specifically, the screen explained:

> When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity—***including information like the video you watched, device IDs, IP address, cookie data, and location***.
>
> ***We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player***.
>
> Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data at My Account (myaccount.google.com).

*Id.* (emphasis added).

41. The New Account Creation Agreement also explains that Google uses the data for a variety of purposes, including to "[d]eliver personalized ads, . . . both on Google services and on sites and apps that partner with Google."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

42. In May 2018, Google modified the New Account Creation Agreement in several ways. Attached hereto as **Exhibit 7** are true and correct copies of screenshots taken of the New Account Creation Agreement in or around May 2020 that Google produced as GOOG-CABR-04067873-74:

Google

Privacy and Terms

You're in control of the data we collect & how it's used

To create a Google Account, you'll need to agree to the Terms of Service below.

In addition, when you create an account, we process your information as described in our Privacy Policy, including these key points:

**Data we process when you use Google**

- When you set up a Google Account, we store information you give us like your name, email address, and telephone number.
- When you use Google services to do things like write a message in Gmail or comment on a YouTube video, we store the information you create.
- When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity – including information like the video you watched, device IDs, IP addresses, cookie data, and location.
- We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player.

**Why we process it**

We process this data for the purposes described in our policy, including to:

- Help our services deliver more useful, customized content such as more relevant search results;
- Improve the quality of our services and develop new ones;
- Deliver personalized ads, depending on your account settings, both on Google services and on sites and apps that partner with Google;
- Improve security by protecting against fraud and abuse; and
- Conduct analytics and measurement to understand how our services are used. We also have partners that measure how our services are used. Learn more about these specific advertising and measurement partners.

**Combining data**

We also combine this data among our services and across your devices for these purposes. For example, depending on your account settings, we show you ads based on information about your interests, which we can derive from your use of Search and YouTube, and we use data from trillions of search queries to build spell-correction models that we use across all of our services.

**You're in control**

Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data now by clicking "More Options" below. You can always adjust your controls later or withdraw your consent for the future by visiting My Account (myaccount.google.com).

MORE OPTIONS

Cancel    I agree

43. First, the top of the screen was modified to say: "To create a Google Account, you'll need to agree to the Terms of Service below. In addition, when you create an account, we process your information as described in our Privacy Policy, including these key points: … " Like the prior version, the phrases "Terms of Service" and "Privacy Policy" linked to the then-current versions of Google's Terms of Service and Privacy Policy.

44. Second, Google added the "Learn More" link which brought users to https://policies.google.com/privacy/google-partners which explains the data collection at issue here and states that "over 2 million non-Google websites and apps partner with Google to show ads."

45. Third, Google added a paragraph at the end ("You're in control") and a "MORE OPTIONS" link to make it easier for users to adjust their settings and control the data associated with their Google Accounts. Attached hereto as **Exhibit 8** are true and correct copies of screenshots taken of the "MORE OPTIONS" dropdown in or around September 2019 that Google produced as GOOG-CABR-04067875-80.

46. In order to create an account, users had to click the "I AGREE" button at the bottom of the New Account Creation Screen.

47. Google records confirm that Plaintiffs Jeremy Davis and Chasom Brown each created at least one Google Account after June 2016. Both of these Plaintiffs were presented with the New Account Creation Agreement and selected "I AGREE."

48. I am informed that Plaintiff Davis represented that he has a Google account associated with the email address [REDACTED]. Attached hereto as **Exhibit 9** is a true and correct copy of a Google record that Google produced as GOOG-BRWN-00030922 that shows that account was created on [REDACTED]. Attached hereto as **Exhibit 10** is a true and correct copy of a Google record that Google produced as GOOG-BRWN-00708085 – 92 that shows Davis viewed the New Account Creation Agreement on [REDACTED] and that he selected "I AGREE." Attached hereto as **Exhibit 11** is a true and correct copy of a record Google produced as GOOG-BRWN-00708167 that shows the text of the New Account Creation Agreement that was shown to Davis, and to which Davis selected "I AGREE."

49. I am informed Plaintiff Brown represented that he has a Google account associated with the email address [REDACTED]. Attached hereto as **Exhibit 12** is a true and correct copy of a Google record that Google produced as GOOG-BRWN-00229498-500 that shows that account was created on [REDACTED]. Attached hereto as **Exhibit 13** is a true and correct copy of a Google record that Google produced as GOOG-BRWN-00708058 – 66 that shows Brown viewed the New Account Creation Agreement on [REDACTED], and that he selected "I AGREE." Attached hereto as **Exhibit 14** is a true and correct copy of a record Google produced as GOOG-BRWN-00708165-66 that shows the text of the New Account Creation Agreement shown to Brown, and to which Brown selected "I AGREE."

50. [REDACTED] of U.S.-based accounts were created after users selected "I AGREE" to the New Account Creation Agreement. Attached hereto as **Exhibit 15** is a true and correct copy of a screenshot of the Google system that measures these statistics that Google produced as GOOG-CABR-05435660.

51. The other Plaintiffs, and [REDACTED] of other Class Members, who created Google accounts prior to June 2016 would not have seen these screens.

**D. <u>Google's Disclosures Relating to Incognito Mode</u>**

52. As described above, Google discloses that it receives the data at issue when users visit non-Google websites that use Google services. In other documents described below, Google describes the purpose and functionality of Incognito mode and/or private browsing modes generally. None of these documents represents that Incognito or other private browsing modes prevent Google from receiving the data used to provide its advertising and analytics services.

**1. The Chrome Privacy Notice**

53. I understand that Plaintiffs allege the Chrome Privacy Notice is part of their contract with Google. TAC ¶ 268. Google's Chrome Privacy Notice currently identifies five modes in which Chrome may be used (Basic, Sign-In, Sync, Guest, and Incognito). True and correct copies of the current and archived versions of the Chrome Privacy Notice are publicly available at: https://www.google.com/chrome/privacy/.

54. The May 20, 2020 Chrome Privacy Notice, in effect at the time Plaintiffs' filed the Complaint, defines "Chrome" as "refer[ring] to all the products in the Chrome family listed above."[6] The Chrome Privacy Notice uses the terms Chrome and Google differently. For example, the May 20, 2020 Chrome Privacy Notice states that "Chrome periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." And the Chrome Privacy Notices in effect between June 21, 2016 and October 23, 2018 states that "You can stop Chrome from accepting cookies from Google or other sites."

55. The May 20, 2020 Chrome Privacy Notice also explains that in Incognito mode:

> You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:
>
> - Basic browsing history information like URLs, cached page text, or IP addresses of pages linked from the websites you visit
> - Snapshots of pages that you visit
> - Records of your downloads, although the files you download will still be stored elsewhere on your computer or device
>
> ***
>
> Cookies. Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window.
>
> ***
>
> Profile information. In incognito mode, you will still have access to information from your existing profile, such as suggestions based on your browsing history and saved passwords, while you are browsing. In guest mode, you can browse without seeing information from any existing profiles.

56. This page makes clear that Incognito mode allows a user to "limit the information Chrome [*i.e.*, the user's browser] stores on *your system*." It also makes clear that cookies may still be placed on a user's browser *during* an Incognito session, and will be deleted when the user *closes* "the last incognito window."

[6] In contrast, Google defines "Google" in the Terms of Service and Privacy Policy as "Google LLC and its affiliates."

57. The text "incognito mode or guest mode" is hyperlinked and directs users to the "Browse in Private" help page. Attached as **Exhibit 16** is a true and correct copy of the Help Center Article titled "Browse in Private," which is also publicly available at https://support.google.com/chrome/answer/95464. The "Browse in private" page similarly explains "[w]hat happens when you browse privately" including that "Chrome won't save your browsing history, cookies and site data, or information entered in to forms," and "[y]our activity isn't hidden from websites you visit, your employer or school, or your internet service provider." The "Browse in Private" help page was viewed nearly [REDACTED] times between August 1, 2016 (the month the page was created) to January 1, 2022 (the most recent statistic as of the date the data was pulled) by U.S.-based users. Attached hereto as **Exhibit 17** is a true and correct copy of an export from the Google system that measures these statistics that Google produced as GOOG-CABR-05876957.

58. The "Browse in Private" help page directs users to "Learn more about how private browsing works." Clicking on the "how private browsing works" hyperlink referenced above takes users to the "How private browsing works in Chrome" page. Attached as **Exhibit 18** is a true and correct copy of the Help Center Article titled "How private browsing works in Chrome," which is also publicly available at https://support.google.com/chrome/answer/7440301. The "How private browsing works in Chrome" page explains that:

> When you browse privately, other people who use the device won't see your history.
>
> Chrome doesn't save your browsing history or information entered in forms. Cookies and site data are remembered while you're browsing, but deleted when you exit Incognito mode. You can choose to block third-party cookies when you open a new incognito window. Learn more about cookies.
>
> ***
>
> **Your activity might still be visible**
>
> Incognito mode stops Chrome from saving your browsing activity to your local history. Your activity, like your location, might still be visible to:
>
> - Websites you visit, including the ads and resources used on those sites
> - Websites you sign in to
> - Your employer, school, or whoever runs the network you're using

- Your internet service provider
- Search engines
  - Search engines may show search suggestions based on your location or activity in your current Incognito browsing session. When you search on Google, Google will always estimate the general area that you're searching from. Learn more about location when you search on Google.

**Some of your info might still be visible**

A web service, website, search engine, or provider may be able to see:

- Your IP address, which can be used to identify the general area you're in
- Your activity when you use a web service
- Your identity if you sign in to a web service, like Gmail

59. The "How private browsing works in Chrome" help page was viewed more than [REDACTED] times between July 1, 2017 (the month the page was created) to January 1, 2022 (the most recent statistic as of the date the data was pulled) by U.S.-based users. Attached hereto as Exhibit 17 is a true and correct copy of an export from the Google system that measures these statistics that Google produced as GOOG-CABR-05876957.

60. The text "cookies" in paragraph 55 above is hyperlinked to a definition of cookies within the Chrome Privacy Notice, which states:

> A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

61. Clicking on the "how Google uses cookies" hyperlink takes users to the "How Google uses cookies" help center article. Attached as **Exhibit 18** is a true and correct copy of the Help Center Article titled "How Google uses cookies," which is also publicly available at https://policies.google.com/technologies/cookies?hl=en-US. This page explains that:

> Google Chrome also has Incognito mode, which doesn't store your Chrome history of visited sites or cookies on your device after you close all Incognito windows.

62. Clicking on the "when you use our partners' sites or apps takes you to the "HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICES" page described above in Paragraph 20.

63. Similarly, the September 1, 2015 Chrome Privacy Notice, in effect at the start of the Class Period, explains:

> Sites that you visit using Chrome will automatically receive standard log information similar to that received by Google. These sites may also set their own cookies or store site data on your system. You can restrict cookies[7] and other site data in Chrome's preferences page.
>
> ***
>
> If you use Chrome in incognito mode[8] or guest mode, it will not transmit any pre-existing cookies to sites that you visit. Sites may deposit new cookies on your system while you are in these modes; these cookies will only be temporarily stored and transmitted to sites while you remain in incognito / guest mode. They will be deleted when you close the browser, close all open incognito windows or exit guest mode.
>
> ***
>
> Incognito mode is useful if you would still like to have access to information from your existing profile, such as suggestions based on your browsing history, while you are browsing. Guest mode is useful if you would prefer to begin a browsing session without seeing information from any existing profiles. In either of these modes, Chrome will not store basic browsing history information such as URLs, cached page text, or IP addresses of pages linked from the websites you visit. It will also not store snapshots of pages that you visit or keep a record of your downloads (although this information could still be stored elsewhere on your system, e.g. in a list of recently opened files). New cookies received in these modes will not be saved after you close your browser, close all open incognito windows or exit guest mode. You can see when you are in incognito / guest mode because the incognito icon appears in the top corner of your browser; in some cases the border of your browser window may also change color.

**2. Google Chrome Privacy Whitepaper**

64. Since June 21, 2016, the Chrome Privacy Whitepaper was linked to the Chrome Privacy Notice. The Google Chrome Privacy Whitepaper, publicly available at https://www.google.com/chrome/privacy/whitepaper.html, describes Incognito Mode similarly to the Chrome Privacy Notice.

65. The current version, which was last updated on February 4, 2021, explains:

> Incognito mode in Chrome is a temporary browsing mode. It ensures that you don't leave browsing history and cookies on your computer. The browsing history and cookies are

[7] This hyperlink directs users to the cookie definition discussed in paragraph 57 above.
[8] This hyperlink directs users to the "Browse in private" page discussed in paragraph 54 above.

> deleted only once you have closed the last incognito window. Incognito mode cannot make you invisible on the internet. Websites that you navigate to may record your visits. Going incognito doesn't hide your browsing from your employer, your internet service provider, or the websites you visit.

66. Prior versions of the Google Chrome Privacy Whitepaper have the same language. Attached as **Exhibit 19** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on September 30, 2020, that Google produced as GOOG-CABR-00048617. Attached as **Exhibit 20** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on April 7, 2020, that Google produced as GOOG-CABR-00087981. Attached as **Exhibit 21** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on March 12, 2019, that Google produced as GOOG-CABR-00000066. Attached as **Exhibit 22** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on January 29, 2019, that Google produced as GOOG-CABR-00000122. Attached as **Exhibit 23** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on December 5, 2018, that Google produced as GOOG-CABR-00000150. Attached as **Exhibit 24** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on November 11, 2018, that Google produced as GOOG-CABR-00000290. Attached as **Exhibit 25** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on September 4, 2018, that Google produced as GOOG-CABR-00000262. Attached as **Exhibit 26** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on July 19, 2018, that Google produced as GOOG-CABR-00000455. Attached as **Exhibit 27** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on April 17, 2018, that Google produced as GOOG-CABR-00000430. Attached as **Exhibit 28** is a true and correct copy of the Google Chrome Privacy Whitepaper, last modified on March 6, 2018, that Google produced as GOOG-CABR-00000505.

/ / /

/ / /

/ / /

/ / /

/ / /

67. The Google system that measures these statistics shows that the English language version of the Chrome Privacy Whitepaper available at /chrome/privacy/whitepaper.html?hl=en-US was viewed nearly [REDACTED] times between October 3, 2018 (the date Google started collecting this data) to July 27, 2022 (the date the data was pulled):

[REDACTED]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**3. The Incognito Screen**

68. In addition to the description of Incognito mode in the Chrome Privacy Notice and the Chrome Privacy Whitepaper, the Incognito Screen that appears each time a user opens an Incognito window states:

69. The Incognito screen explains that "[n]ow you can browse privately, and other people who use this device won't see your activity."

70. It also states that Chrome won't save the following information: []Your browsing history[,] Cookies and site data[, and ] information entered in forms."

71. It also makes clear that Incognito mode is not private from entities on the web because that "[y]our activity might still be visible to," among other things,"[w]ebsites you visit."

/ / /

/ / /

/ / /

/ / /

/ / /

72.     I am informed that the screen itself was largely the same throughout the class period with one exception: In May 2020, Google announced the addition of the "Block third-party cookies" box. The box was slowly rolled out to Incognito users throughout June and July 2020. Prior to that date, although third-party cookies were not blocked by default, users could still navigate to their cookies settings at chrome://settings/cookies and block third-party cookies:



73.     Additionally, the "Learn more" hyperlink took users to different pages throughout the class period. From approximately August 2016 until approximately July 2017, the "Learn more" hyperlink took users to the "Browse in private" help center page, described above in paragraph 58. Between July 2017 and May 2020, the "Learn more" hyperlink took users to the "How Private Browsing Works in Chrome" help page, described above in paragraph 59.

Beginning in May 2020, the "Learn more" hyperlink has taken users to the "How Chrome Incognito keeps your browsing private" help page. Attached as **Exhibit 29** is a true and correct copy of the Help Center Article titled "How Chrome Incognito keeps your browsing private," which is also publicly available at https://support.google.com/chrome/answer/9845881. The "Learn more" link has been clicked more than [REDACTED] times between August 1, 2016 (the month the "Browse in private" help page was created) to January 1, 2022 (the most recent statistic as of the date the data was pulled) by U.S.-based users. Attached hereto as Exhibit 17 is a true and correct copy of an export from the Google system that measures these statistics that Google produced as GOOG-CABR-05876957.

74. The "How Chrome Incognito keeps your browsing private" page explains that "Incognito mode can help keep your browsing private from other people who use your device." It also explains "[w]hat Incognito mode does" including "Browsing in Incognito mode means your activity data isn't saved on your device, or to a Google Account you're not signed into" and "Chrome doesn't tell websites, including Google, when you're browsing privately in incognito mode." It further explains "[w]hat Incognito mode doesn't do" including:

- Prevent you from telling a website who you are. If you sign in to any website in Incognito mode, that site will know that you're the one browsing and can keep track of your activities from that moment on.
- Prevent your activity or location from being visible to the websites you visit, your school, employer, or your Internet Service provider.
- Prevent the websites you visit from serving ads based on your activity during an Incognito session. After you close all Incognito windows, websites won't be able to serve ads to you based on your signed-out activity during that closed session.

75. The "How Chrome Incognito keeps your browsing private" help page was viewed more than [REDACTED] times between May 1, 2020 (the month the page was created) to January 1, 2022 (the most recent statistic as of the date the data was pulled) by U.S.-based users. Attached hereto as Exhibit 17 is a true and correct copy of an export from the Google system that measures these statistics that Google produced as GOOG-CABR-05876957.

76. Google similarly explains in the "Search & browse privately" help page that "[i]f you want to search the web without saving your search activity to your account, you can use

private browsing mode in a browser (like Chrome or Safari)." It also explains that "Private browsing works differently depending on which browser you use," but it "usually means…[c]ookies are deleted after you close your private browsing window or tab" and "[y]ou might see search results and suggestions based on your location or other searches you've done during your current browsing session." Finally, it notes: "Important: If you sign in to your Google Account to use a web service like Gmail, your searches and browsing activity might be saved to your account." Attached as **Exhibit 30** is a true and correct copy of the Help Center Article titled "Search & browse privately," which is also publicly available at https://support.google.com/websearch/answer/4540094?. The "Search & browse privately" help page was viewed fewer than [REDACTED] times between August 1, 2016 (the month the page was created) to January 1, 2022 (the most recent statistic as of the date the data was pulled) by U.S.-based users. Attached hereto as Exhibit 17 is a true and correct copy of an export from the Google system that measures these statistics that Google produced as GOOG-CABR-05876957.

77. The Search & browse privately page was not linked from the Privacy Policy until May 25, 2018. Before that time, it could be found in the Google Help Center, and was linked from other Help Center articles, such as the "View & control activity in your account" page, which is publicly available at https://support.google.com/accounts/answer/7028918. Beginning with the May 25, 2018 Privacy Policy, the following sentence was added:

> We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results.

78. Clicking on the blue "customized search results" text displayed the following text:

> For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

79. Clicking on the blue "search and browse privately" text would take users to the "Search & browse privately" page discussed in the preceding paragraphs.

**E. Google's Agreements With Analytics and Ad Manager Customers Require That Websites Disclose The Use Of Those Services**

80. Google's agreements with websites that use its services require those websites to make certain disclosures.

81. For example, the Google Analytics Terms of Service requires websites to:

> post a Privacy Policy and that Privacy Policy must provide notice of Your use of cookies, identifiers for mobile devices (e.g., Android Advertising Identifier or Advertising Identifier for iOS) or similar technology used to collect data. You must disclose the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the site "How Google uses data when you use our partners' sites or apps", (located at www.google.com/policies/privacy/partners/, or any other URL Google may provide from time to time).

82. Attached as **Exhibit 31** is a true and correct copy of the Google Analytics Terms of Service, which is also publicly available at https://marketingplatform.google.com/about/analytics/terms/us/. The link www.google.com/policies/privacy/partners/ is hyperlinked to the "How Google Uses Information From Sites and Apps That Use Our Services," attached as Exhibit 1 and excerpted in Paragraph 20, above.

83. Google Analytics also has a Privacy Disclosures Policy that requires websites to "disclose the use of Google Analytics and how it collects and processes data." Attached as **Exhibit 32** is a true and correct copy of the Privacy Disclosures Policy, which is also publicly available at https://support.google.com/analytics/answer/7318509.

84. Similarly, Google's Ad Manager Publisher policies require websites that use Google Ad Manager to:

> have and abide by a privacy policy that clearly discloses any data collection, sharing and usage that takes place on any site, app, email publication or other property as a consequence of your use of Google products. The privacy policy must disclose to users that third parties may be placing and reading cookies on your users' browsers, or using web beacons to collect information as a result of ad serving on your website. To comply with this disclosure obligation with respect to Google's use of data, you have the option to display a prominent link to How Google uses data when you use our partners' sites or apps.

85. Attached as **Exhibit 33** is a true and correct copy of Google's Ad Manager Publisher policies, which is also publicly available at https://support.google.com/admanager/answer/10502938?visit_id=637746843701355304-

1137658824&rd=1. Relevant portions of the page a user would go to if they clicked on the hyperlink "How Google uses data when you use our partners' sites or apps" are displayed above in paragraph 20 and the full page is attached as Exhibit 1.

86. Websites can comply with these rules in many ways. For example, the Drudge Report Website (a website I am informed Plaintiff Castillo has represented he has visited) Cookie Policy explains that:

> We use Google Analytics cookies to collect aggregate statistical data about how visitors use the Sites so that we can improve the user experience and serve up the content our visitors find most useful. Google Analytics cookies store information such as what pages users visit, how long they are on the Sites, how they arrived at the Sites, and what they click on. To learn more about Google's practices and to opt out, please visit http://www.google.com/policies/privacy/partners/, https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage, and https://tools.google.com/dlpage/gaoptout....We may partner with certain third parties to deliver advertising that we believe may interest you based on your activity on our Sites and other websites over time. …Google Ads [__gads]...is a cookie associated with Google Ads, a digital advertising service. To learn more about Google's practices and to opt out, please visit Ads Settings.

87. Attached as **Exhibit 34** is a true and correct copy of the Drudge Report Website Cookie Policy, which is also publicly available at which is publicly available at https://www.drudgereport.com/privacy/cookie-policy/.

88. Plaintiffs' law firm Boies Schiller Flexner LLP has a Privacy and Cookie Policy that discloses that:

> Non-personal Information. Like many websites, we may collect certain technical information about your use of the website and generally this is not information the Firms could use to identify you without reference to other information. For example, we may collect your internet protocol (IP) address, browser type, the identity of your internet service provider (ISP), the number and duration of page visits, how you were directed to the website, and the number of clicks you make when you use the website….We may use third parties, such as Google and our website host, to provide analytics services based on this data.

89. Attached as **Exhibit 35** is a true and correct copy of the Boies Schiller Flexner LLP Privacy and Cookie Policy, which is also publicly available at which is publicly available at https://www.bsfllp.com/privacy-policy.html.

90. The Privacy Policy of another of Plaintiffs' law firms, Morgan & Morgan, discloses that:

> We and our third party providers may use cookies and other technologies such as log files, tracking pixels,and analytic tools and services to collect information (including Personal Information) automatically from you. Such information includes your IP address, location information, the type of the web browser and operating system you use, browsing activities, usage information, and any other information that your web browsing software or Internet Service Provider automatically provides to our Services….We may use third party analytics tools, such as Google Analytics and Mouseflow, in order to better understand your use of our Services and how we can improve them. These tools collect information sent by your browser or mobile device, including the pages you visit and other usage information. For more information regarding how Google collects, uses, and shares your information please visit http://www.google.com/policies/privacy/partners/.

91. Attached as **Exhibit 36** is a true and correct copy of the Morgan & Morgan Privacy Policy, which is also publicly available at which is publicly available at https://www.forthepeople.com/privacy-policy/. The link at the end of the paragraph is hyperlinked to the "How Google Uses Information From Sites and Apps That Use Our Services," attached as Exhibit 1 and excerpted in Paragraph 20, above.

92. In addition to privacy and cookie policies, websites may also chose to include additional disclosures in a "pop-up." For example, I visited Latham & Watkins' website in Incognito mode, which is publicly available at https://www.lw.com/, and it had a specific Google Analytics pop-up disclosure that the user has to toggle on before Analytics is enabled:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

93.     Additionally, when users see ads on non-Google websites, including while in a private browsing mode, the ads are accompanied by an "AdChoices" icon:



94.     When clicked, users see that the ad is served through Google Ads:



95.     Users can then click on an icon titled "Why this ad?" that provides information on what type of data Google used to serve the ad. If Ad personalization is off, this page will explain that ads are shown based on factors like "[T]he time of day," "The website you're on," and "Your general location (like your country or city)."



96.     As noted above, a user can opt out of personalized ads even if they are not signed into a Google Account by navigating to https://adssettings.google.com, where they can select a setting to disable "Ad personalization on the Web."

97.     Google also makes available help pages that explain how ad personalization works. For example, the "About Google ad personalization" help page, which is publicly available at https://support.google.com/ads/answer/1660762, explains:

> Ads that Google shows can be personalized based on many factors, like the types of websites you visit or mobile apps you've installed. If ad personalization is off, ads may still use non-personal data, such as your general location or the topics on the website or app you're looking at.

98. Additionally, the "Why you're seeing an ad" help page, publicly available at https://support.google.com/ads/answer/1634057, includes many explanations as to why a user may see an ad, including: (1) the user's general location; (2) user activity, like "[y]our current search query," "[p]revious search activity," "[y]our previous interactions with ads," and "[t]ypes of websites you visit,"; and (3) other info, such as "time of day" and "[i]nfo you gave to an advertiser, like if you signed up for a newsletter with your email address."

**F. Chrome's Developer Tools**

99. I am informed that Plaintiffs have described the process through which Google receives the data at issue through its services installed on third-party websites as "surreptitious[]" and as being conducted in "secret." *See, e.g.,* TAC ¶¶ 63-66, 68-69, 85, 87. As described in the preceding section, there are ways that Incognito users can see, in real time, that Incognito is not blocking Google's services. In addition, Google designed a tool that comes standard on Chrome that allows Chrome users to view, on each website they visit, a list of providers of third-party web-services the website is using, including Google Services such as Google Ad Manager and Google Analytics, and which are receiving data when the user visits those sites. To view all of the third-party scripts (including Google scripts) on a given website, a Chrome user may simply click on Chrome's "View" tab, select Developer > Developer Tools > and then click on the Sources tab. Chrome users can access the same tool and information by right clicking on the webpage, selecting "View Page Source," and selecting "Sources." This feature is available in all Chrome modes including Incognito.

/ / /

/ / /

/ / /

/ / /

/ / /

100. Plaintiffs appear to be aware of this tool because their complaint includes a screenshot of a visit in Incognito mode to a website that uses Google services, the New York Times, while using what appears to be Chrome's Developer Tools function:

TAC ¶ 86.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## G. Other Browsers' Disclosures

101. The Firefox private browsing screen explains that private browsing "doesn't make you anonymous."

102. Clicking "Learn more" takes users to a page called "Common Myths about Private Browsing." Attached as **Exhibit 37** is a true and correct copy of the "Common Myths about Private Browsing" page, which is publicly available at https://support.mozilla.org/en-US/kb/common-myths-about-private-browsing?as=u&utm_source=inproduct. This page explains that "Private Browsing is a useful feature of Firefox, but only if you understand the protection it offers. It helps you obscure your online activity from other people who use Firefox on your computer, but does not make you invisible online" and that "Private Browsing does not mask your identity or activity online. Websites and Internet service providers can still gather information about your visit, even if you are not signed in."

/ / /

/ / /

103. Similarly, Microsoft Edge's private browsing page explains that private browsing does not "[h]ide your browsing from your school, employer, or internet service providers[;] [g]ive you additional protection from tracking by default[;] [or] [a]dd additional protection to what's available in normal browsing."

104. A Microsoft Edge help page also provides details of "[w]hat data is collected or stored, and why" and provides instructions to limit the amount of data collected. Attached as **Exhibit 38** is a true and correct copy of the "Microsoft Edge, browsing data, and privacy" page, which is publicly available at https://support.microsoft.com/en-us/windows/microsoft-edge-browsing-data-and-privacy-bb8174ba-9d73-dcf2-9b4a-c582b4e640dd.

DocuSign Envelope ID: F607DC4B-0464-4B8A-A275-31A527149C21

105. Another Microsoft help page notes that "[w]ebsites can still personalize content for you during your InPrivate browsing session because cookies and other site permissions aren't deleted until you close all InPrivate windows." Attached as **Exhibit 39** is a true and correct copy of the "Browse InPrivate in Microsoft Edge" page, which is publicly available at https://support.microsoft.com/en-us/microsoft-edge/browse-inprivate-in-microsoft-edge-cd2c9a48-0bc4-b98e-5e46-ac40c84e27e2.

106. And Safari's private browsing pop-up explains that "[a]fter you close this window, Safari won't remember the pages you visited, your search history, or your Autofill information."

Search or enter website name

Private Browsing Enabled
Safari will keep your browsing history private for all tabs in this window. After you close this window, Safari won't remember the pages you visited, your search history, or your AutoFill information.

Privacy Report
Safari does not keep cross-site tracker statistics in Private Browsing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Mountain View, California on August 5, 2022.

DocuSigned by:
Jonathan McPhie
844C699DCB8C4D1...

Jonathan McPhie