# EXHIBIT 18

# Redacted Version of Document Sought to be Sealed

```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4                       ---oOo---

5    CHASOM BROWN, et al.,          )
     on behalf of themselves and   )
6    all others similarly          )
     situated,                     )
7                                  )
             Plaintiffs,           )Case No.
8                                  )4:20-cv-03664-YGR-SVK
     vs.                           )
9                                  )
     GOOGLE LLC,                   )
10                                 )
             Defendant.            )
11   _____)

12

13                       ---oOo---

14          Videotaped Zoom Deposition of

15                 GLENN BERNTSON

16           Tuesday, February 14, 2023

17                    CONFIDENTIAL

18                       ---oOo---

19

20

21

22

23   Katy E. Schmidt

24   RPR, RMR, CRR, CSR 13096

25   Veritext Job No.: 5757744
```

Page 1

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4                        ---oOo---
 5   CHASOM BROWN, et al.,        )
     on behalf of themselves and  )
 6   all others similarly         )
     situated,                    )
 7                                )
             Plaintiffs,          )Case No.
 8                                )4:20-cv-03664-YGR-SVK
     vs.                          )
 9                                )
     GOOGLE LLC,                  )
10                                )
             Defendant.           )
11   _____)
12           BE IT REMEMBERED that, pursuant to Notice,
13   and on Tuesday, the 14th day of February, 2023,
14   commencing at the hour of 6:03 a.m., thereof, in New
15   York, New York, before me, KATY E. SCHMIDT, a
16   Certified Shorthand Reporter in and for the County of
17   Yolo, State of California, there virtually personally
18   appeared
19
20                      GLENN BERNTSON
21   called as a witness herein, who, being by me first
22   duly sworn, was thereupon examined and interrogated as
23   hereinafter set forth.
24
25
```

Page 2

```
 1   APPEARANCES:
 2   For The Brown Plaintiffs:
 3                   (Appeared via Zoom)
 4           BOIES SCHILLER FLEXNER LLP
             BY: MARK MAO, Esq.
 5           44 Montgomery Street, 41st Floor
             San Francisco, California 94104
 6           415.293.6800
             mmao@bsfllp.com
 7
                     (Appeared via Zoom)
 8
             SUSMAN GODFREY, LLP
 9           BY: ALEXANDER FRAWLEY, Esq.
             1301 Avenue Of The Stars, 32nd Floor
10           New York, New York 10019
             afrawley@susmangodfrey.com
11
12   For The Defendants:
13                   (Appeared via Zoom)
14           QUINN EMANUEL URQUHART & SULLIVAN LLP
             BY: JOSEF ANSORGE, Esq.
15           BY: JOSEPH MARGOLIES, Esq.
             51 Madison Avenue, 22nd Floor
16           New York, New York 10010
             212.849.7000
17           josefansorge@quinnemanuel.com
18   Also present:
19           Steven Togami, Videographer
20           Matthew Gubiotti, In-house counsel
21
                     ---o0o---
22
23
24
25
```

Page 3

| | | |
|---|---|---|
| 1 | privacy where they can go interact on the web as a | 06:25 |
| 2 | person that has no prior history, and then when | 06:25 |
| 3 | they're done with that session, it's all thrown out. | 06:25 |
| 4 | So it's privacy by design is how I would | 06:25 |
| 5 | characterize it as a user of Chrome. | 06:26 |
| 6 | BY MR. FRAWLEY: | 06:26 |
| 7 | Q.   Is it fair to say that these cookie jars in | 06:26 |
| 8 | your declaration are showing -- let me rephrase this | 06:26 |
| 9 | question. | 06:26 |
| 10 | These cookie jars are not representing | 06:26 |
| 11 | what's happening on the server side of Google. | 06:26 |
| 12 | Is that correct? | 06:26 |
| 13 | MR. ANSORGE:   Objection.   Form. | 06:26 |
| 14 | THE WITNESS:   The notion of a cookie jar is | 06:26 |
| 15 | specifically a client side concept. | 06:26 |
| 16 | BY MR. FRAWLEY: | 06:26 |
| 17 | Q.   Can you tell me what "client side" means? | 06:26 |
| 18 | A.   In the case of Chrome, the browser within | 06:26 |
| 19 | Chrome. | 06:27 |
| 20 | Q.   And how is that different from server side? | 06:27 |
| 21 | A.   So when I say within Chrome, let's say you | 06:27 |
| 22 | have a laptop and you have Chrome installed on your | 06:27 |
| 23 | laptop.   It is an application that is running in the | 06:27 |
| 24 | memory of your laptop.   And all of the content that's | 06:27 |
| 25 | in Chrome is physically stored on your laptop.   And as | 06:27 |

Page 21

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | you go to sites and, for example, log into sites, that | 06:27 |
| 2 | information is then stored locally inside the | 06:27 |
| 3 | application Chrome which is on your laptop. | 06:27 |
| 4 | And so the notion of a cookie really | 06:27 |
| 5 | represents the equivalent of a document that is stored | 06:27 |
| 6 | inside Chrome.  Different cookie jars within Chrome | 06:27 |
| 7 | mean that there are these two different sets of | 06:28 |
| 8 | documents that are not intermingled at all. | 06:28 |
| 9 | Server side is where, say, a request is made | 06:28 |
| 10 | to an entity such as New York Times dot com. | 06:28 |
| 11 | New York Times dot com is a domain that then gets | 06:28 |
| 12 | resolved to a physical device on the internet.  And | 06:28 |
| 13 | if, for example, I open up my browser and I type | 06:28 |
| 14 | New York Times dot com, my browser makes a call to | 06:28 |
| 15 | New York Times dot com often with, say, a URL.  Could | 06:28 |
| 16 | be just New York Times dot com, could be an actual URL | 06:28 |
| 17 | to a story that when that request is made, the content | 06:28 |
| 18 | that is stored server side, in this case, for example, | 06:28 |
| 19 | the content of a particular page of the | 06:28 |
| 20 | New York Times, is then delivered back to the client. | 06:28 |
| 21 | And so what you're seeing in your client | 06:29 |
| 22 | when you navigate to a given site is a copy of content | 06:29 |
| 23 | that the server, in this case New York Times, had | 06:29 |
| 24 | server side that when you made the request, was | 06:29 |
| 25 | delivered back to your browser and then rendered in | 06:29 |

Page 22

```
 1    your browser.                                    06:29

 2          So server side is the information that's   06:29

 3    stored basically in the systems associated with, say,  06:29

 4    a request from the browser.                      06:29

 5    Q.   And if a user in Chrome incognito visits a  06:29

 6    website that uses Google Ad Manager, fair to say that  06:29

 7    Google may receive certain data about that visit;  06:29

 8    correct?                                          06:30

 9          MR. ANSORGE:  Objection.  Form.            06:30

10          THE WITNESS:  Ad Manager can't tell the    06:30

11    difference between when a user is in private browsing  06:30

12    mode and when they are not.                       06:30

13          And if a publisher is using Ad Manager to  06:30

14    serve ads into their site and therefore has integrated  06:30

15    RSDK into their site and enabled that SDK to make an  06:30

16    ad request, then from the user's browser, who has then  06:30

17    loaded the content, say, from the New York Times, an  06:30

18    ad request can be made to Ad Manager to retrieve an ad  06:30

19    that is then rendered in the New York Times.  And as  06:30

20    part of that ad request, there's standard HTTP   06:30

21    information that's included in the ad request.    06:30

22    BY MR. FRAWLEY:                                   06:30

23    Q.   And the information that comes to Google in  06:31

24    that scenario would be stored server side in Google  06:31

25    logs; correct?                                    06:31
```

Page 23

| | | |
|---|---|---|
| 1 | If you use IP address, you can't do that. | 06:53 |
| 2 | So we've designed our systems very | 06:53 |
| 3 | specifically to keep IP address to very limited usages | 06:53 |
| 4 | that are sort of required to meet our obligations as | 06:53 |
| 5 | an ad-serving platform, but otherwise it's locked down | 06:53 |
| 6 | and not used by the rest of our systems. | 06:54 |
| 7 | BY MR. FRAWLEY: | |
| 8 | Q.   Can you look at paragraph 28 of your | 06:54 |
| 9 | declaration? | 06:54 |
| 10 | Do you see where you wrote: | 06:54 |
| 11 | "When the private browsing mode user | 06:54 |
| 12 | closes the session, the cookies that were | 06:54 |
| 13 | set during that private browsing session | 06:54 |
| 14 | are automatically and permanently deleted | 06:54 |
| 15 | from the browser"? | 06:54 |
| 16 | Do you see that? | 06:54 |
| 17 | A.   Yes. | 06:54 |
| 18 | Q.   And the cookie jar, the cookies are fading | 06:54 |
| 19 | because they're being deleted. | 06:54 |
| 20 | Is that right? | 06:54 |
| 21 | A.   Yes.   That's -- that's what that indicates. | 06:54 |
| 22 | Q.   Now, when the private browsing session is | 06:54 |
| 23 | closed and the cookies are deleted on the browser, | 06:54 |
| 24 | does that mean that the corresponding information is | 06:54 |
| 25 | also deleted by Google on the server side? | 06:55 |

Page 37

```
 1        A.    Eventually.  What happens is because these      06:55

 2   cookies are gone, we don't see any more traffic with       06:55

 3   these IDs, and a clock starts ticking.  Data -- you        06:55

 4   know, any data we have associated with an ID, like a       06:55

 5   GAIA ID or a Biscotti ID, when it becomes stale, we        06:55

 6   will then delete the data after a certain amount of        06:55

 7   time.                                                      06:55

 8        The longest we're retaining any data like             06:55

 9   this would be  ███████ .  So if there's no activity,       06:55

10   we just delete the data.  And in many cases copies of      06:55

11   the data that we store, we delete much sooner than         06:55

12   that.                                                      06:55

13        So we won't delete it right away.  We use             06:55

14   the fact there's no activity associated with the ID        06:55

15   that we then mark it as stale and then delete the          06:55

16   data.                                                      06:56

17        Q.    Okay.  Can you look at paragraph -- sorry --    06:56

18   page 13 of your declaration.                               06:56

19        So on this page, at least in the top two             06:56

20   paragraphs you're discussing cookie blocking; correct?    06:56

21        A.    Yes.                                            06:56

22        Q.    What is cookie blocking?                        06:57

23        A.    There are two different types of cookie         06:57

24   blocking that are described in the page that you're        06:57

25   referring to.                                              06:57
```

Page 38

| | | |
|---|---|---|
| 1 | websites where you don't even sign into that website? | 07:01 |
| 2 | MR. ANSORGE:  Objection.  Compound.  Form. | 07:01 |
| 3 | THE WITNESS:  I didn't say signed in.  I | 07:01 |
| 4 | said state.  Signed in is one example of state that | 07:01 |
| 5 | can be recorded in a first-party cookie or even a | 07:01 |
| 6 | third-party cookie.  It will impact an awful lot more | 07:01 |
| 7 | than just your signed-in browsing experience. | 07:01 |
| 8 | BY MR. FRAWLEY: | |
| 9 | Q.  Now, in both of these examples on page 13 | 07:01 |
| 10 | for cookie blocking, either disabling third-party | 07:02 |
| 11 | cookies or blocking all cookies, do those things | 07:02 |
| 12 | prevent Google Ad Manager from receiving any | 07:02 |
| 13 | information or just some information? | 07:02 |
| 14 | MR. ANSORGE:  Objection.  Compound.  Form. | 07:02 |
| 15 | Vague. | 07:02 |
| 16 | THE WITNESS:  When disabling third-party | 07:02 |
| 17 | cookies, that will prevent Ad Manager from receiving | 07:02 |
| 18 | third-party cookies which correspond in our prior | 07:02 |
| 19 | conversations to both GAIA and Biscotti.  Those would | 07:02 |
| 20 | both be blocked. | 07:02 |
| 21 | If all cookies are blocked, that would | 07:02 |
| 22 | include GAIA and Biscotti, and that would also include | 07:02 |
| 23 | any first-party identifier that may be set, including | 07:02 |
| 24 | if a publisher is, for example, storing some | 07:03 |
| 25 | representation of a user because they are trying to | 07:03 |

Page 42

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | maintain some state. | 07:03 |
| 2 | Neither of these options would impact | 07:03 |
| 3 | whether or not an ad request can be made.  It would | 07:03 |
| 4 | just impact the information that is stored in cookies | 07:03 |
| 5 | in the browser from being able to be included in the | 07:03 |
| 6 | ad request. | 07:03 |
| 7 | BY MR. FRAWLEY: | |
| 8 | Q.   So can you look at paragraph 9 of your | 07:03 |
| 9 | declaration on page 4? | 07:03 |
| 10 | And do you see where it says | 07:03 |
| 11 | "Google Ad Manager may receive:" colon, and then | 07:03 |
| 12 | there's a list of information that Google Ad Manager | 07:03 |
| 13 | may receive? | 07:03 |
| 14 | A.   Yes. | 07:03 |
| 15 | Q.   So in the case of either blocking | 07:03 |
| 16 | third-party cookies or blocking all cookies, those | 07:03 |
| 17 | things are only going to affect No. 1 in this list. | 07:04 |
| 18 | Is that correct? | 07:04 |
| 19 | A.   I'm reviewing to make sure. | 07:04 |
| 20 | Q.   Please. | 07:04 |
| 21 | A.   It does impact 1.  Those that are listed, it | 07:04 |
| 22 | impacts 1. | 07:04 |
| 23 | Q.   Okay.  Can you go back to page 13? | 07:04 |
| 24 | Do you see at the bottom where you discuss | 07:04 |
| 25 | disabling JavaScript in Chrome settings? | 07:04 |

Page  43

| | | |
|---|---|---|
| 1 | Q.   Now, going back to how we changed the | 08:44 |
| 2 | examples before and we inserted something underneath | 08:44 |
| 3 | 27 where the user goes to gmail and signs in, do you | 08:44 |
| 4 | recall that? | 08:44 |
| 5 | A.   I do. | 08:44 |
| 6 | Q.   Does that act of signing into gmail change | 08:44 |
| 7 | your view on whether the paragraph 26 cookie is still | 08:44 |
| 8 | part of the data at issue in this case? | 08:44 |
| 9 | MR. ANSORGE:  Objection.  Vague. | 08:44 |
| 10 | THE WITNESS:  My understanding is that the | 08:44 |
| 11 | data at issue for this case is a non-signed-in private | 08:44 |
| 12 | browsing mode. | 08:45 |
| 13 | And as I have documented here in No. 26, | 08:45 |
| 14 | that is a non-signed-in user in private browsing mode, | 08:45 |
| 15 | so it's a pseudonymous non-signed-in Biscotti cookie | 08:45 |
| 16 | that is added to the private browsing mode cookie jar. | 08:45 |
| 17 | In 27, we have another non-signed-in cookie | 08:45 |
| 18 | added to the cookie jar. | 08:45 |
| 19 | You proposed inserting an additional step | 08:45 |
| 20 | which involved signing into a Google property while in | 08:45 |
| 21 | private browsing mode, which itself means we're now | 08:45 |
| 22 | talking about something that is outside the scope of | 08:45 |
| 23 | the case, as I understand it. | 08:45 |
| 24 | BY MR. FRAWLEY: | |
| 25 | Q.   So I'm just trying to be really specific. | 08:45 |

Page 96

```
 1    I'm not trying to reask the same question.          08:45

 2           Are you saying that once the user signs in,  08:45

 3    in my new No. 28, it is that all future data is     08:45

 4    outside the case or does it also make the prior data 08:46

 5    in 26 and 27 outside the case?                       08:46

 6           MR. ANSORGE:  Objection.  Compound.           08:46

 7    Foundation.  And calls for a legal conclusion.       08:46

 8           THE WITNESS:  I'm not sure how to understand  08:46

 9    or really answer your question because this          08:46

10    declaration was written with an understanding that the 08:46

11    case is based on non-signed-in users in private     08:46

12    browsing mode.                                       08:46

13           And if I understand what you're saying,       08:46

14    you're saying, okay, how about signed-in users in   08:46

15    private browsing mode, in which case I may need to   08:46

16    write another declaration.                           08:46

17           My understanding is the case -- the scenario  08:46

18    that you brought up is outside the scope of the case. 08:46

19    That is my understanding.                            08:46

20    BY MR. FRAWLEY:

21       Q.   So when you think about the case being       08:47

22    limited to signed-out users, you're imagining the user 08:47

23    who stays signed out the entire private browsing    08:47

24    session; correct?                                    08:47

25       A.   The scope of this case is a signed-out       08:47
```

Page 97

```
 1    private browsing session, and I believe you've        08:47
 2    answered your own question because if you sign in, it  08:47
 3    is no longer a signed-out private browsing session.    08:47
 4          So if you sign in during a private browsing      08:47
 5    session, it is no longer a signed-out private browsing 08:47
 6    session.                                               08:47
 7       Q.   And it makes no difference to you whether      08:47
 8    the person signs in at the very beginning, in the      08:47
 9    middle, or at the end?                                 08:47
10          MR. ANSORGE:   Objection.   Compound.            08:47
11          THE WITNESS:   I'm happy to talk through how     08:47
12    cookies are managed and data flows even when you sign  08:47
13    into a private browsing session.   But that is, as I   08:47
14    understand it, outside the scope of this case.   And   08:48
15    this declaration was authored to cover topics that     08:48
16    were in scope for the case.                            08:48
17          So I'm happy to answer additional questions      08:48
18    you may have relating to how data is managed and what  08:48
19    data flows look like if you sign in in a private       08:48
20    browsing mode.   But the declaration I have written    08:48
21    here is covering material as I understood it to be     08:48
22    within the scope of the case.                          08:48
23    BY MR. FRAWLEY:                                         08:48
24       Q.   So one follow-up question on that.             08:48
25          The sentence that I read to you that goes        08:48
```

Page 98

| | | |
|---|---|---|
| 1 | It's impossible.  Because there are technical | 09:14 |
| 2 | restrictions, there are policies that are very clear, | 09:14 |
| 3 | there are reviews that every piece of code goes | 09:14 |
| 4 | through where multiple people have to look at that | 09:14 |
| 5 | code. | 09:14 |
| 6 | So I say it does because we don't.  But if | 09:14 |
| 7 | you actually look at the processes and policies we | 09:14 |
| 8 | have in place, operationally this is impossible | 09:14 |
| 9 | because we've committed to not do it and we put | 09:14 |
| 10 | processes in place that mean it would be impossible to | 09:14 |
| 11 | actually have a product doing this. | 09:14 |
| 12 | The only thing that I can concede is that if | 09:14 |
| 13 | a person who was an engineer, who was in a trusted | 09:14 |
| 14 | role, who was given access to this data for a very | 09:14 |
| 15 | specific business purpose, decided they wanted to find | 09:14 |
| 16 | an IP address and do something nefarious with it, it | 09:15 |
| 17 | is hypothetically possible.  But if they did so, they | 09:15 |
| 18 | would be fired. | 09:15 |
| 19 | So, no, I'm not going to concede Google | 09:15 |
| 20 | could do this.  We have made it impossible for | 09:15 |
| 21 | ourselves to be able to do this because user privacy | 09:15 |
| 22 | matters. | 09:15 |
| 23 | Q.   Does Google Ad Manager use any data that it | 09:15 |
| 24 | receives to train any AI or machine-learning | 09:16 |
| 25 | algorithms? | 09:16 |

Page 115

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:16 |
| 2 | Q.   Can you elaborate on that? | 09:16 |
| 3 | MR. ANSORGE:  Objection.  Form. | 09:16 |
| 4 | THE WITNESS:  It's a pretty long list.  How | 09:16 |
| 5 | about some examples? | 09:16 |
| 6 | MR. FRAWLEY:  That would be helpful. | 09:16 |
| 7 | THE WITNESS:  Okay.  Machine learning and AI | 09:16 |
| 8 | are tools that allow you to look at sort of a complex | 09:16 |
| 9 | set of data and try to identify patterns so that you | 09:16 |
| 10 | can make predictions about what something may happen. | 09:16 |
| 11 | You can think of them in some ways as being | 09:16 |
| 12 | extensions of statistics. | 09:16 |
| 13 | And in a lot of cases we're using what are | 09:16 |
| 14 | really tools derived from the field of statistics, | 09:16 |
| 15 | like basing an inference, that are really applied in | 09:16 |
| 16 | an at-scale computational manner, which is really what | 09:16 |
| 17 | AI and machine learning is all about. | 09:17 |
| 18 | One case where we use information that, say, | 09:17 |
| 19 | comes in on ad requests and bids that come into our | 09:17 |
| 20 | system is to look at patterns of bids.  Like how much | 09:17 |
| 21 | is all the different advertisers that we can integrate | 09:17 |
| 22 | with and provide ads to a publisher?  We'll look at | 09:17 |
| 23 | all the bids that come in and look at the distribution | 09:17 |
| 24 | of those bids.  And then using machine-learning derive | 09:17 |
| 25 | estimates for what an ideal floor price for a | 09:17 |

Page 116

1   publisher would be.                                      09:17

2            Now, this is really quite powerful for          09:17

3   publishers because publishers can set a floor price      09:17

4   that basically says, "I'm not going to accept an ad      09:17

5   from you unless you pay at least this much money."       09:17

6            And when we send out bid requests, we can       09:18

7   tell advertisers, "Hey, this publisher has set a         09:18

8   floor.  You really need to pay more than this if you     09:18

9   actually want to serve the ad."                          09:18

10           And what's interesting is when a publisher      09:18

11  communicates, "Oh, here's my floor," if they set that    09:18

12  floor just a little bit above what they know most of     09:18

13  the distribution of bids are, they can change the        09:18

14  behavior of buyers and they bid more.                    09:18

15           And so how does a publisher intelligently       09:18

16  set a floor at just the right amount where we know       09:18

17  there's additional demand that's possible to drive       09:18

18  bids up a little bit?                                    09:18

19           So that's an example of where we're             09:18

20  processing huge amounts of data and we can help          09:18

21  publishers understand even across different parts of     09:18

22  their inventory, such as on the New York Times, on the   09:18

23  sports pages, versus the front page, versus their        09:18

24  cuisine and cooking pages.                               09:18

25           What's the ideal strategy for setting floors    09:19

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | to maximize how much money they are? | 09:19 |
| 2 | So that's an example of how we just use tons | 09:19 |
| 3 | of data to try to find these patterns and solve for | 09:19 |
| 4 | this model that then allows publishers to earn the | 09:19 |
| 5 | maximum amount of money possible for their inventory. | 09:19 |
| 6 | And that's the kind of thing we do.  We've | 09:19 |
| 7 | got a lot of data flowing through our system. | 09:19 |
| 8 | For Ad Manager the models we build are | 09:19 |
| 9 | fundamentally how can we help publishers? | 09:19 |
| 10 | MR. ANSORGE:  Could I get another time | 09:19 |
| 11 | count, please? | 09:19 |
| 12 | MR. FRAWLEY:  Just to be clear, Joey, it's | 09:19 |
| 13 | not limited to three hours.  We're on the same page | 09:19 |
| 14 | there; right? | 09:19 |
| 15 | MR. ANSORGE:  Yeah.  But my understanding | 09:19 |
| 16 | was you were doing another hour.  And since we've been | 09:19 |
| 17 | communicating, you were taking a short break, there's | 09:19 |
| 18 | two hearings today, Dr. Berntson has a full deck this | 09:19 |
| 19 | afternoon. | 09:19 |
| 20 | How much longer are you intending on going, | 09:19 |
| 21 | Alex? | 09:19 |
| 22 | MR. FRAWLEY:  Not -- I don't think a ton | 09:19 |
| 23 | longer but I just -- this is the second time you asked | 09:19 |
| 24 | so it just seems like you're -- you were asking as if | 09:19 |
| 25 | there's a time hard stop, and I just want to be clear | 09:20 |

Page 118

| | | |
|---|---|---|
| 1 | there's not. | 09:20 |
| 2 | THE WITNESS:  I do have a meeting at 1:00 | 09:20 |
| 3 | that if I need to change, I need to notify the person | 09:20 |
| 4 | that I'm not going to be able to make that meeting. | 09:20 |
| 5 | MR. FRAWLEY:  I don't think you'll need to | 09:20 |
| 6 | change that meeting, but I -- I don't -- I don't think | 09:20 |
| 7 | you will need to. | 09:20 |
| 8 | Should we go off the record to talk about | 09:20 |
| 9 | this or -- | 09:20 |
| 10 | MR. ANSORGE:  No.  Let's get the questioning | 09:20 |
| 11 | done.  If you think we can get it done in the | 09:20 |
| 12 | 40 minutes, let's do it. | 09:20 |
| 13 | Except, Dr. Berntson, if you would like a | 09:20 |
| 14 | bathroom break -- | 09:20 |
| 15 | THE WITNESS:  Let's go.  Let's go. | 09:20 |
| 16 | MR. ANSORGE:  Yeah.  Let's go. | 09:20 |
| 17 | BY MR. FRAWLEY: | 09:20 |
| 18 | Q.   All right.  These things that Ad Manager | 09:20 |
| 19 | builds for publishers, do these Google | 09:20 |
| 20 | machine-learning things have names or are there | 09:20 |
| 21 | specific examples of them that have different names? | 09:20 |
| 22 | A.   The example that I gave you is that, it's | 09:20 |
| 23 | optimize floors.  Optimize floors, which evolved to | 09:20 |
| 24 | optimize pricing rules, because pricing rules is where | 09:20 |
| 25 | a publisher can set up different rules for pricing or | 09:21 |

Page 119

```
 1    setting floors on their inventory based on attributes    09:21

 2    of the inventory.                                        09:21

 3            So that would be an example.                     09:21

 4        Q.   And do you remember we agreed earlier that      09:21

 5    Ad Manager doesn't distinguish how it treats private     09:21

 6    browsing traffic from any other kind of traffic?         09:21

 7        A.   Yes.                                             09:21

 8        Q.   Does that apply to Ad Managers' use of data     09:21

 9    to build things like optimize floor?                     09:21

10        A.   Entirely.                                       09:21

11        Q.   Aside from optimize floors -- or floor -- I     09:21

12    forget what you said -- are there any other specific     09:21

13    machine-learning products that Ad Manager has built to   09:21

14    help publishers?                                         09:21

15            MR. ANSORGE:  Mr. Frawley, I'm going to          09:21

16    object as outside of the scope of the declaration.       09:21

17            THE WITNESS:  Yes.                               09:22

18    BY MR. FRAWLEY:                                          09:22

19        Q.   Can you tell me any other specific examples?    09:22

20            MR. ANSORGE:  Objection.  Scope.                 09:22

21            THE WITNESS:  I provided an example.  I          09:22

22    can't give you an exhaustive list.  I don't know if      09:22

23    you're asking for one more example or if you're asking   09:22

24    for every example I can remember.                        09:22

25    ///
```

Veritext Legal Solutions
866 299-5127

```
 1   BY MR. FRAWLEY:                                    09:22

 2       Q.   As many examples as you can remember just 09:22

 3   sitting here right now.                            09:22

 4            MR. ANSORGE:  Objection.  Scope.          09:22

 5            THE WITNESS:  Well, this is certainly not 09:22

 6   covered in my declaration but let me see what I can 09:22

 7   come up with.                                      09:22

 8            So we've talked about optimize pricing    09:22

 9   rules, reserved price optimization.  Let's see.   09:22

10   Enhanced dynamic allocation.  Oh, smart throttling. 09:23

11   BY MR. FRAWLEY:                                    09:23

12       Q.   That's helpful.                           09:23

13            If you have --                            09:23

14       A.   There are more, but...                    09:23

15       Q.   No.  I think in the interest of time we can 09:23

16   stop there.                                        09:23

17            Fair to say if you had a long time to think 09:23

18   about it, you could come up with an exhaustive list of 09:23

19   close to exhaustive list?                          09:23

20            MR. ANSORGE:  Objection.  Form.  Vague.   09:23

21            THE WITNESS:  For Ad Manager itself?      09:23

22   BY MR. FRAWLEY:                                    09:23

23       Q.   Yes.  For Ad Manager.  Okay.              09:23

24       A.   But there are other ad products that have 09:24

25   their own models.  Yeah.                           09:24
```

Veritext Legal Solutions
866 299-5127

```
 1          Q.   And focusing on optimize floors, about how    09:24

 2    long has it taken to build that program or model or     09:24

 3    whatever you phrase it as?                               09:24

 4               MR. ANSORGE:  Objection.  Scope.              09:24

 5               Mr. Frawley, do you have any more questions   09:24

 6    about Dr. Berntson's declaration?  Because although we   09:24

 7    might not have had a hard stop of three hours, we did    09:24

 8    have an understanding that the questions would be tied   09:24

 9    to his declaration, and we have now exceeded the three   09:24

10    hours and you appear to be very far afield from where    09:24

11    we started.                                              09:24

12               MR. FRAWLEY:  So I'll just ask, are you       09:24

13    instructing Dr. Berntson not to answer?                  09:24

14               MR. ANSORGE:  No.  I was asking you whether   09:24

15    you had any questions that pertained to his              09:24

16    declaration with the agreement between the parties       09:24

17    that the questioning would be focused on the             09:24

18    declaration.                                             09:24

19               MR. FRAWLEY:  I think it does, but I don't    09:24

20    think we want to waste time having like an oral          09:24

21    argument because that will take us longer.               09:24

22               MR. ANSORGE:  Well, but it would be helpful   09:24

23    if you point to the path in the declaration you're       09:25

24    asking about because I've lost track of where we are.    09:25

25               MR. FRAWLEY:  So I'll just re-ask my          09:25
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | question then, and it's your right to instruct | 09:25 |
| 2 | Dr. Berntson not to answer, if that's what you'd like | 09:25 |
| 3 | but -- what did I say? | 09:25 |
| 4 | BY MR. FRAWLEY: | 09:25 |
| 5 | Q.   Oh.   Focusing on optimize floors, about how | 09:25 |
| 6 | long has it taken to build that program or model? | 09:25 |
| 7 | MR. ANSORGE:   Same objection. | 09:25 |
| 8 | THE WITNESS:   That was about a year. | 09:25 |
| 9 | BY MR. FRAWLEY: | 09:25 |
| 10 | Q.   Okay.   I'm going to return to something we | 09:25 |
| 11 | were talking about earlier in the deposition.   Forgive | 09:25 |
| 12 | me if I butcher exactly how you described things. | 09:25 |
| 13 | But do you recall when we were talking about | 09:25 |
| 14 | how on the server side, signed-in data will be in | 09:25 |
| 15 | different logs from -- well, I'll just say a long | 09:26 |
| 16 | thing and Joey can object, and we can get there | 09:26 |
| 17 | together. | 09:26 |
| 18 | Do you recall when we were talking about how | 09:26 |
| 19 | signed-in logs are different from signed-out logs when | 09:26 |
| 20 | there's identifiers that are going to be kept in | 09:26 |
| 21 | separate logs?   Does that at all ring any bell? | 09:26 |
| 22 | Sort of? | 09:26 |
| 23 | MR. ANSORGE:   Objection.   Vague. | 09:26 |
| 24 | THE WITNESS:   I believe I know what you're | 09:26 |
| 25 | referring to.   The characterization is inaccurate. | 09:26 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1                    REPORTER'S CERTIFICATE
 2                          ---oOo---
 3    STATE OF CALIFORNIA    )
                             ) ss.
 4    COUNTY OF YOLO         )
 5          I, KATY E. SCHMIDT, a Certified Shorthand
 6    Reporter in and for the State of California, duly
 7    commissioned and a disinterested person, certify:
 8          That the foregoing deposition was taken before
 9    me at the time and place herein set forth;
10          That GLENN BERNTSON, the deponent herein, was
11    put on oath by me;
12          That the testimony of the witness and all
13    objections made at the time of the examination were
14    recorded stenographically by me to the best of my
15    ability and thereafter transcribed into typewriting;
16          That the foregoing deposition is a record of
17    the testimony of the examination.
18          IN WITNESS WHEREOF, I subscribe my name on this
19    16th day of February, 2023.
20
21
22    Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
      Certified Shorthand Reporter
23    in and for the
      County of Sacramento,
24    State of California
25    Ref. No. 5757744 KES
```

Page 148