# EXHIBIT 20

# Redacted Version of Document Sought to be Sealed

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - - - - - - - - - - - - - - - - - - - x
CHASOM BROWN; MARIA NGUYEN; WILLIAM
BYATT; JEREMY DAVIS; and CHRISTOPHER
CASTILLO, individually and on behalf
of all other similarly situated,

        Plaintiffs,

                No. 5:20-cv-03664-LHK

   -against-

GOOGLE LLC,

        Defendant.

- - - - - - - - - - - - - - - - - - - - x


        Zoom video conference deposition of
RORY McCLELLAND, taken pursuant to
notice, was held remotely, commencing
February 18, 2022, 5:30 a.m. Eastern
Standard Time, before Leslie Fagin, a
Stenographic Court Reporter and Notary
Public in the State of New York.
              - - -




        MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



Page 2

```
 1
 2   A P P E A R A N C E S:
     (All Parties Present Via Zoom.)
 3
 4
     BOIES SCHILLER & FLEXNER LLP
 5   Attorneys for Plaintiffs
                 44 Montgomery Street, 41st Floor
 6               San Francisco, California 94104
     BY:         MARK MAO, ESQUIRE
 7               ROSANNA BAEZA, ESQUIRE
 8
     QUINN EMANUEL URQUHART & SULLIVAN
 9   Attorneys for Defendant
                 51 Madison Avenue, 22nd Floor
10               New York, New York 10010
     BY:         JOMAIRE A. CRAWFORD, ESQUIRE
11               CARL SPILLY, ESQUIRE
12
     BAILEY GLASSER
13   Attorneys for Witness
                 209 Capitol Street
14               Charleston, West Virginia 25301
     BY:         BENJAMIN L. BAILEY, ESQUIRE
15               ELLIOTT McGRAW, ESQUIRE
16
     ALSO PRESENT:
17
     LESLEY WEAVER, ESQUIRE
18   BLEICHMAR FONTI
         For the Calhoun Plaintiffs
19
     VANESSA WHEELER, Exhibit Tech
20       Magna Legal Services
21
22
23
24
25
```



Page 3

```
 1              R. McClelland
 2   R O R Y   M c C L E L L A N D,  called as a
 3       witness, having been duly sworn by a
 4       Notary Public, was examined and testified
 5       as follows:
 6            MS. BAEZA:  Good morning this is
 7       Rosanna Baeza on behalf of plaintiffs
 8       and with me is Mark Mao, also from Boies
 9       Schiller Flexner.
10            MS. WEAVER:  Good morning.  Lesley
11       Weaver, Bleichmar Fonti on behalf of the
12       Calhoun plaintiffs.
13            MS. CRAWFORD:  Jomaire Crawford
14       from Quinn Emanuel Urquhart for the
15       defendant, Google LLC.  I am joined this
16       morning by my colleague, Carl Spilly.
17            MR. BAILEY:  I'm Ben Baily with
18       Bailey Glasser and my colleague, Elliott
19       McGraw is on.  We represent the witness.
20            Even if one steps out, there will
21       always be one of us here.
22   EXAMINATION BY
23   MS. BAEZA:
24       Q.   Good morning.  My name is Rosanna
25   Baeza and I represent the plaintiffs in this
```



Page 52

```
 1               R. McClelland
 2      Q.   So that would be a device-specific
 3 protection?
 4      A.   Exactly, local and device are
 5 synonymous here.
 6      Q.   Can you walk me through the next
 7 icon where we have a cross and it says
 8 network?
 9      A.   Certainly.  The network refers to
10 the mechanism through which the request from
11 the browser, request, meaning, when you type
12 a URL in and press the enter button, a
13 request is routed through the internet to the
14 correct web server.
15           That routing requires third parties
16 to successfully reach the right destination
17 and then the web server responds with what is
18 technically referred to as a response.  That
19 response contains the website that you had
20 requested.
21           The input then gets routed back
22 through the internet to your client device,
23 so that you can view the websites on your
24 browser.
25           Intermediaries typically are your
```



Page 53

```
 1                    R. McClelland
 2   router, your ISP, potentially an authority,
 3   like a school or an employer.  There then
 4   typically are government entities involved,
 5   as well, and various backbone-type internet
 6   providers that provide and facilitate the
 7   working of the internet as a whole and that
 8   covers that middle section.
 9        Q.   Can you walk me through the third
10   icon that says Google?
11        A.   Certainly.  So Google, amongst
12   other website and web applications, are web
13   servers available for users to access using
14   their browsers.
15             Google is one of many Incognito
16   mode doesn't differentiate between Google and
17   third parties.
18             One of the promises that Incognito
19   mode makes the user is that the web server is
20   unaware of your Incognito intent, so,
21   therefore, by extension, Google and third
22   parties cannot be aware of the fact that you
23   are in Incognito mode and cannot change their
24   behavior accordingly.
25        Q.   What do you mean by, you are not
```



Page 54

```
 1                R. McClelland
 2   protected from Google?
 3        A.   The use of Incognito mode does not
 4   afford you any additional protections from
 5   Google or third parties when using the
 6   internet.
 7        Q.   What kind of protections are you
 8   referring to?
 9        A.   For example, there is no change to
10   tracking behavior, there is no change to
11   server logging or server log retention policy
12   because the server is not aware you are in
13   Incognito mode.  It just treats you as if you
14   were a new user.  There is no special
15   treatments on the web server for Incognito
16   users.
17        Q.   What do you mean by tracking?
18        A.   On the internet, there are various
19   tracking technologies employed to measure the
20   performance of advertising.  Google has its
21   own ad tech division, product area team, so
22   because they cannot be aware of the Incognito
23   intent, they cannot behave differently for an
24   Incognito user versus a regular mode user.
25        Q.   By that, by they cannot behave
```



CONFIDENTIAL

Page 55

```
 1                  R. McClelland
 2   differently, do you mean that Google does not
 3   stop tracking users who are in Incognito
 4   mode?
 5            MS. CRAWFORD:  Objection.
 6        A.    That is right.  The tracking
 7   continues, albeit in an isolated session, so
 8   the user has Incognito mode affords the user
 9   segmentation of their tracking, their
10   browsing activity and tracking, so that any
11   browsing activity or searches undertaken in
12   Incognito mode are not associated with their
13   primary browsing activity, but the tracking
14   does continue, yes, it is session-based
15   tracking, the tracking continues for the
16   duration of the Incognito session.
17            At the end of the Incognito
18   session, locally everything is deleted from
19   the user's computer, but the web server,
20   because it didn't know it has an Incognito
21   user, has no way of knowing that that user
22   cannot ever come back again, but that user
23   will never be seen again from the web
24   server's point of view.
25        Q.    Earlier, you testified there is no
```



CONFIDENTIAL

Page 56

1              R. McClelland

2    change to server logging or server log

3    retention policy.

4              Do you recall that?

5        A.   I do, yes.

6        Q.   What did you mean by server

7    logging?

8        A.   Most servers, Google or otherwise,

9    when you visit their website, records certain

10   data around that visit.  Typically, the IP

11   address, the time and date, the pages you

12   visit, amongst many other things.

13             That happens in regular mode

14   browsing, as well as in Incognito mode

15   because the web server is not aware of the

16   user being in Incognito mode, it cannot treat

17   that user in any different way, so,

18   therefore, logging happens as usual.

19       Q.   What did you mean by server log

20   retention?

21       A.   Server log retention refers to how

22   long logs are kept on the server before they

23   are deleted.

24       Q.   Is it correct to say that this icon

25   was meant to convey that users who are in



Page 57

```
 1                R. McClelland
 2    Incognito mode are not protected from
 3    Google's server logging?
 4              MS. CRAWFORD:  Objection.
 5        A.   Yes, basically, that is right.  The
 6    intent was broader than just Google, but it's
 7    important to communicate to the user that
 8    it's all web services.
 9        Q.   Do you recall the study we looked
10    at earlier that said disclosures to be
11    difficult to ignore in order to clear up
12    misconceptions?
13              MS. CRAWFORD:  Objection, misstates
14         the document.
15        A.   I do, yes.
16        Q.   Is this proposal for the use of
17    iconography to show the limits of Incognito
18    protection, an effort to create a disclosure
19    that is difficult to ignore, to clear up
20    misconceptions about Incognito mode?
21              MS. CRAWFORD:  Objection, insofar
22         as you're misquoting the document or
23         mischaracterizing the witness'
24         testimony.
25        Q.   You can answer.
```



Page 58

                        R. McClelland

1

2      A.    It is intended to present it in a

3   format that is more accessible to a broader

4   audience, but not to change the fundamental

5   message.

6      Q.    What you do you mean by more

7   accessible?

8      A.    It is intent to simplify the

9   language use and to use imagery in lieu of

10  text, so that it could be understood by a

11  broader range of users.

12     Q.    This proposal sought to address the

13  misconception that Incognito mode hides

14  browsing history from Google?

15          MS. CRAWFORD:  Objection.

16     A.    That is right.  It is intended to

17  help a broader range of users understand that

18  limitation.

19     Q.    Did Google ever implement this

20  proposal for the use of iconography to show

21  Chrome Incognito users that they are not

22  protected from Google when in Chrome

23  Incognito mode in certain instances?

24          MS. CRAWFORD:  Objection, misstates

25          the witness' testimony, calls for



Page 59

 1                R. McClelland

 2      speculation.

 3      A.    The change was never implemented

 4 during my tenure at Google and I don't

 5 believe any changes have happened since

 6 either.

 7      Q.    Can you identify anyone at Google

 8 who supported this Incognito change to inform

 9 users they are not protected from Google?

10           MS. CRAWFORD:  Objection.

11      A.    Yes, I could.  There are many

12 people who would have supported this.

13      Q.    Please name them.

14      A.    The first name that comes to mind

15 is the engineering lead for the Incognito

16 team, Ramin Halavati from memory, I struggle

17 slightly.

18      Q.    Anyone else?

19      A.    Martin Sramek.  Again, a lead

20 engineer on a different team privacy team,

21 Chrome browser privacy team.

22           Any member of the privacy

23 engineering teams would have supported this

24 site.  I don't remember there being any

25 dissent on this particular topic.



```
 1                    R. McClelland
 2        Q.   Do you remember who did not support
 3   this Incognito change?
 4             MS. CRAWFORD:  Objection.
 5        A.   I do, yes.  There were concerns
 6   within an internal counsel around how this
 7   change was happening after this particular
 8   lawsuit had started and there were concerns
 9   that --
10             MS. CRAWFORD:  Sorry, I do need to
11             object.  It's unclear to me whether or
12             not this testimony is treading on to
13             privileged grounds, insofar as I just
14             heard the witness say conversations were
15             had with counsel.
16             So, Mr. McClelland, I'm going to
17             ask that if Ms. Baeza's question does
18             contemplate conversations that you had
19             with Google legal, including product
20             counsel, that you make it clear that
21             that's what the question calls for, so
22             that I can object and instruct you not
23             to answer on the basis of privilege.
24             It seems as though that is what
25             this question called for, in which case,
```



Page 61

```
 1                    R. McClelland
 2         I do ask that you refrain from
 3         disclosing any privileged conversations
 4         you had with counsel.
 5         Q.   I want to add, I'm not asking about
 6    communications you had with counsel.  I'm
 7    just trying to understand who opposed this
 8    Incognito change.
 9         A.   There was no real opposition to
10    this change otherwise.
11         Q.   But there were people within Google
12    who did not support the change, isn't that
13    correct?
14              MS. CRAWFORD:  Objection.
15         A.   Yeah.
16         Q.   Who are those people?
17              MS. CRAWFORD:  Asked and answered.
18              THE WITNESS:  May I answer that
19         question, Jomaire?
20              MS. CRAWFORD:  Yes, insofar as you
21         are not disclosing the contents of any
22         conversations.
23         A.   It was Google internal product
24    counsel.
25         Q.   Google internal product counsel?
```



Page 62

1                R. McClelland

2        A.    Yes.

3        Q.    Who was on the Google product

4    council?

5              MS. CRAWFORD:  Objection.

6        A.    It was legal counsel, not a group

7    of people.

8              MS. BAEZA:  I think we have been

9         going about an hour.  If you want to

10         take a quick break, we can do so,

11         otherwise, I can keep going.

12              THE WITNESS:  I'm happy to keep

13         going, but if anyone else wants a break,

14         it's not only me.

15              MS. BAEZA:  Vanessa, can you

16         introduce the next exhibit?

17              I will mark this as Exhibit 5.

18              (Exhibit 5, documents bearing Bates

19         stamp No. GOOG-CABR-00141578 and

20         GOOG-CABR-00141579, marked for

21         identification.)

22        Q.    Exhibit 5 is a document Google

23    produced with production Nos.

24    GOOG-CABR-00141578 to page ending in 579.

25              Let me know when you can see it.



Page 63

```
 1                    R. McClelland
 2        A.   I see it.
 3        Q.   Google counsel has represented that
 4   this document is the hyperlink in a document
 5   called Chrome Sin Rastro one-pager.  We will
 6   review that exhibit later.  I just want to
 7   make that representation to you.
 8             Please take a moment to look at the
 9   document.
10             MS. CRAWFORD:  Does the witness
11        have the ability to manipulate this
12        document on his own?
13             I ask because, obviously, this is a
14        multipage document, unlike the prior
15        exhibits we were reviewing, and so it
16        may be helpful for him to, as he's
17        reviewing it, control and scroll at his
18        discretion.
19             MS. BAEZA:  Thanks, Jomaire.
20        Q.   Mr. McClelland, you can -- if you
21   go to the exhibit share link, you are able to
22   see the document and control it yourself.
23        A.   The exhibit share link is in the
24   Chat, is it?
25        Q.   I don't think it's in the Chat.  I
```



Page 64

```
 1                  R. McClelland

 2     think you should have received it from your

 3     counsel?

 4                  THE EXHIBIT TECH:  I can share a

 5          fresh link in the Chat.

 6                  MS. BAEZA:  Thank you.

 7          A.   Which document am I looking at?

 8          Q.   This is what has been marked as

 9     Exhibit 5.

10          A.   I found it.  Thank you.  Reviewing

11     now.

12          Q.   Please let me know when you are

13     done.

14          A.   Okay.  I'm ready.  Thank you.

15          Q.   Do you see at the top of the page

16     where it says, Motivation, and it says,

17     Leaning into two Google-wide OKRs?

18          A.   I do, yes.

19          Q.   The first bullet point says,

20     Increase the helpfulness and cohesiveness of

21     our products across Google and the second

22     says, Deliver leading industry privacy,

23     safety, security and reliability to our users

24     and customers.

25                  Did I read that correctly?
```



Page 65

```
 1                  R. McClelland
 2      A.   You did, yes.
 3      Q.   The next paragraph, in the second
 4  sentence, it says, We would like to make the
 5  Incognito experience coherent and simple
 6  across the products as is possible, in
 7  addition to offering the user more powerful
 8  controls over the persistence of their
 9  server-side data.
10           Do you see that?
11      A.   I do, yes.
12      Q.   What understanding, if any, do you
13  have regarding that reference to controls?
14      A.   I'm sorry, I don't understand the
15  reference to controls in this context -- I do
16  understand, sorry, my misunderstanding.
17           This was part of a broader
18  Google-wide initiative to roll out Incognito
19  mode to more products.
20           So the controls being referred to
21  here are the ability to enable Incognito mode
22  in additional Google products, such as
23  YouTube and Maps.
24      Q.   What do you understand the
25  reference to offering the users more powerful
```



Page 66

```
 1                 R. McClelland
 2    controls over the persistence of their
 3    server-side data to mean?
 4             MS. CRAWFORD:  Asked and answered.
 5        Q.    You can answer.
 6        A.    For the visibility of Maps and
 7    YouTube to go in Incognito mode and,
 8    therefore, watch videos or search for things
 9    and have that data on the server removed more
10    quickly than it would have been in regular
11    mode.
12        Q.    What about in the context of Chrome
13    Incognito mode?
14        A.    Chrome was excluded at this stage.
15    This initiative was subsequent to the one we
16    were looking at previously.  That's the one
17    to allow the user to signal their Incognito
18    intent to Google web services, that had, as
19    we discussed, that had been escalated and
20    rejected and this was then, how do we move
21    forward and where are we able to offer users
22    this level of protection.
23             So this particular document is
24    referring to Google native apps, particularly
25    on Android, Maps that Google general search
```



```
 1                  R. McClelland
 2    application, as its referred to, and YouTube,
 3    from memory.  So to be clear, it doesn't
 4    include Chrome browser.
 5         Q.   So there was no proposal to offer
 6    anymore powerful controls over the
 7    persistence of user server-side data in
 8    Chrome Incognito mode?
 9         A.   That's right.  This proposal did
10    not include that.
11         Q.   What does server-side data mean?
12         A.   It's another way of talking about
13    the logs that the servers keep, so anything
14    that is stored by the web server when you
15    access content on it that relate to your
16    browsing or your usage activity.
17         Q.   Do you understand that to mean data
18    that Google collects from users who are in
19    Incognito mode?
20              MS. CRAWFORD:  Objection, vague as
21         to data collected from users.
22         A.   Are you referring to Chrome browser
23    now or to applications like Maps and YouTube?
24         Q.   Both.
25         A.   In Maps and YouTube, the intent was
```



Page 121

```
 1                    R. McClelland
 2              (Exhibit 8, documents bearing Bates
 3         stamp No. GOOG-CABR-04734899 through
 4         GOOG-CABR-04734902, marked for
 5         identification.)
 6    A.    Looking at it now.
 7              Okay.  I have reviewed it.
 8              MS. CRAWFORD:  Before you begin
 9         your questions about this document, I
10         would just like to note for the record
11         and the witness that the email chain
12         presented includes at least five
13         portions of text that have been marked
14         as redacted and subject to
15         attorney/client privilege.  Those pages
16         appear at the Bates number ending in 900
17         and 901.
18              Mr. McClelland, I just ask that if
19         counsel asks any questions that you
20         think might cause you to reveal the
21         substance of privileged communications
22         in this chain or otherwise, that you
23         please flag that before responding.
24              THE WITNESS:  Understood.
25    Q.    I'm not trying to go into any
```



Page 122

```
 1                    R. McClelland
 2     conversations you had with counsel.
 3              Do you see the subject line where
 4     it says the DNT header?
 5          A.   I do, yes.
 6          Q.   If you know, what is a DNT header?
 7          A.   DNT stands for do not track.  It's
 8     an option in Chrome and other browsers that
 9     allows users to send a signal to the web
10     server requesting that they are not tracked.
11          Q.   Does this include Chrome Incognito
12     mode?
13              MS. CRAWFORD:  Objection.
14          A.   It includes Chrome, the same DNT is
15     sent regardless of Incognito mode or
16     otherwise, I believe, from memory.  There is
17     no distinct setting for Incognito mode.
18          Q.   So it would include Chrome
19     Incognito sessions because they are on Chrome
20     browsers?
21          A.   If it's by default, off, from
22     memory, if the user has turned it on in
23     regular mode Chrome, then it is sent in
24     regular Chrome mode and also in Incognito
25     mode.  If it's off, it is sent in neither.
```



Page 123

1                    R. McClelland
2    That's my memory of how it works.
3         Q.   Can you explain how the DNT header
4    functions?
5              MS. CRAWFORD:  Objection,
6         overbroad.
7              You can answer.
8         A.   It sends a simple signal to the web
9    server that the user requested in their
10   settings not to be tracked and relies upon
11   the web server to honor that request.
12        Q.   Does this include Google web
13   servers?
14        A.   All web servers, Google or
15   otherwise.
16        Q.   Please go to the page ending in
17   900, halfway through the document, there is
18   an email from you dated February 18th.
19        A.   I see it.
20        Q.   You wrote, Sorry to be persistent
21   here, but would it be a complete non-starter
22   to reopen the conversation around whether we
23   should respect it?
24              What were you referring to by
25   respect it?



Page 124

```
 1                    R. McClelland
 2        A.    The do not track header signal.
 3        Q.    It says, Given all the scrutiny at
 4   the moment, it would be a really good privacy
 5   story.  Ruling out ████████  changes whilst
 6   continuing to ignore an explicit user
 7   statement as the DNT header is really giving
 8   mixed messages to both users and the press.
 9   If we really are serious about respecting
10   users' choices, then respecting this flag
11   seems a bare minimum.
12             Do you see that?
13        A.    I do, yes.
14        Q.    Was the conversation that you
15   wanted to reopen, a conversation about Google
16   respecting the DNT header?
17        A.    That is right.
18        Q.    Can you explain in more detail that
19   conversation?
20             MS. CRAWFORD:  Objection, vague and
21        overbroad.
22        A.    It's a long conversation that
23   predates my time at Google.  The do not track
24   setting header was naive.  All browsers added
25   it and it relied up the web server Google or
```



CONFIDENTIAL

Page 125

```
 1                    R. McClelland
 2   otherwise to observe and honor that user's
 3   request.
 4            Very rapidly, I can't give more
 5   precise than that, but, pretty quickly, it
 6   transpired that most ad tech companies were
 7   not observing that, were not honoring that
 8   user request and were just ignoring it.
 9            Then -- and I'm not entirely sure
10   of the timelines.  As I said, it was prior to
11   my time at Google and prior to me becoming a
12   specialist in this, but at some point in
13   time, Microsoft made the decision that they
14   would send do not track through for every
15   single user, at which point the value of that
16   header was negated in that it was no longer
17   an assertive expression from the user.  It
18   was one that Microsoft had determined for
19   them.  It also meant that there was a large
20   proportion of the web sending this signal,
21   which would have had revenue impacts for all
22   ad tech companies.
23            My understanding of how that story
24   played out, and, again, this is prior to my
25   time, was that Google observed that signal
```



Page 126

```
 1                    R. McClelland
 2    for a while through ads, observed that signal
 3    for a while, but it got to a point where they
 4    were -- they perceived they were at a
 5    competitive disadvantage compared to the
 6    competition and at that point in time, a
 7    decision was made to no longer observe it.
 8    The conversation here was, should we revisit
 9    that decision.
10          To be clear though, all of this is
11    prior to my time and it is information that I
12    have gained through having conversations with
13    other people, rather than being first party.
14       Q.   Do you have an idea, more or less,
15    of when Google began having conversations
16    about whether to respect the DNT header?
17          MS. CRAWFORD:  Objection, calls for
18       speculation.
19       A.   I don't know, but my understanding
20    was that initially, it was respected, so from
21    the beginning, it was respected and then, at
22    a point in time, they decided not to.
23       Q.   What do you mean by, decided not to
24    respect it?
25       A.   They would no longer honor that
```



CONFIDENTIAL

Page 127

```
 1              R. McClelland
 2  intent of the user, they would ignore the
 3  signal.
 4      Q.   What does it mean for Google to
 5  ignore the signal?
 6      A.   I don't know the specifics of what
 7  that would mean, but it would mean that a
 8  user who was signaling do not track true,
 9  would be treated the same as a user who was
10  signaling do not track false.
11      Q.   Can you explain to me the
12  difference between a do not track signal
13  that's true and a do not track false?
14      A.   I can.   True means that the user
15  has ticked the check box saying, do not
16  track, and false would be where the user has
17  not ticked the check box, do not track.
18      Q.   So if a user checks the do not
19  track true, Google made a decision not to
20  honor that signal?
21      A.   That is my understanding.
22          MS. CRAWFORD:  Objection, misstates
23      the witness' testimony, calls for
24      speculation, vague and overbroad as to
25      time.
```



Page 128

```
 1                    R. McClelland
 2       Q.   Why do you think that reopening the
 3  conversation about the do not track header
 4  was a non-starter?
 5            MS. CRAWFORD:  Objection, misstates
 6       the witness' testimony and
 7       mischaracterizes the document.
 8       A.   It wasn't my opinion that it was a
 9  non-starter.  I was being informed other
10  people thought it to be a non-starter,
11  speculation, but I think it was because
12  Microsoft was sending it for all users,
13  regardless of their desire, thus devaluing it
14  as a user statement.  It was more indicative
15  of a browser choice than a user preference.
16       Q.   Do you know who had the opinion
17  that it was a non-starter?
18       A.   No, I don't, sorry.
19       Q.   When you say that Microsoft was
20  sending it for all users, regardless of their
21  desire, does that mean that Microsoft was
22  honoring -- strike that.
23            When you said that Microsoft was
24  sending it for all users, regardless of their
25  desire, does that mean that Microsoft was
```



Page 129

```
 1                   R. McClelland
 2    sending a do not track true signal for
 3    everybody by default?
 4        A.   That is right.
 5        Q.   So Microsoft, by default, was not
 6    tracking users?
 7        A.   I don't know.  That is a different
 8    question.  Whether Microsoft was observing it
 9    or not, I don't know.
10             The intent there is that
11    Microsoft's Internet Explorer, in those days,
12    was sending it by default, whether Microsoft
13    observed it on the server side, I don't know.
14        Q.   Google was not sending the signals
15    by default, is that fair?
16        A.   Correct, it was off by default in
17    Google Chrome.
18        Q.   Even if a user opted to send the
19    signal as do not track true, Google was not
20    honoring that signal, correct?
21             MS. CRAWFORD:  Objection, misstates
22        the witness' testimony, vague and
23        overbroad.
24        A.   My understanding, from what I
25    learned from other people, was that
```



Page 130

```
 1                  R. McClelland
 2   initially, Google was respecting that, but at
 3   a point in time, that decision was reverted
 4   and from then on, they no longer were.
 5        Q.   During your time at Google, was
 6   Google respecting do not track signals that
 7   were true?
 8        A.   I don't know when the change was
 9   made.  I don't know if that was during my
10   tenure or prior to it, but at some point
11   during my tenure, they were not respecting
12   it.
13        Q.   Do you know why Google closed the
14   conversation it was having about the do not
15   track pattern?
16        A.   I don't know why.  Again, I think
17   that was prior to my time.
18        Q.   You mentioned that there may have
19   been anti-competitive issues.
20             What were you referring to?
21             MS. CRAWFORD:  Objection, and going
22        to caution the witness not to reveal any
23        information reflecting conversations
24        from or information obtained from
25        speaking with counsel or other Google
```



Page 131

```
 1                  R. McClelland

 2          in-house counsel.

 3          A.   Can you direct me to the phrase you

 4     are referring to, please?

 5          Q.   Earlier, you mentioned something

 6     about competition issues with the do not

 7     track pattern.

 8               Do you recall that?

 9          A.   I do.  I know what you are

10     referring to, yes.

11          Q.   What did you mean by that?

12          A.   The Google -- my understanding was

13     that the Google Ads team were happy to

14     observe that signal whilst the majority of

15     their competition were doing the same, but it

16     had got to a point where they were being put

17     in, in their own eyes, at a competitive

18     disadvantage by being the only ones who did

19     observe it and that was their motivation for

20     reverting.  Again, what I heard through other

21     people, not first party conversations.

22          Q.   How would there be a competitive

23     disadvantage to observing the signal?

24          A.   Revenue is made through tracking

25     users and, therefore, driving the ability to
```


MAGNA
LEGAL SERVICES

Page 132

```
 1                    R. McClelland
 2   serve the targeted advertising without the
 3   ability to target advertising to users.  The
 4   revenue per user is lower.
 5              A user who requests not to be
 6   tracked cannot be served targeted advertising
 7   and, therefore, is a less valuable user to
 8   the ad tech company.
 9      Q.   So honoring a do not track true
10   signal would have hurt Google's revenues?
11              MS. CRAWFORD:  Objection, insofar
12        as that calls for speculation.
13      A.   That is my understanding, yes.
14      Q.   Where it says, Rolling out
15   ██████████ changes while continuing to ignore
16   an explicit user statement as a DNT header is
17   really giving mixed messages to both users
18   and the press.
19              Do you see that?
20      A.   I do, yes.
21      Q.   What did you mean by ignore
22   explicit user statement as a DNT?
23      A.   Do not track within Chrome is a
24   option the user has to manually enable, so to
25   that extent, it is an explicit desire from
```



CONFIDENTIAL

 1                    R. McClelland
 2    the user, the desire not to be tracked.
 3         Q.    So Google was ignoring an explicit
 4    user statement?
 5              MS. CRAWFORD:  Objection.  Sorry,
 6         go ahead, Rosie.
 7         Q.    So Google was ignoring user
 8    requests that were explicit to honor a do not
 9    track true signal?
10              MS. CRAWFORD:  Objection, misstates
11         the document.
12         A.    Whether that signal was coming from
13    a Chrome browser, Google was not observing
14    it.  Where it were coming from an internet
15    Explorer, it could be argued it was not an
16    explicit user statement.
17         Q.    How is rolling out ████████
18    changes while ignoring the DNT header
19    creating a mixed message to users?
20         ██     █████████████████████
██    ███████████████████████████████
██    ███████████████████████████████████
██    ██████████████████████████████████
██    ████████████████████████████████
██    ████████████████████████████████████



```
 1              R. McClelland
 2  ████████   ████████████████████
    █ ████████████████████   ██████████
    █ ████████████████████████
 5         So this was Google trying to wean,
 6  trying to move away from using third party
 7  cookies in lieu of signed-in users, but it
 8  had to also move the entire web ecosystem,
 9  not just itself, so it was a complex change
10  program that had to incentivize web
11  developers to move to this new technique,
12  whilst at the same time, gradually devaluing
13  the use of the third party cookie as a
14  motivator to make that change.
15         So  ████████  -- Google was doing a
16  lot of work to try to sell this way forward
17  internally, but also to other browsers and to
18  other members of the web ecosystem, meaning,
19  publishers and content creators and was
20  trying to be seen to be leading the
21  conversation on the need to move away from
22  third party cookies for reasons of privacy
23  and the concern here was that whilst we are
24  doing that, if we are also and concurrently
25  ignoring this signal, this do not track
```



Page 209

1                    R. McClelland

2        A.   It's Melissa.  She is a software

3   engineer on the Chrome privacy team.

4        Q.   Her last name is Galonsky?

5        A.   Yes, that's right.

6        Q.   Do you see it says, There should be

7   separate Zwieback cookies between Incognito

8   sessions, but they could be joinable on a

9   technical level?

10       A.   I see it, yes.

11       Q.   If you know, how can separate

12   Zwieback cookies between Incognito sessions

13   be joinable?

14            MS. CRAWFORD:  Objection, insofar

15       as the question calls for speculation.

16       A.   It could be joinable by looking at

17   information in the cookie, for example, the

18   IP address.  If there is enough information,

19   similar conversations to fingerprinting this

20   morning.  If there is sufficient information,

21   then they become joinable, if you wanted to

22   do so.

23       Q.   Could it be joinable by Google?

24       A.   Google or anyone else.

25            MS. BAEZA:  We can take this



Page 210

```
 1                    R. McClelland
 2        exhibit down and I will go back to
 3        Exhibit 15 because I have time.
 4        Q.   Exhibit 15 is an email produced by
 5   Google with production Nos.
 6   GOOG-CABR-05256755 through page ending in
 7   760.
 8             Please let me know when you have
 9   that in front of you.
10             (Exhibit 15, documents bearing
11        Bates stamp No. GOOG-CABR-05256755
12        through GOOG-CABR-05256760, marked for
13        identification.)
14        A.   Can you repeat the page number
15   again, please?
16        Q.   I am focusing on the page ending in
17   758.  If you would like to go a little higher
18   and to read the email starting with -- the
19   email from Mark Pearson to get more context,
20   please go ahead and do so.
21        A.   Thank you.
22             MS. CRAWFORD:  Is that the page
23        ending in 759?
24        Q.   However you want to proceed, Mr.
25   McClelland.
```



Page 211

 1                    R. McClelland

 2        A.    I'm reading from the M. Pearson

 3   email on 755 now.

 4              Okay.  I have the general gist.

 5        Q.    Please go to the page ending in

 6   758.  You will see it's an email from you,

 7   starts at the bottom of page.  It says,

 8   Thanks, Mark.

 9        A.    Yeah, I see it.

10        Q.    If you go to the next page, it

11   says, I'd also point out, we already consider

12   it possible for Google to join regular and

13   Incognito sessions, so the promise not to do

14   this is effectively already being applied.

15   The GWS ID's approach would just make this

16   easier and more reliable.

17        A.    Uh-huh.

18        Q.    Where it says the GWS ID's approach

19   would just make this easier and more

20   reliable, what were you referring to?

21        A.    There was a desire to be able to

22   run experiments in Incognito mode and in

23   order for us to better understand what users

24   were using and to evaluate new features in

25   order to improve the product prior to this



Page 212

```
 1                  R. McClelland
 2   exchange, we were not able to do that within
 3   Incognito mode for risk of making more
 4   joinable with regular sessions, so we were
 5   proposing different ways through which we
 6   could run a limited number of experiments in
 7   Incognito mode and what the right level of
 8   balance was between our need as a product
 9   team to understand usage of our feature with
10   respecting the privacy needs of users who
11   are, by definition, in an elevated state of
12   privacy in Incognito mode.
13        Q.   Where it says, we already consider
14   it possible for Google to join regular and
15   Incognito sessions, who were you referring to
16   when you said, we?
17        A.   The Google Chrome privacy team.
18        Q.   Do you still agree with the
19   statement, it's possible for Google to join
20   regular and Incognito sessions?
21             MS. CRAWFORD:  Objection.
22        A.   As far as I know, assuming nothing
23   has changed, then, yes, it should still be
24   possible.
25             MS. BAEZA:  Thank you.  I have no
```



Page 213

```
 1              R. McClelland
 2      more questions at this time.
 3           Do you want to go off the record,
 4      Jomaire.
 5           THE EXHIBIT TECH:  The time is
 6      9:46.  We are off the record.
 7           (Off the record.)
 8           THE EXHIBIT TECH:  Recording has
 9      resumed.  The time is 10:07 a.m. and we
10      are back on the record.
11  EXAMINATION BY
12  MS. CRAWFORD:
13      Q.  Good afternoon, Mr. McClelland.
14  I'm counsel for Google.  I'm going to be
15  asking you a couple of questions following up
16  on the examination that was led by Ms. Baeza
17  for plaintiffs' counsel in the Brown action.
18           Do you recall when Ms. Baeza asked
19  you about your educational background and
20  employment history?
21      A.  I do, yes.
22      Q.  Did you hold any jobs -- have you
23  held any jobs that were not covered during
24  your discussion?
25      A.  Yes, plenty.
```



Page 214

              1                    R. McClelland
              2          Q.   Are these all jobs that sort of
              3     postdate your undergraduate degree?
              4          A.   Yes, some of them.
              5          Q.   Do you mind listing out for me the
              6     different places where you worked prior to
              7     your employment at Google?
              8          A.   Certainly.  I worked in Japan for
              9     three years teaching English with the
             10     Japanese government.  I did my master's.  I
             11     went to London, I worked for a company called
             12     Via doing enterprise class digital asset
             13     management.  Through acquisition, they became
             14     North Plains, which is when I became product
             15     manager.  I moved to a different company
             16     called Constant Commerce, who were an ad tech
             17     type of organization, very small one.  I
             18     moved out to Germany, to Berlin, to work for
             19     Babble, a language learning consumer.  I then
             20     moved to Google.
             21          Q.   I believe you testified that you
             22     worked at Google from about August 2018 to
             23     March 2021.
             24               Does that sound about right?
             25          A.   That sounds about right.



Page 316

```
  1              R. McClelland
  2       A.   Yes, you are right, there are
  3   things that only Google is aware of,
  4   including Chrome itself, that other third
  5   parties would not be aware of.
  6       Q.   Those things include Chrome UMA
  7   signals and absence of the X-Client Data
  8   Header?
  9       A.   Yes, that's correct.
 10       Q.   Do you remember testifying about
 11   ChromeGuard and testing for ChromeGuard?
 12       A.   I do, yes.
 13       Q.   If ChromeGuard was meant to be a
 14   more privacy-enhancing feature, why did
 15   Google test it in 2020 with one version
 16   defaulted on and one version defaulted off?
 17       A.   It was more about understanding how
 18   users perceived that feature and whether they
 19   felt it generally useful.  We wanted to gain
 20   insight into what percentage of people
 21   decided to turn it off when we put it on by
 22   default and, conversely, if it were off by
 23   default, what percentage would turn it on.
 24   We wanted to get a sense of how users
 25   perceived that feature and whether they saw
```



Page 317

```
 1              R. McClelland
 2  value in it.
 3      Q.   Earlier you were asked some
 4  questions about Google logging.
 5           Do you recall that?
 6           MS. CRAWFORD:  Objection to the
 7      form of the question.
 8      A.   Can you be more specific, which
 9  particular one?
10      Q.   Sure.  Earlier you testified about
11  Google logging data on their servers?
12      A.   Yes, I do remember.
13      Q.   You would agree that users
14  generally have no practical way of avoiding
15  Google from logging them on the internet,
16  correct, identified or not?
17           MS. CRAWFORD:  Objection, vague and
18      overbroad as to identifying them on the
19      internet and no practical way of
20      avoiding Google.
21      Q.   You can answer.
22      A.   It is difficult, but not
23  impossible.
24      Q.   Google logs Incognito and
25  non-Incognito activities of users, correct?
```



Page 318

```
              R. McClelland
 1
 2     A.   That is right, yes.
 3     Q.   And users have no way of preventing
 4  Google from logging their Incognito activity,
 5  correct?
 6          MS. CRAWFORD:  Objection as to
 7          Incognito activity and to the term,
 8          logging.
 9     Q.   I will qualify that.  By logging on
10  Google's servers?
11     A.   Thank you.  That helps.  Yes, there
12  is no way that users can prevent that.
13     Q.   Earlier you testified about Google
14  profiles.
15          Do you remember that?
16     A.   I do, yes.
17     Q.   Counsel asked you questions about
18  profiles in connection with authenticated and
19  unauthenticated data.
20     A.   I do, I remember.
21     Q.   So you agree that users have two
22  profiles, correct?
23          MS. CRAWFORD:  Objection, assumes
24          facts, vague and ambiguous as to the
25          word, users, in this context.
```



Page 319

```
 1                R. McClelland
 2        A.    It's a simplification.  Users
 3   typically have one or two primary profiles,
 4   perhaps a personal one and a work one and
 5   then, depending upon how frequently and if
 6   they use Incognito, they may have multiple
 7   orphaned Incognito sessions.
 8             With each new Incognito session,
 9   there is a new profile.
10        Q.    There is a profile for
11   authenticated data and a different profile
12   for unauthenticated data?
13        A.    There is one profile for
14   authenticated data and potentially many
15   separate profiles for unauthenticated data.
16        Q.    You agree that a user can control
17   much of their authenticated data from My
18   Account, in My Google Account?
19             MS. CRAWFORD:  Objection, misstates
20        the evidence.  You might mean my
21        activity.
22        Q.    You can answer.
23        A.    Yes, I believe that that page, I
24   agree that that page in the My Accounts
25   section gives the user controls over Google's
```

