*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

CHASOM BROWN, WILLIAM BYATT,)          **Motions Hearing**
JEREMY DAVIS, CHRISTOPHER   )
CASTILLO, and MONIQUE       )
TRUJILLO, individually and  )
on behalf of all similarly  )
situated,                   )
                            )
            Plaintiffs,     )
                            )
  vs.                       )          NO. C 20-03664 YGR (SVK)
                            )
GOOGLE LLC,                 )          Pages 1 - 113
                            )
            Defendant.      )          Oakland, California
_____)          Friday, May 12, 2023


                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiffs:          Boies Schiller Flexner LLP
                         333 Main Street
                         Armonk, New York  10504
                  BY:  DAVID BOIES, ATTORNEY AT LAW

                         Boies Schiller Flexner LLP
                         44 Montgomery Street, 41st Floor
                         San Francisco, California  94104
                  BY:  HSIAO C. (MARK) MAO, ATTORNEY AT LAW




                  (Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S  (CONT'D.)

 2

 3   For Plaintiffs:         Boies Schiller Flexner LLP
                             100 SE 2nd Street, 28th Floor
 4                           Miami, Florida  33131
                       BY:  JAMES W. LEE, ATTORNEY AT LAW
 5
                             Morgan & Morgan
 6                           Complex Litigation Group
                             201 N. Franklin Street, 7th Floor
 7                           Tampa, Florida  33602
                       BY:  JOHN YANCHUNIS, ATTORNEYS AT LAW
 8
                             SAMUEL ISSACHAROFF, ATTORNEY AT LAW
 9                           40 Washington Square South
                             Suite 411J
10                           New York, New York  10012

11                           Susman Godfrey L.L.P.
                             1900 Avenue of the Stars, Suite 1400
12                           Los Angeles, California  90067
                       BY:  AMANDA K. BONN, ATTORNEY AT LAW
13
                             Susman Godfrey LLP
14                           1301 Avenue of the Stars, 32nd Floor
                             New York, New York  10019
15                     BY:  ALEXANDER P. FRAWLEY, ATTORNEY AT LAW

16

17   For Defendant:          Quinn, Emanuel, Urquhart & Sullivan
                             191 N. Wacker Drive, Suite 2700
18                           Chicago, Illinois 60606
                       BY:  ANDREW H. SCHAPIRO,
19                           JOSEPH H. MARGOLIES, ATTORNEYS AT LAW

20
                             Quinn, Emanuel, Urquhart & Sullivan
21                           865 S. Figueroa Street, Floor 10
                             Los Angeles, California  90017
22                     BY:  STEPHEN A. BROOME,
                             ALYSSA G. OLSON,
23                           VIOLA TREBICKA, ATTORNEYS AT LAW

24

25                             --o0o--
```

```
 1   Friday, May 12, 2023                              1:03 p.m.
 2                    P R O C E E D I N G S
 3                         --o0o--
 4
 5        THE CLERK:  Your Honor, calling the matter of Brown,
 6   et al. versus Google, LLC, et al., case number
 7   20-CV-03664-YGR.
 8      Parties, please step forward and state your appearances
 9   for the record.
10        MR. BOIES:  Good afternoon, Your Honor.  David Boies,
11   Boies, Schiller & Flexner for the plaintiffs.
12        THE COURT:  Good afternoon, sir.
13        MR. ISSACHAROFF:  Good afternoon, Your Honor.  Samuel
14   Issacharoff for the plaintiffs.
15        THE COURT:  Good afternoon.
16      We're going to take forever if you all do it that way, so
17   I'm happy to have you all come up if you want or have one
18   person introduce all of you.
19      Mr. Shapiro, come on up, too.
20      Keep going.
21        MR. LEE:  All right.  Good afternoon, Your Honor.
22   James Lee for the plaintiffs.  Also on this side, we have
23   Amanda Bonn.
24        MS. BONN:  Good afternoon, Your Honor.
25        THE COURT:  Good afternoon.
```

 1              **MR. LEE:**  Mark Mao, John Yanchunis, and Alex Frawley.

 2              **THE COURT:**  Okay.  Good afternoon.

 3              **MR. SHAPIRO:**  Good afternoon, Your Honor.  I'm Andrew

 4      Shapiro from Quinn Emanuel for Google.  I'm joined by my

 5      colleagues Steve Broome, Viola Trebicka, and our associates

 6      Alyssa Olson and Joe Margolies.

 7              **THE COURT:**  Okay.  Good afternoon.

 8          In terms of today's argument, who's going to be doing what

 9      parts?

10              **MS. BONN:**  Good afternoon.  Amanda Bonn for

11      plaintiffs.

12          Today the (c)(4) motion will be argued by James Lee and

13      Professor Issacharoff.

14          And then on the summary judgment motion, Mr. Boies will be

15      arguing issues around the topic of consent and breach of

16      contract.

17          I will be arguing issues around Article III standing, as

18      well as any issues particular to the following causes of

19      action:  The privacy torts invasion of privacy and intrusion

20      upon seclusion and the UCL claim.

21          Mr. Mao will be arguing issues regarding the wiretap

22      counts, the federal wiretap count and the state CIPA counts,

23      with the exception that Mr. Frawley will address the issue of

24      communications being confidential under CIPA 632.

25          If the court has questions, Mr. Mao will also be arguing

1   the CDAFA.

2       And if there are questions about the topics of data as a

3   property right, Mr. Mao will be arguing that as well.

4           **MR. BROOME:**  Good afternoon, Your Honor.  Steven

5   Broome for Google.  Mr. Shapiro will address the (c)(4)

6   motion.  I will address the issues of express consent and

7   breach of contract.

8       On the summary judgment motion, Ms. Trebicka will address

9   the issue of Article III standing.

10      Mr. Margolies will address the state and federal

11  wiretapping claims, as well as the privacy claims, intrusion

12  upon seclusion and the -- and the constitutional claim.

13      Ms. Olson will address the CDAFA, California Penal Code

14  502 claim, as well as the UCL claim.

15      And to the extent the motion to strike comes up,

16  Mr. Margolies will argue that as well.

17          **THE COURT:**  Okay.

18      I take it there are no PowerPoints; is that right?

19          **MR. BROOME:**  No.

20          **MS. BONN:**  Correct, Your Honor.

21          **THE COURT:**  It's your motion.

22      Proceed.

23          **MR. BROOME:**  On summary judgment, Your Honor?

24          **THE COURT:**  Yes.

25      And I take it that's, then, consent and breach of

```
 1    contract?

 2            MR. BROOME:  Yes, Your Honor.  We'll start there.

 3       The most basic problem --

 4            THE COURT:  Can I -- hold on?  I thought Mr. Boies

 5    was doing --

 6            MS. BONN:  Yes, I just heard you say consent, Your

 7    Honor.  I'll allow Mr. Boies to step up.

 8            THE COURT:  All right.  Now proceed.

 9            MR. BROOME:  Thank you, Your Honor.

10       The most basic problem with plaintiff's case is that they

11    cannot point to a single statement by Google that makes the

12    promise alleged.

13       Beginning with fact one in the statement of undisputed

14    facts and throughout their response, plaintiffs repeat the

15    claim that Google, quote, promised not to collect and use

16    private browsing information while users were visiting

17    non-Google websites and signed out of their Google accounts,

18    end quote.

19       But Google never made that statement, and it can't be

20    implied by cherry-picking language from various documents and

21    ignoring their full context.

22       There is lots of precedent on this issue, Your Honor.  It

23    has been addressed in numerous Ninth Circuit decisions,

24    including *Facebook Tracking* in 2020, *Ewert v. eBay* in 2015,

25    and *Miron v. Herbalife* in 2001.
```

1    It has also been addressed by courts in this district,

2    including in cases that address the same Google terms of

3    service and privacy policy at issue here and even some cases

4    that address the same language at issue here.

5          **THE COURT:**  Are those cases on appeal?  Where is the

6    procedural status of them?

7          **MR. BROOME:**  In *Rodriguez v. Google*, some of the

8    claims have been dismissed.  That's a case that plaintiffs'

9    counsel brought against Google before Judge Seeborg.  That

10   case involves very similar claims involving the same language

11   at the beginning of privacy policy.

12      In *Hammerling v. Google*, that was Judge Breyer, also

13   addressed very similar language and on a very similar theory.

14   That was dismissed.  I believe that will -- at the motion to

15   dismiss stage.  I believe that is heading to an appeal.

16      *Beecher v. Google* and *In re Google Assistant*, Judge

17   Freeman, again involved the same privacy policy language.  I'm

18   not sure where those cases stand in terms of their procedural

19   posture.

20          **THE COURT:**  All right.  A response on those cases.

21          **MR. BOIES:**  Excuse me?

22          **THE COURT:**  A response with respect to the impact of

23   those cases.

24          **MR. BOIES:**  Your Honor, those cases did not involve

25   the -- the statements here.  They did not involve the

1    statements with respect to what Incognito and private browsing

2    did.

3        This is really basically the same argument that the court

4    rejected at the motion to dismiss stage.

5        In Docket 363, the court, not dealing with snippets, not

6    dealing with things taken out of context, said, quote, a

7    reasonable user reading Google's contract with plaintiffs as a

8    whole could easily conclude that Google promised plaintiffs

9    that using private browsing mode would prevent Google from

10   collecting plaintiff's data.

11       That is something that is not present in any of the other

12   cases that he has cited.  It is something --

13           **THE COURT:**  All right.  I got your point.

14       Response -- you can keep going or respond.

15           **MR. BROOME:**  Well, I'm happy to respond and then keep

16   going, Your Honor.

17           **THE COURT:**  You won't have forever.

18           **MR. BROOME:**  Okay.

19       The response, very briefly, is -- is that that was a

20   decision at the pleading stage beyond the full record.

21   We're --

22           **THE COURT:**  Were any of those cases Incognito mode in

23   front of Seeborg, Breyer, or Freeman?

24           **MR. BROOME:**  None of those cases involved Incognito

25   mode.

```
 1              THE COURT:  I would suggest you move on.

 2              MR. BROOME:  But in every one of those cases, Your

 3    Honor, the Court held that courts do not imply promises in

 4    user agreements that weren't made expressly.

 5         Now, what Google did say in the privacy policy and the

 6    account holder agreements is that it does collect the at issue

 7    date and that it uses that data for the challenged purposes.

 8    That's not genuinely disputed.  It's clear from the documents

 9    themselves.

10         It's undisputed that plaintiffs consented to the privacy

11    policy when they signed up for Google accounts.  So to avoid

12    summary judgment on the basis of express consent, plaintiffs

13    must negate their general consent to the data collection by

14    identifying a Google document that says private browsing mode

15    will block this collection.  But, again, that statement was

16    not made.  We have given plaintiffs the opportunity to

17    identify such is statement, and they have not done that.

18              THE COURT:  Response.

19              MR. BOIES:  As this court held in the *Calhoun* case,

20    while consent can be express or implied, quote, any consent

21    must be actual.

22         This court also held, quote, consent is only effective if

23    the person alleging harm consented to the particular conduct

24    or to substantially the same conduct and if the alleged

25    tortfeasor did not exceed the scope of that consent.  For
```

1    consent to be actual, the disclosure must explicitly notify

2    users of a conduct at issue.

3        And there had to be -- that in, quote, the disclosures

4    must have given users notice of the specific practice at

5    issue.

6              **THE COURT:**  All right.  Response.

7              **MR. BROOME:**  I agree with Mr. Boies that *Calhoun* is

8    instructive on this issue, Your Honor, because the argument

9    that the plaintiffs are making here today, that we did not get

10   specific consent to collect the data while users were in

11   Incognito mode is substantively identical to the argument to

12   that the *Calhoun* plaintiffs made --

13             **THE COURT:**  And if I disagree with you, then what?

14             **MR. BROOME:**  Well, I -- the law is, Your Honor, that

15   you have to get specific consent to the data collection, to

16   the uses.  We've done that.  We did not -- we did not lay out

17   in the privacy policy each mode.

18             **THE COURT:**  And therein lies your problem, so keep

19   going.

20             **MR. BROOME:**  Well, again, it's the same issue in

21   *Calhoun*.  They said in non- -- in non-sync mode or in unsync

22   mode, you never disclose that you had collected --

23             **THE COURT:**  I think they're distinctly different.  I

24   would -- keep going.

25             **MR. BROOME:**  Okay.  Well, I would -- I would emphasis

1    that the Ninth Circuit cases have -- have held that the -- in

2    particular, in *Ewert v. eBay*, the Court has held that if

3    there's a general consent to a practice and there's no

4    specific carve-out, then -- then the consent stands and it's

5    valid.

6           **THE COURT:**  That's not an explicit notification.

7           **MR. BROOME:**  If there -- if there is a -- there is

8    explicit notification of the data collection.  That's how the

9    privacy policy is set up here.  It's not broken out by modes

10   because --

11          **THE COURT:**  And that's the problem.  That's the

12   problem.

13      Keep going.

14      Anything else?  Or we can move to new topics.

15          **MR. BROOME:**  Well, I guess we can address the breach

16   of contract claim, then, Your Honor.  I think that there, even

17   if we -- if we move past consent and we move to breach of

18   contract, again, the case law is very clear that the

19   plaintiffs need to identify a specific promise that Google has

20   breached.  And they've alleged that the promises that Google

21   will not collect or use private browsing data, again, that

22   promises appears nowhere in any of the documents that they

23   cite.

24      And the starting premise for their claim, their breach of

25   contract claim, is the privacy policy.  And I'm on -- I'm

```
 1   looking at Docket 908-11, Your Honor.

 2            THE COURT:  What exhibit?

 3            MR. BROOME:  This -- this is Exhibit 104.  Excuse me.

 4                 (Pause in the proceedings.)

 5            THE COURT:  All right.  I'm at 104.

 6            MR. BROOME:  Okay.  So the breach of contract claim

 7   really begins with the paragraph in the introduction section

 8   there, the paragraph beginning, "You can use our services in

 9   variety of ways to manage your privacy."

10            THE COURT:  You need to slow down when you read.

11            MR. BROOME:  Understood, Your Honor.

12            THE COURT:  You should know we've been on the record

13   nonstop since 8:00 a.m. this morning.

14            MR. BROOME:  I understand, Your Honor.

15            THE COURT:  Go ahead.

16            MR. BROOME:  And plaintiffs focus on a sentence that

17   says, you can also choose to browse the web privately using

18   Chrome and Incognito mode.

19        The -- this -- when plaintiffs consented to the privacy

20   policy and the data collection that is described therein, this

21   sentence did not even appear.  There was no mention of private

22   browsing mode at all in the years when they consented.  This

23   was added much later in -- midway through the class period.

24            THE COURT:  Are you suggesting that changes in the

25   policy are not enforceable?
```

```
 1           MR. BROOME:  Well, this language we would argue is

 2    not enforceable at all under the Ninth Circuit's Block v. eBay

 3    decision, Your Honor, but, again, this --

 4           THE COURT:  Because I've never really heard Google

 5    argue that its changes in policy shouldn't be enforced against

 6    consumers when they change the policy.

 7           MR. BROOME:  And I'm not making that argument, Your

 8    Honor.

 9       I'm just making the argument that when these -- when these

10    plaintiffs consented to the privacy policy and the data

11    collection described therein, when they said, yes, I accept

12    that --

13           THE COURT:  So only Google can enforce later-amended

14    policies?  Consumers can't enforce them?

15           MR. BROOME:  I'm not saying that, Your Honor.  And I

16    think maybe there's a distinction between consent and notice,

17    informed consent, and breach of contract.

18       But -- But let me turn back to the contract claim, Your

19    Honor.  This sentence in the privacy policy is accurate.

20    Incognito mode does provide privacy.  We -- plaintiffs' own

21    privacy expert in this case has admitted that the

22    functionality that Incognito provides does indeed provide

23    privacy.  It doesn't block all data transmission to Google

24    services, but that's not what the representation is here.

25           THE COURT:  Let me ask you this question.  Is there
```

1    ambiguity in the policy or not?

2              **MR. BROOME:**  No.

3              **THE COURT:**  All right.  So you understand by saying

4    that -- because I do not let people change their positions at

5    trial.  By arguing that, Google is saying that they will not

6    even attempt to offer extrinsic evidence as to the meaning of

7    those terms.

8              **MR. BROOME:**  Correct.  We --

9              **THE COURT:**  Okay.

10             **MR. BROOME:**  We understand that, Your Honor.  We do

11   not believe that the privacy policy is ambiguous.

12       Now, as I was saying, their expert admits that Incognito

13   does provide privacy.  And what other cases addressing this --

14   this kind of language, including Chief Judge Seeborg in the

15   *Rodriguez* case has --

16             **THE COURT:**  That was a motion to dismiss?

17             **MR. BROOME:**  Yes, Your Honor.  Motion to dismiss.

18             **THE COURT:**  Very different procedural posture.

19             **MR. BROOME:**  Okay.

20             **THE COURT:**  Define "privacy" given that it's not

21   ambiguous.

22             **MR. BROOME:**  Right.  So -- so the other document --

23             **THE COURT:**  No, I'd like you to tell me what the

24   definition of it is from Google's perspective to which you are

25   basically stipulating if I have to try this case.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1              MR. BROOME:  This -- this document does not explain
 2    what "privacy" is.  It -- that -- that explanation -- the
 3    privacy that Incognito provides is contained in the Chrome
 4    privacy notice, which plaintiffs claim is part of their
 5    contract.
 6         And there, in the Chrome privacy notice --
 7              THE COURT:  Exhibit number.
 8              MR. BROOME:  It is Exhibit number 130.
 9              THE COURT:  Okay.  I have it.
10              MR. BROOME:  Okay.  And we're at --
11         If we're looking at the Bates pages at the bottom
12    right-hand corner, Your Honor, it would be page 31.
13         Or page 81 of the document at the top.
14              THE COURT:  Okay.  Your courtesy copy to me does not
15    have ECF numbers, so hold on.
16                   (Pause in the proceedings.)
17              THE COURT:  All right.  Go ahead.
18              MR. BROOME:  And there, Your Honor will see a section
19    tiled "Incognito mode and Guest Mode."
20              THE COURT:  Okay.  I see it.
21              MR. BROOME:  And it -- it states, you can limit the
22    information that Chrome stores on your system -- on your
23    system by using Incognito mode or guest mode.  And then it
24    explains how Incognito functions.
25         It says Chrome won't store certain information, such as
```

1   basic browsing history information, and then it goes on.  And

2   then it has a --

3           **THE COURT:**  -- such as.  And it says -- it says "such

4   as," right?

5           **MR. BROOME:**  Right.

6           **THE COURT:**  Critical words, "such as," and then it

7   gives three examples, three bullet points.

8           **MR. BROOME:**  Right.

9     And then -- and then under that, it has a bold heading

10  relating to cookies.  And it says Chrome won't share existing

11  cookies with cites you visit in incognito or guest mode.

12    Sites may deposit new cookies on your system while you are

13  in modes, but they'll only be stored and transmitted until you

14  close that last Incognito or guest mode.

15    And this is how Incognito mode provides privacy.  And I

16  want to make clear that the Court understands that -- the

17  technology here.  What Incognito mode does is when the user

18  launches it, a new cookie jar is created.

19          **THE COURT:**  I want you to -- hold on just a moment.

20              (Pause in the proceedings.)

21          **THE COURT:**  Okay.  Go ahead.

22          **MR. BROOME:**  Okay.  So when you lunch an Incognito

23  session, Your Honor, a new cookie jar is created so any

24  cookies that were on your browser before you launched the

25  session, such -- and that would include, you know, what we

1   call GAIA cookies -- Google account identifier cookies that

2   could being used to associate your browsing activity with your

3   Google account.

4       Those cookies are not -- are not in the new cookie jar,

5   and so they're not shared with websites or their web service

6   providers, including Google.

7       So when you get -- when you go to, say, the *New York*

8   *Times*, assuming they're using a Google service, one of the

9   services at issue, neither the *New York Times* nor Google is

10  going to recognize the user.

11      That's not to say that cookies can't be placed on the

12  browser during that session.  They can be.  It says right

13  here, sites may deposit new cookies in your system while

14  you're in these modes.  And so there could be some tracking

15  within the session.

16      But then what happens at the end is when the user closes

17  the Incognito window, the cookies that are associated with

18  that activity are deleted from the user's browser, so in

19  Google systems, they have, you know, a random cookie value.

20  It's what we call pseudonymous.  It's not linked to the user

21  or their identity.

22      And they might have, you know, one, two, or however many

23  sites they visited in Incognito mode.  But because in Google

24  systems, that data is linked to a cookie -- that cookie value

25  and that cookie is no longer on the user's browser, then

1    that -- that session can never be associated with that user

2    again.

3        And Google has very strict policies and technical

4    procedures in place to prevent that data from ever being

5    associated with that -- with that user or with their other

6    browsing activity.

7        And so that's -- that's the -- that's the privacy that all

8    private browsing modes provide.  Google's not the only

9    provider of private browsing mode.  But that's -- that's at a

10   high level how they work.

11       And the undisputed record in this case is that Chrome

12   Incognito performs all of those functions, right?  There --

13   there was never a promise anywhere in any of the documents

14   they cite, and -- and we would say most of those documents are

15   not contractual, and I want to come back to the privacy policy

16   and the terms of service in a moment.  But there's never a

17   promise that says, here's how private browsing works.  It's

18   going to block all of your data from ever going to Google.

19       That just wasn't said.

20           **THE COURT:**  Mr. Boies, response.

21           **MR. BOIES:**  First, Your Honor, with respect to the

22   document that he has directed the Court's attention to, it

23   says Chrome won't store certain information such as basic

24   browsing history information.  That is not an accurate

25   statement.

1          And as the Court held, in Docket 363, a -- with respect to

2    this exact language, quote, a reasonable user could read

3    Google's representations about Chrome to mean that Google

4    designed Chrome not to send Google data while in private

5    browsing mode.  And yet that is exactly what the evidence

6    shows Google did do.  They designed Chrome to send Google

7    data.

8               **THE COURT:**  So you're talking about -- 363 is Judge

9    Koh's motion to dismiss order.

10              **MR. BOIES:**  Yes, Your Honor.

11              **THE COURT:**  That's separate and distinct from -- from

12   a summary judgment where we have evidence.

13         So clearly, it sounds like at the time of the motion to

14   dismiss stage, she had -- the question is whether you get to

15   litigate.  And she decided that based upon the allegations of

16   the complaint, you were able to litigate.

17         What I'm asking for is a response on the evidence, and it

18   is the evidence that is in front of me.

19              **MR. BOIES:**  And what I'm -- what I'm saying, Your

20   Honor, is that there is no more evidence in front of you on

21   this issue than what was in front of Judge Koh at the time

22   of --

23              **THE COURT:**  Have you not had discovery?

24              **MR. BOIES:**  Yes.

25              **THE COURT:**  You said that that isn't true.  Is there

1    evidence that it is not -- that what is disclosed on Google

2    page ending 2531 is not true because there's evidence of that?

3          **MR. BOIES:**  Yes, Your Honor.

4        In the -- in discovery, belatedly, and that was -- we --

5    we received sanctions because they did not produce it on

6    time -- timely basis.

7        We have discovered 70 logs in which Google has recorded

8    data relating to private browsing mode.  The -- the Court had

9    ordered that we have a jury instruction that despite repeated

10   court orders, they had failed to produce these documents that

11   were called for, that demonstrated that they did record these

12   Incognito-detection data.

13       And that the jury could infer --

14         **THE COURT:**  I don't believe that Judge --

15                 (Simultaneous colloquy.)

16         **THE COURT:**  -- van Keulen did anything with respect

17   to -- she certainly didn't -- she -- I'm not clear -- I --

18   it's not clear to me that you're accurately describing what

19   Judge van Keulen said.

20         **MR. BOIES:**  Your Honor, I -- what it said -- I can

21   quote.  It said, quote, despite multiple court orders

22   requiring Google to disclose the information, Google failed to

23   timely disclose, A, at least 70 relevant data sources --

24         **THE COURT:**  I don't.

25         **MR. BOIES:**  -- reflecting the use --

1      **THE COURT:**  It's -- did she issue an order that

2  controls my jury trial?

3      **MR. BOIES:**  No --

4      **THE COURT:**  Because you just said that she did.

5      **MR. BOIES:**  Well, she -- she issued an order that

6  they could have -- they had every right to appeal to Your

7  Honor.  The -- they did not appeal to the [sic] Honor.  And

8  obviously Your Honor will control what -- what happens.

9     But she issued --

10     **THE COURT:**  Right.  She issued a sanctions order and

11  said that they couldn't offer certain evidence because they

12  hadn't disclosed it.  That's my understanding generically of

13  what she did.

14     **MR. BOIES:**  If I could just --

15     **THE COURT:**  And I thought that you had asked for --

16  the plaintiffs asked for a jury instruction for inferences,

17  which she refused to grant.

18     **MR. BOIES:**  No, Your Honor, I -- I don't -- I don't

19  think that's accurate.

20     If I could --

21     **THE COURT:**  You cannot speak when you're not at the

22  mic, Mr. Boies.  My court reporter can't hear you, nor can I.

23     **MR. BOIES:**  I apologize.  I needed to get a document,

24  Your Honor.  I --

25     **THE COURT:**  That's okay.  I'll wait, but don't speak

```
 1    while you're walking.
 2            MR. BOIES:  In the sanctions order, if I can --
 3            THE COURT:  Look --
 4            MR. BROOME:  May I respond while he's looking, Your
 5    Honor?
 6            THE COURT:  I'll give him a second.
 7            MR. BROOME:  Okay.
 8                    (Pause in the proceedings.)
 9            MR. BOIES:  She ordered -- this is a quotation, "if
10    in the course of proceedings before the trial judge, it is
11    determined that Google's discovery misconduct is relevant to
12    an issue before the jury, the Court finds the following jury
13    instructions appropriate:  One, Google failed to disclose to
14    plaintiffs the names of key Google employees responsible for
15    developing and implementing Google's Incognito-detection bits;
16    and, two, despite multiple court orders requiring Google to
17    disclose the information, Google failed to timely disclose, A,
18    at least 70 relevant data sources reflecting the use of three
19    Incognito-detection bits; and, B, at least one additional
20    Incognito-detection-bit and any data sources in which it was
21    used.  The jury may infer from Google's failure to disclose
22    these data sources that they are not helpful to Google."
23            THE COURT:  All right.  So I understand that she's
24    making a recommendation to me.
25            MR. BOIES:  And -- and they -- as I say, they had an
```

1    opportunity to appeal that.  They chose not to do that.

2              THE COURT:  She's making a recommendation --

3         MR. BOIES:  Yes, absolutely.

4              THE COURT:  -- to me, Mr. Boies?

5         MR. BOIES:  Absolutely, Your Honor.  No question

6    about that.

7              THE COURT:  All right.  You want to respond.

8         MR. BROOME:  I definitely do, Your Honor, because we

9    started with the Chrome privacy notice, and Your Honor asked

10   Mr. Boies whether it was accurate that -- that -- that

11   Incognito limits the information that Chrome stores on your

12   system.  And we've gone very far afield from that.

13       Now we're talking about the data that is -- exists in

14   Google's logs and a sanctions proceeding that relates to

15   Incognito-detection bits that do not form the basis for any of

16   plaintiffs' claims.

17       They have never amended their complaint to -- to add

18   allegations that -- suggesting that those detection bits

19   somehow support any of their claims despite the opportunity --

20             THE COURT:  So you concede that the

21   Incognito-detection bits -- and I haven't been involved in

22   your discovery fights -- that you -- that you collect these.

23             MR. BROOME:  Well --

24             THE COURT:  You concede that there's evidence that

25   you collect?

1              MR. BROOME:   There was -- there was a project that --

2    what the evidence shows is that there was a project by a team

3    within Google that used the absence of the X-Client Data

4    Header as a proxy to measure, like, on a aggregate basis how

5    much of that traffic is incognito.  That's what happened.

6         And that was late disclosed.  That was our fault.  We did

7    not appeal Judge van Keulen's order.  We don't necessarily

8    agree with it, but it is what it is.

9         It is very far afield from the issue that we're discussing

10   here.  And -- and -- and I want to make clear that when

11   Mr. Boies referred to the motion to dismiss decision and you

12   asked him, well, what evidence do we have since then.  Well,

13   that's -- that's the heart of it, right?

14        They pled this claim.  The claim was that an incognito --

15   even in Incognito mode, Google is collecting all of this data

16   and associating with the user's identity with their Google

17   accounts.  And this was on the heels of the *Facebook Tracking*

18   case, and so they tracked the language.  And they said Google

19   is collecting cradle-to-grave profiles associated with

20   individuals users.

21        And that's the key evidence, Your Honor.  That's what has

22   happened in discovery.  That -- that theory, that allegation,

23   has been completely disproven.

24             THE COURT:   All right.  A response on that.

25             MR. BOIES:   With respect to the contract claim, Your

1    Honor, these exact -- and I understand the difference between

2    summary judgment and a motion to dismiss.

3        But at the motion to dismiss stage, what the Court was

4    doing was interpreting the contract.  That was a legal

5    interpretation.  It was not a factual determination.  It was a

6    legal determination.

7                **THE COURT:**  She didn't grant you judgment on the

8    pleadings.

9                **MR. BOIES:**  No, but it -- but -- the -- the documents

10   were in front of her and -- in front of the judge.

11               **THE COURT:**  Mr. Boies, we have documents in front of

12   us all the time for purposes of a motion to dismiss.

13       If somebody comes in and asks me for an injunction and I

14   can look at the documents and I can say, you know, yeah, it

15   looks like you're going to win, I might make a legal ruling

16   with respect to the -- to the meaning of a contract.

17       But just because there can be multiple interpretations of

18   a contractual term and I let something go through to be

19   litigated does not, by necessity, mean -- and I'll go back and

20   look at her order.  I --

21       What you're arguing is the law of the case.  I'll go back

22   and look at it.  But I don't recall her saying that as a

23   matter of fact, she's interpreting this policy to have one

24   meaning and one meaning only.

25               **MR. BOIES:**  I don't think she did interpret it to say

```
1    it was one meaning and one meaning only.  But what she did do
2    was to say that -- and this is a quote -- "a reasonable user
3    reading Google's contract with the plaintiffs" -- "Google's
4    contract with plaintiffs as a whole, could easily conclude
5    that Google promised plaintiffs that using private browsing
6    mode would prevent Google from collecting plaintiffs' data."
7        Now, there has not been any evidence that has come forward
8    that is inconsistent with that.  That is, there hasn't -- I
9    understand that you can have a decision at the motion to
10   dismiss stage and --
11           THE COURT:  And she was looking at Exhibit 130 when
12   she said that?  130 was attached to the complaint?
13           MR. SHAPIRO:  I -- I don't personally remember
14   whether it was attached.
15           THE COURT:  Did anybody on the plaintiffs' side know
16   whether 130 was attached to the complaint.
17           MR. BROOME:  It was at issue, Your Honor.  We're
18   willing to concede that.  It was part of the motion to dismiss
19   stage.  There's no dispute over that, but -- I'm happy to
20   address that -- Mr. -- Mr. Boies' point now or -- I'm not sure
21   if you were finished.
22           THE COURT:  No, what I'm also waiting to hear for is
23   a response with respect to his second point about what
24   discovery has shown in terms of the actual collection and the
25   allegations of the complaint.
```

1          **MR. BOIES:**  Okay.

2       Both the discovery and our expert reports, Your Honor,

3    have shown that Google does collect this data.  Collect --

4          **THE COURT:**  When you say "this," specifically what do

5    you mean?

6          **MR. BOIES:**  Data with respect to the private browsing

7    mode use of Google Chrome, that you have a -- now we don't

8    know everything about this, Your Honor, because these logs

9    were produced after the close of discovery.

10       And one of the reasons why we believe that the jury

11   instruction that was suggested to Your Honor is appropriate is

12   because since these were discovered late, we have not had

13   an -- we never had an opportunity to examine some of these

14   people.  We never had an opportunity to see how this

15   information was used.  And we never had an opportunity even to

16   determine whether there were additional logs that tracked the

17   Incognito activity.

18          **THE COURT:**  Now --

19          **MR. BOIES:**  So --

20          **THE COURT:**  -- Mr. Broome has indicated that the

21   information related to that particular proceeding, the

22   Incognito-detection bits, do not come within the scope of the

23   complaint.

24       Your response.

25          **MR. BOIES:**  We completely disagree with that, Your

```
 1     Honor.  I -- I frankly don't understand how he can say that.
 2             MR. BROOME:  It -- I can say it because it's not in
 3     the complaint.  And -- and we had this proceeding.  And then
 4     they amended their complaint.  They got a sanctions order, and
 5     then we -- they amended their complaint again, and there were
 6     no allegations added.  They've never added allegations about
 7     the Incognito-detection bits.
 8             MR. BOIES:  It's not --
 9             MS. BONN:  Your Honor, I'd like to state that in the
10     complaint, we repeatedly alleged that the absence of the
11     X-Client Data Header could be used by Google to detect
12     Incognito.
13         Throughout discovery, Google told us that that allegation
14     was false.  And now that it's come to light that in fact
15     Google used the absence of the X-Client Data Header to track
16     Incognito usage with an Incognito-detection bit, now, they are
17     coming before the court and saying plaintiffs never alleged it
18     in the first place.  Our complaint is replete with allegations
19     about the absence of the X-Client Data Header.
20             THE COURT:  All right.
21             MR. BROOME:  The --
22                 (Off-the-record discussion.)
23             MR. BROOME:  Right.
24         At the end of the day, Your Honor, they asked for the
25     adverse inference that they are now -- would go to the heart
```

```
1    of this issue, right?  Does Google join authenticated data,

2    data Google knows, you know, for data with whom -- you know,

3    for whom Google knows who the user is with their

4    unauthenticated private browsing data.

5       And Judge van Keulen spent a lot of time looking at the

6    issue, and she rejected that adverse inference.

7            THE COURT:  She can't make it.  That was my point to

8    the plaintiff.  I control my trials.  She does not.  She has

9    no authority to make it in the first place.  She can suggest

10   it to me.  And by the way, given her role in the case, her

11   suggestion is given a lot of weight.  But she ultimately can't

12   make those kinds of decision for me.

13           MR. BROOME:  That's fair, Your Honor.

14      I understand.  But they did ask for it, and she said it

15   was not appropriate.  She did not even recommend it to Your

16   Honor.

17      I do want to address another point Mr. Boies made about

18   how this was some profound discovery about the private

19   browsing data being in Google's logs.  That's never been

20   disputed.  We have never argued that Google does not receive

21   data whether users visit a website that uses Google services

22   while they were in Incognito mode.  We do.  We -- Google does

23   receive that data.

24      But the point is, is that it's not identified with a

25   particular user, and it is very, very isolated, right?  It is
```

1   isolated to that particular Incognito session.  So it's not

2   joined to the user after they close out.  It's not even joined

3   that their device after they close out.  And that is why it

4   provides privacy.

5        And plaintiffs presented a privacy expert, and in his

6   deposition, I asked him, does the deletion of cookies at the

7   end of the -- if a browser node deletes cookies automatically

8   at the end of a session, does that provide a measure of

9   privacy.  And he said yes.

10            THE COURT:  All right.  A response?  Is that what he

11   said?

12            MR. BOIES:  What he just said at the end was about

13   the cookies -- is yes.  But what he said before is not

14   accurate.

15        They denied repeatedly whether they had the ability to

16   track and store Incognito user data.

17        In fact, they put a witness up in the first sanctions

18   hearing that testified inaccurately about that.

19        And -- although I know that the magistrate judge only

20   makes recommendations to you, one of the things that she found

21   in the sanctions was that they had not complied accurately

22   with the discovery obligations and had not accurately

23   described their tracking of the Incognito usage.

24        So that part of what he says is completely inaccurate.

25            THE COURT:  What is the legal relevance of the

1    Incognito splash screen?

2              **MR. BROOME:**  Is that a question to me, Your Honor?

3              **THE COURT:**  It's a question to both of you.

4              **MR. BROOME:**  I'm happy to answer.  It is -- it's an

5    informational screen.  Judge Koh did hold that a reasonable

6    user could read the privacy policy to include the Incognito

7    screen thereby making it a contract.

8         We respectfully submit, Your Honor, that is wrong as a

9    matter of law.  The incorporation by reference doctrine but

10   its very name requires a reference to the document, and it

11   requires a clear and unequivocal reference -- some language

12   that -- that makes clear that the terms of this external

13   document are being incorporated to the primary document and

14   are enforceable by both parties.

15        And here --

16             **THE COURT:**  You keep saying on the one hand, the

17   contract has no ambiguity.  And then you've argued repeatedly

18   that what Google is doing gives, quote, a measure of privacy,

19   closed quote.

20        That suggests to me that the reference or the term

21   "privacy" is in fact somewhat ambiguous because we don't know

22   the precise parameters of -- of that privacy --

23             **MR. BROOME:**  I respectfully disagree with that, Your

24   Honor, because the -- the Chrome private notice is where

25   Google explains how Incognito works.  That document also links

1   to the Chrome privacy white paper which provides further

2   information.  But -- but let me address that point by turning

3   to Exhibit 136, which is the terms of service.

4           **THE COURT:**  Let me have a response on the splash

5   screen from plaintiffs.

6           **MR. BOIES:**  Well, Your Honor, first, we believe that

7   the -- decision at the motion to dismiss was accurate as a

8   law.  We think it is consistent with Ninth Circuit law, which

9   does not provide that you have to specifically reference

10  the -- the document.  You can be guided to it or directed to

11  it.  And that is what to court at the motion to dismiss stage

12  held was done with respect to the splash screen.

13      And the -- the splash screen -- and I think one of the

14  reasons why we're arguing whether it's part of the contract,

15  clearly, makes promises that you can browse privately.  And as

16  the court held at the motion to dismiss stage, a reasonable

17  user could have read this sentence to state that Incognito

18  mode provided privacy from Google and privacy from other

19  people who use the same device.  Both.

20      It also -- the splash screen also says that Chrome won't

21  save the following information, including the browsing

22  history.

23      And, again, at the motion to dismiss stage, the Court

24  reading this document said, quote, the Court concludes that a

25  reasonable user could read this statement to mean that their

1    browsing history and cookies and site data would not be saved.

2        Yet the evidence is that it is saved.

3        The splash screen also says your activity might still be

4    visible to websites you visit, your employer or school, your

5    Internet service provider.  And what the Court held at the

6    motion to dismiss stage is, quote, based on the admission of

7    Google from the list of entities that can see a user's

8    activity, a user might have reasonably concluded that Google

9    would not see --

10            **THE COURT:**  Mr. Boies, we have a lot of issues to get

11   through, and so it would be helpful to me to know whether your

12   entire argument is just read Judge Koh's opinion, and we stand

13   by that, and we have nothing else.

14            **MR. BOIES:**  It is not, Your Honor.

15            **THE COURT:**  Okay.  So let's stop reading Judge Koh's

16   decision.

17            **MR. BOIES:**  Okay.  I --

18            **THE COURT:**  I promise you I will read it.

19            **MR. BOIES:**  I appreciate it.  And --

20            **THE COURT:**  But we have a lot to get through.

21            **MR. BOIES:**  We do.

22            **THE COURT:**  So what else on the breach of contract --

23            **MR. BOIES:**  The other thing that I would say, Your

24   Honor, is that we read -- the way we read the contract is not

25   only different.  It's different from what Google's counsel

1    reads it.  But it is the same as Google's executives read it.

2        And the -- the discovery record has -- one of the things

3    the discovery record has contributed is that rather than

4    contradicting what was held at the motion to dismiss stage, it

5    has reinforced that.

6        What the -- what the discovery record shows is that

7    internally, Google's engineers and managers described Google

8    as, quote, effectively a lie, closed quote.  Exhibit 58 at

9    page 26 as, quote, a problem of professional ethics and basic

10   honesty, closed quote.  Exhibit 57 at page 4.

11       That it, quote, has always been a misleading name, closed

12   quote.  Exhibit 63 at 65 -- at page 65.

13       That it, quote, can deceive users, closed quote.

14   Exhibit 62 at page 55.

15       That it provides, quote, a false sense of privacy, closed

16   quote.  Exhibit 62 at 55.

17       They discuss how, quote, participants overestimate private

18   mode protections, closed quote.  And that there are --

19            **THE COURT:**  I get the point.

20            **MR. BOIES:**  -- misconceptions.

21            **THE COURT:**  I get the point.

22       A response.

23            **MR. BROOME:**  Thank you, Your Honor.  Most of the

24   documents -- well, first of all, I think the most important

25   document in this case, Your Honor, is -- is the statement of

1    undisputed fact that I think -- that will show that the

2    material facts on -- on all of these claims are really not in

3    dispute and that the evidence that plaintiffs are citing, they

4    have done a very nice job of cherry-picking language.  But it

5    is not -- it is a fair characterization of most of these

6    documents.

7         There are some documents where an employee -- I believe

8    his name -- well, I don't need to give you his name.  You'll

9    see it in the pleadings or in the evidence.  But he was very

10   concerned about the Incognito name and icon.  And he thought

11   that was misleading, because it -- I have one particular

12   document here that plaintiffs cite -- well, the -- he -- his

13   problem with it was that the -- he says that Incognito can --

14   is the -- is the spy mode that James bond would use.  And he

15   thinks that it conveys more privacy than it actually provides.

16        But at -- that same employee in the same email says, but

17   our disclosures are accurate.  They're -- they're clear.

18   They're accurate.  And -- and he was happy about those.

19        And that's what matters, right?  We're talking about a

20   breach of contract claim and issues of consent.  What matters

21   is whether the contract is clear and whether the disclosures

22   are clear.

23        You cannot sue for breach of contract because the icon or

24   the brand name are potentially misleading.  That's a different

25   claim.

```
1            THE COURT:  Could be a UCL claim.

2            MR. BROOME:  Potentially.

3            THE COURT:  All right.  Let's move on.

4      Wiretap.

5      It's helpful for the court reporter to have names.

6      That's Mr. Mao?

7            MR. MAO:  Good afternoon, Your Honor.  Mark Mao,

8  Boies Schiller Flexner for the plaintiffs.

9            MR. MARGOLIES:  Joe Margolies from Quinn Emanuel for

10 Google.

11           THE COURT:  Thank you.  Proceed.

12           MR. MARGOLIES:  Thank you, Your Honor.

13     I'll begin with the federal wiretap claim.  The first

14 issue is that plaintiffs' claim must fail because websites

15 consented.  The Wiretap Act is a one-party consent statute.

16 And the intended recipients of the alleged communications in

17 this case are the websites that installed Google's code for

18 express purpose of obtaining Google's services like Ads and

19 Analytics.

20     Since the purpose of installing those services was to send

21 data to Google, it is clear that websites consented.  And

22 courts overwhelmingly hold, even at the pleading stage, that

23 installing code for web services like Ads or Analytics creates

24 a presumption of consent to data collection for those

25 services.
```

1          And we've referred Your Honor to cases like *Rodriguez;*

2     *Katz-Lacabe*, which was decided in March; *Cohen v. Casper*

3     *Sleep*; and *In re DoubleClick*.  Plaintiffs have raised no

4     evidence to rebut the presumption that courts overwhelmingly

5     apply.  But in discovery Google has backed that presumption up

6     with additional evidence.

7          I won't belabor the point, Your Honor, but I'd like to hit

8     a few highlights.  The full evidence there is in our statement

9     of facts number 92.  But I'd like to point you specifically to

10    a portion of our expert report, which is Exhibit 80 at

11    paragraphs 48 and 49, that references a Google Analytics

12    document explaining to web developers that Analytics reports

13    include Incognito and private browsing in the reports they're

14    given.

15         Obviously, that data has to be collected by Google for it

16    to be appear in Analytics reports.  And the websites with

17    Analytics and Ad Manager traffic all contain notices about

18    this data collection, often referencing Google specifically.

19         Those notices do not indicate that this collection stops

20    in private browsing mode.  And, in fact, those notices

21    continue to appear to users who visit the websites in private

22    browsing mode.

23         I'll also note, Your Honor, that all of plaintiffs' law

24    firms use Google Analytics, as do their experts, Mr. Hochman

25    and Mr. Keegan.  And Mr. Hochman's consulting business

1    actually advises visitors to install Analytics, including

2    Google Analytics, citing its value as a resource for

3    developers.  I went to his site this week, Your Honor, and

4    those recommendations are still there.

5        Plaintiffs have argued that web developers cannot be said

6    to consent because Google represented that it would comply

7    with its own privacy policy.  But the privacy policy, as

8    Mr. Broome has explained, Your Honor, has never represented

9    that private browsing blocks all of the data collection at

10   issue.

11       And even if a user could interpret the privacy policy that

12   way, it would not negate a developer's separate consent.

13           **THE COURT:**  All right.  Let's talk about the

14   developer's separate consent.

15       Mr. Mao.

16           **MR. MAO:**  Thank you, Your Honor.

17       Your Honor, it is unclear what Counsel is referring to

18   with regard to consent from the website developers because

19   consent has to be commensurate with the disclosures.

20       The disclosures in which Mr. Margolies is referring to

21   does not disclose that Google is violating its own privacy

22   policy with regard to what happens in private mode.

23       Let me give you an example.  It's entirely possible the

24   websites -- they themselves can figure out because they are

25   part of the parties discussing it with the users as to what is

1     going on with the communications.

2         But the question at issue in this case is whether or not

3     Google itself has disclosed to websites and also consumers

4     that they actually collect in Incognito mode and other private

5     modes.  And the privacy policy in [sic] which Mr. Margolies's

6     own client requires the websites consent to as part of the

7     contract specifically says that in private mode, users are

8     allowed their privacy.

9         It is a circular argument, Your Honor.  They're saying

10    that they don't do what they do, and then they say that they

11    do what they do and that none of that violates the privacy

12    policy.  They're talking out of both sides of their mouths.

13             **MR. MARGOLIES:**  May I respond, Your Honor?

14             **THE COURT:**  You may.

15             **MR. MARGOLIES:**  I disagree with that characterization

16    for a couple of reasons.  First of all, The Federal Wiretap

17    Act is based on consent.  It's not based on what specific

18    information Google provided to developers, so whether Google

19    gave accurate representations to its users, who are separate

20    from developers -- of course, we believe they do -- but

21    whether or not they did --

22             **THE COURT:**  So they could -- you could give -- you

23    could lie to them and say, well, we lied to you, but you

24    consented and so therefore your consent is binding?

25             **MR. MARGOLIES:**  Your Honor, that's not my argument at

1    all.

2        My argument is that website developers consented.  So

3    regardless of whether users consented in a one-party consent

4    statute, whatever information users were given, there is still

5    consent for purposes of The Federal Wiretap Act claim because

6    the websites consented.

7        But, of course, it is Google's position that we did not

8    lie to anyone.

9        But I'll note, Your Honor -- and I would refer you to the

10   *Rodriguez* decision in which Chief Judge Seeborg --

11           **THE COURT:**  There are so many *Rodriguez*'s.  Which one

12   are you talking about?

13           **MR. MARGOLIES:**  I can get you that cite in a moment.

14   This is 2021WL2026726 from 2021.

15           **THE COURT:**  Okay.  Go ahead.

16           **MR. MARGOLIES:**  And in that case, Your Honor, Chief

17   Judge Seeborg expressly rejected this consent-upon-consent

18   argument that Mr. Mao just made about the privacy policy that

19   Google provides to user and how that may affect where the

20   consent ends for developers.

21           **THE COURT:**  Why isn't that persuasive, Mr. Mao?

22           **MR. MAO:**  Entirely different set of behavior and

23   services.  In that case, Your Honor, there was no specific

24   redress and address of the Incognito and private modes in the

25   privacy policies.

```
 1        And there was a question as to whether or not the websites
 2   were bound in being asked to comply with those specific
 3   provisions.
 4        Here, Your Honor, as opposing counsel concedes, both users
 5   and websites are being told in order for you to use our
 6   services, you have to have comply and we have to comply with
 7   our privacy policies, okay?  And here, again, that's why the
 8   argument's entirely circular.
 9        THE COURT:  Oh, so but -- this also, then, goes back
10   to you don't make any distinctions between your modes.
11        MR. MARGOLIES:  Your Honor, I'm sorry.  I don't think
12   I understand the question.  I -- oh, actually, I think I do
13   understand the question.
14        THE COURT:  If terms of consent, you don't make any
15   distinctions in terms of what you disclose based upon the
16   mode.
17        Is that -- is that why you think Rodriguez is persuasive?
18        MR. MARGOLIES:  No, Your Honor.  Let me read you a
19   brief quotation from Rodriguez if you don't mind, which is
20   that plaintiffs, pointing to the mat- -- the WAA materials,
21   which are the consent-related materials in that case,
22   plausibly demonstrate an objectively reasonable expectation
23   that their communications with third party apps would not
24   be -- oh, I am sorry.  I'm reading from the wrong portion,
25   Your Honor.  That's -- that's my fault.
```

1          It is -- the -- the position that I'm taking, Your Honor,

2     is that he rejected the notion that if a -- if a plaintiff's

3     consent -- if a plaintiff could reasonably read the privacy

4     policy to end their own consent, it simply does not affect the

5     consent that's given by the website developer.

6          **THE COURT:**  Where is the -- what exhibit do I have

7     with respect to the developers' consent?

8          **MR. MARGOLIES:**  It's our fact number 92.

9          **THE COURT:**  What exhibit?

10         **MR. MARGOLIES:**  Exhibit 80 and Exhibit 76 are the

11    most relevant, Your Honor.

12         **THE COURT:**  Thank you.

13       And that is the same or different from the privacy policy?

14         **MR. MARGOLIES:**  That's different, Your Honor.  That's

15    an expert report.

16                    (Pause in the proceedings.)

17         **THE COURT:**  Okay.

18       Response, Mr. Mao.

19         **MR. MAO:**  Sorry, Your Honor.  Response to the exhibit

20    or the -- the argument that was just made?

21         **THE COURT:**  The argument.

22         **MR. MAO:**  Your Honor, first of all, we flatly

23    disagree, as Mr. Margolies was unable to do when he was

24    referring to *Rodriguez.*  The *Rodriguez* decision is

25    inapplicable because specifically, as he read, it referred to

```
 1    apps.
 2        But setting that aside, the -- the -- the issue I think
 3    that opposing counsel is confusing here is that in the privacy
 4    policy here at issue, Google specifically says that in the
 5    private modes at issue, they are not collecting data, or at
 6    least that is one way in which we believe it would be
 7    reasonable for a juror to read that.
 8        And here, this is Google's motion for summary judgment.
 9    They are supposed to be the ones to show that Google
10    unambivalently explain what happened and what happens in
11    private mode to users and, here specifically, to the websites.
12    And there is no such demonstration.
13        In addition to that, Your Honor, I just want to make --
14    make very clear.  One of the other arguments --
15            THE COURT:   -- developers consent or not?
16            MR. MAO:  They did not.
17            THE COURT:  Why?
18            MR. MAO:  Because if they consented, they would have
19    consented insofar [sic] it is used consistent with the privacy
20    policy.  That is undisputed by the other side.  The other side
21    does not dispute that consent -- that -- that website consent
22    would have to be consistent with the privacy policy and that
23    there is no evidence not only that any website is actually
24    being told that this is happening in private browsing that,
25    that the specific behavior we're talking about is -- is
```

1      actually explained to the website.

2          But there's also no dispute by the other side, that in

3      order for this consent to be valid, it has to be consistent

4      with the disclosures and promises made in the privacy policy.

5          **THE COURT:**  All right.  Let's move to content.

6          Google argues that the claim fails because the information

7      here or the intercepted data here isn't content.

8          Response.

9          **MR. MAO:**  Your Honor, I think we made pretty clear

10     that we believe that *In re Meta Pixel* and also *In re Google*

11     *RTB* specifically says that URL's, including the path, are

12     content because they concern the substance of a communication.

13         And the test for content under the wiretap acts is any

14     information relating to the substance, purport, or meaning of

15     the communications at issue.

16         And, Your Honor, if you look at our brief, we provided

17     specific examples not only of the URLs, which show exactly

18     what the user is looking at -- and that you can see on our

19     opposition.

20         **THE COURT:**  Right.  And this is in part because it

21     goes beyond what the Ninth Circuit held in *Zynga*, I take it?

22         **MR. MAO:**  Yeah.  It's over and beyond, but -- but

23     even if we were to look at *Zynga*, you can see we also provided

24     examples of both search IDs and search queries within what is

25     captured in terms of what you Google is capturing.

1         If you look at the reply brief, Your Honor, for the motion

2    for summary judgment, Google has absolutely no response to the

3    fact that this is within the traffic and it's captured, and

4    it's undisputed that they capture content.

5         **THE COURT:**  All right.  Respond to in one.  I think

6    this is a narrow issue.  Respond to that one argument.

7         **MR. MARGOLIES:**  The argument on search terms only,

8    Your Honor, or including folders and subfolders?

9         **THE COURT:**  I didn't hear you.

10         **MR. MARGOLIES:**  Just with regard to search terms,

11    Your Honor, or also in folders and subfolders and paths?

12         **THE COURT:**  With respect to whether or not what is

13    being taken in terms of content goes beyond what the Ninth

14    Circuit has said is not content.

15         **MR. MARGOLIES:**  No, Your Honor.  So I'll address both

16    of the examples, then, that Mr. Mao gave.

17        The first is the path URLs that he referred to.  But *Zynga*

18    made clear that -- and I'm quoting, "the web page address that

19    identifies the location of a web page a user is viewing is not

20    content."

21        And that included detailed information.  It gave as an

22    example a user who visits a gay support group on Facebook that

23    may give information --

24         **THE COURT:**  Okay.  That gives you the website.  Now

25    we've got the folder and the subfolders.

1          **MR. MARGOLIES:**  So the folder and subfolders, Your

2   Honor, are simply how the website stores its own information.

3   That's not user generated.  It's not part of the communication

4   between the user and the web page.  It's not part of the

5   communication from the web page to the user.

6          **THE COURT:**  All right.  A response.

7          **MR. MAO:**  Your Honor, of course it is content.  It

8   shows exactly on what page and in what content of the page the

9   user is viewing because that's exactly what they requested and

10  communicated to the website.  That part again undisputed by

11  the other side.

12         **THE COURT:**  Okay.

13         **MR. MAO:**  The other side cannot and does not dispute

14  that.

15         **THE COURT:**  Does that change -- the folders

16  subfolders, does all of that change every time a user tries to

17  access different information on the website.?

18         **MR. MAO:**  No, it does not, Your Honor --

19         **THE COURT:**  I'm not asking you.

20         **MR. MAO:**  Oh, sorry.  I apologize.

21         **MR. MARGOLIES:**  Your Honor, in a URL like Mr. Mao is

22  describing, that's a static URL.  It's an address.  It's

23  exactly what was covered by *Zynga* --

24         **THE COURT:**  My question is, do the subfolders change

25  if someone changes what they are looking for on a website?

```
 1            MR. MARGOLIES:  No, Your Honor, because the

 2   subfolders refer to the specific file, the specific web page,

 3   exactly what's at issue in Zynga, so the example --

 4            THE COURT:  So if I'm on Amazon, and I'm searching

 5   for a book, when I'm on that page, I'm going to have the

 6   website visited, right?

 7            MR. MARGOLIES:  Right.

 8            THE COURT:  And there are going to be some folders

 9   and subfolders, right?

10            MR. MARGOLIES:  That would be the website visited,

11   Your Honor.  The -- the website -- the web page that you're

12   on, Your Honor --

13            THE COURT:  Yeah.

14            MR. MARGOLIES:  -- is associated with a single URL.

15            THE COURT:  Okay.  So if I go from that page to

16   looking for detergent, you're telling me that the information

17   isn't going to change?

18            MR. SHAPIRO:  The URL -- sorry, Your Honor.

19            THE COURT:  And I'm talking about specifically about

20   kind of the example that they gave in the briefing with the

21   website, the folders, the subfolders, et cetera.

22       You're saying -- it's your argument that that -- that that

23   string doesn't change when I change pages to look for

24   different items?

25            MR. MARGOLIES:  No.  If you change pages, Your Honor,
```

1    you're going to a different specific web page, it will have a

2    different URL and if that --

3              **THE COURT:**  Right.  And all of that is collected, so

4    it's not just -- it's not just the first part.  I assume that

5    the first part of it is the -- is the Amazon-specific, right?

6              **MR. MARGOLIES:**  That's this domain, yes, Your Honor.

7              **THE COURT:**  Okay.  And then every time I change a

8    search for new information or new products, the extension off

9    of the website address -- all of that information's going to

10   change.  All of those subfolders will change, correct?

11             **MR. MARGOLIES:**  That is correct, Your Honor.

12             **THE COURT:**  Okay.  So all of that individual search

13   activity that I am doing every time I change a page, that

14   information is changed and all of that specific search

15   activity is collected.

16             **MR. MARGOLIES:**  Well, Your Honor, I don't think I

17   would characterize it as search activity.  But as you browse

18   from page to page, the folders and subfolders will change.

19        Maybe I can clear up the example from the brief that

20   plaintiffs filed.  When they gave the example of the brief

21   from *Washington Post*, and it shows an article that was about

22   Ukraine, and there was folders and subfolders for the date,

23   that is not an indication that the user searched 2022, May, a

24   date, Ukraine.  That's simply an indication that the link the

25   user clicked was that URL with the folders and subfolders.

1    It reflects how the website itself, without any input from

2    the user, organizes files on its own server.  It is not a

3    reflection of the search.

4          THE COURT:  A response.

5          MR. MAO:  We disagree, Your Honor.  It clearly shows

6    that the user is searching and browsing.  And the subfolders

7    do change every time because it shows exactly what page -- the

8    subfolders, as Your Honor had point out, shows exactly what

9    the user is pointing at and had requested and has searched.

10         THE COURT:  You know, we do that all the time.  You

11   want to send somebody an article, you want to send somebody a

12   product, all you have to do is copy and paste that -- that

13   address and it takes them to the exact page that they were

14   looking at to suggest that it's not an indication of what a

15   user is looking at or searching or browsing for is I think a

16   stretch.

17         MR. MARGOLIES:  But, Your Honor, that's not the test

18   under *Zynga* because *Zynga* recognized that the URL may point

19   you to a specific page.  And subsequent cases to interpret it,

20   including *Yoon*, have given even more record data, for example,

21   keystrokes, mouse clicks, pages viewed, shipping and billing

22   information, the date and time, how long you spent, name,

23   address, phone number.  All of those things may be information

24   that are related to your interaction with the page.  But all

25   of those things are record information and not content under

 1    the statute so --

 2            THE COURT:  All right.  A response.

 3            MR. MAO:  Your Honor, the test under the statutes

 4    themselves which is the clearest indication of what is -- of

 5    what is content is any information relating to the substance,

 6    purport, and --

 7            THE COURT:  Right.  But I also am bound by *Zynga*, so

 8    do you want to argue *Zynga* or not?

 9            MR. MAO:  Yes.  And -- and, Your Honor, we believe

10    that the decisions that we've cited to, which is *Meta Pixel*

11    and *Google RTB* clearly show exactly as this technology had

12    progressed, the specific pages being use -- being communicated

13    and the searches being communicated clearly is consistent.

14            THE COURT:  All right.  Let's move to the CIPA.

15            MR. MARGOLIES:  Your Honor, CIPA Section 631 is the

16    same argument that I've just made about content, so I'll move

17    on to Section 630.

18        I understand that Mr. Frawley may address parts of that.

19        Mr. Mao, are you --

20            MR. MAO:  Well, sorry, I'm just trying to wait for a

21    cue from the judge first as to which issue under CIPA we're

22    looking for --

23            THE COURT:  If the CIPA arguments on 631 are the

24    same, are they the same on your side, too?

25            MR. MAO:  Yeah.  I mean, it's a two-way -- I mean,

```
1    it's a two-party consent statute, and I just wanted to point

2    out, Your Honor, that we do believe that actually in the

3    course of discovery, we have demonstrated -- I just wanted to

4    address really quickly Mr. Broome's allegation that we have

5    not shown that users have their profiles being built in the

6    middle of Incognito.

7         Your Honor is curious about where in the expert reports

8    those may be.  I can point to that, which is our Hochman reply

9    report, Exhibit 8.

10            THE COURT:  All right.  Hochman reply?

11            MR. MAO:  Yeah, Hochman reply report, Exhibit 8,

12   Appendix C and Appendix D, which are pages 23 to 26.  It shows

13   the building of user profiles.  I just wanted to address that

14   really quickly.  And that also goes to the exception versus --

15   exception to the exception.  Sorry.  I --

16            THE COURT:  Mr. Broome, do you stand to talk about

17   Exhibit 8?

18            MR. BROOME:  I was going to, Your Honor.  It seems

19   like a non sequitur on the -- on the CIPA claim.  But if Your

20   Honor would like a response with the point Mr. Mao is making,

21   I think I'd be best situated to do it.

22            MR. MAO:  My point was simply that was a triable

23   issue of fact because the two experts dispute whether or not

24   their profile was being built.

25            MR. BROOME:  I guess the dispute -- I don't think
```

1    there's a dispute on -- Your Honor.  I think we would agree
2    that if the user goes into an Incognito session and visits
3    websites A, B, and C, and those websites all use Google
4    services that are set up to send this data to Google, then
5    Google will have a record of those three visits.
6        They will be associated -- the way they are linked is
7    through an unauthenticated cookie, right?  It does not
8    indicate who the user is.  And then -- and it's a cookie
9    value, so a random -- randomized alpha-numeric number.  And
10   then as soon as that user -- they're finished looking at -- at
11   website C.  They close their session.  The cookie that would
12   allow Google to track that user.
13            THE COURT:  She can't cough and type at the same
14   time.
15            MR. BROOME:  Apologies.
16                (Off-the-record discussion.)
17                (Pause in the proceedings.)
18            THE COURT:  Go ahead.
19            MR. BROOME:  So the -- I'm not sure.  Did you get up
20   to "the cookie"?
21            THE CERTIFIED SHORTHAND REPORTER:  Yes.
22            MR. BROOME:  Okay.
23        So the -- the cookie that would -- Google would use to
24   link those websites visits and to the user is then deleted
25   from the user's device, never to be used again.

```
1            And, again, in Google systems, you have what we would call
2     orphaned islands of data.  They're not associated with any
3     individual, not associated with an account.  And they exist --
4     they're linked together but they're not linked with the user.
5            THE COURT:  And --
6            MR. BROOME:  And --
7            THE COURT:  -- they exist for Google's benefit.
8            MR. BROOME:  They exist for Google -- I mean, they
9     exist for the website's benefit and for Google's benefit.
10    That's how these systems work.  But, again, Your Honor, that's
11    the privacy that Incognito provides and that's explained in
12    Google's disclosures.  And all of these disclosures, including
13    the Learn More pages that are linked to the Incognito
14    screen -- it's very, very clear that this is the functionality
15    that these -- that this mode provides --
16           THE COURT:  All right.
17           MR. BROOME:  -- so to the extent --
18           THE COURT:  CIPA 632.
19           MR. MARGOLIES:  Your Honor, the Section 632 claim
20    fails because it protects only confidential communications
21    which includes communications made under -- and I'm quoting --
22    any circumstances in which the parties to the communication
23    may reasonably expect that the communication may be overheard
24    or recorded.  Plaintiffs admit that they understood from the
25    Incognito screen that their activity would be visible to their
```

1   Internet Service Provider, to their employer, or school, and

2   they knew that it would be visible and could be recorded by

3   the websites that they visit.  That's admitted in fact 98.

4   That's sufficient under CIPA 632.

5       Plaintiffs' argument that Google was an unannounced second

6   observer is a misunderstanding of the law, because as long as

7   plaintiffs understood that some third-party observer was

8   present in the communication or could record or view the

9   communication, the communication is not confidential.

10          **THE COURT:**  A response.

11       **MR. FRAWLEY:**  Thank you, Your Honor.

12   Alexander Frawley from Susman Godfrey for the plaintiffs.

13       Your Honor, we -- we don't dispute that the communications

14   could be visible to the ISPs.

15          **THE COURT:**  Speak up, sir.

16       **MR. FRAWLEY:**  We don't -- I agree with one thing

17   Mr. Margolies said, which is that we don't dispute that on the

18   splash screen, it discloses the ISPs and the --

19          **THE COURT:**  I'm sorry.  I'm having a hard time

20   hearing you, so if you could speak up and slow down --

21          **MR. FRAWLEY:**  Sure.

22          **THE COURT:**  -- I would appreciate it.

23       **MR. FRAWLEY:**  So, Your Honor, one thing that

24   Mr. Margolies said that we do dispute in terms of the law

25   here, that I believe he said just because there's a third

1    party there, that will hear the communication, that renders

2    them not confidential, and we fundamentally disagree with that

3    as a matter of law.

4        There's a case that's actually very helpful for this exact

5    point.  We disclosed it to the other side yesterday.  It's not

6    in our brief, but it's called the *Lieberman* case, *Lieberman v.*

7    *KCOP Television*, 110 Cal.App 4th 156.  It's a 2003 California

8    Court of Appeal case.

9        And what it says there is that one who listens with the

10   speaker's knowledge is not an eavesdropper.  That's a party to

11   the communication.

12       So in this case, when we apply that logic here, when we

13   think about the splash screen and how it discloses the ISPs

14   and employers, those are parties to the communications.  Those

15   aren't eavesdroppers.

16       And what CIPA protects against -- CIPA 632 -- is the right

17   to know who is listening.  That's in a crux of the statute.

18       And here, plaintiffs reasonably understood that they knew

19   exactly who was listening; that is, a defined audience on the

20   splash screen.

21       Every time they open an Incognito session, it said these

22   are the three entities to whom your communications may be

23   visible, one, two, three.  Nothing else.  So it's --

24           **THE COURT:**  All right.  A response on *Lieberman*.

25           **MR. MARGOLIES:**  Your Honor, that case is

1    inapplicable.  The facts of that case were that a doctor had a

2    conversation with a patient and someone the doctor believed to

3    be and was presented to the doctor to be a partner or

4    significant other or associate of the patient within a closed

5    examination room in the doctor's office.  The doctor had no

6    reason to believe that that third party was not a party to the

7    communication, as Mr. Frawley acknowledged.  Had no reason to

8    believe that that person was recording; in fact, that person

9    was an eavesdropper in the case because it was a news reporter

10   who was recording by video and audio the conversation.  This

11   is a prototypical case of eavesdropping.

12       The case here is very different.  First of all, we contest

13   the notion that the ISP or the employer or the school is a

14   party to the conversation.  I don't think that that's a

15   reasonable interpretation of the statute or the language.

16       If I'm visiting a website, I don't consider my employer or

17   school to be a party to that communication.  It's a third

18   party, not a party to the communication, who I would

19   reasonably expect to be able to view overhear or recorded it.

20       Also the websites themselves who are parties to the

21   communication can record the communication, and users know

22   this.  Recording is another way in which a -- a communication

23   can be deemed non-confidential, and that's not addressed by

24   the *Lieberman* case.

25           **MR. FRAWLEY:**  May I respond to that point, Your

1    Honor?

2              **THE COURT:**  You may.

3              **MR. FRAWLEY:**  I think *Lieberman* supports us for the

4    reasons I said earlier.  But Mr. Margolies's made a new

5    argument just now about a person's knowledge about whether or

6    not the website would record the communication.  We dispute

7    that fact.  It's fact 99.  But more importantly, that argument

8    taken to its logical end leads to pretty concerning outcomes,

9    which is that what Google is essentially saying -- for

10   example, if I have an online communication with my doctor's

11   office in a patient portal, what Google is saying, well, since

12   it's online communication, they can eavesdrop because you know

13   it might be recorded; it's online.

14       And that's a troubling and absurd outcome, and a case

15   actually recently dealt with a very similar scenario, and

16   that's the *Meta Pixel* case we cite in our brief.

17       We actually don't cite it for this part of the argument,

18   Your Honor, but it's in our brief.  And what happened there

19   was the Court at the preliminary injunction stage said that

20   users were likely to prevail on the merits of proving the

21   confidentiality of online communications in a patient portal

22   with health-related information from Meta was allegedly

23   intercepting those communications.

24       That's squarely analogous to this case on the facts.  And

25   it's squarely analogous in terms of the sensitivity of the

```
1   communications.  In fact, the logic of that case applies
2   almost even stronger here, 'cause here, not only do we have
3   sensitive browsing communications that are what people are
4   going to be doing in private browsing, but we have
5   representations from Google, the eavesdropper where they
6   promise that you can browse privately and you're in control
7   and there's a defined audience.
8        So we think that Meta case actually rebuts Mr. Margolies's
9   argument that taken to its logical conclusion means there
10  could never be an online confidential communication.  That
11  shouldn't be the law, and in Meta Pixel it wasn't.
12            THE COURT:  All right.  The Computer Data and Access
13  Fraud Act.
14                 (Pause in the proceedings.)
15            MS. OLSON:  Hi, Your Honor.  Allie Olson from Quinn
16  Emanuel on behalf of Google.
17            THE COURT:  Go ahead.
18            MR. MAO:  Apologize.
19            MS. OLSON:  So California's Criminal anti-hacking
20  statute, CDAFA, requires knowing access and without permission
21  taking data from a computer.
22        Google did not access class members' computers.  It's the
23  websites that have accessed class members' computers.  When a
24  user goes to a website, their browser calls up that website's
25  HTML code, which can include both first-party code created by
```

```
 1    the developer and third-party code created by web service

 2    companies.

 3        This is very common, as we note in fact 97.  And as

 4    plaintiffs acknowledge in response to fact 101, when the

 5    browser and the website interact, the website's code is

 6    executed as part of rendering the publish's website.  And that

 7    is both the first- and the third-party code.

 8        Data is sent to the --

 9        THE COURT:  I'm going to stop you.

10        Mr. Mao, are there any material disputes of fact with

11    respect to this claim?  And I say it in the sense that it

12    seems to me that in many ways people don't really disagree

13    about what is happening.  The question is can you fit those

14    facts into the particular statute at issue.

15        And you've got many alternative theories about why the

16    plaintiffs are harmed, but are there really any facts that are

17    disputed with respect to this topic.

18        MR. MAO:  Yes, Your Honor.  Just in one aspect, and

19    it's a little subtle.  But I want to know if you want me to

20    address that now or if I should wait for Ms. Olson to finish.

21        Sorry.  Just trying to be --

22        THE COURT:  I'm asking you the question because I'd

23    like you to answer my question.

24        MR. MAO:  Of course, Your Honor.

25        So the one subtle thing that I think is not very apparent
```

1   if you're looking at the documents itself is that there's a

2   number of ways in which device -- you know, the hacking into

3   the device could be at -- layered here.  Because you do have

4   the browser application, and you also have the user's device

5   that contains that application.

6       We believe that there is more than one way by which that

7   was hacked because you have either a transmission away from

8   the device by the surreptitious code in which the user is not

9   aware of.  Or you have a circumvention of the browser itself

10  using Google code in a manner that's unauthorized and contrary

11  to the representations.

12      I -- I don't think this is very fleshed out -- very well

13  flushed out in the dueling statements of fact.  And I hope

14  that answers your question, Your Honor.

15          **THE COURT:**  All right.  Response on that with respect

16  to the factual issue.

17          **MS. OLSON:**  I don't really understand the factual

18  issue because there is no surreptitious code.  The -- the code

19  is the website code which can be seen using the developer

20  tools, and it's the code that's on the website.  So I'm not

21  really sure what surreptitious code Mr. Mao is referring to.

22      In terms of -- in terms of kind of skipping ahead to the

23  without permission section, I think that that misses the

24  access portion of -- of the requirement, which is what we are

25  talking about here.

1    And so I don't think -- while I disagree that this -- that

2    this -- that these transmissions occurred without permission,

3    I don't think that that relates to the -- what we're talking

4    about now, which is whether Google -- whether Google accessed

5    the plaintiffs' browsers or devices just because their code

6    was used in websites.

7        **MR. MAO:**  If I may describe this a little better

8    because I do think it's a factual dispute, Your Honor.

9        The description analog here matters.  Google wants to

10   describe this as a regular communication, almost implying that

11   it's almost like a user expected Google to be there.

12       That's just not true.  The analog that we have been giving

13   is either with my browser or with my device, which is why I

14   was talking about different layers, when I am reaching out to

15   a *Washington Post* for example, I am not expecting Google to be

16   interjecting code into the communications that would cause the

17   communications to be transmitted either by the browser or by

18   the device.

19       Whichever layer you want to count, we believe that both of

20   those transmissions are hacking and an unauthorized access

21   of -- of the user's, you know -- there's a couple different

22   ways it was described under the CDFA [sic], which is, you

23   know, there's systems, there's networks, there's devices,

24   there's computers.  And that's what I was trying to describe,

25   Your Honor.

```
 1          We do fundamentally disagree with the analog in which

 2     Google's trying to use.

 3          MS. OLSON:   And can I just respond to one thing

 4     briefly, Your Honor?

 5          Google's not interjecting any code, so I don't agree with

 6     what Mr. Mao is saying, any of it, because Google is not

 7     secretly interjecting code or interjecting code at all.

 8          Websites are choosing to incorporate that code in their

 9     website to take use of Google's web services.

10          MR. MAO:   Your Honor, we do believe that under the

11     Christensen -- the California Supreme Court standard, in which

12     we cited to in our opinions [sic], it's one -- a test of

13     whether or not Google was authorized to access that

14     information.

15          THE COURT:   All right.

16          There's a argument that Google makes about damages under

17     the statute?

18          MS. OLSON:   Yes, Your Honor.

19          We believe that the statute requires and subsequent Ninth

20     Circuit cases and cases in this district applying both the

21     California statute and the federal analog have hold -- have --

22     have held that in order to allege damage or loss, it must

23     relate to the actual service interruption or corruption of

24     data in some way.

25          And that is Cottle vs. Plaid, Andrews vs. Sirius XM Radio,
```

1    *NovelPoster vs. Javitch*, and *Nowak vs. Xapo*.  And the only

2    case that plaintiffs cite in response is *Facebook Tracking*,

3    which is a case that held unjust enrichment was sufficient at

4    the pleading stage for Article III standing.

5        And that -- and so I think that that doesn't apply here,

6    and they don't cite a case that -- that actually analyzes the

7    loss or damages provision of -- of CDAFA.

8              **MR. MAO:**  We disagree, Your Honor.  We believe that

9    Ninth Circuit opinion in which we cite to is controlling and

10   that the way the opinion rendered it, it had nothing to do

11   with pleading versus non-pleading stage.  It simply was the

12   question of what damages are sufficient for the purposes of a

13   CDAFA claim.

14       And the Ninth Circuit there, contrary to all the lower

15   court opinions, in which opposing counsel cites to squarely

16   said that unjust enrichment damages, which we have alleged

17   here in multiple ways, and which was supported and upheld

18   during the *Daubert* motion stage is sufficient for the purposes

19   of cognizable claim under CDAFA, Your Honor.

20             **THE COURT:**  So you've got a damages expert that's

21   going to address this issue.

22             **MR. MAO:**  Yes, Your Honor, and that was -- it's the

23   same report in which Your Honor upheld during the *Daubert*

24   motion.

25             **THE COURT:**  And is it part of the summary judgment?

```
 1              MR. MAO:  Lasinski report, yes, it is.  And it -- one
 2   of my colleagues will be able to give us an exhibit number.  I
 3   apologize.
 4              THE COURT:  All right.  Invasion of privacy.
 5              MR. MAO:  Can we -- is it okay if we give you that
 6   number when we're up?
 7        We're going to give it to Ms. Bonn, Your Honor.
 8        Thank you, Your Honor.
 9              THE COURT:  Two elements:  No reasonable or -- claim
10   that it fails because there's no reasonable expectation of
11   privacy.  Sounds like a repeat of most -- of many of the
12   arguments that's already been made.
13        Is that right, Mr. Margolies?
14              MR. MARGOLIES:  It's largely consistent, Your Honor.
15   It's based on --
16              THE COURT:  Anything different?  That is, unique to
17   this claim?
18              MR. MARGOLIES:  I'll -- I'll -- no -- no, Your Honor.
19   I think that the arguments are the same.
20              THE COURT:  How about for plaintiff?  Anything that
21   is different and unique to this claim.
22              MS. BONN:  I would like to add something that I think
23   is important to this issue you raised that has not been
24   addressed by my colleagues yet.
25        And that issue is this:  On both this claim and elsewhere,
```

1   Google's brief suggests that its collection of data is

2   permissible under these claims, that you have no reasonable

3   expectation of privacy as long as Google does not deliberately

4   take that data and link it back to what they call your

5   authenticated profile, meaning your Gmail account.

6       And we fundamentally disagree with that motion.  Google

7   does not have a single case that suggests that either under

8   California law on these privacy torts, under a breach of

9   contract claim, frankly, under any of our claims, that the

10  claim would fail as long as there's no linkage between the

11  data Google collects without consent and your Gmail account.

12      And I think it's helpful to step back and use an analogy.

13  Imagine that someone shopping in a store walks in and there

14  are signs everywhere that says, we may record you on our video

15  cameras while you're shopping to detect shoplifting.

16      And then you walk into the changing room, and there's a

17  sign on the door that says now you can change privately and

18  others in this dressing room won't be able to see you.  And

19  yet there's a hidden camera in the dressing room.

20      What Google is basically saying is that's not an invasion

21  after your privacy as long as in our footage of you, we blur

22  your face and as long as we store the recording of you in the

23  changing room in a way that it can't be readily combined with

24  the other footage of you where your face isn't blurred when

25  you're shopping in the store.

```
1          And we have put in evidence from our technical expert,
2    Mr. Hochman.  This is his opening report at Broome Exhibit 70
3    and Mr. Hochman's rebuttal report at Mao Exhibit 8, which
4    describe how Google collects browsing data that includes time
5    stamps, IP address, user agent string, and other identifying
6    qualities such that it is actually trivial and, in fact, our
7    expert was able to link our plaintiffs and our test experts'
8    Incognito data with their signed-in data with 100 percent
9    accuracy.
10         So essentially what Google is trying to say is we can
11   freely collect your data in violation of our contracts, in
12   violation of our promise.  And as long as we don't have
13   someone behind the scenes who's going ah ha, the user who
14   happens to live at this house and whose browsing information
15   is totally consistent with a female age 35 to 40 and who sure
16   seems to travel every day to Susman Godfrey's offices, as long
17   as we don't sit there and say, ah ha, and, but that's the same
18   person as AmandaKBonn@gmail.com, you have no article standing
19   you have reasonable expectation of privacy, you have no claim
20   that we've breached our contract.
21              THE COURT:  All right.  Response.
22              MS. BONN:  So we fundamentally disagree with that.
23              THE COURT:  Response.
24              MR. MARGOLIES:  Your Honor, I will respond briefly to
25   both points but I'll note also if we get into the standing
```

1     argument, I'll yield to my colleague Ms. Trebicka to address

2     that specifically.

3          But first of all, there are cases that describe

4     anonymized -- even data that can be de-anonymized data as not

5     carrying an expectation of privacy.  And that includes the

6     *Sanchez* case, which involved GPS tracking for scooters in the

7     City of Los Angeles that could be de-anonymized if someone

8     behind the scenes decided to do so.

9          But I'll also address Ms. Bonn's example which is not

10    applicable here for a few reasons.  First, in terms of the

11    disclosures, if the disclosures were truly analogous in this

12    case, the disclosure on the dressing room dorm would say, the

13    store won't see you, but other people can see you.  And that's

14    just -- that makes the analogy a bit nonsense.

15         But also there's something fundamentally different between

16    a person's naked body while undressing and the data at issue

17    here, which is browsing information that is not connected to

18    an identity.  There's a big difference, Your Honor.

19         And this is a case dependent analysis.  If you look at all

20    the cases about invasion of privacy under California law and

21    federal law interpreting it, it's a case-by-case fact-specific

22    analysis.

23         And the fact-specific analysis about watching somebody

24    undress in a dressing room is very different from receiving,

25    for example, a URL that someone went to a website, even a list

```
1    of URLs.  So --
2              THE COURT:  All right.  So why is this highly
3    offensive, the next element?
4              MS. BONN:  Your Honor, I think that actually what was
5    just said is a perfect segue into that, which is this notion
6    that, oh, it's -- it's clearly an intrusion that would be
7    highly offensive to film one's naked body but it's not when
8    Google actually collects information that reveals your
9    inner-most thoughts which you've specifically taken the action
10   of flagging as being incognito and private.
11        And it is a fact-specific analysis.  And we think that a
12   reasonable jury looking at the facts could find it highly
13   offensive that not only did Google promise on its Incognito
14   screen, its privacy policy, that people could browse privately
15   in Incognito but that for years, Google employees -- and we
16   heard earlier from Google, it's just this one rogue employee
17   Chris Palmer.
18        Google's former CEO, Mr. Schmidt, went on national
19   television on ABC News and said, quote, in Incognito, no one
20   sees anything about you.  That is also in your summary
21   judgment record.
22        There are document after document from 2009 all way to
23   when we filed this case of employees recognizing that the
24   splash screen and Google's disclosures are effectively a lie.
25   They mislead users.  They cause misconceptions.  And a
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    reasonable juror looking at the combination of facts and the

2    facts that Google with its essentially monopoly position in

3    the advertising and analytic space collects so much data that

4    in fact there is no way for a person to prevent it from

5    happening.

6        We think a reasonable jury could find that that very

7    notion is highly offensive.  And in some sense, many people

8    may think it's more offensive than the changing room example.

9    It more offensive that Google believes that a user has no way

10   to completely stop Google from tracking everything they do on

11   line, including through Incognito mode.

12           **THE COURT:**  Any response?

13       **MR. MARGOLIES:**  Yes, Your Honor.  Two responses.

14       The first is it is still accurate -- although it's not a

15   contractual representation what Mr. Schmidt said way back

16   when, it is still accurate that when you're in Incognito,

17   Google doesn't see anything about you.

18       To return again to this example in the changing room, what

19   would happen is not that someone would see, again, what

20   inflames our notions or privacy, a vision of a person

21   changing.  What it would see is the information that someone

22   went into changing room A -- perhaps someone went into

23   changing room A and tried on a T-shirt.  It's very different.

24       But, Your Honor, I'd like to also address the points about

25   offensiveness.  The data collection -- I think, respectfully,

1    Ms. Bonn understates the standard here.  It's a very high bar.

2    It requires an egregious breach of social norms.  And courts

3    routinely deny privacy claims based on browsing data and

4    similar collection because it is routine commercial behavior

5    and not an egregious breach of social norms.

6         **THE COURT:**  How much does the expert indicate how

7    much Google has profited by collecting all this data?

8         **MS. BONN:**  Billions of dollars, You Honor.  Billions.

9         **THE COURT:**  So billions of dollars and a monopoly

10   position.

11        Any cases that suggest that that might not be highly

12   offensive to a jury, that you're having -- you know, that

13   you're making -- or your client, not you, billions of dollars

14   creating a monopoly position that, you know, many have tried

15   and are not so successful in trying to compete because you can

16   collect and use and monetize that data?

17        **MR. MARGOLIES:**  Not under a privacy theory, Your

18   Honor.

19        I think that the notion that someone has been successful

20   in business is one thing.  But how they became successful.

21   Under a privacy theory, I don't think that this sort of

22   collection -- this unidentified collection applies.

23        And, Your Honor, I'd like to point you again to a fact,

24   which is that all three of plaintiff's law firms use these

25   services.  Plaintiffs' experts continue to use those services.

```
 1    If true they were an egregious breach of social norms, I
 2    doubt --
 3              THE COURT:  Or could it just be that there's a
 4    monopoly and, therefore, there's no other real option.
 5              MR. MARGOLIES:  Your Honor, there are many other
 6    analytics and ads companies in the ecosystem.
 7              THE COURT:  Yeah, I -- I would -- you've made that
 8    argument now a couple of times.  Is that in the record?
 9              MR. MARGOLIES:  Yes, Your Honor.
10              THE COURT:  Hmm.
11              MR. MARGOLIES:  And I can point you, for example, to
12    our Exhibit 80 and our Exhibit 76 which describe this
13    ecosystem.
14              THE COURT:  Are you suggesting that -- you're not
15    suggesting, I take it, that Google doesn't have the primary
16    position in the -- in the search engine function globally, I
17    take it.  You're not taking that position.
18              MR. MARGOLIES:  I'm not taking any position with
19    respect to Google's market position, Your Honor.
20              THE COURT:  Yeah.
21        All right.  Next.
22              MS. BONN:  And, Your Honor, very briefly, I received
23    the citation you were asking for earlier.  Our damage expert
24    report to Mr. Lasinski is at Exhibit 25.
25              THE COURT:  Thank you.
```

1          The UCL?

2          **MS. OLSON:**  Allie Olson again, Your Honor.

3          Under the UCL, plaintiffs have to meet this heightened

4     pleading standard for standing, which is lost money or lost

5     property.  And plaintiffs have not shown that they lost any

6     money.

7          Fact 102, it's -- shows it's undisputed that they have not

8     paid any money to use Chrome or other at-issue browsers.

9     Facts 103 and 104 show that it's undisput- -- show that it's

10    undisputed that plaintiffs never tried to sell their private

11    browsing data, despite the fact that they claim would have

12    demanded payment for such data, nor do they show that they

13    could have sold such data given that the data from prior

14    private browsing sessions is not tied to their identity.

15         They further don't show any impairment to their ability to

16    sell that data, which is what's required under various cases

17    *Ji v. Naver*, *Moore v. Centrelake* and *Facebook User Profile*

18    *Litigation*.

19         As to lost property, the motion to dismiss decision in

20    *Calhoun* is the exception.  Every other case to have decided

21    this exact issue has found that the data at issue is not --

22    not lost property for purposes of UCL standing.

23         And it's -- it's not the trend going otherwise, as

24    plaintiffs claim in their brief.  In fact, Chief Judge Seeborg

25    recently found in *Katz-Lacabe* the opposite, that *Calhoun* is

1    actually the outlier.  And as the Court explained in *Cottle*,

2    *Calhoun* rested or four Article III standing cases.

3        The four cases that are cited by plaintiffs similarly are

4    not on point.  *Carrier IQ* is based on processing and storage

5    impairment, not disclosure of personal information.  *Klein vs.*

6    *Facebook* was about antitrust injury.  *Griffey vs. Magellan*

7    *Health*, the plaintiff paid extra money in order to get data

8    security.  And in *Callahan vs. PeopleConnect*, the data at

9    issue was intellectual property.

10            **THE COURT:**  Any response?

11            **MS. BONN:**  Yes, Your Honor.

12        I'd like to take those two prongs of UCL standing one at a

13    time, lost money or property.

14        And first of all, in this case, we have a damages expert,

15    Mr. Lasinski, again at Exhibit 25, who has actually quantified

16    the value in terms of a lower bound of users giving up the

17    choice to browse privately at $3 a month based on the

18    screen-wise panel.

19        Your Honor has addressed that extensively in the prior

20    *Daubert* ruling.  And so we think that, frankly, there is

21    nothing in Ninth Circuit or controlling California case law

22    that suggests that when you have defendant who has taken

23    something of value from you and when that value has been

24    quantified by a damage expert, that that would not satisfy

25    lost money under the UCL.

```
1              Point two, lost property.  One point we made in our
2       opposition brief, which Google's reply is silent on, is that
3       since many of the lower court district discussions in ND Cal
4       that have addressed the property issue.  California has
5       enacted the CCPA.  It went into effect in 2020.  And the CCPA
6       provides users with extensive rights over data that is
7       collected by online companies like Google.
8              For instance, they have a right to see what data has been
9       collected.  They have a right to request that the data be
10      deleted.  And part of the test as to whether someone has a
11      property interest is a right to exclude.  And the California
12      legislature in enacting the CCPA has provided users with
13      control over their data by providing them with a right to
14      demand that companies that collect their data online actually
15      delete it.
16             And none of the cases that Google has cited for the notion
17      that stolen data or misappropriated data failed to satisfy a
18      property interest under the UCL addressed this intervening and
19      substantive change in California law which recognizes that
20      users have some right to exercise control over their data even
21      when companies like Google collect it online.
22             THE COURT:  Okay.  Do you want to respond?
23             MS. OLSON:  Yeah, just briefly.
24             As to the first point about lost money, the money -- the
25      amount of -- the value has to be that valuable to plaintiffs.
```

```
1   And plaintiffs here have not put in any evidence that they

2   would have participated in this market, they attempted to

3   participate in this market or that the private browsing data

4   at issue is at all -- is at all the same, in the same market

5   at the screen-wise panel, which specifically is linked to

6   identity, which is what makes the private browsing data here

7   different.

8       And I think actually the answer to the CCPA is similar.

9   Google does allow for --

10          THE COURT:  So you mean --

11          MS. OLSON:  Sorry.

12          THE COURT:  -- prospectively?  Are you saying that

13  they haven't done this prospectively given that the plaintiffs

14  didn't know it was being done to them retrospectively?

15      How -- you understand my question?  How could they say

16  that they would have done it when they didn't know it was

17  being done to them.

18          MS. OLSON:  Well, they've known for at least three

19  years, and they still haven't tried.

20          THE COURT:  So going forward; is that what you're

21  saying?

22          MS. OLSON:  And -- I'm saying they never tried to

23  sell their data before, and they haven't tried to sell their

24  data since.

25          THE COURT:  Okay.
```

1          Do you want to respond on that?

2          **MS. BONN:**  I would briefly, which is to say the point

3     is they could and there's a ready market value that in fact

4     Google itself has placed on this data.

5          And imagine a situation where someone owns a necklace, a

6     priceless family heirloom and someone steals it.  Would it be

7     an answer to say, well, you never intended to sell it.  The

8     point is you could have.  It is a thing that has value that's

9     in your possession.  And you have a right, should you so

10    choose, to monetize it or not.

11         But either way, if someone through a practical that would

12    be unlawful under the UCL stole your family heirloom necklace,

13    without be an answer to say, well, you never intended to sell

14    it; therefore I can take it and you have no cause of action

15    because you haven't lost any money or property.  That would

16    not be an answer.

17         And we think here, the situation is deeply analogous.  Our

18    plaintiffs had private browsing data which they placed a high

19    value on.  They had a choice whether to keep it private or to

20    monetize it.  And Google, through actions that we contend

21    violate the UCL, deprived them of that choice, took the data,

22    and now we're sitting here saying it wasn't worth anything to

23    you because you've never tried to sell it on the open market

24    and it's not technically property because it's not a thing you

25    can touch.

```
 1        And, frankly, we just don't think that there's support

 2   under either controlling Ninth Circuit or California case law

 3   for that proportion.

 4             THE COURT:  All right.  Anything else on the UCL?

 5             MS. OLSON:  Can I respond or a new topic?

 6             THE COURT:  Go ahead.

 7             MS. OLSON:  First of all, a necklace is very

 8   different than the data at issue in this case, which can be --

 9   which if you -- if someone else takes it --

10             THE COURT:  I understand --

11             MS. OLSON:  Okay.

12             THE COURT:  -- that they're different things.

13        Do you want to respond to the statute that gives rights

14   over data?

15             MS. OLSON:  Sure.  So, first of all, some of the

16   cases that we cited are -- were more recent and after the CCPA

17   and still nevertheless -- nevertheless held that -- that this

18   is insufficient for lost property under the UCL like

19   Katz-Lacabe.

20             THE COURT:  Did those cases -- what was -- what was

21   the procedural posture?  And did they have experts who had

22   monetized?

23             MR. MARGOLIES:  No, Your Honor.  I believe that was

24   at a motion to dismiss.  They didn't have -- they didn't have

25   experts, but in this case, I don't think they have experts
```

```
1    either that are talking about monetizing this data, Your
2    Honor.
3        And I think Ms. Bonn is a little bit loose with -- with
4    the way she's describing a market for this data -- for private
5    browsing data, that's -- there is no market that they've shown
6    evidence of for this data.
7            THE COURT:  Can I --
8            MS. OLSON:  That data is different.
9            THE COURT:  Where can I find the evidence to the
10   extent it exists?
11           MS. BONN:  Your Honor, in Lasinski -- Lasinski's
12   expert report, which is our Exhibit 25, it talks about the
13   market for browsing data, and it talks about Google
14   specifically in other analogous instances paying people for
15   data that would otherwise be private from Google to instead
16   share that data with Google.
17           THE COURT:  Any response regarding the Lasinski
18   report?
19           MS. OLSON:  No, I don't -- I don't have anything more
20   to add than what I said beyond its -- it's not about this
21   data.  And I think if you just -- you will look at, you'll see
22   it's not the same data, and there -- it doesn't show a market
23   for the data that's at issue here.
24           THE COURT:  Okay.  Well, what data does it show the
25   market for?  What is the data at issue?
```

1              **MS. OLSON:**  Is that a question to me, Your Honor?

2              **THE COURT:**  No.

3              **MS. BONN:**  Yes, Your Honor.  So in the case of

4    Screenwise, which Mr. Lasinski used to value the data, Google

5    itself paid participants for a couple of things.  One is to

6    essentially tap their browser and allow all of their browsing

7    data to be collected by Google.  And --

8              **THE COURT:**  So it's the same issue I've seen in the

9    past.

10             **MS. BONN:**  Correct.

11             **THE COURT:**  All right.  Anything else on the UCL?

12             **MS. OLSON:**  Yes, Your Honor.

13        Also as it relates to *Sonner*, it's our position that

14   because there's -- plaintiffs seek damages related to contract

15   and other privacy claims, they have to show that there's no

16   adequate remedy at law, and they cannot do that.

17             **THE COURT:**  That argument doesn't persuade.  They're

18   entitled to injunctive relief if they win on this claim, so

19   that one will not fly.

20        Anything else?

21             **MS. OLSON:**  The one other thing I was going to say

22   about the point before about the CCPA and about data that

23   needs to be corrected and deleted Google allows -- Google

24   allows users to see and delete data that's connected to their

25   account, and that's not the data at issue here.

 1          **MS. BONN:**  May I respond to that very briefly?

 2          Correct.  That's one of the interesting problems, that

 3     with other data Google collects when you're signed in, if you

 4     go to your My Account, you see what they have, and you

 5     apparent or purportedly have an option to delete some of it.

 6          But with Incognito data, the user has no ability to see

 7     that Google has collected it or to direct Google to delete it.

 8     So rather than providing some exoneration under the UCL, we

 9     think that further supports our position.

10          **MS. OLSON:**  And I think that erodes the purpose of

11     Incognito mode, which is to provide privacy in the manner that

12     Mr. Broome alleged.  And the dat- -- because the data is not

13     connected to their identity, it -- who would know who could

14     request to see or delete that data?

15          And why would -- and Google doesn't know to authorize

16     someone to see that data if they don't know whose data it is.

17          **THE COURT:**  Then why take it other than to monetize

18     it and profit from it?

19          **MS. OLSON:**  They don't need to know who the person is

20     in order --

21          **THE COURT:**  Why take it without telling anyone other

22     than to monetize it?

23          **MS. OLSON:**  Well, Your Honor, we don't agree that

24     they don't tell anyone.  We -- you know, we -- we believe that

25     this data was -- is disclosed extensively in the privacy

1    policy, and the ways that Incognito mode changes how browsing

2    work [sic] is explained in the Chrome privacy notice.

3         **THE COURT:**  Mr. Broome, you're jumping up.

4         **MR. BROOME:**  May I address that point, Your Honor?

5         **THE COURT:**  Briefly.

6         **MR. BROOME:**  There -- again, the -- the privacy

7    policy discloses the collection in browser and I -- browser

8    and browser mode agnostic terms, very similar issue to what

9    was going on in *Calhoun*.

10        And the reason Google -- Google is receiving this data --

11   well, let me take a step back.  The services that are at issue

12   here, the ads and analytic services, they are built to be both

13   browser agnostic and mode agnostic.  They are not -- there's

14   no signal saying this person is private browsing, you know,

15   go -- go -- you know --

16        **THE COURT:**  It's a problem for Google.

17        All right.  Let's move on.

18        **MS. TREBICKA:**  Standing, Your Honor?

19        **THE COURT:**  Go ahead.

20        **MS. TREBICKA:**  And, Your Honor, before we go to

21   standing --

22        Apologies.  Viola Trebicka, Quinn Emanuel, for Google.

23        Before we go to standing, you asked a couple of questions

24   about Mr. Lasinski in particular, and I'd like to clarify a

25   few of those in response.

1      First is that Mr. Lasinski himself, when deposed on the

2  topic of restitution and the Ipsos Screenwise model that he

3  used said that -- and I'm quoting -- this data is

4  qualitatively and quantitatively different from the private

5  browsing data at issue.

6      And one of the reasons that he had to admit that at his

7  deposition is because the Ipsos data is not -- is attached to

8  an identity and the private browsing data at issue here is not

9  attached to an identity.

10      And this is actually a good segue into the standing --

11  Article III standing issue because we heard today that

12  plaintiffs admit there is no triable dispute of fact that

13  Google did not link the private browsing data to plaintiff's

14  identities.

15      And I don't mean just plaintiff's Google accounts.  I mean

16  their real life identities, both.  Google didn't do either of

17  those two things.

18      And that's a problem for --

19      **THE COURT:**  Also don't dispute that they could have.

20  Because the expert was able to do it, as I understand it, with

21  a hundred percent accuracy.  Right?

22      I want to make sure I'm understanding the facts.

23      Am I right?

24      **MS. TREBICKA:**  No, Your Honor.  I would like to --

25  no, there -- that is not correct.

1          Well, two -- two responses.  It's besides the standing

2      point or any point, but it's also incorrectly phrased to Your

3      Honor.  And I'd like to clarify it and make it accurate.

4              **THE COURT:**  Okay.

5              **MS. TREBICKA:**  So it's beside the point because the

6      issue as to whether there is harm or not is whether this

7      issue -- this data is linked to an identity and also the very

8      nature of this data.

9          And I'd like to talk more about the nature of the data,

10     but I'll -- I'll got to the second reason, which is it's

11     inaccurate that this data was linked to -- or it's -- rather,

12     it's inaccurate that the expert opinion that they have shown

13     or that they have presented shows that all the data that

14     Google collects can be linked to an identity with a hundred

15     percent accuracy.

16         Rather, what the expert opinion showed is that under very

17     controlled circumstances, where a couple of experts went to

18     browse, then sent -- then asked Google for that data -- for

19     that very specific data to be given back to them, they were

20     able to say, oh, okay.  They were able to check the box and

21     say, oh, yes, that's our data set.  So, therefore, it's a

22     hundred percent accurate that we can determine that someone --

23             **THE COURT:**  Slow down.

24             **MS. TREBICKA:**  -- someone's identity.

25             **THE COURT:**  Slow down.

```
1              MS. TREBICKA:  But that is not what's at issue here.

2         That controlled expert experiment does not prove the point

3    that this data, this private browsing data, is at all times

4    actually linkable to an identity.  And it's not, Your Honor.

5         And on that point, very instructive and comprehensive is

6    our Exhibit 62, which is the testimony of Dr. Glenn Berntson,

7    who was a witness in Your Honor's courtroom in the related

8    Calhoun case in the Rule 56(e) hearing where he explained very

9    carefully why that is not true, why it is true that Google

10   does not link this private browsing data to identities or

11   Google accounts.  And it's also true that it cannot routinely

12   be done.

13        Yes, it may be done under some hypothetical circumstances

14   with sufficient data if all the circumstances are right, but

15   it cannot be done on a routine basis and certainly the reason

16   for that is because Google not only has policies and practices

17   that forbid it -- and that's our facts 63 through 66, Your

18   Honor.  But also because Google backs up its practices and

19   policies with actual technical safeguards against it.  And

20   it's all explained in -- in detail in this Exhibit 62 that I

21   pointed Your Honor to.

22        Your Honor, I'd also like to take us back to the

23   complaint, which is plaintiff' biggest problem, because at the

24   start of the case, what they alleged, pages of -- and pages of

25   it, in their complaint is that Google links routinely and
```

1    always private browsing data to their identities.

2         We challenged it at the motion to dismiss set -- stage and

3    said that's not plausible.  And at the hearing, plaintiffs

4    counsel said, oh, no, we will prove it.  We will prove that

5    that's what you do, Google.  And that is the February 25, 2021

6    hearing on page 29 and 30.

7         And that very promise that plaintiffs will indeed prove

8    that Google links private browsing data to identities was then

9    memorialized in Judge Koh's order, Docket 113 at -- on

10   page 38, where she said it -- it passes the pleadings, they've

11   stated a claim for intrusion upon privacy because they have

12   sufficiently alleged, seven pages of it, that Google links

13   private browsing data to identities.

14        This is -- this is the shrinking case, Your Honor.  Now

15   what they're left with -- we heard that it's not really

16   disputed that Google does not do that.  Now what we're left

17   is, well, in some circumstances, Google could perhaps do that.

18   That is not sufficient, Your Honor.

19        And after two and a half years of scorched-earth

20   discovery, which of most of it you've been spared the disputes

21   of, Your Honor.

22              **THE COURT:**  Yeah, and you all don't come out very

23   clean on that front, do you, because you didn't produce things

24   and you've been sanctioned multiple times, so let's -- the

25   scorched earth could be your fault.

1   But keep going.

2        **MS. TREBICKA:**  Sure, Your Honor.  I would like to

3   address the sanctions, though, because --

4        **THE COURT:**  No, you shouldn't.  You should keep

5   going.

6        **MS. TREBICKA:**  Okay.  That's fine.

7     17,000 megabytes of data we produced, private browsing and

8   other data, for them to find even a single instance where

9   Google links private browsing data to -- to users' identities,

10  and they could not.

11       And, Your Honor, these facts, which are, as we established

12  here today, not genuinely disputed -- in fact, not disputed at

13  all -- cannot give rise to a concrete injury that will clear

14  the Article III standing.

15       And any other conclusion would be a departure from Ninth

16  Circuit precedent on this because where the Ninth Circuit has

17  found standing, it's always been in circumstances where this

18  type of data was linked to an identity.  It was identifiable

19  data.  That's the *In re Facebook Tracking* case.  That's the

20  *Campbell vs. Facebook* case.

21       And the Ninth Circuit, by contrast, has not found standing

22  where the data was not linked to someone's identity.

23        **THE COURT:**  All right.  A response.

24       **MS. BONN:**  Thank you, Your Honor.

25   I'd like to --

```
 1              THE COURT:  I'd like very specific responses on

 2    Exhibit 62 through 66 and the 17,000 megabytes of data.

 3         Go ahead.

 4              MS. BONN:  Yes, Your Honor.  Thank you.

 5         First of all, the 17,000 megabytes of data that was

 6    produced, that is the very data that our expert Mr. Hochman

 7    analyzed and determined could be linked back to a user's

 8    identity --

 9              THE COURT:  And was it --

10              MS. BONN:  -- with hundred percent accuracy.

11              THE COURT:  Was it this controlled experiment with

12    two people?

13              MS. BONN:  Well, let me say two things on that.  Yes,

14    we were forced to experiment because Google --

15              THE COURT:  How many people?

16              MS. BONN:  I'll check with our expert, who's here,

17    Ms. Dye, but I believe there were at least our named

18    plaintiffs.  There are five of them.  Some of their data was

19    returned.  Our expert, Ms. Dye, who's in the back, she was a

20    participant in the experiment.  She also had a helper who was

21    a participant, so I think it was somewhere between five and

22    seven people, but I'll allow myself to be corrected if I got

23    that inaccurately.

24              THE COURT:  And it wasn't data that you took and

25    manipulated to go and specifically find out who it was.  It
```

```
 1    was a reverse engineer in a sense.
 2             MS. BONN:  Correct, Your Honor.  It was a
 3    reverse-engineer.  We essentially had both our named
 4    plaintiffs and our consulting expert browse in Incognito,
 5    browse in regular.  We then had to provide cookie values and
 6    other information for Google.  Google said we need you to tell
 7    us what is the cookie value so we can go into our systems and
 8    pull whatever data we had in our systems tied to those cookie
 9    values and give it back to you.
10             THE COURT:  How is that -- how do you have -- where
11    your control?
12             MS. BONN:  So it's -- I guess let me step back.
13             THE COURT:  Did anybody take the data -- so, you know
14    it's the five or six.
15        Did you give that data to someone who didn't know it was a
16    five or six and --
17             MS. BONN:  Yes.
18             THE COURT:  -- say go tell me and -- tell me who
19    these five or six are.
20             MS. BONN:  Correct, Your Honor.  That's what we did.
21    Let me explain a little bit more clearly.
22        Mr. Hochman is our testifying expert.  The people who
23    worked underneath him and the named plaintiffs were conducting
24    browsing.  Google then produced data that they pulled from
25    their systems associated with cookie values or identifiers we
```

1    provided.

2       And then Mr. Hochman, who was not the person who engaged

3    in the browsing, looked at the data Google produced, and he

4    offers a few opinions.  And was he also unaware of who had

5    done the browsing?

6       **MS. BONN:**  He knew in general who had done the

7    browsing.  He did not know from the data produced ex-ante what

8    data Google produced came from whom.  And using exclusively

9    Google's data, what he was able to do is say, if you look at

10   the entries that are signed in, and their time stamps, their

11   user agent string and air IP address, you can then find over

12   here in the Incognito data traffic that is identifiable by the

13   same time stamp, user agent, and IP address, or vice versa.

14      Likewise, yet another method, that he was able to use user

15   Google's data, is that Google has certain identifiers called

16   PPIDs and UIDs, which also allowed him to demonstrate using

17   Google's data that there are linkages between the Incognito

18   data and the person's actual identity.

19      **THE COURT:**  I can go back and I can look, but I

20   thought I was asking a really simple question, which is that

21   if you take this anonymized data, did you give it to an expert

22   who had no idea who the people were who had been doing the

23   searching, and based upon that data and perhaps other data

24   that was readily accessible, that they could actual identify

25   the individual.

```
 1              MS. BONN:  So our expert Mr. Hochman knew that the

 2     set of five or seven people were doing the browsing, right.

 3              THE COURT:  Did he opine that one could do that?

 4              MR. BOIES:  Yes.

 5              THE COURT:  Did he opine that Google --

 6              MS. BONN:  Yes.

 7              THE COURT:  -- could actually reverse-engineer back

 8     to an actual person?

 9              MS. BONN:  Yes, Your Honor.

10              THE COURT:  Where is the opinion?

11              MS. BONN:  Yes.

12        In Exhibit 8, Mao declaration Exhibit 8 -- to bring it up.

13     I'll point to the specific paragraphs.

14              THE COURT:  All right.  A response on that specific

15     topic.

16              MS. TREBICKA:  So, Your Honor, it -- the -- you asked

17     a pointed question of was this someone who was able to take

18     this data and find the identities linked with the -- with that

19     browsing, the answer is no.  That's not the experiment that

20     was performed.

21        As far as what Mr. Hochman opined, he opined that I see

22     the data.  With this data, if Google were to fingerprint

23     users, use IP address and user agent --

24                   (Off-the-record discussion.)

25              MS. TREBICKA:  -- it could identify someone.
```

1          But that would be, of course, against all the technical

2     safeguards that are in place, which we removed for purposes of

3     the experiment, of course.  And it would violate policy.  And

4     there is absolutely no conclusion that it could be done on --

5     en masse at a large scale because the method that Mr. Hochman

6     would use is using an IP address and a user agent.

7          All of us sitting here today who are connected to a device

8     on the Internet would have the exact same IP address.  And all

9     of us who have, you know, the latest iPhone would have the

10    same user agent.  Multiply by that by thousands, millions,

11    billions of interactions a day, it would be an exercise in

12    futility.

13         But -- but, Your Honor, all of this, the could Google do

14    it is -- is really besides the point when it comes to the law,

15    to what they need to show, to what they alleged they would

16    show, and what they've actually shown.

17         It is not compara- -- they have not actually proven with

18    this statement -- or they cannot prove with the evidence that

19    they have here in response to our statement of undisputed

20    facts -- no jury could find that Google actually does it.

21         No jury could find that Google does what they alleged in

22    their complaint.  And I think that's the critical point here.

23              **THE COURT:**  All right.  Response.

24         **MS. BONN:**  Yes, Your Honor.

25         I'd like to address that in two parts.  So part one, I'd

1    like to just step back to the proposition they're suggesting,

2    which is that the law somehow requires that a company like

3    Google actually link or have a person say, oh, this Incognito

4    data is Amanda K. Bonn.  That argument as a whole has no

5    support in controlling case law.

6         In *In re Facebook Internet Tracking*, the Court said that

7    the critical fact was that Facebook promised not to collect

8    the logged-out data and collected it anyway.

9         And the term that the Court in *Facebook Internet Tracking*

10   used over and over wasn't, quote, "identifying."  The term

11   that they used was that it was "sensitive data."  "Sensitive

12   data."  And the facts that were alleged in that case about why

13   the data was sensitive included that it could be linked to

14   one's profile and that it was information people were browsing

15   when they were logged out of Facebook and had a reasonable

16   expectation of privacy that Facebook would no longer track

17   them.

18        Our case is even stronger because here, people were using

19   a private browsing mode.  And it is the fact that Google

20   nevertheless collected the sensitive private browsing data

21   that is the determinative fact.

22        And under *TransUnion*, which is the -- you know, core

23   Article III case that Google has to contend with, the Court

24   explicitly noted that there would be Article III standing for

25   common law torts like intrusion upon seclusion.  And that is

1    one of our claims here.

2        Google has not cited any law whatsoever that they are

3    allowed to intrude on one's private space --

4            **THE COURT:**  Well, the --

5            **MR. BOIES:**  -- private browsing.

6            **THE COURT:**  Common law analog is just one component

7    of the *TransUnion* analysis.

8            **MR. BOIES:**  Correct, Your Honor.  Correct.  But I

9    think it's illustrative.

10       And here, we also have an intrusion upon seclusion claim.

11   And what Google is basically saying is even if we intrude on

12   your private browsing, that's not enough of an injury.  You

13   have to show not only that we can tie that data to your

14   identity but that we do or that we then disclose it to

15   somebody else.

16       But the harm here is that Google was not supposed to have

17   the private browsing data in the first place.

18           **THE COURT:**  Hold on.

19                   (Pause in the proceedings.)

20           **THE COURT:**  All right.  Go ahead.

21           **MS. BONN:**  And I think that one case that's important

22   is that Google has tried to make this argument elsewhere in

23   this court.  They made the argument in *In re Google Referer*

24   *Header* in front of Judge Davila, and the Court said, no, *In re*

25   *Facebook Internet Tracking* does not require that data

```
 1   collected be linked to one's identity in order to confer
 2   Article III standing.
 3       Google would certainly like to have a rule that no one
 4   could bring any claim or have Article III standing if they
 5   collect your data a as long as they, quote, don't link it back
 6   to your identity.  That will be a free-for-all.
 7       Google could collect all manner of data without consent
 8   after making false representations to people if that were the
 9   rule.  And so there's a reason that Google has repeatedly
10   advocated that position.
11       And we think that the decision in In re Google Header is
12   correct.  We think nothing in --
13           THE COURT:  Was that a appealed?
14           MS. BONN:  Excuse me.
15           THE COURT:  Was that appealed.
16           MS. BONN:  I don't think so yet.  It hasn't been
17   appealed yet, Your Honor.
18           THE COURT:  Is the case concluded?
19           MS. BONN:  I think it's still pending.
20       It might be in settlement --
21           THE COURT:  All right.
22           MS. BONN:  -- phase.
23       Point two, let's assume for a moment that some sort of
24   linkage to one's identity were a requirement -- and for the
25   reasons I've stated, we don't think that it is -- our expert
```

1    Professor Hochman has demonstrated that this data is readily

2    linkable.  And, in fact, Google doesn't contest it.  Google

3    pointed to the testimony of Dr. Bernston [sic].  Dr. Bernston

4    put in a declaration where he said Google doesn't do this.

5    Google has strict policies against doing this.

6        Of course, why would one need a policy to prohibit one

7    from doing that which was not possible in the first place.

8    Nowhere in Dr. Bernston's declaration does he say that Google

9    could not or that another actor could not or that this data

10   isn't linked.

11       And if you look at our Hochman rebuttal report, pages 23

12   to 25 and 26 address how the data is identifying with specific

13   identifiers called a PPID and a -- which is a publisher

14   provided ID and a user ID or UID.

15       And if Your Honor looks at the portion of Mr. Hochman's

16   opinion and -- I apologize.  If you give me a moment -- where

17   he talks about identifying the data with a hundred percent

18   accuracy, some of the methods that he describes are -- are

19   easy to understand.  And I'll go back to the changing room

20   example.

21       If a store has a video of me entering the store with time

22   stamps, it can see what I'm doing, what I'm picking up and it

23   can see when I reached the door that says now you change

24   privately.  And then inside the changing room, they also have

25   a time-stamped recording, but they blur my face.  The notion

1    that, well, we don't know this is you in the changing rooming,

2    but that data set is sitting together with all the prior

3    recordings with my time stamps that show what I'm carrying,

4    that show what I'm walking around with.

5        And so the idea that, well, this isn't identifying

6    because -- even though if one were to look at this

7    holistically, it would be clear that this is Amanda Bonn, we

8    keep that data in two different parts of a log.  I mean,

9    that's essentially what's going on here.

10       Google has logs -- this -- on came out in the sanctions

11   process where they have entries for both Incognito data

12   flagged with the Incognito bit and one's regular browsing data

13   that shows your user agent, IP address, the sites you're

14   visiting, the specific time stamp.

15       And so that's why Dr. Bernston could not and would not

16   represent to this Court that Google cannot identify you with

17   private browsing data.  All he said is we have policies in

18   place that present us, and we don't.

19            **THE COURT:**  All right.

20            **MS. TREBICKA:**  May I respond, Your Honor?

21            **THE COURT:**  Last response.

22            **MS. TREBICKA:**  Yes.  Actually, that is incorrect,

23   that last bit.  Dr. Berntson did say under oath it is for the

24   most part not possible to do so.

25       He -- I --

```
 1              THE COURT:  That sounds --

 2              MS. TREBICKA:  -- direct Your Honor's --

 3              THE COURT:  That sounds qualified.

 4              MS. TREBICKA:  Well, Your Honor, because it is not

 5    possible to do so.  I mean, impossible under any circumstance

 6    is quite a tall order to state.

 7         But what -- what's happening here, though, is that we're

 8    dealing with a class action.  We're dealing with this idea

 9    that plaintiffs are now claiming that Google can do it at --

10    at a drop of hat readily for anyone in the class.  And that is

11    just false.  And that is what all the evidence that we've put

12    in shows.  And Dr. Berntson also said it.

13         Is it possible if you spend a lot of time and you have the

14    right data, the right circumstances, to do it?  Yes, perhaps.

15    But the issue here is not whether it's possible in one of a

16    million cases.  The issue is whether it's actually possible

17    for -- for a class.  And it is not.  And that's what all the

18    evidence shows.

19         Your Honor, in -- the -- we've been talking about the law

20    here, but I'd just like you to think about what plaintiffs are

21    saying in terms of what the law should be and where the Ninth

22    Circuit is at.

23         Plaintiffs are saying that any company should be let --

24    held liable for everything that they are able to do if -- even

25    if it's a one-in-a-million chance.  That's not the law.  That
```

1    should not be the law.  And that is what you'd have to find to

2    be able to find for plaintiffs.

3        The Ninth Circuit appropriately is much more nuanced than

4    that.  And another case that plaintiffs haven't addressed is

5    the *Cahen v. Toyota* case where, really, when we look at the

6    Ninth Circuit decisions, every time the Ninth Circuit has

7    found standing, it's been for data that's linked to an

8    identity.  And every time it has not, it's because in -- in

9    some extent -- to some extent, it was not -- the data was for

10   the linked to an identity.  The *Cahen vs. Toyota* case.

11       And if we're looking at district court decisions, the *In*

12   *re Google Referer* case, to the extent that it goes counter to

13   what the Ninth Circuit has been doing for the last ten years,

14   well, then it should be disregarded.

15       But, again, if we're looking at district court cases, then

16   I -- I find more instructive Your Honor's decision in *I.C. vs.*

17   *Zynga* where one of the reasons that there was no standing for

18   many of same claims at issue here is because the data was

19   anonymized.  The data was not linked to an identity.

20           **THE COURT:**  Okay.  Enough on that one.

21       The next issue is class cert.  And that should be the end

22   of it.

23           **MS. BONN:**  Thank you, Your Honor.

24           **MS. TREBICKA:**  Thank you, Your Honor.

25           **MR. LEE:**  Good afternoon, Your Honor.  James Lee from

1    Boies Schiller Flexner for the plaintiffs.

2         **MR. SHAPIRO:**  Good afternoon.  Andrew Shapiro for

3    Google.

4         **MR. LEE:**  Your Honor, also real briefly, I have

5    Professor Issacharoff and Mr. Yanchunis here.  They -- they

6    may step in to answer some questions if your questions get too

7    hard.

8         I'll just start off right off the bat, Judge.

9    Conceptually, there are two major boxes to check to meet the

10   standard for (c)(4) certification, which is what plaintiffs

11   are seeking today.

12        The first box is have plaintiffs met the requirements of

13   23(a) and 23(b)(2).  The answer to that is unequivocally yes.

14   Your Honor found that the requirements of 23(a) and 23(b)(2)

15   have been met.  And Google acknowledges that these

16   requirements have been met.

17        So what's the second box?  The second box is does (c)(4)

18   certification materially advance the litigation?  The answer

19   to that is also yes.  In this case, we've been litigating now

20   for three years.  We've had over 900 filings.  We've had

21   6 million pages of discovery produced, dozens of depositions,

22   at least a dozen expert retained, special master proceedings,

23   sanctions proceedings.

24        For plaintiffs part, I think the spend is now 40 million

25   in legal fees and costs.  And based on all of this work over

1    the last three years, we are prepared to try a (c)(4) case in

2    November along with the (b)(2).  And that could resolve

3    virtually all of the liability issues for the class.

4        Now Google is hoping you say no to (c)(4).  If you say to

5    no to (c)(4), Google is betting that no one will be -- will

6    bring individual claims because for an individual to do it

7    from scratch, it will be too time-consuming and too expensive.

8    They've said as much in one of their filings.

9        Now, the purpose of Rule 23 and (c)(4) is to prevent this

10   exact outcome.  (c)(4) is there to promote fairness and

11   efficiency by allowing key common issues to be tried just

12   once, leaving only a few individual issues to be tried in

13   follow-on trials.

14       And I doubt Mr. Shapiro will get up here and say it's more

15   efficient to try thousands of cases one at a time from

16   scratch.

17       So what do we -- what are the liability issues that we're

18   specifically seeking to certify under (c)(4)?  It will be the

19   same liability issues as (b)(2)., so the same stuff we're

20   going to do in November for (b)(2), it will be the same proof

21   and the same issues.

22       Google seems to not know what those issues are.  But we've

23   identified all of the liability issues in our trial plan, as

24   Your -- as Your Honor required us to almost a year ago.  We

25   did that back in June with our first class certification

1    motion, and that went to the Court as well as to Google.

2              THE COURT:  So if we -- so why -- why would I go

3    through this process if we've already gone through it?  Why

4    would I carve it out?

5              MR. LEE:  Why would you carve out -- carve out

6    (c)(4)?

7              THE COURT:  Why would I carve out the liability

8    issues?

9              MR. LEE:  Well, I think because the liability issues

10   for --

11             THE COURT:  And the reason that I say it that way is

12   because you just said we've already done this, so --

13             MR. LEE:  I think what I mean "we've already done

14   this," Judge, is that in their papers, Google is saying, what

15   are you seeking to certify?  And we're saying it's the same

16   issues we're going to do under (b)(2).  But if it has a (c)(4)

17   certification, then when the follow-on trials come, we have

18   absolute clarity as to what the findings are that apply to

19   those cases, what the burdens are, and what need not be

20   proven.  And then we get the follow-on trials.  And in the

21   follow-on trials, really all the plaintiff -- the individual

22   plaintiff will need to prove is -- for damages is that there

23   was no implied consent.  And then go damages.

24        So that would be, I think, a one-day trial versus a

25   two-week trial, so I think there's a lot of value in -- in

1   doing (c)(4) this way.  And that's, frankly, what the purpose

2   of (c)(4) is.

3       In -- Judge Posner in *McReynolds* actually tied (b)(2) and

4   (c)(4) together for that very reason because he saw a lot of

5   value in having injunctive relief and then kind of

6   piggy-backing off of those same issues so that follow-on cases

7   could -- could more efficiently be run.

8           **THE COURT:**  Mr. Shapiro.

9           **MR. SHAPIRO:**  I think Your Honor hit the nail on the

10  head with your question to Mr. Lee, which is why would I go

11  through this process if we've already done it?

12      The standard that applies here is abuse of discretion.  No

13  one -- they're asking you to exercise your discretion to take

14  this step.  No one is suggesting that this is legally

15  compelled or that it would be error not to certify.  But

16  certifying would be fraught and if that could be an abuse of

17  discretion, why?

18      First of all, what they're asking you to do is

19  unprecedented.  In every case that they cite where (b)(3) was

20  denied and a (c)(4) was certified, it was only damages that

21  were not common.  In fact, we point out in our brief that they

22  even edited out the key text in the *Spengler* decision, which

23  is the -- page 6 of -- of the -- our opposition.

24      So I'm not saying that every case they cite is damages,

25  but every one in which (b)(3) was denied.  This is certainly

1    not typical.  And I want to refer Your Honor to the Newberg

2    treatise, which the plaintiffs cite and invoke, Newberg and

3    Rubenstein on class action.

4        Okay.  So what Professor Rubenstein and Newberg says is

5    that the -- the most typical use of class certification of --

6    excuse me -- of issue class certification is for damages.  And

7    that makes sense.  Of course, it makes sense.  They -- the

8    plaintiffs cannot point to a single case here in which the

9    exact same issues that were certified in a (b)(2) were also

10   certified in a (c)(4).

11       And let me specifically refer to the *McReynolds* case --

12   the Posner case that Mr. Lee just spoke about -- because if

13   you look at the actual language and what the district court

14   did afterwards upon remand in *McReynolds* was that it kept the

15   issues separate as is supposed to happen.

16       So I'm looking here at the district court decision in

17   *McReynolds*, which is cited by the plaintiffs in their brief.

18   And the district court in that case said -- ordered that

19   pursuant to the Federal Rule of -- sorry -- pardon me.  It is

20   here by ordered that class certification is granted pursuant

21   to Federal Rule of Procedure 23(b)(2) and 23(c)(4) 'cause it

22   had denied all class certification.  And then said ordered

23   that pursuant to 23(c)(4), the class action certified pursuant

24   to 23(b) shall be limited to determining the issues of, and

25   then it lists some issues.

1    So what it said was, I'm going to grant -- I'm going to

2    certify a (b)(2), but I'm going to use (c)(4) to make this

3    (b)(2) trial smaller and carve out some issues.

4    I think the more relevant Posner opinion is really the

5    *Rhone-Poulenc* decision, which also the plaintiffs cite, which

6    says you need to carve carefully at the joint.

7    And I said a moment ago that proceeding this way would be

8    fraught.  It's a especially fraught because the plaintiffs

9    have not clearly identified the issues.  They -- they in their

10   reply accuse us of feigning confusion.  But I think Your Honor

11   can read the briefs.  The plaintiffs in that case say, well,

12   we just want you to certify the liability issues.

13   Well, what are those?  What is the special verdict form

14   that they're asking Your Honor to put together?  What are the

15   questions that they want to be asked to the jurors.  They've

16   done --

17   **THE COURT:**  I hear your point Mr. Shapiro.

18   **MR. SHAPIRO:**  Um.

19   **THE COURT:**  A very --

20   **MR. LEE:**  May I respond real briefly, Your Honor?

21   **THE COURT:**  I will let you.

22   I will also say that I'm not the only one who's been on

23   the bench since 8:00.  My court reporter has not stopped

24   reporting since 8:00 a.m. this morning.

25   **MR. LEE:**  Understood.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1         So Mr. Shapiro raised a couple of things.  The first was
2    this notion that for (c)(4), you have to be a damages --
3    it's -- it's basically just parsing out liability on one side
4    and damages on the other.  And every case he says he --
5         THE COURT:  Could you tell me, what do you expect
6    that verdict form to look like?
7         MR. LEE:  Sure.
8         THE COURT:  What is it going to say?
9         MR. LEE:  I think the verdict form will be -- it's
10   really -- you can do it two ways.  One, the verdict form will
11   either be more of a general verdict form, which says --
12        THE COURT:  How is that at all helpful?
13        MR. LEE:  Well, because if we have -- we have the
14   liability issues taken care of other than implied consent,
15   then the follow-on jury can take that as the findings, and the
16   only things that's limited for the individual cases would be
17   implied consent and damages.
18        I think that's incredibly helpful to a jury when it's --
19   particularly when we're talking about perhaps thousands of
20   follow-on cases.
21        MR. SHAPIRO:  You --
22        MR. LEE:  But what -- what I was trying to get at,
23   Judge, was this notion that -- that it's only -- it can only
24   be damages is -- is just wrong, and the law is pretty clear on
25   this, and --
```

```
1          THE COURT:  I don't.  It may be most typical.  All
2     right.
3          Mr. Issacharoff, you came all the way.
4          MR. ISSACHAROFF:  There's two points -- Samuel
5     Issacharoff for the plaintiffs.
6          There's two points that are raised in the opposition.  The
7     first is that it has to be for the entirety of liability.  I
8     think Judge Stranch's opinion in the Martin case for the Sixth
9     Circuit deals with that and says that's the typical
10    circumstances in which it comes up.
11         But in her opinion there, she lists a series of six or
12    seven issues that will be broken out for trial by the (c)(4)
13    component of it in just a same way that the trial plan here
14    does and that our brief addresses.  I think that that's one --
15    one question of, is this appropriate under any circumstances.
16         The question Your Honor's asking, which I think is -- goes
17    to the matter of the heart of it is, what do you -- what do
18    you gain by this?  What's the plus on this?  And my thought
19    would be that a trial of the (b)(2), as is scheduled for
20    November, would be a trial of many issues that go to the
21    establishment of liability, and the remedy question would be
22    should an injunction issue if the plaintiffs have prevailed.
23         Along the way, the Court will necessarily -- or the jury
24    will necessarily make separate findings as to the discrete
25    elements of the -- the several causes of action they're
```

1    presented.

2        It's messy at that point to say what carries over to the

3    individual cases if the plaintiffs prevail, because clearly

4    there will be the issue preclusion questions, there will be

5    questions of what -- what has been sufficiently established to

6    be the law of the case effectively.

7        **THE COURT:**  Well, but isn't that -- and that's why I

8    asked about a generic verdict form.  I mean, it was suggested

9    that I should have a generic verdict form, which seems to me

10   to be a bit unhelpful, to say it politely.

11       **MR. ISSACHAROFF:**  Yeah, I -- I think that we should

12   -- we will reconsider that position because I think that in

13   order to get an issue class, you need to isolate the issues

14   for the issue class.  And I think that would be done in the

15   (b)(2) context anyway, given the complexity of this case.

16       **THE COURT:**  But couldn't you have a (b)(2) context,

17   have a verdict form with special interrogatories, and isn't

18   that the same as what you're proposing here?

19       **MR. ISSACHAROFF:**  It is and it isn't, Your Honor.

20       In structure, it is the same.  The jury would answer the

21   exact same questions.  In effect, it is not the same because

22   it clarifies what the preclusive effect of those findings will

23   be, that we don't to have re-litigate the -- the preclusion

24   issue in subsequent cases because there would already have

25   been litigation on those questions between every individual

1    class member and Google.

2        And if Google prevails, obviously, that's good for Google.

3    But if we prevail, that means that it streamlines the

4    subsequent proceeding in the way that Mr. Lee just addressed.

5        So I think that the Court would not get -- have any

6    additional work to do and the jury wouldn't have additional

7    work to do from the certification of a (c)(4), but it would

8    streamline the proceedings going forward and also clarify what

9    the boundaries of the preclusion will be from the (b)(2)

10   trial.

11        **MR. SHAPIRO:**  Your Honor?

12        Your Honor, what we have here is a solution in search of a

13   problem.  And maybe it would be useful -- it could be a good

14   law review article, but it's not a good way to manage a case

15   here.  You know, the Newberg treatise also says that it's

16   incumbent upon the plaintiff in a case like this and the Court

17   to very specifically identify what the issues should be.

18        And they're asking to you fly blind here.  And this is a

19   third bite at the apple.  They had some in their brief

20   originally.  You didn't grant it.  They came back and said

21   reconsider.  They put in a brief that just said, it's due to

22   liability issues.  Now they're saying, well, maybe we would

23   have a different special verdict form.  That's a way to walk

24   into error.

25        And if you want to know one thing that's inefficient, it's

1    commissioning [sic] an error and having this case come back

2    because certification was an abuse of discretion.

3        We've also heard essentially a concession that they

4    already have what they need.  If their concern is follow-on

5    cases.  There is something called issue preclusion.  And it

6    may be that future judges in the these hypothetical cases

7    would have to do some assessment of whether issues are

8    precluded or not.  But all of the issues are going to be tried

9    in the (b)(2).

10       Why on earth would we go down this road?  It's more work

11   for everyone with little clarity, in particular when this idea

12   of these hordes of claimants coming forth is as yet

13   hypothetical.  I can tell you as representative of the

14   defendant in this case, today on the six-month anniversary of

15   your ruling denying a (b)(3) class, the total number of people

16   who have come forward and sued Google as individuals on this

17   theory is zero.

18       So it remains to be seen what these future lawsuits will

19   be.  And it can be much more readily dealt with through

20   standard tools of res judicata than by applying what even the

21   plaintiffs concede would be at least an typical (c)(4).

22           **THE COURT:**  Okay.  I'm done.

23       You are at the end of the day, so sorry about that.  But

24   there were other things and other trials that are coming

25   before yours.

1    I'll give it some thought.  Could you -- I just want to --

2    and, again, it's been a long day.

3        The issue of implied consent, is it -- just want to

4    confirm, is it Google's position that that's only a defense to

5    damages at this point?

6            **MR. SHAPIRO:**  No, Your Honor.  Implied consent is in

7    fact an element, as we've laid out in our brief, of some of

8    the claims.  And in other claims, it is also -- it's a defense

9    to liability as to any individual person.

10           **THE COURT:**  I think that -- well, there may be some

11   dispute about that obviously in terms of whose burden it is,

12   but that's for another day.

13       Okay.

14           **MR. SHAPIRO:**  Your Honor?

15       Thank you.  And thank --

16           **THE COURT:**  I can tell you --

17           **MR. SHAPIRO:**  -- court reporter.

18       Can I say literally three sentences on summary judgment?

19       We would -- sentence number one:  We will ask Your Honor

20   to go back and look at the statements of undisputed facts

21   because as we looked through the briefing on this, we said,

22   wow, is that really undisputed?  And then you go to the

23   statements of undisputed facts, and it's not.

24       Sentence number two:  We think it is undisputed that

25   Google never made the specific promise alleged here, which is

1    that the data won't be shared in the way they say it was being

2    shared.

3        And number three:  It is clear that it is undisputed now

4    that Google does not -- there's no evidence that Google

5    actually joins Incognito data with a person's identity.  The

6    issue is only that in some instances, there's a dispute about

7    whether it could.

8        Thank you, Judge.

9        **THE COURT:**  So, again, one of the problems that

10   Google has, and -- and I'll go back and look at this evidence.

11   This was helpful -- is that you're resting your position on

12   the fact that your disclosures, you know, are browser

13   agnostic, and that's a problem for you.

14       But, again, I'll go and see what is there in -- and what

15   is not there in terms of the -- the anonymous information,

16   whether it can be reverse-engineered, how you use it, and how

17   all of that maps onto these various claims, each of which have

18   different causes of action.  I mean, each of which have

19   different elements.

20       I can tell you, given my schedule, I won't be looking at

21   this until July so -- there's just not enough time in the day.

22   So that's why where I am, and I will --

23       I don't think I'm known as a slacker, so I will try to get

24   to it when I -- as soon as I can.

25       Go ahead.  Yeah.

| | |
|---|---|
| 1 | **MR. BROOME:**  One housekeeping. |
| 2 | **MR. SHAPIRO:**  A housekeeping matter. |
| 3 | **MR. BROOME:**  One housekeeping matter, Your Honor. |
| 4 | **THE COURT:**  Okay. |
| 5 | **MR. BROOME:**  We cited a -- I just wanted to correct |
| 6 | this on the record.  We cited a case at page 6 of our reply |
| 7 | brief.  It's *EM General, LLC vs. Electronic Commerce*.  We have |
| 8 | attributed it to Your Honor.  It is not a decision by Your |
| 9 | Honor. |
| 10 | **THE COURT:**  I didn't remember it. |
| 11 | **MR. BROOME:**  It was Judge Birotte.  It was very |
| 12 | well-reasoned, so I guess we just assumed it was Your Honor, |
| 13 | but I just wanted to clarify that for the record. |
| 14 | **THE COURT:**  Okay. |
| 15 | Looking around the courtroom, anybody -- anything else? |
| 16 | Mr. Boies, anything else? |
| 17 | **MR. BOIES:**  Nothing -- nothing, Your Honor. |
| 18 | **THE COURT:**  Okay.  Mr. Shapiro? |
| 19 | **MR. SHAPIRO:**  Thank you for the time and energy, Your |
| 20 | Honor. |
| 21 | **THE COURT:**  All right.  Well, for those of you who |
| 22 | have to fly, I know it's late.  Sorry that you're not getting |
| 23 | that -- well, it's going to be a very late flight for you, but |
| 24 | I'm in the same boat, so I understand. |
| 25 | Okay.  We're adjourned.  Thank you. |

1                (Proceedings were concluded at 3:35 P.M.)

2                                --o0o--

3

4                        **CERTIFICATE OF REPORTER**

5

6                I certify that the foregoing is a correct transcript

7        from the record of proceedings in the above-entitled matter.

8        I further certify that I am neither counsel for, related to,

9        nor employed by any of the parties to the action in which this

10       hearing was taken, and further that I am not financially nor

11       otherwise interested in the outcome of the action.

12

13       _____

14            Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

15                     Saturday, June 3, 2023

16

17

18

19

20

21

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*