**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 7, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DENNIS A. BLACK; ANITA C.
DESELMS, as Trustee of the Anita C.
Deselms Living Trust and for all similarly
situated persons; GROSS WILKINSON
RANCH LLC; JOHN G. WILLIAMS;
THERESA M. WILLIAMS, Trustee for the
John & Theresa Williams Trust dated
July 18, 2019; RUSSELL I. WILLIAMS,
JR., Trustee Russell I Williams Jr
Revocable Trust U/A dated July 27, 1983;
RABOU RESOURCES, LLC, by and
through its manager, a/k/a Ron Rabou;
JOLENE M. SIMKINS; NORMA JEAN
SMITH; RICHARD BAGBY; TRACY
BAGBY; PHYLLIS A. COONEY, Trustee
of the Phyllis A Cooney Trust U/A dated
September 22, 1995; JUSTIN W.
MILLER; BRANDI J. MILLER; MINA
BAYNE; KAREN BRYANT, Individually
and as Trustee of the Karen Bryant Living
Trust dated September 22, 2017; KAREN
BLACK; PHILLIP BROCK CARL
WILLIAMS, Trustee of the Williams
Family Trust U/A dated July 21, 2014;
SUZANNE LEE EKLUND, Trustee of the
Suzanne Lee Eklund Revocable Trust UA
April 25, 2011; JOHN K. MARQUARDT,
Trustee of the John K Marquardt
Revocable Trust UA dated May 1, 2008;
GUST OF WIND, LLC, a Nebraska
limited liability company; PARTY
VIKINGS, LLC, a Colorado limited
liability company; J & L LERWICK
LIMITED PARTNERSHIP; JULIE
JAYNE GOYEN; J. MICHAEL POWERS,
Trustee of the J. Michael Powers

No. 22-8040

Revocable Trust UA dated August 10,
1982; BENJAMIN D. ADKINSON, a/k/a
Benjamin Adkison, a/k/a Benjamin D.
Adkison; KELLI J. ADKISON, a/k/a Kelli
Adkison; VAL D. EKLUND, a/k/a Val
Eklund; SHARRON R. EKLUND, a/k/a
Sharon Eklund; KAREN LESLIE
EKLUND, a/k/a Karen Bryant; JOHN C.
EKLUND, Trustee of the John C. Eklund
Revocable Trust UA April 25, 2011; JOHN
GILBERT WILLIAMS, Trustee of the
John & Theresa Williams Trust dated
July 18, 2019, a/k/a John G. Williams;
THERESA M. WILLIAMS, Individually,

     Plaintiffs - Appellees,

v.

OCCIDENTAL PETROLEUM
CORPORATION; ANADARKO
PETROLEUM CORPORATION;
ANADARKO E&P ONSHORE LLC;
ANADARKO LAND CORP;
ANADARKO OIL & GAS 5 LLC,

     Defendants - Appellants.

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:19-CV-00243-NDF)**

---

Lauren Moskowitz, Cravath, Swaine & Moore, New York, New York (Katherine B.
Forrest, Benjamin Gruenstein, Samantha Hall, Benjamin M. Wylly, Cravath, Swaine &
Moore, LLC, New York, New York, and Darin B. Scheer, Timothy M. Stubson, Crowley
Fleck PLLP, Casper, Wyoming, on the briefs), for Defendants – Appellants.

Samuel Issacharoff, New York, New York (Robert Klonoff, Portland, Oregon; Robert P.
Schuster, Bradley L. Booke, Adelaide P. Myers, Robert P. Schuster, P.C., Jackson,
Wyoming; J.N. Murdock, Murdock Law Firm LLC, Casper, Wyoming; Cody L. Balzer,
Balzer Law Firm, P.C., Loveland, Colorado; Thomas N. Long, Kris C. Koski, Aaron J.

Lyttle, Kaylee A. Harmon, Long Reimer Winegar LLP, Cheyenne, Wyoming; and Laurence O. Masson, Law Office of Laurence O. Masson, Berkeley, California; with him on the brief), for Plaintiffs – Appellees.

———————————————

Before **McHUGH**, **EID**, and **CARSON**, Circuit Judges.

———————————————

**McHUGH**, Circuit Judge.

———————————————

This appeal is from the district court's certification of a class in an antitrust dispute between private landowners holding "many thousands of surface and mineral acres lying within Laramie County, Wyoming," ("Plaintiffs") and Anadarko Petroleum Corporation, a surface and mineral interest owner and operator in Laramie County, and its subsidiaries (collectively "Anadarko"). App. Vol. I at 99. Plaintiffs allege Anadarko's intracompany practice of leasing its mineral interests to its affiliated operating company, including its 30% royalty rate, had the intent and effect of reducing the value of Plaintiffs' mineral interests. Plaintiffs claim Anadarko thereby maintained and furthered its dominant position in the market for leasing oil and gas mineral interests in violation of the Sherman Act § 2 and Wyoming antitrust laws. Plaintiffs seek treble damages and attorneys' fees under § 4 of the Clayton Act.

The district court certified a class action, for liability purposes only, comprised of "[a]ll persons . . . having ownership of Class Minerals during the Class Period." App. Vol. II at 275. Class Minerals were further defined as oil and gas mineral interests that were not under lease to drill and operate wells during the Class Period and that were situated within specified geographic regions of Laramie County and adjacent to sections

of minerals covered by Anadarko's 30% royalty intracompany leases. The Class Period

ran from November 1, 2017, through October 19, 2020.

Anadarko appeals the district court's class certification pursuant to Federal Rule of

Civil Procedure 23(f). We conclude the district court applied the correct legal standard in

deciding whether the class satisfied the requirements of Rule 23, and it did not abuse its

discretion in certifying the class. We therefore affirm the district court's class

certification.

## I.       BACKGROUND

### A.       *Factual History*[1]

### 1.       **Wyoming Oil and Gas Leasing and Development**

Mineral ownership in Laramie County follows a checkerboard pattern, consisting

of odd- and even-numbered one-square-mile "sections." App. Vol. I at 127. This pattern

originated in the 1860s when the federal government granted fee simple title in land to

railroad companies during the construction of the transcontinental railroad. During the

Class Period, mineral interests in the odd-numbered sections of the checkerboard were

predominantly owned by Anadarko. Mineral interests in the even-numbered sections

were predominantly owned by other private landowners, including Plaintiffs.

Smaller mineral interest owners, such as the named Plaintiffs, generally lack the

resources or expertise to develop and market their own minerals. Instead, such owners

---

[1] The following facts are drawn from the parties' briefing, the district court's class
certification order, and the record developed before the district court. They are accepted
as true solely for the purposes of this appeal.

often lease the right to develop their mineral interests in the form of "working interests" to operators. The operators thereby become working interest owners and have the "right to work on the leased property to search for, develop and produce oil and gas and the obligation to pay all costs of production." Wyo. Stat. Ann. § 30-5-304 (a)(viii). This has created a well-established leasing market in Laramie County. Under the established system, the operator typically pays the mineral interest owner a lease "bonus," a one-time payment at the start of the lease, followed by royalties on any revenue generated from development of the leased minerals. In exchange, the mineral interest owner grants the operator the right to develop the leased minerals over the duration of the lease.

Generally, the most economical method for recovering oil and gas in eastern Laramie County is through drilling two-mile horizontal wells. This entails drilling down to the depth of the target formation, then drilling horizontally through the formation for two miles. This dispute relates to two productive formations in eastern Laramie County, the Niobrara and Codell Formations, which are configured such that horizontal stretches run north and south rather than east and west. Because checkerboard sections are approximately one square mile, drilling two-mile horizontal wells necessarily involves drilling through more than one section and therefore impacts mineral interests belonging to multiple owners. Because Anadarko was the mineral interest owner and working interest owner for most of the odd-numbered sections during the Class Period, developing two-mile horizontal wells often required drilling through sections owned or leased by Anadarko.

An operator interested in drilling a two-mile horizontal well must first establish a drilling and spacing unit ("DSU") with the Wyoming Oil and Gas Conservation Commission ("WOGCC") setting out the area to be drilled. *See* Wyo. Stat. Ann. §§ 30-5-104(d)(i)–(ii), (iv); § 30-5-109. Next, the operator must file an application for a permit to drill ("APD") for each desired well in the DSU. *See id.* §§ 30-5-115, 30-5-403. Wyoming operates a first-to-file system, meaning the first operator to file an APD for a given well location in a DSU prevents any other operators from obtaining an APD for that location until the first-filed APD expires, is withdrawn, or is denied. The first-to-file operator enjoys priority over the DSU for the duration of the APD, regardless of whether the operator drills a well.

When the holder of an APD decides to drill a well, it must coordinate with other owners of mineral and working interests in the DSU. To do this, the operator provides all owners in the DSU with information about the proposed well, including the anticipated costs. If all owners consent, they agree to pool their working interests, sharing drilling costs and revenues for the well. If some owners do not consent, the operator can seek an order from the WOGCC to "force[] pool[]" the non-consenting interests. Decl. of Mark Doelger at ¶¶ 30–31, *Black v. Occidental Petroleum*, No. 19-CV-243-NDF (D. Wyo., Mar. 3, 2022), ECF No. 190-4; *see also* Wyo. Stat. Ann. § 30-5-109(f).

When interests are force pooled, the operator must pay the pro-rata share of drilling and completion costs attributable to non-consenting working interest owners and mineral owners. But the operator also receives the non-consenting owner's share of any resulting revenues until certain costs are recouped by the participating owners ("penalty

costs").[2] Wells in Laramie County rarely generate sufficient revenues to satisfy the penalty costs, so non-consenting owners are unlikely to receive any royalties if subjected to forced pooling. However, if the non-consenting party is a working interest owner, the operator initiating forced pooling must pay royalties to the mineral interest owner (the lessor) under the terms of the lease creating the non-consenting working interest. Thus, mineral interest owners whose working interests are under lease are afforded greater protection under Wyoming's force pooling system.

## 2. Anadarko's Intracompany Leases

During the Class Period, Anadarko was uniquely situated as both a mineral interest owner, working interest owner, and operator in Laramie County. Anadarko could, and did, lease mineral interests owned by one of its subsidiaries (Anadarko Land Corp.) to another of its subsidiaries (Anadarko E&P Onshore). Thus, Anadarko could set the terms of the intracompany leases that would govern the royalty it would be paid if another operator "force pooled" its mineral interests.

In November 2017, Anadarko began raising the royalty rates on its intracompany leases to 30%, above what Plaintiffs allege was the historically-prevailing 18–20% royalty rates for leases in Laramie County. Eventually, Anadarko placed 30% intracompany leases on all its non-producing mineral interests in Laramie County.

---

[2] This discussion pertains to Wyoming's force pooling statute in effect during the class period, prior to the statute's amendment in July 2020. *See* 2020 Wyo. Sess. Laws 43. The amended force pooling statute provides unleased mineral interest owners with certain rights and benefits not previously granted.

Anadarko maintained this system of 30% intracompany leases until October 19, 2020, when it sold most of its mineral interests in eastern Laramie County to Orion Mine Finance Group. Immediately prior to the sale, Anadarko amended its intracompany leases, reducing the royalty rate from 30% to 20%.

### B.      Procedural History

In November 2019, Plaintiffs filed suit against Anadarko in the United States District Court for the District of Wyoming. In their operative complaint, Plaintiffs seek damages in accordance with the Sherman Act § 2, the Clayton Act § 4, and Wyoming law for Anadarko's alleged antitrust violations. Plaintiffs allege Anadarko "obtained, maintained, and extended its dominance" in the "market for leasing of oil and gas mineral rights" in Laramie County by (1) creating intracompany oil and gas leases with anticompetitive 30% royalty rates and (2) filing APDs without engaging in drilling or having intent to drill. App. Vol. I at 99–100. Plaintiffs allege these actions constituted a "willful exercise of monopoly or monopsony power[,]" in violation of state and federal

antitrust laws,[3] and injured named Plaintiffs and other putative class members "by the loss of lease royalties, loss of lease bonuses[,] and loss of realization of the full value of their mineral ownership." *Id.* at 131–32. Anadarko denied any system of anticompetitive conduct or intent to monopolize the market for oil and gas leasing and development in Laramie County.

Plaintiffs moved to certify a class of "[a]ll persons . . . having ownership of Class Minerals during the Class Period" subject to specified exclusions not at issue in this appeal. App. Vol. II at 12. Class Minerals were defined as:

> Oil and gas minerals . . . . , as shown by the public records of the Clerk and Recorder of Laramie County, Wyoming, that were:
> (a) Not under an oil and gas lease to drill and operate wells during the Class Period;
> (b) Located in the Niobrara and/or Codell geologic formations in Laramie County, Wyoming, east of the eastern boundary of Range 67W having oil and gas pools that could be reasonably produced as demonstrated by industry's filing of drilling spacing applications or applications for drilling permits in at least 50% of the sections in the relevant township; and
> (c) Located either:

---

[3] "Monopsony power is market power on the buy side of the market" such that "a monopsony is to the buy side of the market what a monopoly is to the sell side." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007). Thus, a monopsony is sometimes referred to as a buyer's monopoly. *Id.* On appeal, Plaintiffs describe Anadarko's position as a monopsonist with alleged monopsony power as a buyer setting onerous terms for would-be sellers. However, the parties are inconsistent in their usage of "monopoly" or "monopsony" in referring to Anadarko's alleged anticompetitive activity. Further, "[t]he kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization." *Id.* at 322; *see Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017) (describing the difference between monopsony and monopoly but expressing that "[t]he same general framework for assessing market power applies" to both alike). Thus, for simplicity, we will default to the term "monopoly."

a. Within one section of a section that had a 30% royalty Intracompany
Lease covering at least 50% of the oil and gas minerals provided the lease
or memorandum of the lease was filed in the Laramie County public
records disclosing the royalty rate, or
b. In a section (or a part thereof) immediately bounded to the north, south,
or both by a section in which Defendants had a 30% royalty Intracompany
Lease as set forth in subparagraph a.

*Id.* at 12–13. The Class Period was defined as the time from July 1, 2016, through

October 19, 2020. Plaintiffs argued the proposed class satisfied all the requirements of

Federal Rules of Civil Procedure 23(a) and 23(b)(3) such that class certification was

appropriate. Alternatively, should the court find individualized damages issues

predominated, Plaintiffs argued the court should still certify the class under Rule 23(c)(4)

for the determination of Anadarko's antitrust liability.

Anadarko opposed Plaintiffs' motion for class certification, arguing Plaintiffs had

failed to meet their burden of satisfying the Rule 23(a) requirements of typicality and

adequate representation or the Rule 23(b)(3) requirements of predominance and

superiority. Specifically, Anadarko argued individual issues regarding market power and

antitrust impact would predominate future proceedings, damages could not be reasonably

calculated or apportioned on a class-wide basis, and its conduct across the class area was

variable and thus did not present an issue common to the class.

The district court granted Plaintiffs' motion in part and certified an issue class,

"for liability purposes only[,]" pursuant to Federal Rule of Civil Procedure 23(c)(4). *Id.* at

275–77. Concluding that claims based on Anadarko's applications for APDs were not

actionable,[4] the court limited Plaintiffs' antitrust violation theory to Anadarko's 30%

royalty intracompany lease actions. Consequentially, the district court adjusted the Class

Period to start on November 1, 2017, the date when Anadarko first instituted its

intracompany leases with 30% royalty rates. The court determined that an issue class,

limited to the issues of antitrust violation and antitrust impact, satisfied the requirements

of Rules 23(a) and 23(b)(3). However, the court found individual inquiries would

predominate the determination of damages. Thus, the court denied class certification as to

damages, instead certifying a liability issue class under Rule 23(c)(4). Anadarko filed a

timely petition for permission to appeal class certification pursuant to Federal Rule of

Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5. This court granted

Anadarko's petition and we exercise appellate jurisdiction under 28 U.S.C. § 1292(e).

## II.        DISCUSSION

Anadarko raises two main issues in its appeal of class certification. First,

Anadarko argues the district court erred in holding Plaintiffs had met their burden of

proving the predominance requirement of Rule 23(b)(3). Specifically, Anadarko argues

the district court erred in concluding the issues of market power and antitrust impact

could be proven on a class-wide basis. Second, Anadarko argues the district court erred in

---

[4] Plaintiffs' proposed theory included the claim that Anadarko applied for APDs without any intent to drill, but rather as part of an effort to block and control oil and gas development in eastern Laramie County. The district court found such conduct was immunized as state action because the alleged harm from Anadarko's APDs arose just as much from Wyoming's regulatory program as from Anadarko's actions consistent with that program.

certifying an issue class under Rule 23(c)(4) without making specific findings as to "why doing so would materially advance the litigation." Appellants' Br. at 52.

We conclude the district court applied the correct standards for determining whether to certify a class under Rule 23(b)(3) and whether an issue class was appropriate under Rule 23(c)(4). And we hold the district court did not abuse its discretion either by concluding the questions of market power and antitrust impact presented common issues capable of class-wide resolution or by certifying an issue class under Rule 23(c)(4). Therefore, we affirm the district court's class certification.

### A.      *Standard of Review*

We review de novo the question of whether the district court applied the proper legal standard in granting class certification. *See Shook v. El Paso Cnty.*, 386 F.3d 963, 967 (10th Cir. 2004). "When the district court has applied the proper standard in deciding whether to certify a class, we may reverse that decision only for abuse of discretion." *Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir. 1988). "[W]e will not disturb the underlying decision unless we have a definite and firm conviction that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). "The district court abuses its discretion when it misapplies the Rule 23 factors—either through a clearly erroneous finding of fact or an erroneous conclusion of law—in deciding whether class certification is appropriate." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1085–86 (10th Cir. 2014).

Federal Rule of Civil Procedure 23 sets forth the requirements for maintaining a class action. The party seeking certification must demonstrate the proposed class satisfies all the requirements of Rule 23(a) and one of the three alternatives provided by Rule 23(b). *See* Fed. R. Civ. P. 23(a)–(b). Here, Plaintiffs requested class certification pursuant to Rule 23(b)(3). Anadarko does not contest the district court's conclusion that Plaintiffs' proposed class satisfies the requirements of Rule 23(a), challenging only the court's assessment of compliance with Rule 23(b)(3).

If the requirements of Rule 23(a) are satisfied, a class action may proceed under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(c)(4) additionally provides that, "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Although other circuits have interpreted this rule to varying degrees, *see Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 273–74 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 2706 (2022) (discussing interpretations of Rule 23(c)(4) from the Second, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits), we undertake this opportunity to do so for the first time in this circuit.

Rule 23's requirements set forth more than "a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Id.* That is, the party seeking class certification must prove the requirements "are *in fact*" satisfied.

*Id.* And the district court must conduct a rigorous analysis, often necessarily "prob[ing] behind the pleadings[,]" to assure itself the requirements for certification are satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). Nonetheless, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). The district court "must generally accept the substantive, non-conclusory allegations of the complaint as true." *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009). But the court must not relax or shift the burden of proof to liberally construe Rule 23's requirements or resolve doubts in favor of certification. *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) ("Relaxing and shifting Rule 23(a)'s strict burden of proof results in an abuse of discretion . . . ." (internal quotation marks and citations omitted)).

### B.    *District Court's Application of the Legal Standard*

Before proceeding to review the district court's application of the Rule 23 factors, we consider whether the court applied the proper legal standard in granting class certification. Anadarko contends the district court failed to apply the appropriately rigorous analysis in scrutinizing whether Plaintiffs' proposed class satisfied the requirements for certification under Rule 23(b)(3).

We conclude the district court applied the correct legal standard in conducting its Rule 23(b)(3) analysis. The court first addressed Rule 23(b)(3)'s requirements of

14

predominance and superiority. Analyzing the elements of Plaintiffs' antitrust claim, the court found that the question of antitrust liability presented common issues, but the question of damages was an individualized issue not suitable for class certification. Next, the court considered the efficiencies of proceeding as a class action, limited to liability, and concluded doing so would be superior to individual litigation. Having found Plaintiffs satisfied Rule 23(b)(3)'s requirements for a liability class, the court considered whether Plaintiffs demonstrated the proposed liability class satisfied Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. While noting that Anadarko seriously contested only the requirements of adequacy and typicality, the court analyzed each of Rule 23(a)'s requirements "for the sake of completeness." App. Vol. II at 270. Thus, the court specifically and clearly addressed the proper factors for class certification under Rules 23(a) and 23(b)(3). *See Shook*, 386 F.3d at 972 (finding the district court erred "by not specifically addressing the traditional Rule 23 factors"). In doing so, the district court did not presume compliance with Rule 23 but rather carefully reviewed whether Plaintiffs had affirmatively demonstrated each requirement for certification was satisfied. Therefore, we hold the district court applied the correct legal standard under Rule 23.

Having determined the district court applied the correct legal standard, we proceed to review Anadarko's arguments that the district court abused its discretion in granting class certification. Specifically, Anadarko objects to the district court's application of the Rule 23(b)(3) requirement of predominance and to its certification of a liability issue class under Rule 23(c)(4). We address each argument in turn.

### C.      *Rule 23(b)(3) Predominance*

Rule 23(b)(3)'s predominance inquiry looks to "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4:49 (5th ed. 2012)). The court should "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *CGC Holding Co., LLC*, 773 F.3d at 1087. Common issues are those for which "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.*, 577 U.S. at 453 (alteration in original) (quoting 2 *Newberg on Class Actions* § 4:50). Individual issues are those for which "members of [the] proposed class will need to present evidence that varies from member to member." *Id.* (quoting 2 *Newberg on Class Actions* § 4:50). Notably, "[i]t is not necessary that all [] elements of the claim entail questions of fact and law that are common to the class." *CGC Holding Co., LLC*, 773 F.3d at 1087.

Sensibly, the predominance inquiry begins "with the elements of the underlying cause of action." *Id.* at 1088 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Plaintiffs allege Anadarko's 30% intracompany leasing program constituted monopolization or attempted monopolization in violation of the Sherman Act

§ 2 and Wyoming law.[5] Section 2 of the Sherman Act prohibits any "monopoliz[ation], or attempt to monopolize, or combin[ation] or conspir[acy] with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To succeed on their monopolization claim, Plaintiffs must prove Anadarko (1) had monopoly power in the relevant market and (2) willfully acquired or maintained that power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). To succeed on their attempted monopolization claim, Plaintiffs must prove the relevant market and Anadarko's (1) "dangerous probability of success in monopolizing" that market, (2) "specific intent to monopolize[,]" and (3) "conduct in furtherance" of its attempted monopolization. *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989). Further, to obtain a private civil remedy and treble damages under the Clayton Act, Plaintiffs must also prove they suffered antitrust impact, that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful[,]" and the amount of damages sustained. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Anadarko argues the district court mischaracterized the central issues of market power and antitrust impact as common and thereby failed to appropriately assess whether common issues would predominate over individual issues.

---

[5] Because the parties' briefing before the district court and on appeal treats Plaintiffs' claims under Wyoming law as coterminous with their Sherman Act claims, we focus on Plaintiffs' Sherman Act claims.

1.      **District Court's Market Power Analysis**

Anadarko argues the district court failed to conduct the appropriately "rigorous"

Rule 23 inquiry and therefore failed to recognize the issue of market power "will involve

highly individualized proof." Appellants' Br. at 31. Specifically, Anadarko argues the

district court made two errors in its Rule 23 analysis. First, the court "accepted Plaintiffs'

methodology for measuring market power on a class-wide basis" without scrutinizing its

validity or applicability to evaluating market power. *Id.* at 44. Second, the court

disregarded the individualized evidence Anadarko proffered regarding market power.

Plaintiffs respond that the district court appropriately credited their expert evidence in

concluding "there will be generalized class-wide evidence that focuses on [] two distinct

product market groups—one where [Anadarko] hold[s] 100% monop[oly] power and the

other where [it] hold[s] 67% monop[oly] power." Appellees' Br. at 25 (quoting App. Vol.

II at 262). Plaintiffs also assert the court correctly found Anadarko's claimed individual

evidence was irrelevant to Plaintiffs' claims, which turn on "generalized class-wide

proof." *Id.* at 26 (quoting App. Vol. II at 264).

Because market power is contextualized by the relevant market, inquiry into an

antitrust defendant's market power necessarily begins with defining the relevant market.

*See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843

F.3d 1225, 1236 (10th Cir. 2016) (explaining that both § 2 monopoly and attempted

monopoly claims require proof of power in a relevant market). The relevant market is

defined in terms of the product market, comprised of "products found to be sufficiently

substitutable," and the geographic market, encompassing "the terrain in which

18

competition takes place." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846

F.3d 1297, 1312 (10th Cir. 2017) (internal quotation marks omitted). Within the relevant

market, "there may be submarkets that are separate economic entities." *Grinnell Corp.*,

384 U.S. at 572. "To demonstrate market power, a plaintiff may show evidence of *either*

[a defendant's] power to control prices *or* [] power to exclude competition" in the

relevant market. *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1315 (internal quotation

marks omitted). These aspects of market power, in turn, depend on various market

characteristics including but not limited to defendant's market share, barriers to entry, the

number of competitors, and market trends. *Id.* A defendant's market share is a necessary,

but not independently sufficient, component of establishing its power in the relevant

market. *Id.*

      a.    *Relevant market*

      Although both parties focus on leasing activity in the Niobrara and Codell

geologic formations in Laramie County, Wyoming, they disagree as to how to define the

relevant market within that area. Both in the district court and on appeal, Anadarko

claims it does "not contest the market definition offered by Plaintiffs," but characterizes

the Niobrara and Codell Formations as consisting of "more than 500 relevant markets."

App. Vol. II at 235. In support, Anadarko points to the declaration of Plaintiffs' expert,

Dr. Wickelgren, opining that "the product market here should be restricted to sections

that can create north-south, two-section, horizontal wells." App. Vol. I at 251. From this,

Anadarko claims Plaintiffs advance a definition of over 500 relevant markets each

comprised of "particular one-square-mile section[s] of the Laramie County checkerboard

with unleased minerals that [were] in or adjacent to a section where Anadarko had [an] intracompany lease[].” Appellants’ Br. at 45. But Plaintiffs never advocated for a definition of 500 relevant markets. Rather, Plaintiffs argue they have “alleged and will prove a relevant mineral leasing market consisting of the area of Eastern Laramie County where oil and/or gas is reasonably producible from the Niobrara and Codell geologic formations.” App. Vol. II at 214. Plaintiffs clarified that the sections within the Niobrara and Codell Formations could “reasonably be aggregated into and analyzed in just two groups,” namely, sections with Anadarko 30% intracompany leases to both the north *and* south and those with such an intracompany lease only to the north *or* south. *Id.*

The district court was “unpersuaded” by Anadarko’s argument that there were over 500 relevant markets. *Id.* at 262. The court acknowledged Dr. Wickelgren “recognize[d] that each section *can* be viewed as its own product market” but noted he went “on to opine that these sections can be grouped by competitive conditions, creating two distinct groups.” *Id.* Based on its understanding of the parties’ arguments and Dr. Wickelgren’s declaration, the court found the relevant market, for class certification purposes, consisted of the “eastern Laramie County market for mineral leases in the north/south-oriented two-section DSUs[,]” which could be further broken down into “two distinct product market groups.” *Id.* at 261–62.

The district court’s market definition, for purposes of class certification, was not a clearly erroneous finding of fact and not an abuse of the district court’s discretion. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 975 (10th Cir. 1990)

("Market definition is a question of fact."). Both parties' proposed market definitions were based on the analysis advanced by Dr. Wickelgren, who concluded:

> [T]he product market should be restricted to potential, contiguous two-section undeveloped oil and gas mineral leases that run north-south. . . . But, following the approach of the [Department of Justice and Federal Trade Commission's Horizontal Merger] Guidelines, these [sections] can be grouped by competitive conditions, creating two distinct groups: sections with a 30% Anadarko royalty in an intra-company lease to both the north and south of the section and sections with a 30% Anadarko royalty only [to] the north or the south, but not both.

App. Vol. I at 238 (footnotes omitted). Anadarko's proposed market definition stopped at the first half of Dr. Wickelgren's conclusions and selectively omitted Dr. Wickelgren's full submarket definition, based on his application of the Horizontal Merger Guidelines.[6] In doing so, Anadarko's proposed market definition failed to include products, here oil and gas leases, "found to be sufficiently substitutable," or to encompass "the terrain in which competition takes place." *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1312 (quotation marks omitted). The court's decision to credit Plaintiffs' definition of the relevant market and submarket groupings, based on the evidence presented, was not clearly erroneous and "falls within the bounds of rationally available choices given the facts and law involved." *Vallario*, 554 F.3d at 1264.

---

[6] The Horizontal Merger Guidelines outline the Department of Justice's and Federal Trade Commission's "principal analytical techniques, practices, and [] enforcement policy . . . with respect to mergers and acquisitions involving actual or potential competitors ('horizontal mergers') under the federal antitrust laws." U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 1 (2010). In part, the Guidelines describe the principles these agencies apply to define the relevant product and geographic market in evaluating a horizontal merger's potential competitive concerns. *See id.* § 4.

b.    *Market share*

In the district court, Plaintiffs argued measuring Anadarko's market share would "turn[] on calculations achievable through generalized proofs . . . , namely, '[h]ow much of the market did [Anadarko] actually lease.'" App. Vol. II at 214 (quoting *Id.* at 172). Plaintiffs argued the relevant market could be analyzed in two subgroups: (1) where Anadarko had 100% monopoly power, corresponding to sections where Anadarko had a 30% intracompany lease to the north *and* south, and (2) where Anadarko had 67% monopoly power, corresponding to sections where Anadarko had a 30% intracompany lease to only the north *or* south. Anadarko responded that, based on its market definition, measuring market power would require individualized evidence regarding each of over 500 relevant markets. Thus, Anadarko argued market power would present an individualized issue, weighing strongly against certification.

Having reviewed and rejected Anadarko's proposal of 500 relevant markets, the district court concluded that "there will be generalized class-wide evidence which focuses on the[] two distinct product market groups" and "individual questions will not arise in determining whether [] Anadarko [] possessed monop[oly] power in the relevant market." *Id.* at 262. The district court acknowledged, but was ultimately unpersuaded by, Anadarko's argument that determining market power will "require[] individualized inquiries . . . based on percentages of leased minerals in [] hundreds of markets." *Id.* at 261–62. Instead, the court found that "Anadarko [] [could] advance common class-wide evidence in an attempt to disprove sufficient monop[oly] power and market share to exclude rivals and suppress competition." *Id.* at 262.

22

On appeal, Anadarko asserts the district court erred by failing to appropriately scrutinize Plaintiffs' proposed methodology for calculating market power and by ignoring Anadarko's proffered individualized evidence rebutting its alleged market power. First, Anadarko argues Plaintiffs' proposed subgrouping methodology "would lead to absurd results" and overcalculate Anadarko's market share. Appellants' Br. at 46. Anadarko challenges Plaintiffs' methodology on the basis that it calculates only market share and disregards other market characteristics needed to determine market power. Second, Anadarko argues it "put forward evidence, not acknowledged by the District Court," rebutting its alleged market power. *Id.* at 51. Anadarko asserts it "proffered individualized evidence—varying market by market, and Plaintiff by Plaintiff—that for reasons that depend on competitive conditions particular to each parcel, Anadarko's strength in markets differed." Reply at 15. For example, Anadarko points to evidence that "third-party operators in fact leased parcels adjacent to Anadarko's intracompany leases, . . . undercut[ting] a finding that Anadarko had the power to exclude competitors." Appellants' Br. at 51.

On review, we perceive no abuse of discretion in the district court's conclusion that market power presents a common question susceptible to generalized class-wide proof as to the two submarkets. Anadarko's contentions, that Plaintiffs' methodology overcalculates market share and that Anadarko lacked power to exclude competitors, both present class-wide rebuttal evidence. Where Anadarko's primary defense is to show that Plaintiffs' methodology is "unrepresentative or inaccurate," "[t]hat defense is itself common to the claims made by all class members." *Tyson Foods, Inc.*, 577 U.S. at 457.

"This is not a case in which the asserted problem . . . 'exhibits some fatal dissimilarity' among class members. . . . Instead, what [Anadarko] alleges is 'a fatal similarity—[an alleged] failure of proof as to an element of the [P]laintiffs' cause of action.'" *Amgen Inc.*, 568 U.S. at 470 (second alteration in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)). "Such a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* Similarly, a challenge to the persuasiveness of Plaintiffs' methodology for determining market power "is, in general, a matter for the jury." *Tyson Foods, Inc.*, 577 U.S. at 459. Because Anadarko's arguments regarding Plaintiffs' proposed methodology for calculating market power challenge the validity and persuasiveness of that methodology on a class-wide basis, the district court correctly concluded that individual issues would not predominate.

Additionally, Anadarko's proposed individualized evidence addresses whether Anadarko had power to exclude competitors from each individual section, not whether Anadarko had power to exclude competitors or control prices *in the relevant market*. While market power depends on various market characteristics in addition to market share, those characteristics apply to the relevant market. For class certification purposes, the district court determined the relevant market was the mineral leasing market in the Niobrara and Codell Formations, divided into two submarkets. Evidence pertaining to barriers to entry, the number of competitors, or market trends must relate to that market, not to each separate section. Thus, the district court's determination, that individual issues will not predominate in a determination of market power in *the relevant market*,

24

was not erroneous. Anadarko may put forth common, class-wide evidence to disprove its alleged monopoly power in the submarkets for mineral leases in the Niobrara and Codell Formations.

Considered overall, the district court applied the correct standard under Rule 23 in determining that Plaintiffs had proved that market definition and market power would "*in fact*" present common questions capable of class-wide resolution. *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Therefore, we may reverse only for abuse of discretion. *See Adamson*, 855 F.2d at 675. The court considered Anadarko's proposed evidence, but ultimately determined "there will be generalized class-wide evidence which focuses on the[] two distinct product market groups." App. Vol. II at 262. Anadarko's rebuttal evidence took two forms: (1) evidence alleging a class-wide failure of proof as to the issue of market power and (2) evidence pertinent to Anadarko's power to exclude competitors from individual sections rather than from the relevant market as a whole or from the two subgroupings of that market. The former presents common rather than individualized evidence, and the latter is irrelevant to a determination of Anadarko's power in *the relevant market*. Therefore, the district court did not exceed the bounds of permissible choice in characterizing the question of market power as a common issue.

## 2.     District Court's Antitrust Impact Analysis

To maintain a private action and recover treble damages under the Clayton Act § 4, a private plaintiff must prove antitrust impact. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This requirement "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's

behavior." *Id.* at 344. Antitrust impact is a "question of law." *City of Chanute v. Williams Nat. Gas Co.*, 955 F.2d 641, 652 (10th Cir. 1992), *overruled on other grounds by Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137 (10th Cir. 1997). The Tenth Circuit employs a two-prong test for determining antitrust impact. *See Comet Mech. Contractors, Inc. v. E. A. Cowen Constr., Inc.*, 609 F.2d 404, 405–06 (10th Cir. 1980). First, a plaintiff must "allege injury to his business or property within the meaning of the [Sherman] Act." *Id.* at 405 (internal quotation marks omitted). Second, a plaintiff "must show proximate causation that the injury directly resulted from a violation of the antitrust laws." *Id.* (quotation marks omitted). This second requirement looks to whether "(1) there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage[,] and (2) [] the illegal act is linked to a plaintiff engaged in activities intended to be protected by the antitrust laws." *Id.* at 406 (quotation marks omitted).

In determining whether antitrust impact presented a common issue, the district court considered both parties' evidence, but ultimately credited Plaintiffs' expert evidence showing Anadarko's anticompetitive conduct created "negative impacts to every mineral owner in the area" by "reduc[ing] [] the value for all mineral interests owned by the class" such that class members were "excluded from the market." App. Vol. II at 265. In the court's view, Anadarko's proffered individualized evidence regarding antitrust impact showed the presence of uninjured class members or a general failure of Plaintiffs' proof of antitrust impact, neither of which impeded class certification. Ultimately the court found Plaintiffs' evidence and theory of antitrust

impact common to the class such that "proving an impact theory for a single class member would prove it for all without the need for individualized inquiry." *Id.* at 267–68.

Anadarko contests the district court's conclusion and argues individualized inquiries will be required to prove whether a causal connection exists between its alleged antitrust violation and Plaintiffs' alleged injury. Anadarko argues the district court erred by disregarding its proffered individualized evidence of antitrust impact and that this error ensued from (a) the district court's misinterpretation of *In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014), to create an inference of class-wide impact and (b) its misstatement of Plaintiffs' theory of impact as "reduction in value of [] mineral interests, rather than . . . a loss of lease bonuses and royalties." Appellants' Br. at 27. Plaintiffs respond that Anadarko's individualized evidence could demonstrate the presence of uninjured class members or a failure of Plaintiffs' proof of class-wide impact, but not that the issue of antitrust impact is unfit for class-wide resolution. Additionally, Plaintiffs assert the district court correctly understood *In re Urethane* as standing for the proposition that the presence of some uninjured class members does not defeat a finding of predominance and also correctly understood Plaintiffs' theory of antitrust impact.

We begin by addressing Anadarko's arguments regarding the district court's interpretation of *In re Urethane* and its understanding of Plaintiffs' theory of harm. We then turn to Anadarko's assertion that the court erred by disregarding its individualized evidence and by determining that antitrust impact presented a common issue. Ultimately, we conclude the district court did not abuse its discretion in classifying antitrust impact as a common issue.

a.     *In re Urethane Antitrust Litigation*

*In re Urethane* involved claims by industrial purchasers of polyurethane products

that the defendant, together with a group of polyurethane manufacturers, conspired to fix

prices for polyurethane chemical products in violation of the Sherman Act § 1 and the

Clayton Act § 4. 768 F.3d at 1249–50. Plaintiffs presented the district court with expert

evidence that common, economic analysis of the polyurethane industry could prove

antitrust impact by showing the defendant's antitrust violation "artificially inflated list

prices influenc[ing] all or nearly all customers' transaction[s]." *In re Urethane Antitrust

Litigation*, 237 F.R.D. 440, 451 (D. Kan. 2006). The defendant contended plaintiffs'

methodology was flawed because prices were established through individualized

negotiations such that specific, separate "inquir[i]es of actual transaction prices would be

necessary to show impact." *Id.* at 450. The district court certified plaintiffs' 23(b)(3)

class, concluding antitrust impact could be proven by common evidence on a class-wide

basis. *Id.* at 451.

The defendant appealed, contending the issue of antitrust impact "involved

individualized questions because the class members experienced varying degrees of

injury, with some avoiding injury altogether." *In re Urethane*, 768 F.3d at 1254.

Affirming class certification, this court noted that, "[u]nder the prevailing view, price-

fixing affects all market participants, creating an inference of class-wide impact even

when prices are individually negotiated." *Id.* Such an inference "is especially strong

where . . . there is evidence that the conspiracy artificially inflated the baseline for price

negotiations." *Id.* Ultimately, this court concluded the district court "could reasonably

28

weigh the evidence and conclude that price-fixing would have affected the entire market, raising the baseline price for all buyers" such that antitrust impact presented a common issue. *Id.* at 1255.

In the district court, Plaintiffs and Anadarko disputed the relevance of *In re Urethane* to the certification of Plaintiffs' proposed class. Plaintiffs argued, similar to the *In re Urethane* plaintiffs, that Anadarko's royalty rate "affected the entire market," altering the baseline price for all negotiations. App. Vol. II at 157–58. Plaintiffs characterized their impact argument as the reverse of that in *In re Urethane*: rather than anticompetitive pricing inflating the baseline price for buyers, Plaintiffs alleged Anadarko's 30% royalty rate deflated the baseline price for sellers. Anadarko sought to distinguish *In re Urethane* because "Plaintiffs' claimed injury [was] not that they were offered lower lease prices . . . , but rather that [Anadarko] prevented them from leasing their Class Minerals altogether." *Id.* at 240. Anadarko argued that "[e]ven if Plaintiffs could use common evidence to show a general effect on the leasing market," they had not presented common evidence to show whether, but for Anadarko's conduct, Plaintiffs would have leased their Class Minerals. *Id.*

The district court credited Plaintiffs' expert evidence as providing common proof that Anadarko's 30% intracompany leasing program created a reduction in the value of mineral interests in the class area. The district court concluded that, at the class certification stage, Plaintiffs were not required to present class-wide proof identifying, or demonstrating the absence of, "individual class members who were not injured by the alleged antitrust violation." *Id.* at 265. The court opined that such a burden would be

29

inconsistent with the "'prevailing view' that anticompetitive actions affect all market participants, 'creating an inference of class-wide impact' even in cases where mineral leases are individually negotiated." *Id.* at 265–66 (quoting *In re Urethane*, 768 F.3d at 1254). The court noted that an inference of class-wide impact was supported by "evidence that Anadarko's intra-company 30% royalty rate lowered the value of neighboring mineral interests, or at least lowered the starting point for any operator interested in leasing the neighboring minerals." *Id.* at 266.

On appeal, Anadarko argues the district court misread *In re Urethane* to justify a presumption of class-wide antitrust impact in all cases alleging anticompetitive conduct. We agree that *In re Urethane* does not endorse such a broad presumption. *In re Urethane* is limited to its facts, in particular plaintiffs' evidence of the polyurethane industry's standardized pricing structure, the defendant's price-fixing conspiracy, and the artificially inflated baseline for pricing negotiations. *See In re Urethane*, 768 F.3d at 1251, 1254–55. This evidence supported a reasonable conclusion that "price-fixing would have affected the entire market." *Id.* at 1255.

Although we reject an expansive reading of *In re Urethane*, we are not convinced the district court decision relied on *In re Urethane* to presume the existence of class-wide antitrust impact here. To be sure, the district court's summary of the "prevailing view" identified in *In re Urethane* suggests antitrust impact could be inferred rather than proven. *See* App. Vol. II at 265–66. Considered in context, however, the court did not actually presume the existence of class-wide impact. Rather, the district court credited Plaintiffs' expert evidence and concluded Plaintiffs could be expected to prove their

claimed antitrust impact through common proof. The court was unpersuaded by

Anadarko's contention that the presence of, or need to identify, uninjured class members

made antitrust impact an individualized issue, and the court invoked *In re Urethane* to

support its conclusion that Plaintiffs should not be required "to show class-wide antitrust

impact at the certification stage." *Id.* at 266. Contrary to Anadarko's assertion, the court

did not rely on *In re Urethane* to relax or shift Plaintiffs' burden of proving that antitrust

impact presented a common issue. *See Wallace B. Roderick Revocable Living Tr.*, 725

F.3d at 1218 (holding the district court abused its discretion by relaxing and shifting

plaintiff's burden of proving actual conformity with the requirements of Rule 23). In four

pages of analysis, the district court carefully weighed the evidence and concluded

Plaintiffs could demonstrate that Anadarko's alleged anticompetitive conduct affected the

entire market, lowering the baseline value of all neighboring mineral interests to such an

extent that class members were unable to lease their interests. Despite the district court's

inapt quoting of *In re Urethane*, we are satisfied that the court did not relax or shift

Plaintiffs' burden of proof.

      b.   *Plaintiffs' theory of impact*

     Next, Anadarko argues the district court "misstated Plaintiffs' theory of antitrust

impact" and used that misstated theory to justify ignoring Anadarko's individualized

evidence. Appellants' Br. at 41. Anadarko understands Plaintiffs' theory of impact to be a

"*loss of lease royalties* and *loss of lease bonus payments* that they otherwise would likely

have received." *Id.* at 41–42 (quoting App. Vol. I at 108). Anadarko asserts the district

court erred in stating the theory of impact as "a reduction of the value for all mineral

interests owned by the class[,]" *id.* at 41 (quoting App. Vol. II at 265), which Anadarko frames as "a reduction in the value of minerals" or "a reduction in value of the rights owned by Plaintiffs," *id.* at 42. Thus, Anadarko argues the court could not have found "a class-wide reduction in mineral value could be proven by common evidence" because "Plaintiffs have made zero attempt to calculate how much Anadarko's purportedly anticompetitive conduct reduced the value of those minerals." *Id.*

Plaintiffs respond that they never contended that "the level of production or non-production of oil and gas in eastern Laramie County sets the value of the underlying minerals." Appellees' Br. at 32. That is, Plaintiffs have never claimed Anadarko's alleged anticompetitive conduct affected the monetary value that oil and gas, once extracted from eastern Laramie County, would have when offered for sale. Rather, Plaintiffs argued, and the court found, that common proof could be used to prove antitrust impact based on "a reduction of the value of all mineral *interests* owned by the class." *Id.* at 33 (quoting App. Vol. II at 265) (emphasis added). Plaintiffs clarify that their claimed reduction of the value of mineral interests is, in turn, "based on the inability to exploit the mineral deposits [or] . . . to lease minerals to those who might more effectively realize the value of the underlying minerals." *Id.* In short, Plaintiffs argue Anadarko fundamentally misunderstood Plaintiffs' theory of impact as affecting "the value of the minerals themselves." *Id.*

We agree with Plaintiffs and conclude that the district court's statement of Plaintiffs' antitrust impact theory was not clearly erroneous. First, there is nothing in the district court's opinion to support Anadarko's suggestion that the court understood

Plaintiffs' impact theory to be a reduction in the value of their extracted minerals. As

Plaintiffs note, their claim is a reduction in "the value one gets from being able to drill or

to lease to those who wish to drill[,]" not a reduction in "the value of the minerals

themselves." *Id.* at 33. Moreover, the district court correctly understood Plaintiffs' impact

theory to be "a reduction of the value for [] mineral *interests*" as demonstrated through

"the lack of lease offers and lower realized lease bonuses" and "the lack of wells drilled

by competitors in proximity to Anadarko's 30% royalty leases." App. Vol. II at 265

(emphasis added) (footnote omitted). As Plaintiffs argued before the district court, in

their briefing on appeal, and at oral argument, the alleged loss of lease royalties and

bonus payments is an element demonstrating their theory of antitrust impact: a class-wide

reduction in value of mineral interests. *See* App. Vol. I at 132 (pleading injury including

"the loss of realization of the full value of their mineral ownership."); App. Vol. II at

157–58 (framing Plaintiffs' theory of impact as an artificially lowered baseline price);

Appellees' Br. at 33; Oral Argument at 19:43–52, *Black v. Occidental Petroleum*, No.

22-8040 (10th Cir. Mar. 21, 2023) ("We've alleged no leasing as an element of the

reduction in value of the class's mineral interests.").

     *c.*     *Antitrust impact is a common issue*

     Having addressed Anadarko's precursory arguments, we now reach Anadarko's

claim that the district court abused its discretion in concluding antitrust impact could be

determined through class-wide evidence. Both in the district court and on appeal,

Anadarko argues that, to prove antitrust impact, Plaintiffs must show that, but for

Anadarko's 30% intracompany leases, class members would have leased their working

interests. Anadarko contends this would devolve into a series of highly individualized inquiries because "whether a particular parcel is attractive for horizontal drilling—and therefore likely to be leased—depends on a number of factors that are particular to each parcel, and [that] vary significantly across eastern Laramie County." Appellants' Br. at 32. These factors include: geological characteristics, availability of data regarding potential productivity, proximity to existing infrastructure or active drilling, which operator holds the DSU for a given area, the extent to which a section is surrounded by Anadarko's 30% intracompany leases, whether a section is covered by Anadarko's APDs, and the observed leasing outcomes for other mineral owners in or around a given section. Based on these factors, Anadarko asserts that determining antitrust impact would require numerous individualized inquiries and that a large portion of the class would be unable to prove they suffered any antitrust impact stemming from Anadarko's leasing program.

Plaintiffs respond that Anadarko's proposed but-for proof requirement would present "a virtually insurmountable burden of proof" by requiring each individual plaintiff to prove "the likely terms of a nonexistent exchange in a blocked market." Appellees' Br. at 29 (quotation marks omitted). Moreover, Plaintiffs argue that, by the class definition, all class members were unable to lease their mineral interests during the class period. And ultimately, if Plaintiffs fail to establish that Anadarko's anticompetitive conduct "materially caused those losses," that would constitute a failure of proof which would result in Anadarko's class-wide victory. *Id.* at 31–32. Plaintiffs emphasize that the question at class certification is "whether the method by which plaintiffs propose to prove

34

class-wide impact *could* prove such impact, not whether plaintiffs *in fact can* prove class-wide impact." *Id.* at 32 (quotation marks omitted) (emphasis added).

In certifying the class, the district court considered Anadarko's argument for requiring proof of what leasing decisions would occur in a but-for world and its evidence that such an inquiry would depend on highly variable, individualized factors. But the court rejected Anadarko's argument and held that Plaintiffs' theory of antitrust impact, and burden at class certification, "does not require proof that *every* mineral owner lost value due to the alleged antitrust violation." App. Vol. II at 267. Rather than defeating predominance, the court viewed Anadarko's proposed evidence of variable factors affecting Plaintiffs' leasing outcome as relevant to "rebut the assumptions underlying Plaintiffs' theories" or to challenge "the persuasiveness of Plaintiffs' evidence." *Id.* The court concluded that Plaintiffs had proffered evidence in support of an impact theory that was "common to all class members" such that "proving [it] for a single class member would prove it for all without the need for individualized inquiry." *Id.* at 267–68.

Contrary to Anadarko's contention, the district court explicitly considered Anadarko's individualized evidence but found it did not defeat predominance. Instead, the court considered Anadarko's evidence as challenging the persuasiveness of Plaintiffs' expert evidence or demonstrating the presence of uninjured class members. This was not an erroneous interpretation of the evidence. Plaintiffs bear the burden of proving antitrust impact, including that Anadarko's alleged anticompetitive conduct was "a substantial factor" in Plaintiffs' inability to lease their mineral interests. *Comet Mech. Contractors, Inc.*, 609 F.2d at 406 (quotation marks omitted). Plaintiffs' inability to do so would not

result in individualized questions overwhelming the questions common to the class; instead, a failure of proof on the element of antitrust impact would end the litigation for all. *See Amgen Inc.*, 568 U.S. at 467. Anadarko's evidence that other factors affected the desirability of leasing mineral interests, or that numerous mineral interests were in fact leased adjacent to its 30% intracompany leases, does not point to "some fatal dissimilarity" among class members, but rather to a "fatal similarity[.]" *Id.* at 470 (quoting Nagareda, *supra*, at 107). Namely, Anadarko's evidence might show that its intracompany leasing program was not a substantial factor in Plaintiffs' inability to lease their interests because (1) numerous other external factors made it undesirable for operators to lease interests in the class minerals; and (2) many non-Plaintiffs did successfully lease their mineral interests to operators, despite being subject to the same neighboring 30% intracompany leases that Plaintiffs complain of. These contentions present a class-wide defense or undermine the persuasiveness of Plaintiffs' evidence that Anadarko's intracompany leasing program materially caused their losses. The district court correctly reasoned that such matters are properly left for summary judgment or trial, not for resolution at class certification. *Id.* (holding failure of plaintiffs' proof of an essential element is properly addressed at summary judgment or trial, not at class certification); *Tyson Foods, Inc.*, 577 U.S. at 459 (holding "persuasiveness is, in general, a matter for the jury" and not grounds for denying class certification unless "no reasonable juror could have believed" plaintiffs' evidence of an essential element of their claim).

Additionally, the district court correctly concluded that Plaintiffs are not required to prove antitrust impact as to every class member at the class certification stage. The presence of class members who experienced varying degrees of injury, including some who were altogether uninjured, does not bar class certification—particularly here, where damages were not part of the issue class certified but were left for individual determination after liability is resolved. *See In re Urethane*, 768 F.3d at 1254 (rejecting defendant's contention that antitrust impact was an individualized inquiry because of class members' varying degrees of injury or the presence of uninjured class members). The successful identification of uninjured class members is, at this juncture, premature. *See Tyson Foods, Inc.*, 577 U.S. at 461 (holding the question of identifying uninjured class members was premature following return of a jury verdict and aggregate damages award for plaintiffs but that defendants could challenge any proposed method of allocating damages "when the case return[ed] to the District Court for disbursal of the award"). The predominance inquiry at class certification asks to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries— not whether such issues are likely to be resolved in Plaintiffs' favor. *Id.* at 453; *Amgen Inc.*, 568 U.S. at 467. A class including a significant portion of members "who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct, . . . is defined too broadly to permit certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) (emphasis added). But a class may still be properly certified even if it "consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm." *Id.* If, hypothetically speaking, the certified

37

class consists entirely of Plaintiffs who cannot show Anadarko's alleged anticompetitive conduct was the proximate cause of their injury, the result would not be devolution into a myriad of individual inquiries but rather a verdict in Anadarko's favor.

Considered overall, the district court applied the correct standard under Rule 23 in looking to whether Plaintiffs had demonstrated that the issue of antitrust impact presented common questions capable of class-wide resolution. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350 (explaining that a party seeking class certification "must affirmatively demonstrate" the proposed class satisfies the requirements of Rule 23). Therefore, we may reverse only for abuse of discretion. *Adamson*, 855 F.2d at 675. Contrary to Anadarko's contention, the district court did consider its proffered individualized evidence, but ultimately decided such evidence either (1) challenged the persuasiveness or underlying assumptions of Plaintiffs' common, expert evidence of antitrust impact or (2) demonstrated the potential existence of uninjured class members. The court weighed the parties' evidence and concluded Plaintiffs could demonstrate through class-wide proof that Anadarko's alleged anticompetitive conduct lowered the baseline value of all neighboring mineral interests to such an extent that class members were unable to lease their interests. Therefore, the district court did not exceed the bounds of permissible choice in determining the question of antitrust impact presented a common issue.

Having determined the district court did not abuse its discretion in categorizing the questions of market power and antitrust impact as common issues, we conclude the court likewise did not err in determining common questions would predominate in a determination of antitrust liability. Where all essential elements are susceptible to

common proof, the district court correctly determined that common questions would predominate the issue class.

### D.   Certification of an Issue Class Under Rule 23(c)(4)

Because the district court determined Plaintiffs had failed to demonstrate that common questions predominated the issue of damages, it declined to certify the class for all purposes under Rule 23(b)(3). Instead, the court certified a liability issue class under Rule 23(c)(4). Drawing on the interpretation of Rule 23(c)(4) by the Districts of Kansas and Colorado, Anadarko contends the district court erred in certifying a liability class because it "made no findings as to why doing so would materially advance the litigation." Appellants' Br. at 52. Anadarko further argues certification of an issue class "clearly [would] not" materially advance the litigation "once the two key liability issues— antitrust impact and market power—are correctly seen as individualized issues." *Id.* Plaintiffs respond that the district court went beyond finding certification of an issue class would "materially advance the litigation," Appellees' Br. at 34, by finding it would "drive the litigation and generate common answers that will determine liability in a single stroke," *id.* (quoting App. Vol. II at 270). Plaintiffs further contend that resolution of the issue class would in fact materially advance the litigation.

We begin by addressing the applicable law for certification of an issue class under Rule 23(c)(4). As a matter of first impression in this circuit, we hold that certification of an issue class is appropriate when the issue class itself satisfies the requirements of Rules 23(a) and 23(b). Then, we turn to the parties' arguments regarding (1) whether the district

court applied the correct standard and made the requisite findings to certify an issue class

and (2) whether certification of an issue class was appropriate under Rule 23(c)(4).

## 1.     Applicable Law

Rule 23(c)(4) states, in its entirety, "When appropriate, an action may be brought

or maintained as a class action with respect to particular issues." This court has not

opined on how it would apply Rule 23(c)(4). *See, e.g.*, *Morris v. Davita Healthcare*

*Partners, Inc.*, 308 F.R.D. 360, 374 (D. Colo. 2015). But nearly all other circuits that

have interpreted Rule 23(c)(4) agree issue class certification is appropriate when the issue

class itself satisfies the requirements of Rule 23(a) and the predominance and superiority

requirements of Rule 23(b)(3). This interpretation has been adopted by the Second,

Fourth, Sixth, Seventh, and Ninth Circuits. *See, e.g.*, *In re Nassau Cnty. Strip Search*

*Cases*, 461 F.3d 219, 226–27 (2d Cir. 2006); *Gunnells v. Healthplan Servs., Inc.*, 348

F.3d 417, 441 (4th Cir. 2003); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d

405, 413 (6th Cir. 2018); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005);

*Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The Third Circuit

has taken a more detailed approach, asking first whether the proposed issue class meets

the requirements of Rules 23(a) and 23(b) then whether certification of an issue class is

"appropriate" based on rigorous consideration of a non-exclusive list of factors.[7] *Russell*,

15 F.4th at 270; *see also id.* at 272 (concluding the district court abused its discretion by

failing to "rigorously consider" several of the relevant factors); *Gates v. Rohm & Haas

Co.*, 655 F.3d 255, 273 (3d Cir. 2011) (setting forth a non-exclusive list of factors to

guide courts' application of Rule 23(c)(4)). Only the Fifth Circuit has applied Rule

---

[7] The Third Circuit has adopted a non-exclusive list of nine factors to guide courts
faced with motions to certify an issue class:

> 1. the type of claim(s) and issue(s) in question;
> 2. the overall complexity of the case;
> 3. the efficiencies to be gained by granting partial certification in light of
> realistic procedural alternatives;
> 4. the substantive law underlying the claim(s), including any choice-of-law
> questions it may present and whether the substantive law separates the
> issue(s) from other issues concerning liability or remedy;
> 5. the impact partial certification will have on the constitutional and
> statutory rights of both the class members and the defendant(s);
> 6. the potential preclusive effect or lack thereof that resolution of the
> proposed issue class will have;
> 7. the repercussions certification of an issue(s) class will have on the
> effectiveness and fairness of resolution of remaining issues;
> 8. the impact individual proceedings may have upon one another, including
> whether remedies are indivisible such that granting or not granting relief to
> any claimant as a practical matter determines the claims of others;
> 9. and the kind of evidence presented on the issue(s) certified and
> potentially presented on the remaining issues, including the risk subsequent
> triers of fact will need to reexamine evidence and findings from resolution
> of the common issue(s).

*Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 268 (3d Cir. 2021),
*cert. denied*, 142 S. Ct. 2706 (2022) (citing *Gates v. Rohm & Haas Co.*, 655 F.3d 255,
273 (3d Cir. 2011)). The Third Circuit has added that certification of an issue class may
still be appropriate, even if resolving the issue class will not resolve defendant's liability,
"provided that [] certification substantially facilitates the resolution of the civil dispute,
preserves the parties' procedural and substantive rights and responsibilities, and respects
the constitutional and statutory rights of all class member and defendants." *Id.* at 270.

23(c)(4) to require that the entire cause of action, not just the contemplated issue class,

meet the predominance requirement. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21

(5th Cir. 1996). However, the Fifth Circuit has since indicated its retreat from this

application and toward embracing the same perspective as the majority of circuits to have

addressed the issue. *See In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir. 2014)

("[P]redominance may be ensured . . . when a district court performs a sufficiently

rigorous analysis of the means by which common and individual issues will be divided

and tried. In many circuits, this has been accomplished by means of multi-phase trials

under Rule 23(c)(4), which permits district courts to limit class treatment to particular

issues and reserve other issues for individual determination." (internal quotation marks

omitted)); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006)

(noting subclasses or bifurcation might "remedy [] the obstacles preventing a finding of

predominance" but plaintiffs had not proposed bifurcation or subclasses to the district

court).

      Within this circuit, the Districts of Colorado, Kansas, Wyoming, and Utah have all

interpreted Rule 23(c)(4) consistent with the Second, Fourth, Sixth, Seventh, and Ninth

Circuits. *See Morris*, 308 F.R.D. at 374–75, 379; *In re Motor Fuel Temperature Sales*

*Pracs. Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013); *In re Copley Pharm., Inc.*, 161 F.R.D.

456, 461–62 (D. Wyo. 1995); *Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366,

384–85 (D. Utah 2020). The Districts of Kansas and Colorado have elaborated on their

application of Rule 23(c)(4), opining that certification of an issue class is appropriate if

the requirements of Rules 23(a) and 23(b) are satisfied with respect to the issue class and

42

"resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *In re Motor Fuel*, 292 F.R.D. at 665 (quotation marks omitted); *see also Morris*, 308 F.R.D. at 379 (quoting *In re Motor Fuel*, 292 F.R.D. at 665). In contrast, certification of an issue class would be inappropriate "if [the] noncommon issues are inextricably entangled with common issues or . . . are too unwieldy or predominant to be handled adequately on a class action basis." *In re Motor Fuel*, 292 F.R.D. at 665 (quotation marks omitted).

We now join our sister circuits in holding that certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself satisfies the requirements of Rules 23(a) and 23(b). Therefore, when a class action is pursued under Rule 23(b)(3), the contemplated issue class must meet all the requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3). Subsumed in consideration of whether treatment as an issue class is "superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), is whether resolution of the issue class will "materially advance" resolution of the dispute. *See In re Motor Fuel*, 292 F.R.D. at 665. But this consideration is not a magic phrase the district court must recite prior to certifying an issue class. Rather, it is a pertinent consideration to finding whether Rule 23(b)(3)'s superiority requirement is met.

## 2.   District Court's Application of the Legal Standard

Having clarified this circuit's interpretation of Rule 23(c)(4), we consider whether the district court applied the correct standard. Anadarko's primary objection to the district court's issue class certification is that the court failed to "make *any* findings that

43

certifying an issues class would materially advance [the] litigation." Appellants' Br. at

54. Specifically, Anadarko argues the district court failed to consider "the unwieldy

effects an issues class would create." *Id.*

We are satisfied the district court applied the correct legal standard in determining

whether certification of a liability issue class was appropriate. The district court's

certification order did not use the words "materially advance" or include a separate

section addressing whether an issue class was appropriate. Nonetheless, it is apparent the

court incorporated its analysis of whether an issue class was appropriate into its

consideration of Rule 23(b)(3)'s superiority requirement. The court concluded:

> [T]here are two common questions that could yield common answers at
> trial: the existence of an antitrust violation and the existence of impact.
> These questions will drive the litigation and generate common answers that
> will determine liability in a single stroke. Therefore, the Court finds that
> Plaintiffs have met their burden to show "that a class action [on liability] is
> superior to other available methods for fairly and efficiently adjudicating
> the controversy."

App. Vol. II at 270 (quoting Fed. R. Civ. P. 23(b)(3)) (second alteration in original). The

court also noted the efficiencies of certifying a liability issue class, concluding "there is

no reason to burden either the courts or the parties with the requirement to file individual

suits, secure costly experts, and repeatedly litigate the same elements of an antitrust

liability case." *Id.* And the district court did not presume Rule 23's requirements were

met; it carefully considered whether the requirements of Rule 23(a) and 23(b)(3) were

actually met as to the contemplated issue class such that certification was appropriate.

Therefore, the district court applied the correct legal standard under Rule 23(c)(4).

3.     **District Court's Issue Class Certification**

Lastly, Anadarko argues certification of a liability issue class was not appropriate

because much of the evidence critical for determining damages is also relevant to

determining Anadarko's liability. Anadarko argues "there are no efficiencies to be gained

by certifying a class for liability when individual trials on damages—requiring analysis of

much of the same evidence needed to determine liability—will follow." Appellants' Br.

at 54–55. Plaintiffs respond that "[s]ome overlap between liability and damages is

inevitable, but . . . determining liability issues on a class-wide basis is still far more

preferable than requiring the filing of myriad individual cases for all purposes."

Appellees' Br. at 39. [8]

Having determined that the district court applied the correct legal standard, we

review its certification of an issue class for abuse of discretion. *See Adamson*, 855 F.2d at

---

[8] Plaintiffs also argue Anadarko has forfeited any argument that resolution of the issue class will not materially advance the litigation because it failed to include any such argument in its 23(f) petition and inadequately briefed its argument before this court. We disagree. Plaintiffs analogize a 23(f) petition to a petition for certiorari and contend the same forfeiture principles should apply to prevent consideration of Anadarko's argument. But Plaintiffs provide no support, nor are we aware of any, for applying the Supreme Court's Rule 14.1(a) to this court's consideration of 23(f) appeals. Even were we to accept the premise of Plaintiffs' analogy, Anadarko's argument that the court abused its discretion in certifying an issue class significantly overlaps with its argument regarding the sufficiency of the district court's findings, such that the former can be considered as "fairly included" in the latter. *Yee v. City of Escondido*, 503 U.S. 519, 535 (1992) (quoting Sup. Ct. R. 14.1(a)). Additionally, Anadarko provides a "specific and reasoned argument," with citations to authorities and the record, for why it thinks the certification of an issue class was an abuse of discretion. *Burrell v. Armijo*, 603 F.3d 825, 835 (10th Cir. 2010); Appellants' Br. at 54–55. Thus, Anadarko sufficiently raised this argument in its opening brief so that it is not forfeited.

675. Rule 23(c)(4) advances judicial economy by allowing adjudication of issues common to the class even when the entire case does not satisfy the requirements to proceed as a class action. *Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379, 395 (D. Kan. 1998). But certification of an issue class is not appropriate "if noncommon issues are inextricably entangled with common issues" such that proceeding as a limited issue class is not superior to alternative methods of adjudication. *In re Motor Fuel*, 292 F.R.D. at 665 (quotation marks omitted). That said, "[c]ertifying a class to determine defendant's liability, while leaving the class members to pursue their individual damages claims, is a common example of partial certification." *Id.*

As discussed, the district court considered the efficiencies of certifying a liability issue class when individualized damages issues would persist and concluded that resolution of the issue class would "generate common answers that [] determine liability in a single stroke." App. Vol. II at 270. The court determined Plaintiffs had met their burden of showing resolution of a liability issue class, prior to individualized damages proceedings, would be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

We discern no abuse of discretion in this conclusion. While there may be some overlap in evidence relevant to determining liability and damages, it was not a clear error in judgment for the district court to conclude that it would advance judicial economy, and resolution of the dispute, to permit class-wide resolution of liability before determining individual class members' damages. *See In re Motor Fuel*, 292 F.R.D. at 665. The district court clearly articulated its findings that common questions predominated an issue class

46

as to liability and antitrust impact and that resolution of those issues on a class-wide basis would be superior to alternative methods of adjudication. Thus, the district court did not abuse its discretion by certifying a liability issue class.

### III.   CONCLUSION

Because the district court applied the correct legal standard, and because it did not abuse its discretion in certifying an issue class, we AFFIRM the district court's class certification.