# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORA PHILLIPS; ERIKA PINHEIRO; NATHANIEL DENNISON, | No. 21-55768 |
| | D.C. No. 2:19-cv-06338-SVW-JEM |
| *Plaintiffs-Appellants*, | |
| v. | |
| | OPINION |
| U.S. CUSTOMS AND BORDER PROTECTION; MARK MORGAN; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW ALBENCE; FEDERAL BUREAU OF INVESTIGATION; CHRISTOPHER WRAY, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted February 9, 2023
Pasadena, California

Filed July 21, 2023

Before:  Mary M. Schroeder, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Schroeder

## SUMMARY[*]

### Standing

The panel affirmed the district court's summary judgment in favor of the government in an action seeking to expunge plaintiffs' records that were created by several federal agencies as part of a surveillance program.

The surveillance program gathered information on individuals that the agencies believed were associated with a migrant caravan approaching the southern border of the United States.  The panel held that the retention of the allegedly illegally obtained records at issue, without more, did not give rise to a concrete injury necessary for standing, and plaintiffs had not shown that the retention gave rise to any other sort of harm that constituted a concrete injury.

The panel rejected plaintiffs' central argument that the government's retention of illegally obtained information about them was per se an injury-in-fact.  Under Supreme Court precedent, the retention of records alone does not constitute a concrete injury, and plaintiffs must assert that

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

such retention gives rise to a tangible harm or material risk of future tangible harm or bears a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

The panel rejected plaintiffs' alternative argument that the government's retention of records allegedly obtained in violation of their First and Fourth Amendment rights constituted a concrete and ongoing injury under that framework. The evidence did not show that the government was using or will use the records to investigate plaintiffs or prevent them from crossing the border or that a third party will obtain the records and use them to plaintiffs' detriment. Plaintiffs had not shown that retention of the type of information contained in the records could give rise to a common law tort claim. Finally, plaintiffs failed to explain (or identify supporting authority) why retention of the records was an ongoing violation of their constitutional rights.

Concurring, Judge Schroeder observed that plaintiffs did not challenge any governmental conduct in obtaining the underlying information. Nor could they, because the information came from publicly available sources or existing law enforcement databases.

## COUNSEL

Mohammad Tajsar (argued), ACLU Foundation of Southern California, Los Angeles, California; R. Alexander Pilmer, Kirkland and Ellis LLP, Los Angeles, California; for Plaintiffs-Appellants.

Thomas G. Pulham (argued), Michael S. Raab, and Joshua M. Salzman, Appellate Staff Attorneys, Civil Division; Lisa Olson; Stephanie S. Christensen, Acting United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice; Washington, D.C.; for Defendants-Appellees.

## OPINION

IKUTA, Circuit Judge:

Nora Phillips, Erika Pinheiro, and Nathaniel Dennison (collectively, plaintiffs) seek to expunge records that were created by several federal agencies as part of a surveillance program in 2018–2019, arguing that the collection and retention of these records violated their constitutional rights. The district court granted summary judgment to the government, holding that plaintiffs lacked Article III standing to seek expungement.[1] Because the retention of the allegedly illegally obtained records at issue, without more,

---

[1] Plaintiffs also challenge the district court's denial of their requests for additional discovery. We affirm the district court's denial in the memorandum disposition filed contemporaneously with this opinion. -- F. App'x-- (9th Cir. 2023).

does not give rise to a concrete injury necessary for standing, and plaintiffs have not shown that the retention gives rise to any other sort of harm that constitutes a concrete injury, we affirm.

I

The following background facts are undisputed. From 2018 through 2019, a migrant caravan comprised of tens of thousands of people approached the southern border of the United States. In response, Customs and Border Protection (CBP) organized a surveillance program, called Operation Secure Line, in coordination with Immigration and Customs Enforcement (ICE) and the Federal Bureau of Investigation (FBI), as well as with "state and local law enforcement partners, non-law enforcement governmental organizations, and Mexican law enforcement officials."

As part of Operation Secure Line, CBP gathered information on individuals it believed were associated with the migrant caravan. CBP used both open source information available to the public, such as media reports and social media pages, as well as preexisting law enforcement databases, which were not publicly available.

In connection with its effort to provide border security officers with information about the caravan, CBP used the information it gathered to prepare a PowerPoint presentation with the names, photographs, date of birth, and citizenship status of 67 individuals. The presentation also indicated each person's alleged role in the caravan and whether the person had been interviewed by government officials. A CBP official presented the PowerPoint document at a weekly command staff meeting in January 2019. Subsequently, an ICE agent who was not involved in the caravan response

discovered the presentation on a government computer system and leaked it to the media.

The three plaintiffs here are three of the 67 individuals named in the PowerPoint document. Each of these individuals was stopped by border officials in 2019 when attempting to cross the United States-Mexico border. There is no evidence linking their encounters to their inclusion in the PowerPoint document or other records maintained by the government. Phillips and Pinheiro are attorneys employed by Al Otro Lado, an organization that "provide[s] services to immigrants." In January 2019, Phillips attempted to take a family trip to Mexico. Upon her arrival at the airport in Guadalajara, Mexico, Mexican immigration officials informed her that there was an alert on her passport. Two hours later, she was informed that Mexican immigration would not permit her to enter Mexico, and she returned to the United States the following morning. Phillips did not identify any evidence that the United States government was responsible for the alert. After this incident, Phillips stated that she did not travel to Mexico for several months for health reasons. Then in August 2019, Phillips attempted to travel to Mexico at the San Ysidro port of entry and was turned away by Mexican immigration officials due to an alert on her passport. She was permitted to enter Mexico the next day, and was approved for one-year temporary residency by the Mexican government. CBP subsequently approved her application for a SENTRI pass.[2] Other than

---

[2] SENTRI (Secure Electronic Network for Travelers Rapid Inspection) "allows expedited clearance for pre-approved, low-risk travelers upon arrival in the United States." U.S. Customs and Border Protection, *Secure Electronic Network for Travelers Rapid Inspection* (Jan. 4, 2022), https://www.cbp.gov/travel/trusted-traveler-programs/sentri.

the January and August 2019 incidents, Phillips has never been detained, questioned, or searched while crossing the United States-Mexico border.

Erika Pinheiro's experience was similar. In January 2019, Pinheiro was stopped by Mexican border officials and denied entry to Mexico because there was an alert on her passport. Ten minutes after the encounter, she entered Mexico through the car lane without incident. In April 2019, Pinheiro was granted temporary residence status in Mexico. In February 2020, Mexican border officials "directed her to secondary inspection, where her vehicle was sent through a large scanning device," and asked her "a few questions before admitting her to [Mexico]." And in March 2020, she was granted permanent resident status in Mexico, where she currently lives. She crossed the border without incident nearly 70 times from 2018 through 2020.

The third plaintiff, Dennison, was present during an incident extending from the evening of December 31, 2018 to the morning of January 1, 2019. During that period, migrants attempted to climb over the border wall and assaulted border patrol agents by throwing rocks at them. Dennison took photographs and video footage of the incident and spoke to some of the migrants. The government suspected that Dennison had been involved in organizing or providing assistance to the migrants during this incident. Later in January, when Dennison crossed the border into the United States, he was detained for about six hours and interviewed "about his work with the migrant caravan." He was then permitted to enter the United States. From September 2019 to September 2020, Dennison crossed the United States-Mexico border over 100 times. He was stopped and questioned only once, in January 2020, when he crossed the border from the United States to Mexico, stopped

less than 50 yards from the border, asked for directions, and immediately drove back to reenter the United States. Upon Dennison's reentry, a CBP officer asked him a few questions and searched Dennison's vehicle. The whole interaction took approximately 25 minutes.

Plaintiffs filed suit against the federal agencies involved in Operation Secure Line (CBP, FBI, and ICE) and several officials in their official capacity (collectively, "the government"). The operative Second Amended Complaint (SAC) first alleged that the government violated all three plaintiffs' First Amendment rights of free speech and free association because the government "collected and maintain[s] records describing Plaintiffs' First Amendment-protected activity," namely their conduct relating to "charitably supporting migrants traveling through Mexico to seek asylum in the United States." Second, the SAC alleged that the government violated Dennison's Fourth Amendment right to be free from unreasonable searches and seizures because the government "unlawfully and without legal justification intrusively seized . . . Dennison while he attempted to cross into the United States on January 10, 2019," and, as a result, the creation and maintenance of "all records which contain information gathered about him as a result of [the] unlawful seizure and interrogation" likewise violated the Fourth Amendment. Finally the SAC alleged that the government violated all three plaintiffs' rights under the federal Privacy Act, 5 U.S.C. § 552a, a claim that is not raised in this appeal. The SAC sought an injunction ordering the government "to expunge all records unlawfully collected and maintained about [p]laintiffs, and any information

derived from that unlawfully obtained information," as well as other injunctive and declaratory relief.[3]

The district court granted the government's motion for summary judgment, on the grounds that plaintiffs lacked standing to seek prospective injunctive relief and expungement of the records with respect to both their First and Fourth Amendment claims. Plaintiffs timely appealed this holding. We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo, *see Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021).

II

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To do so, plaintiffs bear the burden to establish standing by showing that an injury-in-fact was caused by the challenged conduct and can be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

To establish an injury-in-fact, plaintiffs must establish "an invasion of a legally protected interest which is . . . concrete and particularized" and "actual or imminent,

---

[3] Dennison also sought damages with respect to his claims under the Privacy Act for income allegedly lost from inability to travel "without fear of reprisal" and his inability to return to Mexico to collect his camera and footage. Because the Privacy Act claim is not on appeal, we do not consider his damages claim.

not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citation omitted). An injury is "concrete" if it "actually exist[s]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Tangible injuries, like physical harms or monetary losses, are concrete. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). But "[a] concrete injury need not be tangible." *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019). As explained by the Supreme Court, an *intangible* injury may be concrete if it presents a material risk of *tangible* harm or "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," like common law torts or certain constitutional violations. *Spokeo*, 578 U.S. at 340–41; *see also TransUnion*, 141 S. Ct. at 2204.

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000). A past harm may "confer standing to seek injunctive relief if the plaintiff . . . continue[s] to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). However, "a plaintiff who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief." *Id.* at 969. To the extent a plaintiff seeks relief for a possible future injury, that injury must be "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (citation omitted), or there must be a "'substantial risk' that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

III

Plaintiffs' central argument is that the government's retention of illegally obtained information about them is per

se an injury-in-fact.[4]    Plaintiffs first contend that the government unlawfully obtained the records. They argue that the creation of the records violated their "First Amendment right to be free of unlawful government scrutiny based on their associations and political expressions." They also claim that at least one record was created using information collected during Dennison's January 11, 2019 allegedly unlawful detention, which plaintiffs assert violated the Fourth Amendment.

Second, according to plaintiffs, the government's retention of records collected in violation of plaintiffs' constitutional rights constitutes an ongoing injury that satisfies standing. Therefore, plaintiffs contend they need not demonstrate ongoing or future risk of an additional injury attributable to the retention of the illegally obtained records. In their reply brief, however, plaintiffs argue that they have also established a likelihood of a future injury from the retention of the records.

A

Under Supreme Court precedent, the retention of records alone does not constitute a concrete injury, and plaintiffs must assert that such retention gives rise to a tangible harm or material risk of future tangible harm, or bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," like "reputational harms, disclosure of private information, and intrusion upon seclusion" or those "specified by the Constitution itself." *TransUnion*, 141 S. Ct. at 2204; *see also Spokeo*, 578 U.S.

---

[4] Because plaintiffs claim they have standing due to the government's retention of records alone, they do not argue that the nature of the alleged underlying constitutional violation affects our analysis.

at 340–41.  In *TransUnion*, plaintiffs claimed that a credit
reporting agency violated federal law by failing to follow
"reasonable procedures to ensure the accuracy of
[information in] their credit files," 141 S. Ct. at 2200, and
wrongly identified them "as potential terrorists, drug
traffickers, or serious criminals," *id.* at 2209.  The plaintiffs
attempted to certify a class that included members whose
inaccurate information had been disseminated to potential
creditors and members whose information had merely been
retained by the credit reporting agency.  *Id.* at 2200.  The
Supreme Court held that class members whose information
had not been disseminated failed to establish Article III
standing to challenge the credit reporting agency's retention
of their inaccurate credit reports.[5]  *See id.* at 2200, 2209.
First, the plaintiffs did not demonstrate that the inaccurate
credit information allegedly created in violation of federal
law posed a tangible harm to the plaintiffs' finances in the
future.  *See id.* at 2212.  Specifically, they "did not
demonstrate a sufficient likelihood that their individual
credit information would be requested by a third-party
business and provided by TransUnion" or that "TransUnion
would otherwise intentionally or accidentally release their
information to third parties."  *Id.*  Second, the credit
reporting agency's mere retention of the plaintiffs'
inaccurate credit reports was not itself an injury that had a

---

[5] Plaintiffs attempt to distinguish *TransUnion* from their case by arguing
that the plaintiffs in that suit sought damages rather than expungement.
But the Court explained that regardless whether plaintiffs seek
retrospective relief (in the form of damages) or prospective relief (like
an injunction or expungement), the injury must be concrete, and mere
retention of inaccurate credit reports is not a concrete injury.  141 S. Ct.
at 2210.

"historical or common-law analog" and therefore did not itself qualify as an injury-in-fact. *Id.* at 2209.

This standing analysis is applicable here. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. Thus, "deprivation of a procedural right" in violation of a statute "is insufficient to create Article III standing" "without some concrete interest that is affected by the deprivation." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Put differently, "for Article III purposes, it is not enough for a plaintiff to allege that a defendant has violated a right created by a statute; we must still ascertain whether the plaintiff suffered a concrete injury-in-fact due to the violation." *Patel*, 932 F.3d at 1270. This analysis does not change if the information at issue was collected in violation of a plaintiff's constitutional rights rather than a statutory violation as in *TransUnion*. Unless the retention of unlawfully obtained or created information amounts to the type of concrete injury recognized by the Supreme Court, it is insufficient to establish standing. *See infra* Section III.B.

In arguing against this conclusion, plaintiffs assert that we have previously held that the retention of illegally obtained records, without more, constitutes a concrete injury, citing *Norman-Bloodsaw v. Lawrence Berkely Laboratory*, 135 F.3d 1260, 1274–75 (9th Cir. 1998), *Mayfield*, 599 F.3d at 969–72, and *Fazaga v. FBI*, 965 F.3d 1015, 1027, 1030, 1054–55 (9th Cir. 2020), *rev'd and remanded on other grounds*, 142 S. Ct. 1051 (2022). This contention does not withstand scrutiny. Where we have held that the retention of illegally obtained records resulted in a concrete injury, we have always identified something beyond retention alone that resulted in an injury of the sort recognized by the Supreme Court, such as a material risk of

future tangible harm, a violation of the common law right to privacy, or a cognizable constitutional violation. *See Spokeo*, 578 U.S. at 340–41; *TransUnion*, 141 S. Ct. at 2204.

In *Norman-Bloodsaw* and *Mayfield*, the plaintiffs alleged an ongoing injury that involved an invasion of privacy, an injury identified by the Supreme Court as concrete. *See Spokeo*, 578 U.S. at 341. In *Norman-Bloodsaw*, plaintiffs alleged that their employer, a public university laboratory, took their blood and urine to test for conditions such as syphilis, sickle cell anemia, and pregnancy, without their knowledge or consent, in violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and their constitutional right to privacy. 135 F.3d at 1264–65. The university laboratory's retention of this "undisputedly intimate medical information," *id.* at 1275, implicated information in which the plaintiffs enjoyed "the highest expectations of privacy," *id.* at 1270. Under these circumstances, we held that the plaintiffs suffered "a continuing 'irreparable injury' for purposes of equitable relief." *Id.* at 1275. In *Mayfield*, the government unlawfully searched and seized documents from the plaintiff's home, including confidential client files, bank records, and "summaries of confidential conversations between husband and wife, parents and children." 599 F.3d at 969 n.6. The plaintiff argued that "the retention by government agencies of materials derived from the seizures in his home and office constitute[d] an ongoing violation of [the plaintiff's] constitutional right to privacy." *Id.* at 970. We agreed that the plaintiff "suffer[ed] a present, on-going injury due to the government's continued retention of derivative material from [this] seizure." *Id.* at 971 (citation omitted).

*Norman-Bloodsaw* and *Mayfield* are consistent with many other cases in which we held that the plaintiffs had

standing to challenge the retention of illegally obtained records because the retention amounted to an invasion of their privacy interests. In *Campbell v. Facebook, Inc.*, we held that parties had standing to sue a social media company that captured, read, and used information in their private messages in violation of various state and federal statutes, because there was "a straightforward analogue between" the protections codified in those statutes against viewing or using private communications and the common law privacy tort of "unreasonable intrusion upon the seclusion of another." 951 F.3d 1106, 1112, 1117–18 (9th Cir. 2020). Therefore, a violation of those statutes gave rise to a concrete injury. *Id.*; *see also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491–92 (9th Cir. 2019) (holding that "[w]hen a third party obtains [a] consumer's credit report in violation of 15 U.S.C. § 1681b(f)," the consumer suffers a concrete injury because the violation is analogous to a "harm that has traditionally been regarded as providing a basis for a lawsuit: intrusion upon seclusion (one form of the tort of invasion of privacy)"); *Patel*, 932 F.3d at 1268, 1273 (holding that a violation of a state law prohibiting the collection, use, and storage of a person's biometric identifiers from photographs constituted a concrete injury because it was analogous to violations of the right to privacy "actionable at common law"). In none of these cases did we hold that the plaintiffs had standing due to the retention of records alone.

Plaintiffs' reliance on *Fazaga* is also misplaced. *Fazaga* did not address whether the plaintiffs had standing. In that case, the government collected and retained documents that included the contents of surreptitiously recorded conversations held in prayer halls of mosques, an Imam's chambers, and "other parts of the mosque not open to the public" as well as the inside of individuals' homes, in

violation of multiple constitutional and statutory provisions. 965 F.3d at 1027, 1030, 1054–55. *Fazaga* held that federal courts could order expungement of records to vindicate constitutional rights, and therefore the injunctive remedy of expungement was available to vindicate the plaintiffs' Fourth Amendment rights in that case. *Id.* at 1055 & n.36. But *Fazaga* did not address the question whether the retention of records collected in violation of the plaintiffs' constitutional rights in that case gave the plaintiffs standing.**[6]**

By contrast, when considering a plaintiff's standing to challenge the retention of records collected in violation of constitutional rights, we have carefully identified a concrete and ongoing injury. In *Scott v. Rosenberg*, for instance, a plaintiff claimed that the government's request for a record of the plaintiff's donations to his church violated his free exercise rights under the First Amendment. 702 F.2d 1263, 1267–68 (9th Cir. 1983). We held that the government's request constituted an injury-in-fact because an undisputed tenet of the plaintiff's faith was that his giving had to be secret in order to be efficacious. *Id.* We explained that if the government had "already procured the requested records, the alleged injury may be actual," and if the government had "not yet received the documents, but continue[d] to threaten

---

[6] *MacPherson v. IRS*, another decision relied on by plaintiffs, is not on point because it did not discuss standing, 803 F.2d 479, 484 (9th Cir. 1986), but rather addressed whether the collection of certain records violated the Privacy Act, 5 U.S.C. § 552a(e)(7), which precludes an agency that maintains a system of records from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity," *MacPherson*, 803 F.2d at 480–81 (citing § 552a(e)(7)).

the church with a loss of its license for failure to produce them, the alleged injury [was] at least threatened." *Id.* In light of the burden placed by the government on the plaintiff's sincerely held religious belief, the plaintiff "properly allege[d] injury from disclosure of his donations." *Id*. "Therefore, the injury aspect of Article III standing [was] met." *Id.*

In sum, there is no support for plaintiffs' claim that the government's unlawful collection and retention of records alone gives rise to a concrete injury for purposes of standing. In every case where we (or the Supreme Court) held that the plaintiffs had standing, the collection or retention caused a concrete harm of the sort the Supreme Court has recognized.

B

In light of this conclusion, we turn to plaintiffs' alternative argument that the government's retention of the records allegedly obtained in violation of their First and Fourth Amendment rights constitutes a concrete and ongoing injury under the framework discussed above.

First, plaintiffs argue that the government's retention of the records constitutes a concrete, ongoing injury because it "subject[s] them to an unncecessary risk of future detention and unwarranted government scrutiny." We disagree. The evidence in this case does not show that the government is using or will use the records in the future to investigate plaintiffs or prevent them from crossing the border or that a third party will obtain the records and use them to plaintiffs' detriment.

Acknowledging the lack of support in the record, plaintiffs argue that they need not predict how the records maintained by the government are likely to injure plaintiffs

in the future. Rather, relying on *Flint v. Dennison*, 488 F.3d 816, 823–24 (9th Cir. 2007), they contend, it is enough if the records "may" have some effect in the future. This argument is contrary to Supreme Court precedent, which requires a plaintiff to show that a "risk of harm is sufficiently imminent and substantial." *TransUnion,* 141 S. Ct. at 2210.

Nor does *Flint* support plaintiffs' claim. *Flint* addressed whether a student's suit against a state university for violation of his First Amendment free speech rights was moot after the student graduated. 488 F.3d at 823. We held that the case was not moot because the student was seeking both declaratory relief and injunctive relief to remove disciplinary records from his file. *Id.* at 824. Because the student's record contained evidence of disciplinary sanctions, which "may jeopardize the student's future employment or college career," we concluded that we retained the ability to "grant relief in a legally significant way," by ordering their expungement, and therefore the case was not moot. *Id.*

*Flint* is not on point here. First, *Flint* acknowledged that we apply different standards to a mootness inquiry than we do to a standing inquiry, because "mootness, unlike standing, is a flexible justiciability doctrine." *Id.* Therefore, *Flint* did not consider whether the retention of disciplinary records constituted a concrete harm or an ongoing injury or gave rise to an imminent risk of injury. Even had we considered that issue, we may well have determined that the retention of the disciplinary records at issue in *Flint* is analogous to a "reputational harm[]," which has been "traditionally recognized as providing a basis for lawsuits in American courts," and therefore constituted a concrete and ongoing injury as discussed above. *TransUnion*, 141 S. Ct. at 2204; *see also Kennedy v. Warren*, 66 F.4th 1199, 1206

(9th Cir. 2023) ("Reputational harm stemming from an unretracted government action is a sufficiently concrete injury for standing purposes.").

Next, plaintiffs do not show that the type of information contained in the records—names, birthdays, social security numbers, occupations, addresses, social media profiles, and political views and associations—is so sensitive that another's access to that information "would be highly offensive to a reasonable person," Restatement (Second) of Torts § 652B, or otherwise gives rise to reputational harm or injury to privacy interests. A person's "name, address, date and place of birth, place of employment, . . . and social security number" are not "generally considered 'private.'" *Russell v. Gregoire*, 124 F.3d 1079, 1082, 1094 (9th Cir. 1997) (citation omitted). This identifying information is also a far cry from the types of information that we have held are so sensitive that another's retention of the information is analogous to tortious conduct. *See Nayab*, 942 F.3d at 487–88, 492 (holding that obtaining another's consumer credit report is analogous to intrusion upon seclusion because "a credit report can contain highly personal information" including "information 'bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living'" (citation omitted)); *Patel*, 932 F.3d at 1273 (explaining that scanning a person's face to create a face template that can be used to identify that individual in other images, "determine when the individual was present at a specific location," and "used to unlock the face recognition lock on that individual's cell phone" "invades an individual's private affairs"). Indeed, the record shows that many of the records were created with "open source information available to the public," like media reports and

social media pages, as well as information already collected and retained in other law enforcement databases (which plaintiffs do not challenge).

Finally, plaintiffs do not explain (or identify supporting authority) why retention of the records here is an ongoing violation of their constitutional rights. *See Scott*, 702 F.2d at 1268; *see also TransUnion*, 141 S. Ct. at 2204 (noting that concrete harms include those "specified by the Constitution itself").    To the extent that plaintiffs argue that the government's retention of the records will chill their First Amendment rights of free speech and free association, "[a]llegations of a subjective 'chill' are not an adequate substitution for a claim of specific present objective harm or a threat of specific future harm." *Clapper*, 568 U.S. at 418 (citation omitted); *see also Laird v. Tatum*, 408 U.S. 1, 10–11 (1972). Thus, plaintiffs fail to show a "risk of real harm" from the government's retention of the records. *Spokeo*, 578 U.S. at 341.

Because plaintiffs fail to establish that the government's retention of the records constitutes a concrete harm, we hold that they lack standing to seek expungement of the records.

**AFFIRMED.**

SCHROEDER, Circuit Judge, concurring:

Appellants contend in this appeal that the government's retention of records concerning their border crossings may cause them harm in the future and they seek expungement of the records. They do not challenge any governmental conduct in obtaining the underlying information. Nor could they, because the information came from publicly available sources or existing law enforcement databases.

This case is thus unlike *Fazaga v. Federal Bureau of Investigation*, 965 F.3d 1015, 1054 (9th Cir. 2020), where the Plaintiffs claimed the government obtained the information by means of warrantless surveillance that violated Plaintiffs' constitutional rights, and where standing was not even questioned. Nor is there anything of a medical or other sensitive, personal nature about the information that would make this case resemble the situation in *Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260 (9th Cir. 1998).

As the district court correctly recognized, there is no ongoing injury here, or any likelihood of future injury attributable to the government's conduct. With these observations, I join the majority opinion.