# DECLARATION OF VIOLA TREBICKA ISO DEFENDANT GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE 5 RE: DISPARAGING EVIDENCE OR ARGUMENT

# Redacted Version of Document Sought to be Sealed

1 **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

2 Stephen A. Broome (CA Bar No. 314605)  Andrew H. Schapiro (admitted *pro hac vice*)
   stephenbroome@quinnemanuel.com  andrewschapiro@quinnemanuel.com
3 Viola Trebicka (CA Bar No. 269526)  Teuta Fani (admitted *pro hac vice*)
   violatrebicka@quinnemanuel.com  teutafani@quinnemanuel.com
4 Crystal Nix-Hines (Bar No. 326971)  Joseph H. Margolies (admitted *pro hac vice*)
   crystalnixhines@quinnemanuel.com  josephmargolies@quinnemanuel.com
5 Rachael L. McCracken (Bar No. 252660)  191 N. Wacker Drive, Suite 2700
   rachaelmccracken@quinnemanuel.com  Chicago, IL 60606
6 Alyssa G. Olson (CA Bar No. 305705)  Telephone: (312) 705-7400
   alyolson@quinnemanuel.com  Facsimile: (312) 705-7401
7 865 S. Figueroa Street, 10th Floor
8 Los Angeles, CA 90017
   Telephone: (213) 443-3000
9 Facsimile: (213) 443-3100

10

11 Jomaire Crawford (admitted *pro hac vice*)  Xi ("Tracy") Gao (CA Bar No. 326266)
   jomairecrawford@quinnemanuel.com  tracygao@quinnemanuel.com
12 D. Seth Fortenbery (admitted *pro hac vice*)  Carl Spilly (admitted *pro hac vice*)
   sethfortenbery@quinnemanuel.com  carlspilly@quinnemanuel.com
13 51 Madison Avenue, 22nd Floor  1300 I Street NW, Suite 900
   New York, NY 10010  Washington D.C., 20005
14 Telephone: (212) 849-7000  Telephone: (202) 538-8000
   Facsimile: (212) 849-7100  Facsimile: (202) 538-8100

15

16 *Attorneys for Defendant Google LLC*

17

18 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

19 CHASOM BROWN, *et al.*, on behalf of  Case No. 4:20-cv-03664-YGR-SVK
themselves and all others similarly situated,
20  **DECLARATION OF VIOLA TREBICKA**
   Plaintiffs,  **IN SUPPORT OF DEFENDANT GOOGLE**
21  **LLC'S OPPOSITION TO PLAINTIFFS'**
   v.  **MOTION *IN LIMINE* 5 RE:**
22  **DISPARAGING EVIDENCE OR**
GOOGLE LLC,  **ARGUMENT**
23
   Defendant.  The Honorable Yvonne Gonzalez Rogers
24  Date: November 29, 2023
   Time: 9:00 a.m.
25  Location: Courtroom 1 – 4th Floor
26  Trial Date: January 29, 2024

27

28

I, Viola Trebicka, declare as follows:

1.     I am a member of the bar of the State of California and a partner with Quinn Emanuel Urquhart & Sullivan, LLP. I make this declaration of my own personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     I submit this declaration in support of Google's Opposition to Plaintiffs' Motion *in Limine* 5 re: Disparaging Evidence or Argument.

3.     Attached hereto as Exhibit A is a true and correct excerpted copy of Plaintiff William Byatt's deposition transcript, dated December 20, 2021.

4.     Attached hereto as Exhibit B is a true and correct excerpted copy of Plaintiff Chasom Brown's deposition transcript, dated January 13, 2022.

5.     Attached hereto as Exhibit C is a true and correct copy of a document produced during discovery bearing Bates number GOOG-BRWN-00225677.

6.     Attached hereto as Exhibit D is a true and correct copy of Plaintiffs' Exhibit List, served on Google on August 24, 2023.

7.     Attached hereto as Exhibit E is a true and correct excerpted copy of Brian Rakowski's deposition transcript, dated August 19, 2021.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Los Angeles, California on October 17, 2023.

By   */s/ Viola Trebicka*
Viola Trebicka

# EXHIBIT A

```
 1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
 2              SAN JOSE DIVISION
 3
        CHASOM BROWN, WILLIAM BYATT,
 4      JEREMY DAVIS, CHRISTOPHER
        CASTILLO, and MONIQUE TRUJILLO,
 5      individually and on behalf of
        all other similarly situated
 6
           Plaintiffs,          CASE NO.
 7                         5:20-CV-03664-LHK-SVK
        VS.
 8
        GOOGLE LLC
 9
           Defendant.
10
11
           ****************************************
12       ZOOM VIDEOTAPED DEPOSITION OF WILLIAM BYATT
                  December 20, 2021
13                 11:04 a.m. EST
           ****************************************
14
15
16      TAKEN BY:
17         VIOLA TREBICKA, ESQ.
           ATTORNEY FOR DEFENDANT
18
19      REPORTED BY:
20         BELLE VIVIENNE, CRR
           CERTIFIED STENOGRAPHIC
21         REALTIME COURT REPORTER
           VERITEXT LEGAL SOLUTIONS
22         JOB NO. 5001125
           866 299-5127
23
24
25
```

Page 1

A P P E A R A N C E S

FOR THE PLAINTIFFS:

JAMES W LEE, ESQ
ROSSANA BAEZA, ESQ
MARK MAO, ESQ (San Francisco)
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
305 539 8400
jlee@bsfllp com

RYAN J MCGEE, ESQ
MORGAN & MORGAN, P A
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
813 223 5505
rmcgee@forthepeople com

FOR THE DEFENDANT:
VIOLA TREBICKA, ESQ
TRACY GAO, ESQ
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S Figueroa St, 10th Floor
Los Angeles, California 90017
213 443 3000
Violatrebicka@quinnemanuel com

VIDEOGRAPHER:
JoAnn Yager

- - -

I N D E X

- - -

Testimony of:
WILLIAM BYATT
MS. TREBICKA............................ 9
MR. LEE................................. 253

- - -

E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE
Exhibit 1     Screenshot................. 32
Exhibit 2     The New York Times
              Privacy Policy, Updated
              July 1, 2021............... 50
Exhibit 3     Google Analytics Opt-out
              Browser Add-on document.... 70
Exhibit 4     Twitter Privacy Policy..... 76
Exhibit 5     Google Ad Personalization
              Settings................... 88

- - -

E X H I B I T S (Continued.)

- - -

NO.          DESCRIPTION          PAGE
Exhibit 6     Google Terms of Services
              effective dates
              04/16/2007 to 02/29/2012...104
Exhibit 7     Google Privacy Policy......112
Exhibit 8     Screenshot of Chrome's
              You've Gone Incognito
              pop-up screen from
              08/20/2020................123
Exhibit 9     How Private Browsing
              Works in Chrome Google
              document..................142
Exhibit 10    Google Search Help
              Document..................148
Exhibit 11    Second Amended Complaint...156
Exhibit 12    May 12, 2021 Amended
              Responses and Objections
              to Google's
              Interrogatories Number 1,
              4 and 5....................166

- - -

E X H I B I T S (Continued.)

- - -

NO.          DESCRIPTION          PAGE
Exhibit 13    Byatt's Revised Responses
              to Defendant's Rog 2.......174
Exhibit 14    Google Subscriber
              Information Sheet..........195
Exhibit 15    Google Subscriber
              Information Sheet..........195
Exhibit 16    Google Subscriber
              Information Sheet..........195
Exhibit 17    Google Subscriber
              Information Sheet..........195
Exhibit 18    Google Subscriber
              Information Sheet..........195
Exhibit 19    Plaintiff William Byatt's
              Objections and Responses
              to Defendant's First Set
              of Interrogatories.........205
Exhibit 20    Plaintiff William Byatt's
              Amended Objections and
              Responses to Defendant's
              Second Set of
              Interrogatories............206

2 (Pages 2 - 5)

| | |
|---|---|
| 1 | A. I do.                                    12:50:10 |
| 2 | MR. LEE: Viola, do I have the       12:50:10 |
| 3 | same standing objection for this      12:50:11 |
| 4 | document as for lack of foundation?    12:50:13 |
| 5 | MS. TREBICKA: Yes, that's fine.     12:50:14 |
| 6 | MR. LEE: Thanks.                 12:50:16 |
| 7 | BY MS. TREBICKA:                       12:50:16 |
| 8 | Q. Do you see how you can turn it    12:50:17 |
| 9 | on or turn it off?                      12:50:18 |
| 10 | A. I do see those buttons, yes.     12:50:19 |
| 11 | Q. And do you also see the          12:50:22 |
| 12 | hyperlink down there "learn more about how  12:50:24 |
| 13 | Google ads work"?                   12:50:25 |
| 14 | A. Oh, it took me a second to find  12:50:28 |
| 15 | it, but, yes, I do.                     12:50:30 |
| 16 | Q. Do you -- have you ever clicked  12:50:31 |
| 17 | on that link to your memory as far --   12:50:35 |
| 18 | A. I don't -- I don't remember      12:50:40 |
| 19 | ever -- whether or not I've ever been on  12:50:41 |
| 20 | this page so I certainly don't remember  12:50:43 |
| 21 | whether I've ever clicked on that link,  12:50:45 |
| 22 | but I don't know what's on the other side  12:50:47 |
| 23 | of that link to know if I have seen what's  12:50:49 |
| 24 | on the other side of that link.          12:50:52 |
| 25 | Q. That's all fair. Have you ever   12:50:54 |

Page 90

| | |
|---|---|
| 1 | looked into documents that explain how  12:50:55 |
| 2 | Google ads work?                    12:50:58 |
| 3 | A. I'm sure I have, yes.            12:51:02 |
| 4 | Q. And those documents also explain  12:51:08 |
| 5 | how Google ads uses user data?        12:51:11 |
| 6 | A. To some extent, yes. I -- I      12:51:15 |
| 7 | can't say for sure whether I've seen    12:51:16 |
| 8 | authoritative documents from Google about  12:51:20 |
| 9 | how ad personalization works or whether  12:51:22 |
| 10 | the things that I have seen have been    12:51:25 |
| 11 | third party or general explainers. So   12:51:29 |
| 12 | anything that I've seen, I don't -- I    12:51:34 |
| 13 | don't know how accurate or how -- I don't  12:51:37 |
| 14 | know how accurate the information that   12:51:40 |
| 15 | I've seen has been. And I do not recall  12:51:42 |
| 16 | if any of that information has been      12:51:44 |
| 17 | represented by Google.                12:51:46 |
| 18 | Q. When you are in Incognito mode,  12:51:50 |
| 19 | do you receive ads? Let me rephrase that.  12:51:52 |
| 20 | When you are in Incognito mode,    12:51:57 |
| 21 | are ads displayed to you when you browse?  12:51:59 |
| 22 | A. Probably. I would think so. I    12:52:02 |
| 23 | don't know, to be honest.             12:52:08 |
| 24 | Q. You have never noticed --        12:52:14 |
| 25 | MR. LEE: Well, I think he was     12:52:17 |

Page 91

| | |
|---|---|
| 1 | still finishing his prior answer,      12:52:18 |
| 2 | Viola.                            12:52:21 |
| 3 | A. Yeah, I'm -- I'm sure I have     12:52:21 |
| 4 | noticed, but I can't sit here saying that  12:52:22 |
| 5 | I recall specific ads that I've -- that I  12:52:29 |
| 6 | have seen. I certainly don't recall     12:52:32 |
| 7 | whether they've been served by Google.   12:52:34 |
| 8 | BY MS. TREBICKA:                       12:52:34 |
| 9 | Q. I'm not asking about specific    12:52:40 |
| 10 | ads.                             12:52:42 |
| 11 | A. Sure.                           12:52:43 |
| 12 | Q. However, my question relates to  12:52:45 |
| 13 | whether you know whether ads are served  12:52:47 |
| 14 | while you are in Incognito mode to you?  12:52:51 |
| 15 | MR. LEE: Asked and answered.     12:52:54 |
| 16 | A. Do I continue to answer again?   12:52:57 |
| 17 | BY MS. TREBICKA:                       12:52:57 |
| 18 | Q. Yes.                           12:52:59 |
| 19 | A. Okay. Yeah, I believe ads are    12:53:00 |
| 20 | served to me in Incognito mode. I just  12:53:04 |
| 21 | don't recall any particular details.    12:53:06 |
| 22 | Q. When you are in Incognito mode,  12:53:09 |
| 23 | do you browse for extended periods of time  12:53:16 |
| 24 | or for limited periods of time?         12:53:21 |
| 25 | MR. LEE: Objection to form.       12:53:29 |

Page 92

| | |
|---|---|
| 1 | A. Yeah, I'd say both. Probably     12:53:30 |
| 2 | more often I'd say shorter periods of time  12:53:31 |
| 3 | but not exclusively.                 12:53:33 |
| 4 | BY MS. TREBICKA:                       12:53:33 |
| 5 | Q. When you browse for longer       12:53:36 |
| 6 | periods of time, what kinds of browse --  12:53:38 |
| 7 | what kinds of browsing is that?        12:53:40 |
| 8 | MR. LEE: Objection to form.       12:53:47 |
| 9 | A. Yeah, I don't -- I don't really  12:53:49 |
| 10 | know how to answer that. It would look  12:53:51 |
| 11 | like probably mostly reading news and   12:53:55 |
| 12 | things like that for more extended      12:54:07 |
| 13 | periods, but, yeah, I can't say          12:54:09 |
| 14 | specifically.                       12:54:12 |
| 15 | BY MS. TREBICKA:                       12:54:12 |
| 16 | Q. When you browse on Incognito for  12:54:16 |
| 17 | an extended period of time, do you have  12:54:18 |
| 18 | one tab in Incognito open or do you have  12:54:20 |
| 19 | multiple Incognito tabs open?          12:54:24 |
| 20 | A. It varies, but I could have      12:54:26 |
| 21 | multiple tabs open.                  12:54:29 |
| 22 | Q. So sometimes you have one,       12:54:29 |
| 23 | sometimes you have multiple; it varies?  12:54:31 |
| 24 | A. That's correct.                  12:54:36 |
| 25 | Q. When you have multiple tabs      12:54:36 |

Page 93

Veritext Legal Solutions
866 299-5127

```
 1    last answer before you moved on.        15:51:50
 2    That's -- I think this is a reasonable   15:51:52
 3    request and certainly proper under the   15:51:53
 4    rules.                                   15:51:55
 5    BY MS. TREBICKA:                         15:51:55
 6    Q.  Mr. Byatt, were you finished         15:51:55
 7    with your answer?                        15:51:57
 8    A.  What I was going to say was that     15:51:59
 9    I don't know everything that Google does 15:52:00
10    or syncs up when I log in to the Chrome  15:52:04
11    application, but I do know that I can log 15:52:07
12    in to Chrome and log in to Gmail         15:52:10
13    separately.                              15:52:12
14    Q.  Mr. Byatt, do you understand         15:52:15
15    that there are two ways in which you can 15:52:16
16    use Chrome, one is on your mobile device 15:52:19
17    and one is on your computer?             15:52:21
18    A.  I don't know if those are the        15:52:25
19    only two ways, but I do agree that those 15:52:28
20    are two ways, yes.                       15:52:31
21    Q.  Do you use Chrome in any other       15:52:32
22    way?                                     15:52:34
23    A.  Yes, actually.  I have used          15:52:39
24    Chrome in another way.                   15:52:41
25    Q.  Tell me what that way is.            15:52:42
                                          Page 186
```

```
 1    A.  I have used Chrome inside of         15:52:44
 2    virtual machines for software development 15:52:48
 3    testing and I have used Chrome in a way  15:52:52
 4    that is automated for the purpose of     15:52:58
 5    testing software.                        15:53:02
 6    Q.  And is that on a computer?           15:53:04
 7    A.  That is on a computer, yes.          15:53:07
 8    Q.  So limiting your answers             15:53:09
 9    initially to using Chrome on a computer  15:53:11
10    and what I'm limiting it to is you opening 15:53:13
11    a browsing session on Chrome.            15:53:16
12       As far as you being in the           15:53:21
13    Chrome browser on a computer and being in 15:53:24
14    Incognito, have you ever logged in to your 15:53:28
15    Gmail accounts once you have been in     15:53:31
16    that -- in that environment?             15:53:34
17    A.  I do not recall specifically         15:53:39
18    ever having done that.                   15:53:40
19    Q.  Have you logged in to any of         15:53:48
20    your Google accounts, any other Google   15:53:49
21    accounts you may have once you have been 15:53:52
22    in Incognito on your computer?           15:53:54
23    A.  I do not recall ever                 15:53:57
24    specifically having done that.           15:53:58
25    Q.  Now, moving on to your device.       15:54:02
                                          Page 187
```

```
 1    Have you -- do you have a Chrome         15:54:04
 2    application on your handheld device?     15:54:07
 3    A.  Yes.                                 15:54:12
 4    Q.  And you use that to browse?          15:54:13
 5    A.  Yes.                                 15:54:15
 6    Q.  Do you use it to browse in           15:54:16
 7    Incognito mode?                          15:54:17
 8    A.  Yes.                                 15:54:19
 9    Q.  When you use the Chrome              15:54:20
10    application on your handheld device to   15:54:22
11    browse in Incognito mode, have you also at 15:54:25
12    the same time logged in to your Gmail    15:54:28
13    account?                                 15:54:32
14    A.  I do not recall.                     15:54:32
15    Q.  And when you have used your          15:54:35
16    Chrome application on your handheld device 15:54:37
17    to browse in Incognito mode, have you also 15:54:39
18    at the same time logged in to any other  15:54:42
19    Google accounts that you may have?       15:54:45
20    A.  Inside of Chrome?                    15:54:47
21    Q.  Yes, inside of Chrome for now.       15:54:49
22    A.  Yeah, that -- I do not recall        15:54:52
23    ever having done that.                   15:54:53
24    Q.  What about outside of Chrome?        15:54:54
25    A.  I have certain -- my cell phones     15:54:57
                                          Page 188
```

```
 1    have always been Android phones, so if I'm 15:55:00
 2    browsing in Incognito mode on my phone,  15:55:07
 3    that phone is logged in to my account and 15:55:10
 4    I'll have the Gmail application on the    15:55:14
 5    phone that is logged in to my Google      15:55:16
 6    account.  It -- I would imagine, I        15:55:19
 7    probably have other applications that are 15:55:22
 8    also logged in to the Google account.     15:55:24
 9    Q.  You have listed here a few --         15:55:27
10    and by "here," I mean on Exhibit 13, you  15:55:35
11    have listed here a few e-mail accounts.   15:55:40
12    Do you see that?                          15:55:43
13    A.  I do, yes.                            15:55:44
14    Q.  And the first two e-mail              15:55:46
15    accounts, ████████████ and               15:55:47
16    ████████████ are these your personal     15:55:56
17    accounts or what you would consider your  15:55:58
18    personal Google accounts?                 15:55:59
19    A.  Yes.                                  15:56:00
20    Q.  You have listed here an               15:56:01
21    additional three Google accounts:         15:56:04
22    Scm@miamidadedems.org,                    15:56:06
23    treasurer@miamidadedems.org, and          15:56:12
24    william.byatt@miamiprogressives.org.      15:56:15
25    Do you see that?                          15:56:21
                                          Page 189
```

48 (Pages 186 - 189)

1    A.  I do.                    15:56:21
2    Q.  Are these your personal Google   15:56:22
3 accounts too?                    15:56:24
4    A.  No.                     15:56:24
5    Q.  How would you describe these   15:56:25
6 accounts?                      15:56:26
7    A.  Those are accounts that I have   15:56:26
8 in my various roles as working with   15:56:30
9 certain organizations.  The Miami-Dade   15:56:38
10 Democratic Party for the two that end in   15:56:40
11 MiamiDadeDems.org, and the Democratic   15:56:46
12 Progressive Caucus of Miami-Dade for the   15:56:48
13 ones that end in MiamiProgressives.org.   15:56:52
14    Q.  Focusing your attention on the   15:56:55
15 two personal Gmail accounts, have you ever   15:56:58
16 shared them with anyone?            15:57:00
17       MR. LEE:  Objection to form.   15:57:03
18    A.  Can you clarify what you mean by   15:57:06
19 "shared"?                       15:57:07
20 BY MS. TREBICKA:                 15:57:07
21    Q.  Does anyone else have access to   15:57:09
22 the credentials for these two accounts?   15:57:10
23    A.  I certainly hope not.        15:57:14
24    Q.  What about the three accounts   15:57:15
25 that are associated with your various   15:57:21
                                Page 190

1 roles at -- at organizations, are those   15:57:24
2 shared accounts?                 15:57:28
3    A.  Sort of.                  15:57:29
4    Q.  What do you mean by "sort of"?   15:57:33
5    A.  I mean two things.  First is   15:57:34
6 that they are all, you know, administered   15:57:36
7 accounts much like a corporate Gmail   15:57:43
8 account would be.  So the administrators,   15:57:46
9 the -- the -- they used to call it   15:57:50
10 G Suites, I believe they now call it   15:57:53
11 Google Workspaces, the -- the people in   15:57:56
12 those organizations who administer the   15:57:57
13 organization's Google account would have   15:58:04
14 administrative access to those.  Also,   15:58:08
15 scm@miamidadedems.org and            15:58:11
16 treasurer@miamidadedems.org, those are   15:58:15
17 both e-mail accounts that belong to a   15:58:19
18 position.  Only one person holds those   15:58:21
19 positions at any given time, but the   15:58:24
20 e-mail account transfers who has those   15:58:26
21 credentials when a new person has those --   15:58:29
22 those seats, those offices.          15:58:33
23    Q.  What does SCM stand for in that   15:58:35
24 account that says -- or that is   15:58:39
25 scm@miamidadedems.org?              15:58:42
                                Page 191

1    A.  State Committeeman.          15:58:47
2    Q.  Do you currently hold these   15:58:52
3 positions, these two positions?        15:58:53
4    A.  I -- I -- I am sorry for that,   15:58:57
5 Belle.  I hold the State Committeeman   15:59:00
6 seat.  I am no longer the treasurer, and I   15:59:04
7 no longer have access to that account   15:59:06
8 either.                         15:59:09
9    Q.  Do you use -- as far as the two   15:59:10
10 personal accounts, do you use them   15:59:20
11 equally?                        15:59:22
12    A.  No, I do not.              15:59:24
13    Q.  Do you no longer use one of   15:59:24
14 them?                          15:59:28
15    A.  I would say that I use the one   15:59:31
16 that's listed first █████████████   15:59:34
17 I use that as my sort of main functional   15:59:39
18 account.  The other one I do still   15:59:44
19 occasionally use, but mostly for spam and   15:59:48
20 a couple of websites that I may have just   15:59:55
21 never changed what my e-mail address on   15:59:58
22 record was with them.              16:00:01
23    Q.  Do you sign into them at the   16:00:08
24 same rate, at the same frequency?      16:00:09
25    A.  Well, I -- so my browser       16:00:17
                                Page 192

1 preserves which accounts I'm logged in to   16:00:26
2 and I'm -- I'm basically constantly logged   16:00:32
3 in to both of them.  In terms of actually   16:00:37
4 accessing and using, I certainly use the   16:00:42
5 ████████ one more.                16:00:53
6    Q.  What about the two             16:00:54
7 organization-related ones that you still   16:00:57
8 have access to, which my understanding is,   16:01:00
9 is william.byatt@miamiprogressives.org and   16:01:03
10 scm@miamidadedems.org, are you constantly   16:01:09
11 logged in to both as well?           16:01:14
12    A.  Yes.                     16:01:17
13    Q.  Do you use both of those        16:01:18
14 equally?                        16:01:21
15    A.  Can you explain what you mean by   16:01:24
16 "use"?                          16:01:26
17    Q.  Go in to --                 16:01:26
18       MR. LEE:  Before we -- before   16:01:26
19 we -- excuse me.  Before we go         16:01:29
20 further, Viola, I'm just looking at      16:01:30
21 some correspondence that -- that       16:01:32
22 states that Mr. Byatt revoked consent   16:01:33
23 for the two accounts that you're       16:01:35
24 inquiring about.  So I'm not sure that   16:01:37
25 your inquiry into those accounts is   16:01:43
                                Page 193

49 (Pages 190 - 193)

|  |  |
|---|---|

**Page 258 (left top)**

```
1        (Time noted:  5:45 p.m.)
2
3    _____
         WILLIAM BYATT
4
5    _____

6    Subscribed and sworn to
     before me this _____
7    day of _____ 2022.
8    _____
         Notary Public
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 258
```

**Page 260 (right top)**

```
1    VIOLA TREBICKA, ESQ.
2    violatrebicka@quinnemanuel.com
3                      December 23, 2021
4    RE: BROWN VS. GOOGLE LLC
5    DECEMBER 20, 2021, WILLIAM BYATT, JOB NO. 5001125
6    The above-referenced transcript has been
7    completed by Veritext Legal Solutions and
8    review of the transcript is being handled as follows:
9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20   __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23   __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                                    Page 260
```

**Page 259 (left bottom)**

```
1              CERTIFICATION
2
3      I, BELLE VIVIENNE, a Nationally
4    Certified Realtime Reporter, do hereby
5    certify:
6      That the witness whose testimony as
7    herein set forth, was duly sworn by me;
8    and that the within transcript is a true
9    record of the testimony given by said
10   witness.
11     I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I am
14   in no way interested in the outcome of
15   this matter.
16     IN WITNESS WHEREOF, I have hereunto
17   set my hand this 23rd day of December
18   2021.
19
20
          Belle Vivienne
21   BELLE VIVIENNE, CRR, CCR, RPR
22
23        *   *   *
24
25
                                    Page 259
```

**Page 261 (right bottom)**

```
1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2    Transcript - The witness should review the transcript and
3    make any necessary corrections on the errata pages included
4    below, notating the page and line number of the corrections.
5    The witness should then sign and date the errata and penalty
6    of perjury pages and return the completed pages to all
7    appearing counsel within the period of time determined at
8    the deposition or provided by the Federal Rules.
9    _X_ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 261
```

66 (Pages 258 - 261)

# EXHIBIT B

```
 1                 UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5     CHASOM BROWN, WILLIAM BYATT,
       JEREMY DAVIS, CHRISTOPHER
 6     CASTILLO, and MONIQUE
       TRUJILLO, individually and on
 7     behalf of all other similarly
       situated,
 8
                      Plaintiffs,
 9                                        No.
              vs.                         5:20-cv-03664-LHK-SVK
10
       GOOGLE LLC,
11
                      Defendant.
12     _____/
13
14
15          VIDEOTAPED DEPOSITION OF CHASOM BROWN
16               Remote Zoom Proceedings
17                Los Angeles, California
18               Thursday, January 13, 2022
19
20
21
22
23     REPORTED BY:
24     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25     Pages 1 - 208                 Job No. 5028094
```

Page 1

1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3
4
5
6   CHASOM BROWN, WILLIAM BYATT,
    JEREMY DAVIS, CHRISTOPHER
7   CASTILLO, and MONIQUE
    TRUJILLO, individually and on
8   behalf of all other similarly
    situated,
9
          Plaintiffs,
10
    vs.              No.
11                   5:20-cv-03664-LHK-SVK
    GOOGLE LLC,
12
          Defendant.
13   _____/
14
15
16       Videotaped deposition of CHASOM BROWN, taken on
17   behalf of the Defendant, Remote Zoom Proceedings from
18   Los Angeles, California, beginning at 9:52 a.m. Pacific
19   Standard Time and ending at 5:20 p.m. Pacific Standard
20   Time, on Thursday, January 13, 2022, before
21   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
22   No. 3462.
23
24
25
                                                    Page 2

1   APPEARANCES:
2
3   FOR THE PLAINTIFFS:
4       BOIES SCHILLER FLEXNER LLP
5       BY: JAMES LEE, ESQ.
6       100 SE Second Street, Suite 2800
7       Miami, Florida 33131
8       (305) 539-8400
9       jlee@bsfllp.com
10
11      BY: HSIAO (MARK) C. MAO, ESQ.
12      44 Montgomery Street, 41st Floor
13      San Francisco, California 91401
14      (415) 293-6800
15      mmao@bsfllp.com
16
17      MORGAN & MORGAN
18      BY: RYAN MCGEE, ESQ.
19      201 North Franklin Street, 7th Floor
20      Tampa, Florida 33602
21      (813) 223-5505
22      rmcgee@forthepeople.com
23
24
25
                                                    Page 3

1   APPEARANCES (Continued):
2
3   FOR THE DEFENDANT:
4       QUINN EMANUEL URQUHART & SULLIVAN, LLP
5       BY: SARA JENKINS, ESQ.
6          TRACY XI GAO, ESQ.
7       555 Twin Dolphin Drive, 5th Floor
8       Redwood Shores, California 94065
9       (650) 801-5040
10      sarajenkins@quinnemanuel.com
11      tracygao@quinnemanuel.com
12
13
14   Also Present:
15      Scott Slater, Videographer
16
17
18
19
20
21
22
23
24
25
                                                    Page 4

1               I N D E X
2
3
4   THURSDAY, JANUARY 13, 2022
5
6   WITNESS                    EXAMINATION
7   CHASOM BROWN
8
9   BY MS. JENKINS              11, 201
10  BY MR. LEE                  195
11
12
13
14
15   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
16       Page    Line
17        56      7
18       155      1
19       202      3
20
21
22
23
24
25
                                                    Page 5

2 (Pages 2 - 5)

Veritext Legal Solutions
866 299-5127

1 that relate to this case and potentially the testimony
2 you might give today?
3     A   No   You don't have anything to worry about
4     Q   Okay   Do you have any documents with you in the
5 room today?                                   09:58:02
6     A   I do   I do have a few
7     Q   Okay   Can you tell me what those are?
8     A   I have the -- the Complaint   I don't know if
9 you need to see them
10     Q   Is it the Second Amended Complaint, does it say   09:58:15
11 on the first page?
12     A   It says Second Amended Complaint
13     Q   Thank you
14     A   The Incognito splash screen (indicating),
15 Privacy Policy (indicating)   The Google Terms of Service   09:58:36
16 (indicating)
17         The only other document is Google Chrome Privacy
18 Notice (indicating)
19     Q   BY MS JENKINS:  Okay   Thank you
20         I notice there's some highlighting on those   09:58:58
21 pages   Do you have any notes written on any of those,
22 handwritten notes or anything in the margin?
23     A   I have one note on one page
24         MS JENKINS:  All right   James, could you
25 please get a scan of highlighting and any notes on those   09:59:16

Page 14

1 pages and send those over to us
2         MR LEE:  Yep
3         MS JENKINS:  Thank you
4     Q   And do you have your phone with you there today?
5     A   The phone, yeah, is in the room              09:59:28
6     Q   And is it -- is it turned on or could you leave
7 it --
8     A   The phone itself is on, but the ringer is off
9     Q   All right   Thank you
10         What did you do to prepare for your deposition   09:59:48
11 today?
12         MR LEE:  Hold on one second, given this is
13 Mr Brown, I believe, his first deposition
14         Mr Brown, when Google's attorney, when
15 Ms Jenkins asks you questions, you should not assume   09:59:57
16 anywhere in her questioning that she's trying to ask you
17 about any communications you may have had with your
18 lawyers   So when you answer her questions, you should
19 only answer to the extent you can do so without revealing
20 any communications you've had with your attorneys   10:00:17
21         Does that make sense?
22         THE WITNESS:  Yeah, I understand
23         MR LEE:  Okay
24         Ms Jenkins, why don't you just ask the question
25 again with that in mind                       10:00:26

Page 15

1         MS JENKINS:  Sure.
2     Q   What I asked is what you did to prepare for your
3 deposition today, and as Mr. Lee pointed out, I'm not
4 asking about any communications you may have had with
5 your counsel.  But if you met with counsel, you can tell   10:00:36
6 me when you met and who you met with.
7     A   Well, I printed out some documents, the
8 documents that I just showed you, and then outside of
9 that, I didn't prepare, except for speaking with my
10 lawyers, of course.                           10:01:00
11     Q   Okay.  And without telling me anything you
12 discussed, can you tell me when you met with your
13 lawyers?
14     A   Yesterday.
15     Q   And for about how long?                    10:01:11
16         MR. LEE:  You can answer.
17         THE WITNESS:  A few hours.
18     Q   BY MS. JENKINS:  Had you met with them
19 prior to yesterday to prepare for the deposition?
20     A   No.                                       10:01:24
21     Q   Did you meet with Mr. Lee?
22     A   Yes, I did.
23     Q   Were any of your other lawyers present?
24     A   Yes.  Mark was there as well.
25     Q   Okay.  Did you review -- in addition to the   10:01:43

Page 16

1 documents that you have in front of you there, did you
2 review any other documents?
3         MR. LEE:  Hold on.  Are you asking about
4 documents that refreshed his recollection?  Otherwise,
5 it's privileged.                              10:01:55
6         MS. JENKINS:  Well, I was just asking if he
7 reviewed any others.  I'm not asking what they are.
8         MR. LEE:  Okay.  You can answer that limited
9 question, Mr. Chasom, but I don't want you to identify
10 any additional documents.                      10:02:06
11         THE WITNESS:  Yes.
12     Q   BY MS. JENKINS:  And of those documents, did any
13 of those documents refresh your recollection with respect
14 to the issues described in those documents?
15     A   No.                                       10:02:23
16     Q   Did you review any deposition transcripts from
17 this case?
18     A   No.
19     Q   Can you tell me, what is your current job?
20     A   It's a little complicated.  I guess -- like I   10:02:40
21 guess I'm an entrepreneur, like I technically probably am
22 unemployed.  So I own a few companies.
23     Q   Okay.  And what companies are those?
24     A   Well, I have ownership interest in several, but
25 would you like me to name them?                10:03:03

Page 17

1    Q. Sure, yeah.
2    A. Well, I guess there's an over-arching company
3    called Eppek, E-P-P-E-K, LLC. And that's actually
4    generally where all the interest is in. So there's that
5    one. And then I have a sole prop that is Chasom, just my        10:03:18
6    first name.
7    Q. Okay. And what type of business is Eppek LLC?
8    A. It's a cannabis business. It's a transportation
9    business. It is a real estate business. It is -- that
10   probably is -- is good. I probably dabble in some other        10:03:47
11   random things, but nothing --
12   Q. Does --
13   A. -- worth --
14   Q. -- Eppek LLC have a website?
15   A. No.                                                         10:03:57
16   Q. Do any of those services or -- or products that
17   you just listed, do any of them have a website related to
18   cannabis or travel?
19   A. Well, I guess my sole prop does, which is my
20   band, which is Chasom.com.                                     10:04:16
21   Q. Okay. And what is the name of your band?
22   A. Chasom, which is my first name.
23   Q. Do you run that website?
24   A. I -- I feel like I put -- I haven't seen it in a
25   long time, to be honest, but I -- me and the guitar           10:04:35

Page 18

1    player in the band have added things to the website, yes.
2    Q. And are you able to do that yourself
3    technically, you have the know-how of how to change the
4    website?
5    A. If I use like a program like Wix, where it                  10:04:52
6    pretty much does it for you, then yeah, I could figure it
7    out, but my -- that's why I have the guitar player do it
8    because he has a bit more technical knowledge than I do
9    on that.
10   Q. When is the last time that you were employed by            10:05:10
11   someone other than yourself?
12   A. About a year and a half ago.
13   Q. And can you tell me what that job was?
14   A. That was with T-Mobile USA.
15   Q. And what was your role there?                               10:05:30
16   A. I was a -- my title at the end was -- I was an
17   account manager, and then they had changed my title to --
18   I basically was an account manager at the time I was
19   there.
20   Q. And how long were you at T-Mobile?                          10:05:49
21   A. Like 13 years, 13-and-a-half years.
22   Q. What's the highest level of education that
23   you've completed?
24   A. Some college.
25   Q. And where did you go to college?                            10:06:05

Page 19

1    A. At Golden West and Long Beach, Cal State Long
2    Beach.
3    Q. Were you studying for a specific degree?
4    A. Business administration.
5    Q. How did you get involved in this case?                      10:06:25
6        MR. LEE: Again, Mr. Brown, you can answer that
7    question, but to the extent that -- only to the extent
8    that it doesn't reveal any communications you've had with
9    your counsel. Okay?
10       THE WITNESS: (Nods head.)                                  10:06:42
11       I -- I'd noticed some odd things that -- that I
12   had questions about going on with my account and ads and
13   things like that. And so then I inquired about, you
14   know, talking to an expert in the field, and then that's
15   how I got in touch with my lawyer.                             10:07:04
16   Q. BY MS. JENKINS: Okay. Can you describe the odd
17   things that you just mentioned? What were those?
18   A. It -- it just essentially had to do with the ads
19   that were being served to me, and I got curious like how
20   and where they were coming from.                               10:07:30
21   Q. Were these ads being served to you while you
22   were browsing in Chrome Incognito mode?
23   A. I don't really remember specifically if it was
24   that or not. It was more just -- yeah, I don't really
25   remember if it was specifically in the Incognito mode,        10:07:57

Page 20

1    but there were -- it would be both, I guess
2        MR LEE: By the way, Mr Brown, I just want you
3    to know that -- since Ms Jenkins agrees -- nobody
4    wants you to guess So if you recall something, then you
5    can recall it, and if you don't recall something, that's      10:08:16
6    perfectly fine But we certainly don't want you to
7    guess
8        THE WITNESS: Okay So I'm not 100 percent
9    clear if it was in Incognito mode or not
10   Q BY MS JENKINS: When -- when you said your --              10:08:31
11   when you were answering the questions earlier, you said
12   both By that did you mean it may have been in Incognito
13   mode or it may have been in regular mode on Chrome; is
14   that correct?
15   A Yes                                                       10:08:45
16   Q So I believe that you said, then, that you --
17   you were looking for an expert about -- after noticing
18   some odd things regarding advertising -- advertisements
19   that you were seeing; is that correct?
20   A Yeah                                                      10:09:05
21   Q Okay And so who did you reach out to when you
22   were looking for an expert about that?
23   A It -- one of my business partners had known one
24   of the experts in the lawyers, and so we were discussing
25   it, and I guess he got us in contact                        10:09:25

Page 21

6 (Pages 18 - 21)

Page 70

1  you, would that cause the same concern?
2      MR LEE: Objected -- objection to form to the
3  extent that -- strike that.
4      Objection to form, vague as to "anonymous."
5      THE WITNESS: Yeah. Like I don't -- I don't --    11:56:15
6  I would have the same concern because I feel like my
7  identifiers are me. I don't know how Google identifies
8  me. I think -- I think my name is probably the last
9  thing Google cares about me.
10     So it's -- it's like equivalent to like, Sara, I    11:56:31
11  just met you. We don't know each other. But I know
12  you're wearing a black jacket, I know you're wearing a
13  red shirt, I know you wear glasses, I know like the type
14  of chair that you're looking at. I know I know a lot of
15  things about you. I could probably figure out where    11:56:51
16  you're located.
17     And so just maybe if I didn't know your first
18  name, that -- it's almost irrelevant. I now know a lot
19  about you, probably more than you would prefer me knowing
20  about you.    11:57:00
21     And especially if you clicked on the button and
22  you muted your mic, but now I can hear everything you're
23  saying. But you clicked on the button. You muted the
24  mic. But I can hear everything you're saying? That's
25  something inherently wrong with that.    11:57:12

Page 71

1      Q. BY MS. JENKINS: Well, in that way with your
2  explanation of it, that would not be anonymous in that
3  you would still know it was me talking. I'm rather
4  talking about if Google knows that some user is in a
5  specific location, but doesn't know what user it is and    11:57:28
6  cannot connect that location back to you as a person,
7  does that cause the same concern?
8      MR. LEE: Objection. Asked and answered.
9      THE WITNESS: Yes, that causes the same concern.
10  Because they know a myriad of things about me that I    11:57:42
11  specifically asked them to not know right now. And --
12  and, yeah, so it does cause the same concern.
13     Q. BY MS. JENKINS: Do you know whether the
14  information that Google receives affects your browsing
15  experience?    11:58:00
16     MR. LEE: Objection to form, vague.
17     THE WITNESS: I believe it has an effect. To
18  what degree, I don't know. I could probably speculate,
19  but I'm sure you don't want that.
20     Q. BY MS. JENKINS: No, I don't want you to    11:58:18
21  speculate, but if you -- if you have any idea that
22  wouldn't be speculation.
23     A. Well, tailored advertisements. I'm sure that's
24  something that -- that would happen.
25     Q. Okay. Anything else that you can think of?    11:58:31

Page 72

1      MR MAO: Let me jump on and say that you're on
2  mute Just tell him to pause
3      Excuse me Hey, sorry, like there's something
4  wrong with the connection Can we take a break real
5  fast? Just two minutes I think James' screen is    11:58:49
6  frozen, Sara
7      MS JENKINS: Oh, okay Sure Yeah, I hadn't
8  noticed Sorry
9      MR MAO: Sara, you're actually -- I actually
10  can't hear you I can't hear Chasom, either    11:59:03
11     THE WITNESS: Oh, really? Okay
12     THE REPORTER: Shall we go off the record?
13     MR MCGEE: Yeah, this is Ryan Why don't we go
14  off the record
15     MS JENKINS: Sure    11:59:16
16     THE VIDEOGRAPHER: We are off the record The
17  time is 11:59 a m
18     (Discussion off the record )
19     (Recess )
20     THE VIDEOGRAPHER: We are back on the record    12:05:42
21  The time is 12:06 p m
22     Q BY MS JENKINS: All right Mr Brown, if
23  Google has your browsing activity from one Incognito
24  session and it also has browsing activity from a second
25  different Incognito session, but Google doesn't know that    12:06:04

Page 73

1  they come from the same person, would that still cause
2  you concern?
3      MR LEE: Objection to form, vague as to
4  "person "
5      THE WITNESS: Yes, that would cause me concern    12:06:22
6      Q BY MS JENKINS: And why is that?
7      A Because you did -- you collected my data without
8  my consent, and now you're saying it, hey, we did it
9  twice But it's like you -- you -- you stole from me
10  once, and then you stole from me again, and then you're    12:06:47
11  saying, hey, we just don't keep it in the same place
12  Are you cool with that? No, I'm not cool with that
13     Q Do you have an understanding of whether Google
14  profits from user data?
15     A I -- I believe they do --    12:07:09
16     Q And what's your understanding of how --
17     A -- a lot I believe they do a lot
18     Q And what's your understanding of how Google
19  profits from user data?
20     A Well, data can be monetized in an assortment of    12:07:16
21  ways One of those ways is putting profiles together
22  and -- you know, to advertisers to, hey, here's your type
23  of customer It's this guy He's in the cannabis
24  history He's 43 years old He likes these certain
25  things And then they -- there's certain things that    12:07:47

1 advertisers want, and Google provides that to them, and I

2 think a transaction occurs and there's probably a lot of

3 money that exchanges hands

4     And just -- just to be fair, I -- I -- for

5 business, I have used Google like AdSense before and     12:08:06

6 things like that for targeted ads   And so there's a lot

7 of different things you could click, and you could

8 like -- you could pick exactly who you're going to

9 target, so

10     Q  For -- for what business have you used AdSense?     12:08:23

11     A  Oh, this is going to be funny   I -- me and a

12 buddy of mine, we started a puppet show online on

13 YouTube, and we were advertising that -- it wasn't a

14 puppet show   It was reviewed movies, basically, but with

15 puppets     12:08:48

16     And so we wanted to advertise to certain people

17 People that liked movies, people that were in our area,

18 people like that, that type of stuff

19     Q  Is this one of the -- the businesses that you're

20 running under the LLC you mentioned earlier?     12:09:03

21     A  That -- that would have been under my sole prop,

22 I believe, when I did that   Because that's more along

23 the lines of entertainment   It was just kind of just a

24 fun little project between me and my buddy, but we did,

25 you know, put some time into it     12:09:24

Page 74

1     Q  Did you use AdSense to increase views on your

2 videos?

3     A  Yes.  Yes.

4     Q  And -- and did the -- did that advertising

5 effort have any results?     12:09:39

6     A  It did.  We did get more views and more

7 subscribers from it.

8     Q  Were you happy with that experience?

9     A  Lukewarm.  I don't know if I'd do it again, but

10 I don't -- I don't regret it.  It was a puppet show.  So,     12:10:00

11 you know, like conversations about puppet shows, Sara.

12     Q  Is it fair to say that Google AdSense did what

13 you wanted it to do in that it increased views and

14 subscribership?

15     A  I think that's a fair thing to say.     12:10:22

16     Q  Other than advertising, do you have an

17 understanding of any other ways that Google profits from

18 user data?

19     A  Not to any depth, but there's a lot of ways that

20 data can be used to be monetized.  I don't know which     12:10:47

21 ones Google uses the most or anything like that.  I can

22 imagine they -- because they have so much data, they

23 probably use it in every way possible.

24     Q  Okay.  And what other ways to monetize data are

25 you aware of?     12:11:07

Page 75

1     A  Like, for example, something newer coming out

2 is -- you know, data's being collected from people's

3 driving habits, and then that's -- like insurance

4 companies are paying to get that information.  So that

5 would be another example.     12:11:24

6     Q  Okay.  You're not aware if Google is doing

7 anything with that -- to that respect, are you?

8     A  No, I'm not aware of that.

9     Q  And are there any other ways that you know of

10 monetizing user data that you can think of?     12:11:41

11     A  There's -- yeah, there's probably a lot of ways.

12 Give me a moment to think about it, and I'll try to -- I

13 think many, many companies would be very curious about,

14 you know, habits of people and -- and they would pay for

15 that as well.  So not necessarily advertising, but the     12:12:11

16 general habits of people, and I would think Google is

17 doing that.

18     Q  Okay.  Anything else?

19     A  Yeah, like you can -- like a lot of like bulk

20 data collection.  Like I guess that would lean more     12:12:41

21 toward -- toward companies wanting information, but it

22 could be companies, individuals, like -- yeah, I -- I

23 don't deal in that world so I don't know specifics, and

24 I'm trying not to like, oh, guess does Google do this or

25 guess does Google do that.  I don't know.  My guess is     12:13:02

Page 76

1 they do it all

2     Q  Yeah   My question was not specific to Google,

3 but just generally ways that user data might be

4 monetized, but --

5     A  Oh     12:13:14

6     Q  Are there any other ways that you can think of?

7     A  Yeah   You can check effectiveness of like

8 things that you're doing   Like, for example, there's one

9 way I use data is we send out an email, and then we find

10 out how many people click on that email   And then we     12:13:42

11 analyze the different forms of like, oh, hey, this email,

12 more people will click on it when we put this or we do

13 that

14     And so we -- to find the effectiveness of

15 practices is one way that it can be monetized     12:13:59

16     Q  For -- for what company or endeavor have you

17 done that -- that sort of practice with regard to email?

18     A  It was in my cannabis company

19     Q  What is your cannabis company?

20     A  Well, it's all -- it's a series of a bunch of     12:14:19

21 it, but the ownership company is Eppek LLC

22     Q  And what are the companies, the cannabis

23 companies then under Eppek?

24     A  One of them is called Maturin (phonetic), one of

25 them is called Connick, one of them is called Elemental     12:14:38

Page 77

20 (Pages 74 - 77)

1 Holistic.  There's like some other LLCs that we use for
2 random things that -- off the top of my head, I don't
3 really know.  I don't really deal with them or write
4 checks for them very often, but there's LLCs that Eppek
5 would own.                                    12:15:05
6       Q.  And what types of companies are those?
7       A.  Well, either in like -- well, in cannabis, or
8 they would be -- yeah, they would be cannabis companies.
9       Q.  When you say cannabis companies, I'm wondering,
10 do you mean they sell cannabis or -- I'm just not sure    12:15:26
11 what you mean by you hold it.
12       MR. LEE:  Okay, hold on for a second.  Hold on
13 for a second, Sara.
14       I'm actually not sure, either, Sara.  How do you
15 think this line of questioning is going to lead to      12:15:35
16 relevant testimony?  I've let you get into it, but we
17 keep going further down into this, and I see no -- no way
18 any of this is relevant.
19       MS. JENKINS:  Well, I think I'm allowed to delve
20 into his background a little bit.  I haven't gone very    12:15:49
21 far.  He's talking about user data with respect to emails
22 from some of these companies.  I'm asking what the
23 companies are and what they do, so...
24       MR. LEE:  You seem particularly focused on the
25 cannabis companies.  That's -- that's all I'm saying.    12:16:06

Page 78

1       MS. JENKINS:  I've also asked about the puppet
2 show company.  I'm happy to ask about the other companies
3 he has as well.  I'm interested in -- in these companies,
4 the technology that they use, and his understanding of
5 the technology through these companies.        12:16:21
6       So if you want to instruct him not to answer
7 what types of cannabis companies he's involved in, go
8 ahead.
9       MR. LEE:  I'm not instructing him not to answer.
10 I'm just trying to understand.  I guess I'll just make my    12:16:32
11 objections.  It's certainly your time, but I guess you
12 can choose how to use it.
13       Go ahead.
14       THE WITNESS:  It's a licensed retail cannabis
15 company.                                       12:16:49
16       Q.  BY MS. JENKINS:  And is that what all of those
17 different cannabis companies that you mentioned are?
18       A.  One of them owns some real estate, and that
19 houses a cannabis -- a cannabis company in it.  And what
20 was the other one?  And the company in it is a licensed    12:17:09
21 manufacturing lab.  So that would be the extent.
22       Q.  Okay.  What does a licensed -- licensed
23 manufacturing lab, does that mean they're licensed for
24 producing cannabis?
25       A.  Oh, yeah.  Okay.  Now we're getting into my    12:17:32

Page 79

1 world.  So if you're curious about manufacturing licenses
2 that cannabis.  So what you do is you pull -- basically,
3 you get the plant, and then you pull it into the lab, and
4 then what happens is you are extracting the terpene
5 profile from it.  So through all the machinery.      12:17:54
6       Now, hey, I do -- am part owner of the lab, but
7 I don't know the chemistry behind it all, but I can tell
8 you what the machine does, is you then extract the THC
9 and you -- in the form of distillate, and then you
10 extract the terpene profiles.                  12:18:11
11       And then you can make -- like you've probably
12 seen people generally have like a -- a vape, like or a
13 vape cartridge.  And who knows?  You may partake
14 yourself, Sara, in vapes.
15       And so if you want to get essentially high off    12:18:24
16 THC, then you can -- you'll have a vape in distillate
17 form, and through a -- and before we get it to you, it
18 would, of course, be tested, all licensed, and then sold
19 through another licensed retailer.  So then you can have
20 a clean, pure, unobstructed hit of THC, essentially.    12:18:44
21       Q.  And are you involved in the day-to-day
22 operations of these companies?
23       A.  No.
24       Q.  So are you involved as an investor?
25       A.  I'm involved as, you know, an investor, an    12:19:04

Page 80

1 advisor.  Like I know a lot about the industry and -- but
2 like am I the manager of the location?  No, we have a
3 manager of the locations, and they kind of run all the
4 day-to-day.  But basically when they screw up, then I get
5 on them and get them back on -- on track.       12:19:26
6       Q.  Okay.  Are you aware that you can enable block
7 all cookies in the Chrome browser?
8       A.  Block all cookies in the Chrome browser.  I'm
9 not aware of that, but I'm sure -- I'm sure it's in the
10 realm of possibilities.                        12:19:46
11       Q.  Did you know that you could enable block
12 third-party cookies in Chrome settings?
13       A.  I'm -- I'm sure I've seen something that says
14 that.
15       Q.  Do you know if you've done that?        12:20:02
16       A.  I don't even exactly know what that is.  So if
17 you're blocking third-party cookies from another website,
18 I assume.  I don't really know how that works.
19       Q.  Okay.  Do you know that you can enable clear
20 cookies and site data when you close all windows in    12:20:22
21 Chrome settings?
22       A.  So I know you can clear cookies, and I think
23 I've done that before, only because something wasn't
24 working and somebody told me to clear cookies, and so I
25 cleared the cookies, and then it started working.    12:20:39

Page 81

21 (Pages 78 - 81)

1 has; is that correct?

2    A.   Correct.

3    Q.   And on what basis has your understanding of the

4 way that Incognito works changed?

5         MR. LEE:   And now I'm going to ask you to not        17:19:44

6 answer that question because it's based on

7 attorney-client privilege.

8         MS. JENKINS:   James, you're the one who brought

9 this up; right?   You're the one who asked the question.

10        MR. LEE:   I asked has it changed.   You're asking   17:19:58

11 for the bases.   Those are two different things.

12   Q.   BY MS. JENKINS:   All right.   Mr. Brown, will you

13 adhere to your counsel's instruction?

14   A.   Yes.

15        MS. JENKINS:   All right.   Then I have no further   17:20:10

16 questions.

17        MR. LEE:   Thanks, everyone.   We'll take the

18 rough.   We'll take the rough copy, please.

19        THE REPORTER:   Fine.   Thank you.   Can we go off

20 the record?                           17:20:25

21        THE VIDEOGRAPHER:   We are off the record.   The

22 time is 5:20 p.m. on January 13th, 2022.

23        This concludes today's testimony given by

24 Chasom Brown.   The total number of media units used was

25 eight and will be retained by Veritext Legal Solutions.   17:20:38

Page 202

---

1        (Time noted: 5:20 p.m. Pacific Standard Time.)

2                  --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 203

---

1        I declare under the penalty of perjury under the

2 laws of the State of California that the foregoing is

3 true and correct.

4        Executed on _____, 2022, at

5 _____, _____.

6

7

8

9

10

11        _____

12             SIGNATURE OF THE WITNESS

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

---

1 STATE OF CALIFORNIA      ) ss:

2 COUNTY OF MARIN          )

3

4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5 hereby certify:

6        That the foregoing deposition testimony was

7 taken before me at the time and place therein set forth

8 and at which time the witness was administered the oath;

9        That testimony of the witness and all objections

10 made by counsel at the time of the examination were

11 recorded stenographically by me, and were thereafter

12 transcribed under my direction and supervision, and that

13 the foregoing pages contain a full, true and accurate

14 record of all proceedings and testimony to the best of my

15 skill and ability.

16        I further certify that I am neither counsel for

17 any party to said action, nor am I related to any party

18 to said action, nor am I in any way interested in the

19 outcome thereof.

20        IN WITNESS WHEREOF, I have subscribed my name

21 this 17th day of January, 2022.

22

23

24

25        LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 205

---

52 (Pages 202 - 205)

# EXHIBIT C

Message

| | |
|---|---|
| **From**: | chrome-leads@google.com [chrome-leads@google.com] |
| on behalf of | Sean Harvey [sharvey@google.com] |
| **Sent**: | 2/2/2009 3:47:30 PM |
| **To**: | Welmer Van Der Wel [wvanderwel@google.com] |
| **CC**: | Sundar Pichai [sundar@google.com]; Linus Upson [linus@google.com]; Caesar Sengupta [caesars@google.com]; Mike Belshe [mbelshe@google.com]; Ian Fette [ifette@google.com]; Barbara Stanley [bstanley@google.com]; xfp-leads [xfp-leads@google.com]; Joerg Heilig [jh@google.com]; Jonathan Bellack [jbellack@google.com]; chrome-leads [chrome-leads@google.com]; Jim Roskind [jar@google.com] |
| **Subject**: | [chrome-leads] Re: [xfp-leads] Re: IE8 "inprivate filtering" is not a part of a "porn mode" and may be an attack on Google ads or analytics |

totally aware that this is a big problem. still working to get formal messaging out on this.

On Mon, Feb 2, 2009 at 10:42 AM, Welmer Van Der Wel <wvanderwel@google.com> wrote:
It would help greatly if we could get a formal statement from Google. Many DFP clients are asking about this and we keep telling them that we have not had a chance to fully test the impact.

On Sun, Feb 1, 2009 at 9:52 AM, Sundar Pichai <sundar@google.com> wrote:
Thanks, we are following this and responding, pls dont discuss more in this thread. Thanks

On Sun, Feb 1, 2009 at 8:30 AM, Linus Upson <linus@google.com> wrote:
[+sundar,chrome-leads]

I believe Sundar is involved in Google's response. It may not be something suitable for email.

Linus

On Sat, Jan 31, 2009 at 8:07 PM, Jim Roskind <jar@google.com> wrote:
I have not investigated personally, but I was told by my colleague that this filter feature is separate from the "inprivate mode," which some refer to as a "porn mode." You can read about Inprivate Filtering (formerly Inprivate Blocking) as distinct from Inprivate Browsing (a.k.a., Inprivate Mode a.k.a., porn mode) at:

http://www.efluxmedia.com/news_Internet_Explorer_8_RC1_Released_33967.html

Quoting from that article: "*Along with the InPrivate Filter, another sought-after feature that was first implemented in IE 8 Beta 2 is an updated version of InPrivate Browsing, similar to Google Chrome's Incognito window.*" That sure makes it sound like these features are distinct.

I was told that in one IE 8 beta the FILTER was on by default, but now it is off by default.  I was told that the real problem is that it has become progressively easier to "turn on" the filter.  I was told the a pop-up dialog is something kindred to "Would you like IE to protect your privacy and prevent third parties from sharing information about you?".

I strongly suspect that confusion between the mode and the filter is reducing push-back (as per Mike's comment).  My subject line was meant to help illuminate the confusion (and I'm hoping I'm not the confused person).

CONFIDENTIAL

I was also told that parts of MS (where they sell ads) are not as pleased about this feature, but perchance MS is in a better position to deploy the "work-arounds."

On Sat, Jan 31, 2009 at 6:46 PM, Mike Belshe <mbelshe@google.com> wrote:
This has come up a number of times and does appear to be a significant threat to google, google's partners, and all advertising on the web.  I don't know what the official google response is; except that since it is only in the "inprivate" mode, it is less of a threat.

A more adventurous jump would be for MIcrosoft to simply bundle an adblocker in IE by default.  They haven't done that yet, but if I were them, it would be on the radar.

On Sat, Jan 31, 2009 at 3:41 PM, Jim Roskind <jar@google.com> wrote:
Sorry If Already Known:

A friend of mine at AOL called today to chat with me about the new "inprivate filtering" in IE 8.  Apparently it is making his life hard, as it is seemingly targeted at harming providers of advertisements.

To review what he told me (which matches the high level blurbs I found on the net): "Inprivate filtering" adaptively blacklists domains that are found to provide sub-resource content to ten or more separate sites.  They purport to do this to prevent these blacklisted sites from tracking user surfing actions.  It is interesting that this filtering doesn't actually check to see if cookies etc. are being set.  In the extreme, if a company with many subdomains hosts a trademark GIF file on a central domain, that central domain may get blacklisted (even if the content it serves is cachable, and no cookies are set etc.).

My friend told me that when he surfed around with IE 8, after a few hours, a number of Google sites were at the top of the blacklist (with a bunch of AOL sites next on the list).

He also told me that the algorithm was pretty stupid, and probably could be avoided, but it was going to be a hassle (at least for him, at AOL) to change the domains and/or paths in all their deployed ads.

I was wondering if we were actively tracking this (mis)feature, and its potential impact on google served (or tracked) advertisements?

Thanks,

p.s., It is rather interesting that the new adaptive DNS pre-resolution for sub-resources in Chrome tries to accelerate access to these subresources, which are being blocked by IE 8.

GOOG-BRWN-00225678

--
_____

Sundar Pichai
GoogleInc.

Voice: 650-253-6341
Email: sundar@google.com




--

wvanderwel@google.com




--
Sean Harvey
Product Manager
Google Content Network & Platform Ad Serving
212-381-5330
sharvey@google.com

GOOG-BRWN-00225679

# EXHIBIT D

































# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


CHASOM BROWN; MARIA NGUYEN;
WILLIAM BYATT; JEREMY DAVIS;
and CHRISTOPHER CASTILLO,
individually and on behalf
of all other similarly
situated,

                Plaintiffs,

vs.                      No. 5:20-cv-03664-LHK

GOOGLE LLC,

                Defendant.
_____/



CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF BRIAN RAKOWSKI

THURSDAY, AUGUST 19, 2021


Stenographically Reported by:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

California CSR No. 9830

Job No. 741808


MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                        ---oOo---
 4
 5   CHASOM BROWN; MARIA NGUYEN;
     WILLIAM BYATT; JEREMY DAVIS;
 6   and CHRISTOPHER CASTILLO,
     individually and on behalf
 7   of all other similarly
     situated,
 8
              Plaintiffs,
 9   vs.              No. 5:20-cv-03664-LHK
10   GOOGLE LLC,
11            Defendant.
     _____/
12
13
14       REMOTE VIDEOTAPED DEPOSITION OF BRIAN RAKOWSKI
15       taken on behalf of the Plaintiffs, on Thursday,
16       August 19, 2021, beginning at 9:00 a.m., and ending
17       at 6:02 p.m., Pursuant to Notice, and remotely
18       before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~
19       License No. 9830.
20
21
22
23
24
25
```

Page 3

```
 1   R E M O T E  A P P E A R A N C E S :
 2
 3
 4   COUNSEL FOR THE PLAINTIFFS:
 5      BOIES SCHILLER & FLEXNER LLP
 6      By: BEKO RICHARDSON, ESQ.
 7         MARC C. MAO, ESQ.
 8         ERIKA NYBORG-BURCH, ESQ.
 9      44 Montgomery Street, 41st Floor
10      San Francisco, California 94104
11
12      BOIES SCHILLER & FLEXNER LLP
13      By: ROSSANA BAEZA, ESQ.
14      100 SE 2nd Street, 28th Floor
15      Miami, Florida 33131
16
17      MORGAN & MORGAN
18      By: RYAN MCGEE, ESQ.
19         RA AMEN, ESQ.
20      201 N. Franklin Street, 7th Floor
21      Tampa, Florida 33602
22
23
24
25
```

Page 4

```
 1   R O M O T E  A P P E A R A N C E S :  (Cont.)
 2
 3
 4   COUNSEL FOR THE DEFENDANT:
 5      QUINN EMANUEL URQUHART & SULLIVAN
 6      By: VIOLA TREBICKA, ESQ.
 7         TEUTA FANI, ESQ.
 8      865 S. Figueroa Street, 10th Floor
 9      23 Los Angeles, California 90017
10
11
12   ALSO PRESENT: Matthew Gubiotti, Google
13         Evan Tsilimidos, Videographer
14         Vanessa Wheeler, Exhibit Technician
15                  ---oOo---
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1               INDEX OF STATEMENT
 2
 3   WITNESS:  Brian Rakowski
 4
 5   EXAMINATION                      PAGE
 6   By Mr. Richardson            12, 320
 7   By Mr. Trebicka                 318
 8
 9         INDEX OF DEPOSITION EXHIBITS
10   EXHIBIT                         PAGE
11   Exhibit 2   6-10-08 E-mail, Re: Chrome    68
12      top 10 - mk, Bates
13      GOOG-BRWN-00228744.R - '745.R
14   Exhibit 3   6-12-08 E-mail, Re: Chrome    85
15      Closing Interviews Today -
16      Summary of P2, P6, P5, Bates
17      GOOG-BRWN-00228597 - '99
18   Exhibit 4   7-11-08 E-mail, Re: Chrome   103
19      redirect loop issue - observation
20      Bates GOOG-BRWN-00410076
21   Exhibit 5   7-11-08 E-mail, Chrome redirect  120
22      loop issue - observation
23      Bates GOOG-BRWN-00226894 - '95
24   Exhibit 6   7-17-18 E-mail, Chrome Team Meeting 135
25      Notes, Bates GOOG-BRWN-00409986 - '87
```

Page 242

1  being a popular completion of the query you typed.  15:32
2      When you were in Incognito Mode, we just  15:32
3  don't send that query to the suggest server.  So  15:32
4  there's no suggest result that comes back.  15:32
5      MR. RICHARDSON:  Okay.  15:33
6  Q  Do you agree that people can choose to browse  15:33
7  the web privately by using Chrome in Incognito Mode?  15:33
8  A  It's a bit under-specified.  Can you -- can  15:33
9  you clarify what you mean by use the web privately.  I  15:33
10  need more context.  15:33
11  Q  I guess I'm just trying to understand whether  15:33
12  or not that's an accurate statement, that you can  15:33
13  choose to browse the web privately using Chrome in  15:33
14  Incognito Mode?  15:33
15  A  Well, if you're talking about privately in  15:33
16  terms of private so that your computer doesn't have a  15:33
17  record of what you -- what sites you went to, which  15:33
18  was the design intent of Incognito Mode, then yes.  15:33
19  It's private from your roommate, you know, looking at  15:33
20  your browsing history or whatever.  15:33
21  Q  So this -- this goes back to the circularity  15:33
22  problem.  You can browse incognito using Incognito  15:33
23  Mode if you define Incognito Mode to be what you  15:34
24  designed?  15:34
25  A  Right.  Right.  15:34

Page 243

1  Q  Okay.  So if you define "private" to mean how  15:34
2  Incognito Mode functions, then yes, that would be an  15:34
3  accurate statement?  15:34
4  A  Well, that's slightly different.  But I'm  15:34
5  defining "private" to -- you know, there's different  15:34
6  interpretations of private.  If you're specific about  15:34
7  private meaning your computer won't retain a record of  15:34
8  it, then -- then yes, that's what it was designed to  15:34
9  do.  15:34
10  Q  Okay.  Do you consider Incognito Mode for  15:34
11  Chrome to be a browser setting?  15:34
12  A  Browser setting?  It -- it would depend on  15:34
13  the context for using the word "setting."  But in  15:34
14  general, like, normal parlance, I would say no, it's  15:34
15  not a setting.  15:34
16  Q  We talked earlier about the Incognito new tab  15:35
17  page.  15:35
18      Do you recall that?  15:35
19  A  Yes.  15:35
20  Q  And -- and we looked at some drafts of the  15:35
21  Incognito new tab page.  15:35
22      Do you recall that?  15:35
23      MS. TREBICKA:  Objection; misstates --  15:35
24  objection; assumes facts; misstates the record.  15:35
25      THE WITNESS:  I think we looked at a -- one  15:35

Page 244

1  exhibit that showed new tab page.  I remember that.  15:35
2      MR. RICHARDSON:  Right.  I'm sorry.  15:35
3  Q  Do -- can you pull up Exhibit 10?  15:35
4      Is that easy for you to do?  15:35
5      Or have you put all those aside?  15:35
6  A  I can do it.  15:35
7  Q  So if you look at Exhibit 10 there down by  15:35
8  the bottom, it says:  15:35
9      "Going incognito doesn't affect the behavior  15:35
10  of other people, servers, or software."  15:35
11      Do you see that?  15:35
12  A  At the bottom, there's a lot --  15:35
13  Q  It's a quarter --  15:35
14      MS. TREBICKA:  First page, you mean, Beko?  15:35
15      MR. RICHARDSON:  First page, above the five  15:35
16  bullets.  15:36
17      THE WITNESS:  Okay.  Yeah, yeah.  15:36
18      MR. RICHARDSON:  Q.  Let me read that again.  15:36
19  It says:  15:36
20      "Going incognito doesn't affect the behavior  15:36
21  of other people, servers, or software."  15:36
22      Do you see that?  15:36
23  A  I see that.  15:36
24  Q  And that would include Google servers;  15:36
25  correct?  15:36

Page 245

1  A  Yeah.  15:36
2  Q  And did you feel that it was important to  15:36
3  include that reference to servers in this disclosure?  15:36
4  A  I -- again, I can't remember the -- the  15:36
5  timing of all this.  But we did want to be as clear as  15:36
6  possible about what happens in this mode.  So that's  15:36
7  why this page was designed, and including that  15:36
8  description of what does and doesn't happen was  15:36
9  important.  15:36
10  Q  And we had seen some discussions regarding  15:36
11  server logging confusion; right?  15:36
12  A  Right.  15:36
13  Q  And was this reference to servers in the  15:36
14  Incognito new tab page meant to address that server  15:36
15  logging confusion?  15:36
16  A  Again, I don't remember the timing of what  15:37
17  came first or second.  But this would -- in my mind,  15:37
18  this -- this would clarify what this feature does and  15:37
19  does not do.  15:37
20  Q  Do you know what a GWS ID is, W -- GWS?  15:37
21  A  It rings a bell.  This is super old.  This  15:37
22  is, like, 100 years old.  15:37
23  Q  What's your understanding of what a GWS ID  15:37
24  is?  15:37
25  A  Well, this is super cobwebs.  GWS was the  15:37

Page 246

1    acronym for Google Web Server, GWS.  It was the front    15:37
2    end for much of our traffic.  I cannot recall right    15:37
3    now what the -- what -- what ID was involved.    15:38
4        Q   Do you have any understanding as to whether    15:38
5    or not a GWS ID is sent when someone is in Incognito    15:38
6    Mode?    15:38
7        MS. TREBICKA:  Objection; vague as to time    15:38
8    period.    15:38
9        THE WITNESS:  I -- I can't recall what the    15:38
10   GWS ID was anymore, so I don't know.    15:38
11       MR. RICHARDSON:  That's fine.    15:38
12       Q   Do you have any understanding as to whether    15:38
13   or not something called the X client data header is    15:38
14   sent when someone is in Incognito Mode?    15:38
15       A   I'm trying to remember that header.  I -- all    15:38
16   these headers that start with an X, I don't -- I don't    15:38
17   recall specifically.    15:38
18       MR. RICHARDSON:  Go to the next exhibit,    15:38
19   Exhibit 21.    15:38
20       (Document remotely marked Exhibit 21    15:38
21       for identification.)    15:38
22       MR. RICHARDSON:  Exhibit 21 is a document    15:38
23   produced by Google, with Production Nos. '225677    15:39
24   through '225679, with the metadata sheet.    15:39
25       Q   Mr. Rakowski, would you please let me know    15:39

Page 247

1    when you have Exhibit 21 in front of you.    15:39
2        A   I just opened it.    15:39
3        Q   And when you're ready, my first question will    15:39
4    be whether or not Exhibit 21 is an e-mail you received    15:39
5    as part of your work for Google?    15:39
6        A   I'm -- I'm browsing it.    15:39
7        (Witness reading document.)    15:39
8        Okay.  I've read it.  And as part of    15:41
9    chrome-team, I would have -- or chrome-leads, I would    15:41
10   have gotten this e-mail.    15:41
11       Q   And do you see on the second page where    15:41
12   there's an e-mail from Jim Roskind where he writes:    15:41
13       "Sorry If Already Known:  A friend of mine at    15:41
14   AOL called today to chat with me about the new    15:41
15   'inprivate filtering' in IE 8.  Apparently it is    15:41
16   making his life hard, as it is seemingly targeted at    15:41
17   harming providers of advertisements."    15:41
18       Do you see that?    15:41
19       A   I see that.    15:41
20       Q   And then Mr. Mike Belshe responded:    15:41
21       "This has come up a number of times and does    15:41
22   appear to be a significant threat to google."    15:41
23       Do you see that?    15:41
24       A   Yes.    15:41
25       Q   To the first page, Mr. Upson writes:    15:41

Page 248

1        "I believe Sundar is involved in Google's    15:42
2    response.  It may not be something suitable for    15:42
3    email."    15:42
4        Do you see that?    15:42
5        A   I see it.    15:42
6        Q   And do you understand that reference to    15:42
7    Sundar to be a reference to Sundar Pichai?    15:42
8        A   Yes.    15:42
9        Q   And do you have any understanding as to what    15:42
10   Mr. Upson meant by:    15:42
11       "It may not be something suitable for email."    15:42
12       A   I don't know.  I would have to -- I would    15:42
13   have to guess at what he meant.    15:42
14       Q   In your experience, are there certain topics    15:42
15   at Google that are not suitable for e-mail?    15:42
16       A   There are certain things that -- that we just    15:42
17   don't want to -- it's inefficient to go back and forth    15:42
18   over e-mail on a complicated, nuanced topic.  That --    15:42
19   that tends to be a reason why Linus would have gone    15:42
20   that route.    15:43
21       Q   Sitting here today, it's your testimony that    15:43
22   Mr. Upson was describing this as not suitable for    15:43
23   e-mail for efficiency purposes; is that correct?    15:43
24       A   That's my -- that's my guess.    15:43
25       Q   Did you ask Mr. Upson why he wrote:    15:43

Page 249

1        "It may not be something suitable for email."    15:43
2        A   No, I don't -- I don't recall talking to him    15:43
3    about this e-mail.    15:43
4        Q   Did you ask Mr. Pichai why he wrote:    15:43
5        "Pls dont discuss more in this thread."    15:43
6        A   I did not.    15:43
7        Q   Were there other occasions where Mr. Pichai    15:43
8    told you and other employees to not put things in    15:43
9    writing?    15:43
10       A   It's possible.    15:43
11       Q   Can you recall any of those specific    15:43
12   occasions?    15:43
13       A   No, I can't recall any specific instances.    15:43
14       Q   And then at the very top here, it says:    15:43
15       "Totally aware that this is a big problem."    15:43
16       Do you see that?    15:44
17       A   Yes.    15:44
18       Q   If you know, why was this being described as    15:44
19   "a big problem"?    15:44
20       A   I don't know.    15:44
21       MS. TREBICKA:  Calls for speculation.    15:44
22       THE WITNESS:  Yeah, I don't know.  I don't --    15:44
23   this whole thread is a bit -- I can't remember much of    15:44
24   it.    15:44
25       MR. RICHARDSON:  Q.  Do you recall any    15:44

Page 250

1    discussions with Mr. Pichai about this?          15:44
2        A   I don't recall discussions about in private    15:44
3    browsing.                                        15:44
4        Q   Okay.  Does Google have profiles tied to    15:44
5    Incognito browsing?                              15:44
6        MS. TREBICKA:  Objection; vague, and as to    15:44
7    time period, too.                                15:44
8        THE WITNESS:  What do you mean by "profiles"?    15:44
9        MR. RICHARDSON:  Q.  Do you ever use profiles    15:44
10   in connection with your work for Google?        15:44
11       A   Yeah, the --                             15:44
12       Q   -- profiles?                             15:44
13       A   The most common -- the use that I'm familiar    15:44
14   with is the browser profile.  And a browser -- should    15:44
15   I -- should I explain what that is?             15:45
16       Q   Please let me know what a browser profile is.    15:45
17       A   Okay.  A browser profile is an instance of    15:45
18   the browser.  So for instance, the feature that one    15:45
19   could build, and I believe we considered building, but    15:45
20   I don't think -- I don't know that we built it, was    15:45
21   you could have a separate profile for you, and then    15:45
22   another profile for your wife.                  15:45
23       So they would keep your bookmarks separate    15:45
24   and all -- you know, basically be a separate instance    15:45
25   of the browser without having to -- it's -- it's a bit    15:45

Page 251

1    dependent on the operating system upon which you're    15:45
2    running.                                         15:45
3        But in a normal -- you know, I don't remember    15:45
4    how -- I don't actually know how profiles work in    15:45
5    different operating systems anymore.  But at -- on    15:45
6    Windows, it was pretty onerous to switch Windows    15:45
7    profiles.                                        15:45
8        So we considered building a Chrome profile so    15:45
9    that you could have multiple user profiles, either for    15:45
10   different people or, you know, maybe have a work    15:46
11   version and a personal version or whatever.     15:46
12       Q   And would there be a profile linked to an    15:46
13   Incognito browsing session, a browser profile?    15:46
14       A   That -- that would be how I would -- I would    15:46
15   describe it.  You could use Incognito within any of    15:46
16   those browser profiles.                         15:46
17       MR. RICHARDSON:  Let's just look quickly at    15:46
18   Exhibit 22.                                      15:46
19       (Document remotely marked Exhibit 22        15:46
20       for identification.)                        15:46
21       MR. RICHARDSON:  Exhibit 22 is a document    15:46
22   produced by Google with Production No. '225151, with    15:46
23   the metadata sheet.                             15:46
24       THE WITNESS:  Okay.  I have it.             15:47
25       MR. RICHARDSON:  Q.  Mr. Rakowski, is       15:47

Page 252

1    Exhibit 22 an e-mail you received as part of your work    15:47
2    for Google?                                      15:47
3        A   "Chromium-dev."  It looks like it was sent to    15:47
4    the chromium-dev list, of which I can't remember    15:47
5    whether I was an owner or a member.             15:47
6        Q   If you look at the metadata, you'll see at    15:47
7    the very bottom there all custodies.  It has your    15:47
8    name, Brian Rakowski; right?                    15:47
9        A   That's right.                           15:47
10       Q   So I'll just represent that Google produced    15:47
11   this as a document from your files.             15:47
12       A   Okay.  Then I will --                    15:47
13       Q   I just wanted to ask about the first        15:47
14   sentence, where it says:                        15:47
15       "We do officially support profiles:  they're    15:47
16   how Incognito works."                           15:47
17       Do you see that?                            15:47
18       A   I see that.                             15:47
19       Q   Do you have an understanding of what that    15:47
20   means?                                           15:47
21       A   Yeah.                                    15:47
22       Q   What do you understand that to mean that:    15:47
23       "We do officially support profiles:  they're    15:48
24   how Incognito works."                           15:48
25       A   Let me -- let me just read this.  I don't    15:48

Page 253

1    know if I've ever read this e-mail before, even though    15:48
2    I might have gotten it.                         15:48
3        (Witness reading document.)                 15:48
4        Okay.  The -- this quickly gets out of my    15:48
5    depth.  But the -- what I -- what I believe Tim, who    15:48
6    wrote this message, is -- is describing is the    15:48
7    underlying infrastructure upon which we built    15:48
8    Incognito was to effectively create a fresh browser    15:48
9    profile that you would use.                     15:48
10       As I mentioned before, it's like getting a    15:48
11   new computer, using it, and then you tear it down and    15:48
12   throw it away when you -- when you close the window.    15:49
13       So I think he's saying that the             15:49
14   infrastructure is implemented in this general purpose    15:49
15   profiles thing, which could be used in other ways    15:49
16   also.                                            15:49
17       Q   And is data from that Incognito profile ever    15:49
18   sent to Google servers?                         15:49
19       MS. TREBICKA:  Objection; overbroad; vague.    15:49
20       THE WITNESS:  You'll have to be more specific    15:49
21   from a "profile."                              15:49
22       MR. RICHARDSON:  I'm not sure how to be more    15:49
23   specific.                                        15:49
24       Q   There's data associated with that Incognito    15:49
25   profile; correct?                              15:49

Page 322

1    MS. TREBICKA:  We object, but we can take          18:02
2  that up with communications outside of the record of    18:02
3  this deposition.                                    18:02
4    MR. RICHARDSON:  Thank you.                      18:02
5    THE VIDEOGRAPHER:  The time is 6:02.  That       18:02
6  concludes today's deposition.                       18:02
7    THE REPORTER:  Do you need a copy and rough      18:03
8  sent to you as well?                                18:03
9    MS. TREBICKA:  Yes, please.                       18:03
10   MR. RICHARDSON:  Yes, please, with us as          18:03
11 well.  You can send that to -- to Rosie and myself and   18:03
12 Mark Mao.                                           18:03
13   (WHEREUPON, the deposition ended                  18:04
14     at 6:02 p.m.)                                    18:04
15             ---oOo---
16
17
18
19
20
21
22
23
24
25

Page 323

1    DECLARATION UNDER PENALTY OF PERJURY
2
3    I, BRIAN RAKOWSKI, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my remote deposition, taken on
6  August 19, 2021, that I have made such corrections
7  as appear noted herein in ink; initialed by me;
8  that my testimony contained herein, as corrected,
9  is true and correct.
10
11   DATED this ____ day of _____, 2021, at
12 _____.
13
14   _____
15       SIGNATURE OF WITNESS
16
17
18
19
20
21
22
23
24
25

Page 324

1          CERTIFICATE OF REPORTER
2
3    I, ANDREA M. IGNACIO, hereby certify that the
4  witness in the foregoing remote deposition was by me
5  remotely sworn to tell the truth, the whole truth, and
6  nothing but the truth in the within-entitled cause;
7    That said deposition was taken in shorthand
8  by me, a disinterested person, at the time and place
9  therein stated, and that the testimony of the said
10 witness was thereafter reduced to typewriting, by
11 computer, under my direction and supervision;
12   That before completion of the deposition,
13 review of the transcript [x] was [ ] was not
14 requested.  If requested, any changes made by the
15 deponent (and provided to the reporter) during the
16 period allowed are appended hereto.
17   I further certify that I am not of counsel or
18 attorney for either or any of the parties to the said
19 deposition, nor in any way interested in the event of
20 this cause, and that I am not related to any of the
21 parties thereto.
22   Dated:
23   _____
24   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
25

Page 325

1            DEPOSITION ERRATA SHEET
2
3  Page No.____Line No.____Change to:_____
4  ____
5  Reason for change:_____
6  Page No.____Line No.____Change to:_____
7  ____
8  Reason for change:_____
9  Page No.____Line No.____Change to:_____
10 ____
11     Reason for
   change:_____
12 Page No.____Line No.____Change to:_____
13 ____
14     Reason for
   change:_____
15 Page No.____Line No.____Change to:_____
16 ____
17     Reason for
   change:_____
18 Page No.____Line No.____Change to:_____
19 ____
20     Reason for
   change:_____
21 Page No.____Line No.____Change to:_____
22 ____
23     Reason for
   change:_____
24 SIGNATURE:_____DATE:_____
25