# Pretrial Conference Statement

# Redacted Version of Document Sought to be Sealed

BOIES SCHILLER FLEXNER LLP
David Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile: (415) 999 9695

SUSMAN GODFREY L.L.P.
Bill Carmody
(*pro hac vice*)
bcarmody@susmangodfrey.com
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

MORGAN & MORGAN
John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

*Attorneys for Plaintiffs; additional counsel
listed in signature blocks below*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Andrew H. Schapiro (*pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
Joseph H. Margolies (admitted *pro hac vice*)
josephmargolies@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (CA Bar No. 326971)
crystalnixhines@quinnemanuel.com
Rachael L. McCracken (CA Bar No. 252660)
rachaelmccracken@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendant; additional counsel
listed in signature blocks below*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all other similarly situated, <br><br> Plaintiffs, <br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 4:20-cv-03664-YGR-SVK <br><br> **PRETRIAL CONFERENCE STATEMENT** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Courtroom 1 – 4th Floor <br> Date: November 29, 2023 <br> Time: 9:00 a.m. |

Pursuant to the Court's September 18, 2023 Order (Dkt. 1001), the Court's September 29, 2022 Standing Order Re: Pretrial Instructions in Civil Cases, and in advance of the Pretrial Conference set for November 29, 2023 at 9:00 a.m., Plaintiffs and Defendant Google LLC jointly submit this Pretrial Conference Statement.

## A. THE ACTION

### i. The Substance of the Action

**Plaintiffs' Statement**

"Bad for users, bad for human rights, bad for democracy." GOOG-CABR-05905167 at -67. That is how Google employees internally (not publicly) described Google's private browsing mode—Chrome Incognito. In its form contract, Google promised class members "control" over Google's collection of their browsing data, and Google invited them to exercise that control by using a private browsing mode, like Incognito. In breach of that promise, Google collected (and continues collecting) enormous amounts of sensitive data from users' private browsing, including during their visits to *non-Google* websites while *signed out* of their Google accounts. Through its unlawful voyeurism, Google has collected and used private data for Google's own benefit, generating ███ in advertising revenues for Google and using the data with various Google products and services, including its artificial intelligence.

This Court certified two classes under Rule 23(b)(2) to pursue eight claims against Google: (1) violation of the California Computer Data Access and Fraud Act ("CDAFA"); (2) and (3) violation of the California Invasion of Privacy Act ("CIPA"), under sections 631 and 632; (4) violation of the Electronic Communications Privacy Act ("ECPA"); (5) invasion of privacy under the California Constitution; (6) intrusion upon seclusion under California law; (7) breach of contract; and (8) violation of California's Unfair Competition Law ("UCL"). The two classes are:

> **Class 1** – All Chrome browser users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in "Incognito mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

**Class 2** – All Safari, Edge, and Internet Explorer users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in a "private browsing mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

With the exception of the UCL claim, where Plaintiffs only seek injunctive relief, Plaintiffs are also pursuing these claims individually for damages. Every claim survived Google's motion for summary judgment, for Plaintiffs and both classes. Dkt. 969. The detailed allegations supporting those claims are contained in the operative Fourth Amended Complaint. Dkt. 886.

Plaintiffs also seek issue certification under Rule 23(c)(4).[1] Plaintiffs moved to certify "the same liability issues that will necessarily be decided in connection with the claims certified under Rule 23(b)(2) and asserted by the named Plaintiffs." Dkt. 894 at 13; Dkt. 932 at 4-5. As explained in Plaintiffs' motion, Appendix A to their Trial Plan lists the elements of every claim, and those elements will be decided with common evidence. Dkt. 932 at 4 (citing Dkt. 608-4 at 27). The Court's summary judgment order provides further justification for issue certification because the Court clarified that implied consent is an affirmative defense, which Google has the burden to prove. Dkt. 969 at 13 n.13. Every element of every claim can and should be decided under Rule 23(c)(4), leaving only the issues of implied consent and damages for individual class members.

Plaintiffs' Statement of the Elements of Proof (below) summarizes the elements of their claims and evidence they will use to prove them, including for purposes of their individual damages claims, their claims on behalf of certified Rule 23(b)(2) classes, and (if granted) their claims on behalf of the Rule 23(c)(4) classes. For example, Plaintiffs will present admissions from Google employees and executives (discussing the same disclosures cited by Google below) where they described Incognito as "a lie" and a "confusing mess," flagging "common misconceptions" among

---

[1] Plaintiffs' June 20, 2022 class certification motion sought issue certification under Rule 23(c)(4) in the alternative to Rule 23(b)(3) certification, and Google's opposition brief did not address that request. Dkts. 608-3 at 25, 659-3. The Court's December 12, 2022 class certification order did not address issue certification, Dkt. 803, but at the February 14, 2023 Case Management Conference, the Court advised that Plaintiffs may renew their motion for issue certification, Dkt. 872. Plaintiffs renewed their motion on March 14, 2023. Dkt. 894. The motion was heard on May 12, 2023, and it remains pending.

users about "how Incognito works" and "private browsing more generally"—like that it "hides browsing activity from Google."[2] Employees begged for Google to ██████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ GOOG-CABR-04746153 at -69-72; GOOG-CABR-00094550 at -50. These concerns made their way to Google's C-Suite, with CMO Lorraine Twohill informing CEO Sundar Pichai that Incognito was ████████ ████████████████████████████████████████ GOOG-BRWN-00406065 at -67.

Google recognized the problem posed by its "Incognito" brand and "Spy Guy" icon: "People pay attention to the name 'Incognito' and the Spy Guy icon, and people draw incorrect conclusions from there." GOOG-BRWN-00812710 at -10. Incognito "has always been a misleading name" and is "a problem of professional ethics and basic honesty." GOOG-BRWN-00475063 at -65; GOOG-CABR-04971904 at -04. Time and again, employees demanded meaningful change – not only to the branding and disclosures but also to Google's behavior, proposing that Google no longer collect, store, and use private browsing data, or that Google at least give people a real choice, including with plans to "offer some privacy towards Google." GOOG-BRWN-00063505 at -05.

Ultimately, Google employees "lost" the internal "incognito war," with the company choosing profits and voyeurism over user privacy. GOOG-BRWN-00475063 at -65. Google was making █████ of dollars from private browsing data, and Google was also using that data to create and update Google's products, algorithms, and services. So when employees proposed changes to Incognito, Google managers instructed them ████████████████████████████████████ ██████." GOOG-BRWN-00169228 at -28. ████████████████████████████████ ████████████" *Id.* Worse, Google greenlighted the marketing team's "pitch" to "double down" on Incognito. GOOG-CABR-04195517 at -17. When employees complained, Mr. Pichai told them he "didn't want to put incognito under the spotlight." GOOG-BRWN-00388293 at -93.

---

[2] GOOG-BRWN-00806426 at -26; GOOG-CABR-03827263 at -63; GOOG-CABR-00084985 at -43; GOOG-CABR-00093167 at -82.

Plaintiffs now seek relief for Google's unlawful and continuing interception, storage, and use of their private browsing data. That relief includes monetary damages, including statutory damages, for Plaintiffs' individual claims. On behalf of the certified classes, Plaintiffs also seek injunctive relief, including an order requiring in part that Google (1) delete any products, algorithms, or services built with any private browsing data, (2) cease all use of the "Incognito" brand name and "Spy Guy" icon, and (3) offer users a real option to stop Google's collection of private browsing data. Google made one change to its Incognito tracking practices after Plaintiffs filed this lawsuit (blocking third-party cookies by default for all Incognito users), but far more is required for Google to deliver the privacy it promised.

Google now claims (below) that private browsing works "exactly" as described because it provides "local" privacy. But whether Incognito provides "local privacy" is irrelevant because Incognito is "not private in ways that many users want, that is, *as to Google*" (GOOG-BRWN-00153850.C). As recognized by Google employees, the words "Incognito" and "private" reinforce the "*misperception that your browsing is private everywhere instead of just on your device*" (GOOG-CABR-03764749). "Local privacy" is a red herring. Google promised class members "control" over Google's collection of their browsing data, and Google invited them to exercise that control by using a private browsing mode. This case is about Google's breach of that promise.

█████████████████████████████████████████████████████████████████ ████████████   GOOG-BRWN-00433503. As conceded by employees, ████████████ ███████████████████████████████████████████████████." *Id.* "We would never sa[y] that Google doesn't know who you are while you're Incognito." GOOG-CABR-04780837.R. That is because Google keys the data to unique identifiers associated with users' devices and browsing activity. Hochman Rep. Section VIII.F. Despite an avalanche of documents and admissions proving Google's intentional misconduct, Google somehow claims it did nothing wrong. The truth is that Google intentionally designed its products to vacuum up class members' private data, while giving users no ability to browse privately, free from Google's surveillance.

Google's defense (below) suffers from another fundamental inconsistency. Google steadfastly refused to disclose the full scope of its collection and use of private browsing data

1  (including for example its use of private browsing detection bits), but Google at the same time claims

2  it had consent for any and all use of private browsing data. This strains common sense. If Google's

3  collection and use were straightforward and disclosed, there would not have been more than 100

4  motions by Google to seal information in this case. Even as this case moves toward a public trial,

5  Google continues to seek to seal materials, claiming they are "highly sensitive" and "confidential in

6  the ordinary course of its business and [] not generally known to the public or Google's

7  competitors," such as "Google's internal strategies" and its "business practices for operating and

8  maintaining many of its important services." *See*, *e.g.*, Dkt. 999. If Google's conduct were

9  straightforward and disclosed, Google would not have been sanctioned for concealing information

10  regarding its use of private browsing data. If it were straightforward and disclosed, there wouldn't

11  be internal emails characterizing Incognito as "a lie", "confusing", and "misleading." Change is

12  long past due, and it is time to hold Google accountable.

13  **Google's Statement**

14      Google attempted to reach agreement with Plaintiffs to a mutual submission of short,

15  descriptive statements to orient the Court. Plaintiff did not agree. Instead, Plaintiffs submitted a

16  closing argument in written form, rife with inflammatory mischaracterizations of evidence and

17  unsupported rhetoric like "unlawful voyeurism." Google has not responded in kind to avoid

18  burdening the Court with information that will not assist with trial preparation. Google's submission

19  of a focused overview of the case, rather than a point-by-point refutation of Plaintiffs' statement,

20  does not indicate that Plaintiffs' characterizations are accurate. Rather, Google strongly disputes

21  each of Plaintiffs' characterizations and looks forward to refuting them at trial.

22      The evidence confirms that Chrome's Incognito mode and other browsers' private browsing

23  modes (collectively, "private browsing modes" or "PBMs") work exactly as Google publicly

24  described. Specifically, for each member of the class, PBMs: (1) provide local privacy from other

25  users of the same device by automatically deleting the sites visited from the "History" tab, and

26  deleting site data, cookies, and information entered in forms from the user's device; and (2) provide

27  privacy from entities online (including Google) by both automatically signing a user out of all

28  accounts upon opening a new Incognito session and by blocking the sharing of existing cookies and

automatically deleting new cookies from the browser when the user closes the session. These protections ensure that the data online entities (including Google) receive *is not associated with the user's identity, device, or with their other browsing activity*. It is undisputed that Incognito performs these functions as described in Google's disclosures, and Plaintiffs' own privacy expert admits that the private browsing functionality provides additional privacy.

Google's user agreements and privacy disclosures accurately disclose the specific protections provided by PBMs and the limits to those protections. Rather than focusing on the language of the disclosures, Plaintiffs instead excerpt admittedly non-public documents (which no user ever saw or relied on) reflecting a robust internal debate within Google to ensure that its privacy policy and other public statements strike the proper balance between clear and concise disclosures that users are more likely to read and understand and  more detailed and lengthy disclosures that users may ignore or find harder to comprehend. Plaintiffs misleadingly combine snippets of this internal debate (primarily attributable to a single former Google employee) that are divorced from their full context and relate to products that are not relevant here (*e.g.* Incognito in YouTube or Google Search) or scenarios excluded from the class definition (*e.g.*, Incognito users who sign back into their Google Accounts after Incognito automatically signs them out). Even if relevant, these internal documents serve only to confirm that Google takes privacy seriously and welcomes fulsome discussions to identify ways to improve its products and disclosures. Plaintiffs cannot cite any documents or testimony to undermine the fact that Incognito mode provides the multi-pronged privacy protection set forth in its disclosures. Plaintiffs instead draw tenuous inferences from Google's use of the words "private" and "control" to describe PBMs, while ignoring the express language of the disclosures, the way that PBMs operate, and the testimony of their privacy expert that PBMs *do* provide privacy and control. In fact, Plaintiffs do not genuinely dispute that "private browsing works 'exactly' as described," but rather argue (above) that it does not work in the way that "many users want." That Plaintiffs endeavor to cast what the disclosures *actually say* as a "red herring," but insist that what *some subset of* users may "want" is relevant, underscores how far they intend to stray from relevant issues. Further, Incognito, and other PBMs, do provide a measure of

1  "control" over Google's receipt of the at-issue data, as explained by numerous Google witnesses

2  and as admitted by Plaintiffs' privacy expert.

3      The full page disclosure that users see *each time* they open an Incognito session (the

4  "Incognito Screen") accurately describes the scope of privacy provided. It notifies users that

5  Incognito mode does not make them invisible online, but rather provides privacy by preventing

6  "other people who use this device" from "see[ing] your activity." GOOG-CABR-04400007. It does

7  so by "limit[ing] the information Chrome stores *on your system*." GOOG-CABR-00002522 at -31

8  (emphasis added); *see also id.* (noting that, Chrome (*i.e.*, the user's browser) "won't store…[b]asic

9  browsing history information like URLs…from the websites you visit."). The websites visited while

10  in Incognito mode will not appear in the user's Chrome browsing history, and others who use the

11  device will not see the pages visited in Incognito mode—providing the promised local privacy from

12  other users of a device.

13      Incognito provides privacy protection in additional ways consistent with the definition of

14  "Incognito"—*i.e.*, "with one's identity concealed."[3] When a user first starts an Incognito session,

15  they "are, by default, not signed into any accounts or sites" (*i.e.*, are signed out of their Google

16  accounts and other accounts that identify them). GOOG-CABR-05252306 at -06. Additionally,

17  while browsing in Incognito mode, Chrome "won't share existing cookies with sites you visit,"

18  GOOG-CABR-00002522 at -31, meaning users will appear as a new unidentified user to websites

19  they visit and to any third-party services (such as Google services) that the website has installed.

20  Google explains that websites "may deposit new cookies on your system while you are in

21  [Incognito], but they'll only be stored and transmitted until you close the last incognito or guest

22  window." *Id.* This means that for users (like Plaintiffs and Class Members) who do not sign into

23  their Google accounts during the Incognito session (per the class definition), any data associated

24  with their PBM session is not associated with their identities, their Google Accounts, their device,

25  or with their other browsing data. It is anonymous and orphaned.

26

27

_____

28  [3]  https://www.merriam-webster.com/dictionary/incognito.

CASE NO. 4:20-cv-03664-YGR-SVK
**PRETRIAL CONFERENCE STATEMENT**

It is true that neither Incognito mode—nor any other PBM—makes users invisible online. And the Incognito Screen makes that clear each time a user starts a session: clearly noting that browsing activity might still be visible to: "[w]ebsites you visit[,] [y]our employer or school[,] [and] [y]our internet service provider." GOOG-CABR-04400007. And Google further explains that Incognito mode does not "[p]revent the websites you visit from serving ads based on your activity during an Incognito session." GOOG-CABR-05252306 at -07. However, "[a]fter you close all Incognito windows, websites won't be able to serve ads to you based on your signed-out activity during that closed [Incognito] session." *Id.* Plaintiffs (and class members) understood and accepted that their PBM activity was not fully private.

Google provides even more detail for interested users on the "Learn More" page linked prominently from the Incognito Screen. That disclosure elaborates that the "websites" to which activity might be visible include "the ads and resources used on those sites." GOOG-CABR-00043362. The at-issue data—which includes the basic components of HTTP resource requests (*e.g.*, IP address, user-agent data, URL of the site visited) that Google receives when users visit websites that have installed Google services—is used to serve ads and provide other useful resources for websites (such as embedded maps, fonts, and search functionality). The collection and use for these purposes is detailed in plain language in Google's Privacy Policy. *See, e.g.*, GOOG-CABR-00001584 (Google uses the information it receives to determine "which ads you'll find most useful," "to deliver our services," "to ensure our services are working as intended," "to help us develop new [services]," "to customize our services…including content and ads" "for analytics and measurement to understand how our services are used," "to interact with you directly," and "to help improve the safety and reliability of our services"). The true red herring is Plaintiffs' arguments about the hypothetical joining of data and the use of Incognito detection bits (which Google addresses in its concurrently filed motions *in limine*). Plaintiffs' effort to impose a rule that Google cannot obtain consent because the public is not specifically aware of "Incognito detection bits," or the methods by which Google accomplishes these disclosed uses, must be rejected as not only unsupported by the law, but also as unworkable and counter to the goals of plain language disclosures that are intended to be understood by millions of people. Finally, the fact that Google sought to seal certain

confidential information concerning technical processes and other limited categories of information contained in the broad scope of discovery it produced does not mean that Google concealed its receipt of the at issue data. The data collection is disclosed in Google's Privacy Policy and elsewhere.

Google provided its users the privacy that it promised in its disclosures.

**ii.   Relief Prayed**

**Plaintiffs' Statement**

**Equitable Relief:**

Plaintiffs, on behalf of the certified Rule 23(b)(2) classes, seek equitable relief, including an order that directs Google to do all of the following:

1. Refrain from using the "Incognito" brand name and "Spy Guy" icon.

2. Perform an audit to identify:

    a. all logs that store private browsing data,

    b. all private browsing detection bits, and

    c. all purposes for which Google has used private browsing data.

3. Delete or refrain from using private browsing data Google is currently storing.

4. Delete or refrain from using any services, products, models, algorithms, experiments, or artificial intelligence that Google built, trained, or developed (in whole or in part) with private browsing data, including downstream services, products, models, algorithms, experiments, and artificial intelligence.

5. Delete or refrain from using all private browsing detection bits.

6. Refrain from collecting any private browsing data unless Google complies with the above requirements and also adds a consent toggle to the Splash Screen that allows users to choose whether Google may collect their private browsing data. The Splash Screen should specifically state that if the user consents, then Google "will record, store, and use your browsing activities on non-Google sites that use Google services, even if you remain signed out of your Google account," and that "your activity may only be private from users of the same device." For users who do not so consent,

Google shall present a real choice, and redesign its systems to stop collecting data from those browsing sessions.

7. Refrain from collecting any private browsing data unless Google complies with the above requirements and also modifies the "Learn More" page to the Splash Screen by disclosing:

    a. Every way in which Google uses private browsing data.

    b. That private browsing data is identifying, and that bad actors can identify users through their private browsing data.

    c. That while Google currently has policies against trying to identify private browsing users, (A) Google can amend that policy at any time, and (B) Google may be required to identify users through their private browsing data in response to demands from the government and/or law enforcement.

    d. Providing users with actual choices as to how they can prevent Google tracking.

8. Refrain from collecting any private browsing data unless Google complies with the above requirements and also revises its Privacy Policy and Chrome Privacy Notice (subject to the limits of the consent toggle described above) to expressly disclose that Google collects and uses private browsing data from users' visits to non-Google websites, including when users are signed out of their Google accounts. At a minimum, each of those disclosures should inform users that "Google will still record your browsing activities on sites that use Google services when you are using private browsing mode on Chrome as well as the 'private browsing' modes for other browsers like Safari and Edge."

9. Refrain from collecting any private browsing data unless Google complies with the above requirements and also amends its Terms of Service to clarify that any and all representations that Google makes regarding private browsing are incorporated into its Terms of Service, and that all such statements shall going forward be deemed contractual.

CASE NO. 4:20-cv-03664-YGR-SVK
**PRETRIAL CONFERENCE STATEMENT**

10. Refrain from using private browsing data for any revenue-generating purpose including but not limited to conversion tracking and improvement of Google products and services.

11. Refrain from collecting private browsing data from users who use non-Chrome private browsing modes. To the extent Google contends that it cannot comply with this requirement alone, ordering Google to approach all other browser companies (including but not limited to Safari and Edge) and to offer to work with those companies to develop a mechanism that will prevent Google from receiving any data associated with users who use those non-Chrome private browsing modes, unless those users specifically consent to Google receiving their private browsing data at the beginning of every private browsing session. Alternatively, Google should be required to provide a consent banner on every webpage that contains Google tracking beacons so that users of other private browsing modes have the opportunity to consent to Google collecting and using their private browsing data.

12. Any other relief the Court chooses to impose.

For all of these directions, to the extent Google claims it cannot distinguish private browsing data from other signed-out browsing data, the direction should apply to all signed-out browsing data. Plaintiffs further seek restitution and/or disgorgement for Google's collection, storage, and use of private browsing data, if available as relief for the Rule 23(b)(2) classes. Finally, Plaintiffs seek appointment of an independent third-party auditor to verify Google's compliance with these requirements. Google should seek advance approval from that auditor before making any changes to its policies or practices related to its collection, storage, or use of private browsing data. The Court can maintain oversight over Google's compliance.

Google suggests (below) that this Court is somehow powerless to issue classwide injunctive relief because of Google's "implied consent" defense. Incorrect. Contrary to what Google claims below, the certified Rule 23(b)(2) classes are not subject to an implied consent defense from Google. While Google may try to prove implied consent against the named Plaintiffs, it has no relevance to whether "Google is liable to the entire class."

More fundamentally, Google's argument misrepresents blackletter law on Rule 23(b)(2) certification. Whether Google could prove that any absent class members impliedly consented is irrelevant for purposes of the Rule 23(b)(2) trial. The Court may award injunctive relief regardless. "Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. ***Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate***." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998); *see also* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1775 (3d ed. 2023 Update) ("All the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).").

*In re Yahoo Mail Litigation*, 308 F.R.D. 577, 599 (N.D. Cal. 2015) is instructive. In opposition to Rule 23(b)(2) certification, Yahoo made the same argument that Google makes below: "Yahoo contends that . . . consent to Yahoo's practices cannot be determined on a class basis. More specifically, Yahoo argues that '[t]he need for individualized inquiries' would make it too difficult to determine whether any class member 'has a claim and has suffered a common injury.'" *Id.* The court rejected that argument, reasoning that it incorrectly presumes "that individual class members must prove their claims or individualized injuries in order for Rule 23(b)(2) certification to be appropriate." *Id.* "***In contrast to Rule 23(b)(3) classes, the focus is not on the claims of individual class members, but rather whether [a defendant] has engaged in a 'common policy.'***" *Id.* Here, Google has "engaged in a common policy" that generally applies to both classes. For all class members, Google collects, stores, and uses their private browsing data by way of the same tracking beacons, storage systems, services, products, and algorithms. Google's counsel previous understood this blackletter law, conceding in open court that "there is not an implied consent defense that I can think of that is specific to injunction." Oct. 11 Tr. at 20:4-5. He was correct then, and Google should revise its statement below to not mislead the Court.

Google's remaining arguments are easily rejected. First, Google contends that Plaintiffs cannot prove irreparable harm simply because they have continued to use Incognito mode. That

1    argument ignores the fact that Plaintiffs have no choice (other than to avoid the Internet altogether),

2    because there is (at least currently) no way to prevent Google from collecting their data. According

3    to a former Google employee, there "is no way that users can prevent" "Google from logging their

4    Incognito activity." McClelland Tr. at 318:3-12. Similarly, Google's technical expert never claimed

5    that any setting or feature (or combination thereof) will entirely prevent Google's collection of

6    browsing data. Hochman Supp'l Rep. ¶ 121 (discussing Zervas Rep.).  Indeed, should the jury find

7    that no real choice was actually presented by Google to the Plaintiffs, "implied consent" should not

8    be available to Google at all.

9          Google's argument is also improper because Google insisted that any data productions

10   during discovery be tied to Plaintiffs' data, which means Plaintiffs had to continue using the at-issue

11   private browsing modes to generate data for discovery. Plaintiffs sought a random sample of data

12   from class members. Google refused, and the Court denied Plaintiffs' motion to compel, limiting

13   productions to Plaintiffs' data. Dkt. 331. Having forced Plaintiffs to always be tracked on the

14   internet, whether using private browsing or not, it is unfair for Google to blame them for continuing

15   to use private browsing for the purposes of this litigation. Google's argument is also improper

16   because if Plaintiffs ceased using private browsing, then Google would argue they lack standing to

17   seek injunctive relief. *See In re Yahoo Mail Litig.*, 308 F.R.D. at 589 (rejecting arguments about

18   plaintiffs' continued use of the at-issue product because that "would put Plaintiffs in a catch-22 that

19   would essentially preclude injunctive relief altogether"). Furthermore, courts routinely find that the

20   "violation of privacy shows irreparable harm." *In re Meta Pixel Healthcare Litig.*, 2022 WL

21   17869218, at *17 (N.D. Cal. Dec. 22, 2022) (citing cases).

22         Second, Google incorrectly suggests that remedies at law are adequate compensation. The

23   Court already (correctly) rejected that argument at summary judgment: "[G]iven the nature of

24   Google's data collection, the Court is satisfied that money damages alone are not an adequate

25   remedy. Injunctive relief is necessary to address Google's ongoing collection of users' private

26   browsing data." Dkt. 969 at 36. "Without an injunction, . . . there is no way the Court can ensure

27   that [Google] will stop [collecting and using plaintiffs' private browsing data] without their consent.

28

1    Damages for past [collection] are not likely to dissuade [Google] from continuing this behavior in
2    the future." *Brooks*, 2021 WL 3621837, at *11.

3    Third, Google claims the public would not be served by an injunction because Plaintiffs seek
4    relief that "may force Google and other websites to stop offering value services used by millions of
5    people every day." This is nonsense. Private browsing traffic accounts for a small portion of the data
6    Google collects and uses. *E.g.*, Hochman Rep. ¶ 290 (citing internal Google documents explaining
7    that Incognito data accounts for ███ of browsing traffic). Google cannot credibly contend that it
8    would be unable to provide services to websites, including Google Analytics and Google Ad
9    Manager, if this Court ordered Google to stop its collection and use of private browsing data.

10   Google also wrongly claims that changes to Google's disclosures would somehow provide
11   adequate relief to the classes. The evidence proves otherwise. As explained by Google's own
12   employees, "People pay attention to the name *'Incognito' and the Spy Guy icon, and people draw*
13   *incorrect conclusions from there*." GOOG-BRWN-00812710. Changing the disclosures cannot
14   remedy that fundamental problem. Google should be ordered to cease any further use of the
15   "Incognito" band name and "Spy Guy" icon.

16   Google should provide users with the private browsing experience it promises, including by
17   offering a toggle that allows users to choose whether Google collects their Incognito data. Google's
18   Chief Marketing Officer Lorraine Twohill in 2021 implored Mr. Pichai to finally ███████████
19   ████████████  GOOG-BRWN-00406065. Other Google employees recommended that Google
20   make this precise change. As explained by former employee Rory McClelland:

21   ████████████████████████████████████████
22   ████████████
23   ████████████████████████████████████████
24   McClelland Tr. 312:20-313:4. That ████████████████████████████
25   ████████████████████████████████████████
26   ████████████████████████████." *Id.* at 88:16-89:6. Internal Google
27   documents support this testimony. Google engineers pushed for an ████████████████

28

1    ████████████████████████████.” GOOG-CABR-04511160. It is long past time for

2    Google to deliver the privacy it promised.

3        To the extent Google argues that its actions are excused on the basis that Plaintiffs expressly

4    consented, such consent must be informed and actual. Plaintiffs contend that Google cannot prove

5    that they were either informed or given an actual choice. Regardless, if Google's disclosures and

6    agreements are ambiguous, that ambiguous should be construed against Google as the drafter.

7        **Attorneys' Fees and Costs:**

8        Plaintiffs, on behalf of the certified classes, also seek attorneys' fees and costs (to be

9    determined by the Court after trial).

10       **Monetary Relief:**

11       Plaintiffs also seek the following monetary relief for their individual damages claims, which

12   have survived Google's motion for summary judgment:

13       Statutory damages:

14       Plaintiffs seek statutory damages to be awarded by the Court.

15       *ECPA:* For this claim, the Court "may assess as damages whichever is the greater of (A) the

16   sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result

17   of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each violation

18   or $10,000." 18 U.S.C. § 2520(c)(2). "Each interception is a separate violation." Dkt. 113 at 24.

19   Testimony from Plaintiffs and their damages expert Michael Lasinski will provide inputs for these

20   formulas. The Court has discretion to award these damages, and Plaintiffs will seek to have the

21   Court to exercise that discretion, including by demonstrating that Google's conduct was egregious.

22   *See infra* Section i.v.

23       *CIPA:* Plaintiffs are each entitled to "the greater of the following amounts: (1) Five thousand

24   dollars ($5,000) per violation [or] (2) three times the amount of actual damages, if any." Cal. Penal

25   Code § 637.2(a). As noted above, "[e]ach interception is a separate violation." Dkt. 113 at 24.

26   Testimony from Plaintiffs and their damages expert will provide the inputs for these formulas.

27       *Calculation*:  Google (below) incorrectly claims there is no evidentiary basis to quantify the

28   number of interceptions for purposes of calculating these statutory damages, and that Google

1   therefore should not pay any statutory damages. While Plaintiffs cannot reasonably be expected to

2   recall each and every private browsing session they undertook during the class period, Plaintiffs are

3   entitled to (and will) testify to their best conservative estimates. Google relatedly ignores Plaintiffs'

4   responses to Google's Interrogatory No. 2, which includes Plaintiffs' best estimates for how often

5   they used the at-issue private browsing modes.

6         While irrelevant, Google's argument also ignores that Google has (or should have) data to

7   verify Plaintiffs' testimony. As explained by Plaintiffs' expert Mr. Hochman, Google's records (to

8   the extent preserved) can be used to identify class members and verify class members' claims.

9   Hochman § VIII.H; Hochman Rebuttal §§ V.A, D, E; *see also* Lasinski Rep. ¶ 9 (analyzing "UMA"

10  data produced by Google, which tracks Incognito pageloads, as well as Google's collection of

11  "UMPBI", or unique monthly private browsing instances). To the extent Google contends that it no

12  longer has the data to verify claims, that is a problem of Google's making, which the Court already

13  addressed: "Google may not use the fact that only sampled data, not complete data, is available to

14  challenge class certification generally or attestations by individuals that they are members of the

15  class." Dkt. 587 at 7. Google's argument also ignores that Google has been precluded from

16  contesting whether any non-Google website contains Google tracking beacons.[4]

17        Google's discussion of Mr. Lasinski's statutory damages models is misplaced because those

18  are *classwide* models, where Mr. Lasinski provided *classwide* inputs to multiply against the

19  applicable statutory rate. The calculations for this trial will be straightforward because statutory

20  damages for this trial are limited to Plaintiffs' individual damages claims. Plaintiffs will testify to

21  the appropriate input (e.g., how frequently they used private browsing), and if accepted, the Court

22  can multiply the statutory rate by that input. Google's reliance on *In re: Lenovo Adware Litig.*, 2016

23

---

24  [4] When Google refused to identify all websites that contain Google tracking beacons, the Court
    precluded Google from arguing "that any specific website did not use" such tracking beacons unless

25  Google "respond[s] to this interrogatory as to that website at least 30 days in advance." Dkt. 288-1
    at 1-2. Google failed to do so before discovery closed. Regardless, since internal Google documents

26  reveal that 70% of the most popular websites contain Google Analytics tracking beacons (to say
    nothing of the other tracking beacons), any user who visited just four non-Google websites would

27  have a 99.2% chance of encountering a Google tracking beacon. Hochman Report ¶ 311; GOOG-
    BRWN-00490767 at -72.

28

WL 6277245, at *19 (N.D. Cal. Oct. 27, 2016) is likewise misplaced. That was a class certification decision, where the court concluded that individualized issues would predominate over whether class members "actually experienced a statutory violation." Here, statutory damages are limited to the Named Plaintiffs, who will testify about their use of private browsing, and as noted above, Google has (or should have) the data to verify their claims.

Actual Damages:

Plaintiffs also seek damages calculated as the full value of the harm they suffered by virtue of Google's violation of their privacy, including but not limited to the value of their private browsing data. As just one example, Google has admitted to this Court that the products and services it built with user data (including private browsing data) are "███████ products." Feb. 14, 2023 Tr. at 27:15-21. Plaintiffs here summarize the floor for those actual damages calculations.

Plaintiffs each seek damages of no less than $3 per month for every device they used to access one or more of the relevant private browsing modes during the class period. These damages will be proven through testimony from Plaintiffs and Plaintiffs' damages expert, Michael Lasinski. Mr. Lasinski will rely on Google's Ipsos Screenwise Panel program, where Google paid users to track their activity on a device. While payments to users could exceed $16 per month, Mr. Lasinski selected the minimum recurring payment for a single device ($3 per month) as a conservative indicator of the monthly payment necessary for a reasonable user to knowingly relinquish online privacy even in private browsing mode. Lasinski Rep. (Dkt. 608-9) § 8.[5] Each Plaintiff will testify as to the number of devices they used to access the relevant private browsing modes during the relevant time period and the time period. Based on Mr. Lasinski's formula, Plaintiffs (as of right now) intend to seek an award of damages that are no less than as follows:

1. Brown: 89 months * 3 devices * $3 = At least $801

2. Byatt: 89 months * 2 devices * $3 = At least $534

---

[5] This Court denied in full Google's motion to exclude Mr. Lasinski's opinions. Dkt. 803 at 6, 9-10. Relatedly, at summary judgment, this Court relied on this damages model to hold that Plaintiffs may seek damages for Google's collection and use of their private browsing data, reasoning that "plaintiffs proffer evidence that there is a market for their data." Dkt. 969 at 33; *see also id.* at 12, 36.

3.   Castillo: 89 months * 4 devices * $3 = At least $1,068

4.   Davis: 89 months * 6 devices * $3 = At least $1,602

5.   Trujillo: 89 months * 4 devices * $3 = At least $1,068

As mentioned above, Mr. Lasinski will also testify that Google was enriched by ███████ from its collection and use of class members' private browsing data. Lasinski Rep. § 7. This damages model is based on Google's internal ██████████" financial analysis, where Google's own analysts determined for its senior executive team that it would lose ███████ in 2021 alone if Incognito users were able to prevent just one form of Google tracking. *See* GOOG-CABR-04324934. Plaintiffs will ask the jury to award their respective shares of that ████████, relying on data such as the total number of class members and/or Google records demonstrating the number of private browsing sessions from which Google collected data. For example, there are 81,697,762 class members in Class 1 (the Chrome Incognito class), and Google made ███████ from Chrome Incognito browsing. Under one apportionment method, each Plaintiff is entitled to a ████ share. Plaintiff Trujillo is also a member of Class 2. There are 54,366,243 class members for Class 2, and Google made ████████ from Class 2's private browsing data, meaning that Ms. Trujillo is also entitled to a ████ share.

Plaintiffs can (and do) claim damages for the portion of the class period after they filed this lawsuit. Plaintiffs are not "inflat[ing] their damages" by continuing to use private browsing modes. As explained above, Plaintiffs have no choice (other than to avoid the Internet altogether). *Magna Weld Sales Co. v. Magna Alloys & Rsch. Pty. Ltd.*, 545 F.2d 668, 672 (9th Cir. 1976) (which Google cites below) is distinguishable because the plaintiff was "allowed [] to terminate" the at-issue agreement at any time, and yet chose to remain in business with the defendant. Unlike here, the *Magna* plaintiff had a real choice. Google's argument is also improper because Google insisted that any data productions during discovery be tied to Plaintiffs' data, which means Plaintiffs had to continue using the relevant private browsing modes, and if Plaintiffs ceased using private browsing, Google would argue that Plaintiffs lack standing for injunctive relief.

Finally, Plaintiffs will testify about how Google's violation of their privacy harmed their peace of mind, making them feel powerless. Plaintiffs will seek damages for that harm, consistent

1   with California law. *See, e.g.*, *Operating Engineers Loc. 3 v. Johnson*, 110 Cal. App. 4th 180, 187

2   (2003) ("The right of privacy concerns one's own peace of mind . . . ."); *Miller v. Nat'l Broad. Co.*,

3   187 Cal. App. 3d 1463, 1485 (Ct. App. 1986) (in invasion of privacy case, "[t]he elements of

4   emotional distress damages, i.e., anxiety, embarrassment, humiliation, shame, depression, feelings

5   of powerlessness, anguish, etc. would thus be subjects of legitimate inquiry by a jury in the action

6   before us, taking into account all of the consequences and events which flowed from the actionable

7   wrong"). Plaintiffs previously identified this harm, including in response to the interrogatory Google

8   cites below. *E.g.*, Davis's Resp. to Interrogatory 3 at ("Plaintiff Davis considered this browsing

9   activity private and confidential, and did not intend to share it with Google"); *see also* Other

10  Plaintiffs' Responses to Interrogatory 3 (similar). Plaintiffs elaborated at their depositions. For

11  example, Mr. Brown explained that "when you have [] your privacy breached, I consider that harm,"

12  emphasizing his "unknown harm" in that "all of my data that has been collected [] is being used to

13  – without my knowledge, without my consent, with not even knowing what it is and what's being

14  done with it." Brown Tr. 156:1-24. Mr. Davis similarly testified about the "huge erosion of trust and

15  a huge sense of disappointment" he experienced upon learning that Google was collecting his private

16  browsing information. Davis Tr. 139:24-25. Mr. Castillo described how a targeted ad from Google

17  ruined his plan to surprise his girlfriend with an engagement ring: Google "spoil[ed] something that

18  was so intimate and personal to me that it caused me priceless damages." Castillo Tr. 94:18-95:1.

19      Google is wrong to suggest that Plaintiffs must "quantify[]" this type of emotional harm.

20  That is for the jury to decide. "[I]f the proof discloses a wrongful invasion of the right of privacy,

21  substantial damages for mental anguish alone may be recovered." *Fairfield v. Am. Photocopy Equip.*

22  *Co.*, 138 Cal. App. 2d 82, 88 (1955) (citation omitted). "The measure of damages therefore is for

23  the trier of fact, and in assessing such damages he is accorded a wide and elastic discretion." *Id.*

24  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), which Google cites

25  below, is inapposite because that was an FLSA case where the plaintiffs failed to disclose "damage

26  computations."

27

28

1    Punitive damages:

2         Plaintiffs seek punitive damages to the extent available, including without limitation under

3    the ECPA, CIPA, CDAFA, and for their intrusion upon seclusion and invasion of privacy claims.

4    Punitive damages are available for these claims. *See* 18 U.S.C. § 2520(b)(2); Cal. Penal Code §

5    637.2; Cal. Penal Code § 502I(4) (CDAFA); *Condon v. Condon*, 2008 WL 11338437, at *7 (C.D.

6    Cal. June 6, 2008) (privacy claims). For the ECPA, CDAFA, and intrusion upon seclusion claim,

7    Google does not even argue otherwise. Moreover, Google's argument that money damages are not

8    available for a constitutional invasion of privacy is incorrect. The case Google cites addressed the

9    availability of monetary relief against a governmental actor. *See Blanco v. Cnty. of Kings*, 142 F.

10   Supp. 3d 986, 1001 (E.D. Cal. 2015) (claims asserted against policy department and officers). That

11   line of authority does not govern cases against private actors. *See Hart v. TWC Prod. & Tech. LLC*,

12   526 F. Supp. 3d 592, 602 (N.D. Cal. 2021).

13        To prove their entitlement to punitive damages, Plaintiffs will proffer evidence

14   demonstrating, among other things, that Google knew it should not be collecting and using private

15   browsing data, with Google's employees and some executives repeatedly proposing changes to

16   Google's disclosures, branding, and practices, going so far as to label Incognito a "lie" and a

17   ███████████████████████████████  GOOG-CABR-04971904 at -04. But Google

18   ignored these cries for change, including because Google was making at least ████████ from its

19   improper collection and use of the data. Lasinski Rep. § 7; *see also, e.g.*, Section i.v (summarizing

20   evidence which proves that Google's conduct is highly offensive).

21        Nominal damages and prejudgment interest:

22        Plaintiffs seek nominal damages and prejudgment interest for any monetary award.

23   **Google's Statement**

24        Injunctive Relief: Google contends *no* injunctive relief may be awarded to the class because

25   Plaintiffs cannot prove that Google is liable to the entire class. *See* Dkt. 803 (Class Certification

26   Order) at 32 (Google's liability to class members depends on whether they implicitly consented,

27   which in turn depends on "the sources of information to which each class member was exposed").

28

1  Because Plaintiffs cannot show that Google is liable to the entire class, injunctive relief is not

2  "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

3      Plaintiffs incorrectly argue that even if class members impliedly consented, injunctive relief

4  under Rule 23(b)(2) would be appropriate, citing *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.

5  1998). Their reliance on *Walters* improperly conflates liability and injury. That decision observed

6  that "[e]ven if some class members have not been injured . . . , a class may nevertheless be

7  appropriate." 145 F3d at 1047. But *Walters* was a civil rights action, in which the government's

8  conduct may have been *unlawful* (in this case, by violating class members' due process rights) even

9  if it caused no injury to certain class members. *Id.* As a result, injunctive relief would provide relief

10 to the entire class by ceasing unlawful conduct directed at all of them. That is not the case here.

11     Here, in contrast, class members' consent renders Google's conduct *lawful* (indeed, for

12 certain claims, lack of consent is an *element* of the putative violation).[6] For consenting class

13 members, there is no unlawful conduct to enjoin; indeed, many such class members *value* the data

14 collection at issue and would be harmed by the injunction Plaintiffs seek. As the Supreme Court's

15 post-*Walters* decision in *Wal-Mart Stores, Inc. v. Dukes* made clear, "Rule 23(b)(2) applies only

16 when a single injunction or declaratory judgment ***would provide relief to each member of the class***."

17 564 U.S. 338, 360 (2011). An injunction that applies indiscriminately to lawful, or even beneficial,

18 conduct, does not meet that bar. Other decisions have held that classwide relief (and, indeed,

19 certification) is inappropriate where class members may not be entitled to any relief due to their

20 consent. *See, e.g.*, *Lautemann v. Bird Rides, Inc.*, 2019 WL 3037934, at *8 (C.D. Cal. May 31, 2019)

21 (denying Rule 23(b)(2) certification where "some class members may not be entitled to any relief,

22 for example if they had consented to Defendant's [challenged conduct]").

23

24

25 ---

[6]  For similar reasons, Plaintiffs are incorrect that "Plaintiffs can prove during this trial that 'Google is liable

26 to the entire class.'" If Google establishes that Plaintiffs' impliedly consented—whether as an affirmative
defense or as a defense to an element on which Plaintiffs bear the burden—then Google *is not liable*. Even if

27 Google bears the burden to prove consent as to all claims (and Google contends it does not, *see infra* n. 13),
Plaintiffs can at most establish the affirmative elements of their claims. But absent adjudication of Google's

28 implied consent defense, they cannot prove classwide liability.

In any event, even if injunctive relief were *permissible* absent liability to the entire class, the fact that Plaintiffs cannot demonstrate Google's liability to the entire class is a strong equitable basis to hold such relief to be inappropriate, including for the reasons discussed further below.

Additionally, Plaintiffs cannot satisfy the elements for a permanent injunction:

> (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs' alleged injury cannot be "irreparable" when they have continued to use Incognito mode for more than three years after they admittedly knew Google received the at-issue data.

Plaintiffs incorrectly argue that "actual consent" is equivalent to "actual choice" and claim that they had "no choice" but to continue using Incognito mode if they wanted to continue having internet access. This is, of course, not true. Plaintiffs are free to browse the internet on any browser (including browsers like Tor or Brave that they themselves have identified as being more privacy protective) in any mode. They are not obligated to browse in a private browsing mode, nor are they obligated to use the internet in such a way that they generate data that they do not want Google to receive. Plaintiffs' claim that Google required Plaintiffs to continue using Incognito mode is even more absurd. To the extent Plaintiffs had to run tests in order to generate PBM data that Google could confirm came from Plaintiffs' use of PBM, Plaintiffs' experts ran those tests on Plaintiffs' behalf under controlled, experimental conditions. That is not the usage to which Google refers when it argues that Plaintiffs continued using Incognito after filing their complaint. Rather, Plaintiffs continued to use Incognito mode for more than three years for their own purposes after filing a complaint calling Google's actions "highly offensive."

Nor can Plaintiffs show that remedies available at law are inadequate to compensate for that injury, especially here where they are seeking damages for the same harm. *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022) (federal courts are "preclude[ed] … from awarding equitable relief when an adequate legal remedy exists." (quoting *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 (9th Cir. 2020))). Further, particularly given the expansive injunctive remedies

CASE NO. 4:20-cv-03664-YGR-SVK
**PRETRIAL CONFERENCE STATEMENT**

Plaintiffs are seeking (discussed below), they cannot show that "the public interest would not be disserved" by injunctions that may force Google and other websites to stop offering valuable services used by millions of people every day. Plaintiffs' effort to minimize the effect their requested relief may have on Google and other websites fails. Plaintiffs seek a Court order ordering Google to "[d]elete or refrain from using any services…developed (in whole or in part) with private browsing data," which may include Google Analytics and Google Ad Manager. Plaintiffs requested relief therefore would affect all websites that use those services, despite the fact that Incognito usage is a relatively small percentage of total internet usage. Additionally, for Google to stop collecting and using private browsing data, it would need to identify private browsing data, a practice which Plaintiffs' expert has stated is itself a privacy violation, and something which Plaintiffs are seeking to enjoin Google from doing (for example, by seeking an order that Google "[d]elete or refrain from using all private browsing detection bits."). Google would have to identify private browsing data in order to separate it and give it the unique treatment Plaintiffs demand.

If the Court determines injunctive relief is warranted, the relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Plaintiffs' proposed injunctive relief (*e.g.*, requiring Google to "delete" advertising and analytics products used by businesses worldwide simply because some small percentage of the data they received is from PBM users) fails to satisfy that requirement. Plaintiffs' theory is that they and some class members understood certain of Google's disclosures to convey that Incognito and other PBMs blocked all transmissions to Google (*i.e.*, makes the user completely invisible online) notwithstanding the fact that *no* Google disclosure ever made such a statement. The Court has already held that this misconception was not uniformly shared across the class and that other Google disclosures, such as the pages linked to the Incognito Screen's "Learn more" button, would have correctly informed some class members that PBMs do not block all transmissions to Google. *See* Dkt. 803 at 31. Injunctive relief, if warranted, must be limited to further clarifying Google's relevant disclosures, which is sufficient to provide "complete relief to the plaintiffs." *McCormack*, 694 F.3d at 1019.

Plaintiffs' argument that Google "should also be required to provide users with the private browsing experience it promises" is wrongheaded. Google has provided the experience its disclosures promise. Plaintiffs are instead demanding an experience some limited subset of users may want. Plaintiffs are not entitled to a browser that blocks all Google services, and a court cannot order a party to build one. Even if the jury were to agree with Plaintiffs' interpretation of Google's disclosures, Google could simply amend those disclosures to further clarify how private browsing provides privacy and the limits to that privacy. Google would then be providing "the private browsing experience it promises."

Damages for the Class. Plaintiffs also seek restitution and disgorgement "if available" for their injunctive relief class; neither is available. Such monetary damages are inconsistent with Plaintiffs' Rule 23(b)(2) class, which, as the Court acknowledged, "seek[s] only forward-looking relief on a classwide basis." Dkt. 969 at 18 n.23. In any event, a court may not award *any* monetary relief to a Rule 23(b)(2) class *unless* monetary relief is "incidental" to the injunctive or declaratory relief—that is, if such damages could be granted without "individualized determinations of each [class member]'s eligibility for [monetary damages]." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 366 (2011). In declining to certify a Rule 23(b)(3) class, the Court has already determined that eligibility for monetary damages would require individualized inquiry that cannot be resolved on a class-wide basis. Dkt. 803; *see also Young v. Neurobrands, LLC*, 2020 WL 11762212, at *8 (N.D. Cal. Oct. 15, 2020) (claims for restitution and disgorgement inappropriate for Rule 23(b)(2) class); *I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1132–33 (N.D. Cal. 2015) (no restitution available to Rule 23(b)(2) class where plaintiffs had not shown it was "incidental" to the injunctive relief). Plaintiffs cite no contrary authority. For these reasons, Plaintiffs' Rule 23(b)(2) classes can seek neither restitution nor disgorgement.

Statutory damages for individual Plaintiffs. Plaintiffs' statutory damages are improperly calculated.

First, statutory damages require Plaintiffs to prove the number of "violations." Plaintiffs failed to proffer any such evidence. To the contrary, because the at-issue data is not linked to Plaintiffs' identities or accounts, the record contains no evidence (other than Plaintiffs' testimony

that they sometimes used Incognito mode) that Google collected *any* PBM data from Plaintiffs before they filed the complaint. Plaintiffs also took the position that they "used private browsing mode with the specific purpose of that activity not being tracked, recorded, or otherwise memorialized," and therefore they "cannot recall the particular details of each and every time she [or he] engaged in private browsing mode." Response to Interrogatory No. 5. There is therefore no evidence of the specific violations required to establish statutory damages. *Cf. In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *19 (N.D. Cal. Oct. 27, 2016) (finding individualized questions predominate where "Plaintiffs' class-wide evidence…does not identify any particular 'violations' or instances of unauthorized interception" and "Plaintiffs do not cite evidence that could be used to determine whether class members actually experienced a statutory violation, and if so, how many").

Second, Plaintiffs' damages expert (Mr. Lasinski) cannot testify to such a calculation. Mr. Lasinski prepared no calculation, nor disclosed any method to allocate statutory damages to individual Plaintiffs. The classwide damages methodology he proposed cannot be reliably modified to establish damages as to individual Plaintiffs. Three of the four "bases" Mr. Lasinski used to calculate classwide damages cannot be applied because they rely on factors for which Plaintiffs have no Plaintiff-specific evidence: they failed to provide evidence of individual page loads, unique private browsing instances, or unique monthly private browsing instances for any particular Plaintiff. The fourth "basis" is equally unhelpful, as it is simply an (unspecified) statutory damages number multiplied by the number of members of the class, which is irrelevant because the Court declined to certify a damages class.

<u>Other damages for named Plaintiffs.</u> First, Plaintiffs indicate that they seek damages for each month from the beginning of the Class Period (June 2016) through trial (January 2024). This range includes more than three years of monthly damages *after* the complaint was filed, when Plaintiffs were plainly well aware of the challenged conduct and nonetheless continued using Incognito without taking any further steps to achieve the privacy they claim they desire. Plaintiffs cannot seek damages they knowingly and voluntarily incurred. *See, e.g.*, *Magna Weld Sales Co. v. Magna Alloys & Rsch. Pty. Ltd.*, 545 F.2d 668, 672 (9th Cir. 1976) ("Once the Soderlings became aware of the falsity of representations, they were no longer entitled to rely on them, and they cannot recover

losses incurred as a result of their choosing to remain in the business"). Plaintiffs should not be permitted to inflate their damages claim by knowingly continuing the very browsing practices about which they complain. For the reasons stated above, it is not true that "Plaintiffs have no choice [to continue using Incognito mode] (other than to avoid the Internet altogether)"— there are other private browsing modes (and other privacy preserving technologies) they can use— and in any event their use of the accused PBMs after filing the lawsuit was with full knowledge of Google's alleged collection of their data.

Additionally, for the first time, Plaintiffs state that they will seek damages because "Google's violation of their privacy harmed their peace of mind, making them feel powerless." These alleged harms were not pleaded in their recently filed Fourth Amended Complaint, nor mentioned at Plaintiffs' depositions, *see, e.g.* Davis Tr. at 138:18-104:6; Trujillo Tr. at 230:10-17. Even more, when Google specifically asked Plaintiffs to "[d]escribe with particularity how YOU have been harmed or damaged by [Google's] conduct," **none of the Plaintiffs identified such harms**. Responses to Interrogatory No. 3. Because Plaintiffs failed to timely disclose this theory of harm, they are precluded from seeking damages based upon it. *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), as amended (Sept. 16, 2008) (upholding exclusion of damages theory where it was first disclosed through pretrial conference).

Beyond being untimely, Plaintiffs provided no discovery or testimony relevant to quantifying such harm—*i.e.* there is no evidence of harm to Plaintiffs' "peace of mind" or feelings of powerlessness as they now claim. As is evident by the language quoted by Plaintiffs above, their interrogatory response says nothing about "peace of mind" or powerlessness; all that Plaintiffs disclosed is that they "considered this browsing activity private and confidential, and did not intend to share it with Google." Plaintiffs cite two cases and neither justify their novel damages theory nor excuse its late disclosure. *See Operating Engineers Loc. 3 v. Johnson*, 110 Cal. App. 4th 180, 187 (2003) (discussing whether invasion of privacy claims seeking emotional distress damages for "anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, anguish" are within the exclusive jurisdiction of the Workers' Compensation Appeals Board); *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1485 (1986) (concluding that a widow had stated a cause of

action for intrusion upon seclusion where a TV crew entered her husband's bedroom while he was suffering from a seizure because the intrusion was in her home). Plaintiffs' undisclosed and untested theory of damages has no place in this trial.

Punitive damages for named Plaintiffs. Plaintiffs seek punitive damages under the ECPA, CIPA, and CDAFA, and for their intrusion upon seclusion and invasion of privacy claims. However, Plaintiffs' evidence falls far short of the "clear and convincing" evidence that Google acted with "malice, oppression, or fraud" required for a punitive damages award. In any event, contrary to Plaintiffs' assertion, under California law punitive damages are not available for CIPA violations or privacy claims under the California constitution. *See, e.g.*, *Russell v. Kronos Inc.*, 2019 WL 5485891, at *2 (N.D. Cal. Oct. 25, 2019) (collecting cases and concluding that "punitive damages do not appear to be available" under CIPA); *Blanco v. County of Kings*, 142 F.Supp.3d 986, 1001 (E.D. Cal. 2015) ("the California Constitutional right to privacy contained in article I, section I does not give rise to a cause of action for money damages"). Plaintiffs claim that *Blanco* does not apply to cases against private actors, relying on *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 602 (N.D. Cal. 2021). But in that case, Judge Tigar found "it prudent to decline ruling on the issue in the absence of briefing by the parties on how this framework applies." *Id.*

## B. THE FACTUAL BASIS OF THE ACTION

### i. Undisputed Facts[7]

1) The Rule 23(b)(2) class period is from June 1, 2016 to the present.

2) Google designed the Chrome browser, including Chrome Incognito.

3) Throughout the relevant period, Google has made the Chrome browser, including Chrome Incognito, available to any members of the public who agree to the Google Terms of Service and Chrome and ChromeOS Additional Terms of Service.

---

[7] Google's understanding is that this section is to include "all relevant facts not in dispute," but Google believes that not all such facts are relevant to issues to be decided by the jury. By including a fact in this section, Google does not agree it is properly presented to the jury.

Plaintiffs do not understand the position Google is taking here in this footnote.

4)  Each of the Plaintiffs was (and continues to be) a Google account holder during the relevant period.

5)  Google does not contend that any Plaintiff failed to comply with any of their obligations under any Google contract.

6)  Google's Privacy Policy was incorporated into Google's Terms of Service for the period from June 1, 2016 through March 30, 2020.

7)  Throughout the relevant period, the Chrome browser displayed the Incognito Splash Screen to users when they opened Incognito.

8)  The at-issue private browsing modes are Incognito mode in Google's Chrome browser, Private Browsing in Apple's Safari browser, and InPrivate in Microsoft's Edge and Internet Explorer browsers.

### ii.   Disputed Factual Issues

**Plaintiffs' Statement:** Seeking to streamline trial, Plaintiffs proposed a number of reasonable factual stipulations that Google refused to include above, including stipulations that track various concessions made during the extensive discovery in this case and also the Court's observations at summary judgment. For example, the Court recognized that "the parties do not dispute the way Google receives the at-issue data." Dkt. 969 at 31; *see also id.* at 24 ("the way the interception occurs is not in dispute"); *id.* at 2-3 (the "operation" of Google's tracking bacons "is not in dispute"). This Court also recognized the parties' common ground on the scope of the contract. *E.g.*, *id.* at 4 ("The parties do not dispute that Google's General Terms of Service and its Chrome Privacy Notice are the basis of the contract between Google and its accountholders."). Google claims to have disclosed its collection of private browsing data, but Google now refuses to stipulate to that collection. Google has inexplicably refused to agree to the following factual stipulations:

1)  The Incognito Splash Screen has never listed "Google" as an entity to whom users' private browsing activity may be visible.

2)  Throughout the class period, Google made available to users a webpage regarding private browsing titled "Search & browse privately."

3) The at-issue private browsing data is data Google collected during the class period when Plaintiffs and others were: (1) in one of these private browsing modes, (2) while visiting a non-Google website, and (3) without being signed in to a Google account.

4) Throughout the relevant period Google attempted to collect the at-issue private browsing data, regardless of any settings.

5) Throughout the relevant period, as a default but subject to certain limitations that could impact its collection of some but not all data, Google collected private browsing data that included without limitation the URL of the webpage that the user visited, the user's IP address, the user's user agent string, the referrer URL, and a timestamp.

6) During the relevant period, Google stored private browsing data in the logs listed in Appendix A.[8]

7) As identified in Appendix A, Google has kept some of these logs permanently.

8) Throughout the relevant period, there was at least one log in which Google stored both private browsing data and regular browsing data.

9) Throughout the relevant period, subject to certain Google policies, at least some Google employees in California had access to private browsing data stored in one or more of the Google logs identified in Appendix A, which includes members from the Google Analytics and Ad Manager teams.

10) During the relevant period, Google developed and began using four private browsing detection bits, named is_chrome_incognito, is_chrome_non_incognito_mode, maybe_chrome_incognito, and ███████████.

11) Three of these (is_chrome_incognito, is_chrome_non_incognito_mode, maybe_chrome_incognito) were used by Google only with Chrome browsing data.

---

[8] Seeking to agree on a stipulated fact regarding which logs contain private browsing data, Plaintiffs sent Google this Appendix A and the Appendix B listed in this section. Plaintiffs can provide these appendices to the Court upon request.

12) One of these ███████ was used by Google with not only Chrome but also browsing data in Apple's Safari browser and InPrivate in Microsoft's Internet Explorer.

13) Google has identified at least ██ data sources that used these ██ private browsing detection bits, listed in Appendix B.

14) During the relevant period, Google used private browsing data that was tagged with private browsing detection bits to quantify the ongoing financial impact of blocking third-party cookies by default in Incognito.

15) During the relevant period, blocking third-party cookies on non-Google websites financially impacted Google.

16) During the relevant period, Google used private browsing data that was tagged with private browsing detection bits to perform analysis and modeling to predict advertising revenues.

17) During the relevant period, Google used private browsing data that was tagged with private browsing detection bits to track users' interactions with advertisements related to third-party exchanges.

18) During the relevant period, Google used private browsing data to develop algorithms, machine learning, and artificial intelligence.

In addition to the above, Plaintiffs provide the following list of disputed facts:

1) Whether the Google form contract includes the Incognito Splash Screen and Google's "Search & browse Privately" Help Center webpage?

2) Whether the Google Privacy Policy was part of the form contract for the period March 31, 2020 through January 5, 2022?

3) For Class 1 (Incognito users), whether, through its form contract, Google obtained their consent to collect, store, and use their Incognito browsing data?

4) For Class 2 (Safari and Internet Explorer / Edge users), whether, through its form contract, Google obtained their consent to collect, store, and use their private browsing data?

5) For Class 1 (Incognito users), whether Google, through its form contract, represented that it would not collect, store, and use their Incognito browsing data?

6) For Class 2 (Safari and Internet Explorer / Edge users) whether Google, through its form contract, represented that it would not collect, store, and use their browsing data?

7) Whether Google obtained non-Google websites' consent to collect, store, and use class members' private browsing data?

8) Whether Google collected Plaintiffs' private browsing data for the purpose of committing any criminal or tortious act?

9) Whether the private browsing data that Google intercepts qualifies as the "contents" of users' communications with non-Google websites for purposes of the ECPA and CIPA claims?

10) Whether class members' private browsing communications qualify as "confidential" for purposes of the CIPA § 632 claim?

11) Whether Google "accessed" class members' devices for purposes of the CDAFA claim?

12) Whether Google had "permission" to take and use Plaintiffs' private browsing data?

13) Whether class members reasonably expected that Google would not collect, store, or use their private browsing data?

14) Whether Google's collection, storage, and use of class members' private browsing data is highly offensive to a reasonable person?

15) Whether Google diminished the value of Plaintiffs' data by collecting and using their private browsing data?

16) Whether Plaintiffs are entitled damages, including punitive damages and nominal damages, and if so, the amount?

17) If Google is permitted to assert an implied consent defense (which should not be permitted), whether Google provided an informed and actual choice to users, whereby users could prevent Google from collecting and using their browsing data?

18) Whether Google contractually agreed to seek and obtain class members' "explicit consent", rather than implied consent?

**Google's Statement[9]**: Plaintiffs argue above that they made an effort to streamline trial through stipulated facts and Google opposed. On both sides the Parties worked in good faith but were unable to agree upon stipulations. Plaintiffs refused to stipulate to numerous facts that Google believes are genuinely undisputed and not controversial. For example, Google proposed that the Parties stipulate to the undisputed fact that each of the Plaintiffs used (and continues to use) the Chrome browser, including Chrome Incognito mode, during the relevant period, which is relevant to each of Plaintiffs' claims and their purported damages. Plaintiffs refused. Ultimately, the Parties could not agree on how to frame or describe many of the proposed stipulated facts. In Google's view, the manner in which Plaintiffs sought to describe certain facts lacked requisite and necessary detail, was self-serving and inaccurate, was irrelevant to the issues to be tried, lacked necessary context, or all of the above. Both Parties rejected proposed stipulated facts. For example, Google proposed the following facts, which Plaintiffs rejected:

1) The at-issue data flow is data Google may have received from standard HTTP resource requests during the class period when Plaintiffs were: (1) in one of these private browsing modes, (2) visiting a non-Google website that contains one or more Google services on their website, and (3) not signed in to a Google account. An HTTP request typically contains: the URL of the webpage that the user visited that installed the Google service, the user's IP address, user-agent information, the referrer URL, and the date and time of the request.

2) During the relevant period, Google may have received data contained in HTTP resource requests when users visit non-Google websites that contain one or more Google services on their website, such as the GET request (which contains the URL of the specific webpage the user is viewing), the user's IP address, the User Agent

---

[9]  In the Summary Judgment Order, the Court identified several of the issues below as "triable issues" of fact. Google respectfully disagrees that all such issues are factual, as opposed to legal, and reserves its rights on this issue.

(which includes information about the device, operating system, and browser), and cookies.

3) Throughout the class period, Google received data contained in HTTP resource requests from non-Google websites that chose to incorporate one or more Google service on their website.

4) Throughout the relevant period, some Google employees based in California had access to user browsing data, provided they had proper access permissions.

5) Each of the Plaintiffs used (and continues to use) the Chrome browser, including Chrome Incognito, during the relevant period.

6) During the relevant period, the relationship between Google and its account holders using Chrome is governed by, among other things, Google's Terms of Service, the Google Chrome and Chrome OS Additional Terms of Service and the Chrome Privacy Notice.

7) Since May 2020, Google has made available to users a webpage regarding private browsing titled "How Chrome Incognito keeps your browsing private," which was also linked from the "Learn More" button on the Incognito Screen beginning in May 2020.

8) Since July 2017, Google has made available to users a webpage regarding private browsing titled "How private browsing works in Chrome," which was also linked from the "Learn More" button on the Incognito Screen from July 2017 to May 2020.

9) Throughout the class period, Google has made available to users a webpage regarding private browsing titled "Browse in private," which was also linked from the "Learn More" button on the Incognito Screen from the beginning of the class period to July 2017.

10) Mozilla also publishes a browser—Firefox—that has a private browsing mode.

Google further identifies the following disputed factual issues:

Wiretap Act/CIPA § 631

1) Whether the data Google received qualifies as "content" or "record information" (Dkt. 969 at 26);

2) Whether the "device" that Plaintiffs allege Google used to wiretap their "communications" with websites is the Google source code that websites download and install in their site's source code and which sends HTTP requests to Google;

3) Whether Google used that "device" in the ordinary course of its business of providing advertising, analytics and other web-services (Dkt. 969 at 25);

4) Whether website developers consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 23-24);

5) Whether plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15).

CIPA § 632

6) Whether the transmissions at issue (HTTP requests) constitute "confidential communications" when plaintiffs understand those "communications" may be overheard and by third parties and recorded by the websites they visit (Dkt. 969 at 27-28, 31);

7) Whether website developers consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 23-24);

8) Whether plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15).

CDAFA

9) Whether the Plaintiffs owned the data at issue;

10) Whether Google knowingly accessed the data at issue;

11) Whether Google received the data without Plaintiffs' permission;

12) Whether the fact that website developers chose to embed Google's services onto their websites means that the developers, not Google, "cause output from" Plaintiffs' computers (Dkt. 969 at 32);

13) Whether the Plaintiffs suffered "damage or loss" under CDAFA (Dkt. 969 at 33);

14) Whether Google's conduct was a substantial factor in causing Plaintiffs' harm;

15) Whether plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15);

Invasion of Privacy/Intrusion Upon Seclusion

16) Whether Plaintiffs possess a legally protected privacy interest in the data at issue;

17) Whether Plaintiffs had a reasonable expectation of privacy in the at-issue data (Dkt. 969 at 34);

18) Whether Google intentionally intruded on Plaintiffs' privacy;

19) Whether Google's receipt of the at-issue data was so serious as to constitute an egregious breach of the social norms such that the breach was "highly offensive" (Dkt. 969 at 35);

20) Whether Plaintiffs suffered harm from Google's alleged invasion of privacy (Dkt. 969 at 9-11);

21) Whether Plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15);

22) Whether any invasion of privacy was justified;

Breach of Contract

23) Whether the alleged contract makes an explicit promise that Google will not collect, store, or use data it receives from PBM users (Dkt. 969 at 20-21);

24) Whether the Privacy Policy post-March 2020 is part of the contract between Google and Plaintiffs (Dkt. 969 at 17-18);

25) Whether the Incognito Screen is part of the contract between Google and Plaintiffs, and, if so, whether the "Learn More" help pages linked to the Incognito Screen are also part of the contract (Dkt. 969 at 18-19);

26) Whether the Search & Browse Privately Help page is part of the contract between Google and Plaintiffs (Dkt. 969 at 18);

27) Whether any statement in the Chrome Privacy Notice, Privacy Policy, the Incognito Screen, or the Search & Browse Private page constitutes an enforceable promise that Google would not receive the at-issue data while users browsed in a private browsing mode (Dkt. 969 at 20);

28) Whether Google's PBM-specific disclosures accurately describe its functionality and the degree to which it provides privacy;

29) Whether Plaintiffs performed or were excused from performing;

30) Whether Google breached any promise about the at-issue data reception to Incognito users;

31) Whether Plaintiffs suffered damages;

32) Whether Google's breach of contract was a substantial factor in causing Plaintiffs' damages;

33) Whether Plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15);

34) Whether Plaintiffs and class members waived their right to enforce the alleged contract;

35) Whether the alleged contract was supported by consideration;

36) Whether the alleged contract exculpated Google for the conduct alleged;

37) Whether the alleged contract limits Google's liability to $0;

UCL

38) Whether Google has engaged in an unlawful or unfair business act or practice;

39) Whether Plaintiffs have lost money or property under the UCL (Dkt. 969 at 36);

-36-

40) Whether Plaintiffs' loss was caused by Google's allegedly unlawful or unfair business act or practice;

41) Whether Plaintiffs and class members consented to Google's receipt of the at-issue data for all browsing modes (Dkt. 969 at 15);

<u>Consent</u>

42) Whether the Privacy Policy discloses Google's receipt of the at-issue data;

43) Whether Google received the at-issue data in a manner that is consistent with its Privacy Policy and/or PBM-specific disclosures;

44) Whether media and academic reports, browser developer tools, Google help pages, other documents or other sources notified Plaintiffs or other class members of the collection and use of at-issue data;

<u>Damages/Harm</u>

45) Whether the Plaintiffs suffered any cognizable injury or harm;

46) Whether Google was unjustly enriched;

47) Whether Plaintiffs would be unjustly enriched if they are awarded the damages they seek;

48) Whether Plaintiffs' data has lost value;

49) Whether Google acted with malice, oppression, or fraud;

50) Whether Plaintiffs' continued use of PBM after the complaint was filed eliminates or limits their damages claims;

<u>Injunctive Relief</u>

51) Whether the Plaintiffs have been irreparably injured;

52) Whether the Plaintiffs could be adequately compensated with monetary damages;

53) Whether, considering the balance of hardships between plaintiffs and Google, a remedy in equity is warranted;

54) Whether the public interest would be disserved by the permanent injunction Plaintiffs seek; and

55) Whether Plaintiffs' continued use of PBM after the complaint was filed eliminates or limits their right to seek injunctive relief.

### iii.  Agreed Statement

The Parties do not believe that all or part of the action may be presented upon an agreed statement of facts.

### iv.  Stipulations

**Agreed Trial Stipulations:**

The Parties agree to the following stipulations to streamline the presentation at trial:

1) Copies of documents may be used at trial in lieu of originals and shall not be deemed inadmissible solely on the basis that they are copies.

2) Venue is proper in this Court.

3) This Court has personal jurisdiction over the Parties.

4) California law applies to all disputes arising out of or relating to the Terms of Service, service-specific additional terms, or any related services.

5) The Parties agree to exchange proposed demonstratives to be used during opening statements no later than 12:00 p.m. PT January 25, 2024. The Parties agree to provide any objections to opening demonstratives no later than 6:00 p.m. PT on January 25, 2024 and to meet and confer by no later than 7:00 p.m. PT on January 25, 2024. Any disputes on opening demonstratives will be presented to the Court on January 26, 2024.

6) Any party seeking to use a demonstrative will provide a native copy to the other side via FTP or thumb drive, including for video or animations. This provision does not apply to demonstratives created during testimony which need not be provided to the other side in advance of their use. In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

7) To the extent that deposition designations or counter-designations are admitted into evidence, they must either be played by video or read in open court. The Parties will request that the court reporter transcribe any deposition video testimony that is played in open court.

8) If the deposition testimony will be presented by video, the party offering the deposition testimony in its case-in-chief shall provide a copy of the video to be played to the opposing party by 7:00 p.m. the night before the testimony is to be played.

9) The Parties agree that demonstrative exhibits that the Parties intend to use at trial do not need to be included on their respective lists of trial exhibits with the exception of any such exhibits, such as Rule 1006 summaries, that a party will seek to be admitted into evidence. Plaintiff's demonstratives will be identified with PDX numbers. Defendants' demonstratives will be identified with DDX numbers.

10) The Parties agree that demonstrative exhibits to be used for closing arguments will be exchanged no later than 6:00 P.M. PT the day before closing arguments. Any objections to demonstratives to be used for closing arguments will be provided no later than 9:00 P.M. the day before closing arguments, and the Parties shall meet and confer regarding any objections no later than 10:00 P.M. PT the day before closing arguments.

**Disputed Trial Stipulations:**

The Parties have disputes related to the following trial stipulations:

1) Google seeks a stipulation that each witness will testify only once to maximize trial efficiency and minimize the burden on witnesses. If Plaintiffs and Google plan to call the same witness for each of their respective cases, Google may conduct its examination of that witness during Plaintiffs' case in chief and Google's examination will not be limited to the scope of Plaintiffs' examination. Google believes this approach will maximize efficiency and prevent the juror confusion that will result from the same witness testifying two different times on the same or similar topics, creating the risk that jurors believe a witness is somehow changing or altering their testimony by appearing to testify a second time. Plaintiffs have not agreed, and Plaintiffs respectfully seek the Court's guidance on this issue. Plaintiffs expect that the examinations of many Google witnesses during Plaintiffs' case in chief will be limited in scope (including the possibility of testimony from some Google witnesses that is solely for purposes of

admitting documents), and Plaintiffs believe it is preferable for Google to limit its examination and then separately call witnesses in its case.

2) Google seeks a stipulation that the Parties may call third-party witnesses out of order (including Google calling witnesses during Plaintiffs' direct case and *vice versa*) if necessary, to accommodate the schedules of third-party witnesses. Google proposed this stipulation in its first exchange of the pre-trial conference statement on September 8, 2023 to minimize the burden on third parties. Plaintiffs summarily rejected it. Plaintiffs' position is that this issue is premature. Google raised this issue for the first time today, after the Parties had met and conferred, and without identifying which witnesses they have in mind. If this issue arises at trial, the Parties can meet and confer and then at that time raise any issues with the Court.

3) The Parties stipulate that a neutral introduction may be made before the testimony of each witness who testifies by deposition designation. The Parties disagree over what information would be included in the neutral introduction. Plaintiffs believe that the neutral introduction should identify the witness's name, title, and current Google employment status. Google believes that the neutral statement should also include the reason the witness is not appearing live at trial because (i) it would be prejudicial to identify someone as a current employee without explaining the legal circumstances that make them unavailable, such as parental leave or international residency, and (ii) it would assist the jury in understanding why they are viewing a video instead of live testimony. Alternatively, Google requests that, at a minimum, the jury be informed of the location where the witness resides.

4) Google seeks a stipulation that each Party identify any exhibits, by exhibit number, that it may use for the direct and cross examination of each witness testifying at trial (other than unforeseeable impeachment) and provide copies of any demonstrative exhibits that may be shown during the examination in advance. Plaintiffs do not believe this requirement should apply to witnesses being called adverse or to cross-examination. Google disagrees, as this would mean that there is no opportunity to object in advance

of a witness examination outside the presence of the jury, which risks objections disrupting trial time. Because the Parties have agreed to reserve certain evidentiary objections for trial that the Special Master will not resolve in advance, there will be evidentiary disputes for the Court to resolve that risk disrupting trial. Plaintiffs in response note that the Parties have already (consistent with the Court's Standing Order) identified the sponsoring witness(es) for each exhibit, including witnesses that will be called adverse, and there is a process in place to work through objections in advance with the Special Master. Plaintiffs do not believe that further disclosures should be required for adverse witnesses, for either side.

5) The Parties disagree as to the timing to identify any witnesses they intend to call (live or by deposition), in the order in which they will be presented. Plaintiffs believe 7:00 p.m. PT two (2) calendar days before the day on which the witnesses will testify is adequate, with the exception of Google Chief Marketing Officer Lorraine Twohill, for whom Plaintiffs will provide three days' notice. But Plaintiffs believe that a three-day requirement for every witness is unnecessary. Plaintiffs also point out that the Parties will have already raised disputes over deposition designations with Magistrate Judge Laporte. Google believes three (3) days will be beneficial to give the Court adequate time to rule on any disputes related to witnesses testifying by designation, and for the Parties to re-cut and proof any videos to reflect rulings by the Court.

6) The Parties disagree as to the timing to identify any exhibits they may introduce during their examination of witnesses. Plaintiffs believe that documents to be used for direct examinations of non-adverse witnesses only should be disclosed at 8:00 a.m. PT on the day before the witness will be called. Google believes that exhibits for direct examinations (whether adverse or not) should be disclosed three (3) days in advance (*i.e.*, the same time the witness is disclosed) and cross-examination exhibits and demonstratives should be shared by 5:00 p.m. PT two (2) calendar days before the witness is to be called. Google's proposal will be beneficial to give the Court adequate time to rule on any disputes, and for the Parties to make any changes required to reflect

rulings from the Court. Because certain evidentiary objections are reserved for trial and will not be presented to the Special Master, pursuant to the agreement of both Parties, there will be evidentiary disputes to be resolved by the Court that risk disrupting trial if a process is not put into place to resolve them. Plaintiffs in response point out that Magistrate Judge Laporte will be addressing objections in advance. Plaintiffs however respectfully seek the Court's guidance as to whatever timing it wishes for ruling on any disputes.

7) The Parties disagree as to the timing and procedure for resolving objections to proposed exhibits and demonstratives. Plaintiffs seek to stipulate that the Parties shall promptly confer regarding any objections and identify any remaining objections to be presented to the Court in a joint report to be filed by 11:59 p.m. PT the night before the witness is expected to testify, so that the Court may then address any remaining objections at the start of the day before bringing in the jury. Google seeks to stipulate that unresolved objections to proposed exhibits and demonstratives shall be provided by 8:00 p.m. PT two (2) calendar days before the witness is expected to testify at trial, that the Parties shall promptly confer regarding any objections by no later than 10:00 p.m. PT two (2) calendar days before the witness is expected to testify at trial to narrow their disputes, and that the Parties identify any remaining objections to be presented to the Court in a joint report to be filed by 11:59 p.m. PT two (2) calendar days before the witness is expected to testify at trial. Google believes this schedule allows time to resolve disputes well in advance, which will allow trial to proceed in an orderly manner and lower the risk that a witness needs to be called before all objections have been resolved. Submitting briefing the night before the Court is expected to resolve it gives the Court very little time to prepare and risks Court staff having to wait up until midnight each night to receive and review disputes to be heard the following morning.

8) Google seeks a stipulation that for deposition designations, the Party calling the witness by deposition shall, not later than 7:00 p.m. PT three (3) calendar days before the witness is to be called at trial, serve a chart of the deposition testimony it expects to play and the

exhibits it expects to introduce with the designations, with a listing of all previously served objections and counter-designations. Google further seeks a stipulation that the Parties will meet and confer two (2) calendar days before the deposition testimony is expected to be played to narrow their disputes and identify any remaining objections to be presented to the Court in a joint report to be filed by 11:59 p.m. PT two days before the testimony is expected to be played at trial, which includes a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, exhibits and any remaining objections, as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering Party's response to it.  Google believes that this process will streamline the deposition designation process and ensure that only ripe disputes are presented to the Court.  The parties currently have 15 hours of deposition designations, which is not feasible for trial, so these should be narrowed and presented to the Court only as needed for trial.  Plaintiffs do not agree to this exchange.

9) The Parties disagree as to whether any counter-designation of that same witnesses' testimony will be played or read consecutively in the sequence in which the testimony was originally given at deposition (Google's position) or whether the designations will be played first, followed by the counter-designations (Plaintiffs' position). Google believes that the designations should be played in chronological order to avoid burdening the Court with disputes between the Parties about the order in which designations should be played for each witness.

10) Google seeks a stipulation that each Party's opening presentation be limited to 125 slides per side. Plaintiffs seek to exclude from this limit shall slides that merely contain excerpts from documents. Plaintiffs relatedly believe these artificial numerical constraints are unnecessary. The trial's time constrains will already serve as an adequate incentive for the Parties to prepare focused presentations. Google believes that such an exclusion would swallow the rule and prevent the parties from identifying potential disputes in advance of the opening, which would mean objections could disrupt trial time. A greater

1  number of slides also means the potential for a greater number of objections to slides to

2  be resolved by the Court.

3  11) Google seeks a stipulation that each Parties' closing presentation be limited to 125 slides

4  per side. Plaintiffs do not agree to any slide limitation for closing presentations.  Google

5  believes this cap will allow the parties to identify disputes in advance of closing and

6  ensure that only disputes relating to slides that will actually be used are presented to the

7  Court. A greater number of slides also means the potential for a greater number of

8  objections to slides to be resolved by the Court.  Plaintiffs relatedly believe these

9  artificial numerical constraints are unnecessary. The trial's time constrains will already

10  serve as an adequate incentive for the Parties to prepare focused presentations

11  **C. DISPUTED LEGAL ISSUES**

12      **i.    Disputed Points of Law**

13      <u>**Plaintiffs' Statement**</u>: Plaintiffs respectfully disagree with the Court's order denying their

14  motion to certify the classes under Rule 23(b)(3), including for the reasons identified in their Rule

15  23(f) petition. The Parties' summary judgment briefing also reflects certain legal disputes, including

16  the scope of the ordinary course of business exception. Dkt. 969. Google's arguments below about

17  the availability of injunctive relief are meritless for the reasons described above, and the Court has

18  separately already rejected them, including in its class certification order and summary judgment

19  order.

20      Google takes the position that implied consent is an available affirmative defense. It is not

21  an available affirmative defense against the 23(b)(2) classes for the reasons noted above. Further,

22  implied consent is not an available defense for any claim because, in its form contract with all class

23  members, Google agreed to always seek class members' "explicit consent." *See* Dkt. 83-1 at 12

24  ("We [Google] will not reduce your rights under this Privacy Policy without your *explicit* consent."

25  (emphasis added)). Google has not presented any evidence that a single class member gave "explicit

26  consent" to collect their private browsing data (nor did Google ever allege or present any evidence

27  that any class member even waived this "explicit consent" requirement).

28

1       Even setting aside the "explicit consent" requirement in the form contract, implied consent

2   is not an available defense to the breach of contract claim. *See e.g.*, Judicial Council of Cal. Civil

3   Jury Instructions 330-38 (2022) (listing affirmative defenses to breach of contract and omitting

4   implied consent). At class certification, Google led this Court astray into assuming that implied

5   consent is an available defense, but in opposition to Plaintiffs' Rule 23(f) Petition, Google all but

6   conceded that it is not, pivoting to implied waiver, Case No. 22-80147 Dkt. 3 at 3, which is a

7   different defense with far more demanding requirements that Google never even pleaded. Further,

8   to the extent that Google's form contract is found to be ambiguous, that ambiguity is to be construed

9   against Google as the drafter.

10      Even setting aside the "explicit consent" requirement in the form contract, implied consent

11  is not an available defense to the CDAFA claim because that claim turns on whether Google had

12  "permission" to collect and use the data. Cal. Penal Code § 502(c)(2). Permission cannot be implied.

13  "Permission" is defined "as the 'act of permitting' or 'a license or liberty to do something;

14  authorization.'" *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1100 (N.D. Cal. 2015) (discussing

15  CDAFA's "without permission" requirement). "Permission" therefore requires an exchange

16  between two people. Absent any exchange with Google, a user's subjective awareness cannot give

17  rise to an "act" or "license" that "permits" Google to collect and use data.

18      Even setting aside the "explicit consent" requirement in the form contract, implied consent

19  is not an available defense to the intrusion upon seclusion or invasion of privacy claims. For these

20  claims, "California law does not require Plaintiffs to prove subjective expectation." The claims "may

21  require an examination of [Google's] motives, but they will not require individualized

22  determinations of class members' subjective expectations." *Opperman v. Path, Inc.*, 2016 WL

23  3844326, at *11 (N.D. Cal. July 15, 2016).

24      Even setting aside the "explicit consent" requirement in the form contract, implied consent

25  is not an available defense to the UCL claim. The UCL "borrows" violations of other laws, which

26  means this claim turns on the same evidence underlying Plaintiffs' other claims. *Rose v. Bank of*

27  *Am., N.A.*, 304 P.3d 181, 185 (Cal. 2013). Since Google may not rely on implied consent to defeat

28

1    Plaintiffs' other claims (for the reasons explained above) it may not rely on implied consent to defeat

2    the UCL claim, either.

3        Even if there were no "explicit consent" requirement in the form contract (there is, and

4    Google never obtained explicit consent), and even if implied consent were an available defense for

5    all seven claims (it is not), implied consent cannot be proven here for any claim because there is no

6    actual choice, nor any informed choice. Class members had no way to stop Google from collecting

7    and profiting from their private browsing information, nor did Google ever inform users about how

8    it stores the data and what it does with the data. Implying consent under these circumstances violates

9    the well-settled principle that "[c]onsent under [the ECPA] is not to be cavalierly implied." *Watkins*

10   *v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983).

11       **Google's Statement:**

12       Google respectfully disagrees with the Court's order granting Plaintiffs' motion to certify

13   the classes under Rule 23(b)(2), including for the reasons explained in its oppositions to Plaintiffs'

14   original class certification motion and Plaintiffs' Rule 23(c)(4) motion. In particular, because many

15   class members at least implicitly, if not explicitly, consented to the challenged data collection, and

16   Plaintiffs thus cannot establish liability to the entire class, injunctive relief is not "appropriate

17   respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Further, Plaintiffs lack standing to

18   seek injunctive relief, and cannot satisfy the elements for a permanent injunction, including that they

19   lack an adequate remedy at law.

20       The Parties' summary judgment briefing reflects the key legal disputes to be raised at trial.

21   As explained above, Google respectfully disagrees with many of the Court's findings in the

22   summary judgment order, including that certain issues are factual and not legal.

23       Plaintiffs' arguments that implied consent is not available as an affirmative defense lacks

24   merit and is inconsistent with the legal determinations of this Court and Judge Koh. *See* Dkt. 113 at

25   14; Dkt. 803 at 32. As an initial matter, nothing in Google's contract with users waives its right to

26   assert an implied consent defense. Plaintiffs point only to a statement in Google's Privacy Policy

27   that Google "will not reduce your rights under this Privacy Policy" without explicit consent. First,

28   Google has not "reduced" any of Plaintiffs' rights under the Privacy Policy, both because it has

complied with that policy and because the Privacy Policy (i) did not mention private browsing until two years into the class period, and (ii) even then, contained only a general, non-contractual statement that users can "manage [their] privacy in a variety of ways" including browsing "privately using Chrome in Incognito mode." Second, Google expressly excluded the Privacy Policy from its contract with users months before Plaintiffs filed suit. Even if Plaintiffs were correct in their interpretation of that Policy's language, implied consent would remain a defense for much of the class period.

Nor is there any merit to Plaintiffs' related arguments that implied consent is not a defense to certain cause of action. Implied consent is a defense to breach of contract whether styled as such or under the substantively equivalent doctrine of waiver. *See* Case No. 22-80147 (9th Cir.), Dkt. 3 (Google's successful opposition to Plaintiffs' 23(f) petition) at 13–18 & nn. 5–9. Implied consent is a defense to CDAFA claims because a consenting party (who knowingly permits the data collection at issue) cannot prove that the defendant acted "without permission." Plaintiffs' only counterargument is their *ipse dixit* that "permission" requires an ill-defined "exchange" between Plaintiffs and Google. That conclusion finds no support in the statute or any legal authority. Implied consent is a defense to intrusion upon seclusion and invasion of privacy because those claims require that plaintiffs have an actual expectation of privacy, which is negated by consent to the data collection. Plaintiffs' argument that they need not have a "subjective" expectation of privacy is irrelevant because a "reasonable expectation of privacy" is based on "the circumstances of each case." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Even under an *objective* standard, a user who has notice of the challenged data collection and still proceeds (*i.e.*, who has impliedly consented) has no reasonable expectation of privacy in the data at issue. And as Plaintiffs acknowledge, the UCL "borrows" violations of other laws. Because the implied consent defense defeats each of Plaintiffs' claims, it defeats their UCL claims as well.

Finally, Plaintiffs' "actual choice" argument fails for the reasons discussed in the separate section on injunctive relief.

### ii.   Objections to Proposed Conclusions of Law

1    Pursuant to the Court's guidance on the October 13, 2023 status conference, the Parties will

2    be prepared to provide objections to each other's conclusions of law should the Court request them

3    after the completion of a jury trial on the issues triable to a jury.

4    **D. FURTHER DISCOVERY OR MOTIONS**

5        **Depositions:**

6        On June 20, 2023, Plaintiffs served a Second Supplemental Expert Report of Jonathan

7    Hochman, which addresses material that was not available to Mr. Hochman when he served his prior

8    expert reports.[10] Google served a responsive expert report on August 31, 2023 from Professor

9    Konstantinos Psounis. Google deposed Mr. Hochman on his second supplemental report on October

10   10, 2023. Plaintiffs deposed Mr. Psounis on his responsive report on October 9, 2023.

11       The Parties have a dispute about the deposition for one of Plaintiffs' witnesses, former

12   Google employee Blake Lemoine.

13       Plaintiffs' Statement:

14       Approximately one week after the Court denied Google's motion for summary judgment, a

15   former Google employee named Blake Lemoine read news articles about the ruling and contacted

16   Plaintiffs' counsel indicating that he had information relevant to this case. Mr. Lemoine has relevant

17   knowledge, for example, about Google's use of the at-issue data to develop products and algorithms,

18   including for Google AI-based products and services, relevant topics that Google ardently

19   obstructed Plaintiffs from pursuing during discovery. *See* Dkt. 411. While Google disagrees, the

20   witness will testify otherwise.

21       Two days later on August 17, 2023 Plaintiffs promptly notified Google by including Mr.

22   Lemoine on Plaintiffs' witness list. Google waited almost three weeks later until September 5, 2023

23   to ask if Mr. Lemoine intended to testify at trial, which Plaintiffs confirmed that same day and also

24   offered to schedule his deposition. On September 10, 2023, Plaintiffs again offered to schedule that

25   deposition, proposed targeted custodial search terms, and requested that Google produce responsive

---

26

27   [10]   Google sought leave to file a *Daubert* motion to exclude certain of these opinions. Dkt. 982.
     The Court granted the motion and permitted Google to file a two-page letter brief, Dkt. 988, which
28   it filed on September 20, 2023, Dkt. 1003.

documents in advance of that deposition (in part to ensure that Google is not gaining any advantage by reviewing documents in preparation for that deposition that are not made available to Plaintiffs). Plaintiffs followed up with Google on September 25, 2023. Google still has not responded to any of these correspondences, and instead has raised this dispute here.

There is no dispute that Mr. Lemoine is willing to sit for deposition—Plaintiffs have offered that repeatedly. What is in dispute is whether Google is willing to depose Mr. Lemoine on a level playing field, including by producing custodial documents from targeted search terms in advance of his deposition, agreeing not to rely on or use any information not produced during discovery at his deposition or at trial, or any other reasonable limitation this Court might order to prevent Google from ambushing Mr. Lemoine at his deposition or at trial with documents it has failed to produce. But Google refuses to engage in any dialogue despite Plaintiffs' repeated attempts to narrow or resolve this dispute.

Although Google should have disclosed Mr. Lemoine long ago as an employee with relevant knowledge, and Mr. Lemoine should have been a document custodian, Plaintiffs remain ready and willing to negotiate any conditions to ensure that Mr. Lemoine's deposition is conducted in a fair and reasonable manner. Plaintiffs welcome the Court's guidance, as Google continues to refuse to engage in any dialogue to narrow or resolve this matter.

Google's Statement:

On August 17, 2023, Plaintiffs identified former Google employee Blake Lemoine for the first time in their trial witness list. Plaintiffs contend that they represent Mr. Lemoine, but they did not list him in their initial disclosures nor did they collect or produce any of his documents. Mr. Lemoine is a former Google employee who did not work on the products (Chrome and Google Web Services, like Google Analytics or Ad Manager) or functionality (Incognito mode) at issue. He worked on Google's artificial intelligence chatbot which is not relevant to any issues in this litigation and will waste trial time by forcing Google to offer witnesses and testimony explaining, *inter alia*, why Mr. Lemoine is no longer a Google employee. Mr. Lemoine's controversial views on artificial intelligence (including that certain AI devices are sentient beings) have been the subject of numerous news reports and will result in a distracting and time consuming side show at trial. Google further

addresses Mr. Lemoine in detail in its motion to preclude Mr. Lemoine from testifying at trial. Dkt. 1015. Google requested that Plaintiffs make Mr. Lemoine available for a deposition in advance of trial, but they refused to do so unless Google makes a burdensome production. Google has not received any notice of the witness's expected testimony. Plaintiffs have provided no support for their claim that their belated identification of a former employee for the first time on their trial witness list obligates Google to conduct a review and custodial production of his documents.

**Document Productions:**

Plaintiffs' Statement: In addition to the dispute about Mr. Lemoine's documents (summarized just above), Plaintiffs identify two more issues.

Plaintiffs have requested that Google produce custodial documents for four current or former Google employees, whom Google did not timely disclose and who therefore never became document custodians – yet Google plans to call as trial witnesses: Caitlin Sadowski, Jonathan McPhie, George Levitte, and Steve Ganem. Plaintiffs have also moved to exclude these witnesses (Dkt. 992).

Because of the almost two-year gap between the March 2022 close of fact discovery and the January 2024 trial, Plaintiffs have also requested that Google either (1) agree not to introduce any argument or evidence concerning post-fact-discovery events, *see, e.g., FTC v. Qualcomm, Inc.*, 2018 WL 6597273, at *4-5 (N.D. Cal. Dec. 13, 2018), or alternatively, (2) agree to produce a complete document "refresh" to update the evidence in the case. If Google intends to make arguments about a time period for which it has not produced evidence, it is only fair that Google "refresh" its document productions (from the already existing custodians).

Google's Statement:

In addition to the dispute about Mr. Lemoine's documents discussed above, Google responds to Plaintiffs' other two issues.

First, regarding Plaintiffs' request for a custodial production for Caitlin Sadowski, Jonathan McPhie, George Levitte, and Steve Ganem, Magistrate Judge van Keulen long ago rejected Plaintiffs' argument that custodial productions must be made for all trial witnesses, including some of the very same witnesses. Dkt. 454-1 (March 4, 2022 Order), at 2-3 (denying Plaintiffs' request

for custodial production from Steve Ganem or George Levitt because "plaintiffs have not made any showing from the voluminous productions to date that these individuals are likely to possess custodial documents that warrant custodial searches in excess of the cap."). Therefore, Google will not be searching, reviewing, and producing additional documents from these witnesses custodial files. Additionally, during subsequent meet and confer efforts, Google agreed to drop Jonathan McPhie and George Levitte from its witness list, mooting Plaintiffs' request as to those witnesses. Further, Google has produced many documents involving these witnesses and Plaintiffs have included Dr. Sadowski on their witness list, including to authenticate documents. Google addresses Plaintiffs' additional arguments about these witnesses in further detail in its opposition to Plaintiffs' motion to preclude those witnesses. Dkt. 1008.

Second, Google does not agree to a "complete document 'refresh'" or to Plaintiffs' demand that Google not to introduce any argument or evidence concerning post-fact-discovery events. A document "refresh" would be extremely burdensome and contrary to the purpose for setting a fact discovery cut-off. Further, it is premature to prevent witnesses from offering relevant testimony about events that have occurred since the close of fact discovery before seeing how that evidence may be relevant to rebut Plaintiffs' case. The case Plaintiffs cite does not compel a contrary position. In *Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6597273 (N.D. Cal. Dec. 13, 2018), the defendant sought to introduce documents related to two specific categories of post-discovery events. *Id.* at *5. The court denied that request because the defendant could not show that such evidence "would be necessary for the Court to determine whether unlawful conduct is likely to recur" in order to issue an injunction, noting that "[b]y necessity, the evidence at trial will never be fully up-to-date following the cutoff for discovery." *Id.* at *6. The case did not address what Plaintiffs seek here: to compel a complete "refresh" of discovery by re-running dozens of search terms across more than 40 custodians for an additional two-year time period.

In short, document discovery is closed and Google will not search for or produce any additional documents.

**E.  ESTIMATE OF TRIAL TIME**

Plaintiffs believe that two weeks is sufficient, with the Parties splitting their time. Google's statement below about Plaintiffs' witness list is misleading because Plaintiffs already offered to drop eight (8) witnesses provided Google does not object to their documents being admitted separately, and Google is continuing to evaluate that list.

Google agrees that two weeks is sufficient with trial time split equally between Plaintiffs and Google. Google has raised legitimate concerns that Plaintiffs' disclosures to date suggest a much lengthier trial. In addition to the 13 fact witnesses that both Parties have identified, Plaintiffs identified 21 additional fact witnesses. Google has attempted to address those issues through the meet and confer process without burdening the Court, but as of the date of this filing Plaintiffs have agreed to remove only two witnesses from their list. Google may need to seek relief from the Court so that it can reasonably prepare for trial and to avoid burdening witnesses who Plaintiffs will not have time to call.  This is not merely a dispute about having a witness to sponsor and admit documents. Plaintiffs have demonstrated throughout this case that they intend to take snippets of Google documents out of context and to mischaracterize their meaning and intent. Google therefore cannot agree that Plaintiffs may introduce such documents and argue their meaning and intent with no Google witness present to provide a foundation and clarify the documents' *actual* meaning and intent. Google is committed to minimizing the number of witnesses necessary to merely lay foundation for documents and the Parties have entered stipulations on basic evidentiary issues to streamline trial.

## F.  LIST OF MOTIONS *IN LIMINE*

The Parties were unable to reach agreement as to the following motions *in limine*:

1. Plaintiffs' Motion *in Limine* No. 1 to Preclude Google from Relying on Non-Public Source Code at Trial

2. Plaintiffs' Motion *in Limine* No. 2 to Preclude Argument or Evidence on Implied Consent

3. Plaintiffs' Motion *in Limine* No. 3 re: Use of Google Services by the Court, Law Firms, and Experts

4.  Plaintiffs' Motion *in Limine* No. 4 re: Plaintiffs' continued use of Private Browsing Mode

5.  Plaintiffs' Motion *in Limine* No. 5 to Preclude Google from Introducing Disparaging Evidence or Argument

6.  Google's Motion *in Limine* No. 1 to Exclude Evidence and Argument Regarding Sanctions Orders, Sanction Proceedings, and Purported Discovery Misconduct

7.  Google's Motion *in Limine* No. 2 to Exclude Evidence and Argument Regarding Class-Wide Damages and Certain Other Damages Evidence

8.  Google's Motion *in Limine* No. 3 to Exclude Evidence and Argument Regarding Products, Services, Regulations, and Data Flows Outside of the Scope of Plaintiffs' Allegations

9.  Google's Motion *in Limine* No. 4 to Exclude Evidence and Argument Regarding the Joining of Authenticated and Unauthenticated Data

## G.  JUROR QUESTIONNAIRE

The Parties intend to propose a limited number of additional questions to identify potential juror bias on the schedule set by the Court.

## H.  TRIAL ALTERNATIVES AND OPTIONS

### i.  Settlement Discussions

The Parties mediated on September 29, 2023. The mediation did not resolve the case.

### ii.  Consent to Trial Before a Magistrate Judge

The Parties do not consent to trial before a magistrate judge or special master.

### iii.  Amendments, Dismissals

Plaintiffs do not seek any further amendment to the Complaint.

### iv.  Bifurcation, Separate Trial of Issues

Per the Court's statements at the October 13, 2023 status conference, the Parties understand the Court will hear evidence specific to Plaintiffs' claims under the UCL and for classwide injunctive relief after the jury has begun deliberations on Plaintiffs' individual claims.

## I.   STATEMENT OF THE ELEMENTS OF PROOF

Below Plaintiffs outline what they contend are the elements of proof for their claims (with a summary of supporting evidence) and Google outlines its affirmative defenses (with a summary of supporting evidence).[11]

**Plaintiffs' Summary of Proof of Claims**

### i.   Claim 1 (California Computer Data Access and Fraud Act) ("CDAFA"), Cal. Penal Code § 502

The CDAFA makes it a "public offense" to "[k]nowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2). Plaintiffs believe some of these elements can be resolved by stipulation, including because, in the Court's words, "the parties do not dispute the way Google receives the at-issue data." Dkt. 969 at 31.

If required to present evidence on "access," Plaintiffs will rely on testimony from Mr. Hochman and others, internal Google documentation, and Google's written discovery admissions. "Access" means to "instruct [or] cause output from [or] communicate with . . . a computer." Cal. Penal Code § 502(b)(1). In Google's own words, its "code instructs the user's browser" on Plaintiffs' device to send the data to Google. Google's Resp. to RFA No. 31. Plaintiffs will likewise rely on expert testimony (from both their technical and damages experts), internal Google documentation, and employee admissions to prove that Google both "takes" and "make[s] use of" private browsing data, thus violating the CDAFA two times over. Google lacked permission to take and use Plaintiffs' private browsing data, as will be demonstrated through documents and testimony.

---

[11] The Parties respectfully clarify that this summary is not intended to be an exhaustive list of the evidence they will rely on or their complete position on the applicable law. This is a high-level summary to provide the Court with an overview of the ways in which Plaintiffs will prove their claims and Google will provide its affirmative defenses. The Parties' complete positions on the applicable law and required elements of proof will be set forth in the Parties' jury instructions and verdict form.

Plaintiffs will also rely on expert testimony to meet the CDAFA's "damage or loss" requirement. Cal. Penal Code § 502(e)(1). Relying on Google's own analyses and payments for user data, Plaintiffs' damages expert Michael Lasinski will testify that there is a market for Plaintiffs' data, and that Google made ███ of dollars from its collection, saving, and use of their private browsing data. That evidence amounts to "damage or loss" under the CDAFA. *See In re Facebook*, 956 F.3d at 600 (sustaining CDAFA claim where plaintiffs alleged that Facebook was unjustly enriched by collecting their browsing data, holding that "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."). "The Ninth Circuit's decision stands for the proposition that plaintiffs can state an economic injury for their misappropriated data." Dkt. 969 at 33. Moreover, Plaintiffs' technical expert Mr. Hochman will testify that Google's collection of private browsing data diminished the computing power and battery life of Plaintiffs' devices. Such harm independently constitutes "damage or loss" under the CDAFA. *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1066–67 (N.D. Cal. 2015).

Plaintiffs will also prove they were harmed by Google's conduct. "The Ninth Circuit has found that each of the statutory claims brought here codify substantive rights to privacy." Dkt. 969 at 9. "The violation of a statute that protects a 'substantive right to privacy' does result in a concrete harm." *Id.* "The intrusion into privacy itself is what makes a defendant liable." *Id.* Here, Google's interception of Plaintiffs' private browsing data amounts to harm in and of itself. But Google's conduct was particularly egregious and harmful, including because Google intercepted Plaintiffs' most sensitive private data, marked that data with "private" Incognito detection bits, stored that data alongside unique identifiers, and then used the data to make ███ of dollars, all without giving users any choice. What is more, Google could have at any time redesigned its systems to enhance user privacy, including with Incognito mode, but Google chose otherwise. To prove these points, Plaintiffs will rely on testimony from their technical and damages experts (Mr. Hochman and Mr. Lasinski), as well as their privacy expert Bruce Schneier. Plaintiffs will also rely on Google employee documents and testimony. *See also infra* Section i.v. (summarizing evidence which proves that Google's conduct was highly offensive). Finally, for the reasons described above,

Google's unjust enrichment amounts to harm, as does the effect of Google's conduct on Plaintiffs'

ability to participate in the market for their data, and the way Google's conduct diminished the

computing power and battery life of Plaintiffs' devices. Plaintiffs also seek relief for harm to their

peace of mind, as summarized above. *Supra* Section i.a.ii.

### ii.    Claims 2 and 3 (California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632

"The California Invasion of Privacy Act ('CIPA') mirrors the federal Wiretap Act, but with

a few important exceptions." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *13 (N.D.

Cal. Dec. 22, 2022). "The purpose of the act was to protect the right of privacy by, among other

things, requiring that *all parties consent* to a recording of their conversation." *Id.* (emphasis added)

(citing *Flanagan v. Flanagan*, 27 Cal. 4th 766, 769 (2002)). To avoid liability, Google must

therefore prove that "all parties" to the private browsing communications consented to Google's

interceptions—i.e., *both* the non-Google websites *and* Plaintiffs. For claims where consent is a

defense, this Court has correctly ruled that "consent is a defense to plaintiffs' claims and it is

therefore on Google not plaintiffs, to prove." Dkt. 969 at 13 n.13. Consistent with Google's

summary judgment motion, Plaintiffs anticipate Google will argue that class members expressly

consented to the at-issue conduct.

If Google asserts this affirmative defense, Plaintiffs will refute it with their own testimony,

as well as Google's form contract and disclosures, where Google represented that it would not

collect, save, and use private browsing data. Plaintiffs will present testimony from Google

employees and executives to corroborate their interpretation of the form contract, as well as internal

Google presentations and studies. Plaintiffs will also point out that, in the form contract, Google

agreed to be bound by an "explicit consent" standard. *See, e.g.*, Dkt. 83-1 at 12 ("We [Google] will

not reduce your rights under this Privacy Policy without your explicit consent." (emphasis added)).

Google has not presented any evidence that a single class member gave "explicit consent" to collect

their private browsing data, in the form contract or otherwise. Plaintiffs will also rely on their survey

expert Mark Keegan to support their interpretation of the disclosures, who determined that 93.1%

of users did not understand or believe that they consented to Google's collection and storage of their private browsing data. *See* Keegan Rebuttal Report (Dkt. 608-10) Opinions 6-7, ¶¶ 7-8, 156-92.

Through their experts, Plaintiffs will also present evidence that consent is impossible here because users have no choice. There is no way to avoid the at-issue Google tracking. Further, consent should not be available to Google where the disclosures referenced do not actually describe what Google does when users are in private browsing and how Google stores and uses that data. For the avoidance of doubt, Plaintiffs will make all of these arguments for any claim where Google asserts consent as a defense.

To succeed on this consent defense, Google must prove that class members expressly consented, and that any disclosures Google alleges to form the basis of consent actually and unambiguously informed class members of the specific practices at issue. Google must also prove that *both* users and non-Google websites consented. Google cannot prove that websites consented either because Google does not have any evidence that even a single website knew Google was collecting private browsing data, let alone evidence that a website consented. Plaintiffs will separately refute any website consent argument by explaining how Google told websites that Google would always comply with its representations to users, which include Google's commitments about private browsing.

Plaintiffs will also rely on the evidence described above to demonstrate harm (*see supra* Section i.i—though because the Named Plaintiffs only seek statutory damages for these claims, it is unnecessary for them to prove harm.

Plaintiffs are pursuing claims under CIPA sections 631 and 632. Section 631, the wiretapping provision, applies to "[a]ny person . . . who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631(a). "The analysis for a violation of CIPA [§ 631] is the same as that under the federal Wiretap Act." *In re Meta Pixel*, 2022 WL 17869218, at

*14. Plaintiffs will rely on the same evidence described below to prove that Google designed and used its tracking beacons to attempt to intercept and in fact intercept the contents of users' private browsing communications during their visits to non-Google websites, even while signed out of their Google accounts. *See infra* Section i.iii. As with the ECPA claim, Plaintiffs anticipate factual stipulations to streamline trial, particularly because "the parties do not dispute the way Google receives the at-issue data." Dkt. 969 at 31.

Section 632 is CIPA's anti-recording provision. That section makes it unlawful to "intentionally and without the consent of all parties to a confidential communication" or "use[ ] [a] recording device to . . . record the confidential communication." Plaintiffs will rely on Mr. Hochman's expert testimony, internal Google documentation, and employee admissions to prove that Google recorded voluminous records of users' private browsing communications. Plaintiffs will also prove their communications are "confidential," which means Plaintiffs "had an expectation of privacy against Google even if they knew others could be listening in." Dkt. 969 at 28; *see also* Dkt. 113 at 30 (confidentiality turns on whether plaintiffs reasonably expected their communications were not being disseminated to an "***unannounced*** second observer," i.e., Google (quoting *Mirkarimi v. Nevada Prop. 1 LLC*, 2013 WL 3761530, at *2 (S.D. Cal. July 15, 2013))). Plaintiffs will rely on the Google form contract, their own testimony, and employee admissions.

Finally, Plaintiffs will prove that notwithstanding all of Google's arguments, even Google's own evidence and experts concede that the Rule 23(b)(2) classes did not consent to having the at-issue private browsing data collected by Google.

### iii.    Claim 4 (ECPA, 18 U.S.C. § 2510 et seq.)

The ECPA provides a private right of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a); *see also id.* § 2520 (providing a private right of action for violations of § 2511). "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

CASE NO. 4:20-cv-03664-YGR-SVK
**PRETRIAL CONFERENCE STATEMENT**

1    As with the above claims, Plaintiffs anticipate that factual stipulations can and should

2  significantly streamline trial on this claim. As recognized by the Court, "the parties do not dispute

3  the way Google receives the at-issue data." Dkt. 969 at 31; *see also id.* at 24 ("the way the

4  interception occurs is not in dispute"); *id.* at 2-3 (the "operation" of Google's tracking bacons "is

5  not in dispute").

6    If for some reason required to present evidence on these issues, Plaintiffs will prove that

7  Google acted intentionally with evidence that Google designed the at-issue tracking beacons to

8  attempt to intercept and in fact intercept private browsing communications. Plaintiffs will rely on

9  expert testimony from Jonathan Hochman, who reviewed Google's written discovery admissions

10  and documentation regarding these tracking beacons. Plaintiffs will also rely on admissions from

11  Google and its employees.

12    Plaintiffs will also prove that Google intercepted the contents of private browsing

13  communications, relying in part on Mr. Hochman's expert analysis of the private browsing data

14  produced in the case. Plaintiffs will also rely on expert and fact witness testimony and written

15  discovery admissions and documentation that describe the nature of the data that Google intercepts,

16  as well as the process by which Google intercepts and stores that data, including Google's use of

17  private browsing detection bits.

18    Plaintiffs do not believe it should be necessary to address Google's previous reliance on the

19  ordinary course of business exception because the Court rejected Google's position on the scope of

20  that exception. *See* Dkt. 969 at 24. But if required, Plaintiffs will present evidence, including expert

21  testimony from Mr. Hochman, establishing that this exception does not apply because

22  communications flow back and forth between the user's browser and the non-Google website's

23  server irrespective of the Google tracking beacons.

24    It is not "unlawful . . . for a person . . . to intercept a[n] . . . electronic communication . . .

25  where one of the parties to the communication has given prior consent to such interception." 18

26  U.S.C. § 2511(2)(d). If Google asserts this defense, Plaintiffs will refute it by way of the same

27  arguments and evidence summarized above. *See supra* Section i.ii. Google has the burden to prove

28  consent, and Google cannot meet that burden as to either users or websites.

Plaintiffs will alternatively rely on the criminal-or-tortious purpose exception to consent. For this claim, consent is not a defense where the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). "[S]ubsequent [use] of the contents of the intercepted conversations for the alleged purpose of further invading the [Plaintiffs'] privacy" is a tortious act that satisfies this exception. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016). Plaintiffs will rely on expert testimony and Google employee testimony and documentation to prove that, after improperly intercepting private browsing data, Google uses the data in various ways to enrich itself, thus further invading Plaintiffs' privacy. For example, Google has keyed that sensitive, private browsing data to unique identifiers and geographic locations, used that data to create user profiles and track conversions, and to develop products, models, and algorithms.

Plaintiffs will also prove they have been harmed, including for the reasons identified above. *See supra* Section i.i. But because the Named Plaintiffs only seek statutory damages for this claim, they need not prove harm.

### iv.    Claim 5 (Breach of Contract)

"The elements for breach of contract under California law are: (i) the existence of a contract; (ii) the plaintiff's performance or excuse for nonperformance of its side of the agreement; (iii) the defendant's breach; and (iv) resulting damage to the plaintiff." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 801 (N.D. Cal. 2019). Here, there is no dispute that (i) the relationship between Google and its users is governed by contract, and (ii) that Plaintiffs complied with their obligations under the contract.

Plaintiffs will prove that Google breached the contract through its collection, storage, and use of their private browsing data. This form contract consists of the Google Terms of Service, the Google Privacy Policy, the Incognito Splash Screen, the Chrome Privacy Notice, and the Search & browse privately webpage. At the pleadings stage, Judge Koh held that "a reasonable user, reading Google's contract with Plaintiffs as a whole, could easily conclude that Google promised Plaintiffs that using 'private browsing mode' would prevent Google from collecting Plaintiffs' data." Dkt.

363 at 21. And at summary judgment, this Court ruled that "a triable issue exists as to whether these writings created an enforceable promise that Google would not collect users' data while they browsed privately." Dkt. 969 at 20. Plaintiffs will prove up their contractual interpretation, including through their testimony and with the Google employee admissions highlighted above. *See also* Section i.i. (discussing Plaintiffs' arguments and evidence relating to Google's representations). That Google collected, stored, and used private browsing data throughout the class period is undisputed.

Plaintiffs were harmed. "The longstanding common law rule in most states, including California, is that the failure to perform a duty required by contract is a legal wrong, independently of actual damage sustained by the party to whom performance is due." Dkt. 969 at 7. Therefore, Google's breach of contract in and of itself harmed Plaintiffs. Plaintiffs were also harmed because Google violated their privacy, as summarized above. *See supra* Section i.i.

Moreover, Plaintiffs' expert Mr. Lasinski will testify that Google was unjustly enriched by ███ of dollars. Non-restitutionary disgorgement is an available form of contract damages under California law. *See* Dkt. 969 at 12 ("Plaintiffs have sufficiently shown that Google profited from their personal browsing histories and thus a remedy based upon unjust enrichment may lie"); *In re Google Assistant Privacy Litigation*, 546 F. Supp. 3d 945, 968 (N.D. Cal. 2021) (plaintiffs pled entitlement to nonrestitutionary disgorgement for breach of contract by alleging their "unlawfully-obtained private conversations have financial value, in that they enabled Google to improve the functionality of the Google Assistant and to better target advertisements to Google users, thereby increasing Google's revenues"). Mr. Lasinski will also testify that Google pays for user data, there is a market for users' data, and that by collecting and using private browsing data, Google diminished the value of users' data. Finally, Mr. Hochman will describe how Google's misconduct harms Plaintiffs' devices by draining their computing power and battery life.

### v. Claims 6 and 7 (Invasion of Privacy under the California Constitution and Intrusion Upon Seclusion)

"Because of the similarity of the tests, courts consider the[se] claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly

offensive." *In re Facebook, Inc. Internet Tracking*, 956 F.3d 589, 601 (9th Cir. 2020). For the first element, "the relevant question [] is whether a user would reasonably expect that [Google] would have access to" private browsing data. *Id.* at 34 (quoting *Facebook*, 956 F.3d at 602). "Whether plaintiffs had a reasonable expectation of privacy is an objective inquiry." Dkt. 969 at 34; *see also Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016) (rejecting defendant's argument that "an individual inquiry will be required into the subjective expectations of each class member"). Plaintiffs will prove they reasonably expected that Google would not collect and use their private browsing data, including by relying on the Google form contract and Google employee admissions and testimony that bolster their interpretation of the contract. Plaintiffs will also rely on testimony from Mr. Hochman and Mr. Schneier about the type of sensitive and identifying data that Google collects, and Plaintiffs will testify they used private browsing mode to explore sensitive material they desired to keep private from Google. Internal Google documents corroborate the reasonableness of Plaintiffs' privacy expectation, with employees stating: "When a user asks for Incognito, it's a huge gift, it's a valuable moment; the user is telling us I feel at risk, we need to make a better commitment in respecting that intent." GOOG-BRWN-00466897.R at -97.R. Plaintiffs will prove that even Google's own technical designs flagged Plaintiffs' private browsing data as private.

Plaintiffs will also prove that Google's conduct was and still is highly offensive, including by relying on employee admissions which demonstrate that Google knew it was "deceiv[ing] users" by collecting their private browsing data. GOOG-BRWN-00457255 at -55. Google then retains this private data in troves of logs, sometimes permanently, and in all cases tied to unique identifiers such that Google employees concede that "we would never sa[y] that Google doesn't know who you are while you're Incognito." GOOG-CABR-04780837.R at -40.R. Plaintiffs' experts Jonathan Hochman and Bruce Schneier will relatedly describe how the data is identifying, including through Mr. Hochman's analysis of actual data produced in the case. Admissions from Google employees support Plaintiffs' argument that the data is identifying.

Plaintiffs will also feature Google's private browsing detection bits (addressed in the sanctions orders), which among other things, violate Google's representation to users that "We want

1   you to be able to access the web privately, with the assurance that your choice to do so is private as

2   well."[12]

3        Worse yet, Plaintiffs will demonstrate that Google provides no option for users to review

4   and have Google delete their private browsing data, nor any way to prevent Google from collecting

5   and storing it in the first place. As explained by a former employee, there "is no way that users can

6   prevent" "Google from logging their Incognito activity." McClelland Tr. at 318:3-12. That problem

7   is even more alarming because of Google's omnipresence and users' lack of choice. Mr. Hochman

8   will testify that a user who visits just four non-Google websites has a ███████ chance of being tracked

9   by Google, including within a private browsing mode. No wonder Google employees describe the

10  company as the "data kraken that knows everything about you." GOOG-CABR-04739070 at -75.

11  Plaintiffs' expert Bruce Schneier will highlight the risks posed by Google's omnipresence,

12  emphasizing how the rise of the Internet and surveillance business models have created significant

13  threats to online privacy, making it more important than ever for users to have refuge from pervasive

14  tracking and exercise real choices.

15        Google's executives' refusal to fix the "Incognito Problem," including by presenting

16  Americans with real privacy choices, provides additional context for Google's highly offensive

17  behavior. GOOG-BRWN-00140297 at -98. In 2014, Google's then-Executive Chairman Eric

18  Schmidt publicly and falsely stated that within Incognito "no one sees anything about you." GOOG-

19  CABR-05477364 at -66. Employees lamented how if Google's Chairman did not even understand

20  Incognito, "[n]ormal people have no chance." *Id.* But rather than fix this problem, in 2016, Google's

21  current CEO Sundar Pichai proposed expanding the Incognito brand to other products. Google

22  employees tried "to get Sundar to reconsider" and "re-brand Incognito as something more honest

23  and understandable," GOOG-CABR-04971904 at -04, even warning him to not use the word

24  "private' when discussing Incognito to avoid "exacerbat[ing] known misconceptions about

25  protections Incognito mode provides," GOOG-BRWN-00048967.C at -67.C. But those concerns

---

[12] Brad Palser, *Protecting Private Browsing in Chrome*, Google News Initiative (July 21, 2020), https://blog.google/outreach-initiatives/google-news-initiative/protecting-private-browsingchrome/.

1    fell on deaf ears. Calls to improve privacy through ████████████ were likewise

2    ignored. GOOG-CABR-04991831 at -31. Google instead allowed Incognito to remain "broken,"

3    prioritizing profits and voyeurism over privacy, and continuing to make ███████ GOOG-BRWN-

4    00441285 at -86; *see also* Lasinski Rep. §§ 7-8.

5         Plaintiffs will also prove they were harmed by Google's conduct, including by way of the

6    evidence summarized in this section and above. *See also supra* Section i.i; Dkt. 969 at 9 ("The

7    Supreme Court has noted that certain torts, like the disclosure of private information and intrusion

8    upon seclusion claims brought here, result in 'intangible' but concrete harms.").

9    **vi.    Claim 8 (California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200)**

10        The UCL "provides a cause of action against persons who engage in 'unfair competition',

11   which includes business practices that are '(1) unlawful, (2) unfair, or (3) fraudulent.'" Dkt. 363 at

12   23-24 (citing *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014); Cal. Bus. & Prof.

13   Code § 17200)). Plaintiffs here assert claims under the "unlawful" and "unfair" prongs. Dkt. 886

14   (FAC) ¶¶ 277-84.

15        Plaintiffs will prove their claim under the unlawful prong through the same evidence that

16   supports their other claims. "The UCL's 'unlawful' prong borrows violations of other laws . . . and

17   makes those unlawful practices actionable under the UCL[;] virtually any law or regulation – federal

18   or state, statutory or common law – can serve as a predicate." *Deerpoint Grp., Inc. v. Agrigenix,*

19   *LLC*, 393 F. Supp. 3d 968, 990 (E.D. Cal. 2019). By proving any of their other claims, Plaintiffs by

20   extension prove their UCL claim.

21        Plaintiffs will also rely on the same evidence to prove their claim under the "unfair prong."

22   This prong "creates a cause of action for a business practice that is unfair even if not proscribed by

23   some other law." *Kennard v. Lamb Weston Holdings, Inc.*, 2019 WL 1586022, at *9 (N.D. Cal. Apr.

24   12, 2019) (Gonzalez Rogers, J.) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

25   1134, 1143 (2003)). While "the UCL does not define the term 'unfair,'" courts have applied "a

26   balancing approach, which requires courts to weigh the utility of the defendant's conduct against

27   the gravity of the harm to the alleged victim." *Id.* (applying that balancing test). Here, Plaintiffs'

28

technical expert Mr. Hochman will explain that Google could have at any time redesigned its systems to stop collecting, storing, and using private browsing information. Plaintiffs will also introduce evidence that Google knew its practices were violating users' privacy but continued engaging in them anyway. Plaintiffs' damages expert will describe how Google made ████ from its improper collection and use of class members' private data.

Finally, Plaintiffs will prove the requisite "lost money or property" for UCL standing. Cal. Bus. & Prof. Code § 17204. "[T]he California Supreme Court has held that '[t]here are innumerable ways in which economic injury from unfair competition may be shown.'" Dkt. 969 at 35 (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011)). "For example, a plaintiff may surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have or have a present or future property interest diminished." *Id.* (citing *Kwikset*, 51 Cal. 4th at 323). Plaintiffs have UCL standing if "the cash value of the data which Google collected can be quantified and [] there is an active market for such data." Dkt. 363 at 25. Plaintiffs' damages expert Mr. Lasinski will testify that he quantified the value of Plaintiffs' private browsing data to be at least $3 per device per month, relying on a Google market offering where Google itself paid users $3 per month to track their activity on a device. By collecting and using Plaintiffs' private browsing data, Google "inhibited plaintiffs' ability to participate" in the market for their data. Dkt. 969 at 36; *see also* Dkt. 363 at 27-28 (UCL standing satisfied where defendant "caused Plaintiffs to 'acquire in a transaction less[] than [they] otherwise would have and have diminished' Plaintiffs' 'future property interest'").

Moreover, the California Consumer Privacy Act confers upon Plaintiffs "an unopposed property interest for at least a portion of the class period." Dkt. 969 at 36. That property interest is independently sufficient for UCL standing.

Plaintiffs only seek injunctive relief for this claim, so Plaintiffs' position is that this claim will be decided by the Court.

**Google's Summary of Proof of Affirmative Defenses**

1    **vii.   <u>Google's Affirmative Defense 1:  Consent</u>**

2          "He who consents to an act is not wronged by it." Cal. Civ. Code § 3515.[13] It is undisputed

3    that each Plaintiff reviewed and consented to the Privacy Policy, which discloses the at-issue data

4    collection, including that Google uses the data for advertising and other purposes. No other

5    document negates that consent. The disclosures themselves, along with testimony from Plaintiffs,

6    Google's witnesses, and Google's experts will establish Plaintiffs' and other class members' express

7    consent. Plaintiffs and other class members also impliedly consented, as Google will establish

8    through expert surveys, media and academic reports, browser developer tools, Google help pages,

9    and evidence relating to Plaintiffs.

10         Additionally, "the consent of one party is a complete defense" to a federal Wiretap Act claim.

11    Therefore, either the consent of the Plaintiffs (as described above) or websites' consent of the

12    website Plaintiffs visited is fatal to Plaintiffs' Wiretap Act claim. *Rodriguez v. Google LLC*, 2021

13    WL 2026726, at *6 (N.D. Cal. May 21, 2021). As to website consent, Google will rely on testimony

14    from its experts, Plaintiffs' experts, Google's witnesses, evidence relating to Plaintiffs, and more,

15    to establish that websites have consented to Google's receipt of the data at-issue from website users

16    in private browsing mode, including because the website developers incorporated Google's code

17    into their website for the express purpose of transmitting the data to Google. For example, Plaintiffs'

18    expert, Mr. Keegan, uses Google Analytics on his own website, knows that Google receives such

19    information from private browsing users, and nevertheless did not "see [him]self removing analytics

20    from [his] website" because it "is an important tool for a small company like mine." Keegan Tr. at

21    225:10-226:10. Similarly, another of Plaintiffs' experts, Jonathan Hochman, and Plaintiffs'

22    attorneys continue to use Google services on their websites even today, fully aware that Google

23    receives the at-issue data from website users in private browsing mode.

24

25    [13] Google recognizes that at summary judgment, the Court held "'[c]onsent is a defense to plaintiffs' claims' and it is therefore on Google, not plaintiffs, to prove," Dkt. 964 at 13 n.13, but respectfully

26    disagrees given the weight of the authority Google cites. *See, e.g.*, *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020) ("the plaintiff bringing a CIPA claim has the

27    burden to prove that the defendant lacked consent"); 18 U.S.C. § 2511(2)(d) (consent exception); Cal. Penal Code § 502(c) ("without permission" is an element of CDAFA claim); *Hill v. Nat'l*

28    *Collegiate Athletic Assn.*, 7 Cal. 4th 1, 26 (1994) ("the plaintiff in an invasion of privacy case ... must not have manifested by his or her conduct a voluntary consent").

1        **viii.**     **Google's Affirmative Defense 2:  Statute of Limitations/Laches**

2        Each of Plaintiffs' claims has a limitations period of between one and four years. The statute

3   of limitations for Plaintiffs' Wiretap Act claim is "two years after the date upon which the claimant

4   first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). "Under the CIPA,

5   the applicable statute of limitations is one year." *Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 134

6   (N.D. Cal. 2020). The statute of limitations for Plaintiffs' CDAFA claim is "three years of the date

7   of the act complained of, or the date of the discovery of the damage, whatever is later."  Cal. Pen.

8   Code § 502(e)(5). The statute of limitations for Plaintiffs' intrusion upon seclusion and invasion of

9   privacy claims is two years. *See* Cal. Civ. Proc. Code § 335.1 (setting a two-year limitations period);

10  *Cain v. State Farm Mut. Auto. Ins. Co.*, 62 Cal. App. 3d 310, 313 (1976) (providing that Section

11  335.1, formally codified as Section 340, contains the statute of limitations for invasion of privacy

12  claims); *accord Quan v. Smithkline Beecham Corp.*, 149 F. App'x 668, 670 (9th Cir. 2005) (stating

13  that, as of 2003, invasion of privacy is subject to a two year limitations period); Cal. Bus. & Prof.

14  Code § 17208 (UCL) ("Any action to enforce any cause of action pursuant to this chapter shall be

15  commenced within four years after the cause of action accrued."); *Buschman v. Anesthesia Bus.*

16  *Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) ("Under California law, breach of

17  contract actions based on a written contract are governed by a four year statute of limitations.").

18        Plaintiffs filed their complaint on June 2, 2020. Dkt. 1. Therefore, at a minimum, Plaintiffs

19  cannot seek damages for UCL or breach of contract earlier than June 2, 2016, for violations of

20  CDAFA earlier than June 2, 2017, for violations of the Wiretap Act, intrusion upon seclusion, and

21  invasion of privacy any earlier than June 2, 2018, and for violations of CIPA earlier than June 2,

22  2019. Further, certain Plaintiffs discovered the facts forming the basis of their claims before filing

23  the complaint. For example, Plaintiff Davis testified that prior to filing the complaint in this action,

24  he read articles suggesting that Google could be aggregating information and that "things were not

25  as they appear with regard to incognito." (Davis Tr. 82:17-18). Plaintiff Trujillo also testified that

26  she started having concerns about Google's collection of data "six or seven years ago" (Trujillo Tr.

27  118:2), and she had read an article "about how incognito was not sticking to its privacy policy" (*id.*

28  28:1-2) and that Google was "tracking information while I'm in incognito mode" (*id.* 91:18-19).

1  Plaintiff Castillo had also seen a "news article about…the case" prior to contacting counsel (Casillo

2  Tr. 16:12-16).

3      "To establish laches, a defendant must show 'an unreasonable delay by plaintiff in

4  bringing suit, and ... prejudice to [it]self.'" *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997

5  (9th Cir. 2006). Determining whether a plaintiff delayed unreasonably consists of (1) assessing the

6  length of the delay and then (2) determining whether the delay was reasonable." *Kiva Health*

7  *Brands LLC v. Kiva Brands Inc.*, 439 F. Supp. 3d 1185, 1191–92 (N.D. Cal. 2020). As noted

8  above, Plaintiff Trujillo testified that she started having concerns about Google's collection of data

9  "six or seven years ago" (Trujillo Tr. 118:2), and she had read an article "about how incognito was

10 not sticking to its privacy policy" (*id.* 28:1-2) and that Google was "tracking information while

11 I'm in incognito mode" (*id.* 91:18-19). Nevertheless, she continued (and still continues) using

12 PBMs, seeking damages from June 2016 through trial.

13              **ix.      Google's Affirmative Defense 3: Failure to Mitigate**

14     Plaintiffs failed to mitigate their damages because (1) they continued to use Incognito mode

15 and other PBMs even after they admittedly were aware of Google's receipt of the at-issue data while

16 in a PBMand (2) they took no steps to prevent Google from receiving the at-issue data since filing

17 suit, such as using other browsers, using VPNs, or blocking cookies.

18              **x.      Google's Affirmative Defense 4: Unjust Enrichment**

19     Plaintiffs have used and benefited from Google's services that are enabled by the practices

20 that Plaintiffs challenge. All five of the Plaintiffs testified that Google Chrome is their preferred

21 internet browser and they continue to browse in Incognito mode. *See, e.g.*, Trujillo Tr. 117:11-13;

22 Davis Tr. 72:17-73:14, 82:23-11; Byatt Tr. 14:12-15:16; Brown Tr. 92:5-11; Castillo Tr. 143:23-

23 24. Plaintiff Davis also acknowledged that "there could be some utility" to targeted advertising.

24 Davis Tr. 72:14-15. Plaintiff Trujillo testified that "some ads are helpful [and] useful," particularly

25 if the ad was from "a store that [she] like[s]," including Macy's, Target, and Williams-Sonoma.

26 Trujillo Tr. 112:13; 113:4; 113:11-22. Plaintiff Byatt similarly admitted that he is generally aware

27 of targeted advertising and gets value out of seeing ads on websites because he "enjoy[s] getting

28 new products and services." Byatt Tr. 24:14-21. Further, Plaintiffs can choose to use websites that

provide access for free because of those website's use of Google services such as advertising and analytics. Evidence from Google's witnesses, including experts, will show that other users similarly benefitted from the Google services at-issue in this case.

### xi.      Google's Affirmative Defense 5: Waiver/Estoppel

Plaintiffs explicitly exculpated Google for the conduct alleged through their contractual agreements with Google. *See, e.g.*, Apr. 14, 2014 Terms of Service ("OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTIONS OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES 'AS IS'....WHEN PERMITTED BY LAW, GOOGLE. . . WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES."); Oct. 25, 2017 Terms of Service ("OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTIONS OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES 'AS IS'....WHEN PERMITTED BY LAW, GOOGLE,. . . WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES . . . TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE. . . FOR ANY CLAIMS UNDER THESE TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS LIMITED TO THE AMOUNT YOU PAID US TO USE THE SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE SERVICES AGAIN) . . . IN ALL CASES, GOOGLE. . . WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE THAT IS NOT REASONABLY FORESEEABLE."); March 31, 2020 Terms of

1   Service ("The only commitments we make about our services (including the content in the services,

2   the specific functions of our services, or their reliability, availability, or ability to meet your needs)

3   are (1) described in the Warranty section, (2) stated in the service-specific additional terms, or (3)

4   provided under applicable laws. We don't make any other commitments about our services. And

5   unless required by law, we don't provide implied warranties, such as the implied warranties of

6   merchantability, fitness for a particular purpose, and non-infringement….Other than the rights and

7   responsibilities described in this section (In case of problems or disagreements), Google won't be

8   responsible for any other losses, unless they're caused by our breach of these terms or service-

9   specific additional terms.").

10      Plaintiffs rely upon alleged promises that are not "expressly set out in [the Terms of Service]

11   or additional terms [such as the Chrome Privacy Notice]" even though Google specifically disclaims

12   liability for any such statements.

13      Plaintiffs incorrectly argue below that Google waived this defense because it did not cite the

14   March 2020 or January 2022 Terms of Service in its Answer. Google clearly pled this waiver

15   defense in its answer. *See* Dkt. 531 at 33. Google's answer stated that "Plaintiffs explicitly

16   exculpated Google for the conduct alleged through their contractual agreements with Google," and

17   cited (under a "see, e.g.," signal) Google's April 14, 2014 Terms of Service and October 25, 2017

18   Terms of Service. In context, it is evident that Google's defense encompassed the express

19   exculpatory language in all versions of its Terms of Service applicable during the class period.

20   Moreover, Google's March 9, 2022 Supplemental Response to Plaintiffs' Interrogatory No. 40

21   (requesting "the factual bases for . . . affirmative defenses that Google has asserted") cites and quotes

22   the March 2020 Terms of Service. Plaintiffs cannot claim to be prejudiced by a purported failure to

23   identify in Google's Answer each version of the contracts on which *Plaintiffs* base their claims, all

24   of which Plaintiffs purport to have read in full.

25      Plaintiffs also implicitly waived any claims by continuing to use Incognito mode and other

26   private browsing modes with knowledge that Google would receive data related to their browsing

27   activity. *See Old Repub. Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678–79 (2000)

28   (holding a party waives its claims where it "intentionally relinquishes a right" or its acts "are so

1   inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has

2   been relinquished"); *id.* at 678 ("The waiver may be either express, based on the words of the

3   waiving party, or implied, based on conduct indicating an intent to relinquish the right.").

4          Plaintiffs argue below that Google asserts an implied waiver defense in this submission for

5   the first time, and that they have been prejudiced by this purported delinquency. Both assertions are

6   wrong. First, Google has always pleaded implied consent as a defense to Plaintiffs' breach of

7   contract claims, and has included in that defense the substantively equivalent doctrine of waiver.

8   *See, e.g.*, Oct. 11 Hr'g Tr. at 21:23–22:2 ("This is a question about whether, with regard to the

9   contract claim, Google breached the contract or did not, and one question that is relevant to that is

10  whether Plaintiffs impliedly consented or waived their claims by using the service with full

11  knowledge of what it does . . . ."); *id.* at 93:24–94:2 ("You would have implied consent, or if you

12  don't want to call it implied consent, waiver, for some significant portion of the class."). Plaintiffs

13  understood that to be the case long before they adopted (for the first time in their unsuccessful Rule

14  23(f) petition) the opportunistic position that Google failed to plead a cognizable implied consent

15  or waiver defense to breach of contract. *See* Dkt. 712-1 (Plaintiffs' Class Cert. Reply) at 3 ("The

16  'implied consent' defense requires Google to show . . . that Class members *waived* their contractual

17  rights . . . ." (citing *Old Repub.*, 80 Cal. App. 4th at 678)); *id.* at 4 ("Google points to just one kind

18  of *act* by Class members *that it contends shows a waiver* . . . ." (emphasis added)).

19         Second, there has been no conceivable prejudice. Since Plaintiffs have always understood

20  Google's implied consent defense to encompass waiver, they cannot claim to be blindsided now. (If

21  anything, *Google* is prejudiced by Plaintiffs' abrupt pivot to arguing that Google has somehow

22  waived a defense that it has pursued, and Plaintiffs have acknowledged, since the beginning of the

23  case.) In any event, Plaintiffs have pointed to no discovery they were unable to take related to the

24  waiver defense, and cannot do so. Google's evidence for its implied consent and implied waiver

25  defenses—which Google contends are coextensive—is the same; the evidence Plaintiffs would need

26  to oppose them is also the same. *See, e.g.*, *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1124

27  (9th Cir. 2008) (collecting authority for the "established rule that acceptance of the benefit of a

28  contract following breach by the other party constitutes a waiver of the breach"). In fact, Plaintiffs

argue that their burden to oppose Google's implied waiver defense is *lower* than their burden to oppose an implied consent defense. *See* Dkt. 1014 at 3 (arguing Google must meet a "much more demanding standard" to plead waiver). By their own terms, then, Plaintiffs would need *less* discovery, not more, to oppose Google's waiver defense.

### xii.   Google's Affirmative Defense 6: Contractual Defenses - No Liability

Plaintiffs' claims are barred because Google's liability for the alleged conduct is precluded by the terms of the contracts between Google and Plaintiffs. *See, e.g.*, April 14, 2014 Google Terms of Service ("WHEN PERMITTED BY LAW, GOOGLE. . . WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES."); October 25, 2017 Google Terms of Service ("WHEN PERMITTED BY LAW, GOOGLE, AND GOOGLE'S SUPPLIERS AND DISTRIBUTORS, WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES . . . IN ALL CASES, GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE THAT IS NOT REASONABLY FORESEEABLE."); March 31, 2020 Terms of Service ("The only commitments we make about our services (including the content in the services, the specific functions of our services, or their reliability, availability, or ability to meet your needs) are (1) described in the Warranty section, (2) stated in the service-specific additional terms, or (3) provided under applicable laws. We don't make any other commitments about our services. And unless required by law, we don't provide implied warranties, such as the implied warranties of merchantability, fitness for a particular purpose, and non-infringement….Other than the rights and responsibilities described in this section (In case of problems or disagreements), Google won't be responsible for any other losses, unless they're caused by our breach of these terms or service-specific additional terms."); January 5, 2022 Terms of Service ("We built our reputation on providing useful, reliable services like Google Search and Maps, and we're continuously improving our services to meet your needs. However, for legal purposes, we offer our services without warranties unless explicitly stated in our service-specific additional terms. … TO THE EXTENT ALLOWED BY APPLICABLE

LAW, WE PROVIDE OUR SERVICES 'AS IS' WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. FOR EXAMPLE, WE DON'T MAKE ANY WARRANTIES ABOUT THE CONTENT OR FEATURES OF THE SERVICES, INCLUDING THEIR ACCURACY, RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. …To the extent allowed by applicable law: Google is liable only for its breaches of these terms or applicable service-specific additional terms[.] Google isn't liable for: []loss of profits, revenues, business opportunities, goodwill, or anticipated savings[,] indirect or consequential losses[,] punitive damages…."). Plaintiffs' argument below that Google waived this defense by citing (under a "*see, e.g.,*" signal) certain versions of its Terms of Service but not all versions fails for the reasons described in subsection xi above.

### xiii.    Google's Affirmative Defense 7: Contractual Defenses—No Damages Available

Plaintiffs' damages—including actual, punitive, compensatory, or exemplary damages—are limited by the terms of contracts between Google and Plaintiffs. *See, e.g.*, Apr. 14, 2014 Terms of Service at 3 ("WHEN PERMITTED BY LAW, GOOGLE. . . WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES."); Oct. 25, 2017 Terms of Service at 4 ("WHEN PERMITTED BY LAW, GOOGLE,. . . WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES. TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE. . . FOR ANY CLAIMS UNDER THESE TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS LIMITED TO THE AMOUNT YOU PAID US TO USE THE SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE SERVICES AGAIN)." Plaintiffs have not paid Google anything to use Chrome, Incognito mode, or any other PBM; accordingly their damages are limited to $0. Plaintiffs' argument below that Google waived this defense by citing (under a "*see, e.g.,*" signal) certain

versions of its Terms of Service but not all versions fails for the reasons described in subsection xi above.

### xiv.     Google's Affirmative Defense 8: Lack of Consideration

Plaintiffs did not provide anything of value in exchange for their use of Google's services. In response to Interrogatory 13, Plaintiffs Brown, Castillo, Davis, and Trujillo admitted that they had "not directly paid any money to Google." Plaintiffs contend that they provided "valuable consideration in the form of his personal information for the use of Google products," but do not explain which personal information was provided for use of which Google products and which personal information was not provided for use of any Google products. To the extent Plaintiffs provided certain information in exchange for the creation of a Google account, they do not explain how that is something of value to Google, or what specific consideration, if any, they provided in exchange for their use of Chrome or Incognito mode (because there was none). To the extent Plaintiffs mean that they provided the at-issue data as consideration, that position would vitiate their claim that Google improperly received the data.

And for those class members that are neither Google Account Holders nor Chrome users, there is no contractual relationship with Google and therefore they have not provided any consideration to Google.

### xv.     Google's Affirmative Defense 9: Invasion of Privacy Justified

Google's conduct was justified because any invasion of privacy substantially furthered the legitimate interest of websites in obtaining analytics, advertising, or other services from Google, and the interests of users who want access to these services even in PBM. These legitimate interests are particularly compelling here, where the information collected does not identify a particular user. *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 38 (1994); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 288 (2009).

### Plaintiffs' Statement Regarding Google's Affirmative Defenses

Plaintiffs deny Google's affirmative defenses. Plaintiffs also believe that many of Google's Affirmative Defenses misstate the law, as explained in more detail in the parties' submission on jury instructions and verdict forms. Plaintiffs also contend that Google waived the following affirmative

1  defenses or portions thereof by not including these defenses in their Answer: Affirmative Defenses

2  6 and 7. Specifically, Google did not cite the March 2020 nor January 2022 Terms of Service in its

3  Answer. Google also did not cite this Terms of Service provision: "Other than as expressly set out

4  in these . . . as is'". And Google did not plead implied waiver in its Answer yet seeks to do so in this

5  Statement for the first time. That is improper, and Plaintiffs have been prejudiced by Google's

6  failure to timely assert this defense, including because Plaintiffs were deprived of the opportunity

7  to take discovery.  *See also* Dkt. 1014 at 3-4 [Plaintiffs' Reply ISO Amir *Daubert*] (summarizing

8  problems with Google's newly asserted implied waiver defense.)

9

10  DATED: October 17, 2023

11  QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

12  By:  */s/ Andrew H. Schapiro*

13  Andrew H. Schapiro (admitted *pro hac vice*)
    andrewschapiro@quinnemanuel.com
14  Teuta Fani (admitted *pro hac vice*)
    teutafani@quinnemanuel.com
    Joseph H. Margolies (admitted *pro hac vice*)
15  josephmargolies@quinnemanuel.com
    191 N. Wacker Drive, Suite 2700
16  Chicago, IL 60606
    Telephone: (312) 705-7400
17  Facsimile: (312) 705-7401

18  Diane M. Doolittle (CA Bar No. 142046)
    dianedoolittle@quinnemanuel.com
    Sara Jenkins (CA Bar No. 230097)
19  sarajenkins@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
20  Redwood Shores, CA 94065
    Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
21
    Stephen A. Broome (CA Bar No. 314605)
22  stephenbroome@quinnemanuel.com
    Viola Trebicka (CA Bar No. 269526)
23  violatrebicka@quinnemanuel.com
    Crystal Nix-Hines (Bar No. 326971)
    crystalnixhines@quinnemanuel.com
24  Rachael L. McCracken (CA Bar No. 252660)
    rachaelmccracken@quinnemanuel.com
25  Alyssa G. Olson (CA Bar No. 305705)
    alyolson@quinnemanuel.com
26  865 S. Figueroa Street, 10th Floor
    Los Angeles, CA 90017
27  Telephone: (213) 443-3000
    Facsimile: (213) 443-3100

28  Jomaire Crawford (admitted *pro hac vice*)
    jomairecrawford@quinnemanuel.com

DATED: October 17, 2023

BOIES SCHILLER FLEXNER LLP

By:  */s/ Mark C. Mao*

David Boies (*pro hac vice*)
dboies@bsfllp.com
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

James W. Lee (*pro hac vice*)
jlee@bsfllp.com
Rossana Baeza
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33130
Telephone: (305) 539-8400
Facsimile: (305) 539-1304

Bill Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

CASE NO. 4:20-cv-03664-YGR-SVK
**PRETRIAL CONFERENCE STATEMENT**

D. Seth Fortenbery (admitted *pro hac vice*)
sethfortenbery@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice)*
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

Alison L. Anderson, CA Bar No. 275334
alanderson@bsfllp.com
M. Logan Wright CA Bar No. 349004
mwright@bsfllp.com
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
Telephone: (813) 482-4814

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

Michael F. Ram, CA Bar No. 104805
MORGAN & MORGAN
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

*Attorneys for Plaintiffs*

# ATTESTATION

I, [Name], hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.


DATED:   October 17, 2023                    By:   */s/ Mark C. Mao*