# DECLARATION OF VIOLA TREBICKA ISO DEFENDANT GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE 5 RE: DISPARAGING EVIDENCE OR ARGUMENT

# Redacted Version of Document Sought to be Sealed

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Rachael L. McCracken (Bar No. 252660)
rachaelmccracken@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
Joseph H. Margolies (admitted *pro hac vice*)
josephmargolies@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Jomaire Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
D. Seth Fortenbery (admitted *pro hac vice*)
sethfortenbery@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

*Attorneys for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| CHASOM BROWN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No. 4:20-cv-03664-YGR-SVK<br><br>**DECLARATION OF VIOLA TREBICKA IN SUPPORT OF DEFENDANT GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* 5 RE: DISPARAGING EVIDENCE OR ARGUMENT**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Date: November 29, 2023<br>Time: 9:00 a.m.<br>Location: Courtroom 1 – 4th Floor<br><br>Trial Date: January 29, 2024 |

I, Viola Trebicka, declare as follows:

1.      I am a member of the bar of the State of California and a partner with Quinn Emanuel Urquhart & Sullivan, LLP. I make this declaration of my own personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.      I submit this declaration in support of Google's Opposition to Plaintiffs' Motion *in Limine* 5 re: Disparaging Evidence or Argument.

3.      Attached hereto as Exhibit A is a true and correct excerpted copy of Plaintiff William Byatt's deposition transcript, dated December 20, 2021.

4.      Attached hereto as Exhibit B is a true and correct excerpted copy of Plaintiff Chasom Brown's deposition transcript, dated January 13, 2022.

5.      Attached hereto as Exhibit C is a true and correct copy of a document produced during discovery bearing Bates number GOOG-BRWN-00225677.

6.      Attached hereto as Exhibit D is a true and correct copy of Plaintiffs' Exhibit List, served on Google on August 24, 2023.

7.      Attached hereto as Exhibit E is a true and correct excerpted copy of Brian Rakowski's deposition transcript, dated August 19, 2021.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Los Angeles, California on October 17, 2023.

By   */s/ Viola Trebicka*
         Viola Trebicka

# EXHIBIT A

1          UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
2                 SAN JOSE DIVISION
3

    CHASOM BROWN, WILLIAM BYATT,
4   JEREMY DAVIS, CHRISTOPHER
    CASTILLO, and MONIQUE TRUJILLO,
5   individually and on behalf of
    all other similarly situated
6

        Plaintiffs,          CASE NO.
7                        5:20-CV-03664-LHK-SVK
    VS.
8

    GOOGLE LLC
9

        Defendant.
10
11

        *****************************************
12      ZOOM VIDEOTAPED DEPOSITION OF WILLIAM BYATT
                December 20, 2021
13                 11:04 a.m. EST
        *****************************************
14
15
16   TAKEN BY:
17      VIOLA TREBICKA, ESQ.
        ATTORNEY FOR DEFENDANT
18
19   REPORTED BY:
20      BELLE VIVIENNE, CRR
        CERTIFIED STENOGRAPHIC
21      REALTIME COURT REPORTER
        VERITEXT LEGAL SOLUTIONS
22      JOB NO. 5001125
        866 299-5127
23
24
25

                                        Page 1

Page 2:

```
 1         A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
        JAMES W  LEE, ESQ
 4      ROSSANA BAEZA, ESQ
        MARK MAO, ESQ  (San Francisco)
 5      BOIES SCHILLER FLEXNER LLP
        100 SE 2nd Street, Suite 2800
 6      Miami, Florida 33131
        305 539 8400
 7      jlee@bsfllp com
 8
        RYAN J  MCGEE, ESQ
 9      MORGAN & MORGAN, P A
        201 North Franklin Street, 7th Floor
10      Tampa, Florida 33602
        813 223 5505
11      rmcgee@forthepeople com
12   FOR THE DEFENDANT:
13      VIOLA TREBICKA, ESQ
        TRACY GAO, ESQ
14      QUINN EMANUEL URQUHART & SULLIVAN LLP
        865 S  Figueroa St, 10th Floor
15      Los Angeles, California 90017
        213 443 3000
16      Violatrebicka@quinnemanuel com
17
     VIDEOGRAPHER:
18      JoAnn Yager
19
20
21
22
23
24
25
                                      Page 2
```

Page 3:

```
 1              - - -
 2            I N D E X
 3              - - -
 4
 5   Testimony of:
 6      WILLIAM BYATT
 7   MS. TREBICKA............................ 9
 8   MR. LEE................................. 253
 9
10              - - -
11          E X H I B I T S
12              - - -
13
14   NO.        DESCRIPTION        PAGE
15   Exhibit 1    Screenshot................ 32
16   Exhibit 2    The New York Times
17            Privacy Policy, Updated
18            July 1, 2021............... 50
19   Exhibit 3    Google Analytics Opt-out
20            Browser Add-on document.... 70
21   Exhibit 4    Twitter Privacy Policy..... 76
22   Exhibit 5    Google Ad Personalization
23            Settings................... 88
24
25
                                      Page 3
```

Page 4:

```
 1              - - -
 2          E X H I B I T S (Continued.)
 3              - - -
 4
 5   NO.        DESCRIPTION        PAGE
 6   Exhibit 6    Google Terms of Services
 7            effective dates
 8            04/16/2007 to 02/29/2012...104
 9   Exhibit 7    Google Privacy Policy......112
10   Exhibit 8    Screenshot of Chrome's
11            You've Gone Incognito
12            pop-up screen from
13            08/20/2020................123
14   Exhibit 9    How Private Browsing
15            Works in Chrome Google
16            document...................142
17   Exhibit 10   Google Search Help
18            Document...................148
19   Exhibit 11   Second Amended Complaint...156
20   Exhibit 12   May 12, 2021 Amended
21            Responses and Objections
22            to Google's
23            Interrogatories Number 1,
24            4 and 5....................166
25
                                      Page 4
```

Page 5:

```
 1              - - -
 2          E X H I B I T S (Continued.)
 3              - - -
 4   NO.        DESCRIPTION        PAGE
 5   Exhibit 13   Byatt's Revised Responses
 6            to Defendant's Rog 2.......174
 7   Exhibit 14   Google Subscriber
 8            Information Sheet..........195
 9   Exhibit 15   Google Subscriber
10            Information Sheet..........195
11   Exhibit 16   Google Subscriber
12            Information Sheet..........195
13   Exhibit 17   Google Subscriber
14            Information Sheet..........195
15   Exhibit 18   Google Subscriber
16            Information Sheet..........195
17   Exhibit 19   Plaintiff William Byatt's
18            Objections and Responses
19            to Defendant's First Set
20            of Interrogatories.........205
21   Exhibit 20   Plaintiff William Byatt's
22            Amended Objections and
23            Responses to Defendant's
24            Second Set of
25            Interrogatories............206
                                      Page 5
```

```
 1    A.  I do.                    12:50:10
 2         MR. LEE:  Viola, do I have the    12:50:10
 3    same standing objection for this    12:50:11
 4    document as for lack of foundation?    12:50:13
 5         MS. TREBICKA:  Yes, that's fine.    12:50:14
 6         MR. LEE:  Thanks.          12:50:16
 7    BY MS. TREBICKA:
 8    Q.   Do you see how you can turn it    12:50:17
 9    on or turn it off?              12:50:18
10    A.   I do see those buttons, yes.    12:50:19
11    Q.   And do you also see the      12:50:22
12    hyperlink down there "learn more about how    12:50:24
13    Google ads work"?              12:50:25
14    A.   Oh, it took me a second to find    12:50:28
15    it, but, yes, I do.              12:50:30
16    Q.   Do you -- have you ever clicked    12:50:31
17    on that link to your memory as far --    12:50:35
18    A.   I don't -- I don't remember    12:50:40
19    ever -- whether or not I've ever been on    12:50:41
20    this page so I certainly don't remember    12:50:43
21    whether I've ever clicked on that link,    12:50:45
22    but I don't know what's on the other side    12:50:47
23    of that link to know if I have seen what's    12:50:49
24    on the other side of that link.        12:50:52
25    Q.   That's all fair.  Have you ever    12:50:54
```
Page 90

```
 1    looked into documents that explain how    12:50:55
 2    Google ads work?              12:50:58
 3    A.   I'm sure I have, yes.        12:51:02
 4    Q.   And those documents also explain    12:51:08
 5    how Google ads uses user data?      12:51:11
 6    A.   To some extent, yes.  I -- I    12:51:15
 7    can't say for sure whether I've seen    12:51:16
 8    authoritative documents from Google about    12:51:20
 9    how ad personalization works or whether    12:51:22
10    the things that I have seen have been    12:51:25
11    third party or general explainers.  So    12:51:29
12    anything that I've seen, I don't -- I    12:51:34
13    don't know how accurate or how -- I don't    12:51:37
14    know how accurate the information that    12:51:40
15    I've seen has been.  And I do not recall    12:51:42
16    if any of that information has been    12:51:44
17    represented by Google.          12:51:46
18    Q.   When you are in Incognito mode,    12:51:50
19    do you receive ads?  Let me rephrase that.    12:51:52
20         When you are in Incognito mode,    12:51:57
21    are ads displayed to you when you browse?    12:51:59
22    A.   Probably.  I would think so.  I    12:52:02
23    don't know, to be honest.          12:52:08
24    Q.   You have never noticed --      12:52:14
25         MR. LEE:  Well, I think he was    12:52:17
```
Page 91

```
 1    still finishing his prior answer,    12:52:18
 2    Viola.                        12:52:21
 3    A.   Yeah, I'm -- I'm sure I have    12:52:21
 4    noticed, but I can't sit here saying that    12:52:25
 5    I recall specific ads that I've -- that I    12:52:29
 6    have seen.  I certainly don't recall    12:52:32
 7    whether they've been served by Google.    12:52:34
 8    BY MS. TREBICKA:                12:52:34
 9    Q.   I'm not asking about specific    12:52:40
10    ads.                          12:52:42
11    A.   Sure.                    12:52:43
12    Q.   However, my question relates to    12:52:45
13    whether you know whether ads are served    12:52:47
14    while you are in Incognito mode to you?    12:52:51
15         MR. LEE:  Asked and answered.    12:52:54
16    A.   Do I continue to answer again?    12:52:57
17    BY MS. TREBICKA:                12:52:57
18    Q.   Yes.                      12:52:59
19    A.   Okay.  Yeah, I believe ads are    12:53:00
20    served to me in Incognito mode.  I just    12:53:04
21    don't recall any particular details.    12:53:06
22    Q.   When you are in Incognito mode,    12:53:09
23    do you browse for extended periods of time    12:53:16
24    or for limited periods of time?      12:53:21
25         MR. LEE:  Objection to form.    12:53:29
```
Page 92

```
 1    A.   Yeah, I'd say both.  Probably    12:53:30
 2    more often I'd say shorter periods of time    12:53:31
 3    but not exclusively.              12:53:33
 4    BY MS. TREBICKA:                12:53:33
 5    Q.   When you browse for longer    12:53:36
 6    periods of time, what kinds of browse --    12:53:38
 7    what kinds of browsing is that?      12:53:40
 8         MR. LEE:  Objection to form.    12:53:47
 9    A.   Yeah, I don't -- I don't really    12:53:49
10    know how to answer that.  It would look    12:53:51
11    like probably mostly reading news and    12:53:55
12    things like that for more extended    12:54:07
13    periods, but, yeah, I can't say    12:54:09
14    specifically.                  12:54:12
15    BY MS. TREBICKA:                12:54:12
16    Q.   When you browse on Incognito for    12:54:16
17    an extended period of time, do you have    12:54:18
18    one tab in Incognito open or do you have    12:54:20
19    multiple Incognito tabs open?        12:54:24
20    A.   It varies, but I could have    12:54:26
21    multiple tabs open.              12:54:29
22    Q.   So sometimes you have one,      12:54:29
23    sometimes you have multiple; it varies?    12:54:31
24    A.   That's correct.              12:54:36
25    Q.   When you have multiple tabs    12:54:36
```
Page 93

24 (Pages 90 - 93)

1    last answer before you moved on.        15:51:50
2    That's -- I think this is a reasonable      15:51:52
3    request and certainly proper under the      15:51:53
4    rules.                                  15:51:55
5    BY MS. TREBICKA:                        15:51:55
6    Q.   Mr. Byatt, were you finished        15:51:55
7    with your answer?                       15:51:57
8    A.   What I was going to say was that    15:51:59
9    I don't know everything that Google does     15:52:00
10   or syncs up when I log in to the Chrome      15:52:04
11   application, but I do know that I can log    15:52:07
12   in to Chrome and log in to Gmail             15:52:10
13   separately.                             15:52:12
14   Q.   Mr. Byatt, do you understand        15:52:15
15   that there are two ways in which you can     15:52:16
16   use Chrome, one is on your mobile device     15:52:19
17   and one is on your computer?            15:52:21
18   A.   I don't know if those are the       15:52:25
19   only two ways, but I do agree that those     15:52:28
20   are two ways, yes.                      15:52:31
21   Q.   Do you use Chrome in any other      15:52:32
22   way?                                    15:52:34
23   A.   Yes, actually.  I have used         15:52:39
24   Chrome in another way.                  15:52:41
25   Q.   Tell me what that way is.           15:52:42

Page 186

1    A.   I have used Chrome inside of        15:52:44
2    virtual machines for software development    15:52:48
3    testing and I have used Chrome in a way      15:52:52
4    that is automated for the purpose of         15:52:58
5    testing software.                       15:53:02
6    Q.   And is that on a computer?          15:53:04
7    A.   That is on a computer, yes.         15:53:07
8    Q.   So limiting your answers            15:53:09
9    initially to using Chrome on a computer      15:53:11
10   and what I'm limiting it to is you opening   15:53:13
11   a browsing session on Chrome.           15:53:16
12        As far as you being in the          15:53:21
13   Chrome browser on a computer and being in    15:53:24
14   Incognito, have you ever logged in to your   15:53:28
15   Gmail accounts once you have been in         15:53:31
16   that -- in that environment?            15:53:34
17   A.   I do not recall specifically        15:53:39
18   ever having done that.                  15:53:40
19   Q.   Have you logged in to any of        15:53:48
20   your Google accounts, any other Google       15:53:49
21   accounts you may have once you have been     15:53:52
22   in Incognito on your computer?          15:53:54
23   A.   I do not recall ever                15:53:57
24   specifically having done that.          15:53:58
25   Q.   Now, moving on to your device.      15:54:02

Page 187

1         Have you -- do you have a Chrome    15:54:04
2    application on your handheld device?    15:54:07
3    A.   Yes.                              15:54:12
4    Q.   And you use that to browse?        15:54:13
5    A.   Yes.                              15:54:15
6    Q.   Do you use it to browse in         15:54:16
7    Incognito mode?                         15:54:17
8    A.   Yes.                              15:54:19
9    Q.   When you use the Chrome            15:54:20
10   application on your handheld device to       15:54:22
11   browse in Incognito mode, have you also at   15:54:25
12   the same time logged in to your Gmail        15:54:28
13   account?                                15:54:32
14   A.   I do not recall.                   15:54:32
15   Q.   And when you have used your         15:54:35
16   Chrome application on your handheld device   15:54:37
17   to browse in Incognito mode, have you also   15:54:39
18   at the same time logged in to any other      15:54:42
19   Google accounts that you may have?      15:54:45
20   A.   Inside of Chrome?                  15:54:47
21   Q.   Yes, inside of Chrome for now.      15:54:49
22   A.   Yeah, that -- I do not recall       15:54:52
23   ever having done that.                  15:54:53
24   Q.   What about outside of Chrome?       15:54:54
25   A.   I have certain -- my cell phones    15:54:57

Page 188

1    have always been Android phones, so if I'm   15:55:00
2    browsing in Incognito mode on my phone,      15:55:07
3    that phone is logged in to my account and    15:55:10
4    I'll have the Gmail application on the        15:55:14
5    phone that is logged in to my Google         15:55:16
6    account.  It -- I would imagine, I           15:55:19
7    probably have other applications that are    15:55:22
8    also logged in to the Google account.        15:55:24
9    Q.   You have listed here a few --      15:55:27
10   and by "here," I mean on Exhibit 13, you     15:55:35
11   have listed here a few e-mail accounts.      15:55:40
12   Do you see that?                        15:55:43
13   A.   I do, yes.                         15:55:44
14   Q.   And the first two e-mail           15:55:46
15   accounts, ███████████ and             15:55:47
16   ███████████ are these your personal    15:55:56
17   accounts or what you would consider your     15:55:58
18   personal Google accounts?               15:55:59
19   A.   Yes.                              15:56:00
20   Q.   You have listed here an            15:56:01
21   additional three Google accounts:      15:56:04
22   Scm@miamidadedems.org,                  15:56:06
23   treasurer@miamidadedems.org, and        15:56:12
24   william.byatt@miamiprogressives.org.    15:56:15
25        Do you see that?                   15:56:21

Page 189

48 (Pages 186 - 189)

**Page 190**

```
 1    A.  I do.                      15:56:21
 2    Q.  Are these your personal Google   15:56:22
 3  accounts too?                     15:56:24
 4    A.  No.                         15:56:24
 5    Q.  How would you describe these   15:56:25
 6  accounts?                         15:56:26
 7    A.  Those are accounts that I have   15:56:26
 8  in my various roles as working with   15:56:30
 9  certain organizations.  The Miami-Dade   15:56:38
10  Democratic Party for the two that end in   15:56:40
11  MiamiDadeDems.org, and the Democratic   15:56:46
12  Progressive Caucus of Miami-Dade for the   15:56:48
13  ones that end in MiamiProgressives.org.   15:56:52
14    Q.  Focusing your attention on the   15:56:55
15  two personal Gmail accounts, have you ever   15:56:58
16  shared them with anyone?           15:57:00
17        MR. LEE:  Objection to form.   15:57:03
18    A.  Can you clarify what you mean by   15:57:06
19  "shared"?                         15:57:07
20  BY MS. TREBICKA:                   15:57:07
21    Q.  Does anyone else have access to   15:57:09
22  the credentials for these two accounts?   15:57:10
23    A.  I certainly hope not.       15:57:14
24    Q.  What about the three accounts   15:57:15
25  that are associated with your various   15:57:21
```

**Page 191**

```
 1  roles at -- at organizations, are those   15:57:24
 2  shared accounts?                   15:57:28
 3    A.  Sort of.                    15:57:29
 4    Q.  What do you mean by "sort of"?   15:57:33
 5    A.  I mean two things.  First is   15:57:34
 6  that they are all, you know, administered   15:57:36
 7  accounts much like a corporate Gmail   15:57:43
 8  account would be.  So the administrators,   15:57:46
 9  the -- the -- they used to call it   15:57:50
10  G Suites, I believe they now call it   15:57:53
11  Google Workspaces, the -- the people in   15:57:56
12  those organizations who administer the   15:57:57
13  organization's Google account would have   15:58:04
14  administrative access to those.  Also,   15:58:08
15  scm@miamidadedems.org and            15:58:11
16  treasurer@miamidadedems.org, those are   15:58:15
17  both e-mail accounts that belong to a   15:58:19
18  position.  Only one person holds those   15:58:21
19  positions at any given time, but the   15:58:24
20  e-mail account transfers who has those   15:58:26
21  credentials when a new person has those --   15:58:29
22  those seats, those offices.        15:58:33
23    Q.  What does SCM stand for in that   15:58:35
24  account that says -- or that is   15:58:39
25  scm@miamidadedems.org?             15:58:42
```

**Page 192**

```
 1    A.  State Committeeman.         15:58:47
 2    Q.  Do you currently hold these   15:58:52
 3  positions, these two positions?    15:58:53
 4    A.  I -- I -- I am sorry for that,   15:58:57
 5  Belle.  I hold the State Committeeman   15:59:00
 6  seat.  I am no longer the treasurer, and I   15:59:04
 7  no longer have access to that account   15:59:06
 8  either.                           15:59:09
 9    Q.  Do you use -- as far as the two   15:59:10
10  personal accounts, do you use them   15:59:20
11  equally?                          15:59:22
12    A.  No, I do not.               15:59:24
13    Q.  Do you no longer use one of   15:59:24
14  them?                             15:59:28
15    A.  I would say that I use the one   15:59:31
16  that's listed first▮▮▮▮▮▮▮▮▮▮▮      15:59:34
17  I use that as my sort of main functional   15:59:39
18  account.  The other one I do still   15:59:44
19  occasionally use, but mostly for spam and   15:59:48
20  a couple of websites that I may have just   15:59:55
21  never changed what my e-mail address on   15:59:58
22  record was with them.              16:00:01
23    Q.  Do you sign into them at the   16:00:08
24  same rate, at the same frequency?   16:00:09
25    A.  Well, I -- so my browser      16:00:17
```

**Page 193**

```
 1  preserves which accounts I'm logged in to   16:00:26
 2  and I'm -- I'm basically constantly logged   16:00:32
 3  in to both of them.  In terms of actually   16:00:37
 4  accessing and using, I certainly use the   16:00:42
 5  ▮▮▮▮▮▮▮▮ one more.                 16:00:53
 6    Q.  What about the two             16:00:54
 7  organization-related ones that you still   16:00:57
 8  have access to, which my understanding is,   16:01:00
 9  is william.byatt@miamiprogressives.org and   16:01:03
10  scm@miamidadedems.org, are you constantly   16:01:09
11  logged in to both as well?         16:01:14
12    A.  Yes.                        16:01:17
13    Q.  Do you use both of those      16:01:18
14  equally?                          16:01:21
15    A.  Can you explain what you mean by   16:01:24
16  "use"?                            16:01:26
17    Q.  Go in to --                  16:01:26
18        MR. LEE:  Before we -- before   16:01:26
19  we -- excuse me.  Before we go     16:01:29
20  further, Viola, I'm just looking at   16:01:30
21  some correspondence that -- that   16:01:32
22  states that Mr. Byatt revoked consent   16:01:33
23  for the two accounts that you're   16:01:35
24  inquiring about.  So I'm not sure that   16:01:37
25  your inquiry into those accounts is   16:01:43
```

49 (Pages 190 - 193)

```
 1        (Time noted:  5:45 p.m.)
 2
 3    _____
          WILLIAM BYATT
 4
 5    _____

 6  Subscribed and sworn to
      before me this _____
 7  day of _____ 2022.
 8  _____
          Notary Public
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 258

```
 1  VIOLA TREBICKA, ESQ.
 2  violatrebicka@quinnemanuel.com
 3                    December 23, 2021
 4  RE: BROWN VS. GOOGLE LLC
 5  DECEMBER 20, 2021, WILLIAM BYATT, JOB NO. 5001125
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, notating the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25
```
Page 260

```
 1         CERTIFICATION
 2
 3    I, BELLE VIVIENNE, a Nationally
 4  Certified Realtime Reporter, do hereby
 5  certify:
 6    That the witness whose testimony as
 7  herein set forth, was duly sworn by me;
 8  and that the within transcript is a true
 9  record of the testimony given by said
10  witness.
11    I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome of
15  this matter.
16    IN WITNESS WHEREOF, I have hereunto
17  set my hand this 23rd day of December
18  2021.
19
20    Belle Vivienne
21  BELLE VIVIENNE, CRR, CCR, RPR
22
23       *   *   *
24
25
```
Page 259

```
 1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, notating the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  _X_ Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 261

66 (Pages 258 - 261)

# EXHIBIT B

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3
4
5    CHASOM BROWN, WILLIAM BYATT,
     JEREMY DAVIS, CHRISTOPHER
6    CASTILLO, and MONIQUE
     TRUJILLO, individually and on
7    behalf of all other similarly
     situated,
8
               Plaintiffs,
9                                  No.
          vs.                      5:20-cv-03664-LHK-SVK
10
     GOOGLE LLC,
11
               Defendant.
12   _____/
13
14
15        VIDEOTAPED DEPOSITION OF CHASOM BROWN
16             Remote Zoom Proceedings
17             Los Angeles, California
18            Thursday, January 13, 2022
19
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 208              Job No. 5028094

                                        Page 1

1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3
4
5
6  CHASOM BROWN, WILLIAM BYATT,
   JEREMY DAVIS, CHRISTOPHER
7  CASTILLO, and MONIQUE
   TRUJILLO, individually and on
8  behalf of all other similarly
   situated,
9
          Plaintiffs,
10
      vs.              No.
11                     5:20-cv-03664-LHK-SVK
   GOOGLE LLC,
12
          Defendant.
13  _____/
14
15
16       Videotaped deposition of CHASOM BROWN, taken on
17  behalf of the Defendant, Remote Zoom Proceedings from
18  Los Angeles, California, beginning at 9:52 a.m. Pacific
19  Standard Time and ending at 5:20 p.m. Pacific Standard
20  Time, on Thursday, January 13, 2022, before
21  Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
22  No. 3462.
23
24
25
                                                    Page 2

1  APPEARANCES (Continued):
2
3  FOR THE DEFENDANT:
4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
5      BY: SARA JENKINS, ESQ.
6          TRACY XI GAO, ESQ.
7      555 Twin Dolphin Drive, 5th Floor
8      Redwood Shores, California 94065
9      (650) 801-5040
10     sarajenkins@quinnemanuel.com
11     tracygao@quinnemanuel.com
12
13
14  Also Present:
15     Scott Slater, Videographer
16
17
18
19
20
21
22
23
24
25
                                                    Page 4

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4      BOIES SCHILLER FLEXNER LLP
5      BY: JAMES LEE, ESQ.
6      100 SE Second Street, Suite 2800
7      Miami, Florida 33131
8      (305) 539-8400
9      jlee@bsfllp.com
10
11     BY: HSIAO (MARK) C. MAO, ESQ.
12     44 Montgomery Street, 41st Floor
13     San Francisco, California 91401
14     (415) 293-6800
15     mmao@bsfllp.com
16
17     MORGAN & MORGAN
18     BY: RYAN MCGEE, ESQ.
19     201 North Franklin Street, 7th Floor
20     Tampa, Florida 33602
21     (813) 223-5505
22     rmcgee@forthepeople.com
23
24
25
                                                    Page 3

1              I N D E X
2
3
4  THURSDAY, JANUARY 13, 2022
5
6  WITNESS                        EXAMINATION
7  CHASOM BROWN
8
9  BY MS. JENKINS              11, 201
10 BY MR. LEE                  195
11
12
13
14
15     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
16          Page    Line
17          56      7
18          155     1
19          202     3
20
21
22
23
24
25
                                                    Page 5

2 (Pages 2 - 5)

1  that relate to this case and potentially the testimony
2  you might give today?
3     A   No  You don't have anything to worry about
4     Q  Okay  Do you have any documents with you in the
5  room today?                                    09:58:02
6     A  I do  I do have a few
7     Q  Okay  Can you tell me what those are?
8     A  I have the -- the Complaint  I don't know if
9  you need to see them
10    Q  Is it the Second Amended Complaint, does it say  09:58:15
11  on the first page?
12    A  It says Second Amended Complaint
13    Q  Thank you
14    A  The Incognito splash screen (indicating),
15  Privacy Policy (indicating)  The Google Terms of Service  09:58:36
16  (indicating)
17       The only other document is Google Chrome Privacy
18  Notice (indicating)
19    Q  BY MS JENKINS: Okay  Thank you
20       I notice there's some highlighting on those  09:58:58
21  pages  Do you have any notes written on any of those,
22  handwritten notes or anything in the margin?
23    A  I have one note on one page
24       MS  JENKINS:  All right  James, could you
25  please get a scan of highlighting and any notes on those  09:59:16

Page 14

1  pages and send those over to us
2       MR  LEE:  Yep
3       MS  JENKINS:  Thank you
4     Q  And do you have your phone with you there today?
5     A  The phone, yeah, is in the room         09:59:28
6     Q  And is it -- is it turned on or could you leave
7  it --
8     A  The phone itself is on, but the ringer is off
9     Q  All right  Thank you
10       What did you do to prepare for your deposition  09:59:48
11  today?
12       MR  LEE:  Hold on one second, given this is
13  Mr Brown, I believe, his first deposition
14       Mr Brown, when Google's attorney, when
15  Ms Jenkins asks you questions, you should not assume  09:59:57
16  anywhere in her questioning that she's trying to ask you
17  about any communications you may have had with your
18  lawyers  So when you answer her questions, you should
19  only answer to the extent you can do so without revealing
20  any communications you've had with your attorneys  10:00:17
21       Does that make sense?
22       THE WITNESS:  Yeah, I understand
23       MR  LEE:  Okay
24       Ms Jenkins, why don't you just ask the question
25  again with that in mind                       10:00:26

Page 15

1       MS  JENKINS:  Sure.
2     Q  What I asked is what you did to prepare for your
3  deposition today, and as Mr. Lee pointed out, I'm not
4  asking about any communications you may have had with
5  your counsel.  But if you met with counsel, you can tell  10:00:36
6  me when you met and who you met with.
7     A.  Well, I printed out some documents, the
8  documents that I just showed you, and then outside of
9  that, I didn't prepare, except for speaking with my
10  lawyers, of course.                           10:01:00
11    Q.  Okay.  And without telling me anything you
12  discussed, can you tell me when you met with your
13  lawyers?
14    A.  Yesterday.
15    Q.  And for about how long?               10:01:11
16       MR. LEE:  You can answer.
17       THE WITNESS:  A few hours.
18    Q.  BY MS. JENKINS:  Had you met with them
19  prior to yesterday to prepare for the deposition?
20    A.  No.                                    10:01:24
21    Q.  Did you meet with Mr. Lee?
22    A.  Yes, I did.
23    Q.  Were any of your other lawyers present?
24    A.  Yes.  Mark was there as well.
25    Q.  Okay.  Did you review -- in addition to the  10:01:43

Page 16

1  documents that you have in front of you there, did you
2  review any other documents?
3       MR. LEE:  Hold on.  Are you asking about
4  documents that refreshed his recollection?  Otherwise,
5  it's privileged.                             10:01:55
6       MS. JENKINS:  Well, I was just asking if he
7  reviewed any others.  I'm not asking what they are.
8       MR. LEE:  Okay.  You can answer that limited
9  question, Mr. Chasom, but I don't want you to identify
10  any additional documents.                    10:02:06
11       THE WITNESS:  Yes.
12    Q.  BY MS. JENKINS:  And of those documents, did any
13  of those documents refresh your recollection with respect
14  to the issues described in those documents?
15    A.  No.                                    10:02:23
16    Q.  Did you review any deposition transcripts from
17  this case?
18    A.  No.
19    Q.  Can you tell me, what is your current job?
20    A.  It's a little complicated.  I guess -- like I  10:02:40
21  guess I'm an entrepreneur, like I technically probably am
22  unemployed.  So I own a few companies.
23    Q.  Okay.  And what companies are those?
24    A.  Well, I have ownership interest in several, but
25  would you like me to name them?              10:03:03

Page 17

5 (Pages 14 - 17)

1   Q.  Sure, yeah.
2   A.  Well, I guess there's an over-arching company
3   called Eppek, E-P-P-E-K, LLC.  And that's actually
4   generally where all the interest is in.  So there's that
5   one.  And then I have a sole prop that is Chasom, just my        10:03:18
6   first name.
7   Q.  Okay.  And what type of business is Eppek LLC?
8   A.  It's a cannabis business.  It's a transportation
9   business.  It is a real estate business.  It is -- that
10  probably is -- is good.  I probably dabble in some other        10:03:47
11  random things, but nothing --
12  Q.  Does --
13  A.  -- worth --
14  Q.  -- Eppek LLC have a website?
15  A.  No.                                                          10:03:57
16  Q.  Do any of those services or -- or products that
17  you just listed, do any of them have a website related to
18  cannabis or travel?
19  A.  Well, I guess my sole prop does, which is my
20  band, which is Chasom.com.                                       10:04:16
21  Q.  Okay.  And what is the name of your band?
22  A.  Chasom, which is my first name.
23  Q.  Do you run that website?
24  A.  I -- I feel like I put -- I haven't seen it in a
25  long time, to be honest, but I -- me and the guitar             10:04:35

Page 18

1   player in the band have added things to the website, yes.
2   Q.  And are you able to do that yourself
3   technically, you have the know-how of how to change the
4   website?
5   A.  If I use like a program like Wix, where it            10:04:52
6   pretty much does it for you, then yeah, I could figure it
7   out, but my -- that's why I have the guitar player do it
8   because he has a bit more technical knowledge than I do
9   on that.
10  Q.  When is the last time that you were employed by       10:05:10
11  someone other than yourself?
12  A.  About a year and a half ago.
13  Q.  And can you tell me what that job was?
14  A.  That was with T-Mobile USA.
15  Q.  And what was your role there?                         10:05:30
16  A.  I was a -- my title at the end was -- I was an
17  account manager, and then they had changed my title to --
18  I basically was account manager at the time I was
19  there.
20  Q.  And how long were you at T-Mobile?                    10:05:49
21  A.  Like 13 years, 13-and-a-half years.
22  Q.  What's the highest level of education that
23  you've completed?
24  A.  Some college.
25  Q.  And where did you go to college?               10:06:05

Page 19

1   A.  At Golden West and Long Beach, Cal State Long
2   Beach.
3   Q.  Were you studying for a specific degree?
4   A.  Business administration.
5   Q.  How did you get involved in this case?           10:06:25
6   MR. LEE:  Again, Mr. Brown, you can answer that
7   question, but to the extent that -- only to the extent
8   that it doesn't reveal any communications you've had with
9   your counsel.  Okay?
10  THE WITNESS:  (Nods head.)                           10:06:42
11  I -- I'd noticed some odd things that -- that I
12  had questions about going on with my account and ads and
13  things like that.  And so then I inquired about, you
14  know, talking to an expert in the field, and then that's
15  how I got in touch with my lawyer.                   10:07:04
16  Q.  BY MS. JENKINS:  Okay.  Can you describe the odd
17  things that you just mentioned?  What were those?
18  A.  It -- it just essentially had to do with the ads
19  that were being served to me, and I got curious like how
20  and where they were coming from.                     10:07:30
21  Q.  Were these ads being served to you while you
22  were browsing in Chrome Incognito mode?
23  A.  I don't really remember specifically if it was
24  that or not.  It was more just -- yeah, I don't really
25  remember if it was specifically in the Incognito mode,  10:07:57

Page 20

1   but there were -- it would be both, I guess
2   MR LEE:  By the way, Mr Brown, I just want you
3   to know that -- unless Ms Jenkins agrees -- nobody
4   wants you to guess  So if you recall something, then you
5   can recall it, and if you don't recall something, that's   10:08:16
6   perfectly fine  But we certainly don't want you to
7   guess
8   THE WITNESS:  Okay  So I'm not 100 percent
9   clear if it was in Incognito mode or not
10  Q  BY MS JENKINS:  When -- when you said your --     10:08:31
11  when you were answering the questions earlier, you said
12  both  By that did you mean it may have been in Incognito
13  mode or it may have been in regular mode on Chrome; is
14  that correct?
15  A  Yes                             10:08:45
16  Q  So I believe that you said, then, that you --
17  you were looking for an expert about -- after noticing
18  some odd things regarding advertising -- advertisements
19  that you were seeing; is that correct?
20  A  Yeah                            10:09:05
21  Q  Okay  And so who did you reach out to when you
22  were looking for an expert about that?
23  A  It -- one of my business partners had known one
24  of the experts in the lawyers, and so we were discussing
25  it, and I guess he got us in contact          10:09:25

Page 21

6 (Pages 18 - 21)

1 you, would that cause the same concern?
2     MR MAO: Objected -- objection to form to the
3 extent that -- strike that.
4     Objection to form, vague as to "anonymous."
5     THE WITNESS: Yeah. Like I don't -- I don't --   11:56:15
6 I would have the same concern because I feel like my
7 identifiers are me. I don't know how Google identifies
8 me. I think -- I think my name is probably the last
9 thing Google cares about me.
10    So it's -- it's like equivalent to like, Sara, I   11:56:31
11 just met you. We don't know each other. But I know
12 you're wearing a black jacket, I know you're wearing a
13 red shirt, I know you wear glasses, I know like the type
14 of chair that you're looking at. I know a lot of
15 things about you. I could probably figure out where   11:56:51
16 you're located.
17    And so just maybe if I didn't know your first
18 name, that -- it's almost irrelevant. I now know a lot
19 about you, probably more than you would prefer me knowing
20 about you.   11:57:00
21    And especially if you clicked on the button and
22 you muted your mic, but now I can hear everything you're
23 saying. But you clicked on the button. You muted the
24 mic. But I can hear everything you're saying? That's
25 something inherently wrong with that.   11:57:12

Page 70

1     Q. BY MS. JENKINS: Well, in that way with your
2 explanation of it, that would not be anonymous in that
3 you would still know it was me talking. I'm rather
4 talking about if Google knows that some user is in a
5 specific location, but doesn't know what user it is and   11:57:28
6 cannot connect that location back to you as a person,
7 does that cause the same concern?
8     MR. LEE: Objection. Asked and answered.
9     THE WITNESS: Yes, that causes the same concern.
10 Because they know a myriad of things about me that I   11:57:42
11 specifically asked them to not know right now. And --
12 and, yeah, so it does cause the same concern.
13    Q. BY MS. JENKINS: Do you know whether the
14 information that Google receives affects your browsing
15 experience?   11:58:00
16    MR. LEE: Objection to form, vague.
17    THE WITNESS: I believe it has an effect. To
18 what degree, I don't know. I could probably speculate,
19 but I'm sure you don't want that.
20    Q. BY MS. JENKINS: No, I don't want you to   11:58:18
21 speculate, but if you -- if you have any idea that
22 wouldn't be speculation.
23    A. Well, tailored advertisements. I'm sure that's
24 something that -- that would happen.
25    Q. Okay. Anything else that you can think of?   11:58:31

Page 71

1     MR MAO: Let me jump on and say that you're on
2 mute  Just tell him to pause
3     Excuse me  Hey, sorry, like there's something
4 wrong with the connection  Can we take a break real
5 fast?  Just two minutes  I think James' screen is   11:58:49
6 frozen, Sara
7     MS JENKINS: Oh, okay  Sure  Yeah, I hadn't
8 noticed  Sorry
9     MR MAO: Sara, you're actually -- I actually
10 can't hear you  I can't hear Chasom, either   11:59:03
11    THE WITNESS: Oh, really?  Okay
12    THE REPORTER: Shall we go off the record?
13    MR MCGEE: Yeah, this is Ryan  Why don't we go
14 off the record
15    MS JENKINS: Sure   11:59:16
16    THE VIDEOGRAPHER: We are off the record  The
17 time is 11:59 a m
18    (Discussion off the record )
19    (Recess )
20    THE VIDEOGRAPHER: We are back on the record   12:05:42
21 The time is 12:06 p m
22    Q  BY MS JENKINS: All right  Mr Brown, if
23 Google has your browsing activity from one Incognito
24 session and it also has browsing activity from a second
25 different Incognito session, but Google doesn't know that   12:06:04

Page 72

1 they come from the same person, would that still cause
2 you concern?
3     MR LEE: Objection to form, vague as to
4 "person "
5     THE WITNESS: Yes, that would cause me concern   12:06:22
6     Q  BY MS JENKINS: And why is that?
7     A  Because you did -- you collected my data without
8 my consent, and now you're saying it, hey, we did it
9 twice  But it's like you -- you -- you stole from me
10 once, and then you stole from me again, and then you're   12:06:47
11 saying, hey, we just don't keep it in the same place
12 Are you cool with that?  No, I'm not cool with that
13    Q  Do you have an understanding of whether Google
14 profits from user data?
15    A  I -- I believe they do --   12:07:09
16    Q  And what's your understanding of how --
17    A  -- a lot  I believe they do a lot
18    Q  And what's your understanding of how Google
19 profits from user data?
20    A  Well, data can be monetized in an assortment of   12:07:16
21 ways  One of those ways is putting profiles together
22 and -- you know, to advertisers to, hey, here's your type
23 of customer  It's this guy  He's in the cannabis
24 history  He's 43 years old  He likes these certain
25 things  And then they -- there's certain things that   12:07:47

Page 73

19 (Pages 70 - 73)

1  advertisers want, and Google provides that to them, and I
2  think a transaction occurs and there's probably a lot of
3  money that exchanges hands
4        And just -- just to be fair, I -- I -- for
5  business, I have used Google like AdSense before and          12:08:06
6  things like that for targeted ads  And so there's a lot
7  of different things you could click, and you could
8  like -- you could pick exactly who you're going to
9  target, so
10     Q  For -- for what business have you used AdSense?       12:08:23
11     A  Oh, this is going to be funny  I -- me and a
12  buddy of mine, we started a puppet show online on
13  YouTube, and we were advertising that -- it wasn't a
14  puppet show  It was reviewed movies, basically, but with
15  puppets                                                      12:08:48
16        And so we wanted to advertise to certain people
17  People that liked movies, people that were in our area,
18  people like that, that type of stuff
19     Q  Is this one of the -- the businesses that you're
20  running under the LLC you mentioned earlier?                 12:09:03
21     A  That -- that would have been under my sole prop,
22  I believe, when I did that  Because that's more along
23  the lines of entertainment  It was just kind of just a
24  fun little project between me and my buddy, but we did,
25  you know, put some time into it                              12:09:24

Page 74

1     Q  Did you use AdSense to increase views on your
2  videos?
3     A  Yes.  Yes.
4     Q  And -- and did the -- did that advertising
5  effort have any results?                                     12:09:39
6     A  It did.  We did get more views and more
7  subscribers from it.
8     Q  Were you happy with that experience?
9     A  Lukewarm.  I don't know if I'd do it again, but
10  I don't -- I don't regret it.  It was a puppet show.  So,   12:10:00
11  you know, like conversations about puppet shows, Sara.
12     Q  Is it fair to say that Google AdSense did what
13  you wanted it to do in that it increased views and
14  subscribership?
15     A  I think that's a fair thing to say.                   12:10:22
16     Q  Other than advertising, do you have an
17  understanding of any other ways that Google profits from
18  user data?
19     A  Not to any depth, but there's a lot of ways that
20  data can be used to be monetized.  I don't know which       12:10:47
21  ones Google uses the most or anything like that.  I can
22  imagine they -- because they have so much data, they
23  probably use it in every way possible.
24     Q  Okay.  And what other ways to monetize data are
25  you aware of?                                                12:11:07

Page 75

1     A  Like, for example, something newer coming out
2  is -- you know, data's being collected from people's
3  driving habits, and then that's -- like insurance
4  companies are paying to get that information.  So that
5  would be another example.                                    12:11:24
6     Q  Okay.  You're not aware if Google is doing
7  anything with that -- to that respect, are you?
8     A  No, I'm not aware of that.
9     Q  And are there any other ways that you know of
10  monetizing user data that you can think of?                 12:11:41
11     A  There's -- yeah, there's probably a lot of ways.
12  Give me a moment to think about it, and I'll try to -- I
13  think many, many companies would be very curious about,
14  you know, habits of people and -- and they would pay for
15  that as well.  So not necessarily advertising, but the      12:12:11
16  general habits of people, and I would think Google is
17  doing that.
18     Q  Okay.  Anything else?
19     A  Yeah, like you can -- like a lot of like bulk
20  data collection.  Like I guess that would lean more          12:12:41
21  toward -- toward companies wanting information, but it
22  could be companies, individuals, like -- yeah, I -- I
23  don't deal in that world so I don't know specifics, and
24  I'm trying not to like, oh, guess does Google do this or
25  guess does Google do that.  I don't know.  My guess is       12:13:02

Page 76

1  they do it all
2     Q  Yeah  My question was not specific to Google,
3  but just generally ways that user data might be
4  monetized, but --
5     A  Oh                                                     12:13:14
6     Q  Are there any other ways that you can think of?
7     A  Yeah  You can check effectiveness of like
8  things that you're doing  Like, for example, there's one
9  way I use data is we send out an email, and then we find
10  out how many people click on that email  And then we        12:13:42
11  analyze the different forms of like, oh, hey, this email,
12  more people will click on it when we put this or we do
13  that
14        And so we -- to find the effectiveness of
15  practices is one way that it can be monetized               12:13:59
16     Q  For -- for what company or endeavor have you
17  done that -- that sort of practice with regard to email?
18     A  It was in my cannabis company
19     Q  What is your cannabis company?
20     A  Well, it's all -- it's a series of a bunch of         12:14:19
21  it, but the ownership company is Eppek LLC
22     Q  And what are the companies, the cannabis
23  companies then under Eppek?
24     A  One of them is called Maturin (phonetic), one of
25  them is called Connick, one of them is called Elemental     12:14:38

Page 77

20 (Pages 74 - 77)

Page 78

1  Holistic.  There's like some other LLCs that we use for
2  random things that -- off the top of my head, I don't
3  really know.  I don't really deal with them or write
4  checks for them very often, but there's LLCs that Eppek
5  would own.                        12:15:05
6       Q.  And what types of companies are those?
7       A.  Well, either in like -- well, in cannabis, or
8  they would be -- yeah, they would be cannabis companies.
9       Q.  When you say cannabis companies, I'm wondering,
10  do you mean they sell cannabis or -- I'm just not sure    12:15:26
11  what you mean by how you hold it.
12       MR. LEE:  Okay, hold on for a second.  Hold on
13  for a second, Sara.
14       I'm actually not sure, either, Sara.  How do you
15  think this line of questioning is going to lead to        12:15:35
16  relevant testimony?  I've let you get into it, but we
17  keep going further down into this, and I see no -- no way
18  any of this is relevant.
19       MS. JENKINS:  Well, I think I'm allowed to delve
20  into his background a little bit.  I haven't gone very     12:15:49
21  far.  He's talking about user data with respect to emails
22  from some of these companies.  I'm asking what the
23  companies are and what they do, so...
24       MR. LEE:  You seem particularly focused on the
25  cannabis companies.  That's -- that's all I'm saying.     12:16:06

Page 79

1       MS. JENKINS:  I've also asked about the puppet
2  show company.  I'm happy to ask about the other companies
3  he has as well.  I'm interested in -- in these companies,
4  the technology that they use, and his understanding of
5  the technology through these companies.                  12:16:21
6       So if you want to instruct him not to answer
7  what types of cannabis companies he's involved in, go
8  ahead.
9       MR. LEE:  I'm not instructing him not to answer.
10  I'm just trying to understand.  I guess I'll just make my  12:16:32
11  objections.  It's certainly your time, but I guess you
12  can choose how to use it.
13       Go ahead.
14       THE WITNESS:  It's a licensed retail cannabis
15  company.                          12:16:49
16       Q.  BY MS. JENKINS:  And is that what all of those
17  different cannabis companies that you mentioned are?
18       A.  One of them owns some real estate, and that
19  houses a cannabis -- a cannabis company in it.  And what
20  was the other one?  And the company in it is a licensed    12:17:09
21  manufacturing lab.  So that would be the extent.
22       Q.  Okay.  What does a licensed -- licensed
23  manufacturing lab, does that mean they're licensed for
24  producing cannabis?
25       A.  Oh, yeah.  Okay.  Now we're getting into my      12:17:32

Page 80

1  world.  So if you're curious about manufacturing licenses
2  that cannabis.  So what you do is you pull -- basically,
3  you get the plant, and then you pull it into the lab, and
4  then what happens is you are extracting the terpene
5  profile from it.  So through all the machinery.          12:17:54
6       Now, hey, I do -- am part owner of the lab, but
7  I don't know the chemistry behind it all, but I can tell
8  you what the machine does, is you then extract the THC
9  and you -- in the form of distillate, and then you
10  extract the terpene profiles.                           12:18:11
11       And then you can make -- like you've probably
12  seen people generally have like a -- a vape, like or a
13  vape cartridge.  And who knows?  You may partake
14  yourself, Sara, in vapes.
15       And so if you want to get essentially high off    12:18:24
16  THC, then you can -- you'll have a vape in distillate
17  form, and through a -- and before we get it to you, it
18  would, of course, be tested, all licensed, and then sold
19  through another licensed retailer.  So then you can have
20  a clean, pure, unobstructed hit of THC, essentially.     12:18:44
21       Q.  And are you involved in the day-to-day
22  operations of these companies?
23       A.  No.
24       Q.  So are you involved as an investor?
25       A.  I'm involved as, you know, an investor, an

Page 81

1  advisor.  Like I know a lot about the industry and -- but
2  like am I the manager of the location?  No, we have a
3  manager of the locations, and they kind of run all the
4  day-to-day.  But basically when they screw up, then I get
5  on them and get them back on -- on track.                12:19:26
6       Q.  Okay.  Are you aware that you can enable block
7  all cookies in the Chrome browser?
8       A.  Block all cookies in the Chrome browser.  I'm
9  not aware of that, but I'm sure -- I'm sure it's in the
10  realm of possibilities.                                 12:19:46
11       Q.  Did you know that you could enable block
12  third-party cookies in Chrome settings?
13       A.  I'm -- I'm sure I've seen something that says
14  that.
15       Q.  Do you know if you've done that?              12:20:02
16       A.  I don't even exactly know what that is.  So if
17  you're blocking third-party cookies from another website,
18  I assume.  I don't really know how that works.
19       Q.  Okay.  Do you know that you can enable clear
20  cookies and site data when you close all windows in      12:20:22
21  Chrome settings?
22       A.  So I know you can clear cookies, and I think
23  I've done that before, only because something wasn't
24  working and somebody told me to clear cookies, and so I
25  cleared the cookies, and then it started working.        12:20:39

Veritext Legal Solutions
866 299-5127

1  has; is that correct?
2      A.  Correct.
3      Q.  And on what basis has your understanding of the
4  way that Incognito works changed?
5          MR. LEE:  And now I'm going to ask you to not          17:19:44
6  answer that question because it's based on
7  attorney-client privilege.
8          MS. JENKINS:  James, you're the one who brought
9  this up; right?  You're the one who asked the question.
10         MR. LEE:  I asked has it changed.  You're asking     17:19:58
11 for the bases.  Those are two different things.
12     Q.  BY MS. JENKINS:  All right.  Mr. Brown, will you
13 adhere to your counsel's instruction?
14     A.  Yes.
15         MS. JENKINS:  All right.  Then I have no further     17:20:10
16 questions.
17         MR. LEE:  Thanks, everyone.  We'll take the
18 rough.  We'll take the rough copy, please.
19         THE REPORTER:  Fine.  Thank you.  Can we go off
20 the record?                                     17:20:25
21         THE VIDEOGRAPHER:  We are off the record.  The
22 time is 5:20 p.m. on January 13th, 2022.
23         This concludes today's testimony given by
24 Chasom Brown.  The total number of media units used was  17:20:38
25 eight and will be retained by Veritext Legal Solutions.

Page 202

---

1      I declare under the penalty of perjury under the
2  laws of the State of California that the foregoing is
3  true and correct.
4      Executed on _____, 2022, at
5  _____, _____.
6
7
8
9
10
11     _____
12     SIGNATURE OF THE WITNESS
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 204

---

1      (Time noted: 5:20 p.m. Pacific Standard Time.)
2              --oOo--
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 203

---

1  STATE OF CALIFORNIA      ) ss:
2  COUNTY OF MARIN          )
3
4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6          That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9          That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16         I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20         IN WITNESS WHEREOF, I have subscribed my name
21 this 17th day of January, 2022.
22
23
24
25     LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 205

52 (Pages 202 - 205)

# EXHIBIT C

Message

| | |
|---|---|
| **From**: | chrome-leads@google.com [chrome-leads@google.com] |
| on behalf of | Sean Harvey [sharvey@google.com] |
| **Sent**: | 2/2/2009 3:47:30 PM |
| **To**: | Welmer Van Der Wel [wvanderwel@google.com] |
| **CC**: | Sundar Pichai [sundar@google.com]; Linus Upson [linus@google.com]; Caesar Sengupta [caesars@google.com]; Mike Belshe [mbelshe@google.com]; Ian Fette [ifette@google.com]; Barbara Stanley [bstanley@google.com]; xfp-leads [xfp-leads@google.com]; Joerg Heilig [jh@google.com]; Jonathan Bellack [jbellack@google.com]; chrome-leads [chrome-leads@google.com]; Jim Roskind [jar@google.com] |
| **Subject**: | [chrome-leads] Re: [xfp-leads] Re: IE8 "inprivate filtering" is not a part of a "porn mode" and may be an attack on Google ads or analytics |

totally aware that this is a big problem. still working to get formal messaging out on this.

On Mon, Feb 2, 2009 at 10:42 AM, Welmer Van Der Wel <wvanderwel@google.com> wrote:
It would help greatly if we could get a formal statement from Google. Many DFP clients are asking about this and we keep telling them that we have not had a chance to fully test the impact.

On Sun, Feb 1, 2009 at 9:52 AM, Sundar Pichai <sundar@google.com> wrote:
Thanks, we are following this and responding, pls dont discuss more in this thread. Thanks

On Sun, Feb 1, 2009 at 8:30 AM, Linus Upson <linus@google.com> wrote:
[+sundar,chrome-leads]

I believe Sundar is involved in Google's response. It may not be something suitable for email.

Linus

On Sat, Jan 31, 2009 at 8:07 PM, Jim Roskind <jar@google.com> wrote:
I have not investigated personally, but I was told by my colleague that this filter feature is separate from the "inprivate mode," which some refer to as a "porn mode." You can read about Inprivate Filtering (formerly Inprivate Blocking) as distinct from Inprivate Browsing (a.k.a., Inprivate Mode a.k.a., porn mode) at:

http://www.efluxmedia.com/news_Internet_Explorer_8_RC1_Released_33967.html

Quoting from that article: "*Along with the InPrivate Filter, another sought-after feature that was first implemented in IE 8 Beta 2 is an updated version of InPrivate Browsing, similar to Google Chrome's Incognito window.*" That sure makes it sound like these features are distinct.

I was told that in one IE 8 beta the FILTER was on by default, but now it is off by default. I was told that the real problem is that it has become progressively easier to "turn on" the filter. I was told the a pop-up dialog is something kindred to "Would you like IE to protect your privacy and prevent third parties from sharing information about you?".

I strongly suspect that confusion between the mode and the filter is reducing push-back (as per Mike's comment). My subject line was meant to help illuminate the confusion (and I'm hoping I'm not the confused person).

CONFIDENTIAL

I was also told that parts of MS (where they sell ads) are not as pleased about this feature, but perchance MS is in a better position to deploy the "work-arounds."

On Sat, Jan 31, 2009 at 6:46 PM, Mike Belshe <mbelshe@google.com> wrote:
This has come up a number of times and does appear to be a significant threat to google, google's partners, and all advertising on the web. I don't know what the official google response is; except that since it is only in the "inprivate" mode, it is less of a threat.

A more adventurous jump would be for MIcrosoft to simply bundle an adblocker in IE by default. They haven't done that yet, but if I were them, it would be on the radar.

On Sat, Jan 31, 2009 at 3:41 PM, Jim Roskind <jar@google.com> wrote:
Sorry If Already Known:

A friend of mine at AOL called today to chat with me about the new "inprivate filtering" in IE 8. Apparently it is making his life hard, as it is seemingly targeted at harming providers of advertisements.

To review what he told me (which matches the high level blurbs I found on the net): "Inprivate filtering" adaptively blacklists domains that are found to provide sub-resource content to ten or more separate sites. They purport to do this to prevent these blacklisted sites from tracking user surfing actions. It is interesting that this filtering doesn't actually check to see if cookies etc. are being set. In the extreme, if a company with many subdomains hosts a trademark GIF file on a central domain, that central domain may get blacklisted (even if the content it serves is cachable, and no cookies are set etc.).

My friend told me that when he surfed around with IE 8, after a few hours, a number of Google sites were at the top of the blacklist (with a bunch of AOL sites next on the list).

He also told me that the algorithm was pretty stupid, and probably could be avoided, but it was going to be a hassle (at least for him, at AOL) to change the domains and/or paths in all their deployed ads.

I was wondering if we were actively tracking this (mis)feature, and its potential impact on google served (or tracked) advertisements?

Thanks,

p.s., It is rather interesting that the new adaptive DNS pre-resolution for sub-resources in Chrome tries to accelerate access to these subresources, which are being blocked by IE 8.

GOOG-BRWN-00225678

--

_____

Sundar Pichai
GoogleInc.

Voice: 650-253-6341
Email: sundar@google.com

--

wvanderwel@google.com

--
Sean Harvey
Product Manager
Google Content Network & Platform Ad Serving
212-381-5330
sharvey@google.com

CONFIDENTIAL                                                                    GOOG-BRWN-00225679

# EXHIBIT D

































# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


CHASOM BROWN; MARIA NGUYEN;
WILLIAM BYATT; JEREMY DAVIS;
and CHRISTOPHER CASTILLO,
individually and on behalf
of all other similarly
situated,

              Plaintiffs,

vs.                        No. 5:20-cv-03664-LHK

GOOGLE LLC,

              Defendant.
_____/



CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF BRIAN RAKOWSKI

THURSDAY, AUGUST 19, 2021


Stenographically Reported by:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

California CSR No. 9830

Job No. 741808


MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com

Page 2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      ---oOo---
 4
 5   CHASOM BROWN; MARIA NGUYEN;
     WILLIAM BYATT; JEREMY DAVIS;
 6   and CHRISTOPHER CASTILLO,
     individually and on behalf
 7   of all other similarly
     situated,
 8
              Plaintiffs,
 9   vs.            No. 5:20-cv-03664-LHK
10   GOOGLE LLC,
11            Defendant.
     _____/
12
13
14       REMOTE VIDEOTAPED DEPOSITION OF BRIAN RAKOWSKI
15   taken on behalf of the Plaintiffs, on Thursday,
16   August 19, 2021, beginning at 9:00 a.m., and ending
17   at 6:02 p.m., Pursuant to Notice, and remotely
18   before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~
19   License No. 9830.
20
21
22
23
24
25
```

Page 3

```
 1   R E M O T E   A P P E A R A N C E S :
 2
 3
 4   COUNSEL FOR THE PLAINTIFFS:
 5      BOIES SCHILLER & FLEXNER LLP
 6      By:  BEKO RICHARDSON, ESQ.
 7         MARC C. MAO, ESQ.
 8         ERIKA NYBORG-BURCH, ESQ.
 9      44 Montgomery Street, 41st Floor
10      San Francisco, California 94104
11
12      BOIES SCHILLER & FLEXNER LLP
13      By:  ROSSANA BAEZA, ESQ.
14      100 SE 2nd Street, 28th Floor
15      Miami, Florida 33131
16
17      MORGAN & MORGAN
18      By:  RYAN MCGEE, ESQ.
19         RA AMEN, ESQ.
20      201 N. Franklin Street, 7th Floor
21      Tampa, Florida 33602
22
23
24
25
```

Page 4

```
 1   R O M O T E   A P P E A R A N C E S :  (Cont.)
 2
 3
 4   COUNSEL FOR THE DEFENDANT:
 5      QUINN EMANUEL URQUHART & SULLIVAN
 6      By:  VIOLA TREBICKA, ESQ.
 7         TEUTA FANI, ESQ.
 8      865 S. Figueroa Street, 10th Floor
 9      23 Los Angeles, California 90017
10
11
12   ALSO PRESENT:  Matthew Gubiotti, Google
13            Evan Tsilimidos, Videographer
14            Vanessa Wheeler, Exhibit Technician
15                 ---oOo---
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            INDEX OF STATEMENT
 2
 3   WITNESS:  Brian Rakowski
 4
 5   EXAMINATION                    PAGE
 6   By Mr. Richardson          12, 320
 7   By Mr. Trebicka              318
 8
 9       INDEX OF DEPOSITION EXHIBITS
10   EXHIBIT                       PAGE
11   Exhibit 2   6-10-08 E-mail, Re:  Chrome     68
12      top 10 - mk, Bates
13      GOOG-BRWN-00228744.R - '745.R
14   Exhibit 3   6-12-08 E-mail, Re:  Chrome     85
15      Closing Interviews Today -
16      Summary of P2, P6, P5, Bates
17      GOOG-BRWN-00228597 - '99
18   Exhibit 4   7-11-08 E-mail, Re:  Chrome    103
19      redirect loop issue - observation
20      Bates GOOG-BRWN-00410076
21   Exhibit 5   7-11-08 E-mail, Chrome redirect  120
22      loop issue - observation
23      Bates GOOG-BRWN-00226894 - '95
24   Exhibit 6   7-17-18 E-mail, Chrome Team Meeting 135
25      Notes, Bates GOOG-BRWN-00409986 - '87
```

Page 242

1    being a popular completion of the query you typed.        15:32
2        When you were in Incognito Mode, we just           15:32
3    don't send that query to the suggest server. So          15:32
4    there's no suggest result that comes back.               15:32
5        MR. RICHARDSON: Okay.                           15:33
6    Q  Do you agree that people can choose to browse        15:33
7    the web privately by using Chrome in Incognito Mode?     15:33
8    A  It's a bit under-specified. Can you -- can          15:33
9    you clarify what you mean by use the web privately. I    15:33
10   need more context.                                   15:33
11   Q  I guess I'm just trying to understand whether       15:33
12   or not that's an accurate statement, that you can       15:33
13   choose to browse the web privately using Chrome in      15:33
14   Incognito Mode?                                      15:33
15   A  Well, if you're talking about privately in         15:33
16   terms of private so that your computer doesn't have a    15:33
17   record of what you -- what sites you went to, which     15:33
18   was the design intent of Incognito Mode, then yes.     15:33
19   It's private from your roommate, you know, looking at   15:33
20   your browsing history or whatever.                    15:33
21   Q  So this -- this goes back to the circularity      15:33
22   problem. You can browse incognito using Incognito      15:33
23   Mode if you define Incognito Mode to be what you       15:34
24   designed?                                           15:34
25   A  Right. Right.                                   15:34

Page 243

1    Q  Okay. So if you define "private" to mean how       15:34
2    Incognito Mode functions, then yes, that would be an    15:34
3    accurate statement?                                  15:34
4    A  Well, that's slightly different. But I'm          15:34
5    defining "private" to -- you know, there's different    15:34
6    interpretations of private. If you're specific about    15:34
7    private meaning your computer won't retain a record of   15:34
8    it, then -- then yes, that's what it was designed to    15:34
9    do.                                                15:34
10   Q  Okay. Do you consider Incognito Mode for          15:34
11   Chrome to be a browser setting?                       15:34
12   A  Browser setting? It -- it would depend on         15:34
13   the context for using the word "setting." But in       15:34
14   general, like, normal parlance, I would say no, it's    15:34
15   not a setting.                                       15:34
16   Q  We talked earlier about the Incognito new tab     15:35
17   page.                                              15:35
18       Do you recall that?                             15:35
19   A  Yes.                                           15:35
20   Q  And -- and we looked at some drafts of the         15:35
21   Incognito new tab page.                              15:35
22       Do you recall that?                             15:35
23       MS. TREBICKA: Objection; misstates --           15:35
24   objection; assumes facts; misstates the record.         15:35
25       THE WITNESS: I think we looked at a -- one       15:35

Page 244

1    exhibit that showed new tab page. I remember that.      15:35
2        MR. RICHARDSON: Right. I'm sorry.               15:35
3    Q  Do -- can you pull up Exhibit 10?                 15:35
4        Is that easy for you to do?                      15:35
5        Or have you put all those aside?                 15:35
6    A  I can do it.                                    15:35
7    Q  So if you look at Exhibit 10 there down by         15:35
8    the bottom, it says:                                15:35
9        "Going incognito doesn't affect the behavior     15:35
10   of other people, servers, or software."              15:35
11       Do you see that?                               15:35
12   A  At the bottom, there's a lot --                  15:35
13   Q  It's a quarter --                               15:35
14       MS. TREBICKA: First page, you mean, Beko?       15:35
15       MR. RICHARDSON: First page, above the five       15:35
16   bullets.                                           15:36
17       THE WITNESS: Okay. Yeah, yeah.                 15:36
18       MR. RICHARDSON: Q. Let me read that again.       15:36
19   It says:                                           15:36
20       "Going incognito doesn't affect the behavior    15:36
21   of other people, servers, or software."              15:36
22       Do you see that?                               15:36
23   A  I see that.                                     15:36
24   Q  And that would include Google servers;            15:36
25   correct?                                           15:36

Page 245

1    A  Yeah.                                          15:36
2    Q  And did you feel that it was important to          15:36
3    include that reference to servers in this disclosure?   15:36
4    A  I -- again, I can't remember the -- the           15:36
5    timing of all this. But we did want to be as clear as   15:36
6    possible about what happens in this mode. So that's     15:36
7    why this page was designed, and including that          15:36
8    description of what does and doesn't happen was         15:36
9    important.                                          15:36
10   Q  And we had seen some discussions regarding        15:36
11   server logging confusion; right?                      15:36
12   A  Right.                                         15:36
13   Q  And was this reference to servers in the          15:36
14   Incognito new tab page meant to address that server     15:36
15   logging confusion?                                  15:36
16   A  Again, I don't remember the timing of what        15:37
17   came first or second. But this would -- in my mind,     15:37
18   this -- this would clarify what this feature does and   15:37
19   does not do.                                        15:37
20   Q  Do you know what a GWS ID is, W -- GWS?           15:37
21   A  It rings a bell. This is super old. This         15:37
22   is, like, 100 years old.                            15:37
23   Q  What's your understanding of what a GWS ID        15:37
24   is?                                                15:37
25   A  Well, this is super cobwebs. GWS was the          15:37

Page 246

1  acronym for Google Web Server, GWS. It was the front    15:37
2  end for much of our traffic. I cannot recall right    15:37
3  now what the -- what -- what ID was involved.    15:38
4    Q  Do you have any understanding as to whether    15:38
5  or not a GWS ID is sent when someone is in Incognito    15:38
6  Mode?    15:38
7      MS. TREBICKA:  Objection; vague as to time    15:38
8  period.    15:38
9      THE WITNESS:  I -- I can't recall what the    15:38
10  GWS ID was anymore, so I don't know.    15:38
11      MR. RICHARDSON:  That's fine.    15:38
12    Q  Do you have any understanding as to whether    15:38
13  or not something called the X client data header is    15:38
14  sent when someone is in Incognito Mode?    15:38
15    A  I'm trying to remember that header. I -- all    15:38
16  these headers that start with an X, I don't -- I don't    15:38
17  recall specifically.    15:38
18      MR. RICHARDSON:  Go to the next exhibit,    15:38
19  Exhibit 21.    15:38
20      (Document remotely marked Exhibit 21    15:38
21      for identification.)    15:38
22      MR. RICHARDSON:  Exhibit 21 is a document    15:38
23  produced by Google, with Production Nos. '225677    15:39
24  through '225679, with the metadata sheet.    15:39
25    Q  Mr. Rakowski, would you please let me know    15:39

Page 247

1  when you have Exhibit 21 in front of you.    15:39
2    A  I just opened it.    15:39
3    Q  And when you're ready, my first question will    15:39
4  be whether or not Exhibit 21 is an e-mail you received    15:39
5  as part of your work for Google?    15:39
6    A  I'm -- I'm browsing it.    15:39
7      (Witness reading document.)    15:39
8      Okay. I've read it.  And as part of    15:41
9  chrome-team, I would have -- or chrome-leads, I would    15:41
10  have gotten this e-mail.    15:41
11    Q  And do you see on the second page where    15:41
12  there's an e-mail from Jim Roskind where he writes:    15:41
13      "Sorry If Already Known:  A friend of mine at    15:41
14  AOL called today to chat with me about the new    15:41
15  'inprivate filtering' in IE 8.  Apparently it is    15:41
16  making his life hard, as it is seemingly targeted at    15:41
17  harming providers of advertisements."    15:41
18      Do you see that?    15:41
19    A  I see that.    15:41
20    Q  And then Mr. Mike Belshe responded:    15:41
21      "This has come up a number of times and does    15:41
22  appear to be a significant threat to google."    15:41
23      Do you see that?    15:41
24    A  Yes.    15:41
25    Q  To the first page, Mr. Upson writes:    15:41

Page 248

1      "I believe Sundar is involved in Google's    15:42
2  response.  It may not be something suitable for    15:42
3  email."    15:42
4      Do you see that?    15:42
5    A  I see it.    15:42
6    Q  And do you understand that reference to    15:42
7  Sundar to be a reference to Sundar Pichai?    15:42
8    A  Yes.    15:42
9    Q  And do you have any understanding as to what    15:42
10  Mr. Upson meant by:    15:42
11      "It may not be something suitable for email."    15:42
12    A  I don't know.  I would have to -- I would    15:42
13  have to guess at what he meant.    15:42
14    Q  In your experience, are there certain topics    15:42
15  at Google that are not suitable for e-mail?    15:42
16    A  There are certain things that -- that we just    15:42
17  don't want to -- it's inefficient to go back and forth    15:42
18  over e-mail on a complicated, nuanced topic.  That --    15:42
19  that tends to be a reason why Linus would have gone    15:42
20  that route.    15:43
21    Q  Sitting here today, it's your testimony that    15:43
22  Mr. Upson was describing this as not suitable for    15:43
23  e-mail for efficiency purposes; is that correct?    15:43
24    A  That's my -- that's my guess.    15:43
25    Q  Did you ask Mr. Upson why he wrote:    15:43

Page 249

1      "It may not be something suitable for email."    15:43
2    A  No, I don't -- I don't recall talking to him    15:43
3  about this e-mail.    15:43
4    Q  Did you ask Mr. Pichai why he wrote:    15:43
5      "Pls dont discuss more in this thread."    15:43
6    A  I did not.    15:43
7    Q  Were there other occasions where Mr. Pichai    15:43
8  told you and other employees to not put things in    15:43
9  writing?    15:43
10    A  It's possible.    15:43
11    Q  Can you recall any of those specific    15:43
12  occasions?    15:43
13    A  No, I can't recall any specific instances.    15:43
14    Q  And then at the very top here, it says:    15:43
15      "Totally aware that this is a big problem."    15:43
16      Do you see that?    15:44
17    A  Yes.    15:44
18    Q  If you know, why was this being described as    15:44
19  "a big problem"?    15:44
20    A  I don't know.    15:44
21      MS. TREBICKA:  Calls for speculation.    15:44
22      THE WITNESS:  Yeah, I don't know.  I don't --    15:44
23  this whole thread is a bit -- I can't remember much of    15:44
24  it.    15:44
25      MR. RICHARDSON:  Q.  Do you recall any    15:44

Page 250

1    discussions with Mr. Pichai about this?                    15:44
2        A   I don't recall discussions about in private        15:44
3    browsing.                                                  15:44
4        Q   Okay.  Does Google have profiles tied to           15:44
5    Incognito browsing?                                        15:44
6        MS. TREBICKA:  Objection; vague, and as to             15:44
7    time period, too.                                          15:44
8        THE WITNESS:  What do you mean by "profiles"?          15:44
9        MR. RICHARDSON:  Q.  Do you ever use profiles          15:44
10   in connection with your work for Google?                   15:44
11       A   Yeah, the --                                       15:44
12       Q   -- profiles?                                       15:44
13       A   The most common -- the use that I'm familiar       15:44
14   with is the browser profile.  And a browser -- should      15:44
15   I -- should I explain what that is?                        15:45
16       Q   Please let me know what a browser profile is.      15:45
17       A   Okay.  A browser profile is an instance of         15:45
18   the browser.  So for instance, the feature that one        15:45
19   could build, and I believe we considered building, but     15:45
20   I don't think -- I don't know that we built it, was        15:45
21   you could have a separate profile for you, and then        15:45
22   another profile for your wife.                             15:45
23       So they would keep your bookmarks separate             15:45
24   and all -- you know, basically be a separate instance      15:45
25   of the browser without having to -- it's -- it's a bit     15:45

Page 251

1    dependent on the operating system upon which you're        15:45
2    running.                                                   15:45
3        But in a normal -- you know, I don't remember          15:45
4    how -- I don't actually know how profiles work in          15:45
5    different operating systems anymore.  But at -- on          15:45
6    Windows, it was pretty onerous to switch Windows           15:45
7    profiles.                                                  15:45
8        So we considered building a Chrome profile so          15:45
9    that you could have multiple user profiles, either for     15:45
10   different people or, you know, maybe have a work            15:46
11   version and a personal version or whatever.                15:46
12       Q   And would there be a profile linked to an          15:46
13   Incognito browsing session, a browser profile?             15:46
14       A   That -- that would be how I would -- I would       15:46
15   describe it.  You could use Incognito within any of        15:46
16   those browser profiles.                                    15:46
17       MR. RICHARDSON:  Let's just look quickly at            15:46
18   Exhibit 22.                                                15:46
19       (Document remotely marked Exhibit 22                   15:46
20       for identification.)                                   15:46
21       MR. RICHARDSON:  Exhibit 22 is a document              15:46
22   produced by Google with Production No. '225151, with       15:46
23   the metadata sheet.                                        15:46
24       THE WITNESS:  Okay.  I have it.                        15:47
25       MR. RICHARDSON:  Q.  Mr. Rakowski, is               15:47

Page 252

1    Exhibit 22 an e-mail you received as part of your work     15:47
2    for Google?                                                15:47
3        A   "Chromium-dev."  It looks like it was sent to      15:47
4    the chromium-dev list, of which I can't remember           15:47
5    whether I was an owner or a member.                        15:47
6        Q   If you look at the metadata, you'll see at         15:47
7    the very bottom there all custodies.  It has your          15:47
8    name, Brian Rakowski; right?                               15:47
9        A   That's right.                                      15:47
10       Q   So I'll just represent that Google produced        15:47
11   this as a document from your files.                        15:47
12       A   Okay.  Then I will --                              15:47
13       Q   I just wanted to ask about the first               15:47
14   sentence, where it says:                                   15:47
15       "We do officially support profiles:  they're          15:47
16   how Incognito works."                                      15:47
17       Do you see that?                                       15:47
18       A   I see that.                                        15:47
19       Q   Do you have an understanding of what that          15:47
20   means?                                                     15:47
21       A   Yeah.                                              15:47
22       Q   What do you understand that to mean that:          15:47
23       "We do officially support profiles:  they're          15:48
24   how Incognito works."                                      15:48
25       A   Let me -- let me just read this.  I don't          15:48

Page 253

1    know if I've ever read this e-mail before, even though     15:48
2    I might have gotten it.                                    15:48
3        (Witness reading document.)                            15:48
4        Okay.  The -- this quickly gets out of my              15:48
5    depth.  But the -- what I -- what I believe Tim, who       15:48
6    wrote this message, is -- is describing is the             15:48
7    underlying infrastructure upon which we built              15:48
8    Incognito was to effectively create a fresh browser       15:48
9    profile that you would use.                                15:48
10       As I mentioned before, it's like getting a             15:48
11   new computer, using it, and then you tear it down and      15:48
12   throw it away when you -- when you close the window.       15:49
13       So I think he's saying that the                        15:49
14   infrastructure is implemented in this general purpose      15:49
15   profiles thing, which could be used in other ways          15:49
16   also.                                                      15:49
17       Q   And is data from that Incognito profile ever       15:49
18   sent to Google servers?                                    15:49
19       MS. TREBICKA:  Objection; overbroad, vague.            15:49
20       THE WITNESS:  You'll have to be more specific          15:49
21   from a "profile."                                          15:49
22       MR. RICHARDSON:  I'm not sure how to be more           15:49
23   specific.                                                  15:49
24       Q   There's data associated with that Incognito        15:49
25   profile; correct?                                          15:49

Page 322

```
1        MS. TREBICKA:  We object, but we can take        18:02
2   that up with communications outside of the record of    18:02
3   this deposition.                             18:02
4        MR. RICHARDSON:  Thank you.              18:02
5        THE VIDEOGRAPHER:  The time is 6:02.  That   18:02
6   concludes today's deposition.                 18:02
7        THE REPORTER:  Do you need a copy and rough   18:03
8   sent to you as well?                         18:03
9        MS. TREBICKA:  Yes, please.              18:03
10       MR. RICHARDSON:  Yes, please, with us as    18:03
11  well.  You can send that to -- to Rosie and myself and  18:03
12  Mark Mao.                                    18:03
13       (WHEREUPON, the deposition ended          18:04
14          at 6:02 p m.)                         18:04
15              ---oOo---
16
17
18
19
20
21
22
23
24
25
```

Page 323

```
1   DECLARATION UNDER PENALTY OF PERJURY
2
3        I, BRIAN RAKOWSKI, do hereby certify under
4   penalty of perjury that I have read the foregoing
5   transcript of my remote deposition, taken on
6   August 19, 2021, that I have made such corrections
7   as appear noted herein in ink; initialed by me;
8   that my testimony contained herein, as corrected,
9   is true and correct.
10
11  DATED this ____ day of _____, 2021, at
12  _____.
13
14  _____
15       SIGNATURE OF WITNESS
16
17
18
19
20
21
22
23
24
25
```

Page 324

```
1        CERTIFICATE OF REPORTER
2
3        I, ANDREA M. IGNACIO, hereby certify that the
4   witness in the foregoing remote deposition was by me
5   remotely sworn to tell the truth, the whole truth, and
6   nothing but the truth in the within-entitled cause;
7        That said deposition was taken in shorthand
8   by me, a disinterested person, at the time and place
9   therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12       That before completion of the deposition,
13  review of the transcript [x] was [ ] was not
14  requested.  If requested, any changes made by the
15  deponent (and provided to the reporter) during the
16  period allowed are appended hereto.
17       I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22  Dated:
23       _____
24  ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
25
```

Page 325

```
1        DEPOSITION ERRATA SHEET
2
3   Page No.____ Line No.____ Change to:_____
        _____
4   _____
5   Reason for change:_____
6   Page No.____ Line No.____ Change to:_____
7   _____
8   Reason for change:_____
9   Page No.____ Line No.____ Change to:_____
        _____
10  _____
11       Reason for
    change:_____
12  Page No.____ Line No.____ Change to:_____
        _____
13  _____
14       Reason for
    change:_____
15  Page No.____ Line No.____ Change to:_____
        _____
16  _____
17       Reason for
    change:_____
18  Page No.____ Line No.____ Change to:_____
        _____
19  _____
20       Reason for
    change:_____
21  Page No.____ Line No.____ Change to:_____
        _____
22  _____
23       Reason for
    change:_____
24  SIGNATURE:_____ DATE:_____
25
```