BOIES SCHILLER FLEXNER LLP
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

*Attorneys for Plaintiffs*

SUSMAN GODFREY L.L.P.
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASOM BROWN, WILLIAM BYATT, JEREMY DAVIS, CHRISTOPHER CASTILLO, and MONIQUE TRUJILLO individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.: 4:20-cv-03664-YGR-SVK<br><br>**DECLARATION OF BLAKE LEMOINE** |

I, Blake Lemoine, declare as follows:

1. I have personal knowledge of the matters discussed below and if called as a witness, I could competently testify to them.

2. I received my Bachelor's degree in Computer Science from the University of Louisiana at Lafayette in 2008 and my Masters in Computer Science from the University of Louisiana at Lafayette in 2010. I have served as an advisor to the National Science Foundation and have been a technical expert contributor to ISO standards on artificial intelligence and AI bias as well as their technical report on the societal and ethical implications of artificial intelligence.

3. I worked for Google in Mountain View, California, as a software engineer between February 2015 and November 2017, and then as a senior software engineer between November 2017 and July 2022. In July of 2022 my employment with Google was terminated after I complied with a request for information about potentially illegal activity at Google from a US Senator's office.

4. I am now employed as head of AI for MIMIO.ai, an early-stage start-up building an artificial intelligence ("AI") powered Personality Engine™ that allows people to create their own authentic AI interactive personas.

5. I reached out to Plaintiffs' lawyers in this case for the first time after I saw news articles reporting that the Court had denied Google's motion for summary judgment. Those articles were reported around August 8, 2023. After reading some of those articles and learning some of what this case was about, I left a voicemail for attorney Mark Mao on August 8, 2023, advising him that I may have information relevant to this case.

6. I am prepared to testify at trial regarding my work at Google and my knowledge from working at Google, including about information relating to Google's use of private browsing data. I am also willing and available to appear for a deposition in advance of trial.

7. While employed at Google, I worked on various projects relating to search, backend infrastructure, machine learning, automation, and artificial intelligence (or AI). I contributed to the creation and maintenance of predictive analytic systems for Google Search which interacted heavily with various Google data sources (including Chrome logs). In the course of creating those systems, I also integrated many artificial intelligence systems managed by other teams into the systems that I was building; through that, I gained knowledge of how AI is trained at Google (using both "personalized" and "non-personalized" logs).

8. I also designed the system for Google Discover's compliance with the GDPR and have had extensive contact with Google's upper management, people operations, and legal divisions with regards to ethics and privacy related matters. This work required me to gain knowledge of the data sources that Search uses as inputs.

9. While I worked at Google, Google took the position that its internal limitations on access to end-user data (which would include private browsing data collected by Google) did not apply with respect to the algorithms, machine learning, and artificial intelligence services within Google that would use that data. More specifically, Google took the position that information inferred about a user through AI was considered to be "data about the user" owned by Google rather than "user data" owned by the user. I implemented privacy compliance according to this specification under protest.

10. In my experience, engineers within Google ran tests, experiments, and training regularly on and using browsing data—including private browsing data—for various Google products and services. Many of the core AI systems consume a broad collection of different data sources and the downstream engineers building products using the output of those systems have little to no visibility into whether or not private data were used in the creation of the AI's output.

11. The Google algorithms, machine learning, and artificial intelligence that various Google teams worked on were able to use and in fact used data generated by end users not only from their regular browsing but also their private-mode web browsing, including users' private browsing activities using Chrome Incognito mode.

12. Some of Google's algorithms, machine learning, and artificial intelligence were improved by learning about activities based on geographic location. In addition, they were trained to recognize browsing behavior and patterns originating from the same persons and devices. Thus, in my experience, Google's algorithms, machine learning, and artificial intelligence are still able to reidentify the same persons and devices, even if the end users decided to use private-mode web browsing. People's browsing patterns can serve as a signature of sorts which the AI can identify and use to transfer data about one "account" (e.g. a person's Incognito history) to a different "account" (e.g. that same person's normal Chrome experience).

13. In my experience, Google also has a culture and practice of limiting the creation of written documentation regarding the sorts of issues discussed above, including through Google's "Communicate with Care" program and efforts internally (by Google executives and others) to limit internal communications and punish people who raised ethical concerns about Google's practices.

14. While employed with Google, I conducted an internal study that included feedback from every technical lead in proactive Search. That study related in part to Google's storage and use of what can be described as "signed out" data. Following the study, I created a report summarizing my key findings, which included many potential problems that we should address before they harmed anyone. One technical issue raised in that document is that data from a user's signed out session may transfer to their signed in sessions, and vice versa. The same technical issue applied to data transference between Chrome Incognito and regular Chrome sessions (as well as other Google surfaces), through the same mechanism. I was told by my Director that my VP was advised not to

DECLARATION OF BLAKE LEMOINE                                    CASE NO. 4:20-cv-03664-YGR-SVK

read the report in order to maintain plausible deniability and I was moved off of projects related to AI and fairness in Search after that. I continued to be assigned work unrelated to my expertise until I changed teams.

15. On June 4, 2022, I sent an email to Senator Mike Lee's office attaching the above summary of the findings from my study at their request. The summary mentioned my finding that users' "signed out" experiences could bleed over into their "signed in" experiences, as well as other concerns about Google's algorithms discriminating against users on the basis of their religious beliefs which was the specific topic his office had contacted me concerning.

16. On June 5, 2022, I sent an email to Google CEO Sundar Pichai and Alphabet's Chief Legal Officer Kent Walker advising them of the e-mail I had sent to Senator Mike Lee's office. I do not have a copy of that email, which I sent from my work e-mail account at Google to which I no longer have access. Google placed me on administrative leave the next day and terminated my employment 54 days later on July 29, 2022.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 23rd day of October, 2023, in the City of San Francisco, in the State of California.

*Blake Lemoine*

_____

BLAKE LEMOINE