**Pages 1 - 209**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CHASOM BROWN, ET AL.,            )
                                 )
            Plaintiffs,          )
                                 )
  VS.                            )      **NO. CV 20-03664-YGR**
                                 )
GOOGLE LLC,                      )
                                 )
            Defendants.          )
_____  )

                    Oakland, California
                    Wednesday, November 29, 2023

              **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, NY 10504
              BY:   **DAVID BOIES, ESQUIRE**

                    BOIES SCHILLER FLEXNER LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA 94104
              BY:   **MARK MAO, ESQUIRE**
                    **BEKO REBLITZ-RICHARDSON, ESQUIRE**
                    **JOSHUA STEIN, ESQUIRE**
                    LAUREN LAVARE, ESQUIRE

                    BOIES SCHILLER FLEXNER LLP
                    100 SE 2nd Street
                    Miami, FL 33131
              BY:   **JAMES LEE, ESQUIRE**

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

        BOIES SCHILLER FLEXNER LLP
        725 S. Figueroa Street
        Los Angeles, CA 90017
  BY: **LOGAN WRIGHT, ESQUIRE**

        SUSMAN GODFREY L.L.P.
        1900 Avenue of the Stars, Suite 1400
        Los Angeles, CA 90067
  BY: **AMANDA BONN, ESQUIRE**

        SUSMAN GODFREY LLP
        1301 Avenue of the Americas
        New York, NY 10019
  BY: **ALEXANDER FRAWLEY, ESQUIRE**
     **RYAN SILA, ESQUIRE**

        MORGAN AND MORGAN
        201 N. Franklin Street, 7th Floor
        Tampa, FL 33602
  BY: **RYAN MCGEE, ESQUIRE**
     **JOHN A. YANCHUNIS, ESQUIRE**

For Defendant:

        QUINN EMANUEL URQUHART SULLIVAN LLP
        191 N. Upper Wacker Drive, Suite 2700
        Chicago, IL 60606
  BY: **ANDREW SHAPIRO, ESQUIRE**
     **JOSEPH MARGOLIES, ESQUIRE**
     **TEUTA FANI, ESQUIRE**

        QUINN EMANUEL URQUHART SULLIVAN LLP
        865 South Figueroa Street, 10th Floor
        Los Angeles, CA 90017
  BY: **STEPHEN BROOME, ESQUIRE**
     **RACHEL MCCRACKEN, ESQUIRE**
     **VIOLA TREBICKA, ESQUIRE**
     **CRYSTAL NIX-HINES, ESQUIRE**

        QUINN EMANUEL URQUHART SULLIVAN LLP
        51 Madison Avenue
        New York, NY 10010
  BY: **JOMAIRE CRAWFORD, ESQUIRE**

| | |
|---|---|
| 1 | <u>**Wednesday - November 29, 2023**</u>                          <u>**8:55 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | **---0O0---** |
| 4 | **THE CLERK:**  Good morning, everyone.  Calling the |
| 5 | matter of CV 20-3664-YGR, Brown, et al. vs. Google LLC, et al. |
| 6 | Parties, please step forward and state your appearances |
| 7 | for the record, starting with the plaintiff. |
| 8 | **MR. BOIES:**  Good morning, Your Honor.  David Boies of |
| 9 | Boies Schiller & Flexner representing the plaintiff. |
| 10 | **THE COURT:**  Good morning, Mr. Boies.  All right. |
| 11 | So let's go around so I get to you know you all better.  I |
| 12 | think I know most of you, but we'll see. |
| 13 | **MS. BONN:**  Good morning, Your Honor.  Amanda Bonn with |
| 14 | Susman Godfrey for the plaintiffs. |
| 15 | **THE COURT:**  Good morning. |
| 16 | Why don't you all just line up here so we're not waiting |
| 17 | for you to get to the mic. |
| 18 | **MR. FRAWLEY:**  Good morning, Your Honor.  Alexander |
| 19 | Frawley from Susman Godfrey for the plaintiffs. |
| 20 | **THE COURT:**  Good morning. |
| 21 | **MR. LEE:**  Good morning, Your Honor.  James Lee, Boies |
| 22 | Schiller Flexner, for the plaintiffs. |
| 23 | **THE COURT:**  Yes, Mr. Lee. |
| 24 | **MR. MAO:**  Good morning, Your Honor.  Mark Mao with |
| 25 | Boies Schiller Flexner the plaintiffs. |

1          **THE COURT:**  Mr. Mao.

2          **MR. MCGEE:**  Good morning, Your Honor.  Ryan McGee of

3   Morgan and Morgan, also for the plaintiffs.

4          **THE COURT:**  Good morning.

5          **MR. WRIGHT:**  Good morning, Your Honor.  Logan Wright

6   with Boies Schiller & Flexner, also for the plaintiffs.

7          **THE COURT:**  Hold on, hold on.  I did not have you

8   highlighted, Mr. Wright.  So Logan Wright.  Okay.

9          **MR. SILA:**  Good morning, Your Honor.  Ryan Sila,

10   Susman Godfrey, for the plaintiffs.

11          **THE COURT:**  Hold on.  Okay.  Give me your name again.

12          **MR. SILA:**  Ryan Sila.

13          **THE COURT:**  Are you on the docket?  Ryan Sila.  I

14   thought you said "Brian."

15          **MR. SILA:**  Happens all the time.  Thanks, Your Honor.

16          **MR. YANCHUNIS:**  Good morning, Your Honor.  John

17   Yanchunis with Morgan and Morgan, also for the plaintiffs.

18          **MR. REBLITZ-RICHARDSON:**  Good morning, Your Honor.

19   Beko Reblitz-Richardson, also for the plaintiffs.

20          **THE COURT:**  Good morning.

21       And you have, Mr. Mao, a few other people with you?

22          **MR. MAO:**  I'm sorry, Your Honor?

23          **THE COURT:**  Do you have a few other people with you.

24          **MR. MAO:**  Yes, sorry.

25          **MR. STEIN:**  Good morning, Your Honor.  Joshua Stein,

1    Boies Schiller & Flexner, for the plaintiffs.

2              THE COURT:  Are you a lawyer?

3          MR. STEIN:  Yes, Your Honor.

4              THE COURT:  Okay.  Mr. Stein.

5          MS. LAVARE:  Good morning, Your Honor.  Lauren LaVare

6    with Boies Schiller & Flexner, also an attorney.

7              THE COURT:  Hold on.  Hold on.  I see Mr. Stein.  Tell

8    me your last name again.

9          MS. LAVARE:  LaVare, Your Honor.

10             THE COURT:  LaVare.  Okay.  Ms. LaVare.  I'm not

11   seeing you on our list.

12       How do you spell your last name?

13         MS. LAVARE:  L-A capital V-A-R-E.

14             THE COURT:  You may want to check the docket because

15   I'm not seeing you as identified.

16         MR. MAO:  Your Honor, Professor Sam Asarnaw is also

17   appearing remotely.

18             THE COURT:  So at this point, I'm not allowing

19   speaking participation.  I understand he might be on the

20   platform.  If there's a need, then I will open that up, but at

21   this point, I'm not doing that.

22         MR. MAO:  Understood, Your Honor.

23             THE COURT:  Okay.  Thank you.

24       And for the defense, Mr. Shapiro, you're leading off?

25         MR. SHAPIRO:  Yes, Your Honor.  Good morning, Andrew

```
 1    Shapiro.
 2              THE COURT:  Good morning.
 3              MR. BROOME:  Good morning, Your Honor.  Stephen
 4    Broome, Quinn Emanuel, for Google.
 5              THE COURT:  Good morning.
 6              MS. MCCRACKEN:  Good morning, Your Honor.  Rachel
 7    McCracken, Quinn Emanuel, for Google.
 8              THE COURT:  Good morning.
 9              MS. TREBICKA:  Good morning, Your Honor.  Viola
10    Trebicka, Quinn Emanuel, for Google.
11              THE COURT:  Good morning.
12              MS. NIX-HINES:  Good morning, Your Honor.  Crystal
13    Nix-Hines from Quinn Emanuel.
14              THE COURT:  Ms. Nix-Hines, good morning.  It's
15    probably been --
16              MS. NIX-HINES:  It's my first appearance before you.
17              THE COURT:  Yeah, but you are well-known to me.
18              MS. NIX-HINES:  Uh oh.
19              THE COURT:  You were a classmate of my husband, but --
20              MS. NIX-HINES:  Who is that?
21              THE COURT:  Matt Rogers.
22              MS. NIX-HINES:  I had no idea.  Send him my regards.
23    He' terrific.
24              THE COURT:  I will.
25          He is.  I agree.  We've been married over 35 years.
```

| | |
|---|---|
| 1 | **MS. NIX-HINES:**  Wow. |
| 2 | **THE COURT:**  Okay. |
| 3 | **MS. CRAWFORD:**  Good morning, Your Honor.  Jomaire |
| 4 | Crawford, Quinn Emanuel Urquhart Sullivan, for Google. |
| 5 | **THE COURT:**  Okay.  Good morning. |
| 6 | **MR. MARGOLIES:**  Good morning, Your Honor.  Joseph |
| 7 | Margolies from Quinn Emanuel for Google. |
| 8 | **THE COURT:**  Okay.  Good morning. |
| 9 | **MS. FANI:**  Good morning, Your Honor.  Teuta Fani from |
| 10 | Quinn Emanuel for Google. |
| 11 | **THE COURT:**  Good morning. |
| 12 | Obviously lots of firepower on both sides and me and my |
| 13 | little team on this side. |
| 14 | Okay.  We have a lot to do today.  Who is leading on both |
| 15 | sides? |
| 16 | **MR. BOIES:**  Your Honor, I will lead on our side, |
| 17 | although many other people will participate. |
| 18 | **THE COURT:**  All right.  Then stay at the microphone, |
| 19 | sir. |
| 20 | **MR. BROOME:**  I think it depends on the issues, |
| 21 | Your Honor.  We do have all of the different motions -- |
| 22 | **THE COURT:**  We will start with your trial readiness |
| 23 | binder.  Motions will come later. |
| 24 | **MR. BROOME:**  Okay.  I believe that will be |
| 25 | Ms. McCracken. |

1      **MR. BOIES:**  Your Honor, before we commence with the

2  Court's schedule, could I take a moment to update the Court on

3  discussions that we had with plaintiffs' counsel yesterday?

4      **THE COURT:**  With defense counsel?

5      **MR. BOIES:**  That we had with defense counsel

6  yesterday.

7      **THE COURT:**  Okay.  Go ahead.

8      **MR. BOIES:**  The Court is aware that we, rather

9  belatedly, made a motion for certification with respect to a C4

10  class.  We informed counsel for Google last night that we are

11  withdrawing that motion.  In light of that and in light of some

12  of the other developments in the case, including the difficulty

13  that we have had simplifying the case and dealing with the jury

14  instructions, we also informed Google that we were withdrawing

15  our demand for a jury trial.

16      **THE COURT:**  So that's interesting.  Do I have the

17  option of not allowing you to withdraw the jury demand?

18      **MR. BOIES:**  Well, they -- they can keep me from

19  withdrawing the jury demand.

20      **THE COURT:**  Are you keeping the jury demand?

21      **MR. SHAPIRO:**  So, Your Honor, we only learned about

22  this yesterday afternoon, and we're still processing it, but we

23  like our chances with a jury and we like the jury system, so

24  this came kind of out of the blue to us.  We welcome the

25  plaintiffs giving us a heads-up about it yesterday, but we

1    don't have a position yet.

2        And it's correct, that once a jury demand has been made,

3    the consent of the defendant is needed to withdraw it.  So we

4    don't have a position on that yet, Your Honor.  We have a lot

5    of jury instructions and verdict forms and everything we've

6    been working on, of course.

7        **THE COURT:**  Well, we do, and my -- you know, good or

8    bad, I write too much when I have to do a bench trial, and with

9    a jury trial, I don't have to write so much.  The jury just

10   gets to decide.

11       **MR. BOIES:**  Right.

12       **THE COURT:**  And the Ninth Circuit or most circuits

13   don't -- do not -- I think most circuits give jury verdicts a

14   bit more deference than they give district judges.

15       **MR. BOIES:**  Your Honor, I would say that if -- if the

16   Court -- we realize that we're making this decision late.  If

17   the Court would since prefer us not to do that, I think we

18   would not withdraw our jury demand.

19       We don't intend by this to put anybody out.  The defendant

20   had previously said that they thought it ought to be a bench

21   trial.  We thought by waiving the jury trial, it would expedite

22   things, but --

23       **THE COURT:**  Well, I mean --

24       **MR. BOIES:**  -- we're prepared to go either way.

25       **THE COURT:**  There are pros and cons, obviously.  I

tell law clerks that -- they all want trials, and I understand

why law clerks want trials, but I tell them it is the gift that

keeps on giving because as soon as the verdict comes in, we get

post-trial motions, and so for a trial judge, it's kind of

anticlimactic because it's just the next phase of briefing

after a jury verdict.

On the other hand, it's done.  And I, you know, frequently

believe that it's my job to protect jury verdicts because I

believe they generally get it right.  So unless they get it

incredibly wrong, then, you know, I -- I leave jury verdicts

alone.

So, anyway, I'll have to think about it.  Obviously if

Google doesn't have a position yet, in any event, then the jury

trial will proceed as planned.

**MR. SHAPIRO:**  And, Your Honor, just to make sure we

have a clear record, I think what Mr. Boies was referring to

when he said we believed that it should be a bench trial was

there were some initial questions about whether the injunctive

relief questions are questions for a judge.

**THE COURT:**  Well, they are.

**MR. SHAPIRO:**  Yes.

**THE COURT:**  Injunctive relief is -- and that comes up

in the context of a number of the motions that you have

provided.

**MR. SHAPIRO:**  Exactly.

1          **THE COURT:**  And it also comes up in the context -- and

2     perhaps we'll get there at the end of the day.  It also comes

3     up in the context of what gets presented to the jury because I

4     have frequently bifurcated so that material that doesn't need

5     to go to the jury doesn't go to the jury.

6          On the other hand, in this kind of case, especially, it's

7     important for the -- for the public to understand what the

8     allegations are, for the jury to be involved in what they

9     believe is the right answer with respect to that.  And I can

10    always, as I have in other kinds of cases, get, you know,

11    preliminary findings by jurors, which then I can accept or not

12    accept for purposes of injunctive relief.

13         So there are lots of different ways to slice the issues.

14    But this is -- this is new information for me.  Okay.

15         **MR. SHAPIRO:**  That's all we've got, Your Honor.

16    Thanks.

17         **THE COURT:**  So then with respect to the motion to

18    certify class, Docket 894, that's deemed withdrawn.  That

19    docket gavels is terminated.  And as in poker, I won't tell you

20    what I was going to do.

21         Okay.  So let's go through your issues beginning with book

22    1 of 4.  I received -- I'm at tab 2, your trial stipulations.

23    I received the updated versions of those, so this is now the

24    new version of this at Docket 1069, filed last night.  Okay.

25    So your agreed-upon.

1        Why don't we have for the record whoever is going to

2   address Docket 1069.

3        **MR. BOIES:**  Mr. Lee is going to address that,

4   Your Honor.

5        **THE COURT:**  Mr --

6        **MS. MCCRACKEN:**  I will be addressing that for Google,

7   Your Honor.  Rachel McCracken.

8        **THE COURT:**  Okay.  Agreed-upon stipulations 1 through

9   6 are acceptable.

10       With respect to No. 7, the way I do -- and I'm not exactly

11  sure what you mean here.

12       When you all play deposition designations in the

13  courtroom, agreed upon with each side's designations, and it

14  lasts five minutes, ten minutes, whatever it lasts, the court

15  reporter is relieved of her obligations to transcribe those, so

16  No. 7 is not accepted.

17       What you will be required to do is by the end of the day

18  lodge with the court reporter the transcript portions which

19  were played.  Those will get attached to the transcript.  She

20  will transcribe any deposition testimony that is used for

21  purposes of cross-examination, little short things, but she

22  won't sit there and transcribe while you're playing all these

23  designations.

24       Do you understand?

25       **MR. LEE:**  Yes, Your Honor.

1          **MS. MCCRACKEN:**  Yes, Your Honor.

2          **THE COURT:**  Numbers 8 through 11 are also acceptable.

3      With respect to the disputes, No. 13, I'm going to hold on

4  13.  Frankly, I don't know if I can trust you yet.  No offense.

5  But I've never had you as trial lawyers.  And I'll know closer

6  to the end of trial whether I trust you.

7      I can tell you that I've had a case -- in general, look,

8  this is an adversarial system.  I would tend to agree with

9  plaintiffs' proposal except that I had an antitrust class

10  action trial where the exchange happened, and I was somewhat

11  outraged at what the plaintiffs thought they could argue, given

12  the evidence that was presented in the case, and so based upon

13  the objections and what I saw in their slide presentation, I

14  bifurcated the argument because I no longer trusted them.

15      So hopefully we'll get to a point where I trust you, and

16  if I do, then you don't have to exchange.

17          **MR. LEE:**  We hope to win your trust, Your Honor.

18  Thank you.

19          **THE COURT:**  With respect to No. 14, I expect that most

20  of plaintiffs' case -- well, again, in general, this is an

21  adversarial system.  Where are these witnesses?  Are they

22  local?  Are they not local?

23          **MR. LEE:**  So, Your Honor, there are -- there are many

24  local witnesses.  There are also a handful of witnesses that

25  are not local.

1        I think -- here's the problem, is that plaintiffs have a

2   handful of Google witnesses that we intend to put on the stand

3   for a very limited purpose, for a very short amount of time.  A

4   lot of times it's just to establish foundation or get a couple

5   documents in, but looking at their witness list and their

6   estimated time for some of these witnesses, what Google intends

7   to do is, you know, we put on somebody for 10 minutes, they're

8   going to put them on for 45 minutes, an hour, essentially

9   putting their case in our case in chief.

10       So --

11           **THE COURT:**  A response.

12           **MS. MCCRACKEN:**  Your Honor, we think it's important

13   that each witness testify once in a complete form.  We --

14           **THE COURT:**  You understand this is an adversarial

15   system.

16           **MS. MCCRACKEN:**  We do, Your Honor.

17           **THE COURT:**  And that you can't co-opt the plaintiffs'

18   case.

19           **MS. MCCRACKEN:**  That is not our intention, Your Honor.

20           **THE COURT:**  Look, every morning if you can't figure it

21   out -- I'm not accepting either one.  Well, I guess it would be

22   plaintiffs' at this point.

23       It is my belief that we shouldn't have to have witnesses

24   come back multiple times for no good reason.  So understand

25   that, and, again, that all goes as to trust.

1    I have to tell you, given the level of disputes I've seen,

2    I do not trust you.  I don't.  You fight about everything, and

3    you fight about dumb things.

4        So as a general rule, I like the -- I like the witnesses

5    to testify just once, and I think it's helpful for the jury,

6    but that doesn't mean that the defendant can co-opt the

7    plaintiffs' case.

8        So --

9        **MS. MCCRACKEN:**  Your Honor, I would like to assure you

10   that is not our intention.  The reason our estimates are a bit

11   longer than the plaintiffs' are plaintiffs intend to just

12   authenticate a document and then Google needs to have testimony

13   on the document to put it in context, which --

14       **THE COURT:**  No.  That would not be allowed.  If they

15   get a document in, you can explain it later.

16       And why do we have a witness on the stand for

17   authentication purposes?

18       **MS. MCCRACKEN:**  We would --

19       **THE COURT:**  Why wouldn't you stipulate to

20   authentication?

21       **MS. MCCRACKEN:**  Your Honor, we do have a stipulation

22   as to authenticity and certain evidentiary issues, but there

23   are objections pending to other documents that would need to be

24   resolved in advance.

25       We also believe --

1          **THE COURT:**  Give me an example.

2          **MS. MCCRACKEN:**  So if you look at the statement that

3     plaintiffs submitted as part of the pretrial --

4          **THE COURT:**  And, understand -- if I look at the

5     statement -- you understand that I have four three-inch binders

6     so what are you talking about?

7          **MS. MCCRACKEN:**  So a number of excerpts of documents

8     are taken out of context and mischaracterized, and what it

9     appears plaintiffs intend to do, if we stipulate that they're

10    admissible for all purposes, is introduce those arguments

11    through attorney argument without any sponsoring witness or any

12    testimony --

13         **THE COURT:**  Okay.  How -- how many -- I know --

14    Mr. Boies, you don't have to raise your hand.

15       How many attorneys here have tried more than five cases?

16       All right.  In this courtroom, you do not get to put on --

17    throw in documents and evidence and not present it to a jury

18    and then argue it later.  That's not how it works.  We aren't

19    going to have hordes of evidence in here that the jury has

20    never seen or heard and then sprung on them at closing.

21         **MR. LEE:**  Understood, Your Honor.

22         **MS. MCCRACKEN:**  Thank you, Your Honor.  Understood.

23         **THE COURT:**  Okay.  So now what's the issue?

24         **MS. MCCRACKEN:**  I think with that guidance from the

25    Court, we can negotiate further with plaintiffs, and we may be

```
1    able to make significant progress.

2              THE COURT:  Terrific.

3         Why would I allow you to call third-party witnesses out of

4    order?

5              MS. MCCRACKEN:  Your Honor, a number of third-party

6    witnesses have other jobs currently and other responsibilities

7    and we just can't guarantee that for the full --

8              THE COURT:  So why can't you work together?

9              MR. LEE:  We tried, Your Honor.  We asked Google who

10   are these third parties that might have scheduling --

11             THE COURT:  Yeah.  Exactly.

12             MR. LEE:  And they didn't identify any.  So for us,

13   it's sort of a hypothetical problem.

14             MS. MCCRACKEN:  We did make it clear that the

15   witnesses we're speaking about are the third-party employees --

16             THE COURT:  The answer is no.  You can call them in

17   any order you want in your case in chief but not in theirs.

18   And if you need to do it in theirs, you need to work with the

19   other side.  Back to my point.  Not trustable yet.

20             MS. MCCRACKEN:  Yes, Your Honor.  We will endeavor to

21   earn your trust.

22             THE COURT:  And if you need my help because you really

23   have someone who has no ability to otherwise get here and

24   plaintiffs aren't being professional about it, then raise it

25   with me, and I will help you.
```

1          **MS. MCCRACKEN:**  Thank you, Your Honor.

2          **THE COURT:**  But you can't co-opt their case.

3          **MS. MCCRACKEN:**  That's not our intention, Your Honor.

4     Our intention was just to give the Court advance notice that --

5          **THE COURT:**  Well, this says advance notice, and that

6     is not what you were suggesting.  What you were suggesting is

7     that you should be able to do it whenever you want.  That's

8     what this says.  Each party -- "either party my call

9     third-party witnesses out of order, if necessary, to

10    accommodate the schedules of third parties, including Google

11    calling witnesses during plaintiffs' case in chief."  That's

12    not acceptable.

13         **MS. MCCRACKEN:**  Okay, Your Honor.  With your guidance,

14    we will work with plaintiffs and find a way --

15         **THE COURT:**  Working together is the key to this

16    conference.  If there is one takeaway that you shall all take

17    away, it is that you better start working together better

18    because you are not.

19         With respect to deposition testimony, so your No. 16,

20    plaintiffs' approach is -- is the appropriate approach.  Why

21    they're not appearing at trial is not relevant at all.

22         I don't want there to be any sympathy, *Oh, I can't, I'm at*

23    *someone's graduation* or *my daughter is this* or -- no.  If they

24    can't make it, they can't make it.  We have a process.  That

25    process is being used.  There will be no indication as to why

1    they're not here.

2        18, plaintiffs' approach is appropriate.  This is an

3    adversarial process.

4        **MS. MCCRACKEN:**  Your Honor, we respectfully request

5    that if there's not advance disclosure, we be permitted to

6    object before certain exhibits are introduced to a witness

7    outside the presence of the jury.

8        **THE COURT:**  Denied.  You should be able to get -- so,

9    let's see.  Let's look at this a little more closely.

10       "Plaintiff agrees to the exchange schedule and framework

11   set forth below."  So take me to the line.

12       Mr. Lee, so what part are you agreeing to here?

13       **MR. LEE:**  Judge, we agree to all of it, except that it

14   should not apply to cross-examinations or examinations of

15   adverse witnesses.  So the process is fine.  We just don't

16   think it -- as you said, it's an adversarial system --

17       **THE COURT:**  You need to have, though, with respect --

18   I totally agree with cross-examine.  You give them the binder

19   right before you start cross-examining them, and that's fine.

20       With respect to the directs, I mean, most of your -- most

21   of your witnesses are adverse.

22       **MR. LEE:**  That's the issue, Judge, is that I think

23   we're going to call a lot of Google witnesses, and they will be

24   adverse, so it's effectively a cross-examination for each of

25   them.  And, you know, we're going to have a lot more of these

```
 1    types of witnesses than Google, so it's not really a
 2    goose/gander issue because --
 3             THE COURT:  I understand.
 4             MR. LEE:  Yep.
 5             THE COURT:  Have the exhibits to them for the day's
 6    proceedings by 7:00 a.m.
 7             MR. LEE:  That's for the adverse witnesses, right,
 8    Your Honor?
 9             THE COURT:  Correct.
10             MR. LEE:  Thank you.
11             THE COURT:  Anything that is so shockingly bad, you
12    can raise it at 8:00.
13             MS. MCCRACKEN:  Thank you, Your Honor.
14             THE COURT:  No. 9 -- or No. 20, Google's proposal is
15    the appropriate one.  So I'm not going to have any argument in
16    the morning about the rule of completeness and switching up the
17    testimony.  It's a waste of time.  So if anybody thinks that
18    the jury is going to remember the exact way in which something
19    was read two weeks or so after the evidence is presented,
20    you're wrong.  They barely remember what happened the prior
21    day.
22             MS. MCCRACKEN:  Your Honor, may I raise one additional
23    issue on deposition designations that came to light during
24    discussions yesterday?
25             THE COURT:  You may.
```

1     **MS. MCCRACKEN:**  Plaintiffs have taken the position

2   that they can play the deposition designations, not for

3   impeachment, but simply for their case in chief of witnesses

4   who will appear live at trial.  And we would like some guidance

5   because Google's understanding is if a witness appears live --

6         **THE COURT:**  There is a rule on this.

7         **MS. MCCRACKEN:**  That is our understanding, Your Honor.

8         **THE COURT:**  There is a rule on this.  You're not

9   allowed to do that, I don't think.

10        **MR. LEE:**  I thought that, too, Your Honor, but there

11  actually was a rule that allows it.

12        **THE COURT:**  What's the number.

13        **MS. BONN:**  Amanda Bonn for plaintiffs, Your Honor.

14    I think the issue is under Federal Rule of Civil Procedure

15  32(a)(2) and (3).  There's --

16        **THE COURT:**  Hold on.

17        **MS. BONN:**  Excuse me.  Sorry.

18        **THE COURT:**  Let's hold on this one.  I'm missing my --

19  I'm missing my book.  I tried my last case in San Francisco and

20  I must have left it in chambers.

21    The rule number again?

22        **MS. BONN:**  FRCP 32(a)(2) and (3).  And specifically

23  this comes up in the context of 30(b)(6) depositions.  Google

24  has taken the position that if they intend to call a 30(b)(6)

25  deponent that we took live in their case, we can't play the

1    30(b)(6) for any purpose in ours --

2            **THE COURT:**  That's different.

3        **MS. BONN:**  Yes.

4            **THE COURT:**  Those are admissions.

5        **MS. BONN:**  Correct.

6            **THE COURT:**  So admissions can be played.

7        **MS. MCCRACKEN:**  We were not previously told that they

8    were intending to play only the Rule 30(b)(6) designations.  If

9    that's the limitation and plaintiffs are willing to disclose

10   the designations so we can confirm it was the 30(b)(6) portion,

11   I think the parties may be able to resolve this without

12   burdening the Court.

13       **MS. BONN:**  To be clear I didn't say "only."  So that's

14   issue number one --

15           **THE COURT:**  So admissions can be played.  Party

16   admissions can be played, whether or not the person is here.

17   They could have a witness on the stand and play it anyway.

18   That's what -- that's what the rule allows.

19       So there may or may not be an issue.  I mean, you have

20   to -- if you're going to play something, you needed to already

21   disclose the deposition designations.  That should have already

22   happened.

23       **MS. BONN:**  It has, Your Honor.

24       **MS. MCCRACKEN:**  I think the issue is we were unaware

25   that they were planning to play designations for witnesses that

1   were live, so we haven't been told which witnesses they're

2   taking the position would be by designation as opposed to live.

3        **THE COURT:**  Okay.

4        **MS. MCCRACKEN:**  If they do that, we can look.

5        **THE COURT:**  There's no issue in front of me right now.

6   The rule says that they can do it and they can play the

7   admissions.  If you have a real issue, let me know later.

8        **MS. MCCRACKEN:**  I believe Ms. Bonn was about to

9   address the -- the other piece, which --

10       **MS. BONN:**  There's two other issues, Your Honor.  One

11  is that there are certain witnesses that are outside the

12  jurisdiction unavailable, and Google has said, *Well, in our*

13  *case, we intend to call them.  Therefore you can't play their*

14  *deposition in your case.*  So that's Issue No. 2.

15       **THE COURT:**  If they do not show up -- again, I need to

16  know who the witnesses are.  If they do not show up in the

17  plaintiffs' case, then they can play them.

18       **MS. MCCRACKEN:**  We will bring the witnesses live.

19  We've indicated they will be here live in our case.

20       **THE COURT:**  Well, then, you don't meet the

21  requirements of the rule, then they are no longer unavailable.

22       **MS. BONN:**  Correct, Your Honor.  If they've got them

23  sitting here and they're under subpoena and they're ready to

24  get on the stand, that's fine.

25       **THE COURT:**  Have you issued trial subpoenas?

1          **MS. BONN:**  Not yet.

2          **THE COURT:**  Well, I suggest you do.

3          **MS. BONN:**  Yes.

4          **THE COURT:**  What next?

5          **MS. BONN:**  That's it, Your Honor.

6          **THE COURT:**  Okay.

7          **MS. BONN:**  Thank you.

8          **THE COURT:**  Work together.  That's the motto for

9   today.

10          **MR. LEE:**  Thank you, Your Honor.

11          **THE COURT:**  Okay.  Witness list.  My estimate is --

12   who is doing witnesses?

13          **MS. MCCRACKEN:**  I will be handling it for Google,

14   Your Honor.

15          **THE COURT:**  All right.  Ms. McCracken; right?

16          **MS. MCCRACKEN:**  Yes, Your Honor.

17          **THE COURT:**  Mr. Boies?

18          **MR. BOIES:**  Yes, Your Honor.

19          **THE COURT:**  All right.  My back of the envelope

20   indicates that plaintiff is asking for about 11 hours of fact

21   testimony, another 10 of experts for a total of 20 hours, and

22   the defendants are asking for approximately 16 hours; right?

23          **MR. BOIES:**  Yes, Your Honor.

24          **MS. MCCRACKEN:**  That's very close to our numbers as

25   well, Your Honor.

1          **THE COURT:**  You have eight trial days.  Trial day

2     equals four and a half hours.  That's eight trial days total.

3     And that means four and a half hours times four days is 18

4     hours, and that's -- so you each get 18 hours, and that

5     includes openings and closings, not *voir dire*.

6          So on a daily basis, you will get time sheets, and your

7     time sheets will tell you how much time is left.

8          How much time do you want to reserve for closing?

9          **MR. BOIES:**  I would think, you know, subject to being

10    somewhat consistent with the defendants, about 45 minutes,

11    Your Honor.

12         **MS. MCCRACKEN:**  We would estimate about 60 minutes,

13    Your Honor.

14         **THE COURT:**  Okay.  That will be on the time sheet so

15    that you don't run out.

16         Very early on I had a party that ran out, so now I just

17    put it in the time sheet so you don't misread it.

18         Okay.  With respect to the witnesses then, we expect that

19    they will be here live:  Messrs Brown, Byatt, Castillo, Davis,

20    Castillo and McClelland.

21         **MR. BOIES:**  Yes, Your Honor.

22         **THE COURT:**  So all of the -- Felt, Fair and Kleber or

23    no?

24         **MR. BOIES:**  I'm sorry, Your Honor?

25         **MS. MCCRACKEN:**  Ms. Felt and Mr. Fair will appear

1    live, Your Honor.

2              THE COURT:  So Davis and Trujillo, those are the ends

3    of the individual plaintiffs.  All of those will be here live.

4         McClelland, do we have an indication yet?  Live?  Is he

5    coming live?

6              MR. MAO:  We don't know yet, Your Honor.  We are

7    endeavoring.  It's a former Google employee that lives abroad.

8              THE COURT:  And you have deposition transcripts, in

9    any event?

10             MR. MAO:  We do.  Since the last dispute, Your Honor.

11             THE COURT:  He's a former employee?

12             MR. MAO:  Yes, Your Honor.

13             THE COURT:  So what is -- all right.  So Google

14   doesn't have any control over him.

15        How about Mardini?

16             MS. MCCRACKEN:  Mr. Mardini will appear live,

17   Your Honor.

18             THE COURT:  And he will appear live in plaintiffs'

19   case?

20             MS. MCCRACKEN:  Yes, Your Honor.

21             THE COURT:  Where is he located?

22             MS. MCCRACKEN:  Mr. Mardini is based in France.

23             THE COURT:  Felt?

24             MS. MCCRACKEN:  Ms. Felt will also appear live, and

25   she's based in the Bay Area.

1      **THE COURT:**  Okay.  Fair?  He's a former.  What's the

2  plan with Fair?

3      **MS. MCCRACKEN:**  We expect that Mr. Fair will appear

4  live, but he's a former with a new employer, so we will need to

5  work with plaintiffs to give adequate notice to Mr. Fair so he

6  can arrange for time off of work.

7      **THE COURT:**  Okay.  And Kleber?

8      **MS. MCCRACKEN:**  Mr. Kleber we expect will appear live.

9      **THE COURT:**  And he's in Massachusetts?

10     **MS. MCCRACKEN:**  Yes, Your Honor.

11     **THE COURT:**  Berntson?

12     **MS. MCCRACKEN:**  We expect Mr. Berntson will also

13 appear live, and he's based in New York.

14     **THE COURT:**  Sadowski?

15     **MS. MCCRACKEN:**  We expect Ms. Sadowski will appear

16 live as well, and she's based in the Bay Area.

17     **THE COURT:**  Walker?

18     **MS. MCCRACKEN:**  Mr. Walker is now a former Google

19 employee, but we expect that he will appear live, and he is

20 based in Los Angeles.

21     **THE COURT:**  Palmer?

22     **MS. MCCRACKEN:**  We expect that Mr. Palmer will appear

23 live, although...

24     **THE COURT:**  Is he current -- still current?

25     **MS. MCCRACKEN:**  He's not currently a Google employee.

1          **THE COURT:**  So he's former?

2          **MS. MCCRACKEN:**  Yes, Your Honor.

3          **THE COURT:**  Is he still in the Bay Area?

4          **MS. MCCRACKEN:**  I'm not certain, Your Honor.  Let me

5    see if one of my colleagues has confirmation.

6        We believe he's still in the Bay Area.

7          **THE COURT:**  Tabriz?

8          **MS. MCCRACKEN:**  We expect Ms. Tabriz will appear live,

9    and she's based in the Bay Area.

10         **THE COURT:**  Borsay?

11         **MS. MCCRACKEN:**  Ms. Borsay is one of the witnesses

12   where we do have a dispute.  Ms. Borsay is based in Germany and

13   is a German citizen, and we do not expect her to appear live.

14         **MR. LEE:**  Your Honor, may I be heard on Ms. Borsay,

15   please?

16         **THE COURT:**  Who -- who --

17         **MR. BOIES:**  Mr. Lee.

18         **THE COURT:**  Okay.  Go ahead.

19         **MR. LEE:**  The issue with Ms. Borsay is she is the

20   former head of Chrome Privacy and managed Incognito Mode.

21         **THE COURT:**  Right.  That will be very interesting to

22   the jury, I think, that Ms. Borsay is a Google employee,

23   managed the technology at issue, and Google chooses not to

24   bring her.

25         **MR. LEE:**  Right.  I think we'd prefer to cross-examine

1    her live.  She's a managing agent and --

2           THE COURT:  There's -- under what rule can I force her

3    to show up?

4           MR. LEE:  If she's a current employee and is

5    considered a managing agent of the company, the company can be

6    compelled to bring her live, whether she's outside the

7    jurisdiction or not.

8           THE COURT:  All right.

9       Response.

10          MS. MCCRACKEN:  We don't believe Ms. Borsay qualifies

11   as a managing agent.

12          THE COURT:  Okay.  Somebody start a list.  This issue

13   will be briefed.  Unless otherwise authorized, no brief shall

14   exceed three pages.

15      Sometimes -- I looked at the jury instructions and

16   realized that I now have to put in my standing order what the

17   definition of "brief" is given that it's clear that neither

18   side understands what the term "brief" means.  "Brief" does not

19   mean 10 pages on one instruction.

20          MR. LEE:  Three pages will do it, Judge.

21          THE COURT:  Okay.  Twohill?

22          MS. MCCRACKEN:  Ms. Twohill will appear live, and

23   she's based in the Bay Area.

24          THE COURT:  Lemoine or Lemoine?

25          MS. MCCRACKEN:  Mr. Lemoine is not a current Google

employee, and there's a motion pending on Mr. Lemoine.

 THE COURT:  Oh, this is -- yeah.  Okay.  We'll deal with him later.

 Rakowski?

 MS. MCCRACKEN:  We expect Mr. Rakowski to appear live. He's a current employee in the Bay Area.

 THE COURT:  Halavati?

 MS. MCCRACKEN:  Mr. Halavati will not appear live.  He is a resident of Germany and not a just citizen.

 MR. LEE:  The issue with Mr. Halavati, Your Honor, he's not a managing agent.  We agree with that.  We're not requesting he appear live, but we are requesting he appear by Zoom.

 Germany does not allow witnesses to testify by Zoom.  When this issue came up during fact discovery, during depositions, Judge van Keulen ordered a handful of the German Google employees to drive over to Switzerland and have their testimony taken via Zoom there.

 So that's something that we're willing to do, and we think that makes the most sense.

 MS. MCCRACKEN:  Your Honor, we don't think Federal Rule of Civil Procedure 45 allows for a trial subpoena to a non-U.S. citizen based outside of the country.

 MR. BOIES:  We agree with that, Your Honor.  I don't think we can -- I don't think the -- the Rule 45 contemplates

1   at this point Zoom depositions.  The technology has advanced

2   considerably since the rule was amended.

3       I do think it is within the discretion of the Court, but

4   it would be a -- it is something as to which I don't know of

5   any precedent for.

6               THE COURT:  Do we have his deposition?

7               MS. MCCRACKEN:  Yes, Your Honor.

8               MR. BOIES:  Yes, we do, Your Honor.

9               THE COURT:  What's wrong with the deposition?

10              MR. BOIES:  I'm sorry, Your Honor?

11              THE COURT:  What's wrong with just doing deposition

12  testimony?

13              MR. BOIES:  We think it would be better for the

14  jury --

15              THE COURT:  Well, it's always better.

16              MR. BOIES:  We can deal with it.  We can deal with the

17  deposition, Your Honor.

18              THE COURT:  Do you want to brief this or not?

19              MR. BOIES:  No, Your Honor.  We're -- we have got

20  enough things that we're burdening the Court with.

21              THE COURT:  Shelton.

22              MS. MCCRACKEN:  We expect that Mr. Shelton will appear

23  live.

24              THE COURT:  Adhya.

25              MS. MCCRACKEN:  Mr. Adhya will be on parental leave

1    during trial, Your Honor, so we've asked plaintiffs to submit

2    deposition designations, and they have done so for Mr. Adhya.

3          **THE COURT:**  Okay.

4          **MR. LEE:**  Mr. Adhya lives in the Bay Area.  I actually

5    didn't know he was going on parental leave.  I thought he was

6    going on vacation.  If it's parental leave, then I think he's

7    unavailable, and we'll use his deposition.

8          **MS. MCCRACKEN:**  Thank you.

9       And we disclosed that in our footnote, but it may have

10   been lost, but thank you for your consideration of Mr. Adhya.

11         **THE COURT:**  One other thing before it gets lost.

12      On your depo designations, any time you have deposition

13   designations where you're just playing the video or where

14   you're playing video, at the beginning of the day, I need to

15   know how much time is being allocated for each side with

16   respect to the runtime.  Okay?  I'll explain my clock to you

17   before we're done, but it is important that you make sure to do

18   that.

19         **MS. MCCRACKEN:**  Would Your Honor like that by

20   7:00 a.m. each day or at the beginning of the court day.

21         **THE COURT:**  No.  When you get here, you just hand it

22   to Mr. Cuenco, and he'll give it to me.

23         **MS. MCCRACKEN:**  Thank you, Your Honor.

24         **THE COURT:**  Okay.  Jesse Adkins?

25         **MS. MCCRACKEN:**  He's expected to appear by deposition.

1          THE COURT:  Chung?

2          MS. MCCRACKEN:  Mr. Chung is also expected to appear

3    by deposition.

4          THE COURT:  Leung or Leung?  Leung, Bert?

5          MS. MCCRACKEN:  Mr. Leung is expected to appear live,

6    and there is a dispute identified in the footnotes as to

7    Mr. Leung.

8          Plaintiffs' position is that they are allowed to examine

9    Mr. Leung and Google is not allowed to cross-examine Mr. Leung

10   due to a sanctions order in this case, and that's addressed in

11   Footnotes 4 and 5 of Docket 1049.

12         THE COURT:  Okay.

13         This is insufficient briefing.  I have no idea what you're

14   talking about, and I'm not going to go cross-check docket

15   numbers.

16         MR. MAO:  We will brief that, Your Honor.

17         THE COURT:  What's the issue?

18         MR. MAO:  The issue is that the magistrate judge

19   ordered that Google be precluded from using this and the next

20   two witnesses from providing testimony for Google, but the

21   order was also clear that it not bar plaintiffs from being able

22   to use testimony, and the dispute is that Google believes that

23   they, notwithstanding the order, have the right to

24   cross-examine -- I'm sorry -- to redirect the witness.

25         MS. MCCRACKEN:  Your Honor, the language of the order

1    says, quote, Google cannot offer or rely on testimony, end

2    quote, but does not address a scenario where plaintiffs make

3    the affirmative choice to call these witnesses.

4        The order is silent as to that scenario, and we believe

5    that Google has a due process right to cross-examine witnesses

6    should plaintiffs make the affirmative choice to offer evidence

7    from those witnesses.

8        **THE COURT:**  It seems to me that Google's position,

9    just hearing what you've said right here, is probably right.  I

10   don't -- it's -- it's -- I'll go back and read it.

11       You get three pages, and you collectively do them

12   together.  I take it it's Leung, Liao, and Liu?

13       **MS. MCCRACKEN:**  Yes, Your Honor.  They're hopefully in

14   order.

15       **THE COURT:**  Actually, I don't need briefing.  I'll ask

16   van Keulen and I'll read it myself and I'll let you know.

17   Okay.

18       **MR. MAO:**  Your Honor, if I may, there is a nuance

19   there I want to just point out.  I don't believe that Google's

20   position is that once we put on the witness, they are

21   limited -- they're limited to redirects.

22       **THE COURT:**  Correct.

23       **MR. MAO:**  Right.

24       **THE COURT:**  And that's all -- that's all I would

25   expect; that is, only a redirect, not an affirmative

1  presentation.  But what you're suggesting is that -- from what

2  I just heard is that they don't even get to redirect.

3       **MR. MAO:**  I think there are some permutations there

4  that we could potentially work with, but I think they've taken

5  the opposite position which is that they can elicit anything

6  once we put on the witness.

7       **THE COURT:**  I'm not so sure of that.

8       **MS. MCCRACKEN:**  Your Honor, our position is that we

9  are permitted to redirect the witness within the -- to address

10  plaintiffs' examination.  We have not taken the position that

11  we could affirmatively call those witnesses in our case.

12       **MR. BOIES:**  Your Honor, I think that they are entitled

13  to, in effect, cross-examine what we put on.  I don't think

14  they're entitled to go beyond that.

15       **THE COURT:**  Right.  That's what I'm saying.

16       **MR. BOIES:**  I think that's right.

17       **MS. MCCRACKEN:**  I think we may all be in agreement on

18  this.

19       **THE COURT:**  Okay.  Great.  Agreement.  That's what

20  we're working for.  All right.  Redirect only by Google.

21     Justin Schuh?

22       **MS. MCCRACKEN:**  I think our understanding is that

23  Mr. Schuh will appear by designation.

24       **THE COURT:**  Okay.

25       **MR. MAO:**  I'm sorry, Your Honor.  Just point of

```
 1    clarification, if you don't mind.
 2        Is our understanding correct then -- it sounds like
 3    Mr. Liao and Ms. Liu will be appearing live?
 4            MS. MCCRACKEN:  Yes.  Those witnesses will appear
 5    live.
 6            MR. MAO:  Thank you.  Sorry about that, Your Honor.
 7            THE COURT:  No worries.
 8        Justin Schuh.
 9            MS. MCCRACKEN:  We believe he will be appearing by
10    deposition.
11            THE COURT:  Okay.
12        Deepti Bhatnagar?
13            MS. MCCRACKEN:  I'm afraid to attempt pronunciation on
14    that, but Mr. Bhatnagar -- Ms. Bhatnagar will be appearing by
15    deposition.
16            THE COURT:  Okay.  Ms. Bindra?
17            MS. MCCRACKEN:  Ms. Bindra will appear live.
18            THE COURT:  Hopefully we will have no custodians.
19            MS. MCCRACKEN:  That is my sincere hope, Your Honor.
20            THE COURT:  Steve Ganem?
21            MS. MCCRACKEN:  Mr. Ganem will appear live.
22            THE COURT:  Bruce Schneier?
23            MS. MCCRACKEN:  Mr. Schneier will appear live.
24            THE COURT:  Okay.  So all the experts I expect are
25    going to appear live; right?  Hochman, Keegan, Lasinski?
```

1          **MR. MAO:**  Yes, Your Honor, for the plaintiffs.

2          **MS. MCCRACKEN:**  That's true for Google as well,

3     Your Honor.

4          **THE COURT:**  And then Zervas?

5          **MS. MCCRACKEN:**  Psounis.

6          **THE COURT:**  Psounis.  Amir.

7       Do we still have issues with Amir?

8          **MS. MCCRACKEN:**  There is a *Daubert* pending on

9     Mr. Amir, Your Honor.

10         **THE COURT:**  There was something resolved, I thought,

11    with respect to Amir at the last minute.

12         **MR. MAO:**  I think some, and then I just want to point

13    out, Your Honor, on the prior list, there is also a limited

14    *Daubert* on Mr. Hochman as well -- Mr. Hochman as well.  So I

15    think there are -- they may be motions that are in front of you

16    for today, I think.

17         **MS. MCCRACKEN:**  That's our understanding as well.

18         **THE COURT:**  Strombom?

19         **MS. MCCRACKEN:**  Mr. Strombom will appear live.

20         **THE COURT:**  And Schwartz?

21         **MS. MCCRACKEN:**  He will also appear live.

22         **THE COURT:**  Okay.  With respect to the next tab, the

23    combined exhibit list, why are you seeking to have this under

24    seal?

25         **MS. MCCRACKEN:**  Your Honor, Ms. Crawford will be

1    addressing the exhibit list for our side.

2              **MS. CRAWFORD:**  Your Honor --

3          **MR. MCGEE:**  Your Honor, Ryan McGee.

4          **THE COURT:**  Appearances for Tab 4 exhibits.

5          **MR. MCGEE:**  Your Honor, this is Ryan McGee from Morgan

6    and Morgan for the plaintiffs.  I will be addressing the

7    exhibit list and --

8          **THE COURT:**  And I need who on the defense side?

9          **MS. CRAWFORD:**  Jomaire Crawford, Your Honor.

10         **THE COURT:**  Okay.  Ms. Crawford.

11         **MR. MCGEE:**  Your Honor, I'll let Google address why

12   they believe it should be under seal.

13         **MS. CRAWFORD:**  My understanding, Your Honor, is

14   portions of the exhibit list are to be filed under seal,

15   including because there are descriptions for some of the

16   documents appearing on the exhibit list that have been sealed

17   to date, sensitive information and other identifiers.

18         **THE COURT:**  So you are all going to have to figure out

19   how you're going to try this case without me sealing this

20   courtroom because I don't seal courtrooms in a public setting.

21      First of all, I can't read your exhibit list.  The font is

22   too small.  Second, you have Bates numbers, so there is zero

23   reason to have a description that contains something -- I mean,

24   I don't -- I don't know why you have to have it in there to

25   begin with.  Why do you need it in there?

1      **MS. CRAWFORD:**  We're happy to modify the list

2  consistent with that guidance, Your Honor, in order to

3  eliminate the likelihood of having to seal the exhibit list.

4  So we'll go back through the list with an eye toward making

5  those changes.

6      **MR. MCGEE:**  Agreed, Your Honor.

7      **THE COURT:**  The other thing you're going to do is

8  you're going to get -- you can keep this internally.  I

9  understand why you would want it internally.  I want one that I

10  can read because I actually look at the exhibit list during

11  trial, and I track things during trial.  Little things that we

12  judges sometimes do.

13      So I don't need the Bates number.  Delete it from the

14  public version.  Delete anything in the description that you

15  want sealed.  I don't need a sponsoring witness.

16      In this Docket 1054, there is not a single -- well, I take

17  that back.  Five stipulations to admit?  Maybe a few more.  Why

18  aren't there more stipulations to admit?

19      Actually, let's talk about time.  Here's the way time

20  works.  This is the reason why you need to stipulate.  Time

21  will be limited.  Maybe what I'll do is I'll limit it even more

22  to give you more of an incentive to stipulate to exhibits.

23      The clock is always running.  I get four and a half hours

24  of trial time every day.  We start at 8:30 promptly.  So if you

25  need to go to the bathroom, do it before.  I start with you at

8:00 a.m. promptly.  If you need to go to the bathroom, do you
it before.

The jury comes in at 8:30, and at 8:30, the clock starts
ticking, and we start -- let's say plaintiffs go first.  Four
and a half hours.  You are deducted four and a half hours minus
any amount of time that the other side uses.

When we get to their case in chief, then it flips, and the
clock starts, and they get deducted four and a half hours less
any time that you use.

So while your witnesses are sauntering in from the
attorney lounge to the courtroom and you say, "Sorry, Judge," I
say, "Well, that's fine.  Clock's ticking."  It's on you, not
on me and not on the jury.

So if you have to spend precious time laying the
foundation for your exhibits, then the jury's not going to get
to the substance of the case, and you're going to run out of
time.  That's why you should be stipulating, because I can --
look.  You can give me the -- you can give me the binders in
advance, and you've got 15 exhibits for this witness.  "Judge,
we've looked at it.  We've all stipulated."  And that's great.
You reference the exhibit.  We just keep rolling.  There is no
interruption.  I just note it's stipulated.  Admitted.  We're
good to go.

If not, then you -- then you have to go through the whole
process of laying the foundation.

1        If there is an objection and you lose the objection, the

2   time is allocated against the losing party.  Minimum, one

3   minute.

4        So, you need to be working on these stipulations.

5        Now, it could be that you want to do it the day of.

6   That's fine.  I don't care.  But you really should work

7   together because it is a waste of trial time to do some of

8   these things.

9        **MR. MCGEE:**  And, Your Honor, if you will recall, the

10  Court referred the discovery disputes to a special master, and

11  we selected Special Master -- the retired Judge Laporte.

12       Yesterday, I believe, Google was able to execute or

13  counter-execute the retainer agreement for Judge Laporte.  I

14  think it had been sent two or three months ago, and we had done

15  that.  I think they had some accounting issues, so I believe

16  that it will get started with Judge Laporte, and we'll be able

17  to resolve a lot of these objections through that process.

18       But that's kind of where that stands right now.  And

19  that's why I don't think there's any more movement for

20  Your Honor.

21       And then some of the reasons that we're not stipulating,

22  subject to a couple of motions in limine, including Google's --

23  when they moved for summary judgment on the contract and took

24  the unambiguous position.  So we contend that much of their

25  exhibit list includes impermissibly -- or -- excuse me --

1    impermissible evidence.

2            THE COURT:  Okay.

3        I also don't need on the revised list to be filed.  I have

4    this one.  So I don't need it again, either side's objections.

5        What do you mean by "expert identification"?

6            MR. MCGEE:  Your Honor, I believe with that, it was we

7    identified it.  I believe we had gone through your standing

8    order, and for expert identification, it would be something

9    that the expert may refer to but we would not seek to introduce

10   it into evidence.  So, for example, a treatise, an economics

11   book, things of that nature.

12           THE COURT:  Okay.  But you're not offering those into

13   evidence?

14           MR. MCGEE:  If they're marked for identification, I

15   don't believe so.

16           MS. CRAWFORD:  That's right.

17           THE COURT:  I don't need that column either.

18       All right.  So what I need -- so what you'll keep is the

19   prefix, the exhibit number, the description modified to only

20   have information that is public, the stipulation to admit,

21   injunction phase, and date admitted.  Okay?

22       You will be required at the close of evidence on the last

23   day to submit to the Court a list of all exhibits that have

24   been admitted with the description.  That helps the jury wade

25   through all of the evidence.  So somebody should be doing that

on a daily basis, and you should be checking with each other in

terms of making sure that we're all on the same page in terms

of admitted exhibits.

Any questions?

**MR. MCGEE:**  Not presently, Judge.

**MS. CRAWFORD:**  Not from that point, Your Honor.

Would you like for us to make the changes that you've just

outlined and file a corrected version of the exhibit list, or

should we wait until the process with Special Master Laporte

plays out, which I expect will yield further compromises and

resolutions of some of the open exhibit list disputes?

**THE COURT:**  That's fine.  January 5th.

**MS. CRAWFORD:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Tab 5, she's resolving your -- your

deposition designations?

**MR. MCGEE:**  Per Your Honor's order, yes.

**MS. CRAWFORD:**  She is.

**THE COURT:**  Perfect.  Okay.

We're not going to talk about jury instructions right this

minute.

I need a proposed statement of the case that is neutral

and that is short.  Half a page.  That is all I want.

Who is going to be in charge of negotiating half a page to

give me?

**MS. MCCRACKEN:**  I can do that, Your Honor.

1          **THE COURT:**  Who can work with Ms. McCracken?

2          **MS. BONN:**  I can, Your Honor, Amanda Bonn.

3          **THE COURT:**  All right.  I want half a page by

4    tomorrow.  That's all I want.  I just need to let the jury know

5    what kind of case this is.  It's not a sex crime case, it's not

6    a murder, it's not a guns and drugs.  It's just a civil case

7    over something that happens on Google.  That's all I want them

8    to know.  All right.  They don't need me to go on for pages.

9    Half a page by tomorrow.

10          **MS. CRAWFORD:**  Yes, Your Honor.

11          **THE COURT:**  Thank you.

12     We are allowed -- we use a SurveyMonkey now, so I'm at Tab

13    10.  Who is doing Tab 10?

14          **MS. MCCRACKEN:**  I will be doing tab 10, Your Honor.

15          **MR. LEE:**  Tab 10 questionnaires, Your Honor.

16          **THE COURT:**  Okay.

17          **MS. MCCRACKEN:**  And this is one, Your Honor, where the

18    parties are attempting to work together, and we've been

19    exchanging proposals to try to get to a joint questionnaire,

20    and we may be able to do that if the Court is willing to give

21    us a bit more time.

22          **MR. LEE:**  I would welcome that, too, Your Honor.  Last

23    night we told Google that we were prepared to agree to all

24    their questions.

25          **THE COURT:**  You only get 10.

1          **MR. LEE:**  That's helpful to know.  Is it 10 total?

2          **THE COURT:**  Ten total.

3          **MR. LEE:**  Okay.  I think with that framework, we can

4     work something out.

5          **THE COURT:**  So a couple of thoughts.  You all have

6     lived with this case for a long time.  I expect that all of my

7     prospective jurors will not have.  So on some of these

8     questions, the answer may just be "never considered," "never

9     thought about it."

10         These are normal people, you know.  You have friends.  Ask

11    them one of these questions.  See -- how do they respond?

12    "What are you talking about?  I've never even thought about

13    that."  Exactly.  And that's what many of these jurors are

14    going to -- for some of these might think.  "What is your

15    impression, opinion, or feeling about a person's right to

16    privacy while using the internet?"  I don't know.  I never

17    thought about it.

18         **MS. MCCRACKEN:**  Your Honor, on that line, I think we

19    may reach agreement.  Google tried to propose a bit simpler

20    questions that are just yes or no, "do you have a strong

21    opinion," to try to make it a little bit more juror friendly.

22         **THE COURT:**  And that would be helpful because they may

23    have an opinion, but if it's not a strong opinion -- I'm only

24    really interested in strong opinions.  Okay.  So I'm going to

25    need your proposals by December 15th.

1          **MR. LEE:**  Will do, Your Honor.

2          **MS. MCCRACKEN:**  Will do, Your Honor.

3          **THE COURT:**  Okay.  Great.

4      We don't need to talk about verdict forms right now.

5  Let's move to motions.  Actually, hold on.  Let me go through

6  my list before we go through motions.

7      Okay.  So you are confirmed to proceed in this courtroom

8  on January 29th, 2024.  However, you are trailing United States

9  vs. James.  That case should be done by that time.  I don't

10  think there will be any issue, but you are trailing.

11      The jury will come in at approximately 9:00.  Trial itself

12  on a daily basis, as I just mentioned before, we start with the

13  jury at 8:30 every day.  We start together at 8:00 a.m.  This

14  is the way the trial day begins.

15      I'll have one person at each mic.  I'll ask you for a list

16  of your issues.  I don't want argument.  I just want your list.

17  I need to know the totality of what's in front of me.

18      Once I have that list from each side, then we'll figure

19  out what we can accomplish in 30 minutes because that's all you

20  get.  We'll obviously take the most important things.  Jury

21  comes in at 8:30.

22      My schedule is -- for this case I will probably do Monday

23  through Friday, 8:30 to 1:40, with two 20-minute breaks.  My

24  standing calendars remain at 2:00.  To the extent that we have

25  to do something that needs to be done and we can't get it done

1  between 8:00 and 8:30, then you'll do it after my standing
2  calendars.
3       As I indicated, each side will be given 18 hours to
4  present your case.  That includes openings and closings.  I've
5  already explained how timing works.
6       There are two conference rooms in the attorney lounge.
7  Those are reserved on a first-come-first-serve basis.  You can
8  do that through the clerk's office.
9       It is my standard motions in limine that all witnesses
10 shall be excluded until their testimony is complete.  There
11 shall be no reference to settlement discussions, mediation, or
12 insurance.  There is no reference to wealth or lack thereof
13 in -- unless we get to the punitive damages phase.
14      I always bifurcate punitive damages, so liability gets
15 tried on the front end.  With respect to punitive damages, that
16 only happens in the second phase.
17      With respect to punitive damages, the way it works is that
18 by the morning of the 29th, defendants shall have all relevant
19 financial information in a sealed envelope and provide it to
20 the courtroom deputy.  You shall have and identify the witness
21 who will be called to testify about that financial information
22 available on one hour's notice once the jury starts to -- well,
23 let's just do 30 minutes -- once the jury begins its
24 deliberations.  Basically they need to be here in the
25 courthouse once the jury starts deliberating.

1      Any efforts to streamline that phase are appreciated,

2   although I'm not sure there will be.  So that's the way it

3   works.

4      Anybody have questions about punitive damages and its

5   bifurcation from the primary?

6           MR. BOIES:  Not from us, Your Honor.

7           THE COURT:  Okay.  Mr. Broome?

8           MR. BROOME:  No, nothing from Google, Your Honor.

9           THE COURT:  All right.  You're all limited to calling

10  the witnesses that we have discussed.  I know that there are

11  some questions about some, but you can't call any others except

12  upon a showing of good cause and only -- that would include for

13  rebuttal or impeachment purposes.  I don't expect any surprises

14  in this particular case.

15     Same thing with exhibits.  So nothing beyond what's in the

16  scope of that that's already been on file.  We went through

17  your trial processes.

18     Okay.  Equipment.  You need to be at the microphones.  If

19  you're a trial lawyer who seems to not be able to stay by a

20  microphone, and there are some, you can use encrypted digital

21  wireless systems that including a receiver and transmitter with

22  an XLR connector.  You do you have to make arrangements to come

23  in with your equipment and try it so that we don't have

24  technical difficulties.

25     The U.S. Marshals are very cautious about what they let

1    people bring into the courthouse.  You must have an order with

2    any equipment that you want, so send me a proposed form of

3    order about what it is that you want to bring in so that I can

4    authorize it.  If I have any questions, we'll reach out to you.

5         This is a great courtroom for trials.  These screens are

6    interactive, and they work.  I just tried a case in

7    San Francisco, and the courtroom I was given did not have

8    working equipment, which was less fun.  Those of you who are

9    going to be examining witnesses need to come in and practice on

10   the screens.

11        There are all sorts of things you can do.  There's six or

12   seven different colors.  You can mark them, you can tap them,

13   you can use arrows.  Lots of different things that you can

14   control by the examining attorneys over there.  Obviously, the

15   jurors have their screens.  We'll probably -- I'll probably

16   have a couple more on the side, but, in any event, you need to

17   know how it works.

18        I expect that -- will the jury -- will some of this

19   evidence -- will any of the evidence that the jury has need to

20   be viewed on a computer, or is it all paper?

21        **MR. SHAPIRO:**  Do you mean as opposed to projecting

22   something on a screen or something that's --

23        **THE COURT:**  So the actual exhibits, are there any

24   exhibits that are only accessible by computer or are they

25   all --

1   **MR. SHAPIRO:**  We can have -- I think right now we have

2 everything electronically because it would be this high, but we

3 can have paper copies of the things that we have

4 electronically.  They're all --

5   **MS. TREBICKA:**  Does Your Honor mean if there is a

6 document in native form that we need to manipulate the Excel

7 rows or something like that?

8   **THE COURT:**  Is there a spreadsheet that really isn't

9 printable?

10   **MR. MAO:**  For us, Your Honor, yes, because some of the

11 data at issue, the examples, right, so concrete example --

12   **THE COURT:**  That's fine.

13   **MR. MAO:**  Okay.

14   **THE COURT:**  You need to then review the court's policy

15 regarding the jury's use of a computer during deliberations.

16 I'm going to have a comprehensive trial conference order, and

17 the website is noted there, but on our website, we do have

18 instructions about how the jury uses a computer.  It's stripped

19 down.  It's safe.  There is no access to Google or ChatGPT or

20 anything else.

21  Okay.  I will seat nine jurors.  No alternates.  You each

22 get three peremptory challenges.  That is all.

23  I conduct most of the *voir dire*.  You'll be allowed about

24 15 minutes, maybe 20, to conduct additional *voir dire*.

25  So let me explain to you how I do it because I do it

1    differently than other judges.

2         Who is going to be doing the *voir dire*?

3              **MR. BOIES:**  I will be for the plaintiffs, Your Honor.

4              **MR. SHAPIRO:**  And I for the defendants.

5              **THE COURT:**  Okay.  So this is what I do.

6         I realized early on, having been a state court trial

7    judge, that jurors hate to -- on the front end, because my

8    jurors actually love being jurors on the back end, but on the

9    front end, nobody wants to be a juror, and they're always

10   looking for excuses to get out of jury service.

11        So if they see something that works, all of a sudden,

12   everybody has the same excuse.  And as you -- those of you who

13   tried cases in state court know and some courts, there are some

14   judges where they fill up the box, and if you excuse somebody,

15   then that seat gets taken, and it's kind of the hot seat, and

16   everybody knows, *Heck, I'm number one, I'm really going to get*

17   *on this jury* or whatever.

18        So I totally confuse them, and it works great.  It

19   decreases the amount of tension.  They all get called in.  They

20   all have a number.  There is a random order, and you will have

21   that.  You will have the random, and you will have their

22   surveys, which will also -- which also help streamline jury

23   selection because you have all the basics.

24        What I'm doing and -- is in my *voir dire*, I use the

25   surveys as a means of being able to know -- to ask follow-up

1    questions to them.  It's especially important in criminal

2    cases, but it works in civil case, too.

3        But what I do is I'll take probably 20.  The first group

4    will be a batch of 20.  I'll take the first 20 off the random

5    list, and I re-sort them alphabetically so they get called up

6    alphabetically, and they have no clue where they are on the

7    random list.

8        I will *voir dire* the first set of 20.  If there is

9    somebody who obviously has an issue like *I work for Google* and

10   you haven't stipulated to excuse that person, I'll excuse them,

11   and a new person will get there.  But what I'm trying to do is

12   get you 20, and then you'll have 15 minutes to *voir dire* them.

13       I conduct pretty thorough *voir dire*.  If you actually find

14   something that I haven't, I'm not going to stop you in your

15   follow-up, and I'll give the other side an equal measure of

16   time.  But so far, I haven't had to ever do that.

17       So once the 20 goes -- and this is a very organic process.

18   Let's see.  Nine -- I'm seating nine.  You each get three.

19   That's 15.  I might call up a few more to have more than 20,

20   but then they'll take a break, and while they're on break, you

21   will do your strikes.  We do strikes open, so I will ask the

22   plaintiff.  You'll tell me who you strike, and then we'll move

23   to the defense.  They will tell me who they strike.  And we'll

24   go back and forth until we -- until we have the jury.

25       The jury then gets called back in, and I just call up the

1   people who got seated.  And when I talk to jurors afterwards,

2   the very first question they ask is, "How did I get on the

3   jury" because they have no clue.

4       But it allows us to just cut with the anxiousness of being

5   seated and have a conversation about issues.  So that's how I

6   do it.

7       Any questions?

8           **MR. BOIES:**  No, Your Honor.

9           **MR. SHAPIRO:**  No, Your Honor.

10          **THE COURT:**  Okay.  I do have your expert disclosures.

11  Any offers of judgment need to be made on the first day of

12  trial, or you need to lodge with me any offer of judgment made

13  by the first day of trial.

14          **MR. SHAPIRO:**  I realize I have a question about maybe

15  what you were just discussing with how things are going to work

16  on the first day or so.  Maybe you were going to get to this.

17      Does Your Honor have a rule with regard to opening

18  statements and closing argument about -- do you have a podium

19  rule that time attorney needs to be within, you know, a foot of

20  the podium, or since you mentioned those mobile microphones,

21  can I assume that attorneys can walk?

22          **THE COURT:**  So that -- that podium there turns to the

23  side so that you can have notes there.  I wouldn't expect you

24  TO be walking all over the well, but if you -- yeah.  I would

25  say I wouldn't want you within two feet of the jury box.  No

1    one has ever asked me, but this is, again --

2              **MR. SHAPIRO:**  Thank you, Judge.

3              **THE COURT:**  I am potentially surprised by this group.

4    So two feet.  I'll add it to my standing order.

5         Okay.  All defendants will be deemed dismissed once the

6    jury or the first witness is sworn.

7         In terms of depositions, I do need the actual transcripts.

8    Again, those can be delivered by January 5th.  When you deliver

9    the transcripts, you must also have with them an index, and the

10   index shall have the name of the deponent -- it should be a

11   chart.  It will have the name of the deponent and a place for

12   my courtroom deputy to confirm receipt and a place -- that is,

13   he's just going to put his initials -- and a place for one of

14   you to also confirm delivery.

15        This is because I've had instances way back when, when

16   people said, "But, Your Honor, we did deliver it," and the

17   courtroom deputy is looking at me and saying, "No, they

18   didn't."  So this way I have an actual record of what was

19   delivered, both sides agree, and we have no issues.

20        Every morning you must confer with the courtroom deputy

21   and identify which transcripts might get used that day so he

22   can give them to me in advance and I'm not wasting time as he

23   looks for them in terms of potential use for impeachment.

24        So how do I do impeachment?  It's up to you, obviously, if

25   you want to go through with the jury the whole -- what we would

1    call it -- the whole performance of *do you remember when you*

2    *were there on January 17th and you said that you were*

3    *testifying under oath* -- you know, do what you're going to do.

4    That's fine.  I don't care.  What I do care about is the actual

5    impeachment.  So, again, I don't know you as trial lawyers, and

6    I don't trust you yet.

7        If you want to impeach someone, you need to say to me,

8    "Your Honor, please take a look at page 55, lines 3 through

9    10."  I say, "Okay."  I'll get my transcript.  I'll look at

10   those pages.  I know what the question is and what the answer

11   is, and I'll read them.  And I'll say, "Go ahead."  That means

12   you have my approval to impeach with that testimony.

13       If I say, "Nope, lay more foundation," it means I don't

14   believe that you have laid sufficient foundation for

15   impeaching.  And then you do what you're going to do.  Okay?

16       So any questions about how we do impeachment?

17           **MR. BOIES:**  No, Your Honor.

18           **THE COURT:**  Okay.

19       No speaking objections.  So "Objection, hearsay."

20   "Objection, 702."  "Objection," whatever, as long as it's

21   short.  If I want argument, I will ask for it.

22       I had a trial once, three months, criminal trial.  This

23   lawyer kept objecting under 702.  One of the first questions I

24   got when I talked to the jurors, "What's 702?"  They were

25   keeping count of how often she said 702.

1          So no speaking objections.

2          In terms of examination, direct examination requires that

3     you ask open-ended questions.  You all know your case.  You all

4     know the law.  You all know what you would like the testimony

5     to be.  But that's not the point.  The point is that we have to

6     hear from the witnesses, and so this is your warning.  If you

7     lead and there is an objection, I will sustain the objection.

8     I might sustain it twice.  But if you don't get the point after

9     the second time, this is what will happen, and I've had to do

10    it.

11         "Ladies and gentlemen" -- or "Members of the jury" -- I'm

12    trying not to say "ladies and gentlemen."

13         "Members of the jury, they continue to object as to

14    leading, and I've sustained those objections.  That is because

15    as I instructed you earlier, the lawyers are not witnesses.  We

16    don't want to hear what the lawyers think.  We actually want to

17    hear what the witnesses think.  So they have to ask open-ended

18    questions so you can hear what the witness has to say, not the

19    lawyers.  Objection sustained.  Try again."

20         Do not make me embarrass you.  The only reason you would

21    be asking leading questions is to get stuff in that you wanted

22    in in the way you want it in.  And, by the way, if it's a bench

23    trial and you're leading, don't think that I'm going to be

24    particularly persuaded.  I need to hear it from the witness,

25    not from you.

1      Any questions?

2           **MR. BOIES:**  No, Your Honor.

3           **THE COURT:**  It matters when people walk into a federal

4    courtroom and take an oath.  I had a pretty high profile case

5    not that long ago where the lawyers for the whole time leading

6    up to this trial said, you know, the -- the whole theory is

7    that this witness wouldn't have done it -- would not have done

8    it just for the company.  They're doing it for everybody.  And

9    when that witness got up on the stand and took the oath, that's

10   not what the witness said.

11      Most of us almost fell off our chair.  The lawyer had to

12   ask three different times, and that witness confirmed the

13   opposite of what the lawyer thought.  So I know it is a

14   lawyer's nightmare, but it was the truth, and that's what we're

15   seeking.

16      I let jurors ask questions.  They will have a binder.

17   Make sure that you've read my standing order.  You're required

18   to give me pictures of the witnesses, not taken, you know, at

19   some photography store or something like that.  You take them

20   the morning of, print it off, printed on a color printer.  I

21   need one copy for each of the jurors plus two more.  And in

22   their binder, they'll be able to take notes.  They will have

23   the pictures, and they'll have some question sheets.

24      If someone asks a question, I'll share it with you.  You

25   can either roll it into your examinations or I can ask myself

1    or I can tell -- and I use the standard instruction to the jury

2    about when they're allowed and when they're not allowed.  Okay?

3        Any questions?

4            **MR. BOIES:**  No, Your Honor.

5            **MR. SHAPIRO:**  No questions.

6            **THE COURT:**  Any need for interpreters?

7            **MR. BOIES:**  I don't think so, Your Honor.

8            **THE COURT:**  Are you going to be asking for daily

9    transcripts?

10           **MR. BOIES:**  Yes, Your Honor.

11           **MR. SHAPIRO:**  We will.

12           **THE COURT:**  Okay.  You need to do that sooner rather

13   than later.  There is a form on the website and it will be in

14   the order, but we have shortages of court reporters, and so it

15   takes a lot of effort to -- yeah, you're surprised Mr. Shapiro?

16   There is a shortage of court reporters in the federal courts

17   and the state courts.  So they have to find and make

18   arrangements to have scribes and other people to help them so

19   they can get those dailies out to you.  So let's try to make

20   sure that you do that, make that request, let's say, by

21   December 15th.

22       I don't know if you're talking settlement.  This is always

23   in my standing -- in my order, though.  If you do settle, I

24   need to know by 4:00 p.m. on the Friday prior to the Monday of

25   trial.  If not, you have to split jury costs.  It's a couple

1    hundred dollars.  And if it's more, it's still not that much.

2        Okay.  You shall always, while you're on the record and

3    off the record, act in a professional way.  Do not approach any

4    other parties' witness without my permission.  You may approach

5    your own witnesses who are not hostile without permission.

6        During *voir dire*, I do not want you engaging with jurors,

7    so you can use the jury room bathroom.  There are two in there.

8    You go in that door and out that door.  You do not access the

9    other door because that's the secured hallway.  Okay?  But that

10   way during *voir dire*, you're not in those hallway bathrooms

11   with the jurors.

12       In the trial order, you'll be given some really standard

13   procedural stipulations.  Those are just really basic things.

14   Hopefully you'll -- there will be no issues, so look at those.

15   Hopefully just approve them.  If you have any objections, we'll

16   talk about it next time.

17       At the end of the trial, you will also certify trial

18   exhibits.  You'll be required to review them, confirm the

19   accuracy, and then file the certification.

20       One of my colleagues was reversed by the Ninth Circuit,

21   had to retry a case because of something that went in that

22   wasn't supposed to.  So this is not something that you should

23   take lightly.  Make sure that you've got someone who knows what

24   they're doing, because you will be -- you'll be held to that.

25       Okay.  Those are the standards for me.  Any questions?

1          **MR. SHAPIRO:**  Nothing Your Honor.

2          **THE COURT:**  Then let's go to motions.

3      Are there any updates, first of all, that I should know

4  about?

5          **MR. SHAPIRO:**  Regarding motions, Your Honor?

6          **THE COURT:**  Correct.

7          **MR. SHAPIRO:**  I do not believe so.

8          **MR. MCGEE:**  I apologize.  Ryan McGee from Morgan and

9  Morgan.

10      On Plaintiffs' Motion in Limine No. 5, we filed a

11  stipulation.  I'm not sure if the Court has had a chance to

12  review it, but if that stipulation is acceptable, we would

13  withdraw that motion.

14          **THE COURT:**  Okay.  This is on the introduction of

15  disparaging evidence?

16          **MR. MCGEE:**  Yes, Your Honor.

17          **THE COURT:**  Okay.  That is -- the stipulation is

18  granted.  Motion in Limine No. 5 is deemed withdrawn.

19      Okay.  Let's start -- we'll do this by docket number, so

20  Docket 975.  This is the motion with respect to Amir.

21      Okay.  Names again.

22          **MR. FRAWLEY:**  Alexander Frawley from Susman Godfrey

23  for plaintiffs.

24          **MR. MARGOLIES:**  Joseph Margolies from Quinn Emanuel

25  for Google.

1          **THE COURT:**  Okay.

2      So this is the argument that -- just reduced to its

3  essence, plaintiff argues that the opinion should be excluded

4  on three grounds.  One, because the survey is about implied

5  consent, and that's irrelevant.

6          **MR. FRAWLEY:**  Yes, Your Honor.

7          **THE COURT:**  Two, because Google cannot rely on

8  extrinsic evidence to support its interpretation of the

9  contract documents.

10          **MR. FRAWLEY:**  Yes, Your Honor.

11          **THE COURT:**  And, three, because Amir did not ask the

12  right questions.

13          **MR. FRAWLEY:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  Let's start with the issue of

15  consent.

16          **MR. FRAWLEY:**  Sure.  So the surveys are irrelevant to

17  whether any particular named plaintiff consented --

18          **THE COURT:**  I agree with you generically.  So why is

19  it relevant to their consent?  You get to cross-examine them on

20  whether or not they consented, and a jury can decide, based

21  upon that evidence and your cross-examination, whether or not

22  there was consent.

23      How does some third-party survey bear on that topic?

24          **MR. MARGOLIES:**  It bears on it in two ways,

25  Your Honor.  The first is with respect to individual claims,

there are questions about what a reasonable person's

expectation would be; for example, whether there was a

reasonable expectation of privacy.

The privacy torts also have elements involving whether the

conduct was an egregious breach of social norms.  So a survey

indicating that more than half of the respondents or a much

greater number of respondents believed that the conduct that's

challenged was occurring would be evidence that a reasonable

person would not consider this to be an egregious breach of

social norms or have a reasonable expectation of privacy.

And separately, Your Honor, implied consent is relevant to

the classwide claims --

**THE COURT:**  There are no classwide claims that the

jury is deciding on.

**MR. MARGOLIES:**  That's right, Your Honor.

**THE COURT:**  So that argument does not persuade.

**MR. MARGOLIES:**  If Your Honor does not intend to have

an advisory jury on those issues, we don't argue that that

evidence should be part of the injunctive relief question

before the jury.

**THE COURT:**  Okay.

Response.  Why isn't it relevant to the reasonable

expectation of privacy?

**MR. FRAWLEY:**  The reason, Your Honor, is because that

gets us to which -- our second argument, that Google can use

1    the disclosures as extrinsic evidence.

2              THE COURT:  Well, that's a separate issue.

3         MR. FRAWLEY:  Well, we think it's related, Your Honor,

4    and if we think about how the parties litigated summary

5    judgment, how Google litigated its position and how the Court

6    evaluated these issues, all of us were talking about these

7    other issues like reasonable expectations, offensiveness.  We

8    were looking at those issues through the lens of the form

9    contract; right?

10        So was it reasonable for users to expect what would happen

11   based on what the form contract says.  So in effect --

12             THE COURT:  Those were contract claims, though,

13   weren't they?  I mean, we have both tort claims, and there are

14   contract claims.  The tort claims have different elements of

15   proof.

16             MR. FRAWLEY:  Yes.

17             THE COURT:  How is it not relevant to the tort

18   elements of proof?

19             MR. FRAWLEY:  It may normally be relevant, Your Honor.

20   I think our argument here is really the notion of the evidence

21   rule applying, and this would be sort of a way -- your ruling,

22   Your Honor, that you told the parties about at summary

23   judgment, that if --

24             THE COURT:  I agree.  With respect to contract claims,

25   I think that that's right.  That's not my question.  My

1   question relates to the tort claims.

2         **MR. FRAWLEY:**  We think that if Google were allowed to

3   use the surveys for some of the elements of the tort claims,

4   that would effectively be an end run around the Court's ruling.

5         **THE COURT:**  There are -- well, I take it that you're

6   not withdrawing your tort claims.

7         **MR. FRAWLEY:**  Not at this time, Your Honor, no.

8         **THE COURT:**  And there are -- evidence can be used for

9   lots of different purposes.  Just because it cannot be used for

10   one purpose doesn't mean that it can't be used for another

11   purpose.

12     Do you concede that it's relevant for the tort elements?

13         **MR. FRAWLEY:**  It may be relevant, Your Honor.  That's

14   not the basis of our argument that it's irrelevant to those

15   claims.

16         **THE COURT:**  You argued that it's not relevant to the

17   trial.

18         **MR. FRAWLEY:**  Right.

19         **THE COURT:**  That's what you argued.

20         **MR. FRAWLEY:**  And -- and the reason is -- and it

21   sounds like Your Honor might disagree, but we understood the

22   rule about no extrinsic evidence, that that would cover not

23   just the contract claims -- claim.  Sorry.  Because --

24         **THE COURT:**  So I have to go back and check.  I --

25   and -- and I'll hear argument.

1    I warned you that I would not allow you to use extrinsic

2   evidence for purposes of interpreting the contract claims if

3   you argued that they were unambiguous.  I've done that before.

4   We do it in patent cases all the time.  We make people take

5   positions, and you stick by those positions, and then you can't

6   waffle later and get a second bite at the apple when you lose.

7    So you lost that argument.  Why should you be allowed to

8   change your position now?

9    **MR. MARGOLIES:**  Your Honor, I want to be very clear

10   that I'm not here to re-litigate what your rule says.  We, of

11   course, defer to your own interpretation of your own rule.

12    In this case, these -- these survey -- the survey evidence

13   is relevant to rebutting expert opinions that plaintiffs intend

14   to put in.  If plaintiffs are allowed to put in survey evidence

15   on a given topic and we are precluded from responding to that

16   with a survey that we believe is better constituted and more

17   informative, it would be highly prejudicial to us.

18    So if Your Honor's rule is that we cannot affirmatively

19   offer this survey evidence as means of contract interpretation,

20   we'll accept that rule.  Subject to preserving any arguments

21   that we've made about a potential due process issue, we, of

22   course, accept Your Honor's rule.

23    But to the extent that it precludes us from even

24   responding to their survey evidence, we believe that would be

25   prejudicial.

1          And if I could say one more point on that, Your Honor.  We

2     still believe that our contract is unambiguous.  We have not

3     wavered from that position.  But if we make the argument that

4     our contract is unambiguous and they can present unrebutted

5     survey evidence suggesting that it actually is ambiguous, then

6     even if the unambiguous evidence might have stood on its own,

7     that could prejudice the jury, so we should be able --

8          **THE COURT:**  Remember, all evidence in some way is --

9     is viewed as prejudicial to the other side.  That's not the

10    rule.  403 relates to unduly prejudicial.  Something that's

11    good for the plaintiff is usually prejudicial for the defense

12    and vice versa.  That's the nature of the -- of the process.

13         So that's not the point.  The question is whether it is

14    unduly prejudicial under 403.

15         **MR. MARGOLIES:**  Your Honor, I believe it would be

16    unduly prejudicial under Rule 403 in part because it would be

17    confusing to the jury for there to be unrebutted survey

18    evidence on one side.  They know that we have survey evidence

19    that shows that --

20         **THE COURT:**  How would they know that?

21         **MR. MARGOLIES:**  Because it would be -- I believe,

22    Your Honor, it would be admitted for other claims.  The tort

23    claims still require that evidence to come in because it

24    remains relevant to, for example, the privacy torts.

25         **MR. FRAWLEY:**  Can I make a quick point on the point

1   that Mr. Margolies made about unrebutted testimony?

2          THE COURT:  Okay.

3          MR. FRAWLEY:  So we don't think that our survey expert

4   would be unrebutted because their survey expert, Amir, he also

5   submitted two additional reports, and those were rebuttal

6   opinions where he was critiquing what our survey expert did,

7   and we're not seeking to exclude any of those opinions, nothing

8   from those reports.

9          So under our framework, now that I'm thinking about it,

10  our survey expert would testimony and their survey expert Amir,

11  would testify --

12          THE COURT REPORTER:  I'm sorry.  This is the court

13  reporter.  You are too close to the mic, and I'm having

14  trouble.  If you could back up a little bit.  Thank you.

15          MR. FRAWLEY:  Sorry.  Is that better?

16          THE COURT REPORTER:  That is much better.  Thank you.

17          MR. MARGOLIES:  Your Honor, may I respond briefly?

18          THE COURT:  Hold on.

19          By the way, why was this brought as a *Daubert*?  It seems

20  to be procedurally improper?  You're limited to the number of

21  motions that you could bring.  You used all your motions, and

22  then you bring this motion.

23          MR. FRAWLEY:  No.  I'm sorry, Your Honor.  This is

24  only our second *Daubert* motion.  We submitted one with class

25  certification against their expert Psounis.  This was denied.

1    This is the second time we bring a *Daubert* motion.

2        I think you might be referring to our argument against

3    their *Daubert* as to Hochman where we argue well, this is their

4    fourth, that's improper.

5        **THE COURT:**  Okay.  This motion was brought under

6    *Daubert*?

7        **MR. FRAWLEY:**  Yes, Your Honor.

8        **THE COURT:**  And it was filed in August, which is past

9    the deadline for filing *Dauberts*.

10       **MR. FRAWLEY:**  No, Your Honor.  Actually, we -- we

11   agreed after summary judgment to a case schedule for things

12   including *Daubert*, and that was --

13       **THE COURT:**  How is this a *Daubert*?  It seems to be an

14   end run around my limitation on motions to -- in limine and --

15   I mean, this looks like a motion to exclude.  There is nothing

16   wrong with the analysis.

17       **MR. FRAWLEY:**  So we -- we're bringing this under the

18   relevance prong of *Daubert*, under the fit requirement.  We're

19   not arguing that his surveys are unreliable, although our

20   survey expert will make those points himself.

21       Your Honor, just looking at the *Daubert* standard on page 4

22   of our opening brief, the proposed expert testimony must be

23   relevant to the task at end, i.e., logically to advance a

24   material aspect of the proposing party's case.

25       **THE COURT:**  I hear what you're saying.

1    Okay.  What else do you want --

2         **MR. FRAWLEY:**  I would like to just briefly discuss our

3    third point.

4         So even if Your Honor were to agree with Google's argument

5    that things can come in for the tort claims, notwithstanding

6    the extrinsic evidence rule, even if Your Honor accepted that

7    argument, we don't think these surveys are still relevant

8    because they actually surveyed the wrong thing.

9         So these surveys did not focus on signed-out browsing.

10   They did not focus on browsing on non-Google websites.  And

11   that's the core of our case.  Those are key limitations to our

12   claims, which make the claim stronger, and ye Amir did not ask

13   about those scenarios.

14        If a jury were to use these surveys to decide reasonable

15   expectations, they would be deciding reasonable expectations

16   for a very different case, one that includes signed-in and one

17   that includes google.com browsing.  So that also make the

18   surveys irrelevant.

19        Even if they were relevant to an issue being litigated,

20   they would be irrelevant as asking the wrong questions.  And I

21   will point you to the *Rawles* case which we cited in our brief.

22   That's a case where the court -- a district court excluded

23   surveys that it said used the -- there is an analytical gap

24   between the questions asked and the metric that was at issue.

25   So we think that that case squarely applies here.

1          **THE COURT:**  Response.

2          **MR. MARGOLIES:**  Your Honor, there is no analytical gap

3    between the questions here and the conclusions that were drawn.

4    But before I even get to that point, I would just like to point

5    out that these are all methodological critiques.  They go to

6    the formation of the questions, the methodology of the survey,

7    which Mr. Frawley has just said they're not questioning the

8    reliability of.

9          It's very clear under Ninth Circuit precedent -- and we've

10   cited a lot of that in our brief -- that methodological

11   critiques go to the weight, not the admissibility of the

12   evidence.

13         It sounds like all of the critiques that Mr. Frawley

14   raised could easily be asked of Dr. Amir on cross-examination

15   rather than be a basis to exclude his testimony entirely.

16         On the actual surveys themselves, though, the two

17   critiques I heard was that it didn't specify in the questions

18   that users were logged out, which is part of the class

19   definition, and it didn't specify that they were on non-Google

20   websites, but neither of those is a serious methodological

21   issue.

22         On the logged-out point, one of the core purposes of

23   Incognito Mode is that it logs out users from all of their

24   accounts as soon as they enter the mode.  It's the default

25   state.

1          So if the questions are about browsing in Incognito or a

2     private browsing mode, asking about logged out is unnecessary.

3     That is the default state and indeed the purpose of the mode.

4          As to visiting non-Google websites, it was very clear from

5     the questions, including portions of the survey that said do

6     you expect services that provide ads and analytic services to

7     websites to receive your data, but the questions were geared at

8     third-party websites and not at Google owned and operated

9     websites.  So these are not serious methodological concerns,

10    certainly not an analytical gap.

11         And a final point, Your Honor, is that even if there were

12    a gap, there is no requirement under *Daubert* that the survey

13    answer the ultimate question that the jury is tasked with, just

14    whether it's relevant, just whether it would help the finder of

15    fact.  And in this case, the survey evidence clearly gets the

16    jury closer to answering that ultimate question.

17              **THE COURT:**  Okay.  I'll take it under submission.

18         **MR. MARGOLIES:**  Thank you, Your Honor.

19              **THE COURT:**  Next.

20         **MR. FRAWLEY:**  Thank you, Your Honor.

21              **THE COURT:**  The next one is this motion to exclude

22    certain of Google employee witnesses.

23         As I understand it, at this point we're only talking about

24    Caitlin Sadowski and Steve Ganem; is that right?

25              **MR. FRAWLEY:**  Yes, Your Honor.

1          **MS. CRAWFORD:**  Yes, Your Honor.

2          **MR. FRAWLEY:**  Sorry.  It's Alexander Frawley again for

3    the plaintiffs.

4          **MS. CRAWFORD:**  Jomaire Crawford.

5          **THE COURT:**  Okay.  Motion is denied.

6       Next motion.

7          **MR. FRAWLEY:**  Does that include, Your Honor, our

8    request for discovery, which was an alternative request that we

9    made?  Just to be able to cross-examine these witnesses with

10   their custodial documents?

11         **THE COURT:**  So let me -- let me go through this.

12      You were first told about these witnesses back on

13   September 30th, 2020; correct?

14         **MR. FRAWLEY:**  I don't think that's correct,

15   Your Honor.

16         **THE COURT:**  Is that wrong?

17         **MS. CRAWFORD:**  My understanding is that they were

18   disclosed in February 2021 in response to plaintiffs' request

19   for document production.

20         **THE COURT:**  Okay so February 2021.

21         **MR. FRAWLEY:**  Can I just make one really quick

22   clarification on that?  That was not a Rule 26 disclosure.

23   That was a list of over 200 employees that Google gave us and

24   said these are the employees who might become custodians.  It's

25   Exhibit 6 to our motion.

1          **THE COURT:**  Okay.  You tried to exclude those, and
2     van Keulen denied the request.
3          **MR. FRAWLEY:**  Well, not exactly, Your Honor.  And so
4     not at all for Dr. Sadowski, but for Mr. Ganem, we asked for
5     his custodial documents in February of 2022 when they finally
6     disclosed him under Rule 26.  She said no to custodial
7     documents but yes to the deposition.
8          For Dr. Sadowski --
9          **THE COURT:**  So why would you have to depose him again?
10         **MR. FRAWLEY:**  Your Honor, I -- I agree with you, our
11    motion is much stronger as to Dr. Sadowski.
12         **THE COURT:**  So it's denied.  Your request for
13    discovery with respect to him is denied.
14         Okay.  Now with respected to Sadowski.
15         **MR. FRAWLEY:**  Yes.  She was --
16         **THE COURT:**  Sadowski you've got on your trial list so
17    you knew this was an issue; right?
18         **MR. FRAWLEY:**  We put her only because we were
19    mindful --
20         **THE COURT:**  She was identified as a 30(b)(6) witness.
21         **MR. FRAWLEY:**  At the very end of discovery on some
22    limited topics, yes.
23         **THE COURT:**  Okay.  So you knew at the end of
24    discovery, and you could have chosen to depose her at that time
25    or at least notice it, and if you had noticed it, then you

```
1     could have gone to Judge van Keulen to make sure that you had

2     time.  Am I correct on the timing?

3               MR. FRAWLEY:  Her 30(b)(6) witness took place, I

4     think, on March 10th or March 4th.  There is two dates in

5     my head, but --

6               MS. CRAWFORD:  March 10.

7               MR. FRAWLEY:  March 10.  That was after the close of

8     discover.

9         I suppose we could have said on the 30(b)(6) witness we

10    also want to take them as a fact witness, but there are a

11    couple people who fit this bucket.  There were a few people who

12    became 30(b)(6) witnesses, and I don't think Judge van Keulen

13    would have appreciated if we tried to sort of bring all those

14    motions.  We want all these extra depositions --

15              THE COURT:  But now you're asking me to do it on the

16    eve of trial.  Denied.

17              MR. FRAWLEY:  Okay.

18              THE COURT:  Denied.  The motion is denied.

19        Next motion.  Next I have at Docket 1001.  There was a

20    letter brief that was filed with respect to Hochman.

21        Let me be clear about something, and this is always my

22    rule.  No one ever, ever, ever, ever in trial refers to any

23    court proceedings for any reason whatsoever without explicit

24    authorization.  You will not -- no one will refer to any orders

25    for sanctions, summary judgment, or anything that I have
```

1    ordered or that Judge van Keulen has ordered.  No witness shall

2    refer to it, no lawyer shall refer to it.  You will be

3    sanctioned if you do.

4         If there is a need to do it, you will ask permission and

5    tell me why, and I will have the context, and I will consider

6    it.  It will not be done.  Do you understand?

7              **MR. FRAWLEY:**  Understood, Your Honor.

8              **THE COURT:**  Hochman shall not do that.  Do you

9    understand?

10             **MR. WRIGHT:**  Yes, Your Honor.

11        Apologies.  This is Logan Wright for the plaintiffs.

12             **THE COURT:**  There are a number of things.  I looked at

13   his expert report and the paragraphs that were referenced in

14   the letter brief.  There are a number of -- of inappropriate

15   statements by him relative to those issues.  That shall not be

16   allowed and would never be allowed.

17        There were other statements in there because it was mixed

18   together that were appropriate.  And I am not going to sit here

19   and micromanage portions of sentences.  The rule is the rule.

20   Do you understand?

21             **MR. WRIGHT:**  Yes, Your Honor.

22             **THE COURT:**  Okay.  That one is resolved.

23             **MR. BROOME:**  Thank you, Your Honor.  And Stephen

24   Broome for Google.  I think that also resolves our MIL 1 as

25   well.

1      **THE COURT:**  By the way, the three-page letter brief

2  was so much more persuasive than your 10, 15 pages of just

3  rambling.  Seriously, you all should take -- you should all

4  remember Mark Twain.

5      **MR. BROOME:**  A shorter letter, yes.

6      **THE COURT:**  Take the time to write it shorter.  It's

7  more persuasive.

8      **MR. BROOME:**  Thank you, Your Honor.

9      **MR. MAO:**  Just a quick question on that in terms of

10  the nuances on how to implement that order, and of course we

11  heard you loud and clear, Your Honor, which is insofar as data

12  algorithms that were not produced and Google just refused to do

13  that, that did end up in proceedings, and there were -- it's

14  not called orders.  There were requirements in which they

15  ultimately still did not comply with.

16      So how do we maneuver around that?  Obviously we will seek

17  your guidance, Your Honor, but --

18      **THE COURT:**  So I -- so I am happy to work with you on

19  that.  They do not --

20      **MR. MAO:**  I understand.

21      **THE COURT:**  They do not get a free pass, and -- and --

22  but I have to manage that in a very precise way.  And those are

23  the kinds of things that you should say *this is what I want to*

24  *do*, and so that I understand what the context looks like and I

25  can tell you the appropriate means of doing it.

1          Those sanctions orders are meaningful.  And you should

2     have produced things that you didn't produce.  But that's --

3     that's our process.  That's not something that I will just

4     have, you know, doors open for the jury.  So I will micromanage

5     that.  And that's why the -- the default is nothing, and you

6     come and you ask in a specific context.

7          **MR. MAO:**  I heard you loud and clear, Your Honor, and

8     we will come and ask.  Thank you.

9          **THE COURT:**  All right.

10    1015, the next one on the docket.

11    I am not inclined to have a sideshow in this trial.

12         **MR. LEE:**  I think you're directing that to me, Judge.

13         **THE COURT:**  I am.

14         **MR. LEE:**  There will be no sideshow, Judge.

15         **THE COURT:**  I'm not so convinced.  So -- and I don't

16    know what relevance -- what probative value there is in light

17    of the huge baggage with which that witness comes.  So the best

18    I can do is have an evidentiary hearing in advance to figure

19    out what it is he has to offer so that I can balance that

20    against the defendants' appropriate ability to cross-examine on

21    things that, again, would, in my view, create a sideshow.

22         So that's the best I can offer.  And I would suggest that

23    you think about it, and if you want to have that evidentiary

24    hearing in advance, I have very few days to offer you.  But I

25    could find something the first or second week of January.

1     **MR. LEE:**  We will take anything we can get, Judge.

2  We'll have to check with the witness, but we'll make ourselves

3  available.

4     **MR. SHAPIRO:**  And, Your Honor, this is Andrew Shapiro

5  for Google.

6     Our position on -- surprisingly is that even -- that even

7  if an evidentiary hearing would -- would support whatever it is

8  the plaintiffs think it would support, this witness shouldn't

9  be allowed to be added at this late date, in any event.  So

10 there are lots of reasons.  Obviously one independent reason

11 not to allow this witness is --

12     **THE COURT:**  Well, they didn't -- you can make your

13 record.  I don't agree with you.  He came to them.  It's not as

14 if he'd been hiding this.  And he has told them and they gave

15 you notice as soon as they knew or as soon as they reasonably

16 could after they knew, so I'm not persuaded by that argument on

17 your side.

18     **MR. SHAPIRO:**  I've made my record.  That's fine,

19 Your Honor.

20     **MR. LEE:**  In terms of the evidentiary hearing,

21 Your Honor, just from a process perspective, will there be

22 documents exchanged in advance, depositions --

23     **THE COURT:**  I don't know.  You don't have documents?

24 You don't --

25     **MR. LEE:**  He's a former Google employee, Judge, so

1   they have all the document.  We've requested those documents.

2   They refused to produce them to us.

3       There is a motion to compel pending on that, and that's

4   sort of been the holdup because what we're asking for is

5   produce the documents.  Let's take his deposition, and then we

6   can all decide what's what and what's not what.

7       And so far Google has had a hundred days to respond to our

8   disclosure.  They refused to pull any documents.  We know

9   they've collected them, but they refused to turn them over to

10  us, and they refused to have him sit for deposition.  I think

11  that would clarify a lot of the issues --

12      **THE COURT:**  How can they refuse to let him sit for

13  deposition?

14      **MR. LEE:**  We've offered him for deposition, and they

15  won't notice him.  Instead, they are moving to strike him so

16  that he could never testify.

17      I think we have to do this in stages.  So if they were to

18  produce the documents and then they could take his deposition,

19  I think we could submit to Your Honor briefing on it.  It could

20  be very short.  We'll attach the deposition.  And then

21  Your Honor can decide, you know, on balance whether -- whether

22  Mr. Lemoine's testimony is going to be meaningful to the jury.

23  We think it's going to be very, very meaningful to the jury.

24      And I can touch on some of the relevance because you had

25  asked about that if it would be helpful for the Court.

1              **THE COURT:**  Go ahead.

2              **MR. LEE:**  So he's going to testify, in a nutshell,

3      that Google's AI uses private browsing data across its

4      services, including Chrome, and that AI can merge users'

5      private browsing profiles with their non-private browsing

6      profiles.

7              The AI also can re-identify users, even when they're in

8      private browsing mode.  The reason why that's important, Judge,

9      is throughout this litigation, Google has taken the position

10     that it doesn't do any of those things.  So it's highly, highly

11     relevant.

12             In addition to that, he'll testify how Google forbids

13     written documentations of these exact practices and that when

14     he spoke up and others spoke up to raise concerns, they were

15     silenced.  So this is -- these are brand new facts.  And he's

16     the only person that will testify that can talk about these

17     things.

18             So, you know, candidly, Your Honor, the -- the sideshow

19     aspects are not going to be anything that we introduced to the

20     Court.  What Google has said is they're going to attack his

21     credibility; right?  They're free to do that on cross.  If they

22     think that's a good use of their time, they're free to do that.

23             And I guess the way I look at it, Judge, is if the cross

24     on his credibility is so good and he really has nothing to say,

25     then why are they working so hard to preclude him?  Why don't

1    they just turn over the documents and take his deposition.   And

2    then if there is still a question then, I think Your Honor can

3    decide.

4            **THE COURT:**  Mr. Shapiro.

5            **MR. SHAPIRO:**  So, Your Honor, I -- this is Exhibit A

6    or at least as aspect, an important aspect of why we maintain

7    our position that the late request here is relevant because

8    what the plaintiffs have asked for is for us -- so I can

9    represent we've not pulled all of Mr. Lemoine's documents.

10        The plaintiffs have asked us now or in August, right

11   before our pretrial binders were due, to -- they've declined

12   our request for a deposition unless we went through and

13   provided discovery on this former employee who didn't work on

14   any of the products at issue here, who worked in AI, and then

15   Search.  They've accused us of concealing or trying to hide

16   this witness, which is absolutely not the case.  This person's

17   name didn't come up in two years of discovery, and it's not

18   because anybody was hiding anything.  It's because what he has

19   to offer is tangential at best in this case.

20        And on the cross-examination in particular, you heard it

21   from Mr. Lee a moment ago, they are going to argue that Google

22   has some culture of retaliation, and so we will be within our

23   rights and we are going to have use portions of everybody's 18

24   hours, I guess our 18 hours, to explain why this person is no

25   longer working at Google.

1    It's not efficient, it's not fair, it's not consistent

2    with the rules.  If -- I'll leave it at that.

3        **THE COURT:**  Well, it sounds as if you've got a -- on

4    the plaintiffs' side, a potential whistleblower who -- who

5    really, in many ways, guts much of what you say if he's

6    credible, much of what your client says.

7        And I also have been told that the key people who are

8    running your operation you're refusing to bring in from Europe,

9    even though you're a multibillion dollar company.

10       So I don't know.  I am not so convinced that I shouldn't

11   allow him to testify.

12       **MR. SHAPIRO:**  Nothing that Mr. Lemoine can testify to

13   will gut what Google is saying or destroy our defense.  We will

14   win this case whether he testifies or not.

15       **THE COURT:**  You have argued that the unauthenticated

16   information cannot and has not ever been matched with users.

17   That is the perspective.  And that the mere fact that you have

18   the ability to do it doesn't mean that you have done it.

19       We are not in a position to just trust what Google says.

20   That's why we have an adversarial process.  There are plenty of

21   corporations who do not always accurately describe what it is

22   they're doing.  That's why we have a trial process.

23       Now, you could be right; you could be wrong.  I don't

24   know.  But here I have a proffer that suggests that it can be

25   done, has been done, and that seems to be directly

1    contradictory to Google's position.  That's what I'm hearing.

2         MR. SHAPIRO:  At the threshold or just to introduce

3    what I'm about to say, if Your Honor is going to direct us to

4    have an evidentiary hearing, we will have a hearing, but I want

5    to clarify a couple of things.

6         No one is asking the jury, no one is asking the Court

7    simply to trust Google that this joining doesn't occur.  There

8    has been a tremendous amount of discovery, depositions, there

9    will be expert witnesses, there will be vigorous, I'm sure,

10   examination and cross-examination of Google witnesses who work

11   actually on Incognito and on Chrome and beyond and by all of

12   these things and there has been.

13        I'm looking at Mr. Lemoine's declaration here.  The only

14   thing he says -- I'm tested, but it's in his declaration -- he

15   says in paragraph 9 of his declaration, which is Document

16   1042-1 -- "While I worked at Google, Google took the

17   position" -- I'm -- I would put a dot, dot, dot in here because

18   I'm skipping to the end of that paragraph -- "that information

19   inferred about a user through AI was considered data about the

20   user owned by Google rather than user data owned by the user."

21   And then he says that he believes later on that Google could

22   infer certain things about how a user is based on patterns.

23        So, A, I don't think that is some direct whistleblowing in

24   any way; B, I think in any fairness, if the case is going to go

25   down that road now, we are going to be arguing about what AI

1  can or can't do, something that has never been an issue in this

2  case.  Then we have a right, just in terms of fundamental

3  fairness, to put on or bring witnesses of our own to rebut

4  that, which is going to completely derail the timing of -- of

5  this trial or leave us unable to -- to actually answer these

6  Eleventh-hour claims.

7        **THE COURT:**  Well, I don't know, because I don't know

8  exactly what he's going to say.  I've only had a proffer.

9        So you're ordered to produce the documents.  Now, I can

10 get into the micromanaging of it, or if it's already briefed in

11 front of Judge van Keulen, she can do it.  Or you can all agree

12 on what's critical, which, again, I'm not exactly sure that you

13 will, given your history.  And a deposition shall be taken.

14 And all of that has to happen by December 22nd.

15       **MR. LEE:**  Thank you, Your Honor.

16       **THE COURT:**  They need documents no later than

17 December 11th at noon.  So figure out what's going to be

18 produced.  I'll let her know.

19       **MR. LEE:**  Thank you, Your Honor.

20       **MR. SHAPIRO:**  Thank you, Judge.

21       **THE COURT:**  Okay.  Next issue, 1020.  It's the next on

22 the docket.  Plaintiffs Motion in Limine No. 1.

23       Oh, on that last issue, I need a joint notice filed by

24 December 27th as to whether or not you want an evidentiary

25 hearing, or at least your respective positions on that topic.

1    One statement, no longer than a page and a half.

2        Okay.

3            MR. MCGEE:  Your Honor, Ryan McGee for the plaintiffs.

4            MS. CRAWFORD:  And Jomaire Crawford for Google.

5            THE COURT:  Thank you.

6            MS. CRAWFORD:  Thank you.

7            THE COURT:  All right.  Request to preclude Google

8    from relying on its non-public source code.

9            MR. MCGEE:  Yes, Your Honor.  It relates to one

10   particular piece of source code that Google disclosed on its

11   exhibit list and that --

12           THE COURT:  And I take it Google wants to use this?

13           MS. CRAWFORD:  We would like to have the ability to

14   reference it, including an expert report, if plaintiffs

15   introduce a particular argument about a log for which that

16   source code would be relevant to rebut their allegations.

17           THE COURT:  And do you plan on relying on such log?

18           MR. MCGEE:  Your Honor, Dr.-- excuse me -- Mr. Hochman

19   authored a second supplemental report that --

20           THE COURT:  The one with all the inappropriate

21   statements?

22           MR. MCGEE:  That -- yes, Your Honor.  The one that you

23   referenced earlier, yes, Judge.

24       In that report, he references what's called a joined log

25   where there's both --

1          **THE COURT:**  Which paragraph?

2          **MR. MCGEE:**  Sorry.  I didn't --

3          **THE COURT:**  And what tab is it in my binder or

4     binders?

5          **UNIDENTIFIED SPEAKER:**  Tab 14 in your binder.

6          **THE COURT:**  Okay.  Thank you.

7       All right.  So what paragraph are we talking about?

8          **MS. CRAWFORD:**  If I may, there is a sealed version of

9     these documents, and I just want to make sure that Mr. McGee is

10    not in open court using any of the sealed terminology in

11    reference to these log-related issues.

12         **THE COURT:**  I asked for a paragraph number.

13         **MR. MCGEE:**  Your Honor, in the introduction, paragraph

14    2.

15         **THE COURT:**  Paragraph 2?

16         **MR. MCGEE:**  Correct.  It's the --

17         **THE COURT:**  So the second or what?

18         **MR. MCGEE:**  The second bullet, Your Honor.

19         **THE COURT:**  Okay.  Hold on.  All right.  This

20    references 46 logs.  And does this issue concern all 46 logs?

21         **MR. MCGEE:**  No, Your Honor.  One particular log.

22         **THE COURT:**  All right.  So what's the other paragraph?

23         **MR. MCGEE:**  If you also move to paragraph 40 of the

24    report.  I think that's getting into some of the sealed

25    material, Your Honor.

1      **THE COURT:**  All right.  So in the documents that you

2   gave me, I can't tell what's being requested to be sealed

3   versus not.  Just an FYI.  So when you send us documents, you

4   may want to send us versions of the documents where things are

5   highlighted.  They were not.

6      So paragraph 40 has seven lines.  Which of these have you

7   asked to seal or which are sealable?

8      **MS. CRAWFORD:**  I believe we're looking at paragraph

9   43.

10      **THE COURT:**  You said 40.

11      **MR. MCGEE:**  My apologies, Your Honor.  I was walking

12   through it.  But it is paragraph 43 that references the

13   specific log that --

14      **THE COURT:**  All right.  Hold on.  Paragraph 43 has 12

15   lines.  So tell me what lines we're talking about.  It has 4

16   lines on page 18 and lines 5 through 12 on page 17.

17      **MR. MCGEE:**  I believe it starts on line 5, Your Honor.

18      **MS. CRAWFORD:**  5 through 9 contain references, many of

19   which are in quotations, to materials -- sorry -- to

20   descriptors that are under seal.

21      **THE COURT:**  Okay.  So you -- so now that I have the

22   information, explain to me again what it is you want to use at

23   trial.

24      **MR. MCGEE:**  Your Honor, throughout the litigation, as

25   you -- I believe we've touched on a couple of times, Google has

1    made the argument that authenticated data and unauthenticated

2    data is never joined, and, again, I'm trying to tiptoe around

3    the sealing issue here, but Mr. Hochman analyzed some of these

4    logs and had some information on these logs, not full

5    information.  It was not subject to full discovery.

6          But what he was able to do is with the information that he

7    had and that is included in this second supplemental report was

8    come closer to, if not concluding that, Google does join the

9    data.  And it's specifically in this log.

10          **THE COURT:**  Okay.

11          **MR. MCGEE:**  And when Mr. Hochman raised this, Google

12    then authored the Psounis rebuttal to his report, Dr. Psounis,

13    that stated that he analyzed or that he had previously analyzed

14    this log, the source code that controlled how the log was

15    written.  So just how it was written, Your Honor, not what was

16    done with it afterward, not what may have been done with it in

17    other systems at Google.  It didn't control how the information

18    would be excised from that log but just how it was written at

19    Google.

20          And he concluded that based on his limited review of the

21    source code that Google provided to him, not that he went and

22    looked at Google's source code and selected certain portions

23    but he asked for the source code that wrote the log, that he

24    was concluding that it was not joined by Google's definition of

25    what "joined" is.

1      So we get into a little bit of a vocabulary dispute on

2   plaintiffs' suggesting that "joined" is the information goes to

3   the same place and then Google saying well, the information is

4   just on different lines in the same place and that's not joined

5   by Google's 's definition.

6      The prejudice that we face -- and it's unfair prejudice,

7   Judge, it's undue, unfair prejudice -- is that this source

8   code, again selected by Google, was never disclosed during the

9   regular course of discovery, it wasn't disclosed in the first

10  round of sanctions, and it was only disclosed as a defense in

11  the second round of sanctions.

12     Mr. Hochman had one of his assistants, who is one of the

13  consultants in this case -- he had him go to Quinn Emanuel's

14  offices in Washington, D.C.  I attended with him.  For two

15  days, we looked at snippets of source code, and based on the

16  review, we had more questions than we had answers.

17     Basically devolved -- I know there is a lot in the

18  briefing, but we basically contend that because the non-public

19  source code was never produced during discovery, Google opposed

20  the production of that at least 12 times during normal course.

21  It went to the special master for his review.  The special

22  master determined that it wasn't relevant to any claim or

23  defense of the case, and he ordered that no public --

24  non-public source code would be produced in this case.

25     And then when Google was facing a second round of

1    sanctions to defend against a very particular part of that

2    sanctions, Google then allowed one of its experts to review

3    that source code.

4         And then I also deposed that expert, Dr. Psounis, and

5    again raised more questions than we had answered.  He doesn't

6    know who manages the source code, he doesn't know when that

7    source code was implemented, he didn't know if there were prior

8    versions of it, he didn't know if there were safeguards, he

9    didn't know how it could be disabled or modified.  He basically

10   accepted a piece of source code from Google, conducted a

11   limited analysis of it, and gave the opinion that I just

12   summarized for Your Honor.

13            **MS. CRAWFORD:**  Your Honor, may I be heard?

14            **THE COURT:**  You may.

15            **MS. CRAWFORD:**  What Mr. McGee's argument omits is that

16   as a result of the source code --

17            **THE COURT:**  Let me ask you first.

18            **MS. CRAWFORD:**  Yes.

19            **THE COURT:**  Is there anything that he said to me that

20   was a misstatement?  Did he inaccurately describe anything?

21            **MS. CRAWFORD:**  Insofar as he omitted that --

22            **THE COURT:**  I'm not asking for admissions.  You can

23   get to those.  There was -- was there anything affirmatively

24   that he said that was inaccurate?

25            **MS. CRAWFORD:**  Yes.  Plaintiffs were given a full

1   opportunity to examine the code, not snippets, full files of

2   source code.  14,000 lines of additional source code were

3   offered to plaintiffs to be reviewed, and they declined

4   Google's offer.

5       Many opportunities --

6           **THE COURT:**  So this was before or after they went to

7   Quinn Emanuel in Washington, D.C.

8           **MS. CRAWFORD:**  In connection with that process.

9   After -- Mr. McGee referenced questions arose, and as a result

10  of negotiations with us, we offered to produce 14,000

11  additional lines of code, and plaintiffs refused to examine

12  that additional source code.

13          **THE COURT:**  When was the -- when did you go to Quinn

14  Emanuel's office in D.C.?

15          **MR. MCGEE:**  It was February of 2023, Your Honor.

16      And I would like to see this email.  I'm not saying that

17  we didn't decline it, but I do recall multiple rounds, and I

18  spent 19 hours looking at that source code with Mr. Bhatia, and

19  I know that were tens of thousands of lines, so that's nowhere

20  in this briefing, so I'm not prepared on it.  I'm not saying

21  it's a misstatement, but --

22          **MS. CRAWFORD:**  Your Honor, if I may?

23          **THE COURT:**  You should not interrupt.

24          **MS. CRAWFORD:**  Apologies.

25          **THE COURT:**  All right.

1       **MR. MCGEE:**  I had nothing further, Judge.

2       **THE COURT:**  Go ahead.

3       **MS. CRAWFORD:**  My colleague, Mr. Margolies, was

4  involved in this and can speak directly to that process.

5       **MR. MARGOLIES:**  Your Honor, if I may.

6       **THE COURT:**  You may.

7       **MR. MARGOLIES:**  It is -- it is not the case that

8  plaintiffs as a whole declined to review the 14,000 additional

9  lines of source code.  Mr. Hochman declined to review it.

10      What Mr. McGee describes, Mr. Bhatia did review that

11  source code.  The parties conferred on an opportunity for

12  Mr. Bhatia to submit an expert declaration or other evidence or

13  argument concerning the purport of that source code, and he

14  declined to do that.

15      **MR. MCGEE:**  I'd like to address that one thing,

16  Your Honor.  The --

17      **THE COURT:**  This is Bhatia, B-H-A-T-I-A?

18      **MR. MCGEE:**  B-H-A-T-I-A, yes, Your Honor.

19      And -- okay.  So to clarify, we did in some capacity

20  review all 14,000 lines of the source code.  It's that

21  Mr. Hochman declined.

22      And, Your Honor, Mr. Bhatia submitted a declaration based

23  on his initial review of some source code for the sanctions

24  process.  He then went back in February-- I believe that was in

25  December of 2022.  He then went back in February of 2023.  I

accompanied him.  Again, I think it was February 10th and 11th.
I'm not saying that's absolutely correct, but it was somewhere
in there.  And, again, he had more questions than he had
answers.  We were going toward the sanctions hearing which I
believe was March 2nd of 2023, and he had no new opinions.

So when we said we weren't submitting a new declaration,
it's because there was nothing new to declare.  And when we
were going to the sanctions process, that was initially
understood by the plaintiffs to involve witnesses.

Google then declined to bring any witnesses.  Mr. Bhatia
and our consultants showed up in case Judge van Keulen had
questions, but she did not take witness testimony.

So it's a bit of a misnomer.  I'm not saying it's a
complete misstatement, but the declination to submit the
supplemental declaration was because there was nothing new to
declare.

So that's kind of the legislative history, Your Honor.  I
don't know if we want to get to why we want it excluded from
the jury process.

**THE COURT:**  So when was this supposed to have been
disclosed?

**MR. MCGEE:**  The first request that plaintiffs made for
source code was on October 19th 2020, and that was
approximately two and a half months after we filed the case.
It was in our second request for production.

1   Google then declined on December 2nd of 2020, and then

2   again we went through the 12 or, I guess it would be 11,

3   additional asks, and they repeatedly assured the Court and

4   plaintiffs that the non-public source code would not be

5   relevant to any claim or defense in the case.

6          **THE COURT:**  Is that accurate?

7          **MS. CRAWFORD:**  It's accurate insofar as plaintiffs

8   requested various categories of source code from Google.  Those

9   disputes went to Judge van Keulen, and she denied plaintiffs'

10  request through the special master process --

11         **THE COURT:**  Did you make the argument that the

12  non-public source code was not relevant, yes or no?  Because

13  I'm going to go ask her.

14      So what was the argument made about the non-public source

15  code?

16         **MS. CRAWFORD:**  Our position has long been that that

17  source -- that source code is not necessary for plaintiffs to

18  prove its case or the allegations -- sorry -- or our defenses

19  in this case.

20      We are only seeking to use source code if plaintiffs

21  maintain their position that a log does something that the

22  source code proves it technically cannot do.  That is the

23  limited purpose for which we are interested in using any

24  references to the source code, to directly rebut an expert's

25  contention --

1      **THE COURT:**  And who would do that?  Who would make --

2   who would testify?  Obviously not you, so who?

3      **MS. CRAWFORD:**  Our expert, Dr. Psounis, who reviewed

4   the code.

5      **THE COURT:**  And where is that?  Where is the statement

6   that you want to use in the report?  Where have you disclosed

7   that?

8      **MS. CRAWFORD:**  I can get you specific references,

9   Your Honor.  There are several reports where this specific log

10  and the source code is -- has been evaluated by Dr. Psounis,

11  and he's rebutting Dr. Hochman's opinions with respect to this

12  issue of joinability.

13     **THE COURT:**  So where is it?

14     **MS. CRAWFORD:**  It's his rebuttal to this very report

15  that Mr. McGee has been talking about it --

16     **THE COURT:**  I need -- where in my documents is it?  So

17  Volume 4?

18     **MS. CRAWFORD:**  Just give me one second, Your Honor, to

19  call that up.

20     **THE COURT:**  You cannot be talking outside of a mic.

21      I have Volume 4, which has his reports at Tabs 25 and 26.

22     **MR. MCGEE:**  Your Honor, I believe it's 26 -- is the

23  tab.  It's the August 30th, 2023, rebuttal report of Google's

24  expert, Konstantinos Psounis.

25     **THE COURT:**  All right.  What lines?  And has he been

1   deposed on this topic?

2          **MS. CRAWFORD:**  Yes, he has, Your Honor.

3          **MR. MCGEE:**  I apologize, Your Honor?

4          **THE COURT:**  Was he deposed on this issue?

5          **MR. MCGEE:**  I deposed him on October 9th or

6   October 10th of this year, Your Honor, and it was after we,

7   under the exchange schedule, had to author this motion in

8   limine.

9          **MS. CRAWFORD:**  And I defended that deposition,

10  Your Honor.  It went a full seven hours.  This was the subject,

11  among other things, of the deposition.

12         **MR. MCGEE:**  I believe Mr. Spilly defended the

13  deposition.

14         **MS. CRAWFORD:**  Mr. Spilly and I defended the

15  deposition, Ryan.

16         **THE COURT:**  Okay.  While you're finding it, we're

17  going to go ahead and take a -- Pam we've been on the record

18  for two-and-a-half hours.  We will take a break for 15 minutes.

19  Okay.  Pam needs a break.  I'm going sit here.  I want you to

20  get me the paragraphs.

21         **MS. CRAWFORD:**  I will.

22         **THE COURT:**  Take a break.  That's fine.

23              (Recess taken at 11:25 a.m.)

24            (Proceedings resumed at 11:38 a.m.)

25         **THE COURT:**  Okay.  I have from the defendants the

1   references to the paragraphs in the Psounis --

2            MS. CRAWFORD:  Yes.  Dr. Psounis.

3        THE COURT:  -- report.  So paragraphs 50 through 61,

4   which seem to relate to specifically the -- well, you tell me.

5       He says he examined source code with the specific file

6   name, and that is the file name that we're talking about.

7            MR. MCGEE:  I believe it was SOQS mapper dot sc or dot

8   cc.

9            THE COURT:  I didn't know if that was confidential or

10  not.

11           MS. CRAWFORD:  I believe it is.

12           THE COURT:  It's not highlighted in here.

13           MS. CRAWFORD:  Perhaps not in --

14           THE COURT:  Okay.

15           MS. CRAWFORD:  -- that copy.

16           THE COURT:  It's -- well, I can strike it.

17      Everybody should understand, you asked me to have the

18  webinar on.  The webinar is on, and that means that this --

19  anybody who's listening in is listening in.

20           MS. CRAWFORD:  If helpful, Your Honor, we can just

21  refer to it as the SOQS log going forward.

22           THE COURT:  How do you spell that?

23           MS. CRAWFORD:  S-O-Q-S.

24           THE COURT:  Okay.  All right.  I've looked at it

25  response.

1    So they produced it.  They produced it late.

2         **MR. MCGEE:**  Yes, Your Honor.  They -- I think late

3    would be generous.  You know --

4         **THE COURT:**  They argue that it doesn't prove anything.

5    You have an expert that says it proves something.  They have an

6    expert that says it doesn't.

7         **MR. MCGEE:**  I think, to clarify, our expert did not

8    look at the source code.

9         **THE COURT:**  Your expert's assistant looked at the

10   source code.

11        **MR. MCGEE:**  Correct.  The import of it is that the

12   source code writes authenticated and unauthenticated

13   information data --

14        **THE COURT:**  Let me --

15        **MR. MCGEE:**  Signed in and signed out, Judge.  I'm

16   sorry.

17        **THE COURT:**  As I understand it, you -- Google only

18   wants to be able to have the -- Dr. Psounis testify as a

19   rebuttal to something that plaintiffs propose.

20        **MS. CRAWFORD:**  That is correct, Your Honor.

21        **THE COURT:**  So no affirmative opinion, only as a

22   rebuttal opinion.

23        **MS. CRAWFORD:**  It is a rebuttal opinion of his.

24        **THE COURT:**  Okay.  So what is it that you want to

25   affirmatively have testimony on to which this would rebut?

1      **MR. MCGEE:**  Mr. Hochman would testify that based on

2   his review of Google's documents and the special master

3   process, again, where this information was not disclosed and it

4   had not been disclosed at that point, that Google does join

5   signed in and signed out data in the same place.

6      **THE COURT:**  And you don't want to reference the

7   non-public data at all, the non-public source code?

8      **MR. MCGEE:**  I think that's correct, Your Honor, yes.

9      **THE COURT:**  So if they're not offering the non-public

10  source code, you have nothing to rebut.

11      **MS. CRAWFORD:**  That's precisely the point, Your Honor.

12  Google would be unduly prejudiced in its ability to rebut that

13  argument without our ability to reference the source code.

14      **THE COURT:**  How could you be unduly prejudiced?  You

15  never disclosed this in the first instance.

16      **MS. CRAWFORD:**  Plaintiffs did not -- our opposition

17  makes this clear.  Plaintiffs, throughout the course of

18  discovery, requested several different logs, not this

19  particular log, Your Honor.

20      **THE COURT:**  How I do know you just weren't hiding all

21  of this, and here at the last minute, you want -- you want to

22  use something that -- that you withheld for years?

23      **MS. CRAWFORD:**  This wasn't -- so our opposition brief

24  specifically lays out the different types of source code that

25  plaintiffs requested.  Judge van Keulen denied their request on

1    the basis that their request for source code was overbroad.

2         This disclosure during the sanctions process is one that

3    plaintiffs were able to review the source code.  They reviewed

4    the source code.  They deposed our expert --

5         **THE COURT:**  But this is during a sanctions process.

6    That means that you weren't doing something.

7         **MR. MCGEE:**  And, Your Honor, if I may -- apologies.

8         **THE COURT:**  You were being sanctioned for failure to

9    disclose, so how were you complying with your discovery

10   obligations if you were being sanctioned?

11        **MS. CRAWFORD:**  I think those are separate issues, Your

12   Honor.  The source code that we're referencing here and the log

13   that we're describing was not sought by plaintiffs during the

14   course of discovery.  Our brief lays out very clearly Judge

15   van Keulen denied their request for -- and it was an overbroad

16   one for several different types of source code related to

17   Chrome specifically.

18        This is a separate log, again, one that plaintiffs have

19   had an opportunity to examine.  They deposed our expert for

20   seven hours about this log.  They simply don't like his

21   testimony -- our expert's testimony that conclusively shows

22   their assertions about joinability as to this log are false.

23        And, again, we would only be seeking to introduce this to

24   rebut any assertion by their expert, Mr. Hochman, that Google

25   does, in fact, join data from regular browsing mode sessions

1   and private mode sessions in the context of this single log.

2   That is the limited purpose for which this source code would be

3   referenced, purely in rebuttal.

4           **THE COURT:**  Well, it's not purely in rebuttal, it

5   sounds like, because they're not -- they're not seeking to

6   opine on the -- on the source code.  You're using source

7   code -- you're using additional source code to prove a rebuttal

8   point.

9           **MS. CRAWFORD:**  As to how the log functions, yes,

10  Your Honor.  The logic of the log itself, which the source code

11  is reflective of, would definitively disprove the assertion

12  Mr. Hochman has made.

13      The logic for the log that Mr. Hochman is opining on

14  requires reference to the underlying source code because it

15  contains the programmatic logic for that log.

16          **THE COURT:**  What is Hochman's perspective on

17  paragraphs 50 to 61?

18          **MR. MCGEE:**  Your Honor, with respect to how the source

19  code works, I want to be very clear.  Mr. Hochman reviewed what

20  Dr. Psounis put in his report, and Mr. Zervas confirmed in his

21  deposition that this source code only controls how the data

22  goes into the log, not what happens with it afterward, and only

23  this very specific -- specific one log.

24      So Mr. Hochman doesn't have the benefit of looking at the

25  entire Google system, all of the billions of lines of source

1    code, just the ones that Google identified in response to the

2    second sanctions, and that is what I wanted to point out.  It

3    was not in response to a first sanctions bid on behalf of the

4    plaintiffs.  We successfully secured sanctions.  Judge

5    van Keulen wrote her order on May 20th of 2022, and it ordered

6    Google to certify that these bids did not exist in any other

7    logs, and as part of that process and part of our continued

8    efforts, Google then revealed this log in a subsequent list.

9         So to your point about hiding and whether they were being

10   forthright with discovery, I think the record is clear that

11   they were not, and it was only at our continued insistence that

12   they provided this subsequent source.  And then when we went to

13   the sanctions hearing on March 2nd of 2023, did their

14   Dr. Psounis review this source code to rebut that, according to

15   Google's syntax or Google's vocabulary, authenticate or

16   signed-in data and unauthenticated data, potentially from the

17   same person, goes into the same log, but it's just not written

18   on the same line.

19        And so now Google wants to introduce this, what they

20   propose is a rebuttal.  They want to have -- I know,

21   Your Honor, you've looked at paragraphs 50 through 61.  They

22   said there's 14,000 lines of code.  But they want to have

23   Dr. Psounis, you know, succinctly explain that he reviewed all

24   of this and comes to the simple conclusion that Google never

25   joins any data.  We haven't had the benefit of that discovery.

1  We didn't have the benefit of any of this source code when we

2  were reviewing custodians, when we were looking to depose

3  people, when we were deposing people who Google has now listed

4  as sponsoring witnesses for this exact source code, including

5  Dr. Berntson.

6      So now we have to wait and see what Google is going to do

7  with the source code.  It is patently unfair.  It is pure 403.

8          **MS. CRAWFORD:**  Your Honor, if I may?

9          **THE COURT:**  You may.

10         **MS. CRAWFORD:**  Mr. McGee references Google's position

11  on source code.  It is true that plaintiffs propounded

12  extremely overbroad requests for source code during the course

13  of discovery.  That was briefed during discovery.  They

14  identified the types of logs they were interested in.  They

15  asked many different times for certain logs.  Judge van Keulen

16  evaluated their arguments and ultimately denied their request

17  for an overbroad sampling of source code from Google's system.

18     This specific log, as soon as Google was made aware of it,

19  it was disclosed.  Google has already been sanctioned, and the

20  prejudice through the order has been cured.

21     Plaintiffs were given an opportunity to review the

22  underlying source code.  For the same log, the one log that is

23  in dispute now, plaintiffs have had a chance to look at the

24  source code and depose Google's expert on it and what the log

25  logic does and does not show, whether joining does or does not

1   exist in the form Dr. Hochman contends.

2       The testimony from Dr. Psounis on this point could not be

3   clearer, Your Honor.  There is no open question or outstanding

4   issue as to whether Dr. Psounis has reviewed the source code,

5   whether plaintiffs have had an opportunity to review the source

6   code, and --

7       **THE COURT:**  Where does it say in here -- all this says

8   in paragraph 50 is what he -- is that he examined a particular

9   source code file.  It doesn't identify or indicate that he's

10  looked at all files relating to the joining of authenticated or

11  unauthenticated data.

12      **MS. CRAWFORD:**  This is the log that plaintiff contends

13  contains the joined non-private browsing data or regular-mode

14  data and private browsing data.  That is the assertion from

15  their expert, Mr. Hochman, which is why we are limiting our

16  discussion to this particular log.

17      **THE COURT:**  Where is Hochman's -- in what paragraphs

18  of his report does he reference the SOQS log?

19      **MR. MCGEE:**  I apologize, Your Honor.  I'm pulling that

20  up.

21      As I'm going back, I think it was paragraph 43.  It was

22  the log that we were talking about.

23      **THE COURT:**  Is it the same log that's referenced in

24  paragraph 50?

25      **MR. MCGEE:**  Sorry.  One moment, Your Honor.

1          **MS. CRAWFORD:**  Yes, Your Honor.

2          **MR. MCGEE:**  I believe so.  Yes, Judge.

3          **THE COURT:**  So you want to give your expert -- your

4     expert wants to give his view of what the SOQS log means, and

5     your motion seeks to preclude Google from having their expert

6     provide an alternative interpretation?

7          **MR. MCGEE:**  I think, Judge, that their expert would

8     provide -- again, this vocabulary issue -- is Mr. Hochman is

9     going to say is joined because authenticated and

10    unauthenticated data are in the same place.  Their expert is

11    going to say it's not on the same lines.

12         **THE COURT:**  Okay.  So what's the problem?

13         **MR. MCGEE:**  Well, they're now going to bolster that

14    with the non-public source code --

15         **THE COURT:**  Hold on.  That's -- I want to make sure

16    that I'm understanding the -- the code that is -- that is being

17    referenced.  So there is a source code file called, for our

18    purposes, the SOQS log; correct?

19         **MR. MAO:**  Yes, Your Honor.  I'm standing in because I

20    handled this from the beginning to the end.

21         **THE COURT:**  That's fine.

22      So the SOQS log, Hochman has an opinion about what it

23    does, and that's in paragraph 43 of his report.

24         **MR. MAO:**  We -- we -- that is correct, Your Honor, but

25    we felt like we had to because it was proffered for the first

1    time after repeatedly being denied that since 2021.  I have a

2    record on this.

3            THE COURT:  Let me ask this question.

4            MR. MAO:  Yes.

5            THE COURT:  Can the -- can the -- I don't know what

6    you mean by you felt like you had to.  This is -- as I

7    understand it, paragraphs 50 through 61 is a rebuttal to

8    paragraph 43.

9            MR. MAO:  If I may just take a step back, it will

10   literally just take a minute.

11       We asked at the onset, okay, whether or not they joined

12   data, and the representation from Google was that they did not.

13       When counsel is referring to our requesting -- not having

14   requested specific logs, it needs to be clear that the log at

15   issue was never disclosed at that point until after the

16   sanctions.

17           THE COURT:  But as I understand it, their position

18   remains consistent, that is, that even though you have this log

19   and it has been produced, it is still their position that it is

20   not joined, that the data is not joined.  That's still their

21   position.

22           MR. MAO:  That's right, Your Honor.  But that's not a

23   rebuttal.  This is actually an affirmative proof they're trying

24   to use to offer to show that it's not joined.  It's selective.

25           THE COURT:  It's a different interpretation of the

1   log.

2       **MR. MAO:**  But, Your Honor, if that is throughout the

3   entire system, why didn't they produce them in the first place

4   when we asked for the source code?  They cannot -- they cannot

5   selectively pick --

6       **THE COURT:**  Why does -- how --

7       **MR. MAO:**  It --

8       **THE COURT:**  It's just -- I --

9       **MR. MAO:**  I understand.

10      **THE COURT:**  Big picture.

11      **MR. MAO:**  Yes, Your Honor.

12      **THE COURT:**  If the SOQS log does not join, from their

13  perspective, how is it evidence of code that joins?

14      **MR. BOIES:**  Can I try, Your Honor?

15      **THE COURT:**  You can.  I don't think I'm that dumb.

16      **MR. BOIES:**  You're not.  You're not at all.  And I

17  think we're -- we're being confusing, I think.

18     Our expert says that this log demonstrates joining.

19      **THE COURT:**  Right.

20      **MR. BOIES:**  They say it doesn't, and I agree with

21  Your Honor, that that's rebuttal.  Okay?

22     Our expert, in reaching that conclusion, did not rely on

23  the source code because we didn't have it, and we didn't have

24  access to it.  Their expert now, in addition to rebutting our

25  expert based on what we had available, says, "I want" --

1    **THE COURT:**  So this source code file, the SOQS log, is

2 a public file?

3    **MR. MAO:**  No, Your Honor.

4    **MR. BOIES:**  No.  It's not a public file.  What we

5 had -- what our expert did was without the source code, because

6 we didn't have the source code, did an analysis that leads our

7 expert to conclude that they do join the -- they do join the

8 data.

9    Their expert disagrees, and to the extent that their

10 expert is relying on stuff that we had access to in terms of

11 the discovery, that's fair game.

12    What their expert is now doing is saying, *I've looked at*

13 *the source code and that source code,* which we did not have

14 access to during the discovery period, *demonstrates that I'm*

15 *right and that source code -- that is not all the source code.*

16 *The* -- *what we have is the source code that* --

17    **THE COURT:**  What did your expert's position -- if your

18 expert's position with respect to the joining, as identified in

19 the logs, isn't based on the SOQS log, what is it based on?

20    **MR. MAO:**  It's based on -- sorry, Your Honor.  Mr. Mao

21 here.

22    It's based on the fact that when you look at the data in

23 the log itself, the output.  Without having to resort to the

24 algorithm or the source code, you can see the unauthenticated

25 and authenticated sitting together in the same log.

1        **THE COURT:**  I see.

2        **MR. MAO:**  And then Google is coming around and saying,

3    *Well, you haven't seen the source code*.  Our response is, well,

4    back in November 4, 2021, Your Honor -- this is on the record

5    in front of the magistrate judge -- I myself specifically asked

6    opposing counsel "with regard" -- and as I'm quoting now.

7        "With regard to Google's allegation that they don't

8    join" -- and I note, Your Honor, that some they don't join,

9    some could be setting that aside, the fact that they do, under

10   this service, we believe that's something we can prove and

11   shift the burden to Google in terms of documentation and then

12   it's incumbent on Google to prove that they don't do that.

13       How are they going to do that if they don't prove this is

14   the source code, your Honor, because the one thing that should

15   be undisputed in terms of what the code does is being able to

16   inspect to see if it does A or it does not do A.

17       This is November 4th, 2021, pages 23 to 24.  Just so you

18   know, Your Honor, I pointed this out to opposing counsel before

19   we came up to make additional representations during the

20   recess.  Okay.

21       So as you can see, Your Honor, we asked them to do that

22   almost three years ago now.  For them to --

23       **THE COURT:**  Okay.

24       **MR. MAO:**  I made my point.

25       And that illustrates, Your Honor, that we did not have to

1    rely on the source code; instead, they were trying to use that

2    affirmatively.

3         **THE COURT:**  I see.

4         **MS. CRAWFORD:**  Your Honor, if I may, Your Honor, just

5    to correct the record, Mr. Boies referenced plaintiffs not

6    having access to the source code.  I think the record is clear

7    and maybe he ultimately clarified that he was referring to the

8    during the course of discovery, but the log at issue has been

9    examined by plaintiffs.  They've looked at it.

10        **THE COURT:**  Yeah.  But that's all recent and as a

11   result of sanctions orders.

12        Why didn't -- why didn't -- why wasn't the SOQS log

13   produced in 2021 after the December-- after the November 4th

14   hearing?

15        **MS. CRAWFORD:**  My understanding is that we were not

16   aware of it, Your Honor, and as soon as we became --

17        **THE COURT:**  Who is "we"?  The lawyers or Google?

18        **MS. CRAWFORD:**  I would have to confer --

19        **THE COURT:**  Google is the party, not the lawyers.  So

20   you may not have been aware of it, but that doesn't mean that

21   Google is not aware of it.  You can't say that Google is not

22   aware of its own source code.

23        **MR. BROOME:**  No.  We can't make that statement

24   obviously, Your Honor.

25        Google has thousands of logs and thousands of employees,

and in this process what happened is we -- we belatedly
produced these logs.  We located them, we identified them, and
then we produced them.

        **THE COURT:**  Fifteen months later.

        **MR. BROOME:**  I agree it was late, and we were
sanctioned for that.  Judge van --

        **THE COURT:**  So you are all clear that in November of
'21, the issue was -- the specific issue was raised about the
specific source code which would be necessary and that -- or
any source code to address this issue, which is a specific
issue, and that wasn't produced until 2023.

        **MR. BROOME:**  No.  I don't believe that's accurate,
Your Honor.  I think we're talking about just one particular
log here of many that were -- many logs were produced, and
these particular logs were produced late.

        There were two sanctions proceedings and two sanctions
orders.  The -- the -- this log was identified.  Then we had
some discovery on it.  We had expert declarations on it.  Our
expert got to look at the source code for this particular log
and theirs did.  Then we had further sanctions proceedings, and
Judge van Keulen looked at the entire record, and she said,
*What is the appropriate sanction to cure the prejudice suffered
by plaintiffs*?  She then issued an order or -- she amended her
prior sanctions order to address this very prejudice.

        And so from our perspective, we agree that -- we

1    acknowledge that these logs were produced late, but we've been

2    sanctioned for them, and we can live with that.

3        But this would go further because the point of the trial

4    is to get to the truth, and we think that what plaintiffs are

5    arguing is extremely misleading.  And if we are not allowed --

6    if our expert is not allowed to respond by pointing to how the

7    log at issue is actually designed to keep this data segregated,

8    that would be unduly prejudicial.

9        **THE COURT:**  I understand.

10       Anything else and we'll move on?

11       **MR. MCGEE:**  Your Honor, just -- I have nothing

12   further, Judge.

13       **THE COURT:**  All right.

14       The Motion in Limine No. 2.

15       **THE COURT:**  All right.  This goes to the consent

16   issue, which we started addressing earlier.

17       **MS. BONN:**  Yes, Your Honor.

18       **THE COURT:**  So consent, again -- I don't -- the fact

19   that it might be relevant to injunctive relief isn't relevant

20   to a jury trial, so that's one issue.

21       Does everybody agree that just because it's relevant --

22           (Whereupon, the Zoom proceedings froze)

23       **THE COURT:**  And I have -- so I have up until "does

24   everybody" -- I'm at line 24.  Let's see if it goes.

25       Okay.  So the issue of consent is relevant to the

individual claims; correct?

     **MS. BONN:**  Correct.

     **THE COURT:**  And if the issue of consent is relevant to the individual claims, then express and/or implied is relevant. So they're individual claims.

     **MS. BONN:**  Potentially.  And what our issue is, Your Honor --

     **THE COURT:**  You have asked me to exclude, quote, all evidence and argument regarding implied consent at trial. That's what you've asked.

     **MS. BONN:**  I want to correct that.  What we're asking -- look, I have no problem.  If they want to show a plaintiff a document and say, "I'm showing you an article. Have you seen" --

     **THE COURT:**  I need to know --

     **MS. BONN:**  Yes.

     **THE COURT:**  I need to know a succinct statement of what you're asking for.

     **MS. BONN:**  Material such as news articles or developer tools that perhaps absent class members may have seen but these plaintiffs didn't.  That's really the issue.

    I have no problem if Google wants to ask each plaintiff, "Have you seen this article?  Have you used a developer tool? Did you know about this?"  But then to say --

     **THE COURT:**  Well, if they don't have any foundation

1   for the question, it's a waste of time.

2           **MS. BONN:**  Exactly.  That's our point.

3       But our understanding is they want to say whether our

4   plaintiff saw it or not.  We can be like it was out there in

5   the ether.  Someone might have seen it.  Some absent class

6   members might have seen it.  That's the issue we have.

7           **THE COURT:**  Okay.  A response.

8           **MR. MARGOLIES:**  The primary purpose for which we would

9   want this evidence before a jury is exactly what we've just

10  discussed, to show it to plaintiffs, to confirm whether or not

11  they've seen it --

12          **THE COURT:**  You -- so if there is a news article and

13  you show that news article to a plaintiff and ask them whether

14  they recognize it, and the answer to the question is no, the

15  examination is over and the exhibit does not come in, because

16  there is no foundation that has been laid for the exhibit to

17  come in, plus it's hearsay.

18      So you'd have to address that, in any event.  But you

19  don't get to just say because it's in the either, it's

20  admitted.

21          **MR. MARGOLIES:**  Understood, Your Honor.

22          **THE COURT:**  Okay.  So what's the issue?

23          **MS. BONN:**  No remaining issue from our perspective.

24          **THE COURT:**  Why do I have the motion then?

25          **MS. BONN:**  Because our understanding is they still

1  wanted to put it out there as it's in the ether.  Our

2  understanding is regardless of whether a plaintiff had seen

3  it --

4          **THE COURT:**  The rules of evidence apply.

5          **MS. BONN:**  Thank you.

6          **MR. MARGOLIES:**  Thank you, Your Honor.

7          **THE COURT:**  But the motion is -- is denied because as

8  it stands, it says it seeks to exclude all evidence of implied

9  consent, which is inappropriate.

10          **MS. BONN:**  Correct.  And we apologize to the extent

11  that was not clear, Your Honor.  Thank you.

12          **THE COURT:**  No. 3.

13          **MR. REBLITZ-RICHARDSON:**  For plaintiffs, Beko

14  Reblitz-Richardson.

15          **MR. BROOME:**  For Google, Stephen Broome.

16          **THE COURT:**  Okay.

17      And I don't, just so that you know, Pam, I don't have

18  realtime.  So -- okay.  I missed your name.

19          **MR. REBLITZ-RICHARDSON:**  Reblitz-Richardson is the

20  last name.

21          **THE COURT:**  Okay.  Thank you.

22      Okay.  No. 3.  So no one is going to talk about the Court.

23          **MR. BROOME:**  We have made that clear in our brief,

24  Your Honor.  We will stipulate that we have no -- I think we

25  already did stipulate that we have no intentions of bringing

1    the Court into this.

2         **THE COURT:**  So that's granted.

3         No one is going to attack the lawyers for what the lawyers

4    do.  It's granted as to the lawyers.

5         With respect to plaintiffs' experts, I mean, any witness

6    who talks -- who testifies, they're fair game.  I mean, look, I

7    had Tim Sweeney who admitted to using an iPhone and he was

8    suing Apple.  It's fair game.

9         **MR. REBLITZ-RICHARDSON:**  We understand, Your Honor.

10   We -- we moved because we thought it would be a distraction,

11   but we understand the Court's direction.

12        **THE COURT:**  Okay.  So anything else left in this one?

13        **MR. BROOME:**  Your Honor, I just -- with respect to the

14   lawyers, I understand your position, but we do think it's

15   fundamentally unfair for the lawyers to be standing up in front

16   of the jury, pounding the lectern saying, "Google is engaged in

17   unlawful voyeurism and then at the same time using these exact

18   same services that they claim are improperly sending the data

19   to --

20        **THE COURT:**  You know, we all do things that have

21   risks.

22        **MR. BROOME:**  Yes, but those risks --

23        **THE COURT:**  It's the nature of the game.

24        **MR. BROOME:**  But those risks should be exposed here.

25        **THE COURT:**  I'm not having you attack the lawyers.

1    I'm not going to to let them attack you and you're not going to

2    attack them.

3              **MR. BROOME:**  Understood.

4              **THE COURT:**  Granted in part, denied in part.

5         Next one, MIL 4.

6              **MR. SILA:**  This is Ryan Sila for the plaintiffs.

7              **MR. BROOME:**  And, again, Stephen Broome for Google.

8              **THE COURT:**  Okay.  Okay.  This is a similar kind of

9    thing.  So plaintiffs' continued use of the browsing mode.  It

10   is what it is.  They're using it, then jury is entitled to know

11   that they're using it.

12             **MR. SILA:**  Understood, Your Honor.  And just to

13   clarify, I think really what we're worried about is arguments

14   of the continued use of private browsing modes undermines the

15   merits of plaintiffs' claims for monetary or injunctive relief.

16             **MR. BROOME:**  I could stipulate that we do definitely

17   intend to make those arguments.

18             **THE COURT:**  I'm sure you do.

19        Denied.  I mean it's -- it is -- it is -- it is both the

20   reason why -- why attacking some -- an entity like Google that

21   is ubiquitous and ever present is -- you know, in some ways,

22   it's hard to escape.  It cuts both ways.  And good trial

23   lawyers can turn that against the other side.  You just have to

24   figure out how to do it.  That's what good trial lawyers do.

25        It's denied.

1          **MR. BROOME:**  Thank you, Your Honor.

2          **THE COURT:**  No. 5 -- No. 5 all resolved right so

3     that's withdrawn?

4          **MR. BROOME:**  Yes, Your Honor.

5          **THE COURT:**  I need a "yes" from the plaintiffs.  Mr.--

6     all right.  Mr. Boies says "yes."

7          All right Google's No. 1.  Again, I think I already

8     addressed this.  No one talks about what the Court is doing.

9     So it is granted without prejudice to revisiting in a very

10    specific instance, if necessary, where I can micromanage how it

11    comes in.

12         No. 2, all right.  There are a couple of problems with

13    this.  No. 2 is really three motions.  You've got motions to

14    exclude three different sets of documents, all of which haven't

15    even been discussed.  I would just -- I would just deny it on

16    the fact that it's not -- it was procedurally improper, but

17    let's see what we can do with it.

18         You have 52 documents, 52 exhibits of which you attach a

19    list.  I don't even have them so I don't know how I'm supposed

20    to deal with it given that you didn't give them to me.

21         **MS. TREBICKA:**  We can cure that, Your Honor.

22         **THE COURT:**  It's a little late.

23         **MS. TREBICKA:**  We can cure it by the end of the day.

24         **THE COURT:**  We are here right now.

25         **MS. TREBICKA:**  Understood, Your Honor.

1          **THE COURT:**  And I need names for the record.

2          **MR. SILA:**  This is Ryan Sila again for the plaintiffs.

3          **THE COURT:**  I have Ms. Trebicka, who --

4          **MS. TREBICKA:**  Yes, Your Honor.  Viola Trebicka for

5    Google.

6          **THE COURT:**  All right.

7       So on the issue of damages, what are the individuals'

8    damages?  And do you have an expert who's opining on unjust

9    enrichment?

10         **MR. SILA:**  We do, Your Honor.  We have a damages

11   expert who will be offering an opinion as to the individual

12   plaintiffs' damages in the form of a market-based measure.  I'm

13   sorry.  I don't have the exact number off the top of my head.

14         **THE COURT:**  Who is the expert?

15         **MR. SILA:**  Michael Lasinski.

16         **THE COURT:**  Michael --

17         **MR. SILA:**  Michael Lasinski, L-A-S-I-N-S-K-I.

18      His opinions were the subject of a previous *Daubert* that

19   Your Honor denied in connection with the class cert order.

20         **THE COURT:**  Okay.  So you have his opinion.

21      The 52 exhibits that are referenced but not discussed,

22   according to the plaintiffs, these not only -- focus on other

23   issues regarding Google's misconduct, not just specific to

24   damages.  I can't tell because no one gave me the documents.

25      So I'm not exactly sure -- you're moving to exclude all

1   evidence and argument regarding classwide damages numbers.

2       Is there an objection to that?  Class damages isn't

3   relevant here.

4           **MR. SILA:**  There is, Your Honor.  And to be clear,

5   we're not seeking classwide damages for, but for purposes of

6   our privacy tort claims, one of the elements is whether the

7   conduct is highly offensive and the amount of injury caused by

8   Google's practice of collecting private browsing data, and the

9   amount of Google's profit that it earned from doing so is

10  relevant to the offensiveness inquiry, to the extent of the

11  intrusion, to Google's motives and objectives, that kind of

12  thing.

13          **THE COURT:**  Okay.  How are the methodologies, inputs,

14  and financials relevant to that?

15          **MR. SILA:**  So those really aren't, but the

16  methodologies that Mr. Lasinski uses to calculate individual's

17  unjust enrichment are the same inputs, methodologies, and

18  financial information.  It kind of all flows down -- it's kind

19  of a top-down analysis, so for those reasons, we think those

20  pieces of information, which aren't clearly described in the

21  motion in the first place, should not be excluded.

22          **THE COURT:**  Which documents specifically refer to this

23  first category?

24          **MS. TREBICKA:**  Your Honor, so what we're -- can I back

25  up and just respond to a couple of things opposing counsel

said?

Yes, Your Honor.  The documents listed in Mr. Fortenbery's declaration are documents that contain classwide damages financials or numbers.  These are hundred-million-dollar numbers or billion-dollar numbers.  Those are the references that we're trying to exclude.

We can have annotated versions of those to Your Honor so that you can review, but we think that this outcome is very much consistent with Your Honor's prior ruling that the trial will be bifurcated, that punitive damages and financials related to punitive damages will be dealt with in a separate phase of the trial.

Again, it's a technicality.  I apologize that we cannot submit the actual documents, but we can cure that by the end of the day.

**MR. SILA:**  If I can respond just on the punitive damages point, Your Honor.

We're certainly not seeking to introduce in the initial phase of the trial Google -- evidence of Google's total financial revenues.  That's not -- we're not offering that for purposes of trying to prove punitives in the first phase or anything like that.

Really what we're trying to do is introduce the evidence, both to show that Google's conduct was highly offensive and to prove up our unjust enrichment calculations.

1          **MS. TREBICKA:**  May I respond, your Honor?

2          **THE COURT:**  You can, because you're seeking to exclude

3     evidence of one of their claims that is still in the case.

4          **MS. TREBICKA:**  No, Your Honor.

5       First off, the documents that we have highlighted here --

6          **THE COURT:**  I thought that the unjust enrichment was

7     still in the case.  Is --

8          **MR. SILA:**  It is.

9          **MS. TREBICKA:**  It's not a claim, Your Honor.  It's a

10    remedy.  It's a damages remedy.

11         **THE COURT:**  Isn't it still in the case?

12         **MS. TREBICKA:**  As a remedy, it is.  We don't believe

13    that it applies to any of the claims.  It is a damages theory

14    that we dispute is -- is relevant to any of their claims.

15      But separately from that, Your Honor --

16         **THE COURT:**  Where is the motion on unjust enrichment

17    being irrelevant to the trial?  Where is that motion?

18         **MS. TREBICKA:**  Your Honor, that is something that we

19    are prepared to discuss in the context of the jury

20    instructions.  We have briefed that issue in the jury

21    instruction document.

22         **THE COURT:**  Another -- the two of you -- another

23    back-door approach to getting another issue briefed.

24         **MS. TREBICKA:**  Your Honor, may I just address the

25    issue here, though, which is very specific to large dollar

1    values --

2            THE COURT:  Do you not -- what is Google's worth these

3    days?  What is Google's worth these days?  Billions?

4            MS. TREBICKA:  I don't know, Your Honor, but it's a

5    public -- it's a matter of public record.

6            THE COURT:  Exactly.  You think that they don't know

7    that it is -- that this company makes billions of dollars?

8            MS. TREBICKA:  The issue is different, Your Honor,

9    though.  It's not about the trillion-dollar net worth or

10   whatever it is.  It's about them trying to use documents and

11   numbers that specifically relate to their claimed harm to the

12   class.  And they plan to use those documents that --

13           THE COURT:  Well, again --

14           MS. TREBICKA:  The claimed harm to the class --

15           THE COURT:  This was filed October 17th, and you make

16   an argument and I see nothing attached.

17           MS. TREBICKA:  Your Honor, with respect to the

18   admitted -- exhibits admitted, we apologize.  It was an

19   oversight, and as I said, we can cure that by the end of the

20   day.

21           THE COURT:  Do you not understand we're here right

22   now?  It's -- this isn't the only case I have.  I have hundreds

23   of cases.  This is the time that I set aside to deal with this

24   case, and I prepped all of this stuff before walking in here.

25           MS. TREBICKA:  Your Honor, however, that does not

1   detract from the main point of that first section of the brief,

2   which is that these are eye-popping numbers that relate to the

3   class.

4          **THE COURT:**  So -- all right.  Somebody give me --

5   somebody give me one example --

6          **MS. TREBICKA:**  Yes, Your Honor.

7          **THE COURT:**  -- of what you're talking about.

8          **MS. TREBICKA:**  I can give you an example, Your Honor.

9   I apologize that the actual numbers are sealed --

10         **THE COURT:**  I need --

11         **MS. TREBICKA:**  I can --

12         **THE COURT:**  And I need to see something.  Can someone

13  send me -- give me a document, anything?

14         **MS. TREBICKA:**  Yes.

15         **MR. SILA:**  Your Honor, these numbers are going to be

16  found in Mr. Lasinski's expert report which is Tab 15 of Volume

17  2 of your binder.

18         **THE COURT:**  What page?

19         **MR. SILA:**  Just a moment.  I think probably the best

20  place to look is going to be -- well, for one such example,

21  Figure 71, which is on page 78.

22         **THE COURT:**  Okay.  I don't anticipate having -- well,

23  I want to come back to this one.

24         **MR. SILA:**  If I may -- just one moment about the

25  relevance of this figure, it might be helpful --

1              **THE COURT:**  It's not.

2              **MR. SILA:**  Okay.  Thank you.

3              **THE COURT:**  And -- yeah.  I'm not prepared to rule on

4       this.

5          Next one, MIL 3.

6              **MR. FRAWLEY:**  Alexander Frawley for the plaintiffs.

7              **MS. CRAWFORD:**  Jomaire Crawford for Google.

8              **THE COURT:**  Okay.  Another 104 exhibits, and actually,

9       Mr. Beko [sic], my apologies.  This is the one that was put

10      into three buckets that weren't discussed.  This one, though,

11      too, I don't have any of the documents.

12          So, you're seeking to exclude three different things, all

13      in the context of one motion, so pick one.  The other two are

14      deemed withdrawn.  You need to follow the rules.

15             **MS. CRAWFORD:**  Understood, Your Honor.  And apologies

16      for that.

17          Of the three categories --

18             **THE COURT:**  I don't need apologies.  I need you all to

19      follow the rules.

20             **MS. CRAWFORD:**  We will, Your Honor.

21             **THE COURT:**  What are you withdrawing?

22             **MS. CRAWFORD:**  Non-browser --

23             **THE COURT:**  You have three different issues --

24             **MS. CRAWFORD:**  Yes.

25             **THE COURT:**  Litigation and regulations not at issue in

1    this litigation; non-browser applications or practices

2    expressly excluded from plaintiffs' allegations; and features

3    that Google considered but never implemented.

4         **MS. CRAWFORD:**  We're looking to preserve the first

5    category, Your Honor, irrelevant foreign and domestic

6    investigations in litigation, and withdraw the other two,

7    non-browser products and signed-in users and features that were

8    never implemented.

9         **THE COURT:**  Okay.

10        So what does other litigations and regulations have to do

11   with any of this?

12        **MR. FRAWLEY:**  I think -- I'm not sure -- so this is --

13   hopefully only now we're talking about three exhibits on our

14   exhibit list.  I don't think any of these documents, these

15   three exhibits, fit into that category.  I can just tell that

16   you Exhibit 708 --

17        **THE COURT:**  I don't know --

18        **MR. FRAWLEY:**  Yeah.  Sure, Your Honor.  Well, I'll

19   just tell you that one of these exhibits --

20        **THE COURT:**  I asked about the topic.

21        **MR. FRAWLEY:**  Oh.

22        **THE COURT:**  Why -- we are litigating this particular

23   case, which is already complicated enough.  Why should there be

24   evidence of other litigation.

25        **MR. FRAWLEY:**  I -- there might not -- arguably there

1    shouldn't be, but that's not what these documents they're

2    seeking to exclude are.

3           **THE COURT:**  That's what the motion seeks to exclude.

4           **MR. FRAWLEY:**  And consistent with your standing

5    overred, they haven't attached them, but they've said *these are*

6    *the three exhibits we're talking about,* and I don't think those

7    three exhibits are -- I don't know what is an accurate way to

8    describe those exhibits.

9           **THE COURT:**  What are the exhibit numbers?

10          **MR. FRAWLEY:**  So they say it's Exhibit 61, 380, and

11   708, and I can appreciate you don't have them.

12          **THE COURT:**  61 is what?

13          **MR. FRAWLEY:**  That's an email among Google employees.

14   They're addressing some concerns that they have about Google's

15   retention of data, and they're doing so in the context of

16   thinking about the Chinese government.  I don't believe there's

17   an investigation or a proceeding or anything like that.

18   They're just talking about what might happen to data that's

19   stored in Google's logs in the context of what the Chinese

20   government could do.

21          **THE COURT:**  A response.

22          **MS. CRAWFORD:**  Insofar as plaintiffs seek to --

23          **THE COURT:**  61.  I want a response on 61.

24          **MS. CRAWFORD:**  Yes.

25       Insofar as plaintiffs seek to argue using emails about

1    conversations that -- about Google data that applied to

2    non-U.S. users, so users that would be outside of the purported

3    class here, our view is that those documents, because they

4    reference extraterritorial users and perhaps regulations that

5    apply or govern the use of such data, is irrelevant and runs

6    the risk of jury confusion, among other things.

7        **THE COURT:**  I am going to look at these documents and

8    that's -- this is your opportunity.  That's all you want to say

9    on this one document, 61?

10       **MS. CRAWFORD:**  Yes.  That is an email chain, as

11   Mr. Frawley represented, discussing home for users located in

12   China.  Again, to the extent there is argument about any

13   foreign investigation or regulations that govern the use of

14   Google data, user data, and that's what the email is describing

15   or discussing, those are the categories of both arguments and

16   documents that we will be seeking to exclude.

17       **THE COURT:**  And the relevance is?

18       **MR. FRAWLEY:**  For 61, Your Honor, at least two

19   reasons.

20       **THE COURT:**  Yes.

21       **MR. FRAWLEY:**  One is when we think about the

22   offensiveness of what's happening, that Google employees are

23   admitting that the data is stored in a way that it could be

24   used to harm users, and in this case, they were thinking about

25   the Chinese government, but we don't see why that wouldn't

1    apply to the United States government potentially or anybody

2    who got ahold of this kind of data.  That's one reason.

3        And number two is this notion of joining and joinability.

4    I don't want to go too far into it.  It's actually the next

5    motion, and you've heard a lot about it already.

6        But to the extent that employees are concerned about,

7    well, is this data that we're storing going to be tied to a

8    user, can it be tied, is it tied, and they're grappling with

9    these problems, it's --

10            **THE COURT:**  How do you intend to get this document in?

11            **MR. FRAWLEY:**  I actually, Your Honor, believe --

12   someone can correct me if I'm wrong -- but I believe

13   Mr. Lemoine is on this email chain, so he's potentially one

14   way.  And I can't -- I'm sorry, Your Honor -- remember which

15   other sponsoring witnesses we put, but I believe Mr. Lemoine

16   was at least a sponsoring witness and there might be more.

17            **MS. CRAWFORD:**  And if I may just add, Your Honor,

18   insofar as there is no nexus to U.S. users or U.S. laws that

19   would apply to again -- or govern the use of Google user data,

20   we contend that that would be extremely prejudicial.

21            **THE COURT:**  Docket 38 -- or document 380?

22            **MR. FRAWLEY:**  Should I start, Your Honor?

23            **THE COURT:**  What's the relevance?

24            **MR. FRAWLEY:**  Sure.  This one I want to point you -- I

25   understand you're going to review them -- to one portion of

1   this document, which you don't have yet but hopefully you can

2   take a look at when you get it, which is that it's a disclosure

3   that Google is providing to website publishers, and, yes, this

4   document is focusing in general on the GDPR, so I understand

5   Google's argument that that's potentially irrelevant.

6       But Google is making a representation to website

7   publishers in this document that users have control over their

8   data.  We think that's relevant to their website consent

9   argument because they've said that they're going to argue that

10  website were aware of and consented to Google's collection of

11  the at-issue data.

12      So we think any representation we made to websites that

13  users are, in fact --

14          **THE COURT:**  Slow down.

15          **MR. FRAWLEY:**  Sorry.

16      Any representation that Google makes to websites to the

17  effect of users have control, we think that -- we should be

18  allowed to use documents like that to rebut Google's argument

19  that the websites knew about this and consented.

20          **MS. CRAWFORD:**  If I may, Your Honor?

21          **THE COURT:**  Hold on.

22      Go ahead.

23          **MS. CRAWFORD:**  Plaintiffs have identified over 850

24  exhibits on the joint exhibit list as it currently stands.  The

25  relevance of this document, which on its face references and is

described as, quote, tools to help publishers comply with the

GDPR, there are several references in here to complying with

Europe's, quote, new general data protection regulation which

applies to users in the EEA and the UK, and it goes on to

continue to describing the GDPR.

Plaintiffs don't need this exhibit, which is focused on a

non-U.S. regulation, in order to make the point that

Mr. Frawley just articulated.  Of the 850 exhibits that

plaintiffs seek to introduce and put on the joint exhibit list,

there are others that do exactly what Mr. Frawley described.

Therefore, this particular one, 7 -- 380, "tools to help

publishers comply with the GDPR," is unduly prejudicial and

risks confusing the jury or confusion of the issues because the

GDPR is not at issue in this case.

**THE COURT:**  Any response?

**MR. FRAWLEY:**  Your Honor, I think if -- and I'd have

to go back to our exhibit list to review, but to the extent

Google is suggesting that well, maybe we can agree that you,

you know, will stipulate to admitting this document that's an

exchange between Google and publishers because that's an

existing point that you want to make, I think we should be open

to that kind of conversation.

But off the top of my head, I unfortunately am not aware

of a substitute document where I could comfortably say I agree

we don't need this one.

1          **THE COURT:**  Last one is 708.

2          **MR. FRAWLEY:**  This one, Your Honor, I hope can be

3    easy, and the reason is because on our exhibit list, we put

4    this one in the bucket of the injunctive relief only part of

5    the case.  So this -- this one, we would argue, would not be

6    going to the jury, and we might use it with Your Honor, and we

7    think that hopefully means we don't have to grapple with it

8    right now.

9          **MS. CRAWFORD:**  We're fine deferring a resolution of

10   that particular exhibit until that later stage in the case,

11   Your Honor.

12         **THE COURT:**  Okay.

13      Is there anything that needs to be said with respect to

14   the fourth motion in limine?  I mean, is it anything beyond the

15   arguments with respect to what we were talking about before?

16         **MS. TREBICKA:**  That's a great question, and I think it

17   really depends on, in part, the resolution to Plaintiffs'

18   Motion in Limine No. 1 because this is about joining of private

19   browsing data with users' identification.

20         **THE COURT:**  Isn't that the whole point?

21         **MS. TREBICKA:**  That is the whole point, Your Honor.

22         **THE COURT:**  So why would I exclude the whole point --

23   one of the main points of the trial?

24         **MS. TREBICKA:**  Your Honor, then we would submit to you

25   that at the very least, we be allowed to correct this --

1          **THE COURT:**  Okay.

2          **MS. TREBICKA:**  -- mistaken --

3          **THE COURT:**  It sounds like it's the exact same issue

4     that we had a ton of argument on.

5          **MS. TREBICKA:**  No disagreement there, Your Honor, but

6     this is another way to get at the issue of Google needing to be

7     allowed, for due process purposes, to refer to the source code

8     so that it can correct a misstatement.

9          **THE COURT:**  You know, companies have to remember that

10    they have obligations, and I will go back and I will check, and

11    I'm checking with Judge van Keulen.

12         I had a company that failed to do what they were supposed

13    to do under the code.  It was a class action trial.  And at the

14    last minute, when they were getting ready for trial, they all

15    of a sudden had evidence to suggest that they were complying

16    with the law.

17         Case went to trial.  The evidence was excluded, as it was

18    properly excluded for failure to disclose.  And the jury

19    awarded statutory damages in the amount of $278 million.  It

20    was a TCPA case, of all kinds of cases.  TCPA, $278 million,

21    affirmed on appeal.

22         You have obligations.

23         **MR. FRAWLEY:**  May I make one brief point, Your Honor,

24    about this one?

25              **THE COURT:**  No.

1      Next motion, Google's last motion, for bifurcating

2   punitive damages.  I already granted that.

3           MS. TREBICKA:  Thank you, Your Honor.

4           THE COURT:  All right.

5      Before I forget, I take it -- I do not need 50 boxes of

6   documents with all your exhibits.  So tell me what you're

7   thinking in terms of examinations.  Are you going to have

8   witness binders?  Is that what you're going to do with the

9   exhibits that you're using with respect to each individual

10  witness?  Is that the plan?

11          MR. MAO:  Your Honor, if we may real quickly on the

12  last one, bifurcation, that motion was not entirely a

13  bifurcation motion.  It was partially a motion to exclude

14  evidence as well.  And it was wrapped up in the motion that you

15  previously heard on -- I think essentially -- I don't remember

16  the title of it but the financial condition.  Okay?  It

17  basically was the same motion rewrapped as a motion for

18  bifurcation.

19     So I just want to make sure that when you say you grant

20  it, you grant it as in a bifurcation but not necessarily the

21  evidentiary things that they've listed in that motion to be --

22          THE COURT:  Let me check.

23          MR. MCGEE:  And, Your Honor, this is Ryan McGee again.

24     We filed our opposition last night.  I know that Google is

25  a bit delayed in filing that motion for bifurcation.

1          **THE COURT:**  So I did not look at everything that was

2    filed last night.

3          **MR. MCGEE:**  I understand, Your Honor.  And I can

4    represent that we suggested an alternative that I believe is

5    what you articulated this morning.

6          **THE COURT:**  Let me -- let me get the motion.

7       By the way, why was it filed so late, Mr. Shapiro?

8          **MR. SHAPIRO:**  This was the other side's opposition

9    that was filed last night, Your Honor.

10          **THE COURT:**  The motion was timely filed?

11          **MR. SHAPIRO:**  I believe so, yes.

12          **MR. MCGEE:**  We suggest no, Your Honor.  And we point

13    out in our response that in your pretrial statement, you

14    require in Section H the parties to discuss bifurcation, and

15    that was not discussed by Google, and a month later they filed

16    their motion for bifurcation.

17       We have a physical copy --

18          **THE COURT:**  Folks, I'm just pulling up your docket.

19          **MR. MCGEE:**  I can give you a paper copy if it's

20    helpful, Judge.

21          **THE COURT:**  Okay.

22          **MR. MCGEE:**  May I approach?

23          **THE COURT:**  No.  Just give it to Mr. Cuenco.

24          **MR. SHAPIRO:**  Your Honor, A, my understanding -- but

25    maybe I'm wrong.  My understanding is we did, in our pretrial

1    statement in the section asking about whether we were seeking

2    bifurcation -- we did identify this.  We have not yet -- we got

3    the other side's brief last night, late last night, and we have

4    not filed our reply, but we read it.

5        **THE COURT:**  My question was there -- pretrial motions

6    are on a schedule.  Failing to call something a motion in

7    limine when it's a motion to exclude evidence of punitive

8    damages is, in fact, a motion in limine.  Calling it something

9    else doesn't change what its fundamental nature is.  As they

10   say, a rose by any other name is still a rose.

11       **MR. SHAPIRO:**  This is -- I believe, Your Honor --

12   first of all I have to correct myself.  I guess we did not --

13       **THE COURT:**  This was filed November 14th --

14       **MR. SHAPIRO:**  But this is, for all purposes here, a

15   motion to bifurcate.  The very introduction, the first sentence

16   of our brief says -- so it's not a motion in limine.  I'm not

17   sure what evidence they are referring to.  It says, "Google

18   respectfully asks the Court to bifurcate the trial in this case

19   into two phases."

20       **THE COURT:**  Okay.  Hold on.  Let me get it.

21       Did you do a proposed form of order?  Yes, did you.  Let

22   me look at your order.

23       It is hereby -- you are asking me to bifurcate into two

24   phases, the first addressing liability and the second the

25   amount of damages.

1          **MR. SHAPIRO:**  Yeah.

2          **THE COURT:**  That's -- sounds like I dealt with that.

3     There's nothing else in the proposed order.

4          **MR. MCGEE:**  And, Your Honor, I believe you did deal

5     with it in our response.  We suggested the alternative.  How

6     you did deal with it this morning was bifurcation with

7     financials to be done with the punitive stage, but what they're

8     seeking to exclude touches on what Mr. Sila and Mr. Frawley

9     argued.  With the classwide damages and some other exhibits,

10    they're suggesting that should only come in when we're

11    discussing punitive damages.

12         So I think it goes a bit further than suggesting it's just

13    going to be how much is Google worth and how much can they pay.

14    It's also how much did they make, what are the classwide

15    damages.  Those are the issues that they're trying to exclude

16    from the trial through this motion.

17         If we have that wrong, we did propose in the alternative,

18    I think, what you granted this morning, that it would just be

19    this morning routine bifurcation that California and federal

20    courts engage in.

21         **MR. SHAPIRO:**  I don't think we have a real dispute

22    here, Your Honor.  I think the -- some questions about specific

23    evidence, I think, are before you, and you're going to be

24    deciding that under the classwide evidence motion that --

25    that's pending and that you're going to be deciding.

1    This motion that I'm reading here, which is Docket 1064,

2    all we ask is that liability and damages and entitlement be

3    tried in one phase and the amount of punitive damages be tried

4    in another phase.  I don't think that -- unless -- the

5    plaintiffs may be saying, *well, we need to right now decide*

6    *which types of evidence fall into phase one or phase two*.  I

7    think that will be much clearer after Your Honor rules on the

8    motion about classwide evidence.

9         **MR. BOIES:**  We agree, Your Honor.  We agree with that.

10        **THE COURT:**  I don't -- I'm not going to allow a reply

11   to be filed.  I don't need a reply.

12        **MR. MCGEE:**  Thank you, Your Honor, for the

13   clarification.

14        **THE COURT:**  Okay.

15   I asked a question about testimony.

16        **MS. MCCRACKEN:**  Yes, Your Honor.  We plan to provide

17   witness binders for each examination to the Court and

18   additional copies for The Court staff.

19        **THE COURT:**  Let's talk about the way you need to deal

20   with exhibits.  And I don't need them before the morning

21   because I'm not doing examinations.

22   So before each witness, you need to provide me with two

23   witness binders of your exhibits, one for me, one for my law

24   clerk.  That is different than what you need to provide to

25   Mr. Cuenco.

1    Mr. Cuenco is the custodian of all exhibits that have been

2    admitted into evidence.  What he needs from you is a -- just a

3    regular manila folder with the exhibit number and the exhibit

4    that has been admitted, and you give that to him, and he will

5    have a box, and he will collect in order anything that's been

6    admitted.  Don't give him anything that's not been admitted.

7    All right?

8        **MR. MAO:**  Understood, Your Honor.

9        **THE COURT:**  Each needs to be individually put in a

10   folder so we can make sure at the end of the trial that we have

11   everything that's been admitted.

12   That box of exhibits individually identified will go into

13   the jury room.  If there is something that is electronic, give

14   him the envelope with a sheet that says "electronic version

15   provided separately" or something to that effect so that the

16   jury knows, okay, if they're looking for that exhibit and they

17   look at the file folder, then they'll know *okay, we have to go*

18   *to the computer to find that particular exhibit*.  Okay?  Do

19   not -- do not bring in -- I don't need ten carts of documents.

20   Okay?

21       **MS. MCCRACKEN:**  Yes, Your Honor.

22   Would Your Honor prefer that we hand each individual

23   manila folder as the exhibits admitted in realtime or a

24   complete set of the folders at the close of --

25       **THE COURT:**  You won't know if I haven't admitted them

1   yet, so you can give them to him at the end of the day, unless

2   they're stipulated.  If you -- for instance, if you come in and

3   say *okay, for this witness, we've agreed on these ten*, then you

4   can hand him the ten, and ultimately I still need to decide

5   whether I admit them or not.  Just because you stipulate does

6   not mean they come in.  It probably will mean that they come

7   in, but it doesn't mean that they come in until I say that they

8   come in.

9           **MS. MCCRACKEN:**  Yes, Your Honor.

10          **MR. MAO:**  Yes, Your Honor.

11          **THE COURT:**  All right.  Any questions on that?

12          **MR. MAO:**  No, Your Honor.

13          **MS. MCCRACKEN:**  No, Your Honor.

14          **THE COURT:**  All right.  I want to talk about some

15   legal issues with respect to your instructions.

16          **MR. MAO:**  Your Honor, just to explain a little bit,

17   Ms. Bonn and I divided up instructions, so we may both be up

18   here.

19          **THE COURT:**  Okay.  Our court reporter still needs to

20   know the plaintiffs' side.  She just can't see the other side.

21          **THE COURT REPORTER:**  I can see both sides now, Your

22   Honor.

23          **THE COURT:**  Oh, okay.  Great, Pam.

24          **MS. TREBICKA:**  This is Viola Trebicka for defendants.

25      Your Honor, we have split up our jury instructions, so

depending on the issue, it will either be myself or my

colleagues, Ms. Crystal Nix-Hines or Ms. Teuta Fani.

**THE COURT:**  Okay.  Thank you.  Okay.

Why is it that you all couldn't even agree on standard

non-substantive merit0based jury instructions?  And I'm looking

at the plaintiff because the defense offered a whole slew of

basic generic instructions to which you did not stipulate.

Why?

**MS. BONN:**  I believe on the -- on the standard Ninth

Circuit Pattern Instructions, we're fine with the content of

them.  We -- all we're saying is that some of them may or may

not be necessary.  If they're done in pretrial, you may not do

it in post or it may not become an issue during the trial.

That's all.  But we have no issue with that set in terms of the

former content.

**THE COURT:**  Where do you say that in your 500 pages?

**MS. BONN:**  Yes, Your Honor.

**THE COURT:**  I was doing a panel presentation, and --

actually for a class, and some of them, they were non-lawyers.

It was all about what Article III judges really do.  Some of

them were lawyers, some of them weren't, so I kind of gave them

an overview of what we do.

And one of them, who was a lawyer, said, "Judge, what do

we do when the judge comes in and they're just cranky right off

the bat?"  I said, "Well, maybe it's because of what you did

1  before the judge got on the bench that made them cranky, like

2  not agree to things that should be agreed to," and I'm supposed

3  to -- and I'm sitting here looking at you're disputing Jury

4  Instruction No. 2?

5       **MS. BONN:**  I understand, Your Honor.  So on page 39 of

6  Docket No. 1057, which is where that set of Ninth Circuit

7  Pattern Instructions come up, we say, "For the following

8  proposed instructions number through 16 to 0-34, plaintiffs do

9  not have any substantive objection; rather, plaintiffs believe

10 it may not be necessary to give these instructions at the end

11 of the trial, particularly if they've already been given at the

12 beginning."  That's it.

13     So I apologize if that was done in a way that I was not

14 clear.

15     **THE COURT:**  Let's see.  When was it done?  Here it was

16 done at the end of -- no.

17     How many pages do I have to go back?  There are eight

18 pages of pontification regarding discovery misconduct, and

19 somehow at the eighth page, there's not even a page break about

20 statements regarding general instructions.

21     I look at the index, and I see dispute, dispute, dispute,

22 dispute, dispute.  What does it mean when a judge sees a

23 dispute?  It means we're supposed to resolve them for you.

24     **MS. BONN:**  Understood, Your Honor.

25     **THE COURT:**  It's a really bad look.

1        **MS. BONN:**  Understood Your Honor.

2        **THE COURT:**   I give these instructions at the beginning

3   and I give them at the end.   That's the way I do it.   The

4   objections are overruled.

5        With respect to -- it appears as if -- okay.   Off the bat,

6   I am not your advocate, period.   You should never give me

7   anything that would suggest to the jury that I care one way or

8   the other who wins this case.   It is the jury's decision to

9   decide that.

10        So your statements frequently -- you know, that's why we

11   use models, because lawyers can't help themselves, and you

12   really should.   You can't help yourselves to somehow suggest

13   things should be in instructions that are merely a recitation

14   of your theory of the indication.

15        If by the end of two weeks they don't know what data we

16   are talking about, you have failed on both sides.   So why do I

17   need to explain that to them?

18        These are instructions for the end of the case, and you

19   think that they're not going to know what data we're talking

20   about?   So what are we going to call it?   I called it "at-issue

21   data" because that's the data that was at issue.   The point is

22   to try to get this to the jury packaged in a way where they can

23   make the decision.

24        So what are you going to call it at trial?   What are you

25   going to call it?

1      **MS. BONN:**  Plaintiffs -- it's been used throughout the

2 case -- have called it "private browser" or "private browsing

3 data" because you're in a private browsing mode.  So I just

4 think in practicality --

5      **THE COURT:**  That's what you are going to use?

6      **MS. BONN:**  That's what --

7      **THE COURT:**  And what are you going to use?

8      **MS. TREBICKA:**  Your Honor, the parties have called it

9 "at-issue data" throughout this case.  Private --

10     **THE COURT:**  Okay.  So look at what you're going to do.

11 You're going to rewrite this knowing that the other side is not

12 going to use the same term as you.  And I guarantee you that by

13 the end of the two weeks, they will know that you're not using

14 the same term.  But I'm not going to use your terms.  So figure

15 it out and rewrite it.

16     This is not a class action trial, and I am not inclined to

17 make it more complicated by suggesting that it is.

18     **MS. BONN:**  Yes, Your Honor.  I understand that.

19     One of the concerns that we have is that the reality of

20 our named plaintiffs' damage claims individually are like three

21 dollars a person, and I think that the jury is just going to be

22 confused and furious to be sitting here going *why are the*

23 *plaintiffs making us sit here in a jury box for a two-week*

24 *trial over a hundred dollars a plaintiff*, and I think that just

25 having -- we don't --

1          THE COURT:  So how are you going to answer that

2     question?

3          MS. BONN:  I think some context that they are also

4     issuing a finding that the Court will consider on behalf of the

5     class.  That's it.  We just want them to understand that what

6     they are finding matters not only for three dollars a plaintiff

7     or whatever it is, but the Court will take it into

8     consideration on behalf of the class as a whole.  That is, I

9     think, important context for the jury not to be left with this

10    total misimpression that their time is just being wasted on a

11    fool's errand over a hundred dollars in federal court.

12         THE COURT:  Response.

13         MS. NIX-HINES:  Thank you, Your Honor.

14         Well, first of all, we would be happy to stip to a hundred

15    dollars total damages if opposing counsel would like.

16         In all seriousness, Your Honor, I think in all the

17    instructions that are before you, this is the one that is most

18    prejudicial to Google.  There is absolutely no reason that

19    plaintiffs should be told anything about classwide damages.

20         They lost a damages class.  There is no reason that the

21    jury -- and you can hear it even in the way counsel has

22    described it, that they want to indicate to the jury that there

23    are, in fact, millions of people behind these five plaintiffs

24    that -- that are the only things that they are deciding.

25         And it would be extremely prejudicial to Google.  It would

1    convey that they've done something wrong, that there are a lot

2    of other people out there like the plaintiffs that have these

3    claims, and that is not, as Your Honor indicated this morning,

4    anything that the jury is going to be deciding.

5         And there is -- the probative value of that is minimal.

6    The prejudice is incalculable.

7         **MS. BONN:**  May I respond briefly on that?

8         The notion that the jury won't hear that Google's

9    practices affect millions of people is wrong on the merits

10   because some of our claims have an element that depends on

11   whether the conduct at issue is highly offense to a reasonable

12   person, and Google itself has taken the position that it

13   relates to whether it violates social norms.

14        So the notion that somehow the jury is going to be walled

15   off from the fact that Google wasn't simply cherrypicking these

16   five people and targeting them with Incognito collection, but,

17   rather, they engaged in a practice that led them to profit and

18   that actually that's why repeatedly they refused to make

19   changes to Incognito because within the company, there are

20   numerous documents -- and I'm thinking of one in particular

21   where Ms. Porter Felt said, "We received a directive not to

22   make any change to the Incognito language or otherwise that

23   could affect our revenue."

24        So the idea that somehow we can create a hermetically

25   sealed system where the jury is just only going to hear

1    evidence about these five people and not that it's a broader

2    practice is impractical.

3              MS. NIX-HINES:  Your Honor, if I may?

4              THE COURT:  Hold on.

5         There are liability issues with respect to punitives.

6              MS. BONN:  Yes.

7              THE COURT:  And that's Phase 1.

8              MS. BONN:  Yes.

9              THE COURT:  So why isn't that enough?  Why isn't that

10   enough?  They're obviously going to know you're not here for a

11   hundred dollars.

12        Respond.  Think about that.

13        A response.

14             MS. NIX-HINES:  Your Honor, I agree with that totally.

15        And also, you know, if you look at the language of the

16   instruction, it has nothing to do with what she's talking

17   about.  They are trying to propose "a class action is a lawsuit

18   that has been brought by one or more plaintiffs on behalf of a

19   larger group of people who have similar" --

20             THE COURT:  Hold on.  When lawyers read, they forget I

21   have a court reporter.

22             MS. NIX-HINES:  Apologies, Your Honor.

23             THE COURT:  Slow down.

24             MS. NIX-HINES:  I'm reading from the very beginning of

25   their instruction, and it's laying out that this is -- "a class

1   action is a lawsuit that has been brought by one or more

2   plaintiffs on behalf of a larger group of people who have

3   similar legal claims.  All of these people together are called

4   a class."

5       This is very different.  To tell the jury that there is a

6   class action here when they lost their damages class is not

7   only misleading, but it's not doing what she's claiming they're

8   trying to accomplish, which is to talk about patterns.

9       They're trying to get it before the jury that there is a

10  class action.  That's nothing the jury is going to decide, and

11  there's no basis to prejudice them with that at this point in

12  the trial.

13      **MS. BONN:**  One last comment and then I think I've made

14  my point.

15      If the jury is not advisory to the Court on the

16  injunction, then maybe we wouldn't disagree, but this is an

17  advisory jury, and --

18      **THE COURT:**  They can still be advisory to me

19  without --

20      **MS. BONN:**  Understood.  Understood.

21      But here's -- I think here's the issue and here's why I

22  think just -- they need to know that their ruling may have an

23  import broader than these five people.  That's it.  And they

24  need to know that it's something the Court is going to consider

25  more broadly.

1          **MS. NIX-HINES:**  Your Honor, just in closing, what's

2     before the jury is deciding on the claims of these five

3     individuals.  That's what they're being asked to do.

4          As you've already noted, it's a very complicated trial

5     with lots of claims, and they should be focused on what is the

6     business at hand and not have extraneous information that is

7     going to lead them to think that Google has did -- done a lot

8     of wrong for millions of people.  That is intended to put a

9     finger on the scale, I would say probably even a hand, to tip

10    it in their favor in a way that's not going to get at the

11    truth.  It's going to get them thinking about all sorts of

12    wrongdoing on a global scale when what is before them for

13    decision are the claims of these five plaintiffs.

14          **THE COURT:**  Are there going to be charts or summaries?

15          **MS. BONN:**  There are.  We've submitted a handful of

16    106 -- 1006 summaries for our experts, I believe.  There is

17    like a damages summary for Mr. Lasinski and then others.  So,

18    yes.

19          **THE COURT:**  And will there be -- okay.  All right.

20          With respect to the misconduct, I probably won't give

21    that.  We'll deal with that in different ways.

22          And here's another one of these examples where -- well,

23    argument went on for seven pages, which I don't classify it as

24    brief.

25          So 17, 0-17 will be given.  18 will be given.  19 will be

1    given.

2         So that you know, especially at the beginning of the

3    trial, I repeatedly remind jurors about publicity, about their

4    obligations, about due process.  Their binders have -- the very

5    first sheet of their binder is a -- you know, it's a picture of

6    a cell phone that the courts have with all of the "do nots"

7    that they are supposed to do not do.  And once, you know --

8    once I am sure that they have -- that message is fully embedded

9    in their conscious and subconscious, then I'll lighten up, but

10   before then I don't.

11        I tell them about the transcript.  I tell them about

12   taking notes.  All of that will happen.

13        At the end, the bench conferences won't happen.  That's

14   22.  That will be given at the beginning.

15        All right.  Deposition in lieu of live testimony.

16   Typically what I do with 25 is I do it at the time that the

17   deposition is read.  I do it a handful of times until I'm sure

18   that they understand.

19        Are we anticipating use of interrogatories?

20             **MS. BONN:**  Potentially, yes.  Potentially.

21             **THE COURT:**  That, again, will be typically done at the

22   time so they understand what they're seeing.

23        By the way, you've given me a list of stipulations.  It

24   doesn't look like any of them are stipulations as to facts;

25   correct?

1          **MS. BONN:**  Correct.

2          **THE COURT:**  Okay.  Admissions -- are there going to be

3     admissions, requests for admissions?  Are they being used?

4          **MS. BONN:**  I think for plaintiffs it's very unlikely,

5     from what I recall.

6          **MS. NIX-HINES:**  Potentially on our end, Your Honor.

7          **THE COURT:**  Expert opinion, again, I typically do that

8     at the time.  I'll repeat it at the end.

9          29 is not given in -- I usually don't give that as part of

10    the normal -- if they ask for readback, then I will, but I

11    don't encourage them to ask for readback.

12         Same with 30.  There is no need.

13         Same with 31.  It's not given unless necessary.

14         Same with 32.

15         And I give some version of 33, but I obviously won't give

16    it at the beginning.

17         Okay.  With respect to 34, the Electronic Communications

18    Privacy Act, isn't it known as the Federal Wiretap Act?

19         **MS. BONN:**  Colloquially sometimes known as the ECPA.

20    I think in this case we just intend to refer to it correctly as

21    the ECPA.  I think that the word "wiretap," which it's not even

22    really the name of the current statute, brings up all sorts of

23    thoughts amongst jurors.  *Oh, it's Nixon.  You have to have*

24    *some device tacked to a phone line*, and I don't see the need to

25    use an incorrect statement.

1          **MS. NIX-HINES:**  Your Honor, it is known as the ECPA or

2     the Wiretap At.  In fact, the ECPA is the over-arching title

3     for three separate acts:  Title I is the Wiretap Act, Title II

4     is the Communications Act, and Title II is the Pen Register

5     Act.  So actually the "Wiretap Act" is more the specific term.

6     Judge Sands uses it in his instruction.  DOJ uses the Wiretap

7     Act in their guidance, and case law, as recently as 2023,

8     including the Ninth Circuit, uses the Wiretap Act, so we see

9     this as a non-issue and both terms can be used.

10          **THE COURT:**  I'll use both.

11          Okay.  With respect to the California Computer Data Access

12     and Fraud Act, Claim 1 -- let me ask this question.  Which of

13     the claims allow for injunctive relief?

14          **MS. BONN:**  I believe, Your Honor, that all of our

15     claims do, and with the slight caveat with respect to the

16     breach of contract claim, it may be referred to as specific

17     performance or other equitable relief rather than,

18     quote/unquote, an injunction, but the effect is essentially the

19     same.

20          **MS. TREBICKA:**  Your Honor, the breach of contract

21     claim does not allow for injunctive relief.

22          **THE COURT:**  But all of the others do?

23          **MS. TREBICKA:**  I believe all of the others do.

24          **THE COURT:**  Okay.  So there are going to be -- they're

25     going to be deciding then the factual elements underlying all

1    of the claims that provide for injunctive relief.

2            MS. BONN:  I think with this caveat, which is neither

3    side have submitted any jury instructions related to our unfair

4    competition law claim --

5            THE COURT:  The unfair competition claim 17200 is not

6    a jury claim.

7            MS. BONN:  Correct.

8            THE COURT:  All right.

9        Do you wish to be heard on -- well, let me say this.

10   Given that all of the claims, other than breach of contract,

11   relate to or include injunctive relief, I will advise the jury

12   that their factual findings on liability can inform the Court

13   with respect to court-ordered remedies.

14           MS. BONN:  Thank you.

15           THE COURT:  I will do that, and so you can -- you

16   should meet and confer on a possible instruction, and we'll add

17   that to the -- I think it's December-- the December deadline.

18           MS. TREBICKA:  22nd.

19           THE COURT:  Is that the date I gave?

20           MS. TREBICKA:  Yes, Your Honor.

21           THE COURT:  I thought it was earlier than that.  We

22   can't hear you, but I'm checking my notes.  December 15.

23           MS. TREBICKA:  I apologize, Your Honor.  I believe

24   22nd was for something else.

25           THE COURT:  Yes.

1      Okay.  So not a class action, but the fact that their

2  findings with respect to the elements of all of these claims

3  will help inform the Court's role in providing a remedy.

4         **MS. BONN:**  Thank you, Your Honor.

5         **THE COURT:**  All right.  I have your -- your arguments

6  with respect to -- well, with respect to damage loss versus

7  harm.  Do you want to say anything more or not?

8         **MS. BONN:**  I would make one comment because I was

9  looking at what further areas we might be able to compromise

10  on, and I think there's two issues.

11      There's one of do you use the word "harm" or do you use

12  "damage or loss."  And then there's the second issue which is

13  Google says "damage or loss" is like confined to this small

14  cabin that excludes disgorgement and the other remedies that

15  were already addressed at summary judgment.

16      To the extent that there's not a limitation placed on us

17  of not being able to say that unjust enrichment, etc.,

18  constitute loss, we would be fine using the terminology "damage

19  or loss" instead of "harm."  I'm not sure it's -- it's -- it

20  may be a distinction without much of a difference.  But to the

21  extent what Google is trying to do is to say well, damage or

22  loss is this much more cabined issue than harm, that's where I

23  think the dispute comes down to.

24         **THE COURT:**  Well, that can be addressed in terms of

25  the damages instruction.

1          **MS. BONN:**  Correct.

2          **THE COURT:**  Is it wrong -- you have a -- well, okay.

3     Anything else on this one?

4          **MS. TREBICKA:**  Your Honor, which way is Your Honor

5     leaning so I know whether to address or not --

6          **THE COURT:**  So I'm not -- I'm not going to tell you.

7     I can tell you in general I'm leaning towards whatever the CACI

8     says.  So if you have changed CACI, you're on the losing side.

9     I don't know because I've got 10 pages on one instruction when,

10    in fact, I was kind of thinking that what I do is strike the

11    entire document, make you go back, and do what I said to do,

12    which was give me a brief argument because your brief arguments

13    are all so much better than your long pontification arguments.

14    So --

15         **MS. TREBICKA:**  We feel good on the cases, Your Honor,

16    because that's the models that we have used.

17         On damage or loss, there is a lot of precedent, including

18    Supreme Court precedent, that cabins damage or loss to

19    technological harms, so now sweeping in remedies like unjust

20    enrichment will be clear error, and the seminal case here is

21    the Van Buren Supreme Court decision --

22         **THE COURT:**  We're not at damages.

23         **MS. TREBICKA:**  Understand, Your Honor.

24         **THE COURT:**  You're late on your damages argument.

25         **MS. BONN:**  CACI uses the word "harm," I believe, not

1    "damage" or "loss" on this instruction.

2              THE COURT:  CACI 1821.  Yep, CACI uses "harm."

3         MS. TREBICKA:  No dispute there, Your Honor.  But I

4    heard opposing counsel say that plaintiffs will take "damage"

5    or "loss" which is the phrasing that's closer to the statute.

6         MS. BONN:  Well, it all comes down to damages.  I

7    mean, if we work out the damages instruction to our

8    satisfaction, I'm not going to sit here and fight over "harm"

9    versus "damage" or "loss" but CACI says "harm."

10             THE COURT:  On 1.2, the addition -- defendants'

11   additional statement, which exceeds CACI, there's -- I doubt

12   I'll give that.  That's argument, and it's not necessary.

13        MS. TREBICKA:  Understood, Your Honor.  And

14   plaintiffs' addition or data is likewise not in the CACI.

15        MS. BONN:  I will say it's straight out of the

16   statute, and on that issue, CACI, you know -- the statute talks

17   about computer, computer network, computer system, computer

18   program or data, and the CACI abbreviates it.

19             THE COURT:  Slow down.

20        MS. BONN:  Yeah.

21        CACI talks about -- excuse me.  Penal Code 502 talks about

22   computer, computer network, computer system, computer program,

23   perhaps a few other computer modifiers and then "or data," and

24   CACI abbreviates and only uses a couple of the words from the

25   statute.  Clearly here -- I mean, our claim is about private

browsing data, so I think that that's why we proposed that

addition.

THE COURT:  Is it legally wrong?

MS. TREBICKA:  Yes, Your Honor, it's legally wrong.

Let me clarify that actually.  Let's look at the essential

factual elements which is CACI 1812, and in the first element,

which is "proof that plaintiffs owned the computer, computer

system, network, and/or data," that's where "data" appears

because plaintiffs do need to prove that to the extent data was

at issue, they are the owners of that data.

However, when it comes to access, which is the instruction

that Your Honor was focused on, Disputed Instruction 1.2,

access to data will not do, according to the statute as well as

according to the CACI, which is why plaintiffs had to add the

word "or data."

And, Your Honor, you not look only to the CACI.  The

statute itself defines the term "access" as "access to computer

systems and networks," not to data.

THE COURT:  Is there any doubt that anybody is using

Incognito Mode without a computer or a mobile device?  I mean,

is anybody arguing that they're using Incognito Mode without

accessing a computer or mobile device?

MS. TREBICKA:  That's not the issue for the

instruction.  Plaintiffs need to show that Google accessed that

computer system or device.  So no one is doubting --

1    **THE COURT:**  I'm sitting here, and I pull up Incognito

2    Mode on my computer, and the jury finds that you have accessed

3    my data inappropriately, how did you get there but for going to

4    the computer or device?

5    **MS. TREBICKA:**  That's a long -- wrong legal issue

6    though, Your Honor.  The legal issue is according to the

7    statutes, which is a hacking statute, did defendant access a

8    computer, computer system, computer network, or device.  That

9    is the issue that the jury must decide.

10    Data comes in in the -- in the context of harm, proving

11    harm, etc., but --

12    **THE COURT:**  All right.  I understand.

13    **MS. TREBICKA:**  Thank you.

14    **THE COURT:**  Okay.  Yes.

15    Yay.  You agree on substantial factor.  Yay, fun.  Three

16    lines.

17    Okay.  Second claim.  CIPA.

18    **MR. MAO:**  Your Honor, one of the --

19    **THE COURT:**  Mr. Mao, just for purposes of the record.

20    Go ahead.

21    **MR. MAO:**  Mark Mao, Boies Schiller, for the

22    plaintiffs.

23    Your Honor, one of the reasons for the disagreements on

24    631 is because there is no standard instruction for 631.  There

25    is one for 632.

1        So we believe that the plaintiffs have done their best to

2   try to keep it within the statute and the actual language of

3   the statute.

4        There is other some disagreements, but I'm happy to

5   address that, Your Honor.

6            **THE COURT:**  So who's version is closest to CACI 632?

7            **MR. MAO:**  If you're asking me, Your Honor, of course I

8   would say that we are, but there's some disagreement.

9            **MS. NIX-HINES:**  Actually, Your Honor, we believe that

10  with respect to 631, it's more appropriate to follow the plain

11  language of the statute, and that's what our instruction does.

12           **MR. MAO:**  I think we would agree on that, Your Honor.

13           **THE COURT:**  You would agree on what?

14           **MR. MAO:**  Following the language of the statute.

15           **MS. NIX-HINES:**  And, in fact, Your Honor, there are

16  several instances in which plaintiffs are reading out elements

17  that are in the plain language of the statute, and we think

18  that's very problematic, and I'm happy to walk through that, if

19  you'd like.

20           **MR. MAO:**  If --

21           **THE COURT:**  So why is it that -- is there -- you

22  disagree on whether there's a 632 claim?

23           **MS. NIX-HINES:**  No, Your Honor.  We're going to

24  address 632 separately.  Right now we were talking about 631-A.

25           **THE COURT:**  The reason I'm asking is they have in here

1    631 and 632.

2         **MS. NIX-HINES:**  Oh, yes.  We disagree that that should

3    be incorporated into 631.  We think that's going to be

4    confusing for the jury, and it's not necessary because there is

5    a separate 632 instruction.

6         **MR. MAO:**  If we can clarify the differences in 631 and

7    632, I would be okay with that modification, Your Honor, to

8    make sure that's clear.

9         **THE COURT:**  Typically what I would do is the verdict

10   form is going to have -- the jury instructions need to track

11   the verdict form, and so I would separate them out.  That is my

12   practice.  They can look at an instruction, and they will all

13   have copies of the instructions.  They look at an instruction,

14   they'll look at the form, and figure that out.  So in general,

15   I separate them out.

16        **MR. MAO:**  May I perhaps attempt to summarize what I

17   think are the four main issues of dispute for this instruction?

18        **THE COURT:**  Go ahead.

19        **MR. MAO:**  I believe, Your Honor, it is first on the

20   issue of what constitute contents, and that is primarily on the

21   issue of whether URL can qualify as contents, although Google

22   does not address the fact that search terms are in the URLs and

23   whether or not that's content.  I believe that's already been

24   agreed to by counsel in prior hearings, that search terms

25   included in URLS would be contents.  I think our --

1          **MS. NIX-HINES:**  Sorry, Mr. Mao --

2          **THE COURT:**  Do not interrupt him.

3          **MS. NIX-HINES:**  Apologies.

4          **THE COURT:**  Finish.

5          **MR. MAO:**  I believe, Your Honor, the primary

6     disagreement is on contents as to a URL only without search

7     terms not in instances in this case where the URL contains

8     search terms.

9          **THE COURT:**  Hold on.

10         Okay.  I'm going to need you to say that again.  I lost my

11    realtime.  One more time.

12         **MR. MAO:**  I'm trying to avoid argument because I'm

13    just trying to summarize.

14         On contents, I believe the fight is over URL alone without

15    search terms.  In prior hearings, if we review the transcripts,

16    I don't think there is any dispute on the search terms within

17    the URLs themselves.

18         Next, number two, is what is "in transit"?  I believe the

19    dispute, if I may try to characterize it, is that Google's

20    argument is that if it's intercepted from the device as opposed

21    to between the two devices during the communications, that

22    would not be an interception.  In other words, if I tap the

23    phone when the phone is receiving on the receiver end, that

24    would not be in transit.  That is Google's argument and the

25    basis for that dispute.

1      I believe that there is a dispute on intentionality and

2  whether or not there's a factual dispute in this case on

3  intentionality.

4      And then lastly I believe that there is a dispute on

5  whether or not CIPA applies in this case to everybody, although

6  we point out in the pretrial statement, Google already conceded

7  that California law applies.

8      But those are -- those are my understanding as to the four

9  disputes.

10     And happy to address that in any order, Your Honor.

11     **THE COURT:**  All right.  With respect to this, is

12  content -- well, let me ask first, yes or no, are those the

13  four issues?

14     **MS. NIX-HINES:**  Well, Your Honor, we would prefer to

15  talk about what elements are actually required in CIPA.  We are

16  not making substantive arguments about whether certain elements

17  have been satisfied.  Those are going to be arguments that we

18  would --

19     **THE COURT:**  That's not my question.  Are the four

20  issues that he -- that he has identified, are those the four

21  issues of dispute with respect to the elements of the claim?

22     **MS. NIX-HINES:**  Your Honor, we believe that there are

23  some additional elements, if I may --

24     **THE COURT:**  So at least those four?

25     **MS. NIX-HINES:**  Well, I don't agree with his

1   interpretation of what the in transit dispute is about, but,

2   yes, generally there is a dispute over in transit.

3          **THE COURT:**  So do you agree there is a dispute about

4   content?

5          **MS. NIX-HINES:**  Yes.

6          **THE COURT:**  In transit?

7          **MS. NIX-HINES:**  Yes.

8          **THE COURT:**  Intentionality?

9          **MS. NIX-HINES:**  Yes.

10          **THE COURT:**  Whether it applies to all plaintiffs?

11          **MS. NIX-HINES:**  I'm not sure what Mr. Mao means by

12   that one.

13          **THE COURT:**  I see your colleague nodding yes.

14          **MS. NIX-HINES:**  Oh, the in California, yes.

15          **THE COURT:**  And then what else is a dispute, in your

16   view?

17          **MS. NIX-HINES:**  So we had already discussed the use of

18   private browsing communications, and I won't belabor that, but

19   we do believe that that is a prejudicial term to include in the

20   elements because it presupposes a fact that we believe

21   plaintiffs must prove, which is that the communication --

22          **THE COURT:**  I understand.  What else?

23          **MS. NIX-HINES:**  We also disagree with the structure of

24   the way the statute is -- the instruction is framed.  There are

25   two separate burdens, in our view, and according to the

1    statute, to prove that the communication was intercepted in

2    transit and that it occurred in the State of California,

3    plaintiffs eliminate -- seek to eliminate the in-transit

4    requirement and merge it with the in-California requirement,

5    and we believe that that's improper, so that is another area of

6    dispute.

7         And then finally --

8         **THE COURT:**  What is the evidence on the California

9    portion?

10        **MR. MAO:**  It's actually rather straightforward,

11   Your Honor.

12        Setting aside the company and the processes and the team

13   reading and using the contents that are in California, Google

14   in this case has consistently argued that their terms apply in

15   this case for everybody with or without the class.  And within

16   that provision is the selection of California law, and CIPA is

17   that California law, so I'm a little confused as to how Google

18   would, on the one hand, say that there is either -- you know,

19   these various contractual arguments and, on the other hand,

20   selectively take out the fact that they've agreed and conceded

21   that California law, such as CIPA, applies.

22        **THE COURT:**  Okay.  Court reporter needs another break

23   so we will stand in recess for 15 minutes.

24                  (Recess taken at 1:34 p.m.)

25                  (Proceedings resumed at 1:48 p.m.)

 1          **THE COURT:**  All right.  We're finishing up with

 2    respect to CIPA, Claim 2.  In terms of your -- well, in terms

 3    of your arguments on defining certain terms, anything you want

 4    to say beyond what's already here?

 5          **MS. NIX-HINES:**  Yes, Your Honor.

 6          We think terms matter, and as much as possible, we've

 7    tried to adhere to plain language of the statute, as well as

 8    terms that have been used throughout the litigation and that we

 9    think will be clear to the jury.  As you indicated, they are

10    ordinary humans.  We want to make sure things are very clear

11    and straightforward, so we've used in the -- if you look at the

12    introductory instruction and it carries over, while in private

13    browsing mode, which is something that actually the plaintiffs

14    reference and they cite our 2018 privacy policy in their mini

15    brief in which we use that very term, "in private mode," like

16    Chrome Incognito Mode, and they, you know, embrace that.  So we

17    don't think that there should be any issue with using a very

18    clear term and a neutral term, as Your Honor has indicated,

19    like "in private browsing mode" as opposed to a loaded term

20    like "private browsing communications" which presupposes that a

21    communication was private.

22          But as you know, a core defense for Google is that we

23    don't guarantee privacy in all circumstances, and this is

24    something that the plaintiffs --

25          **THE COURT:**  You don't need to say more other than

1    that.  My inclination on that element, at least, is to use

2    Google's suggestion.

3              **MS. NIX-HINES:**  Thank you.

4              **MR. MAO:**  Your Honor --

5              **THE COURT:**  There are --

6              **MR. MAO:**  Your Honor --

7              **THE COURT:**  Your suggestion has an inference.  I never

8    give instructions with inferences.  And there's nothing

9    inconsistent with your theory, given their suggestion.

10             **MR. MAO:**  Yes, Your Honor.  I was actually trying to

11   make sure that before you moved on -- your question was, is

12   there anything else to address.  I was actually trying to

13   address that.

14       Generally, Your Honor, I think we're okay with sticking

15   with the statutory language of 631.  I think where we actually

16   are in debate is the case law over how some of those

17   definitions end up getting fleshed out.

18       Again, just reminding Your Honor, there is no model

19   instruction for 631, and I do think that that contributes to

20   the aggregation on both sides.

21       May I at least address the two things I just wanted to

22   flag real fast, Your Honor?

23             **THE COURT:**  On what?

24             **MR. MAO:**  On the 631 instruction, which is what we

25   went on break on.

1    **THE COURT:**  Well, I just -- there are a couple of

2    other things, so you each want -- well, there's -- there are

3    proposed definitions for "transit," for "consent," and then for

4    "willfulness."

5    **MS. NIX-HINES:**  Your Honor --

6    **THE COURT:**  Again, my -- what I will always do first

7    is go to the form instructions.  Then I'll go to the statute.

8    Then I'll go to Ninth Circuit authority.  That tends to be my

9    approach.

10   **MS. NIX-HINES:**  Thank you, Your Honor.  We're very

11   pleased with that approach.

12   And if I may, with respect to Element 2, we are the only

13   party that actually uses the express language of the statute,

14   which is requiring that Google receive the communications,

15   quote, while in transit.

16   Plaintiffs are seeking to read that requirement out of the

17   statute, and there's simply no justification for it.  It's part

18   of an express requirement that's in the statute.

19   **THE COURT:**  Okay.  We need to move on from 631.  I've

20   got -- I have the arguments.

21   Did you want to say anything about the other -- the other

22   pieces that I mentioned:  Transit, consent, willfully?

23   **MR. MAO:**  Yes, Your Honor.

24   So first of all, "in transit," I disagree with the

25   characterization "in transit" because we did use the language

1   from the statute on Element No. 2, which is what counsel is

2   referring to.

3        There has been a decision subsequent to this submission

4   which further elucidated, and I realize it's a different judge

5   in this district court, but Judge Chen agreed with our

6   definition and our interpretation of "in transit" which is that

7   you can be tapped on your device and that would still be in

8   transit as part of the communications.

9        We sent the authority which is the case of *James vs. Walt*

10  *Disney company*.  This was decided on the 8th of this month, so

11  after the submission, and we sent that -- a copy of that

12  authority to opposing counsel, and if Your Honor wants a hard

13  copy for your convenience, we have that --

14            **THE COURT:**  Case number.

15            **MR. MAO:**  Sure.  That is 2023 U.S. District Lexus --

16            **THE COURT:**  Do you have a case -- the number of the

17  case?

18            **MR. MAO:**  I have a West -- yes, I do.  I have -- it's

19  23-CV-02500.  And --

20            **THE COURT:**  Okay.  And it was on -- what kind of

21  motion was it?

22            **MR. MAO:**  This was a motion to dismiss.  And Walt

23  Disney's argument was similarly that if the device is

24  essentially tapped at the -- at the end, for the purposes of

25  listening to the conversations and the communications, then

1    that would not be in transit.  And the judge there rejected

2    that.

3           **THE COURT:**  I'll take a look at his opinion.

4           **MR. MAO:**  With regard to in California, this is what

5    happened when we had went on break, Your Honor.  Again, point

6    out, Google argues California law applies.

7           **THE COURT:**  You already said that.

8           **MR. MAO:**  Yes.

9        And then lastly, with regard to the fifth element --

10   sorry.  With regard to the element of willfulness, the

11   interpretation and definitions which is used by Google is just

12   nowhere within the statute.  They have a very high threshold

13   for what willfulness is, essentially incorporating criminal

14   statutes for the purposes of the statute, and that's just not

15   what's within the case law and that's just not there.

16       And I don't think that factually Google has any dispute

17   really that they've been undergoing this conduct intentionally,

18   especially given the documents that have shown up in this case.

19          **MS. NIX-HINES:**  May I respond, Your Honor?

20          **THE COURT:**  You may.

21          **MS. NIX-HINES:**  Thank you, Your Honor.

22       First, with respect to the first argument, again, we go

23   back to the plain language of the statute which requires that

24   the communication must have occurred in the State of

25   California, and the fact that California law applies to terms

1    of service in other issues does not mean and it does not

2    relieve the plaintiffs of having to establish an express

3    element of 631.  It's simply not the case.

4        With respect to willfully -- and you will see it again in

5    intentionally throughout their instructions -- plaintiffs

6    actually assert that we have conceded these elements, and

7    therefore they ask you to state that there's no dispute that

8    these elements have been satisfied, and we fundamentally

9    disagree, Your Honor.  We have consistently denied that we've

10   engaged in willful violations of the law.  And it is not for

11   them to take away a defense that we're entitled to or an

12   obligation of the plaintiffs that -- of an element that they

13   must affirmatively prove.

14        **THE COURT:**  So this a penal code statute.  So there

15   are definitions for "willfully."  Are you suggesting that the

16   plaintiffs are using a -- a civil version of -- of a "willful"

17   definition versus criminal?  I don't --

18        **MR. MAO:**  No, Your Honor.  I think --

19        **THE COURT:**  Who's referencing Penal Code Section 7 in

20   the authorities?  That's from plaintiffs so --

21        **MR. MAO:**  I -- I think it is -- I think the point,

22   Your Honor -- if you want me to step back for a moment on

23   this -- it's easier to stick to the statute which is that the

24   word says "willfully."

25        **THE COURT:**  I'm going to define what "willfully"

1    means.

2              MR. MAO:  Yes.

3              THE COURT:  If there's a definition in the statute or

4    in CACI or some other book, that's the definition I'm going to

5    use.  They need to know what "willfully" means.

6              MR. MAO:  And if you look at the authorities we've

7    cited to, we've stuck to what we believe is the proper

8    referencing section.

9              MS. NIX-HINES:  Your Honor, I'm not sure --

10             THE COURT:  Okay.

11             MR. MAO:  Sorry.  And that's on page 95, just so

12   that --

13             THE COURT:  I have it.  "Willful" --

14             MR. MAO:  That was for opposing counsel because we

15   were looking at different pages, she and I.

16             THE COURT:  I see.

17             MR. MAO:  Sorry about that.

18             THE COURT:  We're on Docket 1057 page 95 or page 96 of

19   293.

20        So plaintiff suggests that "'Willfully' means

21   intentionally; that is, that the defendant intended to do the

22   act.  It does not require any intent to violate the law or to

23   injure another or to acquire any advantage."  That's pretty

24   basic in terms of what the term means under California law.

25   We've got a California cite.

1     Google suggests that "To act 'willfully' means to act with

2  a purpose or willingness to commit the act."

3     I'm not sure that that's accurate.  It's not an accident,

4  and there -- I mean, unless you're referring to some

5  specific-intent criminal statute, where -- where does that come

6  from?

7          **MS. NIX-HINES:**  Well, Your Honor --

8          **THE COURT:**  This isn't a criminal case.  It's a civil

9  case.

10          **MS. NIX-HINES:**  Well, first, I just wanted to make the

11  point, but it sounds like Your Honor agrees that willfulness

12  should be included as part of the instruction.  Plaintiffs'

13  initial position was that willfulness doesn't even need to be

14  given --

15          **THE COURT:**  I'm going to define it.

16     What is wrong with the California statute -- the

17  California *People vs. Hagedorn* definition?

18          **MS. NIX-HINES:**  Well, we believe, Your Honor, that

19  it's not simply, you know, an intent to do the act, but it's --

20  you have to look at willful next in the context of the words in

21  the statute so --

22          **THE COURT:**  I'm not sure that I agree with you.  What

23  authority do you have?  And, in fact, as an initial matter,

24  these words are commonly used, and that's why they have common

25  definitions.  And *People vs. Hagedorn* seems to be -- it

1    certainly defines it in a way that I understand it.  And I

2    don't know where your definition comes from.

3         **MS. NIX-HINES:**  Thank you, Your Honor.

4       We're prepared to accept that definition.  Our biggest

5    concern was that it be included as an affirmative element as it

6    is in the statute.

7         **THE COURT:**  In terms of the number of violations, I'm

8    not going to tell them what the statutory amount is, not in the

9    instructions.  It doesn't really matter.

10      I will remind them that plaintiffs have to prove their --

11   each and every element by a preponderance of the evidence, and

12   that includes the number of violations, and if they are proving

13   it by a preponderance of the evidence, then they're not

14   speculating, guessing, or engaging in conjecture.

15      We're moving to 632.  I don't want to hear argument

16   anymore about the private browsing modes.

17      With respect to the way it's structured, I will likely use

18   Google's approach as opposed to plaintiffs' for the same

19   reasons I'm doing it with respect to Claim No. 3.

20      "These" versus "this"?  What is it that you don't agree on

21   between "these" versus "this" in Elements 2 and 3?

22        **MR. MAO:**  So this -- I think this relates a little bit

23   to the issue of contents in 631.  If you looked at 631, the

24   disagreement over contents had to do with the examples, in my

25   opinion, at least -- had more to do with the examples that

1  would help a juror reading the instructions understand what --

2  what are examples of contents.

3          **THE COURT:**  Well, that's what argument is for.

4          **MR. MAO:**  Right.  Right.  And I think that "these"

5  versus "this" has to do with whether each and every one of

6  those examples, insofar as they may sit in data, may or may not

7  be confidential.

8          **THE COURT:**  "These" versus "this".

9          **MS. NIX-HINES:**  Your Honor, so there are a number of

10  issues here.  One, plaintiffs proposed to instruct the jury

11  that it need not consider whether plaintiffs were harmed, and

12  we think this is misleading standing alone.

13          **THE COURT:**  I asked you about "these" versus "this",

14  page 100, Claim 3, Elements 2 and 3.

15          **MS. NIX-HINES:**  Regarding the objectively reasonable

16  expectation and that Google did not have the consent of all the

17  parties --

18          **THE COURT:**  She's not going to be able to hear you

19  when you're talking not in the mic.

20          **MS. NIX-HINES:**  Sorry.  It's hard being tall.  I have

21  to bend down.

22          **THE COURT:**  Claim 3 has a reference to Element 2 and

23  element 3.  You cannot agree on the words "these" vs. "this."

24          **MS. NIX-HINES:**  Right.  Thank you, Your Honor.

25      So plaintiffs have made what we consider to be, you know,

1    a strawman argument regarding communications.  They believe it

2    should be in the plural rather than the singular.  And we, you

3    know -- if you look at the case law, you look at the language

4    in the statute, it all uses the singular, even Judge Koh, who

5    they tout also uses the singular.

6        We don't think it creates the perception that there could

7    only be one communication at issue in the trial.  Obviously

8    plaintiffs will have the opportunity to show that there were

9    multiple interactions with non-Google websites.  But, again, we

10   like to adhere to the plain language.

11           **THE COURT:**  So --

12           **MR. MAO:**  Your Honor --

13           **THE COURT:**  CIPA 632 uses "intentionally" and CIPA 631

14   uses "willful."

15           **MS. NIX-HINES:**  Yes, Your Honor.

16           **MR. MAO:**  It defend on which of the four different

17   types of violations we're talking about under 631.  It's a very

18   long paragraph.  And I believe, from my recollection, I think

19   both words are used, but --

20           **THE COURT:**  The reason that I'm asking obviously is

21   because in 631, you're asking me to define "willfully" and 632

22   you're asking me to define "intentionally."  I will define it.

23   Again, it is not clear to me that Google's proposal is

24   accurate, and I will --

25           **MS. NIX-HINES:**  Your Honor, respectfully, I point you

1    to Judge Sands' Instruction No. 92.7.

2         THE COURT:  I don't know who Judge Sands is, and is

3    that -- who is Judge Sands and are they on the Court of Appeal

4    for California?

5         MS. NIX-HINES:  No, Your Honor.  This is a New York

6    judge, but our understanding was that a number of courts rely

7    on his model instructions for these statutory --

8         THE COURT:  A New York judge.  I'm supposed to take

9    his word over a three-judge panel of the Court of Appeal of

10   California?  No, I don't think so.  Unlikely.

11        Okay.  Next.

12        THE COURT:  So --

13        MR. MAO:  I believe Your Honor had an interpretation

14   of this element in your summary judgment order following --

15   although the order says 630, subsection C, I believe Your Honor

16   meant 632, subsection C in the order, but my point there is we

17   believe that you have the correct interpretation there in that

18   order, Your Honor.

19        MS. NIX-HINES:  Sorry, counselor.  Which elements are

20   you discussing?

21        THE COURT:  I can't hear you.

22        MR. MAO:  Oh, sorry.  Over "objectively reasonable

23   expectation of confidentiality," as you have termed it, which

24   is jury instruction 33.

25        MS. NIX-HINES:  Your Honor, with respect to that

1    instruction, the parties agree that plaintiffs must prove

2    objectively reasonable expectation of privacy -- well --

3         THE COURT:  I will likely -- I think "overheard" or

4    "recorded" might need definition.  "Objectively reasonable

5    expectation" I doubt does.  Juries ultimately decide what is

6    objectively reasonable by the -- by their decision.  They are

7    the ultimate arbiters tosser of what that means.

8         It will be important for you to remember, when you're

9    presenting evidence, what evidence you're actually presenting

10   so that they can understand what evidence supports an

11   objectively reasonable interpretation.

12        I don't know that I would define it in the first instance

13   unless there was some confusion, but I'll think about it.

14        MS. NIX-HINES:  Yes, Your Honor.  And as you're

15   deliberating, I would just call out the importance of the jury

16   understanding that it's an objective standard and not a

17   subjective standard, which I think could be confusing to the

18   jury unless it's succinctly --

19        THE COURT:  And it may be that I should define

20   "objective" if it comes up multiple times.  That's reasonable.

21        MR. MAO:  Your Honor, we definitely always agreed it

22   was an objective standard.

23        THE COURT:  I don't think anyone disagrees with the

24   standard.  The question is whether it gets defined.  But

25   defining "objective" or "objectively reasonable" and the entire

1    phrase are two different things.

2        Moving on to the fourth claim.

3        **MS. NIX-HINES:**  Your Honor, before we move on -- I

4    know we're long on time -- I just want to say briefly that with

5    respect to consent, Google uses the CACI 1809, and it's

6    important that each plaintiff has to prove either that the

7    plaintiff or the website she visited did not consent to

8    Google's receipt of the plaintiff communications with

9    non-Google websites, so our instruction is oriented towards

10   making that clear, which we believe is firmly grounded in the

11   precedent.

12       **MR. MAO:**  Your Honor, we do have a fundamental

13   disagreement there, which is if you look at both that section

14   and the preamble to that section, California Wiretap Act

15   provides that all parties to the communications must consent.

16       And the disjunctive that is being used by counsel is not

17   only contrary to the instructions and the case law but also the

18   express language of the statute and the legislative intent.  I

19   think that one is really clear.

20       And, Your Honor, I do believe that -- that the statutory

21   construction on that was also laid out in your motion for

22   summary judgment order, Your Honor.

23       **MS. NIX-HINES:**  Your Honor, when you look at what

24   plaintiffs are proposing, that plaintiffs must offer some

25   evidence that they or non-Google websites did not consent,

1    there is nothing in the statute that has a -- that partial

2    consent, some evidence.  It's simply not there in the plain

3    language, and this is -- will significantly relieve the

4    plaintiffs of having to prove that they did not consent.  And

5    nowhere have they cited any case that has that kind of partial

6    language.

7            **THE COURT:**  Moving to the fourth claim.

8            **MS. NIX-HINES:**  I'm happy to start, if you'd like.

9            **THE COURT:**  You're the one that is asking for

10   additional ones.  Do not repeat -- a lot of this -- again,

11   there is repeat, so I don't need to hear repeated arguments.

12           **MS. NIX-HINES:**  Understood, Your Honor.

13           **MR. MAO:**  If I may, just on 44, "contents," real fast,

14   Your Honor, because this incorporates the prior sections, I

15   just want to make clear that contents, there is -- I think part

16   of the disagreement is that Google should be putting -- if

17   they're going to give very specific examples and a long list of

18   examples, it should include at minimum the type of data

19   actually at issue in this case, which does include search --

20   search terms search queries -- that's actually in the technical

21   reports and analysis, and you can't selectively pick ones in

22   which they would argue how close they are to non-content and

23   selectively leave out the ones which are, indeed, content, and

24   they've conceded in the prior hearings that those things are,

25   indeed, content.

1        So I think for contents here, insofar as we're going to

2   rely on, you know, prior examples, I think that one is also

3   very clear with the ECPA across multiple circuits.

4        **MS. NIX-HINES:**  Google's instruction lays out very

5   clearly what has been considered contents and what is not.

6        With -- regarding URLs, we believe that plaintiffs are

7   sort of skipping over *Zynga* lightly.  You know, *Zynga* gave the

8   example -- and we don't disagree that a URL under certain

9   circumstances, as Your Honor has pointed out, could be

10  contents, but it has to be in the very specific situation of

11  containing search terms that were inputted by the user; not a

12  third party, but by the user.

13       And *Zynga* gave the example of collecting a URL revealing

14  that the user had to been to a gay support groups page on

15  Facebook, and even though that involved sensitive information,

16  the case held that that did not constitute contents, even

17  though it revealed a particular page and the nature of the

18  user's browsing.

19       And Facebook, which they rely on, concerned URLs that

20  could emanate from search terms inputted into a third party's

21  search engine.  So it would be misleading to just say that URLs

22  could be contents.  It has to be in a specific situation of

23  where there are search terms inputted by the user.

24       **MR. MAO:**  Just real quickly on that, Your Honor, I'm

25  glad that counsel agrees that search terms within URLs will be

1    content.  I think that's going to be easy to establish in this

2    case.  It's already well-briefed in the reports.

3        But setting that aside, contents for non-search for URLs I

4    think is also well-briefed and well-reasoned, including in your

5    most recent decision of *Ghanatt vs. Numerade*, which although it

6    was a VPPA case, also assessed whether or not a URL was

7    content, and there, consistent with *In Re* -- *In Re Real-Time*

8    *Bidding* and also with the prior rulings in this case, we agreed

9    that full URLs, which basically show examples of the pages, are

10   indeed content.

11       And we believe that there is numerous other cases, for

12   example, by other courts in this circuit and elsewhere that we

13   cited in our briefing here which demonstrate.

14       **MS. NIX-HINES:**  Mr. Mao sent over like five or six,

15   maybe seven cases this morning, Your Honor.  We have not had a

16   chance to dig in on them.  So we request the ability to reserve

17   until such time as we have had an opportunity to delve into

18   those cases.

19       **THE COURT:**  I'm not going to look at them.  You all

20   have briefed enough.  If I need additional briefing -- I don't

21   know what you're talking about.  I'm sorry.  It must have

22   been -- I missed it.

23       **MS. NIX-HINES:**  That's fine with me, Your Honor.  We

24   only received them this morning, so -- he just referred to one,

25   but we have not had a chance to dig in on that.

1        **THE COURT:**  I did not write it down, and I've got

2    pages of briefing from you all.  The only thing I wrote down

3    was the new Judge Chen case.

4        Fifth claim, breach of contract.

5        I'm not sure that with respect to 5-1, that I am going to

6    do any of the lines 4 through 14.  Just delete them all.

7        This is breach of contract.  You all argue it.  I'm just

8    going to give them the elements and the law.  That's my job.

9    You can argue whatever you want, as long as there's evidence

10   for it.

11       I tell you what.  I'm not going to hear any argument on

12   the breach of contract.  I'm going to write what I think is

13   appropriate.  I'll show it to you, and then you can tell me

14   whether some law is missing, because so much of what I see in

15   here is just argument.  So we'll get to that.

16       All right.  Moving to six, invasion of privacy.

17           **MS. NIX-HINES:**  Your Honor --

18           **THE COURT:**  Hold on.

19           **MS. NIX-HINES:**  Sorry.

20           **THE COURT:**  All right.  Let's start with CACI 1800.

21           **MS. NIX-HINES:**  So, Your Honor, if I may, I think, you

22   know, these two claims, invasion of privacy and intrusion of

23   seclusion, require some context because plaintiffs have

24   fundamentally misapprehended the distinction between an

25   invasion of privacy claim under the California constitution,

Article I, Section 1, and an intrusion upon seclusion claim which emanates from the common law tort.

And so because of that fundamental misapprehension, they are applying CACI 1800, but that applies to -- well, it emanates from intrusion into private affairs.  That's what it is called, but it applies to the analogous common law tort of intrusion upon seclusion.  An invasion of privacy claim, which as Your Honor probably recalls, came from Proposition 11 of the privacy initiative amendment as a product of California's peculiar but certainly endemically California process of getting propositions, and this was intended to expand the constitutional right of privacy.  And, therefore, it's -- its standards are found in judicial precedent, not in the CACI.

**THE COURT:**  Before I got this case, did Judge Koh issue a ruling with respect to the elements of this in a motion to dismiss?

**MS. BONN:**  She did, Your Honor.  And I think her order is essentially consistent with virtually all of the orders on these two privacy torts out of this district, which is essentially the elements are the same.  The core elements is was there an objectively reasonable expectation of privacy.

**THE COURT:**  What's the difference?  Objectively the same between the sixth claim and the seventh claim?

**MS. BONN:**  Correct, Your Honor.  I think the only real difference --

1          THE COURT:  Why do you have both if you don't need

2     both?

3          MS. BONN:  I think that there's arguably a distinction

4     that may matter, which is when you look at the California case

5     law -- and there is a *Shulman* case on this that we cite --

6     intrusion upon seclusion tends to be particularly focused on a

7     space or an area in which a plaintiff has an expectation of

8     privacy and the defendant has intruded into that private space.

9          And so to the extent there's a difference between the

10    elements, I think an invasion of privacy could be broader or

11    different than that, but an intrusion upon seclusion under

12    California case law, the *Shulman* case, is really focused upon

13    intruding into a private area.

14         THE COURT:  Then why do you have the seventh claim?

15         MS. BONN:  Because we think that both have been done

16    here.  I mean, number one, there has been an intrusion onto

17    people's device and their private browser, which we think is an

18    area in --

19         THE COURT:  So the tort of intrusion under *Shulman*,

20    quote, encompasses unconsented to physical intrusion into the

21    home, hospital room, or other place of privacy of which is

22    legally recognized, as well as unwarranted sensory intrusion,

23    such as eavesdropping, wiretapping, and visual or photographic

24    spying.

25         MS. BONN:  Yes.

1          **THE COURT:**  I see.

2          **MS. BONN:**  There is also, I guess, one further

3    distinction we disagree with, but Google has taken the position

4    that the invasion of privacy claim under the constitution

5    cannot provide damages as a remedy, so we disagree.  We think

6    both provide those remedies, but Google has taken a position

7    that there is an important distinction between the two claims

8    with respect to the remedy.

9          **THE COURT:**  I see.

10         **MS. NIX-HINES:**  Your Honor, with respect to the

11   invasion of privacy instruction, plaintiffs have left out

12   important elements that are found in the case law, including

13   the requirement that plaintiffs have to prove a legally

14   protected privacy interest in the data.  And then also there is

15   a debate between the parties about whether the standard is

16   substantial and highly offensive or, as we argue, that it

17   constitutes an egregious breach of the social norms.  And,

18   again, this is where they confuse the common law tort of

19   intrusion upon seclusion and using CACI 1800 versus judicial

20   precedent, which unequivocally applies the egregious breach of

21   the social norm standard.

22        And we have some of those cases --

23         **THE COURT:**  What's the difference?  Define each.

24         **MS. NIX-HINES:**  We do define "egregious" --

25         **THE COURT:**  So --

1    **MS. NIX-HINES:**  -- "breach."  Let's turn to that.

2    That's on page 178.  And there we draw directly from the case

3    law indicating that --

4         **THE COURT:**  Okay.

5         **MS. NIX-HINES:**  "Egregious breach of social norms" --

6    sorry.

7         **THE COURT:**  So plaintiffs' proposal suggests that they

8    consider all the evidence, including the degree of invasion and

9    that's the extent and gravity of the invasion.  That's your sub

10   A.

11       So what's the difference between considering the degree of

12   invasion and the extent and gravity of the invasion?

13       **MS. NIX-HINES:**  Your Honor, again --

14       **THE COURT:**  Look, I have to -- you don't agree so

15   that's why I'm forced to look at the actual words.  What is the

16   difference substantively?  I understand that there are some

17   words that are different, but it doesn't seem to me that there

18   is a substantive difference between the jury considering the

19   degree of invasion and the extent and gravity of the invasion.

20   Do you agree?

21       **MS. BONN:**  I agree.

22       **MS. NIX-HINES:**  Agreed, Your Honor.  That one is --

23       **THE COURT:**  All right.  So then next, you disagree

24   that they should consider the context, conduct, and

25   circumstances surrounding the invasion?  Do you disagree with

1    that?  I mean, your sub B is argument.  I'm not going to give

2    sub B.  You can argue that.

3        With respect to routine commercial behavior, this is all

4    argument.  You can say -- you can argue, hey, this is routine

5    commercial behavior.  How can that be egregious?  That's

6    argument.  I'm not going to tell them that as a matter of law.

7    You argue that.  That's the context, conduct, and circumstances

8    surrounding the invasion.  They're going to say it's egregious.

9    You're going to say it's routine commercial.  That's what

10   argument is.  It's not -- it's not a proper basis for an

11   instruction.

12        **MS. NIX-HINES:**  I understand, Your Honor.  And I will

13   certainly defer to you on what the language ultimately looks

14   like.  I guess the point I would make is we think it would be a

15   mistake to blend the standards of 631 and 632 because they have

16   different roots:  One is constitutional, one is common law.

17   And so we think that to do justice to both, we should use the

18   language that each one uses and then obviously --

19        **THE COURT:**  That's legal argument, which I can

20   appreciate.  All right.

21        So 631 you said is based in?

22        **MS. NIX-HINES:**  The constitution, California

23   constitution, Article I, Section 1, for invasion of privacy.

24        **THE COURT:**  And 632 is common law.

25        **MS. NIX-HINES:**  Common law.  Tort, intrusion upon

1    seclusion.

2              THE COURT:  All right.

3              MS. NIX-HINES:  Oh, sorry.  I'm sorry, Your Honor.  I

4    was reverting back to CIPA.  We're talking about invasion of

5    privacy, the constitutional claim, versus the intrusion upon

6    seclusion, which is the common law tort.  And there we do apply

7    the analogous CACI 1800.

8              THE COURT:  For the seventh claim.

9              MS. NIX-HINES:  Correct.

10             THE COURT:  All right.

11        Any other distinctions with respect to 6 or 7?  Yes, no,

12    maybe so?

13             MS. NIX-HINES:  With respect to the seventh claim on

14    harm, Your Honor, we have no countervailing proposal.  And we

15    believe that plaintiffs inappropriately -- and they do this in

16    a number of places in the instructions.  They apply the BAJI

17    rather than the CACI.

18        As you know, the CACI supersedes the BAJI, and we don't

19    understand why they continue to use it.  They seem to

20    cherrypick language that they prefer.

21             THE COURT:  So I use CACI first, use BAJI second.

22             MS. BONN:  Can I address that for the harm issue which

23    comes across in numerous instructions?

24        So CACI, in general, assumes that jurors are going to

25    understand what a harm is by virtue of reading the damages

1  instructions, which in many cases might work.  You know, an

2  individual plaintiff says, *You recorded me in my dressing room*

3  *and I'm seeking emotional distress damages and they're in this*

4  *amount*, that is all going to be laid out in the damages

5  instruction.  But in this case, the damages we're seeking are

6  for unjust enrichment, disgorgement essentially, and then this

7  screenwise fair packet value of data, and that is an

8  appropriate damage measure, but in addition, as the Court

9  recognized in summary judgment, there is an essential harm by

10  virtue of having one's privacy invaded.

11      And BAJI has some instructions on harm in the privacy

12  context that explain that the injury to one's peace of mind

13  from the loss of privacy is a cognizable harm.  So that's why

14  specifically with respect to the harm instruction across the

15  privacy torts, we ask that the Court take a look at the BAJI

16  instruction on harm because we're not sure that without some

17  instruction that tells the jury look, you can find a fact of

18  harm by virtue of, you know, the loss of privacy itself, it is

19  a legally recognizable harm, they might just look at these

20  damage instructions and go, *Okay, well, this talks about unjust*

21  *enrichment and this talks about fair market value, but what*

22  *tells me -- how I do know if the plaintiffs were harmed?  They*

23  *didn't lose a leg.*

24      So I think it's appropriate to look at those privacy harm

25  instructions.

1      **MS. NIX-HINES:**  And, Your Honor, if I may, we think

2   those very things are improper, peace of minds, injury to

3   feelings, because they've never pleaded them.  And, in fact, in

4   their responses to Interrogatory No. 3 when plaintiffs were

5   asked, you know, what are the harms, none of them, not one,

6   identified peace of minds or injury to feelings.  And so we

7   think it's too late in the game to try and expand notions of

8   harm.

9      And, in addition, you know, they're seeking to include

10  purported remedies that they claim they're entitled to like

11  disgorgement of profits resulting from unjust enrichment and an

12  inhibited ability to participate in a market, but those are not

13  harms under the common law invasion of privacy, and they should

14  not be allowed to bootstrap their damages theories into an

15  instruction on harm.

16     **MS. BONN:**  Briefly, I disagree.  The Internet Facebook

17  Tracking case at the Ninth Circuit made clear that one's right

18  under California lawful to seek a disgorgement or an unjust

19  enrichment is a sufficient harm to confer standing on these

20  claims, so we think the jury is entitled to hear that if the

21  plaintiffs had their privacy rights invaded and they would have

22  a right to recover unjust enrichment, that that in and of

23  itself -- they may find that that is sufficient to constitute a

24  harm.

25     **THE COURT:**  Consent.  We are now at page 199.

1              **MS. NIX-HINES:**  Your Honor is turning to the

2     affirmative defense of consent?

3              **THE COURT:**  Unless I missed it.  Did I miss something?

4     We're at affirmative defenses.  First one, that's 8.2.  Yep.

5     8.2, consent.

6         I take it there is no basic instruction?

7              **MS. BONN:**  I don't think so, Your Honor.

8              **MS. TREBICKA:**  No, Your Honor, there is not.

9              **THE COURT:**  All right.  I'll read what you have to

10    say.

11        Anything that you want to add on 8.2 or 8.3?

12             **MS. BONN:**  I'd like to make a couple of key points,

13    which I think is where the core dispute is between the parties.

14        One is that -- and it's clear from the restatement on

15    torts, it's clear from this Court's ruling on summary judgment,

16    Judge Koh's prior ruling, that consent has to be proportionate

17    to the disclosure, that the practice has to be clearly

18    disclosed.  That concept of the proportionality we think has to

19    be included within the instruction, and that to the extent that

20    Google's conduct exceeded the scope of what is disclosed, they

21    could find a lack of consent as to the portion that's been

22    exceeded.

23        Those two concepts are in ours, and we don't think that

24    they're fairly included within Google's.  One could quibble

25    with the language, but I think it was hard for us to reach

1    agreement because we couldn't even agree on the premise that

2    those two points need to be in there.

3         And then the third point is that plaintiffs have argued --

4    and Google never moved for summary judgment to defeat this

5    argument or this claim -- that the parties' contract in the

6    privacy policy during all relevant times has included the

7    explicit consent provision which says "Google will not reduce

8    your rights under this privacy policy without your explicit

9    consent."  And we think the jury should be able to interpret

10   that provision.

11        And our argument is that if they agree with our

12   interpretation, it means Google cannot advance arguments that a

13   plaintiff impliedly consented.  And so that concept is in here

14   as well.

15        Google has taken the position that somehow the Court has

16   rejected our argument as to this contractual provision as a

17   matter of law on the merits in its class certification order,

18   and I don't think the Court did any such thing.

19            THE COURT:  If that's the case, then -- I have to go

20   back and look.  Did I address that issue?

21            MS. BONN:  Your Honor stated --

22            THE COURT:  If -- if what you're saying is accurate,

23   then the issue of implied consent would have been -- would have

24   had common evidence.

25            MS. BONN:  That's our point of view.  And --

1      **THE COURT:**  And I didn't -- and I found to the

2  contrary.

3      **MS. BONN:**  You found that it would be -- implied

4  consent would be an individualized issue.

5      **THE COURT:**  Correct.

6      **MS. BONN:**  However -- because I think, look, at this

7  trial, Google might prevail.  They might convince the jury that

8  we're wrong about our reading of that contract and we're wrong

9  about what the explicit consent provision means, but it's a

10  fact issue as to what that provision means.

11     The Court did not discuss the explicit consent provision,

12  other than to state what plaintiffs argued.  The Court said

13  plaintiffs argue that the explicit consent provision --

14     **THE COURT:**  But I ruled against you.

15     **MS. BONN:**  You did.  On class certification.  But not

16  on summary judgment.  Not that as a matter of law, we could not

17  prevail on our interpretation of what that provision means.

18     **THE COURT:**  I'm not sure I would exclude Google from

19  making that argument when I ruled against you on that topic.

20     **MS. BONN:**  No.  I'm not saying that Google should be

21  precluded from making the argument.  I'm saying we shouldn't be

22  precluded either.  I'm saying let's put that provision to the

23  jury, say, *Look, plaintiffs are arguing that we will not reduce*

24  *your rights without your explicit consent means Google is not*

25  *going to rely on implied consent.*  And Google is going to come

to the jury and say, *That's not what we mean by that.*   I don't

know what they're going to say it means.  They've never really

told us what they think it means.

     But whatever they think it means, they can present the

other argument, and let's let the jury decide.  All we are

asking for is that the jury be instructed what the import would

be, depending on who they agree with.  If they agree with

Google, then they can consider implied consent.  If they agree

with plaintiff, then they can't.

          **MS. TREBICKA:**  May I respond, Your Honor?

          **THE COURT:**  You may.

          **MS. TREBICKA:**  Plaintiffs are arguing for the

inclusion of a legal principle that the Court has rejected, and

that is a concern.  The plaintiffs raised that issue.

Your Honor rejected it.  And, in fact, it makes sense to have

been rejected because the phrase that plaintiffs are

identifying says "Google will not reduce your rights under this

privacy policy."  It is not with -- with application to all

documents that constitute the contract.  That's issue number 1.

     Further, the plaintiffs' phrasing of this issue as a legal

matter is wrong because what they're arguing is that this

statement that the -- the plaintiffs' rights will not be

reduced without their explicit consent actually means that an

action -- that -- that is not an action by Google which would

implicate implied consent or an action -- or an action to

1   reduce users' rights.  It's just user conduct.  So it has no

2   place in the legal instruction on implied consent.

3       And that is the fundamental reason that Your Honor

4   rejected this with respect to implied consent.  It has no place

5   in the jury instruction now with respect to implied consent.

6           THE COURT:  Statute of limitations.

7           MS. TREBICKA:  Your Honor, may I make -- opposing

8   counsel made a couple other points on this instruction on

9   affirmative defense.  May I respond very briefly?

10           THE COURT:  Briefly.

11           MS. TREBICKA:  The fundamental reason that we could

12  not agree on the joint instruction here is because plaintiffs

13  believe that only three of their claims actually -- that --

14  that our affirmative defense of consent applies only to three

15  of their seven claims, and that is wrong as a matter of law.

16  As long as we cure that, I think we can find some ground, some

17  common ground here.

18       And also with respect to identifying additional strictures

19  on implied consent, I think we can again find some common

20  ground, but the strictures cannot be as argumentive as

21  plaintiffs have put them in their jury instructions, for

22  example, instructing the jury that Google must show that

23  plaintiffs consented to Google collecting, saving, and using

24  his or her private browsing data.  So the details matter here,

25  Your Honor, and I think that's where we don't see eye to eye.

1          **THE COURT:**  All right.  We are going to take a break

2    from this case.  I've got a criminal case that I forgot about.

3    Why don't you all come up.

4                   (Pause in Proceedings.)

5          **THE COURT:**  Back on the record, Brown vs. Google.

6       All right.  Statute of limitations, 8-5.

7          **MS. FANI:**  Your Honor, Teuta Fani for Google.

8          **THE COURT:**  Okay.  All right.  Your disagreements

9    about the introduction, is there anything substantive?

10         **MS. FANI:**  Yes, Your Honor.  There is one significant

11   disagreement.  I can distill it in a sentence, and that's

12   whether the statute of limitations bars liability or whether it

13   limits damages.  And Google's position is there is no case law

14   that statute of limitations just limits damages.  It's always

15   been a defense that bars liability.  So --

16         **THE COURT:**  Wasn't that an issue of law?

17         **MS. FANI:**  Sorry, Your Honor?

18         **THE COURT:**  Isn't that an issue of law?

19         **MS. FANI:**  The statute of limitations?

20         **THE COURT:**  Right.  The effect of the statute of

21   limitations.  Isn't that an issue of law?

22         **MS. FANI:**  So it's not in this case because -- because

23   of the delayed discovery rule, so plaintiffs of arguing --

24         **THE COURT:**  The effect of the statute of limitations

25   finding, isn't that an issue of law as opposed to the factual

1    issue with respect to when the statute begins to run?

2            MS. FANI:  Yes.  The effect is a legal --

3            THE COURT:  Okay.  This needs to be written as a

4    factual issue, not as a legal issue.

5            MS. FANI:  So we followed CACI 454 for this -- both

6    parties substantially followed that CACI.  We just disagree

7    with one insert.

8        So plaintiffs seek to add a limitation of damages insert,

9    and we clarify that it's -- it bars liability -- excuse me --

10   that it bars liability of a claim or a portion of a claim, but

11   for the most part, the parties adhere to --

12           THE COURT:  Just stop.

13           MS. FANI:  Okay.

14           THE COURT:  Well, the first -- the -- at line 5 1/2,

15   Google's insert, red insert, is consistent with 454.  What is

16   not consistent is its second insert at line 6 1/2.

17       So when you have a continuing violation, if -- if they

18   have harm that comes within the statute, it's viable harm.

19   You're seeking to exclude all of it, and that's just wrong so

20   that's going to be denied.

21       Next issue.  8-6, there's no dispute.

22       8-7, if you're wrong about the other, you may be wrong on

23   that one.  I'm look at 455.  And try to do it consistent to

24   CACI.

25       8-8.  What is going on here?

1          **MS. FANI:**  So this -- this instruction clarifies or

2     provides instruction to the jury for Google's affirmative

3     defense of limitation of liability, and plaintiffs object to it

4     in its entirety.  And Google believes it should be given

5     because it's one of our defenses raised in the --

6          **THE COURT:**  Why can't you argue this?  And how am I

7     supposed to read a chart?

8          **MS. FANI:**  So the chart just identifies --

9          **THE COURT:**  You understand I have to read it; right?

10         **MS. FANI:**  Yes, Your Honor.

11         **THE COURT:**  You understand I have to sit here and read

12    it to them.

13         **MS. FANI:**  Yes, Your Honor.  And we just identify the

14    statements so if the issue is reading the chart --

15         **THE COURT:**  Why can't you argue this?  What is the law

16    in here that needs to be read by the judge as opposed to the

17    litigants arguing their case?

18         **MS. FANI:**  So the law that the plaintiff -- the jury

19    needs to be instructed on is how to interpret --

20         **THE COURT:**  What are the lines?  Give me the lines

21    that reflect the law as opposed to the argument.

22         **MS. FANI:**  So right before the chart, Your Honor, we

23    say to the jury, "You must decide whether the following

24    statements from the contract preclude liability for Google's

25    receipt of the at-issue data during the corresponding time

1    period."

2          **THE COURT:**  I'm not so sure.  I'll look at it more

3    closely later.  It seems awfully odd.  And I take it there is

4    no -- yeah.  And there's zero kind of CACI instruction for this

5    kind of thing.

6          **MS. FANI:**  This is similar to our instruction on the

7    parties' disputed terms of contract.  So --

8          **THE COURT:**  So it goes all -- look, and I don't like

9    your breach of contract instructions, which I have to probably

10   redo in their entirety.

11      I'll take a look at it in the context of the breach of

12   contract instructions.

13      And the same thing probably goes for waiver.  Where is the

14   law?  CACI 336?

15         **MS. FANI:**  So waiver is actually based on CACI 336,

16   but I will yield to my colleague.  Ms. Trebicka is going to

17   cover that one.

18         **THE COURT:**  So contract instruction.

19         **MS. FANI:**  Yes, Your Honor.

20         **THE COURT:**  I will look at it then when I go back and

21   do those.  All right.

22      Waiver is the intentional relinquishment of a known right

23   after knowledge of the facts, *Roesch vs. DeMota* 20 -- Supreme

24   Court of California.

25         **MS. TREBICKA:**  Your Honor, we've used the CACI 336,

1    but if it would please Your Honor, we can redo it, provide a

2    different instruction that uses that California court cite that

3    you just mentioned.

4            **THE COURT:**  No.  I'm just looking -- I just read the

5    first -- the first reference to authority, and I was a little

6    bit surprised because -- are you arguing waiver after -- after

7    the filing of the lawsuit?

8            **MS. TREBICKA:**  We're -- well, Your Honor, we believe

9    that the waiver argument goes beyond that.  It's both express

10   waiver and implied waiver.  One of the pieces of evidence that

11   we will argue is, for example, continued use of the private

12   browsing after the filing of the lawsuit, but that's not the

13   only piece of evidence that will apply to that claim -- or to

14   that instruction.

15           **MS. BONN:**  May I be heard briefly on that, Your Honor?

16           **THE COURT:**  Go ahead.

17           **MS. BONN:**  Thank you, Your Honor.

18       Google pled a waiver affirmative defense in its Answer in

19   which it only appeared to cite explicit contract documents

20   between the parties as an example.  So we served an

21   Interrogatory No. 9 where we asked them to explain the factual

22   bases for all of their affirmative defenses, and on March 9th

23   of 2022, just before the close of discovery, Google responded,

24   and at page 16 they said, "11the affirmative defense

25   waiver/estoppel, plaintiffs explicitly exculpated Google for

the conduct alleged through their contractual agreements with Google," and then they cite and quote from the terms of service.

So we asked Google to provide us in discovery with the basis for their waiver defense, and they said they are only relying on an explicit waiver based on the contents of the parties' form agreement.

And now months later and after this was the subject of extensive briefing in our Rule 23 petitions, Google says, *Well, actually, we kind of told you we had consent defense, and consent is substantially equivalent to waiver, and so now we want to assert an implied waiver defense.* And the truth is these are two very different standards. Waiver is subject to a clear and convincing evidence standard.

And the problem that Google is facing is that at class certification, they told the Court that consent, rather than waiver, is the relevant defense to a breach of contract claim, and yet under California law, it is not. There is no CACI pattern instruction under the contract Section 300 for consent to a contract. The relevant standard is a waiver.

And so Google pled waiver based on the contract itself. It's a different standard. It's subject to clear and convincing evidence. And now they're sort of impliedly admitting that maybe there is a difference because they want the waiver instruction, not just a consent instruction, but

1    they want the waiver instruction to be on an implied waiver

2    when in discovery, we served the necessary interrogatory to ask

3    them for the basis of their waiver defense, and they said the

4    basis is that plaintiffs explicitly exculpated Google through

5    their contractual agreement.

6              THE COURT:  All right.  Response.

7              MS. TREBICKA:  Let me cut through some of that

8    conjecture, Your Honor, and go back to the 11th affirmative

9    defense, which is the defense of waiver where we very

10   specifically state that -- and I'm quoting, the -- that, "The

11   TAC," which is the Third Amended Complaint, "and each cause of

12   action stated therein is barred in whole or in part by the

13   doctrines of waiver and estoppel."

14       And then separately "and because plaintiffs explicitly

15   exculpated Google for its conduct."  Those are all bases --

16             THE COURT:  You were asked to explain in your

17   discovery responses the basis.  Did you do that or not?

18             MS. TREBICKA:  We did respond, Your Honor.  I'll have

19   to --

20             THE COURT:  You said you did not?

21             MS. TREBICKA:  No.  We did respond, Your Honor.  And

22   I'll have to --

23             THE COURT:  Did you respond -- that's -- that's what

24   their argument is here.  And they've said that you failed to

25   identify this basis in discovery, and if you did, you may have

1    waived it.  Not the -- use the same term, but I did.

2        So I need a response on her issue with respect to your

3    failure to disclose it during discovery.

4            MS. TREBICKA:  Yes, Your Honor.

5        So we did respond citing to the explicit exculpation in

6    the discovery response.  However, throughout litigation, we

7    maintained, as we did in our affirmative defense in the

8    pleading, in our answer, that there is a separate waiver

9    affirmative defense, and plaintiffs never contested that up

10   until now.

11       In fact, at the class certification stage, plaintiffs

12   repeatedly recognized that Google has an implied waiver defense

13   to the breach of contract claim, and there is no ambiguity

14   there, Your Honor.

15       The plaintiffs' class certification reply -- it's Docket

16   712-1 at page 3 -- where they recognize --

17           THE COURT:  Is this not in your response.

18           MS. TREBICKA:  Sorry, Your Honor?

19           THE COURT:  In your 500- or 300-page document, do I

20   have that?

21           MS. TREBICKA:  You do, Your Honor.

22           THE COURT:  Okay.

23           MS. TREBICKA:  Would you like a page number?

24           THE COURT:  Well, I'm looking at it now.  I'm just

25   asking if it's in here.

1          **MS. TREBICKA:**  It is in there, Your Honor.

2          **THE COURT:**  All right.  That's all I need then.

3     Next.

4          **MS. TREBICKA:**  Your Honor, I wasn't done on the waiver

5     issue, but --

6          **THE COURT:**  We're going to run out of time here.

7     We've been on the record since 9:00.  I have to take a felony

8     plea.

9          **MS. TREBICKA:**  Understood, Your Honor.

10         The waiver is in there, is my parting word.  It is a

11    crucial defense, affirmative defense, that we included in our

12    answer.

13         **THE COURT:**  But you understand that just including it

14    in the Answer is not enough if you didn't follow up with your

15    discovery obligations.

16         **MS. TREBICKA:**  We did follow up with discovery

17    obligations and in briefing, Your Honor, and it was never

18    contested up until now.

19         **THE COURT:**  As long as you understand you have

20    obligations and you cannot just rely on something that was

21    filed at the beginning.

22         **MS. TREBICKA:**  Yes, Your Honor.

23         **THE COURT:**  And I will check because at this point, I

24    don't know who to believe.

25         Damages.  I don't want any argument because you all don't

1    agree on much of anything of this, and there's a lot to do, and

2    we aren't going to do it in 15 minutes.

3        What I do need -- what's today.  I want it by 9:00 a.m. on

4    Friday, I want an editable version of just the -- of just the

5    instructions.  No argument.  So strip out everything that

6    you've put in here in Docket 1057 and just give me an editable

7    version and strip out all the signature blocks and everything

8    else of the instructions themselves so I can work on them.

9    Send it to the proposed order mailbox.

10       **MS. TREBICKA:**  Would you like the authorities as well,

11   Your Honor?

12       **THE COURT:**  No.  I have your documents.  I will

13   cross-reference them.  I want it -- I want a clean version of

14   that document.

15       **MS. TREBICKA:**  Assuming with the red and the blue --

16       **THE COURT:**  Yes, please.  All right.

17       **MS. TREBICKA:**  I know we're running out of time.  We

18   did skip through a couple of affirmative defense instructions

19   in the middle, that my colleague, Ms. Nix-Hines, was prepared

20   to address, including the -- the a -- 8.3 and 8.4, Your Honor.

21       **THE COURT:**  Is there anything else you all want to

22   discuss in these final minutes other than that?

23       **MS. BONN:**  No.

24       **THE COURT:**  Anything else on the defense side?

25       **MS. TREBICKA:**  No, Your Honor.

1           **THE COURT:**  All right.  Then 8.3 and 8.4 -- well, that

2     was consent, and we've had a loss of discussion about consent.

3           **MS. NIX-HINES:**  Yes, Your Honor.  Just very briefly,

4     because I know it's getting late, the big difference between

5     our instruction and plaintiffs' is that plaintiffs' instruction

6     only pertains to the affirmative defense if the websites

7     consented.  The law is actually that either the plaintiffs or

8     the websites consent.  If we can prove either of those, then we

9     succeed on that affirmative defense, and so we --

10          **THE COURT:**  I think they disagree with you obviously

11    on the law, and that's already been argued today, so take a

12    look at it.

13          **MS. NIX-HINES:**  Thank you, Your Honor.

14          **MR. MAO:**  Just two quick points on that.

15          First of all, there is a difference between the federal

16    and the state on the one-party to two-party consent.  So

17    Google's argument with regard to the ECPA is that they have the

18    website's consent.  Obviously we disagree.

19          But that in itself is not going to be sufficient for CIPA,

20    which is clear, every secondary authority agrees, not even

21    Google disagrees, that it requires two-party consent.

22          Second thing, Your Honor, as we've laid out in all of the

23    instructions on consent, consent requires an actual choice, and

24    here Google has never ever disputed that users do not have an

25    actual choice on whether they can be tracked, T-R-A-C-K-E-D.

1    We believe that -- that consent requiring a choice should be

2    part of the consent instruction.

3            THE COURT:  Okay.  Anything else?

4            MS. NIX-HINES:  Just to refer you to a couple of cases

5    in our mini brief, *In Re Meta Pixel* and *Rodriguez vs. Google*

6    bot establish -- two cases I am pointing Your Honor to, *In Re*

7    *Meta Pixel Healthcare*, 2022 Westlaw 17869218 at 12, and

8    *Rodriguez vs. Google*, 2021 Westlaw 2026726 at 6, both of which

9    establish that there is no liability under the Wiretap Act

10   where one party consents.

11       We think that is black letter law that needs to be

12   included in the affirmative defense instruction.

13       And then finally, Your Honor, turning to the 8.4, invasion

14   of privacy justified, Your Honor, we have followed CACI 1807

15   with minor modifications to identify which claims this applies

16   to, but it's a correct statement of the law, and it's a

17   necessary instruction for the jury.  It's important that they

18   understand that there could be no liability if Google can show

19   that it's conduct was justified.  And we've set forth, pursuant

20   to the CACI, that standard as well as the rationales that

21   Google will seek to show were -- proved that its conduct was

22   justified, to the extent plaintiffs can establish any

23   wrongdoing in the first instance.

24           MR. MAO:  Your Honor, we believe that one is well

25   briefed.  It's our responses to that --

1          **THE COURT:**  All right.  I'll look at it.

2          **MS. NIX-HINES:**  With that, Your Honor, we thank you

3    for your time and your patience and appreciate the fulsome

4    hearing you've given us today.

5          **THE COURT:**  Okay.  I'll be in touch.  We're adjourned.

6              (Proceedings adjourned at 3:07 p.m.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Sunday, December 3, 2023

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
      U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25