1    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

2    Stephen A. Broome (CA Bar No. 314605)          Andrew H. Schapiro (admitted *pro hac vice*)
     stephenbroome@quinnemanuel.com                andrewschapiro@quinnemanuel.com
3    Viola Trebicka (CA Bar No. 269526)             Teuta Fani (admitted *pro hac vice*)
     violatrebicka@quinnemanuel.com                teutafani@quinnemanuel.com
4    Crystal Nix-Hines (CA Bar No. 326971)          Joseph H. Margolies (admitted *pro hac vice*)
     crystalnixhines@quinnemanuel.com              josephmargolies@quinnemanuel.com
5    Rachael L. McCracken (CA Bar No 252660)        191 N. Wacker Drive, Suite 2700
     rachaelmccracken@quinnemanuel.com             Chicago, IL 60606
6    Alyssa G. Olson (CA Bar No. 305705)            Telephone: (312) 705-7400
7    alyolson@quinnemanuel.com                     Facsimile: (312) 705-7401
     865 S. Figueroa Street, 10th Floor
8    Los Angeles, CA 90017
9    Telephone: (213) 443-3000
     Facsimile: (213) 443-3100
10

11   Jomaire Crawford (admitted *pro hac vice*)     Xi ("Tracy") Gao (CA Bar No. 326266)
     jomairecrawford@quinnemanuel.com              tracygao@quinnemanuel.com
12   51 Madison Avenue, 22nd Floor                  Carl Spilly (admitted *pro hac vice*)
     New York, NY 10010                             carlspilly@quinnemanuel.com
13   Telephone: (212) 849-7000                      1300 I Street NW, Suite 900
     Facsimile: (212) 849-7100                      Washington D.C., 20005
14                                                  Telephone: (202) 538-8000
15                                                  Facsimile: (202) 538-8100

16

17   *Counsel for Defendant Google LLC*

18                      **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

19

20   CHASOM BROWN, *et al*., on behalf of          Case No. 4:20-cv-03664-YGR-SVK
     themselves and all others similarly situated,
21                                                  **GOOGLE LLC'S OPPOSITION TO**
          Plaintiffs,                               **PLAINTIFFS' MOTION FOR AN**
22                                                  **AWARD OF ATTORNEYS' FEES,**
          v.                                        **COSTS, AND SERVICE AWARDS**
23
     GOOGLE LLC,                                    Judge: Hon. Yvonne Gonzalez Rogers
24                                                  Date: August 7, 2024
          Defendant.                                Time: 2:00 p.m.
25                                                  Location: Courtroom 1 – 4th Floor

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................3

       A.   Google's Data Collection in PBM Was Well Known—Not A "Secret" as
            Plaintiffs Sought to Prove ........................................................................3

       B.   Plaintiffs Spend Years Failing to Prove Google Uses PBM Data to Create
            "Cradle-to-Grave Profiles" Linked to Class Members' Accounts ...........................4

       C.   Counsel Inflate Their Lodestar by Over-Lawyering ...................................5

       D.   The Settlement Does Not Provide Any Monetary or Injunctive Relief—And
            Only a Fraction of the Onerous Terms Plaintiffs Sought ............................6

       E.   Counsel Seek to Recover Even More Attorneys' Fees by Mass Pursuit of
            De Minimis Individual Damages Claims ...................................................9

III.   ARGUMENT ....................................................................................................10

       A.   Counsel's $62 Million Lodestar Is Excessive And Must Be Adjusted ..................11

            1.   Counsel's Rates Are at the High End of the Market and Their
                 Document-Review Rates are Particularly Excessive ......................11

            2.   Counsel's Excessive Hours Require a Further Lodestar Reduction ...........12

                 a.   Certain Work Should Be Excluded in Full ........................12

                 b.   Pervasive Inefficiencies Warrant a 25% Across-the-Board
                      Reduction ......................................................................13

       B.   The Court Should Apply a Negative Multiplier to the Adjusted Lodestar .............15

            1.   The Limited Benefit Obtained for the Class Warrants a Negative
                 Multiplier ......................................................................16

            2.   The Value of the Relief Confirms the Court Should Apply a
                 Negative Multiplier ..........................................................18

            3.   Comparable Awards Support a Negative Multiplier ...................20

            4.   The Case's Alleged "Importance and Complexity" Does Not
                 Warrant a Positive Multiplier ............................................21

            5.   The Case's Contingent Nature Does Not Warrant a Positive
                 Multiplier ......................................................................22

            6.   Counsel's Fees Should Be Reduced Because They Are Repurposing
                 Their Work Product in Support of a Mass Action for Damages .................22

| | | | |
|---|---|---|---|
| | | 7. Failing to Apply a Negative Multiplier Would Be Bad Policy | 23 |
| | C. | Counsel's $7.7 Million in Costs Should be Reduced | 23 |
| | D. | Plaintiffs' Excessive Request for $30,000 Service Awards Should Be Denied | 25 |
| CONCLUSION | | | 25 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*A. A. v. Cnty. of Riverside*,
  2022 WL 822187 (9th Cir. Mar. 18, 2022) ..................................................... 23, 24

*Adkins v. Facebook, Inc.*,
  2021 WL 1817047 (N.D. Cal. May 6, 2021) ........................................................ 17

*Arcona, Inc. v. Farmacy Beauty, LLC*,
  2021 WL 2414856 (C.D. Cal. June 14, 2021),
  *aff'd*, 2022 WL 1486822 (9th Cir. May 11, 2022) ................................................ 15

*Banas v. Volcano Corp.*,
  47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................................................... 24

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011)........................................................ 10, 15, 16, 19, 22

*Brown v. Google LLC*,
  No. 22-80147, Dkt. 1-2 (9th Cir. 2023) ................................................................. 9

*Brown v. Google LLC*,
  No. 22-80147, Dkt. 10 (9th Cir. 2023)................................................................... 9

*Campbell v. Facebook Inc.*,
  2017 WL 3581179 (N.D. Cal. Aug. 18, 2017),
  *aff'd*, 951 F.3d 1106 (9th Cir. 2020) ............................................................... 12, 17

*City of Burlington v. Dague*,
  505 U.S. 557 (1992) ............................................................................................. 22

*City of Plantation Police Officers' Employees' Retirement Sys. v. Jeffries*,
  2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) .................................................... 17

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
  2023 WL 8445812 (N.D. Cal. Oct. 10, 2023)........................................... 20, 23, 25

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020)................................................................................. 4

*Fischel v. Equitable Life Assur. Society of U.S.*,
  307 F.3d 997 (9th Cir. 2002)............................................................................... 22

*Gaston v. LexisNexis*,
  2021 WL 2077812 (W.D.N.C. May 24, 2021) ................................................. 1, 17

*Gates v. Deukmejian*,
  987 F.2d 1392 (9th Cir. 1992)............................................................................. 13

*GemCap Lending I, LLC v. Unity Bank Minnesota*,
    2019 WL 3842010 (N.D. Cal. Aug. 15, 2019) ...................................................................... 15

*Gilead Scis., Inc. v. Merck & Co.*,
    2017 WL 3007071 (N.D. Cal. July 14, 2017) ...................................................................... 13

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .............................................................................. 10, 12, 15, 16

*Hernandez v. Grullense*,
    2014 WL 1724356 (N.D. Cal. Apr. 30, 2014) ...................................................................... 14

*Iswed v. Caruso*,
    2013 WL 12093132 (W.D. Mich. Feb. 14, 2013) ...................................................................... 16

*John Meggs v. Gomez, Inc.*,
    2018 WL 11355448 (C.D. Cal. July 12, 2018) ...................................................................... 24

*Johnson v. MGM Holdings, Inc*,
    943 F.3d 1239 (9th Cir. 2019) ...................................................................... 13

*Kerr v. Extras Guild, Inc.*,
    526 F. 2d 67 (9th Cir. 1975) ...................................................................... 20

*Ketchum v. Moses*,
    24 Cal.4th 1122 (2022) ...................................................................... 13, 15, 22

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) ...................................................................... 18, 20

*Krumme v. Mercury Ins. Co.*,
    123 Cal. App. 4th 924 (2004) ...................................................................... 17

*Lahiri v. Universal Music & Video Distribution Corp.*,
    606 F.3d 1216 (9th Cir. 2010) ...................................................................... 15

*Lota by Lota v. Home Depot U.S.A., Inc.*,
    2013 WL 6870006 (N.D. Cal. Dec. 31, 2013) ...................................................................... 12

*Lowery v. Rhapsody Int'l, Inc.*,
    75 F.4th 985 (9th Cir. 2023) ...................................................................... 2, 10

*Matera v. Google*,
    2018 WL 11414641 (N.D. Cal. Feb. 9, 2018) ...................................................................... 17, 22

*Nadarajah v. Holder*,
    569 F.3d 906 (9th Cir. 2009) ...................................................................... 12

*Newton v. Equilon Enterprises, LLC*,
    411 F. Supp. 3d 856 (N.D. Cal. 2019) ...................................................................... 20, 22

*Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*,
    2016 WL 1165214 (N.D. Cal. Mar. 25, 2016) ...................................................................... 14

*Phigenix, Inc. v. Genentech Inc.*,
    2019 WL 2579260 (N.D. Cal. June 24, 2019) .................................................................... 14

*Pierce v. Cnty. of Orange*,
    905 F. Supp. 2d 1017 (C.D. Cal. 2012) .............................................................................. 17

*Red v. Kraft Foods Inc.*,
    680 F. App'x 597 (9th Cir. 2017) ...................................................................................... 16

*Resilient Floor Covering Pension Fund v. M & M Installation, Inc.*,
    2012 WL 1813395 (N.D. Cal. May 17, 2012) .................................................................... 24

*Rodgers v. Claim Jumper Rest., LLC*,
    2015 WL 1886708 (N.D. Cal. Apr. 24, 2015) .................................................................... 12

*S. Yuba River Citizens League & Friends of River v. Nat'l Marine Fisheries Serv.*,
    2012 WL 1038131 (E.D. Cal. Mar. 27, 2012),
    *aff'd* 581 F. App'x 693 (9th Cir. 2014) ............................................................................. 15

*Scott v. HSS Inc.*,
    2017 WL 7049524 (C.D. Cal. Dec. 18, 2017) ................................................................... 14

*Sols. 30 E. Eur., S.R.L. v. Muddy Waters Cap. LLC*,
    2022 WL 1814439 (N.D. Cal. Apr. 28, 2022) .............................................................. 11, 13

*St. Louis Police Ret. Sys v. Severson*,
    2014 WL 3945655 (N.D. Cal. Aug. 11, 2014) ................................................... 13, 14, 17, 18

*Stathakos v. Columbia Sportswear Co.*,
    2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) ........................................................ 12, 16, 21

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ............................................................................................ 20

*Stetson v. Grissom*,
    821 F.3d 1157 (9th Cir. 2016) ........................................................................................... 22

*Stonebrae, L.P. v. Toll Bros.*,
    2011 WL 1334444 (N.D. Cal. Apr. 7, 2011),
    *aff'd*, 521 F. App'x 592 (9th Cir. 2013) ............................................................................ 14

*Tenorio v. Gallardo*,
    2019 WL 3842892 (E.D. Cal. Aug. 15, 2019) ................................................................... 24

*In re Twitter Inc. Sec. Litig.*,
    2022 WL 17248115 (N.D. Cal. Nov. 21, 2022) ................................................. 20, 21, 23, 25

*In re Twitter Inc. Sec. Litig.*,
 No. 4:16-cv-05314, Dkt. 661 (N.D. Cal. October 13, 2022) .................................................. 21

*Uphold our Heritage v. Town of Woodside*,
2008 WL 4868816  (Cal. Ct. App. Nov. 12, 2008) ........................................................................ 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
 2023 WL 4109573 (N.D. Cal. June 20, 2023) .............................................................................. 14

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
 19 F.3d 1291 (9th Cir. 1994) ........................................................................................................ 22

*Welch v. Metro. Life Ins. Co*.,
 480 F.3d 942 (9th Cir. 2007) ................................................................................................. 14, 15

*In re Wells Fargo & Co. S'holder Derivative Litig*.,
 445 F. Supp. 3d 508 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021) .................... 11

*Wynn v. Chanos*,
 2015 WL 3832561 (N.D. Cal. June 19, 2015) ........................................................................... 14

*Xu v. Yamanaka*,
 2014 WL 3840105 (N.D. Cal. Aug. 1, 2014) ............................................................................. 14

*Yong Soon Oh v. AT&T Corp.*,
 225 F.R.D. 142 (D. N.J. 2004) ..................................................................................................... 17

## Other Authorities

Local Rule 11-1 ................................................................................................................................ 6

Local Rule 11-3 ................................................................................................................................ 6

## I.   INTRODUCTION

This was the Incredible Shrinking Case. Plaintiffs originally sought to recover more than $9 billion in class damages and sweeping injunctive relief, and failed at both. The proposed settlement provides *no money* for any class member and only a small aspect of the expansive non-monetary relief Plaintiffs unreasonably demanded. And although it does provide meaningful relief to the Rule 23(b)(2) classes, it is neither "historic" nor a testament to Plaintiffs' "success." Dkt. 1097-1 ("Approval Mot."), at 1. The Court should reject class counsel's extraordinary request for $217 million in attorneys' fees—3.5 times their inflated $62 million lodestar—for what can only be described as a "limited success." *See* Declaration of Prof. William B. Rubenstein ("Rubenstein Decl.").

Plaintiffs began with a grand theory of liability—that Google "surreptitiously" collects data from private browsing mode ("PBM") users that it then joins to their accounts to identify them and create "cradle-to-grave profiles." But Google's practices were no secret at all. The data Google received was viewable in real time by any Chrome user and widely discussed publicly for years before Plaintiffs filed suit (including by their own expert). And discovery flatly refuted Plaintiffs' "cradle-to-grave" theory, showing instead that Google implemented policies and technical safeguards to prevent such joining. Plaintiffs' theory thus eroded to a hypothetical—that even though Google does *not* identify PBM users or create cradle-to-grave profiles, it *could* do so. After conducting two mock jury exercises, Plaintiffs recognized their theory may fall flat and withdrew their jury demand on the eve of trial. Then they abandoned nearly all the relief they sought and settled for modest terms proportional to the remnants of their case.

Counsel's request for a nine-figure award would be pushing the envelope even if they had obtained a $1 billion common fund. Here, it is beyond the pale. They cite no precedent for awarding such a massive sum to class counsel who *failed* to obtain a common fund. Their requested fee would dwarf the largest ever in these circumstances ($5 million by counsel's own account) by many multiples.  *See* Dkt. 1107-1 ("Mot."), at 18 n.11 (citing *Gaston v. LexisNexis*, 2021 WL 2077812 (W.D.N.C. May 24, 2021)). And there the fee was *uncontested* by the defendant.

The Court should reduce the lodestar to address pervasive overstaffing and award a reasonable fee commensurate with counsel's limited success and awards in comparable cases.

*First*, the Court should reduce counsel's bloated lodestar. Counsel seek reimbursement for an army of 72 attorneys (including 21 partners) and 25 staff seemingly assigned with no concern for efficiency—*e.g.*, four attorneys to defend depositions, ten attorneys at hearings. Twenty-four partners and associates billed four million dollars in fees *but did not even appear in the case*. And with no client minding the bills, counsel recorded time with abandon—*e.g.*, a senior partner block-billed 23 hours in a single day (at $1,450/hr) for travel and research, and another block-billed 10 hours (at $2,500/hr) to attend a hearing at which he did not appear. Counsel exacerbated their over-lawyering by charging market-leading rates, including $676/hr for document reviewers—leading to over $15 million for document review alone. At the threshold, the Court should reduce counsel's lodestar to no more than $40 million to account for these and other inefficiencies described below and detailed in Exhibit 3 to the June 7, 2024 Declaration of Stephen A. Broome ("Broome Decl.").

*Second*, counsel's limited success for the class warrants a substantial negative multiplier—not a massive bonus. The "touchstone" for any fee award is the "benefit to the class." *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 988 (9th Cir. 2023). Here, counsel's assertion that they secured "fundamental changes to Google's data-collection practices," Approval Mot. 16, is refuted by the settlement itself, which does not require *any* changes to the core practices that Plaintiffs challenged. Incognito and other private browsing modes will continue to function just as they did when the Complaint was filed in 2020. The only material change since that time is that Incognito now blocks third-party cookies by default. But that is not counsel's doing—Google announced that change before Plaintiffs filed suit. Instead, the settlement's primary benefit to the class consists of clarifications to Google's disclosures to directly address the Court's concern that Google was not specifically identified as one of the many entities that may receive data when users are in PBM. Google also agreed to delete or remediate certain "bits" and legacy data it was no longer using. Counsel's assertion that the settlement "returns" billions of dollars in "value" to class members is sophistry—the settlement "returns" neither data, nor its monetary equivalent, nor anything else.

The Court should also consider that class counsel is trying to double-dip on their fees. Having failed to certify a damages class, counsel is separately pursuing individual damages cases against Google on behalf of more than 95,000 class members in the Superior Court to recover even more fees. If the individual damages claims have any merit, counsel will receive appropriate compensation there. Any award for the work done here in pursuit of the failed damages claims is inappropriate.

An award even close to the purported lodestar would be unprecedented and ill-advised. It would perversely incentivize class counsel to over-litigate cases unlikely to yield damages or change core business practices. Even more, it would inhibit the efficient resolution of cases that, like this one, were poised for settlement on reasonable terms commensurate with the pretrial posture of the case. This Court should award modest fees in line with comparable cases and the outcome here.

## II.     BACKGROUND

### A.     Google's Data Collection in PBM Was Well Known—Not A "Secret" as Plaintiffs Sought to Prove

Plaintiffs contend their initial complaint required "an extensive many-months investigation" employing technical experts that exposed Google "secretly" collecting PBM data. Approval Mot. 3. But as the Court recognized, a publicly available Chrome feature allows users "to see, in real time, what data is being collected when users are browsing in private mode." Dkt. 803 ("Class Cert. Order"), at 31; *see also* Dkt. 1 ("Compl.") ¶ 38 (demonstrative created using Chrome's publicly available tools showing data collection in Incognito).

Thus, there was never anything "secret" about the collection of this data—which consists of anonymous, routine communications used to enable Google services on websites—nor anything that required millions of dollars in litigation efforts to confirm. Indeed, Plaintiffs' own privacy expert published a book in 2015 reminding users "that the private browsing option on your browser *only deletes data locally*. So while it's useful for hiding your [] viewing habits from your spouse, *it doesn't block internet tracking*." Dkt. 666-2, Ex. 33 at 153 (emphasis added). A *Wired* article he cited in his report recounted "*the long-known fact* that Incognito isn't truly anonymous" because

"Google [is] still tracking you in privacy mode." Dkt. 666-8, Ex. 108 at 2; *see also* Dkt. 659-3 (Class Cert. Opp.), at 5-6 n.10 (collecting pre-2020 sources with same observation).

## B.    Plaintiffs Spend Years Failing to Prove Google Uses PBM Data to Create "Cradle-to-Grave Profiles" Linked to Class Members' Accounts

Had Plaintiffs limited their case to Google's collection and use of PBM data for advertising and analytics, it would have been swiftly resolved. Google acknowledged those undisputed facts from the outset.[1] The case entered scorched-earth territory because Plaintiffs sought to prove that Google linked PBM data to users' Google Accounts to identify them and "gain[] a complete, cradle-to-grave profile of Plaintiffs without their consent" (Compl. ¶ 39)—a theory copied from the Ninth Circuit's *In re Facebook, Inc. Internet Tracking Litigation* decision issued months earlier. *See* 956 F.3d 589, 599 (9th Cir. 2020) ("[B]y correlating users' browsing history with users' personal Facebook profiles … Facebook gained a cradle-to-grave profile without users' consent.").

Plaintiffs' copycat theory—alleged on information and belief (Compl. ¶ 39)—lacked any foundation in Google's practices. Nonetheless, it was the central dispute of the case and a core focus of discovery. The same "linking" theory was also central to Plaintiffs' claim that they could identify putative Rule 23(b)(3) class members and quantify damages. Accordingly, many of Plaintiffs' discovery requests focused on data or facts related to their linking and class member identification theories. Broome Decl. ¶¶ 13-16 & Exs. 6-8. The lengthy and expensive Special Master process was also intended to "facilitate the production of data and information for Plaintiffs to use to identify Incognito users and traffic and to quantify damages." Dkt. 370-1 (Pltf.'s Mot. For Relief), at 12. Plaintiffs then sought and received gigabytes of data, and hired an army of consulting experts to attempt to "identify class members" and "get to our damages model."[2] Plaintiffs' disproven linking

---

[1] *See* Dkt. 87 (Pltf.'s 11/18/20 MTD Opp.), at 1 ("Google's [MTD] confirms … that Google intercepts and collects data from its users' private browsing communications."); Dkt. 908-3, Ex. 40 (February 5, 2021 Response to Rog No. 1), at 4-6 (acknowledging transmissions and use of PBM data to provide analytics and advertising services).

[2] Broome Decl. Ex. 9 (11/04/21 Hrg. Tr.), at 18:3–12; *see also id.* at 13:12–14 (MS. BONN:… there is … what Google may term authenticated data that can be linked in order to identify class members.").

theories fueled many of the dozens of motions to compel counsel mentioned in their brief (which in fact were denied in whole or in part as often as they were granted).[3]

This immense effort was an avoidable expense. Early discovery disproved Plaintiffs' copycat "cradle-to-grave" theory.[4] Google strictly maintains policies and technical safeguards that prevent the at-issue data from being associated with an identified user or account. Dkt. 907-8, Ex. 83 (Berntson Decl.), at ¶¶ 4–5, 10–11, 19–31. But Plaintiffs persisted for years, costing the parties tens of millions of dollars. Ultimately, they retreated to a hypothetical—that Google *could* link the data and identify class members *if* it were inclined to violate its policies and safeguards preventing the practice. They advanced this conjecture despite conceding they never unearthed *any evidence* that Google did so. Dkt. 924-4 ("SUF"), at Fact 56 (claiming it would be "trivial" for Google to link PBM data to users' accounts but citing no evidence this ever occurred). In short, Plaintiffs spent years—and tens of millions of dollars—unsuccessfully seeking an imagined needle in a haystack even after eliciting early sworn discovery stating that no needle existed.[5]

### C.    Counsel Inflate Their Lodestar by Over-Lawyering

Any one of the three national law firms seeking compensation could have prosecuted this case. They teamed up to mitigate contingency risk, but tripled the effort in the process with no regard for the resulting inefficiencies. The numbers are staggering. They seek reimbursement for the time of 72 attorneys and 25 staff. As a point of reference, Google's outside counsel team consisted of 43

---

[3] *See* Dkts. 91, 125, 133, 147, 159, 191, 209, 221, 242, 263, 288, 307, 358, 359, 385, 393, 401, 418, 437, 480, 487, 515, 522, 567, 587, 605, 758, 763.

[4] *See, e.g.*, Broome Decl. Ex. 8 (2/5/21 R&Os to Rog No. 1, Sub-part (d)) ("Google does not create 'profiles' from data received from users who are signed out of their Google Accounts and in Incognito mode."); *id.* Ex. 12 (4/14/21 Adkins Depo Tr.), at 144:13 ("We certainly don't profile users[.]"); *id.* at 189:3–8 ("we don't use any information to try to uniquely identify users, other than in the cases where they're logged into Google and, … so there is no, in your words, fingerprinting[.]"); *id.* Ex. 15 (2/18/22 McClelland Depo Tr.), at 278:5–9, 279:19–24 ("Q. Google prohibits, based on your understanding of this policy, correlating authenticated and non-authenticated information, is that right? A. That is right, yes. . . . Q. In the context of Incognito mode for Chrome specifically, is it also true that Google prohibits joining authenticated information with non-authenticated data? A. Exactly, the policy still applies for Incognito mode.").

[5] Counsel also spill much ink mischaracterizing the sanctions proceedings and arguing that these contributed to their massive lodestar. But the Court required Google to pay attorneys' fees reasonably incurred in those proceedings, so they are already accounted for.

attorneys, including 10 who billed fewer than 20 hours to the case.[6]

Plaintiffs' retention of three firms caused egregious over-staffing that would have made any paying client balk. *See, e.g.*, Broome Decl. Ex. 2. Examples are legion and include:

- Routinely sending four attorneys (often partners) to take or even to *defend* depositions where Google had no more than two attorneys present.

- Assigning *ten* counsel to attend the two-and-a-half-hour hearing on Google's summary judgment motion, generating a bill for 69.9 hours ($84,139.80). *Sixteen* attorneys spent an additional 375.1 hours ($392,413) to prepare for the hearing. Five attorneys attended for Google.

- Billing for *nine* counsel to attend the parties' initial 8-hour mediation session, resulting in a total of 85.4 hours ($108,142). *Fifteen* counsel billed an additional 479 hours—$582,229.10—to write a statement and prepare for this session. Four partners (and one associate who did not bill) attended for Google.

*See id.* Ex. 3, at Sheets 6-12.

Counsel also seek reimbursement of fees totaling more than $4.1 million for 24 partners and associates *who never appeared in the case* (in addition to their 22 document-review and staff attorneys). *Id.* Ex. 5. Alex Boies never appeared but billed over $1 million, nearly all to prepare for and attend meetings with his father and hearings at which he was a spectator, *id.* Ex. 3, at Sheet 13; Susman partner Ian Crosby, who is not admitted to practice in this state or this Court (and yet defended a deposition, in apparent violation of Local Rules 11-1 and 11-3), billed nearly $600,000, *id.* at Sheet 14; and Morgan & Morgan associate Shelby Serig billed more than $400,000, nearly 40% of which was for sending or reading emails, *id.,* at Sheet 15.

### D. The Settlement Does Not Provide Any Monetary or Injunctive Relief—And Only a Fraction of the Onerous Terms Plaintiffs Sought

The settlement provides no monetary or injunctive relief, and no product changes. And it omits entire categories of relief Plaintiffs sought. It does not enjoin or prohibit Google from "using the 'Incognito' brand name and 'Spy Guy' icon," "further collecting [PBM] information," or "using

---

[6] Counsel note that, when the Magistrate Judge ordered Google to review more than 200,000 documents in less than 90 days, Google was forced to hire 300 contract lawyers for that short period of time to review documents for responsiveness and privilege. But there is no equivalence—that is a task counsel did not need to perform because they received a curated set of documents. Even more, Google paid only $69/hr (on average) for these document reviewers. That is over $607/hr *less* than Morgan & Morgan charged for document review.

[PBM] data for any revenue generating purpose." *See id.* Ex. 4 (Injunctive Relief Comparison Chart). Nor does it require Google "to [d]elete or refrain from using" Google products and services that benefited from PBM data, "an audit to identify" all logs storing PBM data, or "appointment of an independent auditor" to monitor Google's practices.  *See id.*

Even the benefits the settlement does provide reflect a significant gap between Plaintiffs' unreasonable demands and the limited relief counsel obtained, as shown in Exhibit 4 to the Broome Declaration and described briefly below:

Disclosure Changes. Plaintiffs demanded sweeping changes to Google's PBM disclosures, including a "consent toggle" on the Incognito Screen, and modifying the Screen's "Learn More" page to list "[e]very way in which Google uses private browsing data," state that "[PBM] data is identifying," and warn users that "bad actors" or Google may identify PBM users. Dkt. 1028-1 ("Pretrial Statement"), at 9. They settled for far less—modest changes to further clarify that PBM is primarily intended to provide *local* privacy and thus does not block data transmissions to websites or their service providers, "including Google."[7] Although Google has no present intent to "roll back" the changes, the settlement does not preclude Google from doing so (as counsel falsely claim, Approval Mot. 11).

Data Deletion and Remediation. Plaintiffs demanded that Google "[d]elete or refrain from using [PBM] data that Google is currently storing." Pretrial Statement at 9. But, because Google cannot identify PBM data, the parties agreed to an alternative approach to address counsel's conjecture that someone at Google *might* override its policies and technical safeguards to try to link PBM data to identified users. As an additional layer of protection against this hypothetical, Google agreed to delete or remediate certain unauthenticated data. Specifically, Google agreed to reduce

---

[7] Google also agreed to deprecate the Chrome Privacy Notice and White Paper consistent with its effort to streamline Chrome-related disclosures. *See* Mardini Decl. ¶ 11. As the Court recognized in its class certification order, long before Plaintiffs filed suit, Google provided disclosures that alerted users to the fact that PBM provides local privacy but does not block transmissions to web-service providers like Google.  These include the Incognito Screen's "Learn More" page that explains that "Incognito mode stops Chrome from saving your browsing history to your local history," but "your activity … might still be visible to," among others, "websites you visit, including the ads and resources used on those sites," "Search-engines," and "web services." Dkt. 803 (Class Cert. Order), at 31.

1    retention periods for ███ logs and delete old Display Ads data that no longer serves critical business

2    purposes. Declaration of Benjamin Kornacki ("Kornacki Decl.") ¶¶ 2-7. In ██ logs, data older than

3    ██████████ from the anticipated approval date will be remediated in a privacy-enhancing way

4    without impacting Google's business.[8] *Id.* ¶ 8. The settlement did not require Google to delete or

5    remediate data in Analytics logs. *Id.* ¶ 12.

6        <u>Removal of PBM Detection Bits.</u> The settlement provides that Google will delete ██ "bits"

7    historically used to detect spam, counter fraud, improve geo-location functions, or approximate

8    aggregate Incognito traffic. Contrary to counsel's claim, Approval Mot. 2, the bits were never used

9    "to track people's choice to browse privately." *See* Dkt. 809-5 (Benko Decl.); Dkt. 527-12 (Leung

10   Decl.); Dkt. 527-10 (Liao Decl.); Dkt. 527-4 (OSC Opp.); Dkt. 857-3 (Reply ISO Resp. to OSC).

11   In fact, ███ of the bits had not been used since before Plaintiffs filed suit. *See* Dkt. 527-16, Ex. 42

12   (3/10/22 Sadowski Depo Tr.), at 70:24-71:23 (explaining that ██ of the bits have not been used

13   since 2018); Broome Decl. Ex. 18 (8/30/23 Psounis Rep.) ¶¶ 4, 25-34 (explaining that a ███ bit has

14   not worked since before Plaintiffs filed suit); *see also* 809-5 ¶ 6 (Benko Decl.). The ███ bit was

15   created in mid-2020 only to detect aggregate changes in the flow of cookieless traffic in Incognito

16   so that Google could assess the revenue impact of its plan to block third-party cookies by default,

17   which it began implementing in May 2020. *See* Dkt. 527-12 (Leung Decl.) ¶ 8; Broome Decl. Ex.

18   10 (4/21/22 Hrg Tr.) at 161:4-9. The bit has not served any purpose for some time. Kornacki Decl.

19   ¶ 20.

20       <u>Default Cookie Blocking in Incognito</u>. In May 2020—before Plaintiffs' filed suit—Google

21   publicly announced that it would "*start blocking third-party cookies by default within each*

22   *Incognito session* and include a prominent control on the [Incognito Screen]." Declaration of

23   AbdelKarim Mardini ("Mardini Decl.") ¶ 3 & Ex. 2 (emphasis added). Initially, the goal was to have

24   the feature fully rolled out by mid-July 2020. *Id.* ¶ 3. When Plaintiffs filed suit, the feature had

25   already been rolled out to 20% of users. *Id.* ¶ 4. Google completed the rollout to all users by July

26

27   ――――――――――――――
     [8] Counsel wrongly claim credit for Google "partially redacting IP addresses." Approval Mot. 12.

28   The settlement acknowledges Google was "already" doing this. Dkt. 1097-3 ("Settlement"), at
     § III.2; *see also* Kornacki Decl. ¶ 11.

13, 2020. *Id.* In the settlement, Google agreed that Plaintiffs earned some "catalyst recognition" relating to the deployment of this feature, but only insofar as their lawsuit encouraged Google to deploy the feature slightly faster than originally planned. Given that the feature was publicly announced before the lawsuit, it would be irrational to attribute counsel any credit for the feature itself.

Counsel also trumpet Google's agreement to maintain third-party cookie blocking by default in Incognito for five years. Mot. 22–23. But Google never had any intention of reverting the feature. Mardini Decl. ¶ 5. In fact, months before Plaintiffs filed suit, Google publicly announced its plan to "render third party cookies obsolete" for the entire internet ecosystem (not just PBM browsing), and has been driving that effort ever since. *See, e.g.*, *id.* ¶¶ 2, 6-10 & Exs. 1, 3-7; Broome Decl. Ex. 16 (10/41/22 *Calhoun* Hr'g Tr.), at 215:7-217:22. Early deposition testimony confirmed this. Broome Decl. Ex. 13 (11/23/21 Mardini Dep. Tr.), at 95:16-96:21; *id.* Ex. 14 (11/24/21 Mardini Dep. Tr.), at 382:6-382:15, 416:25-419:5.

Waiver of Right to Appeal Rule 23(b)(3) Denial. Having lost their bid to certify a damages class, Plaintiffs promptly sought to appeal, arguing that this Court's decision was "manifestly erroneous" and "offered no analysis or reasoning." *Brown v. Google*, No. 22-80147, Dkt. 1-2, at 1 (9th Cir. 2023). The Ninth Circuit denied the petition. *Id.* Dkt. 10. Despite vowing to appeal after trial, counsel agreed in the settlement to "extinguish[]" their clients' right to appeal the denial of a damages class. Settlement at § II.8. Counsel now spin that concession as having "succeeded" in "preserving" class members' rights to pursue individual damages claims. Mot. 16. That characterization is nonsensical—counsel's bid to represent a damages class was *rejected.* They thus lacked authority to release or "preserve" such claims. *See* Rubenstein Decl. ¶ 15. Counsel cannot seek credit for the consequences of the certification motion they lost, and for not releasing claims they did not control.

**E.    Counsel Seek to Recover Even More Attorneys' Fees by Mass Pursuit of *De Minimis* Individual Damages Claims**

Just months ago, counsel acknowledged that most class members' damages were "like three dollars a person" and described pursuing individual damages claims as "a fool's errand over a

hundred dollars." Broome Decl. Ex. 11 (11/29/23 Hr'g Tr.), at 145:10–46:11. Yet, that is the course upon which counsel have embarked. Over the past three months, they have flooded the Superior Court with cookie-cutter complaints on behalf of over 95,000 individual class members seeking damages. As counsel admit, the individual plaintiffs stand little to gain. These actions have potential value only in the aggregate, and then only to counsel who seek to settle them *en masse* to recover even more in fees.

## III.   ARGUMENT

Fee awards in class actions must be "reasonable in relation to the results obtained." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434, 440 (1983)). "The touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class." *Lowery*, 75 F.4th at 988. In particular, "[s]ettlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class" justifying the requested fees. *Bluetooth*, 654 F.3d at 944 (quoting F. R. Civ. P. 23(h), 2003 Advisory Cmte. Notes).

"It matters little that the plaintiffs' counsel may have poured their blood, sweat, and tears into a case," or that they "devoted … thousands of hours to a case," if "they end up merely spinning wheels on behalf of the class." *Lowery*, 75 F.4th at 988, 994. Where, as here, "the plaintiff has achieved 'only limited success,' counting *all* hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount,' and the Supreme Court has instructed district courts to instead 'award only that amount of fees that is reasonable in relation to the results obtained.'" *Bluetooth*, 654 F.3d at 942 (quoting *Hensley*, 461 U.S. at 436).

Counsel's request for an eye-popping $217 million is flawed for two principal reasons. First, it is based on a bloated lodestar that results from pervasive inefficient billing by three law firms at premium rates. Second, precedent and logic both require that counsel's limited success in obtaining only modest relief for the class after erosion of their case warrants a negative multiplier. The Court should also reduce counsel's nearly $8 million in claimed costs, which includes charges no paying client would accept.

**A.      Counsel's $62 Million Lodestar Is Excessive And Must Be Adjusted**

Counsel's $62 million lodestar cannot withstand scrutiny. The significant reductions identified below and summarized in Broome Declaration Exhibits 1 and 3 reflect excessive billing and inefficiency. The lodestar should be reduced to—at most—$39.7 million. Although admittedly not apples-to-apples, even this reduced amount is many millions of dollars more than Google spent on outside counsel (including contract lawyers performing document review). Broome Decl. ¶ 11.

> *1.      Counsel's Rates Are at the High End of the Market and Their Document-Review Rates are Particularly Excessive*

Counsel's rates (as high as $2,500 for partners, and $1,000 for associates) are among the top rates billed in the Bay Area, and generally above the third quartile of the Wolter Kluwer's Real Rate Report. *See* Broome Decl. ¶ 8. These high rates demand scrupulous efficiency and prudent delegation to junior timekeepers. *Sols. 30 E. Eur., S.R.L. v. Muddy Waters Cap. LLC*, 2022 WL 1814439, at *1 (N.D. Cal. Apr. 28, 2022) (Gonzalez Rogers, J.) (collecting cases).

But the $676 hourly rate Morgan & Morgan ("M&M") billed for document review—totaling $12,335,648.00 for M&M alone—cannot stand. As an initial matter, counsel fail to explain whether the document reviewers are employees or contract attorneys. If the latter, they should be billed at cost. *See In re Wells Fargo & Co. S'holder Derivative Litig*., 445 F. Supp. 3d 508, 531 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021) (reducing contract attorneys' time to the $42.50 per hour actually paid). Even if employees, M&M's document reviewer rate dramatically exceeds the $300-$475 that Boies Schiller and Susman Godfrey staff attorneys charged for the same work, and exceeds even the rates of several associates.

Counsel admit these rates are "higher than those typically assigned to document-review lawyers" and seek to defend them on the ground that the reviewers purportedly had "technical educations." Mot. 8. Yet most reviewers majored in social sciences or equally inapplicable subjects. Dkt. 1107-22 ("Yanchunis Decl.") ¶ 8. And counsel billed nearly $3 million for *seventeen* technical experts, including eleven assigned to review "technical document productions." Approval Mot. 5; Dkt. 1107-20 ("Lee Decl.") ¶¶ 73-74, 77-78, 81. In any event, the vast majority of documents

1 produced—and those Plaintiffs used in the case—are ordinary emails and chats that are not at all

2 technical. *See generally* Dkt. 924-3 (MSJ Opp.); Pretrial Statement at 1-5.

3       The Court should reduce the M&M document reviewer rates to their actual cost, if they were

4 contract attorneys, or otherwise to $387.50—the mid-point of their co-counsel's reviewer rates. The

5 latter adjustment alone lowers the lodestar by $5.3 million. Broome Decl. Ex. 3, at Sheet 1.

6          *2.*    *Counsel's Excessive Hours Require a Further Lodestar Reduction*

7       Counsel in class actions are expected to "exercise 'billing judgment,'" and district courts

8 "should exclude from [the] initial fee calculation hours that were not reasonably expended,"

9 including "excessive, redundant, or otherwise unnecessary" work. *Hensley*, 461 U.S. at 434–37.

10          a.     <u>Certain Work Should Be Excluded in Full</u>

11       <u>Time Related to Rules 23(b)(3), 23(f), and 23(c)(4)</u>. It is impossible to fully account for time

12 spent on the denied Rule 23(b)(3) motion, the Rule 23(f) petition, and the withdrawn Rule 23(c)(4)

13 motion. However, the Court should exclude at least the time entries that clearly indicate they are

14 related to those unsuccessful efforts—1,767.9 hours ($1.9 million) for (b)(3) and 23(f) appeal, and

15 719.78 hours ($842,871.70) for (c)(4). Broome Decl. Ex. 3, at Sheets 2, 3. Indeed, class counsel

16 often voluntarily exclude time spent on damages where they fail to certify a damages class. *See,*

17 *e.g.*, *Stathakos v. Columbia Sportswear Co.*, 2018 WL 1710075, at *3 (N.D. Cal. Apr. 9, 2018)

18 (Gonzalez Rogers, J.) (it is an "appropriate starting point" for counsel to remove from the lodestar

19 "time entries related to monetary relief"); *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *4, *7

20 (N.D. Cal. Aug. 18, 2017), *aff'd*, 951 F.3d 1106 (9th Cir. 2020) (after (b)(3) defeat, plaintiffs sought

21 less than half of their actual fees). Similarly, Google should not have to pay for counsel's withdrawn

22 Rule 23(c)(4) motion. This reduces the lodestar to $54.2 million.

23       <u>Clerical Tasks</u>. Time for clerical tasks is not recoverable and should be excluded. *Nadarajah*

24 *v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009) (deducting time billed for clerical tasks).[9] Counsel

25

26 ────────────────────

27 [9] *See also Rodgers v. Claim Jumper Rest., LLC*, 2015 WL 1886708, at *8 (N.D. Cal. Apr. 24, 2015) ("purely secretarial or clerical tasks are generally not recoverable"); *Lota by Lota v. Home Depot*

28 *U.S.A., Inc.*, 2013 WL 6870006, at *10 (N.D. Cal. Dec. 31, 2013) (Gonzalez Rogers, J.) (deducting hours spent on "administrative or clerical tasks [because] not recoverable").

improperly seek to recover at least $387,865.90 for this non-compensable work (*e.g.*, $935 for an associate to reserve space for mediation at their office). Broome Decl. ¶ 5 & Ex. 3, at Sheet 4.

<u>Vague Entries.</u> An additional 803.8 hours (amounting to $931.286.60 in fees) should be removed because they "do not provide sufficient information for [defendant] or this Court to assess whether the hours spent were reasonable." *Gilead Scis., Inc. v. Merck & Co.*, 2017 WL 3007071, at *8 (N.D. Cal. July 14, 2017); *see also St. Louis Police Ret. Sys v. Severson*, 2014 WL 3945655, at *3 (N.D. Cal. Aug. 11, 2014) (excluding "vague entries that only reference 'email counsel' or 'phone counsel' without any further descriptor"). The Court should exclude the vague entries, Broome Decl. Ex. 3, at Sheet 4, further reducing the lodestar, *id.* Ex. 1.

> b.    <u>Pervasive Inefficiencies Warrant a 25% Across-the-Board Reduction</u>

Unsurprisingly given the unchecked army of 72 attorneys and 25 staff representing Plaintiffs, the remaining $52.9 million lodestar is rife with inefficiencies and padding that support an additional 25% discount on remaining time. "'[P]adding' in the form of inefficient or duplicative efforts is not subject to compensation," *Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2022), and "when faced with a massive fee application, the district court has the authority to make across-the-board percentage cuts" to "trim[] the fat from a fee application," *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992); *see also Johnson v. MGM Holdings, Inc*, 943 F.3d 1239, 1241 (9th Cir. 2019) (affirming district court's *sua sponte* application of a 25% across the board discount). "Courts also ground reductions in the experience of counsel and expect quality representation to inherently include efficient billing." *Muddy Waters*, 2022 WL 1814439, at *4 (Gonzalez Rogers, J.) (imposing a 25% across-the-board reduction for duplication and excessive partner time).

This non-exhaustive list demonstrates that counsel's lodestar warrants a substantial across-the-board discount.   *See* Broome Decl. Ex. 3, at Sheets 5-15.

<u>Duplication.</u> Counsel overlawyered virtually every task—*e.g.*, routinely sending four attorneys to defend depositions, and outnumbering defense counsel at hearings and other events two to one, with many class counsel having no perceivable role. *See* Broome Decl. Ex. 2; *id.* Ex. 3, at Sheets 5-15. "[G]iven the sophistication of counsel and their substantial billing rates, this case

should have been litigated much more efficiently." *Wynn v. Chanos*, 2015 WL 3832561, at *6 (N.D. Cal. June 19, 2015) (25% across-the-board reduction on fees for excessive billing *after* additional individual reductions); *see also Stonebrae, L.P. v. Toll Bros.*, 2011 WL 1334444, at *12–13 (N.D. Cal. Apr. 7, 2011) ("inefficiencies and duplicative efforts engendered by multiple counsel and law firms" warranted 50% reduction in one firms' hours), *aff'd*, 521 F. App'x 592 (9th Cir. 2013); *St. Louis*, 2014 WL 3945655, at *3 (reducing hours billed by 19% due to inefficiency); *Xu v. Yamanaka*, 2014 WL 3840105, at *2–3 (N.D. Cal. Aug. 1, 2014) (Gonzalez Rogers, J.) (duplication justified a 20% reduction for certain hours).

<u>Excessive Partner Time</u>. "The trade-off for the higher billing rate" "is that more senior attorneys are expected to delegate routine tasks to others with lower billing rates." *Hernandez v. Grullense*, 2014 WL 1724356, at *11 (N.D. Cal. Apr. 30, 2014); *Scott v. HSS Inc.*, 2017 WL 7049524, at *8 (C.D. Cal. Dec. 18, 2017) (reducing lodestar by 20% for excessive partner time). No such delegation happened here. Boies Schiller partners billed *twice* as many hours as associates, routinely performing tasks that a paying client would have required be delegated to paralegals or lower-rate attorneys, such as scheduling depositions (often more than an hour per entry), reviewing documents, and compiling research materials for co-counsel. These excesses total at least $2.1 million.  *See* Broome Decl. Ex. 3, at Sheet 5.

<u>Internal Meetings</u>. Counsel routinely billed for large groups of attorneys (sometimes ten or more) to attend lengthy meetings, including hour-long weekly calls. Instances of three or more attorneys billing for the same meeting or call total over $11 million. *Id.* Such "unnecessary and duplicative" hours warrant reductions. *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir. 2007) (affirming reduction for "duplicative" time spent on "intra-office conferences"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2023 WL 4109573, at *9 (N.D. Cal. June 20, 2023) ("counsel should not bill for internal communications and communicating with each other, as such time is unnecessary."); *Phigenix, Inc. v. Genentech Inc.*, 2019 WL 2579260, at *16 (N.D. Cal. June 24, 2019) (not every attorney present in internal meetings should bill).[10]

---

[10] *See also Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*, 2016 WL 1165214, at *9 (N.D. Cal. Mar. 25, 2016) (reducing requested fees by 25% in part because of excessive internal

1    <u>Block Billing</u>. Counsel block-billed 5,153 hours ($5,408,504.70). *See* Broome Decl. Ex. 3,

2    at Sheet 5. For example, one senior partner block-billed 23 hours ($33,350) *in a single day* for travel

3    and working on a motion. Another block-billed 10 hours ($25,000) for traveling to and attending a

4    two-hour hearing at which he did not appear. Again, no paying client would accept such practices.

5    These entries warrant a significant reduction. *See Welch*, 480 F.3d at 948 (9th Cir. 2007) ("block

6    billing may increase time by 10% to 30%"); *Lahiri v. Universal Music & Video Distribution Corp.*,

7    606 F.3d 1216, 1222–23 (9th Cir. 2010) (affirming 30% reduction to account for block billing and

8    additional 10% reduction for excessive and redundant work); *GemCap Lending I, LLC v. Unity Bank

9    Minnesota*, 2019 WL 3842010, at *3 (N.D. Cal. Aug. 15, 2019) (Gonzalez Rogers, J.) (reducing

10   block-billed fees by 15%); *Arcona, Inc. v. Farmacy Beauty, LLC*, 2021 WL 2414856, at *5 (C.D.

11   Cal. June 14, 2021), *aff'd*, 2022 WL 1486822 (9th Cir. May 11, 2022) (applying 30% reduction to

12   all block-billed time and additional 25% cut across the board for excessive billing).

13   <u>Other Inefficiencies</u>: The list of additional infractions is long and troubling:  dozens of 12+-

14   hour days with time entries not supporting such long hours (totaling at least $2.3 million); over $4

15   million in fees by attorneys who did not appear; and myriad other entries that cannot reasonably be

16   justified (*e.g.*, a $2,500/hr partner billing 10 hours for attending a meeting). *See* Broome Decl. Ex.

17   3, at Sheet 5.

18   The pervasive and extreme nature of these inefficiencies warrant at least a 25% reduction to

19   the adjusted lodestar, reducing it to $39,681,184.93. *See* Broome Decl. Ex. 1.

20   **B.      The Court Should Apply a Negative Multiplier to the Adjusted Lodestar**

21   A negative multiplier is appropriate to account for "a host of 'reasonableness' factors," the

22   "foremost" of which "is the benefit obtained for the class." *Bluetooth*, 654 F.3d at 941-42 (citing

23   *Hensley*, 461 U.S. at 434-36); *see also Ketchum*, 24 Cal. 4th at 1138 (under California law, "a trial

24   court … has broad discretion to adjust the fee downward or deny an unreasonable fee altogether").

25   Here, the reasonableness factors counsel cite (Mot. 17–23) serve only to confirm that a substantial

26

27   ───────────────────

28   conferences); *S. Yuba River Citizens League & Friends of River v. Nat'l Marine Fisheries Serv.*,
     2012 WL 1038131, at *5 (E.D. Cal. Mar. 27, 2012), *aff'd* 581 F. App'x 693 (9th Cir. 2014) (reducing
     fees by 20% in part because of billing for internal conferences).

1   negative multiplier is warranted.  *See generally* Rubenstein Decl.

2       1.      The Limited Benefit Obtained for the Class Warrants a Negative Multiplier

3           Counsel claim near-total success because none of Plaintiffs' claims was summarily

4   dismissed and their motion for class certification was granted in part. Mot. 16. But the touchstone

5   for evaluating a reasonable fee is the "benefit obtained for the class," not overcoming procedural

6   hurdles. *See Hensley*, 461 U.S. at 436. By that proper legal standard, any "success" was severely

7   limited: Plaintiffs failed to recover a penny of the $9 billion in classwide damages they sought, nor

8   achieve any of the onerous injunctions they pursued. Instead, they obtained clarifications to certain

9   disclosures and other modest—but proportional—data remediation. And, at the cost of surrendering

10  appeal of their rejected motion for certification of a damages class. Their failure to deliver on their

11  grandiose objectives warrants a negative multiplier.[11] *See generally* Rubenstein Decl.

12          In *Stathakos*, for example, this Court found that, although "plaintiffs' counsel obtained

13  meaningful relief for the class" in the form of changes to the defendant's misleading labels and sales

14  practices, "a 35% reduction in the lodestar is appropriate" because "plaintiffs' success was limited

15  in that plaintiffs did not (i) persuade this Court to certify a damages class or (ii) obtain monetary

16  relief for the class." 2018 WL 1710075, at *3–4 (citing *Bluetooth* as "remanding district court's

17  approval of an $800,000 attorneys' fee award in settlement where no monetary relief was obtained

18  for the class").

19          The analysis and holding in *Stathakos* is in line with other decisions in this Circuit that apply

20  a negative multiplier where class plaintiffs failed to obtain monetary relief or achieved only limited

21  injunctive relief. *See, e.g.*, *Red v. Kraft Foods Inc*., 680 F. App'x 597, 599 (9th Cir. 2017) (affirming

22  over 90% reduction of lodestar from $1.43 million to $101,702.38 and denying multiplier given

23  appellants' failure to certify a Rule 23(b)(3) class and stipulating to an injunction that did not require

24

---

25  [11] Counsel claim that  that "courts have emphatically rejected [the] argument to reduce hours based
    on an injunctive-relief outcome." Mot. 16 (citing *Iswed v. Caruso*, 2013 WL 12093132 (W.D. Mich.

26  Feb. 14, 2013)). *Iswed* is inapposite and counsel misstate its holding. The court awarded $52,055 in
    fees (no multiplier) to a court-appointed law professor and two law students who won a damages

27  jury verdict in a section 1983 action, which the court vacated in favor of an injunction. *Id.* at *1, 5.
    The court rejected the request for an "automatic" reduction of fees, but did not suggest that failure

28  to recover damages can *never* result in a fee reduction.

1 | defendant to "change its business practices"); *Adkins v. Facebook, Inc.*, 2021 WL 1817047, at *6

2 | (N.D. Cal. May 6, 2021) (refusing to award a multiplier, even if the defendant were to agree to one,

3 | where no damages class was certified); *Campbell*, 2017 WL 3581179, at *7 (granting attorneys'

4 | fees of $3.89 million (0.497 multiplier) where plaintiffs failed to certify a damages class but obtained

5 | injunctive relief in the form of disclosure changes); *Pierce v. Cnty. of Orange*, 905 F. Supp. 2d 1017,

6 | 1042 (C.D. Cal. 2012) (imposing 30% reduction where plaintiffs achieved limited success on their

7 | constitutional claims and failed to certify (b)(3) damages class).[12] The Court should apply a

8 | substantial negative multiplier here for the same reasons.

9 |     Tellingly, class counsel cite only a single (plainly distinguishable and out-of-circuit)

10 | decision awarding a positive multiplier where class plaintiffs pursued but were denied a damages

11 | class and obtained a (b)(2)-only settlement. Mot. 18 n.11 (citing *Gaston*, 2021 WL 2077812 at *7).

12 | The court there simply awarded class counsel the $5.1 million in fees that the defendant had *agreed*

13 | to pay (a 1.85 multiplier, and less than 3% of what counsel seek here). *Gaston*, 2021 WL 2077812

14 | at *7.

15 |     The other cases counsel cite are inapposite and do not support a positive multiplier. *See* Mot.

16 | 17–18 ("The list goes on."). Indeed, in most, the parties agreed to certify an injunctive relief class

17 | for settlement purposes—before moving for class certification—and the courts awarded positive

18 | multipliers in recognition of the plaintiffs' efficient achievement of the primary relief sought (though

19 | on fees far more humble than counsel's here). *St. Louis Police Ret. Sys.*, 2014 WL 3945655, at *6

20 | (rejecting request for $1.65 million fee award (2.8 multiplier) and awarding $543,018 (1.5

21 | multiplier)); *Matera v. Google*, 2018 WL 11414641, at *5–6 (N.D. Cal. Feb. 9, 2018) (awarding

22 | $2.2 million (1.067 multiplier)); *Yong Soon Oh v. AT&T Corp.*, 225 F.R.D. 142, 154 (D. N.J. 2004)

23 | (awarding $3.3 million (2.15 multiplier)); *City of Plantation Police Officers' Employees' Retirement*

24 |

25 | ---

[12] Counsel incorrectly assert that in *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924 (2004), the

26 | court "rejected" the argument that plaintiffs who seek damages but obtain only injunctive relief

27 | should not benefit from a multiplier. Mot. 17. To the contrary, the Court of Appeal stated that "the trial court may have taken account of plaintiff's incomplete success when it reduced the multiplier requested by plaintiffs," and found this decision would have been soundly within the trial court's

28 | "discretion to increase or decrease a lodestar." *Id.* at 947.

*Sys. v. Jeffries*, 2014 WL 7404000, at *18–19 (S.D. Ohio Dec. 30, 2014) (rejecting request for $2.775 million (4.2 multiplier) and awarding $1,616,595 (3.0 multiplier after reducing lodestar)). In all but one of these cases (*St. Louis*), the defendant did not object to the requested fee.

Counsel's extensive reliance, Mot. 3, 18, 19, on *Uphold our Heritage v. Town of Woodside*, 2008 WL 4868816  (Cal. Ct. App. Nov. 12, 2008) (unpublished), is baffling. The plaintiff there, a heritage society, fully achieved its sole goal of preventing Steve Jobs from demolishing an historic house. The court awarded $403,548 in fees (a 2.0 multiplier). *Id.* at *2–7.

In sum, counsel rely on inapposite authority where the plaintiffs efficiently achieved their goals and their counsel was rewarded accordingly. Here, in contrast, three law firms billed $62 million pursuing monetary and injunctive relief that they *failed* to obtain. Their authority only highlights the unprecedented nature of their request and that a negative multiplier is appropriate.

> ### 2.  The Value of the Relief Confirms the Court Should Apply a Negative Multiplier

Counsel's contention that "the multi-billion-dollar value of the relief provides [] support for the [3.5X] multiplier," Mot. 22, is self-aggrandizing puffery. Counsel do not seek fees based on a percentage-of-recovery method, so the "value" of the relief is relevant only to the extent it may serve as a "cross-check." *Id.* Even in that limited respect, any actual value of the relief controverts counsel's extraordinary fee request. Their pie-in-the-sky valuation is a paradigmatic example "of the danger that parties will overestimate the value of injunctive relief in order to inflate fees." *Kim v. Allison*, 8 F.4th 1170, 1181 (9th Cir. 2021).

Counsel notably do not ascribe any monetary value to the primary relief for the (b)(2) classes—changes to certain disclosures.[13] That makes sense, given the negligible monetary value of these clarifications. Robust survey evidence produced in discovery showed that specifically naming "Google" among the entities that may see users' PBM activity—*i.e.*, the principal disclosure change Google agreed to make under the settlement—has no statistically significant impact on users' likelihood of using Incognito. Dkt. 913, Ex. 78 ("4/15/22 Amir Rep.") ¶ 16 & § VIII. This is

---

[13] Nor does counsel ascribe any specific value to the deprecation of the Chrome Privacy Notice or Whitepaper, or the deletion of the "bits."

1   presumably because, as the same survey shows, many users already understood that Google received

2   the at-issue data in PBM. Indeed, Plaintiffs used Incognito until the eve of trial. Pretrial Statement

3   at 17–18.

4         Nearly all the monetary value counsel attempts to ascribe to the settlement is tied to the data

5   deletion and remediation—a fact highlighting the remarkably limited success counsel achieved. The

6   principal pillar of counsel's fanciful "multi-billion-dollar" valuation is that Google's deletion and

7   remediation of historic data somehow "returns" ██████████ in "value" to class members. Mot. 22–

8   23. That is nonsense. Even if counsel were assigning fair value to the old data that Google agreed

9   to delete or remediate—and they are not[14]—that action does not "return" anything to class members.

10   Indeed, counsel concedes the data remediation aims to "address[] Plaintiffs' re-identification

11   theories" (*i.e.*, that someone at Google might in the future violate its policies and technical

12   safeguards that ensure PBM users are not identified). Approval Mot. at 12; *supra* at II.B.  But the

13   tens of millions of dollars counsel spent on prodigious discovery failed to unearth evidence that such

14   rogue malfeasance ever occurred or was likely. *See* Dkt. 659-7 (Berntson Decl.) ¶ 5; SUF Fact 56.

15         In short, counsel ultimately settled for Google's agreement to implement additional

16   protections to ensure Google does not do something it never did and had no intention of doing. The

17   peace-of-mind value of protection against a hypothetical risk is nominal at best.

18         Counsel's second valuation is even less credible. They seek credit for "Google's decision to

19   implement" default cookie blocking in Incognito, which purportedly yields "an additional ██████

20   ██████ in settlement value." Mot. 23. But Google publicly announced that decision *before* Plaintiffs

21   sued. *Supra* at II.D; Mardini Decl. ¶ 3. A fee applicant cannot take credit for independent actions by

22   a defendant. *See also Bluetooth*, 654 F.3d at 945 ("The value of the injunctive relief is not apparent

23   to us" where settlement "occurred after defendants had already voluntarily" implemented measures

24

25   [14] Counsel's flawed valuation is based on an Ipsos Screenwise focus group that paid participants to

26   answer questions and collect a broad array of other data, including *current* browsing activity that
Plaintiffs' damages expert conceded is "qualitatively different, as well as quantitatively different"

27   from PBM data. Dkt. 661-3, Ex. 1 (Lasinski Tr.) at 102:14-22, 114:2-116:2, 118:24-122:8 114:2-
15; 122:4-8. The Court's decision not to exclude Mr. Lasinski's damages opinions based on

28   Screenwise does not mean it blessed his valuation methodology.

to address plaintiffs' claims). Google did agree to give Plaintiffs "catalyst recognition" for the full deployment of the feature slightly earlier than planned, *see* Mot. 23; Mardini Decl. ¶¶ 3-4, but the accelerated timing of this pre-announced feature adds negligible value for the class—and certainly counsel made no attempt in their fee motion to isolate and quantify the limited value of a timing change.

Nor is there merit to counsel's suggestion that "Google's obligation to continue blocking third-party cookies by default in Incognito for the next five years yields an additional ████████ in value." Mot. 23. Months before Plaintiffs filed suit, Google announced its plan to deprecate third party cookies *across the internet ecosystem*. Mardini Decl. ¶ 2. Given that Google never had any intention of reversing course, *id.* ¶ 5, the value of Google maintaining the status quo for Incognito is illusory.

The reality is this: although the settlement provides fair value to class members, that value is neither quantifiable nor large—and certainly not worth billions. "[B]ecause the value of injunctive relief is difficult to quantify [and] its value is so easily manipulable by overreaching lawyers," courts should account for such value in awarding fees "only in the unusual instance where the value to individual class members … can be accurately ascertained." *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003); *see also Kim*, 8 F.4th at 1181. This is not one of those "unusual instances."

### 3. Comparable Awards Support a Negative Multiplier

When applying the lodestar method to calculate attorneys' fees, this Court considers "awards in similar cases." *Newton v. Equilon Enterprises, LLC*, 411 F. Supp. 3d 856, 881 (N.D. Cal 2019) (Gonzalez Rogers, J.) (citing *Kerr v. Extras Guild, Inc.*, 526 F. 2d 67, 70 (9th Cir. 1975)). A robust analysis of similar cases by the preeminent class action professor William B. Rubenstein supports application of a negative multiplier. *See* Rubenstein Decl. ¶¶ 7-10.

Counsel's claim that they stand shoulder-to-shoulder with the plaintiffs' counsel in *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2023 WL 8445812 (N.D. Cal. Oct. 10, 2023), and *In re Twitter Inc. Sec. Litig.*, 2022 WL 17248115 (N.D. Cal. Nov. 21, 2022), is risible. The *Facebook* plaintiffs obtained a $725 million common fund—the largest ever in a privacy class action—and their counsel were awarded $181 million in fees (a 1.99 multiplier). 2023 WL 8445812,

at *1. The *Twitter* plaintiffs secured an $810 million common fund—"the second largest security class action settlement ever obtained in the Ninth Circuit"—and counsel obtained $182 million in fees (a 4.15 multiplier). 2022 WL 17248115, at *2; *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314, Dkt. 661, at 1 (N.D. Cal. October 13, 2022) (Mot. for Fees); *see also* Rubenstein Decl. ¶ 21. By contrast, counsel here *failed* to certify a damages class, and then surrendered the right to appeal that loss in order to secure modest relief proportional to their eroded case. Settlement § II.8. Their audacious request for nearly $40 million *more* in fees (and double the costs and service awards) than counsel received in these groundbreaking cases cannot be justified by any evidence-based metric.

Rather than engage with Plaintiffs' invitation for inapt comparisons to cases that secured significant common-fund relief, this Court should consider comparable Rule 23(b)(2)-only settlements. In these cases, courts routinely apply a negative multiplier. *See, e.g.*, *Stathakos*, 2018 WL 1710075, at *3-4 (awarding $683,411.79 (0.65 multiplier)); Rubenstein Decl. ¶¶ 7-10.

### 4. The Case's Alleged "Importance and Complexity" Does Not Warrant a Positive Multiplier

This case should have been straightforward. Google admitted at the outset that it collects PBM data in the ordinary course and uses it to serve ads and analytics. The data transmissions could be viewed in real time within Chrome and were widely discussed in the media (including by Plaintiffs' expert). The primary dispute should have been whether Google obtained appropriate consent. Instead, counsel made the case infinitely more "difficult," Mot. at 19-20, by pursuing their speculative theory that Google uses PBM data to create "cradle-to-grave profiles" of identified users—and by refusing to stand down when discovery showed their theory was wrong.

Nor is there merit to counsel's boast that they "correct[ed] a wrong being perpetrated on 136 million Americans." Mot. at 20. Many class members at least implicitly consented to the challenged conduct, Class Cert. Order at 32, and adding "Google" to the list of third parties that may receive PBM data has no statistically significant impact on users' behavior. 4/15/22 Amir Rep. ¶ 16 & § VIII. Indeed, any crowing about mitigating harm must be taken with a grain of salt—as Plaintiffs themselves continued to use Incognito throughout the case, fully aware of the data transmissions and at least implicitly consenting to the challenged conduct. Pretrial Statement at 17-18. Neither this

case nor the settlement is likely to materially affect the way most class members interact with the challenged Google products.

5.    *The Case's Contingent Nature Does Not Warrant a Positive Multiplier*

Three national firms strategically teamed up to mitigate risk, and yet they now contend the Court "must" apply a risk multiplier because they worked on a contingent-fee basis. Mot. 18 (citing *Matera*). They are wrong. The California Supreme Court has expressly held that "the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk."[15] *Ketchum*, 24 Cal. 4th at 1138 (emphasis in original); *see also Newton*, 411 F. Supp. 3d at 883 (court "is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors," and declining to award multiplier (emphasis in original)). In any event, a risk multiplier is just one factor to consider when determining whether to enhance or reduce the lodestar, *see Matera*, 2018 WL 11414641, at *2 (quoting *Bluetooth*, 654 F.3d at 941-42), and here it does not support enhancement given counsel's decision to team up to reduce their exposure.

6.    *Counsel's Fees Should Be Reduced Because They Are Repurposing Their Work Product in Support of a Mass Action for Damages*

Yet another factor supports a negative multiplier: Counsel have now filed individual damages actions against Google in California state court on behalf of more than 95,000 plaintiffs. Even a cursory review of the state-court complaints reveals that counsel are simply recycling and seeking to profit from what was done in this case. *See, e.g.*, Dkt. 1097-14 (*Luna* complaint). If the

---

[15] In *Matera*, the district court noted that it "*must* apply a risk multiplier" when certain factors are present. 2018 WL 11414641, at *5 (emphasis in original) (quoting *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016)). However, the Ninth Circuit has explained that this rule applies "[i]n common fund cases," where, unlike here, "there is no concern about financially burdening a defendant for the risk of nonpayment, because the attorneys' fee award is deducted from the plaintiffs' fund," and "the plaintiffs should share the wealth with the lawyers whose skill and effort helped create it." *Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008-09 (9th Cir. 2002); *cf. In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("Unlike statutory fee-shifting cases, where the winner's attorneys' fees are paid by the losing party …. [t]here is nothing unfair about contingency enhancements in common fund cases because … those who benefit from the creation of the fund should share the wealth with the lawyers [who] helped create it."); *see also City of Burlington v. Dague*, 505 U.S. 557, 565 (1992) (barring contingency enhancements under fee-shifting statutes because, *inter alia*, they are inconsistent with the requirement that a losing defendant pay only a "reasonable" fee).

individual plaintiffs' damages claims have merit, counsel will receive shares of their clients' recoveries as recompense for the hours they spent developing and refining their Incognito privacy claims. And if instead counsel lose most of those cases, then the hours they spent in this case developing their liability and damages theories will be shown to have lacked merit, and that work necessarily should not be a basis for fees here; it will have generated no benefit for anyone. *See* Rubenstein Decl. ¶¶ 16-17.

### 7. *Failing to Apply a Negative Multiplier Would Be Bad Policy*

Counsel's suggestion, Mot. at 4, that it would be "bad policy" to award them anything less than the exorbitant fee they seek has it backwards. Awarding counsel an amount even close to their lodestar would disincentivize defendants in disclosure or labeling cases to settle Rule 23(b)(2) cases, rather than taking their chances at trial. Google's situation here is illustrative. After the case had been significantly "de-risked" due to this Court's appropriate denial of a damages class, Google's worst-case scenario would have been a defeat at trial, likely resulting in injunctive relief centered around disclosures and data remediation, and payment of a fee award. The best-case scenario would have been a victory at trial, with *no* injunctive relief and *no* fee award. If the fee award now ends up in the range of counsel's bloated lodestar (or beyond), settlement would not be rational because Google will have gained nothing by giving up the chance to defeat Plaintiffs' claims on the merits. *See* Rubenstein Decl. ¶¶ 11–13, 18-20.

### C.     Counsel's $7.7 Million in Costs Should be Reduced

A district court has wide discretion to "eliminate[] or reduce[] excessive or unnecessary charges." *A. A. v. Cnty. of Riverside*, 2022 WL 822187, at *2 (9th Cir. Mar. 18, 2022).

The $7.7 million in costs counsel seeks is unreasonably high—nearly *twice* the costs sought in the purportedly "comparable" settlements in *Facebook*, 2023 WL 8445812, at *3 (costs of $4.1 million to be paid from $725 million fund), and *Twitter*, 2022 WL 17248115 at *1 (costs of $3.5 million to be paid from a $809 million fund). Nor can the costs be justified on their own terms. A few glaring examples: a partner submitted costs for Uber rides to and from an establishment that appears to be a day spa (on a day when he billed no time) and from the address of a karaoke bar to

that of another bar; another submitted costs for his TSA precheck membership. Broome Decl. Ex. 20. No paying client would bear such costs. Other reductions are also warranted:

Reduction in Expert Fees. Counsel seek nearly $5 million in expert expenses without having provided the underlying invoices of those experts, even after Google requested them. Lee Decl. ¶ 71; Broome Decl. Ex. 17. Courts routinely reduce expert fees where "there are no time entries or invoices from the experts" to assess whether the experts' rates and hours are reasonable. *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 978-79 (N.D. Cal. 2014) (reducing expert fees by 15% and collecting cases); *John Meggs v. Gomez, Inc.*, 2018 WL 11355448, at *3 (C.D. Cal. July 12, 2018) (denying all expert fees for which plaintiff provided "no evidentiary support"). Accordingly, the Court should reduce the expert fees by at least 15% ($746,228.97). The fees for their class damages expert (Lasinski) and claims administration expert (Weisbrot) warrant an additional 15% cut ($235,349.44) given counsel's failure to secure damages for the class.

Denial of Fees for Computerized Legal Research. Counsel submitted a remarkable $335,685.54 fee for computerized legal research, *see* Broome Decl. Ex. 19, without evidentiary support that such fees were actually incurred, *see* Yanchunis, Lee, and Carmody Decls. Many, if not most, national law firms maintain flat-fee subscriptions for legal research services. These unsubstantiated charges should be rejected. *See Resilient Floor Covering Pension Fund v. M & M Installation, Inc.*, 2012 WL 1813395, at *4 (N.D. Cal. May 17, 2012) (denying costs for legal research); *Tenorio v. Gallardo*, 2019 WL 3842892, at *6 (E.D. Cal. Aug. 15, 2019) (same).

Reduction of Other Unnecessary Or Duplicative Charges. The Court should halve the $603,558.78 cost for *two* separate mock juries, Lee Decl. ¶¶ 71, 88, particularly in light of Plaintiffs' last minute request to withdraw their jury demand, Broome Decl. Ex. 11 (11/29/23 Hr'g Tr.) at 9:11-15, and deny the $138,525.37 in costs for unnecessary charges related to Plaintiffs' withdrawn Rule 23(c)(4) motion. Lee Decl. ¶¶ 71, 83; *see Cnty. of Riverside*, 2022 WL 822187, at *2 (affirming reduction for "unnecessary charges"). The Court should reduce counsel's costs to at most $5,898,996.61. Broome Decl. Ex. 19.

**D.     Plaintiffs' Excessive Request for $30,000 Service Awards Should Be Denied**

Plaintiffs continue to pursue their damages claims in arbitration, and may yet recover in full. Settlement § II.8–9. The Court should reject their request for $30,000 in service awards as above the norm. *See, e.g.*, *Facebook*, 2023 WL 8445812, at *3 ($15,000 award); *Twitter*, 2022 WL 17248110, at *1 (denying request for awards); William B. Rubenstein, Newberg and Rubenstein on Class Actions § 17:8 (average award is $16,305).

## **CONCLUSION**

The Court should reject class counsel's request and award reasonable fees and costs commensurate with the exceedingly limited success they achieved for the class.

DATED: June 7, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____/s/ Andrew H. Schapiro_____
       Andrew H. Schapiro

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
Joseph H. Margolies (admitted *pro hac vice*)
josephmargolies@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Rachael L. McCracken (Bar No 252660)
rachaelmccracken@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire Crawford (admitted pro hac vice)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

*Attorneys for Defendant Google LLC*