Mao Exhibit 28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IOWA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, *et al.*,

        Plaintiffs,

              v.

BANK OF AMERICA CORPORATION,
*et al.*,

        Defendants.

Case No.  17-cv-6221 (KPF) (SLC)


Hon. Katherine Polk Failla


**JOINT DECLARATION OF DANIEL L. BROCKETT AND MICHAEL B. EISENKRAFT IN SUPPORT OF (1) MOTION FOR FINAL APPROVAL OF THE CREDIT SUISSE AND NEW SETTLEMENT AGREEMENTS, CERTIFICATION OF THE SETTLEMENT CLASSES, AND FINAL APPROVAL OF THE PLANS OF ALLOCATION, AND (2) MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   CO-LEAD COUNSEL'S PROSECUTION OF THE ACTION ........................................2

    A.   Co-Lead Counsel's Efforts to Uncover the Wrongdoing and Plead the
        Initial Claims...................................................................................................4

        1.   Co-Lead Counsel conduct extensive pre-filing investigations and
              file a best-in-class initial pleading ..................................................4

        2.   Co-Lead Counsel continue the investigation and file the Amended
              Class Action Complaint ...................................................................4

        3.   Co-Lead Counsel oppose Defendants' motions to dismiss........................5

    B.   Co-Lead Counsel's Discovery Efforts ....................................................................6

        1.   Co-Lead Counsel negotiate the production of, and then review,
              over 500 million pages of documents ...............................................6

        2.   Co-Lead Counsel respond to, and issue, a significant volume of
              written discovery.............................................................................8

        3.   Co-Lead Counsel negotiate for the production of voluminous and
              complicated transactional data........................................................8

        4.   Co-Lead Counsel take and defend nearly 100 depositions.......................12

        5.   Co-Lead Counsel litigate numerous discovery motions ...........................13

    C.   Co-Lead Counsel's Expert Discovery Efforts And Efforts To Certify The
        Litigation Class................................................................................................18

II.   THE SETTLEMENTS AND CO-LEAD COUNSEL'S EFFORTS TO GET
    THEM APPROVED ..........................................................................................................20

III.  CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS'
    FEES, LITIGATION EXPENSES, AND SERVICE AWARDS....................................22

    A.   Co-Lead Counsel's Fee Request as Compared to Our Significant Time
        Invested In This Action.....................................................................................22

    B.   Co-Lead Counsel's Request for Litigation Expenses ............................................23

    C.   Co-Lead Counsel's Request for Service Awards..................................................24

Pursuant to 28 U.S.C. § 1746, we, Daniel L. Brockett and Michael B. Eisenkraft, declare as follows:

1.      We are, respectively, partners of the law firms of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and Cohen Milstein Sellers & Toll, PLLC ("Cohen Milstein"). Our firms are interim co-lead counsel ("Co-Lead Counsel") for the class in the above-captioned action (the "Action").  By orders dated February 25, 2022, and September 1, 2023, the Court granted preliminary approval to the Credit Suisse Settlement Agreement and the New Settlement Agreement (collectively, the "Settlements"), and preliminarily appointed our firms as Co-Lead Counsel for the Settlement Classes.  ECF Nos. 529, 654.  We have been actively involved in prosecuting and resolving this Action since mid-2017.  We are familiar with the case history and have personal knowledge of the matters set forth herein.

2.      Collectively, the Settlements provide for $580,008,750 in cash payments (the "Settlement Funds") to members of the Settlement Classes.  The Settlements also contain certain forward-looking measures that are intended to provide additional value to the classes by promoting a competitive stock lending market, and by requiring Defendants to cooperate in Plaintiffs' continuing case against the Bank of America Defendants.  The Settlements would resolve the Action with respect to all Defendants except the Bank of America Defendants.

3.      At the same time, the Settlements avoid the substantial risk, expense, and delay of taking this Action to trial against the Settling Defendants, including the risk that the Settlement Classes would recover less than the amount of the Settlement Fund at trial, or nothing at all, after additional years of litigation.

4.      The Settlements were reached after hard-fought, arm's-length negotiations among experienced counsel.  Based on our extensive pre-suit investigation, our familiarity with the

challenges the Action faces after litigating it for over six years, and a thorough analysis of the record including our work with world-class experts during the class-certification process, we believe the Settlements are an outstanding result for the Settlement Classes.

5.     For these reasons and those set forth below, we believe the Settlements should be approved.  We therefore respectfully submit this declaration in support of Plaintiffs' motion for final approval of the Settlements, and for Plaintiffs' and Co-Lead Counsel's motion for an award of attorneys' fees, expenses, and for named Plaintiffs' service awards.

## I.     CO-LEAD COUNSEL'S PROSECUTION OF THE ACTION

6.     This case is very complex and required significant investments in time and resources, even relative to other major antitrust class actions.  The case examines collusion in the stock lending market, a crucial but little-known corner of the financial markets where expertise is closely held among a small number of financial professionals.  Plaintiffs seek to establish a conspiracy spread across several years that impacted multiple boycotted products, including anonymous all-to-all trading platforms and data transparency providers.

7.     To prove our case, we had to gather many millions of documents and records from a myriad of parties, take and defend nearly 100 depositions, and employ complex economic theories for showing antitrust impact and damages.  Plaintiffs' damages model required intensive analysis of millions of individual stock loan transactions.  These were drawn from more than 100 different sets of transactional data, all of which had to be cleaned and merged.  And at every turn, Co-Lead Counsel faced  numerous, well-funded defense counsel, all of whom fought zealously for their clients.

8.     In sum, over the past several years, Co-Lead Counsel have worked tirelessly for the benefit of the class.  Co-Lead Counsel's work has included, among other things:

- Pre-suit investigation of the facts and legal theories that formed the basis for Plaintiffs' allegations, including reviewing publicly available information, identifying and interviewing key industry insiders, and consulting with industry experts to understand the market structure and economics;

- Successfully defending against Defendants' motions to dismiss, including lengthy briefs and extensive pre-motion oral argument;

- Negotiating extensive document discovery with Defendants and third parties, resulting in more than half a *billion* pages of produced documents;

- Negotiating extraordinarily complex transactional data discovery from Defendants, including evaluation of sample data productions, extensive database-by-database analysis and correspondence to interpret Defendants' productions, and ultimately analyzing a total of 12.9 *terabytes* of data produced by Defendants;

- Litigating numerous discovery motions, including disputes over Defendants' search terms, Defendants' production of profit and loss and transactional data, and Defendants' attempts to pierce Co-Lead Counsel's work product;

- Taking and defending nearly 100 depositions, including many of the antitrust bar's first virtual depositions during the onset of the COVID-19 pandemic;

- Responding to dozens of interrogatories and 211 requests for admission, including preparing (in response to Defendants' contention interrogatories) a 77-page narrative history of the alleged conspiracy with citation to hundreds of record documents, and issuing over 20 interrogatories to each Defendant and 322 total requests for admission on Defendants;

- Working with non-testifying experts to improve our understanding of issues such as platform construction and operation, central counterparty operations, and Basel III financial regulations and risk assessments;

- Briefing a motion for class certification, consisting of a 50-page opening memorandum with 162 exhibits, including two expert reports, a 35-page reply brief with 16 exhibits, including two more expert reports, and a 5-page sur-sur-reply with another expert report;

- Working with three world-renowned economists to develop a viable class certification model based on cutting-edge economic theory, extensive real-world comparator evidence, and a damages model that required creation of the most comprehensive set of observations of real-world stock lending transactions ever collected in this market, drawing on nearly 13 terabytes of data;

- Deposing Defendants' four testifying experts and defending depositions of Plaintiffs' three testifying experts;

- Arguing class certification during a full-day hearing after months of preparation, the scope of which can be illustrated with the 169 PowerPoint slides Plaintiffs prepared for potential use during the hearing;

- Opposing Defendants' objections to Magistrate Judge Cave's Report and Recommendation and filing a limited objection to the Report and Recommendation;

- Negotiating the two Settlements now before the Court, including preparing for and attending a two-day mediation with retired U.S. District Court Judge Layn Phillips, as well as months of negotiations with Defendants conducted both with and without Judge Phillips's help; and

- Successfully briefing the Court's preliminary approval of the Settlements and managing the notice and allocation process in concert with expert settlement administrators.

**A.** **Co-Lead Counsel's Efforts to Uncover the Wrongdoing and Plead the Initial Claims**

    *1.*     *Co-Lead Counsel conduct extensive pre-filing investigations and file a best-in-class initial pleading*

9. Before filing suit, Co-Lead Counsel invested months of attorney time and substantial expenses in investigating the possibility of an anticompetitive boycott in the stock lending market. This investigation was carried out "from scratch," without any precipitating government investigations or public reports.

10. Based on our extensive pre-filing investigation, Co-Lead Counsel filed the first complaint in the Action in August 2017. ECF No. 1. Our 238-paragraph initial complaint detailed, for the first time in a public forum, Defendants' successful efforts to boycott potential new entrants into the stock lending market.

    *2.*     *Co-Lead Counsel continue the investigation and file the Amended Class Action Complaint*

11. In November 2017, Co-Lead Counsel filed the Amended Class Action Complaint. ECF No. 73. At 144 pages and 398 paragraphs, the amended complaint was more than one and a half times the length of the initial pleading. It added new allegations based on months of

additional analysis and investigation, and new details based on further interviews with former industry insiders. As the Court noted in its opinion denying Defendants' motions to dismiss, the amended complaint included direct evidence of a conspiracy, including:

> a. A statement by John Shellard, a Managing Director at J.P. Morgan and an Equilend Board member, at an August 7, 2013 meeting that there was a "general agreement among [the] directors [of Equilend]" that "industry advances should be achieved from within EquiLend," rather than through third parties such as AQS, SL-x, and Data Explorers.
>
> b. A statement by Thomas Wipf, Morgan Stanley's Global Head of Bank Resource Management, that he and William Conley agreed that Morgan Stanley and Goldman Sachs needed to "get a hold of this thing," meaning they needed to act together to acquire and shut down AQS.

ECF No. 123 at 46-48 (quoting Amended Complaint ¶¶ 239, 295-96).

### 3. Co-Lead Counsel oppose Defendants' motions to dismiss

12. In January 2018, the Court held a two-hour initial pretrial conference to discuss the amended complaint, Defendants' potential grounds for dismissal, and whether Plaintiffs would seek further amendments. ECF No. 102. During that conference, Co-Lead Counsel detailed the "thorough investigation" they had done in order to "plead collusion claims with the level of detail and specificity that are alleged in" the amended complaint. *See, e.g.*, ECF No. 102 at 11:18-12:11.

13. Later that same month, Defendants filed two motions to dismiss the amended complaint. In addition to 63 pages of briefs, Defendants submitted two supporting declarations and two exhibits in support of the motions. ECF Nos. 106-11.

14.     In March 2018, Co-Lead Counsel filed 65 pages of briefing in opposition to Defendants' motions to dismiss. ECF Nos. 112-13. Defendants filed an additional 32 pages of reply briefs. ECF Nos. 114-15.

15.     In September 2018, the Court issued a 93-page order denying in full Defendants' motions to dismiss. ECF No. 123. The Court acknowledged the parties' detailed briefing, stating: "The Court pauses to observe that the briefing on all sides was excellent, for which the Court extends its gratitude." *Id.* at 3 n.1.

16.     In October 2018, Defendants each answered the amended complaint. ECF Nos. 128-134.

**B.     Co-Lead Counsel's Discovery Efforts**

17.     In November 2018, shortly after the Court's decision on Defendants' motions to dismiss, Co-Lead Counsel diligently set about to coordinate discovery, proposing a schedule in November 2018. ECF No. 136. Co-Lead Counsel thereafter vigorously pursued discovery in this case over the course of more than two years. Discovery at every turn was long and zealously fought. Fact discovery ultimately closed on October 20, 2020, except for certain depositions that were taken after the close of fact discovery, *see* ECF No. 363, and responses to certain written discovery requests, which were due on December 11, 2020, *see* ECF No. 371.

*1.     Co-Lead Counsel negotiate the production of, and then review, over 500 million pages of documents*

18.     This case involves five different named Plaintiffs (the "Class Representatives," Iowa Public Employees' Retirement System, Los Angeles Country Employees Retirement Association, Orange County Employees Retirement System, Sonoma County Employees' Retirement Association, and Torus Capital, LLC), six Prime Broker Defendants (Bank of America, Credit Suisse, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS), and Equilend.

Each produced documents, as did numerous third parties, including the boycotted platforms and transparency providers (AQS, SL-x, and Data Explorers), agent lenders (State Street, Blackrock, Northern Trust, Bank of New York Mellon), and central clearinghouses (the Options Clearing Corporation and the Depository Trust & Clearing Corporation).

19.     Defendants issued three different sets of production requests, totaling 116 requests.  These requests called for not only emails and other types of correspondence, but also complex financial data and records.  Working with Co-Lead Counsel, the Class Representatives spent extensive time searching for, reviewing, and eventually producing responsive documents.  Altogether, the Class Representatives produced 621,337 pages of documents.  That review included detailed privilege analysis to avoid the production of documents protected by the attorney client privilege or work product protection.

20.     Co-Lead Counsel issued four sets of requests for production, totaling 110 requests, on the Prime Broker Defendants.  In total, the Prime Broker Defendants produced 8,741,565 pages of documents.  Co-Lead Counsel also issued four sets of request for production, totaling 102 requests, to Equilend.  In total, Equilend produced 502,748,194 pages of documents.

21.     Co-Lead Counsel also served 42 subpoenas to a total of 36 third-party entities or corporate families.  In response, those third parties produced 1,682,310 pages of documents.

22.     Co-Lead Counsel's document database in this case contains over 513 million pages of discovery materials.  That database is massive, containing 4.7 terabytes of information.

23.     Given this extraordinary volume of information, Co-Lead Counsel employed a variety of review techniques.  We used cutting-edge technology-assisted review and predictive coding tools to efficiently identify the most important documents.  We supplemented these tools with linear review by specialized discovery attorneys of potentially important document sets and

targeted searches. From more than half a billion pages of produced documents, we were able to identify hundreds of key documents substantiating Plaintiffs' claims.

>    *2.    Co-Lead Counsel respond to, and issue, a significant volume of written discovery*

24.    The volume of written discovery in this case was also significant. Both sides issued and responded to numerous written discovery requests.

25.    Defendants issued dozens of interrogatories to the Class Representatives. Our responses and objections span 163 pages in length, including a 77-page extended narrative description of Defendants' conspiracy, replete with record cites to documents and depositions. Defendants also issued 57 requests for admission to all Plaintiffs, along with an additional 30 to IPERS, 44 to LACERA, 44 to OCERS, and 36 to SCERA, for a total of 211 unique requests for admission. Collectively, the Class Representatives' responses and objections to these requests for admission span 125 pages.

26.    Co-Lead Counsel also issued numerous interrogatories, in December 2018 (to the Prime Broker Defendants), August 2020 (to all Defendants), and January 2022 (to JPMorgan). Co-Lead Counsel also issued 322 requests for admission to Defendants; Defendants' responses and objections span 240 pages.

>    *3.    Co-Lead Counsel negotiate for the production of voluminous and complicated transactional data*

27.    To support the motion for class certification, Co-Lead Counsel negotiated and analyzed an unusually significant amount of transactional data, which was essential to our expert reports. Each Defendant produced detailed data reflecting its stock loan transactions. Equilend similarly produced extensive data about the transactions it facilitated, along with legacy data from AQS. Along the way, Co-Lead Counsel navigated numerous challenges, including complications associated with negotiation and production and protective order issues.

28.     Co-Lead Counsel initially requested transactional data from the Defendants in December 2018.  Between late 2018 and May 2019, the parties engaged in dozens of meet and confers regarding these requests and exchanged dozens of detailed letters.  *See* ECF No. 176. Defendants first produced exemplar data to confirm that the data specifications were correct.  *Id*. The exemplar data reflected that Defendants maintained data in distinct, unique databases with hundreds of unique fields.  *Id*.  The initial data exemplars often lacked critical fields and explanations for the fields provided.  *Id*.  Accordingly, Co-Lead Counsel recognized early that these complications would necessitate an extension of the deadline for data production, and promptly raised the issue with the Court.  *Id*.  Meanwhile, Co-Lead Counsel continued to engage with Defendants to obtain complete data sets and interpretive material.  Of note, Co-Lead Counsel were able to work cooperatively with most Defendants' counsel on interpreting Defendants' data sets and obtaining efficient, early answers to data-related questions.

29.     Because the data was housed in different databases, obtaining a timeline for actual production proved difficult.  Even after a March 17, 2019 Court-ordered status conference, Defendants still could not commit to a deadline for the production of full data sets.  ECF No. 185.  Accordingly, after letter updates to the Court, *see* ECF Nos. 183-84, the Court ordered that the parties resolve disputes regarding the production of transactional data by June 24, 2019, that Defendants produce data dictionaries by the same date, and that Defendants advise Plaintiffs and the Court of the date by which Defendants could complete their production by July 1, 2019. ECF No. 185.

30.     Data productions became substantially more complicated when—on the eve of production—Defendants provided notice to their clients of the impending production.  ECF No. 192.  Those clients expressed concerns regarding the sufficiency of the parties' protective

order.  *Id*.  Co-Lead Counsel worked swiftly to resolve those concerns, meeting with putative

class members and weighing options to ameliorate any issues.  ECF No. 193.

31.     Co-Lead Counsel took numerous steps to assure putative class members that their

data would be secure.  *First*, Co-Lead Counsel explained that their experts employed

state-of-the-art security measures.  ECF No. 196.  *Second*, Co-Lead Counsel offered to discuss

changes and amendments to the parties' protective order.  *Id*.  *Third*, Co-Lead Counsel offered to

anonymize the data, to further protect putative class members' interests.  *Id*.  Ultimately, Co-

Lead Counsel's persistence paid off—the parties agreed to a supplemental protective order, ECF

No. 228.  That supplemental protective order provided still further protections for putative class

members, including additional notice requirements.  *See e.g.*, ECF No. 246.  In January 2020,

Co-Lead Counsel reached agreement with the Defendants and putative class members on the

format of the data production.  In addition to the supplemental protective order, the parties

agreed to anonymize all borrow-side data.  ECF No. 264.

32.     The data productions Defendants ultimately made are massive in scope, even for a

complex antitrust class action.  Goldman Sachs produced a total of 31 sets of data files,

representing more than 815 gigabytes of information; Morgan Stanley produced 16 sets of data

files, representing more than 2,217 gigabytes of information; JPMorgan produced 10 sets of data

files, representing more than 399 gigabytes of information; Bank of American produced 28 sets

of data files, representing more than 706 gigabytes of information; Credit Suisse produced 25

sets of data files, representing more than 64 gigabytes of information; UBS produced 22 sets of

data files, representing more than 814 gigabytes of information; and Equilend produced 26 sets

of data files, representing more than 7,907 gigabytes of information.  *See* ECF no. 414-10,

Appendix C.

33.     All told, Defendants produced more than 12.9 terabytes of data.  It is hard to overstate how much information that figure represents—usually, data measured in terabytes describes libraries of big multimedia files, such as hundreds of hours of 4K video, or hundreds of thousands of high quality photos.  The data collected in Defendants' productions are lines of comma-separated text representing tens of millions of stock loan transactions—roughly 26 *billion* printed pages of information.

34.     Equilend also produced legacy data from AQS, one of the boycotted platforms that the Prime Broker Defendants acquired through Equilend as part of the conspiracy.  ECF No. 414-10, Appendix D.  The data reflect more than 13,000,000 unique stock loan billing observations.  *Id.*  Even after filtering for sufficiently robust data and limiting the data to the class period, the total number of observations still exceeded 5,000,000.  *Id.*

35.     Data of this volume is not easy to work with.  It cannot be stored in familiar formats such as Microsoft Excel spreadsheets.  Performing operations often requires writing new computer code, and takes hours of processing by high-powered computers not available in consumer markets.  Manipulating and otherwise "cleaning" this data took months; the process was sufficiently arduous that, despite millions of dollars in expert fees, Plaintiffs' damages experts were unable to complete the process for all banks by the date of their opening class certification report.  ECF No. 414-10 ¶ 521.  And the damages experts' opening report data appendix alone spans 37 pages just on Defendants' data.  *Id*. at Appendix C.

36.     Apart from sheer volume, Defendants' data is also extremely complex.  Just understanding the data required Co-Lead Counsel repeatedly to seek clarification in follow-up questions to Defendants.  This process occurred for more than a year.  By way of example, Co-Lead Counsel and counsel for JPMorgan exchanged over twenty formal letters, alongside

many more emails, between April of 2019 to January 2021 concerning JPMorgan's data production. Those letters concern a huge array of topics, including field definitions (*e.g.*, what does a particular field mean or represent), field-value definitions (*e.g.*, what does a particular value in a given field represent), missing data (*e.g.*, why is there no data for a particular date range), anomalous entries (*e.g.*, why is a given field value, expected to be positive, negative sometimes), and units of observation (*e.g.*, what triggers or events are necessary for a particular dataset to record an observation). Co-Lead Counsel had similar exchanges with each Defendant.

37.     Equilend's data was particularly complex and voluminous. In January 2020, Co-Lead Counsel served a notice of a 30(b)(6) deposition on Equilend driven largely by the need for additional information about Equilend's data. After extensive negotiation, in August 2020, Co-Lead Counsel took a 30(b)(6) deposition of an Equilend designee. That deposition transcript spans 224 pages and almost exclusively concerns Equilend's data production.

4.     *Co-Lead Counsel take and defend nearly 100 depositions*

38.     Fact depositions in this case spanned the better part of a year, from late 2019 until the end of 2020. Many depositions occurred during the midst of the COVID-19 pandemic, which necessitated that Co-Lead Counsel develop remote deposition protocols as well as learn to take and defend depositions on Zoom.

39.     Co-Lead Counsel took 56 depositions of Defendants' witnesses. This included eight from Bank of America, eight from Credit Suisse, five from Equilend—including a 30(b)(6) deposition and a two day deposition of Equilend's CEO—nine from Goldman Sachs, eight from JPMorgan, nine from Morgan Stanley, and nine from UBS. These depositions were critical to the overall success of the case.

40.     Given the nature of the conspiracy in this case—a group boycott of trading platforms and data transparency providers—third-party discovery was also critical. Co-Lead

12

Counsel also took 33 third-party depositions. This included seven AQS depositions, one Barclays deposition, one Blue Ridge Capital deposition, one BNY Mellon deposition, one Citi deposition, one D.E. Shaw deposition, two DTCC depositions, one FIS deposition, four Markit (purchaser of Data Explorers) depositions, three Northern Trust depositions, four Options Clearing Corporation depositions, six SL-x depositions, and one State Street deposition.

41.    Co-Lead Counsel also defended seven depositions of witnesses from the Class Representatives. This included one 30(b)(6) deposition for each of the four pension fund plaintiffs—IPERS, LACERA, OCERS, and SCERA—as well as three depositions of Torus Capital representatives. Defense of these depositions was important, given that Defendants ultimately argued (unsuccessfully) that both Torus and SCERA were inadequate and atypical Class Representatives. *See* ECF No. 441 at 46-47.

42.    In total, Co-Lead Counsel took and defended nearly 100 fact depositions during the span of just over one year, in the middle of a global pandemic.

### 5.    *Co-Lead Counsel litigate numerous discovery motions*

43.    This case was zealously fought, with Co-Lead Counsel litigating against many of the world's top firms, including Cravath Swaine & Moore (Morgan Stanley); Shearman & Sterling (Bank of America); Covington & Burling LLP (JPMorgan); Cahill Gordon & Reindel LLP (Credit Suisse); Clearly Gottlieb Steen & Hamilton LLP (Equilend); Katten Munchin Rosenman LLP (UBS); and Winston & Strawn LLP, Sullivan & Cromwell LLP, and, later, Paul Weiss Rifkind Wharton & Garrison (Goldman Sachs). The parties litigated numerous discovery disputes. Some examples are set forth below.

44.    In March 2019, Co-Lead Counsel submitted a letter-motion relating to a search-term dispute with JPMorgan. ECF No. 165. JPMorgan refused to apply reasonable search terms, instead demanding that Co-Lead Counsel accept much narrower, and unhelpful,

terms. *Id*. JPMorgan then requested an extension to respond, ECF No. 166, which the Court subsequently granted, ECF No. 167. Co-Lead Counsel then met and conferred with counsel for JPMorgan, who ultimately capitulated, at which point Co-Lead Counsel withdrew their motion. ECF No. 168. Co-Lead Counsel's request for Court intervention was critical to JPMorgan capitulating on search terms, which was essential to obtaining the needed documents.

45. In May 2019, Co-Lead Counsel wrote to inform the Court of delays associated with Defendants' production of transactional data. ECF No. 175. One day later, the Court ordered a status conference on this issue. ECF No. 176. Ahead of that conference, Co-Lead Counsel updated the Court on the progress of negotiations. ECF No. 177. At that conference, Co-Lead Counsel discussed a number of outstanding issues with Defendants' transactional data and apprised the Court of the parties' timelines. ECF No. 178.

46. In June 2019, Co-Lead Counsel again updated the Court on the progress of data negotiations, and asked for relief in the form of a deadline to resolve disputes and an order compelling the production of data dictionaries. ECF No. 183. The Court ultimately granted that relief. ECF No. 185. On July 1, 2019, Defendants provided the required update. ECF No. 186. On July 29, 2019, given the extensive delays in data production, Co-Lead Counsel moved to extend the deadlines for class certification. ECF No. 189. The Court granted that relief, too. ECF No. 190.

47. In the fall of 2019, as discussed above, the ultimate production of Defendants' transactional data was further complicated by some putative class members raising concerns about the confidentiality of their transactional data. ECF No. 193. Co-Lead Counsel, Defendants, and 22 putative class members spent the better part of several months negotiating protections for putative class members' data. *See* ECF Nos. 192, 193, 195, 196, 198, 199, 207.

48.     In October 2019, Defendants moved to compel information they viewed as responsive to their first interrogatory, aimed at uncovering our work product and confidential sources of information.  ECF No. 233.  Co-Lead Counsel opposed, explaining that Defendants' request was designed not for proper purposes, but instead to pierce Plaintiffs' and Co-Lead Counsel's privileges.  ECF No. 238.  Co-Lead Counsel also explained that Defendants' request implicated significant privacy and anti-retaliation concerns.  *Id*.  The Court ultimately granted Defendants' motion, but critically limited the relief to only the names of individuals quoted in the amended complaint.  ECF No. 240.

49.     In December 2019, after months of failed negotiations, Co-Lead Counsel moved to compel Bank of America to produce its profit and loss data.  ECF No. 254.  Bank of America vigorously opposed.  ECF No. 256.  Later that month, after recognizing Co-Lead Counsel's efforts to resolve this dispute, the Court ordered Bank of America to produce the requested data. ECF No. 260.

50.     In February 2020, Defendants moved *again* to compel additional answers in response to its first interrogatory.  ECF No. 271.  As Co-Lead Counsel carefully explained in their opposition, we had promptly complied with the Court's prior order.  ECF No. 276.  We explained that Defendants' latest request was an attempt to *expand* that order rather than seek compliance with it.  *Id*.  The Court agreed, denying Defendants' request.  ECF No. 280.

51.     In April 2020, Defendants issued subpoenas to a non-testifying industry consultant and his attorney.  ECF Nos. 297-1, 297-2.  Those subpoenas sought information relating to the non-testifying industry consultant's communications with Co-Lead Counsel.  ECF No. 297.  Co-Lead Counsel also argued that Defendants' subpoenas were designed to harass and intimidate the industry consultant, a former executive of one of the boycotted platforms who had

spoken out against the Defendants' illegal conduct.  *Id.*  The Court held a conference in June

2020, wherein Co-Lead Counsel argued that Defendants' subpoenas were improper.  ECF Nos.

ECF No. 307, 311.  The Court ultimately agreed, asking Defendants to re-issue the subpoenas

with a narrower scope, and ordering further briefing on the topic of the industry consultant's

retention.

      52.    Later that month, in June 2020, Co-Lead Counsel and Equilend submitted

10-page letters regarding the non-testifying industry consultant.  Co-Lead Counsel explained that

their relationship with the non-testifying industry consultant was nothing out of the ordinary.

ECF No. 319.  As Co-Lead Counsel argued, courts regularly permit parties to hire industry

consultants with knowledge about the underlying facts of the lawsuit.  *Id.*  Co-Lead Counsel

explained that their communications with the non-testifying industry consultant were work

product, clearly protected from Equilend's attempt to seek discovery into Co-Lead Counsel's

litigation strategy.  *Id.*  This marked the *third* time that Defendants had attempted to pierce Co-

Lead Counsel's work product protections.

      53.    In July 2020 the Court ordered the parties to appear for another teleconference.

ECF No. 328.  Ahead of that conference, Equilend submitted a "supplemental" letter, again

aimed at smearing Co-Lead Counsel's retention of industry consultants.  ECF No. 330.  This

letter necessitated a further response from Co-Lead Counsel.  ECF No. 333.  At the resulting

teleconference, the parties again argued about the propriety of retaining the non-testifying

industry consultant, and about his dual role as industry consultant and fact witness.  ECF

No. 342.  The Court granted Co-Lead Counsel's motion to quash, finding that the sought-after

documents were protected work product.  *Id.*  The Court also discussed Co-Lead Counsel's

acquisition of documents, and Equilend indicated its view that it would move for sanctions.  *Id.*

The Court indicated that it would consider those issues after the non-testifying industry consultant's forthcoming deposition. *Id*.

54.     In November 2020, after that deposition, Equilend informed the Court that it intended to seek sanctions against Co-Lead Counsel. ECF No. 373. Co-Lead Counsel responded, explaining that the non-testifying industry consultant's deposition had fully vindicated Plaintiffs' position. ECF No. 376. The Court ordered a teleconference. ECF Nos. 381, 384. The Court explained that Equilend had a "tough row to hoe" on its anticipated motion, but nevertheless said it would allow Equilend the opportunity to file its motion. *Id*.

55.     Equilend brought its motion later that month, in November 2020. ECF No. 388. Equilend's 25-page motion requested: (1) disqualification of any attorney who handled the documents at issue from working on the case, (2) a "clean team" to review plaintiffs' work product for information purportedly privileged to Equilend, (3) prohibiting Co-Lead Counsel from using the industry consultant's testimony in the case, (4) ordering Co-Lead Counsel to pay a monetary sanction, (5) prohibiting Co-Lead Counsel from using any documents produced by the non-testifying industry consultant, and (6) reimbursing Equilend for its costs. *Id*.

56.     In December 2020, Co-Lead Counsel responded. ECF No. 399. Co-Lead Counsel's opposition explained that Equilend failed to adduce any evidence that Co-Lead Counsel engaged in sanctionable conduct. *Id*. Equilend identified no evidence of bad faith, no prejudice it suffered, and its proposed "remedies" would merely punish Co-Lead Counsel for bringing and prosecuting this antitrust case. *Id*. Co-Lead Counsel prepared our opposition over the course of the holidays, while simultaneously preparing to file Plaintiffs' class certification motion.

57.     The Court denied Equilend's sanction motion on July 8, 2021. ECF No. 436.

58.     During the pendency of the industry-consultant dispute, Co-Lead Counsel briefed several other discovery disputes.  For instance, in December 2020, Co-Lead Counsel moved to compel the production of data concerning certain potential "opt-out" Class members.  ECF No. 392.  The motion was necessitated because Defendants initially stated they would provide the information, but later reneged on their promise.  *Id*.  Defendants responded, but effectively conceded by agreeing to produce the information by January 15, 2021.  ECF No. 397.  Accordingly, the Court noted that the dispute was mooted.  *Id*.

C.     **Co-Lead Counsel's Expert Discovery Efforts And Efforts To Certify The Litigation Class**

59.     Co-Lead Counsel filed Plaintiffs' motion for class certification and appointment of class counsel in February 2021.  ECF No. 411.  The motion was accompanied by a 50-page memorandum of law and two attorney declarations attaching a combined 162 exhibits.  ECF Nos. 419-2.  Those included two expert reports:  the report of Plaintiffs' lead impact expert, Dr. Haoxiang Zhu, and the report of Plaintiffs' damages and impact experts, Profs. Paul Asquith and Parag Pathak.  ECF No. 420-11, 12.

60.     After filing our opening motion for class certification, Co-Lead Counsel spent many hours preparing our three testifying experts for their depositions.  Co-Lead Counsel prepared the three testifying experts with mock questioning, anticipating many of the lines of questioning that Defendants' counsel pursued in depositions.

61.      Defendants filed their 50-page opposition to Plaintiffs' motion for class certification in June 2021.  ECF Nos. 441, 442.  Defendants included 68 exhibits with their opposition, including reports from four experts:  Professor Terrence Hendershott from the Berkeley Haas School of Business; Professor Justin McCrary from Columbia Law School;

William Pridmore, a purported industry expert; and Fabio Savoldelli, another purported industry expert. ECF Nos. 442-1-4.

62.     Utilizing these experts, Defendants made numerous lengthy and complex arguments in support of their opposition to Plaintiff's class certification motion. Co-Lead Counsel immediately got to work in preparing responses. Co-Lead Counsel conducted extensive research into the law, the evidentiary record, and economic literature.

63.     Co-Lead Counsel deposed Defendants' testifying experts following extensive preparation. Co-Lead Counsel wrote to the court requesting to file a 35-page reply brief in support of our motion for class certification, which the Court granted. ECF Nos. 466-67.

64.     Co-Lead Counsel ultimately filed our reply memorandum in support of our motion for class certification in October 2021. ECF No. 491. The reply brief was accompanied with 16 new exhibits, including expert reply reports by Dr. Zhu and Professors Asquith and Pathak. ECF No. 492.

65.     The Court scheduled oral argument on the motion for class certification for April 28, 2022. ECF No. 535. Co-Lead Counsel spent many hours preparing. This included preparing PowerPoint decks that we used during the hearing consisting of 114 affirmative slides and 55 potential rebuttal slides. ECF No. 556-1, 556-2. All of this work was essential to putting on a strong showing at the hearing, which was a full day of argument before Magistrate Judge Sarah Cave.

66.     Before the hearing, Co-Lead Counsel also submitted two notices of supplemental authority to alert the Court to new cases that supported Plaintiffs' arguments. Magistrate Judge Cave later cited both of these submissions in the Report and Recommendation. ECF No. 563 at 45, 59.

67.     Magistrate Judge Cave issued a Report and Recommendation recommending that the Court certify the class in June 2022.  ECF No. 563.  Magistrate Judge Cave agreed with nearly all of Co-Lead Counsel's arguments, vindicating the thousands of hours Co-Lead Counsel had invested in discovery, preparing our class certification papers (including the supporting expert reports), and preparing for the class certification hearing.  Magistrate Judge Cave's 70-page recommendation analyzed both sides' arguments and contentions in depth and determined that Plaintiffs satisfy each of Rule 23's certification requirements.

68.     Defendants filed objections to Magistrate Judge Cave's recommendation in August 2022.  ECF No. 587.  Co-Lead Counsel prepared and filed an opposition brief in October 2022.  ECF No. 609.  Defendants filed their reply brief in November 2022.  ECF No. 630.  Co-Lead Counsel filed a limited objection to Magistrate Judge Cave's recommendation—regarding the applicable class period—on the same timetable.  ECF Nos. 573, 604, 627.

## II.     THE SETTLEMENTS AND CO-LEAD COUNSEL'S EFFORTS TO GET THEM APPROVED

69.     The Credit Suisse Agreement was reached after extensive arm's-length negotiations with Credit Suisse and its counsel, concluding in late January 2022.  In February 2022, Co-Lead Counsel prepared and filed a motion to approve the Credit Suisse Agreement, including a 25-page brief and supporting documentation.  ECF No. 520.  Later that same month, the Court granted the motion to preliminarily approve the Credit Suisse Agreement.  ECF No. 529.

70.     The New Settlement Agreement was reached after extensive arm's-length negotiations with the assistance of a leading mediator, the Honorable Layn Phillips.  Negotiation began in early 2023 and concluded in June 2023.  The parties met in person in March for a

two-day mediation.  While some progress was made, the parties were still far apart after the end of the second day.

71.     The parties continued to negotiate for three months more, finally agreeing to a term sheet in June 2023.  The negotiations concluded only after both sides accepted a mediator's proposal put forward by Judge Phillips.

72.     Turning the agreement into a long-form document (the New Settlement Agreement) was itself the subject of intense additional negotiations, which concluded in August 2023.  Very shortly thereafter, also in August 2023, Co-Lead Counsel prepared and filed a motion to approve the New Settlement Agreement, including a 25-page brief and supporting documentation.  ECF No. 651.

73.     Co-Lead Counsel's work continued even after the Settlements were preliminarily approved.

74.     For instance, Co-Lead Counsel spent the next few months preparing to give notice to members of the Settlement Classes.  This included working with both the Settling Defendants and the non-settling Bank of America Defendants to provide the reasonably available contact information for potential members of the Settlement Classes.  This also included retaining and then working with the settlement administrator to devise the notice program and all of the notice materials.

75.     Co-Lead Counsel also continued to work for the benefit of the Settlement Classes by way of devising the Plans of Allocation.  While built off of our extensive work during the class-certification stage, translating the lessons learned and the conclusions reached during litigation into an easy-to-understand, easy-to-administer, universal plan covering the entire class of lenders and borrowers required additional effort and consultation with the settlement

21

administrator.  The Plans of Allocation assign different damages and risk multipliers based on (i) whether the claimant was a borrower or lender; (ii) the "temperature" of the transaction, determined by the loan cost; and (iii) the date of the transaction.  Co-Lead Counsel believe the methodology achieves an equitable distribution of settlement funds among members of the Settlement Classes, while ensuring that both the preparation of claims by class members and the administration of claims by the settlement administrator is as seamless and efficient as possible.

76.    In February 2024, Co-Lead Counsel filed a motion to preliminarily approve the notice and allocation plans, including a 16-page brief and extensive supporting documentation, including the proposed notice materials, claim form, and allocation plans.  ECF No. 661.

77.    Attached as Exhibit A is a report from Dr. Rosa Abrantes-Metz, a Ph.D. economist with deep experience in the study, detection, and prevention of collusion, including compliance.  Dr. Abrantes-Metz's report seeks to estimate the value of the industry reforms secured by the New Settlement Agreement.

## III.   CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS

78.    Class members were advised that Co-Lead Counsel would submit an application for an award of attorneys' fees in an amount not to exceed $105,000,000; litigation expenses in an amount not to exceed $23,000,000; Class Representative service awards in an amount not to exceed $500,000; and interest accrued on these amounts in the Settlement Fund accounts.  Our fee, expense, and award application is fully consistent with the notice materials.

### A.   Co-Lead Counsel's Fee Request as Compared to Our Significant Time Invested In This Action

79.    Co-Lead Counsel seek a fee award of $102,200,000, plus interest.

80.     As detailed in our concurrently filed individual declarations, Co-Lead Counsel have invested more than 180,000 hours in this Action over the course of seven years, through February 29, 2024 (Quinn Emanuel) and May 3, 2024 (Cohen Milstein).

81.     Our individual declarations also identify the attorneys and support staff who worked on the Action, their hourly rates and number of hours billed, and the lodestar value of their time.  Using the "historic rate" method described therein, this amounts to an investment of more than $97,000,000 in the time of Co-Lead Counsel's attorneys and professional support staff.  Using the "current rate" method described therein, this amounts to an investment of more than $146,000,000 in the time of Co-Lead Counsel's attorneys and professional support staff.  Valuable work on behalf of the class by other firms, such as Safirstein LLC, is not included in these figures for simplicity's sake.

82.     Co-Lead Counsel took this case on a fully contingent basis.

**B.     Co-Lead Counsel's Request for Litigation Expenses**

83.     Co-Lead Counsel seek expenses in the amount of $18,845,997.91, plus interest accrued in the Settlement Fund accounts thereon.

84.     The total request above includes 1)  $3,615,045.17 incurred directly by Quinn Emanuel, as seen in the Brockett Declaration, 2) $15,222,005.24 incurred by Cohen Milstein, as seen in the Eisenkraft Declaration (a figure that includes expenditures from the common litigation fund managed by Cohen Milstein, to which both firms contributed), and 3) $8,947.50 incurred by Safirstein Law LLC, as seen in the Safirstein Declaration. To avoid double counting, individual firms' contributions to the common litigation fund are not included in these figures.

85.     The categorization of all expenses incurred by Co-Lead Counsel and explanations as to how they were arrived at, as well as other details, are provided in our respective concurrently filed individual declarations.

86.    Almost all of these expenses represent payments to testifying and non-testifying experts and Plaintiffs' discovery management platform.  As more fully discussed above, these expenses reflect the extraordinary work required from experts to develop usable transactional data from which Plaintiffs' testifying experts could create the damages models that supported Plaintiffs' motion for class certification, which was ultimately approved by Magistrate Judge Cave and drove the settlement.  Document storage fees were also extraordinary, because of the enormous volume of documents provided by Defendants, which greatly exceeded case productions even in other complex antitrust cases.

87.    As noted in our motion for attorneys' fees, litigation expenses, and named Plaintiff service awards, in our reply brief to that motion we may update this request with additional expenses incurred during the pendency of the motion, such as ongoing document hosting fees or vendor corrections. Even with such updates, Co-Lead Counsel's expense request is and will be significantly below the $23 million in litigation expenses proposed in notices to the Settlement Classes.

**C.    Co-Lead Counsel's Request for Service Awards**

88.    As reflected in the attached Exhibits B through F, each Class Representative devoted extensive time and effort to supervising Co-Lead Counsel's prosecution of the case and participating in discovery as named Plaintiffs.  Without the Class Representatives' participation, this case would not have been brought, leaving the hundreds of millions of dollars achieved in these Settlements in the hands of the banks.

89.    As Co-Lead Counsel, we endorse their request for incentive awards of $100,000 each, for a total of $500,000, plus interest accrued thereon.  Co-Lead Counsel believe these awards, which reflect the disproportionate responsibility the Class Representatives undertook to

prosecute this case, are a key element of an equitable distribution of the Settlement Funds to members of the Settlement Classes under Rule 23(e)(2)(D).

*    *    *

We declare, under penalty of perjury, that the foregoing is true and correct.

Executed May 8, 2024
New York, New York

Daniel L. Brockett

Executed May 8, 2024
New York, New York

Michael B. Eisenkraft