Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CHASOM BROWN, et al.,           )
                                )
          Plaintiffs,           )
                                )
   VS.                          )     NO. 20-CV-03664-YGR
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____)

                        Oakland, California
                        Wednesday, August 7, 2024

                 TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                    MORGAN & MORGAN, P.A.
                    201 N Franklin Street, 7th Floor
                    Tampa, FL 33602
               BY:  JOHN A. YANCHUNIS, ATTORNEY AT LAW
                    RYAN MCGEE, ATTORNEY AT LAW

                    SUSMAN GODFREY LLP
                    One Manhattan West
                    395 9th Avenue, 50th Floor
                    New York, NY 10001
               BY:  ALEXANDER P. FRAWLEY, ATTORNEY AT LAW

                    SUSMAN GODFREY LLP
                    1900 Avenue of the Stars, Suite 1400
                    Los Angeles, CA 90067-6029
               BY:  AMANDA K. BONN, ATTORNEY AT LAW


           (APPEARANCES CONTINUED ON THE NEXT PAGE.)


REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**APPEARANCES (Continued):**

        BOIES SCHILLER FLEXNER LLP
        333 Main Street
        Armonk, NY 10504
  BY:  **DAVID BOIES, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        100 SE 2nd Street, Suite 2800
        Miami, FL 33131
  BY:  **JAMES W. LEE, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        44 Montgomery Street, 41st Floor
        San Francisco, CA 94104
  BY:  **MARK C. MAO, ATTORNEY AT LAW**

For Defendant:

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        191 N Upper Wacker Drive, Suite 2700
        Chicago, IL 60606
  BY:  **ANDREW H. SCHAPIRO, ATTORNEY AT LAW**
      **TEUTA FANI, ATTORNEY AT LAW**

        QUINN EMANUEL URQUHART & SULLIVAN LLP
        865 S Figueroa Street, 10th Floor
        Los Angeles, CA 90017
  BY:  **STEPHEN A. BROOME, ATTORNEY AT LAW**
      **VIOLA TREBICKA, ATTORNEY AT LAW**

For Movant:

        WALKER TRIAL LAWYERS, LLP
        30113 Point Marina Drive, Suite 2
        Canyon Lake, CA 92587
  BY:  **BARRY M. WALKER, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>Wednesday - August 7, 2024</u>                                    <u>2:17 p.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | **THE COURTROOM DEPUTY:**  All rise.  The United States |
| 5 | District Court is now in session, the Honorable Yvonne Gonzalez |
| 6 | Rogers presiding. |
| 7 | **THE COURT:**  Good afternoon, everyone. |
| 8 | **THE COURTROOM DEPUTY:**  Please be seated.  Thank you. |
| 9 | Good afternoon.  These proceedings are being court |
| 10 | reported by this court.  Any other recording of this |
| 11 | proceeding, either by video, audio, including screenshots or |
| 12 | other copying of the hearing, is strictly prohibited. |
| 13 | Your Honor, now calling the Civil Matter 20-CV-3664-YGR, |
| 14 | Brown, et al. v. Google LLC, et al [sic]. |
| 15 | Parties, please step forward and state your appearances |
| 16 | for the record, starting with the plaintiffs. |
| 17 | **MR. BOIES:**  Afternoon, Your Honor.  David Boies, of |
| 18 | Boies Schiller & Flexner, for the plaintiffs' class. |
| 19 | **THE COURT:**  Good afternoon, Mr. Boies.  And are you |
| 20 | going to be arguing the motion? |
| 21 | **MR. BOIES:**  Yes, Your Honor. |
| 22 | **THE COURT:**  Okay. |
| 23 | For the defense, who will be arguing? |
| 24 | **MR. SCHAPIRO:**  Good afternoon, Your Honor.  Andrew |
| 25 | Schapiro, from Quinn Emanuel, for Google. |

1      Mr. Broome, Ms. Trebicka, and potentially Ms. Fani may be

2  handling some pieces of the argument, depending on where it

3  goes or what we hear from the other side.

4          **THE COURT:**  Okay.

5          **MR. SCHAPIRO:**  Oh, and Mr. Broome will be arguing the

6  intervention motion, which -- as is on the schedule for today,

7  as well.

8          **MR. WALKER:**  Good afternoon, Your Honor.  Barry Walker

9  on behalf of the moving parties and the motion to intervene.

10         **THE COURT:**  Okay.  Well, why don't we start there.

11  Sir, we'll start with your motion.

12         **MR. WALKER:**  I'm sorry, Judge?

13         **THE COURT:**  We'll start with your motion.

14         **MR. WALKER:**  Okay.

15         **THE COURT:**  So why are you leaving the podium?

16         **MR. WALKER:**  I just brought my -- I'll grab my

17  computer.

18         **THE COURT:**  Okay.

19      Mr. Broome, good afternoon.

20         **MR. BROOME:**  Good afternoon, Your Honor.

21         **THE COURT:**  Mr. Boies, you can take the middle mic.

22         **MR. BOIES:**  We'll share a podium.

23         **THE COURT:**  My inclination is to deny the motion to

24  intervene, as it doesn't comply with the elements of the

25  statute.  Do you wish to be heard?

1          **MR. WALKER:**  Are there particular elements that your

2     Court -- that the Court found lacking?

3          **THE COURT:**  So I've been in trial since June.  And my

4     trial ends next month in September.  I plan to issue a written

5     order that denies the motion.  Do you wish to be heard?

6          **MR. WALKER:**  Yes, Your Honor.  I think that

7     intervention in this action is appropriate for several reasons.

8     First of all, the class representatives in a class action are

9     fiduciaries for all parties.  That's for the unnamed class

10    members, as well.  And according to the Ninth Circuit Supreme

11    Court -- the Ninth Circuit Court in *Staton v. Boeing*, that

12    Court found, generally, when a person joins in an action as a

13    class action, he has disclaimed any right to a preferred

14    position in the settlement.

15         **THE COURT:**  The federal rules have a four-part test.

16    The first part of the test is whether the application was

17    timely.  You waited to file this motion until the eve of the

18    final approval of class settlement, a year over the Court's

19    denial of class certification of the damages class.  Why did

20    you wait?

21         **MR. WALKER:**  Your Honor, the reason for the -- for the

22    late filing is we did not understand at the time -- so, first

23    of all, in December of 2022, it was denied.  But with the

24    filing of the motion for final approval, we saw that the

25    settlement agreement would be -- would be a dismissal of all of

1    the claims.  And that would include a waiver of the right to

2    appeal that decision back in 2022.  And so no party would be --

3    would remain -- with the dismissal -- based on the settlement

4    agreement, no party would remain in order to file an appeal of

5    that decision denying cert --

6            **THE COURT:**  When do you --

7            **MR. WALKER:**  -- of the damages.

8            **THE COURT:**  What -- when do -- when do you claim to

9    have learned about that?

10           **MR. WALKER:**  So we saw the motion was filed in April

11   of -- April 1st, I believe.  We began looking at the case.  And

12   then upon noticing the existence of a tolling agreement, asked

13   for -- asked the parties for a copy of the tolling agreement.

14   In reviewing that and case law, it looked like if we were not

15   permitted to move to intervene, that no party would be able to

16   challenge that denial of cert once the settlement was approved

17   and the case was dismissed.

18           **THE COURT:**  Response?

19           **MR. BROOME:**  I'm happy to address that, Your Honor.

20       I think the -- there are multiple reasons that the

21   intervenors seek to intervene.  The motion to intervene in

22   order to preserve their appellate rights would be futile.  And

23   that's because 28 USC 1291 does not establish jurisdiction

24   over -- over an appeal from a voluntary dismissal.  And that's

25   what the settlement provides here.  The named plaintiffs are

1    voluntary -- voluntarily dismissing their claims.  So there

2    would be no final decision, under 1291, for the intervenors to

3    appeal from.  I guess I'll leave it at that.

4              MR. BOIES:  Your Honor --

5              THE COURTROOM DEPUTY:  Excuse me, Counsel.  The court

6    reporter is requesting that you introduce yourself before

7    speaking.

8              MR. BOIES:  Your Honor, David Boies for the

9    plaintiffs' class.

10         There's a sense in which we don't really have a position

11   one way or another on intervention; however, this is a

12   complicated issue.  And just for the Court's benefit, I think

13   the threshold issue is a question of timing from April.  I

14   think the time to generally act would have been 30 days from

15   April.  And I think the Court has discretion in this area.  But

16   I think the first threshold question the Court needs to

17   consider is whether -- having learned that the class

18   representatives were going to settle their individual actions

19   in April -- whether waiting until the time that they did file

20   made it untimely.

21         I think the second question is even if it were timely, can

22   somebody intervene in a class action when the named class

23   representatives are dismissing their individual claims?  If

24   they are intervening simply to appeal the denial of the class

25   certification, I think the cases that have been cited to the

1    Court by Google indicate that that probably is not -- including

2    the Microsoft case -- that it's probably not a basis for

3    jurisdiction.

4        On the other hand, if they were seeking to intervene as

5    new class representatives to represent the putative class, then

6    I think there's not a decision that we're aware of on point

7    with respect to that particular question.

8        **MR. BROOME:**  May I respond to that, Your Honor?

9        Actually, I should have added that in addition to the

10   *Microsoft v. Baker* case, there are two Ninth Circuit cases that

11   do directly address this issue, both unpublished, neither of

12   which is cited in our briefs, because it wasn't clear to us,

13   until the reply brief, that this was one of the primary bases

14   upon which they sought intervention.  And those two cases are

15   *Bobbitt v. Milberg* --

16       **THE COURT:**  Did you share those with --

17       **MR. BROOME:**  I did, Your Honor.

18       **THE COURT:**  Okay.

19       **MR. BROOME:**  It's 723 F. App'x 413.  It's Ninth

20   Circuit 2018.

21       **THE COURT:**  Hold on.  Hold on.  You're going to have

22   to slow down.  Right?  Because I've been on the record for

23   hours today.  So --

24       **MR. BROOME:**  No problem.

25       **THE COURT:**  Go ahead again.

1          **MR. BROOME:** It's *Bobbitt v. Milberg*, 723 F. App'x

2    413.

3          **THE COURT:** All right.

4          **MR. BROOME:** And *Martinez v. Flowers Foods, Inc.*,

5    720 F. App'x 415.

6          **THE COURT:** And they say?

7          **MR. BROOME:** And they say, quote, "28 USC 1291 does

8    not establish jurisdiction over an appeal from a denial of

9    class certification if the named plaintiffs stipulated to the

10   dismissal with prejudice of their individual claims."

11         **THE COURT:** All right.

12         **MR. BROOME:** Now, that addresses the first point

13   Mr. Boies made about if they're seeking to intervene solely for

14   the purposes of taking the appeal, that is I think clearly

15   prescribed under *Microsoft v. Baker* and the two Ninth Circuit

16   cases that I just cited to you.

17        If they were seeking to intervene for the purpose of

18   stepping into the named plaintiffs' shoes, which is not clear

19   that that's what they seek from their motion, that's a much

20   bigger problem.  That really would change and probably blow up

21   the settlement that we've agreed to.  Because a material term

22   of that settlement, from Google's perspective, is that we're

23   buying peace and that this case goes away.  We did not intend

24   to -- we never intended to settle the injunctive portion, pay

25   plaintiffs whatever fees Your Honor decides to award them, and

1   then continue on with this case and maybe have an appeal.  And,

2   frankly, I'm not sure how that would work --

3           **THE COURT:**  Yeah, I agree.

4           **MR. BROOME:**  -- because you've appointed class

5   counsel.  So...

6           **THE COURT:**  Response?

7           **MR. WALKER:**  Your Honor, those problems are exactly

8   what we seek to avoid.  The class --

9           **THE COURT:**  What you seek to avoid?  You're creating

10  the issue.

11          **MR. WALKER:**  Well, Your Honor, there are hundreds of

12  thousands of class members that are -- that -- whose voices are

13  not being heard because --

14          **THE COURT:**  They were heard.

15          **MR. WALKER:**  They --

16          **THE COURT:**  They were heard.  They sought billions of

17  dollars in damages, and I found that the damages class could

18  not proceed, period.

19          **MR. WALKER:**  Understood, Your Honor.

20          **THE COURT:**  And it's not as if counsel for plaintiffs

21  are not adequate.  Some of the best counsel in the United

22  States.

23          **MR. WALKER:**  I don't disagree with either of those

24  points, Your Honor.

25          **THE COURT:**  Okay.  So why -- why would I do this?  I

1    see no reason -- yeah -- why would I do it?

2            **MR. WALKER:**  Because a primary reason for the filing

3    of the complaint was to seek damages on behalf of the class.

4            **THE COURT:**  Really?

5            **MR. WALKER:**  That --

6            **THE COURT:**  I think Mr. Boies would now dispute that.

7    But that's not -- that's not -- I'm sure he'll argue

8    differently, but okay.

9            **MR. WALKER:**  Okay.  And Mr. Boies' firm is

10   representing nearly 100,000 plaintiffs in an individual

11   capacity, which is a small portion of the class members.

12           **THE COURT:**  Well, you can file suits on behalf of

13   individual class members.

14           **MR. WALKER:**  Right.  As long as -- so one of the

15   things that the class members can rely upon is the ability to

16   challenge that denial of cert that affects the statute of

17   limitations on all claims, which is -- it is being waived with

18   the settlement.  Once the -- once the settlement is in place,

19   there's a voluntary dismissal of all claims, and there's no

20   ability to move forward to try and revive that claim.

21       And we have class members who certainly object to the

22   settlement in terms of that and would like to pursue those

23   claims either to try and revive that claim through an appeal or

24   to bring those damages claims in state court.

25           **MR. BOIES:**  Your Honor, I think I would just point

1    out, for context, that -- and the Court may already be aware of

2    this -- but counsel for the proposed intervenor has already

3    brought individual damage cases on behalf of members of the

4    class.

5           **THE COURT:**  Okay.  So how is the interest of the

6    class -- individual class members -- impacted if they're

7    bringing their own individual claims for damages?

8           **MR. WALKER:**  Because there's -- there's otherwise two

9    methods to do that.  One is to appeal the denial.  And the

10   other one is to seek damages on an individual basis.  And the

11   settlement basically wipes out one of those methods.  And

12   that --

13          **THE COURT:**  So you're --

14          **MR. WALKER:**  That's a prejudice.

15          **THE COURT:**  So you're left with one avenue but not

16   two.

17          **MR. WALKER:**  We're left with --

18          **THE COURT:**  What's the response on *Bobbitt* and

19   *Martinez*?

20          **MR. WALKER:**  I think --

21          **THE COURT:**  He said he gave you those cases.

22          **MR. WALKER:**  I think that -- that counsel read the

23   opinion.  It's -- if -- if there's a voluntary dismissal, there

24   will be no jurisdiction to appeal.  That's my understanding.  I

25   think that that compels a serious review of our motion.  I

```
 1   think it -- I think it justifies our motion, in a way, because
 2   that's real prejudice.
 3          THE COURT:  You still haven't answered the question as
 4   to timeliness --
 5          MR. WALKER:  You Honor --
 6          THE COURT:  -- and why you should be allowed to
 7   piggyback an appeal on work you never did and on a subject
 8   matter of which you have very little substantive information --
 9          MR. WALKER:  If --
10          THE COURT:  -- to the order of multiple millions of
11   dollars of time.
12          MR. WALKER:  If -- if we're not permitted to
13   intervene, then there's no right to appeal those --
14          THE COURT:  You're not answering the question.  I
15   understand that.  One, you've waited a long time.
16          MR. WALKER:  Yes.
17          THE COURT:  Two, you want to piggyback on all of the
18   plaintiffs' work.  And you want a free shot at an appeal having
19   not spent the kind of time and effort that the plaintiffs'
20   lawyers have spent evaluating the merits of the claim.  So you
21   want a free ride on that.
22          MR. WALKER:  We don't want a free ride, Your Honor.
23          THE COURT:  You absolutely do.  You're not going to
24   pay them the fees for all of the work they've done; are you?
25          MR. WALKER:  No.
```

1          THE COURT:  I didn't think so.

2          MR. WALKER:  No.  We --

3          THE COURT:  That's what we call a "free ride."

4          MR. WALKER:  We're not asking for a portion of

5    anybody's fees.  What we're asking for is the ability to

6    continue with a claim that -- it will be eviscerated when this

7    settlement is ordered and the dismissal is filed.

8          THE COURT:  And why do you think you even have grounds

9    to appeal?

10         MR. WALKER:  Well --

11         THE COURT:  As you stand there, you've done a lot of

12   analysis.  So you tell me, what would your appeal look like?

13         MR. WALKER:  I can't tell you as I sit here today.

14         THE COURT:  Well, have you not done any analysis?

15         MR. WALKER:  Some, yes.

16         THE COURT:  Okay.  Well, what's your analysis?

17         MR. WALKER:  Well, I think that the damages claims --

18   well, I can't really say, Your Honor.

19         THE COURT:  All right.  Anything else on this motion?

20         MR. BROOME:  Not from Google, Your Honor.  Thank you.

21         THE COURT:  All right.  Submitted?  Submitted?

22         MR. WALKER:  Yes, Your Honor.

23         THE COURT:  Let's move to the fees.  Ninth Circuit law

24   says that I cannot do across-the-board cuts above 10 percent.

25   And defendants have given me no authority for the proposition

1    that I should or that I can.

2        It is unlikely that I would give anybody a lodestar of

3    over three in attorney's fees.  There were very specific

4    metrics provided to the Court.  I've got spreadsheets that

5    were -- that had thousands of entries.  So we can go through

6    those.  I asked -- one of these spreadsheets from the

7    plaintiffs indicated that Google's recitation had lots of

8    duplications.  I asked, but the spreadsheet didn't total the

9    number of duplications.

10       I sent -- we sent an email.  We got an email response.  I

11   think we just sent it today.  And the email response said that

12   the $8.5 million figure of purportedly -- or the duplicative

13   cuts was in the order of 8.5 million.  That was from the

14   plaintiffs.  The defense said that they didn't have -- they

15   didn't know where the number came from.  And I don't understand

16   that.  I thought you all had the spreadsheet and you've had it

17   for weeks.  Am I wrong?

18           **MR. BOIES:**  I apologize.  Davis Boies.  It's their

19   spreadsheet, I believe, Your Honor.

20           **THE COURT:**  Now, I thought I had a spreadsheet from

21   the plaintiffs --

22           **THE COURTROOM DEPUTY:**  Excuse me, Your Honor.  The

23   court reporter cannot hear us.

24       Confirming you can hear, Madame Reporter?

25       Yes, Your Honor.  We can proceed.  Thank you.

1          **THE COURT:**  Thank you.

2      The defense, in response to the motion for fees, sent

3  spreadsheets that took issue with many of the individual line

4  items.  The plaintiffs, in response to all those spreadsheets,

5  sent its own spreadsheet that seemed to suggest that there were

6  duplications in Google's request for reductions.

7          **MR. MCGEE:**  That's correct, Your Honor.  It's Mao

8  Exhibit 23 to the reply.

9          **THE COURT:**  Okay.

10         **MR. MCGEE:**  And it was --

11         **THE COURT:**  But it didn't have -- it didn't have a

12  calculation.

13         **MR. MCGEE:**  That's correct, Your Honor.

14         **THE COURT:**  And so we sent an email today asking what

15  the calculation was, to which you responded somewhere at about

16  upwards of 8.5 million.

17         **MR. MCGEE:**  And if I can clarify, Your Honor -- I'm

18  sorry -- Ryan McGee from Morgan & Morgan.

19      It's in response to Broome Exhibit 3 to the response in

20  opposition.  There is a Tab 5.  That Tab 5 was labeled

21  "pervasive time entries."  That contained literally every

22  single time entry from the plaintiffs.  Every single one.  It's

23  32,032.

24      Of those entries, they identified, via tick boxes in the

25  Excel spreadsheet, which entries suffered from what they

1    purported to be block billing, 12-plus hours, and five general

2    categories.  When we were able to de-duplicate that by using

3    sorting functions in Excel, it was that $8.5 million number.

4        What that de-duplication was not able to include were the

5    other tabs of that spreadsheet for vague time entries and other

6    things that we noted -- the 23(f), (c)(4).  So there's

7    further -- excuse me -- there's further duplicates in their

8    spreadsheet.

9        What the Mao Exhibit 23 provided were the illustrations.

10   And in his declaration, Mr. Mao noted that they were

11   illustrative.  That they were not comprehensive.  But we wanted

12   to show the Court that no -- excuse me -- no de-duplication was

13   performed by Google prior to submitting that.  And then in

14   their motion itself, they have various charts where they

15   represent those totals.  And those totals are not

16   de-duplicated.  And they're overstated by at least

17   $8.5 million.

18           **MS. TREBICKA:**  May I address and clarify, Your Honor?

19           **THE COURT:**  You may.

20           **MS. TREBICKA:**  So we --

21           **THE COURTROOM DEPUTY:**  Excuse me, Counsel.

22           **MS. TREBICKA:**  Thank you.  Viola Trebicka for Google.

23       Your Honor, what we did when we saw the 30,000 entries

24   that plaintiffs provided and submitted to the Court is not an

25   audit of every single entry.  But I'd like to walk Your Honor

1    through what we did.  And this is a summary of Google's --

2           **THE COURT:**  Okay.

3           **MS. TREBICKA:**  -- requested exclusions.  It's

4    Exhibit 1 to the Broome declaration, which walks through our

5    thinking process and the request that we make of Your Honor.

6        The very first entry --

7           **THE COURT:**  Let me ask you -- I'm going to stop you --

8           **MS. TREBICKA:**  Yeah.

9           **THE COURT:**  -- right off the bat before we do this.

10   And we can go through each of these categories.

11       Plaintiffs are asking for upwards of 62 million in a

12   lodestar.  As I've said to you, Ninth Circuit law does not

13   allow me to do across-the-board cut of 25 percent, which is

14   what you're asking.  The most I can do under Ninth Circuit law

15   is a 10 percent cut across the board.

16       30,000 entries where there is overlap and duplication --

17   you want me to do that myself?  Is that what you're all asking

18   me to do?

19          **MS. TREBICKA:**  No, Your Honor.  I think -- so what

20   we're asking you to do is initially to exclude, wholesale,

21   certain categories that we don't think are recoverable.  And

22   the law agrees with us -- they're not recoverable -- such as

23   vague entries, clerical entries.  And we have very clearly set

24   that out in Exhibit 1 to the Broome declaration.

25       Next, what we've identified is certain entries that we are

```
 1    not seeking wholesale exclusion of, but just for the remainder

 2    of the lodestar, once you remove the entries that must be

 3    excluded --

 4             THE COURT:  Let's go through them.  We're going to go

 5    through this.  And then you're going to see -- we're going to

 6    see how much it is that you want me to do.  Because the other

 7    alternative is to go to a special master, which you have

 8    before, and for you all to pay someone to do this kind of work.

 9             MS. TREBICKA:  Your Honor, may I address -- before we

10    go through one by one, may I address one other comment that

11    Your Honor made, which is that Ninth Circuit law doesn't allow

12    for reductions of more than 10 percent across the board?  That

13    is correct without specific justification.  What we have

14    provided is very specific justifications with actual --

15             THE COURT:  You've not --

16             MS. TREBICKA:  -- entries --

17             THE COURT:  You've not provided a specific

18    justification for 25 percent across the board.  You've not.

19    You provide justifications.  I understand that.  But anything

20    over 10 percent -- and I've done it before -- I have done

21    line-item reviews.

22             MS. TREBICKA:  Yeah.

23             THE COURT:  But not where someone's asking for

24    $62 million.

25             MS. TREBICKA:  Understood, Your Honor.  May I --
```

1        **THE COURT:**  And $62 million tripled is what they're

2   asking for.  So let's go through this.  You want to reduce the

3   document review rate from $676 to $387.50 for document review

4   by Morgan & Morgan.  $5.2 million of a reduction.  Do you wish

5   to be heard on this?

6        **MS. TREBICKA:**  Yes, Your Honor.  The document review

7   rate for the Morgan & Morgan document reviewers is nothing that

8   a -- as far as we're aware -- a paying client would ever agree

9   to.  This -- we're talking about a first-level document review.

10       **THE COURT:**  How much did your client pay?

11       **MS. TREBICKA:**  Not 606 -- or 660 -- 676, Your Honor.

12  It's not that -- $69 an hour for first-level review, Your

13  Honor.  $69, Your Honor.  And that is in our opposition brief.

14       Now, another point of reference is the document review

15  rate for Boies Schiller and Susman Godfrey attorneys.  And as

16  we know from their submissions, these are firms that routinely

17  do paying client work.  And their document review hourly rates

18  is $300 to $475 an hour, which is still high -- higher than

19  what Google paid -- however, it's more palatable.

20       What we did is -- just as a suggestion to Your Honor -- is

21  to take those two rates, and arrive at the midpoint, and ask

22  for that to be the rate that applies to the Morgan & Morgan

23  document reviewers, as well.

24       Now, the excuses that Morgan & Morgan provides in its

25  reply really do not withstand scrutiny.  Because, first, they

claim that these attorneys have technical educations, which is
what purportedly supports the higher rate.  But what we pointed
out in the opposition is that that's actually not true.  Most
of them majored in things like social sciences or equally
nontechnical subjects.  And there's no response to that.

        Next, they claim that there's -- that these attorneys have
substantial experience working on technical cases.  No support
for that in the brief.  They don't say what technical cases
these are.  And that they -- it seems to suggest that they
purportedly helped to review technical documents to synthesize
them for expert reports.  But, first off, again, no support for
that.  And this suggestion that these attorneys actually did
that synthesizing work is refuted by reviewing these entries.
Because the entry -- at least one entry itself -- Entry 316 --
suggests that further expert review would be required.  No
synthesizing there.  And, in any event, Your Honor, counsel
already billed separately for technical document review to the
tune of nearly $3 million.

        **THE COURT:**  Response?

        **MR. MCGEE:**  Your Honor, Ryan McGee from Morgan &
Morgan.

        First of all, the characterization that this is
first-level document review is just patently false.  And that's
from an obvious review of these entries that are before Your
Honor.  Routinely, these document review -- well, what Google

1    calls "document review attorneys" -- these Morgan & Morgan

2    lawyers were locating documents for depositions, locating

3    documents for motions practice, locating documents for the

4    21-some-odd discovery disputes that we had with Google.  It was

5    not this first-level review that Google wants to characterize

6    it as.

7          Number two, for the technical educations, it's true that

8    some of them do not have a degree that would be a technical

9    education.  But it's the technical experience they have, much

10   like the Google engineers that we deposed in this case often

11   had musical backgrounds from Berklee or other educational

12   backgrounds that had no technical backgrounds, but they were

13   still coders, project managers at Google, and the like.

14         And for number three, we do provide some of the technical

15   cases.  One of them is *Capital One*.  And Mr. Yanchunis with my

16   firm -- he manages the class-action group.  And I'm sure he

17   would be fine with providing other cases that they've been

18   involved with.  They're MDLs.  They are massive data breach

19   cases and other privacy cases.  That's all --

20              **THE COURT:**  Where is this in the -- where is this in

21   the record?

22              **MR. MCGEE:**  Sure.  It's -- I know that *Capital One* is

23   mentioned in Mr. Yanchunis' declaration, which is 1107-22.

24              **THE COURT:**  Now, where are all of the -- where's all

25   the expertise as it relates to the entries that are provided?

 1  Where did you give that to me so I can review it?

 2          **MR. MCGEE:**  That was emailed in camera, Judge.  Those

 3  were the -- I'm sorry.  We didn't specifically point to every

 4  single entry.  But for the technical expertise and

 5  Mr. Yanchunis' declaration, again, at 1107-22, Mr. Yanchunis

 6  walks through all of the document reviewers; how long they've

 7  been with the firm; how long they've been barred; what

 8  districts they're barred in; and then walks through, at a high

 9  level, some of the cases that they've been involved with.  And

10  it was only --

11          **THE COURT:**  I don't think that Google took issue with

12  the expertise; did they?  And, if so, where would that be in

13  the -- in the docket?

14          **MS. TREBICKA:**  The technical expertise, Your Honor?

15  So the issue is whether these reviewers --

16          **THE COURT:**  Technical and expertise of the attorneys

17  who were billing.

18          **MS. TREBICKA:**  Right.  So the issue is whether these

19  attorneys have some sort of technical, scientific,

20  engineering-type expertise that would allow for an hourly rate

21  way above the -- the normal.

22          **THE COURT:**  Well, your -- your submission suggests

23  that this is first-level review.  Counsel disputes that.  What

24  is the basis for your assertion that this is all first-level

25  review as opposed to specific review or specific depositions,

1    specific motions?

2            **MS. TREBICKA:**  It's in the entries themselves, Your

3    Honor.  If you -- I don't know if you have the capability to go

4    into the Excel spreadsheet that we submitted.  This is the

5    Broome Exhibit 3.

6            **THE COURT:**  Keep going.  I'll try to find it.

7            **MS. TREBICKA:**  Okay.  So just the 28th line -- this is

8    just a random scrolling through the exhibit.  But the

9    28th line, for example, says -- and I will not read it into the

10   record, because plaintiffs have asked us not to reveal quotes

11   from their -- from their time entries, Your Honor.  But it's

12   very clear that these are -- this is first-level review.  It's

13   review and coding of documents.

14       And, Your Honor, just to respond to a few other things

15   that Mr. McGee said, nowhere in Mr. Yanchunis' opening

16   declaration does it reveal technical expertise of these

17   individuals, which is what we're talking about.  And, second,

18   let's not forget the army of technical experts that were hired

19   for review of technical documents.

20       As far as review for depositions or hearings, that work,

21   as is clear from the entries, was performed by associates, not

22   by staff attorneys.  The entries of the staff attorneys reveal

23   review and coding of documents, which is first-level review.

24           **THE COURT:**  All right.  Anything else on this one?

25           **MR. MCGEE:**  Your Honor, I would just say that the

1    Exhibit 3 to Broome clearly demonstrates the detail that these

2    reviewers were providing in their records themselves.  We had

3    700,000 documents dumped on us with about three months to

4    review prior to expert discovery and other phases --

5              THE COURT:  What was the -- what was the line, again,

6    that you just read?

7              MS. TREBICKA:  28, Your Honor.  But I could keep

8    going.  41, 42 --

9              THE COURT:  Hold on.  Hold on.  There are many tabs.

10   Which tab am I supposed to --

11             MS. TREBICKA:  Yes, Your Honor.  It's the first tab.

12             THE COURT:  All right.  I have it.

13             MS. TREBICKA:  You have it?  Okay.

14             MR. MCGEE:  Your Honor, I do have responses to those,

15   but I'll let Ms. Trebicka finish.

16             THE COURT:  I mean, it says "review and code, review

17   and code, review and code."

18             MR. MCGEE:  Sure.  And then if we go to line 381,

19   Caroline Wilson is --

20             THE COURT:  How -- how am I supposed to -- you want me

21   to jump from line 28 to line 381?  Or have you -- have you done

22   that for me somewhere?

23             MR. MCGEE:  I don't think we've pointed to specific

24   entries.

25             THE COURT:  Which is -- okay.  Someone start a list.

```
 1    That's the bullet point under the headline that if you want
 2    this kind of detailed review, you should hire a special master.
 3    Because I see a lot of "review and code, review and code,
 4    review and code."
 5            MR. MCGEE:  And, yes, Your Honor.  Those billing
 6    entries are from early 2021, before we were even taking
 7    depositions in this case.
 8            THE COURT:  Correct.  And --
 9            MS. TREBICKA:  Actually that's not --
10            MR. MCGEE:  I understand.  And that's -- and that's,
11    again, Judge -- that's why we blended the rates, because, yes,
12    there may be some --
13            THE COURT:  These are not blended rates.  This is $676
14    for coding.
15            MR. MCGEE:  And in Mr. Yanchunis' -- well, in
16    Mr. Yanchunis' declaration, he notes that these attorneys
17    regularly bill at 919 per hour because they've been barred,
18    some, since the 1980s.
19            THE COURT:  Reviewing and coding at $676 an hour is
20    excessive, period.  There's -- the whole point in having
21    detailed entries is so that we know what was done and the
22    appropriate billing rate for that.  We can do a blended rate
23    later.  But if you're saying that we did 676 for coding and
24    then later 676 for something else, I mean, the whole point of
25    keeping records is to be compensated.  How am I supposed to
```

1    know that without doing the cross-reference that you want me to

2    do on my own time?  How am I supposed to know?  Right?  I can't

3    even sort this.  If you had done a $100 rate and a $900 rate,

4    and then we sorted it and figured out what the blended rate

5    was, that would be one thing.  But that's not what you did.

6        All right.  The next one.

7            **MS. TREBICKA:**  Yes, Your Honor.

8            **THE COURT:**  Time entries relative to the Rule 23(b)(3)

9    and Rule 23(f).

10            **MS. TREBICKA:**  Yes, Your Honor.  So we have not -- as

11    I -- as I mentioned at the beginning, we've not done an audit

12    of all 30,000 entries.  But what we have done here is we've

13    identified those entries that specifically relate to, very

14    clearly, either 23(b)(3) or the withdrawn -- or the denied

15    23(f).

16        And, as we have seen, including in cases in front of Your

17    Honor -- for example, *Stathakos v. Columbia Sportswear*

18    *Company* -- in cases where, as here, the 23(b)(3) was denied,

19    and the 23(b)(2) class was certified and then later went on to

20    settle, it is common practice for class counsel to remove,

21    automatically and voluntarily, time that's spent on the

22    monetary damages.  And it has not been done here.

23            **THE COURT:**  I -- I don't disagree with you.  I think

24    it's inappropriate to compensate for those motions, and I won't

25    do it.

1    So the question is, do you want to rely on Google's

2    analysis, or are you going to want an opportunity to do your

3    own analysis that can then be litigated?  But I don't

4    compensate for that.

5        **MR. BOIES:**  We'll accept Google's analysis, Your

6    Honor.

7        **THE COURT:**  Your next category is Rule 23(c)(4).

8        **MS. TREBICKA:**  Yes, Your Honor.  This was a motion

9    that plaintiffs litigated and then withdrew before there was an

10   order from Your Honor.  We likewise think that it is

11   inappropriate for Google to have to pay for 3.5 times X for

12   that amount of money that was spent.

13       **MR. BOIES:**  I think, Your Honor, it could follow your

14   ruling on the 23(b)(3) and 23(f).

15       **THE COURT:**  All right.  Do you want to accept their

16   number or do your own?

17       **MR. BOIES:**  We'll accept their number in the interest

18   of trying to avoid elongating this matter unnecessarily.

19       **THE COURT:**  Clerical tasks.  They're challenging 300

20   and -- and I'm just doing rounding here -- 388,000.

21       **MR. BOIES:**  There was one of those entries that we

22   agreed was a clerical task and we removed.  The rest we do not

23   agree that they are clerical tasks.

24       There's a lot of work that goes on in preparing for

25   depositions.  They can be characterized a variety of ways.  But

1   particularly given the time pressures that we had, associates

2   and paralegals were doing a variety of tasks that, you know,

3   could be characterized a variety of ways.  Where they were

4   truly clerical -- there was one case that we agreed with them

5   and we removed it.  But the others, we really don't agree.  And

6   it is a -- I -- I fully sympathize with the Court as to how we

7   get this resolved.

8          THE COURT:  The spreadsheet conflates clerical tasks

9   and vague entries.  The vague entries, they're seeking a

10  reduction of 931,000.

11         MS. TREBICKA:  May I clarify, Your Honor?  Because we

12  don't conflate it.  We just included both in the same sheet.

13  And if Your Honor will filter either according to clerical task

14  or vague entries, then you will see which entires we challenge

15  as clerical -- bless you -- and which entries we challenge as

16  vague.

17         THE COURT:  All right.

18         MS. TREBICKA:  Clerical entries, Your Honor, are

19  entries where someone is charging to route correspondence.

20  That's what we see as clerical.

21      I have more examples for Your Honor to review if you are

22  in the sheet, such as line 500.  And we're happy to read them

23  if plaintiffs' counsel will agree, Your Honor, to save time.

24  But, again, we --

25         THE COURT:  Well, I have to go through -- we have to

1    go through them.  I've not done that.

2             **MR. BOIES:**  Your Honor --

3             **THE COURT:**  So --

4             **MR. BOIES:**  -- we should -- I agree wholeheartedly.

5    We should not be putting the Court in the position of having to

6    do these things line by line.  If this Court -- you had a case

7    ten years ago -- you may or may not remember -- *Rodger*s against

8    *Claim Jumper*.  It was a 2015 case.  And one of the things the

9    Court said there -- and -- and the Ninth Circuit has said it

10   many times -- is what you need to show is merely the general

11   subject matter of the time expenditure.

12        These -- our diaries here -- our time entries here -- are

13   much more detailed than is often the case.  I think that the --

14   the vague allegation here -- I guarantee you if we get their

15   diaries, we'll find diaries that are a lot more vaguer than

16   ours.

17        One of the things that the Ninth Circuit says, if they're

18   going to challenge some of this, they need to show us what they

19   did.  And these vague entries provide the general subject

20   matter.  And if they're -- on the 32,000, you know, maybe there

21   are half a dozen the people can quibble about.  But --

22             **THE COURT:**  All right.

23             **MR. BOIES:**  I'm just --

24             **THE COURT:**  I'll look at them.

25             **MR. BOIES:**  Yeah.  Okay.

1          **THE COURT:**  It's going to be a very quick review.  And

2     I will -- by looking at them -- like some of these -- well,

3     what does it mean to review incoming correspondence pleadings

4     and routing to appropriate file -- paralegals charging $75 to

5     do that?

6          **MR. BOIES:**  And -- it's stuff coming in.  And stuff

7     has got to be read.  It's got to be sorted.  It's got to be

8     analyzed.  Somebody's got to do that.  The -- and, again, Your

9     Honor, I guarantee if we can -- I know their billing rates,

10    because they're public.  They bill more than $400 for a

11    paralegal.  So the idea that somehow this is overinflated

12    compared to what we had to confront, I think just doesn't --

13    doesn't add up.  But --

14         **MS. TREBICKA:**  Your Honor, clerical tasks are not paid

15    by any paying client, including Google.  Quinn Emanuel sorts

16    correspondence and files it away, but does not charge the

17    client for it.  We've only identified 478 entries.  We did the

18    work to identify what is clerical and what is vague.  And in

19    their reply, when they had an opportunity to either challenge

20    or respond to the deficiencies that we identified, they only

21    addressed eight of the 8,000 entries that we had issues with.

22    Only eight, Your Honor.  And of -- those two they actually

23    quietly withdrew in footnotes, because we were right.  But --

24         **THE COURT:**  That's fine.  Okay.  Your next category is

25    excessive partner time.

1              **MS. TREBICKA:**  Yes, Your Honor.  So I'd like to

2    explain, because I think this is where perhaps there was some

3    confusion.  What we did is we -- we went through the entries --

4    not with a fine-tooth comb like plaintiff should have done

5    before they submitted them -- but we tried to identify, at a

6    high level, whether there was excessive partner time, recorded

7    what we could find in the time that was allotted to us to write

8    the opposition, and tallied the fees associated with that time.

9              Next, we went to over-attendance at meetings.  Nowhere did

10   we indicate that we had de-duplicated this.  And there was no

11   need to do that.  Because our point, Your Honor, is that this

12   shows there are serious issues of padding, inefficiencies,

13   duplication.  And, again, none of that has been responded to in

14   their reply.  Our point is that all of this taken together --

15   and we've done the work to tell -- to show Your Honor the tip

16   of the iceberg -- necessitates a cut in the remaining lodestar.

17   Not across the entire lodestar, just in the remaining lodestar.

18             And in support of that, Your Honor, I'd like to identify

19   the following case, which is in our papers too, *Johnson v. MGM*

20   *Holdings*.  It's a Ninth Circuit opinion from 2019 where the

21   Ninth Circuit validates the District Court's across-the-board

22   cut of 25 percent for deficiencies very similar to the

23   deficiencies that are at issue here.  And that -- the

24   deficiencies are identified in that opinion in Footnote 2:

25   block billing, excessive time spent on law firm conferences

1  that did not advance the case, unreasonable travel, duplicative

2  work, et cetera.  And that is our authority, Your Honor, for,

3  again, not a whole lodestar across-the-board cut, but a -- a

4  more measured cut of only the remaining lodestar.

5          **MR. BOIES:**  Well, Your Honor, two things.  First of

6  all, we did respond to all of these issues in our response --

7  in our reply.

8          **THE COURT:**  Well, it's -- I don't -- I don't know how

9  you can say that it's -- well, you've identified, back of the

10  envelope, 20 million in overbilling by way of excessive partner

11  time, over-attendance at meetings, block billing, 12-plus-hour

12  days, time entries for attorneys who didn't appear in the case.

13  You've identified -- you've identified that number.  But, in

14  fact, it's not that number; right?  It's -- if you take out the

15  duplicates, apparently it's somewhere in the range of eight.

16          **MS. TREBICKA:**  No, Your Honor.  May I clarify?

17  Because we -- since we received Your Honor's email, we did some

18  additional work.  The de-duplicated amount is $15,000,693.  And

19  that -- and that's not inconsistent with what plaintiffs said.

20  Because their view was that the 8 million was just the

21  duplication, meaning you have to remove that from the -- just

22  the addition of those numbers.  So $16 million de-duplicated.

23          **THE COURT:**  So the balance is 16 million when you take

24  out the duplication?

25          **MS. TREBICKA:**  Correct.

1          **THE COURT:**  Okay.  So what -- I thought that the

2     balance was 8 million.

3          **MS. TREBICKA:**  No, Your Honor.  That's incorrect.

4          **MR. BOIES:**  The eight and a half that we referenced in

5     the email was the amount of duplication, not the amount of the

6     balance.

7          **THE COURT:**  Okay.

8          **MR. BOIES:**  May I respond to the *Johnson* case, Your

9     Honor?

10         **THE COURT:**  You may.

11         **MR. BOIES:**  We don't think the *Johnson* case has

12    anything to do with this.  The *Johnson* case -- there was

13    excessive time spent on law conferences that did not advance

14    the case or the interest of the class.  They were doing work on

15    things that were not advancing the interest of the class.

16    That's not -- there's none of that that's been demonstrated in

17    anything that's been submitted to the Court.

18         They had unreasonable travel time billed.  That's not what

19    is involved here.  There was duplicative work.  There was not

20    duplicative work here.  There was unsupported, identical

21    conclusory statements and something in puffery.  I don't know

22    exactly what that involved.  Here, what they're complaining

23    about are 12-and-a-half-hour days.  They say some people spent

24    more than 12 hours in a day.  And that's true.  Not very often,

25    but occasionally.  And I'm sure that was true for people

1    working on the other side.  It's been true in every case I've

2    ever been involved in.

3         They talk about non-appearing attorneys.  We -- I think we

4    cited the *Hanrahan* case in our papers.  But, in any event, the

5    Ninth Circuit has made clear that if the attorney at issue

6    would have been permitted to appear pro hac vice, or if they

7    were doing work that didn't require an appearance, that's not a

8    basis for disqualifying the fee.

9         In terms of over-attendance at meetings, they say we

10   shouldn't have had more than one person at various meetings.

11   This is a complicated case, Your Honor.  We know how many

12   people they had at some of these meetings and some of the

13   depositions --

14             THE COURT:  Right.  But that --

15             MR. BOIES:  -- both internal and external.

16             THE COURT:  -- doesn't always mean that the client

17   pays for it.

18             MR. BOIES:  What?

19             THE COURT:  I said that doesn't always mean that the

20   client pays for it or that they should pay for it.

21             MR. BOIES:  No.

22             THE COURT:  Right?  There are been plenty of times --

23   perhaps you and I are too old to remember being associates --

24   but --

25             MR. BOIES:  Yeah.

1          **THE COURT:**  Right?  We got to go to a deposition.  It
2    was written off.  Client never saw it.  It was more education
3    than anything else.
4          **MR. BOIES:**  Right.
5          **THE COURT:**  And so I can't tell whether -- you know --
6    you certainly don't need three or four people at a deposition.
7    You may want them there.  That's fine.  But you can't charge
8    for them.
9          **MR. BOIES:**  Right.  Well, Your Honor, I mean, first,
10    there was time we wrote off.  But it -- maybe we have to go to
11    the special master, get their time records, because the Ninth
12    Circuit says that's permissible in these kind of situations,
13    and compare what got written off, what didn't get written off,
14    what clients got billed for.
15          **THE COURT:**  I think that that is fair.  I mean, again,
16    I can through this stuff.  So I don't think you've provided to
17    me how much your client has paid you for services rendered, and
18    it is a -- you know -- it can be done in camera.  And that is
19    frequently a cross-measure that Courts look at.
20          **MR. BOIES:**  And remember, Your Honor --
21          **THE COURT:**  Hold on.
22          **MR. BOIES:**  Oh, excuse me.
23          **THE COURT:**  Go ahead, Mr. Schapiro.
24          **MR. SCHAPIRO:**  Yeah, Your Honor.  Andrew Schapiro.
25      And we'd be happy to provide that.  And I don't think I'm

giving anything away, because we refer to it, in somewhat more
vague terms, in our brief.  But I can tell the Court -- and I
think this is just further support for our application here,
which we're happy to back up if anyone challenges it -- but I'm
telling you as an officer of the Court, Google paid for this
case under $40 million.

That's including what was paid to Quinn Emanuel, what was
paid to the 300 contract attorneys who had to come in and
review a bunch of documents in 90 days, and it's what was paid
for -- we had a sub-matter that we called "document review."

There's -- you know -- there's three law firms on the
other side.  And I don't know if this is what was going on.
But I have a suspicion, because I've been, sometimes, in the
plaintiffs' cases.  That is, I don't know what the cocounseling
agreement among these law firms is.  But sometimes the
cocounseling agreement says that, at the end of the day, when
there's an award to be divided, it gets divided in some
proportionate way to the hours of lodestar that each firm
contributed.

So that might explain why they would send four or five
lawyers to show up at a deposition where we have two, because
each firm wants to make sure it's got a lawyer or two there, or
why they sent nine lawyers to a mediation when we had four,
plus an associate who didn't bill, because it was
educational -- the associate.  That's possible.

1    In any event, we'd be happy to use our figure, which we

2    think is a figure representing near complete success for our

3    client, as a comparator point.

4    MR. BOIES:  I would say two things about that, Your

5    Honor.  First, in addition to Quinn Emanuel, there were other

6    firms working with them on related matters they were relying

7    on, including the *Calhoun* case.

8    The -- second, they had numerous people from in-house

9    Google -- lawyers and technical people -- working with them

10    that we didn't have that we had to match.

11    I would actually add a third thing.  And that is that it's

12    always easier for the defendant that has all of the knowledge

13    about a case to defend a case and learn the documents than it

14    is for outside counsel.  We have to learn everything they

15    already know.

16    THE COURT:  Right.  Yeah.  I --

17    MR. BOIES:  And comparing $40 million to $60 million

18    under those circumstances I think demonstrates that our

19    position is pretty reasonable.

20    MS. TREBICKA:  Your Honor, there was no cocounseling

21    arrangement.  We are counsel of record in *Calhoun* as we are in

22    *Brown*.  And there's no other firm.  So that's incorrect.

23    And, also, the in-house counsel is, of course, our client

24    liaison, who, yes, is a lawyer, but is our client, who

25    obviously we will have to keep in the loop.  And he's here

1    today.  He perhaps wants to raise his hand and say hello.

2    That's the army of lawyers, Your Honor.  But I think the

3    exhibit that we submitted -- Exhibit 2 to the Broome

4    declaration -- really makes the point.

5        **MR. MAO:**  Your Honor, Mark Mao for plaintiffs.  If you

6    would allow me just a quick moment.

7        One of the complaints in this case about partner time is

8    actually my time.  You've seen me argue, Your Honor, in front

9    of Judge -- in front of you, in front of the magistrate judge.

10   You know how much I know the facts.  You know that I was ready

11   to try the case.  And you know that I'm very technically adept.

12       As Mr. Boies says, we did not have anybody -- anybody

13   close to that kind of equivalence in all of the cases because

14   of Google's own in-house expertise.  They talk about their army

15   of lawyers being few, because they're the ones sitting over

16   there, but they don't talk about the army of engineers in which

17   they have.

18       Here, on our side, we have a very scant group of -- you

19   were very complimentary of our group, Your Honor.  But you know

20   Mr. James Lee started the case with me.  Mr. Beko Richardson,

21   as well.  One of the largest complaints is that we three

22   partners, who untangled the technical -- let's just call it

23   technical -- we would probably say "shenanigans" on the side of

24   Google -- using our -- I have a poli sci degree, Your Honor.

25   Okay?  But I would like to think that Your Honor thought that

1    we did a pretty good job on this case for people who are trying

2    to unravel it, you know, not being Google engineers ourselves.

3         THE COURT:  Where did you go to college?

4         MR. MAO:  Berkeley, Your Honor.  I came here.  Learned

5    English when I was ten.

6         THE COURT:  No, no.  That's just interesting.  I guess

7    there they call it "science."  Where I went, they said it

8    wasn't science.  It was politics.

9         MR. MAO:  Yes.  But, Your Honor, of course I attended

10   the depositions.  Because these were technical depositions in

11   which we don't -- we did not have engineers.  People were

12   relying for me and Mr. Lee, Mr. Beko Richardson, Ms. Bonn to

13   help dissect these cases --

14        THE COURT:  Right.

15        MR. MAO:  -- and what they were saying, and, yet,

16   they're complaining about our time.

17        THE COURT:  No, I -- okay.  Well --

18        MR. MAO:  Oh, and then just real quick --

19        THE COURT:  No.  Are you willing to share your joint

20   attorney's fees agreements with the Court?

21        MR. BOIES:  Sure.  Definitely.

22        MR. MAO:  And just real quick --

23        MR. BOIES:  And then, Your Honor --

24        THE COURT:  So the reason that --

25        MR. BOIES:  We have to --

1          **THE COURT:** -- again, I ask, is because, certainly

2    when I do MDLs, and I have many lawyers, I get -- I get

3    quarterly billings precisely to make sure that we do not have

4    the kind of padding.  Because, there, it certainly is.

5    Everybody, at the end, is always fighting for a piece of the

6    pie.  But, there, the circumstance is little bit different, so

7    I would like to see the inner agreement.

8          **MR. BOIES:**  We'd be happy to provide it, Your Honor.

9          **MR. MAO:**  And, Your Honor, there was a very important

10   point, just real quickly, about *Calhoun*.  What we're talking

11   about is that -- if you remember, Your Honor, we were forced to

12   coordinate with *Calhoun*, including on discovery.  So while

13   Quinn Emanuel divided two matters separately and billed them

14   separately, they're talking about, quote/unquote, "the numbers

15   in which they billed for *Brown*."  They did not give you their

16   numbers for *Calhoun*.

17       And we were forced to be in all of the proceedings for

18   *Calhoun*, all of the discovery for *Calhoun*.  We had to figure

19   out whether or not they were hiding documents in one case

20   versus the other.  And that was one of the other difficulties

21   in which Mr. Boies was pointing out, which goes, actually,

22   unrefuted by the other side.

23         **THE COURT:**  Okay.

24         **MS. TREBICKA:**  I'll -- I'll refute it, Your Honor,

25   without lengthening this unnecessarily.  But the *Calhoun*

1  discovery was cross-produced in *Brown*.  There was nothing

2  special in *Calhoun* that has not been included in the numbers

3  that you've seen of the depositions, of the documents, et

4  cetera.

5      The numbers that you see are *Brown* numbers, including --

6  whatever is included of *Calhoun*, as well.  And, frankly, those

7  were two separate cases.  There was some overlap in discovery.

8  But Quinn Emanuel had to handle both cases separately, and the

9  billing was done separately, and there was not a lot of

10  efficiency.

11      Plaintiffs, in fact, were the parties that sought the

12  cross-use.  We initially did not want because -- to have this

13  cross-use agreement -- because the cases are very separate.

14  There was nothing in *Calhoun* that the *Brown* plaintiffs needed

15  to learn.

16      And, Your Honor, on the technical point, the army of

17  engineers, apparently, that Google has, in addition to the army

18  of in-house lawyers, plaintiffs, of course, had an army of

19  technical experts who they paid, who they're also asking costs

20  for, and who were at their beck and call to review these

21  documents, whereas, of course, the Google engineers had to

22  perform their daily duties, as well.

23      And, finally, Your Honor, we -- the Quinn Emanuel team

24  that is litigating these cases -- we had to learn Google's

25  business from scratch.  We had not done work for Google before,

```
 1   just as plaintiffs' counsel had to learn it from scratch, as

 2   well.  And we're --

 3            THE COURT:  Okay.

 4            MS. TREBICKA:  Privacy work -- right -- well, this

 5   team had not done work for Google before.

 6            MR. SCHAPIRO:  I have --

 7            MS. TREBICKA:  Okay.

 8            MR. SCHAPIRO:  -- for years.

 9            MS. TREBICKA:  That's true.

10       But the point is that we had to learn the case, as well.

11            THE COURT:  I heard you the first time.

12       I'm going to allow just a little bit more argument.  I've

13   still got someone -- I've still got another case after this.

14            MR. MAO:  Your Honor, just real quick on that,

15   Ms. Trebicka actually demonstrated exactly our point, which is

16   that they were handling one case -- sorry -- they were handling

17   two cases with one production.  But we had to coordinate with

18   three other law firms in the Calhoun case.  And both sides had

19   to review the same productions.  So, of course, when they're

20   talking about deficiencies, she actually demonstrated for you

21   why their stated bills on one case as opposed to both cases

22   added together are actually lower.

23       If you -- of the slides in which we submitted, if you look

24   at Slide 61 of Mr. Boies' slides, you will see that, in

25   comparison to some of the other cases, which actually did not
```

```
1    reach class certification, nor did they reach motion for
2    summary judgment, the number of hours in which we billed was
3    far more efficient in comparison when, specifically, you're
4    looking at In Re Facebook Consumer Private User Professional
5    Litigation.
6         With that, I'll pass the mic back to Mr. Boies.
7              THE COURT:  The last issue is, in fact, where we
8    started today, which is that -- the question of the multiplier.
9              MR. BOIES:  Right.
10             THE COURT:  So a few minutes on that topic.
11             MR. BOIES:  I think Your Honor --
12             THE COURT:  Like I said, rarely -- I don't think I've
13   ever given over three.  Two, I don't think you were entirely
14   successful, because you didn't win on the damages claim, which
15   was clearly part of what was driving it.  But this was not
16   insignificant.  And so the notion that I would give a negative
17   multiplier is equally a stretch.  So you can each have a few
18   minutes on that topic.
19             MR. BOIES:  I think Your Honor, from your background
20   in the case, knows what we went through in the case.
21   Obviously, the question of multiplier is -- it's in the
22   discretion of the Court.  I think that it's worth considering
23   how much effort we had to go through to get stuff that we
24   should have been able to get easier.
25             THE COURT:  Well, I don't disagree.  But the lodestar
```

1    takes care of that, in part.

2           **MR. BOIES:**  The lodestar does take care of that, in

3    part, Your Honor.

4        I think the -- I think the significance of the -- in the

5    relief that we've gotten -- I think the Court can judge that

6    for herself.  It is -- it's something that I think the Court

7    also, with the Court's experience in these kind of cases, knows

8    how rare it is to get the kind of relief that we've gotten

9    here, particularly from Google.

10       So I think that -- if you -- if you look at the results

11   that we achieved in the injunctive relief -- and the cases say

12   that if you seek both, and you only get one, that doesn't mean

13   that you're not successful.  We lost class certification and

14   never got to the merits on the damages claim.  But the Court

15   looked at some of those issues in the context of our injunctive

16   relief case, because many of the same things that we had to

17   prove for damages we had to prove for -- to justify the

18   injunctive relief.

19       The Court's aware that we were not able to get to the

20   settlement table until after we had gone through not only class

21   certification but summary judgment.  Unlike the *Facebook* case

22   and a lot of other cases where there's very substantial fees

23   awarded for injunctive relief cases, early on, before this all

24   happens, this was -- this was something where we really had

25   to -- had to fight it out.  I think the Court understands that.

1   And I'm comfortable leaving with the Court the sense of what

2   you think we -- how successful or unsuccessful you think we

3   were.

4           **MR. SCHAPIRO:**  Thank you, Your Honor.

5       This is a partial success case.  And it's a partial

6   success case that warrants a partial fee via a negative

7   multiplier.

8       If you look at where the plaintiffs began and what they

9   spent the $16 million on, they started out seeking $9 billion

10  in damages.  They started out seeking sweeping injunctive

11  relief.  They failed at both.  It was limited success, at best.

12  And even a 1X multiplier would put this case at the outer limit

13  if they'd obtained a large common fund.  There's no precedent

14  for an award, such as a 1X multiplier here, for counsel who

15  failed to obtain a common fund.

16      And I would direct the Court to the report of Professor

17  Rubenstein that we submitted here, because the weight of

18  authority is firmly in line with the holding of cases such as

19  *Bluetooth* and *Lowery* that suggest that class counsel who seek

20  but fail to obtain damages typically get less than their

21  lodestar.  And, in fact, they usually acknowledge this and they

22  seek less than their lodestar.  That's -- was the case -- for

23  example, Your Honor awarded a negative multiplier in the

24  *Stathakos* case.

25      In the Rubenstein declaration, Professor Rubenstein

```
 1   finds -- looks at 72 cases where someone sought damages -- was
 2   seeking damages -- and didn't get them.  And then found a
 3   smaller number that are like this one, where there was a (b)(3)
 4   sought but only a (b)(2) obtained.  And there was a negative
 5   multiplier in three of the four.  And the fourth, for reasons
 6   that Professor Rubenstein explains in his brief, is not
 7   analogous here as a small case, in any event.  So this would --
 8   awarding a positive or a 1X multiplier here would be --
 9             THE COURT:  Well, what if I agreed to your amounts?
10   They've conceded some of these.  And everything related to --
11   at least with respect to the motions -- and you've not given me
12   anything else -- is taken out of the lodestar, what remains is
13   the work that had to be done to achieve what they achieved.
14             MR. SCHAPIRO:  I don't think so, Your Honor.  I think
15   it's a two-step process.  What we've agreed and I guess what
16   the plaintiffs have now agreed can be taken out is work
17   specifically devoted to the motion for class certification, the
18   (b)(3).  But most of this case -- the more than a year that we
19   spent on this -- was the plaintiffs pursuing a damages claim
20   and a theory that would allow them -- for example, most of
21   their discovery fights that they talked about, half of which we
22   won, by the way, so they brought them on themselves -- most of
23   the discovery fights were about --
24             THE COURT:  I don't think they were sanctioned though.
25             MR. SCHAPIRO:  Well, but, Your Honor, they've already
```

1  been paid attorney's fees for the sanctions.  And in those --

2  in the sanctions rulings, the Court found that we were

3  negligent, not that we were intentionally hiding a thing.

4      So most of the work in this case -- or certainly a

5  substantial proportion of it -- was chasing this theory that

6  they thought was going to get them $9 billion damages.  That's

7  not been removed solely by taking out what we take out where we

8  have the (b)(3).

9      But even if you look at the injunctive relief that they

10  sought -- and this is Exhibit C to Professor Rubenstein's

11  report -- they sought as -- and this is from their pretrial

12  statement.  So this was not something early on in the case.

13  They sought 14 different kinds of injunctive relief.  And as to

14  that, they obtained -- nine of those they are not getting in

15  the settlement agreement.  Three of them they're getting only

16  partially.  And two they are getting.

17      So even if we were just saying, fine, okay, there's a

18  damages case -- and we said, in our brief, this was the

19  incredible shrinking case.  It started out as a big damages

20  case.  They don't get any damages for the class.  And they say,

21  okay, fine, we're getting injunctive relief.  Technically, of

22  course, it's not an injunction.  It's an agreement to change

23  conduct, but okay.  But they don't even get that.

24      They wanted Google to refrain from using the word

25  "Incognito" and the "Spy Guy" icon.  That was not obtained.

1    They wanted Google to perform an audit.  That was not obtained.

2    They wanted Google to delete or refrain from using services

3    developed with private browsing data.  That they didn't obtain.

4    They struck out again and again and again.

5         They wanted Google to refrain from using private browsing

6    data for any revenue-generating purpose, including but not

7    limited to conversion tracking and improvement of Google

8    products and services.  They didn't get it.  I could go on.

9    But this is all in the two-page Exhibit C to Professor

10   Rubenstein's declaration.

11        So let's assume that the starting point is lodestar, which

12   should be brought down from the 60 million to whatever it might

13   be -- 40 million -- something like that -- after these

14   admittedly inflated invoices or charges are removed.  That just

15   is what -- that's -- that's the -- should have been the

16   lodestar if they had won.  That would be the lodestar if they

17   had won, other than removing the -- preparing the (b)(3)

18   motion, which was unsuccessful.  There has to be something to

19   take into account the fact that the victory they claimed to

20   have obtained here was not the historic victory that they claim

21   it was, nor was it anything remotely comparable to what they

22   sought at the beginning of the case or even as recently as

23   pretrial.

24             **THE COURT:**  All right.

25        Response?

1           **MR. BOIES:**  Brief response, Your Honor.

2       First of all, I think Mr. Schapiro misspeaks,

3   inadvertently, when he says that the (b)(3) cut was only for

4   the class certification.  It included other things than that.

5           **MR. SCHAPIRO:**  I'll take your word for it and rest on

6   whatever it is we put in our papers, but I have --

7           **MR. BOIES:**  Yeah.

8           **MR. SCHAPIRO:**  -- a two-sentence response, which is we

9   were not able to pull out all of the work that was done towards

10  determining damages, identifying class members, et cetera.

11  It's interwoven.  And there has to be some way -- I would say

12  through a negative multiplier -- to take that out.

13          **MR. BOIES:**  Yeah.  The second thing is that I think

14  this is tested not by what we didn't get, but by what we did

15  get.  When you file a complaint, you never know what you're

16  going to find.  The test here is what was the success that we

17  got?  What is the value that we got to the class?

18      First of all, we got them to make clear disclosures that

19  they are keeping this data and using this data, something that

20  Your Honor knows they fought over and over and over again about

21  doing.  We got them to eliminate the detection bits -- the

22  private browsing detection bits -- that they first claimed they

23  never had.  And we've got them to now agree to eliminate those.

24      We got them to eliminate the cookies -- the third-party

25  cookies.  And they said in your -- in one of their papers to

1  you recently -- that, well, we were going to eliminate them

2  anyway.  The next month, they make an announcement that they're

3  not eliminating them, except for where they're required to by

4  this injunction.

5      We got them to spend what they say is a huge amount of

6  money decimating the data that they had collected.  We got them

7  to eliminate the analytics from the ad manager logs, logs that

8  they initially said didn't exist, which was part of the

9  sanctions motion.

10      So I think the Court has to look at what we accomplished.

11  It's not what we didn't accomplish, I respectfully suggest,

12  it's what we did.

13          **THE COURT:**  All right.

14      **MR. SCHAPIRO:**  Respectfully, I think the law requires

15  the Court to look not only at what was accomplished, but also

16  what was sought and not obtained.

17      And, by the way, the plaintiffs' firms at the other

18  table -- they're still suing us for damages.  They're still

19  suing Google for damages in state court.  They've filed

20  thousands of damages cases trading off of I'm sure what they've

21  learned here.  So they'll do okay, ultimately, if their case

22  has merit.

23          **THE COURT:**  Individual plaintiff complaints; right?

24      **MR. SCHAPIRO:**  Mass quantities -- 100,000 -- something

25  like that.

1          **THE COURT:**  Well, but --

2          **MR. BOIES:**  And I'm sure those are going to be very

3  vigorously defended.

4          **THE COURT:**  Yeah.  Well, and it's what you asked for,

5  in a sense.

6          **MR. BOIES:**  Right.

7          **THE COURT:**  You could have done it on a class-wide

8  basis.  You didn't want to, and that's fine.

9          **MR. SCHAPIRO:**  I'm not complaining.

10          **THE COURT:**  And the notion that an individual

11  plaintiff would get the kinds of awards that -- you know --

12  that people seek in these kinds of cases is a stretch.

13    All right.

14          **MR. SCHAPIRO:**  Your Honor, my only point there was

15  that to the extent that work was done in this case to develop

16  their full theory and the damages theory, et cetera -- if it

17  turns out that those claims have merit -- because they never

18  were tried here -- they will get paid by the -- what I would

19  imagine are 30 percent or more fee arrangements with those

20  100,000 folks.  They're trying to get it all resolved in one.

21  And if the cases don't -- if they don't have merit, then they

22  shouldn't get paid now for them.

23          **THE COURT:**  Yeah.  I'm not sure I agree with that

24  premise, but okay.

25          **MR. SCHAPIRO:**  You're in charge.

 1              THE COURT:  All right.  Well, I will get to this.

 2      You're on the list of things to review.  Thank you.

 3              MR. BOIES:  Thank you, Your Honor.

 4              THE COURT:  Submitted?

 5         I have another case after yours, so you can pack up

 6      quietly and leave.  Thank you.

 7              THE COURTROOM DEPUTY:  Case is adjourned in this

 8      matter.

 9                  (Proceedings adjourned at 3:37 p.m.)

10

11                              ---oOo---

12

13

14                      **CERTIFICATE OF REPORTER**

15         I certify that the foregoing is a correct transcript

16      from the record of proceedings in the above-entitled matter.

17

18      DATE:   Sunday, August 11, 2024

19

20

21      _____

22              Kendra A. Steppler, RPR, CRR

23          Official Reporter, U.S. District Court

24

25